inventory; *provided*, that it is understood that any Asset Disposition of Bitcoin for the Fair Market Value at the time thereof will be permitted hereunder.

10.1.14 Bankruptcy Related Matters.

(a) Cause all proposed (i) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (ii) any Acceptable Chapter 11 Plan and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (iv) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement, to the extent applicable.

(b) Comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

(c) Deliver to the Administrative Agent and the Lenders, to the extent practicable (absent exigent circumstances), not less than one (1) Business Day's prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Parties, and shall consult in good faith with the Administrative Agent and the Lenders regarding the form and substance of any such document.

(d) If not otherwise provided through the Bankruptcy Court's electronic docketing system, deliver to the Administrative Agent and to the Lenders promptly, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e) Provide the Administrative Agent and the Lenders not less than two (2) Business Days' prior written notice, where practicable, of any assumption or rejection of any Debtor's or any Subsidiary's Material Contracts, or of any material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and procure that no such contract or lease, as applicable, shall be assumed or rejected if the Administrative Agent (acting at the direction of the Required Lenders) informs Borrower in writing, within one (1) Business Day of receipt of the notice from Borrower referenced above, that it objects to such assumption or rejection, as applicable, or needs additional time to make the decision.

10.1.15 Priority of Liens and Claims. Cause the Obligations to, upon and at all times after entry of the Interim DIP Order (i) constitute DIP Superpriority Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and fully and properly perfected Lien in favor of the Administrative Agent to secure the Obligations to the fullest extent required hereunder, which Lien, subject to the terms of the DIP Orders, shall rank super senior and prior to, and shall have first priority over, all other Liens thereon (subject only to the Carve-Out and, solely in the case of the Junior-Priority DIP Collateral,

to only those Permitted Prior Liens explicitly set forth in the DIP Order as being senior to the Administrative Agent's Liens in the Collateral). In furtherance thereof, the Obligors hereby agree to execute, deliver to the Administrative Agent and/or (where applicable) file or authorize the filing of, such Security Documents, UCC financings, intellectual property security agreements, Control Agreements, Mortgages (to the extent required hereunder) and such other instruments, documents and agreements as the Administrative Agent may reasonably request in order to grant, evidence, confirm, validate, perfect or preserve the Liens granted to the Administrative Agent hereunder and pursuant to the DIP Orders or the Obligations.

**10.2. Negative Covenants**. From and after the Interim DIP Order Date to and until Full Payment, each Obligor shall not, and shall cause each Subsidiary not to:

10.2.1 Permitted Debt. Create, incur, guarantee or suffer to exist any Debt, except Debt incurred or arising pursuant to clauses (a) through (x) below (provided, that, in the case of any such Debt incurred or arising at any time on or after the Petition Date, such Debt shall only be permitted hereunder if no Default or Event of Default shall exist or be continuing as of the time that such Debt is to be incurred or to arise, or shall occur upon, or as a result of, such Debt being incurred or arising):

(a) the Obligations;

(b) the Prepetition NPA Facility Debt;

(c) any (i) Debt incurred to finance the acquisition, construction, or improvement of any fixed or capital assets (whether or not constituting Purchase Money Debt), including Capital Lease Obligations and (ii) Debt assumed in connection with the acquisition of any of the foregoing assets or secured by a Lien on any such assets prior to the acquisition thereof; provided, that no Debt shall be incurred pursuant hereto at any time after the Petition Date unless permitted pursuant to the applicable Chapter 11 Approvals, and no payments in respect thereof shall be made except to the extent in accordance with the Financial Covenants; and provided, further, that the aggregate principal amount of Debt incurred in reliance on this clause (c) after the Petition Date and the creditor payments related thereto are set forth in, and made pursuant to and in accordance with, the Approved Budget;

(d) Debt incurred prior to the Petition Date; provided, that if any such Debt exceeds an aggregate principal amount of $100,000, a description of such Debt is set forth on **Schedule 10.2.1** hereof;

(e) Debt with respect to Debt in respect of netting services, automatic clearinghouse arrangements, overdraft protections, treasury, depository, corporate purchasing cards and other credit cards, cash management, and similar arrangements, in each case incurred in the Ordinary Course of Business;

(f) [reserved];

(g) Permitted Contingent Obligations;

(h) intercompany Debt solely among the Obligors; *provided*, that any such Debt shall be subordinated on terms reasonably satisfactory to the Administrative Agent to the Obligations hereunder (including pursuant to the terms of the Intercompany Subordination Agreement);

(i) Debt incurred in connection with the financing of insurance premiums in the Ordinary Course of Business;

(j) Debt owed to any Person providing workers' compensation, unemployment insurance, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the Ordinary Course of Business;

(k) Debt in respect of performance bonds, completion guarantees, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the Ordinary Course of Business;

(l) [reserved];

(m) [reserved];

(n) [reserved];

(o) preferred stock of Borrower issued prior to the Petition Date and that does not constitute Disqualified Equity Interests, as set forth on **Schedule 9.1.4**;

(p) Debt consisting of take or pay obligations contained in supply arrangements entered into in the Ordinary Course of Business; *provided*, that the aggregate amount of all such obligations incurred or arising and outstanding at any time shall not exceed $500,000; *provided, further*, that no such obligations shall be incurred at any time as of the Petition Date unless permitted by the DIP Orders or other Chapter 11 Order (in each case, in accordance with the Approved Budget);

(q) guarantees required by Governmental Authorities in the Ordinary Course of Business;

(r) [reserved];

(s) Debt arising under Permitted Employment Arrangements in accordance with the Approved Budget, all of which Debt (other than to the extent relating to KEIP/KERP payments approved by the Bankruptcy Court) shall be subordinated on terms acceptable to the Administrative Agent to the Full Payment of the Obligations;

(t) endorsements for collection, deposit, or negotiation and warranties of products or services, in each case incurred in the Ordinary Course of Business;

(u) rental obligations incurred in the Ordinary Course of Business; *provided*, that the aggregate amount thereof incurred or arising at any time following the Petition

Date shall not exceed $1,500,000 unless previously approved in writing by the Administrative Agent;

(v) [reserved];

(w) trade payables and other current liabilities incurred in the Ordinary Course of Business and in accordance with the Approved Budget;

(x) all interest accruing on (including capitalized interest), and all reasonable and documented fees and expenses payable in connection with, the obligations described in the foregoing clauses (in the case of (1) clause (a) of this **Section 10.2.1**, without limiting the amounts otherwise included pursuant to the definition of Obligations or as provided elsewhere in this Agreement and (2) clause (b) of this **Section 10.2.1**, without limiting the amounts otherwise included pursuant to the definition of Prepetition April NPA Debt or Prepetition August NPA Debt)); and

(y) to the extent constituting Debt, obligations under Permitted BTC Hedging Agreement.

Notwithstanding anything to the contrary in this **Section 10.2.1**, no payment shall be made in respect of any Debt (whether or not such Debt is permitted hereunder) at any time after the Interim DIP Closing Date except in accordance with the Approved Budget.

10.2.2 Permitted Liens. Create or suffer to exist any Lien upon any of its property or assets, except the following Liens (provided, that, in the case of any Liens created or arising at any time on or after the Petition Date, such Liens shall only be permitted hereunder if no Default or Event of Default shall exist or be continuing as of the time that such Lien is to be created or to arise, or shall occur upon, or as a result of, such Lien being created or arising) (collectively, "Permitted Liens"):

(a) Liens in favor of the Administrative Agent (for the benefit of the Secured Parties) granted pursuant to the Loan Documents and the DIP Orders to secure the Obligations;

(b) Liens in favor of the Prepetition Secured Parties securing the Debt permitted pursuant to **Section 10.2.1(b)**, so long as any such Lien pursuant to this clause (b) on any First-Priority DIP Collateral shall be subordinate to the Administrative Agent's and the Secured Parties' Liens thereon as set forth in the DIP Orders;

(c) Liens for Taxes (including real estate taxes) not yet due or being Properly Contested;

(d) statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens (other than Liens for Taxes or imposed under ERISA) arising in the Ordinary Course of Business, but, with respect to any of the foregoing arising after the Petition Date, only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested, and (ii) such Liens do

not materially impair the value or use of the real or personal property or materially impair operation of the business of any Borrower or Subsidiary;

(e) customary Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Borrowed Money), statutory obligations, surety, stay, customs, and appeal bonds, performance bonds, and other similar obligations, or arising as a result of progress payments under government contracts;

(f) pledges, deposits, or Liens in the Ordinary Course of Business in connection with (i) workers' compensation, payroll taxes, unemployment insurance, and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Borrower, the Obligors, or any of the Subsidiaries;

(g) Liens arising by virtue of a judgment or judicial order against any Obligor, or any real or personal property of an Obligor, as long as such judgment does not otherwise result in an Event of Default under **Section 11.1(h)**;

(h) easements, rights-of-way, restrictions, encroachments, other survey defects or matters that would be shown by a current, accurate survey of physical inspection, and covenants, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions, or other agreements of record, and other similar charges, encumbrances or irregularities in title on any Subject Real Property imposed by law or arising in the Ordinary Course of Business that do not or could not reasonably be expected to materially detract from the value of the affected property nor secure any monetary obligation and do not interfere with the business of the Obligors in any material respect;

(i) normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection;

(j) without duplication of any other Liens set forth in this **Section 10.2.2**, Liens that are listed on **Schedule 10.2.2** hereto, to the extent such Liens are existing, valid, fully perfected and non-avoidable as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (the "Permitted Prior Liens"), which such Permitted Prior Liens shall be subject to the priority set forth in the DIP Orders;

(k) leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others that do not (i) interfere in any material respect with the business of Borrower or the Subsidiaries or (ii) secure any Debt;

(l) Liens arising from UCC financing statements filed regarding operating leases entered into by an Obligor;

(m) Liens in favor of customs or revenue authorities to secure payment of customs duties in connection with the importation of goods;

(n) Liens solely on any cash earnest money deposits made by any Obligor or any Subsidiary in connection with any letter of intent or purchase agreement not prohibited by this Agreement;

(o) Post-Petition Liens on the DIP Collateral in favor of the Prepetition Secured Parties and the Prepetition secured equipment lenders, in each case, granted as adequate protection liens pursuant to the DIP Orders, but only to the extent such Liens are expressly permitted pursuant to the DIP Orders and, in the case of the First-Priority DIP Collateral, are junior in priority to the Administrative Agent's Liens securing the Obligations hereunder;

(p) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor in the Ordinary Course of Business permitted by this Agreement;

(q) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the Ordinary Course of Business and not for speculative purposes;

(r) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted hereunder to be applied against the purchase price for such Investment and (ii) consisting of an agreement to dispose of any property in an Asset Disposition permitted hereunder, to the extent that such Asset Disposition would have been permitted on the date of the creation of such Lien;

(s) ground leases in respect of any Real Estate (other than (x) any ground leases demised by an Obligor or Subsidiary, as the lessor thereunder, of any Subject Real Property and (y) any ground leases demised to any Obligor, as the lessee thereunder, in each case, unless otherwise consented to in writing by the Administrative Agent) on which facilities owned or leased by any of the Obligors are located; provided that with respect to any Real Estate owned by any of the Obligors and demised pursuant to a ground lease by an Obligor or Subsidiary as the lessor thereunder, such ground leases are fully subordinate to the Administrative Agent's Lien thereon (if any);

(t) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto not to exceed the amount of such premiums in the Ordinary Course of Business;

(u) Liens on specific items of inventory or other goods (in each case, other than any Obligor's Bitcoin and other Cryptocurrencies) and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods in the Ordinary Course of Business;

(v) deposits of cash with the owner or lessor of premises leased and operated by any Obligor to secure the performance of such Obligor's obligations under the terms of the lease for such premises in the Ordinary Course of Business and if occurring after the Petition Date, such deposits are permitted pursuant to the Approved Budget;

(w) Purchase Money Liens in respect of Purchase Money Debt permitted to be incurred under **Section 10.2.1(c)**;

(x) other than with respect to any First-Priority DIP Collateral, Liens on property subject to any sale-leaseback transaction not prohibited hereunder and the general intangibles related thereto, in each case, solely to the extent securing any obligations owing under such transaction;

(y) Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(z) Liens existing on property at the time of its acquisition by an Obligor in accordance herewith, or existing on the property of any Person at the time such Person becomes an Obligor in accordance herewith, in either case, after the Closing Date, so long as such Lien is limited to such property so acquired and, in all cases, excluding Liens on the Equity Interests of any Person that becomes a Subsidiary;

(aa) Liens granted or arising prior to the Petition Date, to the extent such Liens are existing, valid, fully perfected and non-avoidable as of the Petition Date; *provided* that the aggregate amount of Debt secured by such Liens at any time shall not exceed $100,000 at any time outstanding without the Required Lenders' consent;

(bb) Liens (which shall rank junior to the Liens securing the Obligations) upon the specific real or personal property leased under operating leases in the Ordinary Course of Business by Borrower or any of its Subsidiaries in favor of the lessor created at the inception of the lease transaction, securing obligations of Borrower or any of its Subsidiaries under or in respect of such lease and extending to or covering only the property subject to such lease and improvements thereon;

(cc) Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Debt, (ii) relating to pooled deposit or sweep accounts of Borrower or any of the other Obligors to permit satisfaction of overdraft or similar obligations incurred in the in the Ordinary Course of Business of Borrower or any of the other Obligors or (iii) relating to purchase orders and other agreements entered into with customers of any Subsidiary in the Ordinary Course of Business;

(dd) Liens on cash and Cash Equivalents securing reimbursement obligations under letters of credit permitted hereunder;

(ee) Liens in connection with any zoning, building or similar requirement of law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of any Subject Real Property or the structure thereon; and

(ff) Liens, if any, on affected Bitcoin securing any Permitted BTC Hedging Agreement.

For the avoidance of doubt, notwithstanding anything else herein to the contrary, no Lien on any property or assets of any Obligor (including any Permitted Lien or Permitted Prior Lien (except, other than with respect to the First-Priority DIP Collateral, any Prior Senior Lien (as defined in the DIP Orders), if and solely to the extent provided pursuant to the DIP Order) shall rank pari passu with, or senior to, any Lien thereon granted in favor of the Administrative Agent or otherwise securing any of the Obligations.

10.2.3 <u>Distributions; Upstream Payments</u>. Declare or make any Distributions, except for the following Distributions, if no Default or Event of Default shall exist or be continuing as of the time that such Distribution is made, or shall occur upon, or as a result of, such Distribution:

(a) Upstream Payments;

(b) Any Distribution or payment, the proceeds of which are contemporaneously used solely to pay Taxes imposed on or incurred by Borrower or any Obligor (so long as such Distribution or payment is accounted for as expenditures for purposes of **Section 10.1.12** and **Section 10.3.1**, in each case, to the same extent as if the Obligors had paid such amounts themselves);

(c) Distributions, the proceeds of which are contemporaneously used solely to pay franchise and excise taxes attributable to Borrower and its Subsidiaries and reasonable and customary operating or overhead expenses required to maintain Borrower's and any Subsidiary's corporate or organizational existence during the Chapter 11 Cases, in each case, to the extent such Distributions are made in accordance with the Approved Budget and are accounted for as an expenditures for purposes of **Section 10.1.12** and **Section 10.3.1**, in each case, to the same extent as if Borrower or such Subsidiary had paid such amounts themselves; and

(d) Any Distribution or payment in order to pay a Permitted Employment Arrangements, specifically identified in, and made in accordance with, the Approved Budget and the DIP Orders.

Borrower shall not create or permit to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except any Permitted Restriction or as otherwise consented to by the Administrative Agent. Notwithstanding anything to the contrary, no Distribution or other payment shall be made (whether or not permitted hereunder) at any time from and after the Interim DIP Closing Date except in accordance with the Approved Budget, subject to the Permitted Variance.

10.2.4 <u>Restricted Investments</u>. Make any Restricted Investment.

10.2.5 <u>Disposition of Assets</u>. Make any Asset Disposition, except a Permitted Asset Disposition; <u>provided</u>, that, any proceeds thereof received at any time by Borrower or any Subsidiary thereof shall be maintained by them in accordance with this Agreement (it being agreed that, in the case of any proceeds in the form of cash or Cash Equivalents, the same shall at all times be held in a Deposit Account subject to a Control Agreement; provided, that, if any such cash or Cash Equivalents are initially received by Borrower or applicable Subsidiary in any other account, Borrower or applicable Subsidiary shall procure that such cash or Cash Equivalents shall be

transferred and deposited into a Deposit Account subject to a Control Agreement within one (1) Business Day of initial receipt); *provided*, *further*, that, no cash or Cash Equivalents shall be transferred out of any Deposit Account except if, and solely in the amount, required to (x) make a payment that constitutes a disbursement permitted pursuant to, and made in accordance with, the Approved Budget and in compliance with the Budget Covenant, or (y) make a prepayment or repayment of Obligations in accordance with **Section 5**. For the avoidance of doubt, the foregoing shall not be construed as permitting, and shall not operate as a consent or waiver with respect to, the consummation of any Asset Disposition, or the payment of any disbursement, in each case, that would not otherwise be permitted hereunder, or any Default or Event of Default resulting from the same, or any consequence thereof.

10.2.6 [Reserved].

10.2.7 Restrictions on Payment of Debt. Make any payment (whether in cash, kind or consisting of any assets or interests or otherwise, including on account of or in respect of any principal payments, and whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition), in each case, with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or the DIP Orders; provided that no such payment shall be permitted to be made on account of any Subordinated Debt (other than payments to be paid in kind), without the prior written consent of the Administrative Agent or as otherwise agreed to by the Administrative Agent in any applicable subordination agreement (with respect to any such payments being made in accordance with the terms of such subordination agreement).

10.2.8 Fundamental Changes. Change its legal name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or effect a Division, merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions.

10.2.9 Subsidiaries. Form or acquire any Subsidiary after the Petition Date; or permit any existing Subsidiary to issue any Equity Interests.

10.2.10 Organic Documents and Material Contracts. Amend, modify or otherwise change (or in the case of Material Contracts, accept or reject) any of its Organic Documents or any Material Contract other than in the Ordinary Course of Business, in a manner that is not adverse to the Lenders or the Administrative Agent, and in each case, with prior written consent of the Administrative Agent and, if applicable, if the Obligors are permitted to reject any such Material Contracts pursuant to the Bankruptcy Code so long as it has been permitted in an approved Chapter 11 Order.

10.2.11 [Reserved].

10.2.12 Accounting Changes. Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

10.2.13 Restrictive Agreements. Become a party to any Restrictive Agreement other than agreements containing solely Permitted Restrictions.

10.2.14 Hedging Agreements. Enter into, amend or modify any Hedging Agreement (including, directly or indirectly, with respect to any notional amount, or any Swap Obligation or other obligation or exposure thereunder) at any time without the prior written consent of the Administrative Agent, or make any payment pursuant to, or in connection with, any Hedging Agreement (or any Swap Obligation or other obligation thereunder) except to the extent set forth in, and made in accordance with, the Approved Budget. In no event shall any Obligor enter into any Hedging Agreement for speculative purposes. Notwithstanding the foregoing, this **Section 10.2.14** shall not restrict or otherwise limit any (i) sale of Bitcoin pursuant to clause (n) of the definition of Permitted Asset Disposition and **Section 10.2.5** or (ii) to the extent reviewed and approved in writing by the Administrative Agent prior to the entry into any such arrangement, Permitted BTC Hedging Agreement.

10.2.15 Conduct of Business. Engage in any line of business other than lines of business substantially related to that conducted by it on the Interim DIP Order Date and any activities related, similar or incidental thereto or synergistic therewith. No Obligor shall acquire any fee interest in any Real Estate other than the Subject Real Property.

10.2.16 Affiliate Transactions. Enter into or be party to, or consummate any transaction with an Affiliate except (a) transactions expressly permitted by the Loan Documents, (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities (solely to the extent that payment thereof is in accordance with the Approved Budget), (c) the payment of reasonable fees to independent directors of Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of Borrower or their Subsidiaries in the Ordinary Course of Business, subject to the Approved Budget, (d) transactions solely among Obligors, (e) ongoing transactions with Affiliates that were entered into prior to the Petition Date and are set forth on **Schedule 10.2.16**, (f) transactions with Affiliates, which would otherwise permitted hereunder with any non-Affiliates, which are consummated in good faith upon approval thereof by such Obligor's board of directors (*provided*, that a copy of the resolution adopted by the majority of such board of directors approving such transaction and a certificate of a Senior Officer thereof certifying that such transaction complies with this sub-clause (f)), and on terms and pricing no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; *provided*, that, without the Administrative Agent's prior written consent, the aggregate amount of payments or other obligation made pursuant to this clause (f) by any Obligor shall not exceed $500,000 per Fiscal Year, (g) Permitted Employment Arrangements and (h) transactions between or among Obligors; *provided*, that such transactions are intercompany transactions entered into in the Ordinary Course of Business as part of tax, accounting, pension, cash management and other administrative activities and not for the purpose of circumventing any covenant hereunder; *provided*, that, if such any transaction that shall otherwise be permitted under this **Section 10.2.16** gives rise to any payment or other obligation of the Obligors or any of their Subsidiaries in excess of $500,000 per Fiscal Year, the Administrative Agent's prior written approval shall be required notwithstanding that such transaction shall otherwise comply with the terms hereof.

10.2.17 Plans. Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Interim DIP Order Date.

10.2.18 Amendments to Subordinated Debt. Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt.

10.2.19 [Reserved].

10.2.20 Classification. Borrower shall not take any action (or permit any parent entity or other Person Controlling Borrower to take any action at any time (including, but not limited to, an election under Treasury Regulations Section 301.7701-3)) that would result in a change in the tax classification of Borrower for U.S. federal income tax purposes.

10.2.21 Restricted Actions. Notwithstanding anything else herein, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) (i) incur any Debt, grant or permit to arise any Lien, make any Investment or Distribution, or (ii) undertake any Asset Disposition, Affiliate transaction or any other transaction, enter into or modify any Hedging Agreement, or take any other action or exercise any right or power, in each case, that is subject to the covenants contained in **Sections 10.2.1** through **10.2.20** (each, an "Applicable Transaction") except, in each case, solely if and to the extent that, no Default or Event of Default shall exist or be continuing prior to (or after giving effect to) such Applicable Transaction, and such Applicable Transaction (and any action in connection therewith) (x) does not violate any Applicable Law, and is in accordance with any applicable Chapter 11 Order (and, if any approval, authorization or consent, or any notice, motion, filing or other action, as the case may be, is required to cause such Applicable Transaction to be permitted during the pendency of the Chapter 11 Cases (each of the foregoing, a "Chapter 11 Approval"), the Debtors shall have obtained all such Chapter 11 Approvals prior to consummating such Applicable Transaction and shall consummate the same in accordance with the requirements thereof), (y) is undertaken by the applicable Obligor (or by the Subsidiaries of the Obligors involved therein) acting in good faith, and (z) is effectuated or consummated in the Ordinary Course of Business and in accordance with prudent business practices of the Obligors; *provided*, that, except in connection with making a payment not in violation of the foregoing, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) transfer any funds (other than such funds to pay payroll) from any account that is (or is required to be) subject to a Control Agreement in favor of the Administrative Agent into any account that is not subject to a Control Agreement in favor of the Administrative Agent.

10.2.22 Immaterial Subsidiaries.

(a) permit any Immaterial Subsidiary to (i) engage in any business activities or own any property (real or personal) or assets (in each case, of whatever nature), (ii) create, incur, assume or suffer to exist any Debt or (iii) create or permit to exist any Lien on any of its real or personal properties, assets or rights of whatever nature (whether now owned or hereafter acquired).

(b) Shall not, and shall not permit any other Obligor to, make any Investment, Distribution or enter into any other transaction of any nature whatsoever with any Immaterial Subsidiary.

10.2.23 Use of Proceeds. Permit any Loan, Collateral or any portion of the Carve-Out or Carve-Out Account to be used directly or indirectly by any Obligor, any official

committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity for any purpose other than as permitted hereby and pursuant to the Final Orders.

**10.3. Financial Covenants**.

From and after the Interim DIP Order Date to and until Full Payment hereunder:

10.3.1 Permitted Variances. Obligors shall not permit or cause, for any Performance Period, (i) the Receipts Variance to exceed twenty-five percent (25%) (as compared to budget) or (ii) the Disbursements Variance to exceed 20% (as compared to budget). The covenants and requirements set forth in this **Section 10.3.1** being, the "Budget Covenant".

10.3.2 Minimum Liquidity. Obligors shall not permit or cause the aggregate amount of Liquidity to be less than $5,000,000 at any time (the requirements hereof, the "Liquidity Covenant", and, the Liquidity Covenant, together with the Budget Covenant, the "Financial Covenant").

10.3.3 Permitted Obligations and Disbursements. Obligors shall not incur any payment obligation, or make any payment or disbursement (whether voluntary or on account of any obligation, Investment, Distribution or otherwise), unless, in each case, (a) the applicable payment or disbursement is identified in, and made in accordance with, the Approved Budget, (b) pro forma for such payment or disbursement, the Obligors shall be in compliance with the Financial Covenant, and (c) no Default or Event of Default shall exist or be continuing at the time of, or shall arise or result from, such payment or disbursement.

For the avoidance of doubt, any incurrence of any obligation, or any payment or distribution or disbursement or (as relating to clause (y) below) the existence of such other condition, as applicable, by or with respect to any of Borrower and its Subsidiaries (x) other than as set forth in the Approved Budget and (y) results in an applicable Budget Variance in excess of the Permitted Variances permitted by the Budget Covenant shall, in each case, constitute a default under **Section 10.3**, and an immediate Event of Default under **Section 11.1(d).** Notwithstanding anything in any Loan Document or in any Approved Budget to the contrary, Borrower may make deposits into, and allow disbursements from, the Carve-Out Account to fund professional fees and expenses to the extent permitted by the DIP Orders.

**10.4. Chapter 11 Cases**.

From and after the Interim DIP Order Date to and until Full Payment, Obligors shall not:

(a) Other than the claims and Liens of the Administrative Agent arising from this Agreement, and other than the adequate protection claims or Liens provided in the DIP Orders, as applicable, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other DIP Superpriority Claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and Lenders.

(b) Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the prior written consent of the Administrative Agent and the Required Lenders.

(c) Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent or any Lender with respect to any Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby.

(d) Make (i) any Prepetition "critical vendor" payments or other payments on account of any creditor's Prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by the Bankruptcy Court after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Administrative Agent and the Required Lenders.

(e) File any material motion or application with the Bankruptcy Court with regard to actions taken outside the Ordinary Course of Business of the Debtors without consulting with the Administrative Agent and providing the Administrative Agent and the Lenders prior (in any case, not less than two (2) Business Days' (or as soon as reasonably practicable if two (2) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f) Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

## SECTION 11. EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**11.1. Events of Default**. Each and any one or more of the following shall be an "Event of Default" if it occurs or exists for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise, in each case, at any time from and after the Interim DIP Order Date to and until Full Payment:

(a) Borrower or any Obligor shall fail to pay any principal of any Loan, or any Exit Premium (or portion thereof) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) Borrower or any Obligor shall fail to pay any interest on any Loan or any fee or any other Obligation (other than an amount referred to in clause (a) above) payable under any Loan Document, within three (3) Business Days after the same shall become due and payable;

(c) any representation or warranty of an Obligor made in any Loan Document shall be false or misleading in any material respect when given;

(d) any Obligor or Subsidiary shall breach, or fail to perform, or default under, any covenant applicable to it contained in **Section 6.3, 7.2, 7.3, 8.2.4, 8.2.5, 8.5, 8.6.1, 10.1.1, 10.1.12, 10.1.14, 10.1.15, 10.2, 10.3** or **10.4;**

(e) any Obligor shall breach, or fail to perform, or default under, any other covenant contained herein or in any Loan Documents, and such breach, failure or default is not cured within 30 days (or 10 days in the case of a breach of **Section 10.1.2**) after a Senior Officer of such Obligor or Subsidiary has knowledge thereof or receives notice thereof from the Administrative Agent, whichever is sooner; *provided, however*, that such notice and opportunity to cure shall not apply if the breach, failure to perform or default is not capable of being cured within such period;

(f) any Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to the Administrative Agent; any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by the Administrative Agent and Lenders and other than in accordance with the terms of this Agreement); any lien created hereunder or under the Security Documents ceases to be a valid and perfected lien (other than as a result of any action or inaction by the Administrative Agent and other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Full Payment) or the Obligations cease to be DIP Superpriority Claim;

(g) any "Event of Default" (in each case, as defined in the Prepetition Note Purchase Agreements) occurs under any Prepetition Note Purchase Agreement, or any breach or default of an Obligor or Subsidiary occurs under any Hedging Agreement or under any instrument or agreement to which it is a party or by which it or any of its properties is bound, in each case, relating to any Debt (other than the Obligations) or other payment obligation in excess of $5,000,000 (in the case of any Hedging Agreement, determined on a net basis), and as a result thereof the maturity of or any payment with respect to such Debt or other payment obligation is or may be accelerated or demanded due or otherwise required to be paid prior to its stated maturity, in each case, due to such breach;

(h) any judgment or order is entered against an Obligor or Subsidiary for the payment of money in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors and Subsidiaries, $5,000,000 (excluding amounts of insurance coverage therefor that has not been denied by the insurer, or subject to another contractual indemnity arrangement reasonably acceptable to the Administrative Agent, and available to the Obligors for payment of such liabilities), and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days;

(i) an Obligor or Subsidiary is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any part of its business which would have or could reasonably be expected to have a Material Adverse Effect; there is a cessation of any part of an Obligor's or Subsidiary's business which would have or which could reasonably be expected to

have a Material Adverse Effect; a material portion of the Collateral or real or personal property of an Obligor or Subsidiary is taken or impaired through condemnation the effect of which would have or which could reasonably be expected to have a Material Adverse Effect;

(j) an Insolvency Proceeding is commenced by (including by joining any such proceeding) an Obligor; an Obligor makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial real or personal property of or to operate any of the business of an Obligor; or an Insolvency Proceeding is commenced against an Obligor, and the Obligor consents to institution of the proceeding, the petition commencing the proceeding is not timely contested by the Obligor, the petition is not dismissed within 60 days after filing, or an order for relief approving such Insolvency Proceeding is entered in the proceeding; *provided*, *however*, that the Chapter 11 Cases shall not constitute an Event of Default pursuant to this clause (j);

(k) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan to the extent the foregoing would have or could reasonably be expected to have a Material Adverse Effect;

(l) any Obligor is criminally convicted for (i) a felony committed in the conduct of the Obligor's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that would have or that could reasonably be expected to have a Material Adverse Effect;

(m) Borrower does not immediately (i) prepay, or cause to be prepaid, the Loans, and (ii) terminate, or cause to be terminated, the Commitments upon the occurrence of a Change of Control pursuant to **Section 5.3.3** hereof or in any amount less than as set forth thereunder;

(n) [reserved];

(o) [reserved];

(p) there shall have occurred any of the following in the Chapter 11 Cases:

(i) the bringing of a motion by any Obligor in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (A) obtaining additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash (including the Exit Premium); (B) granting any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (C) except as provided in this Agreement, the Interim DIP Order or the Final DIP

