IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORE SCIENTIFIC, INC., *et al.*,[1] | ) | Case No. 22-90341 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**CELSIUS MINING LLC'S
OBJECTION TO THE DEBTORS' MOTION
FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT
TO PROOF OF CLAIM NOS. 425 AND 497 FILED BY CELSIUS MINING LLC**

Celsius Mining LLC ("Celsius")[2] files this objection (this "Objection") in response to the *Debtors' Motion for Partial Summary Judgment with Respect to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC* [Docket No. 942] (the "Motion"). In support of this Objection, Celsius respectfully states as follows:

**Objection**

1.     Contractual limitations of liability cannot insulate a party from the consequences of its intentional or bad faith misconduct. The discovery that Celsius has taken in the Celsius Chapter 11 Cases related to the parties' Master Services Agreement ("MSA"), attached here as **Exhibit A**, shows—or, at a minimum, raises questions of material fact—that the Debtors acted in

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2]     Celsius is a debtor in possession in its own chapter 11 case pending in the Bankruptcy Court for the Southern District of New York, being jointly administered under Case No. 22-10964 (MG) (collectively, the "Celsius Chapter 11 Cases").

bad faith in passing through electricity costs despite the fixed hosting services rate in the parties' contracts.

2.      The MSA between Celsius and the Debtors incorporates various "Orders," which provide a **fixed**—*i.e.*, non-variable—hosting services rate of dollars per kilowatt hour to cover electricity costs associated with the hosting services provided by the Debtors.  The MSA permits the Debtors to pass through to Celsius only certain, specific types of "new" charges that were unforeseeable at the time of contracting: "increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services."  *See* MSA §4(f).  Section 4(f) does not permit a pass through of charges to the base cost of electricity.

3.      Nevertheless, in June 2022, the Debtors began passing through increases in electricity costs and including—for the first time—a "power costs pass through" charge on Celsius' invoices.  While the Debtors now take the position that this new policy was supported by the MSA's reference to "tariff" pass-throughs, the Debtors' internal documents confirm that the Debtors' employees and advisors in fact shared Celsius' interpretation of the MSA as a **fixed** contract prior to instituting the "pass through."  In other words, the Debtors knew they had no legal basis for charging Celsius a "power costs pass-through," and yet did so anyway.  The Debtors cannot avail themselves of a one-sided contractual limitation of liability clause to insulate themselves from their willful misconduct.  Summary judgment should be denied on this basis alone.

4.      There is, however, a second basis for denial of summary judgment: the Debtors' motion is premature.  Celsius included five components in Proofs of Claim Nos. 425 and 497, which relate to: (i) prepetition breach of contract claim; (ii) postpetition, pre-rejection breach of

**Debtors' Exhibit No. 28**
**Page 2 of 35**

contract claim; (iii) claim for return of prepayments; (iv) contract rejection damages claim; and (v) claim for damages related to Celsius' mining rigs. The only discovery that has been taken so far relates to the pre-petition breach of contract claim. The Debtors cannot short circuit further discovery on these issues by filing a premature motion for summary judgment, before Celsius has had the opportunity to complete discovery and determine if the Debtors engaged in other bad faith misconduct that would negate the limitation of liability clause with respect to these claims.

5. Celsius respectfully requests that the Court deny summary judgment at this time.

**I. The Debtors Engaged in Bad Faith Conduct Related to the MSA.**

6. The limitation of liability provision in the MSA is unenforceable on the existing discovery record, which shows that the Debtors engaged in bad faith conduct by re-interpreting the MSA to add an improper power cost pass through to the fixed hosting services rate.

7. As a matter of public policy, courts applying Delaware law (which governs the MSA) will not enforce limitations of liability clauses in cases of intentional or bad faith misconduct. *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006) (finding a limitation of liability provision was unenforceable against a buyer where the seller made intentional misrepresentations); *Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) ("[I]t is undisputed that parties cannot absolve themselves for their own conduct amounting to fraud."). In *J.A. Jones Construction Company v. City of Dover,* the court reviewed a limitation of liability provision that did not specifically carve out an exception for bad faith and observed that "[e]ven if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own fraud or bad faith." 372 A.2d 540, 545 (Del. Super. Ct. 1977). *J.A. Jones* makes clear that limitation of liability clauses are not enforceable against a victim of bad faith conduct,

3

including bad faith breaches of contract and breaches of the implied covenant of good faith and fair dealing. *J. A. Jones at 5*45 n.6, 546.

