IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (CML) |
|  | § § | (Jointly Administered) |
| Debtors.[1] | § § § |  |

### DECLARATION OF CAROL HAINES IN SUPPORT OF DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 34 FILED BY OKLAHOMA GAS AND ELECTRIC COMPANY

I, Carol Haines, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am Senior Vice President of Power and Sustainability at Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**"). I have served in this capacity, or similar, since September 2018. Prior to joining Core, I worked in the areas of energy infrastructure, deregulated markets, site selection, and economic development.

2. I submit this Declaration in support of Core's Objection to Proof of Claim No. 34 filed by Oklahoma Gas and Electric Company ("**OGE**"). The facts set forth in this declaration are based on my personal knowledge and experience, and my review of relevant documents.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

3. In connection with Core's construction of a cryptocurrency mining and data center facility in Muskogee, Oklahoma, Core entered into two agreements with OGE.

4. First, on September 17, 2021, Core and OGE entered into the "Will Serve Agreement for Electric Service" (the "**2021 Agreement**"). The 2021 Agreement provided that Core would purchase electrical services from OGE to be used at Core's cryptocurrency mining and data center facility to be located in Lot 5 of the John T. Griffin Industrial Park in Muskogee, Oklahoma (the "**Service Location**"). A true and correct copy of the 2021 Agreement is attached hereto as **Exhibit 1**.

5. Second, on March 1, 2022, Core and OGE entered into a subsequent and separate agreement, the "Electric Service Agreement Minimum Bill" (the "**2022 Agreement**"). The 2022 Agreement likewise concerned electric services to be provided to Core at the Service Location and superseded the 2021 Agreement in all respects. A true and correct copy of the 2022 Agreement is attached hereto as **Exhibit 2**.

6. The 2022 Agreement required Core to pay a $17 million security deposit within thirty days of signing the 2022 Agreement. The 2022 Agreement further provided that if Core did not pay the security deposit within thirty days of signing, or by the end of any extension period, then the Agreement would terminate. Core never paid the security deposit and the 2022 Agreement terminated.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 17, 2023
Austin, Texas

By:   */s/ Carol Haines*
      Carol Haines

# **Exhibit 1**

# WILL SERVE
# AGREEMENT FOR ELECTRIC SERVICE

THIS AGREEMENT made and entered into in duplicate this 17th day of September 2021, by and between the OKLAHOMA GAS AND ELECTRIC COMPANY (hereinafter called the "Company") and Core Scientific, Inc., with offices at 2800 Northup Way #220, Bellevue, WA 98004 (hereinafter called the "Consumer"), WITNESSETH:

That for and in consideration of the mutual covenants and Agreements herein contained the parties hereto agree as follows:

The Consumer agrees to purchase and receive from the Company, and the Company agrees to sell and deliver to the Consumer, the electrical service to be used for digital asset mining and blockchain infrastructure in and about the Consumer's premises located at Lot 5 of the John T Griffin Industrial Park in Muskogee, Oklahoma (the "Service Location").

The Consumer agrees to pay the Company for services rendered hereunder in accordance with the Company's applicable filed rate tariffs.  Should a change in the Company's standard tariffs or classification of service occur during the term of this Agreement, the Company shall, upon the effective date thereof, bill the Consumer in accordance with the revised tariff or classification, and the Consumer agrees to pay such amount billed.  The Company will provide the Consumer advance notice of such application.

For all other service levels, the point of delivery under this Agreement shall be the point at which the electric facilities of the Company connect to the electric facilities of the Consumer.

The electric service delivered to the Consumer under this Agreement will be for an electric load to be determined at a later date.  The service level for this Service Location is elected to be service level.  A change to service level election should be communicated in writing.  The Company will communicate any impact to the Consumer regarding costs or timeline.

 Should the Consumer elect Service Level 2 service from an onsite substation, Consumer shall grant, at no cost to Company: i) necessary easements for the new substation to be constructed; ii) easements for all necessary transmission and distribution infrastructure; and iii) easements for appropriate ingress and egress access to the substation and transmission and distribution infrastructure. In addition, Consumer shall be responsible for the grading and compacting of the new substation site to Company's specifications and shall construct the access road to the new substation. Consumer further agrees that it will extend the bus duct or conductors from the Consumer's owned switchgear building to the low side of the bus in the new substation.

