**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CORE SCIENTIFIC, INC., *et al,* | ) | Case No. 22-90341 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**HARLIN DEAN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT RELATED TO**
**DEBTORS' OBJECTION TO PROOF OF CLAIM NOS. 364 and 383**

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

Harlin Dean ("**Dean**" or "**Movant**") hereby files this *Motion for Summary Judgment and Brief in Support Related to Debtors' Objection to Proof of Claim Nos. 364 and 383* [Dkt. 1246] (the "**Core Objection**") filed by Core Scientific Operating Company f/k/a Core Scientific Inc. and its debtor affiliates (collectively, "**Core**"), and respectfully states as follows:

### I.     PRELIMINARY STATEMENT

1.     This is a straightforward dispute related to Core's breach of the Dean Employment Agreements (defined *infra*). Dean is a former employee of Core Scientific Acquired

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions,VII, LLC (3198).

Mining, LLC (formerly, Blockcap, Inc.), a subsidiary of Core. In order to induce Mr. Dean to accept employment with the company and relocate to Austin, and to incentivize Mr. Dean to accomplish the company's goal of becoming a public company, Blockcap entered into four compensatory agreements with Mr. Dean that Core has breached. There is no genuine dispute as to any material fact and Mr. Dean is entitled to summary judgment as a matter of law. Core's Objection to Dean Proof of Claims Nos. 364 and 383 failed to provide any valid evidence whatsoever, instead providing only conclusory allegations and unsupported assertions. The Court should grant this Motion in its entirety, overrule the Core Objection, and allow the Dean Proof of Claim Nos. 364 and 383 in the amount of $7,638,779.17 as of the petition date.

## II.   SUMMARY JUDGMENT EVIDENCE

2.     Dean relies upon and incorporates the following evidence contained in his Appendix in Support of Claimant Harlin Dean's Motion for Summary Judgment and Brief in Support Related to Debtors' Objection to Proof of Claim Nos. 364 and 383, filed contemporaneously with the motion and brief. Citations to the Appendix will be made as App. 1-89, with reference to the specific page(s) of the Appendix.

## III.   RELEVANT FACTS

3.     Mr. Dean has practiced corporate law in private practice, and as the General Counsel of three companies, for over 30 years. [App. 1] Mr. Dean was hired by Blockcap, Inc., currently known as Core Scientific Acquired Mining LLC (a subsidiary of Core and a debtor in this case), as its General Counsel in March 2021, for the primary purpose of taking Blockcap public. [App. 1] At the time Blockcap offered employment to Mr. Dean, Blockcap's headquarters were in Dallas, Texas, and Mr. Dean resided in Allen, Texas, approximately 15 miles north of Dallas. [App. 1] Shortly after Mr. Dean accepted employment, Blockcap relocated to Austin, Texas, requiring

Mr. Dean to relocate away from his family to work full-time in Blockcap's Austin headquarters. [App. 1]

4.      In March 2021, Blockcap was a start-up company focused on growing its Bitcoin mining business by investing substantially all of its cash resources in Bitcoin miners. [App. 2] As a result, Blockcap limited the cash component of its executives' compensation to an annual salary of $200,000 with no bonus opportunity, a level substantially less than Mr. Dean's historical compensation levels. [App. 2] In order to induce Mr. Dean to accept employment with the company and relocate to Austin, and to incentivize Mr. Dean to accomplish the company's goal of becoming a public company, Blockcap entered into the following compensatory agreements setting forth the terms and conditions of Mr. Dean's employment:

a)  Executive Employment Agreement, dated June 1, 2021 (the "**Employment Agreement**"), which provided Mr. Dean an annual salary of $200,000 with no bonus potential [App. 2];

b)  Award Agreement, dated March 4, 2021 (the "**March 4 Award Agreement**"), granting Mr. Dean 350,000 stock options exercisable for common shares of Blockcap with an exercise price of $6.00 per share and vesting in four equal installments on each one-year anniversary of March 4, 2021 [App. 2];

c)  Award Agreement, dated May 6. 2021 (the "**May 6 Award Agreement**"), granting Mr. Dean 50,000 shares of restricted common stock of Blockcap vesting in four equal installments on each one-year anniversary of May 6, 2021 [App. 2];

d)  Award Agreement, dated June 1, 2021 (the "**June 1 Award Agreement**" and, together with the Employment Agreement, the March 4 Award Agreement, and the May 6 Award Agreement, the "**Dean Employment Agreements**"), granting Mr. Dean 800,000 shares of restricted common stock of Blockcap vesting in four equal

installments on each one-year anniversary of June 1, 2021.  The June 1 Award

Agreement contains a provision (referred to herein as the "**Public Event Vesting**

**Provision**") providing that 400,000 shares would automatically vest on the first

date that Blockcap, or any successor entity or controlling affiliate thereof, became

subject to the public company reporting requirements of the U.S. Securities and

Exchange Commission (the "**Public Event Date**"), unless Mr. Dean signed a

contract containing a lock-up restriction applicable to such shares [App. 2-3].[2]

5.      As General Counsel for Blockcap, Mr. Dean's duties included leading Blockcap's

efforts to complete its initial public offering; mergers and acquisitions, including Blockcap's

acquisition of Radar Relay and Blockcap's merger with Core; negotiating and documenting fund

raising through debt financings and private stock offerings;  corporate governance, including

preparation of all board meeting materials, leading the board meetings, and documenting all

meeting minutes and written consents; administration of Blockcap's equity compensation plan;

maintenance of Blockcap's stock records, including transitioning the stock records to

Computershare, Blockcap's third-party transfer agent, and managing Computershare's activities;

all contracting matters; shareholder relations; all employment matters, including employment

agreements and employee benefit plans; and all other legal and regulatory matters. [App. 3]

6.      On July 15, 2021, Blockcap entered into a merger agreement with Core Scientific

Holding Co. ("**Old Core**") pursuant to which Old Core would acquire Blockcap. [App. 57] At this

---

[2] Section 2(a) of the June 1 Award Agreement states in relevant part "upon the first date that the Company, or any successor entity or controlling affiliate thereof, becomes subject to the public company reporting requirements of the U.S. Securities and Exchange commission (or any similar authority of any foreign jurisdiction), a total of 400,000 shares of Restricted Stock granted pursuant to this Award Agreement shall automatically become fully vested and be released from any repurchase or forfeiture rights (other than rights exercisable at Fair Market Value) for all of the Shares (or other consideration) at the time represented by such portion of this Award; provided, however, that if Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction". [App. 52]

time, Blockcap had been in existence for less than one year, had approximately 10 employees, and its only material assets, aside from Bitcoin reserves, were Bitcoin and other cryptocurrency miners, substantially all of which were located in Core's hosting facilities. [App. 4]. On the other hand, Core, formed in 2017, was one of the largest blockchain infrastructure, hosting provider and digital asset mining companies in North America [App. 58], with over 100 employees [App. 59], including a legal team of several attorneys and one or more paralegals, led by Todd DuChene, as General Counsel of Core. [App. 4] Mr. DuChene had over 30 years of experience as an attorney, including nearly 25 years of service as a general counsel in private and public companies. [App. 60] As stated in the Form S-4 registration statement filed by XPDI (hereinafter defined) in connection with XPDI's acquisition of Old Core, Core's acquisition of Blockcap significantly expanded Core's self-mining operations and increased the number of miners Core owned.  [App. 58]

7.      Prior to the closing of Core's acquisition of Blockcap, during the week of July 19, 2021, Mr. Dean met with Mr. DuChene by teleconference to discuss Mr. Dean's future following the transaction. [App. 4] In this call, Mr. Dean pointed out that both he and Mr. DuChene were well-qualified attorneys with years of experience as public company general counsels and asked if there was a place for Mr. Dean with Core following the transaction. [App. 4] Mr. Duchene responded frankly that he and his legal team were well-equipped to handle all legal matters for Core, including public company reporting and other matters following Core's pending acquisition by XPDI, and that the acquisition of Blockcap only added mining machines and would not increase Core's legal workload. [App. 4] Mr. Duchene was very congenial and understanding of Mr. Dean's position, living away from his family to work on a transaction that would effectively eliminate his job, and told Mr. Dean that he was free to leave Core after the transaction and take all of his equity. [App. 4] Mr. Dean stated he was grateful to hear this as his Employment Agreement

allowed him to resign for "Good Reason" under these circumstances and it was a great relief for

Mr. DuChene to confirm that Core would honor the terms of his Employment Agreements. [App.

