UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CORE SCIENTIFIC, INC., et al, | ) | Case No. 22-90341 |
| | ) | |
| DEBTORS.[1] | ) | (JOINTLY ADMINISTERED) |

**DECLARATION OF HARLIN DEAN IN SUPPORT OF CLAIMANT HARLIN DEAN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT RELATED TO DEBTORS' OBJECTION TO PROOF OF CLAIM NOS. 364 AND 383**

I, Harlin Dean, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. "My name is Harlin Dean. I am over twenty-one (21) years of age and I am fully competent to testify to the matters stated in this Declaration. I have personal knowledge of the facts set forth in this Declaration, each of which is true and correct.

2. I have practiced corporate law, in private practice and as the General Counsel of three companies, for over 30 years. I was hired by Blockcap, Inc., currently known as Core Scientific Acquired Mining LLC (a subsidiary of Core and a debtor in this case), as its General Counsel in March 2021, for the primary purpose of taking Blockcap public. At the time Blockcap offered the position to me, Blockcap's headquarters were in Dallas, Texas, and I resided in Allen, Texas, approximately 15 miles north of Dallas. Shortly after I accepted employment, Blockcap relocated to Austin, Texas, requiring me to move away from my family to work full-time in Blockcap's Austin headquarters.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

3. In March 2021, Blockcap was a start-up company focused on growing its Bitcoin mining business by investing substantially all of its cash resources in Bitcoin miners. As a result, Blockcap limited the cash component of its executives' compensation to an annual salary of $200,000 with no bonus opportunity. Blockcap had no bonus program in which the executive officers of Blockcap participated. At my previous General Counsel positions, I had significantly higher salaries with bonus potential up to 100% of my base salary.

4. To induce me to accept employment with Blockcap at this reduced cash compensation level and to relocate to Austin, and to incentivize me to accomplish the company's goal of becoming a public company, Blockcap entered into the following compensatory agreements with me (collectively, the "Dean Employment Agreements"):

a) Executive Employment Agreement, dated June 1, 2021 (the "**Employment Agreement**"). A true and correct copy of the Employment Agreement is attached as **Exhibit 1**. Under the Employment Agreement, my annual salary was $200,000.

b) Award Agreement, dated March 4, 2021 (the "**March 4 Award Agreement**"), pursuant to which Blockcap issued to me 350,000 stock options exercisable for common shares of Blockcap with an exercise price of $6.00 per share. A true and correct copy of the March 4 Award Agreement is attached as **Exhibit 2**. The options were to become vested in four equal installments on each one-year anniversary of March 4, 2021.

c) Award Agreement, dated May 6. 2021 (the "**May 6 Award Agreement**"), pursuant to which Blockcap issued to me 50,000 shares of restricted common stock of Blockcap. A true and correct copy of the May 6 Award Agreement is attached as **Exhibit 3**. The shares were to vest in four equal installments on each one-year anniversary of May 6, 2021.

d) Award Agreement, dated June 1, 2021 (the "**June 1 Award Agreement**"), pursuant to which Blockcap issued to me 800,000 shares of restricted common stock of Blockcap. A true and correct copy of the June 1 Award Agreement is attached as **Exhibit 4**. The shares were to vest in four

equal installments on each one-year anniversary of June 1, 2021, provided that 400,000 shares would automatically vest on the first date that Blockcap or any successor entity or controlling affiliate thereof became subject to the public company reporting requirements of the U.S. Securities and Exchange Commission, unless I signed a contract containing a lock-up restriction applicable to such shares.

5. Each of the Dean Employment Agreements is a valid contract, duly authorized and executed by me and Blockcap. Prior to January 19, 2022, Blockcap, and Core as its successor, complied with the terms of the Dean Employment Agreements. I have at all times performed as required under the Dean Employment Agreements. At no time has Blockcap or Core alleged or asserted that any of the Dean Employment Agreements are invalid or that I failed to perform as required under the Dean Employment Agreements.

6. In my role as General Counsel for Blockcap, my duties included leading Blockcap's efforts to complete its initial public offering; mergers and acquisitions, including Blockcap's acquisition of Radar Relay and Blockcap's merger with Core; negotiating and documenting fund raising through debt financings and private stock offerings; corporate governance, including preparation of all board meeting materials, leading the board meetings, and documenting all meeting minutes and written consents; administration of Blockcap's equity compensation plan; maintenance of Blockcap's stock records, including transitioning the stock records to Computershare, Blockcap's third-party transfer agent, and managing Computershare's activities; all contracting matters; shareholder relations; all employment matters, including employment agreements and employee benefit plans; and all other legal and regulatory matters.

