## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement (this "Agreement") is made and entered into by and between **Blockcap, Inc.** (the "Company"), and Harlin Dean ("Executive") as of June 1, 2021 (the "Effective Date").

W I T N E S S E T H :

WHEREAS, the Company desires to employ Executive as its Chief Legal Officer, and Executive is willing to accept such employment on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements set forth below, the parties hereto agree as follows:

1. **EMPLOYMENT**

The Company agrees to employ Executive, and Executive agrees to be so employed by the Company beginning on the Effective Date and continuing subject to the terms and conditions of this Agreement.

2. **DUTIES AND RESPONSIBILITIES**

Executive shall be the Chief Legal Officer of the Company.  In such capacity, Executive shall work in good faith to promote the interests of the Company and to comply in all material respects with the Company's policies regarding its employees.  Executive acknowledges and agrees that the Company has the right to amend existing policies and to establish new policies from time to time regarding its employees.

3. **COMPENSATION**

a. **Base Salary**

Executive's initial Base Salary shall be the gross amount of $200,000.00 per annum.

b. **Discretionary Bonus**

In addition to annual Base Salary, Executive shall be entitled to participate in bonus plans established by the Company from time to time.  Executive's target bonus amount and other terms of participation in the bonus plans shall be determined by the Company's Board or Audit Committee provided that Executive shall participate in the bonus plan on the same general terms as the Company's other Executive's at a similar level.  Bonus payments are expected to be made on an annual basis in the first financial quarter following the year for which the bonus is payable. Subject to Section 8, Executive must be employed by the Company at the scheduled payment date to be eligible for payment of such bonus.

**c.     Equity Awards**

Simultaneously with the execution of this Agreement, Executive has been awarded a grant under the Blockcap, Inc. Equity Incentive Plan (the "Plan") as reflected in the Award Agreement between the Company and Executive dated as of June 1, 2021.   Executive shall be eligible for further awards under the Plan as and to the extent determined by the Company's Board of Directors or Audit Committee.

**4.     DUTIES AND SERVICES**

Executive agrees to provide and perform his duties and services to the Company in good faith and in a diligent manner.  Executive's duties and services shall be performed and provided at such times and for such length of time as Executive shall reasonably and prudently determine to be appropriate.  Executive shall perform all of duties and services in material compliance with the policies, and reasonable directions and instructions given to Executive by the Company.

**5.     VACATION AND HOLIDAYS**

Executive will be entitled to participate in the Company's Paid Time Off program as in effect from time to time, provided that Executive shall be entitled to at least fifteen (15) days of vacation per year.

**6.     BENEFITS**

Upon commencement of employment, Executive will be entitled to participate in all benefit plans that are generally available to employees of the Company on the same general terms as other Executives of the Company at a similar level.  All such plans are governed and shall be interpreted by their written terms and may be altered from time to time in the Company's reasonable discretion.

**7.     EXPENSES**

Executive shall be reimbursed for reasonably incurred business-related expenses, as long as Executive makes a reasonable effort to provide an itemized account of expenditures and receipts pursuant to Company policy.

**8.     TERMINATION OF AGREEMENT AND EMPLOYMENT**

Executive's employment may be terminated by either the Company or Executive at any time and for any reason, subject to the terms of this Section 8.  Upon termination of Executive's employment, Executive shall be entitled to the compensation and benefits described under the provisions of this Section 8 through the last date of employment (the "Termination Date") and shall have no further rights to any compensation, Severance Pay (as hereinafter defined), or any other benefits from the Company or any of its affiliates.

### a.   Termination for Cause

Executive's employment hereunder may be terminated by the Company for Cause, subject to the rights to cure described below.  If Executive's employment is terminated by the Company for Cause, Executive shall be entitled to receive only:  (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee benefits as of the Termination Date; and (iv) subject to the Company's setoff rights described in subparagraph (g) below, the portion of any award granted to Executive under the Plan for services in any capacity to the Company which shall have vested pursuant to the terms of such award prior to the Termination Date, subject to Section 8(b) of the Plan. Executive shall not be entitled to any other payments upon termination for Cause.

