## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                                         |   |                              |
|-----------------------------------------|---|------------------------------|
|                                         | § |                              |
| In re:                                  | § | Chapter 11                   |
|                                         | § |                              |
| CORE SCIENTIFIC, INC., *et al.,*        | § | Case No. 22-90341 (CML)      |
|                                         | § |                              |
|                                         | § | (Jointly Administered)       |
| Debtors.[1]                             | § |                              |
|                                         | § |                              |
|                                         | § |                              |

### DEBTORS' OPPOSITION TO CLAIMANT HARLIN DEAN'S
### MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................2

STATEMENT OF FACTS ..........................................................................................3

      A.     Dean's Employment and Equity Grants ....................................3

      B.     Dean's Employment Agreement and Resignation .......................5

      C.     Core's Lock-Up Period and S-8 Registration Statement ............9

ARGUMENT .........................................................................................................11

   I.     Legal Standard ...................................................................11

   II.    Discovery is Necessary to Develop the Factual Record .......................13

   III.   Genuine Disputes of Material Fact Preclude Summary Judgment ........14

      A.     There is A Genuine Dispute Concerning Whether Mr. Dean Resigned with "Good Reason." .......................................15

      B.     There Are Additional Genuinely Disputed Issues of Fact Concerning the Extent to Which Mr. Dean's Equity Awards Vested, And If So, When They Vested .......................................19

      C.     Even Assuming that Mr. Dean's Equity Awards Had Vested, There Are Genuinely Disputed Issues of Fact Concerning When He Could Have Received Those Shares and Could Have Sold Them ...........20

CONCLUSION........................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fam. Life Assurance Co. v. Biles*,
  714 F.3d 887 (5th Cir. 2013) ...............................................................14

*ASARCO, LLC v. Mont. Res., Inc.*,
  2019 WL 195059 (Bankr. S.D. Tex. Jan. 15, 2019) ...............................11

*Batiste v. Lewis*,
  976 F.3d 493 (5th Cir. 2020) ...............................................................11

*Blackwell Publ'g, Inc. v. Excel Rsch. Grp., LLC*,
  2008 WL 506329 (E.D. Mich. Feb. 22, 2008) .......................................13

*In re Clear the Air, LLC*,
  631 B.R. 286 (Bankr. S.D. Tex. 2021) .............................................12, 18

*Cole v. Chevron Chem. Co.*,
  427 F.2d 390 (5th Cir. 1970) ...............................................................12

*Coleman v. BP Exploration & Prod., Inc.*,
  19 F.4th 720 (5th Cir. 2021) ...............................................................11

*In re Consol. Capital Equities Corp.*,
  143 B.R. 80 (Bankr. N.D. Tex. 1992) ..................................................12

*Converse v. City of Kemah*,
  2021 WL 5811726 (S.D. Tex. Dec. 7, 2021) .........................................13

*Cottam v. 6D Glob. Techs., Inc.*,
  2022 WL 16908708 (2d Cir. Nov. 14, 2022) .........................................22

*Crystal City v. Del Monte Corp.*,
  463 F.2d 976 (5th Cir. 1972) ...............................................................12

*In re Fidelity Holding Co.*,
  837 F.2d 696 (5th Cir. 1988) ..........................................................13, 14

*In re GHR Energy Corp.*,
  62 B.R. 226 (Bankr. S.D. Tex. 1986) ...................................................12

*Hercules Offshore, Inc. v. Guthrie*,
  No. 01-10-00968-CV, 2013 WL 772939 (Tex. App.—Houston [1st Dist.] Feb.
  28, 2013) (mem. op.)............................................................................21

*In re Hight*,
    393 B.R. 484 (Bankr. S.D. Tex. 2008) ................................................................................15

*Innovo Grp., Inc. v. Tedesco*,
    1996 WL 580465 (Tex. App. Oct. 10, 1996)(not designated for publication) ......................22

*IRS v. Taylor (In re Taylor)*,
    132 F.3d 256 (5th Cir. 1998) ...............................................................................................14

*In re Kilgore Meadowbrook Country Club, Inc.*,
    315 B.R. 412 (Bankr. E.D. Tex. 2004) .................................................................................15

*Lovable Co. v. Honeywell, Inc.*,
    431 F.2d 668 (5th Cir. 1970) ...............................................................................................12

*Miga v. Jensen*,
    96 S.W.3d 207 (Tex. 2002).................................................................................................21

*Moore v. LaSalle Mgmt. Co.*,
    41 F.4th 493 (5th Cir. 2022) ................................................................................................11

*Morris v. Covan World Wide Moving, Inc.*,
    144 F.3d 377 (5th Cir. 1998) .........................................................................................12, 18

*In re Reilly*,
    245 B.R. 768 (B.A.P. 2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000)
    (unpublished decision) ...........................................................................................................14

*Sindermann v. Perry*,
    430 F.2d 939 (5th Cir. 1970), *aff'd*, 408 U.S. 593 (1972) .......................................................12

*Smith v. L.A. Unified Sch. Dist.*,
    2017 WL 10562961 (C.D. Cal. June 9, 2017) ......................................................................14

*In re Today's Destiny, Inc.*,
    2008 WL 5479109 (Bankr. S.D. Tex. Nov. 26, 2008)...........................................................14

*In re USA Gymnastics*,
    624 B.R. 443 (Bankr. S.D. Ind. 2021) .................................................................................14

*Vance ex rel. Hammons v. United States*,
    90 F.3d 1145 (6th Cir. 1996) ...............................................................................................13

*In re WHET, Inc.*,
    33 B.R. 424 (D. Mass. 1983) ...............................................................................................13

*Williams v. Time Warner Operation, Inc.*,
    98 F.3d 179 (5th Cir. 1996) .................................................................................................12

*In re WorldCom, Inc.*,
    372 B.R. 159 (Bankr. S.D.N.Y. 2007)......................................................................................14

**Statutes & Rules**

11 U.S.C. § 510(b)......................................................................................................................22

Fed. R. Bankr. P. 3001(f)......................................................................................................13, 14

Fed. R. Civ. P. 56................................................................................................................11, 13

Core Scientific, Inc. ("**Core**")[2] and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this opposition to *Harlin Dean's Motion for Summary Judgment and Brief in Support Related to Debtors' Objection to Proof of Claim Nos. 364 and 383* (the "**Motion**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.    In the face of numerous and obvious heavily contested disputed issues of material fact, and in the absence of any discovery, claimant Harlin Dean nevertheless seeks summary judgment on his claims that Core allegedly breached the employment agreement and various equity award agreements Mr. Dean had entered into with Blockcap, Inc. ("**Blockcap**") prior to Core's acquisition of Blockcap.

