IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § § | Case No. 22-90341 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) (Emergency Hearing Requested) |

### DECLARATION OF JOHN SINGH IN SUPPORT OF THE EMERGENCY MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING ENTRY INTO BACKSTOP COMMITMENT LETTER, (II) APPROVING PERFORMANCE OF OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF

I, John Singh, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

2.  PJT was retained in October 2022 to provide general restructuring and strategic advice and is serving as the investment banker for Core Scientific, Inc. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"). More information about the retention of PJT and my qualifications can be found

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

in the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling A Final Hearing, and (G) Granting Related Relief* (Docket No. 98).

3. I submit this declaration (the "**Declaration**") in support of the relief requested in the *Emergency Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Performance of Obligations Thereunder, and (III) Granting Related Relief* (the "**Motion**") (Docket No. 1383).[2] Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge, including of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by PJT's employees working with me and/or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or the Debtors' other advisors, (v) information received from discussions and negotiations with the Debtors' stakeholders and potential third-party investors, and/or (vi) my opinion based upon my experience as a restructuring professional. I, along with others from the PJT team, Debtors' counsel, and the Debtors' management team, led the chapter 11 plan negotiations for the Debtors, which culminated in the Mediated Settlement and the Plan (each as defined below). I, along with other members of the PJT team, also led the Debtors' exit capital marketing process and I was personally involved in negotiations regarding the terms of the Backstop Commitment Letter and the Rights Offering. If

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. The Debtors also filed a *Supplement to Backstop Motion* (Docket No. 1415) on November 14, 2023, which includes a revised Backstop Commitment Letter and Backstop Term Sheet.

2

called to testify, I could and would testify to each of the statements set forth herein on that basis. I am not being compensated specifically for this testimony other than through payments received by PJT as a professional retained by the Debtors as set forth in PJT's engagement letter.[3]

### Stakeholder Negotiations, the Mediated Settlement, and the Plan

4. Following several months of negotiations, including over three months in mediation before the Honorable Judge Marvin Isgur, the Debtors entered into a mediated settlement (the "**Mediated Settlement**") with (i) an ad hoc group of the Debtors' secured convertible noteholders (the "**Ad Hoc Noteholder Group**"), the Debtors' largest stakeholder group, and (ii) the official committee of equity security holders (the "**Equity Committee**"), reflected in that certain term sheet attached to the *Joint Notice of Agreement on Restructuring Term Sheet by and Among the Debtors, the Ad Hoc Noteholder Group, and the Equity Committee* (Docket No. 1367) (the "**Restructuring Term Sheet**"). The Debtors, the Ad Hoc Noteholder Group, and the Equity Committee (collectively, the "**RSA Parties**") are close to executing a Restructuring Support Agreement (the "**RSA**") and will file an updated version of the chapter 11 plan[4], each in accordance with the Restructuring Term Sheet. The Debtors believe that the Mediated Settlement embodied in the Plan will maximize value for the Debtors and their estates by, among other things, (i) substantially deleveraging the Debtors' balance sheet, (ii) preserving in excess of 240 jobs, (iii) providing for payment in full to all creditors (in debt, equity, or some

---

[3] Under PJT's engagement letter, to the extent that a financing is raised from existing debt or equity holders of the Debtors, PJT will be entitled to a capital raising fee of 2.5% of the issuance and/or committed amount of equity financing (or 5.0% if raised from parties other than existing debt or equity holders of the Debtors), including by means of backstop commitment.

[4] The Debtors intend to file contemporaneously with this Declaration an updated version of the *Third Amended Joint Chapter 11 Plan of Reorganization of Core Scientific, Inc. and its Debtor Affiliates* (as may be amended, modified or supplemented, the "**Plan**") and related Disclosure Statement (as may be amended, modified, or supplemented, the "**Disclosure Statement**"), which will revise the versions filed on docket nos. 1407 and 1410.

3

combination of debt and equity), except those that agree to take a lesser payment, and (iv) result in meaningful recoveries for existing equity holders.

