**Exhibit B**

**Redline of Backstop Commitment Letter**

*EXECUTION VERSION*

[●]November 16, 2023

Core Scientific, Inc.
210 Barton Springs Road
Suite 300
Austin, Texas 78704

  Re: <u>Backstop Commitment Letter</u>

Ladies and Gentlemen:

  Core Scientific, Inc. (the "***Company***" and together with its debtor affiliates, the "***Debtors***") filed for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***"), which cases are being jointly administered under lead case no. 22-90341 (the "***Chapter 11 Cases***").

  The equity rights offering ("***ERO***") shall be implemented in connection with a chapter 11 plan consistent with the terms of this backstop commitment letter (this "***Backstop Commitment Letter***") and the terms of the mediated settlement set forth in the that certain Restructuring Support Agreement entered into between the Company and the other parties signatory thereto (the "***RSA***"), which shall be consistent with the terms set forth in the restructuring term sheet dated as of October 30, 2023 [Docket No. 1367], and otherwise reasonably satisfactory to the Requisite Commitment Parties (the "***Plan***"), pursuant to which the reorganization of the Debtors and related transactions, including an equity rights offering, will be implemented. Further reference is made to the Backstop Commitment Term Sheet, attached hereto as <u>Exhibit A</u> (the "***Term Sheet***"), which sets forth the terms and conditions upon which the Commitment Parties party hereto are willing to backstop the proposed ERO described therein and herein in order to facilitate the Debtors' emergence from chapter 11. The Term Sheet is incorporated by reference as if set forth fully herein. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.

  This Backstop Commitment Letter shall be effective upon the execution and delivery by the Company and each Commitment Party of the signature pages attached hereto (which Commitment Parties shall provide $37.1 million in Backstop Commitments in the aggregate), subject to entry of the Backstop Order and execution of the RSA.

1. <u>Equity Rights Offering & Backstop Commitment</u>.
 (a) Subject to the terms and conditions set forth herein and in the Term Sheet, and pursuant to the Plan, among other things, the Debtors shall conduct the ERO by providing each Eligible Equity Holder (including the Commitment Parties, as applicable) subscription rights to purchase Common Stock issued pursuant to the Plan and available to be purchased in connection with the ERO, in an amount consistent with the Term Sheet. All Eligible Equity Holders shall have the right to participate in the ERO.
 (b) Subject to the terms and conditions set forth herein and in the Term Sheet, each Commitment Party hereby severally, and not jointly, commits to: (i) to the extent such Commitment Party owns Existing Common Interests as of the date hereof, not sell its Existing

Common Interests (other than as provided herein and in the Term Sheet), and (ii) purchase, on the Effective Date, its Backstop Commitment Percentage of any unsubscribed ERO Shares in an amount consistent with the Term Sheet.  For the avoidance of doubt, ~~(x) any amounts raised from the exercise of oversubscription rights shall first be applied towards the portion of the ERO that is not backstopped (if any) before the Backstop Commitment is reduced by proceeds from the exercise of oversubscription rights and (y)~~ any Commitment Party may, but is not obligated to, exercise subscription rights allocated to it in the ERO and any oversubscription rights.

(c) Subject to the terms and conditions set forth in the Term Sheet and herein, each Commitment Party shall fund its Backstop Commitment Deposit in cash to the Escrow Account within three business days following the entry of the Backstop Order (the "***Deposit Deadline***").  Each Commitment Party's Backstop Commitment Deposit shall be subject to forfeiture upon a Funding Default by such Commitment Party as set forth in Section 11 herein.  A Commitment Party shall be deemed to have voted to accept the Plan upon the funding of its Backstop Commitment Deposit to the Escrow Account by the Deposit Deadline (or thereafter, at the sole discretion of the Debtors).

