UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CORE SCIENTIFIC, INC., *et al*, | ) | Case No. 22-90341 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**HARLIN DEAN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RELATED TO DEBTORS' OBJECTION TO PROOF OF CLAIM NOS. 364 and 383**

Harlin Dean ("**Dean**" or "**Movant**") hereby files this *Reply in Support of Motion for Summary Judgment Related to Debtors' Objection to Proof of Claim Nos. 364 and 383* [Dkt. 1246] (the "**Core Objection**") filed by Core Scientific Operating Company f/k/a Core Scientific Inc. and its debtor affiliates (collectively, "**Core**"), and respectfully states as follows:

### I.    PRELIMINARY STATEMENT

1.      This is a straightforward matter related to Core's breach of the Dean Employment Agreements. There is no genuine dispute as to any material fact and Dean is entitled to summary judgment as a matter of law. Core's Opposition to Claimant Harlin Dean's Motion for Summary Judgment (the "Opposition") is premised on conclusory allegations that are not competent summary judgment evidence. The Court should grant Dean's Motion in its entirety, overrule the Core Objection, and allow the Dean Proof of Claim Nos. 364 and 383.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions,VII, LLC (3198).

**HARLIN DEAN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**–                                                Page 1

          II.   **ARGUMENT AND AUTHORITIES**

**A. Discovery is not a procedural prerequisite to summary judgment and Core has not met its FRCP 56(d) burden.**

  2.  Discovery is not a procedural prerequisite to summary judgment. *Dominick v. Mayorkas*, 52 F.4th 992, 995 (5th Cir. 2022) ("Rule 56 does not require that any discovery take place before summary judgment can be granted…."); *see Smith v. State*, No. H-12-469, 2014 WL 670751, at *9 (S.D. Tex. Feb. 20, 2014) (granting summary judgment over nonmovant's claim that case was prejudiced by movant's failure to participate in discovery). That the parties have not taken discovery is not a basis to deny the Motion. This makes sense, and protects a party, particularly an individual like Dean, from having to bear the costs and burden of discovery where there is no genuine dispute as to any material fact and judgment is appropriate as a matter of law.

  3.  Core, however, mistakenly argues the Motion is premature under FRCP 56(d) and therefore the Motion should be denied or deferred. Rule 56(d)—title "When Facts are Unavailable to the Nonmovant"—is a remedy for when a party cannot adequately defend against a motion for summary judgment without taking discovery. *Dominick*, 52 F.4th at 995. Under FRCP 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for *specified reasons*, it cannot present facts essential to justify its opposition, the court may…defer considering the motion or deny it" among other remedies, including allowing time to obtain declarations or take discovery. Fed. R. Civ. P. 56(d) (emphasis added).

  4.  To secure relief under FRCP 56(d), the nonmovant "must show 'both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence.'" *Smith*, 2014 WL 670751, at *9 (quoting *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 719 (5th Cir. 1999). Courts deny requests for relief pursuant to FRCP 56(d) when the nonmovant fails to demonstrate that the requested discovery could reveal a genuine dispute of material fact, or when the nonmovant should have in

its possession the discovery it purportedly seeks. *See Mayo v. Hartford Life Ins.*, 220 F.Supp. 2d 714, 781-82 (S.D. Tex. 2002) (denying request for discovery where nonmovant failed to specify how additional discovery would reveal a genuine dispute of material fact), *aff'd* 354 F.3d 400 (5th Cir. 2004); *Bishop v. City of Galveston*, 595 F. App'x 372, 377-78 (5th Cir. 2014) (affirming district court's decision to grant summary judgment without allowing discovery on certain factual issue identified by nonmovant where evidence on that issue would have been in nonmovant's possession).

5.  As it relates to Dean's rights under the Employment Agreements, Core contends that it would "depose Mr. Dean…as well as obtain other necessary discovery from Mr. Dean and non-party witnesses as may be appropriate." [Dkt No. 1397 at ¶37]. The declaration of Core's counsel is vague. It contends Core needs to depose Dean and that unidentified "highly probative evidence" is within the "possession, custody, or control of Mr. Dean alone…." [Dkt No. 1400 at ¶7]. Core does not identify or describe any such evidence in Dean's possession alone or explain what testimony it would attempt to elicit from Dean. The reason for Core's omission is manifest; there is no other evidence needed because there is no genuine dispute of material fact and Core has in its possession all necessary evidence.

