IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (CML) |
| | § | |
| Debtors[1]. | § | (Jointly Administered) |
| ------------------------------------------- | § | |
| | § | Adv. Pro. No. 23-_____ |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **SPHERE 3D CORP. and GRYPHON DIGITAL MINING, INC.,** | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |
| ------------------------------------------- | | |


**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF
AGAINST SPHERE 3D CORP. AND GRYPHON DIGITAL MINING, INC.
AND IN SUPPORT OF OBJECTION TO PROOFS OF CLAIM NOS. 358 AND 359**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**") and its Debtor affiliates (collectively, the "**Debtors**")[2] in the above-captioned chapter 11 cases and as Plaintiffs in the above-captioned adversary proceeding, hereby file this complaint (the "**Complaint**") against Sphere 3D Corp. ("**Sphere**") and Gryphon Digital Mining Inc. ("**Gryphon**") seeking damages and declaratory relief.  The Debtors additionally file this Complaint in support of the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* (Docket No. 869) (the "**Debtors' Objection**") and seek a judgment disallowing proofs of claim nos. 358 and 359 filed by Sphere (the "**Sphere POCs**").  In support thereof, the Debtors allege the following upon information and belief.

## NATURE OF THE ACTION

1.     This is a dispute grounded in bad-faith breach of contract, where defendants Sphere and Gryphon used Gryphon's large-volume hosting agreements with Core to bolster the legitimacy of their pending merger and induce shareholder support and investments, all at Core's expense. But the merger never closed and the agreement with Core was breached as Sphere—who admits that it was responsible for providing Gryphon with the 70,000 mining machines Gryphon had contracted to host with Core—failed to deliver anywhere near the contracted number of machines for reasons including lack of sufficient financing.

2.     While it is undisputed that Sphere is not a party to the hosting agreements at issue, Sphere claims that it has rights and obligations under those agreements through a sub-licensing agreement that it executed with Gryphon *after* Gryphon inked the hosting agreements with Core. Core is not a party to this sub-licensing agreement, however, and was not involved in its negotiation or otherwise aware of its terms.  Significantly, nothing in the sub-licensing agreement

---

[2] Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022.

contains the assignment that Sphere describes.  Moreover, to the extent Gryphon was going to assign or sub-license any rights to Sphere, the hosting agreements make clear that any such assignment or sub-license was subject to Sphere satisfying Core's requirements *prior to* any such assignment or sub-license, which Sphere never did.  Sphere also claims that Gryphon was acting as Sphere's manager under the hosting agreements—and that pursuant to this relationship Sphere funded the $35 million in prepayment deposits that Gryphon made under the hosting agreements— but nothing in the hosting agreements even hints at this purported arrangement or suggests that Sphere has any rights under the hosting agreements.  And whatever business relationship Gryphon and Sphere may have negotiated among themselves has no bearing on the Debtors' obligations under the hosting agreements.

3.      The Debtors have always disputed that Sphere has any rights under the hosting agreements, but if the Court rules that Sphere has rights (and obligations) thereunder, then Sphere is directly liable for failing to deliver the miners as required under the MSA and Order #2 (as defined below).  If the Court rules that Gryphon alone has rights under these agreements, then Gryphon is responsible for failing to deliver the miners.  Finally, if Gryphon and Sphere share rights and obligations under the MSA and Order #2, then both parties are to blame for the breach and jointly responsible for the Debtors' damages.  Under any of these scenarios, the Debtors suffered millions of dollars in damages as a result of Sphere's and/or Gryphon's breach of the MSA and Order #2 and are entitled to recover those sums from Sphere and/or Gryphon.

4.      Regardless of whether it is Sphere, Gryphon, or a combination of the two who have rights, obligations, and liability to the Debtors under the MSA and Order #2, neither Sphere nor Gryphon could deliver the 70,000 miners contracted for delivery, including because of financing constraints and an inability to secure the volume and type of miners the contract required.  Gryphon

and/or Sphere later purportedly intended to fulfill the obligations owed to Core by using machines from a company named "NuMiner."  But those miners not only were not a permitted substitute under the MSA and Order #2, they did not even exist: they were a fiction.

5.      When Sphere and Gryphon learned that the NuMiner machines were fake and part of an apparent scam, they did not disclose this to Core, or anyone else, likely concerned that such disclosure would bring unwanted scrutiny, reduce Sphere's stock price, and torpedo their planned merger.  Although Sphere and Gryphon knew that they could not perform under Order #2, they strung Core along by promising delayed deliveries, all to maintain the appearance of a hosting agreement with Core.  This bad-faith tactic only increased the Debtors' damages as Core continued preparing to host miners that Sphere and Gryphon knew, or at least should have known, they could not deliver.

6.      As soon as the anticipated merger between Sphere and Gryphon failed in April 2022, Sphere schemed to cut Gryphon out of the arrangement and tried to negotiate a separate hosting contract directly with Core in hopes of gaining control over the now forfeited prepayment deposit.  During these negotiations, Patricia Trompeter, Sphere's CEO, admitted to Russell Cann, Core's Executive Vice President of Client Services, that Gryphon had breached Order #2 and acknowledged that, as a public company, Sphere could be sued if its shareholders learned that there was no contract requiring Core to host miners for Sphere.

7.      It is with respect to those deposits, among other things, that Sphere filed its proofs of claim against the Debtors.  These deposits are not refundable, however, and in any event cover only a portion of the Debtors' damages, which include over $60 million that Core spent on constructing additional data-center facilities to create sufficient space to host the 70,000 machines that Gryphon was to deliver; approximately $16 million in remaining amounts due and owing

under Order #2; and over $40 million in lost profits.  In short, not only is Sphere not entitled to any recovery on the Sphere POCs, but Sphere and/or Gryphon owe the Debtors damages of well over $100 million.

8.      While the Debtors' Objection addressed the assertions made in the Sphere POCs that are the subject of a pending contested matter associated therewith (the "**Sphere Contested Matter**"),  this adversary proceeding is necessary to allow the Debtors to affirmatively recover the damages they suffered from Gryphon's and/or Sphere's breach of the MSA and Order #2, and to address all of the issues relevant to this dispute in one consolidated proceeding, thereby subsuming the Sphere Contested Matter into this proceeding.

## PARTIES

9.      Plaintiff Core Scientific, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 210 Barton Springs Road, Suite 300, Austin, Texas 78704 and a Debtor in these Chapter 11 Cases.

10.      Defendant Sphere 3D Corp. is a corporation organized under the laws of Ontario, Canada, with its principal place of business at 895 Don Mills Road Bldg. 2 Suite 900 Toronto, ON M3C 1W3.  Sphere is registered to do business in Texas and California.

11.      Defendant Gryphon Digital Mining, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 5953 Mabel Road, Unit 138, Las Vegas, NV 89110.

## JURISDICTION AND VENUE

12.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 7001 and 7003.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  To the extent necessary, pursuant to Rule 7008 of the Bankruptcy Rules and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District

of Texas (the "**Bankruptcy Local Rules**"), the Debtors consent to the entry of final orders or judgment by this Court in connection with this Adversary Proceeding.

13.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY

14.     On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     On April 13, 2023, Sphere filed the Sphere POCs: identical claims for $39,541,996.30 plus certain unliquidated amounts against Core Scientific, Inc. and Core Scientific Operating Company.  *See* Sphere POCs.  Specifically, Sphere claims that Core failed to perform under the MSA and Order #2 and asserts claims for (1) $34,383,713 in hosting deposits paid pursuant to Order #2, (2) $5,000,724.06 in alternative hosting costs, (3) $157,559.24 in storage fees, and (4) an unliquidated amount for the value of any Bitcoin that Core purportedly mined and misappropriated by allegedly installing Sphere's miners as its own.  Sphere POCs at 4.

16.     On May 9, 2023, Core objected to the Sphere POCs.  *See* Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp. (Docket No. 869).  Sphere filed a response on July 10, 2023.  *See* Sphere 3D Corp.'s Response to Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp. (Docket No. 1045).

