# Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90341-11 |
| | § | JOINTLY ADMINISTERED |
| CORE SCIENTIFIC, INC., | § | HOUSTON, TEXAS |
| ET AL, | § | MONDAY, |
| | § | AUGUST 7, 2023 |
| DEBTORS. | § | 4:29 P.M. TO 6:03 P.M. |

**MOTION HEARING**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

**(RECORDED VIA COURTSPEAK)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

<u>APPEARANCES</u>:

FOR THE DEBTOR:                    WEIL GOTSHAL & MANGES, LLP
                                  Cliff Carlson, Esq.
                                  Ted Tsekerides, Esq.
                                  700 Louisiana, Ste. 1700
                                  Houston, TX  77002
                                  713-546-5040


FOR SPHERE 3D CORP.:              DONTZIN NAGY & FLEISSING, LLP
                                  Gregory Wolfe, Esq.
                                  980 Madison Avenue
                                  New York, NY  10075
                                  212-717-2900


                                  HUNTON ANDREWS KURTH, LLP
                                  Tad Davidson, Esq.
                                  600 Travis St., Ste. 4200
                                  Houston, TX  77003
                                  713-220-3631

1          **HOUSTON, TEXAS; MONDAY, AUGUST 7, 2023; 4:29 P.M.**

2          THE COURT:  This is the docket for Houston, Texas.

3          On the 4:00 o'clock docket -- and I do apologize for

4     the delay -- we have the jointly administered cases in Case

5     Number 22-90341, Core Scientific, Inc.

6          Folks, please don't forget to record your electronic

7     appearance.  That's a quick trip to the website, a couple of

8     mouse clicks.  You can do that at any time prior to the

9     conclusion of the hearing.

10         We do have some folks here in the courtroom, perhaps

11    everyone.  If you are in the courtroom, if you do rise to

12    speak, if you would, please come to the lectern.  It's the

13    only place that you can both be seen and be heard.

14         If you are on GoToMeeting, I have activated the

15    hand-raising feature.  If you know you're going to speaking,

16    if you'd give me a five-star, I'll get you unmuted.  You can,

17    of course, change your mind at any time.

18         Either way, the first time that you do speak, if you

19    would, please state your name and who you represent.  It

20    really does help the court reporters do what is a very

21    difficult job in the event that a transcript request is made.

22         Finally, we are recording this afternoon using

23    CourtSpeak, and we will have that audio up on the docket,

24    available for your download, shortly after the conclusion of

25    the hearing.

4

1        (Participants confer)

2            THE COURT:  Anyone on GoToMeeting think they're

3    going to be speaking, five star on their telephone.

4        (No audible response.)

5            THE COURT:  All right, no takers.

6            All right.  Good afternoon.

7            MR. CARLSON:  Good afternoon, Your Honor.  Cliff

8    Carlson for Core, and here with me is Ted Tsekerides.

9            THE COURT:  All right.  Thank you.

10           Mr. Tsekerides, good afternoon.

11           MR. TSEKERIDES:  Good afternoon, Your Honor.  Again,

12   for the record, Ted Tsekerides from Weil Gotshal for the

13   debtors, and Christine Calabrese is with me, as well.

14           THE COURT:  All right.  Thank you.

15           MR. TSEKERIDES:  Your Honor, I did walk together a

16   demonstrative to walk through, if I could have control given

17   over to miss ...

18       (Participants confer)

19           THE COURT:  And how are you going to be listed with

20   your computer?

21           MS. CALABRESE:  It's my name, Your Honor, Christine

22   Calabrese.

23           THE COURT:  Ms. Tsekerides, I just couldn't hear.

24           MR. TSEKERIDES:  What did you say, Tsekerides?  What

25   are you listed as?

1        MS. CALABRESE:  It's my name, Your Honor, Christine
2   Calabrese.
3        MR. TSEKERIDES:  Christine Calabrese.
4        THE COURT:  Oh, okay.  I was looking for like Weil
5   presentation one or something like that, I just couldn't find
6   it.
7        All right.  You should have it.
8      (Pause in proceedings)
9        MS. CALABRESE:  On my screen, Your Honor, it's
10   showing the first page, but it looks like on the Court's
11   monitor.
12      (Pause in proceedings)
13        MR. TSEKERIDES:  We have parked offices [sic].  Is
14   it easier if I just give you one, Your Honor?  It's really
15   just for us here in the courtroom.
16        THE COURT:  Then sure.
17      (Participants confer)
18        THE COURT:  Yeah, thank you.
19        And I assume you folks have a copy of this?
20        UNIDENTIFIED:  We're getting one, Your Honor.
21        THE COURT:  All right.  Thank you.
22        MR. TSEKERIDES:  And Your Honor, just to level-set,
23   this is the motion for summary judgment that we filed in
24   connection with the claim that Sphere filed.
25        THE COURT:  Right.

1           MR. TSEKERIDES:  Two parts.  We hope there's no

2     second part, but we have two parts.  The first part is that

3     they're not a party and the second part is limitations of

4     liability.  And then, depending on how that goes, there was an

5     agenda item that the schedule would be --

6           THE COURT:  Scheduling conference.

7           MR. TSEKERIDES:  -- discussed.

8           THE COURT:  Right.

9           MR. TSEKERIDES:  Yeah.  So, if Your Honor will

10    indulge me, so the first page, just to take you through.  The

11    issue really comes down to whether or not Sphere is a party to

12    the MSA and the orders that govern the MSA.  That's really

13    what it comes down to.

14          And there was some discussion in the papers about

15    whether you need to have discovery in order for you to rule on

16    summary judgment, and the case law supports that you don't.

17    If the facts are clear that they're not a party, you can rule

18    in our favor.  If the facts are clear that the limitation on

19    liability applies, you can rule in our favor.

20          And really, what this first page shows is who are

21    the parties.  The parties are Gryphon and Core.  And in that

22    MSA, which was in September, early September, Sphere is not

23    even mentioned.  There was an Order Number 1 done on that same

24    day, Sphere is not mentioned in that one, either.

25          And this shows -- these are just excerpts.  For the

1     record, the MSA is at 1099-5 and Order Number 1 is at 1099-6.

2     And you can see here, Your Honor:  Core Scientific, Gryphon;

3     Order Number 1, Core Scientific Gryphon.  In fact, as I said,

4     those two documents don't even mention Sphere.

5          Now we've heard in Sphere's papers that Gryphon was

6     acting as a manager.  That's not anywhere in the contract.

7     And even if it was between the two of them, that's not really

8     our business.

9          THE COURT:  Right.

10         MR. TSEKERIDES:  Core has nothing to do with that,

11    so --

12         THE COURT:  I agree.

13         MR. TSEKERIDES:  -- it's relevant.

14         So what does it come down to?  Order Number 2.

15         THE COURT:  Right.

16         MR. TSEKERIDES:  And I put some slides in there just

17    to show Your Honor we did make this point.  And I think the

18    point of this third -- no third-party beneficiary and no

19    assignment is just to level-set that, absent anything else,

20    there is no third-party beneficiary, there is no assignment.

21         So let's get to the meat of the matter.  Order

22    Number 2 has an amendment to Section 8(d).  And Section 8(d)

23    is the section in the MSA that says no assignment.  The

24    language is in front of you.  This would be at 1099-7, that's

25    Order Number 2.

1        And it says Gryphon can assign to Sphere.  It

2    doesn't say that Gryphon did assign to Sphere.  It's something

3    that can happen.  So this document doesn't say any rights had

4    been assigned.  It only provides a mechanism for an assignment

5    to occur.

6        And then there's language at the end of that

7    provision:

8        "-- as long as Sphere 3D Corp satisfies company" --

9    that's Core -- "requirements prior to."

10        That's what it says.

11        Now the other side will tell you, well, what does

12    that mean, what are the requirements.  Well, we put in a

13    declaration from Mr. Cann, who you've met before, and you know

14    him to be the head of mining, Executive VP Client Services.

15    The declaration affirms he's familiar with the agreements, the

16    relationship between the parties, and has personal knowledge

17    of that relationship.  He also knows who Core's customers are

18    and whose miners they're hosting.

19        Whatever those requirements are -- and he lays some

20    out in his declaration.  But whatever they are, they have to

21    be at least one.  And the other side had to satisfy at least

22    something; otherwise, that provision is meaningless.  And that

23    goes against every canon of interpretation under Delaware law

24    or any other law.

25        So they say, well, we don't know which ones they

1    were.  Our response to that is it doesn't matter.  And we

2    don't have discovery that you need from us.  You, Sphere, had

3    to do something, you had to satisfy company requirements.  And

4    if you did that, presumably, you'd have some evidence of it,

5    you'd have some emails, something that went between the two

6    parties.  Nothing.

7           What we do have, to try to get out summary judgment,

8    first, they rely on 56(d).  That's a Federal Rule, I'm sure

9    you're well aware, that, if you believe that you don't have

10   available discovery, you can make an application to the Court

11   to ask for leave to put off summary judgment while you get the

12   discovery.  Okay.  Well, but what discovery do they need here

13   that would not be in their possession?  Again, if they

14   satisfied a requirement, they would know, they would have sent

15   something to somebody, and they didn't.  So 56(d) doesn't

16   really help them.

17          So flip the page to the one that has the invoice --

18   it's Page 6 in the slide deck.  All of the invoices, all of

19   them, have bill to Gryphon, ship to Gryphon.  Nowhere is

20   Sphere on any of these invoices.  And this one here is from

21   May 12th, 2023, and that's a date that's important and I'll

22   come back to it in a minute.

23          So what does Sphere say to try to get out of summary

24   judgment?  Well, they say three things, basically, maybe four.

25          The first one is they point to a sub-license and

1    delegation agreement.  That one will be on Slide 7, Your

2    Honor.

3              THE COURT:  Uh-huh.

4              MR. TSEKERIDES:  The problem is we're not a party to

5    that, Core is not a party to that agreement.  Again, they

6    could agree to whatever they want to agree.  If those

7    requirements were not satisfied, then the condition for

8    assignment did not occur.  So that's sort of Number 1.  But

9    the sub-license agreement doesn't help them.

10             So let's get to the heart of it, so the next page.

11   They point to three things:

12             A meeting with the former CEO of Core, Mike Levitt,

13   in April of 2022;

14             A text message from someone at Core reviewing a

15   press release regarding Sphere and Gryphon;

16             And then a July 27, 2022 letter from Gryphon's CFO

17   to some unnamed person at Core.

18             None of these are sufficient to withstand summary

19   judgment.  We'll start with Mr. Levitt's conversation.

20             Now we deny that the statement was made, but that's

21   neither here, nor there for today.  Even if it was, it's too

22   vague a statement as to context, what was being discussed, or

23   to support that Sphere has rights under Order Number 2 or that

24   any requirements were satisfied.

25             It also took place, according to them, six months

1    after these agreements were signed.  That can't change the

2    contractual requirements.  And again, all of the evidence that

3    we have -- and they have documents, too, if their -- if they

4    had something different -- all of the invoices say Gryphon.

5            So then let's look at the text messages.  That one

6    is at 1098-7, Your Honor.

7            THE COURT:  Okay.

8            MR. TSEKERIDES:  I'm going to pull that up myself.

9            And that goes with 1099-3 -- and I apologize, this

10   is part of a bigger document -- at Page 61.  So the text

11   message is referring to this press release, two different

12   documents.

13           So nothing in the text or the press release say

14   anything about Core agreeing that Sphere satisfied any

15   requirements, nothing.  All the press release says is that

16   Sphere and Gryphon entered into an agreement and Core is going

17   to be hosting some miners.  Well, yeah, Core is hosting

18   miners, Gryphon's miners, to this day, and we have the

19   invoices to show it.

20           Now the reason I mentioned earlier that I'll come

21   back to that date, the invoice was 2023, May of 2023, going to

22   Gryphon.  If, in fact, Core had a contract with Sphere based

23   on that conversation that happened in April of 2022, this was

24   a year later and it's still going to Gryphon.  So there's

25   nothing from that conversation.  There's nothing in these

1     texts or in the Sphere press release indicating a satisfaction
2     of any requirements.  None.
3            And then, lastly, this July 27, 2022 letter.  That
4     can be found at 1098-6.  Let's look at that letter.
5            The CFO of Gryphon, again, dated July 27, 2022,
6     three months after the supposed meeting in April of 2022.  And
7     what does it say?  "To whom it may concern," not Dear CEO, not
8     Dear CFO, just to whom it may concern, want to let you know
9     that the money that was paid came from Sphere.  Okay.  So
10    what?  That's all it says.  It doesn't say that the contract
11    and all the rights that Gryphon had under the contract have
12    been assigned to Sphere, it doesn't say that.  In fact, it's
13    limited to just the issue of the money, nothing else; nothing
14    that says, oh, by the way, they satisfied those requirements,
15    nothing.
16           In fact, at the very end, it says, notwithstanding
17    anything above, Gryphon doesn't waive or otherwise amend or
18    modify any provision of the MSA.  According to Gryphon, it's
19    their contract, not Sphere's.  And again, three months after
20    that meeting in Miami.
21           So, at the end of the day, as it comes to whether or
22    not Sphere has any rights, we submit that summary judgment
23    disallowing Sphere's claim is appropriate because we've set
24    out that they don't have any rights, they haven't satisfied
25    the requirements, and they haven't put any evidence in that

13

1    they did.

