# Exhibit 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

### DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.

> **THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**"), and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), represent as follows in support of this claim objection (the "**Objection**") and request entry of an order, substantially in the form attached hereto as Exhibit 1 (the "**Proposed Order**") disallowing Proofs of Claim Nos. 358 and 359 (the "**Sphere POCs**") filed by Sphere 3D Corp. ("**Sphere**") against debtors Core Scientific Operating Company (Claim No. 359) and Core Scientific, Inc. (Claim No. 358).[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 21, 2022) at ¶31 (Dkt. No. 5), Core Scientific,

# I. Preliminary Statement

1. The Sphere POCs must be disallowed for a number of reasons. Most fundamentally, Core has no contracts with Sphere upon which Sphere can base any claim. Instead, the contracts that Sphere references in the Sphere POCs are between Core and an entity called Gryphon Digital Mining, Inc. ("**Gryphon**"). Core and Gryphon entered into a Master Services Agreement ("**MSA**") and two orders that were governed by the MSA: Order #1 and Order #2.[3] The MSA and Order #1 and Order #2 are referred to collectively as the "**Gryphon Hosting Agreements**".[4] It is pursuant to the Gryphon Hosting Agreements that Core hosted (and currently hosts) hundreds of Gryphon's digital-asset mining machines (the "**Miners**"). In exchange for Core's services, Gryphon (not Sphere) made certain pre-payments directly to Core as provided for under the Gryphon Hosting Agreements, and Gryphon (not Sphere) currently hosts Miners with Core.[5] Sphere, with whom Core has no contractual relationship, now brings two identical proofs of claim in which it alleges that Core breached its obligations under the Gryphon Hosting Agreements and seeks to recover, among other things, the pre-payments that Gryphon made to Core under Order #2.

2. In the Sphere POCs, Sphere alleges that Gryphon entered into the Gryphon Hosting Agreements as Sphere's "manager" and that Gryphon assigned all rights under those

---

Inc. changed its name to Core Scientific Operating Company in January 2022. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company. Given that the Sphere POCs are identical, this Objection applies equally to both, and references to "Core" shall include Core Scientific Operating Company and Core Scientific, Inc. for purposes of this Objection.

[3] A true and correct copy of the MSA is attached hereto as Exhibit 2. The attached Exhibits Nos. 2–6 were excerpted from Sphere's Form F-4 filed with the Securities and Exchange Commission on January 5, 2022, and contain redactions applied by Sphere to certain fees and rates. Core will provide the Court with unredacted versions of these Exhibits as may become necessary.

[4] Sphere does not appear to be claiming any rights or recovery under Order #1, but to the extent that it does, any such claims should be disallowed for the same reasons set forth herein.

[5] Core continues to host these few hundred Gryphon Miners as a business courtesy to Gryphon even though Gryphon breached the Gryphon Hosting Agreements.

agreements to Sphere pursuant to a Sub-License and Delegation Agreement entered into between Sphere and Gryphon on October 5, 2021, as amended on December 29, 2021 (the "**Sub-License Agreement**").[6]  Missing from the Gryphon Hosting Agreements, however, is any suggestion that Gryphon was acting as manager for Sphere or in any capacity other than its own.  Indeed, the MSA and Order #2 both refer to and define Gryphon as "the Client."  The MSA further makes clear that "there are no third-party beneficiaries."  Moreover, Core is not a party to the Sub-License Agreement.

        3.    Sphere attempts to circumvent these undisputed facts by pointing to language in Order #2 that permits Gryphon to assign or sub-license the Gryphon Hosting Agreements and its rights and obligations thereunder to Sphere without Core's prior written consent.  Sphere POCs ¶ 7.  Sphere, however, omits the language that immediately follows in that same sentence, which states: "as long as Sphere 3D Corp. satisfies [Core] requirements prior to."  In negotiating this provision, Core expressly added this additional language to ensure that any assignment, delegation, sub-license, sub-lease or transfer of any rights to Sphere was conditioned on Sphere satisfying Core's requirements prior thereto.  These requirements would include, among other things: creditworthiness; Foreign Corrupt Practices Act considerations; Know Your Customer considerations (e.g. business with Chinese entities/Chines government); form of assignment (e.g. how and which rights and obligations were to be transferred, allocated or retained); whether any such assignment would implicate securities laws or constitute an investment contract; and whether any assignment would impact Core's own rights and obligations

---

[6] True and correct copies of the Sub-License Agreement and amendment thereto are attached hereto as <u>Exhibit 5</u> and <u>Exhibit 6</u> respectively.  Notwithstanding Sphere's claims that the relevant agreements are subject to confidentiality, the Sub-License Agreement and the merger agreement between Gryphon and Sphere (the "**Merger Agreement**") were attached to Sphere's Form F-4 public filing, dated January 5, 2022, and are in the public domain.

under the Gryphon Hosting Agreements. Critically, there is nothing in the Sphere POCs, or anywhere else, demonstrating that Sphere ever satisfied (or attempted to satisfy) any such requirements—because Sphere never did.

