# Exhibit 13

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## DEBTORS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PROOF OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.

---

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS MOTION WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**")[2] and its

debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the First Day Declaration, Core Scientific, Inc. changed its name to Core Scientific Operating Company in January 2022. *See* First Day Decl. ¶ 31. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company.

(collectively, the "**Debtors**"), hereby move for summary judgment (the "**Motion**") with respect to certain purely legal issues identified in the Debtors' objection (the "**Objection**") to Proofs of Claim Nos. 358 and 359 (together, the "**Sphere Claim**") filed by Sphere 3D Corp. ("**Sphere**," and, together with Core, the "**Parties**") that bar the recovery of any amount in connection with the Sphere Claim, or, in the alternative, substantially limit the amounts that Sphere could potentially recover in connection with the Sphere Claim.  A proposed order is attached hereto as **Exhibit A**.

### Preliminary Statement

1.     Sphere filed proofs of claim against the Debtors seeking over $39 million in alleged damages related to the Gryphon Hosting Agreements[3] that Core entered into with an entirely different party, Gryphon Digital Mining, Inc.  Sphere, however, has no rights under the Gryphon Hosting Agreements because it is neither a party to those Agreements nor is it an intended third-party beneficiary.   The Court should therefore grant summary judgment on this claim-dispositive issue.   Alternatively, and only if the Court does not dismiss the Sphere Claim in its entirety, the Court should rule that the unambiguous limitations of liability provisions set forth in the MSA (1) limit Core's total liability to one-months fee (here, $84,658.94), and separately also (2) prevent Sphere from recovering for any lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance or punitive damages.).

---

[3] Capitalized terms not defined herein have the meaning ascribed to them in the Objection.

## Relevant Facts

### A. The Gryphon Hosting Agreements

2.      Effective as of September 12, 2021, Gryphon and Core entered into a Master Services Agreement ("**MSA**") through which Core would host Gryphon's digital-asset mining machines (the "**Miners**"). Sphere is not a party to the MSA. A true and correct copy of the MSA is attached to the accompanying Declaration of Russell Cann (the "***Cann Decl.***") as **Exhibit A**.

3.      Pursuant to the MSA, Gryphon entered into two separate orders that the MSA would govern. The first order was Master Service Agreement Order #1 ("**Order #1**"), entered into on or about September 12, 2021. A true and correct copy of Order #1 is part of **Exhibit A** to the *Cann Decl.* Pursuant to Order #1, Gryphon (not Sphere) was to deliver Miners to Core. Sphere does not appear to assert any claims under Order #1.

4.      The second order was Master Service Agreement Order #2 ("**Order #2**"), signed by Gryphon and Core on October 5, 2021. Order #2 sets out the specific terms under which Gryphon (not Sphere) was to deliver and Core was to host a total of 70,000 Miners, in addition to the Miners hosted under Order #1. A true and correct copy of Order #2 is attached as **Exhibit B** to the *Cann Decl.* The MSA, Order #1, and Order #2 are referred to collectively as the "**Gryphon Hosting Agreements**" or the "**Agreements**." Sphere is not a party to either Order #1 or Order #2.

5.      The Gryphon Hosting Agreements are governed by Delaware law. *Cann Decl.*, Exhibit A, MSA § 8.f. They contain several unambiguous provisions relevant to this Motion that confirm Sphere has no rights under the Gryphon Hosting Agreements, and otherwise limit Core's potential liability in both amount and type of damages.

6.     **First**, the MSA makes clear that Gryphon "may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of [Core]. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement." *See Cann Decl.*, Exhibit A, MSA § 8.d.

7.     **Second**, Order #2 provides:

> **Amendment to Section 8.d of the Agreement.** Both [Core] and [Gryphon] agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of [Core] *as long as Sphere 3D Corp. satisfies* [*Core's*] *requirements prior to*.

*Cann Decl.*, Exhibit B, Order #2 (emphasis added).

8.     **Third**, the MSA limits the amount of Core's total liability:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, ***COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM)*** WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) ***WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.***

*See Cann Decl.*, Exhibit A, MSA § 5.d (emphasis added).

9.     **Fourth**, the MSA limits the type of damages that give rise to liability:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ***(I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES*** (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; **(V) ANY**

4

*CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES* (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*See Id.* § 5.c (emphasis added).

10.    Additionally, the MSA is clear that, "THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY." *See Id.* § 5.e.

11.    And to avoid any confusion regarding the materiality of the limitations provisions, the MSA goes on to say: "Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties." *See Id.* § 5.f.

**B.    The Merger And Sub-License Agreements**

12.    On June 3, 2021, Gryphon and Sphere entered into a Merger Agreement, pursuant to which Gryphon was to merge with a subsidiary of Sphere created for the merger, with Gryphon as the surviving corporation. Core was not a party to the Merger Agreement. On October 5, 2021, Gryphon entered into a Sub-License Agreement with Sphere in connection with the contemplated merger. Core was not a party to the Sub-License Agreement. Sphere and Gryphon never consummated the merger. At no time prior to the Sub-License Agreement, or otherwise, has Sphere satisfied Core's requirements to permit Gryphon to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order #1 or Order #2, or any of its rights and obligations thereunder to Sphere. *See Cann Decl.* ¶ 8.

5

### C.   The Sphere Claim

13.   On April 13, 2023, Sphere filed the Sphere Claim, which breaks down to two identical claims for $39,541,996.30 plus additional unliquidated amounts against Core Scientific, Inc. and Core Scientific Operating Company.   *See* Proofs of Claim Nos. 358, 359. Proofs of Claim Nos. 358 and 359 are attached hereto as **Exhibits B and C**, respectively.[4]   The Debtors' Objection to the Sphere Claim is attached hereto as **Exhibit D**.[5]

14.   Sphere provided an addendum to its claim (the "**Sphere Addendum**"), dividing its claim for damages into four categories:

| | |
|---|---|
| Claim for Hosting Deposits | $34,383,713.00 |
| Claim for Alternative Hosting Costs | $5,000,724.06 |
| Claim for Storage Fees | $157,559.24 |
| Losses and damages arising from Core's failure to satisfy its obligations including, but not limited to, consequential, expectation, and reliance damages. | Unliquidated |

*See* attached **Exhibit B**, Sphere Claim.

### Legal Standard

### D.   Summary Judgment In A Contested Matter

15.   Once a debtor objects to a proof of claim, the validity of the claim becomes a "contested matter."   *In re Gilbreath,* 395 B.R. 356, 365 (Bankr. S.D. Tex. 2008).   A party to a contested matter can move for summary judgment.   Fed. R. Bankr. P. 9014(c) (stating that Federal

---

[4] Because Proofs of Claim Nos. 358 and 359 are identical in all material respects, for ease of reference the citations set forth herein are uniformly to Proof of Claim No. 358 (Exhibit B hereto).

[5] For the avoidance of doubt, the Debtors object to the Sphere Claim in its entirety, on the merits, and reserve all of their rights in connection therewith.

Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56, applies to contested matters); *see In re Alta Mesa Res., Inc.*, No. 19-35133, 2022 WL 17984306, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) (applying Federal Rules of Bankruptcy Procedure 9014 and 7056 to grant summary judgment on a proof of claim); *Cimerring v. ORIX Cap. Mkts., LLC (In re Canoco Inc.)*, 323 F. App'x 306, 308 (5th Cir. 2009) (holding that "[b]ankruptcy courts can render summary judgment in contested matters.").

16.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  The movant must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009), *aff'd*, 563 U.S. 277 (2011).  To avoid summary judgment, an opposing party must identify a genuine dispute of material fact—one that could allow a reasonable fact finder to find for the nonmoving party. *See, e.g., Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014); *Hartman v. Ultra Petroleum Corp. (In re Ultra Petroleum Corp.)*, 571 B.R. 755, 761 (Bankr. S.D. Tex. 2017). Although a court views the facts and evidence in the light most favorable to the non-moving party, "[s]ummary judgment may not be thwarted by conclusory allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

17.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co*., 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).  However, prima facie validity under Bankruptcy Rule 3001(f) "can be overcome by

rebuttal evidence . . . ." *California State Bd. of Equalization v. Off. Unsecured Creditors' Comm. (In re Fid. Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988). "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fid. Holding*, 837 F.2d at 698). And, "the ultimate burden of proof always lies with the claimant." *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

### E.    Summary Judgment In A Contract Dispute

18.    Under Delaware law—which governs the MSA and likewise dictates Core and Sphere's relationship (or lack thereof) and any related damages—courts grants summary judgment to enforce unambiguous contracts. *See Rossi v. Ricks*, No. CIV. A. 1747-CC, 2008 WL 3021033, at *3 (Del. Ch. Aug. 1, 2008) (granting summary judgment on breach claim where counterclaimants unambiguously were not parties to the agreement); *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012) ("We have long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous." (internal citation and quotation marks omitted)); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008) ("Summary judgment is an appropriate process for the enforcement of unambiguous contracts because there is no material dispute of fact for the court to resolve.").

19.    Summary judgment is appropriate "[w]here a contract term is objectively clear and there is only one 'reasonable interpretation[.]'" *Seidensticker v. Gasparilla Inn, Inc.*, No. Civ. A. 2555-CC, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007); *see also Imo Indus. Inc. v. Siemens Demag Delaval Turbomachinery, Inc.*, No. CIV. A. 20142, 2005 WL 1138807, at *3–4 (Del. Ch. May 4, 2005), *aff'd*, 888 A.2d 231 (Del. 2005) (granting summary judgment where only interpretation of express conditions of assignment clause rendered conditions applicable);

*eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. 7471-VCP, 2013 WL 5621678, at \*45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision and holding that contracts are to be enforced as written); *In re Pilgrim's Pride Corp.*, 467 B.R. 871, 881 (Bankr. N.D. Tex. 2012) (applying Delaware law and granting summary judgment to the debtors where the contracts excluded the asserted consequential and/or non-compensatory damages).

20.     A court interpreting a contract must "give priority to the parties' intentions as reflected in the four corners of the agreement." *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018) (internal quotations omitted).  The Court must "interpret clear and unambiguous terms according to their ordinary meaning . . . ." *Id.*  In an "unambiguous, integrated written contract," the Court may not use extrinsic evidence to "vary or contradict the terms of that contract." *Id.* (internal brackets and quotations omitted).

## Argument

### A.     Sphere Has No Rights Under The Gryphon Hosting Agreements

21.     Summary judgment is warranted here, where—as a matter of law—Sphere has no right to enforce the Gryphon Hosting Agreements.  "As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions.  Mere incidental beneficiaries have no legally enforceable rights under a contract." *E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols. L.L.C.*, 248 F. Supp. 3d 570, 575 (D. Del. 2017) (quoting *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007)).  Put another way: "a stranger to a contract acquires no rights thereunder unless it is the intention of the parties to confer a benefit upon such a third-party." *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. Ct. 1990).  As set forth in more detail below, there is no genuine dispute that (1) *Gryphon* (not Sphere) is the contracting party to the

Gryphon Hosting Agreements, (2) Sphere it not an intended third-party beneficiary of the Agreements, and (3) no rights were ever transferred to Sphere under the clear terms of Order #2.

### i. Sphere Is A "Stranger" To The Agreements

22.     There is no genuine dispute that Sphere is a "stranger" to the Agreements. The Agreements were entered into between only Core and Gryphon—not Sphere.  Indeed, the Agreements make no reference to Sphere having any rights under the Agreements and they define and refer to Gryphon as "the Client."  *See Cann Decl.*, Exhibit A, MSA at 1 (defining Gryphon as "Client"); *id.*, Order #1 at 13 (signature block identifying Gryphon as "Client"); *Cann Decl.*, Exhibit B, Order # 2 at 6 (signature block identifying Gryphon as "Client").

23.     Sphere admits in the Sphere Claim that Gryphon executed the Agreements, but states that Gryphon entered in the Agreements "as manager" for Sphere.  Exhibit B, Sphere Claim, Addendum ¶ 6.  Significantly, however, it is undisputed that nothing in the Agreements support that Gryphon was acting for anyone other than itself.  Moreover, even if Gryphon and Sphere had a side arrangement whereby Gryphon was acting "as manager" for Sphere, any such behind-the-scenes deal cannot, as a matter of law, give Sphere any rights under the Agreements. *E.I. du Pont de Nemours*, 248 F. Supp. 3d at 575 (quoting *NAMA Holdings*, 922 A.2d at 434 ("Mere incidental beneficiaries have no legally enforceable rights under a contract.")).

### ii. Sphere Is Not An Intended Third-Party Beneficiary Of The Agreements

24.     There is also no genuine dispute that Sphere is not an intended third-party beneficiary of the Agreements.  The MSA provides that "Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void." *Cann Decl.*, Exhibit A, MSA § 8.d.  The MSA further states that "[n]othing in this Agreement is intended to or will

confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement." *Id.*; *see also id.* § 8.g ("There are no third-party beneficiaries to this Agreement."). This sets forth an unambiguous baseline expectation between Core and Gryphon that the Agreement was between *only* Core and Gryphon, and prohibited assignment to any third party (like Sphere).

