# Exhibit 16

# HEARING
# *IN RE: CORE SCIENTIFIC, INC., ET AL.*

August 7, 2023

DONTZIN NAGY & FLEISSIG LLP

# SPHERE-GRYPHON BTS DATED AUGUST 19, 2021

| Exclusivity | ==Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations== including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location (collectively, the "**Services**") unless the Agreement is terminated by Customer as per Term/Termination below. |
|---|---|



Sphere-Gryphon BTS
Dated August 19, 2021

### MASTER SERVICES AGREEMENT ORDER #2

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| **Commencement Date:** | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. |
| --- | --- |

Gryphon Core Order #2
Dated October 5, 2021

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

Gryphon-Core MSA
Dated September 12, 2021

# SPHERE-GRYPHON DELEGATION AGREEMENT DATED OCTOBER 5, 2021

1.     Sub-License and Delegation.  Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2.  Sphere hereby accepts such sub-license and delegation in all respects.

Sphere-Gryphon Delegation Agreement
Dated October 5, 2021

# Order #2: Sphere Assignment Provision



Gryphon Core Order #2
Dated October 5, 2021

# CORE'S PURPORTED REQUIREMENTS

8. Order #2 amended Section 8.d. of the MSA to permit Gryphon to assign its rights under the Agreements to Sphere without Core's written consent, but only if Sphere satisfies Core's requirements prior to any assignment of Gryphon's rights. These requirements would have included, among other things: creditworthiness, Foreign Corrupt Practices Act considerations; Know Your Customer considerations (*e.g.*, business with Chinese entities/Chinese government); form of assignment (*e.g.*, how and which rights and obligations were transferred, allocated or retained); whether any such assignment would implicate securities laws or constitute an investment contract; and whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements.

Declaration of Russell Cann
Dated June 9, 2023

7

### III. CORE'S THEN-CEO MIKE LEVITT AFFIRMED THAT SPHERE AND CORE WERE IN A CONTRACTUAL RELATIONSHIP

6. On or around April 7, 2022, I had a meeting with Core's then-CEO Mike Levitt at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite requesting Sphere to continue making deposit payments. During that meeting, Mr. Levitt acknowledged that Sphere and Core were in a contractual relationship. Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him.

### III. CORE'S THEN-CEO MIKE LEVITT AFFIRMED THAT SPHERE AND CORE WERE IN A CONTRACTUAL RELATIONSHIP

5. In or around April 2022, Sphere's CEO Patricia Trompeter had a meeting with Core's then-CEO Mike Levitt in Florida. I joined part of the meeting by phone. During that meeting, Mr. Levitt characterized Sphere as Core's "customer" and indicated the parties were in a contractual relationship. Mr. Levitt also indicated that he would like to increase communications between Sphere and Core.



Declaration of Patricia Trompeter
Dated July 7, 2023



Declaration of Peter Tassioupolos
Dated July 7, 2023

8

# CORE APPROVES DISCLOSURE OF DELEGATION AGREEMENT



Core Text Thread
Dated October 12, 2021



Sphere Press Release
Dated October 13, 2021

# GRYPHON CONFIRMS SPHERE HAS ALL RIGHTS TO THE DEPOSIT FUNDS

As of the date hereof, Sphere 3D has provided a total of $35,104,363 US Dollars, through Gryphon, to Core for prepayment of hosting services on the units contemplated under Order #2 under the Master Services Agreement between Gryphon and Core (the "Prepayment Balance"). ==We hereby confirm that Sphere 3D solely and exclusively maintains any and all right and claim to Prepayment Balance.== Further, we hereby authorize Core to transfer, refund, apply, or otherwise direct the Prepayment Balance in a manner as instructed by Sphere 3D in its sole discretion.

2. Sphere, through Gryphon Digital Mining Inc., wired all deposit payments to Core Scientific Inc. ("Core"), a sum of $35,104,363.00, including a payment of $16,330,670.00 in October 2021.

