# Exhibit 12

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |

## SPHERE 3D CORP.'S RESPONSE TO DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.
[Relates to Docket No. 869]

Sphere 3D Corp. ("Sphere") files this response ("Response") to the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 869] (the "Claim Objection"), and in support thereof, respectfully states as follows[2]:

### PRELIMINARY STATEMENT

1.      Over the course of approximately six months, Sphere paid approximately $35.1 million in deposit payments (the "Deposit") to Core, to be drawn upon as Core provided hosting services for Sphere's miners at a hosting services rate of $ ▮▮▮▮▮ .  It did so pursuant to a Master Services Agreement dated September 12, 2021 (the "MSA", attached as Exhibit 1), and an accompanying order dated October 5, 2021 ("Order #2", attached as Exhibit 2).

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198) (collectively, the "Debtors"). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Many of the arguments set forth in the Claim Objection were addressed in *Sphere's Opposition to Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket Nos. 1039, 1040] (the "MSJ Opposition").  To the extent practicable, Sphere has endeavored to avoid reiterating certain points addressed in the MSJ Opposition in the preliminary statement.

2.      While Sphere upheld its end of the bargain, Core did not.  Core declined to deploy hundreds of Sphere's miners, as required, because it did not have the space to do so; hooked up the few miners it did deploy as its own to generate bitcoin for its own benefit; and all together delivered to Sphere a few hundred thousand dollars' worth of services—before repudiating the MSA and Order #2 because the cost of hosting had risen and Core no longer found the agreed-upon hosting services rate to be as advantageous.  Although it delivered almost nothing to Sphere, Core now contends it is entitled to a windfall and should be allowed to retain Sphere's Deposit (of which close to $35 million remains), Sphere's miners (the "Miners")—which have an approximate book value of $8.5 million—and the unknown amount of bitcoin (the "Coins") that Core wrongfully seized from Sphere.  This is palpably unfair and impermissible under the law; the Debtors have no right to retain Sphere's property, which must be returned to Sphere.

3.      Through the Proofs of Claim[3], Sphere asserts, among other things, that Core intentionally converted Sphere's property; that Core breached its contractual obligations, including in bad faith, and is thus liable under repudiation, breach of contract, and breach of the implied covenant theories; and that Core is also liable in equity under estoppel theories for failing to return the property.  The Claim Objection is without merit and will almost certainly require a full evidentiary hearing to resolve.  To that end, on June 2, 2023, the parties filed a joint stipulation and agreed order, which the Court entered on June 6, 2023 (the "Stipulation and Agreed Order")[4], that requires the parties to confer on and present "a proposed scheduling order for discovery, litigation schedule, and trial date on the Claim Objection . . . to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."

---

[3] Proofs of Claim Numbers 358 and 359 (together, the "Proofs of Claim").

[4] Docket No. 956.

DMS 302863949

4.     *First*, as also explained in the MSJ Opposition, Core's headline argument that Sphere does not have enforceable contractual rights here is wrong.  Core seeks to take advantage of the fact that third-party Gryphon Digital Mining, Inc. ("Gryphon")—which serves as the exclusive manager of Sphere's crypto-related operations and an agent of Sphere—entered into Order #2 with Core on behalf of Sphere.  But Gryphon entered into the Sub-License and Delegation Agreement with Sphere dated October 5, 2021, as subsequently amended (the "Delegation Agreement", attached as Exhibit 3), which expressly provided for the assignment of Gryphon's rights in Order #2 to Sphere.  Gryphon was allowed to do so:  Order #2 expressly provided that Gryphon could "sub-license, assign, delegate or transfer" any of "its rights . . . to *Sphere*" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent as long as [Sphere] satisfies [Core's] requirements prior to." *See* Order #2 at 4.  This provision is hereinafter referred to as the "Sphere Assignment Provision."

5.     Core incorrectly contends that the assignment was void because the phrase "requirements prior to" unambiguously required Sphere to satisfy, at least, six listed categories of requirements, as well as additional, unspecified, requirements—all of which Core claims Sphere failed to meet.  Claim Objection, ¶ 3.  The meagre phrase "requirements prior to" cannot support Core's "unambiguous" construction.   Moreover, the record—including the contemporaneous admissions of Core's then-CEO Mike Levitt to Sphere's current CEO Patti Trompeter and former CEO Peter Tassiopoulos that the parties, in fact, had a contractual relationship—reflects that either Sphere satisfied Core's requirements or that Core did not require Sphere to meet any requirements.

6.     Core's remaining arguments rely on distortions of the Delegation Agreement.  Core contends that the Delegation Agreement did not assign *all* of Gryphon's rights to Sphere, but Core cannot deny the plain language of Section 1 of the Delegation Agreement, where Gryphon

3

expressly assigned its material rights to Sphere—*i.e.*, the right to "access and use [Core's] Facility" and "to make payments to Core pursuant to Order [#]2." And Core makes no effort to explain why that assignment cannot support Sphere's claims here.

7.     In any event, Sphere is entitled to pursue its claims because Gryphon entered into Order No. #2 as an agent of Sphere's, irrespective of any assignment.

8.     *Second*, there can be no serious dispute that Core breached Order #2 and converted Sphere's assets. From the outset, Core has proven unable to host Sphere's miners due to lack of space at its facilities. Rather than keeping sufficient space open, as required by Order #2, Core overbooked its facilities and prioritized its own mining operations to the detriment of Sphere and Core's other customers. Between December 2021 and April 2022, Core rejected the delivery of hundreds of miners. On information and belief, over the same period, Core rejected the delivery of thousands of miners from its other customers, which have hosting arrangements similar to Sphere's. Meanwhile, Core increased its own personal mining fleet from 67,000 miners to 85,000 miners, which occupied the space that should have been allocated to its other customers, including Sphere. And, in April 2022, Core informed Sphere it could not accommodate additional miners "until this summer sometime" due to space constraints, and later recommended that Sphere send its miners to a competitor.

9.     Core's primary argument is that, under the MSA, it was only required to provide its services on an "as available" basis, meaning, incredibly, that it had no obligation to host any miners under Order #2 on any timeline. According to Core, it could have accepted 70,000 miners and let them all lie fallow, but Core ignores that Order #2 included a detailed deployment schedule (the "Deployment Schedule") that provided for the deployment of miners in specific months:

DMS 302863949

| Client Equipment hosted**: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |

10.     Core's construction would impermissibly render the Deployment Schedule superfluous.  Furthermore, the MSA is explicit that, in the event of a conflict between the MSA and Order #2, Order #2 controls.

11.     And Core does not seriously dispute that it disavowed the $▮▮▮▮ hosting services rate when it asserted it would not host additional miners unless Sphere agreed to sign a new contract with a much higher rate of $▮▮▮▮.  Core's extracontractual demand was an attempt to pass rising power costs onto Sphere—which is not permissible under Order #2.

12.     Beyond its breaches, this is a clear case of conversion, as Core is holding Sphere's property—the Deposit, the Miners, and the Coins—without its permission.  With respect to the Coins, Core inexplicably installed Sphere's Miners as its own and for weeks used them to mine an undisclosed amount of bitcoin for its own account.  Core claimed to Sphere that this was a mistake and promised in writing to compensate Sphere for the loss, but never did.  The conversion claims, along with Core's claims in equity, stand irrespective of whether Sphere and Core have a contractual relationship.

13.     *Third*, Core's claims that Sphere did not adhere to the Deployment Schedule fails because Core already breached Order #2, releasing Sphere from any obligation to adhere to Order

5

#2, and, independently, because Core frustrated the agreement by refusing to accept Sphere's miner deliveries.

14.     But even if Sphere had breached Order #2 (it did not), Core would still not be entitled to a windfall—namely, Core's Deposit, Miners, and Coins, collectively worth tens of millions of dollars.  Instead, Core would be entitled to its provable damages, which would be *de minimis* because it was overbooked and thus could not host and generate revenues from Sphere's miners in any event.

15.     *Finally*, Core's claim that the limitation of liability provisions unambiguously cap Core's liability at $84,685.94 and eliminate the possibility that Core can be liable for various categories of damages, such as consequential damages, is without merit.

16.     As a matter of public policy, Delaware—like the vast majority of jurisdictions—will not permit a defendant to limit its tort or contractual liability from acts taken intentionally or in bad faith.  This means that Core cannot limit its liability, for example, for conversion or to the extent its contractual breaches were in bad faith.

17.     As a matter of contract construction, Section 5.d of the MSA—which provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2]"—does not, as Core claims, cap its liability at the amount actually charged in the "last invoice" submitted prior to Core's filing a motion for summary judgment—*i.e.*, $84,658.94 in charges for "Hosting Services," "Replacement Parts" and "Replacement Service" as reflected on its May 2023 invoice (the "May 2023 Invoice").  At the outset, the property Core is holding belongs to Sphere, and should not be subject to a limitation of liability provision.  But, regardless, Section 5.d does not reference fees "actually charged," let alone on an arbitrarily selected invoice, as Core contends; rather, the more sensible interpretation of Section 5.d is that

6

any cap is determined by reference to the greatest amount of fees called for in one month by (*i.e.*, payable under) Order #2 as written—a sum in excess of ten million dollars.  But even if Section 5.d were interpreted to refer to fees actually charged, the better interpretation of fees (an undefined term) would include the payments that comprise the Deposit, which were more than $███████ in a single month.  That is a reasonable construction, as it avoids the absurd consequence that a party like Sphere could make a deposit payment of $██████ in the first month of the parties' relationship and then immediately be reduced to recovering less than one percent of that payment if Core decided to breach.

18.     In any event, consistent with Delaware law and the practice of federal courts applying Delaware law, the applicability of the limitation of liability provisions should not be resolved until after trial.

19.     The Claim Objection should be overruled.

## **BACKGROUND**

20.     The following provides the background needed to explain why the Court should overrule the Claim Objection based on the limited record available to Sphere.[5]

### I.  **BACKGROUND ON CRYPTOCURRENCY MINING**

21.     Sphere is in the business of what is known in the crypto industry as "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, mining companies generate new bitcoin for themselves and also earn revenues through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are (usually) sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.

