Exhibit 14

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**SPHERE 3D CORP.'S OBJECTION TO DEBTORS' MOTION
FOR SUMMARY JUDGMENT WITH RESPECT TO
PROOF OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.**
[Relates to Docket No. 959]

Sphere 3D Corp. ("Sphere") files this objection ("Objection") to the *Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 959] (the "Motion" or the "Motion for Summary Judgment") filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and in support, respectfully states as follows:

## SUMMARY OF OBJECTION

1.      The Motion for Summary Judgment should have never been brought and must be denied for numerous reasons, including because *no discovery* has been taken in this contested matter and because, even without the benefit of discovery, genuine disputes of material fact exist with respect to the issues raised in the Motion.

2.      By way of background, the liability of Debtor Core Scientific Operating Company (f/k/a Core Scientific, Inc.) ("Core") to Sphere arises out of Core's conversion of Sphere's digital

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198) (each a "Debtor" and collectively, the "Debtors"). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

assets and miners and failure to perform under the Master Services Agreement dated September 12, 2021 (the "MSA", attached as Exhibit 2 to the Trompeter Decl.), and an accompanying order dated October 5, 2021 ("Order #2", attached as Exhibit 3 to the Trompeter Decl.), pursuant to which Core agreed to provide certain services, including colocation, hosting, and rack space for Sphere's miners. Per the terms of Order #2, Sphere delivered to Core $35,104,363 in cash deposits (collectively, the "Deposit") to be applied as "credit against future monthly invoices as they become due." Core, however, refused to host Sphere's miners, made clear it would no longer honor the hosting rate provided for in Order #2, and ran Sphere's miners for its own benefit (thus siphoning bitcoin for itself), among other things. After Core made clear it would no longer honor the terms of Order #2, Sphere demanded the return of its property, *i.e.*, the Deposit, its miners, and the bitcoin that Core had mined for its own account using Sphere's miners. Core refused and Sphere initiated an arbitration in October 2022 seeking the return of its property and damages. Shortly thereafter, Core initiated these Chapter 11 proceedings and, on June 9, 2023, Sphere filed proofs of claim numbers 358 and 359 (together, the "Proofs of Claim").[2] The property Core is holding is Sphere's property. Through the Proofs of Claim, Sphere asserts, among other things, that Core intentionally converted Sphere's property; that Core breached its contractual obligations, including in bad faith, and is thus liable under repudiation, breach of contract, and breach of the implied covenant theories; and that Core is also liable in equity under estoppel theories for failing to return the property.

    3.     Core desperately wants to avoid discovery in this case, as it will validate Sphere's Proofs of Claim. Before filing the Proofs of Claim, Sphere served requests for production of

---

[2] Following Core's practice (*see* Motion, at 6 n.4), because Proofs of Claim Nos. 358 and 359 are identical in all material respects, for ease of reference the citations set forth herein are uniformly to Proof of Claim No. 358 (Ex. 1, hereto).

documents on Core pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Bankruptcy Rules"), *see Notice of Bankruptcy Rule 2004 Requests for Production of Documents from Core Scientific Inc.* [Docket No. 678] (the "Bankruptcy Rule 2004 RFP"), which Core resisted *in toto*. *See Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 711]. Thereafter, Core filed the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* (the "Claim Objection"), and requested that the parties set forth a rational schedule for this contested matter. The parties entered into a stipulation so-ordered by this Court on June 6, 2023 (the "Stipulation and Agreed Order", Docket. No. 956) that (i) "deferred and suspended" all discovery "until after a non-evidentiary scheduling conference with the Court to set relevant discovery and litigation deadlines and a trial date"[3]; and (ii) provided for the parties "to confer on a proposed scheduling order for discovery, litigation schedule, and trial date on the Claim Objection to file and present to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."[4] Three days later, before Sphere filed its response to the Claim Objection, Core filed this Motion without meeting and conferring and in disregard of the Stipulation and Order that the Court would set all "litigation deadlines."[5]

4. Given that the parties have not had *any* discovery, the Motion is, at this juncture, procedurally improper. Summary judgment is usually premature unless the parties have "had a full opportunity to conduct discovery." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 (5th Cir. 2002) ("Summary judgment assumes some discovery."); *see also Ins. Distribution Consulting, LLC v. Freedom Equity Group,*

---

[3] Stipulation and Agreed Order, ¶ 4.
[4] *Id*. ¶ 7.
[5] Sphere reserves the right to seek appropriate relief here.

DMS 302733999

*LLC*, No. 3:20-CV-00096, 2020 WL 5803249, at *3 (S.D. Tex. Sept. 4, 2020), ("Because granting summary judgment is improper when basic discovery has not been completed, I do not doubt that, even if I thought summary judgment was appropriate at the present time, the Fifth Circuit would reverse that ruling faster than a Nolan Ryan heater.") (citing *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 355-56 (5th Cir. 1989) (finding that district court abused its discretion by granting a motion for summary judgment when plaintiff had not been allowed to conduct any discovery at all)), *report and recommendation adopted*, No. 3:20-CV-00096, 2020 WL 5802898 (S.D. Tex. Sept. 29, 2020). Here, Core has produced no discovery whatsoever, which provides a basis to reject the Motion out of hand.

5. Setting aside that the Motion is procedurally improper, the Motion is also substantively deficient. To give the Motion a (thinnest-of-thin) veneer of propriety, Core claims that it is moving on "purely legal issues" and "unambiguous" language in the MSA and Order #2 that warrant either (i) granting summary judgment in full and dismissing the claims based on a purportedly void assignment of rights to Sphere; or (ii) granting partial summary judgment on the basis that limitation of liability provisions severely cap Core's potential liability. *See* Motion, at 1–2. Core is wrong.

6. Beginning with the assignment of rights to Sphere, it is undisputed that third-party Gryphon Digital Mining, Inc. ("Gryphon")—which serves as the exclusive manager of Sphere's crypto-related operations—entered into Order #2 with Core and that Gryphon entered into the Sub-License and Delegation Agreement with Sphere dated October 5, 2021, as subsequently amended (the "Delegation Agreement", attached as Exhibit 4 to the Trompeter Decl.), that expressly provided for the assignment of Gryphon's rights in Order #2 to Sphere. It is also undisputed that Order #2 expressly provided that Gryphon could "sub-license, assign, delegate or transfer" any of

4

"its rights . . . to *Sphere*" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent of [Core] as long as [Sphere] satisfies [Core's] requirements prior to . . . ." *See* Order #2.  This provision is hereinafter referred to as the "Sphere Assignment Provision."

7.      Based on a single paragraph in a single declaration from Russell Cann, an EVP at Core (the "Cann Declaration"), Core claims that the phrase "as long as [Sphere] satisfies [Core's] requirements prior to" *unambiguously* required Sphere to satisfy no less than *six categories of requirements*, including, apparently without limitation:

- *First*, "creditworthiness";

- *Second*, "Foreign Corrupt Practices Act [FCPA] considerations";

- *Third*, "Know Your Customer [KYC] considerations (*e.g.*, business with Chinese entities/Chinese government)";

- *Fourth*, "form of assignment (e.g., how and which rights and obligations were transferred, allocated or retained)";

- *Fifth*, "whether any such assignment would implicate securities laws or constitute an investment contract";

- *Sixth*, "whether any assignment would impact Core's own rights and obligations under the Gryphon Hosting Agreements;" and

- *Finally*, many other undisclosed requirements.[6]

8.      Mr. Cann goes on to declare in two sentences, based on his "personal knowledge" (no elaboration on how he has that knowledge), that Sphere never met Core's six (and counting) requirements.  No other evidence is proffered before Core declares it is undisputed that Sphere did not meet Core's requirements and therefore any assignment from Gryphon to Sphere is void.

---

[6] *See* Cann Decl. ¶ 8.

9. The phrase "requirements prior to" cannot support the *unambiguous* construction Core advances. And, far from presenting a legal issue, whether Sphere met any of Core's purported requirements is a fact-bound question and the evidence, even without the benefit of discovery, refutes Core's claim that Sphere somehow failed to meet its requirements. That evidence includes: (1) the sworn statements of Sphere CEO Patricia Trompeter and former Sphere CEO Peter Tassiopoulos (*see* Trompeter Decl. ¶ 6; Tassiopoulos Decl. ¶ 5) that Core's then-CEO Mike Levitt acknowledged to each in April 2022 that Sphere in fact had an enforceable contract with Core (admissions sufficient on their own to defeat summary judgment); (2) the text of Order #2 itself, which plainly contemplated an assignment of rights to Sphere; (3) text messages from Core representatives reflecting Core's contemporaneous approval of a public press release in which Sphere announced the Delegation Agreement (*see* Tassiopoulos Decl., Ex. 2); and (4) a letter from Gryphon CFO Brian Chase in which Gryphon affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit (*see* Trompeter Decl., Ex. 5).

10. In addition, Core's claim that the Court can, on this record, determine that the limitation of liability provisions unambiguously cap its liability at $84,685.94, *see* Motion, ¶ 8, citing MSA, § 5.d, and eliminate the possibility that Core can be liable for various categories of damages, such as consequential damages, Motion, ¶ 9, citing MSA, § 5.c, is without merit for at least three reasons:

11. *First*, Delaware courts and federal courts applying Delaware law generally refuse to decide issues related to the applicability of limitation of liability provisions until after trial. One Delaware court recently surveyed the landscape and observed that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss." *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *5 (Del. Super. Ct.

6

Oct. 27, 2015). That is functionally the case here, where Core seeks an order either disallowing the claims outright by grant of summary judgment, or capping any recovery on such claims, before *any* discovery has been conducted.

12. *Second*, as a matter of public policy, Delaware—like the vast majority of jurisdictions—will not permit a defendant to limit its tort or contractual liability from acts taken intentionally or in bad faith. *See, e.g.*, *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages"). Core cannot limit its liability, for example, for conversion or to the extent its contractual breaches were in bad faith.

13. *Third*, as a matter of contract construction, Core is wrong that Section 5.d of the MSA—which provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2]"—unambiguously means that Core's liability is capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment—i.e.*, $84,658.94 in charges for "Hosting Services," "Replacement Parts" and "Replacement Service" as reflected on its May 2023 invoice (the "May 2023 Invoice"). At the outset, the property Core is holding belongs to Sphere, and should not be subject to a limitation of liability provision. But, regardless, Section 5.d does not reference fees "actually charged," let alone on an arbitrarily selected invoice, as Core contends; rather, the more sensible interpretation of Section 5.d is that any cap is determined by reference to the greatest amount of fees called for in one month by (*i.e.*, payable under) Order #2 as written—a sum in excess of ██ ████████. But even if Section 5.d were interpreted to refer to fees actually charged (an

7

interpretation the Court cannot adopt on this Motion), there would still be an open question of which "fees" paid in which "month" cap liability, as the relevant agreements do not define the terms fees. Core's own documents show that the payments to Core that comprise the Deposit (more than ███████ in a single month) may be considered "fees" for purposes of Section 5.d. By way of illustration, just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—an invoice from April of 2022 (the "April 2022 Invoice")[7] included a charge of $██████ for *Hosting Services*, which included a payment toward the Deposit:

| Terms | | Due Date | | PO # | | Sales Rep | |
|---|---|---|---|---|---|---|---|
| | | 5/22/2023 | | Order 1-2 | | | |

| Quantity | Item | | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|---|
| 1 | **Hosting Services*** <br> April 2023 Actual Usage | | | 0% | $84,083.25 |
| 1 | **Hosting Services*** <br> Reverse April 2023 Estimated Prepayment <br> INV42894 | | | 0% | ($82,174.34) |
| 1 | **Hosting Services*** <br> Estimated June 2023 Usage Prepayment | | | 0% | $82,174.34 |
| 1 | **Replacement Parts** <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Parts | | Dalton, GA | 7% | $456.25 |
| 1 | **Replacement Service** <br> 04/03/2023 to 05/03/2023 - Dalton, GA - Labor | | Dalton, GA | 0% | $87.50 |

| | | |
|---|---|---|
| **Subtotal** | | $84,627.00 |
| **Tax Total (%)** | | $31.94 |
| **Total** | | $84,658.94 |
| **Amount Due** | | $84,658.94 |

*See* Cann Decl., Ex. C (excerpt from the May 2023 Invoice).

---

[7] The April 2022 Invoice is attached to the Kalbfleisch Declaration as Exhibit 1.



*See* Kalbfleisch Decl., Ex. 1 (excerpt from the April 2022 Invoice).

14.     As further confirmation, Core in its Claim Objection characterizes the Deposit payments—including ▇▇▇▇▇▇▇▇▇▇▇—as payments made pursuant to Order #2's "*fee schedule*."  Claim Objection at ¶ 19.

15.     Core provides no principled basis for selecting payments to it in one month over another as the cap in liability—in fact, Core does not even address the issue.  In all events, it is plain that genuine disputes of material fact exist with respect to whether Section 5.d, as a matter contract interpretation, unambiguously caps Core's liability at the charges reflected on an invoice self-servingly selected by Core—$84,658.94—or at a different number.

16.     The Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS

17.     The following statement of facts is presented solely as needed to explain why the Court should deny the Motion and must be construed in the light most favorable to Sphere.

## I.    BACKGROUND ON CRYPTOCURRENCY MINING

18.    Sphere is in the business of what is known in the crypto industry as "mining" for bitcoin.  Mining ensures that the payment network underlying bitcoin functions.  Through mining, mining companies generate new bitcoin for themselves and also earn revenues through transaction fees.  To mine for bitcoin, mining companies use purchased or leased "miners," which are (usually) sophisticated, high-capacity computers that run programs designed to support the network underlying bitcoin.

19.    Mining companies frequently turn to third parties to host their miners.  As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as warehouse space, electricity, security, Internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

## II.    ON BEHALF OF SPHERE, GRYPHON ENTERED INTO ORDER #2 WITH CORE AND ASSIGNED ITS RIGHTS TO SPHERE—WHICH CORE EXPRESSLY ACKNOWLEDGED

### A.    On Behalf Of Sphere, Gryphon Entered Into Order #2, Which As Written Called For Over ▮▮▮▮▮▮▮▮ In Fees For Services In A Single Month

20.    Pursuant to an agreement between third-party Gryphon and Sphere, Gryphon acts as the "exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations" for Sphere.  *See* Trompeter Decl., Ex. 1.

21.    On September 12, 2021, Gryphon and Core entered into the MSA and, on October 5, 2021, into Order #2 to the MSA on Sphere's behalf.  Order #2 sets forth the terms under which Core would host Sphere's miners, including the fees called for by Order #2.

22.    The term "fees" is not defined in the MSA or Order #2.  Order #2 provides that "Client shall pay the fees provided for in this Order" and includes a schedule of payments.  For example, Order #2 provides for "Fees for Service," which "will be determined initially by

reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order)" and is then subject to adjustments in future months depending on "additional charges" and "estimates of power to be utilized." Order #2 further sets forth the hosting rate per KWh at ███████ (decreasing to $████ after 30 months), assumed power consumption per unit at 3.255 KWh, and the miners to be "deployed" at Core by month, with 70,000 miners due to be online in November 2022:

| Client Equipment hosted**: | Deployment Month | Quantity & Type of Unit (the "Units") | Assumed power consumption per Unit (KWh): |
|---|---|---|---|
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| Hosting-Services Rate: | ███████████████████████ | | |

23.     To calculate the Fees for Services called for by the MSA in any given month, one multiplies the number of miners hosted in the month, by the "Assumed power consumption per Unit (KWh)", by the applicable Hosting-Services Rate, by the number of hours in a given month.

24.     As written, beginning in April 2022, ████████████ were due in Fees for Services under Order #2. In December 2022, the Fees for Services called for by MSA as written were ██████████.[8]

---

[8] ████████████████████████████████████████████████████████████

25. Order #2 also references "prepayment(s) for hosting services," with as much as ████████████ due as of October 12, 2021 and ████████████████████ due in ensuing months:



| Payment Due Prior to Installation: | |
|---|---|

*See* Order #2 at 1 (excerpt showing October 2021 payments due).

