## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                                        |   |                            |
|----------------------------------------|---|----------------------------|
| **In re:**                             | § | **Chapter 11**             |
|                                        | § |                            |
| **CORE SCIENTIFIC, INC.,** *et al.,*   | § | **Case No. 22-90341 (CML)** |
|                                        | § |                            |
|                                        | § | **(Jointly Administered)** |
| **Debtors.**[1]                        | § |                            |
|                                        | § |                            |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING ASSUMPTION AND PERFORMANCE OF THE LEGACY DALTON AGREEMENTS, AS AMENDED BY THE DALTON SETTLEMENT AGREEMENT AND (II) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 10:00 A.M. (CENTRAL PREVAILING TIME) ON DECEMBER 22, 2023.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **THE DEBTORS REQUEST A HEARING TO BE CONDUCTED ON THIS MATTER NO LATER THAN DECEMBER 22, 2023 AT 10:00 A.M (CENTRAL PREVAILING TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**
>
> **ONCE A HEARING IS SCHEDULED, YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

Core Scientific, Inc. ("**Core Parent**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, with Core Parent,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677);RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

the "**Debtors**"), hereby submit this emergency motion (the "**Motion**") and respectfully represent as follows:

<u>**Preliminary Statement**</u>

1.      The Debtors and Dalton Utilities[2]—a municipal utility—are party to several prepetition agreements[3] relating to the provision of electricity utility services at the Debtors' blockchain infrastructure, hosting, and digital asset mining data center facility located in Dalton, Georgia (the "**Dalton Facility**").  As the largest of the Debtors' six fully-operational data centers by capacity, the Dalton Facility is an important part of the Debtors' business operations and go-forward business plan.  The Dalton Facility requires significant quantities of electricity to operate at an optimal level and Dalton Utilities is the only commercially practicable electricity services provider for the Dalton Facility.

2.      Following months of good faith and arm's length negotiations, the Debtors and Dalton Utilities have entered into the Dalton Settlement Agreement (as defined herein), which, among other things, (i) expressly amends and supersedes the Legacy Dalton Agreements by their entirety to include more favorable economic terms (*i.e.*, reduced rates and certain credits) and (ii) incorporates a global resolution of all disputes between the Parties (the "**Settlement**").  As detailed below, the Dalton Settlement Agreement and the Settlement incorporated therein, among other things:

---

[2] The City of Dalton, Georgia, acting by and through its Board of Water, Light, and Sinking Fund Commissioners d/b/a Dalton Utilities ("**Dalton Utilities**" and, together with the Debtors, the "**Parties**" and, each, a "**Party**").

[3] These prepetition agreements are: (i) *Amended and Restated Electric Service Agreement (Boring Drive Property)*, dated October 11, 2018 (the "**2018 Boring Drive Electric Service Agreement**"); (ii) *Amended and Restated Electric Service Agreement (Industrial South Premises)*, dated October 11, 2018 (the "**2018 Industrial South Electric Service Agreement**"); (iii) *Letter from Dalton Utilities to Core Scientific, Inc.*, dated August 2, 2022 (the "**August 2022 Rate Letter**"); and (iv) *(Demand) Large Industrial and Manufacturing Electric Rates Effective for Service Provided After 11/20/2022* (the "**November 2022 Electric Rate Notice**," and, collectively with the 2018 Boring Drive Electric Service Agreement, the 2018 Industrial South Electric Service Agreement, and the August 2022 Rate Letter, the "**Legacy Dalton Agreements**").

- requires Dalton Utilities to provide electricity services at the Dalton Facility at substantially lower rates, resulting in approximately ████████ in annual costs savings for the Debtors and their estates;

- allows the Debtors to pay the undisputed cure amounts owed to Dalton Utilities in five equal installments over 5 months following the Effective Date depending on the Debtors' date of emergence—rather than payment in full upon assumption at emergence, which will preserve the Debtors' liquidity;

- permits the Debtors to apply the $4.25 million Adequate Assurance Deposit[4] (as defined herein) to (i) all unpaid charges from the last billing cycle under the existing rate, (ii) prepayment of electricity services under the new favorable rate, and (iii) prepayment of the Note; and

- provides for mutual releases.

