**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | Case No. 22-90341 (CML) |
| | (Jointly Administered) |
| Debtors.[1] | **Re: Docket No. 1461** |

**OBJECTION OF THE AD HOC GROUP
OF CONVERTIBLE NOTEHOLDERS TO THE
APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP PURSUANT TO SECTIONS 503(B)(3) AND 503(B)(4) OF THE
BANKRUPTCY CODE, BANKRUPTCY RULE 2016, AND SECTIONS
1.6 AND 6.3 OF THE DEBTORS' THIRD AMENDED PLAN FOR
ALLOWANCE OF FEES AND EXPENSES INCURRED IN THE MAKING
OF A SUBSTANTIAL CONTRIBUTION AS AN ADMINISTRATIVE EXPENSE**

The ad hoc group (the "Ad Hoc Group") of beneficial holders and/or investment advisors

or managers of discretionary accounts that hold (i) secured convertible notes issued pursuant to

that certain Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 and/or (ii)

the secured convertible notes issued pursuant to that certain Convertible Note Purchase

Agreement, dated on or about August 20, 2021, each issued by Core Scientific, Inc. (as successor

to or assignee of Core Scientific Holdings Co.), hereby submits this objection (the "Objection") to

the *Application of Skadden, Arps, Slate, Meagher & Flom LLP Pursuant to Sections 503(B)(3)*

*and 503(B)(4) of the Bankruptcy Code, Bankruptcy Rule 2016, and Sections 1.6 and 6.3 of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR, LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Debtors' Third Amended Plan for Allowance of Fees and Expenses Incurred in the Making of a Substantial Contribution as an Administrative Expense* [Docket No. 1461] (the "Skadden Application")[2] in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors").  In support of this Objection, the Ad Hoc Group states as follows:

## **PRELIMINARY STATEMENT**

1.      Through the Skadden Application, Skadden (as defined below) seeks payment of approximately $1.5 million for professional fees and expenses incurred in connection with "representing the Ad Hoc Equity Group in getting the Official Equity Committee appointed." Skadden Application at ⁋ 5. However, Skadden's basic premise underlying its claim for having made a substantial contribution to these Chapter 11 Cases is flawed.  The success of the Skadden Application is dependent on Skadden taking credit for the progress that was made ***after*** the appointment of the Official Equity Committee.  Indeed, Skadden played no material role of which the Ad Hoc Group is aware in the Chapter 11 plan mediation process over the last few months and thus can take no credit for the mediated plan settlement and negotiated recovery being provided to equityholders pursuant to the Debtors' Third Amended Plan.  Moreover, the estate fiduciary actually responsible for such achievements—the Official Equity Committee—is already being compensated by the estates in connection with its efforts, rendering any contribution by the Ad Hoc Equity Group (as defined below) duplicative.  At bottom, the Ad Hoc Equity Group's actions were self-serving, were not intended to benefit the Debtors' estates as a whole, and did not directly benefit the Debtors' estates as a whole.

---

[2]   Capitalized terms used herein, but not defined have the meanings ascribed to such terms in the Skadden Application.

2.      To grant the Skadden Application would have the effect of turning the purpose of substantial contribution on its head and opening bankrupt estates to substantial liabilities which they should not be obligated to pay.  It is a long-standing rule that parties must bear their own attorney's fees and costs, and nothing described in the Skadden Application or otherwise justifies a deviation from that rule.  Accordingly, for these reasons and the reasons stated below, the Ad Hoc Equity Group cannot meet its burden of showing that they have made a substantial contribution in these Chapter 11 Cases, such as to justify an administrative expense claim for any portion of the fees and expenses incurred by Skadden, and the Skadden Application should therefore be denied.

## BACKGROUND

3.      On December 21, 2022 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  Since the Petition Date, the Debtors have operated and managed their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Debtors entered these Chapter 11 Cases with a restructuring support agreement (the "Initial RSA") with the Ad Hoc Group in place and an agreement by the Ad Hoc Group to provide postpetition financing (the "Initial DIP Facility"), which provided the Debtors with a path toward a timely and expeditious exit from bankruptcy.  *See Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] at ¶¶ 82, 83.

