IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CORE SCIENTIFIC, INC., et al., | § § § | Case No. 22-90341 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) Re: Docket No. 1461, 1551 |

**REPLY OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP TO THE AD HOC GROUP OF CONVERTIBLE NOTEHOLDER'S OBJECTION TO THE APPLICATION FOR ALLOWANCE OF FEES AND EXPENSES INCURRED BY THE AD HOC EQUITY GROUP IN MAKING <u>A SUBSTANTIAL CONTRIBUTION IN THE CASES</u>**

Skadden, Arps, Slate, Meagher and Flom LLP ("**Skadden**") hereby submits this reply (the "**Reply**") on behalf of the ad hoc group (the "**Ad Hoc Equity Group**") of beneficial holders of the common stock of Core Scientific, Inc., in response to the *Objection of the Ad Hoc Group of Convertible Noteholders* [Docket No. 1551] (the "**Objection**") to the *Application of Skadden, Arps, Slate, Meagher & Flom LLP Pursuant to Sections 503(b)(3) and 503(b)(4) of the Bankruptcy Code, Bankruptcy Rule 2019, and Sections 1.6 and 6.3 of the Debtors' Third Amended Plan for Allowance of Fees and Expenses Incurred in the Making of a Substantial Contribution as an*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas, 78704. The Debtors' service address is 2407 S. Congress Ave., Suite E-101, Austin, Texas 78704.

*Administrative Expense* (the "**Application**") [Docket No. 1461]. In support of this Reply, Skadden respectfully represents as follows:

## REPLY

1. The Ad Hoc Equity Group,[2] through Skadden, invested significant effort to obtain the appointment of the Official Equity Committee in these cases. That effort positioned the Official Equity Committee to give a voice to all equity holders, which, in turn, contributed to achieving a result reflecting Core Scientific's significant value. Skadden, on behalf of the members of the Ad Hoc Equity Group, seeks approval of a substantial contribution claim for fees and expenses incurred in winning appointment of the Official Equity Committee so that the Ad Hoc Equity Group members, who comprise approximately 18% of all equity holders, do not bear the cost of that work alone while the benefits are enjoyed by all equity holders.

2. Not a single equity holder or estate fiduciary has objected to the Application, even though equity holders' recovery under the Plan would be affected by granting it. The Debtors and the Official Equity Committee support the Application, which is expressly contemplated by the Debtors' consensual chapter 11 plan (the "**Plan**").[3] And the Application has the unanimous support of all members of the Ad Hoc Equity Group, 5 of whom serve on the Official Equity Committee.

---

[2] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Application.

[3] The Debtors support for the Application is expressed in Section 1.6 of the Third Amended Plan, which defines the "Ad Hoc Equity Group Substantial Contribution Claim" as a "Claim by the Ad Hoc Equity Group for the reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP in its capacity as counsel to the Ad Hoc Equity Group, in an amount not to exceed $1,500,000, … *to be supported by the Debtors* (subject to the parties 'rights and obligations under the RSA)[.]" *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* [Docket No. 1438] (the "**Third Amended Plan**") (emphasis added); *see also Notice of (I) Execution of Restructuring Support Agreement and (II) Filing of Solicitation Versions of (A) Third Amended Plan and (B) Disclosure Statement for Third Amended Plan*, Exh. 1, at 7(x) ("the Company agrees to: … support a substantial contribution claim for the professional fees and expenses incurred on behalf of the Ad Hoc Equity Group in an amount no greater than $1.5 million") [Docket No. 1440].

2

Only the ad hoc group of convertible noteholders (the "**Ad Hoc Noteholder Group**")—who would *not* be impacted by the Court's ruling on the Application—objected.

3. Because the Ad Hoc Noteholder Group would not be affected by the Application, it lacks standing to raise its Objection. But even if the Ad Hoc Noteholder Group had standing, the Objection is without merit.

