IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § | Case No. 22-90341 (CML) |
|  | § § | (Jointly Administered) |
| Debtors.[1] | § § § |  |

**ORDER
(I) AUTHORIZING ASSUMPTION AND PERFORMANCE OF THE
LEGACY DALTON AGREEMENTS, AS AMENDED BY THE DALTON
SETTLEMENT AGREEMENT AND (II) GRANTING RELATED RELIEF**

On December 5, 2023, Core Scientific, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed an emergency motion (the "**Motion**")[2] and requested (a) authority for the assumption and performance of the Legacy Dalton Agreements, in each case as amended and superseded by the Dalton Settlement Agreement annexed hereto as **Exhibit 1** between the Debtors and the City of Dalton, Georgia, acting by and through its Board of Water, Light, and Sinking Fund Commissioners d/b/a Dalton Utilities ("**Dalton Utilities**", and together with the Debtors, the "**Parties**" and, each, a "**Party**"), and (b) granting related relief, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334; and consideration of the Motion and the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677);RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409; and due and proper notice of the Motion having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing,

**IT IS HEREBY ORDERED THAT:**

1. Pursuant to sections 365(a) and 105(a) of the Bankruptcy Code, the Legacy Dalton Agreements, as amended by the Dalton Settlement Agreement, are assumed in their entirety by the Debtors.

2. The Debtors' assumption of the Legacy Dalton Agreements, as amended by the Dalton Settlement Agreement, represents a reasonable exercise of the Debtors' sound business judgment under section 365 of the Bankruptcy Code.

3. Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors are authorized to enter into the Dalton Settlement Agreement, including the Settlement, and perform all obligations thereunder, including payment of the Dalton Cure Claims pursuant to the issuance of the Note.

4. The Debtors' issuance of the Note, shall be subject in all respects to the confirmation of the Plan and the occurrence of the Emergence Date.

5. The Debtors' entry into the Dalton Settlement Agreement represents a reasonable exercise of the Debtors' sound business judgment under section 363 of the Bankruptcy Code.

6. The Settlement is the product of extensive, good faith, arms' length negotiations between the Parties and their respective representatives.

7. The Debtors are authorized to enter into, execute, deliver, and implement the terms of the Dalton Settlement Agreement in all respects, as agreed to by the Parties.

8. Subject to the occurrence of the Emergence Date, the Note shall bear interest at the rate of 5% per annum and be payable in five (5) equal monthly installments. The first installment payment date shall occur, and interest shall begin accruing on the Note, on the date that is ten (10) calendar days following the Emergence Date, and the last installment payment date shall occur in May of 2024. For example, if the Emergence Date is December 22, 2023, the initial payment date will be January 1, 2024, and each subsequent monthly payment date will be as follows: (i) February 1, 2024, (ii) March 1, 2024, (iii) April 1, 2024; and (iv) May 1, 2024.

9. Dalton Utilities shall vote in favor and accept the Plan and otherwise support the Plan. For the avoidance of doubt, the Plan will provide for the implementation of the Dalton Settlement Agreement.

10. Upon the occurrence of the Settlement Effective Date under the Dalton Settlement Agreement, (a) any "claim" (as defined in section 101(5) of the Bankruptcy Code) held by Dalton Utilities against the Debtors, including the Dalton Cure Claims (including but not limited to proofs of claim numbers. 397 and 398), shall be deemed finally and fully paid, satisfied, released and expunged; (b) the Debtors and their respective bankruptcy estates (together, the "**Debtor Releasors**") and Dalton Utilities (each of the Debtor Releasors and Dalton Utilities,

a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), irrevocably releases, acquits and forever discharges (i) each other Releasing Party and its respective their affiliates, successors, assigns, designees, subsidiaries, employees, shareholders, attorneys, accountants, officers and directors (each of the foregoing, including each Releasing Party, a "**Released Party**") from any and all claims, actions, liabilities, debts and causes of action, whatsoever, whether in law or in equity, whether known or unknown, that such releasing Party has, ever had, might have had, or might have in the future, up through and including the Settlement Effective Date, including with respect to those certain proofs of claim numbers. 397 and 398 and any other claims arising out of or pertaining to the Dalton Cure Claims, the Legacy Dalton Agreements, the Parties business dealings and all matters related thereto, and (c) other than as set forth herein and the Dalton Settlement Agreement, Dalton Utilities shall not be entitled to receive any other recovery in connection with any claims it has, or could have, asserted in connection with these chapter 11 cases or otherwise.

