# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS OF CORE SCIENTIFIC FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

---

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on February 28, 2023 at 11:00 a.m. before The Honorable Judge Jones in Courtroom 400, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones' home page. The meeting code is "JudgeJones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones' home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

An ad hoc group (the "**Ad Hoc Equity Group**")[2] of beneficial holders of the common stock of Core Scientific, Inc. ("**Core Scientific**" or the "**Company**" and, together with its affiliated debtors and debtors in possession, the "**Debtors**"), by and through their undersigned counsel, hereby submits this motion (the "**Motion**") for the entry of an order, substantially in the form attached as **Exhibit A**, directing the United States Trustee to appoint an official committee of equity security holders (the "**Official Equity Committee**") in these cases. In support thereof, the Ad Hoc Equity Group respectfully submits as follows:

### PRELIMINARY STATEMENT

1. The unique facts and circumstances of these Chapter 11 Cases[3] clearly warrant the appointment of an official equity committee. The Debtors concede they are balance-sheet solvent and that value is available for distribution to equity; they have acknowledged that assets exceed liabilities, and they described proposed plan terms in the restructuring support agreement previously agreed to between the Debtors and the secured convertible noteholders (the "**RSA**") as providing a "meaningful" recovery to equity. Given the Debtors' decision to pivot to a superior financing alternative and terminate the RSA, even more value is now available to stakeholders, including shareholders. Furthermore, market conditions, including the postpetition

---

[2] The member of the Ad Hoc Equity Group are identified in *Verified Statement of the Ad Hoc Group of Equity Holders Pursuant to Bankruptcy Rule 2019*, filed contemporaneously herewith.

[3] "**Chapter 11 Cases**" refers to the chapter 11 cases commenced by the Debtors on December 21, 2022 (the "**Petition Date**"), which are being jointly administered before this Court.

**SASMF EXHIBIT 14**

**2 of 74**

rally in Bitcoin pricing, moderating energy prices and inflation, and the slowing interest-rate hike environment, suggest that the value available for equity is increasing.

2.      Indeed, every factor generally considered by courts strongly weighs in favor of appointing an official equity committee: (a) the Debtors are balance-sheet solvent and valuation will show that the fair market value of the Company breaks in the equity; (b) no other party in the Chapter 11 Cases is adequately aligned with the equity holders to provide adequate representation; (c) the Chapter 11 Cases are undoubtedly complex; (d) given the crucial need for adequate representation, the additional costs associated with an equity committee are justified; and (e) an official equity committee would add substantial value to the Chapter 11 Cases by providing critical input with respect to valuation and negotiating chapter 11 plan terms on behalf of equity, while maintaining a narrow scope of engagement, targeting the most important issues confronting shareholders, which will keep costs down.

3.      ***There is ample evidence that the Debtors are solvent.*** Notably, both the Debtors and the secured convertible noteholders holding more than 66% of the secured convertible notes (the "**Noteholder Group**") already agreed in their RSA and the accompanying plan term sheet that there is value for distribution to shareholders. In addition:

- The Debtors acknowledge they are balance-sheet solvent in both the Core Scientific petition and the First-Day Declaration of the Company's Senior Vice President of Capital Markets & Acquisitions, Michael Bros. *See Attachment to Voluntary Pet. Of Core Scientific, Inc.* [Docket No. 1] ("**Chapter 11 Petition**") ¶ 2 (showing approximately $1.4 billion in assets compared to $1.3 billion in liabilities); *Declaration of Michael Bros In Support Of The Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5] (the "**First-Day Declaration**") ¶ 63 (same).

3

- The Debtors' most recent balance sheet shows positive shareholder equity. Core Scientific, Inc., Quarterly Report (Form 10-Q) at 4 (Nov. 22, 2022).

- Mr. Bros averred in the First-Day Declaration that the proposed distribution pursuant to the RSA would have provided a "meaningful recover[y]" to equity holders in these Chapter 11 Cases.

- Over the course of the Chapter 11 Cases, the trading price of Bitcoin has substantially increased, energy prices and inflation have moderated, and interest rate increases have slowed. The combined effect of these trends has led to an increase in the Debtors' value, as illustrated by the surge in the Debtors' stock price, as well as that of comparable companies (as explained in more detail below). In addition, the Replacement DIP Facility (defined below) provided by B. Riley leaves the Debtors with flexibility and even more potential value to allocate to its stakeholders, due in part to substantially lower aggregate fees, a lower principal loan amount, and the elimination of the requirement that a rollover of the DIP loans into an exit facility comes with the price tag of 30% of the value of the reorganized Company.

4. ***Without an official equity committee, the equity holders have no real representation in the Chapter 11 Cases.*** Everything that has transpired in the Chapter 11 Cases to date makes clear that no other estate fiduciary is sufficiently aligned with the interests of shareholders, and shareholders require the appointment of an effective advocate. The Debtors have a duty to maximize value for all stakeholders, including shareholders; however, the chapter 11 process often requires debtors to accommodate competing interests of different creditor classes and shareholders. The Debtors commenced these cases with a DIP financing and RSA that sought to transfer nearly all the Debtors' value to the prepetition secured convertible

**SASMF EXHIBIT 14**
**4 of 74**

noteholders, including through fees, a roll-up, liens on valuable unencumbered property, and the distribute of 97% of the reorganized Company's value, leaving 3% (subject to further dilution) of the Company to be divided among the unsecured creditors and shareholders. The Original DIP Financing and RSA, taken together, highlight management's and shareholders' differing interests; the shareholders cannot rely on the Debtors' management to adequately represent them in these Chapter 11 Cases.

5.      Although the Debtors' options were limited, had the equity holders had real input prior to the Petition Date, there might have been viable alternatives to the Original DIP Financing, which this Court has described as "expensive money." *See In re Core Scientific, Inc.* (Case No. 22-90341 (DRJ)) (Bankr. S.D. Tex. Dec. 22, 2022) Hr'g Tr. at 61:14.  This is not mere speculation. Notwithstanding the lack of official status, certain members of the Ad Hoc Equity Group realized the significant value that could be preserved if the Debtors had alternative DIP financing and worked with its counsel to seek out alternatives.  The Ad Hoc Equity Group successfully encouraged a third party to submit a competing DIP financing proposal with terms superior to the Original DIP Financing. Upon information and belief, this proposal was the first of the viable competing proposals received by the Debtors, and the competition undoubtedly improved the Debtors' ability to negotiate the B. Riley replacement DIP financing facility supported by all key stakeholders. Had the Ad Hoc Equity Group been involved from the outset, the Debtors might well have avoided the original agreement with the secured convertible noteholders that allowed for a $6 million termination fee, equating to an internal rate of return in excess of 500%.

6.      The official committee of unsecured creditors (the "**Creditors' Committee**") is also not positioned or incentivized to effectively represent equity holders' interests. The

Creditors' Committee is explicitly tasked with maximizing recoveries for unsecured creditors. Value remains to be allocated among stakeholders. The Creditors' Committee may seek to augment distributions to unsecured creditors at the direct expense of equity.

7.     Equity holders require representation in an official capacity to meaningfully and fairly participate in these Chapter 11 Cases, including: (a) testing valuation in a methodical fashion to facilitate a fair and equitable distribution of value among stakeholders; (b) ensuring representation in the negotiation of the terms of a chapter 11 plan as a unified group; and (c) continuing to support and facilitate approval of a less expensive and value-preserving DIP facility (which the Ad Hoc Equity Group understands may be resolved at the time an official equity committee is appointed) and providing a check and balance over the new DIP lender that has strong ties to the Creditors' Committee. Without an official committee, the equity holders lack the gravitas and funding afforded to an official committee to advance these goals and advocate effectively for shareholders' rights.

8.     ***These Chapter 11 Cases are complex, and the Ad Hoc Equity Group is seeking appointment at a time in the cases when they can make the biggest contribution.*** The Debtors operate in a highly technical industry and owe more than $900 million of net debt, including $857 million in secured debt. The proposed RSA, Noteholder Group DIP facility, and the pleadings filed by the Creditors' Committee and this Ad Hoc Equity Group in opposition to the Noteholder Group DIP facility demonstrate that a central focus of these Chapter 11 Cases will be valuation and proper allocation of the same—a complicated issue that requires expertise. The Ad Hoc Equity Group is seeking appointment of an official equity committee now so that it can meaningfully participate in the analysis, discussions, and negotiations around valuation, value allocation, and the terms of a chapter 11 plan.

**SASMF EXHIBIT 14**
**6 of 74**

9. ***The critical need for an equity committee outweighs the marginal additional costs of an equity committee.*** For the Official Equity Committee to fulfill its role as the fiduciary representative of shareholders, it must have access to adequate resources. While this will add cost to the estates, the Official Equity Committee will be laser-focused on certain issues that are of critical concern to shareholders, including: (1) valuation; (2) negotiating the terms of a chapter 11 plan that treats the shareholders equitably; and (3) supporting and facilitating approval of a value-preserving DIP facility, while serving as a check and balance for the Debtors and Creditors' Committee. The Ad Hoc Equity Committee understands the role of the Creditors' Committee and will endeavor not to duplicate the efforts of the Creditors' Committee—an effort that is perfectly aligned with the Ad Hoc Equity Group's aim of preserving value. In addition, the Ad Hoc Equity Group supports a reasonable and mutually-agreed-upon budget that permits the Official Equity Committee to pursue these matters. The incremental costs associated with the appointment of an Official Equity Committee in these circumstances are justified.

10. ***An Official Equity Committee will add value to these cases.*** The goal of the Ad Hoc Equity Group—to seek a value-maximizing resolution to these Chapter 11 Cases—is aligned with the fundamentals of bankruptcy policy. Indeed, no other party in these cases has a comparable incentive to maximize value. And, as explained more fully below, the Ad Hoc Equity Group is convinced that a rigorous fair market value analysis will show that equity is "in the money." Moreover, the Ad Hoc Equity Group and its counsel have already added significant value by playing a meaningful role in facilitating a competitive DIP process. Without a doubt, the Ad Hoc Equity Group and their counsel would be more effective and efficient in their pursuit of value-maximization and an equitable chapter 11 plan if they were able to act in an official capacity as an estate fiduciary.

7

11. For the reasons set forth herein, the Court should order the immediate appointment of an official equity committee.

## RELIEF REQUESTED

12. By this Motion, the Ad Hoc Equity Group seeks, pursuant to section 1102(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), entry of an order, substantially in the form attached as **Exhibit A**, directing the appointment of an official equity committee.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

14. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### I. These Chapter 11 Cases

15. On the Petition Date, the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A detailed description of the relevant facts and circumstances is set forth in the First-Day Declaration.

16. On the Petition Date, the Debtors also filed, among other things, the *Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superiority Administrative Expense Status, (D) Granting Adequate Protection to the Petition Secured Parties, (E) Modifying the Automatic*

8

*Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief.* [Docket No. 38] (the "**Original DIP Motion**"), requesting authorization to obtain debtor-in-possession financing ("**Original DIP Financing**"). The details regarding the exorbitant economics are set forth in greater detail in the Ad Hoc Equity Group's objection to the Original DIP Financing [Docket No. 375] (the "**Ad Hoc Equity Group DIP Objection**"). Also on the Petition Date, the Debtors filed the RSA between the Debtors and the Noteholder Group.

17.     This Court held a first-day hearing on December 22, 2022. On December 23, 2022, the Court entered an interim order granting the relief requested in the Original DIP Motion on an interim basis [Docket. No. 130] (the "**Original Interim DIP Order**").

18.     On January 9, 2023, the U.S. Trustee appointed the Creditors' Committee, comprised of three members. *See Notice of Appointment of Creditors' Committee* [Docket No. 256]. On February 3, 2023, the U.S. Trustee reconstituted the Creditors' Committee, appointing two additional members after BRF Finance Co., LLC ("**BRF Finance**") resigned. *See Notice of Appointment of Reconstituted Official committee of Unsecured Creditors* [Docket No. 456].

19.     For the reasons set forth in the Ad Hoc Equity Group DIP Objection, the Original DIP Financing was value-destructive for all stakeholders except the DIP Lenders and secured convertible noteholders who were obtaining a windfall. Fortunately, the Debtors entered into a binding agreement with B. Riley Commercial Capital, LLC ("**B. Riley**")—an affiliate of BRF Finance, one of the Debtors' prepetition unsecured lenders and formerly, one of the three original members of the Creditors' Committee—for an alternative DIP financing facility that provides a superpriority, non-priming, senior-secured, multi-draw term-loan facility in an aggregate principal amount of up to $70 million (the "**Replacement DIP Facility**"). On February 2, 2023,

**SASMF EXHIBIT 14**
**9 of 74**

the Court held a hearing on the Replacement DIP Facility and entered an interim order approving the Replacement DIP Facility on an interim basis [Docket No. 447] (the "**Replacement Interim DIP Order**"). A hearing is currently scheduled for February 27, 2023 to consider approval of the Replacement DIP Facility on a final basis.

