IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | Related Docket Nos. 458, 568, 569, 570, 571, 572 |

**REPLY OF AD HOC GROUP OF EQUITY HOLDERS (A) TO OBJECTION OF THE AD HOC NOTEHOLDER GROUP AND (B) IN FURTHER SUPPORT OF THE MOTION OF THE AD HOC GROUP OF EQUITY HOLDERS OF CORE SCIENTIFIC FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

An ad hoc group (the "**Ad Hoc Equity Group**") of beneficial holders of the common stock of Core Scientific, Inc. ("**Core Scientific**" or the "**Company**" and, together with its affiliated debtors and debtors in possession, the "**Debtors**"), by and through their undersigned counsel, hereby submit this reply (the "**Reply**") to the *Objection of the Ad Hoc Group to the Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Equity Committee of Equity Security Holders* [Docket No. 572] (the "**Objection**") and in further support of the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6073); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Security Holders* [Docket No. 458] (the "**Motion**"). In reply to the Objection and in further support of the Motion, the Ad Hoc Equity Group respectfully states as follows:

### PRELIMINARY STATEMENT

1.        In response to the commencement of the Debtors' Chapter 11 Cases, the terms of the initial proposed DIP financing, and the proposed RSA, among other things, a group of stockholders—comprised largely of individuals and their family trusts—pooled their individual resources to hire counsel to assist them in securing the appointment of an Official Equity Committee to protect stockholder interests in the Chapter 11 Cases. This group of individuals had conviction in the temporary nature of the "crypto winter," and the long-term value of the Debtors' business. Recent market trends and the Debtors' strong performance since the Petition Date have only strengthened that confidence. In fact, the transitory market dislocation has turned around in the Debtors' and stakeholders' favor. The price of Bitcoin has rebounded, rising 37% since the Petition Date and has stabilized, trading over $23,000 for twelve consecutive days and over $20,000 for the past six weeks; energy prices are materially lower; the capital markets are opening to the digital asset space; and other economic conditions are generally trending favorably. All these factors point to significant value for stakeholders and indicate a material increase in the Company's value since the commencement of these Chapter 11 Cases.

2.        In light of the significant additional value that has accreted to the estate since the Petition Date, the Debtors and Creditors' Committee have agreed to support the appointment of an Official Equity Committee, subject to the terms reflected in the proposed order approving the formation of an Official Equity Committee (the "**Proposed Order**")[2]—namely: (a) the Official

---

[2]      *See* Exhibit A to the *Notice of Rescheduled Hearing Regarding Mot. of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Comm. of Equity Sec. Holders* [Docket No. 568].

**SASMF EXHIBIT 24**

**2 of 99**

Equity Committee has a $4.75 million budget, (b) the scope of the Official Equity Committee is limited to issues involving valuation and the negotiation of a chapter 11 plan, (c) the Official Equity Committee can seek an increase to the budget and/or expansion of the scope, but any such increase in budget or expansion in scope requires the consent of both the Debtors and Creditors' Committee *or* relief from this Court, and (d) the Debtors and Creditors' Committee have the right to request that the Court disband the Official Equity Committee in the event that the Official Equity Committee is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases. This agreement was meant to balance, among other things, the needs of stockholders, some of whom are currently coming out of pocket to fund the expenses of engaging in these Chapter 11 Cases, with the risk that the Debtors' performance weakens to such an extent that the Debtors become hopelessly insolvent, in which case the five-factor test would no longer be satisfied.

3.      Notwithstanding the support of the estate fiduciaries—the Debtors and Creditors' Committee—and the protections they have negotiated, the Ad Hoc Noteholder Group objects to the Motion. The Objection focuses on four of the five factors in the five-factor analysis, arguing that (1) the Ad Hoc Equity Group has not offered evidence of the Debtors' solvency; (2) stockholders are already adequately represented in light of their participation thus far in the Chapter 11 Cases, as well as by the Debtors' insider stockholders and the Creditors' Committee; (3) the estates and creditors (including the Ad Hoc Noteholder Group, which represents prepetition secured noteholders that are squarely "in the money") should not be required to bear the cost of an Official Equity Committee "gambl[ing]" with *their* money; and (4) appointment of the Official Equity Committee is premature. The Ad Hoc Noteholder Group appears to concede that these

**SASMF EXHIBIT 24**
**3 of 99**

Chapter 11 Cases are complex—it does not meaningfully analyze this factor and acknowledges the impact of the volatility and complexity of Bitcoin pricing on the Debtors' valuation.

4.      The Ad Hoc Noteholder Group's arguments fail. ***First***, the Ad Hoc Noteholder Group spends a significant portion of the Objection attempting to undermine the significance of data points and other indicia of value highlighted in the Motion. The Ad Hoc Noteholder Group's argument is not that these indicia do not exist, but that they do not *establish* solvency. However, there is no requirement that the Debtors or stockholders prove definitively the Debtors' solvency or undertake an expert valuation before an Official Equity Committee is appointed. Nor does the Ad Hoc Noteholder Group provide any authority for its apparent position that the Ad Hoc Equity Group must establish solvency. If that were the test, an Official Equity Committee could likely never be appointed until well into the Chapter 11 process—well past the time period where it could add meaningful value for its constituents. Rather, the relevant inquiry is whether the debtor is "hopelessly insolvent" and whether there is a substantial *likelihood* of a meaningful distribution to stockholders.

5.      The Debtors themselves have stated that, given current market conditions, they are *not* hopelessly insolvent and may well be solvent,[3] and the Ad Hoc Noteholder Group cannot deny that the market data continues to support the position that the Debtors are likely solvent. And it is telling that the Creditors' Committee, which represents the general unsecured creditors, supports the appointment of an Official Equity Committee, subject to the terms set forth in the Proposed Order. Moreover, the Ad Hoc Noteholder Group's attempt to distinguish the Debtors' peer group in a comparable company analysis based on debt-load defies conventional financial and valuation

---

[3]     *Debtors Response to Mot. for Appointment of an Official Comm. of Equity Sec. Holders* [Docket No. 570] (the "**Debtors' Reply**"), ¶¶ 7-11.

**SASMF EXHIBIT 24**
**4 of 99**

methodologies, including the common practice of using EBITDA—a metric that explicitly excludes debt service.

6. **Second**, the Ad Hoc Noteholder Group's arguments that stockholders are already adequately represented do not withstand scrutiny. The Ad Hoc Equity Group consists of individuals and family trusts with limited resources. Their ability to organize and fund counsel to represent them in seeking appointment of an Official Equity Committee does not constitute adequate representation. In addition, the insider management and board members that hold approximately 30% of the Company's common stock are fiduciaries of the estate[4]—not only stockholders—and have delegated decision-making authority with respect to these Chapter 11 Cases to the independent Special Committee members who do not own equity. Finally, the Creditors' Committee's efforts to ensure general unsecured creditors are paid in full in no way guarantees that it will pursue maximum value for stockholders; in fact, its fiduciary duties may compel it to take positions opposed to the interests of stockholders.

7. **Third**, the Ad Hoc Noteholder Group largely ignores the agreed-upon budget and limited scope of the Official Equity Committee in arguing that the costs of an Official Equity Committee are unjustified. Its position is ironic in light of the $6 million termination fee it received

---

[4]     The Ad Hoc Noteholder Group questions the Debtors' agreement to the terms of the Proposed Order, arguing that the Debtors are not exercising their "fiduciary duties to maximize recoveries for its creditors **ahead of** its [sic] equity holders." Objection at 3 n. 4. (emphasis added). There is no such duty, nor has the Ad Hoc Noteholder Group offered any authority for this position. Rather the Debtors' fiduciary duties are to maximize value of the estate for the benefit of all stakeholders. *See In re Pilgrim's Pride*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009) ("[I]t is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors."); *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546–48, 554–55 (Del. Ch. 2015) (observing that directors of a Delaware corporation "do not owe any particular duties to creditors" and should instead seek maximize "the value of the firm as a whole"); *cf. Sol. Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 327–30 (Bankr. C.D. Cal. 2016) (observing, with respect to a California corporation, that "[s]tockholders and creditors are likely to have different approaches to risk" and that the "only . . . rational approach to resolve those differences . . . is for the directors to exercise their business judgment in a good faith attempt to weigh the likely value of each proposed course of action, taking into account both the risks and the potential rewards, and then choose whichever has the best chance to preserve and increase value *of the corporation as a whole*, for the benefit of all constituent groups").

**SASMF EXHIBIT 24**

**5 of 99**

in connection with the refinancing of the original DIP and the fees and expenses that the Ad Hoc Noteholder Group asks the estate to bear in connection with the unnecessary eleventh-hour discovery it is now demanding in connection with the Motion. The Official Equity Committee will necessarily be highly efficient in light of the budget, and the risk of duplication of effort is low given the limited nature of the Official Equity Committee's proposed mandate.

8. **Fourth**, the Ad Hoc Noteholder Group relies on the uncertainty of value to argue that appointment of an Official Equity Committee is premature. But uncertainty is not a basis to deny the appointment of an Official Equity Committee. Indeed, it is that very uncertainty that demonstrates that stockholders need a voice *now* as parties begin discussing and negotiating matters related to the Debtors' path forward and valuation. Waiting to appoint an Official Equity Committee until there is certainty would render its appointment largely perfunctory, as most case-critical issues are likely to be substantially determined at that point.

9. For the reasons set forth herein and in the Motion, the Court should overrule the Objection and grant the relief requested in the Motion.

**REPLY**

I. **The Debtors and Creditors' Committee Support the Appointment of an Official Equity Committee and No Other Party Has Objected.**

10. The Debtors and the Creditors' Committee agree that the appointment of an Official Equity Committee is warranted in these Chapter 11 Cases under the terms negotiated by them and reflected in the Proposed Order, including:

- a defined scope of the Official Equity Committee limited to (i) valuation and (ii) plan negotiations (subject to expansion only if consented to by the Debtors and Creditors' Committee or by relief from this Court);

- a budget of $4.75 million for the professional fees of the Official Equity Committee, inclusive of legal and financial advisors (subject to increase only if consented to by the Debtors and Creditors' Committee or by relief from this Court); and

6

- the right for the Debtors and the Creditors' Committee to request that the Court disband the Official Equity Committee in the event that the Official Equity Committee is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases.

11.     Furthermore, no other constituents have objected to the formation of an Official Equity Committee. Counsel to the Ad Hoc Equity Group spoke to the U.S. Trustee, who indicated the U.S. Trustee was pleased to hear of the agreement and does not oppose the appointment of an Official Equity Committee. Moreover, when the U.S. Trustee declined to appoint an Official Equity Committee in January, the U.S. Trustee indicated to counsel to the Ad Hoc Equity Group that it was a close call that might be revisited during the course of the Chapter 11 Cases. The U.S. Trustee has taken an active role in the administration of these Chapter 11 Cases and has opposed motions to appoint an official equity committee in other cases before this Court.[5]

## II.     The Court Should Overrule the Ad Hoc Noteholder Group's Objections.

### A.     Core Scientific Is Not Hopelessly Insolvent.

12.     The Ad Hoc Noteholder Group improperly implies that the Ad Hoc Equity Group must establish definitively that the Debtors *are* solvent. Not so. Rather, the applicable standard requires the Ad Hoc Equity Group to show that the Debtors are *not* "hopelessly insolvent" and that there is a likelihood of meaningful distribution to stockholders. *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220-21, 223 (Bankr. S.D.N.Y. 2002) (applicable legal standard on a motion requesting appointment of an official equity committee is whether the debtor "appears to be

---

[5]     *See, e.g.*, *In re Azure Midstream Partners LP*, Case No. 17-30461 (DRJ), *Statement of U.S. Tr. Regarding Emergency Mot. and Request to Appoint an Equity Comm.* (Bankr. S.D. Tex. Apr. 27, 2017) [Docket No. 238]; *In re Ion Geophysical Corp.*, Case No. 22-30987 (mi), *Statement of U.S. Tr. Regarding Requests to Appoint an Equity Comm.* (Bankr. S.D. Tex. June 28, 2022) [Docket No. 350]; *see also All Am. Oil & Gas Inc.*, Case No. 18-52695-RBK, *Response of the U.S. Tr. to Expedited Mot. of the Ad Hoc Equity Comm. to Appoint an Equity Comm. of Equity Sec. Holders for Debtor All Am. Oil & Gas Inc.* (Bankr. W.D. Tex., Feb. 4, 2019) [Docket No. 342].

**SASMF EXHIBIT 24**

**7 of 99**

hopelessly insolvent"); *see also In re Emons Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985). And the Ad Hoc Equity Group has carried its burden.

13.     On the other hand, the Ad Hoc Noteholder Group's attempts to undermine each of the indicia of value discussed in the Motion do not establish that the Debtors are insolvent. First, the Ad Hoc Noteholder Group criticizes the Ad Hoc Equity Group for referencing the Debtors' balance sheet and public filings, noting that these documents do not provide a measure of fair market valuation. But assessing a debtor's likely solvency or insolvency does not require a full-blown fair market valuation; it requires a practical analysis based on a review of available information. *See, e.g., In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) ("The court does have available to it values provided in Debtors' schedules and in Debtors' public filings with the SEC and may deduce a value for Debtors from the operating reports filed with the UST. While these values may prove illusory, except for Debtors' most recent operating report they all indicate that Debtors are solvent."); *see also Williams Commc'ns Grp.*, 281 B.R. at 221 (considering the balance sheet and a "host of other indicia" in considering whether the Debtors appeared hopelessly insolvent). Indeed, in *Williams Commc'ns Grp.*, the court noted that "Valuation is a proper issue for confirmation[.] . . . In short this Court has not made a valuation, nor is one necessary at this stage. Instead, it has reached a practical conclusion, based on a confluence of factors[.]" *Id.*

14.     Nor does the solvency analysis require a business plan. *See, e.g., Pilgrim's Pride.*, 407 B.R. at 217. Indeed, developing the business plan itself is generally an iterative process between the Debtors and their key stakeholders. The business plan must be satisfactory to the Debtors' DIP Lender, and no doubt the Creditors' Committee and its advisors will scrutinize the business plan, run their own analyses, and discuss the same with the Debtors. If equity holders are

forced to wait until a definitive business plan blessed by the stakeholders or valuation is certain, they are likely to be served a business plan and valuation analysis without any ability to provide meaningful input.

15.     Having first argued that the balance sheet is an unreliable measure of value, the Ad Hoc Noteholder Group then goes on to use its own view of the Debtors' balance sheet to argue insolvency; however, in contradiction to all of the Debtors' filings in these Chapter 11 Cases, the Ad Hoc Noteholder Group grossly overstates the Debtors' liabilities by adding approximately $400-$500 million to the face amount of the prepetition secured notes as a result of an alleged 200% Repayment Premium that will be the subject of significant litigation.[6]

16.     Moreover, in connection with the Debtors' funded indebtedness, at the time of the Debtors' Q2 2022 Earnings Presentation on August 11, 2022 (the "**Earnings Presentation**")—when Bitcoin was trading at approximately $24,402—the Debtors' business plan provided for satisfaction of $900 million in debt over three years.[7] In the Earnings Presentation, the Debtors

---

[6]     While arguing that the Debtors are likely insolvent, the Ad Hoc Noteholder Group simultaneously asserts that under *Ultra Petroleum*, the full amount of bargained for contractual payments must be paid before there can be any recovery to equity holders. Obj. at 7-8 n. 6 (citing *In re Ultra Petroleum Corp.*, 51 F. 4th 138, 145 (5th Cir. 2022)). *Ultra Petroleum* is not dispositive regarding the treatment of the Repayment Amount and is likely distinguishable. Even under *Ultra Petroleum*, 51 F.4th at 156-157. If the Repayment Premium "is unenforceable under governing state law, the Bankruptcy Code would still disallow it–the solvent-debtor exception notwithstanding." *Id*. at 156. *Ultra Petroleum* is likely distinguishable on other grounds as well. In addition, a *certiorari* petition with respect to the *Ultra Petroleum* decision is currently pending before the Supreme Court.

The 200% Repayment Premium may also be challenged on other grounds. For example, given the equity-like rate of return and the convertible feature of the prepetition secured notes, it is equally plausible that the prepetition secured notes may be recharacterized as equity, in which case value breaks deeply into equity.

In any case, these are issues that should be litigated at a different time. It is the Ad Hoc Equity Group's expectation that the Creditors' Committee will handle this litigation, but the parties can confirm allocations of responsibilities at a later date.

[7]     Core Scientific Second Quarter Fiscal Year 2022 Earnings Presentation (Aug. 11, 2022), available at https://investors.corescientific.com/investors/events-and-presentations/default.aspx (depicting repayment plans for $536.3 million of convertible notes "in April 2025" and $348.9 million of equipment financing "over approximately 2 years") and attached as **Exhibit A**.

stated they were comfortable with their ability to service and satisfy this debt.[8] At that time, energy costs were at their highest point in fourteen years.[9] In fact, that presentation reflected that the cost of mining one Bitcoin at that time was $10,200, consisting of $8,500 in energy costs and $1,700 in operational costs.[10] Today, Bitcoin prices have rebounded from the temporary low that followed the chapter 11 filing of industry leader FTX, and have stabilized at approximately the same prices as in August 2022, when those statements were made.[11]

---

[8] They made the following statements:

- "We are *very comfortable* with the maturity in 2025 . . . and the likelihood that our stock will be hopefully soon at a level where this debt converts to equity . . ."

