other Consenting Creditor), other than advisors to the Company, the principal amount or percentage of Convertible Notes held by any Consenting Creditor, in each case, without such Consenting Creditor's prior written consent; *provided that* (a) if such disclosure is required by Law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes held by all the Consenting Creditors collectively and (c) any Party may disclose information requested by a regulatory or licensing authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person. Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditors (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

## 10. Amendments and Waivers.

(a) Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented or the performance of any obligation thereunder waived except in a writing signed by the Company and the Requisite Consenting Creditors.

(b) Notwithstanding Section 10(a) hereof:

(i) any waiver, modification, amendment or supplement to this Section 10 shall require the written consent of all of the Parties;

(ii) any modification, amendment or change to the definition of "Requisite Consenting Creditors" shall require the written consent of each Consenting Creditor that is a holder of Convertible Notes;

(iii) any change, modification or amendment to this Agreement or the Plan that materially and adversely affects the treatment of the April Convertible Notes Claims shall require the written consent of Consenting Creditors holding at least 50.01% of the accreted principal amount of the Convertible Notes under the April Convertible Note Purchase Agreement held by the Consenting Creditors;

(iv) any change, modification or amendment to this Agreement or the Plan that materially and adversely affects the treatment of the August Convertible Notes Claims shall require the written consent of Consenting Creditors holding at least 50.01% of the outstanding principal amount of the Convertible Notes under the August Convertible Note Purchase Agreement held by the Consenting Creditors; and

(v) any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic basis, to the manner in which any of the

other similarly situated Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and the recoveries contemplated by the Plan), or that requires any Consenting Creditor to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Consenting Creditor.

11.     **Effectiveness**.  This Agreement shall become effective and binding upon each Party upon the Support Effective Date.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, the applicable exhibit, annex or schedule shall govern.

12.     **Transaction Expenses**.  Whether or not the transactions contemplated by this Agreement are consummated and, in each case, the Company hereby agrees, on a joint and several basis, to pay in cash the Restructuring Expenses as follows to the extent permissible under the DIP Orders or applicable law:  (i) all accrued and unpaid reasonable and documented Restructuring Expenses shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly (but in any event within five (5) Business Days) against receipt of invoices, (ii) upon termination of this Agreement, all accrued and unpaid reasonable and documented Restructuring Expenses incurred up to (and including) the applicable date of termination shall be paid in full in cash promptly (but in any event within five (5) Business Days) against receipt of invoices, and (iii) on the Effective Date, all accrued and unpaid reasonable and documented Restructuring Expenses incurred up to (and including) the Effective Date shall be paid in full in cash on the Effective Date against receipt of invoices, in each case without any requirement for Bankruptcy Court review or further Bankruptcy Court order.

13.     **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)     Governing Law; Submission to Jurisdiction; Selection of Forum.  This agreement is to be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in the chosen state, without giving effect to its conflict of laws principles.  After the Petition Date, each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

(b)     **EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS**

**CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

14.  **Specific Performance/Remedies**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

15.  **Survival**.  Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in Sections 3(h), 4(c), 5, 6(d), 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 hereof (and any defined terms used in any such Sections solely to the extent used therein) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided* that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.  **Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.  **Successors and Assigns; Severability**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided that*, during the Support Period, nothing contained in this Section 17 shall be deemed to permit Transfers of the Convertible Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.  **Several, Not Joint, Obligations**.  Notwithstanding anything herein to the contrary, the duties, agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint; provided that the duties, agreements, representations and obligations of the Company shall be joint and several.

19.  **Relationship Among Parties**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall

be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. None of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company or any of the Company's other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated herein or in any exhibit hereto; and no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as a "group."

20.    **Prior Negotiations; Entire Agreement**. This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect solely with respect to any then-continuing obligations thereunder.

21.    **Reservation of Rights**.

(a)    Except as expressly provided in this Agreement or the Restructuring Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)    Without limiting clause (a) of this <u>Section 21</u> in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22.    **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

23.    **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(a)    If to the Company, to:

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, Texas 78704
Attention: Todd DuChene
Email: tduchene@corescientific.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile:  (212) 310-8007
Attention: Ray C. Schrock, P.C., Esq. and Ronit Berkovich, Esq.
Email: ray.schrock@weil.com and ronit.berkovich@weil.com

(b)    If to a Consenting Creditor or a transferee thereof, to the addresses, or e-mail addresses set forth below such Consenting Creditor's signature hereto (or as directed by any transferee thereof), as the case may be, with copies to (which shall not constitute notice):

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Kris Hansen; Sayan Bhattacharyya
Email:  krishansen@paulhastings.com; sayanbhattacharyya@paulhastings.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

24.    **Settlement Discussions**.  This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable Law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.

25.    **No Solicitation; Investor Status**.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes on the Plan.  The voters of the holders of claims against the Company will not be solicited until such holders who are entitled to vote have received the Plan, the Disclosure Statement,

and related Solicitation Materials, including the ballots. In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company, and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of the Plan or an offering of securities, each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is a Qualified Institutional Buyer (as defined in Rule 144A of the Securities Act of 1933 (the "**Securities Act**")), "institutional accredited investor" (within the meaning of Rule 501(a)(1), (2), (3), or (7) of the Securities Act) or Non-"U.S. Person" (as defined in Regulation S of the Securities Act), (ii) understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iii) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

[Signature Page Follows]

# Exhibit A

## Restructuring Term Sheet

Ad Hoc Equity Group Exhibit 3

31

SASMF EXHIBIT 25

107 of 979

## CORE SCIENTIFIC, INC. AND CERTAIN AFFILIATES

## RESTRUCTURING TERM SHEET

## DECEMBER [●], 2022

This restructuring term sheet (this "**Term Sheet**") presents the principal terms of a Restructuring (as defined in the RSA (as defined below)) of the existing capital structure of Core Scientific, Inc. ("**Core Scientific**") and certain of its direct and indirect subsidiaries, which Restructuring will be consummated pursuant to a chapter 11 plan containing terms set forth herein to be confirmed in the cases commenced in the United Bankruptcy Court for the Southern District of Texas under chapter 11 of title 11 of the United States Code. This is the Term Sheet referred to in, and attached as **Exhibit A** to, the Restructuring Support Agreement, dated as of December [●], 2022, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**RSA**").[1]

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

**THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO PROVIDE FINANCING OF THE TYPE DESCRIBED HEREIN OR OTHERWISE. ANY BINDING AGREEMENT AND/OR COMMITMENT TO EXTEND CREDIT ON THE TERMS AND CONDITIONS OUTLINED HEREIN SHALL BE SUBJECT TO, AND EXCLUSIVELY EVIDENCED BY, DEFINITIVE LEGAL DOCUMENTATION IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY AND THE REQUISITE CONSENTING CREDITORS (AS DEFINED IN THE RSA). IN ADDITION, THE TERMS AND CONDITIONS CONTAINED HEREIN ARE SUBJECT TO SATISFACTORY COMPLETION OF CREDIT AND UNDERWRITING APPROVAL AND SUCH OTHER TERMS AND CONDITIONS AS MAY BE**

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the RSA.

DETERMINED BY THE COMPANY AND THE REQUISITE CONSENTING CREDITORS IN THEIR SOLE DISCRETION.

2

SASMF EXHIBIT 25

109 of 979

| OVERVIEW | |
|---|---|
| **The Debtors:** | Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Mining LLC, Radar Relay, Inc., Starboard Capital LLC, Radar LLC, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisitions, LLC, American Property Acquisitions I, LLC, and American Property Acquisitions VII, LLC. |
| **Claims and Interests to Be Restructured:[2][3]** | **April Convertible Notes Claims**:  consisting of approximately $316.1 million in aggregate accreted principal amount of the senior secured convertible notes issued pursuant to the April Convertible Note Purchase Agreement, plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto (the "**April Convertible Notes Claims**"). |
| | **August Convertible Notes Claims**:  consisting of approximately $320.7 million in aggregate outstanding principal amount of the senior secured convertible notes issued pursuant to the August Convertible Note Purchase Agreement, plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto (the "**August Convertible Notes Claims**" and together with the April Convertible Notes Claims, the "**Prepetition Secured Convertible Notes Claims**"). |
| | **Miner Equipment Financing Claims**:  consisting of each of the Debtors' loans and/or finance leases incurred to finance the acquisition of and secured by certain of the Debtors' cryptocurrency mining equipment, in an aggregate outstanding principal amount of approximately $284 million, plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto (the "**Miner Equipment Financing Claims**"). |
| | **Non-Miner Financing Claims**:  consisting of each of the Debtors' loans and/or finance leases incurred to finance the acquisition of and secured by certain of the Debtors' property and equipment other than cryptocurrency mining equipment, in an aggregate outstanding principal amount of approximately |

---

[2] Treatment of construction claims to be discussed.
[3] Nothing in this term sheet, including the stipulated allowed amount of any claim, shall constitute or be construed as an admission of any fact or liability, a stipulation or a waiver, and each statement contained herein is made without prejudice solely for settlement purposes, with a full reservation as to any rights, remedies or defenses of the Parties in the event the RSA is terminated.

3

| | |
|---|---|
| | $30.9 million, plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto (the "**Non-Miner Financing Claims**").<br><br>**General Unsecured Claims**: consisting of any prepetition Claim against the Debtors that is not a Prepetition Secured Convertible Notes Claim, a Miner Equipment Financing Claim, an Other Secured Claim, an Intercompany Claim, a Subordinated Claim (as defined below) or a Claim entitled to priority under the Bankruptcy Code (the "**General Unsecured Claims**"). For the avoidance of doubt, deficiency Claims in respect of the Miner Equipment Financing Claims shall constitute General Unsecured Claims, but deficiency Claims (if any) in respect of Prepetition Secured Convertible Notes Claims shall not constitute General Unsecured Claims.<br><br>**Existing Core Scientific Interests**: consisting of all Interests in Core Scientific (collectively, the "**Existing Core Scientific Interests**").<br><br>**Subordinated Claims**: consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "**Subordinated Claims**"). |
| | **TRANSACTION SUMMARY** |
| **Overview of the Restructuring:** | A chapter 11 plan, which shall be materially consistent in all respects with this Term Sheet and the RSA and otherwise reasonably acceptable to the Company and the Requisite Consenting Creditors (including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the RSA, the "**Plan**"), will be filed and prosecuted with the support of the Consenting Creditors on the terms and conditions set forth in the RSA.<br><br>The Chapter 11 Cases will be funded by the DIP Facility (as defined below) and the Debtors' use of cash collateral, each on the terms and conditions set forth below.<br><br>As of the Effective Date, each holder of a DIP Claim, an April Convertible Notes Claim, an August Convertible Notes Claim, a Miner Equipment Financing Claim, a Non-Miner Financing Claim, an Other Secured Claim, a General Unsecured Claim, and/or an Existing Core Scientific Interest, shall, in each case, to |

4

| | the extent such Claim or Interest is Allowed, receive under the Plan the treatment described in this Term Sheet in full and final satisfaction, settlement, release, and discharge, and in exchange for such Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Requisite Consenting Creditors, and the holder of such Allowed Claim or Allowed Interest. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Effective Date pursuant to this Term Sheet may be taken either (a) on the Effective Date or (b) with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld, as soon as reasonably practicable thereafter. |
| **DIP Financing and Use of Cash Collateral:** | The Chapter 11 Cases will be financed by (i) the Debtors' use of cash collateral and (ii) a postpetition senior secured priming new money debtor-in-possession delayed-draw term loan facility (the "**DIP Facility**") backstopped by certain Consenting Creditors (or their affiliates, partners or investors) and made available to all holders of Prepetition Secured Convertible Notes Claims during the interim period. |
| | The DIP Facility will be in the initial aggregate principal amount of up to approximately $150 million, consisting of: (i) up to $75 million in new money, and (ii) subject to the entry of the Final DIP Order, a 1:1 roll-up of April Convertible Notes Claims and August Convertible Notes Claims held by the DIP Lender and/or the Convertible Noteholder in which such DIP Lender is an affiliate, partner or investors, (each, on a cashless dollar-for-dollar basis) in the aggregate amount of up to $75 million (the claims described in this clause (ii), the "**Rolled April Convertible Notes Claims**" or the "**Rolled August Convertible Notes Claims**", as applicable). The terms of the DIP Facility are set forth in further detail in the DIP Credit Agreement and the DIP Orders, which shall govern in the event of any conflict between such documents and this Term Sheet. |
| | The Ad Hoc Group of holders of Prepetition Secured Convertible Notes Claims shall consent to the use of cash collateral on the terms and conditions set forth in the DIP Credit Agreement (subject to entry of the DIP Orders), which shall be consistent with the terms of this Term Sheet, the RSA and the DIP Orders and otherwise reasonably acceptable to the Company and to the Requisite Consenting Creditors. Any DIP Order shall provide for the adequate protection of the Prepetition Secured Convertible |

5

SASMF EXHIBIT 25
112 of 979

| | Notes Claims, including in the form of adequate protection liens on all collateral under the DIP Credit Agreement, superpriority claims that are junior only to the DIP Facility and the Carve Out and the payment of the fees and expenses of the Ad Hoc Group (including the fees of the Ad Hoc Group Advisors); *provided* that the adequate protection liens for the equipment lenders shall be as set forth in the DIP Order. |
|---|---|
| **Definitive Documents:** | Any documents contemplated by this Term Sheet, that are not executed or remain the subject of negotiation or completion as of the RSA Effective Date shall be subject to the rights and obligations set forth in the RSA and this Term Sheet. Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |

|     |
|:---:|
| **EXIT FINANCING** |

| | |
|---|---|
| **Exit Term Loans:** | The Company shall use commercially reasonable efforts to obtain commitments prior to the Effective Date Milestone for a new exit term loan facility (a "**New Exit Term Loan Facility**") to be entered into on the Effective Date, which New Exit Term Loan Facility shall be (i) in an amount not to exceed the sum of (a) 112% of the outstanding principal amount of the DIP Facility on the Effective Date, and (b) interest, fees, and other amounts arising thereunder or payable pursuant thereto (and in any event an amount sufficient to repay the DIP Facility in full, in cash), and (ii) on terms and conditions otherwise reasonably acceptable to the Debtors and the Requisite Consenting Creditors. The proceeds of any New Exit Term Loan Facility shall be used solely to repay the DIP Claims in full as set forth below.

A summary of the material terms and conditions of any New Exit Term Loan Facility, to the extent then available, will be set forth in the Plan Supplement.

If the Company is unable to obtain commitments for a New Exit Term Loan Facility on the terms set forth herein prior to the Effective Date Milestone, the Debtors shall have the right to cause the DIP Facility to roll into an exit facility (the "**Rolled Exit Facility**" and the loans thereunder, the "**Rolled Exit Term Loans**") on the Effective Date and on terms and subject to conditions set forth on <u>Exhibit A</u> attached hereto and otherwise satisfactory to Debtors, the Requisite Consenting Creditors and the Required Lenders (as defined in the DIP Credit Agreement). If the Debtors cause the DIP Facility to roll into the Rolled Exit |

6

| | Facility, the Debtors shall also issue to the DIP Lenders their pro rata share of the DIP Warrants. |
|---|---|
| **Mortgage Exit Financing:** | The Debtors and the Ad Hoc Group shall confer in good faith during the Chapter 11 Cases regarding the construction and buildout of the Debtors' facility located in Denton, Texas (the "**Denton Facility**"). To the extent mutually agreed between the Company and the Requisite Consenting Creditors, the Company shall use commercially reasonable efforts to obtain commitments prior to the Effective Date Milestone, for a 10-year mortgage financing (the "**Mortgage Exit Financing**") to be entered into on the Effective Date, in an amount not to exceed $45 million in aggregate principal amount on terms and conditions, including with respect to security and lien priority, set forth herein and otherwise reasonably acceptable to the Debtors and the Requisite Consenting Creditors. The Mortgage Exit Financing will be secured solely by a first priority mortgage on the Denton Facility and shall not be guaranteed by any of the Reorganized Debtors. The Denton Facility shall secure such other indebtedness of the Reorganized Debtors as agreed between the Debtors and the Requisite Consenting Creditors. The proceeds of the Mortgage Exit Financing shall solely be used to fund the construction and expansion of the Denton Facility after the Effective Date.<br><br>The terms and conditions of the Mortgage Exit Financing will be set forth in the Plan Supplement and shall be subject to applicable consents. |
| <div align="center">**TREATMENT OF CLAIMS AND INTERESTS**</div> | |
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim or Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims:** | On the Effective Date, each holder of an Allowed DIP Claim (other than a Rolled April Convertible Notes Claim or a Rolled August Convertible Notes Claim) in full and final satisfaction of such Allowed DIP Claims will either (i) if the Debtors obtain a New Exit Term Loan Facility, receive payment in full in cash of its Allowed DIP Claim (including, for the avoidance of doubt the Termination Payment provided for under the DIP Credit |

| | Agreement) or (ii) if the Debtors do not obtain a New Exit Term Loan Facility, subject to the satisfaction (or waiver) of the conditions precedent to the Rolled Exit Facility, receive its pro rata share of (a) the Rolled Exit Term Loans and (b) the DIP Warrants.

