| 7. | *Maturity and Termination* | • | All DIP Obligations (including, without limitation, all capitalized interest and fees) shall be due and payable in full in cash (or such other form of consideration as the DIP Agent and the DIP Lender may agree in their sole discretion) on the earliest of: |
|---|---|---|---|
| | | | i. the date that is twelve (12) months after the Petition Date; *provided*, that the Borrowers shall be permitted to extend such date by three (3) months upon paying the DIP Agent an extension fee (the "**Extension Fee**"), in cash, in an amount equal to three and one-half percent (3.50%) of the aggregate amount of all DIP Obligations drawn and outstanding as of the effective date of the extension (after giving effect to the Final Draw) (any such date being the "**Scheduled Maturity Date**") |
| | | | ii. the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor (a "**Plan**"); |
| | | | iii. the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; |
| | | | iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance herewith or with the DIP Documents; |
| | | | v. the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default (as defined below) under the DIP Facility; |
| | | | vi. dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | | | vii. 30 days after the date on which a motion to approve the DIP Facility is filed (or such later date as agreed to by the DIP Agent), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • | The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to make the Other Draws or the Final Draw. |
| 9. | *Interest Rate:* | • | The DIP Loans shall bear interest at a per annum rate equal to ten percent (10.00%), in each case payable in kind in arrears on the first day of each month (the "**Non-Default Interest**"). |
| | | • | Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.00%), in each case payable in kind, together with the Non-Default Interest, on the first day of each month. |

Ad Hoc Equity Group Exhibit 7
138

**SASMF EXHIBIT 25**
**301 of 979**

| 10. | *Monthly DIP Agent Fee:* | • $75,000 per month payable, in cash in advance, to DIP Agent for its sole account and benefit, on the Closing Date and the first business day of each calendar month thereafter (the "**Monthly DIP Agent Fee**"). |
|-----|--------------------------|---|
| 11. | *Upfront & Exit Premium; Approvals:* | • An upfront premium of three and one-half percent (3.50%) of the Maximum DIP Commitment Amount (the "**Upfront Premium**"), payable in kind to the DIP Lenders and added to the total amount of the DIP Obligations. |
| | | • The Upfront Premium shall be approved by the Bankruptcy Court in the Interim Order and shall be deemed fully earned and payable upon entry of the Interim Order. |
| | | • Following entry of the Interim Order, upon and concurrently with the repayment or satisfaction of the DIP Loans in whole or in part (including any scheduled, mandatory or voluntary prepayment thereof, including upon the acceleration thereof and the final payment at maturity), the Borrowers shall pay to the DIP Agent, in cash, an exit premium equal to five percent (5.00%) of the amount of the DIP Loans being repaid, reduced or satisfied (the "**Exit Premium**"). |
| | | • The Upfront Premium, the Exit Premium, the Extension Fee and the Monthly DIP Agent Fee shall be approved by the Bankruptcy Court as part of the Interim Order and reaffirmed in the Final Order. |
| 13. | *Use of Proceeds:* | • The proceeds of the DIP Facility shall be used only for the following purposes and, in the case of payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget, the Carve-Out and any permitted variances as set forth below |
| | |    i.   Payment in full of the obligations under that certain senior secured super-priority debtor-in-possession loan and security agreement, dated as of December 22, 2022 (the "**Existing DIP Credit Agreement**"), among the Borrowers, the lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as administrative agent, including, without limitation, any fees, premiums, costs or expenses related thereto; it being agreed that such amounts shall be payable from the Borrowers' existing cash at such time (including the Initial Draw); |
| | |    ii.   working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries; |
| | |    iii.   any adequate protection payments in accordance with the Orders (as defined below); |
| | |    iv.   professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date); |

11226390v13

Ad Hoc Equity Group Exhibit 7
139

**SASMF EXHIBIT 25**
**302 of 979**

> v. fees and expenses payable under the DIP Facility;
>
> vi. interest and other amounts payable under the DIP Facility; and
>
> vii. funding of the Carve-out Account.

- Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

> i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation
>
>> a. against the DIP Agent or the DIP Lender, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or
>>
>> b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;
>
> ii. to prevent, hinder, or otherwise delay the DIP Agent's or the DIP Lender's, as applicable, enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Orders, each in accordance with the DIP Documents and the Orders; *provided, however,* this shall not apply to objections by the official committee of the unsecured creditors to the Final Order;
>
> iii. to seek to modify any of the rights and remedies granted to the DIP Agent or the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable;
>
> iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or

Ad Hoc Equity Group Exhibit 7
140

SASMF EXHIBIT 25
303 of 979

| | | security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless (x) permitted hereunder or under the DIP Documents or unless all DIP Obligations, and claims granted to the DIP Agent or DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or paid in full in cash and the DIP Facility terminated or (y) otherwise agreed to in writing by the DIP Agent and the DIP Lender; or |
|---|---|---|
| | | v.  to pay any amount on account of any claims arising prior to the Petition Date unless such payments are permitted hereunder or under the DIP Documents or otherwise agreed to in writing by the DIP Agent and the DIP Lender, and in each case, included in the Budget, or otherwise approved pursuant to an order of the Bankruptcy Court. |
| 15. | ***Voluntary Prepayments/Mandatory Repayments:*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to, after entry into the Final Order, payment of the Exit Premium; <u>provided</u>, that, any DIP Loans voluntarily prepaid prior to the Final Order may be re-drawn after entry into the Final Order (subject to Section 6 above). |
| | | • Mandatory prepayment of the DIP Loans, together with all previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, including any Exit Premium shall be required from: |
| | | (i) net proceeds from sale, sale/leaseback, sublease of any real estate (or interests therein) identified in Section 16 below; and |
| | | (ii) any Excess Cash (meaning any cash on hand (other cash than in the Carve-out Account), in excess of $50,000,000 as at the last day of each month, such prepayment being required on the fifth (5th) Business Days of each calendar month). |
| | | • Such prepayments shall be applied first, to any previously uncapitalized interest then accrued and owing on such portion of the DIP Loan then being prepaid, second, to payment of any Exit Premium, third, to any accrued and unpaid fees and expenses owing to the DIP Agent or the DIP Lenders which are then due and owing and fourth, to the unpaid principal amount of the DIP Loans then outstanding. |
| 16. | ***Priority and Security:*** | • Subject to the Carve-Out, all obligations of the Borrowers and the Guarantors under the DIP Documents (or hereunder), including, without limitation, all principal, accrued interest, costs, fees, indemnities, reimbursements and premiums provided for herein and herein, and all obligations of the Debtors under the DIP Facility (the "***DIP Obligations***") shall be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority |

Ad Hoc Equity Group Exhibit 7
141

SASMF EXHIBIT 25
304 of 979

over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "***DIP Claims***")

- Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be:

  i. secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first priority lien on all property and assets (or interests therein) of the Borrowers' and the Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (the "**First Priority DIP Collateral**"); including, without limitation, all real property and the facility located in Marble, North Carolina; and

  ii. secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior priority lien on all property (or interest therein) of the Borrowers' and Guarantors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date that (and subject and junior only to that):

      a. is subject to valid, perfected, and nonavoidable liens in existence as of the Petition Date (including mortgages, mechanics' liens and fixture filings disclosed to the DIP Agent and the DIP Lender); limited, with respect to all real property and the facilities, to those located in:

          i. Calvert City, Kentucky;

          ii. Grand Forks, North Dakota;

          iii. Muskogee, Oklahoma;

          iv. Barstow, Texas (Cedarvale);

          v. Pecos, Texas (Cottonwood); and

          vi. Dalton, Georgia; and

      b. is subject to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (this clause (ii) being collectively, the "**Second Priority DIP Collateral**" and together with the First Priority DIP Collateral, the "**DIP Collateral**"); provided, however, that any DIP Liens in already encumbered collateral shall be junior to any adequate protection liens granted to existing creditors secured by such collateral.

11226390v13

| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
|---|---|---|
| | | • DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds, and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds, and/or profits. |
| 17. | *Conditions Precedent to Closing:* | • The Closing and the obligation of the DIP Lender to make the Initial Draw (and the right of the Borrowers to request such Initial Draw) shall be subject to the satisfaction of the conditions precedent set forth below and such other conditions set forth in the Interim Order:<br><br>i. entry of the Interim Order, which order shall not be stayed or subject to appeal;<br><br>ii. delivery of the Initial Budget and any subsequent Budget as applicable;<br><br>iii. the payment in full of the obligations under, and the termination of, the Existing DIP Credit Agreement and the inclusion in the Interim Order of provisions terminating all liens granted to the agent and lenders thereunder effective as of the date of the Interim Order;<br><br>iv. in addition to the release set forth in Section 30 hereof, the Interim Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors;<br><br>v. delivery by the Debtors of the notice of intent to terminate referenced in section 6(b)(ii) of the Restructuring Support Agreement dated as of December 22, 2022 entered into between the Debtors and the Consenting Creditors (as defined therein) (the "**RSA**") to the Ad Hoc Group Advisors (as defined in the RSA) (it being agreed that a copy of such notice shall have been provided to the DIP Agent for its review and reasonable comment prior to the Debtors' delivery thereof, as well as a final copy of such notice as so delivered by the Debtors);<br><br>vi. The DIP Agent shall have received Monthly DIP Agent Fee due and owing on the initial funding date (as set forth above); |

| | | vii. | no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
| | | viii. | no Event of Default or event or condition which with the giving of notice or lapse of time, or both, would constitute an Event of Default (a "**Default**") shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); and |
| | | ix. | accuracy of representations and warranties of the Debtors in all material respects (or, if such representation and warranty is qualified as to materiality, in all respects) as of the Closing Date and the date of the Initial Draw (or if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition). |
| 18. | ***Conditions Precedent to Full Availability of DIP Loans:*** | • | The right of the Loan Parties to request, and the obligation of the DIP Lenders to advance, any Other Draws and/or the Final Draw shall be subject to the conditions precedent set forth below, in the Final Order, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), and shall include, without limitation: |
| | | i. | execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Agent and the DIP Lender and the Borrowers and the Guarantors (it being agreed that the Initial Draw may be advanced based on the terms set forth in this Term Sheet and the Interim Order); |
| | | ii. | not later than 30 days following the date on which a motion to approve the DIP Facility is filed, the Final Order as to the DIP Facility shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order and such other changes as the DIP Agent may reasonably require and/or the |

|  |  |  | parties may mutually agree, in all cases, to be acceptable to the DIP Agent; |
|--|--|--|--|
|  |  | iii. | in addition to the release set forth in Section 30 hereof, the Final Order shall include customary stipulations by the Debtors and their estates disclaiming the existence of any claims or causes of action against each of the DIP Agent and the DIP Lender, subject to a customary challenge period by the official committee of unsecured creditors; |
|  |  | iv. | the Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal; |
|  |  | v. | the DIP Agent, the DIP Lenders and the Loan Parties shall have finalized and entered into the DIP Documents relating to the facilities contemplated hereby (and all of which have been approved by Bankruptcy Court); |
|  |  | vi. | the Debtors shall be in compliance in all respects with the Interim Order and the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
|  |  | vii. | at the time of each draw, no Default or Event of Default shall have occurred and be continuing (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  |  | viii. | at the time of each draw, accuracy of representations and warranties of the Debtors in all material respects (or if such representation and warranty is qualified as to materiality, in all respects) as of such date (or, if such representation or warranty expressly speaks to an earlier date, as of such earlier date) (the requesting and acceptance of any such draw being deemed to be a representation and warranty by the Borrowers as to the satisfaction of this condition); |
|  |  | ix. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Agent and DIP Lender the Interim Order or the Final Order, as applicable; |
|  |  | x. | delivery of a notice of borrowing, including a certification as to the satisfaction of the condition to the making of any Other Draws; |
|  |  | xi. | all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Agent or the DIP |

11226390v13

Ad Hoc Equity Group Exhibit 7
145

SASMF EXHIBIT 25
308 of 979

| | | Lender on or before the Final Draw shall have been paid; and |
|---|---|---|
| | | xii. The RSA shall have been fully terminated and shall be of no further force or effect. |
| 19. | ***Representations and Warranties:*** | • The Loan Parties shall make and be subject to (and are hereby deemed to agree to and make) the representations and warranties set forth herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| 20. | ***Affirmative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation: |
| | | i. the Loan Parties and the DIP Agent agree to discuss in good faith with potential providers thereof and the DIP Agent an agreement to provide for forward sales or hedging arrangements with respect to the Loan Parties' Bitcoin present and anticipated Bitcoin inventory; and |
| | | ii. the Loan Parties shall covenant and agree to timely and diligently pursue and prosecute the termination of the RSA and to take such actions as are required pursuant to the terms of the RSA to effect the such termination by a date no later than the date the Final Order is entered. |
| 21. | ***Negative Covenants:*** | • The Loan Parties shall be subject to (and are hereby deemed to agree to and make) the covenants and undertakings set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender), including, without limitation: |
| | | i. The Loan Parties shall not take, participate or support any action, motion or claim to rescind its termination of, or to continue or reinstate the RSA, or shall cease or fail to take the actions specified in clause (ii) of Section 20 above. |
| | | ii. It is agreed that such covenants will permit (a) sales of (i) Bitcoin in the ordinary course and (ii) non-core assets (it being agreed that non-core assets shall NOT include the Debtors' real estate listed in Section 16 above) and, with the DIP Agent's prior consent, the Debtors' real estate listed in Section 16 above, so long as, in each case, net proceeds (including reductions to satisfy claims of |

| | | other lienholders with respect to such assets including amounts to be escrowed or otherwise required to be held back or segregated by the Bankruptcy Court) thereof are used to repay the DIP Obligations (including any applicable Exit Premium) and (b) (i) transactions with respect to miners and equipment in the ordinary course of business and (ii) subject to the consent of the DIP Agent (subject to thresholds to be agreed) (x) the ability to reject or modify contracts, and (y) settlements of litigation. |
|---|---|---|
| 22. | ***DIP Budget / Variance Reporting:*** | • On or prior to the Closing Date, the Loan Parties shall deliver to the DIP Agent and the DIP Lender an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors through projected emergence (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). <br><br> • The Budget shall be updated and provided to the DIP Agent and the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of either the Borrowers or the DIP Agent, with such updated Budget extending the term thereof and the DIP Agent, in its reasonable discretion, shall have the right to approve or reject any such updates (or any amendments) by providing the Borrowers specific notice thereof within such four (4) business days after the delivery by the Borrowers of any such update or amendment; provided that, (i) to the extent the DIP Agent does not provide notice of approval or rejection within such four (4) business day period, such update or amendment shall be deemed approved and consented to by the DIP Lender and shall be deemed to constitute the updated approved Budget ("**Updated Budget**") upon the expiration of such 4 business day objection period and, (ii) to the extent the DIP Lender provides notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent. <br><br> • On a weekly basis thereafter, the Borrowers shall deliver to the DIP Agent and DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4 week rolling basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any variance exceeding twenty percent (20%) shall be material (each such report, a |

11226390v13

| | | "**Variance Report**," which shall be in a form satisfactory to the DIP Agent). |
|---|---|---|
| | | • For purposes of each Measuring Period, the Debtors shall calculate: (x) the numerical difference between total net receipts (with respect to self-mining and hosted miners) for such period to total net receipts (with respect to self-mining and hosted miners) for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a negative number, the percentage such difference (as an absolute amount) is of the cumulative budgeted amount for receipts for such period (the "**Receipts Variance**"); and (y) the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "**Disbursements and Capital Expenditure Variance**"). For the avoidance of doubt, the Disbursements Variance shall not include any amounts in the Budget related to professional fees, utility deposits or adequate assurance payments. |
| | | • For purposes herein, a "Permitted Variance" shall be limited to not greater than (a) twenty-five percent (25%) for budget variances with respect to the Receipts Variance and (b) twenty percent (20%) for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report. |
| 23. | *Interim Order:* | • The interim order approving the DIP Facility, which shall include the terms hereof and shall otherwise be in form and substance reasonably acceptable to the DIP Agent and the DIP Lender (the "**Interim Order**"), shall, among other things, authorize and approve: |
| | |     i.    the terms set forth in this Term Sheet and the entry into the Commitment Letter to which this Term Sheet is attached; |
| | |     ii.    the Initial Draw; |
| | |     iii.    the making of the DIP Loans; |
| | |     iv.    the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | |     v.    the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Agent and the DIP Lender as described herein under the heading "*Indemnification and Reimbursement of Expenses*" by the Debtors; it |

13

Ad Hoc Equity Group Exhibit 7
148

SASMF EXHIBIT 25
311 of 979

| | | |
|---|---|---|
| | | being acknowledged and agreed that all such fees and expenses may and will be withheld from the Initial Draw for direct payment thereof (to the DIP Agent, the DIP Lenders or such counsel and financial advisors) from such Initial Draw (without reducing the obligations of the Debtor to repay the entire amount of the Initial Draw); *provided, however,* notwithstanding anything to the contrary, fees and expenses incurred by the DIP Agent and the DIP Lender prior to the Interim Order and reimbursable pursuant to this clause (v) shall be limited to the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender. |
| | vi. | the termination of the Existing DIP Credit Agreement and related documents and all liens granted thereunder (and/or the interim order approving such Existing DIP Credit Agreement) as security therefor; and |
| | vii. | the calculations and payment of the Monthly DIP Agent Fee, the Upfront Premium, the Extension Fee and the Exit Premium, which fee payments shall not be subject to reduction, setoff or recoupment, and shall be fully earned upon entry of the Interim Order. |
| 24. | *Final Order:* | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order), with such modifications or additions thereto as may reasonably be required by the DIP Agent or as mutually agreed to by the parties, but in any event, to be in form and substance acceptable to the DIP Agent and the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, and the Final Draw. |
| 25. | *Carve out:* | • The "**Carve-Out**" shall, except as otherwise set forth herein, be consistent with the Existing DIP Credit Agreement. |
| 26. | *Events of Default:* | • The DIP Facility and the Loan Parties shall be subject to (and the Loan Parties hereby acknowledge and agree that the occurrence or existence thereof will constitute an Event of Default hereunder, under the Orders and under the DIP Documents) the Events of Default set forth below, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (the "**Event of Default**"), including, without limitation: |
| | i. | the entry of the Final Order shall have not occurred within 30 days after the date on which a motion to approve the DIP Facility is filed; |

11226390v13

| | | | ii. | the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | | | iii. | noncompliance, subject to any applicable grace and/or cure periods (other than in the case, among others pursuant the Documentation Principles, of any negative covenant (none of which shall be subject to any grace or cure period, except to the extent incorporated within any such covenant)), by any Loan Party or any of its subsidiaries with the terms of hereof (as giving effect to the Documentation Principles), the DIP Documents, the Interim Order or the Final Order; |
| | | | iv. | the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case, without the prior written consent of the DIP Agent and the DIP Lender; |
| | | | v. | the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Agent in its sole discretion; |
| | | | vi. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $20,000,000; provided, however, that any such order with respect to the assets of either (x) Blockfi Lending LLC ("**BlockFi**") or (y) NYDIG or their affiliates (so long as (i) relating solely to such equipment provided by such party, or in the case of Blockfi, the debt owing to Blockfi pursuant to its agreements as in effect prior to the Petition Date and (ii) such arrangement shall not result in the improvement or enhancement of such party's claims in the Chapter 11 Cases or security or priority position with respect to any of the Debtors' collateral) shall not be an Event of Default; |
| | | | vii. | the entry of an order (a) surcharging any of the DIP Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the |

Ad Hoc Equity Group Exhibit 7
150

**SASMF EXHIBIT 25**
**313 of 979**

DIP Agent, or (c) resulting in the marshaling of any DIP Collateral;

viii. any action by any Debtor to (a) challenge the rights and remedies of the DIP Agent or the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Agent or the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

ix. any Debtor files a motion in the Chapter 11 Cases without the express written consent of DIP Agent to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Facility and all DIP Obligations (including the Exit Premium);

x. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Agent, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Agent, (d) as permitted under the DIP Documents, or (e) as otherwise agreed to by the DIP Agent;

xi. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Agent and the DIP Lender;

xii. the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or the DIP Claims, (c) contest any material provision of any DIP Document;

xiii. any Debtor shall fail to execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent or the DIP Claims;

xiv. The Borrowers, DIP Agent and DIP Lenders do not agree upon the terms of and execute the final DIP Documents (which DIP Documents shall be subject to Bankruptcy Court approval in the Final Order), prior to

Ad Hoc Equity Group Exhibit 7
151

SASMF EXHIBIT 25
314 of 979

| | | |
|---|---|---|
| | | twenty (20) days after the Closing Date (or such later date to which the DIP Agent may otherwise agree), unless such failure is attributable to the DIP Agent's or the DIP Lender's bad faith in negotiating such documents (as determined in a final, non-appealable determination by a court of competent jurisdiction), or the Bankruptcy Court does not approve the Debtors' entry into the final DIP Documents; |
| | xv. | The RSA is not fully and finally terminated and/or has not ceased to be in full force and effect on or prior to the date upon which the Final Order is to be entered; and/or |
| | xvi. | Any Budget Variance exceeds the applicable Permitted Variance as set forth in the last bullet point in Section 22 above. |
| 27. | *Milestone:* | • None. |
| 28. | *Remedies:* | • The remedies exercisable by the DIP Agent and the DIP Lender following the occurrence of an Event of Default as set forth above shall be as set forth herein, in the Orders, in the DIP Documents, as deemed incorporated herein pursuant to the Documentation Principles and otherwise as are usual and customary in loan documents for similar debtor-in-possession financings and, in each case, as are acceptable to the DIP Agent and the DIP Lender. |
| 29. | *Indemnification and Reimbursement of Expenses:* | • The Loan Parties shall be subject to and liable for the customary indemnifications in favor of the DIP Agent, the DIP Lenders and their related parties as are included herein, in the Orders, in the DIP Documents and as otherwise deemed incorporated herein (and/or to be included in the DIP Documents), in each case, in accordance with the Documentation Principles (all to be in form and substance satisfactory to the DIP Agent and DIP Lender). |
| | | • Subject to the DIP Documents and in accordance with the Documentation Principles, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of (i) the DIP Agent and (ii) the DIP Lender, including the fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Agent and the DIP Lender, and as necessary, other local counsel in their capacity as counsel to the DIP Agent and the DIP Lender, incurred in connection with, the preparation, analysis, negotiation, documentation, execution and enforcement of, or actions or suits relating to, this Term Sheet, the related commitment letter, the DIP Documents, the Orders and/or otherwise in connection with the DIP Facility and the Chapter 11 Cases and/or the transactions contemplated thereby, shall be paid on a current basis <u>provided</u>, however, notwithstanding anything to the contrary, fees and expenses incurred prior to the Interim Order and reimbursable hereunder shall be limited to those of Choate, Hall & Stewart LLP, as counsel to the DIP Lender. |

