graph provides that if such individual is a partner, the tax attributes of the partnership are distributable to the partner's estate rather than to the partner, except to the extent that section 728 of title 11 provides otherwise.

Subsection (b) (2) states a general rule that the estate of an individual is to be taxed as an estate. The paragraph is made subject to the remainder of section 346 and section 728 of title 11.

Subsection (b) (3) requires the accounting method, but not necessarily the accounting period, of the estate to be the same as the method used by the individual debtor.

Subsection (c) (1) states a general rule that the estate of a partnership or a corporated debtor is not a separate entity for tax purposes. The income of the debtor is to be taxed as if the case were not commenced, except as provided in the remainder of section 346 and section 728.

Subsection (c) (2) requires the trustee, except as provided in section 728 of title 11, to file all tax returns on behalf of the partnership or corporation during the case.

Subsection (d) indicates that the estate in a chapter 13 case is not a separate taxable entity and that all income of the estate is to be taxed to the debtor.

Subsection (e) establishes a business deduction consisting of allowed expenses of administration except for tax or capital expenses that are not otherwise deductible. The deduction may be used by the estate when it is a separate taxable entity or by the entity to which the income of the estate is taxed when it is not.

Subsection (f) imposes a duty on the trustee to comply with any Federal, State, or local tax law requiring withholding or collection of taxes from any payment of wages, salaries, commissions, dividends, interest, or other payments. Any amount withheld is to be paid to the taxing authority at the same time and with the same priory as the claim from which such amount withheld was paid.

Subsection (g) (1) (A) indicates that neither gain nor loss is recognized on the transfer by law of property from the debtor or a creditor to the estate. Subparagraph (B) provides a similar policy if the property of the estate is returned from the estate to the debtor other than by a sale of property to debtor. Subparagraph (C) also provides for nonrecognition of gain or loss in a case under chapter 11 if a corporate debtor transfers property to a successor corporation or to an affiliate under a joint plan. An exception is made to enable a taxing authority to cause recognition of gain or loss to the extent provided in IRC section 371 (as amended by section 109 of this bill).

Subsection (g) (2) provides that any of the three kinds of transferees specified in paragraph (1) take the property with the same character, holding period, and basis in the hands of the transferor at the time of such transfer. The transferor's basis may be adjusted under section 346(j) (5) even if the discharge of indebtedness occurs after the transfer of property. Of course, no adjustment will occur if the transfer is from the debtor to the estate or if the transfer is from an entity that is not discharged.

Subsection (h) provides that the creation of the estate of an individual under chapters 7 or 11 of title 11 as a separate taxable entity

46

does not affect the number of taxable years for purposes of computing loss carryovers or carrybacks. The section applies with respect to carryovers or carrybacks of the debtor transferred into the estate under section 346(i)(1) of title 11 or back to the debtor under section 346(i)(2) of title 11.

Subsection (i)(1) states a general rule that an estate that is a separate taxable entity nevertheless succeeds to all tax attributes of the debtor. The six enumerated attributes are illustrative and not exhaustive.

Subsection (i)(2) indicates that attributes passing from the debtor into an estate that is a separate taxable entity will return to the debtor if unused by the estate. The debtor is permitted to use any such attribute as though the case had not been comenced.

Subsection (i)(3) permits an estate that is a separate taxable entity to carryback losses of the estate to a taxable period of the debtor that ended before the case was filed. The estate is treated as if it were the debtor with respect to time limitations and other restrictions. The section makes clear that the debtor may not carryback any loss of his own from a tax year during the pendency of the case to such a period until the case is closed. No tolling of any period of limitation is provided with respect to carrybacks by the debtor of post-petition losses.

Subsection (j) sets forth seven special rules treating with the tax effects of forgiveness or discharge of indebtedness. The terms "forgiveness" and "discharge" are redundant, but are used to clarify that "discharge" in the context of a special tax provision in title 11 includes forgiveness of indebtedness whether or not such indebtedness is "discharged" in the bankruptcy sense.

Paragraph (1) states the general rule that forgiveness of indebtedness is not taxable except as otherwise provided in paragraphs (2)–(7). The paragraph is patterned after sections 268, 395, and 520 of the Bankruptcy Act.

Paragraph (2) disallows deductions for liabilities of a deductible nature in any year during or after the year of cancellation of such liabilities. For the purposes of this paragraph, "a deduction with respect to a liability" includes a capital loss incurred on the disposition of a capital asset with respect to a liability that was incurred in connection with the acquisition of such asset.

Paragraph (3) causes any net operating loss of a debtor that is an individual or corporation to be reduced by any discharge of indebtedness except as provided in paragraphs (2) or (4). If a deduction is disallowed under paragraph (2), then no double counting occurs. Thus, paragraph (3) will reflect the reduction of losses by liabilities that have been forgiven, including deductible liabilities or nondeductible liabilities such as repayment of principal on borrowed funds.

Paragraph (4) specifically excludes two kinds of indebtedness from reduction of net operating losses under paragraph (3) or from reduction of basis under paragraph (5). Subparagraph (A) excludes items of a deductible nature that were not deducted or that could not be deducted such as gambling losses or liabilities for interest owed to a relative of the debtor. Subparagraph (B) excludes indebtedness of a debtor that is an individual or corporation that resulted in deductions which did not offset income and that did not contribute to an unex-

**SASMF EXHIBIT 25**

**402 of 979**

# DOCUMENT 52

47

pired net operating loss or loss carryover. In these situations, the debtor has derived no tax benefit so there is no need to incur an off-setting reduction.

Paragraph (5) provides a two-point test for reduction of basis. The paragraph replaces sections 270, 396, and 522 of the Bankruptcy Act. Subparagraph (A) sets out the maximum amount by which basis may be reduced—the total indebtedness forgiven less adjustments made under paragraphs (2) and (3). This avoids double counting. If a deduction is disallowed under paragraph (2) or a carryover is reduced under paragraph (3) then the tax benefit is neutralized, and there is no need to reduce basis. Subparagraph (B) reduces basis to the extent the debtor's total basis of assets before the discharge exceeds total preexisting liabilities still remaining after discharge of indebtedness. This is a "basis solvency" limitation which differs from the usual test of solvency because it measures against the remaining liabilities the benefit aspect of assets, their basis, rather than their value. Paragraph (5) applies so that any transferee of the debtor's property who is required to use the debtor's basis takes the debtor's basis reduced by the lesser of (A) and (B). Thus, basis will be reduced, but never below a level equal to undischarged liabilities.

Paragraph (6) specifies that basis need not be reduced under paragraph (5) to the extent the debtor treats discharged indebtedness as taxable income. This permits the debtor to elect whether to recognize income, which may be advantageous if the debtor anticipates subsequent net operating losses, rather than to reduce basis.

Paragraph (7) establishes two rules excluding from the category of discharged indebtedness certain indebtedness that is exchanged for an equity security issued under a plan or that is forgiven as a contribution to capital by an equity security holder. Subparagraph (A) creates the first exclusion to the extent indebtedness consisting of items not of a deductible nature is exchanged for an equity security, other than the interests of a limited partner in a limited partnership, issued by the debtor or is forgiven as a contribution to capital by an equity security holder. Subparagraph (B) excludes indebtedness consisting of items of a deductible nature, if the exchange of stock for debts has the same effect as a cash payment equal to the value of the equity security, in the amount of the fair market value of the equity security or, if less, the extent to which such exchange has such effect. The two provisions treat the debtor as if it had originally issued stock instead of debt. Subparagraph (B) rectifies the inequity under current law between a cash basis and accrual basis debtor concerning the issuance of stock in exchange for previous services rendered that were of a greater value than the stock. Subparagraph (B) also changes current law by taxing forgiveness of indebtedness to the extent that stock is exchanged for the accrued interest component of a security, because the recipient of such stock would not be regarded as having received money under the *Carman* doctrine.

## § 347. Unclaimed property

Section 347 is derived from Bankruptcy Act § 66. Subsection (a) requires the trustee to stop payment on any distribution check that is unpaid 90 days after the final distribution in a case under chapter

48

7 or 13. The unclaimed funds, and any other property of the estate are paid into the court and disposed of under chapter 129 of title 28, which requires the clerk of court to hold the funds for their owner for 5 years, after which they escheat to the Treasury.

Subsection (b) specifies that any property remaining unclaimed at the expiration of the time allowed in a chapter 9 or 11 case for presentation (exchange) of securities or the performance of any other act as a condition to participation in the plan reverts to the debtor or the entity acquiring the assets of the debtor under the plan. Conditions to participation under a plan include such acts as cashing a check, surrendering securities for cancellation, and so on. Similar provisions are found in section 96(d) and 205 of current law.

### § 348. Effect of conversion

This section governs the effect of the conversion of a case from one chapter of the bankruptcy code to another chapter. Subsection (a) specifies that the date of the filing of the petition, the commencement of the case, or the order for relief are unaffected by conversion, with some exceptions specified in subsections (b) and (c).

Subsection (b) lists certain sections in the operative chapters of the bankruptcy code in which there is a reference to "the order for relief under this chapter." In those sections, the reference is to be read as a reference to the conversion order if the case has been converted into the particular chapter. Subsection (c) specifies that notice is to be given of the conversion order the same as notice was given of the order for relief, and that the time the trustee (or debtor in possession) has for assuming or rejecting executory contracts recommences, thus giving an opportunity for a newly appointed trustee to familiarize himself with the case.

Subsection (d) provides for special treatment of claims that arise during chapter 11 or 13 cases before the case is converted to a liquidation case. With the exception of claims specified in proposed 11 U.S.C. 503(b) (administrative expenses), preconversion claims are treated the same as prepetition claims.

Subsection (e) provides that conversion of a case terminates the service of any trustee serving in the case prior to conversion.

### § 349. Effect of dismissal

Subsection (a) specifies that unless the court for cause orders otherwise, the dismissal of a case is without prejudice. The debtor is not barred from receiving a discharge in a later case of debts that were dischargeable in the case dismissed. Of course, this subsection refers only to pre-discharge dismissals. If the debtor has already received a discharge and it is not revoked, then the debtor would be barred under section 727(a) from receiving a discharge in a subsequent liquidation case for six years. Dismissal of an involuntary on the merits will generally not give rise to adequate cause so as to bar the debtor from further relief.

Subsection (b) specifies that the dismissal reinstates proceedings or custodianships that were superseded by the bankruptcy case, reinstates avoided transfers, reinstates voided liens, vacates any order, judgment, or transfer ordered as a result of the avoidance of a trans-

SASMF EXHIBIT 25

404 of 979

# DOCUMENT 52

49

fer, and revests the property of the estate in the entity in which the property was vested at the commencement of the case. The court is permitted to order a different result for cause. The basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case. This does not necessarily encompass undoing sales of property from the estate to a good faith purchaser. Where there is a question over the scope of the subsection, the court will make the appropriate orders to protect rights acquired in reliance on the bankruptcy case.

## § 350. Closing and reopening cases

Subsection (a) requires the court to close a bankruptcy case after the estate is fully administered and the trustee discharged. The Rules of Bankruptcy Procedure will provide the procedure for case closing. Subsection (b) permits reopening of the case to administer assets, to accord relief to the debtor, or for other cause. Though the court may permit reopening of a case so that the trustee may exercise an avoiding power, laches may constitute a bar to an action that has been delayed too long. The case may be reopened in the court in which it was closed. The rules will prescribe the procedure by which a case is reopened and how it will be conducted after reopening.

## § 361. Adequate protection

Sections 362, 363, and 364 require, in certain circumstances, that the court determine in noticed hearings whether the interest of a secured creditor or co-owner of property with the debtor is adequately protected in connection with the sale or use of property. The interests of which the court may provide protection in the ways described in this section include equitable as well as legal interests. For example, a right to enforce a pledge and a right to recover property delivered to a debtor under a consignment agreement or an agreement of sale or return are interests that may be entitled to protection. This section specifies means by which adequate protection may be provided but, to avoid placing the court in an administrative role, does not require the court to provide it. Instead, the trustee or debtor in possession or the creditor will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the limits of the concept.

The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court. See *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935).

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

**Ad Hoc Equity Group Exhibit 9**

**SASMF EXHIBIT 25**

**405 of 979**

Subsection (a) defines the scope of the automatic stay, by listing the acts that are stayed by the commencement of the case. The commencement or continuation, including the issuance of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy case is stayed under paragraph (1). The scope of this paragraph is broad. All proceedings are stayed, including arbitration, administrative, and judicial proceedings. Proceeding in this sense encompasses civil actions and all proceedings even if they are not before governmental tribunals.

The stay is not permanent. There is adequate provision for relief from the stay elsewhere in the section. However, it is important that the trustee have an opportunity to inventory the debtor's position before proceeding with the administration of the case. Undoubtedly the court will lift the stay for proceedings before specialized or nongovernmental tribunals to allow those proceedings to come to a conclusion. Any party desiring to enforce an order in such a proceeding would thereafter have to come before the bankruptcy court to collect assets. Nevertheless, it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

Paragraph (2) stays the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the bankruptcy case. Thus, execution and levy against the debtors' prepetition property are stayed, and attempts to collect a judgment from the debtor personally are stayed.

Paragraph (3) stays any act to obtain possession of property of the estate (that is, property of the debtor as of the date of the filing of the petition) or property from the estate (property over which the estate has control or possession). The purpose of this provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion. Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available for distribution.

Paragraph (4) stays lien creation against property of the estate. Thus, taking possession to perfect a lien or obtaining court process is prohibited. To permit lien creation after bankruptcy would give certain creditors preferential treatment by making them secured instead of unsecured.

Paragraph (5) stays any act to create or enforce a lien against property of the debtor, that is, most property that is acquired after the date of the filing of the petition, property that is exempted, or property that does not pass to the estate, to the extent that the lien secures a prepetition claim. Again, to permit postbankruptcy lien creation or enforcement would permit certain creditors to receive preferential treatment. It may also circumvent the debtors' discharge.

Paragraph (6) prevents creditors from attempting to collect a prepetition debt. Creditors in consumer cases occasionally telephone debtors to encourage repayment in spite of bankruptcy. Inexperienced, frightened, or ill-counseled debtors may succumb to sug-

DOCUMENT 52

51

gestions to repay notwithstanding their bankruptcy. This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors.

Paragraph (7) stays setoffs of mutual debts and credits between the debtor and creditors. As with all other paragraphs of subsection (a), this paragraph does not affect the right of creditors. It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights.

Subsection (b) lists seven exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of proposed title 11, derived from Bankruptcy Act § 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity, 28 U.S.C. §§ 151 and 164 as proposed in S. 2266, § 201, and 28 U.S.C. § 1334, as proposed in S. 2266, § 216. Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.

With respect to stays issued under other powers, or the application of the automatic stay, to governmental actions, this section and the other sections mentioned are intended to be an express waiver of sovereign immunity of the Federal Government, and an assertion of the bankruptcy power over State governments under the supremacy clause notwithstanding a State's sovereign immunity.

The first exception is of criminal proceedings against the debtor. The bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial overextension. Thus, criminal actions and proceedings may proceed in spite of bankruptcy.

Paragraph (2) excepts from the stay the collection of alimony, maintenance or support from property that is not property of the estate. This will include property acquired after the commencement of the case, exempted property, and property that does not pass to the estate. The automatic stay is one means of protecting the debtor's discharge. Alimony, maintenance and support obligations are excepted from discharge. Staying collection of them, when not to the detriment of other creditors (because the collection effort is against property that is not property of the estate), does not further that goal. Moreover, it could lead to hardship on the part of the protected spouse or children.

Paragraph (3) excepts any act to perfect an interest in property to the extent that the trustee's rights and powers are limited under section 546(a) of the bankruptcy code. That section permits postpetition perfection of certain liens to be effective against the trustee. If

SASMF EXHIBIT 25
407 of 979

52

the act of perfection, such as filing, were stayed, the section would be nullified.

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

Paragraph (6) excepts the setoff of any mutual debt and claim for commodity transactions.

Paragraph (7) excepts actions by the Secretary of Housing and Urban Development to foreclose or take possession in a case of a loan insured under the National Housing Act. A general exception for such loans is found in current sections 263 and 517, the exception allowed by this paragraph is much more limited.

Subsection (c) of section 362 specifies the duration of the automatic stay. Paragraph (1) terminates a stay of an act against property of the estate when the property ceases to be property of the estate, such as by sale, abandonment, or exemption. It does not terminate the stay against property of the debtor if the property leaves the estate and goes to the debtor. Paragraph (2) terminates the stay of any other act on the earliest of the time the case is closed, the time the case is dismissed, or the time a discharge is granted or denied (unless the debtor is a corporation or partnership in a chapter 7 case).

Subsection (c) governs automatic termination of the stay. Subsections (d) through (g) govern termination of the stay by the court on the request of a party in interest.

Subsection (d) requires the court, upon motion of a party in interest, to grant relief from the stay for cause, such as by terminating, annulling, modifying, or conditioning the stay. The lack of adequate protection of an interest in property is one cause for relief, but is not the only cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditors.

Upon the court's finding that the debtor has no equity in the property subject to the stay and that the property is not necessary to an effective reorganization of the debtor, the subsection requires the court grant relief from the stay. To aid in this determination, guidelines are established where the property subject to the stay is real

SASMF EXHIBIT 25
408 of 979

DOCUMENT 52

53

property. An exception to "the necessary to an effective reorganization" requirement is made for real property on which no business is being conducted other than operating the real property and activities incident thereto. The intent of this exception is to reach the single-asset apartment type cases which involve primarily tax-shelter investments and for which the bankruptcy laws have provided a too facile method to relax conditions, but not the operating shopping center and hotel cases where attempts at reorganization should be permitted. Property in which the debtor has equity but which is not necessary to an effective reorganization of the debtor should be sold under section 363. Hearings under this subsection are given calendar priority to ensure that court congestion will not unduly prejudice the rights of creditors who may be obviously entitled to relief from the operation of the automatic stay.

Subsection (e) provides protection that is not always available under present law. The subsection sets a time certain within which the bankruptcy court must rule on the adequacy of protection provided for the secured creditor's interest. If the court does not rule within 30 days from a request by motion for relief from the stay, the stay is automatically terminated with respect to the property in question. To accommodate more complex cases, the subsection permits the court to make a preliminary ruling after a preliminary hearing. After a preliminary hearing, the court may continue the stay only if there is a reasonable likelihood that the party opposing relief from the stay will prevail at the final hearing. Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order are similar to the hearing and issuance or denial of a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection and existence of an equity. It is not, however, intended to be confined strictly to the constitutional requirement. This section and the concept of adequate protection are based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest where such steps are a necessary part of the rehabilitative process. Though the creditor might not be able to retain his lien upon the specific collateral held at the time of filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

409 of 979

54

The section specifies two exclusive means of providing adequate protection, both of which may require an approximate determination of the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. In light of the restrictive approach of the section to the availability of means of providing adequate protection, this flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.

Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.

In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case. Finally, the determination of value is binding only for the purposes of the specific hearing and is not to have a res judicata effect.

The first method of adequate protection outlined is the making of cash payments to compensate for the expected decrease in value of the opposing entity's interest. This provision is derived from *In re Bermec Corporation*, 445 F.2d 367 (2d Cir. 1971), though in that case it is not clear whether the payments offered were adequate to compensate the secured creditors for their loss. The use of periodic payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation.

The second method is the fixing of an additional or replacement lien on other property of the debtor to the extent of the decrease in value or actual consumption of the property involved. The purpose of this method is to provide the protected entity with an alternative means of realizing the value of the original property, if it should decline during the case, by granting an interest in additional property from whose value the entity may realize its loss. This is consistent with the view expressed in *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940), where the Court suggested that it was the value of the secured creditor's collateral, and not necessarily his rights in specific collateral, that was entitled to protection.

The section makes no provision for the granting of an administrative priority as a method of providing adequate protection to an entity as was suggested in *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir. 1967), because such protection is too uncertain to be meaningful.

### § 362. Automatic stay

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment

**Ad Hoc Equity Group Exhibit 9** SASMF **EXHIBIT 25**

410 of 979

# DOCUMENT 52

55

or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties, Ltd.*, 430 F. Supp. 1112 (N.D.Cal. 1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing.

*§ 363. Use, sale, or lease of property*

This section defines the right and powers of the trustee with respect to the use, sale, or lease of property and the rights of other parties that have interests in the property involved. It applies in both liquidation and reorganization cases.

Subsection (a) defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest, such as a lien or a co-ownership interest. The definition is not restricted to property of the estate that is cash collateral on the date of the filing of the petition. Thus, if "non-cash" collateral is disposed of and the proceeds come within the definition of "cash collateral" as set forth in this subsection, the proceeds would be cash collateral as long as they remain subject to the original lien on the "non-cash" collateral under section 552(b). To illustrate, rents received from real property before or after the commencement of the case would be cash collateral to the extent that they are subject to a lien.

Subsection (b) permits the trustees to use, sell, or lease, other than in the ordinary course of business, property of the estate upon notice and opportunity for objections and hearing thereon.

Subsection (c) governs use, sale, or lease in the ordinary course of business. If the business of the debtor is authorized to be operated under § 721, 1108, or 1304 of the bankruptcy code, then the trustee may use, sell, or lease property in the ordinary course of business or enter

Ad Hoc Equity Group Exhibit 9 SASMF EXHIBIT 25

58

411 of 979

56

into ordinary course transactions without need for notice and hearing. This power is subject to several limitations. First, the court may restrict the trustee's powers in the order authorizing operation of the business. Second, with respect to cash collateral, the trustee may not use, sell, or lease cash collateral except upon court authorization after notice and a hearing, or with the consent of each entity that has an interest in such cash collateral. The same preliminary hearing procedure in the automatic stay section applies to a hearing under this subsection. In addition, the trustee is required to segregate and account for any cash collateral in the trustee's possession, custody, or control.

Under subsections (d) and (e), the use, sale, or lease of property is further limited by the concept of adequate protection. Sale, use, or lease of property in which an entity other than the estate has an interest may be effected only to the extent not inconsistent with any relief from the stay granted to that interest's holder. Moreover, the court may prohibit or condition the use, sale, or lease as is necessary to provide adequate protection of that interest. Again, the trustee has the burden of proof on the issue of adequate protection. Subsection (e) also provides that where a sale of the property is proposed, an entity that has an interest in such property may bid at the sale thereof and set off against the purchase price up to the amount of such entity's claim. No prior valuation under section 506(a) would limit this bidding right, since the bid at the sale would be determinative of value.

Subsection (f) permits sale of property free and clear of any interest in the property of an entity other than the estate. The trustee may sell free and clear if applicable nonbankruptcy law permits it, if the other entity consents, if the interest is a lien and the sale price of the property is greater than the amount secured by the lien, if the interest is in bona fide dispute, or if the other entity could be compelled to accept a money satisfaction of the interest in a legal or equitable proceeding. Sale under this subsection is subject to the adequate protection requirement. Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.

At a sale free and clear of other interests, any holder of any interest in the property being sold will be permitted to bid. If that holder is the high bidder, he will be permitted to offset the value of his interest against the purchase price of the property. Thus, in the most common situation, a holder of a lien on property being sold may bid at the sale and, if successful, may offset the amount owed to him that is secured by the lien on the property (but may not offset other amounts owed to him) against the purchase price, and be liable to the trustee for the balance of the sale price, if any.

Subsection (g) permits the trustee to sell free and clear of any vested or contingent right in the nature of dower or curtesy.

Subsection (h) permits sale of a co-owner's interest in property in which the debtor had an undivided ownership interest such as a joint tenancy, a tenancy in common, or a tenancy by the entirety. Such a sale is permissible only if partition is impracticable, if sale of the estate's interest would realize significantly less for the estate that sale of the property free of the interests of the co-owners, and if the benefit to

**SASMF EXHIBIT 25**

**412 of 979**

the estate of such a sale outweighs any detriment to the co-owners. This subsection does not apply to a co-owner's interest in a public utility when a disruption of the utilities services could result.

Subsection (i) provides protections for co-owners and spouses with dower, curtesy, or community property rights. It gives a right of first refusal to the co-owner or spouse at the price at which the sale is to be consummated. Subsection (j) requires the trustee to distribute to the spouse or co-owner the appropriate portion of the proceeds of the sale, less certain administrative expenses.

Subsection (k) permits the trustee to use, sell, or lease property notwithstanding certain bankruptcy or ipso facto clauses that terminate the debtor's interest in the property or that work a forfeiture or modification of that interest. This subsection is not as broad as the anti-ipso facto provision in proposed 11 U.S.C. 541(c)(1).

Subsection (l) protects good faith purchasers of property sold under this section from a reversal on appeal of the sale authorization, unless the authorization for the sale and the sale itself were stayed pending appeal. The purchaser's knowledge of the appeal is irrelevant to the issue of good faith.

Subsection (m) is directed at collusive bidding on property sold under this section. It permits the trustee to void a sale if the price of the sale was controlled by an agreement among potential bidders. The trustees may also recover the excess of the value of the property over the purchase price, and may recover any costs, attorney's fees, or expenses incurred in voiding the sale or recovering the difference. In addition, the court is authorized to grant judgment in favor of the estate and against the collusive bidder if the agreement controlling the sale price was entered into in willful disregard of this subsection. The subsection does not specify the precise measure of damages, but simply provides for punitive damages, to be fixed in light of the circumstances.

### § 364. Obtaining credit

This section is derived from provisions in current law governing certificates of indebtedness, but is much broader. It governs all obtaining of credit and incurring of debt by the estate.

Subsection (a) authorizes the obtaining of unsecured credit and the incurring of unsecured debt in the ordinary course of business if the business of the debtor is authorized to be operated under section 721, 1108, or 1304. The debts so incurred are allowable as administrative expenses under section 503(b)(1). The court may limit the estate's ability to incur debt under this subsection.

Subsection (b) permits the court to authorize the trustee to obtain unsecured credit and incur unsecured debts other than in the ordinary course of business, such as in order to wind up a liquidation case, or to obtain a substantial loan in an operating case. Debt incurred under this subsection is allowable as an administrative expense under section 503(b)(1).

Subsection (c) is closer to the concept of certificates of indebtedness in current law. It authorizes the obtaining of credit and the incurring of debt with some special priority, if the trustee is unable to obtain unsecured credit under subsection (a) or (b). The various priorities

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25
413 of 979

58

are (1) with priority over any or all administrative expenses; (2) secured by a lien on unencumbered property of the estate; or (3) secured by a junior lien on encumbered property. The priorities granted under this subsection do not interfer with existing property rights.

Subsection (d) grants the court the authority to authorize the obtaining of credit and the incurring of debt with a superiority, that is a lien on encumbered property that is senior or equal to the existing lien on the property. The court may authorize such a super-priority only if the trustee is otherwise unable to obtain credit, and if there is adequate protection of the original lien holder's interest. Again, the trustee has the burden of proof on the issue of adequate protection.

Subsection (e) provides the same protection for credit extenders pending an appeal of an authorization to incur debt as is provided under section 363(1) for purchasers: the credit is not affected on appeal by reversal of the authorization unless the authorization and the incurring of the debt were stayed pending appeal. The protection runs to a good faith lender, whether or not he knew of the pendency of the appeal.

A claim arising as a result of lending or borrowing under this section will be a priority claim, as defined in proposed section 507(a)(1), even if the claim is granted a super-priority over administrative expenses and is to be paid in advance of other first priority claims.

### § 365. Executory contracts and unexpired leases

Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

Because of the volatile nature of the commodities markets and the special provisions governing commodity broker liquidations in subchapter IV of chapter 7, the provisions governing distribution in section 765(a) will govern if any conflict between those provisions and the provisions of this section arise.

Subsections (b), (c), and (d) provide limitations on the trustee's powers. Subsection (b) requires the trustee to cure any default in the contract or lease and to provide adequate assurance of future performance if there has been a default, before he may assume. This provision does not apply to defaults under ipso facto or bankruptcy clauses, which is a significant departure from present law.

Subsection (b)(3) permits termination of leases entered into prior to the effective date of this title in liquidation cases if certain other conditions are met.

