## DOCUMENT 52

145

ceptions for retired or reserve military personnel, a bankruptcy judge may not hold employment with the U.S. Government. An individual may not continue to serve as a bankruptcy judge after reaching 70 years of age without the unanimous approval of the judges of the judicial council of the circuit.

Subsection (d) prescribes the same oath of office for bankruptcy judges as for district court judges.

Subsection (e) requires each bankruptcy judge to maintain residence in a district for which he is appointed, or, in the case of the District of Columbia, within 20 miles. Subsection (f) authorizes the chief judge of the circuit to require a bankruptcy judge to maintain his abode in or near a particular place in the district, unless the bankruptcy judges are able to agree among themselves which of them shall do so.

Subsection (g) sets forth the grounds upon which and prescribes the procedures by which the removal of a bankruptcy judge may be accomplished. Incompetence, misconduct, neglect of duty and disability, as determined by the judicial council of the circuit, are the sole grounds for removal. The bankruptcy judge is entitled to be heard on the charges against him.

The restrictive nature of the grounds for removal of a bankruptcy judge requires that they construed since they are intended to insulate the bankruptcy court from improper challenges to its judicial independence.

*Section 153. Numbers and locations of bankruptcy judges*

Subsection (a) requires the Director of the Administrative Office of U.S. Courts to make continuing studies to determine the numbers and locations of bankruptcy judges necessary to provide effective and expeditious bankruptcy administration. The Director is instructed to take local conditions and suggestions into account before making recommendations to the various bodies specified in subsection (b).

Subsections (b) and (c) authorize the Judicial Conference of the United States, acting on the recommendations of the Director, the district courts, and the judicial councils of the circuits, to determine and, from time to time, alter the numbers and locations of bankruptcy judgeships. It is envisioned that the recommendations of the district courts will represent the views of the bankruptcy courts, which can be expected to possess the requisite familiarity and expertise.

Subsection (d) authorizes the filling of a vacancy in the office of bankruptcy judge by the circuit court, as provided by 28 U.S.C. § 152, unless the position is discontinued by the Judicial Conference, after such vacancy occurs, in the manner prescribed by subsection (c).

*Section 154. Chief judge; precedence of bankruptcy judges*

The internal organization of the bankruptcy courts is patterned after that of the district courts as concerns the precedence of bankruptcy judges (§ 154), the division of business among bankruptcy judges (§ 155), the times for holding sessions of court (§ 156), adjournment of court (§ 157), special sessions (§ 158), accommodations (§ 159), vacancy in judgeships as affecting proceedings (§ 160) and temporary assignments of bankruptcy judges (§ 165).

146

Subsection (a) of section 154 of title 28, United States Code, as amended by section 201 of this act, declares that whichever bankruptcy judge is senior in service, but under 70 years of age, shall serve as the chief judge of the bankruptcy court of the district. A bankruptcy judge must have served at least 1 year on the bankruptcy bench before he may serve as chief judge of the bankruptcy court.

Subsection (b) gives the chief judge precedence and the right to preside at any session of the court or judges that he attends. Bankruptcy judges junior in service to the chief judge have precedence according to the seniority of their commissions.

Subsection (c) states that a bankruptcy judge appointed to serve in more than one district is the junior judge in all districts, except that in which he resided upon appointment to the bankruptcy bench.

Subsection (d) authorizes the Chief Justice of the United States to designate the bankruptcy judge next in precedence who is willing to serve as chief bankruptcy judge to replace a bankruptcy judge who resigns as chief judge but remains in active service.

Subsection (e) authorizes the active bankruptcy judge next in service who is present and able to serve as chief judge in the event of the temporary inability of the chief judge to perform his duties.

Subsection (f) provides that service as a referee in bankruptcy and service as a bankruptcy judge are to be taken into account in determining seniority of commissions under section 154.

*Section 155. Division of business among bankruptcy judges*

Section 155 prescribes that the business of the bankruptcy court for each district is to be divided among the active bankruptcy judges of the district as provided by the rules and orders of the bankruptcy court. The chief judge of the bankruptcy court is responsible for securing compliance with such rules and orders, and for dividing the business and assigning cases among the active bankruptcy judges of the district where rules and orders of the bankruptcy court fail to do so. The district court of the district wherein the bankruptcy court sits is to make necessary orders for the division of business among bankruptcy judges where such bankruptcy court rules and orders are not in existence, action by the chief judge of the bankruptcy court is not forthcoming within a reasonable time and the concurrence of the bankruptcy judges of the district cannot be obtained.

*Section 156. Times for holding regular sessions*

Section 156 authorizes regular sessions, including continuous sessions, of the bankruptcy court as determined by the rules or orders of the bankruptcy court.

*Section 157. Adjournment*

Subsection (a) authorizes the bankruptcy court to adjourn or, with the consent of the chief judge of the bankruptcy court of the district, to pretermit any regular session for cause.

Subsection (b) enables the clerk of the bankruptcy court to adjourn court where no bankruptcy judge is able to do so.

*Section 158. Special sessions; places; notice*

Special sessions of the bankruptcy court may be held anywhere in the district and on such notice as is ordered by the bankruptcy court, for the purpose of transacting whatever business is required.

DOCUMENT 52

147

*Section 159. Accommodations at places for holding court*

Court may be held at any location within the district where suitable quarters and accommodations are furnished without cost to the United States. The General Service Administration may provide quarters and accommodations for the bankruptcy court, at cost to the United States, with the approval of the judicial council of the circuit.

*Section 160. Vacant judgeship as affecting proceedings*

The clerk of the bankruptcy court shall continue all pending process, pleadings, and proceedings until a successor or replacement judge is appointed or designated, whenever the office of a bankruptcy judge becomes vacant.

*Section 161. Bias or prejudice of bankruptcy judge*

Section 161 requires that the bankruptcy judge against whom an affidavit of bias or prejudice is filed proceed no further in the pending matter and that it be heard, by another bankruptcy judge. The affidavit must be filed at least 10 days before the pending matter is to be heard or good cause must be shown for later filing. It must state facts and reasons for the belief that bias or prejudice exists and be accompanied by a certificate of counsel of record that it is made in good faith.

*Section 162. Practice of law*

An active bankruptcy judge may not engage in any business occupation, or employment, including the practice of law, inconsistent with the expeditious, proper, and impartial performance of the duties of a bankruptcy judge.

*Section 163. Compensation; benefits*

Subsection (a) provides for compensation for a bankruptcy judge at the current annual rate of $48,500, subject to adjustment under section 225 of the Federal Employees Salary Act and 28 U.S.C. § 461.

Subsection (b) provides that all bankruptcy judges and their employees are officers and employees in the judicial branch of the Government within the meaning of chapter 83 (subchapter III) (civil service retirement), chapter 87 (Federal employees' group life insurance), and chapter 89 (Federal employees' health benefits) of title 5, United States Code.

*Section 164. Powers of bankruptcy judges*

Subsection (a) generally confers upon bankruptcy judges in active service the exclusive power to perform all judicial functions arising in cases and proceedings under title 11 and in actions and proceedings brought under 28 U.S.C. § 1334, as amended by section 216 of this Act except in municipal adjustment and railroad reorganization cases. Subsection (a) (3) empowers bankruptcy judges to administer oaths and affirmations.

Subsection (b) of section 164 of title 28, United States Code, vests jurisdiction to determine appeals from judgments and orders of a bankruptcy judge with the U.S. district court for the district in which the case, action, or proceeding in which the order or judgment appealed from was entered is pending. Unless a notice of appeal is filed with the bankruptcy judge within 10 days, or within any extended period granted within the 10 day period by the bankruptcy

148

court, the order of judgment is final. In the event the bankruptcy court refuses to suspend the execution or enforcement of any order or judgment from which a timely appeal is taken, the district court may do so on the application of any party in interest on such terms as will protect the rights of all parties in interest.

Subsection (c), like section 1334(d)(2)(A) of title 28, United States Code, as amended by section 216 of this act, prohibits the enjoining of a court by a bankruptcy judge.

Subsection (d) constitutes certain conduct in bankruptcy proceedings a contempt of the U.S. district court for the district in which the case or proceeding out of which the contempt arises is pending. Any conduct which would constitute a contempt if committed before a judge of a district court constitues a contempt when committed before a bankruptcy judge. A bankruptcy judge may impose a fine of not more than $1,000 for contempt of court and is to certify the facts to a judge of the district court when the contempt warrants imprisonment or a fine in excess of $1,000.

*Section 165. Temporary assignment of bankruptcy judges*

Subsection (a) permits the chief judge of the circuit to make temporary intracircuit assignments of bankruptcy judges to perform judicial duties in other districts.

Subsection (b) permits the chief judge of a circuit, with the consent of the chief judge of the other circuit, to make temporary intercircuit assignments of bankruptcy judges to perform duties in any district within a circuit other than that in which is located the district in which the bankruptcy judge was appointed to serve.

Subsection (c) permits the temporary assignment of a retired bankruptcy judge by the chief judge of circuit, with the consent of both the Director of the Administrative Office of the U.S. Courts and the retired bankruptcy judge, to serve in any judicial district where there is a vacancy in the office of a bankruptcy judge or the expeditious transaction of the business of the court so requires. While actually engaged in such service, the retired bankruptcy judge is to be considered a reemployed annuitant within the meaning of the civil service laws and may not engage, during such service, in any activity inconsistent with the performance of the duties of the office of bankruptcy judge. See section 162, title 28, United States Code, as enacted by section 201 of this act. The provisions of subsection (c) are designed to make clear that the practice of law and similar activities are not permitted by retired bankruptcy judges during any period that they are in active service on the bankruptcy bench pursuant to subsection (c) of this section.

Subsection (d) requires the bankruptcy judge to discharge all the judicial duties for which he is designated and assigned.

*Section 166. Expenses; facilities*

Section 166 authorizes and mandates the provision and payment by the Director of the Administrative Office of U.S. Courts of all necessary secretarial and other supporting personnel, courtrooms, office space, furniture and facilities reasonably required for the performance of the duties of bankruptcy judge. It is elsewhere made clear that a clerk of the bankruptcy court, deputy clerks and clerical assistants

DOCUMENT 52

149

(§ 757), secretaries and law clerks (§ 758) and court reporters (§ 759) are reasonably required and therefore to to be made available to bankruptcy judges.

It is envisioned that the bankruptcy judge or judges shall appoint and direct all employees in the performance of bankruptcy court duties, without any involvement on the part of the district court, including the district judge himself and the clerk of the district court. Individuals in the employ of the bankruptcy court may be removed at the pleasure of the bankruptcy judge or judges, as provided by section 760, title 28, United States Code, as enacted by section 214(a) of this act.

*Section 202*

This section amends section 331 of title 28 of the United States Code to create an additional position on the Judicial Conference of the United States to be filled by a bankruptcy judge. The representative of the bankruptcy judges on the Judicial Conference will be selected by the bankruptcy judges. In the event the bankruptcy judge so selected is unable to attend, the Chief Justice may designate a bankruptcy judge to attend the Conference. The representation of bankruptcy judges in the Conference is similar to the participation on the Judicial Conference by judges of the Court of Claims and Court of Customs and Patent Appeals.

During the past decade the number of bankruptcy cases and controversies arising within bankruptcy cases handled by bankruptcy judges has far exceeded the combined number of civil and criminal cases filed in the district courts. The failure of the Judicial Conference to adapt to this phenomenon is indicated by the fact that bankruptcy judges have been systematically excluded from membership on the Bankruptcy Committee of the Judicial Conference. Testimony at the hearings indicates the Judicial Conference has not at all times given adequate consideration to the needs of the bankruptcy courts. Representation on the Conference should insure adequate representation and consideration of the views of bankruptcy judges.

*Section 203*

This section amends section 332(d) of title 28 of the United States Code to place bankruptcy judges under the direction of the judicial council of the circuit. Section 332(d) of title 28 of the United States Code authorizes each judicial council to make all necessary orders for the effective and expeditious administration of the business of the courts within the circuit and, as amended, provides that bankruptcy judges as well as district judges shall promptly carry into effect all orders of the judicial council. This is a conforming amendment.

*Section 204*

This section amends section 333 of title 28 of the United States Code to include bankruptcy judges as participants in circuit conferences which are held annually for the purpose of considering the business of the courts and advising means of improving the administration of justice within the circuit. As amended, the section will require the chief judge of the circuit to summon the chief judge of each bankruptcy court within the circuit to the conference. In view of the fact

150

that bankruptcy cases constitute a major portion of the caseload of the Federal courts, it seems appropriate that bankruptcy judges should participate in conferences called for the purpose of considering the business of the courts.

*Section 205*

This section makes a conforming change to section 455 of title 28 of the United States Code by substituting the term "bankruptcy judge" for "referee in bankruptcy."

*Section 206*

This section amends the catchline of 28 U.S.C. 460 to repeal an obsolete reference to Alaska as a territory. References to Alaska in the body of the section were eliminated by Public Law 85–508.

*Section 207*

This section makes a conforming change to 28 U.S.C. 526(a)(2) substituting the term "bankruptcy judge" for "referee in bankruptcy" and deleting a reference to receivers in bankruptcy. Section 105(b) of title I of the bill precludes the appointment of a receiver in a case under title II.

*Section 208*

This section amends section 604(a) of title 28 of the United States Code relating to the powers of the Director of the Administrative Office of the U.S. Courts. It requires the Director to lay before Congress, annually, statistical tables that will accurately reflect the business transacted in cases and proceedings under title 11.

*Section 209*

This section adds a new subsection (f) to 28 U.S.C. 604 relating to the duties of the Director of the Administrative Office of the U.S. Courts. The Director is empowered to establish a panel of trustees for each bankruptcy court and to name qualified persons to membership on the panel. The number and qualifications of persons named to membership on the panel of private trustees shall be determined by rules and regulations adopted by the Director. It is intended that these rules and regulations will upgrade the caliber of private trustees and insure that any favoritism, real or apparent, is prevented. Persons and corporations named to membership on the panel of trustees must meet certain residency requirements. A corporation named to membership on the panel of trustees must be authorized by its charter to act as trustee. The Director may remove a person from the panel of trustees. Promptly upon the entry of an order of relief (which occurs concurrently with the filing of a petition in a voluntary case) the court must appoint an interim trustee from the panel of trustees to serve until he is replaced by a trustee elected by creditors. If the creditors fail to elect a trustee, the trustee appointed by the court continues to serve until the case is concluded.

*Section 210*

This section adds bankruptcy courts to the definition of "courts" found in section 610 of chapter 41, relating to the Administrative Office of the U.S. Courts.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**506 of 979**

DOCUMENT 52

151

*Section 211*

This section makes a conforming amendment to 28 U.S.C. 620(b) (3) by substituting the term "bankruptcy judges" for the term "referees."

*Section 212*

This section amends 28 U.S.C. 621 which establishes the Board of the Federal Judicial Center. A proposal that was considered by the Committee but not deemed necessary for adoption at this time. The amendment requires the Board of the Federal Judicial Center to consult with a representative of the bankruptcy judges and the representative of the magistrates on matters directly affecting bankruptcy judges and magistrates. The representative of the bankruptcy judges and the representative of the magistrates, who are to act as liaison with the Board of the Federal Judicial Center, are to be selected by the bankruptcy judges and the magistrates in any manner they see fit. The amendment does not place a bankruptcy judge on the Board of the Federal Judicial Center.

*Section 213*

This section makes a conforming amendment in 28 U.S.C. 634(a) relating to the salaries of magistrates. Language which pegs the salaries of full-time and part-time magistrates to the salaries of full-time and part-time referees in bankruptcy is deleted and the maximum salary figure allowable to a magistrate under current law is inserted. This change will not affect the maximum salaries now allowable for magistrates. The amendment, along with the amendment to the Federal Salary Act of 1967 made by section 301 of title III of this bill, does place the maximum salary allowable to magistrates in the future under the auspices of the Quadrennial Salary Commission.

*Section 214*

Subsection (a) of this section amends chapter 49 of title 28 of the United States Code, providing for the staffing of the district courts, by adding at the end thereof four new sections relating to clerks, court reporters and other employees of the bankruptcy courts. The four new sections are as follows:

*Section 757. Clerk of bankruptcy courts*

Subsection (a) permits each bankruptcy court to appoint a clerk. The clerk is subject to removal by the court.

Subsection (b) permits the clerk, with the approval of the court, to appoint necessary deputies, clerical assistants and employees in such number as may be approved by the Director of the Administrative Office of the U.S. Courts. Such deputies, clerical assistants, and employees are subject to removal by the clerk, with the approval of the bankruptcy court.

Subsection (c) specifies that the clerk of the bankruptcy court must reside in the district for which he is appointed. The bankruptcy court is permitted to designate places within the district for the offices of the clerk and his deputies, and their official stations.

Subsection (d) prohibits the clerk, his deputy, or assistant from receiving any compensation or emolument through any office or position to which he is appointed by the court, other than that received as

152

clerk, deputy, or assistant, whether from the United States or from private litigants.

Subsection (e) requires the clerk of each bankruptcy court to pay into the Treasury all fees, costs, and other moneys collected by him, except uncollected fees not required by Act of Congress to be prepaid. The clerk is also required to make returns of the money collected to the Director of the Administrative Office of the U.S. Courts under regulations prescribed by the Director.

*Section 758. Other employees of bankruptcy courts*

This section is designed to provide the bankruptcy court with adequate staff. Bankruptcy judges are authorized to appoint law clerks, secretaries, and other necessary employees, subject to any limitation on the aggregate salaries of such employees which may be imposed by law. The employees which the bankruptcy judges are authorized to appoint under this section are in addition to those authorized under section 757.

*Section 759. Records of proceedings in bankruptcy courts; reporters*

Subsection (a) requires the bankruptcy court to have a record made, whenever practicable, of all proceedings in cases had in open court. The Director of the Administrative Office of the U.S. Courts is authorized to prescribe that the record be taken by electronic sound recording, by a court reported appointed or employed by the bankruptcy court to take a verbatim record by shorthand or mechanical means, or by an employee of the court designated by the court to take such a verbatim record. Flexibility is allowed in the use of electronic sound recording devices because of the technological development of sound recording devices which are in wide use today and are adequate for the purpose. It shall be left to the discretion of the Director to authorize the appropriate mode of recordation of bankruptcy court proceedings.

Subsection (b) requires that a transcript of the original record of a proceeding that has been recorded be made and delivered promptly to any party to a proceeding or the judge on request. A certified transcript is deemed prima facie a correct statement of the testimony taken and the proceedings had. Transcripts made from other than the certified records of the court are not to be considered official transcripts.

Subsection (c) governs fees for transcripts in proceedings to persons permitted to appeal in forma pauperis.

*Section 760. Power to appoint and remove employees of bankruptcy courts*

This section gives bankruptcy judges the power to appoint and remove employees. Whenever the majority of the bankruptcy judges of any bankruptcy court cannot agree upon the appointment of any employee of such court, the chief judge shall make the appointment. Even though the bankruptcy court is an adjunct of the district court, the district judges are not given any power over the appointment or removal of employees of the bankruptcy court. Moreover, this section is written to make it clear that the district courts have no authority to order employees of the bankruptcy court merged into the office of the clerk of the district court and placed under the supervision of the clerk of the district court. The office of the clerk of the bankruptcy court is

## DOCUMENT 52

153

to be maintained as separate from the office of the district court clerk. The clerk of the bankruptcy court and the clerical employees of the office are to function under the direct supervision of the bankruptcy judge.

Subsection (b) of this section amends the table of sections for chapter 49 of title 28 of the United States Code by adding at the end thereof the numbers and headings of sections relating to the staff of the bankruptcy courts.

*Section 215*

This section makes a conforming change to 28 U.S.C. 957(a), extending certain restrictions on clerks of court to clerks of bankruptcy courts.

*Section 216*

This section amends 28 U.S.C. 1334 relating to the jurisdiction of the U.S. district courts over bankruptcy proceedings. In deference to concern over the splintering of the jurisdiction of the district courts, original and exclusive jurisdiction of all bankruptcy cases shall remain in the district court, and the jurisdiction of the district courts over bankruptcy matters is expanded to include all controversies arising out of or related to a case under title 11. However, a statutory scheme has been adopted whereby the totality of this jurisdiction, subject only to the exceptions set forth in subsection (d) of this section, shall be exercised by the bankruptcy court, which is created as an adjunct of each U.S. district court.

Subsection (a) of this section gives the U.S. district courts original and exclusive jurisdiction of all cases under title 11. To facilitate the exercise of this jurisdiction by the bankruptcy court provision is made elsewhere for the case to be filed directly with the clerk of the bankruptcy court. See section 220 of title II of this bill.