Order, as the case may be, authorizing use of cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (D) that (in the case of any Obligor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Obligor) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii) the filing by any Obligor of (A) any disclosure statement or other document or instrument relating to any Chapter 11 Plan that is not an Acceptable Chapter 11 Plan, or (B) any direct or indirect amendment to any disclosure statement or other document or instrument relating to any Acceptable Chapter 11 Plan that would cause the same to cease to constitute an Acceptable Chapter 11 Plan;

(iii) the modification, expiry or termination of any Obligor's exclusive right to file and solicit acceptances of a Chapter 11 Plan without the prior written consent of the Administrative Agent and the Lenders;

(iv) the entry of an order in any of the Chapter 11 Cases confirming a Plan that does not constitute an Acceptable Chapter 11 Plan;

(v) any Obligor seeks authorization from the Bankruptcy Court for the entry in the Chapter 11 Cases of any order, or the entry of an order in the Chapter 11 Cases, in either case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the DIP Orders or impairing the rights, privileges, benefits or protections of the Administrative Agent and the Lenders under the DIP Orders or the Loan Documents, in each case, without the prior written consent of the Administrative Agent and the Required Lenders;

(vi) the payment of, or application by any Obligor for authority to pay, any Prepetition Debt or other Prepetition claim without the Required Lenders' prior written consent other than (A) as provided in any "first day order", (B) as permitted by any order of the Bankruptcy Court reasonably satisfactory to the Administrative Agent, or (C) to the extent such payment is expressly permitted pursuant to this Agreement or consented to by the Administrative Agent and the Required Lenders in writing;

(vii) the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Obligor for an order seeking the appointment of, in either case, without the prior written consent of the Administrative Agent and the Required Lenders, an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (including any powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of Borrower or with the power to conduct an investigation of (or compel discovery from) any of the Secured Parties or against any of the Prepetition Secured Parties; or the sale without the Required Lenders' prior written consent, of any Obligor's assets (including through a sale under section 363 of the Bankruptcy Code), except to the extent expressly permitted hereunder and the DIP Orders;

(viii) the dismissal of the Chapter 11 Cases which does not contain a provision for Full Payment, or any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Full Payment;

(ix) the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, or into any other bankruptcy proceeding under any Bankruptcy Law, as applicable, or any Obligor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x) the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral of which the Fair Market Value exceeds (when aggregated with any Collateral of any other creditor granted relief from the automatic stay as contemplated by this clause (x)) $20,000,000, in the aggregate; provided however that any such order with respect the assets of either (i) Blockfi Lending LLC ("Blockfi") or (ii) NYDIG ABL LLC or either of their affiliates (so long as (1) relating solely to such equipment financed and sold to the Obligors by such party or, in the case of Blockfi, relating to the debt owing to Blockfi pursuant to its agreements with the Obligors as in effect prior to the Petition Date and (2) such arrangement shall not result in the improvement of enhancement of such party's claims in the Chapter 11 Cases or its Lien or priority position with respect to any of the DIP Collateral) shall not constitute an Event of Default pursuant to this provision, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent, subject to any Permitted Liens;

(xi) the entry of an order in the Chapter 11 Case, avoiding, recharacterizing, subordinating, disgorging or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents, or the making, institution or commencement of any filing, action or suit by any Debtor seeking the taking of any such action;

(xii) the failure of any Obligor to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(xiii) the challenge (or support) in writing by any Obligor to (and/or the entry of an order of the Court impairing or modifying in any manner) the validity, enforceability, extent, perfection or priority of any liens or claims granted under the Prepetition Loan Documents, the DIP Orders or the Loan Documents;

(xiv) the entry of an order in any of the Chapter 11 Cases granting any super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Lenders, without the consent in writing of the Administrative Agent and the Required Lenders, except (A) in respect of the Carve-Out in accordance with the DIP Orders and (B) as expressly provided in the DIP Orders;

(xv) the filing of a motion by any Obligor requesting, or the entry of any order granting, any super-priority administrative expense claim which is senior to or pari passu with the Lenders' claims or with the claims of the Prepetition Secured Parties without the consent in writing of the Administrative Agent and the Required Lenders, except (A) in respect of the Carve-Out and (B) as expressly provided in the DIP Orders;

(xvi) the entry of an order precluding the Administrative Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Obligors;

(xvii) any attempt by any Obligor (including by joining any other party in any such attempt or supporting any motion by any other party) to (i) reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt, (ii) to disallow all or any party of the Obligations, (iii) to contest any provision of any Loan Documents or the DIP Order, or (iv) challenging the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents or the DIP Orders or otherwise acting in a manner inconsistent with the Loan Documents and the DIP Orders;

(xviii) the reversal, vacatur, or stay of the effectiveness of either the Interim DIP Order or the Final DIP Order or any provision thereof without the written consent of the Administrative Agent and the Required Lenders;

(xix) the payment of, or granting adequate protection (except as expressly contemplated by the DIP Orders) with respect to, any Prepetition NPA Facility Debt or other Prepetition Debt;

(xx) an application for any of the orders described in this **Section 11.1(p)** shall be (a) made, joined in or supported by any of the Obligors or (b) made by any other Person (other than the Administrative Agent or the Lenders) and such application is not, to the extent requested by the Administrative Agent or the Lenders, contested by the Obligors in good faith, and the relief requested is granted in an order that is not stayed pending appeal;

(xxi) cessation of the Administrative Agent's Liens or super-priority claims granted with respect to this Agreement and the DIP Orders to be valid, perfected (in the case of any Liens) and enforceable in all respects or to have the priority as specified in the herein and in the DIP Orders;

(xxii) the entry of an order (a) surcharging any of the Collateral under Section 105, Section 506(c) or any other section of the Bankruptcy Code, (b) allowing any administrative expenses claim having priority over or ranking in equal priority with the Obligations or the rights of the Administrative Agent and the Lenders or (c) resulting in the marshaling of any Collateral; or

(xxiii) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Security Documents and the Collateral.

**11.2. Remedies upon Default**.

11.2.1 Remedies Generally. If an Event of Default described in **Section 11.1(j)** occurs with respect to any Obligor, then to the extent permitted by Applicable Law, all Obligations shall become automatically due and payable, and all Commitments shall terminate, without any action by the Administrative Agent or notice of any kind. In addition, if, when and as permitted by the DIP Orders or if any other Event of Default has occurred and exists, the Administrative Agent may in its discretion (and shall upon written direction of Required Lenders) do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in **Section 11.2**):

(a) declare any Obligations (including the Exit Premium and all premiums thereon) to be immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

(b) terminate, reduce or condition any Commitment;

(c) require the Obligors to cash collateralize then outstanding Obligations; and

(d) exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the DIP Orders and any other Chapter 11 Order, by law (including under the Bankruptcy Code and other Applicable Law), at equity and otherwise, including the rights and remedies of a secured party under the UCC.

11.2.2 Disposition of Collateral. Without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Interim DIP Order or the Final DIP Order, as applicable) to or upon any Obligor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Interim DIP Order or the Final DIP Order, as applicable)), during the continuance of any Event of Default (personally or through its agents or attorneys), to the maximum extent permitted under the Bankruptcy Code and other Applicable Law (including the DIP Orders): (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Obligor or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) sell, grant any option to purchase, and/or deliver any Collateral (in its then condition, or after any further manufacturing or processing thereof) (and enter into contractual obligations to do any of the foregoing), in lots or in bulk, in one or more parcels, at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere, upon such terms and conditions, and at such prices, as it may deem necessary, prudent or advisable, for cash or on credit or for future delivery (or any combination thereof), or without charge, and/or without assumption of any credit risk, and any of the foregoing may be adjourned from time to time in accordance with Applicable Law, and the Administrative Agent shall have the right to purchase all or any portion of the Collateral free of any right or equity of redemption of any Obligor, which right or equity is hereby waived and

released, at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations, (iv) withdraw all cash and Cash Equivalents in any Deposit Account, Commodity Account or Securities Account (including any DIP Funding Account) of a Obligor and apply such cash and Cash Equivalents and other cash, if any, and other securities, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account, Commodity Account or Securities Account pursuant to the related Control Agreement.

11.2.3 Management of Collateral. Each Obligor further agrees, that, during the continuance of any Event of Default, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Obligor's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require that each Obligor store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent, and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Lenders), with respect to such appointment without prior notice or hearing as to such appointment. The Administrative Agent shall not have any obligation to any Obligor to maintain or preserve the rights of any Obligor as against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

11.2.4 Direct Obligation. Neither the Administrative Agent nor any other Secured Party shall be required, subject to the DIP Orders, to make any demand upon, or pursue or exhaust any right or remedy against, any Obligor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Applicable Law. To the extent it may lawfully do so, each Obligor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such Sale or other disposition.

11.2.5 Commercially Reasonable. To the extent that any Applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Obligor acknowledges and agrees that the Administrative Agent shall be deemed to have complied with such duties even if it shall:

(i) fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii) fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii) fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv) advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Obligor, for expressions of interest in acquiring any such Collateral;

(v) exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi) dispose of assets in wholesale rather than retail markets;

(vii) disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii) purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

11.2.6 Accounts and Payments in Respect of General Intangibles.

(a) In addition to, and not in substitution for, any other provision in this Agreement, if required by the Administrative Agent at any time during the continuance of an Event of Default, on and after the date on which at least one deposit account or securities account has been established, any payment of accounts or payment in respect of general intangibles, when collected by any Obligor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Obligor in the exact form received, duly indorsed by such Obligor to the Administrative Agent, in the DIP Funding Account or such other account, subject to withdrawal

by the Administrative Agent as provided herein. Until so turned over, such payment shall be held by such Obligor in trust for the Administrative Agent, segregated from other funds of such Obligor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b) At any time during the continuance of an Event of Default:

(i) each Obligor shall, upon the Administrative Agent's written request, deliver to the Administrative Agent all original and other documents evidencing, and relating to, the contractual obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invokes and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Administrative Agent and that payments in respect thereof shall be made directly to the Administrative Agent;

(ii) the Administrative Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of an Obligor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any account or amounts due under any general intangible. In addition, the Administrative Agent may at any lime enforce such Obligor's rights against such account debtors and obligors of general intangibles; and

(iii) each Obligor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Administrative Agent to ensure any Internet domain name is registered.

(c) Anything herein to the contrary notwithstanding, each Obligor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Obligor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

11.2.7 Proceeds to be Turned over to and Held by the Administrative Agent. Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, all proceeds of any Collateral received by any Obligor hereunder in cash or Cash Equivalents shall be held by such Obligor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Obligor, and shall, promptly upon

receipt by any Obligor, be turned over to the Administrative Agent in the exact form received (with any necessary endorsement).

11.2.8 Deficiency. Each Obligor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Lender Party to collect such deficiency.

**11.3. Setoff**. At any time during an Event of Default, the Administrative Agent, Lenders, and any of their Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Administrative Agent, such Lender or such Affiliate to or for the credit or the account of an Obligor against any Obligations, irrespective of whether or not the Administrative Agent, such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of the Administrative Agent, such Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness, *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of **Section 4.2.1(b)** and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of the Administrative Agent, each Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have. NOTWITHSTANDING THE FOREGOING, NO LENDER AND NO PARTICIPANT SHALL EXERCISE ANY RIGHT OF SETOFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY OBLIGOR HELD OR MAINTAINED BY SUCH PERSON WITHOUT THE WRITTEN CONSENT OF THE ADMINISTRATIVE AGENT.

**11.4. Remedies Cumulative; No Waiver**.

11.4.1 Cumulative Rights and Remedies. All agreements, warranties, guaranties, indemnities and other undertakings of the Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of the Administrative Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations. Each Obligor acknowledges that the purpose of **Section 11.2** is, among other things, to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.

11.4.1 Waivers. No waiver or course of dealing shall be established by (a) the failure or delay of the Administrative Agent or any Lender to require strict performance by Borrower or any other Obligor with any terms of the Loan Documents, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by the Administrative Agent or any Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein. It is expressly acknowledged by Borrower that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date; *provided*, *however*, that notwithstanding anything in any Loan Document to the contrary, the exercise of rights and remedies following an Event of Default by the Administrative Agent and Lenders shall be subject to the DIP Orders.

## SECTION 12. THE ADMINISTRATIVE AGENT

### 12.1. Appointment, Authority and Duties of the Administrative Agent.

12.1.1 Appointment and Authority. Each Secured Party appoints and designates B. Riley Commercial Capital, LLC, as the Administrative Agent under all Loan Documents. The Administrative Agent may, and each Secured Party authorizes the Administrative Agent to, enter into all Loan Documents to which the Administrative Agent is intended to be a party and accept all Security Documents, for the benefit of Secured Parties. Any action taken by the Administrative Agent in accordance with the provisions of the Loan Documents, and the exercise by the Administrative Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties. Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as the Administrative Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) to execute, deliver and perform any intercreditor agreement in respect of this Facility or the Liens granted pursuant to the Security Documents or the DIP Orders, in each case under this clause (c) to the extent such agreement, amendment or restatement has been approved in writing by the Required Lenders; (d) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (e) manage, supervise or otherwise deal with Collateral; and (f) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise. The duties of the Administrative Agent are ministerial and administrative in nature only, and the Administrative Agent shall not have a fiduciary relationship with any Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto.

12.1.2 Duties. The Administrative Agent shall not have any duties except those expressly set forth in the Loan Documents. The conferral upon the Administrative Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

12.1.3 Agent Professionals. The Administrative Agent may perform its duties through agents and employees. The Administrative Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

12.1.4 Instructions of Required Lenders; Action by the Administrative Agent. The rights and remedies conferred upon the Administrative Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law. In determining compliance with a condition for any action hereunder, including satisfaction of any condition in **Section 6**, the Administrative Agent may presume that the condition is satisfactory to a Secured Party unless the Administrative Agent has received notice to the contrary from such Secured Party before the Administrative Agent takes the action. The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by any other Loan Document that it is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**) and in all cases it shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses that may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders. Notwithstanding the foregoing, the Administrative Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against Claims that could be incurred by the Administrative Agent. The Administrative Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in **Section 14.1.1**. If a Default or Event of Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this **Section 12.1.4**; *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders. In no event shall the Administrative Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability (as the terms thereof may be modified by the DIP Orders). In any case, where the consent of the Administrative Agent is expressly required under this Agreement, the other Loan Documents or the DIP Orders, the withholding or giving of such consent may be conditioned by

the Administrative Agent upon the receipt of the approval of the Required Lenders, and the Administrative Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such approval or failing to act in the absence of such approval. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct as determined by a final, nonappealable order of a court of competent jurisdiction. No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers, in each case, other than as resulting from its gross negligence or willful misconduct, as determined by a nonappealable order of a court of competent jurisdiction. Anything herein to the contrary notwithstanding, whenever reference is made in this Agreement or any other Loan Document to any action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent hereunder or thereunder, it is understood that in all cases the Administrative Agent shall be acting, giving, withholding, suffering, omitting, taking or otherwise undertaking and exercising the same (or shall not be undertaking and exercising the same) as directed by the Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in **Section 14.1**). Beyond the exercise of reasonable care in the custody of the Collateral in the possession or control of the Administrative Agent, it will not have any duty as to any other Collateral or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement and the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other

wire or communication facility, in each case, other than as resulting from its gross negligence or willful misconduct, as determined by a nonappealable order of a court of competent jurisdiction.

**12.2. Agreements Regarding Collateral and Borrower Materials**.

12.2.1 Lien Releases; Care of Collateral. Secured Parties authorize the Administrative Agent to, and the Administrative Agent shall, (1) release any Lien with respect to any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a Permitted Asset Disposition to a Person that is not an Obligor (and the Administrative Agent may request that the Obligors certify that such disposition is a Permitted Asset Disposition and may rely conclusively on any such certificate without further inquiry); it being agreed that such release shall not extend to the Net Cash Proceeds thereof; (c) subject to **Section 14.1**, with the prior written consent of the Required Lenders; and (d) if the Collateral subject to such Lien is owned by an Obligor, upon release of such Obligor from its obligations under the Loan Documents pursuant to the following clause (2) and (2) upon request of an Obligor, release any Obligor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents. Secured Parties authorize the Administrative Agent to subordinate its Liens only to any Purchase Money Lien or other Permitted Lien expressly entitled to senior priority hereunder. The Administrative Agent shall have no obligation to assure that any Collateral exists or is owned by an Obligor, or is cared for, protected or insured, nor to assure that the Administrative Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this **Section 12.2.1**. If any Collateral is disposed pursuant to a Permitted Asset Disposition to any Person other than an Obligor, such Collateral (but not the proceeds thereof, which will continue to be subject to the Liens of the Administrative Agent) shall be sold free and clear of the Liens created by the Loan Documents and the Administrative Agent shall, at the expense of the Obligors, take any and all actions reasonably requested by the Obligors to effect the foregoing (*provided*, that if requested by the Administrative Agent, the Obligors shall provide a certification that such disposition is permitted by this Agreement).

12.2.2 Possession of Collateral. The Administrative Agent and Secured Parties appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control. If any Lender obtains possession or control of any Collateral, it shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request, deliver such Collateral to the Administrative Agent or otherwise deal with it in accordance with the Administrative Agent's instructions.

12.2.3 Reports. The Administrative Agent shall promptly provide to Lenders, when complete, any field audit or examination report prepared for the Administrative Agent with respect to any Obligor or Collateral ("Report"). Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but the Administrative Agent shall not be responsible for system failures or access issues that may occur from time to time. Each Lender agrees (a) that Reports are not intended to be comprehensive audits or

examinations, and that the Administrative Agent or any other Person performing an audit or examination will inspect only specific information regarding the Obligations or Collateral and will rely significantly upon the Obligors' books, records and representations; (b) that the Administrative Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential and strictly for such Lender's internal use, not to distribute any Report or other Borrower Materials (or the contents thereof) to any Person (except to other Lenders, such Lender's Participants, its officers, directors and employees, and its attorneys and accountants provided such Persons are informed of the confidential nature of such Reports and Borrower Materials and instructed to keep them confidential and strictly for such Lender's use and as otherwise permitted herein), and to use all Borrower Materials solely for administration of the Obligations. Each Lender shall severally and not jointly indemnify and hold harmless the Administrative Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Claims arising as a direct or indirect result of the Administrative Agent furnishing same to such Lender, via the Platform or otherwise.

**12.3. Reliance By the Administrative Agent**. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent, as determined in a final, non-appealable judgment by a court of competent jurisdiction. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**12.4. Action Upon Default**. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Section 6,** unless it has received written notice from Borrower or Required Lenders specifying the occurrence and nature thereof. If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify the Administrative Agent and the other Lenders thereof in writing. Each Secured Party (other than the Administrative Agent) agrees that, except as otherwise expressly provided in any Loan Documents or with the written consent of the Administrative Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid

at foreclosure sales, UCC sales or other dispositions of Collateral, or to assert any rights relating to any Collateral.

**12.5. Ratable Sharing**. If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with **Section 5.6.2,** as applicable, such Lender shall forthwith purchase from the Administrative Agent and the other Lenders such participations in the affected Obligation as are necessary to share the excess payment or reduction on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable. If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest. Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to the Administrative Agent for application under **Section 4.2.1(b)** and it shall provide a written statement to the Administrative Agent describing the Obligation affected by such payment or reduction. No Lender shall set off against any DIP Funding Account without the Administrative Agent's prior written consent.

**12.6. Indemnification**. EACH LENDER SHALL SEVERALLY AND NOT JOINTLY INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY OBLIGORS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT INDEMNITEE, PROVIDED, THAT ANY CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR THE ADMINISTRATIVE AGENT (IN THE CAPACITY OF AGENT). In no event shall any Lender have any obligation hereunder to indemnify or hold harmless an Agent Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Agent Indemnitee. In the Administrative Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Secured Parties. If the Administrative Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Administrative Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Administrative Agent by each Lender to the extent of its Pro Rata share.

**12.7. Limitation on Responsibilities of the Administrative Agent**. The Administrative Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by the Administrative Agent's gross negligence or willful misconduct as determined in a final, non-appealable judgment by a court of competent jurisdiction. The Administrative Agent does not assume any responsibility for any failure or delay in performance or any breach by any Obligor, Lender or other Secured Party of any obligations under the Loan Documents. The Administrative Agent does not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Obligations, Collateral, Loan Documents or Obligor. No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or

enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or Account Debtor. No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Obligor of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

**12.8. Successor Agent and Co-Agents.**

12.8.1 Resignation; Successor Agent. The Administrative Agent may resign at any time by giving at least 5 days written notice thereof to Lenders and Obligor Representative (or such shorter time period as agreed to by the Required Lenders). Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Administrative Agent which shall be (a) a Lender or an Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders. If no successor agent is appointed prior to the effective date of the Administrative Agent's resignation, then the Administrative Agent may (but shall not be obligated to) appoint a successor agent that is a financial institution acceptable to it, which shall be a Lender unless no Lender accepts the role. Whether or not a successor has been appointed, such resignation shall become effective. Upon acceptance by a successor Administrative Agent of its appointment hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Administrative Agent without further act, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in **Sections 12.6** and **14.2**. Notwithstanding any Administrative Agent's resignation, the provisions of this **Section 12** shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while the Administrative Agent. The resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and except for any indemnity payments or other amounts then owed to the resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Any successor to B. Riley Commercial Capital, LLC by merger or acquisition of stock or this loan shall continue to be the Administrative Agent hereunder without further act on the part of any Secured Party or Obligor.

12.8.2 Co-Collateral Agent. If necessary or appropriate under Applicable Law, the Administrative Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document. Each right and remedy intended to be available to the Administrative Agent under the Loan Document shall also be vested in such agent. Secured Parties shall execute and deliver any instrument or agreement that the Administrative Agent may request to effect such appointment. If any such agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by

Applicable Law, shall vest in and be exercised by the Administrative Agent until appointment of a new agent.

12.8.3 Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Affiliates of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.9. Non-Reliance on the Administrative Agent and the Other Lenders**. Each Lender expressly acknowledges that neither the Administrative Agent nor the Arranger has made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Obligor of any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its (or its Related Parties') possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, the Arranger, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and their Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into, or consent to, this Agreement and the other Loan Documents and to extend credit to Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold

such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

**12.10. Remittance of Payments and Collections**.

12.10.1 Remittances Generally. All payments by any Lender to the Administrative Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds. If no time for payment is specified or if payment is due on demand by the Administrative Agent and request for payment is made by the Administrative Agent by 11:00 a.m. on a Business Day, payment shall be made by Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day. Payment by the Administrative Agent to any Secured Party shall be made by wire transfer, in the type of funds received by the Administrative Agent. Any such payment shall be subject to the Administrative Agent's right of offset for any amounts due from such payee under the Loan Documents.

12.10.2 Failure to Pay. If any Secured Party fails to pay any amount when due by it to the Administrative Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the rate determined by the Administrative Agent as customary for interbank compensation for two Business Days and thereafter at the Default Rate. In no event shall Borrower be entitled to receive credit for any interest paid by a Secured Party to the Administrative Agent, nor shall any Defaulting Lender be entitled to interest on any amounts held by the Administrative Agent pursuant to **Section 4.2**.

12.10.3 Recovery of Payments. If the Administrative Agent pays an amount to a Secured Party in the expectation that a related payment will be received by the Administrative Agent from an Obligor and such related payment is not received, then the Administrative Agent may recover such amount from the Secured Party. If the Administrative Agent determines that an amount received by it must be returned or paid to an Obligor or other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, the Administrative Agent shall not be required to distribute such amount to any Secured Party. If any amounts received and applied by the Administrative Agent to any Obligations are later required to be returned by the Administrative Agent pursuant to Applicable Law, each Lender shall pay to the Administrative Agent, **on demand**, such Lender's Pro Rata share of the amounts required to be returned.

**12.11. Individual Capacities**. As a Lender, the Administrative Agent shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include the Administrative Agent in its capacity as a Lender, to the extent applicable. The Administrative Agent, Lenders and their Affiliates may accept deposits from, lend money to, provide bank products to, act as financial or other advisor to, and generally engage in any kind of business with, Obligors and their Affiliates, as if they were not the Administrative Agent or Lenders hereunder, without any duty to account therefor to any Secured Party. In their individual capacities, the Administrative Agent, Lenders and their Affiliates may receive information regarding Obligors, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Secured Party.

**12.12. Erroneous Payments**.

12.12.1        Each Lender hereby agrees that (i) if the Administrative Agent notifies any Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received) and (ii) to the extent permitted by Applicable Law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation a waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this clause shall be conclusive absent manifest error.

12.12.2        Without limiting the immediately preceding clause, each Lender hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that the Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by Applicable Law, the Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation, waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received).

**12.13. [Reserved]**.

**12.14. No Third Party Beneficiaries**.  This **Section 12** is an agreement solely among Secured Parties and the Administrative Agent, and shall survive Full Payment of the Obligations. This **Section 12** does not confer any rights or benefits upon Borrower, any Obligor or any other Person.  As between Borrower and Obligors, on the one hand, and the Administrative Agent, on the other hand, any action that the Administrative Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.

**12.15. Withholding Tax**. To the extent required by any Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall severally and not jointly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the commitments and the repayment, satisfaction or discharge of all other Obligations.

**12.16. The Administrative Agent May File Proofs of Claim; Credit Bidding**.

12.16.1 Proofs of Claim. In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relative to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent in writing to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

12.16.2 Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to take all actions and exercise all rights described in **Section 11.2,** including to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which an Obligor is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided*, that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (g) of **Section 14.1.1** of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

12.16.3 Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents,

and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided*, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law;

(c) shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Obligors or any of their Affiliates, that is communicated to, obtained or in the possession of, the Administrative Agent or any of their Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein;

(d) shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 11.2** and **14.1**) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent by any Obligor, the Obligor Representative or a Lender;

(e) shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in **Section 6** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, but, in each case, subject at all times to the DIP Orders, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of the Administrative Agent, the Administrative Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent jurisdiction permitted under **Section 14.14**) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof. The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Administrative Agent pursuant to the terms of this Agreement.

**12.17. Certain ERISA Matters**.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Obligor, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

**12.18. Successors By Merger, Etc.**. Any corporation or association into which the Administrative Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative Agent is a party, will be and become the successor Administrative Agent under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## SECTION 13. BENEFIT OF AGREEMENT; ASSIGNMENTS

**13.1. Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of Borrower, Obligors, the Administrative Agent, Lenders, Secured Parties, and their respective successors and assigns, except that (a) no Borrower or Obligor shall have the right to assign its rights or delegate its obligations under any Loan Documents; (b) any assignment by a Lender must be made in compliance with **Section 13.3**; and (c) any assignment by the Administrative Agent of its role as such must be made in compliance with **Section 13.3**. The Administrative Agent may treat the Person which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with **Section 13.3**. Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2. Participations**.

13.2.1 Permitted Participants; Effect. Subject to **Section 13.3.3**, any Lender may sell to a financial institution ("Participant") a participating interest in the rights and obligations of such Lender under any Loan Documents. Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, it shall remain solely responsible to the other parties hereto for performance of such obligations, it shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Borrower shall be determined as if it had not sold such participating interests, and Borrower, the other Obligors and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents. Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and the Administrative Agent

and the other Lenders shall not have any obligation or liability to any such Participant. Borrower agrees that each Participant shall be entitled to the benefits of **Sections 3.7** and **5.9** (subject to the requirements and limitations of such Sections and **Section 5.10**; *provided*, that any documentation required under **Section 5.10** shall be delivered solely to the applicable participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 13.1**. A Participant shall not be entitled to receive any greater payment under **Section 3.7** or **5.9** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a Change in Law occurring after the sale of the participation. Each Lender that sells a participation agrees, at Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of **Sections 3.8 and 13.4** with respect to any Participant.

13.2.2 Voting Rights. Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of a Loan Document other than that which forgives principal, interest or fees, reduces the stated interest rate or fees payable with respect to any Loan or Commitment in which such Participant has an interest, postpones the Termination Date (other than pursuant to **Section 2.1.5**) or any date fixed for any regularly scheduled payment of principal, interest or fees on such Loan or Commitment (other than pursuant to **Section 2.1.5**), or releases Borrower, substantially all Guarantors or substantially all Collateral.

13.2.3 Benefit of Set-Off. Borrower agrees that each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it. By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with **Section 12.5** as if such Participant were a Lender.

13.2.4 Participant Register. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, or its other Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations (or, in each case, any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

**13.3. Assignments.**

13.3.1 Permitted Assignments. A Lender may assign to an Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (a) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the Loan Documents and, in the case of a partial assignment (except to an affiliated fund of such Lender), is in a minimum principal amount of $1,000,000 (unless otherwise agreed by the Administrative Agent in its discretion) and integral multiples of $500,000 in excess of that amount; (b) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $1,000,000 (unless otherwise agreed by the Administrative Agent in its discretion) and (c) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording, an Assignment and Acceptance. Nothing herein shall limit the right of a Lender to pledge or assign any rights under the Loan Documents to secure obligations of such Lender, including a pledge or assignment to a Federal Reserve Bank; *provided*, *however*, that no such pledge or assignment shall release the Lender from its obligations hereunder nor substitute the pledge or assignee for such Lender as a party hereto.

13.3.2 Effect; Effective Date. Upon delivery to the Administrative Agent of an assignment notice in the form of **Exhibit B** and a processing fee of $3,500 (unless otherwise agreed by the Administrative Agent in its discretion), the assignment shall become effective as specified in the notice, if it complies with this **Section 13.3.** From such effective date, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder. Upon consummation of an assignment, the transferor Lender, the Administrative Agent and Borrower shall make appropriate arrangements for issuance of replacement and/or new notes, if applicable. The transferee Lender shall comply with **Section 5.10** and deliver, upon request, an administrative questionnaire satisfactory to the Administrative Agent.

13.3.3 Certain Assignees. Without the Administrative Agent's prior written consent, no assignment or participation may be made to Borrower, an Obligor, an Affiliate of Borrower or an Obligor, a Defaulting Lender or natural person. Any assignment by a Defaulting Lender shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to the Administrative Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as the Administrative Agent deems appropriate), to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder. If an assignment by a Defaulting Lender shall become effective under Applicable Law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.3.4 Register. The Administrative Agent, acting as a non-fiduciary agent of Borrower, shall maintain (a) a copy of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the principal amounts of the Loans (and stated interest) owing to, each Lender (the "Register"). Entries in the Register shall be conclusive, absent manifest error, and Borrower, the Administrative Agent and Lenders shall treat each lender recorded in such Register as a Lender for all purposes under the Loan Documents, notwithstanding any notice to the contrary. The Register shall be available for

inspection by Borrower and any Lender (but, in the case of any Lender, only with respect to its holdings (unless consented to otherwise in writing by the Administrative Agent)), from time to time upon reasonable notice.

**13.4. Replacement of Certain Lenders**. If (a) a Lender (i) fails to give its consent to any amendment, waiver or action for which consent of all Lenders was required and the Required Lenders consented or (ii) is a Defaulting Lender, then, in addition to any other rights and remedies that any Person may have, the Administrative Agent or Borrower may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to Eligible Assignee(s), pursuant to appropriate Assignment and Acceptance(s), within 20 days after the notice, *provided*, that a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply. The Administrative Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if the Lender fails to execute it. Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents through the date of assignment.