8.      In the Celsius Chapter 11 Cases, Celsius uncovered evidence that the Debtors knew that the Orders provided for a fixed hosting services rate, knew that they were not permitted to pass through increases in base electricity costs, and yet did so anyway by re-imagining Section 4(f) of the MSA to allow pass throughs for power cost fluctuations.  For example, the Debtors' internal accounting documents referred to the hosting-services rate in all of the Debtors' contracts as "***fixed*** per kWh of power consumption," and explained that the contracts as a whole are "variable consumption, ***not*** variable price."   **Exhibit B** at -00009903, -00009911 (emphasis added).

9.      The Debtors' external auditor, Ernst & Young ("EY") also questioned "the legal validity of passing through [power] cost" under the "tariff" language in MSA.  **Exhibit C** at CORE-00017158.  As EY explained to the Debtors in June 2022, "[EY's] understanding is that tariffs can be defined as government imposed levies." *Id.*  EY suggested that the Debtors include in its financials "an offsetting allowance . . . as opposed to merely recording of revenue" in case customers disputed the pass through of increased utility costs. *Id.* at -00017158– -00017159.

10.     When EY asked for a meeting on the issue, the Debtors' Vice President of Accounting Policy, Ed Haney, wrote back on July 18, 2022 and claimed "the potential reversal of revenue recognized from the power pass-through charges is not significant, as the contract clearly provides for the power pass-through in the monthly charge." *Id.* at -00017155– -00017156.  He punctuated his assessment by representing that the Debtors' customers were accepting, and paying, the pass-through amounts: "***There is currently no challenge from any client on the legality of the pass-through charges.***" *Id.*  (emphasis added).

4

11.    That representation to the Debtors' auditor was not true.  **Exhibit D**, 10/31/22 M. Xia Dep. Tr. at 219:5-10 ("This sentence is not as accurate as it's supposed to be.").  In fact, at the time, the Debtors had received multiple direct challenges to the legality of their pass-through practices, including from Atlas,[3] CoreWeave,[4] Poolin Technology Pte.,[5] and Alloy Ventures Management.[6]  Altogether, the Debtors lost between five to ten clients as a result of their new decision to pass through rising power costs.  **Exhibit D**, 10/31/22 M. Xia Dep. Tr. at 22:1–25.

12.    The Debtors also collected nearly $17 million from Celsius to support deployment of Celsius' rigs that they then used for their own mining fleet instead of deploying Celsius' rigs as required under the contracts.  The Debtors have argued that they were not obligated to deploy Celsius' rigs on any timeline, but this defies the plain language of the contract, common sense, and economic rationality.  Under the Debtors' view, the contract requires Celsius to pay tens of millions of dollars in up front pre-payments, but the Debtors had no obligation to deploy Celsius' rigs at all.  *See Core Scientific, Inc.'s Objection to Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt*, *In re Celsius Network LLC*, No. 22-10964 (MG) [Celsius Docket No. 1140] at ¶ 78; **Exhibit I** 11/8/22 M. Levitt Dep. Tr. at 225:14–226:25.  Celsius would not—and did not—enter into such an illusory contract.  The Debtors' documents over and over again state that it was critical for the Debtors to "prioritize the self mining machines ahead of client

---

3    "Atlas hereby disputes Core's June 2022 invoice because Core has inappropriately and without any contractual basis increased the price of KWh."  **Exhibit E** at CORE-00007809.

4    "[Y]ou are hereby notified that CoreWeave disputes charges 1 and 2 of the Invoice; namely, the two charges for May and June 2022 'Power Costs Pass-through.'"  **Exhibit F** at CORE-00002521.