A separate Electric Services Agreement with specific terms and conditions may be required for permanent electric service.  This will be determined at a later time when electric load, cost of service, and other information is made available.

The performance of this Agreement is contingent upon the Company being able to secure the necessary rights of way to the Service Location for its facilities at a cost which, in its judgment, is reasonable.  While excessive costs are not anticipated, the Consumer shall be required to pay any such right of way costs in excess of that amount which the Company determines to be reasonable.

Nothing contained herein shall be construed as affecting in any way the right of the Company to unilaterally make application to the **Corporation Commission of Oklahoma/Arkansas Public Service Commission** or to any other regulatory agency having jurisdiction, for a change in rates, charges, classification, service, Term and Conditions of Service or any rule, regulation or contact relating thereto, occur during the term of this Agreement, Company shall, upon the effective date thereof, bill the Consumer on the basis of such change and Consumer agrees to pay such

amount billed reflecting such change.

The Southwest Power Pool (SPP) may require a confirming load connection study to be completed to determine if any transmission system upgrades are needed before official permission can be given to serve a future load that exceeds what has been included in the growth projections for this area. Projects are typically reviewed, and a decision made, within approximately sixty (60) days for routine requests and up to one hundred twenty (120) or more days for non-routine requests. Any associated upgrade costs will be added to and included in the Minimum Bill amount. This could result in a cost in aid of construction payment from the Consumer.

If the Consumer elects to terminate this Agreement prior to the permanent electric service being made available at the Service Location or does not make application for an electric service account within three (3) months from the date permanent electric service has been made available to the Service Location, the Consumer will reimburse the Company for all actual expenses associated with the construction and design of the electrical system required to serve the Consumer's facility located at the premises described in this Agreement. These expenses include but are not limited to the engineering costs, costs of obtaining easements, material costs, material cancellation costs, and construction labor. Termination of the Agreement shall not affect the Company's exclusive right to provide electrical service to the Consumer at the Service Location for any future electrical service needs at its standard tariffed rates.

Agreed to this 17th day of September, 2021.

IN WITNESS WHEREOF, The parties hereto have caused this Agreement to be signed and executed in duplicate by their duly authorized officers the day and year first above written.

CORE SCIENTIFIC, INC.

By __*Wes Adams*_____
    Wes Adams

Title __CCO_____

OKLAHOMA GAS AND ELECTRIC COMPANY

By __*Donnie Jones*_____
    Donnie Jones

Title __VP Utility Operations_____

Internal Use:

Account Exec_____ All. Exp._____ CTS_____ Service Level___

Case 22-90341   Document 1334   Filed in TXSB on 10/17/23   Page 7 of 15

# **Exhibit 2**

# ELECTRIC SERVICE AGREEMENT
# MINIMUM BILL

THIS ELECTRIC SERVICE AGREEMENT MINIMUM BILL ("Agreement") is made and entered into in duplicate this ____ day of _____ 2022___, by and between the **OKLAHOMA GAS AND ELECTRIC COMPANY** (hereinafter called "Company") and **CORE SCIENTIFIC OPERATING COMPANY**, a Delaware corporation (hereinafter together with its specified affiliated entity or entities called "Consumer," and together with Company, the "Parties")

## WITNESSETH:

For and in consideration of the mutual covenants and agreements herein contained the Parties agree as follows: Consumer agrees to purchase and receive from Company, and Company agrees to sell and deliver to Consumer, the electrical service to be used for cryptocurrency mining and data center in and about Consumer's premises located at **Port of Muskogee John T. Griffin Industrial Park-Lot 5, Muskogee, Oklahoma** ("Service Location").

Consumer agrees to pay Company for services rendered hereunder in accordance with Company's applicable filed and approved rate tariffs / classifications of service. Should a change in Company's standard tariffs or classification of service occur during the term of this Agreement, Company shall, upon the effective date thereof, bill Consumer in accordance with the revised tariff or classification and Consumer agrees to pay such amount billed. Company will provide Consumer advance notice of such application.