4] Mr. DuChene ended the call by re-affirming that he would fully support Mr. Dean's decision to

resign for "Good Reason" and asking Mr. Dean to get back to him on the timing of Mr. Dean's

resignation. [App. 4]

8.      Shortly after this conversation, Mr. Dean and other Blockcap officers were asked

to resign from their officer positions in connection with the closing of Old Core's acquisition of

Blockcap pursuant to resignation letters prepared by Core's outside counsel. [App. 5] Mr. Dean

wanted to make sure that his signing of this letter would not in any way be deemed to waive or

adversely affect Mr. Dean's right to resign for "Good Reason" as agreed with Mr. DuChene,

particularly given that Mr. Dean intended to ask Mr. DuChene if he could stay with Core until

completion of the De-SPAC Transaction (as defined below) with XPDI. [App. 5] Accordingly, Mr.

Dean revised the form resignation letter by adding the following paragraph:

> As a result of (i) Blockcap's request for me to resign from my officer positions, (ii)
> the change in my title, without my consent, and (iii) the material diminution of
> my duties and responsibilities, which have occurred as a result of the transactions
> contemplated by the Merger Agreement, I am entitled to resign from
> employment with Blockcap for "Good Reason" as defined in Section 8(d)(i) of my
> Executive Employment Agreement, dated June 1, 2021 (the "Employment
> Agreement"), and to receive the Severance Pay described in Section 8(h) of the
> Employment Agreement (collectively, my "Resignation and Severance Rights").
> By acceptance of this resignation, Blockcap expressly acknowledges (a) this
> resignation shall not extend to my employment with Blockcap, (b) this resignation
> does not, and shall not be deemed to, constitute a waiver of my Resignation and
> Severance Rights, (c) my Resignation and Severance Rights shall survive
> consummation of the transactions contemplated by the Merger Agreement, and
> (d) that I shall be entitled to exercise my Resignation and Severance Rights at any
> time, for any reason, and without any limitation.

[App. 65]

9.      On July 24, 2021, Mr. Dean sent an email to Mr. DuChene, which included Mr.

Dean's request to remain with Core until completion of the De-SPAC Transaction and an

explanation that Mr. Dean's revisions to the resignation letter were to confirm that neither that

letter, nor Mr. Dean's continued employment with Core until the De-SPAC Transaction, would be

deemed to waive "the rights I have today under my employment agreement to resign for good

reason and accelerate my equity." [App. 5 and 62] Mr. DuChene responded by email that same

day as follows: "Sure.  Fine with that.  Mark it up however you want.  Again will fully support."

[App. 5 and 62]. The email states:

---

**From:** Todd DuChene <tduchene@corescientific.com>
**Sent:** Saturday, July 24, 2021 9:33 PM
**To:** Harlin Dean <hd@blockcap.com>
**Subject:** Re: Post-Closing

Sure. Fine with that. Mark it up however you want. Again will support fully.

**TODD DUCHENE**
GENERAL COUNSEL
Core Scientific
(408) 464-3421

> On Jul 24, 2021, at 7:08 PM, hd@blockcap.com wrote:
>
> [EXTERNAL] Use caution when opening attachments or links.
>
> Todd,
>
> I've been doing some thinking about our conversation earlier in the week.  Do you have some time tomorrow to discuss a little further?  I'll be in my office starting around 11:00 a.m. your time.
>
> I would like to hang around post-closing to see the SPAC deal to completion and work through transition on the legal and admin side.  The one issue with that is I need to sign a resignation at closing and I'm a concerned that resigning from my positions and hanging around for a couple of months may waive the rights I have today under my employment agreement to resign for good reason and accelerate my equity.  So I was thinking that if you're on board with me hanging out for a while, I could revise the resignation letter Cooley would to address that issue.
>
> Wanted to share that thought with you as well as a draft resignation so you could think about it prior to our call.
>
> Thank you and let me know if you're available tomorrow and a time that works for you.
>
> Harlin

---

[App. 62].

      10.     Blockcap was acquired by Old Core on July 30, 2021.  [App. 89]. Pursuant to the

merger agreement governing this transaction, Mr. Dean's Blockcap options converted into

options to acquire common shares of Old Core and Mr. Dean's restricted common shares of

Blockcap converted into restricted common shares of Old Core at an exchange ratio of 0.5074

[App. 57] as follows:

a)  Mr. Dean's 350,000 Blockcap options with an exercise price of $6.00 converted into 177,590 Old Core options with an exercise price of $11.83 [App. 72];

b)  Mr. Dean's 50,000 restricted shares of Blockcap common stock issued pursuant to the May 6 Award Agreement converted into 25,370 restricted shares of Old Core common stock [App. 73] ; and

c)  Mr. Dean's 800,000 restricted shares of Blockcap common stock issued pursuant to the June 1 Award Agreement converted into 405,920 shares of Old Core common stock, of which 202,960 shares of Old Core common stock would automatically vest on the Public Event Date [App. 71 and 74][3].

11.     On August 31, 2021, Mr. Dean had a meeting with Michael Levitt, the CEO and Co-Chairman of Old Core, and Kyle Buckett, another officer of Old Core. [App. 7] During this meeting, Mr. Levitt asked Mr. Dean how long Mr. Dean intended to stay with Old Core. [App. 7] Before Mr. Dean could answer, Mr. Levitt also said he understood Mr. Dean had originally agreed to be employed by Blockcap in Dallas and that he was then required to move to Austin, away from his family. [App. 7] Mr. Levitt also stated that he knew Mr. Dean had an employment contract that would allow Mr. Dean, as a result of Old Core's acquisition of Blockcap, to leave Old Core and to receive all of his equity. [App. 7] Mr. Levitt then assured Mr. Dean that Core would not contest Mr. Dean's Employment Agreement and would honor the terms of the Employment Agreement. [App. 7] Mr. Levitt had similar conversations with at least two other officers of Blockcap, including

---

[3] Exhibit 9A [App. 71] presents the conversion calculation for Mr. Dean's 400,000 shares of Blockcap which vested on the Public Event Date.  Such 400,000 shares converted into 202,960 shares of Old Core common stock. Exhibit 9D [App. 74] presents the conversion calculation of Mr. Dean's remaining 400,000 shares of Blockcap granted under the June 1, 2021 Award Agreement.  Such shares converted into 202,960 shares of Old Core common stock.  In total, Mr. Dean's 800,000 shares of Blockcap converted into 405,920 shares of Old Core common stock (202,960+202,960=405,920).