7. **Exhibit 5 and Exhibit 17** consist of selected pages from Amendment No. 6 to Form S-4 Registration Statement as filed by Power & Digital Infrastructure Acquisition Corp. with the Securities and Exchange Commission on December 30, 2021. On October 16, 2023, I downloaded the entire filing in pdf format from Core's website at https://investors.corescientific.com/investors/financials/sec-filings/default.aspx. On October 17 and 18, 2023, I selectively copied specific pages from the filing into

six pdf files comprising **Exhibits 5A-5E and Exhibit 17**, to reflect excerpts from the filing relied upon to make certain statements herein and in the Motion for Summary Judgment.

8. On July 15, 2021, the date that Blockcap entered into a merger agreement with Core Scientific Holding Co., Blockcap had been in existence less than a year, had approximately 10 employees, and its only material assets, aside from Bitcoin reserves, were Bitcoin and cryptocurrency miners, substantially all of which were located in Core's hosting facilities.

9. On July 15, 2021, Core had a legal team of several attorneys and one or more paralegals, led by Todd DuChene, as General Counsel of Core.

10. Prior to the closing of Core's acquisition of Blockcap, during the week of July 19, 2021, I participated in a teleconference with Todd DuChene, the General Counsel of Core to discuss my future following the transaction. In this call, I pointed out that both Mr. DuChene and I were well-qualified attorneys with years of experience as public company general counsels and asked if there was a place for me with Core following the transaction. Mr. Duchene informed me that he had an in-house legal team which, to the best of my recollection, included at least two other attorneys and at least one paralegal. Mr. DuChene then responded frankly to my question by stating that he and his legal team were well-equipped to handle all legal matters for Core, including public company reporting and other matters following Core's pending acquisition by XPDI, and that the acquisition of Blockcap only added mining machines and would not increase Core's legal workload. Mr. Duchene was very congenial and understanding of my position, living away from my family and working on a transaction, Core's acquisition of Blockcap, that would effectively eliminate my job, and told me that I was free to leave Core after the transaction and take all of my equity. I replied that I was grateful to hear this because my Employment Agreement allowed me to resign for "good reason" under the circumstances and it was a great relief for me to have Mr. DuChene confirm that Core would honor the terms of my Employment Agreement and Award Agreements. Mr. DuChene ended the call by re-affirming that he would fully support my decision to resign for "Good Reason" and asking me to get back to him on the timing of my resignation.

11. Shortly after my conversation with Mr. DuChene, I and other Blockcap officers were asked to resign from our officer positions with Blockcap in connection with the closing of Core's acquisition of Blockcap and were presented with form resignation letters prepared by Core's outside counsel, Cooley LLP ("Cooley"). I wanted to make clear that, by signing a letter resigning from my officer position, I would not in any way be deemed to waive or adversely affect my rights to resign for "Good Reason" as agreed with Mr. DuChene. In addition, I intended to ask Mr. DuChene if I could stay with Core until completion of Core's transaction with XPDI (the "**DeSPAC Transaction**") and I wanted to confirm that my continuing with Core for the short time period necessary to close the DeSPAC Transaction, in lieu of resigning immediately following Core's acquisition of Blockcap, was not to be construed as a waiver of my rights to resign for "Good Reason". On July 24, 2021, I sent an email to Mr. DuChene with my request to remain with Core until completion of the De-SPAC Transaction and an explanation that I had revised the resignation letter to confirm that neither the resignation letter, nor my continued employment with Core until the De-SPAC Transaction, would be deemed to waive "the rights I have today under my employment agreement to resign for good reason and accelerate my equity." Mr. DuChene responded by email that same day as follows: "Sure. Fine with that. Mark it up however you want. Again will fully support." A true and correct copy of the July 24, 2021 email string is attached as **Exhibit 6**.

12. As reflected in **Exhibit 6**, on July 27, 2021, I forwarded the July 24, 2021 emails between Mr. DuChene and myself from my Blockcap email account to my personal email account. I did this to keep a record of my conversations with Mr. DuChene in which he expressly agreed to my resignation for "Good Reason." On October 16, 2023, I saved this email chain into the pdf file comprising **Exhibit 6**.