For purposes of this Agreement, "Cause" shall mean any of the following:

     **1.**    Executive's conviction of or plea of guilty to a charge of theft, embezzlement, or fraud related to Executive's employment with the Company; or

     **2.**    Executive's willful, knowing and unauthorized violation of Section 11 hereof, not cured by Executive following 30 days written notice actually delivered to and received by Executive by the Company which (i) specifically describes the conduct or omission of Executive that must be cured and (ii) is accompanied by substantiating evidence of the alleged violation.

### b.   Termination without Cause.

Executive's employment hereunder may be terminated by the Company without Cause for any reason.  In the event of termination without Cause, Executive shall be entitled to receive:  (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee benefits as of the Termination Date; and (iv) the Severance Pay outlined in Section 8(h), subject to Executive's compliance with the terms and conditions therein.

### c.   Resignation of All Other Positions.

Upon termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from any and all other positions that Executive holds with the Company or any of its affiliates.  Executive shall cooperate to comply with all reasonable requirements to affect such resignations.

    **d.**    **Resignation.**

        **i.**    **Resignation for Good Reason.**

        Executive shall be entitled to resign for "Good Reason," which shall mean (i) a reduction in Executive's Base Salary, (ii) a change of Executive's title not consented to by Executive; (iii) a relocation of Executive's principal place of employment more than 50 miles from Executive's initial location of employment, (iv) a material diminution in Executive's duties or responsibilities; or (v) a request or instruction by the Company for Executive to resign under any circumstances not involving an act or omission by Executive that meets the definition of "Cause" set forth in Section 8(a). In the event Executive resigns for Good Reason, Executive shall be entitled to receive:  (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee benefits as of the Termination Date; and (iv) the Severance Pay outlined in Section 8(h), subject to Executive's compliance with the terms and conditions therein.

        **ii.**    **Resignation without Good Reason.**

        Notwithstanding anything contained herein, Executive shall be entitled to resign his employment at any time upon 30 days written notice.  Provided the resignation is not for Good Reason, the Company shall have no further obligations to Executive, except: (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee's benefit plans as of the Termination Date; and (iv) the portion of any award granted to Executive under the Plan for services in any capacity to the Company which shall have vested pursuant to the terms of such award prior to the Termination Date, subject to Section 8(b) of the Plan.   Executive shall not be entitled to any other payments, including any Severance Pay.

    **e.**    **Death or Disability.**

        In the event of Executive's death or total disability, whether due to physical or mental condition, such that Executive would be prevented from substantially performing Executive's essential duties and responsibilities under this Agreement, even with reasonable accommodation, for a period of at least 90 consecutive days, Executive's employment shall be terminated.  If Executive's employment is terminated under this Section, Executive shall be entitled to receive: (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's Employee benefits as of the Termination Date; and (iv) the Severance Pay outlined in Section 8(h), subject to Executive's compliance with the terms and conditions therein.

**f.**     **[RESERVED].**

**g.**     **Setoff.**

Executive acknowledges and agrees that should Executive be indebted to the Company on the termination or resignation from his employment, howsoever caused, or at any other time, the Company shall be entitled to deduct such debt from any outstanding pay, bonus, vacation, or any other sum which is then due and payable or may subsequently become due and payable to Executive.

**h.**     **Severance Pay**

In the event of Termination of the Agreement and Employment, pursuant to Sections 8(b) (Termination without Cause), 8(d)(i) (Resignation for Good Reason), or 8(e) (Death or Disability), Executive will be eligible for Severance Pay, subject to Executive, or Executive's estate or representative, if applicable, executing and not revoking a customary and reasonable general and mutual release of claims that includes a mutual non-disparagement provision and Executive's reaffirmation of the Restrictive Covenants in this Agreement ("Release"). Severance Pay consists of: (1) One (1) year Base Salary in the amount in effect at the time of the termination; provided that if the termination is a result of Executive's resignation for good reason due to a decrease in Executive's salary, such Base Salary shall be in the amount in effect immediately prior to the decrease; (2) the maximum amount of bonus for which the Executive would be eligible for the year in which termination occurs, prorated for the current year of termination, together with Executive's bonus for the prior year if not yet then paid; and (3) at the date of termination, all Awards granted to Executive under the Plan for services in any capacity to the Company shall immediately and automatically become fully vested, exercisable and payable and shall be released from any repurchase or forfeiture provisions with respect to all shares of the Company' common stock at the time represented by such Award.