2.    As reflected below and in the accompanying declarations,[3] the list of disputed issues of fact here is long and substantial and includes, among other things, the following: (i) whether Mr. Dean resigned with "Good Reason" as defined by his employment agreement; (ii) the facts and circumstances leading up to Mr. Dean's resignation and the alleged conversations with Core personnel related thereto; (iii) the supposed inducement that allegedly caused Mr. Dean to enter into the employment agreement; (iv) the extent to which restricted shares and options to be awarded to Mr. Dean under various equity award agreements vested (and if so, when); (v) whether

---

[2] As discussed in the Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief ¶ 31, In re Core Scientific, Inc., *et al.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 21, 2022) Dkt. No. 5, Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company. Given that the Proofs of Claim are identical, this Objection applies equally to both, and references to "Core" shall include Core Scientific Operating Company and Core Scientific, Inc. for purposes of this Objection.

[3] *See*, *Declaration of Todd DuChene in Support of Debtors' Opposition to Motion for Summary Judgment in Connection with Proof of Claim Nos. 364 and 383 Filed by Harlin Dean*, filed contemporaneously herewith (the "**Second DuChene Declaration**"); and the *Declaration of Mike Levitt in Support of Debtors' Opposition to Motion for Summary Judgment in Connection with Proof of Claim Nos. 364 and 383 Filed by Harlin Dean*, filed contemporaneously herewith (the "**Levitt Declaration**").

Mr. Dean was subject to certain lockups that would have restricted his sale of shares (or precluded the vesting of certain shares during the lockup period); (vi) even assuming Mr. Dean's shares and options had vested, when he would have been entitled to actually receive those shares and whether he had the wherewithal or ability to pay the taxes necessary to even receive those shares in the first place; and (vii) the extent and calculation of any alleged damages. While any one of these factual disputes is sufficient grounds to deny the Motion, summary judgment is clearly inappropriate here given the host of material facts in dispute.

3.      Discovery, including the deposition of Mr. Dean, with respect to all of these issues should proceed before the Court even considers whether summary judgment is appropriate, if ever, as relates to Mr. Dean's claims. Moreover, although discovery is necessary to develop the record for deciding these issues and no discovery has been taken in connection with this contested matter, Core's Objection to Mr. Dean's proofs of claim, along with its supporting declaration, already rebutted any *prima facie* validity of Mr. Dean's claims and demonstrate that summary judgment is not appropriate.

4.      Accordingly, the Court should deny the Motion and set a schedule for discovery and a substantive evidentiary hearing on Mr. Dean's claims.

## BACKGROUND

5.      On December 21, 2022, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors, together with their non-debtor affiliates, are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia.

6.      Mr. Dean filed his Proofs of Claim No. 364 and 383 against Core Scientific, Inc. and Core Scientific Acquired Mining LLC, respectively, on April 13, 2023, seeking a general

unsecured claim in the amount of $8,000,000.  *See* Claim Nos. 364 and 383 (the "**Proofs of Claim**" or "**Dean POCs**").  In addition to claiming breach of the Employment Agreement, Mr. Dean asserts claims for (i) quantum meruit; (ii) promissory estoppel; (iii) fraudulent inducement; and (iv) conversion.  Dean POCs, 9–15.  Mr. Dean also asserts counts for declaratory judgment, specific performance of the Employment Agreement, imposition of a constructive trust, an accounting, and indemnification of the attorneys' fees he has incurred in connection with his attempt to obtain shares of Core stock, and severance pay.  *Id.* at 15–19.

7.    On September 19, 2023, Core filed its *Debtors' Objection to Proof of Claim Nos. 364 and 383 Filed By Harlin Dean* (Dkt. No. 1246) (the "**Objection**") and the *Declaration of Todd DuChene in Support of Debtors' Objection to Proof of Claim Nos. 364 and 383 Filed By Harlin Dean* (Dkt. No. 1247) (the "**First DuChene Declaration**").

## STATEMENT OF FACTS

8.    The following statement of facts is presented solely to reflect why the Court should deny the Motion and must be construed in the light most favorable to Core.  Given that no discovery has taken place to date with respect to the Dean POCs, Core does not yet have all of the facts that would be necessary to address fully all of the claims asserted by Mr. Dean.

### A.  Dean's Employment and Equity Grants

9.    Starting March 17, 2021, Mr. Dean served as General Counsel of Blockcap. He was promoted to Chief Legal Officer of Blockcap effective June 1, 2021.  Upon his promotion, Mr. Dean and Blockcap entered into an Executive Employment Agreement (the "**Employment Agreement**"), attached to the First DuChene Decl. as <u>Exhibit 1</u>.  Under the Employment Agreement, Mr. Dean's annual base salary was $200,000.00.

10.    Blockcap entered into three equity award agreements with Mr. Dean between March and June of 2021 (the "**Award Agreements**").  *See* First Duchene Decl. ¶ 4 and

Dean Appendix at 25-56. On March 4, 2021, Mr. Dean was awarded 350,000 shares of nonqualified stock options, with 25% of the options scheduled to vest annually for each of the next four years, starting on March 4, 2022, and ending on March 4, 2025. On May 6, 2021, Mr. Dean was awarded 50,000 shares of restricted stock of Blockcap, with 25% of the shares scheduled to vest annually for each of the next four years, starting on May 6, 2022, and ending on May 6, 2025. On June 1, 2021, Mr. Dean was awarded an additional 800,000 shares of restricted stock of Blockcap, with 25% of the shares scheduled to vest annually for each of the next four years, starting on June 1, 2022, and ending on June 1, 2025. In total, Mr. Dean was awarded 350,000 shares of nonqualified stock options and 850,000 shares of restricted stock of Blockcap.