5. The Mediated Settlement resolved a number of disputed issues among the RSA Parties, including, among other things, (i) the Enterprise Value of the Reorganized Debtors, (ii) the allowed amount of the Convertible Notes Claims (including settlement of the "2X" issue),[5] (iii) the treatment of Convertible Notes Claims, (iv) the treatment of holders of Existing Common Interests[6], and (v) the terms of exit capital to fund the Plan.  Specifically, the Mediated Settlement and the Plan provide that the Plan and the Reorganized Debtors' post-emergence capital needs will be funded from two external sources: (i) an exit delayed draw term loan facility (the "**Exit Facility**") consisting of $40 million of new availability provided by certain members of the Ad Hoc Noteholder Group and (ii) a $55 million equity rights offering (the "**Rights Offering**"). Pursuant to the RSA, a minimum of $30 million of the Rights Offering must be backstopped by the Commitment Parties.

6. The Backstop Commitment Letter provides the Debtors with a number of key benefits.  Most importantly, the Backstop Commitment Letter provides the Debtors with assurances that they can raise the Rights Offering proceeds necessary to implement the Mediated Settlement and the Plan.  As mentioned, the RSA and the Restructuring Term Sheet require that a minimum of $30 million of the Rights Offering must be backstopped.  As of the date herein, the Debtors have already secured commitments from 31 parties comprised of certain members of the Equity Committee and various other parties (collectively, the "**Commitment Parties**") to backstop approximately $37 million of the Rights Offering (the "**Backstop Commitment**"), subject to entry

---

[5] As defined in the Plan.

[6] As defined in the Plan.

of the Proposed Order approving the Motion. Therefore, failure to obtain the Court's approval to enter into the Backstop Commitment Letter may jeopardize the Debtors' ability to implement the Mediated Settlement and the Plan.

7. Moreover, as further discussed below, the Backstop Commitment Letter provides the Debtors with assurances that they will raise the exit capital necessary to fund the Plan and address the Debtors' post-emergence capital needs.

### Sound Business Reasons Support Entry into the Backstop Commitment Letter

8. I believe the Debtors' entry into the Backstop Commitment Letter is a reasonable exercise of their business judgment. The Backstop Commitment Letter is the product of extensive good faith, arm's-length negotiations among the Debtors and the Equity Committee, with input from and approval by the Ad Hoc Noteholder Group.

9. Beginning in May 2023, the Debtors and their advisors, overseen by the Special Committee, spent months exploring possible avenues for raising new money exit financing. The PJT team prepared marketing materials, populated a virtual dataroom, and identified potential outreach parties in connection with the exit debt and/or equity capital raise. PJT and the Debtors' management team worked together to contact over 75 parties, comprised of (i) parties inside the Debtors' capital structure, (ii) parties previously interested in investing in the Debtors, (iii) hedge funds, (iv) private equity / venture capital firms, and (v) certain strategic parties. As a result of this outreach, PJT held more than 50 introductory calls, culminating in more than 20 parties executing non-disclosure agreements that provided them with access to a virtual data room.

10. In parallel with the exit capital marketing process, the Debtors engaged in extensive negotiations with each of their key stakeholder groups regarding the terms of a

5

consensual chapter 11 plan, beginning in May 2023. Throughout the mediation, which commenced in July 2023, the Debtors and their key stakeholder groups held numerous in-person meetings and conference calls and exchanged several restructuring proposals. Ultimately, the RSA Parties reached a settlement on key economic terms in September 2023 and spent the following two months documenting the settlement, which is memorialized in the Restructuring Term Sheet, the RSA, and the Plan. The Backstop Commitment Letter is an integral element of the Mediated Settlement, the RSA, and the Plan, which require that a minimum of $30 million of the Rights Offering must be backstopped.

11. The terms of the Backstop Commitment Letter and the Backstop Term Sheet were extensively negotiated between the Debtors, the Equity Committee, and their respective advisors over the course of several months, in conjunction with the broader Mediated Settlement and the RSA. The Commitment Parties have indicated to me that they would not have agreed to provide commitments to backstop the Rights Offering, or even agreed to the Mediated Settlement and the RSA, without agreement on the terms of the Backstop Commitment Letter, including the Backstop Term Sheet. The Debtors did not receive any superior or actionable alternatives as part of the marketing process nor during mediation. Therefore, I believe the Rights Offering and the Backstop Commitment Letter, along with the Exit Facility, present the best currently available option for the Debtors – taken as a whole – to raise exit capital necessary to fund a value-maximizing chapter 11 plan supported by the Ad Hoc Noteholder Group, the Equity Committee, and a significant majority of the Debtors' equipment lenders.