(d) Within five business days following the Subscription Deadline, the Debtors shall deliver to each Commitment Party a Funding Notice providing: (i) the aggregate number of ERO Shares elected to be purchased by Eligible Equity Holders and the aggregate Per Share Price therefor; (ii) the aggregate number of unsubscribed ERO Shares (after any amounts raised from the exercise of oversubscription rights), if any, and the aggregate Per Share Price therefor; (iii) each Commitment Party's Backstop Commitment Percentage and number of shares of Common Stock to be issued and sold to such Commitment Party, if any, pursuant to its Backstop Commitment, and the aggregate Per Share Price therefor; and (iv) if applicable, the number of ERO Shares such Commitment Party subscribed for in the ERO, if any, that such Commitment Party had not yet funded, and the aggregate Per Share Price therefor.  Within three business days following receipt of the Funding Notice (the "***Funding Date***"), each Commitment Party shall fund to the Escrow Account its respective (1) Backstop Funding Amount, less such Commitment Party's Backstop Commitment Deposit, and (2) Subscription Rights Funding Amount, if any, in each case as set forth in the Funding Notice.  If the ERO is terminated for any reason or if any portion of the Backstop Commitments are unused, each Commitment Party's Subscription Rights Funding Amount, if any, and Backstop Funding Amount, including its Backstop Commitment Deposit, shall be refunded to the applicable Commitment Party in full, in the case of termination, or in full or in part, in the case of unused Backstop Commitments, in each case with interest, as soon as practicable following termination or completion of the ERO, as applicable.

(e) The ERO will be made, and the ERO Shares issued thereunder will be issued and sold in reliance upon, the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code; provided that, all Common Stock issued in respect of the Backstop Commitments will be issued and sold in reliance upon the exemption from registration as a private placement provided by section 4(a)(2) of the Securities Act and/or the safe harbor of Regulation D, or such other exemption as may be available from any applicable registration requirements under the Securities Act.  All Common Stock issued in respect of the Backstop Commitment Premium shall be issued and sold in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code.

(f) Each Commitment Party, if any, that receives 10 percent or more of the shares of Common Stock issued under the Plan and the ERO or that cannot sell its shares under Rule 144

under the Securities Act without volume or manner of sale restrictions shall be entitled to customary registration rights with respect to such Common Stock, pursuant to a registration rights agreement in a form agreed to by the Effective Date and entered into as soon as practicable following the Effective Date, by Reorganized Core and such Commitment Party.  A form of a registration rights agreement, which shall be consistent with the terms herein and in the Term Sheet, shall be filed with the Bankruptcy Court as part of the Plan Supplement, if applicable.

(g)     The Commitment Parties, and by countersigning this Backstop Commitment Letter, the Debtors, hereby, severally and not jointly, agree to cooperate and negotiate in good faith the terms and conditions of the Common Stock issued to the Commitment Parties in respect of the ERO and the Backstop Commitments and the documents and agreements governing the procedures and arrangements for the ERO, including, without limitation, the ERO Procedures, which shall be in form and substance reasonably acceptable to the Requisite Commitment Parties.

2. [RESERVED]
3. <u>Termination</u>.

Subject to the terms and conditions set forth in the Term Sheet, this Backstop Commitment Letter may terminate at any time prior to the Effective Date upon the occurrence of a Mutual Termination or a Termination Event and, in the event of a specified Termination Event set forth in the Term Sheet, the Company shall pay to the Commitment Parties the Termination Payment.  The payment of the Termination Payment is an integral part of the transactions contemplated by this Backstop Commitment Letter and, without such Termination Payment, the Commitment Parties would not have entered into this Backstop Commitment Letter.  The Termination Payment, to the extent not paid, is intended to and shall constitute an allowed administrative expense of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code under the Backstop Order.  If, following the entry of the Backstop Order, this Backstop Commitment Letter is terminated, nothing contained herein shall limit or restrict the Commitment Parties from seeking allowance and payment of any unpaid Termination Payment as an administrative expense of the Debtors' estates under the Bankruptcy Code, including under sections 503(b) and 507 thereof.  Subject to entry of the Backstop Order, the Debtors' obligations with respect to the Termination Payment (to the extent payable) and the Indemnification Obligations shall survive the termination of this Backstop Commitment Letter indefinitely and shall remain in full force and effect.