6.  Core "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts" and must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (per curiam) (quotation and citation omitted). The request to depose Dean may be denied if it is apparent that the requested discovery would not assist the non-movant in opposing summary judgment. *See Paul Kadair, Inc. v. Sony Corp. of Am.*, 694 F.2d 1017, 1029-30 (5th Cir.

1983) ("[A] [non-movant's] entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when the record shows that the requested discovery is not likely to produce the facts needed by [non-movant] to withstand a Rule 56(e) motion for summary judgment.").[2]

7. Core's request for relief under FRCP 56(d) is also belied by the fact its Opposition cites three declarations – two from DuChene and one from Levitt and attached documents, including emails, *in Core's possession*. Moreover, for the reasons detailed in the Motion and below, discovery is not required and Dean's Motion should be granted.

**B.   Dean is entitled to summary judgment as a matter of law for Core's breach of the Employment Agreements.**

8. A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach. *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502, n. 21 (Tex. 2018); *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016). It is undisputed the Employment Agreements are valid and Dean performed. The first and second elements of the breach-of-contract claim are satisfied. Core's Opposition instead challenges the third element (breach) and fourth element (damages).

    **(i)   Core breached the Employment Agreements by failing to process the automatic vesting of shares of Core Class A Common Stock on January 19, 2022.**

---

[2] Core cites *Converse v. City of Kemah*, 2021 WL 5811726, at *2 (S.D. Tex. Dec. 7, 2021) for the contention that the nonmovant always has the right to depose a movant who presents a sworn statement in connection with a motion for summary judgment. *Converse* is distinguishable. Family members of deceased sued the City and police officers after deceased committed suicide while in jail. Defendants filed summary judgment based on qualified immunity and included Defendants' sworn declarations. The immunity issue depended on Defendants' subjective knowledge and intent – information related to their subjective intent and knowledge of the City's policies were solely within the possession of the Defendants and therefore required the depositions. Here, the relevant information is in the possession of Core as demonstrated by the three declarations and its own documents, including emails, attached to the Opposition.

9. Dean's June 1 Award Agreement states:

> [U]pon the first date that the Company, or any successor entity or controlling affiliate thereof, becomes subject to the public company reporting requirements of the U.S. Securities and Exchange commission (or any similar authority of any foreign jurisdiction), total of 400,000 shares of Restricted Stock granted pursuant to this Award Agreement shall automatically become fully vested and be released from any repurchase or forfeiture rights (other than rights exercisable at Fair Market Value) for all of the Shares (or other consideration) at the time represented by such portion of this Award; provided, however, that if Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction. [Dkt. 1341-5; App 52]

10. Core's de-SPAC transaction with XPDI closed on January 19, 2022. [Dkt. 1397 at ¶20; Dkt. 1398 at ¶11]. XPDI was a public company on January 19, 2022, and XPDI became a controlling affiliate of Blockcap as a result of that transaction. [Dkt. 1341-1; App. 8, ¶19]. 400,000 shares of Blockcap granted pursuant to the June 1 Award Agreement ultimately converted into 324,767 shares of the stock of Core, the public entity. [Dkt. 1341-15; App 71].

11. Core asserts that the lock-up imposed by the bylaws of XPDI constituted a "contractual lock-up" which expired on March 10, 2022, thus preventing the vesting of Dean's shares on January 19, 2022. This assertion by Core is merely an attempt to re-interpret the clearly drafted Public Event Vesting Provision for the sole purpose of fabricating a post hoc excuse for its breach of the June 1 Award Agreement. The lock-up imposed by a bylaw of XPDI did not constitute a "contractual lock-up" as contemplated by Dean's June 1 Award Agreement [Dkt. 1341-1; App 8-9, ¶¶ 26-29] and, as a result, 324,767 shares of Core stock vested automatically upon the closing of the de-SPAC transaction on January 19, 2022.