17.     On June 9, 2023, the Debtors moved for summary judgment with respect to the Sphere POCs, arguing, among other things, that (1) the Sphere POCs are foreclosed because Sphere does not have any rights under the Gryphon Hosting Agreements, (2) in any event, the MSA limits Core's total liability to Sphere to one month's fee payable to Core pursuant to the applicable order (MSA § 5.d), and (3) the MSA also prevents Sphere (but not Core) from

recovering certain types of damages, including consequential or indirect damages (MSA § 5.c.).
*See* Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359
Filed by Sphere 3D Corp. (Docket No. 959).  Sphere objected and the Debtors filed a reply.  *See*
Sphere 3D Corp.'s Objection to Debtors' Motion for Summary Judgment with Respect to Proof of
Claim Nos. 358 and 359 Filed by Sphere 3D Corp. (Docket No. 1039); Reply in Further Support
of Debtors Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed
by Sphere 3D Corp.  (Docket No. 1094).  A hearing on the Debtors' motion for summary judgment
was held on August 7, 2023.  The Court denied the  motion in an order entered on August 8, 2023.

## FACTUAL ALLEGATIONS

### A.  *The Gryphon Hosting Agreements*

18.    Core is one of the largest blockchain infrastructure companies in North America
with data-center facilities in Texas, Georgia, Kentucky, North Carolina, and North Dakota.  Core
"self-mines" digital assets for its own account and hosts miners for third-party customers pursuant
to hosting agreements.

19.    In the summer of 2021, Core engaged in negotiations with Gryphon to enter into a
large-volume hosting agreement based on Gryphon's representations that it was seeking to host
tens of thousands of miners.  Gryphon also represented that it had contracts with a company named
BitFuFu for the miners that it would host with Core under the contemplated agreement.  Core was
obviously interested, as a hosting agreement of this scale promised to be lucrative, but it would
require that Core invest tens of millions of dollars in constructing data-center facilities to expand
its hosting capacity.  Sphere did not participate in these negotiations between Gryphon and Core.

20.    In reliance on Gryphon's representations, Core entered into three agreements with
Gryphon: the MSA, Order #1, and Order #2.  First, effective as of September 12, 2021, Core and
Gryphon entered into a Master Services Agreement (the "**MSA**") through which Core would host

for Gryphon digital-asset mining machines.  A true and correct copy of the MSA is attached hereto as **Exhibit 1**.  Sphere is not a party to the MSA.  The MSA does not contain any references to Sphere or to Gryphon acting as a manager for Sphere and defines "the Client" as Gryphon.  The MSA further makes clear that "there are no third-party beneficiaries."

21.     Pursuant to the MSA, Gryphon and Core entered into two separate orders that the MSA would govern.  The first order was Master Service Agreement Order #1 ("**Order #1**"), entered into on or about September 12, 2021.  Sphere is not a party to Order #1.  A true and correct copy of Order #1 is attached to the MSA.  Order #1 was effectively a test order designed to ensure that the configuration at Core's data-center facilities was compatible with the miners and that Gryphon was comfortable moving forward with a large-volume hosting agreement with Core.  Pursuant to Order #1, Gryphon delivered and Core deployed 100 S19j miners in early October 2021.  Core is currently continuing to host these 100 miners for Gryphon as an accommodation, along with several hundred others discussed below, but intends to discontinue that accommodation and have Gryphon retrieve these miners.

22.     The second order was Master Service Agreement Order #2 ("**Order #2**," and together with the MSA and Order #1 the "**Gryphon Hosting Agreements**"), signed by Gryphon and Core on October 5, 2021.  A true and correct copy of Order #2 is attached hereto as **Exhibit 2**.  Sphere is not a party to Order #2 either.  Pursuant to Order #2, Core was to host 70,000 S19 miners or their equivalent for Gryphon.  The MSA and Order #2 make clear that Gryphon was obligated to deliver 70,000 miners pursuant to the following delivery schedule set forth in Order

#2.

| Client Equipment hosted**: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |

*See* Ex. 2, Order #2 at 1.

23.     While Order #2 required that *Gryphon* deliver miners according to the above schedule, the Gryphon Hosting Agreements do not require that *Core* deploy machines on or before a certain date.  This is clear as the MSA includes a warranty disclaimer that "ALL [CORE] FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN . . . 'AS AVAILABLE' BASIS," Ex. 1, MSA § 5.b and defines "services" to include hosting services, Ex. 1, MSA § 1.a.

24.     Order #2 further required that Gryphon make a total of approximately $51 million in prepayment deposits to Core on a set schedule and prior to installation of the miners.  Ex. 2, Order #2 at 1–2.  The MSA provides that, in the event of non-performance, Core may take certain actions, including "declar[ing] all amounts due under the applicable Order through the balance of the Term to be immediately due and payable."  Ex. 1, MSA § 4.d.  In total, according to Core's records, Gryphon was invoiced for and made payments to Core totaling approximately $35 million, approximately $16 million short of the total prepayments due under Order #2.  Core's banking records reflect that for each of these payments, the wire transfers came from Gryphon, not Sphere.

9

Sphere claims that it funded these $35 million in prepayment deposits by providing the funds to Gryphon, but whether Sphere was the source of those non-refundable prepayment deposits is irrelevant because whatever Sphere and Gryphon may have agreed to among themselves is not binding on Core and certainly does not amend the terms of the MSA and Order #2.

25.     Pursuant to the MSA, Gryphon can "dispute any invoice or any part therefor (a "**Disputed Amount**") by submitting written notice of such a dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, *failing which the Client waives all rights to dispute such Disputed Amount and to file any claim*." Ex. 1, MSA§ 3.b (emphasis added). Order #2 states the same, but permits Gryphon to raise disputes "within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, *failing which Client waives all rights to dispute such Disputed Amount and to file any claim*." Ex. 2, Order #2 at 5 (emphasis added). Neither Gryphon (nor Sphere) disputed any invoice relating to these prepayment deposits.

26.     One of the purposes of these prepayment deposits is to ensure performance by Core's customer (here Gryphon) under Order #2, including because of the enormous undertaking and investment Core had to make to prepare data-center facilities to host the 70,000 miners that Gryphon was to deliver pursuant to Order #2. The prepayment deposits also served as a form of down payment for the services Core was to provide. In short, Gryphon signed a contract with Core to deliver and have Core host 70,000 miners—a significant amount—and Core needed some assurance of performance. These prepayment deposits are not refundable pursuant to the clear terms of the MSA and Order #2.

27.     Having committed to a lucrative large-volume hosting agreement with Gryphon for 70,000 miners, Core invested in building data-center facilities in Texas and Oklahoma, expecting

10

to generate hundreds of millions of dollars in revenue on Order #2 alone.  Specifically, Core started construction on four data-center facilities—Denton, Cedarvale, Cottonwood, and Muskogee—and had the capability and intention to continue building out additional data-center facilities as needed to meet hosting demands.  While Core was also expanding capacity to host miners for other customers and for Core's own self-mining, Core's reliance on the large-volume hosting commitment set forth in Order #2, including the expectation that Gryphon would pay approximately $51 million in prepayment deposits, informed the scope and extent of Core's investment and capacity expansion.  Core simply would not have spent as much on construction absent Gryphon's commitments under Order #2.  And when Gryphon failed to deliver as required by Order #2, Core sustained damages not only in the sums it spent constructing these facilities, but also in the profits it would have earned but for the breach of Order #2.

28.     Finally, the MSA contains a provision explicitly prohibiting the assignment of the Gryphon Hosting Agreements without Core's prior written consent.  Ex. 1, MSA §8.d.  Core and Gryphon later agreed in Order #2 to amend that provision to allow Gryphon to assign its rights under Order #2 to Sphere, provided that Sphere *satisfied Core's requirements prior to assignment*. Ex. 2, Order #2 at 4.  In negotiating this provision, Core expressly added this additional language to ensure that any assignment, delegation, sub-license, sub-lease or transfer of any rights to Sphere was conditioned on Sphere satisfying Core's requirements.  These requirements were as follows: creditworthiness; sources of funds; financial information; proof of ownership of miners to be delivered; reconfirmation of delivery schedule and machine type; Foreign Corrupt Practices Act considerations; Know Your Customer considerations (e.g. business with Chinese entities/Chinese government); form of assignment (e.g. how and which rights and obligations were to be transferred, allocated or retained); whether any such assignment would implicate securities laws

11

or constitute an investment contract; and whether any assignment would impact Core's own rights and obligations under the MSA, Order #1, and Order #2.