2         THE COURT:  Can I ask you to take just a pause?  I

3    have a very inappropriately --

4         MR. TSEKERIDES:  Oh, I see them --

5         THE COURT:  -- dressed judge --

6         MR. TSEKERIDES:  -- behind you.

7         THE COURT:  -- behind me, yes.

8         MR. TSEKERIDES:  Okay.

9         THE COURT:  My apologies.

10        (Unrelated matters discussed)

11        MR. TSEKERIDES:  So, Your Honor, on that first piece

12   that I talked about, the they're not a party, that's our

13   argument.  We've laid out the undisputed facts, they didn't

14   have anything in response, and there we are.  Up to you, but I

15   could stop there or continue on, on the second piece, which is

16   the limitation of liability.  If they don't have any rights

17   under the contract, the second part doesn't matter, or I can

18   just go and finish everything up and then take it all --

19        THE COURT:  Go ahead and make the --

20        MR. TSEKERIDES:  Make the --

21        THE COURT:  -- entirety --

22        MR. TSEKERIDES:  -- argument?

23        THE COURT:  -- of the argument.

24        MR. TSEKERIDES:  Okay.  So, if you reach this issue,

25   this relates to the limitation of liability provisions --

1          THE COURT:  Right.

2          MR. TSEKERIDES:  -- that are in the --

3          THE COURT:  You're just --

4          MR. TSEKERIDES:  -- MSA.

5          THE COURT:  -- saying, if they have rights under the

6     contract, they have all the rights, they have all the

7     obligations, they don't get to pick and choose, right?

8          MR. TSEKERIDES:  Right.  Well, our argument is, if

9     they have rights, they're subject to these limitations.

10         THE COURT:  Right.  I got it.

11         MR. TSEKERIDES:  You can't get -- you know,

12    goose/gander, bittersweet, pick your metaphor.  You know, if

13    you ...

14         THE COURT:  Got it.

15         MR. TSEKERIDES:  So there are really two in the MSA.

16    One we call, as to type, consequential, incidental, punitives

17    --

18         THE COURT:  Uh-huh.

19         MR. TSEKERIDES:  -- one as to amount --

20         THE COURT:  Right.

21         MR. TSEKERIDES:  -- one month's fee.

22         So the one month's fee, if you have the "flip book,"

23    we'll call it --

24         THE COURT:  Yep.

25         MR. TSEKERIDES:  -- Page 9, that's at Section 5(d).

1    And again, "company" is Core.  Total liability to client in

2    the aggregate, for the entire time, and regardless whether

3    brought during or after term, et cetera:

4         "-- will not exceed an amount equal to one month's

5    fee, payable to the company, pursuant to the applicable

6    order."

7         THE COURT:  Sure.

8         MR. TSEKERIDES:  Now there's debate about what that

9    means.  Our view -- and we think it's supported by the

10   contract -- is that one month's fee would be the month before

11   any alleged breach, because that's usually when you -- this

12   would come in.  So we picked the month before we filed the

13   motion.  They're pretty much the same as it relates to Sphere

14   anyway, roughly in the 80,000 range.

15        And the reason why we say that is you have to read -

16   - again, Contract Interpretation 101 -- the contract as a

17   whole.  And there are other portions of the contract that tell

18   us, well, what are they talking about, one month's fee.

19        Section 3 -- and again, the contract is at 1099-5.

20   And by "contract," I mean MSA here.  Company -- this is (a):

21        "Company will invoice client monthly in advance for

22   all applicable fees for use of company facility and provision

23   of services as set forth in the applicable order."

24        Then it talks about how client is going to pay these

25   within calendar days, et cetera.

1          So the way it works is they get billed based on the

2    number of miners times whatever the cost is for hosting --

3          THE COURT:  Right.

4          MR. TSEKERIDES:  -- and then there's like a true-up

5    later.  But this is all based on what's happening at the

6    facility.

7          So we say one month's fee.  All right.  Let's say

8    the month of May, it was 84,000.  And that, we have the

9    invoice that we just looked at -- which is part of the

10   materials we showed you --

11         THE COURT:  Right.

12         MR. TSEKERIDES:  Number 6 -- 84,658, sent in May.

13         They say, well, wait a minute, it can't be that,

14   it's got to be more because there are other provisions in

15   Order Number 2.  And most typical orders that I think you've

16   seen in this case, they talk about distribution dates and

17   prepayments and things of that nature.  So they say, well,

18   prepayments have to be factored in.  Well, prepayments are not

19   services, prepayments are not fees.

20         And I think one way to put a fine point on that, if

21   you look at Order Number 2 --

22         THE COURT:  I have it up.

23         MR. TSEKERIDES:  -- there's a section, "Payment Due

24   Prior to Installation."  So it doesn't say fee for services,

25   for monthly services.  "Payment Due Prior to Installation."

1    And just look at the third bullet, fifteen million and change,

2    right?  Thirty percent of prepayment for March 2022 to

3    November.  Okay.  That's not a month; that's multiple months,

4    and it relates to payments that are prepayments.  They're not

5    for services.  So it doesn't make any sense what Sphere is

6    saying, that look to the prepayments to factor in what the one

7    month's fee is.  You look at the monthly fee for actually

8    hosting.

9         Another reason why it makes no sense, according to

10    them, even if there were only 500 miners, but maybe, under a

11    schedule for a particular month, there were supposed to be

12    5,000 miners, even though they didn't pay for 5,000 miners to

13    be hosted, we should use that at the -- as the one month's

14    fees.  Well, that makes no sense.  That's the amount.

15         5(c), which is -- I don't know if it's on here, but

16    it's Page 10 in the deck.

17              THE COURT:  Okay.

18              MR. TSEKERIDES:  This is what we call "as to type,"

19    and it's pretty broad.

20         "Notwithstanding anything to the contrary in this

21    agreement, in no event will either party" -- so either party -

22    - "be liable to the other party for lost profits, loss of

23    business, loss of revenues.  Except the client" -- that's them

24    -- or Gryphon, actually -- shall be liable for any fees or

25    other amounts owed to company," and that's us.

1          So the only exception to that is going in our favor.

2          Loss, interruption, use of data, et cetera, any

3     consequential or indirect damages.  This is as to type.

4     There's no question Delaware law upholds provisions like this.

5          THE COURT:  Right.

6          MR. TSEKERIDES:  They make some noises about fraud

7     claims, intentional torts.  With the exception of one thing

8     about bitcoin that they say we stole, which we'll have to deal

9     with, I guess, this provision applies to everything.

10          And if you look at the next page, 5(e) and 5(f) make

11     that clear.  The limitations set forth in section -- this is

12     in (e), Your Honor:

13          "The limitations set forth in Sections 5(c) and

14     5(d)" -- the ones we just looked at -- "apply to all claims

15     and causes of action, regardless of whether in contract, tort,

16     strict liability, or other theory."

17          There are Delaware cases they cited about

18     intentional torts.  I suggest, in those cases, there weren't

19     these broad provisions.  And you should take a look if there

20     is any issue.  Those cases did not have provisions like this

21     that say explicitly whether in contract, tort, strict

22     liability even, or other theory.

23          And then, just to let everybody know how important

24     these provisions are, in (f) it says:

25          "Each party recognizes and agrees that the warranty

1    disclaimers, limitations of liability, and remedy limitations
2    in this agreement are materially bargained for by the
3    parties."
4            It couldn't be more clear.
5            I think you can flip to the end, we went over some
6    of the other points.
7            So when you look at what are the damages they're
8    alleging, they're all contract-based:
9            Claims for hosting deposits;
10           Claims for alternative hosting costs;
11           Claims for storage fees, losses and damages arising
12   from Core's failure to satisfy its obligations, including, but
13   not limited to consequential, expectation, and reliance
14   damages, the exact damages that the contract says you're not
15   allowed to get.
16           THE COURT:  Right.  So let me ask you this.  So you
17   start off by saying they're not a party to the contract.  So,
18   if they're not a party to a contract, none of the limitations
19   apply, correct?
20           MR. TSEKERIDES:  Right.  If they're not a party to
21   the contract, then we would say they are -- they have no
22   rights, they're out.
23           THE COURT:  Just hold on a second.
24           MR. TSEKERIDES:  I'm with you.
25           THE COURT:  All right.

1                    MR. TSEKERIDES:  Okay.

2                    THE COURT:  So -- and again, I don't have -- I don't

3       have enough information to know what happened with respect to

4       the prepayment.  Did the prepayment come directly from Sphere

5       to Core or did it come through --

6                    MR. TSEKERIDES:  We have it from Gryphon.

7                    THE COURT:  So you --

8                    MR. TSEKERIDES:  Sphere may have sent it to Gryphon.

9                    Again, we would say it would be like if Judge Isgur

10      paid for one of your bills.  If I have a contract with you, I

11      don't care who else is paying for it.

12                   THE COURT:  Totally got it.

13                   But I just -- I want to -- walk through this --

14                   MR. TSEKERIDES:  Sure.

15                   THE COURT:  -- with me.  And again, this is not

16      binding on you and --

17                   MR. TSEKERIDES:  No, no, no, no.  We're having a

18      conversation.

19                   THE COURT:  So, if they're not a party to the

20      contract, as you allege, then the claim for the return of part

21      or all of the deposit doesn't fall under the contract, right?

22      It's some other theory.  You took money, money hadn't

23      received, it's a deposit that you've wrongfully converted.

24      All of those things, if it's -- I mean, that's not a claim

25      under the contract.

1            MR. TSEKERIDES:  I would say it's not a claim under

2     the contract and it's not a claim against us because I got

3     paid under the contract by some guy who I have the contract

4     with.

5            THE COURT:  Yeah.

6            MR. TSEKERIDES:  If you have a beef with somebody,

7     maybe it's that other guy.

8            THE COURT:  Does it matter who sent you the money?

9            MR. TSEKERIDES:  I don't think so.  I have a

10     contract with you -- and I don't want to -- I don't want to

11     make it personal.  I have a contract with some third party.

12            THE COURT:  But how did you know what the money is

13     for --

14            MR. TSEKERIDES:  Well --

15            THE COURT:  -- if it --

16            MR. TSEKERIDES:  -- Gryphon sends us money --

17            THE COURT:  -- if it came from Sphere?

18            MR. TSEKERIDES:  Well, Gryphon sent us money.  Okay?

19     Even if it came from Sphere, I mean, we have the money coming

20     to us -- you know, say a Gryphon wire transfer --

21            THE COURT:  So it came from Gryphon.

22            MR. TSEKERIDES:  Yeah.  But it -- they're saying

23     they gave it to them.  And if we look at the letter --

24            THE COURT:  No, no.

25            MR. TSEKERIDES:  -- and we give it credence --

1           THE COURT:  Forget --

2           MR. TSEKERIDES:  -- no, no --

3           THE COURT:  Forget what --

4           MR. TSEKERIDES:  -- and we give --

5           THE COURT:  -- they said.

6           MR. TSEKERIDES:  -- credence -- yeah, yeah.

7           THE COURT:  But if it came from Sphere --

8           MR. TSEKERIDES:  Okay.

9           THE COURT:  -- then it's a slightly different issue,

10     right?

11           MR. TSEKERIDES:  I would --

12           THE COURT:  How did you know -- how did you know

13     whose money it was if --

14           MR. TSEKERIDES:  I would say --

15           THE COURT:  -- you knew there was something going

16     on?

17           MR. TSEKERIDES:  I would say the fact that you paid

18     for somebody else's obligation, that's between you and him.

19     Even --

20           THE COURT:  But how did -- that's my question.

21           MR. TSEKERIDES:  Yeah.

22           THE COURT:  How did you know that -- if it -- if the

23     money came from Sphere -- and I don't know where it came from

24     because I haven't seen --

25           MR. TSEKERIDES:  Well, let's assume --

1           THE COURT:  That wasn't --

2           MR. TSEKERIDES:  -- for our discussion here it came

3     from them --

4           THE COURT:  Okay.

5           MR. TSEKERIDES:  -- that -- to pay for --

6           THE COURT:  How --

7           MR. TSEKERIDES:  -- this contract.

8           THE COURT:  But how did you know it was to pay for

9     this contract?

10          MR. TSEKERIDES:  Well, there would be an in --

11    there's an invoice -- I mean, we can get into that.  There's

12    an invoice that would show that we got these prepayments,

13    there was one attached to their papers that shows Gryphon --

14          THE COURT:  Right.

15          MR. TSEKERIDES:  -- that they say they gave the

16    money to Gryphon to pay us.

17          THE COURT:  But you didn't see that, though, did

18    you?