4. These facts are fatal to Sphere's claims against Core. But even if not, Sphere still cannot recover on the Sphere POCs because it fails to cite any provision in the Sub-License Agreement—or any agreement—pursuant to which Gryphon assigned all of its rights under the Gryphon Hosting Agreements to Sphere. Although Sphere does not point to any specific provision in the Sub-License Agreement it is relying on, the only provision in that agreement that deals with assignment of all of Gryphon's rights is section 2 ("Contingent Assignment"), which states, "[e]ffective immediately *upon the consummation of the Merger* [between Sphere and Gryphon]. . . all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, *the Surviving Corporation*." *See* Sub-License Agreement § 2. (emphasis added). But that provision cannot constitute the basis for an assignment of rights from Gryphon to Sphere. First, section 2 contemplates an assignment of rights from Gryphon to the Surviving Corporation—not Sphere.[7] And second, and even more dispositive, section 2 is contingent "upon the consummation of the Merger," which never happened.

5. Section 1 of the Sub-License Agreement also does nothing to help Sphere's cause. That section, entitled "Sub-License and Delegation," merely provides that Gryphon sub-licensed to Sphere its rights to access and use Core's facility and delegated to Sphere (as between Gryphon and Sphere) Gryphon's obligations to make payments to Core. But nothing in that

---

[7] Moreover, the Surviving Corporation is defined in the unconsummated Merger Agreement as Gryphon.

provision even purports to provide Sphere with all of Gryphon's rights under the Gryphon Hosting Agreements—which section 2 presumably sought to do had the merger been consummated. And, of course, whatever rights section 1 was seeking to sub-license to Sphere, there is nothing demonstrating that the contractual requirements for doing so were ever met in order for any such sub-licensing or delegation to comply with Order #2.

6. In the absence of any contractual support for its contention that Gryphon assigned all of its rights to Sphere, or that it had any relationship with Core at all, Sphere claims that it allegedly "delivered to Core $35,104,363 in cash deposits" as though that should suffice to provide it rights under the Gryphon Hosting Agreements. Sphere POCs, ¶ 8. There is no evidence to support this assertion. In fact, Core's records reflect that all wire transfer banking information relating to the pre-payments made to Core (what Sphere refers to as "deposits") with respect to the Gryphon Hosting Agreements came from Gryphon. Whatever Sphere and Gryphon may have agreed to among themselves as to the source of payment cannot bind Core and certainly cannot change the terms of the Gryphon Hosting Agreements. To the extent Sphere has any dispute related to funds it allegedly provided to Gryphon, that dispute should be with Gryphon, not with Core. Additionally, even if Sphere had made these payments directly to Core, those payments were made on behalf of Gryphon and pursuant to a contract between Core and Gryphon; that posture does nothing to change who had rights under the Gryphon Hosting Agreements.

7. Even if Sphere has rights under the Gryphon Hosting Agreements, which it does not, it cannot have any more rights than those Gryphon enjoyed. Similarly, whatever obligations Gryphon may have had under the Gryphon Hosting Agreements would be binding on Sphere if Sphere is to be believed that the Gryphon Hosting Agreements were sub-licensed. But, as detailed below, and as will be demonstrated during the course of this contested matter, the

Sphere POCs must still be disallowed because Core has performed its obligations under the Gryphon Hosting Agreements, and because Gryphon—or Sphere, to the extent the Gryphon Hosting Agreements were properly assigned—breached the Gryphon Hosting Agreements by failing to deliver anywhere near the number of Miners it was obligated to provide under Order #2.

8.     In the Sphere POCs, Sphere asserts that Core breached the Gryphon Hosting Agreements by allegedly (i) failing to abide by Order #2's "deployment schedule"; (ii) refusing to honor the contractual hosting rate set out in Order #2; and (iii) installing Sphere's miners for Core's own benefit and using them to mine bitcoin for Core's own account.  None of these claims is valid.[8]

9.     First, Core accepted and deployed all Miners that Gryphon delivered to it. To the extent Core ever communicated to Gryphon that there would be any delay in deploying Miners, any such delay would not be a breach of the Gryphon Hosting Agreements because there is no provision that holds Core to a specific date for deployment.  Rather, the MSA contains a disclaimer that Core furnishes its facilities and hosting services on an "as available" basis.  On the other hand, and as the record will show, Gryphon breached the Gryphon Hosting Agreements because the MSA expressly obligated Gryphon to deliver machines on or before the "applicable scheduled delivery date," which Gryphon repeatedly failed to do.  In fact, even though Core expected that it had signed a contract to host 70,000 Miners—and the substantial revenue that would come with such a contract—Gryphon never came anywhere near delivering the 70,000 Miners reflected in Order #2 and likely never had the wherewithal to ever perform under the

---

[8] Gryphon has not filed any proof of claim against Core.

Gryphon Hosting Agreements.[9]  It also appears that Sphere never had the ability to deliver those number of Miners at any time either, and certainly not on the schedule set forth in Order #2—even assuming that it could lay claim to any rights under the Gryphon Hosting Agreements.

10.     Second, Core has not repudiated the hosting services rate in Order #2. Rather, Core has applied and continues to apply that rate to the 639 Miners it currently hosts for Gryphon under Order #1 (100 units) and Order #2 (534 units)—a far cry from the 70,000 units Gryphon obligated itself to deliver in Order #2.  The fact that Core currently hosts Gryphon's Miners (as a business courtesy) is further evidence that Gryphon—not Sphere—had the rights under the Gryphon Hosting Agreements.  Sphere's grievance seems to be that Core is not willing to provide Sphere the hosting rates in Order #2 that Gryphon breached.  But Core has no obligation to offer Sphere the same hosting services rates as contained in Order #2 because it had no contract with Sphere, and Core did not breach any agreement by refusing to do so. Furthermore, because Gryphon breached Order #2 by failing to deliver the tens of thousands of Miners under the Gryphon Hosting Agreements, there is no Order #2 rate to apply for new miners. Indeed, to the extent Gryphon at this point sought to do increased business with Core, it too would need a new MSA and/or new order with new rates and terms.