25. Order #2 modified this baseline expectation, amending the MSA "so that Client [Gryphon] is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company ***as long as Sphere 3D Corp. satisfies Company requirements prior to***" (the "**Amendment**"). *Cann Decl.*, Exhibit B, Order #2 at 4 (emphasis added). This provision makes plain that Sphere did not have any rights under the Gryphon Hosting Agreements and that some event would have to take place, i.e., Sphere satisfying Core's requirements, before Sphere could obtain any rights under the Gryphon Hosting Agreements. Such requirements would include, among other things: creditworthiness, Foreign Corrupt Practice Act considerations; Know Your Customer considerations (*e.g.*, business with Chinese entities/Chinese government); form of assignment (*e.g.*, how and which rights and obligations were to be transferred, allocated or retained); whether any such assignment would implicate securities laws or constitute an investment contract; and whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements. *See Cann Decl.* ¶ 8. Given the unambiguous language of the provision and the undisputed fact that Sphere at no time has satisfied Core's requirements to obtain any rights under the Gryphon Hosting Agreements, the Sphere Claim must be disallowed in its entirety.

26.     First, as a threshold point, that the Amendment identifies Sphere as a separate entity—distinct from Gryphon—confirms that Sphere necessarily had no rights under the Gryphon Hosting Agreements when they were executed.  This is fatal to any argument that Sphere had rights under the MSA from the start, and is also fatal to the claim that Gryphon was merely "acting as a manager" for Sphere in executing the Agreements.  If Sphere were correct, which it is not, the Amendment would not have identified Sphere as a distinct entity to whom Gryphon could, *subject to the satisfaction of certain requirements*, assign the Gryphon Hosting Agreements.

27.     Second, the Amendment plainly does not *automatically* give Sphere any rights under the Gryphon Hosting Agreements.  Instead, it *permits* Gryphon to assign certain of its rights to Sphere, but—in order for Gryphon to do so—Sphere is *required* to satisfy Core's requirements in advance.  It is undisputed that Sphere did not do so here; therefore, any purported assignment that Sphere and Gryphon may have sought to effectuate is void as a matter of law

*          *          *          *          *

28.     For the foregoing reasons, the Court should rule, as a matter of law, that Sphere has no rights under the Gryphon Hosting Agreements.  The Debtors are therefore entitled to summary judgment on their Objection and the Sphere Claim should be disallowed in its entirety.  If, and only if, the Court does not rule that the Sphere Claim should be disallowed in its entirety— which Core submits that it should so rule—then Core is entitled, in the alternative, to partial summary judgment on the Sphere Claim for the reasons set forth below.

### B.     The MSA Limits Core's Total Liability Under The Gryphon Hosting Agreements To One-Months Fee

29.     Partial summary judgment is warranted here because two unambiguous contract provisions each limit Core's potential liability to Sphere.  As detailed above, Sphere asserted a claim for over $39 million.  The MSA, however, limits Core's "total liability . . . in the

aggregate" to "an amount equal to one (1) months fee payable to [Core] pursuant to the applicable order." *See Cann Decl.*, Exhibit A, MSA § 5.d. This one-months fee is a clear and unambiguous limitation on Core's liability that applies to limit, as a matter of law, the Sphere Claim. In the event that the Court rejects Core's argument that Sphere has no right to enforce the Gryphon Hosting Agreements, the Court should rule that, based on the limitation of damages provision set forth in the MSA, Sphere cannot—as a matter of law—recover from the Debtors more than one-months fee payable to Core pursuant to the applicable Orders.

30. Section 3.a of the MSA states that Core "will invoice [Gryphon] monthly in advance for all applicable fees for use of [Core's] Facility and provision of Services as set forth in the applicable Order." *See Cann Decl.*, Exhibit A, MSA § 3.a. Thus, the *amount* of the one-months fee is determined based on the monthly invoice for the applicable Orders. Here, the last monthly invoice that Core sent *to Gryphon* was in the amount of $84,658.94. *See Cann Decl.*, Exhibit C. Under the plain terms of the MSA, Sphere's total recovery could not ever exceed this amount. The one-month limitation of liability provision therefore reduces Sphere's claim from over $39 million to *at most* $84,658.94. The Court should therefore also rule that Sphere cannot—as a matter of law—recover more than $84,658.94 in total from the Debtors in connection with the Sphere Claim.

31. In any event, even if there were to be a dispute regarding the precise amount of the one-months fee, that would not preclude the Court from ruling, as a matter of law, that the limitation of liability provision limits Sphere to recovering no more than one-months fee.

## C. The MSA Limits The Type Of Damages That Sphere Can Recover

32. The MSA also limits the *type* of damages that can be recovered against Core, providing that "in no event will either party be liable to the other party for (i) lost profits;

13

(ii) loss of business; (iii) loss of revenues . . . ; (iv) loss, interruption or use of data or loss of use of [Sphere] equipment; (v) any consequential or indirect damages; or (vi) cost of cover, any incidental, special, reliance, exemplary or punitive damages . . . ." *See Cann Decl.*, Exhibit A, MSA § 5.c. This provision is likewise a clear and unambiguous limitation on Core's liability. The Court should therefore rule that, based on the limitation set forth in the contract, Sphere cannot— as a matter of law—recover for lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance exemplary or punitive damages.

33.     In effect, this means that when assessing what portion of the one-months fee Sphere may recover (if any), the asserted damages must be the type of damages that are not precluded under the MSA. Moreover, regardless of how the Court may rule on the one-months fee limitation, Core is entitled to a finding, as a matter of law, that Sphere would not be entitled to recover any of the types of damages set forth in section 5.c of the MSA—assuming Sphere even has rights under the Agreements and that it could ever establish that it was entitled to any recovery at all.

## Conclusion

The Debtors respectfully request that the Court grant the Motion and enter summary judgment disallowing the Sphere Claim in its entirety. In the alternative, the Debtors respectfully request that the Court enter partial summary judgment against Sphere as relates to the contractual limitations of liability provisions. Debtors further request all other just relief to which they may be entitled.

[*Remainder of page intentionally left blank*]

14

Dated: June 9, 2023
Houston, Texas

                       */s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:    (713) 546-5000
Facsimile:     (713) 224-9511
Email: Alfredo.Perez @weil.com
         Clifford.Carlson@weil.com
-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:     (212) 310-8007
Email: Ray.Schrock@weil.com
         Ronit.Berkovich@weil.com
         Theodore.Tsekerides@weil.com
         Christine.Calabrese@weil.com

*Counsel for Debtors and Debtors in Possession*

15

## **Certificate of Service**

I hereby certify that on June 9, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                              */s/ Alfredo R. Pérez*
                              Alfredo R. Pérez

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

ORDER GRANTING DEBTORS' MOTION
FOR SUMMARY JUDGMENT WITH RESPECT TO
PROOF OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.

Debtors Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**")

and its debtor affiliates, as debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), move for summary judgment (the "**Motion**") on their objection (the

"**Objection**") to Proofs of Claim Nos. 358 and 359 filed by Sphere 3D Corp.

After considering the Motion and exhibits, any response and reply thereto, it is

**HEREBY ORDERED THAT** the Debtors' Motion is **GRANTED** and the claims asserted by

Sphere 3D Corp. in Proofs of Claim Nos. 358 and 359 are **DISALLOWED**.

This Court retains exclusive jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Dated: _____, 2023

Houston, Texas

 

 

 

 

_____

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Fill in this information to identify the case:**

Debtor _____ Core Scientific, Inc. _____

United States Bankruptcy Court for the District of _____ Southern District of Texas _____

Case number _____ 22-90341 _____

## Official Form 410

# Proof of Claim

**04/22**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Sphere 3D Corp. |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☑ No |
| | ☐ Yes. From whom? _____ |

| | |
|---|---|
| 3. **Where should notices and payments to the creditor be sent?** | Where should notices to the creditor be sent? |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should payments to the creditor be sent? (if different) |

Sphere 3D Corp.
Patricia Trompeter
4 Greenwich Office Park
Suite 100
Greenwich, CT 06831
United States
**E:** patricia.trompeter@sphere3d.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — —

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No |
| | ☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____ MM/DD/YYYY |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | ☐ Yes. Who made the earlier filing? _____ |

Official Form 410

1202404122333302423700001

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

---

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

---

7. **How much is a claim?**   See attached addendum _____   Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum _____

---

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property**

☐ Real estate.   If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

---

10. **Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

---

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Check one: | | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority.For example, law limits the amount entitled to priority. | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ | Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ | Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |
| | | *Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |
| 13. | Is all or part of the claim pursuant to 11 U.S.C § 503(b)(9)? | ☑ No | | |
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | | |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

| Executed on date & time | 04/13/2023 at 09:01 am PT |
|---|---|
| | MM / DD / YYYY HH : MM |

/s/Patricia Trompeter
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Patricia | | Trompeter |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | CEO | | |
| Company | Sphere 3D Corp | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 4 Greenwich Office Park | Suite 100 | |
| | Number | Street | |
| | Greenwich | CT | 6831 |
| | City | State | ZIP Code |
| Contact phone | | | |
| Email | patricia.trompeter@sphere3d.com | | |

### ADDENDUM TO PROOF OF CLAIM OF
### SPHERE 3D CORP. AGAINST
### CORE SCIENTIFIC, INC., CASE NO. 22-90341 (DRJ)

1.      Sphere 3D Corp. ("Sphere" or the "Claimant") submits this addendum to its proof of claim (the "Proof of Claim") against Core Scientific, Inc. ("Core" and, together with its debtor affiliates, the "Debtors").  Claimant has its principal place of business at 4 Greenwich Office Park, Suite 100, Greenwich, CT 06831.

### Background

2.      On December 21, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  The bankruptcy cases are being jointly administered under the lead Case No. 22-90341 (DRJ).

3.      On March 9, 2023, the Bankruptcy Court established an April 14, 2023 deadline for creditors to file proofs of claim for claims that arose prior to the Petition Date against the Debtors in these Chapter 11 cases.

### Basis for Claim

**Background on Cryptocurrency Mining**

4.      Sphere is in the business of what is known in the crypto industry as "mining" for Bitcoin.  Through mining, companies generate new Bitcoin for themselves and also earn revenues through transaction fees.  To mine for Bitcoin, mining companies use purchased or leased "miners," which are sophisticated, high-capacity computers that run programs designed to support the network underlying Bitcoin.

5.      Mining companies frequently turn to third parties to host their miners.  As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as

1

warehouse space, electricity, security, internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

**Sphere's Claims Arising Under the Hosting Agreements**

6.        Third-party non-debtor Gryphon Digital Mining, Inc. ("Gryphon"), as manager for Sphere, and Core entered into a Master Services Agreement dated September 12, 2021 (the "MSA") and an accompanying order dated October 5, 2021 ("Order #2") pursuant to which Core agreed to provide certain services, including colocation, hosting, and rack space for Sphere's miners.

7.        Under Order #2, Core also expressly agreed that Gryphon could "sub-license, assign, delegate or transfer" any of "its rights . . . to Sphere" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent."  Gryphon, in fact, assigned its contractual rights under the MSA and Order #2 to Sphere pursuant to a Sub-License and Delegation Agreement dated October 5, 2021 (the "Sub-License Agreement").[1]

8.        In the months that followed, and as called for by Order #2, Sphere delivered to Core $35,104,363 in cash deposits (collectively, the "Deposits") to be applied as "credit against future monthly invoices as they become due."  Core's billing department dealt directly with Sphere regarding the Deposits, and Sphere provided Core with detailed wire information and a letter from its auditors showing that the Deposits originated from Sphere.  Upon information and belief, Core has only drawn down approximately $720,650 through February 2023 in consideration for hosting services, meaning that $34,383,713 remained.

---

[1] The Sub-License Agreement and certain documents supporting the Claim (as defined below) are voluminous, contain proprietary business information, and/or may be subject to certain confidentiality requirements and, therefore, are not included with the Claim.  On information and belief, copies of the Sub-License Agreement and relevant documents are in the possession of the Debtors.  Copies of the relevant documents will be provided upon request and in compliance with any confidentiality orders, agreements, or provisions.

9.     Order #2 included a deployment schedule that, as written, called for incremental deployment of Sphere's miners to Core (e.g., 500 miners deployed at Core by the end of February 2022) and ultimately envisioned Core to host 60,000 of Sphere's miners by the end of November 2022.  To date, however, Core has only hosted 519 of Sphere's miners.

10.     Since executing Order #2, Core has failed to perform under the MSA and Order #2 by failing to abide by the deployment schedule as written, both in terms of timing and the absolute number of miners to be hosted.  By way of illustration:

- In December 2021, 493 miners were supposed to be shipped to Core.  Core, however, could not accommodate any of the miners due to lack of space.

- As written, the deployment schedule stated that Core could accommodate 500 miners as of February 2022.  Although Sphere wished to send Core approximately 500 miners in February 2022, Core could only accept 297 miners at that time.

- On April 8, 2022, Sphere attempted to move 496 miners to Core.  Core responded that it could not accommodate the units "until this summer sometime," as "April and May are tight deployment wise."

- Since May 2022, Core has been unwilling to accept any additional miners from Sphere.

11.     Core's failure to abide by the deployment schedule was a material breach of the MSA and Order #2.  Moreover, since at least May 2022, Core has refused to honor the contractual hosting rate set out in Order #2.  Instead, Core has insisted it will only host additional Sphere miners at a much higher rate than the contract provides.  This insistence constitutes a breach and repudiation of Order #2 and Sphere has suffered additional damages as a result, including increased alternative hosting fees and storage costs.

12.     In addition, Core has breached its contractual obligations by installing and using hundreds of Sphere's miners for its own benefit.  As noted, Core first received 297 of Sphere's miners in February 2022.  Rather than hosting them for the benefit of Sphere, however, Core

3

inexplicably installed them as its own miners and used them to mine for Bitcoin for its own account.