Gryphon Letter to Sphere
Dated July 27, 2022

Declaration of Kurt Kalbfleisch
Dated July 7, 2023

10

# Delaware Does Not Limit Liability
# For Intentional Torts Or Contractual Bad Faith

**B.**    **As A Matter Of Public Policy, Core's Liability Cannot Be Limited For Acts Of Intentional Misconduct Or Bad Faith**

45.    Like other jurisdictions, Delaware courts generally permit parties to limit or eliminate liability for acts committed before a contract is entered into, but will not as a matter of public policy permit parties to prospectively limit their liability for intentional acts or acts of bad faith committed after contract execution. *See New Enter. Assocs. 14, L.P. v. Rich*, No, 2022-0406- JTL, 2023 WL 3195927, at *8. 52–54 (Del. Ch. May 2, 2023) (observing that "extant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct" and distinguishing Delaware decisions that have permitted a party entering into a contract to disclaim liability for pre-contract extracontractual fraud through non-reliance provisions); *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *5 & n.41 (Del. Super. Ct. July 25, 2007) (collecting authority and observing that if the contract "expressed an unambiguous intent to relieve [defendant] of liability for his own intentional torts, it is exceedingly doubtful that such a provision would be enforceable as a matter of public policy"); *James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 38 (Del. Super. Ct. 1983) ("to the extent that paragraph 9 seeks to indemnify [the defendant] against its willful acts, as opposed to its negligence, the agreement is void and unenforceable"); 8 Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort . . . or for a future willful or grossly negligent act is generally held void." (footnotes omitted)).

46.    Sphere asserts in its Proofs of Claim that Core is liable to it based on its intentional acts, including for the tort of conversion, namely, for Core wrongfully seizing Sphere's Deposit and other digital assets generated for the benefit of Sphere. No limitation of liability can apply to such claims. *See Saraga*, 2007 WL 2142848, at *5 & n.41 (citing *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 409 N.E.2d 849, 853 (N.Y. 1980) ("Although public policy will in many situations countenance voluntary prior limitations upon that liability which the law would otherwise impose upon one who acts carelessly . . . such prior limitations may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct . . such as a conversion. Any other rule would encourage wrongdoing by allowing the converter to retain the difference between the value of the converted property and the limited amount of liability. . . . That result would be absurd.").); *accord Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy.").

Sphere's Response to Core's Motion for Summary Judgment ¶ ¶ 45–46
Dated September 12, 2021

11

# PETROLEUM ADDRESSED A MATERIALLY SIMILAR LIMITATION OF LIABILITY

"The 2005 and 2011 Agreements each contain provisions waiving the parties' rights to recover lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages in connection with this Agreement."

*Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, at *22 (Del. Super. Ct. June 23, 2015) (internal quotation marks omitted).

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Gryphon-Core MSA
Dated September 12, 2021

12

Case 22-50624   Document 212-18   Filed 07/26/24   Page 14 of 25

"The case law from the Superior Court carves out an exception for bad faith breaches of contract in specific instances. . . . It is undisputed that parties cannot absolve themselves for their own conduct amounting to fraud. However, as to claims that fall somewhere short of fraud, such as claims for bad faith, the Court must undergo a factual analysis that is premature on summary judgment."

*Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015)

33.     Sphere also cites *J.A. Jones,* in which the court held that a limitation of liability provision could not limit exposure for tort liability unless the intent to do so was "stated clearly and unequivocally."

"The case law from the Superior Court carves out an exception for bad faith breaches of contract in specific instances. For example, in *J.A. Jones Const. Co. v. City of Dover,* 372 A.2d 540, in the context of interpreting a construction contract provision that did not specifically carve out an exception for bad faith, the Court observed that [e]ven if a contract purports to give a general exoneration from damages, it will not protect a party from a claim involving its own fraud or bad faith."

*Petroleum v. Magellan Terminals Holdings, L.P.,* 2015 WL 3885947, at *23 (Del. Super. Ct. June 23, 2015) (internal quotation marks omitted).