---

[5] At present, the parties have not exchanged any discovery.

7

22.     Mining companies frequently turn to third parties to host their miners. As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as warehouse space, electricity, security, Internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

## II.  CORE AGREED TO PROVIDE SPHERE WITH HOSTING AT A RATE OF $█████ — AND SPHERE PROVIDED $35.1 MILLION IN CASH AS A DEPOSIT BASED ON THAT AGREEMENT

23.     Pursuant to an agreement between third-party Gryphon and Sphere (the "Gryphon-Sphere Agreement"), Gryphon acts as the "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations" for Sphere.  *See* Exhibit 4.

24.     On September 12, 2021, Gryphon and Core entered into the MSA and, on October 5, 2021, into Order #2 to the MSA on Sphere's behalf.  Order #2 sets forth the terms under which Core would host Sphere's miners.  Core agreed to, among other things:

- Charge $█████ as the rate for hosting services over the █████ of the life of Order #2, a rate that would decrease to $█████ thereafter.[6]

- Receive $█████ in Deposit funds according to a payment schedule, with the deposit funds to be applied as "credit against future monthly invoices as they become due."[7]

25.     The hosting services rate was a material term of Order #2, as power consumption costs are among the most significant and variable costs associated with the mining for, and hosting of, digital assets. Nowhere does either Order #2 or the MSA permit Core to vary the rate or pass through other costs, such as those attributable to inflation, the forces of supply and demand, and so on.

---

[6] Order #2, at 1.

[7] *Id*. at 1-3.

8

26. Order #2 contains terms with respect to "fees" but does not in fact define the term; nor does the MSA. Order #2 provides "Client shall pay the fees provided for in this Order" and then includes a schedule of payments. For example, Order #2 provides for "Fees for Service," which "will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order)"[8] and is then subject to adjustments in future months depending on "additional charges" and "estimates of power to be utilized."[9] Order #2 further sets forth the hosting rate, assumed power consumption per unit at 3.255 KWh, and the miners to be "deployed" by Core by month, with 70,000 miners due to be online in November 2022.[10]

27. To calculate the Fees for Services called for by the MSA in any given month, one multiplies the number of miners hosted in the month, by the "Assumed power consumption per Unit (KWh)", by the applicable Hosting-Services Rate, by the number of hours in a given month.[11]

28. As written, beginning in April 2022, over a ███████ were due in Fees for Services under Order #2. In December 2022, the Fees for Services called for by MSA as written were $██████████.[12]

29. Order #2 also references "prepayment(s) for hosting services," with as much as $██████████ due as of October 12, 2021, and ██████████████████████ due in ensuing months:

---

[8] *Id*. at 4.

[9] *Id*.

[10] *Id*. at 1.

[11] *Id*. at 4.

[12] This figure is derived by multiplying the number of miners to be hosted under Order #2 in December 2022 (70,000), by the "Assumed power consumption per Unit" (3.255), by the "Hosting Service Rate ██████, by the number of days in December (31), by the number of hours in a day (24).

DMS 302863949



| Payment Due Prior to Installation: | |
|---|---|

*See* Order #2, at 1 (excerpt showing October 2021 payments due).

30.     Between October 2021 and April 2022, Sphere made Deposit payments according to the schedule set forth in Order #2.  Per the terms of Order #2, Sphere delivered to Core $35,104,363 in Deposit payments to be applied as "credit against future monthly invoices as they become due."

## III.     GRYPHON ASSIGNED RIGHTS UNDER ORDER #2 TO SPHERE—WHICH CORE EXPRESSLY ACKNOWLEDGED

### A.     Core Explicitly Agreed Gryphon Could "Assign . . . Order #2" To "Sphere"

31.     Core at all points understood that Gryphon was acting as a manager for Sphere. As reflected in Order #2, Core expressly agreed that Gryphon could assign its rights under the MSA and Order #2 to Sphere without seeking prior written consent from Core. Specifically, Order #2 provides:

> **Amendment to Section 8.d of the Agreement**. Both [Core] and [Gryphon] agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that [Gryphon] is permitted to sub-

10

lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of [Core] as long as Sphere 3D Corp. satisfies [Core's] requirements prior to.[13]

**B.** **Gryphon Assigned Rights In Order #2 To Sphere Pursuant To The Delegation Agreement And Core Approved Of Sphere's Press Release Disclosing The Delegation Agreement**

32.     On October 5, 2021, the same date it entered into Order #2, Gryphon entered into the Delegation Agreement with Sphere in which it assigned rights in Order #2 to Sphere.  At no point in the Claim Objection does Core suggest that it informed Sphere, prior to these bankruptcy proceedings, that Sphere failed to satisfy any requirements necessary for Gryphon's assignment to Sphere of rights under Order #2.   On the contrary, on October 13, 2021, in reference to the Delegation Agreement, Sphere in a Form 6-K publicly filed with the U.S. Securities & Exchange Commission (the "SEC") "announce[d] that it [had] entered into an agreement with [Gryphon] for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by [Core] as hosting partner."  *See* Exhibit 5.  In a text chain involving Gryphon and representatives from Core—including Mr. Cann and SVP Taras Kulyak—Mr. Kulyak signed off on the press release on behalf of Core.

**C.** **In April 2022, Core's Then-CEO Mr. Levitt Acknowledged That Sphere Had A Valid Contract With Core**

33.     On or around April 7, 2022 Ms. Trompeter, Sphere's CEO, had a meeting with Mr. Levitt, Core's then-CEO, at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite requesting Sphere to continue making deposit payments. During that meeting, Mr. Levitt

---

[13] Order #2, at 4.

acknowledged that Sphere and Core were in a contractual relationship. Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him. Mr. Tassiopoulos, Sphere's former CEO, dialed in for part of that meeting and confirms that Mr. Levitt characterized Sphere as a "customer" of Core, indicated that the parties had a contractual relationship, and stated that the parties should improve their communication.

## IV. CORE BREACHED AND REPUDIATED ORDER #2 AND CONVERTED SPHERE'S DEPOSIT, MINERS, AND COINS.

### A. Core Disavowed The Deployment Schedule

34. Order #2 included a Deployment Schedule that, as written, called for incremental deployment of Sphere's miners to Core (*e.g.*, 500 miners deployed at Core by the end of February 2022) and, ultimately, envisioned Core hosting 70,000 of Sphere's miners by the end of November 2022. Order #2, at 2-4. Core, however, never hosted more than a few hundred of Sphere's miners.

35. Since executing Order #2, Core has repeatedly made clear that it cannot abide by the Deployment Schedule as written, both in terms of timing and absolute number of miners to be hosted—because it lacks sufficient space at its facilities. By way of illustration:

- In December 2021, 493 miners were supposed to be shipped to Core. Core, however, could not accommodate any of the miners due to lack of space.

- As written, the Deployment Schedule stated that Core could accommodate 500 miners as of February 2022. Although Sphere wished to send Core approximately 500 miners in February 2022, Core could only accept 297 miners at that time.

- On April 8, 2022, Sphere attempted to move 496 miners to Core. Core responded that it could not accommodate the units until this summer sometime, as April and May are tight deployment wise.

- Because Core could not accommodate Sphere's miners, it resorted to encouraging Sphere to host miners with Core's hosting competitors.

- After May 2022, Core became unwilling to accept any additional miners from Sphere.

36.     Similarly, Core has been unable to host the miners of its other contract-counterparties, which reinforces that Core could not—and never could—host Sphere's miners as required by the Deployment Schedule.  For example, in April 2022, Core informed Gryphon that it could not host 600 of Gryphon's own miners due to lack of space.  Since October 2021, Core has let thousands of miners that belong to non-party Celsius Network LLC and its affiliates (collectively, "Celsius") idle at its facilities.  *See In re: Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 28, 2022), Dkt. 915 ¶ 21.  Core's unwillingness to host Sphere's miners and the miners of its other customers is attributable to oversubscription at its facilities and Core's decision to prioritize hosting its own miners over honoring its contractual-hosting obligations.  Tellingly, according to Core's own public securities filings, between December 2021 and April 2022, Core increased its own mining fleet from 67,000 miners to 85,000 miners.  *See* Exhibit 99.1 to Core Scientific Inc./tx's Form 8-K, filed May 5, 2022.  This is space that should have been, but was not, allocated to Sphere and Core's other customers.

37.     As this series of events demonstrates, Core disavowed Order #2's Deployment Schedule.  If Core could not in April 2022 accommodate 496 Sphere miners or the many miners of its other customers, it is exceedingly unlikely that Core could have accommodated the thousands of miners otherwise called for by the Deployment Schedule.

**B.     Core Repudiated The $███████ Rate And Order #2**

38.     Although it was holding approximately $35.1 million in Deposit payments from Sphere, Core decided it would no longer honor the most critical term of Order #2: the parties' agreed-upon rate of $████████.  No provision in Order #2 or the MSA permits Core to unilaterally change the rate, but that is exactly what Core has done.

13

39.     Since at least May 2022, Core has refused to honor the contractual $███████

rate.  Instead, Core has insisted it will only host Sphere miners at a much higher Rate of

$█████████

> **C.     When Core Received Sphere's Miners, It Breached Order #2 By Installing Them As Its Own**

40.     Core also breached its contractual obligations by hosting hundreds of Sphere's

miners for its own benefit.  As noted, Core first received 297 of Sphere's miners in February 2022.

Rather than hosting them for the benefit of Sphere, however, Core inexplicably installed them as

its own miners and used them to mine bitcoin for its own account.

41.     At the time, Core claimed that it compensated Sphere for the time it

misappropriated Sphere's miners.  For example, Core EVP Russell Cann assured Ms. Trompeter

that Core compensated Sphere by "point[ing] extra hash" to Sphere—which, in crypto industry

parlance, meant that Core sent bitcoin generated by Core's own proprietary miners to Sphere.  But

Sphere has no record of ever receiving any additional bitcoin, which Core now denies that it sent.