**B.  Core Explicitly Agreed Gryphon Could "Assign . . . Order #2" To "Sphere"**

26. Core at all points understood that Gryphon was acting as a manager for Sphere. As reflected in Order #2, Core expressly agreed that Gryphon could assign its rights under the MSA and Order #2 to *Sphere* without seeking prior written consent from Core. Specifically, Order #2 provides:

> **Amendment to Section 8.d of the Agreement**. Both [Core] and [Gryphon] agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that [Gryphon] is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent

12

of [Core] as long as Sphere 3D Corp. satisfies [Core's] requirements prior to.[9]

**C.    Gryphon Assigned Rights In Order #2 To Sphere Pursuant To The Delegation Agreement And Core Approved Of Sphere's Press Release Disclosing The Delegation Agreement**

27.    On October 5, 2021, the same date it entered into Order #2, Gryphon entered into the Delegation Agreement with Sphere in which it assigned rights in Order #2 to Sphere. *See* Trompeter Decl., Ex. 4 § 1 (providing that Gryphon "exclusively sub-licenses to Sphere its rights to access and use [Core's] Facility pursuant to Order 2" and "delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2"). At no point in the Motion does Core suggest that it informed Sphere, prior to these bankruptcy proceedings, that Sphere had failed to satisfy any requirements necessary for Gryphon's assignment to Sphere of rights under Order #2. On the contrary, on October 13, 2021, in reference to the Delegation Agreement, Sphere in a Form 6-K publicly filed with the U.S. Securities & Exchange Commission (the "SEC") "announce[d] that it [had] entered into an agreement with [Gryphon] for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by [Core] as hosting partner." *See* Tassiopoulos Decl., Ex. 1. In a text chain involving Gryphon and representatives from Core— including Mr. Cann and SVP Taras Kulyak—Mr. Kulyak signed off on the press release on behalf of Core. *See* Tassiopoulos Decl., Ex. 2.

**D.    In April 2022, Core's Then-CEO Mr. Levitt Acknowledged That Sphere Had A Valid Contract With Core**

28.    On or around April 7, 2022 Ms. Trompeter, Sphere's CEO, had a meeting with Mr. Levitt, Core's then-CEO, at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite

---

[9] Order #2, at 4.

DMS 302733999

requesting Sphere to continue making deposit payments. Trompeter Decl. ¶ 6. During that meeting, Mr. Levitt acknowledged that Sphere and Core were in a contractual relationship. *Id.* Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him. *Id.* Mr. Tassiopoulos, Sphere's former CEO, dialed in for part of that meeting and confirms that Mr. Levitt characterized Sphere as a "customer" of Core, indicated that the parties had a contractual relationship, and stated that the parties should improve their communication. Tassiopoulos Decl. ¶ 5.

### E. Sphere Paid The $35 Million Deposit To Core, Which Gryphon Acknowledged Was Sphere's Property

29.     Through Gryphon, Sphere made all payments to Core that comprised the Deposit, including by paying ███████████ to Core in October 2021. *See* Kalbfleisch Decl. ¶ 2. Gryphon's CFO in a letter conclusively affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit. *See* Trompeter Decl., Ex. 5.

## ARGUMENT

30.     The Court must deny summary judgment when a genuine dispute of material fact exists.[10] *See* Fed. R. Civ. P. 56(a). "The moving party bears the burden of establishing that there are no genuine issues of material fact," *In re Sadler Clinic, PLLC*, Adv. Proc. No. 14-3229, 2016 WL 921983, at *2 (Bankr. S.D. Tex. Mar. 7, 2016), and "always bears the initial responsibility of informing the district court of the basis for its motion," *Young v. Johnson*, No. SA: 19-CV-00270, 2020 WL 4194015, at *1 (W.D. Tex. July 21, 2020). On summary judgment, "[a] court views the facts and evidence in the light most favorable to the non-moving party at all times." *Sadler Clinic*, 2016 WL 921983, at *2. "A court cannot make a credibility determination in light of conflicting

---

[10] Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56 in adversary proceedings. *See In re Sadler Clinic, PLLC*, No. 12-34546, 2016 WL 921983, at *2 (Bankr. S.D. Tex. Mar. 7, 2016).

evidence or competing inferences. If there appears to be some support for disputed allegations, such that 'reasonable minds could differ as to the import of the evidence,' the motion must be denied." *United States v. One Fossilized Tyrannosaurus Bataar Skull*, 365 F. Supp. 3d 759, 763 (N.D. Tex. 2018) (citations omitted).

31. Under Delaware law, which controls the interpretation of the MSA and Order #2, in a contract interpretation case, summary judgment is appropriate "only if the contract in question is unambiguous." *Barton v. Club Ventures Invs. LLC*, No. CV 8865-VCN, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013). Contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). When "two equally reasonable, but conflicting, interpretations" exist, that is an unresolved issue of material fact that "renders summary judgment inappropriate." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012). The moving party must show that its construction of the contract "is the only reasonable interpretation" to be entitled to summary judgment. *Bean v. Fursa Cap. Partners, LP*, C.A. No. 7566-VCP, 2013 WL 755792, at *8 (Del. Ch. Feb. 28, 2013).

## I. CORE SPECIFICALLY INFORMED SPHERE THAT "SPHERE HAD AN ENFORCEABLE CONTRACT" WITH CORE, WHICH PRECLUDES SUMMARY JUDGMENT

32. Genuine disputes of material fact preclude granting Core summary judgment on whether Sphere had rights in the MSA and Order #2. It is undisputed the Sphere Assignment Provision in Order #2 specifically contemplated that Gryphon could assign rights to *Sphere* without the prior written consent of Core, as it provided that Gryphon was "permitted to sub-lease, sub-license, assign, delegate or transfer the [MSA] . . . and Order 2, or any of its rights and obligations hereunder to [*Sphere*] and thereunder without the *prior written consent of [Core]* as

15

long as [Sphere] satisfies [Core's] requirements prior to."  And there can be no reasonable dispute that Gryphon entered into the Delegation Agreement with Sphere and that the Delegation Agreement provided that it assigned rights in Order #2 to Sphere.  *See* Trompeter Decl. Ex. 4.

33.     To argue that the assignment was ineffective, however, Core rests on the phrase "as long as [Sphere] satisfies [Core's] requirements prior to." which Core contends "*unambiguous[ly]*" required Sphere to satisfy no fewer than *six categories of "requirements"*— ranging from "creditworthiness" to "form of assignment"—as well as additional requirements that Core chose not to disclose. Motion, ¶ 25.   To support this extrapolation from the phrase "requirements prior to," Core relies on a paragraph in a single declaration based on the "personal knowledge" of a Core EVP, Mr. Cann.  *See* Cann Decl. ¶ 8.  How Mr. Cann acquired his personal knowledge is not stated and Core submits no documentary evidence—no contemporaneous emails or documents related to the negotiation of the Sphere Assignment Provision, nothing—to support this interpretation.  From there, Core asserts that it is "undisputed . . . that Sphere at no time has satisfied Core's requirements to obtain any rights" under the MSA and Order #2.  Motion, ¶ 25.  The only support for the assertion is two sentences in the declaration of the Mr. Cann based on his "personal knowledge" (again, no elaboration on how he acquired the knowledge) denying that Sphere satisfied Core's many requirements—both those listed and unlisted in his declaration.  *See* Cann Decl. ¶ 8.

34.     The phrase "requirements prior to" is not self-defining; Core's contention that that phrase must be *unambiguously* interpreted to mean that Sphere had to satisfy the six enumerated "requirements" in the Cann Declaration—and any other requirements Core might come forward

with during the course of this proceeding—is without merit. The actual requirements (if any) Sphere had to meet will need to await discovery.

35. But whatever the actual requirements, it is very much disputed that Sphere did not meet them, or that Core actually required that they be met. As set forth in the Trompeter and Tassiopoulos declarations, Coe's CEO acknowledged in April 2022 that the parties had an enforceable contractual relationship. *See* Trompeter Decl. ¶ 6; Tassiopoulos Decl. ¶ 5. These admissions are in-and-of-themselves raise genuine disputes of material fact as to whether the assignment from Gryphon to Sphere was effective, including whether Sphere satisfied Core's "requirements" (whatever those might be) or if Core did not actually require Sphere to meet any such requirements.

36. But there are additional reasons to believe that Core's claim that Sphere did not satisfy its "requirements" is nothing more than pretext.

37. For starters, Core agreed to the Sphere Assignment Provision, which specifically referenced Sphere and indicates that Core understood that Gryphon would be assigning rights in Order #2 to Sphere.

38. Next, Gryphon entered into Order #2 with Core on October 5, 2021, and on the same date assigned rights in Order #2 to Sphere through the Delegation Agreement. A mere eight days later, on October 13, 2021, Sphere announced that it had entered into the Delegation Agreement. Contemporaneous text communications reflect that Core reviewed and specifically signed off on the press release, which was filed publicly with the SEC. And Core in its Motion never claims it ever informed Sphere that it had not met its requirements, including in connection

17

with reviewing the press release. Construed in the light most favorable to Sphere, as required on this Motion, the exchange shows that Core was aware of the assignment and approved of it.

39. Moreover, Gryphon's CFO, Mr. Chase, conclusively affirmed that Sphere "exclusively maintains any and all right and claim to" the Deposit, demonstrating that Gryphon plainly believed it did what was required to assign its rights under Order #2 to Sphere.

40. Consequently, viewing the evidence in the light most favorable to Sphere, disputed issues of material fact preclude summary judgment.[11]

## II. THE LIMITATION OF LIABILITY ISSUES CANNOT BE RESOLVED AGAINST SPHERE ON THIS MOTION

41. Genuine disputes of material fact preclude granting Core summary judgment on the applicability of the limitation of liability provisions in the MSA. At the outset, "[c]ontract clauses which exonerate a party from the consequences of its own actions are disfavored" under Delaware law. *Hampton v. Warren-Wolfe Assocs.*, 2004 WL 838847, at *3 (Del. Super. Ct. Mar. 25, 2004); *accord Gabriels Tech. Sols., Inc. v. PNJP, LLC*, No. 17 CIV. 6410 (AT), 2018 WL 11309883, at

---

[11] The foregoing grounds are sufficient to reject Core's argument that summary judgment may be granted on the assignment issue; Sphere thus need not address every argument Core raised in its Motion. Briefly, however:

*First*, that Sphere was not an express third-party beneficiary in Order #2 is irrelevant; rather, the operative question is whether Gryphon validly assigned rights to Sphere pursuant to the Sphere Assignment Provision.

*Second*, Core argues that Gryphon was not acting as an agent of Sphere during its negotiations with Sphere, but "[t]he existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 452 (S.D.N.Y. 2015). Whether Gryphon held itself out as an agent of Sphere during negotiations, and the ramifications of whether Sphere may sue as a principal on a contract entered its behalf by its agent, is a subject that will be addressed in discovery. Sphere does not presently have sufficient discovery on this issue—which itself presents a ground to deny the Motion, *see* Wolfe Decl. ¶ 4.

*Finally*, Sphere's conversion and equitable claims may be asserted irrespective of whether the parties were in contractual privity, which is not an element of either claim. Indeed, Core continues to hold Sphere's property against its will long after Core purportedly terminated the MSA. Accordingly, there is in all events no basis to grant the Motion in favor of Core.

*4 (S.D.N.Y. Sept. 7, 2018) (applying close scrutiny to limitation of liability clause that limited liability without completely exculpating it).

42.     Core is wrong that Section 5.d limits its total liability to $84,685.94 and that Section 5.c excludes a variety of damages, including lost profits, loss of business, and consequential damages. *See* Motion, at 12–14. On the contrary, these provisions do not limit Core's liability at all as a matter of public policy for the type of misconduct at issue here, namely, intentional acts and acts taken in bad faith. *See* Section III.B, *infra*. Setting aside public policy, Core is also wrong as a matter of contract interpretation that Section 5.d limits its total liability to $84,685.94. *See* Section III.C.

**A.     Courts Generally Refuse To Resolve The Applicability Of Limitation Of Liability Clauses Pre-Trial, Which Provides An Adequate Basis To Reject Core's Request That The Court Grant Core Partial Summary Judgment On The Limitation Of Liability Provisions**

43.     At the outset, as a matter of Delaware law, "[g]enerally, the enforceability of liability limitation provisions should not be decided on the pleadings or on summary judgment." *Data Centers, LLC v. 1743 Holdings LLC*, 2015 WL 9464503, at *5 (Del. Super. Ct. Oct. 27, 2015); *see also Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *2 (Del. Ch. Dec. 31, 2019) ("[I]n recognition of the fact that it is preferable for the court to have a factual record before ruling out available remedies, particularly when issues of public policy may be implicated, Delaware courts have held that 'the enforceability of liability limitations should not be decided on the pleadings or on summary judgment.'" (citation omitted)); *Hampton*, 2004 WL 838847, at *3 (denying motion for summary judgment on limitation of liability where, as here, "[t]he case [was] still in the discovery stages"). "Relying on this principle, multiple federal courts applying Delaware law have declined to enforce limitation of liability provisions on motions to

19

dismiss and motions for summary judgment." *Gabriels Tech. Sols.*, 2018 WL 11309883, at *4 (collecting cases).

44.     In *Data Centers*, the court noted that it had been "unable to locate any case where a Delaware court enforced a purported limitation on damages upon a motion to dismiss." 2015 WL 9464503, at *5. That is functionally the case here, where Core has moved for summary judgment before the parties have taken *any* discovery, and before the agreed-upon extended deadline for Sphere to file its response to the Claim Objection—and, pointedly, summary judgment on the applicability of limitation of liability provisions is typically rejected even after the close of discovery. This Court should follow the well-trodden rule applied by Delaware courts and federal courts applying Delaware law and reject Core's request for partial summary judgment on the limitation of liability provisions out of hand.

**B.      As A Matter Of Public Policy, Core's Liability Cannot Be Limited For Acts Of Intentional Misconduct Or Bad Faith**

45.     Like other jurisdictions, Delaware courts generally permit parties to limit or eliminate liability for acts committed before a contract is entered into, but will not as a matter of public policy permit parties to prospectively limit their liability for intentional acts or acts of bad faith committed after contract execution. *See New Enter. Assocs. 14, L.P. v. Rich*, No, 2022-0406-JTL, 2023 WL 3195927, at *8. 52–54 (Del. Ch. May 2, 2023) (observing that "extant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct" and distinguishing Delaware decisions that have permitted a party entering into a contract to disclaim liability for pre-contract extracontractual fraud through non-reliance provisions); *Data Mgmt. Internationale, Inc. v. Saraga*, No. CIV.A. 05C-05-108, 2007 WL 2142848, at *5 & n.41 (Del. Super. Ct. July 25, 2007) (collecting authority and observing that if the contract "expressed an unambiguous intent to relieve [defendant] of liability for his own

20

intentional torts, it is exceedingly doubtful that such a provision would be enforceable as a matter of public policy"); *James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 38 (Del. Super. Ct. 1983) ("to the extent that paragraph 6 seeks to indemnify [the defendant] against its willful acts, as opposed to its negligence, the agreement is void and unenforceable"); 8 Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort . . . or for a future willful or grossly negligent act is generally held void." (footnotes omitted)).

46.     Sphere asserts in its Proofs of Claim that Core is liable to it based on its intentional acts, including for the tort of conversion, namely, for Core wrongfully seizing Sphere's Deposit and other digital assets generated for the benefit of Sphere.  No limitation of liability can apply to such claims.  *See Saraga*, 2007 WL 2142848, at *5 & n.41 (citing *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 409 N.E.2d 849, 853 (N.Y. 1980) ("Although public policy will in many situations countenance voluntary prior limitations upon that liability which the law would otherwise impose upon one who acts carelessly . . . such prior limitations may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct . . such as a conversion.  Any other rule would encourage wrongdoing by allowing the converter to retain the difference between the value of the converted property and the limited amount of liability. . . . That result would be absurd.").); *accord Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy.").