3.       In exchange for these substantial benefits under the Dalton Settlement Agreement, the Debtors have agreed to, among other things, (i) a prepayment billing structure, whereby the Debtors shall prepay to Dalton Utilities amounts sufficient to fund their estimated electricity consumption during the twelve-day period following the latest billing cycle, (ii) purchase a greater minimum volume of electricity capacity, and (iii) pay interest under the Note at five percent (5%) per annum.  As explained below, the benefits to the Debtors' estates substantially outweigh the costs associated with entering into the Dalton Settlement Agreement.

4.       For these reasons, and as more fully set forth below, assuming the Legacy Dalton Agreements as amended by the Dalton Settlement Agreement, which incorporates the Settlement, is appropriate under the circumstances and reflects a valid exercise of the Debtors' business judgment.

---

[4] The Debtors have also provided Dalton Utilities with an adequate assurance deposit in the amount of $4.25 million held in a segregated account (the "**Adequate Assurance Deposit**"), in accordance with this Court's *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; And (IV) Granting Related Relief* (Docket No. 334) (the "**Utility Order**").

## Relief Requested

5.      Pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), (a) authorizing the assumption and performance of the Legacy Dalton Agreements, as amended and superseded by that certain *Electric Utility Rate Agreement, Bankruptcy Claim Settlement, and Mutual Release* (the "**Dalton Settlement Agreement**"),[5] which is annexed to the Proposed Order as **Exhibit 1**, and (b) granting related relief.[6]

## Jurisdiction

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

7.      On December 21, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Dalton Settlement Agreement.

[6] Although the Debtors have not filed an accompanying declaration with this Motion, to the extent the Motion is contested or the Court otherwise deems it appropriate, the Debtors will file an accompanying declaration(s) and make such parties available for cross examination.

8.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.   On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors.   On March 23, 2023, the U.S. Trustee appointed an official committee of equity security holders.   No trustee or examiner has been appointed in these chapter 11 cases.

## I.      The Parties' Business Relationship

9.      The Debtors are one of the largest blockchain infrastructure, hosting provider, and digital asset mining companies in North America, with fully operational data centers in Texas, Kentucky, North Carolina, North Dakota, and Georgia, including the Dalton Facility. The Debtors provide hosting solutions for third parties, as well as operate their own digital asset mining machines.

10.      Dalton Utilities is a municipal utility and provides electric utility services are provided to the Dalton Facility pursuant to the rates, terms and conditions set forth in the Legacy Dalton Agreements.   Among other things, the Legacy Dalton Agreements require Dalton Utilities to provide electricity (up to a certain capacity) to power the Dalton Facility (provided that the Debtors are not in default of their obligations thereunder) at a base rate of $▮▮ per kilowatt-hour (the "**2022 Base Rate**") plus a fuel cost adjustment calculated by Dalton Utilities and published on a monthly basis.

11.      In connection with its utility services to the Dalton Facility prior to the Petition Date, Dalton Utilities has asserted against the Debtors proofs of claim numbers 397 and 398 in the aggregate amount of $9,092,339.54, which are comprised of (i) a $4,091,580.30 priority claim pursuant to Bankruptcy Code section 503(b)(9) (the "**Dalton Priority Claim**") and (ii) a $5,000,759.24 unsecured claim (together with the Dalton Priority Claim and any such other

post-petition claims that may have accrued up through the Settlement Effective Date[7], the "**Dalton Cure Claims**").

## II.    The Dalton Settlement Agreement and the Settlement

12.    After engaging in extensive good faith and arm's length negotiations that extended for many months throughout the Debtors' chapter 11 cases, the Debtors and Dalton Utilities executed the Dalton Settlement Agreement on December 5, 2023, subject to this Court's approval.  The Dalton Settlement Agreement, which amends and supersedes the Legacy Dalton Agreements by their entirety, ensures that Dalton Utilities will provide the Debtors with electricity to power the Dalton Facility under a substantially reduced pricing structure that will remain in effect through December 31, 2024.  The Dalton Settlement Agreement also resolves all issues and claims between the Debtors and Dalton Utilities pursuant to the Settlement incorporated therein, including, but not limited to, by allowing the Debtors to pay the Dalton Cure Claims over the course over an approximately four-month period (depending on the timing of the Debtors' emergence from chapter 11).  For the avoidance of doubt, pursuant to the Dalton Settlement Agreement, Dalton Utilities has agreed to compromise and settle the Dalton Cure Claims and release all other claims[8] against the Debtors arising on or before the entry of the Settlement Effective Date (as defined in the Dalton Settlement Agreement).