5.      On December 26, 2023, certain members of the ad hoc group of beneficial holders of the common stock of Debtor Core Scientific, Inc. (the "Ad Hoc Equity Group") retained Skadden, Arps, Slate, Meagher and Flom LLP ("Skadden") in connection with a potential restructuring of the Debtors.   Skadden Application at ¶ 13.

3

6.      On January 6, 2023, Skadden (on behalf of the Ad Hoc Equity Group) submitted a letter to the United States Trustee requesting the appointment of an official committee of equity securities holders in these Chapter 11 Cases.  That request was denied on January 20, 2023.  *Id.* at ¶¶ 13, 15.

7.      On January 9, 2023, the United States Trustee appointed the official committee of unsecured creditors in these Chapter 11 Cases (the "Creditors' Committee") [Docket No. 256].

8.      The Creditors' Committee, as well as the Ad Hoc Equity Group and certain of the Debtors' equipment lenders, each objected to final approval the Initial DIP Facility.  *See* Docket Nos. 291, 298, 363 and 375.

9.      On January 30, 2023, the Debtors filed a notice with the Bankruptcy Court [Docket No. 378] informing all parties that they had reached an agreement with B. Riley Commercial Capital, LLC ("B. Riley") on the terms of a replacement postpetition financing facility (the "Replacement DIP Facility"), which terms were more favorable to the Debtors than those contained in the Initial DIP Facility, and that they intended to pay off their existing obligations under the Initial DIP Facility.  In connection with the Debtors' entry into the Replacement DIP Facility, on February 9, 2023, the Debtors exercised their right to terminate the Initial RSA, effective February 9, 2023.  *See Notice of RSA Termination* [Docket No. 517].

10.     On February 3, 2023, the Ad Hoc Equity Group filed the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* [Docket No. 458] (the "Equity Committee Motion"), requesting the appointment of an official equity committee in these Chapter 11 Cases.

11.     While the Debtors initially opposed the Equity Committee Motion and the formation of an official equity committee, due to changing industry and economic conditions, the

Debtors ultimately agreed to support the appointment of an official equity committee (*see* Docket 568), subject to certain conditions including a fee cap and a limited scope of engagement.

12.     The Ad Hoc Group filed its objection to the Equity Committee Motion on February 24, 2023.  *See Objection of the Ad Hoc Group to the Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* [Docket No. 572].   At a continued hearing to consider the Equity Committee Motion, the Debtors, the Ad Hoc Group and the Ad Hoc Equity Group informed the Bankruptcy Court that they had reached an agreement on the appointment of an official equity committee and filed a revised agreed form of order to that effect.

13.     On March 1, 2023, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 608], approving the Replacement DIP Facility on a final basis and authorizing the repayment in full of all obligations owed under the Initial DIP Facility.

14.     On March 7, 2023, the Bankruptcy Court entered the *Agreed Order Directing the Appointment of an Official Committee of Equity Security Holders* [Docket No. 642] (the "Equity Committee Appointment Order"), appointing the official committee of equity security holders (the "Official Equity Committee") in these Chapter 11 Cases.   Pursuant to the Equity Committee Appointment Order, the fees and expenses of the Official Equity Committee were limited to $4.75 million and may only be increased upon further order of the Bankruptcy Court (the "OEC Fee Cap").   *See* Equity Committee Appointment Order at ⁋ 3.   Moreover, the scope of the Official Equity Committee's appointment was limited to (i) valuation and (ii) negotiations, in each case,

related to determining the terms of a chapter 11 plan of reorganization and confirmation.  *Id.* at ¶

8.  To date, the advisors to the Official Equity Committee have exceeded the OEC Fee Cap and

the Official Equity Committee has filed the *Motion for Entry of an Order (I) Increasing Fee Cap*

*(II) Amending the Agreed Order Directing Appointment of an Official Committee of Equity*

*Security Holders and (III) Granting Related Relief* [Docket No. 1488], seeking an increase of the

OEC Fee Cap to $6.75 million.

15.     On March 23, 2023, the United States Trustee appointed seven members to the

Official Equity Committee.  *See Notice of Appointment of Official Committee of Equity Security*

*Holders* [Docket No. 724].