**I. The Ad Hoc Noteholder Group Lacks Standing to Object to the Application.**

4. All noteholders, including the members of the Ad Hoc Noteholder Group, will be compensated in full under the Plan, regardless of whether the Court grants or denies the Application. *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* [Docket No. 1439] (the "**Disclosure Statement**"), Section I.A.iii. at 13. If the Court grants the Application, noteholders will get an increased number of shares from the solvent Debtors to fully compensate them for the effect of any payment by the Debtors of the Ad Hoc Equity Group's allowed substantial contribution claim.[4]

5. Allowing Skadden's fees and expenses as a substantial contribution claim therefore impacts only the recoveries of equity holders and any section 510(b) claimants, both of which are *pari passau* and receive a recovery from the Residual Equity Pool. And it does so by allocating the payment obligation undertaken by the Ad Hoc Equity Group *pro rata* among all equity holders

---

[4] Specifically, under the Plan, the Convertible Noteholders will receive additional incremental New Common Interests equal in value to the Ad Hoc Equity Group Substantial Contribution Claim that is Allowed, which would have otherwise been distributed to the common equity holders and holders of allowed Section 510(b) claims, if any. *Third Amended Plan*, Sections 4.1(c), 4.2(c) at 41; *Disclosure Statement* at 13 ("In accordance with the Plan and RSA Settlement, there are two circumstances where increased professional fees paid by the Reorganized Debtors on account of representatives of Holders of Existing Common Interests will … result in the Holders of Allowed Convertible Notes Secured Claims receiving additional New Common interests. The first is if the final Allowed amount of professional fees of the Equity Committee exceeds $6.75 million. The second is on account of any Allowed Claim of the ad hoc group of equity security holders for the reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP, in its capacity as counsel to the Ad Hoc Equity Group, pursuant to section 503(b)(3)(D) of the Bankruptcy Code in an amount not to exceed $1.5 million.")

and any section 510(b) claimants. *Disclosure Statement* at 13-14, 19 (explaining that fees paid to Skadden result in removal of New Common Interests equal to the value of Skadden's fees from the Residual Equity Pool to compensate convertible noteholders).[5]

6. Accordingly, the Ad Hoc Noteholder Group does not have standing to pursue its Objection. The Fifth Circuit has long recognized that constitutional and prudential case or controversy and standing requirements apply at the trial and appellate level in bankruptcy cases. *NexPoint Advisors, LP v. Pachulski Stang Zeil & Jones L.L.P* (*In re Highland Capital Mgmt. LP*), 74 F. 4th 361, 366 (5th Cir. 2023); *see generally In re Legacy Reserves Operating LP*, 2023 Bankr. LEXIS 2450 at *6-8 (Bankr. S.D. Tex. Oct. 13, 2023); *In re Pratz*, 2002 Bankr. LEXIS 1978 at *3 (Bankr. N.D. Tex. Feb. 7, 2002) ("Standing in bankruptcy cases is conferred by a movant's economic interest in the outcome of the case. Should a party lack a pecuniary interest in the outcome, he lacks standing.") (internal quotations and citations omitted); *see also In re Quigley Co.*, 391 B.R. 695, 701-04 (Bankr. S.D.N.Y. 2008) (11 U.S.C. § 1109 eliminates neither constitutional nor prudential standing requirements in bankruptcy proceedings).

7. The burden of showing an affected interest sufficient to establish standing applies to objections to fee and expense applications in bankruptcy cases. *See In re Alpha Natural Res.*, 2016 Bankr. LEXIS 4374 at *34-7 (Bankr. E.D. Va. Dec. 20, 2016) ("Bankruptcy courts decline to litigate objections to claims when the requested relief will have no impact on the litigant."); *In re Moye*, 2012 Bankr. LEXIS 3619 at *5-6 (Bankr. S.D. Tex. Aug. 7, 2012); *In re Mushroom Transp. Co.*, 486 B.R. 148, 154-55 (Bankr. E.D. Pa. 2013) (creditor would have standing to object

---

[5] Moreover, in calculating estimated recoveries to claimants and equity holders, the Debtors assumed payment of the substantial contribution claim. *Emergence Overview Presentation*, at 35 [Docket No. 1502]. In other words, if the Court denies the Application, the recoveries of equity holders and any section 510(b) claimants would increase ratably across all such holders by an aggregate of $1,500,000 of New Common Interests, and if the Court grants the Application, there is "no reduction in value of distributed equity consideration." *Id.*