11. The Debtors are authorized to enter into, perform, execute, and deliver all documents, including without limitation the Note (subject to paragraph 4 of this Order), and take all actions, necessary or appropriate to immediately continue and fully implement the Dalton Settlement Agreement and carry out the relief granted in this Order.

12. Except as set forth in this Order, nothing contained in the Motion, the Dalton Settlement Agreement, this Order, or any actions taken by the Debtors pursuant to the relief granted in the Order shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (iii) an approval of an assumption or rejection of any lease, sublease, or contract pursuant to section 365 of the Bankruptcy Code.

13. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

14. This Court shall retain jurisdiction to hear and determine matters arising from or related to the implementation, interpretation, or enforcement of this Order to the extent provided under the Dalton Settlement Agreement.

Dated: _____, 2023
        Houston, Texas

                                    _____
                                    THE HONORABLE CHRISTOPHER M. LOPEZ
                                    UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**The Dalton Settlement Agreement**

## ELECTRIC UTILITY RATE AGREEMENT, BANKRUPTCY CLAIM SETTLEMENT, AND MUTUAL RELEASE

THIS ELECTRIC UTILITY RATE AGREEMENT, BANKRUPTCY CLAIM SETTLEMENT, AND MUTUAL RELEASE (the "Agreement") is made and entered into this fifth day of December 2023, by and between: (i) the City of Dalton, Georgia, acting by and through its Board of Water, Light, and Sinking Fund Commissioners d/b/a Dalton Utilities ("Dalton"); and (ii) Core Scientific, Inc., a Delaware corporation ("Core").

**R E C I T A L S**:

WHEREAS, on December 21, 2022 (the "Petition Date"), Core, et al. (the "Debtors" and each, a "Debtor") filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101 et. Seq., the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") and such Chapter 11 cases (the "Chapter 11 Cases") remain pending;

WHEREAS, Dalton and Core are parties to certain agreements relating to the provision of electric utility services: (i) *Amended and Restated Electric Service Agreement (Boring Drive Property)*, dated October 11, 2018 (the "2018 Boring Drive Electric Service Agreement"), (ii) *Amended and Restated Electric Service Agreement (Industrial South Premises)*, dated October 11, 2018, (the "2018 Industrial South Electric Service Agreement"), (iii) *Letter from Dalton Utilities to Core Scientific, Inc.*, dated August 2, 2022 (the "August 2022 Rate Letter") and (iv) *(Demand) Large Industrial and Manufacturing Electric Rates Effective For Service Provided After 11/20/2022* (the "November 2022 Electric Rate Notice," and, collectively with the 2018 Boring Drive Electric Service Agreement, the 2018 Industrial South Electric Service Agreement, and the August 2022 Rate Letter, the "Legacy Dalton Agreements"), pursuant to which Dalton provides Core electricity at two locations ("Service Locations") under four separate accounts;

WHEREAS, in connection with the Legacy Dalton Agreements and on account of electricity provided to the Debtors prior to the Petition Date, Dalton timely asserted claims against the Debtors, including, without limitation, the claim asserted in those certain Proofs of Claim Nos. 397 and 398 in the aggregate amount of $9,092,339.54, which is comprised of: (i) a $4,091,580.30 priority claim pursuant to Bankruptcy Code section 503(b)(9) the "Dalton Priority Claim,"; and (ii) a $5,000,759.24 unsecured claim (together with the Dalton Priority Claim and any such other post-petition claims that may have accrued up through the Settlement Effective Date, the "Dalton Cure Claims").

WHEREAS, in connection with the Debtors' Chapter 11 Cases and pursuant to Section 366 of the Bankruptcy Code, the Debtors funded an adequate assurance deposit into a segregated account held for the benefit of Dalton to secure the Debtors' obligations to Dalton incurred during the pendency of the Chapter 11 Cases (the "Adequate Assurance Deposit"), in accordance with the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; And (IV) Granting Related Relief* (Doc. No. 334).