## II.     The Ad Hoc Equity Group's Prior Requests to Form an Official Equity Committee

20.     On January 6, 2023, Skadden (on behalf of the Ad Hoc Equity Group) submitted a letter to the U.S. Trustee requesting the appointment of an official equity committee (the "**January 6 Letter**"), a copy of which is attached as **Exhibit B**.[4]

21.     The Ad Hoc Equity Group continued to correspond with the U.S. Trustee regarding the substantial increase in the price of Bitcoin over the past month, the surge in the stock prices of the Company's competitors, and the addition of a substantial number of shareholders to the Ad Hoc Equity Group.[5]

22.     On January 20, 2023, the U.S. Trustee sent counsel to the Ad Hoc Equity Group an email, attached as **Exhibit D**, advising counsel that it was declining to appoint an official equity committee. The U.S. Trustee has not provided a rationale to the Ad Hoc Equity Group for its decision not to appoint an official equity committee.

23.     Throughout the month of January, counsel to the Ad Hoc Equity Group communicated with Debtors' counsel, asking for support for the formation of an official equity committee. In addition, on January 23, 2023, Skadden sent a letter to Debtors' counsel seeking

---

[4]     As reflected in the January 6 Letter, at the time of the January 6 Letter, the Ad Hoc Equity Group comprised of shareholders holding 12,322,419 shares of the Company's common stock, representing approximately 3.29% of all issued and outstanding common stock of the Company. The Ad Hoc Equity Group has since substantially grown to a group holding 67,086,243 shares of the Company's common stock, representing approximately 17.91% of all issued and outstanding common stock of the Company.

[5]     This email correspondence, which contains several emails, is attached as **Exhibit C**.

the Debtors' support for the formation of an equity committee and indicating the Ad Hoc Equity Group's intent to file a motion seeking the appointment of the same, a copy of which is attached as **Exhibit E**. Since sending the letter, counsel to the Ad Hoc Equity Group and the Debtors have communicated regularly regarding their request. In addition, over the course of the last month, counsel to the Ad Hoc Equity Group has also made the same request to the Creditors' Committee. Neither party has affirmatively supported the request.

## BASIS FOR RELIEF

24.     The bases for the relief requested are section 1102(a)(2) of the Bankruptcy Code and rule 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

25.     Pursuant to section 1102(a)(2), "on request of a party in interest, the court may order the appointment of additional committees . . . of equity security holders if necessary to assure adequate representation of . . . equity security holders. The United States Trustee shall appoint any such committee." 11 U.S.C. § 1102(a)(2).

26.     The Court retains absolute discretion to appoint an official equity committee under the facts and circumstances of the case even if the U.S. Trustee previously declined to do so. *See In re Sunedison, Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016) (quoting *In re Williams Commc'ns Grp. Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002)); *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002).

27.     Section 1102(a)(2) does not define "adequate representation," but cases interpreting this section have generally considered the following factors:

> (a) whether the Debtors are likely to prove solvent;
>
> (b) whether equity is adequately represented by stakeholders already at the table;
>
> (c) the complexity of the Debtors' cases; and

(d) whether the value of an official equity committee to the chapter 11 cases outweighs any additional cost to the Debtors' estates.

*In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *see also Williams Commc'ns*, 281 B.R. at 220; *In re Kalvar Microfilm Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996).

28.     This Court has adopted these factors and has considered a fifth practical factor: whether the appointment of an equity committee "is going to add something to the case." *See In re Sandridge Energy, Inc.*, Case No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016) Hr'g Tr. at 94:10-12. No one factor is dispositive, and the weight attributed to each factor depends upon the facts and circumstances of each case. *Kalvar Microfilm*, 195 B.R. at 600–01.

29.     Application of each of these factors strongly favors the prompt appointment of an official equity committee.

## I.     There Is a Substantial Likelihood that the Debtors Are Solvent and that Shareholders Are Entitled to a Distribution.

30.     Case law addressing the appointment of equity committees in chapter 11 cases accords great importance to the debtor's likely solvency, or lack thereof. *See, e.g.*; *Pilgrim's Pride*, 407 B.R. at 217 n.15 ("[A]ppointment of an equity committee should be denied in cases where there is no doubt about the debtor's solvency; in cases like the one at bar, the court should not disfavor equity."); *Williams Commc'ns*, 281 B.R. at 220 (describing solvency as a "major factor"); *see also Exide Techs. v. Wis. Inv. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, at *1–2 (D. Del. Dec. 23, 2002).

31.     The significance of this factor is straightforward: while equity holders of a "hopelessly insolvent" debtor are not entitled to a distribution under a chapter 11 plan, equity holders of a debtor who is, appears to be, or is likely solvent retain a legal and economic interest and are entitled to adequate representation during the chapter 11 process. *See SunEdison*, 556

12

B.R. at 102–03 ("If the debtor is solvent or appears to be solvent, the concern is that a creditors' committee will negotiate a plan based on a conservative estimate of the debtor's worth that captures all of the value of the reorganized entity, including value possibly in excess of the unsecured claims, through the issuance of new stock to the creditors at the expense of an old equity whose shares will be cancelled.").

32.     A debtor's solvency need not be conclusively established to justify appointment of an official equity committee. Rather, appointment of an equity committee may rest on preliminary indicia of value that suggest a "substantial likelihood" that equity security holders are entitled to a "meaningful distribution" under the absolute priority rule. *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Techs.*, 2002 WL 32332000, at *1); *see also Pilgrim's Pride.* 407 B.R. at 217 ("The court does have available to it values provided in Debtors' schedules and in Debtors' public filings with the SEC and may deduce a value for Debtors from the operating reports filed with the UST. While these values may prove illusory, except for Debtors' most recent operating report they all indicate that Debtors are solvent."). The Debtors have already conceded this point, and, as explained futher below, this factor is satisfied.

### A.  The Debtors' Filings Evidence that Equity Is "In the Money."

33.     The Debtors have already put forward evidence in these Chapter 11 Cases that the Company is solvent and that its shareholders are entitled to a meaningful distribution. Core Scientific's Chapter 11 Petition and First-Day Declaration indicate that, as of the end of third quarter 2022, the Company's assets (approximately $1.4 billion) exceed its liabilities (approximately $1.3 billion). In addition, Core Scientific's most recent balance sheet as of September 30, 2022 reports shareholders' equity was valued at approximately $73 million. Core Scientific, Inc., Quarterly Report (Form 10-Q) at 4 (Nov. 22, 2022).

**SASMF EXHIBIT 14**

**13 of 74**

34.     Consistent with these representations, the Debtors filed an RSA and accompanying plan term sheet on the first day of the Chapter 11 Cases that proposed a distribution of a yet-to-be-determined portion of 3% of the reorganized Company's common stock (subject to dilution) and warrants to the Company's shareholders. At the time, the Debtors characterized these distributions as a "meaningful recover[y]." First-Day Declaration ¶ 15.

35.     Now, the Debtors are seeking final approval of the Replacement DIP Facility, which, compared to the Original DIP Facility, comes with a lower headline number (available new money up to $70 million compared to $75 million), does not require a roll-up of prepetition debt, does not grant liens on unencumbered property to rolled-up prepetition debt, comes with lower aggregate fees, and requires the Debtors to terminate the RSA that provided a windfall to the secured convertible noteholders and allows the Debtors to negotiate the terms of a plan with all their stakeholders. The Replacement DIP Financing leaves more value in the Debtors' estates to be allocated among stakeholders.

36.     Moreover, since the Petition Date, the Debtors have seen an increase in value (by virtue, among other things, of significantly increased cash flows), suggesting even more meaningful recoveries are available to shareholders. Of note, the reported equity value and the Debtors' proposed distribution to equity were made at a time when Bitcoin was trading close to $16,817 and *before* (a) the market grew increasingly comfortable that the Federal Reserve would slow interest rate hikes, (b) energy prices settled, and (c) confidence grew about moderating inflation. Today, Bitcoin is trading over $23,000, and the Company is likely generating more than $1 million per day.[6]

---

[6]     The Debtors mined 1,435 Bitcoin in December 2022. Press Release, Core Scientific, *Core Scientific Announces November and December 2022 Updates* (Jan. 9 2023), https://investors.corescientific.com/investors/news/news-details/2023/Core-Scientific-Announces-November-and-December-2022-Updates/default.aspx. This suggests
*(cont'd)*



37.     One might fairly ask whether today's pricing is a fair reflection of future pricing of Bitcoin and a fair input for valuation. While no one can predict the future, it is clear that, except for the short period between mid-November 2022 and early January 2023, and as illustrated in the graph below, pricing between December 2020 and the present has consistently been between $19,000 and $63,000.[7] The RSA between the Debtors and the secured convertible noteholders was executed at the lowest point in nearly three years.

_____

*(cont'd from previous page)*

    they mined approximately 46.3 Bitcoin per day or approximately 324 Bitcoin per week. The Debtors have also indicated that they convert Bitcoin to U.S. dollars generally within 2.5 days. First-Day Decl. ¶ 37. Yesterday, Bitcoin closed trading at a price of $23,471.87. *Bitcoin USD (BTC-USD)*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 2, 2023). Based on today's price of Bitcoin, and assuming the Debtors continue to mine Bitcoins at the same rate they achieved last month, the Debtors can achieve more than $1 million in daily revenues.

[7]    In fact, between December 13, 2020 and November 8, 2022, the trading price of Bitcoin at market close was below $19,000 on only five days—and never closed below $18,500. From December 2020 to present, the average trading price at market close was $36,478. *Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 2, 2023).

**SASMF EXHIBIT 14**

**15 of 74**



The complexity involved in the valuation of this asset is precisely why this Court should hear and consider the views on value from an expert and counsel to be retained by an official equity committee.

38. Indeed, a preliminary and high-level analysis of certain indicia of value, undertaken without the benefit of a financial advisor or investment banker, indicates a substantial likelihood that fair value exceeds liabilities. Based on a review of publicly available data from other comparable public digital asset mining companies and Core Scientific, including revenues, EBITDA and hashrates, the Ad Hoc Equity Group is confident that the fair value of the Debtors'

16

businesses substantially exceeds its liabilities and that hundreds of millions of dollars are available for shareholders.

39. For example, public reporting from HIVE Blockchain Technologies Ltd. ("**HIVE**"), a competitor of the Debtors, indicates an enterprise valuation of approximately $289 million.[8] HIVE's revenue in the twelve months precededing September 30, 2022 were approximately $100 million, indicating a multiple of approximately 2.9x. Core Scientific reported revenues over the twelve months ending September 30, 2022 at approximately $519 million. Applying the same 2.9x multiple implies Core Scientific's enterprise value could be more than $1.5 billion, which would leave at least $200 million to $500 million in value for equity. Using a hashrate[9] multiple similarly implies a significant valuation. HIVE reported a hashrate of approximately 2.1 exahash per second ("**EH/s**") as of December 31, 2022, whereas Core Scientific reported a hashrate of 15.4 EH/s. Dividing HIVE's enterprise valuation by its 2022 year-end hashrate implies a multiple of 142.1x. Applying the 142.1x multiple to Core Scientific's hashrate implies an enterprise valuation of $2.2 billion. Looking at another competitor, the publicly available data for Riot Blockchain ("**Riot**") imply an enterprise value of

---

[8]     The numbers used in this paragraph have been rounded to the nearest million.

       The enterprise value assumes the share price of $4.09 (as of February 1, 2023) and the reported approximately 82 million issued and outstanding shares, the Ad Hoc Equity Group calculated market cap at approximately $336 million.  As of September 30, 2022, long-term debt was reported as approximately $26 million and cash (including digital asset holdings) was reported at approximately $73 million.  Accordingly, the Ad Hoc Equity Group calculates an enterprise valuation (market cap plus long-term debt minus cash) of approximately $289 million.

[9]     Hashrate measures the computational power on the blockchain network. The higher the hashrate, the more Bitcoin output a crypto miner will generate.  It is similar to measuring horsepower of a car – the more horsepower, the faster the car will go.