- "We owe B. Riley approximately $57 million payable monthly over the course of the next 11 months. The loan was originally $75 million, but we have paid down $18 million already this year. Again, we are *very comfortable with our obligations* to B. Riley."

- "Through the end of July, we have paid $75 million in principal [sic] amortization this year and are comfortable with our ability to continue to service our equipment debt. We have multiple options for creating and maintaining liquidity."

Transcript of Core Scientific, Inc. (CORZ) Q2 2022 Earning Conference Call (Aug. 11, 2022), available at https://seekingalpha.com/article/4533335-core-scientific-inc-s-corz-ceo-mike-levitt-on-q2-2022-results-earnings-call-transcript and attached as **Exhibit B**.

[9] *See, e.g., Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 26, 2023) (showing that in August 2022 Henry Hub natural gas spot prices reached highest costs since July 2008).

[10] Core Scientific Second Quarter Fiscal Year 2022 Earnings Presentation 13 (Aug. 11, 2022), available at https://investors.corescientific.com/investors/events-and-presentations/default.asp.

[11] The average of Bitcoin trading prices at market close throughout August 2022 was $22,366.27. The average of Bitcoin trading prices at market close from February 1, 2023, to February 27, 2023, was $23,301.20. *Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 27, 2023).

**SASMF EXHIBIT 24**

**10 of 99**



17.    In addition, during the same period, energy prices have declined materially, with natural gas prices down approximately 60%[12] and the World Bank's metric on energy prices down approximately 30%.[13] And as discussed below, the Debtors are mining more Bitcoin per day today than they were in August 2022.

18.    Furthermore, the Ad Hoc Equity Group expects that the amount of mechanics' liens will likely end up materially lower than the amount set forth in the Objection, as is customary following claim reconciliation, negotiation, and settlement.

19.    The Ad Hoc Noteholder Group also critiques the other market evidence cited in the Motion. Objection ¶ 18. For example, the Ad Hoc Noteholder Group tries to distinguish the comparable company analysis by focusing on the amount of debt (or alleged lack thereof) on the balance sheets of Riot, Hut8, and HIVE. *Id.* But, as this sophisticated group of financial institutions

---

[12]    *Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 26, 2023); *see also Electricity Prices Surged 14.3% in 2022, Double Overall Inflation: US Report*, Utility Dive (Jan. 19, 2023), https://www.utilitydive.com/news/electricity-prices-inflation-consumer-price-index/640656/.

[13]    *Energy Price Index,* World Bank, available at https://ycharts.com/indicators/energy_index_world_bank (last visited Feb. 26, 2023).

**SASMF EXHIBIT 24**

**11 of 99**

and their well-regarded financial advisor know, this argument is inconsistent with standard valuation methodologies. Valuation models are designed to look past differing capital structures to arrive at a fair value of a company. A company's capital structure is wholly irrelevant to whether these three peers are comparable.[14]

20.     If the Ad Hoc Noteholder Group is suggesting something about the Reorganized Debtors' projected debt capacity, that question is one that will be tested and negotiated as the parties, with the help of their financial advisors, determine the Company's appropriate debt capacity and capital structure upon exit from the Chapter 11 Cases. Notably, the Ad Hoc Noteholder Group has not suggested any *other* companies are more comparable, nor has it explained why the businesses themselves are not comparable.[15]

21.     The Ad Hoc Noteholder Group also downplays the significant value accretion to the Debtors' estates as a result of increase in Bitcoin pricing, arguing that "[s]peculation on future bitcoin pricing is not a business plan." Objection ¶ 1. This is an incongruous position: as

---

[14]   The Ad Hoc Equity Group has not asserted that this market evidence provides a complete analysis of the Company's value. The Ad Hoc Equity Group lacks sufficient resources to engage a financial advisor and an expert to undertake a full valuation analysis at this time. Nor is now the time to undertake a full valuation.

[15]   The Ad Hoc Noteholder Group also critiques the Motion's use of data from September 30, 2022. But, as the Ad Hoc Noteholder Group knows well, year-end data is not yet publicly available. The data set was not used in an attempt to "disregard" events leading to the Debtors' bankruptcy. Moreover, as described in the First Day Declaration, many of the "Significant Events Leading to the Chapter 11 Filing" discuss events and factors that occurred prior to September 30, 2022. First-Day Decl. ¶ 64 ("Although the Debtors' operating performance has been, and remains, strong, a number of factors have rendered the Debtors' balance sheet unsustainable. These primary factors include, among other things: (i) the recent decline in bitcoin prices; (ii) increased energy costs; and (iii) ongoing litigation costs, including litigation with Celsius."); *id.* ¶ 67 ("[O]n May 5, 2022, the Federal Reserve raised interest rates by 0.5%, triggering another round of market selloff. Thereafter, Bitcoin fell 27% during an eight-day period. By July 2022, multiple companies in the cryptocurrency sector commenced chapter 11 proceedings, each one affecting and further pushing the next to the same conclusion as a result of significant interconnectedness and contagion within the industry."); *id.* ¶ 71 ("Between July 2022 and September 2022, significantly higher energy prices, inflation, and supply chain disruptions increased the Company's electricity costs, and together with delays in facility development and miner deployments reduced profits."); *id.* ¶¶ 73-77 (describing the impact of the Celsius chapter 11 filing on the Debtors' business, including losing $900,000 each month since the Celsius chapter 11 petition date on July 13, 2022, to cover increased electricity tariffs that would have been paid by Celsius.).

noteholders, they chose to invest in a Company whose valuation is in fact inextricably tied to the price of Bitcoin. In other words, their own investment decision was tied to speculation on the pricing of Bitcoin. Moreover, many companies in commodities industries, such as oil and gas companies and various metal mining companies, face volatility in pricing. That volatility does not preclude the preparation of a business plan; it merely requires measured analyses and assumptions. And contrary to the Ad Hoc Noteholder Group's claim that it is "impossible" to predict Bitcoin prices, just as with other commodities, one can look at the forward curve to understand the collective expectations of market participants concerning future pricing. With respect to Bitcoin, there is an established CME futures market that reflects anticipated pricing for Bitcoin in the $24,000 range throughout this calendar year and into next year. *Bitcoin \Futures and Options*, CME Group (Feb. 27, 2023, 8:20 a.m. CT), https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/bitcoin.quotes.html.

22. Moreover, the Ad Hoc Noteholder Group places undue emphasis on the "speculative" and "volatile" nature of price of Bitcoin. The Debtors filed these Chapter 11 Cases when Bitcoin pricing was at one of its lowest points in the wake of digital asset industry leader FTX filing for chapter 11 bankruptcy on November 11, 2022. Between December 2020 and November 8, 2022, the price of Bitcoin was consistently between $19,000 and 63,000.[16] The trading price of Bitcoin dipped below $19,000 on only five days in those two years, and it never dipped below $18,500.[17] A holistic look at the historical pricing of Bitcoin, including its recent rebound and stabilization, suggests that the Bitcoin pricing at the time of the Debtors' chapter 11

---

[16] *Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 27, 2023).

[17] *Id.*

SASMF EXHIBIT 24
13 of 99

filing was at a temporary low, likely related to the industry's short-term reaction to the FTX bankruptcy.



23.     In its attempt to downplay the significance of the stabilized price of Bitcoin, the Ad Hoc Noteholder Group tries to emphasize the "global bitcoin network hash rate," also known as the "difficulty level," increasing over time. But this is a red herring. The Ad Hoc Noteholder Group fails to support its attempted "gotcha" moment with any evidence that participants in the digital asset industry don't already incorporate the well-known difficulty level into their projections. Moreover, notwithstanding the generally increasing difficulty level, Core Scientific produces more Bitcoin per day today than it did last year, increasing from an average of approximately 35 Bitcoin

14

per day in January 2022[18] to approximately 50 Bitcoin per day in January 2023.[19] The math is simpler than the Ad Hoc Noteholder Group tries to suggest: the Debtors' costs have gone down because of materially lower energy prices, while their production has gone up as it is mining more Bitcoin per day at a higher Bitcoin price.[20] The real arithmetic is indisputable: the Debtors make more money today than they did at the end of last year.

24.     The Ad Hoc Equity Group has demonstrated—and the Debtors agree—that market factors indicate that the Debtors are not hopelessly insolvent. *See* Debtor's Response ¶ 8. Indeed, the available data still suggests that the value of the Company is much higher than it was on the Petition Date:

- As of close of business on February 26, 2023, Bitcoin was trading at $23,561, a 40% increase since the Petition Date.[21]

---

[18]  Press Release, Core Scientific, *Core Scientific Announces January 2022 Updates* (Feb. 7, 2022), https://investors.corescientific.com/investors/news/news-details/2022/Core-Scientific-Announces-January-2022-Updates/default.aspx (reporting the production of 1,077 self-mined Bitcoin in January 2022, or approximately 35 per day).

[19]  Press Release, Core Scientific, *Core Scientific Announces January 2023 Production and Operational Updates* (Feb. 6, 2023), https://investors.corescientific.com/investors/news/news-details/2023/Core-Scientific-Announces-January-2023-Production-and-Operational-Updates/default.aspx (reporting the production of 1,527 self-mined Bitcoin in January 2023, or approximately 50 per day). Notably, the Company's production in 2023 has also increased from production in November and December 2022. *See* Press Release, Core Scientific, *Core Scientific Announces November and December 2022 Updates* (January. 9, 2023), https://investors.corescientific.com/investors/news/news-details/2023/Core-Scientific-Announces-November-and-December-2022-Updates/default.aspx (reporting the production of 1,356 self-mined Bitcoin in November 2023, or approximately 45 per day, and 1,425 self-minded Bitcoin in December 2023, or approximately 46 per day).

[20]  *See* Debtor's Response ¶ 10 ("[[O]ne of the Debtors' most significant operating costs—utilization of power to operate their mining facilities—has declined steadily since the Petition Date as underlying fuel costs have generally decreased."); *Energy Price Index*, World Bank, available at https://ycharts.com/indicators/energy_index_world_bank (last visited Feb. 26, 2023) (reporting the World Bank's Energy Price Index data that shows a 30% decrease from August 31, 2022 ($172.77) to January 31, 2023 ($119.29)).

[21]  *See Bitcoin-USD*, Yahoo! Finance, https://finance.yahoo.com/quote/BTC-USD/ (last visited Feb. 26, 2023); *see also* Debtor's Response ¶ 8 ("The price of bitcoin has remained well-above $20,000 for more than a month.").

SASMF EXHIBIT 24
15 of 99

- The share prices of comparable competitor companies are likewise higher than at the beginning of the year.[22]

- The macroeconomic conditions that the Debtors were facing on the Petition Date continue to moderate. Energy prices are going down[23] and interest rate hikes have slowed.[24]

- Capital markets are opening for the digital asset space, as evidenced by several recent developments, including:

  o After the Petition Date, multiple potential lenders submitted proposals for a replacement facility in these Chapter 11 Cases.[25]

  o Digital asset mining companies Hut 8 Mining Corp. and US Bitcoin Corp announced an all-stock merger to create a new company that will have approximately 825 MW of gross energy across six mining sites. The aggregate value of the merger based on combined market capitalization is $990 million.[26]

  o Taurus SA, a Swiss crypto firm that develops infrastructure for digital assets, announced that it raised $65 million in an equity round led by Credit Suisse.[27]

---

[22] For example, the trading prices of competitor companies HIVE Blockchain Technologies Ltd., Riot Platforms, Inc., and Marathon Digital Holdings, Inc. have increased by 81%, 78%, and 109%, respectively, since the first day of trading in 2023.

[23] *See Natural Gas*, U.S. Energy Information Administration, https://www.eia.gov/dnav/ng/hist/rngwhhdm.htm (last visited Feb. 28, 2023) (reflecting a drop in price for gas spot prices by more than 60% from August 2022 to January 2023); *see also Electricity Prices Surged 14.3% in 2022, Double Overall Inflation: US Report*, UTILITY DIVE (Jan. 19, 2023), https://www.utilitydive.com/news/electricity-prices-inflation-consumer-price-index/640656 (reporting that gas and energy prices are expected to decrease throughout 2023 and 2024 after natural gas consumption "broke records" in 2022); Press Release, U.S. Bureau of Labor Statistics, Consumer Price Index Summary (Jan. 12, 2023, 8:30 a.m. ET), available at https://www.bls.gov/news.release/cpi.nr0.htm (reporting that the energy index declined 4.5% in December 2022). *See also* Debtor's Response ¶ 10.

[24] *See* Chair Powell, Transcript of Chair Powell's Press Conference, at 9 (February 1, 2023), available at https://www.federalreserve.gov/mediacenter/files/FOMCpresconf20230201.pdf ("[T]he Committee decided to raise interest rates by 25 basis points today, continuing the step-down from last year's rapid pace of increases. Shifting to a slower pace . . . .").

[25] See *Declaration of John Singh in Support of Replacement DIP Motion* [Docket No. 390] ¶ 13.

[26] *See* Press Release, Hut 8 Mining Corp., *Hut 8 and US Bitcoin Announce Merger of Equals to Create a Preeminent Digital Asset Mining, Hosting, Managed Infrastructure Operations, and High Performance Computing Organization* (Feb. 7, 2023, 6:30 a.m. ET), https://www.prnewswire.com/news-releases/hut-8-and-us-bitcoin-announce-merger-of-equals-to-create-a-preeminent-digital-asset-mining-hosting-managed-infrastructure-operations-and-high-performance-computing-organization-301740441.html.

[27] *See* Yogita Khatri, *Credit Suisse Leads $65 Million Series B in Digital Asset Firm Taurus*, THE BLOCK (Feb. 14, 2023, 2:00 a.m. EST), https://www.theblock.co/post/211162/taurus-crypto-series-b-credit-Suisse.

16

- o Bitcoin mining consulting firm Sabre56 announced a private financing of $35 million to build out its hosting business.[28]

- • Certain large companies are accepting Bitcoin as a form of payment, including Microsoft, AT&T, and Overstock.com.[29]

**B.      No Other Party Is Adequately Representing Equity Holder Interests.**

25.      The Objection argues that the stockholders' interests are adequately represented because (a) the Ad Hoc Equity Group is represented by prominent counsel and has, at its own expense, already participated in the Chapter 11 Cases; (b) the insiders hold approximately 30% of the stock and are therefore aligned with equity holder interests; and (c) the Creditors' Committee is capable of advancing the equity holder interests. Objection ¶¶ 23-25. These facts do not establish adequate representation, nor is the Ad Hoc Noteholder Group's suggestion that the Ad Hoc Equity Group can apply for administrative expense status at the conclusion of the Chapter 11 Cases if it establishes that it has made a substantial contribution an answer.

**(i)      Participation Does Not Indicate Adequate Representation.**

26.      The Ad Hoc Equity Group's engagement of counsel to assist in establishing an Official Equity Committee is not indicative of access to adequate resources to continue actively participating in these Chapter 11 Cases. Rather, it engaged counsel out of necessity. The Ad Hoc Equity Group was quick to realize that if it sat by and did nothing, nearly all value of the Company would be handed over to the prepetition secured noteholders notwithstanding the Company's significant value. Its individual members understood that to preserve value for stockholders and ensure a fair process, prompt retention of counsel was of paramount importance. Accordingly, the

---

[28]      *See* Eliza Gkritsi, *Bitcoin Mining Consulting Firm Sabre56 Raises $35M to Build 150MW of Hosting Sites*, CoinDesk (Feb. 23, 2023, 8:00 a.m. EST), https://www.coindesk.com/business/2023/02/23/bitcoin-mining-consulting-firm-sabre56-raises-35m-to-build-150mw-of-hosting-sites/.

[29]      Ofir Beigel, *Who Accepts Bitcoin as Payment?*, 99 Bitcoins (Jan. 15, 2023), https://99bitcoins.com/bitcoin/who-accepts/.

17

individuals that compose Ad Hoc Equity Group pooled their resources to hire Skadden to assist them in this endeavor. The Ad Hoc Equity Group members are not sophisticated financial institutions with deep pockets like the Ad Hoc Noteholder Group whose fees and expenses *are* being borne by the estate. Rather, the Ad Hoc Equity Group consists largely of individuals and family trusts. Unlike large financial institutions, the individual members of the Ad Hoc Equity Group do not have access to—and should not have to expend—the requisite financial resources to properly represent equity throughout the entirety of the Chapter 11 Cases. The Ad Hoc Equity Group members should not be punished for effectively organizing and hiring counsel to preserve their rights and have a seat at the table.

27.     Moreover, to date, the Ad Hoc Equity Group's participation has not given stockholders the same access to the Debtors as those whose fees are being borne by the estate regarding financial reporting, business diligence, other matters related to valuation, and plan negotiations.[30] Notwithstanding the Ad Hoc Equity Group's successes to date, an estate fiduciary with official committee status is needed and warranted to give stockholders a meaningful voice on matters related to valuation and plan negotiations.