On the Effective Date, except to the extent that a holder of a Rolled April Convertible Notes Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Rolled April Convertible Notes Claims each holder of an Allowed Rolled April Convertible Notes Claims shall receive its pro rata share of the Convertible Notes Equity Distribution and shall be entitled to make the Second Lien Takeback Election (as described below).

On the Effective Date, except to the extent that a holder of a Rolled August Convertible Notes Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Rolled August Convertible Notes Claims, each holder of an Allowed Rolled August Convertible Notes Claims shall receive its pro rata share of the Convertible Notes Equity Distribution. |
|---|---|
| **Class 1**<br><br>**Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld) or the Reorganized Debtors, (i) such holder will receive payment in full in cash, payable on the later of the Effective Date and the date that is ten (10) business days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired<br><br>**Unimpaired – Presumed to accept.** |
| **Class 2**<br><br>**Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors (with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld) or the Reorganized Debtors, (i) be paid in full in cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) business days after the date on which such Other Priority Claim becomes an Allowed Other Priority |

8

| | |
|---|---|
| | Claim, in each case, or as soon as reasonably practicable thereafter.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 3**<br><br>**April Convertible Notes Claims:** | The April Convertible Notes Claims shall be deemed Allowed in the amount of $316.1 million, plus accrued and unpaid interest through the Petition Date, less the amount of Rolled April Convertible Notes Claims. On the Effective Date, except to the extent that a holder of an April Convertible Notes Claim agrees to less favorable treatment, each holder of an Allowed April Convertible Notes Claim will receive, in full and final satisfaction of their Allowed April Convertible Notes Claims, its pro rata share of the Convertible Notes Equity Distribution (after taking into account any Second Lien Takeback Election).<br><br><u>Second Lien Takeback Election</u>: In its sole discretion, in lieu of its full pro rata share of the Convertible Notes Equity Distribution, each holder of an Allowed April Convertible Notes Claim or an Allowed Rolled April Convertible Notes Claim may elect to receive its pro rata share of up to $75 million of New Second Lien Notes (the "**Second Lien Takeback Election**").<br><br>The pro rata share of New Second Lien Notes distributed to holders of Allowed April Convertible Notes Claims and Allowed Rolled April Convertible Notes Claims making the Second Lien Takeback Election shall be the lesser of (x) the Allowed amount of its April Convertible Notes Claim or Allowed Rolled April Convertible Notes Claim, as applicable and (y) an amount of New Second Lien Notes based on the proportion of its Allowed April Convertible Notes Claim or Allowed Rolled April Convertible Notes Claim to the aggregate amount of Allowed Convertible Notes Claims and Allowed Rolled April Convertible Notes Claims of all holders making the Second Lien Takeback Election. Each Holder of April Convertible Notes Claims or Rolled April Convertible Notes Claims making the Second Lien Takeback Election shall have its Allowed April Convertible Notes Claim or Rolled April Convertible Notes Claim, as applicable. reduced on a dollar-for-dollar basis by the amount of New Second Lien Notes it receives for purposes of determining its pro rata share of the Convertible Notes Equity Distribution.<br><br>**Impaired – Entitled to vote.** |
| **Class 4** | The August Convertible Notes Claims shall be deemed Allowed in the amount of $320.7 million, plus accrued and unpaid interest through the Petition Date, less the amount of Rolled August |

SASMF EXHIBIT 25
116 of 979

| **August Convertible Notes Claims:** | Convertible Notes Claims. On the Effective Date, except to the extent that a holder of an August Convertible Notes Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed August Convertible Notes Claims, each holder of an Allowed August Convertible Notes Claim will receive, its pro rata share of the Convertible Notes Equity Distribution.<br><br>**Impaired – Entitled to vote.** |
|---|---|
| **Class 5 (and subclasses)**<br><br>**Miner Equipment Financing Claims:** | Each Miner Equipment Financing Claim shall be deemed to be an Allowed Secured Claim either (i) in an amount equal to the value of the collateral securing such Miner Equipment Financing Claim, as set forth on **<u>Exhibit E</u>** hereto, (ii) in an amount agreed upon between the Debtors and the holder of such Miner Equipment Financing Claim with the consent of the Requisite Consenting Lenders, or (iii) an amount determined by the Bankruptcy Court, *provided* that the aggregate of the amounts set forth in clauses (i) through (iii) hereof shall not exceed $90 million without the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld.<br><br>Except to the extent that a holder of a Miner Equipment Financing Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Miner Equipment Financing Claim, on the Effective Date, each holder of an Allowed Miner Equipment Financing Claims will receive, in full and final satisfaction of the secured amount of their Allowed Miner Equipment Financing Claim (as determined in accordance with the preceding paragraph), Miner Equipment Takeback Debt in a principal amount equal to such holder's Allowed Miner Equipment Financing Claim; *provided* that the aggregate principal amount of Miner Equipment Takeback Debt shall not exceed $90 million without the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld. The amount of any holder's Miner Equipment Financing Claim in excess of the secured amount of such Miner Equipment Financing Claim as determined in accordance with the preceding paragraph, shall be treated as a General Unsecured Claim.<br><br>The Miner Equipment Financing Claims shall be classified separately or as subclasses of Class 5.<br><br>**Impaired – Entitled to vote.** |
| **Class 6** | Except to the extent that a holder of a Non-Miner Financing Claim agrees to less favorable treatment, in full and final satisfaction of |

Ad Hoc Equity Group Exhibit 3
41

SASMF EXHIBIT 25
117 of 979

| Non-Miner Financing Claims | such Allowed Non-Miner Financing Claim, on the Effective Date, all Non-Miner Financing Claims shall be reinstated.<br><br>**Unimpaired – Presumed to Accept.** |
|---|---|
| **Class 7**<br><br>**General Unsecured Claims:** | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed General Unsecured Claim, on the Effective Date, each holder of an Allowed General Unsecured Claims will receive:<br><br>(i) <u>In the event that Class 7 votes to accept the Plan</u>: (a) its pro rata share of the GUC Equity Distribution; and (b) its pro rata share of the GUC Warrants; or<br><br>(ii) <u>In the event that Class 7 votes to reject the Plan</u>: no recovery.<br><br>**Impaired – Entitled to vote.** |
| **Class 8**<br><br>**Intercompany Claims:** | All Intercompany Claims will be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the consent of the Requisite Consenting Creditors, or in the Reorganized Debtors' discretion at the direction of the New Board.<br><br>**Unimpaired – Presumed to accept.** |
| **Class 9**<br><br>**Subordinated Claims:** | All Subordinated Claims, if any, will be discharged, cancelled, released, and extinguished as of the Effective Date and will be of no further force or effect, and Holders of Allowed Subordinated Claims will receive New Common Shares in an amount sufficient to provide such holder a percentage recovery equal to the percentage recovery provided to holders of Existing Core Scientific Interests pursuant to the Plan.<br><br>**Impaired – Deemed to reject.** |
| **Class 10**<br><br>**Existing Core Scientific Interests:** | On the Effective Date, each holder of an Existing Core Scientific Interests will receive:<br><br>(i) <u>In the event that both Class 7 and Class 10 votes to accept the Plan</u>: its pro rata share of CS Interests Equity Distribution, and (b) its pro rata share of the Existing Equity Warrants; or<br><br>(ii) <u>In the event that either Class 7 or Class 10 votes to reject the Plan</u>: no recovery. |

11

| | Impaired – Entitled to vote. On the Effective Date, Existing Core Scientific Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. |
|---|---|
| **Class 11** **Intercompany Interests:** | All Allowed Intercompany Interests will be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld, or in the Reorganized Debtors' discretion at the direction of the New Board. **Unimpaired – Presumed to Accept.** |
| **GENERAL PROVISIONS** | |
| **Executory Contracts and Unexpired Leases:[4]** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors is a party will be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the date on which the Bankruptcy Court enters the Confirmation Order, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; each decision by the Debtors described in the foregoing clauses (i) through (iv) shall be reasonably acceptable to the Requisite Consenting Creditors. |
| **Board of Directors:** | The Reorganized Debtors shall be managed by a board of directors (the "**New Board**") initially comprised of five (5) individuals, consisting of (i) the chief executive officer and (ii) four (4) individuals selected by the Requisite Consenting Creditors in their sole discretion. |
| **Public Company:** | The Reorganized Debtors will take the steps necessary to continue to be a public company that is listed on the Nasdaq or the NYSE on or as soon as reasonable practicable after the Effective Date. |
| **Registration Rights:** | On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall enter into one or more registration rights agreements (the "**Registration Rights Agreements**") with |

---

[4] Treatment of construction contracts and customer contracts to be discussed.

Ad Hoc Equity Group Exhibit 3
43

SASMF EXHIBIT 25
119 of 979

| | the holders of (i) Prepetition Secured Convertible Notes Claims that receive New Common Shares (ii) holders of DIP Claims that receive DIP Warrants (if applicable), which registration rights agreements shall include (a) demand registration rights for a holder or holders who hold an aggregate of more than 5% of the equity of the Reorganized Debtors (on a diluted basis treating the DIP Warrants as if exercised), such demand to be exercisable up to 2 times per year, subject to minimum expected proceeds of $5 million and (b) piggyback registration rights for all holders of New Common Stock or DIP Warrants that are party to the Registration Rights Agreement. |
| | The form of the Registration Rights Agreement shall be on terms and conditions consistent with this Term Sheet, otherwise acceptable to the Debtors and the Requisite Consenting Creditors, in their sole discretion and included in the Plan Supplement. |
| **Management Incentive Plan:** | The New Board shall adopt the terms of a new management incentive plan (the "**Management Incentive Plan**") after the Effective Date. The Management Incentive Plan shall reserve 10% of the New Common Shares on terms to be determined by the New Board; *provided,* that the Ad Hoc Group will engage in discussions with existing management and the board during the Chapter 11 Cases regarding the Management Incentive Plan, including consideration of any effective date grants. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents:** | On the Effective Date, except to the extent otherwise provided in this Term Sheet, the RSA or the Plan, all notes, instruments, or certificates evidencing Claims against the Company and Interests in Core Scientific will be cancelled and obligations of the Company thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents to receive distributions from the Debtors under the Plan and to make further distributions to the applicable holders on account of their Claims. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances, as set forth in the Plan. |
| **Conditions to Effectiveness:** | The occurrence of the Effective Date will be subject to the satisfaction or waiver of the following conditions to confirmation of the Plan and effectiveness of the Plan, as applicable: |
| | (i) the Definitive Documents shall have been executed and/or effectuated, and shall contain terms and conditions |

13

|  | consistent in all material respects with this Term Sheet and the RSA, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived by the party whose consent is required thereunder; |
|  | (ii) the DIP Facility and the RSA shall remain in full force and effect and shall not have been terminated; |
|  | (iii) there shall not have been instituted or be pending any action, proceeding, application, claim, counterclaim, or investigation by any Governmental Entity (a) making illegal, enjoining, or otherwise prohibiting the consummation of the restructuring transaction contemplated herein and in the Definitive Documents or (b) imposing a material award, claim, injunction, fine or penalty that both (1) is not dischargeable, as determined by the Bankruptcy Court in the Confirmation Order, and (2) has a material adverse effect on the financial condition or operations of the Reorganized Debtors, taken as whole; |
|  | (i) all conditions precedent to the effectiveness of the New Exit Term Loan Credit Agreement or the Rolled Exit Term Loan Credit Agreement, as applicable, shall have been satisfied or duly waived by the party whose consent is required thereunder, and the New Exit Term Loan Credit Agreement or the Rolled Exit Term Loan Credit Agreement, as applicable, shall be in full force and effect; |
|  | (ii) all conditions precedent to the effectiveness of the definitive documents governing the New Second Lien Notes (if any) shall have been satisfied or duly waived by the party whose consent is required thereunder, and the definitive documents governing the New Second Lien Notes (if any) shall be in full force and effect; |
|  | (iii) all conditions precedent to the effectiveness of the Mortgage Exit Financing (if any) shall have been satisfied or duly waived by the party whose consent is required thereunder, and the definitive documents governing Mortgage Exit Financing (if any) shall be in full force and effect; |

14

|  | (iv) the New Common Shares, the DIP Warrants (if applicable), and the New Warrants (if applicable) shall have been issued;<br><br>(v) all "Closing Conditions" in the Plan shall have been satisfied or waived by the party whose consent is required thereunder, or satisfied contemporaneously with the occurrence of the Effective Date;<br><br>(vi) the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been amended or modified (other than with the consent of the Company and the Requisite Consenting Creditors, such consent not to be unreasonably withheld), dismissed, or vacated or be subject to a stay;<br><br>(vii) all waiting periods imposed by any Governmental Entity with respect to the transactions contemplated by the Plan shall have terminated or expired and all authorizations, approvals, consents or clearances under any antitrust laws in connection with the transactions contemplated by the Plan shall have been obtained;<br><br>(i) the New Corporate Governance Documents shall be in full force and effect;<br><br>(ii) if applicable, all amounts payable to the agent and the lenders under the New Exit Term Loan Facility in connection with the New Exit Term Loan Facility shall have been paid in full by the Debtors; and<br><br>(iii) all accrued and unpaid Restructuring Expenses shall have been paid in full by the Debtors.<br><br>The conditions to effectiveness may be waived, in whole or in part, in writing (which may be via email) by the Debtors and the Requisite Consenting Creditors, which waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |
| **Releases by the Debtors:** | The Plan will contain customary release provisions in favor of the Released Parties reasonably acceptable to the Company and the Requisite Consenting Creditors; *provided*, that such release provisions shall not include releases of any Causes of Action of the Debtors or the Reorganized Debtors against any customer. |

15

SASMF EXHIBIT 25
122 of 979

| Releases by Third Parties: | The Plan will contain customary third-party release provisions reasonably acceptable to the Company and the Requisite Consenting Creditors. |
| --- | --- |
| Exculpation: | The Plan will contain customary exculpation provisions reasonably acceptable to the Company and the Requisite Consenting Creditors. |
| Discharge and Injunction: | The Plan will contain customary discharge and injunction provisions reasonably acceptable to the Company and the Requisite Consenting Creditors. |
| Restructuring Transactions: | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. |
| Tax: | The Company and the Consenting Creditors shall work in good faith to structure the Restructuring Transactions in as tax efficient a manner as practicable for the Reorganized Debtors and the Consenting Creditors. |

| **DEFINITIONS** | |
| --- | --- |
| "Ad Hoc Group" | The holders of Convertible Notes represented by Paul Hastings LLP and Moelis & Company. |
| "Ad Hoc Group Advisors" | Paul Hastings LLP, Moelis & Company and any other advisor retained by the Ad Hoc Group from time to time with the consent of the Debtors, such consent not to be unreasonably withheld. |
| "Administrative Expense Claim" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114I(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (ii) Restructuring Expenses. |
| "Allowed" | With reference to any Claim or Interest against a Debtor, (a)(i) that is timely filed by the bar date, as ordered by the |

16

| | Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b)(i) that is listed in the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code as not contingent, not unliquidated, and not disputed and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided, however*, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
|---|---|
| **"Claim"** | A "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor. |
| **"Confirmation Order"** | The order of the Bankruptcy Court, which shall be acceptable to the Debtors and the Requisite Consenting Creditors, confirming the Plan in the Chapter 11 Cases, which is not subject to a stay. |
| **"Convertible Notes Equity Distribution"** | 97% of the New Common Shares to be distributed on a pro rata basis to holders of Allowed April Convertible Notes Claims, Allowed Rolled April Convertible Notes Claims, Allowed August Convertible Notes Claims and Allowed Rolled August Convertible Notes Claims, subject to dilution by the DIP Warrants, the New Warrants and the Management Incentive Plan. |

Ad Hoc Equity Group Exhibit 3
48

SASMF EXHIBIT 25
124 of 979

| "CS Interests Equity Distribution" | [•]%[5] of the New Common Shares, subject to dilution by the DIP Warrants, the New Warrants and the Management Incentive Plan. |
|---|---|
| "DIP Agent" | The agent under the DIP Credit Agreement to be designated by the DIP Lenders. |
| "DIP Claim" | Any Claim resulting from the issuance of the DIP Facility. |
| "DIP Lenders" | The lenders party to the DIP Credit Agreement. |
| "DIP Warrants" | Warrants entitling the holders thereof to purchase, in the aggregate, 30% of the New Common Shares, and having the terms set forth on the DIP Warrant Term Sheet attached hereto as Exhibit C, *provided* that the quantum of DIP Warrants issued shall be prorated in the event that the outstanding amount of the DIP Facility is less than $70 million on the Effective Date. For the avoidance of doubt, proration to this effect may only result in a downward adjustment to the quantum of DIP Warrants issued. |
| "Existing Equity Warrants" | Collectively, (i) [•]%[6] of the Tranche I Warrants, (ii) [•]%[7] of the Tranche II Warrants; and (iii) [•]%[8] of the Tranche III Warrants, in each case as described in the term sheet attached hereto as Exhibit D. |
| "Exculpated Parties" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the Consenting Creditors, (v) the agents and lenders under the DIP Facility, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "Final DIP Order" | The Final Order of the Bankruptcy Court, which shall be acceptable to the Debtors, the Requisite Consenting Creditors, the |

---

[5] Debtors to allocate a total of 3% of the New Common Shares between the GUC Equity Distribution and the CS Interests Equity Distribution.
[6] Debtors to allocate Tranche 1 Warrants between General Unsecured Claims and Existing Equity Claims.
[7] Debtors to allocate Tranche II Warrants between General Unsecured Claims and Existing Equity Claims.
[8] Debtors to allocate Tranche III Warrants between General Unsecured Claims and Existing Equity Claims.