Ad Hoc Equity Group Exhibit 7
152

**SASMF EXHIBIT 25**
**315 of 979**

| 30. | *Release:* | • The Orders shall include a customary release of the DIP Agent and DIP Lender, each in their capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|---|---|---|
| 31. | *Waivers:* | • The Orders shall include, in addition to those set forth herein, terms and conditions customary for final DIP financing orders or which shall otherwise be acceptable to the DIP Agent and DIP Lender (in their discretion), including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions, and waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable. |
| 32. | *Governing Law:* | • New York (and to the extent applicable, the Bankruptcy Code). |
| 33. | *Documentation Principles:* | • Without limiting and with the exception of any of the express provisions in this term sheet and/or in the Interim DIP Order or the Final Order, (x) until such time as definitive DIP Documents have been negotiated and executed by the Debtors, the DIP Agent and the DIP Lenders and approved by the Bankruptcy Court, the undertakings, restrictions, duties and obligations of the Debtors and the rights, remedies, protections, privileges, exculpations, and rights of reimbursement and indemnity of the DIP Agent and the DIP Lenders hereunder shall, in each case, be deemed to be governed by the terms of the Existing DIP Credit Agreement (unless and to the extent otherwise agreed to by the DIP Agent its discretion) as if the DIP Agent and the DIP Lenders were making the DIP Loans and the Debtors were incurring the DIP Obligations, in each case, under and pursuant to such Existing DIP Credit Agreement (and such agreement were among the Debtors, the DIP Agent and the DIP Lender), including as relating to the conditions precedent to lending, representations and warranties of the Debtors, affirmative and negative covenants and undertakings of the Debtors, events of default and the consequences thereof and the rights and remedies of the DIP Agent and the DIP Lender relating thereto, the agreements in Sections 3.4 through 3.7 and Sections 12 through Section14 of the Existing DIP Credit Agreement, together in each case with the related definitions (to the extent relevant) and (y) the DIP Documents shall be based on the Existing DIP Credit Agreement, with such additions and modifications thereto as the DIP Agent deems reasonably appropriate to reflect the terms of this Term Sheet or which are usual and customary for similar debtor-in-possession financings or which the DIP Agent and the Borrowers deem reasonably appropriate in light of the transactions contemplated hereby (collectively, the "**Documentation Principles**"). Until such time as the DIP Documents are fully-executed and approved by the Bankruptcy Court, in the event of a conflict between the terms of the Existing DIP Credit Agreement and the terms set forth in this term sheet or the Interim Orders, the terms of this term sheet and the Interim Order shall control. Notwithstanding anything to the contrary |

18

Ad Hoc Equity Group Exhibit 7
153

|   |   | herein, in the event of (and solely to the extent of) any direct conflict between the provisions of the Interim Order and this Term Sheet (as so interpreted to incorporate the terms of the Existing DIP Credit Agreement), the terms of the Interim Order shall control. |
|---|---|---|

**Ad Hoc Equity Group Exhibit 7
154**

**SASMF EXHIBIT 25
317 of 979**

**Exhibit 2**

**Commitment Letter**

EXECUTION VERSION

**B. Riley Commercial Capital, LLC**
299 Park Avenue
New York, NY 10171

January 29, 2023

Core Scientific, Inc.
210 Barton Springs Road, Suite 300
Austin, TX 78704
Attn: Todd DuChene; President, Chief Legal Officer and Secretary

## Commitment Letter

Dear Ladies and Gentleman:

You have informed **B. Riley Commercial Capital, LLC** (the "***DIP Lender***") that Core Scientific, Inc., a Delaware corporation (the "***Company***") and certain of the Company's direct and indirect subsidiaries (collectively and together with the Company, the "***Debtors***" and "***you***") referred to in the DIP Term Sheet attached hereto as ***Annex A*** (including[1] all exhibits and schedules thereto, the "***DIP Term Sheet***"; capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Sheet) have commenced cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under Case No. ***22-90341 (DRJ) (Jointly Administered)***, and wish to obtain the up to $70,000,000 DIP Facility referenced in the DIP Term Sheet, substantially on the terms set forth in this letter, as well as the DIP Term Sheet (such letter and the DIP Term Sheet, collectively, the "***Commitment Letter***"). The transactions contemplated by the DIP Term Sheet and this Commitment Letter are hereinafter collectively referred to as, the "***Transactions***".

1. Upon the terms and subject only to the conditions set forth in this Commitment Letter (including paragraph 3 hereof) and the DIP Term Sheet (including the "Conditions Precedent to Closing and Funding the Initial Draw" set forth in the DIP Term Sheet), the DIP Lender is pleased to inform you of its commitment to provide up to $70,000,000 of the DIP Commitments (as defined in the DIP Term Sheet). You hereby agree that, effective upon your acceptance of this Commitment Letter, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate any component of the DIP Facility or any other senior financing similar to or as a replacement of any component of the DIP Facility.

2. In consideration of the DIP Lender's commitments hereunder, the Company agrees to pay the fees described in the DIP Term Sheet on the terms and subject to the conditions (including as to timing and amount) set forth therein, including, without limitation the fees required to be paid to the DIP Agent and the DIP Lender by the Debtors as described therein under the heading "Interim Order".

3. The DIP Lender's commitments and agreements hereunder in respect of the DIP Facility are subject to the satisfaction or waiver in writing (by the DIP Lender) of all conditions precedent set forth in this Commitment Letter and the DIP Term Sheet, including those conditions precedent set forth across the heading "Conditions Precedent to Closing" and, in the case of the borrowing of any DIP Loans after the Closing Date, also the conditions precedent set forth across from the heading "Conditions Precedent to Full Availability of DIP Loans", in each case, in the DIP Term Sheet.

4. The Company, on behalf of itself and the other Debtors, represents and covenants that (i) all information, other

---

[1] For the avoidance of doubt, the terms "include", "includes" and "including" as used in this Commitment Letter are by way of example and not limitation, and shall be deemed to be followed by the words "without limitation" whether or not they are in fact followed by such words.

Ad Hoc Equity Group Exhibit 7
156

SASMF EXHIBIT 25
319 of 979

than Projections and Lien Information, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates in connection with the Transactions (the "*Information*") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading and (ii) all financial projections concerning the Debtors and their subsidiaries that have been or will be made available to DIP Lender or its affiliates by the Company or any of its affiliates, advisors or representatives (the "*Projections*") and all information related to all outstanding liens (including, without limitation, mechanics' liens), the amount thereof, the validity of such liens, any claims or counterclaims with respect to such liens and any materials available to offset such liens, in each case, which has been or is hereafter provided directly or indirectly by the Company or any of its affiliates, advisors or representatives to the DIP Lender or its affiliates (the "*Lien Information*") have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made. You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information, Projections and Lien Information were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information, Projections and Lien Information so that such representations will be correct in all material respects under those circumstances.

5. [Reserved].

6. [Reserved].

7. In addition, please note that the DIP Lender and its affiliates do not provide accounting, tax or legal advice. Notwithstanding anything herein to the contrary, DIP Lender (and each of its partners, officers, directors, employees, affiliates, agents, advisors and attorneys) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to DIP Lender relating to such tax treatment and tax structure. However, the foregoing sentence shall not apply to any information relating to the tax treatment or tax structure to the extent reasonably necessary to enable any person to comply with applicable securities laws.  For this purpose, "*tax treatment*" means U.S. federal income tax treatment, and "*tax structure*" is limited to any facts relevant to the U.S. federal income tax treatment of the Transactions.

8. The DIP Lender hereby notifies you that consistent with the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*PATRIOT ACT*") and 31 C.F.R. § 1010.230 (the "*Beneficial Ownership Regulation*"), it may be required to obtain, verify and record information that identifies you and each Guarantor, which information includes the name and address of you and each Guarantor and other information that will allow the DIP Lender to identify you and each Guarantor, including the delivery of the certification regarding beneficial ownership in relation to you, in accordance with, or as otherwise required by, the PATRIOT ACT and the Beneficial Ownership Regulation.  In addition, the DIP Lender may also request corporate formation documents, or other forms of identification, to verify information provided.  This notice is given in accordance with the requirements of the PATRIOT ACT and the Beneficial Ownership Regulation and is effective for the DIP Lender, any other lender and agent (including the DIP Agent) in respect of the DIP Facility.

9. As you know, DIP Lender and/or its affiliates may from time to time effect transactions, for their own account or the account of customers, and hold positions in loans or options on loans of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender and/or its affiliates may from time to time effect transactions and hold positions in securities or options on securities of the Company and other companies that may be the subject of this Commitment Letter.  In addition, DIP Lender may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of this Commitment Letter, and such affiliates shall be entitled to the benefits afforded to DIP Lender (subject to any limitations thereof) hereunder.

10.  The DIP Lender and its affiliates may have economic interests that conflict with those of the Company.  You agree that the DIP Lender will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the DIP Lender and the Company, its stockholders or their affiliates.  You acknowledge and agree that (i) the Transactions are arm's-length commercial transactions between the DIP Lender, on the one hand, and the Company and their affiliates, on the other, (ii) in connection therewith and with the process leading to such Transactions the DIP Lender is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors, or any other person, (iii) the DIP Lender has not assumed an advisory or fiduciary responsibility in favor of the Company and their affiliates with respect to the Transactions contemplated hereby or the process leading thereto (irrespective of whether the DIP Lender or any of its affiliates has advised or is currently advising the Company and their affiliates on other matters) or any other obligation to the Company and their affiliates except the obligations expressly set forth in this Commitment Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate.  The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such Transactions and the process leading thereto.  The Company, on behalf of itself and their affiliates, agrees that it will not claim that the DIP Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and their affiliates, in connection with such Transaction or the process leading thereto.

11. This Commitment Letter (including the DIP Term Sheet) may not be amended or waived except by an instrument in writing signed by the DIP Lender and the Company.  This Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page of this Commitment Letter by facsimile or email transmission shall be effective as delivery of a manually executed counterpart thereof.

12. This Commitment Letter (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto (other than the Interim Order), (ii) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS, and (iii) may not be assigned by the Company or the DIP Lender without the DIP Lender's or the Company's prior written consent, respectively, and any purported assignment without such consent shall be null and void, (iv) shall be binding upon the parties and their respective successors and assigns, and (v) may not be relied upon or enforced by any other person or entity and is not intended to confer any benefit upon, or create any right in favor of, any person other than the parties hereto except hereto except the entities and persons described in the definition of Indemnified Person.  ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF EITHER THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET IS HEREBY WAIVED BY THE PARTIES HERETO.  EACH OF THE COMPANY AND THE DIP LENDER AGREE THAT ANY SUIT OR PROCEEDING ARISING IN RESPECT OF THE TRANSACTIONS OR ANY MATTER REFERRED TO IN THE COMMITMENT LETTER OR THE DIP TERM SHEET WILL BE TRIED EXCLUSIVELY IN THE BANKRUPTCY COURT AND THE COMPANY AND THE DIP LENDER EACH AGREE TO SUBMIT TO THE JURISDICTION OF, AND TO VENUE IN, SUCH COURT.

13.  If any term, provision, covenant or restriction contained in this Commitment Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The DIP Lender and the Company shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

14. [Reserved].

**Ad Hoc Equity Group Exhibit 7
158**

**SASMF EXHIBIT 25
321 of 979**

15.  If you accept the terms and conditions of this Commitment Letter in accordance with, and by the deadline specified in, paragraph 18 hereof, the DIP Lender's commitments and other obligations hereunder will remain effective and terminate on February 2, 2023 at 11:59 p.m. (New York City time) unless prior to such time the Court has entered the Interim Order (the "Termination Date"); provided, that this Commitment Letter may otherwise be terminated by (x) mutual consent of the DIP Lender and the Company, (y) by the DIP Lender by written notice (i) prior to the Company's acceptance hereof or (ii) material breach by the Company of any of the conditions, representations, or its respective obligations or undertakings under this Commitment Letter or the DIP Sheet, as applicable, or (z) by the Company, in its reasonable discretion, to the extent that (i) it determines doing so would be required by its fiduciary duties and (ii) the Company promptly reimburses the DIP Lender, in full in cash, for all of its then-outstanding reasonable and documented fees and expenses (including, without limitation, the reasonable and documented fees and expenses of Choate, Hall & Stewart LLP, as counsel to the DIP Lender).

16. Paragraphs 2, 4, 7, 9, 10, 12 and 17 hereof shall remain in full force and effect regardless of whether any DIP Loans are funded or the DIP Documents shall be executed and delivered and notwithstanding the termination or expiration of this Commitment Letter or the DIP Lender's commitments hereunder; provided, that your obligations under this Commitment Letter (other than your obligations set forth in paragraphs 4, 5 and 14) shall automatically terminate and be superseded by the Interim Order and/or corresponding provisions of the DIP Documents upon the execution and delivery thereof, as applicable, in each case, solely to the extent such paragraphs (and the content thereof) are covered thereby with retroactive application to the date hereof.

17.  Subject to the Bankruptcy Court's approval of the Interim Order, you agree to indemnify and hold harmless the DIP Lender, its respective affiliates and its officers, directors, employees, agents, advisors, consultants, representatives, controlling persons, members and successors and assigns (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("**Losses**") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof, the Transactions, to reimburse each such Indemnified Person from time to time upon their reasonable demand upon presentation of a summary statement, for any reasonable and documented out-of-pocket legal expenses (including one outside local counsel in each relevant jurisdiction) or other expenses incurred in connection with the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (x) gross negligence or willful misconduct or (y) material breach of obligations under this Commitment Letter, in each case, whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the Transaction is consummated. You agree that, notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective equity holders or creditors or any other person or entity arising out of, related to or in connection with any aspect of the Transactions, the DIP Facility, the enforcement of this Commitment Letter, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's (a) gross negligence or willful misconduct or (b) breach of obligations under this Commitment Letter.

18.  If the foregoing correctly sets forth the DIP Lender's agreement with you, please indicate your acceptance of the terms and conditions of this Commitment Letter (including the DIP Term Sheet) by returning an executed counterpart to this Commitment Letter to the Company's counsel Weil, Gotshal & Manges LLP (by electronic (pdf) transmission to Maximilien.Pucci-SistiMaisonrouge@weil.com, Claudia.Stantzyk-Guzek@weil.com and Kate.Waterman@weil.com) on or before 11:59 p.m. (New York City time) on January 29, 2023.

**Exhibit 3**

**Schedule of Existing Liens**

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 1. | Affidavit for Mechanic's Lien | 8/19/2022 | 2022-3219 | Ward | Priority Power Management, LLC | $16,319,916 | 3013 FM 516 North, Barstow, TX 79777 Property Ownership is unclear from the document, but may be Core Scientific. |
| | Partial Release of Lien | 9/27/2022 | 2022 - 3741 | Ward | Priority Power Management, LLC | Amount Released - $6,250,096 Amount Remaining - $10,069,820 | 3013 FM 516 North, Barstow, TX 79777 |
| 2. | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022-4794 | Ward | Priority Power Management, LLC | $8,920,490 | 3013 FM 516 North, Barstow, TX 79777 |
| 3. | Affidavit Claiming Mechanic's and Materialman's Lien | 9/9/2022 | 2022-3542 | Ward | Graybar Electric Company, Inc. | $839,883.12 | 3013 FM 516 North, Barstow, TX 79777 Cedarvale Project, located at 3015 ranch Road 516, Barstow, Texas - Property Ownership is unclear from the document, but may be Core Scientific. |
| 4. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022-4334 | Ward | Huband-Mantor Construction | $4,155,739.72 total ($2,949,813.67 due and the remainder in retainage) | 3013 FM 516 North, Barstow, TX 79777 Property Ownership is unclear from the document, but may be Core Scientific. |
| 5. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/19/2023 | 2023-0202 | Ward | Huband-Mantor Construction | $10,297,562.23 | 3013 FM 516 North, Barstow, TX 79777 |

Ad Hoc Equity Group Exhibit 7

161

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 6. | Mechanic's Lien dated October 11, 2022 | 10/14/2022 | 2022-3951 | Ward | Wessely-Thompson Hardware, Inc. | $54,016.75 | 3013 FM 516 North, Barstow, TX 79777 |
| 7. | Affidavit for Mechanic's Lien | 11/15/2022 | 2022007947 | Ward | MK Marlow Company, LLC | $536,728.57 | 3013 FM 516 North, Barstow, TX 79777 Property Ownership is unclear from the document, but may be Core Scientific. |
| 8. | Affidavit for Mechanic's and Materialman's Lien | 11/16/2022 | 2022-4371 | Ward | ComNet Communications, LLC | $31,875.00 | 3013 FM 516 North, Barstow, TX 79777 Core Scientific Texas 2 Cedarvale CVL I project. Property Ownership is unclear from the document, but may be Core Scientific. |
| 9. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/21/2022 | 2022-4431 | Ward | Coonrod Electric Co., LLC | $1,547,802.40 | 3013 FM 516 North, Barstow, TX 79777 Property Ownership is unclear from the document, but may be Core Scientific. |
| 10. | Affidavit of Mechanics Lien by Tiered Contractor or Supplier | 11/28/2022 | 2022-4495 | Ward | Summit Electric Supply Co. | $309,162.20 | 3013 FM 516 North, Barstow, TX 79777 |
| 11. | Affidavit of Mechanics Lien by Tiered Contractor of Supplier | 11/30/2022 | 2022-4527 | Ward | Morsco Supply LLC DBA Morrison Supply Company | $4,466.68 | 3013 FM 516 North, Barstow, TX 79777 |

Ad Hoc Equity Group Exhibit 7
162

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 12. | Mechanic's and Materialman's Lien | 12/30/2022 | 22-90341 | Ward | Condair Inc. | $1,319,788.93 | 3013 FM 516 North, Barstow, TX 79777 |
| 13. | Affidavit for Mechanic's Lien | 8/18/2022 | 2022005550 | Reeves | Priority Power Management, LLC | $14,442,661 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| | Partial Release of Lien | 9/27/2022 | 202200662 | Reeves | Priority Power Management, LLC | Amount Released - $3,023,269<br><br>Amount Remaining - $11,419,392 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772<br><br>Property Owned by Jobe Ranch Family Limited Partnership |
| 14. | Amended Affidavit for Mechanic's Lien | 12/15/2022 | 2022008754 | Reeves | Priority Power Management, LLC | $12,162,237.00 | 1851 FM 2119, Pecos, TX 79772 and/or<br><br>1939 FM 2119, Pecos, TX 79772 |
| 15. | Notice of Claim for Unpaid Labor and/or Materials | 9/9/2022 | 2022006200 | Reeves | Graybar Electric Company, Inc. | $1,153,226.72 | 1851 FM 2119, Pecos, TX 79772<br><br>Appears to be property owned by JRC/RGC34 Trade Tracts, LTD. |

Ad Hoc Equity Group Exhibit 7

163

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | Unconditional Waiver and Partial Release dated September 23, 2022 | No recording information provided. | No recording information provided. | Reeves | Graybar Electric Company, Inc. | Released Amount: $279,961.04<br>Remaining Amount: $873,265.68 | 1851 FM 2119, Pecos, TX 79772 |
| 16. | Affidavit for Mechanic's Lien dated November 11, 2022 | 11/15/2022 | 2022007946 | Reeves | MK Marlow Company, LLC | $83,744.45 (including $24,157.65 in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or |
| 17. | Affidavit for Mechanic's Lien | Date of recording not provided. | 202211150000 03 | Reeves | MK Marlow Company, LLC | $978,127.96 | 1851 FM 2119, Pecos, TX 79772 and/or |
| 18. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007951 | Reeves | Huband-Mantor Construction | $9,007,945.01 total ($7,310,708.27 due and the remainder in retainage) | 1851 FM 2119, Pecos, TX 79772 and/or<br>1939 FM 2119, Pecos, TX 79772<br>Property Owned by Jobe Ranch Family Limited Partnership |
| 19. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/14/2022 | 2022007953 | Reeves | Huband-Mantor Construction | $1,699,939.21 | 1851 FM 2119, Pecos, TX 79772 and/or<br>1939 FM 2119, Pecos, TX 79772<br>Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County – Appears to be property owned by Jobe Ranch |

**Ad Hoc Equity Group Exhibit 7**

**164**

**SASMF EXHIBIT 25**

**327 of 979**

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | Limited Partnership and Hawkins Investments, Inc. |
| 20. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000447 | Reeves | Huband-Mantor Construction | $15,603,889.45 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Core Scientific Cottonwood Data Center Pecos Project in Reeves County, Texas |
| 21. | Affidavit Claiming Mechanic's and Materialman's Lien | 1/18/2023 | 2023000448 | Reeves | Huband-Mantor Construction | $1,967,676.93 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Core Scientific Cottonwood Data Center #2 Pecos Project in Reeves County |
| 22. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007983 | Reeves | Coonrod Electric Co., LLC | $4,083,704.13 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772 Cottonwood #1 Data Processing Center – Ownership of the Property is unclear |
| 23. | Affidavit Claiming Mechanic's and Materialman's Lien | 11/15/2022 | 2022007984 | Reeves | Coonrod Electric Co., LLC | $677,993.88 | 1851 FM 2119, Pecos, TX 79772 and/or |

**Ad Hoc Equity Group Exhibit 7**

165

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 24. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 11/30/2022 | 2022008322 | Reeves | Summit Electric Supply Co. | $821,433.16 | 1939 FM 2119, Pecos, TX 79772; Cottonwood #2 Data Processing Center – Ownership of the Property is unclear; 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772; 60 acre surface lease property |
| 25. | Affidavit of Mechanic's Lien by Tiered Contractor or Supplier | 12/2/2022 | 2022008384 | Reeves | Summit Electric Supply Co. | $22,558.14 | 1851 FM 2119, Pecos, TX 79772 and/or 1939 FM 2119, Pecos, TX 79772; 60 acre surface lease property |
| 26. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008777 | Reeves | T&D Moravits & Co., LLC | $305,769.50 | 1851 FM 2119, Pecos, TX 79772 |
| 27. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008778 | Reeves | T&D Moravits & Co., LLC | $82,240.00 | 1851 FM 2119, Pecos, TX 79772 |
| 28. | Affidavit for Mechanic's Lien | 12/15/2022 | 2022008779 | Reeves | T&D Moravits & Co., LLC | $96,192.50 | 1851 FM 2119, Pecos, TX 79772 |
| 29. | Affidavit for Mechanic's and Materialman's Lien | 12/16/2022 | 2022008811 | Reeves | Condair Inc. | $2,566,892.93 | 1851 FM 2119, Pecos, TX 79772 |

Ad Hoc Equity Group Exhibit 7

166

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 30. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Multiple | Trilogy | $6,170,853.24 | 1851 FM 2119, Pecos, TX 79772 |
| 31. | Affidavit for Mechanic's and Materialman's Lien | 10/28/2022 | 152295 | Denton | Sure Steel – Texas, L.P. | $1,237,031.22 | 8171 Jim Christal Road, Denton, TX 76207<br><br>DENTON DATA CENTER/ 8161 JIM CHRISTAL ROAD, DENTON, TEXAS; DESCRIBED IN DOCUMENT NUMBER 216662; PERMIT # 2202-0339; PARCEL ID 984633 |
| 32. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153496 | Denton | Way Mechanical | $151,316.10 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 33. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153498 | Denton | Way Mechanical | $284,712.90 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 34. | Affidavit for Mechanic's and Materialman's Lien - Leasehold | 11/1/2022 | 153497 | Denton | McCorvey Sheet Metal Works, LP | $20,895.50 | 8171 Jim Christal Road, Denton, TX 76207 |