Subsection (b)(4) prohibits the trustee's assumption of an executory contract requiring the other party to make a loan or deliver equipment to or to issue a security of the debtor. The purpose of this subsection is to make it clear that a party to a transaction which is based upon the

DOCUMENT 52

59

financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans, lease financing, or the purchase or discount of notes.

Subsection (b) (5) provides that in lease situations common to shopping centers, protections must be provided for the lessor if the trustee assumes the lease, including protection against decline in percentage rents, breach of agreements with other tenants, and preservation of the tenant mix. Protection for tenant mix will not be required in the office building situation.

Subsection (c) prohibits the trustee from assuming or assigning a contract or lease if applicable nonbankruptcy law excuses the other party from performance to someone other than the debtor, unless the other party consents. This prohibition applies only in the situation in which applicable law excuses the other party from performance independent of any restrictive language in the contract or lease itself.

Subsection (d) places time limits on assumption and rejection. In a liquidation case, the trustee must assume within 60 days (or within an additional 60 days, if the court, for cause, extends the time). If not assumed, the contract or lease is deemed rejected. In a rehabilitation case, the time limit is not fixed in the bill. However, if the other party to the contract or lease requests the court to fix a time, the court may specify a time within which the trustee must act. This provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.

Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

The unenforcibility of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

This subsection does not limit the application of an ipso facto or bankruptcy clause if a new insolvency or receivership occurs after the bankruptcy case is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of disposition of the executory contract or unexpired lease.

Subsection (f) partially invalidates restrictions on assignment of contracts or leases by the trustee to a third party. The subsection imposes two restrictions on the trustee: he must first assume the contract or lease, subject to all the restrictions on assumption found in the section, and adequate assurance of future performance must be provided to the other contracting party. Paragraph (3) of the subsection invalidates contractual provisions that permit termination or modification in the event of an assignment, as contrary to the policy of this subsection.

60

Subsection (g) defines the time as of which a rejection of an executory contract or unexpired lease constitutes a breach of the contract or lease. Generally, the breach is as of the date immediately preceding the date of the petition. The purpose is to treat rejection claims as prepetition claims. The remainder of the subsection specifies different times for cases that are converted from one chapter to another. The provisions of this subsection are not a substantive authorization to breach or reject an assumed contract. Rather, they prescribe the rules for the allowance of claims in case an assumed contract is breached, or if a case under chapter 11 in which a contract has been assumed is converted to a case under chapter 7 in which the contract is rejected.

Subsection (h) protects real property lessees of the debtor if the trustee rejects an unexpired lease under which the debtor is the lessor (or sublessor). The subsection permits the lessee to remain in possession of the leased property or to treat the lease as terminated by the rejection. The balance of the term of the lease referred to in paragraph (1) will include any renewal terms that are enforceable by the tenant, but not renewal terms if the landlord had an option to terminate. Thus, the tenant will not be deprived of his estate for the term for which he bargained. If the lessee remains in possession, he may offset the rent reserved under the lease against damages caused by the rejection, but does not have any affirmative rights against the estate for any damages after the rejection that result from the rejection.

Subsection (i) gives a purchaser of real property under a land installment sales contract similar protection. The purchaser, if the contract is rejected, may remain in possession or may treat the contract as terminated. If the purchaser remains in possession, he is required to continue to make the payments due, but may offset damages that occur after rejection. The trustee is required to deliver title, but is relieved of all other obligations to perform.

A purchaser that treats the contract as terminated is granted a lien on the property to the extent of the purchase price paid. A party with a contract to purchase land from the debtor has a lien on the property to secure the price already paid, if the contract is rejected and the purchaser is not yet in possession.

Subsection (k) relieves the trustee and the estate of liability for a breach of an assigned contract or lease that occurs after the assignment.

§ *366. Utility service*

This section gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility. The utility may not alter, refuse, or discontinue service because of the nonpayment of a bill that would be discharged in the the bankruptcy case. Subsection (b) protects the utility company by requiring the trustee or the debtor to provide, within ten days, adequate assurance of payment for service provided after the date of the petition.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**
**416 of 979**

DOCUMENT 52

61

## CHAPTER 5—CREDITORS, THE DEBTOR, AND THE ESTATE

### SUBCHAPTER I—CREDITORS AND CLAIMS

*§ 501. Filing of proofs of claims or interests*

This section governs the means by which creditors and equity security holders present their claims or interests to the court. Subsection (a) permits a creditor to file a proof of claim or interest. An indenture trustee representing creditors may file a proof of claim on behalf of the creditors he represents.

This subsection is permissive only, and does not require filing of a proof of claim by any creditor. It permits filing where some purpose would be served, such as where a claim that appears on a list filed under proposed 11 U.S.C. 924 or 1111 was incorrectly stated or listed as disputed, contingent, or unliquidated, where a creditor with a lien is undersecured and asserts a claim for the balance of the debt owed him (his unsecured claim, as determined under proposed 11 U.S.C. 506(a)), or in a liquidation case where there will be a distribution of assets to the holders of allowed claims. In other instances, such as in no-asset liquidation cases, in situations where a secured creditor does not assert any claim against the estate and a determination of his claim is not made under proposed 11 U.S.C. 506, or in situations where the claim asserted would be subordinated and the creditor would not recover from the estate in any event, filing of a proof of claim may simply not be necessary. The Rules of Bankruptcy Procedure and practice under the law will guide creditors as to when filing is necessary and when it may be dispensed with. In general, however, unless a claim is listed in a chapter 9 or chapter 11 case and allowed as a result of the list, a proof of claim will be a prerequisite to allowance for unsecured claims, including priority claims and the unsecured portion of a claim asserted by the holder of a lien.

The Rules of Bankruptcy Procedure will set the time limits, the form, and the procedure for filing, which will determine whether claims are timely or tardily filed. The rules governing time limits for filing proofs of claims will continue to apply under section 405(d) of the bill. These provide a 6-month-bar date for the filing of tax claims.

Subsection (b) permits a codebtor, surety, or guarantor to file a proof of claim on behalf of the creditor to which he is liable if the creditor does not timely file a proof of claim.

In liquidation and individual repayment plan cases, the trustee or the debtor may file a proof of claim under subsection (c) if the creditor does not timely file. The purpose of this subsection is mainly to protect the debtor if the creditor's claim is nondischargeable. If the creditor does not file, there would be no distribution on the claim, and the debtor would have a greater debt to repay after the case is closed than if the claim were paid in part or in full in the case or under the plan.

Subsection (d) governs the filing of claims of the kinds specified in subsections (f), (g), (h), (i), or (j) of proposed 11 U.S.C. 502. The separation of this provision from the other claim-filing provisions in this section is intended to indicate that claims of the kind specified, which do not become fixed or do not arise until after the commence-

SASMF EXHIBIT 25

417 of 979

ment of the case, must be treated differently for filing purposes such as the bar date for filing claims. The rules will provide for later filing of claims of these kinds.

Subsection (e) gives governmental units (including tax authorities) at least six months following the date for the first meeting of creditors in a chapter 7 or chapter 13 case within which to file proof of claims.

### § 502. Allowance of claims or interests

A proof of claim or interest is prima facie evidence of the claim or interest. Thus, it is allowed under subsection (a) unless a party in interest objects. The rules and case law will determine who is a party in interest for purposes of objection to allowance. The case law is well developed on this subject today. As a result of the change in the liability of a general partner's estate for the debts of this partnership, see proposed 11 U.S.C. 723, the category of persons that are parties in interest in the partnership case will be expanded to include a creditor of a partner against whose estate the trustee of the partnership estate may proceed under proposed 11 U.S.C. 723(c).

Subsection (b) prescribes the grounds on which a claim may be disallowed. The court will apply these standards if there is an objection to a proof of claim. The burden of proof on the issue of allowance is left to the Rules of Bankruptcy Procedure. Under the current chapter XIII rules, a creditor is required to prove that his claim is free from usury, rule 13–301. It is expected that the rules will make similar provision for both liquidation and individual repayment plan cases. See Bankruptcy Act § 656(b); H.R. 31, 94th Cong., 1st sess., sec. 6–104(a) (1975).

Paragraph (1) requires disallowance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration) other than because it is contingent or unmatured. All such contingent or unmatured claims are to be liquidated by the bankruptcy court in order to afford the debtor complete bankruptcy relief; these claims are generally not provable under present law.

Paragraph (2) requires disallowance to the extent that the claim is for unmatured interest as of the date of the petition. Whether interest is matured or unmatured on the date of bankruptcy is to be determined without reference to any ipso facto or bankruptcy clause in the agreement creating the claim. Interest disallowed under this paragraph includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy. For example, a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original discount was 10 percent so that the cash advanced was only $900, then notwithstanding the face amount of note, only $900 would be allowed. If $900 was advanced under the note some time before bankruptcy, the interest component of the note would have to be prorated and disallowed to the extent it was for interest after the commencement of the case.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

65

418 of 979

DOCUMENT 52

63

Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim. Thus, this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebutable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.

Paragraph (3) requires disallowance of a claim to the extent that the creditor may offset the claim against a debt owing to the debtor. This will prevent double recovery, and permit the claim to be filed only for the balance due. This follows section 68 of the Bankruptcy Act.

Paragraph (4) requires disallowance of a property tax claim to the extent that the tax due exceeds the value of the property. This too follows current law to the extent the property tax is ad valorem.

Paragraph (5) prevents overreaching by the debtor's attorneys and concealing of assets by debtors. It permits the court to examine the claim of a debtor's attorney independently of any other provision of this subsection, and to disallow it to the extent that it exceeds the reasonable value of the attorneys' services.

Postpetition alimony, maintenance or support claims are disallowed under paragraph (6). They are to be paid from the debtor's postpetition property, because the claims are nondischargeable.

Paragraph (7), derived from current law, limits the damages allowable to a landlord of the debtor. The history of this provision is set out at length in *Oldden* v. *Tonto Realty Co.*, 143 F.2d 916 (2d Cir. 1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years, after the earlier of the date of the filing of the petition and the date of surrender or repossession in a chapter 7 case and 3 years lease payments in a chapter 9, 11, or 13 case. The sliding scale formula for chapter 7 cases is new and designed to protect the long-term lessor. This subsection does not apply to limit administrative expense claims for use of the leased premises to which the landlord is otherwise entitled.

This paragraph will not overrule *Oldden*, or the proposition for which it has been read to stand: To the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. Moreover, his allowed claim is for his total damages, as limited by this paragraph. By virtue of proposed 11 U.S.C. 506(a) and 506(d), the claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds is less than his damages. As under *Oldden*, he will not be permitted to offset his actual damages against

64

his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

As used in section 502(b)(7), the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security.

Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. Second, in a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor.

However, these considerations are not present in "lease financing" transactions where, in substance, the "lease" involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The "lessors" are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law.

Whether a "lease" is true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease". The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property. See, e.g., Financial Accounting Standards Board Statement No. 13 and SEC Reg. S–X, 17 C.F.R. sec. 210.3–16(q) (1977); cf. *First National Bank of Chicago* v. *Irving Trust Co.*, 74 F. 2d 263 (2nd Cir. 1934); and Albenda and Lief, "Net Lease Financing Transactions Under the Proposed Bankruptcy Act of 1973," 30 Business Lawyer, 713 (1975).

Paragraph (8) is new. It tracks the landlord limitation on damages provision in paragraph (7) for damages resulting from the breach by the debtor of an employment contract, but limits the recovery to the

DOCUMENT 52

65

compensation reserved under an employment contract for the year following the earlier of the date of the petition and the termination of employment.

Subsection (c) requires the estimation of any claim liquidation of which would unduly delay the closing of the estate, such as a contingent claim. or any claim for which applicable law provides only an equitable remedy. such as specific performance. This subsection requires that all claims against the debtor be converted into dollar amounts.

Subsection (d) is derived from present law. It requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises.

Subsection (e), also derived from present law, requires disallowance of the claim for reimbursement or contribution of a codebtor, surety or guarantor of an obligation of the debtor, unless the claim of the creditor on such obligation has been paid in full. The provision prevents competition between a creditor and his guarantor for the limited proceeds in the estate.

Subsection (f) specifies that "involuntary gap" creditors receive the same treatment as prepetition creditors. Under the allowance provisions of this subsection, knowledge of the commencement of the case will be irrelevant. The claim is to be allowed "the same as if such claim had arisen before the date of the filing of the petition." Under voluntary petition, proposed 11 U.S.C. 303(f), creditors must be permitted to deal with the debtor and be assured that their claims will be paid. For purposes of this subsection, "creditors" include governmental units holding claims for tax liabilities incurred during the period after the petition is filed and before the earlier of the order for relief or appointment of a trustee.

Subsection (g) gives entities injured by the rejection of an executory contract or unexpired lease, either under section 365 or under a plan or reorganization, a prepetition claim for any resulting damages, and requires that the injured entity be treated as a prepetition creditor with respect to that claim.

Subsection (h) gives a transferee of a setoff that is recovered by one trustee a prepetition claim for the amount recovered.

Subsection (i) answers the nonrecourse loan problem and gives the creditor an unsecured claim for the difference between the value of the collateral and the debt in response to the decision in *Great National Life Ins. Co.* v. *Pine Gate Associates, Ltd.*, Bankruptcy Case No. B75-4345A (N.D. Ga. Sept. 16, 1977).

The bill, as reported, deletes a provision in the bill as originally introduced (former sec. 502(i)) requiring a tax authority to file a proof of claim for recapture of an investment credit where, during title 11 proceedings, the trustee sells or otherwise disposes of property before the title 11 case began. The tax authority should not be required to submit a formal claim for a taxable event (a sale or other disposition of the asset) of whose occurrence the trustee necessarily knows better than the taxing authority. For procedural purposes, the recapture of investment credit is to be treated as an administrative expense, as to which only a request for payment is required.

Ad Hoc Equity Group Exhibit 9

68

SASMF EXHIBIT 25

421 of 979

66

*§ 503. Allowance of administrative expenses*

Subsection (a) of this section permits administrative expense claimants to file with the court a request for payment of an administrative expense. The Rules of Bankruptcy Procedure will specify the time, the form, and the method of such a filing.

Subsection (b) specifies the kinds of administrative expenses that are allowable in a case under the bankruptcy code. The subsection is derived mainly from section 64a(1) of the Bankruptcy Act, with some changes. The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the order for relief, and any taxes on, measured by, or withheld from such wages, salaries, or commissions, are allowable as administrative expenses.

In general, administrative expenses include taxes which the trustee incurs in administering the debtor's estate, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate during the case. Interest on tax liabilities and certain tax penalties incurred by the trustee are also included in this first priority.

Taxes which the Internal Revenue Service may find due after giving the trustee a so-called "quickie" tax refund and later doing an audit of the refund are also payable as administrative expenses. The tax code permits the trustee of an estate which suffers a net operating loss to carry back the loss against an earlier profit year of the estate or of the debtor and to obtain a tentative refund for the earlier year, subject, however, to a later full audit of the loss which led to the refund. The bill, in effect, requires the Internal Revenue Service to issue a tentative refund to the trustee (whether the refund was applied for by the debtor or by the trustee), but if the refund later proves to have been erroneous in amount, the Service can request that the tax attributable to the erroneous refund be payable by the estate as an administrative expense.

Postpetition payments to an individual debtor for services rendered to the estate are administrative expenses, and are not property of the estate when received by the debtor. This situation would most likely arise when the individual was a sole proprietor and was employed by the estate to run the business after the commencement of the case. An individual debtor in possession would be so employed, for example. *See Local Loan v. Hunt*, 292 U.S. 234, 243 (1943).

Compensation and reimbursement awarded officers of the estate under section 330 are allowable as administrative expenses. Actual, necessary expenses, other than compensation of a professional person, incurred by a creditor that files an involuntary petition, by a creditor that recovers property for the benefit of the estate, by a creditor that acts in connection with the prosecution of a criminal offense relating to the case, by a creditor, indenture, trustee, equity security holder, or committee of creditors or equity security holders (other than official committees) that makes a substantial contribution to a reorganization or municipal debt adjustment case, or by a superseded custodian, are all allowable administrative expenses. The phrase "substantial contribution in the case" is derived from Bankruptcy Act §§ 242 and 243. It does not require a contribution that leads to confirmation of a plan,

**SASMF EXHIBIT 25**

**422 of 979**

# DOCUMENT 52

67

for in many cases, it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation, such as fraud in connection with the case.

Paragraph (4) permits reasonable compensation for professional services rendered by an attorney or an accountant of an equity whose expense is compensable under the previous paragraph. Paragraph (5) permits reasonable compensation for an indenture trustee in making a substantial contribution in a reorganization or municipal debt adjustment case. Finally, paragraph (6) permits witness fees and mileage as prescribed under chapter 119 of title 28.

*Section 504. Sharing of compensation*

Section 504 prohibits the sharing of compensation, or fee splitting, among attorneys, other professionals, or trustees. The section provides only two exceptions: partners or associates in the same professional association, partnership, or corporation may share compensation inter se; and attorneys for petitioning creditors that join in a petition commencing an involuntary case may share compensation.

*Section 505. Determination of tax liability*

Subsections (a) and (b) are derived, with only stylistic changes, from section 2a (2A) of the Bankruptcy Act. They permit determination by the bankruptcy court of any unpaid tax liability of the debtor that has not been contested before or adjudicated by a judicial or administrative tribunal of competent jurisdiction before the bankruptcy case, and the prosecution by the trustee of an appeal from an order of such a body if the time for review or appeal has not expired before the commencement of the bankruptcy case. As under current Bankruptcy Act § 2a(2A), *Arkansas Corporation Commissioner* v. *Thompson*, 313 U.S. 132 (1941), remains good law to permit abstention where uniformity of assessment is of significant importance.

Section (c) deals with procedures for obtaining a prompt audit of tax returns filed by the trustee in a liquidation or reorganization case. Under the bill as originally introduced, a trustee who is "in doubt" concerning tax liabilities of the estate incurred during a title 11 proceeding could obtain a discharge from personal liability for himself and the debtor (but not for the debtor or the debtor's successor in a reorganization), provided that certain administrative procedures were followed. The trustee could request a prompt tax audit by the local, State, or Federal governmental unit. The taxing authority would have to notify the trustee and the court within sixty days whether it accepted the return or desired to audit the returns more fully. If an audit were conducted, the tax office would have to notify the trustee of any tax deficiency within 4 months (subject to an extension of time. if the court approved). These procedures would apply only to tax years completed on or before the case was closed and for which the trustee had filed a tax return.

The committee bill eliminates the "in doubt" rule and makes mandatory (rather than optional) the trustee's request for a prompt audit of the estate's tax returns. In many cases, the trustee could not be certain that his returns raised no doubt about possible tax issues. In

**Ad Hoc Equity Group Exhibit 9**

68

addition, it is desirable not to create a situation where the taxing authority asserts a tax liability against the debtor (as transferee of surplus assets, if any, returned to him) after the case is over; in any such situation, the debtor would be called on to defend a tax return which he did not prepare. Under the amendment, all disputes concerning these returns are to be resolved by the bankruptcy court, and both the trustee and the debtor himself do not then face potential post-bankruptcy tax liabilities based on these returns. This result would occur as to the debtor, however, only in a liquidation case.

In a reorganization in which the debtor or a successor to the debtor continues in existence, the trustee could obtain a discharge from personal liability through the prompt audit procedure, but the Treasury could still claim a deficiency against the debtor (or his successor) for additional taxes due on returns filed during the title 11 proceedings.

*Section 506. Determination of secured status*

Subsection (a) of this section separates an undersecured creditor's claim into two parts: He has a secured claim to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim. The subsection also provides for the valuation of claims which involve setoffs under section 553. While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim. This provision abolishes the use of the terms "secured creditor" and "unsecured creditor" and substitutes in their places the terms "secured claim" and "unsecured claim."

Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees (including attorney's fees), costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges aare secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.

Subsection (c) also codifies current law by permitting the trustee to recover from property the value of which is greater than the sum of the claims secured by a lien on that property the reasonable, necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim.

Subsection (d) provides that to the extent a secured claim is not allowed, its lien is void unless the holder had neither actual notice nor knowledge of the case, the lien was not listed by the debtor in a chapter 9 or 11 case or such claim was disallowed only under section 502(e).

*Section 507. Priorities*

Section 507 specifies the kinds of claims that are entitled to priority in distribution, and the order of their priority. Paragraph (1) grants first priority to allowed administrative expenses and to fees and

**Ad Hoc Equity Group Exhibit 9**

**SASMF EXHIBIT 25**

**424 of 979**

## DOCUMENT 52

69

charges assessed against the estate under chapter 123 of title 28. Taxes included as administrative expenses under section 503(b)(1) of the bill generally receive the first priority, but the bill makes certain qualifications: Examples of these specially treated claims are the estate's liability for recapture of an investment tax credit claimed by the debtor before the title 11 case (this liability receives sixth priority) and the estate's employment tax liabilities on wages earned before, but paid after, the petition was filed (this liability generally receives the same priority as the wages).

"Involuntary gap" creditors, granted first priority under current law, are granted second priority by paragraph (2). This priority, covering claims arising in the ordinary course of the debtor's business or financial affairs after a title 11 case has begun but before a trustee is appointed or before the order for relief, includes taxes incurred during the conduct of such activities.

Paragraph (3) expands and increases the wage priority found in current section 64a(2). The amount entitled to priority is raised from $600 to $1800. The former figure was last adjusted in 1926. Inflation has made it nearly meaningless, and the bill brings it more than up to date. The three month limit of current law is retained, but is modified to run from the earlier of the date of the filing of the petition or the date of the cessation of the debtor's business. The priority is expanded to cover vacation, severance, and sick leave pay. The bill adds to the third priority so-called "trust fund" taxes, that is, withheld income taxes and the employees' share of the social security or railroad retirement taxes, but only to the extent that the wages on which taxes are imposed are themselves entitled to third priority.

The employer's share, the employment tax and the employer's share of the social security or railroad retirement tax on third priority compensation, is also included in the third priority category, but only if, and to the extent that the wages and related trust fund taxes have first been paid in full. Because of the claimants urgent need for their wages in the typical cases, the employer's taxes should not be paid before the wage claims entitled to priority, as well as the related trust fund taxes, are fully paid.

Paragraph (4) overrules *United States* v. *Embassy Restaurant*, 359 U.S. 29 (1958), which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, where fringe benefits may be substituted for wage demands. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered within 120 days before the commencement of the case or the date of cessation of the debtor's business, whichever occurs first. The dollar limit placed on the total of all contributions payable under this paragraph is equal to the difference between the maximum allowable priority under paragraph (3), $1,800, times the number of employees covered by the plan less the actual distributions under paragraph (3) with respect to these employees.

Paragraph (5) is a new priority for consumer creditors—those who have deposited money in connection with the purchase, lease, or rental of property, or the purchase of services, for their personal, family, or

**Ad Hoc Equity Group Exhibit 9** SASMF **EXHIBIT 25**

72

**425 of 979**

70

household use, that were not delivered or provided. The priority amount is not to exceed $600. In order to reach only those persons most deserving of this special priority, it is limited to individuals whose adjustable gross income from all sources derived does not exceed $20,000. See *Senate Hearings*, testimony of Prof. Vern Countryman, at pp. 848–849. The income of the husband and wife should be aggregated for the purposes of the $20,000 limit if either or both spouses assert such a priority claim.

The sixth priority is for certain taxes. Priority is given to income taxes for a taxable year that ended on or before the date of the filing of the petition, if the last due date of the return for such year occurred not more than 3 years immediately before the date on which the petition was filed (§ 507(a)(6)(A)(i)). For the purposes of this rule, the last due date of the return is the last date under any extension of time to file the return which the taxing authority may have granted the debtor.

Employment taxes and transfer taxes (including gift, estate, sales, use and other excise taxes) are also given sixth priority if the transaction or event which gave rise to the tax occurred before the petition date, provided that the required return or report of such tax liabilities was last due within 3 years before the petition was filed or was last due after the petition date (§ 507(a)(6)(A)(ii).) The employment taxes covered under this rule are the employer's share of the social security and railroad retirement taxes and required employer payments toward unemployment insurance.

Priority is given to income taxes and other taxes of a kind described in section 507(a)(6)(A) (i) and (ii) which the Federal, State, or local tax authority had assessed within 3 years after the last due date of the return, that is, including any extension of time to file the return, if the debtor filed in title 11 within 240 days after the assessment was made (§ 507(a)(6)(B)(i)). This rule may bring into the sixth priority the debtor's tax liability for some taxable years which would not qualify for priority under the general three-year rule of section 507(a)(6)(A).

The sixth priority category also includes taxes which the tax authority was barred by law from assessing or collecting at any time during the 300 days before the petition under title 11 was filed (§ 507(a)(6)(B)(ii)). In the case of certain Federal taxes, this preserves a priority for tax liabilities for years more than three years before the filing of the petition where the debtor and the Internal Revenue Service were negotiating over an audit of the debtor's returns or were engaged in litigation in the Tax Court. In such situations, the tax law prohibits the service's right to assess a tax deficiency until ninety days after the service sends the taxpayer a deficiency letter or, if the taxpayer files a petition in the Tax Court during that 90-day period, until the outcome of the litigation. A similar priority exists in present law, except that the taxing authority is allowed no time to assess and collect the taxes after the restrictions on assessment (discussed above) are lifted. Some taxpayers have exploited this loophole by filing in bankruptcy immediately after the end of the 90-day period or immediately after the close of Tax Court proceedings. The bill remedies this defect by preserving a priority for taxes the assessment of which was barred by law by giving the tax authority 300 days within

DOCUMENT 52

71

which to make the assessment after the lifting of the bar and then to collect or file public notice of its tax lien. Thus, if a taxpayer files a title 11 petition at any time during that 300-day period, the tax deficiency will be entitled to priority. If the petition is filed more than 300 days after the restriction on assessment was lifted, the taxing authority will not have priority for the tax deficiency.

Taxes for which an offer in compromise was withdrawn by the debtor, or rejected by a governmental unit, within 240 days before the petition date (§ 507(a)(6)(B)(iii)) will also receive sixth priority. This rule closes a loophole under present law under which, following an assessment of tax, some taxpayers have submitted a formal offer in compromise, dragged out negotiations with the taxing authority until the tax liability would lose priority under the three-year priority period of present law, and then filed in bankruptcy before the governmental unit could take collection steps.

Also included are certain taxes for which no return or report is required by law (§ 507(a)(6)(C)), if the taxable transaction occurred within three years before the petition was filed.

Taxes (not covered by the third priority) which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims (§ 507 (a)(6)(D)) are included. This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, the employees' shares of social security and railroad retirement taxes, and also Federal unemployment insurance. This category also includes excise taxes which a seller of goods or services is required to collect from a buyer and pay over to a taxing authority.

This category also covers the liability of a responsible corporate officer under the Internal Revenue Code for income taxes or for the employees' share of employment taxes which, under the tax law, the employer was required to withhold from the wages of employees. This priority will operate where a person found to be a responsible officer has himself filed a petition under title 11, and the priority covers the debtor's liability as an officer under the Internal Revenue Code, regardless of the age of the tax year to which the tax relates.

The priority rules under the bill governing employment taxes can be summarized as follows: In the case of wages earned and actually paid before the petition under title 11 was filed, the liability for the employees' share of the employment taxes, regardless of the prepetition year in which the wages were earned and paid. The employer's share of the employment taxes on all wages earned and paid before the petition receive sixth priority; generally, these taxes will be those for which a return was due within three years before the petition. With respect to wages earned by employees before the petition but actually paid by the trustee after the title 11 case commenced, taxes required to be withheld receives the same priority as the wages themselves. Thus, the employees' share of taxes on third priority wages also receives third priority. Taxes on the balance of such wages receive no priority and are collectible only as general claims because the wages themselves are payable only as general claims and liability for the taxes arises only to the extent the wages are actually paid. The em-

**Ad Hoc Equity Group Exhibit 9**   SASMF **EXHIBIT 25**

74                                                            **427 of 979**

72

ployer's share of employment taxes on third priority wages earned before the petition but paid after the petition was filed receives third priority, but only if the wages in this category have first been paid in full. Assuming there are sufficient funds to pay third priority wages and the related employer taxes in full, the employer's share of taxes on the balance of wage payments becomes a general claim (because the wages themselves are payable as general claims). Both the employees' and the employer's share of employment taxes on wages earned and paid after the petition was filed receive first priority as administrative expenses.