Subsection (b) grants to the U.S. district courts original, but not exclusive, jurisdiction of all civil proceedings arising under title 11 or arising under or related to cases under title 11. This broad grant of jurisdiction will enable the bankruptcy courts, which are created as adjuncts of the district court for the purpose of exercising the jurisdiction, to dispose of controversies that arise in bankruptcy cases or under the bankruptcy code. Actions that formerly had to be tried in the State court or in the Federal district court, at great cost and delay to the estate, may now be tried in the bankruptcy court. The idea of possession and consent as bases for jurisdiction is eliminated. The adjunct bankruptcy courts will exercise in personam jurisdiction as well as in rem jurisdiction in order that they may handle everything that arises in a bankruptcy case.

The jurisdiction to be exercised by the bankruptcy courts is of all proceedings arising under title 11 or arising under or related to a case under title 11. The term "proceeding" is used instead of "matters and proceedings," the terminology currently used in the Bankruptcy Act and Rules. As used in this section everything that occurs in a bankruptcy case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass what are now called contested matters, adversary proceedings, and plenary actions under current bankruptcy law. It also includes and disputes related to administrative matters in

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

156

**509 of 979**

154

a bankruptcy case. Likewise, the term proceeding includes issues which may arise after a case is closed, such as in a controversy over a reaffirmation agreement under section 524(b) of title I of the bill.

The phrase "arising under title 11" will enable the bankruptcy court to hear any matter under which a claim is made under a provision of title 11. The combination of the three bases for jurisdiction, "arising under title 11," "arising under a case under title 11," and "related to a case under title 11," will leave no doubt as to the scope of the jurisdiction over disputes to be exercised by the bankruptcy court.

Subsection (c) permits the bankruptcy court, in the interest of justice, to abstain from hearing a particular proceeding arising under title 11 or arising under or related to a case under title 11, and makes the abstention, or a decision not to abstain, nonreviewable. The subsection recognizes there may be cases in which it is more appropriate to have a State court hear a particular matter of State law.

Subsection (d), when read in conjunction with section 164 of chapter 6 of title 28, as enacted by section 201 of this bill, restricts the power of the bankruptcy judge in only two areas which have traditionally been reserved to district judges, (1) the enjoining of another court, and (2) the imposition of punishment for contempt of court. District judges are to conduct cases under chapter 9 and railroad reorganization cases under chapter 11. Otherwise, bankruptcy judges shall have full and complete responsibility for cases under title 11 and all litigation arising out of such cases. The use of the term "may" in this section is not intended to imply that the district court has any discretion whatsoever in withholding bankruptcy cases or civil proceedings arising under title 11 or arising under or related to a case under title 11 from the bankruptcy court. The powers of the bankruptcy judge enumerated in section 164 include the power to conduct all proceedings under title 11 except in municipal adjustment and railroad reorganization cases, and the power to conduct trials and all other proceedings in actions under section 1334(b) of this title. It is the intent of these provisions that the bankruptcy court will receive and the bankruptcy judge will handle cases and proceedings under title 11, and that all actions filed under section 1334(b) except those arising in connection with municipal adjustment and railroad reorganization cases will be automatically referred to the bankruptcy judge. It is contemplated that rules of Bankruptcy Procedure will be adopted to carry out this intent in order that the bankruptcy judge shall exercise the full range of jurisdiction in bankruptcy cases and proceedings. Except for municipal adjustment and railroad reorganization cases, the district judge will be expected to act in title 11 cases only in limited instances (1) where it is necessary to enjoin a State or Federal court or (2) to punish a person for contempt by imprisonment or by a fine of more than $1,000. Otherwise, the district judge will function only as an appellate judge in bankruptcy matters, as provided in subsection (e) of this section.

Subsection (e)(1) confers upon the district court for each judicial district jurisdiction of appeals from (A) final decisions and interlocutory orders of the bankruptcy court in bankruptcy cases, and (B) final judgments, orders, and decrees of the bankruptcy court for such district in proceedings arising under title 11 or arising under or

DOCUMENT 52

155

related to cases under title 11. Subsection (e)(2) provides that the decisions of the bankruptcy court shall be final unless a notice of appeal to a district judge is timely filed. It is contemplated that the manner and time for filing a notice of appeal will be set forth in Rules of Bankruptcy Procedure.

*Section 217.*

This section makes a technical amendment to 28 U.S.C. 1360(a) relating to the status of Alaska as a territory.

*Section 218.*

Subsection (a) of this section amends chapter 87 of title 28 of the United States Code relating to venue of civil actions in the U.S. district courts by adding at the end thereof three new sections specifying venue requirements in bankruptcy cases and proceedings. These new sections are as follows:

*Section 1408. Venue of proceedings under title 11*

This section governs the venue for commencement of a bankruptcy case. The section permits the commencement of a bankruptcy case in the judicial district in which the domicile, residence, principal place of business, or principal assets of the debtor have been located for 180 days preceding the bankruptcy, or for the greater part of that 180-day period than in any other judicial district. An affiliate, general partner, or partnership of a debtor may commence a case in the judicial district in which the debtor's case is pending. This section is derived from section 2a(1) of the Bankruptcy Act and rule 116 of the Rules of Bankruptcy Procedure. The section does not apply to cases ancillary to foreign proceedings.

*Section 1409. Venue of proceedings arising under or related to cases title 11*

Subsection (a) of this section specifies that the court in which the bankruptcy case is pending is always proper venue for proceedings arising under title 11 or arising under or related to a case under title 11, with two exceptions as enumerated in subsections (b) and (d) of this section.

Subsection (b) creates an exception which prevents unfairness to distant debtors of the estate, when the cost of defending might be greater than paying the debt owed. This section specifies that a proceeding by a trustee to recover a money judgment of less than $1,000 or a consumer debt of less than $5,000 must be commenced in the district in which the defendant resides. For example, if a store doing a major part of its business through catalog sales took bankruptcy, the trustee could not file suit in the bankruptcy court in which the case is pending to collect from customers owing for merchandise ordered from catalogs. The debts owed by such customers generally speaking would be consumer debts. This subsection (b) requires a suit to collect a consumer debt of less than $5,000 to be filed in the judicial district in which the defendant resides.

Subsection (b) creates an exception which prevents unfairness to successor to the debtor or creditors under section 541 or 544(b) of title I of this bill. The proper venue for such actions is the district where the debtor or the creditors, as the case may be, could have brought the action to which the trustee succeeds.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

**158** 511 of 979

Subsection (d) relates to claims in favor of the debtor arising out of the operation of the debtor's business after the commencement of the case. The trustee may commence a proceeding on such a claim only in the judicial district in which the debtor could have sued on the claim in the absence of bankruptcy.

Subsection (e) relates to claims against the debtor arising out of the operation of the debtor's business after commencement of the case. A party adverse to the estate may sue the representative of the estate (either the debtor in possession or the trustee) on such a claim in the district where the adverse party could have sued on the claim in the absence of bankruptcy.

*Section 1410. Venue of cases ancillary to foreign proceedings*

Subsection (a) prescribes the proper venue for a case commenced under section 304 of title I of this bill. Cases to enjoin the commencement or continuation of an action or proceeding in a State or Federal court or the enforcement of a judgment may be commenced only in the district where that court sits.

Subsection (b) permits cases ancillary to foreign proceedings to enjoin lien enforcement or to require turnover of property to be commenced only in the district where the property is located.

Subsection (c) permits other cases ancillary to foreign proceedings to be commenced only in the judicial district in which is located the principal place of business in the United States, or the principal assets in the United States, of the estate which is the subject of the case.

Subsection (d) amends the table of sections for chapter 87 of title 28 of the United States Code by adding sections relating to the venue of bankruptcy cases and proceedings.

*Section 219*

Subsection (a) amends chapter 89 of title 28 of the United States Code relating to removal of cases from State courts, by adding a new section covering removal of bankruptcy matters and proceedings.

*Section 1451. Removal of bankruptcy matters and proceedings*

Subsection (a) of this section permits removal of any claim or cause or cause of action to the district court for the district where such a case or proceeding is pending, if the district courts have jurisdiction over such claim or cause of action. The application for removal shall be presented to and acted upon by the bankruptcy judge and if removal is granted the claim or cause of action shall be tried by the bankruptcy judge. Only a proceeding before the U.S. Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power is nonremovable.

Subsection (b) permits the court to which a claim or cause of action has been removed to remand the claim or cause of action on any equitable ground. An order of the bankruptcy judge remanding a claim or cause of action is not reviewable by appeal or otherwise.

Subsection (c) amends the table of sections for chapter 89 of title 28 of the United States Code by inserting the number and heading of the new section relating to removal of bankruptcy matters and proceedings.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

159                    512 of 979

## Section 220

Subsection (a) of this section amends chapter 121 of title 28 of the United States Code relating to trial by jury by adding at the end thereof a new section dealing with jury trials in cases and proceedings under title 11.

### Section 1875. Jury trials in cases and proceedings under title 11

Subsection (a) continues any current right of a litigant in a case or proceeding under title 11 or related to such a case, to a jury trial.

Subsection (b) permits the issues arising on the trial of an involuntary petition in bankruptcy to be tried without a jury.

Subsection (b) amends the table of sections of chapter 121 of title 28 of the United States Code by adding at the end thereof the number and heading of the new section dealing with jury trials in cases and proceedings under title 11.

## Section 221

Subsection (a) of this section amends chapter 123 of title 28 of the United States Code relating to fees and costs by inserting at the end thereof a new section dealing with bankruptcy fees.

### Section 1930. Bankruptcy fees

Subsection (a) of this section fixes the filing fee for a bankruptcy case at $60. Under current law the filing fee is $30, not including an additional $15 confirmation fee, for a chapter XIII case and $50 for a straight bankruptcy, chapter XI, or chapter XII case. The filing fee is somewhat higher for cases under chapters IX, X, and section 77. An individual instituting a voluntary bankruptcy case may pay the filing fee in installments.

Subsection (b) permits the Director of the Administrative Office of the U.S. Courts, with approval of the Judicial Conference, to prescribe additional fees, including fees to be assessed against bankrupt estates similar to the fees currently assessed pursuant to section 40c of the Bankruptcy Act. A proviso limits the maximum assessment against an estate to $100,000. The Director, with the approval of the Conference, is authorized to promulgate rules and regulations governing assessment of these fees.

Subsection (c), copied from 28 U.S.C. 1917, governs fees upon the filing of a notice of appeal or application for appeal.

Subsection (d) governs the payment of costs in instances where a case or proceeding is dismissed for want of jurisdiction.

Subsection (e) prohibits the clerk of the bankruptcy court from collecting any fees other than those prescribed under this section.

Subsection (b) of section 220 amends the table of sections of chapter 123 of title 28 of the United States Code by adding at the end thereof the number and heading of the new section relating to bankruptcy fees.

## Section 222

This section makes a conforming change and a major change in 28 U.S.C. 2675 which authorizes the Supreme Court to prescribe rules of practice and procedure for the bankruptcy courts. The first change is

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**513 of 979**

158

a conforming change which merely deletes a reference to the Bankruptcy Act and inserts in lieu thereof a reference to title 11. The second change repeals the last sentence of 28 U.S.C. 2075 which provides that rules supersede provisions of the Bankruptcy Act in conflict with the rules. This bill extensively revises the bankruptcy law. Nearly all procedural matters have been removed and left to the Rules of Bankruptcy Procedure. Consequently, the need to permit the Supreme Court's rules to supersede the statute no longer exists. To the extent a rule is inconsistent, the statute will govern.

*Section 223*

This section amends 28 U.S.C. 2201 relating to declaratory judgments, to except from the prohibition on declaratory judgment on tax matters, the two instances provided for under the bankruptcy code, relating to relief of a trustee from personal liability for taxes owing by the estate [11 U.S.C. 505(c)] and the tax effects of a reorganization [11 U.S.C. 1146(d)].

*Section 224*

Subsection (a) of this section adds a new section 2256 to chapter 153 of title 28, relating to writ of habeas corpus:

*§ 2256. Habeas corpus from bankruptcy courts*

Under this section, the bankruptcy court is authorized to issue the writ of habeas corpus when appropriate to bring a person before the court for examination, to testify, or to perform a duty imposed on him under title 28. The court may also issue the writ to release a debtor in custody under the judgment of a State or Federal court if the debtor was arrested or imprisoned on process in a civil action, if the process was issued for the collection of a debt that is dischargeable in bankruptcy or that is or will be provided for in a reorganization or individual repayment plan, and if the person holding the debtor in custody is given notice and a hearing in order to contest the issuance of the writ.

Subsection (b) of section 223 of the bill adds a reference to new section 2256 to the table of sections of chapter 153 of title 28.

*Section 225*

This section amends rule 1101(a) of the Federal Rules of Evidence to delete a reference to referees in bankruptcy and insert a reference to bankruptcy judges in lieu thereof. The section further amends rule 1101(b) to delete a reference to the Bankruptcy Act and to substitute a reference to title 11 of the United States Code in lieu thereof.

*Section 226*

Subsection (a) of this section amends section 8339 of Title 5 of the United States Code relating to the computation of the annuity payable to persons retiring under the civil service law. The significant amendment provides for computation of the annuity payable to a bankruptcy judge at the same rate used in computing the annuity for Members of Congress or congressional employees. The other amendments are conforming amendments.

Subsection (b) amends section 8334(c) of title 5 of the United States Code relating to the deductions, contributions and deposits

DOCUMENT 52

159

required to be withheld from the pay of an employee or Member for credit to the civil service retirement fund. The contribution of a bankruptcy judge is increased to 8 percent after June 30, 1979, which is the same contribution now made by a Member of Congress, or employees of Members.

Subsection (c) amends section 8341 of Title 5 of the United States Code relating to survivor annuities to provide for survivors of bankruptcy judges the same annuity provided for employees or Members of Congress.

Subsection (d) makes a conforming amendment to section 8344 (a) (A) of Title 5 of the United States Code relating to annuities and payments of reemployed annuitants.

Subsection (e) amends section 8331 of title 5 of the United States Code containing definitions for purposes of Civil Service retirement so as to insert at the end thereof a definition of "bankruptcy judge." Bankruptcy judge is defined as a judge who is appointed or serves after October 1, 1979, the effective date of this act. This definition precludes inclusion of prior service as a referee in bankruptcy, or bankruptcy judge when computing the annuity payable to a bankruptcy judge at the increased rate provided for by this act.

## TITLE III—AMENDMENTS TO OTHER ACTS

*Section 301*

This section makes a conforming amendment to the Federal Salary Act of 1967. It deletes the cross-reference to referees in bankruptcy in section 402(d) of the Federal Judiciary Salary Act of 1964 and inserts a reference to magistrates, needed because magistrates' salaries are currently based on referees' salaries (28 U.S.C. 634(a)).

*Section 302*

This section adds to the Commodity Exchange Act a section that gives the Commodity Futures Trading Commission (CFTC) rulemaking authority in connection with commodity broker bankruptcies. It was recommended by the Chairman of the CFTC, William Bagley. The CFTC is given the authority to provide that certain cash, securities, other property, or open contractual commitments are to be included in or excluded from customer property or member property (as defined in 11 U.S.C. 761), or to be specifically identifiable to a particular customer in a specific capacity; the method by which the business of the commodity broker debtor is to be conducted or liquidated after the case is commenced: and how the net equity of a customer is to be determined; and indicate the persons to which customer property and commodity contracts may be transferred under section 770 of title 11 of the U.S. Code.

Subsection (b) provides that terms used in the section added to the Commodity Exchange Act are to be construed in pari materia with the Commodity Broker Liquidation subchapter of the bankruptcy code, with the exception that the terms "commodity options dealer", "commodity contract", and "clearing organization" may be altered by rule or order of the Commission.

**Ad Hoc Equity Group Exhibit 9** SASMF **EXHIBIT 25**

515 of 979

160

### Section 303

This section amends section 4 of the Perishable Agricultural Commodities Act by conforming it with policy contained in section 525 of the proposed bankruptcy code. It is amended to prohibit denial or revocation of a license solely on the basis of the filing of bankruptcy petition, without consideration of the factors that may have led to the bankruptcy. Under subsection (e), a license may be revoked in the event of bankruptcy if the circumstances surrounding the bankruptcy warrant. The section as amended does not prohibit consideration of financial responsibility in licensing determinations, but simply requires a deeper look than the fact of bankruptcy.

### Section 304

This section deletes references to bankruptcy found in section 21(a) of the Agricultural Adjustment Act (7 U.S.C. 623(a)). That section, as written, prohibits the institution of a suit, action, or proceeding, including a bankruptcy case, that has the effect of restraining the collection of any tax imposed under that Act. That language amounts to a near absolute prohibition on bankruptcy, because the filing of a petition in bankruptcy operates as an automatic stay of collection efforts against the debtor. The treatment of taxes and their payment in bankruptcy cases is handled exhaustively in the proposed bankruptcy code. The reference to bankruptcy is proposed to be deleted for that reason.

### Section 305

Section 305 makes a conforming amendment to the first section of the Act entitled "An Act to authorize the Secretary of Agriculture to compromise, adjust, or cancel certain indebtedness, and for other purposes," approved December 20, 1944 (58 Stat. 837; 12 U.S.C. 1150). The "Bankruptcy Act or under title 11 of the United States Code" is substituted for the former long title of the Bankruptcy Act.

### Section 306

This section makes two changes in the Securities Act of 1933, that conform it to proposed 11 U.S.C. 1145 (Exemption from securities laws). First, the provision in paragraph (7) of section 3(a) is amended to remove exempt status from a bankruptcy trustee's certificates. This is covered by 11 U.S.C. 1145(a)(1). Second, exempt status is denied for securities issued in a bankruptcy case (primarily reorganizations) in exchange for other securities of the same issuer. Paragraphs (9) and (10) of section 3(a) of the Securities Act now appear to grant exempt status though the SEC has enforced the exemption as transactional rather than as an exempt security. Section 306 of this bill inserts at the beginning of each of those paragraphs the phrase "Except with respect to a security exchanged in a case under title 11 of the United States Code." These kinds of securities are dealt with by 11 U.S.C. 1145(a)(2) and (3).

### Section 307

This section makes a conforming amendment to the Trust Indenture Act of 1939, striking out the former long title of the Bankruptcy Act and inserting "Bankruptcy Act or title 11 of the United States Code".

*Section 308*

The Securities Investor Protection Act of 1970 presently contains numerous cross-references to the Bankruptcy Act. This section changes those cross-references to conform with proposed title 11 of the United States Code.

Subsection (a) conforms the cross-reference to the definition of "insolvent" in the Bankruptcy Act, and deletes reference to acts of bankruptcy, which are eliminated under the proposed bankruptcy code.

Subsection (b) changes the cross-reference to the courts presently handling bankruptcy cases to the courts that will have jurisdiction of bankruptcy cases under the proposed bankruptcy code.

Subsection (c) changes the cross-reference to the definition of "disinterested" in the Bankruptcy Act.

Subsection (d) adds a reference to title 11 of the United States Code immediately after a reference to the Bankruptcy Act.

Subsection (e) is a conforming amendment to section 6(b)(1) of SIPA, changing a reference to a trustee in a Chapter X case to a trustee in a case under title 11.

Subsection (f) amends section 6(c)(2) of SIPA, which makes inapplicable the stockholder liquidation provisions in 60e of the Bankruptcy Act. The references will now be to subchapter III of chapter 7 of title 11.

Subsection (g) amends section 6(c)(1) of SIPA, which now incorporates by reference the bulk of the substantive law provisions of Chapter X of the Bankruptcy Act. The amendment cross-references the new title 11 instead.

Subsection (h) amends section 6(c)(2) of SIPA, which makes inapplicable the stockbroker liquidation provisions in 60e of the Bankruptcy Act. The references will now be to subchapter III of chapter 7 of title 11.

Subsection (i) changes a cross-reference to the Bankruptcy Act to one to title 11 of the United States Code. .

Subsection (j) changes a cross-reference to the definition of "securities" in the Bankruptcy Act to one in the bankruptcy code.

Subsection (k) changes the cross-reference to priority claims to conform to the proposed bankruptcy code.

Subsection (l) changes a reference to the Bankruptcy Act to a reference to title 11 of the United States Code.

Subsection (m) changes a cross-reference to the notice provisions of the Bankruptcy Act.

Subsection (n) changes a cross-reference to the trustee's investigative duties under the Bankruptcy Act.

*Section 309*

This section amends the Public Utility Holding Company Act of 1935 by changing a cross-reference to bankruptcy to one to a case under title 11 of the United States Code.

*Section 310*

Subsection (a) changes a cross-reference in section 2(a)(8) of the Investment Company Act of 1940 to bankruptcy to one to a case under title 11.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**164** **517 of 979**

162

Subsection (b) does the same in section 6(a)(2) of that Act.