## SECTION 14. MISCELLANEOUS

### 14.1. Consents, Amendments and Waivers.

14.1.1 Amendment. No modification of any Loan Document, including any extension (other than in accordance with **Section 2.1.5**) or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of the Administrative Agent (with the consent of Required Lenders) (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**) and each Obligor party to such Loan Document; *provided*, *however*, that

(a) without the prior written consent of the Administrative Agent (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties or discretion of the Administrative Agent;

(b) [reserved];

(c) without the prior written consent of each affected Lender (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), including a Defaulting Lender, no modification shall be effective that would (i) increase the Commitment of such Lender (it being understood that a waiver of any condition precedent set forth in **Section 6** or the waiver of any Default shall not constitute an extension or increase of any Commitment of any Lender); (ii) reduce the amount of, or rate of, or waive or delay payment of, any principal, reimbursement obligation, interest, fees or other amounts payable to such Lender hereunder or under any Loan Document (except as provided in **Section 4.2** and any waiver of interest accruing at the Default Rate; provided that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate"); (iii) extend the Termination Date or the

Maturity Date (except, as relating to the Maturity Date, in accordance with **Section 2.1.5**); or (iv) amend this clause (c);

(d) without the prior written consent of all Lenders (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**) (except any Defaulting Lender), no modification shall be effective that would (i) alter **Section 5.6.2**, **7.1** (except to add Collateral) or **14.1.1**; (ii) amend the definition of Pro Rata or Required Lenders, (iii) amend any payment provision in a manner that would alter the pro rata sharing of payments required thereby (iii) release all or substantially all Collateral; or (iv) except in connection with a merger, disposition or similar transaction expressly permitted hereby, release any Obligor from liability for any Obligations (as measured by value not number);

(e) without the written consent of each Lender directly and adversely affected thereby (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), no modification shall postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment;

(f) [reserved]; and

(g) without the prior written consent of each affected Lender (which, for the avoidance of doubt, may be provided via email in accordance with **Section 14.3.6**), including a Defaulting Lender, no modification shall be effective that would alter **Section 12.5** or **14.3.1**.

14.1.2 Limitations. Only the consent of the parties to any agreement relating to fees shall be required for modification of such agreement. Any waiver or consent granted by the Administrative Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified. Further, notwithstanding anything to the contrary contained in this **Section 14.1**, if following the Closing Date, the Administrative Agent and Obligor Representative shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Obligor Representative shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

14.1.3 [Reserved].

**14.2. Indemnity**. Borrower and each other Obligor, jointly and severally, shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Lender Related Person") against, and hold each Lender Related Person harmless from, any and all losses, claims, damages, liabilities and related expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one primary counsel, one local counsel in each relevant jurisdiction, and one special counsel (the appointment of any such special counsel to be subject to the reasonable consent of Obligors, so long as not unreasonably withheld, conditioned

or delayed) for each relevant specialization deemed necessary or appropriate by the Administrative Agent, for all Lender Related Persons and, in the case of an actual or reasonably perceived conflict of interest, one additional primary counsel (and one additional local counsel in each relevant jurisdiction) per group of similarly situated affected parties), to the extent incurred by any Lender Related Person or asserted against any Lender Related Person by any Person (including Borrower or any other Obligor) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in **Section 5.9**), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Environmental Release of Hazardous Materials on or from any property owned or operated by Borrower or any of its Subsidiaries or any other Obligor, or any Environmental Liability related in any way to Borrower or any of its Subsidiaries or any other Obligor, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, in all cases, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower, any of its Subsidiaries or any other Obligor, and regardless of whether any Lender Related Person is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE LENDER RELATED PERSON; *provided*, that such indemnity shall not, as to any Lender Related Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Lender Related Person or (y) result from a claim brought by Borrower or any other Obligor against a Lender Related Person for a material breach of such Lender Related Person's obligations hereunder or under any other Loan Document, if Borrower or such Obligor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Without limiting the provisions of **Section 5.9.2**, this **Section 14.2** shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**14.3. Notices and Communications**.

14.3.1 Notice Address. Subject to **Section 4.1.3**, all notices and other communications by or to a party hereto shall be in writing and shall be given to (x) any Borrower or Obligor, to the Obligor Representative to the attention of Kristen Carnevali, Denise Sterling and Todd DuChene at 210 Barton Springs Road, Suite 300, Austin, Texas 78704, (y) to any other Person at its address shown on the signature pages hereof (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment and Acceptance), or (z) at such other address as any such party may hereafter specify by notice in accordance with this **Section 14.3**. Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received or when received by electronic mail; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to the Administrative Agent pursuant to **Sections 2.1.4**

or **4.1.1** shall be effective until actually received by the individual to whose attention at the Administrative Agent such notice is required to be sent. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Borrower shall be deemed received by Borrower.

14.3.2 Communications. Secured Parties make no assurance as to the privacy or security of electronic communications. E-mail and voice mail shall not be effective notices from the Obligors under the Loan Documents, unless otherwise expressly agreed.

14.3.3 Platform. Borrower Materials shall be delivered pursuant to procedures approved by the Administrative Agent, including via e-mail and other electronic delivery (if possible) upon request by the Administrative Agent to an electronic system maintained by the Administrative Agent ("Platform"). Obligor Representative shall notify the Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by the Administrative Agent only upon its receipt of such notice. Borrower Materials and other information relating to this credit facility may be made available to Lenders on the Platform. The Platform is provided "as is" and "as available." The Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in Borrower Materials or any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM. Lenders acknowledge that Borrower Materials may include material non-public information of Obligors and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Obligor's securities. No Agent Indemnitee shall have any liability to Borrower, any Obligor, any Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials, notices and other information through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

14.3.4 Public Information. Obligors and Secured Parties acknowledge that "public" information may not be segregated from material non-public information on the Platform. Secured Parties acknowledge that Borrower Materials may include Obligors' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to an Obligor's securities.

14.3.5 Non-Conforming Communications. The Administrative Agent and Lenders may rely upon any communications purportedly given by or on behalf of Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses

arising from any electronic or telephonic communication purportedly given by or on behalf of Borrower.

14.3.6 Electronic Mail. Notwithstanding the foregoing, or anything else to the contrary contained herein or in any other Loan Document, the parties hereto agree that (i) if the Administrative Agent requires or seeks consent and/or direction of any Lender in connection with exercising any of its rights or powers, or otherwise taking any action, under this Agreement or any other Loan Document (including in connection with providing any consent or waiver that this Agreement or such other Loan Document expressly permits the Administrative Agent to provide), the Administrative Agent shall be entitled to rely on any such consent and/or direction delivered to it by electronic mail ("e- mail") by or on behalf of the applicable Lender (including by any investment advisor, manager or similar Person holding itself out as authorized to act on behalf of such Lender or by any counsel thereto or to such Lender), (ii) with respect to (a) any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder or under such other Loan Document to be extended and (b) any amendment, consent, waiver, modification or otherwise of this Agreement or any other Loan Document, in each case, that requires the consent and/or the direction of one or more of the Lenders, each Lender shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("e-mail") to Borrower's counsel or the Administrative Agent's counsel, as applicable, (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the applicable Lender (including by any investment advisor, manager or similar entity holding itself out as authorized to act on behalf of such Lender)) and (iii) with respect to (a) any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder (including any date set forth on **Schedule 10.1.13**) or under such other Loan Document to be extended and (b) any amendment, consent, waiver, modification or otherwise of this Agreement or any other Loan Document, in each case, that requires the consent and/or direction of the Administrative Agent, the Administrative Agent shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("e-mail") to Borrower's counsel or Lender's counsel, as applicable, (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the Administrative Agent.

**14.4. Performance of Borrower's Obligations**. The Administrative Agent may (but shall not be obligated to), in its discretion at any time and from time to time, at Borrower's expense, pay any amount or do any act required of Borrower or any Obligor under any Loan Documents or otherwise lawfully requested by the Administrative Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of the Administrative Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien. All payments, costs and expenses (including Extraordinary Expenses) of the Administrative Agent under this Section shall be reimbursed to the Administrative Agent by Borrower, within 10 Business Days after demand, with interest from the

date incurred until paid in full, at the Default Rate. Any payment made or action taken by the Administrative Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**14.5. Credit Inquiries**. The Administrative Agent and Lenders may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

**14.6. Severability**. Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law. If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**14.7. Cumulative Effect; Conflict of Terms**. The provisions of the Loan Documents are cumulative. The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided. Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**14.8. Counterparts; Execution**. Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments or other modifications, Notices of Borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved in writing by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper- based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved in writing by it.

**14.9. Entire Agreement**. Time is of the essence with respect to all Loan Documents and Obligations. The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

**14.10. Relationship with Lenders**. The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt. It shall not be necessary for the Administrative Agent or any other Lender to be joined as an additional party in any proceeding for such purposes. Nothing in this Agreement and no action of the

Administrative Agent, Lenders or any other Secured Party pursuant to the Loan Documents or otherwise shall be deemed to constitute the Administrative Agent and any Secured Party to be a partnership, joint venture or similar arrangement, nor to constitute control of any Obligor.

**14.11. No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated by any Loan Document, Borrower and Obligors acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by the Administrative Agent, any Lender, any of their Affiliates or any arranger are arm's-length commercial transactions between Borrower or such Obligor and such Person; (ii) Borrower and the Obligors have consulted its own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrower and the Obligors are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of the Administrative Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower, any Obligor, any of its or their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) the Administrative Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Borrower, Obligors and their Affiliates, and have no obligation to disclose any of such interests to Borrower, Obligors or their Affiliates. To the fullest extent permitted by Applicable Law, Borrower and Obligors each hereby waives and releases any claims that it may have against the Administrative Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

**14.12. Confidentiality**. Each of the Administrative Agent and Lenders shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives, as well as financing sources and prospective investors (*provided* such Persons are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any bank product; (g) with the consent of Obligor Representative; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section, or (ii) is available to the Administrative Agent, any Lender or any of their Affiliates on a nonconfidential basis from a source other than Borrower and Obligors. Notwithstanding the foregoing, the Administrative Agent and Lenders may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrower's and Obligors' logos, trademarks or product photographs in advertising materials. As used herein, "Information" means all information received from an Obligor or Subsidiary relating to it or its business. Any Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that which it accords its own confidential information. Each of the Administrative Agent and Lenders acknowledges that (i) Information may include material non-public information; (ii) it has

developed compliance procedures regarding the use of material non-public information; and (iii) it will handle such material non-public information in accordance with Applicable Law.

**14.13. GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**14.14. Consent to Forum. BORROWER AND OBLIGORS HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. BORROWER AND OBLIGOR IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1. A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law**.

**14.15. Waivers by Obligors**. To the fullest extent permitted by Applicable Law, Borrower and each other Obligor waives (a) the right to trial by jury (which the Administrative Agent and each Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non- payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by the Administrative Agent on which Borrower or any such Obligor may in any way be liable, and hereby ratifies anything the Administrative Agent may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing the Administrative Agent to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against the Administrative Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof. Borrower and each other Obligor acknowledge that the foregoing waivers are a material inducement to the Administrative Agent and Lenders entering into this Agreement and that they are relying upon the foregoing in their dealings with Borrower

and the Obligors. Borrower and Obligors have each reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**14.16. Patriot Act Notice**. The Administrative Agent and Lenders hereby notify Borrower and Obligors that pursuant to the Patriot Act, the Administrative Agent and Lenders are required to obtain, verify and record information that identifies Borrower and each Obligor, including its legal name, address, tax ID number and other information that will allow the Administrative Agent and Lenders to identify it in accordance with the Patriot Act. The Administrative Agent and Lenders will also require information regarding each guarantor, if any, and may require information regarding Borrower's and Obligors' management and owners, such as legal name, address, social security number and date of birth. Borrower and each other Obligor shall, promptly upon request, provide all documentation and other information as the Administrative Agent or any Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.17. NO ORAL AGREEMENT. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

**14.18. Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an Affected Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Affected Resolution Authority.

**14.19. DIP Orders**. Borrower, the Obligors, the Administrative Agent and the Lenders hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any other Loan Document), on the one hand, and any DIP Order, on the other hand, the applicable DIP Order then in effect shall control. Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable. This Agreement is subject in all respects (including with respect to all obligations and agreements of the Obligors provided for hereunder) to the terms of the Interim DIP Order (and, when applicable, the Final DIP Order) and, notwithstanding anything in the foregoing, the Obligors shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim DIP Order (and, when applicable, the Final DIP Order).

**14.20. Acknowledgment Regarding any Supported QFCs**. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b) As used in this **Section 14.20,** the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**THE ADMINISTRATIVE AGENT**

**B. RILEY COMMERCIAL CAPITAL, LLC**,
as the Administrative Agent and as the sole initial Lender

DocuSigned by:
Phil Ahn
By: 8F3ED3A59DDF4B0...
Name: Phil Ahn
Title: Chief Financial Officer

**Notice to Administrative Agent:**
B. Riley Commercial Capital, LLC
11100 Santa Monica Blvd., Suite 800
Los Angeles, CA 90025
Attention: Perry Mandarino
Telephone: 646-367-2402
E-mail: pmandarino@brileyfin.com

**With a copy to:**
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attention: John Ventola
Telephone: 617-248-5085
E-mail: jventola@choate.com

**BORROWER**

**CORE SCIENTIFIC, INC.**, as Borrower

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

**GUARANTORS**

**CORE SCIENTIFIC MINING LLC**, as a Guarantor

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President and Chief Legal Officer

**RADAR RELAY, INC.**, as a Guarantor

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**, as a Guarantor
By its sole member, Core Scientific Operating Company

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**, as a Guarantor
By its sole member, Radar Relay, Inc.

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President

[Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement]

Debtors' Exhibit No. 22
Page 249 of 393

**RADAR LLC**, as a Guarantor
By its sole member, Radar Relay, Inc.

DocuSigned by:
Todd DuChene
43048BB7D89C4FE...

By:____________________________
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITIONS I LLC**, as a Guarantor
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

DocuSigned by:
Todd DuChene
43048BB7D89C4FE...

By:____________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**AMERICAN PROPERTY ACQUISITIONS VII, LLC**, as a Guarantor
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

DocuSigned by:
Todd DuChene
43048BB7D89C4FE...

By:____________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

[Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement]

Debtors' Exhibit No. 22
Page 250 of 393

DocuSign Envelope ID: 3A1B955B-154D-4F6B-B520-FDBBF6F26F87 Case 22-90341 Document 678 Filed in TXSB on 03/01/23 Page 251 of 393

**CORE SCIENTIFIC ACQUIRED MINING LLC**, as a Guarantor

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**, as a Guarantor

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**, as a Guarantor

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: Chief Executive Officer

[Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement]

Debtors' Exhibit No. 22
Page 251 of 393

**Schedule 1.1**

**DIP Term Loan Commitment Schedule**

| **Lender** | **DIP Term Loan Commitment** | **Interim Availability Period Draw Amount** |
|---|---|---|
| B. Riley Commercial Capital, LLC | $70,000,000 | $35,000,000 |
| **Total** | $70,000,000 | $35,000,000 |

**Schedule 1.1(a)**

**Subject Real Properties**

| Facility | Owner | Ownership | Property Address | Legal Description |
|---|---|---|---|---|
| Marble, North Carolina | American Property Acquisitions I, LLC | Fee | 155 Palmer Lane, Marble, NC 28905 | That certain tract or parcel of land situated, lying and being in the city of Marble, Cherokee County, North Carolina and being more particularly described as follows:<br><br>Beginning at an existing nail in the intersection of Airport Road having an apparent 50' public right-of-way and Palmer Road (60' public right-of-way), said nail also being located South 68°26'33" West a distance of 1596.35 feet from NCGS Monument "CHE 7" having NAD 83 grid coordinates last updated in 2011 of N=558373.51, E=533753.95 with a combined grid factor of 0.99979819; and runs thence with the center of Airport Road South 62°27'04" West a distance of 482.24 feet to a new nail; thence leaving Airport Road and with the line of Nancy H Martin as described in Deed Book 1482, Page 201 of the Cherokee County Public Registry North 27°42'25" West passing through an existing 1" iron pipe on the northerly right-of-way of Airport Road at 23.30 feet, an existing 1" iron pipe at 288.19 a total distance of 337.00 feet to a new #4 iron rebar; thence South 56°06'57" West a distance of 525.04 feet to an existing 1" iron pipe being the southeast corner of Henry Lane Young Trustee property as described in Deed Book 1453, Page 609 of said Registry; thence along and with the line of Henry Lane Young Trustee the following six (6) courses and distances: (1) North 23°25'54" West a distance of 486.76 feet to an existing iron rod with cap; (2) North 65°23'16" East a distance of 43.93 feet to an existing iron rod with cap; (3) North 14°24'22" West a distance of 227.94 feet to a new #4 iron rebar; (4) North 44°26'47" East a distance of 50.00 feet to an existing 2" bolt; (5) North 18°22'30" West a distance of 436.13 feet to an existing 1" iron pipe; (6) South 82°34'23" West passing through an existing 1" iron pipe at 804.86 feet a total distance of 839.50 feet to an existing 48" sycamore tree being a northeast corner of Joseph Benjamin Chastain and Dorothy Chastain property as described in Deed Book 1373, Page 123 of said Registry; thence along and with the line of Joseph Benjamin Chastain and Dorothy Chastain and continuing with the line of Hazel Arlene Mclean property as described in Deed Book 1205, Page 135 of said Registry North 00°21'26" East a distance of 94.79 feet to a computed point in creek; thence leaving creek and along and |

11273420v8

| | | | | |
|---|---|---|---|---|
| | | | | with the line of Hazel Arlene Mclean property as described in Deed Book 1205, Page 135 of said Registry and Henry Lane Young Trustee property as described in Deed Book 1453, Page 609 of said Registry North 82°09'20" East passing through an existing iron with cap at 23.26 feet a total distance of 839.50 feet to an existing iron with cap; thence with another line of Henry Lane Young Trustee North 00°08'15" West a distance of 600.31 feet to an existing 1" iron pipe being the southeast corner of Gale B Jenkins and Elaine Jenkins property as described in Deed Book 676, Page 57 of said Registry; thence along and with the line of Gale B Jenkins and Elaine Jenkins North 00°52'51" West a distance of 309.32 feet to an existing 2" pipe being the southwest corner of the Tennessee Valley Authority property (no deed found); thence along and with the line of the Tennessee Valley Authority the following two (2) courses and distances: (1) North 82°23'27" East a distance of 675.91 feet to an existing 2" pipe; (2) North 00°19'51" East a distance of 119.65 feet to an existing concrete monument being the southwest corner of Nantahala Power & Light Company property as described in Deed Book 662, Page 102 of said Registry; thence along and with the line of Nantahala Power & Light Company the following two (2) courses and distances: (1) North 82°26'26" East a distance of 599.89 feet to an existing concrete monument; (2) South 81°30'32" East a distance of 344.17 feet to an existing nail in the center of Palmer Road (60' public right-of-way), said nail being a common corner of Dewey William Stiles property as described in Deed Book 1398, Page 73 of said Registry; thence along and with the line of Dewey William Stiles and continuing with the line of Larry R Martin and Vickie T Martin as described in Deed Book 479, Page 52 of said Registry and with the line of Larry R Martin and Vickie T Martin as described in Deed Book 611, Page 198 of said Registry the following four (4) courses and distances: (1) South 28°20'42" East a distance of 129.43 feet to a computed point in right-of-way of Palmer Road; (2) South 23°24'18" West a distance of 58.63 feet to a computed point in right-of-way of Palmer Road; (3) South 13°10'18" West a distance of 338.30 feet to a computed point in right-of-way of Palmer Road; (4) South 09°05'24" West a distance of 367.78 feet to a computed point in right-of-way of Palmer Road being the northwest corner of Trudy T Evans property as described in Deed Book 1004, Page 148 of said Registry; thence along and with the line of Trudy T Evans South 10°32'13" West a distance of 139.00 feet to a computed point in right-of-way of Palmer Road being the northwest corner of Larry R Martin and Vickie T Martin property as described in Deed Book 1004, Page 145 of said Registry; thence along and with the line of Larry R Martin and Vickie T Martin South 10°32'13" West a distance of 160.68 feet to a computed point in right-of-way of Palmer Road being on line of Marvin Leroy Moss and Carolyn Moss as described in Deed Book 1447, Page 1030 of said Registry; thence along and with the line of Marvin Leroy Moss and Carolyn Moss the following four (4) courses and distances: (1) South 83°14'34" West a distance of 20.94 feet to a computed point in right-of-way of Palmer Road; (2) with an arc of a circular curve to the left having a radius of 772.58 feet, an arc length of 36.03 feet, chord:(South 07°23'07" West 36.03 feet) to a computed point in right-of-way of Palmer Road; (3) with an arc of a circular curve to the left having a radius of 935.59 feet, an arc length of 99.73 feet, chord:(South 02°59'44" West 99.68 feet) to a computed point in right-of-way of Palmer Road; (4) with an arc of a circular curve to the left having a radius of 57140.41 feet, an arc length of 101.55 feet, chord:(South 00°06'33" East 101.55 feet) to a computed point in right-of-way of Palmer Road; thence with another line of Marvin Leroy Moss and Carolyn Moss and continuing with the line of Shyland Clark Moss as described in Deed Book 1447, Page 1026 of said Registry the following two (2) courses and distances: (1) with an arc of a circular curve to the right having a radius of 1060.22 feet, an arc |

11273420v8

| | | | | |
|---|---|---|---|---|
| | | | | length of 105.22 feet, chord:(South 02°40'58" West 105.17 feet) to a computed point in right-of-way of Palmer Road; (2) with an arc of a circular curve to the right having a radius of 5377.31 feet, an arc length of 222.20 feet, chord:(South 06°42'34" West 222.18 feet) to an existing nail in Palmer Road, said nail being the northwest corner of Martha W Peacock property as described in Deed Book 928, Page 125 of said Registry; thence along and with the line of Martha W Peacock South 06°48'40" West a distance of 448.83 feet to an existing nail being the point or place of BEGINNING, containing 3,163,469 Sq. Ft or 72.623 acres more or less, as shown on a survey by James H Mauney, Jr., PLS # L-3885, with James Mauney & Associates, P.A., Dated December 21, 2017, bearing file No. F1799 |
| Calvert City, Kentucky | American Property Acquisition, LLC | Fee | 1035 Shar Cal Rd., Calvert City, KY 42029 | That certain tract of land located in Marshall County, Kentucky containing 35.6193 acres identified as Tract "A" on that certain Plat of Survey of Tract "A" of the Holliwood, LLC Property prepared by Ricky A. Tosh, PLS 2900 of the firm of Dummer Surveying & Engineering Services, Inc. of Paducah, Kentucky on October 24, 2018 (the "Survey"). A copy of the Survey is attached hereto as Exhibit A-1 and the Property is more particularly described as follows:<br><br>Bearings described herein are based on a record bearing of North 69 Degrees 49 Minutes 16 Seconds East along the south right of way of Shar-Cal Road as recorded in Deed Book 455, Page 649.<br><br>All rebars and caps (set) are 1/2" diameter by 18" long rebar with a plastic cap stamped "R. TOSH KYPLS 2900".<br><br>Beginning at a rebar and cap (set), 40.00 feet south at right angles to the road centerline, said rebar being located North 69 Degrees 19 Minutes 13 Seconds East for a distance of 1143.89 feet from the northwest corner of the parent tract, said rebar also being located at Kentucky State Plane Coordinate North: 1912546.019 East: 867551.183; Latitude: 37°03'03.62520" Longitude: 88°23'55.44549";<br><br>Thence North 69 Degrees 49 Minutes 16 Seconds East for a distance of 766.20 feet to a 1/2" diameter rebar and cap stamped "FMT ENGRS KRLS 1842" (found) 40.00 feet south of the road centerline;<br><br>Thence with a curve turning to the right with an arc length of 78.12 feet, with a radius of 1,902.23 feet, with a chord bearing of North 70 Degrees 59 Minutes 43 Seconds East, with a chord length of 78.11 feet, to a rebar and cap (set) 40.00 feet south of the road centerline; |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | Thence South 17 Degrees 49 Minutes 42 Seconds East for a distance of 15.00 feet to a rebar and cap (set) 55.00 feet south of the road centerline;<br><br>Thence with a curve turning to the right with an arc length of 76.76 feet, with a radius of 1,887.23 feet, with a chord bearing of North 73 Degrees 20 Minutes 13 Seconds East, with a chord length of 76.76 feet, to a rebar and cap (set) 55.00 feet south of the road centerline;<br><br>Thence with a compound curve turning to the right with an arc length of 483.67 feet, with a radius of 1,637.02 feet, with a chord bearing of North 80 Degrees 02 Minutes 09 Seconds East, with a chord length of 481.91 feet, to a rebar and cap (set) 40.00 feet south of the road centerline;<br><br>Thence with a compound curve turning to the right with an arc length of 108.83 feet, with a radius of 1,902.23 feet, with a chord bearing of South 89 Degrees 15 Minutes 12 Seconds East, with a chord length of 108.81 feet, to a 1/2" diameter rebar and cap stamped "FMT ENGRS KRLS 1842" (found) 40.00 feet south of the road centerline;<br><br>Thence South 87 Degrees 36 Minutes 47 Seconds East for a distance of 345.40 feet to a rebar and cap (set) 40.00 feet south of the road centerline;<br><br>Thence severing the lands of Holliwood, LLC described in Tract 1 of Deed Book 455, Page 649 the following (6) six courses:<br><br>1. South 02 Degrees 36 Minutes 01 Seconds West for a distance of 858.39 feet to a rebar and cap (set);<br>2. North 88 Degrees 18 Minutes 57 Seconds West for a distance of 1,284.90 feet to a rebar and cap (set);<br>3. South 02 Degrees 33 Minutes 49 Seconds West for a distance of 600.57 feet to a rebar and cap (set);<br>4. North 87 Degrees 22 Minutes 33 Seconds West for a distance of 189.74 feet to a rebar and cap (set);<br>5. North 42 Degrees 27 Minutes 43 Seconds West for a distance of 431.81 feet to a rebar and cap (set);<br>6. North 02 Degrees 28 Minutes 45 Seconds East for a distance of 728.09 feet to the point of beginning and being a part of the Tract 1 described in Deed Book 455, Page 649. |

11273420v8

| | | | | |
|---|---|---|---|---|
| | | | | TOGETHER WITH:<br><br>Any and all rights and easements to which the Property is benefited by reason of that certain Declaration of Easements recorded in Deed Book _165_, Page _596_ in the Marshall County Clerk's Office.<br><br>Being a portion of the same property acquired by Holliwood LLC, a Kentucky limited liability company, by Deed dated November 6, 2017, of record in Deed Book 455, Page 649 in the Marshall County Clerk's Office. |
| Muskogee, Oklahoma | Core Scientific | Fee | 1525 W Smith Ferry Rd, Muskogee, OK 74401 | **The east half of the east half of the NW¼ AND the east half of the west half of the east half of the NW¼ of Section 15, Township 14 North, Range 18 East of the Indian Base and Meridian, Muskogee County, Oklahoma.**<br>**and**<br>**A tract of land in the NW/4 of Section 15, Township 14 North, Range 18 East of the Indian Meridian, Muskogee County, Oklahoma, more particularly described as follows:**<br>**Beginning at the northeast corner of the west half of the west half of the SE/4 of the NW/4; thence S01°37'08"E along the east line thereof 180.00 feet; thence S88°45'27"W 400.00 feet; thence N01°37'08"W 180.00 feet to the north line of said SW/4 of the NW/4; thence continuing N01°37'08"W 276.45 feet; thence N88°48'27"E 400.00 feet to a point on the east line of the west half of the west half of the NW/4 at 1043.58 feet south of the northeast corner thereof; thence S01°37'08"E along said line 276.45 feet to the point of beginning** |

11273420v8

| | | | | |
|---|---|---|---|---|
| Barstow, Texas (Cedarvale) | Core Scientific, Inc. | Fee | 303 FM 516 N. Barstow, TX 79777 | BEING A 43.41 ACRE TRACT OF LAND SITUATED IN SECTION 229, BLOCK 34, H. & T.C. RR. CO. SURVEY, ABSTRACT NO. 292, WARD COUNTY, TEXAS, BEING A PART OF A CALLED 135 ACRE TRACT OF LAND CONVEYED TO C. S. MAJORS, AS RECORDED IN VOLUME 33, PAGE 592, OFFICIAL PUBLIC RECORDS, WARD COUNTY, TEXAS. SAID 43.41 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:<br><br>BEGINNING AT A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE SOUTHEAST CORNER OF SAID 43.41 ACRE TRACT, FROM SAID CORNER A 1/2" CAPPED IRON ROD FOUND FOR THE SOUTHEAST CORNER OF SAID SECTION 229 BEARS S 07°25'59" W, A DISTANCE OF 2395.13 FEET (TIE). SAID SET 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" BEING CALLED THE POINT OF BEGINNING AND HAVING A TEXAS COORDINATE SYSTEM OF 1983, CENTRAL ZONE (4203), STATE PLANE COORDINATE OF N: 10528546.63, E: 1326591.79 FEET, FOR REFERENCE.<br><br>THENCE N 59°29'33" W, A DISTANCE OF 567.34 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE SOUTHWEST CORNER OF SAID 43.41 ACRE TRACT FROM WHICH A FOUND 1" IRON ROD BEARS S 42°42'20" W, A DISTANCE OF 1840.32 FEET (TIE);<br><br>THENCE N 42°42'20" E, A DISTANCE OF 3483.15 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE NORTHWEST CORNER OF SAID 43.41 ACRE TRACT, FROM WHICH A FOUND 60D NAIL BEARS S 30°18'49" E, A DISTANCE OF 70.14 FEET (TIE);<br><br>THENCE S 47°19'55" E, A DISTANCE OF 550.09 FEET TO A 1/2" CAPPED IRON ROD STAMPED "TRANSGLOBAL SERVICES" SET FOR THE NORTHEAST CORNER OF SAID 43.41 ACRE TRACT, FROM WHICH A MONUMENT FOUND FOR THE NORTHEAST CORNER OF SAID SECTION 229 BEARS S 47°19'55" E, A DISTANCE OF 1443.13 FEET (TIE);<br><br>THENCE S 42°37'48" W, A DISTANCE OF 3363.64 FEET TO THE POINT OF BEGINNING, CONTAINING 43.41 ACRES OR 1,890,906 SQUARE FEET OF LAND, MORE OR LESS. |

| | | | | |
|---|---|---|---|---|
| Pecos, Texas | **Landlord**: Jobe Ranch Family Limited Partnership<br><br>**Tenant**: Core Scientific, Inc. | Leasehold estate | 1851 FM 2119, Pecos Texas 79772 | Being a 60.00-acre surface lease located in the T. & P. RR. Co. Survey, Section 6, Block 55, Abstract 3149 and the T. & P. RR. Co. Survey, Section 6, Block 55, Abstract 3148, Reeves County, Texas; being part of a tract of land described in Deed to Jobe Ranch Family Limited Partnership as recorded in Volume 937, Page 328 of the Official Public Records of Reeves County Texas; said surface lease being more particularly described as follows:<br><br>**BEGINNING** at a 3-inch iron pipe found for the Northwest corner of said Section 6;<br><br>**THENCE** N 01°42'45" E, a distance of 642.18 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** S 62°55'34" E, a distance of 2,278.78 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** S 01°38'17" W, a distance of 780.09 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner;<br><br>**THENCE** N 88°21'43" W, a distance of 2,058.72 feet, to a 1/2-inch capped iron rod stamped "DATAPOINT 10194585" set for corner, from which a 1/2-inch capped iron rod found for the Northeast corner of Public School Lands Survey, Section 48, Block 57, Abstract 5055 bears S 01°44'36" W a distance of 2,354.38 feet;<br><br>**THENCE** N 01°38'17" E, a distance of 1,116.65 feet, to the **POINT OF BEGINNING**, in all containing 2,613,600 square feet or 60.00 acres, more or less. |
| Dalton, Georgia | Dalton-Whitfield County Joint Development Authority | Leasehold estate Leased<br><br>(obligation to purchase for $10 following the expiration (i.e., December 1, 2030) or sooner termination of the Lease) | 206 Boring Drive, Dalton, GA 30721 | All that tract or parcel of land lying and being in Land Lot No. 48 in the 13th District and 3rd Section of Whitfield County, Georgia, being Lot Nos. 8, 9, 10, and 11, as shown on Final Subdivision Plat for Whitfield Properties Industrial Park South, Phase 2, as prepared by Whitfield Engineering Company, dated October 4, 2000, revised November 2, 2000, as more particularly depicted on a plat recorded in Plat Cabinet C, Slides 2198 and 2199, Records of Whitfield County, Georgia, which plat is incorporated herein by reference hereto. |
| Grand Forks, | **Landlord**: Minnkota | Leasehold estate | 5601 11th | Lot 2, Block 1, Prairie Power Addition, Grand Forks County, North Dakota<br>Parcel No. 44-2626-00002-000 |

11273420v8

| | | | | |
|---|---|---|---|---|
| North Dakota | Power Cooperative<br><br>**Tenant**: Core Scientific, Inc. | | Avenue South, Grand Forks, ND 58201 | |

**Schedule 1.1 (b)**

**Commitment Letter**

*See attached.*

11273420v8

**EXECUTION VERSION**

**B. Riley Commercial Capital, LLC**
299 Park Avenue
New York, NY 10171

**PRIVILEGED AND CONFIDENTIAL**
**SUBJECT TO FRE RULE 408 & EQUIVALENTS**

January 29, 2023

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attn: Todd DuChene; President, Chief Legal Officer and Secretary

**Commitment Letter**

Dear Ladies and Gentleman:

You have informed **B. Riley Commercial Capital, LLC** (the "***DIP Lender***") that Core Scientific, Inc., a Delaware corporation (the "***Company***") and certain of the Company's direct and indirect subsidiaries (collectively and together with the Company, the "***Debtors***" and "***you***") referred to in the DIP Term Sheet attached hereto as ***Annex A*** (including[1] all exhibits and schedules thereto, the "***DIP Term Sheet***"; capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Sheet) have commenced cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under Case No. ***22-90341 (DRJ) (Jointly Administered)***, and wish to obtain the up to $70,000,000 DIP Facility referenced in the DIP Term Sheet, substantially on the terms set forth in this letter, as well as the DIP Term Sheet (such letter and the DIP Term Sheet, collectively, the "***Commitment Letter***"). The transactions contemplated by the DIP Term Sheet and this Commitment Letter are hereinafter collectively referred to as, the "***Transactions***".