5    "I remembered the hosting fee is 6.5cents in the hosting contract, could you explain why the hosting price was changed?"  **Exhibit G** at CORE-00004157.

6    "This is a bit unexpected as conversations in the past had led me to believe our rate would be guaranteed through end of term in March 2023."  **Exhibit H** at CORE-00004165.

**Debtors' Exhibit No. 28**
**Page 5 of 35**

installations and defer client installs," **Exhibit J** at -00007270, because self-mining was simply a better business, **Exhibit K** at -00006852 ("[T]here will be pressure on self-miner deployment as it unlocks financing and cash inflows, more so than anything else coming in right now.").  The Debtors needed to—and did—"[s]low … Celsius deployment, considerably, until all self-mining is deployed." **Exhibit L** at -00003530.

13.     Thus, the evidence uncovered to date shows that the Debtors knowingly and intentionally misrepresented the terms of the MSA, lied about the challenges they received from other customers related to this abrupt interpretation change, and prioritized their own fleet over their contractual obligation to paying customers like Celsius.  At a minimum, this evidence is sufficient to defeat summary judgment on the limitation of liability clause: "It has been repeatedly recognized that the issue of whether limitation provisions are enforceable under the contractual relations of the parties and the nature of the contractual performance are matters which generally should not be decided on the pleadings or on summary judgment."  *Petroleum* at *24 (citing *J. A. Jones* at 553).  *See also Hampton v. Warren–Wolfe Assocs., Inc.*, 2004 WL 838847, at *3 (Del. Super. Ct. Mar. 25, 2004) (denying summary judgment with respect to a limitation of liability clause where questions remained for trier of fact); *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *5 (Del. Super. Ct. Oct. 27, 2015) (denying summary judgment finding it procedurally premature to enforce the liability limitation provision).  Even when a party's claims "fall somewhere short of fraud, such as claims for bad faith," the Court "must undergo a factual analysis that is premature on summary judgment." *Petroleum* at *24.

14.     Accordingly, Celsius respectfully requests that the Court deny summary judgment because questions of material fact exist as to the Debtors' bad faith.

**Debtors' Exhibit No. 28
Page 6 of 35**

II.     **Celsius' Claim for the Return of Prepetition and Postpetition Pre-Rejection Prepayments Does Not Fall Under the Limitation of Liability Provision in the MSA.**

15.     Summary judgment should be denied specifically as to Celsius' claim for return of pre-payments it made for future hosting services, which are plainly not covered by the limitation of liability provision.

16.     As described further in *Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of Its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(B)(1)(A) and (II) Granting Related Relief* [Docket No. 801], under the MSA and the related orders Celsius was required to make payments in advance that would be applied to future hosting services.  On December 22, 2023 Celsius sent an approximately $4.7 million payment postpetition to the Debtors in satisfaction of a prepetition invoice requesting prepayment for hosting services to be provided in January 2023.  On January 3, 2023, the Debtors rejected the MSA and related contracts between the Debtors and Celsius related to hosting.  As such, the amount of Celsius' $4.7 million prepayment for the month of January that was not applied to services actually provided by the Debtors should be returned to Celsius along with all prepetition prepayments that have not been applied to outstanding obligations under the MSA and related orders.

17.     The Debtors summarily assert that "to the extent Celsius is entitled to any recovery on [the claim for return of prepayments], such recovery would still be capped at the one-month's fee set forth in the MSA."  Motion at 8.  As noted by the Debtors in the Administrative Expense Objection,[7] there is no express provision in the MSA that describes the timing or method of a return of an overpayment made by Celsius.  That said, it is absurd to suggest that the return of the

---

[7]     *Debtors' Objection to Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Granting Related Relief* [Docket No. 861] (the "Administrative Expense Objection").