The electric service delivered to Consumer under this Agreement for an estimated maximum demand requirement of **500,000 kilowatts (kW)** will be of a character commonly known as **345,000 volts, 3 phases 4-wire** solidly grounded wye of approximately **60 hertz** (with reasonable variation in voltage and frequency in either direction allowed) ("the Maximum Demand"). The service will be billed as Service Level 1. A change to Service Level election shall be communicated in writing. Company will communicate any impact to Consumer regarding costs or timeline. Consumer shall not require the delivery of electric power hereunder in excess of the estimated Maximum Demand without securing the prior written consent of Company, not to be unreasonably withheld. Upon Company's receipt of Consumer's request for delivery of electric power in excess of the Maximum Demand, Company shall use commercially reasonable efforts to attempt to deliver such additional electric power under terms and conditions acceptable to both Parties. Within sixty (60) days of Company's receipt of such request, Company shall respond to Consumer in writing as to the request and advise Consumer whether the additional electric power can be delivered under existing system conditions. If Company begins providing Consumer with electric power in excess of the Maximum Demand, the amount of additional electric power shall be added to the Maximum Demand and this total shall become the new Maximum Demand amending and superseding the Maximum Demand. If Consumer's highest billed demand level remains below seventy-five percent (75%) of the Maximum Demand for any six (6) consecutive month period, Company may, at its sole discretion, reduce the Maximum Demand requirement to the highest billed demand level within the six (6) consecutive month period and inform Consumer in writing of the change. The reduced demand level communicated to Consumer shall become the new Maximum Demand. The obligations under this paragraph shall survive the termination of this Agreement and shall continue for so long as Consumer has an active account associated with the Service Location. The point of delivery under this Agreement shall be the point at which the electric facilities of Company connect to the electric facilities of Consumer.

Consumer shall be responsible for providing, owning, installing and maintaining their electrical system, equipment and process designed to operate under and conform with all applicable standards and Codes including, but not limited to IEEE Standards 519-1992 and IEEE 141-1993 (borderline Visibility curve) and any successor IEEE Standards.

Should Consumer elect Service Level 1 service from a Consumer-owned substation, the point of delivery under this Agreement shall be the point at which the electric facilities of Company will connect to the electric facilities of Consumer, typically at Consumer-owned dead end structure in Consumer's substation. Consumer is obligated to modify the substation in the future as Company's transmission continues to evolve. When deemed necessary by Company changes in Consumer's substation may be needed to conform to industry standards, transmission system characteristics, and Company practices, or to take advantage of technological advances which will maintain the reliability of the substation. The billing metering will be on the low side of Consumer-owned transformer. Consumer shall install Company-owned and provided potential and current transformers used for metering per Company specifications. Consumer shall also install raceway from the potential and current transformers to a Company-owned but Consumer installed meter base. Company

1

will adjust for transformer losses when calculating the bill. Consumer shall provide reasonable access to the metering equipment for maintenance and testing.

Should Consumer elect Service Level 2 service from an onsite substation, Company will be responsible for the design and construction of the substation pad. The location of the pad will be on Consumer's property at a mutually agreeable location. Consumer agrees to design the drainage plan for Consumer's site such that the water: (i) does not drain onto Company's substation pad; (ii) runoff from the substation pad drains away from the substation; and (iii) runoff does not impact adjoining neighboring properties. Consumer shall submit such drainage plans to Company for its review and approval, which shall not be unreasonably delayed or denied. Consumer will be responsible for the design and construction of any retention ponds or detention ponds required for drainage of the substation pad. Consumer will be responsible for the design and construction of an access road to the substation that meets OG&E specifications. Consumer shall grant, at no cost to Company easements for: (i) the new substation to be constructed; (ii) the transmission and distribution infrastructure; and (iii) ingress and egress access to the substation and transmission and distribution infrastructure. All such easements shall be in a form that is acceptable to and approved by Company and such easements shall include, as a material term, the right of Company to extend the rights granted to Company under the easements to third parties for purposes including, but not limited to, allowing such third parties to accessing the substation for their electric service needs or area load growth needs. Consumer will identify any environmental permitting exemptions, authorizations, and/or existing permits that apply to their current or anticipated construction and operations. These may include, but are not limited to, areas such as, stormwater discharges, spill control and countermeasure plans, waste management, temporary generators, air emissions, or endangered species. The acquisition of such permits or authorizations, as well as the development of related control and implementation plans, will be identified and coordinated between the Parties in a timely manner so as not to impact a project plan that is mutually agreeable to the Parties.