Brett Harrison, the Chief Operating Officer of Blockcap, and Mr. Peter Dorrius, the Chief Financial Officer of Blockcap. [App. 7]

      12.    Old Core was acquired by Power & Digital Infrastructure Acquisition Corp. ("**XPDI**") on January 19, 2022, pursuant to a merger between Old Core and a subsidiary of XPDI (the "**De-SPAC Transaction**"). [App. 75] At the time of the De-SPAC Transaction, XPDI was a public company subject to the reporting requirements of the U.S. Securities and Exchange Commission (the "SEC"). [App. 8]  As a result of the De-SPAC Transaction, Blockcap became a subsidiary of XPDI and XPDI became a controlling affiliate of Blockcap. [App. 8] The Public Event Vesting Provision included in the June 1 Award Agreement was a performance target meant to incentivize Mr. Dean to cause Blockcap (or a successor or controlling affiliate) to become a public reporting company. [App. 2 and 52] This performance target provided that one-half of the restricted shares granted to Mr. Dean under the June 1 Award Agreement "would automatically vest on the first date that Blockcap or any successor entity or controlling affiliate thereof became subject to the public company reporting requirements of the U.S. Securities and Exchange Commission" unless Mr Dean signed a contract containing a lock-up restriction applicable to such shares in which case the vesting would be deferred until the expiration of the lock-up. [App. 52] Because (a) Blockcap became a subsidiary of XPDI on January 19, 2022, and XPDI was a public reporting company on that date and (b) Mr. Dean did not sign a contract with a lock-up provision applicable to his shares, the Public Event Date occurred on January 19, 2022, resulting in the automatic vesting of 202,960 of Mr. Dean's shares of Old Core common stock on January 19, 2022, pursuant to the June 1 Award Agreement.

      13.    On January 20, 2022, XPDI merged with Old Core, with XPDI surviving the merger under the name Core Scientific, Inc. (the entity referred to as "Core" herein). [App. 75]

14.     As a result of the De-SPAC Transaction, Mr. Dean's Old Core options converted into options to acquire Class A common shares of Core and Mr. Dean's vested and restricted common shares of Old Core converted into vested and restricted Class A common shares of Core at an exchange ratio of 1.6001528688 [App. 76] as follows:

a.   Mr. Dean's 177,590 Old Core options with an exercise price of $11.83 converted into 284,171 Core options with an exercise price of $7.40 [App. 72];

b.   Mr. Dean's 25,370 restricted shares of Old Core common stock issued pursuant to the May 6 Award Agreement converted into 40,595 restricted shares of Core Class A common stock [App. 73];

c.   Mr. Dean's 202,960 shares of Old Core common stock issued pursuant to the June 1 Award Agreement, which vested on the Public Event Date, converted into 324,767 vested shares of Core Class A common stock [App. 71]; and

d.   Mr. Dean's remaining 202,960 shares of restricted shares of Old Core common stock issued pursuant to the June 1 Award Agreement converted into 324,767 restricted shares of Core Class A common stock [App. 74].

15.     Core breached its obligations under the Dean Employment Agreements, specifically the June 1 Award Agreement, by refusing to process the automatic vesting of 324,767 shares of Core Class A common stock on January 19, 2022, the Public Event Date as required by the Public Event Vesting Provision included in the June 1 Award Agreement (the "**January 19, 2022 Core Breach**"). [App. 8]

16.     On February 10, 2022, Mr. Dean tendered to Core Scientific Acquired Mining LLC, the successor to Blockcap, his resignation for "Good Reason", such resignation to be effective on February 28, 2022.  [App. 8 and Apps. 77-78] On February 14, 2022, prior to the effective date of

Mr. Dean's resignation for "Good Reason", Core terminated Mr. Dean's employment without "Cause".[4] [App. 8, App. 10-11, and App. 87]

17.      Section 8(d)(i) of the Employment Agreement sets forth provisions relating to a termination of Mr. Dean's employment by Mr. Dean for "Good Reason" [App. 16] and Section 8(b) of the Employment Agreement sets forth provisions relating to the termination of Mr. Dean's employment by Core without "Cause". [App. 15] Both sections contain the same terms as follows:

> Executive shall be entitled to receive: (i) any unpaid Base Salary up to the Termination date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee benefits as of the Termination Date; and (iv) the Severance Pay outlined in Section 8(h), subject to Executive's compliance with the terms and conditions therein.

18.      Section 8(h) of the Employment Agreement provides as follows:

> **h.  Severance Pay**
>
> In the event of Termination of the Agreement and Employment, pursuant to Sections 8(b) (Termination without Cause), 8(d)(i) (Resignation for Good Reason), or 8(e) (Death or Disability), Executive will be eligible for Severance Pay, subject to Executive, or Executive's estate or representative, if applicable, executing and not revoking a customary and reasonable general and mutual release of claims that includes a mutual non-disparagement provision and Executive's reaffirmation of the Restrictive Covenants in this Agreement ("Release"). Severance Pay consists of: (1) One (1) year Base Salary in the amount in effect at the time of the termination; provided that if the termination is a result of Executive's resignation for good reason due to a decrease in Executive's salary, such Base Salary shall be in the amount in effective immediately prior to the decrease; (2) the maximum amount of bonus for which the Executive would be eligible for the year in which termination occurred, prorated for the current year of termination, together with Executive's bonus for the prior year if not yet then paid; and (3) at the date of termination, all Awards granted to Executive under the Plan for services in any capacity to the Company shall immediately and automatically become fully vested, exercisable and payable and

---

[4] Section 8(a) of the Employment Agreement defines "Cause" to mean any of the following:  "1. Executive's conviction of or plea of guilty to a charge of theft, embezzlement, or fraud related to Executive's employment with the Company; or 2. Executive's willing, knowing and unauthorized violation of Section 11 hereof, not cured by Executive following 30 days written notice actually delivered to and received by Employee by the Company which (i) specifically describes the conduct or omission of Executive that must be cured and (ii) is accompanied by substantiating evidence of the alleged violation." [App. 15] At no time has Core asserted that any of the foregoing applied to Core's termination of Mr. Dean and, in fact, no such event ever occurred. [App. 8]

shall be released from any repurchase or forfeiture provisions with respect to all shares of the Company's common stock at the time represented by such Award.

[App. 17]

19.    Core breached its obligations under the Dean Employment Agreements, specifically Section 8(h) of the Employment Agreement, on February 14, 2022 (the "**February 14, 2022 Core Breach**"), by refusing to provide the following to Mr. Dean on the date of his termination by Core without "Cause" [App. 8]:

    a.    One year's base salary in the amount of $200,000 [App. 8];

    b.    Automatic vesting of 284,171 options to acquire Core Class A common stock at an exercise price of $7.40 [App. 72];

    c.    Automatic vesting of 40,595 shares of Core Class A common stock granted pursuant to the May 6 Award Agreement [App. 73]; and

    d.    Automatic vesting of 324,767 shares of Core Class A common stock, representing the balance of the shares granted pursuant to the June 1 Award Agreement after taking into account the vesting of 324,767 shares on the Public Event Date [App. 74].

20.    On September 30, 2022, Mr. Dean filed a lawsuit against Core and Core Scientific Acquired Mining LLC in Travis County, Texas, for breach of the Dean Employment Agreements and asserting additional causes of action. [App. 79-80]

21.    On December 21, 2022 (the "**Petition Date**"), Core initiated the above styled bankruptcy cases (the "**Bankruptcy Cases**") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

22.    On April 13, 2023, Mr. Dean filed the following proofs of claim (collectively, the "**Dean Proof of Claim Nos. 364 and 383**") in the Bankruptcy Cases:

d) Proof of Claim No. 364 against Core Scientific, Inc. in the amount of $8,000,000.00; and

e) Proof of Claim No. 383 against Core Scientific Acquired Mining LLC in the amount of $8,000,000.00.