13. The email I forwarded to my personal email account on July 27, 2021, which is included in **Exhibit 6**, did not include my revised form of resignation letter as an attachment. A true and correct copy of the form resignation letter with my revisions is included as **Exhibit 7B**. The form resignation letter was included as an attachment to an email that I sent to attorneys at Blockcap's outside law firm, Zukerman Gore Brandeis & Crossman, LP ("**Zuckerman Gore**"), on July 25, 2021, with a request to forward the letter

to Core's outside counsel so they could confirm that Mr. DuChene had approved the revised resignation letter. A true and correct copy of my email to Zukerman Gore is attached as **Exhibit 7A**.

14. My revised resignation letter, in the form included in **Exhibit 7B**, was transmitted by Karen S. Park, an attorney with Zukerman Gore, to Michael Zhang, an attorney with Cooley, on July 25, 2022, which was followed by a series of emails between the two firms, true and correct copies of which are attached as **Exhibit 8**. In this email, Cooley informed Zuckerman Gore that Core had decided to ask all of the Blockcap officers to remain as officers post-closing. As a result, I was not required to sign a resignation letter at the closing of Core's acquisition of Blockcap.

15. As reflected in **Exhibit 8**, on July 27, 2021, I forwarded the July 24, 2021 emails between Zukerman Gore and Cooley LLP from my Blockcap email account to my personal email account. I did this to keep a record of the fact that the resignation letter was not ultimately signed in connection with Core's acquisition of Blockcap because Core decided not to require all Blockcap officers to resign and was not due to any dispute over my resignation for "Good Reason." On October 17, 2023, I saved this email chain into the pdf file comprising **Exhibit 8**.

16. **Exhibit 9** is comprised of four excel spreadsheets constituting **Exhibits 9A – 9D**. I prepared each of these spreadsheets for the following purposes:

   a. Each spreadsheet calculates the conversion of the shares or stock options granted to me by Blockcap pursuant to the Award Agreements to shares and stock options of Core at an exchange ratio of .5074 pursuant to the July 30, 2021 acquisition of Blockcap by Core;

   b. Each spreadsheet then calculates the conversion of the Core shares or stock options into shares or stock options of XPDI at an exchange ratio of 1.6001528688 pursuant to the July 19, 2022 De-SPAC transaction;

  c. Exhibit 9A also includes a calculation of damages for Core's breach of the June 1, 2021 Award Agreement on January 19, 2021, based on the closing price on that date of $9.60, which price is reflected in **Exhibit 15**.

  d. Exhibits 9B-9D include a calculation of damages for Core's breach of the Employment agreement on February 14, 2022, based on the closing price on that date of $9.89, which price is reflected in **Exhibit 15**.

  e. Exhibits 9B-9D also include a calculation of the value of shares and stock options on February 28, 2022, which would have been the effective date of my resignation for "Good Reason" if Core had not terminated my employment without "Cause" on February 14, 2022.

  17. On August 31, 2021, I met with Michael Levitt, the CEO and Co-Chairman of Core, and Kyle Buckett, another officer of Core. During this meeting, Mr. Levitt asked me how long I intended to stay with Core. Before I could answer, Mr. Levitt also said he understood that I had originally agreed to be employed by Blockcap in Dallas and that I was then required to move to Austin, away from my family. Mr. Levitt also stated that he knew I had an employment contract that would allow me, as a result of Core's acquisition of Blockcap, to leave Core and to receive all of my equity. Mr. Levitt then assured me that Core would not contest my Employment Agreement and would honor the terms of the Employment Agreement. Mr. Levitt had similar conversations with at least two other officers of Blockcap, including Brett Harrison, the Chief Operating Officer of Blockcap, and Mr. Peter Dorrius, the Chief Financial Officer of Blockcap.

  18. **Exhibit 10** consists of selected pages from the Form 8-K filed by Core with the Securities and Exchange Commission on January 24, 2022. On October 17, 2023, I downloaded the entire filing in pdf format from Core's website at https://investors.corescientific.com/investors/financials/sec-filings/default.aspx. On October 17, 2023, I selectively copied specific pages from the filing into the pdf files comprising Exhibits **10A-10B**, to reflect excerpts from the filing relied upon to make certain statements herein and in the Motion for Summary Judgment.

19. At the time of the De-SPAC Transaction, XPDI was a public company subject to the reporting requirements of the U.S. Securities and Exchange Commission. As a result of the De-SPAC Transaction, Blockcap became a subsidiary of XPDI and XPDI became a controlling affiliate of Blockcap.