**9.     NO CONFLICTING OBLIGATION**

Executive confirms that the performance of his duties under this Agreement does not and will not breach any previous agreement which may still be in effect regarding:  (i) confidential information Executive has acquired with a previous company; or (ii) an agreement precluding Executive from engaging in employment as described in this Agreement.  The Company has explicitly directed Executive that Executive should not use or disclose the confidential information of any third party to the Company unless permitted to do so by law.

**10.     CONFIDENTIAL INFORMATION**

Executive acknowledges that in the course of carrying out, performing and fulfilling his duties under this Agreement, Executive will have access to and will be entrusted with detailed confidential information and trade secrets of the Company, and the Company hereby promises to provide Executive with such access as is necessary for the performance of his duties hereunder. Executive further acknowledges that the disclosure of such detailed confidential information and trade secrets to competitors of the Company, or to the general public, will be detrimental to the interests of the Company.  Executive further acknowledges that all such Confidential information is the exclusive property of the Company, and that such property is held by Executive in trust for

the Company and for the sole and exclusive benefit of the Company. Executive shall not disclose any secret or confidential information of the Company at any time during his employment, or at any time thereafter except as necessary to carry out or perform his duties under this Agreement or as otherwise authorized by the Company. For the purposes of this Agreement, trade secrets and confidential information shall include all material proprietary information that relates to the Company's business activities, and that is identified to Executive by the Company as being confidential or that a reasonable person would understand to be confidential under the relevant circumstances. Such information includes, but is not limited to pricing or pricing policies, trade or business terms or secrets, operating systems, financial information, negotiation details, planning strategies, and computer, network or software systems information. Confidential information does not include information that is developed independently or already in Executive's possession without obligation of confidentiality; obtained from a source other than the Company not known by Executive to be bound by an obligation of confidentiality; or publicly available when received, or subsequently becomes publicly available through no fault of Executive.

Upon termination of employment for any reason, Executive shall immediately return to the Company all of its property, including without limitation, all keys, security cards, electronic devices, products, drawings, plans, confidential information as defined above, and all files, computer disks, external hard drives, thumb drives, lists, records, and any other data used by Executive or the Company in rendering services under this Agreement or otherwise, which may be in his possession or under his control, or to which Executive had access. If Executive stores any personal data or information on or within the Company's property, such storage shall be at Executive's own risk and Company shall have no duty or obligation to recover, transfer, or deliver such data or information to Executive upon any event of loss or upon Executive's termination or resignation.

Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law or otherwise in connection or accordance with the terms of any compliance manual of the Company. Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Executive files a lawsuit for retaliation for reporting a suspected violation of law, Executive may disclose the trade secret to his attorney and use the trade secret information in the court proceeding, as long as any document containing the trade secret is filed under seal, and Executive does not disclose the trade secret, except pursuant to court order.

## 11.    RESTRICTIVE COVENANTS

### a.    Non-Competition.

Because of The Company's legitimate business interests and the good and valuable consideration offered to Executive, during the term of Executive's employment and for the twelve (12) months after employment, to run consecutively, beginning on the last day of Executive's employment with the Company (the "Restricted Period"), Employee agrees and covenants not to engage in Prohibited Activity as defined herein. For purposes of this Non-Competition clause,

6

"Prohibited Activity" is: activity in which Executive contributes Executive's knowledge and/or efforts as an employee, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer, or any other similar capacity to any entity identified by the Company as a competitor in the Company's public filings under U.S. securities laws.

This Section does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

      **b.**    **Non-Solicitation of Employees.**

Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee for a period of twelve (12) months, beginning on the last day of Executive's employment with the Company. This Section does not prohibit any general solicitation not specifically directed to employees of the Company. It will not be deemed a violation of this Agreement if Executive updates Executive's LinkedIn profile or connects with a Covered Employee on LinkedIn, or other social media platforms without engaging in any other substantive communication that is prohibited by this Section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, Executive from discussing the terms and conditions of Executive's employment with co-workers or union representatives/exercising Executive's rights under Section 7 of the National Labor Relations Act (NLRA)/exercising protected rights that cannot be waived by agreement, if applicable.

      **c.**    **Non-Solicitation of Customers.**

Executive agrees and covenants, for twelve (12) months, beginning on the last day of Executive's employment with the Company, not to contact, or attempt to contact, the Company's customers for purposes of encouraging any such customers to reduce their business or terminate their relationship with the Company. However, it will not be deemed a violation of this Agreement if the Employee updates Executive's LinkedIn profile or connects with a customer on LinkedIn, or other social media platforms without engaging in any other substantive communication that is prohibited by this Section.