11.     Blockcap was acquired by Core Scientific Holding Co. on July 30, 2021, pursuant to a merger between Blockcap and a subsidiary of Core Scientific Holding Co., in which Blockcap was the surviving entity as a subsidiary of Core Scientific Holding Co. *See* First Duchene Decl. ¶ 5. Mr. Dean asserts that as a result of the merger, Mr. Dean's options and restricted shares of Blockcap stock were converted into Core Scientific Holding Co. restricted shares and options at an exchange ratio of 0.5074. Dean POCs ¶ 15. Regardless of whether Mr. Dean's shares and options under his Award Agreements converted to restricted shares and options of Core Scientific Holding Co. following the merger, none of those shares or options vested at that time.

12.     Core's current corporate structure is the result of a series of transactions that resulted in a "de-SPAC merger." First DuChene Decl. ¶ 6. On January 19, 2022, Core Scientific Holding Co. merged with a subsidiary of Power & Digital Infrastructure Acquisition Corp. ("XPDI"), with Core Scientific Holding Co. surviving the merger as a wholly owned subsidiary of XPDI. *Id.* A second merger occurred on January 20, 2022 between XPDI and Core Scientific Holding Co., with XPDI surviving this second merger. *Id.* Following the close of the second

4

merger, on January 20, 2022, Blockcap merged with and into a subsidiary of XPDI, with the surviving entity named Core Scientific Acquired Mining LLC. *Id.* In connection with the mergers, XPDI changed its name to Core Scientific, Inc. *Id.* Core Scientific, Inc., went public on January 20, 2022. *Id.* Core Scientific Inc. is the Core debtor whose shares are relevant to the issues here.

13.     Mr. Dean asserts that as a result of the XPDI merger, Mr. Dean's options and restricted shares were converted into restricted shares and options of Core stock, at an exchange ratio of 1.6001528688. Dean POCs ¶ 16. Regardless of whether Mr. Dean's shares and options under his Award Agreements converted to restricted shares and options of Core following the merger, none of those shares or options vested at that time.

**B.  Dean's Employment Agreement and Resignation**

14.     Prior to the closing of Core's acquisition of Blockcap, in July 2021, Mr. Dean and Todd DuChene, Core's Chief Legal and Administrative Officer, discussed Mr. Dean's career aspirations with Blockcap following Core's acquisition of Blockcap. Second DuChene Decl. ¶ 4. Mr. Duchene expressed to Mr. Dean that he empathized with Mr. Dean's difficulties but made it very clear that he was unaware of any determination that had been made regarding the operation of Blockcap following the closing. *Id.* At no time did Mr. DuChene state or suggest to Mr. Dean that his role would change in any way or that he would not be the lead lawyer for Blockcap. *Id.* Mr. DuChene also expressed that Core was looking forward to working with Mr. Dean following Core's acquisition of Blockcap, and that if Mr. Dean wished, he would continue to lead Blockcap's legal affairs and could have a meaningful role within Core's legal department. *Id.* At no time did Mr. DuChene ever tell Mr. Dean that Core would acquiesce in his orchestrated resignation for "Good Reason" following Core's acquisition of Blockcap or that Core's acquisition of Blockcap constituted "Good Reason" for his resignation as defined by his Employment Agreement. *Id.*

15.     In July 2021, as Core was considering whether certain officers of Blockcap would resign following Core's acquisition of Blockcap, Core provided certain Blockcap officers, including Mr. Dean, with a draft resignation letter prepared by Core's outside counsel.  *Id.* ¶ 5.

16.     On July 24, 2021, Mr. Dean emailed Mr. DuChene stating that he wanted to remain employed at Core until its de-SPAC closed, that he planned to resign from Core at closing, that he wished to mark up the draft resignation letter, and that he wished to discuss these issues further with Mr. DuChene.  A true and correct copy of the July 24, 2021 email is attached as Exhibit 1 to the Second DuChene Declaration.

17.     That same day, Mr. DuChene responded, "Sure.  Fine with that.  Mark it up however you want.  Again will support fully."  Second DuChene Decl. ¶ 7.  By this statement, Mr. DuChene meant to convey that he was fine with Mr. Dean remaining employed with Core until after its de-SPAC transaction closed, and that Core would consider Mr. Dean's proposed revisions to the draft resignation letter.  *Id.*  Mr. DuChene never discussed or agreed with Mr. Dean, either before or after the Blockcap transaction closed, that Mr. Dean could resign for "Good Reason" or that "Good Reason" existed for his resignation.  *Id.*  Rather, Mr. DuChene simply informed Mr. Dean that he was free to leave his employment when he wanted to, and that if he did, he would receive whatever he was entitled to at that time under the terms of his Employment Agreement. *Id.*

18.     On July 25, 2021, Mr. Dean emailed his proposed edits to the draft resignation letter to Blockcap's outside counsel.  *Id.* ¶ 8.  Core never agreed to Mr. Dean's edits to the draft resignation letter, and Mr. Dean never signed the draft resignation letter reflecting his proposed edits or tendered a signed copy of that letter to Core.  *Id.*

19.     Mr. Dean did not resign following the Blockcap merger but rather continued to be employed by Core for more than six months without ever raising any issues concerning any

6

purported diminution in his role or his duties at Core. *Id.* ¶ 10.  In addition, following the merger, Mr. Dean's duties and responsibilities were not diminished and he continued to serve the same functions as he did prior to the merger. *Id.*

20.    Core's de-SPAC transaction with XPDI closed on January 19, 2022. *Id.* ¶ 11.

21.    Following the January 20, 2022 transaction in which Blockcap changed its name to Core Scientific Acquired Mining LLC, Mr. Dean continued serving as the Chief Legal Officer for that entity, a subsidiary of Core.  *See* First DuChene Decl. ¶¶ 6, 7.  Three weeks after Core went public, on February 10, 2022, Mr. Dean resigned from Core.  In his resignation letter (the "**Resignation Letter**," attached to the First DuChene Decl. as <u>Exhibit 2</u>), Mr. Dean claimed that he was resigning for "Good Reason," though he did not provide any explanation or support for that assertion.  This purported "Good Reason" resignation was an attempt to accelerate and cash out equity incentives that would have otherwise taken years to vest.