### The Backstop Commitment and the Termination Payment Under the Backstop Commitment Letter Are Reasonable

12. As described above, pursuant to the Backstop Commitment Letter, the Commitment Parties have committed approximately $37 million of equity capital to ensure the

6

successful implementation of the Plan as of the date herein. In consideration of the Commitment Parties' substantial commitments under the Backstop Commitment Letter, the Commitment Parties will receive their respective share of (i) a commitment premium equal to 20% of the Backstop Commitment (the "**Commitment Premium**") payable in New Common Interests at the Per Share Price[7] upon emergence, including consummation of the Rights Offering, (ii) a termination payment of 5% of the Backstop Commitment in cash (the "**Termination Payment**"), which is only payable in certain limited circumstances, and (iii) customary indemnification rights (the "**Indemnification Obligations**", and collectively with the Commitment Premium and the Termination Payment, the "**Commitment Protections**").

13. The Commitment Protections are integral components of the Backstop Commitment Letter. The Commitment Protections compensate the Commitment Parties for their support and associated opportunity costs of reserving their capital commitments for a period of up to over two months (including the requirement to provide a 10% deposit of their respective Backstop Commitment) under the Backstop Commitment Letter. As mentioned above, the Commitment Parties have indicated to me that they would not have agreed to provide commitments to backstop the Rights Offering without the Commitment Protections. If the Commitment Protections are not approved, there is significant doubt as to whether the Debtors would be able to obtain sufficient commitments to backstop the Rights Offering as required under the RSA and to consummate the Mediated Settlement and the Plan.

14. The Commitment Premium and the Termination Payment, taken as a whole, are reasonable in light of the facts and circumstances of these cases and the Backstop

---

[7] As the defined in the Motion, which means the per share price for the holders of Existing Common Interests to subscribe to the Rights Offering and acquire shares of the New Common Interests at a 30% discount to the Plan Equity Value based on a $1.5 billion Enterprise Value.

Commitments' significant benefit to the Debtors' estates. When negotiating and considering the reasonableness of the Commitment Protections – including the Commitment Premium and the Termination Payment – the Debtors and their advisors considered many factors, including the following primary factors: (i) the size of the Backstop Commitment, (ii) the limited conditionality of the Commitment Parties' commitments and reasonable milestones, (iii) the limited circumstances under which such Termination Payment would be payable, (iv) the Debtors' non-institutional shareholder base that constitutes the Commitment Parties, and (v) the fact that the Debtors do not have other superior or actionable alternatives to the Plan – that the Backstop Commitments are an integral component of – both (a) at the Enterprise Value and (b) that is also supported by the Ad Hoc Noteholder Group and the Equity Committee.

15. In my experience, payment of a Commitment Premium to backstop parties is customary in rights offerings. Additionally, the Commitment Premium in this case is only payable in New Common Interests upon a successful Rights Offering, which would reflect the effectiveness of the Plan. PJT compared the Commitment Premium and the Termination Payments to similar fees in rights offerings in other recent and comparable chapter 11 cases. The Commitment Premium, despite being on the high end, is within the range of commitment premiums approved in comparable chapter 11 cases and, more importantly, is reasonable and necessary in light of the circumstances and facts of these chapter 11 cases. The Termination Payment is in the middle of the range of termination fees approved in comparable chapter 11 cases.

16. Accordingly, I believe the Commitment Premium and the Termination Payment provided by Debtors under the Backstop Commitment Letter, taken as a whole, are reasonable compared to the substantial benefits afforded thereby to the Debtors and are necessary to maximize the value of the Debtors' estates. I also believe the entry into the Backstop

Commitment Letter and effectuating the transactions contemplated thereby – including payment and performance of the Commitment Protections – are in the best interest of the Debtors' estates.

Dated: November 14, 2023
New York, New York

                                                                                */s/ John Singh*
                                                                                John Singh
                                                                                Partner
                                                                                PJT Partners LP

**Certificate of Service**

I hereby certify that on November 14, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                     */s/ Alfredo R. Pérez*
                                                     Alfredo R. Pérez