4. <u>Backstop Commitment Premium</u>.

The Debtors shall pay to the Commitment Parties on the Effective Date the Backstop Commitment Premium in accordance with the Term Sheet.  The payment of the Backstop Commitment Premium is an integral part of the transactions contemplated by this Backstop Commitment Letter and, without the Backstop Commitment Premium, the Commitment Parties would not have entered into this Backstop Commitment Letter.  The Backstop Commitment Premium, to the extent not paid, is intended to and shall constitute an allowed administrative expense of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code under the Backstop Order.  If, following the entry of the Backstop Order, this Backstop Commitment Letter is terminated, nothing contained herein shall limit or restrict the Commitment Parties from seeking allowance and payment of any unpaid Backstop Commitment Premium as an

administrative expense of the Debtors' estates under the Bankruptcy Code, including under sections 503(b) and 507 thereof.

5. <u>Indemnification</u>.

(a) Subject to entry of the Backstop Order, the Debtors, including as reorganized pursuant to the Plan (each, an "***Indemnifying Party***"), shall jointly and severally indemnify, defend and hold harmless each Commitment Party and each Commitment Party's affiliates and each of its respective officers, directors, managers, partners, stockholders, members, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of their respective successors and assigns (each, an "***Indemnified Party***") from and against, and shall promptly reimburse each Indemnified Party for, all losses, damages, liabilities and reasonable and documented costs and expenses (collectively, "***Losses***"), including, without limitation, reasonable and documented out-of-pocket attorneys' fees and expenses and, solely in the case of a conflict of interest, one additional counsel in each applicable jurisdiction to each group of affected Indemnified Parties similarly situated (taken as a whole), arising or resulting from or in connection with (i) any action, suit, proceeding, claim, challenge, litigation, investigation, or demand (collectively, "***Claims***"), in each case, brought by a third-party, related to or arising from this Backstop Commitment Letter, the ERO, or the transactions contemplated thereby irrespective of whether or not the transactions contemplated by this Backstop Commitment Letter or the ERO are consummated or whether or not this Backstop Commitment Letter is terminated; and (ii) the Confirmation Order being reversed, dismissed, or vacated (clauses (i) and (ii) collectively, the "***Indemnification Obligations***"), up to the dollar amount of each Commitment Party's Backstop Commitment, which shall be no more than $55 million in the aggregate for all Commitment Parties; *provided* that, the Indemnification Obligations shall exclude any Losses found by a final judgment of a court of competent jurisdiction to arise from an Indemnified Party's bad faith, gross negligence, fraud, or a material breach of the obligations of such Commitment Party under this Backstop Commitment Letter.  In addition, the Indemnification Obligations shall exclude any Claim by one Commitment Party against another Commitment Party.

(b) Each Indemnified Party entitled to indemnification hereunder shall (i) give prompt written notice to the Indemnifying Party of any Claim with respect to which it intends to seek indemnification or contribution pursuant to this Backstop Commitment Letter and (ii) permit such Indemnifying Party to assume the defense of such Claim with counsel selected by the Indemnified Party and reasonably satisfactory to the Indemnifying Party; *provided* that, the failure to so notify any Indemnifying Party will not relieve any Indemnifying Party from any liability that any Indemnifying Party may have hereunder except to the extent such Indemnifying Party has been materially prejudiced by such failure; *provided further* that, any Indemnified Party entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such Claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Indemnifying Party has agreed in writing to pay such fees and expenses, (y) the Indemnifying Party shall have failed to assume the defense of such Claim within a reasonable time following delivery of the written notice of the Indemnified Party with respect to such Claim or failed to employ counsel reasonably satisfactory to such Indemnified Party or (z) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such Claim (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense

of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such Claim on behalf of such Indemnified Party). In connection with any settlement negotiated by an Indemnifying Party, no Indemnifying Party shall, and no Indemnified Party shall be required by an Indemnifying Party to, (i) enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a full and unconditional release from all liability in respect to such Claim or litigation, (ii) enter into any settlement that attributes or admits liability or fault to the Indemnified Party, or (iii) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. In addition, without the consent of the Indemnified Party, no Indemnifying Party shall be permitted to consent to entry of any judgment or enter into any settlement which provides for any action or restriction on the part of the Indemnified Party other than the payment of money damages which are to be paid in full by the Indemnifying Party. If an Indemnifying Party fails or elects not to assume the defense of a Claim or is not entitled to assume or continue the defense of such Claim pursuant to the foregoing, the Indemnified Party shall have the right (without prejudice to its right of indemnification hereunder), in its discretion, to contest, defend and litigate such Claim and may settle such Claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable; *provided* that, at least 10 days prior to any settlement, written notice of its intention to settle is given to the Indemnifying Party. If requested by the Indemnifying Party, the Indemnified Party agrees (at the expense of the Indemnifying Party) to reasonably cooperate with the Indemnifying Party and its counsel in contesting any Claim that the Indemnifying Party elects to contest; *provided* that, such cooperation shall not include the provision of any information to the extent that the provision thereof would violate any attorney-client privilege, law, rule or regulation, or any obligation of confidentiality binding on such Indemnified Party. If such indemnification is for any reason not available or is insufficient to hold an Indemnified Party harmless, each Indemnifying Party agrees to contribute to the Indemnified Liabilities to which the Indemnified Party may be subject in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by each Indemnifying Party and each Indemnified Party with respect to the Backstop Commitments or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of each Indemnifying Party on the one hand and of each Indemnified Party on the other hand; *provided* that, to the extent permitted by applicable law, an Indemnified Party shall not be responsible for amounts which in the aggregate are in excess of the amount of all premiums and fees actually received by the Indemnified Party from the Indemnifying Party in connection with the Backstop Commitments, including, without limitation, the Backstop Commitment Premium and the Termination Payment. Relative benefits to an Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, with respect to the Backstop Commitments shall be deemed to be in the same proportion as (i) the total value paid or received or proposed to be paid or received by the Indemnifying Party pursuant to the issuance and sale of the Common Stock contemplated by this Backstop Commitment Letter bears to (ii) all premiums and fees actually received by the Indemnified Parties in connection with the Backstop Commitments, including, without limitation, the Backstop Commitment Premium and the Termination Payment. Subject to entry of the Backstop Order, the terms set forth in this Section 5 shall survive termination of this Backstop Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

6. <u>Consent Rights</u>.

Subject to the terms and conditions set forth herein, the Requisite Commitment Parties shall have the consent rights set forth in the Term Sheet.

7. <u>Representations and Warranties</u>.

(a)  The Debtors hereby represent and warrant to the Commitment Parties, subject to any limitations or approval arising from or required in connection with the Chapter 11 Cases, as set forth below:

(i) the Debtors are validly existing and in good standing under the laws of their jurisdiction of incorporation or organization, and have all requisite organizational power and authority to execute this Backstop Commitment Letter, carry out the transactions contemplated hereby and perform the obligations contemplated hereunder, and the execution and delivery of this Backstop Commitment Letter and the performance of the Debtors' obligations hereunder have been duly authorized;

(ii) the execution and delivery of and performance under this Backstop Commitment Letter does not and will not (a) violate any provision of law, rule or regulation applicable to the Debtors, (b) does not violate any of the Debtors' charter or bylaws (or other similar governing documents), (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which the Debtors are a party, or (d) require any consent, approval or similar authorization by any federal, state or governmental authority or regulatory body, except (I) such filings that may be necessary in connection with the Chapter 11 Cases and (II) such filings as may be necessary or required for disclosure by the U.S. Securities and Exchange Commission ("**SEC**") or other securities regulatory authorities under applicable securities laws, except, with respect to clauses (a), (c), and (d) above, as would not, individually or in the aggregate, reasonably be expected to (x) be materially adverse to the Debtors, taken as a whole, or (y) adversely affect in any material respect the Debtors' ability to perform their obligations under this Backstop Commitment Letter;