12. Core did not rebut the evidence that it breached the June 1 Award Agreement by failing to process the automatic vesting of shares of Core Class A Common Stock on January 19, 2022. Instead, Core offered merely a conclusory and unsupported statement that "there remain

open issues of fact concerning whether Dean was subject to a lock-up that would prevent him from selling his shares or even prevented the vesting of his share on account of Blockcap's successor going public." [Dkt. 1397, pp. 19-20, ¶54]. This statement is not evidence and it does not contradict the undisputed facts related to the vesting of Dean's shares on January 19, 2022. Because Core failed to process the vesting of 324,767 shares on January 19, 2022, it breached the June 1 Award Agreement.

> **(ii) Core breached the Employment Agreement by failing to deliver severance to Dean following Core's wrongful termination of Dean without Cause**

13. The following facts are undisputed:

▶ Dean tendered his resignation on February 10, 2022, to be effective on and as of February 28, 2022 [Dkt. 1341-1; App 8, ¶21 and Dkt. 1341-21; App 77 and Dkt 1341-22; App 78];

▶ On February 14, 2022, while Dean was still an employee, Core terminated Dean's employment with immediate effect [Dkt. 1341-1; App 8 and Dkt. 1398, p. 4 of 6, ¶14];

▶ Core did not have a basis to terminate Dean for "Cause" under the Employment Agreement [Dkt. 1341-2; App 15, subpart (a)][3]; and

▶ if Dean is terminated without "Cause", Dean is entitled to the same severance under Section 8(h) of the agreement as would be payable to him upon his resignation for "Good Reason" [Dkt. 1341-2; App 15, subpart (b)and 17 subpart (h)].

14. Core attempts to obfuscate its wrongful termination of Dean without "Cause" and tries to avoid the consequences of its actions by re-characterizing Core's termination of Dean as a change to the effective date in the resignation letter. [Dkt. 1397 at ¶26]. Core has no legal right to change the effective date. In addition, Core asserts that it "rejected [Dean's] resignation for 'Good Reason'". [Dkt. 1397 at ¶29]. Core cannot reject Dean's resignation and then turn-around and accept the resignation with a unilaterally assigned earlier effective date. In sum, Core

---

[3] "Cause" is limited to two narrow circumstances neither of which occurred or are alleged to have occurred.

wrongfully terminated Dean's employment without "Cause" on February 14, 2022 and breached the Employment Agreements by failing to provide the severance due.

### (iii) Core breached the Employment Agreement by failing to deliver severance to Dean after he resigned for Good Reason.

15. Core attempts to present revisionist history to avoid the inescapable conclusion that Core acknowledged Dean's rights to resign for "Good Reason" following Core's acquisition of Blockcap in July 2021 and that Dean resigned for "Good Reason", including the material diminution of his duties or responsibilities.

16. Dean participated in a telephone call with DuChene prior to Core's acquisition of Blockcap to discuss Dean's role following the transaction. [Dkt. 1341-1; App. 4, ¶10]. In this conversation, DuChene told Dean that his current legal team was well-equipped to handle all legal matters for Core and that the acquisition of Blockcap only added mining machines and would not increase Core's legal workload. *Id*. DuChene also stated that if Dean chose to leave, Dean was free to do so and take all of his equity. *Id*. Dean specifically referenced his rights to resign for "Good Reason" and stated that he was relieved to hear that Core would honor the terms of his Employment Agreement. *Id*. Duchene ended the call by confirming he would fully support whatever decision Dean made. *Id*.

17. Dean, along with all of the other officers of Blockcap, were then asked to sign letters resigning from their officer positions in connection with Core's acquisition of Blockcap. [Dkt. 1341-1; App. 5, ¶11]. Dean, however, was only willing to sign the resignation letter and stay with Core after its acquisition of Blockcap if Core confirmed these two matters would not be construed to waive his rights to resign for "Good Reason". *Id*. Dean sent DuChene an email on July 24, 2022 raising these concerns, which stated that Dean was "concerned that resigning from my positions and hanging around a couple of months **may waive the rights I have today under my employment agreement to resign for good reason and accelerate my equity**." [Dkt. 1341-11;

**HARLIN DEAN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**–                                    Page 7

App. 62-63] (emphasis added). Dean then requested to revise the form resignation letter to address these issues. DuChene's response was unequivocal – "**Sure. Fine with that**. Mark it up however you want. **Again will support fully**." [Dkt. 1341-11; App. 62 and Dkt. 1398 at ¶7] (emphasis added).