29.     Sphere never satisfied any of these requirements, which in addition to being requirements under Order #2, are fundamental for several sound business reasons, including that Core must know who it is doing business with and ensure that any counterparty is in compliance with the terms of the MSA and Order #2, including the warranties, representations, and covenants contained therein.  For example, pursuant to the MSA, Core is contractually entitled to certain representations and warranties, including that its hosting customer "owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by the Company [Core]."  Ex. 1, MSA § 5.a.  Absent such protections, Core would have no assurance that the assigned party could actually perform under the agreements and is otherwise an entity that meets Core's standards.  Because Sphere never satisfied these requirements, any purported assignment, sub-license or sub-delegation to Sphere is invalid.

**B.    *The Gryphon/Sphere Agreements***

30.     On June 3, 2021, Gryphon and Sphere entered into a merger agreement (the "**Merger Agreement**").  Pursuant to the Merger Agreement, Gryphon was to merge with a Sphere subsidiary created for the merger, with Gryphon to emerge as the "Surviving Corporation" and ostensibly the largest Bitcoin mining company in the world.  Core was not a party to the Merger Agreement.  Ultimately, Sphere and Gryphon did not merge.  On April 4, 2022, Sphere issued a

press release announcing the failed merger and stating that Sphere and Gryphon mutually agreed to terminate the Merger Agreement.

31.     On October 5, 2021—months before the failed merger—Gryphon entered into a Sub-Licensing and Delegation Agreement with Sphere in connection with the contemplated merger between the two companies (the "**Sub-Licensing Agreement**").  Sphere claims that Gryphon assigned its contractual rights under the MSA and Order #2 to Sphere pursuant to this agreement.  Sphere POCs ¶ 7.  But, the Sub-Licensing Agreement cannot provide a basis for Sphere to have any rights under the Gryphon Hosting Agreements.

32.     First, and fatal to Sphere's claim, Sphere never satisfied Core's requirements that were an express precondition to any purported assignment of rights by Gryphon to Sphere.  In short, whatever Gryphon and Sphere may have contemplated among themselves, cannot change the fact that before any assignment, sublicense or delegation of rights could take place, Sphere needed to satisfy Core's requirements in advance.  Sphere never did.

33.     Second, the Sub-License Agreement contains only one provision that deals with the assignment of all rights under Order #2: a "Contingent Assignment" provision providing that "upon the consummation of the Merger . . . all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation (as defined in the Merger Agreement), without any further action required by either such party."  But this "Contingent Assignment" provision does not actually assign anything to Sphere.  Indeed, paragraph 2 contemplates an assignment of rights from Gryphon to the *Surviving Corporation*

(defined in the Merger Agreement as Gryphon)—not Sphere.  Further, and even more dispositive, paragraph 2 is contingent "upon consummation of the Merger," which never happened.

34.     Third, the Sub-License Agreement also contains a "Sub-License and Delegation" provision through which Gryphon "(i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2."  This provision does not support Sphere's claim either, as it merely provides that Gryphon sub-licensed to Sphere its rights to access and use Core's facility—not all of its rights under the Gryphon Hosting Agreements—and delegated to Sphere the obligation to make payments to Core.  Nothing in this "Sub-License and Delegation" provision even purports to effectuate a complete assignment of Gryphon's rights under the MSA and Order #2, as Sphere claims.  And, the fact that Gryphon and Sphere agreed *among themselves* that Sphere would fund the required prepayment deposits owed by Gryphon does not change the fact that as between Core and Gryphon, Core looked to Gryphon for payment.

**C.  *Gryphon/Sphere Breach of the MSA and Order #2***

35.     Treating its contract with Core as only a polite suggestion rather than a binding agreement, Gryphon did not deliver its first units under Order #2 until February 8, 2022, missing the first four months of deliveries required under the schedule set forth in Order #2.  Though the MSA expressly obligated Gryphon to deliver machines on or before the "applicable scheduled delivery date," Gryphon missed its October, November, December, and January delivery dates under Order #2.  In this way, Gryphon breached Order #2 and triggered Core's contractual right to exercise remedies such as suspending the provision of the services, declaring all amounts due under Order #2 (including all prepayment deposits) to be immediately due and payable, directing

proceeds from any miners to the Company's own account until all amounts due have been recovered, and terminating the MSA, Order #1, and Order #2.  Ex. 1, MSA § 4.d.

36.    When Gryphon did eventually send 297 miners in early February, they were not marked as Gryphon miners and were delivered to Core in a shipment from the manufacturer that also contained Core's own mining machines.  Gryphon did not notify Core about the delivery until sometime thereafter.  Once Gryphon notified Core about the shipment of its 297 miners, it was initially believed that some of the Gryphon machines had been mistakenly deployed as Core's self-miners.  After investigating further, however, Core determined that the Gryphon miners had not in fact been deployed but were still being stored at Core's hub warehouse in Marble, North Carolina, mixed with Core's other machines.  This was all because of a shipping error from the manufacturer from whom both Gryphon and Core purchased their mining machines.  After discovering the error, Core promptly developed a solution to designate its own already-deployed machines as Gryphon's. In this way, rather than waiting the weeks it would have taken to get Gryphon's machines out of the hub and deployed, these 297 "swapped" machines were immediately deemed to be Gryphon's and any Bitcoin mined from those machines going forward was directed to Gryphon.   Core communicated this resolution to Gryphon, who voiced no objection.

37.    Thereafter, on February 28, 2022, Gryphon sent Core 95 more miners and then another 108 on March 7, 2022.   Under the schedule in Order #2, by March 15, 2022, Gryphon was supposed to have delivered to Core a total of 3,000 miners (in addition to the 100 miners under Order #1) but in fact had delivered a total of only about 600 miners by that date.

38.    Additionally, although not formally announced until April, it became clear in early February 2022 that the Gryphon/Sphere merger was not going to close, and that Gryphon could not fulfill its contractual obligation to deliver the 70,000 miners agreed to in Order #2.

39.     On February 11, 2022, Gryphon sent Core an email in which Gryphon stated that it would not be able to meet the quantity and type of units it had agreed to and that it was expecting delivery of miners from another manufacturer, NuMiner, in connection with a contract Sphere apparently entered into in early February that Gryphon presumably would have access to after the merger.  Order #2, however, was very specific that the miners Gryphon was obligated to provide had to be S19 miners (manufactured by Bitmain) or their equivalent.  Not only was there nothing confirming that these new miners from NuMiner were S19 equivalents, even assuming that the miners from NuMiner were equivalents and could be configured for use at Core—which itself would be a tall order given that the racking, switch gear and other infrastructure items would need to be reconfigured—it was not realistic to expect that any miners from NuMiner would be forthcoming.  Indeed, Gryphon and Sphere suspected (but hid that suspicion from Core) that the NuMiner machines were in fact a fraud and would never be delivered.

40.     As it turned out, there were no miners from NuMiner, and Sphere's agreement with NuMiner for the purchase of 1.7 billion dollars' worth of miners was never going to result in the delivery of new miners, even if Sphere had the financing available to purchase these miners, which it did not.  Gryphon and Sphere kept this quiet however, using the promise of 60,000 NuMiner machines to inflate their value prior to the anticipated merger between the two companies.  Worse, Gryphon and Sphere never informed Core of this fact, likely out of fear of being in obvious breach of the Gryphon Hosting Agreements and the negative impact such information would have on their proposed merger.  No miners ever materialized from the NuMiner agreement, and ultimately, neither Sphere nor Gryphon ever had any such machines to provide Core.