19          MR. TSEKERIDES:  We would know it came from Gryphon.

20          THE COURT:  How did you know that if it came from

21    Sphere?

22          MR. TSEKERIDES:  Well, it wouldn't be obvious that

23    it came from Sphere.

24          THE COURT:  But --

25          MR. TSEKERIDES:  Are you saying how would we know,

1      line in the abstract --

2                THE COURT:  No.

3                MR. TSEKERIDES:  -- that --

4                THE COURT:  If I got a wire transfer for a million

5      dollars --

6                MR. TSEKERIDES:  Well --

7                THE COURT:  -- into my bank account --

8                MR. TSEKERIDES:  -- Gryphon did tell -- I mean,

9      there's a letter from Gryphon saying that the money came from

10     Sphere.

11               THE COURT:  At the time?

12               MR. TSEKERIDES:  Certainly in July.

13               THE COURT:  Okay.

14               MR. TSEKERIDES:  But again, I would say that's

15     between the two of them.  Like, even if Sphere is paying for

16     this contract --

17               THE COURT:  Uh-huh.

18               MR. TSEKERIDES:  -- if they didn't get -- if they

19     didn't do what they needed to do to get the rights, who pays

20     doesn't matter.  And if they're out money because Gryphon

21     didn't pay them back, we're still using -- whatever these

22     prepayments were, they're still being applied --

23               THE COURT:  Right.

24               MR. TSEKERIDES:  -- to the Gryphon --

25               THE COURT:  Do we know what --

1        MR. TSEKERIDES:  -- to the Gryphon miners.

2        THE COURT:  Do we know what the number was on the

3   petition date?  Do we know what the number is today?

4        MR. TSEKERIDES:  Yeah, it's about $34 million.

5        THE COURT:  Well, that's what they say the claim is.

6        MR. TSEKERIDES:  I mean, it's close.  I mean, I

7   couldn't give you to the penny, but it's up there.

8        THE COURT:  Okay.

9        MR. TSEKERIDES:  And our view is, okay, if you -- it

10  can't be -- it can't be what I think you're asking me, that

11  you have no rights under the contract, you give me money

12  anyway for the contract for the other guy, but somehow I have

13  to give it back to you, even though I have the contract with

14  the other guy.  And he's not asking me for the money back.

15  He's using the money as a credit for the miners that I'm

16  hosting for him.

17        THE COURT:  So let's break that down, if we could --

18        MR. TSEKERIDES:  Sure.

19        THE COURT:  -- because you start off by saying

20  they're not a party under the contract.

21        MR. TSEKERIDES:  That's right.

22        THE COURT:  And I think we've -- I think we've put

23  that issue to bed, is that, if they're not a party to the

24  contract, they have no benefits under the contract, they have

25  no obligations under the contract if they're not a party.

1           MR. TSEKERIDES:  If they're not a party.

2           THE COURT:  Right.

3           So it means that, to the extent that they have a

4   claim, it has to arise under some other legal theory, right?

5           MR. TSEKERIDES:  A claim against us?

6           THE COURT:  Uh-huh.

7           MR. TSEKERIDES:  If one legal theory exists --

8           THE COURT:  If one exists.

9           MR. TSEKERIDES:  Yeah.

10          THE COURT:  I got that.

11          MR. TSEKERIDES:  Okay.

12          THE COURT:  We got --

13          MR. TSEKERIDES:  I'm just --

14          THE COURT:  -- to get --

15          MR. TSEKERIDES:  You know --

16          THE COURT:  -- past that.

17          MR. TSEKERIDES:  -- I'm being a lawyer here.

18          THE COURT:  Yeah.

19          MR. TSEKERIDES:  You know?

20          THE COURT:  But if -- it can't arise under the

21  contract if they're not a party to the contract.

22          MR. TSEKERIDES:  It can't.  If they have no rights

23  under the contract, then their right to that payment cannot

24  come from the contract, yeah.

25          THE COURT:  Right.  It has to come from somewhere

1      else --

2              MR. TSEKERIDES:  Someplace else.

3              THE COURT:  -- if at all.

4              MR. TSEKERIDES:  If at all.

5              THE COURT:  Okay.

6              MR. TSEKERIDES:  Or they have a claim against

7      Gryphon.

8              THE COURT:  Well, it may be both, right?

9              MR. TSEKERIDES:  Yeah.  I don't know about that --

10             THE COURT:  You're a --

11             MR. TSEKERIDES:  -- but maybe.

12             THE COURT:  You're a good lawyer.  You'd --

13             MR. TSEKERIDES:  Yeah, well ...

14             THE COURT:  You'd go after both.

15             So what I'm trying to figure out is, on a summary

16     judgment basis, if -- and see, I've gone down both branches of

17     the tree because I --

18             MR. TSEKERIDES:  As well you should.  You're a good

19     judge.

20             THE COURT:  Eh, still learning.

21             If, as you say, they're not a party to the contract,

22     then, to the extent they have a claim, it has to arise from

23     somewhere else.  If they are a party to the contract, then

24     they're subject to all of the limitations, all of the

25     contractual provisions of the agreement.  Do you agree with

28

1    that?

2              MR. TSEKERIDES:  I would agree with that, yeah.

3              THE COURT:  Okay.  And so is there anything in your

4    mind in the proof of claim that suggests an alternative

5    theory, other than damages under the agreement?

6              MR. TSEKERIDES:  Not that I'm aware of.

7              THE COURT:  Okay.

8              MR. TSEKERIDES:  Their theory is that they're --

9    they have the rights under the contract, that they were

10   assigned to them.

11             THE COURT:  Okay.

12             MR. TSEKERIDES:  That's it, Your Honor.

13             THE COURT:  I got it.

14             MR. TSEKERIDES:  Okay.  Thank you.

15             THE COURT:  Thank you for --

16             MR. TSEKERIDES:  Yep.

17             THE COURT:  -- indulging me.

18             MR. TSEKERIDES:  Appreciate it, yep.

19        (Pause in proceedings)

20             MR. WOLFE:  Your Honor, bear with me for one moment.

21             THE COURT:  No, of course.

22             And as I understand it, you wanted to put some

23   things up, but only in the courtroom, right?

24             MR. WOLFE:  Yeah.  So we'll give you a copy  of the

25   same as the demonstrative and we'll also give our adversaries

1     a copy.

2              THE COURT:  Okay.  So you don't want to publish it

3     or you do?

4              MR. WOLFE:  We're fine either way.

5         (Participants confer)

6              MR. WOLFE:  So why don't we publish it?  And we'll

7     give it to you, as well.

8              THE COURT:  Okay.

9         (Participants confer)

10             MR. WOLFE:  May I approach?

11             THE COURT:  Of course.  Thank you.

12             Ms. Harper, are you plugged in?

13             MS. HARPER:  I am now, Your Honor.

14             MR. WOLFE:  Your Honor, my name is -- oh, if you're

15    ready.

16             THE COURT:  No, I was -- I wanted to make sure that

17    Ms. Harper --

18             MR. WOLFE:  Fantastic.

19             THE COURT:  Okay.  Got it.

20             MR. WOLFE:  So, Your Honor, my name is Greg Wolfe, I

21    represent Sphere, alongside by friends Tad Davidson, Ashley

22    Harper, and Brandon Bean [sic].  Also in attendance is --

23    excuse me, Brandon Bell.  And also in attendance is Sphere's

24    CEO Patricia Trompeter.

25             Just as a housekeeping matter, I'd like to move all

1    exhibits on our exhibit list into evidence for purposes of

2    this MSJ hearing and record only.  And Sphere's exhibits are

3    filed under seal.  The Docket Number is 1098-1 through 1098-9.

4              THE COURT:  Any objection?

5         (Participants confer)

6              MR. TSEKERIDES:  Not at all.

7              And in fact, I was remiss, I apologize, Your Honor.

8    Prior to the hearing, we did discuss with counsel that we

9    would agree to that, and also reciprocally for us, which would

10   be the 1099 numbers.  So no objection to both, for purposes

11   just of the hearing today.

12             THE COURT:  Certainly.

13             So, by agreement, I will agree Sphere's Exhibits 1

14   through 9, identified as 1098-1 through 1098-9.

15        (Sphere Exhibits 1 through 9, ECF 1098-1 through 1098-9

16   received in evidence)

17             THE COURT:  And Core Exhibits 1 through 8,

18   identified as 1099-1 through 1099-8.

19        (Debtors' Exhibits 1 through 8, ECF 1099-1 through 1099-8

20   received in evidence)

21             THE COURT:  Did I get them all?

22             MR. WOLFE:  Great.  Thank you.  Yeah.

23             MR. TSEKERIDES:  I believe so, Your Honor.

24             THE COURT:  Okay.  Thank you.

25             MR. TSEKERIDES:  Thank you.

1          MR. WOLFE:  Of course.

2          So I'd like to begin actually where Your Honor left

3     off on whether we have any claims outside the contract.

4          THE COURT:  Right.

5          MR. WOLFE:  And I've directed you to Page 4 of our

6     proof of claim, Paragraph 13.

7          THE COURT:  Okay.  So I want to use your documents.

8     Which exhibit is your proof of claim?

9        (Participants confer)

10          THE COURT:  I'll find it.  I just thought --

11          MR. WOLFE:  Apologies.

12          THE COURT:  -- we -- no, no, no.

13          MR. WOLFE:  Apologies --

14          THE COURT:  I just --

15          MR. WOLFE:  -- Your Honor.

16          THE COURT:  -- thought you knew.

17        (Participants confer)

18          THE COURT:  Okay.  I don't think it's one of your

19     marked exhibits.

20          MR. WOLFE:  I believe it's attached to our summary

21     judgment papers.

22        (Participants confer)

23          MR. WOLFE:  All right.  It --

24          THE COURT:  Please help.

25          UNIDENTIFIED:  Your Honor, I think these --

1          THE COURT:  That would be great, if you have it.

2          MR. WOLFE:  And we filed -- just so the record is

3     clear, we filed two proofs of claim, they're materially

4     identical.  And I'd direct you to Paragraph 13 --

5          THE COURT:  All right.

6          MR. WOLFE:  -- on Page 4.

7          THE COURT:  Paragraph 13.

8          MR. WOLFE:  And as you'll see, we asserted that

9     there were, in fact, claims outside the contract, including

10    unjust enrichment, conversion, and estoppel.

11         And the estoppel claim, for example, would arise

12    when my -- Ms. Trompeter and Mr. Tassiopoulos go to meet with

13    Core's CEO, and he says you have a contract, keep making

14    deposit payments, that will give rise to an estoppel.

15    Conversion, you get a conversion claim when someone holds onto

16    your property wrongfully.  Those are claims outside the

17    contract.  And that, more within our briefing, fit within the

18    rubric of, look, we would need discovery on this.

19         I think we can beat the motion for summary judgment

20    as to whether we have contractual rights on the merits, and

21    I'd like to get into that.  But I just do want to make clear

22    we do have claims outside the contract.

23         THE COURT:  So help me ... and I'm sorry.  Give me

24    just -- give me just a second.

25         MR. WOLFE:  Of course.

1          (Pause in proceedings)

2              THE COURT:  So do you have a copy of the addendum

3      available to you?

4              MR. WOLFE:  The addendum.

5          (Participants confer)

6              MR. WOLFE:  My colleagues will bring that up in one

7      moment.

8              THE COURT:  Sure.

9          (Participants confer)

10             THE COURT:  So I now understand -- I'm sorry.  What

11     was this?

12             MR. WOLFE:  That's the addendum.

13             UNIDENTIFIED:  That's the same claim, Your Honor.

14             THE COURT:  Oh, no, that was for you.

15             MR. WOLFE:  Oh --

16             THE COURT:  I was just --

17             MR. WOLFE:  Oh, for me.

18             THE COURT:  I wanted to --

19             UNIDENTIFIED:  Oh --

20             THE COURT:  -- ask you --

21             UNIDENTIFIED:  Oh, sure.

22             THE COURT:  -- a question.

23         (Participants confer)

24             MR. WOLFE:  I apologize, Your Honor.

25             THE COURT:  Yeah, I now -- okay.  I now understand.

1     Okay.

2          (Participants confer)

3          THE COURT:  So what you did in Paragraph 13 is you

4     said I filed a demand for arbitration and I asserted all of

5     these -- all of these theories, and that you, by reference,

6     incorporating -- incorporated those claims within the

7     addendum.

8          MR. WOLFE:  Correct.

9          THE COURT:  I missed that one sentence because then

10    I went on and it said --

11         MR. WOLFE:  This was a --

12         THE COURT:  -- we have --

13         MR. WOLFE:  This was a little bare.

14         THE COURT:  No, no, no.  In 15 and 16 and, quite

15    frankly, the rest of it, it's all contractual-based.

16         MR. WOLFE:  Yes.

17         THE COURT:  But I got it.  Okay.

18         MR. WOLFE:  Yes.  And --

19         THE COURT:  Do you think you can have both?

20         MR. WOLFE:  I think it depends.  I think, for the

21    conversion claim, their position is they have canceled the

22    contract a long time ago and, as a result, they're still

23    holding onto our property, so converted, right?  You can't

24    just keep -- you can't have a contract and then just keep

25    holding onto property, right?