11.     Third, Core never misappropriated Gryphon's Miners (which Sphere claims belong to it) or proceeds derived therefrom.  Rather, because Gryphon failed to provide Core notice of a delivery of unmarked Gryphon Miners that Core received on February 8, 2022, Core stored those Miners along with its own at Core's hub warehouse in Marble, North Carolina.  When Gryphon informed Core that it had shipped some Miners to Core on February 8, Core investigated

---

[9] For some reason, the Sphere POCs incorrectly claim that the delivery agreed to by Gryphon was 60,000 units, but the math in Order #2 clearly adds up to 70,000 units.

to determine where Gryphon's Miners had been stored and then promptly installed them. The Miners had not, contrary to Sphere's contentions, been used by Core to mine bitcoin for its own account.

12.     Finally, regardless of whatever Gryphon and Sphere may have agreed to between themselves regarding the approximately $35 million in prepayments paid by Gryphon to Core in connection with the Gryphon Hosting Agreements, neither Gryphon nor Sphere has a claim against Core for those funds.  Not only is there nothing in the Gryphon Hosting Agreements that allows for a "refund" of payments that were made to Core in connection with what was supposed to be a delivery by Gryphon of 70,000 Miners (which Gryphon breached), but the MSA expressly makes Gryphon liable to Core for any fees and other amounts owed to Core (like the prepayments) under the Gryphon Hosting Agreements.  Because Gryphon breached the Gryphon Hosting Agreements by failing to provide anything close to the 70,000 Miners it contracted for hosting, it (and Sphere who claims it has Gryphon's rights and obligations) has no right to recover the prepayments made to Core in connection with Gryphon's obligations under the Gryphon Hosting Agreements.  While Core continues to credit those payments against the services it is currently providing Gryphon, which it has been doing since the Gryphon Hosting Agreements inception and which has been known to Sphere, Core has no obligation to "refund" any amounts to Gryphon (or Sphere) under the Gryphon Hosting Agreements or otherwise.

13.     As shown above, Core has performed all obligations under the Gryphon Hosting Agreements and the Sphere POCs should be disallowed in their entirety.  Nevertheless, to the extent Sphere has rights under the Gryphon Hosting Agreements, which it does not, and that Core breached those rights, which it did not, Sphere's claims would be subject to the robust limitation of liability provisions contained in sections 5(c) and 5(d) of the MSA.  These provisions

would bar Sphere from recovering, among other things, any loss of revenue, lost profits, loss of business, cost of cover or any consequential, expectation, reliance, and punitive damages. Additionally, although Sphere states that its claim is worth close to $40 million, Section 5(d) of the MSA caps Core's total liability to 1 month's fee payable to Core under Order #2, which is approximately $84,000.

## II.  Relief Requested

14.     By this Objection, pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of the Proposed Order, disallowing Proofs of Claim Nos. 358 and 359 filed by Sphere in their entirety

## III.  Jurisdiction

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1

## IV.  Background

### A.    *The Gryphon Hosting Agreements*

16.     In the summer of 2021, Gryphon approached Core about entering into a hosting agreement for tens of thousands of miners Gryphon indicated it would have access to in connection with a merger it was contemplating with Sphere.  Gryphon represented to Core that pursuant to that merger, which it expected to close in late 2021 or early 2022, Gryphon would host with Core 70,000 Miners.  Gryphon indicated that a contract had been signed with a company

named BitFuFu for the delivery of the miners that would allow it to perform under the contemplated hosting agreement. Such a hosting agreement would obviously be very lucrative for Core, and terms were negotiated and agreed to based on Gryphon's representations. Sphere was not a party to those negotiations.

17. Following the negotiations between Core and Gryphon, on September 12, 2021, Core entered into the MSA with Gryphon to provide hosting and other services for Gryphon's Miners. Sphere is not a party to the MSA. Pursuant to the MSA, Gryphon entered into two separate orders that would be governed generally by the MSA. The first was Master Service Agreement Order #1 ("**Order #1**"), entered into on or about September 12, 2021.[10] Order #1 was for 100 S19j miners and was meant to be a means by which to test the specifications of a small set of miners to make sure that the configurations at Core would be appropriate to deploy the miners and that any necessary adjustments could be made. Those Miners were received in early October 2021, the appropriate tests were run, and the Miners were deployed. Those Miners all came from Gryphon, not Sphere. Sphere does not appear to be making any claim under Order #1.

18. Master Service Agreement Order #2 ("**Order #2**"), signed by Gryphon and Core on October 5, 2021, sets out the specific terms under which Gryphon was to deliver and Core was to host a total of an additional 70,000 S19 Miners or their equivalent.[11] The MSA and Order #2 make clear that Gryphon is obligated to deliver machines pursuant to the delivery dates contained therein. MSA at § 2(b), Order #2 ("Estimated Delivery Date"). Pursuant to that schedule, Gryphon was to deliver the 70,000 Miners over the course of several months from October 2021 through November 2022. From Gryphon's perspective, it appears the schedule was

---

[10] A true and correct copy of Order #1 is attached hereto as <u>Exhibit 3</u>.