13.     On October 31, 2022, Sphere filed a demand for arbitration against Core asserting claims for repudiation of a contract, breach of contract, breach of implied covenant of good faith and fair dealing (in the alternative), unjust enrichment (in the alternative), conversion, and promissory estoppel.  The arbitration has been stayed since the Petition Date.  The claims and causes of action set forth in the arbitration demand are expressly incorporated herein.

14.     As of the Petition Date, Core was, and remains, indebted to Sphere in an amount not less than $39,541,996.30 (the "Claim").  This Proof of Claim is filed in an unliquidated amount for any damages that are incapable of being calculated at this time including, but not limited to, the value of any Bitcoin that was mined and misappropriated by Core when it installed Sphere's miners as its own.  At a minimum, Sphere has claims against Core for the following amounts:

- Hosting Deposits – $34,383,713.00

- Alternative Hosting Costs – $5,000,724.06

- Storage Fees – $157,559.24

**Reservation of Rights**

15.     Core may be indebted to the Claimant for interest to the extent that such payment of interest is legally enforceable, and the Claimant expressly reserves its rights to seek payment from Core pursuant thereto.

16.     In addition to other amounts stated herein, this Proof of Claim is filed in an unliquidated amount for (1) any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and

4

reliance damages, and (2) any and all fees, including the fees and expenses of the Claimant's counsel and other agents, arising from Core's failure to satisfy its obligations to the Claimant.

17. The Claimant may have post-petition claims against the Debtors. The Claimant is not asserting these claims herein, as the sole purpose of this Proof of Claim is to assert its prepetition claims against the Debtors. By filing this Proof of Claim, the Claimant does not waive any of its post-petition claims against the Debtors and expressly reserves all of its rights in connection with such claims.

18. No part of the Claim has been paid and no cash or property is held by the Claimant for the Claim.

19. No judgment has been rendered on the Claim.

20. To the best of the Claimant's knowledge, the claims set forth herein are not subject to any valid set off or counterclaim by the Debtors. However, the Claimant expressly reserves and does not waive any setoff or recoupment rights it may possess.

21. This Claim is a general unsecured claim, except as it may be determined to be subject to setoff or recoupment, or otherwise determined to be an administrative, priority, or secured claim.

22. The Claimant expressly reserves all rights accruing to it and the filing of this Proof of Claim is not intended to be and shall not be construed as (a) an election of remedy or (b) a waiver or limitation of any rights of the Claimant.

23. This Proof of Claim is made without prejudice to the filing of additional proofs of claim with respect to any other indebtedness or liability of the Debtors to the Claimant.

24. Filing of this Proof of Claim is not: (a) a waiver or release of the Claimant's rights against any person, entity, or property; (b) a consent by the Claimant to the jurisdiction of the

Bankruptcy Court with respect to the subject matter of this Claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving the Claimant; or (c) a waiver of the right to move to withdraw the reference or otherwise to challenge the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection or other proceedings commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving the Claimant.

25. The Claimant expressly reserves the right to amend or supplement this Proof of Claim if the Claimant should deem it necessary and appropriate for any reason including, without limitation, (i) to provide an updated statement of amounts then due, (ii) in the event the MSA is rejected, pursuant to an order of the Bankruptcy Court, or (iii) for any other purpose for which a Proof of Claim filed in this case may be amended.

26. All notices to the Claimant should be sent to:

> Pryor Cashman LLP
> 7 Times Square
> New York, New York 10036-6569
> Attn:      Seth H. Lieberman, Esq.
>             Matthew W. Silverman, Esq.
> Telephone:  (212) 421-4100
> Facsimile:  (212) 326-0806
>
> -and-
>
> Hunton Andrews Kurth LLP
> 600 Travis Street, Suite 4200
> Houston, Texas 77002
> Attn:      Timothy ("Tad") Davidson II, Esq.
>             Ashley L. Harper, Esq.
> Telephone: (713) 220-4200
> Facsimile:  (713) 220-4285

EXHIBIT C

**Fill in this information to identify the case:**

Debtor  Core Scientific Operating Company

United States Bankruptcy Court for the District of  Southern District of Texas

Case number  22-90343

---

## Official Form 410

# Proof of Claim       04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Sphere 3D Corp |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☑ No |
| | ☐ Yes. From whom? |

| | |
|---|---|
| 3. **Where should notices and payments to the creditor be sent?** <br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?    Where should payments to the creditor be sent? (if different) <br><br> Sphere 3D Corp <br> Patricia Trompeter <br> 4 Greenwich Office Park <br> Suite 100 <br> Greenwich, CT 06831 <br> United States <br> **E:** patricia.trompeter@sphere3d.com <br><br><br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br> — — — — — — — — — — — — — — — — — — — — — — — — |

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No |
| | ☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____ <br>                      MM/DD/YYYY |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | ☐ Yes. Who made the earlier filing? |

| | | | |
|---|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No | |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ | |

| | | | |
|---|---|---|---|
| 7. | **How much is a claim?** | See attached addendum | Does this amount include interest or other charges? |
| | | | ☐ No |
| | | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

| | | | |
|---|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No | |
| | | ☐ Yes. Amount necessary to cure any default as of the date of the petition. | $ _____ |

| | | | |
|---|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No | |
| | | ☐ Yes. Identify the property: _____ | |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Check one: | | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority.For example, law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | | |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | | |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. | Is all or part of the claim pursuant to 11 U.S.C § 503(b)(9)? | ☑ No |
|---|---|---|
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time 04/13/2023 at 09:06 am PT
MM / DD / YYYY HH : MM

/s/Patricia Trompeter
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Patricia | | Trompeter |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | CEO | | |
| Company | Sphere 3D Corp | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 4 Greenwich Office Park | Suite 100 | |
| | Number | Street | |
| | Greenwich | CT | 6831 |
| | City | State | ZIP Code |
| Contact phone | | | |
| Email | patricia.trompeter@sphere3d.com | | |

**ADDENDUM TO PROOF OF CLAIM OF**
**SPHERE 3D CORP. AGAINST**
**CORE SCIENTIFIC OPERATING COMPANY, CASE NO. 22-90343 (DRJ)**

1.      Sphere 3D Corp. ("Sphere" or the "Claimant") submits this addendum to its proof of claim (the "Proof of Claim") against Core Scientific Operating Company ("Core" and, together with its debtor affiliates, the "Debtors").  Claimant has its principal place of business at 4 Greenwich Office Park, Suite 100, Greenwich, CT 06831.

**Background**

2.      On December 21, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  The bankruptcy cases are being jointly administered under the lead Case No. 22-90341 (DRJ).

3.      On March 9, 2023, the Bankruptcy Court established an April 14, 2023 deadline for creditors to file proofs of claim for claims that arose prior to the Petition Date against the Debtors in these Chapter 11 cases.

**Basis for Claim**

**Background on Cryptocurrency Mining**

4.      Sphere is in the business of what is known in the crypto industry as "mining" for Bitcoin.  Through mining, companies generate new Bitcoin for themselves and also earn revenues through transaction fees.  To mine for Bitcoin, mining companies use purchased or leased "miners," which are sophisticated, high-capacity computers that run programs designed to support the network underlying Bitcoin.

5.      Mining companies frequently turn to third parties to host their miners.  As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as

1

warehouse space, electricity, security, internet access, and cooling. Hosting space is finite and limits the number of miners a host can accommodate.

**Sphere's Claims Arising Under the Hosting Agreements**

6.      Third-party non-debtor Gryphon Digital Mining, Inc. ("Gryphon"), as manager for Sphere, and Core entered into a Master Services Agreement dated September 12, 2021 (the "MSA") and an accompanying order dated October 5, 2021 ("Order #2") pursuant to which Core agreed to provide certain services, including colocation, hosting, and rack space for Sphere's miners.

7.      Under Order #2, Core also expressly agreed that Gryphon could "sub-license, assign, delegate or transfer" any of "its rights . . . to Sphere" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent." Gryphon, in fact, assigned its contractual rights under the MSA and Order #2 to Sphere pursuant to a Sub-License and Delegation Agreement dated October 5, 2021 (the "Sub-License Agreement").[1]

8.      In the months that followed, and as called for by Order #2, Sphere delivered to Core $35,104,363 in cash deposits (collectively, the "Deposits") to be applied as "credit against future monthly invoices as they become due." Core's billing department dealt directly with Sphere regarding the Deposits, and Sphere provided Core with detailed wire information and a letter from its auditors showing that the Deposits originated from Sphere. Upon information and belief, Core has only drawn down approximately $720,650 through February 2023 in consideration for hosting services, meaning that $34,383,713 remained.

---

[1] The Sub-License Agreement and certain documents supporting the Claim (as defined below) are voluminous, contain proprietary business information, and/or may be subject to certain confidentiality requirements and, therefore, are not included with the Claim. On information and belief, copies of the Sub-License Agreement and relevant documents are in the possession of the Debtors. Copies of the relevant documents will be provided upon request and in compliance with any confidentiality orders, agreements, or provisions.

9.      Order #2 included a deployment schedule that, as written, called for incremental deployment of Sphere's miners to Core (e.g., 500 miners deployed at Core by the end of February 2022) and ultimately envisioned Core to host 60,000 of Sphere's miners by the end of November 2022.  To date, however, Core has only hosted 519 of Sphere's miners.

10.     Since executing Order #2, Core has failed to perform under the MSA and Order #2 by failing to abide by the deployment schedule as written, both in terms of timing and the absolute number of miners to be hosted.  By way of illustration:

- In December 2021, 493 miners were supposed to be shipped to Core.  Core, however, could not accommodate any of the miners due to lack of space.

- As written, the deployment schedule stated that Core could accommodate 500 miners as of February 2022.  Although Sphere wished to send Core approximately 500 miners in February 2022, Core could only accept 297 miners at that time.

- On April 8, 2022, Sphere attempted to move 496 miners to Core.  Core responded that it could not accommodate the units "until this summer sometime," as "April and May are tight deployment wise."

- Since May 2022, Core has been unwilling to accept any additional miners from Sphere.

11.     Core's failure to abide by the deployment schedule was a material breach of the MSA and Order #2.  Moreover, since at least May 2022, Core has refused to honor the contractual hosting rate set out in Order #2.  Instead, Core has insisted it will only host additional Sphere miners at a much higher rate than the contract provides.  This insistence constitutes a breach and repudiation of Order #2 and Sphere has suffered additional damages as a result, including increased alternative hosting fees and storage costs.

12.     In addition, Core has breached its contractual obligations by installing and using hundreds of Sphere's miners for its own benefit.  As noted, Core first received 297 of Sphere's miners in February 2022.  Rather than hosting them for the benefit of Sphere, however, Core

inexplicably installed them as its own miners and used them to mine for Bitcoin for its own account.

13.     On October 31, 2022, Sphere filed a demand for arbitration against Core asserting claims for repudiation of a contract, breach of contract, breach of implied covenant of good faith and fair dealing (in the alternative), unjust enrichment (in the alternative), conversion, and promissory estoppel.  The arbitration has been stayed since the Petition Date.  The claims and causes of action set forth in the arbitration demand are expressly incorporated herein.

14.     As of the Petition Date, Core was, and remains, indebted to Sphere in an amount not less than $39,541,996.30 (the "Claim").  This Proof of Claim is filed in an unliquidated amount for any damages that are incapable of being calculated at this time including, but not limited to, the value of any Bitcoin that was mined and misappropriated by Core when it installed Sphere's miners as its own.  At a minimum, Sphere has claims against Core for the following amounts:

- Hosting Deposits – $34,383,713.00

- Alternative Hosting Costs – $5,000,724.06

- Storage Fees – $157,559.24

**Reservation of Rights**

15.     Core may be indebted to the Claimant for interest to the extent that such payment of interest is legally enforceable, and the Claimant expressly reserves its rights to seek payment from Core pursuant thereto.

16.     In addition to other amounts stated herein, this Proof of Claim is filed in an unliquidated amount for (1) any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and

4

reliance damages, and (2) any and all fees, including the fees and expenses of the Claimant's counsel and other agents, arising from Core's failure to satisfy its obligations to the Claimant.

17.     The Claimant may have post-petition claims against the Debtors.  The Claimant is not asserting these claims herein, as the sole purpose of this Proof of Claim is to assert its prepetition claims against the Debtors.  By filing this Proof of Claim, the Claimant does not waive any of its post-petition claims against the Debtors and expressly reserves all of its rights in connection with such claims.

18.     No part of the Claim has been paid and no cash or property is held by the Claimant for the Claim.

19.     No judgment has been rendered on the Claim.

20.     To the best of the Claimant's knowledge, the claims set forth herein are not subject to any valid set off or counterclaim by the Debtors.  However, the Claimant expressly reserves and does not waive any setoff or recoupment rights it may possess.

21.     This Claim is a general unsecured claim, except as it may be determined to be subject to setoff or recoupment, or otherwise determined to be an administrative, priority, or secured claim.

22.     The Claimant expressly reserves all rights accruing to it and the filing of this Proof of Claim is not intended to be and shall not be construed as (a) an election of remedy or (b) a waiver or limitation of any rights of the Claimant.

23.     This Proof of Claim is made without prejudice to the filing of additional proofs of claim with respect to any other indebtedness or liability of the Debtors to the Claimant.