Core's Reply in Support of its Motion for Summary Judgment ¶ 33
Dated July 31, 2023

# OTHER JURISDICTIONS DO NOT LIMIT CONTRACTUAL BAD FAITH

"Generally, a contractual provision exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy. We think the same may be said of contract liability. To conclude otherwise would incentivize wrongful conduct and damage contractual relations. This conclusion is supported by lower court decisions in Texas and court decisions in at least 28 American jurisdictions. We join this overwhelming consensus."

*Zachry Const. Corp. v. Port of Houston Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014) (cleaned up).

"New Hampshire would adopt the rule that limitations clauses are unenforceable by a party that has acted in bad faith" and collecting cases for the proposition that numerous courts across the U.S. have applied this rule to breach claims for "bad faith" in "contract performance."

*Vermont Telephone Co., Inc. v. FirstLight Fiber, Inc.*, 2022 WL 19236267, at *5 (N.H. Super. Jan. 14, 2022).

"As a matter of public policy, a party should not benefit from a bargain it performed in bad faith. Accordingly, in the absence of any contrary argument or authority, we adopt this sensible rule."

*Airfreight Exp. Ltd v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 111 (Ct. App. 2007) (collecting cases).

# CORE STATED IT USED SPHERE'S MINERS FOR ITS OWN BENEFIT

---

**IV.** **CORE ADMITTED THAT IT USED SPHERE'S MINERS FOR ITS OWN BENEFIT AND SAID IT HAD COMPENSATED SPHERE, BUT NEVER DID**

7.    In or around April 2022, ==Core representatives claimed to me that Core had installed approximately 297 of Sphere's miners for Core's own benefit and used those miners to mine bitcoin for Core's own account==, which Core claimed was an accident. Core EVP Russell Cann apologized and informed me that Core had compensated Sphere by "pointing extra hash" from Core's miners to Sphere's wallet "for a couple of weeks," meaning that Core had used its proprietary miners to mine bitcoin for Sphere's benefit. ==As it turned out, Core never did.==

Declaration of Patricia Trompeter
Dated July 7, 2023

16

attempts pursuant to the "anti-bootstrapping rule." "[A] plaintiff cannot bootstrap a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *DecisivEdge, LLC v. VNU Grp., LLC*, C.A. No. N17C-05-584 WCC CCLD, 2018 WL 1448755, at *8 (Del. Super. Ct. Mar. 19, 2018) (citing *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014)) (internal quotations omitted). "[A] fraud claim alleged contemporaneously with a breach of contract claim" will therefore survive only if "the claim is based on conduct that is separate and distinct from the conduct constituting breach." *Id.* (citations omitted). Because Sphere is attempting to shroud its breach of contract claims in the

Core's Reply in Support of its Motion for Summary Judgment ¶ 35
Dated July 31, 2023

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

| Terms | | Due Date | PO # | | Sales Rep | |
|---|---|---|---|---|---|---|
| | | 5/22/2023 | Order 1-2 | | | |

| Quantity | Item | | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|---|
| 1 | Hosting Services* April 2023 Actual Usage | | | 0% | $84,083.25 |
| 1 | Hosting Services* Reverse April 2023 Estimated Prepayment INV42894 | | | 0% | ($82,174.34) |
| 1 | Hosting Services* Estimated June 2023 Usage Prepayment | | | 0% | $82,174.34 |
| 1 | Replacement Parts 04/03/2023 to 05/03/2023 - Dalton, GA - Parts | | Dalton, GA | 7% | $456.25 |
| 1 | Replacement Service 04/03/2023 to 05/03/2023 - Dalton, GA - Labor | | Dalton, GA | 0% | $87.50 |

| | | |
|---|---|---|
| | Subtotal | $84,627.00 |
| | Tax Total (%) | $31.94 |
| | Total | $84,658.94 |
| | Amount Due | $84,658.94 |



Gryphon-Core MSA
Dated September 12, 2021

Core Invoice
Dated May 12, 2023

18

# ORDER #2: DEPLOYMENT SCHEDULE

| Client Equipment hosted**: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| Hosting-Services Rate: | USD $0.06175/ KWh; USD $.06/KWh after hosting month 30 | | |