**V.     CORE ASSURED SPHERE THAT IT WOULD FOLLOW ITS DIRECTION ON THE DEPOSIT— AND THEN REFUSED TO RETURN THE DEPOSIT, AS WELL AS THE COINS AND MINERS**

42.     Sphere attempted in good faith to negotiate a resolution following Core's demand

that Sphere adhere to the non-contractual $██████ Rate.  It did so in reliance on Core's May

12, 2022, written assurance from Mr. Cann to Ms. Trompeter that Core would follow any

"instructions. . . by [Sphere] and Gryphon" regarding the disposition of the "[D]eposit."

43.     Gryphon had no right to the Deposit and thus no instruction was required to release

the Deposit.  Core, however, ostensibly requested an instruction from Gryphon as well to avoid

any possibility that it would be held liable to Gryphon, as Sphere's manager, for releasing Sphere's

Deposit.

14

44.    Sphere knew that Gryphon would cooperate with Sphere to instruct Core to release the Deposit back to Sphere, as it later did.  *See infra*.  Accordingly, Sphere agreed to continue to negotiate with Core and forebear taking, among other things, immediate legal action against Core because it was secure in the knowledge that Core would release the Deposit funds back to it upon request.  It appears that Core's promise was a delay tactic.

45.    For about two months, Sphere engaged in good faith negotiations regarding Core's refusal to accept further miners unless Sphere acceded to a higher Rate.  Unable to reach common ground, on July 15, 2022, Sphere unequivocally demanded the return of the Deposit.

46.    On September 6, 2022, Sphere through a demand letter reiterated its demand for the Deposit and also demanded the return of its Coins and miners.  Attached to the demand letter was a letter from Gryphon's CFO Brian Chase (the "Chase Letter"), which affirmed that Sphere "solely and exclusively maintain[s] any and all right" to the Deposit.  The Chase Letter further instructed Core to "transfer, refund, apply, or otherwise direct the [Deposit] in a manner as instructed by Sphere 3D in its sole discretion."

47.    Given Core's prior representation that it would adhere to any "instructions… by [Sphere] and Gryphon" regarding the disposition of the "[D]eposit," Core should have immediately transferred the Deposit to Sphere.  To date, however, Core has improperly withheld Sphere's Deposit, miners, and coins.

## PROCEDURAL HISTORY

48.    Since the summer of 2022, Sphere has sought the return of its property, but to no avail.  Following the exchange of correspondence, on October 31, 2022, Sphere filed a demand for arbitration against Core seeking the return of its property and all damages.  Nothing substantive transpired in the arbitration—Core never filed an answer and the parties neither selected a panel

15

nor exchanged discovery.  The arbitration was automatically stayed when Core initiated these bankruptcy proceedings on December 21, 2022.

49.     On March 13, 2023, Sphere served requests for production of documents on Core pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Bankruptcy Rules"). *See Notice of Bankruptcy Rule 2004 Requests for Production of Documents from Core Scientific, Inc.* [Docket No. 678] (the "Bankruptcy Rule 2004 RFP").  Core refused to produce any discovery in response and filed a motion to quash, which Sphere opposed.  *See Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 711]; and *Sphere 3D's Objection to Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 729].

50.     On April 13, 2023, Sphere filed its Proofs of Claim, to which Core objected on May 9, 2023 by filing the Claim Objection.  Core also served discovery requests on Sphere on May 10, 2023.

51.     In anticipation that this dispute would require comprehensive discovery, motion practice, and a trial, the parties entered into the Stipulation and Agreed Order that (i) "deferred and suspended" all discovery "until after a non-evidentiary scheduling conference with the Court to set relevant discovery and litigation deadlines and a trial date"; and (ii) provided for the parties "to confer on a proposed scheduling order for discovery, litigation schedule, and a trial date on the Claim Objection to file and present to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."  *See* Stipulation and Order ¶¶ 4, 7.

52.     Three days later, Core filed a Motion for Summary Judgment [Docket No. 959] (the "MSJ").  Sphere opposed the MSJ on July 7, 2023.

## ARGUMENT

### I.   SPHERE HAS ENFORCEABLE CONTRACTUAL RIGHTS AGAINST CORE

53.     Core's principal argument for why the Proofs of Claim should be disallowed—namely, that Sphere had no rights under Order #2 and the MSA—is without merit and relies on repeated misrepresentations of the record.  Core disingenuously argues that "the MSA . . . makes no reference to Sphere," and that the MSA forbids "assign[ment]" . . . without the prior written consent of [Core]," which is incorrect.  Claim Objection ¶ 35.  Order #2 specifically amended the MSA to provide that Gryphon could assign rights to *Sphere* without the prior written consent of Gryphon, as it provided that Gryphon was "permitted to sub-lease, sub-license, assign, delegate or transfer the [MSA] . . . and Order 2, or any of its rights and obligations hereunder to [*Sphere*] and thereunder without the *prior written consent of [Core]* as long as [Sphere] satisfies [Core's] requirements prior to."

54.     Next, while Core eventually concedes that "Gryphon is *permitted* to assign its rights to Sphere," it disingenuously claims that Gryphon never did so and further argues that "Sphere falsely asserts that Gryphon assigned its contractual rights pursuant to the Sub-License Agreement."  Claim Objection ¶ 36-37 (emphasis in original).  Again, Core is incorrect.  Section 1 of the Delegation Agreement expressly provides that Gryphon "exclusively sub-licenses to Sphere its rights to access and use [Core's] Facility pursuant to Order 2" and "delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2."  Delegation Agreement § 1.  Accordingly, Gryphon assigned its material rights under Order #2 to Sphere and these are the precise rights that give rise to Core's liability:  Sphere was denied the use of Core's facility in accordance with Order #2 when Core refused to host Sphere's miners and did not receive the benefit of the bargain from its payments.  By any metric, it is outrageous for Core to claim that Gryphon did not assign *any* rights to Sphere through the Delegation Agreement.

17

55.     Similarly outrageous is Core's claim that the assignment was "contingent."  *See* Claim Objection ¶¶ 37, 39.  A wholly separate provision of the Delegation Agreement—Section 2—provided for the assignment of "all of Gryphon's rights and obligations under Order No. 2" to Sphere in the event a merger between Sphere and Gryphon was consummated (which it was not). But Sphere relies on Section 1 of the Delegation Agreement, which unambiguously did assign rights to Sphere.  Section 2 in no way diminishes the effectiveness of Section 1 and Core never explains why the rights Sphere received pursuant to Section 1 are insufficient to maintain its claims.  And while Core asserts that Gryphon did not assign *all* of its rights to Sphere, it points to nothing suggesting a partial assignment was improper; to the contrary, the Sphere Assignment Provision specifically envisioned that Gryphon could "assign . . . rights" in Order #2 without assigning all of those rights.  *See* Claim Objection ¶¶ 39-40.

56.     Finally, Core contends that the phrase "as long as [Gryphon] satisfies [Core's] requirements prior to" in the Sphere Assignment Provision "*unambiguous[ly]*" required Sphere to satisfy no fewer than *six categories of "requirements*":

- *First*, "creditworthiness";

- *Second*, "Foreign Corrupt Practices Act [FCPA] considerations";

- *Third*, "Know Your Customer [KYC] considerations (*e.g.*, business with Chinese entities/Chinese government)";

- *Fourth*, "form of assignment (e.g., how and which rights and obligations were transferred, allocated or retained)";

- *Fifth*, "whether any such assignment would implicate securities laws or constitute an investment contract";

- *Sixth*, "whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements;" and

- *Finally*, many other undisclosed requirements.

18

57.     Core further contends that Sphere never met Core's supposed "requirements."  In its MSJ, Core offered only the *ipse dixit* of a single employee to support this interpretation of the Sphere Assignment Provision.  *See* MSJ, Cann Decl. ¶ 8.

58.     The phrase "requirements prior to" is not self-defining and cannot support the weight Core puts on it. Core's contention that that phrase must be *unambiguously* interpreted to mean that Sphere had to satisfy the six enumerated "requirements"—and any other requirements Core may add during the course of this proceeding—is without merit.  The actual requirements (if any) Sphere had to meet will need to await discovery.

59.     But whatever the actual requirements, it is apparent that Sphere either met the requirements or that Core, whether through estoppel, acquiescence, waiver, or otherwise, did not actually require Sphere to meet them.  Indeed, in April 2022, Core's then-CEO Mr. Levitt specifically told Ms. Trompeter and Mr. Tassiopoulos that Sphere had an enforceable contractual relationship with Core.

60.     Beyond the admissions of its then-CEO, there are additional reasons to believe that Core's claim that Sphere did not satisfy its "requirements" is nothing more than pretext.  For example, Core agreed to the Sphere Assignment Provision, which specifically referenced Sphere and indicates that Core understood that Gryphon would be assigning rights in Order #2 to Sphere. The fact that Gryphon entered into the Delegation Agreement with Sphere the same date that it entered into Order #2 is further evidence that the parties—including Core—planned this arrangement.  A mere eight days later, on October 13, 2021, Sphere announced in a press release publicly filed with the SEC that it had entered into the Delegation Agreement.  Contemporaneous text communications reflect that Core reviewed and specifically signed off on the press release. Core in its Claim Objection never claims it ever informed Sphere that it had not met Core's

DMS 302863949

requirements, including in connection with reviewing the press release. Furthermore, in the Chase Letter, Gryphon affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit, demonstrating that Gryphon plainly believed it did what was required to assign its rights under Order #2 to Sphere. Even if Gryphon's assignment to Sphere had not reached the payment of the Deposit (which it did), the Chase Letter would have cured the issue and assigned any of Gryphon's rights in the Deposit to Sphere.

61.     In sum, Sphere plainly has enforceable contractual rights against Core.

## II.     CORE'S COUNTERARGUMENTS AGAINST SPHERE'S BREACH CLAIMS FAIL

62.     As set forth in the Proofs of Claim, Core breached Order #2 in several ways. *See also* Section IV, *supra*. Core's arguments to the contrary are without merit.