47.     Sphere also asserts that Core acted in bad faith in performing under the MSA.  In Delaware, where "bad faith" is present, a limitation of liability is ineffective as a matter of public policy with respect to liability sounding in contract; indeed, Delaware courts have rejected the

21

precise relief Core seeks here, holding that it is "premature on summary judgment" to rule that a "limitations of damages clause is enforceable and that it applies to cap damages on claims for breach" of contract claims where "bad faith" is claimed.[12]  *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *24 (Del. Super. Ct. June 23, 2015) (denying summary judgment on "contractual" and "implied covenant" claims with respect to applicability of limitation of liability clause purporting to exclude "lost profits, lost business opportunities, or other indirect, special, incidental, punitive, or consequential damages"); *see also, e.g.*, *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) ("Even if a contract purports to give a general exoneration from 'damages,' it will not protect a party from a claim involving its own . . . bad faith."); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, No. C.A. 89C-DE-34,  1992 WL 207276, at *5 (Del. Super. Ct. Aug. 17, 1992); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 508 (S.D.N.Y. 2005).  As in Delaware, courts in other jurisdiction generally hold that a party cannot limit its liability for a bad faith breach of contract.[13] *See e.g.*, *Vermont Telephone Co., Inc. v. FirstLight Fiber, Inc.*, No. 216-2020-CV-00312, 2022

---

[12] Core has not argued that Sphere failed to adduce facts to support its claims; rather, it has only argued that the contractual language unambiguously limits the damages Sphere can recover regardless of the evidence Sphere can muster.  Given the limited contours of the Motion, and that no discovery has been taken, Sphere does not set forth the evidence that Core acted intentionally or in bad faith, the vast majority of which is in Core's possession.  Suffice to say, Core stealing Sphere's Deposit and digital assets generated for Sphere's account, rejecting the delivery of Spheres' miners so that it can host its own miners, and wrongfully holding onto Sphere's property long after purported contract termination is more than sufficient to support the claims at this stage, in particular given that Core has not moved on those issues.

And, even on this limited record, there is evidence that Core acted in bad faith.  As but one example, although Core now claims that it never used Sphere's miners for its own benefit (*see* Claim Objection at ¶ 24), it at the time conceded that it had and informed Sphere that it had compensated Sphere by "point[ing] extra hash" to Sphere's wallet, which it never did.  *See* Trompeter Decl. ¶ 7.  It was plausibly bad faith for Core to hook up Sphere's miners as its own, generate proceeds for itself, and then inform Sphere that it had in fact provided compensation, which itself was a misrepresentation.

[13] Sphere acknowledges that at least one Delaware court has held, in a post-trial opinion, that public policy will invalidate provisions that purport to limit tort liability, but not contract liability.  *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013).  As described above, *eCommerce* is out of sync with the vast majority of decisional law nationally.  In any event, rather than resolve an issue of potentially disputed law regarding the scope of Delaware public policy, the prudent course for this Court is to rule on the issue, if needed, post-trial with the benefit of a full evidentiary record—*i.e.*, when courts generally assess the applicability of limitation of liability clauses in any event.  *See* Section III,A, *supra*.

WL 19236267, at *6 (N.H. Super. Jan. 14, 2022) ("New Hampshire would adopt the rule the rule [*sic*] that a limitation clause may not be enforceable in instances where the party seeking to enforce it has acted in bad faith" and collecting cases for the proposition that numerous courts across the U.S. have applied this rule to breach claims "for bad faith" in "contract performance"); *Airfreight Exp. Ltd v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 110–11 (Az. Ct. App. 2007) (collecting cases).

48.     Accordingly, summary judgment must be denied to the extent that Core seeks to invoke the MSA to limit its liability for any intentional or bad faith acts.

**C.     As A Matter Of Contract Construction, Core's Potential Liability Is Not Limited To $84,685.94**

49.     Setting aside public policy, as a matter of contract construction, Core seriously misreads Section 5.d to argue that its total liability is unambiguously limited to $84,685.94.  *See* Motion, at 12–13.  Section 5.d provides that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  At the outset, Section 5.d—a provision designed to cap damages—cannot be understood to apply where, as here, a party is seeking the return of its own property, namely, the Deposit, the miners, and the digital assets Core wrongfully generated for its own account.

50.     But, regardless, Core's argument regarding the construction of Section 5.d is unreasonable, namely, that it must be interpreted, unambiguously, to mean that Core's damages are capped at the amount *actually charged* in the "last invoice" submitted *prior to Core's filing a motion for summary judgment*—here, $84,658.94 for Hosting Services (among other things) in the May 2023 Invoice.  *See* Cann. Decl., Ex. C.  It would be easy to imagine a limitation of liability provision that limited liability to the amount actually reflected on a specific invoice—even on the last invoice submitted before filing for summary judgment.

51.     But that is not what Section 5.d provides; it does not cap liability based on amounts actually charged, let alone amounts reflected on an arbitrarily selected invoice.

52.     Rather, Section 5.d by its plain terms instructs that Core's "total liability . . . will not exceed an amount equal to one (1) months' fee payable to [Core] pursuant to [Order #2.]"  The question is not what was actually charged or paid to Core under Order #2, but what is the greatest amount of fees called for in a single month by (*i.e.*, payable under) Order #2 under its terms as written.

53.     Neither Order #2 nor the MSA define the term "fees," which is ambiguous.  Order #2 provides that "Client shall pay the fees provided for in [Order #2]" and further states that "Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate)," subject to certain fee adjustments.  Based on Order #2 as written, that amount is ███████████████ in certain months and constitutes fees for purposes of Section 5.d.  *See* Section II, *supra*.

54.     Moreover, "payment due prior to installation"—*i.e.*, the payments that went toward the Deposit—is listed among the payments called for in Order #2 and may properly be considered fees for purposes of Section 5.d.  In October 2021, Sphere sent Core ██████████████ in Deposit funds, as called for by Order #2.  Tellingly, Core in its Claim Objection characterizes the Deposit payments—including the October 2021 payments—as payments made pursuant to Order #2's "fee schedule."  Claim Objection at 11.  Core's own documents confirm that Core cannot disclaim that "payments due prior to installation" may constitute fees: just as the May 2023 Invoice charged $84,658.94 for (among other things) Hosting Services—which Core contends must be considered fees for purposes of Section 5.d—Core's April 2022 Invoice too charged $██████████ for *Hosting Services*.

24

55.     And even if Core were right, and the amount actually charged in an invoice represented the cap on damages, there would still be no principled basis to select the May 2023 Invoice as the controlling invoice. To the extent prepayments constitute fees, the more natural reading of Section 5.d dictates that the month in which Core received the greatest payment should control—namely, October 2021, when Core received approximately █████████ from Sphere.

56.     Sphere's construction is far more sensible, while Core's construction is unreasonable. Core cannot arbitrarily select an invoice most favorable to it (here, the last invoice before filing for summary judgment) and declare that it provides the cap on its liabilities.

57.     In addition, Core's construction leads to the sort of "absurd" results that Delaware law will not countenance. *See Osborn ex rel. Osorn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."). While Order #2 called for a large deposit payment of █████████ by October 12, 2021, it only provided for 100 miners to be operational in October 2021, which would be expected to generate hosting service fees of █████████ in October 2021.[14] Under Core's interpretation, Core could have taken the deposit payment of █████ █████ and *immediately* defaulted on its obligations, with its liability capped at under █████ That makes no sense.

58.     Sphere has not endeavored to show definitively the amount at which Section 5.d, as a matter of contract construction, caps Core's liability (if at all); that is not its burden. Rather, it is clear that genuine disputes of material fact exist as to whether Core's damages are capped at $84,658.94 (and they are plainly not capped at that number). That suffices at this stage, especially

---

[14] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

where, as here, Core has offered no extrinsic evidence (*e.g.*, from negotiations, course of performance, industry custom, or otherwise) to support its unreasonable construction of Section 5.d.

59.     Accordingly, at the very least, as a matter of contract construction, ambiguities in the contract language preclude granting summary judgment in favor of Core on its claim that Section 5.d caps its damages at $84,658.94.

## III.    AS A MATTER OF PROCEDURE, THE MOTION SHOULD BE SUMMARILY REJECTED BECAUSE SPHERE HAS YET TO TAKE ANY DISCOVERY

60.     Finally, as a matter of procedure, the Court should dismiss the Motion out of hand because discovery has yet to begin.  *Brown v. Miss. Valley State Univ.*, 311 F.3d at 333 ("Summary judgment assumes some discovery."); *see also Ins. Distribution Consulting, LLC*, 2020 WL 5803249, at *3 ("Because granting summary judgment is improper when basic discovery has not been completed, I do not doubt that, even if I thought summary judgment was appropriate at the present time, the Fifth Circuit would reverse that ruling faster than a Nolan Ryan heater."); *Gilbert v. French*, CIV.A. H-06-3986, 2008 WL 2513690, at *5 (S.D. Tex. June 19, 2008) ("Discovery has not meaningfully commenced in this matter and Defendants' summary judgment motion is premature.").

61.     Federal Rule of Civil Procedure 56(d) provides that the Court "may defer considering or deny" a motion for summary judgment, or "allow" for the "tak[ing]" of "discovery," in the event that the "nonmovant shows . . . it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d). "Rule 56(d) is 'usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party.'"  *VDF FutureCeuticals, Inc. v. Freed Foods, Inc.*, No. 1-20-CV-855-LY, 2021 WL 1667129, at *2 (W.D. Tex. Apr. 27, 2021) (quoting *Union City Barge Line, Inc. v. Union*

*Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987)), *report and recommendation adopted*, No. A-20-CV-00855-LY, 2021 WL 4127785 (W.D. Tex. May 19, 2021). In this Circuit, "Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (cleaned up).

62. For the foregoing reasons, Sphere submits that it presented adequate facts to warrant denying the Motion. As set forth in Declaration of Gregory N. Wolfe, however, the truth remains, however, that Sphere is dealing with a major handicap because it has conducted no discovery and did not directly negotiate the relevant agreements with Core. *See* Wolfe Decl. ¶ 4. It has no discovery whatsoever, including into contract negotiations and industry custom, which would help elucidate the relevant contract language. *See id.* Likewise, it has no discovery on the issue of Core's view of Sphere's satisfaction of its purported "requirements"—or even how Core interpreted that provision contemporaneously. *See id.* And it has had no discovery into any of Core's misconduct, as needed to validate its claims that Core acted intentionally and in bad faith. *See id.* In such circumstances, Rule 56(d) provides an independent basis to deny or defer the Motion to give Sphere an opportunity to conduct discovery.

## CONCLUSION

For the reasons set forth above, Sphere respectfully requests that the Court (i) deny the Motion and (ii) grant Sphere such other and further relief as is appropriate under the circumstances.

*[Remainder of page left blank intentionally]*

DMS 302733999

Dated: July 7, 2023

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

Timothy A. ("Tad") Davidson II
TX Bar No. 24012503
Ashley L. Harper
TX Bar No. 24065272
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
E-mail:    taddavidson@HuntonAK.com
           ashleyharper@HuntonAK.com

- and -

Seth H. Lieberman (admitted *pro hac vice*)
Matthew W. Silverman (admitted *pro hac vice*)
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
E-mail:    slieberman@pryorcashman.com
           msilverman@pryorcashman.com

- and -

*Co-Counsel for Sphere 3D Corp.*

Tibor L. Nagy, Jr.
TX Bar No. 24041562
Gregory N. Wolfe (admitted *pro hac vice*)
**DONTZIN NAGY & FLEISSIG LLP**
980 Madison Avenue
New York, New York 10075
Telephone: (212) 717-2900
Email:    tibor@dnfllp.com
       greg@dnfllp.com

## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

28

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.**, *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

## ORDER DENYING DEBTORS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PROOF OF CLAIM NOS. 358 AND 359 <u>FILED BY SPHERE 3D CORP.</u>
[Relates to Docket No. 959, [•]]

Upon consideration of the *Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 959] (the "<u>Motion</u>") and Sphere 3D Corp.'s objection (the "<u>Objection</u>") to the Motion, and upon all of the proceedings had before this Court, it is **HEREBY ORDERED THAT:**

1.     The Debtors' Motion is denied.

2.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: _____

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

# __EXHIBIT 1__

**Fill in this information to identify the case:**

Debtor _____Core Scientific, Inc._____

United States Bankruptcy Court for the District of _____Southern District of Texas_____

Case number _____22-90341_____

## Official Form 410

# Proof of Claim

**04/22**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Sphere 3D Corp. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |

2. **Has this claim been acquired from someone else?**
- ☑ No
- ☐ Yes. From whom? _____

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Sphere 3D Corp.
Patricia Trompeter
4 Greenwich Office Park
Suite 100
Greenwich, CT 06831
United States
**E:** patricia.trompeter@sphere3d.com

Where should payments to the creditor be sent? (if different)

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

4. **Does this claim amend one already filed?**
- ☑ No
- ☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
  MM/DD/YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**
- ☑ No
- ☐ Yes. Who made the earlier filing? _____

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

---

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

---

7. **How much is a claim?** See attached addendum

Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum

---

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

---

10. **Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

---

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Check one: | | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | | _____ |
| | | *Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | Is all or part of the claim pursuant to 11 U.S.C § 503(b)(9)? | ☑ No |
|---|---|---|
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    04/13/2023 at 09:01 am PT
                          MM / DD / YYYY HH : MM

/s/Patricia Trompeter
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Patricia | | Trompeter |
|---|---|---|---|
| | First Name | Middle Name | Last Name |

| Title | CEO |
|---|---|

| Company | Sphere 3D Corp |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer |

| Address | 4 Greenwich Office Park | Suite 100 |
|---|---|---|
| | Number | Street |
| | Greenwich | CT | 6831 |
| | City | State | ZIP Code |

| Contact phone | |
|---|---|

| Email | patricia.trompeter@sphere3d.com |
|---|---|

## ADDENDUM TO PROOF OF CLAIM OF
## SPHERE 3D CORP. AGAINST
## <u>CORE SCIENTIFIC, INC., CASE NO. 22-90341 (DRJ)</u>

1.      Sphere 3D Corp. ("<u>Sphere</u>" or the "<u>Claimant</u>") submits this addendum to its proof of claim (the "<u>Proof of Claim</u>") against Core Scientific, Inc. ("<u>Core</u>" and, together with its debtor affiliates, the "<u>Debtors</u>").  Claimant has its principal place of business at 4 Greenwich Office Park, Suite 100, Greenwich, CT 06831.

### <u>Background</u>

2.      On December 21, 2022 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>").  The bankruptcy cases are being jointly administered under the lead Case No. 22-90341 (DRJ).

3.      On March 9, 2023, the Bankruptcy Court established an April 14, 2023 deadline for creditors to file proofs of claim for claims that arose prior to the Petition Date against the Debtors in these Chapter 11 cases.

### <u>Basis for Claim</u>

**Background on Cryptocurrency Mining**

4.      Sphere is in the business of what is known in the crypto industry as "mining" for Bitcoin.  Through mining, companies generate new Bitcoin for themselves and also earn revenues through transaction fees.  To mine for Bitcoin, mining companies use purchased or leased "miners," which are sophisticated, high-capacity computers that run programs designed to support the network underlying Bitcoin.

5.      Mining companies frequently turn to third parties to host their miners.  As a general matter, hosts will (in exchange for fees) provide hosting services for the miners, such as

warehouse space, electricity, security, internet access, and cooling.  Hosting space is finite and limits the number of miners a host can accommodate.