---

[7] As defined in the Dalton Settlement Agreement.

[8] For the purposes of the Settlement and as used herein, "claims" has the meaning set forth in section 101(5) of the Bankruptcy Code.  11 U.S.C. § 101(5) (defining "claim").

13.     The principal terms of the Dalton Settlement Agreement are set forth below:[9]

| Term | Description |
|---|---|
| Mutual Release of Claims | Immediately upon entry of the Proposed Order:<br><br>(i)  the Dalton Cure Claims shall be deemed fully satisfied and released, consistent with and subject to the terms of the Dalton Settlement Agreement; and<br><br>(ii)  the Parties shall each grant a complete and final release of all claims against each and covenant not to sue, in each case, in favor of the other Party; *provided*, however, that nothing herein shall be deemed to release any Party of its obligations under the Dalton Settlement Agreement and the Settlement contemplated herein, all of which expressly shall remain in full force and effect. |
| The Note | Within one (1) business day of the entry of the Proposed Order, the Debtors shall have delivered to Dalton a fully executed promissory note in the principal amount of the Dalton Cure Claims (the "**Note**"), which has been duly executed by an authorized signatory of the Debtors and which shall not be subject to any conditions regarding enforceability, in full and final satisfaction of the Dalton Cure Claims.<br><br>The Note shall bear interest at the rate of 5% per annum and shall be payable in equal monthly installments until paid in full, including all accrued interest and any fees; the first installment payment date shall occur, and interest shall begin accruing on the Note, on the date that is ten (10) calendar days following the effective date of the Debtors' Plan (the "**Emergence Date**"), and the last installment payment date shall occur in May of 2024.   For example, if the Emergence Date is December 22, 2023, the initial payment date will be January 1, 2024, and each subsequent monthly payment date will be as follows: (i) February 1, 2024, (ii) March 1, 2024, (iii) April 1, 2024; and (iv) May 1, 2024.<br><br>The Debtors shall have the right, exercisable at any time and from time to time, to voluntarily prepay the Note in whole or in part, without any penalty or fee. Any prepayment of the Note shall be immediately applied toward principal, be applied in inverse order of maturity and |

---

[9]  In the event of any inconsistency between the summary set forth herein and the Dalton Settlement Agreement, the Dalton Settlement Agreement shall govern.

| | |
|---|---|
| | shall not extend or postpone the due dates of the monthly installments due under the Note. |
| Dalton Agreements | Upon entry of the Proposed Order, the Debtors shall assume the Legacy Dalton Agreements, as expressly amended and superseded by the Dalton Settlement Agreement, and the Dalton Settlement Agreement shall govern the purchase and sale of electricity and electricity related services. |
| Prepay Billing Structure and Payment | During the term (the "**Term**") of the Dalton Settlement Agreement, billing shall occur in advance on a weekly basis. Beginning on the first Tuesday following the Settlement Effective Date and on each Tuesday during the Term, Dalton Utilities shall submit to the Debtors a bill (each such bill, an "**Invoice**") that includes the following two parts:<br><br>(i)   A true up amount (the "**True Up Amount**") which shall either be payable by the Debtors or shall be credited to the Debtors' Prepayment Account (as defined below), as applicable. The True Up Amount shall represent the difference between actual and estimated consumption during the most recent Monday through Sunday ("**Billing Period**") prior to the Invoice date.<br><br>(ii)   A prepayment amount (the "**Prepayment Amount**") payable by the Debtors. The Prepayment Amount shall be in an amount sufficient to fund the Debtors' estimated electric consumption during the first 12 calendar days following the most recently completed Billing Period.<br><br>For the avoidance of doubt, each Billing Period shall begin on a Monday and end on a Sunday.  Payment of each Invoice (to be delivered on each Tuesday) is intended to fund electric consumption to and through the 12th day after the most recently completed Billing Period, or in calendar days, through the second Friday after the date of the applicable Invoice.<br><br>The Debtors shall establish on or before the Settlement Effective Date a prepayment account (the "**Prepayment Account**") into which they shall remit payment for each weekly Invoice.  The Prepayment Account shall be initially funded by the Debtors on the Settlement Effective Date in an amount sufficient to fund electric service for the period beginning on the Settlement Effective Date and ending on the twelfth (12th) day after the first Tuesday following the Settlement Effective Date, calculated based on the Debtors' average daily consumption during the billing for the previous two (2) weeks (the "**Initial Funding**"). |