16.     Thereafter, the Official Equity Committee retained (i) Vinson & Elkins LLP

("V&E") as counsel, effective as of March 30, 2023, and (ii) FTI Consulting, Inc. ("FTI") as

financial advisor, effective as of April 8, 2023.  *See Application For Entry of an Order Authorizing*

*the Retention and Employment of Vinson & Elkins LLP as Counsel for the Official Committee of*

*Equity Security Holders* [Docket No. 827]; *Application for an Order Authorizing the Retention*

*and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Equity*

*Security Holders* [Docket No. 825]; *Order Authorizing the Retention and Employment of Vinson*

*& Elkins LLP as Counsel for the Official Committee of Equity Security Holders* [Docket No. 933];

*Order Authorizing the Retention of FTI Consulting, Inc. as Financial Advisor for the Official*

*Committee of Equity Security Holders* [Docket No. 934].  After the retention of V&E and FTI,

Skadden ceased its participation in the Chapter 11 Cases.

17.     To facilitate the plan negotiation process, the Debtors, the Ad Hoc Group, the

Official Equity Committee and certain of the Debtors' other stakeholders agreed to participate in

mediation with Judge Isgur.  *See Agreed Mediation Order Appointing Judge Marvin Isgur as*

*Mediator Regarding Debtors' Chapter 11 Plan* [Docket No. 1052] (the "Agreed Mediation Order").  Pursuant to the Agreed Mediation Order, a pre-mediation conference was scheduled for July 17, 2023 and an initial mediation session was scheduled for July 26, 2023.  While the mediation was initially scheduled to expire on August 31, 2023, the mediation period was extended several times as the parties worked with each other and with Judge Isgur to negotiate a consensual resolution of the Chapter 11 Cases.

18.     On September 17, 2023, following approximately two months of good-faith negotiations, the Debtors, the Ad Hoc Group and the Official Equity Committee reached an agreement in principle with respect to the economic terms of a chapter 11 plan (the "Mediated Settlement").  *See Joint Notice of Mediated Agreement in Principle Between the Debtors and the Ad Hoc Noteholder Group* [Docket No. 1245].  Neither Skadden nor the Ad Hoc Equity Group participated in the mediation process.

19.     Following an additional two months of negotiations among the Debtors, the Ad Hoc Group and the Official Equity Committee, the terms of the Mediated Settlement were ultimately memorialized in that certain Restructuring Support Agreement, dated November 16, 2023 (the "Postpetition RSA"), and are reflected in the *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and its Affiliated Debtors* [Docket No. 1438] (the "Third Amended Plan"). *See Notice of (I) Execution of Restructuring Support Agreement and (II) Filing of Solicitation Versions of (A) Third Amended Plan and (B) Disclosure Statement for Third Amended Plan* [Docket No. 1440].  The Ad Hoc Equity Group played no material role of which the Ad Hoc Group is aware in negotiating the terms of the Mediated Settlement embodied in the Third Amended Plan, including the recoveries to existing equityholders, which were negotiated exclusively among Judge Isgur and the Debtors, the Ad Hoc Group and the Official Equity Committee.

20.     On November 22, 2023, Skadden filed the Skadden Application on behalf of the Ad Hoc Equity Group, seeking allowance of an administrative expense claim for up to $1,500,000.00 for amounts that Skadden incurred in these Chapter 11 Cases in connection with its purported substantial contribution to the Debtors' estates (the "Substantial Contribution Claim").

## OBJECTION

### I.     The Ad Hoc Equity Group Has Not Demonstrated That It Has Made a Substantial Contribution to the Chapter 11 Cases.

21.     Section 503 of the Bankruptcy Code provides that certain administrative expenses shall be allowed after notice and a hearing. 11 U.S.C. § 503(b).  Section 503(b)(3)(D) states, in relevant part, that administrative expense claims may be allowed for "actual, necessary expenses . . . in making a substantial contribution in a case under . . . chapter 11[.]" 11 U.S.C. §503(b)(3)(D). Additionally, under section 503(b)(4) of the Bankruptcy Code, a bankruptcy court can, in turn, authorize administrative expense claims and reasonable compensation for professional services rendered by an attorney whose expense is allowable under, *inter alia*, 11 U.S.C. § 503(b)(3)(D). 11 U.S.C. § 503(b)(4).