4

if grant of fee application were to reduce its recovery, but objection would become moot upon approval of trustee's settlement of fee application that left objector's recovery unaffected). *See also Matter of E. Coast Foods, Inc.*, 80 F. 4th 901, 905 (9th Cir. 2023) (creditor of a solvent debtor could not appeal a trustee's fee application because its recovery under the chapter 11 plan was not affected); *In re Williams*, 49 F. App'x 845, 847 (10th Cir. 2002) (creditor of solvent debtor unaffected by the grant of a substantial contribution award lacks standing to appeal, because "the outcome of this appeal cannot affect her pecuniary interests, and she has not suggested how it will otherwise increase her burdens or affect her rights"). *Cf. In re Ramirez*, 633 B.R. 297, 301-02 (Bankr. W.D. Tex. 2021) (creditor had standing to object to fee application because it had a claim and a potential recovery that could be affected by the result).

8. Nor can the Ad Hoc Noteholder Group manufacture its own standing by asserting the interests of those who do have standing but have chosen not to object to the Application. *Harker v. Troutman* (*In re Troutman Enters., Inc.*), 286 F.3d 359, 364 (6th Cir. 2002). As the Sixth Circuit observed:

> Under ordinary prudential standing limitations, litigants must normally assert their own rights, rather than those of third parties. … These concerns apply with particular force in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that party is present. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.

*Id.* (internal quotations and citations omitted).

**II. Skadden's efforts on behalf of the Ad Hoc Equity Group Substantially Contributed to These Chapter 11 Cases.**

**A.     Obtaining the Hotly-Contested Appointment of the Official Committee of Equity Security Holders Made a Substantial Contribution.**

9. The Objection recognizes, as it must, that the policy behind the allowance of substantial contribution claims is to "promote meaningful [] participation" in the bankruptcy

5

process in order to help foster the "progress of reorganization." *Matter of DP Partners Ltd. P'ship*, 106 F.3d 667, 672 (5th Cir. 1997) (citing *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986)). That policy may be in tension with the policy favoring the generally narrow interpretation of administrative expenses, such that mere active participation in a chapter 11 case does not warrant allowance of a substantial contribution claim. But the case law strongly suggests that any such tension is reconciled by limiting section 503(b)(3)-(4) claims to contributions in harmony with the administrative construct of chapter 11, where estate-compensated professionals are already tasked with representing their statutory beneficiaries and usually, but not always, fulfill that role. In other words, a party that facilitates the administration of a chapter 11 case by performing a "leadership role that normally would be expected of an estate-compensated professional but was not so performed" merits compensation under sections 503(b)(3) and (4). *In re Bayou Grp., LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010); *see also In re Mirant Corp.*, 354 B.R. 113, 136-7 (Bankr. N.D. Tex. 2006), aff'd 308 Fed. Appx. 824 (5th Cir. 2009) (ad hoc noteholder committee denied substantial contribution award where it duplicated role of official noteholder committee).

10. Moreover, any tension between the policy of encouraging participation and reducing administrative expenses is further reduced when dealing with a solvent estate and the focus is on the fair allocation of value to a class. Thus, *Mirant* also noted,

> Although the Fifth Circuit indicated in *DP Partners*, 106 F.3d at 673, that 'benefits flowing to only a portion of the estate or to limited classes of creditors' should be regarded under section 503(b) as diminished in weight, in doing so the Court, by defining the issue as a matter of degree acknowledged that benefit to a class is worthy of some consideration. … Moreover, as this court noted above, where, as here, the issue is less one of the sufficiency of the estate than the proper allocation of its value, ensuring fair return to a class benefits the case and the estate.