WHEREAS, on November 16, 2023, the Debtors' filed the *Third Amended Joint Chapter 11 Plan* (Docket No. 1438) ("Plan") and the *Disclosure Statement for Third Amended Joint Chapter 11 Plan* (Docket No. 1439) (the "Disclosure Statement");

1

**WHEREAS**, the Court is scheduled to hold a combined hearing on the confirmation of the Plan and the adequacy of the Disclosure Statement on December 22, 2023 at 10 a.m.;

**WHEREAS**, during the pendency of the Chapter 11 Cases the Debtors and Dalton have engaged in extensive discussions on ways to address the Dalton Cure Claims while allowing the Debtors the ability to reduce electric utility costs at the Service Locations on a go-forward basis;

**WHEREAS**, following good faith negotiations, Dalton and Core (each, individually, a "Party"; and together, collectively, the "Parties") have reached an agreement and desire to settle and compromise all disputes between them, including the Dalton Cure Claims, application of the Adequate Assurance Deposit, the electric utility rate at the Service Locations on a go-forward basis, and certain other items on the terms and conditions as set forth herein; and

**WHEREAS**, the Debtors' shall file a motion and proposed order (the "Proposed Order"), in form and substance reasonably acceptable to Dalton, with the Court seeking approval of this Agreement and the settlement terms contemplated herein.

## AGREEMENT

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties hereby stipulate and agree as follows:

1. **Incorporation of Recitals**. The Recitals set forth above are incorporated herein by reference and shall be deemed true and correct representations of the Parties with respect to such statements as apply to each Party.

2. **Payment of the Dalton Cure Claims**. Upon the occurrence of the Settlement Effective Date (as defined herein), the Dalton Cure Claims shall be deemed fully satisfied and released, consistent with and subject to the terms of this Agreement.

3. **Assumption and Modification of the Legacy Dalton Agreements.** Upon entry of the Proposed Order, the Debtors shall assume the Legacy Dalton Agreements, as expressly amended by this Agreement, which shall govern the purchase and sale of electricity and electricity related services in accordance with subsections (a) – (c) of Section 4. The Parties expressly acknowledge and agree that the amendment by this Agreement and the modifications set forth herein concern only the Legacy Dalton Agreements and the associated rates and conditions under which the Debtors shall receive electric utility service during the Term, following the Settlement Effective Date, and that the rates and terms under which the Debtors receive non-electric utility services pursuant to any non-electric utility agreements are not governed by this Agreement and may be subject to increase, termination or other changes notwithstanding any provision of this Agreement. For the avoidance of doubt, it is expressly understood and agreed by the parties hereto that this Agreement and the terms and conditions provided herein shall exclusively govern the provision of electric utility services to the Debtors at the Service Locations and shall supersede all terms and conditions in the Legacy Dalton Agreements.

4. a. **Prepay Billing Structure and Invoice Event of Default**. During the term (the "Term") of this Agreement, billing shall occur in advance on a weekly basis. Beginning on the first Tuesday following the Settlement Effective Date and on each Tuesday

during the Term, Dalton shall submit to the Debtors a bill (each such bill, an "Invoice") that includes the following two parts:

   (i) A true up amount (the "True Up Amount") which shall either be payable by the Debtors or shall be credited to the Debtors' Prepayment Account (as defined below), as applicable. The True Up Amount shall represent the difference between actual and estimated consumption during the most recent Monday through Sunday ("Billing Period") prior to the Invoice date.

   (ii) A prepayment amount (the "Prepayment Amount") payable by the Debtors. The Prepayment Amount shall be in an amount sufficient to fund the Debtors' estimated electric consumption during the first 12 calendar days following the most recently completed Billing Period.

For the avoidance of doubt, each Billing Period shall begin on a Monday and end on a Sunday. Payment of each Invoice (to be delivered on each Tuesday) is intended to fund electric consumption to and through the 12th day after the most recently completed Billing Period, or in calendar days, through the second Friday after the date of the applicable Invoice.