       Hashrates are often updated often and can give real-time visibility into enterprise value. Cryptocurrency experts analyze hashrates as one metric for value. A multiple can be determined by dividing the enterprise value of a company by its hashrate.

approximately $904 million.[10] Riot's revenues for the 12 months ending on September 30, 2022 were approximately $290 million, indicating a multiple of 3.2x. Riot reported a hashrate of 9.7 as of December 31, 2023, indicating a multiple of 94.9x. Applying these multiples to Core Scientific suggests an enterprise value between approximately $1.5 billion and $1.6 billion. The table below provides a summary (dollars reflected in millions):

| Company | Enterprise Value (Market Cap + Long Term Debt – Cash (incl. Digital assets)) | LTM (as of Sept. 30, 2022) | EH/s (as of Dec. 31, 2022) | LTM Multiple | EH/s Multiple | Core Scientific Implied EV (LTM) | Core Scientific Implied EV (EH/s) |
|---|---|---|---|---|---|---|---|
| HIVE | $289 | $100 | 2.1 | 2.9x | 142.1x | $1,527 | $2,188 |
| Riot | $904 | $290 | 12.5 | 3.2x | 94.9x | $1,649 | $1,462 |

40.    These very preliminary analyses suggest that that Core Scientific is likely valued well above $1.4 billion, a value that shows a substantial likelihood of solvency.[11] These analyses, however, are complex, and shareholders need a formal committee and proper representation to make their case to this Court about value. As noted above, cryptocurrency and companies in the sector are a novel asset class. In these circumstances, the Court will be benefitted by having additional information from a constituency that is uniquely incentivized to maximize value for all stakeholders. With the input of advisors, the shareholders will have the ability to share their view on valuation—an issue that poses an existential threat to the shareholders.

---

[10]    Assumes share price of $7.39, approximately 167 million shares issued and outstanding, long-term debt of approximately $50 million, and cash and digital assets of approximately $380 million.

[11]    The Ad Hoc Equity Group is operating without the benefit of a financial advisor or banker and reserves all rights to modify and/or supplement its analyses.

18

**B. Current Macroeconomic Trends Imply Equity Value Is Increasing.**

41.     Moreover, the macroeconomic factors to which the Debtors attributed their financial difficulties are now trending favorably, suggesting that value is rebounding and will continue to accrete to the shareholders going forward.

42.     The Debtors commenced the Chapter 11 Cases amid transitory market dislocation. Just one year ago, the Company consummated a de-SPAC merger transaction, premised on a pre-transaction equity valuation of $4 billion, and thereafter experienced "tremendous growth, as measured by cash flow increases." First-Day Declaration ¶¶ 31–32; *Power & Digital Infrastructure Acquisition Corp.*, Amendment No. 6 to Registration Statement (Form S-4) at 5–6, 223 (Dec. 30, 2021) (reflecting "the agreed upon pre-transaction equity value of $4.0 billion").[12]. As of March 31, 2022, the Company's market capitalization stood at approximately $2.67 billion. *See Core Scientific, Inc.*, Yahoo! Finance, https://finance.yahoo.com/quote/CORZ/key-statistics/ (last visited Jan. 24, 2023).

43.     However, later in the spring of 2022, the Debtors began to experience a confluence of headwinds that interrupted the Company's high-growth phase. Specifically, the Debtors began suffering financially as a result of the precipitous decline in the price of Bitcoin, an increase in interest rates, and an increase in power prices. In addition, the Debtors were impacted by a number of cryptocurrency companies filing for chapter 11 protection, including Celsius, one of the Debtors' largest hosting customers. *See* First-Day Declaration ¶¶ 6, 65–78.

44.     These factors are now trending in a favorable direction. Among other things, inflation rates are falling and the cost of power is moderating. As recently as February 1, 2023,

---

[12]     As explained in the First Day Declaration, Power & Digital Infrastructure Acquisition Corp. is the corporation that acquired legacy Core Scientific operations. ¶¶ 31–32.

the Federal Reserve acknowledged that "inflation has eased" and stated at a press conference that "the disinflationary process" has started. Press Release, *Federal Reserve, Federal Reserve Issues FOMC Statement* (Feb. 1, 2023, 2:00 p.m. ET), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230201a.htm; Jennifer Schonberger, *Federal Reserve Raises Interest Rates Another 0.25% to Highest Since October 2007*, Yahoo! Finance, Feb. 1, 2023, 2:00 p.n. EST), https://money.yahoo.com/federal-reserve-interest-rates-decision-february-1-174421486.html; *see also* Press Release, U.S. Bureau of Labor Statistics, *Consumer Price Index Summary* (Jan. 12, 2023, 8:30 a.m. ET), https://www.bls.gov/news.release/cpi.nr0.htm (reporting that the overall Consumer Price Index declined 0.1%, and the energy index declined 4.5%, in December 2022); Rachel Siegel, *Inflation Slowed Further in December for the Sixth Month in a Row*, WASH. POST (Jan. 12, 2023, 4:41 p.m. EST), https://www.washingtonpost.com/business/2023/01/12/cpi-report-december-inflation/ ("The latest inflation data . . . showed prices were 6.5 percent higher in December than they were a year before—and fell 0.1 percent compared with November, the first time prices have dopped since October 2021."); Laila Kearney, *U.S. Wholesale Power Prices Broadly Expected to Fall This Year*, REUTERS (Jan. 10, 2023, 4:54 p.m. EST), https://www.reuters.com/business/energy/us-wholesale-power-prices-broadly-expected-fall-this-year-2023-01-10/ ("The price that utilities pay for power could drop by more than a third in some regions after huge run-ups last year.").

45. In addition, between the Petition Date and the date of this filing, the price of Bitcoin has increased by more than $6,600, or approximately 40%. *Bitcoin USD (BTC-USD)*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Jan. 31, 2023). The

SASMF EXHIBIT 14
20 of 74

Company's competitors have also seen a significant surge in value of the trading price of their stock since the beginning of the year:[13]

| Competitor Company | Stock Price on January 3, 2023[14] | Stock Price on February 2, 2023 | Percent Increase in Stock Price |
|---|---|---|---|
| HIVE Blockchain Technologies Ltd. (HIVE) | $1.53 | $4.13 | 170% |
| Hut 8 Mining Corp. (HUT) | $0.82 | $2.41 | 195% |
| Marathon Digital Holdings, Inc. (MARA) | $3.40 | $8.00 | 135% |
| Riot Platforms, Inc. (RIOT) | $3.37 | $7.49 | 122% |



[13]   *HIVE Blockchain Technologies Ltd.*, Yahoo! Finance, https://finance.yahoo.com/quote/HIVE/ (last visited Feb. 1, 2023); *Hut 8 Mining Corp.*, Yahoo! Finance, https://finance.yahoo.com/quote/HUT/ (last visited Feb. 1, 2023); *Marathon Digital Holdings, Inc.*, Yahoo! Finance, https://finance.yahoo.com/quote/MARA/ (last visited Feb. 1, 2023); *Riot Platforms, Inc.*, Yahoo! Finance, https://finance.yahoo.com/quote/RIOT/ (last visited Feb. 1, 2023).

[14]   January 3, 2023 was the first day of trading in 2023.

Even the Company's stock price is up more than 970% since market close on the Petition Date. This, too, indicates that the macroeconomic conditions leading to the chapter 11 filing are moderating and the value of the Company is increasing.

46.     Undoubtedly, any uptick in the market generally, and an increase in the price of Bitcoin particularly, are value-accretive to the estates. Indeed, at the current Bitcoin price, the Company is generating more than $1 million in revenues per day for self-mined Bitcoin, plus additional revenue for its hosting operations.[15] Furthermore, as noted in the December 14, 2022 open letter from B. Riley to the Company and its shareholders and lenders, every $1,000 increase in the price of Bitcoin would likely increase EBITDA by $20 million. Press Release, B. Riley Financial, *B. Riley Financial Issues Open Letter to Core Scientific Investors* (Dec. 14, 2022), https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-core-scientific-investors-301703337.html. Under that analysis, the Bitcoin pricing increase of more than $6,600 since the Petition Date translates into approximately an additional $132 million annual EBITDA and additional value in the hundreds of millions. B. Riley also estimated Adjusted EBITDA of approximately $140 million at a Bitcoin price of $18,000. *Id.* Using these estimates, at a Bitcoin price of $23,000, Adjusted EBITDA would be approximately $240 million, which at any reasonable multiple would establish the substantial likelihood of solvency.[16]

---

[15]  *See supra* note 6 and accompanying text.

[16]  Of course, in addition to these market trends, other actions that the Company takes to reorganize may contribute to even greater value growth, and, therefore, greater recoveries for shareholders. For example, B. Riley suggests that building out the Company's Denton, Texas facility could provide an incremental $25 million of EBITDA. *Id.*

## II.     An Official Committee Is Necessary To Ensure Adequate Representation of Shareholders in the Chapter 11 Cases.

47.     Because the Company's shareholders have a substantial stake in the outcome of the Chapter 11 Cases, they deserve meaningful representation in these proceedings. And they cannot rely on the Debtors' board or the Creditors' Committee to adequately represent their interests. The Company's shareholders deserve an independent and empowered fiduciary to represent their interests in the Chapter 11 Cases.

### A.  The Debtors' Board Cannot Zealously Represent the Interests Of the Equity Holders in These Chapter 11 Cases.

48.     Although a company's management and board of directors are typically viewed out of court as representing shareholder interests, in chapter 11 proceedings, the directors of a corporation in bankruptcy must advance the interests of all of the estate's stakeholders— including its creditors—rather that the specific interests of shareholders. *See Pilgrim's Pride*, 407 B.R. at 218–19 ("While it is unquestionably true that a debtor's officers and directors have a duty to maximize a debtor's estate to the benefit of shareholders as well as creditors . . ., the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity owning management."). Indeed, the dynamics of chapter 11 are such that debtors are frequently pressured to reach accord with their creditors and obtain creditor consent to a reorganization plan expeditiously. *Id.* And often, debtors prioritize a quick exit from chapter 11, which may not be the proper path to maximize value in a market that is suffering from temporary market dislocation. As a result, debtors may be incentivized to advocate a conservative value to

SASMF EXHIBIT 14
23 of 74

obtain swift senior creditor approval to the detriment of their junior stakeholders, including equity holders. *Id.*[17]

49.     Moreover, officers and directors in chapter 11 cases may also focus on other priorities and even self-interest, such as compensation. How a management incentive plan ("**MIP**") is structured may have the effect of aligning management with more senior stakeholders and/or plan sponsors to the detriment of more junior stakeholders, including shareholders.  For example, compensating management with reorganized equity of a Company capitalized with less debt in the reorganized capital structure could, in theory, be more valuable to management than the equity of a company with more leverage.[18]

50.     Moreover, the Debtors' entry into the Original DIP Financing and RSA in the first place demonstrates that the interests of the Debtors and the shareholders diverge. The RSA would have distributed excessive value to the secured convertible noteholders, leaving unsecured creditors and equity holders to fight over the remaining 3% of the reorganized company. This structure would have given the secured convertible noteholders more than their entitlement under the Bankruptcy Code, to the detriment of other stakeholders, including shareholders. In addition, the ostensible minimal value allocated to shareholders may have ultimately proven illusory, as

---

[17]    The legislative history of Bankruptcy Code section 1102 illustrates the important role official equity committees serve in situations such as these "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." S. Rep. No. 95-989, at 10 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5796 (noting that "it is essential for [public investors] to have legislative assurance that their interests will be protected" and "[s]uch assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional [creditors] who will have their own best interest to look after").

[18]    By way of example, if the enterprise value of a company was $1.5 billion and $1 billion of that was debt, then equity would be valued at approximately $500 million, and the MIP equity would be worth approximately $50 million. On the other hand, assuming the same enterprise value, if all of the secured convertible notes converted to equity, and the only remaining debt was the $90 million of takeback paper, which is distributed in exchange for the secured equipment financing, the equity value would have been approximately $1.4 billion, and the MIP's allocation of equity would be worth nearly triple the amount, or approximately $140 million.

the shareholders would have been stripped of *any* distribution if either general unsecured creditors *or* the equity holders voted to reject the proposed plan.

51.     The divergence in the shareholders' and Debtors' interests are further exemplified by the Debtors' agreement to significantly limit their ability to explore, consider, or negotiate any superior alternative to the RSA transactions, requiring third parties to submit *bona fide* proposals and the Debtors to first obtain advice from counsel that failure to pursue or discuss a potential alternative would be a violation of their fiduciary duties.[19]

52.     It appears that the Debtors acquiesced to these constraints and commenced these Chapter 11 Cases in a time of crisis, without the ability to conduct a comprehensive market check of either their proposed terms of a chapter 11 plan or the DIP financing.[20] The only restructuring alternative that the Special Committee appears to have considered prepetition was a proposal from an affiliate of B. Riley, which on its face seemed reasonable and appropriate. However, as evidenced by the competing proposals submitted in the past week and the Replacement DIP Financing that has now been approved on an interim basis, there is much more value here than what was contemplated in the RSA.