> **(ii)     Neither The Debtors Nor The Creditors' Committee Adequately Represents Stockholders With Respect To Valuation And Plan Negotiations.**

28.     The Objection seems to ignore the circumscribed mandate reflected in the agreed Proposed Order. The scope of the Official Equity Committee's activity would be limited to matters related to valuation and plan negotiations. Proposed Order ¶ 6. Accordingly, the stockholders *will* have to rely on the Debtors and the Creditors' Committee to advance their interests with respect

---

[30]     For example, the DIP Lender, Ad Hoc Noteholder Group, and Creditors' Committee have access to more robust financial reporting, whereas the Ad Hoc Equity Group must wait for and rely upon monthly operating reports and press releases.

to all other issues. But, as detailed in the Motion, neither the Debtors nor the Creditors' Committee are positioned to adequately represent the stockholders on matters related to valuation and plan negotiations.

29. Legislative history reflects that Congress understood the important role an official equity committee serves in chapter 11 cases:

> Investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws . . . [I]t is essential for [public investors] to have legislative assurance that their interests will be protected. . . .
>
> Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional [creditors] who will have their own best interest to look after.

S. Rep. No. 95-989, at 10 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5796. An equity committee plays an essential and unique role: "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered investors." *Id.*

30. The Debtors' role in these Chapter 11 Cases requires them to maximize value for all stakeholders—many of whom have already demonstrated that they have divergent interests. Indeed, at the outset of these cases, the Debtors accepted an RSA that favored the secured convertible noteholders at the expense of unsecured creditors and equity holders. As the *Pilgrim's Pride* court aptly notes, the principal concern of debtors and their board must be "preservation of the Debtors' going concern value and their successful emergence from chapter 11." *Pilgrim's Pride*, 407 B.R. at 218. "While it is unquestionably true that a debtor's officers and directors have a duty to maximize a debtor's estate to the benefit of shareholders as well as creditors . . ., the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity owning management." *Id.* at 218–19. A debtor's success in bankruptcy heavily depends on reaching accord with all constituents, some of whom—namely, the Creditors'

SASMF EXHIBIT 24
19 of 99

Committee and the Ad Hoc Noteholder Group—are not incentivized to advocate a value that would facilitate an equitable recovery for stockholders. *Id.* at 218 ("[W]hen it comes to valuation and determination of future capital structures for plan purposes, [the] agendas [of the creditors committee and the equity holders] are likely to be very much at odds."). In other words, the Debtors' duty to maximize value for *all* stakeholders—not just stockholders—requires the Debtors to act as an intermediary to attempt to reach consensus. An Official Equity Committee will provide a counterbalance with a single-minded focus on maximizing value.

31.     The Ad Hoc Noteholder Group also argues that because the Debtors' insiders hold approximately 30% of the aggregate outstanding common stock, the management team and board members who hold these shares are "at the table" on behalf of equity. Objection ¶ 24. First, this argument ignores the fact that all decision-making authority with respect to these Chapter 11 Cases has been delegated to a Special Committee of disinterested non-stockholder directors. Second, this also ignores that the insiders, in their capacity as directors or officers, should be acting as estate fiduciaries and not in their own self-interest. As fiduciaries, they are obligated to maximize value for *all* stakeholders (not only stockholders), which gives rise to the same concerns set forth above.

32.     The Creditors' Committee is likewise not adequately aligned with the stockholders to serve as an effective representative. Certainly, there will be times when the Creditors' Committee and equity holders will be aligned. They will both pursue what they believe to be "value-maximizing" transactions; they both opposed the RSA and the original DIP. And they both dispute the alleged 200% repayment penalty asserted by the Ad Hoc Noteholder Group. But a shared interest in some key matters does not equate to adequate representation for all matters. Indeed, the sole purpose (and duty) of the Creditors' Committee is to maximize recoveries and value for its constituents alone: the general unsecured creditors. The Ad Hoc Noteholder Group

20

argues that general unsecured creditors are not entitled to recover more than the allowed amount of their claims, and that the Creditors' Committee's efforts to maximize value will inure to the benefit of stockholders, who will receive any residual value once creditors are paid in full.[31] Objection ¶ 25. But that is precisely the point: because general unsecured creditors are entitled only to the full satisfaction of their claims, they have neither the incentive nor the obligation to pursue or support alternatives that, on a risk-adjusted basis, are value-maximizing for the company, taken as a whole, but potentially disadvantageous for unsecured creditors. *Cf. Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546–48, 54–55 (Del. Ch. 2015) (discussing at length the divergence of interests between creditors and stockholders of a Delaware corporation). Their argument also ignores differing views on valuation. Accordingly, the Creditors' Committee is not the appropriate fiduciary to represent equity holders in negotiating the terms of a plan, establishing valuation, or undertaking any other strategy to truly maximize value for stockholders.[32]

### C. The Budgeted Costs Are Justified.

33.     The Ad Hoc Noteholder Group speculates that there will likely be duplication of effort and that the creditors should not bear the additional costs associated with an Official Equity Committee. These alleged fears are unwarranted. The Ad Hoc Equity Group takes seriously the need to manage the costs of these cases. The Debtors negotiated, and the Ad Hoc Equity Group agreed to support, a budget of $4.75 million and a narrow mandate limited to negotiating the terms

---

[31]   The Ad Hoc Equity Group agrees that creditors are not entitled to recover more than the allowed amount of their claims. Yet, the RSA that the Ad Hoc Noteholder Group sponsored contemplated a double or triple recovery for the prepetition secured noteholders, which magnanimously would have triggered an incremental tiered recovery for junior stakeholders.

[32]   The Debtors make many of the same statements in their Response in support of the appointment of an Official Equity Committee and tout their ability to serve as adequate representatives. The Ad Hoc Equity Group does not doubt that the directors and management team believe they are adequate representatives, but it respectfully disagrees that they are adequate representatives with respect to valuation and plan negotiations, given their competing priorities and obligations.

**SASMF EXHIBIT 24**

**21 of 99**

of a chapter 11 plan that provide a fair recovery to equity holders and ensuring input on valuation. The risk of duplication of effort is low in light of this limited scope, the budget, and the inherent oversight process in any chapter 11 case with respect to professional fees. Moreover, the budget may be increased, or the scope expanded, only with the consent of the Debtors and Creditors' Committee or by orders of this Court. Finally, the Debtors and the Creditors' Committee have negotiated the right to request that the Court disband the Official Equity Committee in the event it is no longer necessary to assure adequate representation of equity holders in these Chapter 11 Cases.

34. Notably, the $4.75 million budget is significantly lower than the approximately $6 million fee that certain of the Ad Hoc Noteholder Group members earned in connection with a $37.5 million, 41-day DIP, which resulted in a more-than-550% internal rate of return to them. And it is worth noting that the Ad Hoc Noteholder Group itself—whose fees are being borne by the estate—are not subject to *any* budget. The Ad Hoc Noteholder Group's position on this matter is particularly paradoxical in light of their last-minute discovery and emergency motion to adjourn. Undoubtedly, it will ask the Debtors to reimburse any money it spends on engaging the Debtors and other stakeholders in unnecessary, expensive, last-minute discovery in connection with this Motion, yet it contends that the Ad Hoc Equity Group must continue to pay its own fees to participate in the Chapter 11 Cases.

### D. The Appointment of the Official Equity Committee Is Not Premature.

35. The Ad Hoc Noteholder Group Objection asserts that it is premature for the Court to order the appointment of an Official Equity Committee and that the Ad Hoc Equity Group should instead seek payment of its fees and expenses under section 503(b) of the Bankruptcy Code at the conclusion of the case. Objection ¶ 30. The Court should decline the Ad Hoc Noteholder

**SASMF EXHIBIT 24**
**22 of 99**

Group's invitation to deny stockholders a seat at the table until after the table has been set and the meal has been served.

36.    In *Pilgrim's Pride*, parties also objected to the request for appointment of an official equity committee and urged the bankruptcy court to defer appointment until the debtors had completed their business plan, when it allegedly would be "clearer" that such a committee was necessary. 407 B.R. 211. The court rejected that suggestion, finding that "[r]ather than presenting a basis for delaying appointment of an equity committee, the state of [the] Debtors' cases is such that establishment of an advocate for shareholders is urgent." *Id.* at 220. "[A] debtor's business plan, which projects future cash flows, is a critical element in the valuation equation." *Id.* at 219–20 (citing *In re Mirant Corp.*, 334 B.R. 800, 823 (Bankr. N.D. Tex. 2005)). "Denying equity owners the means to analyze and critique [the] Debtors' projections in their business plan is likely to hinder if not hopelessly cripple any later effort to show that [the] Debtors' value is sufficient to justify participation." *Id.* at 220. Here, as in *Pilgrim's Pride*, it is "imperative" that stockholders have an "adequate opportunity to participate in the critical stages" of the Debtors' valuation and restricting process. *Id.*; *see also In re Delphi Corp.*, No. 05-44481(RDD) (Bankr. S.D.N.Y. Mar. 22, 2006), Hr'g Tr. at 182-83 [Docket No. 3262] ("It seems to me, again, that given the important transformative events that will be taking place in this company through this bankruptcy case over the next few months, it's important to give [stockholders] representation[.]")[33]

37.    Equity holders need a seat at the table *now*, with the ability to hire advisors and prepare before discussions regarding a chapter 11 plan and valuation are significantly, if not completely, determined.

---

[33]    A excerpt of the *Delphi Corporation* transcript is attached as **Exhibit C**.

## CONCLUSION

38.     For these reasons and those set forth in the Motion, the Ad Hoc Equity Group respectfully requests that the Court overrule the Objection, grant the relief requested in the Motion, and grant any other relief that is just.


Dated: Houston, Texas
         February 28, 2023

                                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        */s/ Noelle M. Reed*
                                        Noelle M. Reed
                                        Attorney-in-Charge
                                        State Bar No. 24044211
                                        Federal Bar No. 27139
                                        1000 Louisiana Street, Suite 6800
                                        Houston, Texas 77002
                                        Tel: (713) 655-5122
                                        Fax: (713) 483-9122
                                        Email: Noelle.Reed@skadden.com

                                        -and-

                                        George N. Panagakis (*Admitted pro hac vice*)
                                        Ron E. Meisler (*Admitted pro hac vice*)
                                        Jennifer Madden
                                        (*Application for pro hac vice admission forthcoming*)
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606-1720
                                        Tel: (312) 407-0700
                                        Fax: (312) 407-0411
                                        Email: George.Panagakis@skadden.com
                                        Email: Ron.Meisler@skadden.com
                                        Email: Jennifer.Madden@skadden.com

                                        *Attorneys for the Ad Hoc Equity Group*

**SASMF EXHIBIT 24**
**24 of 99**

## CERTIFICATE PURSUANT TO
## BANKRUPTCY LOCAL RULE 9013-1(g)(1)

I hereby certify that counsel to the Ad Hoc Equity Group conferred with counsel to the Ad Hoc Noteholders Group prior to the filing of this Reply to attempt to resolve their objections, including a telephonic conference on February 28, 2023. The parties were not able to resolve the dispute.

*/s/ Noelle M. Reed*
Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

/s/ Noelle M. Reed
Noelle M. Reed

**EXHIBIT A**

SASMF EXHIBIT 24

27 of 99



# Second Quarter Fiscal Year 2022 Earnings Presentation

**August 11, 2022**

SASMF EXHIBIT 24

28 of 99

# Legal Disclaimer

### Forward-Looking Statements

This presentation includes "forward-looking statements'' within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, those related to the Company's ability to scale and grow its business, source clean and renewable energy, the advantages and expected growth of the Company, future estimates of revenue, net income, adjusted EBITDA, liquidity and cash flow, and availability of capital, future estimates of computing capacity and operating power, future demand for hosting capacity, future estimate of hashrate (including mix of self-mining and hosting), operating gigawatts and power, future projects in construction or negotiation and future expectations of operation location, orders for miners and critical infrastructure, future estimates of self-mining capacity, the public float of the Company's shares, future infrastructure additions and their operational capacity, and operating power and site features of the Company's operations center in Denton, Texas. These statements are provided for illustrative purposes only and are based on various assumptions and on the current expectations of the Company's management. These forward-looking statements are not intended to serve, and must not be relied on by any investor, as a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company. These forward-looking statements are subject to a number of risks and uncertainties, including those identified in the Company's reports filed with the U.S. Securities and Exchange Commission ("SEC") from time to time, including the Company's definitive proxy statement filed with the SEC on January 3, 2022, and other subsequent filings the Company files with the SEC from time to time, including its Annual Report on Form 10-K for the year ended December 31, 2021, and Current Report on Form 8-K filed on January 24, 2022, and Quarterly Report on form 10-Q for the second quarter ended June 30, 2022, to be filed with the SEC by August 15, 2022. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. Accordingly, undue reliance should not be placed upon the forward-looking statements. Except as required by law, the Company assumes no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in the forward-looking statements, even if new information becomes available in the future.

Year over year comparisons are based on the combined results of Core Scientific and its acquired entities.

### Non-GAAP Financial Measures

This presentation also contains non-GAAP financial measures as defined by the SEC rules, including Adjusted EBITDA and adjusted earnings (loss) per diluted share. The Company believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and results of operations. The Company's management uses certain of these non-GAAP measures to compare the Company's performance to that of prior periods for trend analyses and for budgeting and planning purposes. The Company urges investors not to rely on any single financial measure to evaluate its business.

**SASMF EXHIBIT 24**

**29 of 99**



# Core Scientific Snapshot

## Digital Asset Self-Mining | Colocation Services | Blockchain Technology

**Nasdaq: CORZ**

**$164.0M**
Second Quarter 2022 Revenue

**+/- Year End 300,000 Servers**
Expected 2022 Fleet Size

**$(861.7)M**
Second Quarter 2022 Net Loss Driven Primarily by Goodwill Impairment

**+/- Year End 31 EH/s**
Expected 2022 Hashrate[1]

**$59.1M**
Second Quarter 2022 Adjusted EBITDA

**+/- Year End 1 GW**
Expected 2022 Power

1 Represents midpoint of 30 EH/s to 32 EH/s guidance range for 2022E performance

**SASMF EXHIBIT 24**
**30 of 99**

CORE SCIENTIFIC

3

# Second Quarter 2022 Performance Summary

| Metric (dollars in millions except per share amounts) | Second Quarter 2022 | Notes |
|---|---|---|
| Total ending hashrate | 17.9 EH/s | 10% increase from 3/31/22 (16.2 EH/s) |
| Bitcoins produced | 3,365 | Increased from 3,202 bitcoins in first quarter |
| Bitcoins held | 1,959 | $40.7 million carrying value as of 6/30/22, including effect of accounting impairment |
| Revenue | $164.0 | 118% increase over prior year |
| Net loss | $(861.7) | $858.3 million increase in loss over prior year |
| Adjusted EBITDA [1] | $59.1 | 185% increase over prior year |
| Loss per diluted share | $(2.65) | — |
| Adjusted earnings per diluted share [2] | $0.18 | 38% increase over prior year |

[1] Adjusted EBITDA is a non-GAAP financial measure. See slide 19 for a reconciliation of adjusted EBITDA to its most comparable GAAP figure.

[2] Adjusted earnings per diluted share is a non-GAAP financial measure.  See slide 20 for a reconciliation of adjusted earnings (loss) per diluted share to its most comparable GAAP figure.