18

| | DIP Lenders and the DIP Agent, authorizing on a final basis, among other things, the Debtors' entry into and borrowing under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
|---|---|
| **"Final Order"** | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided, however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| **"GUC Equity Distribution"** | [•]%[9] of the New Common Shares, subject to dilution by the DIP Warrants, the New Warrants and the Management Incentive Plan. |
| **"GUC Warrants"** | Collectively, (i) [•]%[10] of the Tranche I Warrants, (ii) [•]%[11] of the Tranche II Warrants; and (iii) [•]%[12] of the Tranche III Warrants, in each case as described in the term sheet attached hereto as <u>Exhibit D</u>. |
| **"Impaired"** | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |
| **"Intercompany Claim"** | Any Claim against a Debtor held by another Debtor. |
| **"Intercompany Interest"** | An Interest in a Debtor held by another Debtor (and excluding, for the avoidance of doubt, any Existing Core Scientific Interests). |
| **"Interest"** | Any equity interest as defined in section 101(16) of the Bankruptcy Code, in the Company. |
| **"Interim DIP Order"** | The interim order of the Bankruptcy Court, which shall be acceptable to the Debtors, the Requisite Consenting Creditors, the DIP Lenders and the DIP Agent, authorizing on an interim basis, among other things, the Debtors' entry into and borrowing under |

---

[9] Debtors to allocate a total of 3% of the New Common Shares between the GUC Equity Distribution and the CS Interests Equity Distribution.
[10] Debtors to allocate Tranche 1 Warrants between General Unsecured Claims and Existing Equity Claims.
[11] Debtors to allocate Tranche II Warrants between General Unsecured Claims and Existing Equity Claims.
[12] Debtors to allocate Tranche III Warrants between General Unsecured Claims and Existing Equity Claims.

Ad Hoc Equity Group Exhibit 3
50

SASMF EXHIBIT 25
126 of 979

| | the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
|---|---|
| **"Miner Equipment Takeback Debt"** | The takeback debt to be received by each holder of a Miner Equipment Financing Claim, which debt shall have (i) a principal amount not to exceed the secured amount of such holder's Allowed Miner Equipment Financing Claim as determined in accordance with this Term Sheet, (ii) an interest rate of no more than 5.0% per annum, (iii) a 7-year maturity, (iv) mortgage-style amortization, (v) shall not be secured by any assets of the Reorganized Debtors other than the collateral securing such holder's Allowed Miner Equipment Financing Claim as of the Petition Date, and (vi) shall have no obligors other than the existing obligors on such Miner Equipment Financing Claim. The aggregate principal amount of all Miner Equipment Takeback Debt shall not exceed $90 million without the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld. |
| **"New Common Shares"** | The shares of common stock or other common equity interests of Reorganized Core Scientific to be issued on the Effective Date. |
| **"New Corporate Governance Documents"** | The organizational and governance documents for the Reorganized Debtors and its subsidiaries and affiliates, including, without limitation, certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, shareholder agreements, operating agreements, registration rights agreements, including the Registration Rights Agreements, or similar organization or formation documents, as applicable, in each case acceptable to the Debtors and the Requisite Consenting Creditors. |
| **"New Exit Term Loan Credit Agreement"** | The credit agreement in respect of the New Exit Term Loan Facility to be entered into on the Effective Date in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Creditors. |
| **"New Second Lien Notes"** | The notes to be issued by the Reorganized Debtors on the Effective Date, on terms and subject to conditions set forth on Exhibit B attached hereto and otherwise satisfactory to Debtors and the Requisite Consenting Creditors. |
| **"New Warrants"** | Collectively, the GUC Warrants and the Existing Equity Warrants.<br><br>The forms of the New Warrants shall be on terms and conditions consistent with this Term Sheet, otherwise reasonably acceptable |

| | to the Debtors and the Requisite Consenting Creditors, and included in the Plan Supplement. |
|---|---|
| **"Other Priority Claim"** | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| **"Other Secured Claim"** | A Secured Claim other than a Priority Tax Claim, a DIP Claim, a Prepetition Secured Convertible Notes Claim or a Miner Equipment Financing Claim. |
| **"Plan Supplement"** | A supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the RSA (including any consent rights in favor of the Requisite Consenting Creditors) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA (including any consent rights in favor of the Requisite Consenting Creditors), which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) forms of the New Exit Term Loan Facility documents or the Rolled Exit Term Loan documents, as applicable, (v) the form of New Second Lien Notes (if applicable), (vi) the form of Registration Rights Agreement, (vii) the form of DIP Warrants (if applicable), (viii) the forms of New Warrants (if applicable), (ix) a schedule of retained Causes of Action, and (x) the Schedule of Rejected Contracts. |
| **"Priority Tax Claim"** | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **"Released Parties"** | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Creditors, (iv) the agents and lenders under the DIP Facility, (v) the agents under the April Note Purchase Agreement, (vi) the agents under the August Note Purchase Agreement, and (vii) with respect to each of the foregoing Persons (i)–(vi), each of their affiliates, predecessors, successors, assigns, subsidiaries, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, |

21

| | accountants, investment bankers, consultants, representatives, management companies, fund advisors, employees of affiliates who worked on matters related to the Debtors or the Chapter 11 Cases, and other professionals, affiliated investment funds or investment vehicles, managed accounts or funds, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided,* that in each case, an entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation. |
|---|---|
| **"Reorganized Core Scientific"** | Core Scientific, as reorganized on the Effective Date pursuant to and under the Restructuring Transactions and the Plan, including any successor thereto or any entity established to acquire, directly or indirectly, all or a portion of the assets of Core Scientific and/or its direct and indirect subsidiaries. |
| **"Reorganized Debtors"** | The Debtors as reorganized on the Effective Date pursuant to and in accordance with the Restructuring Transactions and the Plan. |
| **"Restructuring Expenses"** | All reasonable and documented fees, costs and out-of-pocket expenses of the Ad Hoc Group Advisors in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the RSA and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and the Chapter 11 Cases, in each case, if applicable, pursuant to any engagement letters or fee reimbursement letters entered into between the applicable Debtors, on the one hand, and each Ad Hoc Group Advisor, on the other hand. |
| **"Restructuring Transactions"** | One or more transactions to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the RSA and this Term Sheet; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan, the RSA and this Term Sheet and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, |

22

| | liability, duty, or obligation on terms consistent with the terms of the Plan and the RSA; and (d) all other actions that the Debtors (with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld) or the Reorganized Debtors (at the direction of the New Board), as applicable, determine are necessary or appropriate. |
|---|---|
| **"Rolled Exit Term Loan Credit Agreement"** | The credit agreement in respect of the Rolled Exit Term Loan Facility to be entered into on the Effective Date in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Creditors and the DIP Lenders. |
| **"Schedule of Rejected Contracts"** | The schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Creditors, as the same may be amended, modified, or supplemented from time to time with the consent of the Requisite Consenting Lenders. |
| **"Secured Claim"** | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan or (b) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **"Unimpaired"** | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(3) and 1124 of the Bankruptcy Code. |

**EXHIBIT A**

**Rolled Exit Term Loans**

<u>Borrower</u>:  Reorganized Core Scientific

<u>Guarantors</u>:  Each of the Debtors, as reorganized, other than Reorganized Core Scientific

<u>Security</u>:  Same as DIP Facility

<u>Interest Rate</u>:  10.0% payable quarterly in cash

<u>DIP Exit Fee</u>:  3.0% to be paid-in-kind on the Effective Date and to be included in principal amount of the Rolled Exit Term Loans.  For the avoidance of doubt, the 112% termination fee shall not be paid.

<u>Maturity</u>:  4-year anniversary of the Effective Date

<u>Covenants</u>:  To be agreed

<u>Cash Flow Sweep</u>:  To include cash flow sweep on terms to be agreed

## EXHIBIT B

**New Second Lien Notes**

Issuer:  Reorganized Core Scientific

Guarantors:  Each of the Debtors, as reorganized, other than Reorganized Core Scientific

Security:  Same as Rolled Exit Term Loan Facility, but on a second priority basis

Interest Rate:  6.0%, payable quarterly, in kind

Maturity:  7-year anniversary of the Effective Date

Covenants:  TBD

**EXHIBIT C**

**DIP Warrants**

Issuer:  Reorganized Core Scientific

Aggregate Number of New Common Shares Represented:  The number of New Common Shares represented by the DIP Warrants shall equal thirty percent (30%) of the total New Common Shares outstanding as of the Effective Date, subject to dilution for equity issued under or in connection with the New Warrants and the Management Incentive Plan; *provided* that the quantum of DIP Warrants issued shall be prorated in the event that the outstanding amount of the DIP Facility is less than $70 million on the Effective Date.  For the avoidance of doubt, proration to this effect may only result in a downward adjustment to the quantum of DIP Warrants issued.

Exercise Price:  $0.001 on the Effective Date, subject to adjustment.  Each DIP Warrant may be converted into New Common Shares by the holders thereof only by the payment of the Exercise Price in cash to Reorganized Core Scientific or by cashless exercise.

Anti-Dilution/Adjustment:  The DIP Warrants shall be subject to anti-dilution protection regarding the Exercise Price and number of New Common Shares to be issued upon the exercise of the DIP Warrants only for (i) corporate structural events (*e.g.*, for recapitalizations, reclassifications, splits, reverse splits, reorganizations, consolidations, mergers, stock dividends and similar dilutive or structural transactions), (ii) dividends or distributions made to equity holders, (iii) issuances of equity or equity-linked securities materially below fair market value (the determination of "materially below fair market value," in each case, shall be made by the New Board, acting in good faith consistent with its fiduciary duties) to affiliates and/or then-existing holders of equity of Reorganized Core Scientific and (iv) repurchases or redemptions of equity or equity-linked securities at a price greater than fair market value.

Expiration Date:  3 years after the Effective Date

Termination Date:  The DIP Warrants shall be deemed terminated and canceled for all purposes without further notice to or action of any Person or Entity upon the earlier to occur of either of the following: (a) the date a Liquidity Event where the Reorganized Core Scientific shareholders receive solely cash in exchange for their New Common Shares is consummated; or (b) the Expiration Date. Upon termination of the DIP Warrants, all rights and obligations of the Reorganized Debtors and the holder of the DIP Warrants shall terminate and be of no further force or effect.

"Liquidity Event" means the first to occur of: (i) any transaction or series of related transactions that results in (a) the sale or exchange of all or substantially all of the equity interests of Reorganized Core Scientific, or any successor, to one or more third parties (whether by merger, sale, recapitalization, consolidation, combination or otherwise) or (b) the sale, directly or indirectly, by Reorganized Core Scientific, or any successor, of all or substantially all of the assets of Reorganized Core Scientific, or any successor, and its subsidiaries, taken as a whole; or (ii) a liquidation, dissolution or winding up of Reorganized Core Scientific or any successor; provided

that, in each case, the closing or other consummation of such Liquidity Event occurs on or prior to the Expiration Date. Notwithstanding the foregoing, no transaction shall be a Liquidity Event if the Reorganized Core Scientific shareholders prior to a transaction continue to own or control at least a majority of Reorganized Core Scientific following such transaction.

Exercise: Each DIP Warrant will be immediately exercisable upon issuance and will terminate if not exercised prior to the Termination Date. The New Warrants shall be exercisable in whole or in part.

Reservation of New Common Shares: Reorganized Core Scientific shall at all times reserve and keep available a number of its authorized but unissued shares of New Common Shares sufficient to permit the exercise in full of all outstanding DIP Warrants and New Warrants.

Limitation on Exercise: The DIP Warrants may not be exercised if, after exercise of the warrants, a holder would hold 9.99% or more of the New Common Shares.

No Rights as a Stockholder: No holder shall, by virtue of the DIP Warrants allocated to such holder, be entitled at any time prior to the conversion of such warrants into New Common Shares to vote, receive dividends or distributions on, or be deemed for any purpose a holder of New Common Shares, nor shall anything contained herein be construed to confer upon any such holder any of the rights of a holder of New Common Shares or any right or entitlement to vote for or upon any matter submitted to such holders of New Common Shares, to give or withhold consent to any corporate action, to receive notice of meetings or other actions affecting holders of New Common Shares, to receive subscription rights, to exercise appraisal rights or otherwise. Rather, unless and until such holder converts its DIP Warrants into New Common Shares, the sole and exclusive right and benefit of such holder shall be its right to exercise the DIP Warrants.

Transfers: Freely transferable.

Black Scholes/Other Protections: The DIP Warrants shall be entitled to Black Scholes valuation-based entitlement to recovery if there is a Liquidity Event prior to the Expiration Date where the Reorganized Core Scientific shareholders receive solely cash in exchange for their New Common Shares.

Governing Law: New York

Ad Hoc Equity Group Exhibit 3
58

SASMF EXHIBIT 25
134 of 979

# EXHIBIT D

## New Warrants

### Tranche I Warrants

Aggregate Number of New Common Shares Represented:  The number of New Common Shares represented by the Tranche I Warrants shall equal ten percent (10%) of the total New Common Shares outstanding as of the Effective Date (after exercise of the DIP Warrants), subject to dilution for equity issued under the Management Incentive Plan.

Exercise Price:  The exercise price (as may be adjusted from time to time) for each New Common Share issuable upon the exercise of the Tranche I Warrants shall assume an enterprise value at which the holders of the Convertible Notes receive a par recovery (including accretion on the April 2021 Convertible Notes Claim).  Each Tranche I Warrant may be converted into New Common Shares by the holders thereof only by the payment of the Exercise Price in cash to Reorganized Core Scientific.

### Tranche II Warrants

Aggregate Number of New Common Shares Represented:  The number of New Common Shares represented by the Tranche II Warrants shall equal seventeen and a half percent (17.5%) of the total New Common Shares outstanding as of the Effective Date (after exercise of the DIP Warrants and the Tranche I Warrants), subject to dilution for equity issued under the Management Incentive Plan.

Exercise Price:  The exercise price (as may be adjusted from time to time) for each New Common Share issuable upon the exercise of the Tranche II Warrants shall assume an enterprise value at which the holders of the Convertible Notes receive a 200% recovery (including accretion on the April 2021 Convertible Notes Claim).  Each Tranche II Warrant may be converted into New Common Shares by the holders thereof only by the payment of the Exercise Price in cash to Reorganized Core Scientific.

### Tranche III Warrants

Aggregate Number of New Common Shares Represented:  The number of New Common Shares represented by the Tranche III Warrants shall equal ten percent (10%) of the total New Common Shares outstanding as of the Effective Date (after exercise of the DIP Warrants, the Tranche I Warrants and the Tranche II Warrants), subject to dilution for equity issued under the Management Incentive Plan.

Exercise Price:  The exercise price (as may be adjusted from time to time) for each New Common Share issuable upon the exercise of the Tranche III Warrant shall assume an enterprise value at which the holders of the Convertible Notes receive a 300% recovery (including accretion on the April 2021 Convertible Notes Claim).  Each Tranche III Warrant may be converted into New

Ad Hoc Equity Group Exhibit 3
59

SASMF EXHIBIT 25
135 of 979

Common Shares by the holders thereof only by the payment of the Exercise Price in cash to Reorganized Core Scientific.

**Terms Applicable to All New Warrants**

<u>Issuer</u>:  Reorganized Core Scientific

<u>Anti-Dilution/Adjustment</u>:  The New Warrants shall be subject to anti-dilution protection regarding the Exercise Price and number of New Common Shares to be issued upon the exercise of the New Warrants only for (i) corporate structural events (*e.g.*, for recapitalizations, reclassifications, splits, reverse splits, reorganizations, consolidations, mergers, stock dividends and similar dilutive or structural transactions), (ii) dividends or distributions made to equity holders, (iii) issuances of equity or equity-linked securities materially below fair market value (the determination of "materially below fair market value," in each case, shall be made by the New Board, acting in good faith consistent with its fiduciary duties) to affiliates and/or then-existing holders of equity of Reorganized Core Scientific and (iv) repurchases or redemptions of equity or equity-linked securities at a price greater than fair market value.