**Ad Hoc Equity Group Exhibit 7**
167

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| | | | | | | | Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 35. | Affidavit for Mechanic's and Materialman's Lien | 11/3/2022 | 154942 | Denton | McCarthy Building Companies, Inc. | $3,685,631.28 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 36. | Amended Affidavit of Lien by McCarthy Building Companies Inc. | 11/14/2022 | 158011 | Denton | McCarthy Building Companies, Inc. | $17,052,583.65 | 8171 Jim Christal Road, Denton, TX 76207 |
| 37. | Mechanic's Lien Affidavit | 11/14/2022 | 157743 | Denton | BEAM Concrete Construction, Inc. | $878,306.82 | 8171 Jim Christal Road, Denton, TX 76207<br><br>Ownership of the Property is unclear, but appears to be in connection with a Core Scientific lease. |
| 38. | Lien Affidavit and Claim | 11/15/2022 | 158075 | Denton | Humphrey & Associates, Inc. | $9,365,366.20 | 8171 Jim Christal Road, Denton, TX 76207<br><br>leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207, 8161 Jim Christal Road, Denton, Texas 76207, and/or |

**Ad Hoc Equity Group Exhibit 7**

**168**

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 39. | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | | | | | | 8171 Jim Christal Road, Denton, Texas 76207 |
| | Affidavit Claiming Mechanic's and Materialman's Lien Including for Retainage | 12/1/2022 | 164584 | Denton | Housley Communications | $53,883.90 | 8171 Jim Christal Road, Denton, TX 76207 and/or 8151 Jim Christal Road, Denton, Texas 76207 |
| 40. | Lien Affidavit | 12/12/2022 | 168014 | Denton | Imperial Fire Protection, LLC | $209,210.00 | 8171 Jim Christal Road, Denton, TX 76207 and/or 8161 Jim Christal Road, Denton, Texas 79207 |
| 41. | Affidavit for Mechanic's and Materialman's Lien | 12/13/2022 | 168734 | Denton | ABLe Communications, Inc. | $1,228,932.14 total ($268,053.12 unpaid retainage) | leasehold interest in the Core Scientific Denton Data Center Project located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8171 Jim Christal Road, Denton, Texas 76207 |
| 42. | Affidavit for Mechanic's Lien | 12/15/2022 | 169545 | Denton | Pillar Electric Group, LP | $28,266.49 | leasehold interest located at 8151 Jim Christal Road, Denton, Texas 76207 and/or 8161 Jim Christal Road, Denton, Texas 76207 |

Ad Hoc Equity Group Exhibit 7
169

| | Document | Date Recorded | Document Number | County | Claimant | Amount Claimed | Property Site |
|---|---|---|---|---|---|---|---|
| 43. | Affidavit for Mechanic's Lien | 12/16/22 | 170453 | Denton | Power Engineering Services, Inc. | $98,440.00 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 44. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Denton | Maddox Transformers | $7,000,000 | 8151 Jim Christal Road, Denton, Texas 76207 |
| 45. | Mechanic's and Materialman's Lien Statement | 10/31/2022 | 2022-013536 | Muskogee | Harper Construction Company, Inc. | $7,500,000.00 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 46. | Mechanic's and Materialman's Lien Statement | 11/02/2022 | 2022-013616 | Muskogee | Contech, Inc. | $602,556.08 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 47. | Mechanic's and Materialman's Lien Statement | 11/28/2022 | 2022-014455 | Muskogee | Gaylor Electric, Inc. DBA Gaylor, Inc. | $5,245,601.81 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |
| 48. | Unrecorded Mechanic's and Materialman's Lien (documentation to be confirmed) | Not recorded. | Not recorded. | Muskogee | J.W. Didado | $6,000,000 | 1525 W Smith Ferry Rd, Muskogee, OK 74401 |

**Ad Hoc Equity Group Exhibit 7**
**170**

**SASMF EXHIBIT 25**
**333 of 979**

**<u>Exhibit 4</u>**

**Initial Budget**

SASMF EXHIBIT 25
334 of 979

# Detailed DIP Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| Week Starting | 1/28/2023 | 2/4/2023 | 2/11/2023 | 2/18/2023 | 2/25/2023 | 3/4/2023 | 3/11/2023 | 3/18/2023 | 3/25/2023 | 4/1/2023 | 4/8/2023 |
| Week Ending | 2/3/2023 | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 |
| **Operating Cash Flows** | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.4 | 6.9 | 6.1 | 6.1 | 6.7 | 7.4 | 7.5 | 7.5 | 7.5 | 7.8 | 7.9 |
| Hosting Payments | 1.3 | - | - | - | 3.2 | - | - | - | 7.3 | - | - |
| **Net Receipts** | 8.8 | 6.9 | 6.1 | 6.1 | 9.9 | 7.4 | 7.5 | 7.5 | 14.7 | 7.8 | 7.9 |
| Power Costs | (7.1) | (9.4) | (5.4) | (5.5) | (12.1) | (5.3) | (5.3) | (5.4) | (4.0) | (10.5) | (5.0) |
| Operating Costs | (2.2) | (1.3) | (3.1) | (1.4) | (2.5) | (1.3) | (2.5) | (1.3) | (2.5) | (1.1) | (2.1) |
| Tax Payments | (0.0) | (0.0) | (0.0) | (0.0) | (0.7) | - | - | - | - | - | - |
| **Net Operating Disbursements** | (9.3) | (10.8) | (8.5) | (6.9) | (15.3) | (6.6) | (7.7) | (6.6) | (6.5) | (11.7) | (7.1) |
| Construction & Infrastructure Capex | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| Miner Capex (Inc. Customs) | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | - | - | - | (1.1) | (0.5) | - | - | - | (1.2) | - | - |
| **Total Operating Cash Flows** | (0.6) | (3.9) | (2.3) | (1.9) | (5.9) | 0.8 | (0.3) | 0.9 | 7.0 | (3.8) | 0.8 |
| **Non-Operating Cash Flows** | | | | | | | | | | | |
| Professional Fees | (5.0) | (1.6) | (1.7) | (1.7) | (4.6) | (1.5) | (1.3) | (1.3) | (2.8) | (1.5) | (1.2) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | - |
| Debt Service Costs | - | - | - | - | (0.1) | - | - | - | (0.1) | - | - |
| Other (TBD) | (0.0) | - | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| **Net Non-Operating Cash Flows** | (5.0) | (1.6) | (1.7) | (2.4) | (5.4) | (2.2) | (2.0) | (2.0) | (3.6) | (2.2) | (1.9) |
| **Liquidity Balances** | | | | | | | | | | | |
| Starting Cash Balance | 46.5 | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 |
| New Money / DIP Financing | 35.0 | - | - | - | 20.0 | - | - | - | - | 5.0 | - |
| Existing DIP Repayment and Fees | (46.4) | - | - | - | - | - | - | - | - | - | - |
| Net Cash Flow | (5.6) | (5.5) | (4.0) | (4.3) | (11.3) | (1.4) | (2.3) | (1.1) | 3.5 | (6.1) | (1.1) |
| **Ending Cash Balance** | 29.6 | 24.1 | 20.1 | 15.8 | 24.5 | 23.1 | 20.8 | 19.7 | 23.2 | 22.1 | 21.0 |
| BTC Held & In Transit | 1.1 | 1.0 | 0.9 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | 30.6 | 25.1 | 20.9 | 16.7 | 25.5 | 24.2 | 21.9 | 20.8 | 24.2 | 23.2 | 22.2 |

**Ad Hoc Equity Group Exhibit 7**

172

# Detailed DIP Budget (Continued)

| | Week 12 Fcst | Week 13 Fcst | Week 14 Fcst | Week 15 Fcst | Week 16 Fcst | Week 17 Fcst | Week 18 Fcst | Week 19 Fcst | Week 20 Fcst | Week 21 Fcst | Week 22 Fcst | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 4/15/2023 | 4/22/2023 | 4/29/2023 | 5/6/2023 | 5/13/2023 | 5/20/2023 | 5/27/2023 | 6/3/2023 | 6/10/2023 | 6/17/2023 | 6/24/2023 | 01/28-06/30 |
| Week Ending | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | 6/2/2023 | 6/9/2023 | 6/16/2023 | 6/23/2023 | 6/30/2023 | |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Sale Proceeds | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 165.8 |
| Hosting Payments | - | - | 6.9 | - | - | - | 7.6 | - | - | - | 9.2 | 35.6 |
| **Net Receipts** | 7.9 | 7.9 | 14.8 | 7.9 | 7.9 | 7.9 | 15.5 | 7.9 | 7.9 | 7.9 | 17.1 | 201.4 |
| Power Costs | (4.8) | (5.0) | (10.6) | (4.8) | (4.7) | (4.8) | (8.7) | (5.1) | (4.9) | (5.0) | (5.6) | (139.0) |
| Operating Costs | (0.8) | (2.1) | (0.9) | (2.1) | (1.3) | (2.1) | (0.9) | (2.6) | (1.2) | (2.5) | (1.2) | (39.1) |
| Tax Payments | - | - | - | - | - | - | - | - | - | - | - | (0.8) |
| **Net Operating Disbursements** | (5.7) | (7.1) | (11.5) | (6.9) | (6.0) | (6.9) | (9.6) | (7.7) | (6.1) | (7.5) | (6.9) | (178.8) |
| Construction & Infrastructure Capex | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| Miner Capex (inc. Customs) | - | - | - | - | - | - | - | - | - | - | - | - |
| PP&E Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Capital Expenditures** | - | - | (0.9) | - | - | - | (0.9) | - | - | - | (0.9) | (5.6) |
| **Total Operating Cash Flows** | 2.3 | 0.8 | 2.4 | 1.0 | 1.9 | 1.0 | 5.0 | 0.3 | 1.8 | 0.4 | 9.3 | 16.9 |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | (1.2) | (1.2) | (2.8) | (1.2) | (1.2) | (1.2) | (2.2) | (1.1) | (1.1) | (1.1) | (16.5) | (54.8) |
| Utility Deposits | - | - | - | - | - | - | - | - | - | - | 6.3 | 6.3 |
| Debt Service Costs | - | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | (0.4) |
| Other (TBD) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (9.5) |
| **Net Non-Operating Cash Flows** | (1.5) | (1.5) | (3.2) | (1.5) | (1.5) | (1.5) | (2.6) | (1.5) | (1.5) | (1.5) | (10.6) | (58.3) |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | 21.0 | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 46.5 |
| New Money / DIP Financing | - | - | - | - | - | - | - | - | - | - | - | 60.0 |
| Existing DIP Repayment and Fees | - | - | - | - | - | - | - | - | - | - | - | (46.4) |
| Net Cash Flow | 0.7 | (0.7) | (0.8) | (0.5) | 0.4 | (0.5) | 2.4 | (1.2) | 0.3 | (1.1) | (1.3) | (41.4) |
| **Ending Cash Balance** | 21.8 | 21.1 | 20.3 | 19.9 | 20.2 | 19.7 | 22.1 | 20.9 | 21.2 | 20.0 | 18.7 | 18.7 |
| BTC Held & In Transit | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Ending Liquidity** | 22.9 | 22.2 | 21.5 | 21.0 | 21.4 | 20.8 | 23.2 | 22.0 | 22.3 | 21.2 | 19.9 | 19.9 |

**Exhibit 8**

SASMF EXHIBIT 25
337 of 979

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | § § | Case No. 22-90341 (DRJ) |
|  | § § | (Jointly Administered) |
| Debtors.[1] | § |  |

### DECLARATION OF JOHN SINGH IN SUPPORT OF EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN REPLACEMENT SENIOR SECURED NON-PRIMING REPLACEMENT SUPERPRIORITY POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PAY OFF EXISTING POSTPETITION FINANCING FACILITY, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, John Singh, pursuant to section 1746 of title 28 of the United States Code, hereby declare under the penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am above 18 years of age, and I am competent to testify. I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

Ad Hoc Equity Group Exhibit 8

SASMF EXHIBIT 25
338 of 979

2. PJT was retained in October 2022 to provide general restructuring and strategic advice and is the proposed investment banker for Core Scientific, Inc. ("**Core Scientific**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor subsidiaries, "**Core**," or the "**Company**").

3. On December 22, 2022, I provided a declaration in support of the Original DIP Facility and the Original Interim DIP Order (Docket No. 98)[2] (the "**First Singh Declaration**").

4. I submit this declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Non-priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Motion**").

5. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by PJT employees working under my supervision,

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (Docket No. 130) (the "**Original Interim DIP Order**"), or *Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Non-Priming Superpriority Replacement Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with SuperpriorityAdministrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Proposed Replacement Interim DIP Order**"), as applicable.

2

(iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, (v) information received from discussions and negotiations with potential lenders, and/or (vi) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the statements set forth herein on that basis.

6.      Information about my qualifications and the retention of PJT may be found in the First Singh Declaration.  I am not being compensated specifically for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors.[3]

### Summary of Relief Requested in the Motion

7.      Following an extensive marketing process, which is described in greater detail below, the Debtors have reached an agreement with B. Riley Financial, Inc. ("**B. Riley**" or the "**Replacement DIP Lender**") to provide the Debtors with a Replacement DIP Facility (as defined below).

8.      Pursuant to the Motion, the Debtors request entry of the Proposed Replacement Interim DIP Order that, among other things:

(a)      authorizes the Debtors to obtain postpetition financing on a superpriority, non-priming, senior secured basis (the "***Replacement DIP Facility***," and the loans made, advanced or deemed advanced thereunder, the "***Replacement DIP Loans***") in the form of a multiple-draw term-loan facility in an aggregate principal amount of up to $70 million, pursuant to which (i) an aggregate principal amount of $35 million shall be borrowed (the "***Second Interim DIP Borrowing***") in a single borrowing on the Closing Date (as defined in the Replacement DIP Term Sheet (as defined below)), and (ii) following entry of the Final Order (as defined below), the remaining aggregate principal amount under the Replacement DIP Facility shall be available, in one or more borrowings (each such borrowing, including the Second Interim DIP Borrowing, a "***DIP Borrowing***," and, collectively, the "***DIP Borrowings***"), and, in each case, in accordance with and subject to the terms and conditions (including any conditions precedent to each of the DIP Borrowings) set forth in the term sheet attached to the Motion as **Exhibit 1** (the "***Replacement DIP***

---

[3]      Pursuant to PJT's engagement letter entered into with the Debtors, and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the Replacement DIP Facility equal to, 0.75% x $70 million or $525,000.  Furthermore, pursuant to PJT's engagement letter and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the Original DIP Facility.

Term Sheet"), that certain *Commitment Letter*, dated as of January 29, 2023, by and between Core Scientific and the Replacement DIP Lender attached to the Motion as **Exhibit 2** (the "***Commitment Letter***"), and, subject to entry of the Final Order, on a final basis pursuant to a loan agreement (the "***Replacement DIP Credit Agreement***," and, together with all other agreements, guarantees, pledge, collateral and security agreements, mortgages, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Replacement DIP Agent and/or the Replacement DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, including the Replacement DIP Term Sheet, collectively, the "***Replacement DIP Loan Documents***"), by and among each of the Debtors, as borrowers (the "***Replacement DIP Borrowers***"), each of the direct and indirect subsidiaries of Core Scientific that are or become debtors in the Chapter 11 Cases, as guarantors (collectively, the "***Replacement DIP Guarantors***," and together with the Replacement DIP Borrowers, the "***Replacement DIP Loan Parties***"), B. Riley Commercial Capital, LLC, as administrative agent and collateral agent (in such capacities, together with its successors and permitted assigns, the "***Replacement DIP Agent***"), and the Replacement DIP Lender, and together with the DIP Agent, the "***Replacement DIP Secured Parties***") and this Interim Order;

(b)    authorizes the Replacement DIP Loan Parties to (i) execute, deliver, and perform under the Replacement DIP Term Sheet and each of the Replacement DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Replacement DIP Loan Documents, whenever the same shall become due or payable, whether at stated maturity, by prepayment, declaration, acceleration or otherwise, in each case, in accordance with the Replacement DIP Loan Documents and this Interim Order (collectively, the "***Replacement DIP Obligations***"), and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Interim Order, the Replacement DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)    authorizes the Replacement DIP Borrowers to incur, and the Replacement DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Interim Order and the Replacement DIP Loan Documents;

(d)    grants to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, the DIP Liens (as defined in the Proposed Replacement Interim DIP Order) in all DIP Collateral (as defined in the Proposed Replacement Interim DIP Order), as set forth in this Interim Order, subject to the Carve-Out and subject to the relative priorities set forth in this Interim Order;

(e)    grants to the Replacement DIP Agent, for the benefit of itself and the other Replacement DIP Secured Parties, allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all

Replacement DIP Obligations, subject in each case to the Carve-Out, as set forth in this Interim Order;

(f)     authorizes the Debtors to use the proceeds of the Replacement DIP Facility, the DIP Collateral and the Prepetition Secured Notes Collateral (as defined in the Proposed Replacement Interim DIP Order), including Cash Collateral (as defined below), solely in accordance with the terms and conditions set forth in this Interim Order and the Replacement DIP Loan Documents, including the Approved Budget (as defined in the Proposed Replacement Interim DIP Order), subject to any variances expressly permitted under the Replacement DIP Term Sheet (the "**_Permitted Variances_**");

(g)     authorizes the Debtors to irrevocably repay in full all obligations outstanding under that certain _Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement_, dated as of December 22, 2022, as filed with the Court on December 28, 2022 [Docket No. 188] (as modified, the "**_Original DIP Credit Agreement_**") the lenders from time to time party thereto, the "**_Original DIP Lenders_**," the Administrative Agent (as defined therein) thereunder, the "**_Original DIP Agent_**," and the postpetition financing facility provided thereby, the "**_Original DIP Facility_**") with the proceeds from the Replacement DIP Facility as soon as practicable upon funding;

(h)     grants adequate protection, as and to the extent set forth in this Interim Order, to the Prepetition Secured Parties (as defined below) to protect against any Diminution in Value (as defined in the Proposed Replacement Interim DIP Order) of their respective Prepetition Notes Liens (as defined in the Proposed Replacement Interim DIP Order) in the Prepetition Secured Notes Collateral (including Cash Collateral);

(i)     approves certain stipulations, waivers, and releases by the Debtors with respect to, _inter alia_, the Replacement DIP Secured Parties, the Replacement DIP Loan Documents, the DIP Liens, the Replacement DIP Obligations and the Replacement DIP Collateral, in each case, subject to the terms and provisions of this Interim Order;

(j)     approves the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or otherwise, upon the terms set forth in this Interim Order;

(k)     approves the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the Replacement DIP Secured Parties;

(l)     modifies or vacates the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Interim Order and the Replacement DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and

enforceability of this Interim Order, providing for the immediate effectiveness of this Interim Order, and granting related relief; and

(m)    schedules a final hearing (the "***Final Hearing***") on the Motion to consider entry of a final order (the "***Final Order***") authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions reasonably acceptable in all respects to the Replacement DIP Lender and Replacement DIP Agent in accordance with the Replacement DIP Term Sheet, and approving the form of notice with respect to such Final Hearing.

9.    I have personally observed, and it is therefore my opinion, based on my experience, in my professional judgment, and as a result of the broad marketing process undertaken regarding the DIP financing opportunity, and the subsequent negotiations and revised provisions of the Replacement DIP Facility agreed to by the Replacement DIP Lender, that the proposed Replacement DIP Facility is the product of good faith arm's-length negotiations, represents the best postpetition financing alternative currently available to the Debtors under the circumstances, and is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

## Debtors' Efforts to Obtain Postpetition Financing

10.    As discussed in the First Singh Declaration, leading up to the Petition Date, the Debtors, through PJT, launched a broad marketing process designed to maximize competition and solicit proposals from a wide range of prospective lenders, including (i) creditors already in the Debtors' capital structure, (ii) banks outside of the Debtors' capital structure, (iii) institutional and alternative lenders outside the Debtors' capital structure, and (iv) strategic parties.

11.    Prior to the Petition Date, PJT contacted 24 potential lenders it believed may have been interested in providing the Debtors with postpetition financing, including an ad hoc group of the Prepetition Secured Parties (the "**Ad Hoc Group**"), B. Riley, and several alternative lenders outside of the Debtors' capital structure. Nine (9) parties signed non-disclosure agreements, and the Debtors received two (2) initial proposals, including one from the Ad Hoc

Group and one from a third party that ceased negotiations prior to reaching an agreement with the Debtors. The Debtors ultimately determined that the best path forward was pursuing the DIP Facility provided by the Ad Hoc Group, as that was the only remaining financing proposal and the Debtors were able to obtain several concessions from the Ad Hoc Group through negotiations.

12.     Following entry of the Original Interim DIP Order, the Debtors continued to pursue potential alternative postpetition financing that would (i) improve terms relative to those of the Original DIP Facility and (ii) pay off the Original DIP Facility prior to final approval thereof and effectiveness of the roll-up contemplated thereunder.

13.     Subsequent to the entry of the Original Interim DIP Order, PJT contacted forty-eight (48) potential lenders that it believed may have been interested in providing the Debtors with postpetition financing, seven (7) of which PJT had previously contacted during the prepetition DIP marketing process. Twenty (20) parties signed non-disclosure agreements, and the Debtors received four (4) initial proposals for a replacement DIP facility. The Debtors negotiated with three of the four potential Replacement DIP Lender, as the fourth proposal was received too late to be actionable in a timely manner, including trading multiple term sheets. All four potential lenders engaged in significant diligence during the postpetition DIP marketing process. From these discussions, it was clear that the negotiated term sheet with B. Riley would provide the Debtors with the best terms—as a whole—for a postpetition financing facility. The Debtors were able to reach an agreement with B. Riley, as reflected in the Replacement DIP Term Sheet. Over the course of the past few days, the Debtors also provided the Ad Hoc Group with ample opportunity to improve their DIP Facility terms. Specifically, the Debtors requested that the Ad Hoc Group agree to several changes to the DIP Facility, including eliminating the Roll-Up, eliminating the default based on termination of the Restructuring Support Agreement, permitting

Ad Hoc Equity Group Exhibit 8
7

SASMF EXHIBIT 25
344 of 979

asset sale proceeds to be used to pay off the DIP Facility, and improved economics. In addition, the Debtors shared the term sheets received on a timely basis with both the Ad Hoc Group and the Committee. The Ad Hoc Group indicated an unwillingness to make the significant changes that would have been required to make its DIP Facility competitive with the other proposals the Debtors received.

14. The Replacement DIP Facility provides numerous benefits to the Debtors' estates in the form of a lower cost of capital as well as greater flexibility to pursue a restructuring that will maximize value for all interested parties. It also eliminates the Roll Up contemplated in the Original DIP Facility and resolves the Creditors' Committee's objections to the Original DIP Facility. Such flexibility includes removing milestones and eliminating the Restructuring Support Agreement.

15. Under the proposed Replacement DIP Facility, the Debtors will gain access to DIP financing in the aggregate amount of up to $70 million, with an interim borrowing of $35 million following entry of the Proposed Replacement Interim DIP Order. In addition to providing liquidity for the business, the borrowing under the Proposed Replacement Interim DIP Order, along with cash on hand, will be used to repay the Original DIP Facility to avoid an event of default as contemplated under the Original DIP Facility. The Debtors will be in default of the Original DIP Facility if, by February 2, 2023, (a) the court has not entered the Final DIP Order as contemplated in the Interim Order or (b) the Original DIP Facility has not been repaid in full.

16. To ensure the Debtors have sufficient time to prosecute these Chapter 11 Cases and seek to negotiate a consensual chapter 11 plan with stakeholders throughout the capital structure, the Replacement DIP Lender has provided the Replacement DIP Facility that matures in

Ad Hoc Equity Group Exhibit 8
8

SASMF EXHIBIT 25
345 of 979

twelve (12) months from the date of the Replacement DIP Term Sheet, which can be extended by an additional three (3) months for a fee.