Also covered by this sixth priority are property taxes required to be assessed within 3 years before the filing of the petition (§ 507(a)(6)(E)).

Taxes attributable to a tentative carryback adjustment received by the debtor before the petition was filed, such as a "quickie refund" received under section 6411 of the Internal Revenue Code (§ 507(a)(6)(F)) are included. However, the tax claim against the debtor will re-in a prepetition loss year for which the tax return was last due, including extensions, within 3 years before the petition was filed.

Taxes resulting from a recapture, occasioned by a transfer during bankruptcy, of a tax credit or deduction taken during an earlier tax year (§ 507(a)(6)(G)) are included. A typical example occurs when there is a sale by the trustee of depreciable property during the case and depreciation deductions taken in prepetition years are subject to recapture under section 1250 of the Code.

Taxes owed by the debtor as a transferee of assets from another person who is liable for a tax, if the tax claim against the transferor would have received priority in a chapter 11 case commenced by the transferor within 1 year before the date of the petition filed by the transferee (§507(a)(6)(H)), are included.

Also included are certain tax payments required to have been made during the 1 year immediately before the petition was filed, where the debtor had previously entered into a deferred payment agreement (including an offer in compromise) to pay an agreed liability in periodic installments but had become delinquent in one or more installments before the petition was filed (§507(a)(6)(I)). This priority covers all types of deferred or part payment agreements. The priority covers only installments which first became due during the 1 year before the petition but which remained unpaid at the date of the petition. The priority does not come into play, however, if before the case began or during the case, the debtor and the taxing authority agree to a further extension of time to pay the delinquent amounts.

Certain tax-related liabilities which are not true taxes or which are not collected by regular assessment procedures (§ 507(a)(6)(J)) are included. One type of liability covered in this category is the liability under section 3505 of the Internal Revenue Code of a lender who pays wages directly to employees of another employer or who supplies funds to an employer for the payment of wages. Another is the liability under section 6332 of the Internal Revenue Code, of a person who fails to turn over money or property of the taxpayer in response to a levy. Since the taxing authority must collect such a liability from the third

DOCUMENT 52

73

party by suit rather than normal assessment procedures, an extra year is added to the normal 3-year priority periods. If a suit was commenced by the taxing authority within the four-year period and before the petition was filed, the priority is also preserved, provided that the suit had not terminated more than 1 year before the date of the filing of the petition.

Also included are certain unpaid customs duties which have not grown unreasonably "stale" (§ 507(a)(6)(K)). These include duties on imports entered for consumption with 3 years before the filing of the petition if the duties are still unliquidated on the petition date. If an import entry has been liquidated (in general, liquidation is in an administrative determination of the value and tariff rate of the item) or reliquidated, within two years of the filing of the petition the customs liability is given priority. If the Secretary of the Treasury certifies that customs duties were not liquidated because of an investigation into possible assessment of anti-dumping or countervailing duties, or because of fraud penalties, duties not liquidated for this reason during the five years before the importer filed under title 11 also will receive priority.

Subsection (a) of this section also provides specifically that interest on sixth priority tax claims accrued before the filing of the petition is also entitled to sixth priority.

Subsection (b) of this section provides that any fine or penalty which represents compensation for actual pecuniary loss of a governmental unit, and which involves a tax liability entitled to sixth priority, is to receive the same priority.

Subsection (b) also provides that a claim arising from an erroneous refund or credit of tax is to be given the same priority as the tax to which the refund or credit relates.

*Section 508. Effect of distribution in a foreign proceeding*

This section prohibits a creditor from receiving any distribution in the bankruptcy case if he has received payment of a portion of his claim in a foreign proceeding, until the other creditors in the bankruptcy case in this country that are entitled to share equally with that creditor have received as much as he has in the foreign proceeding.

*Section 509. Claims of codebtors*

Section 509 deals with codebtors generally, and is in addition to the disallowance provision in section 502(e). This section is based on the notion that the only rights available to a surety, guarantor, or comaker are contribution, reimbursement, and subrogation. The right that applies in a particular situation will depend on the agreement between the debtor and the codebtor, and on whether and how payment was made by the codebtor to the creditor. The claim of a surety or codebtor for contribution or reimbursement is discharged even if the claim is never filed, as is any claim for subrogation even if the surety or codebtor chooses to file a claim for contribution or reimbursement instead.

Subsection (a) subrogates the codebtor (whether as a codebtor, surety, or guarantor) to the rights of the creditor, to the extent of any payment made by the codebtor to the creditor. Whether the creditor's claim was filed under section 501(a) or 501(b) is irrelevant. The right

SASMF EXHIBIT 25
429 of 979

74

of subrogation will exist even if the primary creditor's claim is allowed by virtue of being listed under proposed 11 U.S.C. 924 or 1111, and not by reason of a proof of claim.

Subsection (b) permits a subrogated codebtor to receive payments in the bankruptcy case only if the creditor has been paid in full, either through payments under the bankruptcy code or otherwise.

### Section 510. Subordination or disallowance of claims

Subsection (a) requires the court to enforce subordination agreements. A subordination agreement will not be enforced, however, in a reorganization case in which the class that is the beneficiary of the agreement has accepted, as specified in proposed 11 U.S.C. 1126, a plan that waives their rights under the agreement. Otherwise, the agreement would prevent just what chapter 11 contemplates: that seniors may give up rights to juniors in the interest of confirmation of a plan and rehabilitation of the debtor. The subsection also requires the court to subordinate in payment any claim for rescission of a purchase or sale of a security of the debtor or of an affiliate, or for damages arising from the purchase or sale of such a security, to all claims and interests that are senior to the claim or interest represented by the security. Thus, the later subordination varies with the claim or interest involved. If the security is a debt instrument, the damages or rescission claim will be granted the status of a general unsecured claim. If the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself.

Subsection (b) authorizes the bankruptcy court, in ordering distribution of assets, to subordinate all or any part of any claim to all or any part of another claim, regardless of the priority ranking of either claim. In addition, any lien securing such a subordinated claim may be transferred to the estate. The bill provides, however, that any subordination ordered under this provision must be based on principles of equitable subordination. These principles are defined by case law, and have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct. As originally introduced, the bill provided specifically that a tax claim may not be subordinated on equitable grounds. The bill deletes this express exception, but the effect under the amendment should be much the same in most situations since, under the judicial doctrine of equitable subordination, a tax claim would rarely be subordinated.

### § 511. Certain employment tax credits

This section prevents any reduction of the Federal tax credit against the Federal unemployment tax in a situation where the trustee makes a late payment of a contribution to a State unemployment compensation fund. Section 3302 of the Internal Revenue Code normally requires a reduction in the Federal credit for late contributions to a State fund (§ 3302). This reduction is, in substance, a penalty. However, it is inappropriate to impose the penalty on a trustee who may be barred from making a timely payment of the State contribution before the pendency of a title 11 case. The amendment made by the bill applies where the State and Federal unemployment tax contributions were paid by the trustee before or after the petition, regardless of whether the wages were earned before or after the petition.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

430 of 979

*Section 521. Debtor's duties*

This section lists three duties of the debtor in a bankruptcy case. The Rules of Bankruptcy Procedure will specify the means of carrying out these duties. The first duty is to file with the court a list of creditors and, unless the court orders otherwise, a schedule of assets and liabilities and a statement of his financial affairs. Second, the debtor is required to cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties. Finally, the debtor must surrender to the trustee all property of the estate, and any recorded information, including books, documents, records, and papers, relating to property of the estate. This phrase "recorded information, including books, documents, records, and papers," has been used here and throughout the bill as a more general term, and includes such other forms of recorded information as data in computer storage or in other machine readable forms.

The list in this section is not exhaustive of the debtor's duties. Others are listed elsewhere in proposed title 11, such as in section 343, which requires the debtor to submit to examination, or in the Rules of Bankruptcy Procedure, as continued by § 404(a) of S. 2266, such as the duty to attend any hearing on discharge, Rule 402(2).

*Section 522. Exemptions*

Subsection (a) of this section defines two terms: "dependent" includes the debtor's spouse, whether or not actually dependent; and "value" means fair market value as of the date of the filing of the petition.

Subsection (b) tracks current law. It permits a debtor the exemptions to which he is entitled under other Federal law and the law of the State of his domicile. Some of the items that may be exempted under Federal laws other than title 11 include:

Foreign Service Retirement and Disability payments, 22 U.S.C. 1104;

Social security payments, 42 U.S.C. 407;

Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717;

Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601;

Civil service retirement benefits, 5 U.S.C. 729, 2265;

Longshoremen's and Harbor Workers' Compensation Act death and disability benefits, 33 U.S.C. 916;

Railroad Retirement Act annuities and pensions, 45 U.S.C. 228 (L);

Veterans benefits, 45 U.S.C. 352(E);

Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and

Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175.

He may also exempt an interest in property in which the debtor had an interest as a tenant by the entirety or joint tenant to the extent that interest would have been exempt from process under applicable nonbankruptcy law.

Under proposed section 541, all property of the debtor becomes property of the estate, but the debtor is permitted to exempt certain

**Ad Hoc Equity Group Exhibit 9** SASMF **EXHIBIT 25**

**431 of 979**

76

property from property of the estate under this section. Property may be exempted even if it is subject to a lien, but only the unencumbered portion of the property is to be counted in computing the "value" of the property for the purposes of exemption.

As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

Subsection (c) insulates exempt property from prepetition claims other than tax claims (whether or not dischargeable), and other than alimony, maintenance, or support claims that are excepted from discharge. The bankruptcy discharge does not prevent enforcement of valid liens. The rule of *Long* v. *Bullard*, 117 U.S. 617 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property. *Cf. Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555, 583 (1935).

Subsection (c)(3) permits the collection of dischargeable taxes from exempt assets Only assets exempted from levy under Section 6334 of the Internal Revenue Code or under applicable state or local tax law cannot be applied to satisfy these tax claims. This rule applies to prepetition tax claims against the debtor regardless of whether the claims do or do not receive priority and whether they are dischargeable or nondischargeable. Thus, even if a tax is dischargeable vis-a-vis the debtor's after-acquired assets, it may nevertheless be collectible from exempt property held by the estate. (Taxes incurred by the debtor's estate which are collectible as first priority administrative expenses are not collectible from the debtor's estate which are collectible as first priority administrative expenses are not collectible from the debtor's exempt assets.)

Subsection (d) protects the debtor's exemptions, either Federal or State, by making unenforceable in a bankruptcy case a waiver of exemptions or a waiver of the debtor's avoiding powers under the following subsections.

Subsection (e) protects the debtor's exemptions, his discharge, and thus his fresh start by permitting him to avoid certain liens on exempt property. The debtor may avoid a judicial lien on any property to the extent that the property could have been exempted in the absence of the lien, and may similarly avoid a nonpurchase-money security interest in certain household and personal goods. The avoiding power is independent of any waiver of exemptions.

Subsection (f) gives the debtor the ability to exempt property that the trustee recovers under one of the trustee's avoiding powers if the property was involuntarily transferred away from the debtor (such as by the fixing of a judicial lien) and if the debtor did not conceal the property. The debtor is also permitted to exempt property that the trustee recovers as the result of the avoiding of the fixing of certain security interests to the extent that the debtor could otherwise have exempted the property.

Subsection (g) provides that if the trustee does not exercise an avoiding power to recover a transfer of property that would be exempt, the debtor may exercise it and exempt the property, if the trans-

DOCUMENT 52

77

fer was involuntary and the debtor did not conceal the property. If the debtor wishes to preserve his right to pursue any action under this provision, then he must intervene in any action brought by the trustee based on the same cause of action. It is not intended that the debtor be given an additional opportunity to avoid a transfer or that the transferee should have to defend the same action twice. Rather, the section is primarily designed to give the debtor the rights the trustee could have, but has not, pursued. The debtor is given no greater rights under this provision than the trustee, and thus, the debtor's avoiding powers under proposed sections 544, 545, 547, and 548, are subject to proposed 546, as are the trustee's powers.

These subsections are cumulative. The debtor is not required to choose which he will use to gain an exemption. Instead, he may use more than one in any particular instance, just as the trustee's avoiding powers are cumulative.

Subsection (h) permits recovery by the debtor of property transferred by an avoided transfer from either the initial or subsequent transferees. It also permits preserving a transfer for the benefit of the debtor. In either event, the debtor may exempt the property recovered or preserved.

Subsection (i) makes clear that the debtor may exempt property under the avoiding subsections (f) and (h) only to the extent he has exempted less property than allowed under subsection (b).

Subsection (j) makes clear that the liability of the debtor's exempt property is limited to the debtor's aliquot share of the costs and expenses recovery of property that the trustee recovers and the debtor later exempts, and any costs and expenses of avoiding a transfer by the debtor that the debtor has not already paid.

Subsection (k) requires the debtor to file a list of property that he claims as exempt from property of the estate. Absent an objection to the list, the property is exempted. A dependent of the debtor may file it and thus be protected if the debtor fails to file the list.

Subsection (l) provides the rule for a joint case.

*Section 523. Exceptions to discharge*

This section specifies which of the debtor's debts are not discharged in a bankruptcy case, and certain procedures for effectuating the section. The provision in Bankruptcy Act § 17c granting the bankruptcy courts jurisdiction to determine dischargeability is deleted as unnecessary, in view of the comprehensive grant of jurisdiction prescribed in proposed 28 U.S.C. 1334(b), which is adequate to cover the full jurisdiction that the bankruptcy courts have today over dischargeability and related issues under Bankruptcy Act § 17c. The Rules of Bankruptcy Procedure will specify, as they do today, who may request determinations of dischargeability, subject, of course, to proposed 11 U.S.C. 523(c), and when such a request may be made. Proposed 11 U.S.C. 350, providing for reopening of cases, provides one possible procedure for a determination of dischargeability and related issues after a case is closed.

Subsection (a) lists nine kinds of debts excepted from discharge. Taxes that are excepted from discharge are set forth in paragraph (1). These include claims against the debtor which receive priority in the second, third and sixth categories (§ 507(a)(3)(B) and (C) and (6).

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25

433 of 979

78

These categories include taxes for which the tax authority failed to file a claim against the estate or filed its claim late. Whether or not the taxing authority's claim is secured will also not affect the claim's non-dischargability if the tax liability in question is otherwise entitled to priority.

Also included in the nondischargable debts are taxes for which the debtor had not filed a required return as of the petition date, or for which a return had been filed beyond its last permitted due date (§ 523 (a)(1)(B)). For this purpose, the date of the tax year to which the return relates is immaterial. The late return rule applies, however, only to the late returns filed within three years before the petition was filed, and to late returns filed after the petition in title 11 was filed. For this purpose, the taxable year in question need not be one or more of the three years immediately preceding the filing of the petition.

Tax claims with respect to which the debtor filed a fraudulent return, entry or invoice, or fraudulently attempted to evade or defeat any tax (§ 523(a)(1)(C)) are included. The date of the taxable year with regard to which the fraud occurred is immaterial.

Also included are tax payments due under an agreement for deferred payment of taxes, which a debtor had entered into with the Internal Revenue Service (or State or local tax authority) before the filing of the petition and which relate to a prepetition tax liability §523(a)(1)(D)) are also nondischargeable. This classification applies only to tax claims which would have received priority under section 507(a) if the taxpayer had filed a title 11 petition on the date on which the deferred payment agreement was entered into. This rule also applies only to installment payments which become due during and after the commencement of the title 11 case. Payments which had become due within one year before the filing of the petition receive sixth priority, and will be nondischargeable under the general rule of section 523(a)(1)(A)).

The above categories of nondischargeability apply to customs duties as well as to taxes.

Paragraph (2) provides that as under Bankruptcy Act § 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge. Second, the creditor must not only have relied on a false statement in writing, but the reliance must have been reasonable. This codifies case law construing present section 17a(2). Third, the phrase "in any manner whatsoever" that appears in current law after "made or published" is deleted as unnecessary, the word "published" is used in the same sense that it is used in defamation cases.

Unscheduled debts are excepted from discharge under paragraph (3). The provision, derived from section 17a(3), follows current law, but clarifies some uncertainties generated by the case law construing 17a(3). The debt is excepted from discharge if it was not scheduled in

DOCUMENT 52

79

time to permit timely action by the creditor to protect his rights, unless the creditor had notice or actual knowledge of the case.

Paragraph (4) excepts debts for fraud incurred by the debtor while acting in a fiduciary capacity or for defalcation, embezzlement, or misappropriation.

Paragraph (5) provides that debts for willful and malicious conversion or injury by the debtor to another entity or the property of another entity are nondischargeable. Under this paragraph "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 139 U.S. 473 (1902), held that a less strict standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

Paragraph (6) excepts from discharge debts to a spouse, former spouse, or child of the debtor for alimony to, maintenance for, or support of the spouse or child. This language, in combination with the repeal of section 456(b) of the Social Security Act (42 U.S.C. 656(b)) by section 326 of the bill, will apply to make nondischargeable only alimony, maintenance, or support owed directly to a spouse or dependent. What constitutes alimony, maintenance, or support, will be determined under the bankruptcy law, not State law. Thus, cases such as *In re Waller*, 494 F.2d 447 (6th Cir. 1974), are overruled, and the result in cases such as *Fife v. Fife*, 1 Utah 2d 281, 265 P.2d 642 (1952) is followed. The proviso, however, makes nondischargeable any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless on joint debts, to the extent that the agreement is in payment of alimony, maintenance, or support of the spouse, as determined under bankruptcy law considerations as to whether a particular agreement to pay money to a spouse is actually alimony or a property settlement.

Paragraph (7) makes nondischargeable certain liabilities for penalties including tax penalties if the underlying tax with respect to which the penalty was imposed is also nondischargeable (sec. 523(a)(7)). These latter liabilities cover those which, but are penal in nature, as distinct from so-called "pecuniary loss" penalties which, in the case of taxes, involve basically the collection of a tax under the label of a "penalty." This provision differs from the bill as introduced, which did not link the nondischarge of a tax penalty with the treatment of the underlying tax. The amended provision reflects the existing position of the Internal Revenue Service as to tax penalties imposed by the Internal Revenue Code (Rev. Rul. 68-574, 1968-2 C.B. 595).

Paragraph (8) follows generally current law and excepts from discharge student loans until such loans have been due and owing for five years. Such loans include direct student loans as well as insured and guaranteed loans. This provision is intended to be self-executing and the lender or institution is not required to file a complaint to determine the nondischargeability of any student loan.

Paragraph (9) excepts from discharge debts that the debtor owed before a previous bankruptcy case concerning the debtor in which the debtor was denied a discharge other than on the basis of the six-year bar.

Subsection (b) of this section permits discharge in a bankruptcy case of an unscheduled debt from a prior case. This provision is carried over from Bankruptcy Act § 17b. The result dictated by the sub-

SASMF EXHIBIT 25

435 of 979

80

section would probably not be different if the subsection were not included. It is included nevertheless for clarity.

Subsection (c) requires a creditor who is owed a debt that may be excepted from discharge under paragraph (2), (4), or (5), (false statements, defalcation or larceny misappropriation, or willful and malicious injury) to initiate proceedings in the bankruptcy court for an exception to discharge. If the creditor does not act, the debt is discharged. This provision does not change current law.

Subsection (d) is new. It provides protection to a consumer debtor that dealt honestly with a creditor who sought to have a debt excepted from discharge on the ground of falsity in the incurring of the debt. The debtor may be awarded costs and a reasonable attorney's fee for the proceeding to determine the dischargeability of a debt under subsection (a) (2), if the court finds that the proceeding was frivolous or not brought by its creditor in good faith.

The purpose of the provision is to discourage creditors from initiating proceedings to obtaining a false financial statement exception to discharge in the hope of obtaining a settlement from an honest debtor anxious to save attorney's fees. Such practices impair the debtor's fresh start and are contrary to the spirit of the bankruptcy laws.

*Section 524. Effect of discharge*

Subsection (a) specifies that a discharge in a bankruptcy case voids any judgment to the extent that it is a determination of the personal liability of the debtor with respect to a prepetition debt, and operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, including telephone calls, letters, and personal contacts, to collect, recover, or offset any discharged debt as a personal liability of the debtor, or from property of the debtor, whether or not the debtor has waived discharge of the debt involved. The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph has been expanded over a comparable provision in Bankruptcy Act § 14f to cover any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession, and the like. The change is consonant with the new policy forbidding binding reaffirmation agreements under proposed 11 U.S.C. 524(b), and is intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it. In effect, the discharge extinguishes the debt, and creditors may not attempt to avoid that. The language "whether or not discharge of such debt is waived" is intended to prevent waiver of discharge of a particular debt from defeating the purposes of this section. It is directed at waiver of discharge of a particular debt, not waiver of discharge in toto as permitted under section 727(a)(9).

Subsection (a) also codifies the split discharge for debtors in community property states. If community property was in the estate and community claims were discharged, the discharge is effective against community creditors of the nondebtor spouse as well as of the debtor spouse.

Subsection (b) gives further effect to the discharge. It limits reaffirmation and allows the debtor a 30-day cooling off period after the

DOCUMENT 52

81

execution of the reaffirmation during which time he can change his mind and rescind the reaffirmation.

Subsection (c) grants an exception to the anti-reaffirmation provision. It permits reaffirmation in connection with the settlement of a proceeding to determine the dischargeability of the debt being reaffirmed, or in connection with a redemption agreement permitted under section 722. In either case, the reaffirmation agreement must be entered into in good faith and must be approved by the court.

Subsection (d) provides the discharge of the debtor does not affect co-debtors or guarantors.

*Section 525. Protection against discriminatory treatment*

This section is additional debtor protection. It codifies the result of *Perez v. Campbell*, 402 U.S. 637 (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.

Notwithstanding any other laws, section 525 prohibits a governmental unit from denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to, from conditioning such a grant to, from discrimination with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor or that is or has been associated with a debtor. The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the *Perez* situation). It does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily.

In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

The section is not so broad as a comparable section proposed by the Bankruptcy Commission, S. 236, 94th Cong., 1st Sess. § 4–508 (1975), which would have extended the prohibition to any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy.

SUBCHAPTER III—THE ESTATE

*Section 541. Property of the estate*

This section defines property of the estate, and specifies what property becomes property of the estate. The commencement of a bankruptcy case creates an estate. Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70a, as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor." The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example. The result of *Segal* v. *Rochelle*, 382 U.S. 375 (1966), is followed, and the right to a refund is property of the estate.

Though this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had. But *see* proposed 11 U.S.C. 108, which would permit the trustee a tolling of the statute of limitations if it had not run before the date of the filing of the petition.

Paragraph (1) has the effect of overruling *Lockwood* v. *Exchange Bank*, 190 U.S. 294 (1903), because it includes as property of the estate all property of the debtor, even that needed for a fresh start. After the property comes into the estate, then the debtor is permitted to exempt it under proposed 11 U.S.C. 522, and the court will have jurisdiction to determine what property may be exempted and what remains as property of the estate. The broad jurisdictional grant in proposed 28 U.S.C. 1334 would have the effect of overruling *Lockwood* independently of the change made by this provision.

Paragraph (1) also has the effect of overruling *Lines* v. *Frederick*, 400 U.S. 18 (1970).

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act § 206, 7 U.S.C. 196.

SASMF EXHIBIT 25
438 of 979

DOCUMENT 52

83

Bankruptcy Act § 8 has been deleted as unnecessary. Once the estate is created, no interests in property of the estate remain in the debtor. Consequently, if the debtor dies during the case, only property exempted from property of the estate or acquired by the debtor after the commencement of the case and not included as property of the estate will be available to the representative of the debtor's probate estate. The bankruptcy proceeding will continue in rem with respect to property of the state, and the discharge will apply in personam to relieve the debtor, and thus his probate representative, of liability for dischargeable debts.

The estate also includes the interests of the debtor and the debtor's spouse in community property, subject to certain limitations; property that the trustee recovers under the avoiding powers; property that the debtor acquires by bequest, devise, inheritance, a property settlement agreement with the debtor's spouse, or as the beneficiary of a life insurance policy within 180 days after the petition; and proceeds, product, offspring, rents, and profits of or from property of the estate, except such as are earning from services performed by an individual debtor after the commencement of the case. Proceeds here is not used in a confining sense, as defined in the Uniform Commercial Code, but is intended to be a broad term to encompass all proceeds of property of the estate. The conversion in form of property of the estate does not change its character as property of the estate.

Subsection (b) excludes from property of the estate any power, such as a power of appointment, that the debtor may exercise solely for the benefit of an entity other than the debtor. This changes present law which excludes powers solely benefiting other persons but not other entities.

Subsection (c) invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become property of the estate. The provisions invalidated are those that restrict or condition transfer of the debtor's interest, and those that are conditioned on the insolvency or financial condition of the debtor, on the commencement of a bankruptcy case, or on the appointment of a custodian of the debtor's property. Paragraph (2) of subsection (c), however, preserves restrictions on a transfer of a spendthrift trust that the restriction is enforceable nonbankruptcy law to the extent of the income reasonably necessary for the support of a debtor and his dependents.

Subsection (d), derived from section 70c of the Bankruptcy Act, gives the estate the benefit of all defenses available to the debtor as against an entity other than the estate, including such defenses as statutes of limitations, statutes of frauds, usury, and other personal defenses, and makes waiver by the debtor after the commencement of the case ineffective to bind the estate.

Section 541(e) confirms the current status under the Bankruptcy Act of bona fide secondary mortgage market transactions as the purchase and sale of assets. Mortgages or interests in mortgages sold in the secondary market should not be considered as part of the debtor's estate. To permit the efficient servicing of mortgages or interests in mortgages the seller often retains the original mortgage notes and related documents, and the purchaser records under State recording

statutes the purchaser's ownership of the mortgages or interests in mortgages purchased. Section 541(e) makes clear that the seller's retention of the mortgage documents and the purchaser's decision not to record do not impair the asset sale character of secondary mortgage market transactions. The committee notes that in secondary mortgage market transactions the parties may characterize their relationship as one of trust, agency, or independent contractor. The characterization adopted by the parties should not affect the statutes in bankruptcy of bona fide secondary mortgage market purchases and sales.

### Section 542. Turnover of property to the estate

Subsection (a) of this section requires anyone holding property of the estate on the date of the filing of the petition, or property that the trustee may use, sell, or lease under section 363, to deliver it to the trustee. The subsection also requires an accounting. The holder of property of the estate is excused from the turnover requirement of this subsection if the property held is of inconsequential value to the estate. However, this provision must be read in conjunction with the remainder of the subsection, so that if the property is of inconsequential monetary value, yet has a significant use value for the estate, the holder of the property would not be excused from turnover.

Subsection (b) requires an entity that owes money to the debtor as of the date of the petition, or that holds money payable on demand or payable on order, to pay the money to the order of the trustee. An exception is made to the extent that the entity has a valid right of setoff, as recognized by section 553.

Subsection (c) provides an exception to subsections (a) and (b). It protects an entity that has neither actual notice nor actual knowledge of the case and that transfers, in good faith, property that is deliverable or payable to the trustee to someone other than to the estate or on order of the estate. This subsection codifies the result of *Bank of Marin* v. *England*, 385 U.S. 99 (1966), but does not go so far as to permit bank setoff in violation of the automatic stay, proposed 11 U.S.C. 362(a)(7), even if the bank offsetting the debtor's balance has no knowledge of the case.

Subsection (d) protects life insurance companies that are required by contract to make automatic premium loans from property that might otherwise be property of the estate.

Subsection (e) requires an attorney, accountant, or other professional that holds recorded information relating to the debtor's property or financial affairs, to surrender it to the trustee. This duty is subject to any applicable claim of privilege, such as attorney-client privilege. It is a new provision that deprives accountants and attorneys of the leverage that they have today, under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate.