Subsection (c) changes the reference to the Bankruptcy Act in section 25(d) of the Investment Company Act to a reference to title 11 of the United States Code.

*Section 311*

This section amends the Investment Advisers Act of 1940 by striking out a reference to bankruptcy in section 202(a)(5) and inserting a reference to a case under title 11 of the United States Code in its place.

*Section 312*

Subsection (a) amends section 302(b)(2) of the Consumer Credit Protection Act by changing the cross-reference to a court of bankruptcy under Chapter XIII of the Bankruptcy Act to a cross-reference to the court of the United States having jurisdiction over cases under chapter 13 of title 11 of the United States Code.

Subsection (b) amends section 605(a)(1) of the Fair Credit Reporting Act by changing a reference to a bankruptcy adjudication to include a reference to the order for relief under the proposed bankruptcy code.

*Section 313*

Section 313 makes conforming amendments to chapter 9 of title 18 of the United States Code, the chapter dealing with bankruptcy crimes in the criminal code. Subsection (a) changes references to bankrupts to references to debtors, references to bankruptcy proceeding to references to cases under title 11, and references to bankruptcy law to references to the provisions of title 11.

Subsection (b) makes a conforming amendment to the definitions in section 151 of the 18. Subsection (c) deletes references to receivers in bankruptcy, and makes a stylistic change to conform to the new style of title 11, relating to books and records.

Subsection (d) deletes references to receiver in bankruptcy in section 153.

Subsection (e) deletes references to referees in bankruptcy and receivers. The term "bankruptcy judge" replaces the term referee."

Subsection (f) changes references to bankruptcy proceeding in section 155 to references to cases under title 11 of the United States Code.

Subsection (g) changes a reference in section 1961 of the criminal code to bankruptcy fraud to a reference to fraud connected with a case under title 11.

Subsection (h) makes the same change in section 2516(1)(c) of the criminal code.

Subsection (i) deletes reference to referee in bankruptcy and inserts bankruptcy judge in lieu thereof in section 3057 of the criminal code, and changes a reference to violations of the bankruptcy laws to a reference to violation under chapter 9 of title 18. These changes conform this section with the revision of the Bankruptcy Act and criminal code under which bankruptcy crimes were removed from the Bankruptcy Act and placed in title 18.

Subsection (j) changes a reference in section 3281 to bankrupt to a reference to debtor in a case under title 11.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**165** **518 of 979**

DOCUMENT 52

163

Subsection (k) inserts in section 6001(4) a reference to a United States bankruptcy court established under chapter 6 of title 28 of the United States Code. This amendment, which enlarges the definition of court in Part V of the criminal code, relating to immunity for witnesses, conforms with the provision found in section 344 of proposed title 11.

*Section 314*

This section deletes a reference to receiver in bankruptcy found in section 485(f) of the Tariff Act of 1930.

*Section 315*

This section changes a reference in section 302(1)(3) of the Automotive Products Trade Act of 1965 to bankruptcy to a reference to cases under title 11 of the United States Code.

*Section 316*

This section repeals a provision of the Higher Education Act of 1965, section 439A, which excepts certain guaranteed student loan and Federally insured student loans from bankruptcy discharge for a five-year period. This exception to the discharge is found in section 523(a)(8) of the proposed bankruptcy code.

*Section 317*

This section makes a conforming amendment to section 239(d) of the Foreign Assistance Act of 1969 relating to the priority of the Government in insolvency situations. It conforms to the amendment made by section 321 of the bill to the Government's priority.

*Section 318*

This section changes a cross-reference in the National Labor Relations Act, section 2(l). The present cross-reference is to bankruptcy; the new one is to cases under title 11 of the United States Code.

*Section 319*

This section changes a reference to bankruptcy in section 3(d) of the Labor-Management Reporting and Disclosure Act of 1959 to a reference to cases under title 11 of the United States Code.

*Section 320*

Section 320 changes a cross-reference in subsection (f) of the same section from court of bankruptcy to court having jurisdiction over cases under title 11 of the United States Code.

Subsection (b) makes two changes in section 4062(c)(2) of ERISA, changing cross-references to conform to the new terminology.

Subsection (c) does the same in section 4068(c)(2) of ERISA.

*Section 321*

Subsection (a) of this section amends section 3466 of the Revised Statutes of the United States to make the Government's general priority in insolvency cases inapplicable in cases under title 11 of the United States Code. This conforms section 3466 with the change made to section 64a of the Bankruptcy Act by section 507 of title 11, eliminating the Government's non-tax priority.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

166                                                    **519 of 979**

The amendment to Revised Statutes 3466 applies to claims or liens that are given the priority of the United States under other laws of the United States.

Subsection (b) makes a conforming change in section 3467 of the Revised Statutes, by relieving a bankruptcy trustee from personal liability for nonpayment of Government claims in bankruptcy cases, where the Government is not entitled to priority.

Subsections (c), (d), and (e) repeal deadwood in the Revised Statutes, specifically, sections 3469, 3473, and 3474, relating to compromise of claims by the United States and to payment of Government claims in gold or silver coin. Subsection (f) makes a conforming change in the table of contents of that title of the Revised Statutes.

Subsection (g) repeals an archaic provision in the Revised Statutes making inapplicable the bankruptcy laws of the United States with respect to the Union Pacific Railroad Company.

## Section 322

This section changes a reference to bankruptcy in the Act entitled "An Act to provide for the alteration of certain bridges over navigable waters of the United States, for the apportionment of the cost of such alterations between the United States and the owners of such bridges, and for other purposes", approved June 21, 1940 (54 Stat. 497; 33 U.S.C. 511).

## Section 323

This section repeals section 17(a) of the Longshoremen's and Harbor Workers' Compensation Act of 1927, which provides a special priority and super-priority lien to the holder of a workmen's compensation claim when the employer of the worker or the insurance carrier involved files under the bankruptcy laws.

Bankruptcy policy strongly favors equality of treatment of all creditors, and strongly disfavors the creation of property rights upon the filing of a bankruptcy case. The purpose of bankruptcy is to enforce rights that have arisen before bankruptcy, and to enforce them in an orderly liquidation process. Springing interests unfairly defeat legitimate expectations of other creditors who may have relied on the absence of any such prior interests in extending credit. Section 67 of the present Bankruptcy Act and section 545 of proposed title 11 of the United States Code implement this important bankruptcy policy.

Accordingly, in order to avoid a potential conflict between section 17(a) and section 545, the bill proposes deletion of section 17(a). The section may already be ineffective under present law, because the prohibition of springing interests was enacted in the 1930's, after the enactment of section 17(a). The amendment proposed would conform the two laws and delete what may already be deadwood.

## Section 324

This section makes a conforming change in section 213 of the Transportation Act, 1920, by changing "bankruptcy" to "case under title 11 of the United States Code."

## Section 325

This section amends section 7 of the Act entitled "An Act to provide conditions for the purchase of supplies and the making of contracts

by the United States, and for other purposes", approved June 30, 1936 (49 Stat. 2036; 41 U.S.C. 41). The reference to trustees in bankruptcy is changed to read trustees in cases under title 11 of the United States Code.

## Section 326

This section repeals section 733(g) of the Public Health Service Act, which excepts from discharge for a period of five years certain educational loans. This exception to discharge is found in section 523 (a)(8) of the proposed bankruptcy code.

## Section 327

This section amends section 503 of the Housing Act of 1949, entitled "Potentially adequate farms," to make a nonassignability provision inapplicable in cases under proposed title 11.

## Section 328

This section changes a reference in section 701 of the Civil Rights Act of 1964 from trustee in bankruptcy to trustee in a case under title 11 of the United States Code.

## Section 329

This section changes a reference in section 802 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes", approved April 11, 1968 (82 Stat. 81; 42 U.S.C. 3602(d)), from trustee in bankruptcy to trustee in a case under title 11 of the United States Code.

## Section 330

Section 17 of the Boulder Canyon Project Act provides for super-priority for claims of the United States arising out of any contract authorized by that Act. Section 331 of the bill makes the priority inapplicable in cases under title 11 of the United States Code, in conformity with the amendment to section 3466 of the Revised Statutes (section 321(a) of the bill) and the general bankruptcy policy against special priorities for the Government.

## Section 331

This section adds a new section to Title IX of the Merchant Marine Act, 1936. The provision added is presently Chapter XIV of the Bankruptcy Act. It does not govern bankruptcy proceedings, and is more properly placed in the Merchant Marine Act than in proposed title 11 of the United States Code. It is inserted with only minor stylistic changes from present law.

## Section 332

This section makes a change in section 22(b) of the Organic Act of Guam. It changes a cross-reference to the Rules of Bankruptcy Procedure to conform it to the present enabling provision in title 28 governing the rules.

## Section 333

This section makes the same changes in section 25 of the Revised Organic Act of the Virgin Islands as section 332 of the bill makes in the Organic Act of Guam.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

168 **521 of 979**

*Section 334*

This section makes three amendments to the Interstate Commerce Act. The amendments are conforming amendments. changing references in sections 20c, 213(a)(3), and 323 of that Act to bankruptcy to references to title 11 of the United States Code.

## TITLE IV—TRANSITION

*Section 401; repealer*

Section 401 provides for the repeal of the existing Bankruptcy Act and all relevant provisions of other laws amending the Bankruptcy Act.

*Section 402; effective date of new act; incumbents*

Subsection (a) of section 402 makes all provisions of this act effective October 1, 1979.

Subsection (b) authorizes the completion of their regular terms of office by referees in bankruptcy serving on the date of the enactment of the act. Subsection (b) extends through September 30, 1982, the term of office of any referee in bankruptcy which would otherwise expire before that date, unless the incumbent is found unqualified by a merit screening committee established pursuant to section 402(c).

Subsection (c) establishes for each State a merit screening committee to evaluate the qualifications of each incumbent referee in bankruptcy to serve during the extended transition term prescribed in the proviso to subsection (b) of this section. Each State screening committee is to be constituted and organized as specified in subsection (c) prior to the expiration of the term of any referee in bankruptcy serving in that State whose term was extended as provided by subsection (b). Merit screening is not required on the part of a bankruptcy judge serving the balance of the regular term for which he was appointed prior to the enactment of this act.

Subsection (d) authorizes an incumbent referee in bankruptcy, upon the expiration of a regular or an extended term of office. to continue to serve until a successor is appointed and qualified as provided in section 201 of the act. This provision safeguards against possible delays in the replacement of bankruptcy judges in service at the end of the transition period.

Subsection (e) confers upon each referee in bankruptcy serving on the date of the enactment of this act. the title of bankruptcy judge and vests in him all of the rights and powers vested in a bankruptcy judge appointed under section 201 of the act. Therefore. the broadened jurisdiction conferred by 28 U.S.C. § 1334. as amended by section 216 of this act. is exercisable by incumbent bankruptcy judges serving on and after the date of the enactment of this act, except to the extent such exercise would be inconsistent with the provisions of section 403 of this act.

*Section 403. Saving provisions*

Subsection (a) makes it clear that the provisions of this act are not to affect cases commenced under prior law. which are to proceed, with respect to both substantive and procedural matters. in the same fashion as though this act were not in effect. Fiduciaries serving in cases pend-

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

169

**522 of 979**

# DOCUMENT 52

167

ing on the date of the enactment of this act are permitted to continue in office.

Subsection (b) preserves the rights of incumbent referees in bankruptcy and their survivors to whatever pension and survivor benefits may have accrued before the repeal of section 40(d) of the Bankruptcy Act, by section 401 of this act.

Notwithstanding section 313 of this act, section 403(c) provides for the continuing application of chapters 9 and 96 and sections 2516, 3057, and 3284 of title 18, United States Code, to the act of any person committed before October 1, 1979, or in connection with a case commenced before that date.

Subsection (d) empowers the bankruptcy judge in a case confirmed after enactment, to reduce a fee in excess of $100,000 charged under section 40c(2)(b) of the Bankruptcy Act, as the interests of justice may require. It is elsewhere provided (section 404(b)) that fees assessed following the effective date of this act are not to exceed $100,000 in any one chapter XI case.

## Section 404. Rules of bankruptcy procedures; fees and charges

Under subsection (a), rules of bankruptcy procedure in force on September 30, 1979, unless inconsistent with this act, are continued in effect during the transition period until either repealed or superseded pursuant to 28 U.S.C. section 2075, as amended by section 221 of this act.

Subsection (b) continues the fees and charges in effect on October 1, 1979, pending the promulgation of new fees and charges in accordance with 28 U.S.C. § 1930. The fees chargeable in any one case may not exceed $100,000.

## Section 405. Transition study

Section 405 requires the Director of the Administrative Office of the U.S. Courts (1) to complete a study to determine the number of bankruptcy judges needed to implement the provisions of this act and (2) to report the results of that study to the Congress and to the Judicial Conference before July 1, 1982.

The transition period prescribed by section 402 (a) and (b) is necessary in view of the time required to acquire meaningful empirical data under the vastly enlarged jurisdiction and altered structure of the new bankruptcy court.

The broadened jurisdiction and powers of the new bankruptcy courts pertain only to cases commenced after October 1, 1979. The transition study report by the Director is to be made to the Judicial Conference by July 1, 1982. The committee feels a 3-year transition period should be sufficient to enable the Director to conduct a meaningful survey on which to base his report to the Congress. However, the committee also recognizes the magnitude and importance of the survey may dictate that the Director require more time to assemble and evaluate decisive data in which case the committee expects the Director to notify the Congress of his needs and request a suitable extension.

The provisions of section 405 are to be read with section 153(b) of this act, which vests in the Judicial Conference of the United States the power to determine the number of bankruptcy courts and their locations.

**Ad Hoc Equity Group Exhibit 9** **SASMF EXHIBIT 25**

**170** **523 of 979**

168

Since implementation of the approved changes may be infeasible within the allotted time, section 402(d), authorizing bankruptcy judges serving on September 30, 1982, to continue to serve until their successors are appointed and qualified, permits the bankruptcy courts to continue to function under the direction of incumbent transition bankruptcy judges until the numbers and locations of bankruptcy court judgeships can be established under this section.

### Estimated Costs

Cost estimates were prepared for the bill in May 1978 by the Administrative Office of the United States Courts and on July 13, 1978, by the Congressional Budget Office.

The cost estimate by the Administrative Office compared the costs for S. 2266 and the analogous House bill, H.R. 8200, and it is attached as appendix I. It shows that S. 2266 would cost, annually, approximately $62.8 million more than current costs.

The cost estimate of the Congressional Budget Office for S. 2266 which follows indicates an approximate annual increase of $14 million per year beginning in fiscal year 1980. This is substantially less than the $62.8 million annual increase estimated for H.R. 8200.

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., July 13, 1978.*

Hon. JAMES O. EASTLAND,
*Chairman, Committee on the Judiciary, U.S. Senate, Dirksen Senate
Office Building, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for S. 2266, a bill to establish a uniform law on the subject of bankruptcies.

Should the committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

ALICE M. RIVLIN,
*Director.*

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

JULY 13, 1978.

1. Bill number: S. 2266.

2. Bill title: A bill to establish a uniform law on the subject of bankruptcies.

3. Bill status: As ordered reported by the Senate Committee on the Judiciary, July 12, 1978.

4. Bill purpose: The purpose of this bill is to establish a modern uniform law on the subject of bankruptcies. The bill provides for substantive changes in the current bankruptcy law and in judicial administration of the law. The jurisdiction of the district court is expanded to include all bankruptcy cases commenced under Title 11 of the U.S. Code, and bankruptcy judges may exercise all powers and jurisdiction conferred on the district courts.

DOCUMENT 52

169

The bill authorizes the appointment of additional personnel for the bankruptcy courts and it requires that the Director of the Administrative Office of the U.S. Courts conduct continuing studies to determine the number of additional judgeships which may be required to provide expeditious administration of the revised bankruptcy law. The Director is also to name qualified persons eligible to membership on the panel of trustees for each bankruptcy court.

The bill also increases bankruptcy court filing fees from the current $50 to $60 per filing.

5. Cost estimate:

|  | Millions |
| --- | --- |
| Fiscal year 1979: Estimated cost | $0.2 |
| Fiscal year 1980: Estimated cost | 14.1 |
| Fiscal year 1981: Estimated cost | 14.2 |
| Fiscal year 1982: Estimated cost | 15.1 |
| Fiscal year 1983: Estimated cost | 16.0 |

The costs of this bill fall within budget function 750.

6. Basis of estimate: Based on information from the Administrative Office of the U.S. Courts, the expansion of the jurisdiction of the district courts is expected to result in bringing before bankruptcy courts approximately 6,000 to 8,000 plenary actions previously adjudicated in state courts. Based on current workload statistics, approximately 20 additional bankruptcy judges will be required to handle the increased caseload. However, the final number of additional judgeships will ultimately be dependent upon further analysis by the Administrative Office of the U.S. Courts of the types of plenary proceedings which will be brought into the district courts.

Assuming 20 additional judgeships will be needed, the fiscal year 1980 cost is estimated to be $2.8 million. This includes lump-sum costs for space, facilities, furnishings, fixtures, and recurring costs for each judge's salary, benefits, expenses, and supporting staff.

This bill requires that records be maintained of proceedings in bankruptcy courts. It is estimated that implementation of this requirement will require approximately 123 court reporters to be employed by the bankruptcy courts. This is based on one court reporter position for each two full-time bankruptcy judges. Costs for salaries benefits and overhead for these positions are estimated to be $3.5 million in fiscal year 1980.

This estimate also includes the cost of one law clerk per bankruptcy judge to provide him with the necessary research and legal assistance to fulfill the responsibilities under this bill. The cost for salaries, benefits and overhead for 246 law clerks is estimated to be $7.3 million in fiscal year 1980.

The Administrative Office of the U.S. Courts will require additional staff to perform several functions necessitated by this bill. First, a staff of three attorneys along with two clerks will be needed to prepare the transitional study to be transmitted to the Congress in 1982, as required by this bill. Second, a staff of three attorneys and two clerks will be needed to establish and maintain information on persons qualified for membership on the panel of trustees for each district court. These positions will have to be established during fiscal year 1979 in order to have trustee panels in operation by the effective date of this bill, October 1, 1979.

170

In addition, as a function of maintaining the panel of trustees, additional staff is estimated to be required to review and audit the work performed by trustees in each district court and to maintain information and statistics on the trustees. The fiscal year 1979 cost is estimated to be approximately $200,000. Costs are estimated to be approximately $500,000 for each of fiscal years 1980, 1981 and 1982, with a slight drop in costs in fiscal year 1983 after the transitional study is completed.

This bill has an effective date of October 1, 1979. All costs are estimated to begin in fiscal year 1980, with the exception referred to above.

All costs are inflated through fiscal year 1983 based on CBO projections of federal salary increases and the cost of federal purchases or services.

7. Estimate comparison: None.

8. Previous CBO estimate: On September 6, 1977, CBO prepared an estimate on H.R. 8200, the corresponding bill reported by the House Committee on the Judiciary, July 19, 1977. The estimated cost of S. 2266 is lower, primarily because it does not provide for a complete upgrading of the status of bankruptcy courts and because H.R. 8200 contains several provisions which are not in S. 2266.

9. Estimate prepared by: Thomas J. Elzey.

10. Estimate approved by:

C. J. NUCKOLS,
(For James L. Blum, Assistant Director for Budget Analysis).

Ad Hoc Equity Group Exhibit 9 SASMF EXHIBIT 25
173
526 of 979

## DOCUMENT 52

# APPENDIX I

### COST ESTIMATES FOR PROPOSED BANKRUPTCY LEGISLATION PREPARED BY THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

#### GENERAL

The following estimates reflect the differences between current costs of the bankruptcy system and the proposed legislation: S. 2266, S. 2266—with modifications proposed by the Judicial Conference, and H.R. 8200.

(a) *S. 2266.*—Cost differences between this proposal and the current law includes the addition of a court reporter for each two-bankruptcy judges, liberalized retirement benefits for the bankruptcy judge, and 20 additional bankruptcy judges to handle increased workload created by an estimated 8,000 plenary actions.

(b) *S. 2266—modified.*—This proposal differs from S. 2266 by the addition of bankruptcy administrators and their staff. No provision has been made for additional referees above the current level based on the assumption that the addition of bankruptcy administrators will assume some of the administrative workload and offset some of the added workload created by the 8,000 plenary actions.

(c) *H.R. 8200.*—This proposed legislation would upgrade the status and salary of referees in bankruptcy to that Article III judges. Each bankruptcy judge would be authorized a law clerk, secretary, court reporter and courtroom deputy. In addition, separate bankruptcy courts would be established, requiring additional supporting personnel and reclassification of some positions. The bill also creates the office of the U.S. Trustees and staff who would be supervised by an Assistant Attorney General. This cost estimate is based on the assumption of a reduction from the current level to 200 full-time bankruptcy judges.