1. Upon the terms and subject only to the conditions set forth in this Commitment Letter (including paragraph 3 hereof) and the DIP Term Sheet (including the "Conditions Precedent to Closing and Funding the Initial Draw" set forth in the DIP Term Sheet), the DIP Lender is pleased to inform you of its commitment to provide up to $70,000,000 of the DIP Commitments (as defined in the DIP Term Sheet). You hereby agree that, effective upon your acceptance of this Commitment Letter, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the DIP Facility or any other senior financing similar to or as a replacement of any component of the DIP Facility.

2. In consideration of the DIP Lender's commitments hereunder, the Company agrees to pay the fees described in the DIP Term Sheet on the terms and subject to the conditions (including as to timing and amount) set forth therein, including, without limitation the fees required to be paid to the DIP Agent and the DIP Lender by the Debtors as described therein under the heading "Interim Order".

3. The DIP Lender's commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction or waiver in writing (by the DIP Lender) of all conditions precedent set forth in this Commitment Letter and the DIP Term Sheet, including those conditions precedent set forth across the heading "Conditions Precedent to Closing" and, in the case of the borrowing of any DIP Loans after the Closing Date, also the conditions precedent set forth across from the heading "Conditions Precedent to Full Availability of DIP Loans", in each case, in the DIP Term Sheet.

[1] For the avoidance of doubt, the terms "include", "includes" and "including" as used in this Commitment Letter are by way of example and not limitation, and shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by such words.

4. The Company, on behalf of itself and the other Debtors, represents and covenants that (i) all information, other than Projections and Lien Information, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates in connection with the Transactions (the "***Information***") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) all financial projections concerning the Debtors and their subsidiaries that have been or will be made available to DIP Lender or its affiliates by the Company or any of its affiliates, advisors or representatives (the "***Projections***") and all information related to all outstanding liens (including, without limitation, mechanics' liens), the amount thereof, the validity of such liens, any claims or counterclaims with respect to such liens and any materials available to offset such liens, in each case, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates (the "***Lien Information***") have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made. You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information, Projections and Lien Information were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information, Projections and Lien Information so that such representations will be correct in all material respects under those circumstances.

5. [Reserved].

6. [Reserved].

7. In addition, please note that the DIP Lender and its affiliates do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, DIP Lender (and each of its partners, officers, directors, employees, affiliates, agents, advisors and attorneys) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to DIP Lender relating to such tax treatment and tax structure. However, the foregoing sentence shall not apply to any information relating to the tax treatment or tax structure to the extent reasonably necessary to enable any person to comply with applicable securities laws. For this purpose, "***tax treatment***" means U.S. federal income tax treatment, and "***tax structure***" is limited to any facts relevant to the U.S. federal income tax treatment of the Transactions.

8. The DIP Lender hereby notifies you that consistent with the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "***PATRIOT ACT***") and 31 C.F.R. § 1010.230 (the "***Beneficial Ownership Regulation***"), it may be required to obtain, verify and record information that identifies you and each Guarantor, which information includes the name and address of you and each Guarantor and other information that will allow the DIP Lender to identify you and each Guarantor, including the delivery of the certification regarding beneficial ownership in relation to you, in accordance with, or as otherwise required by, the PATRIOT ACT and the Beneficial Ownership Regulation. In addition, the DIP Lender may also request corporate formation documents, or other forms of identification, to verify information provided. This notice is given in accordance with the requirements of the PATRIOT ACT and the Beneficial Ownership Regulation and is effective for the DIP Lender, any other lender and agent (including the DIP Agent) in respect of the DIP Facility.

9. As you know, DIP Lender and/or its affiliates may from time to time effect transactions, for their own account or the account of customers, and hold positions in loans or options on loans of the Company and other companies that may be the subject of this Commitment Letter. In addition, DIP Lender and/or its affiliates may from time to time effect transactions and hold positions in securities or options on securities of the Company and other companies that may be the subject of this Commitment Letter. In addition, DIP Lender may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information

concerning the Company and other companies that may be the subject of this Commitment Letter, and such affiliates shall be entitled to the benefits afforded to DIP Lender (subject to any limitations thereof) hereunder.

10. The DIP Lender and its affiliates may have economic interests that conflict with those of the Company. You agree that the DIP Lender will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the DIP Lender and the Company, its stockholders or their affiliates. You acknowledge and agree that (i) the Transactions are arm's-length commercial transactions between the DIP Lender, on the one hand, and the Company and their affiliates, on the other, (ii) in connection therewith and with the process leading to such Transactions the DIP Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors, or any other person, (iii) the DIP Lender has not assumed an advisory or fiduciary responsibility in favor of the Company and their affiliates with respect to the Transactions contemplated hereby or the process leading thereto (irrespective of whether the DIP Lender or any of its affiliates has advised or is currently advising the Company and their affiliates on other matters) or any other obligation to the Company and their affiliates except the obligations expressly set forth in this Commitment Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate. The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto. The Company, on behalf of itself and their affiliates, agrees that it will not claim that the DIP Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and their affiliates, in connection with such Transaction or the process leading thereto.

11. This Commitment Letter (including the DIP Term Sheet) may not be amended or waived except by an instrument in writing signed by the DIP Lender and the Company. This Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed signature page of this Commitment Letter by facsimile or email transmission shall be effective as delivery of a manually executed counterpart thereof.

12. This Commitment Letter (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto (other than the Interim Order), (ii) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, and (iii) may not be assigned by the Company or the DIP Lender without the DIP Lender's or the Company's prior written consent, respectively, and any purported assignment without such consent shall be null and void, (iv) shall be binding upon the parties and their respective successors and assigns, and (v) may not be relied upon or enforced by any other person or entity and is not intended to confer any benefit upon, or create any right in favor of, any person other than the parties hereto except hereto except the entities and persons described in the definition of Indemnified Person. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF EITHER THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO. EACH OF THE COMPANY AND THE DIP LENDER AGREE THAT ANY SUIT OR PROCEEDING ARISING IN RESPECT OF THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET WILL BE TRIED EXCLUSIVELY IN THE BANKRUPTCY COURT AND THE COMPANY AND THE DIP LENDER EACH AGREE TO SUBMIT TO THE JURISDICTION OF, AND TO VENUE IN, SUCH COURT.

13. If any term, provision, covenant or restriction contained in this Commitment Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The DIP Lender and the Company shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes

as close as possible to that of the invalid, void or unenforceable provisions.

14. [Reserved].

15. If you accept the terms and conditions of this Commitment Letter in accordance with, and by the deadline specified in, paragraph 18 hereof, the DIP Lender's commitments and other obligations hereunder will remain effective and terminate on February 2, 2023 at 11:59 p.m. (New York City time) unless prior to such time the Court has entered the Interim Order (the "Termination Date"); provided, that this Commitment Letter may otherwise be terminated by (x) mutual consent of the DIP Lender and the Company, (y) by the DIP Lender by written notice (i) prior to the Company's acceptance hereof or (ii) material breach by the Company of any of the conditions, representations, or its respective obligations or undertakings under this Commitment Letter or the DIP Sheet, as applicable, or (z) by the Company, in its reasonable discretion, to the extent that (i) it determines doing so would be required by its fiduciary duties and (ii) the Company promptly reimburses the DIP Lender, in full in cash, for all of its then-outstanding reasonable and documented fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Lender).

16. Paragraphs 2, 4, 7, 9, 10, 12 and 17 hereof shall remain in full force and effect regardless of whether any DIP Loans are funded or the DIP Documents shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the DIP Lender's commitments hereunder; provided, that your obligations under this Commitment Letter (other than your obligations set forth in paragraphs 4, 5 and 14) shall automatically terminate and be superseded by the Interim Order and/or corresponding provisions of the DIP Documents upon the execution and delivery thereof, as applicable, in each case, solely to the extent such paragraphs (and the content thereof) are covered thereby with retroactive application to the date hereof.

17. Subject to the Bankruptcy Court's approval of the Interim Order, you agree to indemnify and hold harmless the DIP Lender, its respective affiliates and its officers, directors, employees, agents, advisors, consultants, representatives, controlling persons, members and successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("***Losses***") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof, the Transactions, to reimburse each such Indemnified Person from time to time upon their reasonable demand upon presentation of a summary statement, for any reasonable and documented out-of-pocket legal expenses (including one outside local counsel in each relevant jurisdiction) or other expenses incurred in connection with the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (x) gross negligence or willful misconduct or (y) material breach of obligations under this Commitment Letter, in each case, whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You agree that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective equity holders or creditors or any other person or entity arising out of, related to or in connection with any aspect of the Transactions, the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's (a) gross negligence or willful misconduct or (b) breach of obligations under this Commitment Letter.

18. If the foregoing correctly sets forth the DIP Lender's agreement with you, please indicate your acceptance of the terms and conditions of this Commitment Letter (including the DIP Term Sheet) by returning an executed counterpart to this Commitment Letter to the Company's counsel Weil, Gotshal & Manges LLP (by electronic

(pdf) transmission to Maximilien.Pucci-SistiMaisonrouge@weil.com, Claudia.Stantzyk-Guzek@weil.com and Kate.Waterman@weil.com) on or before 11:59 p.m. (New York City time) on January 29, 2023.

We look forward to working with you.

Very truly yours,

**B. RILEY COMMERCIAL CAPITAL, LLC**, as DIP Lender

DocuSigned by:
Bryant Riley
By: 51E1CD56AA4A45C...
Name: Bryant R. Riley
Title: Co-Chief Executive Officer

[Signature Page to Core DIP Commitment Letter]

DocuSign Envelope ID: 99BE7BC5-D9F5-4F8F-885A-1E25B1495AFB Case 22-90341 Document 671 Filed in TXSB on 03/01/23 Page 268 of 393

**ACCEPTED AND AGREED AS OF THE DATE ABOVE:**

**CORE SCIENTIFIC, INC.**

DocuSigned by:

By: Todd DuChene

43048BB7D89C4FE...

Name: Todd DuChene

Title: President, Chief Legal Officer and Secretary

[Signature Page to Core DIP Commitment Letter]

Debtors' Exhibit No. 22
Page 268 of 393

***Annex A***

*(see attached)*

**Core Scientific, Inc.**
**Up to $70,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**THIS TERM SHEET IS PROVIDED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO ENTER INTO THE DEFINITIVE DIP DOCUMENTS (AS DEFINED BELOW). NOTHING IN THIS TERM SHEET IS INTENDED TO REPRESENT A COMMITMENT ON THE PART OF THE PROSPECTIVE DIP AGENT OR DIP LENDER TO ENTER INTO THE DIP FACILITY OR ANY OTHER DEFINITIVE AGREEMENT WITH ANY PERSON**.

*The statements contained in this Term Sheet and all discussions between and among the parties in connection herewith constitute privileged communications that shall not be disclosed or introduced pursuant to Federal Rule of Evidence 408 and/or other applicable law, unless otherwise required by judicial order or applicable law. All assumptions, principles and numbers are based upon and subject to continuing due diligence and are subject to change as the parties' positions develop further.*

| | | |
|---|---|---|
| 1. | ***Borrowers:*** | • Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC (the "**Borrowers**"), as debtors and debtors-in-possession in Case **No. 22-90341 (DRJ) (Jointly Administered)** (together with the cases of certain of its affiliated debtors and debtors-in-possession, the "**Chapter 11 Cases**", and such affiliated debtors, together with the Borrowers, the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") commenced in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on December 21, 2022 (the "**Petition Date")**.<br>• The Borrowers shall, in all cases, be jointly and severally liable for all DIP Obligations (as defined below). |
| 2. | ***Guarantors:*** | • Each of Core Scientific, Inc.'s existing and future, direct and indirect domestic or foreign subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases, including all existing obligors under the Existing DIP Credit Agreement (as defined below) (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**").<br>• The DIP Obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors. |
| 3. | ***DIP Agent and Initial DIP Lender:*** | • B. Riley Commercial Capital, LLC . |

| | | |
|---|---|---|
| 4. | ***Type and Amount of the DIP Facility:*** | • A non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70,000,000 (the "**Maximum DIP Commitment Amount**") consisting of up to $70,000,000 in term loan commitments (the "**DIP Facility**"; the definitive documentation evidencing the DIP Facility being the "**DIP Documents**"; the DIP Lender's commitments under the DIP Facility being the "**DIP Commitments**"; and the loans under the DIP Facility being the "**DIP Loans**").<br>• The borrowing of DIP Loans shall permanently decrease the DIP Commitments and DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Final Order (as defined below).<br>• Loan proceeds to be funded into newly established (or, in the case of the Carve-out Account referred to below, a previously established (expressly for such purpose pursuant to Existing DIP Credit Agreement)) funding accounts, including a carve-out account (to be fully funded (to the extent of any deficiency) in the amount of the Post-Carve-out Notice Amount (as such term shall be defined in the Orders) from the Initial Draw) (the "**Carve-out Account**"), each to be initially maintained at Bank of America, N.A. |
| 5. | ***Initial Availability:*** | • Upon the Bankruptcy Court's entry of the Interim Order (as defined below), and satisfaction of all applicable conditions precedent described herein (the "**Closing Date**"), the Borrowers shall be entitled to make a single draw of DIP Loans in an amount of up to $35,000,000 prior to the entry of the Final Order (the "**Initial Draw**"). |
| 6. | ***Full Availability:*** | • Upon the Bankruptcy Court's entry of the Final Order, and satisfaction of all applicable conditions precedent described herein, following the Initial Draw, the full remaining amount of the then undrawn DIP Facility (after giving effect to any repayments of the Initial Draw prior to the entry of the Final Order) shall be available to the Debtors, subject to compliance with the terms, conditions and covenants described herein and in the DIP Documents in additional draws ("**Other Draws**"). Other Draws shall only be permitted when the Debtors' cash on hand (other than cash in the Carve-out Account) prior to giving effect to such draw is less than $30,000,000. In addition, Other Draws shall be made (x) only in a principal amount of not less than $5,000,000, per draw and (y) in no more than five (5) draws and (z) no more frequently than once every three (3) weeks. In addition, a final single draw (which shall also be deemed to be an "Other Draw" for purposes hereof (other than requiring satisfaction of the conditions set forth in clauses (x) and (y) above)) in an amount not to exceed the amount of the then undrawn DIP Commitment, as then in effect, may be requested; *provided* that at the time of (and prior to giving effect to) such final draw, the Debtors' cash then on hand (other than cash in the Carve-out Account) is less than $30,000,000 (the "**Final Draw**"). |

11226390v13

| | | |
|---|---|---|
| 7. | ***Maturity and Termination*** | • All DIP Obligations (including, without limitation, all capitalized interest and fees) shall be due and payable in full in cash (or such other form of consideration as the DIP Agent and the DIP Lender may agree in their sole discretion) on the earliest of:<br><br>i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent an extension fee (the "**Extension Fee**"), in cash, in an amount equal to three and one-half percent (3.50%) of the aggregate amount of all DIP Obligations drawn and outstanding as of the effective date of the extension (after giving effect to the Final Draw) (any such date being the "**Scheduled Maturity Date**")<br><br>ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**");<br><br>iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents;<br><br>v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility;<br><br>vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and<br><br>vii. 30 days after the date on which a motion to approve the DIP Facility is filed (or such later date as agreed to by the DIP Agent), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**").<br><br>• The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to make the Other Draws or the Final Draw. |
| 9. | ***Interest Rate:*** | • The DIP Loans shall bear interest at a per annum rate equal to ten percent (10.00%), in each case payable in kind in arrears on the first day of each month (the "**Non-Default Interest**").<br><br>• Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.00%), in each case payable in kind, together with the Non-Default Interest, on the first day of each month. |

| | | |
|---|---|---|
| 10. | ***Monthly DIP Agent Fee:*** | • $75,000 per month payable, in cash in advance, to DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter (the "**Monthly DIP Agent Fee**"). |
| 11. | ***Upfront & Exit Premium; Approvals:*** | • An upfront premium of three and one-half percent (3.50%) of the Maximum DIP Commitment Amount (the "**Upfront Premium**"), payable in kind to the DIP Lenders and added to the total amount of the DIP Obligations.<br>• The Upfront Premium shall be approved by the Bankruptcy Court in the Interim Order and shall be deemed fully earned and payable upon entry of the Interim Order.<br>• Following entry of the Interim Order, upon and concurrently with the repayment or satisfaction of the DIP Loans in whole or in part (including any scheduled, mandatory or voluntary prepayment thereof, including upon the acceleration thereof and the final payment at maturity), the Borrowers shall pay to the DIP Agent, in cash, an exit premium equal to five percent (5.00%) of the amount of the DIP Loans being repaid, reduced or satisfied (the "**Exit Premium**").<br>• The Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee shall be approved by the Bankruptcy Court as part of the Interim Order and reaffirmed in the Final Order. |
| 13. | ***Use of Proceeds:*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below<br>i. Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "**Existing DIP Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw);<br>ii. working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries;<br>iii. any adequate protection payments in accordance with the Orders (as defined below);<br>iv. professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date); |

      v. fees and expenses payable under the DIP Facility;

vi. interest and other amounts payable under the DIP Facility; and

vii. funding of the Carve-out Account.

- Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation

a. against the DIP Agent or the DIP Lender, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or

b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;

ii. to prevent, hinder, or otherwise delay the DIP Agent's or the DIP Lender's, as applicable, enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents and the Orders; *provided, however,* this shall not apply to objections by the official committee of the unsecured creditors to the Final Order;

iii. to seek to modify any of the rights and remedies granted to the DIP Agent or the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable;

iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or

| | | |
|---|---|---|
| | | security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless (x) permitted hereunder or under the DIP Documents or unless all DIP Obligations, and claims granted to the DIP Agent or DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or paid in full in cash and the DIP Facility terminated or (y) otherwise agreed to in writing by the DIP Agent and the DIP Lender; or<br><br>v. to pay any amount on account of any claims arising prior to the Petition Date unless such payments are permitted hereunder or under the DIP Documents or otherwise agreed to in writing by the DIP Agent and the DIP Lender, and in each case, included in the Budget, or otherwise approved pursuant to an order of the Bankruptcy Court. |
| 15. | ***Voluntary Prepayments/Mandatory Repayments:*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to, after entry into the Final Order, payment of the Exit Premium; <u>provided</u>, that, any DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order (subject to Section 6 above).<br><br>• Mandatory prepayment of the DIP Loans, together with all previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, including any Exit Premium shall be required from:<br><br>(i) net proceeds from sale, sale/leaseback, sublease of any real estate (or interests therein) identified in Section 16 below; and<br><br>(ii) any Excess Cash (meaning any cash on hand (other cash than in the Carve-out Account), in excess of $50,000,000 as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month).<br><br>• Such prepayments shall be applied first, to any previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the DIP Agent or the DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the DIP Loans then outstanding. |
| 16. | ***Priority and Security:*** | • Subject to the Carve-Out, all obligations of the Borrowers and the Guarantors under the DIP Documents (or hereunder), including, without limitation, all principal, accrued interest, costs, fees, indemnities, reimbursements and premiums provided for herein and herein, and all obligations of the Debtors under the DIP Facility (the "***DIP Obligations***") shall be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority |

11226390v13

over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "***DIP Claims***")

- Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be:

    i. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and

    ii. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):

        a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the DIP Agent and the DIP Lender); limited, with respect to all real property and the facilities, to those located in:

            i. Calvert City, Kentucky;

            ii. Grand Forks, North Dakota;

            iii. Muskogee, Oklahoma;

            iv. Barstow, Texas (Cedarvale);

            v. Pecos, Texas (Cottonwood); and

            vi. Dalton, Georgia; and

        b. is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (ii) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**DIP Collateral**"); provided, however, that any DIP Liens in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

| | | |
|---|---|---|
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements.<br><br>• DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits. |
| 17. | ***Conditions Precedent to Closing:*** | • The Closing and the obligation of the DIP Lender to make the Initial Draw (and the right of the Borrowers to request such Initial Draw) shall be subject to the satisfaction of the conditions precedent set forth below and such other conditions set forth in the Interim Order:<br><br>i. entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>ii. delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>iii. the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Interim Order;<br><br>iv. in addition to the release set forth in Section 30 hereof, the Interim Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;<br><br>v. delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors);<br><br>vi. The DIP Agent shall have received Monthly DIP Agent Fee due and owing on the initial funding date (as set forth above); |

11226390v13

| | | |
|---|---|---|
| | | vii. no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets;<br><br>viii. no Event of Default or event or condition which with the giving of notice or lapse of time, or both, would constitute an Event of Default (a "**Default**") shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); and<br><br>ix. accuracy of representations and warranties of the Debtors in all material respects (or, if such representation and warranty is qualified as to materiality, in all respects) as of the Closing Date and the date of the Initial Draw (or if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition). |
| 18. | ***Conditions Precedent to Full Availability of DIP Loans:*** | • The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws and/or the Final Draw shall be subject to the conditions precedent set forth below, in the Final Order, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), and shall include, without limitation:<br><br>i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Agent and the DIP Lender and the Borrowers and the Guarantors (it being agreed that the Initial Draw may be advanced based on the terms set forth in this Term Sheet and the Interim Order);<br><br>ii. not later than 30 days following the date on which a motion to approve the DIP Facility is filed, the Final Order as to the DIP Facility shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the |

11226390v13

| | | |
|---|---|---|
| | | parties may mutually agree, in all cases, to be acceptable to the DIP Agent;<br>iii. in addition to the release set forth in Section 30 hereof, the Final Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and the DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;<br>iv. the Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal;<br>v. the DIP Agent, the DIP Lenders and the Loan Parties shall have finalized and entered into the DIP Documents relating to the facilities contemplated hereby (and all of which have been approved by Bankruptcy Court);<br>vi. the Debtors shall be in compliance in all respects with the Interim Order and the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents;<br>vii. at the time of each draw, no Default or Event of Default shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition);<br>viii. at the time of each draw, accuracy of representations and warranties of the Debtors in all material respects (or if such representation and warranty is qualified as to materiality, in all respects) as of such date (or, if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition);<br>ix. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Agent and DIP Lender the Interim Order or the Final Order, as applicable;<br>x. delivery of a notice of borrowing, including a certification as to the satisfaction of the condition to the making of any Other Draws;<br>xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Agent or the DIP |

| | | |
|---|---|---|
| | | Lender on or before the Final Draw shall have been paid; and<br><br>xii. The RSA shall have been fully terminated and shall be of no further force or effect. |
| 19. | ***Representations and Warranties:*** | • The Loan Parties shall make and be subject to (and are hereby deemed to agree to and make) the representations and warranties set forth herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| 20. | ***Affirmative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i. the Loan Parties and the DIP Agent agree to discuss in good faith with potential providers thereof and the DIP Agent an agreement to provide for forward sales or hedging arrangements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>ii. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Final Order is entered. |
| 21. | ***Negative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation:<br><br>i. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in clause (ii) of Section 20 above.<br><br>ii. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 above) and, with the DIP Agent's prior consent, the Debtors' real estate listed in Section 16 above, so long as, in each case, net proceeds (including reductions to satisfy claims of |

| | | |
|---|---|---|
| | | other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation. |
| 22. | ***DIP Budget / Variance Reporting:*** | • On or prior to the Closing Date, the Loan Parties shall deliver to the DIP Agent and the DIP Lender an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors through projected emergence (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**").<br><br>• The Budget shall be updated and provided to the DIP Agent and the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of either the Borrowers or the DIP Agent, with such updated Budget extending the term thereof and the DIP Agent, in its reasonable discretion, shall have the right to approve or reject any such updates (or any amendments) by providing the Borrowers specific notice thereof within such four (4) business days after the delivery by the Borrowers of any such update or amendment; provided that, (i) to the extent the DIP Agent does not provide notice of approval or rejection within such four (4) business day period, such update or amendment shall be deemed approved and consented to by the DIP Lender and shall be deemed to constitute the updated approved Budget ("**Updated Budget**") upon the expiration of such 4 business day objection period and, (ii) to the extent the DIP Lender provides notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent.<br><br>• On a weekly basis thereafter, the Borrowers shall deliver to the DIP Agent and DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4 week rolling basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any variance exceeding twenty percent (20%) shall be material (each such report, a |

| | | |
|---|---|---|
| | | "**Variance Report**," which shall be in a form satisfactory to the DIP Agent).<br><br>• For purposes of each Measuring Period, the Debtors shall calculate: (x) the numerical difference between total net receipts (with respect to self-mining and hosted miners) for such period to total net receipts (with respect to self-mining and hosted miners) for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "**Disbursements and Capital Expenditure Variance**"). For the avoidance of doubt, the Disbursements Variance shall not include any amounts in the Budget related to professional fees, utility deposits or adequate assurance payments.<br><br>• For purposes herein, a "Permitted Variance" shall be limited to not greater than (a) twenty-five percent (25%) for budget variances with respect to the Receipts Variance and (b) twenty percent (20%) for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report. |
| 23. | ***Interim Order:*** | • The interim order approving the DIP Facility, which shall include the terms hereof and shall otherwise be in form and substance reasonably acceptable to the DIP Agent and the DIP Lender (the "**Interim Order**"), shall, among other things, authorize and approve:<br>i. the terms set forth in this Term Sheet and the entry into the Commitment Letter to which this Term Sheet is attached;<br>ii. the Initial Draw;<br>iii. the making of the DIP Loans;<br>iv. the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br>v. the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lender as described herein under the heading "*Indemnification and Reimbursement of Expenses*" by the Debtors; it |

| | | |
|---|---|---|
| | | being acknowledged and agreed that all such fees and expenses may and will be withheld from the Initial Draw for direct payment thereof (to the DIP Agent, the DIP Lenders or such counsel and financial advisors) from such Initial Draw (without reducing the obligations of the Debtor to repay the entire amount of the Initial Draw); *provided, however,* notwithstanding anything to the contrary, fees and expenses incurred by the DIP Agent and the DIP Lender prior to the Interim Order and reimbursable pursuant to this clause (v) shall be limited to the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender.<br>vi. the termination of the Existing DIP Credit Agreement and related documents and all liens granted thereunder (and/or the interim order approving such Existing DIP Credit Agreement) as security therefor; and<br>vii. the calculations and payment of the Monthly DIP Agent Fee, the Upfront Premium, the Extension Fee and the Exit Premium, which fee payments shall not be subject to reduction, setoff or recoupment, and shall be fully earned upon entry of the Interim Order. |
| 24. | ***Final Order:*** | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order), with such modifications or additions thereto as may reasonably be required by the DIP Agent or as mutually agreed to by the parties, but in any event, to be in form and substance acceptable to the DIP Agent and the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, and the Final Draw. |
| 25. | ***Carve out*:** | • The "**Carve-Out**" shall, except as otherwise set forth herein, be consistent with the Existing DIP Credit Agreement. |
| 26. | ***Events of Default:*** | • The DIP Facility and the Loan Parties shall be subject to (and the Loan Parties hereby acknowledge and agree that the occurrence or existence thereof will constitute an Event of Default hereunder, under the Orders and under the DIP Documents) the Events of Default set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (the "**Event of Default**"), including, without limitation:<br>i. the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed; |

| | | |
|---|---|---|
| | | ii. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;<br><br>iii. noncompliance, subject to any applicable grace and/or cure periods (other than in the case, among others pursuant the Documentation Principles, of any negative covenant (none of which shall be subject to any grace or cure period, except to the extent incorporated within any such covenant)), by any Loan Party or any of its subsidiaries with the terms of hereof (as giving effect to the Documentation Principles), the DIP Documents, the Interim Order or the Final Order;<br><br>iv. the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the DIP Agent and the DIP Lender;<br><br>v. the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Agent in its sole discretion;<br><br>vi. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) Blockfi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of Blockfi, the debt owing to Blockfi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default;<br><br>vii. the entry of an order (a) surcharging any of the DIP Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the |