**Debtors' Exhibit No. 28**
**Page 7 of 35**

prepayments should be subject to a provision addressing a limitation of liability intended to cap damages.  If Celsius sought damages or the payment of interest on the improper retention of the prepayments, that could arguably fall under the limitation of liability provision, but that is not what Celsius sought in its proofs of claim—Celsius requested only the amount of the prepayments that was not applied to services rendered before the contract was rejected.  Clearly the request for the return of the prepayments is not associated in any manner with lost profits, loss of business, loss of revenue, or damages, which are all referenced in the limitation of liability provision in the MSA.  Again, the return of a prepayment is not recompensing for a harm—rather, it is returning something that is not property of the Debtors or their estate, as the Debtors only hold a contingent right to the prepayment that springs into action once services are rendered.  The Debtors do not have the right to apply the funds at will, and because the Debtors stopped performing services, they no longer have any right to hold the prepayments.  There is no basis for applying the limitation of liability provision to this claim.

### III.    Summary Judgment at this Stage Is Premature as There Are Genuine Issues of Material Fact and Discovery Is Incomplete.

18.    When deciding a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, courts must determine whether the pleadings and discovery show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).  When deciding whether a genuine and material fact issue exists courts must review the facts and the inferences to be drawn from

Debtors' Exhibit No. 28
Page 8 of 35

those facts in the light most favorable to the non-movant.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

19.     By its terms, Rule 56 of the Federal Rules of Civil Procedure contemplates that summary judgment is not appropriate if nonmovants are unable to "present facts essential to justify its opposition."  Fed. R. Civ. P. 56.  The purpose of Rule 56(d) is to provide non-movants with a "much needed tool to keep open the doors of discovery in order to adequately combat a summary judgment motion."  *Wichita Falls Off. Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 (5th Cir. 1992).  Further, "there is no stringent procedure that will bar litigants access to further discovery.  In order to trigger the rule non-movants need only submit an 'equivalent statement preferably in writing' that conveys the need for additional discovery."  *Id.* (citations omitted).  And such a request "should be granted almost as a matter of course."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991).  *See also Culwell v. City of Fort Worth*, 468 F.3d 868 (5th Cir. 2006) (reversing the district court's grant of summary judgment after finding that it was "reasonable that [non-movants] would need further discovery to prove their theory").

20.     Celsius included five components in Proofs of Claim Nos. 425 and 497, all which the Debtors argue should be subject to the limitation of liability provisions in the MSA.  These claims include: (i) prepetition breach of contract claim; (ii) postpetition, pre-rejection breach of contract claim; (iii) claim for return of prepayments; (iv) contract rejection damages claim; and (v) claim for damages related to Celsius' mining rigs.  Genuine issues of material fact or a lack of discovery exist with respect to each of these claims, rendering summary judgment inappropriate at this time.

21.     First, during the discovery process completed in the Celsius Chapter 11 Cases related to the prepetition breach of contract claims, Celsius uncovered documents indicating the

9

Debtors knowingly and intentionally misrepresented the terms of the MSA and lied about the challenges they received from other customers related to this abrupt change of interpretation. Specifically, the Debtors produced documents that confirmed that the Debtors knew that they had no legal basis for attempting to impose pass-through charges on Celsius under the relevant contracts and lied to EY and Celsius about whether other customers had challenged this new process. As discussed above, under Delaware law, parties cannot contract around bad faith, willful misconduct, or fraud. As a result, both the behavior itself and the appropriateness of applying the limitation of liability provision are material disputed facts, the resolution of which could affect Celsius' recovery on account of these claims.

22.     Second, the Debtors and Celsius have not engaged in any discovery process related to the postpetition, pre-rejection breach of contract claims and as such Celsius is unable to confirm whether any issue of material fact exists with regard to these claims. Absent an opportunity to conduct discovery on these claims, summary judgment is inappropriate. In particular, given the documents uncovered in the discovery to date Celsius believes there may be additional internal documents reflecting that the Debtors agree with Celsius' interpretation that regular electricity costs are not a "tariff" and may not be passed on to Celsius. These documents would support a finding of bad faith or willful misconduct for the postpetition, pre-rejection breach of contract claims. These facts, to the extent they are uncovered, are material to the outcome of whether the limitation of liability provision applies to these claims under Delaware law.