The performance of this Agreement is contingent upon Company being able to secure the necessary rights of way to the Service Location for its facilities at a cost which, in its sole judgment, is reasonable. In the event difficulty is encountered in obtaining such rights of way, Consumer shall be required to pay any such rights of way costs in excess of that amount which Company determines to be reasonable. The Parties further understand and agree that in order for Company to be able to commit to the investment involved in expanding its present electric system to meet Consumer's estimated electric power needs as stated in this Agreement, that Consumer shall be required to enter into a binding and enforceable lease or purchase agreement for the property associated with the Service Location with the address and location identified in this Agreement as a precondition to entering into this Agreement.

As a condition to Company's willingness to commit to expanding its present electric system to meet Consumer's estimated electric power needs as stated in this Agreement, Consumer shall provide to Company within thirty (30) days of the date that this Agreement is signed sufficient security in cash or surety bond or irrevocable bank letter of credit issued by a domestic bank in a form acceptable to Company as required under the terms of this Agreement.

The Southwest Power Pool ("SPP") may require a confirming load connection study to be completed to determine if any transmission system upgrades are needed before official permission can be given to serve a future load that exceeds what has been included in the growth projections for this area. Projects are typically reviewed, and a decision made, within approximately sixty (60) days for routine requests and up to one hundred twenty (120) or more days for non-routine requests. Any associated upgrade costs will be added to and included in the Minimum Bill amount. This could result in a contribution in aid of construction payment from Consumer.

For a Service Location outside of the OG&E certified territory, Consumer is responsible for installing a connected load of 1,000 kW or greater. If, after service is initiated and it is determined that the actual connected load is under 1,000 kW, Consumer will be required to obtain service from the incumbent retail electric service provider and will reimburse Company for all actual expenses associated with the construction and design of the electrical system required to serve Consumer's facility located at the premises described in this Agreement.

Subject to Company's Terms and Conditions of Service and rules and regulations of any regulatory authority having jurisdiction, including but not limited to the posting of the Required Security, if any, required in Attachment B, this Agreement shall remain in full force and effect for an initial term of five (5) years from and after the date permanent service is first rendered hereunder (the "Initial Term") and shall continue year to year thereafter unless and until canceled at the end of such Initial Term or at the end of any such subsequent anniversary period by either Party giving to the other Party written notice not less than ninety (90) days prior to the end of such term or period.

Special terms and conditions of this Agreement are as shown on Attachment A and Attachment B. Attachment A and B

are incorporated into this Agreement in their entirety by reference and are deemed to be a part of this Agreement.

Because Consumer's estimate of the electric power needs of the Service Location will require an expansion of Company's present electric system and, due to the nature, location, voltage, or other characteristics, the requested facilities are not likely to be required by Company's other customers within the Initial Term following the requested date for the proposed system expansion and because of the uncertainty that Company will fully recover its investment in such infrastructure expansion in the event Consumer's projected load does not materialize and the need to avoid placing the burden for those costs on Company's other customers, Consumer is willing to provide sufficient assurance and security, as set out in Attachment B, that Company will recover its investment in the expansion of Company's electric system based on Consumer's projections in the event that sufficient revenue from service to the Service Location is not realized.

Nothing contained herein shall be construed as affecting in any way the right of Company to unilaterally make application to the Corporation Commission of Oklahoma or to any other regulatory agency having jurisdiction, as applicable, for a change in rates, charges, classification, service, Term and Conditions of Service or any rule, regulation or contact relating thereto, during the term of this Agreement, Company shall, upon the effective date of any order or rule resulting from such application, bill Consumer on the basis of such change and Consumer agrees to pay such amount billed reflecting such change. All costs in this agreement are valid for ninety (90) days from date sent to Consumer.

All notices or communications relating to this Agreement shall be in writing and sent to the addresses identified by the Parties below via internationally recognized delivery service or certified United States mail with delivery confirmation for all such methods. Either Party may change its notice address by providing written notice of such change to the other Party.