23.     As explained in the Dean Proof of Claim Nos. 364 and 383 and in this Motion, Mr. Dean has claims against Core resulting from Core's breach of the Dean Employment Agreements by failing to process the automatic vesting of 324,767 shares on the Public Event Date and by failing to provide to Mr. Dean the severance set forth in the Employment Agreement on February 14, 2022, following Core's termination of Mr. Dean's employment without "Cause".  Further, while Mr. Dean seeks only one recovery against Core, Mr. Dean has filed a proof of claim against each of Core and Core Acquired Mining because the Dean Employment Agreements are with Core Acquired Mining and require the delivery of vested stock options and vested shares by Core.

24.     On September 19, 2023, Core filed the Core Objection objecting to the Dean Proof of Claim Nos. 364 and 383 based on the following assertions: (a) Core did not breach the Employment Agreement, and (b) if Core did breach the Employment Agreement, Mr. Dean's damages were speculative and subject to reduction.  The only evidence presented in support of the Core Objection is the *Declaration of Todd DuChene in Support of Debtors' Objection to Proof of Claim Nos. 364 and 383 filed by Harlin Dean* (the "DuChene Declaration").

25.     For the reasons stated herein, the Court should grant this Motion in its entirety, overrule the Core Objection, and allow the Dean Proof of Claim Nos. 364 and 383.

### IV.     SUMMARY JUDGMENT STANDARD

26.     ***Summary judgment is appropriate in a contested matter***. Once a debtor objects to a proof of claim, the validity of the claim becomes a "contested matter." *In re Gilbreath*, 395 B.R. 356, 365 (Bankr. S.D. Tex. 2008). A party to a contested matter can move for summary

judgment. Fed. R. Bankr. P. 9014 (c) (Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56, applies to contested matters); *see In re Alta Mesa Res., Inc.,* No. 19-35133, 2022 WL 17984306 (Bankr. S.D. Tex. Dec. 28, 2022) (applying Federal Rules of Bankruptcy Procedure 9014 and 7056 to grant summary judgment on proof of claim); *Cimerring v. ORIX Cap. Mkts., LLC* (*In re Canoco Inc.*), 323 F. App'x 306, 308 (5th Cir. 2009) (holding that "[b]ankruptcy courts can render summary judgment in contested matters.").

27.     ***Summary judgment should be granted in favor of Mr. Dean because there is no genuine dispute as to any material fact and he is entitled to summary judgment as a matter of law***. Summary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir. 1986). If the Rule 56 standards are met, summary judgment is not to be regarded as a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

28.     "The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56 (a). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). If the movant meets its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party opposing summary judgment must do more than simply show some "metaphysical doubt as to the material facts." *Id.* at 586. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991). Summary

judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co*., 805 F.3d 535, 538 (5th Cir. 2015).

29.     ***Discovery is not a procedural prerequisite to summary judgment***. *Dominick v. Mayorkas*, 52 F.4th 992, 995 (5th Cir. 2022) ("Rule 56 does not require that any discovery take place before summary judgment can be granted...."); *see Smith v. State*, No. H-12-469, 2014 WL 670751, at *9 (S.D. Tex. Feb. 20, 2014) (granting summary judgment over nonmovant's claim that case was prejudiced by movant's failure to participate in discovery).

**V.      ARGUMENTS AND AUTHORITIES**

**A.      Debtor failed to provide substantial evidence to overcome the prima facie validity of Dean Proof of Claim Nos. 364 and 383.**

*30.*     Rule 3001 of the Federal Rules of Bankruptcy Procedure provides that a properly filed proof of claim shall constitute prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001.  If a party objects to the claim and produces evidence to rebut the claim, the burden shifts to the claimant to prove its claim by a preponderance of the evidence.  *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988); *see also In re Mid-American Waste Sys., 284 B.R 53, 65* (Bankr. Delaware 2002) ("Where the objecting party presents substantial evidence to overcome the prima facie validity of the claim, the burden shifts to the claimant to prove his claim by a preponderance of the evidence").  Core failed to produce substantial evidence to overcome the prima facie validity of Dean's Proof of Claim Nos. 364 and 383.  In fact, Core has failed to provide any valid evidence whatsoever, instead providing only conclusional allegations and unsupported assertions.  As a result, the preponderance of the evidence establishes the validity of Claim Nos. 364 and 383.

**B.      Dean is entitled to summary judgment as a matter of law for breach of contract.**

31.      A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach. *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n. 21 (Tex. 2018); *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).[5] When the terms of a contract are clear and the facts surrounding the breach are undisputed, the issue of whether the facts show breach are decided as a matter of law. *In re 1960 Family Practice, P.A.*, 2023 WL 50111727, *9 (Bankr. S.D. Tex. Aug. 4, 2023); *Meek v. Bishop Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

32.      Each of the Dean Employment Agreements is a valid contract, duly authorized and executed by Mr. Dean and Blockcap.  [App. 3]  Prior to January 19, 2022, Blockcap, and Core as its successor, complied with the terms of the Dean Employment Agreements. [App. 3]  Mr. Dean has at all times performed as required under the Dean Employment Agreements.  [App. 3] At no time has Blockcap or Core alleged or asserted that any of the Dean Employment Agreements are invalid or that Mr. Dean failed to perform as required under the Dean Employment Agreements. [App. 3].  As such, it is undisputed that the Dean Employment Agreements are valid contracts and that Mr. Dean tendered performance as required under the Dean Employment Agreements.  Accordingly, the remainder of this brief addresses (1) Core's breaches of the Dean

---

[5] The Executive Employment Agreement is governed by Texas law. [App. 21] Each of the Award Agreements are governed by Nevada law. [App. 28, App. 39, and App. 49] Texas law and Nevada law are, however, consistent regarding the elements of a breach of contract claim. Under Nevada law, a plaintiff asserting a breach-of-contract claim must demonstrate: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damages as a result of the breach. *Cohen-Been v. Gray Television Group, Inc.*, 661 F.Supp.2d 1158, 1171 (D. Nev. 2009).

Employment Agreements by failing to perform as required by such agreements and (2) the damages sustained by Mr. Dean as a result of Core's breaches.

> **1. Core breached the Dean Employment Agreements by failing to process the automatic vesting of shares of Core Class A Common Stock on the Public Event Date.**

33.     Core committed multiple breaches of the Dean Employment Agreements, the first of which was the January 19, 2022 Core Breach.  As described above in Paragraphs 12 -15 under "Relevant Facts", the merger of Old Core with a subsidiary of XPDI on January 19, 2022, resulted in Blockcap becoming a subsidiary of a public reporting company.  Mr. Dean did not sign a lock-up agreement in connection with the De-SPAC Transaction. [App. 9] As a result, Mr. Dean's performance target in his June 1, 2022 Award Agreement was satisfied, resulting in the automatic vesting on January 19, 2022, of 202,960 shares of common stock of Old Core. By virtue of the various mergers contemplated by the De-SPAC Transaction, Mr. Dean's 202,960 vested shares of common stock of Old Core were converted into 324,767 vested shares of Core Class A common stock. [App. 71] Core breached its obligations under the Dean Employment Agreements, specifically the Public Event Vesting Provision set forth in the June 1 Award Agreement, by refusing to process the automatic vesting  of 324,767 vested shares of Core Class A common stock on January 19, 2022, the Public Event Date.