20. Core failed to process the vesting of 324,767 of my shares of Core Class A common stock on January 19, 2022, the Public Event Date, as required by the June 1 Award Agreement.

21. On February 10, 2022, I tendered to Core Scientific Acquired Mining LLC, the successor to Blockcap, my resignation for "Good Reason", such resignation to be effective on February 28, 2022. True and correct copies of my resignation communications on February 10, 2022, are attached as **Exhibits 11A and 11B**.

22. On February 14, 2022, prior to the February 28, 2022 effective date of my resignation for "Good Reason", Core terminated my employment without "Cause". Section 8(a) of my Employment Agreement sets forth the definition of "Cause". At no time has Core asserted that any of the events constituting "Cause" applied to Core's termination of my employment and, in fact, no such event ever occurred.

23. On February 14, 2022, my annual salary remained at $200,000.

24. Core failed to deliver to me the severance required by Section 8(h) of the Employment Agreement on February 14, 2022.

25. **Exhibit 12** is a true and correct copy of a Filing Acknowledgement evidencing the filing of my lawsuit against Core on September 30, 2022, in Travis County, Texas. This acknowledgement was provided to me by the law firm Riddle & Williams, P.C., my attorneys for purposes of that lawsuit, by email dated September 30, 2022.

26. At no time prior to the filing of the Core Objection did Core communicate to me that my shares did not vest on the Public Event Date as a result of me being subject to a contractual lock-up.

27. My June 1 Award Agreement was drafted and signed prior to Core's acquisition of Blockcap and no employee or representative of Core was present or involved with the drafting of the June

1 Award Agreement. The intention of Section 2(a) of Attachment 1-D to the June 1 Award Agreement (the "Public Event Vesting Provision") was to vest the referenced number of shares on the Public Event Date. The proviso in the Public Event Vesting Provision was meant to narrowly apply to only defer vesting in the limited circumstance in which I had signed a contract specifically including an agreement to subject my shares to a lock-up provision. The word "contractual" was added before the words "lock-up provision" for the express purpose of <u>avoiding</u> deferred vesting in circumstances where I had not signed a contract with a lock-up provision. Two other executive officers of Blockcap had the same vesting provisions in their grant agreements as the Public Vesting Event Provision.

28. I joined Blockcap to be the General Counsel, and an executive officer, in a public company. On June 1, 2021, I was an executive officer of Blockcap, a stand-alone company seeking to complete its initial public offering. Had Blockcap completed its initial public offering or completed a De-SPAC transaction on its own, and not as a subsidiary of another entity, I would have continued to be an executive officer of a public company and, in that position, would most likely have been requested to sign a contract containing a lock-up provision applicable to my shares, as it is typical for executives of a company about to go public to be asked to sign a contract agreeing to subject their shares to a lockup. The intention of the words "subject to a contractual lock-up provision" was to only defer vesting if I was (a) requested to sign a contract with a lock-up provision and (b) actually signed a contract with a lock-up provision.

29. I have no recollection of being asked to sign, or signing, a contractual lock-up provision in connection with the De-SPAC transaction.

30. **Exhibits 13A and 13B** consist of selected pages from the Definitive Proxy Statement as filed by XPDI with the Securities and Exchange Commission which is dated December 30, 2021 and which was first mailed to stockholders of XPDI on January 3, 2022. On October 17, 2023, I downloaded the entire filing in pdf format from Core's website at https://investors.corescientific.com/investors/financials/sec-filings/default.aspx. On October 17, 2023, I selectively copied specific pages from the filing into the pdf

files comprising **Exhibits 13A-B**, to reflect excerpts from the filing relied upon to make certain statements herein and in the Motion for Summary Judgment.

31.     **Exhibit 14** consists of page 1 from the Form 8-K filed by Core with the Securities and Exchange Commission on January 20, 2022. On October 17, 2023, I downloaded the entire filing in pdf format from Core's website at https://investors.corescientific.com/investors/financials/sec-filings/default.aspx. On October 17, I selectively copied page 1 from the filing into the pdf file comprising **Exhibit 14** to reflect an excerpt from the filing relied upon to make certain statements herein and in the Motion for Summary Judgment.