      **12.**    **INTELLECTUAL PROPERTY, INVENTIONS, PATENTS AND WORK PRODUCT.**

Executive understands and acknowledges that, whether or not it is Confidential information, all intellectual property, inventions, patents, ideas, discoveries, concepts, inventions, improvements, innovations, methods, trade secrets, designs, copyrightable work (including all registrations or applications related thereto), and all other proprietary information which are conceived, created, developed or made by Executive (whether alone or with others) pursuant to Executive's execution of work assigned by the Company and performed during Executive's employment belong to the Company and not Executive. In the event Employee deems that the

7

above-listed are not a work made for hire, the Employee agrees to assign to the Company all rights and interests of same, including relevant intellectual property rights.

### 13.   REMEDIES

It is specifically understood and agreed that any breach of the provisions of this Agreement may result in irreparable injury to Executive or the Company and that the remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other available remedy, Executive and the Company shall be entitled to enforce the specific performance of this Agreement by the other party in any court of competent jurisdiction and to seek both temporary and permanent injunctive relief (to the extent permitted by law) without bond and without liability should such relief be denied, modified or violated. Neither the right to obtain such relief nor the obtaining of such relief shall be exclusive or preclude Executive or the Company from any other remedy. The prevailing party in any litigation shall be entitled to recover from the other party all of its reasonable and necessary attorney's fees and costs.

### 14.   SECTION 409A

The compensation and benefits provided under this Agreement are intended to qualify for an exemption from or to comply with the requirements of Section 409A of the Code and the treasury regulations and other official guidance issued thereunder (collectively, "Section 409A"), so as to prevent the inclusion in gross income of any compensation or benefits accrued hereunder in a taxable year prior to the taxable year or years in which such amount would otherwise be actually distributed or made available to the Executive, and this Agreement shall be administered and interpreted consistent with such intention. For purposes of this Agreement, "removal," "termination of the Executive's employment" and words of similar import mean a "separation from service" with the Company as defined by Section 409A. The reimbursement or payment of taxable expenses contemplated hereunder to the Executive shall be made no later than the end of the year following the year in which the expense was incurred, and the expenses reimbursed in one year shall not affect the expenses eligible for reimbursement in any other year. Where the period for the Executive to execute and not revoke a general release and waiver begins in one calendar year and ends in the following calendar year, payment shall be made no sooner than the first day of the following calendar year, unless such sooner payment would not result in a violation of Section 409A. Each payment shall be a payment in a series of separate payments for all purposes under Section 409A. If the Executive is a "specified employee" within the meaning of Section 409A at the time of his "separation from service" within the meaning of Section 409A, then any payment otherwise required to be made to him under this Agreement on account of his separation from service, to the extent such payment (after taking in to account all exclusions applicable to such payment under Section 409A) is properly treated as deferred compensation subject to Section 409A, shall not be made until the first business day after (i) the expiration of six months from the date of the Executive's separation from service, or (ii) if earlier, the date of the Executive's death (the "Delayed Payment Date") and, on the Delayed Payment Date, there shall be paid to the

Executive or, if the Executive has died, to the Executive's estate, in a single cash lump sum, an amount equal to aggregate amount of the payments delayed pursuant to the preceding clause.

### 15.     SECTION 280G

In the event that the Executive becomes entitled to any payments or benefits under this Agreement and any portion of such payments or benefits, when combined with any other payments or benefits provided to Executive (including, without limiting the generality of the foregoing, by reason of the exercise or vesting of any stock options or the receipt or vesting of any other equity awards), which in the absence of this Section would be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code"), then the amount payable to the Executive under this Agreement shall, either (A) be reduced to the largest amount or greatest right such that none of the amounts payable to the Executive under this Agreement and any other payments or benefits received or to be received by Executive as a result of, or in connection with, an event constituting a change in the ownership or effective control of the Company or in the ownership of a substantial portion of the assets of the Company (within the meaning of Section 280G(b)(2)(A) of the Code) or the termination of employment shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code or (B) be made in full, with Executive bearing full responsibility for any Excise Tax liability, whichever of (A) or (B) provides the Executive with a larger net after-tax amount. The Company shall cooperate in good faith with the Executive in making such determination, including but not limited to providing the Executive with an estimate of any parachute payments as soon as reasonably practicable prior to an event constituting a change in the ownership or effective control of the Company or in the ownership of a substantial portion of the assets of the Company (within the meaning of Section 280G(b)(2)(A) of the Code). Any reduction pursuant to this Section shall be made in a manner compliant with Section 409A of the Code. This Section shall apply in lieu of any provision applicable to the Executive under any other agreement or arrangement (including the Plan) with respect to Section 4999 of the Code. All determinations with respect to this Section shall be made by an independent nationally recognized certified public accounting firm reasonably acceptable to the Executive at the Company's sole expense. The after tax amount shall be calculated, as applicable, using the maximum marginal income tax rates for each year in which the payment is payable to the Executive (based upon the rates in effect for such year as set forth in the Code at the relevant time).