22.    Under Section 8(d)(ii) of the Employment Agreement, upon resigning without Good Reason, as Mr. Dean did here, Mr. Dean is entitled to the following:

> Executive shall be entitled to resign his employment at any time upon 30 days written notice. Provided the resignation is not for Good Reason, the Company shall have no further obligations to Executive, except: (i) any unpaid Base Salary up to the Termination Date; (ii) reimbursement for unreimbursed business expenses properly incurred by Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; (iii) such benefits, if any, to which Executive may be entitled under the Company's benefit plans as of the Termination Date; and (iv) the portion of any award granted to Executive under the Plan for services in any capacity to the Company **which shall have vested pursuant to the terms of such award prior to the Termination Date**, subject to Section 8(b) of the Plan. Executive shall not be entitled to any other payments, including any Severance Pay.  (emphasis added.)

23.    Additionally, the Restrictive Stock Agreement attached to Mr. Dean's June 1, 2021 Award Agreement provides in relevant part that, notwithstanding the agreement's default

schedule for the vesting of shares of restricted stock, upon the first date that the Company, or any successor entity or controlling affiliate thereof, becomes subject to the public company reporting requirements of the Securities and Exchange Commission, the following will occur:

> [A] total of 400,000 shares of Restricted Stock granted pursuant to the Award Agreement shall automatically become fully vested and be released from any repurchase or forfeiture rights (other than repurchase rights exercisable at Fair Market Value) for all of the Shares (or other consideration) at the time represented by such portion of this Award; **provided, however, that if Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction.**

Dean Appendix at 52 (June 1, 2021 Award Agreement, Attachment 1-D, § 2(a)) (Dkt. No. 1341-5) (emphasis added).

24.     Section 8(d)(i) of the Employment Agreement narrowly defines the circumstances in which Mr. Dean may resign for "Good Reason":

> Executive shall be entitled to resign for "Good Reason," which shall mean (i) a reduction in Executive's Base Salary, (ii) a change of Executive's title not consented to by Executive; (iii) a relocation of Executive's principal place of employment more than 50 miles from Executive's initial location of employment, (iv) a material diminution in Executive's duties or responsibilities; or (v) a request or instruction by the Company for Executive to resign under any circumstances not involving an act or omission by Executive that meets the definition of "Cause" set forth in Section 8(a).

25.     Contrary to Mr. Dean's assertions, neither Mr. DuChene nor Mike Levitt, Core's then CEO, ever told Mr. Dean that Core would acquiesce in his orchestrated resignation for "Good Reason" or that the terms of Mr. Dean's employment agreement could be read to support a resignation for "Good Reason," or that Core would accelerate the vesting of any restricted stock or options under his equity Award Agreements.  Second DuChene Decl. ¶ 13; Levitt Decl. ¶ 4.

26.     After Mr. Dean resigned from Core on February 10, 2022, Core informed him on February 14, 2022, that it disputed his resignation was for "Good Reason." First DuChene Decl. ¶ 9. Because Mr. Dean had already given notice of his resignation on February 14, Core told Mr. Dean he did not need to remain on the payroll for an additional two weeks and that his resignation would be effective that same day. Second DuChene Decl. ¶ 14.

27.     On February 17, 2022, Mr. Dean forwarded to Mr. DuChene an email he had sent to Core's Human Resource department on February 15, 2022 claiming that Core rejected his resignation for Good Reason and terminated his employment effective February 14, 2022. As Mr. DuChene has made clear, that allegation is not true, and Core disputed that Mr. Dean's resignation qualified as one for "Good Reason" pursuant to his Employment Agreement. *Id.*

28.     In addition, Mr. DuChene has also made clear that he never stated to Mr. Dean that his resignation for Good Reason would be accepted or that he would receive all of the equity under his Award Agreements. *Id.* ¶ 15. In order to set the record straight and respond to Mr. Dean's false accusations, Mr. DuChene replied to Mr. Dean's February 17, 2022 email and explained to Mr. Dean, "I never uttered the word 'good reason' to you nor have you and I ever engaged in a good reason discussion." *Id.* ¶¶ 15-16. Mr. DuChene went on to address other fallacies in Mr. Dean's self-serving email. *Id.* ¶ 16. A true and correct copy of Mr. DuChene's February 17, 2022 email is attached as Exhibit 2 to the Second DuChene Declaration.

**C. Core's Lock-Up Period and S-8 Registration Statement**

29.     In connection with its go-public de-SPAC merger, Core issued a bylaw imposing a lock-up period, which prevented certain shareholders from trading the following for 180 days: (i) any shares of Class A Core common stock, (ii) any shares of Class B common stock that was converted into Class A common stock pursuant to the Merger Agreement, (iii) any shares of common stock issuable upon the exercise of options to purchase shares of common stock held

by such Lock-Up Holder immediately after the Closing, and (iv) any common stock underlying the warrants issued and sold in private placement at the time of the closing.  First DuChene Decl. ¶ 8.  Thus, as of January 20, 2022, none of these shares (including any Mr. Dean may have been entitled to) could be traded for at least 180 days.  The lock-up period was ultimately waived on February 24, 2022, allowing the trading of these Core shares starting on March 10, 2022, if otherwise not subject to any other restrictions.  *See id.*

30.     After Core went public, it needed to ensure the correct distribution of shares for all employees from Computershare to Core's Fidelity platform, and that process took time to ensure that it was done correctly.  Second DuChene Decl. ¶ 18.  That process was not complete until March 10, 2022.  *Id.*  Even if an employee had "vested" shares on the date of Core's go-public event, that would not mean they would have been distributed to the employee on the date of the go-public event and it would not mean the shares were immediately tradeable.  *Id.*  By the time of Mr. Dean's resignation, Core had not yet completed the procedural steps necessary for distributing employee stock to its Fidelity platform.  *Id.*  Mr. Dean was well aware of this process of moving all employee equity grants to Fidelity and that it would take several weeks.  *Id.*  In addition, before Core employees could have received shares of Core common stock issuable upon the vesting of restricted stock and stock options, the employee must have satisfied the statutory tax withholding applicable to the value of the shares vested and that were to be received.  *Id.* ¶ 19.