(iii) this Backstop Commitment Letter is the legally valid and binding obligation of the Debtors, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court;

(iv) the Common Stock to be issued pursuant to the Plan and in connection with the ERO will, when delivered, be duly and validly authorized, issued and delivered;

(v) the Debtors acknowledge and agree that the transactions contemplated hereunder are arm's-length and each Commitment Party is acting solely in the capacity of an arm's-length contractual counterparty to the Debtors in respect thereof;

6

(vi) the Debtors are compliant in all material respects with all applicable securities laws and have filed all required reports, schedules, forms and statements with the SEC and each of the foregoing documents filed since January 1, 2023 (the "**SEC Filed Documents**");

(vii) no Material Adverse Effect has occurred or exists since June 8, 2023;

(viii) none of the Debtors is an "investment company" as defined in the Investment Company Act of 1940;

(ix) none of the Debtors are party to any contract with any person that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the ERO;

(x) other than the Chapter 11 Cases and any adversary proceedings or contested matters commenced in connection therewith, none of the Debtors are party to, nor their property subject of, any pending or threatened material legal, governmental, administrative, judicial or regulatory investigations, actions, claims, or similar proceedings, which, if adversely determined, would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect;

(xi) in each case solely to the extent that the failure of the following such representation to be true would result in a material liability of the Debtors for taxes following the Effective Date, the Debtors (a) have filed or caused to be filed all material tax returns required to have been filed and each such tax return is true and correct in all material respects, (b) have timely paid or caused to be timely paid all material taxes or assessments due and payable with respect to all periods or portions thereof ending on or before the date hereof, (c) have complied in all material respects with all applicable laws, rules, and regulations relating to the payment and withholding of taxes, and (d) other than in connection with the Chapter 11 Cases or to the extent the Debtors are sufficiently reserved in accordance with GAAP, are not subject to any asserted claims with respect to any material taxes, no presently effective waivers or extensions of statutes of limitation with respect to material taxes have been given or requested, and no material tax returns are being audited or examined;

(xii) except as disclosed in the SEC Filed Documents, the Debtors have established and maintain a system of internal controls over financial reporting that comply with the requirements of the Exchange Act and which have been designed to provide reasonable assurances regarding the reliability of financial reporting in accordance with GAAP, and there are no material weaknesses in the Debtors' internal control over financial reporting as of the date hereof; and

(xiii) except as disclosed in the SEC Filed Documents, the Debtors have established and maintain disclosure controls and procedures designed to ensure that information required to be disclosed by the Debtors in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms.

(b) Each Commitment Party, severally (in accordance with its Backstop Commitment Percentage) and not jointly, represents and warrants as to itself only as set forth below:

7

(i) such Commitment Party, if an entity, is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite organizational power and authority to execute this Backstop Commitment Letter, carry out the transactions contemplated hereby and perform the obligations contemplated hereunder, and the execution and delivery of this Backstop Commitment Letter and the performance of the Commitment Party's obligations hereunder have been duly authorized;

(ii) the execution and delivery of and performance under this Backstop Commitment Letter does not and will not (a) violate any provision of law, rule or regulation applicable to such Commitment Party or its charter or bylaws (or other similar governing documents), as applicable, (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which such Commitment Party is a party, or (c) require any consent, approval or similar authorization by any federal state or governmental authority or regulatory body, except, with respect to clause (b), as would not, individually or in the aggregate, reasonably be expected to adversely affect in any material respect the Commitment Parties' ability to perform their obligations under this Backstop Commitment Letter;

(iii) this Backstop Commitment Letter is the legally valid and binding obligation of the Commitment Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court;

(iv) such Commitment Party understands that (a) the issuance of the Common Stock issued on account of the Backstop Commitments has not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, and (b) such Common Stock cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available;

(v) such Commitment Party is acquiring Common Stock in respect of its Backstop Commitment for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities laws;

(vi) such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act;

(vii) such Commitment Party has independently evaluated the merits and risks of its investment in the Common Stock attributable to it Backstop Commitment; and

  (viii) such Commitment Party will have sufficient immediately available funds to perform all of its obligations under this Backstop Commitment Letter, including the ability to timely make and complete the payment of the aggregate purchase price for such Commitment Party's Backstop Commitment and Backstop Commitment Deposit.