18. Core's numerous unsupported assertions that "Good Reason" was never discussed or agreed to, as well as its feeble attempt to characterize DuChene's response as only agreeing to Dean's remaining employed with Core after the acquisition and making proposed revisions to the letter, fail. [Dkt. 1397, p. 5, ¶17]. These unsubstantiated assertions are insufficient in light of Dean's clear and express statement of his rights to resign for Good Reason in his email to DuChene and DuChene's express and unequivocal acceptance of Dean's email, including Dean's statement expressing his rights to resign for "Good Reason" and accelerate his equity. DuChene's final sentence states "**Again** will support fully" because this matter was previously discussed. [Dkt. 1341-11; App. 62 and Dkt. 1398 at ¶7] (emphasis added).

19. At a minimum, this email established Dean brought to Core's attention that he intended to resign for "Good Reason". [Dkt. 1341-11; App. 62]. At no point prior to Dean's resignation did DuChene or any other representative of Core object to Dean's express statement that he was entitled to resign for Good Reason. Core merely asserts that Core never agreed to Dean's edits and Dean never signed the resignation letter. [Dkt. 1397 at ¶18]. Core waived the requirement for all of the Blockcap officers to resign. [Dkt. 1341-1; App. 6 and Dkt. 1341-14; App 67-68]. This was a business decision by Core pertaining to all of the officers of Blockcap and was not related to Dean's revisions to the form resignation letter. The first time Dean was informed that Core disputed his right to resign for Good Reason was upon receipt of DuChene's email of February 17, 2022 - a post-hoc effort to avoid the consequences of Core's breaches of the Employment Agreements. [Dkt. 1398-2, p. 2 of 3].

20. The Employment Agreement expressly entitled Dean to resign for "Good Reason" if there was a "material diminution in [Mr. Dean's] duties or responsibilities." [Dkt. 1341-2; App. 16, subpart (i)]. Plainly there was a material diminution in Dean's duties and responsibilities as demonstrated by the evidence and common sense.

21. Dean identified specific duties and responsibilities he held as the Chief Legal Officer and only attorney of Blockcap prior to the Core Acquisition. [Dkt. 1341-1; App. 3, ¶6]. He had ultimate responsibility for all legal matters of Blockcap, a stand-alone company, including filings with the SEC; mergers and acquisitions; debt and equity financings; corporate governance, including preparing for and leading all board and shareholder meetings; maintenance of stock records and managing the relationship with Blockcap's transfer agent; all contracts; shareholder relations; employment matters; and all other legal and regulatory matters. [Dkt. 1341-1; App 3, ¶6]. Following Core's acquisition of Blockcap, Dean retained his title, but he had nowhere near the duties or responsibilities he held as an executive and the Chief Legal Officer of Blockcap prior to the acquisition. [Dkt. 1341-1; App 11, ¶¶37-38] Blockcap, as one of many subsidiaries of Core, had no securities filings, equity or debt financings, or mergers or acquisitions, and virtually no contracting matters other than contracts with Core, and DuChene, not Dean, was responsible for all of these matters for Core and its subsidiaries. *Id*. Dean had no involvement with stockholders or Core's transfer agent and never was asked to participate in any corporate governance matters. *Id*. Dean's only duties were working on a few limited contracting matters assigned by Duchene and Dean was not responsible for such matters as he was required to obtain Duchene's review and approval before obtaining Core's signature on such contracts. *Id*.

22. Core's conclusory statement that "Mr. Dean's duties and responsibilities were not diminished and he continued to serve the same functions as he did prior to the merger" [Dkt. 1397, p. 12 of 29, ¶19] is not competent summary judgment evidence. It is inconceivable that

Dean's demotion from the executive position of Chief Legal Officer at a stand-alone company, active in acquisitions and financings, and in the process of filing for its initial public offering, to being one of several staff attorneys serving only as the legal officer of one of many subsidiaries and reporting to the General Counsel of the parent company, would not be accompanied by a substantial diminution of rights and responsibilities.