41.     While it was already clear by the end of February 2022 that Gryphon had breached the Gryphon Hosting Agreements, Gryphon admitted to Core that the agreed upon deliveries

would not be forthcoming and, in an email dated February 28, 2022, Gryphon presented Core with a new delivery schedule that not only purported to reduce the total number of miners from 70,000 to 60,800 but also pushed out delivery of the majority of miners to later months.  For example, although the schedule in Order #2 had Gryphon delivering a total of 15,500 miners to Core by May 15, 2022, the revised proposed schedule reduced that number to 3,800.  As a result, the cumulative assumed power consumption of Gryphon's miners for 2022 would decrease by about 30 million watts as compared to the schedule in Order #2, significantly reducing the fees owed to Core and Core's profit.  This unilateral reschedule was not permitted by the contract, and in any event, Gryphon had already long since breached Order #2 by failing to deliver the miners as scheduled. Core did not agree to this proposed modification and instead offered to negotiate a new agreement with Gryphon, which would have had a higher hosting rate given the significantly lower volume of machines that Gryphon was now seeking to deliver and the increased market rate for hosting services.

42.     Given that Gryphon was not delivering miners to Core in accordance with Order #2 and made clear to Core in February that it could not meet its obligations, Core otherwise utilized the capacity it had previously set aside for Gryphon but still lost revenue because Core otherwise could have deployed both Gryphon's miners *and* the machines that Core deployed instead. Subsequently, in April 2022, Gryphon delivered 597 miners to Core and asked if Core could deploy them immediately.  Core notified Gryphon that it could not deploy the miners immediately but could do so in a few weeks' time, having already made other arrangements given Gryphon's lack of prior deliveries.  Gryphon did not want to wait and asked Core to send the units back.  Core obliged, but 39 units that were already deployed remained and are part of the 639 Gryphon miners that Core hosted.  Gryphon understood that Core was under no contractual obligation to deploy

17

these miners, and further understood that Core was willing to host these few hundred miners as an accommodation.

43.    Indeed, even though Gryphon had breached Order #2, Core tried to work with Gryphon—and later, Sphere—to develop a solution that could work for all parties.  Notably, during these negotiations, Ms. Trompeter admitted to Mr. Cann that Gryphon had breached Order #2.  Ms. Trompeter also acknowledged that she was in a bind that could result in a shareholder lawsuit against Sphere if it came to light that Sphere had funded $35 million in prepayment deposits on a contract that Sphere had no rights under.

44.    To foster positive business relationships, Core was willing to work with both parties to develop a go-forward plan whereby Core would deploy their respective miners and apply the prepayment deposit made under Order #2, which had long since been forfeited based on Gryphon's breach of the MSA and Order #2.  That proved impossible.  The main issue that hampered the negotiations was Sphere's insistence on a deal with the same terms as the now breached Order #2, including the lower-than-market hosting rate that was outdated and quoted based on the expectation of the large-volume hosting of 70,000 miners that never materialized.  As for Gryphon, it continued to cling to the notion that miner deliveries were just around the corner, but because Gryphon was already in breach of Order #2, it too would require a new MSA and/or order if it wanted to host additional miners with Core.  In the end, the parties could not reach a deal and neither Gryphon nor Sphere entered into new hosting agreements with Core.

45.    Although it had no contractual obligation to do so, Core continued hosting the 100 miners that Gryphon has delivered under Order #1 and the 539 miners that Gryphon had delivered under Order #2, applying the credit from the previously forfeited $35 million contractual prepayment to the hosting of that small volume of machines.  At this stage of these chapter 11

proceedings, with the Debtors on the verge of a confirmation hearing and emerging from chapter 11, Core has decided that it no longer makes sense to continue extending this accommodation to Gryphon. Indeed, these miners have no meaningful benefit to the Debtors and are not part of the Debtors' post-confirmation business plans. Accordingly, the Debtors will be notifying Gryphon that Core will no longer continue to host these miners and will coordinate with Gryphon to schedule their pickup.

### D. *Debtor's Damages Caused by Breach*

46.     Relying on the Gryphon Hosting Agreements and the expected hosting of 70,000 miners under Order #2, Core began constructing data-center facilities in Texas and Oklahoma to accommodate the capacity needed to fulfill its contracts. In connection with the construction and preparation of the Texas and Oklahoma facilities (Denton, Cedarvale, Cottonwood, and Muskogee), Core incurred construction costs totaling at least $401.8 million. Because the 70,000 miners set forth under Order #2 encompass approximately 210 megawatts—which is 15.6 percent of the approximately 1347 total megawatts that the Debtors were constructing and otherwise preparing these data-center facilities to accommodate for Gryphon and other customers—the construction costs attributable to Order #2 would be 15.6 percent of the Debtors' total $401.8 million spent. This results in approximately $62.7 million in total construction costs incurred in connection with Order #2, and represents a component of Core's direct damages.

47.     In addition, Gryphon stopped making the remaining contractual prepayment deposits due under Order #2. Pursuant to the MSA, in the event of breach, Core may "declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable." Ex. 1, MSA § 4.d(iii). Under this provision, Core is entitled to retain the already-

paid contractual prepayment deposits and Sphere and/or Gryphon must pay the remaining $16 million due and owing under Order #2.

48.     Additionally, because of Gryphon's failure to deliver the required miners under Order #2, Core also lost approximately $470 million in revenue and approximately $43.2 million in profits that Core would have made under Order #2, but for the breach.

**E.  _Proofs of Claim and the Debtors' Objection_**

49.     Sphere filed the Sphere POCs, claiming that Core breached the MSA and Order #2 by allegedly (1) failing to abide by the "deployment schedule" set forth in Order #2, (2) refusing to honor the contractual hosting rate agreed in Order #2, and (3) installing Sphere's miners for Core's own benefit and using them to mine Bitcoin for Core's own account.  Sphere asserts claims for (1) $34,383,713 in hosting deposits paid pursuant to Order #2, (2) $5,000,724.06 in alternative hosting costs, (3) $157,559.24 in storage fees, and (4) an unliquidated amount for the value of any Bitcoin that Core purportedly mined and misappropriated by allegedly installing Sphere's miners as its own.  _See_ Sphere POCs at 4.  Sphere goes on to state that the Sphere POCs are filed "in an unliquidated amount for [] any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and reliance damages."  Sphere POCs ¶¶ 14–16.  For the reasons stated in this Complaint—which were also reflected in the Debtors' Objection—the claims asserted in the Sphere POCs should be disallowed.

50.     **_First_**, Sphere has no rights under the Gryphon Hosting Agreements and thus no contractual relationship with the Debtors and no standing to assert claims against Core under the MSA and Order #2.  Sphere was not a party to the Gryphon Hosting Agreements.  Contrary to Sphere's claim that Gryphon assigned its rights under the MSA and Order #2 to Sphere pursuant to the Sub-License Agreement, no provision in that agreement effectuates an assignment.  And in

any event, for any assignment to be valid, Sphere would have had to satisfy Core's "requirements" that served as a contractual precondition to any assignment of Gryphon's rights to Sphere, which it failed to do  Additionally, the $35 million prepayment deposit that Sphere seeks to recover is non-refundable pursuant to the terms of the contract, where the deposit was intended to ensure Gryphon's performance, including to protect the significant investment Core had to make to expand capacity to host the 70,000 miners under Order #2.  Gryphon's failure to perform extinguished Core's obligations under the contract and further defeats Sphere's claim for return of approximately $34 million in hosting deposits.

51.     **_Second_**, Core performed its obligations under the Gryphon Hosting Agreements. Sphere asserts that Core failed to "abide by the deployment schedule as written, both in terms of timing and the absolute number of miners to be hosted."  Sphere POCs ¶ 10.  This is not a serious claim.  No provision in the Gryphon Hosting Agreements requires Core to deploy machines on or before a certain date.  This is clear as the MSA includes a warranty disclaimer that "ALL [CORE] FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN . . . 'AS AVAILABLE' BASIS," Ex. 1, MSA § 5.b and defines "services" to include hosting services, Ex. 1, MSA § 1.a.  This is fatal to Sphere's claim.  Additionally, and in any event, Core accepted and deployed all miners that Gryphon timely delivered, even though Core's obligations to perform under the contract were extinguished at Gryphon's first breach of the agreement in October 2021.