1          THE COURT:  So you've --

2          MR. WOLFE:  (Indiscernible)

3          THE COURT:  You've been -- you believe that you --

4    or you've been told, I assume in writing, that, prior to the

5    petition date, the agreement was canceled?

6          MR. WOLFE:  Well, it's funny you should say that.

7    So we -- it's sort of not clear.  The -- I think the position

8    they took with us in 2022 --

9          THE COURT:  Right.

10         MR. WOLFE:  -- was, at some point, this has been

11   canceled.  I then read their papers and they sure seem to

12   indicate it's been canceled.  And yet, I just heard my

13   adversary saying that they're still billing things in

14   accordance with Order Number 2, which is sort of the

15   opposite --

16         THE COURT:  Right.

17         MR. WOLFE:  -- right?  That contract is still

18   effective.  It seems to me the contract has been canceled, but

19   without discovery, I'm not sure.

20         THE COURT:  So let me ask you.  Have you thought

21   about pushing that issue?  Because doesn't that change your

22   view of the world?  And let --

23         MR. WOLFE:  Yeah --

24         THE COURT:  I want to be very clear.  It -- I want

25   to tell you exactly where I'm headed.

1        MR. WOLFE:  Sure.

2        THE COURT:  On this track that we're currently on,

3   you're going to have to choose because I don't think that the

4   claims can exist together.  Either you're a party to the

5   contract and you're going to be subject to all the limitations

6   and everything else, or you're going to take the position

7   that, no, I have tort claims that are based upon whatever

8   theories you have because I don't think -- I mean, I got the

9   conversion claim.

10       If, in fact -- well, maybe.  I don't know.  I have

11  to go read the entire contract to find out what the rights and

12  remedies are on the parties upon a termination.  But I don't

13  think that you can maintain this, at least based on what I've

14  read, as both -- I'm just going to call it a "tort claim" and

15  a "contractual claim."  I think it's one or the other.

16       MR. WOLFE:  Yeah.  So, I mean, part of the issue is

17  my adversaries didn't move on that.

18       But what I would say is, for unjust enrichment,

19  you're probably right, right?  Classically, there has to be a

20  contract --

21       THE COURT:  Sure.

22       MR. WOLFE:  -- otherwise, there's no unjust

23  enrichment.

24       THE COURT:  Right.

25       MR. WOLFE:  For estopped, not so, which is more --

1          THE COURT:  Estoppel --

2          MR. WOLFE:  -- quasi-contract.

3          THE COURT:  -- is not really a claim, right?

4          MR. WOLFE:  Well, it can be, right?  So a promise --

5  so an estoppel claim, for example, if he says -- if he --

6  right?  If there's no contract, but he says --

7          THE COURT:  Oh, but it's a contract claim --

8          MR. WOLFE:  Yes.

9          THE COURT:  -- just based --

10          MR. WOLFE:  It's --

11          THE COURT:  -- on estoppel.

12          MR. WOLFE:  I'm basically --

13          THE COURT:  Yeah.

14          MR. WOLFE:  -- substituting consideration.

15          THE COURT:  Okay.

16          MR. WOLFE:  Some jurisdictions consider that a tort,

17  some a contract.

18          As far as the conversion claim, I will agree with

19  you that there may be some elements of it that we can't

20  maintain.  But I do believe that the law would say, for

21  example, with respect to the machines, right?  If those -- if

22  that's our property, the machines are our property, and they

23  cancel the contract and then they just won't give them back,

24  that's a conversion claim, right?  They've converted them.

25          THE COURT:  Assuming they have -- right.  I mean,

1    assuming they have no right to hold it, right?

2              MR. WOLFE:  Assuming they have no right to hold it.

3              THE COURT:  Okay.  I got it.

4              So -- all right.  Then I want to hear your

5    contractual-based argument --

6              MR. WOLFE:  Yes, please.

7              THE COURT:  -- because I struggle with that.  So I

8    want -- I absolutely want to hear him.

9              Given what I've said, I also am trying to figure out

10   if you really want to maintain that or not.

11             MR. WOLFE:  Well, I think we will, and hopefully, I

12   can sway Your Honor away from struggle to a decisive feeling

13   that this should just be denied, at the very least, at this

14   juncture.

15             So let me begin where I think I would have began,

16   which is just to level-set what's at stake here.  Over the

17   course of a little over half of a year, we paid Core

18   $35.1 million in deposit funds.

19             THE COURT:  And can I ask you the same question

20   that --

21             MR. WOLFE:  Sure.

22             THE COURT:  -- Mr. Tsekerides couldn't answer?  Who

23   paid it?

24             MR. WOLFE:  So it was Sphere who would give it to

25   Gryphon, who would then give it to Core.

1                    THE COURT:  And -- okay.

2                    MR. WOLFE:  And I --

3                    THE COURT:  And so --

4                    MR. WOLFE:  -- will --

5                    THE COURT:  -- from the debtors' point of view, if

6          we were only looking at the wire transfer, they would have no

7          idea that you paid it?

8                    MR. WOLFE:  If you were only looking at the wire

9          transfer.  But I will get to why it makes sense, under the

10         delegation --

11                   THE COURT:  Totally --

12                   MR. WOLFE:  -- agreement --

13                   THE COURT:  -- got that.

14                   MR. WOLFE:  Right.

15                   THE COURT:  I want to -- I got to start --

16                   MR. WOLFE:  Of course.

17                   THE COURT:  -- at the easy things.

18                   MR. WOLFE:  I will --

19                   THE COURT:  So a wire transfer -- you wire-

20         transferred the money to your -- how do you refer to them?

21                   MR. WOLFE:  Our exclusive manager --

22                   THE COURT:  Okay.

23                   MR. WOLFE:  -- of our --

24                   THE COURT:  You transfer --

25                   MR. WOLFE:  -- cryptocurrency --

1          THE COURT:  -- them to --

2          MR. WOLFE:  -- operations.

3          THE COURT:  -- your manager.  Your managers are --

4    then transferred --

5          MR. WOLFE:  Yes.

6          THE COURT:  -- to the debtor.

7          MR. WOLFE:  Yes.  And if you put --

8          THE COURT:  Okay.

9          MR. WOLFE:  -- blinders on and you were only looking

10   at the wire transfers, correct.

11         THE COURT:  Okay.

12         MR. WOLFE:  Right.

13         THE COURT:  Got it.

14         MR. WOLFE:  So, as I began, 35.1 million to them.

15   We get a few hundreds thousand dollars worth of services.  And

16   then they say we're not going to -- we're not going to host

17   any more of your miners, we're not going to uphold our end of

18   the bargain.

19         THE COURT:  So is -- are there miners being hosted

20   today?

21         MR. WOLFE:  There are approximately 600 miners being

22   hosted.

23         THE COURT:  And are they your miners or they're

24   somebody else's miners?

25         MR. WOLFE:  They're our miners.

1          THE COURT:  Okay.  And so is it your belief that you

2     have to pay for those or you don't have to pay for those?

3          MR. WOLFE:  They've been using, tellingly, our

4     prepayments --

5          THE COURT:  I got it.

6          MR. WOLFE:  -- that -- yes.

7          THE COURT:  But that was --

8          MR. WOLFE:  Yeah.

9          THE COURT:  -- a totally --

10          MR. WOLFE:   Absolutely.

11          THE COURT:  -- different question.

12          MR. WOLFE:  We would absolutely have to pay for

13     that.

14          THE COURT:  Okay.  And is it that you believe you

15     have to pay for it pursuant to Order 2 or some other

16     agreement?

17          MR. WOLFE:  Well, they've canceled Order Number 2,

18     according to them, so --

19          THE COURT:  That's what I'm --

20          MR. WOLFE:  -- I think --

21          THE COURT:  That's what I'm struggling with.

22          MR. WOLFE:  Right, I know.  So I think what -- if

23     you were -- you can cancel a contract and continue to charge a

24     fair rate without a contract in place.

25          THE COURT:  Well, that's --

1          MR. WOLFE:  And it --

2          THE COURT:  -- actually --

3          MR. WOLFE:  It --

4          THE COURT:  -- a different --

5          MR. WOLFE:  It seems --

6          THE COURT:  -- contract, though.

7          MR. WOLFE:  It seems like that's what's going on

8     here, right?  They won't give it back, but they're still

9     following Order Number 2's rate.

10          THE COURT:  How can that be with sophisticated

11    parties and $35 million at issue?

12          MR. WOLFE:  That's why we're here before, Your

13    Honor.

14          THE COURT:  Okay.  Is there -- were there any

15    agreements that the $35 million had to be segregated or it was

16    just a deposit that could go into the general coffers and be

17    spent --

18          MR. WOLFE:  My --

19          THE COURT:  -- and --

20          MR. WOLFE:  My understanding is, if you look at the

21    fee schedule within Order Number 2, is that this would be

22    credits for (indiscernible) hosting, so that would be --

23    right?  That would suggest to me that general -- right?  You

24    would have it as a separate, distinct money allocated toward

25    Sphere's benefit.

1          THE COURT:  Well, that just says an accounting

2     entry, I'm going to take your money, and -- but on the ledger

3     of life, you just have a plus that it's -- it gets a paper

4     deduction every month, right?

5          MR. WOLFE:  It -- yeah.  I mean, so, if -- I don't

6     know if it's that simple because, if you are running our --

7     right?  So let's say you were to put into the general ledger

8     on your hypothetical, and then, all of a sudden, right?

9     You're -- you have below $30 million in the general ledger and

10    you -- you know, you can't do what you were supposed to do

11    under the contract for Sphere anymore.

12          THE COURT:  Why not?

13          MR. WOLFE:  Well, because you don't have enough

14    money, right?  There was -- you got 35 million from Sphere,

15    you didn't get --

16          THE COURT:  But at that point, it's not money; it's

17    a credit.

18          MR. WOLFE:  I may not be following your question

19    then --

20          THE COURT:  Well, I mean --

21          MR. WOLFE:  -- Your Honor.

22          THE COURT:  -- I asked you an accounting question,

23    which was not fair because, once I take your cash in -- you

24    swapped your cash for a credit.

25          MR. WOLFE:  Uh-huh.

1          THE COURT:  But you have a -- you have an account

2     there that reflects for, subject to future deductions, I took

3     your cash, it's in the general coffers and you now have -- you

4     now have a credit there against which will satisfy future

5     billings.

6          MR. WOLFE:  So --

7          THE COURT:  So you don't actually need cash at that

8     point.

9          MR. WOLFE:  So I will be candid.  My mom is an

10    accountant and there was only one profession she said I

11    couldn't go into.

12        (Laughter)

13

14         THE COURT:  It was accounting?

15         MR. WOLFE:  And that was accounting, so ...

16         THE COURT:  Okay.  Fair enough.

17         MR. WOLFE:  So, look, the question before the

18    contested matter -- and we look forward to presenting our case

19    to you, hopefully on a full discovery record and at trial on

20    whether Core should enjoy a windfall.  You just heard from my

21    adversary they still have $34 million of our money, right?

22    The question will be:  Should they enjoy the windfall?

23         THE COURT:  So let me ask.  Mr. Tsekerides -- and --

24         MR. TSEKERIDES:  Yes, sir.

25         THE COURT:  Is there a contract in force or not?

1          MR. TSEKERIDES:  There's a contract with Gryphon

2    that we're performing under, even though we believe that

3    Gryphon is in breach.  Gryphon's miners -- I mean, my

4    adversary keeps saying they're his.  They're not his; they're

5    Gryphon's.  The miners that are there are Gryphon's; they were

6    never Sphere's.  I mean, that's the whole argument, right?

7          Our view is the miners that came over, their

8    argument is they belong to Sphere; our argument is, no,

9    they're Gryphon's, and I got the invoice to prove it, right?

10   It says Gryphon, May 2023.

11          THE COURT:  I got it.  So let me ask --

12          MR. TSEKERIDES:  So --

13          THE COURT:  So let me ask -- I'm going to ask you a

14   bankruptcy question.

15          MR. TSEKERIDES:  Oh, boy.  Okay.

16          THE COURT:  So you've -- just I'm assuming this

17   contract has neither been rejected, nor assumed.

18          MR. TSEKERIDES:  That is correct.

19          THE COURT:  And so, if they're your manager, why

20   haven't they moved to compel rejection of the agreement?

21   Because you're going to allege that they can never cure.

22        (Participants confer)

23          MR. WOLFE:  And the answer to that question is I'm

24   not sure, Your Honor, why they haven't done that.  I think our

25   impression was that the -- up until -- right?  We -- they said

1      that -- I'll take a step back.