[11] A true and correct copy of Order #2 is attached hereto as <u>Exhibit 4</u>.

meant to coincide with its proposed merger with Sphere. For example, for the months October 2021 through February 2022, Gryphon was to deliver and Core was to host a total of 500 Miners (100 per month). In March 2022, presumably after the merger with Sphere was to close, the number of Miners to be delivered by Gryphon was to increase, with 2,500 in March, 5,000 more in April, 7,500 more in May, and then 10,000 in each of the months of June through October 2002, capping off with 4,500 in November 2022.

19. Order #2 requires that Gryphon make certain payments to Core prior to installation of the Miners, also pursuant to a set schedule set out in Order #2. In total, according to Core's records, Gryphon made payments to Core totaling $35,264,413.57, pursuant to the fee schedule set forth in Order #2 for the hosting services. Core's banking records reflect that for each of these payments, the wire transfers came from Gryphon, not Sphere. One of the purposes of these prepayments is to ensure some level of performance by the counterparty, in this case Gryphon, given the enormous undertaking and investment Core must make to prepare its facilities for the number of expected units. It also serves as a form of down-payment for the services Core was to provide. In short, Gryphon signed a contract with Core to deliver and have Core host 70,000 units—a significant amount—and Core needed some assurance of performance.

**B.** **The Gryphon/Sphere Agreements**

20. On June 3, 2021, Gryphon and Sphere entered into their Merger Agreement. Core is not a party to that agreement. Pursuant to that agreement, Gryphon was to merge with a Sphere subsidiary created for the merger, with Gryphon surviving as the "Surviving Corporation" as defined in the Merger Agreement.

21. On October 5, 2021, Gryphon entered into the Sub-License Agreement with Sphere in connection with the contemplated merger between the two companies. Although the MSA contains a provision explicitly prohibiting the assignment of the Gryphon Hosting

11

Agreements without Core's prior written consent, Core and Gryphon agreed in Order #2 to amend that provision to allow Gryphon to assign its rights under Order #2 to Sphere, provided, however, that Sphere *satisfied Core's requirements prior to assignment*. Order #2 at 4. The Sub-License Agreement contains a provision related to assignment that provides that upon the consummation of a merger between Sphere and Gryphon, all of Gryphon's rights and obligations would be automatically assigned to the Surviving Corporation. Sub-License Agreement § 2.

22.     The Sub-License Agreement also contains a provision through which, as between Gryphon and Sphere, Gryphon sub-licensed to Sphere its right to access and use Core's facility and delegated to Sphere all of its payment obligations under Order #2. Sub-License Agreement § 1.

23.     Sphere and Gryphon never consummated the merger. In fact, Sphere issued a press release on April 4, 2022, indicating that Sphere and Gryphon mutually agreed to terminate their Merger Agreement "due to changing market conditions, the passage of time, and the relative financial positions of the companies, among other factors."[12]

## C.     *Gryphon's Failure to Perform Under the Gryphon Hosting Agreements*

24.     After making its delivery of 100 Miners under Order #1 on October 6, 2021, Gryphon did not deliver its first units under Order #2 until February 8, 2022. In other words, Gryphon missed its October, November, December and January delivery dates. And when it sent those Miners in early February, a total of 297 of them, they were unmarked as being from Gryphon and were delivered to Core in a shipment from the manufacturer that also contained Core's own mining machines. Gryphon did not notify Core about the delivery until sometime thereafter. Once Gryphon notified Core about the shipment of its 297 Miners, it was initially believed that some of

---

[12] A true and correct copy of Sphere's press release dated April 4, 2022, is attached hereto as Exhibit 7.

the Gryphon machines had been mistakenly deployed as Core's self-miners. After investigating further, however, Core determined that the Gryphon Miners had not in fact been deployed as Core self-mining machines, but that they were being stored at Core's hub warehouse in Marble, North Carolina along with Core's own machines. After this discovery, Core promptly deployed Gryphon's 297 Miners and Gryphon received all proceeds mined from those machines. Thus, contrary to Sphere's contention, at no time were any of Gryphon's Miners (which Sphere wrongly refers to as Sphere miners) used for Core's own benefit.

25.     Thereafter, on February 28, 2022 Gryphon sent Core 95 more Miners and then another 108 on March 7, 2022. Under the schedule in Order #2, by March 15, 2022 Gryphon was supposed to have sent Core a total of 3,000 Miners (in addition to the 100 miners under Order #1) but in fact only had a total of approximately 600 Miners delivered by that date. To make matters worse, it was clear by early February 2022 that not only was the Gryphon/Sphere merger a dead letter, but that—more importantly to Core—Gryphon was not going to be in a position to fulfill its contractual obligation under the Gryphon Hosting Agreements to provide the 70,000 Miners agreed to in Order #2.

26.     In fact, on February 11, 2022, Gryphon sent Core an email in which Gryphon makes clear that it would not be able to meet the quantity of units it had agreed to and that it was expecting delivery of miners from another manufacturer, NuMiner, in connection with a contract Sphere apparently entered into in early February that Gryphon presumably would have access to. Even assuming that Miners from NuMiner could be configured for use at Core—which itself would be a tall order given that the racking, switch gear and other infrastructure items would need to be reconfigured—there was nothing to indicate that any Miners from NuMiner would be forthcoming. As it turned out, there were no Miners from NuMiner and neither Sphere nor

Gryphon ever had any such Miners to provide Core, and certainly not any on the scale needed to fulfill the unit obligations in the Gryphon Hosting Agreements.