24.     Filing of this Proof of Claim is not: (a) a waiver or release of the Claimant's rights against any person, entity, or property; (b) a consent by the Claimant to the jurisdiction of the

Bankruptcy Court with respect to the subject matter of this Claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving the Claimant; or (c) a waiver of the right to move to withdraw the reference or otherwise to challenge the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection or other proceedings commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving the Claimant.

25.    The Claimant expressly reserves the right to amend or supplement this Proof of Claim if the Claimant should deem it necessary and appropriate for any reason including, without limitation, (i) to provide an updated statement of amounts then due, (ii) in the event the MSA is rejected, pursuant to an order of the Bankruptcy Court, or (iii) for any other purpose for which a Proof of Claim filed in this case may be amended.

26.    All notices to the Claimant should be sent to:

> Pryor Cashman LLP
> 7 Times Square
> New York, New York 10036-6569
> Attn:    Seth H. Lieberman, Esq.
>          Matthew W. Silverman, Esq.
> Telephone:  (212) 421-4100
> Facsimile:  (212) 326-0806
>
> -and-
>
> Hunton Andrews Kurth LLP
> 600 Travis Street, Suite 4200
> Houston, Texas 77002
> Attn:    Timothy ("Tad") Davidson II, Esq.
>          Ashley L. Harper, Esq.
> Telephone: (713) 220-4200
> Facsimile:  (713) 220-4285

# EXHIBIT D

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

## DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.

> **THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

Core Scientific Operating Company f/k/a Core Scientific, Inc. ("**Core**"), and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), represent as follows in support of this claim objection (the "**Objection**") and request entry of an order, substantially in the form attached hereto as Exhibit 1 (the "**Proposed Order**") disallowing Proofs of Claim Nos. 358 and 359 (the "**Sphere POCs**") filed by Sphere 3D Corp. ("**Sphere**") against debtors Core Scientific Operating Company (Claim No. 359) and Core Scientific, Inc. (Claim No. 358).[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] As discussed in the Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief, *In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex., Dec. 21, 2022) at ¶31 (Dkt. No. 5), Core Scientific,

## I.   **Preliminary Statement**

1.      The Sphere POCs must be disallowed for a number of reasons.  Most fundamentally, Core has no contracts with Sphere upon which Sphere can base any claim.  Instead, the contracts that Sphere references in the Sphere POCs are between Core and an entity called Gryphon Digital Mining, Inc. ("**Gryphon**").  Core and Gryphon entered into a Master Services Agreement ("**MSA**") and two orders that were governed by the MSA: Order #1 and Order #2.[3]  The MSA and Order #1 and Order #2 are referred to collectively as the "**Gryphon Hosting Agreements**".[4] It is pursuant to the Gryphon Hosting Agreements that Core hosted (and currently hosts) hundreds of Gryphon's digital-asset mining machines (the "**Miners**").  In exchange for Core's services, Gryphon (not Sphere) made certain pre-payments directly to Core as provided for under the Gryphon Hosting Agreements, and Gryphon (not Sphere) currently hosts Miners with Core.[5]  Sphere, with whom Core has no contractual relationship, now brings two identical proofs of claim in which it alleges that Core breached its obligations under the Gryphon Hosting Agreements and seeks to recover, among other things, the pre-payments that Gryphon made to Core under Order #2.

2.      In the Sphere POCs, Sphere alleges that Gryphon entered into the Gryphon Hosting Agreements as Sphere's "manager" and that Gryphon assigned all rights under those

---

Inc. changed its name to Core Scientific Operating Company in January 2022. Therefore, any claims against Core Scientific, Inc., are more properly claims against Core Scientific Operating Company.  Given that the Sphere POCs are identical, this Objection applies equally to both, and references to "Core" shall include Core Scientific Operating Company and Core Scientific, Inc. for purposes of this Objection.

[3] A true and correct copy of the MSA is attached hereto as Exhibit 2.  The attached Exhibits Nos. 2–6 were excerpted from Sphere's Form F-4 filed with the Securities and Exchange Commission on January 5, 2022, and contain redactions applied by Sphere to certain fees and rates.  Core will provide the Court with unredacted versions of these Exhibits as may become necessary.

[4] Sphere does not appear to be claiming any rights or recovery under Order #1, but to the extent that it does, any such claims should be disallowed for the same reasons set forth herein.

[5] Core continues to host these few hundred Gryphon Miners as a business courtesy to Gryphon even though Gryphon breached the Gryphon Hosting Agreements.

agreements to Sphere pursuant to a Sub-License and Delegation Agreement entered into between Sphere and Gryphon on October 5, 2021, as amended on December 29, 2021 (the "**Sub-License Agreement**").[6]  Missing from the Gryphon Hosting Agreements, however, is any suggestion that Gryphon was acting as manager for Sphere or in any capacity other than its own.  Indeed, the MSA and Order #2 both refer to and define Gryphon as "the Client."  The MSA further makes clear that "there are no third-party beneficiaries."  Moreover, Core is not a party to the Sub-License Agreement.

3.　　Sphere attempts to circumvent these undisputed facts by pointing to language in Order #2 that permits Gryphon to assign or sub-license the Gryphon Hosting Agreements and its rights and obligations thereunder to Sphere without Core's prior written consent.  Sphere POCs ¶ 7.  Sphere, however, omits the language that immediately follows in that same sentence, which states: "as long as Sphere 3D Corp. satisfies [Core] requirements prior to."  In negotiating this provision, Core expressly added this additional language to ensure that any assignment, delegation, sub-license, sub-lease or transfer of any rights to Sphere was conditioned on Sphere satisfying Core's requirements prior thereto.  These requirements would include, among other things: creditworthiness; Foreign Corrupt Practices Act considerations; Know Your Customer considerations (e.g. business with Chinese entities/Chines government); form of assignment (e.g. how and which rights and obligations were to be transferred, allocated or retained); whether any such assignment would implicate securities laws or constitute an investment contract; and whether any assignment would impact Core's own rights and obligations

---

[6] True and correct copies of the Sub-License Agreement and amendment thereto are attached hereto as <u>Exhibit 5</u> and <u>Exhibit 6</u> respectively.  Notwithstanding Sphere's claims that the relevant agreements are subject to confidentiality, the Sub-License Agreement and the merger agreement between Gryphon and Sphere (the "**Merger Agreement**") were attached to Sphere's Form F-4 public filing, dated January 5, 2022, and are in the public domain.

under the Gryphon Hosting Agreements. Critically, there is nothing in the Sphere POCs, or anywhere else, demonstrating that Sphere ever satisfied (or attempted to satisfy) any such requirements—because Sphere never did.

4. These facts are fatal to Sphere's claims against Core. But even if not, Sphere still cannot recover on the Sphere POCs because it fails to cite any provision in the Sub-License Agreement—or any agreement—pursuant to which Gryphon assigned all of its rights under the Gryphon Hosting Agreements to Sphere. Although Sphere does not point to any specific provision in the Sub-License Agreement it is relying on, the only provision in that agreement that deals with assignment of all of Gryphon's rights is section 2 ("Contingent Assignment"), which states, "[e]ffective immediately *upon the consummation of the Merger* [between Sphere and Gryphon]. . . all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, *the Surviving Corporation*." *See* Sub-License Agreement § 2. (emphasis added). But that provision cannot constitute the basis for an assignment of rights from Gryphon to Sphere. First, section 2 contemplates an assignment of rights from Gryphon to the Surviving Corporation—not Sphere.[7] And second, and even more dispositive, section 2 is contingent "upon the consummation of the Merger," which never happened.

5. Section 1 of the Sub-License Agreement also does nothing to help Sphere's cause. That section, entitled "Sub-License and Delegation," merely provides that Gryphon sub-licensed to Sphere its rights to access and use Core's facility and delegated to Sphere (as between Gryphon and Sphere) Gryphon's obligations to make payments to Core. But nothing in that

---

[7] Moreover, the Surviving Corporation is defined in the unconsummated Merger Agreement as Gryphon.

provision even purports to provide Sphere with all of Gryphon's rights under the Gryphon Hosting Agreements—which section 2 presumably sought to do had the merger been consummated. And, of course, whatever rights section 1 was seeking to sub-license to Sphere, there is nothing demonstrating that the contractual requirements for doing so were ever met in order for any such sub-licensing or delegation to comply with Order #2.

6.     In the absence of any contractual support for its contention that Gryphon assigned all of its rights to Sphere, or that it had any relationship with Core at all, Sphere claims that it allegedly "delivered to Core $35,104,363 in cash deposits" as though that should suffice to provide it rights under the Gryphon Hosting Agreements. Sphere POCs, ¶ 8. There is no evidence to support this assertion. In fact, Core's records reflect that all wire transfer banking information relating to the pre-payments made to Core (what Sphere refers to as "deposits") with respect to the Gryphon Hosting Agreements came from Gryphon. Whatever Sphere and Gryphon may have agreed to among themselves as to the source of payment cannot bind Core and certainly cannot change the terms of the Gryphon Hosting Agreements. To the extent Sphere has any dispute related to funds it allegedly provided to Gryphon, that dispute should be with Gryphon, not with Core. Additionally, even if Sphere had made these payments directly to Core, those payments were made on behalf of Gryphon and pursuant to a contract between Core and Gryphon; that posture does nothing to change who had rights under the Gryphon Hosting Agreements.

7.     Even if Sphere has rights under the Gryphon Hosting Agreements, which it does not, it cannot have any more rights than those Gryphon enjoyed. Similarly, whatever obligations Gryphon may have had under the Gryphon Hosting Agreements would be binding on Sphere if Sphere is to be believed that the Gryphon Hosting Agreements were sub-licensed. But, as detailed below, and as will be demonstrated during the course of this contested matter, the

Sphere POCs must still be disallowed because Core has performed its obligations under the Gryphon Hosting Agreements, and because Gryphon—or Sphere, to the extent the Gryphon Hosting Agreements were properly assigned—breached the Gryphon Hosting Agreements by failing to deliver anywhere near the number of Miners it was obligated to provide under Order #2.

8. In the Sphere POCs, Sphere asserts that Core breached the Gryphon Hosting Agreements by allegedly (i) failing to abide by Order #2's "deployment schedule"; (ii) refusing to honor the contractual hosting rate set out in Order #2; and (iii) installing Sphere's miners for Core's own benefit and using them to mine bitcoin for Core's own account. None of these claims is valid.[8]

9. First, Core accepted and deployed all Miners that Gryphon delivered to it. To the extent Core ever communicated to Gryphon that there would be any delay in deploying Miners, any such delay would not be a breach of the Gryphon Hosting Agreements because there is no provision that holds Core to a specific date for deployment. Rather, the MSA contains a disclaimer that Core furnishes its facilities and hosting services on an "as available" basis. On the other hand, and as the record will show, Gryphon breached the Gryphon Hosting Agreements because the MSA expressly obligated Gryphon to deliver machines on or before the "applicable scheduled delivery date," which Gryphon repeatedly failed to do. In fact, even though Core expected that it had signed a contract to host 70,000 Miners—and the substantial revenue that would come with such a contract—Gryphon never came anywhere near delivering the 70,000 Miners reflected in Order #2 and likely never had the wherewithal to ever perform under the

---

[8] Gryphon has not filed any proof of claim against Core.

Gryphon Hosting Agreements.[9]  It also appears that Sphere never had the ability to deliver those number of Miners at any time either, and certainly not on the schedule set forth in Order #2—even assuming that it could lay claim to any rights under the Gryphon Hosting Agreements.

10.     Second, Core has not repudiated the hosting services rate in Order #2.  Rather, Core has applied and continues to apply that rate to the 639 Miners it currently hosts for Gryphon under Order #1 (100 units) and Order #2 (534 units)—a far cry from the 70,000 units Gryphon obligated itself to deliver in Order #2.  The fact that Core currently hosts Gryphon's Miners (as a business courtesy) is further evidence that Gryphon—not Sphere—had the rights under the Gryphon Hosting Agreements.  Sphere's grievance seems to be that Core is not willing to provide Sphere the hosting rates in Order #2 that Gryphon breached.  But Core has no obligation to offer Sphere the same hosting services rates as contained in Order #2 because it had no contract with Sphere, and Core did not breach any agreement by refusing to do so.  Furthermore, because Gryphon breached Order #2 by failing to deliver the tens of thousands of Miners under the Gryphon Hosting Agreements, there is no Order #2 rate to apply for new miners.  Indeed, to the extent Gryphon at this point sought to do increased business with Core, it too would need a new MSA and/or new order with new rates and terms.

11.     Third, Core never misappropriated Gryphon's Miners (which Sphere claims belong to it) or proceeds derived therefrom.  Rather, because Gryphon failed to provide Core notice of a delivery of unmarked Gryphon Miners that Core received on February 8, 2022, Core stored those Miners along with its own at Core's hub warehouse in Marble, North Carolina.  When Gryphon informed Core that it had shipped some Miners to Core on February 8, Core investigated

---

[9] For some reason, the Sphere POCs incorrectly claim that the delivery agreed to by Gryphon was 60,000 units, but the math in Order #2 clearly adds up to 70,000 units.

to determine where Gryphon's Miners had been stored and then promptly installed them. The Miners had not, contrary to Sphere's contentions, been used by Core to mine bitcoin for its own account.