Gryphon Core Order #2
Dated October 5, 2021

19

# ORDER #2: PAYMENT SCHEDULE

| Payment Due Prior to Installation: | USD **$15,575,025.00** on or before October 12, 2021 consisting of:<br>• $73,350.00, 100% of the prepayment for hosting services for OCT 2021 Units to be applied as a credit against future monthly invoices as they become due.<br>• $205,380.00, 70% of the prepayment for hosting services for NOV 2021 – FEB 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $15,296,295.00, 30% of the prepayment for hosting services for MAR 2022 – NOV 2022 Units ($550,230.00 for MAR 2022: $1,100,460.00 for APR 2022: $1,650,675.00 for MAY 2022: $2,200,905 for each of JUN 2022, JUL 2022, AUG 2022, SEP 2022, OCT 2022: and $990,405.00 for NOV Units) to be applied as a credit against future monthly invoices as they become due.<br><br>USD **$755,645.00** on or before October 12, 2021 consisting of:<br>• $733,640.00, 40% of the prepayment for hosting services for MAR 2022 Units to be applied as a credit against future monthly invoices as they become due.<br>• $22,005.00, 30% of the prepayment for hosting services for NOV 2021 Units to be applied as a credit against future monthly invoices as they become due. |
|---|---|

installation of the Miners, also pursuant to a set schedule set out in Order #2. In total, according to Core's records, Gryphon made payments to Core totaling $35,264,413.57, pursuant to the fee schedule set forth in Order #2 for the hosting services. Core's banking records reflect that for

Gryphon Core Order #2
Dated October 5, 2021

Core's Objection to Sphere's Proof of Claim ¶ 19
Dated May 9, 2023

| Terms | | Due Date | PO # | | Sales Rep |
|-------|--|----------|------|--|-----------|
| | | 4/15/2022 | Order 2 - 10000 Units S19 | | |

| Quantity | Item | | Tax Location | Tax Rate | Amount |
|----------|------|--|--------------|----------|--------|
| 1 | **Hosting Services\*** Second 40% Payment for Order 2 (10000 Units S19 Transferred in (Sep 2022) Batch) Contractual Prepayment (5 months) - USD $7,336,350.00. To be applied as a credit against future monthly invoices for hosting services as they become due. | | | 0% | $2,934,540.00 |

| | | |
|--|--|--|
| | **Subtotal** | $2,934,540.00 |
| | **Tax Total (0%)** | $0.00 |
| | **Total** | $2,934,540.00 |
| | **Amount Due** | $2,934,540.00 |

Core Invoice
Dated April 4, 2022

21

**3.     PAYMENT TERMS AND TAXES**

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order.  Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice.  All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order).  Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

Top and Middle: Gryphon-Core MSA Dated September 12, 2021
Bottom: Gryphon Core Order #2 Dated October 5, 2021

# The Absence Of Discovery Defeats Core's Motion



# CORE'S RULE 56(D) CASES ARE DISTINGUISHABLE

"We begin our analysis by pointing out that this case had been pending for over fifteen months....The record indicates that [plaintiff] had reviewed over half a million FMC documents and had also subpoenaed documents from twenty municipal airport authorities. It had also conducted several depositions."

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999)

"[Claimant] failed to diligently pursue further discovery during the two-month continuance the district court provided.... She had the benefit of nearly 1,000 pages of deposition testimony and records."

Dominick v. Mayorkas, 52 F.4th 992, 995–96 (5th Cir. 2022)

"Although Plaintiffs argued in the district court that discovery was not complete, they failed to file a motion for continuance under Rule 56(d) or otherwise specify what discovery was necessary to produce evidence on a material issue. . . . But even if Plaintiffs had filed the proper motion, the district court had sound reasons for not delaying a ruling by allowing further discovery. The time provided for discovery was ample."

*Bishop v. City of Galveston,* 595 F. App'x 372, 377 (5th Cir. 2014)