### A.     Core's Argument That It Could Disregard The Deployment Schedule Is Without Merit

63.     Core could not abide by the deployment schedule set forth in Order #2—which called for Core to host 500 miners by February 2022—due to lack of space, as confirmed by Core's (1) refusal to accommodate hundreds of Sphere's miners in December 2021; (2) refusal to accommodate hundreds of Sphere's miners in February 2022; (3) refusal to accommodate hundreds of Sphere's miners in April 2022; (4) refusal to accommodate any of Sphere's miners after May 2022; (5) refusal to accommodate the miners of other parties, including Gryphon and Celsius; (6) baffling suggestion that Sphere should seek hosting with competitors; and (7) own dramatic increase in its proprietary mining fleet between December 2021 and April 2022.[14]

64.     Against this backdrop, Core argues that "[n]o provision in" the MSA or Order #2 "requires Core to deploy machines on or before a certain date." Claim Objection ¶ 46. Core's

---

[14] Core states it only rejected miners in April 2022, which Sphere disputes. *See* Claim Objection ¶¶ 46-47.

DMS 302863949

construction is unreasonable, as it effectively reads the very detailed Deployment Schedule out of the MSA and renders it meaningless, in derogation of well-settled Delaware law that "[c]ontractual interpretation operates under the assumption that the parties would never include superfluous verbiage in their agreement, and that every word should be given meaning and effect by the court." *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008). Indeed, the phrase "Deployment Month" in the Deployment Schedule can only be understood to mean that Core would actually deploy the miners delivered to it in the given month.

65. Core also points to Section 5.b of the MSA, which provides that Core's "facility and services are provided or performed on an 'as is', 'as available' basis, and Client's use of the company facility and services is solely at its own risk." MSA, § 5b. But Section 5.b does not speak to when a miner must be deployed—Order #2 does. In any event, the MSA expressly provides that Order #2 controls "[i]n the event of any conflict or inconsistency" with the MSA. *See* MSA § 1. Order #2 requires deployment in the given deployment month and accordingly controls.[15]

66. Core also implies that it was free to disregard the Deployment Schedule because Sphere did not deliver the miners called for in the Deployment Schedule. *See* Claim Objection ¶¶ 43-43, 49. But it is axiomatic that "the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." *In re Est. of Bickling*, No. CIV.A. 20002, 2004 WL 1813291, at *13 (Del. Ch. Aug. 6, 2004). Likewise, a party cannot frustrate performance, as Core did by refusing delivery of miners. *See Murphy Marine Servs. of Del., Inc.*

---

[15] Even taken on its terms, Section 5.b requires deployment when space is available and would not permit Core to reserve space for its own miners.

*v. GT USA Wilmington, LLC*, No. 2018-0664-LWW, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) ("Refusing to permit one party to perform or ordering it to stop performance may constitute prevention excusing performance.") (cleaned up). Because Core failed to honor its obligations, Sphere was relieved of any obligation to perform under Order #2, such as by delivering additional miners.

### B. Core Repudiated The Hosting Services Rate Of $▇▇▇▇▇

67. Core does not appear to seriously dispute that it refused to honor the hosting services rate of $▇▇▇▇ and demanded that Sphere accede to a higher, extracontractual rate. It claims that is continuing to host Miners at that rate but in the same breath states that it would not host additional miners unless Sphere agreed to pay a higher rate. Claim Objection ¶ 10. Core's "wrongfully demanded price increases" constitute a material breach and repudiation of Order #2. *See, e.g.*, *In re Meridian*, 372 B.R. 710, 716-17 (Bankr. D. Del. 2007). That repudiation entitles Sphere "to recover its prepayment." *See, e.g.*, *In re Asia Glob. Crossing, Ltd.*, 404 B.R. 335, 343 (S.D.N.Y. 2009); *see also* 3 Dan B. Dobbs, The Law of Remedies § 12.7(1) (3d ed. 2018) ("The general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract, for example, any part of the price which he has prepaid").

68. Against this, Core argues only that Sphere breached first. As noted, the argument inverts the chronology and is a non-starter.

## III. EVEN IF THE ASSIGNMENT WERE INEFFECTIVE, CORE WOULD STILL BE LIABLE TO SPHERE

### A. Core Is Liable To Sphere For Conversion Other Tort And Equitable Theories Regardless Of Whether There Was A Contract Between The Parties

22

69.     Sphere may recover irrespective of a contractual relationship.  As Sphere alleges, Core is liable to it for converting its Deposit, Miners, and Coins.  Sphere also alleges that Core is liable to it under estoppel theories, including based on its promise to return the Deposit upon receipt of instructions from both Gryphon and Sphere to do so and based on its representation that Core had compensated Sphere, by routing extra hash to Sphere, to compensate Sphere for the time Core was using Sphere's miners to mine digital assets for its own account.  None of these claims require privity of contract or, otherwise, rely on the assignment of Gryphon's rights to Sphere having been effective.

70.     Moreover, while the theories above are not predicated on the parties being in contractual privity, Sphere could, in fact, establish and pursue its claim through quasi-contract. For example, Mike Levitt's representations in April of 2022, which caused Sphere to wire additional monies to Core, could serve as the basis for estoppel.

**B.      Gryphon Was Acting As Sphere's Agent, Meaning Sphere Can Recover Irrespective Of Any Assignment**

71.     In addition, even if the assignment were ineffective, Sphere may sue under Order #2 under basic agency principles.  Under the Gryphon-Sphere Agreement, which is governed by New York law, Gryphon as "the exclusive provider of management services" to Sphere acts as an agent of Sphere and negotiates agreements on its behalf.  *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015) (under New York law, an agency relationship is created "where a writing erects the essential structure of an agency relationship").

72.     It is well-settled that, in the ordinary course, a principal is party to a contract made by its agent on its behalf.  *See* Restatement (Third) Of Agency § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the principal and the third party are parties to the contract."); *id*. § 6.02 (2006) ("When an agent acting with

23

actual or apparent authority makes a contract on behalf of an unidentified principal . . . the principal and the third party are parties to the contract."); *see also Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 5994971, at *4 (Del. Ch. Nov. 13, 2018) ("When an agent acting with actual authority makes a contract on behalf of an undisclosed principal, (1) unless [specifically] excluded by the contract, the principal is a party to the contract; (2) the agent and the third party are parties to the contract; and (3) the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal made the contract personally[.]" (quoting Restatement (Third) Of Agency § 6.03 (2006)).

73.     Here, employing a belt-and-suspenders approach, Gryphon assigned rights in Order #2 to Sphere pursuant to the Delegation Agreement.  The effectiveness of the assignment, however, is ultimately irrelevant: under basic agency principles, Sphere still has rights by virtue of its status as a principal in Order #2, which was entered into on its behalf.  Sphere can thus sue Gryphon directly for a breach of Order #2.

## IV.     IN ALL EVENTS, CORE CANNOT RETAIN SPHERE'S PROPERTY BECAUSE IT HAS SUFFERED NO DAMAGES

74.     As set forth above, Sphere did not breach Order #2.  Even if it had, however, Core would not be able to retain Sphere's property.  Although Core's argument is somewhat unclear, it appears to be arguing that Sphere's breach entitles it to retain the Deposit as damages for Sphere's alleged breach of Order #2 as a windfall for services it undisputedly never delivered (it wrongly denies that it mined digital assets for its own account and that it is hosting Sphere's miners).

75.     But the general rule is that a party who prevails on a breach of contract claim may only recover the damages it actually suffered.  *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) ("Contract damages 'are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed.").  It is

24

axiomatic that "[s]uch damages should not act as a windfall." *Id.*  Core has not even attempted to contend that it suffered any damages from any purported nonperformance by Sphere.  Core had no space to host even hundreds of Sphere's miners much less the 70,000 miners called for by the Deployment Schedule.  Given the fact that Core was overbooked, it is highly unlikely that Core could prove any damages, let alone $35 million worth.

76.    Nevertheless, even though Core delivered to Sphere only a few hundred thousand dollars' worth of service, it contends that it should be entitled to retain the Deposit as a windfall.  Core contends it may do so under Section 5.d, which provides that if:

> Client fails to pay all invoiced amounts when due (an "Unpaid Balance"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense . . . declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable[.][16]

77.    Initially, Core neither provides evidence nor even contends that it actually declared all amounts due under Order #2 under Section 5.d.  Core's continued practice of drawing down on the Deposit notwithstanding its purported termination of the MSA and Order #2 is a tacit acknowledgment that Core realizes that the Deposit is Sphere's property and that it did not invoke Section 5.d—or if it did invoke Section 5.d, that it recognizes the provision is unenforceable.

78.    On the latter point, Section 5.d is unenforceable as a "penalt[y] . . . disguised as [a] liquidated damages provision[]."  *See Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1033 (Del. Super. Ct. 2021) ("A liquidated damages provision may be best described as any 'contract provision that requires payment in the event of a termination.'" (citation omitted)).

---

[16] Order #2, §5.d.

"[A] penalty is a 'punishment for default, rather than a measure of compensation for … breach,' that inserts with blunt instruments 'a stipulated sum ... irrespective of the damage sustained.'" *Id.*

79.     Liquidated damages provisions are subject to "close scrutiny." *Id.*   Determining the enforceability of such clauses is a "a mixed question of law and fact" and subject to a "two-prong analysis":

> First, the Court must determine whether damages were certain, *i.e.*, capable of accurate calculation, at the time of contracting. If damages were calculable with a fair amount of precision, then a clause that concocts an aggravated total is a penalty. And second, if damages were uncertain or at least could not be forecasted reliably, then the Court must determine whether the amount selected is reasonable. To be unreasonable, the amount at issue must be unconscionable or not rationally related to any measure of damages a party might conceivably sustain.

*Id.* at 1032–33 (cleaned up).

80.     The liquidated damages provision flunks both prongs.  On the first prong, Core's damages were determinable at the time of contracting because it had no room to host Sphere's miners and thus would not have suffered any damages through a breach.  But even if Core had been ready and able to perform, damages would still be ascertainable, as they would equal the revenues generated through the term of Order #2 minus the cost performance.

81.     On the second prong, the damages are not reasonable in that they treat every penny due under the MSA and Order #2—hundreds of millions of dollars—as pure profit without taking into account whether Core could actually meet the Deployment Schedule or the costs of performing to Core, which would decrease profit and could not be treated as compensable damages.  Core never tries to justify its contention that it should be entitled to every penny it could have been paid under Order #2 other than a vague reference to the "undertaking and investment Core must make to prepare its facilities," an expense it never attempts to quantify and that could

not possibly equal all amounts due under Order #2 through the end of the term.  *See* Claim Objection ¶ 19.