**Sphere's Claims Arising Under the Hosting Agreements**

6.      Third-party non-debtor Gryphon Digital Mining, Inc. ("Gryphon"), as manager for Sphere, and Core entered into a Master Services Agreement dated September 12, 2021 (the "MSA") and an accompanying order dated October 5, 2021 ("Order #2") pursuant to which Core agreed to provide certain services, including colocation, hosting, and rack space for Sphere's miners.

7.      Under Order #2, Core also expressly agreed that Gryphon could "sub-license, assign, delegate or transfer" any of "its rights . . . to Sphere" under the "[MSA]" or "Order [#]2 . . . without . . . prior written consent."  Gryphon, in fact, assigned its contractual rights under the MSA and Order #2 to Sphere pursuant to a Sub-License and Delegation Agreement dated October 5, 2021 (the "Sub-License Agreement").[1]

8.      In the months that followed, and as called for by Order #2, Sphere delivered to Core $35,104,363 in cash deposits (collectively, the "Deposits") to be applied as "credit against future monthly invoices as they become due."  Core's billing department dealt directly with Sphere regarding the Deposits, and Sphere provided Core with detailed wire information and a letter from its auditors showing that the Deposits originated from Sphere.  Upon information and belief, Core has only drawn down approximately $720,650 through February 2023 in consideration for hosting services, meaning that $34,383,713 remained.

---

[1] The Sub-License Agreement and certain documents supporting the Claim (as defined below) are voluminous, contain proprietary business information, and/or may be subject to certain confidentiality requirements and, therefore, are not included with the Claim.  On information and belief, copies of the Sub-License Agreement and relevant documents are in the possession of the Debtors.  Copies of the relevant documents will be provided upon request and in compliance with any confidentiality orders, agreements, or provisions.

9.      Order #2 included a deployment schedule that, as written, called for incremental deployment of Sphere's miners to Core (e.g., 500 miners deployed at Core by the end of February 2022) and ultimately envisioned Core to host 60,000 of Sphere's miners by the end of November 2022.  To date, however, Core has only hosted 519 of Sphere's miners.

10.      Since executing Order #2, Core has failed to perform under the MSA and Order #2 by failing to abide by the deployment schedule as written, both in terms of timing and the absolute number of miners to be hosted.  By way of illustration:

- In December 2021, 493 miners were supposed to be shipped to Core.  Core, however, could not accommodate any of the miners due to lack of space.

- As written, the deployment schedule stated that Core could accommodate 500 miners as of February 2022.  Although Sphere wished to send Core approximately 500 miners in February 2022, Core could only accept 297 miners at that time.

- On April 8, 2022, Sphere attempted to move 496 miners to Core.  Core responded that it could not accommodate the units "until this summer sometime," as "April and May are tight deployment wise."

- Since May 2022, Core has been unwilling to accept any additional miners from Sphere.

11.      Core's failure to abide by the deployment schedule was a material breach of the MSA and Order #2.  Moreover, since at least May 2022, Core has refused to honor the contractual hosting rate set out in Order #2.  Instead, Core has insisted it will only host additional Sphere miners at a much higher rate than the contract provides.  This insistence constitutes a breach and repudiation of Order #2 and Sphere has suffered additional damages as a result, including increased alternative hosting fees and storage costs.

12.      In addition, Core has breached its contractual obligations by installing and using hundreds of Sphere's miners for its own benefit.  As noted, Core first received 297 of Sphere's miners in February 2022.  Rather than hosting them for the benefit of Sphere, however, Core

3

inexplicably installed them as its own miners and used them to mine for Bitcoin for its own account.

13.     On October 31, 2022, Sphere filed a demand for arbitration against Core asserting claims for repudiation of a contract, breach of contract, breach of implied covenant of good faith and fair dealing (in the alternative), unjust enrichment (in the alternative), conversion, and promissory estoppel.  The arbitration has been stayed since the Petition Date.  The claims and causes of action set forth in the arbitration demand are expressly incorporated herein.

14.     As of the Petition Date, Core was, and remains, indebted to Sphere in an amount not less than $39,541,996.30 (the "Claim").  This Proof of Claim is filed in an unliquidated amount for any damages that are incapable of being calculated at this time including, but not limited to, the value of any Bitcoin that was mined and misappropriated by Core when it installed Sphere's miners as its own.  At a minimum, Sphere has claims against Core for the following amounts:

- Hosting Deposits – $34,383,713.00

- Alternative Hosting Costs – $5,000,724.06

- Storage Fees – $157,559.24

**Reservation of Rights**

15.     Core may be indebted to the Claimant for interest to the extent that such payment of interest is legally enforceable, and the Claimant expressly reserves its rights to seek payment from Core pursuant thereto.

16.     In addition to other amounts stated herein, this Proof of Claim is filed in an unliquidated amount for (1) any and all losses and damages arising from Core's failure to satisfy its obligations to the Claimant including, but not limited to, consequential, expectation, and

4

reliance damages, and (2) any and all fees, including the fees and expenses of the Claimant's counsel and other agents, arising from Core's failure to satisfy its obligations to the Claimant.

17.     The Claimant may have post-petition claims against the Debtors.  The Claimant is not asserting these claims herein, as the sole purpose of this Proof of Claim is to assert its prepetition claims against the Debtors.  By filing this Proof of Claim, the Claimant does not waive any of its post-petition claims against the Debtors and expressly reserves all of its rights in connection with such claims.

18.     No part of the Claim has been paid and no cash or property is held by the Claimant for the Claim.

19.     No judgment has been rendered on the Claim.

20.     To the best of the Claimant's knowledge, the claims set forth herein are not subject to any valid set off or counterclaim by the Debtors.  However, the Claimant expressly reserves and does not waive any setoff or recoupment rights it may possess.

21.     This Claim is a general unsecured claim, except as it may be determined to be subject to setoff or recoupment, or otherwise determined to be an administrative, priority, or secured claim.

22.     The Claimant expressly reserves all rights accruing to it and the filing of this Proof of Claim is not intended to be and shall not be construed as (a) an election of remedy or (b) a waiver or limitation of any rights of the Claimant.

23.     This Proof of Claim is made without prejudice to the filing of additional proofs of claim with respect to any other indebtedness or liability of the Debtors to the Claimant.

24.     Filing of this Proof of Claim is not: (a) a waiver or release of the Claimant's rights against any person, entity, or property; (b) a consent by the Claimant to the jurisdiction of the

Bankruptcy Court with respect to the subject matter of this Claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving the Claimant; or (c) a waiver of the right to move to withdraw the reference or otherwise to challenge the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection or other proceedings commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving the Claimant.

25.     The Claimant expressly reserves the right to amend or supplement this Proof of Claim if the Claimant should deem it necessary and appropriate for any reason including, without limitation, (i) to provide an updated statement of amounts then due, (ii) in the event the MSA is rejected, pursuant to an order of the Bankruptcy Court, or (iii) for any other purpose for which a Proof of Claim filed in this case may be amended.

26.     All notices to the Claimant should be sent to:

> Pryor Cashman LLP
> 7 Times Square
> New York, New York 10036-6569
> Attn:      Seth H. Lieberman, Esq.
>               Matthew W. Silverman, Esq.
> Telephone:  (212) 421-4100
> Facsimile:  (212) 326-0806
>
> -and-
>
> Hunton Andrews Kurth LLP
> 600 Travis Street, Suite 4200
> Houston, Texas 77002
> Attn:      Timothy ("Tad") Davidson II, Esq.
>               Ashley L. Harper, Esq.
> Telephone: (713) 220-4200
> Facsimile:  (713) 220-4285

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § § | **Case No. 22-90341 (DRJ)** |
| **Debtors.**[1] | § § § | **(Jointly Administered)** |

**DECLARATION OF PATRICIA TROMPETER IN SUPPORT OF SPHERE 3D CORP.'S OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT**

I, Patricia Trompeter, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct, based on my personal knowledge:

I. BACKGROUND

1.     I joined Sphere 3D Corp.'s ("Sphere") Board of Directors in April 2021. I have been Sphere's CEO since April 2022.

II. RELEVANT CONTRACTS

2.     Attached as **Exhibit 1** is the Master Services Agreement between Sphere and Gryphon Digital Mining Inc. ("Gryphon") dated August 19, 2021.

3.     On September 12, 2021, Gryphon entered into the Master Services Agreement (the "MSA") with Core Scientific Inc. ("Core"). The MSA is attached to this declaration as **Exhibit 2**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

4.      Gryphon negotiated with Core, on Sphere's behalf, to secure hosting, colocation, and rack space for Sphere's cryptocurrency miners.  On October 5, 2021, Core and Gryphon, acting as Sphere's manager, entered into Order #2, which is attached as **Exhibit 3**.

5.      On October 5, 2021, Gryphon and Sphere entered into the Sub-License And Delegation Agreement, which is attached as **Exhibit 4**.

### III.    CORE'S THEN-CEO MIKE LEVITT AFFIRMED THAT SPHERE AND CORE WERE IN A CONTRACTUAL RELATIONSHIP

6.      On or around April 7, 2022, I had a meeting with Core's then-CEO Mike Levitt at the Setai hotel in Miami, Florida, to discuss the state of affairs between Sphere and Core, including that Core had not accepted Sphere's miners for hosting despite requesting Sphere to continue making deposit payments.  During that meeting, Mr. Levitt acknowledged that Sphere and Core were in a contractual relationship.  Mr. Levitt stated that Sphere was one of Core's largest customers and that the relationship was important to him.

### IV.    CORE ADMITTED THAT IT USED SPHERE'S MINERS FOR ITS OWN BENEFIT AND SAID IT HAD COMPENSATED SPHERE, BUT NEVER DID

7.      In or around April 2022, Core representatives claimed to me that Core had installed approximately 297 of Sphere's miners for Core's own benefit and used those miners to mine bitcoin for Core's own account, which Core claimed was an accident.  Core EVP Russell Cann apologized and informed me that Core had compensated Sphere by "pointing extra hash" from Core's miners to Sphere's wallet "for a couple of weeks," meaning that Core had used its proprietary miners to mine bitcoin for Sphere's benefit.  As it turned out, Core never did.

### V.    SPHERE PAID THE $35.1 MILLION DEPOSIT TO CORE, WHICH GRYPHON ACKNOWLEDGED

8.      On July 27, 2022, Brian Chase, Gryphon's CFO, in a letter, conclusively affirmed that Sphere "is the sole source and beneficiary of the funds paid to Core Scientific Inc." and

"exclusively maintains any and all right and claim to" the deposit payments. This letter is attached as **<u>Exhibit 5</u>** to this declaration.

**Executed on:** July 7, 2023

                */s/ Patricia Trompeter*

                Patricia Trompeter

# EXHIBIT 1

# MASTER SERVICES AGREEMENT

### Binding Term Sheet

*This Binding Term Sheet (the "Binding Term Sheet") constitutes a legally binding commitment to enter into a transaction on the terms described herein. This Binding Term Sheet shall be superseded by a definitive agreement as set forth below, and this Binding Term Sheet constitutes a legally binding and enforceable agreement with respect to the relationship of the parties between the Effective Date until the execution and delivery of the definitive agreement and/or the Term/Termination as further defined below.*

| | |
|---|---|
| **Provider** | Gryphon Digital Mining Inc., a Delaware corporation, located at 5953 Mable Road, Unit 138, Las Vegas, NV 89110 ("Provider"). |
| **Customer** | Sphere 3D Corp., a Canada corporation, located at 895 Don Mills Road, Building 2, Suite 900, Toronto, Canada M3C 1W3 ("Customer"). |
| **Definitive Agreement** | The parties intend to enter into a Master Services Agreement that shall contain all the terms and conditions set forth in this Binding Term Sheet, as well as other terms and conditions customary to such agreements (the "Master Services Agreement") and replace this Binding Term Sheet. Until such Master Services Agreement is entered into, this Binding Term Sheet shall govern the relationship between the parties as described herein with respect to the Services. The term "Agreement" as used herein refers to either the Binding Term Sheet or the Master Services Agreement, as the case may be, whichever is in effect at the relevant time. |
| **Exclusivity** | Provider shall be Customer's exclusive provider of any and all management services for all blockchain and cryptocurrency-related operations including but not limited to services relating to all mining equipment owned, purchased, leased, operated, or otherwise controlled by Customer and/or its subsidiaries and/or affiliates at any location (collectively, the "**Services**") unless the Agreement is terminated by Customer as per Term/Termination below. |
| **Management Fee / Operating Costs** | • As consideration for the Services, Provider shall receive the equivalent of twenty-two- and one-half percent (22.5%) of the Net Operating Profit of all of Customer's blockchain and cryptocurrency-related operations (the "**Management Fee**").<br>• Net Operating Profit shall be defined as the value of digital assets mined using Customer's mining equipment as of 11:59 pm Eastern Time on the date of mining based upon the price of such digital asset quoted on Coinbase minus the cost of electricity and profit-share paid to hosts.<br>• The Management Fee shall be calculated and distributed to Provider subsequent to payment of all operating expenses, including but not limited to all payments to hosts and electricity providers.<br>• The total costs of electricity and any profit-share paid to hosts shall capped at 9 cents ($0.09) per kilowatt hour ($0.09/kwh).<br>• Provider shall assist Customer to source and negotiate the appropriate host to locate the mining equipment. |
| **Term/Termination** | • The initial term of the Agreement shall be three (3) years and shall automatically renew for consecutive one (1) year terms thereafter.<br>• Customer shall be entitled to terminate the Agreement in the event of: (i) Provider's failure to perform the Services in a professional and workmanlike manner in accordance with generally recognized crypto-mining industry standards for similar services, subject to written notice and an opportunity to |

| | |
|---|---|
| | cure, or (ii) Provider's gross negligence, fraud or willful misconduct in connection with performing the Services. |
| | • Provider shall be entitled to specific performance or termination for cause in the event of a breach by Customer, subject to written notice and an opportunity to cure. |
| | • Customer shall be entitled to terminate the agreement on 30 days' notice in the event Provider terminates the Merger Agreement between the parties dated as of June 3, 2021, unless: (i) such termination is pursuant to Section 8.01(f) or 8.01(h) of the Merger Agreement or (ii) Customer waives its right to terminate the agreement in writing within five days of receipt of any notice to terminate the Merger Agreement by Provider |
| | • Customer shall be entitled to terminate the Agreement with 30 day notice, if the Nasdaq Stock Market and/or US Securities and Exchange Commission, ("Regulators") informs Customer that either one or both, will not approve the Nasdaq Listing Application or Merger agreement as applicable, (as defined by the Merger Agreement) solely due to concerns raised by Regulators regarding Provider's business or one or more of Provider's shareholders, officers or directors (the "Provider Regulatory Concerns") and Provider has not cured the Provider Regulatory Concerns to allow for the closing of the Merger agreement within 365 days of the execution of this agreement. Provider shall be entitled to work directly with Regulators to attempt to cure any such concerns related to Provider raised by Regulators. For greater clarity, if, as of the one year anniversary of the execution of this agreement, the Merger has not closed due to unresolved Provider Regulatory Concerns the Customer may terminate this agreement on 30 days' notice. |
| **Commercial Terms** | • Customer shall not in any way, without the prior written consent of Provider, sell, subordinate, encumber or otherwise convey to any third party that is an Affiliate of Customer a security interest in the mining equipment (including but not limited to servers, machines, hashboards, controller boards, case assemblies, fans, and power units) (the "**Mining Equipment**"). "**Affiliate**" shall mean any person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common controller with an issuer, including but not limited to: (1) any beneficial owner or holder of 5% or more of any class of shares of Customer, and (2) any director, officer, employee or independent contractor (or a member of the immediate family of the foregoing) of Customer. |
| | • Except in the case of an emergency or a potential security breach, Customer shall not voluntarily take any Mining Equipment offline without the prior written consent of Provider. |
| | • Provider shall at all times control the digital wallet, which shall be a wallet address selected by Provider on behalf of Customer for storing digital assets (the "**Digital Wallet**"). The digital assets shall be in the denomination of cryptocurrencies, virtual currencies or coins mined by Provider for or on behalf of Customer at any location whatsoever (the "**Digital Assets**"). |
| | • Provider shall pay directly from the Digital Wallet on behalf of Customer all operating costs, inclusive of electricity and any profit share to hosts, such payments to occur prior to calculation and payment of the Management Fee. |
| | • Provider shall at all times select the mining pool and custodian of the Digital Assets. |

| | |
|---|---|
| | • Customer shall provide written instructions to Provider with respect to all decisions to sell or hold Digital Assets.<br>• Customer agrees that the hosts shall at all times be responsible for the installation of the Mining Equipment and the provision of any ancillary items necessary to operate the Mining Equipment.<br>• Provider shall not be responsible for the uptime of the hosting site nor shall Provider be responsible for providing power or electricity to the hosting site. |
| **Mutual Indemnification** | Each party shall indemnify and hold harmless the other party from all losses and damages incurred in connection with its respective acts or omissions in connection with the Agreement. |
| **Limitation of Liability** | The parties expressly exclude all consequential, incidental, indirect, special and punitive damages, and loss of profits. The parties shall only be entitled to seek direct damages. |
| **Survival** | Customer agrees that the Agreement shall survive any bankruptcy of Customer, where permitted by law. |
| **Governing Law / Jury Waiver / Fees** | This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles. All disputes, suits, actions or proceedings relating to this Agreement ("Claims") shall be brought solely in the state or federal courts located in the State of New York. Each party hereby consents to the exclusive jurisdiction and venue of the State of New York in connection with any such dispute, suit, action or proceeding, and waives any defense of *forum non conveniens* in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARTY IN CONNECTION WITH THIS AGREEMENT.<br><br>If any Claim is brought by any party to enforce its rights under this Agreement against any other party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing party regarding such Claim shall be reimbursed by the losing party; provided, that if a party to such Claim prevails in part, and loses in part, the court or other adjudicator presiding over such Claim shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis. |
| **Duty to Disclose** | As this Agreement is exclusive and legally binding in nature, Customer represents and warrants that it shall disclose its existence to existing and prospective creditors, investors, lenders, finance partners, etc. and Customer shall in all circumstances provide notice to Provider of such d<br>isclosure. |

*\*\* Signature Page Follows \*\**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the _19th_ day of August, 2021.