| | |
|---|---|
| Revised Pricing Structure | For the period beginning on December 5, 2023 and ending on December 31, 2024, Dalton shall provide the Debtors with electricity pursuant to the revised pricing structure set forth in subsections (i)-(iii) below.<br><br>Dalton Utilities shall issue to the Debtors a credit for any difference in electric rates actually paid by the Debtors and the revised pricing structure contemplated herein for the period between December 5, 2023 and the Settlement Effective Date, with such credit being issued by Dalton Utilities within one billing cycle.<br><br>(i) <u>Base Rate</u>. Dalton Utilities shall provide the Debtors with electricity at a base rate of $▮▮▮ per kilowatt-hour (the "**Base Rate**"), subject to the adjustments for the Interruptible Credit (defined below) and Fuel Cost Adjustment (defined below) described in clauses (ii)-(iii), below.<br><br>(ii) <u>Interruptible Credit</u>. The Debtors shall receive a monthly interruptible credit (the "**Interruptible Credit**"), calculated as set forth on <u>Exhibit A</u> to the Dalton Settlement Agreement, beginning in the first calendar month immediately following the occurrence of the Settlement Effective Date.<br><br>(iii) <u>Fuel Cost Adjustment</u>. The Debtors shall pay to Dalton Utilities a fuel cost adjustment (the "**Fuel Cost Adjustment**"), calculated by Dalton Utilities and published on a monthly basis. The Fuel Cost Adjustment shall be calculated as follows and billed to the Debtors:<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>▮▮▮▮▮▮▮▮▮ |
| Minimum Volume Requirement | The Debtors shall, from the Settlement Effective Date until December 31, 2024, guarantee a minimum purchase of electricity (the "**Minimum Volume Requirement**") for any calendar month, calculated as follows: ▮▮▮▮▮▮▮▮▮▮ *provided however*:<br><br>    (i) if the actual electricity price billed to and payable by the Debtors (calculated as the Base Rate plus the Fuel Cost Adjustment minus the Interruptible Credit) rises above $▮▮▮ per kilowatt-hour; |

9

(ii) if the bitcoin hashprice[10] (expected value of 1 TH/s of hashing power per day, denoted in USD) goes below ███████ USD/TH/day;

(iii) if the Debtors are experiencing a planned outage that has been coordinated at least 24 hours in advance between the Debtors and Dalton Utilities and to which Dalton Utilities has expressly agreed in writing may reduce the Minimum Volume Requirement; *provided however*, that notwithstanding Dalton's consent to a planned outage, this subsection (iii) shall not apply and the Debtors shall not be relieved of the Minimum Volume Requirement if the planned outage has the effect of causing the Debtors' actual electrical usage to fall below the Minimum Volume Requirement for any billing cycle;

(iv) if Dalton Utilities is completely or partially unable to provide the Debtors with electric service that results in an event or condition that prevents the debtor's Dalton facilities from operating ████████████████████ ████████████████████████ (a "**Material Adverse Effect**") on the Debtors' operations;

(v) if a Force Majeure Event (defined on Exhibit B to the Dalton Settlement Agreement) occurs; or

(vi) if the Debtors or Dalton Utilities experience electrical equipment failure that results in a Material Adverse Effect on the Debtors' operations,

then, in each case the Minimum Volume Requirement shall be waived with respect to the associated Billing Period; *provided however*, that if Debtors fail to meet the Minimum Volume Requirement and none of the above-enumerated exceptions apply, the Debtors shall pay to Dalton Utilities the difference of the Minimum Volume Requirement and the actual usage (the "**Shortage Charge**").  The Shortage Charge shall equal the (Minimum Volume Requirement (kWh) minus the Actual Monthly Volume (kWh)) multiplied by the base rate of ███ cents per kilowatt hour (no taxes should be included in this amount).  Dalton Utilities shall invoice the Debtors for the Shortage Charge in a miscellaneous invoice to the Debtors for the subsequent billing cycle,