22.     The policy behind the allowance of substantial contribution claims is meant to "promote meaningful creditor participation" in the bankruptcy process in order to help foster the "progress of reorganization." *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986). However, in analyzing substantial contribution claims, courts must be "sensitive to the danger of mushrooming administrative expenses." *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 279 (Bankr. W.D. Tex. 2005).  "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008). "[T]he general rule remains that attorneys must look to their own clients

for payment . . . [and] [t]he integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." *Id*. (internal citations and quotations omitted). As such, substantial contribution claims may only be granted in "unusual" or "rare circumstances." *Id*. at 279; *see also In re Eldercare Home Health & Hospice*, 2007 WL 527943, at *1 (Bankr. S.D. Tex. Feb. 14, 2007) (holding that courts narrowly construe the substantial contribution statute granting applications "in only unusual or rare circumstances"); *Dana Corp.*, 390 B.R. at 108 ("[C]ompensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate.").

23.     The party seeking reimbursement pursuant to section 503(b) of the Bankruptcy Code bears the burden of proving, by a preponderance of the evidence, that it has made a substantial contribution. *See In re ASARCO,* 2010 WL 3812642, at *7 (Bankr. S.D. Tex. Sept. 28, 2010) ("Movants bear the burden to demonstrate, by a preponderance of the evidence, that they caused a substantial contribution if they wish to recover the fees and expenses associated with their making such a contribution"). To meet this high threshold, moving parties, such as Skadden and the Ad Hoc Equity Group, must establish that their "services have some causal relationship to the contribution." *In re Fortune Natural Res. Corp.*, 366 B.R. 549, 554 (Bankr. E.D. La. 2007).

24.     The Bankruptcy Code does not define the phrase "substantial contribution." *Eldercare Home Health & Hospice*, 2007 WL 527943, at *1. The Fifth Circuit, however, has defined "substantial contribution" to mean "a contribution that is 'considerable in amount, value, or worth.'" *ASARCO*, 2010 WL 3812642, at *7 (internal citations omitted). Activities of creditors, equityholders or their advisors that are ordinary, expected, routine or duplicative do not constitute a substantial contribution to a debtor's estate. *ASARCO*, 2010 WL 3812642, at *8; *see also Am.*

9

*Plumbing & Mech., Inc.*, 327 B.R. at 291 ("Absent some spectacular result, such as dramatically improving treatment of all creditors, expected and routine activities do not constitute substantial contribution." (citation omitted)).  Courts in the Fifth Circuit have identified several factors when analyzing whether a creditor has made a substantial contribution, including:

1.    whether the services involved in the contribution provided a benefit to the estate;

2.    whether the services involved in the contribution were undertaken just for the applicant alone or for the benefit of all parties in the case;

3.    whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate;

4.    whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate;

5.    whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries;

6.    whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did; and

7.    whether the applicant had a negative effect on the case.

*In re Mirant*, 354 B.R. 113, 132-36 (Bankr. N.D. Tex. 2006), *subsequently aff'd*, 308 F. App'x 824 (5th Cir. 2009).  At bottom, the threshold inquiry is whether the Ad Hoc Equity Group made a substantial contribution in these Chapter 11 Cases that provided an actual and demonstrable benefit to the Debtors' estates and its stakeholders.  *Id*. at 132; s*ee also In re Synergy Pharms. Inc.*, 621 B.R. 588, 610 (Bankr. S.D.N.Y. 2020) ("An applicant will satisfy the substantial contribution test when it has provided 'actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders.'") (citing *In re U.S. Lines, Inc*., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989)).  As discussed in greater detail herein, the Ad Hoc Equity Group's efforts with respect to the foregoing factors fall short of meeting the stringent requirements for

reimbursement as an administrative expense under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  For these reasons, the Skadden Application should be denied.

A.     **The Ad Hoc Equity Group's Actions Did Not Result in a Demonstrable Benefit to the Debtors' Estates**

25.     The Ad Hoc Equity Group asserts that its substantial contribution consists of its efforts in laying the foundation for (a) the negotiation of the Third Amended Plan and an increased potential recovery to equityholders from that in the Initial RSA, (b) the Debtors' negotiation and entry into the Replacement DIP Facility and termination of the Initial RSA, and (c) the formation of the Official Equity Committee.  *See* Skadden Application at ¶¶ 3, 4.  However, the Ad Hoc Equity Group's efforts played little to no role in achieving the first or second results.  Further, assuming, *arguendo*, the Ad Hoc Equity Group's third assertion is true, such fact alone is insufficient to establish that an actual and direct benefit was provided to the Debtors' estates and their stakeholders.