6

354 B.R. at 133 n. 51 (Bankr. N.D. Tex. 2006). Accordingly, the *Mirant* court granted substantial contribution applications by attorneys representing certain creditor and equity groups, explaining that "the parties seeking reimbursement or professional compensation under section 503(b) did not act for the benefit of all parties in the case. Rather, each acted to benefit a class of creditors or interest-holders of which class it was a member. The court concludes that each of the Applicants, by so acting, satisfied the requirement that the party's conduct serve the more general good." *Id*. at 132-33

11.  The majority of the fees and expenses requested in the Application relate to the Ad Hoc Equity Group's efforts to obtain the appointment of the Official Equity Committee. That effort was vigorously opposed and litigated by the Ad Hoc Noteholder Group. Consistent with the foregoing authorities, any "self interest" in pursuing a chapter 11 result in that context does not disqualify a substantial contribution application. *In re Bayou Grp.*, 431 B.R. at 561-62. Indeed, the Fifth Circuit has rejected that notion, explaining that

> nothing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503. Rather, section 503 patently states that a creditor is entitled to actual and necessary expenses 'incurred ... in making a substantial contribution in a case under chapter 9 or 11. … The benefits, if any, conferred upon an estate are not diminished by selfish or shrewd motivations. We therefore hold that a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to a case.

*Matter of DP Partners Ltd. P'ship*, 106 F.3d at 673. Skadden's work to obtain the appointment of an official equity committee fits precisely into the foregoing policies behind sections 503(b)(3)-(4).

12.  Courts recognize that when the appointment of an official equity committee is warranted, the committee serves a unique and critical fiduciary role as the representative of an entire class or classes of otherwise unrepresented stakeholders. As the court observed in *In re*

7

*Pilgrim's Pride Corp.*, 407 B.R. 211 (Bankr. N.D. Tex. 2009), "when it comes to valuation and determination of future capital structures for plan purposes, the agendas of [the creditors' committee and equity holders] are likely to be very much at odds," and the "the dynamics of chapter 11 are such that [d]ebtors—and their management—are likely to be constrained to accept and advocate to the court a conservative value for their business in order to obtain creditor assent to a reorganization plan" at the expense of equity holders. *Id.* at 217 n. 17, 218-19. In a complex case in which a debtor is solvent or near-solvent, "regarding the argument that an informal committee is sufficient to protect the equity—the cost of disputing value and capital structure with the UCC and the Banks is likely to be too great to be borne other than by a statutory fiduciary paid by the estate." *Id.* at 219. Thus, in cases like these Chapter 11 Cases, that involved complex issues with numerous stakeholders who have competing goals, and where preliminary valuations sufficiently established the solvency of the Debtors, the appointment of an official equity committee is not just advantageous, it is necessary to ensure adequate representation and the proper administration of the case. *Id. See Agreed Order Directing the Appointment of an Official Committee of Equity Security Holders*, at 2 [Docket No. 642].

13. There is no question that the Official Equity Committee would not have been appointed to perform its critical role[6] in these cases but for the Ad Hoc Equity Group's efforts through Skadden. There also is no question that those efforts were considerable. First, the U.S. Trustee, presented with evidence about the increasing value of Bitcoin and the Debtors' business, declined to appoint an equity committee. Then, when the Ad Hoc Equity Group directed Skadden

---

[6] Much of the Objection focuses on the red herring argument that the Ad Hoc Equity Group and Skadden should not take credit for the Official Equity Committee's work. The Application of course does no such thing. It is merely a truism that the Official Equity Committee would not have been in a position to represent all equity holders had the Ad Hoc Equity Group, through Skadden, not won its appointment and a budget in the first instance.

8

to draft and prosecute a motion to compel appointment of an official committee, that effort was met with full-blown opposition, including written discovery and deposition notices served by the Ad Hoc Noteholders Group. Despite Skadden's best efforts to reach a negotiated resolution, the Ad Hoc Noteholder Group persisted in its opposition, and the motion was resolved only after the parties appeared at the evidentiary hearing, fully prepared to put on witnesses and evidence to support the motion.

14. In similar circumstances courts have found that securing the appointment of an official committee constitutes a substantial contribution in the case for purposes of sections 503(b)(3)-(4). For example, in *In re Energy Partners*, the debtor filed an initial disclosure statement and chapter 11 plan that would "essentially wipe out the interests of the Debtor's common stockholders" based on an assessment that "liabilities exceeded its assets." 422 B.R. 68, 72 (Bankr. S.D. Tex. 2009). In response, an equity holder, through its counsel, successfully objected to the disclosure statement's valuation of the company, arguing the debtor's solvency; communicated with other shareholders about the formation of a committee; and, after repeated attempts, persuaded the U.S. Trustee to appoint an official equity committee, at which time counsel's efforts ceased. *Id.* at 81-3. The Court granted the equity holder's motion under section 503(b)(3) for allowance of fees and expenses for the equity holder and its counsel's pre-committee formation work, finding that their efforts "provided the *key spark* that ignited the engines of consensual confirmation negotiations and doused the flames of enormous legal fees and expenses that the Debtor's estate would have otherwise incurred." *Id.* at 81 (emphasis added).