The Debtors shall establish on or before the Settlement Effective Date a prepayment account (the "Prepayment Account") into which they shall remit payment for each weekly Invoice. The Prepayment Account shall be initially funded by the Debtors on the Settlement Effective Date in an amount sufficient to fund electric service for the period beginning on the Settlement Effective Date and ending on the twelfth (12th) day after the first Tuesday following the Settlement Effective Date, calculated based on the Debtors' average daily consumption during the billing for the previous two (2) weeks (the "Initial Funding").

The payment due date for each Invoice shall be the date that is 7 calendar days (in each case a Tuesday) after the date of the Invoice (the "Invoice Due Date"). In the event any Invoice is not paid in full by the Invoice Due Date (an "Invoice Event of Default"), the Debtors are subject to disconnection at 1700 hours Eastern Standard Time on the tenth (10th) day following the Invoice Due Date associated with any applicable Invoice (in each case a Friday). In the event that a Tuesday falls on a non-business day for Dalton, a bill will be issued on the last business day prior to the Tuesday. Due dates and non-payment disconnect will remain on the otherwise scheduled Tuesday and Friday, respectively.

  b. **Revised Pricing Structure**. For the period beginning on December 5, 2023 and ending on December 31, 2024, Dalton shall provide the Debtors with electricity pursuant to the revised pricing structure set forth in subsections (i)-(iii) below. Dalton shall issue to the Debtors a credit for any difference in electric rates actually paid by the Debtors and the revised pricing structure contemplated herein for the period between December 5, 2023 and the Settlement Effective Date, with such credit being issued by Dalton within one billing cycle.

   (i) Base Rate. Dalton shall provide the Debtors with electricity at a base rate of $[REDACTED] per kilowatt-hour (the "Base Rate"), subject to the adjustments for the Interruptible Credit (defined below) and Fuel Cost Adjustment (defined below) described in clauses (ii)-(iii), below.

3

(ii) <u>Interruptible Credit</u>. The Debtors shall receive a monthly interruptible credit (the "<u>Interruptible Credit</u>"), calculated as set forth on <u>Exhibit A</u> hereto, beginning in the first calendar month immediately following the occurrence of the Settlement Effective Date.

(iii) <u>Fuel Cost Adjustment</u>. The Debtors shall pay to Dalton a fuel cost adjustment (the "<u>Fuel Cost Adjustment</u>"), calculated by Dalton and published on a monthly basis. The Fuel Cost Adjustment shall be calculated as follows and billed to the Debtors:

[REDACTED]

c. <u>Minimum Volume</u>. The Debtors shall, from the Settlement Effective Date until December 31, 2024, guarantee a minimum purchase of electricity (the "<u>Minimum Volume Requirement</u>") for any calendar month, calculated as follows: [REDACTED] *provided however*:

(i) if the actual electricity price billed to and payable by the Debtors (calculated as the Base Rate plus the Fuel Cost Adjustment minus the Interruptible Credit) rises above $[REDACTED] per kilowatt-hour;

(ii) if the bitcoin hashprice[1] (expected value of 1 TH/s of hashing power per day, denoted in USD) goes below [REDACTED] USD/TH/day;

(iii) if the Debtors are experiencing a planned outage that has been coordinated at least 24 hours in advance between the Debtors and Dalton and to which Dalton has expressly agreed in writing may reduce the Minimum Volume Requirement, <u>provided however,</u> that notwithstanding Dalton's consent to a planned outage, this subsection (iii) shall not apply and the Debtors shall not be relieved of the Minimum Volume Requirement if the planned outage has the effect of causing the Debtor's actual electrical usage to fall below the Minimum Volume Requirement for any billing cycle;

(iv) if Dalton is completely or partially unable to provide the Debtors with electric service that results in an event or condition that prevents the debtor's Dalton facilities from operating [REDACTED] (a "<u>Material Adverse Effect</u>") on the Debtors' operations;

(v) if a Force Majeure Event (defined on Exhibit B hereto) occurs; or

(vi) if the Debtors or Dalton experience electrical equipment failure that results in a Material Adverse Effect on the Debtors' operations,

---

[1] Bitcoin hashprice refers to the expected value of 1 TH/s of hashing power per day, denoted in USD. The metric quantifies how much a miner can expect to earn from a specific quantity of hashrate per day. Luxor publishes a public index of bitcoin hashprice found at the following link: https://data.hashrateindex.com/chart/bitcoin-hashprice-index.