53.     The Ad Hoc Equity Group applauds the Debtors' successful effort to secure the Replacement DIP Financing prior to entry of the final order approving the Original DIP

---

[19]     Specifically, following 15 days after the Debtors executed the RSA, the Debtors agreed not to participate in discussions regarding any alternative restructuring proposals with any party not contacted prior to the end of that 15-day period unless and until a party submitted a *bona fide* offer *and* the Debtors determined, with the advice of counsel, that failure to engage in discussions would have violated their fiduciary duties. *Id.* If the Special Committee of Core Scientific's board determined that it could no longer support the RSA, the Debtors could exercise a "fiduciary out" and terminate the RSA. *Id.* § 6(b)(ii). However, termination of the RSA was an event of default under the Original DIP Financing and therefore, the Debtors would have needed to refinance the DIP facility. DIP Credit Agreement § 11.1(p)(xxii).

[20]     The Ad Hoc Equity Group understands that during the prepetition process there was a lack of clarity regarding unencumbered assets and the quantum of capital actually needed by the Debtors to fund the Chapter 11 Cases. Any prepetition marketing of the DIP, therefore, may have been clouded by this lack of information.

Financing. Had the final order approving the Original DIP Financing been entered, any alternative proposal would have required a competing bidder or plan sponsor to commit to refinancing the Original DIP Financing facility, potentially in an amount in excess of $107.6 million even *before* it had any certainty of whether the transaction could close.[21] However, replacing the Original DIP Financing at this juncture is not without its cost. As a result of the refinancing, the original DIP lenders have been paid a $6 million fee. Taken together, the Original DIP Financing and RSA are a prime example of the Company's decision to pursue a creditor-supported plan that would provide a significant upside to the secured convertible noteholders while adversely impacting junior stakeholders, including equity interests. An official equity committee could have served as a check on the process and the Debtors' position by bringing competitors to the initial DIP process that could have offered real alternatives.

### B. The Official Committee of Unsecured Creditors Cannot Adequately Represent the Interests of the Shareholders.

54.     The Creditors' Committee is not positioned or incentivized to maximize value for equity holders, as its role is limited to ensuring that general unsecured creditors achieve maximum value for their claims. The Creditors' Committee is a fiduciary for general unsecured creditors. *See In re Saxon Indus.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (stating that unsecured creditors' committees and equity committees "are separate and distinct entities with the members of the unsecured creditors and equity . . . classes possessing variant priorities and interests with respect to their relationship with the debtor"); *see also Pilgrim's Pride*, 407 B.R. at 217 n.17 ("[W]hen it comes to valuation and determination of future capital structures for plan

---

[21]    The Creditors' Committee's advisors, who have access to updated information, calculated the payoff amount to be approximately $107.6 million based on a $60 million draw. UCC DIP Objection ¶¶ 3, 40.

SASMF EXHIBIT 14
26 of 74

purposes, [the] agendas [of the creditors committee and the equity holders] are likely to be very much at odds."). In its efforts to maximize recoveries for unsecured creditors, the Creditors' Committee may seek to trade higher general unsecured claim recoveries (or premiums) for little or no equity recoveries.

55.     Here, only an official equity committee can protect shareholders' substantial legal and economic interests. B. Riley—the Replacement DIP Lender—is a former member of the Creditors' Committee. Upon entry of the Replacement Interim DIP Order, B. Riley has stepped down, and the U.S. Trustee has since appointed two additional members to the Creditors' Committee. The two members who have been on the Creditors' Committee since the outset of these cases have formed a relationship with B. Riley, and lead counsel to the Creditors' Committee formerly represented B. Riley. The Replacement DIP Facility appears favorable, but any amendments to its terms, and the ongoing fees and expenses to be reimbursed, must be evaluated impartially with rigor to ensure fairness to all stakeholders. The Creditors' Committee may not be best positioned to do this because of the unique circumstance in these Chapter 11 Cases.

## III.     The Chapter 11 Cases Are Complex.

56.     There is no doubt that these Chapter 11 Cases are complex. The cases involve eleven debtors operating across several states in a sophisticated and highly technical industry. The Debtors' capital structure consists of over $900 million in total debt, including $857 million in secured debt and numerous equipment financing leases. Approximately 374,527,988 shares of the Company's common stock remain outstanding and are held across a broad base of shareholders.

27

57. The allocation of value among stakeholders, and therefore enterprise valuation, will be a core issue in these Chapter 11 Cases. Valuation issues alone introduce complexities that merit the appointment of an official equity committee. In *Pilgrims Pride*, 407 B.R. at 220, the court held that appointment of a statutory fiduciary is "appropriate where the complexities of the case make it more difficult for another—here management—to protect equity interests as well as those of creditors." The *Pilgrims Pride* court noted that the difficulties of valuing the Debtors complicate the ability of any single fiduciary to both determine the fair treatment for creditors and advocate the entitlement of equity to participate in a reorganized enterprise. *Id.*

## IV. The Need for an Official Equity Committee Outweighs Potential Costs.

58. The Ad Hoc Equity Group has clearly established the need for an official equity committee in these Chapter 11 Cases. Once the need for adequate representation for shareholders is established, the "burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways." *See Beker Indus.*, 55 B.R. at 949.

59. The Ad Hoc Equity Group understands that the scope of its role in the Chapter 11 Cases must be tailored to its purpose. The Official Equity Committee would focus on those issues that most impact the shareholders—valuation; negotiating the terms of a chapter 11 plan that treats the shareholders equitably; and oversight over the value-maximizing DIP facility. And the Ad Hoc Equity Committee is willing to work within a reasonable, mutually agreeable budget to achieve these objectives. With a narrow focus, the Official Equity Committee can avoid unnecessary duplication of efforts with the Creditors' Committee. The cost of allowing the Official Equity Committee to pursue these issues is justified given the need for adequate

representation and the material prejudice to shareholders if they do not have representation would be irreparable.

## V.     The Appointment of an Official Equity Committee Adds Value To the Chapter 11 Cases.

60.     The Court has added a "fifth" factor to its analysis to assess, as a practical matter, whether the Official Equity Committee would "add" anything to the Chapter 11 Cases. The appointment of a fiduciary who will act on behalf of the shareholders is the only way to ensure that the bankruptcy process works fairly and justly to maximize value for all stakeholders, not only the creditors. *See, e.g.*, *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) ("[D]ue regard for appearances also warrants the appointment of an equity committee, if only to dispel any implication that, here, a group of creditors took control of the Board of Directors in the first stage of a two-stage restructuring, neutralized the general unsecured creditors and then took for itself the value of the remaining equity."). As detailed above, no other party is currently in a position to advocate for the interests of equity holders. Neither the Debtors nor the Creditors' Committee are aligned with equity holders. Only the Official Equity Committee can effectively represent the interests of equity holders and give further legitimacy to the proceedings by giving equity holders a voice.

61.     The importance of representation for equity holders is further pronounced given the novelty of the asset and the complexity in valuing the Company, in part due to the volatility in the price of Bitcoin. Having access to their own advisors and valuation experts will be helpful inputs for this Court to make a reasoned and just determination. In addition, shareholders are in need of representation to negotiate the terms of a new chapter 11 plan. And given the divergent interests of shareholders from the Debtors and other stakeholders, having input on these case-critical issues is essential.

29

62.     In addition, the Ad Hoc Equity Group has already added substantial value to these Chapter 11 Cases and can be more effective when appointed in an official capacity. As noted above, the Ad Hoc Equity Committee actively worked with parties to encourage a competing DIP financing proposal. The submission of competing DIP proposals allowed the Debtors to negotiate the terms of the Replacement DIP Facility proposed by B. Riley. The Ad Hoc Equity Committee strongly supported this competitive process because it improves value for all stakeholders. The Ad Hoc Equity Committee applauds the Debtors and B. Riley for their success in negotiating a stronger DIP facility that should maximize value for all stakeholders.

## CONCLUSION

63.     The factors make clear that an official equity committee is needed. As Bitcoin prices rise, and macroeconomic factors continue to trend in an upward direction, there is more value that may be distributed to shareholders. And now that the RSA will be terminated, the table has been reset and the terms of a chapter 11 plan of reorganization that allocates value appropriately can be negotiated.

64.     The complexity of the valuation issues and the fact that no other fiduciary is aligned or incentivized to maximize shareholder recoveries necessarily requires that the equity holders are appointed their own representative in an official capacity to act as a fiduciary in assessing value and negotiating the terms of the chapter 11 plan. Without the appointment of the Official Equity Committee, the equity holders will be unable to negotiate, or even evaluate, critical case issues; no one will be standing up to the Company, the secured convertible noteholders, or the well-represented general unsecured creditors to ensure that equity holders receive the value to which they are entitled.

65.     However, in order to have a seat at the table with respect to these matters, it is essential that the Official Equity Committee be constituted now and begin its work quickly.

66.     For the reasons set forth above, the Ad Hoc Equity Group submits that the Court should immediately direct the appointment of the Official Equity Committee in these cases.

*[Remainder of page left intentionally blank]*

31

WHEREFORE, the Ad Hoc Equity Group respectfully requests that the Court enter an

order, substantially in the form attached as **Exhibit A**, directing the appointment of the Official

Equity Committee.

Dated: Houston, Texas
February 3, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Noelle M. Reed*
Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 27139
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483-9122
Email: Noelle.Reed@skadden.com

-and-

George N. Panagakis
(*Admitted pro hac vice*)
Ron E. Meisler
(*Admitted pro hac vice*)
Christopher M. Dressel
(*Application for pro hac vice Admission Forthcoming*)
Jennifer Madden
(*Application for pro hac vice Admission Forthcoming*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Tel: (312) 407-0700
Fax: (312) 407-0411
Email: George.Panagakis@skadden.com
Email: Ron.Meisler@skadden.com
Email: Christopher.Dressel@skadden.com
Email: Jennifer.Madden@skadden.com

*Attorneys for the Ad Hoc Equity Group*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

*/s/ Noelle M. Reed*

Noelle M. Reed

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## ORDER DIRECTING THE APPOINTMENT
## OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

The Court, having considered the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for an Order Directing the Appointment of an Official Committee of Equity Security Holders* (the "**Motion**"), and finding good cause therefor, and for the reasons stated on the record, it is hereby:

ORDERED that the Motion is granted as set forth herein (the "**Order**"); and it is further

ORDERED that the U.S. Trustee shall appoint an official committee of equity holders in the chapter 11 cases as expeditiously as possible; and it is further

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

ORDERED that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____
       Houston, Texas

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

2

**EXHIBIT B**

# Skadden, Arps, Slate, Meagher & Flom llp

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL

+1 (312) 407-0549

DIRECT FAX

+1 (312) 407-8641

EMAIL ADDRESS

RON.MEISLER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
—
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

January 6, 2023

*Via First-Class Mail and Email*

Jayson B. Ruff, Esquire
Trial Attorney
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002

RE: Core Scientific, Inc., et al., Case No. 22-90341 (DRJ)
(the "**Chapter 11 Cases**") –
Request for Appointment of an Official Committee of
Equity Security Holders

Dear Mr. Ruff:

We write on behalf of an ad hoc group of equity security holders (the "**Ad Hoc Group**") of Core Scientific Inc. ("**Core Scientific**" or the "**Company**," and together with its subsidiaries and affiliates in the Chapter 11 Cases, the "**Debtors**"). The members of the Ad Hoc Group collectively own 12,322,419 shares of the Company's common stock (representing approximately 3.29% of all issued and outstanding common stock of the Company and approximately 4.61% of issued and outstanding common stock of the Company not held by insiders).[1] The current members of the Ad Hoc Group are identified on **Exhibit A** attached hereto.

---

[1] Based on public filings, we believe approximately 107.03 million shares of the Company's common stock are currently held by insiders, representing approximately 28.58% of all issued and outstanding shares of common stock of the Company.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 2

By this letter, the Ad Hoc Group respectfully requests that the United States Trustee promptly appoint an official committee of equity security holders in these Chapter 11 Cases. As detailed below, the circumstances underlying the Debtors' bankruptcy filing, the terms of their proposed restructuring plan, and their own statements provide substantial reason to believe that equity is "in the money." As such, the Company's stockholders have a substantial stake in the outcome of the Chapter 11 Cases and deserve meaningful representation in these proceedings. Unfortunately, no other fiduciary can adequately fill this role. In these circumstances, prompt appointment of an official committee is necessary to safeguard stockholders' legitimate interests, facilitate their meaningful participation in the Chapter 11 Cases, and maximize value for all stakeholders.