**SASMF EXHIBIT 24**
**31 of 99**

CORE SCIENTIFIC

4

# Core Scientific Mined More Bitcoins in the First Half of 2022 than Any Other Listed Digital Asset Miner



## BTC Mined First Half 2022

- Core Scientific: 6,567
- RIOT: 2,800
- Bitfarms: 2,218
- Marathon Digital Holdings: 1,966
- HUT 8: 1,888
- CleanSpark: 1,863
- HIVE: 1,608
- Argo Blockchain: 939

**Sources -** BTC mined from monthly update press releases

**SASMF EXHIBIT 24**



**32 of 99**

5

# Digital Asset Mining Revenue Represented 67% of Second Quarter Revenue and Grew 10x Year-Over-Year

## Second Quarter 2022 Revenue Mix

(Unaudited)



■ Hosting  ■ Equipment Sales  ■ Digital Asset Mining

## Second Quarter Revenue by Segment

(In Millions, Unaudited)



■ Hosting  ■ Equipment Sales  ■ Digital Asset Mining

**SASMF EXHIBIT 24**

**33 of 99**



6

# Second Quarter Net Loss Driven Primarily by $840 Million Goodwill Impairment



**SECOND QUARTER 2022 LOSS DRIVERS**

(In Millions, Unaudited)

**SASMF EXHIBIT 24**



# Developed and Manage Data Centers Totaling Approximately 800,000 Square Feet Across Five States



**GRAND FORKS, ND**
100 MW

**CALVERT CITY, KY**
150 MW

**MARBLE, NC**
104 MW

**DENTON, TX**
△ Expanding
up to 200 MW

**MUSKOGEE, OK**
△ In Development
up to 500 MW

**DALTON, GA**
195 MW

**PECOS, TX & BARSTOW, TX**
△ Expanding
up to 200 MW

**SASMF EXHIBIT 24**

AUG 11, 2022

CORE SCIENTIFIC

8

# Continued Progress on Three Texas Data Center Projects



Denton, TX



Pecos, TX



Denton, TX



Barstow, TX

**SASMF EXHIBIT 24**

**36 of 99**

# Expectations for Fiscal Year 2022

| Metric | 2021 Results | 2022 Expectations |
|---|---|---|
| Hashrate | 13.5 EH/s | 30 to 32 EH/s |
| Power | 450+ MW | Approximately 1 GW |

SASMF EXHIBIT 24
37 of 99



# Visibility toward 2022 Hashrate Goal



**Build-Up to Projected Year-End 2022 Hashrate (EH/s)**

SASMF EXHIBIT 24

AUG 11, 2022

11

# Total Debt of ~$1 Billion[1] Being Restructured to Improve Cash Flow in the Second Half of 2022 (in thousands)



Repayment of principal in April 2025; 4% cash interest, no amortization, 6% payment in kind

Payable over approximately 2 years current principal is now $335mm

Amended to extend maturity date and timing of principal payments. Modified schedule shifts $37.5M of principal payments from H2 2022 to H1 2023[2]. Current principal is now $58mm

$ 536.3 — Convertible Notes
$ 348.9 — Equipment Financing
$ 75.0 — Bridge Loan
$ 1.1 — Facility Mortgages
$ 961.2 — Total

[1] Does not include $190,277k Fair Value Adjustment on Convertible Notes or $(4,214)k Unamortized Discount and Debt Issuance Costs
[2] Note, under the terms of the amendment, 25% of any ELOC proceeds will be applied to principal amortization of the Bridge Notes with the payments applied in reverse chronological order beginning with the 6/1/2023 payment

**SASMF EXHIBIT 24**

CORE SCIENTIFIC

# Self-Mining Economics: Year-to-Date Second Quarter Cash (Cost) to Mine a Bitcoin

| Cash to Mine a BTC[1] | Year-to-Date Q2 2022 | |
|---|---|---|
| | Total Cost (thousands) | Per BTC |
| Power Costs | $ 55,500 | $ 8,500 |
| Operational Costs [2] | 11,400 | 1,700 |
| Cash to Mine a BTC | $ 66,850 | $ 10,200 |

Total Costs / 6,567 BTC

[1] Produced 6,567 Bitcoins during Q1 and Q2 2022 at an average BTC price of ~$37.0K

[2] Includes personnel and related costs, software, telecommunications, security, etc. Amount excludes stock-based compensation and depreciation

SASMF EXHIBIT 24

40 of 99

# Why Core Scientific?



SASMF EXHIBIT 24
41 of 99

AUG 11, 2022

14



# Blockchain Computing Data Centers for Self-Mining and Colocation Services

SASMF EXHIBIT 24
42 of 99

# 2022 Selected Quarterly Results

**(Thousands)**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | YTD Fiscal Year 2022 | Full Fiscal Year 2021 |
|---|---|---|---|---|---|---|
| | | | Unaudited | | Unaudited | |
| **Revenue** | $192,519 | $163,972 | - | - | **$356,491** | **$544,483** |
| **Cost of Revenue** | 122,516 | 151,255 | - | - | 273,771 | **305,621** |
| **Gross Profit** | 70,003 | 12,717 | | | 82,720 | **238,862** |
| **Research and Development** | 3,340 | 14,773 | - | - | 18,113 | **7,674** |
| **Sales, Marketing, G&A** | 41,558 | 101,112 | - | - | 142,670 | **64,666** |
| **Operating (Loss) Income** | (26,717) | (1,094,630) | | | (1,121,347) | **131,494** |
| **Net (Loss) Income** | (466,204) | (861,670) | - | - | (1,332,874) | **47,312** |
| **Adjusted EBITDA [1]** | 93,041 | 59,111 | - | - | 152,152 | **238,940** |
| **Adjusted EBITDA Margin** | 48.3% | 36.0% | | - | **42.7%** | **43.9%** |

[1] Adjusted EBITDA is a non-GAAP financial measure. See slide slide #19 for a reconciliation of adjusted EBITDA to its most comparable GAAP figure.

**SASMF EXHIBIT 24**

**43 of 99**

CORE SCIENTIFIC

16

| | Quarter Ended | | | | | | Change |
|---|---|---|---|---|---|---|---|
| | **2Q22** | 1Q22 | 4Q21 | 3Q21 | **2Q21** | 1Q21 | Y/Y |
| Hosting Hash Rate (EOP) | 7.6 | 7.9 | 7.0 | 4.6 | 5.0 | 3.2 | 52% |
| Self-Mining Hash Rate (EOP) | 10.3 | 8.3 | 6.7 | 2.7 | 0.5 | 0.4 | NM |
| **Total Hash Rate (EOP)** | 17.9 | 16.2 | 13.7 | 7.3 | 5.5 | 3.6 | 227% |
| Network Hash Rate (EOP) | 214.6 | 201.8 | 168.2 | 140.2 | 89.0 | 164.9 | 141% |
| Core Share of Network | 8% | 8% | 8% | 5% | 6% | 2% | 36% |
| **# of BTC Mined** | 3,365 | 3,202 | 2,498 | 1,588 | 928 | 753 | 263% |
| Number of BTC Hosted Miners ('000) | 79 | 82 | 74 | 56 | 61 | 47 | 29% |
| Number of BTC Self-Miners ('000) | 103 | 82 | 67 | 29 | 5 | 4 | NM |
| **Total BTC Miners est. ('000)** | 182 | 164 | 141 | 85 | 66 | 51 | 177% |

# Key Financial and Operating Metrics

SASMF EXHIBIT 24
44 of 99

CORE SCIENTIFIC

Unaudited

# Condensed Consolidated Income Statement

| ($ Millions) | 2Q22 | 1Q22 | 4Q21 | 3Q21 | 2Q21 | 1Q21 | Change Y/Y |
|---|---|---|---|---|---|---|---|
| Hosting Revenue | $38.9 | $33.2 | $27.6 | $20.5 | $18.6 | $12.7 | 110% |
| Equipment Sales | $15.2 | $26.3 | $134.8 | $35.5 | $46.0 | $31.9 | -67% |
| Digital Asset Mining | $109.8 | $133.0 | $139.4 | $57.1 | $10.8 | $9.6 | 920% |
| **Total Revenue** | **$164.0** | **$192.5** | **$301.8** | **$113.1** | **$75.3** | **$54.2** | **118%** |
| Cost of Revenue (excl. SBC) | $134.4 | $120.5 | $156.0 | $55.1 | $50.8 | $39.7 | 165% |
| Stock-Based Compensation (SBC) | $16.9 | $2.0 | $4.1 | $0.0 | $0.0 | $0.0 | - |
| **Total Cost of Revenue** | **$151.3** | **$122.5** | **$160.1** | **$55.1** | **$50.8** | **$39.7** | **198%** |
| **Gross profit** | **$12.7** | **$70.0** | **$141.7** | **$58.1** | **$24.5** | **$14.5** | **-48%** |
| Gain on legal settlements | $0.0 | $0.0 | ($0.0) | ($2.6) | $0.0 | $0.0 | - |
| Gain from sales of digital currency assets | $11.8 | $2.2 | $4.4 | $0.4 | ($0.0) | $0.0 | NM |
| Impairment on goodwill | ($840.0) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | - |
| Impairment of digital currency assets | ($150.2) | ($54.0) | ($24.7) | ($12.6) | $0.0 | $0.0 | - |
| Losses on exchange of disposal or property, plant, and equipment | ($13.1) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | - |
| Operating Expenses: | | | | | | | |
| Research and Development (excl. SBC) | $1.6 | $1.5 | $2.3 | $1.6 | $1.4 | $1.2 | 11% |
| Sales and Marketing (excl. SBC) | $1.2 | $1.0 | $1.0 | $0.9 | $0.7 | $0.5 | 63% |
| General and Administrative (excl. SBC) | $19.0 | $18.7 | $12.1 | $7.7 | $4.7 | $3.2 | 304% |
| Stock-Based Compensation (SBC) | $94.1 | $23.8 | $3.8 | $28.3 | $2.1 | $0.6 | NM |
| **Total Operating Expenses** | **$115.9** | **$44.9** | **$19.3** | **$38.5** | **$9.0** | **$5.5** | **NM** |
| Operating Income | ($1,094.6) | ($26.7) | $102.2 | $4.8 | $15.5 | $9.0 | NM |
| Total Non-Operating Income | $186.3 | ($397.1) | ($25.2) | ($22.2) | ($18.8) | ($2.2) | NM |
| **Net (Loss) Income Before Tax** | **($908.4)** | **($423.8)** | **$77.0** | **($17.4)** | **($3.3)** | **$6.8** | **NM** |
| Income Tax (Benefit) Expense | ($46.7) | $42.4 | $16.5 | ($0.8) | $0.1 | $0.0 | NM |
| **Net (Loss) Income** | **($861.7M)** | **($466.2M)** | **$60.5M** | **($16.6M)** | **($3.4M)** | **$6.8M** | **NM** |
| | | | | | | | |
| **Adjusted EBITDA** | **$59.1M** | **$93.0M** | **$150.9M** | **$54.7M** | **$20.8M** | **$12.5M** | **185%** |

SASMF EXHIBIT 24
45 of 99



18

# Appendix A

**Reconciliation of Second Quarter Fiscal Year 2021-2022 Adjusted EBITDA (Unaudited, Thousands)**

| | Three Months Ended June 30, | |
|---|---|---|
| | **2022** | **2021** |
| **Net (loss) income** | $ (861,670) | $ (3,414) |
| **Adjustments:** | | |
| Interest expense, net | 27,116 | 10,846 |
| Income tax (benefit) expense | (46,702) | 118 |
| Depreciation and amortization | 49,835 | 3,075 |
| Loss on debt from extinguishment | — | 7,974 |
| Stock-based compensation expense | 110,998 | 2,136 |
| Fair value adjustments on derivative warrant liabilities | (22,189) | — |
| Fair value adjustment on convertible notes | (195,061) | — |
| Gain (loss) from sales of digital assets | (11,808) | 16 |
| Impairment of digital assets | 150,213 | — |
| Impairment of goodwill | 840,000 | — |
| Losses on exchange or disposal of property, plant and equipment | 13,057 | 17 |
| Gain on sale of intangible assets | (5,904) | — |
| Restructuring charges | 1,445 | — |
| Other non-cash and non-recurring items | 9,781 | — |
| **Adjusted EBITDA** | $ 59,111 | $ 20,768 |

SASMF EXHIBIT 24

19

# Appendix B

## Reconciliation of Second Quarter Fiscal Year 2021-2022 Adjusted earnings per share (Unaudited, Shares in Thousands)

Three Months Ended June 30,

| | 2022 | 2021 |
|---|---|---|
| Net (loss) income per diluted share | $ (2.65) | $ (0.02) |
| Adjustments: | | |
| Interest expense, net | 0.08 | 0.07 |
| Income tax (benefit) expense | (0.14) | — |
| Depreciation and amortization | 0.15 | 0.02 |
| Loss on debt from extinguishment | — | 0.05 |
| Stock-based compensation expense | 0.34 | 0.01 |
| Fair value adjustments on derivative warrant liabilities | (0.07) | — |
| Fair value adjustment on convertible notes | (0.60) | — |
| Gain (loss) from sales of digital assets | (0.04) | — |
| Impairment of digital assets | 0.46 | — |
| Impairment of goodwill | 2.59 | — |
| Losses on exchange or disposal of property, plant and equipment | 0.04 | — |
| Gain on sale of intangible assets | (0.02) | — |
| Restructuring charges | — | — |
| Other non-cash and non-recurring items | 0.04 | — |
| Adjusted earnings per diluted share | $ 0.18 | $ 0.13 |
| Weighted average shares outstanding - diluted | 324,967 | 158,890 |

SASMF EXHIBIT 24

CORE SCIENTIFIC

20

**EXHIBIT B**

Transcripts



# Core Scientific, Inc.'s (CORZ) CEO Mike Levitt on Q2 2022 Results - Earnings Call Transcript

Aug. 11, 2022 9:31 PM ET | **Core Scientific, Inc. (CORZQ)**, **CRZWQ** | 2 Comments

 **SA Transcripts**
134.7K Followers

 ▶ **Play Earnings Call**

Core Scientific, Inc. (CORZ) Q2 2022 Earnings Conference Call August 11, 2022 4:30 PM ET

**Company Participants**

Steven Gitlin – Senior Vice President-Investor Relations

Mike Levitt – Chief Executive Officer

Denise Sterling – Chief Financial Officer

**Conference Call Participants**

Lucas Pipes – B. Riley

Chris Brendler – D.A. Davidson

Stephen Glagola – Cowen

Kevin Dede – H.C. Wainwright

**Steven Gitlin**

Good afternoon, ladies and gentlemen, and welcome to Core Scientific's Second Quarter Fiscal Year 2022 Earnings Call. This is Steven Gitlin, Senior Vice President of Investor Relations for Core Scientific. At this time, all participants are in a listen-only mode. We will conduct a question-and-answer session after management's remarks. As a reminder, this conference is being recorded for replay purposes.

Before we begin, please note that on this call certain information presented contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include without limitation, any statement that may predict forecast, indicate or imply future results, performance or achievements, and may contain words such as believe, anticipate, expect, estimates, intend, project, plan, or words or phrases with similar meaning. Forward-looking statements are based on current expectations, forecasts and assumptions that involve risks and uncertainties, including but not limited to, economic, competitive, governmental and technological factors outside of our control that may cause our business strategy or actual results to differ materially from the forward-looking statements.

For further information on these risks, we encourage you to review the risk factors discussed in Core Scientific's periodic reports on Form 10-K and Form 10-Q filed with the SEC, and the Form 8-K filed today with the SEC, along with the associated earnings release and the Safe Harbor statement contained therein.

This afternoon, we're also filing a slide presentation with our earnings release, and we're posting the presentation on our website at corescientific.com in the Events & Presentations section. The content of this conference call contains time-sensitive information that is only accurate as of today, August 11, 2022. The company undertakes no obligation to make any revision to any forward-looking statements contained in our remarks today or to update them to reflect the events or circumstances occurring after this conference call.

Joining me today from Core Scientific are Chief Executive Officer, Mr. Mike Levitt; and Chief Financial Officer, Mrs. Denise Sterling. We will now begin with remarks from Mike Levitt. Mike?

**Mike Levitt**

Thank you, Steve. On behalf of our entire team, welcome to today's second quarter 2022 earnings conference call. On today's call we'll provide highlights from our second quarter, discuss our financial performance, comment on current market conditions, and provide thoughts on how we are structuring our company for long-term success.

Core Scientific operates more bitcoin mining servers in our facilities than any other public company in the United States. We have eight data centers operating in five states and expect to begin operation our ninth data center in Oklahoma within the next few quarters. Our purpose-built company owned data centers now hold over 200,000 servers and approximately 800,000 square feet. By year-end, we expect to be operating approximately 300,000 servers of which more than half will be for our own self-mining operations in over one million square feet.

I will discuss our future plans in more detail later in this call. But first I'd like to introduce my colleague and our CFO, Denise Sterling, to discuss our financial highlights.

**Denise Sterling**

Thank you, Mike, and good afternoon, I will review for – I will review results of our second quarter as compared to the same period one year ago. Total revenue consisting of self-mining, hosting and equipment sales increased by 118% to $164 million from $75.3 million, driven primarily by an increase in our self-mining revenue.

The total number of bitcoin produced in the second quarter was 3,365 compared to 180 for the three months ended June 30, 2021. The average price of bitcoin was $32,500, a decrease of 30% as compared to $46,500 for the three months ended June 30, 2021.

Total hosting revenue increased by 110% to $38.9 million, equipment sales for the quarter decreased by 90% to $30.5 million. As the majority of our hosting customers now purchase their miners directly from manufacturers for deployments in our data centers. Cost of revenue increased by a $100.5 million to $151.3 million. The increase was primarily attributable to an increase in our number of self-mining and hosted servers operating in our facilities.

Power consumption increased by $45.9 million, depreciation rose by $46.3 million and personnel and related expenses and facilities cost increased by $25.8 million. Related expenses included stock-based compensation of $16.9 million. The increases were offset by a decline on equipment sales of $17.6 million.

Cost of revenue for the three months ended June 30, 2022 included depreciation expense of $49.1 million of which $46.5 million was from the self-mining segment. For the three months ended June 30, 2021 cost of revenue included depreciation expense of $2.8 million of which $0.9 million was for self-mining segment.

With increases in energy prices, generally we expect our average power price for the year to now come in at about $0.05 to $0.055 per kilowatt hour. Prices do move around seasonally and the extreme heat across the south has impacted our pricing for the second quarter and will continue to do so in the third quarter. Gain from the sales of our digital assets was $11.8 million for the three months end of June 30, 2022, resulting from a total sales price of our digital assets sold up $265.8 million versus the carrying value of $254.0 million.