<u>Expiration Date</u>:  3 years after the Effective Date

<u>Termination Date</u>:  The New Warrants shall be deemed terminated and canceled for all purposes without further notice to or action of any Person or Entity upon the earlier to occur of either of the following: (a) the date a Liquidity Event where the Reorganized Core Scientific shareholders receive solely cash in exchange for their New Common Shares is consummated; or (b) the Expiration Date. Upon termination of the New Warrants, all rights and obligations of the Reorganized Debtors and the holders of the New Warrants shall terminate and be of no further force or effect.

"<u>Liquidity Event</u>" means the first to occur of: (i) any transaction or series of related transactions that results in (a) the sale or exchange of all or substantially all of the equity interests of Reorganized Core Scientific, or any successor, to one or more third parties (whether by merger, sale, recapitalization, consolidation, combination or otherwise) or (b) the sale, directly or indirectly, by Reorganized Core Scientific, or any successor, of all or substantially all of the assets of Reorganized Core Scientific, or any successor, and its subsidiaries, taken as a whole; or (ii) a liquidation, dissolution or winding up of Reorganized Core Scientific or any successor; provided that, in each case, the closing or other consummation of such Liquidity Event occurs on or prior to the Expiration Date.  Notwithstanding the foregoing, no transaction shall be a Liquidity Event if the Reorganized Core Scientific shareholders prior to a transaction continue to own or control at least a majority of Reorganized Core Scientific following such transaction.

<u>Exercise</u>:  Each New Warrant will be immediately exercisable upon issuance and will terminate if not exercised prior to the Termination Date.  The New Warrants shall be exercisable in whole or in part.

<u>Reservation of New Common Shares</u>:  Reorganized Core Scientific shall at all times reserve and keep available a number of its authorized but unissued shares of New Common Shares sufficient to permit the exercise in full of all outstanding DIP Warrants and New Warrants.

<u>No Rights as a Stockholder</u>:  No holder shall, by virtue of the New Warrants allocated to such holder, be entitled at any time prior to the conversion of such warrants into New Common Shares to vote, receive dividends or distributions on, or be deemed for any purpose a holder of New Common Shares, nor shall anything contained herein be construed to confer upon any such holder any of the rights of a holder of New Common Shares or any right or entitlement to vote for or upon any matter submitted to such holders of New Common Shares, to give or withhold consent to any corporate action, to receive notice of meetings or other actions affecting holders of New Common Shares, to receive subscription rights, to exercise appraisal rights or otherwise.  Rather, unless and until such holder converts its New Warrants into New Common Shares, the sole and exclusive right and benefit of such holder shall be its right to exercise the New Warrants.

<u>Transfers</u>:  Freely transferable.

<u>Black Scholes/Other Protections</u>:  The New Warrants shall be entitled to Black Scholes valuation-based entitlement to recovery if there is a Liquidity Event prior to the Expiration Date where the Reorganized Core Scientific shareholders receive solely cash in exchange for their New Common Shares.

<u>Governing Law</u>:  New York

Ad Hoc Equity Group Exhibit 3
61

SASMF EXHIBIT 25
137 of 979

## Exhibit B

### FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Restructuring Support Agreement, dated as of December [●], 2022 (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), by and among the Company and the Consenting Creditor (each, as defined in the Agreement) is executed and delivered by _____ (the "**Joining Party**") as of _____, _____.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "**Consenting Creditor**" and a "**Party**" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate principal amount of Notes under the Convertible Note Purchase Agreements, as applicable, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 8 of the Agreement to each other Party to the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York, without regard to any conflict of Laws provisions which would require the application of the Law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.


[CONSENTING CREDITOR]

By: _____

Name: _____

Title: _____


Principal Amount of April Convertible Notes:  $_____

Principal Amount of August Convertible Notes:  $_____

<u>Notice Address</u>:

_____

_____

_____

Attention:_____

Email:_____

**Exhibit C**

**FORM OF DIP CREDIT AGREEMENT**

**TO BE FILED UNDER SEPARATE COVER**

Ad Hoc Equity Group Exhibit 3
64

SASMF EXHIBIT 25
140 of 979

**Exhibit 4**

SASMF EXHIBIT 25
141 of 979

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | Related Docket No. 38 |

## NOTICE OF FILING OF INITIAL BUDGET

**PLEASE TAKE NOTICE** that on December 21, 2022, Core Scientific, Inc. and

its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the **"Debtors"**), filed the *Emergency Motion of Debtors for Entry of Interim and*

*Final Order (A) Authorizing The Debtors to Obtain Postpetition Financing, (B) Authorizing The*

*Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority*

*Administrative Expense Status, (D) Granting Adequate Protection to The Prepetition Secured*

*Parties, (E) Modifying The Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting*

*Related Relief* (Docket No. 38) (the **"DIP Motion"**) with a proposed order granting the relief

requested in the DIP Motion attached thereto as <u>Exhibit A</u> (the **"Initial Proposed Order"**).

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file **Exhibit 2 –**

**Initial Budget** to the Initial Proposed Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Dated: December 22, 2022
       Houston, Texas

                              Respectfully submitted,

                                _/s/  Alfredo R. Pérez_____
                              WEIL, GOTSHAL & MANGES LLP
                              Alfredo R. Pérez (15776275)
                              700 Louisiana Street, Suite 1700
                              Houston, Texas 77002
                              Telephone:  (713) 546-5000
                              Facsimile:  (713) 224-9511
                              Email:   Alfredo.Perez@weil.com

                              -and-

                              WEIL, GOTSHAL & MANGES LLP
                              Ray C. Schrock, P.C. (*pro hac vice* pending)
                              Ronit J. Berkovich (*pro hac vice* pending)
                              Moshe A. Fink (*pro hac vice* pending)
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007
                              Email:   Ray.Schrock@weil.com
                                      Ronit.Berkovich@weil.com
                                      Moshe.Fink@weil.com

                              *Proposed Attorneys for Debtors*
                              *and Debtors in Possession*

Ad Hoc Equity Group Exhibit 4          **SASMF EXHIBIT 25**
2                                      **143 of 979**

## Certificate of Service

I hereby certify that on December 22, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                         */s/ Alfredo R. Pérez*
                                         Alfredo R. Pérez

**Exhibit 2**

**Initial Budget**

SASMF EXHIBIT 25

145 of 979

# Detailed DIP Budget

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Starting** | 12/21/2022 [1] | 12/24/2022 | 12/31/2022 | 1/7/2023 | 1/14/2023 | 1/21/2023 | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 |
| **Week Ending** | 12/23/2022 | 12/30/2022 | 1/6/2023 | 1/13/2023 | 1/20/2023 | 1/27/2023 | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 2.5 | 5.3 | 6.0 | 6.2 | 6.2 | 6.2 | 6.3 | 6.5 | 6.5 | 6.5 | 6.7 | 6.9 |
| Hosting Payments | - | 3.8 | - | - | - | - | 10.9 | - | - | - | 7.4 | - |
| **Net Receipts** | 2.5 | 9.1 | 6.0 | 6.2 | 6.2 | 6.2 | 17.2 | 6.5 | 6.5 | 6.5 | 14.0 | 6.9 |
| Power Costs | (2.9) | (6.4) | (6.8) | (9.3) | (5.5) | (5.6) | (12.6) | (5.5) | (5.5) | (5.6) | (12.6) | (5.3) |
| Operating Costs | - | (1.4) | (2.2) | (0.7) | (1.9) | (0.7) | (2.2) | (1.4) | (2.5) | (1.4) | (2.5) | (1.3) |
| Tax Payments | - | - | (0.6) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - |
| **Net Operating Disbursements** | (2.9) | (7.8) | (9.6) | (9.9) | (7.5) | (6.4) | (14.8) | (6.9) | (8.0) | (7.0) | (15.8) | (6.6) |
| Construction & Infrastructure Capex | - | (0.2) | (1.2) | - | - | - | - | (0.5) | - | - | - | (1.2) |
| Miner Capex (Inc. Customs) | (0.9) | - | (0.0) | - | - | (0.4) | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | (0.9) | (0.2) | (1.2) | - | - | (0.4) | - | (0.5) | - | - | - | (1.2) |
| **Total Operating Cash Flows** | (1.3) | 1.1 | (4.8) | (3.7) | (1.3) | (0.5) | 2.4 | (0.9) | (1.5) | (0.5) | (1.7) | (0.9) |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (0.9) | (1.4) | (1.6) | (2.4) | (1.5) | (2.1) | (1.5) | (1.6) | (3.4) | (1.6) | (1.6) | (1.4) |
| Utility Deposits (TBD) | - | (10.0) | - | - | - | - | - | - | - | - | - | - |
| Interest Income | - | - | - | - | - | - | - | - | - | - | - | - |
| Other (TBD) | - | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| **Net Non-Operating Cash Flows** | (0.9) | (11.7) | (2.0) | (2.7) | (1.9) | (2.4) | (1.9) | (1.9) | (3.8) | (1.9) | (1.9) | (1.8) |
| **Squidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 3.7 | 39.0 | 28.3 | 21.6 | 15.1 | 11.9 | 21.5 | 22.0 | 19.2 | 14.0 | 21.7 | 18.0 |
| New Money / DIP Financing | 37.5 | - | - | - | - | 12.5 | - | - | - | 10.1 | - | - |
| Net Cash Flow | (2.2) | (10.6) | (6.8) | (6.5) | (3.1) | (3.0) | 0.6 | (2.8) | (5.2) | (2.4) | (3.7) | (2.6) |
| **Ending Cash Balance** | 39.0 | 28.3 | 21.6 | 15.1 | 11.9 | 21.5 | 22.0 | 19.2 | 14.0 | 21.7 | 18.0 | 15.4 |
| BTC Held & In Transit | 0.8 | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 1.0 | 1.0 |
| **Ending Liquidity** | 39.8 | 29.1 | 22.4 | 16.0 | 12.8 | 22.3 | 22.9 | 20.1 | 14.9 | 22.6 | 19.0 | 16.4 |

(1)  Partial week starting 12/21/2022

**Ad Hoc Equity Group Exhibit 4**

5

SASMF EXHIBIT 25

146 of 979

Case 22-90341 Document 87-4 Filed in TXSB on 12/22/23 Page 6 of 7

# Detailed DIP Budget (continued)

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Starting** | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 12/21-06/02 |
| **Week Ending** | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | |
| **Operating Cash Flows** | | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 6.9 | 6.9 | 6.9 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 157.6 |
| Hosting Payments | - | - | 7.5 | - | - | - | - | 7.1 | - | - | - | 7.7 | 44.3 |
| **Net Receipts** | **6.9** | **6.9** | **14.4** | **7.2** | **7.2** | **7.2** | **7.2** | **14.3** | **7.2** | **7.2** | **7.2** | **14.9** | **201.9** |
| Power Costs | (5.4) | (5.5) | (4.2) | (11.6) | (5.1) | (4.9) | (5.1) | (11.2) | (4.9) | (4.8) | (4.9) | (9.0) | (160.2) |
| Operating Costs | (2.4) | (1.3) | (2.5) | (1.0) | (2.1) | (0.8) | (2.1) | (0.8) | (2.1) | (0.8) | (2.1) | (0.9) | (37.2) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | - | (1.4) |
| **Net Operating Disbursements** | **(7.8)** | **(6.8)** | **(6.7)** | **(12.7)** | **(7.2)** | **(5.8)** | **(7.2)** | **(12.1)** | **(7.0)** | **(5.6)** | **(7.0)** | **(10.0)** | **(198.8)** |
| Construction & Infrastructure Capex | - | - | - | (0.9) | - | - | - | (0.9) | - | - | - | - | (4.9) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - | (1.3) |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | **-** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **(0.9)** | **-** | **-** | **-** | **-** | **(6.3)** |
| **Total Operating Cash Flows** | **(0.9)** | **0.1** | **7.7** | **(6.4)** | **0.0** | **1.5** | **0.0** | **1.3** | **0.3** | **1.6** | **0.2** | **5.0** | **(3.2)** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | |
| Professional Fees | (2.5) | (1.2) | (1.4) | (1.2) | (2.0) | (1.2) | (1.2) | (1.2) | (2.1) | (1.3) | (1.3) | (14.2) | (51.9) |
| Utility Deposits (TBD) | - | - | - | - | - | - | - | - | - | - | - | 10.0 | - |
| Interest Income | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (8.1) |
| **Net Non-Operating Cash Flows** | **(2.9)** | **(1.5)** | **(1.8)** | **(1.5)** | **(2.4)** | **(1.6)** | **(1.6)** | **(1.6)** | **(2.5)** | **(1.7)** | **(1.7)** | **(4.5)** | **(60.0)** |
| **Liquidity Balances** | | | | | | | | | | | | | |
| Starting Cash Balance | 15.4 | 11.6 | 16.0 | 21.9 | 13.9 | 11.6 | 15.6 | 14.1 | 13.9 | 11.6 | 13.2 | 11.7 | 3.7 |
| New Money / DIP Financing | - | 5.8 | - | - | - | 4.1 | - | - | - | 1.6 | - | - | 71.6 |
| Net Cash Flow | (3.8) | (1.4) | 5.9 | (8.0) | (2.4) | (0.1) | (1.5) | (0.2) | (2.2) | (0.1) | (1.5) | 0.5 | (63.2) |
| **Ending Cash Balance** | **11.6** | **16.0** | **21.9** | **13.9** | **11.6** | **15.6** | **14.1** | **13.9** | **11.6** | **13.2** | **11.7** | **12.1** | **12.1** |
| BTC Held & In Transit | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Ending Liquidity** | **12.6** | **17.0** | **22.9** | **15.0** | **12.6** | **16.6** | **15.1** | **14.9** | **12.7** | **14.2** | **12.7** | **13.2** | **13.2** |

**Ad Hoc Equity Group Exhibit 4**

6

**Exhibit 5**

SASMF EXHIBIT 25
148 of 979

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BANKRUPTCY DIVISION

```
IN RE:                        § CASE NO. 22-90341-11
                              § JOINTLY ADMINISTERED
                              § HOUSTON, TEXAS
CORE SCIENTIFIC, INC.,        § THURSDAY,
                              § DECEMBER 22, 2022
            DEBTOR.           § 9:15 A.M. TO 11:34 A.M.
```

**FIRST DAY HEARINGS (VIA ZOOM)**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY:                     ALBERT ALONZO

(Recorded via CourtSpeak; Not all callers could be heard
clearly.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

For the Debtor:                      WEIL GOTSHAL & MANGES, LLP
                                     Alfredo Perez, Esq.
                                     Ray C, Schrock, PC
                                     Ronit Berkovich, Esq.
                                     Destiny Reyes, Esq.
                                     Alex Kane, Esq.
                                     Moshe Fink, Esq.
                                     700 Louisiana, Ste. 1700
                                     Houston, TX  77002


For the Interested Parties:

                                     TJC PARTNERS
                                     John Singh, Esq.

                                     PAUL HASTINGS, LLP
                                     Kris Hansen, Esq.
                                     Erez Giland, Esq.

                                     WILLKIE FARR & GALLAGHER, LLP
                                     Jennifer Hardy, Esq.

                                     PRYOR CASHMAN, LLP
                                     Matthew Silverman, Esq.

                                     HAYNES AND BOONE, LLP
                                     Matt Ferris, Esq.

                                     KIRKLAND & ELLIS, LLP
                                     Chris Koenig, Esq.

                                     SIDLEY AUSTIN, LLP
                                     Dennis Twomey, Esq.

                                     ARNOLD & PORTER
                                     Brian Lohan, Esq.

                                     US DEPARTMENT OF JUSTICE
                                     Jayson Ruff, Esq.


         (Please also see Electronic Appearances.)

1           THE COURT:  -- to give presentation control to?

2           MR. SCHROCK:  I believe that would be Austin

3      Crabtree should be getting that control, Your Honor.

4           THE COURT:  Okay.  Hold on a second.

5        (Pause in the proceedings.)

6           THE COURT:  All right.  Mr. Crabtree --

7           MR. SCHROCK:  Great.

8           THE COURT:  -- should have control.

9           MR. SCHROCK:  Okay.  Great.  All right.  Looks like

10     we're getting the full screen mode.  Let's go ahead and flip

11     the page, please, Austin, and the next page.

12           So Your Honor, just a little bit of background about

13     the company.

14           I know a lot of this is covered in the First Day

15     Declaration.  The company was founded in 2017, and the

16     company's revenue stream was from bitcoin that it mined from

17     film account and for variety hosting services to third party

18     customers.