17.     Further, the Debtors are seeking to reach an agreement with the Ad Hoc Group that permits the Debtors to use Prepetition Collateral, in exchange for which, the Debtors will provide adequate protection to the Prepetition Secured Noteholders as described in the Proposed Replacement Interim DIP Order filed on January 30, 2023.  At this time, the Debtors do not have an agreement with the Ad Hoc Group on this issue, but are continuing to work to obtain consent.  If the Debtors do not obtain such consent, they will seek to use the cash collateral on a non-consensual basis.  The Approved Budget under the Replacement DIP Facility assumes access to the Prepetition Collateral, and, absent the authority to use the Prepetition Collateral, the Debtors' funding and operational needs are not anticipated to be met and the Debtors will likely not be able to continue operations in the ordinary course of business, which would have a detrimental impact on the value of the enterprise.

18.     After nearly two months of prepetition and postpetition marketing and negotiations, I am confident that the Debtors are currently unable to obtain another DIP Facility on more attractive terms than those of the Replacement DIP Facility.  I believe entry into the Replacement DIP Facility is a reasonable exercise of the Debtors' business judgment.

**The Replacement DIP Facility's Terms Are Vastly Superior to the Original DIP Facility**

19.     It is my professional opinion based on my professional experience that the Replacement DIP Facility provides numerous benefits to the Debtors estates as compared to the Original DIP Facility.

20.     The Replacement DIP Facility provides the Debtors with capital at a significantly lower cost.  The cost of capital of the Replacement DIP Facility is approximately one-third of the annualized cost of the Original DIP Facility.

9

21.     In addition, the Replacement DIP Facility has several features that provide the Debtors with greater ability to pursue the best possible outcome for all stakeholders in these chapter 11 cases.  The Replacement DIP Facility eliminates all of the milestones under the Original DIP Facility and has a 12-month maturity with a 3-month extension compared to the Original DIP Facility, which has a 6-month maturity with a 3-month extension.[4]  The Replacement DIP Facility eliminates the requirement that the Debtors pursue the Restructuring Support Agreement (including the chapter 11 plan term sheet) negotiated with the Ad Hoc Group.  The Debtors understand that the Creditors' Committee and an ad hoc group of equity holders vehemently oppose the chapter 11 plan contemplated by the Restructuring Support Agreement.  The Debtors intend to negotiate with all stakeholders to propose a confirmable, and hopefully consensual, chapter 11 plan following Court approval of the Replacement DIP Facility.  Significantly, the Replacement DIP Facility also eliminates the Roll Up, which reduces takeout costs if the Original DIP Facility were to be approved on a final basis.

22.     Although the Replacement DIP Facility does not come with the consensual use of cash collateral that was provided by the Original DIP Facility, negotiations have been ongoing with the Ad Hoc Group to reach a consensual agreement that would permit the Debtors to continue to use cash collateral.

23.     The table below summarizes certain key features of both the Replacement DIP Facility and the Original DIP Facility in a side-by-side comparison.  When viewed in this manner, the key differences between the two deals make it clear that the Replacement DIP Facility is a superior deal for the Debtors.

---

[4]  The Replacement DIP Facility has a limited number of milestones related to documenting the Replacement DIP Facility and the timing of when a Final DIP Order must be entered.

Ad Hoc Equity Group Exhibit 8

**SASMF EXHIBIT 25**

**347 of 979**

| DIP Facility Term | Original DIP Facility | Replacement DIP Facility | Improvement vs. Original DIP Facility |
|---|---|---|---|
| Annualized Cost of Capital on New Money | Greater than 60% | Approximately 20% | Yes |
| Maturity | 6-month, with 3-month extension | 12-month, with 3-month extension | Yes |
| Roll-up | 1-to-1 roll-up, in full commitment amount upon entry of Final Order (*i.e.*, no creeping mechanism) | None | Yes |
| RSA | Linked | No link | Yes |
| Refinancing Exit Treatment | Exit: 115% of then-outstanding debt amount in cash | Exit: 105% of then-outstanding debt amount in cash | Yes |
| Access to Incremental Liquidity | Up to ~$28 million of incremental draws limited to schedule in approved budget, which requires consent from DIP Lender | Up to $35 million of incremental draws available at any time after Final Order, so long as cash balance is below $30 million | Yes |
| Milestones | Multiple, including regarding case timing as it relates to RSA | None, other than related to DIP documentation and Final DIP Order | Yes |
| Potential for Challenges and Litigation | Objections filed by the Committee and the ad hoc group of equity holders | Potentially Ad Hoc Group, regarding use of cash collateral | Yes |
| Payment to Take Out Original DIP Facility | No payment needed now to continue DIP Facility | Immediate payment of approximately $9 million to Original DIP Lenders for accrued interest, fees, and termination payments | No |
| Asset Sales | Limited to $10 million to the extent needed to fund shortfall of DIP commitments | Permitted; net proceeds used to repay Replacement DIP Facility | Yes |

24.     As noted, the Debtors will use the Replacement DIP Facility and their cash

on hand to pay off the Original DIP Facility, including approximately $9 million of take-out costs,

consisting of approximately $0.5 million in accrued PIK interest, approximately $0.8 million of

upfront fees, approximately $1.6 million in backstop fees, and approximately $6 million in termination fees. These fees were approved by the Court in connection with its interim approval of the Original DIP Facility and most of these costs would have been due whether the DIP Facility is repaid early or repaid at maturity.

25.     The Replacement DIP Facility also provided better terms than any of the other three postpetition financing proposals that the Debtors received over the last week. The Replacement DIP Facility provides the Debtors with greater flexibility relative to the Original DIP Facility and the other three postpetition financing proposals received, and the Replacement DIP Lender did not seek to prime any existing liens or link funding of the Replacement DIP Facility to any particular chapter 11 exit structure or chapter 11 plan.

26.     In summary, it is my professional opinion that the benefits of the Replacement DIP Facility justify the Debtors replacing the Original DIP Facility.

**Terms of the Replacement DIP Facility Are Reasonable Under the Circumstances**

27.     Based on my experience as a restructuring professional and my understanding of the Debtors' need for postpetition financing, the obligations, interest rate, fees, maturity, and covenants under the Replacement DIP Facility are reasonable, taken as a whole, under the circumstances, as well as compared to the Original DIP Facility and other DIP loans. Further, based on my experience with DIP financing transactions, my involvement in the negotiation of the Replacement DIP Facility, and the Debtors' pursuit of alternative postpetition financing proposals, the Replacement DIP Facility provides the best financing option currently available to the Debtors under the circumstances. In my view, the Replacement DIP Lender has acted in good faith and has agreed to provide the Replacement DIP Facility to the Debtors on

terms, taken as a whole, which I consider to be fair and reasonable under the current circumstances and market conditions, and as compared to other DIP loans.

28.    **Junior Liens**.  A substantial portion of the Debtors' assets consist of equipment that is encumbered by the Prepetition NPAs and certain equipment loans, as well as some real estate encumbered by mortgages and mechanics' liens.  Rather than insisting on a non-consensual priming lien on such encumbered property, the Replacement DIP Lender has agreed to receive junior liens on such assets, with the goal of avoiding objections from these other secured parties.  The Replacement DIP Lender would not provide capital without receiving liens that are junior to the liens securing these assets, which I believe is reasonable under the circumstances.

29.    **Liens on Unencumbered Assets.**  In addition, the Replacement DIP Lender require a perfected first priority security interest and lien on substantially all of the Debtors' unencumbered assets.  In my view, absent such protections, the Replacement DIP Lender would not have agreed to provide the Replacement DIP Facility to the Debtors.  I believe that the request for such liens on unencumbered assets is reasonable under the circumstances.

**Fees in Connection with Replacement DIP Facility Are Fair and Reasonable**

30.    The Replacement DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the Replacement DIP Facility.  In view of those commitments and the circumstances of these cases, I believe that the consideration being provided to the Replacement DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount and appropriately compensates the Replacement DIP Lender for its costs and the assurances they are providing to the process.

A.    *DIP Fees*

31.    In consideration for the Replacement DIP Agent's and Replacement DIP Lender's respective commitments in connection with the Replacement DIP Facility, the Debtors

have agreed to, among other things, (i) pay certain fees (the "**DIP Fees**"), all of which will be paid-in-kind during the Chapter 11 Cases, with cash payments only occurring upon repayment of the Replacement DIP Facility, (ii) pay certain agent monitoring fees in the amount of $75,000 per month, (iii) pay reasonable and documented out-of-pocket fees and expenses for the Replacement DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "**Out-of-Pocket Expenses**" and, together with the DIP Fees and agent monitoring fees, the "**DIP Fees and Expenses**"), and (iv) indemnify the Replacement DIP Lender in accordance with the Replacement DIP Loan Agreement.

     B.     *DIP Fees Are Reasonable*

     32.     The DIP Fees were the subject of arm's-length and good-faith negotiations between the Debtors and the Replacement DIP Lender, are integral components of the overall terms of the Replacement DIP Facility, and were required by the Replacement DIP Lender as consideration for the extension of postpetition financing. I do not believe that a financing commitment with terms similar to those in the Replacement DIP Facility is available to the Debtors for lower fees. Accordingly, I believe that the DIP Fees are reasonable under the circumstances of these Chapter 11 Cases.

     33.     In sum, it is my professional opinion that (i) the terms of the Replacement DIP Facility – including the fee structure and applicable interest rates – are, taken as a whole, (a) within the range of comparable DIP financing transactions and (b) are reasonable under the current circumstances and market conditions; (ii) the terms of the Replacement DIP Facility were the product of good faith, arm's-length negotiations; (iii) the Replacement DIP Facility will benefit all stakeholders in these Chapter 11 Cases; and (iv) absent the Court's entry of the Proposed Replacement Interim DIP Order, the Debtors' business will likely be harmed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed this 31st day of January, 2023

New York, New York


                                    Respectfully submitted,

                                    By:     _/s/ John Singh_____
                                            John Singh

**Exhibit 9**



DATE DOWNLOADED: Sun Feb 26 18:29:28 2023
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
Alan N.; Wypyski Resnick, Eugene M. Bankruptcy Reform Act of 1978: A Legislative History (1979).

ALWD 7th ed.
Resnick, Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative History (1979).

APA 7th ed.
Resnick, A. (1979). Bankruptcy Reform Act of 1978: Legislative History. Buffalo, NY, William S. Hein & Co.

Chicago 17th ed.
Resnick Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative History. Buffalo, NY, William S. Hein & Co.

McGill Guide 9th ed.
Alan N.; Wypyski Resnick, Eugene M., Bankruptcy Reform Act of 1978: A Legislative History (Buffalo, NY: William S. Hein & Co., 1979)

AGLC 4th ed.
Alan N.; Wypyski Resnick, Eugene M., Bankruptcy Reform Act of 1978: A Legislative History (William S. Hein & Co., 1979

MLA 9th ed.
Resnick, Alan N., and Eugene M. Wypyski. Bankruptcy Reform Act of 1978: A Legislative History. Buffalo, NY, William S. Hein & Co. HeinOnline.

OSCOLA 4th ed.
Resnick, Alan N.; Wypyski, Eugene M. Bankruptcy Reform Act of 1978: A Legislative History. Buffalo, NY, William S. Hein & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.

**Ad Hoc Equity Group Exhibit 9**



*Bankruptcy Reform Act of 1978* . . . . . . . . . . . . . . . . . . Document 52
Senate, 95th Congress, 2nd Session, Report No. 95-989
(to accompany S. 2266), July 14 (legislative day, May 17), 1978.

Ad Hoc Equity Group Exhibit 9
3

SASMF EXHIBIT 25
356 of 979

DOCUMENT 52

| 95TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 95–989 |
|---|---|---|

## BANKRUPTCY REFORM ACT OF 1978

JULY 14 (legislative day, MAY 17), 1978.—Ordered to be printed

Mr. DECONCINI, from the Committee on the Judiciary,
submitted the following

## REPORT

[To accompany S. 2266]

The Committee on the Judiciary, to which was referred the bill, S. 2266, to establish a uniform law on the subject of bankruptcies, having considered the same, reports favorably thereon and recommends that the bill in the nature of a substitute do pass. The committee amendment strikes out all after the enacting clause and inserts a new text, which appears in italic type in the reported bill.

### PURPOSE OF THE BILL

The purpose of the bill is to modernize the bankruptcy law by codifying a new title 11 that will embody the substantive law of bankruptcy and to make extensive amendments to title 28, Judiciary and Judicial Procedure, that will encompass the structure of the revised bankruptcy courts.

### PURPOSE OF THE AMENDMENT

The amendment in the nature of a substitute reflects, testimony received by the committee and the changes that resulted. The purpose of the revised bill remains to modernize the bankruptcy law.

### INTRODUCTION

In 1970, Congress created the Commission on the Bankruptcy Laws of the United States to study and recommend changes in bankruptcy laws. The Commission became operational in June 1971, and filed its final report with Congress on July 30, 1973. Its report was in two parts. Part I contained the Commission's findings and recommendations.

2

Part II contained a draft of a bill to implement those recommendations. Senator Quentin Burdick, Chairman of the Subcommittee on Improvements in Judicial Machinery and a member of the Commission, and Senator Marlow Cook, a member of the Commission, introduced that bill in the 93d Congress as S. 4026. No action was taken on the bill during the 93d Congress.

In the 94th Congress the Commission bill was again introduced by Senator Burdick as S. 236. Senator Burdick also introduced an alternative to the Commission bill that had been drafted by representatives of the National Conference of Bankruptcy Judges. The Judge's bill, S. 235, which differed in several major aspects from the Commission bill.

Hearings on both bills commenced in late February of 1975 and continued through November of 1975. All interested parties were invited to give testimony on the bills. The Subcommittee on Improvements in Judicial Machinery heard from several hundred interested parties and had nearly 80 witnesses personally testify over 24 days of hearings. The hearings covered all aspects of bankruptcy law. Testimony was heard on the structure of the new bankruptcy courts, the relationships of laws to bankruptcies, tax aspects, consumer bankruptcies, business reorganizations, railroad reorganizations, and the effect and interaction of the securities laws in bankruptcy cases.

Throughout the remainder of 1975 and all of 1976 the subcommittee continued to gather information and to begin work on a draft bill; however, no bill was reported to the full Judiciary Committee during the 94th Congress. Introduced in the House at this time were parallel bills to S. 235 and S. 236 entitled H.R. 31 and 32, and during the 94th Congress the House also held extensive hearings on the bankruptcy reform bills. The House culminated its actions with the introduction early in the 95th Congress of H.R. 6 which was amended and reintroduced as H.R. 8200. That bill was passed by the House of February 1, 1978.

S. 2266, a bill, the analogous bill to H.R. 8200, was introduced by Senators DeConcini and Wallop on November 1, 1977. The Subcommittee on Improvements in Judicial Machinery conducted further hearings in late November and early December, receiving testimony from nearly 60 witnesses and again receiving several hundred written statements and comments with regard to the bill. Subcommittee amendments as a result of the hearings, statements, and comments were made to the bill over the next five months and these efforts culminated in the reporting, by the subcommittee, on May 17, 1978, of a bill in the nature of a substitute offered. The report of the vote of the subcommittee was three in favor, none opposed, and one not voting.

The major purpose of this bill is the modernization of the bankruptcy laws. The substantive law of bankruptcy and the current bankruptcy system were designed in 1898, and underwent the last significant overhaul in 1938, nearly 40 years ago. Since that time there have been vast changes in the law of debtor-creditor relations, including the widespread adoption of the Uniform Commercial Code in the early 1960's and the vast spread of consumer credit. There has been a steady growth in the number of bankruptcies, both consumer and the more complicated business reorganization cases, over the last 20 years, and this

# DOCUMENT 52

3

steady growth has led to great stresses and strains in the bankruptcy system. The bankruptcy referee has gradually taken over the prime responsibility for the operation of the system from the Federal district judges.

The hearings before the Subcommittee on Improvements in Judicial Machinery confirmed that revision was necessary, and the bill is the attempt to upgrade and modernize our bankruptcy courts and also the law which they must apply in the bankruptcy area.

The bankruptcy bill is divided into four titles. Title I, consisting only of Section 101, codifies and enacts Title 11 of the United States Code entitled "Bankruptcy." Title 11 of the code will contain the substantive, and much of the procedural, law of bankruptcy.

Title II of the bill is a series of amendments to title 28 of the United States Code, entitled "Judicial Code and Judiciary," and it is to this title that a series of amendments are made establishing the bankruptcy courts, giving them their jurisdiction and providing them with staff, the appellate route, and setting out other integral portions of the bankruptcy system.

Title III of the bill contains amendments to other laws of the United States. Many of these amendments are technical and conforming in nature. Some, however, rationalize the status of liens in bankruptcy cases, to eliminate special priorities for various creditors, and to prevent discrimination against former bankrupts. All priorities will, under the bill, be contained in Title 11 of the United States Code itself, instead of being scattered throughout Federal law. The transition provisions are found in title IV. These include a repeal of the Bankruptcy Act, rules for the governance of the bankruptcy system during a period of transition to the new court system, and provisions for a study during transition to determine the number of bankruptcy judges needed under the new system.

The proposed title II of the United States Code is divided into seven chapters: 1, 3, 5, 7, 9, 11, and 13. Chapter 1 (General Provisions), chapter 3 (Case Administration), and chapter 5 (Creditors, the Debtor and the Estate), apply generally to all cases under chapter 7 (Liquidation), chapter 11 (Reorganization), and chapter 13 (Adjustment of Debts of an Individual with Regular Income). Limited portions of chapters 1, 3, and 5 apply to cases under chapter 9 (Adjustment of Debts of a Municipality).

Cases are filed in only one of the four operative chapters, 7, 9, 11, or 13, though the bill does provide for the conversion of a case from one chapter to another. In addition, there are special subchapters in chapters 7 and 11 for certain kinds of debtors. Chapter 7 contains two subchapters to handle the unique problems of stock brokers and commodity brokers. Chapter 11 contains one subchapter for railroad reorganizations. The remainder of those chapters, 7 and 11, apply in the special cases as well. Special subchapters provide supplementary rules and procedures.

Chapter 11, Reorganization, is primarily designed for businesses, although individuals are eligible for relief under the chapter. The procedures of chapter 11, however, are sufficiently complex that they will be used only in a business case and not in the consumer context. Chapter 13, Adjustment of Debts for Individuals with Regular In-

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**359 of 979**

6

4

come, is limited exclusively to individuals, but permits small sole proprietorships to use the chapter. The bill places a debt ceiling on individuals seeking to use chapter 13.

Similarly, the provisions in the generally applicable chapters, 1, 3, and 5 are not divided along consumer business lines. Specific provisions do have more frequent applicability in consumer or business cases, however, and some provisions are limited only to use by individuals.

## TITLE I

### CHAPTER 1—GENERAL PROVISIONS

Chapter 1 is the General Provision chapter. It contains sections such as definitions, rules of construction, guidelines as to the applicability and interrelationship of the various chapters and subchapters, and identification of who may be debtors under each chapter. It also sets out the ground rules for applicability of the later chapters and is really more a procedural chapter than one setting out substantive rights of the parties.

### CHAPTER 3—CASE ADMINISTRATION

Voluntary cases are commenced by the filing of a petition in the office of a bankruptcy judge. Current law is charged to allow for a joint petition in the instance of a husband and wife who both wish to file. Involuntary cases may be filed only under chapter 7 or 11 of the title.

An involuntary case may be filed by three or more creditors having claims aggregating at least $5,000 unless there are fewer than twelve creditors, in which case one creditor holding a claim of at least $5,000 may file. The requirement for filing an involuntary petition is that the debtor is generally unable to pay, or has failed to pay a major portion of, his debts as they become due or, that, within 90 days before the filing of a petition, a custodian has been appointed for the debtor's property. The inability or failure to pay debts test is a change from current law which requires "balance sheet" insolvency.

Trustees in cases under title 11 will continue as in present law to be private individuals qualified for the performance of such duties.

As under present law, within a reasonable time after the order for relief in a bankruptcy case, there shall be a meeting of creditors at which the court will preside. The court's presence is necessary to impress upon the debtor the seriousness of the proceedings and to rule upon questions that may arise at such meetings.

The filing of a bankruptcy petition or any other petition commencing a case under this title automatically stays the enforcement of any lien against the debtor's property or to recover any claim owed by the debtor. The automatic stay, by its nature, seriously affects the rights of all of the debtor's creditors. As a result, certain limitations are placed upon the continuance of the stay. Adequate protection in the form of either cash payments or a replacement lien must be provided the creditor whose collateral is decreasing in value or is being consumed during the stay. Moreover, any creditor may request the court for relief from

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

360 of 979

DOCUMENT 52

5

such stay, which request shall be given calendar priority by the court. In cases where the single asset of the debtor is real property, the court shall grant relief from the stay if the debtor has no equity in the collateral, thereby allowing the creditor to proceed with his foreclosure. If equity is present in property that is not needed for a reorganization, the court must order the property sold, so that the creditor can be paid.

A troubling concept, and the subject of much litigation in recent chapter cases, has been the use by the debtor of collateral during the reorganization. Under the bill, the debtor may use inventory or accounts receivable collateral during the ordinary course of the business without court approval. However, before the debtor may use cash collateral, defined as cash, negotiable instruments, documents of title, securities, deposit accounts, or a cash equivalent, there must be a hearing and finding by the court. Such a finding may be conditioned upon the providing of adequate protection by periodic cash payments or a replacement lien.

An important exception to the trustee's rights to use, sell, or lease property of the estate is in the instance of joint ownership of public utilities. The trustee is unable to sell the interest of a co-owner in a bankruptcy case, if the nonbankrupt co-owner's interest is related to the service of a public utility.

Provisions are made under the bill for a trustee to obtain credit while he operates the business of the debtor. The trustee may be authorized to incur debts having priority over existing liens on the property of the estate. Such a debt may be incurred, however, only after notice and hearing by the court and only if adequate protection is provided to the other holders of security interests in that property of the debtor.

The rights of the trustee to reject executory contracts and unexpired leases provided by current law is continued in the bill. In a liquidation case, if the trustee does not assume or reject such a contract or a lease within sixty days after the order of relief, such contract is deemed rejected. Under chapters 9, 11, or 13 of this title, the court, upon request of any party to such contract or lease, may order the trustee to set a time in which to assume or reject such contract or lease. The right of a trustee to assume or reject executory contracts does not include the right to assume a loan commitment.

CHAPTER 5—CREDITORS, DEBTOR, AND THE ESTATE

Chapter 5 reflects the policy of the revision of the Bankruptcy Act to include all of the property of the debtor in the bankruptcy case and to allow the trustee more easily to recover property that may have been transferred by the debtor. As a result of these changes the amounts that will be returned to all creditors can be greater.

A new section requires secured creditors to file claims, allowing an early evaluation to determine the secured and unsecured portion of the claim.

The priority section is greatly broadened for employees and consumers and reduced for Government claims. Under current law, employees currently are allowed a $600 priority for unpaid wages, which does not include any claims for contributions to employee benefit plans such as pension, health, and life insurance plans. The bill's priority

SASMF EXHIBIT 25
361 of 979

6

section will raise the $600 limit to $1800 and create an additional, separate priority of up to $1800 for fringe benefits. Any one employee's combined priority for wages and fringe benefits, however, cannot exceed $1800. A new priority for consumer creditors who had deposited money in connection with the purchase, lease, or rental of property is also created. The Government's general priority for nontax claims, currently the fifth priority in section 64 of the Bankruptcy Act, is abolished.