### Section 543. Turnover of property by a custodian

This section requires a custodian appointed before the bankruptcy case to deliver to the trustee and to account for property that has come into his possession, custody, or control as a custodian. "Property

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

440 of 979

DOCUMENT 52

85

of the debtor" in section (a) includes property that was property of the debtor at the time the custodian took the property, but the title to which passed to the custodian. The section requires the court to protect any obligations incurred by the custodian, provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by the custodian, and to surcharge the custodian for any improper or excessive disbursement, unless it has been approved by a court of competent jurisdiction. Subsection (d) reinforces the general abstention policy in section 305 by permitting the bankruptcy court to authorize the custodianship to proceed notwithstanding this section.

*Section 544. Trustee as lien creditor and as successor to certain creditors and purchasers*

Subsection (a) is the "strong arm clause" of current law, now found in Bankruptcy Act § 70c. It gives the trustee the rights of a creditor on a simple contract with a judicial lien on the property of the debtor as of the date of the petition; of a creditor with a writ of execution against the property of the debtor unsatisfied as of the date of the petition; and a bona fide purchaser of the real property of the debtor as of the date of the petition. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4). The third status, that of a bona fide purchaser of real property, is new.

Subsection (b) is derived from current section 70e. It gives the trustee the rights of actual unsecured creditors under applicable law to void transfers. It follows *Moore* v. *Bay,* 284 U.S. 4 (1931), and overrules those cases that hold section 70e gives the trustee the rights of secured creditors.

*Section 545. Statutory liens*

This section permits the trustee to avoid the fixing of certain statutory liens. It is derived from subsections 67b and 67c of present law. Liens that first become effective on the bankruptcy or insolvency of the debtor are voidable by the trustee. Liens that are not perfected or enforceable on the date of the petition against a bona fide purchaser are voidable. If a transferee is able to perfect under section 546(a) and that perfection relates back to an earlier date, then in spite of the filing of the bankruptcy petition, the trustee would not be able to defeat the lien, because the lien would be perfected and enforceable against a bona fide purchaser that purchased the property on the date of the filing of the petition. Finally, a lien for rent or of distress for rent is voidable, whether the lien is a statutory lien or a common law lien of distress for rent: *See* proposed 11 U.S.C. 101(37); Bankruptcy Act § 67(c)(1)(C). The trustee may avoid a lien under this section even if the lien has been enforced by sale before the commencement of the case. To that extent, Bankruptcy Act § 67c(5) is not followed.

Subsection (b) limits the trustee's power to avoid tax liens under Federal, state, or local law. For example, under § 6323 of the Internal Revenue Code. Once public notice of a tax lien has been filed, the Government is generally entitled to priority over subsequent lienholders. However, certain purchasers who acquire an interest in certain specific kinds of personal property will take free of

SASMF EXHIBIT 25

441 of 979

86

an existing filed tax lien attaching to such property. Among the specific kinds of personal property which a purchaser can acquire free of an existing tax lien (unless the buyer knows of the existence of the lien) are stocks and securities, motor vehicles, inventory, and certain household goods. Under the present Bankruptcy Act (§ 67(c)(1)), the trustee may be viewed as a bona fide purchaser, so that he can take over any such designated items free of tax liens even if the tax authority has perfected its lien. However, the reasons for enabling a bona fide purchaser to take these kinds of assets free of an unfiled tax lien, that is, to encourage free movement of these assets in general commerce, do not apply to a trustee in a title 11 case, who is not in the same position as an ordinary bona fide purchaser as to such property. The bill accordingly adds a new subsection (b) to sec. 545 providing, in effect, that a trustee in bankruptcy does not have the right under this section to take otherwise specially treated items of personal property free of a tax lien filed before the filing of the petition.

*Section 546. Limitations on avoiding powers*

The trustee's rights and powers under certain of the avoiding powers are limited by section 546. First, if an interest holder against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the petition, the opportunity to perfect his lien against an intervening interest holder, then he may perfect his interest against the trustee. If applicable law requires seizure for perfection, then perfection is by notice to the trustee instead. The rights granted to a creditor under this subsection prevail over the trustee only if the transferee has perfected the transfer in accordance with applicable law, and that perfection relates back to a date that is before the commencement of the case.

The phrase "generally applicable law" relates to those provisions of applicable law that apply both in bankruptcy cases and outside of bankruptcy cases. For example, many State laws, under the Uniform Commercial Code, permit perfection of a purchase-money security interest to relate back to defeat an earlier levy by another creditor if the former was perfected within ten days of delivery of the property. U.C.C. §9–301(2). Such perfection would then be able to defeat an intervening hypothetical judicial lien creditor on the date of the filing of the petition. The purpose of the subsection is to protect, in spite of the surprise intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection. It is not designed to give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy case.

Subsection (b) specifies that the trustee's rights and powers under the strong arm clause, the successor to creditors provision, the preference section, and the postpetition transaction section are all subject to any statutory or common-law right of a seller, in the ordinary course of business, of goods to the debtor to reclaim the goods if the debtor received the goods on credit while insolvent. The seller must demand reclamation within ten days after receipt of the goods by the debtor. As under nonbankruptcy law, the right is subject to any superior rights of secured creditors. The purpose of the provision

SASMF EXHIBIT 25

442 of 979

DOCUMENT 52

87

is to recognize, in part, the validity of section 2–702 of the Uniform Commercial Code, which has generated much litigation, confusion, and divergent decisions in different circuits. The right is subject, however, to the power of the court to deny reclamation and protect the seller by granting him a priority as an administrative expense for his claim arising out of the sale of the goods.

Subsection (c) adds a statute of limitations to the use by the trustee of the avoiding powers. The limitation is two years after his appointment, or the time the case is closed or dismissed, whichever occurs later.

*Section 547. Preferences*

This section is a substantial modification of present law. It modernizes the preference provisions and brings them more into conformity with commercial practice and the Uniform Commercial Code.

Subsection (a) contains three definitions. Inventory, new value, and receivable are defined in their ordinary senses, but are defined to avoid any confusion or uncertainty surrounding the terms.

Subsection (b) is the operative provision of the section. It authorizes the trustee to avoid a transfer if five conditions are met. These are the five elements of a preference action. First, the transfer must be to or for the benefit of a creditor. Second, the transfer must be for or on account of an antecedent debt owed by the debtor before the transfer was made. Third, the transfer must have been made when the debtor was insolvent. Fourth, the transfer must have been made during the 90 days immediately preceding the commencement of the case. If the transfer was to an insider, the trustee may avoid the transfer if it was made during the period that begins one year before the filing of the petition and ends 90 days before the filing, if the insider to whom the transfer was made had reasonable cause to believe the debtor was insolvent at the time the transfer was made.

Finally, the transfer must enable the creditor to whom or for whose benefit it was made to receive a greater percentage of his claim than he would receive under the distributive provisions of the bankruptcy code. Specifically, the creditor must receive more than he would if the case were a liquidation case, if the transfer had not been made, and if the creditor received payment of the debt to the extent provided by the provisions of the code.

The phrasing of the final element changes the application of the greater percentage test from that employed under current law. Under this language, the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the creditor is a member. The language also requires the court to focus on the allowability of the claim for which the preference was made. If the claim would have been entirely disallowed, for example, then the test of paragraph (5) will be met, because the creditor would have received nothing under the distributive provisions of the bankruptcy code.

The trustee may avoid a transfer of a lien under this section even if the lien has been enforced by sale before the commencement of the case.

Subsection (b)(2) of this section in effect exempts from the preference rules payments by the debtor of tax liabilities, regardless of their priority status.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

90                                                                    **443 of 979**

88

Subsection (c) contains exceptions to the trustee's avoiding power. If a creditor can qualify under any one of the exceptions, then he is protected to that extent. If he can qualify under several, he is protected by each to the extent that he can qualify under each.

The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous", and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3-503 (2) (a), that will amount to a transfer that is "in fact substantially contemporaneous."

The second exception protects transfers in the ordinary course of business (or of financial affairs, where a business is not involved) tranfers. For the case of a consumer, the paragraph uses the phrase "financial affairs" to include such nonbusiness activities as payment of monthly utility bills. If the debt on account of which the transfer was made was incurred in the ordinary course of both the debtor and the transferee, if the transfer was made not later than 45 days after the debt was incurred, if the transfer itself was made in the ordinary course of both the debtor and the transferee, and if the transfer was made according to ordinary business terms, then the transfer is protected. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

The third exception is for enabling loans in connection with which the debtor acquires the property that the loan enabled him to purchase after the loan is actually made.

The fourth exception codifies the net result rule in section 60c of current law. If the creditor and the debtor have more than one exchange during the 90-day period, the exchanges are netted out according to the formula in paragraph (4). Any new value that the creditor advances must be unsecured in order for it to qualify under this exception.

Paragraph (5) codifies the improvement in position test, and thereby overrules such cases as *DuBay* v. *Williams*, 417 F.2d 1277 (C.A. 9, 1966), and *Grain Merchants of Indiana, Inc.* v. *Union Bank and Savings Co.*, 408 F.2d 209 (C.A. 7, 1969). A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of the petition. If new value was first given after 90 days before the case, the date on which it was first given substitutes for the 90-day given point.

Paragraph (6) excepts statutory liens validated under section 545 from preference attack. It also protects transfers in satisfaction of such liens, and the fixing of a lien under section 365(j), which protects a vendee whose contract to purchase real property from the debtor is rejected.

Subsection (d), derived from section 67a of the Bankruptcy Act, permits the trustee to avoid a transfer to reimburse a surety that posts

DOCUMENT 52

89

a bond to dissolve a judicial lien that would have been avoidable under this section. The second sentence protects the surety from double liability.

Subsection (e) determines when a transfer is made for the purposes of the preference section. Paragraph (1) defines when a transfer is perfected. For real property, a transfer is perfected when it is valid against a bona fide purchasers. For personal property and fixtures, a transfer is perfected when it is valid against a creditor on a simple contract that obtains a judicial lien after the transfer is perfected. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4). Paragraph (2) specifies that a transfer is made when it takes effect between the transferor and the transferee if it is perfected at or within 10 days after that time. Otherwise, it is made when the transfer is perfected. If it is not perfected before the commencement of the case, it is made immediately before the commencement of the case. Paragraph (3) specifies that a transfer is not made until the debtor has acquired rights in the property transferred. This provision, more than any other in the section, overrules *DuBay* and *Grain Merchants*, and in combination with subsection (b)(2), overrules *In re King-Porter Co.*, 446 F.2d 722 (5th Cir. 1971).

Subsection (e) is designed to reach the different results under the 1962 version of Article 9 of the U.C.C. and under the 1972 version because different actions are required under each version in order to make a security agreement effective between the parties.

Subsection (f) creates a presumption of insolvency for the 90 days preceding the bankruptcy case. The presumption is as defined in Rule 301 of the Federal Rules of Evidence, made applicable in bankruptcy cases by sections 224 and 225 of the bill. The presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists.

*Section 548. Fraudulent transfers*

This section is derived in large part from section 67d of the Bankruptcy Act. It permits the trustee to avoid transfers by the debtor in fraud of his creditors. Its history dates from the statute of 13 Eliz. c. 5 (1570).

The trustee may avoid fraudulent transfers or obligations if made with actual intent to hinder, delay, or defraud a past or future creditor. Transfers made for less than a reasonably equivalent consideration are also vulnerable if the debtor was or thereby becomes insolvent, was engaged in business with an unreasonably small capital, or intended to incur debts that would be beyond his ability to repay.

The trustee of a partnership debtor may avoid any transfer of partnership property to a partner in the debtor if the debtor was or thereby became insolvent.

If a transferee's only liability to the trustee is under this section, and if he takes for value and in good faith, then subsection (c) grants him a lien on the property transferred, or other similar protection.

Subsection (d) specifies that for the purposes of the fraudulent transfer section, a transfer is made when it is valid against a subsequent bona fide purchaser. If not made before the commencement of

SASMF EXHIBIT 25

445 of 979

90

the case. it is considered made immediately before then. Subsection (d) also defines "value" to mean property, or the satisfaction or securing of a present or antecedent debt, but does not include an unperformed promise to furnish support to the debtor or a relative of the debtor.

*Section 549. Postpetition transactions*

This section modifies section 70d of current law. It permits the trustee to avoid transfers of property that occur after the commencement of the case. The transfer must either have been unauthorized, or authorized under a section that protects only the transferor. Subsection (b) protects "involuntary gap" transferees to the extent of any value (including services, but not including satisfaction of a debt that arose before the commencement of the case), given after commencement in exchange for the transfer. Notice or knowledge of the transferee is irrelevant in determining whether he is protected under this provision.

*Section 550. Liability of transferee of avoided transfer*

Section 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee. Subsection (a) permits the trustee to recover from the initial transferee of an avoided transfer or from any immediate or mediate transferee of the initial transferee. The words "to the extent that" in the lead in to this subsection are designed to incorporate the protection of transferees found in proposed 11 U.S.C. 549(b) and 548(c). Subsection (b) limits the liability of an immediate or mediate transferee of the initial transferee if such secondary transferee takes for value, in good faith and without knowledge of the voidability of the transfer. An immediate or mediate good faith transferee of a protected secondary transferee is also shielded from liability. This subsection is limited to the trustee's right to recover from subsequent transferees under subsection (a)(2). It does not limit the trustee's rights against the initial transferee under subsection (a)(1). The phrase "good faith" in this paragraph is intended to prevent a transferee from whom the trustee could recover from transfering the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability under this paragraph, he himself must be a good faith transferee. Subsection (c) is a further limitation on recovery. It specifies that the trustee is entitled to only one satisfactory, under subsection (a), even if more than one transferee is liable.

Subsection (d) protects good faith transferees, either initial or subsequent. to the extent of the lesser of the cost of any improvement the transferee makes in the transferred property and the increase in value of the property as a result of the improvement. Paragraph (2) of the subsection defines improvement to include physical additions or changes to the property, repairs, payment of taxes on the proper…, payment of a debt secured by a lien on the property, discharge of a lien on the property, and preservation of the property.

Subsection (e) establishes a statute of limitations on avoidance by the Trustee. The limitation is one year after the avoidance of the transfer or the time the case is closed or dismissed, whichever is earlier.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

93 **446 of 979**

DOCUMENT 52

91

*Section 551. Automatic preservation of avoided transfer*

This section is a change from present law. It specifies that any avoided transfer is automatically preserved for the benefit of the estate. Under current law, the court must determine whether or not the transfer should be preserved. The operation of the section is automatic, unlike current law, even though preservation may not benefit the estate in every instance. A preserved lien may be abandoned by the trustee under proposed 11 U.S.C. 554 if the preservation does not benefit the estate. The section as a whole prevents junior lienors from improving their position at the expense of the estate when a senior lien is avoided.

*Section 552. Postpetition effect of security interest*

Under the Uniform Commercial Code, article 9, creditors may take security interests in after-acquired property. Section 552 governs the effect of such a prepetition security interest in postpetition property. It applies to all security interests as defined in section 101(37) of the bankruptcy code, not only to U.C.C. security interests.

As a general rule, if a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property. Subsection (b) provides an important exception consistent with the Uniform Commercial Code. If the security agreement extends to proceeds, product, offspring, rents, or profits of the property in question, then the proceeds would continue to be subject to the security interest pursuant to the terms of the security agreement and provisions of applicable law, except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party.

The exception covers the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors, but is limited to the benefit inuring to the secured party thereby. Situations in which the estate incurs expense in simply protecting collateral are governed by 11 U.S.C. 506(c). In ordinary circumstances, the risk of loss in continued operations will remain with the estate.

*Section 553. Setoff*

This section preserves, with some changes, the right of setoff in bankruptcy cases now found in section 68 of the Bankruptcy Act. One exception to the right is the automatic stay, discussed in connection with proposed 11 U.S.C. 362. Another is the right of the trustee to use property under section 363 that is subject to a right of setoff.

The section states that the right of setoff is unaffected by the bankruptcy code except to the extent that the creditor's claim is disallowed, the creditor acquired (other than from the debtor) the claim during the 90 days preceding the case while the debtor was insolvent, the debt being offset was incurred for the purpose of obtaining a right of setoff, while the debtor was insolvent and during the 90-day prebankruptcy

92

period, or the creditor improved his position in the 90-day period (similar to the improvement in position test found in the preference section 547(c)(5)). Only the last exception is an addition to current law.

As under section 547(f), the debtor is presumed to have been insolvent during the 90 days before the case.

## Section 554. Abandonment of property of the estate

Under this section the court may authorize the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. Abandonment may be to any party with a possessory interest in the property abandoned. In order to aid administration of the case, subsection (b) deems the court to have authorized abandonment of any property that is scheduled under section 521(1) and that is not administered before the case is closed. That property is deemed abandoned to the debtor. Subsection (c) specifies that if property is neither abandoned nor administered it remains property of the estate.

## CHAPTER 7—LIQUIDATION

### SUBCHAPTER I—OFFICERS AND ADMINISTRATION

## Section 701. Interim trustee

This section requires the court to appoint an interim trustee. The appointment must be made from the panel of private trustees established and maintained by the Director of the Administrative Office under proposed 28 U.S.C. 604(e).

Subsection (a) requires the appointment of an interim trustee to be made promptly after the order for relief, unless a trustee is already serving in the case, such as before a conversion from a reorganization to a liquidation case.

Subsection (b) specifies that the appointment of an interim trustee expires when the permanent trustee is elected or designated under section 702.

Subsection (c) makes clear that an interim trustee is a trustee in a case under the bankruptcy code.

Subsection (d) provides that in a commodity broker case where speed is essential the interim trustee must be appointed by noon of the business day immediately following the order for relief.

## Section 702. Election of trustee

Subsection (a) of this section specifies which creditors may vote for a trustee. Only a creditor that holds an allowable, undisputed, fixed, liquidated, unsecured claim that is not entitled to priority, that does not have an interest materially adverse to the interest of general unsecured creditors, and that is not an insider may vote for a trustee. The phrase "materally adverse" is currently used in the Rules of Bankruptcy Procedure, rule 207(d). The application of the standard requires a balancing of various factors, such as the nature of the adversity. A creditor with a very small equity position would not be excluded from voting solely because he holds a small equity in the debtor. The Rules of Bankruptcy Procedure also currently provide

SASMF EXHIBIT 25
448 of 979

for temporary allowance of claims, and will continue to do so for the purposes of determining who is eligible to vote under this provision.

Subsection (b) permits creditors at the meeting of creditors to elect one person to serve as trustee in the case. Creditors holding at least 20 percent in amount of the claims specified in the preceding paragraph must request election before creditors may elect a trustee. Subsection (c) specifies that a candidate for trustee is elected trustee if creditors holding at least 20 percent in amount of those claims actually vote, and if the candidate receives a majority in amount of votes actually cast.

Subsection (d) specifies that if a trustee is not elected, then the interim trustee becomes the permanent trustee and serves in the case permanently.

*Section 703. Successor trustee*

If the office of trustee becomes vacant during the case, this section makes provision for the selection of a successor trustee. The office might become vacant through death, resignation, removal, failure to qualify under section 322 by posting bond, or the reopening of a case. If it does, creditors may elect a successor in the same manner as they may elect a trustee under the previous section. Pending the election of a successor, the court may appoint an interim trustee in the usual manner if necessary to preserve or prevent loss to the estate. If creditors do not elect a successor, or if a trustee is needed in a reopened case, then the court appoints a disinterested member of the panel of private trustees to serve.

*Section 704. Duties of trustee*

The essential duties of the trustee are enumerated in this section. Others, or elaborations on these, may be prescribed by the Rules of Bankruptcy Procedure to the extent not inconsistent with those prescribed by this section. The duties are derived from section 47a of the Bankruptcy Act.

The trustee's principal duty is to collect and reduce to money the property of the estate for which he serves, and to close up the estate as expeditiously as is compatible with the best interests of parties in interest. He must be accountable for all property received, and must investigate the financial affairs of the debtor. If a purpose would be served (such as if there are assets that will be distributed), the trustee is required to examine proofs of claims and object to the allowance of any claim that is improper. If advisable, the trustee must oppose the discharge of the debtor, which is for the benefit of general unsecured creditors whom the trustee represents.

The trustee is responsible to furnish such information concerning the estate and its administration as is requested by a party in interest. If the business of the debtor is authorized to be operated, then the trustee is required to file with governmental units charged with the responsibility for collection or determination of any tax arising out of the operation of the business periodic reports and summaries of the operation, including a statement of receipts and disbursements, and such other information as the court requires. He is required to give constructive notice of the commencement of the case in the manner specified under section 342(b).

**Ad Hoc Equity Group Exhibit 9** SASMF **EXHIBIT 25**

96                                      **449 of 979**

94

*Section 705. Creditors' committee*

This section is derived from section 44b of the Bankruptcy Act without substantial change. It permits election by general unsecured creditors of a committee of not fewer than 3 members and not more than 11 members to consult with the trustee in connection with the administration of the estate, to make recommendations to the trustee respecting the performance of his duties, and to submit to the court any question affecting the administration of the estate. There is no provision for compensation or reimbursement of its counsel.

*Section 706. Conversion*

Subsection (a) of this section gives the debtor the one-time absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case. If the case has already once been converted from chapter 11 or 13 to chapter 7, then the debtor does not have that right. The policy of the provision is that the debtor should always be given the opportunity to repay his debts, and a waiver of the right to convert a case is unenforceable.

Subsection (b) permits the court, on request of a party in interest and after notice and a hearing, to convert the case to chapter 11 at any time. The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest.

Subsection (c) is part of the prohibition against involuntary chapter 13 cases, and prohibits the court from converting a case to chapter 13 without the debtor's consent.

Subsection (d) reinforces section 109 by prohibiting conversion to a chapter unless the debtor is eligible to be a debtor under that chapter.

*Section 707. Dismissal*

This section authorizes the court to dismiss a liquidation case only for cause, such as unreasonable delay by the debtor that is prejudicial to creditors or nonpayment of any fees and charges required under chapter 123 of title 28. These causes are not exhaustive, but merely illustrative. The section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy.

SUBCHAPTER II—COLLECTION, LIQUIDATION, AND DISTRIBUTION
OF THE ESTATE

*Section 721. Authorization to operate business*

This section is derived from section 2a(5) of the Bankruptcy Act. It permits the court to authorize the operation of any business of the debtor for a limited period, if the operation is in the best interest of the estate and consistent with orderly liquidation of the estate. An example is the operation of a watch company to convert watch movements and cases into completed watches which will bring much higher prices than the component parts would have brought.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

450 of 979

*Section 722. Redemption*

This section is new and is broader than rights of redemption under the Uniform Commercial Code. It authorizes an individual debtor to redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a nonpurchase money dischargeable consumer debt. It applies only if the debtor's interest in the property is exempt or has been abandoned.

This right to redeem is a very substantial change from current law. To prevent abuses such as may occur when the debtor deliberately allows the property to depreciate in value, the debtor will be required to pay the fair market value of the goods or the amount of the claim if the claim is less. The right is personal to the debtor and not assignable.

*Section 723. Rights of partnership trustee against general partners*

This section is a significant departure from present law. It repeals the jingle rule, which, for ease of administration, denied partnership creditors their rights against general partners by permitting general partners' individual creditors to share in their estates first to the exclusion of partnership creditors. The result under this section more closely tracks generally applicable partnership law, without a significant administrative burden.

Subsection (a) specifies that each general partner in a partnership debtor is liable to the partnership's trustee for any deficiency of partnership property to pay in full all administrative expenses and all claims against the partnership.

Subsection (b) requires the trustee to seek recovery of the deficiency from any general partner that is not a debtor in a bankruptcy case. The court is empowered to order that partner to indemnify the estate or not to dispose of property pending a determination of the deficiency. The language of the subsection is directed to cases under the bankruptcy code. However, if, during the early stages of the transition period, a partner in a partnership is proceeding under the Bankruptcy Act while the partnership is proceeding under the bankruptcy code, the trustee should not first seek recovery against the Bankruptcy Act partner. Rather, the Bankruptcy Act partner should be deemed for the purposes of this section and the rights of the trustee to be proceeding under title 11.

Subsection (c) requires the partnership trustee to seek recovery of the full amount of the deficiency from the estate of each general partner that is a debtor in a bankruptcy case. The trustee will share equally with the partners' individual creditors in the assets of the partners' estates. Claims of partnership creditors who may have filed against the partner will be disallowed to avoid double counting.

Subsection (d) provides for the case where the total recovery from all of the bankrupt general partners is greater than the deficiency of which the trustee sought recovery. This case would most likely occur for a partnership with a large number of general partners. If the situation arises, the court is required to determine an equitable redistribution of the surplus to the estate of the general partners. The determination will be based on factors such as the relative liability of each of the general partners under the partnership agreement and

**SASMF EXHIBIT 25**
**451 of 979**

the relative rights of each of the general partners in the profits of the enterprise under the partnership agreement.

### Section 724. Treatment of certain liens

Subsection (a) of section 724 permits the trustee to avoid a lien that secures a fine, penalty, forfeiture, or multiple, punitive, or exemplary damages claim to the extent that the claim is not compensation for actual pecuniary loss. The subsection follows the policy found in section 57j of the Bankruptcy Act of protecting unsecured creditors from the debtor's wrongdoing, but expands the protection afforded. The lien is made voidable rather than void in chapter 7, in order to permit the lien to be revived if the case is converted to chapter 11, under which penalty liens are not voidable. To make the lien void would be to permit the filing of a chapter 7, the voiding of the lien, and the conversion to a chapter 11, simply to avoid a penalty lien, which should be valid in a reorganization case.

Subsection (b) governs tax liens. This provision retains the rule of present bankruptcy law (§ 67(C)(3) of the Bankruptcy Act) that a tax lien on personal property, if not avoidable by the trustee, is subordinated in payment to unsecured claims having a higher priority than unsecured tax claims. Those other claims may be satisfied from the amount that would otherwise have been applied to the tax lien, and any excess of the amount of the lien is then applied to the tax. Any personal property (or sale proceeds) remaining is to be used to satisfy claims secured by liens which are junior to the tax lien. Any proceeds remaining are next applied to pay any unpaid balance of the tax lien.

Subsection (d) specifies that any statutory lien whose priority is determined in the same manner as a tax lien is to be treated as a tax lien under this section, even if the lien does not secure a claim for taxes. An example is the ERISA lien.

### Section 725. Disposition of certain property

This section requires the court to determine the appropriate disposition of property in which the estate and an entity other than the estate have an interest. It would apply, for example, to property subject to a lien or property co-owned by the estate and another entity. The court must make the determination with respect to property that is not disposed of under another section of the bankruptcy code, such as by abandonment under section 554, by sale or distribution under 363, or by allowing foreclosure by a secured creditor by lifting the stay under section 362. The purpose of the section is to give the court appropriate authority to ensure that collateral or its proceeds is returned to the proper secured creditor, that consigned or bailed goods are returned to the consignor or bailor, and so on. Current law is curiously silent on this point, though case law has grown to fill the void. The section is in lieu of a section that would direct a certain distribution to secured creditors. It gives the court greater flexibility to meet the circumstances, and it is broader, permitting disposition of property subject to a co-ownership interest.

### Section 726. Distribution of property of the estate

This section is the general distribution section for liquidation cases. It dictates the order in which distribution of property of the estate,

## DOCUMENT 52

97

which has usually been reduced to money by the trustee under the requirements of section 704(1).

First, property is distributed among priority claimants, as determined by section 507, and in the order prescribed by section 507. Second, distribution is to general unsecured creditors. This class excludes priority creditors and the two classes of subordinated creditors specified below. The provision is written to permit distribution to creditors that tardily file claims if their tardiness was due to lack of notice or knowledge of the case. Though it is in the interest of the estate to encourage timely filing, when tardy filing is not the result of a failure to act by the creditor, the normal subordination penalty should not apply. Third distribution is to general unsecured creditors who tardily file. Fourth distribution is to holders of fine, penalty, forfeiture, or multiple, punitive, or exemplary damage claims. More of these claims are disallowed entirely under present law. They are simply subordinated here.

Paragraph (4) provides that punitive penalties, including prepetition tax penalties, are subordinated to the payment of all other classes of claims, except claims for interest accruing during the case. In effect, these penalties are payable out of the estate's assets only if and to the extent that a surplus of assets would otherwise remain at the close of the case for distribution back to the debtor.

Paragraph (5) provides that postpetition interest on prepetition claims is also to be paid to the creditor in a subordinated position. Like prepetition penalties, such interest will be paid from the estate only if and to the extent that a surplus of assets would otherwise remain for return to the debtor at the close of the case.