There are 214 full-time and 24 part-time bankruptcy judgeships authorized at this time. The 24 part-time referees currently authorized are working half-time and for purpose of cost estimates, therefore, represent the equivalent of 12 full-time positions.

The attached statements describe in some detail the budgetary impact of each bill on current expenditures. In addition to these statements, an object classification statement compares current costs by major object class with each proposed bill and a personnel summary statement compares current numbers of personnel and total salaries by each major category of position with each bill. Estimated costs by State based on numbers of bankruptcy referees are also provided. All estimates are based on the current level of bankruptcy filings with the exception of 8,000 plenary actions. Costs are also based on current salary rates and without taking into consideration inflation or other possible cost increases.

(171)

Ad Hoc Equity Group Exhibit 9

174

SASMF EXHIBIT 25

527 of 979

172

## COMPARATIVE COST BY OBJECT CLASS
[In thousands of dollars]

| | Current | S. 2266 | S. 2266 (modified) | H.R. 8200 |
|---|---|---|---|---|
| Personnel compensation [1] | $27,295 | $31,534 | $37,409 | $54,438 |
| Personnel benefits | 6,399 | 8,228 | 9,538 | 16,428 |
| Travel and transportation of persons | 484 | 615 | 533 | 1,470 |
| Transportation of things | 2 | 2 | 2 | 2 |
| Space and facilities: | | | | |
|   Standard level user charges | 5,269 | 5,799 | 6,651 | 12,809 |
|   Space renovations | | | | [2]85,000 |
| Communications, utilities, and other rent | 2,771 | 2,998 | 3,189 | 3,346 |
| Printing and reproduction | 407 | 449 | 506 | 537 |
| Security investigations: | | | | |
|   Nonrecurring | | [2]80 | [3]440 | [2]970 |
|   Recurring | 20 | 20 | 20 | 20 |
| Other services | 197 | 725 | 770 | 294 |
| Supplies and materials | 565 | 639 | 762 | 825 |
| Equipment: | | | | |
|   General office, initial | | [2]252 | [2]262 | [2]1,961 |
|   Lawbooks: | | | | |
|     Initial | 141 | [2]221 | [2]171 | [2]6,000 |
|     Recurring | | (154) | (141) | (1,200) |
|   Furniture and furnishings: | | | | |
|     Initial | | [2]841 | [2]1,500 | [2]5,273 |
|     Recurring | 223 | (247) | (299) | (546) |
| Cost of general administration: | | | | |
|   Administrative Office of the U.S. Courts (Administrative Support Services) | 1,000 | 1,040 | 1,081 | 1,081 |
|   Federal Judicial Center (education and training) | 129 | 242 | 292 | 433 |
|   Assistant Attorney General (supervising U.S. Trustees) | | | | [2]473 |
| Budgetary impact: | | | | |
|   1st yr | | 53,675 | -63,486 | 191,360 |
|   Succeeding years | 44,902 | 52,682 | 61,553 | 93,887 |
| Change in revenue: | | | | |
|   Loss (+) | | | | [4]14,000 |
|   Gain (-) | | [5]-120 | [5]-120 | [5]-120 |
| Total cost: | | | | |
|   1st yr | | 53,555 | 63,366 | 205,240 |
|   Succeeding years | 44,902 | 52,562 | 61,433 | 107,767 |

[1] Personnel compensation takes into account normal lapses (savings due to vacancies).
[2] Nonrecurring expenses.
[3] Includes nonrecurring of $15,000 for security investigations.
[4] Revenue loss due to elimination of contributions to referee salary and expense fund from net proceeds realized from liquidations and reorganizations.
[5] A $15 filing fee will be received for each of the estimated 8,000 plenary actions.

## PERSONNEL SUMMARY [1]
[Dollar amounts in thousands]

| | Current | | S. 2266 | | S. 2266 (modified) | | H.R. 8200 | |
|---|---|---|---|---|---|---|---|---|
| | Number of positions | Total salaries | Number of positions | Total salaries | Number of positions | Total salaries | Number of positions | Total salaries |
| Bankruptcy judges: | | | | | | | | |
|   Full time | 214 | $10,379 | 246 | $11,883 | 226 | $10,961 | 200 | $10,900 |
|   Part time (equivalent full-time positions) | 12 | 582 | | | | | | |
| Personal staff: | | | | | | | | |
|   Secretaries | 226 | 3,088 | 246 | 3,347 | 226 | 3,088 | 200 | 3,324 |
|   Law clerks | | | | | | | 200 | 4,158 |
| Court reporters | | | 123 | 2,730 | 113 | 2,519 | 200 | 4,434 |
| Courtroom deputies | | | | | | | 200 | 3,652 |
| Clerical staff | 1,097 | 13,246 | 1,112 | 13,574 | 1,097 | 13,246 | | |
| Bankruptcy administrators: | | | | | | | | |
|   Bankruptcy administrators | | | | | 164 | 5,667 | | |
|   Staff | | | | | 164 | 1,928 | | |
| U.S. trustees: | | | | | | | | |
|   Trustees | | | | | | | 188 | 5,980 |
|   Staff | | | | | | | 470 | 6,259 |
| Clerk of the bankruptcy court: | | | | | | | | |
|   Clerks | | | | | | | 94 | 3,508 |
|   Staff | | | | | | | 871 | 12,323 |
| Total | 1,549 | 27,295 | 1,727 | 31,534 | 1,980 | 37,509 | 2,623 | [1]54,438 |

[1] Excluding personnel in the Administrative Office of the U.S. Courts, the Federal Judicial Center, and the Department of Justice.

# DOCUMENT 52

## 173

### S. 2266—BUDGETARY IMPACT

| Increase | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Bankruptcy judges—S. 2266 will result in an estimated 8,000 plenary actions to be handled by bankruptcy judges. The increased workload will require 20 additional bankruptcy judges over the current equivalent of 226 full-time positions (214 full-time and 24 part-time positions): | | |
| Personnel compensation | 20 | $922 |
| Personnel benefits | | 93 |
| Unfunded cost of retirement | | 120 |
| Secretaries: | | |
| Personnel compensation | 20 | 259 |
| Personnel benefits | | 26 |
| Unfunded cost of retirement | | 35 |
| 2. Court reporters—An average of 1 court reporter will be required for each 2 bankruptcy judges: | | |
| Personnel compensation | 123 | 2,730 |
| Personnel benefits | | 273 |
| Unfunded cost of retirement | | 366 |
| 3. Chief deputy clerks—Deconsolidation of clerk's offices requires addition of middle level management personnel: | | |
| Personnel compensation | 15 | 328 |
| Personnel benefits | | 33 |
| Unfunded cost of retirement | | 44 |
| 4. Liberalized retirement benefits for 246 bankruptcy judges | | 839 |
| 5. Travel and miscellaneous: | | |
| Bankruptcy judges and staff | | 148 |
| Court reporters | | 320 |
| Chief deputy clerks | | 24 |
| 6. Security investigations for 32 bankruptcy judges | | [1] 80 |
| 7. Contractual services for court reporters for those locations where full-time reporters are not available | | 500 |
| 8. New libraries for 32 bankruptcy judges | | [1] 80 |
| Annual cost of maintaining libraries | | (13) |
| 9. General office equipment: | | |
| Bankruptcy judges and staff (32) | | [1] 240 |
| Chief deputy clerks (15) | | [1] 12 |
| 10. Space rental: | | |
| Bankruptcy judges and staff (20) | | 306 |
| Court reporters (123) | | 200 |
| Chief deputy clerks (15) | | 24 |
| 11. Furniture and furnishings: | | |
| New personnel: | | |
| Bankruptcy judges (32) | | [1] 480 |
| Court reporters (123) | | [1] 123 |
| Chief deputy clerks (15) | | [1] 15 |
| Recurring requirements: | | |
| Bankruptcy judges and staff (20) | | (10) |
| Court reporters and chief deputy clerks | | (14) |
| 12. General administration: | | |
| Federal Judicial Center (education and training) | | 113 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 2 | 40 |
| 13. Revenue gain (represents filing fees of $15 for 8,000 plenary actions) | | −120 |
| Budgetary impact: | | |
| 1st yr | 180 | 8,653 |
| Succeeding years | 180 | 7,660 |

[1] Nonrecurring expenses.
Note: All amounts included for salaries and benefits of new personnel take into account normal lapses (savings due to vacancies) of 5 percent.
In addition to the 20 additional bankruptcy judges required for plenary actions, it is anticipated that the 24 part-time judges will be replaced by 12 full-time bankruptcy judges.

**Ad Hoc Equity Group Exhibit 9** SASMF EXHIBIT 25

529 of 979

174

S. 2266—MODIFIED BUDGETARY IMPACT

| Increase | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Court reporters—an average of 1 court reporter will be required for each 2 referees: | | |
| Personnel compensation | 113 | $2,519 |
| Personnel benefits | | 252 |
| Unfunded cost of retirement | | 338 |
| 2. Bankruptcy administrators—S. 2266 (modified) provides for the establishment of the Office of Bankruptcy Administrator: | | |
| Personnel compensation | 164 | 5,667 |
| Personnel benefits | | 566 |
| Unfunded cost of retirement | | 759 |
| Secretaries to bankruptcy administrators: | | |
| Personnel compensation | 164 | 1,928 |
| Personnel benefits | | 193 |
| Unfunded cost of retirement | | 259 |
| 3. Liberalized retirement benefits for 226 referees in bankruptcy | | 772 |
| 4. Travel and miscellaneous expenses: | | |
| Court reporters | | 294 |
| Bankruptcy administrators and staff | | 902 |
| 5. Security investigations: | | |
| Referees in bankruptcy (12) | | ¹ 30 |
| Bankruptcy administrators (164) | | ¹ 410 |
| 6. Contractual service for court reporters for those locations where full-time reporters are not available | | 500 |
| 7. New libraries for 21 referees in bankruptcy | | ¹ 30 |
| Annual cost of maintaining libraries | | |
| 8. General office equipment: Bankruptcy administrators and staff (328) | | ¹ 262 |
| 9. Space rental: | | |
| Court reporters (113) | | 184 |
| Bankruptcy administrators and staff (328) | | 1,198 |
| 10. Furniture and furnishings: | | |
| New personnel: | | |
| Referees in bankruptcy (12) | | ¹ 180 |
| Court reporters (113) | | ¹ 113 |
| Bankruptcy administrators and staff (328) | | ----- |
| Recurring requirements: | | |
| Referees in bankruptcy and staff | | |
| Court reporters | | (11) |
| Bankruptcy administrators and staff | | (65) |
| 11. General administration: | | |
| Federal Judicial Center (education and training) | | 163 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 4 | 81 |
| 12. Revenue gain (represents filing fees of $15 for 8,000 plenary actions) | | −120 |
| Budgetary impact: | | |
| 1st yr | 455 | 18,464 |
| Annual recurring | 445 | 16,531 |

¹ Nonrecurring expenses.

Note: Although S. 2266 (modified) will result in additional plenary actions, it is believed that the number of referees in bankruptcy will remain the same as currently (226) because the bankruptcy administrators will assume some of the present administrative workload of the referees. All amounts included for salaries and benefits of new personnel take into account normal lapses (savings due to vacancies) of 5 percent. It is anticipated under S. 2266 (modified) that the 24 part-time referees will be replaced by 12 full-time referees.

# DOCUMENT 52

## 175

### H.R. 8200—BUDGETARY IMPACT

| Increase [1] | Permanent positions | Amount (thousands) |
|---|---|---|
| 1. Salary adjustment for bankruptcy judges. H.R. 8200 raises bankruptcy referees to art. III judges with salaries increasing from $48,500 to $54,500 | | $1,200 |
| 2. Life tenure, noncontributing retirement system increase in cost over the present civil service retirement system and other personnel benefits | | 3,519 |
| 3. Participation in judicial survivors' annuities system with agency contributions at 4½ percent | | 491 |
| 4. Additional staff for bankruptcy judges: | | |
| Law clerk, JSP-12: | | |
| Personnel compensation | 200 | 4,158 |
| Personnel benefits | | 416 |
| Unfunded cost of retirement | | 558 |
| Court reporters, ungraded: | | |
| Personnel compensation | 200 | 4,434 |
| Personnel benefits | | 444 |
| Unfunded cost of retirement | | 594 |
| Reclassification of secretaries from JSP-8 to JSP-10 and courtroom deputies from JSP-6 to JSP-11 | | 2,496 |
| 5. U.S. trustees and staff: The cost is based on 94 U.S. trustees, 94 assistant trustees with a staff of 2 secretaries and 3 clerks for each office. | | |
| Personnel compensation | 658 | 12,238 |
| Personnel benefits | | 1,225 |
| Unfunded cost of retirement | | 1,641 |
| 6. The clerical staff of the bankruptcy court will be upgraded with grade levels of the clerk and his or her deputy commensurate with those of district courts and an additional position for middle level management. | | |
| Personnel compensation | 94 | 4,995 |
| Personnel benefits | | 500 |
| Unfunded cost of retirement | | 669 |
| 7. Travel and miscellaneous: | | |
| Judges and staff | | 974 |
| U.S. trustee and staff | | 724 |
| Clerical staff | | 350 |
| 8. Security investigations: | | |
| Judges (200) | | [2] 500 |
| U.S. trustees and assistant trustees (188) | | [2] 470 |
| 9. New libraries for 200 bankruptcy judges | | [2] 5,859 |
| Annual cost of maintaining libraries | | (1,059) |
| 10. General office equipment: | | |
| Bankruptcy judges and staff (200) | | [2] 1,360 |
| U.S. trustees and staff (658) | | [2] 526 |
| Clerks of bankruptcy court (94) | | [2] 75 |
| 11. Space rental: | | |
| Bankruptcy judges and staff (1,000) | | 5,403 |
| U.S. trustees and staff (658) | | 1,603 |
| Clerks of bankruptcy court (965) | | 534 |
| Space renovations | | [2] 85,000 |
| 12. Furniture and furnishings: | | |
| New personnel: | | |
| Bankruptcy judges and staff (1,000) | | [2] 3,264 |
| U.S. trustees and staff (658) | | [2] 1,222 |
| Clerks of bankruptcy court (965) | | [2] 564 |
| Recurring requirements: | | |
| Bankruptcy judges and staff (1,000) | | (224) |
| U.S. trustees and staff (658) | | (85) |
| Clerks of bankruptcy court (965) | | (14) |
| 13. General administration: | | |
| Assistant Attorney General (supervising U.S. trustees) | 10 | [4] 473 |
| Administrative Office of the U.S. Courts (Administrative Support Services) | 4 | 81 |
| Federal Judicial Center (education and training) | | 304 |
| Less: | | |
| 14 full-time and the equivalent of 24 part-time referees | −26 | −1,261 |
| 52 secretaries and clerical assistants | −52 | −644 |
| Benefits (funded and unfunded cost) | | −501 |
| Revenue loss [5] | | 14,000 |
| Revenue gain | | −120 |
| Budgetary impact: | | |
| 1st yr | 1,083 | 160,338 |
| Succeeding yr | 1,083 | 62,865 |

[1] The cost estimate for H.R. 8200 is based on 200 judges.
[2] All amounts included for salaries and benefits of new personnel takes into account normal lapse (savings due to vacancies) of 5 percent.
[3] Nonrecurring expenses.
[4] Includes nonrecurring of $15,000 for security investigations.
[5] Revenue loss due to elimination of contributions to referee salary and expense fund from net proceeds realized from liquidations and reorganizations.

Ad Hoc Equity Group Exhibit 9    SASMF EXHIBIT 25

531 of 979

176

PROPOSED BANKRUPTCY LEGISLATION—COMPARATIVE COST BY STATE[1]

[Dollar amounts in thousands]

| | Current cost | S. 2266 | | S. 2266 (modified) | | H.R. 8200 | |
|---|---|---|---|---|---|---|---|
| | | 1st yr cost | Annual recurring | 1st yr cost | Annual recurring | 1st yr cost | Annual recurring |
| Total | $44,902 | $53,555 | $52,562 | $63,365 | $61,433 | $205,240 | $107,767 |
| District of Columbia circuit: District of Columbia | 199 | 216 | 214 | 280 | 272 | | |
| 1st circuit: | | | | | | | |
| Maine | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Massachusetts | 795 | 1,088 | 1,068 | 1,122 | 1,086 | 4,105 | 2,155 |
| New Hampshire | 99 | 218 | 214 | 140 | 136 | | |
| Rhode Island | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Puerto Rico | 397 | 218 | 214 | 561 | 544 | 1,026 | 539 |
| 2d circuit: | | | | | | | |
| Connecticut | 397 | 435 | 437 | 561 | 544 | 2,052 | 1,078 |
| New York | 3,577 | 4,789 | 4,701 | 5,047 | 4,892 | 15,394 | 8,082 |
| Vermont | 99 | 218 | 214 | 140 | 136 | 1,026 | 539 |
| 3d circuit: | | | | | | | |
| Delaware | 99 | 218 | 214 | 140 | 136 | | |
| New Jersey | 894 | 1,306 | 1,282 | 1,402 | 1,359 | 5,131 | 2,694 |
| Pennsylvania | 1,590 | 1,959 | 1,923 | 2,243 | 2,175 | 6,157 | 3,233 |
| Virgin Islands | 99 | | | 140 | 136 | | |
| 4th circuit: | | | | | | | |
| Maryland | 298 | 435 | 427 | 420 | 408 | 2,052 | 1,078 |
| North Carolina | 795 | 1,089 | 1,068 | 1,122 | 1,087 | 3,079 | 1,616 |
| South Carolina | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Virginia | 993 | 1,524 | 1,496 | 1,402 | 1,359 | 5,132 | 2,694 |
| West Virginia | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| 5th circuit: | | | | | | | |
| Alabama | 1,788 | 1,524 | 1,496 | 2,523 | 2,447 | 6,157 | 3,233 |
| Florida | 1,195 | 1,959 | 1,923 | 1,682 | 1,631 | 6,157 | 3,233 |
| Georgia | 1,391 | 1,742 | 1,709 | 1,963 | 1,903 | 7,183 | 3,772 |
| Louisiana | 497 | 871 | 854 | 701 | 680 | 3,079 | 1,616 |
| Mississippi | 695 | 653 | 641 | 981 | 951 | 3,079 | 1,616 |
| Texas | 1,788 | 2,830 | 2,778 | 2,524 | 2,446 | 9,236 | 4,850 |
| Canal Zone | | | | | | | |
| 6th circuit: | | | | | | | |
| Kentucky | 596 | 653 | 641 | 841 | 815 | 3,079 | 1,616 |
| Michigan | 1,391 | 1,524 | 1,496 | 1,963 | 1,903 | 5,131 | 2,694 |
| Ohio | 2,980 | 3,266 | 3,205 | 4,205 | 4,077 | 13,340 | 7,005 |
| Tennessee | 1,391 | 1,306 | 1,282 | 1,963 | 1,903 | 5,131 | 2,695 |
| 7th circuit: | | | | | | | |
| Illinois | 2,285 | 2,613 | 2,564 | 3,225 | 3,126 | 10,262 | 5,389 |
| Indiana | 1,192 | 1,524 | 1,496 | 1,682 | 1,631 | 5,131 | 2,694 |
| Wisconsin | 894 | 1,088 | 1,068 | 1,262 | 1,223 | 4,105 | 2,155 |
| 8th circuit: | | | | | | | |
| Arkansas | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Iowa | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Minnesota | 894 | 1,306 | 1,282 | 1,262 | 1,223 | 5,132 | 2,693 |
| Missouri | 1,193 | 871 | 854 | 1,683 | 1,630 | 4,105 | 2,155 |
| Nebraska | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| North Dakota | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| South Dakota | 99 | 218 | 214 | 140 | 136 | 1,026 | 539 |
| 9th circuit: | | | | | | | |
| Alaska | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Arizona | 795 | 871 | 854 | 1,122 | 1,087 | 4,105 | 2,155 |
| California | 5,165 | 5,878 | 5,769 | 7,290 | 7,068 | 23,603 | 12,393 |
| Hawaii | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Idaho | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Montana | 199 | 435 | 427 | 280 | 272 | 1,026 | 539 |
| Nevada | 397 | 435 | 427 | 561 | 544 | 2,052 | 1,078 |
| Oregon | 894 | 871 | 854 | 1,262 | 1,223 | 4,105 | 2,155 |
| Washington | 993 | 1,088 | 1,069 | 1,402 | 1,358 | 5,131 | 2,694 |
| Guam | | | | | | | |
| 10th circuit: | | | | | | | |
| Colorado | 794 | 871 | 854 | 1,122 | 1,087 | 4,105 | 2,156 |
| Kansas | 596 | 653 | 641 | 841 | 816 | 3,079 | 1,616 |
| New Mexico | 199 | 435 | 427 | 280 | 272 | 1,026 | 539 |
| Oklahoma | 794 | 653 | 641 | 1,122 | 1,087 | 3,079 | 1,616 |
| Utah | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |
| Wyoming | 199 | 218 | 214 | 280 | 272 | 1,026 | 539 |

[1] Represents estimates based on average unit cost of establishing or maintaining each bankruptcy referee (judge) position.