11226390v13

DIP Agent, or (c) resulting in the marshaling of any DIP Collateral;

viii. any action by any Debtor to (a) challenge the rights and remedies of the DIP Agent or the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Agent or the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

ix. any Debtor files a motion in the Chapter 11 Cases without the express written consent of DIP Agent to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Facility and all DIP Obligations (including the Exit Premium);

x. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Agent, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Agent, (d) as permitted under the DIP Documents, or (e) as otherwise agreed to by the DIP Agent;

xi. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent and the DIP Lender;

xii. the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or the DIP Claims, (c) contest any material provision of any DIP Document;

xiii. any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent or the DIP Claims;

xiv. The Borrowers, DIP Agent and DIP Lenders do not agree upon the terms of and execute the final DIP Documents (which DIP Documents shall be subject to Bankruptcy Court approval in the Final Order), prior to

| | | |
|---|---|---|
| | | twenty (20) days after the Closing Date (or such later date to which the DIP Agent may otherwise agree), unless such failure is attributable to the DIP Agent's or the DIP Lender's bad faith in negotiating such documents (as determined in a final, non-appealable determination by a court of competent jurisdiction), or the Bankruptcy Court does not approve the Debtors' entry into the final DIP Documents;<br><br>xv. The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; and/or<br><br>xvi. Any Budget Variance exceeds the applicable Permitted Variance as set forth in the last bullet point in Section 22 above. |
| 27. | ***Milestone:*** | • None. |
| 28. | ***Remedies:*** | • The remedies exercisable by the DIP Agent and the DIP Lender following the occurrence of an Event of Default as set forth above shall be as set forth herein, in the Orders, in the DIP Documents, as deemed incorporated herein pursuant to the Documentation Principles and otherwise as are usual and customary in loan documents for similar debtor-in-possession financings and, in each case, as are acceptable to the DIP Agent and the DIP Lender. |
| 29. | ***Indemnification and Reimbursement of Expenses:*** | • The Loan Parties shall be subject to and liable for the customary indemnifications in favor of the DIP Agent, the DIP Lenders and their related parties as are included herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender).<br><br>• Subject to the DIP Documents and in accordance with the Documentation Principles, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of (i) the DIP Agent and (ii) the DIP Lender, including the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender, and as necessary, other local counsel in their capacity as counsel to the DIP Agent and the DIP Lender, incurred in connection with, the preparation, analysis, negotiation, documentation, execution and enforcement of, or actions or suits relating to, this Term Sheet, the related commitment letter, the DIP Documents, the Orders and/or otherwise in connection with the DIP Facility and the Chapter 11 Cases and/or the transactions contemplated thereby, shall be paid on a current basis provided, however, notwithstanding anything to the contrary, fees and expenses incurred prior to the Interim Order and reimbursable hereunder shall be limited to those of Choate, Hall & Stewart LLP, as counsel to the DIP Lender. |

| | | |
|---|---|---|
| 30. | ***Release:*** | • The Orders shall include a customary release of the DIP Agent and DIP Lender, each in their capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| 31. | ***Waivers:*** | • The Orders shall include, in addition to those set forth herein, terms and conditions customary for final DIP financing orders or which shall otherwise be acceptable to the DIP Agent and DIP Lender (in their discretion), including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable. |
| 32. | ***Governing Law:*** | • New York (and to the extent applicable, the Bankruptcy Code). |
| 33. | ***Documentation Principles:*** | • Without limiting and with the exception of any of the express provisions in this term sheet and/or in the Interim DIP Order or the Final Order, (x) until such time as definitive DIP Documents have been negotiated and executed by the Debtors, the DIP Agent and the DIP Lenders and approved by the Bankruptcy Court, the undertakings, restrictions, duties and obligations of the Debtors and the rights, remedies, protections, privileges, exculpations, and rights of reimbursement and indemnity of the DIP Agent and the DIP Lenders hereunder shall, in each case, be deemed to be governed by the terms of the Existing DIP Credit Agreement (unless and to the extent otherwise agreed to by the DIP Agent its discretion) as if the DIP Agent and the DIP Lenders were making the DIP Loans and the Debtors were incurring the DIP Obligations, in each case, under and pursuant to such Existing DIP Credit Agreement (and such agreement were among the Debtors, the DIP Agent and the DIP Lender), including as relating to the conditions precedent to lending, representations and warranties of the Debtors, affirmative and negative covenants and undertakings of the Debtors, events of default and the consequences thereof and the rights and remedies of the DIP Agent and the DIP Lender relating thereto, the agreements in Sections 3.4 through 3.7 and Sections 12 through Section14 of the Existing DIP Credit Agreement, together in each case with the related definitions (to the extent relevant) and (y) the DIP Documents shall be based on the Existing DIP Credit Agreement, with such additions and modifications thereto as the DIP Agent deems reasonably appropriate to reflect the terms of this Term Sheet or which are usual and customary for similar debtor-in-possession financings or which the DIP Agent and the Borrowers deem reasonably appropriate in light of the transactions contemplated hereby (collectively, the "**Documentation Principles**"). Until such time as the DIP Documents are fully-executed and approved by the Bankruptcy Court, in the event of a conflict between the terms of the Existing DIP Credit Agreement and the terms set forth in this term sheet or the Interim Orders, the terms of this term sheet and the Interim Order shall control. Notwithstanding anything to the contrary |

| | | |
|---|---|---|
| | | herein, in the event of (and solely to the extent of) any direct conflict between the provisions of the Interim Order and this Term Sheet (as so interpreted to incorporate the terms of the Existing DIP Credit Agreement), the terms of the Interim Order shall control. |

**Schedule 6.2.1**

**List of Closing Documents**

1. Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of the Closing Date, by and among, among others, the Obligors, the Administrative Agent, and the Lenders.

2. Commitment Letter, dated as of January 29, 2023, by and between the Obligor Representative and the Administrative Agent.

3. Guaranty Agreement, dated as of the Closing Date, by and among the Guarantors and the Administrative Agent.

4. Perfection Certificate, dated as of the Closing Date, delivered by the Obligors.

5. Global Intercompany Note and Allonge thereto, each dated as of the Closing Date, executed by the Obligors.

6. Intercompany Subordination Agreement, dated as of the Closing Date, by and among the Obligors and the Administrative Agent.

7. Side Letter Agreement, dated as of the Closing Date, by and between the Obligor Representative and the Administrative Agent.

8. Trademark Security Agreement, dated as of the Closing Date, by and between each Grantor noted therein and the Administrative Agent.

9. Patent Security Agreement, dated as of the Closing Date, by and between each Grantor noted therein and the Administrative Agent.

10. UCC-1 financing statements in favor of the Administrative Agent covering all assets of Core Scientific, Inc.; Core Scientific Operating Company; American Property Acquisition, LLC; American Property Acquisitions I, LLC; American Property Acquisitions VII, LLC; Core Scientific Acquired Mining LLC; CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC; Radar Relay, Inc.; Starboard Capital LLC; RADAR LLC; and Core Scientific Mining LLC and in each case, filed in the appropriate filing office for each Obligor.

11. Subject to Schedule 6.3, Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Financing Statement, to be entered into after the Closing Date, by American Property Acquisitions I, LLC in favor of the Administrative Agent with respect to the Marble Real Property.

12. Subject to Schedule 6.3, each of the Control Agreements set forth therein.

**Schedule 6.3**

**Conditions Subsequent**

(a) Within one (1) day after the entry of the Final DIP Order by the Bankruptcy Court, so long as summary invoices of such DIP Professional Fees and Expenses and the Noteholder Professional Fees and Expenses are provided to the lead restructuring counsel to the Debtors and to counsel to the Official Committee (as defined in the Final DIP Order) prior to the entry of the Final DIP Order, and such invoices shall not be subject to the review procedures set forth in paragraphs 11(a) and 11 (b) of the Final DIP Order, the Obligors shall pay or cause to be paid, all reasonable and documented fees, costs, expenses and disbursements of the Administrative Agent and Lenders, including, without limitation, the fees, costs and expenses of counsel and other advisors engaged by the Administrative Agent and the Lenders in connection with the negotiation, preparation, documentation and execution of the Commitment Letter, the Credit Agreement, the other Loan Documents, the DIP Orders, the participation in the Chapter 11 Cases and the consummation of the transactions contemplated hereby and thereby, in each case, subject to the limitations thereon set forth in the Credit Agreement.

(b) As soon as reasonably practicable, but in no event later than ten (10) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, the original signatures of each of the parties to the Global Intercompany Note and the Allonge thereto.

(c) As soon as reasonably practicable, but in no event later than ten (10) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, evidence that the account holder of Bank of America, N.A. Deposit Account ending –x7616 has been transferred from Blockcap, Inc. to Core Scientific Acquired Mining LLC, which evidence shall be in form and substance reasonably satisfactory to the Administrative Agent (such requirement the "Account Holder Change").

(d) As soon as reasonably practicable, but in no event later than ten (10) Business Days after the satisfaction of the Account Holder Change (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, a Control Agreement with respect to Core Scientific and Core Scientific Acquired Mining LLC's respective Bank of America, N.A. Deposit Accounts ending –x6773, -x7616, -x7360 and –x7817, duly executed by and among each of the applicable parties thereto and in form and substance reasonably satisfactory to the Administrative Agent.

(e) As soon as reasonably practicable, but in no event later than fifteen (15) Business Days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, (x) amendments to the bylaws of Core Scientific Operating Company and Radar Relay, Inc. or (y) to the extent the Obligors do not elect to amend such bylaws pursuant to the preceding clause, stock certificates and corresponding stock powers (executed in blank) with respect to all issued, outstanding and certificated Equity Interests of Core Scientific Operating Company and Radar Relay, Inc., in

each case in the foregoing clauses (x) and (y), in form and substance reasonably satisfactory to the Administrative Agent.

(f) As soon as reasonably practicable, but in no event later than twenty (20) calendar days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver or cause to be delivered, to the Administrative Agent, the insurance endorsements required by Section 8.6.1 of the Credit Agreement, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

(g) As soon as reasonably practical, but in no event less than thirty (30) calendar days after the Closing Date (or such later date as may be agreed to by the Administrative Agent), the Obligors shall deliver, or cause to be delivered, to the Administrative Agent, with respect to the Marble Real Property, a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Financing Statement, duly executed by and between the applicable parties thereto, in connection with the Marble Real Property.

**<u>Schedule 7.1(c)</u>**

**Commercial Tort Claims**

None.

**Schedule 7.3(a)**

**Equity Interests and Debt Securities**

| Owner | Issuer | % of Ownership | Certificated? |
|---|---|---|---|
| Core Scientific, Inc. | Core Scientific Operating Company | 100% | No[1] |
| Core Scientific, Inc. | Core Scientific Acquired Mining LLC | 100% | N/A |
| Core Scientific, Inc. | Core Scientific Mining LLC | 100% | N/A |
| Core Scientific Acquired Mining LLC | Radar Relay, Inc. | 100% | No[2] |
| Radar Relay, Inc. | Starboard Capital LLC | 100% | N/A |
| Radar Relay, Inc. | RADAR LLC | 100% | N/A |
| Core Scientific Operating Company | CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC | 100% | N/A |

[1] To the extent the interests of Core Scientific Operating Company become certificated, share certificates and stock transfer powers will be delivered to the Administrative Agent in accordance with Schedule 6.3 of the DIP Credit Agreement.

[2] To the extent the interests of Radar Relay, Inc. become certificated, share certificates and stock transfer powers will be delivered to the Administrative Agent in accordance with Schedule 6.3 of the DIP Credit Agreement.

| | | | |
|---|---|---|---|
| Core Scientific Operating Company | American Property Acquisition, LLC | 100% | N/A |
| American Property Acquisition, LLC | American Property Acquisitions I, LLC | 100% | N/A |
| American Property Acquisition, LLC | American Property Acquisitions VII, LLC | 100% | N/A |
| Core Scientific, Inc. (99% owner) Core Scientific Partners GP, LLC (1% owner) | Core Scientific Partners, LP | Core Scientific, Inc. (99% owner) Core Scientific Partners GP, LLC (1% owner) | N/A |
| Core Scientific, Inc. | Core Scientific Partners GP, LLC | 100% | N/A |
| Core Scientific Partners, LP | CSP Advisors, LLC (SMLLC) | 100% | N/A |
| Core Scientific Partners, LP (99% owner) and Core Scientific Partners GP, LLC (1% owner) | CSP Liquid Opportunities GP, LP | Core Scientific Partners, LP (99% owner) and Core Scientific Partners GP, LLC (1% owner) | N/A |
| CSP Liquid Opportunities GP, LP | CSP Liquid Opportunities Fund, LP | 100% | N/A |

11273420v8

| | | | |
|---|---|---|---|
| CSP Liquid Opportunities GP, LP | CSP Liquid Opportunities Master Fund, LP | 100% | N/A |

11273420v8

**Debt Securities**

None.

**Schedule 8.5**

**Deposit Accounts, Security Accounts, Commodity Accounts**

| Name of Entity on the Account | Name and Address of Bank | Account Number | Type of Account |
|---|---|---|---|
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle, WA | 501014796773[1] | Deposits Account |
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle, WA | 501014796786[2] | Deposits Account |
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle WA | 501014717817 | Concentration |
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle WA | 501014727713[3] | Disbursement |
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle WA | 501014837360 | Utilities Deposits |
| Core Scientific, Inc. | Bank of America<br>800 5th Ave<br>Seattle WA | 5S404Z19-438262 | Overnight Deposits |
| Core Scientific Acquired Mining LLC (f/k/a BlockCap, Inc.) | Bank of America<br>800 5th Ave<br>Seattle WA | 501014837616 | General |
| Core Scientific, Inc. | City National Bank<br>555 South Flower St<br>Los Angeles CA | 433007395 | General |

[1] Dip Funding Account

[2] Excluded Account

[3] Excluded account

11273420v8

| Name of Entity on the Account | Name and Address of Bank | Account Number | Type of Account |
|---|---|---|---|
| Core Scientific, Inc. | City National Bank<br>555 South Flower St<br>Los Angeles CA | 433057589[4] | Credit Card |
| Core Scientific, Inc. | Bremer Bank<br>3100 S Columbia Road<br>Grand Forks ND | 41531154[5] | General |

[4] Excluded Account

[5] Excluded Account

**Schedule 9.1.4**[1]

**Names and Capital Structure**

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| Core Scientific, Inc. | Delaware | Authorized: 12,000,000,000<br>Issued: 373,799,959 | | Warrant Agreement dated March 19, 2020, by and between Michael Levitt and Core Scientific, Inc. (expires March 10, 2023)<br><br>Warrant Agreement dated January 30, 2021, by and between Jack Novak and Core Scientific, Inc. (expires January 30, 2023)<br><br>Bridge Promissory Note dated April 7, 2022, by and between B. Riley Commercial Capital, LLC and Core Scientific, Inc. | 0 |

[1] This schedule does not include RSU grants and outstanding options granted to employees.

11273420v8

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | Bridge Promissory Note dated April 7, 2022, by and between BRF Finance Co, LLC and Core Scientific, Inc. | |
| Core Scientific Operating Company | Delaware | Authorized: 250,000,000.00<br>Issued: 100 | Core Scientific, Inc. | Agreement and Plan of Merger of Core Scientific, Inc and Core Scientific Acquisition Co. dated August 14, 2020[2] | 0 |
| American Property Acquisition, LLC | Delaware | 100% | Core Scientific Operating Company | Operating Agreement dated May 17, 2018 and amended on December 14, 2022 | 0 |
| American Property Acquisitions I, LLC | North Carolina | 100% | American Property Acquisition, LLC | A&R Operating Agreement dated May 19, 2020 and amended on December 14, 2022 | 0 |
| American Property Acquisitions VII, LLC | Georgia | 100% | American Property Acquisition, LLC | A&R Operating Agreement dated May 17, 2020 and | 0 |

[2] Core Scientific, Inc. was the surviving entity.

11273420v8

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | amended on December 14, 2022 | |
| Core Scientific Acquired Mining LLC | Delaware | 100% | Core Scientific, Inc | A&R LLC Agreement as amended on December 14, 2022<br><br>Common Stock Purchaser Agreement dated July 14, 2021 by and between Block Merger Sub, Inc and Core Scientific Holdings Co.[3] | 0 |
| CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC | Delaware | 100% | Core Scientific Operating Company | A&R Operating Agreement dated May 19, 2020 | 0 |
| Radar Relay, Inc. | Delaware | Authorized: 1000<br>Issued: 1 | Core Scientific Acquired Mining LLC | 2nd Amended and Restated Certificate of Radar Relay, Inc.<br>Agreement and Plan of Merger dated June 4, 2021 by and between Radar Relay, Inc., Blockcap, Inc | 0 |

[3] Core Scientific, Inc. was the surviving entity

| Legal Name | Jurisdiction of Organization | Authorized and Issued Equity Interest | Holder of Equity Interest | Agreements Binding on Holder of Equity Interests | Preferred Stock |
|---|---|---|---|---|---|
| | | | | and Rdr Luv, Inc.[4] | |
| Starboard Capital LLC | Colorado | 100% | Radar Relay, Inc. | Operating Agreement dated July 20, 2022 and amended on December 14, 2022 | 0 |
| RADAR LLC | Colorado | 100% | RADAR LLC | Operating Agreement dated December 23, 2019 and amended on December 14, 2022 | 0 |
| Core Scientific Mining LLC | Texas | 100% | Core Scientific, Inc. | Limited Liability Company Agreement dated as of December 14, 2022 | 0 |

[4] Radar Relay, Inc. was the surviving entity.

**Schedule 9.1.10**

**Patents, Trademarks, Copyrights and Licenses**

**(i) United States Patents:**

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 2/5/2019 | 10,701,835 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY HAVING A PLURALITY OF SUPPLY AIR SPACES | Granted | 2/5/2019 | 10,806,055 | 10/13/2020 | Core Scientific Inc. |
| COMPUTING DEVICE COOLING FACILITY INCLUDING A MIXING CHAMBER | Granted | 2/5/2019 | 10,694,642 | 6/23/2020 | Core Scientific Inc. |
| SYSTEM FOR PASSIVELY COOLING COMPUTING DEVICES | Granted | 2/5/2019 | 10,701,837 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM FOR COOLING COMPUTING DEVICES OF A PLURALITY OF FACILITIES | Granted | 2/5/2019 | 10,701,836 | 6/30/2020 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 8/2/2018 | 10,299,412 | 5/21/2019 | Core Scientific Inc. |
| COMPUTING SYSTEM AND METHOD | Patent App | 1/30/2020 | 16/777503 | | Core Scientific Inc. |
| LOAD CENTER WITH INTEGRATED RECEPTACLES | Patent App | 11/8/2019 | D968,336 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | Granted | 8/1/2019 | 10,908,658 | 2/2/2021 | Core Scientific Inc. |
| HARVESTING REMNANT CYCLES IN SMART DEVICES | Patent App | 9/30/2019 | 16/587860 | | Core Scientific Inc. |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| COMPUTING SYSTEM TRANSLATION TO PROMOTE EFFICIENCY | Granted | 9/30/2019 | 11,068,292 | 7/20/2021 | Core Scientific Inc. |
| EFFICIENT COMPUTING IN VEHICLES | Granted | 10/21/2019 | 11,485,241 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | Granted | 12/9/2019 | 11,178,021 | 11/16/2021 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | Granted | 12/9/2019 | 11,489,736 | 11/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR HEALTH REPORTING IN A DATA CENTER | Patent App | 12/9/2019 | 16/707964 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | Granted | 1/29/2020 | 10,691,528 | 6/23/2020 | Core Scientific Inc. |
| COMMUNICATION NETWORK FOR GAMING REWARDS | Patent App | 4/6/2020 | 16/841659 | | Core Scientific Inc. |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTE | Granted | 1/31/2020 | 10,783,410 | 9/22/2020 | Core Scientific Inc. |
| WORK PROVENANCE IN COMPUTING TOOLS | Patent App | 6/12/2020 | 16/900860 | | Core Scientific Inc. |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | Granted | 5/20/2020 | 11,249,835 | 2/15/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | Granted | 5/20/2020 | 11,237,605 | 2/1/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | PCT | 7/22/2020 | PCT/US2020/43086 | | Core Scientific Inc. |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | PCT | 7/22/2020 | PCT/US2020/43088 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| HEALTH REPORTING FOR COMPUTING DEVICES | Granted | 7/22/2020 | 11,567,821 | 1/31/2023 | Core Scientific Operating Company |
| MEASURING AIRFLOW FOR COMPUTING DEVICES | Granted | 7/24/2020 | 10,942,195 | 3/9/2021 | Core Scientific Inc. |
| RACK FOR COOLING COMPUTING DEVICES | Patent App | 7/24/2020 | 11,363,743 | 6/14/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | Granted | 8/12/2020 | 11,403,476 | 8/2/2022 | Core Scientific Inc. |
| MEASURING AIRFLOW FOR COMPUTING DEVICES | Granted | 10/21/2020 | 11,092,614 | 8/17/2021 | Core Scientific Inc. |
| COMPUTING DEVICE SYSTEM AND METHOD | Patent App | 11/24/2020 | 17/102604 | | Core Scientific Operating Company |
| CONTAINER-BASED DATA CENTER | Patent App | 10/27/2020 | 17/081393 | | Core Scientific Operating Company |
| MANAGING AIRFLOW FOR COMPUTING DEVICES | Patent App | 11/11/2020 | 17/095310 | | Core Scientific Operating Company |
| DYNAMIC AISLES FOR COMPUTING DEVICES | Granted | 11/11/2020 | 10,959,349 | 3/23/2021 | Core Scientific Operating Company |
| THERMAL MANAGEMENT FOR CONTAINER-BASED DATA CENTERS | Patent App | 11/11/2020 | 17/095335 | | Core Scientific Inc. |
| HELICAL-CONFIGURED SHELVING FOR COOLING COMPUTING DEVICES | Granted | 12/18/2020 | 11,516,942 | 11/29/2022 | Core Scientific Inc. |
| DYNAMIC AISLES FOR COMPUTING DEVICES | Granted | 1/15/2021 | 11,153,988 | 10/19/2021 | Core Scientific Inc. |
| RACK FOR COOLING COMPUTING DEVICES IN A CYLINDRICAL CONFIGURATION | Granted | 1/28/2021 | 11,540,415 | 12/27/2022 | Core Scientific Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | EP | 2/26/2021 | EP/19752872.2 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| WITHIN A FACILITY (EP of 0036) | | | | | |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY (CA of 0036) | CA | 1/29/2021 | CA/3108291 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY (CN of 0036) | CN | 4/1/2021 | 201980064992.5 | | Core Scientific Operating Company |
| hardware for full node (real-time processing service for blockchain) | Trade Secret | N/A | | | Core Scientific Operating Company |
| Stratum update | TBD | | | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES | PCT | 5/14/2021 | PCT/US21/32559 | | Core Scientific Operating Company |
| RACK FOR COOLING COMPUTING DEVICES | PCT | 5/14/2021 | PCT/US21/32564 | | Core Scientific Inc. |
| AUTOMATED SWITCHING OF WORKLOADS (W2M - NP of 0065) | Patent App | 7/23/2021 | 17/383,004 | | Core Scientific Operating Company |
| ENVIRONMENT-BASED TUNING FOR COMPUTING DEVICES (NP of 0091) | Patent App | 9/16/2021 | 17/476,766 | | Core Scientific Operating Company |
| DATA CENTER COOLING (with tubes) (NP of 0092) | Patent App | 9/16/2021 | 17/476,786 | | Core Scientific Operating Company |
| AIR DEFLECTOR FOR COOLING COMPUTING DEVICES (NP of 0093) | Patent App | 9/16/2021 | 17/476,796 | | Core Scientific Operating Company |
| ADJUSTABLE DUCTS FOR COOLING COMPUTING DEVICES (NP of 0094) | Patent App | 9/16/2021 | 17/476,836 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (CA of -0053, -0063) | CA | 9/14/2021 | CA3133672 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (CN of -0053, -0063) | CN | 11/9/2021 | 202080034743.4 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER (EP of -0053, -0063) | EP | 2/22/2022 | EP/20844143.6 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER (CA of PCT 066) | CA | 1/14/2022 | CA/3147648 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER (EP of PCT 066) | EP | 2/10/2022 | EP/20843361.5 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES (CA of PCT 067, US 050) | CA | 1/14/2022 | CA/3147650 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES (EU of PCT 067, US 050) | EP | 2/7/2022 | 843872.1 | | Core Scientific Operating Company |
| RACK FOR COOLING COMPUTING DEVICES IN A HYPERBOLOID CONFIGURATION | Patent App | 1/13/2022 | 17/575,184 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR VISUALLY MANAGING COMPUTING DEVICES IN A DATA CENTER | CN | instr 2/7/2022 | 202080066225.0 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | CN | 4/13/2020 | 202080066226.5 | | Core Scientific Operating Company |
| IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | PCT | 2/28/2022 | PCT/US22/18163 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| SYSTEM FOR COOLING COMPUTING DEVICES IN AN ARRAY | PCT | 3/9/2022 | PCT/US22/19519 | | Core Scientific Operating Company |
| SYSTEM FOR COOLING CIRCUIT BOARDS | PCT | 3/9/2022 | PCT/US22/19521 | | Core Scientific Operating Company |
| TURBULENT AIRFLOW FOR COOLING COMPUTING DEVICES (NP of -0123) | Patent App | 3/10/2022 | 17/691,562 | | Core Scientific Operating Company |
| POWER DISTRIBUTION SYSTEM AND METHOD (NP of -0131) (using PDUs to balance power) | Patent App | 5/5/2022 | 17/737,491 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR OPERATING COMPUTING DEVICES (smart PDU measures power for optimization) (NP of 132) | Patent App | | 17/744,004 | | Core Scientific Operating Company |
| COMPUTING SYSTEM AND METHOD (NP of -0133) ( (#4 proxy for pool - parsing headers, pre-reject and audit hashrate) | Patent App | 5/13/2022 | 17/744,017 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR OPERATING COMPUTERS (NP of -0134) (switching pools) | Patent App | 5/5/2022 | 17/737,505 | | Core Scientific Operating Company |
| HEAT SINK THAT VARIES IN HEIGHT (NP of -0136) | Patent App | 5/6/2022 | 17/738,646 | | Core Scientific Operating Company |
| SYSTEM FOR RECAPTURING WASTE HEAT FROM COMPUTING DEVICES (NP of -0137) | Patent App | 5/6/2022 | 17/738,654 | | Core Scientific Operating Company |
| WASTE ENERGY RECLAMATION WITH DAMPERS (NP of 0138) | Patent App | 5/11/2022 | 17/741,544 | | Core Scientific Operating Company |
| COMPUTER SYSTEM AND METHOD (Optihash) (NP of 0140) | Patent App | 5/13/2022 | 17/744,023 | | Core Scientific Operating Company |
| MULTI-ORACLE (NP of 0141) | Patent App | 5/16/2022 | 17/744,915 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| THERMAL MANAGEMENT FOR CONTAINER-BASED DATA CENTERS (NP of 0145) | Patent App | 5/20/2022 | 17/749,550 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR USING WASTE HEAT FROM COMPUTING DEVICES (crypto dehydrator) | Patent App | 7/14/2022 | 63/221,750 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR IDENTIFYING COMPUTING DEVICES IN A DATA CENTER | PCT | 1/29/2021 | PCT/US21/15799 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR MANAGING COMPUTING DEVICES | Patent App | 9/27/2022 | 17/953,932 | | Core Scientific Operating Company |
| DYNAMIC COMPUTER MARKETPLACE SYSTEM AND METHOD | Granted | 11/9/2018 | 11,017,455 | 5/25/2021 | Core Scientific Operating Company |
| DYNAMIC COMPUTER MARKETPLACE SYSTEM AND METHOD | Patent App | 4/23/2021 | 17/239537 | | Core Scientific Operating Company |
| APPLICATION MAPPING TO SYSTEM RESOURCES FOR INSTANCE CREATION | PCT | 8/3/2021 | PCT/US2021/044347 | | Core Scientific Operating Company |
| APPLICATION MAPPING TO SYSTEM RESOURCES FOR INSTANCE CREATION | Granted | 1/18/2021 | 11,150,957 | 10/19/2021 | Core Scientific Operating Company |
| INSTANCE CREATION IN A COMPUTING SYSTEM | Granted | 1/18/2021 | 11,409,574 | 8/9/2022 | Core Scientific Operating Company |
| SCALABILITY ADVISOR | Patent App | 8/12/2021 | 17/400579 | | Core Scientific Operating Company |
| RANKING COMPUTING RESOURCES | Patent App | 8/18/2021 | 17/405979 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR SCALING PROVISIONED RESOURCES | Patent App | 11/9/2018 | 16/185762 | | Core Scientific Operating Company |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| DYNAMIC NETWORK OF SUPERCOMPUTING RESOURCES WITH UNIFIED MANAGEMENT INTERFACE | Patent App | 1/6/2021 | 17/143111 | | Core Scientific Operating Company |
| LOW OVERHEAD PERFORMANCE DATA COLLECTION | Patent App | 8/12/2021 | 17/400584 | | Core Scientific Operating Company |
| APPLICATION PERFORMANCE CHARACTERIZATION AND PROFILING AS A SERVICE | Granted | 3/17/2021 | 11,347,621 | 5/31/2022 | Core Scientific Operating Company |
| JOB PERFORMANCE BREAKDOWN | Patent App | 8/17/2021 | 17/404401 | | Core Scientific Operating Company |
| BUILD PROCESS FOR APPLICATION PERFORMANCE | Patent App | 8/17/2021 | 17/404166 | | Core Scientific Operating Company |
| APPLICATION PERFORMANCE DATA PROCESSING | Patent App | 8/13/2021 | 17/402359 | | Core Scientific Operating Company |
| JOB BASED BIDDING | Patent App | 8/18/2021 | 17/405370 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR SCHEDULING IN A COMPUTING SYSTEM | Patent App | 1/18/2022 | 17/578066 | | Core Scientific Operating Company |
| AUTONOMOUS ORGANIZATION AND ROLE SELECTION OF HOMOGENOUS WORKERS | Patent App | 1/25/2022 | 17/583737 | | Core Scientific Operating Company |
| MULTI-CLOUD SPOT INSTANCE MARKET | Patent App | 4/7/2022 | 17/715567 | | Core Scientific Operating Company |
| SYNCHRONIZATION SYSTEM AND METHOD | Patent App | 4/18/2022 | 17/723202 | | Core Scientific Operating Company |
| SYSTEM AND METHOD FOR EDGE INFERENCE | Patent App | 4/22/2022 | 17/727192 | | Core Scientific Operating Company |
| CONTAINER CREATION IN A COMPUTING SYSTEM | Patent App | 5/6/2022 | 17/738635 | | Core Scientific, Inc. |

| Title | Type | Application Filed | Application Number / Patent Number | Issued Date | Owner |
|---|---|---|---|---|---|
| WORKLOAD DATA TRANSFER SYSTEM AND METHOD | Patent App | 5/5/2022 | 17/737463 | | Core Scientific, Inc. and Core Scientific Operating Company |
| COST MANAGEMENT IN DISTRIBUTED COMPUTING TEAMS | Patent App | 5/9/2022 | 17/739473 | | Core Scientific, Inc. |
| SYSTEM AND METHOD FOR RECOMMENDING COMPUTING RESOURCES | PCT | 7/20/2021 | PCT/US2021/042439 | | Core Scientific Operating Company |
| FINGERPRINTING DATA TO DETECT VARIANCES | Patent App | 7/14/2022 | 17/864885 | | Core Scientific Operating Company |
| | Patent App | | 17/388503 | | Core Scientific Operating Company |
| | Patent App | | 17/393730 | | Core Scientific Operating Company |
| | Patent App | | 17/495221 | | Core Scientific Operating Company |
| AUTOMATIC REPAIR OF COMPUTING DEVICES IN A DATA CENTER | PCT | 7/22/2020 | PCT/US20/43078 | | Core Scientific, Inc. |
| SYSTEM AND METHOD FOR COOLING COMPUTING DEVICES WITHIN A FACILITY | PCT | 8/01/2019 | PCT/US19/44673 | | Core Scientific, Inc. |