23.     Third, material issues of genuine fact exist with respect to the claim for return of prepetition and postpetition pre-rejection prepayments. As discussed above, Celsius does not believe the return of the prepayments, which the Debtors have no legal right to retain, is subject to the limitation of liability provision that was intended as a cap on damages.

**Debtors' Exhibit No. 28**
**Page 10 of 35**

24.     Finally, no discovery has been completed with respect to the postpetition contract rejection damages claim or the claim for damages related to the mining rigs and as a result it would be premature to rule on whether the limitation of liability provision applies to this claim.  In particular, Celsius believes that discovery may uncover additional facts demonstrating that the Debtors acted in bad faith or with willful misconduct in their decision to reject the MSA at the time that they did.  On December 22, 2022, at the first day hearing, counsel to the Debtors stated that the Debtors "look[ed] forward to engaging with [Celsius] as we move forward" and wanted to "see if we can find a path forward that obviously minimizes expense."[8]  Less than a week later, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* [Docket No. 189] on an "emergency" basis.  Given this abrupt shift and the statements inducing reliance from Celsius, there is reason to believe internal documents may show there was bad faith or willful misconduct at play.  Finally, discovery is required to determine to what extent the damage to the mining rigs is the result of the Debtors' bad faith or willful misconduct in the location the rigs were stored and the supervision or security of the rigs while in storage.

25.     A grant of summary judgment would be premature given the lack of discovery related to certain of Celsius' claims and genuine issues of material fact related to Celsius' remaining claims.  Even if the material factual disputes could be resolved, and time for discovery was allowed, summary judgment on the applicability of a contractual limitation of liability provision is inappropriate for summary judgment.

---

[8]     First Day Hr'g Tr. 17:3–8, December 22, 2022.

## Conclusion

26.     In sum, Celsius remains optimistic that the mediation will lead to a global resolution of the claims held by Celsius and the Debtors against each other and look forward to working with Judge Isgur and the other parties in an attempt to reach a consensual outcome.  Absent a resolution, Celsius requests that the Court decline to grant summary judgment as genuine issues of material fact exist and discovery related to Celsius' claims is incomplete.

## Reservation of Rights

27.     Celsius expressly reserve all rights with respect to the Motion.  Nothing contained herein is intended or should be construed as a waiver or limitation of Celsius' rights under the Bankruptcy Code or any other applicable law, including the right to seek related relief from this Court or the Bankruptcy Court for the Southern District of New York in the Celsius Chapter 11 Cases.

**Debtors' Exhibit No. 28**
**Page 12 of 35**

WHEREFORE, Celsius requests that the Court deny the relief sought in the Motion and

grant such other relief as the Court deems appropriate under the circumstances.


Houston, Texas
June 21, 2023

*Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Victoria Argeroplos (TX Bar No. 24105799)
Emily Flynn Meraia (TX Bar No. 24129307)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
                mcavenaugh@jw.com
                vargeroplos@jw.com
                emeraia@jw.com


*Counsel to Celsius Mining LLC*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig (admitted *pro hac vice*)
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

- and -

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick
Leah Hamlin
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:      (202) 389-5000
Facsimile:      (202) 389-5200
Email:          judson.brown@kirkland.com
                tj.mccarrick@kirkland.com
                leah.hamlin@kirkland.com

*Counsel to Celsius Mining LLC*

13

**<u>Certificate of Service</u>**

I certify that on June 21, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**<u>Exhibit A</u>**

DocuSign Envelope ID: B40E8BC9-A94A-4ACB-857A-F381448669DB

### MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of December 18, 2020 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and CELSIUS CORE LLC ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

**1.      AGREEMENT STRUCTURE**

a.       This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

**2.      SERVICES AND COMPANY FACILITY**

a.       Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest. Unless otherwise set forth in an Order, Client Equipment is owned by Client and will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion.. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.       Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.       Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference. If Company determines in its sole

1

Exhibit No. 1
KC Mares
10/26/22

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 17 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 17 of 35

DocuSign Envelope ID: 620E5BC9-A946-44CB-B57A-F5B446669982
22-10964-mg    Doc 915   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 30 of 245