This Agreement shall be governed and construed in accordance with the laws of the State of Oklahoma excepting its laws regarding conflicts of law. Any suit, claim or legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the state or federal courts located in Oklahoma County, Oklahoma. The Parties hereby agree to the exclusive jurisdiction of and venue in such courts and the Parties expressly and irrevocably waive any objections to such exclusive jurisdiction and venue. In the event of any dispute relating to this Agreement, the Parties agree that they shall first attempt to resolve the dispute via informal negotiations before initiating any legal proceeding. THE PARTIES EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AGREEMENT.

The person signing this Agreement on behalf of a Party represents and warrants that that he or she is a duly authorized representative of that Party and that he or she has express authority to sign this Agreement on behalf of that Party.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous oral or written agreements, conditions or representations.

Agreed to this __1__ day of __March__, 20__22__

IN WITNESS WHEREOF, The Parties have caused this Agreement to be signed and executed in duplicate by their duly authorized officers the day and year first above written.

Charges and Terms Accepted by:

**CORE SCIENTIFIC OPERATING COMPANY COMPANY**

By: _____
Signature (Authorized Representative)

Print Name: Weston Adams

Title: EVP Power + Construction

**OKLAHOMA GAS AND ELECTRIC**

By: _____
Signature (Authorized Representative)

Print Name: Donnie Jones

Title: VP Utility Operations

3

Address: _____

Address: 321 N. Harvey Ave
Oklahoma City, OK
73102

## Attachment A

## To Electric Service Agreement Minimum Bill

Dated _____, 20____

## Between OKLAHOMA GAS AND ELECTRIC COMPANY and CORE OPERATING COMPANY

**A. CONSTRUCTION PAYMENT.**

If Consumer elects to terminate this Agreement prior to the permanent electric service being made available at the Service Location or does not make application for an electric service account within three (3) months from the date permanent electric service has been made available to the Service Location, Consumer will reimburse Company for all actual expenses incurred by Company for the construction and design of the electrical system required to serve Consumer's facility ("Required Facilities") located at the Service Location. These expenses include but are not limited to the engineering costs, costs of obtaining easements, material costs, material cancellation costs, and construction labor.

**B. MINIMUM REVENUE CONTRIBUTION.**

Beginning __six__ ( **6** ) months after the date permanent service is rendered, if Consumer's actual revenue contribution, comprised of the summation of the customer charge, energy charge (excluding any applicable Day Ahead Pricing Energy charge), and demand charge (the "Actual Revenue Contribution") is below $ **402,956** per month (the "Minimum Revenue Contribution"), based on current rates then in effect, the deficit between the Minimum Revenue Contribution and the Actual Revenue Contribution will be added to the current monthly bill using the appropriate tariff rate, taxes & fees. The Minimum Revenue Contribution is designed to reimburse Company for the actual revenue requirements associated with the Required Facilities required to provide electric service under this Agreement. This Minimum Revenue Contribution was calculated to collect the total cost of facilities required to serve the Service Locations ("Actual Revenue Requirements") over the Initial Term of the Agreement and may be increased in the event that a load study is required by the SPP. Once the Actual Revenue Requirements have been fully reimbursed, the Minimum Revenue Contribution will terminate.

**C. TERMINATION OF SERVICES.**

If service is terminated prior to the end of the Initial Term, Consumer shall be responsible for any remaining Revenue Requirements not recovered through the Minimum Revenue Contribution provision of this Agreement.

If an event of Force Majeure occurs that prevents Company from providing retail electric service hereunder or Consumer from receiving retail electric service hereunder ("Claiming Party"), the Minimum Revenue Contribution will be extended to reflect the exact number of days which such Force Majeure event is in effect. Force Majeure shall mean an event that is not within the reasonable control of the Claiming Party, and despite the Claiming Party's exercise of due diligence, the Claiming Party is unable to overcome in a commercially reasonable manner or cause to be obtained a commercially reasonable substitute performance therefore. Events of Force Majeure include, without limitations, wrongful or negligent acts of a person or persons other than Company, acts of God, fire, adverse weather conditions, such are ice, tornados, wind, or other conditions that damage or destroy Claiming Party facilities which damage renders the provision of service impossible, civil disturbance, labor disputes or labor shortage, strikes, sabotage, action or restraints by a governmental authority, provided the Claiming Party has not applied for or assisted in the application for and, where and to the extent reasonable, has opposed such action or restraint, and inability, after diligent application to obtain or maintain required permits, licenses, zoning or other required approvals from any governmental authority or other third person whose consent is required as a condition to Company's performance hereunder. Termination of the Agreement shall not affect Company's exclusive right to provide electrical service to Consumer at the Service Location for any future electrical service needs at its standard tariffed rates.