34.     In Paragraph 28 of the Core Objection, Core asserts that vesting of Mr. Dean's shares on the Public Event Date should be deferred to March 10, 2022, because "Core issued a bylaw ***imposing*** a lock-up period" which expired on March 10, 2022. Core Objection, Dkt. 1246 (emphasis added). Core's only support of this assertion is a citation to a Dallas Court of Appeals decision with a partial quotation stating "Texas courts have long held that a corporation's governing documents . . . are a contract . . . between the corporation on one side and individual members or shareholders on the other". *S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist. Univ.*, 674 S.W.3d 334, 363 (Tex. App.—Dallas, pet. filed Aug. 30, 2023).

35.      At no time prior to the filing of the Core objection has Core communicated to Mr. Dean that his shares did not vest on the Public Event Date as a result of Mr. Dean being subject to a contractual lock-up.  [App.8] This assertion by Core is merely an attempt to re-interpret the clearly drafted Public Event Vesting Provision for the sole purpose of fabricating a post hoc excuse for its breach of the June 1 Award Agreement. However, Core has no basis for its attempted post-hoc interpretation of the true intent of the June 1 Award Agreement. This agreement was prepared before Core's acquisition of Blockcap and no employee or representative of Core was present or involved with the drafting of the agreement. [App. 8-9] The obvious true intention of the Public Event Vesting Provision was to vest shares on the Public Event Date. The proviso in the Public Event Vesting Provision was meant to narrowly apply to only defer vesting in the limited circumstances where the grantee, Mr. Dean, signed a contract specifically including an agreement to subject his shares to a lock-up provision. [App. 9] In other words, the inclusion of the word "contractual" had the express purpose of <u>avoiding</u> deferred vesting in circumstances exactly like the ***imposition*** of a lock-up pursuant to a bylaw provision, such as was the case in the XPDI merger. Had this not been the case, the word "contractual" would not have been added to the provision and the provision would have simply stated "any lock-up provision".

36.      The rationale for limiting the deferral of vesting was simple. At June 1, 2021, Mr. Dean (and two other executives of Blockcap with similar provisions in their grant agreements) were executive officers of Blockcap, a stand-alone company seeking to complete its initial public offering. [App. 9] Had Blockcap completed its initial public offering or completed a De-SPAC transaction on its own, and not as a subsidiary of another entity, Mr. Dean and the others would have continued to be executive officers of a public company and, in that position, would most likely have been requested to sign a contract containing a lock-up provision applicable to their shares. [App. 9] The goal of Mr. Dean, and the other executives, was to be executives in a public

company and, in that situation, they were willing to defer vesting of their shares if they were requested to sign a lock-up agreement as part of the public event transaction <u>and</u> they agreed to sign such an agreement. On the other hand, if they were not executives of the public company, because, say for example, Blockcap was acquired by another company and Mr. Dean and the other executives were relegated to being officers in one of many subsidiaries in roles which had nothing close to the duties, responsibilities and prestige of their executive roles with Blockcap as a stand-alone company, then Mr. Dean and the other officers could refuse to sign a lock-up contract, if one was even requested of them, and thereby assure their shares vested on the Public Event Date.

37.     It is significant to note that certain executive officers of Core were requested to sign a lock-up agreement in the form included as Annex H to XPDI's proxy statement/prospectus dated December 1, 2021, filed with the SEC and mailed to XPDI shareholders on January 3, 2022 (the "**XPDI Proxy Statement**"). [App. 76] Nowhere in the Core Objection or the DuChene Declaration is there an assertion that Mr. Dean signed a lock-up agreement and Mr. Dean has no recollection of being asked to sign, or signing, a lock-up agreement. [App. 9] Accordingly, the clearly drafted and narrowly tailored proviso in the Public Event Vesting Provision was not triggered and vesting of 324,767 shares of Core Class A common stock occurred automatically on January 19, 2022.

38.     Core's citation of *S. Cent. Jurisdictional Conf. of United Methodist Church v. S. Methodist. Univ.*, 674 S.W.3d 334, 363 (Tex. App.—Dallas, pet. filed Aug. 30, 2023) referencing a statement that "Texas courts have long held that a corporation's governing documents . . .are a contract . . . between the corporation on one side and individual members or shareholders on the other" does not overcome the clear intent of the Public Event Vesting Provision. Nor does this citation support Core's proposition that the bylaw provision <u>imposed</u> on Core shareholders is a "contractual lock-up" for purposes of the Public Event Vesting Provision. The referenced line of

cases involved documents between a corporation and its members or shareholders. Old Core, the company in which Mr. Dean was a shareholder at the time the bylaw was adopted, did not adopt the bylaw.  In fact, the bylaws were proposed to the shareholders of XPDI pursuant to the XPDI Proxy Statement [App. 81-82] and were adopted at a meeting of the shareholders of XPDI on January 19, 2022, prior to the consummation of the mergers contemplated in the De-SPAC Transaction. [App. 83] Therefore, the lock-up did not apply to Mr. Dean until the provision was truly "imposed" on Mr. Dean by virtue of the consummation of the De-SPAC Transaction. At any rate, this type of imposed obligation was clearly not what was intended as a "contractual lock-up restriction" in the Public Event Vesting Provision.

39.    In sum, the Public Event Vesting Provision was completely satisfied on January 19, 2022, and the automatic vesting of 324,767 shares was not deferred because Mr. Dean did not sign a contract containing a lock-up restriction on Mr. Dean's shares. All that remained was for Core to fulfill its obligations to process the vesting of the 324,767 of Mr. Dean's shares granted pursuant to the June 1 Award Agreement.  Core committed the January 19, 2022 Core Breach by refusing to process the vesting of 324,767 shares of Class A common stock on June 19, 2022, in violation of the express language of the June 1 Award Agreement requiring the automatic vesting of such shares.  Mr. Dean's damages for the January 19, 2022 Core Breach are to be determined by the price of Core's stock on January 19, 2022, the date of the breach.  *Hercules Offshore, Inc. v. Guthrie*, No. 01-10-00968-CV, 2013 WL 772939, at *6-7 (Tex. App.—Houston [1st Dist.] Feb. 28, 2013, pet. denied) (mem. op.); *Miga v. Jensen*, 96 S.W.3d 207, 215 (Tex. 2002). The closing price of Core's stock on January 19, 2022, was $9.60 [App. 84], giving a value of $3,117,763.20 to the 324,767 vested shares of Core Class A common stock which Core failed to properly vest. [App. 71]

2. **Core breached the Employment Agreements by failing to deliver severance to Mr. Dean on February 14, 2022.**

40.     As described above in Paragraphs 16 – 19 above under "Relevant Facts", on February 10, 2022, Mr. Dean tendered his resignation for "good reason" under the Employment Agreement, such resignation to be effective on February 28, 2022.   On February 14, 2022, prior to the effective date of Mr. Dean's resignation for "Good Reason", Core terminated Mr. Dean's employment without "Cause". The Employment Agreement required Core to deliver severance to Mr. Dean upon the occurrence of a termination of his employment either by Mr. Dean for "Good Reason," or by Core without "Cause".  Core breached its obligations under the Dean Employment Agreements by refusing to deliver to Mr. Dean the severance described in Section 8(h) of the Employment Agreement on February 14, 2022, the date of termination of his employment.