32.     **Exhibit 15** sets forth the closing price of Core's Class A common stock on each of January 19, 2022 -$9.60; February 14, 2022 - $9.89; and February 28 - $9.20. These closing prices are derived from historical data reported on yahoo! Finance at finance.yahoo.com/quote/CORZQ. I downloaded these historical pricing reports from this website on October 16, 2023 and, on October 17, 2023, I copied the downloaded reports into a pdf file comprising **Exhibit 15**.

33.     On February 10, 2022, prior to delivering my resignation for "Good Reason" to Core, I held a teleconference with Kyle Buckett, then the head of HR for Core, and Sangeeta Campos Puri, also in Core's HR department, to explain the reasons for my resignation and to discuss the process for delivering the severance under Section 8(h) of the Employment Agreement. At no time during that call did Mr. Buckett, who participated in the August 31, 2021 meeting in which Mr. Levitt confirmed that Core would honor my resignation for "Good Reason", or Ms. Puri object to my resignation for Good Reason.

34.     On February 14, 2022, Mr. Buckett and Ms. Puri called me. Ms. Puri stated that Core was not accepting my resignation for "Good Reason" but was instead terminating my employment for "Cause". Ms. Puri did not provide a basis for the termination, but after I repeatedly requested a rationale for Core's termination of my employment, Ms. Puri finally stated only that I had talked to Core employees and advised them against the Company. Ms. Puri did not state any specifics to support this statement. I immediately denied this allegation and specifically pointed out that Core had no basis under the

Employment Agreement for terminating my employment for "Cause". At this point, Mr. Buckett ended the call.

35. The next day, February 15, 2022, I sent an email to Mr. Buckett and Ms. Puri expressly stating that Core's actions constituted a termination without "Cause" and referring to Core's previous express agreement to allow Mr. Dean to resign for "Good Reason. A true and correct copy of my February 15, 2022 email is attached as **Exhibit 16**.

36. I did not provide specific reasons for my resignation for "Good Reason" in my February 10, 2022 resignation letter because I did not feel it to be necessary given that both Mr. DuChene, Core's General Counsel and my superior at Core, and Mr. Levitt, Core's CEO and Co-Chairman, had expressly agreed to my resignation for "Good Reason" in recognition of the facts that there was no place for me in the combined organization after Core's acquisition of Blockcap and that I would not have duties or responsibilities at the level of my responsibilities and duties with Blockcap prior to the transaction. Similarly, I did not complain of a reduction in my duties following Core's acquisition of Blockcap because the fact that my duties were basically eliminated was recognized and agreed prior to the closing of the acquisition by Mr. DuChene and subsequently acknowledged by Mr. Levitt.

37. Following Core's acquisition of Blockcap, I reported to Mr. DuChene and Mr. DuChene has knowledge of my diminished duties and responsibilities following Core's acquisition of Blockcap.

38. Following the acquisition of Blockcap by Core, I was no longer responsible for SEC filings or acquisitions, financing activities, corporate governance, compensation plans, stock records, employment matters, or any other substantive legal matter. I only worked on matters approved by Mr. DuChene, which were limited to a few contracting matters, and I was required to obtain Mr. Duchene's approval before allowing any such contracts to be executed on behalf of Core.

39. The restricted shares of stock and stock options granted pursuant to the Award Agreements were granted and issued by Blockcap to me prior to Old Core's acquisition of Blockcap and prior to Old Core's merger with XPDI. These shares and stock options were issued and outstanding

securities and recorded as such in Blockcap's equity ledgers. In addition, the shares and stock options were included in calculating the exchange ratios for both the Core and XPDI transactions and were converted into shares of Core in connection with Core's acquisition of Blockcap and subsequently converted again into shares of XPDI.

40. As a condition to the De-SPAC Transaction, XPDI was required to have an effective registration statement on Form S-4 on file with the SEC for the purpose of registering the shares of XPDI to be issued (a) in exchange for outstanding shares of Old Core's common stock in connection with the De-SPAC Transaction and (b) upon exercise of options of Old Core assumed by XPDI in connection with the De-SPAC Transaction. Because my Core shares and stock options were outstanding prior to the De-SPAC Transaction, the XPDI shares to be issued in exchange for my shares of Core common stock and the shares to be issued upon exercise of my Core options assumed by XPDI, were included in XPDI's Form S-4 registration statement filed in connection with the De-SPAC Transaction.

41. I declare under penalty of perjury that the foregoing factual statements are true and correct, based on my personal knowledge and review of the documents referenced in this Declaration."

Executed this 18th day of October, 2023.

_____
Harlin Dean