### 16.     GENERAL

#### a.     Severability

If any covenant or provision contained herein is determined to be void or unenforceable in whole or in part, such covenant or provision shall be deemed not to affect or impair the validity of any other covenant or provision contained herein.

#### b.     Governing Law and Forum

This Agreement is made and shall be performed, construed and enforced exclusively in accordance with, and the rights of the parties hereto shall be governed by, the laws of the State of Texas, without regard to conflicts of laws. Any proceeding between the Parties involving any

dispute must be conducted within the City of Austin, Texas, and any court proceeding (if and to the extent permitted under this Agreement) must be conducted in the state courts or federal courts in Travis County, Texas.

**c.     No Outside Representations**

Each of the parties expressly acknowledges (a) participation in the preparation of this Agreement; (b) that the language of this Agreement shall in all cases be construed as a whole and in accordance with its fair meaning, without any presumption, construction or implication favoring the position of either party; and (c) that such party has read this Agreement in its entirety, understands its contents and each party's respective responsibilities and obligations hereunder, and has had the opportunity to consult with legal counsel of its own choosing to have the terms of the Agreement fully explained. Neither party is relying on the other party's representations in entering into this Agreement. Each relies on its, his or her own counsel and the terms of the Agreement itself and not any oral or verbal representations outside this Agreement.

**d.     No Waiver of Breach**

No failure of any party to this Agreement to pursue any remedy resulting from a breach of this Agreement by another party shall be construed as a waiver of that breach by that party or as a waiver of any subsequent or other breach.

**e.     Entire Agreement**

This Agreement supersedes and replaces all prior negotiations and/or agreements made between the parties or any third parties relating to the provision of Executive's services or any other matter, whether oral or written, and contains the entire understanding and agreement among the parties with respect thereto.

**f.     Successors and Assigns**

The provisions of this Agreement, where the context permits, shall ensure to the benefit of and be binding upon the heirs, executors, administrators, successors, assigns or other legal representative of the parties. Executive may not assign the performance required by Executive in this Agreement to any another person or entity.

**g.     Amendments**

No supplement, modification or amendment of any term, provision or condition of this Agreement shall be binding or enforceable unless evidenced in writing executed by Executive and the Company.

**h.     Notices**

Any notice or request required or permitted to be given hereunder shall be in writing and shall be transmitted by (a) certified or registered mail, return receipt requested, postage prepaid, (b) personal delivery, (c) nationally recognized overnight courier service, or (d) electronic mail, along with a secondary form of transmission. Except as otherwise specified herein, all notices and

other communications shall be deemed to have been duly given (1) five (5) business days after the date of posting if transmitted by certified or registered mail, (2) the date of delivery if transmitted by personal delivery, (3) the first business day after the date of posting if delivered by recognized national overnight courier service, or (4) if by electronic mail, the earlier of the date of written reply by the recipient or confirmation from the recipient or the deemed date of delivery of the secondary form of transmission.  Notices hereunder shall be delivered to Executive at the address then included in the Company's records and notices hereunder shall be delivered to the Company at Blockcap, Inc., 106 E 6th St., Suite 900-145, Austin, TX 78701 (or such other addresses as either party may hereinafter designate by notice to the other).

[signature page follows]

APP. 23

AGREED TO BY THE PARTIES:

_____

Harlin Dean

DATED: June 1, 2021

_____

By: _____

Title: Chief Operating Officer

ON BEHALF OF BLOCKCAP, INC.

DATED: June 1, 2021

Signature Page to Blockcap Executive Employment Agreement   APP. 24