31.     On April 20, 2022, Core filed its Form S-8 Registration Statement with the Securities and Exchange Commission, a prerequisite for providing shares to employees they might have received as part of any benefits or incentive packages.  First DuChene Decl. ¶ 10.  Prior to that date, even if employees' shares had vested, they could not be sold because Core could not

even issue such shares until the Form S-8 was filed.[4]  More specifically, compensatory equity awards and issuances of stock for outstanding compensatory awards, like Mr. Dean's equity award, were subject to Core having an effective S-8 on file, compliance with Core's Insider Trading Policy,[5] and completion of the transaction by Fidelity, Core's employee stock plan administrator. *Id.* ¶¶ 10-12.  Mr. Dean would have been required to provide additional assurances to Fidelity that his transactions were permitted under Core's equity plan and applicable law.  *Id.*  Furthermore, even when the shares were available for trading, a seller would not be able to sell them without first finding a broker to execute the trade.

## **ARGUMENT**

### I.    **Legal Standard**

32.    A court may only grant summary judgment when "'no genuine dispute as to any material fact' exists 'and the movant is entitled to judgment as a matter of law.'"  Fed R. Civ. P. 56(c); *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 502 (5th Cir. 2022) (quoting *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020)).  "A fact dispute is 'genuine' if 'a reasonable jury could return a verdict for [the nonmovant] based on the evidence.'"  *Moore*, 41 F.4th at 502 (citing *Coleman v. BP Exploration & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021)).  The existence of a genuine issue of material fact precludes summary judgment.  *See, e.g.*, *ASARCO, LLC v. Mont. Res., Inc.*, 2019 WL 195059, at *20 (Bankr. S.D. Tex. Jan. 15, 2019) (denying summary judgment

---

[4] Contrary to Mr. Dean's assertions (Motion ¶ ¶ 53-56), pursuant to the SEC's interpretation, the filing of the S-4 was not sufficient to register shares after the de-SPAC that were the result of employee compensation, like those at issue here.  Rather, the S-8 was required to register those shares.

[5] Core's Insider Trading Policy provides, in relevant part, that a former employee is prohibited from trading for the remainder of a lock-up period, if his employment ends during said lock-up period. In addition, former employees are prohibited from trading if they are aware of material non-public information. The Insider Trading Policy also applies to shareholders' ability to engage in the sale of Core common stock acquired as a result of the exercise or vesting of compensatory equity granted by Core or its predecessor entities.  First DuChene Decl. ¶ 11.

where genuine issues of material fact existed as to the meaning of various provisions of the parties' contract); *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 90 (Bankr. N.D. Tex. 1992) (holding issue of material fact as to whether debtor received fair consideration for its guaranty loan to company which used loan in leveraged buyout of debtor precluded summary judgment for debtor seeking to avoid guaranty obligation as fraudulent conveyance under California law); *In re GHR Energy Corp.*, 62 B.R. 226, 234–35 (Bankr. S.D. Tex. 1986) (denying summary judgment because substantial issues of material fact existed as to whether particular royalty interest was covered by contract and whether prevailing price was a sufficient basis for estimating loss).

33.     In addition, "the granting of a motion for summary judgment is the exception rather than the rule." *Crystal City v. Del Monte Corp.*, 463 F.2d 976, 981 (5th Cir. 1972) (citing *Lovable Co. v. Honeywell, Inc.*, 431 F.2d 668, 670 (5th Cir. 1970)). "In determining whether summary judgment is appropriate, a court is not to weigh evidence, assess its probative value, or resolve factual disputes." *In re Clear the Air, LLC*, 631 B.R. 286, 292 (Bankr. S.D. Tex. 2021) (citing *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996)). And "facts must be reviewed with all 'justifiable inferences' drawn in [the non-movant's] favor." *Id.* (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

34.     Accordingly, "summary judgment is proper only 'when the truth is clear, where the basic facts are undisputed and the parties are not in disagreement regarding material inferences that may be properly drawn from such facts.'" *Del Monte Corp.*, 463 F.2d at 981 (quoting *Sindermann v. Perry*, 430 F.2d 939, 943 (5th Cir. 1970), *aff'd*, 408 U.S. 593 (1972)). "Even [where] the basic facts are undisputed, a summary judgment may be improper if the parties disagree regarding the material factual inferences that properly may be drawn from these facts." *Cole v. Chevron Chem. Co.*, 427 F.2d 390, 393 (5th Cir. 1970).

35.     While a proper proof of claim is presumptively valid, the presumption of *prima facie* validity is lost if an objecting party refutes at least one of the allegations essential to the claim's legal sufficiency.  *See* Fed. R. Bankr. P. 3001(f); *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988) ("If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.'") (quoting *In re WHET, Inc.*, 33 B.R. 424, 437 (D. Mass. 1983)).  "The ultimate burden of proof always rests upon the claimant."  *In re Fidelity Holding Co., Ltd.*, 837 F.2d at 698.