8. <u>Interim Operating Covenant</u>.

Prior to and through the Effective Date, the Debtors shall continue to operate their businesses and transact in respect of their businesses as set forth in the Term Sheet.

9. <u>Conditions Precedent to Funding</u>.

The obligations of each Commitment Party to consummate the funding obligations, including release of any funds held in the Escrow Account with respect to the funding obligations, under this Backstop Commitment Letter shall be subject to the satisfaction of each of the Conditions Precedent set forth in the Term Sheet.

10. <u>Transfer and Assignment; Third Party Beneficiaries</u>.

No Debtor may assign its rights, interests or obligations hereunder without the prior written consent of the Requisite Commitment Parties and any purported assignment by the Debtors in violation of this Section 10 shall be void *ab initio*.  Each Commitment Party may transfer or assign all or any portion of its respective Backstop Commitment hereunder to any other Commitment Party in accordance with and subject to the terms and conditions of the Term Sheet; *provided* that, such transferee and the transferring Commitment Party shall have duly executed and delivered to the Notice Parties written notice of such transfer; *provided further*, that the transferor shall remain liable for (and shall continue to have the financial wherewithal to satisfy) the full amount of its Backstop Commitment (including the portion so transferred in the event that the transferee defaults on its obligation).  Upon the effectiveness of any transfer of all or a portion of a Backstop Commitment: (i) the transferor shall be deemed to relinquish its rights under this Backstop Commitment Letter to the extent of such transferred rights and obligations, (ii) the transferee shall be fully bound with respect to the transferred Backstop Commitment and shall have made its Backstop Commitment Deposit, and (iii) the relevant portion of the transferor's Backstop Commitment Deposit, including interest, shall be refunded to it within one business day following such effectiveness.  Except as provided in Section 5 hereof with respect to the Indemnified Parties, this Backstop Commitment Letter is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Backstop Commitment Letter.

11. <u>Funding Default</u>.
(a) Upon the occurrence of the failure by any Commitment Party to timely pay the applicable purchase price in respect of its Backstop Commitment (such failure, a "***Funding Default***") in accordance with Section 1(c) herein, the Commitment Parties (other than any Commitment Party that causes a Funding Default (a "***Defaulting Commitment Party***")) shall have the right, but not the obligation, within five business days after receipt of written notice from the Company to all Commitment Parties of such Funding Default, which notice shall be given as promptly as practicable following the occurrence of such Funding Default (such five

9

business day period, the "**_Replacement Period_**"), to elect, by written notice to the Company, to purchase all or any portion of the Common Stock attributable to such Defaulting Commitment Party's Backstop Commitment (such purchase, a "**_Replacement Purchase_**") on the terms and subject to the conditions set forth in this Backstop Commitment Letter (such Commitment Parties, the "**_Replacing Commitment Parties_**"). If the Company receives more than one written notice of a Replacement Purchase election, the Company will accept such Replacement Purchases in the order they are received until the Funding Default is replaced in whole or such Replacement Purchases are otherwise exhausted, subject to Paragraph (e) of this Section 11. The purchase price paid by any Replacing Commitment Party in connection with a Replacement Purchase shall be equal to the applicable purchase price in respect of such Defaulting Commitment Party's Backstop Commitment, less such Defaulting Commitment Party's Backstop Commitment Deposit.

(b) A Defaulting Commitment Party's Backstop Commitment Deposit shall be forfeited to the Company without any consideration therefor.