23. Core's response is limited to two unsupported assertions: (a) "In his resignation letter, Mr. Dean claimed that he was resigning for 'Good Reason' though he did not provide any explanation or support for that assertion" [Dkt. 1397, p. 12 of 29, ¶21]; and (b) "Mr. Dean worked for Core for more than six months following its acquisition of Blockcap, despite the 'material and substantial diminution' in his duties he now alleges, without ever raising such issues to Core." [Dkt. 1397, p. 23 of 29, ¶49]. Neither of these statements are evidence that circumstances constituting "Good Reason" did not exist. Dean was entitled to resign for "Good Reason" due to the material diminution in his duties and responsibilities.

> **(iv)  Dean is entitled to summary judgment that Core breached the Employment Agreements to provide Dean: (1) 324,767 vested shares during his employment; (2) cash severance pay, and (3) the vested severance stock and stock option awards.**

24. Dean's damages are based upon three different components. The first is vested stock fully earned during his employment, and is completely unrelated to the issue of whether Dean resigned for Good Reason or was Terminated without Cause. The second is simply cash severance pay, and has nothing to do with any disputes regarding the applicable date for stock valuation. The third involves the stock and stock options which vested on termination of Dean's employment.

25. With respect to the date of valuation – Core is engaging in a disingenuous shell game. First, Core claims that a litany of causes would have delayed Dean from selling the stock, so therefore his date of valuation is incorrect. Second, Core fails to support these alleged causes

with competent and verifiable evidence. And most shockingly, Core fails to provide a specific proposed valuation date and price, and instead requests the Court to deny summary judgment to allow it to exhaust Dean through discovery while he attempts to pin Core down on an actual position. The admissible evidence establishes Dean is entitled to an allowed claim of $7,638,779.17.[4]

### January 19, 2022 - automatic vesting of 324,767 shares

26. Core's first breach was its failure to deliver the automatic vesting of 324,767 shares of Core Class A common stock as required by the Public Event Vesting Provision included in the June 1 Award Agreement, which Dean established would have been due on January 19, 2022 (the Public Event Date), and on such date would have been worth $3,117,763.20. [Dean's Motion at ¶4(d), 14-15, 19, 33-39, 49 and Dkt. 1341-18; App. 71]. Core does not dispute that Dean was owed these fully vested shares, that Core failed to deliver, that the Public Event Date was not January 19, 2022, or the valuation as of January 19, 2022.[5] Core also does not attempt to claim that this is a severance obligation that turns on Good Reason resignation. Rather, Core argues that a bylaw provision imposing a lock-up on Core shareholders (a "lock-up provision")[6] and other alleged delays would have prohibited Dean from selling the stock on January 19, 2022 [Dkt. 1397

---

[4] Paragraph 60 of the Opposition includes a statement that Dean's claim is subject to subordination under section 510(b). Even if this allegation were true, it does not change the calculation and allowance of Dean's claim at this juncture. Such reclassification can only occur in an adversary proceeding or plan pursuant to Federal Rule of Bankruptcy Procedure 7001(8).

[5] Core's Opposition appears to incorrectly summarize Dean's claimed number of Core options and that Dean uses a valuation date of February 14, 2022 for all shares. Core does not claim a different number of shares should be used in this case. Accordingly, this mistake is a Core oversight and not an actual pending dispute for summary judgment purposes.

[6] "[P]rovided, however, that if Grantee shall be subject to a contractual lock-up restriction at the time of such accelerated vesting which restriction prohibits the sale by Grantee of the portion of the Award so accelerated, the vesting of such 400,000 shares of Restricted Stock shall be delayed until the expiration of such lock-up restriction." [Dkt. No. 1341-5; App. 52, subpart 2(a)].

at ¶ 23, 29-31, 52-54, and 56-57). Dean is entitled to summary judgment not only on the existence of breach, but on valuation of damages because:

    a. Core did not include a copy of the alleged additional "contractual" agreement that would delay a January 19, 2022 vesting date, and any testimony on that document is hearsay and violates the best evidence rule;

    b. This alleged additional "contractual" agreement is only alleged to be a corporate bylaw, and not an actual contract to which Dean was a party; and

    c. The various other sweeping and unsupported claims of Core with respect to alleged delays in Opposition [Dkt. 1397 at ¶23, 29-31, 52-54, and 56-57] cannot vary the terms of the relevant employment documents, and even if they could, are not based upon competent summary judgment evidence. DuChene provides no basis to support that he has first-hand knowledge of the various events discussed therein, or that he has the expertise, experience, and basis to cast sweeping expert opinions on various matters such as Fidelity's stock platform, tax issues, various unspecified SEC regulations and required filings, and the contents of other Core documents not attached.