52.     Sphere also claims that Core breached the MSA and Order #2 by "refus[ing] to honor the contractual hosting rate set out in Order #2."  Sphere POCs ¶ 11.  This claim fails too. After Gryphon (and/or Sphere) failed to perform, Core was under no contractual obligation to extend the same below-market hosting rate set forth in Order #2 to any miners delivered post-

breach or to any go-forward agreements with Gryphon and/or Sphere that Core tried to negotiate in good faith.

53.     Sphere additionally asserts that Core breached the MSA and Order #2 by "installing and using hundreds of Sphere's miners for its own benefit."  Sphere POCs ¶ 12.  As detailed above, this is factually incorrect: Core did not misappropriate Bitcoin that belonged to Sphere, but developed a solution to correct a mistake where the machine manufacturer shipped and delivered 297 of Gryphon's machines marked as Core's own mining machines.  But even if Core had retained the Bitcoin generated from Gryphon's 297 machines (which it did not), Core would have been contractually entitled to do so given that Order #2 had long since been breached and the MSA provides that, in the case of a failure to perform, Core may direct proceeds from any miners to the Company's own account until all amounts due have been recovered.  Ex. 1, MSA § 4.d(iv).

54.     ___Third___, to the extent that Sphere has any rights under the Gryphon Hosting Agreements (which it does not), they are subject to the robust limitation of liability provisions contained in the MSA, which limit the type and amount of any potential recovery against Core.

55.     The MSA limits the type of damages that give rise to liability as follows:

NOTWITSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR** (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES **(EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT)**; (IV) LOSS, INTERRUPTATION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) **ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE)**, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*See* Ex. 1, MSA § 5.c (emphasis added).  This provision precludes Sphere from recovering any consequential, expectation, reliance, and punitive damages regardless of whether Sphere's claims arise under the Gryphon Hosting Agreements or sound in tort, such as its claim for the purported

misappropriated Bitcoin.  Section 5.c. thus bars Sphere from recovering the alternative hosting costs and storage fees.  Further, Section 5.c precludes recovery for any cover costs, which includes costs of procuring services of equivalent capability, function, and performance.  The MSA thus further bars Sphere from recovering for the "alternative hosting costs" that it asserts in the Sphere POCs.

56.     The MSA also expressly limits the amount of Core's total liability under Order #2 to one-month's fee:

> NOTWITSHANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM** (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATOIN, ATTORNEY'S FEES) **WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER**.

*See* Ex. 1, MSA § 5.d (emphasis added).  Because all of Sphere's claims arise from or are related to the MSA, this provision precludes Sphere from recovering the over $39 million asserted in the Sphere POCs and caps any recovery at one-month's fee and precludes any refund of the prepayment amounts.  Here, one-month's fee is at most $84,658.94, based on the last monthly invoice that Core sent to Gryphon.  Indeed, there is no provision in any of the Gryphon Hosting Agreements that provide for a refund of the prepayments or any other amounts.

57.     These provisions are enforceable under Delaware law, which governs the Gryphon Hosting Agreements.  Gryphon plainly agreed to the express exclusion of certain types of damages and the limitation of damages to one month's fee.  Tellingly, in Order #1, which apparently is not at issue, Gryphon negotiated an increase to this limitation of liability to three months' fee.  Order #2 contains no such amendment.  Indeed, the MSA provides, "[e]ach party recognizes and agrees that the warranty disclaimers, *limitations of liability and remedy limitations* in this Agreement

*are materially bargained for by the parties*." Ex. 1, MSA § 5.f (emphasis added). These provisions were bargained for by Core and are a material component of the MSA.

*     *     *     *     *

58.     In the end, Sphere's arguments are really nothing more than a tactic to divert attention away from the following simple facts that are fatal to the Sphere POCs: (1) Sphere has no rights under the Gryphon Hosting Agreements and thus no standing to assert any claims arising thereunder; (2) the $35 million prepayment deposit is non-refundable under the terms of the contract, (3) Gryphon failed to deliver the 70,000 miners required for delivery under Order #2, thus breaching the agreements and extinguishing Core's obligations under the Gryphon Hosting Agreements; (4) Sphere is bound by Gryphon's breach and cannot enjoy more rights than Gryphon had under the Gryphon Hosting Agreements; and (5) even if Sphere has asserted a valid claim (it has not), the limitations of liability provisions set forth in the MSA prevent Sphere from recovering the type and amount of damages asserted in the Sphere POCs.

## F.   *The Limitation of Liability Provisions Do Not Limit Core's Recovery*

59.     While the limitation of liability provisions circumscribe Sphere's claims, these provisions do not limit Core's recovery or its claim for over $100 million in damages.

60.     First, the one-month's fee limitation in Section 5.d of the MSA applies to limit only "***COMPANY'S*** [meaning Core's] TOTAL LIABILITY TO CLIENT." Ex. 1, MSA § 5.d (emphasis added). It is not reciprocal and does not limit the amount of damages recoverable by Core for damages it has sustained resulting from Gryphon's and/or Sphere's breach of the Gryphon Hosting Agreements.

61.     Second, Section 5.c contains an express carve-out that makes clear that "CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY

24

UNDER THIS AGREEMENT."   That means that under normal circumstances that might otherwise limit what either party would be entitled to recover, Core can still recover the prepayment deposits it is entitled to under Order #2.  This provision thus further makes clear that because Gryphon and/or Sphere breached the Gryphon Hosting Agreements, whatever deposits were made by Gryphon (or Sphere) are not only not subject to any refund (as stated above), but also that the remaining $16 million balance is due and owing.

62.    Third, the MSA also contains yet another carve-out provision that applies to expand Gryphon's (and/or Sphere's) liability as follows under certain circumstances depending on the type of breach:

> **EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS 4, 5 a, 5 h, and 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT**, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

Ex. 1, MSA § 5.e (emphasis added).  This carve-out provision means that the general limitations of liability that applied to both parties in Section 5.c do not apply to limit Core's recovery where (i) the breach by Gryphon (or Sphere) is of Sections 4, 5.a, 5.h or 6 or (ii) the loss or damage sustained by Core arises out of Gryphon's (or Sphere's) gross negligence, bad faith or willful misconduct.

63.    Gryphon and/or Sphere have triggered the carve-out provision in at least three independent ways.  First, Gryphon and/or Sphere breached their obligations under § 4 of the MSA by failing to deliver the 70,000 miners pursuant to the schedule detailed in Order #2.  Second, Gryphon and/or Sphere breached the representations, warranties, and covenants set forth in § 5.a of the MSA—specifically, that "Client owns and has good title to Client Equipment, free and clear of any mortgage pledge, lien, charge, security interest, claim or other encumbrance or has interest

in Client Equipment as part of financing or other arrangement disclosed and approved by Company"—by failing to properly disclose their arrangements for securing the 70,000 miners contracted for delivery under Order #2. Finally, Gryphon and/or Sphere acted with gross negligence, bad faith, and/or willful misconduct in their contracting to host 70,000 miners with Core to legitimize their pending merger and induce shareholders to invest, then failing to inform Core once they knew, or should have known, that they could not deliver those miners. This grossly negligent, bad-faith, and willful misconduct increased the Debtors' damages as Core continued preparing to host miners that Sphere and Gryphon knew, or at least should have known, they could not deliver.

## RESERVATION OF RIGHTS

64.    Nothing contained herein is intended to be or shall be deemed (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' rights or the rights of any appropriate party-in-interest to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' rights or the rights of any other party-in-interest under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under § 365 of the Bankruptcy Code.

## COUNT ONE
### (Breach of Contract)
### *Sphere*

65.    Debtors incorporate by reference each of the above allegations as though fully set forth herein.

66.    Core and Gryphon entered into the Gryphon Hosting Agreements, including Order #2, which required that Gryphon deliver 70,000 miners to Core pursuant to the delivery schedule set forth in Order #2. Gryphon failed to deliver the 70,000 miners required under the delivery

schedule set forth in Order #2, thereby breaching the MSA and Order #2.  Sphere claims that Gryphon was acting as its manager with respect to the MSA and Order #2, and that Gryphon assigned or sub-delegated its rights under the MSA and Order #2 to Sphere.