2                    There are two conflicting things here, right?

3                    THE COURT:  Uh-huh.

4                    MR. WOLFE:  One is the contract is in force --

5                    THE COURT:  There are more --

6                    MR. WOLFE:  -- but --

7                    THE COURT:  -- than two, but okay.

8                    MR. WOLFE:  You know, as I was listening to my

9      friend speak, I was thinking, gee, there sure do sound like a

10     lot of fact issues here.

11                   But I think the problem is they indicate -- right?

12     I think they indicate in their claim objection that the

13     contract is no longer in effect, and they say they won't host

14     any more miners.  But then they say they're also continuing to

15     host miners, which suggests that the contract is in effect.  I

16     think it's just unclear at the end of the day.

17                   THE COURT:  So what is your relationship with your

18     manager today?  Do you have the ability to direct them or not?

19                   MR. WOLFE:  I think we would have the opinion that

20     we do have the ability to direct them.  I think they may have

21     a different view of that.

22                   THE COURT:  So is this really a thirty-five-million-

23     dollar dispute between you and your manager?

24                   MR. WOLFE:  No, definitely not.

25                   THE COURT:  Well -- so, I mean, you're telling me

1     that the money got paid to your manager and your manager

2     forwarded it on.  Have you asked your manager for the money

3     back?

4                    MR. WOLFE:  Can I ask my client whether we have or

5     not?

6                    THE COURT:  Of course you can.  I'm just trying to -

7     -

8                    MR. WOLFE:  Thank you.

9                    THE COURT:  Because this doesn't make sense to me --

10                   MR. WOLFE:  Well --

11                   THE COURT:  -- and that's --

12                   MR. WOLFE:  -- can I --

13                   THE COURT:  I'm trying --

14                   MR. WOLFE:  Can I --

15                   THE COURT:  I'm struggling --

16                   MR. WOLFE:  -- go to --

17                   THE COURT:  -- with it.

18                   MR. WOLFE:  Can we get to the delegation agreement -

19     -

20                   THE COURT:  Of course.

21                   MR. WOLFE:  -- and I can --

22                   THE COURT:  Of course.

23                   MR. WOLFE:  -- I can explain why it would make

24     sense?

25                   THE COURT:  Okay.

1          MR. WOLFE:  Okay.  So let me walk through the

2     relevant agreements with you.

3          THE COURT:  Okay.

4          MR. WOLFE:  And -- right.  Four agreements.

5          Let's start with -- can we start with Slide 2?

6          So, here, we have the agreement between Sphere and

7     Gryphon, which provides that -- it uses the terms "provider"

8     and "customer," but you can just replace those with Gryphon

9     shall be Sphere's exclusive provider of any and all management

10    services --

11         THE COURT:  Sure.

12         MR. WOLFE:  -- for all --

13         THE COURT:  And is it --

14         MR. WOLFE:  -- blockchain --

15         THE COURT:  Is it your belief that Core knew about

16    this agreement, had it, signed onto it, approved it, tacitly

17    agreed to it?

18         MR. WOLFE:  Given that they -- I don't know if they

19    tacitly agreed to it.  Did they know about it?  Given that the

20    Order Number 2 is so explicit in providing that rights would

21    be assigned to Sphere and that they then --

22         THE COURT:  They knew something was going on.

23         MR. WOLFE:  Right.  And then they then signed off on

24    a press release from Gryphon --

25         THE COURT:  Right.

1          MR. WOLFE:  -- or excuse me -- from us describing

2     the delegation.  It sure seems that they knew about it.

3          THE COURT:  But is Sphere was taking over --

4          MR. WOLFE:  Uh-huh.

5          THE COURT:  -- then why would they need a management

6     agreement?

7          MR. WOLFE:  Why don't I just get to the delegation

8     agreement and explain how I think it functions and --

9          THE COURT:  I'll be quiet.

10          MR. WOLFE:  -- I think that will -- I'm glad you're

11     -- I'm glad you're interested.

12          So, again, the next is we have Order Number 2.

13          And the third is the MSA.

14          And then the final agreement -- and I think this is

15     sort of the key here -- is the delegation agreement between

16     Sphere and Gryphon.

17          And what -- you know, I think what may be the cause

18     of the struggle is not everything is being assigned, right?

19     What's being assigned is the right to access and use the

20     company facility pursuant to Order Number 2.

21          THE COURT:  Okay.

22          MR. WOLFE:  And then it's delegating the obligation

23     to make payments to Core pursuant to Order Number 2.

24          What hasn't been delegated are all of the

25     obligations to actually interact with Core.  And there was a

1    reason for that.  They are the exclusive manager, they are the

2    ones who are getting paid to ultimately deal with Core, right?

3    But in terms of whose money it is, it's our money that's

4    coming to them.

5              THE COURT:  And so why didn't your manager file a

6    proof of claim?

7              MR. WOLFE:  I'm not sure that they would consider

8    that they had -- it's a good question.  I'm not sure that they

9    would consider that they had rights to the money, given that

10   it's our money.

11             THE COURT:  Well, no, they don't have any rights to

12   the money, I mean, according to you.

13             MR. WOLFE:  Correct.

14             THE COURT:  The -- managers take action all the time

15   that have financial benefits to the folks that they're

16   managing for.

17             MR. WOLFE:  Then -- I can't speak for them, Your

18   Honor.

19             THE COURT:  Okay.  Are they represented by anybody?

20             MR. WOLFE:  K&L Gates.

21             THE COURT:  Okay.  And I take it there's -- they

22   haven't filed a proof of claim in this case.

23             UNIDENTIFIED:  That's correct.

24             THE COURT:  Okay.

25             MR. WOLFE:  All right.  So if we can put up Slide 6,

1     which we've been discussing ad nauseam.

2          The -- right.  You have Slide 6, which specifically

3     refers to Sphere.  As Your Honor just put it, they knew

4     something was going on, right?

5          THE COURT:  Uh-huh.

6          MR. WOLFE:  It doesn't say any party, it says

7     "Sphere."

8          THE COURT:  Right.

9          MR. WOLFE:  It specifically references it.

10         And you know, we then go to the crux of just what

11    are the requirements prior to.  They submitted this affidavit

12    from Mr. Cann.  I think we're all in agreement now, my

13    adversaries included, that there's no way you can read the

14    phrase "requirements prior to" and think that's what those

15    requirements are.

16         And so the question for you then becomes:  What are

17    the requirements?  And the requirements, given that there's no

18    written consent required, seem perfunctory to us.  And it

19    could be as simple as Core signing off on a press release,

20    right?  It could be Core doing a search and just verifying

21    that Sphere is a Canadian company.

22         There's no mechanism in the contract that actually

23    says, oh, Sphere has to submit something to Core, right?  It

24    could be Gryphon that's submitting it.  And there's no

25    mechanism that actually says Core has to announce the

1      requirements have been met.  And there's no mechanism because

2      there's no written consent required.

3            And so the an -- so there are many things that could

4      have been done to satisfy the requirements.  We don't know

5      what the requirements are.  And given that Gryphon and Core

6      were the ones interacting, they would be the ones -- the

7      parties that ultimately know if the requirements were

8      satisfied, I think we have a lot of evidence and certainly

9      sufficient evidence on this record to go past a motion for

10     summary judgment.

11           And I'd begin with Order Number 2, which contains

12     the assignment language that specifically references Sphere.

13           We then have the delegation agreement.  And it's

14     undisputed that, whether effective or not, it was certainly

15     the intent of Gryphon -- right?  It was the intent of the

16     parties to accomplish a delegation.

17           And then, third -- and we have the declarations of

18     Ms. Trompeter and Mr. Tassiopoulos -- excuse the

19     mispronunciation, the unrebutted -- their unrebutted missions

20     that Core's CEO said, yeah, we have a contractual

21     relationship, right?  And that's dispositive.

22           And I heard a lot about, from my adversary, whether

23     the requirements had been met.  But what I hadn't heard is

24     anything about whether there was a waiver of a condition

25     precedent.  And when the CEO of a company says we have a

1     contractual relationship, you are our customer, that sure

2     suggests that, either the -- whatever happened between Gryphon

3     and Core, that the requirements were met or we don't really

4     care if the requirements are met, keep paying us millions of

5     dollars, we like it when you pay us money, we don't really

6     care if it comes from you or Gryphon, we just want to keep

7     receiving the money.

8               And Your Honor, we think that that's dispositive and

9     there's really no need to go to the other evidence.  But we

10    did offer other evidence, right?

11              We have the -- and if we could go to Slide 9.

12              Right?  We have Core approving a press release

13    disclosing the delegation agreement.  Surely, if Core thinks

14    this delegation isn't effective, it's going to say, wait, hold

15    on, you can't disclose this delegation.  So we have the

16    approval of the delegation agreement.

17              And finally, we also have the statements from

18    Gryphon that this is actually our money.

19              And unless you have more questions on that branch of

20    the motion, I'll move on to the limitations of liability.

21              THE COURT:  Let me just finish looking.  Okay.

22              MR. WOLFE:  If it's okay with Your Honor, I know

23    that Tad began with contract construction, and I'd like to

24    begin with public policy.

25              THE COURT:  Okay.

1          MR. WOLFE:  Sure.  So Core contends that Section

2     5(c) eliminates certain categories of damages, such as lost

3     profits, and that Section 5(d) limits its liability to just

4     over $84,000.  And its argument fails for several reasons:

5          The parties agree that Delaware public policy

6     controls.  And Delaware public policy will not permit a party

7     to exculpate itself for intentional torts or contract claims

8     that include allegations of bad faith.  And we've included

9     both claims here.

10         Now there was actually -- we've put up on the deck

11    for you the paragraphs discussing why intentional torts can't

12    be disclaimed.  And while my adversary said today, oh, look at

13    the underlying opinions, see, at the limitations of liability

14    and their scope, that was nowhere within their reply papers.

15    And I am unfamiliar with any jurisdiction that permits

16    conversion claims to be disclaimed.  And the purpose of

17    Delaware law indicates they can't be.  And I've never seen a

18    decision that says intentional court -- tort can be

19    disclaimed.

20         THE COURT:  Right.  But a conversion claim isn't

21    under the contract, right?

22         MR. WOLFE:  Correct.

23         THE COURT:  Okay.  So ...

24         MR. WOLFE:  I think your point is, either way, it

25    probably wouldn't subject to the --

1              THE COURT:  But since --

2              MR. WOLFE:  -- limitation of --

3              THE COURT:  I don't --

4              MR. WOLFE:  -- liability.

5              THE COURT:  I don't need to figure that out because

6    I -- your theory on the -- your theory on the conversion claim

7    is that there is no contract and their post-contract

8    termination, they're wrongfully keeping my money and have no

9    right to do so.

10             MR. WOLFE:  I think it might be -- wind up being a

11   little bit more nuanced than that.

12             THE COURT:  Okay.

13             MR. WOLFE:  But either way, I think we're in

14   agreement that the limitations of liability can't limit the

15   conversion claims.

16             THE COURT:  I wouldn't make that assumption.

17             MR. WOLFE:  Okay.  Either way, that's our position.

18             THE COURT:  Okay.

19             MR. WOLFE:  And then, so, to our mind, what this

20   really boils down to is whether contractual bad faith can be

21   disclaimed.  And our adversaries say that there is no Delaware

22   precedent for striking a limitation on contractual liability

23   because of a party's bad faith breach of contract.  And what

24   we submit is that his is a misstatement of Delaware law.

25             And we cited Delaware precedent indicating that

1      Delaware, like most jurisdictions, in fact, does not allow a
2      party to limit its liability for a bad faith breach.  My
3      adversaries cited the same case law.
4              And we would refer you to the Petroleum v. Magellan
5      Terminals Holdings case.  And there, the question was whether
6      a limitation of liability was enforceable against bad faith
7      breach.  And as you can see, the limitation of liability was
8      very -- at issue in Magellan was very similar to the
9      limitation of liability here, as reflected in Section 5(c).
10     And what the Court holds is whether a bad faith breach can be
11     limited is an issue of fact that cannot be decided before
12     trial.  And I quote:
13             "The case law from the Superior Court carves out an
14     exception for bad faith breaches of contract in specific
15     instances.
16             "It is undisputed that parties cannot absolve
17     themselves for their own conduct amounting to fraud. However,
18     as to claims that fall somewhere short of fraud, such as
19     claims for bad faith, the Court must undergo a factual
20     analysis that is premature on summary judgment."
21             Now, on reply, my adversaries say that the Magellan
22     case only reached this conclusion because there were also
23     fraudulent inducement allegations in the case.  And if you
24     read the case, the presence of fraud allegations ultimately
25     had nothing to do with the Court's ruling on bad faith breach

1  of contract.  You can see it right there, it's undisputed that

2  fraud can't be exculpated.  The only question is whether bad

3  faith breach of contract can be.  And the Court says that that

4  raises fact issues that I need to address at trial.

5          And we'd also submit that Petroleum is consistent

6  with the majority position in Delaware that bad faith breaches

7  cannot be limited.  And for example -- if we could go to the

8  next slide.

9          In the context of interpreting a contract

10 construction provision that did not specifically carve out an

11 exception for bad faith, the Court in JA Jones Construction v.