27.     Even further, while it was already clear that Gryphon had breached the Gryphon Hosting Agreements, by the end of February 2022, Gryphon admitted to Core that deliveries would not be forthcoming, and, by email dated February 28, 2022, Gryphon presented Core with a new delivery schedule that not only reduced the total number of units from 70,000 to 60,000 but also pushed out delivery of the majority of Miners to later months.  For example, although the schedule in Order #2 had Gryphon delivering a total of 15,500 Miners to Core by May 15, 2022, the revised proposed schedule reduced that number to 3,800.  As a result, the cumulative assumed power consumption of Gryphon's Miners for 2022 would decrease by about 30 million watts as compared to the schedule in Order #2, which would significantly reduce the fees owed to Core.   That is not the deal Core signed on to, and Core never accepted a revised schedule from Gryphon.

28.     Given that Gryphon was not delivering Miners to Core in accordance with the Gryphon Hosting Agreements and made clear to Core in February that it could not meet its obligations, Core otherwise utilized the capacity it had previously set aside for Gryphon. Subsequently, in April 2022, Gryphon delivered 597 miners to Core and asked if Core could deploy them immediately.  Core notified Gryphon that it could not deploy the miners immediately but could do so in a few weeks' time.  Gryphon did not want to wait and asked Core to send the units back.  Core obliged, but 39 miners units that were already deployed remained and are part of the current complement of 639 Gryphon Miners at Core today.

29.     Even though the Gryphon Hosting Agreements had been breached by Gryphon, for several months after February 2022 Core tried to work with Gryphon, and later even

Sphere, to devise a solution that could work for all parties. Indeed, while Core did not have any contract with Sphere, Core was willing to work with both parties to find a way to deploy their respective miners and apply the prepayment that had since been forfeited based on Gryphon's breach of the Gryphon Hosting Agreements. A main issue that hampered the negotiations was that Sphere would only consider a deal that used the same terms as the now breached Order #2, which Sphere never had any rights to in the first place. As for Gryphon, it continued to cling to a notion that new Miner deliveries were just around the corner, but because Gryphon was already in breach of Order #2, it too would require a new MSA and/or order if new Miners were to be hosted by Core. In the end, nothing could be worked out, and neither Gryphon nor Sphere was willing to enter into new hosting agreements with Core. While that was their choice, of course, that choice has consequences. And the consequences for Sphere is that the Sphere POCs must be disallowed.

### D. Procedural History

30. On October 31, 2022, Sphere filed a demand for arbitration against Core (the "**Arbitration Demand**").

31. On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

32. The Arbitration Demand has been stayed since the Petition Date pursuant to the automatic stay in Core's bankruptcy.

### E. Sphere's Proofs of Claim

33. On April 13, 2023, Sphere filed two identical claims for $39,541,996.30 plus additional unliquidated amounts against Core Scientific, Inc. and Core Scientific Operating Company. *See* Proofs of Claim Nos. 358, 359. In the addendum comprising part of the Sphere

POCs, Sphere alleges that it is entitled to recover because Gryphon assigned all of its rights under the Gryphon Hosting Agreements to Sphere. Sphere POCs at ¶ 7. Sphere alleges that it has claims against Core for the following amounts: (i) Hosting Prepayments ($34,383,713.00); (ii) Alternative Hosting Costs ($5,000,724.06); (iii) Storage Fees ($157,559.24); and (iv) Bitcoins (unliquidated).[13] *See id.* at ¶ 14

## V. Basis for Relief

34.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). However, *prima facie* validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence . . . ." *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding*, 837 F.2d at 698). And, "the ultimate burden of proof always lies with the claimant." *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

### A.     *Sphere has no rights under the Gryphon Hosting Agreements*

35.     The MSA and Order #2 were entered into solely between Core and Gryphon—not Sphere. *Nothing* in the Gryphon Hosting Agreements supports Sphere's contention that it is a party to those agreements or that Gryphon was acting "as manager for Sphere." *See* Sphere POCs, at ¶ 6. In fact, the MSA (i) makes no reference to Sphere; (ii) defines and refers to Gryphon as the "Client" throughout the MSA, *see* MSA preamble; (iii) provides that the "Client

---

[13] Sphere also claims it may have certain unidentified post-petition claims against Core. Sphere POCs, ¶ 17. As no such claims are identified and no motion for administrative expense has been filed, Core reserves all of its rights against any such claim that Sphere may assert.

may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of [Core]," *see* MSA 8d.; and (iv) expressly disclaims any third-party beneficiaries to the MSA. *See id.* ("Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement."). Similarly, Order #2 also refers to Gryphon exclusively as the "Client," including in the signature block, and makes no reference to Gryphon acting as a manager for Sphere.

36. Further, Sphere's contention that Gryphon assigned all of its contractual rights to Sphere pursuant to Order #2 is without merit. Order #2 amends Section 8(d) of the MSA ("Assignment and Subcontracting") such that Gryphon is "*permitted* to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order #1 and Order #2, or any of its rights and obligations [thereunder], to Sphere 3D Corp. . . . without the prior written consent of [Core] *as long as Sphere 3D Corp. satisfies* [Core's] *requirements prior to*." *See* Order #2 (emphasis added). This amendment does not assign any rights under the MSA or Order #2 to Sphere but provides only that Gryphon is *permitted* to assign its rights to Sphere—which Gryphon never did—and then only as long as Sphere satisfied Core's requirements prior to doing so—which Sphere never did.