12.     Finally, regardless of whatever Gryphon and Sphere may have agreed to between themselves regarding the approximately $35 million in prepayments paid by Gryphon to Core in connection with the Gryphon Hosting Agreements, neither Gryphon nor Sphere has a claim against Core for those funds.  Not only is there nothing in the Gryphon Hosting Agreements that allows for a "refund" of payments that were made to Core in connection with what was supposed to be a delivery by Gryphon of 70,000 Miners (which Gryphon breached), but the MSA expressly makes Gryphon liable to Core for any fees and other amounts owed to Core (like the prepayments) under the Gryphon Hosting Agreements.  Because Gryphon breached the Gryphon Hosting Agreements by failing to provide anything close to the 70,000 Miners it contracted for hosting, it (and Sphere who claims it has Gryphon's rights and obligations) has no right to recover the prepayments made to Core in connection with Gryphon's obligations under the Gryphon Hosting Agreements.  While Core continues to credit those payments against the services it is currently providing Gryphon, which it has been doing since the Gryphon Hosting Agreements inception and which has been known to Sphere, Core has no obligation to "refund" any amounts to Gryphon (or Sphere) under the Gryphon Hosting Agreements or otherwise.

13.     As shown above, Core has performed all obligations under the Gryphon Hosting Agreements and the Sphere POCs should be disallowed in their entirety.  Nevertheless, to the extent Sphere has rights under the Gryphon Hosting Agreements, which it does not, and that Core breached those rights, which it did not, Sphere's claims would be subject to the robust limitation of liability provisions contained in sections 5(c) and 5(d) of the MSA.  These provisions

would bar Sphere from recovering, among other things, any loss of revenue, lost profits, loss of business, cost of cover or any consequential, expectation, reliance, and punitive damages. Additionally, although Sphere states that its claim is worth close to $40 million, Section 5(d) of the MSA caps Core's total liability to 1 month's fee payable to Core under Order #2, which is approximately $84,000.

## II.    Relief Requested

14.    By this Objection, pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors seek entry of the Proposed Order, disallowing Proofs of Claim Nos. 358 and 359 filed by Sphere in their entirety

## III.    Jurisdiction

15.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1

## IV.    Background

### A.    *The Gryphon Hosting Agreements*

16.    In the summer of 2021, Gryphon approached Core about entering into a hosting agreement for tens of thousands of miners Gryphon indicated it would have access to in connection with a merger it was contemplating with Sphere.  Gryphon represented to Core that pursuant to that merger, which it expected to close in late 2021 or early 2022, Gryphon would host with Core 70,000 Miners.  Gryphon indicated that a contract had been signed with a company

named BitFuFu for the delivery of the miners that would allow it to perform under the contemplated hosting agreement. Such a hosting agreement would obviously be very lucrative for Core, and terms were negotiated and agreed to based on Gryphon's representations. Sphere was not a party to those negotiations.

17.     Following the negotiations between Core and Gryphon, on September 12, 2021, Core entered into the MSA with Gryphon to provide hosting and other services for Gryphon's Miners. Sphere is not a party to the MSA. Pursuant to the MSA, Gryphon entered into two separate orders that would be governed generally by the MSA. The first was Master Service Agreement Order #1 ("**Order #1**"), entered into on or about September 12, 2021.[10] Order #1 was for 100 S19j miners and was meant to be a means by which to test the specifications of a small set of miners to make sure that the configurations at Core would be appropriate to deploy the miners and that any necessary adjustments could be made. Those Miners were received in early October 2021, the appropriate tests were run, and the Miners were deployed. Those Miners all came from Gryphon, not Sphere. Sphere does not appear to be making any claim under Order #1.

18.     Master Service Agreement Order #2 ("**Order #2**"), signed by Gryphon and Core on October 5, 2021, sets out the specific terms under which Gryphon was to deliver and Core was to host a total of an additional 70,000 S19 Miners or their equivalent.[11] The MSA and Order #2 make clear that Gryphon is obligated to deliver machines pursuant to the delivery dates contained therein. MSA at § 2(b), Order #2 ("Estimated Delivery Date"). Pursuant to that schedule, Gryphon was to deliver the 70,000 Miners over the course of several months from October 2021 through November 2022. From Gryphon's perspective, it appears the schedule was

---

[10] A true and correct copy of Order #1 is attached hereto as <u>Exhibit 3</u>.

[11] A true and correct copy of Order #2 is attached hereto as <u>Exhibit 4</u>.

meant to coincide with its proposed merger with Sphere. For example, for the months October 2021 through February 2022, Gryphon was to deliver and Core was to host a total of 500 Miners (100 per month). In March 2022, presumably after the merger with Sphere was to close, the number of Miners to be delivered by Gryphon was to increase, with 2,500 in March, 5,000 more in April, 7,500 more in May, and then 10,000 in each of the months of June through October 2002, capping off with 4,500 in November 2022.

19.     Order #2 requires that Gryphon make certain payments to Core prior to installation of the Miners, also pursuant to a set schedule set out in Order #2. In total, according to Core's records, Gryphon made payments to Core totaling $35,264,413.57, pursuant to the fee schedule set forth in Order #2 for the hosting services. Core's banking records reflect that for each of these payments, the wire transfers came from Gryphon, not Sphere. One of the purposes of these prepayments is to ensure some level of performance by the counterparty, in this case Gryphon, given the enormous undertaking and investment Core must make to prepare its facilities for the number of expected units. It also serves as a form of down-payment for the services Core was to provide. In short, Gryphon signed a contract with Core to deliver and have Core host 70,000 units—a significant amount—and Core needed some assurance of performance.

### B.     The Gryphon/Sphere Agreements

20.     On June 3, 2021, Gryphon and Sphere entered into their Merger Agreement. Core is not a party to that agreement. Pursuant to that agreement, Gryphon was to merge with a Sphere subsidiary created for the merger, with Gryphon surviving as the "Surviving Corporation" as defined in the Merger Agreement.

21.     On October 5, 2021, Gryphon entered into the Sub-License Agreement with Sphere in connection with the contemplated merger between the two companies. Although the MSA contains a provision explicitly prohibiting the assignment of the Gryphon Hosting

Agreements without Core's prior written consent, Core and Gryphon agreed in Order #2 to amend that provision to allow Gryphon to assign its rights under Order #2 to Sphere, provided, however, that Sphere *satisfied Core's requirements prior to assignment*. Order #2 at 4. The Sub-License Agreement contains a provision related to assignment that provides that upon the consummation of a merger between Sphere and Gryphon, all of Gryphon's rights and obligations would be automatically assigned to the Surviving Corporation. Sub-License Agreement § 2.

22.     The Sub-License Agreement also contains a provision through which, as between Gryphon and Sphere, Gryphon sub-licensed to Sphere its right to access and use Core's facility and delegated to Sphere all of its payment obligations under Order #2. Sub-License Agreement § 1.

23.     Sphere and Gryphon never consummated the merger. In fact, Sphere issued a press release on April 4, 2022, indicating that Sphere and Gryphon mutually agreed to terminate their Merger Agreement "due to changing market conditions, the passage of time, and the relative financial positions of the companies, among other factors."[12]

### C.    *Gryphon's Failure to Perform Under the Gryphon Hosting Agreements*

24.     After making its delivery of 100 Miners under Order #1 on October 6, 2021, Gryphon did not deliver its first units under Order #2 until February 8, 2022. In other words, Gryphon missed its October, November, December and January delivery dates. And when it sent those Miners in early February, a total of 297 of them, they were unmarked as being from Gryphon and were delivered to Core in a shipment from the manufacturer that also contained Core's own mining machines. Gryphon did not notify Core about the delivery until sometime thereafter. Once Gryphon notified Core about the shipment of its 297 Miners, it was initially believed that some of

---

[12] A true and correct copy of Sphere's press release dated April 4, 2022, is attached hereto as <u>Exhibit 7</u>.

the Gryphon machines had been mistakenly deployed as Core's self-miners. After investigating further, however, Core determined that the Gryphon Miners had not in fact been deployed as Core self-mining machines, but that they were being stored at Core's hub warehouse in Marble, North Carolina along with Core's own machines. After this discovery, Core promptly deployed Gryphon's 297 Miners and Gryphon received all proceeds mined from those machines. Thus, contrary to Sphere's contention, at no time were any of Gryphon's Miners (which Sphere wrongly refers to as Sphere miners) used for Core's own benefit.

25. Thereafter, on February 28, 2022 Gryphon sent Core 95 more Miners and then another 108 on March 7, 2022. Under the schedule in Order #2, by March 15, 2022 Gryphon was supposed to have sent Core a total of 3,000 Miners (in addition to the 100 miners under Order #1) but in fact only had a total of approximately 600 Miners delivered by that date. To make matters worse, it was clear by early February 2022 that not only was the Gryphon/Sphere merger a dead letter, but that—more importantly to Core—Gryphon was not going to be in a position to fulfill its contractual obligation under the Gryphon Hosting Agreements to provide the 70,000 Miners agreed to in Order #2.

26. In fact, on February 11, 2022, Gryphon sent Core an email in which Gryphon makes clear that it would not be able to meet the quantity of units it had agreed to and that it was expecting delivery of miners from another manufacturer, NuMiner, in connection with a contract Sphere apparently entered into in early February that Gryphon presumably would have access to. Even assuming that Miners from NuMiner could be configured for use at Core—which itself would be a tall order given that the racking, switch gear and other infrastructure items would need to be reconfigured—there was nothing to indicate that any Miners from NuMiner would be forthcoming. As it turned out, there were no Miners from NuMiner and neither Sphere nor

Gryphon ever had any such Miners to provide Core, and certainly not any on the scale needed to fulfill the unit obligations in the Gryphon Hosting Agreements.

27.     Even further, while it was already clear that Gryphon had breached the Gryphon Hosting Agreements, by the end of February 2022, Gryphon admitted to Core that deliveries would not be forthcoming, and, by email dated February 28, 2022, Gryphon presented Core with a new delivery schedule that not only reduced the total number of units from 70,000 to 60,000 but also pushed out delivery of the majority of Miners to later months.  For example, although the schedule in Order #2 had Gryphon delivering a total of 15,500 Miners to Core by May 15, 2022, the revised proposed schedule reduced that number to 3,800.  As a result, the cumulative assumed power consumption of Gryphon's Miners for 2022 would decrease by about 30 million watts as compared to the schedule in Order #2, which would significantly reduce the fees owed to Core.   That is not the deal Core signed on to, and Core never accepted a revised schedule from Gryphon.

28.     Given that Gryphon was not delivering Miners to Core in accordance with the Gryphon Hosting Agreements and made clear to Core in February that it could not meet its obligations, Core otherwise utilized the capacity it had previously set aside for Gryphon. Subsequently, in April 2022, Gryphon delivered 597 miners to Core and asked if Core could deploy them immediately.  Core notified Gryphon that it could not deploy the miners immediately but could do so in a few weeks' time.  Gryphon did not want to wait and asked Core to send the units back.  Core obliged, but 39 miners units that were already deployed remained and are part of the current complement of 639 Gryphon Miners at Core today.

29.     Even though the Gryphon Hosting Agreements had been breached by Gryphon, for several months after February 2022 Core tried work with Gryphon, and later even

Sphere, to devise a solution that could work for all parties. Indeed, while Core did not have any contract with Sphere, Core was willing to work with both parties to find a way to deploy their respective miners and apply the prepayment that had since been forfeited based on Gryphon's breach of the Gryphon Hosting Agreements. A main issue that hampered the negotiations was that Sphere would only consider a deal that used the same terms as the now breached Order #2, which Sphere never had any rights to in the first place. As for Gryphon, it continued to cling to a notion that new Miner deliveries were just around the corner, but because Gryphon was already in breach of Order #2, it too would require a new MSA and/or order if new Miners were to be hosted by Core. In the end, nothing could be worked out, and neither Gryphon nor Sphere was willing to enter into new hosting agreements with Core. While that was their choice, of course, that choice has consequences. And the consequences for Sphere is that the Sphere POCs must be disallowed.

### D. Procedural History

30. On October 31, 2022, Sphere filed a demand for arbitration against Core (the "**Arbitration Demand**").

31. On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

32. The Arbitration Demand has been stayed since the Petition Date pursuant to the automatic stay in Core's bankruptcy.

### E. Sphere's Proofs of Claim

33. On April 13, 2023, Sphere filed two identical claims for $39,541,996.30 plus additional unliquidated amounts against Core Scientific, Inc. and Core Scientific Operating Company. *See* Proofs of Claim Nos. 358, 359. In the addendum comprising part of the Sphere

POCs, Sphere alleges that it is entitled to recover because Gryphon assigned all of its rights under the Gryphon Hosting Agreements to Sphere. Sphere POCs at ¶ 7. Sphere alleges that it has claims against Core for the following amounts: (i) Hosting Prepayments ($34,383,713.00); (ii) Alternative Hosting Costs ($5,000,724.06); (iii) Storage Fees ($157,559.24); and (iv) Bitcoins (unliquidated).[13] *See id.* at ¶ 14

## V.     Basis for Relief

34.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). However, *prima facie* validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence . . . ." *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). "Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *In re Fidelity Holding*, 837 F.2d at 698). And, "the ultimate burden of proof always lies with the claimant." *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

### A.     *Sphere has no rights under the Gryphon Hosting Agreements*

35.     The MSA and Order #2 were entered into solely between Core and Gryphon—not Sphere. *Nothing* in the Gryphon Hosting Agreements supports Sphere's contention that it is a party to those agreements or that Gryphon was acting "as manager for Sphere." *See* Sphere POCs, at ¶ 6. In fact, the MSA (i) makes no reference to Sphere; (ii) defines and refers to Gryphon as the "Client" throughout the MSA, *see* MSA preamble; (iii) provides that the "Client

---

[13] Sphere also claims it may have certain unidentified post-petition claims against Core. Sphere POCs, ¶ 17. As no such claims are identified and no motion for administrative expense has been filed, Core reserves all of its rights against any such claim that Sphere may assert.