## V.     THE MSA DOES NOT BAR RECOVERY OF ANY OF THE DAMAGES SPHERE SEEKS

82.     "Contract clauses which exonerate a party from the consequences of its own actions are disfavored" under Delaware law.  *Hampton v. Warren-Wolfe Assocs.*, 2004 WL 838847, at *3 (Del. Super. Ct. Mar. 25, 2004); *accord Gabriels Tech. Sols., Inc. v. PNJP, LLC*, No. 17 CIV. 6410 (AT), 2018 WL 11309883, at *4 (S.D.N.Y. Sept. 7, 2018) (applying close scrutiny to limitation of liability clause that limited liability without completely exculpating it).  Core is wrong that Section 5.d limits its total liability to $84,658.94 and that Section 5.c excludes a variety of damages, including consequential, expectation, reliance, and punitive damages.  On the contrary, these provisions do not limit Core's liability at all as a matter of public policy for the type of misconduct at issue here, namely, intentional acts and acts taken in bad faith.  *See* Section III.B, *infra*.  Setting aside public policy, Core is also wrong as a matter of contract interpretation that Section 5.d limits its total liability to approximately $84,685.94.   *See* Section III.C, *supra*.

### A.     Courts Generally Refuse To Resolve The Applicability Of Limitation Of Liability Clauses Pre-Trial, A General Standard From Which This Court Should Not Deviate

83.     At the outset, as a matter of Delaware law, "[g]enerally, the enforceability of liability limitation provisions should not be decided on the pleadings or on summary judgment." *Data Centers, LLC v. 1743 Holdings LLC*, C.A. No. N15C-02-041, 2015 WL 9464503, at *5 (Del. Super. Ct. Oct. 27, 2015); *see also Kainos Evolve, Inc. v. InTouch Techs., Inc.*, No. CV 2018-0712-ABG, 2019 WL 7373796, at *2 (Del. Ch. Dec. 31, 2019) ("[I]n recognition of the fact that it is preferable for the court to have a factual record before ruling out available remedies, particularly when issues of public policy may be implicated, Delaware courts have held that 'the enforceability of liability limitations should not be decided on the pleadings or on summary judgment.'" (citation

omitted)); *Hampton*, 2004 WL 838847, at *3 (denying motion for summary judgment on limitation of liability where "[t]he case [was] still in the discovery stages"). "Relying on this principle, multiple federal courts applying Delaware law have declined to enforce limitation of liability provisions on motions to dismiss and motions for summary judgment." *Gabriels Tech. Sols., Inc.*, 2018 WL 11309883, at *4 (collecting cases).

84.     In *Data Centers*, the court noted that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss." 2015 WL 9464503, at *5. This Court should follow the well-trodden rule applied by Delaware courts and federal courts applying Delaware law and only resolve the applicability of the limitation of liability provisions post-trial.

**B.      As A Matter Of Public Policy, Core's Liability Cannot Be Limited For Acts Of Intentional Misconduct Or Bad Faith**

85.     Like other jurisdictions, Delaware courts generally permit parties to limit or eliminate liability for acts committed before a contract is entered into, but will not as a matter of public policy permit parties to prospectively limit their liability for intentional acts or acts of bad faith committed after contract execution. *See New Enter. Assocs. 14, L.P. v. Rich*, No. 2022-0406-JTL, 2023 WL 3195927, at *8 (Del. Ch. May 2, 2023) (observing that "[e]xtant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct" and distinguishing Delaware decisions that have permitted a party entering into a contract to disclaim liability for pre-contract extracontractual fraud through non-reliance provisions); *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *5 & n.41 (Del. Super. Ct. July 25, 2007) (collecting authority and observing that if the contract "expressed an unambiguous intent to relieve [defendant] of liability for his own intentional torts, it is exceedingly doubtful that such a provision would be enforceable as a matter of public policy");

28

*James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 38 (Del. Super. Ct. 1983) ("to the extent that paragraph 6 seeks to indemnify [the defendant] against its willful acts, as opposed to its negligence, the agreement is void and unenforceable"); 8 Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort . . . or for a future willful or grossly negligent act is generally held void." (footnotes omitted)).

86.     Sphere asserts that Core is liable to it based on its intentional acts, including for the tort of conversion, namely, for Core wrongfully seizing the Deposit and other digital assets generated for the benefit of Sphere.  No limitation of liability can apply to such claims.  *See Saraga*, 2007 WL 2142848, at *5 & n.41 (citing *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 409 N.E.2d 849, 853 (N.Y. 1980) ("Although public policy will in many situations countenance voluntary prior limitations upon that liability which the law would otherwise impose upon one who acts carelessly . . . such prior limitations may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct . .  such as a conversion.  Any other rule would encourage wrongdoing by allowing the converter to retain the difference between the value of the converted property and the limited amount of liability. . . . That result would be absurd.").); *accord Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App. 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy.").

87.     Sphere also asserts that Core acted in bad faith in performing under the MSA.  In Delaware, where "bad faith" is present, a limitation of liability is ineffective as a matter of public policy with respect to liability sounding in contract.  *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to

29

applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages"); *see also, e.g.*, *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) ("Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own . . . bad faith."); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, No. C.A. 89C-DE-34, 1992 WL 207276, at *5 (Del. Super. Ct. Aug. 17, 1992); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 508 (S.D.N.Y. 2005). As in Delaware, courts in other jurisdictions generally hold that a party cannot limit its liability for a bad faith breach of contract.[17] *See, e.g.*, *Vermont Telephone Co., Inc. v. FirstLight Fiber, Inc.*, No. 216-2020-CV-00312, 2022 WL 19236267, at *6 (N.H. Super. Jan. 14, 2022) ("New Hampshire would adopt the rule the rule that a limitation clause may not be enforceable in instances where the party seeking to enforce it has acted in bad faith" and collecting cases for the proposition that numerous courts across the U.S. have applied this rule to breach claims "for bad faith" in "contract performance"); *Airfreight Exp. Ltd v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 110–11 (Az. Ct. App. 2007) (collecting cases).

88.     Accordingly, Core may not as a matter of public policy invoke the MSA to limit its liability for any intentional or bad faith acts.

---

[17] Sphere acknowledges that at least one Delaware court has held, in a post-trial opinion, that public policy will invalidate provisions that purport to limit tort liability, but not contract liability. *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013). As described above, *eCommerce* is out of sync with the vast majority of decisional law nationally. Core's other cases (at 25–26) do not appear to have been confronted with the issue of public policy.

In any event, rather than resolve an issue of potentially disputed law regarding the scope of Delaware public policy, the prudent course for this Court is to rule on the issue, if needed, post-trial with the benefit of a full evidentiary record—*i.e.*, when courts generally assess the applicability of limitation of liability clauses in any event. *See __, supra*.

### C. As A Matter Of Contract Construction, Core's Potential Liability Is Not Limited To $84,658.94

89.    Setting aside public policy, as a matter of contract construction, Core seriously misreads Section 5.d to argue that its total liability is unambiguously limited to $84,658.94.[18] Section 5.d provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  At the outset, Section 5.d—a provision designed to cap damages—cannot be understood to apply to a situation where, as here, a party is seeking the return of its own property, namely, the Deposit, the miners, and the digital assets Core wrongfully generated for its own account.

90.    But, regardless, Core's construction of Section 5.d is unreasonable, namely, that it must be interpreted, unambiguously, to mean that Core's damages are capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment*—here, $84,658.94 for Hosting Services (among other things) in the May 2023 Invoice. *See* Cann. Decl., Ex. C.  It would be easy to imagine a limitation of liability provision that limited liability to the amount actually reflected on a specific invoice—even on the last invoice submitted before filing for summary judgment.

91.    But that is not what Section 5.d provides; it does not cap liability based on amounts actually charged, let alone amounts reflected on an arbitrarily selected invoice.

92.    Rather, Section 5.d by its plain terms instructs that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  The question is not what was actually charged or paid to Core under Order #2, but what is the greatest

---

[18] Core argues, without elaboration, that its liability is limited to approximately $84,000.  Claim Objection, at ¶ 57.

amount of fees called for in a single month by (*i.e.*, payable under) Order #2 under its terms as written.

93.     Neither Order #2 nor the MSA define the term "fees," but the term at the very least encompasses "Fees for Services."  Order #2 provides that "Client shall pay the fees provided for in [Order #2]" and further states that "Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate)," subject to certain fee adjustments.  Based on Order #2, as written, that amount is in excess of $██████[19] and constitutes fees for purposes of Section 5.d.

94.     Moreover, "payment due prior to installation"—*i.e.*, the payments that went toward the Deposit—is listed as among the payments called for in Order #2 and may properly be considered to be fees for purposes of Section 5.d.  In October 2021, Sphere sent Core just over $██ ██████ towards the Deposit, as called for by Order #2.  Core's own documents confirm that Core cannot disclaim that "payments due prior to installation" may constitute fees:  just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—Core's April Invoice 2022 too charged $██████ for *Hosting Services*:

---

[19] In December 2022, for example, the amount is $██████, a sum that equals the maximum number of miners to be hosted under Order #2 (70,000), multiplied by the "Assumed power consumption per Unit" (3.255), multiplied by the "Hosting Service Rate ($0 ████), multiplied by the number of days in December (31), multiplied by the number of hours in a day (24).

| Terms | | Due Date | PO # | | Sales Rep | |
|---|---|---|---|---|---|---|
| | | 5/22/2023 | Order 1-2 | | | |

| Quantity | Item | | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|---|
| 1 | Hosting Services*<br>April 2023 Actual Usage | | | 0% | $84,083.25 |
| 1 | Hosting Services*<br>Reverse April 2023 Estimated Prepayment<br>INV42894 | | | 0% | ($82,174.34) |
| 1 | Hosting Services*<br>Estimated June 2023 Usage Prepayment | | | 0% | $82,174.34 |
| 1 | Replacement Parts<br>04/03/2023 to 05/03/2023 - Dalton, GA - Parts | | Dalton, GA | 7% | $456.25 |
| 1 | Replacement Service<br>04/03/2023 to 05/03/2023 - Dalton, GA - Labor | | Dalton, GA | 0% | $87.50 |

| | | |
|---|---|---|
| | Subtotal | $84,627.00 |
| | Tax Total (%) | $31.94 |
| | Total | $84,658.94 |
| | Amount Due | $84,658.94 |

*See* Cann Decl., Ex. C (excerpt from the May 2023 Invoice).



| Terms | | Due Date | PO # | | Sales Rep | |
|---|---|---|---|---|---|---|
| | | 4/15/2022 | Order 2 - 10000 Units S19 | | | |

| Quantity | Item | | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|---|
| 1 | | | | 0% | $ |

| | | |
|---|---|---|
| | Subtotal | $ |
| | Tax Total (0%) | |
| | Total | $ |
| | Amount Due | $ |

*See* Exhibit 6 (excerpt from the April 2022 Invoice).