GRYPHON DIGITAL MINING INC

By: _____
Name: Robby Chang
Title: CEO & Director

SPHERE 3D CORP.

By: _____
Name: Peter Tassiopoulos
Title: CEO

4

# EXHIBIT 2

DocuSign Envelope ID: A3E0DB4C-6554-4038-9088-AEC158D5EE93

**MASTER SERVICES AGREEMENT**

This Master Services Agreement ("**Agreement**") effective as of September 12, 2021 ("**Effective Date**") is between CORE SCIENTIFIC, INC. ("**Company**") and GRYPHON DIGITAL MINING, INC. ("**Client**").

**WHEREAS**, Client desires access to locate its Client Equipment (as defined below) at the Company Facility (as defined below) and receive certain Services (as defined below); and

**WHEREAS**, Company desires to provide such Services at its Company Facility.

The parties agree as follows:

**1.      AGREEMENT STRUCTURE**

a.      This Agreement provides general terms applicable to Company's provision of certain services, including, without limitation, colocation, hosting, rack space, security, monitoring, maintenance, utilities, Client Equipment maintenance and repair, facility management, account management, network and data access, technical support, and heat and thermal management services ("**Services**") to Client in a data center owned or operated by Company or its affiliates ("**Company Facility**") in mutually agreed transactions described in mutually executed ordering documents in the form of Exhibit A attached hereto that reference and are governed by this Agreement ("**Orders**").  Each Order will be a separate agreement between Company and Client and will be deemed to incorporate the terms of this Agreement by reference. Company may require Customer to provide evidence of creditworthiness or credit support acceptable to Company in its sole discretion as a condition to accepting any Order.  In the event of any conflict or inconsistency between the terms of this Agreement and the specific terms of an Order, the specific terms of the Order govern with respect to such Order.

**2.      SERVICES AND COMPANY FACILITY**

a.      Company will provide Client the Services at a Company Facility set forth in an Order.  This Agreement is not intended to and does not constitute a lease of any real or personal property or a grant of any other real property interest.    Unless otherwise set forth in an Order, Client Equipment is owned by Client will not be construed as fixtures or fittings or otherwise attached to a Company Facility.  Company retains title to all racking, connectors, fittings, parts and other materials used or provided by Company at a Company Facility to provide Client the Services.  Client acknowledges and agrees that access to a Company Facility may be provided only during Company's ordinary business hours and only upon Company's prior written consent, which shall be subject in all events to the terms of this Agreement and may be withheld, conditioned or delayed in Company's sole discretion. Client will be liable for the actions of all persons accessing Company Facility on its behalf.

b.      Company has the right to review and the sole right to approve any delivery, installation (including, without limitation, the location and position of Client Equipment at the Company Facility), replacement or removal work with respect to Client's computer hardware or other tangible equipment ("**Client Equipment**") at a Company Facility.  Client shall be fully responsible for delivering all Client Equipment to Company at a specified Company Facility on or before the applicable scheduled delivery date, each as specified in an Order.  Client will be responsible for all risk of loss or damage to Client Equipment at all times until such Client Equipment is accepted by Company at a designated Company Facility.

c.      Client Equipment will adhere to Company's specifications, procedures, rules, and regulations, including, without limitation, equipment labeling and tracking and security practices and policies for the Company Facility, all of which are incorporated herein by this reference.  If Company determines in its sole

1

DocuSign Envelope ID: A3E0DB4C-6554-4038-9088-AEC158D5EE92

discretion that Client Equipment or related operating software does not conform to its policies or is not suitable for the provision of Services at the Company Facility, Company may suspend installation of Client Equipment and operating software or commencement of the Services until Company approves of the Client Equipment and operating software. Company has no responsibility or liability for any loss or damage to Client Equipment, including without limitation any damage to Client Equipment, failure to adhere to any manufacturer warranty, the voiding of any manufacturer warranty or loss of or inability to collect under any manufacturer warranty, unless directly caused by the gross negligence, bad faith or willful misconduct of Company.

d.      Client is responsible for costs and expenses regarding the installation, repair, replacement and removal of Client Equipment and tariffs, taxes, shipping costs or other expenses associated with owning, shipping, importing or transporting Client Equipment. Upon any expiration or termination of an applicable Order, Company will provide Client with a written notice, which may be by email (the "**Retrieval Notice**"), of the date when Client Equipment is ready to be removed from Company Facility, which will be at Client's sole expense. Such notice will document the condition of Client Equipment being prepared for shipment, any outstanding amounts owed by Client to Company and Client shall have five (5) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility. Client will hold Company harmless from any damage caused to Client Equipment during such pickup and removal of Client Equipment. The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice will constitute abandonment of Client Equipment under the laws of the jurisdiction where the Client Equipment is located and Company will be entitled to pursue at Client's sole risk and expense all available remedies, including, without limitation, the actions set forth in Section 4(d), as applicable.

e.      In order to continue to provide the Services, from time to time Company may request, and Client shall promptly provide, information regarding Client Equipment, Client's related operating software, Client's systems, and other information reasonably necessary in Company's provision of the Services.

f.      If software and services of a third party are requested by Client in conjunction with the Services ("**Third Party Services**") and identified in an Order, Client acknowledges and agrees that such Third Party Services are the responsibility of the third party, subject to separate terms and conditions between such third party and Client and Company accepts no responsibility for the performance of such Third Party Services or any loss or damage arising from or associated with the provision of such Third Party Services.

## 3.      PAYMENT TERMS AND TAXES

a.      Company will invoice Client monthly in advance for all applicable fees for use of Company Facility and provision of Services as set forth in the applicable Order. Client will pay all invoiced amounts in US dollars within ten (10) calendar days of the date of the invoice. All payments must be (i) in US dollars into an ACH account number as set forth in the applicable Order; or (ii) to another account or form of payment directed by Company. Interest shall be charged on past due amounts at the lesser of (A) one and a half percent (1.5%) per month; or (B) the highest rate permitted by applicable law.

b.      Client may, in good faith, dispute any invoice or any part thereof (a "**Disputed Amount**") by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim. Company will review the Disputed Amount after its receipt of the relevant notice and if Company determines that Client was billed in error, a credit for the amount invoiced incorrectly will be made to the next invoice. If Company determines that the amount was invoiced correctly, Client will pay the amount by the due date of the next invoice. For clarity, Client shall promptly pay all undisputed amounts.

c.      All amounts payable to Company under this Agreement exclude applicable taxes.  Client is responsible for (i) taxes related to its activities and the ownership and operation of Client Equipment; and (ii) taxes imposed, levied or assessed thereon by any governmental or other authorities.  If Client is required to make any deduction, withholding or payment for taxes in any jurisdiction on amounts payable to Company, such amounts will be increased such that after making such deduction, Company receives an amount equal to what it would have received if such deduction, withholding or payment had not been made.

## 4.      TERM, TERMINATION, MODIFICATION AND SUSPENSION

a.      This Agreement commences on the Effective Date and continues until terminated as permitted by this Agreement.  Each Order commences on the effective date set forth in the Order, has the initial term ("**Initial Term**") set forth in the Order, and thereafter automatically renews for the additional periods set forth in the Order, or if no renewal period is set forth then one (1) year periods, (each, a "**Renewal term**" and collectively, the "**Term**") unless Client notifies Company in writing not less than ninety (90) calendar days before such renewal of its desire for the order not to renew.

b.      Either party may terminate an Order upon written notice to the other party and take such other action identified in Section 4 d. below if the other party materially breaches such Order or this Agreement and fails to cure such breach within thirty (30) calendar days (5 days in the case of failure to pay an Unpaid Balance (as defined below) or 2 days in the case of failure to pay an Unpaid Balance two or more times during any twelve month period).  If the breach (other than Client failure to pay amounts when due) cannot be cured within thirty (30) calendar days, the breaching party shall be given a reasonable period of time, but not to exceed sixty (60) calendar days after receipt of the notice, to cure the breach, provided that the breaching party acts promptly and diligently to cure such breach.

c.      Either party may terminate this Agreement upon written notice to the other party if there have been no Orders in effect for twelve (12) consecutive months.

d.      In addition to the remedy set forth in Section 4 b. above if Client fails to pay all invoiced amounts when due (an "**Unpaid Balance**"), or otherwise fails to perform any of its obligations under this Agreement after opportunity to cure as provided in Section 4 b above Company may, in its sole discretion, take certain actions including, without limitation, the following actions, at Client's sole risk and expense:

(i)      suspend the provision of the Services;
(ii)     disconnect Client Equipment and store it;
(iii)    declare all amounts due under the applicable Order through the balance of the Term to be immediately due and payable;
(iv)     operate Client Equipment for cryptocurrency mining and other activities at Company's sole discretion and direct all resulting proceeds to Company's own account until Company has recovered all amounts due, including, without limitation, any reinstatement, disconnection or storage fees or costs;
(v)      terminate this Agreement and all Orders; and
(vi)     exercise all other rights under this Agreement, at law, in equity or otherwise.

Unless Company has terminated this Agreement, Company will reverse the suspension of the provision of the Company Facility and Services and disconnection of Client Equipment as soon as reasonably practical after it is satisfied Client has cured the acts or omissions giving rise to the suspension and disconnection.  In connection with the foregoing, Company may charge a reinstatement fee.  Thereafter, Company may, at its sole discretion, require an advance payment equal to the amount of one billing invoice.

e.      Notwithstanding anything in this Agreement to the contrary, Company may suspend its provision of

all or a portion of the Services and disconnect all of a portion of Client Equipment immediately if Company determines in its sole discretion that: Client's use of the Services or Client Equipment (i) may adversely impact or pose a security risk to Company's operation or maintenance of the Company Facility or Company's other clients; (ii) may subject Company to liability; or (iii) is not in compliance with this Agreement or Company's policies. Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension or disconnection. Company will use commercially reasonable efforts to reverse such suspension or disconnection as soon as reasonably practical after it is satisfied that Client has cured the acts or omissions giving rise to such suspension and disconnection. In connection with the foregoing, Company may charge a reinstatement fee as set forth in the applicable Order. Further, Company may terminate this Agreement and all Orders if such suspension or disconnection continues for at least two (2) calendar days or occurs more than three (3) times in any twelve (12) month period. For clarity, during the period of suspension or disconnection, Client remains responsible for all fees and charges Client incurs during such period. Further, after the Effective Date, if Company determines in its sole and absolute discretion that as a result of any change in, or interpretation, introduction or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations, introduction or administration of the foregoing (a "**Change in Law**"), has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders; and/or (ii) modify the Services as may be necessary to account for such Change in Law. Company will use commercially reasonable efforts to notify Client of such Company actions and the effective date of such actions.

f.        Further, and notwithstanding the Change in Law related costs above, after the Effective Date, if there are any increases, changes in, or introduction or administration of, any new taxes, levies,  tariffs or governmental fees and charges with respect to the provision of  Services, Company may, in its sole and absolute discretion, pass through all such amounts to Client ("**Increased Costs**") and Client shall pay all Increased Costs in accordance with the payment and invoicing procedures as set forth in this Agreement.

g.        Company shall not be liable for any Client loss or damage whatsoever as a result of the exercise of its rights under this Agreement.  Upon termination of this Agreement or an Order by Company, Company is entitled to recover from Client all loss or damages incurred by Company as a result of such termination, outstanding fees,  costs, charges, assessments, reimbursements, and expenses (including, without limitation, costs of collection and reasonable attorneys' fees).

h.        In addition to Section 4(f), the Company may terminate or suspend all or a portion of the Services if necessary to be in compliance with applicable law, rules, regulations, administrative or judicial orders or decree.   Company will use commercially reasonable efforts to notify Client, which may be via email or telephone, of such suspension.  Client agrees that the Company shall have no liability whatsoever to Client for any damage, loss, expense or cost as a result of such termination or suspension.