---

[10] Bitcoin hashprice refers to the expected value of 1 TH/s of hashing power per day, denoted in USD.  The metric quantifies how much a miner can expect to earn from a specific quantity of hashrate per day.  Luxor publishes a public index of bitcoin hashprice found at the following link: https://data hashrateindex.com/chart/bitcoin-hashprice-index.

| | and the Shortage Charge shall be paid within seven (7) calendar days of the date of such miscellaneous invoice. |
|---|---|
| Adequate Assurance Deposit | Upon entry of the Proposed Order, the Adequate Assurance Deposit shall be applied as follows: <br><br> (i)   first, in satisfaction of all unpaid charges, fees, and costs incurred by the Debtors in the last billing cycle immediately preceding the Settlement Effective Date; <br><br> (ii)  second, to satisfying the Initial Funding amount into the Prepayment Account; <br><br> (iii) third, to the extent of any excess funds after satisfaction of (i) and (ii) above, payment to Dalton Utilities of such excess funds to reduce the principal balance of the Note. |
| Debtors' Plan | Dalton Utilities will agree to vote to accept the Debtors' Plan[11] or otherwise support the Plan, provided the Plan allows for the implementation of the Dalton Settlement Agreement. |

## Relief Requested Should Be Granted

I.    **The Debtors' Assumption of the Legacy Dalton Agreements, As Amended by the Dalton Settlement Agreement, Is a Reasonable Exercise of Debtors' Sound Business Judgment**

14.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521(1984) (noting that section 365(a) "by its terms includes all executory contracts except those expressly exempted"); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co*., 83 F.3d 735, 741 (5th Cir. 1996) ("Although the Code does not define 'executory contract,' generally an agreement is considered executory 'if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the

---

[11] The *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* (Docket No. 1438) (the "**Plan**").

performance of the other party.'" (quoting *In re Murexco Petorleum, Inc.*, 15 F. 3d 60, 62 (5th Cir. 994))). This allows the debtor in possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504–05 (5th Cir. 2000).

15.     The standard applied to determine whether the assumption of an executory contract or unexpired lease should be authorized is the "business judgment" standard.  *See, e.g.*, *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).  The business judgment standard requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate.  *See In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (holding that the business judgment standard "requires a showing that the proposed course of action will be advantageous to the estate"); *In re Wolflin Oil, L.L.C.*, 318 B.R. 392, 396 (Bankr. N.D. Tex. 2004) ("[T]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services." (quoting *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 438 (5th Cir. 2002))).

16.     Here, the Debtors submit that the assumption of the Legacy Dalton Agreements, as amended by the Dalton Settlement Agreement, is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates.  The Debtors require the electricity provided by Dalton Utilities to operate the Dalton Facility, the Debtors' largest fully operational facility measured by capacity.  Operation of the Dalton Facility is critical to the Debtors' ability to meet the revenue goals contemplated by their business plan and Dalton Utilities is the only commercially practicable electricity services provider for the Dalton Facility. Additionally, the Dalton Settlement Agreement allows the Debtors to satisfy all cure amounts owed to the Dalton Utilities over a 5 month period pursuant to the Note (rather than paying the full

cure amounts on the Effective Date), which preserves substantial liquidity for the Reorganized Debtors.  Accordingly, the Debtors submit that assumption of the Legacy Dalton Agreements, as amended by the Dalton Settlement Agreement, represents a reasonable exercise of their sound business judgment and respectfully request that the Court approve such assumption.

## II.     The Debtors' Entry into the Dalton Settlement Agreement Is a Reasonable Exercise of Debtors' Sound Business Judgment

17.     Although entry into electricity service agreements generally falls within the Debtors' ordinary course of business, out of an abundance of caution and in satisfaction of a condition to the effectiveness of such agreement, the Debtors seek this Court's authority under section 363(b) of the Bankruptcy Code to enter into the Dalton Settlement Agreement.