1.     <u>The Ad Hoc Equity Group Was Not Responsible for the Negotiation of the Third Amended Plan or the Refinancing of the Initial DIP Facility.</u>

26.     <u>Third Amended Plan</u>.  The Ad Hoc Equity Group claims to have laid the groundwork for the negotiation of the Third Amended Plan, which "provides equity holders with new equity and allows them to purchase additional equity through two tranches of warrants and the right to participate in a $55 million rights offering" and certain governance rights.  Skadden Application at ¶ 3.  However, the Ad Hoc Equity Group did not provide any material assistance that the Ad Hoc Group is aware of with respect to the negotiation of the Third Amended Plan or any creditor recoveries thereunder.  In fact, the Ad Hoc Equity Group had no material involvement in the Chapter 11 Cases after the appointment of the Official Equity Committee.  The Third Amended Plan was the result of an extended mediation process, which commenced more than four

months after the appointment of the Official Equity Committee, and is embodied in a Restructuring Support Agreement that was executed after four months of mediation, long after the Ad Hoc Equity Group ceased participating in the Chapter 11 Cases.  The Ad Hoc Equity Group should not be allowed to seek reimbursement for its fees and expenses based on case developments that occurred well after the period for which it is seeking reimbursement.  *See Fortune Nat. Res. Corp.,* 366 B.R. at 557 (holding that a firm that provided legal and accounting services did not make a substantial contribution to a debtor's Chapter 11 plan, as required to support its claim for administrative expenses, despite the firm's contention that its creation of a second proposed plan of reorganization resulted in an increase in the plan's value, where such increase was made well after the period for which the firm sought reimbursement).

27.     DIP Facilities.  The Ad Hoc Equity Group also asserts that its actions in objecting to the Initial DIP Facility and assistance in connection with the Debtors obtaining alternative DIP financing benefitted the estates and provided a substantial contribution thereto.  Skadden Application at ¶ 26.  While the Ad Hoc Equity Group would have the Bankruptcy Court believe that it was somehow responsible for any improvement regarding the economics of the Initial DIP Facility or the Debtors' eventual entry into the Replacement DIP Facility, it is unable to show, and the record does not evidence, that its objection or negotiations were the direct cause of any concessions or benefits to the Debtors' estates.

28.     The Ad Hoc Equity Group also attempts to take credit for the Debtors' entry into the Replacement DIP Facility, arguing that its actions "successfully encouraged a third party to submit a competing DIP financing proposal with terms superior" to the Initial DIP Facility and not tied to the Initial RSA.  Skadden Application at ¶ 39.  Again, the Ad Hoc Equity Group attempts to manufacture a benefit provided to the estates, while ignoring the fact that B. Riley is the lender

under the Replacement DIP Facility and has no relationship with the Ad Hoc Equity Group. Moreover, the Ad Hoc Equity Group itself admits that the Replacement DIP Facility "provided better economics" than the proposal from the Ad Hoc Equity Group's financing source.  Skadden Application at ⁋ 28.  Yet the Ad Hoc Equity Group attempts to take credit for the entry into the Replacement DIP Facility and the termination of the Initial RSA.  Contrary to the Ad Hoc Equity Group's arguments, it was the changing market conditions in the cryptocurrency industry and the rise in the price of Bitcoin which truly afforded the Debtors the flexibility to seek alternative financing.  The Skadden Application notes as such.  *See* Skadden Application at ⁋ 1 ("[O]n January 23… Bitcoin closed at $22,934.43, a 36% increase since the commencement of the Chapter 11 Cases").  What the Skadden Application does not show is that, but for the Ad Hoc Equity Group's efforts, the Debtors would not have entered into the Replacement DIP Facility and correspondingly terminated the Initial RSA.  Once again, the Ad Hoc Equity Group's actions played no role in achieving this result.  *See Dana Corp.*, 390 B.R. at 110 (noting that the applicant, through its substantial contribution motion, "assumes credit for a large share of the efforts and productive activities of others," and denying the requested relief).

        **2.**      The Appointment of the Official Equity Committee, by Itself, Does Not Satisfy the Ad Hoc Equity Group's Burden.