15. In *AM International, Inc.*, the debtors proposed a plan (bearing significant similarities to the Initial RSA filed by Core Scientific) that would have distributed 97% of the stock of the reorganized entity to noteholders and only 3% of the new stock to preferred and

common stockholders. *In re AM Int'l, Inc.*, 203 B.R. 898, 901 (D. Del. 1996). The Court found that an ad hoc group of equity holders made a substantial contribution in the cases by challenging the debtors' valuation, moving for the appointment of an official equity committee, and defending that motion at a hearing against objections by other parties in interest. *Id.* at 901-03.

16. *In re Synergy Pharm.*, 621 B.R. 588 (Bankr. S.D.N.Y. 2020), cited in the Objection, is easily distinguishable. First, the law firm there impermissibly sought compensation under section 503(b)(4) for services and in amounts that its client had not authorized and did not owe under the applicable engagement letter and, therefore, unlike the Ad Hoc Equity Group, had no obligation to pay. *Id.* at 605-06, 609. Alternatively, *Synergy Pharm.* found as a factual matter that the applicant could not establish that its work resulted in the formation of the official equity committee. The applicant claimed it was responsible for the appointment of an official committee because of a single letter to the U.S. Trustee. But the Court found that, without more, the tenuous connection between the letter and the appointment of the committee did not prove the applicant had made a substantial contribution. *Id*. at 617 ("The Firm has not demonstrated that its efforts on behalf of the Ad Hoc Shareholders Group had any impact on the U.S. Trustee's decision to appoint the Equity Committee. The Court is aware of efforts by individual shareholders to lobby the Court and U.S. Trustee to appoint an official equity committee. There is no evidence in the record that links the Firm's letter and other overtures to the U.S. Trustee to the appointment of the Equity Committee."). *Synergy Pharm.* also distinguished its facts from those of *Am. Int'l* and *Energy Partners*, which it cited favorably for the proposition that obtaining the appointment of an official equity committee can, under the right circumstances, warrant a section 503(b)(3)-(4) award. *Id.* at 617-21.

17. There is enough risk inherent in the possibility of losing a motion to compel the formation of an official equity committee to discourage unwarranted attempts to do so. The disincentive to participate in the case should not be compounded, as the Objection suggests, by denying well-founded substantial contribution requests based on successful efforts to form and ensure financing for such a committee.

**B.  The Ad Hoc Equity Group Made a Substantial Contribution by Objecting to the Initial DIP Financing to Protect the Interests of Equity Holders, Including Obtaining a Budget for an Equity Committee.**

18. As set forth in detail in the various pleadings filed by the Ad Hoc Equity Group and Skadden to date, the initial DIP Financing (which would have been provided, at least in part, by the objecting Ad Hoc Noteholder Group) was tied to implementation of an Initial RSA that contemplated little to no recoveries by equity holders notwithstanding the Debtors' solvency. [Docket No. 72-1] *Restructuring Support Agreement*, at 18 n. 5. Then, once the replacement DIP financing facility was presented, the Ad Hoc Noteholder Group and replacement DIP lender refused to include a budget for the professionals of the Official Equity Committee, which would have rendered an Official Equity Committee ineffective.[7] When equity holders did not yet have other meaningful representation in these cases, the Ad Hoc Equity Group, through Skadden, served as the representative of equity holders generally. In acting as such a representative, Skadden objected to the Initial DIP financing, including its Initial RSA features, and ensured the inclusion

---

[7] At the hearing on March 1, 2023, Debtors' counsel explained that the outstanding objection to the replacement DIP financing is the Ad Hoc Noteholder Group's refusal to add a budget to pay for the fees of the Official Equity Committee. *March 1, 2023 Hearing Transcript Regarding the Debtors' Postpetition Financing*, at 30 ("MS. BERKOVICH [Debtors' Counsel]: … [the Ad Hoc Equity Group] want the approved budget to include the Equity Committee professional fees. Your Honor, the Debtors are sympathetic to these requests. If an Equity Committee is appointed and would consent to these, but the DIP Lenders and the pre-petition secured noteholders, whose cash collateral we're using, have refused these changes and they've refused to include the Equity Committee professional fees in either the carve out or the budget.").