4

then, in each case the Minimum Volume Requirement shall be waived with respect to the associated Billing Period; <u>provided however</u>, that if Debtors fail to meet the Minimum Volume Requirement and none of the above-enumerated exceptions apply, the Debtors shall pay to Dalton the difference of the Minimum Volume Requirement and the actual usage (the "<u>Shortage Charge</u>"). The Shortage Charge shall equal the (Minimum Volume Requirement (kWh) minus the Actual Monthly Volume (kWh)) multiplied by the base rate of ▇▇▇ cents per kilowatt hour (no taxes should be included in this amount). Dalton shall invoice the Debtors for the Shortage Charge in a miscellaneous invoice to the Debtors for the subsequent billing cycle, and the Shortage Charge shall be paid within seven (7) calendar days of the date of such miscellaneous invoice.

5. **Adequate Assurance**. Upon entry of the Proposed Order, the Adequate Assurance Deposit shall be applied as follows: (1) first, in satisfaction of all unpaid charges, fees, and costs incurred by the Debtors in the last billing cycle immediately preceding the Settlement Effective Date; (2) second, to satisfying the Initial Funding amount into the Prepayment Account; and (3) third, to the extent of any excess funds after satisfaction of (i) and (ii) above, payment to Dalton of such excess funds to reduce the principal balance of the Note.

6. **Non-Invoice Events of Default**. An "<u>Event of Default</u>" shall occur hereunder with respect to the Note and Dalton's obligations if: (1) the Debtors fail to pay any monthly installment due under the Note on the payment date when such monthly installment becomes due and payable under Section 2 of this Agreement and such failure continues for seven (7) calendar days after Dalton gives written notice thereof to the Debtors by email to legal@corescientific.com or (2) Dalton fails to provide electric services in accordance with section 4 herein.

Upon the occurrence of an Event of Default specified in (1) above, Dalton shall be immediately entitled to (i) any monetary damages against the Debtors and (ii) any other remedy at law or in equity, including without limitation seeking relief to enforce the terms of this Agreement against the Debtors in accordance with section 18 herein.

Upon the occurrence of an Event of Default specified in (2) above and such Event of Default has not been cured following the Debtors' notice, each in accordance with the terms herein, the Debtors are entitled to (i) any monetary damages against the Debtors and (ii) any other remedy at law or in equity, including without limitation seeking relief of specific performance to enforce the terms of this Agreement against Dalton in accordance with section 18 herein.

7. **Settlement Effective Date**. The effective date of this Agreement and all of its terms shall be the first date on which all of the following conditions have been satisfied or expressly waived by the Parties in writing (the "<u>Settlement Effective Date</u>"):

> (a) the Court shall have entered the Proposed Order and such Proposed Order shall be a final order, the implementation, operation, or effect of which has not been stayed and as to which such order (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending, and shall not modify the terms and conditions of this Agreement or the transactions contemplated

hereby in such a manner as to result in any diminution in the benefits of this Agreement to Dalton and

(b) Within one (1) business day of the entry of the Proposed Order, the Debtors shall have delivered to Dalton a fully executed promissory note in the principal amount of the Dalton Cure Claims (the "Note"), which has been duly executed by an authorized signatory of the Debtors and which shall not be subject to any conditions regarding enforceability, in full and final satisfaction of the Dalton Cure Claims. The Note shall bear interest at the rate of 5% per annum and shall be payable in equal monthly installments until paid in full, including all accrued interest and any fees; the first installment payment date shall occur, and interest shall begin accruing on the Note, on the date that is ten (10) calendar days following the effective date of the Debtors' Plan (the "Emergence Date"), and the last installment payment date shall occur in May of 2024. For example, if the Emergence Date is December 22, 2023, the initial payment date will be January 1, 2024, and each subsequent monthly payment date will be as follows: (i) February 1, 2024, (ii) March 1, 2024, (iii) April 1, 2024; and (iv) May 1, 2024. Core shall have the right, exercisable at any time and from time to time, to voluntarily prepay the Note in whole or in part, without any penalty or fee. Any prepayment of the Note shall be immediately applied toward principal, be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under the Note.