### BASIS FOR REQUESTED APPOINTMENT

As you know, Section 1102(a)(1) of the Bankruptcy Code entrusts to the United States Trustee's discretion the decision to appoint an official committee of equity security holders as the United States Trustee "deems appropriate."[2] As set forth herein, there are compelling reasons to appoint an official committee of equity security holders in these Chapter 11 Cases, including:

(1)   The Company's stockholders have an important economic stake in the outcome of these Chapter 11 Cases because there is a substantial likelihood that the Debtors are solvent.

(2)   An official equity committee is necessary to assure adequate representation of the equity holders in the Chapter 11 Cases.

(3)   The appointment of an official equity committee adds value to the Chapter 11 Cases that outweighs any additional cost.

(4)   The request is timely, and the prompt appointment of an official equity committee is essential to allow the equity holders to participate meaningfully in the Chapter 11 Cases.[3]

---

[2]   11 U.S.C. § 1102(a)(1).

[3]   Although Section 1102(a)(1) leaves to your client's discretion the propriety of appointing a committee of equity holders, case precedent focuses on the foregoing factors in considering whether appointment of an official equity committee is appropriate. *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *In re Williams Commc'ns Grp. Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); *In re Kalver Microfilm Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Sandridge Energy Inc.*, No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016), Hr'g Tr. at 94:10-12.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 3

I.    **There is a substantial likelihood that the Debtors are solvent and that stockholders are entitled to a distribution.**

        Case law addressing the appointment of equity committees in chapter 11 cases accords great importance to the debtor's likely solvency, or lack thereof.[4]  The significance of this factor is straightforward.  Equity holders of a "hopelessly insolvent" debtor are entitled to no distribution under a chapter 11 plan; the appointment of a committee to represent them therefore accomplishes little more than to burden the estate with incremental expenses.  Conversely, equity holders of a solvent debtor retain a substantial legal and economic interest entitled to adequate representation during the chapter 11 process.  Of course, the debtor's solvency—and, by extension, its equity holders' entitlement to a distribution—need not be conclusively established in connection with a request to appoint an equity committee.  Rather, appointment of an equity committee may rest on preliminary indicia of value that suggest a "substantial likelihood" that equity security holders are entitled to a "meaningful distribution" under the absolute priority rule.[5]

---

[4]    *See, e.g.*, *Pilgrim's Pride*, 407 B.R. at 217 n. 15 ("Much of the authority suggests—and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency." (citing *Williams Commc'ns*, 281 B.R. 216; *In re Wang Labs., Inc.*, 149 B.R. 1, 4 (Bankr. D. Mass. 1992))); *Williams Commc'ns*, 281 B.R. at 220 (describing solvency as a "major factor"); *Exide Techs. v. Wis. Inv. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, at *1-2 (D. Del. Dec. 23, 2002) (noting that courts only "consider . . . additional factors in determining whether equity holders are adequately represented without the appointment of an official committee" when a debtor is *not* deemed to be "hopelessly insolvent"); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996); *In re Emons Indus., Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("[G]enerally no equity committee should be appointed when it appears that a debtor is hopelessly insolvent[.]").

[5]    *See, e.g.*, *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Techs. v. Wis. Inv. Bd.*, Case No. 02-1572–SLR, 2002 WL 32332000, at *1 (D. Del. Dec. 23, 2002)); *see also In re SunEdison, Inc.*, 556 B.R. 94, 103–04 (Bankr. S.D.N.Y. 2016) (denying a motion to appoint an equity committee where "it is substantially unlikely that equity will receive a distribution"); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *4 (Bankr. S.D.N.Y. June 28, 2012) (denying a motion to appoint an equity committee because, "based on the instant record, there is no substantial evidence that equity will be entitled to a meaningful distribution in this case"); *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008) (denying motion to appoint equity committee based, *inter alia*, on the fact that equity security holders will not receive a meaningful distribution); *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) ("Shareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case [.]"); *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (An equity committee "should not be appointed unless equity holders establish

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 4

Here, even at this early stage, there is ample evidence—including the Debtors' own papers and statements—to suggest that the Company is solvent and that its stockholders therefore are entitled to a meaningful distribution.

Support for this conclusion begins with the Debtors' first-day papers, which indicate that the Company's assets exceed its liabilities. Specifically, Core Scientific's petition and First-Day Declaration[6] indicate that the Company had approximately $1.4 billion in total assets compared to approximately $1.3 billion in total liabilities, as of the end of third quarter 2022.[7]

Consistent with these representations, the Debtors have unilaterally proposed what they characterize as a "meaningful recover[y]" for the Company's stockholders.[8] Specifically, the proposed chapter 11 plan contemplated by the Debtors' Restructuring Support Agreement[9] provides that if both the class of general unsecured claims and the class of equity interests in the Company vote to accept the plan, general unsecured creditors and stockholders will share (in portions to be determined) (1) three percent[10] of the reorganized Company's common stock (subject to dilution by warrants and the management incentive plan) and

---

that . . . there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule[.]").

[6]     The "**First-Day Declaration**" (or "**First-Day Decl.**") refers to the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 5].

[7]     Attachment to Voluntary Pet. of Core Scientific, Inc., ¶ 2, Docket No. 1; First-Day Decl. ¶ 63; *see also* Core Scientific, Inc., Quarterly Report (Form 10-Q) at 4 (Nov. 22, 2022) (balance sheet as of September 30, 2022, reporting stockholders' equity of approximately $73 million).

[8]     First-Day Decl. ¶ 15.

[9]     The "**Restructuring Support Agreement**" (or "**RSA**") refers to that certain Restructuring Support Agreement between the Debtors and certain holders of the Debtors' convertible notes, the form of which was appended to a Notice of Filing dated December 21, 2022 [Docket No. 72] and incorporated into the First-Day Declaration as Exhibit B thereto. It is unclear whether the RSA has been executed and whether the Support Effective Date (as defined therein) has occurred. The form of RSA filed on the docket is undated and includes no signature pages; the Notice of Filing to which the form of RSA was appended states only that "the Debtors have agreed to the form of Restructuring Support Agreement." Notice of Filing 1. The term sheet attached as Exhibit A to the RSA is referred to as the "**Plan Term Sheet**."

[10]    *See* RSA Ex. A, at 11–12.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 5

(2) additional contingent value in the form of warrants exercisable at certain enterprise value thresholds.[11]

In this regard, the United States Trustee need not look beyond the Debtors' own representations and proposals to ascertain a "substantial likelihood" of a "meaningful distribution" to stockholders. The Debtors surely will insist that their proposed plan provides stockholders more than they are legally entitled; the Ad Hoc Group will argue, conversely, that stockholders are entitled to a great deal more. Indeed, the Ad Hoc Group submits that conditioning stockholders' retention of even a small fraction of the value of the Company on value hurdles that imply a double or triple recovery for the senior secured creditors (who are only entitled to par plus accrued) is, in these circumstances, inequitable and suggests an improper transfer of value to senior secured creditors to the detriment of equity holders. Nevertheless, the imminent dispute over the adequacy of the Debtors' proposed treatment of stockholders need not, and cannot, be conclusively resolved now. For present purposes, it suffices that the Debtors' papers and proposed plan raise a substantial and colorable issue concerning the Debtors' solvency—and, by extension, stockholders' entitlement to a distribution. Stockholders deserve an independent and empowered fiduciary to represent their interests in this impending dispute.

The fact that the Debtors reported positive stockholder equity in their most recent balance sheet and have proposed a distribution to stockholders in these cases is reason enough to conclude that there is a substantial likelihood that the Debtors are solvent. But even a more searching inquiry into the circumstances surrounding the Debtor's chapter 11 filing would yield the same conclusion. The Debtors commenced the Chapter 11 Cases amid a pronounced, but likely transitory, market dislocation. Less than one year ago, the Company consummated a deSPAC transaction, premised on a pre-transaction equity valuation of $4 billion,[12] and thereafter experienced "tremendous growth, as measured by cash flow increases."[13] As of March 31, 2022, the Company's market capitalization stood at approximately

---

[11]   Specifically, general unsecured creditors and stockholders would share three tranches of warrants: (1) Tranche I warrants exercisable when the enterprise value implies a 100% recovery to the secured convertible notes; (2) Tranche II warrants exercisable when the enterprise value implies a 200% recovery to the secured convertible notes; and (3) Tranche III warrants exercisable when the enterprise value implies a 300% recovery to the secured convertible notes. *See* RSA Ex. A, at 28–29.

[12]   First-Day Decl. ¶ 31; *Power & Digital Infrastructure Acquisition Corp.*, Amendment No. 6 to Registration Statement (Form S-4) at 5–6, 223 (Dec. 30, 2021).

[13]   First-Day Decl. ¶ 32.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 6

$2.67 billion.[14]  But, beginning in Spring 2022, a confluence of headwinds—
including the decline in the price of cryptocurrency, an increase in interest rates, an
increase in power prices, and a number of companies in the cryptocurrency sector,
including one of the Debtors' largest hosting customers, filing for chapter 11
protection—precipitated a "crypto winter"[15] and interrupted the Company's high-
growth phase.

But there is good reason to believe that the dynamics underlying the crypto
winter are temporary.  Indeed, many of the factors the Debtors blame for their recent
difficulties are now trending in a favorable direction.  Among other things, reports
establish that inflation rates are falling and the cost of power is moderating.[16]  In
short, this is not a company that has endured long-term operational struggles, but
rather a company enduring temporary turbulence.

Notably, this bullish sentiment is not confined to the Ad Hoc Group.  Even as
recently as November 30, 2022, well into the so-called "crypto winter," the
Company was projecting adjusted EBITDA of $130 million in 2023, $142 million in
2024, and $141 million in 2025.[17]  At the First-Day Hearing, counsel to the ad hoc

---

[14]    *See Core Scientific, Inc.*, Yahoo! Finance, https://finance.yahoo.com/quote/CORZ/key-statistics/
(last visited Jan. 2, 2023).

[15]    First-Day Decl. ¶¶ 6, 65–78.

[16]    *See* Associated Press, *U.S. Inflation Slowed Sharply to 7.1 Percent Over Past 12 Months*,
POLITICO (Dec. 13, 2022, 8:56 a.m. EST), https://www.politico.com/news/2022/12/13/us-
inflation-slowed-sharply-past-12-months-00073646 ("Inflation in the United States slowed again
last month in the latest sign that price increases are gradually cooling despite the pressures they
continue to inflict on American households."); Abha Bhattarai, *What's Next for the Economy? 10
Charts That Show Where Things Stand.*, Wash. Post (Dec. 29, 2022, 6:00 a.m. EST),
https://www.washingtonpost.com/business/2022/12/29/economy-2023-outlook-inflation-prices/
(observing that "[o]verall inflation has fallen for five straight months and is expected to continue
its descent in 2023" and "[g]as prices are coming back down"); Austin Hufford, *Prices for Used
Cars, Plane Tickets and Electricity Eased in November*, Wall St. J. (Dec. 13, 2022, 12:37 p.m.
ET), https://www.wsj.com/articles/prices-for-used-cars-plane-tickets-and-electricity-eased-in-
november-11670949912 ("[P]rices have started to ease on a monthly basis in a potential sign that
price pressures are easing . . . Prices for gasoline, electricity and natural gas declined in the
month, in welcome news for consumers who need to heat their homes as the colder months
approach."); *see also See* Andrea Shalal and David Lawder, *World Bank Projects 11% Energy
Price Decline by 2023*, Reuters (Oct. 26, 2022, 10:31 a.m. EDT),
https://www.reuters.com/business/energy/world-bank-projects-energy-prices-decline-11-2023-
after-60-jump-2022-2022-10-26/ (reporting World Bank projection that energy prices will decline
by 11% in 2023).

[17]    *See* Core Scientific Inc., Current Report (Form 8-K) (December 15, 2022), Ex. 99.1, at 2.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 7

convertible noteholder group likewise reaffirmed his clients' "belief in the future of the company."[18]

Certainly, any uptick in the market will have a materially accretive effect on the enterprise value of the Debtors. As noted in open letter from B. Riley Financial ("**B. Riley**") to the Company's shareholders and lenders, dated December 14, 2022, every $1,000 increase in the price of bitcoin would likely increase EBITDA by $20 million.[19] Additional investments and right-sizing of operations could further improve EBITDA. For example, B. Riley suggests that building out the Company's Denton, Texas facility could provide an incremental $25 million of EBITDA.[20]

As described in greater detail below, the Company has not engaged in any meaningful market check on the proposed plan and DIP financing and has restricted itself from doing so on a go-forward basis. A competitive market process could establish a greater enterprise value, and therefore greater recoveries for equity and other stakeholders.