Consistent with prior quarters, we recorded several non-cash accounting entries in the second quarter of 2022, including the impairment of digital assets, impairment of goodwill, a fair value adjustment to our convertible notes and stock-based compensation. Impairment of digital assets increased by $150.2 million for the second quarter, as a result of a decline in our price in the price of bitcoin, an impairment is recorded when the carrying value of our digital assets exceed their fair value based on current market pricing.

We recorded a goodwill impairment of approximately $840 million due to a revaluation of our assets resulting from the sustained decline in bitcoin price. The decline in the market capitalization of public bitcoin mining companies, including Core Scientific and the uncertain outlook for our industry. We recorded a favorable non-cash fair value adjustment to our convertible notes of $195 million due to an decrease in their value resulting from the decline in our stock price. We will continue to mark-to-market our convertible notes each quarter.

Total operating expenses increased by $106.9 million to $115.9 million. This increase was primarily driven by $92 million of stock-based compensation representing 86% of the total increase. This resulted from the removal of the IPO transaction trigger from outstanding RSU awards that had previously met the time vesting requirement.

In order to ensure we are well positioned to achieve our objectives. We have taken a disciplined approach to reducing operating expense growth. We have eliminated the majority of our discretionary expenses reduced headcount by 10%, renegotiated vendor contracts and right size the organization to focus on our core business. We now expect our operating expenses in the second half of the year to be 25% lower compared to the first half of the year.

Net loss of $861.7 million decreased by $858.3 million from a net loss of $3.4 million. The increase in net loss was primarily driven by the non-cash items I spoke about earlier. Adjusted EBITDA increased by $38.3 million to $59.1 million. The increase was driven primarily by increased revenue of $88.7 million offset by higher cost of revenue, excluding depreciation and stock-based compensation of $37.3 million and increased operating expenses of $13 million excluding stock-based compensation.

Adjusted EPS for the quarter ended June 30, 2022 was $0.18 per share. Our total cash position at June 30, 2022, including cash, cash equivalents and restricted cash was $140.5 million a year-to-date increase of approximately $8.8 million. The primary drivers of this change included inflows from operations of $151.9 million and proceeds from borrowing of $415.1 million.

These sources of cash were partially offset by cash outflows for infrastructure costs to build our purpose-built data centers of $238.5 million payments to vendors for our ASIC servers of $217.7 million, interest and principle payments on our outstanding debt of $72.7 million and payment of tax obligations for vesting of employee RSUs of $29.3 million. By net settling our RSUs, we reduced our outstanding share count by approximately 14 million shares.

In order to better understand our self-mining business, cost structure and breakeven price for producing bitcoin, we are introducing a metric that we call cash to mine. It produces a view of the marginal cash cost to mine a single bitcoin, and represents the cash-based components of cost of revenue divided by the number of bitcoin mined for the period. There are two cash-based components of this calculation.

The first is our power cost, which is based on price per kilowatt hour. The second is our data center cash-based operating cost, which include the expenses required to operate, maintain, secure, and secure our data centers, including personnel and related expenses and facilities cost. These two components are included as part of our total cost of revenue. As the metric is cash-based, it does not include expenses such as stock-based compensation or depreciation.

For the first half of 2022, our power costs per bitcoin was approximately $8,500, and our data center operating costs were approximately $1,700. As such our cost, our cash to mine, a bitcoin for the first half of 2022 was approximately $10,200. We expect our cash to mine a bitcoin to vary quarter-by-quarter, primarily based on fluctuations and power costs and global hash rate.

Now, I would like to turn the call back over to Mike.

**Mike Levitt**

Thank you, Denise. In a previous earnings call, I explained that approximately two-thirds of our 2022 growth would occur in the second half of the year. We're now in the second half and we remain confident that will be the case. As we stand here today, we operate eight data centers in five states with approximately 800,000 operating square feet. By year-end, we continue to expect to have developed a total of over one million square feet of operating facilities.

We operate approximately 125,000 self-mining servers and expect to increase that number to approximately 170,000 by year-end. We operate 86,000 servers for our co-location customers and expect to increase that number to approximately 125,000 by year-end. We deployed 14,000 servers in the month of July and have already deployed more than 17,000 servers in the first 10 days of August. We are currently mining over 40 bitcoin per day on average, and yesterday we mined a record 45.7 bitcoin in a single day. Likely the most bitcoin ever self mined in a day by a public company.

As the market and economic environment deteriorated in the second quarter, we took a number of actions to ensure that our business remains well positioned to navigate these difficult times. We conducted a full review of our businesses, our costs, and our balance sheet.

First, I will address our balance sheet. On the asset side of our balance sheet, we've invested in excess of $1 billion in our infrastructure and our servers, since the company's inception. Our approximate $0.5 billion investment to develop world-class blockchain computing data centers will generate returns for years to come. No other company in the United States has invested as heavily or built as significantly infrastructure to support the production of bitcoin, while others search for infrastructure to support their business, we own control, and operate our own. By developing purpose built facilities, we have the ability to employ immersion or any other process that we believe will improve our productivity. We're currently running immersion pilot tests in a number of our data centers.

Our $0.5 billion plus investment in servers will also generate returns for years to come. Our servers should be mining bitcoin well beyond their depreciable life. We have built and maintained significant liquidity through these volatile times. We think it is prudent and we think it is wise. We have chosen to create liquidity by selling our digital assets. In the current environment, we don't do not believe it is sensible to increase our debt.

We have total debt of approximately $960 million excluding accounting reserve adjustments, totaling just less than $200 million as illustrated on Slide 12. Slightly more than $500 million of our debt is our privately placed convertible notes. Those notes mature approximately three years from now in April of 2025; they have little cash impact in the interim because they bear interest in cash at a rate of 4%. They have a non-cash 6% pay and kind feature and no principle payments required until maturity. We are very comfortable with the maturity in 2025 and the likelihood that our stock will be hopefully soon at a level where this debt converts to equity.

We owe B. Riley, approximately $57 million payable monthly over the course of the next 11 months. The loan was originally $75 million, but we have paid down $18 million already this year. Again, we are very comfortable with our obligations to B. Riley.

As for our equipment financing out of the 170,000 or so self-mining servers, we plan to operate by the end of the year, approximately 86,000 are currently encumbered by debt or leases. Equipment debt and leases total approximately $330 million today. Through the end of July, we have paid approximately $75 million in principle amortization this year and are comfortable with our ability to continue to service our equipment debt. We have multiple options for creating and maintaining liquidity.

We have and will continue to sell our bitcoin. Our current bitcoin production provides us the unique ability to replenish our digital assets rapidly. As we previously discussed, we have also entered into a $100 million equity line of credit. We can tap that line anytime over the next two years. Environments like this demand focus and require critical decisions. Since Core Scientific was founded. We have focused a majority of our time and capital investments on site selection, development, and technological innovation to facilitate the deployment and management of our infrastructure and mining servers.

We are a developer and operator of blockchain computing data centers. We own and operate more infrastructure and servers than any other company in the United States. That is what we do and who we are. That is our focus, building reliable geographically distributed data centers that enable the deployment and efficient operation of mining servers is the biggest challenge faced by the digital asset mining ecosystem.

This infrastructure did not always exist in the United States, and that is why Core Scientific accepted the challenge to build enterprise grade digital asset mining data centers five years ago. We have paired our business back to concentrate on what we do best developed data centers and operate ASICs in our purpose-built facilities. We have moved out of any business, not central to our mission and are focusing our resources on continuing to build our core business.

To that end, we have discontinued our blockchain technologies development business. We have taken costs out of our corporate activities and are continuing to develop ways to execute our business more efficiently. To date, we have eliminated approximately 10% of our workforce. None of whom are involved in our data center activities. While taking steps to become leaner and more efficient, we remain focused on growing our business and improving profitability.

The current market turmoil and difficulties facing other companies attempting to develop infrastructure have enabled us to work with our vendor partners to reduce expenses and build more efficiently. As such, we believe our near term data center development expenses over the next six months will be significantly less than what we had previously anticipated. We have paid for all, but approximately $10 million of the cost of the remaining 50,000 self-mining servers to be deployed. We are confident that all 170,000 of our servers will be up and running by year end. We hope to expand our self-mining fleet beyond 170,000, but if not yet, committed to purchase additional servers. We continue to make discounted offers for stranded new miners.

We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day one. We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms. We want our customers to make a profit, but we also want to ensure that our business is making money too. We fully expect our hosting business to be profitable in cash generative, going forward into 2023.

Over time, we think the hosting business should be a 20% to 30% EBITDA margin business, initial customer acceptance, including our recently announced agreements for 75 megawatts of co-location capacity validate our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our firm.

Now, let's talk a little bit about the future. We continue to expect to achieve an operating cash rate of between 30 and 32 exahashs and 1 gigawatt of power by the end of 2022. This is based on the continued expansion of our server fleet to approximately 300,000 units, approximately 170,000 of which will be dedicated to self-mining and continued progress in our data center project in Texas, and Oklahoma, as well as continued demand from co-location customers.

Based on an end of 2022 network cash rate assumption of 250 exahashs, we expect to be producing or self-mining, approximately 2000 bitcoins a month by the end of 2022. Our self-mining fleet is new and efficient consisting of S19s, S19 Pros and S19 XPs. We are well positioned for years of productive mining.

Case 22-90341 Document 1738-24 Filed in TXSB on 02/28/23 Page 56 of 99

Our company designed, developed, populated, and now manages the largest blockchain computer data center business for self-mining and co-location services in North America. As we disclosed in last week's July update, press release, we operated total hash rate of 19.3 exahashes, including 10.9 exahashes in our self-mining business as of July 31. We have built our leadership position in the blockchain infrastructure market by investing a total of more than $1 billion in infrastructure and servers since the inception of our business.

We have strategically located and developed data centers in diverse geographic areas. While we continue to curtail our growing operations in Texas in response to grid operator needs, the majority of our data centers are located in other states, reducing the impact of Texas specific events on our overall bitcoin production. Within Texas, we are working with ERCOT on the CLR program and aim to deploy our Minder software to help provide automatic demand response to the grid. Our track record of innovation and growth in our industry speaks for itself.

Denise introduced today our new cash to mine metric. Given the environment we are pleased with a cash cost of slightly in excess of $10,000 to mine, a single bitcoin in the first half of 2022. We believe this is an important way to assess our efficiency and future profitability. We offer a unique and powerful business model that represents a compelling equity investment in blockchain data centers and at a minimum, a levered investment to the price of Bitcoin. All said, despite the difficulties, our industry has endured this year, assuming a constant bitcoin price and modest growth in the global hash rate, we are on pace to generate nexus of $700 million in revenue and approximately $300 million in EBITDA.

Thank you to our amazing team who continue to focus on executing our plans during a very challenging time. Thank you to our customers for continuing to rely on Core Scientific and thank you to our shareholders who remain committed to the long-term opportunity this company, and this team are working to realize.

Steve, we will now take questions.

**Question-and-Answer Session**

**A - Steven Gitlin**

Thanks Mike. [Operator Instructions] Our first question comes from Lucas Pipes at B. Riley. Hi Lucas.

**Lucas Pipes**

Thank you very much, Steve. Good afternoon, everyone. Mike I want to thank you for the disclosures. This is really, really terrific detail. Both in the released the presentation, and also prepared remarks – appreciate that.

**Mike Levitt**

Thank you. Thanks, Steve and Denise and all my colleagues.

**Lucas Pipes**

Yes, this is really good. Good work. And I want to follow up on the power price a bit. I think you mentioned $0.055 prepared remarks or it was mentioned just wanted to confirm that. And then if you could maybe speak, maybe pushing power prices up and down. Obviously there are inflationary pressures on the power side, but then you're also expanding in Texas. So wondering how kind of power costs could evolve the next six months, 12 months. Thank you very much for your color.

**Mike Levitt**

Sure. So, we think that all things considered heat waves, pressure on energy prices, macro economics, et cetera, that a reasonable full year assumption is in that $0.05 to $0.055 range. There are a number of things that move it around. One is certainly seasonality. So, our power prices are probably net a bit higher in these warm months, especially when you get, 50 days of a hundred degree temperatures across the south, including Texas, that has an impact. And there's also sort of a less well known aspect of developing in Texas, which is that generally speaking, the power prices are a bit higher as you develop a facility and then as the facility scales, those prices come down considerably.

And so it's fair to say, we think that our pricing in the fall and winter will probably come down from where it is this summer. It's also I think fair to assume that as we have our Texas facilities fully scaled going into next year, that on average, our power pricing overall should come down a bit, from where we expected to be full year this year, because we are, to our detriment, we're ramping Texas this year. It's not fully up to scale by the end of this year our facilities in Texas will be fully scaled. So it's going to move around a bit from this year to next year, but we expect that to be a positive movement as opposed to a negative movement. Did that answer your question Lucas?

**Lucas Pipes**

Very, very helpful. Really appreciate the color. And then staying on the topic of cost, I think was also mentioned in the prepared marks that you expect operating expenses to decline by about 25%. And I wonder what sort of first did I hear that? Right. And then what are some of the drivers that bring those costs down? Thank you very much.

**Denise Sterling**

Yes. No, thank you so much for the question. I think, consistent with what you — what we commented on earlier we really did take a disciplined approach. Quite frankly, it was more surgical than suggesting that we were going to take across the board reductions. And so, as we suggested the really the cost savings were around personnel and or areas of our organization that were not necessarily part of that core business, as Mike had suggested that we were really doubling down on and going to focus on.

In addition to, taking a look at some of our project related professional fees and things of that nature, where we said, look, we have the ability to control these and the timing, and if they were not, if they were discretionary that, we literally took a position that they were going to be eliminated. I don't think that this has a significant impact on our ability to meet our objectives. And as Mike had suggested, we did not impact anybody from a data center perspective.

**Lucas Pipes**

Thank you. I'll try to squeeze one last one.

**Steven Gitlin**

Go ahead, Lucas.

**Lucas Pipes**

If possible. Sorry, sorry about that. Just I'm, I was hoping it might be possible to quantify the backlog on the hosting side, but we continued to hear a lot about shortages. You mentioned some of the peers having securing data center space, so how would you frame that up?

**Mike Levitt**

So, I think it's fair to say that what we hear from prospective customers anecdotally is that there continues to be a lack of availability of up and running now or in the near term infrastructure. That a number of folks have been, highly disappointed with the delays that, have occurred. We announce our now make a habit of any of significance announcing, any significant hosting agreements as they occur in order to kind of provide as much transparency in that regard as we can. It continues to be the case that we are in dialogue with demand that exceeds our capacity this year. Generally speaking, it does take, some time to get to agreement. We think that we'll have some additional announcements this quarter with regard to hosting, but there is no guarantee of that, right?

Of course, strength in bitcoin pricing helps. But the other aspect of it is as a lot of folks that don't have a home for their mining equipment also don't have capital. And as we stated in our prior earnings call, we are only interested in working with co-location customers that have the ability to make prepayments and are very, very credit worthy as such. And so we're not talking to everybody, that's got rigs on the ground in warehouses. We are talking to the folks that have capital and rigs on the ground. And that said, the pipeline is very strong, but we're also quite sincere about making sure that our hosting business is a profitable business.

In the call, it the good old days, we used to be a reseller of servers, and there was margin in that. And we could look at the margin in that and combine that with our hosting agreements and look at the overall profitability. Now that we really don't have a very vibrant reseller business, because most folks are going direct to the manufacturers. Our hosting business needs to stand on its own two feet without the benefit of margin coming from equipment sales.

Case 22-90341 Document 1363-24 Filed in TXSB on 02/23/24 Page 59 of 99

And so, for some folks, that's a bigger hill to climb, but as demonstrated by the 70 megawatts of agreements that we recently announced, there are folks that are well capitalized and recognize the value in terms of the up times, the efficiency, the life of the servers and the technology overlay, they recognize the value. But without the benefit of those resale margins, we had to take a good, hard look at the hosting business and reconstructed a little bit to make sure that we're getting paid for the investment, we've made in infrastructure and technology and the capabilities that we offer.

**Lucas Pipes**

Thank you very much. And you and the team. Best of luck.

**Denise Sterling**

Thank you.

**Steven Gitlin**

Thanks, Lucas. Our next question comes from Chris Brendler at D.A. Davidson. Good afternoon, Chris.

**Chris Brendler**

Hi, Steve. Thanks a lot for taking my question and congratulations on the results and really echo comments earlier, but the disclosure very, very helpful. Thank you so much. Along those lines and really enjoy, hearing more details about your power costs and the outlook. I think that's been a key question that a lot of us on the outside have been wrestling with. Mike, if you could maybe talk to some specifics, if you can sort, I think there's been some challenges in Georgia just getting sort of contracts aligned and then in Texas, are you currently able to sell power back to the grid and take advantage of these power – these spikes and prices? Or is that still on the come? Thanks so much.

**Mike Levitt**

So, we have not earned revenue from Texas for curtailing, obviously we think it benefits our power costs, but we are not in the, in an earning revenue mode. We are working, as we mentioned today on implementation of the CLR program, utilizing our software and technology capabilities, that's something that we hope to have in position sometime this year. But it probably will not be something that's in position by the time the heat wave, hopefully subsides within the next few weeks. But in the future, we very well may have the ability to in fact, have a mutually beneficial economic relationship with the grid operator, but we'll just have to see where that goes.