19           They -- you know, since its inception, the Debtors

20     have built a considerable asset base of approximately 180,000

21     miners, or computers.  They've gained market trust.

22           I believe they're one of the, if not the leading

23     miner here in the United States.  And this company unlike, you

24     know, I would say, you know, some of the companies that we

25     have the pleasure of working with, it is cashflow positive

1     before debt service.

2             It mines bitcoin.  It converts that bitcoin into

3     cash.  And it has been, you know, in the past, in the very

4     recent past very significantly cashflow positive.  It's just

5     had a cascading series of events that have hit it over the

6     very recent past.

7             Its most profitable business segment comes from

8     mining bitcoin with machines that it owns that they're self-

9     mining.  It also has posting for many other companies and it

10    sold wholesale computers.  The miners take care of them and

11    will be provided a fixed case.

12            We have eight fully operational data centers, all

13    located in the U.S.  Those are in Texas, Georgia, Kentucky,

14    North Carolina and North Dakota.

15            We've got a couple of large transactions that were

16    undertaken prior to commencing these cases, including

17    acquiring one of our largest customers, Block Cat.  And that's

18    significantly increased the number of miners.

19            We also entered into a spec merger during which the

20    company merged with a company and changed its name to Core

21    Scientific.  And after going public at the start of 2022, we

22    experienced tremendous growth.

23            You know, market conditions and the price of

24    bitcoin, the price of power and many other things went to the

25    company to refocus our efforts in resource and self-mining.

1           There's some peculiar aspects of those private notes
2      that we don't have to get into today, but I'm sure will be
3      discussed further on in the future.  We have a lot of miner
4      equipment financing, and a lot of those already -- you know,
5      we were extremely active with -- in the weeks leading up to,
6      and month leading up to these cases.
7           There's, you know, various interest rates behind
8      these.  You know, it depends on -- you know, if you can
9      imagine with computers, it really depends on the type of
10     computer, how new they are, how fast they are as to how much
11     they're going to be worth.
12          We've been working with them cooperatively and in
13     fact, we were trying to negotiate a couple of different
14     transactions leading up to these cases.  But there was a high
15     degree of dialogue with those parties.
16          We also have some non-miner financing, relatively
17     small amounts.  There's an unsecured note owed to B. Riley,
18     and you know, there was certainly a lot of interaction with
19     Mr. Riley, and it was being -- leading up to these cases.
20          We have an unsecured loan, which is called the Novak
21     loan.  And just to look -- give you an impression just how
22     profitable this company was in the recent past.  The EBITDA
23     was 358 million, as of just six months ago.  We think that,
24     you know, as of the recent past, and lowers, you know,
25     significantly.

1    management incentive plan for up to 10 percent of new common

2    shares.

3           And then we do have the opportunity at various value

4    levels for significant warrant packages for value to be shared

5    with existing common stakeholders.  That was also something

6    that we were fighting very strongly for, and we are looking

7    forward to see if we can try and improve those terms should

8    the situation (indiscernible).

9           Flip, please.

10          The milestones are set forth here.  One thing is

11   certain about the milestones, I'm certain they'll change.

12   They're always going to be subject to what the Court believes,

13   and we'll have to see how the circumstances fold out, or

14   unfold in these cases.

15          Right now, we're contemplating a six-month case.

16   And you know, with any commodity based case, I think it's

17   worth just emphasizing, you know, a lot of the value of this

18   company is dependent on the price of bitcoin.

19          So I don't think anybody can predict at the moment,

20   at least nobody I know, of what the price of bitcoin is going

21   to be, you know, a month out, let alone six months out.  So

22   we're going to have to be flexible moving forward.

23          We certainly hope the price of the bitcoin goes up

24   significantly, and it gives, you know, the company a chance to

25   distribute further value.  But we'll frankly -- we're just

1    going to have to see how that goes as we move forward.

2              And then looks like -- flip to the next one.

3              So you know, what's our path forward?  We want to

4    pursue the Restructure Support Agreement.  I think that there

5    were any altered (indiscernible) if they present themselves.

6    We are also going to pursue the sale in cooperation with our

7    convertible noteholder partners the sales of non-Core assets.

8              We'll address (indiscernible) the stakeholder

9    disputes and related settlements, I think including the

10   Celsius and other parties.  And frankly just proceed with a

11   Plan of Reorganization and emergence.

12             So it's a relatively straightforward path forward.

13   We'll see how easy it becomes, or how hard it becomes as we

14   move forward, but Your Honor, I'm happy to answer any

15   questions, or I'm prepared to try to move the evidence in, in

16   support of the relief we're seeking today.

17             THE COURT:  Thank you, Mr. Schrock.

18             I do have just one question, and it just sort of --

19   as I look at the timing and I try to get a general feel for

20   things.  This -- oh, I agree with you.

21             This all seems relatively straightforward with the

22   exception of, you know, dealing with the valuation issues with

23   the equipment financiers.  Are you contemplating some sort of

24   expedited process, you want to try to wait?

25             I don't know how you'd do that, but are you trying

Ad Hoc Equity Group Exhibit 5
7

SASMF EXHIBIT 25
155 of 979

59

1    even prior to the negotiation with them -- we do give them

2    adequate protection claim for any diminution in value of their

3    equipment and adequate protection replacement liens that are,

4    with respect to their existing collateral, senior to all other

5    liens including DIP liens and liens of the prepetition secured

6    noteholders.

7            And then with respect to the noteholder prepetition

8    collateral, the equipment lender adequate protection liens are

9    junior (indiscernible) and these are junior to DIP liens, but

10   *pari passu* with the noteholder adequate protection liens on

11   assets that are currently unencumbered.  And all of this is

12   subject to those lenders having valid and properly perfectly

13   liens.

14           We'll go through the language in the Order in a

15   minute and I'm sure if I didn't get it exactly right,

16   Mr. Gilad will come in and (indiscernible) that, but

17   everything's, of course, just language in the Order.

18           There's also a standard carve-out for professional

19   fees.

20           So I will pause there because this is a little more

21   complex than normal and I don't know if this is the issue that

22   the Court had questions on.

23           THE COURT:  So let me -- now is a great breaking

24   point.

25           So with respect to -- number one, I appreciate the

**Ad Hoc Equity Group Exhibit 5**
**8**

**SASMF EXHIBIT 25**
**156 of 979**

1    redline.  When I was listening to the opening presentation, I

2    had the opportunity to review the redline that is attached to

3    108.  I don't have any questions.  If you want to highlight a

4    certain provision for me, I'm happy to go there, but I've also

5    had the opportunity to look at and I'm relatively comfortable

6    with what's there and more focused on the changes that were

7    made.  None of the changes caused me any heartburn at all.

8         I do have just a couple of issues that I want to

9    highlight and maybe this will help others, maybe it won't.

10   With respect to the avoidance action issue on the liens that

11   are granted, conceptually I don't have a problem with it.  I

12   do generally ask that there be a last-look provision added

13   with respect to avoidance proceeds and just given the way that

14   this is, I don't see any harm and it takes a strategic concern

15   out of play for me.

16        So I would ask that as you work toward a final

17   because I know that this isn't coming today is that you look

18   at other Orders that the other parties talk about some last-

19   look language for avoidance proceeds.

20        With respect to the roll up, again I got what's

21   being done.  I do really, really like the dollar-for-dollar

22   creep because it protects interests in case something we all

23   don't anticipate occurring, that it just protects everybody's

24   rights and so actually it stops a lot of the jockeying or at

25   least it's been my experience.  So I would ask that as you

Ad Hoc Equity Group Exhibit 5
9

SASMF EXHIBIT 25
157 of 979

1    look at that roll up is that you think about the dollar-for-
2    dollar creep.

3            And perhaps that's just -- maybe I should explain
4    that because now that I'm listening to myself, that sounds a
5    little weird but it just simply, as advances are made, that
6    the roll up creeps up with the total advances that have been
7    made so I just ask that you think about that.

8            With respect to the exercising of remedies, you
9    covered all of my concerns.  I appreciate your pulling that
10   from somewhere else because again I think that that's just the
11   right balance.

12           I think other than that, again I -- this is
13   expensive money.  I don't think anybody's to say that this is
14   just a bargain.  It's expensive money.  Lending into this type
15   of situation is going to be expensive because I don't know how
16   you assess the risk.  And given the PIC feature, I mean, PIC
17   loans are always expensive and I got that issue too.  It's
18   just part of the risk assessment.  So I understand it.
19   Obviously if Ms. Hardy comes up with something that's better,
20   faster, stronger, cheaper, we're all going to applaud her and
21   have another conversation, but I got it.  It's not out of the
22   range of what I expected to see.

23           I think those are my general comments with
24   respect -- again this is just -- it's an interim request.  I
25   don't know if there are other comments or arguments the

**Exhibit 6**

SASMF EXHIBIT 25
159 of 979

**Exhibit 4**

**Initial Budget**

# Detailed DIP Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| Week Starting | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| Week Ending | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | 8.8 | 6.9 | 6.1 | 6.1 | 9.9 | 7.4 | 7.5 | 7.5 | 14.7 | 7.8 | 7.9 |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | (9.3) | (10.8) | (8.5) | (6.9) | (15.3) | (6.6) | (7.7) | (6.6) | (6.5) | (11.7) | (7.1) |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| **Total Operating Cash Flows** | (0.6) | (3.9) | (2.3) | 1.9 | (5.9) | 0.8 | (0.3) | 0.9 | 7.0 | (3.8) | 0.8 |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | (0.1) | - | - | - | (0.1) | - | - |
| Other (TBD) | (0.0) | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | (5.0) | (1.6) | (1.7) | (2.4) | (5.4) | (2.2) | (2.0) | (2.0) | (3.6) | (2.2) | (1.9) |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 | 21.0 |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | 30.6 | 25.1 | 20.9 | 16.7 | 25.5 | 24.2 | 21.9 | 20.8 | 24.2 | 23.2 | 22.2 |

**Ad Hoc Equity Group Exhibit 6**

2

# Detailed DIP Budget (Continued)

| | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 | Week 22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | |
| Week Starting | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 01/28-06/30 |
| Week Ending | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 165.8 |
| Hosting Payments | - | 6.9 | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | 35.6 |
| **Net Receipts** | 7.9 | 7.9 | 14.8 | 7.9 | 7.9 | 7.9 | 15.5 | 7.9 | 7.9 | 7.9 | 17.1 | 201.4 |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | (0.8) |
| **Net Operating Disbursements** | (5.7) | (7.1) | (11.5) | (6.9) | (6.0) | (6.9) | (9.6) | (7.7) | (6.1) | (7.5) | (6.9) | (178.8) |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| **Total Operating Cash Flows** | 2.3 | 0.8 | 2.4 | 1.0 | 1.9 | 1.0 | 5.0 | 0.3 | 1.8 | 0.4 | 9.3 | 16.9 |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (9.5) |
| **Net Non-Operating Cash Flows** | (1.5) | (1.5) | (3.2) | (1.5) | (1.5) | (1.5) | (2.6) | (1.5) | (1.5) | (1.5) | (10.6) | (58.3) |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | (41.4) |
| Ending Cash Balance | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 18.7 | 18.7 |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | 22.9 | 22.2 | 21.5 | 21.0 | 21.4 | 20.8 | 23.2 | 22.0 | 22.3 | 21.2 | 19.9 | 19.9 |

Ad Hoc Equity Group Exhibit 6

3

**Exhibit 7**

SASMF EXHIBIT 25
163 of 979

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CORE SCIENTIFIC, INC., *et al.,* | § | Case No. 22-90341 (DRJ) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § | (Emergency Hearing Requested) |
|  | § |  |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
REPLACEMENT SENIOR SECURED NON-PRIMING SUPERPRIORITY
POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF
EXISTING POSTPETITION FINANCING FACILITY (II) GRANTING
LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT
LATER THAN 11:30 A.M. (CENTRAL PREVAILING TIME) ON WEDNESDAY,
FEBRUARY 1, 2023.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT
THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE
DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH.
OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND
GRANT THE RELIEF REQUESTED.

YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN
AUDIO AND VIDEO CONNECTION.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN
FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE
CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM
NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691. VIDEO

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

> COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES' HOME PAGE.  THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.
>
> HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.  TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES' HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

Core Scientific, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or "**Borrower**"), respectfully move and represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement[2]

1.      On January 30, 2023, the Debtors filed a notice with the Court [Docket No. 378] informing all parties that they reached an agreement with a lender on the terms of a replacement post-petition financing facility and intend to pay off their existing DIP financing loan. By this Motion, the Debtors seek authorization to obtain approval of their entry into a superpriority non-priming replacement senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $70 million (the "**Replacement DIP Facility**"), provided by B. Riley Commercial Capital, LLC ("**B. Riley**" and solely in such capacity, the "**Replacement DIP Lender**") and agented by B. Riley Commercial Capital, LLC (solely in such capacity, the "**Replacement DIP Agent**").  The Replacement DIP Facility consists of a new money multiple draw term loan facility in an aggregate principal amount of up to $70 million (and the loans made under the Replacement DIP Facility, the "**Replacement DIP Loans**").  Details of the terms of the

---

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration and the Proposed Replacement Interim DIP Order (each, as defined herein), as applicable.

WEIL:\98991236\11\39031.0011

Ad Hoc Equity Group Exhibit 7
2

SASMF EXHIBIT 25
165 of 979

Replacement DIP Facility can be found in the "**Replacement DIP Term Sheet**" attached as **Exhibit 2** to the Proposed Replacement Interim DIP Order (as defined below).

2.      The Replacement DIP Facility will provide an aggregate principal amount of $35 million on an interim basis, which shall be borrowed in a single borrowing (the "**Interim DIP Borrowing**") on the Closing Date (as defined in the Replacement DIP Term Sheet) upon entry of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative* (the "**Proposed Replacement Interim DIP Order**") attached hereto as **Exhibit A**.  Following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility ($70 million total) shall be available, in one or more borrowings.

3.      By this Motion, the Debtors also seek the authority to pay off the Original DIP Facility and to use the Cash Collateral of their Prepetition Secured Noteholders.  As of the time of the filing of this Motion, the Debtors are in the process of negotiating the terms for the consensual use of Cash Collateral with the Ad Hoc Group and are hopeful that an agreement will be reached shortly.  If an agreement cannot be reached, the Debtors intend to seek the non-consensual use of cash collateral.  The Debtors continue to work with the Replacement DIP Lender, the Committee, and the Ad Hoc Group on the terms of the Proposed Replacement Interim DIP Order and will file revised documents prior to the hearing, which the Debtors seek to schedule for February 1, 2023 (the time for the hearing originally scheduled as the final hearing on the Original DIP Facility (as defined herein)).

WEIL:\98991236\11\39031.0011

4. The Debtors announced a the outset these Chapter 11 Cases that they would seek to replace the Original DIP Facility with a replacement DIP facility with better terms and more flexibility than the Original DIP Facility. They successfully achieved this goal with the Replacement DIP Facility.

5. The Replacement DIP Facility is the result of extensive marketing and hard-fought negotiations with numerous potential lenders. The Debtors kept both the Ad Hoc Group and the Committee fully informed throughout the marketing and negotiation process, and the Debtors understand that both the Committee and an ad hoc committee of shareholders are supportive of the Debtors' entry into the Replacement DIP Facility and the payoff of the Original DIP Facility prior to final approval thereof. The Replacement DIP Facility provides the Debtors with up to 15 months of runway and significant flexibility, particularly as the Replacement DIP Facility has no plan-related milestones and is not conditioned on seeking approval of any specific chapter 11 plan. It also contains economic terms that are reasonable and generally superior to those provided under the Original DIP Facility. Its terms were also better than any alternative proposal the Debtors received. The Replacement DIP Facility lays the foundation on which the Debtors will seek to negotiate a consensual chapter 11 plan with all of their key constituents and maximize value for all stakeholders.

6. Approval of the DIP orders (the "**Replacement DIP Orders**") on an interim and ultimately final basis, will enable the Debtors to pay off the Original DIP Facility and is the best source of postpetition financing currently available to the Debtors. Absent paying off the Original DIP Facility or obtaining a final order approving the Original DIP Facility (including the roll-up contemplated thereby) by February 2, 2023, the Debtors would be in default under the Original DIP Facility. The Debtors do not believe it is prudent to proceed with approval of the

4

Ad Hoc Equity Group Exhibit 7
4

Original DIP Facility on a final basis given the availability of the superior Replacement DIP Facility. As the Debtors do not have the cash on hand to pay off the Original DIP Facility and still have liquidity to operate their business, the Debtors need authority to enter into the Replacement DIP Facility on an interim basis to avoid immediate and irreparable harm.