Current law is retained in the area of exempt property, which is property that the debtor may retain after bankruptcy for a fresh start. For this purpose, current law adopts the exemption law of the State in which the debtor is a resident. H.R. 8200, the House version of this bill, contains a provision for exemptions that would allow the debtor to choose between State law or Federal exemptions as set by the bill, whichever is higher. H.R. 8200 would establish 11 categories of property for the Federal exemption, among which is a homestead exemption of $10,000. Such a provision in joint cases would result in a husband choosing State exemptions while a wife might choose Federal exemptions. Together, they could thus retain after bankruptcy, very substantial amounts of property, while their debts would have been discharged. The committee feels that the policy of the bankruptcy law is to provide a fresh start, but not instant affluence, as would be possible under the provisions of H.R. 8200. Moreover, current law has allowed the several State legislatures flexibility to meet the needs and fresh-start requirements of the debtors of their particular States.

As with current law, certain debts, particularly those obtained by false pretenses, false representations, or actual fraud, are excepted from discharge. However, the committee received considerable testimony that creditors have used these exceptions to threaten debtors into settlements which the debtors agree to in order to save attorneys' fees that would be incurred in litigating the issue of dischargeability. The committee opposes this practice and has included a provision that in such a case where the court finds that the objection to the discharge of the debt by the creditor was frivolous, or not brought in good faith, the court may award attorneys' fees and costs to the debtor.

Trustees have had great difficulty in recovering preferences that have been made to creditors prior to the bankruptcy proceeding because of the current requirement that the creditor have reasonable cause to believe that the debtor was insolvent at the time the preference was received. Extensive litigation is often required to prove the basis for such belief. The preference section is changed from current law to solve this problem by the addition of a presumption that during the 90 days preceding bankruptcy the debtor will be presumed to have been insolvent. The preference period is reduced from 4 months to 90 days.

CHAPTER 7—LIQUIDATION

The liquidation procedures of the bill track much of current law. A change from current law requires the appointment of an interim trustee promptly after the order for relief. Presently, trustees are not elected until the first meeting of creditors. Provision is made for the election by the creditors, or appointment by the court, of a trustee to succeed the interim trustee at the first meeting of creditors. A creditors' committee may be elected by the creditors at the first meeting of

# DOCUMENT 52

**7**

creditors, which committee may have not fewer than three members and not more than eleven members.

The trustee is authorized to operate the business of the debtor for a limited period if the operation is in the best interest of the estate and consistent with the order and liquidation of the estate.

A new section is added to aid the consumer debtor in making a fresh start after bankruptcy. The provision allows the debtor to redeem tangible personal property from a creditor's nonpurchase money security interest by paying the creditor the fair market value of the property for the claim or the amount of the claim whichever is less. This provision will aid debtors in retaining property such as household goods that would otherwise be turned over to creditors.

At the heart of the fresh start provisions of the bankruptcy law is section 727 covering discharge. The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part. A change from current law will prevent corporations from being discharged in liquidation cases. Corporations are not in the same situation as individual debtors, and the discharge of a corporation promotes trafficking in corporate shells, a form of bankruptcy fraud.

Special provisions are made for the liquidation of stockbrokerage firms. The Securities Investor Protection Corporation (SIPC) is charged by law with the protection of customers in such cases. If SIPC wishes to take charge of the liquidation, the bankruptcy case is suspended, and if SIPC completes the liquidation, the bankruptcy case is dismissed.

Special provision is also made for the bankruptcy of commodity futures brokers. Since the first comprehensive bankruptcy legislation was enacted in 1800, bankruptcy laws have never specifically addressed the unique problems raised by commodity broker bankruptcies. With no cohesive policy for guidance, courts dealing with commodity broker bankrutcies have applied existing laws which are not necessarily consistent with the structure of, and may be potentially disruptive of, commodity futures, options, and leverage markets. The rapid growth of the commodity futures markets in recent years has made the development of statutory guidelines for commodity broker insolvencies all the more imperative. According to the Commodity Futures Trading Commission (the "Commission" or "CFTC"), "[t]he Commission now regulates an industry where the value of commodities for which contracts were traded in 1977 exceeds one trillion dollars. Currently, there are 62 active futures contracts trading 37 commodities on 10 exchanges. The volume of exchange trading in 1977 was nearly 43 million contracts, reflecting an overall growth rate of 55 percent since the Commission's inception [in 1974] and 16 percent growth rate in 1977 alone." Likewise, leverage contract markets have grown rapidly during the past few years. Further, according to the CFTC, from 1973 through 1977, at least 11 leverage contract firms have failed, resulting in at least $17.5 million in customer losses. Although commodity options trading has been suspended by the CFTC, there has been some indication that exchange-traded options may be permitted in the future.

There are several fundamental principles established by the commodity broker subchapter that deserve attention. First, customer

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**10** 363 of 979

·8·

claims are granted the highest priority against the bankrupt's estate. This policy maintains consistency with the Commodity Exchange Act, which establishes customer protection as a primary objective.[2] and should promote customer confidence in commodity markets generally.

A second basic objective of this subchapter is the protection of commodity market stability. Protection of market stability during a commodity broker insolvency is more difficult in the commodities markets than in other markets. Commodity futures, options, and leverage contracts all have limited duration. In addition, gains and losses on open positions in the futures markets are paid out on a daily basis through variation margin payments. Thus, the trustee of an insolvent commodity broker does not have the luxury of an extended period within which to analyze the debtor's business and determine the best course of action. Delay by the trustee can result in default in making the daily variation margin payments, or default on delivery, either of which could have a ripple effect that disrupts the entire market. Further, abrupt actions by the trustee could seriously disrupt orderly trading, resulting in substantial losses to the bankrupt, its customers, and other market participants.

For these reasons the commodity broker subchapter strongly encourages the immediate transfer of customer accounts from the bankrupt to a solvent commodity broker. Such transfers should have no immediate adverse impact on the market, yet they minimize the possibility of default on margin payments and on delivery.

Another policy established by this subchapter is that margin payments made to clearing organizations are not voidable by the trustee in bankruptcy. In addition, margin payments made by commodity brokers (but not by clearing organizations) to some entity other than a clearing organization are not voidale unless the trustee can establish certain conditions have been met.

The commodity broker subchapter provides only a framework within which commodity broker liquidations are to be administered. Due to the germinal state of regulation of the commodities industry, the subchapter does not provide detailed rules to cover every contingency. Instead, general rulemaking authority has been delegated to the CFTC with respect to the contents and determination of net equity; definition of "customer property," "member property," "commodity options dealer," "commodity contract," and "clearing organization": the question of which property or contracts will be specifically identifiable to a particular customer in a specific capacity: the method by which the business of the debtor is to be conducted or liquidated; and the parties to which customer property and contracts may be transferred. This rulemaking authority is to be exercised within the bounds of the policies and framework established by this subchapter.

CHAPTER 9—ADJUSTMENT OF DEBTS OF A MUNICIPALITY

Chapter 9, providing for the adjustment of debts of a municipality, was considered at great length by the Congress during 1975–76, primarily because of the New York City fiscal crisis. Both Houses of

---

[2] *See, e.g.,* Commodity Exchange Act sec. 4d(2), 7 U.S.C. sec. 6d(2) (1977).

SASMF EXHIBIT 25

364 of 979

DOCUMENT 52

9

Congress held extensive hearings on the chapter resulting in Public Law 94–260, which was signed into law on April 8, 1976.

Since that time, there have been no developments in municipal arrangement proceedings to require any new revision of the law. Thus, the bill tracks the provisions of Public Law 94–260 with stylistic changes to conform to the title.

The creditor protection provision, requiring a municipality to attempt a good faith negotiation with its creditors before a petition is filed, is retained. The only deviation from current law is in the area of setoffs where the provisions of chapter 9 conform to the setoff provisions generally applicable to the title.

### CHAPTER 11—REORGANIZATION

Chapter 11 deals with the reorganization of a financially distressed business enterprise, providing for its rehabilitation by adjustment of its debt obligations and equity interests. It should be distinguished from the bankruptcy liquidation under chapter 7 or the adjustment of the debts of an individual with regular income under chapter 13.

Chapter 11 replaces chapters X, XI and XII of the Bankruptcy Act, Chapter 11 also includes special provisions for railroads in view of the impact of regulatory laws on railroad debtors and replaces section 77 of the Bankrupcy Act. A single chapter for all business reorganizations will simplify the law by eliminating unnecessary differences in detail that are inevitable under separately administered statutes.

Business reorganizations have been governed principally by chapters X and XI, both of which have been adopted by the Congress as part of the bankruptcy reforms in 1938. These chapters were not intended to be alternate paths of reorganization; they were to be mutually exclusive. Chapter X was meant for the reorganization of public companies and chapter XI for the rehabilitation of small and privately owned businesses.

That schematic design was well conceived, but flawed somewhat by the failure to include a definition of a "public company." As a result, considerable litigation developed, mostly on the initiative of the Securities and Exchange Commission, over whether a case belonged in chapter X or chapter XI. This issue came to the Supreme Court in three cases, the last one in *SEC* v. *American Trailer Rentals, Inc.,* 379 U.S. 594 (1965), but the Court did not enunciate a hard-and-fast rule for all cases. Although it announced some guidelines, management and creditors of large public companies have continued to resort to chapter XI.

The single chapter for business reorganization, which the bill provides, will eliminate unprofitable litigation over the preliminary issue as to which of the two chapters apply. In addition, the bill provides in section 1101(3) a definition of "public company," and to that definition are related a few provisions expressly designed for the public company, such as the mandatory appointment of a trustee, the advisory role of the Securities and Exchange Commission, the fair and equitable standard for plans of reorganization, and special requirements for solicitation of acceptance by security holders. These provisions constitute the basic safeguards for public investors that for 40 years have been part of chapter X, and are incorporated in the bill to

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

365 of 979

10

serve the same essential purpose. The differentiating standard is not whether the debtor is large or small. It is rather whether the debtor is a public company, as defined.

Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an unsuccessful business and how the values of the estate should be apportioned among creditors and stockholders. In a large public company, whose interests are diverse and complex, the most vulnerable today are public investors who own subordinated debt or equity securities. The bill, like chapter X, is designed to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of small and scattered public investors.

Statistical information provided by the SEC (Hearings before Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, U.S. Senate, on S. 2266 and H.R. 8200, 95th Cong., 1st Session, hereinafter (Senate hearings, pp. 623, 632) ), indicates that the overwhelming majority of reorganization cases would not involve public companies as defined in section 1101(3) of the bill. Reorganization of such companies would be governed by procedures and standards that are drawn and adapted from what is now chapter XI. But the few exceptions—the public companies—are of vast importance. As the SEC noted (Senate hearings, supra) public companies, as defined in section 1101(3), represented only between one-half and one percent of the business reorganization cases in chapters X and XI in the years 1975–77. But these cases, though few in number, represented over 90 percent of the total assets and liabilities of all cases with a substantial public investor interest. It is only for such public companies that the bill reenacts the few basic safeguards of chapter X. In all other respects, the administration of debtor estates for public companies will be governed by the provisions in chapters 3, 5 and 11 that are intended for all cases, public and non-public companies alike.

The Committee believes that it should be emphasized that investor protection is most critical when the company in which the public invested is in financial difficulties and is forced to seek relief under the bankruptcy laws. A fair and equitable reorganization, as provided in the bill, is literally the last clear chance to conserve for them values that corporate financial stress or insolvency have placed in jeopardy. As public investors are likely to be junior or subordinated creditors or stockholders, it is essential for them to have legislative assurance that their interests will be protected. Such assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional creditors who will have their own best interest to look after. Commenting on the need and importance of a disinterested trustee in public cases. Harold J. Tyler, Jr., a distinguished former Federal judge experienced in bankruptcy reorganization, said (Senate Hearings, supra. p. 900) that only the trustee "can be expected to look out for the debt and equity holds. Creditors and their lawyers usually do not do so, and debtors in possession are inclined to think first of satisfying their big creditors."

DOCUMENT 52

11

The pre-chapter-X system of reorganization failed to serve the needs of public investors and for that reason such failure was decisively rejected by the 75th Congress. Such a system all too often resulted in reorganizations that were unfair to public investors, who lacked essential bargaining power, and that frequently perpetuated an unsound financial structure and, perhaps, an unworthy management. A single chapter, without the special standards for the public company, would not serve the public interest. As the SEC said in its report on the bill, "Our experience with both chapters X and XI leaves no doubt that the abusive practices prevailing prior to 1938 in committee-dominated reorganization are as attractive today as they were then." (Senate Hearings, *supra*, p. 622).

Subchapter IV of chapter II deals with the reorganization of railroads. Under present law, railroad reorganizations are conducted under section 77 of the Bankruptcy Act, a statute enacted under the pressure of widespread railroad receiverships in the 1930's and essentially unchanged since 1935. Under the bill, the often complex and time consuming dichotomy between railroad and other business reorganizations is eliminated by incorporating railroad reorganizations into the pattern of business reorganizations generally, and including in subchapter IV only those additional provisions which are necessary to reflect the special characteristics of railroad reorganizations.

The incorporation of railroad reorganizations into the general reorganization provisions of the bill eliminates the cumbersome and duplicative procedure of section 77 under which plans of reorganization shuttled back and forth between the Interstate Commerce Commission (the "Commission") and the courts and proceedings were inevitably more time consuming and expensive. Under the bill, the bankruptcy court, rather than the Commission, assumes the primary responsibility for the reorganization proceeding. However, since a plan of reorganization for a railroad may propose changes in transportation patterns or operation by, among other things, granting operating rights over, or transferring, the debtor's rail lines, the bill retains the Commission's jurisdiction with respect to such proposals. The subchapter requires that such proposals be referred to the Commission for its approval, disapproval, or modification and requires the reorganization court to give binding effect to the Commission's findings on such aspects of a plan. The subchapter also specifies that the trustee is subject to the Interstate Commerce Act, and to lawful orders of the Interstate Commerce Commission, the Department of Transportation, and State or local regulatory bodies, with court approval required if the orders require the expenditure of money, except for the payment of interline freight and passenger accounts and per diem accounts (including incentive per diem) for which no court approval is required.

Special provisions are also included dealing with equipment financing, limiting the extent to which the trustee may disaffirm collective bargaining contracts, and specifying the consequences of the rejection by the trustee of a lease of a line of railroad. The judicial panel on multidistrict litigation is authorized to transfer on consolidate cases pending in different courts.

SASMF EXHIBIT 25

367 of 979

12

The subchapter emphasizes that the trustee in a railroad reorganization, in carrying out his responsibilities, must take into consideration the "public interest" in the preservation of rail service. At the same time, the subchapter recognizes, as section 77 does not, that there may be cases in which a railroad cannot be reorganized, and should be liquidated. The subchapter does not create a mandatory deadline within which a reorganization must be accomplished, but it requires the court to consider liquidation if no reorganization plan has been confirmed within 5 years from the date when the original petition was filed. It is expected that in most such cases the court will order liquidation which will prevent repetition of the lengthy proceedings that have occurred to date.

In the case of a railroad being administered under title 11 the necessity to stem the bankrupt carrier's cash drain requires expeditious treatment of abandonment applications. The subchapter provides that the court rather than the Commission has the authority to authorize abandonments or discontinuances of rail service. After filing of the applications by the trustee with the Commission, the court establishes a time period within which the Commission must report its findings to the court. The Commission in its advisory role before the court represents the "public interest," while the trustee and creditors represent the interest of the debtor's investors. The court may authorize abandonments if it finds the abandonment is consistent with the "public interest" and in the best interest of the estate, or essential to formulation of the plan.

### CHAPTER 13—ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME

Chapter XIII of the present Bankruptcy Act has been one of the least understood and most erratically applied of all federal statutes dealing with bankruptcy or social welfare. In theory, the basic purpose of Chapter XIII has been to permit an individual to pay his debts and avoid bankruptcy by making periodic payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid. The hearings record and the bankruptcy literature show uniform support for this principle. In practice however, the results have been less than satisfactory, even though chapter XIII has been available since 1938.

The credit community does not view chapter XIII with universal esteem, understandably so because any extended delay or reduction in payment to a creditor represents a measurable loss, particularly during the inflation of recent years. However, most credit grantors nevertheless strongly support the concept of chapter XIII as an alternative to ordinary bankruptcy. A greater difficulty has been the diversity of the individuals involved. The problems which caused financial distress to begin with, such as large families, underemployment, heavy medical expenses without adequate health insurance or simple overpurchasing, do not magically disappear on the filing of a petition under chapter XIII. These factors among others often make performance of chapter XIII plans very difficult, and in many cases are eventually dismissed or converted to ordinary bankruptcy after some payments have been made.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

15

368 of 979

# DOCUMENT 52

13

In addition, chapter XIII cases can require considerable time and effort from both bankruptcy judges and debtor attorneys. Where the initiative to undertake such public service work has been lacking, the use of chapter XIII has been very limited. Certainly related to these difficulties are the lack of national uniformity in handling such cases, the length of time such cases must necessarily remain pending and the differences in state exemption and garnishment laws. Such factors among others have caused the bankruptcy bench and bar in each judicial district to carefully measure their responses to and uses of chapter XIII based upon local practices and circumstances.

Finally, the existing chapter 13 statute is basically and seriously defective at this time in five respects. First, it does not permit some individuals with regular income to qualify, such as small business owners or social welfare program recipients, because their principal incomes do not come from wages, salary, or commissions. Second, while the court can grant a hardship discharge, where for example the debtor becomes totally disabled, three years must elapse first. Third, secured creditors are dealt with erratically, tediously, and uncertainly, resulting from a hodgepodge of state and federal statutory provisions, bankruptcy and local rules, many conflicting reported cases and varied local customs. Fourth, accommodation codebtors in consumer finance are usually inexperienced relatives or coworkers, and present law does not provide a reasonable restraint on collection from the while the debtor's case is pending. Fifth, formal creditor voting by literally counting written acceptances has unnecessarily imposed substantial expense for time, paper and uncertainty upon all concerned with only doubtful or marginal benefits.

The new chapter 13 undertakes to solve these problems insofar as bankruptcy law can provide a simple yet precise and effective system for individuals to pay debts under bankruptcy court protection and supervision. The new chapter 13 will permit almost any individual with regular income to propose and have approved a reasonable plan for debt repayment based on that individual's exact circumstances. As in current law, 100 percent payment plans will be encouraged by the limitation on availability of a subsequent discharge in section 727(a)(8). This kind of plan has provided great self-satisfaction and pride to those debtors who complete them and at the same time effect a maximum return to creditors. The limitation of § 727(a)(8) will also provide a slight brake on the wholesale filings of chapter 13's by small businessmen who wish to avoid some of the restrictions of chapter 11. It is also necessary to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor.

SUMMARY AND DESCRIPTION OF PROVISIONS AFFECTING COLLECTION OF TAXES

The bill contains a series of provisions dealing with the priority, discharge, and collection of tax claims in bankruptcy. The writing of provisions dealing with the collection of taxes, at Federal, State, and local levels has presented one of the most difficult problems for the committee.

In a broad sense, the goals of rehabilitating debtors and giving equal treatment to private voluntary creditors must be balanced with

14

the interests of governmental tax authorities who, if unpaid taxes exist, are also creditors in the proceeding.

Since tax authorities are creditors of practically every taxpayer, another important element is that tax collection rules for bankruptcy cases have a direct impact on the integrity of the Federal, State and local tax systems. These tax systems, generally based on voluntary assessment, works to the extent that the majority of taxpayers think they are fair. This presumption of fairness is an asset which should be protected and not jeopardized by permitting taxpayers to use bankruptcy as a means of improperly avoiding their tax debts. To the extent that debtors in a bankruptcy are freed from paying their tax liabilities, the burden of making up the revenues thus lost must be shifted to other taxpayers.

A three-way tension thus exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose "fresh start" should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had reasonable time to collect or which the law has restrained him from collecting.

In balancing these interests, the committee bill gives governmental units a priority claim on assets of a debtor's estate for certain taxes which have not grown so "stale" as to constitute an unjustifiable burden on general unsecured creditors who may have extended new credit to the debtor since the tax liabilities arose. To avoid unduly burdening the debtor's fresh start, the bill continues the basic coordination of priority and discharge provisions that apply to taxes, so that unpaid taxes accorded priority are nondischargeable, and tax claims which are not given priority are with some exceptions not collectible from the debtor's post-bankruptcy assets.

In general, the bill retains two important priority rules of present law: first that priority and nondischarge are recognized for tax claims, for which the tax return was due not more than three years before the title 11 petition was filed, and for withheld income taxes and the employees' shares of social security taxes (the "trust fund" taxes) reeive priority and are nondischargeable regardless of the due date of the return.

S. 2266 contains a longer list of tax priorities than is found in present law. The new priorities which have no counterpart in the Bankruptcy Act are included in part to cover a number of complex situations in which tax collection issues arise, but which are not dealt with by the Bankruptcy Act. The new categories are also designed to deal with some uncertainties and ambiguities in the tax rules of present bankruptcy law as well as certain loopholes under which some debtors have been able to exploit the administrative processes of a governmental unit so as to escape taxes unfairly.

In general, tax claims which are nondischargeable, despite a lack of priority, are those to whose staleness the debtor contributed by some wrong-doing or serious fault as, for example, taxes with respect to which the debtor filed a fraudulent return.

The bill also contains several provisions designed to minimize the administrative problems governmental tax authorities face, or may

SASMF EXHIBIT 25
370 of 979

DOCUMENT 52

15

face, in collecting taxes in bankruptcy proceedings. For example, section 108(c) of the bill extends or suspends the running of the statute of limitations on collection of debts outside of bankruptcy, thereby protect the right of governmental units (and other creditors) to collect debts which are not discharged in the bankruptcy proceeding. Section 501(e) of the bill gives governmental tax units a minimum period of time within which to file proof of their claims in a title 11 proceeding. Section 502 of the bill eliminates a requirement included in H.R. 8200 as § 502(i) that a tax authority file a proof of claim for taxes arising out of taxable sales made by the trustee since. in these situations, the trustee has better knowledge than the tax authority of the existence of such a liability for taxes.

The bill also contains several safeguards to assure normal administrative procedures and to prevent tax avoidance. Section 1130(d) provides that a plan of reorganization cannot be confirmed if its principal purpose is the avoidance of taxes. The bill also requires the proponent of a plan of reorganization of a debtor to exhaust administrative processes (in the form of a request for an advance ruling from the Internal Revenue Service) before the bankruptcy court can declare the tax effects of the plan (sec. 1146(d)).

Section 547(b)(2) provides that preferential transfers made by the debtor which may be avoided by the trustee are not to include tax payments, and section 547(c)(6) provides that the fixing of a tax lien is not to be considered a preferential transfer, provided notice of the lien has been duly filed.