This section also specifies that interest accrued on all claims (including priority and nonpriority tax claims) which accrued before the date of the filing of the title 11 petition is to be paid in the same order of distribution of the estate's assets as the principal amount of the related claims.

Any surplus is paid to the debtor under paragraph (6).

Subsection (b) follows current law. It specifies that claims within a particular class are to be paid pro rata. This provision will apply, of course, only when there are inadequate funds to pay the holders of claims of a particular class in full. The exception found in the section, which also follows current law, specifies that liquidation administrative expenses are to be paid ahead of reorganization administrative expenses if the case has been converted from a reorganization case to a liquidation case, or from an individual repayment plan case to a liquidation case.

Subsection (c) governs distributions in cases in which there is community property and other property of the estate. The section requires the two kinds of property to be segregated. The distribution is as follows: First, administrative expenses are to be paid, as the court determines on any reasonable equitable basis, from both kinds of property. The court will divide administrative expenses according to such factors as the amount of each kind of property in the estate, the cost of preservation and liquidation of each kind of property, and whether any particular administrative expenses are attributable to one kind of property or the other. Second, claims are to be paid as provided

98

under subsection (a) (the normal liquidation case distribution rules) in the following order and manner: First, community claims against the debtor or the debtor's spouse are paid from community property, except such as is liable solely for the debts of the debtor.

Second, community claims against the debtor, to the extent not paid under the first provision, are paid from community property that is solely liable for the debts of the debtor. Third, community claims, to the extent they remain unpaid, and all other claims against the debtor, are paid from noncommunity property. Fourth, if any community claims against the debtor or the debtor's spouse remain unpaid, they are paid from whatever property remains in the estate. This would occur if community claims against the debtor's spouse are large in amount and most of the estate's property is property solely liable, under nonbankruptcy law, for debts of the debtor.

The marshalling rules in this section apply only to property of the estate. However, they will provide a guide to the courts in the interpretation of proposed 11 U.S.C. 725, relating to distribution of collateral, in cases in which there is community property. If a secured creditor has a lien on both community and non-community property, the marshalling rules here—by analogy would dictate that the creditor be satisfied first out of community property, and then out of separate property.

*Section 727. Discharge*

This section is the heart of the fresh start provisions of the bankruptcy law. Subsection (a) requires the court to grant a debtor a discharge unless one of nine conditions is met. The first condition is that the debtor is not an individual. This is a change from present law, under which corporations and partnerships may be discharged in liquidation cases, though they rarely are. The change in policy will avoid trafficking in corporate shells and in bankrupt partnerships. "Individual" includes a deceased individual, so that if the debtor dies during the bankruptcy case, he will nevertheless be released from his debts, and his estate will not be liable for them. Creditors will be entitled to only one satisfaction—from the bankruptcy estate and not from the probate estate.

The next three grounds for denial of discharge center on the debtor's wrongdoing in or in connection with the bankruptcy case. They are derived from Bankruptcy Act §14c. If the debtor, with intent to hinder, delay, or defraud his creditors or an officer of the estate, has transferred, removed, destroyed, mutilated, or concealed, or has permitted any such action with respect to, property of the debtor within the year preceding the case, or property of the estate after the commencement of the case, then the debtor is denied discharge. The debtor is also denied discharge if he has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any books and records from which his financial condition might be ascertained, unless the act or failure to act was justified under all the circumstances of the case. The fourth ground for denial of discharge is the commission of a bankruptcy crime, although the standard of proof is preponderance of the evidence rather than proof beyond a reasonable doubt. These crimes include the making of a false oath or account, the use or presentation of a false

SASMF EXHIBIT 25
454 of 979

claim, the giving or receiving of money for acting or forbearing to act, and the withholding from an officer of the estate entitled to possession of books and records relating to the debtor's financial affairs.

The fifth ground for denial of discharge is the failure of the debtor to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. The sixth ground concerns refusal to testify. It is a change from present law, under which the debtor may be denied discharge for legitimately exercising his right against self-incrimination. Under this provision, the debtor may be denied discharge if he refuses to obey any lawful order of the court, or if he refuses to testify after having been granted immunity or after improperly invoking the constitutional privilege against self-incrimination.

The seventh ground for denial of discharge is the commission of an act specified in grounds two through six during the year before the debtor's case in connection with another bankruptcy case concerning an insider.

The eighth ground for denial of discharge is derived from § 14c(5) of the Bankruptcy Act. If the debtor has been granted a discharge in a case commenced within 6 years preceding the present bankruptcy case, he is denied discharge. This provision, which is no change from current law with respect to straight bankruptcy, is the 6-year bar to discharge. Discharge under chapter 11 will bar a discharge for 6 years. As under current law, confirmation of a composition wage earner plan under chapter 13 is a basis for invoking the 6-year bar.

The ninth ground is approval by the court of a waiver of discharge.

Subsection (b) specifies that the discharge granted under this section discharges the debtor from all debts that arose before the date of the order for relief. It is irrelevant whether or not a proof of claim was filed with respect to the debt, and whether or not the claim based on the debt was allowed.

Subsection (c) permits the trustee, or a creditor, to object to discharge. It also permits the court, on request of a party in interest, to order the trustee to examine the acts and conduct of the debtor to determine whether a ground for denial of discharge exists.

Subsection (d) requires the court to revoke a discharge already granted in certain circumstances. If the debtor obtained the discharge through fraud, if he acquired and concealed property of the estate, or if he refused to obey a court order or to testify, the discharge is to be revoked.

Subsection (e) permits the trustee or a creditor to request revocation of a discharge within 1 year after the discharge is granted, on the grounds of fraud, and within one year of discharge or the date of the closing of the case, whichever is later, on other grounds.

*Section 728. Special tax provisions*

Section 728 of title 11 applies only to state and local taxation. This provision contains four subsections which embody special tax provisions that apply in a case under chapter 7. Subsection (a) terminates the taxable year of an individual debtor on the date of the order for relief under chapter 7 of title 11. The date of termination of the individual's taxable year is the date on which the estate first becomes a separate taxable entity. If the case was originally filed under

100

chapter 11 of title 11, then the estate would have been made a separate taxable entity on the date of the order for relief under that chapter. In the rare case of a multiple conversion, then the date of the order for relief under the first chapter under which the estate was a separate taxable entity is controlling.

Subsection (b) permits the trustee of the estate of an individual debtor or a corporation in a case under chapter 7 of title 11 to make a tax return only if the estate or corporation has net taxable income for the entire case. If the estate or corporation has net taxable income at the close of the case, then the trustee files an income tax return for each tax year during which the case was pending. The trustee of a partnership debtor must always file returns for each such taxable period.

Subsection (c) sets forth a marshalling rule pertaining to tax claims against a partner and a partnership in a case under chapter 7 of title 11. To the extent that the income tax liability arose from the inclusion of undistributed earnings in the partner's taxable income, the court is required to disallow the tax claim against the partner's estate and to allow such claim against the partnership estate. No burden is placed on the taxing authority; the taxing authority should file a complete proof of claim in each case and the court will execute the marshalling. If the partnership's assets are insufficient to satisfy partnership creditors in full, then section 723(c) of title 11 will apply, notwithstanding this subsection, to allow any unsatisfied tax claims to be asserted by the partnership trustee against the estate of the partner. The marshalling rule under this subsection applies only for purposes of allowance and distribution. Thus the tax claim may be nondischargeable with respect to an individual partner.

Subsection (d) requires the court to apportion any tax refund or reduction of tax between the estate of a partner and the estate of his partnership. The standard of apportionment entitles the partnership estate to receive that part of the tax refund or reduction that is attributable to losses sustained by the partnership that were deducted by the partner but for which the partner never reimbursed the partnership. The partner's estate receives any part not allocated to the partnership estate. The section applies notwithstanding section 541 of title 11, which includes the partner's right to a tax refund or to reduction of tax as property of the partner's estate.

### SUBCHAPTER III—STOCKBROKER LIQUIDATION

*Section 741. Definitions for this subchapter*

Section 741 sets forth definitions for subchapter III of chapter 7.

Paragraph (1) defines "Commission" to mean the Securities and Exchange Commission.

Paragraph (2) defines "customer" to include anybody that interacts with the debtor in a capacity that concerns securities transactions. The term embraces cash or margin customers of a broker or dealer in the broadest sense.

Paragraph (3) defines "customer name security" in a restrictive fashion to include only non-transferrable securities that are registered, or in the process of being registered in a customer's own name. The

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

103

456 of 979

securities must not be endorsed by the customer and the stockbroker must not be able to legally transfer the securities by delivery, by a power of attorney, or otherwise.

Paragraph (4) defines "customer property" to include all property of the debtor that has been segregated for customers or property that should have been segregated but was unlawfully converted. Clause (i) refers to customer property not properly segregated by the debtor or customer property converted and then recovered so as to become property of the estate. Unlawfully converted property that has been transferred to a third party is excluded until it is recovered as property of the estate by virtue of the avoiding powers. The concept excludes customer name securities that have been delivered to or reclaimed by a customer and any property properly belonging to the stockholder, such as money deposited by a customer to pay for securities that the stockholder has distributed to such customer.

Paragraph (5) defines "net equity" to establish the extent to which a customer will be entitled to share in the single and separate fund. Accounts of a customer are aggregated and offset only to the extent the accounts are held by the customer in the same capacity. Thus, a personal account is separate from an account held as trustee. In a community property state an account held for the community is distinct from an account held as separate property.

The net equity is computed by liquidating all securities positions in the accounts and crediting the account with any amount due to the customer. Regardless of the actual dates, if any, of liquidation, the customer is only entitled to the liquidation value at the time of the filing of the petition. To avoid double counting, the liquidation value of customer name securities belonging to a customer is excluded from net equity. Thus, clause (ii) includes claims against a customer resulting from the liquidation of a security under clause (i). The value of a security on which trading has been suspended at the time of the filing of the petition will be estimated. Once the net liquidation value is computed, any amount that the customer owes to the stockbroker is subtracted including any amount that would be owing after the hypothetical liquidation, such as brokerage fees. Debts owed by the customer to the debtor, other than in a securities related transaction, will not reduce the net equity of the customer. Finally, net equity is increased by any payment by the customer to the debtor actually paid within 60 days after notice. The principal reason a customer would make such a payment is to reclaim customer name securities under §751.

Paragraph (6) defines "1934 Act" to mean the Securities Exchange Act of 1934.

Paragraph (7) defines "SIPC" to mean the Securities Investor Protection Corporation.

*Section 742. Effect of section 362 of this subchapter*

Section 742 indicates that the automatic stay does not prevent SIPC from filing an application for a protective decree under SIPA. If SIPA does file such an application, then all bankruptcy proceedings are suspended until the SIPC action is completed. If SIPC completes liquidation of the stockbroker then the bankruptcy case is dismissed.

## Section 743. Notice

Section 743 requires that notice of the order for relief be given to SIPC and to the SEC in every stockbroker case.

## Section 744. Executory contracts

Section 744 instructs the court to give the trustee a reasonable time, not to exceed 30 days, to assume or reject any executory contract of the stockbroker to buy or sell securities. Any contract not assumed within the time fixed by the court is considered to be rejected.

## Section 745. Treatment of accounts

Section 745(a) indicates that each account held by a customer in a separate capacity is to be considered a separate account. This prevents the offset of accounts held in different capacities.

Subsection (b) indicates that a bank or another stockbroker that is a customer of a debtor is considered to hold its customers accounts in separate capacities. Thus a bank or other stockbroker is not treated as a mutual fund for purposes of bulk investment. This protects un-related customers of a bank or other stockholder from having their accounts offset.

Subsection (c) effects the same result with respect to a trust so that each beneficiary is treated as the customer of the debtor rather than the trust itself. This eliminates any doubt whether a trustee holds a personal account in a separate capacity from his trustee's account.

## Section 746. Extent of customer claim

Section 746(a) protects entities who deal in good faith with the debtor after the filing of the petition and before a trustee is appointed by deeming such entities to be customers. The principal application of this section will be in an involuntary case before the order for relief, because § 701(b) requires prompt appointment of an interim trustee after the order for relief.

Subsection (b) indicates that an entity who holds securities that are either part of the capital of the debtor or that are subordinated to the claims of any creditor of the debtor is not a customer with respect to those securities. This subsection will apply when the stockbroker has sold securities in itself to the customer or when the customer has otherwise placed such securities in an account with the stockbroker.

## Section 747. Subordination of certain customer claims

Section 747 subordinates to other customer claims, all claims of a customer who is an insider, a five percent owner of the debtor, or otherwise in control of the debtor.

## Section 748. Reduction of securities to money

Section 748 requires the trustee to liquidate all securities, except for customer name securities, of the estate in a manner consistent with good market practice. The trustee should refrain from flooding a thin market with a large percentage of shares in any one issue. If the trust-ee holds restricted securities or securities in which trading has been suspended, then the trustee must arrange to liquidate such securities in accordance with the securities laws. A private placement may be the only exemption available with the customer of the debtor the best

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25

prospect for such a placement. The subsection does not permit such a customer to bid in his net equity as part of the purchase price; a contrary result would permit a customer to receive a greater percentage on his net equity claim than other customers.

## Section 749. Voidable transfers

Section 749 indicates that if the trustee avoids a transfer, property recovered is customer property to any extent it would have been customer property but for the transfer. The section clarifies that a customer who receives a transfer of property of the debtor is a creditor and that property in a customer's account is property of a creditor for purposes of the avoiding powers.

## Section 750. Distribution of securities

Section 750 forbids the trustee from distributing a security other than a customer name security. The term "distribution" refers to a distribution to customers in satisfaction of net equity claims and is not intended to preclude the trustee from liquidating securities under proposed 11 U.S.C. 748.

## Section 751. Customer name securities

Section 751 requires the trustee to deliver a customer name security to the customer entitled to such security unless the customer has a negative net equity. The customer's net equity will be negative when the amount owed by the customer to the stockbroker exceeds the liquidation value of the non-customer name securities in the customer's account. If the customer is a net debtor of the stockbroker, then the trustee may permit the customer to repay debts to the stockbroker so that the customer will not longer be in debt to the stockbroker. If the customer refuses to pay such amount, then the court may order the customer to endorse the security in order that the trustee may liquidate such property.

## Section 752. Customer property

Section 752(a) requires the trustee to distribute customer property to customers based on the amount of their net equity claims. Customer property is to be distributed in priority to all claims except expenses of administration entitled to priority under § 507(1). It is anticipated that the court will apportion such administrative claims on an equitable basis between the general estate and the customer property of the debtor.

Subsection (b)(1) indicates that in the event customer property exceeds customers net equity claims and administrative expenses, the excess pours over into the general estate. This event would occur if the value of securities increased dramatically after the order for relief but before liquidation by the trustee. Subsection (b)(2) indicates that the unpaid portion of a customer's net equity claim is entitled to share in the general estate as an unsecured claim unless subordinated by the court under proposed 11 U.S.C. 501. A net equity claim of a customer that is subordinated under section 747 is entitled to share in distribution under section 726(a)(2) unless subordinated under section 510 independently of the subordination under section 747.

SASMF EXHIBIT 25
459 of 979

Subsection (c) provides for apportionment between customer property and the general estate of any equity of the debtor in property remaining after a secured creditor liquidates a security interest. This might occur if a stockbroker hypothecates securities of his own and of his customers if the value of the hypothecated securities exceeds the debt owed to the secured party. The apportionment is to be made according to the ratio of customer property and general property of the debtor that comprised the collateral. The subsection refers to cash and securities of customers to include any customer property unlawfully converted by the stockbroker in the course of such a transaction. The apportionment is made subject to section 741(4)(B) to insure that property in a customer's account that is owed to the stockbroker will not be considered customer property. This recognizes the right of the stockbroker to withdraw money that has been erroneously placed in a customer's account or that is otherwise owing to the stockbroker.

### Section 761. Definitions for this subchapter

Paragraph (1) defines "Act" to mean the Commodity Exchange Act.

Paragraph (2) defines "clearing organization" to mean an organization that clear (i.e., matches purchases and sales) commodity futures contracts made on or subject to the rules of a contract market or commodity options transactions made on or subject to the rules of a commodity option exchange. Although commodity option trading on exchanges is currently prohibited, it is anticipated that CFTC may permit such trading in the future.

Paragraphs (3) and (4) define terms "Commission" and "commodity futures contract".

Paragraph (5) defines "commodity contract" to mean a commodity futures contract (§ 761(4)), a commodity option (§ 761(6)), or a leverage contract (§ 761(15)).

Paragraph (6) defines "commodity option" by reference to section 4c(b) of the Commodity Exchange Act.

Paragraphs (7), (8), and (9) define "commodity options dealer," "contract market," "contract of sale," "commodity," "future delivery," "board of trade," and "futures commission merchant."

Paragraph (10) defines the term "customer" to mean with respect to a futures commission merchant or a foreign futures commission merchant, the entity for whom the debtor carries a commodity futures contract or foreign future, or with whom such a contract is carried (such as another commodity broker), or from whom the debtor has received, acquired, or holds cash, securities, or other property arising out of or connected with specified transactions involving commodity futures contracts or foreign futures. This section also defines "customer" in the context of leverage transaction merchants, clearing organizations, and commodity options dealers. Persons associated with a commodity broker, such as its employees, officers, or partners, may be customers under this definition.

The definition of "customer" serves to isolate that class of persons entitled to the protection subchapter IV provides to customers. In addition, section 101(5) defines "commodity broker" to mean a futures commission merchant, foreign futures commission merchant, clearing organization, leverage transaction merchant, or commodity options dealer, with respect to which there is a customer. Accordingly, the

**Ad Hoc Equity Group Exhibit 9**

**SASMF EXHIBIT 25**

**107**

**460 of 979**

definition of customer also serves to designate those entities which must utilize chapter 7 and are precluded from reorganizing under chapter 11.

Paragraph (11) defines "customer property" to mean virtually all property or proceeds thereof, received, acquired, or held by or for the account of the debtor for a customer arising of or in connection with a transaction involving a commodity contract.

Paragrap (12) defines "distribution share" to mean the amount to which a customer is entitled under section 765(a).

Paragraphs (13), (14), (15), and (16) define "foreign future," "foreign futures commission merchant," "leverage transaction," and "leverage transaction merchant."

Paragraph (17) defines "margin payment" to mean a payment or deposit commonly known to the commodities trade as original margin, initial margin, or variation margin.[21]

Paragraph (18) defines "member property."

Paragraph (19) defines "net equity" to be the sum of (A) the value of all customer property remaining in a customer's account [22] immediately after all commodity contracts of such customer have been transferred, liquidated, or become identified for delivery and all obligations of such customer to the debtor have been offset (such as margin payments, whether or not called, and brokerage commissions) plus (B) the value of specifically identifiable customer property previously returned to the customer by the trustee, plus (C) if the trustee has transferred any commodity contract to which the customer is entitled or any margin or security for such contract, the value of such contract and margain or security. Net equity, therefore, will be the total amount of customer property to which a customer is entitled as of the date of the filing of the bankruptcy petition, although valued at subsequent dates. The Commission is given authority to promulgate rules and regulations to further refine this definition.

*Section 762. Notice to and intervention by the Commission*

Section 762 provides that the Commission shall be given such notice as is appropriate of an order for relief in a bankruptcy case and that the Commission may raise and may appear and may be heard on any issue in case involving a commodity broker liquidation.

*Section 763. Treatment of accounts*

Section 763 provides for separate treatment of accounts held in separate capacities. A deficit in one account held for a customer may not be offset against the net equity in another account held by the same customer in a separate capacity or held by another customer.

*Section 764. Voidable transfers*

Section 764 permits the trustee to void any transfer of property that, except for such transfer, would have been customer property, to the extent permitted under section 544, 545, 547, 548, 549, or 724(a).

*Section 765. Customer property*

Subsection (a) of this section provides that with respect to liquidation of commodity brokers which are not clearing organizations, the trustee shall distribute customer property to customers on the basis

---

[21] *See* S. Rep. No. 95–850, 95th Cong., 2d Sess. 130, 138 (1978).
[22] The amount remaining in such customers accounts would include any customer property that was unlawfully converted. *See* section 761(11)(A).

and to the extent of such customers' allowed net equity claims, and in priority to all other claims. This section grants customers' claims first priority in the distribution of the estate. Subsection (b) grants the same priority to member property and other customer property in the liquidation of a clearing organization. A fundamental purpose of these provisions is to ensure that the property entrusted by customers to their brokers will not be subject to the risks of the broker's business and will be available for disbursement to customers if the broker becomes bankrupt.

As a result of section 765, a customer need not trace any funds in order to avoid treatment as a general creditor as was required by the Seventh Circuit in *In re Rosenbaum Grain Corporation.*[23]

*Section 766. Nonvoidable transfers*

Section 766 lists certain transfers which are not voidable by the trustee of a commodity broker. Subsection (a) exempts transfers approved by the Commission by rule or order, either before or after the transfer. It is expected that the Commission will use this power sparingly and only when necessary to effectuate the remedial purposes of this legislation, bearing in mind that the immediate transfer of customer accounts from bankrupt commodity brokers to solvent commodity brokers is one of the primary goals of this subchapter. The committee considered and rejected a provision in subsection (b) that would have exempted payments made to a commodity broker. The Commission may not by rule exempt such transfers. The Commission's prompt attention to the promulgation of such rules and regulations is expected.

Subsection (b) provides for the nonavoidability of margin payments made by a commodity broker, other than a clearing organization. If such payments are made by or to a clearing organization, they are nonavoidable pursuant to subsection (c). All other margin payments made by a commodity broker, other than a clearing organization, are nonavoidable if they meet the conditions set forth in subsection (b). Subsections (b)(1) and (b)(2) parallel the requirements for avoidance of fraudulent transfers and obligations under section 548. Subsection (b)(3) adds a requirement that there be collusion between the transferee and transferor in order for such payments to be voidable. It would be unfair to permit recovery from an innocent commodity broker since such brokers are, for the most part, simply conduits for margin payments and do not retain margin for use in their operations. Subsection (b)(4) would permit recovery of a subsequent transferee only if it had actual knowledge at the time of that subsequent transfer of the scheme to defraud. Again it should be noted that if the transfer is a margin payment and the subsequent transferee is a clearing organization, the transfer is nonavoidable under section 766(c).

Subsection (c) overrules *Seligson* v. *New York Produce Exchange,*[24] and provides as a matter of law that margin payments made by or to a clearing organization are not voidable.

*Section 767. Specific powers and duties of trustee*

Section 767 sets forth the procedures to be followed by the trustee. It should be emphasized that many of the duties imposed on the trustee are required to be discharged by the trustee immediately upon his appointment. The earlier these duties are discharged the less potential market disruption can result.

[23] 112 F.2d 315 (7th Cir. 1940).
[24] 394 F. Supp. 125 (S.D.N.Y. 1975).

Ad Hoc Equity Group Exhibit 9    SASMF EXHIBIT 25
462 of 979

# DOCUMENT 52

107

The initial duty of the trustee is to endeavor to transfer to another commodity broker or brokers all identified customer accounts together with the customer property margining such accounts, to the extent the trustee deems appropriate. Although it is preferable for all such accounts to be transferred, exigencies may dictate a partial transfer. The requirement that the value of the accounts and property transferred not exceed the customer's distribution share may necessitate a slight delay until the trustee can submit to the court, for its disapproval, an estimate of each customer's distribution share pursuant to section 768.

Subsection (c) provides that contemporaneously with the estimate of the distribution share and the transfer of identified customer accounts and property, subsection (c) provides that the trustee should make arrangements for the liquidation of all commodity contracts maintained by the debtor that are not identifiable to specific customers. These contracts would, of course, include all such contracts held in the debtor's proprietory account.

At approximately the same time, the trustee should notify each customer of the debtor's bankruptcy and instruct each customer immediately to submit a claim including any claim to a specifically identifiable security or other property, and advise the trustee as to the desired disposition of commodity contracts carried by the debtor for the customer.

This requirement is placed upon the trustee to insure that producers who have hedged their production in the commodities market are allowed the opportunity to preserve their positions. The theory of the commodity market is that it exists for producers and buyers of commodities and not for the benefit of the speculators whose transactions now comprise the overwhelming majority of trades. Maintenance of positions by hedges may require them to put up additional margin payments in the hours and days following the commodity broker bankruptcy, which they may be unable or unwilling to do. In such cases, their positions will be quickly liquidated by the trustee, but they must have the opportunity to make those margin payments before they are summarily liquidated out of the market to the detriment of their growing crop. The failure of the customer to advise the trustee as to disposition of the customer's commodity contract will not delay a transfer of a contract pursuant to subsection (b) so long as the contract can otherwise be identified to the customer. Nor will the failure of the customer to submit a claim prevent the customer from recovering the net equity in that customer's account, absent a claim the customer cannot participate in the determination of the net equity in the account.

If the customer submits instructions pursuant to subsection (a) after the customer's commodity contracts are transferred to another commodity broker, the trustee must transmit the instruction to the transferee. If the customer's commodity contracts are not transferred before he customer's instructions are received, the trustee must attempt to comply with the instruction, subject to the provisions of section 767(d).

Under subsection (d), the trustee has discretion to liquidate any commodity contract carried by the debtor at any time. This discretion must be exercised with restraint in such cases, consistent with the purposes of this subchapter and good business practices. The com-

mittee intends that hedged accounts will be given special consideration before liquidation as discussed in connection with subsection (c).

Subsection (e) instructs the trustee as to the disposition of any security or other property, not disposed of pursuant to subsection (b) or (d), that is specifically identifiable to a customer and to which the customer is entitled. Such security or other property must be returned to the customer or promptly transferred to another commodity broker for the benefit of the customer. If the value of the security or other property retained or transferred, together with any other distribution made by the trustee to or on behalf of the customer, exceeds the customer's distribution share the customer must deposit cash with the trustee equal to that difference before the return or transfer of the security or other property.

Subsection (f) requires the trustee to answer margin calls on specifically identifiable customer commodity contracts, but only to the extent that the margin payment, together with any other distribution made by the trustee to or on behalf of the customer, does not exceed the customer's distribution share.

Subsection (g) requires the trustee to liquidate all commodity futures contracts prior to the close of trading in that contract, or the first day on which notice of intent to deliver on that contract may be tendered, whichever occurs first. If the customer desires that the contract be kept open for delivery, the contract should be transferred to another commodity broker pursuant to subsection (b).

If for some reason the trustee is unable to transfer a contract on which delivery must be made or accepted and is unable to close out such contract, the trustee is authorized to operate the business of the debtor for the purpose of accepting or making tender of notice of intent to deliver the physical commodity underlying the contract, facilitating delivery of the physical commodity, or disposing of the physical commodity in the event of a default. Any property received, not previously held, by the trustee in connection with its operation of the business of the debtor for these purposes, is not by the terms of this subchapter specifically included in the definition of customer property.

Finally, subsection (h) requires the trustee to liquidate the debtor's estate as soon as practicable and consistent with good market practice, except for specifically identifiable securities or other property distributable under subsection (e).

*Section 768. Estimate of distribution share*

Section 768 is an integral part of the commodity broker liquidation procedures outlined in section 767. Prompt action by the trustee to transfer or liquidate customer commodity contracts is necessary to protect customers, the debtor's estate, and the marketplace generally. However, transfers of customer accounts and property valued in excess of the customer's distribution share are prohibited. Since a determination of the customer's distribution share requires a determination of the customer's net equity and the total dollar value of customer property held by or for the account of the debtor, it is possible that the customer's distribution share will not be determined, and thus the customer's contracts and property will not be transferred, on a

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

464 of 979

## DOCUMENT 52

timely basis. To avoid this problem, and to expedite transfers of customer property, section 768 permits the trustee to make distributions to customers in accordance with a preliminary estimate of the debtor's customer property and each customer's distribution share.