Ad Hoc Equity Group Exhibit 9
SASMF EXHIBIT 25
179
532 of 979

# DOCUMENT 52

177

### CHANGES IN EXISTING LAWS

In the opinion of the Committee on the Judiciary, it is necessary in order to expedite the business of the Senate to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate (relating to the showing of changes in existing laws made by the bill as reported). The Committee felt this was justified since the Committee on Finance has a 30-day sequential referral following the date the bill is reported from the Judiciary Committee and further changes could be expected from the Committee on Finance. It is anticipated that completed changes in the existing law section will be available following termination of the referral to the Committee on Finance.

O

Ad Hoc Equity Group Exhibit 9

180

SASMF EXHIBIT 25

533 of 979

**Exhibit 10**

SASMF EXHIBIT 25

535 of 979

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CORE SCIENTIFIC, INC., *et al.*, | § | Case No. 22-90341 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## DEBTORS' RESPONSE TO MOTION FOR APPOINTMENT
## OF AN OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

Core Scientific, Inc. (the "**Company**") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby file this response to the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* (ECF No. 458) (the "**Motion**"), and respectfully represent as follows:[2]

### Preliminary Statement

1. Given the unique facts and circumstances of these chapter 11 cases, the Debtors at this time support the formation of an Official Equity Committee with a limited scope and Budget (as defined and discussed below in more detail). The scope of the Official Equity Committee's mandate should be limited to valuation and plan negotiation issues, and a Budget

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6073); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

commensurately tailored to these responsibilities should limit the costs of the Official Equity Committee.  After discussions between the Debtors and the Ad Hoc Equity Group, the Ad Hoc Equity Group has agreed to these conditions, including an agreed Budget of $4.75 million.  *See Order Directing the Appointment of an Official Committee of Equity Security Holders* (ECF No. 568) (the "**Proposed Order**"), Proposed Order at ¶ 6.  Therefore, the Debtors request that the Court enter the Proposed Order.

2. The Debtors, their advisors, and the Special Committee of Independent Directors of the Debtors' Board of Directors (the "**Special Committee**")[3] are keenly aware of the Debtors' duties to all stakeholders, including equity holders.  After careful consideration and deliberation, the Special Committee determined that the appointment of an Official Equity Committee with a limited scope and Budget is appropriate at this time for two primary reasons.  First, rising bitcoin prices and lower energy costs suggest the Debtors may be solvent (and, at the very least, are not "hopelessly insolvent").[4]  Second, principles of fairness support equity holders, like other constituents in these cases, receiving representation from estate-paid professionals with respect to the two issues most important to them:  valuation and plan negotiation.  To be clear, the Debtors believe that equity holders are adequately represented in these cases without an Official Equity Committee, but believe the appointment of an Official Equity Committee is nonetheless warranted given the totality of the circumstances.

3. Further, as discussed below, the Debtors vehemently disagree with the suggestions in the Motion that any of their actions to date have not been appropriate or entirely consistent with their fiduciary duties.  The Debtors are hopeful that as they move on to the next

---

[3] As of January 28, 2023, the Special Committee consists of Kneeland Youngblood and Neal Goldman.

[4] As discussed below, the Debtors have not finalized their business plan and their advisors have not completed a formal valuation.

2

SASMF EXHIBIT 25
537 of 979

stage of these cases, an Official Equity Committee will be a constructive partner in the Debtors' goal of negotiating a consensual and value-maximizing chapter 11 plan with all their major constituents.

**Response**

**A. Legal Standard**

4.      Section 1102(a)(2) of the Bankruptcy Code provides, in pertinent part, that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or equity security holders." 11 U.S.C. section 1102(a)(2). The Bankruptcy Code does not define the term "adequate representation." *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 695 (Bankr. C.D. Cal. 2008). Instead, courts retain discretion to appoint an equity committee based on the facts of each individual case. *See In re SunEdison, Inc.*, (Bankr. S.D.N.Y. 2016) (quoting *In re Williams Communications Group, Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002)).

5.      Courts in this district generally consider the following factors when deciding a motion under section 1102(a)(2) of the Bankruptcy Code: (1) whether the debtors are likely to prove solvent; (2) whether equity is adequately represented by stakeholders already at the table; (3) the complexity of the debtors' cases; and (4) the likely cost to debtors' estates of an equity committee. *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (stating these four factors); *see also In re SandRidge*, Case No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016) H'rg Tr. at 94:7–10 ("I am a big fan of the thought process that is set forth in *Pilgrim's Pride* and I do think that the Court exhibited a thoughtful analysis and weighing of the various issues and set forth the four factors"). In *SandRidge*, this Court added a practical fifth factor: whether the appointment of an equity committee "is going to add something to the case." H'rg Tr. at 94:10–

3

12 (adding practicality as a fifth factor).  Courts have noted that no one factor is dispositive.  *In re Edison Bros. Stores, Inc.* 1996 WL 534853 at *3 (D. Del. Sept. 17, 1996) (stating that "these factors are simply guidelines for the court to consider").

6.      Bankruptcy courts have authority to limit the scope and budget of an equity committee.  *See Pilgrim's Pride*, 407 B.R. at 221–22 (requiring the equity committee to adhere to a budget; although the court chose not to limit the equity committee's scope at the outset, it noted its authority to do so and stated that equity committee professionals should expect a reduction or elimination of fees if they duplicate work done by the creditors' committee); *see also In re. J.C. Penney Co., Inc.*, Case No. 20-20182 (Bankr. S.D. Tex. June 10, 2020) H'rg Tr. at 61:3–12 (suggesting the debtors consent to the appointment of an equity committee with a limited budget).

**B.  The Debtors Are Not Hopelessly Insolvent**

7.      Courts have held that an equity committee is unwarranted when a debtor is "hopelessly insolvent." *Pilgrim's Pride*, 407 B.R. at 217 n.15 ("[m]uch of the authority suggests— and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency"); *see also SunEdison*, 556 B.R. at 102 ("stockholders of a 'hopelessly insolvent' estate have no economic interest in the [bankruptcy] case, and under the absolute priority rule, are not entitled to any distribution under a plan absent the consent of the unsecured creditors").

8.      The Debtors have not finalized their business plan and their advisors have not yet completed a formal valuation.  Nevertheless, based on market factors, the Debtors do not believe they are hopelessly insolvent.  Since the Petition Date, the price of bitcoin has risen from approximately $16,800 to around $23,000 as of the date of the filing of this response.  The price

Ad Hoc Equity Group Exhibit 10
4

**SASMF EXHIBIT 25**
**539 of 979**

of bitcoin has remained well-above $20,000 for more than a month.[5]  As the Debtors' primary business (self-mining and selling mined bitcoin) is directly tied to bitcoin prices and the number of bitcoin mined, the recent improvement in bitcoin prices has had a direct positive impact on the Debtors' value.

9.      To be sure, the price of bitcoin is volatile.  It could rise significantly or decline significantly in a short period of time, as it has in the past.  Taking a longer view, however, the Debtors note that bitcoin has generally remained above $20,000 for well over two years. Indeed, since January 1, 2021, bitcoin has only briefly dropped below $20,000, which occurred (i) during the four-month period immediately prior to the Petition Date and shortly thereafter,

---

[5]  The U.S. Trustee requested the Debtors' position on the appointment of an Official Equity Committee in mid-January.  On January 14, 2023, the Special Committee decided to oppose the appointment of an Official Equity Committee at that time and the Debtors informed the U.S. Trustee of this position on January 17, 2023 (the next business day).  At that time, bitcoin had only recently risen to around $21,000, the Debtors had not yet secured the Replacement DIP Facility, and the Debtors had not yet terminated the RSA.  The Debtors also believed the decision of whether to appoint an Official Equity Committee in these cases should be made by the Court, which has the authority to limit the committee's budget.  As set forth in this response, the Debtors' circumstances have changed since their initial response to the U.S. Trustee, the rise in bitcoin prices has been more sustained, and the Ad Hoc Equity Group has now agreed to a limited scope and Budget.  The Special Committee made the decision to support an Official Committee with a limited scope and budget on February 18, 2023.  The chart below shows bitcoin prices on and preceding the Special Committee decisions.



**Daily BTC Closing Price: October 1, 2022 to February 18, 2023**

5

SASMF EXHIBIT 25
540 of 979

coinciding with the worst days of the crypto winter, particularly the November 2022 collapse of FTX Trading Ltd., and (ii) for a few days in June 2022, coinciding with the collapse of Three Arrows Capital Ltd. (a large cryptocurrency-focused hedge fund).



10.     At the same time, one of the Debtors' most significant operating costs – utilization of power to operate their mining facilities – has declined steadily since the Petition Date as underlying fuel costs have generally decreased.[6]  Higher bitcoin prices, lower power costs, and other developments have all served to improve the Debtors' prospects since filing.  The marketplace's interest in providing the Debtors debtor-in-possession financing in late January further evidences the Debtors' improved financial prospects since the Petition Date.  The Debtors received four new DIP financing proposals in January versus just one from the Ad Hoc Noteholder Group (as defined below) in December[7]

---

[6]  Indeed, the high price of power was one of the causes of the Debtors' financial decline and chapter 11 filing.  *See Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (ECF No. 5) (the "**Bros Declaration**") ¶ 69–72 (explaining how high energy costs negatively impact the Debtors' bitcoin mining and hosting businesses).

[7]  *Declaration of John Singh in Support Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Replacement Senior Secured Non-priming Replacement Superpriority*

6

SASMF EXHIBIT 25
541 of 979

11.     If current conditions continue to improve, it is likely that the Debtors are not "hopelessly insolvent," and plausible that the Debtors are solvent.

**C. Although the Equity Holders are Adequately Represented, the Debtors Support the Appointment of an Official Equity Committee With Limited Scope and Budget**

12.     The Debtors believe the interests of equity holders are adequately represented. First, the Debtors and the Special Committee are aware of their fiduciary duties and are tasked with maximizing value for all stakeholders, including equity holders. The Special Committee can capably and independently represent the interest of equity holders. For example, the prior RSA with the ad hoc group of the Company's noteholders (the "**Ad Hoc Noteholder Group**"), negotiated prepetition during the darkest days of the crypto winter, provided for a return to equity holders. Further, the Special Committee directed the Debtors to locate replacement DIP financing and approved the Replacement DIP Facility, which will likely result in greater recoveries than provided by the RSA for all stakeholders, including equity holders. Numerous parties noted the benefits of the Replacement DIP Facility, including the Court (*see In re Core Scientific, Inc.* (Case No. 22-90341 (DRJ)) (Bankr. S.D. Tex. Feb. 1, 2023) (the "**Replacement DIP Hearing**") Hr'g Tr. at 71:25–72:4 (noting that the Replacement DIP Facility was "a better deal")), the Ad Hoc Equity Group (*see* Motion at ¶ 53 (applauding the Debtors' successful effort to secure the Replacement DIP Facility)), and the Creditors' Committee (*see Statement of the Official Committee of Unsecured Creditors (I) In Support of Replacement Debtor-In-Possession Financing; and (II) Objecting to Certain Request of the Original DIP Lenders* (ECF No. 397) ¶ 1 (noting that the rejection of the Original DIP Facility in favor of the Replacement DIP Facility was

---

*Postpetition Financing, (b) Use Cash Collateral, and (c) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (ECF No. 390) ("**Second Singh Declaration**") at ¶ 13.

Ad Hoc Equity Group Exhibit 10
7

SASMF EXHIBIT 25
542 of 979

"extremely beneficial for unsecured creditors")).  The Special Committee also directed the Debtors to terminate the RSA as soon as a better alternative became available, including for equity holders. *See Notice of RSA Termination* (ECF No. 517).

13.    Second, in this case, insiders hold a significant amount of the Debtors' equity and Board members account for a significant percentage of insider holdings,[8] factors courts consider in determining adequate representation.  *See, e.g., Edison Bros*, 1996 WL 534853, at *3–5 (D. Del. 1996) (finding that equity holders were adequately represented by insider shareholders that owned 35% of the company).  Although the Board has delegated certain decision-making to the Special Committee,[9] the Board (which includes the Special Committee members) still meets regularly, and directors and officers are free to express their views.

14.    Third, the interests of the Creditors' Committee are aligned with those of equity holders – to increase the value of the Debtors' estates.  *See SunEdison*, 556 B.R. at 105 (stating that the creditors' committee shared equity's interest in maximizing value).[10]

15.    Finally, the equity holders are capable of representing their own interests without the appointment of an Official Equity Committee.  *See In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (reasoning that the ad hoc equity group adequately represented equity's interests without official status).

---

[8] Core Scientific, Inc., Form 4, (December 2, 2022); Core Scientific, Inc., Form 4, (September 6, 2022); Core Scientific, Inc., Form 4, (September 6, 2022); Core Scientific, Inc., Form 4, (August 17, 2022); Core Scientific, Inc., Form 4, (August 17, 2022); Core Scientific, Inc., Form 4, (June 6, 2022); Core Scientific, Inc., Form 3, (January 1, 2022); Core Scientific, Inc., Form S-1/A, (December 2, 2022).

[9] Bros Declaration at ¶¶79–80 (outlining the formation of and delegation to the Special Committee).

[10] In addition, the Creditors' Committee has generally served as an active watchdog in these chapter 11 cases, filing, for example, a limited objection to the fees owed under the Original DIP Facility.  *See Statement of the Official Committee of Unsecured Creditors (I) In Support of Replacement Debtor-In-Possession Financing; and (II) Objecting to Certain Requests of the Original DIP Lenders* (ECF No. 397).

Ad Hoc Equity Group Exhibit 10
8

SASMF EXHIBIT 25
543 of 979

16. Notwithstanding such adequate representation, as discussed below in more detail, the Debtors and the Special Committee believe that fairness supports the appointment of an Official Equity Committee to ensure equity holders' views are expressed and that they believe they have an equal voice in the chapter 11 cases regarding the issues that are most important to them.

## D. The Other Pilgrim's Pride Factors, and this Court's Fifth Factor, Similarly Support the Limited Appointment of an Official Equity Committee

### i. The Debtors Cases Are Indisputably Complex

17. These chapter 11 cases are complex, as noted in the *Notice of Designation as Complex Cases* (ECF No. 10), which this Court granted in its *Order Granting Complex Case Treatment* (ECF No. 29). Additionally, as noted in the Motion, the Debtors operate in a highly technical industry, and carry more than $900 million in net debt. Motion at ¶ 8.

### ii. The Limited Scope and Budget in the Proposed Order Will Limit the Cost of an Official Equity Committee

18. If the Court orders the appointment of an Official Equity Committee, it can impose a budget to limit the fees borne by the estate. *See Pilgrim's Pride*, 407 B.R. at 221 (concluding that the court could control the costs of an equity committee through the use of either a budget or limits on the equity committee's scope and noting that the equity committee "should expect reduction or even elimination by the court of fees sought for work duplicative of that performed by the [creditors' committee]").

19. The Debtors are concerned about the potentially unlimited cost of an Official Equity Committee. To assuage these concerns, the Debtors and the Ad Hoc Equity Group engaged in good faith, arms'-length negotiation to reach common ground regarding a limited scope and Budget that are mutually acceptable to the Ad Hoc Equity Group and the Debtors. The Debtors believe that limiting the scope of an Official Equity Committee to plan negotiation and valuation

9

and limiting costs to the agreed Budget strikes a fair balance between costs to the estate and benefits to equity holders.

20.     The Debtors have agreed to support the Motion, subject to the limited scope and Budget outlined in the Proposed Order, to which the Ad Hoc Equity Group has agreed.  The Creditors' Committee does not oppose the Motion, subject to the conditions in the Proposed Order. The Proposed Order would direct the appointment of an Official Equity Committee with a scope limited to (i) valuation and (ii) plan negotiations, and with a budget of $4,750,000, inclusive of legal and financial advisors' fees (the "**Budget**").  The Proposed Order provides that the Budget and scope can be increased only with (i) the prior written consent of the Debtors and the Creditors' Committee (which may be granted or withheld in the sole discretion of the Debtors or Creditors' Committee) or (ii) approval of the Court, it being understood that the Debtors and the Creditors' Committee may oppose any Budget or scope increase request.

21.     The Debtors believe the Budget is appropriate under the circumstances.  The Budget is sufficient to cover the costs of performing an independent valuation and negotiating a plan of reorganization.  Individualized representation of equity is certainly not necessary with regard to activities such as investigation of liens, review of proposed asset sales, or any other activities in which the interests of the Debtors' creditors are fully aligned with those of equity holders.  The Proposed Order balances the competing interests of the Debtors, to minimize costs, and the Ad Hoc Equity Group to ensure sufficient resources to represent equity holders adequately. Given the Official Equity Committee's limited scope, the Debtors request that the Court impose the Budget on the Official Equity Committee to ensure that the Official Equity Committee performs its role without burdening the Debtors' estates with unnecessary fees and expenses.

10

Ad Hoc Equity Group Exhibit 10
10

SASMF EXHIBIT 25
545 of 979

22.     Further, the Proposed Order reserves the Debtors' right to request that the Court disband the Official Equity Committee in the event that the appointment of an Official Equity Committee is no longer necessary or appropriate to protect the interests of equity holders in these chapter 11 cases.

23.     Accordingly, the Debtors request that the Court enter the Proposed Order.

iii.     <u>An Official Equity Committee Will Provide a Practical Benefit in These Chapter 11 Cases</u>

24.     This Court has added an additional factor to the four factors set out in *Pilgrim's Pride*, which considers if an Official Equity Committee will provide a practical benefit to the estate.  As noted above, this case has several unique characteristics, including that the Debtors are not hopelessly insolvent and that valuation will be based, in part, on the volatile price of bitcoin, making the appointment of an Official Equity Committee practical in these cases.

25.     In addition, the Debtors believe that principles of fairness support the practicality of the appointment of an Official Equity Committee.  Other parties have estate-paid professionals, including the unsecured creditors (through the Creditors' Committee),[11] the Ad Hoc Noteholder Group,[12] and the lender under the Replacement DIP Facility, which is the Debtors' largest unsecured creditor.[13]  The Debtors believe that, in the interests of fairness, equity holders,

---

[11] *Application for Entry of an Order Authorizing the Retention and Employment of Willkie Farr & Gallagher Llp as Counsel to the Official Committee of Unsecured Creditors Effective as of January 9, 2023* (ECF No. 505); *Application for Entry of Order Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker to the Official Committee of Unsecured Creditors Effective as of January 10, 2023* (ECF No. 506).

[12] *Order (I) Authorizing the Debtors on an Interim Basis to (a) Obtain Senior Secured Non-priming Superpriority Replacement Postpetition Financing and (b) Use Cash Collateral, (II) Authorizing the Debtors to Refinance Existing Postpetition Financing on a Final Basis, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties on a Final Basis, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (ECF No. 447) ¶ 2(c).

[13] *Id.*; *see also Voluntary Petition for Non-Individuals Filing for Bankruptcy* (ECF No. 1) (listing B. Riley Financial, Inc. as the Debtors' largest unsecured creditor.

Ad Hoc Equity Group Exhibit 10
11

**SASMF EXHIBIT 25**
**546 of 979**

whose recovery will be impacted by the outcome of these cases, should also receive estate-paid representation on the issue of valuation and plan negotiation. Given the Debtors' current financial situation, the Debtors believe it is important that equity holders feel they have an equal voice to other constituents in the case.

**E. The Court Should Disregard the Ad Hoc Equity Group's Ad Hominem Attacks on the Debtors**

26.     Although the Debtors support, in part, the relief requested in the Motion, the Debtors disagree with certain statements made by the Ad Hoc Equity Group therein.