**(ii) Trademarks:**

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| **CORE SCIENTIFIC OPERATING COMPANY** | | | | | | |
| C Core Scientific Side-By-Side Logo (inline) | U.S. | 87944149 | 31-May-18 | Registered | 9-Feb-21 | 6267073 |

11273420v8

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| Core Scientific Infrastructure & Technology (w/Design) | U.S. | 87944148 | 31-May-18 | Registered | 1-Jan-21 | 6257539 |
| Born of the Blockchain, Inspired by AI | U.S. | 88191911 | 13-Nov-18 | Registered | 25-May-21 | 6364865 |
| Honeyminer (from Stax Digital) | U.S. | 87870683 | 10-Apr-18 | Registered | 10-Dec-19 | 5929809 |
| CORE SCIENTIFIC (Child of 0007) (CL 42) | U.S. | 87983532 | 31-May-18 | Registered | 8-Dec-20 | 6217131 |
| C LOGO (Child of 0008) (CL 37, 42) | U.S. | 87983834 | 31-May-18 | Registered | 1-Jun-21 | 6373351 |
| C CORE SCIENTIFIC (CL 37, 42) | U.S. | 87983841 | 31-May-18 | Registered | 1-Jun-21 | 6373353 |
| CORE SCIENTIFIC (CL 9,37, 42) | CA | 2110256 | 27-May-21 | Pending | | |
| CORE SCIENTIFIC (CL 9, 37, 42) | EU | 18481356 | 28-May-21 | Registered | 1-Oct-21 | 18481356 |
| CORE SCIENTIFIC (CL 9, 37, 42) | UK | UK00003648548 | 28-May-21 | Registered | 3-Dec-21 | UK00003648548 |
| MINDER (CL 42) | CA | 2114725 | 16-Jun-21 | Pending | | |
| MINDER (CL 42) | U.S. | 90778545 | 16-Jun-21 | Registered | 18-Jan-22 | 6622643 |
| MINDERSHELL (CL 42)[1] | U.S. | 88531490 | 23-Jul-19 | Allowed | | |
| MINDER SATELLITE (CL 9)[2] | U.S. | 88613142 | 11-Sep-19 | Allowed | | |

[1] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[2] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

11273420v8

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| MINDER DEEPMINE (CL 42)[3] | U.S. | 88698839 | 19-Nov-19 | Allowed | | |
| MINDER TERMINAL (CL 42)[4] | U.S. | 88698829 | 19-Nov-19 | Allowed | | |
| MINDEROS (CL 9)[5] | U.S. | 97440247 | 02-Jun-22 | Pending | | |
| MINDER (CL 9)[6] | U.S. | 97440128 | 02-Jun-22 | Pending | | |
| CORE SCIENTIFIC (CL 9)[7] | U.S. | 97379997 | 25-Apr-22 | Pending | | |
| C LOGO (CL 9)[8] | U.S. | 97379971 | 25-Apr-22 | Pending | | |
| **RADAR RELAY, INC.** | | | | | | |
| R Logo (CL 36, 41, 42) | U.S. | 88364439 | 30-Mar-19 | Registered | 26-May-20 | 6061787 |
| R Logo (CL 36, 41, 42) | WIPO IR | | | Registered | 9-Sep-19 | 1516684 |
| R Logo (CL 36, 41, 42) | CA | 2014062 | 30-Sep-19 | Registered | 20-Oct-21 | TMA1112035 |
| Ion (CL 41) | U.S. | 88364421 | 30-Mar-19 | Registered | 2-Jun-20 | 6066791 |
| Ion (CL 41) | WIPO IR | | | Registered | 30-Sep-19 | 1516609 |

[3] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[4] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[5] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[6] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

[7] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.
[8] Intent to Use mark. Only disclosed for informational purposes and constitutes an Excluded Asset.

| Name | Jurisdiction | Serial No | Filing Date | Status | Grant Date | Registration No. |
|---|---|---|---|---|---|---|
| Radar (CL 36, 42) | U.S. | 88364418 | 30-Mar-19 | Pending | | |
| Radar (CL 36) | WIPO IR | | | Registered | 30-Sep-19 | 1516643 |
| Radar (CL 36) | CA | 2014063 | 30-Sep-19 | Registered | 20-Oct-21 | TMA1112036 |
| RADAR RELAY (CL 42) | U.S. | 87831579 | 13-Mar-18 | Registered | 5-Feb-19 | 5668823 |
| REDSHIFT (CL 36, 42) | U.S. | 88749316 | 7-Jan-20 | Registered | 20-Jul-21 | 6429223 |

**Copyrights - None**

**Licenses**

Irrevocable Intellectual Property License Agreement dated August 23, 2018 by and between Kristy-Leigh Minehan, The Mineority Group LLC and Core Scientific, Inc.

License Agreement for the unlocking-SSH Firmware by and between Bitmain Technology Inc and Core Scientific, Inc.

**Schedule 9.1.15**

**Litigation**

1. In November 2022, plaintiff Mei Peng filed a putative class action in the United States District Court, Western District of Texas, Austin Division, asserting that the Company violated the Securities Exchange Act by failing to disclose to investors, among other things, that the Company was vulnerable to litigation, that certain clients had breached their agreements, and that this impacted the Company's profitability and ability to continue as a going concern. The Company denies the allegations contained in the complaint and intends to vigorously defend its interests.

2. One of the Company's largest customers, Celsius Mining LLC ("Celsius"), along with its parent company and certain affiliates, filed for voluntary relief under Chapter 11 of the United States Bankruptcy Code in July 2022 in the Bankruptcy Court for the Southern District of New York. On September 28, 2022, Celsius filed a motion in the chapter 11 case alleging that the Company is violating the automatic stay with respect to the Master Services Agreement between Celsius and the Company (the "Agreement"). Celsius is also using its chapter 11 proceeding to withhold payment of certain charges billed to Celsius pursuant to the Agreement. The Company strongly disagrees with the allegations made in the Celsius motion and the interpretation of the Agreement espoused therein and is vigorously defending its interests, including seeking resolution from the bankruptcy court and payment of any outstanding amounts owed under the Agreement (subject to applicable bankruptcy law in the Celsius chapter 11 case). The parties have agreed to stay the proceedings, including the evidentiary hearing scheduled for November 18, 2022. There can be no guarantee that the bankruptcy court will rule in the Company's favor in a timely manner or that Celsius will honor the terms of the Agreement. An adverse ruling by the bankruptcy court that provides Celsius the benefits of the Company's hosting services without Celsius fully paying the costs of such services would have a material effect on the Company's business, financial condition, results of operations and cash flows.

3. On June 17, 2022, the Company received a request to provide information voluntarily from the U.S. Securities and Exchange Commission ("SEC"). The request seeks,inter alia, information relating to the business combinations between the Company on the one hand, and Power Digital Infrastructure Acquisition Corp. ("XPDI") on the other, as well as between the Company and Blockcap, Inc. In addition, the SEC seeks documents related to the investor presentation mentioned in XPDI's July 21, 2021 Form 8-K, documents related to the Company's assessment of costs, stock holdings by certain entities and individuals, and documents related to the decision by the Company's Board of Directors to accelerate the 180-day lock-up as announced in the Company's Form 8-K filed on March 7, 2022. The Company is cooperating with the SEC in its investigation. The Company is nearing completion of its production of documents responsive to the request.

**Schedule 9.1.18**

**Labor Relations**

None.

**Schedule 10.1.16**

**Immaterial Subsidiaries**

1. Core Scientific Partners, LP
2. Core Scientific Partners GP, LLC (SMLLC)
3. CSP Advisors, LLC (SMLLC)
4. CSP Liquid Opportunities GP, LP
5. CSP Liquid Opportunities Master Fund, LP
6. CSP Liquid Opportunities Fund, LP
7. CSP Liquid Opportunities Offshore Fund (Exempted LTD)

**<u>Schedule 10.2.1</u>**

**Existing Debt**

*See attached.*

**Core Scientific Debt & Equipment Lease Summary - Nov 30th, 2022**

| | Issue Date | Original Amount | Maturity | Outstanding Principal |
|---|---|---|---|---|
| **Convertible Notes** | | | | |
| Ibex Partners (Core) LP | April 2021 | 65,000,000 | April 2025 | 70,872,347 |
| Celsius Core LLC | April 2021 | 54,000,000 | April 2025 | 58,878,565 |
| ICG CoreSci Holdings, LP | April 2021 | 41,000,000 | April 2025 | 44,704,096 |
| Kensico Associates, L.P. | April 2021 | 17,129,000 | April 2025 | 18,676,499 |
| Kensico Offshore Fund Master, LTD | April 2021 | 7,871,000 | April 2025 | 8,582,096 |
| Apollo Tactical Value SPN Investments LP 1 | April 2021 | 7,122,000 | April 2025 | 7,765,429 |
| The William R. Guthy Separate Property Trust | April 2021 | 5,000,000 | April 2025 | 5,451,719 |
| Apollo Centre Street Partnership, LP 1 | April 2021 | 3,675,000 | April 2025 | 4,007,013 |
| Birch Grove Credit Strategies Master Fund LP | April 2021 | 3,000,000 | April 2025 | 3,271,031 |
| Ken Wormser | April 2021 | 2,500,000 | April 2025 | 2,725,859 |
| Apollo Lincoln Fixed Income Fund, L.P. 1 | April 2021 | 2,340,000 | April 2025 | 2,551,404 |
| GreensLedge Merchant Holdings LLC | April 2021 | 2,000,000 | April 2025 | 2,180,688 |
| Apollo Moultrie Credit Fund, L.P. 1 | April 2021 | 1,863,000 | April 2025 | 2,031,310 |
| The Kimmel Family Foundation | April 2021 | 1,500,000 | April 2025 | 1,635,516 |
| Michael O. Johnson Revocable Trust | April 2021 | 1,000,000 | April 2025 | 1,090,344 |
| Doug Lipton | August 2021 | 250,000 | April 2025 | 267,173 |
| Cyrptonic Black, LLC | August 2021 | 6,000,000 | April 2025 | 6,412,148 |
| First Sun Investments, LLC | August 2021 | 4,000,000 | April 2025 | 4,274,765 |
| Mass Mutual | August 2021 | 40,000,000 | April 2025 | 42,747,651 |
| Apollo Tactical Value SPN Investments, L.P. | August 2021 | 4,700,000 | April 2025 | 5,022,849 |
| Apollo Centre Street Partnership, L.P. | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| Apollo Lincoln Fixed Income Fund, L.P. | August 2021 | 1,600,000 | April 2025 | 1,709,906 |
| Apollo Moultrie Credit Fund, L.P. | August 2021 | 1,200,000 | April 2025 | 1,282,430 |
| BlockFi | August 2021 | 5,000,000 | April 2025 | 5,343,456 |
| Corbin ERISA Opportunity Fund, Ltd. | August 2021 | 12,000,000 | April 2025 | 12,824,295 |
| Corbin Opportunity Fund, L.P. | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| Galaxy Digital LP | August 2021 | 5,000,000 | April 2025 | 5,343,456 |
| JPAS - Crypto Infrastructure LLC | August 2021 | 11,619,743 | April 2025 | 12,417,918 |
| JPAS - Crypto Infrastructure-A S.P. | August 2021 | 4,380,257 | April 2025 | 4,681,142 |
| JPAS - Credit LLC | August 2021 | 8,333,653 | April 2025 | 8,906,102 |
| JPAS - Credit-A S.P. | August 2021 | 4,166,347 | April 2025 | 4,452,539 |
| TJC3 LLC | August 2021 | 4,000,000 | April 2025 | 4,274,765 |
| Sabby Volatility Warrant Master Fund, Ltd. | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| XMS Core Convert Holdings LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Andrew Rosen 2004 Successor Insurance Tru | August 2021 | 250,000 | April 2025 | 267,173 |
| Cannon Investments LLC | August 2021 | 250,000 | April 2025 | 267,173 |
| FGK Investments Ltd. | August 2021 | 500,000 | April 2025 | 534,346 |
| Ferro Investments Ltd. | August 2021 | 1,500,000 | April 2025 | 1,603,037 |
| Neso Investment Group Ltd | August 2021 | 500,000 | April 2025 | 534,346 |
| Milos Core LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Barkley Investments, LLC | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| FTF Diversified Holdings, LP | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| David Sarner | August 2021 | 250,000 | April 2025 | 267,173 |
| Northdata Holdings Inc. | August 2021 | 200,000 | April 2025 | 213,738 |
| Monbanc Inc. | August 2021 | 100,000 | April 2025 | 106,869 |
| Levbern Management LLC | August 2021 | 250,000 | April 2025 | 267,173 |
| Frank Polaro | August 2021 | 250,000 | April 2025 | 267,173 |
| 1994 Steinfeld Family Trust | August 2021 | 500,000 | April 2025 | 534,346 |
| John Badger Quinn | August 2021 | 500,000 | April 2025 | 534,346 |
| KMR CS Holdings, LLC | August 2021 | 820,000 | April 2025 | 876,327 |
| TBC 222 LLC | August 2021 | 2,500,000 | April 2025 | 2,671,728 |

| | | | | |
|---|---|---|---|---|
| Jason Capello | August 2021 | 2,000,000 | April 2025 | 2,137,383 |
| Richard Katz 2016 GST TRUST | August 2021 | 250,000 | April 2025 | 267,173 |
| Robert Fedrock | August 2021 | 400,000 | April 2025 | 427,477 |
| JSK Partnership LLC | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| James Pulaski | August 2021 | 1,000,000 | April 2025 | 1,068,691 |
| Leon J. Simkins Non-Exempt Trust FBO Mich | August 2021 | 750,000 | April 2025 | 801,518 |
| Better Downtown Miami LLC | August 2021 | 400,000 | April 2025 | 427,477 |
| SunnySide Consulting and Holdings, Inc. | August 2021 | 110,000 | April 2025 | 117,556 |
| Vineet Agrawal | August 2021 | 250,000 | April 2025 | 267,173 |
| Wormser Family Partnership II, LP | August 2021 | 500,000 | April 2025 | 534,346 |
| Marsico AXS CS LLC | August 2021 | 21,564,869 | April 2025 | 23,046,188 |
| Gullane Digital Asset Partners, LLC | August 2021 | 22,500,000 | April 2025 | 24,045,554 |
| Gullane Digital Asset Partners QP, LLC | August 2021 | 32,088,229 | April 2025 | 34,057,275 |
| Gullane Capital Partners, LLC | August 2021 | 2,500,000 | April 2025 | 2,671,728 |
| Amplify Transformational Data Sharing ETF | August 2021 | 26,500,000 | April 2025 | 28,236,050 |
| BlackRock Credit Alpha Master Fund, L.P | August 2021 | 19,600,000 | April 2025 | 20,802,725 |
| HC NCBR FUND | August 2021 | 8,300,000 | April 2025 | 8,809,317 |
| The Obsidian Master Fund | August 2021 | 7,100,000 | April 2025 | 7,535,681 |
| OIP SPV Core Scientific, LLC | August 2021 | 993,033 | April 2025 | 1,053,969 |
| OIP SPV CS, LLC | August 2021 | 873,869 | April 2025 | 927,493 |
| John P. Joliet | August 2021 | 200,000 | April 2025 | 212,273 |
| Pescadero Capital, LLC | August 2021 | 5,000,000 | April 2025 | 5,306,818 |
| Transatlantic Mobility Holdings II LLC | August 2021 | 1,000,000 | April 2025 | 1,061,364 |
| Omega Interceptor Restricted Ltd | August 2021 | 9,822,717 | April 2025 | 10,425,473 |
| **Total Senior Secured** | | **$514,822,717** | | **$552,531,836** |
| | | | | |
| **Unsecured** | | | | |
| B. Riley Bridge Loan | April 2022 | 75,000,000 | June 2023 | 41,777,174 |
| **Total Unsecured** | | **$75,000,000** | | **$41,777,174** |
| | | | | |
| **Facility Mortgages** | | | | |
| Facility Mortgage - Brown | September 2018 | $1,000,000 | September 2023 | $184,459 |
| Facility Mortgage - Holliwood | December 2018 | 2,400,000 | December 2023 | $571,962 |
| **Total Facility Mortgages** | | **$3,400,000** | | **$756,421** |
| | | | | |
| **Equipment Financing** | | | | |
| Arctos Credit, LLC #2 | March 2021 | 1,512,654 | March 2023 | 353,357 |
| Arctos Credit, LLC #3 | March 2021 | 2,295,612 | March 2023 | 536,256 |
| Arctos Credit, LLC #4 | May 2021 | 5,457,000 | May 2023 | 2,239,748 |
| Arctos Credit, LLC #5 | May 2021 | 7,989,097 | May 2023 | 3,279,011 |
| Arctos Credit, LLC #6 | July 2021 | 26,129,258 | July 2023 | 11,792,462 |
| Arctos Credit, LLC #7 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Arctos Credit, LLC #8 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Arctos Credit, LLC #9 | November 2021 | 11,136,533 | November 2023 | 6,790,614 |
| Novak | January 2021 | 10,000,000 | January 2023 | 10,000,000 |
| Dell Financial | March 2021 | 238,278 | March 2026 | 162,158 |
| Bank of the West | March 2021 | 115,139 | January 2024 | 49,187 |
| Trinity Loan Sch. 1 | September 2021 | 1,000,000 | September 2024 | 673,896 |
| Trinity Loan Sch. 2 | November 2021 | 14,000,000 | November 2024 | 10,170,436 |
| Trinity Loan Sch. 3 | December 2021 | 5,000,000 | December 2024 | 3,762,029 |
| Bremer Loan A | October 2021 | 6,800,000 | April 2027 | 6,101,656 |
| Bremer Loan B | October 2021 | 6,156,365 | April 2027 | 5,089,031 |
| Bremer Loan C | December 2021 | 6,945,839 | June 2027 | 7,442,944 |
| Blockfi A | December 2021 | 10,000,000 | December 2023 | 6,666,667 |
| Blockfi B | December 2021 | 70,000,000 | December 2023 | 47,246,377 |
| Trinity Loan Sch. 4 | February 2022 | 10,000,000 | February 2025 | 8,036,361 |
| Anchor Labs #1 (Anchorage Lending) | March 2022 | 20,000,000 | March 2024 | 15,000,002 |

| | | | | |
|---|---|---|---|---|
| Mass Mutual Barings Sch. 1 | March 2022 | 20,000,000 | March 2025 | 18,055,809 |
| Mass Mutual Barings Sch. 2 | March 2022 | 9,003,021 | March 2025 | 8,127,841 |
| Mass Mutual Barings Sch. 3 | March 2022 | 996,979 | March 2025 | 900,063 |
| Mass Mutual Barings Sch. 4 | April 2022 | 12,499,116 | April 2025 | 11,591,557 |
| Mass Mutual Barings Sch. 5 | April 2022 | 9,997,020 | April 2025 | 9,271,137 |
| Mass Mutual Barings Sch. 6 | April 2022 | 17,142,656 | April 2025 | 15,897,930 |
| Liberty Stonebriar | April 2022 | 11,001,717 | March 2024 | 6,968,255 |
| VFS, LLC #4 | January 2022 | 894,240 | January 2025 | 638,407 |
| VFS, LLC #5 | May 2022 | 845,595 | April 2025 | 691,620 |
| Anchor Labs #2 (Anchorage Lending) | May 2022 | 11,682,916 | May 2024 | 10,159,057 |
| Flow TX | January 2023 | 1,463,811 | December 2024 | 1,263,811 |
| **Total Equipment Financing** | | **$338,060,528** | | **$242,538,905** |
| **Total Debt** | | **$931,283,245** | | **$837,604,336** |
| **Equipment Leases** | | | | |
| Garic, Inc. #2 | March 2020 | 958,650 | March 2023 | 87,196 |
| 36th Street Capital #2 | December 2019 | 1,130,000 | December 2022 | 37,883 |
| 36th Street Capital #4 | December 2019 | 748,275 | December 2022 | 25,086 |
| Toyota Commercial Finance Schedules 1-9 | January 2020 | 431,799 | June 2025 | 229,966 |
| Fidelity Capital | May 2021 | 180,500 | October 2023 | 78,540 |
| VFS, LLC #2 | June 2021 | 485,100 | April 2024 | 260,883 |
| Meridian Equipment Finance, LLC | June 2021 | 149,350 | April 2025 | 96,018 |
| Marco | September 2021 | 17,838 | August 2026 | 13,818 |
| Technology Finance Corporation - 2540-05 | October 2021 | 517,500 | October 2024 | 335,626 |
| VFS, LLC #3 | November 2021 | 956,340 | October 2024 | 632,049 |
| Liberty Commercial Finance #1 | December 2021 | 3,108,795 | December 2025 | 2,287,516 |
| Liberty Commercial Finance #2 | December 2021 | 535,724 | November 2025 | 386,403 |
| Liberty Commercial Finance #3 | December 2021 | 565,000 | November 2025 | 404,701 |
| Liberty Commercial Finance #4 | December 2021 | 878,250 | November 2025 | 634,278 |
| Liberty Commercial Finance #5 | December 2021 | 389,300 | November 2025 | 278,521 |
| Liberty Commercial Finance #6 | December 2021 | 610,050 | November 2024 | 382,852 |
| Liberty Commercial Finance #7 | December 2021 | 362,250 | November 2024 | 224,516 |
| Liberty Commercial Finance #8 | December 2021 | 1,875,000 | November 2025 | 1,378,565 |
| Liberty Commercial Finance #9 | December 2021 | 807,164 | November 2025 | 596,099 |
| Liberty Commercial Finance #10 | December 2021 | 10,111,194 | November 2024 | 6,924,129 |
| Liberty Commercial Finance #11 | December 2021 | 5,384,527 | December 2024 | 3,686,877 |
| Liberty Commercial Finance #12 | December 2021 | 5,674,191 | December 2024 | 3,885,265 |
| Liberty Commercial Finance #13 | December 2021 | 5,656,986 | December 2024 | 3,659,252 |
| Liberty Commercial Finance #14 | December 2021 | 487,500 | December 2024 | 314,557 |
| Liberty Commercial Finance #15 | December 2021 | 690,833 | December 2024 | 446,114 |
| Liberty Commercial Finance #16 | December 2021 | 3,727,110 | December 2024 | 2,410,588 |
| Mass Mutual Sch.1-5 | December 2021 | 50,000,000 | December 2024 | 41,667,320 |
| **Total Equipment Leases** | | **$109,904,959** | | **$71,364,620** |
| **Total Debt & Leases** | | **$1,041,188,204** | | **$908,968,955** |



*Note: As of 11/30/2022. Does not include Accounting-tracked Convertible Note Fair Value Adjustment and Trinity Loans End of Term Payment Accrual*

**Schedule 10.2.2**

**Existing Liens**

*See attached.*

**Equipment Leases and Equipment Financings**[1]

1. Master Equipment Financing Agreement, dated as of October 27, 2020, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Arctos Credit, LLC, as lender, and any and all schedules thereto.
2. Equipment Financing Agreement, dated as of March 15, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bank of the West, as lender.
3. Master Equipment Financing Agreement, dated as of August 31, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Trinity Capital Inc., as lender, and any and all amendments, modifications and schedules thereto, including, without limitation, Equipment Financing Schedule Nos. 1 - 4 executed from time to time and any and all amendments and modifications thereto.
4. Liens and security interests securing the payment and performance of Loan Agreement, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.
5. Liens and security interests securing the payment and performance of Promissory Note – Pace Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.
6. Liens and security interests securing the payment and performance of Promissory Note – Improvement/Equipment Term Loan, dated as of October 4, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.
7. Liens and security interests securing the payment and performance of Promissory Note – Construction Real Estate Term Loan, dated as of October 10, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Bremer Bank, National Association, as lender.
8. Payment Agreement, dated as of February 25, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Dell Financial Services L.L.C., as lender.
9. Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto).
10. Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi

[1] This schedule is not intended to acknowledge or otherwise constitute consent with respect to (i) the amount or nature of any claims of any Debt or obligations set forth herein or (ii) the validity, perfection or priority of any liens or security interests with respect to such Debt or other obligations.

Lending LLC, as lender (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Schedule 2 thereto, and any and all amendments or modifications thereto) .

11. Equipment Loan and Security Agreement, dated as of March 11, 2022, by and between the Company, as borrower, and Anchorage Lending CA, LLC, as lender.

12. Equipment Loan and Security Agreement, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

13. Promissory Note, dated as of March 11, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

14. Promissory Note, dated as of May 23, 2022, by and between Company, as borrower, and Anchorage Lending CA, LLC, as lender.

15. Equipment Finance Agreement, dated as of March 22, 2022, by and between the Company, as borrower, and Liberty Commercial Finance LLC, as lender.

16. Master Security Agreement, dated as of March 24, 2022, by and between the Company, as borrower, and Barings Private Credit Corp., Barings Capital Investment Corporation and Barings BDC, Inc. as lenders (and any and all amendments, modifications and collateral schedules thereto, including, without limitation, Collateral Schedules 1 - 6 executed from time to time and any and all amendments and modifications thereto).

17. Term Loan and Purchase Money Security Agreement, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Jack Novak, as lender.

18. Promissory Note, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as maker, and Jack Novak, as payee.

19. Master Equipment Lease Agreement #32109 dated as of June 3, 2021 between Liberty Commercial Finance LLC (now known as Wingspire Equipment Finance LLC) and Core Scientific, Inc. and Core Scientific Holding Co. and Equipment Schedules thereto, including all amendments thereto.

20. Master Lease Agreement dated December 3, 2021, between MassMutual Asset Finance LLC ("**MMAF**") and Core Scientific Operating Company, Inc. f/k/a Core Scientific, Inc. ("**Core**"), and Schedules 1-5 dated December 15, 2021, with respect thereto, as amended, (the Master Lease Agreement, Schedules, and amendments to the Schedules together, the "**Financing Agreements**").

**Mortgages**

| | Document | Date Recorded | Recording Information | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Leasehold Mortgage and Security Agreement with Fixture Financing Statement dated October 4, 2021 and recorded on October 7, 2021 by and between Core Scientific, Inc., as Borrower, and Bremer Bank, National Association, as Lender ("Leasehold Mortgage"), as modified by that certain Leasehold Mortgage Modification Agreement and Extension Affidavit dated December 6, 2021 and recorded on December 16, 2021 by and between Borrower and Lender ("Extension Agreement"), as modified by that certain 2021 Amendment to Loan Agreement, dated December 10, 2021 between Borrower and Lender ("Amendment"). | Leasehold Mortgage: October 7, 2021<br><br>Extension Agreement: December 16, 2021<br><br>Amendment: No recording information provided | Leasehold Mortgage: 819576<br><br>Extension Agreement: 821738<br><br>Amendment: No recording information provided | Grand Forks | Bremer Bank, National Association | 1. PACE/Equipment Term Loan: $6,800,000.00<br>2. Improvement/Equipment Term Loan: $9,359,000.00<br>3. Construction Real Estate Term Loan: $9,567,000.00 | 5601 11th Avenue South, Grand Forks, ND 58201 |
| 2. | Purchase Money Mortgage dated December 19, 2018 and recorded on December 21, 2018, by and between American Property Acquisition, LLC, as Borrower, and Holliwood LLC, as | December 21, 2018 | Book 897, Page 386 | Marshall | Holliwood LLC | $2,400,000.00 | 1035 Shar Cal Rd., Calvert City, KY 42029 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Lender. | | | | | | |
| 3. | Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated June 9, 2020 and recorded on June 11, 2020, by and between American Property Acquisition, LLC, as Mortgagor, and Silverpeak Credit Partners LP, as Mortgagee. | June 11, 2020 | Book 936, Page 561 | Marshall | Silverpeak Credit Partners LP | $21,000,000.00 | 1035 Shar Cal Rd., Calvert City, KY 42029 |

**Mechanic's Liens**[2][3]

[See Below]

[2] All mechanic's liens arising by operation of law that are valid, non-avoidable and properly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

[3] For the avoidance of doubt, in addition to the mechanic's liens specified in this Schedule, any lien of Priority Power Management, LLC that is properly perfected postpetition in accordance with section 546(b) of the Bankruptcy Code is also deemed to be listed in this Schedule, and all parties' rights as to the ability of Priority Power Management, LLC to perfect a lien postpetition are preserved.