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

### 3.      PAYMENT TERMS AND TAXES

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

2

**Debtors' Exhibit No. 28**
**Page 17 of 35**

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 18 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 18 of 35
DocuSign Envelope ID: B2DF82C9-A846-4AC8-BE7A-F39A448690B9
22-10964-mg   Doc 915-7   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 31 of 245

c.      All amounts payable to Company under this Agreement exclude applicable taxes. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period) . If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

    (i)      suspend the provision of the Services;
    (ii)     disconnect Client Equipment and store it;
    (iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
    (iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
    (v)      terminate this Agreement and all Orders; and
    (vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

c.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

**Debtors' Exhibit No. 28**
**Page 18 of 35**

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 19 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 19 of 35
DocuSign Envelope ID: B20E8BC9-A945-4ACB-B57A-53B44B6B99B2
22-10964-mg    Doc 915    Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 32 of 245

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies.  Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection.  Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order.  Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period.  For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period.  Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.      Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.      Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement.  Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.      In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree.   Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension.  Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

5.      **WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY**

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner.  Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 20 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 20 of 35
DocuSign Envelope ID: B2D5FBBC9-A94B-44CB-B57A-F38444660DB9
22-10964-mg   Doc 915-7   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 33 of 245

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

5

Ex. A, Page 5 of 23

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 21 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 21 of 35
DocuSign Envelope ID: B90E8BC9-A946-44C9-B57A-55044069092a
22-10964-mg   Doc 915   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 34 of 245

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.      EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS 4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.      Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated. Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.      Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement. Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.      Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; or (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing.

## 6.      CONFIDENTIAL INFORMATION

a.      Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**"). Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement. Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

6

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 22 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 22 of 35
DocuSign Envelope ID: B20E8BC9-A94A-4ACB-B57A-F3B44866996B
22-10964-mg   Doc 915-7   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 35 of 245

b.      The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.      Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.      Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

**7.      INSURANCE**

a.      Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.      Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

**8.      MISCELLANEOUS**

a.      Notice. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b.      Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.      Survival. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation,

7

Case 22-90341   Document 1280-1   Filed in TXSB on 10/01/23   Page 23 of 35

Case 22-90341   Document 984   Filed in TXSB on 06/21/23   Page 23 of 35

DocuSign Envelope ID: B20E58C0-A946-44CB-B57A-F56448660982
22-10964-mg   Doc 915-7   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 36 of 245

those provisions concerning confidentiality, indemnification and limitation of liability.

d.     <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.     <u>Force Majeure</u>. Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event. A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.     <u>Governing Law and Arbitration</u>. This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures. Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award. The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.     <u>General</u>. The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have. The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them. Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent. There are no third-party beneficiaries to this Agreement. No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

8

DocuSign Envelope ID: B20E8BC9-A946-44CB-B57A-F36448660955
22-10964-mg   Doc 915   Filed 09/28/22   Entered 09/28/22 22:12:49   Main Document
Pg 37 of 245

**Core Scientific, Inc.**

By: _Michael Trzupek_
— 4963E00350804A8...

Name: Michael Trzupek

Title: Authorized Representative

Date: 12/18/2020

**Celsius Core LLC**

By: _S. Daniel Leon_
— 40B7E44670FB4C8...

Name: S. Daniel Leon

Title: S. Daniel Leon, President/COO

Date: 12/18/2020

9

# CELSIUS EXHIBIT B

# FILED UNDER SEAL

# CELSIUS EXHIBIT C

# FILED UNDER SEAL

# CELSIUS EXHIBIT D

# FILED UNDER SEAL

# CELSIUS EXHIBIT E

# FILED UNDER SEAL

# CELSIUS EXHIBIT F

# FILED UNDER SEAL

# CELSIUS EXHIBIT G

# FILED UNDER SEAL

# CELSIUS EXHIBIT H

# FILED UNDER SEAL

# CELSIUS EXHIBIT I

# FILED UNDER SEAL

# CELSIUS EXHIBIT J

# FILED UNDER SEAL

# CELSIUS EXHIBIT K

# FILED UNDER SEAL

# CELSIUS EXHIBIT L

# FILED UNDER SEAL