**D. TITLE AND OWNERSHIP**

Company shall retain all right, title and interest to any items associated with the expansion of Company's electric system as contemplated in the Agreement including but not limited to materials, services, easements purchased, acquired or obtained by Company in connection with this Agreement. In addition, ownership and control of all such items of expansion shall at all times remain with Company and Company shall have the right to use the same for the purpose of serving Company's other customers.

## Attachment B

## To Electric Service Agreement Minimum Bill

Dated _____, 20____

## Between OKLAHOMA GAS AND ELECTRIC COMPANY and CORE SCIENTIFIC OPERATING COMPANY

### A. REQUIRED SECURITY AND SECURITY TERM.

As described in the Electric Service Agreement Minimum Bill ("Agreement"), Consumer shall be required to post the Required Security (as further defined below) in the form of a cash deposit, surety bond or irrevocable bank letter of credit in a form acceptable to Company. The Required Security shall cover the period of time commencing with the start of the Initial Term and ending at the earliest of when Actual Revenue Requirements have been fully reimbursed or at the end of the Initial Term or when Consumer no longer has electric service provided by Company at the Service Location ("Security Term").

The amount of the security that Consumer shall be required to provide Company ("Required Security") shall be the total cost of facilities to be installed to serve the Service Location, as estimated by Company, less the amount of contribution in aid of construction ("CIAC"), if any, paid by Consumer pursuant to Company's General Rules and Regulations for Electric Service as outlined below.

|       | $17,000,000  | Total cost of facilities to be installed to serve Service Location |
|-------|--------------|--------------------------------------------------------------------|
| Minus | $0           | CIAC, if any, paid by Consumer                                     |
|       | $17,000,000  | Total cost, less CIAC, if any paid by Consumer                     |
| Times | 0            | Present value factor                                               |
| =     | $17,000,000  | Required Security                                                  |

### B. PAYMENT OF REQUIRED SECURITY; TERMINATION OF AGREEMENT.

Consumer shall provide the above-specified Required Security to Company before Company installs the facilities to ensure that the total Minimum Revenue Contributions justifies Company's investment. At Consumer's option, the Required Security may be posted with Company in cash, or may be secured either by a surety bond or irrevocable bank letter of credit issued by a domestic bank each in a form acceptable to Company. Time is of the essence with respect to Consumer's obligation to provide the Required Security to Company. If Consumer fails to provide Company with the Required Security as outlined above in a form acceptable to Company within thirty (30) days from the date that the Agreement is signed, then the Agreement shall terminate. Provided, however, that Company may, in its sole discretion, elect to extend the thirty (30) day period referenced in this section. No extension shall be effective unless it is in writing and signed by the Parties. In the event that the Agreement terminates due to Consumer's failure to post the Required Security in a form acceptable to Company as required, then Company shall have no obligation to Consumer under this Agreement and this Agreement shall have no force and effect.

### C. COMPANY'S ADMINISTRATION OF REQUIRED SECURITY.

At the end of the earlier of the Security Term, or the termination of service by Consumer, if the total Actual Revenue Contributions are less than the Required Security provided by Consumer, Consumer shall pay to Company an amount equal to the Required Security, less the total amount of Actual Revenue Contributions received by Company.

If Consumer elects to post the Required Security via cash, a surety bond or irrevocable letter of credit, and during the Security Term, total Actual Revenue Contributions for any calendar quarter equals or exceeds the Actual Revenue

7

Requirements for such calendar quarter such bond or letter of credit shall be released or cancelled, or the amount secured by such instrument shall be reduced by the amount by which the Actual Revenue Contributions for such quarter exceeds Actual Revenue Requirements for such quarter, as applicable until such time as the Required Security amount is depleted.

Upon the termination or expiration of this Agreement, any portion of the Required Security not previously returned or otherwise eligible for return to the Consumer under the terms of this Agreement shall be retained or drawn on by Company, and any remaining balance of the Required Security that is subject to a letter of credit or surety bond shall become immediately due and payable.