41.     Core attempts to focus the Court's attention on purported issues with Mr. Dean's termination for "Good Reason" for the sole purpose of obfuscating the fact that Core terminated Mr. Dean's employment on February 14, 2022, without "Cause".  Core's objection to Mr. Dean's claim that he was terminated without "Cause" is limited to a single assertion: "Core informed Mr. Dean on February 14, 2022 that it disputed his resignation was for Good Cause [sic] and **that Mr. Dean's employment would end that day** – essentially treating his resignation as one without 'Good Reason'".  Core Objection, Dkt. 1246 at Paragraph 28 (emphasis added).  Mr. Dean's resignation was to be effective February 28, 2022, and until that date, Mr. Dean continued to be employed under the terms of his Employment Agreement.  On February 14, 2022, Core informed Mr. Dean "that his employment would end that day".  A company's informing an employee that such employee's employment is ending is undeniably a termination of that employee's employment. Accordingly, **Core expressly admits in the Core Objection that it terminated Mr. Dean's employment on February 14, 2022**.  While Core attempts to recharacterize its termination of Mr. Dean as "essentially treating his resignation as one without Good Reason," this is nothing

more than a thinly disguised attempt to avoid the consequences of Core's true action – actually, as opposed to essentially, terminating Mr. Dean's employment on February 14, 2022, without "Cause". Core has no right to amend Mr. Dean's tendered resignation. Under basic contract law, if a party receiving an offer rejects that offer and changes the terms, the revised offer is not binding on the original offeror. *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968).

42.     Core rejected Mr. Dean's resignation that was to be effective February 28, 2022, then terminated Mr. Dean's employment on February 14, 2022. This unilateral action by Core to re-characterize Mr. Dean's resignation as one "without Good Reason" and to accelerate the effective date of termination to February 14, 2022, simply cannot be enforced against Mr. Dean as a revision to his resignation. It is undisputable that Core terminated Mr. Dean's employment on February 14, 2022.

43.     Likewise, it is undisputed that Core's termination of Mr. Dean was without "Cause". Nowhere in the Core Objection or the DuChene Declaration is there any assertion that Core's termination of Mr. Dean's employment on February 14, 2022, was with "Cause" and, in fact, no event constituting "Cause" under the Employment Agreement ever occurred.   [App. 8] Importantly, Core omits several facts from the Core Objection.  Prior to delivering his resignation on February 10, 2022, Mr. Dean held a teleconference with Kyle Buckett, then the head of HR for Core, and Sangeeta Campos Puri, also in Core's HR department, to explain the reasons for his resignation and to discuss the process for delivering Mr. Dean's severance under Section 8(h) of the Employment Agreement.  [App. 10 and App. 77] At no time during that call did Mr. Buckett, who participated in the August 31, 2021, meeting in which Mr. Levitt confirmed that Core would honor Mr. Dean's resignation for "Good Reason", or Ms. Puri object to Mr. Dean's resignation for Good Reason.  [App. 10]  On February 14, 2022, Mr. Buckett and Ms. Puri called Mr. Dean and Ms.

Puri stated that Core was not accepting Mr. Dean's resignation for "Good Reason" but was instead terminating Mr. Dean for "Cause". [App. 10 and App. 87] Ms. Puri did not provide a basis for the termination, but after repeated requests from Mr. Dean to provide a rationale for Core's termination of Mr. Dean's employment, Ms. Puri finally stated only that Mr. Dean was being terminated for "talking to employees and advising them against the Company." [App. 10 and App. 87] Ms. Puri did not state any specifics to support this statement. [App. 10 and App. 87] Mr. Dean immediately denied this allegation and specifically pointed out that Core had no basis under the Employment Agreement for terminating Mr. Dean's employment for "Cause". [App. 10-11 and App. 87] At this point, Mr. Buckett simply ended the call. [App. 11]

44.    The next day, Mr. Dean sent the following email expressly stating that Core's actions constituted a termination without "Cause" and referring to Core's previous express agreements to allow Mr. Dean to resign for "Good Reason":

---

**From:** Harlin Dean
**Sent:** Tuesday, February 15, 2022 5:47 PM
**To:** kbuckett@corescientific.com; spuri@corescientific.com
**Subject:** Termination of Employment

Kyle and Sangeeta,

I am writing to follow up on our telephone conversation yesterday. It is my understanding that the Company rejected my resignation for good reason and terminated my employment effective yesterday. However, you did not provide any reason for rejecting my resignation, nor did you provide any reason for my termination other than alleging that I "breached my fiduciary obligations by talking to employees and advising them against the Company." You did not provide any other information. This allegation is completely untrue. I have not given any advice to any employee against the Company.

In addition, the Company has not met the requirements under my employment agreement to qualify the purported termination as a termination for "Cause". Pursuant to Section 8(a) of my employment agreement, "Cause" is defined as either:

  1.  Executive's conviction of or plea of guilty to a charge of theft, embezzlement, or fraud related to Executive's employment with the Company; or
  2.  Executive's willful, knowing and unauthorized violation of Section 11 hereof, not cured by Executive following 30 days written notice actually delivered to and received by Executive by the Company which (i) specifically describes the conduct or omission of Executive that must be cured and (ii) is accompanied by substantiating evidence of the alleged violation.

I have not been convicted nor have I plead guilty to any charge of theft, embezzlement or fraud. I have not violated any provision of Section 11 (which sets forth restrictive covenants related to non-competition and non-solicitation of employees or customers). Further, prior to my termination, the Company did not provide written notice alleging any breach of Section 11 and specifically describing the alleged misconduct with substantiating evidence. As a result, I was not provided an opportunity to respond to any such allegation and, if valid, to cure any alleged misconduct within 30 days. As a result, my termination by the Company can only be without Cause, thus entitling me to the same Severance Pay I am entitled to upon my resignation for good reason under the provisions of Section 8(h) of my employment agreement.

My access to email and the Company servers was terminated yesterday, the call we had scheduled yesterday to discuss tax withholding on my Severance Pay was canceled, and I have received no further communications from the Company. I am requesting that the Company re-engage with me to complete the necessary steps for execution of the mutual release specified in my employment agreement and delivery of my Severance Pay, all as described in my email of February 10, 2022. I am available at your convenience and can also be in the office the morning of February 22, 2022, to return my laptop and finalize the necessary documentation.

As I mentioned yesterday, I do not understand why we are in this situation. I have been discussing my departure from the Company with Todd DuChene since shortly after the Core/Blockcap transaction and I also discussed it with Mike Levitt. Both acknowledged my right to resign for good reason and receive the Severance Pay under my employment agreement. I have not done, and would not do, anything to change their position. As I'm sure you can imagine, this matter is of the utmost importance to me and I urge you to respond so that we can timely process my termination pursuant to the terms of my employment agreement.

Thank you and best regards,
Harlin

---

[App. 87]

**HARLIN DEAN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**
**RELATED TO DEBTORS' OBJECTION TO PROOF OF CLAIM NOS. 364 and 383** –                                    **Page 23**

45.     It is clear that Core terminated Mr. Dean's employment without "Cause" on February 14, 2022, which entitles Mr. Dean to his severance as outlined in Section 8(h) of the Employment Agreement.  Core must bear the consequences of its actions and cannot pretend its termination of Mr. Dean did not happen. Yet Core is attempting to do just that by misdirecting the Court toward an argument that Mr. Dean attempted to resign for "Good Reason" which Core, in turn, now disputes. However, even if Core had not affirmatively terminated Mr. Dean without "Cause" on February 14, 2022, Mr. Dean's termination of his employment agreement was in fact for "Good Reason" and Core has presented no evidence to dispute this fact.