## II.     Discovery is Necessary to Develop the Factual Record

36.     Mr. Dean's argument that discovery is "not a procedural prerequisite to summary judgment" misses the mark given the litany of factual disputes and questions surrounding the Dean POCs.  Motion ¶ 29.  While it is true that summary judgment can be decided in certain circumstances without discovery, "'it is axiomatic that when a party files an affidavit or declaration in support of a motion for summary judgment under Fed. R. Civ. P. 56, the opposing party has the right to depose the affiant or declarant on the assertions made.'"  *Converse v. City of Kemah*, 2021 WL 5811726, at *2 (S.D. Tex. Dec. 7, 2021) (quoting *Blackwell Publ'g, Inc. v. Excel Rsch. Grp., LLC*, 2008 WL 506329, at *1 (E.D. Mich. Feb. 22, 2008)); *see also Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) ("The general rule is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery.")

37.     Here, at minimum, Rule 56(d) of the Federal Rules of Civil Procedure, made applicable to this proceeding under the Federal Rules of Bankruptcy Procedure, confirms that Core should be able to depose Mr. Dean on the substance of his declaration—as well as obtain other necessary discovery from Mr. Dean and non-party witnesses as may be appropriate.  *See Converse*, 2021 WL 5811726, at *2 ("Courts across the country 'have recognized that 56(d) relief is warranted when the moving party files a declaration in support of summary judgment but does not

make the declarant available for cross-examination to the non-moving party.'") (quoting *Smith v. L.A. Unified Sch. Dist.*, 2017 WL 10562961, at \*2 (C.D. Cal. June 9, 2017)); *Am. Fam. Life Assurance Co. v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (recognizing that non-moving parties are entitled to safeguards against summary judgment where facts are needed to oppose the motion). *See* accompanying Declaration of Theodore E. Tsekerides, dated November 9, 2023, at ¶¶ 5-8.

### III.   Genuine Disputes of Material Fact Preclude Summary Judgment

38.   Even in the absence of the necessary and appropriate discovery, it is apparent that genuinely disputed issues of material fact precluding summary judgment. Indeed, Core's Objection already sufficiently challenged the validity and amount of Mr. Dean's claim and raised factual issues in response and the Objection was not required to include *all* potential evidence rebutting the validity and amount of a claim, as the filing of an objection creates a contested matter for which discovery may be taken. *See In re USA Gymnastics*, 624 B.R. 443, 453 (Bankr. S.D. Ind. 2021) ("A 'contested proceeding' arises upon the filing of an objection and at that point, there may be discovery taken and arguments may be made about the validity and amount of the claim.") (citing *IRS v. Taylor (In re Taylor)*, 132 F.3d 256, 260 (5th Cir. 1998); *In re WorldCom, Inc.*, 372 B.R. 159, 164 (Bankr. S.D.N.Y. 2007)). Under Rule 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). "If . . . evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.'" *Fidelity Holding*, 837 F.2d at 698 (citations omitted). The evidence an objecting party must bring forth need only "refute at least one of the allegations essential to the [proof of] claim." *In re Today's Destiny, Inc.*, 2008 WL 5479109, at \*4 (Bankr. S.D. Tex. Nov. 26, 2008) (quoting *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) (unpublished decision)). A claim objection will "satisfy [its] burden

14

through 'the production of specific and detailed allegations that place the [proof of] claim into dispute.'" *In re Hight*, 393 B.R. 484, 502 (Bankr. S.D. Tex. 2008) (citing *In re Kilgore Meadowbrook Country Club, Inc.*, 315 B.R. 412, 417–18 (Bankr. E.D. Tex. 2004)).

39.     Further, as detailed below, Core has sufficiently demonstrated numerous disputed issues of material fact, each of which is an independent basis to preclude summary judgment and support denying the Motion.

**A.  There is A Genuine Dispute Concerning Whether Mr. Dean Resigned with "Good Reason."**

40.     The questions of whether Mr. Dean is entitled to Severance Pay under his Employment Agreement and whether his equity awards automatically vested hinge on whether Mr. Dean resigned for "Good Reason" or was terminated without "Cause" (as defined by his Employment Agreement).  Core has disputed Mr. Dean's purported resignation for "Good Reason" ever since he gave notice of his resignation. Second DuChene Decl. ¶¶ 4, 13.  This was not a post-hoc contention by Core offered in litigation but has been Core's position from the outset.

41.     Mr. Dean claims that Core breached the Employment Agreement by failing to pay Mr. Dean severance pay in the form of a lump sum payment of his base salary in the amount of $200,000, plus the automatic and immediate vesting of the stock options and restricted stocks issued to Mr. Dean under the Award Agreements after Mr. Dean purportedly resigned for "Good Reason."

42.     While it is undisputed that Mr. Dean tendered his resignation on February 10, 2022, and that his Resignation Letter stated Mr. Dean was resigning for "Good Reason" without further explanation, the parties dispute the facts and circumstances concerning Mr. Dean's resignation and whether it was actually for "Good Reason."

43.     Mr. Dean contends that prior to the closing of Core's acquisition of Blockcap, during the week of July 19, 2021, Mr. DuChene, Core's General Counsel, told Mr. Dean

that "he was free to leave Core after the transaction and take all of his equity" and "re-affirm[ed] that he would fully support Mr. Dean's decision to resign for 'Good Reason.'" Motion ¶ 7. Mr. DuChene flatly rejects that he made any such statements. Second DuChene Declaration ¶ 13. Indeed, the parties' email exchanges demonstrate that neither Mr. DuChene—nor anyone else from Core—told Mr. Dean that he was free to resign for "Good Reason" and "take all of his equity," and that this has been a hotly contested dispute since Mr. Dean's resignation.