(c) If a Commitment Party is a Defaulting Commitment Party, or is otherwise in breach of its obligations hereunder, it shall not be entitled to any of the Backstop Commitment Premium or the Termination Payment hereunder; _provided_ that, for the avoidance of doubt, this Section 11(c) shall not be deemed to limit any Commitment Party's obligations under Section 1(b)(ii).

(d) Nothing in this Backstop Commitment Letter shall require any Commitment Party to fund more than its Backstop Commitment; _provided_ that, if a Commitment Party makes an election to cover a Defaulting Commitment Party, such election shall be binding, and failure to fund any such cover amount in accordance with this Section 11 shall constitute a Funding Default.

(e) Notwithstanding anything to the contrary set forth in Section 3 but subject to Section 14, no provision of this Backstop Commitment Letter shall relieve any Defaulting Commitment Party from liability hereunder, including for liability for the consequences of its breach, or limit the availability of the remedies available to the non-defaulting Commitment Parties hereto, and such non-defaulting Commitment Parties can enforce rights or damages and/or specific performance upon the failure to timely fund by the Defaulting Commitment Party.

(f) A Defaulting Commitment Party will not be entitled to any Backstop Commitment Premium or any other amounts that the Commitment Parties may be entitled to under the Term Sheet or as may be provided herein, even if such Defaulting Commitment Party subsequently funds the applicable purchase price with respect to its Backstop Commitment

(g) The Debtors may, in their discretion, withhold distributions under the Plan to any Defaulting Commitment Party.

(h) Upon a funding default, the Debtors may seek emergency relief from the Court seeking an order compelling any Defaulting Commitment Party to fund its Backstop Funding Amount, as required under the Term Sheet and herein, and the Commitment Parties, including any Defaulting Commitment Party, shall not object to such relief being heard on an emergency basis.

(i) The remedies available to the Debtors to enforce performance of any Defaulting Commitment Party are not mutually exclusive and the Debtors may utilize any and all remedies available to them to enforce this Backstop Commitment Letter against any Defaulting Commitment Party.

12. [RESERVED]
13. Plan Terms.

Subject to the terms and conditions set forth herein, the terms of the Plan shall be consistent with the terms set forth in the Term Sheet. This Section 13 is not a limitation on the consent rights of the Commitment Parties with respect to the Plan that are set forth in the Term Sheet.

14. Governing Law; Jurisdiction.

This Backstop Commitment Letter shall be governed and construed in accordance with the laws of the State of New York. The parties hereto consent and agree that any action to enforce this Backstop Commitment Letter or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Backstop Commitment Letter and the agreements, instruments and documents contemplated hereby and thereby shall be brought exclusively in the Bankruptcy Court, or if the Bankruptcy Court does not have jurisdiction to hear such action or dispute, any state or federal court located in the City and County of New York (the "***Chosen Courts***"). Each of the parties hereto (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto or constitutional authority to finally adjudicate the matter. Without limiting the rights of any party hereto, each party acknowledges and agrees that the Debtors are entitled to seek damages from any Commitment Party that breaches its obligations under this Backstop Commitment Letter; *provided* that, each party hereto hereby waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding any special, exemplary, punitive or consequential damages. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS BACKSTOP COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

15. Amendments.

This Backstop Commitment Letter represents the final agreement and the entire understanding among the parties hereto with respect to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements and understandings of the parties hereto. There are no unwritten oral agreements or understandings between the parties hereto relating to the subject matter hereof. This Backstop Commitment Letter may only be modified, amended, or supplemented by an agreement signed by the Debtors and the Requisite Commitment Parties; *provided* that: (a) the prior written consent of each Commitment Party adversely affected thereby shall be required for any amendment that would (i) modify such Commitment Party's Backstop Commitment Percentage, (ii) alter the pricing terms set forth in the Term Sheet and/or this Backstop Commitment Letter, or (iii) have an adverse and disproportionate effect on such Commitment Party; (b) each Commitment Party's prior written consent shall be required for any amendment that would increase its or the aggregate Backstop Commitment amount; and (c) each Commitment Party's prior written consent shall be required to amend the definition of "Requisite Commitment Parties" or to amend this Section 15.