### Cash Severance

27.    It is undisputed that the severance provision included one-year's base salary, which was $200,000. [Dean's Motion, Dkt. 1340 at ¶4 and 19]. Core only disputes whether such severance was triggered by a Good Reason resignation. [Dkt. 1397 at ¶ 40-50). Because the summary judgment record establishes Good Reason, Dean is entitled to allowance of the cash severance portion of his claim of $200,000.

### Severance stock and stock options

28.    With respect to the various stock and stock option awards due under the severance provision, Core does not challenge Dean's claim interpretation of the subject documents or calculation of the total damage claim of $4,321,015.97 based upon Core's stock value as of February 14, 2022. Rather, Core claims that Dean is not entitled to summary judgment on this portion of his claim for the same reasons discussed above - the severance provision was not triggered by a Good Reason resignation, the stock was subject to a contractual lock-up

agreement, and various other delays would have precluded Dean from transferring the stock on February 14, 2022.

29. With respect to Core's obligations to ensure Dean received vested stock and exercisable stock options, the contract could not be more clear-cut on this issue:

> [A]t the date of termination, all Awards granted to Executive under the Plan for services in any capacity to the Company **shall immediately and automatically become fully vested, exercisable and payable and shall be released from any repurchase or forfeiture provisions with respect to all shares of the Company's common stock at the time represented by such Award.**

[Dkt. 1341-2; App. 17, subpart (h)] (emphasis added).

30. Even if Core had competent evidence of a contractual lock-up agreement, which it does not, or had competent evidence of the litany of the otherwise unsupported, inadmissible musings of DuChene, which it also does not, nothing in this paragraph relieves Core of its obligation to process the vesting of the stock and stock options essentially free and clear on the day of termination – February 14, 2022.[7]

31. In addition to the actual agreement, holding Core to a February 14, 2022 valuation date is consistent with the case law. In virtually any case concerning a breach of an agreement to buy or sell stock, the parties could litigate in perpetuity what might have happened or not happened after the breach – maybe the buyer would have sold immediately, maybe the buyer would have held for 6 months, or maybe 6 years. Maybe the buyer could have pledged the stock to obtain further financing and increased the profitability of a business venture, or maybe the buyer would have gambled it away. Maybe the breach allowed the seller to profit by

---

[7] One of Core's musing is that Dean's shares could not be distributed without his payment of taxes. This is a red herring and contrary to the undisputed evidence. Dean's Award Agreements allowed him to deliver back to Core a number of shares having a total value equal to the tax withholding obligation. [Dkt. 1341-3; App. 35 and Dkt. 1341-4; App 45 and Dkt. 1341-5; App 55]. Dean's resignation letter expressly elected to exercise this right by stating, "including tax withholding obligations on Severance Pay which I elect to satisfy by surrender of shares." [Dkt. 1341-22; App 78].

**HARLIN DEAN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**–   Page 13

improving its balance sheet to investors or lenders. The list is endless. Further, if the courts allowed damages to be a moving target, when the trial is held relative to the market could be the most important part of the case.

32. The Texas Supreme Court attempted to bring order to these cases by simply holding that "the proper measure of damages [is] the value of the stock on the date the stock option agreement was breached, minus the exercise price." *Miga v. Jensen*, 96 S.W.3d 207, 209 (Tex. 2002); *see also Hercules Offshore, Inc. v. Guthrie*, No. 01-10-00968-CV, 2013 WL 772939, at *6-7 (Tex. App.—Houston [1st Dist.] Feb. 28, 2013, pet. denied) (mem. op.). Incidentally, in *Miga,* the court reduced the award by declining to award plaintiff the additional value due to the appreciation of the stock post-breach. *Id.* at 216-17. If the market for Core stock had increased over time, Core would undoubtedly be asking this Court to simply enforce the documents as written with the requisite January 19, 2022 and February 14, 2022 valuation dates per *Miga*. Here, the Court has the benefit of Core's stock being publicly traded and should simply apply the undisputed price for the stock on the dates that Core was contractually obligated to provide the vested and unrestricted stock to Dean.