67.     If the Court rules that Sphere has rights and obligations under the MSA and Order #2, then Sphere is liable for the failure to perform under the MSA and Order #2.

68.     As a result of the breach, Core has suffered damages in an amount to be determined at trial but currently believed to be over $100 million, including (1) $62.7 million in construction costs to build out data-center facilities, (2) $43.2 million in lost profits, and (3) $16 million in outstanding amounts due and owing under Order #2.  The Debtors are entitled to recover these damages, which far exceed the claims asserted in the Sphere POCs.

**COUNT TWO**
**(Breach of Contract)**
***Gryphon***

69.     Debtors incorporate by reference each of the above allegations as though fully set forth herein.

70.     Core and Gryphon entered into the Gryphon Hosting Agreements, including Order #2 which required that Gryphon deliver 70,000 miners to Core pursuant to the delivery schedule set forth in Order #2.  Gryphon failed to deliver the 70,000 miners required under the delivery schedule set forth in Order #2, thereby breaching the MSA and Order #2.  Sphere claims that Gryphon was acting as its manager with respect to the MSA and Order #2, and that Gryphon assigned or sub-delegated its rights under the MSA and Order #2 to Sphere.

71.     If the Court rules that Gryphon alone has rights and obligations under the MSA and Order #2, then Gryphon is liable for the failure to perform under the MSA and Order #2.

72.     As a result of the breach, Core has suffered damages in an amount to be determined at trial but currently believed to be over $100 million, including (1) $62.7 million in construction costs to build out data-center facilities, (2) $43.2 million in lost profits, and (3) $16 million in outstanding amounts due and owing under Order #2.  The Debtors are entitled to recover these damages, which far exceed the claims asserted in the Sphere POCs.

<u>**COUNT THREE**</u>
**(Breach of Contract)**
***Sphere and Gryphon***

73.     Debtors incorporate by reference each of the above allegations as though fully set forth herein.

74.     Core and Gryphon entered into the Gryphon Hosting Agreements, including Order #2 which required that Gryphon deliver 70,000 miners to Core pursuant to the delivery schedule set forth in Order #2.  Gryphon failed to deliver the 70,000 miners required under the delivery schedule set forth in Order #2, thereby breaching the MSA and Order #2.  Sphere claims that Gryphon was acting as its manager with respect to the MSA and Order #2, and that Gryphon assigned or sub-delegated its rights under the MSA and Order #2 to Sphere.

75.     If the Court rules that Sphere and Gryphon share rights and obligations under the MSA and Order #2, then both are liable for the failure to perform under the MSA and Order #2.

76.     As a result of the breach, Core has suffered damages in an amount to be determined at trial but currently believed to be over $100 million, including (1) $62.7 million in construction costs to build out data-center facilities, (2) $43.2 million in lost profits, and (3) $16 million in outstanding amounts due and owing under Order #2.  The Debtors are entitled to recover these damages, which far exceed the claims asserted in the Sphere POCs.

**COUNT FOUR**
**(Declaratory Judgment Pursuant to 28 U.S.C. §2201)**
*Sphere Has No Contractual Rights*

77.     The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

78.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

79.     Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotations and citation omitted).

80.     Here, there is an actual, justiciable controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

81.     As set forth above, it is undisputed that Sphere is not a party to the Gryphon Hosting Agreements.  Nevertheless, Sphere asserts it has rights and obligations under the MSA and Order #2 pursuant to the Sub-License Agreement to which Core is not a party and never agreed to.  But no provision of the Sub-License Agreement effectuates the assignment that Sphere describes.  And in any event, § 8.d of Order #2 explicitly states that the assignment or sub-licensing of any rights or obligations under the Gryphon Hosting Agreements is conditioned on Sphere satisfying Core's

"requirements prior to" that assignment.  Sphere never satisfied these requirements and thus has

no rights under the MSA and Order #2.

82.     The Debtors seek a declaratory judgment that Sphere has no rights under the

Gryphon Hosting Agreements.

**<u>COUNT FIVE</u>**
**(Declaratory Judgment Pursuant to 28 U.S.C. §2201)**
***Disallowing Claim for Hosting Deposits***

83.     The Debtors incorporate by reference each of the above allegations as though fully

set forth herein.

84.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within

its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought."

28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue

declaratory judgments.

85.     Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under

all the circumstances, show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

86.     Here, there is an actual, justiciable controversy of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

87.     As set forth above, the prepayment deposits are not refundable under the terms of

the MSA and Order #2.  The Debtors are further entitled to retain the prepayment deposits in full

because neither Gryphon nor Sphere delivered the 70,000 miners set forth in Order #2.  This

constitutes a breach of the MSA and Order #2 and caused Core to incur significant financial

30

damages that exceed the amount of the hosting-deposits claim asserted in the Sphere POCs ($34,383,713). Because Gryphon and/or Sphere breached the MSA and Order #2 by failing to deliver the 70,000 miners required to be delivered thereunder, Core was contractually entitled to declare all amounts due under Order #2 immediately due and payable, suspend service, and/or terminate the agreements. Because Gryphon and/or Sphere failed to perform under Order #2, Core was entitled to exercise these contractually proscribed remedies.

88.     The Debtors seek a declaratory judgment that (1) they are entitled to retain the prepayment deposits paid pursuant to Order #2, and (2) the claim asserted in the Sphere POCs for hosting deposits is disallowed pursuant to 11 U.S.C. § 502(b).

## COUNT SIX
### (Declaratory Judgment Pursuant to 28 U.S.C. §2201)
### *Disallowing Claims For Alternative Hosting Costs, Storage Fees, and Other Damages*

89.     The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

90.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

91.     Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

92.     Here, there is an actual, justiciable controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

93.     As set forth above, MSA § 5.c provides that Core is not liable for, *inter alia*, "ANY CONSEQUENTIAL OR INDIRECT DAMAGES" or "COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES."  This provision bars Sphere from recovering the asserted alternative hosting costs, storage fees, and damages in "an unliquidated amount for [] any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and reliance damages." Sphere POCs ¶¶ 14–16.  Additionally, because Gryphon and/or Sphere breached the MSA, Core had no continuing obligations thereunder and cannot be responsible for the costs that Sphere incurred after the breach.

94.     The Debtors seek a declaratory judgment that Sphere's claims for alternative hosting fees, storage costs, and unliquidated damages for consequential, expectation, and reliance damages asserted in the Sphere POCs are disallowed pursuant to 11 U.S.C. § 502(b).

## COUNT SEVEN
### (Declaratory Judgment Pursuant to 28 U.S.C. §2201)
### *Disallowing Claim for Alleged Misappropriation of Bitcoin*

95.     The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

96.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

28 U.S.C. §2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

97.     Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

98.     Here, there is an actual, justiciable controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

99.     As set forth above, Core did not misappropriate Bitcoin that belonged to Sphere, but developed a solution to correct a mistake where the machine manufacturer shipped and delivered 297 of Gryphon's machines marked as Core's own mining machines. Once Core realized the mistake, it communicated a fix to Gryphon that put 297 machines online for Gryphon on a quick turn. Even if Core had retained the Bitcoin generated from Gryphon's 297 machines (which it did not), Core was contractually entitled to do so given that Order #2 had long since been breached and the MSA provides that, in the case of a failure to perform, Core may direct proceeds from any miners to the Company's own account until all amounts due have been recovered.

100.     The Debtors seek a declaratory judgment that (1) they did not misappropriate any Bitcoin from miners belonging to Gryphon and/or Sphere, and (2) the claim asserted in the Sphere POCs based on Core's alleged misappropriation of Bitcoin is disallowed pursuant to 11 U.S.C. § 502(b).