12 City of Dover observed that:

13         "Even if a contract purports to give a general

14 exoneration from 'damages,' it will not protect a party from a

15 claim involving its own fraud or bad faith."

16         And my adversaries in their brief say that JA Jones

17 only dealt with tort liability.  That's not correct.  The

18 Court in Petroleum -- as the Court in Petroleum noted, JA

19 Jones also dealt with contract liability.

20         And if we can go to the next slide.

21         The rule in -- and it may be the rule in every

22 jurisdiction, but it's certainly the rule in the majority of

23 jurisdictions, is consistent with the law we've just given

24 you, which is that bad faith breach cannot be limited.  And my

25 adversaries didn't dispute that.

1          And I'd like to read you what the Texas Supreme

2     Court has said -- to say on that issue in Zachry Construction

3     Corp.:

4          "Generally, a contractual provision 'exempting a

5     party from tort liability for harm caused intentionally or

6     recklessly is unenforceable on grounds of public policy.'  We

7     think the same may be said of contract liability.  To conclude

8     otherwise would incentivize wrongful conduct and damage

9     contractual relations.  This conclusion is supported by lower

10    court decisions in Texas8 and court decisions in at least 28

11    American jurisdictions.  We join this overwhelming consensus."

12         And so the question then is -- and I think we've

13    addressed the public policy aspect of my adversary's motion.

14         THE COURT:  Right.

15         MR. WOLFE:  And --

16         THE COURT:  So let me ask you.

17         MR. WOLFE:  Yes, of course.

18         THE COURT:  I'm looking at your proof of claim.  And

19    so, looking I'm at Paragraph 13.

20         MR. WOLFE:  Uh-huh.

21         And it says:

22         "Sphere filed a demand for arbitration against Core,

23    asserting claims for repudiation of a contract, breach of

24    contract, breach of the implied covenant of good faith and

25    fair dealing, unjust enrichment, conversion, promissory

1     estoppel."

2          MR. WOLFE:  Uh-huh.

3          THE COURT:  No assertion of fraud or bad faith.

4          Then it goes on down in 16:

5          "In addition to the other amounts stated herein, the

6     proof of claim is an unliquidated amount for any amount of

7     losses and damages arising from Core's failure to satisfy its

8     obligations to the claimant, included, but not limited to

9     consequential expectation and reliance damages and any fees

10    and expenses."

11         MR. WOLFE:  So I think our underlying -- obviously,

12    we don't have our underlying arbitration demand.  But I think

13    we make clear that we're pursuing bad faith.

14         But I'd also note that a breach of implied covenant

15    of good faith and fair dealing, under Delaware law,

16    necessarily requires proof that -- of a bad faith breach, and

17    so that's where we would rely on there.

18         THE COURT:  All right.

19         MR. WOLFE:  And so, again, that -- so we're -- I

20    guess we're going to where I was going, which was:  In their

21    motion, my adversaries promised you very narrow legal issues

22    of contract interpretation.  And in the reply, their giving

23    you very fact-heavy questions on whether bad faith has been --

24    whether we're going to be able to prove bad faith on this

25    record.  And that's a fact -- bad faith is a classic fact

1    question and that is -- would be inappropriate to be resolved

2    now, before there's been discovery.

3            But on top of it, we've given you evidence that

4    there was, in fact, bad faith conduct.  As reflected in Ms.

5    Trompeter's declaration, Core hooked up Sphere's miners and

6    used them to mine bitcoin for its own benefit.  It stated it

7    had compensated Sphere, but never did so.  The contract may

8    not say explicitly, oh, gee, you can't hook up your customers'

9    miners and use it for your own benefit, but it's surely bad

10    faith conduct to do so.

11            And we'd also submit that accepting $35 million in

12    deposits and then maybe keeping part of the contract in place,

13    maybe not, and then just refusing to take on more miners is

14    also bad faith conduct.

15            And I'd like to make one last point here, and this

16    was another argument raised in the reply, not in the opening.

17    Core is citing to the anti-bootstrapping rule, which precludes

18    a party from alleging a fraud claim in the guise of a breach

19    of contract.  And I think I heard my friend on the other side

20    also mention fraud.  We haven't asserted any fraud claims, so

21    the anti-bootstrapping rule really has no application here.

22            I'll move -- unless you have any more questions on

23    public policy, I'll move to contract interpretation.

24            THE COURT:  No, I think I'm good.  Thank you.

25            MR. WOLFE:  Okay.  So Section 5(d) provides -- and

1    I'll -- there's language in the middle.  But the gist is

2    Core's total liability would not exceed an amount equal to one

3    month's fee payable to Core pursuant to Order Number 2.  And

4    Core's contention is that Section 5(d) unambiguously limits

5    its liability to the amount charged on the last invoice before

6    it files for summary judgment; namely, $84,685.94.

7              THE COURT:  So I'll help you with that.  I don't buy

8    that argument at all.

9              MR. WOLFE:  Well --

10             THE COURT:  I also don't buy the one that it's the

11   most expensive, which was yours.  So I got it.

12             MR. WOLFE:  Okay.  Well, fortunately, we didn't move

13   for summary judgment on that, so I don't --

14             THE COURT:  All I'm just telling you is I didn't

15   believe either one of you on that issue.

16             MR. WOLFE:  Well, I'll reserve on that for later.

17             So I'm going to move now just to a final word on

18   discovery, which is, look, we submitted a Rule 56(d) motion --

19   or affidavit, excuse me.  I don't think you need to reach it.

20   But I do want to say just a word on discovery.

21             The norm, the norm in the run-of-the-mill case, 99.9

22   percent of cases, is that you get to -- you get to have your

23   claims heard on a full discovery record.

24             THE COURT:  Uh-huh.

25             MR. WOLFE:  And this is not the case that deserves

1    to be cut off at the knees before we have that record.

2              And I'm a baseball fan and I thought -- sorry.

3              THE COURT:  So let me ask you.  What's the end

4    result in this.  So you learn today that somebody still has a

5    contract.  Nobody has moved to do anything with that contract.

6    I mean, you told me that you had miners that were there, you

7    dispute who they belonged to.  You told me that you agree that

8    you should pay for them.  And there's -- the debtors are

9    standing up saying there's a contract between them and your

10   manager.  So what's the end result in this?

11             MR. WOLFE:  Well, I'm going to dispute whether there

12   is a contract.  They told us --

13             THE COURT:  But just assume --

14             MR. WOLFE:  -- it was --

15             THE COURT:  -- for purposes --

16             MR. WOLFE:  All right.

17             THE COURT:  -- of the --

18             MR. WOLFE:  So --

19             THE COURT:  -- conversation there's some sort of

20   contract.

21             MR. WOLFE:  Yeah.

22             THE COURT:  Because you still got people there,

23   right?

24             MR. WOLFE:  You mean miners there.

25             THE COURT:  Yeah.

1          MR. WOLFE:  Sure.  So you're asking what's the end
2    result?

3          THE COURT:  Yeah.

4          MR. WOLFE:  We sue on our claims.  We prove that
5    there was a breach or we prove a non-contract claim and we get
6    our money back and potentially limited by a limitation
7    liability provision.

8          THE COURT:  Well, you get a claim --

9          MR. WOLFE:  Maybe --

10          THE COURT:  -- that's potentially --

11          MR. WOLFE:  Yes.

12          THE COURT:  You may not get your money back at all.

13          MR. WOLFE:  Sure.  Fair enough.  We get a claim.

14          THE COURT:  Okay.  But the miners go away.

15          MR. WOLFE:  Hopefully, we'll get them back.

16          THE COURT:  I don't know how that works, so okay.
17    But --

18          MR. WOLFE:  It's part of --

19          THE COURT:  -- at --

20          MR. WOLFE:  -- our proof of claim.

21          THE COURT:  At the end of the day -- I'm sorry.
22    What?

23          MR. WOLFE:  The miners are part of our proof of
24    claim.

25          THE COURT:  Well, I mean, at the end of the day,

1   what you get is a general unsecured claim, right?

2           MR. WOLFE:  Sure.

3           THE COURT:  I mean, maybe you've got some basis for

4   an admin claim, I haven't heard it yet, but maybe you do.  So

5   you end up getting a general unsecured claim, right?

6           MR. WOLFE:  Uh-huh.

7           THE COURT:  And your relationship with Core is

8   terminated, to the extent that you had one.

9           MR. WOLFE:  Fair.

10          THE COURT:  Fair?

11          MR. WOLFE:  Fair.

12          THE COURT:  Okay.

13          MR. WOLFE:  And of course, there's always the

14  potential for a negotation in something, yeah.

15          THE COURT:  I'm just trying to understand what the

16  end game is because -- okay.

17          MR. WOLFE:  Well, we're trying --

18          THE COURT:  I'll --

19          MR. WOLFE:  -- to get our money back and that's the

20  end game.  And if it's through in a general unsecured claim,

21  we're in a better position than we are today.

22          THE COURT:  Okay.  And what I'm really trying to

23  understand --

24          MR. WOLFE:  Yeah.

25          THE COURT:  -- is you're not asserting that there's

1    some sort of trust fund.  It's just you believe you gave these

2    folks a deposit in return for services.  There's a dispute

3    about who services were provided to and who's entitled to act

4    with respect to whatever agreement it is that parties think

5    exist.

6            But at the end of the day -- I mean, I've been

7    pointed to nothing and I've read nothing which would suggest

8    that there is a fund there or there's a -- some sort of trust

9    fund theory.  It's just you have a claim, like a person who

10   sold a box of pencils and didn't get paid on their receivable.

11           MR. WOLFE:  If you don't mind, I'd like to consult

12   with my esteemed co-counsel on that.

13           THE COURT:  That would be great because it helps me

14   understand what question to ask next.

15           Mr. Davidson.

16           MR. DAVIDSON:  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon.

18           MR. DAVIDSON:  Tad Davidson for Sphere.

19           I think the proof of claim we reserved rights to

20   assert election of remedies and other sort of arguments,

21   reserved --

22           THE COURT:  You did.

23           MR. DAVIDSON:  -- rights for an admin claim.

24           THE COURT:  I'm pressing you, that's all.

25           MR. DAVIDSON:  Yeah.

1        THE COURT:  I'm trying to understand.

2        MR. DAVIDSON:  We understand the Court's pressing

3    and concern and questions about that trust fund issue.  We're

4    not waiving those rights, but we haven't asserted them yet.

5        THE COURT:  Well, when was the bar date?

6        MR. DAVIDSON:  Before we filed our -- or --

7        THE COURT:  Has it now run?

8        MR. DAVIDSON:  It's passed, yeah.

9        THE COURT:  So I'm going to guess a trust fund claim

10   would be viewed as a new claim, probably gone.

11       MR. DAVIDSON:  Whatever the effect of the bar date

12   would be.

13       THE COURT:  I got it.  Okay.

14       MR. DAVIDSON:  Thank you.

15       THE COURT:  And Mr. Tsekerides have we -- do we have

16   -- I'm trying to figure out what we're really fighting about.

17   And have we figured out what the likely distribution to GUCs

18   is going to be?

19       UNIDENTIFIED:  I think the last version of the plan

20   is stock, right?

21       UNIDENTIFIED:  Right.

22       MR. TSEKERIDES: (Not identified) Your Honor, it's a

23   hundred-cent case that gives GUCs --

24       THE COURT:  In terms of cash --

25       MR. TSEKERIDES:  Equity.

1          THE COURT:  -- to unsecured?

2          MR. TSEKERIDES:  Equity.

3          UNIDENTIFIED:  It's converted --

4          THE COURT:  So it's --

5          UNIDENTIFIED:  -- to equity.

6          THE COURT:  Equity.  Okay.  And was that

7    contemplated -- I mean, in terms of getting your money back,

8    that is an entirely different world, right?

9          UNIDENTIFIED:  Like I said, Your Honor, I think --

10         THE COURT:  Can I just get -- so parties are

11   listening.  So just so everyone can hear.

12         UNIDENTIFIED:  As I said, something is better than

13   nothing.

14         THE COURT:  Okay.

15         MR. DAVIDSON:  Said differently, Your Honor, if this

16   were a pot plan with a million dollars in it, we might not be

17   here fighting so hard.  But we've got a proposed plan that at

18   least has an economic recovery that says our claims are going

19   to be paid in full.  Yes, it's in equity, but it's still, you

20   know, $35 million of equity based upon the value of the

21   reorganized company.

22         THE COURT:  Got it.  I wasn't arguing with you --

23         MR. DAVIDSON:  Yeah.

24         THE COURT:  -- just trying to understand.  All

25   right.