37. Sphere falsely asserts that Gryphon assigned its contractual rights pursuant to the Sub-License Agreement. However, nowhere in the Sphere POCs, or the Arbitration Demand incorporated therein, does Sphere cite *any* provision in the Sub-License Agreement that purports to assign all of Gryphon's contractual rights to Sphere. Indeed, no such provision exists. The only provision in the Sub-License Agreement that addresses assignment of rights is Section 2 ("Contingent Assignment"), which states, "[e]ffective immediately *upon the consummation of the Merger* . . . all of Gryphon's rights and obligations under Order #2 shall be automatically assigned

to, and assumed by, *the Surviving Corporation*." *See* Sub-License Agreement § 2 (emphasis added). Accordingly, contrary to Sphere's position, Section 2 of the Sub-License Agreement does not even contemplate the assignment of Gryphon's rights to Sphere. Instead, it provides for the assignment of rights, upon consummation of the merger, to the Surviving Corporation, which is not Sphere.

38.     Further, Section 2 of the Sublicense Agreement is void under Section 8(d) of the MSA. As stated above, under Section 8(d) of the MSA, Gryphon "may not assign, delegate or transfer th[e] Agreement or any of its rights and obligations [thereunder] *without the prior written consent of* [Core]." (Emphasis added). Order # 2 amended Section 8(d) such that Core's consent is not required only with respect to a potential assignment (which never transpired) to Sphere. Therefore, because Core never agreed that Gryphon could assign Order #2 to the "Surviving Corporation," Section 2 of the Sub-License Agreement is void under Section 8(d) of the MSA, which also provides that "[a]ny assignment or transfer in violation of this Agreement is void." *See* MSA § 8(d).

39.     In addition to being void, Section 2 of the Sub-License Agreement is also a "Contingent Assignment" that conditioned the assignment of Gryphon's rights under Order #2 to take "[e]ffect[] immediately upon the consummation of the Merger." But the merger between Gryphon and Sphere never happened. Absent the merger, the "Contingent Assignment" was never triggered, and therefore, Gryphon never assigned all of its rights under the Gryphon Hosting Agreements to the Surviving Corporation, Sphere, or any other entity.

40.     Likewise, Gryphon never assigned to Sphere all of its rights under the Gryphon Hosting Agreements pursuant to section 1 of the Sub-License Agreement. In fact, unlike the Contingent Assignment provision, which purports to assign "all of Gryphon's rights and

obligations," section 1 purports to sub-license to Sphere *only* Gryphon's "rights to access and use [Core's] Facility." By using discrete and far more restrictive terms in section 1 (as compared to section 2) to delineate the scope of the purported sub-license and delegation, Sphere and Gryphon clearly contemplated that any such sub-license and delegation would be substantially more limited in scope and would not encompass all rights under the Gryphon Hosting Agreements. Indeed, had Gryphon and Sphere intended to assign all of Gryphon's rights in section 1, they would have used the same broad—albeit void—assignment language contained in section 2.

41.     Further, even if Sphere could cite a provision pursuant to which Gryphon purportedly assigned its rights under Order #2 to Sphere (which Sphere cannot), Order #2 "permit[s]" such action only "as long as Sphere 3D Corp. satisfies [Core's] requirements prior to." As noted above in paragraph 3, Core specifically negotiated for this additional language to ensure that its requirements would have to be satisfied before any rights were given to Sphere. Sphere fails to reference, let alone substantiate, that it satisfied these requirements.

42.     Moreover, based on publicly available documents, and as discovery will further confirm, it is clear that Sphere was never ready, willing, and able to perform under Order #2 given the costs to obtain 70,000 miners (at the time likely in the range of nearly $300 million) exceeded Sphere's fiscal and operational capabilities. For example, in that same April 4, 2022 press release in which Sphere announced that the merger with Gryphon was off, Sphere stated that it had only 1,000 miners operational and "anticipated" delivery of 2,000 miners in May 2022 and an additional 2,000 in June 2022. Those figures fall drastically short of the terms agreed to in Order #2, which required Gryphon (and Sphere if it stepped into Gryphon's shoes at it claims) to deliver 25,500 miners to Core by June 15, 2022. Similarly, Sphere's Form 6-K for the month of March 2022 reflects that its results for fiscal year 2021 included net revenue of $3.7 million and a

net loss from operations of $17.8 million. In a Sphere Form 6-K for the month of May 2022, Sphere indicated that "[m]anagement has projected that cash on hand will not be sufficient to allow us to continue operations beyond November 30, 2022 if we are unable to raise additional funding for operations." All of this during the time that tens of thousands of Miners were to be delivered to Core under Order #2. In short, Gryphon did not, and Sphere could not have, satisfied the terms of Order #2, thus precluding any claim against Core.

43. Finally, given that Gryphon breached Order #2 by failing to provide the tens of thousands of Miners as required under Order #2, Core is permitted to retain the pre-payments it received from Gryphon and neither Gryphon (nor Sphere as its purposes sub-licensee) has any right to those funds. *See* MSA § 4(d)(iii) (in the event that Client breaches the MSA, Core is permitted to "declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable"). Nevertheless, as noted, in its discretion and as a business courtesy to Gryphon, Core has been crediting Gryphon against those amounts for the hosting services Core continues to provide to Gryphon in connection with the few hundred Miners Gryphon has at Core. In fact, the monthly invoices Core sends to Gryphon make clear that the pre-payments are being applied against hosting fees for Gryphon's Miners. Core understands that Sphere has received a copy of these invoices since February 2022 and has been aware of that practice. To the extent Sphere has any dispute related to funds it allegedly provided to Gryphon, that dispute is with Gryphon, with which Sphere is in privity, not Core.