16

may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of [Core]," *see* MSA 8d.; and (iv) expressly disclaims any third-party beneficiaries to the MSA. *See id.* ("Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement."). Similarly, Order #2 also refers to Gryphon exclusively as the "Client," including in the signature block, and makes no reference to Gryphon acting as a manager for Sphere.

36. Further, Sphere's contention that Gryphon assigned all of its contractual rights to Sphere pursuant to Order #2 is without merit. Order #2 amends Section 8(d) of the MSA ("Assignment and Subcontracting") such that Gryphon is "*permitted* to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order #1 and Order #2, or any of its rights and obligations [thereunder], to Sphere 3D Corp. . . . without the prior written consent of [Core] *as long as Sphere 3D Corp. satisfies* [Core's] *requirements prior to*." *See* Order #2 (emphasis added). This amendment does not assign any rights under the MSA or Order #2 to Sphere but provides only that Gryphon is *permitted* to assign its rights to Sphere—which Gryphon never did—and then only as long as Sphere satisfied Core's requirements prior to doing so—which Sphere never did.

37. Sphere falsely asserts that Gryphon assigned its contractual rights pursuant to the Sub-License Agreement. However, nowhere in the Sphere POCs, or the Arbitration Demand incorporated therein, does Sphere cite *any* provision in the Sub-License Agreement that purports to assign all of Gryphon's contractual rights to Sphere. Indeed, no such provision exists. The only provision in the Sub-License Agreement that addresses assignment of rights is Section 2 ("Contingent Assignment"), which states, "[e]ffective immediately *upon the consummation of the Merger* . . . all of Gryphon's rights and obligations under Order #2 shall be automatically assigned

to, and assumed by, *the Surviving Corporation*." *See* Sub-License Agreement § 2 (emphasis added). Accordingly, contrary to Sphere's position, Section 2 of the Sub-License Agreement does not even contemplate the assignment of Gryphon's rights to Sphere. Instead, it provides for the assignment of rights, upon consummation of the merger, to the Surviving Corporation, which is not Sphere.

38. Further, Section 2 of the Sublicense Agreement is void under Section 8(d) of the MSA. As stated above, under Section 8(d) of the MSA, Gryphon "may not assign, delegate or transfer th[e] Agreement or any of its rights and obligations [thereunder] *without the prior written consent of* [Core]." (Emphasis added). Order # 2 amended Section 8(d) such that Core's consent is not required only with respect to a potential assignment (which never transpired) to Sphere. Therefore, because Core never agreed that Gryphon could assign Order #2 to the "Surviving Corporation," Section 2 of the Sub-License Agreement is void under Section 8(d) of the MSA, which also provides that "[a]ny assignment or transfer in violation of this Agreement is void." *See* MSA § 8(d).

39. In addition to being void, Section 2 of the Sub-License Agreement is also a "Contingent Assignment" that conditioned the assignment of Gryphon's rights under Order #2 to take "[e]ffect[] immediately upon the consummation of the Merger." But the merger between Gryphon and Sphere never happened. Absent the merger, the "Contingent Assignment" was never triggered, and therefore, Gryphon never assigned all of its rights under the Gryphon Hosting Agreements to the Surviving Corporation, Sphere, or any other entity.

40. Likewise, Gryphon never assigned to Sphere all of its rights under the Gryphon Hosting Agreements pursuant to section 1 of the Sub-License Agreement. In fact, unlike the Contingent Assignment provision, which purports to assign "all of Gryphon's rights and

obligations," section 1 purports to sub-license to Sphere *only* Gryphon's "rights to access and use [Core's] Facility." By using discrete and far more restrictive terms in section 1 (as compared to section 2) to delineate the scope of the purported sub-license and delegation, Sphere and Gryphon clearly contemplated that any such sub-license and delegation would be substantially more limited in scope and would not encompass all rights under the Gryphon Hosting Agreements. Indeed, had Gryphon and Sphere intended to assign all of Gryphon's rights in section 1, they would have used the same broad—albeit void—assignment language contained in section 2.

41. Further, even if Sphere could cite a provision pursuant to which Gryphon purportedly assigned its rights under Order #2 to Sphere (which Sphere cannot), Order #2 "permit[s]" such action only "as long as Sphere 3D Corp. satisfies [Core's] requirements prior to." As noted above in paragraph 3, Core specifically negotiated for this additional language to ensure that its requirements would have to be satisfied before any rights were given to Sphere. Sphere fails to reference, let alone substantiate, that it satisfied these requirements.

42. Moreover, based on publicly available documents, and as discovery will further confirm, it is clear that Sphere was never ready, willing, and able to perform under Order #2 given the costs to obtain 70,000 miners (at the time likely in the range of nearly $300 million) exceeded Sphere's fiscal and operational capabilities. For example, in that same April 4, 2022 press release in which Sphere announced that the merger with Gryphon was off, Sphere stated that it had only 1,000 miners operational and "anticipated" delivery of 2,000 miners in May 2022 and an additional 2,000 in June 2022. Those figures fall drastically short of the terms agreed to in Order #2, which required Gryphon (and Sphere if it stepped into Gryphon's shoes at it claims) to deliver 25,500 miners to Core by June 15, 2022. Similarly, Sphere's Form 6-K for the month of March 2022 reflects that its results for fiscal year 2021 included net revenue of $3.7 million and a

net loss from operations of $17.8 million.  In a Sphere Form 6-K for the month of May 2022, Sphere indicated that "[m]anagement has projected that cash on hand will not be sufficient to allow us to continue operations beyond November 30, 2022 if we are unable to raise additional funding for operations."  All of this during the time that tens of thousands of Miners were to be delivered to Core under Order #2.  In short, Gryphon did not, and Sphere could not have, satisfied the terms of Order #2, thus precluding any claim against Core.

43.    Finally, given that Gryphon breached Order #2 by failing to provide the tens of thousands of Miners as required under Order #2, Core is permitted to retain the pre-payments it received from Gryphon and neither Gryphon (nor Sphere as its purposes sub-licensee) has any right to those funds.  *See* MSA § 4(d)(iii) (in the event that Client breaches the MSA, Core is permitted to "declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable").  Nevertheless, as noted, in its discretion and as a business courtesy to Gryphon, Core has been crediting Gryphon against those amounts for the hosting services Core continues to provide to Gryphon in connection with the few hundred Miners Gryphon has at Core.  In fact, the monthly invoices Core sends to Gryphon make clear that the pre-payments are being applied against hosting fees for Gryphon's Miners.  Core understands that Sphere has received a copy of these invoices since February 2022 and has been aware of that practice.  To the extent Sphere has any dispute related to funds it allegedly provided to Gryphon, that dispute is with Gryphon, with which Sphere is in privity, not Core.

44.    In sum, the facts confirm that Sphere is not a party to (or beneficiary of) the Gryphon Hosting Agreements, has no rights under those agreements, and that the Sphere POCs must be disallowed.

**B.    *Core performed its obligations under the Agreements***

45.    Even if Gryphon had assigned its rights under the Gryphon Hosting Agreements to Sphere, which it has not, Sphere still would not have a basis to assert its claims because Core performed all of its obligations under the Gryphon Hosting Agreements.  In the Sphere POCs, Sphere incorrectly asserts that Core breached the Agreements by (i) failing to abide by Order #2's "deployment schedule"; (ii) refusing to honor the contractual hosting rate set out in Order #2; and (iii) installing Sphere's miners for Core's own benefit and using them to mine bitcoin for Core's own account. *See* POC ¶¶ 8–12.  None of these alleged breaches transpired.

46.    First, Core has accepted and deployed all miners that Gryphon has delivered to Core, and Core is not required under the Agreements to abide by any "deployment schedule." The "Deployment Month[s]" in Order #2 reflect only the number of miners that Core anticipates receiving from Gryphon each month.   No provision in the Gryphon Hosting Agreements requires Core to deploy machines on or before a certain date.  On the contrary, the MSA even includes a warranty disclaimer that "ALL [CORE] FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN . . . 'AS AVAILABLE' BASIS."  MSA § 5(b) (Warranties, Limitations of Liability, Indemnity).  Services is defined in the MSA to include colocation and hosting services, and therefore, the parties agreed that Core's facilities and its hosting services are furnished on an "as available" basis and not pursuant to a "deployment schedule" as stated in the Sphere POCs. MSA § 1(a).

47.    Core never declined to host Miners that Gryphon delivered under Order #2 and never attempted to reduce the total number of Miners that Core would be required to host under Order #2.  At most, in April 2022, well after Gryphon had already breached the Gryphon Hosting Agreements, Core informed Gryphon that it could not accommodate its request to immediately deploy certain Miners but indicated it could do so a few weeks thereafter.  Further,

despite claiming that Core breached Order #2 by failing to "abide by the deployment schedule," Sphere has failed to cite any provision in the Gryphon Hosting Agreements that obligates Core to install Gryphon's Miners by a given date. And, of course, Core cannot deploy Miners it has not received.

48.     The MSA also provides that Gryphon "shall be fully responsible for delivering all Client Equipment to [Core] at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order." MSA § 2(b). Order #2 states that the "Estimated Delivery Date" for the Miners shall be "the fifteenth of every month beginning with October 15, 2021, until November 15, 2022." Order #2 goes on to state that Gryphon must "notify [Core] as soon as reasonably possible in advance if Units will not be delivered by this date," and Core "may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date." Order #2 at 3.

49.     Second, as detailed above, Core has not breached Order #2 by failing to offer Sphere the hosting rates in Order #2. Not only is Sphere not entitled to those rates because it has no rights under Order #2, Order #2 cannot apply to any new Miners that either Gryphon or Sphere would seek to have Core host because Gryphon breached that order over a year ago when it failed to deliver the Miners as required under Order #2.

50.     Third, contrary to Sphere's allegations, Core has never installed any Gryphon Miners as its own or misappropriated the proceeds derived from such Miners. Notwithstanding the gravity of its accusations, Sphere fails to cite any evidence to support its position. As explained above, on February 8, 2022, Core received directly from the manufacturer a shipment of mining equipment that, in addition to several hundred Core Miners, contained what was later determined to be 297 unmarked Gryphon Miners. When Gryphon informed Core about

Gryphon's February 8 shipment of miners, Core initially believed that Gryphon's Miners had been installed as Core's own Miners. Core, however, came to learn during an investigation of the matter, that it had not in fact installed the 297 Gryphon Miners but had instead stored them at Core's hub warehouse in Marble, North Carolina. Core thereafter promptly installed Gryphon's Miners, and Gryphon received all coins mined from those machines. To the extent Sphere contends that the coins mined from those machines belong to Sphere, its dispute is with Gryphon, not Core.

51. In the end, Sphere's arguments are really nothing more than a tactic to divert attention away from the following facts that undermine the Sphere POCs: 1) Sphere is not a party to the Gryphon Hosting Agreements and any requirement that may have potentially led to it receiving any rights under those agreements were never satisfied; 2) Sphere never merged with Gryphon and thus never brought together what apparently was going to be an entity that was going to supply the 70,000 miners Gryphon agreed to, but failed to deliver, under the Gryphon Hosting Agreements; 3) Gryphon breached the Gryphon Hosting Agreements by failing to deliver on its obligations in Order #2; 4) Sphere is bound by Gryphon's breach and could not have enjoyed any more rights than Gryphon had under the Gryphon Hosting Agreements; and 5) neither Gryphon nor Sphere had the ability to deliver 70,000 miners in accordance with the schedule in Order #2, or even today.

**C.    The MSA bars recovery of the types and total amount of damages Sphere asserts in the Sphere POCs.**

52. As stated above, Sphere is not a party to (or a third party beneficiary of) the Gryphon Hosting Agreements, and Core has performed its obligations under those agreements. Nevertheless, to the extent Sphere has any rights under the Gryphon Hosting Agreements, which it does not, and that Core breached those agreements, which it did not, Sphere's claims would be

subject to the robust limitation of liability provisions contained in Sections 5(c) and 5(d) of the MSA, which limit both the type and amount of any potential recovery against Core.

53.     More specifically, Sphere asserts damages for (i) the hosting deposits that Gryphon made to Core, (ii) alternative hosting costs, (iii) storage fees, and (iv) the value of any Bitcoin that Core allegedly mined and misappropriated from Gryphon's Miners.  Sphere goes on to state that the Sphere POCs are filed "in an unliquidated amount for [] any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and reliance damages."  Sphere POCs ¶¶ 14, 15. Additionally, Sphere seeks punitive damages in its Arbitration Demand, which is incorporated in the Sphere POCs. But these types of damages are expressly precluded under Section 5(c) of the MSA:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR** (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO [CORE] UNDER THIS AGREEMENT);[14] (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF [SPHERE] EQUIPMENT; (**V) ANY CONSEQUENTIAL, OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES**. (Emphasis added).

MSA § 5(c).