95. And even if Core were right, and the amount actually charged in an invoice represented the cap on damages, there would still be no principled basis to select the May 2023

33

Invoice as the controlling invoice. To the extent prepayments constitute fees, the more natural reading of Section 5.d dictates that the month in which Core received the greatest payment should control—namely, October 2021, when Core received approximately $███████ from Sphere.

96. Sphere's construction is far more sensible and Core's construction is unreasonable. It cannot be that Core can arbitrarily select an invoice (here, the last invoice before filing for summary judgment) and declare that it provides the cap on its liabilities.

97. In addition, Core's construction leads to the sort of "absurd" results that Delaware law will not countenance. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."). While Order #2 called for a large deposit of $███████ by October 12, 2021, it only provided for 100 miners to be operational in October 2021, which would be expected to generate hosting service fees of under $████ in October 2021.[20] Under Core's interpretation, Core could have taken the deposit of $███████ and *immediately* defaulted on its obligations, with its liability capped at under $████. That makes no sense.

98. It is accordingly clear, as a matter of contract construction, that Sphere's liability cannot be capped at $84,658.94.

## **CONCLUSION**

For the reasons set forth above, Sphere respectfully requests that the Court (i) overrule the Claim Objection, (ii) allow the Proofs of Claim, and (iii) grant Sphere such other and further relief as is appropriate under the circumstances.

---

[20] Specifically, $█████ if the miners were hosted the entire month of October 2021, a figure arrived at by multiplying the miners to be hosted in October 2021 (100), by the "Assumed power consumption per Unit" (3.255), by the "Hosting Service Rate ($█████)", by the number of days in October (31), by the number of hours in a day (24).

34

Dated: July 10, 2023

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*
  Timothy A. ("Tad") Davidson II
  TX Bar No. 24012503
  Ashley L. Harper
  TX Bar No. 24065272
  **HUNTON ANDREWS KURTH LLP**
  600 Travis Street, Suite 4200
  Houston, Texas 77002
  Telephone: (713) 220-4200
  Facsimile: (713) 220-4285
  E-mail:    taddavidson@HuntonAK.com
            ashleyharper@HuntonAK.com

  - and -

  Seth H. Lieberman (admitted *pro hac vice*)
  Matthew W. Silverman (admitted *pro hac vice*)
  **PRYOR CASHMAN LLP**
  7 Times Square
  New York, New York 10036
  Telephone: (212) 421-4100
  Facsimile: (212) 326-0806
  E-mail:    slieberman@pryorcashman.com
            msilverman@pryorcashman.com

  - and -

*Co-Counsel for Sphere 3D Corp.*

Tibor L. Nagy, Jr.
TX Bar No. 24041562
Gregory N. Wolfe (admitted *pro hac vice*)
**DONTZIN NAGY & FLEISSIG LLP**
980 Madison Avenue
New York, New York 10075
Telephone: (212) 717-2900
Email:    tibor@dnfllp.com
          greg@dnfllp.com

## CERTIFICATE OF SERVICE

      I certify that on July 10, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

                            */s/ Timothy A. ("Tad") Davidson II*
                            Timothy A. ("Tad") Davidson II

DMS 302863949

# EXHIBIT 1

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

**1.      AGREEMENT STRUCTURE**

a.       This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**").  Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order.  In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

**2.      SERVICES AND COMPANY FACILITY**

a.       Company will provide Client the Services at a Company Facility set forth in an Order.  This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.   Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility.  Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services.  Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.       Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility.  Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order.  Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.       Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference.  If Company determines in its sole

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3.      PAYMENT TERMS AND TAXES

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c.      All amounts payable to Company under this Agreement exclude applicable taxes.  Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities.  If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement.  Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period).  If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

(i)      suspend the provision of the Services;
(ii)     disconnect Client Equipment and store it;
(iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
(iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
(v)      terminate this Agreement and all Orders; and
(vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee.  Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

3

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.      Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs or governmental fees and charges with respect to the provision of Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.      Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement. Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees, costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.      In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension. Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

**5.      WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY**

a.      Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement. Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner. Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.        EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES      , INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.        NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.        NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.    EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5  d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.    Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.    Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.    Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, or (vii) Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

**6.    CONFIDENTIAL INFORMATION**

a.    Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**").  Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement.  Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.  Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event

less than commercially reasonable measures.

b.      The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.      Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.      Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

e.    Notwithstanding any contrary provisions in this Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to freely incorporate such changes or suggestions into Company's products and services without restriction.

## 7.     INSURANCE

a.      Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.      Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8.     MISCELLANEOUS

a.      <u>Notice</u>. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b.      <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly

set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.  <u>Survival</u>.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d.  <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.  <u>Force Majeure</u>.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.  <u>Governing Law and Arbitration</u>.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.  <u>General</u>.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

**Core Scientific, Inc.**

By: _Michael Trzupek_ _____

Name: _Michael Trzupek_ _____

Title: Authorized Representative

Date: _9/13/2021_ _____

**Gryphon Digital Mining, Inc.**

By: _Dan Tolhurst_ _____

Name: _Dan Tolhurst_ _____

Title: _President_ _____

Date: _9/12/2021_ _____

## MASTER SERVICES AGREEMENT ORDER #1

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September __, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of August 31, 2021. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted\*\*:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWH):** |
| | N/A | 100 S19j | 3.203 |
| | | | |
| | | | |
| **Hosting-Services Rate:** | USD $███ / KWh | | |
| **Payment Due Prior to Installation:** | USD $██████ on or before August 31, 2021 consisting of: <ul><li>$████ a six-month prepayment for hosting services to be applied as a credit against future monthly invoices as they become due.</li><li>$████ Equipment Configuration Fee</li></ul> | | |
| **Estimated Delivery Date:** | August 31, 2021. Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Equipment Configuration Fee: $██/Unit payable as provided above. | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $██/Unit<br>Storage Fee: $██/month/Unit<br>Reinstatement fee: $██/Unit<br>Equipment Recycle fee: $██/Unit decommissioned or disposed of during the term | | |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the third anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**").

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed

specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include [routine maintenance of Client Equipment Units, power supply, internet connection].

**Limitation of Client Indemnity Obligation**. Client shall not be required to indemnity defend or hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees or any other party or person from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing except if such a change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, would have the effect of increasing any tax obligation imposed on Company related to this Agreement and such tax obligation is not otherwise paid by Client.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose

DocuSign Envelope ID: A3E0DB4C-6F54-4038-9088-AEC158D5EE92

this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Limitation of Client Damages potentially payable in Force Majeure; Modification of Force Majeure Definition**. Client's obligation to pay amounts owed under this Agreement upon the occurrence of a Force Majeure event shall be limited to any amounts owed that have already accrued at the time of the Force Majeure event and any fees and expenses incurred by Company in de racking, packing and shipping Client equipment as directed by Client. Client and Company agree that any change in change any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, which renders cryptocurrency mining illegal shall be deemed a Force Majeure Event.

**Amendment to Section 5.d of the Agreement**. Both Company and Client Agree that section 5.d of the Agreement is amended so that COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO THREE (3) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per

month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) and shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)      It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)      Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)      Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

\*\*Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Dan Tolhurst_ _____
**Gryphon Digital Mining, Inc. "Client"**
Name: Dan Tolhurst _____
Title: President _____
Date: 9/12/2021 _____

By: _Michael Trzupek_ _____
**Core Scientific, Inc., "Company"**
Name: Michael Trzupek _____
Title: CFO _____
Date: 9/13/2021 _____

# EXHIBIT 2

## MASTER SERVICES AGREEMENT ORDER #2

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted\*\*:** | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| **Hosting-Services Rate:** | ███████████████████████████████ | | |
| **Payment Due Prior to Installation:** | ███████████████████████████ | | |

DocuSign Envelope ID: 6149D831-4057-4555-9338-4E27727A8E90





| | |
|---|---|
| **Estimated Delivery Date:** | As of September 24, 2021 and then the fifteenth of every month beginning with October 15, 2021 until November 15, 2022, respectively.<br><br>Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. |
| **Fees:** | ████████████████ |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | ██████████████<br>████████████<br>████████████<br>████████████████████ |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the fourth anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set

forth in the Agreement.

**Amendment to Section 8.d of the Agreement**. Both Company and Client agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company as long as Sphere 3D Corp. satisfies Company requirements prior to.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**"). At least ten percent (10 %) of the computer hardware ("**Equipment**") (hosted in the Company Facility in which Client Equipment is hosted must be Equipment that is owned by Company. If however, there is a single occupancy restriction at a Company Facility for purposes of maintaining a qualifying data center status for sales tax purposes, the Client shall have the option to either waive this requirement or pay the requisite sales tax. In addition, Company covenants that all power provided to Client under this Order 2 shall be one hundred percent (100%) net carbon neutral. In addition, Company intends to achieve 100% net carbon neutral status for its mining operations. The Company will achieve and maintain this status by continuing to increase relationships with power suppliers providing a higher mix of non-carbon emitting energy sources and by purchasing certified green carbon offset certificates using United States Environmental Protection Agency guidelines for calculating carbon emissions.

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client

Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include routine maintenance of Client Equipment Units, power supply, internet connection.