## 5.        WARRANTIES, LIMITATION OF LIABILITY, INDEMNITY

a.        Each party represents, warrants, and covenants that it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement.  Company represents, warrants, and covenants that it will provide Company Facility and perform the Services in a professional and workmanlike manner.  Client represents, warrants, and covenants (i) Client owns and has good title to Client Equipment, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or has interest in Client Equipment as part of a financing or other arrangement disclosed and approved by Company; (ii) Client Equipment has no defects, is in good condition and is adequate for the purpose it will be used, and is not in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or cost; (iii) Client Equipment has not experienced any failure or outage and has

not been modified in any way from its original manufactured condition; (iv) Client Equipment is in a condition suitable for continued optimal cryptocurrency mining operations, including, without limitation, in the same manner as conducted prior to the Effective Date; (v) Client Equipment has been operated at all times indoors in an appropriate temperature-controlled environment and consistent with the manufacturer's recommended temperatures and operating conditions; (vi) Client Equipment has always been transported and/or handled in a protected manner normally expected when transporting and/or handling sensitive computer hardware; (vii) Client will use the Services only for lawful purposes, and Client will not transmit, retransmit or store material with or in Client Equipment or with or in Company Facility in violation of any federal or state law or regulations or local code, rule, regulation or ordinance; and (viii) Client will comply with applicable laws and regulations in connection with this Agreement. Without limiting the foregoing, Client further represents, warrants, and covenants neither Client, any officer, director, employee, partner, controlling shareholder, affiliated entity nor anyone acting on Client's behalf (A) has used or disclosed or will use or disclose non-public information obtained from Company, (B) has violated or will violate applicable anti-bribery or anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010, (C) has violated or will violate applicable anti-money laundering statutes, or (D) is a Denied Party or subject to any U.S. sanction imposed by the Office of Foreign Assets Control of the U.S. Department of the Treasury.

b.      EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, COMPANY DOES NOT MAKE AND HEREBY DISCLAIMS ALL WARRANTIES      , INCLUDING, WITHOUT LIMITATION, EXPRESS, IMPLIED AND STATUTORY WARRANTIES THAT COMPANY FACILITY OR SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE, AND THE IMPLIED WARRANTIES OF MERCHANTABILITY OR SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF ANY THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS. ALL COMPANY FACILITY AND SERVICES ARE PROVIDED OR PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CLIENT'S USE OF THE COMPANY FACILITY AND SERVICES IS SOLELY AT ITS OWN RISK. CLIENT ACKNOWLEDGES AND AGREES THAT COMPANY DOES NOT AND CANNOT CONTROL THE FLOW OF DATA OR POWER TO OR FROM COMPANY'S NETWORK AND/OR THE INTERNET OR POWER GRID, WHICH ARE PROVIDED OR CONTROLLED BY THIRD PARTIES, AND THAT ACTIONS OR INACTIONS OF THIRD PARTIES CAN IMPAIR OR DISRUPT COMPANY'S CONNECTIONS TO THE INTERNET OR POWER GRID (OR PORTIONS THEREOF) INCLUDING, WITHOUT LIMITATION, INTERRUPTIONS IN SERVICE CAUSED BY GOVERNMENT REGULATIONS OR ORDERS, SYSTEM CAPACITY LIMITATIONS OR LIMITATIONS IMPOSED BY, OR FAILURES OF, AN UNDERLYING COMMUNICATIONS CARRIER. COMPANY WILL ENDEAVOR TO TAKE ACTIONS IT DEEMS APPROPRIATE IN ITS SOLE DISCRETION TO REMEDY AND AVOID SUCH EVENTS. HOWEVER, COMPANY CANNOT AND DOES NOT GUARANTEE THAT SUCH EVENTS WILL NOT OCCUR, AND COMPANY DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS. COMPANY HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACTS OR OMISSIONS BY COMPANY'S OTHER CUSTOMERS AND CLIENTS AND OTHER THIRD PARTIES.

c.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES (EXCEPT THAT CLIENT SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO COMPANY UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CLIENT EQUIPMENT; (V) ANY CONSEQUENTIAL OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

d.      NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT,

DocuSign Envelope ID: A3E0DB4C-6F54-4038-9088-AEC158D5EE92

COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

e.      EXCEPT FOR CLIENT'S BREACH OF ITS OBLIGATIONS UNDER SECTIONS  4, 5 a, 5 h AND 6, AND LOSS OR DAMAGE ARISING OUT OF CLIENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5  d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY.

f.      Client hereby waives the right to bring any claim against Company arising out of or in any way relating to an Order more than one (1) year after the date such Order expires or is terminated.  Each party recognizes and agrees that the warranty disclaimers, limitations of liability and remedy limitations in this Agreement are materially bargained for by the parties.

g.      Client acknowledges that cryptocurrency price movement, cryptocurrency difficulty, and legal and regulatory risks could have a material adverse impact on cryptocurrencies, cryptocurrency mining, Client Equipment, Services, and this Agreement.  Client assumes responsibility for all such risks, and Company disclaims all types of liabilities or loss of funds that may arise as a result.

h.      Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to (i) death, personal injury, bodily injury or property damage caused by Client or Client's customers or clients or Client Equipment; (ii) breach of Client's representations, warranties, or covenants in this Agreement or in an Order or Sections 2 or 6; (iii) fraud, bad faith, negligence or willful or reckless conduct of or by Client or Client's customers or clients; (iv) Client's or Client's customers' or clients' use of the Company Facility, Services, or Client Equipment; (v) any claim whatsoever by Client's customers or clients, or any third party related to the Services or Client Equipment; (vi) any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, or (vii) Client's installation or use of any non-standard software or firmware in connection with the Client Equipment.

## 6.      CONFIDENTIAL INFORMATION

a.      Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary to or confidential to the other party, including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers (collectively, "**Confidential Information**").  Company's Confidential Information also includes the design, address and location of the Company Facilities (which is deemed to be not publicly known), the Services provided, equipment used at the Company Facilities, the configuration of cables, networks and services at the Company Facilities and the terms of this Agreement.  Neither party may use or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to its employees who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.  Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information from use or disclosure in violation of this Agreement, but in no event

less than commercially reasonable measures.

b.     The restrictions on use of Confidential Information do not apply to information if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party. For the avoidance of doubt, the mere placement of materials or equipment containing information at a Company Facility does not constitute disclosure of such information to Company.

c.     Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

d.     Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent may be given in an Order.

e.     Notwithstanding any contrary provisions in this Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to freely incorporate such changes or suggestions into Company's products and services without restriction.

## 7.     INSURANCE

a.     Client agrees to maintain the following insurance, at its expense, during the Term, with insurers having a minimum AM Best rating of A- VII or S&P rating of A: (i) Commercial General Liability or Public Liability Insurance with a limit of US $2,000,000 per occurrence, US $4,000,000 in the aggregate (or the local currency equivalent), provided these limits may be achieved through a combination of primary and excess policies and such insurance will include coverage for bodily injury and property damage.

b.     Client will furnish Company with certificates of insurance upon request that evidence the minimum levels of insurance set forth herein, list Company as an additional insured or interested party on the Commercial General Liability or Public Liability Insurance and designate that Client's insurance is primary and non-contributory. Client will provide at least thirty (30) days' prior written notice to Company of any non-renewal or cancellation of the policies referenced above.

## 8.     MISCELLANEOUS

a.     Notice. Except where expressly provided in this Agreement or an Order, all notices, consents, or approvals required by this Agreement will only be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties at the respective addresses set forth on the first page of this Agreement. Notice is effective when received.

b.     Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly

set out in this Agreement.  This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument.  Except where otherwise expressly provided in this Agreement, this Agreement may be amended only by the written agreement of both parties.

c.      <u>Survival</u>.  Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement will survive any such termination or expiration, including, without limitation, those provisions concerning confidentiality, indemnification and limitation of liability.

d.      <u>Subcontracting and Assignment</u>.  Company may permit any affiliate, independent contractor or other third party to perform any of Company's obligations hereunder provided that Company remains primarily liable for the performance of its obligations.  Company may assign, delegate, or transfer this Agreement or any of its rights and obligations hereunder without notice to or prior written consent of Client.  Client may not assign, delegate or transfer this Agreement or any of its rights and obligations hereunder without the prior written consent of Company.  Any assignment or transfer in violation of this Agreement is void.  This Agreement will be binding upon and inure to the benefit of all permitted successors and assigns.  Nothing in this Agreement is intended to or will confer upon any third party any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement

e.      <u>Force Majeure</u>.  Except for Client's obligation to pay amounts owed under this Agreement, neither party will be responsible or in any way liable to the other party, and neither party will have any termination or other rights, arising out of or relating to a Force Majeure Event.  A "**Force Majeure Event**" is a failure by the other party to perform any of its obligations under this Agreement if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, terrorist act, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health epidemic or any law, order, regulation or other action of any governing authority or agency.

f.      <u>Governing Law and Arbitration</u>.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including, without limitation, the determination of the scope or applicability of this Agreement to arbitrate, shall be determined exclusively by arbitration in King County, Washington before three (3) arbitrators.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures.  Any award, order or judgment pursuant to arbitration ("**Award**") is final and may be entered and enforced in any court of competent jurisdiction, and each party shall submit to any court of competent jurisdiction for purposes of the enforcement of any Award.  The arbitrator may, in the Award, allocate all or part of the costs of the arbitration, including, without limitation, the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party.

g.      <u>General</u>.  The rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have.  The parties are independent contractors, and this Agreement does not establish any relationship of partnership, joint venture, employment, franchise or agency between them.  Neither party may bind the other or incur obligations on the other's behalf without the other's prior written consent.  There are no third-party beneficiaries to this Agreement.  No waiver of any breach of any provision of this Agreement will constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver will be effective unless made in writing and signed by an authorized representative of the waiving party.

*[Signature page follows]*

**Core Scientific, Inc.**

By: _Michael Trzupek_
‾‾‾‾‾4963E00350804A6...‾‾‾‾‾‾‾‾‾‾‾‾

Name: _Michael Trzupek_

Title: Authorized Representative

Date: _9/13/2021_

**Gryphon Digital Mining, Inc.**

By: _Dan Tolhurst_
‾‾‾‾‾7F45D9E28BFE4C7...‾‾‾‾‾‾‾‾‾‾‾‾

Name: _Dan Tolhurst_

Title: _President_

Date: _9/12/2021_

9

## MASTER SERVICES AGREEMENT ORDER #1

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September __, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of August 31, 2021. | | |
|---|---|---|---|
| **Facility:** | Company Facility as determined by Company. | | |
| **Client Equipment hosted**\*\*:** | **Manufacturing Batch Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWH):** |
| | N/A | 100 S19j | 3.203 |
| | | | |
| | | | |
| **Hosting-Services Rate:** | USD $▇ / KWh | | |
| **Payment Due Prior to Installation:** | USD $▇ on or before August 31, 2021 consisting of:<br>• $▇ a six-month prepayment for hosting services to be applied as a credit against future monthly invoices as they become due.<br>• $▇ Equipment Configuration Fee | | |
| **Estimated Delivery Date:** | August 31, 2021. Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. | | |
| **Fees:** | Equipment Configuration Fee: $▇/Unit payable as provided above. | | |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | Equipment disconnection fee: $▇/Unit<br>Storage Fee: $▇/month/Unit<br>Reinstatement fee: $▇/Unit<br>Equipment Recycle fee: $▇/Unit decommissioned or disposed of during the term | | |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the third anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set forth in the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**").

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed

specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include [routine maintenance of Client Equipment Units, power supply, internet connection].

**Limitation of Client Indemnity Obligation**. Client shall not be required to indemnity defend or hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees or any other party or person from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing except if such a change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, would have the effect of increasing any tax obligation imposed on Company related to this Agreement and such tax obligation is not otherwise paid by Client.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose

this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Limitation of Client Damages potentially payable in Force Majeure; Modification of Force Majeure Definition**. Client's obligation to pay amounts owed under this Agreement upon the occurrence of a Force Majeure event shall be limited to any amounts owed that have already accrued at the time of the Force Majeure event and any fees and expenses incurred by Company in de racking, packing and shipping Client equipment as directed by Client. Client and Company agree that any change in change any change in, or interpretation or administration of, any laws, regulations, statutes, treaties, rules, guidelines, ordinances, codes or the like, or any proposed or anticipated changes in, or interpretations or administration of the foregoing, which renders cryptocurrency mining illegal shall be deemed a Force Majeure Event.

**Amendment to Section 5.d of the Agreement**. Both Company and Client Agree that section 5.d of the Agreement is amended so that COMPANY'S TOTAL LIABILITY TO CLIENT IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM) WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) WILL NOT EXCEED AN AMOUNT EQUAL TO THREE (3) MONTHS FEE PAYABLE TO COMPANY PURSUANT TO THE APPLICABLE ORDER.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Provider's determination of power utilized by Client during that month, as well as any adjustments to Provider's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per

month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures.** Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) and shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.
(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and
(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _____
**Gryphon Digital Mining, Inc. "Client"**
Name: Dan Tolhurst
Title: President
Date: 9/12/2021

By: _____
**Core Scientific, Inc., "Company"**
Name: Michael Trzupek
Title: CFO
Date: 9/13/2021

# EXHIBIT 3

## MASTER SERVICES AGREEMENT ORDER #2

This Order, including the terms and conditions hereunder, incorporates by reference the terms of the Master Services Agreement dated as of September 12, 2021 (the "**Agreement**") between Company and Client (as defined below). If any terms of this Order conflict with the terms of the Agreement, the terms of this Order shall govern with respect to this Order. Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Agreement.

| Commencement Date: | As of September 24, 2021 and then the fifteenth of every remaining month beginning with October 15, 2021 until November 15, 2022, respectively. | | |
|---|---|---|---|
| Facility: | Company Facility as determined by Company. | | |
| Client Equipment hosted**: | **Deployment Month** | **Quantity & Type of Unit (the "Units")** | **Assumed power consumption per Unit (KWh):** |
| | OCT 2021 | 100 S19 or equivalent | 3.255 |
| | NOV 2021 | 100 S19 or equivalent | 3.255 |
| | DEC 2021 | 100 S19 or equivalent | 3.255 |
| | JAN 2022 | 100 S19 or equivalent | 3.255 |
| | FEB 2022 | 100 S19 or equivalent | 3.255 |
| | MAR 2022 | 2,500 S19 or equivalent | 3.255 |
| | APR 2022 | 5,000 S19 or equivalent | 3.255 |
| | MAY 2022 | 7,500 S19 or equivalent | 3.255 |
| | JUN 2022 | 10,000 S19 or equivalent | 3.255 |
| | JUL 2022 | 10,000 S19 or equivalent | 3.255 |
| | AUG 2022 | 10,000 S19 or equivalent | 3.255 |
| | SEP 2022 | 10,000 S19 or equivalent | 3.255 |
| | OCT 2022 | 10,000 S19 or equivalent | 3.255 |
| | NOV 2022 | 4,500 S19 or equivalent | 3.255 |
| Hosting-Services Rate: | | | |
| Payment Due Prior to Installation: | | | |





| | |
|---|---|
| **Estimated Delivery Date:** | As of September 24, 2021 and then the fifteenth of every month beginning with October 15, 2021 until November 15, 2022, respectively.<br><br>Client to notify Company as soon as reasonably possible in advance if Units will not be delivered by this date. Company may terminate this Order if substantially all the Units are not delivered within 60 days of the Estimated Delivery Date. |
| **Fees:** | ▓▓▓▓▓▓▓▓▓▓▓ |
| **Fees payable pursuant to Section 4 in connection with Service Termination/ Suspension** | ▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓<br>▓▓▓▓▓▓▓▓▓▓▓▓▓ |

**Order Term.** Subject to acceptance by Company, the term of this Order shall commence on the **Commencement Date** and continue until the fourth anniversary of the Commencement Date (the "**Initial Term**"), unless sooner terminated (i) by Company, as provided above, (ii) by mutual agreement of the parties, or (iii) pursuant to Section 4 of the Agreement. Unless earlier terminated, this Order shall automatically renew for successive 12-month renewal terms ("**Renewal Term**") unless terminated during a renewal term as set

forth in the Agreement.

**Amendment to Section 8.d of the Agreement**. Both Company and Client agree that Section 8.d (Assignment and Subcontracting) of the Agreement is amended so that Client is permitted to sub-lease, sub-license, assign, delegate or transfer the Agreement, Order 1 and Order 2, or any of its rights and obligations hereunder to Sphere 3D Corp. and thereunder without the prior written consent of Company as long as Sphere 3D Corp. satisfies Company requirements prior to.

**Fees**. Client shall pay the fees provided for in this Order. The Fees for Services will be determined initially by reference to the Assumed power consumption per Unit of each deployed Unit, multiplied by the Hosting-Services Rate (each as set forth above in this Order). Subsequent invoices will contain any additional charges incurred by Client and adjustments resulting from any differences between the Fees for Services invoiced in the preceding month and the Fee for Services based on Company's determination of power utilized by Client during that month, as well as any adjustments to Company's estimate of power to be utilized by Client in the upcoming month. Fees for Services for each month shall be paid in advance, in accordance with Section 3 of the Agreement.

**Services.** Company and Client agree that all services to be provided by Company to Client shall be provided in a data center owned or operated by Company or its affiliate which is defined as a company that is wholly owned or jointly owned but operated and managed by the Company ("**Company Facility**"). At least ten percent (10 %) of the computer hardware ("**Equipment**") (hosted in the Company Facility in which Client Equipment is hosted must be Equipment that is owned by Company. If however, there is a single occupancy restriction at a Company Facility for purposes of maintaining a qualifying data center status for sales tax purposes, the Client shall have the option to either waive this requirement or pay the requisite sales tax. In addition, Company covenants that all power provided to Client under this Order 2 shall be one hundred percent (100%) net carbon neutral. In addition, Company intends to achieve 100% net carbon neutral status for its mining operations. The Company will achieve and maintain this status by continuing to increase relationships with power suppliers providing a higher mix of non-carbon emitting energy sources and by purchasing certified green carbon offset certificates using United States Environmental Protection Agency guidelines for calculating carbon emissions.