18.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that debtors "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A court may authorize a debtor to use estate property upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").  Once a debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

19.     Thus, if a debtor's actions satisfy the business judgment test, then the transaction in question should be approved under section 363(b) of the Bankruptcy Code.  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See id.* at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

20.     Entry into the Dalton Settlement Agreement enables the Debtors to operate the Dalton Facility with a reliable source of electricity under a reduced rate structure.  In light of the significant amount of electricity utilized at the Dalton Facility, the Base Rate, all else equal, will result in savings of approximately ███████ per year, which represents a considerable cost saving and margin improvement compared to the 2022 Base Rate.  In addition, under the Dalton Settlement Agreement, the Debtors will be able to apply the Adequate Assurance Deposit to (i) all unpaid charges from the last billing cycle under the 2022 Base Rate before the Settlement Effective Date; (ii) the Initial Funding amount into the Prepayment Account under the New Rate; and (iii) prepay the Note.  This substantially reduces cash costs and preserves liquidity for the Debtors and Reorganized Debtors (following emergence).  Accordingly, the Debtors submit that entry into the Dalton Settlement Agreement represents a reasonable exercise of their sound business judgment and respectfully request that the Court authorize entry into such agreement.

**III.    The Settlement Is Fair, Reasonable, and in the Best Interest of the Debtors' Estates**

21.    Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate.  *See Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin.,Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, approval of a compromise is within the discretion of the bankruptcy court.  *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity*, 624 F.2d at 602–03 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968)).

22.    The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts analyze proposed settlements*. Id.*  The factors courts consider are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin.*, 801 F.3d at 540 (internal citations omitted).

23.    Under the rubric of the third factor, the Fifth Circuit has specified two additional factors that bear on a decision to approve a proposed settlement.  First, the Court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917

(5th Cir. 1995). Second, the Court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Refin.*, 801 F.3d at 540; *Foster Mortg.*, 68 F.3d at 918 (citations omitted).

24.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Rather, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

25.     The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the Settlement. *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high;" rather, the Debtors "need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'" *In re Allied Properties, LLC*, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

26.     First, the Settlement resolves the Dalton Cure Claims and all other claims that may be asserted and provides for the exchange of mutual releases. Entering into the Settlement will avoid the need for potentially costly and distracting litigation associated with determining such amounts. Instead, the Dalton Cure Claims will be satisfied pursuant to the Note, which will be paid in several monthly installments. This avoids a large lump sum cash payment that the Debtors would otherwise have to make on the Effective Date in satisfaction of the Dalton Cure Claims. Further, the mutual release contemplated by the Settlement will provide the Debtors and Dalton Utilities with a clean slate and facilitate a successful go forward business relationship.

16

27.     Second, the Settlement is an integral part of the Dalton Settlement Agreement.  As explained above, the Dalton Settlement Agreement is in the best interests of the Debtors and their estates by providing the Debtors with the needed electricity for the Dalton Facility on substantially more favorable terms, and the Debtors would not be able to reach such agreement without the Settlement.

28.     Lastly, the Settlement was extensively negotiated at arm's length and in good faith over the course of several months.  Accordingly, the Debtors respectfully submit that the Settlement is fair, reasonable and in the best interest of their estates, creditors, and other stakeholders, and the Court should approve the Settlement.

## Reservation of Rights

29.     Except as expressly provided for herein with respect to the Dalton Cure Claims, the Legacy Dalton Agreements, and the Dalton Settlement Agreement, nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (iii) an approval of an assumption or rejection of any lease, sublease, or contract pursuant to section 365 of the Bankruptcy Code.

## Waiver of Bankruptcy Rule 6004(h)

30.     To implement the foregoing successfully, the Debtors respectfully request that the Court waive the 14-day stay of effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  As explained herein, the relief requested herein will immediately result in substantial cost savings and liquidity improvements for the Debtors, and is critical to the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.

**<u>No Previous Request</u>**

31.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 6, 2023
      Houston, Texas

Respectfully submitted,

  */s/ Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (2409024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez @weil.com
      Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
      Ronit.Berkovich@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on December 6, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


      *<u>/s/ Alfredo R. Pérez</u>*
      Alfredo R. Pérez