29.     The Ad Hoc Equity Group incorrectly maintains that its efforts resulting in the mere formation of the Official Equity Committee in the Chapter 11 Cases provided a significant contribution the Debtors' estates.  *See* Skadden Application at ⁋⁋ 35-38.  Courts reviewing such assertions have determined that giving equityholders a voice in plan negotiations, without more, does not rise to the level of a "substantial contribution." *See Synergy Pharms. Inc.*, 621 B.R. at 617 (holding, in part, that assuming applicants' efforts directly led to the appointment of an official

13

equity committee, "that alone is not sufficient to establish 'substantial contribution' to the estates").

30.     Moreover, the other alleged benefits pointed to by the Ad Hoc Equity Group in connection with the appointment of the Official Equity Committee both (i) did not directly occur as a result of the Ad Hoc Equity Group's efforts (as noted above) and (ii) benefited only the Debtors' existing equityholders.  Courts have imposed a particularly high burden in demonstrating a "substantial contribution" has been made because creditors "are presumed to act primarily in their own interests."  *Synergy Pharms. Inc*., 621 B.R. at 610 (citing *Dana Corp.*, 390 B.R. at 108). The Ad Hoc Equity Group's efforts relating to the appointment of the Official Equity Committee and the alleged benefits which flowed from such appointment, including the equity recoveries in the Third Amended Plan, conferred benefits only upon the existing equityholders and not on the Debtors' estates as a whole.  The Ad Hoc Equity Group had a strong self interest in the outcome of the appointment of an official equity committee, and thus, any benefit to the estates at large was purely incidental.  *See In re Buttes Gas & Oil Co*., 112 B.R. 191, 195 (Bankr. S.D. Tex. 1989) (holding that actions taken by an applicant were undertaken for personal benefit, with any benefit to estate being merely incidental and insufficient to warrant a substantial contribution claim). Further, any compensation for fees and expenses incurred in connection with the appointment of the Official Equity Committee is expressly provided for in the Equity Committee Appointment Order, which does not provide for the payment of any amounts incurred in connection with the Ad Hoc Equity Group's efforts prior to the formation of the Official Equity Committee.

31.     As such, Skadden has not met its high burden in establishing that the Ad Hoc Equity Group provided the type of demonstrable benefit necessary to warrant allowance of the Substantial Contribution Claim.

B.   **The Ad Hoc Equity Group's Actions Were Duplicative of the Actions of Other Key Stakeholders in the Chapter 11 Cases and Any Benefit Received is Outweighed by the Cost.**

32.   When evaluating whether a contribution is substantial, courts in the Fifth Circuit, as part of their analysis, have employed a "cost-benefit" test which says that "[a]t a minimum . . . the court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions.  Benefits flowing to only a portion of the estate or to a limited class of creditors are necessarily diminished in weight." *Am. Plumbing & Mech., Inc.*, 327 B.R. at 281 (internal citations omitted).

33.   A corollary of the cost-benefit test is "that no substantial contribution is made when the cost exceeds the benefit or when cost involves needless duplication of time and effort."  *Am. Plumbing & Mech., Inc.*, 327 B.R. at 282.  Services that were "duplicative of services rendered by a committee, the debtor, or the attorneys for a committee or the debtor" are noncompensable.  *In re Gen. Homes Corp. FGMC, Inc*., 143 B.R. 99, 103 (Bankr. S.D. Tex. 1992).

34.   Here, substantially all of the work performed by Skadden is duplicative of the work and efforts of other parties in the Chapter 11 Cases, including the Creditors' Committee and B. Riley (and, to the extent that it takes credit for the achievements of the Official Equity Committee, the Official Equity Committee).  In connection with its objection to the Initial DIP Facility, the efforts of the Ad Hoc Equity Group mirror the efforts expended by the Creditors' Committee (*see* Docket No. 363), which objected to the Initial DIP Facility on substantially the same grounds.  Moreover, there plainly were substantial overlapping interests between the Creditors' Committee (which has a fiduciary obligation to the Debtors' residual stakeholders) and the Ad Hoc Equity Group.  The Debtors' estates, and by extension its creditors, should not be on the hook to pay the fees and expenses incurred by both the Creditors' Committee and the Ad Hoc Equity Group where the underlying work is entirely or substantially duplicative. *See Fortune Nat. Res. Corp.,* 366 B.R.

at 556 (Bankr. E.D. La. 2007) ("The efforts of those seeking compensation that are duplicative of the efforts undertaken by statutory fiduciaries . . . are not considered a substantial contribution").