11

of a budget for the benefit of the Official Equity Committee in the replacement DIP order. These were matters as to which no estate fiduciary had the same interest. These efforts also substantially benefitted all equity holders, and thus the Debtors' estates, because the proper allocation of value to equity holders was a critical element of these cases. *See In re Bayou Grp., LLC*, 431 B.R. at 562; *In re Mirant*, 354 B.R. at 133-32 and 133 n. 51. In contrast, the movant in *Synergy Pharms.*, relied on by the Objection, filed only perfunctory joinders or "me too" objections to pleadings by other fiduciaries. 621 B.R. at 611-615. Similarly, the four movants in *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273 (Bankr. W.D. Tex. 2005) were acting only for themselves or in their capacities as officers and directors, and thus did not warrant relief under section 503(b)(3). *Id.* at 290 and 293-94.

19. The Objection largely ignores these undisputed aspects of the Ad Hoc Equity Group's DIP-related work in these cases, instead arguing that the Application's request for DIP-related work should be denied because Skadden did not take part in the negotiation of the less expensive replacement DIP facility. Objection at ¶¶ 27-28. But the Application does not seek compensation for efforts to improve the replacement DIP facility, beyond ensuring a budget for an official equity committee, except for the limited amount of time that it took to introduce another potential DIP lender to the Debtors and their advisors. That party eventually served as the competing bidder to the replacement DIP lender. This work comprised only a small portion of Skadden's overall efforts on behalf of the Ad Hoc Equity Group—Skadden spent less than 4 hours identifying and introducing an alternative DIP lender to the Debtors. The Application seeks less than $7,000 in fees for that effort. The bulk of the DIP-related work included in the Application was incurred in Skadden's effort to ensure that the replacement DIP included a budget for an official equity committee, which was met with stiff resistance by the Ad Hoc Noteholder Group.

12

Skadden's efforts to identify a potential alternative DIP lender did, however, foster a competitive DIP process and should be covered by section 503(b)(3)-(4). Without the competing DIP lender, it is likely that a "reverse DIP auction" would have been far less successful or not have occurred. Courts have granted substantial contribution applications for such work, recognizing that the promotion of competition can have a substantial positive impact on the administration and trajectory of a chapter 11 case. *See*, *e.g., In re McLean Industries*, 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988) (approving the substantial contribution application of a creditor whose objection to an asset sale resulted in the adjournment of the sale approval hearing, allowing the debtors to secure a superior offer from a competitor and triggering a bidding war); *In re Baldwin-United Corp.*, 79 B.R. 321, 344 (Bankr. S.D. Ohio 1987) (granting a substantial contribution application where a law firm identified a bidder who offered to buy company assets at a price higher than the previously uncontested purchaser, prompting another party to counter with an even higher offer, maximizing the value of the sale to the debtors' estate).

### III. Skadden's Fees and Expenses are Reasonable and Necessary.

20. The Ad Hoc Noteholder Group makes a blanket objection to the reasonableness of Skadden's fees, claiming generally that the total is too high a percentage in relation the Official Equity Committee's initial budget in these cases. Objection at ¶ 39. But the Objection fails to compare the scope and nature of the work done by Skadden with the work of the Official Equity Committee's professionals or with the Ad Hoc Noteholder Group's own professionals in litigating their objection to the appointment of the Official Equity Committee. Moreover, the Ad Hoc Noteholder Group has failed to identify any particular time entry or task as unreasonable.