8. **Releases**.

   a. In consideration of this Agreement and upon the Settlement Effective Date, Dalton hereby irrevocably releases, acquits and forever discharges the Debtors, and their affiliates, successors, assigns, designees, subsidiaries, employees, shareholders, attorneys, accountants, officers and directors, from any and all claims, actions, liabilities, debts and causes of action, whatsoever, whether in law or in equity, whether known or unknown, which Dalton has, ever had, might have had, or might have in the future, up through and including the Settlement Effective Date, including with respect to those certain Proofs of Claim Nos. 397 and 398 and any other claims arising out of or pertaining to the Dalton Cure Claims, the Legacy Dalton Agreements, the Parties business dealings and all matters related thereto (the "Core Release"); provided, however, that nothing herein shall be deemed to release any Party of its obligations under this Agreement and the settlement contemplated herein, all of which expressly shall remain in full force and effect.

   b. In consideration of this Agreement and upon the Settlement Effective Date, the Debtors and their respective bankruptcy estates hereby irrevocably releases, acquits and forever discharges Dalton, and its affiliates, successors, assigns, designees, subsidiaries, employees, shareholders, attorneys, accountants, officers and directors, from any and all claims, actions, liabilities, debts and causes of action, whatsoever, whether in law or in equity, whether known or unknown, which the Debtors have, ever had, might have had, or might have in the future up through and including the Settlement Effective Date, including but not limited to any claims pertaining to the Dalton Cure Claims, the Legacy Dalton Agreements, the Parties business

dealings and all matters related thereto, including without limitation any claim, demand or cause of action for the avoidance or recovery of any payment or transfer under Section 5 of the United States Bankruptcy Code or any similar state law or provision (the "Dalton Release"); provided, however, that nothing herein shall be deemed to release any Party of its obligations under this Agreement and the settlement contemplated herein, all of which expressly shall remain in full force and effect.

9.  **Approval**.  The obligations of the Parties under this Agreement are expressly conditioned on the Court approving the Proposed Order. Dalton will agree to vote to accept the Debtors' Plan or otherwise support the Plan, provided the Plan allows for the implementation of this Agreement.

10. **Further Assurances**.  Without limitation of any of the obligations of Core set forth in the Legacy Dalton Agreements or this Agreement, Core hereby covenants that, from time to time after the delivery of this instrument, at Dalton's request and without further consideration, Core shall promptly execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, conveyances, transfers, assignments, powers of attorney, assurances, records and other documents as reasonably may be required to effect the transactions contemplated herein.

11. **No Third-Party Beneficiaries**.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any person other than the Parties hereto and their respective successors and assigns, any remedy or claim under or by reason of this Agreement or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements in this Agreement shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

12. **No Admission**.  It is understood and agreed that this Agreement is a compromise of a disputed demand, and the Agreement shall not be construed as an admission or concession of any liability by either Party.

13. **No Assignment**.  The Parties each warrant that they have made no assignment, and hereafter will make no assignment of any claim, chose in action, right of action, or any other right released pursuant to this Agreement.

14. **Attorneys' Fees**.  The Parties shall each bear their respective attorneys' fees and costs relating to this matter and implementation of this Agreement.  However, if any action, suit, demand, or proceeding is alleged, filed or commenced, as the case may be, by any Party hereto to enforce the provisions of this Agreement, the prevailing Party shall be entitled to an award, in addition to any other claims or damages, of its costs and expenses including attorneys' fees, in connection with such actions.

15. **Full Agreement**.  The Parties hereto have fully read and understood this Agreement and represent that this Agreement has been explained to them by their respective legal counsel, and that each understands all of the provisions hereto.  Further, (i) this Agreement sets forth the entire agreement and understanding of the Parties hereto with respect to the subject matter herein and supersedes and merges all prior oral and written agreements, discussions and understandings between the Parties with respect thereto, including without limitation the Legacy Dalton Agreements, any electric utility tariffs, agreement, letters of understanding, or any other document or agreement, whether written or oral, between the Parties and (ii) and none of the

Parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein. The Agreement shall not be modified in any manner except by express written agreement signed by all Parties hereto.