The appointment of an equity committee is crucial to ensuring adequate value is allocated to stockholders and is not unfairly diverted to senior secured creditors or other stakeholders.

## II. An official committee is necessary to assure adequate representation of stockholders in the Chapter 11 Cases.

Only an official committee of equity security holders can protect stockholders' substantial legal and economic interests and ensure their meaningful

---

[18] *See In re Core Scientific, Inc.*, No. 22-90341-11 (Bankr. S.D. Tex. Dec. 22, 2022), Hr'g Tr. at 31:19-25, 32:1-4 ("[P]eople believed in this business, they invested in this business as original holders, and they still hold those notes. And so it's not been fun for them to see where the price of the coin is right now, and to see what happened with respect to the company. And so for them to come together and not only support this restructuring, but also be prepared to write a money check into it from a DIP lending perspective because they're also serving in the capacity of DIP lenders, is a real testament to their desire to stick to this process, and their belief in the future of the company."); *Id.* at 32:5-10 ("However, they also know that this company has sustained an extraordinarily volatile larger universe. You only need to look at the price of bitcoin and where it's been and where it is now. There's lots of hopeful people that hope it'll go back in the other direction.").

[19] Press Release, B. Riley Financial, *B. Riley Financial Issues Open Letter to Core Scientific Investors* (Dec. 14, 2022), https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-core-scientific-investors-301703337.html.

[20] *Id.*

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 8

participation in these Chapter 11 Cases. Stockholders can count on neither the Debtors nor an unsecured creditors' committee to adequately represent their interests.

Although, by law, the Company's board of directors has a fiduciary duty to the Company and its stockholders, a board is not necessarily an adequate representative of stockholders' interests in a chapter 11 proceeding. This is so because the directors of a corporation in bankruptcy must advance the interests of the estate generally, rather than the specific interests of stockholders.[21]

That concern is particularly acute here. The Debtors apparently have committed themselves to a restructuring transaction that would award nearly the entire value of their enterprise to their convertible secured noteholders, without having engaged in any rigorous, prepetition marketing process and on terms that tightly constrain their ability to seek out and exploit potentially superior alternatives postpetition. Notably, this course was established by a black-box "Special Committee" that seemingly has supplanted the Company's full board as the ultimate decision-maker concerning restructuring matters, but whose genesis and purpose is not meaningfully explained in the Company's SEC filings or first-day papers.

The RSA and Plan Term Sheet are structured to ensure the outcome of these cases and preclude stockholders' meaningful participation. The proposed plan would not simply compensate the convertible secured noteholders' for their prepetition claims; it would dramatically augment their entitlements, thus awarding them a windfall at the expense of other stakeholders.

The Debtors' DIP facility, provided by members of the ad hoc group of convertible noteholders, is the principal culprit in this respect. The DIP facility inappropriately diverts value to the convertible secured noteholders in numerous ways. Noteholders that agree to participate in the DIP facility will earn handsome fees,[22] plus warrants to obtain 30% of the common stock of the reorganized

---

[21] *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009) ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management. The principal concern of Debtors and their managers . . . must be preservation of Debtors' going concern value and their successful emergence from chapter 11.")

[22] The proposed fees include a 2% commitment fee; a $1.6 million backstop fee; a termination fee equal to (x) 2% of outstanding roll-up loans plus (y) 3% of all other outstanding loans (and interest thereon) (if the DIP facility rolls into an exit facility) or 15% of such other outstanding

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 9

Company in the event that they choose to roll over the DIP facility into exit facility.[23]  More significantly, the Debtors have agreed to roll up the DIP lenders' prepetition notes on a one-to-one basis and to secure the roll-up portion of the DIP facility with liens on substantially all of Debtors' previously unencumbered assets, including nearly all of the Debtors' valuable real estate portfolio.  Viewed in its totality, the DIP facility channels nearly all of the Debtors' residual value to the convertible secured noteholders in exchange for just $75 million in new funding, leaving other stakeholders to fight for scraps.  Even the value ostensibly allocated to equity holders may prove illusory, as the proposed plan includes a double death trap that would strip equity holders of any recovery if either the general unsecured creditors *or* the equity holders vote to reject the proposed plan.

Moreover, the RSA and proposed DIP financing significantly hamstring the Debtors' ability to explore, consider, or negotiate any alternative.  Specifically, the RSA affords the Debtors only 14 days from the Support Effective Date to solicit or discuss alternative restructuring proposals.[24]  Thereafter, the Debtors are forbidden from participating in *any* discussions regarding any alternative restructuring proposals with any party not contacted prior to the end of that 14-day period unless and until a party submits a *bona fide* offer *and* the boards (or similar governing bodies) of the Debtors determine, but only after counsel has so advised, that failure to engage in discussions would violate their fiduciary duties.[25]  If the Special Committee of Core Scientific's board makes such a determination, the Debtors may exercise a "fiduciary out" and terminate the RSA.[26]  But termination of the RSA constitutes an event of default under the DIP Credit Agreement.[27]  Accordingly, any alternative proposal would require a competing bidder or plan sponsor to put up an amount that may exceed $165 million to refinance the DIP facility (including the roll-up loans and exorbitant economics) before it would even know if the alternative

---

loans and interest (upon the termination of the DIP facility in any other circumstance); a 2% fee for a three-month extension of the scheduled maturity date; and other administrative agency and other fees.  *See* Notice of Corrections to DIP Credit Agreement Ex. A §§ 1.1, 2.1.4, 2.1.5, 3.2 [Docket No. 188] (the "**DIP Credit Agreement**").  In other words, in order to refinance the DIP facility following entry of the final order, the Debtors would need to pay an amount that could exceed $165 million (depending on when the refinancing is effected).

[23]    RSA Ex. A, at 6–7.

[24]    RSA § 4(b)(xii).

[25]    *Id.*

[26]    *Id.* § 6(b)(ii).

[27]    DIP Credit Agreement § 11.1(p)(xxii).

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 10

transaction would close. The RSA also requires the Company to timely file a formal objection to any motion that seeks approval of any alternative restructuring or otherwise frustrates the purposes of the proposed plan or challenges the proposed DIP financing.[28] In the event that the Debtors receive any outreach regarding an alternative proposal, the Debtors must share the terms with the Consenting Creditors within two business days of receipt.[29]

      The Debtors' acquiescence to these constraints is particularly troubling given they have not yet taken any comprehensive efforts to market check either their proposed plan or the DIP financing. The only restructuring alternative that the Special Committee appears to have considered was a proposal from B. Riley, which on its face seemed reasonable and appropriate. The First-Day Declaration provides no coherent explanation for the Special Committee's conclusion that the B. Riley proposal was inferior to the plan and DIP financing proposed by the ad hoc convertible noteholder group. Indeed, the proposed plan and DIP financing suffer, in equal (if not greater) measure, from the same putative deficiencies that apparently prompted the Special Committee to reject the B. Riley proposal. For example, the Debtors contend that the B. Riley proposal would have required "the conversion of B. Riley's unsecured claim into secured debt with liens on certain of the Debtors' assets."[30] But, as discussed above, the convertible secured noteholders similarly insisted that the Debtors roll up a significant portion of the prepetition notes into DIP loans secured by liens on substantial additional collateral, including mining equipment and real estate, thereby "restricting the Company's ability to provide collateral to other potential lenders."[31] Indeed, there is no indication that the Debtors properly marketed their previously unencumbered assets in connection to obtain DIP financing. A proper marketing process may have supported a non-priming, cheaper DIP financing facility without a roll-up.

      Similarly, the Debtors complain that B. Riley's proposal required consensual agreements with equipment lenders; however, the equipment financing parties have not agreed to the plan outlined in the RSA, and the Debtors have outlined no credible basis to confirm the proposed plan over the equipment financing parties'

---

[28]    RSA §4 (a)(ii).

[29]    RSA § 4(a)(viii).

[30]    First-Day Decl. ¶ 84.

[31]    *Id.* ¶ 85.

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 11

objections.[32] Thus, the plan outlined in the RSA, just like the B. Riley proposal, will require active negotiations with those constituents.

Moreover, the governance processes that set the Debtors on their present course are obscure and potentially troubling. The First-Day Declaration suggests that the board has delegated all decision-making authority with respect to the restructuring to the Special Committee, which determined to support a proposed restructuring that allocates a disproportionate share of the available value to the prepetition secured noteholders.[33]

In sum, the Company's board cannot zealously represent the interests of the equity holders in these Chapter 11 Cases. Its objectives span multiple constituencies (e.g., equity holders and creditors), and its ability to pursue more attractive alternatives is tightly constrained by the RSA and DIP Credit Agreement.

Nor can the official committee of unsecured creditors, once appointed, adequately represent the interests of stockholder. The creditors' committee's role will be limited to ensuring that general unsecured creditors achieve maximum value for their claims. As noted above, the general unsecured creditors and equity holders have already been pitted against each other in several ways: (1) the proposed double death trap built into the Plan Term Sheet (any vote to reject the plan by the unsecured creditors strips all value from the unsecured creditors *and* equity holders) and (2) the fact that the allocation of the 3% of the reorganized Company's common stock and the warrants as between the equity holders and unsecured creditors remains open. Accordingly, the equity holders require a seat at the table as to how to allocate the value between the equity holders and unsecured creditors. Moreover, although general unsecured creditors and equity holders are currently being treated similarly under the plan, the creditors' committee may seek to decouple general

---

[32]   The Debtors' apparent belief that they can "cram up" the equipment financing parties, thus obviating the need to consensually resolve their claims, is tendentious at best. The Debtors' strategy is premised on a judicial valuation of the mining equipment in an aggregate amount no greater than $90 million. *See* RSA Ex. A, at 10. This alone is a highly uncertain proposition, given the vagaries inherent in judicial valuations. And, even if the Debtors' valuation case succeeds, they likely will face substantial additional legal objections to the contemplated cram-up of the equipment financing debt.

[33]   *See* First-Day Declaration, ¶¶ 13, 17, 80, 85, 87; *see also In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ), Docket No. 1, p. 7 (resolutions suggesting that from November 14, 2022, when Special Committee was formed, until December 12, 2022, Special Committee served in an advisory role; as of December 12, 2022, Special Committee was designated exclusive decision-making authority with respect to "the evaluation, negotiations, and execution of any potential transaction").

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 12

unsecured recoveries from equity recoveries or trade higher general unsecured claim recoveries for little or no equity recoveries. For the foregoing reasons, the creditors' committee cannot adequately represent the interests of the equity holders.

Without the appointment of an official equity committee, the equity holders lack a seat at the table to negotiate, or even evaluate, critical case milestones, and no one will be standing up to the Company, the secured noteholders, or the well-represented general unsecured creditors to ensure that equity holders receive the value to which they are entitled.

### III. The appointment of an official equity committee adds value to the Chapter 11 Cases.

In light of all the facts and circumstances described above, the Ad Hoc Group believes it is clear that the appointment of an official equity committee will ensure that all stakeholders entitled to a recovery are able to meaningfully participate in the Chapter 11 Cases. Giving the equity holders a meaningful role in the process is the only way to ensure that the bankruptcy process works fairly and justly to maximize value for all stakeholders, not only the secured creditors. The added value of giving the equity holders a seat at the table outweighs the costs to the Debtors' estates of appointing an additional committee.

### IV. The request is timely, and the prompt appointment of an official equity committee is essential to allowing the equity holders meaningful participation in the Chapter 11 Proceedings.

The equity holders are seeking the appointment of an equity committee at the nascency of these Chapter 11 Cases, when they can most effectively ensure maximum value for equity holders and before the terms of the DIP financing and plan of reorganization that strip the equity holders of value are set in stone. The Ad Hoc Group's request for appointment of a committee is therefore timely.

The Debtors have committed themselves to a quick timeline for obtaining final approval of the proposed DIP financing and filing and confirming a plan of reorganization. The final hearing on the proposed DIP financing is currently scheduled for January 23, 2022, with objections due by January 17, 2022. It is essential that the equity committee be constituted and begin its work quickly so that it can adequately protect the interests of the Company's equity holders before the Debtors are able to force stakeholders into accepting DIP financing and a plan that does not maximize value for all stakeholders. Time is particularly of the essence in a

**SASMF EXHIBIT 14**

**49 of 74**

Jayson B. Ruff, Esq.
Trial Attorney
Office of the United States Trustee
January 6, 2023
Page 13

complex case like this one, involving eleven debtors with operations across several states in a highly technical industry.

The Ad Hoc Group respectfully requests that, in light of all the facts and circumstances, the United States Trustee promptly appoint an official committee of equity security holders so that the substantial interests of the Company's stockholders are fairly represented in these cases.