With regard to our facility in Georgia, we've been working with the power provider there to do sort of the best they, and we can they are, that is the one place where we have the greatest what I would call exposure to the variability of natural gas pricing. And so we've been working with them to try to develop as efficient a program as possible. And but it absolutely does impact our overall cost right now and has, and that's part of what has driven our us to raise our full year estimate for where power pricing is coming in, has been, kind of that facility, that factor as it relates to that power provider.

**Chris Brendler**

Okay, great. And then a bigger picture question for you, Mike is, as I've been talking to investors and sort of wrestling with the outlook here as prices have come down, but now stabilizing and thinking about the having in 18 months or so, or a little more than that. I think I'm really focused on companies that can take advantage of advantaged power relationships and, or more efficient mining operations. So, can you give me like your high level thoughts on sort of behind the meter facilities that potentially would use renewables or fleet upgrades, immersion technology, have you ordered, where do you stay on the XPs? Is that going to be a significant part of your rig portfolio by the end of next year? So some of those high level comments would be great. Thanks.

**Mike Levitt**

Sure. In no particular order, one we mentioned that we've been running immersion testing in a number of our facilities. And immersion to us is simply an economic question is, can we get the efficiency and productivity that makes it worth the expense? We've been testing equipment from a number of immersion equipment providers to see what we like to see what is efficient to see, what's worth the cost, et cetera. I would be, surprised if when the, within the next 12 months we are not operating some considerable portion of our self-mining fleet in an immersion setting. So that's one.

Two, we are trying to skew all of our development activity to more and more efficient and predictable power provision. Looking back, clearly perhaps the Georgia facility, wasn't the best decision we ever made. I wasn't in this seat at the time. But, we're trying to work that out with the power provider there. That said, we're going to be developing where we think we've got a really good handle on power, and as higher predictability as possible. And that's true with our Texas sites. It's true with our Oklahoma site. We feel pretty good about those, those facilities and those facilities probably buy into, some point next year in the aggregate, will be a considerable percentage of our operating facilities.

We are actively engage in conversations about alternative forms of power supplemental or other behind the meter and otherwise, I think that everybody in our industry is doing so, because we would all like to get our power costs down prior to mid-2024 and to be managing them as inexpensively and prudently as we possibly can. There's nothing that we, sitting here today, can tell you or can promise, but we can say that we're working very hard, on all of that.

SASMF EXHIBIT 24
60 of 99

As we also mentioned, about our facilities, one of the nice things about having purpose built facility is not only are they purpose built, but they are repurposeable. And so the fact that, our business is not really built on steel containers in an exposed environment, but rather in structures allows us a lot more flexibility in pivoting to more efficient mining processes

**Chris Brendler**

That **makes** sense. And thanks so much for that detail. What about the XPs? Are you, I can't remember if you, I don't think you placed a huge one at the peak of the market. So that was probably a smart thing.

**Mike Levitt**

I forgot about that part of your question. Yes, the answer is yes, we do have XPs coming and as we mentioned, we've look, we are trying to be very, very efficient buyers in this market. There are a lot of stranded servers that are here today and that are coming tomorrow. And again, can't promise that any of our conversations will be fruitful, but like you would expect, we're trying to pick up some high quality equipment at low prices. Let's say, that's it we'll see how it plays out the next six months.

**Chris Brendler**

No, I figure out patients there to be well rewarded. Thanks so much. Appreciate the comments and we'll catch up later. Thanks.

**Mike Levitt**

Thanks for your questions.

**Steven Gitlin**

Thank you Chris. [Operator Instructions] And our next question is coming from Stephen Glagola at Cowen. Good afternoon, Stephen.

**Stephen Glagola**

Hey, good afternoon, Steve. Thanks for the question. I just want to drill down a little bit more on the cost a bit more. Denise, you listed where the 25% OpEx is coming out of does that exclude non-cash items?

**Denise Sterling**

It does.

**Stephen Glagola**

Thank you. And also Mike, I just wanted to get more color on the decision to amend the

performance condition that allowed for the RSUs to vest. If you can just provide any color on that, that'd be great.

**Mike Levitt**

Sure. it wasn't a performance condition without throwing any lawyers under a bus, the way the RSU program was drafted way back when as opposed to being drafted, saying that, there was a an event condition, which would be, a sale of the company or a going public, it set up a sale of the company, if you will, or technically an IPO and it just inadvertently frankly, missed that you can go public through a spec.

And so those RSUs were all already time vested. It represented frankly, five years of RSUs for our people. And so what our board was doing was fulfilling what had been the intention and which makes a lot of sense, right, that's how companies usually work, you've got time vesting. And then of course, you've got when you, when you go public, plus when you time vest, for whatever reason, the way it was drafted required our board to take action or the RSUs would've – they, even though were public, they would ever get their RSUs. And I don't know about my colleagues, but if I was never going to get my stock, I'm not sure I would've stayed. Right. So, it really was to correct something that just wasn't in my view, drafted properly when it was originally set up years ago.

But to be clear, we didn't accelerate, anybody's RSUs every one of those RSUs and our RSUs vest over four years, it's not like it's a short vesting period or anything like that. All of those RSUs had met the time vesting requirement. So it was a very technical issue that, that occurred. Now, we did elect to do a net settlement and frankly, the reason was, and it looks like it was a pretty smart trade now was that our stock price at the time was so low that by net settling, we could effectively pull what was 4% to 5% of our outstandings out at a price that's well below where the stocks trading today. Did that answer to your question?

**Stephen Glagola**

Yes, yes, that was very helpful. Thank you. If I can just ask one more follow up here on the June update, I believe you said approximately 90% of the rigs were already paid for, was there a downward market price adjustment on that 90%? And if so, could you quantify it? And then additionally, like what is the remaining CapEx, if any, on the infrastructure spend? Thank you.

**Mike Levitt**

So the answer is, yes. As I think we've said in the past, our agreements have the market price adjustment or mechanism in them. And yes, our manufacturer was did the right thing and was kind enough to agree that a market price adjustment was warranted, and that certainly significantly reduced our obligation as it related to those machines. And because we'd already paid in so much, because there's such near term deliveries, it more or less, took away, most of what we owed at the time.

So it was, yes, it was principally related to the adjustment. I don't remember the exact magnitude, frankly of what we had left versus what they reduced at that time. But it was in the tens of millions of dollars order magnitude, it wasn't $2 million or $3 million bucks. It was, yes, it was, and I think was in that $20 million to $30 million [ph] range, but I don't remember precisely. So, that did have a very beneficial impact for us. What was the second half the question?

**Stephen Glagola**

Just on the remaining infrastructure CapEx. If they're – what's remaining there? Thank you.

**Mike Levitt**

So, we are currently sitting at about 600 megawatts operating, and to get to where we need to get to that kind of plus or minus a gig, which takes care of our miners and our contracted hosting. You know, that's in the order of magnitude of $50 million to $75 million to get that up and running fully.

**Stephen Glagola**

Okay. Thank you very much, Mike. Appreciate it.

**Mike Levitt**

Yes, and the reason I give you a little bit of a range is, I should have thanked also our vendors at the end of my thank you, because the folks we work within developing our infrastructure have been great partners in this timeframe as well, which we're appreciative of. As you know a lot of folks have had to cancel or with on orders for everything. It's not just minors, it's also transformers. And I think our partners appreciate that, we're still in there and making our payments, but in turn, they've also been good partners to us and we've benefited from some price reductions on some of the development activities we've got going on.

**Stephen Glagola**

Thanks.

**Steven Gitlin**

Thank you, Stephen. Our next question comes from Kevin Dede at H.C. Wainwright. Hi, Kevin.

**Kevin Dede**

Hi, Steve. Hi, Mike. Thanks for having me on. Congratulations everything you've done. Hey, Mike, you and the team are super aggressive in site selection and build out. I was wondering if you just sort of at a high level kind of kick off the primary – sort of the primary attributes of each site as you work into them. Just sort of based on your experience in Georgia, I'm kind of wondering how you've shifted cores approach?

**Mike Levitt**

Fair question and a good question. And I know particular order, one is, is power provision and predictability of that power provision related to that is being closer to the actual provider of power one of the issues that we face in Georgia. And the folks in Georgia, they're good folks. Okay. And I like them and we're all trying to be constructive and work through the issues, but they are generally a buyer. It's a utility company. They're generally a buyer of power, and then a provider of that power, as opposed to a producer of power. We want to be closer to the production as oppose to simply the provision. So that's one call it, lesson learned attribute that we are very focused on.

Second has to do with some of these grid and weather inter relationships, right. We love our sites in Texas, and we like the folks in Texas and we're based in Texas. And I recognize that this is an unprecedented heat wave, but it's still not very fun to be curtailing, kind of four hours to five hours a day when it's 104 degrees, that has implications for our productivity. And so we need to be very careful about what percentage of our operations reside where you can have that kind of an issue, right. Is second.

Third is, is certainly our ability to get closer to renewable resources and kind of the behind the meter aspects that we were asked about. Fourth, has to do with availability of talent and what is a hard to hire environment. We need good people, good maintenance techs that we can train in our facilities. So, we are running, big, high powered facilities with on average, more than 30,000 servers in each, we're running them 24/7. So, you need that. I think early on, we got the gig to make sure we were coming to places where we're welcome where we're invited, where they want us, where they're glad to have us.

And so I think our local relationships have all been very, very good. We really haven't had any sort of governmental, political kind of issues. And scalability, I think early on, we were trying to make sure we could create facilities that were 100 megawatts, 150 megawatts. I think we're leaning more into 200 megawatt plus type sites. Now, we believe it's important to be geographically diversified for all sorts of reasons I've talked about in the past, some of which have been, demonstrated this summer. I don't know, Kevin, that's kind of my off the top of my head list. I'm sure that Weston Adams front infrastructure would have more.

**Kevin Dede**

No, I'll all sensible points. Thanks for indulging me. And please don't take offense to this. I'm just super curious about the prospects in Georgia, Volvo 3 and Volvo 4 coming on. I'd expect that could change pricing, and I'm just kind of wondering what your people have told you, if there might be any sort of benefit to that?

**Mike Levitt**

I don't think they're related, really to what we are doing, given our, where we are, it's just different plan.

**Kevin Dede**

Right. Okay. Circling back on immersion, you mentioned a couple of tests. I was wondering if you could speak to end of the data that you're seeing, sort of where you've pushed the envelope to? How the kind of performance improvement you're seeing? And any sort of initial feedback on these initial tests?

Case 22-90341 Document 1583-24 Filed in TXSB on 02/28/24 Page 65 of 99

**Mike Levitt**

No, it's still too early to, probably too early to comment. I don't want to speculate, sorry.

**Kevin Dede**

Yes, no, no apologies. Understood, fair. Do you think that any of the Texas heat issues could be mitigated through that technology? Or is it really more of an air car asks you to decision?

**Mike Levitt**

It's really more of a grid curtailment issue than it is a inability to operate the equipment, in a passive air environment. When the grid gets down to kind of under 10 gigawatts, probably under six gigs of excess capacity we get phone calls, because we're the, even though the entire industry, probably isn't one gig in the state yet, we can represent call it 20% of the excess capacity. We're less than we're less than 1.5% of the total capacity, but we're 20% of the excess capacity when they're trying to run up four gig to five gig excess.

**Kevin Dede**

Right. So, I know you've been questioned on this already, so apologies again, Mike. But can you talk to the length of time it might take before you're able to leverage your PPA into a sale agreement?

**Mike Levitt**

No. Look, we're having really constructive conversations with the folks at ERCOT. They're good people look. We're trying to be a good citizen, right. We want to do what's right for our company. We want to do what's right for Texas. And so it's just too early to talk about how that's going to come out.

**Steven Gitlin**

Kevin, we really appreciate — we appreciate the questions in the interest of schedule. We're going to have to call it here. We thank everybody for your attending.

**Kevin Dede**

No problem, understood, Steve. I just wanted to thank you all for entertaining the questions. Really, really great to speak to you both again.

**Mike Levitt**

You too.

**Steven Gitlin**

Thanks, Kevin. And at this point we thank you all for your attention and for your interest in Core Scientific and archive version of this call, all SEC filings and relevant company and industry news can be found on our website corescientific.com. We wish you a good day. Good afternoon. Good evening. And we look forward to speaking with you again, following next quarter's results.

- Read more current CORZQ analysis and news

- View all earnings call transcripts

**EXHIBIT C**

Closing Argument - Leonhard and Court Decision          156

1   I think others involved in this matter will have an

2   opportunity to weigh in after the fact and Appaloosa, as Mr.

3   Rosenberg pointed out, will have that opportunity, too, as

4   would Brandes, given its substantial resources.

5          I think with that, Your Honor, I'll step down and

6   let Ms. Leonhard make her remarks.  Again, I would propose

7   granting the motion.

8          THE COURT:  Okay.

9          **CLOSING ARGUMENT FOR THE U.S. TRUSTEE**

10         MS. LEONHARD:  Good evening, Your Honor.  Alicia

11  Leonhard for the United States Trustee.

12         Last, but not least, Your Honor, the United States

13  Trustee joins in the comments and the arguments of the

14  objectors and requests that the Court deny the motion.  Thank

15  you very much.

16         THE COURT:  Okay.  All right.  I'll take a five-

17  minute break and then I'll be back.  Well, I'll be back at

18  6:15.

19     (Recess taken at 6:01 p.m.)

20         THE COURT:  Please be seated.

21         I have in front of me a motion by Appaloosa

22  Management, LP, a substantial shareholder of the parent

23  Delphi entity, for the appointment of an official committee

24  of equity security-holders under Section 1102(a)(2) of the

25  Bankruptcy Code.

**SASMF EXHIBIT 24**
**68 of 99**

Court Decision                                                    157

1          The motion is opposed by the debtors, the Official

2     Unsecured Creditors' Committee, the agent for the pre-

3     petition lenders, and the United States Trustee.

4          It has been joined in by another large and

5     sophisticated management company, Brandes, which unlike

6     Appaloosa, was a pre-petition holder of the debtor's equity

7     interests and represents to the Court that it has, under

8     management with authority to vote, again, a substantial stake

9     in the debtor's equity interests.  I believe, if you add the

10    two of them together, they own or control approximately

11    fifteen or sixteen percent of the outstanding shares.

12         Those shares are widely held.  There was no

13    testimony on this point, but I believe the record is clear

14    that there are approximately 300,000 shareholders of the

15    publicly traded equity interests.  In light of that fact, I

16    believe that it is relevant that the SEC has not taken a

17    position on this motion.  There were perhaps contrary

18    representations made to the Court as to why the SEC had not

19    done that, made by counsel to the U.S. Trustee on the one

20    hand, saying that the SEC did not support the motion; and by

21    counsel for Appaloosa, saying the SEC did not support the

22    motion, absent a showing, which it was not taking a position

23    on -- that is, that the SEC was not taking a position on,

24    with regard to whether the debtors at this point are

25    insolvent.

SASMF EXHIBIT 24
69 of 99

Court Decision                                        158

1       This is an important motion because it affects the

2  cost of this case, both directly--that is, the cost of an

3  equity committee and its professionals if I grant the motion-

4  -as well as indirectly, in connection with both the cost of

5  the estate and other estate-compensated professionals,

6  including the Creditors' Committee, in dealing with

7  litigation and other matters raised by an equity committee;

8  and then, in addition, also indirectly, in respect of

9  potential delay that the existence of an equity committee

10  might cause at various stages in the case.

11       Because of its importance, and because of the desire

12  by all parties, at least as initially expressed by all

13  parties, including Appaloosa, to have this matter heard and

14  decided by me quickly, so that if I rule in favor of an

15  equity committee, an equity committee could be appointed

16  quickly before passage of much more time in this case, I have

17  decided to rule from the bench.

18       As I often do with long bench rulings, however,

19  particularly where I cite extensive case law, I reserve the

20  right to correct the ruling based on my review of the

21  transcript.

22       This is a core proceeding under the Bankruptcy Code,

23  as it deals with a committee's appointment under the Code.

24  And one begins, as one must, with the statute, which provides

25  at Section 1102(a)(2) that:

**SASMF EXHIBIT 24**

**70 of 99**

Court Decision                                    159

```
 1            "On request of a party in interest, the Court may
 2             order the appointment of additional committees of
 3             creditors or of equity security-holders, if
 4             necessary to assure adequate representation of
 5             creditors or of equity security-holders.  The United
 6             States Trustee shall appoint any such committee once
 7             the Court has ordered the appointment."
 8            It's well recognized that there is no statutory test
 9   for "adequacy of representation," as used in Section
10   1102(a)(2).  See, for example, In Re:  Johns Manville
11   Corporation, 68 B.R. 155 (SDNY 1986), appeal dismissed 824
12   F.2d 176 (2d Cir. 1987).
13            In light of the absence of a statutory definition of
14   "adequacy of representation," and in light further of the
15   fact that the statute says the Court "may" order the
16   appointment of an additional committee besides the Official
17   Creditors' Committee, the courts have made such
18   determinations on a case-by-case basis in the exercise of the
19   Bankruptcy Court's discretion.  See, again, In Re:  Johns
20   Manville, 68 B.R. 155, as well as In Re:  Becker Industries
21   Corporation, 55 B.R. 945, 948, (Bankruptcy, SDNY 1985), for
22   lists of the factors that the courts have employed in
23   exercising their discretion on a case-by-case basis.
24            I should further note that the case law is clear
25   that the burden of showing a lack of adequacy of
```

Court Decision                                        160

1    representation is upon the movant.  Again, see <u>In Re:  Johns</u>

2    <u>Manville Corporation</u>, 68 B.R. 155.