7.     Additional information regarding the Replacement DIP Facility is set forth in the *Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to The Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to the date hereof (the "**Second Singh Declaration**"), the *Declaration of Rodi Blokh in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Blokh Declaration**"), and *Declaration of Russell Cann in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Replacement Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III)*

5

WEIL:\98991236\11\39031.0011

*Granting Adequate Protection to The  Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, sworn to on the date hereof (the "**Cann Declaration**").[3]

### Relief Requested

8.        By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of the Proposed Replacement Interim DIP Order, as attached hereto as **Exhibit A**:

(a)        authorizing the Debtors to obtain postpetition financing on a superpriority, non-priming, senior secured basis and the loans made, advanced or deemed advanced in the form of a non- amortizing multiple-draw term-loan Replacement DIP Facility, pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed in a single borrowing on the Closing Date (as defined in the Replacement DIP Term Sheet (as defined below)), and (ii) following entry of the Replacement Final DIP Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Interim DIP Borrowing, a "**Replacement DIP Borrowing**," and, collectively, the "**Replacement DIP Borrowings**"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the Replacement DIP Borrowings) set forth in the term sheet attached to the Proposed Replacement Interim DIP Order as **Exhibit 1** (the "**Replacement DIP Term Sheet**"), that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached to the Proposed Replacement Interim DIP Order as **Exhibit 2** (the "**Commitment Letter**"), and, subject to entry of the Replacement Final DIP Order, on a final basis pursuant to a loan agreement (the "**Replacement DIP Credit Agreement**," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the

---

[3]  The Debtors have been in communication with the equipment lenders that filed objections to the Original DIP Facility to determine if they would continue to assert similar objections to the Replacement DIP Facility.  The Debtors believe that most, if not all, of the equipment lenders will be supportive of interim approval of the Replacement DIP Facility to replace the Original DIP Facility.  However, given the lack of finality on this point, the Debtors submit the Cann Declaration as evidence against the equipment lenders' assertions (without evidence) that the mining equipment is likely to decline in value.

WEIL:\98991236\11\39031.0011

Ad Hoc Equity Group Exhibit 7
6

**SASMF EXHIBIT 25**
**169 of 979**

Replacement DIP Term Sheet, collectively, the "**Replacement DIP Loan Documents**"), by and among Core Scientific, Inc., and its debtor affiliates as borrowers (the "**Replacement DIP Borrowers**"), each of the direct and indirect subsidiaries of Core Scientific, Inc. that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "**Replacement DIP Guarantors**," and together with the Replacement DIP Borrowers, the "**Replacement DIP Loan Parties**"), B. Riley, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "**Replacement DIP Agent**"), and the lender party thereto (the "**Replacement DIP Lender**," and together with the Replacement DIP Agent, the "**Replacement DIP Secured Parties**") and the Proposed Replacement Interim DIP Order;

(b)    authorizing the Replacement DIP Loan Parties to (i) perform under the Replacement DIP Term Sheet and execute, deliver, and perform each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order (collectively, the "**Replacement DIP Obligations**"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)    authorizing the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all Replacement DIP Obligations, in accordance with the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents;

(d)    granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the Replacement DIP Liens (as defined below) in all Replacement DIP Collateral (as defined below), as set forth in the Proposed Replacement Interim DIP Order, subject to the Carve-Out and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order;

(e)    granting to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in the Proposed Replacement Interim DIP Order;

(f)    authorizing the Debtors to use the proceeds of the Replacement DIP Facility, the Replacement DIP Collateral and the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral (as defined below), solely in accordance

7

with the terms and conditions set forth in the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**Permitted Variances**");

(g)    authorizing the Debtors to irrevocably repay in full all obligations outstanding under that certain *Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement*, dated as of December 22, 2022, as filed with the Court on December 28, 2022 (Docket No. 188) (as modified, the "**Original DIP Credit Agreement**" by and among the lenders from time to time party thereto (the "**Original DIP Lenders**"), the Administrative Agent (as defined therein) (the "**Original DIP Agent**"), and the postpetition financing facility provided thereby (the "**Original DIP Facility**")) with the proceeds from the Replacement DIP Facility as soon as practicable upon funding and terminating all liens granted to the Original DIP Agent and the Original DIP Lenders;

(h)    granting adequate protection, as and to the extent set forth in the Proposed Replacement Interim DIP Order, to the Prepetition Secured Parties (as in the Proposed Replacement Interim DIP Order) to protect against any Diminution in Value (as defined in the Proposed Replacement Interim DIP Order) of their respective Prepetition Notes Liens (as in the Proposed Replacement Interim DIP Order) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)    approving certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the Replacement DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order;

(j)    approving the Debtors' waiver of the right to surcharge the Replacement DIP Collateral as to the Replacement DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in the Proposed Replacement Interim DIP Order;

(k)    approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the Replacement DIP Collateral as to the Replacement DIP Secured Parties;

(l)    modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Proposed Replacement Interim DIP Order, providing for the immediate effectiveness of the Proposed Replacement Interim DIP Order, and granting related relief; and

WEIL:\98991236\11\39031.0011

(m)   scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of an order (the "**Replacement Final DIP Order**") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions reasonably acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

<div align="center">

### Summary of Terms of Replacement DIP Facility[4]

</div>

9.    In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), as incorporated by Rule 1075-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Facility. Any capitalized terms used herein but not defined shall be used as defined in the Commitment Letter or the Replacement DIP Term Sheet, as applicable.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Core Scientific, Inc., Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard Capital LLC, RADAR LLC and Core Scientific Mining LLC. (the "**Borrowers**") | Proposed Replacement Interim DIP Order Preamble<br><br>Replacement DIP Term Sheet - #1. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Core Scientific Acquired Mining LLC, Core Scientific Operating Company, Core Scientific Specialty Mining (Oklahoma) LLC, American Property Acquisition, LLC, American Property Acquisitions I, LLC, American Property Acquisition VII, LLC, Radar Relay, Inc., Starboard | Proposed Replacement Interim DIP |

---

[4] This summary is qualified in its entirety by reference to the applicable provisions of the Replacement DIP Documents. To the extent there exists any inconsistency between this summary and the provisions of the Replacement DIP Documents or the Replacement DIP Orders, the provisions of the Replacement DIP Documents or the Replacement DIP Orders, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Replacement DIP Documents and/or the Replacement Interim DIP Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain Replacement DIP Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | Capital LLC, RADAR LLC and Core Scientific Mining LLC. and any future subsidiaries of Core Scientific, Inc. that become debtors in the Chapter 11 Cases (the "**DIP Guarantors**") | Order, Preamble.<br><br>Replacement DIP Term Sheet - #2 |
| **Initial DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) | B. Riley Commercial Capital, LLC | Replacement DIP Term Sheet - #3 |
| **DIP Facility and Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) | Replacement DIP Facility to include a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million consisting of up to $70 million in term loan commitments, of which (1) $35 million will be available to the Borrowers in a single draw of Replacement DIP Loans following the entry of the Proposed Replacement Interim DIP Order and prior to the entry of the Replacement Final DIP Order (the "**Initial Draw**") and (2) following entry of the Replacement Final DIP Order, the remaining amount of the then undrawn Replacement DIP Facility shall be available to the Debtors (the "**Other Draws**"), in each case in accordance with and subject to compliance with the terms, conditions and covenants described in Replacement DIP Term Sheet and in the DIP Documents (the Replacement DIP Lender's commitments under the Replacement DIP Facility being the "**Replacement DIP Commitments**" and the loans under the Replacement DIP Facility being the "**Replacement DIP Loans**").<br><br>The Replacement DIP Facility shall be used to permanently decrease the Replacement DIP Commitments and Replacement DIP Loans repaid (for any reason) may not be reborrowed unless (and solely to the extent that) they are repaid prior to the entry of the Replacement Final DIP Order. | Proposed Replacement Interim DIP Order, Preamble.<br><br>Replacement DIP Term Sheet - #4-6 |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | The Debtors have prepared and delivered to the Replacement DIP Secured Parties the initial itemized cash flow forecast set forth on Exhibit 4 attached hereto, which has been approved by the Replacement DIP Lender (the "Initial Budget," as amended, supplemented or updated by the Debtors, and approved by the Replacement DIP Lender, from time to time in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Term Sheet or Replacement DIP Credit Agreement, as applicable, the "**Approved Budget**"), reflecting, on a line item, cumulative and aggregate basis, the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures (including debt service costs) expected to be incurred or made, by the Debtors for each calendar week during the period from the calendar week ending on the Friday of the week in which the Court enters the Proposed Replacement Interim DIP Order through and including the week ending June 30, 2023. The Initial Budget is an integral part of the Proposed Replacement Interim DIP Order, and the Replacement DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter | Proposed Replacement Interim DIP Order, ¶ H,<br><br>Replacement DIP Term Sheet #13, 22 |

Ad Hoc Equity Group Exhibit 7
10
**SASMF EXHIBIT 25**
**173 of 979**

| MATERIAL TERMS | LOCATION |
|---|---|
| | into the Replacement DIP Facility and to allow the Debtors' use of proceeds of the Replacement DIP Facility in accordance with the terms of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The Initial Budget is attached to the Proposed Replacement Interim DIP Order as **Exhibit 4**. | |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | The "Applicable Rate" on the Replacement DIP Facility is 10% per annum, payable in kind in arrears on the first day of each month.<br><br>The Default Rate with respect to the Replacement DIP Loans is the Applicable Rate plus 2.00% per annum.<br><br>As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof. | Replacement DIP Term Sheet - #9 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | *Monthly Replacement DIP Agent Fee.* $75,000 per month payable, in cash advance, to the Replacement DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter.<br><br>*Upfront Premium.* 3.50% (paid-in-kind) of Replacement DIP Loans under the Replacement DIP Facility, accrued and earned on the date upon entry of the Proposed Replacement Interim DIP Order.<br><br>*Extension Fee.* 3.50% in cash of the aggregate loans outstanding on the date the Borrowers extend the Maturity Date of all obligations under the Replacement DIP Facility by an additional three (3) months.<br><br>*Exit Premium.* Following the entry of the Proposed Replacement Interim DIP Order, upon and concurrently with the repayment or satisfaction of the Replacement DIP Loans in whole or in part, the Borrowers shall pay to the Replacement DIP Agent, in cash, 5.00% of the amount of the Replacement DIP Loans being repaid, reduced or satisfied.<br><br>In addition to the above fees, the Proposed Replacement Interim DIP Order provides that the Replacement DIP Loan Parties are authorized and directed to pay any and all (i) amounts due (or that may become due) in respect of any and all indemnification obligations under the Replacement DIP Loan Documents, and (ii) any other amounts payable in connection with the Replacement DIP Facility and the Prepetition Secured Notes, including the payment of all out-of-pocket costs, expenses and disbursements of the Replacement DIP Secured Parties and Prepetition Secured Parties, including the reasonable and documented fees and expenses of (A)(1) Choate, Hall & Stewart LLP ("**Choate**"), as counsel to the Replacement DIP Secured Parties and (2) any other professionals that | Proposed Replacement Interim DIP Order, ¶ 2.<br><br>Replacement DIP Term Sheet - #10 - 11 |

11

**Ad Hoc Equity Group Exhibit 7**
11

**SASMF EXHIBIT 25**
**174 of 979**

| MATERIAL TERMS | LOCATION |
|---|---|
| | may be retained by the Replacement DIP Lender (with the consent of the Replacement DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the Replacement DIP Borrowers shall not be required after the occurrence of a DIP Termination Event (as defined below) (collectively, the "**DIP Professional Fees and Expenses**")) and (B) the Noteholder Professional Fees and Expenses (as defined in the section "Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral" below). | |
| **Maturity Date; Duration for Use of Replacement DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The Maturity Date shall be the earliest of:<br><br>i.   the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent the Extension Fee, in cash (any such date being the "**Scheduled Maturity Date**")<br><br>ii.   the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**");<br><br>iii.   the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>iv.   the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents;<br><br>v.   the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility;<br><br>vi.   dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and<br><br>vii.   30 days after the date on which the Motion is filed (or such later date as agreed to by the DIP Agent), unless the Replacement Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). | Replacement DIP Term Sheet - #7 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: The Replacement DIP Loans may be prepaid at any time, after entry of the Replacement Final DIP Order, subject to payment of the Exit Premium <u>provided</u>, that, any Replacement DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order.<br><br><u>Mandatory Prepayments</u>: Mandatory prepayment of the Replacement DIP Loans together with all previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, including any Exit Premium shall be required from:<br><br>1.   Net proceeds from any sale, sale/leaseback, sublease of any real estate (or interests therein) identified in the Replacement DIP Term Sheet; and | Replacement DIP Term Sheet - #15 |

12

| MATERIAL TERMS | LOCATION |
|---|---|
| 2. Any Excess Cash (meaning any cash on hand (other than in the Carve-out Account)) in excess of $50 million as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month.<br><br>Such prepayments, in each case, shall be applied first to any previously uncapitalized interest then accrued and owing on such portion of the Replacement DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the Replacement DIP Agent or the Replacement DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the Replacement DIP Loans then outstanding. | |

| MATERIAL TERMS | LOCATION |
|---|---|
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | The closing and the obligation of the Replacement DIP Lender to make the Initial Draw includes usual and customary for financings of this type, including, among other things:<br><br>(a) entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>(b) delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>(c) the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement (as defined below) and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Proposed Replacement Interim DIP Order;<br><br>(d) customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; and<br><br>(e) delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the Replacement DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors).<br><br>The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws, shall also be subject to certain closing conditions, including, but not limited to:<br><br>(a) execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other Replacement DIP Documents evidencing the Replacement DIP Facility, in each case, which shall be in form and substance substantially consistent with the Term Sheet and otherwise in form and substance acceptable to | Replacement DIP Term Sheet - #17, 18 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | the Replacement DIP Agent and the Replacement DIP Lender and the Borrowers and the Guarantors;<br><br>(b) not later than 30 days following the date on which a motion to approve the Replacement DIP Facility is filed, the Proposed Replacement Final DIP Order as to the Replacement DIP Facility shall have been entered by the Bankruptcy Court, which the Proposed Replacement Final DIP Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the parties may mutually agree, in all cases, to be acceptable to the Replacement DIP Agent; and<br><br>(c) The RSA shall have been fully terminated and shall be of no further force or effect. | |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the Replacement DIP Agent and Replacement DIP Lenders are granted DIP Superpriority Claims granted on account of all Replacement DIP Obligations | Proposed Replacement Interim DIP Order, ¶ 7.<br><br>Replacement DIP Term Sheet - #23 |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out, all Replacement DIP Obligations in respect of the Replacement DIP Facility shall be:<br><br>1. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and<br><br>2. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):<br><br>    a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the Replacement DIP Agent and the Replacement DIP Lender); limited, with respect to all real property and the facilities, to those located in:<br><br>        i. Calvert City, Kentucky; | Proposed Replacement Interim DIP Order, ¶ 6.<br><br>Replacement DIP Term Sheet - #16 |

| MATERIAL TERMS | LOCATION |
|---|---|
| | |

        ii.   Grand Forks, North Dakota;

       iii.   Muskogee, Oklahoma;

       iv.   Barstow, Texas (Cedarvale);

       v.   Pecos, Texas (Cottonwood); and

       vi.   Dalton, Georgia; and

    b.   is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (2) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**Replacement DIP Collateral**"); provided, however, that any Replacement DIP Liens (as defined below) in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

   3.   upon entry of the Final Order, the proceeds of any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code (the "**Avoidance Actions**") (but not, for the avoidance of doubt, the Avoidance Actions themselves), and

   4.   any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Replacement DIP Agent or the Replacement DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits.

The DIP Liens shall be subject to the following priorities (subject in each case to the Carve-Out):

   1.   <u>First-Priority Liens on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first-priority liens and security interests in all First-Priority DIP Collateral (the "Frist-Priority DIP Liens"), which First-Priority DIP Liens shall be junior and subordinated only to the Carve-Out.