## TITLE II—AMENDMENTS TO TITLE 28 UNITED STATES CODE AND TO THE FEDERAL RULES OF EVIDENCE

### ESTABLISHMENT OF BANKRUPTCY COURT, APPOINTMENT OF BANKRUPTCY JUDGES, AND JURISDICTION

The need for a functionally independent bankruptcy court has been demonstrated beyond question; first by the study and recommendations of the Commission on the Bankruptcy Laws of the United States,[1] by knowledgeable witnesses before the Subcommittee,[2] in published commentary,[3] as well as through long practical experience under the present referee system. A considerable body of opinion has developed in support of the establishment of a bankruptcy court separate from

[1] H. Doc. 93–137, pt. I, 93d Cong., 1st sess., Report of the Commission on the Bankruptcy Laws of the United States (July 1973), at 85 et seq.
[2] E.g., Statement of Robert B. Chatz, president, Commercial Law League of America. Hearings before Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary, U.S. Senate. on S. 2266 and H.R. 8200. 95th Cong., 1st sess. [hereinafter Senate hearings], 601. 601–603. statement of Robert J. Grimmig, member. American Bankers Association Bankruptcy Task Force. Senate hearings, at 573–574; statement of Charles A. Horsky, chairman. National Bankruptcy Conference, Senate hearings, at 831–832; statement of Hon. David A. Kline, president, National Conference of Bankruptcy Judges. Senate hearings, at 436, 437–439; statement of Harold Marsh, chairman, Commission on the Bankruptcy Laws of the United States. Senate hearings, at 480–481.
[3] E.g. Broude, "Jurisdiction and Venue Under the Bankruptcy Act of 1973." 48 Am. Bankr. L.J. 231 (1974); Cyr. "Setting the Record Straight for a Comprehensive Revision of the Bankruptcy Act of 1898," 49 Am. Bankr. L.J. 99 (1975); Cyr. "Structuring a New Bankruptcy Act: A Comparative Analysis." 52 Am. Bankr. L.J. 141 (1978); King, "Bankruptcy Code—Specialized Court Supported," 52 Am. Bankr. L.J. 193 (1978); Lee. "A Critical Comparison of the Commission Bill and the Judges' Bill for the Amendment of the Bankruptcy Act." 49 Am. Bankr. L.J. 1 (1975). But see Rifkind. "Bankruptcy Code—Specialized Court Opposed," 52 Am. Bankr. L.J. 137 (1978).

16

the United States district court, either as an article III court modeled after the present district court,[4] as a separate article I court patterned after the U.S. Tax Court,[5] or as a hybrid court consisting of an article I bankruptcy trial court appended to an article III court of bankruptcy appeals.[6]

The justifications for each proposal have been fully aired and considered. It is the view of the subcommittee that the establishment of the new bankruptcy court as an adjunct of the U.S. district court offers several important advantages:

(1) The presently established U.S. district courts can serve as article III repositories for the broadened jurisdiction essential to efficient judicial administration in bankruptcy cases.

(2) The expanded jurisdiction vested in the U.S. district courts may be delegated by statute for exercise exclusively by bankruptcy judges, subject always to review, as under present law, by the district courts. Certain perceived constitutional impediments[7] to the exercise of the judicial power of the United States by non-tenured judges are thus eliminated.

(3) The dislocations associated with continued evolution of the present referee system into a functionally independent adjunct of the district court are minimal in comparison to those attendant upon the establishment of a separate bankruptcy court system.

(4) The fragmentation of Federal court jurisdiction envisioned by some is thus avoided.

(5) The convenience and economy of district court appeals are preserved.

The court of appeals of each circuit will appoint bankruptcy judges for its circuit. Compensation will be at the current annual rate of $48,500, an income level believed by the committee to be commensurate with the duties of the office.

Qualifications for bankruptcy judges include bar membership in good standing for at least five years at the time of appointment and competence as determined by the judicial council of the circuit. Additional qualification standards may be prescribed by the Judicial Conference of the United States.

The appointment of bankruptcy judges by the district court has contributed significantly (1) to a real and apparent dependency on the part of the bankruptcy court and its judges upon the district courts which appoint and review the decisions of bankruptcy judges, and (2) to the image of the bankruptcy court as the stepchild of the district court.[8] This bill is designed to eliminate both the real and apparent dependency and subservience of the bankruptcy court, in part by vesting the power to appoint bankruptcy judges in the courts of appeals, rather than in the district courts. The change is further warranted by the need to do away with the unseemly appellate practice

[4] Report of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 95th Cong., 2d sess., (committee print 13, Jan. 1978). See note 3 supra.
[5] See Commission report note 1 supra.
[6] See Cyr, "Structuring a New Bankruptcy Court: A Comparative Analysis," 52 Am. Bankr. L.J. 141 (1978).
[7] See note 4 supra.
[8] See. e.g., Statement of Charles A. Horsky, chairman, National Bankruptcy Conference, Senate hearings at 832.

DOCUMENT 52

17

whereby the district judge or judges who appoint the bankruptcy judge often rule on appeals from the orders of their own appointees.

There will be a twelve-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152. The present six-year term is insufficient to attract the calibre of individual needed to perform the highly demanding and important functions of the office of bankruptcy judge. By doubling the term of office for future bankruptcy judges it is anticipated that a major goal of this reform legislation, the establishment of a functionally independent bankruptcy court, can be further advanced.

Subsection (c) prescribes a twelve-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies. With specific exceptions for retired or reserve military personnel, a bankruptcy judge may not hold employment with the United States Government. An individual may not continue to serve as a bankruptcy judge after reaching seventy years of age without the unanimous approval of the judges of the judicial council of the circuit.

Subsection (d) prescribes the same oath of office for bankruptcy judges as for district court judges.

Subsection (e) requires each bankruptcy judge to maintain residence in a district for which he is appointed, or in the case of the District of Columbia, within 20 miles.

Subsection (f) authorizes the chief judge of the circuit to require a bankruptcy judge to maintain his abode in or near a particular place in the district, unless the bankruptcy judges are able to agree among themselves which of them shall do so.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies.

The bill provides grounds upon which and prescribes the procedures by which the removal of a bankruptcy judge may be accomplished. Incompetence, misconduct, neglect of duty, and disability, as determined by the judicial council of the circuit, are the sole grounds for removal. The bankruptcy judge is entitled to be heard on the charges against him.

A major impetus underlying this reform legislation has been the need to enlarge the jurisdiction of the bankruptcy court in order to eliminate the serious delays, expense and duplications associated with the current dichotomy between summary and plenary jurisdiction, a wasteful remnant of the referee system left over from the pre-Chandler Act era. For fully four decades, and more notably during the present decade, referees in bankruptcy have served as trial judges of the bankruptcy court whose orders are final unless a timely appeal is taken to the district court. Yet the jurisdictional limitations presently imposed on the bankruptcy courts have embroiled the court and the parties in voluminous litigation whose sole function is to determine whether the court possesses the requisite summary jurisdiction to determine the merits of issues often necessarily heard by the court in determining its jurisdictional question. Upon a finding that it lacks summary jurisdiction, the bankruptcy court is required to dismiss the action, whereupon it is necessary for the parties to proceed anew with a

Ad Hoc Equity Group Exhibit 9

20

SASMF EXHIBIT 25

373 of 979

18

plenary action in either the U.S. district court or an appropriate state court to try issues already substantially tried in the summary proceedings before the bankruptcy court. Frequently, the liquidation of bankrupt estates and the rehabilitation of debtors are significantly prejudiced thereby.

The advent of the Rules of Bankruptcy Procedure, with their automatic reference of most bankruptcy matters to the referee in bankruptcy and their scrupulous insistence upon procedural due process, have underscored the absurdity of perpetuating these jurisdictional limitations in bankruptcy cases arising under title 11 and civil actions and proceedings arising under or related to cases under title 11.

It is the purpose of new section 164 of title 28, United States Code, in conjunction with 28 U.S.C. section 1334, as amended by section 216 of this act, to eliminate entirely the present jurisdictional dichotomy between summary and plenary jurisdiction. Therefore, except where the bankruptcy court abstains from hearing an action or proceeding arising under or related to a case under title 11, all cases under title 11 and all civil actions and proceedings arising under or related to cases under title 11 are to be before the bankruptcy judge.

Jurisdiction in bankruptcy cases and in civil actions and proceedings arising under or related to bankruptcy cases is vested directly in the district courts by 28 U.S.C. section 1334, as amended by section 216 of this act, consistent with the establishment of new bankruptcy courts as adjuncts of the United States district courts, pursuant to 28 U.S.C. section 151. Sections 164 and 1334 of title 28, United States Code, as enacted and amended by sections 201 and 216 of this bill, while conferring expanded jurisdiction in bankruptcy cases and related civil actions and proceedings directly upon the district courts, delegate the exclusive exercise of that jurisdiction at the trial level to bankruptcy judges, except as provided in subsection (d)(2) of section 1334, as amended.

Appeals from judgments and orders of a bankruptcy judge will go initially to the U.S. district court for the district in which the case, action, or proceeding in which the order or judgment appealed from, was entered is pending. Appeals may be taken by writ of certiorari from the district court to the United States court of appeals for the circuit in which the bankruptcy court is located, 28 U.S.C. § 1291. The initial appeals to the district court will aid in the expeditious processing of appeals and will not increase the costs to litigants. It will also prevent the overburdening of the appellate courts. *See* testimony of Judge Ruggero J. Aldisert, Senate hearings at page 414.

### RETIREMENT PROVISIONS

Under existing law, referees (also designated "bankruptcy judges" by Bankruptcy Rule 901) are classified as ordinary civil service employees for retirement purposes [9] and their annuities are computed by the same formula that applies to the many other groups in the same classification, i.e., the average of the consecutive three highest yearly

---

[9] Title 5 U.S.C. § 8331. Federal judges are expressly excluded and separate treatment is given congressional employees. See n. 2, infra.

**Ad Hoc Equity Group Exhibit 9**

**SASMF EXHIBIT 25**

**374 of 979**

## DOCUMENT 52

19

salaries multiplied by 1.5 percent for each of the first 5 years of service; by 1.75 percent for each of the second 5 years; and, by 2.0 percent for each of all succeeding years.[10] For those retirement benefits each sitting bankruptcy judge (referee) is paying 7 percent of his before-tax salary.[11]

Since 1960 the Judicial Conference has been on record in support of introduced legislation to improve referees' retirement.[12] The committee also agrees that bankruptcy judges are entitled to increased retirement benefits commensurate with their duties and responsibilities. The bill would provide that bankrupty judges receive the average of their "high-three" consecutive yearly salaries multiplied by 2.5 percent. For these retirement benefits, the bankruptcy judge would pay 8 percent of his before tax salary. This retirement program is tailored after that given to Members of Congress and congressional staff. It also represents for a one term bankruptcy judge (12 years) nearly a fifty precent increase in the annuity he would receive as contrasted to his current level of annuity.

A bankruptcy judge who is appointed at age 46 could serve two full terms and retire at 60 percent of his average high 3-year salary which in present dollars would amount to a retirement annuity of $29,100 per annum. The committee feels that this annuity combined with other retirement plans, civil service or private plans, that the bankruptcy judges may have participated in prior to ascending to the bench, will assure the financial security and the concomitant integrity and independence that goes hand in hand with that security.

Incumbents' civil service retirement status is unchanged by the bill.[13] However, there are provisions that if an incumbent should stay on after enactment he would be accorded a new and separate civil service classification from October 1, 1979 forward.[14] Thenceforth, until September 30, 1982,[15] the incumbent would accrue retirement annuity benefits at 2.5 percent per year of the average "high-three" salary.[16] That same formula will apply for those judges who are appointed to regular 12-year terms under section 201,[17] but incumbents with prior service will remain under the lesser percentage to which they are now subject [18] for all service before October 1, 1979.

## TITLE III—AMENDMENTS TO OTHER ACTS

Title III makes conforming amendments to other acts and provisions of the United Stataes Code. These amendments are primarily technical in nature to conform cross references in other provisions of the U.S.C. to the new provisions and designations of Titles I and II of the bill.

---

[10] Title 5 U.S.C. § 8339(a)(1). Congressional employees' annuities are set at 2.5 percent of the "high-3" average for each year of creditable service. Title 5 U.S.C. § 8339(b).
[11] Title 5 U.S.C. § 8334. A congressional employee contributes 7.5 percent. Ibid.
[12] Reports of Proceedings of Judicial Conference, Mar. 10–11, 1960.
[13] Sec. 403(b).
[14] Sec. 225(a).
[15] The end of transition as contemplated by the bill. Sec. 402(b). There is, however, provision for an extension until a successor is appointed and qualified. Sec. 402(d).
[16] Sec. 225(a). After Oct. 30, 1979 the contribution would increase to 8 percent. Sec. 225(b).
[17] This is identical with congressional employees' annuities. See n. 2 supra.
[18] See n. 2 supra and accompanying text.

20

## TITLE IV—TRANSITION

In order to accomplish a smooth transition between the old bankruptcy law and procedures and the new law, the committee felt it necessary to have special provisions for a transition period. These provisions are contained in Title IV. The basic provision of this title calls for a 3-year transition period beyond the effective date of October 1, 1979. This is intended to ensure the availability of a cadre of experienced bankruptcy judges for service on the bankruptcy bench between the enactment of the act and October 1, 1982. It is in the public interest that bankruptcy judges in office on the date of enactment be continued in service, since the attraction of replacement judges from the private sector to serve a 3-year term would be extremely difficult. The acquired experience of the incumbent bankruptcy judges is a public resource which cannot be replaced until such time as their successors have seen equivalent service on the bankruptcy bench. Thus, the terms of bankruptcy judges serving at the date of enactment are extended through September 30, 1982, and a bankruptcy judge in office on the enactment date of this Act whose regular term extends beyond September 30, 1982, is permitted to complete the term for which he was originally appointed even though it may extend beyond September 30, 1982.

To help assure that only qualified bankruptcy judges shall serve during the transition period, a merit screening committee is created to evaluate the qualifications of each incumbent referee whose term of appointment expired prior to October 1, 1982. Bankruptcy judges serving between the enactment of this bill and October 1, 1982, are conferred with the powers of a judge appointed under section 201 of the bill, which include "the powers conferred upon the bankruptcy courts by this act."

The provisions of the bill are not to affect cases commenced under prior law, which are to proceed, with respect to both substantive and procedural matters, in the same fashion as though this act was not in effect. The bill provides that rules of bankruptcy procedure and various fees and charges in effect on October 1, 1979 (the effective date of the bill), shall continue in effect until superseded by new rules or fees promulgated in accordance with the act. However, the rules shall apply only if not inconsistent with the act.

To help the Congress and the Judicial Conference evaluate the impact of the new bankruptcy law, the Director of the Administrative Office of U.S. Courts will conduct a survey to determine the number of judges needed to implement the provisions of the act and report the results of the study to Congress and to the Conference by or before July 1, 1982. The committee feels that the 33-month period between the effective date and the date the report is due will be sufficient time for meaningful data and workload patterns to have evolved upon which to base judgement on the needs of the bankruptcy courts for numbers and distribution of personnel.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

23

376 of 979

DOCUMENT 52

21

SECTION-BY-SECTION ANALYSIS

TITLE I—ENACTMENT OF TITLE 11 OF THE UNITED STATES CODE

*Section 101*

Section 101 codifies and enacts title 11 of the United States Code, entitled "Bankruptcy." It is the only section in title I of the bill. What follows is a description of each of the sections of proposed title 11; the bankruptcy code:

# TITLE II—BANKRUPTCY

## CHAPTER 1—GENERAL PROVISIONS

§ *101. Definitions*

Section 101 of title 11 contains 40 definitions:

Paragraph (1) defines "accountant" as an accountant authorized under applicable law to practice accounting. The term includes a professional accounting association, corporation, or partnership if applicable law authorizes such a unit to practice accounting.

Paragraph (2) defines "affiliate." An affiliate is an entity with a close relationship to the debtor. In includes a 20 percent parent or subsidiary of the debtor, whether a corporate, partnership, individual, or estate parent.

The use of "directly or indirectly" in subparagraphs (A) and (B) is intended to cover situations in which there is an opportunity to control, and where the existence of that opportunity operates as indirect control.

"Affiliate" is defined primarily for use in the definition of insider, *infra*, and for use in the chapter 11 reorganization cases. The definition of "affiliate" does not include an entity acting in a fiduciary or agency capacity if the entity does not have the sole discretionary power to vote 20 percent of the voting securities but hold them solely as security and have not exercised the power to vote. This restriction applies to a corporate affiliate under subparagraph (B) of paragraph (2).

Subsections (C) and (D) of paragraph (2) define affiliate also as those persons and entities whose business or substantially all of whose property is operated under a lease or operating agreement by a debtor and whose business or property is more than 50 percent under the control of the debtor.

The definition of "attorney" in paragraph (3) is similar to the definition of accountant.

Paragraph (4) defines "claim." The effect of the definition is a significant departure from present law. Under present law, "claim" is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of present law far more broadly. The definition in paragraph (4) adopts an even

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25
377 of 979

22

broader definition of claim than is found in the present debtor rehabilitation chapters. The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

Paragraph (5) defines "commodity broker" by reference to various terms used and defined in subchapter IV of chapter 7, Commodity Broker Liquidation. The terms are described in conection with section 761, *infra.*

Paragraph (6) defines "community claim" for those eight States that have community property laws. The definition is keyed to the liability of the debtor's property for a claim against either the debtor or the debtor's spouse. If the debtor's property is liable for a claim against either, that claim is a community claim.

Paragraph (7) defines "consumer debt". The definition is adapted from the definition used in various consumer protection laws. It encompasses only a debt incurred by an individual primarily for a personal, family, or household purpose.

The definition of "corporation" in paragraph (8) is similar to the definition in current law, section 1(8). The term encompasses any association having the power or privilege that a private corporation, but not an individual or partnership, has; partnership associations organized under a law that makes only the capital subscribed responsible for the debts of the partnership; joint-stock company; unincorporated company or association; and business trust. "Unincorporated association" is intended specifically to include a labor union, as well as other bodies that come under that phrase as used under current law. The exclusion of limited partnerships is explicit, and not left to the case law.

Paragraph (g) defines "court" as the bankruptcy judge in the district in which the case is pending except in municipal adjustment and railroad reorganization cases, where "court" means the Federal district judge.

Paragraph (10) defines "creditor" to include holders of prepetition claims against the debtor. However, it also encompasses certain holders of claims that are deemed to arise before the date of the filing of the petition, such as those injured by the rejection of an executory contract or unexpired lease, certain investment tax credit recapture claim holders, "involuntary gap" creditors, and certain holders of the right of setoff. The term also includes the holder of a prepetition community claim. A guarantor of or surety for a claim against the debtor is also a creditor, because he holds a contingent claim against the debtor that becomes fixed when he pays the creditor whose claim he has guaranteed or insured.

DOCUMENT 52

23

Paragraph (11) defines "custodian." There is no similar definition is current law. It is defined to facilitate drafting, and means a pre-petition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or administrator of the debtor's property. The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee.

"Debt" is defined in paragraph (12) as a liability on a claim. The terms "debt" and "claim" are coextensive: a creditor has a "claim" against the debtor; the debtor owes a "debt" to the creditor. This definition of "debt" and the definition of "claim" on which it is based, proposed 11 U.S.C. 101(4), does not include a transaction such as a policy loan on an insurance policy. Under that kind of transaction, the debtor is not liable to the insurance company for repayment; the amount owed is merely available to the company for setoff against any benefits that become payable under the policy. As such, the loan is not a claim (it is not a right to payment) that the company can assert against the estate; nor is the debtor's obligation a debt (a liability on a claim) that will be discharged under proposed 11 U.S.C. 523 or 524.

Paragraph (13) defines "debtor." Debtor means person or municipality concerning which a case under title II has been commenced. This is a change in terminology from present law, which identifies the person by or against whom a petition is filed in a straight bankruptcy liquidation case as the "bankrupt", and a person or municipality that is proceeding under a debtor rehabilitation chapter (chapters VIII through XIII of the Bankruptcy Act) as a "debtor." The term "debtor" is used for both kinds of cases in this bill, for ease of reference in chapters 1, 3, and 5 (which apply to straight bankruptcy and reorganization cases).

Paragraph (14) defines "disinterested person." The definition is adapted from section 158 of chapter X of current law, though it is expanded and modified in some respects. A person is a disinterested person if the person is not a creditor, equity security holder, or insider; is not and was not an investment banker of the debtor for any outstanding security of the debtor (the change from underwriter in current law to investment banker is to make the term more descriptive and to avoid conflict with the definition of underwriter in section 2(11) of the Securities Act of 1933 (15 U.S.C. 77b(11)); has not been an investment banker for a security of the debtor within 3 years before the date of the filing of the petition (the change from five years to three years here conforms the definition with the statute of limitations in the Securities Act of 1933), or an attorney for such an investment banker; is not an insider of the debtor or of such an investment banker; and does not have an interest materially adverse to the estate.

Ad Hoc Equity Group Exhibit 9
SASMF EXHIBIT 25
379 of 979

24

"Entity" is defined, for convenience, in paragraph (15), to include person, estate, trust, and governmental unit. It is the most inclusive of the various defined terms relating to bodies or units.

Paragraph (16) defines "equity security." The term includes a share or stock in a corporation, a limited partner's interest in a limited partnership, and a warrant or right to subscribe to an equity security. The term does not include a security, such as a convertible debenture, that is convertible into equity security, but has not been converted.

Paragraph (17) defines "equity security holder" for convenience as the holder of an equity securing of the debtor.

Paragraph (18) defines "farmer". It encompasses only those persons for whom farming operations contribute 75 percent or more of their total income.

Paragraphs (19) and (20) define "foreign proceeding" and "foreign representative". A foreign proceeding is a proceeding in another country in which the debtor has some substantial connection for the purpose of liquidating the estate of the debtor or the purpose of financial rehabilitation of the debtor. A foreign representative is the representative of the estate in a foreign proceeding, such as a trustee or administrator.

Paragraph (21) defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality, or foreign state, and a department, agency, or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

Paragraph (22) defines "indenture." It is similar to the definition of indenture in the Trust Indenture Act of 1939. An indenture is the instrument under which securities, either debt or equity, of the debtor are outstanding.

Paragraph (23) defines "indenture trustee" as the trustee under an indenture.

Paragraph (24) defines "individual with regular income." The effect of this definition, and of its use in section 109(e), is to expand substantially the kinds of individuals that are eligible for relief under chapter 13, Adjustment of Debts of an Individual with Regular Income. Chapter XIII is now available only for wage earners. The definition encompasses all individuals with incomes that are sufficiently stable and regular to enable them to make payments under a chapter 13 plan. Thus, individuals on welfare, social security, fixed pension incomes, or who live on investment incomes, will be able to work out repayment plans with their creditors rather than being forced into straight bankruptcy. Also, self-employed individuals will be eligible to use chapter 13 if they have regular incomes.

However, the definition excludes certain stockbrokers and commodity brokers, in order to prohibit them from proceeding under chapter 13 and avoiding the customer protection provisions of chapter 7.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

27

380 of 979

DOCUMENT 52

25

"Insider", defined in paragraph (25), is a new term. An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor. If the debtor is an individual, then a relative of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, and a corporation controlled by the debtor are all insiders. If the debtor is a corporation, then a controlling person, a relative of a controlling person, a partnership in which the debtor is a general partner, and a general partner of the debtor are all insiders. If the debtor is a partnership, then a general partner of or in the debtor, a relative of a general partner in the debtor, and a person in control are all insiders. If the debtor is a municipality, then an elected official of the debtor is an insider. In addition, affiliates of the debtor and managing agents are insiders.