It is acknowledged that the necessity for prompt action may not allow the trustee to assemble all relevant facts before such an estimate is made. However, the trustee is expected to develop as accurate an estimate as possible based on the available facts. Further, in order to permit expeditious action, section 768 does not require that notice be given to customers or other creditors before the court approves or disapproves the estimate. Nor does section 768 require that customer claims be received pursuant to section 767(a) before the trustee may act upon and in accordance with the estimate. If the estimate is inaccurate, the trustee is absolved of liability for a distribution which exceeds the customer's actual distribution share so long as the distribution did not exceed the customer's estimated distribution share. However, a trustee may have a claim back against a customer who received more than its actual distribution share.

*Section 769. Proceeds from sale of membership*

Section 769 codifies the holding in *Board of Trade* v. *Johnson*,[25] by validating the bylaws, rules, or regulations of a contract market or clearing organization regarding the application of the proceeds derived from the sale of the debtor's membership in the contract market or clearing organization.

*Section 770. Contractual rights to liquidate or transfer*

This section is designed to preclude any court from issuing any order preventing, staying, or otherwise prohibiting the exercise by a commodity broker of a contractual right to liquidate or transfer a commodity contract. The committee is particularly concerned that clearing organizations not be restricted in their power to close out undermargined accounts.

*Section 902. Definitions*

There are six definitions for use in chapter 9. Paragraph (1) defines what claims are included in a chapter 9 case and adopts the definition now found in section 81(1). All claims against the petitioner generally will be included, with one significant exception. Municipalities are authorized, under section 103(c) of the Internal Revenue Code of 1954, as amended, to issue tax-exempt industrial development revenue bonds to provide for the financing of certain projects for privately owned companies. The bonds are sold on the basis of the credit of the company on whose behalf they are issued, and the principal, interest, and premium, if any, are payable solely from payments made by the company to the trustee under the bond indenture and do not constitute claims on the tax revenues or other funds of the issuing municipalities. The municipality merely acts as the vehicle to enable the bonds to be issued on a tax-exempt basis. Claims that arise by virtue of these bonds are not among the claims defined by this paragraph and amounts owed by private companies to the holders of industrial development revenue bonds are not to be included among the assets of the municipality

[25] 264 U.S. 1 (1924).

110

that would be affected by the plan. See Cong. Record, 94th Cong., 1st Sess. H.R. 12073 (statement by Mr. Don Edwards, floor manager of the bill in the House). Paragraph (2) defines the court which means the federal district court or federal district judge before which the case is pending. Paragraph (3) specifies that when the term "property of the estate" is used in a section in another chapter made applicable in chapter 9 cases, the term means "property of the debtor". Paragraphs (4) and (5) adopt the definition of "special taxpayer affected by the plan" that appears in current sections 81(10) and 81(11) of the Bankruptcy Act. Paragraph (6) provides that "trustee" means "debtor" when used in conjunction with chapter 9.

### Section 903. Reservation of State power to control municipalities

Section 903 is derived, with stylistic changes, from section 83 of current Chapter IX. It sets forth the primary authority of a State, through its constitution, laws, and other powers, over its municipalities. The proviso in section 83, prohibiting State composition procedures for municipalities, is retained. Deletion of the provision would "permit all States to enact their own versions of Chapter IX", *Municipal Insolvency*, 50 Am. Bankr. L.J. 55, 65, which would frustrate the constitutional mandate of uniform bankruptcy laws. *Constitution of the United States*. Art. I, Sec. 8.

This section provides that the municipality can consent to the court's orders in regard to use of its income or property. It is contemplated that such consent will be required by the court for the issuance of certificates of indebtedness under section 364(c) Such consent could extend to enforcement of the conditions attached to the certificates or the municipal services to be provided during the proceedings.

### Section 904. Limitations of jurisdiction and powers of court

This section adopts the policy of section 82(c) of current law. The only change in this section from section 82(c) is to conform the section to the style and cross-references of S. 2266.

### Section 905. Designation of judge

Section 905 adopts the procedures for selection of the judge for the chapter 9 case as found in current section 82(d). It is expected that the large chapter 9 case might take up almost all the judicial time of the presiding judge and involve very complex legal questions. Selection should not be left to chance or the luck of the draw. This provision will insure that calendar demands and levels of experience can be considered in the selection of the judge in a Chapter 9 case.

### Section 906. Eligibility for relief

Section 906 adopts the current law of section 84 of the Bankruptcy Act. It requires general authorization by the State legislature, or by a governmental officer (which includes the chief executive) or governmental organization (such as a municipal finance commission), empowered by State law to authorize filing.

Absent such a requirement for affirmative action by the state, a serious constitutional question would be raised in connection with the 10th amendment. See *New Power of the Chapter IX Bankruptcy Court to Authorize the Issuance of Certificates of Indebtedness: Con-*

SASMF EXHIBIT 25

466 of 979

*gressional Relief or Congressional Overreaching*, 51 Am. Bankr. L.J.1. (   ).

An additional eligibility requirement is contained in this section. It requires that the petitioner meet one of four conditions before it may seek relief under the chapter. The purpose of the provision is to limit accessibility to the bankruptcy court somewhat, as does current law, without making the accessibility requirement so stringent as to preclude relief in a situation in which the petitioner is confronted with stubborn or aggressive creditors or creditors whose identities are unknown because of the existence of a large number of bonds in bearer form.

## Section 924. List of creditors

This section adopts the provision presently contained in section 85 (b) of Chapter IX. A list of creditors, as complete and accurate as practicable, must be filed with the court.

## Section 925. Venue and fees

This section adopts current section 85(c). If a debtor is located in more than one judicial district, it may select as its filing place either of the districts in which it is located.

## Section 926. Effect of list of claims

Section 926 follows the policy contained in section 88(a) of the present Act, though certain details are left to the Rules. The language of section 926 is the same as that of proposed 11 U.S.C. 1111, which applies in chapter 11 cases. The list of creditors filed under section 924 is given weight as prima facie evidence of the claims listed (except claims that are listed as disputed, contingent, or unliquidated), which are deemed filed under section 501, obviating the need for listed creditors to file proofs of claim.

## Section 927. Dismissal

Section 927 conforms to section 98 of current law. The Section permits dismissal by the court for unreasonable delay by the debtor, failure to propose a plan, failure of acceptance of a plan, or default by the debtor under a conformed plan. Mandatory dismissal is required if confirmation is refused.

## Section 928. Avoiding powers

This section adopts current section 85(h) which provides for a trustee to be appointed for the purpose of pursuing an action under an avoiding power, if the debtor refuses to do so. This section is necessary because a municipality might, by reason of political pressure or desire for future good relations with a particular creditor or class of creditors, make payments to such creditors in the days preceding the petition to the detriment of all other creditors. No change in the elected officials of such a city would automatically occur upon filing of the petition, and it might be very awkward for those same officials to turn around and demand the return of the payments following the filing of the petition. Hence, the need for a trustee for such purpose.

The general avoiding powers are incorporated by reference in section 901 and are broader than under current law. Preferences, fraudulent conveyances, and other kinds of transfers will thus be voidable.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

114

467 of 979

112

Incorporated by reference also is the power to accept or reject executory contracts and leases (section 365). Within the definition of executory contracts are collective bargaining agreements between the city and its employees. Such contracts may be rejected despite contrary State laws. Courts should readily allow the rejection of such contracts where there are burdensome, the rejection will aid in the municipality's reorganization and in consideration of the equities of each case. On the last point, "[e]quities in favor of the city in chapter 9 will be far more compelling than the equities in favor of the employer in chapter 11. Onerous employment obligations may prevent a city from balancing its budget for some time. The prospect of an unbalanced budget may preclude judicial confirmation of the plan. Unless a city can reject its labor contracts, lack of funds may force cutbacks in police, fire, sanitation, and welfare services, imposing hardships on many citizens. In addition, because cities in the past have often seemed immune to the constraint of "profitability" faced by private businesses, their wage contracts may be relatively more onerous than those in the private sector." *Executory Contracts and Municipal Bankruptcy*, 85 Yale L.J. 957, 965 (1976) (footnote omitted). Rejection of the contracts may require the municipalities to renegotiate such contracts by state collective bargaining laws. It is intended that the power to reject collective bargaining agreements will pre-empt state termination provisions, but not state collective bargaining laws. Thus, a city would not be required to maintain existing employment terms during the renegotiation period.

*Section 929. Reference*

Section 929 adopts current law as found in section 87(a) and allows reference to be made by the Federal district judge handling the case to a bankruptcy judge for consideration of a special issue of fact. Such reference shall be the exception and not the rule.

*Section 930. Priorities*

Section 930 adopts section 89 of current law. The priorities are those traditional to municipal arrangements. The second priority is necessary to insure that the suppliers of the municipality will continue to provide needed supplies prior to the filing of a petition under chapter 9. Without such a priority, because of the notoriety that will probably accompany the pre-petition negotiations and the decision to file, suppliers would cut off deliveries on credit, and the city would be unduly rushed to the courthouse door.

*Section 941. Filing of plan*

Section 941 gives the debtor the exclusive right to propose a plan, and directs that the debtor propose one either with the petition or within such time as the court directs. The section follows section 90(a) of current law.

*Section 942. Transmission of Plan*

Section 942 adopts current section 90(b) and provides that the plan, or a summary thereof, will be transmitted by the petitioner or such other person as the court directs, to each creditor whose claim is affected by the plan, to each special taxpayer affected by the plan and to any party in interest that the court designates.

**Ad Hoc Equity Group Exhibit 9**   **SASMF EXHIBIT 25**

468 of 979

DOCUMENT 52

113

*Section 943. Modification of plan*

Section 942 permits the debtor to modify the plan at any time before confirmation, as does section 90(a) of current law.

*Section 944. Provisions of plan*

Section 944 adopts current section 91, which provides that a plan may modify or alter the rights of all creditors, including those secured or unsecured. The concept of a "secured" creditor has a different meaning in chapter 9 since in most jurisdictions, municipalities are prohibited from giving traditional types of secured interests such as real estate mortgages, because of the public nature of property of the municipality. Secured creditors will be more likely secured because of the pledge of a particular stream of the city revenues. These persons are so-called revenue bondholders in contrast to general obligation bondholders, who will be treated as unsecured creditors.

*Section 945. Acceptance*

Section 945 is adopted from current section 92. Generally, at least two-thirds by amounts and one-half by number of the creditors voting on the plan and affected by the plan must accept for confirmation.

*Section 946. Confirmation*

Section 946 is adopted from current section 94. The test for confirmation is whether or not the plan is fair and equitable and feasible. The fair and equitable test tracts current chapter X and is known as the strict priority rule. Creditors must be provided, under the plan, the going concern value of their claims. The going concern value contemplates a "comparison of revenues and expenditures taking into account the taxing power and the extent to which tax increases are both necessary and feasible" *Municipal Insolvency, supra,* at p. 64, and is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation.

*Section 947. Effect of confirmation*

Subsection (a) makes the provisions of a confirmed plan binding on the debtor and creditors. It is derived from section 95(a) of chapter 9.

Subsections (b) and (c) provide for the discharge of a municipality. The discharge is essentially the same as that granted under section 95(b) of the Bankruptcy Act.

*Section 948. Continuing jurisdiction*

Section 948 permits the court to retain jurisdiction over the case to ensure successful execution of the plan. The provision is the same as that found in section 96(e) of Chapter 9 of the present Act.

*Section 949. Effect of exchange of securities before the date of filing of the petition*

This section, which follows section 97 of current law, permits an exchange of a security before the case is filed to constitute an acceptance of the plan if the exchange was under a proposal that later becomes the plan.

*Section 950. Unconstitutionality, revival*

This section ensures the existence of a municipal debt adjustment chapter of Chapter 9 is found unconstitutional.

114

*Section 1101. Definitions*

This section contains definitions of three terms that are used in chapter 11. Paragraph (1) defines debtor in possession to mean the debtor, except when a trustee who has qualified is serving in the case.

Paragraph (2), derived from section 229a of current law, defines substantial consummation. Substantial consummation of a plan occurs when transfer of all or substantially all of the property proposed by the plan to be transferred is actually transferred; when the debtor (or its successor) has assumed the business of the debtor or the management of all or substantially all of the property dealt with by the plan; and when distribution under the plan has commenced.

Paragraph (3) defines for purposes of Chapter 11 a public company to mean "a debtor who, within 12 months prior to the filing of a petition for relief under this chapter, had outstanding liabilities of $5 million or more, exclusive of liabilities for goods, services, or taxes and not less than 1,000 security holders." There are, as noted, special safeguards for public investors related to the reorganization of a public company, as so defined.

Both requirements must be met: liabilities, excluding tax obligations and trade liabilities, must be $5 million or more; and (2) the number of holders of securities, debt or equity, or both, must be not less than 1,000. The amount and number are to be determined as of any time within 12 months prior to the filing of the petition for reorganization.

*Section 1102. Creditors' and equity security holders' committees*

This section provides for the election and appointment of committees. Subsection (c) provides that this section does not apply in case of a public company, as to which a trustee, appointed under section 1104(a) will have responsibility to administer the estate and to formulate a plan as provided in section 1106(a).

There is no need for the election or appointment of committees for which the appointment of a trustee is mandatory. In the case of a public company there are likely to be several committees, each representing a different class of security holders and seeking authority to retain accountants, lawyers, and other experts, who will expect to be paid. If in the case of a public company creditors or stockholders wish to organize committees, they may do so, as authorized under section 1109(a). Compensation and reimbursement will be allowed for contributions to the reorganization pursuant to section 503(b) (3) and (4).

*Section 1103. Powers and duties of committees*

This section defines the powers and duties of a committee elected or appointed under section 1102.

Under subsection (a) the committee may, if authorized by the court, employ one or more attorneys, accountants, or other agents to represent or perform services for the committee. Normally one attorney should suffice; more than one may be authorized for good cause. The same considerations apply to the services of others, if the need for any at all is demonstrated.

SASMF EXHIBIT 25
470 of 979

DOCUMENT 52

115

Under subsections (c) and (d) the committee, like any party in interest, may confer with the trustee or debtor regarding the administration of the estate; may advise the court on the need for a trustee under section 1104(b). The committee may investigate matters specified in paragraph (2) of subsection (c), but only if authorized by the court and if no trustee or examiner is appointed.

### Section 1104. Appointment of trustee or examiner

Subsection (a) provides for the mandatory appointment of a disinterested trustee in the case of a public company, as defined in section 1101(3), within 10 days of the order for relief, or of a successor, in the event of a vacancy, as soon as practicable.

Section 156 of chapter X (11 U.S.C. 516) requires the appointment of a disinterested trustee if the debtor's liabilities are $250,000 or over. Section 1104(a) marks a substantial change. The appointment of a trustee is mandatory only for a public company, which under section 1101(3), has $5 million in liabilities, excluding tax and trade obligations, and 1,000 security holders. In view of past experience, cases involving public companies will under normal circumstances probably be relatively few in number but of vast importance in terms of public investor interest.

In case of a nonpublic company, the appointment or election of a trustee is discretionary if the interests of the estate and its security holders would be served thereby. A test based on probable costs and benefits of a trusteeship is not practical. The appointment may be made at any time prior to confirmation of the plan.

In case of a nonpublic company, if no trustee is appointed, the court may under subsection (c) appoint an examiner, if the appointment would serve the interests of the estate and security holders. The purpose of his appointment is specified in section 1106(b).

### Section 1105. Termination of trustee's appointment

This section authorizes the court to terminate the trustee's appointment and to restore the debtor to possession and management of the property of the estate and to operation of the debtor's business. Section 1104(a) provides that this section does not apply in the case of a public company, for which the appointment of a trustee is mandatory.

### Section 1106. Duties of trustee and examiner

Subsection (a) of this section prescribes the trustee's duties. He is required to perform the duties of a trustee in a liquidation case specified in section 704(2), (4), (6), (7), (8), and (9). These include reporting and informational duties, and accountability for all property received. Paragraph (2) of this subsection requires the trustee to file with the court, if the debtor has not done so, the list of creditors, schedule of assets and liabilities, and statement of affairs required under section 521(1).

Paragraph (3) of S. 1106 requires the trustee to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of the business, and any other matter relevant to the case or to the formulation of a plan. Paragraph (4) requires the trustee to report

Ad Hoc Equity Group Exhibit 9 SASMF EXHIBIT 25

118                                                    471 of 979

the results of his investigation to the court and to creditors' committees, equity security holders' committees, indenture trustees and any other entity the court designates.

Paragraph (5) requires the trustee to file a plan or to report why a plan cannot be formulated, or to recommend conversion to liquidation or to an individual repayment plan case, or dismissal. It is anticipated that the trustee will consult with creditors and other parties in interest in the formulation of a plan, just as the debtor in possession would.

Paragraph (6) requires final reports by the trustee, as the court orders.

Subsection (b) gives the trustee's investigative duties to an examiner, if one is appointed. The court is authorized to give the examiner additional duties as the circumstances warrant.

Paragraphs (3), (4), and (5) of subsection (a) are derived from sections 165 and 169 of chapter X (11 U.S.C. 565, 569).

*Section 1107. Rights, powers, and duties of debtor in possession*

This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes cf. *Wolf v. Weinstein,* 372 U.S. 633, 649–650 (1963).

*Section 1108. Authorization to operate business*

This section permits the debtor's business to continue to be operated, unless the court orders otherwise. Thus, in a reorganization case, operation of the business will be the rule, and it will not be necessary to go to the court to obtain an order authorizing operation.

*Section 1109. Right to be heard*

Subsection (a) provides, in unqualified terms, that any creditor, equity security holder, or an indenture trustee shall have the right to be heard as a party in interest under this chapter in person, by an attorney, or by a committee. It is derived from section 206 of chapter X (11 U.S.C. 606).

Subsection (b) provides that the Securities and Exchange Commission may appear by filing an appearance in a case of a public company and may appear in other cases if authorized or requested by the court. As a party in interest in either case, the Commission may raise and be heard on any issue. The Commission may not appeal from a judgment, order, or decree in a case, but may participate in any appeal by any other party in interest. This is the present law under section 208 of chapter X (11 U.S.C. 608).

*Section 1110. Aircraft equipment and vessels*

This section, to a large degree, preserves the protection given lessors and conditional vendors of aircraft to a certificated air carrier or of vessels to a certificated water carrier under section 116(5) and 116(6) of present Chapter X. It is modified to conform with the consolidation of Chapters X and XI and with the new chapter 11 generally. It is also modified to give the trustee in a reorganization case an oppor-

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25
472 of 979

DOCUMENT 52

117

tunity to continue in possession of the equipment in question by curing defaults and by making the required lease or purchase payments. This removes the absolute veto power over a reorganization that lessors and conditional vendors have under present law, while entitling them to protection of their investment.

The section overrides the automatic stay or any power of the court to enjoin taking of possession of certain leased, conditionally sold, or liened equipment, unless, the trustee agrees to perform the debtor's obligations and cures all prior defaults (other than defaults under ipso facto or bankruptcy clauses) within 60 days after the order for relief. The trustee and the equipment financer are permitted to extend the 60-day period by agreement. During the first 60 days, the automatic stay will apply to prevent foreclosure unless the creditor gets relief from the stay.

The effect of this section will be the same if the debtor has granted the security interest to the financer or if the debtor is leasing equipment from a financer that has leveraged the lease and leased the equipment subject to a security interest of a third party.

*Section 1111. Effect of schedule of claims and interests*

This section dispenses with the need for every creditor and equity security holder to file a proof of claim or interest in a reorganization case. Usually the debtor's schedules are accurate enough that they will suffice to determine the claims or interests allowable in the case. Thus, the section specifies that any claim or interest included on the debtor's schedules is deemed filed under section 501. This does not apply to claims or interests that are scheduled as disputed, contingent, or unliquidated.

*Section 1112. Conversion or dismissal*

This section brings together all of the conversion and dismissal rules for chapter 11 cases. Subsection (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case.

Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case *sua sponte* or upon motion of a party in interest, or the court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate, but only for cause. Cause may include the continuing loss to or diminution of the estate of an insolvent debtor, the absence of a reasonable likelihood of rehabilitation, the inability to effectuate a plan, unreasonable delay by the debtor that is prejudicial to creditors, failure to file a plan within the appropriate time limits, denial of confirmation and any opportunity to modify or propose a new plan, revocation of confirmation and denial of confirmation of a modified plan, inability to effectuate substantial consummation of a confirmed plan, material default by the debtor under the plan, and termination of the plan by reason of the occurrence of a condition specified in the plan. This list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases. The power of the court to act *sua sponte* should be used sparingly and only in emergency situations.

Ad Hoc Equity Group Exhibit 9   SASMF EXHIBIT 25

120                                    473 of 979

118

Subsection (c) prohibits the court from converting a case concerning a farmer or an eleemosynary institution to a liquidation case unless the debtor consents.

Subsection (d) prohibits conversion of a reorganization case to a chapter 13 case unless the debtor requests conversion and his discharge has not been granted or has been revoked.

Subsection (e) reinforces section 109 by prohibiting conversion of a chapter 11 case to a case under another chapter proceedings under which the debtor is not permitted to proceed.

SUBCHAPTER II—THE PLAN

### Section 1121. Who may propose a plan

Subsection (a) permits the debtor to file a reorganization plan with a petition commencing a voluntary case or at any time during a voluntary or involuntary case.

Subsection (b) gives the debtor the exclusive right to file a plan during the first 120 days of the case. There are exceptions, however, enumerated in subsection (c). If a trustee has been appointed, if the debtor does not meet the 120-day deadline, or if the debtor fails to obtain the required consent within 180 days after the filing of the petition, any party in interest may propose a plan. This includes the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, and an indenture trustee. The list is not exhaustive. In the case of a public company, a trustee is appointed within 10 days of the petition. In such a case, for all practical purposes, any party in interest may file a plan.

Subsection (d) permits the court, for cause, to increase or reduce the 120-day and 180-day periods specified. Since, the debtor has an exclusive privilege for 6 months during which others may not file a plan, the granted extension should be based on a showing of some promise of probable success. An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.

### Section 1122. Classification of claims and equity securities

This section codifies current case law surrounding the classification of claims [26] and equity securities. It requires classification based on the nature of the claims or interests classified, and permits inclusion of claims or interests in a particular class only if the claim or interest being included is substantially similar to the other claims or interests of the class.

Subsection (b), also a codification of existing practice, contains an exception. The plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

### Section 1123. Contents of plan

Subsection (a) specifies what a plan of reorganization must contain. The plan must designate classes of claims and interests, and specify,

---

[26] Payment in cash of small claims in full is common practice in reorganization. *Brockett* v. *Winkle Terra Cotta Co.*, 81 F. 2d 949, 952 (C.A. 8, 1936) ; *In re New Rochelle Coal & Lumber Co.*, 77 F. 2d 881, 882–83 (C.A. 2, 1935) ; *In re Realty Associates Security Corp.*, 53 F. Supp. 1010, 1011 (E.D.N.Y., 1943).

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

474 of 979

by class, the claims or interests that are unimpaired under the plan. Priority claims are not required to be classified because they may not have arisen when the plan is filed. The plan must provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a different, but not better, treatment of his claim or interest.

Paragraph (3) applies to claims, not creditors. Thus, if a creditor is undersecured, and thus has a secured claim and an unsecured claim, this paragraph will be applied independently to each of his claims.

Paragraph (4) of subsection (a) is derived from section 216 of chapter X with some modifications. It requires the plan to provide adequate means for the plans execution. These means may include retention by the debtor of all or any part of the property of the estate, transfer of all or any part of the property of the estate to one or more entities, whether organized pre- or postconfirmation, merger or consolidation of the debtor with one or more persons, sale and distribution of all or any part of the property of the estate, satisfaction or modification of any lien, cancellation or modification of any indenture or similar instrument, curing or waiving of any default, extension of maturity dates or change in interest rates of securities, amendment of the debtor's charter, and issuance of securities.

Subparagraph (C), as it applies in railroad cases, has the effect of overruling *St. Joe Paper Co.* v. *Atlantic Coast Line R.R.*, 347 U.S. 298 (1954). It will allow the trustee or creditors to propose a plan of merger with another railroad without the consent of the debtor, and the debtor will be bound under proposed 11 U.S.C. 1141(a). *See Hearings*, pt. 3, at 1616. "Similar instrument" referred to in subparagraph (F) might include a deposit with an agent for distribution, other than an indenture trustee, such as an agent under an agreement in a railroad conditional sale or lease financing agreement.

Paragraphs (5) and (6) and subsection (b) are derived substantially from Section 216 of Chapter X (11 U.S.C. 616). Paragraph (5) requires the plan to prohibit the issuance of nonvoting equity securities, and to provide for an appropriate distribution of voting power among the various classes of equity securities. Paragraph (6) requires that the plan contain only provisions that are consistent with the interests of creditors and equity security holders, and with public policy with respect to the selection of officers, directors, and trustees, and their successors.

Subsection (b) specifies the matters that the plan may propose. The plan may impair or leave unimpaired any claim or interest. The plan may provide for the assumption or rejection of executory contracts or unexpired leases not previously rejected under section 365. The plan may also provide for the treatment of claims by the debtor against other entities that are not settled before the confirmation of the plan. The plan may propose settlement or adjustment of any claim or equity security belonging to the estate, or may propose retention and enforcement of such claim or interest by the debtor or by an agent appointed for that purpose.

The plan may also propose the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of the sale among creditors and equity security holders. This would be a liquidating plan. The subsection permits the plan to include any other appro-

**Ad Hoc Equity Group Exhibit 9**   **SASMF EXHIBIT 25**

122   **475 of 979**

120

priate provision not inconsistent with the applicable provisions of the bankruptcy code.

Subsection (c) protects an individual debtor's exempt property by prohibiting its use, sale, or lease under a plan proposed by someone other than the debtor, unless the debtor consents.

*Section 1124. Impairment of claims or interests*

The basic concept underlying this section is not new. It rests essentially on Section 107 of Chapter X (11 U.S.C. 507), which states that creditors or stockholders or any class thereof "shall be deemed to be 'affected' by a plan only if their or its interest shall be materially and adversely affected thereby."

This section is designed to indicate when contractual rights of creditors or interest holders are not materially affected. It specifies three ways in which the plan may leave a claim or interest unimpaired.

First, the plan may propose not to alter the legal, equitable, or contractual rights to which the claim or interest entitled its holder.

Second, a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

Third, a claim or interest is unimpaired if the plan provides for their payment in cash. In the case of a debt liability, the cash payment is for the allowed amount of the claim, which does not include a redemption premium. If it is an equity security with a fixed liquidation preference, such as a preferred stock, the allowed amount is such liquidation preference, with no redemption premium. With respect to any other equity security, such as a common stock, cash payment must be equal to the "value of such holder's interest in the debtor."

Section 1124 does not include payment "in property" other than cash. Except for a rare case, claims or interests are not by their terms payable in property, but a plan may so provide and those affected thereby may accept or reject the proposed plan. They may not be forced to accept a plan declaring the holders' claims or interests to be "unimpaired."

*Section 1125. Postpetition disclosure and solicitation*

This section extends disclosure requirements in connection with solicitations to all cases under chapter 11. Heretofore this subject was dealt with by the Bankruptcy Act mainly in the special contexts of railroad reorganizations and chapter X cases.

Subsection (a) defines (1) the subject matter of disclosure as "adequate information" and relates the standard of adequacy to an (2) "investor typical of holders or claims or interests of the relevant class." "Investor" is used broadly here, for it will almost always in-

SASMF EXHIBIT 25

476 of 979

## DOCUMENT 52

121

clude a trade creditor or other creditors who orginally had no investment intent or interest. It refers to the investment-type decision by those called upon to accept a plan to modify their claims or interests, which typically will involve acceptance of new securities or of a cash payment in lieu thereof.

Both the kind and form of information are left essentially to the judicial discretion of the court, guided by the specification in subparagraph (a)(1) that it be of a kind and in sufficient detail that a reasonable and typical investor can make an informed judgment about the plan. The information required will necessarily be governed by the circumstances of the case.

Reporting and audit standards devised for solvent and continuing businesses do not necessarily fit a debtor in reorganization. Subsection (a)(1) expressly incorporates consideration of the nature and history of the debtor and the condition of its books and records into the determination of what is reasonably practicable to supply. These factors are particularly pertinent to historical data and to discontinued operations of no future relevance.