27.     The Ad Hoc Equity Group attempts to rewrite history by arguing that management somehow failed to represent equity holders adequately when it entered into the Original DIP Facility. This allegation simply ignores reality. On the Petition Date, the Debtors were no more than a few days away from running out of cash, which would have been value destructive for all interested parties. *See Declaration of John Singh in Support of Emergency Motion of Debtors for Entry of Interim and Final Orders (a) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (ECF No. 98, ¶13) (the "**Singh Original DIP Declaration**") (noting the Debtors' immediate need for cash and that they entered chapter 11 with only $4 million of cash on hand, which was not enough to fund ongoing operations). The Debtors searched for alternative financing, but the Original DIP Facility from the Ad Hoc Noteholder Group was the only viable option available. *Id.* at ¶ 29. The Debtors also sought to convince the Ad Hoc Noteholder Group to provide a DIP loan that was untethered to the RSA, but the Ad Hoc Noteholder Group conditioned its DIP loan on the RSA. Bros Declaration at ¶¶ 82, 94. The

12

SASMF EXHIBIT 25
547 of 979

Debtors then negotiated to get the best terms available on the RSA. *Id.* at ¶ 48. Although the Original DIP Facility was tied to the now-terminated RSA, it was simply the best option available to the Debtors at that time and under those circumstances. Indeed, the Court approved the Original DIP Facility on an interim basis and found that the Debtors' agreement to the Original DIP Facility was (i) a proper exercise of the Debtors' business judgment, (ii) "negotiated in good faith and at arm's length among the [parties]," and (iii) necessary to avoid immediate and irreparable harm. *Interim Order (I) Authorizing the Debtors to (a) Obtain Senior Secured Priming Superpriority Postpetition Financing and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (ECF No. 130) (the "**Original DIP Order**") at ¶ G.(l), (n).

28. Similarly, the Ad Hoc Equity Group's assertions that the Debtors' procurement of the Replacement DIP Facility was somehow a result of the Debtors' failure to obtain such terms in the first instance and that the Original DIP Facility marketing process was inadequate are likewise incorrect. As set forth in the Singh Original DIP Declaration, the Original DIP Facility was the result of a robust marketing process in which PJT contacted over 20 potential lenders. Singh Original DIP Declaration ¶¶ 12, 25–26.[14] The Court found that the Debtors were unable to secure financing or other financial accommodations on more favorable terms than what was provided in the Original DIP Facility. Original DIP Order at ¶ G.(c).

29. Moreover, the Debtors immediately began seeking replacement DIP financing after approval of the Original DIP Order and as market conditions in the industry started

---

[14] It bears mentioning that the Debtors did contact the Replacement DIP Lender prepetition regarding debtor-in-possession financing; however, the lender was only willing to extend credit after market conditions improved.

Ad Hoc Equity Group Exhibit 10
13

SASMF EXHIBIT 25
548 of 979

to improve.  *See Second Singh Declaration* ¶¶12–13.[15]  This resulted in the Replacement DIP Facility, which, as noted above, has significantly better terms for the Debtor than the Original DIP Facility.  The Court noted during the Replacement DIP Hearing that entry into the Replacement DIP Facility was a valid exercise of the Debtors' business judgment.  Replacement DIP Hearing, Hr'g Tr. at 69:8–22.  Any assertion by the Ad Hoc Equity Group that the Debtors' circumstances in December 2022 provided the flexibility to forego the Original DIP Facility or that the Debtors did not do everything possible to preserve and maximize value is an unsupported and absurd attack.[16]

30.     The Debtors are hopeful that once appointed, an Official Equity Committee will work constructively with the Debtors on their shared goal of maximizing value through a successful restructuring.  The Debtors will continue to work with all stakeholders toward this end.

## Conclusion

31.     For the reasons set forth herein, at this time, the Debtors support the appointment of an Official Equity Committee as set forth in the Proposed Order.

*[Remainder of Page Intentionally Left Blank]*

---

[15] The Ad Hoc Equity Group's spin on these events distorts the facts.  For example, while it is entirely possible that the Ad Hoc Equity Group "encouraged" one of the proposed DIP lenders to make a proposal (Motion ¶ 5), the Ad Hoc Equity Group did not introduce this lender to the Debtors.  This was one of the potential lenders PJT contacted prepetition.  That lender refused to make a proposal at that time given market conditions.  PJT then reached out again postpetition when market conditions improved.  Second Singh Declaration at ¶ 13.

[16] The Debtors disagree with many statements and assertions in the Motion, but only address certain points herein given the Debtors' position on the relief sought in the Motion.

14

Dated: February 24, 2023
      Houston, Texas

           Respectfully submitted,

         */s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Ray.Schrock@weil.com
          Ronit.Berkovich@weil.com
          Moshe.Fink@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

15

**Certificate of Service**

I hereby certify that on February 24, 2023, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

 

 

    _/s/ Alfredo R. Pérez_             
Alfredo R. Pérez

**Ad Hoc Equity Group Exhibit 10**
**16**

**SASMF EXHIBIT 25**
**551 of 979**

**Exhibit 11**

SASMF EXHIBIT 25
552 of 979

New Pass! Developer Pass ($189) - Learn More ✕

☰                    **CoinDesk**                    👤  🔍

**Finance**

## Bitcoin Mining Consulting Firm Sabre56 Raises $35M to Build 150MW of Hosting Sites

The company is moving into the hosting business and says it already has a "waiting list" of clients.

By Eliza Gkritsi

🕐 Feb 23, 2023 at 8:00 a.m. EST

Updated Feb 23, 2023 at 9:04 a.m. EST

f  in  🐦  ✉



A Sabre56 bitcoin mining facility. (Sabre56)

Ad Hoc Equity Group Exhibit 11        SASMF EXHIBIT 25
553 of 979



**CONSENSUS**
by CoinDesk

Join the most important conversation in crypto
and Web3 taking place in Austin, Texas, April 26–
28.

Secure Your Seat

Sabre56, a company that consults miners on the development and operations
of facilities, has raised $35 million to build its own hosting sites, aiming to have
150 megawatts (MW) of energy capacity ready by the end of the year. Hosting
is a service that data centers provide to crypto miners that want to run their
mining rigs without having to build the infrastructure themselves.

The first four sites will total 115 MW and be located in Wyoming and Texas,
where construction has already begun, according to a press release. The
capacity will be built in 7MW-15 MW of monthly increments, with the first batch
coming online in mid-March, company CEO Phil Harvey said. The $35 million
investment is coming primarily from private individuals, he added.

Hosting space for mining rigs has been in short supply over the past few
months as few new sites were coming online and capital for development ran
dry. The bankruptcies of major hosting firms like Compute North and Core
Scientific (CORZ) heightened the supply issue.

Sabre56 will offer competitive pricing between $0.068-$0.072 per kilowatt
hour (kWh) of electricity consumed, depending on the duration of the contract
and the type of machines, Harvey said. For comparison, Core Scientific
increased its hosting price to just under 10 cents in October as soaring natural
gas prices increased its electricity costs.

Harvey declined to specify the price of the fixed-rate electricity contracts that
Sabre56 has signed.

Sabre56 already has a "waiting list" of clients, said the press release. Harvey
specified that it is comprised mostly of companies and individuals already close
to the company, and the contracts are in the 10 MW-50 MW range. In addition
to its projections to have 150 MW online by the end of 2023, the company
plans to keep adding 150 MW of capacity annually for the next four years. The
profits made from the initial investments will be enough to continue this further
development, Harvey said.

"I'm not interested in taking over, some s***show that people are trying to sell because they're going bankrupt and can't run their operations," said Harvey, responding to a question from CoinDesk about why his company has chosen not to purchase an existing development from a distressed miner.



| | | | |
|---|---|---|---|
| ₿ BTC | $23,399.06 | ▲ 0.88% | → |
| ◆ ETH | $1,639.42 | ▲ 2.45% | → |
| ◉ BNB | $304.80 | ▲ 0.51% | → |
| ✕ XRP | $0.37336017 | ▼ 1.01% | → |
| ◈ APT | $12.45 | ▲ 0.30% | → |

**View All Prices**

**Sign up for The Node, our daily newsletter bringing you the biggest crypto news and ideas.**

Email address

Sign Up

*By signing up, you will receive emails about CoinDesk product updates, events and marketing and you agree to our terms of services and privacy policy.*

**DISCLOSURE**

*Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.*

*The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.*

**Eliza Gkritsi**

Eliza Gkritsi is CoinDesk's crypto mining reporter based in Asia.

Follow @egreechee on Twitter

Learn more about **Consensus 2023**, CoinDesk's longest-running and most influential event that brings together all sides of crypto, blockchain and Web3. Head to **consensus.coindesk.com** to register and buy your pass now.

**Read more about**

Bitcoin Mining   Mining Centers   Texas   Wyoming

## Trending

**1** Markets

**Cryptocurrencies Resilient Despite Weaker Equity Markets, Increased Regulatory Activity: Citi**

Feb 27, 2023

**2** Markets

**Allure of Bitcoin Ordinals, DeFi Drives Crypto Funds to Bitcoin Layer 2-Token Stacks**

Feb 27, 2023

**3** Markets

**Short-Bitcoin Funds Record $10M in Weekly Inflows: CoinShares**

Feb 27, 2023

**4** Policy

**$1B Voyager-Binance Deal Benefits Halved if Alameda Loan Claim Succeeds: Texas Regulators**

Feb 27, 2023



## About

About
Masthead
Contributors
Careers
Company News

## Stay Updated

Consensus
Newsletters
Follow

## Get In Touch

Contact Us
Advertise
Accessibility Help
Sitemap

## The Fine Print

Ethics Policy
Privacy
Terms Of Use
Do Not Sell My Personal Information

Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.

The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.

©2023 CoinDesk

English

Ad Hoc Equity Group Exhibit 11
5

SASMF EXHIBIT 25
557 of 979

**Exhibit 12**

SASMF EXHIBIT 25
558 of 979



# Second Quarter Fiscal Year 2022 Earnings Presentation

**August 22, 2022**

AUG 22, 2022

---

# Legal Disclaimer

**Forward-Looking Statements**

This presentation includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, those related to the Company's ability to scale and grow its business, source clean and renewable energy, the advantages and expected growth of the Company, future estimates of revenue, net income, adjusted EBITDA, liquidity and cash flow, and availability of capital, future estimates of computing capacity and operating power, future demand for hosting capacity, future estimate of hashrate (including mix of self-mining and hosting), quantifying gigawatts and power, future projects in construction or negotiation and future expectations of operation location, orders for miners and critical infrastructure, future estimates of self-mining capacity, the public float of the Company's shares, future infrastructure additions and their operational capacity, and operating power and site features of the Company's operations center in Denton, Texas. These statements are provided for illustrative purposes only and are based on various assumptions and on the current expectations of the Company's management. These forward-looking statements are not intended to serve, and must not be relied on by any investor, as a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company. These forward-looking statements are subject to a number of risks and uncertainties, including those identified in the Company's reports filed with the U.S. Securities and Exchange Commission ("SEC") from time to time, including the Company's definitive proxy statement filed with the SEC on January 3, 2022, and other subsequent filings the Company files with the SEC from time to time, including its Annual Report on Form 10-K for the year ended December 31, 2021, and Current Report on Form 8-K filed on January 24, 2022, and Quarterly Report on form 10-Q for the second quarter ended June 30, 2022, to be filed with the SEC by August 22, 2022. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. Accordingly, undue reliance should not be placed upon the forward-looking statements. Except as required by law, the Company assumes no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in the forward-looking statements, even if new information becomes available in the future.

Year over year comparisons are based on the combined results of Core Scientific and its acquired entities.

**Non-GAAP Financial Measures**

This presentation also contains non-GAAP financial measures as defined by the SEC rules, including Adjusted EBITDA and adjusted earnings (loss) per diluted share. The Company believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and results of operations. The Company's management uses certain of these non-GAAP measures to compare the Company's performance to that of prior periods for trend analyses and for budgeting and planning purposes. The Company urges investors not to rely on any single financial measure to evaluate its business.

AUG 22, 2022



**SASMF EXHIBIT 25**

**559 of 979**

# Core Scientific Snapshot

## Digital Asset Self-Mining | Colocation Services | Blockchain Technology

**Nasdaq: CORZ**

**$164.0M**
Second Quarter 2022 Revenue

**$(810.5)M**
Second Quarter 2022 Net Loss Driven Primarily by Goodwill and other intangibles Impairment

**$59.1M**
Second Quarter 2022 Adjusted EBITDA

**+/- Year End 300,000 Servers**
Expected 2022 Fleet Size

**+/- Year End 31 EH/s**
Expected 2022 Hashrate[1]

**+/- Year End 1 GW**
Expected 2022 Power

[1] Represents midpoint of 30 EH/s to 32 EH/s guidance range for 2022E performance

AUG 22, 2022

CORE SCIENTIFIC   3

**SASMF EXHIBIT 25**
**560 of 979**

# Second Quarter 2022 Performance Summary

| Metric (dollars in millions except per share amounts) | Second Quarter 2022 | Notes |
|---|---|---|
| Total ending hashrate | 17.9 EH/s | 10% increase from 3/31/22 (16.2 EH/s) |
| Bitcoins produced | 3,365 | Increased from 3,202 bitcoins in first quarter |
| Bitcoins held | 1,959 | $40.7 million carrying value as of 6/30/22, including effect of accounting impairment |
| Revenue | $164.0 | 118% increase over prior year |
| Net loss | $(810.5) | $807.1 million increase in loss over prior year |
| Adjusted EBITDA [1] | $59.1 | 185% increase over prior year |
| Loss per diluted share | $(2.49) | — |
| Adjusted earnings per diluted share [2] | $0.18 | 38% increase over prior year |

[1] Adjusted EBITDA is a non-GAAP financial measure. See slide 19 for a reconciliation of adjusted EBITDA to its most comparable GAAP figure.

[2] Adjusted earnings per diluted share is a non-GAAP financial measure.  See slide 20 for a reconciliation of adjusted earnings (loss) per diluted share to its most comparable GAAP figure.

AUG 22, 2022

CORE SCIENTIFIC

4

SASMF EXHIBIT 25

561 of 979



Sources - BTC mined from monthly update press releases

AUG 22, 2022

# Digital Asset Mining Revenue Represented 67% of Second Quarter Revenue and Grew 10x Year-Over-Year



**Second Quarter 2022 Revenue Mix**
(Unaudited)

**Second Quarter Revenue by Segment**
(In Millions, Unaudited)

AUG 22, 2022

CORE SCIENTIFIC    6

**SASMF EXHIBIT 25**

**563 of 979**

# Second Quarter Net Loss Driven Primarily by $790.8 Million Goodwill and Other Intangibles Impairment



**SASMF EXHIBIT 25**
**564 of 979**



**Developed and Manage Data Centers Totaling Approximately 800,000 Square Feet Across Five States**

# Continued Progress on Three Texas Data Center Projects



Denton, TX



Pecos, TX



Denton, TX



Barstow, TX

AUG 22, 2022

CORE SCIENTIFIC    9

SASMF EXHIBIT 25
566 of 979



SASMF EXHIBIT 25
567 of 979

# Visibility toward 2022 Hashrate Goal



**Build-Up to Projected Year-End 2022 Hashrate (EH/s)**

31 EH/s
Middle of
Guidance Range

AUG 22, 2022                                                        CORE SCIENTIFIC   11

SASMF EXHIBIT 25
568 of 979



## Self-Mining Economics: Year-to-Date Second Quarter Cash (Cost) to Mine a Bitcoin

| Cash to Mine a BTC[1] | Year-to-Date Q2 2022 | |
| --- | --- | --- |
| | Total Cost (thousands) | Per BTC |
| Power Costs | $    55,500 | $    8,500 |
| Operational Costs [2] | 11,400 | 1,700 |
| Cash to Mine a BTC | $    66,850 | $    10,200 |

Total Costs / 6,567 BTC

[1]  Produced 6,567 Bitcoins during Q1 and Q2 2022 at an average BTC price of ~$37.0K

[2]  Includes personnel and related costs, software, telecommunications, security, etc.  Amount excludes stock-based compensation and depreciation.

AUG 22, 2022

 CORE SCIENTIFIC    13

**SASMF EXHIBIT 25**
**570 of 979**

## Why Core Scientific?



AUG 22, 2022

CORE SCIENTIFIC   14

SASMF EXHIBIT 25

571 of 979



SASMF EXHIBIT 25
572 of 979

# 2022 Selected Quarterly Results

**(Thousands)**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | YTD Fiscal Year 2022 | Full Fiscal Year 2021 |
|---|---|---|---|---|---|---|
| | | | Unaudited | | Unaudited | |
| **Revenue** | $192,519 | $163,972 | - | - | **$356,491** | **$544,483** |
| **Cost of Revenue** | 122,516 | 151,255 | - | - | 273,771 | 305,621 |
| **Gross Profit** | 70,003 | 12,717 | | | 82,720 | 238,862 |
| **Research and Development** | 3,340 | 14,773 | - | - | 18,113 | 7,674 |
| **Sales, Marketing, G&A** | 41,558 | 101,112 | - | - | 142,670 | 64,666 |
| **Operating (Loss) Income** | (26,717) | (1,045,383) | | | (1,072,100) | 131,494 |
| **Net (Loss) Income** | (466,204) | (810,475) | - | - | (1,276,679) | 47,312 |
| **Adjusted EBITDA [1]** | 93,041 | 59,111 | - | - | 152,152 | 238,940 |
| **Adjusted EBITDA Margin** | 48.3% | 36.0% | - | - | **42.7%** | **43.9%** |

[1] Adjusted EBITDA is a non-GAAP financial measure. See slide slide #19 for a reconciliation of adjusted EBITDA to its most comparable GAAP figure.

AUG 22, 2022

 CORE SCIENTIFIC

16

Unaudited

|  | | | Quarter Ended | | | | Change |
|---|---|---|---|---|---|---|---|
|  | 2Q22 | 1Q22 | 4Q21 | 3Q21 | 2Q21 | 1Q21 | Y/Y |
| Hosting Hash Rate (EOP) | 7.6 | 7.9 | 7.0 | 4.6 | 5.0 | 3.2 | 52% |
| Self-Mining Hash Rate (EOP) | 10.3 | 8.3 | 6.7 | 2.7 | 0.5 | 0.4 | NM |
| Total Hash Rate (EOP) | 17.9 | 16.2 | 13.7 | 7.3 | 5.5 | 3.6 | 227% |
| Network Hash Rate (EOP) | 214.6 | 201.8 | 168.2 | 140.2 | 89.0 | 164.9 | 141% |
| Core Share of Network | 8% | 8% | 8% | 5% | 6% | 2% | 36% |
|  | | | | | | | |
| # of BTC Mined | 3,365 | 3,202 | 2,498 | 1,588 | 928 | 753 | 263% |
|  | | | | | | | |
| Number of BTC Hosted Miners ('000) | 79 | 82 | 74 | 56 | 61 | 47 | 29% |
| Number of BTC Self-Miners ('000) | 103 | 82 | 67 | 29 | 5 | 4 | NM |
| Total BTC Miners est. ('000) | 182 | 164 | 141 | 85 | 66 | 51 | 177% |



Key Financial and Operating Metrics

AUG 22, 2022

CORE SCIENTIFIC   17

**Unaudited**

| ($ Millions) | | Quarter Ended | | | | | | Change |
|---|---|---|---|---|---|---|---|---|
| | 2Q22 | 1Q22 | 4Q21 | 3Q21 | 2Q21 | 1Q21 | Y/Y |
| Hosting Revenue | $38.9 | $33.2 | $27.6 | $20.5 | $18.6 | $12.7 | 110% |
| Equipment Sales | $15.2 | $26.3 | $134.8 | $35.5 | $46.0 | $31.9 | -67% |
| Digital Asset Mining | $109.8 | $133.0 | $139.4 | $57.1 | $10.8 | $9.6 | 920% |
| Total Revenue | $164.0 | $192.5 | $301.8 | $113.1 | $75.3 | $54.2 | 118% |
| Cost of Revenue (excl. SBC) | $134.4 | $120.5 | $156.0 | $55.1 | $50.8 | $39.7 | 165% |
| Stock-Based Compensation (SBC) | $16.9 | $2.0 | $4.1 | $0.0 | $0.0 | $0.0 | - |
| Total Cost of Revenue | $151.3 | $122.5 | $160.1 | $55.1 | $50.8 | $39.7 | 198% |
| Gross profit | $12.7 | $70.0 | $141.7 | $58.1 | $24.5 | $14.5 | -48% |
| Gain on legal settlements | $0.0 | $0.0 | ($0.0) | ($2.6) | $0.0 | $0.0 | - |
| Gain from sales of digital currency assets | $11.8 | $2.2 | $4.4 | $0.4 | ($0.0) | $0.0 | NM |
| Impairment on goodwill and other intangibles | ($790.8) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | - |
| Impairment of digital currency assets | ($150.2) | ($54.0) | ($24.7) | ($12.6) | $0.0 | $0.0 | - |
| Losses on exchange or disposal of property, plant, and equipment | ($13.1) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | NM |
| Operating Expenses: | | | | | | | |
| Research and Development (excl. SBC) | $1.6 | $1.5 | $2.3 | $1.6 | $1.4 | $1.2 | 11% |
| Sales and Marketing (excl. SBC) | $1.1 | $1.0 | $1.0 | $0.9 | $0.7 | $0.5 | 63% |
| General and Administrative (excl. SBC) | $19.1 | $18.7 | $12.1 | $7.7 | $4.7 | $3.2 | 304% |
| Stock-Based Compensation (SBC) | $94.1 | $23.8 | $3.8 | $28.3 | $2.1 | $0.6 | NM |
| Total Operating Expenses | $115.9 | $44.9 | $19.3 | $38.5 | $9.0 | $5.5 | NM |
| Operating (Loss) Income | ($1,045.4) | ($26.7) | $102.2 | $4.8 | $15.5 | $9.0 | NM |
| Total Non-Operating Income (Loss) | $186.3 | ($397.1) | ($25.2) | ($22.2) | ($18.8) | ($2.2) | NM |
| Net (Loss) Income  Before Tax | ($859.1) | ($423.8) | $77.0 | ($17.4) | ($3.3) | $6.8 | NM |
| Income Tax (Benefit) Expense | ($48.7) | $42.4 | $16.5 | ($0.8) | $0.1 | $0.0 | NM |
| Net (Loss) Income | ($810.5) | ($466.2) | $60.5 | ($16.6) | ($3.4) | $6.8 | NM |
| | | | | | | | |
| Adjusted EBITDA | $59.1 | $93.0 | $150.9 | $54.7 | $20.8 | $12.5 | 185% |