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Affidavit for Mechanic's Lien | 8/19/2022 | 2022-3219 | Ward | Priority Power Management, LLC | $16,319,916 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| | Partial Release of Lien | 9/27/2022 | 2022 - 3741 | Ward | Priority Power Management, LLC | Amount Released - $6,250,096 Amount Remaining - $10,069,820 | 3013 FM 516 North, Barstow, TX 79777 |
| 2. | Affidavit Claiming Mechanic's and Materialman's Lien | 9/9/2022 | 2022-3542 | Ward | Graybar Electric Company, Inc. | $839,883.12 | 3013 FM 516 North, Barstow, TX 79777<br><br>Cedarvale Project, located at 3015 ranch Road 516, Barstow, Texas - Property Ownership is unclear from the document, but may be Core Scientific. |
| 3. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022-4334 | Ward | Huband-Mantor Construction | $4,155,739.72 total ($2,949,813.67 due and the remainder in retainage) | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 4. | Mechanic's Lien dated October 11, 2022 | 10/14/2022 | 2022-3951 | Ward | Wessely-Thompson Hardware, Inc. | $54,016.75 | 3013 FM 516 North, Barstow, TX 79777 |
| 5. | Affidavit for Mechanic's Lien | 11/15/2022 | 2022-4351 | Ward | MK Marlow Company, LLC | $536,728.57 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6. | Affidavit for Mechanic's and Materialman's Lien | 11/16/2022 | 2022-4371 | Ward | ComNet Communications, LLC | $31,875.00 | 3013 FM 516 North, Barstow, TX 79777<br><br>Core Scientific Texas 2 Cedarvale CVL I project. Property Ownership is unclear from the document, but may be Core Scientific. |
| 7. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/21/2022 | 2022-4431 | Ward | Coonrod Electric Co., LLC | $1,547,802.40 | 3013 FM 516 North, Barstow, TX 79777<br><br>Property Ownership is unclear from the document, but may be Core Scientific. |
| 8. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/28/2022 | 2022-4495 | Ward | Summit Electric Supply Co. | $309,162.20 | 3013 FM 516 North, Barstow, TX 79777 |
| 9. | Affidavit of Mechanics Lien by Tiered Contractor of Supplier | 11/30/2022 | 2022-4527 | Ward | Morsco Supply LLC DBA Morrison Supply Company | $4,466.68 | 3013 FM 516 North, Barstow, TX 79777 |
| 10. | Affidavit for Mechanic's Lien | 8/18/2022 | 2022005550 | Reeves | Priority Power Management, LLC | $14,442,661 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| | Partial Release of Lien | 9/27/2022 | 202200662 | Reeves | Priority Power Management, LLC | Amount Released - $3,023,269 Amount Remaining - $11,419,392 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |

| | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022008754 | Reeves | Priority Power Management, LLC | $12,162,237.00 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
|---|---|---|---|---|---|---|---|
| 11. | Notice of Claim for Unpaid Labor and/or Materials | 9/9/2022 | 2022006200 | Reeves | Graybar Electric Company, Inc. | $1,153,226.72 | 1851 FM 2119, Pecos, TX 79772<br><br>Appears to be property owned by JRC/RGC34 Trade Tracts, LTD. |
| | Unconditional Waiver and Partial Release dated September 23, 2022 | No recording information provided | No recording information provided | Reeves | Graybar Electric Company, Inc. | Released Amount: $279,961.04<br><br>Remaining Amount: $873,265.68 | 1851 FM 2119, Pecos, TX 79772 |
| | | | | | | | |
| | | | | | | | |
| 12. | Affidavit for Mechanic's Lien dated November 11, 2022 | 11/15/2022 | 2022-4351 | Reeves | MK Marlow Company, LLC | $83,744.45 (including $24,157.65 in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 |
| 13. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007951 | Reeves | Huband-Mantor Construction | $9,007,945.01 total ($7,310,708.27 due and the remainder in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 14. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007953 | Reeves | Huband-Mantor Construction | $1,699,939.21 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County – Appears to be property owned by Jobe Ranch Limited Partnership and Hawkins Investments, Inc. |
| 15. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007983 | Reeves | Coonrod Electric Co., LLC | $4,083,704.13 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #1 Data Processing Center – Ownership of the Property is unclear |
| 16. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007984 | Reeves | Coonrod Electric Co., LLC | $677,993.88 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>Cottonwood #2 Data Processing Center – Ownership of the Property is unclear |
| 17. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 11/30/2022 | 2022008322 | Reeves | Summit Electric Supply Co. | $821,433.16 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 12/2/2022 | 2022008384 | Reeves | Summit Electric Supply Co. | $22,558.14 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772<br><br>60 acre surface lease property |
| 19. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008777 | Reeves | T&D Moravits & Co., LLC | $305,769.50 | 1851 FM 2119, Pecos, TX 79772 |
| 20. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008778 | Reeves | T&D Moravits & Co., LLC | $82,240.00 | 1851 FM 2119, Pecos, TX 79772 |
| 21. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008779 | Reeves | T&D Moravits & Co., LLC | $96,192.50 | 1851 FM 2119, Pecos, TX 79772 |
| 22. | Affidavit for Mechanic's and Materialman's Lien | 12/16/2022 | 2022008811 | Reeves | Condair Inc. | $2,566,892.93 | 1851 FM 2119, Pecos, |
| | | | | | | | |
| 23.. | Affidavit for Mechanic's and Materialman's Lien | 10/28/2022 | 152295 | Denton | Sure Steel – Texas, L.P. | $1,237,031.22 | 8171 Jim Christal Road, Denton, TX 76207<br><br>DENTON DATA CENTER/ 8161 JIM CHRISTAL ROAD, DENTON, TEXAS; DESCRIBED IN DOCUMENT NUMBER 216662; PERMIT # 2202-0339; PARCEL ID 984633 |
| 24. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153496 | Denton | Way Mechanical | $151,316.10 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153498 | Denton | Way Mechanical | $284,712.90 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 26. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153497 | Denton | McCorvey Sheet Metal Works, LP | $20,895.50 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| | | | | | | | |
| 27. | Affidavit for Mechanic's and Materialman's Lien | 11/3/2022 | 154942 | Denton | McCarthy Building Companies, Inc. | $3,685,631.28 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| | Amended Affidavit of Lien by McCarthy Building Companies Inc. | 11/14/2022 | 158011 | Denton | McCarthy Building Companies, Inc. | $17,052,583.65 | 8171 Jim Christal Road, Denton, TX 76207 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 28. | Mechanic's Lien Affidavit | 11/14/2022 | 157743 | Denton | BEAM Concrete Construction, Inc. | $878,306.82 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 29. | Lien Affidavit and Claim | 11/15/2022 | 158075 | Denton | Humphrey & Associates, Inc. | $9,365,366.20 | 8171 Jim Christal Road, Denton, TX 76207<br><br>leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207, 8161 Jim Christal Road, Denton, Texas 76207, and/or 8171 Jim Christal Road, Denton, Texas 76207 |
| 30. | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | 12/1/2022 | 164584 | Denton | Housley Communications | $53,883.90 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8151 Jim Christal Road, Denton, Texas 76207 |
| 31. | Lien Affidavit | 12/12/2022 | 168014 | Denton | Imperial Fire Protection, LLC | $209,210.00 | 8171 Jim Christal Road, Denton, TX 76207 and/or<br><br>8161 Jim Christal Road, Denton, Texas 79207 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 32. | Affidavit for Mechanic's and Materialman's Lien | 12/13/2022 | 168734 | Denton | ABLe Communications, Inc. | $1,228,932.14 total ($268,053.12 unpaid retainage) | leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8171 Jim Christal Road, Denton, Texas 76207 |
| 33. | Affidavit for Mechanic's Lien | 12/15/2022 | 169545 | Denton | Pillar Electric Group, LP | $28,266.49 | leasehold interest located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8161 Jim Christal Road, Denton, Texas 76207 |
| 34. | Affidavit for Mechanic's Lien | 12/16/22 | 170453 | Denton | Power Engineering Services, Inc. | $98,440.00 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 35. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Denton | Maddox Transformers | $7,000,000 | 8151 Jim Christal Road, Denton, Texas 76207 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 36. | Mechanic's and Materialman's Lien Statement | 10/31/2022 | 2022-013536 | Muskogee | Harper Construction Company, Inc. | $7,500,000.00 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 37. | Mechanic's and Materialman's Lien Statement | 11/02/2022 | 2022-013616 | Muskogee | Contech, Inc. | $602,556.08 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 38. | Mechanic's and Materialman's Lien Statement | 11/28/2022 | 2022-014455 | Muskogee | Gaylor Electric, Inc. DBA Gaylor, Inc. | $5,245,601.81 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 39. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded | Not recorded | Muskogee | J.W. Didado | $6,000,000 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |

**Schedule 10.2.4**

**Existing Investments**

None.

**Schedule 10.2.16**

**Existing Affiliate Transactions**

1. Master Services Agreement, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC (the "Gem Mining 1 MSA").

   a. Master Services Agreement Order #3 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

   b. Master Services Agreement Order #5 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

   c. Amended and Restated Order #8 to the Gem Mining 1 MSA, dated as of February 5, 2021, by and among Core Scientific, Inc. and GEM Mining 1 LLC.

2. Master Services Agreement, dated as of July 9, 2021, by and among Core Scientific, Inc. and GEM Mining 4 LLC (the "Gem Mining 4 MSA").

   a. Master Services Agreement Order #1 to the Gem Mining 4 MSA, dated as of July 9, 2021, by and among Core Scientific, Inc. and Gem Mining 4, LLC.

3. Amended and Restated Employment Agreement, dated as of October 10, 2021, by and among Michael J. Levitt and Core Scientific Holding Co.

4. Employment Agreement, dated as of October 10, 2021, by and among Darin Feinstein and Core Scientific Holding Co.

EXHIBIT A
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] ASSIGNMENT AND ACCEPTANCE**

Reference is made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023, (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto, B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders. Terms are used herein as defined in the DIP Credit Agreement.

______________________ ("Assignor") and ______________ ("Assignee") agree as follows:

1. Assignor hereby assigns to Assignee and Assignee hereby purchases and assumes from Assignor (a) a principal amount of $_____________ of Assignor's outstanding Loan and (b) the amount of $__________________ of Assignor's Commitment (which represents ____% of the total Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest. This Assignment and Acceptance shall be effective as of the date ("Effective Date") indicated in the corresponding Assignment Notice delivered to the Administrative Agent, provided such Assignment Notice is executed by Assignor, Assignee and the Administrative Agent, if applicable. From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

2. Assignor (a) represents that (i) as of the date hereof, prior to giving effect to this assignment, its Commitment is $____________, and the outstanding balance of its Loan is $______________; (ii) it is the legal and beneficial owner of the Assigned Interest, (iii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the DIP Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Credit Agreement or any other instrument or document furnished pursuant thereto, other than that Assignor is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance by the Borrower of their obligations under the Loan Documents.

3. Assignee (a) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance; (b) confirms that it has received copies of the DIP Credit Agreement and such other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (c) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (d) confirms that it is an Eligible Assignee; (e) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the DIP

Credit Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto; (f) agrees that it will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents; (g) represents and warrants that the assignment evidenced hereby will not result in a non-exempt "prohibited transaction" under Section 406 of ERISA; and (h) represents and warrants that, if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the DIP Credit Agreement, duly completed and executed by the Assignee.

4. THIS AGREEMENT, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

5. Each notice or other communication hereunder shall be in writing, shall be sent by messenger, by telecopy or facsimile transmission, or by first-class mail, shall be deemed given when sent and shall be sent as follows:

(a) If to Assignee, to the following address (or to such other address as Assignee may designate from time to time):

________________________________
________________________________
________________________________

(b) If to Assignor, to the following address (or to such other address as Assignor may designate from time to time):

________________________________
________________________________
________________________________

Payments hereunder shall be made by wire transfer of immediately available Dollars as follows:

If to Assignee, to the following account (or to such other account as Assignee may designate from time to time):

________________________________________
________________________________________
ABA No. ________________________________
________________________________________
Account No. ____________________________
Reference: ______________________________

If to Assignor, to the following account (or to such other account as Assignor may designate

from time to time):

____________________________________

____________________________________

ABA No. ______________________________

____________________________________

Account No. ___________________________

Reference: ____________________________

Exhibit A-3

11255122v17

Debtors' Exhibit No. 22
Page 342 of 393

**IN WITNESS WHEREOF**, this Assignment and Acceptance is executed as of ________.

______________________________________
("Assignee")

By:___________________________________
Title:

______________________________________
("Assignee")

By:___________________________________
Title:

EXHIBIT B
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] ASSIGNMENT NOTICE**

Reference is made to (1) the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023, (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto, B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders; and (2) the Assignment and Acceptance dated as of __________________, 20__ (the "Assignment Agreement"), between ______________ ("Assignor") and _______________ ("Assignee"). Terms are used herein as defined in the DIP Credit Agreement.

Assignor hereby notifies the Administrative Agent of Assignor's intent to assign to Assignee pursuant to the Assignment Agreement (a) a principal amount of $__________ of Assignor's outstanding Loans and $____________ of Assignor's participations in the Obligations and (b) the amount of $_________ of Assignor's Commitment (which represents __________% of the total Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest. This Agreement shall be effective as of the date ("Effective Date") indicated below, provided this Assignment Notice is executed by Assignor, Assignee and the Administrative Agent, if applicable. Pursuant to the Assignment Agreement, Assignee has expressly assumed all of Assignor's obligations under the DIP Credit Agreement to the extent of the Assigned Interest, as of the Effective Date.

For purposes of the DIP Credit Agreement, the Administrative Agent shall deem Assignor's Commitment to be reduced by $_______, and Assignee's Commitment to be increased by $_______________.

The address of Assignee to which notices and information are to be sent under the terms of the DIP Credit Agreement is:

______________________________
______________________________
______________________________
______________________________

The address of Assignee to which payments are to be sent under the terms of the DIP Credit Agreement is shown in the Assignment and Acceptance.

This Notice is being delivered to the Administrative Agent pursuant to Section 13.3 of the DIP Credit Agreement. Please acknowledge your acceptance of this Notice by executing and returning to Assignee and Assignor a copy of this Notice.

**IN WITNESS WHEREOF**, this Assignment Notice is executed as of ______________________.

_________________________________________
("Assignee")

By:________________________________
Title:

_________________________________________
(Assignee")

By:________________________________
Title:

B. Riley Commercial Capital, LLC,*
as the Administrative Agent

By:________________________________
Title:

* No signature required if Assignee is a Lender or an Affiliate of a Lender.

EXHIBIT C
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] NOTICE OF BORROWING**

[Date]

B. Riley Commercial Capital, LLC, as the administrative agent
(the "Administrative Agent") for the Lenders
party to the DIP Credit Agreement referred to below
11100 Santa Monica Blvd., Suite 800
Los Angeles, CA 90025
Attention:

Perry Mandarino

Ladies and Gentlemen:

The undersigned, Core Scientific, Inc., a Delaware corporation (the "Borrower"), (a) refers to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement", the terms defined therein being used herein as therein defined), among the Borrower, each other Obligor party thereto, the Lenders party thereto from time to time as a Lenders (collectively, the "Lenders"), and B. Riley Commercial Capital, LLC, as the Administrative Agent (the "Administrative Agent"); (b) hereby gives you irrevocable notice pursuant to Section 4.1.1 of the DIP Credit Agreement that the undersigned hereby requests a Borrowing under the DIP Credit Agreement; and (c) sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 4.1.1 of the DIP Credit Agreement:

(i) The Business Day of the Proposed Borrowing is __________ , __________[1]

(ii) The aggregate principal amount of the Proposed Borrowing is $..................[2]

(iii) The location and number of the account to which funds shall be disbursed is as follows: [______________________________].

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing and on the date on which such Loan is funded or made (or deemed to be made):

(A) No Default or Event of Default shall exist at the time of, or immediately result

[1] Shall be at least five (5) Business Days prior to the requested Borrowing Date (unless the Lenders consent in writing to any shorter time period); provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 11:00 am (New York City time) on such day.

[2] This request shall be for a Proposed Borrowing of no less than $5,000,000.

from the funding of such Loan, and

(B) The representations and warranties of each Obligor in the Loan Documents shall be true and correct in all material respects (or, with respect to representations and warranties qualified by materiality, in all respects) on the date of, and upon giving effect to, the making of such Loan (except for representations and warranties that expressly relate to an earlier date, in which case such representation and warranty shall be true and correct in all material respect (or all respects, as applicable) as of such date;

(C) The sum of (x) Obligors' cash and Cash Equivalents on hand (excluding any of Obligors' Eligible Cash in the Carve-Out Account and any Adequate Assurance Deposits) and (y) subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on the date of the Proposed Borrowing as determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day of the date of the Proposed Borrowing (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any Permitted BTC Hedging Agreement then in effect with respect thereto), at such time is less than $30,000,000 immediately prior to giving effect to any such Borrowing, and attached hereto as ANNEX I sets forth a calculation of each of the foregoing clauses (x) and (y); and

(D) All conditions as set forth in Section 6.2.2 of the DIP Credit Agreement are satisfied (or waived by the Administrative Agent and the Required Lenders) prior to (or concurrently with) the making of such Loan on the Borrowing Date relating thereto.

The undersigned hereby agrees that the payments made in accordance with this Notice of Borrowing are made for the administrative convenience of the Borrower and that the legal effect thereof is the same as if the proceeds of the Proposed Borrowing were transferred directly to the Borrower by the Administrative Agent and distributed by the Borrower. The Borrower hereby acknowledges and agrees that the disbursements are being made strictly on the basis of the information set forth in this Notice of Borrowing, and in the event such information is inaccurate, the Borrower shall be liable for any and all losses, costs, taxes, fees and expenses incurred by the Administrative Agent arising out of or as a result of the Administrative Agent's compliance with the information set forth in this Notice of Borrowing; provided that such indemnity shall not be available to the extent such losses, costs, taxes, fees and expenses have resulted from the gross negligence or willful misconduct of the Administrative Agent as determined by a final and nonappealable decision of a court of competent jurisdiction.

Very truly yours,

CORE SCIENTIFIC, INC., as the Borrower

By:______________________________
Name:
Title:

ANNEX I

| | | |
|---|---|---|
| A. | Obligors' cash and Cash Equivalents on hand (excluding any of Obligors' Eligible Cash in the Carve-Out Account and any Adequate Assurance Deposits): | $____________ |
| B. | Subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of the Unrestricted Bitcoin owned by Borrower and the other Obligors on the date of the Proposed Borrowing as determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any Permitted BTC Hedging Agreement then in effect with respect thereto): | $____________ |
| C. | Sum of line A and line B: | $____________ |
| D. | Line C less than $30,000,000? | Yes/No |

EXHIBIT D
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] GUARANTY**

(See attached)

Exhibit D-1

11255122v17

Debtors' Exhibit No. 22
Page 349 of 393

**EXECUTION VERSION**

# GUARANTY

THIS GUARANTY (this "Guaranty") is executed as of the twenty-seventh day of February, 2023, by each of the entities listed on the signature pages hereto (collectively, "Guarantors" and individually, each a "Guarantor"), in favor of **B. RILEY COMMERCIAL CAPITAL, LLC**, as administrative agent, and the other Persons party to the DIP Credit Agreement from time to time (as hereinafter defined) as Lenders. Unless otherwise defined herein, or unless the context otherwise requires, each term used herein with its initial letter capitalized shall have the meaning given such term in the DIP Credit Agreement (as hereinafter defined).

## WITNESSETH:

WHEREAS, Core Scientific, Inc., a Delaware corporation (the "Borrower"), Guarantors and certain other parties, the Lenders, and B. Riley Commercial Capital, LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), are parties to that certain Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of the date hereof (as such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), pursuant to which the Lenders have agreed to make certain loans available to the Borrower;

WHEREAS, on December 21, 2022 (the "Petition Date") the Borrower and Guarantors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas;

WHEREAS, the Lenders have required, as a condition to making advances of the proceeds of the loans under the DIP Credit Agreement, that Guarantors execute and deliver this Guaranty subject to the terms set forth in the DIP Credit Agreement, the other Loan Documents and the DIP Orders;

WHEREAS, each Guarantor has determined that valuable benefits will be derived by it as a result of the DIP Credit Agreement and the Borrowings to be made by the Borrower thereunder; and

WHEREAS, each Guarantor has further determined that the benefits accruing to it from the DIP Credit Agreement exceed such Guarantor's anticipated liability under this Guaranty.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Guarantors hereby covenant and agree as follows:

1. **Guaranty**. (a) Guarantors hereby, jointly and severally, absolutely, irrevocably and unconditionally guarantee to the Administrative Agent, for the ratable benefit of the Secured Parties, the prompt, complete and Full Payment when due (whether at stated maturity, by acceleration, by required prepayment, declaration, demand or otherwise) of the Obligations of the Borrower now or hereafter existing under the DIP Credit Agreement or any Loan Document, whether for principal, interest, fees, costs, disbursements, commissions, expense reimbursements, indemnifications or otherwise, and further guarantee that the Borrower will timely perform the

Obligations in accordance with the terms and provisions of the DIP Credit Agreement and the DIP Orders.

(b) If and to the extent required in order for the obligations of any Guarantor to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of such Guarantor hereunder shall be limited to the maximum amount which can be guaranteed by such Guarantor under such laws. Each Guarantor acknowledges and agrees that, to the extent not prohibited by Applicable Law, (i) such Guarantor (as opposed to its creditors, representatives of creditors or bankruptcy trustee, including such Guarantor in its capacity as debtor in possession exercising any powers of a bankruptcy trustee) has no personal right under such laws to reduce, or request any judicial relief that has the effect of reducing, the amount of its liability under this Guaranty, (ii) such Guarantor (as opposed to its creditors, representatives of creditors or bankruptcy trustee, including such Guarantor in its capacity as debtor in possession exercising any powers of a bankruptcy trustee) has no personal right to enforce the limitation set forth in this Section 1(b) or to reduce, or request judicial relief reducing, the amount of its liability under this Guaranty, and (iii) the limitation set forth in this Section 1(b) may be enforced only to the extent required under such laws in order for the obligations of such Guarantor under this Guaranty to be enforceable under such laws and only by or for the benefit of a creditor, representative of creditors or bankruptcy trustee of such Guarantor or other Person entitled, under such laws, to enforce the provisions thereof.

(c) Each Guarantor agrees that the Obligations may at any time and from time to time be incurred or permitted in an amount exceeding the maximum liability of such Guarantor under Section 1(b) without impairing the guarantee contained in this Section 1 or affecting the rights and remedies of any Secured Party hereunder.

2. **Payment by Guarantors**. (a) All Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will promptly upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of the Secured Parties, an amount equal to the sum of the unpaid principal amount of all Obligations then due as aforesaid, accrued and unpaid interest on such Obligations (including interest which, but for the Borrower's becoming the subject of the Chapter 11 Cases, would have accrued on such Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Obligations then owed to Secured Parties as aforesaid.

(b) If any Guarantor is or becomes liable for any indebtedness owing by the Borrower to the Administrative Agent or the Lenders by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of the Lenders hereunder shall be cumulative of any and all other rights that the Administrative Agent and the Lenders may ever have against such Guarantor. The exercise by the Administrative Agent and the Lenders of any right or remedy hereunder or under any other instrument, at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

(c) In the event of default by the Borrower in payment of the Obligations, or any part thereof, when such Obligations, or any part thereof, become due, either by their terms or as the result of the exercise of any power to accelerate, Guarantors shall, on demand, and without further notice of dishonor and without any notice having been given to Guarantors previous to such demand of the acceptance by the Lenders of this Guaranty, and without any notice having been given to Guarantors previous to such demand of the creation or incurrence of such Obligations, promptly pay the amount due thereon to the Administrative Agent and the Lenders at the Administrative Agent's notice address pursuant to Section 14.3.1 of the DIP Credit Agreement, and it shall not be necessary for the Administrative Agent or any Lender, in order to enforce such payment by any Guarantor, first, to institute suit or exhaust its remedies against the Borrower or others liable on such Obligations, to have the Borrower joined with such Guarantor in any suit brought under this Guaranty or to enforce their rights against any security which shall ever have been given to secure such Obligations; provided, however, that if the Administrative Agent or the Lenders elect to enforce and/or exercise any remedies they may possess with respect to any security for the Obligations prior to demanding payment from any Guarantor, such Guarantor shall nevertheless be obligated hereunder for any and all sums still owing the Administrative Agent and the Lenders on the Obligations and not repaid or recovered incident to the exercise of such remedies.

3. **Liability of Guarantors Absolute**. Subject to the entry of and terms of the DIP Orders, and except as otherwise provided for herein, each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than Full Payment of the Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b) the Administrative Agent may enforce this Guaranty upon the occurrence and during the existence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of any other such Event of Default;

(c) the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other Guarantors and whether or not the Borrower is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Obligations which has not been paid; and without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Obligations that is not the subject of such

suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Obligations;

(e) any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, (i) renew, extend, accelerate, increase the principal amount of or the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Obligations or otherwise amend the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Obligations and take and hold security for the payment hereof or the Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Obligations, any other guaranties of the Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case such Secured Party in its discretion may determine as consistent herewith and the DIP Credit Agreement and any other applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Borrower or any security for the Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than Full Payment of the Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Obligations, except to the extent such security also serves as collateral for Indebtedness other than the Obligations) to the payment of Indebtedness other than the Obligations, even though any Secured Party might have elected to apply such payment to any part

or all of the Obligations; (v) any Secured Party's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Obligations; (vi) any failure to perfect or continue perfection of a security interest in any Collateral which secures any of the Obligations; (vii) any defenses, set offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Obligations.

4. **Waivers by Guarantors**. (a) Each Guarantor hereby further waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any Guarantor from any cause other than Full Payment of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Obligations or any agreement related thereto and notices of any extension of credit to the Borrower; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof. Notice to Guarantors of the acceptance of this Guaranty and of the making, renewing or assignment of the Obligations and each item thereof, are hereby expressly waived by Guarantors.

(b) Each Guarantor agrees that Administrative Agent and Lenders may at any time and from time to time, at their discretion and with or without valuable consideration, allow substitution or withdrawal of collateral or other security and release collateral or other security or compromise or settle any amount due or owing under the DIP Credit Agreement or amend or modify in whole or in part the DIP Credit Agreement or any Loan Document executed in connection with same without impairing or diminishing the obligations of such Guarantor hereunder. Each Guarantor further agrees that if the Borrower executes in favor of Administrative

Agent or Lenders any collateral agreement, mortgage or other security instrument, the exercise by Administrative Agent or Lenders of any right or remedy thereby conferred on Administrative Agent and Lenders shall be wholly discretionary with them, and that the exercise or failure to exercise any such right or remedy shall in no way impair or diminish the obligations of such Guarantor hereunder. Each Guarantor hereby further agrees that the Lenders and Administrative Agent shall not be liable for their failure to use diligence in the collection of the Obligations or in preserving the liability of any Person liable for the Obligations, and each Guarantor hereby waives presentment for payment, notice of nonpayment, protest and notice thereof (including notice of acceleration and notice of intent to accelerate), and diligence in bringing suits against any Person liable on the Obligations, or any part thereof.

(c) Each Guarantor agrees that Administrative Agent and Lenders, in their discretion, may (i) bring suit against all guarantors (including, without limitation, any Guarantor hereunder) of the Obligations jointly and severally or against any one or more of them, (ii) compound or settle with any one or more of such guarantors for such consideration as Administrative Agent and Lenders may deem proper, and (iii) release one or more of such guarantors from liability, and that no such action shall impair the rights of Administrative Agent and Lenders to collect the Obligations (or the unpaid balance thereof) from other guarantors of the Obligations, or any of them, not so sued, settled with or released.

5. **Assignments**. This Guaranty is for the benefit of Administrative Agent and Lenders, their successors and assigns, and in the event of an assignment by Lenders (or their successors or permitted assigns) made in accordance with the terms of the DIP Credit Agreement and the DIP Orders of the Obligations, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Obligations so assigned, shall be transferred with such Obligations. No Guarantor may assign its obligations under this Guaranty without the prior written consent of the Administrative Agent. This Guaranty is binding, not only on each Guarantor, but on the successors and assigns of each Guarantor.

6. **Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guarantee Obligations (other than contingent indemnification obligations that by their express terms survive termination of the Loan Documents) shall have been paid in full and Full Payment shall have otherwise occurred in accordance with and pursuant to the DIP Credit Agreement and the other Loan Documents. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guarantee Obligations. No modification, consent, amendment or waiver of any provision of this Guaranty, nor consent to any departure by any Guarantor therefrom, shall be effective unless the same shall be in writing and signed by Administrative Agent, and then shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Guarantor in any case shall, in itself, entitle such Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Administrative Agent or Lenders in exercising any power or right hereunder shall impair any such right or power or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof, or the exercise of any other right or power hereunder. All rights and remedies of Administrative Agent and Lenders hereunder are cumulative of each other and of every other right or remedy which they may otherwise have at law or in equity or under any other contract or document (including the Loan Documents), and the exercise of one or more rights or

remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

7.    **Chapter 11 Cases**.  The liability of each Guarantor under this Guaranty shall in no manner be reduced, impaired, discharged, affected, suspended, terminated or released by the Chapter 11 Cases, or any proceedings affecting the status, existence or assets of the Borrower or any Guarantor or other similar proceedings instituted by or against the Borrower or any Guarantor and affecting the assets of the Borrower or any Guarantor.  In the event that all or any portion of the Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the vent that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute obligations of Guarantors for all purposes hereunder.

8.    **Interest**.  No provision herein or in any promissory note, instrument or any other Loan Document executed by the Borrower or any Guarantor evidencing the Obligations shall require the payment or permit the collection of interest in excess of the maximum lawful rate.  If any excess of interest in such respect is provided for herein or in any such promissory note, instrument, or any other Loan Document, the provisions of this paragraph shall govern, and neither Guarantors nor the Borrower shall be obligated to pay the amount of such interest to the extent that it is in excess of the maximum lawful rate.  The intention of the parties being to conform strictly to any applicable federal or state usury laws now in force, all promissory notes, instruments and other Loan Documents (any such rate of interest payable under any such document is referred to herein as a "Subject Rate") executed by the Borrower or Guarantors evidencing the Obligations shall be held subject to reduction to the amount allowed under said usury laws as now or hereafter construed by the courts having jurisdiction; provided, that any subsequent reductions in any Subject Rate shall not reduce the rate of interest payable in connection with such promissory note, instrument or other Loan Document below the maximum lawful rate until the total amount of interest accrued equals the amount of interest which would have accrued if the Subject Rate had at all times been in effect.

9.    **Miscellaneous**.  (a) Each Guarantor understands and agrees that any amounts of such Guarantor on account with any of the Lenders may be offset to satisfy the obligations of such Guarantor hereunder, subject to and in accordance with the provisions of Section 11.3 of the DIP Credit Agreement, *mutatis mutandi*.

(b)    If and to the extent any Guarantor makes any payment to the Secured Parties or any of them pursuant to or in respect of this Guaranty, any claim which such Guarantor may have against the Borrower by reason thereof shall be subject and subordinate to Full Payment (including, without limitation, in respect of subrogation, contribution, indemnity, reimbursement or other similar rights).  Each Guarantor hereby waives any and all rights of subrogation to which such Guarantor may otherwise be entitled against the Borrower as a result of any payment made by such Guarantor pursuant to this Guaranty unless and until Full Payment has occurred.

(c)    If any payment made by or on behalf of any Guarantor to Administrative Agent or any Lender is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or such

Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such payment, the Obligation originally intended to be satisfied, and all rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made.

(d) If any provision of this Guaranty is held to be illegal, invalid, or unenforceable, such provision shall be fully severable, this Guaranty shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Guaranty a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

(e) EACH PARTY HERETO HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO THIS GUARANTY, AND AGREES THAT ANY SUCH DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1 OF THE DIP CREDIT AGREEMENT A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(f) THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

(g) EACH GUARANTOR, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ITS RIGHT TO A JURY TRIAL IN ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.

(h) THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE

EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(i) Notwithstanding anything to the contrary herein, the provisions of this Guaranty are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable. In the event of a conflict between the terms of the DIP Orders and this Guaranty, the terms of the DIP Orders shall govern and control.

(j) This Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Guaranty shall become effective when Administrative Agent has received counterparts bearing the signatures of all parties hereto. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Guaranty shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**[Signature Pages to Follow]**

EXECUTED as of the date first above written.

GUARANTORS:

**RADAR RELAY, INC.**, a Delaware corporation

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**, a Delaware limited liability company
By its sole member, Core Scientific Operating Company

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**, a Colorado limited liability company
By its sole member, Radar Relay, Inc.