46.     Core asserts that Mr. Dean did not resign for "Good Reason", but Core offers absolutely no evidence to support their assertion. Rather, Core makes two generic statements: (a) "he failed to provide any explanation or details supporting that the resignation was for 'Good Reason'"(Core Objection. Dkt. 1246 at Paragraph 25); and (b) "Mr. Dean worked for Core for more than six months **following its acquisition of Blockcap,** despite the 'material and substantial diminution in his duties he now alleges, without ever raising such issues to Core" Core Objection, Dkt. 1246 at Paragraph 27. (emphasis added). Neither of these conclusional allegations are actual proof that Mr. Dean had no basis for resigning for "Good Reason". As described above in Paragraphs 7-9 under "Relevant Facts", Mr. Dean and Mr. DuChene discussed and agreed to Mr. Dean's resignation for "Good Reason" in the week **prior** to the closing of Core's acquisition of Blockcap and, as described in Paragraph 11  under "Relevant Facts", Mr. Levitt, the CEO and Co-Chairman of Core, confirmed Mr. Dean's rights to resign for "Good Reason" as a result of such acquisition shortly after the transaction closed. The reason Mr. Dean did not provide specifics in his resignation letter or complain following Core's acquisition of Blockcap is that two of Core's highest-ranking officials had expressly agreed to Mr. Dean's resignation for "Good Reason" in recognition of the fact that there was no place in the combined organization for Mr. Dean, and

thus Mr. Dean would not have duties or responsibilities at the level of Mr. Dean's responsibilities and duties with Blockcap prior to the transaction.  [App. 11]  Note that Core carefully drafts both the Core Objection and the DuChene Declaration to limit their assertions to "following its acquisition of Blockcap" (*see* Core Objection, Dkt. 1246 at Paragraph 27) and "After Core's acquisition of Blockcap" (*see* DuChene Declaration at Paragraph 7), to purposefully exclude the events that occurred prior to closing of Core's acquisition of Blockcap, namely, the agreement by DuChene and Core to Mr. Dean's resignation for "Good Reason".

47.     Core goes so far as to state that "Core did not diminish Dean's responsibilities or duties". Core Objection, Dkt. 1246 at Paragraph 26. This unsupported assertion is followed by this conclusory allegation: "The fact that Dean did not specify any purported reasons for his resignation in his Resignation Letter speaks volumes."  Again, mere unsupported assertions and conclusory allegations are not evidence.  The reason Mr. Dean did not recite specific reasons in his resignation letter was the prior approval by Core of Mr. Dean's resignation for "Good Reason" as described above.  In addition, it is telling that, while the Core Objection asserts that Mr. Dean's duties were not diminished, there is no statement in the DuChene Declaration asserting that Mr. Dean's duties were not diminished. Mr. Dean reported to Mr. DuChene and Mr. DuChene has knowledge of Mr. Dean's duties and responsibilities following Core's acquisition of Blockcap. Were it true that Mr. Dean's duties and responsibilities were not diminished, Mr DuChene would be the ideal representative of Core to make a statement to that effect in the DuChene Declaration. However, Mr. DuChene is not able to make such a statement under oath because he knows it would be untrue.

48.     Mr. Dean's duties and responsibilities with Blockcap are summarized in Paragraph 5 under "Relevant Facts". Following the acquisition of Blockcap by Core, Mr. Dean was no longer responsible for SEC filings or acquisitions, financing activities, corporate governance,

compensation plans, stock records, employment matters, or any other substantive legal matter. [App. 11] Mr. Dean reported to Mr. DuChene and only worked on matters approved by Mr. DuChene, which were limited to a few contracting matters, and Mr. Dean was required to obtain Mr. Duchene's approval before allowing any such contracts to be executed on behalf of Old Core. [App. 11]

49.     In sum, Core terminated Mr. Dean's employment without "Cause" on February 14, 2022, prior to the effective date of Mr. Dean's valid resignation for "Good Reason". As a result, Core was obligated to deliver the severance specified in Section 8(h) of the Employment Agreement on February 14, 2022.  Core committed the February 14, 2022 Core Breach by breaching the Dean Employment Agreements, in particular the Employment Agreement, by refusing to deliver the severance specified in Section 8(h) of the Employment Agreement. Mr. Dean's damages for the February 14, 2022 Core Breach are to be determined by the price of Core's stock on February 14, 2022, the date of the breach.[6] *Hercules Offshore, Inc.*, 2013 WL 772939, at *6-7; *Miga*, 96 S.W.3d at 215. The closing price of Core's stock on February 14, 2022, was $9.89 [App. 85], giving a value of $4,521,015.97 to the severance payments Core failed to deliver to Mr. Dean as follows:

    i.     $200,000, representing one year's base salary  [App. 8];

    ii.    $707,585.79, representing the net value of 284,171 vested options to acquire Core Class A common stock at an exercise price of $7.40, based on the closing price of Core's stock on February 14, 2022  [App. 72];

    iii.   $401,484.55, representing the value of 40,595 vested shares granted pursuant to the May 6 Award Agreement, based on the closing price of Core's stock on February 14, 2022 [App. 73];

---

[6] Had Core not terminated Mr. Dean without "Cause" on February 14, 2022, Mr. Dean's valid resignation for "Good Reason" would have been effective on February 28, 2022. [App. 8, 78] Value calculations as of February 28, 2022, are included in Appendix 72-74.

iv.    $3,211,945.63, representing the value of the remaining 324,767 vested shares granted pursuant to the June 1, 2022 Award Agreement (after vesting of 324,767 shares on the Public Event Date), based on the closing price of Core's stock on February 14, 2022 [App. 74].

### 3. Mr. Dean's damages are not speculative or subject to reduction.

50.    Core's only other basis for their objection to Mr. Dean's claims is the incorrect and unsupported assertion that Mr. Dean's damages are dependent on a sale by Mr. Dean of his Core stock, followed by a fictionalized series of purported hurdles to Mr. Dean's ability to do so. The fact of the matter is that Core is merely trying to steer the Court down a road that has long been closed by the courts.

51.    In *Hercules Offshore, Inc. v. Guthrie,* a case eerily similar to the facts at hand, Plaintiff Gutherie entered into a series of restricted stock grants and option grants with her employer, Hercules. No. 01-10-00968-CV, 2013 WL 772939, at *6-7 (Tex. App.—Houston [1st Dist.] Feb. 28, 2013, pet. Denied) (mem. Op.). Subsequently, Hercules was acquired by merger. Shortly after the merger, the plaintiff's employment was terminated and the acquiring entity refused to vest Guthrie's restricted stock and options which, pursuant to the terms of her agreements, vested at the time of her termination. Guthrie filed suit claiming damages based on the price of the employer's stock on the date of her termination. The trial court ruled that Guthrie was entitled to damages for the failure to vest the restricted stock with the damages based on the market price of the employer's stock on the date of Guthrie's termination – the date the employer breached the agreement by not vesting her shares. The trial court ruled that Guthrie take nothing for her stock option claim. Both parties appealed. On appeal, Hercules argued against the damage award based on the date of termination because Guthrie offered no evidence that she would have sold the restricted stock on her termination date and further argued that the date of breach with respect to the stock options was not the termination date, but another date at which time

Hercules share price was below the strike price of Guthrie's options.  The Court held that Guthrie's "damages with respect to her stock options should be measured, like her damages on her restricted stock claims, based on the price of Hercules's stock on the date of Hercules's breach of the Executive Agreement, namely the date of her termination without cause, which was the date her stock options vested under paragraph 6(b)(ii) of her Executive Agreement and Hercules failed to reward them." *Hercules Offshore, Inc.*, 2013 WL 772939, at *6-7; (the Court concluded *Miga v. Jensen*, 96 S.W.3d 207, 215 (Tex. 2002), which held the damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of the breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach, was controlling).  The Court noted that the Texas Supreme Court's holding in *Miga* was "consistent with the approach of at least two Texas courts of appeals" and "has the support of other jurisdictions, including the New York Court of Appeals."  *Hercules Offshore, Inc.*, 2013 WL 772939, at *7, citing *Hurst v. Forsythe*, 584 S.W.2d 314, 316-17 (Tex. Civ. App.—Texarkana 1979, writ ref'd n.r.e.); *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369, 373 (Tex. Civ. App.—San Antonio 1977, no writ); *see also Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir. 1984); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 269 N.E.2d 21, 26, 320 N.Y.S.2d 225 (N.Y. 1971)).