44.     Relatedly, the parties dispute the relevance and impact of Mr. Dean revising a draft resignation letter that was presented to Mr. Dean and other Blackcap officers prior to the closing of Core's acquisition of Blockcap, which Core never agreed to and Mr. Dean never signed. Specifically, Mr. Dean cites an email from July 24, 2021, in which Mr. Dean expressed that he wanted to stay on with the company until the de-SPAC transaction closed, that he wanted to propose edits to the draft resignation letter, and that wished to discuss these issues further with Mr. Duchene. Motion ¶ 9; Dean Appendix at 62. Mr. DuChene responded, "Sure. Fine with that. Mark it up however you want. Again will fully support." Even assuming Mr. DuChene supported Mr. Dean's decision to stay on with the Company until the de-SPAC transaction closed and allowed Mr. Dean to propose edits to the draft resignation letter, it is disputed that he agreed to accept any edits Mr. Dean made to the draft letter, let alone agree that Mr. Dean could resign for "Good Reason" or accelerate the equity under Mr. Dean's Equity Award Agreements. Second DuChene Declaration ¶ 8.

45.     Mr. Dean also states in his declaration accompanying his Motion that, on August 31, 2021, he had a meeting with Michael Levitt, the CEO and Co-Chairman of Core, and Kyle Buckett, a former Core employee, during which Mr. Levitt purportedly stated he knew Mr. Dean's employment contract would allow Mr. Dean, as a result Core's acquisition of Blockcap, to leave Core and to receive all of his equity. Dean Appendix at 7. Mr. Dean further claims that after

the transaction closed, Mr. Levitt "confirmed Mr. Dean's rights to resign for 'Good Reason' as a result of such acquisition shortly after the transaction closed." Motion ¶ 46. However, as set forth in Mr. Levitt's declaration, Mr. Levitt disputes Mr. Dean's assertions, stating that he never made any such statements to Mr. Dean and would have left any issues relating to Mr. Dean's employment to others at Core. Levitt Decl. ¶¶ 4-5.

46.     Mr. Dean attempts to justify tendering his resignation some seven months after his discussion with Mr. Duchene on February 10, 2022 for purported "Good Reason"— without any explanation or support for such purported "Good Reason"—by claiming that Mr. DuChene and Mr. Levitt had previously "expressly agreed" to Mr. Dean's resignation for "Good Reason." Motion ¶ 46. Despite Mr. Dean's self-serving, post-hoc gloss on his communications with Core personnel about his resignation, no Core officials ever agreed that Mr. Dean could resign for "Good Reason," and Core disputes that there was any "Good Reason" for Mr. Dean's resignation.

47.     Indeed, on February 14, 2022, Core informed Mr. Dean that it disputed that his resignation was for "Good Reason" and that Mr. Dean's employment would end that day— essentially treating his resignation as one without "Good Reason." *See* Dean Appendix at 16 (Employment Agreement § 8(d)(ii) ("Provided the resignation is not for Good Reason, the Company shall have no further obligations to Executive.").

48.     Following Mr. Dean's email to Core on February 15, 2022 asserting that Core rejected his resignation for Good Reason and terminated his employment without "Cause," Mr. DuChene replied to Mr. Dean because he felt compelled to respond to what he considered false accusations by Mr. Dean. Second Duchene Decl., Ex. 2. Mr. DuChene explained to Mr. Dean, "I never uttered the word 'good reason' to you nor have you and I *ever* engaged in a good reason discussion." *Id.* (emphasis added). Mr. DuChene continued, in pertinent part:

You have indicated repeatedly from even before the completion of the acquisition of Blockcap that you intended to resign and never in those conversations did you express that it would be for "good reason". [Sic] I have expressed to you that you could resign at any time at your convenience and you would receive what you were entitled to. Specifically, the only discussion we had was that you wanted to stay beyond the date of the XPDI merger so that your equity was not net share settled pursuant to the terms of the Merger Agreements. In fact, you recently sent me an email inquiring about such treatment without also informing me as a courtesy that you had submitted your resignation.  As for the allegation that we, and not you, have breached your employment agreement, I'll simply let the facts speak for themselves.

49.     Aside from the disputes regarding what Core told Mr. Dean and the circumstances surrounding Mr. Dean's resignation, there are additional factual disputes as to whether "Good Reason" actually existed as defined by Mr. Dean's Employment Agreement.  In the Motion, Mr. Dean suggests that Blockcap "induced" him to accept employment with the company and relocate to Austin, Texas, in connection with entering into the Award Agreements. If the purpose of the Award Agreements was—as Mr. Dean submits—to induce him to relocate to work in Blockcap's Austin headquarters, it would be nonsensical for that very same relocation to constitute "Good Reason" for Mr. Dean's resignation from Core, some seven months later.  At a minimum, discovery is required to probe the facts and circumstances regarding Mr. Dean's claim of inducement, including as may be necessary from third-parties.  Core further disputes that following Core's acquisition of Blockcap, there was a "material diminution" in Mr. Dean's duties or responsibilities.  For example, Mr. Dean worked for Core for more than six months following its acquisition of Blockcap, despite the "material and substantial diminution" in his duties he now alleges, without ever raising such issues to Core.  *See* First DuChene Decl. ¶ 7 and Second DuChene Decl. ¶ 10.

50.     As all justifiable inferences must be drawn in Core's favor as the non-movant, *see In re Clear the Air, LLC*, 631 B.R. 286, 292 (Bankr. S.D. Tex. 2021) (citing *Morris*,

144 F.3d at 380), there are obvious, genuine disputes of material fact concerning Mr. Dean's resignation and whether his resignation meets the contractual definition of "Good Reason" under his Employment Agreement that clearly preclude summary judgment.

**B.  There Are Additional Genuinely Disputed Issues of Fact Concerning the Extent to Which Mr. Dean's Equity Awards Vested, And If So, When They Vested.**

51.    In addition to the disputes surrounding whether Mr. Dean resigned for "Good Reason,"—which Mr. Dean claims resulted in his restricted stocks and stock options under the Award Agreements automatically vesting—there are additional factual disputes regarding whether certain of Mr. Dean's equity awards vested at all.

52.    Mr. Dean claims that because XPDI was a public company subject to the reporting requirements of the U.S. Securities and Exchange Commission (the "**SEC**") at the time it acquired Core, the de-SPAC transaction triggered the automatic vesting of 400,000 shares[6] of restricted stock under section 2(a) of Mr. Dean's June 1 Award Agreement.  Motion ¶ 12.