11

Notwithstanding the foregoing, Exhibit A to the Term Sheet shall be revised as necessary without requiring a written instrument signed by the Debtors and the Requisite Commitment Parties to reflect changes in the composition of the Commitment Parties and Backstop Commitment Percentages as a result of transfers permitted in accordance with the terms and conditions of this Backstop Commitment Letter.

16. Counterparts.

This Backstop Commitment Letter may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to each other party (including via facsimile, portable document format (.pdf) or other electronic transmission), it being understood that each party need not sign the same counterpart.

17. No Fiduciary Duties.

Notwithstanding anything to the contrary herein, the entry into this Backstop Commitment Letter and the transactions contemplated hereby shall not create any fiduciary duties between and among the Commitment Parties or other duties or responsibilities to each other, the Debtors, or any of the Debtor's creditors or other stakeholders.  Nothing in this Backstop Commitment Letter shall require the Debtors, nor the Debtors' directors, managers, or officers, to take or refrain from taking any action (including terminating this Backstop Commitment Letter under Section 3), to the extent such person or persons determines, based on the advice of counsel, that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided* that this Section 17 shall not impede any party's right to terminate this Backstop Commitment Letter pursuant to Section 3.

18. Specific Performance.

Each of the Debtors and the Commitment Parties agree that irreparable damage would occur if any provision of the Term Sheet or this Backstop Commitment Letter were not performed in accordance with the terms thereof and hereof, and that each of the parties hereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Backstop Commitment Letter or to enforce specifically the performance of the terms and provisions hereof or in the Term Sheet, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated herein, no right or remedy described or provided in the Term Sheet or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under the Term Sheet or this Backstop Commitment Letter, at law or in equity.

19. Notice.

Notwithstanding anything to the contrary herein, provision to Vinson & Elkins LLP of any notice that may be due or required to any Commitment Party, as set forth herein, shall constitute notice to such Commitment Party.  Any notice required hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by

registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses (collectively, the "*Notice Parties*"):

>**WEIL, GOTSHAL & MANGES LLP**
>700 Louisiana Street, Suite 1700
>Houston, Texas 77002
>Facsimile:  (713) 224-9511
>Attn:   Alfredo R. Pérez
>           Clifford W. Carlson
>Email: alfredo.perez@weil.com
>           clifford.carlson@weil.com
>
>And
>
>767 Fifth Avenue
>New York, New York 10153
>Facsimile:  (212) 310-8007
>Attn:   Ray C. Schrock
>           Ronit J. Berkovich
>Email: ray.schrock@weil.com
>           ronit.berkovich@weil.com
>
>And
>
>**VINSON & ELKINS LLP**
>1114 Avenue of the Americas, 32nd Floor
>New York, New York 10036
>Facsimile:  (212) 237-0100
>Attn:   David Meyer
>           Lauren Kanzer
>Email:  dmeyer@velaw.com; lkanzer@velaw.com
>
>And
>
>845 Texas Avenue, Suite 4700
>Houston, Texas 77002
>Facsimile:  (713) 758-2346
>Attn:   Mark Kelly
>           Mike Telle
>           Sara Zoglman
>Email:  mkelly@velaw.com; mtelle@velaw.com; szoglman@velaw.com

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

[*Signature Pages to Follow*]

Case 22-90341   Document 1443-2   Filed in TXSB on 11/16/23   Page 15 of 17

[*Signature Pages to Follow*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**[COMMITMENT PARTY]**

**Backstop Commitment:** $_____

**By**: _____

**Name**: _____

**Title**: _____

**Date**: November ___, 2023

[*Signature Page to Backstop Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CORE SCIENTIFIC, INC.**

**By**: _____

**Name**: _____

**Title**: _____

**Date**:  November \_\_\_, 2023

[*Signature Page to Backstop Commitment Letter*]