33. The two unpublished cases cited by Core do not support denying summary judgment in this case given the contracts at issue. First, the case of *Cottam v 6D Glob. Techs., Inc.*, 2022 WL 16908708 (2d Cir. Nov 14, 2022) is a three-page opinion involving a *pro-se* litigant. The facts are not discussed in-depth, but the court discusses that the company stock was illiquid, the stock to be issued under the subscription agreement could have further diluted the share price of a smaller company, and the plaintiff had *contractual* sales restrictions on his ability to sell stock. The court applied unspecified state law and suggested that these issues would reduce the damage award. In the event the court was applying Texas law, which it was not, it would not actually

support discounting Dean's damage award because Dean was entitled to vested unrestricted stock under the agreements at issue.

34. The second case of *Innovo Grp., Inc. v. Tedesco,* 1996 WL 580465, at *4 (Tex App.—Houston [1st Dist.] Oct. 10, 1996, writ denied) (not designated for publication)[8] is a Texas Court of Appeals decision that was issued before the Texas Supreme Court decision in *Miga*, and has not been cited by a single subsequent court. In this case, the court found legally sufficient evidence to support the jury's damage verdict that was, apparently, somewhere in the middle of various competing valuation evidence and arguments by both sides. The court did not cite a single case in support of its one-page damages analysis other than the standard of review that the, "court of appeals should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*. at *2. In addition, the restriction considered was an SEC rule which Core does not assert applies to Dean's shares and which, in fact, does not apply to Dean's shares.

35. The purported obstacles asserted by Core are neither contractual nor statutory and are in no way "restrictions" as contemplated by the *Cottam* and *Innovo* cases. Nor do the mere administrative or procedural matters asserted by Core override the applicability and holdings of *Miga and Hercules* cases establishing damages for breach of contract are determined by the fair market value of the asset on the date of the breach.

36. It is undisputed the shares of Core's stock had a fair market value, as quoted on the NASDAQ Stock Market, of $9.60 on January 19, 2022, and $9.89 on February 14, 2022. [Dkt. 1341-27; App 84-85]. Dean properly calculated the damages resulting from Core's breach under established precedent and the fair market value of his shares on the dates of Core's breaches is undisputed. The total sum of damages incurred by Dean as a result of Core's breaches of the Dean

---

[8] Because this case was not designated for publication, it has no precedential value. Tex. R. App. P. 47.7(b).

Employment Agreements is $7,638,779.17, before interest and attorneys' fees. [Dkt. 1340, at ¶56; Dkt. 1341-27; App 71-74].

### III. CONCLUSION

37. Core breached the Employment Agreements. Dean is entitled to the vested shares, cash severance, and severance stock and stock options as permitted by the Employment Agreements. Core engages in a disingenuous shell game related to the date of valuation of the stock premised on unsupported, inaccurate, and irrelevant delay and avoidance tactics. Core fails to provide a specific proposed valuation date and price, and instead requests the Court to deny summary judgment to allow it to exhaust Dean through discovery while he attempts to pin Core down on an actual position. The admissible evidence establishes as a matter of fact and law that Dean is entitled to an allowed claim of $7,638,779.17.

WHEREFORE, Harlin Dean respectfully requests the Court grant his Motion for Summary Judgment in its entirety and enter an order, substantially similar to the proposed Order submitted with the Motion overruling the Core Objection, granting Dean summary judgment as a matter of law with respect to his claims for Core's breaches of the Employment Agreements, allowing the Dean Proof of Claim Nos. 364 and 383 in an amount no less than $7,638,779.17, and granting Dean such other relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Hudson M. Jobe*
HUDSON M. JOBE
State Bar No. 24041189
GREGORY M. SUDBURY
State Bar No. 24033367
**QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.**
2001 Bryan St., Suite 1800
Dallas, TX 75201
(214) 871-2100
(214) 871-2111 (FAX)
hjobe@qslwm.com
gsudbury@qslwm.com

**ATTORNEYS FOR HARLIN DEAN**

**CERTIFICATE OF SERVICE**

On November 17, 2023 I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another authorized manner.

*/s/ Hudson M. Jobe*
Hudson M. Jobe