**COUNT EIGHT**
**(Declaratory Judgment Pursuant to 28 U.S.C. §2201)**
*MSA Limits Sphere's Damages to One-Month's Fee*

101.    The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

102.    Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

103.    Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

104.    Here, there is an actual, justiciable controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

105.    As set forth above, MSA § 5.d. limits Core's damages as follows:

COMPANY'S TOTAL LIABILITY TO THE CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT . . . WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

106.    The Debtors seek a declaratory judgment that (1) MSA § 5.d limits any claim arising under the Gryphon Hosting Agreements, including those asserted in the Sphere POCs, to one-month's fee, (2) Sphere cannot recover more than one-month's fee on its claims asserted in

34

the Sphere POCs, and (3) the one-month's fee is at most $84,658.94, based on the last monthly invoice that Core sent to Gryphon.

## <u>COUNT NINE</u>
### (Declaratory Judgment Pursuant to 28 U.S.C. §2201)
### *Setoff*

107.    The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

108.    Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

109.    Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

110.    Here, there is an actual, justiciable controversy between the Debtors and Sphere of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

111.    As set forth above, the Debtors have suffered damages as a result of Gryphon's and/or Sphere's failure to deliver the 70,000 miners set forth under Order #2 including (1) $62.7 million in construction costs to build out data-center facilities, (2) $43.2 million in lost profits, and (3) $16 million in outstanding amounts due and owing under Order #2.  These amounts far exceed the claims asserted in the Sphere POCs.

112.     The Debtors seek a declaratory judgment that, to the extent Sphere is entitled to any recovery under the Sphere POCs, the Debtors are entitled to setoff any such recovery by the amounts owed by Sphere and/or Gryphon as a result of the breach of Order #2.

## COUNT TEN
### (Declaratory Judgment Pursuant to 28 U.S.C. §2201)
### *Gryphon Hosting Agreements Are Not Executory Contracts*

113.     The Debtors incorporate by reference each of the above allegations as though fully set forth herein.

114.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

115.     Courts have jurisdiction to issue declaratory relief where "[t]he facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (internal quotations and citation omitted).

116.     Here, there is an actual, justiciable controversy between the Debtors and Sphere of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

117.     As set forth above Gryphon and/or Sphere failed to deliver the 70,000 miners required to be delivered under Order #2, thus breaching the MSA and Order #2 and extinguishing Core's obligation to continuing hosting miners under the Gryphon Hosting Agreements.  Despite this, Core continued to host approximately 639 miners as an accommodation to Gryphon even

though Gryphon breached the Gryphon Hosting Agreements and Core had no continuing contractual obligations thereunder.

118.    The Debtors seek a declaratory judgment that the Gryphon Hosting Agreements are not executory contracts as Core has no continuing obligations thereunder.  In the alternative, the Debtors seek (1) an order authorizing rejection of the Gryphon Hosting Agreements as an exercise of the Debtors' sound business judgment pursuant to 11 U.S.C. § 365(a), and (2) a declaratory judgment that, in light of Gryphon's and Sphere's breach of the Gryphon Hosting Agreements, Gryphon and Sphere are barred from asserting rejection damages pursuant to 11 U.S.C. § 502(g).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Debtors respectfully request the following relief:

a) Consolidation of the Court's adjudication of the Complaint and the Sphere Contested Matter;

b) Judgment that Sphere and/or Gryphon breached the MSA and Order #2 by failing to perform thereunder;

c) Judgment for the Debtors in an amount to be determined at trial but currently believed to be at least $100 million;

d) Declaratory judgment that Sphere has no rights under the Gryphon Hosting Agreements;

e) Declaratory judgment that (1) the Debtors are entitled to retain the prepayment deposits paid pursuant to Order #2, and (2) the claim asserted in the Sphere POCs for hosting deposits is disallowed pursuant to 11 U.S.C. § 502(b);

f) Declaratory judgment that Sphere is not entitled to recover alternative hosting fees, storage costs, and unliquidated damages for consequential, expectation, and

reliance damages asserted in the Sphere POCs and that those claims are disallowed pursuant to 11 U.S.C § 502(b);

g) Declaratory judgment that (1) the Debtors did not misappropriate any Bitcoin from miners belonging to Gryphon and/or Sphere, and (2) the claim asserted in the Sphere POCs based on the alleged misappropriation of Bitcoin is disallowed pursuant to 11 U.S.C. § 502(b);

h) Declaratory judgment that (1) MSA § 5.d limits any claim arising under the Gryphon Hosting Agreements, including those asserted in the Sphere POCs, to one-month's fee, (2) Sphere cannot recover more than one-month's fee on its claims asserted in the Sphere POCs, and (3) the one-month's fee is at most $84,658.94, based on the last monthly invoice that Core sent to Gryphon;

i) Declaratory judgment that the Gryphon Hosting Agreements are not executory contracts as Core has no continuing obligations thereunder.  In the alternative, the Debtors seek (1) an order authorizing rejection of the Gryphon Hosting Agreements as an exercise of the Debtors' sound business judgment pursuant to 11 U.S.C. § 365(a), and (2) a declaratory judgment that, in light of Gryphon's and Sphere's breach of the Gryphon Hosting Agreements, Gryphon and Sphere are barred from asserting rejection damages pursuant to 11 U.S.C. § 502(g);

j) Judgment disallowing the Sphere POCs;

k) Judgment applying a setoff based on the damages the Debtors have suffered as set forth herein; and

l) Judgment awarding such additional and further relief as this Court deems just and proper under the circumstances

38

Dated: November 21, 2023
Houston, Texas

/s/ *Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:    (713) 546-5000
Facsimile:     (713) 224-9511
Email: Alfredo.Perez @weil.com
        Clifford.Carlson@weil.com
-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
David J. Lender (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:     (212) 310-8007
Email: Ray.Schrock@weil.com
        David.Lender@weil.com
        Ronit.Berkovich@weil.com
        Theodore.Tsekerides@weil.com
        Christine.Calabrese@weil.com

*Counsel for Debtors and Debtors in Possession*

**Exhibit 1**

**Master Services Agreement**

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

## 1.     AGREEMENT STRUCTURE

a.      This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**").  Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order.  In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

## 2.     SERVICES AND COMPANY FACILITY

a.      Company will provide Client the Services at a Company Facility set forth in an Order.  This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.    Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility.  Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services.  Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.      Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility.  Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order.  Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.      Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference.  If Company determines in its sole

DocuSign Envelope ID: A3E0DB4C-65F4-4938-9088-AEC158D5EE92

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3.      PAYMENT TERMS AND TAXES

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c.      All amounts payable to Company under this Agreement exclude applicable taxes.  Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities.  If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement.  Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period).  If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

(i)      suspend the provision of the Services;
(ii)     disconnect Client Equipment and store it;
(iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
(iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
(v)      terminate this Agreement and all Orders; and
(vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee.  Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

3

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies.  Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection.  Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order.  Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period.  For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period.  Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.      Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies,  tariffs or governmental fees and charges with respect to the provision of  Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.      Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement.  Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees,  costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.      In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree.   Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension.  Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5.      WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner.  Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement.  Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES      , INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK.  CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER.  COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS.  HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.  COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

DocuSign Envelope ID: A3E0DB4C-65F4-4938-9088-AEC158D5EE92

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.       EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5  d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.       Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.       Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.       Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, or (vii) Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

**6.     CONFIDENTIAL INFORMATION**

a.       Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**").  Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement.  Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.  Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event

DocuSign Envelope ID: A3E0DB4C-66F1-4938-9088-AEC158D5EE92

less than commercially reasonable measures.

b.        The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party.  For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.        Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.        Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

e.    Notwithstanding any contrary provisions in this Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to freely incorporate such changes or suggestions into Company's products and services without restriction.


7.        **INSURANCE**

a.        Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.        Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

8.        **MISCELLANEOUS**

a.        <u>Notice</u>.  Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement.  Notice is effective when received.

b.        <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom.  Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly

set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.    Survival.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d.    Subcontracting and Assignment.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.    Force Majeure.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.    Governing Law and Arbitration.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.    General.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

**Core Scientific, Inc.**

By: *Michael Trzupek*
4963E00350804A6...