1          UNIDENTIFIED:  Just a couple of points, if you don't
2     mind.
3          UNIDENTIFIED:  Oh (indiscernible)
4          THE COURT:  No, no, no.
5          UNIDENTIFIED:  I thought you were finished.
6          THE COURT:  And I've --
7          UNIDENTIFIED:  I apologize.
8          THE COURT:  I've interrupted you a million times.
9          UNIDENTIFIED:  Yeah.
10         THE COURT:  I want you to have --
11         MR. WOLFE:  And I've enjoyed it, Your Honor.
12         THE COURT:  -- all the time you want.
13         MR. WOLFE:  It's much lonelier not to have the
14    conversation, so ...
15         THE COURT:  I got it.  All right.
16         MR. WOLFE:  I just want to say one final word.  So,
17    look, we've put up -- we've put up the slide.  And I just want
18    to say just a couple more words on when it's appropriate to
19    eliminate discovery or to -- excuse me -- to eliminate a case
20    before discovery is complete.
21         As we pointed out in our papers, courts applying
22    Delaware law never rule on the application of partial
23    limitations of liability like those at issue here without the
24    benefit of discovery.  And my adversaries did not cite a
25    single case to you that did so.  And my adversaries did not

69

1    cite a remotely similar case to this one that would have cut

2    off the knees of the case before discovery has commenced.

3              THE COURT:  Sure.

4              MR. WOLFE:  And when a party files for bankruptcy

5    protection, they incur certain obligations that one does as to

6    meet contested matter.  And this is an immensely important

7    case to my client and we deserve our day in court and to

8    present it to you with a full record at trial, and we look

9    forward to that.

10             THE COURT:  Sure.

11             MR. WOLFE:  Thank you.

12             THE COURT:  Let me -- what is it that you think

13   you're going to need, I mean discovery-wise?  Because isn't

14   most of this -- I got it that you want to go take the depo of

15   the guy --

16             MR. WOLFE:  Yeah.

17             THE COURT:  -- who either said or didn't say certain

18   things.

19             MR. WOLFE:  Sure.

20             THE COURT:  But what else do you really need for

21   your case?  I would think it would be coming back the other

22   way.

23             MR. WOLFE:  I think we're -- well, look.  I guess,

24   if there's a disputed issue of material fact on whether the

25   recommend -- the -- on whether the requirements were made

1       today, there's going to be a dispute tomorrow, too, regardless

2       of what discovery reveals, most likely.

3                   THE COURT:  I just didn't hear.  Whether the what?

4                   MR. WOLFE:  If there's a dispute today regard -- of

5       -- right?  I assume that their motion for summary judgment was

6       their best shot at this.  If there's a dispute today that --

7       about whether the requirements were met, then there's going to

8       be a dispute tomorrow, too, and that will  ultimately be --

9       need to be resolved in a credibility determination.  We need

10      depositions --

11                  THE COURT:  But isn't that the same depo, you're

12      going to take --

13                  MR. WOLFE:  Yes.

14                  THE COURT:  -- of the guys that --

15                  MR. WOLFE:  Fair enough.

16                  THE COURT:  Did you ever --

17                  MR. WOLFE:  So we need --

18                  THE COURT:  Did you ever specify anything?

19                  MR. WOLFE:  We'll need discovery into whether the

20      recommendations were -- or the -- what the requirements were,

21      whether they were met, whether they were waived --

22                  THE COURT:  Right.  Is this something you could try

23      in 60 days?

24                  MR. WOLFE:  In 60 days?  I don't know that that's

25      realistic, in part because my -- our star witness is,

1    unfortunately, undergoing cancer treatments and is expecting a

2    major --

3              THE COURT:  My condolences.

4              MR. WOLFE:  -- a major procedure.

5              THE COURT:  And we don't need that on the record.

6    You can just say that she's not available, that's --

7              MR. WOLFE:  I apologize.

8              THE COURT:  No, not to me, to her.

9              MR. WOLFE:  Yeah.

10             THE COURT:  So -- but barring working through that,

11   that is something that could be done -- it just doesn't sound

12   like it's that complicated.

13             MR. WOLFE:  Uh-huh.

14             THE COURT:  It's a big number, but the disputes are

15   relatively confined.  We ought to be able to do this

16   relatively quickly.  It's not something we need six months of

17   discovery and, you know, three months to get ready, and we try

18   this sometime next year.

19             MR. WOLFE:  And --

20             THE COURT:  We ought to be able to do this before

21   the end of the year, if we're going to do it.

22             MR. WOLFE:  I think we -- I'm not sure about that.

23   Let me -- can I think about it.

24             THE COURT:  All right.  So let me ask you this.

25             MR. WOLFE:  Yeah, sure.

1          THE COURT:  If -- subject to all of the legal

2     arguments that you want to make with respect to the effect of

3     certain provisions --

4          MR. WOLFE:  Uh-huh.

5          THE COURT:  -- do you agree with the basic premise

6     that, if you have rights under the contract, they come full

7     burdened with all of the obligations under the contract?

8          MR. WOLFE:  I think that it's a little complicated

9     because there was a partial assignment.  So I think --

10          THE COURT:  No --

11          MR. WOLFE:  But in terms of the limitations of

12     liability, right?  Which is really what we're talking about --

13          THE COURT:  Right.

14          MR. WOLFE:  Yeah.

15          THE COURT:  Okay.  So you agree that, if you are --

16     if you have rights under the contract, you are subject to all

17     of the limitations that are set forth under the contract.

18          MR. WOLFE:  The ones we've just discussed today.

19     Absolutely, Your Honor.

20          THE COURT:  Okay.  Are there others that I've

21     missed?

22          MR. WOLFE:  I'm sure my adversaries will bring them

23     up to you --

24          THE COURT:  Okay.

25          MR. WOLFE:  -- if they have them.

1           THE COURT:  All right.  All right.  I think I got

2      it.  Thank you for --

3           MR. WOLFE:  Thank you.

4           THE COURT:  -- the engagement.

5           MR. TSEKERIDES:  Okay.  Just briefly, Your Honor.

6      And I'll pick up on that last point because I think there were

7      some schedules submitted and we had a very different view.  We

8      agree with Your Honor, we think this could be done by the end

9      of the year, so we -- you know, we can turn to that when we

10     need to.  But their schedule had us going to April, which, to

11     us, is a nonstarter.

12          THE COURT:  Uh-huh.

13          MR. TSEKERIDES:  Just a few points I wanted to make.

14          There was some accusation that whatever happened at

15     that April Miami lunch that, somehow, that's a basis for this

16     estoppel point that counsel was trying to find in his proof of

17     claim.

18          All the money that was paid was paid before then.

19     If you look at the Order Number 2, that adds up to about $35

20     million.

21          MR. WOLFE:  It's not correct, Your Honor.

22          MR. TSEKERIDES:  Okay.  Well, if you look at the

23     order, when you say keep paying millions, when you add up --

24     and if I'm wrong, I'm wrong.  But if -- when I add up Order

25     Number 2 and what the payments were, they come up to about 35

74

1      million.  So it's not like we were sitting around saying keep

2      sending us money.

3              But in any event, we did cite -- oh, sorry.  Go

4      ahead, Your Honor.

5              THE COURT:  No, no, no.  So let me ask you this.  So

6      let's assume that somebody filed a motion to compel rejection

7      of the agreement, somebody with standing.  I'm trying --

8              MR. TSEKERIDES:  Like Gryphon.

9              THE COURT:  -- to make an easy point.

10             MR. TSEKERIDES:  Like Gryphon.

11             THE COURT:  Whoever, whoever has standing files a

12     motion to compel rejection because -- and they allege that you

13     can't cure, can't assume.  Then what happens to the balance;

14     does that just go into a cure claim?

15             MR. TSEKERIDES:  I mean, it's a good question, Your

16     Honor.  I haven't --

17             THE COURT:  Or a --

18             MR. TSEKERIDES:  I mean --

19             THE COURT:  -- rejection --

20             MR. TSEKERIDES:  -- we can --

21             THE COURT:  -- claim.  Excuse me.

22             MR. TSEKERIDES:  Yeah.  I mean, it would be a

23     rejection damage claim.

24             But we -- in connection with this, if the party that

25     -- I mean, I'll just, you know, be candid.  If Gryphon were to

1     have done that, we think that they breached the contract

2     because they didn't supply these miners, that Gryphon --

3                 THE COURT:  Okay.

4                 MR. TSEKERIDES:  -- breached the contract.

5                 THE COURT:  So --

6                 MR. TSEKERIDES:  We'll still performing.  We have

7     600 miners and we're using Order Number 2.

8                 THE COURT:  So what --

9                 MR. TSEKERIDES:  And I --

10                THE COURT:  What would the effect of that be, if, in

11    fact, Gryphon breached the agreement?

12                MR. TSEKERIDES:  We would say we get to keep the

13    money.

14                THE COURT:  Under what theory?

15                MR. TSEKERIDES:  Under the contract.  We built out

16    facilities.  The provision I read to you about the limitations

17    of liability has a carveout that runs in our favor --

18                THE COURT:  But you --

19                MR. TSEKERIDES:  -- for loss --

20                THE COURT:  You would have to file a lawsuit and

21    win.

22                MR. TSEKERIDES:  Oh, yeah.  I mean --

23                THE COURT:  Okay.

24                MR. TSEKERIDES:  If -- yeah, I mean, we'd --

25                THE COURT:  You don't --

1          MR. TSEKERIDES:  -- have a --

2          THE COURT:  -- just --

3          MR. TSEKERIDES:  -- contested matter and an

4     adversary proceeding probably.

5          THE COURT:  Right.  You just don't --

6          MR. TSEKERIDES:  Yeah.

7          THE COURT:  You just don't --

8          MR. TSEKERIDES:  Oh, no.

9          THE COURT:  -- get to keep --

10         MR. TSEKERIDES:  No, no.  Yeah.  No --

11         THE COURT:  Okay.  Okay.

12         MR. TSEKERIDES:  I mean --

13         THE COURT:  Got it.

14         MR. TSEKERIDES:  Yeah.

15         THE COURT:  Okay.

16         MR. TSEKERIDES:  Yeah, of course.

17         THE COURT:  So, if we went down that path, there

18    would then be a piece of litigation somewhere.

19         MR. TSEKERIDES:  Yeah, I mean ...

20         THE COURT:  And so you're objecting to the proof of

21    claim.  And so, if you win, you're not pursuing anything else,

22    you're just done with it.  Is that right?

23

24         MR. TSEKERIDES:  Yeah.  Well, the only entity that's

25    asked for money is Sphere --

1          THE COURT:  Right.

2          MR. TSEKERIDES:  -- right?  Gryphon didn't.  We --

3    in our objection to the proof of claim, we pointed all out how

4    they didn't have the wherewithal to provide the miners that

5    were part of the con -- all that stuff we would get into to

6    show that there's no basis, even if they are a party, that

7    they can't recover this money; we would get into some of that

8    in discovery.

9          And so, if we won, at the end of the day, all of

10   that, that would be it.  We wouldn't be pursuing anybody else

11   for money because we'd be resolving that issue here, in this

12   context.  And my guess is there will be some subpoenaing of

13   the Gryphon people in this context, that the --

14         THE COURT:  Well, I was just trying to figure out

15   should they be -- since -- I didn't really understand what the

16   relationship is between Sphere and Gryphon now.  Is it -- do

17   we need to join those folks?

18         I mean, what I don't want to do is I don't want to

19   do this twice.  I mean, I know we got a bar date, but I don't

20   want somebody to come -- I don't want them to run in and go,

21   well, no, it was my money and I have a claim.

22         MR. TSEKERIDES:  To which we'd say, well, bar dates

23   --

24         THE COURT:  I got all of that.

25         MR. TSEKERIDES:  Yeah, right.

1          THE COURT:  I mean, but you know, we're in a Chapter

2     11.  You got excusable neglect and, you know, well, I didn't -

3     - I thought they were going to do it right and they didn't and

4     I -- you know, I'm just trying to be efficient about this.  I

5     only want to do this one time.

6          MR. TSEKERIDES:  Yeah.  Well, I mean, at the risk of

7     thinking out loud here on the podium, you know, we want to be

8     done with this as quickly as possible.

9          THE COURT:  Are there --

10          MR. TSEKERIDES:  We also -- everyone is talking

11     about Chapter 11.  Yeah, that's right.  We have a plan we want

12     to get done, right?  And we don't want things hanging out.

13     So, I mean, I'd have some concern inviting more people to the

14     party.  But I take your point.  I mean, we're going to be

15     saying things about Gryphon.  We will be deposing Gryphon.  I

16     mean, I'm going to subpoena them, no doubt.

17          You know, but at the end of the day, you know, I'd

18     still get back to it's a problem between those guys one some

19     level.  Like, right now, right now, there are miners over at

20     Core that we say are Gryphon's miners.

21          THE COURT:  Right.

22          MR. TSEKERIDES:  They say they're their miners.

23     Well, Gryphon thinks they're Gryphon's miners, too.  So that's

24     why the issue of do they have a contract, do they have any

25     rights is so critical to us.

1              And we did propose -- and one of the things I'll

2     just segue, that we did propose taking discovery just on that

3     limimted issue, targeted up front, you know, 30 days, 45 days,

4     whatever, on that issue as an alternative possibility, so we

5     don't have to go down the other path.