44. In sum, the facts confirm that Sphere is not a party to (or beneficiary of) the Gryphon Hosting Agreements, has no rights under those agreements, and that the Sphere POCs must be disallowed.

**B.** *Core performed its obligations under the Agreements*

45.     Even if Gryphon had assigned its rights under the Gryphon Hosting Agreements to Sphere, which it has not, Sphere still would not have a basis to assert its claims because Core performed all of its obligations under the Gryphon Hosting Agreements.  In the Sphere POCs, Sphere incorrectly asserts that Core breached the Agreements by (i) failing to abide by Order #2's "deployment schedule"; (ii) refusing to honor the contractual hosting rate set out in Order #2; and (iii) installing Sphere's miners for Core's own benefit and using them to mine bitcoin for Core's own account. *See* POC ¶¶ 8–12.  None of these alleged breaches transpired.

46.     First, Core has accepted and deployed all miners that Gryphon has delivered to Core, and Core is not required under the Agreements to abide by any "deployment schedule." The "Deployment Month[s]" in Order #2 reflect only the number of miners that Core anticipates receiving from Gryphon each month.   No provision in the Gryphon Hosting Agreements requires Core to deploy machines on or before a certain date.  On the contrary, the MSA even includes a warranty disclaimer that "ALL [CORE] FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN . . . 'AS AVAILABLE' BASIS."  MSA § 5(b) (Warranties, Limitations of Liability, Indemnity).  Services is defined in the MSA to include colocation and hosting services, and therefore, the parties agreed that Core's facilities and its hosting services are furnished on an "as available" basis and not pursuant to a "deployment schedule" as stated in the Sphere POCs. MSA § 1(a).

47.     Core never declined to host Miners that Gryphon delivered under Order #2 and never attempted to reduce the total number of Miners that Core would be required to host under Order #2.  At most, in April 2022, well after Gryphon had already breached the Gryphon Hosting Agreements, Core informed Gryphon that it could not accommodate its request to immediately deploy certain Miners but indicated it could do so a few weeks thereafter.  Further,

despite claiming that Core breached Order #2 by failing to "abide by the deployment schedule," Sphere has failed to cite any provision in the Gryphon Hosting Agreements that obligates Core to install Gryphon's Miners by a given date. And, of course, Core cannot deploy Miners it has not received.

48.     The MSA also provides that Gryphon "shall be fully responsible for delivering all Client Equipment to [Core] at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order." MSA § 2(b). Order #2 states that the "Estimated Delivery Date" for the Miners shall be "the fifteenth of every month beginning with October 15, 2021, until November 15, 2022." Order #2 goes on to state that Gryphon must "notify [Core] as soon as reasonably possible in advance if Units will not be delivered by this date," and Core "may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date." Order #2 at 3.

49.     Second, as detailed above, Core has not breached Order #2 by failing to offer Sphere the hosting rates in Order #2. Not only is Sphere not entitled to those rates because it has no rights under Order #2, Order #2 cannot apply to any new Miners that either Gryphon or Sphere would seek to have Core host because Gryphon breached that order over a year ago when it failed to deliver the Miners as required under Order #2.

50.     Third, contrary to Sphere's allegations, Core has never installed any Gryphon Miners as its own or misappropriated the proceeds derived from such Miners. Notwithstanding the gravity of its accusations, Sphere fails to cite any evidence to support its position. As explained above, on February 8, 2022, Core received directly from the manufacturer a shipment of mining equipment that, in addition to several hundred Core Miners, contained what was later determined to be 297 unmarked Gryphon Miners. When Gryphon informed Core about

Gryphon's February 8 shipment of miners, Core initially believed that Gryphon's Miners had been installed as Core's own Miners. Core, however, came to learn during an investigation of the matter, that it had not in fact installed the 297 Gryphon Miners but had instead stored them at Core's hub warehouse in Marble, North Carolina. Core thereafter promptly installed Gryphon's Miners, and Gryphon received all coins mined from those machines. To the extent Sphere contends that the coins mined from those machines belong to Sphere, its dispute is with Gryphon, not Core.

51.     In the end, Sphere's arguments are really nothing more than a tactic to divert attention away from the following facts that undermine the Sphere POCs: 1) Sphere is not a party to the Gryphon Hosting Agreements and any requirement that may have potentially led to it receiving any rights under those agreements were never satisfied; 2) Sphere never merged with Gryphon and thus never brought together what apparently was going to be an entity that was going to supply the 70,000 miners Gryphon agreed to, but failed to deliver, under the Gryphon Hosting Agreements; 3) Gryphon breached the Gryphon Hosting Agreements by failing to deliver on its obligations in Order #2; 4) Sphere is bound by Gryphon's breach and could not have enjoyed any more rights than Gryphon had under the Gryphon Hosting Agreements; and 5) neither Gryphon nor Sphere had the ability to deliver 70,000 miners in accordance with the schedule in Order #2, or even today.

**C.     The MSA bars recovery of the types and total amount of damages Sphere asserts in the Sphere POCs.**

52.     As stated above, Sphere is not a party to (or a third party beneficiary of) the Gryphon Hosting Agreements, and Core has performed its obligations under those agreements. Nevertheless, to the extent Sphere has any rights under the Gryphon Hosting Agreements, which it does not, and that Core breached those agreements, which it did not, Sphere's claims would be

subject to the robust limitation of liability provisions contained in Sections 5(c) and 5(d) of the MSA, which limit both the type and amount of any potential recovery against Core.