54.     Accordingly, the MSA expressly bars recovery of any consequential, expectation, reliance, and punitive damages that Sphere asserts regardless of whether Sphere's claims arise under the Gryphon Hosting Agreements or sound in tort, such as its claim for

---

[14] This exception is notable in that it allows Core to recover fees and other amounts owed to Core under the Gryphon Hosting Agreements, which include the approximately $35 million pre-payments made thereunder.

conversion, which it raised in its Arbitration Demand.  Further, Section 5(c) precludes recovery for any cover costs, which includes costs of procuring services of equivalent capability, function, and performance.  Therefore, the MSA also bars Sphere from recovering for the "alternative hosting costs" that it asserts in the Sphere POCs.

55.     Additionally, in the event that Sphere is entitled to recover any damages, which it is not, the MSA also caps Core's total liability under Section 5(d) to 1 months fee.

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, **[CORE'S] TOTAL LIABILITY TO [SPHERE] IN THE AGGREGATE FOR THE ENTIRE TERM** (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) **WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO [CORE] PURSUANT TO THE APPLICABLE ORDER.**" (Emphasis added.)

MSA § 5(d).

56.     The MSA goes on to state, "THE LIMITATIONS SET FORTH IN SECTIONS 5c AND 5d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY." *Id at 5(e).*

57.     Because all of Sphere's claims arise from or are related to the subject matter of the MSA, Sphere would not be entitled to recover for the nearly $40 million that it asserts in the POCs but would be limited to 1 months fee payable to Core, which in this case is approximately $84,000.

58.     These types of limitation of liability provisions contained in the MSA are routinely enforced by Delaware courts.  *See, e.g., In re Pilgrim's Pride Corp.,* 467 B.R. 871, 881 (Bankr. N.D. Tex. 2012) (applying Delaware law and granting summary judgment to the debtors because the contracts excluded consequential or non-compensatory damages); *Iavarone v. Eagle*

*Eye Home Inspections, LLC,* No. N18C-05-217 ALR, 2019 WL 5692265, at *2 (Del. Super. Ct. Nov. 4, 2019) (upholding limitation of liability provision where the plain language of the clause was clear regarding the people and types of conduct to which the limitation applied, the contract was not lengthy, and the limitations' language was clear); *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. 7471–VCP, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision and noting that "freedom of contract would suggest that parties … should be entitled to draft agreements so as to avoid certain duties and liabilities").

59.     Gryphon plainly agreed to the express exclusion of certain types of damages and the limitation of damages to one month's fee.[15]  Indeed, Section 5(f) of the MSA provides, "[e]ach party recognizes and agrees that the warranty disclaimers, **limitations of liability and remedy limitations** in this Agreement **are materially bargained for by the parties**." (emphasis added).  These provisions were bargained for by Core and are a material component of the MSA.

60.     The limitation of liability provisions were negotiated by two sophisticated commercial entities, with equal bargaining power, at arms' length; the provisions should, therefore, be enforced as written.  *See, e.g.*, *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at *11 (Del. Ch. July 9, 2002) (upholding the terms of a contract as written because nothing prevented the plaintiff, a sophisticated commercial entity, from refusing to contract if it did not have the leverage to obtain favorable terms); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005) (concluding that sophisticated parties cannot "escape the express language" of a contract).

---

[15] Tellingly, in Order #1, which apparently is not at issue, Gryphon negotiated an increase to this limitation of liability to three months fee.  Order #2 contains no such amendment.

61.     Here, the language in sections 5(c) and 5(d) clearly and unambiguously limits Sphere's ability to recover the categories and amount of damages it seeks.  Accepting Sphere's claims for any of these categories of damages or, to the extent the Court finds Sphere is entitled to any damages, in an amount greater than one month's fee, would render the limitation of liability provisions meaningless and against the parties' intent.

## VI.     Reservation of Rights

62.     This Objection is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Debtors or any other party in interest to object to any claim, including the any of Sphere's claims, on any further grounds, and the Debtors expressly reserve all other substantive or procedural objections that they may have.  Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

## VII.     Notice

63.     Notice of this Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: May 9, 2023
Houston, Texas

/s/         Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:   (713) 224-9511
Email:         Alfredo.Perez @weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Email:         Ray.Schrock@weil.com
                   Ronit.Berkovich@weil.com
                   Theodore.Tsekerides@weil.com
                   Moshe.Fink@weil.com

*Counsel for Debtors and Debtors in Possession*

## Certificate of Service

I hereby certify that on May 9, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<div style="text-align: right">

/s/         Alfredo R. Perez
_____

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:       Alfredo.Perez @weil.com

</div>

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **CORE SCIENTIFIC, INC.**, *et al.*, | § | Case No. 22-90341 (DRJ) |
|  | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[16] | § |  |
|  | § |  |
|  | § |  |

## ORDER SUSTAINING THE DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.

Upon the objection, dated April 24, 2023 (the "**Objection**"),[17] of Core Scientific

Operating Company f/k/a Core Scientific, Inc. ("**Core**") and its debtor affiliates, as debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), seeking entry of

an order (this "**Order**") disallowing the Proofs of Claim Nos. 358 and 359 filed by Sphere 3D

Corp. ("**Sphere**") and granting related relief, all as more fully set forth in the Objection; and

pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure, and Bankruptcy Local Rule

3007-1; and the Court having jurisdiction to consider the Objection and the relief requested therein

in accordance with 28 U.S.C. § 1334; and consideration of the Objection and the relief requested

therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before

---

[16] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisitions, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[17]     All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to such terms in the Objection.

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Objection

having been provided; and all responses, if any, to the Objection having been withdrawn, resolved,

or overruled; and the Court having found and determined that the relief sought in the Objection is

in the best interests of the Debtors, their respective estates and creditors, and all parties-in-interest,

and that the legal and factual bases set forth in the Objection establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      Proofs of Claim Nos. 358 and 359 filed by Sphere are disallowed.

2.      Stretto, Inc., as claims, noticing and solicitation agent, is authorized and

directed to update the claims register maintained in these chapter 11 cases to reflect the relief

granted in this Order.

3.      The terms and conditions of this Order will be immediately effective and

enforceable upon its entry.

4.      The Debtors are authorized to take all steps necessary or appropriate to

effectuate the relief granted pursuant to this Order in accordance with the Objection.

5.      This Court retains exclusive jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2023

        Houston, Texas

                                _____
                                DAVID R. JONES
                                UNITED STATES BANKRUPTCY JUDGE

# Exhibit 2

<u>Exhibit A</u>

<u>MASTER SERVICES AGREEMENT</u>

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

**1. AGREEMENT STRUCTURE**

a. This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**"). Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order. In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

**2. SERVICES AND COMPANY FACILITY**

a. Company will provide Client the Services at a Company Facility set forth in an Order. This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest. Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility. Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services. Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b. Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility. Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order. Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c. Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference. If Company determines in its sole discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d. Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e. In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f. If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3. PAYMENT TERMS AND TAXES

a. Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b. Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c. All amounts payable to Company under this Agreement exclude applicable taxes. Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities. If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4. TERM, TERMINATION, MODIFICATION AND SUSPENSION

a. This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement. Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b. Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period). If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c. Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d. In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

    (i)   suspend the provision of the Services;

    (ii)  disconnect Client Equipment and store it;

    (iii) declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;

    (iv) operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;

    (v)  terminate this Agreement and all Orders; and

    (vi) exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee. Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e. Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of all or a portion of the Services and disconnect all or a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f. Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g. Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement. Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h. In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension. Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5. WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a. Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement. Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner. Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has not modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

4

b. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e. EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS 4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f. Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated. Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g. Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement. Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h. Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, or (vii) Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

## 6. CONFIDENTIAL INFORMATION

a. Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**"). Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement. Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event less than commercially reasonable measures.

b. The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c. Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d. Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

e. Notwithstanding any contrary provisions in this Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to freely incorporate such changes or suggestions into Company's products and services without restriction.

## 7. INSURANCE

a. Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b. Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8. MISCELLANEOUS

a. <u>Notice</u>. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c. <u>Survival</u>. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d. <u>Subcontracting and Assignment</u>. Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations. Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client. Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company. Any assignment or transfer in violation of this Agreement is void. This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns. Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e. <u>Force Majeure</u>. Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event. A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f. <u>Governing Law and Arbitration</u>. This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures. Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award. The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g. <u>General</u>. The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have. The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them. Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent. There are no third-party beneficiaries to this Agreement. No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

[*Signature page follows*]

**Core Scientific, Inc.**

By:    /s/ Michael Trzupek
Name:  Michael Trzupek
Title:  Authorized Representative
Date:  9/13/2021

**Gryphon Digital Mining, Inc.**

By:    /s/ Dan Tolhurst
Name:  Dan Tolhurst
Title:  President
Date:  9/12/2021

# Exhibit 3

Exhibit 10.33

**CERTAIN IDENTIFIED INFORMATION HAS BEEN OMITTED FROM THIS EXHIBIT IN ACCORDANCE WITH REGULATION S-K ITEM 601(B)(10)(IV). ASTERISKS DENOTE OMISSIONS. SUCH INFORMATION IS BOTH (i) IMMATERIAL AND (ii) IS OF A TYPE REGULARLY TREATED AS PRIVATE OR CONFIDENTIAL BY THE REGISTRANT.**

<p align="center">**MASTER SERVICES AGREEMENT ORDER #1**</p>

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September ___, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| | | | |
|---|---|---|---|
| **Commencement Date:** | As of August 31, 2021. | | |
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted**:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | N/A | 100 S19j | 3.203 |
| | | | |
| | | | |
| **Hosting-Services Rate:** | USD $[***]/ KWh | | |
| **Payment Due Prior to Installation:** | USD $[***] on or before August 31, 2021 consisting of:<br>· $[***] a six-month prepayment for hosting services to be applied as a credit against future monthly invoices as they become due.<br>· $[***] Equipment Configuration Fee | | |
| **Estimated Delivery Date:** | August 31, 2021. Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Equipment Configuration Fee: $[***]/Unit payable as provided above. | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $[***]/Unit<br>Storage Fee: $[***]/month/Unit<br>Reinstatement fee: $[***]/Unit<br>Equipment Recycle fee: $[***]/Unit decommissioned or disposed of during the term | | |

**Order Term**. Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the third anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Services**. Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**").

**Company Disclosures**. Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include [routine maintenance of Client Equipment Units, power supply, internet connection].

**Limitation of Client Indemnity Obligation.** Client shall not be required to indemnity defend or hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees or any other party or person from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing except if such a change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, would have the effect of increasing any tax obligation imposed on Company related to this Agreement and such tax obligation is not otherwise paid by Client.

**Exception to Confidential Information provision for agents and contractors.** Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Limitation of Client Damages potentially payable in Force Majeure; Modification of Force Majeure Definition.** Client's obligation to pay amounts owed under this Agreement upon the occurrence of a Force Majeure event shall be limited to any amounts owed that have already accrued at the time of the Force Majeure event and any fees and expenses incurred by Company in de racking, packing and shipping Client equipment as directed by Client. Client and Company agree that any change in change any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, which renders cryptocurrency mining illegal shall be deemed a Force Majeure Event.

**Amendment to Section 5.d of the Agreement.** Both Company and Client Agree that section 5.d of the Agreement is amended so that COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO THREE (3) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Fees.** Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Performance Information.** Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

3

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) and shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i) It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii) Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii) Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

\*\*Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

| | |
|---|---|
| **By:** _____ | **By:** _____ |
| **Gryphon Digital Mining, Inc. "Client"** | **Core Scientific, Inc., "Company"** |
| **Name:** _____ | **Name:** _____ |
| **Title:** _____ | **Title:** _____ |
| **Date:** _____ | **Date:** _____ |

4

Exhibit 4

**Exhibit B**

**MASTER SERVICES AGREEMENT ORDER #2**

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted**:** | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| **Hosting-Services Rate:** | [***] | | |
| **Payment Due Prior to Installation:** | [***] | | |
| **Estimated Delivery Date:** | As of September 24, 2021 and then the fifteenth of every month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
| | Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | [***] | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | [***] | | |

[***] = CONFIDENTIAL PORTION HAS BEEN OMITTED BECAUSE IT (I) IS NOT MATERIAL AND (II) WOULD BE COMPETITIVELY HARMFUL IF PUBLICLY DISCLOSED

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the fourth anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Amendment to Section 8.d of the Agreement**. Both Company and Client agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company as long as Sphere 3D Corp. satisfies Company requirements prior to.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**"). At least ten percent (10 %) of the computer hardware ("**Equipment**") (hosted in the Company Facility in which Client Equipment is hosted must be Equipment that is owned by Company. If however, there is a single occupancy restriction at a Company Facility for purposes of maintaining a qualifying data center status for sales tax purposes, the Client shall have the option to either waive this requirement or pay the requisite sales tax. In addition, Company covenants that all power provided to Client under this Order 2 shall be one hundred percent (100%) net carbon neutral. In addition, Company intends to achieve 100% net carbon neutral status for its mining operations. The Company will achieve and maintain this status by continuing to increase relationships with power suppliers providing a higher mix of non-carbon emitting energy sources and by purchasing certified green carbon offset certificates using United States Environmental Protection Agency guidelines for calculating carbon emissions.

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include routine maintenance of Client Equipment Units, power supply, internet connection.