**Exception to Confidential Information provision for agents and contractors.** Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Performance Information.** Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this

Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures.** Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

\*\*Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Rob Chang_____

**Gryphon Digital Mining, Inc. "Client"**
Name: Rob Chang
Title: CEO
Date: 10/5/2021

By: _Michael Trzupek_____

**Core Scientific, Inc., "Company"**
Name: Michael Trzupek
Title: CFO
Date: 10/5/2021

# **EXHIBIT 3**

# SUB-LICENSE AND DELEGATION AGREEMENT

This Sub-License and Delegation Agreement (this "**Agreement**"), dated as of _____ 10/5/2021 ___, 2021, is entered into by and between Gryphon Digital Mining, Inc. ("**Gryphon**") and Sphere 3D Corp. ("**Sphere**"), and relates to that certain Services Agreement, dated as of September 12, 2021 (the "**MSA**"), by and between Core Scientific, Inc. ("**Core**") and Gryphon, and Master Services Agreement Order #2 thereunder ("**Order 2**"), attached hereto as Exhibits A and B, respectively. Capitalized terms used herein without definition shall have the meanings assigned to them in Order #2.

**WHEREAS**, Section 8.d of the MSA, as amended by Order 2, provides that Gryphon is permitted to sub-lease, sub-license, assign, delegate or transfer the MSA and Order 2, or any of its rights and obligations thereunder to Sphere without the prior written consent of Core; and

**WHEREAS**, Gryphon desires to sub-license and delegate certain rights and obligations under Order 2 to Sphere as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Sub-License and Delegation. Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2. Sphere hereby accepts such sub-license and delegation in all respects.

2. Contingent Assignment. Effective immediately upon the consummation of the Merger (as defined in that certain Agreement and Plan of Merger, dated as of June 3, 2021, by and among Sphere, Sphere GDM Corp. and Gryphon, as amended from time to time (the "**Merger Agreement**")), all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation (as defined in the Merger Agreement), without any further action required by either such party.

3. Termination. This Agreement shall automatically terminate upon the termination of the MSA and/or Order 2 in accordance with their respective terms. In addition, upon any termination of the Merger Agreement by Sphere, Gryphon shall have the right, in its sole discretion, to terminate this Agreement in its entirety (including the sublicense and delegation described in Section 1) upon not less than one hundred and eighty (180) calendar days' written notice to Sphere.

4. Governing Law. This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

5. Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. This Agreement may be amended only by the written agreement of both parties.

DocuSign Envelope ID: 2E2CEAE5-39E3-4BA5-A617-E7A12E465FD3

*[Signature Page to Sub-License and Delegation Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**GRYPHON DIGITAL MINING, INC.**

By: _____

Name: Robby Chang

Title: CEO & Director


**SPHERE 3D CORP.**

By: _____

Name: Peter Tassiopoulos

Title: CEO

309132185.2

**Exhibit A**

Master Services Agreement

**<u>Exhibit B</u>**

Master Services Agreement Order #2

# **EXHIBIT 4**

# MASTER SERVICES AGREEMENT

## Binding Term Sheet

*This Binding Term Sheet (the "Binding Term Sheet") constitutes a legally binding commitment to enter into a transaction on the terms described herein. This Binding Term Sheet shall be superseded by a definitive agreement as set forth below, and this Binding Term Sheet constitutes a legally binding and enforceable agreement with respect to the relationship of the parties between the Effective Date until the execution and delivery of the definitive agreement and/or the Term/Termination as further defined below.*

| | |
|---|---|
| **Provider** | Gryphon Digital Mining Inc., a Delaware corporation, located at 5953 Mable Road, Unit 138, Las Vegas, NV 89110 ("Provider"). |
| **Customer** | Sphere 3D Corp., a Canada corporation, located at 895 Don Mills Road, Building 2, Suite 900, Toronto, Canada M3C 1W3 ("Customer"). |
| **Definitive Agreement** | The parties intend to enter into a Master Services Agreement that shall contain all the terms and conditions set forth in this Binding Term Sheet, as well as other terms and conditions customary to such agreements (the "Master Services Agreement") and replace this Binding Term Sheet. Until such Master Services Agreement is entered into, this Binding Term Sheet shall govern the relationship between the parties as described herein with respect to the Services. The term "Agreement" as used herein refers to either the Binding Term Sheet or the Master Services Agreement, as the case may be, whichever is in effect at the relevant time. |
| **Exclusivity** | Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location (collectively, the "**Services**") unless the Agreement is terminated by Customer as per Term/Termination below. |
| **Management Fee / Operating Costs** | • As consideration for the Services, Provider shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of Customer's blockchain and cryptocurrency-related operations (the "**Management Fee**").<br>• Net Operating Profit shall be defined as the value of digital assets mined using Customer's mining equipment as of 11:59 pm Eastern Time on the date of mining based upon the price of such digital asset quoted on Coinbase minus the cost of electricity and profit-share paid to hosts.<br>• The Management Fee shall be calculated and distributed to Provider subsequent to payment of all operating expenses, including but not limited to all payments to hosts and electricity providers.<br>• The total costs of electricity and any profit-share paid to hosts shall capped at 9 cents ($0.09) per kilowatt hour ($0.09/kwh).<br>• Provider shall assist Customer to source and negotiate the appropriate host to locate the mining equipment. |
| **Term/Termination** | • The initial term of the Agreement shall be three (3) years and shall automatically renew for consecutive one (1) year terms thereafter.<br>• Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, subject to written notice and an opportunity to |

|  |  |
|---|---|
|  | cure, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services.<br>• Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure.<br>• Customer shall be entitled to terminate the agreement on 30 days' notice in the event Provider terminates the Merger Agreement between the parties dated as of June 3, 2021, unless: (i) such termination is pursuant to Section 8.01(f) or 8.01(h) of the Merger Agreement or (ii) Customer waives its right to terminate the agreement in writing within five days of receipt of any notice to terminate the Merger Agreement by Provider<br>• Customer shall be entitled to terminate the Agreement with 30 day notice, if the Nasdaq Stock Market and/or US Securities and Exchange Commission, ("<u>Regulators</u>") informs Customer that either one or both, will not approve the Nasdaq Listing Application or Merger agreement as applicable, (as defined by the Merger Agreement) solely due to concerns raised by Regulators regarding Provider's business or one or more of Provider's shareholders, officers or directors (the "<u>Provider Regulatory Concerns</u>") and Provider has not cured the Provider Regulatory Concerns to allow for the closing of the Merger agreement within 365 days of the execution of this agreement. Provider shall be entitled to work directly with Regulators to attempt to cure any such concerns related to Provider raised by Regulators. For greater clarity, if, as of the one year anniversary of the execution of this agreement, the Merger has not closed due to unresolved Provider Regulatory Concerns the Customer may terminate this agreement on 30 days' notice. |
| **Commercial Terms** | • Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "**Mining Equipment**"). "**Affiliate**" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer.<br>• Except in the case of an emergency or a potential security breach, Customer shall not voluntarily take any Mining Equipment offline without the prior written consent of Provider.<br>• Provider shall at all times control the digital wallet, which shall be a wallet address selected by Provider on behalf of Customer for storing digital assets (the "<u>**Digital Wallet**</u>"). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by Provider for or on behalf of Customer at any location whatsoever (the "<u>**Digital Assets**</u>").<br>• Provider shall pay directly from the Digital Wallet on behalf of Customer all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee.<br>• Provider shall at all times select the mining pool and custodian of the Digital Assets. |

|  | • Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets. |
|  | • Customer agrees that the hosts shall at all times be responsible for the installation of the Mining Equipment and the provision of any ancillary items necessary to operate the Mining Equipment. |
|  | • Provider shall not be responsible for the uptime of the hosting site nor shall Provider be responsible for providing power or electricity to the hosting site. |
| **Mutual Indemnification** | Each party shall indemnify and hold harmless the other party from all losses and damages incurred in connection with its respective acts or omissions in connection with the Agreement. |
| **Limitation of Liability** | The parties expressly exclude all consequential, incidental, indirect, special and punitive damages, and loss of profits. The parties shall only be entitled to seek direct damages. |
| **Survival** | Customer agrees that the Agreement shall survive any bankruptcy of Customer, where permitted by law. |
| **Governing Law / Jury Waiver / Fees** | This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles. All disputes, suits, actions or proceedings relating to this Agreement ("Claims") shall be brought solely in the state or federal courts located in the State of New York. Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of *forum non conveniens* in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARTY IN CONNECTION WITH THIS AGREEMENT. <br><br> If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party; provided, that if a party to such Claim prevails in part, and loses in part, the court or other adjudicator presiding over such Claim shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis. |
| **Duty to Disclose** | As this Agreement is exclusive and legally binding in nature, Customer represents and warrants that it shall disclose its existence to existing and prospective creditors, investors, lenders, finance partners, etc. and Customer shall in all circumstances provide notice to Provider of such d isclosure. |

*\*\* Signature Page Follows \*\**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the _19th_ day of August, 2021.

**GRYPHON DIGITAL MINING INC**

By: _____

D577A860A12F40D...

Name: Robby Chang

Title: CEO & Director

**SPHERE 3D CORP**.

By: _____

CA566FB6317F438...

Name: Peter Tassiopoulos

Title: CEO

# **EXHIBIT 5**

6-K 1 form6k.htm FORM 6-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 6-K

**REPORT OF FOREIGN PRIVATE ISSUER PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934**

For the month of **October 2021**

Commission File Number: **001-36532**

# SPHERE 3D CORP.

**895 Don Mills Road, Bldg. 2, Suite 900
Toronto, Ontario, M3C1W3, Canada**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

Form 20-F ☒        Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1): ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7): ☐

The information contained in this Form 6-K is incorporated by reference into, or as additional exhibits to, as applicable, the registrant's outstanding registration statements.