**Company Disclosures.** Company shall disclose to Client all specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement prior to executing the Agreement and any Order. Company shall not be liable, or assessed any penalty, sanction, installation suspension, or fine for violation of or failure to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which are not disclosed to Client prior to execution of the Agreement and Order. If Client violates or fails to comply with any specifications, procedures, rules, policies and regulations which relate to, are mentioned in, or are integrated in the Agreement which were not disclosed to Client prior to execution of the Agreement and Order, Company agrees to provide Client reasonable time to comply with such undisclosed specifications, procedures, rules, policies and regulations.

**Time to Retrieve Client Equipment:** Upon the presentation of any Retrieval Notice to Client, Client shall have fifteen (15) calendar days from the date set forth in the Retrieval Notice to pay any outstanding amounts owed to Company and remove at Client's sole cost and expense Client Equipment from Company Facility.

**Failure or Delay by Client to Retrieve Client Equipment.** The failure or delay by Client to retrieve Client Equipment on or before the date set forth in the Retrieval Notice shall entitle Company to pursue at Client's sole risk and expense all actions set forth in Section 4(d), as applicable, only, and that any such failure or delay by Client to retrieve Client Equipment shall not impact legal title to said Client

DocuSign Envelope ID: 6149D921-4057-4555-9338-4F27727A8599

Equipment.

**Time to Dispute Amounts Billed by Company:** Client may, in good faith, dispute any Disputed Amount by submitting a written notice of such dispute along with reasonable supporting documentation within seven (7) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim.

**Remedies and Notice for Change in Law.** If a Change in law as defined in the Agreement has resulted in an increase in Company's cost of compliance with such Change in Law then Company may, in its commercially reasonable discretion, take certain actions, including, without limitation, the following actions, at Client's sole risk and expense: (i) terminate this Agreement, any or all Orders only with Client's express agreement to such termination; and/or (ii) modify the Services as may be necessary to account for such Change in Law.

**Notice under Section 4.e.** Company shall notify Client of such Company actions described in 4.e as soon as possible and in no event later than within three (3) calendar days of Company determining that it will take any action contemplated, described or enumerated in Section 4.e.

**Ordinary routine maintenance and repairs.** Ordinary, routine maintenance and repairs are defined to include routine maintenance of Client Equipment Units, power supply, internet connection.

**Exception to Confidential Information provision for agents and contractors**. Either party may disclose Confidential Information its employees, contractors, or agents who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement.

**Exception to Confidential Information provision for regulatory and legal requirements and obligations.** Notwithstanding any contrary provision in this Agreement, Company acknowledges and agrees that Client is or intends to become a U.S. publicly traded company and may be required to disclose this Agreement and Order in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended. Client may therefore disclose any information that is reasonably necessary to comply with any legal or regulatory requirement or obligation.

**Prohibition against including Client Equipment Units in any Security Agreement or collateralized transaction.** Company agrees to not include Client Equipment Units in any mortgage, pledge, lien, charge, security interest, claim or other encumbrance or other instrument granting any third party any rights to the Client Equipment Units, or otherwise to cause or allow the creation of any lien or cloud on title of the Client Equipment Units without the express written consent of Client.

**Performance Information**. Company shall prepare reports of Client performance data related to the Uptime of the Client Equipment Units, and any costs assessed. Such reports including data related to the Uptime of Client Equipment Units and costs assessed shall be created on a daily basis and provided to Client upon Client's request. Such data related to Uptime of the Client Equipment Units shall be reported on a monthly basis to Client Uptime is defined for each calendar month as an expression of the availability of the Client Equipment Units as a percentage equal to (a) the difference between the total number of minutes of Downtime in such month and the total number of minutes in such month, divided by (b) the total number of minutes in such calendar month. Downtime as used herein means, for each calendar month, time that the Client Equipment Units are not available to mine digital assets in accordance with this Agreement, excluding periods of time in which the Client Equipment Units are not available resulting from or relating to: (a) a Force Majeure Event; (b) scheduled maintenance or emergency maintenance, provided that Company shall provide Client with reasonable advanced notice of any such maintenance; (c) downtime resulting from Client's breach of this Agreement; (d) faults or errors in the Client Equipment Units not resulting from Company's breach of this

Agreement; or (e) downtime related to any other forces beyond the reasonable control of Company or its agents or subcontractors and not avoidable by reasonable due diligence. Client may request one audit per month at the Client's own cost (an "Audit") of Company to determine whether all fees and costs charged to Client under this Agreement were calculated in accordance with this Agreement. If that audit reveals that Company has undercharged Client, then Client shall pay the difference between the charged amount and the actual amount to Company. Conversely, if an Audit reveals that Company has overcharged Client, then Company shall pay Client the difference between the charged amount and the actual amount.

**Third Party Code.** Client shall indemnify, defend and hold harmless Company and its affiliates, stockholders, directors, officers, employees, subcontractors and invitees from and against any losses, liabilities, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from or relating to Client's installation or use of any non-standard software or firmware in connection with the Client Equipment. Notwithstanding any contrary provisions in the Agreement, if Client requests or suggests changes to Company's products or services, absent a separate custom development agreement Client grants Company the right to incorporate such changes or suggestions into Company's products and services without restriction.

**Warranty.** Company does not make and hereby disclaims all warranties with respect to the Units. Company shall initiate warranty claims with Unit manufacturer. Company cannot and does not guarantee that warranty claims will be accepted by manufacturer.

**Client Equipment Disclosures**. Client shall disclose to Company (a) whether any Client Equipment Units have been financed or are otherwise subject to any security interest, (b) whether any Client Equipment Units were previously used, and (c) shall confirm that Company has all rights and title necessary to comply with all duties assumed in the Agreement. Provided such disclosures are made by Client and security interest granted to financing entity does not impact Company's rights under this Agreement, Company shall approve the usage of any Client Equipment Units.

Client agrees and confirms that:

(i)     It has clean title to the Client Equipment or has otherwise provided Client Equipment Disclosures regarding the Client Equipment and has not entered into any agreement that would interfere with Provider's exercise of its remedies under section 4.d of the Agreement.

(ii)    Neither Client nor Client's customers will use the Services for any illegal activity; and

(iii)   Neither Client nor its customers are subject to any sanctions imposed by the Office of Foreign Asset control of the U.S. Department of the Treasury.

**Client agrees to replace sold, damaged and other inoperable Units within 60 days to maintain the aggregate number of Units subject to this Order, unless Company has been hired to repair the Unit or Units. Additional equipment may be added to this Order at the Hosted Services Rate provided upon the mutual agreement of Provider and Client.

By: _Rob Chang_
**Gryphon Digital Mining, Inc. "Client"**
Name: _Rob Chang_
Title: _CEO_
Date: _10/5/2021_

By: _Michael Trzupek_
**Core Scientific, Inc., "Company"**
Name: _Michael Trzupek_
Title: _CFO_
Date: _10/5/2021_

# **EXHIBIT 4**

# SUB-LICENSE AND DELEGATION AGREEMENT

This Sub-License and Delegation Agreement (this "**Agreement**"), dated as of _____ ___, 2021, is entered into by and between Gryphon Digital Mining, Inc. ("**Gryphon**") and Sphere 3D Corp. ("**Sphere**"), and relates to that certain Services Agreement, dated as of September 12, 2021 (the "**MSA**"), by and between Core Scientific, Inc. ("**Core**") and Gryphon, and Master Services Agreement Order #2 thereunder ("**Order 2**"), attached hereto as <u>Exhibits A</u> and <u>B</u>, respectively. Capitalized terms used herein without definition shall have the meanings assigned to them in Order #2.

**WHEREAS**, Section 8.d of the MSA, as amended by Order 2, provides that Gryphon is permitted to sub-lease, sub-license, assign, delegate or transfer the MSA and Order 2, or any of its rights and obligations thereunder to Sphere without the prior written consent of Core; and

**WHEREAS**, Gryphon desires to sub-license and delegate certain rights and obligations under Order 2 to Sphere as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Sub-License and Delegation</u>.  Gryphon hereby (i) exclusively sub-licenses to Sphere its rights to access and use the Company Facility pursuant to Order 2 and (ii) delegates to Sphere all of its obligations to make payments to Core pursuant to Order 2.  Sphere hereby accepts such sub-license and delegation in all respects.

2.    <u>Contingent Assignment</u>.  Effective immediately upon the consummation of the Merger (as defined in that certain Agreement and Plan of Merger, dated as of June 3, 2021, by and among Sphere, Sphere GDM Corp. and Gryphon, as amended from time to time (the "**Merger Agreement**")), all of Gryphon's rights and obligations under Order 2 shall be automatically assigned to, and assumed by, the Surviving Corporation (as defined in the Merger Agreement), without any further action required by either such party.

3.    <u>Termination</u>.  This Agreement shall automatically terminate upon the termination of the MSA and/or Order 2 in accordance with their respective terms.  In addition, upon any termination of the Merger Agreement by Sphere, Gryphon shall have the right, in its sole discretion, to terminate this Agreement in its entirety (including the sublicense and delegation described in Section 1) upon not less than one hundred and eighty (180) calendar days' written notice to Sphere.

4.    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware without giving effect to the principles of conflict of laws.

5.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. This Agreement may be executed in two (2) or more counterparts (and the signature pages may be delivered with ink or electronic signature or by e-mail), each will be deemed an original, but all together will constitute one and the same instrument. This Agreement may be amended only by the written agreement of both parties.

*[Signature Page to Sub-License and Delegation Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**GRYPHON DIGITAL MINING, INC.**

By:

Name: Robby Chang

Title: CEO & Director

**SPHERE 3D CORP.**

By:

Name: Peter Tassiopoulos

Title: CEO

309132185.2

DocuSign Envelope ID: 3E2CEA53-3853-4BA5-AC17-E7A12E465DB3

**<u>Exhibit A</u>**

Master Services Agreement

DocuSign Envelope ID: 3E2CEAF5-3953-4BA5-AC17-E7A12E465D93

**Exhibit B**

Master Services Agreement Order #2

# EXHIBIT 5

DocuSign Envelope ID: D43AB595-6BB9-411B-9531-B73DA411E599

VIA EMAIL

Core Scientific, Inc.
210 Barton Springs #300
Austin, Texas 78704
(425) 998-5300

July 27, 2022

Re: Source of Funds and Letter of Direction

To Whom It May Concern,

      We hereby confirm that as of the date hereof, Sphere 3D Corp. ("Sphere 3D") is the sole source and beneficiary of the funds paid to Core Scientific Inc. ("Core") by Gryphon Digital Mining ("Gryphon") under Order #2 on Sphere 3D's behalf, as per the terms of the Sub-license and Delegation Agreement dated as of October 5, 2021, as subsequently amended by Amendment No. 1 to the Sub-License and Delegation Agreement dated as of December 29, 2021.

      As of the date hereof, Sphere 3D has provided a total of $35,104,363 US Dollars, through Gryphon, to Core for prepayment of hosting services on the units contemplated under Order #2 under the Master Services Agreement between Gryphon and Core (the "Prepayment Balance"). We hereby confirm that Sphere 3D solely and exclusively maintains any and all right and claim to Prepayment Balance. Further, we hereby authorize Core to transfer, refund, apply, or otherwise direct the Prepayment Balance in a manner as instructed by Sphere 3D in its sole discretion.

      Notwithstanding the above, by this correspondence Gryphon does not waive or otherwise amend or modify any provision of the MSA or any other agreement between Gryphon and Core unless otherwise expressly noted herein.

Best,

Brian Chase
Chief Financial Officer
Gryphon Digital Mining

Signed   *Brian Chase*
AEE11BFA504949C...

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**DECLARATION OF PETER TASSIOPOULOS IN SUPPORT OF SPHERE 3D CORP.'S**
**OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT**

I, Peter Tassiopoulos, under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct, based on my personal knowledge:

## I. BACKGROUND

1.      Since March 2023, I have served as a consultant to Sphere 3D Corp. ("Sphere").  I previously served as the CEO and President of Sphere.

## II. CORE APPROVED A PUBLIC FILING DESCRIBING THE DELEGATION AGREEMENT

2.      On October 13, 2021, Sphere filed a Form 6-K with the U.S. Securities & Exchange Commission, which is attached to this declaration as **Exhibit 1**.  In reference to the October 5, 2021 Delegation Agreement (the "Delegation Agreement," attached as Ex. 4 to the Declaration of Patricia Trompeter), Sphere's Form 6-K "announce[d] that it [had] entered into an agreement with

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[Gryphon Digital Mining Inc.] for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by [Core Scientific Inc.] as hosting partner."

3.      The day before Sphere filed its Form 6-K, on October 12, 2021, at 2:03 p.m., I received an email from Rob Chang, CEO and Director of Gryphon Digital Mining Inc. ("Gryphon"), with the subject: "Core sign off."  The email is attached to this declaration as **Exhibit 2**.  The email contains a screenshot of messages between Gryphon and Core Scientific Inc. ("Core") employees, including Core SVP Taras Kulyk and EVP Russell Cann.  In response to the discussion about the press release, Mr. Kulyk sent a "cheers" emoji and said: "You're good then[.]"

4.      Based on my review of Exhibit 2 at the time, I understood that Core signed off on the press release describing the Delegation Agreement.

## III.   CORE'S THEN-CEO MIKE LEVITT AFFIRMED THAT SPHERE AND CORE WERE IN A CONTRACTUAL RELATIONSHIP

5.      In or around April 2022, Sphere's CEO Patricia Trompeter had a meeting with Core's then-CEO Mike Levitt in Florida.  I joined part of the meeting by phone.  During that meeting, Mr. Levitt characterized Sphere as Core's "customer" and indicated the parties were in a contractual relationship.  Mr. Levitt also indicated that he would like to increase communications between Sphere and Core.

**Executed on:** July 7, 2023                          _____/s/ Peter Tassiopoulos_____
                                                    Peter Tassiopoulos

2

# <u>EXHIBIT 1</u>

6-K 1 form6k.htm FORM 6-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 6-K

### REPORT OF FOREIGN PRIVATE ISSUER PURSUANT TO RULE 13a-16 OR 15d-16
### UNDER THE SECURITIES EXCHANGE ACT OF 1934

For the month of **October 2021**

Commission File Number: **001-36532**

# SPHERE 3D CORP.

**895 Don Mills Road, Bldg. 2, Suite 900**
**Toronto, Ontario, M3C1W3, Canada**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

Form 20-F ☒        Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1): ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7): ☐

The information contained in this Form 6-K is incorporated by reference into, or as additional exhibits to, as applicable, the registrant's outstanding registration statements.

### SUBMITTED HEREWITH

**Exhibits**

| | |
|---|---|
| 99.1 | News Release dated October 13, 2021 |

### SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SPHERE 3D CORP.**

Date: October 13, 2021

/s/ Peter Tassiopoulos
Name: Peter Tassiopoulos
Title: Chief Executive Officer

EX-99.1 2 exhibit99-1.htm EXHIBIT 99.1

**Exhibit 99.1**



# Sphere 3D and Gryphon Secure Largest Single Hosting Services Deal in Core Scientific's History

228 MW hosting agreement is largest in Core Scientific's history, with an estimated capacity of 71,000 miners

Toronto, Ontario, October 13, 2021 - Sphere 3D Corp. (Nasdaq: ANY) ("Sphere 3D" or the "Company"), a company delivering containerization, virtualization, and data management solutions, is pleased to announce that it has entered into an agreement with Gryphon Digital Mining[1] ("Gryphon") for approximately 230 MW of carbon neutral bitcoin mining hosting capacity to be managed by Core Scientific ("Core") as hosting partner. This hosting agreement is the single largest order in Core's history and represents yet another step forward for Sphere 3D and Gryphon in becoming the world's largest carbon neutral bitcoin miner.