35.     Moreover, as previously discussed, the Ad Hoc Equity Group asserts that its efforts in connecting the Debtors with an alternative financing source improved the Debtors' bargaining position and their ability to negotiate for better terms with respect to the Replacement DIP Facility. Skadden Application at ⁋ 14.  The Ad Hoc Equity Group touts the benefits flowing from such efforts, namely that the Debtors were party to a postpetition financing agreement which contained better economics, was supported by all key stakeholders and was not tied to the Initial RSA. Skadden Application at ⁋ 39.  Even assuming that a demonstrable benefit flowed to the estates from such efforts (it did not), such actions would be purely duplicative of B. Riley's labors in connection with the Replacement DIP Facility.  It is evident from the record that both B. Riley and the Creditors' Committee were already actively involved and advocating for such less expensive financing.  Accordingly, the Ad Hoc Equity Group did not confer any actual benefit to the Debtors' estates, but merely provided work duplicative of other interested parties.

**C.     The Ad Hoc Equity Group Undertook Its Actions Without the Expectation of Compensation from the Estate.**

36.     Parties are not entitled to an administrative expense claim under section 503(b) "in connection with activities . . . which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 944 (3d Cir. 1994).  The Ad Hoc Equity Group concedes this factor, admitting that they retained Skadden without any expectation of compensation from the Debtors' estates.  Skadden Application at ⁋ 41.  As demonstrated herein, the Ad Hoc Equity Group's actions in these Chapter 11 Cases were a result of its own self-interest in generating a greater recovery for equityholders.  As the Ad Hoc Equity Group admits, they

16

would have undertaken these actions whether or not they expected reimbursement from the Debtors' estates.  Skadden Application at ¶ 41; *Matter of Columbia Gas Sys., Inc.*, 224 B.R. 540, 549 (Bankr. D. Del. 1998), *aff'd sub nom. In re Columbia Gas Sys.*,  2000 WL 1456298 (D. Del. Sept. 20, 2000) ("[Applicant's] activities would have been undertaken absent expectation of reimbursement from the estate, and did not rise to the level necessary to constitute direct or material contributions to the reorganization of [the debtor]").  Accordingly, this factor weighs against allowing the Substantial Contribution Claim.

### D. The Lack of a Negative Effect on the Chapter 11 Cases Should be Afforded Little Weight.

37.     The final factor courts in assessing a substantial contribution claim—whether the applicant has had a negative effect on the bankruptcy cases, "such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion, resulting in the debtor incurring costs of which delayed the resolution of the case"—does not warrant the allowance of the Substantial Contribution Claim.  *In re R.L. Adkins Corp.*, 505 B.R. 770, 781 (Bankr. N.D. Tex. 2014).  The Skadden Application argues that the Ad Hoc Equity Group "did not engage in conduct that delayed the case or otherwise resulted in the occurrence of needless costs or expenses."  Skadden Application at ¶ 44.  Even if the Bankruptcy Court finds that the Ad Hoc Equity Group did not have a negative effect on the Chapter 11 Cases, such finding should also have little to no bearing on whether the Substantial Contribution Claim should be allowed. The mere fact that the Ad Hoc Equity Group's actions did not impede these Chapter 11 Cases does not justify saddling the Debtors' estates and its creditors with the costs incurred by the Ad Hoc Equity Group.  *See R.L. Adkins Corp.*, 505 B.R. at 783 (holding that while the applicant did not engage in any improper or negative actions, "creditors as a whole should not bear the ultimate cost incurred" under the proposed substantial contribution claim).

17

## II.    Skadden's Fees and Expenses are Nether Reasonable Nor Necessary Under Section 503(b)(4).

38.    The Ad Hoc Group further submits that, even if the Bankruptcy Court finds that the Ad Hoc Equity Group did make a substantial contribution (which it did not), the Skadden Application should, nonetheless, be denied as the Ad Hoc Equity Group has failed to show that Skadden's fees and expenses are actual and necessary.  Under section 503(b)(3)(D), a finding of substantial contribution is only the "first step", after which, "the Court must determine whether an applicant's expenses were actual and necessary." *In re Summit Metals, Inc.*, 379 B.R. 40, 54 (Bankr. D. Del. 2007), *aff'd*, 406 F. App'x 634 (3d Cir. 2011).  This requires that bankruptcy courts "scrutinize claimed expenses for waste and duplication to ensure that expenses are indeed actual and necessary." *In re Condere Corp.*, 251 B.R. 693, 695 (Bankr. S.D. Miss. 2000).