21. In general, once an applicant has established the reasonableness of its fees, the burden shifts to the objector to advance specific objections with reference to the applicant's time

entries. *See generally In re Molina*, 632 B.R. 561, 571 (Bankr. S.D.N.Y. 2021) (evaluating an application under Bankruptcy Code section 330(a) and stating that "the applicant bears the burden of proof on its claim for compensation. … Once that burden is met, a party opposing a fee application must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances.") (internal quotation and citations omitted); *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 112 (Bankr. E.D.N.Y. 1994) ("The amount requested by a fee application [under section 330(a)] cannot be considered unreasonable simply because one party feels it is excessive. … [A] gestalt reaction that there was too much time spent … isn't good enough. … A party opposing a fee application must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances. Absent such evidence by the objectant, the opposition fails.") (internal quotations and citations omitted); *Matter of Hunt's Health Care, Inc.*, 161 B.R. 971, (Bankr. N.D. Ind. 1993) ("[T]he fee applicant has the burden of properly documenting the hours and hourly rates involved and producing evidence of both … the burden of going forward then shifts to an opposing party. … It must submit evidence challenging the accuracy or reasonableness of any item in the application."). The Ad Hoc Noteholder Group has not carried its burden to establish that the time spent by Skadden in its efforts to secure appointment of the Official Equity Committee and its DIP-related work was unreasonable.

22.  The reasonableness of a professional's fees also cannot be determined simply by calculating their proportionality to another party's fees. Section 503(b)(4) establishes that to determine whether fees are reasonable, the Court must look to "the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title." 11 U.S.C. § 503(b)(4). As set forth in the Application, Skadden worked efficiently and effectively, and its fees, at its lodestar rates and within the cap set under the Plan, are reasonable

in the light of the services provided. Indeed, Skadden was forced to incur additional fees even after obtaining the support of the Debtors and the Creditors' Committee because the Ad Hoc Noteholder Group continued to press its objections, refused to allow the cash collateral and DIP budget to reflect a budget for professional fees incurred by an official equity committee, propounded discovery against the Ad Hoc Equity Group, and proceeded to an evidentiary hearing on the section 1102 (a)(2) motion. The Ad Hoc Equity Group was forced to respond to the Noteholders' discovery requests, propound its own discovery requests, prepare witnesses and exhibits for a contested evidentiary hearing, attend two days of hearings to pursue the motion to appoint an official equity committee, and then fight for a budget for the official equity committee, if appointed.

23.     The increased cost resulting from the Ad Hoc Noteholder Group's litigious efforts is evidenced in Skadden's invoices. Skadden sent four invoices, each covering Skadden's work in the preceding month, to the Ad Hoc Equity Group. The first invoice was sent on January 20, 2023 for $132,790.02; the second on February 10, 2023 for $353,401.13; the third on March 13, 2023 for $920,446.77; and the fourth on May 1, 2023 for $50,654.39. *The Application*, at Exh. B. As a result of the Ad Hoc Noteholder Group's objection, a significant portion of the third invoice represents the litigation costs associated with the two-day contested evidentiary hearing on the motion to direct the appointment of the official equity committee and the replacement DIP facility budget.

## CONCLUSION

**WHEREFORE**, Skadden respectfully requests that the Court grant the Application and enter an order, substantially in the form of **Exhibit A** attached to the Application, (i) allowing the Substantial Contribution Claim in the amount of $1,457,292.31 plus the amounts incurred and to

be incurred on account of the Application, up to a maximum amount of $1,500,000, (ii) authorizing and directing the Debtors to pay Skadden the Substantial Contribution Claim and (iii) granting such other and further relief as the Court deems just, proper and equitable.

Dated: Houston, Texas
December 20, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Noelle M. Reed*
Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 27139
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122
Email: Noelle.Reed@skadden.com

-and-

Robert D. Drain
*(Pro hac vice application pending)*
One Manhattan West
New York, New York 10001-8602
Telephone: (212) 735-3000
Fax: (212) 735-2000
Email: Robert.Drain@skadden.com

-and-

Ron E. Meisler
*(Admitted pro hac vice)*
Jennifer Madden
*(Admitted pro hac vice)*
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411
Email: Ron.Meisler@skadden.co
Email: Jennifer.Madden@skadden.com

**Certificate of Service**

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

/s/ *Noelle M. Reed*
Noelle M. Reed