16. **Counterparts**. The Parties agree that facsimile and electronic signatures shall have the same force and effect as original signatures. This Agreement may be executed in counterparts and all counterparts so executed shall constitute one Agreement which shall be binding on the Parties hereto.

17. **Authorization**. Dalton and the individual executing this Agreement on behalf of Dalton, and Core and the individual executing this Agreement on behalf of Core, each represent and warrant that they have the full authority and approval, including approval by any governmental or regulatory entities or persons, to execute and deliver this Agreement and perform the respective obligations hereunder.

18. **Choice of Law and Forum**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby. The Parties irrevocably consent to the jurisdiction of (i) on or prior to the Emergence Date, the Court, and (ii) after the Emergence Date, (a) the Court solely with respect to the Dalton Cure Claims, those certain Proofs of Claim Nos. 397 and 398, the assumption of the Legacy Dalton Agreements as amended by this Agreement, the Note and the enforcement thereof, (b) the United States District Court for the Norther District of Georgia, for all other purposes in connection with any action or proceeding that arises out of or relates to this Agreement, and hereby specifically waive any and all defenses to said jurisdiction.

19. **Severability**. In case any provision of this Agreement shall be determined to be invalid, illegal or unenforceable for any reason, the remaining provisions of this Agreement shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law.

20. **No Waiver**. No term of this Agreement may be waived, modified or amended except in writing signed by the party against whom enforcement of the waiver, modification or amendment is sought.

21. **Additional Documents**. The Parties agree to execute and deliver such additional documents and to take such further action in the future as may be necessary or reasonable to give effect to the terms of this Agreement.

22. **Tolling**. Any statute or period of limitations, statutes of repose, or other time-based limitations or defenses, whether at law, in equity, under statute, contract or otherwise (including, but not limited to, the doctrine of laches or waiver), which might be asserted as a time bar and/or limitation in connection with the Dalton Cure Claims is hereby tolled until the Settlement Effective Date. Nothing in this Agreement shall operate to revive or extend the time for filing or asserting any claim or defense that is now time barred or barred by any applicable statute or period of limitations, statutes of repose, or other time-related defenses as of the date this Agreement is executed as set forth above.

[Signatures on the Following Page]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by themselves or on their behalf by their respective attorneys as of the date first above mentioned.

CITY OF DALTON, GEORGIA, ACTING BY AND THROUGH ITS BOARD OF WATER, LIGHT, AND SINKING FUND COMMISSIONERS D/B/A DALTON UTILITIES

By: _____

Name: _____Jesse Thomas_____

Title: _____CEO_____

CORE SCIENTIFIC, INC. (on behalf of itself and the remaining Debtors and their estates)

By: _____

Name: Todd DuChene

Title: Chief Legal and Administrative Officer

[Signature Page to Electric Utility Rate Agreement, Bankruptcy Claim Settlement and Mutual Release]

# EXHIBIT A

## INTERRUPTIBLE CREDIT

For purposes of calculating the Interruptible Credit under the Agreement, Core Scientific has designated a "Minimum Load" of ▬ kW (the "Minimum Load").

At the end of each month, an "Interruptible Capacity" will be calculated by taking the average hourly load (in Megawatts) across all hours of the previous month and subtracting the Minimum Load from this amount (the "Interruptible Capacity"). By way of example only, for the month of October 2023, Core's average load was ▬ kW. Subtracting the Minimum Load of ▬ kW from the October 2023 average load of ▬ kW yields ▬ kW – ▬ kW OR ▬ kW, which would be the Interruptible Capacity for the following calendar month, November 2023.

Dalton will issue an electric billing credit (the "Interruptible Credit") to Core on its next bill after the conclusion of the calendar month, in the amount of the calculated Interruptible Capacity * $▬/kW-Month. By way of example, for the invoice issued on or about November 30, 2023, Core would have received an Interruptible Credit of ▬ ▬ ▬.