Thank you for your prompt consideration.

Sincerely,

Ron E. Meisler

cc:

*Counsel to the Debtors*

Alfredo R. Pérez (alfredo.perez@weil.com)
Ray C. Schrock, P.C. (ray.schrock@weil.com)
Ronit J. Berkovich (ronit.berkovich@weil.com)
Moshe A. Fink (moshe.fink@weil.com)

## EXHIBIT A

### Ad Hoc Group of Equity Holders

| Shareholder | Number Holdings of Common Stock | Percent Holdings of Common Stock (all holders) | Percent Holdings of Common Stock (excl. insiders) |
|---|---|---|---|
| The Rudolph Family Trust | 6,940,704 | 1.85% | 2.59% |
| Two Trees Capital Limited BVI Custodian CSPB | 2,040,000 | 0.54% | 0.76% |
| Lukasz Gottwald | 1,720,296 | 0.46% | 0.64% |
| Todd Deutsch | 900,000 | 0.24% | 0.34% |
| Douglas Abrams | 475,000 | 0.13% | 0.18% |
| Jay Deutsch | 100,000 | 0.03% | 0.04% |
| Mark Beaven | 88,000 | 0.02% | 0.03% |
| Eddie Griffin | 58,419 | 0.02% | 0.02% |
| **Total** | **12,322,419** | **3.29%** | **4.61%** |

**EXHIBIT C**

# Madden, Jennifer (PAL)

| | |
|---|---|
| **From:** | Meisler, Ron E (CHI) |
| **Sent:** | Friday, January 20, 2023 11:43 AM |
| **To:** | 'Ruff, Jayson B. (USTP)'; Barcomb, Alicia (USTP) |
| **Cc:** | Madden, Jennifer (PAL) |
| **Subject:** | RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee |

Dear Mr. Ruff and Ms. Barcomb,
We wanted to follow up with you on our request for the formation of an official committee of equity holders.  As previously noted, over the last month, Bitcoin prices have rallied materially. See https://finance.yahoo.com/quote/BTC-USD?p=BTC-USD&.tsrc=fin-srch.

With this nearly $5,000/bitcoin increase, Core Scientific's value has increased exponentially.  Even before the rally, and as mentioned in our January 6th letter, the Debtors' first day papers included evidence of solvency, and accordingly, the Restructuring Support Agreement included a distribution for equity. But there is no one to negotiate on behalf of equity.  Moreover, the Final DIP hearing is around the corner, and equity needs an official committee to push back on the value destructive terms.  In fact, the ad hoc group of equity holders has been in touch with a couple funding sources that may be able to compete on the DIP loan, but without an official committee, we are operating with "both hands tied behind our back."  Furthermore, as stated below, the group of ad hoc equity holders continues to grow because of their conviction regarding value.

We are happy to discuss our request with you and answer any questions you may have.  But, most importantly, we urge you to form an official committee of equity holders expeditiously, so that they can assemble, engage counsel and make a meaningful difference in these chapter 11 cases.

Best,
Ron

**Ron E. Meisler**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive | Chicago | Illinois | 60606-1720
**T: +1.312.407.0549** | **F: +1.312.407.8641** | **M: +1.312.282.1111**
**ron.meisler@skadden.com**

Skadden

---

**From:** Madden, Jennifer (PAL) <Jennifer.Madden@skadden.com>
**Sent:** Tuesday, January 17, 2023 1:30 PM
**To:** 'Ruff, Jayson B. (USTP)' <Jayson.B.Ruff@usdoj.gov>; Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Cc:** Meisler, Ron E (CHI) <Ron.Meisler@skadden.com>
**Subject:** RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Dear Mr. Ruff and Ms. Barcomb,

1

**SASMF EXHIBIT 14**
**53 of 74**

We write to provide a further update on the ad hoc group of equity holders seeking appointment of an official committee. Over the past few days, several additional shareholders holding more than 37 million shares (or approximately 10% of the shares outstanding, including shares held by insiders) have reached out to Skadden, expressing interest in joining the ad hoc group. Together with the existing group, we are currently in touch with holders owning approximately 50 million shares (or approximately 13% of the shares outstanding, including shares held by insiders).

The growing size of the group and the substantial additional outreach from shareholders evidences that these holders are passionate about having an official committee appointed in the Core Scientific Chapter 11 cases to advocate for the rights of equity holders for many of the reasons we have communicated in our previous correspondence.

Given the status of the cases and the timing of your decision, we wanted to share this information with you quickly. Please let us know if you would like any additional information.

We look forward to hearing from you soon.

Thanks,
Jenn

**Jennifer Madden**
**Skadden, Arps, Slate, Meagher & Flom LLP**
525 University Avenue | Palo Alto | California | 94301-1908
**T: +1.650.470.4658 | F: +1.650.798.6558**
jennifer.madden@skadden.com

---

**From:** Meisler, Ron E (CHI) <Ron.Meisler@skadden.com>
**Sent:** Friday, January 13, 2023 12:41 PM
**To:** 'Ruff, Jayson B. (USTP)' <Jayson.B.Ruff@usdoj.gov>; Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Cc:** Madden, Jennifer (PAL) <Jennifer.Madden@skadden.com>
**Subject:** RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Dear Mr. Ruff and Ms. Barcomb,

Thanks for your response and considering our request. One more issue worth taking into account is the surge in values in comparable companies – a direct result of the factors mentioned in my prior email. In particular, the market caps for the following companies has nearly doubled over the last several weeks:

- The price of **Marathon Digital Holdings**, a cryptocurrency mining company headquartered in Las Vegas, increased from $3.40 on the first day of trading in 2023 to $7.26 today, January 13, 2023—a 113% increase in less than two weeks. (*Marathon Digital Holdings, Inc.*, Yahoo! Finance, https://finance.yahoo.com/chart/MARA/ (last visited Jan. 13, 2023)).

SASMF EXHIBIT 14
54 of 74



- The price of **Riot Platforms, Inc.**, a Bitcoin mining company headquartered in Colorado, increased from $3.37 on the first day of trading in 2023 to $5.94 today, January 13, 2023—a 76% increase in less than two weeks. (*Riot Platforms, Inc.*, Yahoo! Finance, https://finance.yahoo.com/chart/RIOT/ (last visited Jan. 13, 2023)).



- The price of **HIVE Blockchain Technologies Ltd.**, a cryptocurrency mining company headquartered in Vancouver, increased from $2.09 on the first day of trading in 2023 to $4.14 today, January 13, 2023— a 98% increase in less than two weeks. (*HIVE Blockchain Technologies Ltd.*, Yahoo! Finance, https://finance.yahoo.com/quote/HIVE/chart/ (last visited Jan. 13, 2023)).



- The price of **Hut 8 Mining Corp.**, a Bitcoin mining company based in Toronto, increased from $1.13 on the first day of trading in 2023 to $2.03 today, January 13, 2023—an 80% increase in less than two weeks. (*Hut 8 Mining Corp.*, Yahoo! Finance, https://finance.yahoo.com/chart/HUT.TO/ (last visited Jan. 13, 2023)).



Each of these companies is a competitor of Core Scientific, and all have experienced significant market price increases over the three and a half weeks since Core Scientific filed for chapter 11 bankruptcy protection.

We are happy to discuss at your convenience.

Sincerely,
Ron

**Ron E. Meisler**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0549 | F: +1.312.407.8641 | M: +1.312.282.1111
ron.meisler@skadden.com

**SASMF EXHIBIT 14**
**56 of 74**

Skadden

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Sent:** Friday, January 13, 2023 12:52 PM
**To:** Meisler, Ron E (CHI) <Ron.Meisler@skadden.com>; Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Cc:** Madden, Jennifer (PAL) <Jennifer.Madden@skadden.com>
**Subject:** [Ext] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Ron,

Thank again for reaching out. We are still reviewing the matter I expect we will be able to provide a response next week.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4662 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication. Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Meisler, Ron E <Ron.Meisler@skadden.com>
**Sent:** Friday, January 13, 2023 10:51 AM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Cc:** Madden, Jennifer <Jennifer.Madden@skadden.com>
**Subject:** [EXTERNAL] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Dear Mr. Ruff and Ms. Barcomb,

We are writing as a follow-up to the letter dated January 6, 2023 (the "January 6 Letter"), sent by Skadden on behalf of an ad hoc group of equity holders of Core Scientific, Inc. ("Core Scientific" or the "Company"), requesting the appointment of an official equity committee in the chapter 11 cases of Core Scientific and its affiliated debtors. We are writing to provide additional information that we believe will be helpful to you in

SASMF EXHIBIT 14
57 of 74

making your decision regarding whether to appoint an official equity committee in the Core Scientific chapter 11 cases.

As highlighted in the January 6 Letter, the Debtors pointed to the transitory decline in the price of Bitcoin in both their First-Day Declaration and at their first-day hearing as one of the reasons why Core Scientific was suffering financial decline and seeking chapter 11 relief.

Notably, on December 18, 2022, just days before the debtors filed for bankruptcy, Bitcoin's price was at $16,439.68 at market close.  Today, January 12, 2023, the price of Bitcoin closed at $18,853.84. (*Bitcoin USD*, Yahoo! Finance, https://finance.yahoo.com/chart/BTC-USD (last visited Jan. 12, 2023).)

*Daily Bitcoin Price and Trading Volume  from December 18, 2023 to January 12, 2023*



Over the course of a mere three and a half weeks, the price of Bitcoin rose $2,414.16. This increase of approximately 15% in less than 30 days is attributable, among other things, to favorable macroeconomic factors—including a slowing inflation rate and moderating Fed interest rate hikes that continue to trend in a value accretive direction.  In fact, as noted in the chart below, today's trading activity further reflects the rise in bitcoin pricing, which has a direct effect on the Debtors' valuation.

**SASMF EXHIBIT 14**

**58 of 74**



On that point, in B. Riley's open letter to the Company's shareholders and lenders, and as we highlighted in the January 6 Letter, B. Riley noted that every $1,000 increase in the price of Bitcoin would likely increase EBITDA by $20 million. (Press Release, B. Riley Financial, *B. Riley Financial Issues Open Letter to Core Scientific Investors* (Dec. 14, 2022), https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-

core-scientific-investors-301703337.html)).  In other words, in the past three and a half weeks, the Debtors' EBITDA has likely increased by more than $48 million in just the first few weeks of the chapter 11 cases, which likely equates to an increase in the value of the Company in the hundreds of millions of dollars.

In light of the positive trajectory of the economy, generally, and interest rates and inflation, specifically, values are rapidly increasing, and equity holders are in dire need of representation in the chapter 11 cases.  If the equity holders are denied representation, the cases will result in all of the represented stakeholders carving up the value of the Company among themselves to the detriment of equity holders.

I welcome the opportunity to discuss the position of the ad hoc group of equity holders and our correspondence to date.

Sincerely,

Ron


**Ron E. Meisler**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive | Chicago | Illinois | 60606-1720
**T: +1.312.407.0549** | **F: +1.312.407.8641** | **M: +1.312.282.1111**
**ron.meisler@skadden.com**

Skadden

---

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Sent:** Tuesday, January 10, 2023 12:16 PM
**To:** Madden, Jennifer (PAL) <Jennifer.Madden@skadden.com>; Meisler, Ron E (CHI) <Ron.Meisler@skadden.com>
**Cc:** Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Subject:** [Ext] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Jenn,

Thank you. We are reviewing the request.  We are also seeking the position of the Debtors as well as the Unsecured Creditors Committee with respect to the request as well.  We may have some follow-up questions as we work through this and will reach back out as necessary.


*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4662 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov

**SASMF EXHIBIT 14**
**60 of 74**



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Madden, Jennifer <Jennifer.Madden@skadden.com>
**Sent:** Tuesday, January 10, 2023 11:50 AM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Meisler, Ron E <Ron.Meisler@skadden.com>
**Cc:** Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Subject:** [EXTERNAL] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Jayson, Alicia,

I hope you had a good weekend.  We wanted to reach out and check in on whether you had any follow-up questions about the equity committee request or our letter.  We are available at your convenience to provide any additional information or answer any questions you think may be helpful.  We are getting a number of inquiries from equity holders who have voiced concerns about the chapter 11 cases, and in light of the upcoming final DIP hearing, we just wanted to reach out.  Please don't hesitate to let us know if there is any additional information we can provide.