3           The factors that the Court is to consider on a case-

4    by-case basis are, by this time, fairly well established,

5    although I should say first and foremost, again, they are

6    merely factors informing the Court's discretion.  It is not a

7    litmus test, and no particular factor's absence precludes the

8    appointment of a committee; and, conversely, although if all

9    the factors were present, one would assume a committee would

10   be appointment, the Court still has discretion under the

11   statute, in light of other factors that might be present and

12   relevant, not to appoint a committee.  The case law has in

13   large measure developed out of cases decided in the Southern

14   District of New York, but the factors are employed throughout

15   the country.  They are laid out in the <u>Becker Industries</u>

16   case, and in the <u>Johns Manville</u> case that I have cited.

17   They're also discussed in, for example, <u>In Re:  Kalvar</u>

18   <u>Microfilm, Inc.</u>, 195 B.R. 599 (Bankruptcy, District Court of

19   Delaware 1996), and numerous other cases throughout the

20   country.  They include:

21          Whether the shares are widely held and publicly

22   traded.

23          The size and complexity of the Chapter 11 case.

24          The delay and additional cost that would result if

25   the Court grants the motion.

**SASMF EXHIBIT 24**

**72 of 99**

1           The likelihood of whether the debtors are insolvent.

2           The timing of the motion relative to the status of

3    the Chapter 11 case.

4           And other factors relevant to the issue of adequate

5    representation, including:

6           The role of the board and management acting on

7    behalf of shareholders.

8           The role of other estate-compensated parties,

9    including the Official Creditors' Committee, and whether they

10   can be said in large measure to be acting on behalf of

11   shareholders, at least insofar as maximizing the value of the

12   estate.

13          And according to some courts, the sophistication of

14   the shareholders, particularly those who have made the

15   motion, and their ability to retain counsel and other

16   advisors.

17          And according to some courts, the right of such

18   parties, if they do make a substantial contribution in the

19   case, to be compensated under Section 503(b) of the

20   Bankruptcy Code.

21          Before discussing those factors in more detail,

22   however, and particularly focusing upon the factor dealing

23   with the debtors' financial condition, which has occupied a

24   great deal of the hearing in front of me, I believe it's

25   relevant and significant also to quote the legislative

Court Decision                                                    162

 1  history of Section 1102(a)(2), because, given the lack of a

 2  statutory definition of "adequacy of representation," I

 3  believe congressional intent is relevant.

 4          The relevant legislative history on the section is

 5  not only quoted, but astutely critiqued in Johns Manville at

 6  68 B.R. 155 at 160.  As noted in that case, one of the

 7  purposes of the legislation was, quote:

 8              "-- to counteract the natural tendency of a debtor

 9              in distress to pacify large creditors with whom the

10              debtor would expect to do business at the expense of

11              small and scattered public investors."

12          That's from S. Rep. No. 989, 95th Congress, Second

13  Session at 10 (1978).

14          The Congressional Report went on to state:

15              "The committee believes that it should be emphasized

16              that investor protection is most critical when the

17              company in which the public invested is in financial

18              difficulties and is forced to seek relief under the

19              bankruptcy laws.  A fair and equitable

20              reorganization as provided in the bill is literally

21              the last clear chance to conserve for them values

22              that corporate financial stress or insolvency have

23              placed in jeopardy.  As public investors are likely

24              to be junior or subordinated creditors or debt-

25              holders, it is essential for them to have

**SASMF EXHIBIT 24**
**74 of 99**

Court Decision                                          163

1        legislative assurance that their interests will be

2        protected.  Such assurance should not be left to a

3        plan negotiated by a debtor in distress and senior

4        or institutional debtors who will have their own

5        best interests to look after." Id.

6        The Court in Manville noted, however, that because

7   Congress made the appointment discretionary in the Bankruptcy

8   Court, finding that the Court "may" appoint a committee if

9   necessary to assure adequate representation, it obviously did

10  not take this principle beyond the meaning of the statute.

11       I believe there has been a development in the case

12  law since the Congressional Report was issued, and, frankly,

13  since the Becker Industries case, which was one of the first

14  cases to deal with the appointment of a committee under

15  1102(a)(2), although starting, frankly, with an earlier case,

16  Judge Beatty's case in Emons Industries.

17       The Courts have recognized that even where a Chapter

18  11 case involves a substantial number of public shareholders

19  and is large and complex, the Court should not appoint an

20  equity committee if the debtor appears to be clearly

21  insolvent.  That is because, in the words of Judge Beatty in

22  Emons, which appears at 50 B.R. 692 (Bankruptcy SDNY 1985):

23  to do so would, in effect, give the equity committee and the

24  shareholders a gift.  And that is because the cost of the

25  committee is borne by the estate.

**SASMF EXHIBIT 24**
**75 of 99**

Court Decision                                                    164

1        And if it appears, in the words of Emons, that

2   the debtor is hopelessly insolvent, that cost should not be

3   borne.

4        Courts, I believe, because of their experience of

5   cases where equity committees were formed, where equity

6   committees were inordinately litigious and active in such

7   cases and ultimately obtained for their constituents what

8   might charitably be described as a gift, that is, an

9   inducement to go away through a plan, have come to emphasize

10  the point.  It's discussed in some detail and with some

11  candor in the Wang Laboratories decision by Judge Hillman at

12  149 B.R. 1 (Bankruptcy, District of Massachusetts 1992), in

13  which Judge Hillman recognized the need not to legitimize

14  what he called the, quote, "blackmail factor" inherent in the

15  presence of an equity committee where, in fact, it appears

16  that the debtor is hopelessly insolvent.

17       The Bankruptcy Code gives parties in interest

18  considerable access to the Court and considerable issues to

19  raise, if they choose, in front of the Court, which obviously

20  has the effect potentially of delaying the prosecution of a

21  Chapter 11 case and causing other parties to incur

22  substantial costs.  The benefit to a litigant of controlling

23  an equity committee, or any other official committee, is

24  that, subject of course to Court review, the cost of such

25  litigation is borne by the estate, which raises the stakes

**SASMF EXHIBIT 24**

**76 of 99**

Court Decision                                                    165

1   and makes it tempting to implement the "blackmail factor"

2   strategy.

3        I believe these are legitimate concerns in this area

4   and they have been recognized by numerous courts, and

5   specifically, in what I believe today to be the leading

6   decision in this area, they were recognized by Judge Lifland

7   in In Re:  Williams Communications Group, Inc., 281 B.R. 216

8   (Bankruptcy SDNY 2002), in which he repeated Judge Beatty's

9   concern that an equity committee where the debtor appears to

10  be hopelessly insolvent should not be warranted because, this

11  is a quote:

12       "-- because neither the debtor nor the creditor

13            should have to bear the expense of negotiating over

14            the terms of what is in essence a gift."

15       Judge Lifland used in that quote Judge Beatty's

16  phrase, "appears to be hopelessly insolvent."  He also used

17  it at Page 222 -- I'm sorry, at 221 of his opinion.

18       Interestingly, in his conclusion, however, he

19  provides for a somewhat different test than "hopelessly

20  insolvent."  He states:

21       "The appointment of official equity committees

22            should be the rare exception.  Such committees

23            should not be appointed unless equityholders

24            establish that (i) there is a substantial likelihood

25            that they will receive a meaningful distribution in

**SASMF EXHIBIT 24**
**77 of 99**

Court Decision                                                    166

1              the case under a strict application of the absolute

2              priority rule, and (ii) they are unable to represent

3              their interests in the bankruptcy case without an

4              official committee."  Id. at 223.

5         That is, as to the first prong of his test, it

6    requires more of the movant for an official equity committee

7    to establish than that there are signs of hope of solvency,

8    at least in the general run of such applications.

9         That formulation has since been picked up by another

10   court.  Judge Case, whom I certainly respect as a very astute

11   scholar of bankruptcy law, applied the same test in In Re:

12   Northwestern Corporation, 2004 Westlaw 1077913 (Bankruptcy,

13   District of Delaware, May 13, 2004).

14        Now I say that without necessarily accepting it as

15   an ironclad test myself because I believe that all of the

16   courts that look at these issues, including Judge Lifland and

17   Judge Case, would say first and foremost that the various

18   factors enunciated by the Courts are to be applied on a case-

19   by-case basis, in light of the statute and the congressional

20   policy.  And that's what I have done in my balancing analysis

21   of all of the factors; that is, I have not imposed upon the

22   movant here the burden of showing "a substantial likelihood

23   that it will receive a meaningful distribution in the case."

24        I do that because this motion is filed early in the

25   case, as opposed to at the time a plan is to be negotiated

**SASMF EXHIBIT 24**
**78 of 99**

Court Decision                                                    167

1  and/or litigated at confirmation.  And I believe that it is,

2  as a result, important for me to give the benefit of the

3  doubt to the movants here.

4          As the debtors have acknowledged candidly, it is too

5  early to formulate a business plan.  It is, consequently, too

6  early to formulate a going concern valuation with any

7  credibility; and, finally, it is too early to negotiate a

8  chapter 11 plan.  Consequently, all of the analysis of

9  solvency or insolvency here has around it a substantial

10 amount of speculation and doubt.  And I believe it would be

11 unfair to impose upon a movant in that context the burden of

12 doing a full-scale going-concern valuation to show a

13 "substantial likelihood of a meaningful distribution."

14         Moreover, I believe that such a full-blown valuation

15 at this time is not what is called for in connection with a

16 motion for the appointment of an equity committee.  As Judge

17 Lifland made quite clear in Williams, this is a summary

18 proceeding.  The valuation that the Court performs in

19 connection with the proceeding is not binding in any respect

20 on any party with respect to any future valuation of the

21 debtor or its assets, including, most importantly of course,

22 a valuation for chapter 11 plan confirmation purposes.

23         There's an obvious reason for that.  It's tied into

24 both the strengths of Congressional policy in permitting

25 equity committees to be appointed under the proper

**SASMF EXHIBIT 24**

**79 of 99**

Court Decision                                                168

1   circumstances as well as the potential for abuse of that

2   right; that is, on the one hand, it's unfair to impose the

3   burden of a full-scale valuation on public shareholders in

4   all circumstances, although the burden may be increased in

5   certain circumstances.  It is also unfair to the debtor and

6   the other parties whose money is very clearly at risk in the

7   bankruptcy case, namely the creditors, and in this case the

8   workers, of, in essence, causing the motion for the

9   appointment of an equity committee to take over the entire

10  case so that under the rubric of "valuation" the movant for an

11  equity committee can use all of the cost and delay leverage

12  that an equity committee might have even before the equity

13  committee is appointed, to engage the parties in litigation

14  on the merits of the key issues in the case.

15          That would be an absurd result.  I believe, frankly,

16  that's why I was so angry at Appaloosa's attempt repeatedly

17  to turn this matter into such a proceeding and why the case

18  law is crystal-clear that that is not what the Court is to

19  consider.

20          Now let me -- before that, let me note that although

21  Judge Lifland makes that crystal-clear in his opinion, he's

22  not the only judge to have done so.  In fact, Judge Case in

23  Northwestern didn't have an evidentiary hearing at all.  He

24  did not believe it was appropriate.  The Court in Leap

25  Wireless, 295 B.R. 135 (Bankr. S.D. Cal. 2003) was frustrated

**SASMF EXHIBIT 24**
**80 of 99**

1    as to the lack of substance behind the debtors' schedules,

2    but, again, only treated the matter as a summary proceeding

3    and took whatever evidence she had and weighed that into her

4    analysis with respect to whether a committee should be

5    appointed.

6           So I believe, both logically and under the case law,

7    there is no basis to expand the inquiry that I need to

8    undertake here to force parties to conduct full-blown

9    valuations on either side of the solvency issue.

10          Now, to apply the various factors.  As I noted

11   before, this is a large public company.  There's over 500

12   million of issued and outstanding common shares and over

13   300,000 public shareholders.  This is obviously also a large

14   and complex bankruptcy case.  The docket is already

15   substantial, and it is clear to me that far more than is

16   reflected in the docket is being done by the debtor and other

17   parties behind the scenes in respect to resolving the key

18   issues in this case.

19          Those issues are complex, both in terms of the

20   negotiating and human dynamics, as well as the qualitative

21   and quantitative analysis in regard to the underlying

22   documentation, the parties' rights under the Bankruptcy Code

23   and other law, including labor law and ERISA; and they

24   ultimately involve numerous important judgment calls that in

25   the first instance the debtor must make in consultation with

1   key constituencies in the case, and that ultimately I must

2   make when the debtor goes to seek approval of what it has

3   negotiated.  So those factors clearly call for the

4   appointment of an equity committee.

5           It is also argued that the debtors' management and

6   board is not actually representing the interests of the

7   shareholders as well as those of all of the other

8   constituencies for which they are fiduciaries; and, to some

9   extent, it is argued that they cannot represent those

10  interests.

11          As to the latter point, to the extent it's made, I

12  do not accept that analysis.  Clearly, the board of a public

13  company and its management owes a duty in a bankruptcy case

14  not only to the creditors, assuming that the debtor is

15  insolvent, but also to the shareholders.  And there is no

16  built-in bias there against shareholders.  As noted by Judge

17  Robinson in Edison Brothers Stores, 1996 Westlaw 534, 853

18  (District Court of Delaware, 1996), a movant needs to show

19  more than simply speculation as to such a conflict.

20          It's additionally argued that the very fact of the

21  complexity of this case and the debtors' natural desire to

22  resolve the case may lead the debtor to give short shrift to

23  shareholders' views.  That, I believe, has some merit to it;

24  and, frankly, the argument is, I believe, consistent with the

25  legislative history that I quoted earlier.

SASMF EXHIBIT 24
82 of 99

Court Decision                                                    171

1      That's particularly the case here where there truly

2   are extremely difficult negotiations that the debtors must go

3   through.  And I believe that it is important for the debtors

4   to be fortified in those negotiations by the views of key

5   constituencies.  I believe that has occurred with regard to

6   the Creditors' Committee, as is reflected, I believe, by the

7   constructive relationship between the Creditors' Committee

8   and the debtors that I've viewed in this case.  I say

9   "constructive," rather than "hand-in-glove" because it is very

10  clear to me that the Creditors' Committee is nobody's patsy

11  by any means and makes its views known to the debtor very

12  clearly and forcefully, even if those views are unwelcome.

13      It's not particularly clear to me that that same

14  voice has been expressed by the shareholders.  Partly, that

15  is the fault of the shareholders, at least the sophisticated

16  ones.  For example, I am shocked that Appaloosa made this

17  motion and sent the threatening letter to the board that it

18  sent asserting the allegations that it made without once

19  communicating with the debtor.  And I'll return to that

20  later.

21      But Appaloosa, as Mr. Lauria stated, should not

22  really be the focus of a motion to appoint an official equity

23  committee, although Appaloosa's problems may be the focus of

24  who the U.S. Trustee appoints to a committee.

25      Now Appaloosa also alleges that there are actual

**SASMF EXHIBIT 24**

**83 of 99**

Court Decision                                                    172

1    conflicts over and above the debtor's tendency in a very

2    large and difficult case not to reach out to a constituency

3    that has not reached out to it.  Again, I have a hard time

4    seeing that.  I certainly do not see a level of actual

5    conflict at the level alleged by Appaloosa in what I again

6    believe was irresponsibly loose language.

7              There are really two bases for Appaloosa's

8    allegation.

9              The first is that because at the start of these

10   cases the debtors proposed what I feel free in calling a

11   generous KECP package that included an allocation of post-

12   reorganization equity to post-reorganization management,the

13   debtors' management--and to the extent the board approved the

14   KECP, the board--believes that management's interests are

15   different than shareholder interests.  I note, however, and

16   this, frankly, was obvious to Appaloosa, or at least should

17   have been, that that motion has been repeatedly adjourned and

18   tabled pending further negotiations with the creditors

19   committee, which as I said is nobody's patsy, and secondly,

20   is subject ultimately to my approval.

21             I also note that, traditionally, provisions for

22   allocation of post-reorganization equity for management are

23   dealt with in a plan that is voted upon by those entitled to

24   vote, and, generally, that is done because those entitled to

25   vote then see how they're being diluted.  Generally,

Court Decision                                                        173

1   notwithstanding some cases where shareholders recover

2   something in respect of their old equity, the major issuance

3   of post-reorganization equity in chapter 11 cases goes to the

4   creditors, and they are the ones who are usually most diluted

5   by such management incentive plans in respect of post-

6   reorganization equity.  In other words, I believe Appaloosa's

7   argument on this point is miscast and at best irrelevant and

8   I believe, again, almost willfully so.

9           Secondly, Appaloosa argues that the debtors' very

10  opposition to this motion shows that the debtors' management

11  and board have an actual conflict in representing the

12  interests of the shareholders, primarily because the debtors

13  have stated that for purposes of this motion, at this time,

14  they are clearly or hopelessly insolvent.  The debtors'

15  objection to the motion, to the contrary, is clearly in good

16  faith.  As Mr. Sheehan and Mr. Resnick testifed, the

17  debtors' goal is to maximize value for all constituencies.  I

18  might understand why an unsophisticated shareholder who did

19  not understand the limited issues and inquiries relevant to a

20  motion under section 1102(a)(2) might make the argument, but,

21  knowing Appaloosa's sophistication, I find this "actual

22  conflict" argument to be rhetoric.