   2.   <u>Liens Junior to Certain Other Liens</u>. Pursuant to sections 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all Junior-Priority DIP Collateral (the "Junior-Priority DIP Liens"), which Junior-Priority DIP Liens in such Junior Priority DIP Collateral shall be subject only to the (a) Carve-Out, in all respects, and, as applicable (b)(1) the Prior Senior Liens, (2) the Equipment

| MATERIAL TERMS | LOCATION |
|---|---|
| | Lender Adequate Protection Liens, (3) the Prepetition Notes Liens, and (4) the Noteholder Adequate Protection Liens.<br><br>The liens securing the Replacement DIP Facility (the "**Replacement DIP Liens**") shall mean the liens described above. The Replacement DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Proposed Replacement Interim DIP Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative Covenants:</u> Usual and customary affirmative covenants for financings of this type including stipulations to, among other things:<br><br>1. Permitting Administrative Agent to inspect properties of the Debtor;<br><br>2. Keep adequate records and books of account with respect to its business activities and furnish same to Administrative Agent;<br><br>3. Provide notice of certain legal and pending legal actions against the Debtors;<br><br>4. Comply will all Applicable Laws;<br><br>5. Continue paying obligations and taxes and comply with applicable law in all material respects;<br><br>6. Maintain satisfactory insurance;<br><br>7. Keep each License affecting any collateral;<br><br>8. Deliver updated budgets, cash flow forecasts, and variance reports;<br><br>9. the Loan Parties and the Replacement DIP Agent agree to discuss in good faith with potential providers thereof and the Replacement DIP Agent an agreement to provide for forward sales or hedging agreements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and<br><br>10. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Replacement Final DIP Order is entered.<br><br><u>Negative Covenants:</u> Usual and customary negative covenants for financings of this type including stipulations to not, among other things, other than in accordance with the Replacement DIP Loan Agreement:<br><br>1. Incur, create, assume, or permit indebtedness generally except Permitted Debt; | Replacement DIP Term Sheet - #20, 21 |

16

**Ad Hoc Equity Group Exhibit 7**

16

| MATERIAL TERMS | LOCATION |
|---|---|
| 2. Create, incur, assume, or permit existence of any liens on any property or assets, except for Permitted Liens;<br><br>3. Declare or make any Distributions, except as permitted under the Replacement DIP Loan Agreement;<br><br>4. Make any Restricted Investment;<br><br>5. Make any Asset Disposition, except a Permitted Asset Disposition;<br><br>6. Make any payment or any Creditor Distribution with respect to any Debt, except payments to the extent permitted by, and made in accordance with, the Approved Budget or Replacement DIP Order;<br><br>7. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in Affirmative Covenant 10 above; and<br><br>8. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet) and, with the Replacement DIP Agent's prior consent, the Debtors' real estate listed in Section 16 of the Replacement DIP Term Sheet, so long as, in each case, net proceeds (including reductions to satisfy claims of other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the Replacement DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the Replacement DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation.<br><br>Usual and customary financial covenants for financings of this type including stipulations to, among other things:<br><br>(a) Comply with budget and variance covenants; and<br><br>(b) Not incur payment obligations or make payment disbursement unless in compliance with the Approved Budget, in compliance with the liquidity and budget covenants, and no Event of Default exists or arises at such time. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Usual and customary events of default for financings of this type, including but not limited to:<br><br>(a) the entry of the Replacement Final DIP Order shall have not occurred within 30 days after the date the Motion is filed; | Replacement DIP Term Sheet - #26 |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

**SASMF EXHIBIT 25**
**180 of 979**

| MATERIAL TERMS | LOCATION |
|---|---|
| (b) The failure to pay principal, interest and other amounts when and as required by the Replacement DIP Loan Agreement, subject to certain grace periods, as applicable;<br><br>(c) Any representation or warranty being incorrect when made by or on behalf of any Obligor in connection with any Loan Document in a material respect;<br><br>(d) the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) BlockFi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of BlockFi, the debt owing to BlockFi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default; and<br><br>(e) The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | None.<br><br>The Final Replacement DIP Order must be entered into by no later than 30 days following the filing of the Motion. | Replacement DIP Term Sheet - #18, 27 |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of:<br><br>(i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee plus interest at the statutory rate;<br><br>(ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee;<br><br>(iii) to the extent allowed at any time, whether by interim order, final order, or other order, all accrued but unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**", and together with the Debtor Professionals, the "**Professional Persons**") at any time on or before the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of a Carve Out Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Notice (the amounts set | Proposed Replacement Interim DIP Order, ¶ 22.<br><br>Replacement DIP Term Sheet - #25 |

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | forth in the foregoing clauses (i), (ii) and (iii), the "**Pre-Carve Out Notice Amount**"); and<br><br>(iv) Allowed Professional Fees of Professional Persons incurred after the date of delivery by the Replacement DIP Agent (at the instruction of the Replacement DIP Lender) of the Carve Out Notice, to the extent allowed at any time, whether by interim order, final order, or other court order, in an aggregate amount not to exceed $2.0 million (the amount set forth in this clause (iv) being the "**Post-Carve Out Notice Amount**", and together with the Pre-Carve Out Notice Amount, the "**Carve Out Amount**"). | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Replacement DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below<br><br>i. Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "Existing DIP Credit Agreement"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw);<br><br>ii. working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries;<br><br>iii. any adequate protection payments in accordance with the Proposed DIP Orders;<br><br>iv. professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date);<br><br>v. fees and expenses payable under the DIP Facility;<br><br>vi. interest and other amounts payable under the DIP Facility; and<br><br>vii. funding of the Carve-out Account.<br><br>Proceeds of the Replacement DIP Loans and Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and Replacement DIP Secured Parties (e.g., for investigations and litigation against such parties, incurring indebtedness without prior consent of the Replacement DIP Agent, etc.). | Replacement DIP Term Sheet - #13<br><br>Proposed Replacement Interim DIP Order, ¶ 24. |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties | Proposed Replacement Interim DIP Order, ¶ 12. |

19

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| **Liens, Cash Payments or Adequate Protection Provided for Use of Collateral and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | **Adequate Protection to Prepetition Secured Parties.** The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their Prepetition Liens in Prepetition Collateral (including Cash Collateral), as follows (the liens, security interests, payments and other obligations set forth in paragraph **Error! Reference source not found.** of the Proposed Replacement Interim DIP Order are collectively referred to herein as the "**Noteholder Adequate Protection Obligations**"):<br><br>a) *Noteholder Adequate Protection Claims.* The Prepetition Agents, for their own benefit and for the benefit of the Prepetition Secured Noteholders, are hereby granted, in the amount of any aggregate Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Noteholder Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all Replacement DIP Collateral. The Noteholder Adequate Protection Claims shall be (a) subject and subordinate only to the Carve Out and the DIP Superpriority Claims, (b) *pari passu* with the Equipment Lender Adequate Protection Claims (as defined below), and (c) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.<br><br>b) *Noteholder Adequate Protection Liens.* The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected postpetition liens and security interests in all DIP Collateral (the "Noteholder Adequate Protection Liens"). The Noteholder Adequate Protection Liens shall be (i) junior and subordinated only to (A) the Carve-Out, (B) the First-Priority DIP Liens, (C) the Prior Senior Liens, and (D) the Equipment Lender Adequate Protection Liens in the Prepetition Equipment Financing Collateral, (ii) *pari passu* with the Equipment Lender Adequate Protection Liens in First-Priority DIP Liens, and (iii) senior to any and all other liens and security | Proposed Replacement Interim DIP Order, ¶ 10, 11, 42. |

WEIL:\98991236\11\39031.0011
**Ad Hoc Equity Group Exhibit 7**
20
**SASMF EXHIBIT 25**
**183 of 979**

| MATERIAL TERMS | LOCATION |
|---|---|

interests in the DIP Collateral, including the Equipment Lender Adequate Protection Liens.

c) *Noteholder Professional Fees and Expenses.* The Replacement DIP Loan Parties are authorized and directed to pay, without the necessity of filing fee applications with the Court or compliance with the U.S. Trustee's fee guidelines, all of the out of pocket fees, costs and expenses of (i) the Prepetition Agents, including, the reasonable and documented fees and expenses of Shipman & Goodwin LLP, counsel to the Prepetition Agents, and (ii) the fees and expenses of the Ad Hoc Group, including, the reasonable and documented fees and expenses of (A)Paul Hastings LLP, as counsel to the Original DIP Lenders and the Ad Hoc Group and (B) Moelis & Company, LLC ("**Moelis**"), as investment banker and financial advisor to the Original DIP Lenders and the Ad Hoc Group, pursuant to the terms of that certain letter agreement by and among Core Scientific and Moelis (collectively, the "**Noteholder Professional Fees and Expenses**")

d) *Reporting.* The Debtors shall contemporaneously provide the Prepetition Agents and the Ad Hoc Group (and their respective advisors) with all reports, documents and other information required to be delivered to the Replacement DIP Secured Parties under the Replacement DIP Loan Documents and the Proposed Replacement Interim DIP Order.

e) *Cash Management Covenant.* The Replacement DIP Loan Parties shall maintain their cash management arrangements in a manner consistent with those described in the applicable "first day" order, which shall be in form and substance reasonably acceptable to the Replacement DIP Lender and the Ad Hoc Group.

<u>Adequate Protection to Prepetition Equipment Lenders</u>. Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their purported Prepetition Equipment Liens in Prepetition Equipment Collateral, the Prepetition Equipment Lenders shall be entitled to the following:

a) <u>Equipment Lender Adequate Protection Claims</u>. The Prepetition Equipment Lenders are each hereby granted, in the amount of any aggregate Diminution in Value of the respective purported Prepetition Equipment Liens in Prepetition Equipment Collateral (as applicable) from and after the Petition Date, superpriority administrative expense claims contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors (the "**Equipment Lender Adequate Protection Claims**," together with the Noteholder Adequate Protection Claims, the "**Adequate Protection Claims**"), which shall be payable by each of the Debtors on a joint and several basis, and shall have recourse to all DIP Collateral. The Equipment Lender Adequate Protection Claims shall be (i) subject and subordinate

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | LOCATION |
|---|---|
| only to the Carve-Out, the DIP Superpriority Claims, and the Noteholder Adequate Protection Claims and (ii) senior to any and all other administrative expense claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever.<br><br>b) <u>Equipment Lender Adequate Protection Liens</u>. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "Equipment Lender Adequate Protection Liens," and together with the Noteholder Adequate Protection Liens, the "Adequate Protection Liens"). The Equipment Lender Adequate Protection Liens shall be (i) junior and subordinated to (A) the Carve-Out, (B) the First-Priority DIP Liens in First-Priority DIP Collateral, (C) the Noteholder Adequate Protection Liens in Prepetition Secured Notes Collateral, and (D) the Prior Senior Liens (other than the Prepetition Equipment Liens that constitute Prior Senior Liens), (ii) *pari passu* with the Noteholder Adequate Protection Liens in the First-Priority DIP Collateral, and (iii) senior to the DIP Liens in Prepetition Equipment Financing Collateral (as applicable) and the Noteholder Adequate Protection Liens in Prepetition Equipment Financing Collateral (as applicable). | |
| **Determination Regarding Prepetition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Proposed Replacement Interim DIP Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition unsecured obligations with the Replacement DIP Lender and secured obligations with respect to the Prepetition Secured Parties. | Proposed Replacement Interim DIP Order, ¶ E, F. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Replacement Final DIP Order, the Replacement DIP Agent and the Replacement DIP Lender will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Proposed Replacement Interim DIP Order, ¶ 6. |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Period, the stipulations, admissions, agreements, and releases contained in the Proposed Replacement Interim DIP Order shall be binding upon the Debtors, any statutory or non-statutory committees, and all other parties in interest. The "**Challenge Period**", collectively, means the date that is (i) sixty (60) calendar days from the date of entry of the Proposed Replacement Interim DIP Order, (ii) such | Proposed Replacement Interim DIP Order, ¶ 23. |

**Ad Hoc Equity Group Exhibit 7**

| MATERIAL TERMS | LOCATION |
|---|---|
| | later date as has been agreed to in writing by the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and the affected Prepetition Agent (acting at the instruction of the requisite Prepetition Secured Parties under the affected Prepetition Notes Documents), or (iii) such later date as has been ordered by the Court, for cause shown, upon a motion filed with the Court prior to the Initial Challenge Deadline. | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Replacement DIP Loan Parties to grant the DIP Liens and the DIP Superiority Claims, and to perform such acts as the Replacement DIP Secured Parties may request to assure the perfection and priority of the DIP Liens, (b) the Replacement DIP Loan Parties to incur all liabilities and obligations to the Replacement DIP Secured Parties as contemplated under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such reasonable acts as the Prepetition Agents may reasonably request to assure the perfection and priority of the Adequate Protection Liens, (d) the DIP Loan Parties to incur liabilities and obligations to the Prepetition Secured Parties related to the Adequate Protection Obligations, as contemplated under the Proposed Replacement Interim DIP Order, (e) the Replacement DIP Loan Parties to pay all amounts required hereunder and under the Replacement DIP Loan Documents, (f) the Replacement DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of the Proposed Replacement Interim DIP Order and the DIP Loan Documents (as applicable), (g) subject to paragraph 20(b) of the Proposed Replacement Interim DIP Order, the Replacement DIP Secured Parties to exercise, upon the occurrence of any DIP Termination Event (as defined below), all rights and remedies provided for in the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, or applicable law, (h) the Replacement DIP Loan Parties to perform under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the Replacement DIP Loan Parties under the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Proposed Replacement Interim DIP Order and the Replacement DIP Loan Documents.<br><br>The automatic stay shall be modified to the extent necessary to permit the Replacement DIP Agent or the Prepetition Agents to take all actions, as applicable, regarding perfection of Replacement DIP Liens and Adequate Protection Liens.<br><br>The Replacement DIP Loan Parties shall immediately provide notice to counsel to the Replacement DIP Agent, the Replacement DIP Lender, the Prepetition Agents, and the Ad Hoc Group of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, | Proposed Replacement Interim DIP Order Preamble ¶ (f), 15, 16(c), 20(b). |

**Ad Hoc Equity Group Exhibit 7**

WEIL:\98991236\11\39031.0011

**SASMF EXHIBIT 25**
**186 of 979**

| MATERIAL TERMS | LOCATION |
|---|---|
| | without further application to or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or, with respect to clause (vi) below, the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and/or deliver a Carve-Out Notice, (ii) declare the termination, reduction or restriction of the commitments under the Replacement DIP Facility (to the extent any such commitment remains), (iii) declare all Replacement DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Replacement DIP Loan Parties, (iv) declare the termination of the Replacement DIP Facility and the Replacement DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the Replacement DIP Obligations, (v) declare the reduction or restriction on the Replacement DIP Facility or the Replacement DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral, (vii) invoke a Cash Dominion Period and/or sweep all cash or other amounts contained in the DIP Funding Account, and (viii) charge interest at the default rate set forth in the Replacement DIP Credit Agreement; provided that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral or Prepetition Secured Notes Collateral (as the case may be), the Replacement DIP Agent (acting at the instruction of the Replacement DIP Lender) and/or the Prepetition Agents (acting at the instruction of the requisite Prepetition Secured Parties under the applicable Prepetition Notes Documents), as applicable, shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "**Stay Relief Hearing**") to determine whether a DIP Termination Event has occurred (and the Replacement DIP Loan Parties and the Official Committee shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Event has occurred, the Court may fashion an appropriate remedy, which may include, inter alia, the exercise of any and all rights or remedies available to the Replacement DIP Secured Parties under the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents or applicable law against the DIP Collateral; provided that the Debtors' rights to contest such relief are expressly preserved. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan,** | The limitations on parties' abilities to file a plan, request cash collateral, or request authority to obtain credit without the consent of the Replacement DIP Loan Parties or the Prepetition Loan Parties are still being negotiated. At a minimum, the Debtors may be prohibited from | |

24

**Ad Hoc Equity Group Exhibit 7**
24

WEIL:\98991236\11\39031.0011

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| **Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | doing so unless they seek financing that will result in Full Payment of all Replacement DIP Obligations. | |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | DIP Liens.  As security for the prompt and complete payment and performance of all Replacement DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Replacement DIP Loan Parties or the Replacement DIP Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Replacement DIP Agent, for the benefit of itself and the Replacement DIP Lender, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "**DIP Liens**") in all DIP Collateral, in each case, subject and subordinate to the Carve-Out, and subject to the relative priorities set forth in the Proposed Replacement Interim DIP Order.<br><br>Noteholder Adequate Protection Liens.  The Prepetition Agents, for the benefit of themselves and for the benefit of the Prepetition Secured Noteholders, are hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by any of the Prepetition Secured Parties of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any Prepetition Secured Notes Collateral), in the amount of any aggregate Diminution in Value of the Prepetition Notes Liens in the Prepetition Secured Notes Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Noteholder Adequate Protection Liens**").<br><br>Equipment Lender Adequate Protection Liens. The Prepetition Equipment Lenders are each hereby granted, effective and perfected as of the entry of the Proposed Replacement Interim DIP Order, and without the necessity of the execution, recordation or filing by the Replacement DIP Loan Parties or any of the Prepetition Equipment Lenders of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title for titled goods, or any similar document or instrument, or the taking of any other action (including entering into any control agreements or taking possession or control of any DIP Collateral), in the amount of any aggregate Diminution in Value of the purported Prepetition Equipment Liens in the Prepetition Equipment Financing Collateral (as applicable) from and after the Petition Date, valid, | Proposed Replacement Interim DIP Order, ¶ 6(a); 10(b); 42(b) |