The definition of "insolvent" in paragraph (26) is adopted from section 1(19) of current law. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently transferred. It is the traditional bankruptcy balance sheet test of insolvency. For a partnership, the definition is modified to account for the liability of a general partner for the partnership's debts. The difference in this definition from that in current law is in the exclusion of exempt property for all purposes in the definition of insolvent.

Paragraph (27) defines "judicial lien." It is one of three kinds of liens defined in this section. A judicial lien is a lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding.

Paragraph (28) defines "lien." The definition is new and is very broad. A lien is defined as a charge against or interest in property to secure payment of a debt or performance of an obligation. It includes inchoate liens. In general, the concept of lien is divided into three kinds of liens: judicial liens, security interests, and statutory liens. Those three categories are mutually exclusive and are exhausetive except for certain common law liens.

Paragraph (29) defines "municipality." The definition is adapted from the terms used in the chapter IX (municipal bankruptcy) amendment to the Bankruptcy Act enacted in 1976 (Pub. L. 94–260). That amendment spoke in terms of "political subdivision or public agency or instrumentality of a State". Bankruptcy Act Sec. 84. The term municipality is defined by those three terms for convenience. It does not include the District of Columbia or any territories of the United States.

"Person" is defined in paragraph (30). The definition is a change in wording, but not in substance, from the definition in section 1(23) of the Bankruptcy Act. The definition is also similar to the one contained in 1 U.S.C. sec. 1, but is repeated here for convenience and ease of reference. Person includes individual, partnership, and corporation. The exclusion of governmental units is made explicit in order to avoid any confusion that may arise if, for example, a municipality is incorporated and thus is legally a corporation as well s governmentl unit. The definition does not include an estate or a trust, which are included only in the definition of "entity" in proposed 11 U.S.C. 101(14).

26

"Petition" is defined for convenience in paragraph (31). Petition is a petition under section 301, 302, 303, or 304 of the bankruptcy code—that is, a petition that commences a case under title 11.

Paragraph (32) defines purchaser as a transferre of a voluntary transfer, such as a sale or gift, and includes an immediate or mediate transferee of a purchaser.

The definition of "railroad" in paragraph (33) is derived from section 77 of the Bankruptcy Act. A railroad is a common carrier by railroad engaged in the transportation of individuals or property, or an owner of trackage facilities leased by such a common carrier. The effect of the definition and the use of the term in section 109(d) is to eliminate the limitation now found in section 77 of the Bankruptcy Act that only railroads engaged in interstate commerce may proceed under the railroad reorganization provisions. The limitation may have been inserted because of a doubt that the commerce power could not reach intrastate railroads. Be that as it may, this bill is enacted under the bankruptcy power.

Paragraph (34) defines "relative" as an individual related by affinity or consanguinity within the third degree as determined by the common law, and includes individuals in a step or adoptive relationship. The definition is similar to current law, but adds the latter phrase. This definition should be applied as of the time when the transaction that it concerns took place. Thus, a former spouse is not a relative, but if, for example, for purposes of the preference section, proposed 11 U.S.C. 547(b)(4)(B), the transferee was a spouse of the debtor at the time of the transfer sought to be avoided, then the transferee would be relative and subject to the insider rules, even if the transferee was no longer married to the debtor at the time of the commencement of the case or at the time of the commencement of the preference recovery proceeding.

Paragraph (35) defines "security." The definition is new and is modeled on the most recent draft of the American Law Institute's proposed securities code, with some exceptions. The interest of a limited partner in a limited partnership is included in order to make sure that everything that is defined as an equity security is also a "security." The definition, as with the definition of "entity", "insider", and "person", is open-ended because the term is not susceptible of precise specification. Thus the courts will be able to use the characterization provided in this definition to treat with new kinds of documents on a flexible basis.

Paragraphs (36) and (37) define "security agreement" and "security interest." A security interest is one of the kinds of liens. It is a lien created by an agreement. Security agreement is defined as the agreement creating the security interest. Though these terms are similar to the same terms in the Uniform Commercial Code, article IX, they are broader. For example, the U.C.C. does not cover real property mortgages. Under this definition, such a mortgage is included, as are all other liens created by agreement, even though not covered by the U.C.C. All U.C.C. security interests and security agreements are, however, security interests and security agreements under this definition. Whether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law.

**Ad Hoc Equity Group Exhibit 9**

29

**SASMF EXHIBIT 25**

**382 of 979**

DOCUMENT 52

27

Paragraph (38) defines another kind of lien, "statutory lien." The definition, derived from current law, states that a statutory lien is a lien arising solely by force of statute on specified circumstances or conditions and includes a lien of distress for rent (whether statutory, common law, or otherwise). The definition excludes judicial liens and security interests, whether or not they are provided for or are dependent on a statute, and whether or not they are made fully effective by statute. A statutory lien is only one that arises automatically, and is not based on an agreement to give a lien or on judicial action. Mechanics', materialmen's, and warehousemen's liens are examples. Tax liens are also included in the defintion of statutory lien.

"Stockbroker" is defined in paragraph (39) as a person engaged in the business of effecting transactions in securities for the account of others or with members of the general public from or for such person's own account, if the person has a customer, as defined. Thus, the definition, derived from a combination of the definitions of "broker" and "dealer" in the Securities Exchange Act of 1934, encompasses both brokers and dealers. The definition is used in section 109 and in subchapter III of chapter 7, Stockholder Liquidation. The term does not encompass an employee who acts for a principal that "effects" transaction or deals with the public, because such an employee will not have a "customer".

Paragraph (40) defines "transfer." It is derived and adapted, with stylistic changes, from section 1(30) of the Bankruptcy Act. A transfer is a disposition of an interest in property. The definition of transfer is as broad as possible. Many of the potentially limiting words in current law are deleted, and the language is simplified. Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.

§ *102. Rules of construction*

Section 102 provides seven rules of construction. Some are derived from current law; others are derived from 1 U.S.C. 1; a few are new. They apply generally throughout proposed title 11. These are terms that are not appropriate for definition, but that require an explanation.

Paragraph (1) defines the concept of "after notice and a hearing." The concept is central to the bill and to the separation of the administrative and judicial functions of bankruptcy judges. The phrase means after such notice as is appropriate in the particular circumstances (to be prescribed by either the Rules of Bankruptcy Procedure or by the court in individual circumstances that the Rules do not cover. In many cases, the Rules will provide for combined notice of several proceedings), and such opportunity for a hearing as is appropriate in the particular circumstances. Thus, a hearing will not be necessary in every instance. If there is no objection to the proposed action, the action may go ahead without court action. This is a significant change from present law, which requires the affirmative approval of the bankruptcy judge for almost every action. The change will permit the bankruptcy judge to stay removed from the administration of the

Ad Hoc Equity Group Exhibit 9

28

bankruptcy or reorganization case, and to become involved only when there is a dispute about a proposed action, that is, only when there is an objection. The phrase "such opportunity for a hearing as is appropriate in the particular circumstances" is designed to permit the Rules and the courts to expedite or dispense with hearings when speed is essential. The language "or similar phrase" is intended to cover the few instances in the bill where "after notice and a hearing" is interrupted by another phrase, such as "after notice to the debtor and a hearing."

Paragraph (2) specifies that "claim against the debtor" includes claim against property of the debtor. This paragraph is intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally. Thus, such an agreement would give rise to a claim that would be treated as a claim against the debtor personally, for the purposes of the bankruptcy code.

Paragraph (3) is a codification of *American Surety Co.* v. *Marotta*, 287 U.S. 513 (1933). It specifies that "includes" and "including" are not limiting.

Paragraph (4) specifies that "may not" is prohibitive and not permissive (such as in "might not").

Paragraph (5) specifies that "or" is not exclusive. Thus, if a party "may do (a) or (b)", then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives.

Paragraph (6) makes clear that "order for relief" means entry of an order for relief. If the court orally orders relief, but the order is not entered until a later time, then any time measurements in the bill are from entry, not from the oral order. In a voluntary case, the entry of the order for relief is the filing of the petition commencing the voluntary case.

Paragraph (7) specifies that the singular includes the plural. The plural, however, generally does not include the singular. The bill uses only the singular, even when the item in question most often is found in plural quantities, in order to avoid the confusion possible if both rules of construction applied. When an item is specified in the plural, the plural is intended.

### § 103 Applicability of chapters

Section 103 prescribes which chapters of the proposed bankruptcy code apply in various cases. All cases, other than cases ancillary to foreign proceedings, are filed under chapter 7, 9, 11, or 13, the operative chapters of the proposed bankruptcy code. The general provisions that apply no matter which chapter a case is filed under are found in chapters 1, 3, and 5. Subsection (a) makes this explicit, with an exception for chapter 9. The other provisions, which are self-explanatory, provide the special rules for Stockbroker Liquidations, Commodity Broker Liquidations, Municipal Debt Adjustments, and Railroad Reorganizations.

### § 104. Adjustment of dollar amounts

This section requires that the Director of the Administrative Office of the U.S. Courts report to Congress and the President before Oct. 1,

SASMF EXHIBIT 25

384 of 979

# DOCUMENT 52

29

1985, and before May 1 every 6 years thereafter a recommendation for adjustment in dollar amounts found in this title. The Committee feels that regular adjustment of the dollar amounts by the Director will conserve congressional time and yet assure·that the relative dollar amounts used in the bill are maintained. Changes in the cost of living should be a significant, but not necessarily the only, factor considered by the Director. The fact that there has been an increase in the cost of living does not necessarily mean that an adjustment of dollar amounts would be needed or warranted.

## § 105. *Power of court*

Section 105 is derived from section 2a(15) of present law, with two changes. First, the limitation on the power of a bankruptcy judge (the power to enjoin a court being reserved to the district judge) is removed as inconsistent with the increased powers and jurisdiction of the new bankruptcy court. Second, the bankruptcy judge is prohibited from appointing a receiver in a case under title 11 under any circumstances. The bankruptcy code has ample provision for the appointment of a trustee when needed. Appointment of a receiver would simply circumvent the established procedures.

This section is also anauthorization, as required under 28 U.S.C. 2283, for a court of the United States to stay the action of a State court. As such, *Toucey* v. *New York Life Insurance Company*, 314 U.S. 118 (1941), is overruled.

## § 106. *Waiver of sovereign immunity*

Section 106 provides for a limited waiver of sovereign immunity in bankruptcy cases. Though Congress has the power to waive sovereign immunity for the Federal government completely in bankruptcy cases, the policy followed here is designed to achieve approximately the same result that would prevail outside of bankruptcy. Congress does not, however, have the power to waive sovereign immunity completely with respect to claims of a bankrupt estate against a State, though it may exercise its bankruptcy power through the supremacy clause to prevent or prohibit State action that is contrary to bankruptcy policy.

There is, however, a limited change from the result that would prevail in the absence of bankruptcy; the change is two-fold and is within Congress' power vis-a-vis both the Federal Government and the States. First, the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure, that is, counterclaims arising out of the same transaction or occurrence. The governmental unit cannot receive a distribution from the estate without subjecting itself to any liability it has to the estate within the confines of a compulsory counterclaim rule. Any other result would be one-sided. The counterclaim by the estate against the governmental unit is without limit.

Second, the estate may offset against the allowed claim of a governmental unit. up to the amount of the governmental unit's claim, any claim that the debtor, and thus the estate, has against the government-

al unit, without regard to whether the estate's claim arose out of the same transaction or occurrence as the government's claim. Under this provision, the setoff permitted is only to the extent of the governmental unit's claim. No affirmative recovery is permitted. Subsection (a) governs affirmative recovery.

Though this subsection creates a partial waiver of immunity when the governmental unit files a proof of claim, it does not waive immunity if the debtor or trustee, and not the governmental unit, files proof of a governmental unit's claim under proposed 11 U.S.C. 501(c).

This section does not confer sovereign immunity on any governmental unit that does not already have immunity. It simply recognizes any immunity that exists and prescribes the proper treatment of claims by and against that sovereign.

### § 107. Public access to papers

Subsection (a) of this section makes all papers filed in a bankruptcy case and the dockets of the bankruptcy court public and open to examination at reasonable times without charge. "Docket" includes the claims docket, the proceedings docket, and all papers filed in a case.

Subsection (b) permits the court, on its own motion, and requires the court, on the request of a party in interest, to protect trade secrets, confidential research, development, or commercial information, and to protect persons against scandalous or defamatory matter.

### § 108. Extension of time

Subsections (a) and (b), derived from Bankruptcy Act section 11, permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights. Subsection (a) extends any statute of limitation for commencing or continuing an action by the debtor for two years after the date of the order for relief, unless it would expire later. Subsection (b) gives the trustee 60 days to take other actions, not covered under subsection (a), such as filing a pleading, demand, notice, or proof of claim or loss (such as an insurance claim), unless the period for doing the relevant act expires later than 60 days after the date of the order for relief.

Subsection (c) extends the statute of limitations for creditors. Thus, if a creditor is stayed from commencing or continuing an action against the debtor because of the bankruptcy case, then the creditor is permitted an additional 30 days after notice of the event by which the stay is terminated, whether that event be relief from the automatic stay under proposed 11 U.S.C. 362 or 1301, the closing of the bankruptcy case (which terminates the stay), or the exception from discharge of the debts on which the creditor claims.

In the case of Federal tax liabilities, the Internal Revenue Code suspends the statute of limitations on a tax liability of a taxpayer from running while his assets are in the control or custody of a court and for 6 months thereafter (sec. 6503(b) of the Code). The amendment applies this rule in a title 11 proceeding. Accordingly, the statute of limitations on collection of a nondischargeable Federal tax liability of a debtor will resume running after 6 months following the end of

DOCUMENT 52

31

the period during which the debtor's assets are in the control or custody of the bankruptcy court. This rule will provide the Internal Revenue Service adequate time to collect nondischargeable taxes following the end of the title 11 proceedings.

§ 109. *Who may be a debtor*

This section specifies eligibility to be a debtor under the bankruptcy laws. The first criterion, found in the current Bankruptcy Act section 2a(1) requires that the debtor reside or have a domicile, a place of business, or property in the United States.

Subsection (b) defines eligibility for liquidation under chapter 7. All persons are eligible except insurance companies, and certain banking institutions. These exclusions are contained in current law. However, the banking institution exception is expanded in light of changes in various banking laws since the current law was last amended on this point. A change is also made to clarify that the bankruptcy laws cover foreign banks and insurance companies not engaged in the banking or insurance business in the United States but having assets in the United States. Banking institutions and insurance companies engaged in business in this country are excluded from liquidation under the bankruptcy laws because they are bodies for which alternate provision is made for their liquidation under various State or Federal regulatory laws. Conversely, when a foreign bank or insurance company is not engaged in the banking or insurance business in the United States, then those regulatory laws do not apply; and the bankruptcy laws are the only ones available for administration of any assets found in United States.

The first clause of subsection (b) provides that a railroad is not a debtor except where the requirements of section 1174 are met.

Subsection (c) provides that only a person who may be a debtor under chapter 7 and a railroad may also be a debtor under chapter 11, but a stockbroker or commodity broker is eligible for relief only under chapter 7. Subsection (d) establishes dollar limitations on the amount of indebtedness that an individual with regular income can incur and yet file under chapter 13.

CHAPTER 3—CASE ADMINISTRATION .

SUBCHAPTER I—COMMENCEMENT OF A CASE

§ 301. *Voluntary cases*

Section 301 specifies the manner in which a voluntary bankruptcy case is commenced. The debtor files a petition under this section under the particular operative chapter of the bankruptcy code under which he wishes to proceed. The filing of the petition constitutes an order for relief in the case under that chapter. The section contains no change from current law, except for the use of the phrase "order for relief" instead of "adjudication." The term adjudication is replaced by a less pejorative phrase in light of the clear power of Congress to permit voluntary bankruptcy without the necessity for an adjudication, as under the 1898 act, which was adopted when voluntary bankruptcy was a concept not thoroughly tested.

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25

387 of 979

## § 302. Joint cases

A joint case is a voluntary bankruptcy case concerning a wife and husband. Under current law, there is no explicit provision for joint cases. Very often, however, in the consumer debtor context, a husband and wife are jointly liable on their debts, and jointly hold most of their property. A joint case will facilitate consolidation of their estates, to the benefit of both the debtors and their creditors, because the cost of administration will be reduced, and there will be only one filing fee. ·

Section 302 specifies that a joint case is commenced by the filing of a petition under an appropriate chapter by an individual and that individual's spouse. Thus, one spouse cannot take the other into bankruptcy without the other's knowledge or consent. The filing of the petition constitutes an order for relief under the chapter selected.

Subsection (b) requires the court to determine the extent, if any, to which the estates of the two debtors will be consolidaed; that is, assets and liabilities combined in a single pool to pay creditors. Factors that will be relevant in the court's determination include the extent of jointly held property and the amount of jointly-owned debts. The section, of course, is not license to consolidate in order to avoid other provisions of the title to the detriment of either the debtors or their creditors. It is designed mainly for ease of administration.

## § 303. Involuntary cases

Section 303 governs the commencement of involuntary cases under title 11. An involuntary case may be commenced only under chapter 7, Liquidation, or chapter 11, Reorganization. Involuntary cases are not permitted for municipalities, because to do so may constitute an invasion of State sovereignty contrary to the 10th amendment, and would constitute bad policy, by permitting the fate of a municipality, governed by officials elected by the people of the municipality, to be determined by a small number of creditors of the municipality. Involuntary chapter 13 cases are not permitted either. To do so would constitute bad policy, because chapter 13 only works when there is a willing debtor that wants to repay his creditors. Short of involuntary servitude, it is difficult to keep a debtor working for his creditors when he does not want to pay them back. *See* chapter 3, *supra*.

· The exceptions contained in current law that prohibit involuntary cases against farmers, ranchers and eleemosynary institutions are continued. Farmers and ranchers are excepted because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy. Eleeymosynary institutions, such as churches, schools, and charitable organizations and foundations, likewise are exempt from involuntary bankruptcy.

The provisions for involuntary chapter 11 cases is a slight change from present law, based on the proposed consolidation of the reorganization chapters. Currently, involuntary cases are permitted under chapters X and XII but not under chapter XI. The consolidation requires a single rule for all kinds of reorganization proceedings. Because the assets of an insolvent debtor belong equitably to his credi-

SASMF EXHIBIT 25

388 of 979

DOCUMENT 52

33

tors, the bill permits involuntary cases in order that creditors may realize on their assets through reorganization as well as through liquidation.

Subsection (b) of the section specifies who may file an involuntary petition. As under current law, if the debtor has more than 12 creditors, three creditors must join in the involuntary petition. The dollar amount limitation is changed from current law to $5,000. The new amount applies both to liquidation and reorganization cases in order that there not be an artificial difference between the two chapters that would provide an incentive for one or the other. Subsection (b)(1) makes explicit the right of an indenture trustee to be one of the three petitioning creditors on behalf of the creditors the trustee represents under the indenture. If all of the general partners in a partnership are in bankruptcy, then the trustee of a single general partner may file an involuntary petition against the partnership. Finally, a foreign representative may file an involuntary case concerning the debtor in the foreign proceeding, in order to administer assets in this country. This subsection is not intended to overrule Bankruptcy Rule 104(d), which places certain restrictions on the transfer of claims for the purpose of commencing an involuntary case. That Rule will be continued under section 405(d) of this bill.

Subsection (c) permits creditors other than the original petitioning creditors to join in the petition with the same effect as if the joining creditor had been one of the original petitioning creditors. Thus, if the claim of one of the original petitioning creditors is disallowed, the case will not be dismissed for want of three creditors or want of $5,000 in petitioning claims if the joining creditor suffices to fulfill the statutory requirements.

Subsection (d) permits the debtor to file an answer to an involuntary petition. The subsection also permits a general partner in a partnership debtor to answer an involuntary petition against the partnership if he did not join in the petition. Thus, a partnership petition by less than all of the general partners is treated as an involuntary, not a voluntary, petition.

The court may, under subsection (e), require the petitioners to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i). Subsection (i) provides for costs, attorneys fees, and damages in certain circumstances. The bonding requirement will discourage frivolous petitions as well as spiteful petitions based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause. An involuntary petition may put a debtor out of business even if it is without foundation and is later dismissed.

Subsection (f) is both a clarification and a change from existing law. It permits the debtor to continue to operate any business of the debtor and to dispose of property as if the case had not been commenced. The court is permitted, however, to control the debtor's powers under this subsection by appropriate orders, such as where there is a fear that the debtor may attempt to abscond with assets, dispose of them at less than their fair value, or dismantle his business, all to the detriment of the debtor's creditors.

34

The court may also, under subsection (g), appoint an interim trustee to take possession of the debtor's property and to operate any business of the debtor, pending trial on the involuntary petition. The court may make such an order only on the request of a party in interest, and after notice to the debtor and a hearing. There must be a showing that a trustee is necessary to preserve the property of the estate or to prevent loss to the estate. The debtor may regain possession by posting a sufficient bond.

Subsection (h) provides the standard for an order for relief on an involuntary petition. If the petition is not timely controverted (the Rules of Bankruptcy Procedure will fix time limits), the court orders relief after a trial, only if the debtor is generally unable to pay its debts as they mature, or if the debtor has failed to pay a major portion of his debts as they become due, or if a custodian was appointed during the 90-day period preceding the filing of the petition. The first two tests are variations of the equity insolvency test. They represent the most significant departure from present law concerning the grounds for involuntary bankruptcy, which requires an act of bankruptcy. Proof of the commission of an act of bankruptcy has frequently required a showing that the debtor was insolvent on a "balance-sheet" test when the act was committed. This bill abolishes the concept of acts of bankruptcy.

The equity insolvency test has been in equity jurisprudence for hundreds of years, and though it is new in the bankruptcy context (except in chapter X), the bankruptcy courts should have no difficulty in applying it. The third test, appointment of a custodian within ninety days before the petition, is provided for simplicity. It is not a partial re-enactment of acts of bankruptcy. If a custodian of all or substantially all of the property of the debtor has been appointed, this paragraph creates an irrebuttable presumption that the debtor is unable to pay its debts as they mature. Moreover, once a proceeding to liquidate assets has been commenced, the debtor's creditors have an absolute right to have the liquidation (or reorganization) proceed in the bankruptcy court and under the bankruptcy laws with all of the appropriate creditor and debtor protections that those laws provide. Ninety days gives creditors ample time in which to seek bankruptcy liquidation after the appointment of a custodian. If they wait beyond the ninety day period, they are not precluded from filing an involuntary petition. They are simply required to prove equity insolvency rather than the more easily provable custodian test.

Subsection (i) permits the court to award costs, reasonable attorney's fees, or damages if an involuntary petition is dismissed other than by consent of all petitioning creditors and the debtor. The damages that the court may award are those that may be caused by the taking of possession of the debtor's property under subsection (g) or section 1104 of the bankruptcy code. In addition, if a petitioning creditor filed the petition in bad faith, the court may award the debtor any damages proximately caused by the filing of the petition. These damages may include such items as loss of business during and after the pendency of the case, and so on. "Or" is not exclusive in this paragraph. The court may grant any or all of the damages provided for under the provision. Dismissal in the best interests of credits under section 305 (a) (1) would not give rise to a damages claim.

DOCUMENT 52

35

Under subsection (j), the court may dismiss the petition by consent only after giving notice to all creditors. The purpose of the subsection is to prevent collusive settlements among the debtor and the petitioning creditors while other creditors, that wish to see relief ordered with respect to the debtor but that did not participate in the case, are left without sufficient protection.