A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with an on factually supported expectations as to the future course of the business sufficient to meet the feasibility standard in section 1130(a)(11) of ths title. It may thus be necesasry to provide estimates or judgments for that purpose. Yet it remains practicable to describe, in such detail as may be relevant and needed, the basis for the plan and the data on which supporters of the plan rely.

Subsection (b) establishes the jurisdiction of the court over this subject by prohibiting solicitation of acceptance or rejection of a plan after the commencement of the case, unless the person solicited receives, before or at the time of the solicitation, a written disclosure statement approved by the court, after notice and hearing, as containing adequate information. As under present law, determinations of value, by appraisal or otherwise, are not required if not needed to accomplish the purpose specified in subsection (a)(1).

Subsection (c) requires that the same disclosure statement be transmitted to each member of a class. It recognizes that the information needed for an informed judgment about the plan may differ among classes. A class whose rights under the plan center on a particular fund or asset would have no use for an extensive description of other matters that could not affect them.

Subsection (d) relieves the court of the need to follow any otherwise applicable Federal or state law in determining the adequacy of the information contained in the disclosure statement submitted for its approval. It authorizes an agency or official, Federal or state, charged with administering cognate laws so preempted to advise the court on the adequacy of proposed disclosure statement. But they are not authorized to appeal the court's decision.

Solicitations with respect to a plan do not involve just mere requests for opinions. Acceptance of the plan vitally affects creditors and shareholders, and most frequently the solicitation involves an offering of securities in exchange for claims or interests. The present bank-

122

ruptcy statute has exempted such offerings under each of its chapters from the registration and disclosure requirements of the Securities Act of 1933. an exemption also continued by section 1145(a)(2) of this title. The extension of the disclosure requirements to all chapter 11 cases justifies the cordinate extension of these exemptions. By the same token, no valid purpose is served not to exempt from the requirements of similar state laws in a matter under the exclusive jurisdiction of the Federal bankruptcy laws.

Subsection (e) exonerates any person who, in good faith and in compliance with this title, solicits or participates in the offer, issuance, sale or purchase, under the plan, of a security from any liability, on account of such solicitation or participation, for violation of any law, rule, or regulation governing the offer, issuance, sale, or purchase of securities. This exoneration is coordinate with the exemption from Federal or State registration or licensing requirements provided by section 1145 of this title.

In the nonpublic case, the court, when approving the disclosure statement, has before it the texts of the plan, a proposed disclosure document, and such other information the plan proponents and other interested parties may present at the hearing. In the final analysis the exoneration which subsection (e) grants must depend on the good faith of the plan proponents and of those who participate in the preparation of the disclosure statement and in the solicitation. Subsection (e) does not affect civil or criminal liability for defects and inadequacies that are beyond the limits of the exoneration that good faith provides.

Section 1125 applies to public companies as well. subject to the qualifications of subsection (f). In case of a public company no solicitations of acceptance is permitted unless authorized by the court upon or after approval of the plan pursuant to section 1128(c). In addition to the documents specified in subsection (b). subsection (f) requires transmission of the opinion and order of the court approving the plan and, if filed, the advisory report of the Securities and Exchange Commission or a summary thereof prepared by the Commission.

*Section 1126. Acceptance of plan*

Subsection (a) of this section permits the holder of a claim or interest allowed under section 502 to accept or reject a proposed plan of reorganization. The subsection also incorporates a provision now found in section 199 of chapter X that authorizes the Secretary of the Treasury to accept or reject a plan on behalf of the United States when the United States is a creditor or equity security holder.

Subsection (b) governs acceptances and rejections of plans obtained before commencement of a reorganization for a nonpublic company. Paragraph (3) expressly states that subsection (b) does not apply to a public company.

Prepetition solicitation is a common practice under chapter XI today, and chapter IX current makes explicit provision for it. Section 1126(b) counts a prepetition acceptance or rejection toward the required amounts and number of acceptances only if the solicitation of the acceptance or rejection was in compliance with any applicable

SASMF EXHIBIT 25
478 of 979

DOCUMENT 52

123

nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation. If there is not any such applicable law, rule, or regulation, then the acceptance or rejection is counted only if it was solicited after disclosure of adequate information, to the holder, as defined in section 1125(a)(1). This permits the court to ensure that the requirements of section 1125 are not avoided by prepetition solicitation.

Subsection (c) specifies the required amount and number of acceptances for a class of creditors. A class of creditors has accepted a plan if at least two-thirds in amount and more than one-half in number of the allowed claims of the class that are voted are cast in favor of the plan. The amount and number are computed on the basis of claims actually voted for or against the plan, not as under chapter X on the basis of the allowed claims in the class. Subsection (f) excludes from all these calculations claims not voted in good faith, and claims procured or solicited not in good faith or not in accordance with the provisions of this title.

Subsection (c) requires that the same disclosure statement be transmitted to each member of a class. It recognizes that the information needed for an informed judgment about the plan may differ among classes. A class whose rights under the plan center on a particular fund or asset would have no use for an extensive description of other matters that could not affect them.

Subsection (d) relieves the court of the need to follow any otherwise applicable Federal or state law in determining the adequacy of the information contained in the disclosure statement submitted for its approval. It authorizes an agency or official, Federal or state, charged with administering cognate laws so pre-empted to advise the court on the adequacy of proposed disclosure statement. But they are not authorized to appeal the court's decision.

Solicitations with respect to a plan do not involve just mere requests for opinions. Acceptance of the plan vitally affects creditors and shareholders, and most frequently the solicitation involves an offering of securities in exchange for claims or interests. The present Bankruptcy Act has exempted such offerings under each of its chapters from the registration and disclosure requirements of the Securities Act of 1933, an exemption also continued by section 1145 of this title. The extension of the disclosure requirements to all chapter 11 cases is justified by the integration of the separate chapters into the single chapter 11. By the same token, no valid purpose is served by failing to provide exemption from the requirements of similar state laws in a matter under the exclusive jurisdiction of the Federal bankruptcy laws.

Under subsection (d), with respect to a class of equity securities, it is sufficient for acceptance of the plan if the amount of securities voting for the plan is at least two-thirds of the total actually voted.

Subsection (e) provides that no acceptances are required from any class whose claims or interests are unimpaired under the plan or in the order confirming the plan.

Subsection (g) provides that any class denied participation under the plan is conclusively deemed to have rejected the plan. There is obviously no need to submit a plan for a vote by a class that is to re-

SASMF EXHIBIT 25
479 of 979

ceive nothing. But under subsection (g) the excluded class is like a class that has not accepted, and is a dissenting class for purposes of confirmation under section 1130.

### Section 1127. Modification of plan

Under subsection (a) the proponent may file a proposal to modify a plan prior to confirmation. In the case of a public company the modifying proposal may be filed prior to approval.

Subsection (b) provides that a party in interest eligible to file a plan may file instead of a plan a proposal to modify a plan filed by another. Under subsection (c) a party in interest objecting to some feature of a plan may submit a proposal to modify the plan to meet the objection.

After a plan has been confirmed, but before its substantial consummation, a plan may be modified by leave of court, which subsection (d) provides shall be granted for good cause. Subsection (e) provides that a proposal to modify a plan is subject to the disclosure requirements of section 1125 and as provided in subsection (f). It provides that a creditor or stockholder who voted for or against a plan is deemed to have accepted or rejected the modifying proposal. But if the modification materially and adversely affects any of their interests, they must be afforded an opportunity to change their vote in accordance with the disclosure and solicitation requirements of section 1125.

Under subsection (g) a plan, if modified prior to confirmation, shall be confirmed if it meets the requirements of section 1130.

### Section 1128. Hearing and approval of plan for a public company

This section applies only to a public company. It continues, as to public companies, the requirement that the plan, which the court approves and later confirms, shall be "fair and equitable." First developed in equity receivership, this standard has been applied for the past 40 years under chapter X. A fair and equitable plan, developed under the direction of a disinterested trustee as the focal point in the reorganization, and an affirmative and active judicial role, throughout the hearing approval, and confirmation procedures to assure that the plan is fair and equitable, are vital safeguards for public investors. The alternative, a plan negotiated by management and committees likely to be dominated by senior and institutional creditors—essentially a composition would not serve the reorganization needs of a public company.

The procedure for hearing and approval, including the advisory function of the Securities and Exchange Commission with repect to the plan, are derived from chapter X. The hearing under subsection (a) shall be on the trustee's plan and any other plan that may be filed. If he files no plan of his own, the trustee may support or oppose such other plan in light of his duties specified in section 1106(a). The time for hearing is within the discretion of the court.

At the hearing, evidence may be produced regarding the assets and business which are the subject of the plan, and the fairness and feasibility of the plan, including the character and quality of the securities to be issued. Witnesses may be examined and cross-examined at the hearing. The duration of the hearing depends on the nature of the case and the matters and issues in dispute. The hearing provides a means of

establishing a firm factual foundation for the plan of reorganization; the exploration of divergent views in a forum open to all interests; and a judicial decision on the fairness of the plan to all affected thereby. It also ensures that the order authorizing solicitation of acceptances under section 1125 is based on an independent judicial evaluation of the relevant facts and on a searching inquiry into the merits of the plan approved by the court prior to the solicitation.

Subsection (b) requires that the court, prior to approval, refer any plan or plans worthy of consideration for an advisory report to the Securities and Exchange Commission. This provision is derived from section 172 of chapter X (11 U.S.C. 572). In chapter X the reference is mandatory if scheduled indebtedness exceeds $3 million. Under subsection (b) the reference is required only for a public company as defined in section 1101(3), under which total indebtedness must be $5 million or more, but exclusive of trade debt and tax liabilities, and security holders must be in number not less than 1,000. The SEC is required to report within a fixed time set by the court. It is expected that this time will be sufficiently brief so that the report requirement does not delay the confirmation of the plan.

Subsection (c) provides that after the SEC report is filed, upon the expiration of the time allowed, the SEC, or on receipt of information from the SEC that no report is filed, the court shall, after a hearing, approve a plan or plans that it finds fair and equitable and otherwise in compliance with the pertinent statutory provisions. This hearing is ordinarily in the nature of oral argument, with or without briefs. It affords all parties an opportunity to submit to the court their views in light of the evidence and the report of the Securities and Exchange Commission. However, the court is not precluded at this or another hearing from receiving additional evidence, as circumstances may require.

The hearings provided in subsections (a) and (c) avoid postponing to the hearing on confirmation the kind of complex issues to be expected in the case of public companies. After these hearings and with all controversial issues out of the way, the hearing on confirmation of a plan for a public company should be relatively uneventful, calling for a report on acceptances and dissenting classes, if any, and for considering unusual and anticipated developments.

Subsection (d) provides that for purposes of subsection (c) and section 1130 governing confirmation, a plan is not deemed to be not fair and equitable as to particular creditors or security holders who consent to a modification of their participation in favor of junior claims or interests.

Subsection (e) provides that the order of approval is not appealable. Under section 1129(b) any party in interest may object to confirmation of the plan and may appeal from the confirmation order. A right to one appeal is sufficient. An appeal from the order of approval as well could be a source of tactical obstruction.

*Section 1129. Confirmation hearing*

Subsection (a) requires that there be a hearing in every case on the confirmation of the plan. Notice is required.

Subsection (b) permits any party in interest to object to the confirmation of the plan. The Securities and Exchange Commission and

126

indenture trustees, as parties in interest under section 1109, may object to confirmation of the plan.

*Section 1130. Confirmation of plan*

Subsection (a) enumerates the requirement governing confirmation of a plan. The court is required to confirm a plan if and only if all of the requirements are met.

Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan.

Paragraph (2) requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.

Paragraph (3) requires that the plan have been proposed in good faith, and not by any means forbidden by law.

Paragraph (4) is derived from section 221 of chapter X. It requires that any payment made or promised by the proponent, the debtor, or person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, be disclosed to the court. In addition, any payment made before confirmation must have been reasonable, and any payment to be fixed after confirmation must be subject to the approval of the court as reasonable.

Paragraph (5) is also derived from section 221 of chapter X. It requires the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the reorganized debtor. The appointment to or continuance in one of these offices by the individual must be consistent with the interests of creditors and equity security holders and with public policy. The plan must also disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation to be paid to the insider.

Paragraph (6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation of the plan has approved any rate change provided for in the plan. As an alternative, the rate change may be conditioned on such approval.

Paragraph (7) provides that in the case of a public company the court shall confirm the plan if it finds the plan to be fair and equitable and the plan either (1) has been accepted by classes of claims or interests as provided in section 1126, or (2), if not so accepted, satisfies the requirements of subsection (b) of this section.

Paragraphs (8) and (9) apply only in nonpublic cases. Paragraph (8) does not apply the fair and equitable standards in two situations. The first occurs if there is unanimous consent of all affected holders of claims and interests. It is also sufficient for purposes of confirmation if each holder of a claim or interest receives or retains consideration of a value, as of the effective date of the plan, that is not less than each would have or receive if the debtor were liquidated under chapter 7 of this title. This standard adapts the test of "best interest of creditors" as interpreted by the courts under chapter XI. It is given broader application in chapter 11 of this title since a

# DOCUMENT 52

127

plan under chapter 11 may affect not only unsecured claims but secured claims and stock as well.

Under paragraph (9)(A), if a class of claims or interests has not accepted the plan, the court will confirm the plan if, for the dissenting class and any class of equal rank, the negotiated plan provides in value no less than under a plan that is fair and equitable. Such review and determination are not required for any other classes that accepted the plan.

Paragraph 9(A) would permit a senior creditor to adjust his participation for the benefit of stockholders. In such a case, junior creditors, who have not been satisfied in full, may not object if, absent the "give-up", they are receiving all that a fair and equitable plan would give them. To illustrate, suppose the estate is valued at $1.5 million and claims and stock are:

|  | Claims and stock (millions) | Equity (millions) |
|---|---|---|
| (1)  Senior debt | $1.2 | $1.2 |
| (2)  Junior debt | .5 | .3 |
| (3)  Stock | (¹) | .. |
| Total | 1.7 | 1.5 |

Under the plan, the senior creditor gives up $100,000 in value for the benefit of stockholders as follows:

|  | Millions |
|---|---|
| (1)  Senior debt | $1.1 |
| (2)  Junior debt | .3 |
| (3)  Stock | .1 |
| Total | 1.5 |

¹ No value.

If the junior creditors dissent, the court may nevertheless confirm the plan since under the fair and equitable standard they had an equity of only $300,000 and the allocation to equity security holders did not affect them.

Paragraph 9(A) provides a special alternative with respect to secured claims. A plan may be confirmed against a dissenting class of secured claims if the plan or order of confirmation provides for the realization of their security (1) by the retention of the property subject to such security; (2) by a sale of the property and transfer of the claim to the proceeds of sale if the secured creditors were permitted to bid at the sale and set off against the purchase price up to the allowed amount of their claims; or (3) by such other method that will assure them the realization of the indubitable equivalent of the allowed amount of their secured claims. The indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in *In Re Murel Holding Corp* 75 F.2d 941 (2nd Cir. 1935).

Paragraph (9)(B) provides that, if a class of claims or interests is excluded from participation under the plan, the court may nevertheless confirm the plan if it determines that no class on a parity with or junior to such participates under the plan. In the previous illustration, no confirmation would be permitted if the negotiated plan would grant a participation to stockholders but nothing for junior creditors.

**Ad Hoc Equity Group Exhibit 9**   SASMF EXHIBIT 25

483 of 979

128

As noted elsewhere, by reason of section 1126(g), an excluded class is a dissenting class under section 1130.

Paragraph (10) states that, to be confirmed, the plan must provide that each holder of a claim under section 507 will receive property, as therein noted, of a value equal to the allowed amount of the claim. There are two exceptions: (A) The holder thereof may agree to a different settlement in part or in whole; (B) where a debtor's business is reorganized under chapter 11, this provision requires that taxes entitles to priority (including administrative claims or taxes) must be paid in cash not later than 120 days after the plan is confirmed, unless the Secretary of the Treasury agrees to other terms or kinds of payment. The bill, as introduced, required full payment in cash within 60 days after the plan is confirmed.

Paragraph (11) requires a determination regarding feasibility of the plan. It is a slight elaboration of the law that has developed in the application of the word "feasible" in Chapter X of the present Act.

Paragraph (12) requires that at least one class must accept the plan, but any claims or interests held by insiders are not to be included for purposes of determining the number and amount of acceptances.

Subsection (b) provides that if, in the case of a public company, the plan meets the requirements of subsection (a) (except paragraphs (8) and (9) which do not apply to such a company), the court is to confirm the plan if the plan or the order of confirmation provides adequate protection for the realization of the value of the claims or interests of each class not accepting the plan. The intent is to incorporate inclusively, as a guide to the meaning of subsection (a) the provisions of section 216(7) (11 U.S.C. 616(7)) with respect to claims and section 216(8) (11 U.S.C. 616(8)) with respect to equity security interests.

Under subsection (c) the court may confirm only one plan, unless the order of confirmation has been revoked under section 1144. If the requirements for confirmation are met with respect to more than one plan, the court shall consider the preferences of creditors and stockholders in deciding which plan to confirm.

Subsection (d) provides that the bankruptcy court may not confirm a plan of reorganization if its principal purpose is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933 (15 U.S.C. 77e). This rule modifies a similar provision of present law (section 269 of the Bankruptcy Act).

*Section 1131. Real estate liens*

This section restricts the ability of a debtor in possession or trustee to modify or alter the rights of a creditor holding a claim or interest secured by a lien upon or security interest in property of the estate which is real estate, chattels real, leasehold estates in real property, or fixtures to the extent that such claim or interest was incurred for the purchase or improvement of such property. The section is designed to afford greater protection from the operation of the cram-down provisions to the more significant real estate financing interests by creating a "safe harbor" that will facilitate, rather than discourage, that type of financing, which will often by law or contract be on a nonrecourse basis. The precise determination of the extent to which a claim or interest was incurred for the purchase or improvement of realty is left

SASMF EXHIBIT 25

484 of 979

DOCUMENT 52

to the courts. There exists ample case law on the question in other areas of commercial and real property law.

Subsection (a) provides two means by which such claims or interests may be altered. First, where a default exists in payment of an installment claim or interest. reinstatement is permitted with defaulted payments of principal and interest to be amortized equally over the life of the reinstated loan at the same rate of interest. Second, and alternatively, repayment of the claim or interest may be extended on a reasonable, equitable, and practicable basis, so long as the value of the interest or claim as extended is the indubitable equivalent of the claim or interest if reinstated under the first alternative. A determination of indubitable equivalence of a debt instrument would in most circumstances be by reference to its present money value.

Subsection (b) specifies that claims or interests held by sellers of such property, by creditors who gave value to permit the acquisition of such property, and by direct or indirect successors in interest to the holders of such claims or interests are included within the coverage of the section.

Subsection (c) specifically excludes liens upon or security interests in the property of a farmer, as well as any claim or interest which is a consumer debt, from the section's coverage.

### SUBCHAPTER III—POSTCONFIRMATION MATTERS

*Section 1141. Effect of confirmation*

Subsection (a) of this section makes the provisions of a confirmed plan binding on the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of the creditor, equity security holder, or partner is impaired under the plan and whether or not he has accepted the plan. There are two exceptions, enumerated in paragraph (2) and (3) of subsection (d).

Unless the plan or the order confirming the plan provides otherwise, the confirmation of a plan vests all of the property of the estate in the debtor and releases it from all claims and interests of creditors, equity security holders and general partners.

Subsection (d) contains the discharge for a reorganized debtor. Paragraph (1) specifies that the confirmation of a plan discharges the debtor from any debt that arose before the date of the order for relief unless the plan or the order confirming the plan provides otherwise. The discharge is effective against those claims whether or not proof of the claim is filed (or deemed filed), and whether or not the claim is allowed. The discharge also terminates all rights and interests of equity security holders and general partners provided for by the plan. The paragraph permits the plan or the order confirming the plan to provide otherwise. and excepts certain debts from the discharge as provided in paragraphs (2) and (3).

Paragraph (2) of subsection (d) makes clear what taxes remain nondischargeable in the case of a corporate debtor emerging from a reorganization under chapter 11. Nondischargeable taxes in such a reorganization are the priority taxes (under section 507) and tax pay-

SASMF EXHIBIT 25

485 of 979

130

ments which come due during and after the proceeding under a deferred or part-payment agreement which the debtor had entered into with the tax authority before the bankruptcy proceedings began. On the other hand, a corporation which is taken over by its creditors through a plan of reorganization will not continue to be liable for nonpriority taxes arising from the corporation's prepetition fraud, failure to file a return, or failure to file a timely return, since the creditors who take over the reorganized company should not bear the burden of acts for which the creditors were not at fault.

Paragraph (3) specifies that the debtor is not discharged by the confirmation of a plan if the plan is a liquidating plan and if the debtor would be denied discharge in a liquidation case under section 727. Specifically, if all or substatially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, and if the debtor would be denied a discharge under section 727 (such as if the debtor were not an individual or if he had committed an act that would lead to a denial of discharge), the chapter 11 discharge is not granted.

Paragraph (4) authorizes the court to approve a waiver of discharge by the debtor.

### Section 1143. Distribution

Section 1143 fixes a 5-year limitation on presentment or surrender of securities or the performance of any other act that is a condition to participation in distribution under the plan. The 5 years runs from the date of the entry of the order of confirmation. Any entity that does not take the appropriate action with the 5-year period is barred from participation in the distribution under the plan.

### Section 1144. Revocation of an order of confirmation

If an order of confirmation was procured by fraud, then the court may revoke the order on request of a party in interest if the request is made before 180 days after the date of the entry of the order of confirmation. The order revoking the order of confirmation must revoke the discharge of the debtor, and contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation.

### Section 1145. Exemption from securities laws

This section, derived from similar provisions found in sections 264, 393, and 518 of the Bankruptcy Act, provides a limited exemption from the securities laws for securities issued under a plan of reorganization and for certain other securities. Subsection (a) exempts from the requirements of section 5 of the Securities Act of 1933 and from any State or local law requiring registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, the offer or sale of certain securities.

Paragraph (1) of subsection (a) exempts the offer or sale under section 364 of any security that is not an equity security or convertible into an equity security. This paragraph is designed to facilitate the issuance of certificates of indebtedness, and should be read in light of the amendment made in section 306 of title III to section 3(a) (7) of the 1933 act.

Ad Hoc Equity Group Exhibit 9
SASMF EXHIBIT 25
486 of 979

DOCUMENT 52

131

Paragraph (2) of subsection (a) exempts the offer or sale of any security of the debtor, a successor to the debtor, or an affiliate in a joint plan, distributed under a plan if such security is exchanged in principal part for securities of the debtor or for allowed claims or administrative expenses. This exemption is carried over from present law, except as to administrative claims, but is limited to prevent distribution of securities to other than claim holders or equity security holders of the debtor or the estate.

Paragraph (3) of subsection (a) exempts the offer or sale of any security that arises from the exercise of a subscription right or from the exercise of a conversion privilege when such subscription right or conversion privilege was issued under a plan. This exemption is necessary in order to enhance the marketability of subscription rights or conversion privileges, including warrants, offered or sold under a plan. This is present law.

Paragraph (4) of subsection (a) exempts sales of portfolio securities, excluding securities of the debtor or its affiliate, owned by the debtor on the date of the filing of the petition. The purpose of this exemption is to allow the debtor or trustee to sell or distribute, without allowing manipulation schemes, restricted portfolio securities held or acquired by the debtor. Subparagraph (B) of section 1145(a)(4) limits the exemption to securities of a company that is required to file reports under section 13 of the Securities Act and that is in compliance with all requirements for the continuance of trading those securities. This limitation effectively prevents selling into the market "cats and dogs" of a nonreporting company. Subparagraph (C) places a limitation on the amount of restricted securities that may be distributed. During the case, the trustee may sell up to 4 percent of each class of restricted securities at any time during the first 2 years and 1 percent during any 180-day period thereafter. This relaxation of the resale rules for debtors in holding restricted securities is similar to but less extensive than the relaxation in SEC Rule 114(c)(3)(v) for the estates of deceased holders of securities.

Paragraph (5) contains an exemption for brokers and dealers (stockbrokers, as defined in title 11) akin to the exemption provided by section 4(3)(A) of the Securities Act of 1933. Instead of being required to supply a prospectus, however, the stockbroker is required to supply the approved disclosure statement, and if the court orders, information supplementing the disclosure statement. Under present law, the stockholder is not required to supply anything.

Subsection (b) is new. The subsection should be read in light of the amendment in section 306 of title III to the 1933 act. It specifies the standards under which a creditor, equity security holder, or other entity acquiring securities under the plan may resell them. The Securities Act places limitations on sales by underwriters. This subsection defines who is an underwriter, and thus restricted, and who is free to resell. Paragraph (1) enumerates real underwriters that participate in a classical underwriting. A person is an underwriter if he purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, with a view to distribution or interest. This provision covers the purchase of a certificate of indebtedness issued under proposed 11 U.S.C. 364 and purchased from the debtor, if the purchase of the certificate was with a view to distribution.

Ad Hoc Equity Group Exhibit 9

134

SASMF EXHIBIT 25

487 of 979

132

A person is also an underwriter if he offers to sell securities offered or sold under the plan for the holders of such securities, or offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is with a view to distribution of the securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan. Finally, a person is an underwriter if he is an issuer, as used in section 2(11) of the Securities Act of 1933.

Paragraph (2) of subsection (b) exempts from the definition of underwriter any entity to the extent that any agreement that would bring the entity under the definition in paragraph (1) provides only for the matching combination of fractional interests in the covered securities or the purchase or sale of fractional interests. This paragraph and paragraph (1) are modeled after former rule 133 of the Securities and Exchange Commission.

Paragraph (3) specifies that if an entity is not an underwriter under the provisions of paragraph (1), as limited by paragraph (2), then the entity is not an underwriter for the purposes of the Securities Act of 1933 with respect to the covered securities, that is, those offered or sold in an exempt transaction specified in subsection (a)(2). This makes clear that the current definition of underwriter in section (2)(11) of the Securities Act of 1933 does not apply to such a creditor. The definition in that section technically applies to any person that purchases securities with "a view to distribution." If literally applied, it would prevent any creditor in a bankruptcy case from selling securities received without filing a registration statement or finding another exemption.

Subsection (b) is a first run transaction exemption and does not exempt a creditor that, for example, some years later becomes an underwriter by reacquiring securities originally issued under a plan.

Subsection (c) makes an offer or sale of securities under the plan in an exempt transaction (as specified in subsection (a)(2)) a public offering, in order to prevent characterization of the distribution as a "private placement" which would result in restrictions, under rule 144 of the SEC, on the resale of the securities.

*Section 1146. Special tax provisions*

Section 1146 provides special tax rules applicable to title 11 reorganizations. Subsection (a) provides that the taxable period of an individual debtor terminates on the date of the order for relief, unless the case has been converted into a reorganization from a liquidation proceeding.

Subsection (b) requires the trustee of the estate of an individual debtor in a reorganization to file a tax return for each taxable period while the case is pending after the order for relief. For corporations in chapter 11, the trustee is required to file the tax returns due while the case is pending (sec. 346(c)(2)).

Subsection (c) exempts from Federal, State, or local stamp taxes the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan. This subsection is derived from section 267 of the present Bankruptcy Act.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

488 of 979

DOCUMENT 52

133

Subsection (d) permits the court to authorize the proponent of a reorganization plan to request from the Internal Revenue Service (or State or local tax authority) an advance ruling on the tax effects of the proposed plan. If a ruling is not obtained within 270 days after the request was made, or if a ruling is obtained but the proponent of the plan disagrees with the ruling, the bankruptcy court may resolve the dispute and determine the tax effects of the proposed plan.

Subsection (e) provides that prepetition taxes which are nondischargeable in a reorganization, and all taxes arising during the administration period of the case, may be assessed and collected from the debtor or the debtor's successor in a reorganization (see sec. 505(c) of the bill).

### RAILROAD REORGANIZATIONS

*Section 1161. Inapplicability of other sections*

This section makes inapplicable sections of the bill which are either inappropriate in railroad reorganizations, or relate to matters which are otherwise dealt with in subchapter IV.