AUG 22, 2022



# Condensed Consolidated Income Statement

CORE SCIENTIFIC

18

**SASMF EXHIBIT 25**

**575 of 979**

# Appendix A
## Reconciliation of Second Quarter Fiscal Year 2021-2022 Adjusted EBITDA (Unaudited, Thousands)

Three Months Ended June 30,

| | 2022 | 2021 |
|---|---|---|
| Net (loss) income | $ (810,475) | $ (3,414) |
| **Adjustments:** | | |
| Interest expense, net | 27,116 | 10,846 |
| Income tax (benefit) expense | (48,650) | 118 |
| Depreciation and amortization | 49,835 | 3,075 |
| Loss on debt from extinguishment | — | 7,974 |
| Stock-based compensation expense | 110,998 | 2,136 |
| Fair value adjustments on derivative warrant liabilities | (22,189) | — |
| Fair value adjustment on convertible notes | (195,061) | — |
| (Gain) loss from sales of digital assets | (11,808) | 16 |
| Impairment of digital assets | 150,213 | — |
| Impairment of goodwill and other intangibles | 790,753 | — |
| Losses on exchange or disposal of property, plant and equipment | 13,057 | 17 |
| Gain on sale of intangible assets | (5,904) | — |
| Restructuring charges | 1,445 | — |
| Fair value adjustment on acquired vendor liability | 9,789 | — |
| Other non-cash and non-recurring items | (8) | — |
| **Adjusted EBITDA** | $ 59,111 | $ 20,768 |



CORE SCIENTIFIC   19

**SASMF EXHIBIT 25**
**576 of 979**

# Appendix B

## Reconciliation of Second Quarter Fiscal Year 2021-2022 Adjusted earnings per share (Unaudited, Shares in Thousands)

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Net (loss) income per diluted share | $ (2.49) | $ (0.02) |
| Adjustments: | | |
| Interest expense, net | 0.08 | 0.07 |
| Income tax (benefit) expense | (0.15) | — |
| Depreciation and amortization | 0.15 | 0.02 |
| Loss on debt from extinguishment | — | 0.05 |
| Stock-based compensation expense | 0.34 | 0.01 |
| Fair value adjustments on derivative warrant liabilities | (0.07) | — |
| Fair value adjustment on convertible notes | (0.60) | — |
| (Gain) loss from sales of digital assets | (0.04) | — |
| Impairment of digital assets | 0.46 | — |
| Impairment of goodwill and other intangibles | 2.44 | — |
| Losses on exchange or disposal of property, plant and equipment | 0.04 | — |
| Gain on sale of intangible assets | (0.02) | — |
| Restructuring charges | — | — |
| Fair value adjustment on acquired vendor liability | 0.04 | — |
| Other non-cash or non-recurring items | — | — |
| Adjusted earnings per diluted share | $ 0.18 | $ 0.13 |
| Weighted average shares outstanding - diluted | 324,967 | 158,890 |



CORE SCIENTIFIC    20

**SASMF EXHIBIT 25**

**577 of 979**

**Exhibit 13**

**SASMF EXHIBIT 25**
**578 of 979**

Transcripts



# Core Scientific, Inc.'s (CORZ) CEO Mike Levitt on Q2 2022 Results - Earnings Call Transcript

Aug. 11, 2022 9:31 PM ET | **Core Scientific, Inc. (CORZQ)**, **CRZWQ** | 2 Comments



**SA Transcripts**
134.7K Followers

▶ **Play Earnings Call**

Core Scientific, Inc. (CORZ) Q2 2022 Earnings Conference Call August 11, 2022 4:30 PM ET

**Company Participants**

Steven Gitlin – Senior Vice President-Investor Relations

Mike Levitt – Chief Executive Officer

Denise Sterling – Chief Financial Officer

**Conference Call Participants**

Lucas Pipes – B. Riley

Chris Brendler – D.A. Davidson

Stephen Glagola – Cowen

Kevin Dede – H.C. Wainwright

**Steven Gitlin**

Good afternoon, ladies and gentlemen, and welcome to Core Scientific's Second Quarter Fiscal Year 2022 Earnings Call. This is Steven Gitlin, Senior Vice President of Investor Relations for Core Scientific. At this time, all participants are in a listen-only mode. We will conduct a question-and-answer session after management's remarks. As a reminder, this conference is being recorded for replay purposes.

Before we begin, please note that on this call certain information presented contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include without limitation, any statement that may predict forecast, indicate or imply future results, performance or achievements, and may contain words such as believe, anticipate, expect, estimates, intend, project, plan, or words or phrases with similar meaning. Forward-looking statements are based on current expectations, forecasts and assumptions that involve risks and uncertainties, including but not limited to, economic, competitive, governmental and technological factors outside of our control that may cause our business strategy or actual results to differ materially from the forward-looking statements.

For further information on these risks, we encourage you to review the risk factors discussed in Core Scientific's periodic reports on Form 10-K and Form 10-Q filed with the SEC, and the Form 8-K filed today with the SEC, along with the associated earnings release and the Safe Harbor statement contained therein.

This afternoon, we're also filing a slide presentation with our earnings release, and we're posting the presentation on our website at corescientific.com in the Events & Presentations section. The content of this conference call contains time-sensitive information that is only accurate as of today, August 11, 2022. The company undertakes no obligation to make any revision to any forward-looking statements contained in our remarks today or to update them to reflect the events or circumstances occurring after this conference call.

Joining me today from Core Scientific are Chief Executive Officer, Mr. Mike Levitt; and Chief Financial Officer, Mrs. Denise Sterling. We will now begin with remarks from Mike Levitt. Mike?

**Mike Levitt**

Thank you, Steve. On behalf of our entire team, welcome to today's second quarter 2022 earnings conference call. On today's call we'll provide highlights from our second quarter, discuss our financial performance, comment on current market conditions, and provide thoughts on how we are structuring our company for long-term success.

Core Scientific operates more bitcoin mining servers in our facilities than any other public company in the United States. We have eight data centers operating in five states and expect to begin operation our ninth data center in Oklahoma within the next few quarters. Our purpose-built company owned data centers now hold over 200,000 servers and approximately 800,000 square feet. By year-end, we expect to be operating approximately 300,000 servers of which more than half will be for our own self-mining operations in over one million square feet.

I will discuss our future plans in more detail later in this call. But first I'd like to introduce my colleague and our CFO, Denise Sterling, to discuss our financial highlights.

**Denise Sterling**

Thank you, Mike, and good afternoon, I will review for – I will review results of our second quarter as compared to the same period one year ago. Total revenue consisting of self-mining, hosting and equipment sales increased by 118% to $164 million from $75.3 million, driven primarily by an increase in our self-mining revenue.

The total number of bitcoin produced in the second quarter was 3,365 compared to 180 for the three months ended June 30, 2021. The average price of bitcoin was $32,500, a decrease of 30% as compared to $46,500 for the three months ended June 30, 2021.

Total hosting revenue increased by 110% to $38.9 million, equipment sales for the quarter decreased by 90% to $30.5 million. As the majority of our hosting customers now purchase their miners directly from manufacturers for deployments in our data centers. Cost of revenue increased by a $100.5 million to $151.3 million. The increase was primarily attributable to an increase in our number of self-mining and hosted servers operating in our facilities.

Power consumption increased by $45.9 million, depreciation rose by $46.3 million and personnel and related expenses and facilities cost increased by $25.8 million. Related expenses included stock-based compensation of $16.9 million. The increases were offset by a decline on equipment sales of $17.6 million.

Cost of revenue for the three months ended June 30, 2022 included depreciation expense of $49.1 million of which $46.5 million was from the self-mining segment. For the three months ended June 30, 2021 cost of revenue included depreciation expense of $2.8 million of which $0.9 million was for self-mining segment.

With increases in energy prices, generally we expect our average power price for the year to now come in at about $0.05 to $0.055 per kilowatt hour. Prices do move around seasonally and the extreme heat across the south has impacted our pricing for the second quarter and will continue to do so in the third quarter. Gain from the sales of our digital assets was $11.8 million for the three months end of June 30, 2022, resulting from a total sales price of our digital assets sold up $265.8 million versus the carrying value of $254.0 million.

Consistent with prior quarters, we recorded several non-cash accounting entries in the second quarter of 2022, including the impairment of digital assets, impairment of goodwill, a fair value adjustment to our convertible notes and stock-based compensation. Impairment of digital assets increased by $150.2 million for the second quarter, as a result of a decline in our price in the price of bitcoin, an impairment is recorded when the carrying value of our digital assets exceed their fair value based on current market pricing.

We recorded a goodwill impairment of approximately $840 million due to a revaluation of our assets resulting from the sustained decline in bitcoin price. The decline in the market capitalization of public bitcoin mining companies, including Core Scientific and the uncertain outlook for our industry. We recorded a favorable non-cash fair value adjustment to our convertible notes of $195 million due to an decrease in their value resulting from the decline in our stock price. We will continue to mark-to-market our convertible notes each quarter.

Total operating expenses increased by $106.9 million to $115.9 million. This increase was primarily driven by $92 million of stock-based compensation representing 86% of the total increase. This resulted from the removal of the IPO transaction trigger from outstanding RSU awards that had previously met the time vesting requirement.

In order to ensure we are well positioned to achieve our objectives. We have taken a disciplined approach to reducing operating expense growth. We have eliminated the majority of our discretionary expenses reduced headcount by 10%, renegotiated vendor contracts and right size the organization to focus on our core business. We now expect our operating expenses in the second half of the year to be 25% lower compared to the first half of the year.

Net loss of $861.7 million decreased by $858.3 million from a net loss of $3.4 million. The increase in net loss was primarily driven by the non-cash items I spoke about earlier. Adjusted EBITDA increased by $38.3 million to $59.1 million. The increase was driven primarily by increased revenue of $88.7 million offset by higher cost of revenue, excluding depreciation and stock-based compensation of $37.3 million and increased operating expenses of $13 million excluding stock-based compensation.

Adjusted EPS for the quarter ended June 30, 2022 was $0.18 per share. Our total cash position at June 30, 2022, including cash, cash equivalents and restricted cash was $140.5 million a year-to-date increase of approximately $8.8 million. The primary drivers of this change included inflows from operations of $151.9 million and proceeds from borrowing of $415.1 million.

These sources of cash were partially offset by cash outflows for infrastructure costs to build our purpose-built data centers of $238.5 million payments to vendors for our ASIC servers of $217.7 million, interest and principle payments on our outstanding debt of $72.7 million and payment of tax obligations for vesting of employee RSUs of $29.3 million. By net settling our RSUs, we reduced our outstanding share count by approximately 14 million shares.

In order to better understand our self-mining business, cost structure and breakeven price for producing bitcoin, we are introducing a metric that we call cash to mine. It produces a view of the marginal cash cost to mine a single bitcoin, and represents the cash-based components of cost of revenue divided by the number of bitcoin mined for the period. There are two cash-based components of this calculation.

The first is our power cost, which is based on price per kilowatt hour. The second is our data center cash-based operating cost, which include the expenses required to operate, maintain, secure, and secure our data centers, including personnel and related expenses and facilities cost. These two components are included as part of our total cost of revenue. As the metric is cash-based, it does not include expenses such as stock-based compensation or depreciation.

For the first half of 2022, our power costs per bitcoin was approximately $8,500, and our data center operating costs were approximately $1,700. As such our cost, our cash to mine, a bitcoin for the first half of 2022 was approximately $10,200. We expect our cash to mine a bitcoin to vary quarter-by-quarter, primarily based on fluctuations and power costs and global hash rate.

Now, I would like to turn the call back over to Mike.

**Mike Levitt**

Thank you, Denise. In a previous earnings call, I explained that approximately two-thirds of our 2022 growth would occur in the second half of the year. We're now in the second half and we remain confident that will be the case. As we stand here today, we operate eight data centers in five states with approximately 800,000 operating square feet. By year-end, we continue to expect to have developed a total of over one million square feet of operating facilities.

We operate approximately 125,000 self-mining servers and expect to increase that number to approximately 170,000 by year-end. We operate 86,000 servers for our co-location customers and expect to increase that number to approximately 125,000 by year-end. We deployed 14,000 servers in the month of July and have already deployed more than 17,000 servers in the first 10 days of August. We are currently mining over 40 bitcoin per day on average, and yesterday we mined a record 45.7 bitcoin in a single day. Likely the most bitcoin ever self mined in a day by a public company.

As the market and economic environment deteriorated in the second quarter, we took a number of actions to ensure that our business remains well positioned to navigate these difficult times. We conducted a full review of our businesses, our costs, and our balance sheet.

First, I will address our balance sheet. On the asset side of our balance sheet, we've invested in excess of $1 billion in our infrastructure and our servers, since the company's inception. Our approximate $0.5 billion investment to develop world-class blockchain computing data centers will generate returns for years to come. No other company in the United States has invested as heavily or built as significantly infrastructure to support the production of bitcoin, while others search for infrastructure to support their business, we own control, and operate our own. By developing purpose built facilities, we have the ability to employ immersion or any other process that we believe will improve our productivity. We're currently running immersion pilot tests in a number of our data centers.

Our $0.5 billion plus investment in servers will also generate returns for years to come. Our servers should be mining bitcoin well beyond their depreciable life. We have built and maintained significant liquidity through these volatile times. We think it is prudent and we think it is wise. We have chosen to create liquidity by selling our digital assets. In the current environment, we don't do not believe it is sensible to increase our debt.

We have total debt of approximately $960 million excluding accounting reserve adjustments, totaling just less than $200 million as illustrated on Slide 12. Slightly more than $500 million of our debt is our privately placed convertible notes. Those notes mature approximately three years from now in April of 2025; they have little cash impact in the interim because they bear interest in cash at a rate of 4%. They have a non-cash 6% pay and kind feature and no principle payments required until maturity. We are very comfortable with the maturity in 2025 and the likelihood that our stock will be hopefully soon at a level where this debt converts to equity.

We owe B. Riley, approximately $57 million payable monthly over the course of the next 11 months. The loan was originally $75 million, but we have paid down $18 million already this year. Again, we are very comfortable with our obligations to B. Riley.

As for our equipment financing out of the 170,000 or so self-mining servers, we plan to operate by the end of the year, approximately 86,000 are currently encumbered by debt or leases. Equipment debt and leases total approximately $330 million today. Through the end of July, we have paid approximately $75 million in principle amortization this year and are comfortable with our ability to continue to service our equipment debt. We have multiple options for creating and maintaining liquidity.

We have and will continue to sell our bitcoin. Our current bitcoin production provides us the unique ability to replenish our digital assets rapidly. As we previously discussed, we have also entered into a $100 million equity line of credit. We can tap that line anytime over the next two years. Environments like this demand focus and require critical decisions. Since Core Scientific was founded. We have focused a majority of our time and capital investments on site selection, development, and technological innovation to facilitate the deployment and management of our infrastructure and mining servers.

We are a developer and operator of blockchain computing data centers. We own and operate more infrastructure and servers than any other company in the United States. That is what we do and who we are. That is our focus, building reliable geographically distributed data centers that enable the deployment and efficient operation of mining servers is the biggest challenge faced by the digital asset mining ecosystem.

This infrastructure did not always exist in the United States, and that is why Core Scientific accepted the challenge to build enterprise grade digital asset mining data centers five years ago. We have paired our business back to concentrate on what we do best developed data centers and operate ASICs in our purpose-built facilities. We have not pursued of any business, not central to our mission and are focusing our resources on continuing to build our core business.

Ad Hoc Equity Group Exhibit 6

SASMF EXHIBIT 25
584 of 979

To that end, we have discontinued our blockchain technologies development business. We have taken costs out of our corporate activities and are continuing to develop ways to execute our business more efficiently. To date, we have eliminated approximately 10% of our workforce. None of whom are involved in our data center activities. While taking steps to become leaner and more efficient, we remain focused on growing our business and improving profitability.

The current market turmoil and difficulties facing other companies attempting to develop infrastructure have enabled us to work with our vendor partners to reduce expenses and build more efficiently. As such, we believe our near term data center development expenses over the next six months will be significantly less than what we had previously anticipated. We have paid for all, but approximately $10 million of the cost of the remaining 50,000 self-mining servers to be deployed. We are confident that all 170,000 of our servers will be up and running by year end. We hope to expand our self-mining fleet beyond 170,000, but if not yet, committed to purchase additional servers. We continue to make discounted offers for stranded new miners.

We took a long hard look at our hosting business. Historically, the business delivered low profitability. We will no longer take on hosting business that is not sufficiently profitable from day one. We have restructured our pricing to improve margins over time, including refinements to price per kilowatt hour, contract term, infrastructure and configuration fees and prepayment terms. We want our customers to make a profit, but we also want to ensure that our business is making money too. We fully expect our hosting business to be profitable in cash generative, going forward into 2023.

Over time, we think the hosting business should be a 20% to 30% EBITDA margin business, initial customer acceptance, including our recently announced agreements for 75 megawatts of co-location capacity validate our new strategy. Even during this challenging digital asset market, customers are eager to co-locate their servers at Core Scientific because of the value they see in our firm.

Now, let's talk a little bit about the future. We continue to expect to achieve an operating cash rate of between 30 and 32 exahashs and 1 gigawatt of power by the end of 2022. This is based on the continued expansion of our server fleet to approximately 300,000 units, approximately 170,000 of which will be dedicated to self-mining and continued progress in our data center project in Texas, and Oklahoma, as well as continued demand from co-location customers.

Based on an end of 2022 network cash rate assumption of 250 exahashs, we expect to be producing or self-mining, approximately 2000 bitcoins a month by the end of 2022. Our self-mining fleet is new and efficient consisting of S19s, S19 Pros and S19 XPs. We are well positioned for years of productive mining.

Our company designed, developed, populated, and now manages the largest blockchain computer data center business for self-mining and co-location services in North America. As we disclosed in last week's July update, press release, we operated total hash rate of 19.3 exahashes, including 10.9 exahashes in our self-mining business as of July 31. We have built our leadership position in the blockchain infrastructure market by investing a total of more than $1 billion in infrastructure and servers since the inception of our business.

We have strategically located and developed data centers in diverse geographic areas. While we continue to curtail our growing operations in Texas in response to grid operator needs, the majority of our data centers are located in other states, reducing the impact of Texas specific events on our overall bitcoin production. Within Texas, we are working with ERCOT on the CLR program and aim to deploy our Minder software to help provide automatic demand response to the grid. Our track record of innovation and growth in our industry speaks for itself.

Denise introduced today our new cash to mine metric. Given the environment we are pleased with a cash cost of slightly in excess of $10,000 to mine, a single bitcoin in the first half of 2022. We believe this is an important way to assess our efficiency and future profitability. We offer a unique and powerful business model that represents a compelling equity investment in blockchain data centers and at a minimum, a levered investment to the price of Bitcoin. All said, despite the difficulties, our industry has endured this year, assuming a constant bitcoin price and modest growth in the global hash rate, we are on pace to generate nexus of $700 million in revenue and approximately $300 million in EBITDA.

Thank you to our amazing team who continue to focus on executing our plans during a very challenging time. Thank you to our customers for continuing to rely on Core Scientific and thank you to our shareholders who remain committed to the long-term opportunity this company, and this team are working to realize.

Steve, we will now take questions.

## Question-and-Answer Session

**A - Steven Gitlin**

Thanks Mike. [Operator Instructions] Our first question comes from Lucas Pipes at B. Riley. Hi Lucas.