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President

**RADAR LLC**, a Colorado limited liability company
By its sole member, Radar Relay, Inc.

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITIONS I, LLC**, a North Carolina limited liability company

By its sole member, American Property Acquisition, LLC

By its sole member, Core Scientific Operating Company

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**AMERICAN PROPERTY ACQUISITIONS VII, LLC**, a Georgia limited liability company

By its sole member, American Property Acquisition, LLC

By its sole member, Core Scientific Operating Company

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**CORE SCIENTIFIC MINING LLC**, a Texas limited liability company

By: DocuSigned by: Todd DuChene 43048BB7D89C4FE...
Name: Todd DuChene
Title: President and Chief Legal Officer

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**, a Delaware limited liability company

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC ACQUIRED MINING LLC**, a Delaware limited liability company

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**, a Delaware company

DocuSigned by:
By: Michael Levitt
98B473C5A1F4496...
Name: Michael Levitt
Title: Chief Executive Officer

DocuSign Envelope ID: 78D38297-340A-4FFA-B267-8652B70179A9 Case 22-90341 Document 603 Filed in TXSB on 03/01/23 Page 362 of 393

**B. RILEY COMMERCIAL CAPITAL, LLC**,
as Administrative Agent

By: DocuSigned by: Phil Ahn ____________________
8F3ED3A59DDF4B0...
Name: Phil Ahn
Title: Chief Financial Officer

[Core Scientific– DIP Guaranty Agreement]
Debtors' Exhibit No. 22
Page 362 of 393

EXHIBIT E
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and
Security Agreement

**[FORM OF] COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "Compliance Certificate") is delivered to you pursuant to Section 10.1.2(d) of the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders. Terms defined in the DIP Credit Agreement and not otherwise defined herein are used herein as therein defined.

The undersigned does hereby certify, in [his/her] capacity as a Senior Officer and not in any individual capacity, to the Administrative Agent and each Lender as follows:

1. I am a duly elected, qualified and acting Senior Officer of the Borrower.

2. I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as a Senior Officer of the Borrower. The matters set forth herein are true to the best of my knowledge after due inquiry.

[Use the following paragraph 3 for Fiscal Year-end financial statements of Borrower and Subsidiaries:]

[3. Attached hereto as ANNEX I are the audited Fiscal Year-end balance sheets required by Section 10.1.2(a) of the DIP Credit Agreement for the Fiscal Year of Borrower and Subsidiaries ended [________], 20[__], together with the related statements of income, cash flow and shareholders' equity for such Fiscal Year, on a consolidated basis for Borrower and Subsidiaries, which consolidated statements are in the form required pursuant to Section 10.1.2(a) of the DIP Credit Agreement and are certified (without a "going concern" or like qualification or exception, other than a "going concern" qualification or exception solely as a result of the Chapter 11 Cases or Debt maturing thereafter) by the independent certified public accountants of Borrower.]

[Use the following paragraph 3 for Fiscal Quarter-end financial statements of Borrowers and Subsidiaries:]

[3. Attached hereto as ANNEX I are the Fiscal Quarter-end unaudited balance sheets required by Section 10.1.2(b) of the DIP Credit Agreement for the Fiscal Quarter of Borrower and Subsidiaries ended [________], 20[__], together with the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on a consolidated basis for Borrower and Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year which were prepared in accordance with GAAP and fairly present the financial position and results of operations for such Fiscal Quarter and period, subject only to normal year-end and audit adjustments and the absence of footnotes.]

[Use the following paragraph 3 for calendar month-end financial statements of Borrowers and Subsidiaries:]

[3. Attached hereto as ANNEX I is the calendar month-end consolidated balance sheet required by Section 10.1.2(c) of the DIP Credit Agreement for the calendar month of Borrower and Subsidiaries ended [________], 20[__], together with the related consolidated statements of operations for such month and for the portion of the Fiscal Year then ended, and consolidated statements of cash flows for such month and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding month of the previous fiscal year and the corresponding portion of the previous fiscal year, which are in reasonable detail and fairly present in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP.]

4. ANNEX 2 attached hereto sets forth a detailed calculation of Liquidity and certificate of compliance with such covenant, as of the date hereof.

5. No Default or Event of Default is in existence[, except as set forth below and describing in reasonable detail the nature and extent thereof and what actions the Borrower have taken and proposes to take with respect thereto].

[6. Attached hereto as ANNEX 2 is information regarding any previously undisclosed [Deposit Accounts][3] [Security Accounts][Commodity Accounts][Chattel Paper and Instruments][4] [Investment Property][5] [Letter-of-Credit Rights][6].][7]

IN WITNESS WHEREOF, I have executed this Compliance Certificate this ____________ day of _______________ 202_.

CORE SCIENTIFIC, INC., as the Borrower

By: ___________________________________
Name:
Title: [•][8]

[3] Including the DIP Funding Accounts, but not including Excluded Accounts.
[4] In each case, with a face amount in excess of $500,000.
[5] To the extent in excess of $500,000 or consisting of Equity Interests in a Subsidiary.
[6] To the extent in excess of $500,000.
[7] To be included to the extent applicable pursuant to Section 7.5.2 of the DIP Credit Agreement.
[8] Must be a Senior Officer.

Exhibit E
ANNEX 1

Financial Statements

(See attached)

Annex 1 to Exhibit E

11255122v17

Debtors' Exhibit No. 22
Page 365 of 393

Exhibit E
ANNEX 2

Liquidity Covenant

**Liquidity**:

| | | |
|---|---|---|
| A. | Unrestricted cash and Cash Equivalents (based on the book balance thereof) of Borrower and the other Obligors, in either case, held in a Deposit Account subject to a Control Agreement in favor of the Administrative Agent:[9] | $____________ |
| B. | Subject to the definition of Unrestricted Bitcoin, the aggregate value in U.S. Dollars of Unrestricted Bitcoin owned by Borrower and the other Obligors as of the date of this Compliance Certificate, as such value shall be determined based on the BTCUSD Coinbase spot price as of 5:00 p.m. as of the immediately preceding Business Day (or, if applicable with respect to any Bitcoin, the value thereof, if any, as determined in accordance with any applicable Permitted BTC Hedging Agreement with respect thereto): | $____________ |
| C. | Sum of line A and line B: | |
| D. | Minimum required Liquidity: | $5,000,000.00 |
| E. | In Compliance with Section 10.3.2 of the DIP Credit Agreement? | Yes/No |

[9] Provided that, (1) solely for purposes of determining compliance with the Financial Covenant set forth above, any amount held in any Deposit Account shall be "Liquidity" regardless of whether it is subject to a Control Agreement in favor of the Administrative Agent until the date on which Control Agreements must be put in place pursuant to Section 6.3 of the DIP Credit Agreement and (2) in no event, shall (x) cash or Cash Equivalents in the Carve-Out Account or (y) any cash held or deposited in respect of utility deposits, including any Adequate Assurance Deposits, be included in the calculation of Liquidity.

Exhibit E
ANNEX 3

[Deposit Accounts][Security Accounts][Commodity Accounts][Chattel Paper and Instruments][Investment Property][Letter-of-Credit Rights]

Annex 3 to Exhibit E

11255122v17

Debtors' Exhibit No. 22
Page 367 of 393

EXHIBIT F-1
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN LENDERS THAT ARE NOT PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of a Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to a Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Obligor Representative with a certificate of its non-U.S. person status on IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Obligor Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Obligor Representative and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF LENDER]

By: ______________________________
Name:
Title:

Date: __________________, 20 [_]

EXHIBIT F-2
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN PARTICIPANTS THAT ARE NOT PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: ________________________
Name:
Title:

Date: _________________, 20 _

EXHIBIT F-3
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN PARTICIPANTS THAT ARE PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BENE or IRS Form W-8BEN, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: ________________________
Name:
Title:

Date: ________________, 20 [_]

EXHIBIT F-4
to
Senior Secured Super-Priority Replacement Debtor-In-Possession Loan and Security Agreement

**[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE**

(FOR FOREIGN LENDERS THAT ARE PARTNERSHIPS FOR U.S. FEDERAL INCOME TAX PURPOSES)

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders.

Pursuant to the provisions of Section 5.10.2(b) of the DIP Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s), (iii) with respect to the extension of credit pursuant to this DIP Credit Agreement, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Obligor Representative with IRS Form W- 8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Obligor Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

[NAME OF PARTICIPANT]

By: ________________________
Name:
Title:

Date: ________________, 20 _

EXHIBIT G
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] JOINDER**

This Joinder and Assumption Agreement (this "Joinder") is made on the day of ____________, 20____, by _________, a(n) __________ (the "New Guarantor").

Background

Reference is hereby made to the Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"), among Core Scientific, Inc., a Delaware corporation (the "Borrower"), each other Obligor party thereto and B. Riley Commercial Capital, LLC, as the administrative agent (the "Administrative Agent") for each Person party to the DIP Credit Agreement from time to time as a Lender (collectively, the "Lenders"), and such Lenders; and (ii) the other Loan Documents referred to in the DIP Credit Agreement, as the same may be amended, restated, modified or supplemented from time to time.

Agreement

Capitalized terms defined in the DIP Credit Agreement are used herein as defined therein. The undersigned (the "New Guarantor") is a subsidiary of an Obligor that was [acquired/formed] subsequent to the Closing Date. Pursuant to Section 7 and 10.1.8(c) of the DIP Credit Agreement, it is a condition to the [acquisition/formation] of the New Guarantor that the New Guarantor, effective as of the date hereof: (i) become a party to the DIP Credit Agreement and the other Loan Documents to which the Guarantors are party (collectively, the "Joinder Documents"), and (ii) assume the obligations of a Guarantor under the Joinder Documents pursuant to the terms and conditions of this Joinder. In consideration of the Obligations and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the New Guarantor and the Guarantors, and as a condition to the [acquisition/formation] of the New Guarantor by [______], the New Guarantor hereby agrees that effective as of the date hereof, (i) it hereby is, and shall be deemed to be a Guarantor under the Joinder Documents, (ii) the New Guarantor has assumed the obligations of a Guarantor under the Joinder Documents, and (iii) the New Guarantor shall perform, comply with and be subject to and bound by, jointly and severally, with each of the other Guarantors, each of the terms, provisions and waivers of the Joinder Documents and any other documents that are stated to apply to or are made by a Guarantor.

Without limiting the generality of the foregoing, the New Guarantor hereby represents and warrants that each of the representations and warranties with respect to the Guarantors set forth in the Joinder Documents is true and correct in all material respects as to the New Guarantor (or, with respect to representations and warranties qualified by materiality, in all respects) on and as of the date hereof as if made on and as of the date hereof by the New Guarantor (except for representations and warranties that expressly relate to an earlier date); provided that any such representation or warranty solely as to such New Guarantor and the applicable Collateral that (a) relates to an earlier date shall be deemed to be made on and as of the date hereof and (b) refers to a schedule to the DIP Credit Agreement, shall be deemed to refer to such schedules as supplemented hereby, (ii) the New Guarantor has heretofore received a true and correct copy of the DIP Credit Agreement and each of the other Loan Documents (including any modifications thereof or supplements or waivers thereto) as in effect on the date hereof and (iii) attached

hereto are true and complete supplements, with respect to such New Guarantor, to the schedules to the DIP Credit Agreement and perfection certificate.

When executed and delivered, this Joinder may be attached to each of the Joinder Documents as evidence of the joinder of the undersigned in and to each such Joinder Document.

The New Guarantor hereby makes, affirms, and ratifies in favor of the Lenders and the Administrative Agent, the Joinder Documents given by New Guarantor to the Administrative Agent and any of the Lenders and, without limitation of the foregoing, to secure the prompt payment and performance in full of the Obligations, the New Guarantor hereby collaterally assigns, and further pledges and grants to the Administrative Agent for the benefit of the Secured Parties a continuing first-priority security interest in and to and Lien on, all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.

In furtherance of the foregoing, the New Guarantor shall execute and deliver or cause to be executed and delivered at any time and from time to time such further instruments and documents and do or cause to be done such further acts as may be reasonably necessary or proper in the opinion of the Administrative Agent to carry out more effectively the provisions and purposes of this Joinder, the DIP Credit Agreement and the Loan Documents.

[INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the New Guarantor has duly executed this Joinder and delivered the same to the Administrative Agent for its benefit and for the benefit of the Lenders, on the date and year first above written.

___________,
a(n) ________________

By: ____________________________________
Name: __________________________________
Title: ___________________________________

Notice Address:

**Core Scientific, Inc.**
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attention: Kristen Carnevali; Denise Sterling; and Todd DuChene

Acknowledged and accepted:

**B. Riley Commercial Capital, LLC**
as the Administrative Agent

By: ___________________________________
Name: _________________________________
Title: __________________________________

EXHIBIT H

**INITIAL BUDGET**

[See Attached]

Exhibit H-1

11255122v17

Debtors' Exhibit No. 22
Page 375 of 393

# Detailed DIP Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| **Week Starting** | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| **Week Ending** | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | **8.8** | **6.9** | **6.1** | **6.1** | **9.9** | **7.4** | **7.5** | **7.5** | **14.7** | **7.8** | **7.9** |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | **(9.3)** | **(10.8)** | **(8.5)** | **(6.9)** | **(15.3)** | **(6.6)** | **(7.7)** | **(6.6)** | **(6.5)** | **(11.7)** | **(7.1)** |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **-** | **(1.1)** | **(0.5)** | **-** | **-** | **-** | **(1.2)** | **-** | **-** |
| **Total Operating Cash Flows** | **(0.6)** | **(3.9)** | **(2.3)** | **(1.9)** | **(5.9)** | **0.8** | **(0.3)** | **0.9** | **7.0** | **(3.8)** | **0.8** |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | (0.1) | - | - | - | (0.1) | - | - |
| Other (TBD) | - | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | **(5.0)** | **(1.6)** | **(1.7)** | **(2.4)** | **(5.4)** | **(2.2)** | **(2.0)** | **(2.0)** | **(3.6)** | **(2.2)** | **(1.9)** |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | **29.6** | **24.1** | **20.1** | **15.8** | **24.5** | **23.1** | **20.8** | **19.7** | **23.2** | **22.1** | **21.0** |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **30.6** | **25.1** | **20.9** | **16.7** | **25.5** | **24.2** | **21.9** | **20.8** | **24.2** | **23.2** | **22.2** |

# Detailed DIP Budget (Continued)

| | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 | Week 22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | |
| **Week Starting** | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | Total |
| **Week Ending** | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | 01/28-06/30 |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 165.8 |
| Hosting Payments | - | - | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | 35.6 |
| **Net Receipts** | **7.9** | **7.9** | **14.8** | **7.9** | **7.9** | **7.9** | **15.5** | **7.9** | **7.9** | **7.9** | **17.1** | **201.4** |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | (0.8) |
| **Net Operating Disbursements** | **(5.7)** | **(7.1)** | **(11.5)** | **(6.9)** | **(6.0)** | **(6.9)** | **(9.6)** | **(7.7)** | **(6.1)** | **(7.5)** | **(6.9)** | **(178.8)** |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **(5.6)** |
| **Total Operating Cash Flows** | **2.3** | **0.8** | **2.4** | **1.0** | **1.9** | **1.0** | **5.0** | **0.3** | **1.8** | **0.4** | **9.3** | **16.9** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (9.5) |
| **Net Non-Operating Cash Flows** | **(1.5)** | **(1.5)** | **(3.2)** | **(1.5)** | **(1.5)** | **(1.5)** | **(2.6)** | **(1.5)** | **(1.5)** | **(1.5)** | **(10.6)** | **(58.3)** |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | (41.4) |
| **Ending Cash Balance** | **21.8** | **21.1** | **20.3** | **19.9** | **20.2** | **19.7** | **22.1** | **20.9** | **21.2** | **20.0** | **18.7** | **18.7** |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | **22.9** | **22.2** | **21.5** | **21.0** | **21.4** | **20.8** | **23.2** | **22.0** | **22.3** | **21.2** | **19.9** | **19.9** |

EXHIBIT I
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] GLOBAL INTERCOMPANY NOTE**

(See attached)

Exhibit I-1

11255122v17

Debtors' Exhibit No. 22
Page 378 of 393

**EXECUTION VERSION**

**GLOBAL INTERCOMPANY NOTE**

February 27, 2023

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other Person listed on the signature pages hereto (each, in such capacity, a "**Payor**"), hereby promises to pay to such other Person listed below (each, in such capacity, a "**Payee**"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as such Payee shall from time to time designate, the unpaid principal amount of all Debt owed by such Payor to such Payee on such date or dates as shall be agreed upon from time to time by such Payor and such Payee (or, if no such dates are specified, on demand). Each Payor promises also to pay interest on the unpaid principal amount of all such loans and advances (the "**Debt**") in like money at said location from the date that such Debt was incurred until it is paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee. Prior to demand, a Payor shall be entitled to prepay all or any portion of the Debt owed by such Payor without notice, premium or penalty. Notwithstanding anything to the contrary contained herein or in any other promissory note, instrument, or other agreement, this Intercompany Note shall evidence all loans and advances from each Payee to each Payor, regardless of whether evidenced by another note, instrument or writing.

Reference is made to that certain Senior Secured Super-Priority Debtor-in-Possession Replacement Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among (a) Core Scientific, Inc., a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases, as the borrower thereunder (the "**Borrower**"), (b) each Guarantor, each as an Obligor and a debtor and debtor-in-possession in the Chapter 11 Cases party thereto from time to time, (c) each Lender party thereto from time to time, and (d) B. Riley Commercial Capital, LLC, as Administrative Agent (the "**Administrative Agent**"). Capitalized terms used in this Global Intercompany Note (this "**Note**") but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

This Note is subject to the terms of the DIP Credit Agreement, and shall be pledged by each Payee that is an Obligor to the Administrative Agent, for the benefit of the Secured Parties, pursuant to the related Loan Documents as security for the payment and performance in full of the Obligations under the DIP Credit Agreement and the related other Loan Documents, to the extent required pursuant to the terms thereof. Each Payee hereby acknowledges and agrees that upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement, (a) the Administrative Agent may exercise any and all rights of any Obligor with respect to this Note and (b) upon demand of the Administrative Agent, all amounts evidenced by this Note that are owed by any Payor to any Obligor shall become immediately due and payable, without presentment, demand, protest or notice of any kind (it being understood that the Administrative Agent may make any such demand for all or any subset of the amounts owing to such Obligor and upon any or all Payors obligated to such Obligor, all without the consent or permission of any Payor or Payee). Each Payor also hereby acknowledges and agrees that this Note constitutes notice of assignment for security, pursuant to

the relevant Loan Documents, of the Debt and all other amounts evidenced by this Note and further acknowledges the receipt of such notice of assignment for security.

Upon the commencement of any insolvency or bankruptcy proceeding, other than the Chapter 11 Cases, or any receivership, liquidation, reorganization or other similar proceeding in connection therewith, in respect of any Payor owing any amounts evidenced by this Note to any Obligor, or in respect of all or a substantial part of any such Payor's property, or upon the commencement of any proceeding for voluntary liquidation, dissolution or other winding up of any such Payor, all amounts evidenced by this Note owing by such Payor to any and all Obligors shall become immediately due and payable, without presentment, demand, protest or notice of any kind.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein; provided, however, that the failure of any such Payee to so record any such information in accordance with this clause shall not affect any such Payor's obligations hereunder.

Each Payor hereby waives diligence, presentment, demand, protest or notice of any kind whatsoever in connection with this Note. All payments under this Note shall be made without set-off, counterclaim or deduction of any kind.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and its successors and assigns, including subsequent holders hereof.

From time to time after the date hereof, additional Subsidiaries of the Borrower may become parties hereto (as a Payor and/or a Payee, as the case may be) by executing a counterpart signature page to this Note (each additional Subsidiary, an "**Additional Party**"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payor or Payee hereunder.

No amendment, modification or waiver of, or consent with respect to, any provisions of this Note shall be effective unless the same shall be in writing and signed and delivered by each Payor and Payee whose rights or obligations shall be affected thereby; provided that, until such time as (a) all the Obligations (other than contingent obligations as to which no claim has been made) under the DIP Credit Agreement and the related other Loan Documents have been paid in full in cash or immediately available funds and (b) all Commitments have terminated, as applicable, the Administrative Agent shall have provided its prior written consent to such amendment, modification, waiver or consent of the subordination provisions hereof (which consent shall not be unreasonably withheld or delayed).

THIS NOTE AND ALL DEBT EVIDENCED HEREBY ARE SUBJECT TO THE SUBORDINATION PROVISIONS OF THE INTERCOMPANY SUBORDINATION AGREEMENT, DATED AS OF FEBRUARY 27, 2023 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**INTERCOMPANY SUBORDINATION AGREEMENT**"), AMONG THE BORROWER, SUBSIDIARIES OF THE BORROWER PARTY THERETO AND B. RILEY COMMERCIAL CAPITAL, LLC, AS ADMINISTRATIVE AGENT UNDER THE DIP CREDIT AGREEMENT. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER THE PRINCIPAL OF NOR THE INTEREST ON, NOR ANY OTHER AMOUNTS PAYABLE IN RESPECT OF, ANY DEBT CREATED OR EVIDENCED BY THIS NOTE SHALL BE PAID OR PAYABLE, EXCEPT TO THE EXTENT PERMITTED UNDER THE INTERCOMPANY SUBORDINATION AGREEMENT, WHICH IS INCORPORATED HEREIN BY REFERENCE WITH THE SAME FORCE AND EFFECT AS IF FULLY SET FORTH HEREIN.

THIS GLOBAL INTERCOMPANY NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Global Intercompany Note may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Global Intercompany Note shall become effective when the Administrative Agent has received counterparts bearing the signatures of all parties hereto. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Global Intercompany Note shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

The parties hereto hereby consent to the forum and various waivers set forth in Sections 14.14 and 14.15 of the DIP Credit Agreement.

[*Remainder of Page Intentionally Left Blank*]

**PAYORS & PAYEES:**

**CORE SCIENTIFIC, INC.**

By:______________________________
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

**CORE SCIENTIFIC MINING LLC**

By:______________________________
Name: Todd DuChene
Title: President and Chief Legal Officer

**RADAR RELAY, INC.**

By:______________________________
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**
By its sole member, Core Scientific Operating Company

By:______________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**
By its sole member, Radar Relay, Inc.

By:______________________________
Name: Todd DuChene
Title: President

[Signature Page to Global Intercompany Note]

**RADAR LLC**
By its sole member, Radar Relay, Inc.

By:____________________________
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITIONS I, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By:____________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**AMERICAN PROPERTY ACQUISITIONS VII, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By:____________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

[Signature Page to Global Intercompany Note]

**CORE SCIENTIFIC ACQUIRED MINING LLC**

By:__________________________________
Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**

By:__________________________________
Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**

By:__________________________________
Name: Michael Levitt
Title: Chief Executive Officer

**ALLONGE TO GLOBAL INTERCOMPANY NOTE**

The undersigned ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, hereby absolutely assigns, transfers, endorses, negotiates and sets over to and makes payable to the order of ____________________, ("Assignee"), that certain Global Intercompany Note dated as of ________ (the "Note") made by _____________, in favor of Assignor, and all interest, principal and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note, without recourse, representation or warranty, express or implied.

The foregoing endorsement shall have the same effect as though it were written directly on the Note itself.

Dated: _________________

11247706v5

**PAYORS & PAYEES:**

**CORE SCIENTIFIC, INC.**

By:______________________________
Name: Todd DuChene
Title: President, Chief Legal Officer and Secretary

**CORE SCIENTIFIC MINING LLC**

By:______________________________
Name: Todd DuChene
Title: President and Chief Legal Officer

**RADAR RELAY, INC.**

By:______________________________
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITION, LLC**
By its sole member, Core Scientific Operating Company

By:______________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**STARBOARD CAPITAL LLC**
By its sole member, Radar Relay, Inc.

By:______________________________
Name: Todd DuChene
Title: President

[Signature Page to Allonge]

**RADAR LLC**
By its sole member, Radar Relay, Inc.

By:______________________________
Name: Todd DuChene
Title: President

**AMERICAN PROPERTY ACQUISITIONS I, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By:______________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

**AMERICAN PROPERTY ACQUISITIONS VII, LLC**
By its sole member, American Property Acquisition, LLC
By its sole member, Core Scientific Operating Company

By:______________________________
Name: Todd DuChene
Title: EVP, General Counsel, Chief Compliance Officer and Secretary

[Signature Page to Allonge]

**CORE SCIENTIFIC ACQUIRED MINING LLC**

By:________________________________
Name: Michael Levitt
Title: President

**CORE SCIENTIFIC OPERATING COMPANY**

By:________________________________
Name: Michael Levitt
Title: Chief Executive Officer

**CORE SCIENTIFIC SPECIALTY MINING (OKLAHOMA) LLC**

By:________________________________
Name: Michael Levitt
Title: Chief Executive Officer

[Signature Page to Allonge]

EXHIBIT J
to
Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement

**[FORM OF] VARIANCE REPORT CERTIFICATE**

Reference is made to that certain Senior Secured Super-Priority Replacement Debtor-In Possession Loan and Security Agreement, dated as of February 27, 2023 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Agreement"), by and among (a) **CORE SCIENTIFIC, INC.**, a Delaware corporation and a debtor and debtor-in-possession in the Chapter 11 Cases, as the borrower of the Loans thereunder (the "Borrower"), (b) each **SUBSIDIARY GUARANTOR**, as a Guarantor, an Obligor, and a debtor and debtor-in-possession in the Chapter 11 Cases, (c) each Person party hereto from time to time as a **LENDER**, and (d) **B. RILEY COMMERCIAL CAPITAL, LLC**, as Administrative Agent. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Pursuant to **Section 10.1.12(b)** of the Agreement, the undersigned hereby certifies on behalf of the Borrower, solely in such undersigned's capacity as a Senior Officer of the Borrower, and not individually, as follows:

(a) Attached hereto as Exhibit A is a copy of the Variance Report with respect to the calendar week ending as of (and including) the Friday of the week immediately preceding the date hereof. Exhibit A also provides a reasonably detailed explanation of each Budget Variance identified that is "material", whether on a qualitative or quantitative basis;

(b) The Company is in compliance with **Section 10.3** of the Agreement; and

(c) No Default or Event of Default has occurred or is continuing as of the date hereof, or is reasonably expected to occur or arise.

IN WITNESS WHEREOF, I have executed this Variance Report Certificate this _________ day of _______________ 202_.

CORE SCIENTIFIC, INC., as the Borrower

By: ______________________________________
Name:
Title: [•][10]

[10] Must be a Senior Officer.

**Exhibit A**

**Variance Report**

[See Attached]

Exhibit A to Exhibit J

11255122v17

Debtors' Exhibit No. 22
Page 390 of 393

*Preliminary Draft Subject to Material Change; Privileged and Confidential; Attorney-Work Product*

# Weekly Variance Report

| Week Starting<br>Week Ending | 4 Weeks Ended<br>DIP Budget | Actuals | Variance | Comments |
|---|---|---|---|---|
| **Operating Statistics** | | | | |
| Avg BTC Price Sold | | | | |
| **Operating Cash Flows** | | | | |
| Self-Mined BTC Sale Proceeds | | | | |
| Hosting Payments | | | | |
| **Net Receipts** | | | | |
| **Net Operating Disbursements** | | | | |
| **Net Capital Expenditures** | | | | |
| **Total Operating Cash Flows** | | | | |
| **Non-Operating Cash Flows** | | | | |
| Professional Fees | | | | |
| Utility Deposits | | | | |
| Debt Service Costs | | | | |
| Other (TBD) | | | | |
| **Net Non-Operating Cash Flows** | | | | |
| **Liquidity Balances** | | | | |
| Starting Cash Balance | | | | |
| New Money / DIP Financing | | | | |
| Existing DIP Repayment and Fees | | | | |
| Net Cash Flow | | | | |
| **Ending Cash Balance** | | | | |
| BTC Held & In Transit | | | | |
| **Ending Liquidity** | | | | |
| **Covenants** | | | | |
| Projected Four Week Net Receipts | | | | |
| **Budget Covenant Net Receipts** | | | | |
| Projected Four Week Net Disbursements | | | | |
| **Budget Covenant Net Disbursements** | | | | |

*Preliminary Draft Subject to Material Change; Privileged and Confidential; Attorney-Work Product*

# Weekly Variance Report - Continued

| | Actuals | | | | Variance vs. Approved DIP Budget | | | |
|---|---|---|---|---|---|---|---|---|
| **Week Starting** | 1/14/2023 | 1/21/2023 | 1/28/2023 | 2/4/2023 | 1/14/2023 | 1/21/2023 | 1/28/2023 | 2/4/2023 |
| **Week Ending** | 1/20/2023 | 1/27/2023 | 2/3/2023 | 2/10/2023 | 1/20/2023 | 1/27/2023 | 2/3/2023 | 2/10/2023 |
| **Operating Statistics** | | | | | | | | |
| Avg BTC Price Sold | | | | | | | | |
| **Operating Cash Flows** | | | | | | | | |
| Self-Mined BTC Sale Proceeds | | | | | | | | |
| Hosting Payments | | | | | | | | |
| **Net Receipts** | | | | | | | | |
| **Net Operating Disbursements** | | | | | | | | |
| **Net Capital Expenditures** | | | | | | | | |
| **Total Operating Cash Flows** | | | | | | | | |
| **Non-Operating Cash Flows** | | | | | | | | |
| Professional Fees | | | | | | | | |
| Utility Deposits | | | | | | | | |
| Debt Service Costs | | | | | | | | |
| Other (TBD) | | | | | | | | |
| **Net Non-Operating Cash Flows** | | | | | | | | |
| **Liquidity Balances** | | | | | | | | |
| Starting Cash Balance | | | | | | | | |
| New Money / DIP Financing | | | | | | | | |
| Existing DIP Repayment and Fees | | | | | | | | |
| Net Cash Flow | | | | | | | | |
| **Ending Cash Balance** | | | | | | | | |
| BTC Held & In Transit | | | | | | | | |
| **Ending Liquidity** | | | | | | | | |

**Exhibit 2**

**Lien Priorities Following Refinancing Effective Date (For Illustrative Purposes Only)**

| **Rank** | **First-Priority DIP Collateral** | **Junior-Priority DIP Collateral** | | |
|---|---|---|---|---|
| | | **Junior-Priority DIP Collateral (other than Prepetition Equipment Financing Collateral or Prepetition Secured Notes Collateral)** | **Prepetition Equipment Financing Collateral** | **Prepetition Secured Notes Collateral** |
| ***First*** | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| ***Second*** | DIP Liens | Prior Senior Liens | Prior Senior Liens | Prior Senior Liens |
| ***Third*** | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | DIP Liens | Equipment Lender Adequate Protection Liens | Noteholder Adequate Protection Liens |
| ***Fourth*** | | Noteholder Adequate Protection Liens and Equipment Lender Adequate Protection Liens | Prepetition Equipment Financing Liens | Prepetition Secured Notes Liens |
| ***Fifth*** | | | DIP Liens | DIP Liens |
| ***Sixth*** | | | Noteholder Adequate Protection Liens | Equipment Lender Adequate Protection Liens |

WEIL:\99035730\3\39031.0014