52.     Based on this long-standing precedent, Mr. Dean's damages are to be determined on January 19, 2022, and February 14, 2022, the dates of Core's breaches of the Dean Employment Agreements.  Mr. Dean has no obligation to offer evidence relating to whether or when he would have, or could have, sold his vested shares or exercised his vested options. Similarly, Core's purported obstacles that would supposedly delay any such sales until dates when Core's stock price were substantially lower, are completely irrelevant.  In addition, the purported obstacles are overexaggerated and, in one case, completely false.

53.     Core asserts that Mr. Dean "would not have been able to sell some of his shares no sooner than March 10, 2022, (the date the waiver of a lock-up period became effective) **and the rest no sooner than April 20, 2022 (the date Core filed its Form S-8 Registration Statement with the Securities and Exchange Commission)."** Core Objection, Dkt. 1246 at Paragraph 2 (emphasis added). The assertion as to the Form S-8 Registration Statement is completely false.

54.     Mr. Dean's restricted stock and options were granted and issued by Blockcap to Mr. Dean prior to Old Core's acquisition of Blockcap and prior to Old Core's merger with XPDI. [App. 11]  As a condition to the De-SPAC Transaction, XPDI was required to have an effective registration statement on Form S-4 on file with the SEC for the purpose of registering the shares of XPDI to be issued (a) in exchange for outstanding shares of Old Core's common stock in connection with the De-SPAC Transaction and (b) upon exercise of options of Old Core assumed by XPDI in  connection with the De-SPAC Transaction. [App. 12]  Because Mr. Dean's Old Core shares and stock options were outstanding prior to the De-SPAC Transaction, the shares to be issued to Mr. Dean in exchange for his shares of Old Core upon consummation of the merger between XPDI and Old Core, and the shares to be issued to Mr. Dean upon exercise of his Old Core options assumed by XPDI were included in XPDI's Form S-4 registration statement filed in connection with the De-SPAC Transaction, as reflected by the explanatory footnote from the cover page of XPDI's Form S-4:

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee |
|---|---|---|---|---|
| Class A common stock, par value $0.0001 per share(1) | 405,062,379 | $9.97 | $4,038,471,918.63 | $440,597.29(3) |

(1)  Represents the estimated maximum number of shares of the registrant's Class A common stock, par value $0.0001 per share (the "Class A Common Stock"), to be issued by the registrant to securityholders of Core Scientific Holding Co., a Delaware corporation ("Core Scientific"), in connection with the transactions described herein (the "merger"), estimated solely for the purpose of calculating the registration fee, and is based on the sum of (a) up to 297,426,315 shares of Class A Common Stock issuable as consideration to the holders of common stock, par value $0.00001 per share, of Core Scientific (the "Core Scientific common stock") (including up to 11,333,364 shares of Class A Common Stock issuable as consideration upon the conversion of Core Scientific preferred stock into shares of Core Scientific common stock immediately prior to the Effective Time (as defined in the accompanying proxy statement/prospectus)); (b) up to 6,587,459 shares of Class A Common Stock issuable as consideration (i) upon the exercise of certain warrants to purchase shares of Class A Common Stock, which warrants will be issued upon the assumption by the registrant of Core Scientific warrants on the same terms and conditions as were applicable to such warrants prior to the Effective Time, and (ii) in connection with certain warrants that will be deemed to have been exercised, on a net exercise basis with respect to the applicable exercise price and any required withholding or employment taxes thereon and settled in the applicable number of shares of Core Scientific common stock; (c) up to 90,350,332 shares of Class A Common Stock underlying restricted stock units ("RSUs") of the registrant, which RSUs will be issued upon the assumption by the registrant of Core Scientific RSUs on the same terms and conditions as were applicable to such RSUs prior to the Effective Time or settled as Core Scientific common stock prior to the Effective Time; and (d) up to 10,698,273 shares of Class A Common Stock issuable as consideration (i) upon the exercise of certain options to purchase shares of Class A Common Stock, which options will be issued upon the assumption by the registrant of Core Scientific options on the same terms and conditions as were applicable to such options prior to the Effective Time, and (ii) in connection with certain options that will be deemed to have been exercised, on a net exercise basis with respect to the applicable exercise price and any required withholding or employment taxes thereon and settled in the applicable number of shares of Core Scientific common stock.

[App. 61] (emphasis added).

55.    It cannot be disputed that the shares issued to Mr. Dean in connection with the De-SPAC Transaction and issuable to Mr. Dean pursuant to his stock options which were assumed by XPDI in the De-SPAC transaction were registered under XPDI's Form S-4 Registration Statement.  As such, Mr. Dean's shares were not required to be registered a second time pursuant to a subsequent Form S-8 Registration Statement to be filed by Core.   Any statement to the contrary, including Core's statement in Paragraph 2 of the Core Objection, is patently false.

56.    In sum, Mr. Dean's damages are to be measured on the dates on which Core breached the Dean Employment Agreements, namely January 19, 2022, and February 14, 2022, and such damages are neither speculative nor subject to reduction.  As set forth above, Mr. Dean's damages resulting from the January 19, 2022 Core Breach equal $3,117,763.20 and Mr. Dean's damages resulting from the February 14, 2022 Core Breach equal $4,521,015.97, the sum of which equal total damages in the amount of $7,638,779.17, before interest and attorneys' fees.

### VI.    CONCLUSION

57.    There is no genuine dispute as to any material fact and Mr. Dean is entitled to summary judgment as a matter of law on the allowance of his claim. The Court should grant this

Motion in its entirety, overrule the Core Objection, and allow the Dean Proof of Claim Nos. 364 and 383 in the amount of $7,638,779.17 as of the petition date.

WHEREFORE, Harlin Dean respectfully requests the Court grant this Motion in its entirety and enter an order, substantially similar to the proposed Order submitted herewith overruling the Core Objection, granting Mr. Dean summary judgment as a matter of law with respect to his claims for Core's breaches of the Employment Agreements, allowing the Dean Proof of Claim Nos. 364 and 383 in the amount of $7,638,779.17 as of the petition date, and granting Mr. Dean such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Hudson M. Jobe
HUDSON M. JOBE
State Bar No. 24041189
GREGORY M. SUDBURY
State Bar No. 24033367
**QUILLING, SELANDER, LOWNDS, WINSLETT &
MOSER, P.C.**
2001 Bryan St., Suite 1800
Dallas, TX 75201
(214) 871-2100
(214) 871-2111 (FAX)
hjobe@qslwm.com
gsudbury@qslwm.com

**ATTORNEYS FOR HARLIN DEAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Hudson M. Jobe
Hudson M. Jobe