53.    However, section 2(a) of the June 1 Award Agreement expressly states:

> [I]f Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction.

Dean Appendix at 52 (June 1, 2021 Award Agreement, Attachment 1-D, § 2(a)).

54.    It is undisputed that a lock-up was imposed in connection with the de-SPAC going public event, which prevented certain Core shareholders from trading Core stock, and that this restriction was not waived until February 24, 2022, effective March 10, 2022 (both dates after

---

[6] Mr. Dean asserts that those shares would have converted to 324,767 unrestricted shares of Core ("CORZ") common stock, which "should have vested on January 19, 2022, at a closing price of $9.60 and a total value of $3,117,763.45." Dean POCs ¶ 27 & n.5.

Mr. Dean had already resigned).  However, there remain open issues of fact concerning whether Mr. Dean was subject to a lock-up that would have prevented him from selling his shares or even prevented the vesting of his shares on account of Blockcap's successor going public.

### C. Even Assuming that Mr. Dean's Equity Awards Had Vested, There Are Genuinely Disputed Issues of Fact Concerning When He Could Have Received Those Shares and Could Have Sold Them.

55.    As explained in Core's Objection, Mr. Dean's claim for $8,000,000 is premised on the assumptions that (i) all of the 84,171 stock options and 690,129 restricted shares of Core common stock that he asserts he is entitled to under his Award Agreements automatically vested on February 14, 2022—the date Core rejected his resignation for "Good Reason," and (ii) the closing stock price of $9.89 on February 14, 2022 is the appropriate measure for the value of his claim.   Though Core disputes that Mr. Dean was entitled to any shares or stock options under his Award Agreements, Core has also put forth evidence demonstrating that multiple restrictions would have prevented Mr. Dean from selling any of his shares until months later, at the earliest, even in the absence of any alleged breach.

56.    For example, the lock-up period imposed in connection with the de-SPAC transaction, which would have applied to any of Mr. Dean's shares, was not lifted until March 10, 2022.  Second DuChene Declaration ¶ 18.  Furthermore, following Core's de-SPAC transaction, Core could not legally issue stock to employees as part of their benefits or incentive packages until after filing a Form S-8 Registration Statement with the SEC.  Therefore, even if Mr. Dean was entitled to the shares he claims he was—which he was not—he could not have received those shares from Core prior to its Form S-8 filing on April 20, 2022.  First DuChene Declaration ¶ 10. On April 20, 2022, Core's trading price was $7.18, significantly less than the $9.89 share price on February 14, 2022 that forms the basis of Mr. Dean's claim.

57.     Core has also submitted evidence that before Core employees can trade on restricted stock and stock options, even if they are vested, Core must actually distribute the shares, which cannot occur until the employee pays the necessary taxes owed on the number of shares vested.  Second DuChene Declaration ¶ 19.  Accordingly, Core could not have distributed the shares Mr. Dean claims he is entitled to until he paid the taxes on those shares.  *Id*.  It follows, therefore, that absent Mr. Dean paying those taxes, he would not have been entitled to receive any of those shares.  It remains a fact issue whether Mr. Dean had the wherewithal or ability to pay the taxes necessary to even receive any of the shares he claims were owed to him, let alone the ability to actually sell those shares even if he received them.

58.     Further, even if Mr. Dean had been entitled to the receive some or all of the shares at issue, there are genuine issues of fact as to whether he would have been able to sell those shares, when he could have been able to sell those shares and at what price, as well as the extent of the damages he might be entitled to receive, if any.  While Mr. Dean relies on *Hercules Offshore, Inc. v. Guthrie*, No. 01-10-00968-CV, 2013 WL 772939, at *6-7 (Tex. App.—Houston [1st Dist.] Feb. 28, 2013, pet. denied) (mem. op.), and *Miga v. Jensen*, 96 S.W.3d 207, 215 (Tex. 2002), to argue that the value of the shares he claims he is entitled to should be measured as of January 19, 2022 and February 14, 2022, the dates Mr. Dean alleges Core breached the Employment Agreement and Award Agreements, *see* Motion ¶ 52, neither of these cases change the conclusion that questions of fact exist relating to these critical issues.

59.     Indeed, although those cases stand for the unremarkable proposition that breach-of-contract damages are measured from time of the breach, they do not address the circumstances here, where there can be no doubt that if Mr. Dean were not entitled to receive the shares or options until certain dates under the Award Agreements, and could not have sold those shares even if received, any alleged breach by Core could not be the cause of any damages to Mr.

Dean.  Under those circumstances, even if Core had not allegedly breached the agreements, Mr. Dean would not have been able to sell any of the shares he claims he is entitled to until well after his resignation from Core, by which time the value of Core's stock had significantly decreased in value.  And, given that Mr. Dean's stock was subject to restrictions, the measure of any damages would have to take those disputed facts into consideration.  *See, Cottam v. 6D Glob. Techs., Inc.*, 2022 WL 16908708, at *2 (2d Cir. Nov. 14, 2022) ("Stock that was restricted . . . is additionally discounted because it was not freely sellable on the date of the breach."); *Innovo Grp., Inc. v. Tedesco*, 1996 WL 580465, at *4 (Tex. App. Oct. 10, 1996)(not designated for publication) (affirming jury's finding that discounted $635,000 of stock, the value of the stock at the time of the alleged breach, by over $400,000, to account for its restricted status).

60.     Finally, even if Mr. Dean were to prevail on his claims—and for all the reasons above he should not—his claims are also subject to subordination under section 510(b) of the Bankruptcy Code, which would further impact any recovery he may be entitled to receive.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court deny the relief requested in the Motion, enter the attached Proposed Order, and grant such other relief as the Court deems necessary and appropriate.

Dated:  November 9, 2023
      Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez @weil.com
      Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
      Ronit.Berkovich@weil.com
      Theodore.Tsekerides@weil.com
      Christine.Calabrese@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>  /s/ Alfredo R. Pérez          </u>
Alfredo R. Pérez