Name: Michael Trzupek

Title: Authorized Representative

Date: 9/13/2021

**Gryphon Digital Mining, Inc.**

By: *Dan Tolhurst*
7F45D9E28BFE4C7...

Name: Dan Tolhurst

Title: President

Date: 9/12/2021

**MASTER SERVICES AGREEMENT ORDER #1**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September __, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of August 31, 2021. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted\*\*:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWH):** |
| | N/A | 100 S19j | 3.203 |
| | | | |
| | | | |
| **Hosting-Services Rate:** | USD $0.07/ KWh | | |
| **Payment Due Prior to Installation:** | USD $100,660.00 on or before August 31, 2021 consisting of:<br>• $98,160.00 a six-month prepayment for hosting services to be applied as a credit against future monthly invoices as they become due.<br>• $2,500 Equipment Configuration Fee | | |
| **Estimated Delivery Date:** | August 31, 2021. Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Equipment Configuration Fee: $25/Unit payable as provided above. | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit<br>Equipment Recycle fee: $25/Unit decommissioned or disposed of during the term | | |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the third anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**").

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed

specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include [routine maintenance of Client Equipment Units, power supply, internet connection].


**Limitation of Client Indemnity Obligation**. Client shall not be required to indemnity defend or hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees or any other party or person from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing except if such a change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, would have the effect of increasing any tax obligation imposed on Company related to this Agreement and such tax obligation is not otherwise paid by Client.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose

11

this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Limitation of Client Damages potentially payable in Force Majeure; Modification of Force Majeure Definition**. Client's obligation to pay amounts owed under this Agreement upon the occurrence of a Force Majeure event shall be limited to any amounts owed that have already accrued at the time of the Force <u>Majeure</u> event and any fees and expenses incurred by  Company in de racking, packing and shipping Client equipment as directed by Client. Client and Company agree that any change in change any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, which renders cryptocurrency mining illegal shall be deemed a Force Majeure Event.

**Amendment to Section 5.d of the Agreement**. Both Company and Client Agree that section 5.d of the Agreement is amended so that COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO THREE (3) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the  upcoming month.  Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client  Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per

DocuSign Envelope ID: A3E0DB4C-66F1-4938-9088-AEC158D5EE92

month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Dan Tolhurst_

**Gryphon Digital Mining, Inc. "Client"**
Name: Dan Tolhurst
Title: President
Date: 9/12/2021

By: _Michael Trzupek_

**Core Scientific, Inc., "Company"**
Name: Michael Trzupek
Title: CFO
Date: 9/13/2021

**Exhibit 2**

**Order # 2**

**MASTER SERVICES AGREEMENT ORDER #2**

     This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted\*\*:** | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| **Hosting-Services Rate:** | USD $0.06175/ KWh; USD $.06/KWh after hosting month 30 | | |
| **Payment Due Prior to Installation:** | **USD $15,575,025.00 on or before October 12, 2021 consisting of:**<br>• $73,350.00, 100% of the prepayment for hosting services for OCT 2021 Units to be applied as a credit against future monthly invoices as they become due.<br>• $205,380.00, 70% of the prepayment for hosting services for NOV 2021 – FEB 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $15,296,295.00, 30% of the prepayment for hosting services for MAR 2022 – NOV 2022 Units ($550,230.00 for MAR 2022: $1,100,460.00 for APR 2022: $1,650,675.00 for MAY 2022: $2,200,905 for each of JUN 2022, JUL 2022, AUG 2022, SEP 2022, OCT 2022: and $990,405.00 for NOV Units) to be applied as a credit against future monthly invoices as they become due.<br><br>**USD $755,645.00 on or before October 12, 2021 consisting of:**<br>• $733,640.00, 40% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $22,005.00, 30% of the prepayment for hosting services for NOV 2021 Units to be applied as a credit against future monthly invoices as they become due. | | |

**USD $1,489,285.00 on or before November 15, 2021 consisting of:**
- $1,467,280.00, 40% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $22,005.00, 30% of the prepayment for hosting services for DEC 2021 Units to be applied as a credit against future monthly invoices as they become due.

**USD $2,222,905.00 on or before December 15, 2021 consisting of:**
- $2,200,900.00, 40% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $22,005.00, 30% of the prepayment for hosting services for JAN 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $2,956,545.00 on or before January 15, 2022 consisting of:**
- $2,934,540.00, 40% of the prepayment for hosting services for JUN 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $22,005.00, 30% of the prepayment for hosting services for FEB 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $3,484,770.00 on or before February 15, 2022 consisting of:**
- $2,934,540.00, 40% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $550,230.00, 30% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $4,035,000.00 on or before March 15, 2022 consisting of:**
- $2,934,540.00, 40% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $1,100,460.00, 30% of the prepayment for hosting services for APR 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $4,585,215.00 on or before April 15, 2022 consisting of:**
- $2,934,540.00, 40% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due.
- $1,650,675.00, 30% of the prepayment for hosting services for MAY 2022 Units to be applied as a credit against future monthly invoices as they become due.

**USD $5,135,445.00 on or before May 15, 2022 consisting of:**
- $2,934,540.00, 40% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they

| | become due. |
|---|---|
| | • $2,200,905.00, 30% of the prepayment for hosting services for JUN 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $3,521,445.00 on or before June 15, 2022 consisting of:** |
| | • $1,320,540.00, 40% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | • $2,200,905.00, 30% of the prepayment for hosting services for JUL 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $2,200,905.00 on or before July 15, 2022 consisting of:** |
| | • $2,200,905.00, the remaining 30% of the prepayment for hosting services for AUG 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $2,200,905.00 on or before August 15, 2022 consisting of:** |
| | • $2,200,905.00, the remaining 30% of the prepayment for hosting services for SEP 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $2,200,905.00 on or before September 15, 2022 consisting of:** |
| | • $2,200,905.00, the remaining 30% of the prepayment for hosting services for OCT 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| | **USD $990,405.00 on or before October 15, 2022 consisting of:** |
| | • $990,405.00, the remaining 30% of the prepayment for hosting services for NOV 2022 Units to be applied as a credit against future monthly invoices as they become due. |
| **Estimated Delivery Date:** | As of September 24, 2021 and then the fifteenth of every month beginning with October 15, 2021 until November 15, 2022, respectively.<br><br>Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. |
| **Fees:** | Equipment Configuration Fee: N/A |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $25/Unit<br>Storage Fee: $10/month/Unit<br>Reinstatement fee: $25/Unit<br>Equipment Recycle fee: $25/Unit decommissioned or disposed of during the term |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the fourth anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set

forth in the Agreement.

**Amendment to Section 8.d of the Agreement**. Both Company and Client agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company as long as Sphere 3D Corp. satisfies Company requirements prior to.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**"). At least ten percent (10 %) of the computer hardware ("**Equipment**") (hosted in the Company Facility in which Client Equipment is hosted must be Equipment that is owned by Company. If however, there is a single occupancy restriction at a Company Facility for purposes of maintaining a qualifying data center status for sales tax purposes, the Client shall have the option to either waive this requirement or pay the requisite sales tax. In addition, Company covenants that all power provided to Client under this Order 2 shall be one hundred percent (100%) net carbon neutral. In addition, Company intends to achieve 100% net carbon neutral status for its mining operations. The Company will achieve and maintain this status by continuing to increase relationships with power suppliers providing a higher mix of non-carbon emitting energy sources and by purchasing certified green carbon offset certificates using United States Environmental Protection Agency guidelines for calculating carbon emissions.

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client

DocuSign Envelope ID: 6149D621-4057-4E55-9338-4E2772A8E99

Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include routine maintenance of Client Equipment Units, power supply, internet connection.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this

DocuSign Envelope ID: 6149D621-4057-4E56-9328-4E2772?A8E99

Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.
(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and
(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

\*\*Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Rob Chang_
**Gryphon Digital Mining, Inc. "Client"**
Name: Rob Chang
Title: CEO
Date: 10/5/2021

By: _Michael Trzupek_
4063E00350804A6...
**Core Scientific, Inc., "Company"**
Name: Michael Trzupek
Title: CFO
Date: 10/5/2021