6              I mean, our point -- I think I heard some comment

7     that we -- you know, we agree with them that we can't prove

8     bad faith, or not saying that we're not able to prove --

9     that's got nothing to do with this.  Our whole -- the whole

10    point about the bad faith is that's not a basis to get around

11    the limitations provision.

12             So we would say there should be no whatever that

13    discovery even looks like into bad faith because bad faith --

14    and we cited cases, E-Commerce and a couple of others, where

15    the Court said you can't just say bad faith and get around a

16    limitations provision.  So that's kind of a threshold point

17    for you today; otherwise, we're going to need to take

18    discovery on that, too.

19             So, if we're going down that path, then I'm thinking

20    more four months.  If we're going down just the path on the

21    are they a party, then I'm thinking six to eight weeks.

22             THE COURT:  So would you have any objection to

23    including a provision in an order that said that, Gryphon, if

24    you're going to intervene, you do it by this date or you waive

25    any claim against the estate?

1           MR. TSEKERIDES:  I mean, my own view now is they're

2      -- they've already waived it, so I'm not sure that I'd want to

3      open that up to them.

4           THE COURT:  How have they waived it?

5           MR. TSEKERIDES:  They had an opportunity to file a

6      proof of claim and they didn't.

7           THE COURT:  Well, isn't that what Pioneer says, I

8      mean, that you get another bite at the apple?

9           MR. TSEKERIDES:  Well, it's excusable neglect.

10     What's the excuse here?  I -- you know, they know about it,

11     we're --

12          THE COURT:  All I'm trying to do is I only want to

13     do this once.

14          MR. TSEKERIDES:  I appreciate that point and I take

15     that to heart.

16          THE COURT:  This makes absolutely zero sense to me

17     in how we got here, but we're going to keep going.

18          MR. TSEKERIDES:  I'd have to --

19          THE COURT:  And I --

20          MR. TSEKERIDES:  -- confer.  I -- I'm not prepared

21     to say that.

22          THE COURT:  All fine.  Okay.

23          MR. TSEKERIDES:  Right.

24          THE COURT:  All right.

25          MR. TSEKERIDES:  I don't --

1          THE COURT:  I interrupt --

2          MR. TSEKERIDES:  I mean --

3          THE COURT:  I interrupted --

4          MR. TSEKERIDES:  -- I had other --

5          THE COURT:  -- you.  I --

6          MR. TSEKERIDES:  I don't think there's anything else

7    --

8          THE COURT:  My apologies.

9          MR. TSEKERIDES:  -- to really get into, Your Honor.

10   You understand what's going on here, so ...

11          THE COURT:  All right.

12          MR. TSEKERIDES:  Okay.

13          THE COURT:  All right.

14          MR. TSEKERIDES:  Thank you.

15          THE COURT:  Thank you.

16          All right.  And I've got before me -- I've got

17   before me the debtors' motion for summary judgment.

18          I do find that I have jurisdiction over the matter

19   pursuant to 28 U.S.C., Section 1334.  I do find that the

20   resolution of claims against the estate constitutes a core

21   proceeding under 28 U.S.C., Section 157.  I further find that

22   I have the requisite constitutional authority to enter a final

23   order, to the extent applicable, with respect to the motion.

24          Let me start with what I think we have learned

25   today.  And I think we now have -- and I think we now have an

1      admission and agreement, which I find to be binding, that, if,

2      in fact, Sphere has rights in the contract, they come burdened

3      with the obligations under the contract, as well.  That is

4      about as far as I was going to be willing to go today.

5              As I said, I don't buy the theory about that it's

6      the last invoice.  I don't buy the theory that -- at least

7      based on what I've heard, that it's the most expensive

8      invoice.  I don't know how I would figure that out, if, in

9      fact, that limitation applies.

10             I also find the language that's in there about

11     having the -- about having the necessary permissions, if you

12     will -- I don't have -- that's one of the poorly -- the

13     poorest written provisions that I've ever read.  If it was

14     intended to be substantive, someone just didn't do a very good

15     job.  And so I don't know what that means.

16             I am going to have to have testimony on both what it

17     meant at the time because I do find there to be an ambiguity,

18     and I am, obviously, going to hear testimony about whether or

19     not those conditions were met, to the extent that we're going

20     to go down this path of living under the contract.

21             I do think that the attachment to the proof of claim

22     asserts claims that are outside of the agreement.  They don't

23     do it with specificity.  It's hard to figure out exactly what

24     is being asserted.  But that is the basis for some limited

25     discovery.

1          So I am -- with the admission that was made on the

2     record, again, which I accept -- and I don't think it was much

3     of a give at all -- about the status of the contract, I'm

4     going to deny the motion for summary judgment and we're going

5     to move on to scheduling.

6          But I want to tell everybody this is not a six-month

7     thing.  This is not that hard.  I -- you know, I -- again, I

8     don't want to -- I don't begin to pretend to be a doctor or to

9     understand anyone's personal medical condition.  I want to be

10    as sensitive to that as I can be.  But I also have to

11    recognize that this is a company that, if it's going to

12    survive, it has to get out and it has to get out relatively

13    quickly.

14         And this is going to be one of those things that I

15    don't know why we can't try this; or, in fact, I'm going to

16    give you a schedule.  You all can agree to it, but it's going

17    to be a schedule that has a trial date this year.  I'm

18    perfectly happy to let you all work through that.  I'm

19    perfectly happy to pick dates that work for me.  You have your

20    choice.

21         MR. TSEKERIDES:  Will Your Honor give us some ideas

22    what dates you're thinking that work for you and we can work

23    backwards from that?

24         THE COURT:  Sure.  So let me ask.  If you had to

25    guess, worst case, what do you think it takes to try it, a

1     day, two days?

2           MR. TSEKERIDES:  My guess would be two days.  We'd

3     have -- one, two, three, four -- well, let's see how things

4     go.  Maybe three because we'd have a couple -- probably a

5     couple of witnesses from Gryphon, a couple at least from Core,

6     Sphere, probably six fact witnesses, maybe seven.

7           THE COURT:  I can't imagine, but I'll start talking.

8           MR. TSEKERIDES:  You know, I'm just -- I'm thinking

9     out loud here, Your Honor.

10          THE COURT:  Okay.  So you think two days.

11          MR. TSEKERIDES:  Yeah.  I mean, we had put just --

12    we had filed our proposal.  It had us having -- I mean, we had

13    a trial in January, but I'm certainly not opposed to before

14    the end of the year, just, you know, being mindful of the

15    holidays, but --

16          THE COURT:  What holidays?

17          MR. TSEKERIDES:  I don't know.  You know.

18          THE COURT:  Okay.  In all seriousness, I mean, if

19    you want it in January, it's like this is -- you're the

20    debtor.

21          MR. TSEKERIDES:  I am the debtor.

22          THE COURT:  And it's my view --

23          MR. TSEKERIDES:  Well ...

24          THE COURT:  -- that this needs to get out --

25          MR. TSEKERIDES:  Let me confer with my friend here.

1          THE COURT:  Sure.

2      (Participants confer)

3          MR. WOLFE:  Your Honor, it would also just -- Ms.

4      Trompeter, who is -- I think everybody will agree is an

5      integral witness --

6          THE COURT:  Uh-huh.

7          MR. WOLFE:  -- she has procedures scheduled for

8      tomorrow, actually, that are very important, and then the end

9      of October.  So that's the potential (indiscernible) that we

10     would have.

11         THE COURT:  All right.  So January would work better

12     for you, as well.  I saw a nod yes.

13         MR. WOLFE:  Yeah.  Yes.

14         THE COURT:  Mr. Tsekerides.

15         MR. TSEKERIDES:  Mr. Carlson was just telling me

16     December would be better.  But if we can do it and maybe split

17     the baby and have it in the beginning part of January.

18         THE COURT:  Sure.  Do you want the 2nd and the 3rd?

19         MR. TSEKERIDES:  God love you.  How about the 3rd?

20     (Laughter)

21         THE COURT:  I'll have to take a break on the 4th,

22     but I can absolutely give you the 3rd and the 4th.  And what

23     I'll do is we'll do a late lunch.  You guys can go grab a bite

24     and I'll take up the couple matters that are scheduled; they

25     aren't complicated.

1                    MR. TSEKERIDES:  So that's -- what is that?

2                    THE COURT:  That's Wednesday --

3                    MR. TSEKERIDES:  Wednesday and --

4                    THE COURT:  -- the 3rd and Thursday the 4th.

5                    MR. TSEKERIDES:  Okay.

6            (Participants confer)

7                    MR. TSEKERIDES:  And then should we just confer on

8        working back from there or --

9                    THE COURT:  Works for me.

10                    MR. TSEKERIDES:  Is that all right?

11                    THE COURT:  If you guys can talk and work through

12        those, that's all fine by me.

13            (Participants confer)

14                    THE COURT:  Mr. Davidson?

15            (Participants confer)

16                    MR. DAVIDSON:  The concern we have with the 3rd and

17        4th of January is just we're talking about six witnesses,

18        trying to make six witnesses available right after the New

19        Year, which I think might have been some of the holidays you

20        might have been referring to.  So we think later in January

21        probably works better from availability for witnesses.  We

22        don't even know who they are yet.

23            (Participants confer)

24                    MR. TSEKERIDES:  I mean, I know who my --

25                    MR. DAVIDSON:  Later in January?

1          MR. TSEKERIDES:  I'm okay with the 3rd and the 4th.

2     I mean, I know who my guys are going to be.

3          THE COURT:  You know what?  It's -- there's a lot to

4     learn in all of this because, again, this still makes no sense

5     to me as to why you guys are standing here.  So I'm going to

6     give you the 3rd and the 4th.  And Vriana, just reserve the

7     5th, as well.

8          THE COURT OFFICER:  Okay.

9          THE COURT:  If it turns out to be a problem, you

10    know how to talk jointly to Mr. Alonzo.  He's got full ability

11    to move the calendar.  But this really needs to be honed down.

12    I can't imagine there are six witnesses, but I got it.

13         MR. TSEKERIDES:  Okay.

14         THE COURT:  Let me ask you this.  Do you want -- I

15    mean, I trust you all, so I don't do -- I don't require this

16    with folks that I know and trust.  Do you want a final

17    pretrial or you don't care or don't need it?  Do you want to

18    ask for one if you hit a --

19         MR. TSEKERIDES:  Why don't we --

20         THE COURT:  -- log jam in December?

21         MR. DAVIDSON:  We're going to work on an order with

22    those dates and work back and then have the ability to talk to

23    Mr. Alonzo --

24         THE COURT:  Sure.

25         MR. DAVIDSON:  -- as well, to the extent we feel

1    like we need a pretrial and --

2               THE COURT:  No, absolutely.  That's only if you need

3    it.

4               MR. TSEKERIDES:  Yeah.  And if things come up,

5    you're usually available.

6               MR. DAVIDSON:  Yeah, for discovery issues or

7    whatever, but --

8               THE COURT:  Well, discovery, again, because we've

9    got such a short time frame, do not engage in a letter-writing

10   campaign.  Come see me immediately.

11              MR. DAVIDSON:  Yes, Your Honor.

12              THE COURT:  I tend to save paper and email traffic.

13   All right.

14              MR. TSEKERIDES:  Very good.  Okay.

15              THE COURT:  I'm going to -- what I would ask, Mr.

16   Davidson, if you'd just ask a short order that says, for the

17   reasons stated on the record pursuant to Bankruptcy Rule 7052,

18   the motion for summary judgment is denied without prejudice.

19              Things may change, I may learn a lot.  I have so

20   many questions and a guy just, you know, trying to be as quiet

21   as I could be.

22              But with that, sign off as to form only.  By signing

23   off as to form only, you're not waiving any right of appear or

24   review you may have; you're simply confirming that the paper

25   reflects the oral ruling.  All right?

1          MR. DAVIDSON:  Very good.  Yes, Your Honor.

2          THE COURT:  Great.  And if you would shoot Mr.

3  Alonzo a text or an email once you've uploaded the scheduling

4  order, but we've reserved the time.  If that's going to

5  change, you know, let me know ASAP --

6          MR. DAVIDSON:  Okay.

7          THE COURT:  -- because other people will take it.

8  All right?

9          MR. DAVIDSON:  Thank you, Your Honor.

10          MR. TSEKERIDES:  Sure.

11          THE COURT:  All right.  Sorry for keeping you late,

12  sorry for starting late.

13          I'm going to sit right here because I've got to do

14  Judge Isgur's order.  But with that, everybody have a good

15  day.  Thank you.

16          MR. DAVIDSON:  Thank you, Your Honor.

17          (Proceedings concluded at 6:03 p.m.)

18                              * * * * *

19          *I certify that the foregoing is a correct transcript*

20  *to the best of my ability produced from the electronic sound*

21  *recording of the proceedings in the above-entitled matter.*

22      */S/  MARY D. HENRY*
   _____

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*
*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
*JTT TRANSCRIPT #67554*
*DATE FILED:  AUGUST 11, 2023*