53.  More specifically, Sphere asserts damages for (i) the hosting deposits that Gryphon made to Core, (ii) alternative hosting costs, (iii) storage fees, and (iv) the value of any Bitcoin that Core allegedly mined and misappropriated from Gryphon's Miners.  Sphere goes on to state that the Sphere POCs are filed "in an unliquidated amount for [] any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and reliance damages."  Sphere POCs ¶¶ 14, 15. Additionally, Sphere seeks punitive damages in its Arbitration Demand, which is incorporated in the Sphere POCs. But these types of damages are expressly precluded under Section 5(c) of the MSA:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR** (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO [CORE] UNDER THIS AGREEMENT);[14] (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF [SPHERE] EQUIPMENT; (**V) ANY CONSEQUENTIAL, OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES**. (Emphasis added).

MSA § 5(c).

54.  Accordingly, the MSA expressly bars recovery of any consequential, expectation, reliance, and punitive damages that Sphere asserts regardless of whether Sphere's claims arise under the Gryphon Hosting Agreements or sound in tort, such as its claim for

---

[14] This exception is notable in that it allows Core to recover fees and other amounts owed to Core under the Gryphon Hosting Agreements, which include the approximately $35 million pre-payments made thereunder.

conversion, which it raised in its Arbitration Demand. Further, Section 5(c) precludes recovery for any cover costs, which includes costs of procuring services of equivalent capability, function, and performance. Therefore, the MSA also bars Sphere from recovering for the "alternative hosting costs" that it asserts in the Sphere POCs.

55.     Additionally, in the event that Sphere is entitled to recover any damages, which it is not, the MSA also caps Core's total liability under Section 5(d) to 1 months fee.

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **[CORE'S] TOTAL LIABILITY TO [SPHERE] IN THE AGGREGATE FOR THE ENTIRE TERM** (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) **WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO [CORE] PURSUANT TO THE APPLICABLE ORDER."** (Emphasis added.)

MSA § 5(d).

56.     The MSA goes on to state, "THE LIMITATIONS SET FORTH IN SECTIONS 5c AND 5d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY." *Id at 5(e).*

57.     Because all of Sphere's claims arise from or are related to the subject matter of the MSA, Sphere would not be entitled to recover for the nearly $40 million that it asserts in the POCs but would be limited to 1 months fee payable to Core, which in this case is approximately $84,000.

58.     These types of limitation of liability provisions contained in the MSA are routinely enforced by Delaware courts. *See, e.g.*, *In re Pilgrim's Pride Corp.,* 467 B.R. 871, 881 (Bankr. N.D. Tex. 2012) (applying Delaware law and granting summary judgment to the debtors because the contracts excluded consequential or non-compensatory damages); *Iavarone v. Eagle*

*Eye Home Inspections, LLC,* No. N18C-05-217 ALR, 2019 WL 5692265, at *2 (Del. Super. Ct. Nov. 4, 2019) (upholding limitation of liability provision where the plain language of the clause was clear regarding the people and types of conduct to which the limitation applied, the contract was not lengthy, and the limitations' language was clear); *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. 7471–VCP, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision and noting that "freedom of contract would suggest that parties … should be entitled to draft agreements so as to avoid certain duties and liabilities").

59. Gryphon plainly agreed to the express exclusion of certain types of damages and the limitation of damages to one month's fee.[15] Indeed, Section 5(f) of the MSA provides, "[e]ach party recognizes and agrees that the warranty disclaimers, **limitations of liability and remedy limitations** in this Agreement **are materially bargained for by the parties**." (emphasis added). These provisions were bargained for by Core and are a material component of the MSA.

60. The limitation of liability provisions were negotiated by two sophisticated commercial entities, with equal bargaining power, at arms' length; the provisions should, therefore, be enforced as written. *See, e.g.*, *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at *11 (Del. Ch. July 9, 2002) (upholding the terms of a contract as written because nothing prevented the plaintiff, a sophisticated commercial entity, from refusing to contract if it did not have the leverage to obtain favorable terms); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (concluding that sophisticated parties cannot "escape the express language" of a contract).

---

[15] Tellingly, in Order #1, which apparently is not at issue, Gryphon negotiated an increase to this limitation of liability to three months fee. Order #2 contains no such amendment.

61.     Here, the language in sections 5(c) and 5(d) clearly and unambiguously limits Sphere's ability to recover the categories and amount of damages it seeks.  Accepting Sphere's claims for any of these categories of damages or, to the extent the Court finds Sphere is entitled to any damages, in an amount greater than one month's fee, would render the limitation of liability provisions meaningless and against the parties' intent.

## VI.    Reservation of Rights

62.     This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including the any of Sphere's claims, on any further grounds, and the Debtors expressly reserve all other substantive or procedural objections that they may have.  Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

## VII.    Notice

63.     Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 9, 2023
Houston, Texas

/s/        Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:        Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:        Ray.Schrock@weil.com
                  Ronit.Berkovich@weil.com
                  Theodore.Tsekerides@weil.com
                  Moshe.Fink@weil.com

*Counsel for Debtors and Debtors in Possession*

**Certificate of Service**

I hereby certify that on May 9, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/　　　　Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:　　　Alfredo.Perez @weil.com