**Exception to Confidential Information provision for agents and contractors.** Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Performance Information.** Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement are calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures.** Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) and shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

 (i) It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

 (ii) Neither Client nor Client's customers will use the Services for any illegal activity; and

 (iii) Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

**Gryphon Digital Mining, Inc. "Client"**

**By:** /s/ Rob Chang

**Name:** Rob Chang

**Title:** CEO

**Core Scientific, Inc., "Company"**

**By:** /s/ Michael Trzupek

**Name:** Michael Trzupek

**Title:** CFO

13

# Exhibit 5

Exhibit 10.28

**Certain confidential information contained in this document, marked by brackets, has been omitted because it is both (i) not material and (ii) would be competitively harmful if publicly disclosed**

**SUB-LICENSE AND DELEGATION AGREEMENT**

This Sub-License and Delegation Agreement (this "**Agreement**"), dated as of 10/5/2021, 2021, is entered into by and between Gryphon Digital Mining, Inc. ("**Gryphon**") and Sphere 3D Corp. ("**Sphere**"), and relates to that certain Services Agreement, dated as of September 12, 2021 (the "**MSA**"), by and between Core Scientific, Inc. ("**Core**") and Gryphon, and Master Services Agreement Order #2 thereunder ("**Order 2**"), attached hereto as Exhibits A and B, respectively. Capitalized terms used herein without definition shall have the meanings assigned to them in Order #2.

**WHEREAS**, Section 8.d of the MSA, as amended by Order 2, provides that Gryphon is permitted to sub-lease, sub-license, assign, delegate or transfer the MSA and Order 2, or any of its rights and obligations thereunder to Sphere without the prior written consent of Core; and

**WHEREAS**, Gryphon desires to sub-license and delegate certain rights and obligations under Order 2 to Sphere as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Sub-License and Delegation. Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2. Sphere hereby accepts such sub-license and delegation in all respects.

2. Contingent Assignment. Effective immediately upon the consummation of the Merger (as defined in that certain Agreement and Plan of Merger, dated as of June 3, 2021, by and among Sphere, Sphere GDM Corp. and Gryphon, as amended from time to time (the "**Merger Agreement**")), all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation (as defined in the Merger Agreement), without any further action required by either such party.

3. Termination. This Agreement shall automatically terminate upon the termination of the MSA and/or Order 2 in accordance with their respective terms. In addition, upon any termination of the Merger Agreement by Sphere, Gryphon shall have the right, in its sole discretion, to terminate this Agreement in its entirety (including the sublicense and delegation described in Section 1) upon not less than one hundred and eighty (180) calendar days' written notice to Sphere.

4. Governing Law. This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

5. Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e- mail), each will be deemed an original, but all together will constitute one and the same instrument. This Agreement may be amended only by the written agreement of both parties.

*[Signature Page to Sub-License and Delegation Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**GRYPHON DIGITAL MINING, INC.**

By:    /s/ Rob Chang
Name:  Robby Chang
Title:   CEO & Director

**SPHERE 3D CORP.**

By:    /s/ Peter Tassiopoulos
Name:  Peter Tassiopoulos
Title:   CEO

# Exhibit 6

Exhibit 10.29

**AMENDMENT NO. 1 TO**
**SUB-LICENSE AND DELEGATION AGREEMENT**

This AMENDMENT NO. 1 TO SUB-LICENSE AND DELEGATION AGREEMENT (this "Amendment") is made and entered into as of December 29, 2021 by and among Sphere 3D Corp., an Ontario corporation ("Sphere"), and Gryphon Digital Mining, Inc., a Delaware corporation ("Gryphon", and Sphere and Gryphon, each a "Party" and collectively the "Parties").

**RECITALS**

A. On October 8, 2021, the Parties entered into a Sub-license and Delegation Agreement (the "Sub-License Agreement") relating to that certain Services Agreement, dated as of September 12, 2021, by and between Core Scientific, Inc. and Gryphon, and the Master Services Agreement Order #2 thereunder, pursuant to which Gryphon sub-licensed certain rights and delegated certain obligations under the MSA and Order 2 to Sphere, and Sphere accepted such sub-license of rights and delegation of obligations.

B. The parties hereto desire to amend the Sub-License Agreement as set forth herein.

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing recitals and the respective covenants, agreements, representations and warranties contained herein and in the Sub-License Agreement, the Parties, intending to be legally bound, agree to amend and supplement the Sub-License Agreement as follows:

1. <u>Definitions</u>. All capitalized terms used herein without definition shall have the meanings ascribed to them in the Sub-License Agreement unless otherwise defined herein.

2. <u>Amendments</u>.

   a.     Section 1 shall be amended by adding the following sentence at the end: "Sphere shall advance funds for all pre-payments that are Sphere's responsibilities under this Agreement to Gryphon fifteen (15) days before such pre-payments are due to Core under Order 2, which payments may be offset by any payments then payable by Gryphon pursuant to this Agreement. Gryphon shall provide Sphere copies of all invoices issued to Gryphon relating to the MSA and/or Order 2 within forty-eight (48) business hours of recipt from Core."

   b.     Section 3 shall be deleted and replaced in its entirety with the following:

3. <u>Termination</u>.

   (a) This Agreement shall automatically terminate upon the termination of the MSA and/or Order 2 in accordance with their respective terms.

   (b) In addition, upon any termination of the Merger Agreement pursuant to Section 8.01 thereof, this Agreement shall continue in full force and effect; provided, however, that upon such termination:

   (i) Up to one-half of Sphere's rights under this Agreement to access and use the assumed power consumption of the Company Facility pursuant to Order 2 (the "Potential Reversion <u>Right</u> Percentage")_ shall revert to Gryphon pursuant to the procedures set forth in Section 3(b)(ii) below;

   (ii) Sphere shall continue to make all payments due to Core pursuant to Order 2 for 90 days following the termination of the Merger Agreement (the "<u>Transition Period</u>"). During the Transition Period, Gryphon shall make payments to Core for any utiliization of Core power capacity by Grypon's minors. On or before the 90th day following such termination, Gryphon shall notify Sphere in writing of the percentage of the Potential Reversion Right Percentage that it elects to have under Order 2, up to a maximum of fifty percent (50%) of Sphere's rights under this Agreement (the "<u>Actual Reversion Percentage</u>");

(iii) After the Transition Period, all outstanding payments to Core pursuant to Order 2 shall be paid: (A) one hundred percent (100%) minus the Actual Reversion Percentage by Sphere to Core and (B) the Actual Reversion Percentage to Gryphon by Core; and

iv) Gryphon shall repay Sphere an amount equal to the Actual Rervsion Percentage of all pre-payments made to Core before the end of the Transition Period by Sphere pursuant to Order 2 and this Agreement. Such repayment shall payable by Gryphon to Sphere within thirty (30) days of Core's credit for applicable hosting services to Gryphon under Order 2 tied to an applicable pre-payment of hosting services."

(c) Following Section 5, the following Section 6 shall be added to this Agreement:

"The Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles. All disputes, suits, actions or proceedings relating to this Agreement ("Claims") shall be brought solely in the state or federal courts located in the State of Delaware. Each party hereby consents to the exclusive jurisdiction and venue of the State of Delaware in connection with any such dispute, suit, action or proceeding, and waives any defense of *forum non conveniens* in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARTY IN CONNECTION WITH THIS AGREEMENT.

If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party; provided, that if a party to such Claim prevails in part, and loses in part, the court or other adjudicator presiding over such Claim shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis."

3.  <u>Effect of Amendment</u>. Except as amended by this Amendment, the Sub-License Agreement shall remain in full force and effect. No party shall be deemed to have waived the performance of any covenants in the Sub-License Agreement except as expressly amended by this Amendment. In addition, if there are any inconsistencies between the Sub-License Agreement and this Amendment, the terms of this Amendment shall prevail and control for all purposes.

4.  <u>Governing Law.</u> This Amendment shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

5.  <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original regardless of the date of its execution and delivery. All such counterparts together shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first above written.

SPHERE 3D CORP.

By: _____
Name:   Peter Tassiopoulos
Title:   Chief Executive Officer

GRYPHON DIGITAL MINING, INC.

By: _____
Name:   Robby Chang
Title:   Chief Executive Officer

# Exhibit 7



## Sphere 3D Corp. and Gryphon Digital Mining, Inc. Move Forward After Mutual Agreement Not to Proceed With Merger

April 4, 2022

- *The companies plan to continue working on existing strategic initiatives, including the management of Sphere 3D's 6.0 EH/s mining fleet, which Sphere 3D expects to be operational by year-end 2022*

TORONTO, Ontario--(BUSINESS WIRE)--Apr. 4, 2022-- Sphere 3D Corp. (Nasdaq: ANY), ("Sphere 3D") and  Gryphon Digital Mining, Inc. ("Gryphon"), cryptocurrency mining companies dedicated to growing mining operations with a net  carbon-neutral impact, have mutually agreed to terminate their merger agreement announced on June 3, 2021, and as amended on December 29, 2021.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20220404005997/en/

After careful consideration by both management teams and their respective boards of directors, the parties amicably agreed to the termination due to changing market conditions, the passage of time, and the relative financial positions of the companies, among other factors. The companies will continue their relationship through the previously disclosed Master Services Agreement ("MSA"), enabling  Sphere 3D to leverage Gryphon's expertise in bitcoin mining and Gryphon to generate additional operating income through the management of Sphere 3D's mining fleet. Both companies can now focus on their strategic opportunities to drive growth for their respective shareholders.

Sphere 3D's net- carbon neutral bitcoin mining operation continues to grow with 1,000 miners currently operational and the anticipated delivery of 2,000 S19j Pro miners in May 2022 and an additional 2,000 S19j Pro miners in June 2022. Deliveries of the remaining 55,000 S19j Pro miners are expected to be received by year-end 2022. As previously announced, Sphere 3D's mining fleet will remain managed by Gryphon and primarily collocated with Core Scientific.

Gryphon continues to roll out its net carbon-neutral bitcoin mining operation, with two-thirds of its 7,200 S19j Pro self-mining operation deployed as of March 31, 2022. The MSA enables Gryphon to earn additional hashrate exposure of 1.35 exahash through the management of Sphere 3D's 6.0 exahash mining fleet, creating Gryphon's expected effective unlevered total hashrate from self-mining and MSA operations of approximately 2.1 exahash of bitcoin mining power by year-end 2022.

"Sphere 3D remains committed to building a premier industrial mining operation and already has 6.0 EH/s of capacity under contract for deliveries this year. We are well-positioned to execute on this vision," said  Duncan McEwan, Chairman of Sphere 3D. "The Board has worked closely with our management team, and after extensive discussions, it became clear that shareholders would realize greater value if the companies operated independently as opposed to a merged entity. We look forward to working closely with the Gryphon team to combine our expertise and realize the immense value of the bitcoin network for our shareholders."

Rob Chang, CEO at Gryphon Digital Mining added, "As a pending shareholder and operating partner of  Sphere 3D, we look forward to the mutual success of both companies. With a substantial unlevered total hashrate from our self-mining and MSA operations, Gryphon is well-positioned as it already ranks among the leading bitcoin miners in the world."

**About Sphere 3D Corp**

Sphere 3D Corp. (Nasdaq: ANY) is a net carbon-neutral cryptocurrency miner with decades of proven enterprise data-services expertise. The Company is rapidly growing its industrial-scale mining operation through the capital-efficient procurement of next-generation mining equipment and partnering with best-in-class data center operators. Sphere 3D's mining operation currently has 1,000 S19j Pro miners operating, expects delivery of 4,000 more in the second quarter of 2022 and 55,000 additional S19j Pro miners by year-end 2022. Sphere 3D has approximately 6.0 EH/s of capacity under contract for deliveries this year. Sphere 3D is dedicated to growing shareholder value while honoring its commitment to strict environmental, social, and governance standards. For more information about the Company, please visit Sphere3D.com.

**About Gryphon Digital Mining**

Gryphon Digital Mining is an innovative venture in the cryptocurrency space dedicated to helping bring digital assets onto the clean energy grid. With a talented leadership team coming from globally recognized brands, Gryphon Digital is assembling thought leaders to improve digital asset network infrastructure. Its Bitcoin mining operation has a net carbon-negative footprint, and the company's long-term strategy is to be the first vertically integrated crypto miner with a wholly-owned, 100 percent renewable energy supply. More information is available on https://gryphondigitalmining.com/.

**Forward-Looking Statements**

This communication contains forward-looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements generally relate to future events, including the timing of the proposed transaction and other information related to the proposed transaction. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts,"

"potential" or "continue" or the negative of these words or other similar terms or expressions. Expectations and beliefs regarding matters discussed herein may not materialize, and actual results in future periods are subject to risks and uncertainties that could cause actual results to differ materially from those projected. The forward-looking statements contained in this communication are also subject to other risks and uncertainties, including those more fully described in filings with the SEC, including Sphere 3D's registration statement on Form F-4, reports filed on Form 20-F and Form 6-K and in other filings made by Sphere 3D with the SEC from time to time and available at www.sec.gov. These forward looking statements are based on current expectations, and with regard to the proposed transaction, are based on Sphere 3D's and Gryphon's current expectations, which are subject to change.

**No Offer or Solicitation**

This communication shall not constitute a solicitation of proxy, an offer to sell, the solicitation of an offer to sell or an offer to buy or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

View source version on businesswire.com: https://www.businesswire.com/news/home/20220404005997/en/

**Sphere 3D**

NMN Advisors
Sphere3d@nmnadvisors.com

Kurt Kalbfleisch
+1-858-495-4211
Kurt.kalfleisch@sphere3d.com

**Gryphon**
Media:
media@gryphonmining.com

Investors:
Rob Chang
(877) 646-3374
invest@gryphonmining.com

Source: Sphere 3D Corp.