## SUBMITTED HEREWITH

**Exhibits**

99.1    News Release dated October 13, 2021

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SPHERE 3D CORP.**

Date: October 13, 2021

/s/ Peter Tassiopoulos
Name: Peter Tassiopoulos
Title: Chief Executive Officer

EX-99.1 2 exhibit99-1.htm EXHIBIT 99.1

**Exhibit 99.1**



# Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History

228 MW hosting agreement is largest in Core Scientific's history, with an estimated capacity of 71,000 miners

Toronto, Ontario, October 13, 2021 - Sphere 3D Corp. (Nasdaq: ANY) ("Sphere 3D" or the "Company"), a company delivering containerization, virtualization, and data management solutions, is pleased to announce that it has entered into an agreement with Gryphon Digital Mining[1] ("Gryphon") for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by Core Scientific ("Core") as hosting partner. This hosting agreement is the single largest order in Core's history and represents yet another step forward for Sphere 3D and Gryphon in becoming the world's largest carbon neutral bitcoin miner.

This landmark hosting agreement will provide hosting capacity for up to 71,000[2] state-of-the-art bitcoin mining machines, and furnishes the Company with a world-class partner to host the 60,000 Bitmain S19j Pro miners whose purchase was previously announced by the Company.

The agreement features the installation of digital asset miners at Core Scientific's state-of-the-art, 100% net carbon neutral blockchain data centers over the course of 14 months. As part of the partnership, Core Scientific will provide its industry leading digital mining fleet management and monitoring solution, Minder™, data analytics, alerting, monitoring, and miner management services. Core Scientific's facilities offer 24/7 physical security and technical support operations, with teams available and able to attend to down units and perform repairs around the clock to deliver maximum uptime.

"We recently announced the single largest order in digital mining history through our purchase of 60,000 miners. It only makes sense that we would, through the great work and help of the team at Gryphon, choose the industry leading hosting partner in Core Scientific. Both Sphere 3D and Gryphon are committed to the professionalization of the crypto industry and are excited to work with a blue chip partner like Core Scientific. The commitment to carbon neutrality, industry leading infrastructure, and experience of the Core team were the deciding factors for us as we continue our journey to take the leadership position in crypto mining," said Peter Tassiopoulos, CEO of Sphere 3D.

"Working with and hiring the best is a fundamental philosophy at Gryphon Digital Mining and we could not have found a better hosting partner than Core Scientific. Core has a stellar reputation for being an enterprise-grade hosting services provider and we are excited to work with a similar minded, blue-chip partner. This agreement unlocks the operational capacity for our post-merger company to operate approximately 6.7 exahash of hashing power, which would place us among the top publicly traded bitcoin miners in the world," said Rob Chang, CEO of Gryphon Digital Mining.

[1] As previously announced, the company has entered into an Agreement and Plan of Merger with Gryphon Digital Mining which is anticipated to close in the 4th Quarter of 2021.

[2] Based on the potential deployment of 71,000 S19j Pro Antminers

**About Sphere 3D**

Sphere 3D Corp. (NASDAQ: ANY) has a portfolio of brands, including HVE ConneXions, Unified ConneXions and SnapServer®, dedicated to helping customers achieve their IT goals. For more information on Sphere 3D, please visit www.sphere3d.com.

**Investor Contact:**
Kurt Kalbfleisch
+1-858-495-4211
investor.relations@sphere3d.com

**About Gryphon Digital Mining**

Gryphon Digital Mining is a Bitcoin mining operation with zero carbon footprint. Gryphon's long-term strategy is to be the leading crypto miner with a 100 percent net carbon-free energy supply. Gryphon provides reliable, low-cost hydro-electric powered mining with plans to expand to other renewables such as nuclear, wind, and solar power to lower mining's impact on the environment. Gryphon Digital Mining has entered into an Agreement and Plan of Merger with Sphere 3D (Nasdaq: ANY) through which Gryphon shareholders are expected to become shareholders of Sphere 3D, and the merged company would continue to trade on Nasdaq, subject to shareholder and regulatory approvals. The merger is expected to be complete in Q4/21.

**Media Contact:**
Elyse Bender-Segall
PR Revolution
(516)901-9095
elyse@prrevolution.com

**Investor Contact:**
Rob Chang
Gryphon Digital Mining
(877) MINE-ESG (877) 646-3374
invest@gryphonmining.com

**Important Additional Information Will be filed with the SEC**

In connection with the proposed transaction between Sphere 3D and Gryphon, the parties intend to file a registration statement on Form F-4 (the "Registration Statement"), which will include a preliminary proxy statement of Sphere 3D and a prospectus in connection with the merger. The definitive proxy statement/prospectus and other relevant documents will be mailed to shareholders of Sphere 3D as of a record date to be established for voting on the merger. Stockholders of Sphere 3D and other interested persons are advised to read, when available, the preliminary proxy statement/prospectus, and amendments thereto, the definitive proxy statement/prospectus in connection with Sphere 3D's solicitation of proxies for the special meeting to be held to approve the merger, and other documents filed with the SEC by Sphere 3D and Gryphon, because these documents will contain important information about Sphere 3D, Gryphon, and the merger. Stockholders will also be able to obtain copies of the Registration Statement and the proxy statement/prospectus, without charge, by directing a request to: 895 Don Mills Road, Bldg. 2, Suite 900, Toronto, Ontario, M3C1W3, Canada. These documents, once available, and Sphere 3D's annual and other reports and proxy statements filed with the SEC can also be obtained, without charge, at the SEC's internet site (http://www.sec.gov).

**No Offer or Solicitation**

This press release shall not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the proposed merger or an offer to sell, the solicitation of an offer to sell or an offer to buy or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended. This press release is not for release, publication or distribution, in whole or in part, in or into, directly or indirectly, any jurisdiction in which such release, publication or distribution would be unlawful.

**Participants in the Solicitation**

Sphere 3D, and its directors, executive officers, other members of management and employees and Gryphon, and its directors, executive officers, other members of management and employees may be deemed to be participants in the solicitation of proxies from the stockholders of Sphere 3D in connection with the proposed merger. A list of the names of those directors and executive officers and a description of their interests in Sphere 3D will be included in the proxy statement/prospectus for the proposed merger and will be available at www.sec.gov free of charge. Additional information regarding the interests of such participants will be contained in the proxy statement/prospectus for the proposed merger when available.

**Forward-Looking Statements**

Any statements in this press release that are not statements of historical fact constitute forward- looking statements within the meaning of The Private Securities Litigation Reform Act of 1995, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements include, but are not limited to, statements regarding the proposed merger and other contemplated transactions (including statements relating to satisfaction of the conditions to and consummation of the proposed merger, the expected

ownership of the combined company and the ability of the combined company to raise additional capital to complete its purchase of the Hertford assigned equipment contracts and the Gryphon business and opportunities relating to or resulting from the merger), and statements regarding the nature, potential approval and commercial success of Gryphon and its product line and the miners provided by Hertford, risks related to Gryphon's ability to correctly estimate and manage its operating expenses and its expenses associated with the proposed merger pending closing; the ability of Gryphon to report accurate audited financials, the ability to install and intregrate the miners provided by Hertford, the effects of having shares of capital stock traded on the Nasdaq Capital Market, Gryphon's management team's ability to execute the post- merger operations, Gryphon's and the post-merger combined company's financial resources and cash expenditures. Forward-looking statements are usually identified by the use of words such as "believes," "anticipates," "expects," "intends," "plans," "ideal," "may," "potential," "will," "could" and similar expressions. Actual results may differ materially from those indicated by forward-looking statements as a result of various important factors and risks. These factors, risks and uncertainties include, but are not limited to: risks relating to the completion of the purchase of the miners from Hertford, including to raise additional capital to finance the ongoing operations of the business and the need for stockholder approval in connection with the issuance of Common Shares; risks relating to the completion of the Gryphon merger and consummation of the Hertford equipment purchased and entering into the carbon neutral hosting facility, including the need for stockholder approval and the satisfaction of closing conditions; risks related to Sphere 3D' ability to correctly estimate and manage its operating expenses and its expenses associated with the proposed merger pending closing; the cash balances of the combined company following the closing of the merger; the ability of Sphere 3D to remain listed on the Nasdaq Capital Market; the risk that as a result of adjustments to the exchange ratio, Sphere 3D shareholders, Gryphon stockholders or Hertford stockholder could own more or less of the combined company than is currently anticipated. In addition, the forward-looking statements included in this press release represent Sphere 3D, Gryphon's and Hertford's views as of the date hereof. Sphere 3D, Gryphon and Hertford anticipate that subsequent events and developments will cause their respective views to change. However, while Sphere 3D, Gryphon and Hertford may elect to update these forward-looking statements at some point in the future, Sphere 3D, Gryphon and Hertford specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing Sphere 3D's, Gryphon's or Hertford's views as of any date subsequent to the date hereof.

# **EXHIBIT 6**

 **CORE SCIENTIFIC**

# Invoice
### #INV42043
4/4/2022

| Bill To | Ship To |
|---|---|
| Gryphon Digital Mining, Inc. | Gryphon Digital Mining, Inc. |
| 5953 Mabel Rd | 5953 Mabel Rd |
| Unit 138 | Unit 138 |
| Las Vegas NV 89110 | Las Vegas NV 89110 |
| United States | United States |

**TOTAL**

 $

**Due Date: 4/15/2022**

| Terms | Due Date | PO # | Sales Rep |
|---|---|---|---|
| | 4/15/2022 | Order 2 - 10000 Units S19 | |

| Quantity | Item | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|
| 1 | **Hosting Services*** | | 0% | $ ▮ |
| | ▮ | | | |

| | |
|---|---|
| **Subtotal** | $ ▮ |
| **Tax Total (0%)** | $0.00 |
| **Total** | $ ▮ |
| **Amount Due** | $ ▮ |

Hosting Services includes Security, Monitoring, Maintenance, Facilities Management, Account Management, Usage, Network/Data Access, Technical Support, Rack/Colocation Space, Heat Management/Thermal Management.

1 of 1

**Thank you for your business and your trust. It is our pleasure to work with you.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.**, *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**ORDER DENYING DEBTORS' OBJECTION TO**
**PROOFS OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.**
[Relates to Docket No. 869]

Upon consideration of the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 869] (the "Claim Objection") and Sphere 3D Corp.'s response (the "Response") to the Claim Objection, and upon all of the proceedings had before this Court, it is **HEREBY ORDERED THAT:**

1.      The Claim Objection is overruled.

2.      The Proofs of Claim are allowed.

3.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: _____

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.