This landmark hosting agreement will provide hosting capacity for up to 71,000[2] state-of-the-art bitcoin mining machines, and furnishes the Company with a world-class partner to host the 60,000 Bitmain S19j Pro miners whose purchase was previously announced by the Company.

The agreement features the installation of digital asset miners at Core Scientific's state-of-the-art, 100% net carbon neutral blockchain data centers over the course of 14 months. As part of the partnership, Core Scientific will provide its industry leading digital mining fleet management and monitoring solution, Minder™, data analytics, alerting, monitoring, and miner management services. Core Scientific's facilities offer 24/7 physical security and technical support operations, with teams available and able to attend to down units and perform repairs around the clock to deliver maximum uptime.

"We recently announced the single largest order in digital mining history through our purchase of 60,000 miners. It only makes sense that we would, through the great work and help of the team at Gryphon, choose the industry leading hosting partner in Core Scientific. Both Sphere 3D and Gryphon are committed to the professionalization of the crypto industry and are excited to work with a blue chip partner like Core Scientific. The commitment to carbon neutrality, industry leading infrastructure, and experience of the Core team were the deciding factors for us as we continue our journey to take the leadership position in crypto mining," said Peter Tassiopoulos, CEO of Sphere 3D.

"Working with and hiring the best is a fundamental philosophy at Gryphon Digital Mining and we could not have found a better hosting partner than Core Scientific. Core has a stellar reputation for being an enterprise-grade hosting services provider and we are excited to work with a similar minded, blue-chip partner. This agreement unlocks the operational capacity for our post-merger company to operate approximately 6.7 exahash of hashing power, which would place us among the top publicly traded bitcoin miners in the world," said Rob Chang, CEO of Gryphon Digital Mining.

[1] As previously announced, the company has entered into an Agreement and Plan of Merger with Gryphon Digital Mining which is anticipated to close in the 4th Quarter of 2021.

[2] Based on the potential deployment of 71,000 S19j Pro Antminers

## About Sphere 3D

Sphere 3D Corp. (NASDAQ: ANY) has a portfolio of brands, including HVE ConneXions, Unified ConneXions and SnapServer®, dedicated to helping customers achieve their IT goals. For more information on Sphere 3D, please visit www.sphere3d.com.

**Investor Contact:**
Kurt Kalbfleisch
+1-858-495-4211
investor.relations@sphere3d.com

## About Gryphon Digital Mining

Gryphon Digital Mining is a Bitcoin mining operation with zero carbon footprint. Gryphon's long-term strategy is to be the leading crypto miner with a 100 percent net carbon-free energy supply. Gryphon provides reliable, low-cost hydro-electric powered mining with plans to expand to other renewables such as nuclear, wind, and solar power to lower mining's impact on the environment. Gryphon Digital Mining has entered into an Agreement and Plan of Merger with Sphere 3D (Nasdaq: ANY) through which Gryphon shareholders are expected to become shareholders of Sphere 3D, and the merged company would continue to trade on Nasdaq, subject to shareholder and regulatory approvals. The merger is expected to be complete in Q4/21.

**Media Contact:**
Elyse Bender-Segall
PR Revolution
(516)901-9095
elyse@prrevolution.com

**Investor Contact:**
Rob Chang
Gryphon Digital Mining
(877) MINE-ESG (877) 646-3374
invest@gryphonmining.com

## Important Additional Information Will be filed with the SEC

In connection with the proposed transaction between Sphere 3D and Gryphon, the parties intend to file a registration statement on Form F-4 (the "Registration Statement"), which will include a preliminary proxy statement of Sphere 3D and a prospectus in connection with the merger. The definitive proxy statement/prospectus and other relevant documents will be mailed to shareholders of Sphere 3D as of a record date to be established for voting on the merger. Stockholders of Sphere 3D and other interested persons are advised to read, when available, the preliminary proxy statement/prospectus, and amendments thereto, the definitive proxy statement/prospectus in connection with Sphere 3D's solicitation of proxies for the special meeting to be held to approve the merger, and other documents filed with the SEC by Sphere 3D and Gryphon, because these documents will contain important information about Sphere 3D, Gryphon, and the merger. Stockholders will also be able to obtain copies of the Registration Statement and the proxy statement/prospectus, without charge, by directing a request to: 895 Don Mills Road, Bldg. 2, Suite 900, Toronto, Ontario, M3C1W3, Canada. These documents, once available, and Sphere 3D's annual and other reports and proxy statements filed with the SEC can also be obtained, without charge, at the SEC's internet site (http://www.sec.gov).

## No Offer or Solicitation

This press release shall not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the proposed merger or an offer to sell, the solicitation of an offer to sell or an offer to buy or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended. This press release is not for release, publication or distribution, in whole or in part, in or into, directly or indirectly, any jurisdiction in which such release, publication or distribution would be unlawful.

## Participants in the Solicitation

Sphere 3D, and its directors, executive officers, other members of management and employees and Gryphon, and its directors, executive officers, other members of management and employees may be deemed to be participants in the solicitation of proxies from the stockholders of Sphere 3D in connection with the proposed merger. A list of the names of those directors and executive officers and a description of their interests in Sphere 3D will be included in the proxy statement/prospectus for the proposed merger and will be available at www.sec.gov free of charge. Additional information regarding the interests of such participants will be contained in the proxy statement/prospectus for the proposed merger when available.

## Forward-Looking Statements

Any statements in this press release that are not statements of historical fact constitute forward- looking statements within the meaning of The Private Securities Litigation Reform Act of 1995, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements include, but are not limited to, statements regarding the proposed merger and other contemplated transactions (including statements relating to satisfaction of the conditions to and consummation of the proposed merger, the expected

ownership of the combined company and the ability of the combined company to raise additional capital to complete its purchase of the Hertford assigned equipment contracts and the Gryphon business and opportunities relating to or resulting from the merger), and statements regarding the nature, potential approval and commercial success of Gryphon and its product line and the miners provided by Hertford, risks related to Gryphon's ability to correctly estimate and manage its operating expenses and its expenses associated with the proposed merger pending closing; the ability of Gryphon to report accurate audited financials, the ability to install and intregrate the miners provided by Hertford, the effects of having shares of capital stock traded on the Nasdaq Capital Market, Gryphon's management team's ability to execute the post- merger operations, Gryphon's and the post-merger combined company's financial resources and cash expenditures. Forward-looking statements are usually identified by the use of words such as "believes," "anticipates," "expects," "intends," "plans," "ideal," "may," "potential," "will," "could" and similar expressions. Actual results may differ materially from those indicated by forward-looking statements as a result of various important factors and risks. These factors, risks and uncertainties include, but are not limited to: risks relating to the completion of the purchase of the miners from Hertford, including to raise additional capital to finance the ongoing operations of the business and the need for stockholder approval in connection with the issuance of Common Shares; risks relating to the completion of the Gryphon merger and consummation of the Hertford equipment purchased and entering into the carbon neutral hosting facility, including the need for stockholder approval and the satisfaction of closing conditions; risks related to Sphere 3D' ability to correctly estimate and manage its operating expenses and its expenses associated with the proposed merger pending closing; the cash balances of the combined company following the closing of the merger; the ability of Sphere 3D to remain listed on the Nasdaq Capital Market; the risk that as a result of adjustments to the exchange ratio, Sphere 3D shareholders, Gryphon stockholders or Hertford stockholder could own more or less of the combined company than is currently anticipated. In addition, the forward-looking statements included in this press release represent Sphere 3D, Gryphon's and Hertford's views as of the date hereof. Sphere 3D, Gryphon and Hertford anticipate that subsequent events and developments will cause their respective views to change. However, while Sphere 3D, Gryphon and Hertford may elect to update these forward-looking statements at some point in the future, Sphere 3D, Gryphon and Hertford specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing Sphere 3D's, Gryphon's or Hertford's views as of any date subsequent to the date hereof.

# **<u>EXHIBIT 2</u>**

**From:** Rob Chang ███████████████

**Sent:** Tuesday, October 12, 2021 2:03 PM

**To:** Peter Tassiopoulos

**Cc:** Dan Tolhurst

**Subject:** Core sign off

**Follow Up Flag:** Follow up

**Flag Status:** Flagged



--
Rob Chang
CEO & Director



GryphonDigitalMining.com
Twitter: @GryphonMining



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al*., | Case No. 22-90341 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF KURT KALBFLEISCH IN SUPPORT OF SPHERE 3D CORP.'S OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT**

I, Kurt Kalbfleisch, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct, based on my personal knowledge:

1. I am Sphere 3D Corp.'s ("Sphere") Senior Vice President and CFO.

2. Sphere, through Gryphon Digital Mining Inc., wired all deposit payments to Core Scientific Inc. ("Core"), a sum of $35,104,363.00, including a payment of ███████ in October 2021.

3. Attached as **Exhibit 1** to this declaration is a Core invoice received on April 4, 2022.

**Executed on:** July 7, 2023　　　　　　　　　　　　*/s/ Kurt Kalbfleisch*
　　　　　　　　　　　　　　　　　　　　　　　　Kurt Kalbfleisch

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

1

# EXHIBIT 1

 CORE SCIENTIFIC



# Invoice
## #INV42043
4/4/2022

**Bill To**
Gryphon Digital Mining, Inc.
5953 Mabel Rd
Unit 138
Las Vegas NV 89110
United States

**Ship To**
Gryphon Digital Mining, Inc.
5953 Mabel Rd
Unit 138
Las Vegas NV 89110
United States



**TOTAL**

$ ███████████

**Due Date: 4/15/2022**

| Terms | Due Date | PO # | Sales Rep |
|---|---|---|---|
| | 4/15/2022 | Order 2 - 10000 Units S19 | |

| Quantity | Item | Tax Location | Tax Rate | Amount |
|---|---|---|---|---|
| 1 | **Hosting Services*** ███████████ | | 0% | $ ███ |

| | | |
|---|---|---|
| **Subtotal** | $ ███ |
| **Tax Total (0%)** | $0.00 |
| **Total** | $ ███ |
| **Amount Due** | $ ███ |

Hosting Services includes Security, Monitoring, Maintenance, Facilities
Management, Account Management, Usage, Network/Data Access,
Technical Support, Rack/Colocation Space, Heat Management/Thermal
Management.

1 of 1

**Thank you for your business and your trust. It is our pleasure to work with you.**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **CORE SCIENTIFIC, INC., *et al.*,** | § § | **Case No. 22-90341 (DRJ)** |
| **Debtors.[1]** | § § § | **(Jointly Administered)** |

## DECLARATION OF GREGORY N. WOLFE IN SUPPORT OF SPHERE 3D CORP.'S OPPOSITION TO DEBTORS' MOTION FOR SUMMARY JUDGMENT

I, Gregory N. Wolfe, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct, based on my personal knowledge:

1.  I am an attorney at Dontzin Nagy & Fleissig LLP and represent Sphere 3D Corp. ("Sphere") in this case. I am fully familiar with the facts concerning this matter. I respectfully submit this declaration in support of Sphere 3D Corp.'s Opposition to Debtors' Motion for Summary Judgment (the "Opposition") pursuant to Federal Rule of Civil Procedure 56(d), which provides that: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

2.  As set forth in the Opposition, Sphere believes that the Debtors' Motion for Summary Judgment (the "Motion") should be denied on its own terms based on the current record.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

In the alternative, the Court should deny or defer resolving the Motion to give Sphere the opportunity to pursue discovery. Indeed, Sphere has not had sufficient opportunity to engage in discovery, which would be reasonably calculated to reveal genuine disputes of material fact sufficient to defeat the Motion.

3.        Sphere has diligently pursued discovery. Before filing the Proofs of Claim, Sphere served requests for production of documents on Core Scientific Inc. ("Core") pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Bankruptcy Rules"), *see Notice of Bankruptcy Rule 2004 Requests for Production of Documents from Core Scientific Inc.* [Docket No. 678] (the "Bankruptcy Rule 2004 RFP"), which Core resisted *in toto*. *See Debtors' Motion to Quash Sphere 3D's Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 711]. Thereafter, Core filed the *Debtors' Objection to Proofs of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* (the "Claim Objection"), and requested that the parties set forth a rational schedule for this contested matter. The parties entered into a stipulation and agreed order entered by this Court on June 6, 2023 (the "Stipulation and Agreed Order," Docket. No. 956), that (i) "deferred and suspended" all discovery "until after a non-evidentiary scheduling conference with the Court to set relevant discovery and litigation deadlines and a trial date"[2]; and (ii) provided for the parties "to confer on a proposed scheduling order for discovery, litigation schedule, and trial date on the Claim Objection to file and present to the Court for consideration at a scheduling conference to be held after Sphere files its response to the Claim Objection."[3] The Motion was filed three days after the Stipulation and Agreed Order was entered, while discovery was stayed and prior to the Court setting a schedule for dispositive motions.

---

[2] Stipulation and Agreed Order, ¶ 4.
[3] *Id.* ¶ 7.

4.      Due the Motion being filed prior to the start of discovery, Sphere finds itself forced to respond under difficult limitations.  These limitations include that: (i) Sphere did not directly negotiate the September 12, 2021 master services agreement (the "MSA") or its accompanying October 5, 2021 order ("Order #2") with Core; (ii) Sphere has been unable to seek any discovery on the relevant contract negotiations or industry custom, which would help elucidate the relevant contract language;  and (iii) Sphere has not been able to take any discovery regarding Core's misconduct, which is needed to validate its claims that Core acted intentionally and in bad faith.

5.      If given the opportunity, Sphere would take the discovery on the following issues relevant to the Motion  (1) what Core's "requirements" were for Gryphon Digital Mining, Inc.'s ("Gryphon") assignment to Sphere, as referenced in Russell Cann's declaration; (2) whether Sphere satisfied those requirements; (3) whether Core did not actually require that Sphere satisfy those requirements; (4) whether Core understood Gryphon and Sphere entered into the Delegation Agreement; (5) what constitutes a fee under the MSA and Order #2; (6) the applicability and calculation of the MSA's limitation of liability; (7) Core's performance under the MSA and Order #2; and (8) whether Core is holding Sphere's property and its motives for doing so.

6.      As set forth in the Opposition, and more specifically in the supporting declarations, Sphere has a plausible basis for believing that such facts are susceptible of collection within a reasonable time frame, probably exist, and, if adduced, would raise genuine issues of material fact that would preclude granting the Motion.

7.      Further, to the extent that Core contends that any of Sphere's evidence supporting its Opposition is inadmissible, Sphere should be permitted to take discovery to authenticate and validate the admissibility of its evidence, which it cannot do currently while discovery is stayed.

8.     I have a good faith basis to believe that the foregoing evidence is within the possession, custody, and control of Core and other third-parties.

9.     Accordingly, the Court should deny the Debtor's Motion, or at the very least defer a ruling until Sphere has the opportunity to take discovery in the ordinary course.

**Executed on:** July 7, 2023                          ___*/s/ Gregory N. Wolfe*_____
                                                                                    Gregory N. Wolfe

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.**, *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**ORDER DENYING DEBTORS' MOTION FOR SUMMARY JUDGMENT WITH
RESPECT TO PROOF OF CLAIM NOS. 358 AND 359 FILED BY SPHERE 3D CORP.**
[Relates to Docket No. 959, [•]]

Upon consideration of the *Debtors' Motion for Summary Judgment with Respect to Proof of Claim Nos. 358 and 359 Filed by Sphere 3D Corp.* [Docket No. 959] (the "Motion") and Sphere 3D Corp.'s objection (the "Objection") to the Motion, and upon all of the proceedings had before this Court, it is **HEREBY ORDERED THAT:**

1.     The Debtors' Motion is denied.

2.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: _____

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.