39.    Here, Skadden's claimed fees and expenses are plainly unreasonable and disproportionate.  Skadden was retained as counsel by the Ad Hoc Equity Group in order to pursue and seek the appointment of an official committee of equityholders in these Chapter 11 Cases.  In connection with the appointment of the Official Equity Committee, the Bankruptcy Court imposed a cap of $4.75 million on the fees and expenses of legal and financial advisors that would be paid by the estates and limited the scope of the Official Equity Committee to (i) valuation and (ii) plan negotiations.  In doing so, the Bankruptcy Court did not provide an additional fee budget in connection with the work propounded by the Ad Hoc Equity Group on its own behalf, and the Bankruptcy Court tacitly recognized the fees that would be reasonable in these Chapter 11 Cases for even an estate fiduciary working on behalf of all equityholders (subject to further court order).  By seeking an administrative claim totaling $1.5 million for efforts resulting in the appointment of an official committee, which was afforded a budget of only $4.75 million over the course of the entire span of the Chapter 11 Cases and whose scope was limited to the formulation of a plan of

reorganization, the Ad Hoc Equity Group flouts the understanding embedded in the Equity Committee Appointment Order.  Had the Ad Hoc Equity Group intended or desired for its fees for work prior to the creation of the Official Equity Committee to be reimbursed, the appropriate time to have sought such concession was in connection with the Equity Committee Appointment Order, but it did not do so.  Moreover, the fact that the Ad Hoc Equity Group is requesting a substantial contribution claim representing over 30% of the budget currently allocated to the Official Equity Committee for the entirety of the Chapter 11 Cases demonstrates just how unreasonable the quantum of that request is.  Even were the Bankruptcy Court to find the Substantial Contribution Claim to be valid (and it is not), the Substantial Contribution Claim should be substantially reduced given the excessive time billed in relation to the scope of the Ad Hoc Equity Group's work performed.  *See In re Catalina Spa & R.V. Resort,* Ltd., 97 B.R. 13, 19 (Bankr. S.D. Cal. 1989) (reducing the total compensation allowable due to "excessive billing").

40.    The burden of proof is on the Ad Hoc Equity Group to demonstrate that the services for the fees and costs incurred were actual, necessary and benefited the Debtors' estates.  The Ad Hoc Equity Group has failed to meet that burden.

## **RESERVATION OF RIGHTS**

41.    The Ad Hoc Group reserves its rights to supplement this Objection and to respond to any filing of Skadden, the Ad Hoc Equity Group, the Official Equity Committee, the Debtors, or any other party-in-interest in these Chapter 11 Cases, either by further submission to this Bankruptcy Court, at oral argument or by testimony presented at the hearing to consider the Skadden Application.  The Ad Hoc Group further reserves the right to review and comment on any order with respect to the Skadden Application.

The Ad Hoc Group respectfully requests entry of an Order (a) denying the relief sought in the Skadden Application and (b) granting such other and further relief as is just, proper, and equitable.

Date:  December 13, 2023
      Houston, Texas

Respectfully submitted

*/s/ James T. Grogan*
**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Kristopher M. Hansen (admitted *pro hac vice*)
Sayan Bhattacharyya (admitted *pro hac vice*)
Emily Kuznick (admitted *pro hac vice*)
Joanne Lau (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
       sayanbhattacharyya@paulhastings.com
       emilykuznick@paulhastings.com
       joannelau@paulhastings.com

*Counsel to the Ad Hoc Group of Secured Convertible Noteholders*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 13, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties receiving ECF notice in this case, and by electronic mail on counsel to (i) the Debtors (Weil, Gotshal & Manges LLP), (ii) the Creditors' Committee (Willkie Farr & Gallagher LLP), (iii) the Official Committee of Equity Security Holders (Vinson & Elkins LLP), (iv) the Office of the United States Trustee for the Southern District of Texas, and (v) Skadden, Arps, Slate, Meagher & Flom LLP.

*/s/ James T. Grogan*
James T. Grogan III