### I. Curtailment Procedure

In the event of a circumstance dictating curtailment arising, Dalton shall notify contact Core at least 45 minutes prior to the requested start time of curtailment. Notice to Core shall be provided as follows: (i) by email to ▬, and shall be deemed effective under this Agreement upon Dalton's transmission of the email and telephone call to the email address and telephone number under this Section I. It will be Core's responsibility to shed load equal to the Interruptible Capacity.

Under this Agreement, Dalton can request curtailment for ▬ ▬.

### II. Penalty for Failure to Curtail

In the event that Dalton requests curtailment and Core fails to comply within the required time of 45 minutes, the following penalties may be applied by Dalton:

- Core's load may be disconnected by Dalton personnel at any time following the expiration of 45 minutes from time of notification. If this occurs after normal business hours, Core could be invoiced for a customer-requested after-hours callout in accordance with normal Dalton procedures.
- The Interruptible Credit may be terminated immediately.
- Core will be invoiced a non-performance penalty equal to the energy delivered in excess of the Minimum Load times the IIC Associated Interchange Energy Rate (as defined by Southern Power), ▬. For example, if a curtailment was requested for ▬, and Core ran at a load of ▬ kW for that time period, the delivered energy of the difference

between the demand and the minimum load would be ███████████████
███████████ If the IIC Associated Interchange Energy Rate were $███ /kWh, Core would
be assessed a penalty of ███████████████████████████

EXHIBIT B – FORCE MAJEURE EVENT DEFINITION

"Force Majeure Event" means, when used in connection with the performance of a Party's obligations under this Agreement, any act, condition or event occurring after the Settlement Effective Date which renders said Party unable to perform or comply with its obligations under this Agreement, but only if and to the extent (a) such event is not within the reasonable control, directly or indirectly, of the Party, including its affiliates, contractors, agents or designees, seeking to have its performance obligation(s) excused thereby, (b) the Party seeking to have its performance obligation(s) excused thereby, including its affiliates, contractors, agents or designees, has taken all reasonable precautions and measures in order to prevent or avoid such event or mitigate the effect thereof on its ability to perform its obligations under this Agreement and which by the exercise of due diligence such Party could not reasonably have been expected to avoid and which by the exercise of due diligence it has been unable to overcome, (c) such event is not the result of the negligence or the failure of, or caused by, the Party seeking to have its performance obligations excused thereby, including its affiliates, contractors, agents or designees, and (d) the Party seeking to have its performance obligations excused thereby, including its affiliates, contractors, agents or designees, had no actual or constructive prior knowledge of the impact of such event on or prior to the Settlement Effective Date.

(i)     Without limiting the meaning of but subject to the preceding paragraph, the following events constitute Force Majeure Events to the extent that they render a Party unable to perform or comply with its obligations under this Agreement:

(A)     war (whether or not war is declared), hostilities, invasion, revolution, rebellion, insurrection against any governmental authority, riot, terrorism, acts of a public enemy or other civil disturbance;

(B)     acts of God, including storms, floods, lightning, earthquakes, hailstorms, ice storms, tornados, typhoons, hurricanes, landslides, volcanic eruptions, fires, explosions, objects striking the earth from space (such as meteorites), or any other naturally occurring event or unusually severe weather that directly affects the Service Locations, that impacts the ability of the affected Party to perform its obligations under this Agreement;

(C)     change in relevant law or regulations; or

(D)     embargoes or blockades

(E)     pandemics, epidemics and quarantines which otherwise meet the requirements of a Force Majeure Event under this Agreement.

(ii)    Notwithstanding anything to the contrary in this definition, the term Force Majeure Event shall not be based on or include any of the following:

(A)     economic hardship of either Party, including hardship due to increased fees, costs and expenses resulting from supply-chain impacts or the variability of pricing related to materials, equipment or other resources affecting the Service Locations;

(B) the Debtors' inability to pay;

(C) the Debtors' inability to obtain sufficient labor, materials, equipment or other resources to operate the Service Locations;

(D) the lack of sun or other fuel source of an inherently intermittent nature, except to the extent it is of the specific type described in subsection (i)(B) above;

(E) an equipment failure, except if such equipment failure is caused solely by a Force Majeure Event of the specific type described in any of subsections (i)(A) through (i)(D) above;

(F) reserved; or

(G) transportation or shipping accidents not caused by an independent Force Majeure Event.