Best regards,
Jenn

**Jennifer Madden**
**Skadden, Arps, Slate, Meagher & Flom LLP**
525 University Avenue | Palo Alto | California | 94301-1908
**T: +1.650.470.4658 | F: +1.650.798.6558**
jennifer.madden@skadden.com

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Sent:** Friday, January 6, 2023 1:18 PM
**To:** Meisler, Ron E (CHI) <Ron.Meisler@skadden.com>; Madden, Jennifer (PAL) <Jennifer.Madden@skadden.com>
**Cc:** Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Subject:** [Ext] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Ron & Jennifer,

Confirming receipt of the request.  We will review and let you know of any questions.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516

**SASMF EXHIBIT 14**
**61 of 74**

Houston, Texas 77002
713-718-4662 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Meisler, Ron E <Ron.Meisler@skadden.com>
**Sent:** Friday, January 6, 2023 2:37 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Cc:** Schrock, Ray <Ray.Schrock@weil.com>; 'Berkovich, Ronit' <Ronit.Berkovich@weil.com>; 'alfredo.perez@weil.com' <alfredo.perez@weil.com>; 'moshe.fink@weil.com' <moshe.fink@weil.com>; Madden, Jennifer <Jennifer.Madden@skadden.com>
**Subject:** [EXTERNAL] In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

Dear Mr. Ruff,
Please see attached correspondence on behalf of the shareholders identified therein, requesting the appointment of an official committee of equity security holders in the Core Scientific chapter 11 cases.  We are available to discuss at your convenience, including over this weekend. My and my colleague's contact information are below.

Best regards,
Ron Meisler

**Ron E. Meisler**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive | Chicago | Illinois | 60606-1720
T: +1.312.407.0549 | F: +1.312.407.8641 | M: +1.312.282.1111
ron.meisler@skadden.com

Skadden

**Jennifer Madden**
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue | Palo Alto | California | 94301-1908
T: +1.650.470.4658 | F: +1.650.798.6558
jennifer.madden@skadden.com

Skadden

**SASMF EXHIBIT 14**
**62 of 74**

--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================


--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================


--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================

**SASMF EXHIBIT 14**

**EXHIBIT D**

**Madden, Jennifer (PAL)**

| | |
|---|---|
| **From:** | Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov> |
| **Sent:** | Friday, January 20, 2023 12:52 PM |
| **To:** | Meisler, Ron E (CHI); Barcomb, Alicia (USTP) |
| **Cc:** | Madden, Jennifer (PAL) |
| **Subject:** | [Ext] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee |

Mr. Meisler,

Thank you for following up.  I was intending to respond to the request earlier, but was tied up in Court this morning.  The U.S. Trustee has evaluated the request and at this time and based on the present facts and circumstances of these cases, the U.S. Trustee is exercising his discretion to not appoint an Official Equity Committee.

We will be continuing to monitor these cases with the factors relevant to the appointment of an Equity Committee in mind.  Should the U.S. Trustee decide to exercise his discretion to appoint an Official Equity Committee at a later date, we will reach back out to see if there is still interest from the members of your Ad-Hoc Group in serving on such a committee.

Kind regards,

## *Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4662 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Meisler, Ron E <Ron.Meisler@skadden.com>
**Sent:** Friday, January 20, 2023 1:43 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Barcomb, Alicia (USTP) <Alicia.Barcomb@usdoj.gov>
**Cc:** Madden, Jennifer <Jennifer.Madden@skadden.com>
**Subject:** [EXTERNAL] RE: In re Core Scientific, Inc., et al., Case No. 22-90341 (DRJ) - Request for Appointment of Official Equity Committee

**SASMF EXHIBIT 14**
**65 of 74**

**EXHIBIT E**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
+1 (312) 407-0549
DIRECT FAX
+1 (312) 407-8641
EMAIL ADDRESS
RON.MEISLER@SKADDEN.COM

January 23, 2023

**BY E-MAIL**

*Counsel to Core Scientific, Inc.*

Alfredo R. Perez
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston Texas 77002

Ray C. Schrock
Ronit J. Berkovich
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

RE:  In re Core Scientific, Inc., et al., Case No. 22-90341
(DRJ)—Appointment of an Official Committee of
Equity Holders

Dear Messrs. Perez and Schrock, and Ms. Berkovich:

As you are aware, we represent an ad hoc group of equity security holders
(the "**Ad Hoc Group**") of Core Scientific, Inc. ("**Core Scientific**" or the
"**Company**" and together with its subsidiaries and affiliates in the Chapter 11 Cases,
the "**Debtors**").  As of today, the members of the Ad Hoc Group collectively own
approximately 51,912,524 shares of the company's common stock (representing
approximately 13.9% of all issued and outstanding stock of the Company and

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 2

approximately 19.4% of issued and outstanding common stock of the Company not held by insiders).[1]

As you are also aware, we sent a letter on January 6, 2023 to Mr. Jayson B. Ruff, the trial attorney representing the United States Trustee for Region 7 (the "**U.S. Trustee**") in the Debtors' pending chapter 11 cases (the "**Chapter 11 Cases**"), requesting the appointment of an official committee of equity security holders in the Chapter 11 Cases (the "**UST Letter**"), a copy of which was provided to you. We also engaged in subsequent correspondence with the U.S. Trustee regarding, among other things, the significant increase in the price of Bitcoin, the surge in values of companies comparable to the Debtors since the beginning of the year, and the significant increase in the amount of outstanding and issued common stock included in the Ad Hoc Group since the date of the UST Letter (an increase of nearly 50 million shares of common stock or more than 10% of the Company's issued and outstanding common stock).

On Friday, January 20, 2023, the U.S. Trustee notified the Ad Hoc Group (by email addressed to Skadden) that the U.S. Trustee was exercising his discretion to decline our request to appoint an official committee of equity security holders in the Chapter 11 Cases, but noted that the U.S. Trustee would continue to monitor the cases.

The Ad Hoc Group continues to believe that equity is "in the money" and that equity holders have a substantial stake in the outcome of the Chapter 11 Cases, and therefore, equity holders deserve meaningful representation in the Chapter 11 Cases. Indeed, the Debtors' own representations establish that the Company's common stock holds real value. Specifically, the Debtors reported positive stockholder equity of approximately $73 million in their most recent balance sheet,[2] the First Day Declaration of the Company's CEO indicates that assets exceed liabilities by at least $100 million,[3] and the Debtors have unilaterally proposed a distribution to stockholders in these Chapter 11 Cases[4] that they describe as a

---

[1]   Based on public filings, we believe approximately 107.03 million shares of the Company's common stock are currently held by insiders, representing approximately 28.6% of all issued and outstanding shares of common stock of the Company.

[2]   Core Scientific, Inc., Quarterly Report (Form 10-Q) at 4 (Nov. 22, 2022) (balance sheet as of September 30, 2022).

[3]   Attachment to Voluntary Pet. of Core Scientific, Inc., ¶ 2, Docket No. 1; First-Day Decl. ¶ 63.

[4]   *See* Docket No. 72, Restructuring Support Agreement Ex. A, at 11–12.

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 3

"meaningful recover[y]" for stockholders.[5]  In addition, the price of Bitcoin and the value of companies comparable to the Debtors continue to surge, indicating a significant increase in the value of Debtors' estates since the Petition Date for the benefit of the Company's equity security holders.

Specifically, since December 18, 2022, just days leading up to the Debtors' chapter 11 filings, the price of Bitcoin has increased from $16,439.68 (at market close) to $22,997.80 (at market close today)—a price increase of more than 38 percent.



In addition to the foregoing, the Ad Hoc Group has been monitoring the trading prices of several of the Company's competitors.  As reflected in the charts below, trading prices for these comparable companies have doubled, or even tripled, in the first few weeks of 2023.

---

[5]     First-Day Decl. ¶ 15.

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 4

The price of **Marathon Digital Holdings**, a cryptocurrency mining company headquartered in Las Vegas, increased from $3.40 on the first day of trading in 2023 to $9.00 today, January 23, 2023—a 165% increase in less than three weeks.[6]



The price of **Riot Platforms, Inc.**, a Bitcoin mining company headquartered in Colorado, increased from $3.37 on the first day of trading in 2023 to $6.48 today, January 23, 2023—a 92% increase in less than three weeks.[7]

---

[6] *Marathon Digital Holdings, Inc.*, Yahoo! Finance, https://finance.yahoo.com/chart/MARA/ (last visited Jan. 23, 2023).

[7] *Riot Platforms, Inc.*, Yahoo! Finance, https://finance.yahoo.com/chart/RIOT/ (last visited Jan. 23, 2023).

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 5



The price of **HIVE Blockchain Technologies Ltd.**, a cryptocurrency mining company headquartered in Vancouver, increased from $1.53 on the first day of trading in 2023 to $3.44 today, January 23, 2023—a 125% increase in less than three weeks.[8]



---

[8] *HIVE Blockchain Technologies Ltd.*, Yahoo! Finance,
https://finance.yahoo.com/quote/HIVE/chart/ (last visited Jan. 23, 2023).

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 6

The price of **Hut 8 Mining Corp.**, a Bitcoin mining company based in Toronto, increased from $0.82 on the first day of trading in 2023 to $1.98 today, January 23, 2023—a 142% increase in less than three weeks.[9]



The Debtors pointed to the transitory decline in the price of Bitcoin in both their First Day Declaration[10] and their first day hearing,[11] as well as certain other temporary macroeconomic factors,[12] as the leading cause of the Debtors' financial decline and decision to seek chapter 11 relief.

---

[9]   *Hut 8 Mining Corp.*, Yahoo! Finance, https://finance.yahoo.com/chart/HUT/ (last visited Jan. 23, 2023).

[10]  *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 5] (the "**First Day Declaration**") ¶ 6, 22-23, 65-67.

[11]  *See In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. Dec. 22, 2022), Hr'g Tr. at 10:23-24, 32:6-8.

[12]  *See* First Day Declaration ¶ 76 (referencing energy prices, inflation, and supply chain interruptions between July 2022 and September 2022).

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 7

The surge in value of Bitcoin and the Debtors' competitors illustrate that these macroeconomic factors are trending in a favorable, value-accretive direction.[13] Indeed, B. Riley's open letter to the Company's shareholders and lenders, and as we highlighted in the UST Letter, noted that every $1,000 increase in the price of Bitcoin would likely increase EBITDA by $20 million.[14]  In other words, the Debtors' EBITDA has likely increased by more than $131 million in just the first month of the chapter 11 cases, which the Ad Hoc Group believes equates to an increase in the value of the Company in the hundreds of millions of dollars.

In light of the positive trajectory of the economy and the rapidly increasing value of the Debtors' estates, the equity security holders are in need of adequate and independent representation in the Chapter 11 Cases now.  To that end, the Ad Hoc Group has instructed us to file a motion seeking appointment of an official equity committee in the Chapter 11 Cases.  We intend to file a motion asking the bankruptcy court to appoint an equity committee by the end of the week.

In advance of filing and prosecuting this motion, however, we are reaching out to note that the Ad Hoc Group is open to discussing a consensual resolution with the Company for the appointment of an official equity committee, including defining the scope of an official equity committee's role in the Chapter 11 Cases and agreeing upon a reasonable budget.  We hope you agree that our rationale is sound for the formation of an equity committee notwithstanding the US Trustee's decision, and we would appreciate your support.  If we reach a consensual agreement now, then we can avoid unnecessary expenses and file a joint motion with agreed terms, with the objective of having an official committee appointed efficiently and expeditiously.

---

[13]  Undoubtedly, the value of a company's stock is a strong indication of value.  *See, e.g., VFB LLC v. Campbell Soup Co.*, No. 02-137 KAJ, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), aff'd, 482 F.3d 624 (3d Cir. 2007), and aff'd, 482 F.3d 624 (3d Cir. 2007) ("The price of a company's publicly traded common stock at the time of the transaction is presumably an ideal data point for the determination of fair market value. Specifically, with respect to stock traded on 'the New York Stock Exchange, one of the most efficient capital markets in the world, 'the value established on the open market is the fair market value for purposes of determining reasonably equivalent value, [i]n the absence of any evidence of manipulation or bad faith.'") (quoting *PHP Liquidating, LLC v. Robbins* (*In re PHP Healthcare Corp.*), 128 Fed. Appx. 839, 848 (3d Cir. 2005)).

[14]  Press Release, B. Riley Financial, *B. Riley Financial Issues Open Letter to Core Scientific Investors* (Dec. 14, 2022), https://www.prnewswire.com/news-releases/b-riley-financial-issues-open-letter-to-core-scientific-investors-301703337.html.

Alfredo R. Perez
Ray C. Schrock
Ronit J. Berkovich
January 23, 2023
Page 8

Given the matters discussed herein, we would ask that you also immediately share this letter with the full Board of Directors of Core Scientific.

Sincerely,

Ron E. Meisler

CC:
George N. Panagakis
Jennifer Madden