23          As to the timing factor, because of the very serious

24  issues that the debtors are dealing with in these cases,

25  going to the heart of their business, this is to me obviously

SASMF EXHIBIT 24
85 of 99

```
 1   not a simple balance sheet restructuring where the capital
 2   structure simply needs to be adjusted because there's too
 3   much funded debt on the books.
 4          There are serious -- to use the debtors' phrase
 5   "transformational issues" that have to be resolved here.
 6   Because of that, I believe that this is the appropriate time
 7   to move for an equity committee, and not to wait until later
 8   in the day when a plan is actually being negotiated.
 9          I also believe as a corollary to that, the function
10   of the equity committee and the makeup of its professional
11   advisors should be reflected by this timing.  As I'll say
12   later, again, I think this leads to the conclusion that
13   although it's not before me, except in my need to weigh the
14   cost of an equity committee's appointment, that it's unlikely
15   that I would approve the retention of investment bankers and
16   accountants or even actuaries at this time for an equity
17   committee, since those functions are not really the functions
18   that need to be performed at this time by an equity
19   committee.
20          So that in contrast, while in the Loral case I
21   believe that it was incumbent to have an equity committee, if
22   at all, towards the end of the case, here, I believe if it is
23   incumbent on there being an equity committee, this is the
24   time to have one formed.
25          It is even conceivable to me that if I did form an
```

**SASMF EXHIBIT 24**
**86 of 99**

Court Decision                                                    175

1  equity committee now and it turned out that ultimately I

2  approved interim transformational solutions --

3  transformational solutions to the labor and related pension

4  and GM problems that the debtors face--it might be

5  appropriate to disband the equity committee because, in light

6  of those solutions, it might appear clearly at that time that

7  the debtor was hopelessly insolvent or at least that it was

8  likely that there would be no distribution to shareholders.

9         But because of the importance of those pending

10  issues, one could at least see a rationale for having an

11  equity committee with counsel in the near future to deal at

12  least with those transformational issues on behalf of the

13  shareholders.

14         Now, as far as whether the debtor is insolvent or

15  hopelessly insolvent or there is a likelihood of a meaningful

16  distribution to shareholders, I am at this time on this

17  record frankly skeptical that there will be a meaningful

18  distribution, but I'm not prepared to rule it out.  I say

19  that for a number of reasons.

20         First of all, it's undisputed that on a balance-

21  sheet basis, and it is correct that the movants' experts did

22  not disagree that on a balance sheet basis, the debtors'

23  operating -- most recent operating numbers comply with GAAP,

24  there is roughly a 6.3-billion-dollar hole, or insolvency.

25         The question, obviously, is how does one fill that

SASMF EXHIBIT 24
87 of 99

1    hole or bridge that gap?

2         Although Appaloosa's experts made some effort to do

3    it on the asset side, my review of their analysis is that

4    they have not in any meaningful respect convinced me on the

5    asset side of the balance sheet or in their going-concern

6    value, their enterprise value before deductions, that they

7    have -- they have established a credible case to do so.

8         When you really boil it down, giving the benefit of

9    the doubt to why and how the admitted one-billion-two-dollar

10   -- two-hundred-million-dollar error was corrected by Eureka,

11   what Eureka did was essentially look at the debtors' 2005

12   actual performance and annualize the debtors' actual

13   performance for the first 115 days of 2006 for an EBITDA

14   figure that they then multiplied by two different multiples.

15        I believe Mr. Sheehan's testimony as to why,

16   particularly in respect of the annualization of the first

17   quarter of 2006, Eureka's process was materially if not

18   perhaps fatally flawed, in respect of the Eureka expert's

19   analysis of why the debtors did better in the first quarter

20   of 2006 and what the debtors' properly projected earnings

21   should be.

22        Clearly, to me, Mr. Sheehan's explanation of the

23   debtors' analysis of their projected business with GM and the

24   reason for the potential front-loading of income in 2006 was

25   credible and accounted for the difference between the

SASMF EXHIBIT 24
88 of 99

1  bottoms-up projections that the debtors did and the

2  effectively back-of-the-envelope calculation that Eureka did

3  in respect of EBITDA, and I say "back of the envelope"

4  because, frankly, given the billion-two error on its March

5  10th report, that's all Eureka was really left with: applying

6  a multiple to 2005 and the first quarter actual numbers of

7  2006 without proper analysis of why those figures can be

8  relied upon as the basis for projected EBITDA.

9          I do recognize, however, that Mr. Sheehan

10 acknowledged that it is possible that the debtor's balance-

11 sheet numbers on the asset side might be higher.  It's my

12 experience, and I think most people's experience who've dealt

13 with Chapter 11 debtors for a lengthy period, that that's

14 hardly ever the case.  Almost invariably, the balance sheet

15 overstates the assets, but that's Mr. Sheehan's belief, and

16 he has clearly been through an intensive analysis of the

17 business on a bottoms-up basis and I accept his statement.

18         Now, on the balance sheet liability side, which is

19 most -- where most of the dispute arises, I've considered the

20 testimony of Messrs. Reese and Williams.  And, frankly, I

21 believe that it's very hard on the record to find any exact

22 number as far as what would be the appropriate net savings in

23 respect of OPEB liabilities after the debtors resolve their

24 transformational issues.

25         Clearly, Appaloosa's argument that the OPEB

**SASMF EXHIBIT 24**
**89 of 99**

Court Decision                                    178

1  liabilities go away because the collective bargaining

2  agreements go away in 2007 is -- well, it's almost laughable.

3  The unions aren't going away, and the employees aren't going

4  away without being paid for giving up those rights or having

5  them reinstated in some form.

6          So all the parties recognize that there is a price

7  to resolve those liabilities, including Appaloosa.  The issue

8  is how much of a price has to be paid and how much of a

9  savings can the debtors generate.  I find it hard to believe

10 that despite all of their efforts and all of an equity

11 committee's efforts, there will be a material recovery for

12 shareholders in light of those OPEB negotiations, but the

13 company doesn't preclude it as a possibility.  There are

14 scenarios in which it could occur.  That's agreed to by both

15 sides in this proceeding.

16         And, therefore, while Eureka's March 10th report, as

17 corrected for the billion-two error, still shows on even the

18 most optimistic basis a two-hundred-and-thirty-four-million-

19 dollar insolvency hole, given the huge amounts at stake here

20 in respect of the labor negotiations--and we're talking about

21 potential savings of billions of dollars, I know it's hard to

22 believe it, but $234 million may not be that big of a gap, at

23 least on today's record.

24         I also looked, of course, as Judge Lifland did and

25 Judge Hillman did and other courts have done in connection

SASMF EXHIBIT 24
90 of 99

Court Decision                                                        179

 1   with motions under 1102(a)(2), at the trading prices of the

 2   debtors' securities when evaluating the debtors' solvency.

 3           It's common knowledge that the market in distressed

 4   debt and to some extent distressed stock, but more -- more

 5   the case of distressed debt, is large, indeed, huge, and

 6   active, particularly with respect to public companies such as

 7   Delphi.  That is reflected among other things by the numerous

 8   Wall Street analysts' reports covering the debt introduced

 9   here.

10           There's uncontroverted evidence that Delphi's public

11   debt has consistently traded since the petition date at or

12   below sixty cents on the dollar.  The courts at times have,

13   although not accepting as controlling the trading prices of

14   debt securities, consistently looked at trading prices in the

15   debtors' securities as a indication in this type of summary

16   proceeding of value.

17           Courts obviously know, at least this Court knows,

18   that people engage in a market because they're making various

19   bets on the value of securities.  Some are betting that it's

20   a good idea to sell, and some are betting it's a good idea to

21   buy.  Generally, it's an active market; and, generally,

22   active markets are a good indication of value because there

23   are both buyers and sellers at reasonably arm's length

24   bargaining positions.

25           However, of course, those markets are not guarantees

**SASMF EXHIBIT 24**
**91 of 99**

Court Decision                                        180

```
1   of value.  That's why some analysts get fired and some get
2   promoted.  Market security trading price indicators are most
3   telling where they're quite low, where they're in my
4   experience below or well below fifty cents on the dollar,
5   particularly in respect of cases that are in all likelihood
6   going to be resolved one way or another in a fairly short
7   term, and, in the life of a chapter 11 case of a large
8   company, fairly short term is around a year.
9         It's clear to me and it's been clear from the start
10  of these cases that although the debtors are pushing these
11  cases, appropriately so, as fast as they can, this is a
12  longer term process.  They project emergence from bankruptcy
13  in 2007, although they are doing everything they can to
14  emerge sooner than that.
15        Given that, I am not particularly moved either way
16  by the trading ratios or prices.  Mr. Lauria is correct that
17  anyone buying distressed debt is looking for a large return
18  to make up for the risk, particularly where the debt is
19  unsecured, and so it's conceivable that a sixty-percent-on-
20  the-dollar level, while obviously not suggesting solvency,
21  may indicate at least a hope of solvency.
22        This is, for example, different than the trading
23  levels in Loral, which were considerably lower, or in
24  Williams, which were at 15% to 6% of face value.
25        So, all things considered, in respect of the
```

**SASMF EXHIBIT 24**
**92 of 99**

Court Decision                                                    181

1   solvency analysis, at this point in the case, I cannot find

2   that appointing an equity committee would be a gift.  On the

3   other hand, I am very mindful of the cost to these estates of

4   an equity committee.

5        Some cost clearly is legitimate.  The whole reason

6   you have an equity committee is that the estate bears the

7   cost.  On the other hand, the way that this litigation has

8   been conducted, I mean this litigation in front of me right

9   now, by Appaloosa, gives me very serious pause as to whether

10  the cost ultimately will be appropriate in this case.

11       Now, Appaloosa says I can regulate that by looking

12  at fee applications and the like, but, to some extent, once

13  an equity committee is appointed the cat is out of the bag,

14  and so I have thought very long and hard about whether the

15  cost factor here should lead me not to appoint a committee.

16       I can say this, that I will look very carefully at

17  fee applications of any counsel that is chosen to represent a

18  committee.  I also will look very carefully at whether the

19  continued incurrence of fees is appropriate at various stages

20  in the case where the picture on valuation becomes clearer.

21       But, ultimately, standing alone, as I do believe

22  that I can perhaps with the help of the United States Trustee

23  control costs, the costs alone are not in my mind

24  dispositive, although they are a major factor here calling --

25  arguing that I should not appoint a committee.

**SASMF EXHIBIT 24**
**93 of 99**

Court Decision                                                    182

1      The last point which is raised by some courts, it's

2  specifically raised by Judge Case in the <u>Northwestern</u>

3  opinion, is that at least Appaloosa went into this bankruptcy

4  case with its eyes wide open.  Judge Case thought that was a

5  clear factor calling for denial of the motion.  And of course

6  the ability of certain shareholders to fund their own

7  professionals also is clearly a factor arguing against a

8  committee.  See <u>Williams</u>, 281 B.R. at 223.

9      If this were a relatively small pool of

10  shareholders, I would -- I would obviously do the same.  I

11  don't think the fact that Brandes has joined in the motion

12  particularly helps Appaloosa's cause, because Brandes is

13  obviously very well-heeled, very sophisticated and is well

14  represented by another large national firm with a bankruptcy

15  practice.

16      However, I go back to the first point I made.  There

17  are over 300,000 shareholders here.  Given the rapid change

18  in their fortunes from June of 2005 to today, it's fair for

19  me, I think, to assume that some of them may be in the

20  investor equivalent of a state of shock or disbelief and that

21  that's why they're not showing up here today.

22      It seems to me, again, that given the important

23  transformative events that will be taking place in this

24  company through this bankruptcy case over the next few

25  months, it's important to give those people representation,

**SASMF EXHIBIT 24**
**94 of 99**

1  and if a committee is formed that adequately represents them,

2  then I think that they're entitled to it within the

3  parameters that I've already described.

4          Now, in discussing or mentioning the abrupt changes

5  that have taken place in the fortunes of this company, I do

6  not want to suggest, as Appaloosa, I think, has, that the

7  company has done something over the last several months

8  between June of 2005 and today or even between June of 2005

9  and October when it filed for bankruptcy that is somehow

10  nefarious or improper in respect of its business or its

11  shareholders.

12          I think it's irresponsible to suggest that.

13  Clearly, this company has extremely difficult problems to

14  resolve.  To suggest that it should have spent all of its

15  cash on hand before filing to resolve those problems, to

16  suggest that it should continue with the steady-state

17  projections, which even Appaloosa recognized would lead to

18  the destruction of the debtors' business is absurd and was

19  truly a waste of this Court's time, and, frankly, for those

20  who are not particularly sophisticated and read such

21  allegations in the press, again, Appaloosa's argument or

22  insinuation in this regard was a truly irresponsible attack

23  on the company.

24          So I will order the appointment of an official

25  equity committee.  I'm going to be very clear as to the -- my

**SASMF EXHIBIT 24**
**95 of 99**

Court Decision                                          184

1   expectation as to at least the -- my initial reaction to a

2   request by that committee for retention of professionals.

3         I do not believe that the proper functioning of a

4   committee of equityholders at this time calls for the

5   appointment and retention of investment bankers, accountants

6   or actuaries, and a premise -- a fundamental premise of my

7   ruling is that I would not appoint such parties,

8   professionals at this time.

9         What an equity committee needs to do is to

10  understand through its own members' expertise, and I trust

11  that there will be sophisticated parties like Brandes on the

12  committee, and through the assistance of its counsel, the

13  pressing issues of this case in respect of labor, pension,

14  other benefits and GM.

15        It needs to be informed, it needs to give the debtor

16  its views so that they can be taken into account as the

17  debtor proceeds.

18        To the extent that it feels it needs to do due

19  diligence on actuarial assumptions, I believe an appropriate

20  arrangement can be worked out with regard to using the

21  creditors committee's actuaries.

22        I do not expect an equity committee or its

23  professionals to try to inject themselves into the extremely

24  sensitive negotiations that are ongoing between the debtors,

25  the unions, GM and other parties in the labor transformation

1   issue process.

2          They should be able, however, again, to communicate

3   their views to the debtor and be able to be reasonably

4   informed as to the process so that they can make a

5   determination as to whether to oppose or support it whenever

6   an agreement is brought to the Court.

7          It's very clear that one function of a committee may

8   require the committee at times to take an adversarial role in

9   a case.  However, I believe that consistent with all the case

10  law that I've just cited, it is not proper for an equity

11  committee to view its job as one to create leverage by being

12  a thorn in everyone's side.

13         If the equity committee is not engaged in a two-way

14  dialogue with the debtor, I will believe, and I will act on a

15  motion that contends that, the committee is dysfunctional and

16  disband it.

17         I will also look very closely, and I know that the

18  United States Trustee will look very closely, at any

19  suggestion that the equity committee is taking action in

20  court or otherwise not to maximize recoveries for all

21  committee constituents, but instead to artificially pump up

22  the value of the current stock on a trading basis.

23         I am very concerned about the potential that that

24  has already happened in this case--not by an official

25  committee and obviously not by an equity committee, because

**SASMF EXHIBIT 24**
**97 of 99**

Court Decision                                                        186

1    one has not been appointed, but by parties involved in this

2    litigation, and I will look at the facts closely, and I've

3    already looked closely at the facts of the apparent release

4    of confidential information.

5           And, having looked at those facts, I continue to

6    have serious questions about that apparent release, and if,

7    in fact, Appaloosa applies to be a member of this committee,

8    I direct the U.S. Trustee to investigate those facts.

9           In short, the equity committee needs to be

10   responsible in looking after the interests of the equity-

11   holders as a group, and I trust it will do so.

12          So, Mr. Lauria, you can submit an order to that

13   effect.

14          COUNSEL:  Thank you, Your Honor.  Thank you, Your

15   Honor.

16          THE COURT:  Thank you.

17      (Proceedings concluded at 7:17 p.m.)

18                       CERTIFICATION

19          We certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter to the best of our

22   knowledge and ability, except where, as indicated, the Court

23   has modified its bench ruling.

24   _____        March 23, 2006
     Coleen Rand
25   Certified Court Transcriptionist/Agency Director
     Rand Transcript Service, Inc.

SASMF EXHIBIT 24
98 of 99

Court Decision                                                              187

```
1   _____        March 23, 2006
    Jennifer Linnartz
2   Certified Court Transcriptionist
    For Rand Transcript Service, Inc.
3
                                             March 23, 2006
    _____
4   Cathryn Lynch
    Certified Court Transcriptionist
5   For Rand Transcript Service, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```