**Ad Hoc Equity Group Exhibit 7**

25

WEIL:\98991236\11\39031.0011

**SASMF EXHIBIT 25**

**188 of 979**

| MATERIAL TERMS | | LOCATION |
|---|---|---|
| | binding, enforceable and automatically perfected post-petition liens and security interests in all DIP Collateral (the "**Equipment Lender Adequate Protection Liens**," and together with the Noteholder Adequate Protection Liens, the "**Adequate Protection Liens**"). | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Proposed Replacement Interim DIP Order and subject to paragraph 23 thereof, the Debtors waive and release, *inter alia*, (i) the Prepetition Secured Parties, and (ii) the Replacement DIP Secured Parties, in each case, subject to the terms and provisions of the Proposed Replacement Interim DIP Order. | Proposed Replacement Interim DIP Order, Preamble ¶¶ E(d); F(e) 34. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Replacement DIP Documents and Proposed Replacement Interim DIP Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | Proposed Replacement Interim DIP Order, ¶ (2)(c). |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Replacement DIP Secured Parties upon the DIP Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to Replacement DIP Secured Parties, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Replacement DIP Lender with respect to the DIP Collateral, and no such consent shall be implied, directly or indirectly, from anything contained in the Proposed Replacement Interim DIP Order (including consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Replacement DIP Secured Parties to any charge, lien, assessment or claim against the Replacement DIP Secured Parties with respect to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise. | Proposed Replacement Interim DIP Order, ¶ 26 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | In no event shall the Replacement DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Replacement DIP Obligations, and all proceeds of DIP Collateral shall be received and applied in accordance with the Proposed Replacement Interim DIP Order, the Replacement DIP Loan Documents, as applicable; provided that the Replacement DIP Secured Parties shall use commercially reasonable efforts to first apply all DIP Collateral (other than any proceeds from Avoidance Action), to the extent such collateral may promptly be monetized in a commercially reasonable manner, before applying any proceeds from Avoidance Actions to satisfy the DIP Obligations and the Adequate Protection Obligations, as applicable | Proposed Replacement Interim DIP Order, ¶ 27. |

Ad Hoc Equity Group Exhibit 7
26

SASMF EXHIBIT 25
189 of 979

## Statement Regarding Significant Provisions

10.    Pursuant to paragraph 8 of the Complex Case Procedures, the Replacement DIP Loan Agreement and/or Replacement DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones** Complex Case Procedures ¶ 8(a) | None. |
| **Cross-Collateralization** Complex Case Procedures ¶ 8(b) | The Proposed Replacement Interim DIP Order does not provide for cross collateralization. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** Complex Case Procedures ¶ 8(d) | The Replacement DIP Collateral includes, upon entry of the Replacement Final DIP Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions under Chapter 5 of the Bankruptcy Code. Proposed Replacement Interim DIP Order ¶ 6(b). <u>Justification</u>. The Debtors submit that granting Replacement DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the Replacement DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' reorganization and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the Replacement DIP Lenders as a condition to extending credit, and by the Prepetition Secured Parties as a condition to permitting use of cash collateral. The Debtors respectfully submit that granting liens on Avoidance Proceeds is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** Complex Case Procedures ¶ 8(e) | The Proposed Replacement Interim DIP Order provides for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Proposed Replacement Interim DIP Order by the Debtors, the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed, the RSA not being fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered, or noncompliance, subject to any applicable grace and/or cure periods under the Motion, the Proposed Replacement Interim DIP Order or the Replacement DIP Documents. Replacement Interim DIP Term Sheet ¶26. <u>Justification</u>. These Events of Default appropriately balance, in the Debtors' view, the Replacement DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral. In addition, the Replacement DIP Agent must provide 5 calendar days' notice prior to exercising its rights under the |

Ad Hoc Equity Group Exhibit 7

**SASMF EXHIBIT 25**
**190 of 979**

WEIL:\98991236\11\39031.0011

| DIP Facility Term | Relief Requested |
|---|---|
| | Replacement DIP Documents and file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay. Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Replacement DIP Lenders (which consent shall not be unreasonably withheld or delayed), and (ii) the Professional Fees Escrow Amount. Therefore, the Proposed Replacement Interim DIP Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default. |
| **Releases of Claim Against Lender or Others**<br>Complex Case<br>Procedures ¶ 8(f) | Effective as of the date of entry of the Proposed Replacement Interim DIP Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits:<br><br>a) Each of the Prepetition Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, in each case, that may be asserted by any of the Debtors, their respective estates, predecessors, successors or assigns, against the Prepetition Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in each case, arising under, in connection with, or related to the Proposed Replacement Interim DIP Order, the Prepetition Notes, the Prepetition Liens, the Prepetition Secured Notes Collateral, the Prepetition Secured Obligations, the Prepetition Notes Documents, the Adequate Protection Obligations, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, |

| DIP Facility Term | Relief Requested |
|---|---|
| | marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Notes Documents (as relevant); and<br><br>(b) each of the Replacement DIP Secured Parties and each of their respective Representatives (in their capacities as such) from any and all obligations and liabilities to the Replacement DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the Replacement DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the Replacement DIP Secured Parties or their respective Representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of the Proposed Replacement Interim DIP Order, in connection with, arising under or related to the Proposed Replacement Interim DIP Order, the Replacement DIP Facility, the Replacement DIP Liens, the Replacement DIP Obligations, the Replacement DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the Replacement DIP Liens, the Replacement DIP Obligations or the Replacement DIP Loan Documents; *provided* that subject to the occurrence of the Closing Date, nothing contained in the foregoing shall release the Replacement DIP Secured Parties from their obligations under the Replacement DIP Facility from and after the date hereof.<br><br>Proposed Replacement Interim DIP Order ¶¶ E(d); F(e), 34. |

| DIP Facility Term | Relief Requested |
|---|---|
| | Justification.  The release is appropriate because (i) the Debtors are being provided consideration in the form of the Replacement DIP Facility and the and the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period (i.e., no later than (i) a date that is the later of 60 days after entry of the Replacement Final DIP Order, (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent and the Replacement DIP Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in paragraph 33 of the Proposed Replacement Interim DIP Order).  See Proposed Replacement Interim DIP Order, ¶ 23. |
| **Limitations on the Use of Cash Collateral** Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Lenders, the Replacement DIP Agent, and Prepetition Secured Parties (e.g., for investigations and litigation against such parties).  Proposed Replacement Interim DIP Order ¶ 24. |
| | Justification.  These limitations are usual and customary.  The Debtors, having engaged in arm's length negotiations with the Replacement DIP Lenders, Replacement DIP Agent, Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process.  The limitation is reasonable given the facts and circumstances of these Chapter 11 cases. |

## Comparison of Original DIP Facility and Replacement DIP Facility

11.     As set forth in more detail in the Second Singh Declaration, the table below summarizes certain key features of both the Replacement DIP Facility and the Original DIP Facility in a side-by-side comparison.

| DIP Facility Term | Original DIP Facility | Replacement DIP Facility | Improvement vs. Original DIP Facility |
|---|---|---|---|
| **Annualized Cost of Capital on New Money** | Greater than 60% | Approximately 20% | Yes |
| **Maturity** | 6-month, with 3-month extension | 12-month, with 3-month extension | Yes |

Ad Hoc Equity Group Exhibit 7
30

WEIL:\98991236\11\39031.0011

| | | | |
|---|---|---|---|
| **Roll-up** | 1-to-1 roll-up, in full commitment amount upon entry of Final Order (*i.e.*, no creeping mechanism) | None | Yes |
| **RSA** | Linked | No link | Yes |
| **Refinancing Exit Treatment** | Exit: 115% of then-outstanding debt amount in cash | Exit: 105% of then-outstanding debt amount in cash | Yes |
| **Access to Incremental Liquidity** | Up to ~$28 million of incremental draws limited to schedule in approved budget, which requires consent from DIP Lender | Up to $35 million of incremental draws available at any time after Final Order, so long as cash balance is below $30 million | Yes |
| **Milestones** | Multiple, including regarding case timing as it relates to RSA | None, other than related to DIP documentation and Final DIP Order | Yes |
| **Potential for Challenges and Litigation** | Objections filed by the Committee and the ad hoc group of equity holders | Potentially Ad Hoc Group, regarding use of cash collateral | Yes |
| **Payment to Take Out Original DIP Facility** | No payment needed now to continue DIP Facility | Immediate payment of approximately $9 million to Original DIP Lenders for accrued interest, fees, and termination payments | No |
| **Asset Sales** | Limited to $10 million to the extent needed to fund shortfall of DIP commitments | Permitted; net proceeds used to repay Replacement DIP Facility | Yes |

### Jurisdiction

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.
§ 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the
Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

**A.  General Background**

13.     On December 21, 2022 (the "**Petition Date**"), the Debtors each
commenced with this Court a voluntary case under the Bankruptcy Code.  The Debtors are
authorized to continue to operate their business and manage their properties as debtors in

WEIL:\98991236\11\39031.0011

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

        14.     On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

        15.     On December 23 2022, the Court entered the *Interim Order (A) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 130) (the "**Original Interim DIP Order**").

        16.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions* (Docket No. 5) (the "**First Day Declaration**").

**B. Significant Secured Prepetition Indebtedness**

        17.     The following table provides a summary of the Debtors' prepetition funded debt obligations and lease arrangements (the "**Prepetition Secured Obligations**") under their prepetition s(the "**Prepetition Secured Facilities**"):[5]

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| Prepetition April NPA | $239.6 million | First priority lien on substantially all assets of the Debtors as of the Petition |

---

[5] The Debtors reserve the right to assert that any of the debt is not secured due to invalidly perfected liens or otherwise.

SASMF EXHIBIT 25
195 of 979

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| | | Date (except equipment subject to other liens and real estate) |
| Prepetition August NPA | $320.7 million | Second priority lien on substantially all assets of the Debtors as of the Petition Date (except equipment subject to other liens and real estate) |
| Secured Mining Equipment Financing and Leases | $284 million | First lien on the ASIC Miners set forth in each lender's agreement |
| Secured Non-Mining Financings and Leases | $20.8 million | First lien on non-mining equipment (and real estate facilities) set forth in each lender's agreement |
| Facility Mortgages | $0.8 million | Real estate facilities set forth in each lender's agreement |
| Asserted Mechanics' Liens | Over $65 million (non-duplicative) | Real estate; priority and perfection under review |

18.     Additional details for each of the Debtors' debt instruments is provided in the First Day Declaration.  A summary of the secured debt instruments is provided below.

**1.     April and August Convertible Notes.**

19.     The Debtors have two sets of convertible secured notes with nearly identical terms (the "**Prepetition April NPA**" and the "**Prepetition August NPA**", together, the "**Prepetition NPAs**").  The Prepetition April NPA is dated April 19, 2021, and the Prepetition August NPA is dated August 20, 2021.  The Prepetition NPAs maturity date is April 19, 2025. The Prepetition NPAs carry the same interest rate and are convertible into shares of common stock of Core Scientific at a conversion price of $8.00 per share.

20.     The obligations under the Prepetition April NPA are secured pursuant to (i) that certain Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes Security Agreement**"), by and among Core Scientific Holding Co., the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent), and (ii) that certain Intellectual

WEIL:\98991236\11\39031.0011

Property Security Agreement, dated as of April 19, 2021 (the "**April Convertible Notes IP Security Agreement**").

21.     The obligations of the Debtors under the Prepetition August NPA are secured pursuant to (i) that certain Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes Security Agreement**"), by and among Core Parent, the NPA Guarantors, as guarantors, and the Note Agent (in its capacity as collateral agent for the August Convertible Notes), and (ii) that certain Intellectual Property Security Agreement, dated as of August 7, 2022 (the "**August Convertible Notes IP Security Agreement**" and collectively with the April Convertible Notes Security Agreement, the April Convertible Notes IP Security Agreement, and the August Convertible Notes Security Agreement, the "**Convertible Notes Security Agreements**")

**2.     Secured Mining Equipment Financing and Leases.**

22.     The Debtors utilized equipment leases or secured financing or arrangements to finance application-specific equipment for the mining of bitcoin (the "**ASIC Miners**").  As of the Petition Date, the Debtors have an aggregate of approximately $284 million of equipment leases and secured financing outstanding under different facilities with respective first lien security interests against approximately 91,000 of the Debtors' ASIC Miners.  The ASIC Miners are Excluded Property under such that they are not collateral for the NPA.

**3.     Secured Non-Mining Equipment Financing and Leases.**

23.     In addition to financing secured against mining equipment, the Debtors utilize secured financing and leases against non-mining assets to finance and utilize various infrastructure needs of the Debtors for their day-to-day operations.  As of the Petition Date, the Debtors have approximately $800,000 of facility mortgages, $20.8 million of non-mining equipment financing, and $9.3 million of non-mining equipment leases, each secured by various

34

assets. Like the ASIC Miners, the assets that secure the non-mining financing and leases are considered Excluded Property under the NPA.

### C. Need for Replacement DIP Facility and Use of Cash Collateral

24.      As discussed in the Second Singh Declaration, the Debtors have an immediate and critical need to obtain replacement DIP financing to pay the Original DIP Facility and enter into a DIP financing with more favorable terms to maximize recoveries for all creditors.

25.      Further, the Debtors are seeking to reach an agreement with Ad Hoc Group that permits the Debtors to use Prepetition Secured Noteholders' Cash Collateral, in exchange for which the Debtors will provide adequate protection to the Prepetition Secured Noteholders. At this time, the Debtors do not have an agreement with the Ad Hoc Group on this issue, but are continuing to work with the Ad Hoc Group to obtain consent. If the Debtors do not obtain such consent, they will seek to use the cash collateral on a non-consensual basis. The Approved Budget under the Replacement DIP Facility assumes access to Cash Collateral, and, absent the authority to use Cash Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

### D. Efforts to Obtain Postpetition Financing

26.      As set forth in the Second Singh Declaration, beginning in December 2022, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties.

27.      Prior to the Petition Date, PJT contacted 24 potential lenders it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc

WEIL:\98991236\11\39031.0011

Ad Hoc Equity Group Exhibit 7
35

group of the Prepetition Secured Parties, B. Riley, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals, including one from the Ad Hoc Group and one from a third party that ceased negotiations prior to reaching an agreement with the Debtors.

28.     Subsequent to the entry of the Original Interim DIP Order, PJT contacted 48 potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, seven (7) of which PJT had previously contacted prepetition and a number of which the financial advisors to the Committee recommended that PJT contact. Twenty (20) new parties signed non-disclosure agreements, and the Debtors received four (4) initial proposals for the Replacement DIP Facility. The Debtors negotiated with three of the four potential Replacement DIP Lenders, as the fourth proposal was received too late to be actionable in a timely manner, including trading multiple term sheets. All four potential lenders engaged in significant diligence during the postpetition DIP marketing process. The Replacement DIP Lender ultimately provided the Debtors with the best terms—as a whole—for a postpetition financing facility. Over the course of the past few days, the Debtors also provided the Ad Hoc Group with ample opportunity to improve their DIP Facility terms. Specifically, the Debtors requested that the Ad Hoc Group agree to several changes to the DIP Facility, including eliminating the Roll-Up, eliminating the default based on termination of the Restructuring Support Agreement, permitting asset sale proceeds to be used to pay off the DIP Facility, and improved economics. In addition, the Debtors shared the term sheets received from potential DIP lenders on a timely basis with both the Ad Hoc Group and the Committee. The Ad Hoc Group indicated an unwillingness to make the significant changes that would have been required to make its DIP Facility competitive with the other proposals the Debtors received.

36

WEIL:\98991236\11\39031.0011

29.     The negotiations with the Replacement DIP Lender were rigorous, marked by hard bargaining, and resulted in significant concessions by the Replacement DIP Lender and additional benefits to the Debtors.  It is unlikely that the Debtors would be unable to obtain this level of credit on more attractive terms, taken as a whole, within the timeframe required.

30.     Accordingly, the Replacement DIP Facility, taken as a whole, is the Debtors' best postpetition financing option and is reasonable under the facts and circumstances of Debtors' chapter 11 cases.

### Terms of Replacement DIP Facility Are Reasonable Under the Circumstances

31.     As discussed in the Second Singh Declaration, the obligations, interest rate, fees, maturity, covenants, and lack of milestones under the Replacement DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances.  Accordingly, the Replacement DIP Lender has acted in good faith and has agreed to provide the Replacement DIP Facility to the Debtors on terms, that are fair and reasonable under the current circumstances and market conditions.

32.     ***Junior Liens***.  A substantial portion of the Debtors' assets consists of equipment that is encumbered by secured financing arrangements other than under the Prepetition NPAs, as well as some real estate encumbered by mortgages, fixture filings and mechanics' liens. Rather than insisting on a non-consensual priming lien on such encumbered property, the Replacement DIP Lender has agreed to receive junior liens on such assets, with the goal of enhancing the collateral securing the Replacement DIP Facility and avoiding objections from these other secured parties.  While much of the Debtors' equipment and real estate assets are encumbered by equipment financing, mortgages, fixture filings and mechanics' liens, as applicable, the

37