Subsection (k) governs involuntary cases against foreign banks that are not engaged in business in the United States but that have assets located here. The subsection prevents a foreign bank from being placed into bankruptcy in this country unless a foreign proceeding against the bank is pending. The special protection afforded by this section is needed to prevent creditors from effectively closing down a foreign bank by the commencement of an involuntary bankruptcy case in this country unless that bank is involved in a proceeding under foreign law. An involuntary case commenced under this subsection gives the foreign representative an alternative to commencing a case ancillary to a foreign proceeding under section 304.

§ 304. *Cases ancillary to foreign proceedings*

This section governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings. That is, where a foreign bankruptcy case is pending concerning a particular debtor and that debtor has assets in this country, the foreign representative may file a petition under this section, which does not commence a full bankruptcy case, in order to administer assets located in this country, to prevent dismemberment by local creditors of assets located here, or for other appropirate relief. The debtor is given the opportunity to controvert the petition.

Subsection (c) requires the court to consider several factors in determining what relief, if any, to grant. The court is to be guided by what will best assure an economical and expeditious administration of the estate, consistent with just treatment of all creditors and equity security holders; protection of local creditors and equity security holders against prejudice and inconvenience in processing claims and interests in the foreign proceeding; prevention of preferential or fraudulent disposition of property of the estate; distribution of the proceeds of the estate substantially in conformity with the distribution provisions of the bankruptcy code; and, if the debtor is an individual, the provision of an opportunity for a fresh start. These guidelines are designed to give the court the maximum flexibility in handling ancillary cases. Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.

§ 305. *Abstention*

A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. Abstention under this section, however, is of jurisdiction over the entire case. Abstention from jurisdiction over a particular proceeding in a case is governed by proposed 28 U.S.C. 1471(c). Thus, the court is permitted, if the interests of creditors

· 36 ·

and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a fed recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. Likewise, if there is pending a foreign proceeding concerning the debtor and the factors specified in proposed 11 U.S.C. 304(c) warrant dismissal or suspension, the court may so act.

Subsection (b) gives a foreign representative authority to appear in the bankruptcy court to request dismissal or suspension. Subsection (c) makes the dismissal or suspension order nonreviewable by appeal or otherwise. The bankruptcy court, based on its experience and discretion is vested with the power of decision.

### § 306. *Limited appearance*

Section 306 permits a foreign representative that is seeking dismissal or suspension under section 305 of an ancillary case or that is appearing in connection with a petition under section 303 or 304 to appear without subjecting himself to the jurisdiction of any other court in the United States, including State courts. The protection is necessary to allow the foreign representative to present his case and the case of the foreign estate, without waiving the normal jurisdictional rules of the foreign country. That is, creditors in this country will still have to seek redress against the foreign estate according to the host country's jurisdictional rules. Any other result would permit local creditors to obtain unfair advantage by filing an involuntary case, thus requiring the foreign representative to appear, and then obtaining local jurisdiction over the representative in connection with his appearance in this country. That kind of bankruptcy law would legalize an ambush technique that has frequently been rejected by the common law in other contexts.

However, the bankruptcy court is permitted under section 306 to condition any relief under section 303, 304, or 305 on the compliance by the foreign representative with the orders of the bankruptcy court. The last provision is not carte blanche to the bankruptcy court to require the foreign representative to submit to jurisdiction in other courts contrary to the general policy of the section. It is designed to enable the bankruptcy court to enforce its own orders that are necessary to the appropriate relief granted under section 303, 304, or 305.

SUBCHAPTER II—OFFICERS

### § 321. *Eligibility to serve as trustee*

Section 321 is adapted from current Bankruptcy Act § 45 and Bankruptcy Rule 209. Subsection (a) specifies that an individual may serve as trustee in a bankruptcy case only if he is competent to perform the duties of trustee and resides or has an office in the judicial district within which the case is pending, or in an adjacent judicial district. A corporation must be authorized by its charter or bylaws to act as

Ad Hoc Equity Group Exhibit 9 SASMF EXHIBIT 25

392 of 979

DOCUMENT 52

37

trustee, and, for chapter 7 or 13 cases, must have an office in any of the above mentioned judicial districts.

### § 322  Qualification of trustee

A trustee qualifies in a case by filing, within five days after selection, a bond in favor of the United States, conditioned on the faithful performance of his official duties. This section is derived from the Bankruptcy Act section 50b. The court is required to determine the amount of the bond and the sufficiency of the surety on the bond. Subsection (c). derived from Bankruptcy Act section 50i, relieves the trustee from personal liability and from liability on his bond for any penalty or forfeiture incurred by the debtor. Subsection (d), derived from section 50m, fixes a two-year statute of limitations on any action on a trustee's bond. Finally, subsection (e) dispenses with the bonding requirement for the United States trustee.

### § 323.  Role and capacity of trustee

Subsection (a) of this section makes the trustee the representative of the estate. Subsection (b) grants the trustee the capacity to sue and to be sued. If the debtor remains in possession in a chapter 11 case, section 1107 gives the debtor in possession these rights of the trustee: the debtor in possession becomes the representative of the estate, and may sue and be used. The same applies in a chapter 13 case.

### § 324.  Removal of trustee

This section permits the court, after notice and a hearing, to remove a trustee for cause.

### § 325.  Effect of vacancy

Section 325, derived from Bankruptcy Act section 46 and Bankruptcy Rule 221(b), specifies that a vacancy in the office of trustee during a case does not abate any pending action or proceeding. The successor trustee, when selected and qualified, is substituted as a party in any pending action or proceeding.

### § 326.  Limitation on compensation of trustee

This section is derived in part from section 48c of the Bankruptcy Act. It must be emphasized that this section does not authorize compensation of trustees. This section simply fixes the maximum compensation of a trustee. Proposed 11 U.S.C. 330 authorizes and fixes the standard of compensation. Under section 48c of current law, the maximum limits have tended to become minimums in many cases. This section is not intended to be so interpreted. The limits in this section, together with the limitations found in section 330, are to be applied as outer limits, and not as grants or entitlements to the maximum fees specified.

The maximum fee schedule is derived from section 48c(1) of the present act, but with a change relating to the bases on which the percentage maxima are computed. The maximum fee schedule is based on decreasing percentages of increasing amounts. The amounts are the amounts of money distributed by the trustee to parties in interest, excluding the debtor, but including secured creditors. These amounts were last amended in 1952. Since then, the cost of living has approximately doubled. Thus, the bases were doubled.

**Ad Hoc Equity Group Exhibit 9**

**SASMF EXHIBIT 25**

**393 of 979**

38

It should be noted that the bases on which the maximum fee is computed includes moneys turned over to secured creditors, to cover the situation where the trustee liquidates property subject to a lien and distributes the proceeds. It does not cover cases in which the trustee simply turns over the property to the secured creditor, nor where the trustee abandons the property and the secured creditor is permitted to foreclose. The provision is also subject to the rights of the secured creditor generally under proposed section 506, especially 506(c). The $150 discretionary fee provision of current law is retained.

Subsection (b) of this section entitles an operating trustee to a reasonable fee, without any limitation based on the maximum provided for a liquidating trustee as in current law, Bankruptcy Act § 48c(2).

Subsection (c) permits a maximum fee of five percent on all payments to creditors under a chapter 13 plan to the trustee appointed in the case.

Subsection (d) provides a limitation not found in current law. Even if more than one trustee serves in the case, the maximum fee payable to all trustees does not change. For example, if an interim trustee is appointed and an elected trustee replaces him, the combined total of the fees payable to the interim trustee and the permanent trustee may not exceed the amount specified in this section. Under current law, very often a receiver receives a full fee and a subsequent trustee also receives a full fee. The resultant "double-dipping", especially in cases in which the receiver and the trustee are the same individual, is detrimental to the interests of creditors, by needlessly increasing the cost of administering bankruptcy estates.

Subsection (e) permits the court to deny compensation to a trustee if the trustee has been derelict in his duty by employing counsel, who is not disinterested.

§ 327. *Employment of professional persons*

This section authorizes the trustee, subject to the court's approval, to employ professional persons, such as attorneys, accountants, appraisers, and auctioneers, to represent or perform services for the estate. The trustee may employ only disinterested persons that do not hold or represent an interest adverse to the estate.

Subsection (b) is an exception, and authorizes the trustee to retain or replace professional persons that the debtor has employed if necessary in the operation of the debtor's business.

Subsection (c) provides a professional person is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor.

Subsection (d) permits the court to authorize the trustee, if qualified to act as his own counsel or accountant.

Subsection (e) permits the trustee, subject to the court's approval, to employ for a specified special purpose an attorney that has represented the debtor, if such employment is in the best interest of the estate and if the attorney does not hold or represent an interest adverse to the debtor of the estate with respect to the matter on which he is to be employed. This subsection does not authorize the employment of the debtor's attorney to represent the estate generally or to represent the trustee in the conduct of the bankruptcy case. The subsection will most

**Ad Hoc Equity Group Exhibit 9SASMF EXHIBIT 25**
41
394 of 979

Case 22-90341 Document 1508-28 Filed in TXSB on 02/17/24 Page 95 of 100

likely be used when the debtor is involved in complex litigation, and changing attorneys in the middle of the case after the bankruptcy case has commenced would be detrimental to the progress of that other litigation.

### § 328. *Limitation of compensation of professional persons*

This section, which is parallel to section 326, fixes the maximum compensation allowable to a professional person employed under section 327. It authorizes the trustee, with the court's approval, to employ professional persons on any reasonable terms, including on a retainer, on an hourly, or on a contingent fee basis. Subsection (a) further permits the court to allow compensation different from the compensation provided under the trustee's agreement if the prior agreement proves to have been improvident in light of development unanticipatable at the time of the agreement. The court's power includes the power to increase as well as decrease the agreed upon compensation. This provision is permissive, not mandatory, and should not be used by the court if to do so would violate the code of ethics of the professional involved.

Subsection (b) limits a trustee that has been authorized to serve as his own counsel to only one fee for each service. The purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. Services that a trustee normally performs for an estate without assistance of counsel are to be compensated under the limits fixed in section 326. Only services that he performs that are normally performed by trustee's counsel may be compensated under the maxima imposed by this section.

Subsection (c) permits the court to deny compensation for services and reimbursement of expenses if the professional person is not disinterested of if he represents or holds an interst adverse to the estate on the matter on which he is employed. The subsection provides a penalty for conflicts of interest.

### § 329. *Debtor's transactions with attorneys*

This section, derived in large part from current Bankruptcy Act section 60d, requires the debtor's attorney to file with the court a statement of the compensation paid or agreed to be paid to the attorney for services in contemplation of and in connection with the case, and the source of the compensation. Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.

Subsection (b) permits the court to deny compensation to the attorney, to cancel an agreement to pay compensation, or to order the return of compensation paid, if the compensation exceeds the reasonable value of the services provided. The return of payments already made are generally to the trustee for the benefit of the estate. However, if the property would not have come into the estate in any

Ad Hoc Equity Group Exhibit 9

42

SASMF EXHIBIT 25

395 of 979

40

event, the court will order it returned to the entity that made the payment.

The Bankruptcy Commission recommended a provision similar to this that would have also permitted an examination of the debtor's transactions with insiders. S. 236, 94th Cong., 1st sess. sec. 4–311(b) (1975). Its exclusion here is to permit it to be dealt with by the Rules of Bankruptcy Procedure. It is not intended that the provision be deleted entirely, only that the flexibility of the rules is more appropriate for such evidentiary matters.

§ 330. *Compensation of officers*

Section 330 authorizes the court to award compensation for services and reimbursement of expenses of officers of the estate, and other professionals. The compensation is to be reasonable, for economy in administration is the basic objective. Compensation is to be for actual necessary services, based on the time spent, the nature, the extent and the value of the services rendered, and the cost of comparable services in nonbankruptcy cases. There are the criteria that have been applied by the courts as analytic aids in defining "reasonable" compensation.

The reference to "the cost of comparable services" in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy case fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co.* v. *Brock*, 405 F. 2d 429, 432 (C.A. 5, 1968), cert. denied, 395 U.S. 906 (    ). An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require, *In re Yale Express System, Inc.*, 366 F. Supp. 1376, 1381 (S.D.N.Y. 1973).[19] The rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases.

One of the major reforms in 1938, especially for reorganization cases, was centralized control over fees in the bankruptcy courts. See *Brown* v. *Gerdes*, 321 U.S. 178, 182–184 (1944) ; *Leiman* v. *Guttman*, 336 U.S. 1, 4–9 (1949). It was intended to guard against a recurrence of "the many sordid chapters" in "the history of fees in corporate reorganizations." *Dickinson Industrial Site, Inc.* v. *Cowan*, 309 U.S. 382, 388 (1940). In the years since then the bankruptcy bar has flourished and prospered, and persons of merit and quality have not eschewed public service in bankruptcy cases merely because bankruptcy courts, in the interest of economy in administration, have not allowed them compensation that may be earned in the private economy of business or the professions. There is no reason to believe that, in generations to come, their successors will be less persuaded by the need to serve in the public interest because of stronger allures of private gain elsewhere.

---

[19] See also *In re Delta Food Processing Corp.*, 374 F. Supp. 76, 82 (N.D. Miss. 1974). *Brock, supra; In re Bemporad Carpet Mills, Inc.*, 434 F. 2d 988, 989–90 (C.A. 5, 1970).

# DOCUMENT 52

41

Subsection (a) provides for compensation of paraprofessionals in order to reduce the cost of administering bankruptcy cases. Paraprofessionals can be employed to perform duties which do not require the full range of skills of a qualified professional. Some courts have not hesitated to recognize paraprofessional services as compensable under existing law. An explicit provision to that effect is useful and constructive.

The last sentence of subsection (a) provides that in the case of a public company—defined in section 1101(3)—the court shall refer, after a hearing, all applications to the Securities and Exchange Commission for a report, which shall be advisory only. In Chapter X cases in which the Commission has appeared, it generally filed reports on fee applications. Usually, courts have accorded the SEC's views substantial weight, as representing the opinion of a disinterested agency skilled and experienced in reorganization affairs. The last sentence intends for the advisory assistance of the Commission to be sought only in case of a public company in reorganization under chapter 11.

Subsection (b) reenacts section 249 of Chapter X of the Bankruptcy Act (11 U.S.C. 649). It is a codification of equitable principles designed to prevent fiduciaries in the case from engaging in the specified transactions since they are in a position to gain inside information or to shape or influence the course of the reorganization. *Wolf* v. *Weinstein*, 372 U.S. 633 (1963). The statutory bar of compensation and reimbursement is based on the principle that such transactions involve conflicts of interest. Private gain undoubtedly prompts the purchase or sale of claims or stock interests, while the fiduciary's obligation is to render loyal and disinterested service which his position of trust has imposed upon him. Subsection (b) extends to a trustee, his attorney, committees and their attorneys, or any other persons "acting in the case in a representative or fiduciary capacity." It bars compensation to any of the foregoing, who after assuming to act in such capacity has purchased or sold, directly or indirectly, claims against, or stock in the debtor. The bar is absolute. It makes no difference whether the transaction brought a gain or loss, or neither, and the court is not authorized to approve a purchase or sale, before or after the transaction. The exception is for an acquisition or transfer "otherwise" than by a voluntary purchase or sale, such as an acquisition by bequest. See *Otis & Co.* v. *Insurance Bldg. Corp.*, 110 F.2d 333, 335 (C.A. 1, 1940).

Subsection (c) is intended for no asset liquidation cases where minimal compensation for trustees is needed. The sum of $20 will be allowed in each case, which is double the amount provided under current law.

## § 331. *Interim compensation*

Section 331 permits trustees and professional persons to apply to the court not more than once every 120 days for interim compensation and reimbursement payments. The court may permit more frequent applications if the circumstances warrant, such as in very large cases where the legal work is extensive and merits more frequent payments. The court is authorized to allow and order disbursement to the applicant of compensation and reimbursement that is otherwise allowable

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25
397 of 979

42

under section 330. The only effect of this section is to remove any doubt that officers of the estate may apply for, and the court may approve, compensation and reimbursement during the case, instead of being required to wait until the end of the case, which in some instances, may be years. The practice of interim compensation is followed in some courts today, but has been subject to some question. This section explicitly authorizes it.

This section will apply to professionals such as auctioneers and appraisers only if they are not paid on a per job basis.

## § 341. *Meetings of creditors and equity security holders*

Section (a) of this section requires that there be a meeting of creditors within a reasonable time after the order for relief in the case. The Bankruptcy Act and the current Rules of Bankruptcy Procedure provide for a meeting of creditors, and specify the time and manner of the meeting, and the business to be conducted. This bill leaves those matters to the rules. Under section 405(d) of the bill, the present rules will continue to govern until new rules are promulgated. Thus, pending the adoption of different rules, the present procedure for the meeting will continue.

Subsection (b) authorizes the court to order a meeting of equity security holders in cases where such a meeting would be beneficial or useful, for example, in a chapter 11 reorganization case where it may be necessary for the equity security holders to organize in order to be able to participate in the negotiation of a plan of reorganization.

Subsection (c) makes clear that the bankruptcy judge is to preside at the meeting of creditors.

## § 342. *Notice*

Subsection (a) of section 342 requires the clerk of the bankruptcy court to give notice of the order for relief. The rules will prescribe to whom the notice should be sent and in what manner notice will be given. The rules already prescribe such things, and they will continue to govern unless changed as provided in section 404(a) of the bill. Due process will certainly require notice to all creditors and equity security holders. State and Federal governmental representatives responsible for collecting taxes will also receive notice. In cases where the debtor is subject to regulation, the regulatory agency with jurisdiction will receive notice. In order to insure maximum notice to all parties in interest, the Rules will include notice by publication in appropriate cases and for appropriate issues. Other notices will be given as appropriate.

Subsections (b) and (c) are derived from section 21g of the Bankruptcy Act. They specify that the trustee may file notice of the commencement of the case in land recording offices in order to give notice of the pendency of the case to potential transferees of the debtor's real property. Such filing is unnecessary in the county in which the bankruptcy case is commenced. If notice is properly filed, a subsequent purchaser of the property will not be a bona fide purchaser. Otherwise, a purchaser, including a purchaser at a judicial sale, that has no knowledge of the case, is not prevented from obtaining the status of a bona fide purchaser by the mere commencement of the case. "County" is defined in title 1 of the United States Code to include other political subdivisions where counties are not used.

DOCUMENT 52

43

*§ 343. Examination of the debtor*

This section, derived from section 21a of the Bankruptcy Act, requires the debtor to appear at the meeting of creditors and submit to examination under oath. The purpose of the examination is to enable creditors and the trustee to determine if assets have improperly been disposed of or concealed or if there are grounds for objection to discharge. The scope of the examination under this section will be governed by the Rules of Bankruptcy Procedure, as it is today. *See* rules 205(d), 10–213(c), and 11–26. It is expected that the scope prescribed by these rules for liquidation cases, that is, "only the debtor's acts, conduct, or property, or any matter that may affect the administration of the estate, or the debtor's right to discharge" will remain substantially unchanged. In reorganization cases the examination would be broader, including inquiry into the liabilities and financial condition of the debtor, the operation of his business, and the desirability of the continuance thereof, and other matters relevant to the case and to the formulation of the plan. Examination of other persons in connection with the bankruptcy case is left completely to the rules, just as examination of witnesses in civil cases is governed by the Federal Rules of Civil Procedure.

*§ 344. Self-incrimination; immunity*

Part V of title 18 of the United States Code governs the granting of immunity to witnesses before Federal tribunals. The immunity provided under part V is only use immunity, not transactional immunity. Part V applies to all proceedings before Federal courts, before Federal grand juries, before administrative agencies, and before Congressional committees. It requires the Attorney General or the U.S. attorney to request or to approve any grant of immunity, whether before a court, grand jury, agency, or congressional committee.

This section carries part V over into bankruptcy cases. Thus, for a witness to be ordered to testify before a bankruptcy court in spite of a claim of privilege, the U.S. attorney for the district in which the court sits would have to request from the district court for that district the immunity order. The rule would apply to both debtors, creditors, and any other witnesses in a bankruptcy case. If the immunity were granted, the witness would be required to testify. If not, he could claim the privilege against self-incrimination.

Part V is a significant departure from current law. Under section 7a(10) of the Bankruptcy Act, a debtor is required to testify in all circumstances, but any testimony he gives may not be used against him in any criminal proceeding, except testimony given in any hearing on objections to discharge. With that exception, section 7a(10) amounts to a blanket grant of use immunity to all debtors. Immunity for other witnesses in bankruptcy courts today is governed by part V of title 18.

The consequences of a claim of privileges by a debtor under proposed law and under current law differ as well. Under section 14c(6) of current law, any refusal to answer a material question approved by the court will result in the denial of a discharge, even if the refusal is based on the privilege against self incrimination. Thus, the debtor is confronted with the choice between losing his discharge and opening himself up to possible criminal prosecution.

44

Under section 727(a)(6) of the proposed title 11, a debtor is only denied a discharge if he refuses to tesify after having been granted immunity. If the debtor claims the privilege and the U.S. attorney does not request immunity from the district courts, then the debtor may refuse to testify and still retain his right to a discharge. It removes the Scylla and Charibdis choice for debtors that exists under the Bankruptcy Act.

§ 345. Money of estates

This section is a significant departure from section 61 of the Bankruptcy Act. It permits a trustee in a bankruptcy case to make such deposit of investment of the money of the estate for which he serves as will yield the maximum reasonable net return on the money, taking into account the safety of such deposit or investment. Under current law, the trustee is permitted to deposit money only with banking institutions. Thus, the trustee is generally unable to secure a high rate of return on money of estates pending distribution, to the detriment of creditors. Under this section, the trustee may make deposits in savings and loans, may purchase government bonds, or make such other deposit or investment as is appropriate. Under proposed 11 U.S.C. 541 (a)(6), and except as provided in subsection (c) of this section, any interest or gain realized on the deposit or investment of funds under this section will become property of the estate, and will thus enhance the recovery of creditors.

In order to protect the creditors, subsection (b) requires certain precautions against loss of the money so deposited or invested. The trustee must require from a person with which he deposits or invests money of an estate a bond in favor of the United States secured by approved corporate surety and conditioned on a proper accounting for all money deposited or invested and for any return on such money. Alternately, the trustee may require the deposit of securities of the kind specified in section 15 of title 6 of the United States Code, which governs the posting of security by banks that receive public moneys on deposit. These bonding requirements do not apply to deposits or investments that are insured or guaranteed the United States or a department, agency, or intrumentality of the United States, or that are backed by the full faith and credit of the United States.

These provisions do not address the question of aggregation of funds by a private chapter 13 trustee and are not to be construed as excluding such possibility. The Rules of Bankruptcy Procedure may provide for aggregation under appropriate circumstances and adequate safeguards in cases where there is a significant need, such as in districts in which there is a standing chapter 13 trustee. In such case, the interest or return on the funds would help defray the cost of administering the cases in which the standing trustee serves.

§ 346. Special tax provisions

Subsection (a) indicates that subsections (b), (c), (d), (e), (g), (h), (i), and (j) apply notwithstanding any State or local tax law, but are subject to Federal tax law.

Subsection (b)(1) provides that in a case concerning an individual under chapter 7 or 11 of title 11, income of the estate is taxable only to the estate and not to the debtor. The second sentence of the para-