*Section 1162. Definitions*

Two definitions are provided: That Commission means the Interstate Commerce Commission, and that "person" includes a governmental unit for purposes of the subchapter. The latter definition is made necessary because governmental unit is excluded from the definition of person in section 101(30).

*Section 1163. Debtors eligible for relief*

Debtors eligible for relief under subchapter IV include any common carrier by railroad engaged in either freight or passenger service in either interstate or foreign commerce, as well as any owner of trackage facilities leased by such a carrier. The exclusion in present section 77(m) of street or suburban electric railways is omitted as unnecessary.

*Section 1164. Notice to the Commission*

Section 1164 requires a copy of every petition initiating a case under this subchapter to be filed with the Interstate Commerce Commission, as does present section 77(a).

*Section 1165. Disposition of an involuntary petition; protection*

Section 1165 requires the court, in consideration of the relief to be granted upon the filing of an involuntary petition, to take into account the "public interest" in the preservation of the debtor's rail service. This is an important factor in railroad reorganization, which distinguishes them from other business reorganizations. Hence, this section modifies the provisions in sections 303 and 305 that govern generally when the business of a debtor may continue to operate, when relief under the Act sought should be granted, and when the petition should be dismissed.

*Section 1166. Appointment of trustee*

Requires the court to appoint a trustee in every case. Since the trustee may employ whatever help he needs, multiple trusteeships are unnecessary and add to the cost of administration. The present requirement of section 77(c)(1) that the trustee be approved by the In-

134

terstate Commerce Commission is unnecessary, since the trustee will be selected either from the panel established under section 606(f) of title 28. or someone certified by the Director of the Administrative Office of the United States Courts as qualified to become a member of that panel.

### Section 1167. Duties of trustee

Section 1167 imposes on the trustee the obligations, in addition to his other duties and responsibilities, to take into account the "public interest" in the preservation of the debtor's rail service.

### Section 1168. Effect of other laws and regulations

Section 1168 makes the trustee subject to the Interstate Commerce Act and to lawful orders of the Interstate Commerce Commission. the U.S. Department of Transportation, and State and regulatory bodies. The approval of the court is required, however, if the order requires the expenditure of money or the incurring of an expenditure other than the payment of certain interline accounts. The limitation of "lawful orders" of State commissions to those involving "safety, location of tracks, and terminal facilities," which is contained in present section 77(c)(2). is eliminated.

Subsection (1) further provides that the debtor must pay in cash all amounts owed other carriers for current balances owed for interline freight, passenger and per diem, including incentive per diem. fer periods both prior and subsequent to the filing of the petition. without the necessity of court approval.

Subsection (2) makes the provisions of the chapter subject to section 601(b) of the Regional Rail Reorganization Act, which excludes the Interstate Commerce Commission from any participation in the reorganization of certain northeast railroads that have transferred their rail properties to Consolidated Rail Corporation (Conrail).

### Section 1169. Transfer and consolidation of cases

Section 1169 vests the judicial panel on multidistrict litigation with authority to transfer cases pending in more than one court to a single court when the cases involve disputes regarding the abandonment of property which would affect the service of, or involve a possible merger or common reorganization plan of, two or more debtors. There is no comparable provision in section 77.

### Section 1170. Provisions of the plan

Section 1170 adds to the general provisions required or permitted in reorganization plans by section 1123. Subsection (1) requires that a reorganization plan under the railroad subchapter specify the means by which the value of the claims of creditors and the interests of equity holders which are materially and adversely affected by the plan are to be realized. Subsection (2) permits a plan to include provisions for the issuance of warrants. Subsection (3) requires that the plan provide for fixed charges by probable earnings for their payment. Subsection (4) requires that the plan specify the means by which. and the extent to which, the debtor's rail service is to be continued. and shall identify any rail service to be terminated. Subsection (5) permits other appropriate provisions not inconsistent with the chapter. With the exception of subsection (4), the requirements are com-

# DOCUMENT 52

135

parable to those of present section 77(b); subsection (4) emphasizes the public interest in the preservation of rail transportation.

*Section 1171. Consideration of a plan by the Commission*

Section 1171 imposes on the court, rather than the Interstate Commerce Commission, as in present section 77, the responsibility for the plan of reorganization. The Commission is empowered to make final decisions subject only to review by the court under the standards of the Administrative Procedure Act as to any part of the plan which deals with transportation matters, such as the grant of operating rights of or over, or transfer of, the debtor's rail lines to other carriers.

Subsection (a) requires the trustee to file a plan of reorganization within 18 months after the petition is filed, and permits the court, for good cause shown, to extend such time limit. Subsection (b) permits a plan to be proposed by any interested person, and permits the trustee to revise his plan at any time before it is approved by the court.

Subsections (c), (d) and (e) require the court, when a plan is submitted by the trustee or, if the court deems it worthy of consideration, a plan submitted is proposed by any other person proposes the transfer of, or operation of or over, any of the debtor's lines by other carriers, to refer to such provisions of the plan to the Interstate Commerce Commission. The Commission, within 240 days, and after a hearing if the Commission so determines, is to report to the court the effects of such provisions of the plan in the light of national transportation policy and sections 5(3)(f) (A), (B), and (D), (F)–(I) of the Interstate Commerce Act. The report of the Commission is conclusive in all further hearings on the plan by the court, subject only to review pursuant to 5 U.S.C.S. 706(2) (A)–(D).

*Section 1172. Approval of the plan*

Section 1172 requires, as does present law, a hearing by the court, on at least 20 days' notice, on approval of a plan. The section permits the court to revise the plan—a power which the court lacks under section 77, and which has resulted in unnecessary references back to the Commission with consequent delays in the approval of a plan that would be acceptable as amended. The report of the Interstate Commerce Commission on any provisions respecting transportation matters is conclusive and may be revised by the court only as provided in section 1171.

*Section 1173. Confirmation of plan*

Section 1173 adapts the provisions dealing with reorganization plans generally contained in section 1130 to the particular requirements of railroad reorganization plans, as set out in present section 77(e). Subsection (a) specifies the findings which the court must make before approving a plan: (1) The plan complies with the applicable provisions of the chapter; (2) the proponent of the plan complies with the applicable provisions of the chapter; (3) the plan has been proposed in good faith; (4) any payments for services or for costs or expenses in connection with the case or the plan are disclosed to the court and are reasonable, or, if to be paid later, are subject to the approval of the court as reasonable; (5) the proponent of the

Ad Hoc Equity Group Exhibit 9

SASMF EXHIBIT 25

491 of 979

plan has disclosed the identity and affiliations of the individuals who will serve as directors, officers, or voting trustees, such appointments or continuations in office are consistent with the interests of creditors, equity security holders, and the proponent the public, and has disclosed the identity and compensation of any insider who will be employed or retained under the plan; (6) that rate changes proposed in the plan have been approved by the appropriate regulatory commission, or that the plan is contingent on such approval; (7) that confirmation of the plan is not likely to be followed by further reorganization or liquidation, unless it is contemplated by the plan; (8) that the plan, if there is more than one, is the one most likely to maintain adequate rail service and (9) that the plan provides the priority traditionally accorded by section 77(b) to claims by rail creditors for necessary services rendered during the 6 months preceding the filing of the petition in bankruptcy.

Subsection (b) continues the present power of the court in section 77(e) to confirm a plan over the objections of creditors or equity security holders who are materially and adversely affected. The subsection also confirms the authority of the court to approve a transfer of all or part of a debtor's property or its merger over the objections of equity security holders if it finds (1) that the "public interest" in continued rail transportation outweighs any adverse effect on creditors and equity security holders, and (2) that the plan is fair and equitable, affords due recognition to the rights of each class, and does not discriminate unfairly against any class.

Subsection (c) permits modification of a plan confirmed by a final order only for fraud.

### Section 1174. Conversion to liquidation

Section 1174 permits the court to convert the case to a liquidation under chapter 7 if the court finds that the debtor cannot be reorganized, or if various time limits specified in the subchapter are not met. Section 77 does not authorize a liquidation of a railroad under the Bankruptcy Act. If the railroad is not reorganizable, the only action open to the court is to dismiss the petition, which would in all likelihood be followed by a State court receivership, with all of its attendant disadvantages. If reorganization is impossible, the debtor should be liquidated under the Bankruptcy Act.

### Section 1175. Rolling stock equipment

Section 1175 continues the protection accorded in present section 77(j) to the rights of holders of purchase-money equipment security, and of lessors or conditional vendors of railroad rolling stock, but accords to the trustee a limited period within which to assume the debtor's obligation and to cure any defaults. The rights of such lenders are not affected by the automatic stay and related provisions of sections 362 and 363, or by any power of the court, unless (1) within 60 days after the commencement of the case (or such longer period as may be agreed to by the secured party, lessor or conditional vendor) the trustees, with the approval of the court, agrees to perform all of the debtor's obligations under the security agreement, lease or conditional sale contract, and (2) all defaults are cured within the 60-day period.

# DOCUMENT 52

137

Defaults described in section 365(b)(2)—defaults which are breaches of provisions relating to the insolvency or financial condition of the debtor, or the commencement of a case under this title, or the appointment of a trustee—are, for obvious reasons, excepted.

## Section 1176. Collective bargaining agreements

Section 1176 is derived from present section 77(n). It provides that notwithstanding the general section governing the rejection of executory contracts (section 365), neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act, except in accordance with section 6 of that Act. As reported by the subcommittee this section provided that wages and salaries of rail employees could not be affected by the trustee, but that work rules could be rejected by the trustee. The reorganization court was given the authority to review the trustee's decisions and to settle any disputes arising from the rejection. This provision was withdrawn by the full committee, and hearings will be conducted next year by the Human Resources Committee in the area of rail labor contracts and the trustee's ability to reject them in a bankruptcy situation.

## Section 1177. Effect of rejection of lease of railroad line

Section 1177 continues, essentially without change, the provisions relating to the rejection by the trustee of a lease of a line of railroad now contained in section 77(c)(6). Subsection (a) requires the lessor of a line of railroad to operate it if the lease is rejected by the trustee and the trustee, with the approval of the court, elects not to operate the leased line. Subsection (b), however, further provides that if operation by the lessor is impractical or contrary to the public interest, the court shall require the trustee to operate the line for the account of the lessor until the operation is lawfully terminated. Subsection (c) provides that during such operation, the lessor is a carrier subject to the Interstate Commerce Act.

## Section 1178. Abandonment of railroad line

Subsection (a) of section 1178 permits the court to authorize the abandonment of a railroad line if the abandonment is consistent with the public interest and either in the best interest of the estate or essential to the formulation of a plan. This avoids the normal abandonment requirements of generally applicable railroad regulatory law.

Subsection (b) permits some participation by the Interstate Commerce Commission in the abandonment process. The Commission's role, however, is only advisory. The Commission will represent the public interest, while the trustee and various creditors and equity security holders will represent the interests of those who have invested money in the enterprise. The court will balance the various interests and make an appropriate decision. The subsection specifies that if, except for the pendency of the railroad reorganization case, the proposed abandonment would require Commission approval, then the trustee, with the approval of the court, must initiate an application for the abandonment with the Commission. The court may then fix a time within which the Commission must report to the court on the application.

Subsection (c) permits the court to act after it has received the report of the Commission or the time fixed under subsection (b) has expired, whichever occurs first. The court may then authorize the abandonment after notice and a hearing. The notice must go to the Commission, the Secretary of Transportation, the trustee, and party in interest that has requested notice, any affected shipper or community, and any other entity that the court specifies.

Subsection (d) stays the enforcement of an abandonment until the time for taking an appeal has expired, or if an appeal has been taken, until the order has become final. However, the court may, and after notice and a hearing, on request of a party in interest authorize termination of service on the line or a portion of the line pending the determination of the appeal. The notice required is the same as that required under subsection (c). If the court authorizes termination of service pending determination of the appeal, an appellant may not obtain a stay of the enforcement of the order authorizing termination, either by the giving of a supersedeas bond or otherwise, during the pendency of the appeal.

## CHAPTER 13—ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME

### SUBCHAPTER I—OFFICERS, ADMINISTRATION AND THE ESTATE

*Section 1301. Stay of action against codebtor*

Subsection (a) automatically stays the holder of a claim based on a consumer debt of the chapter 13 debtor from acting or proceeding in any way, except as authorized pursuant to subsections (b) and (c), against an individual or the property of an individual liable with the chapter 13 debtor, unless such codebtor became liable in the ordinary course of his business, or unless the case is closed, dismissed, or converted to another chapter.

Under the terms of the agreement with the codebtor who is not in bankruptcy, the creditor has a right to collect all payments to the extent they are not made by the debtor at the time they are due. To the extent to which a chapter 13 plan does not propose to pay a creditor his claims, the creditor may obtain relief from the court from the automatic stay and collect such claims from the codebtor. Conversely, a codebtor obtains the benefit of any payments made to the creditor under the plan. If a debtor defaults on scheduled payments under the plan, then the codebtor would be liable for the remaining deficiency; otherwise, payments not made under the plan may never be made by the codebtor. The obligation of the codebtor to make the creditor whole at the time payments are due remains.

The automatic stay under this section pertains only to the collection of a consumer debt, defined by section 101(7) of this title to mean a debt incurred by an individual primarily for a personal, family, or household purpose. Therefore, not all debts owed by a chapter 13 debtor will be subject to the stay of the codebtor, particularly those business debts incurred by an individual with regular income, as defined by section 101(24) of this title, engaged in business, that is permitted by virtue of section 109(b) and section 1304 to obtain chapter 13 relief.

SASMF EXHIBIT 25

494 of 979

Subsection (b) excepts the giving of notice of dishonor of a negotiable instrument from the reach of the codebtor stay.

Under subsection (c), if the codebtor has property out of which the creditor's claim can be satisfied, the court can grant relief from the stay absent the transfer of a security interest in that property by the codebtor to the creditor. Correspondingly, if there is reasonable cause to believe that property is about to be disposed of by the codebtor which could be used to satisfy his obligation to the creditor, the court should lift the stay to allow the creditor to perfect his rights against such property. Likewise, if property is subject to rapid depreciation or decrease in value the stay should be lifted to allow the creditor to protect his rights to reach such property. Otherwise, the creditor's interest would be irreparably harmed by such stay. Property which could be used to satisfy the claim could be disposed of or encumbered and placed beyond the reach of the creditor. The creditor should be allowed to protect his rights to reach property which could satisfy his claim and prevent its erosion in value, disposal, or encumbrance.

### Section 1302. Trustee

The principal administrator in a chapter 13 case is the chapter 13 trustee. Experience under chapter XIII of the Bankruptcy Act has shown that the more efficient and effective wage earner programs have been conducted by standing chapter XIII trustees who exercise a broad range of responsibilities in both the design and the effectuation of debtor plans.

Subsection (a) provides administrative flexibility by permitting the bankruptcy judge to appoint an individual from the panel of trustees established pursuant to 28 U.S.C. § 604(f) and qualified under section 322 of title 11, either to serve as a standing trustee in all chapter 13 cases filed in the district or a portion thereof, or to serve in a single case.

Subsection (b)(1) makes it clear that the chapter 13 trustee is no mere disbursing agent of the monies paid to him by the debtor under the plan [section 1322(a)(1)], by imposing upon him certain relevant duties of a liquidation trustee prescribed by section 704 of this title.

Subsection (b)(2) requires the chapter 13 trustee to appear before and be heard by the bankruptcy court whenever the value of property secured by a lien or the confirmation or modification of a plan after confirmation as provided by sections 1323–1325 is considered by the court.

Subsection (b)(3) requires the chapter 13 trustee to advise and counsel the debtor while under chapter 13, except on matters more appropriately left to the attorney for the debtor. The chapter 13 trustee must also assist the debtor in performance under the plan by attempting to tailor the requirements of the plan to the changing needs and circumstances of the debtor during the extension period.

Subsection (c) imposes on the trustee in a chapter 13 case filed by a debtor engaged in business the investigative and reporting duties normally required of a chapter 11 debtor or trustee as prescribed by section 1106(a)(3) and (4).

**Ad Hoc Equity Group Exhibit 9**

140

*Section 1303. Rights and powers of debtor*

A chapter 13 debtor is vested with the identical rights and powers, and is subject to the same limitations in regard to their exercise, as those given a liquidation trustee by virtue of section 363(b), (d), (e), (f), and (h) of title 11, relating to the sale, use or lease of property.

*Section 1304. Debtor engaged in business*

Increased access to the simpler, speedier, and less expensive debtor relief provisions of chapter 13 is accomplished by permitting debtors engaged in business to proceed under chapter 13, provided their income is sufficiently stable and regular to permit compliance with a chapter 13 plan [section 101(24)] and that the debtor (or the debtor and spouse) do not owe liquidated, noncontingent unsecured debts of $50,000, or liquidated, noncontingent secured debts of $200,000 (§ 109(d)).

Section 1304(a) states that a self-employed individual who incurs trade credit in the production of income is a debtor engaged in business.

Subsection (b) empowers a chapter 13 debtor engaged in business to operate his business, subject to the rights, powers and limitations that pertain to a trustee under section 363(c) and 364 of title 11, and subject to such further limitations and conditions as the court may prescribe.

Subsection (c) requires a chapter 13 debtor engaged in business to file with the court certain financial statements relating to the operation of the business.

*Section 1305. Filing of claims; allowance of postpetition claims*

Section 1305, exclusively applicable in chapter 13 cases, supplements the provisions of sections 501–511 of title 11, dealing with the filing and allowance of claims. Sections 501–511 apply in chapter 13 cases by virtue of section 103(a) of this title. Section 1305(a) provides for the filing of a proof of claim for taxes and other obligations incurred after the filing of the chapter 13 case. Subsection (b) prescribes that section 502 of title 11 governs the allowance of section 1305(a) claims, except that its standards shall be applied as of the date of allowance of the claim, rather than the date of filing of the petition. Subsection (c) requires the disallowance of a postpetition claim for property or services necessary for the debtor's performance under the plan, if the holder of the claim knew or should have known that prior approval by the trustee of the debtor's incurring of the obligation was practicable and was not obtained.

Subsection (d) is the successor to section 656(b) of the Bankruptcy Act. Section 1305(d) recognizes the inequity to chapter 13 debtors and their creditors alike of permitting a usurious or other invalid claim to share in distributions under the chapter 13 plan. It is envisioned that appropriate rules will be adopted mandating procedures for assuring the provision of proof by a chapter 13 creditor that the claim is free from any charge forbidden by applicable law, including usury.

*Section 1306. Property of the estate*

Section 541 is expressly made applicable to chapter 13 cases by section 103(a). Section 1306 broadens the definition of property of the

# DOCUMENT 52

141

estate for chapter 13 purposes to include all property acquired and all earnings from services performed by the debtor after the commencement of the case.

Subsection (b) nullifies the effect of section 521(3), otherwise applicable, by providing that a chapter 13 debtor need not surrender possession of property of the estate, unless required by the plan or order of confirmation.

*Section 1307. Conversion or dismissal*

Subsections (a) and (b) confirm, without qualification, the rights of a chapter 13 debtor to convert the case to a liquidating bankruptcy case under chapter 7 of title 11, at any time, or to have the chapter 13 case dismissed. Waiver of any such right is unenforceable. Subsection (c) specifies various conditions for the exercise of the power of the court to convert a chapter 13 case to one under chapter 7 or to dismiss the case. Subsection (d) deals with the conversion of a chapter 13 case to one under chapter 11. Subsection (e) prohibits conversion of the chapter 13 case filed by a farmer to chapter 7 or 11 except at the request of the debtor. No case is to be converted from chapter 13 to any other chapter, unless the debtor is an eligible debtor under the new chapter.

### SUBCHAPTER II—THE PLAN

*Section 1321. Filing of plan*

Chapter 13 contemplates the filing of a plan only by the debtor.

*Section 1322. Contents of plan*

Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions.

Subsection (a) requires that the plan submit whatever portion of the future income of the debtor is necessary to implemnt the plan to the control of the trustee, mandates payment in full of all section 507 priority claims, and requires identical treatment for all claims of a particular class.

Subsection (b) permits a chapter 13 plan to (1) divide unsecured claims not entitled to priority under section 507 into classes in the manner authorized for chapter 11 claims; (2) modify the rights of holders of secured and unsecured claims, except claims wholly secured by real estate mortgages; (3) cure or waive any default; (4) propose payments on unsecured claims concurrently with payments on any secured claim or any other class of unsecured claims; (5) provide for curing any default on any secured or unsecured claim on which the final payment is due after the proposed final payment under the plan; (6) provide for payment of any allowed postpetition claim; (7) assume or reject any previously unrejected executory contract or unexpired lease of the debtor; (8) propose the payment of all or any part of any claim from property of the estate or of the debtor; (9) provide for the vesting of property of the estate; and (10) include any other provision not inconsistent with other provisions of title 11.

Subsection (c) limits the payment period under the plan to 3 years, except that a 4-year payment period may be permitted by the court.

SASMF EXHIBIT 25

497 of 979

*Section 1323. Modification of plan before confirmation*

The debtor is permitted to modify the plan before confirmation without court approval so long as the modified plan, which becomes the plan on filing, complies with the requirements of section 1322.

The original acceptance or rejection of a plan by the holder of a secured claim remains binding unless the modified plan changes the rights of the holder and the holder withdraws or alters its earlier acceptance or rejection.

*Section 1324. Confirmation hearing*

Any party in interest may object to the confirmation of a plan, as distinguished from merely rejecting a plan. An objection to confirmation is predicated on failure of the plan or the procedures employed prior to confirmation to conform with the requirements of chapter 13. The bankruptcy judge is required to provide notice and an opportunity for hearing any such objection to confirmation.

*Section 1325. Confirmation of plan*

The bankruptcy court must confirm a plan if (1) the plan satisfies the provisions of chapter 13 and other applicable provisions of title 11; (2) it is proposed in good faith; (3) it is in the best interests of creditors, and defined by subsection (a) (4) of Section 1325; (4) it has been accepted by the holder of each allowed secured claim provided for the plan or where the holder of any such secured claim is to receive value under the plan not less than the amount of the allowed secured claim, or where the debtor surrenders to the holder the collateral securing any such allowed secured claim; (5) the plan is feasible; and (6) the requisite fees and charges have been paid.

Subsection (b) authorizes the court to order an entity, as defined by Section 101(15), to pay any income of the debtor to the trustee. Any governmental unit is an entity subject to such an order.

*Section 1326. Payments*

Section 1326 supplements the priorities provisions of section 507. Subsection (a) requires accrued costs of administration and filing fees, as well as fees due the chapter 13 trustee, to be disbursed before payments to creditors under the plan. Subsection (b) makes it clear that the chapter 13 trustee is normally to make distribution to creditors of the payments made under the plan by the debtor.

*Section 1327. Effect of confirmation*

Subsection (a) binds the debtor and each creditor to the provisions of a confirmed plan, whether or not the claim of the creditor is provided for by the plan and whether or not the creditor has accepted, rejected, or objected to the plan. Unless the plan itself or the order confirming the plan otherwise provides, confirmation is deemed to vest all property of the estate in the debtor, free and clear of any claim or interest of any creditor provided for by the plan.

*Section 1328. Discharge*

The court is to enter a discharge, unless waived, as soon as practicable after completion of payments under the plan. The debtor is to be discharged of all debts provided for by the plan or disallowed under section 502, except a debt provided for under the plan the last

SASMF EXHIBIT 25
498 of 979

DOCUMENT 52

143

payment on which was not due until after the completion of the plan, or a debt incurred for willful and malicious conversion of or injury to the property or person of another.

Subsection (b) is the successor to Bankruptcy Act Section 661. This subsection permits the bankruptcy judge to grant the debtor a discharge at any time after confirmation of a plan, if the court determines, after notice and hearing, that the failure to complete payments under the plan is due to circumstances for which the debtor should not justly be held accountable, the distributions made to each creditor under the plan equal in value the amount that would have been paid to the creditor had the estate been liquidated under chapter 7 of title 11 at the date of the hearing under this subsection, and that modification of the plan is impracticable. The discharge granted under subsection (b) relieves the debtor from all unsecured debts provided for by the plan or disallowed under section 502, except nondischargeable debts described in section 523 (a) of title 11 or debts of the type covered by section 1322 (b) (5).

Subsection (d) excepts from any chapter 13 discharge a debt based on an allowed section 1305 (a) (2) postpetition claim, if prior trustee approval of the incurring of the debt was practicable but was not obtained.

A chapter 13 discharge obtained through fraud and before the moving party gained knowledge of the fraud may be revoked by the court under subsection (e), after notice and hearing, at the request of any party in interest made within 1 year after the discharge was granted.

*Section 1329. Modification of plan after confirmation*

At any time prior to the completion of payments under a confirmed plan, the plan may be modified, after notice and hearing, to change the amount of payments to creditors or a particular class of creditors and to extend or reduce the payment period. A modified plan may not contain any provision which could not be included in an original plan as prescribed by section 1322. A modified plan may not call for payments to be made beyond four years as measured from the date of the commencement of payments under the original plan.

*Section 1330. Revocation of an order of confirmation*

The court may revoke an order of confirmation procured by fraud, after notice and hearing, on application of a party in interest filed within 180 days after the entry of the order. Thereafter, unless a modified plan is confirmed, the court is to convert or dismiss the chapter 13 case as provided in section 1307.

*Section 1331. Special tax provision*

This special tax provision is parallel to subsection 1146 (e) in allowing assessment and collection of nondischargeable taxes, as well as administrative period taxes, against the debtor in a chapter 13 case. The taxing authority, however, may accept provisions of the plan in a particular case dealing with the assumption, settlement, or payment of any such taxes.

Section 1331 does not include a provision of the bill as introduced, which limited tax assessments against the debtor, including assessments for a nondischargeable tax liability, to the period of 1 year following the date of the filing of the petition.

Ad Hoc Equity Group Exhibit 9
SASMF EXHIBIT 25
499 of 979

144

## TITLE II—AMENDMENTS TO TITLE 28 UNITED STATES CODE AND TO THE FEDERAL RULES OF EVIDENCE

*Section 201. Establishment of bankruptcy court; bankruptcy judges*

Section 201 amends Title 28, United States Code, by adding a new chapter 6, providing for the establishment, jurisdiction and powers, staffing, organization and administration of independent bankruptcy courts. Chapter 6 comprises 16 sections (§§ 151–166) made effective October 1, 1979, by virtue of section 402(a) of this Act.

*Section 151. Creation and composition of bankruptcy courts*

Subsection (a) establishes in each judicial district a court of record, as an adjunct of the U.S. district court, to be known as the bankruptcy court for such district.

Subsection (b) specifies that the bankruptcy court for each judicial district is comprised of the active bankruptcy judges appointed for the district.

Subsection (c) permits exercise of the judicial power of the bankruptcy court by a single bankruptcy judge.

*Section 152. Appointment; qualifications; tenure; oath; removal*

Subsection (a) empowers each court of appeals to appoint bankruptcy judges, in such numbers and at such locations within the circuit as are determined by the Judicial Conference pursuant to section 153 of title 28, United States Code, as enacted by section 201 of this act. The chief judge of the circuit is to make the appointment in case the concurrence of a majority of the active circuit judges cannot be obtained.

The Judicial Conference of the United States may authorize the appointment of a bankruptcy judge to serve in more than one circuit. Where a majority vote of the active judges of each circuit in which the bankruptcy judge is to serve has not been obtained, the appointment is to be made by the chief circuit judge senior in service.

Subsection (b) prescribes the professional and other qualifications of individuals to serve as bankruptcy judges. Qualifications include bar membership in good standing for at least 5 years at the time of appointment and competence as determined by the judicial council of the circuit. Additional qualification standards may be prescribed by the Judicial Conference of the United States, as provided by subsection (b)(4). Other qualifications are set forth in subsections (c) and (e) of this section.

Subsection (c) prescribes a 12-year term of office for bankruptcy judges appointed under new 28 U.S.C. § 152. The present 6-year term is insufficient to attract the calibre of individual needed to perform the highly demanding and important functions of the office of bankruptcy judge. By doubling the term of office for future bankruptcy judges it is anticipated that a major goal of this reform legislation, the establishment of a functionally independent bankruptcy court, can be further advanced.

A bankruptcy judge whose term expires is permitted to continue to serve until a successor is appointed and qualifies. With specific ex-