**Lucas Pipes**

Thank you very much, Steve. Good afternoon, everyone. Mike I want to thank you for the disclosures. This is really, really terrific detail. Both in the released the presentation, and also prepared remarks – appreciate that.

**Mike Levitt**

Thank you. Thanks, Steve and Denise and all my colleagues.

Ad Hoc Equity Group Exhibit 13

SASMF EXHIBIT 25
586 of 979

8

**Lucas Pipes**

Yes, this is really good. Good work. And I want to follow up on the power price a bit. I think you mentioned $0.055 prepared remarks or it was mentioned just wanted to confirm that. And then if you could maybe speak, maybe pushing power prices up and down. Obviously there are inflationary pressures on the power side, but then you're also expanding in Texas. So wondering how kind of power costs could evolve the next six months, 12 months. Thank you very much for your color.

**Mike Levitt**

Sure. So, we think that all things considered heat waves, pressure on energy prices, macro economics, et cetera, that a reasonable full year assumption is in that $0.05 to $0.055 range. There are a number of things that move it around. One is certainly seasonality. So, our power prices are probably net a bit higher in these warm months, especially when you get, 50 days of a hundred degree temperatures across the south, including Texas, that has an impact. And there's also sort of a less well known aspect of developing in Texas, which is that generally speaking, the power prices are a bit higher as you develop a facility and then as the facility scales, those prices come down considerably.

And so it's fair to say, we think that our pricing in the fall and winter will probably come down from where it is this summer. It's also I think fair to assume that as we have our Texas facilities fully scaled going into next year, that on average, our power pricing overall should come down a bit, from where we expected to be full year this year, because we are, to our detriment, we're ramping Texas this year. It's not fully up to scale by the end of this year our facilities in Texas will be fully scaled. So it's going to move around a bit from this year to next year, but we expect that to be a positive movement as opposed to a negative movement. Did that answer your question Lucas?

**Lucas Pipes**

Very, very helpful. Really appreciate the color. And then staying on the topic of cost, I think was also mentioned in the prepared marks that you expect operating expenses to decline by about 25%. And I wonder what sort of first did I hear that? Right. And then what are some of the drivers that bring those costs down? Thank you very much.

**Denise Sterling**

Yes. No, thank you so much for the question. I think, consistent with what you — what we commented on earlier we really did take a disciplined approach. Quite frankly, it was more surgical than suggesting that we were going to take across the board reductions. And so, as we suggested the really the cost savings were around personnel and or areas of our organization that were not necessarily part of that core business, as Mike had suggested that we were really doubling down on and going to focus on.

SASMF EXHIBIT 25

587 of 979

In addition to, taking a look at some of our project related professional fees and things of that nature, where we said, look, we have the ability to control these and the timing, and if they were not, if they were discretionary that, we literally took a position that they were going to be eliminated. I don't think that this has a significant impact on our ability to meet our objectives. And as Mike had suggested, we did not impact anybody from a data center perspective.

**Lucas Pipes**

Thank you. I'll try to squeeze one last one.

**Steven Gitlin**

Go ahead, Lucas.

**Lucas Pipes**

If possible. Sorry, sorry about that. Just I'm, I was hoping it might be possible to quantify the backlog on the hosting side, but we continued to hear a lot about shortages. You mentioned some of the peers having securing data center space, so how would you frame that up?

**Mike Levitt**

So, I think it's fair to say that what we hear from prospective customers anecdotally is that there continues to be a lack of availability of up and running now or in the near term infrastructure. That a number of folks have been, highly disappointed with the delays that, have occurred. We announce our now make a habit of any of significance announcing, any significant hosting agreements as they occur in order to kind of provide as much transparency in that regard as we can. It continues to be the case that we are in dialogue with demand that exceeds our capacity this year. Generally speaking, it does take, some time to get to agreement. We think that we'll have some additional announcements this quarter with regard to hosting, but there is no guarantee of that, right?

Of course, strength in bitcoin pricing helps. But the other aspect of it is as a lot of folks that don't have a home for their mining equipment also don't have capital. And as we stated in our prior earnings call, we are only interested in working with co-location customers that have the ability to make prepayments and are very, very credit worthy as such. And so we're not talking to everybody, that's got rigs on the ground in warehouses. We are talking to the folks that have capital and rigs on the ground. And that said, the pipeline is very strong, but we're also quite sincere about making sure that our hosting business is a profitable business.

In the call, it the good old days, we used to be a reseller of servers, and there was margin in that. And we could look at the margin in that and combine that with our hosting agreements and look at the overall profitability. Now that we really don't have a very vibrant reseller business, because most folks are going direct to the manufacturers. Our hosting business needs to stand on its own two feet without the benefit of margin coming from equipment sales.

SASMF EXHIBIT 25
588 of 979

And so, for some folks, that's a bigger hill to climb, but as demonstrated by the 70 megawatts of agreements that we recently announced, there are folks that are well capitalized and recognize the value in terms of the up times, the efficiency, the life of the servers and the technology overlay, they recognize the value. But without the benefit of those resale margins, we had to take a good, hard look at the hosting business and reconstructed a little bit to make sure that we're getting paid for the investment, we've made in infrastructure and technology and the capabilities that we offer.

**Lucas Pipes**

Thank you very much. And you and the team. Best of luck.

**Denise Sterling**

Thank you.

**Steven Gitlin**

Thanks, Lucas. Our next question comes from Chris Brendler at D.A. Davidson. Good afternoon, Chris.

**Chris Brendler**

Hi, Steve. Thanks a lot for taking my question and congratulations on the results and really echo comments earlier, but the disclosure very, very helpful. Thank you so much. Along those lines and really enjoy, hearing more details about your power costs and the outlook. I think that's been a key question that a lot of us on the outside have been wrestling with. Mike, if you could maybe talk to some specifics, if you can sort, I think there's been some challenges in Georgia just getting sort of contracts aligned and then in Texas, are you currently able to sell power back to the grid and take advantage of these power – these spikes and prices? Or is that still on the come? Thanks so much.

**Mike Levitt**

So, we have not earned revenue from Texas for curtailing, obviously we think it benefits our power costs, but we are not in the, in an earning revenue mode. We are working, as we mentioned today on implementation of the CLR program, utilizing our software and technology capabilities, that's something that we hope to have in position sometime this year. But it probably will not be something that's in position by the time the heat wave, hopefully subsides within the next few weeks. But in the future, we very well may have the ability to in fact, have a mutually beneficial economic relationship with the grid operator, but we'll just have to see where that goes.

With regard to our facility in Georgia, we've been working with the power provider there to do sort of the best they, and we can they are, that is the one place where we have the greatest what I would call exposure to the variability of natural gas pricing. And so we've been working with them to try to develop as efficient a program as possible. And but it absolutely does impact our overall cost right now and has, and that's part of what has driven our us to raise our full year estimate for where power pricing is coming in, has been, kind of that facility, that factor as it relates to that power provider.

**Chris Brendler**

Okay, great. And then a bigger picture question for you, Mike is, as I've been talking to investors and sort of wrestling with the outlook here as prices have come down, but now stabilizing and thinking about the having in 18 months or so, or a little more than that. I think I'm really focused on companies that can take advantage of advantaged power relationships and, or more efficient mining operations. So, can you give me like your high level thoughts on sort of behind the meter facilities that potentially would use renewables or fleet upgrades, immersion technology, have you ordered, where do you stay on the XPs? Is that going to be a significant part of your rig portfolio by the end of next year? So some of those high level comments would be great. Thanks.

**Mike Levitt**

Sure. In no particular order, one we mentioned that we've been running immersion testing in a number of our facilities. And immersion to us is simply an economic question is, can we get the efficiency and productivity that makes it worth the expense? We've been testing equipment from a number of immersion equipment providers to see what we like to see what is efficient to see, what's worth the cost, et cetera. I would be, surprised if when the, within the next 12 months we are not operating some considerable portion of our self-mining fleet in an immersion setting. So that's one.

Two, we are trying to skew all of our development activity to more and more efficient and predictable power provision. Looking back, clearly perhaps the Georgia facility, wasn't the best decision we ever made. I wasn't in this seat at the time. But, we're trying to work that out with the power provider there. That said, we're going to be developing where we think we've got a really good handle on power, and as higher predictability as possible. And that's true with our Texas sites. It's true with our Oklahoma site. We feel pretty good about those, those facilities and those facilities probably buy into, some point next year in the aggregate, will be a considerable percentage of our operating facilities.

We are actively engage in conversations about alternative forms of power supplemental or other behind the meter and otherwise, I think that everybody in our industry is doing so, because we would all like to get our power costs down prior to mid-2024 and to be managing them as inexpensively and prudently as we possibly can. There's nothing that we, sitting here today, can tell you or can promise, but we can say that we're very focused on all of that.

SayHuett Equity Group Exhibit, 13

SASMF EXHIBIT 25
590 of 979

As we also mentioned, about our facilities, one of the nice things about having purpose built facility is not only are they purpose built, but they are repurposeable. And so the fact that, our business is not really built on steel containers in an exposed environment, but rather in structures allows us a lot more flexibility in pivoting to more efficient mining processes

**Chris Brendler**

That **makes** sense. And thanks so much for that detail. What about the XPs? Are you, I can't remember if you, I don't think you placed a huge one at the peak of the market. So that was probably a smart thing.

**Mike Levitt**

I forgot about that part of your question. Yes, the answer is yes, we do have XPs coming and as we mentioned, we've look, we are trying to be very, very efficient buyers in this market. There are a lot of stranded servers that are here today and that are coming tomorrow. And again, can't promise that any of our conversations will be fruitful, but like you would expect, we're trying to pick up some high quality equipment at low prices. Let's say, that's it we'll see how it plays out the next six months.

**Chris Brendler**

No, I figure out patients there to be well rewarded. Thanks so much. Appreciate the comments and we'll catch up later. Thanks.

**Mike Levitt**

Thanks for your questions.

**Steven Gitlin**

Thank you Chris. [Operator Instructions] And our next question is coming from Stephen Glagola at Cowen. Good afternoon, Stephen.

**Stephen Glagola**

Hey, good afternoon, Steve. Thanks for the question. I just want to drill down a little bit more on the cost a bit more. Denise, you listed where the 25% OpEx is coming out of does that exclude non-cash items?

**Denise Sterling**

It does.

**Stephen Glagola**

SASMF EXHIBIT 25
591 of 979

Thank you. And also Mike, I just wanted to get more color on the decision to amend the
Case 22-90341 Document 1508-30 Filed in TXSB on 02/22/24 Page 92 of 100
performance condition that allowed for the RSUs to vest. If you can just provide any color on that,
that'd be great.

**Mike Levitt**

Sure. it wasn't a performance condition without throwing any lawyers under a bus, the way the RSU program was drafted way back when as opposed to being drafted, saying that, there was a an event condition, which would be, a sale of the company or a going public, it set up a sale of the company, if you will, or technically an IPO and it just inadvertently frankly, missed that you can go public through a spec.

And so those RSUs were all already time vested. It represented frankly, five years of RSUs for our people. And so what our board was doing was fulfilling what had been the intention and which makes a lot of sense, right, that's how companies usually work, you've got time vesting. And then of course, you've got when you, when you go public, plus when you time vest, for whatever reason, the way it was drafted required our board to take action or the RSUs would've – they, even though were public, they would ever get their RSUs. And I don't know about my colleagues, but if I was never going to get my stock, I'm not sure I would've stayed. Right. So, it really was to correct something that just wasn't in my view, drafted properly when it was originally set up years ago.

But to be clear, we didn't accelerate, anybody's RSUs every one of those RSUs and our RSUs vest over four years, it's not like it's a short vesting period or anything like that. All of those RSUs had met the time vesting requirement. So it was a very technical issue that, that occurred. Now, we did elect to do a net settlement and frankly, the reason was, and it looks like it was a pretty smart trade now was that our stock price at the time was so low that by net settling, we could effectively pull what was 4% to 5% of our outstandings out at a price that's well below where the stocks trading today. Did that answer to your question?

**Stephen Glagola**

Yes, yes, that was very helpful. Thank you. If I can just ask one more follow up here on the June update, I believe you said approximately 90% of the rigs were already paid for, was there a downward market price adjustment on that 90%? And if so, could you quantify it? And then additionally, like what is the remaining CapEx, if any, on the infrastructure spend? Thank you.

**Mike Levitt**

So the answer is, yes. As I think we've said in the past, our agreements have the market price adjustment or mechanism in them. And yes, our manufacturer was did the right thing and was kind enough to agree that a market price adjustment was warranted, and that certainly significantly reduced our obligation as it related to those machines. And because we'd already paid in so much, because there's such near term deliveries, it more or less, took away, most of what we owed at the time.

So it was, yes, it was principally related to the adjustment. I don't remember the exact magnitude, frankly of what we had left versus what they reduced at that time. But it was in the tens of millions of dollars order magnitude, it wasn't $2 million or $3 million bucks. It was, yes, it was, and I think was in that $20 million to $30 million [ph] range, but I don't remember precisely. So, that did have a very beneficial impact for us. What was the second half the question?

**Stephen Glagola**

Just on the remaining infrastructure CapEx. If they're – what's remaining there? Thank you.

**Mike Levitt**

So, we are currently sitting at about 600 megawatts operating, and to get to where we need to get to that kind of plus or minus a gig, which takes care of our miners and our contracted hosting. You know, that's in the order of magnitude of $50 million to $75 million to get that up and running fully.

**Stephen Glagola**

Okay. Thank you very much, Mike. Appreciate it.

**Mike Levitt**

Yes, and the reason I give you a little bit of a range is, I should have thanked also our vendors at the end of my thank you, because the folks we work within developing our infrastructure have been great partners in this timeframe as well, which we're appreciative of. As you know a lot of folks have had to cancel or with on orders for everything. It's not just minors, it's also transformers. And I think our partners appreciate that, we're still in there and making our payments, but in turn, they've also been good partners to us and we've benefited from some price reductions on some of the development activities we've got going on.

**Stephen Glagola**

Thanks.

**Steven Gitlin**

Thank you, Stephen. Our next question comes from Kevin Dede at H.C. Wainwright. Hi, Kevin.

**Kevin Dede**

Hi, Steve. Hi, Mike. Thanks for having me on. Congratulations everything you've done. Hey, Mike, you and the team are super aggressive in site selection and build out. I was wondering if you just sort of at a high level kind of kick off the primary – sort of the primary attributes of each site as you work into them. Just sort of based on your experience in Georgia, I'm kind of wondering how you've shifted cores approach?

**Mike Levitt**

Fair question and a good question. And I know particular order, one is, is power provision and predictability of that power provision related to that is being closer to the actual provider of power one of the issues that we face in Georgia. And the folks in Georgia, they're good folks. Okay. And I like them and we're all trying to be constructive and work through the issues, but they are generally a buyer. It's a utility company. They're generally a buyer of power, and then a provider of that power, as opposed to a producer of power. We want to be closer to the production as oppose to simply the provision. So that's one call it, lesson learned attribute that we are very focused on.

Second has to do with some of these grid and weather inter relationships, right. We love our sites in Texas, and we like the folks in Texas and we're based in Texas. And I recognize that this is an unprecedented heat wave, but it's still not very fun to be curtailing, kind of four hours to five hours a day when it's 104 degrees, that has implications for our productivity. And so we need to be very careful about what percentage of our operations reside where you can have that kind of an issue, right. Is second.

Third is, is certainly our ability to get closer to renewable resources and kind of the behind the meter aspects that we were asked about. Fourth, has to do with availability of talent and what is a hard to hire environment. We need good people, good maintenance techs that we can train in our facilities. So, we are running, big, high powered facilities with on average, more than 30,000 servers in each, we're running them 24/7. So, you need that. I think early on, we got the gig to make sure we were coming to places where we're welcome where we're invited, where they want us, where they're glad to have us.

And so I think our local relationships have all been very, very good. We really haven't had any sort of governmental, political kind of issues. And scalability, I think early on, we were trying to make sure we could create facilities that were 100 megawatts, 150 megawatts. I think we're leaning more into 200 megawatt plus type sites. Now, we believe it's important to be geographically diversified for all sorts of reasons I've talked about in the past, some of which have been, demonstrated this summer. I don't know, Kevin, that's kind of my off the top of my head list. I'm sure that Weston Adams front infrastructure would have more.

**Kevin Dede**

No, I'll all sensible points. Thanks for indulging me. And please don't take offense to this. I'm just super curious about the prospects in Georgia, Volvo 3 and Volvo 4 coming on. I'd expect that could change pricing, and I'm just kind of wondering what your people have told you, if there might be any sort of benefit to that?

**Mike Levitt**

I don't think they're related, really to what we are doing, given our, where we are, it's just different plan.

**Kevin Dede**

Right. Okay. Circling back on immersion, you mentioned a couple of tests. I was wondering if you

could speak to end of the data that you're seeing, sort of where you've pushed the envelope to? How the kind of performance improvement you're seeing? And any sort of initial feedback on these initial tests?

**Mike Levitt**

No, it's still too early to, probably too early to comment. I don't want to speculate, sorry.

**Kevin Dede**

Yes, no, no apologies. Understood, fair. Do you think that any of the Texas heat issues could be mitigated through that technology? Or is it really more of an air car asks you to decision?

**Mike Levitt**

It's really more of a grid curtailment issue than it is a inability to operate the equipment, in a passive air environment. When the grid gets down to kind of under 10 gigawatts, probably under six gigs of excess capacity we get phone calls, because we're the, even though the entire industry, probably isn't one gig in the state yet, we can represent call it 20% of the excess capacity. We're less than we're less than 1.5% of the total capacity, but we're 20% of the excess capacity when they're trying to run up four gig to five gig excess.

**Kevin Dede**

Right. So, I know you've been questioned on this already, so apologies again, Mike. But can you talk to the length of time it might take before you're able to leverage your PPA into a sale agreement?

**Mike Levitt**

No. Look, we're having really constructive conversations with the folks at ERCOT. They're good people look. We're trying to be a good citizen, right. We want to do what's right for our company. We want to do what's right for Texas. And so it's just too early to talk about how that's going to come out.

**Steven Gitlin**

Kevin, we really appreciate – we appreciate the questions in the interest of schedule. We're going to have to call it here. We thank everybody for your attending.

**Kevin Dede**

No problem, understood, Steve. I just wanted to thank you all for entertaining the questions. Really, really great to speak to you both again.

**Mike Levitt**

You too.

**Steven Gitlin**

Thanks, Kevin. And at this point we thank you all for your attention and for your interest in Core Scientific and archive version of this call, all SEC filings and relevant company and industry news can be found on our website corescientific.com. We wish you a good day. Good afternoon. Good evening. And we look forward to speaking with you again, following next quarter's results.

- Read more current CORZQ analysis and news

- View all earnings call transcripts

**Exhibit 14**

**SASMF EXHIBIT 25**
**597 of 979**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
  For the quarterly period ended September 30, 2022

  **OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
  For the transition period from to

**Commission file number 001-40046**

# Core Scientific, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **86-1243837** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

210 Barton Springs Road

Suite 300

Austin, Texas

(Address of Principal Executive Offices)

78704

(Zip Code)

**(512) 402-5233**

Registrant's telephone number, including area code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 per share | CORZ | The Nasdaq Global Select Market |
| Warrants, exercisable for shares of common stock | CORZW | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

| | |
|---|---|
| Common Stock, par value $0.0001 per share | Shares Outstanding as of November 14, 2022 |
| | 374,527,988 |

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Part I. Financial Information | | |
| Item 1. | Financial Statements | 3 |
| | Consolidated Balance Sheets | 4 |
| | Consolidated Statements of Operations | 5 |
| | Consolidated Statements of Comprehensive Loss | 6 |
| | Consolidated Statements of Changes in Contingently Redeemable Convertible Preferred Stock and Stockholders' Equity | 7 |
| | Consolidated Statements of Cash Flows | 9 |
| | Notes to the Consolidated Financial Statements | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 87 |
| Item 4. | Controls and Procedures | 88 |
| | | |
| Part II. Other Information | | |
| Item 1. | Legal Proceedings | 89 |
| Item 1A. | Risk Factors | 90 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 135 |
| Item 3. | Defaults Upon Senior Securities | 135 |
| Item 4. | Mine Safety Disclosures | 135 |
| Item 5. | Other Information | 135 |
| Item 6. | Exhibits | 136 |
| Signatures | | 137 |

Ad Hoc Equity Group Exhibit 14

2

SASMF EXHIBIT 25

599 of 979

Table of Contents

**Part I - Financial Information**

**Item 1. Financial Statements**

Ad Hoc Equity Group Exhibit 14

3

SASMF EXHIBIT 25

600 of 979