Table of Contents

In addition, the systems that connect our hosting facilities to the Internet and other external networks may become insufficient, including with respect to latency, reliability and diversity of connectivity. We may not be able to adapt to changing technologies, identify and implement new alternatives successfully or meet customer demands for new processes or technologies in a timely and cost-effective manner, if at all, which would have a material adverse effect on our business, financial condition and results of operations.

Even if we succeed in adapting to new processes and technologies, there is no assurance that our use of such new processes or technology would have a positive impact on our financial performance. For example, we could incur substantial additional costs if we needed to materially improve our hosting center infrastructure through the implementation of new systems or new server technologies that require levels of critical load and heat removal that our facilities are not currently designed to provide. In addition, if one of our new offerings were competitive to our prior offerings and represented an adequate or superior alternative, customers could decide to abandon prior offerings that produce higher revenue or better margins for the new offering. Therefore, the adaptation to new processes and technologies could result in lower revenue, lower margins and/or higher costs, which could have a material adverse effect on our business, financial condition and results of operations.

In addition, our competitors or others might develop technologies that are more effective than our current or future technologies, or that render our technologies less competitive or obsolete. Further, many of our competitors may have superior financial and human resources deployed toward research and development efforts. We may not be able to effectively keep pace with relevant technological changes. If competitors introduce superior technologies for hosting operations or transaction processing, and we cannot make upgrades to our hardware or software to remain competitive, it could have a material adverse effect on our business, financial condition and results of operations.

*Our compliance and risk management methods might not be effective and may result in outcomes that could adversely affect our reputation, operating results, and financial condition.*

Our ability to comply with applicable complex and evolving laws, regulations, and rules is largely dependent on the establishment and maintenance of our compliance, audit, and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. While we plan to devote significant resources to develop policies and procedures to identify, monitor and manage our risks, we cannot assure you that our policies and procedures will always be effective against all types of risks, including unidentified or unanticipated risks, or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed in all market environments.

*We may infringe on third-party intellectual property rights or other proprietary rights, which could have a material adverse effect on our business, financial condition and results of operations.*

Our commercial success depends on our ability to operate without infringing third-party intellectual property rights or other proprietary rights. For example, there may be issued patents of which we are not aware that our services or products infringe on. Also, there may be patents we believe we do not infringe on, but that we may ultimately be found to by a court of law or government regulatory agency. Moreover, patent applications are in some cases maintained in secrecy until patents are issued. Because patents can take many years to issue, there may be currently pending applications of which we are unaware that may later result in issued patents that our services or products allegedly infringe on.

If a third party brings any claim against us based on third-party intellectual property rights and/or other proprietary rights, we will be required to spend significant resources to defend and challenge such claim, as well as to invalidate any such rights. Any such claim, if initiated against us, whether or not it is resolved in our favor, could result in significant expense to us, and divert the efforts of our technical and management personnel, which could have a material adverse effect on our business, financial condition and results of operations.

*The further development and acceptance of cryptographic and algorithmic protocols governing transaction validation and the issuance of, and transactions in, digital assets are subject to a variety of factors that are difficult to evaluate. The slowing or stoppage of development or acceptance of blockchain networks and digital assets would have an adverse material effect on the successful development of the mining operation and value of mined digital assets.*

The use of digital assets to, among other things, buy and sell goods and services, is part of a new and rapidly evolving industry that employs digital assets based upon a computer-generated mathematical and/or cryptographic protocol. The future of this industry is subject to a high degree of uncertainty. The factors affecting the further development of this industry include, but are not limited to:

- continued worldwide growth in the adoption and use of digital assets and blockchain technologies;

104

Ad Hoc Equity Group Exhibit 14
104

SASMF EXHIBIT 25
701 of 979

- government and quasi-government regulation of digital assets and their use, or restrictions on or regulation of access to and operations of digital asset transaction processing;

- changes in consumer demographics and public tastes and preferences;

- the maintenance and development of the open-source software protocols or similar digital asset systems;

- the availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies;

- general economic conditions and the regulatory environment relating to digital assets; and

- negative consumer perception of digital assets, including digital assets specifically and digital assets generally.

A decline in the popularity or acceptance of digital assets could materially impact us or our potential hosting customers, which could have a material adverse effect on our business, financial condition and results of operations.

***Our ability to use net operating losses to offset future taxable income may be subject to certain limitations.***

As of December 31, 2021, Core Scientific had U.S. federal and state net operating losses ("NOLs") of $142.3 million and $16.0 million, respectively, available to offset future taxable income, some of which begin to expire in 2035. Federal NOLs incurred in taxable years beginning after December 31, 2017 can be carried forward indefinitely, but the deductibility of federal NOLs in taxable years beginning after December 31, 2020, is subject to certain limitations. A lack of future taxable income would adversely affect our ability to utilize these NOLs before they expire.

In addition, under the Code, substantial changes in our ownership may limit the amount of pre-change NOLs that can be utilized annually in the future to offset taxable income. Section 382 of the Code imposes limitations on a company's ability to use its NOLs if one or more stockholders or groups of stockholders that own at least 5% of the company's stock increase their ownership by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. Similar rules may apply under state tax laws. Thus, prior changes in our ownership or future changes in our ownership may limit our ability to use our NOLs. We have not yet determined the cumulative ownership change resulting from the Transactions or any resulting limits on utilization of NOLs or other tax attributes. Subsequent statutory or regulatory changes in respect of the utilization of NOLs for U.S. federal or state purposes, such as suspensions on the use of NOLs or limitations on the deductibility of NOLs carried forward, or other unforeseen reasons, may result in our existing NOLs expiring or otherwise being unavailable to offset future taxable income. For these reasons, we may not be able to utilize a material portion of the NOLs, even if we have taxable income.

***We may not be able to adequately protect our intellectual property rights and other proprietary rights, which could have a material adverse effect on our business, financial condition and results of operations.***

We may not be able to obtain broad protection in the United States or internationally for all of our existing and future intellectual property and other proprietary rights, and we may not be able to obtain effective protection for our intellectual property and other proprietary rights in every country in which we operate. Protecting our intellectual property rights and other proprietary rights may require significant expenditure of our financial, managerial and operational resources. Moreover, the steps that we may take to protect our intellectual property and other proprietary rights may not be adequate to protect such rights or prevent third parties from infringing or misappropriating such rights. Any of our intellectual property rights and other proprietary rights, whether registered, unregistered, issued or unissued, may be challenged by others or invalidated through administrative proceedings and/or litigation.

We may be required to spend significant resources to secure, maintain, monitor and protect our intellectual property rights and other proprietary rights. Despite our efforts, we may not be able to prevent third parties from infringing upon, misappropriating or otherwise violating our intellectual property rights and other proprietary rights. We may initiate claims, administrative proceedings and/or litigation against others for infringement, misappropriation or violation of our intellectual property rights or other proprietary rights to enforce and/or maintain the validity of such rights. Any such action, if initiated, whether or not it is resolved in our favor, could result in significant expense to us, and divert the efforts of our technical and management personnel, which may have a material adverse effect on our business, financial condition and results of operations.

Ad Hoc Equity Group Exhibit 14
105

SASMF EXHIBIT 25
702 of 979

### Risks Related to our Limited Operating History and Early Stage of Growth

*We operate in a rapidly developing industry and have an evolving business model with a limited history of generating revenue from our services. In addition, our evolving business model increases the complexity of our business, which makes it difficult to evaluate our future business prospects and could have a material adverse effect on our business, financial condition and results of operations.*

Our business model has evolved in the past and continues to do so. We previously were engaged primarily in providing infrastructure hosting services to our commercial counterparties after being founded to engage in the business of verifying and confirming transactions on a blockchain, also known as "transaction processing, or "mining." Recently, we decided to substantially increase our focus on mining blockchain for our own account. As a result of our recent acquisition of Blockcap, we significantly expanded our self-mining operations. We may adjust our business model further from time to time, including trying to offer additional types of products or services, such as a blockchain application designed by us, blockchain services and other related businesses, or entering into strategic partnerships or acquisitions. We have generated limited revenue from such services, and we do not know whether any of them will be successful. The evolution of and modifications to our business strategy will continue to increase the complexity of our business and placed significant strain on our management, personnel, operations, systems, technical performance and financial resources. Future additions to or modifications of our business strategy are likely to have similar effects. Further, any new services that we offer that are not favorably received by the market could damage our reputation or our brand. There can be no assurance that we will ever generate sufficient revenues or achieve profitably in the future or that we will have adequate working capital to meet our obligations as they become due.

We cannot be certain that our current business strategy or any new or revised business strategies will be successful or that we will successfully address the risks we face. In the event that we do not effectively evaluate future business prospects, successfully implement new strategies or adapt to our evolving industry, it will have a material adverse effect on our business, financial condition and results of operations.

*We may not be able to compete effectively against our current and future competitors, which could have a material adverse effect on our business, financial condition and results of operations.*

The digital asset mining industry is highly innovative, rapidly evolving and characterized by healthy competition, experimentation, frequent introductions of new products and services and uncertain and evolving industry and regulatory requirements. We expect competition to further intensify in the future as existing and new competitors introduce new products or enhance existing products. We compete against a number of companies operating both within the United States and abroad, that have greater financial and other resources and that focus on digital asset mining, including businesses focused on developing substantial Bitcoin mining operations. If we are unable to compete successfully, or if competing successfully requires us to take costly actions in response to the actions of our competitors, our business, operating results and financial condition could be adversely affected.

We compete with a range of hosting providers and blockchain providers for some or all of the services we offer. We face competition from numerous developers, owners and operators in the blockchain industry, including technology companies, such as hyperscale cloud players, managed service providers and real estate investment trusts ("REITs"), some of which own or lease properties similar to ours, or may do so in the future, in the same submarkets in which our properties are located. Cloud offerings may also influence our customers to move workloads to cloud providers, which may reduce the services they obtain from us. Our current and future competitors may vary from us in size, service offerings and geographic presence.

Competition is primarily centered on reputation and track record; design, size, quality, available power and geographic coverage of hosting space; quality of installation and customer equipment repair services; relationships with equipment manufacturers and ability to obtain replacement parts; technical and software expertise; and financial strength and price. Some of our current and future competitors may have greater brand recognition, longer operating histories, stronger marketing, technical and financial resources and access to greater and less expensive power than we do.

In addition, many companies in the industry are consolidating, which could further increase the market power of our competitors. As a result, some of our competitors may be able to:

- identify and acquire desirable properties that we are interested in from developers;

- offer hosting services at prices below current market rates or below the prices we currently charge our customers;

- bundle colocation services with other services or equipment they provide at reduced prices;

- develop superior products or services, gain greater market acceptance and expand their service offerings more efficiently or rapidly;

Ad Hoc Equity Group Exhibit 14
106

SASMF EXHIBIT 25
703 of 979

- adapt to new or emerging technologies and changes in customer requirements more quickly;
- take advantage of acquisition and other opportunities more readily; and
- adopt more aggressive pricing policies and devote greater resources to the promotion, marketing and sales of their services.

We operate in a competitive market, and we face pricing pressure with respect to our hosting services. Prices for our hosting services are affected by a variety of factors, including supply and demand conditions and pricing pressures from our competitors. We may be required to lower our prices to remain competitive, which may decrease our margins and could have a material adverse effect on our business, financial condition and results of operations.

In addition, we also face significant competition from other users and/or companies that are processing transactions on one or more digital asset networks, as well as other potential financial vehicles, including securities, derivatives or futures backed by, or linked to, digital assets through entities similar to us, such as exchange-traded funds. Market and financial conditions, and other conditions beyond our control, may make it more attractive to invest in other financial vehicles, or to invest in digital assets directly. Such events could have a material adverse effect on our business, financial condition and results of operations and potentially the value of any digital assets we hold or expect to acquire for our own account.

*Our projections are subject to significant risks, assumptions, estimates and uncertainties, including assumptions regarding the demand for and cost of our hosting services and the adoption of bitcoin and other digital assets. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations in any given quarter or fiscal year.*

We operate in a rapidly changing and competitive industry and our projections are subject to the risks and assumptions made by management with respect to our industry. Operating results are difficult to forecast as they generally depend on our assessment of the timing of adoption and use of bitcoin and other digital assets, which is uncertain. Furthermore, as we invest in the development of our hosting and self-mining business, whether because of competition or otherwise, we may not recover the often substantial up-front costs of constructing, developing and maintaining our hosting facilities and purchasing the latest generation of miners or recover the opportunity cost of diverting management and financial resources away from other opportunities. Additionally, our business may be affected by reductions in miner demand for hosting facilities and services and the price of bitcoin and other digital assets as a result of a number of factors which may be difficult to predict. Similarly, our assumptions and expectations with respect to margins and the pricing of our hosting services and market price of bitcoin or other digital assets we mine may not prove to be accurate. This may result in decreased revenue, and we may be unable to adopt measures in a timely manner to compensate for any unexpected shortfall in revenue. This inability could cause our operating results in a given quarter or year to be higher or lower than expected. If actual results differ from our estimates, analysts or investors may negatively react and our stock price could be materially impacted.

*We have experienced difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions that are willing to provide us with customary financial products and services, which could have a material adverse effect on our business, financial condition and results of operations.*

As an early stage company with operations focused in the digital asset transaction processing industry, we have in the past experienced, and may in the future experience, difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions that are willing to provide us with customary leasing and financial products and services, such as bank accounts, lines of credit, insurance and other related services, which are necessary for our operations. To the extent a significant portion of our business consists of digital asset transaction mining, processing or hosting, we may in the future continue to experience difficulty obtaining additional financial products and services on customary terms, which could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulatory Framework**

*If we were deemed an "investment company" under the Investment Company Act of 1940, as amended (the "1940 Act"), applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.*

An issuer will generally be deemed to be an "investment company" for purposes of the 1940 Act if:

- it is an "orthodox" investment company because it is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities; or

Ad Hoc Equity Group Exhibit 14
107

SASMF EXHIBIT 25
704 of 979

Table of Contents

- it is an inadvertent investment company because, absent an applicable exemption, it owns or proposes to acquire "investment securities" having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis.

We believe that we are not and will not be primarily engaged in the business of investing, reinvesting or trading in securities, and we do not hold ourselves out as being engaged in those activities. We intend to hold ourselves out as a digital asset mining business. Accordingly, we do not believe that we are an "orthodox" investment company as described in the first bullet point above.

While certain digital assets may be deemed to be securities, we do not believe that certain other digital assets, in particular Bitcoin, are securities; therefore, we believe that less than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis will comprise digital assets that could be considered investment securities. Accordingly, we do not believe that we are an inadvertent investment company by virtue of the 40% inadvertent investment company test as described in the second bullet point above. Although we do not believe any of the digital assets we may own, acquire or mine are securities, there is still some regulatory uncertainty on the subject, see "—*There is no one unifying principle governing the regulatory status of digital assets nor whether digital assets are securities in any particular context. Regulatory changes or actions in one or more countries may alter the nature of an investment in us or restrict the use of digital assets in a manner that adversely affects our business, prospects or operations.*" If certain digital assets, including Bitcoin, were to be deemed securities, and consequently, investment securities by the SEC, we could be deemed an inadvertent investment company. Similarly, if we were to acquire digital assets deemed investment securities to hold for our own account or to engage in certain transactions, such as loan or repurchase transactions, we could be deemed an inadvertent investment company.

If we were to be deemed an inadvertent investment company, we may seek to rely on Rule 3a-2 under the 1940 Act, which allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which the issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis or (b) the date on which the issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We are putting in place policies that we expect will work to keep the investment securities held by us at less than 40% of our total assets, which may include acquiring assets with our cash, liquidating our investment securities or seeking no-action relief or exemptive relief from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner. As Rule 3a-2 is available to an issuer no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Finally, we believe we are not an investment company under Section 3(b)(1) of the 1940 Act because we are primarily engaged in a non-investment company business.

The 1940 Act and the rules thereunder contain detailed parameters for the organization and operations of investment companies. Among other things, the 1940 Act and the rules thereunder limit or prohibit transactions with affiliates, impose limitations on the issuance of debt and equity securities, prohibit the issuance of stock options, and impose certain governance requirements. We intend to continue to conduct our operations so that we will not be deemed to be an investment company under the 1940 Act. However, if anything were to happen that would cause us to be deemed to be an investment company under the 1940 Act, requirements imposed by the 1940 Act, including limitations on our capital structure, ability to transact business with affiliates and ability to compensate key employees, could make it impractical for us to continue our business as currently conducted, impair the agreements and arrangements between and among us and our senior management team and materially and adversely affect our business, financial condition and results of operations.

***Any change in the interpretive positions of the SEC or its staff with respect to digital asset mining firms could have a material adverse effect on us.***

We intend to conduct our operations so that we are not required to register as an investment company under the 1940 Act. Specifically, we do not believe that digital assets, are securities. The SEC Staff has not provided guidance with respect to the treatment of these assets under the 1940 Act. To the extent the SEC Staff publishes new guidance with respect to these matters, we may be required to adjust our strategy or assets accordingly. There can be no assurance that we will be able to maintain our exclusion from registration as an investment company under the 1940 Act. In addition, as a consequence of our seeking to avoid the need to register under the 1940 Act on an ongoing basis, we may be limited in our ability to engage in digital asset mining operations or otherwise make certain investments or engage in certain transactions, and these limitations could result in our holding assets we may wish to sell or selling assets we may wish to hold, which could materially and adversely affect our business, financial condition and results of operations.

Ad Hoc Equity Group Exhibit 14
108

SASMF EXHIBIT 25
705 of 979

*If regulatory changes or interpretations of our activities require our registration as a money services business ("MSB") under the regulations promulgated by the Financial Crimes Enforcement Network ("FinCEN") under the authority of the U.S. Bank Secrecy Act, or otherwise under state laws, we may incur significant compliance costs, which could be substantial or cost-prohibitive. If we become subject to these regulations, our costs in complying with them may have a material negative effect on our business and the results of our operations.*

To the extent that our activities cause us to be deemed an MSB under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, we may be required to comply with FinCEN regulations, including those that would mandate us to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that our activities would cause us to be deemed a "money transmitter" ("MT") or equivalent designation, under state law in any state in which we may operate, we may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. For example, in August 2015, the New York State Department of Financial Services enacted the first U.S. regulatory framework for licensing participants in "virtual currency business activity." The regulations, known as the "BitLicense," are intended to focus on consumer protection and regulate the conduct of businesses that are involved in "virtual currencies" in New York or with New York customers and prohibit any person or entity involved in such activity to conduct activities without a license.

Such additional federal or state regulatory obligations may cause us to incur extraordinary expenses. Furthermore, we may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs. If we are deemed to be subject to and determine not to comply with such additional regulatory and registration requirements, we may act to dissolve and liquidate.

*There is no one unifying principle governing the regulatory status of digital assets nor whether digital assets are securities in any particular context. Regulatory changes or actions in one or more countries may alter the nature of an investment in us or restrict the use of digital assets in a manner that adversely affects our business, prospects or operations.*

As digital assets have grown in both popularity and market size, governments around the world have reacted differently, with certain governments deeming digital assets illegal, and others allowing their use and trade without restriction. In some jurisdictions, such as in the U.S., digital assets are subject to extensive, and in some cases overlapping, unclear and evolving regulatory requirements. Bitcoin is the oldest and most well-known form of digital asset. Bitcoin and other forms of digital assets have been the source of much regulatory consternation, resulting in differing definitional outcomes without a single unifying statement. Bitcoin and other digital assets are viewed differently by different regulatory and standards setting organizations globally as well as in the United States on the federal and state levels. For example, the Financial Action Task Force considers a digital asset as currency or an asset, and the U.S. Internal Revenue Service ("IRS") considers a digital asset as property and not currency. Further, the IRS applies general tax principles that apply to property transactions to transactions involving virtual currency.

Furthermore, in the several applications to establish an exchange traded fund ("ETF") of digital assets, and in the questions raised by the Staff under the 1940 Act, no clear principles emerge from the regulators as to how they view these issues and how to regulate digital assets under the applicable securities acts. It has been widely reported that the SEC has recently issued letters and requested various ETF applications be withdrawn because of concerns over liquidity and valuation and unanswered questions about absence of reporting and compliance procedures capable of being implemented under the current state of the markets for exchange traded funds. On April 20, 2021, the U.S. House of Representatives passed a bipartisan bill titled "Eliminate Barriers to Innovation Act of 2021" (H.R. 1602). If passed by the Senate and enacted into law, the bipartisan bill would create a digital assets working group to evaluate the current legal and regulatory framework around digital assets in the United States and define when the SEC may have jurisdiction over a particular token or digital asset (i.e., when it is a security) and when the U.S. Commodity Futures Trading Commission (the "CFTC") may have jurisdiction (i.e., when it is a commodity).

If regulatory changes or interpretations require the regulation of Bitcoin or other digital assets under the securities laws of the United States or elsewhere, including the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the 1940 Act or similar laws of other jurisdictions and interpretations by the SEC, the CFTC, the IRS, Department of Treasury or other agencies or authorities, we may be required to register and comply with such regulations, including at a state or local level. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary expense or burdens to us. We may also decide to cease certain operations and change our business model. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to us.

Current and future legislation and SEC-rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which Bitcoin or other digital assets are viewed or treated for classification and clearing purposes. In particular, Bitcoin and other digital assets may not be excluded from the definition of "security" by SEC

Ad Hoc Equity Group Exhibit 14
109

SASMF EXHIBIT 25
706 of 979

Table of Contents

rulemaking or interpretation requiring registration of all transactions unless another exemption is available, including transacting in Bitcoin or digital assets among owners and require registration of trading platforms as "exchanges."

Furthermore, the SEC may determine that certain digital assets or interests, for example tokens offered and sold in initial coin offerings ("ICO"), may constitute securities under the "Howey" test as stated by the United States Supreme Court. As such, ICO offerings would require registration under the Securities Act or an available exemption therefrom for offers or sales in the United States to be lawful. Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Although, we do not intend to be engaged in the offer or sale of securities in the form of ICO offerings, and we do not believe our planned mining activities would require registration for us to conduct such activities and accumulate digital assets. The SEC, CFTC, Nasdaq, IRS or other governmental or quasi-governmental agency or organization may conclude that our activities involve the offer or sale of "securities," or ownership of "investment securities," and we may be subject to regulation or registration requirements under various federal laws and related rules. Such regulation or the inability to meet the requirements to continue operations, would have a material adverse effect on our business and operations. We may also face similar issues with various state securities regulators who may interpret our actions as subjecting us to regulation, or requiring registration, under state securities laws, banking laws, or money transmitter and similar laws, which are also an unsettled area or regulation that exposes us to risks.

***Regulatory changes or actions may restrict the use of digital assets or the operation of digital asset networks in a manner that may require us to cease certain or all operations, which could have a material adverse effect on our business, financial condition and results of operations.***

Recently, there has been a significant amount of regulatory attention directed toward digital assets, digital asset networks and other industry participants by United States federal and state governments, foreign governments and self-regulatory agencies. For example, as digital assets such as bitcoin have grown in popularity and in market size, the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., FinCEN, the SEC, the CFTC and the Federal Bureau of Investigation) have begun to examine the operations of the Bitcoin network, Bitcoin users and Bitcoin exchange markets.

In addition, local state regulators such as the Texas State Securities Board, the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth, the New Jersey Bureau of Securities, the North Carolina Secretary of State's Securities Division and the Vermont Department of Financial Regulation have initiated actions against, and investigations of, individuals and companies involved in digital assets.

Also, in March 2018, the South Carolina Attorney General Office's Security Division issued a cease-and-desist order against Genesis Mining and Swiss Gold Global, Inc., stating that both companies were to stop doing business in South Carolina and are permanently barred from offering securities in the state in the future since they offered unregistered securities via cloud mining contracts under the South Carolina Uniformed Securities Act of 2005, S.C. Code Ann. § 35-1-101, et seq. (the order against Genesis Mining was subsequently withdrawn).

Further, the North Carolina Secretary of State's Securities Division issued in March 2018 a Temporary Cease and Desist Order against Power Mining Pool (made permanent pursuant to a Final Order on April 19, 2018), ordering it to cease and desist, among other things, offering "mining pool shares," which were deemed "securities" under N.C. Gen. Stat. 78A-2(11), in North Carolina until they are registered with the North Carolina Secretary of State or are offered for sale pursuant to an exemption from registration under the North Carolina Securities Act, N.C. Gen. Stat. Chapter 78A.

Additionally, we rely on third-party mining pool service providers for mining revenue payouts from our mining operation, and certain of our potential hosting customers could be involved in, or could issue, cloud mining contracts or mining pool shares, and any regulatory restrictions on their practices could significantly reduce demand for our hosting services. Furthermore, it is possible that laws, regulations or directives that affect digital assets, digital asset transaction processing or blockchain server hosting may change in a manner that may adversely affect our ability to conduct our business and operations in the relevant jurisdiction.

In addition, various foreign jurisdictions either have adopted or may adopt laws, regulations or directives that affect digital assets, digital asset networks and their users and hosting service providers that fall within such jurisdictions' regulatory scope. Such laws, regulations or directives may conflict with those of the United States, may negatively impact the acceptance of digital assets by users, merchants and service providers outside of the United States and may therefore impede the growth of digital asset use. A number of countries, including India, China, South Korea and Russia, among others, currently have a more restrictive stance toward digital assets and, thereby, have reduced the rate of expansion of digital asset use, as well as digital asset transaction processing, in each of those countries. For example, in January 2018, several media publications reported that a Chinese multiagency government task force overseeing risk in Internet finance issued a notice ordering local authorities to guide the shutdown of digital asset

Ad Hoc Equity Group Exhibit 14
110

SASMF EXHIBIT 25
707 of 979

transaction processing in China. However, the People's Bank of China immediately refuted such reports, indicating that digital asset transaction processing is still permitted in China.

As a result of such conflicting positions taken within the Chinese government, a number of digital asset transaction processing operators have moved their operations from China to other jurisdictions in order to build in more regulatory certainty in their operations.

Governments may in the future take regulatory actions that prohibit or severely restrict the right to acquire, own, hold, sell, use or trade digital assets or to exchange digital assets for fiat currency. Ownership of, holding or trading in digital assets may then be considered illegal and subject to sanction. Governments may also take regulatory action that may increase the cost and/or subject digital asset mining companies to additional regulation.

By extension, similar actions by governments may result in the restriction of the acquisition, ownership, holding, selling, use or trading in the capital stock of digital asset mining companies, including our common stock. Such a restriction could result in us liquidating our digital asset inventory at unfavorable prices and may adversely affect our shareholders. The effect of any regulatory change, either by federal, state, local or foreign governments or any self-regulatory agencies, on us or our potential hosting customers is impossible to predict, but such change could be substantial and may require us or our potential hosting customers to cease certain or all operations and could have a material adverse effect on our business, financial condition and results of operations.

***Current and future legislation and rulemaking regarding digital assets may result in extraordinary, non-recurring expenses and could have a material adverse effect on our business, financial condition and results of operations.***

Current and future legislation and rulemaking by the CFTC or SEC or other regulators, including interpretations released by a regulatory authority, may impact the manner in which digital assets are treated. For example, digital assets derivatives are not excluded from the definition of "commodity future" by the CFTC. Furthermore, according to the CFTC, digital assets fall within the definition of a commodity under the Commodities Exchange Act (the "CEA") and as a result, we may be required to register and comply with additional regulations under the CEA, including additional periodic reporting and disclosure standards and requirements. We may also be required to register as a commodity pool operator and to register as a commodity pool with the CFTC through the National Futures Association. If we are required to register with the CFTC or another governmental or self-regulatory authority, the scope of our business and operations may be constrained by the rules of such authority and we may be forced to incur additional expenses in the form of licensing fees, professional fees and other costs of compliance.

The SEC has issued guidance and made numerous statements regarding the application of securities laws to digital assets. For example, on July 25, 2017, the SEC issued a Report of Investigation (the "Report") which concluded that tokens offered and sold by the Decentralized Autonomous Organization ("DAO"), a digital decentralized autonomous organization and investor-directed venture capital fund for digital assets, were issued for the purpose of raising funds. The Report concluded that these tokens were "investment contracts" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, and therefore securities subject to the federal securities laws. In December 2017, the SEC issued a cease-and-desist letter to Munchee Inc., ordering that the company stop its initial coin offering of MUN Tokens on the grounds that it failed to file a registration statement or qualify for an exemption from registration. Similar to the tokens issued by the DAO, the SEC found that the MUN Tokens satisfied the definition of an "investment contract," and were therefore subject to the federal securities laws. In February 2018, both the SEC and CFTC further reiterated their concerns regarding digital assets in written testimony to the Senate Banking, Housing and Urban Affairs Committee. On March 7, 2018, the SEC released a "Statement on Potentially Unlawful Online Platforms for Trading Digital Assets," and reiterated that, if a platform "offers trading of digital assets that are securities" and "operates as 'exchange,' as defined by the federal securities laws," the platform must register with the SEC as a national securities exchange or be exempt from registration. The SEC's statement serves as a notice to operators of any platforms, including secondary market trading platforms, which the SEC is actively monitoring for potentially fraudulent or manipulative behavior in the market for security tokens, as the SEC has cautioned recently in the context of ICOs. On November 16, 2018, the SEC released a "Statement on Digital Asset Securities Issuance and Trading," and emphasized that market participants must adhere to the SEC's well-established and well-functioning federal securities law framework when dealing with technological innovations, regardless of whether the securities are issued in certificated form or using new technologies, such as blockchain. This has all been followed by additional statements and guidance form the SEC including no-action letters relating to specific blockchain-based projects, and a Framework for "Investment Contract" Analysis of Digital Assets published by the Division of Corporation Finance on April 3, 2019. In an August 2021 interview, SEC Chairman Gensler signaled the SEC is contemplating a robust regulatory regime for digital assets and reiterated the SEC's position that many digital assets are unregulated securities.

The SEC has been active in asserting its jurisdiction over ICOs and digital assets and in bringing enforcement cases. The SEC has directed enforcement activity toward digital assets, and more specifically, ICOs. In September 2017, the SEC created a new division known as the "Cyber Unit" to address, among other things, violations involving distributed ledger technology and ICOs, and

111

Table of Contents

filed a civil complaint in the Eastern District of New York charging a businessman and two companies with defrauding investors in a pair of so-called ICOs purportedly backed by investments in real estate and diamonds (see Securities and Exchange Commission v. REcoin Group Foundation, LLC, et al., Civil Action NO. 17-cv-05725 (E.D.N.Y, filed Sept. 29, 2017)). Subsequently, the SEC has filed several orders instituting cease-and-desist proceedings against (i) Carrier EQ, Inc., d/b/a AirFox and Paragon Coin, Inc. in connection with their unregistered offerings of tokens (see CarrierEQ, Inc., Rel. No. 33-10575 (Nov. 16, 2018) and Paragon Coin, Inc., Rel. No. 33-10574 (Nov. 16, 2018), respectively), (ii) Crypto Asset Management, LP for failing to register a hedge fund formed for the purpose of investing in digital assets as an investment company (see Crypto Asset Management, LP and Timothy Enneking, Rel. No. 33-10544 (Sept. 11, 2018)), (iii) TokenLot LLC for failing to register as a broker-dealer, even though it did not meet the definition of an exchange (see Tokenlot LLC, Lenny Kugel, and EliL. Lewitt, Rel. No. 33-10543 (Sept. 11, 2018)) and (iv) EtherDelta's founder for failing either to register as a national securities exchange or to operate pursuant to an exemption from registration as an exchange after creating a platform that clearly fell within the definition of an exchange (see Zachary Coburn, Rel. No. 34-84553 (Nov. 8, 2018)).

On June 4, 2019, the SEC filed a complaint in the U.S. District Court for the Southern District of New York against Kik Interactive, Inc. with respect to its September 2017 offering of Kin. According to articles published by various news outlets, the SEC has allegedly issued numerous subpoenas and information requests to technology companies, advisers and individuals involved in the digital asset space and ICOs, as part of a broad inquiry into the digital asset market.

Recently, a number of proposed ICOs have sought to rely on Regulation A and have filed with the SEC a Form 1-A covering a distribution of a digital token. Two such offerings were qualified in July 2019. In addition, some token offerings have been commenced as private securities offerings intended to be exempt from SEC registration. Further, the SEC has yet to approve for listing and trading any exchange-traded products (such as ETFs) holding digital assets. The SEC has taken various actions against persons or entities that have allegedly misused digital assets, engaged in fraudulent schemes (i.e., Ponzi scheme) and/or engaged in the sale of tokens that were deemed securities by the SEC.

Although our activities are not focused on raising capital or assisting others that do so, the federal securities laws are very broad. We cannot provide assurance as to whether the SEC will continue or increase its enforcement with respect to digital assets or ICOs, including taking enforcement action against any person engaged in the sale of unregistered securities in violation of the Securities Act or any person acting as an unregistered investment company in violation of the 1940 Act. Because the SEC has held that certain digital assets are securities based on the current rules and law, we may be required to register and comply with the rules and regulations under federal securities laws. On March 9, 2022, President Biden signed an executive order on cryptocurrencies. While the executive order did not mandate any specific regulations, it instructs various federal agencies to consider potential regulatory measures, including the evaluation of the creation of a U.S. Central Bank digital currency. We cannot be certain as to how future regulatory developments will impact the treatment of digital assets under the law, including, but not limited to, whether digital assets will be classified as a security, commodity, currency and/or new or other existing classification. Such additional regulations may result in extraordinary, non- recurring expenses, thereby materially and adversely affecting an investment in us. Further, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties as a result of any regulatory enforcement actions, all of which could harm our reputation and affect the value of our common stock. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain or all of our operations. Any such action could have a material adverse effect on our business, financial condition and results of operations.

***Federal or state agencies may impose additional regulatory burdens on our business. Changing laws and regulations and changing enforcement policies and priorities have the potential to cause additional expenditures, restrictions, and delays in connection with our business operations.***

Federal and state laws and regulations may be subject to change or changes in enforcement policies or priorities, including changes that may result from changes in the political landscape and changing technologies. Future legislation and regulations, changes to existing laws and regulations, or interpretations thereof, or changes in enforcement policies or priorities, could require significant management attention and cause additional expenditures, restrictions, and delays in connection with our business operations.

***Increasing scrutiny and changing expectations from investors, lenders, customers, government regulators and other market participants with respect to our Environmental, Social and Governance ("ESG") policies may impose additional costs on us or expose us to additional risks.***

Companies across all industries and around the globe are facing increasing scrutiny relating to their ESG policies. Investors, lenders and other market participants are increasingly focused on ESG practices and in recent years have placed increasing importance on the implications and social cost of their investments. In February 2021, the Acting Chair of the SEC issued a statement directing the Division of Corporation Finance to enhance its focus on climate-related disclosure in public company filings and in March 2021 the

Ad Hoc Equity Group Exhibit 14
112

SASMF EXHIBIT 25
709 of 979

Table of Contents

SEC announced the creation of a Climate and ESG Task Force in the Division of Enforcement. The increased focus and activism related to ESG may hinder our access to capital, as investors and lenders may reconsider their capital investment allocation as a result of their assessment of our ESG practices. If we do not adapt to or comply with investor, lender or other industry shareholder expectations and standards and potential government regulations, which are evolving but may relate to the suitable deployment of electric power, or which are perceived to have not responded appropriately to the growing concern for ESG issues, our reputation suffer which would have a material adverse effect on our business, financial condition and results of operations.

*We may be subject to risks associated with misleading and/or fraudulent disclosure or use by the creators of digital assets.*

Generally, we rely primarily on a combination of white papers and other disclosure documents prepared by the creators of applicable digital assets, as well as on our management's ability to obtain adequate information to evaluate the potential implications of transacting in these digital assets. However, such white papers and other disclosure documents and information may contain misleading and/or fraudulent statements (which may include statements concerning the creators' ability to deliver in a timely fashion the product and/or service disclosed in their white papers and other disclosure documents) and/or may not reveal any unlawful activities by the creators. Recently, there has been an increasing number of investigations and lawsuits by the SEC and the CFTC involving digital asset creators for fraud and misappropriation, among other charges. Additionally, FinCEN has increased its enforcement efforts involving digital asset creators regarding compliance with anti-money laundering and Know-Your-Customer laws.

To the extent that any of these creators make misleading and/or fraudulent disclosures or do not comply with federal, state or foreign laws, or if we are unable to uncover all material information about these digital assets and/or their creators, we may not be able to make a fully informed business decision relating to our transacting in or otherwise involving such digital assets, which could have a material adverse effect on our business, financial condition and results of operations.

## Risks Related to Digital Assets

*Because there has been limited precedent set for financial accounting for bitcoin and other digital assets, the determinations that we have made for how to account for digital assets transactions may be subject to change.*

Because there has been limited precedent set for the financial accounting for bitcoin and other digital assets and related revenue recognition and no official guidance has yet been provided by the Financial Accounting Standards Board or the SEC, it is unclear how companies may in the future be required to account for digital asset transactions and assets and related revenue recognition. A change in regulatory or financial accounting standards could result in the necessity to change the accounting methods we currently intend to employ in respect of our anticipated revenues and assets and restate any financial statements produced based on those methods. Such a restatement could adversely affect our business, prospects, financial condition and results of operation.

*Digital assets exchanges and other trading venues are relatively new and, in some cases, partially unregulated and may therefore be more exposed to fraud and failure.*

To the extent that digital asset exchanges or other trading venues are involved in fraud or experience security failures or other operational issues, a reduction in digital asset prices could occur. Digital asset market prices depend, directly or indirectly, on the prices set on exchanges and other trading venues, which are new and, in most cases, largely unregulated as compared to established, regulated exchanges for securities, derivatives and other currencies. For example, during the past three years, a number of Bitcoin exchanges have been closed due to fraud, business failure or security breaches. In many of these instances, the customers of the closed Bitcoin exchanges were not compensated or made whole for the partial or complete losses of their account balances in such Bitcoin exchanges. While smaller exchanges are less likely to have the infrastructure and capitalization that provide larger exchanges with additional stability, larger exchanges may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information, or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action.

*Digital asset transactions are irrevocable and, if stolen or incorrectly transferred, digital assets may be irretrievable. As a result, any incorrectly executed digital asset transactions could have a material adverse effect on our business, financial condition and results of operations.*

Typically, digital asset transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction or, in theory, control or consent of a majority of the processing power on the applicable network. Once a transaction has been confirmed and verified in a block that is added to the network blockchain, an incorrect transfer of a digital asset or a theft of a digital asset generally will not be reversible and we may not be capable of seeking compensation for any such transfer or theft. Although transfers of any digital assets we hold will regularly be made to or from vendors, consultants,

Ad Hoc Equity Group Exhibit 14
113

SASMF EXHIBIT 25
710 of 979

Table of Contents

services providers, etc., it is possible that, through computer or human error, or through theft or criminal action, our digital assets could be transferred from us in incorrect amounts or to unauthorized third parties. To the extent that we are unable to seek a corrective transaction with such third party or are incapable of identifying the third party that has received our digital assets through error or theft, we will be unable to revert or otherwise recover our incorrectly transferred digital assets. To the extent that we are unable to seek redress for such error or theft, such loss could have a material adverse effect on our business, financial condition and results of operations.

*We may not have adequate sources of recovery if the digital assets held by us are lost, stolen or destroyed due to third-party digital asset services, which could have a material adverse effect on our business, financial condition and results of operations.*

Certain digital assets held by us are stored using Genesis Custody Limited ("Genesis"), Coinbase Global, Inc. ("Coinbase") and Bittrex, Inc. ("Bittrex"), each a third-party digital asset service. We believe that the security procedures that Genesis, Coinbase and Bittrex utilize, such as dual authentication security, secured facilities, segregated accounts and cold storage, are reasonably designed to safeguard our bitcoin and other digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Nevertheless, the security procedures cannot guarantee the prevention of any loss due to a security breach, software defect or act of God that may be borne by us. In addition, Genesis, Coinbase and Bittrex's limited liability under its services agreement with us may limit our ability to recover losses relating to our bitcoin. If such digital assets are lost, stolen or destroyed under circumstances rendering a third party liable to us, it is possible that the responsible third party may not have the financial resources or insurance sufficient to satisfy any or all of our claims against the third party, or have the ability to retrieve, restore or replace the lost, stolen or destroyed digital assets due to governing network protocols and the strength of the cryptographic systems associated with such digital assets. To the extent that we are unable to recover on any of our claims against any such third party, such loss could have a material adverse effect on our business, financial condition and results of operations.

*Losses relating to our business may be uninsured, or insurance may be limited.*

Our hosting and colocation operations are subject to hazards and risks normally associated with the daily operations of hosting facilities. Currently, we maintain various insurance policies for business interruption for lost profits, property and casualty, public liability, commercial employee, workers' compensation, personal property and auto liability. Our business interruption insurance for lost profits includes coverage for business interruptions, our property and casualty insurance includes coverage for equipment breakdowns and our commercial employee insurance includes employee group insurance. We believe our insurance coverage adequately covers the risks of our daily business operations. However, our current insurance policies may be insufficient in the event of a prolonged or catastrophic event. The occurrence of any such event that is not entirely covered by our insurance policies may result in interruption of our operations, subject us to significant losses or liabilities and damage our reputation as a provider of business continuity services.

Additionally, it may not be possible, either because of a lack of available policies, limits on coverage or prohibitive cost, for us to obtain insurance of any type that would cover losses associated with our digital asset portfolio. In general, we anticipate that certain losses related to our business may be uninsurable, or the cost of insuring against these losses may not be economically justifiable. We have obtained some limited coverage regarding our business, but if an uninsured loss occurs or a loss exceeds policy limits, it could have a material adverse effect on our business, financial condition and results of operations.

The digital assets held by us are not insured. Therefore, a loss may be suffered with respect to our digital assets which is not covered by insurance and for which no person is liable in damages which could adversely affect our operations and, consequently, an investment in us.

*The impact of geopolitical, economic or other events on the supply of and demand for digital assets is uncertain, but could motivate large-scale sales of digital assets, which could result in a reduction in the price of such digital asset and could have a material adverse effect on our business, financial condition and results of operations.*

As an alternative to fiat currencies that are backed by central governments, digital assets, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services. It is unclear how this supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of digital assets either globally or locally. Large-scale sales of digital assets likely would result in a reduction in the price of the subject digital asset and could have a material adverse effect on our business, financial condition and results of operations.

In addition, the price of digital assets may be affected by the buying and selling of a significant amount of digital assets by a holder, or a group of holders. For example, Mt. Gox's bankruptcy trustee sold approximately $400 million of bitcoin and Bitcoin Cash

**Ad Hoc Equity Group Exhibit 14**
**114**

**SASMF EXHIBIT 25**
**711 of 979**

Table of Contents

between December 18, 2017 and February 5, 2018 in order to generate proceeds to repay bitcoin owners and creditors that experienced losses as a result of cyber-attacks against Mt. Gox. Similarly, Satoshi Nakamoto, the pseudonymous person or persons who developed Bitcoin, could sell a significant portion of his estimated 1 million bitcoin representing 5% of the total bitcoin in circulation today. Many believe that such sales created a downward pressure on the price of bitcoin. The current macroeconomic environment, inflationary pressures and capital constraints have resulted in large scale selling of digital assets for cash that has contributed to the decrease in the price of digital assets, including bitcoin. Any such similar events, or other unforeseen actions by holders of a significant amount of digital assets, could have a material adverse effect on our business, financial condition and results of operations.

***Digital assets, including bitcoin, face significant scaling obstacles that can lead to high fees or slow transaction settlement times and any mechanisms of increasing the scale of digital asset settlement may significantly alter the competitive dynamics in the market.***

Digital assets face significant scaling obstacles that can lead to high fees or slow transaction settlement times, and attempts to increase the volume of transactions may not be effective. Scaling digital assets, and particularly bitcoin, is essential to the widespread acceptance of digital assets as a means of payment, which is necessary to the growth and development of our business.

Many digital asset networks face significant scaling challenges. For example, digital assets are limited with respect to how many transactions can occur per second. In this respect, bitcoin may be particularly affected as it relies on the "proof of work" validation, which due to its inherent characteristics may be particularly hard to scale to allow simultaneous processing of multiple daily transactions by users. Participants in the digital asset ecosystem debate potential approaches to increasing the average number of transactions per second that the network can handle and have implemented mechanisms or are researching ways to increase scale, such as "sharding," which is a term for a horizontal partition of data in a database or search engine, which would not require every single transaction to be included in every single miner's or validator's block. For example, the Ethereum network is in the process of implementing software upgrades and other changes to its protocol, the so-called Ethereum 2.0, which are intended to be a new iteration of the Ethereum network that changes its consensus mechanism from "proof of work" to "proof of stake" and incorporate the use of "sharding." This version aims to address: a clogged network that can only handle limited number of transactions per second and the large consumption of energy that comes with the "proof of work" mechanism. This new upgrade is envisioned to be more scalable, secure, and sustainable, although it remains unclear whether and how it may ultimately be implemented.

There is no guarantee that any of the mechanisms in place or being explored for increasing the scale of settlement of digital asset transactions will be effective, how long they will take to become effective or whether such mechanisms will be effective for all digital assets. There is also a risk that any mechanisms of increasing the scale of digital asset settlements, such as the ongoing upgrades as part of Ethereum 2.0, may significantly alter the competitive dynamics in the digital asset market and may adversely affect the value of bitcoin and the price of our common stock. Any of which could have a material adverse effect on our business, prospects, financial condition, and operating results.

***The IRS and certain states have taken the position that digital assets are "property" for income tax purposes.***

In early 2014, the IRS issued basic guidance on the tax treatment of digital assets. The IRS has taken the position that a digital asset is "property" instead of "currency" for income tax purposes. As such, general tax principles applicable to property transactions apply to the acquisition, ownership, use, and disposition of digital assets. This overall treatment creates a potential tax liability for, and potential tax reporting requirements applicable to, us in any circumstance where we mine or otherwise acquire, own, use, or dispose of a digital asset. In 2019, the IRS issued additional guidance specifically relating to the income tax consequences that could arise from a digital asset hard fork event in which a new unit of digital asset may or may not be received, and released frequently asked questions to address certain digital asset topics such as tax basis, gain, or loss on the sale or exchange of certain kinds of digital assets and how to determine the fair market value of such digital assets.

There is no guarantee that the IRS will not alter its position with respect to the taxation of digital assets, or that legislation or judicial determinations in the future will not result in a tax treatment of digital assets and transactions in digital assets for tax purposes that differs from the treatment described above. You are urged to consult your own tax advisor as to the tax implications of our acquisition, ownership, use, and disposition of digital assets. The taxation of digital assets for state, local, or non-U.S. tax purposes may not be the same as the taxation of digital assets for U.S. federal income tax purposes.

In addition, under the Tax Cuts and Jobs Act of 2017, as of January 1, 2018, "like-kind exchange" treatment does not apply to digital assets. This means that gain from the sale or exchange of digital assets cannot be deferred by undertaking an exchange of one type of virtual currency for another.

Certain states, including New York and New Jersey, generally follow IRS guidance with respect to the treatment of digital assets for state income tax purposes, but it is unclear if other states will do so. Transactions involving digital assets for other goods and

115

Table of Contents

services may also be subject to sales and use or similar taxes under barter transaction treatment or otherwise. The treatment of digital assets for state income tax and sales tax purposes may have negative consequences, including the imposition of a greater tax burden on investors in digital assets or a higher cost with respect to the acquisition, ownership, use, and disposition of digital assets generally. In either case, this could have a negative effect on prices in the relevant digital asset exchange market and could have a material adverse effect on our business, financial condition and results of operations.

Non-U.S. jurisdictions may also elect to treat digital assets in a manner that results in adverse tax consequences. To the extent a non-U.S. jurisdiction with a significant share of the market of digital asset owners or users imposes onerous tax burdens on such owners or users, or imposes sales, use, or value added tax on acquisitions and dispositions of digital assets for fiat currency, such actions could result in decreased demand for digital assets in such jurisdiction, which could impact the price of digital assets and have a material adverse effect on our business, financial condition and results of operations.

> ***Changes to, or changes to interpretations of, the U.S. federal, state, local or other jurisdictional tax laws could have a material adverse effect on our business, financial condition and results of operations.***

All statements contained herein concerning U.S. federal income tax (or other tax) consequences are based on existing law and interpretations thereof. The tax regimes to which we are subject or under which we operate, including income and non-income taxes, are unsettled and may be subject to significant change. While some of these changes could be beneficial, others could negatively affect our after-tax returns. Accordingly, no assurance can be given that the currently anticipated tax treatment will not be modified by legislative, judicial or administrative changes, possibly with retroactive effect. In addition, no assurance can be given that any tax authority or court will agree with any particular interpretation of the relevant laws.

In 2022, significant changes to U.S. federal income tax laws were proposed by the current presidential administration, including increasing the U.S. income tax rate applicable to corporations from 21% to 28% and changes implicating information reporting with respect to digital assets. Congress may include some or all of these proposals in future legislation. There is uncertainty regarding whether these proposals will be enacted and, if enacted, their scope, when they would take effect, and whether they would have retroactive effect.

State, local or other jurisdictions could impose, levy or otherwise enforce tax laws against us. Tax laws and regulations at the state and local levels frequently change, especially in relation to the interpretation of existing tax laws for new and emerging industries, and we cannot always reasonably predict the impact from, or the ultimate cost of compliance with, current or future taxes, which could have a material adverse effect on our business, financial condition and results of operations.

> ***Concerns about greenhouse gas emissions and global climate change may result in environmental taxes, charges, assessments or penalties and could have a material adverse effect on our business, financial condition and results of operations.***

The effects of human activity on global climate change have attracted considerable public and scientific attention, as well as the attention of the United States and other foreign governments. Efforts are being made to reduce greenhouse gas emissions, particularly those from coal combustion power plants, some of which plants we may rely upon for power. The added cost of any environmental taxes, charges, assessments or penalties levied on such power plants could be passed on to us, increasing the cost to run our hosting facilities. Any enactment of laws or promulgations of regulations regarding greenhouse gas emissions by the United States, or any domestic or foreign jurisdiction in which we conduct business, could have a material adverse effect on our business, financial condition and results of operations.

> ***Latency in confirming transactions on a network could result in a loss of confidence in the network, which could have a material adverse effect on our business, financial condition and results of operations.***

Latency in confirming transactions on a network can be caused by a number of factors, such as transaction processors ceasing to support the network and/or supporting a different network. To the extent that any transaction processors cease to record transactions on a network, such transactions will not be recorded on the blockchain of the network until a block is solved by a transaction processor that does not require the payment of transaction fees or other incentives. Currently, there are no known incentives for transaction processors to elect to exclude the recording of transactions in solved blocks. However, to the extent that any such incentives arise (for example, with respect to Bitcoin, a collective movement among transaction processors or one or more transaction processing pools forcing Bitcoin users to pay transaction fees as a substitute for, or in addition to, the award of new bitcoin upon the solving of a block), transaction processors could delay the recording and verification of a significant number of transactions on a network's blockchain. If such latency became systemic, and sustained, it could result in greater exposure to double-spending transactions and a loss of confidence in the applicable network, which could have a material adverse effect on our business, financial condition and results of operations.

Ad Hoc Equity Group Exhibit 14
116

SASMF EXHIBIT 25
713 of 979

Table of Contents

In addition, increasing growth and popularity of digital assets, ICOs and security token offerings, as well as non-digital asset related applications that utilize blockchain technology on certain networks, can cause congestion and backlog, and as result, increase latency on such networks. An increase in congestion and backlogs could result in longer transaction confirmation times, an increase in unconfirmed transactions (that is, transactions that have yet to be included in a block on a network and therefore are not yet completed transactions), higher transaction fees and an overall decrease in confidence in a particular network, which could ultimately affect our ability to transact on that particular network and, in turn, could have a material adverse effect on our business, financial condition and results of operations.

### *Significant or unexpected changes to our transaction processing operations may have a material adverse effect on our business, financial condition and results of operations.*

We and our potential customers are engaged in the business of verifying and confirming transactions on a blockchain, also known as transaction processing, or "mining." We may have to make changes to the specifications of our transaction processing operations for any number of reasons beyond our control (e.g., increased governmental and quasi-governmental regulation of blockchain-related digital assets; changes in methods of validating digital asset transactions; creation of new digital assets; general economic conditions; changes in consumer demographics and public tastes and preferences; and rising energy costs, among other reasons), or we may be unable to develop our transaction processing operations in a manner that realizes those specifications or any form of functioning and profitable transaction processing operations. Furthermore, it is still possible that our transaction processing operations may experience malfunctions, electrical power failure, hacking, cybersecurity breaches or otherwise fail to be adequately developed or maintained. Any of the above risks, which could also impact our potential hosting customers, may have a material adverse effect on our business, financial condition and results of operations.

### *Currently, we believe there is relatively limited use of digital assets in the retail and commercial marketplace in comparison to relatively sizable use by speculators, thus contributing to price volatility that could adversely affect an investment in our stock.*

We believe digital assets have not yet gained widespread acceptance as a means of payment for goods and services by any major retail or commercial outlets. We believe a significant portion of the demand for digital assets is generated by speculators and investors, some of whom may have no knowledge of the inner workings of those assets. Certain of these investors may seek to profit from the short-term or long-term holding of digital assets, and thus, may contribute to digital asset price volatility. A lack of expansion in the use of digital assets in retail and commercial markets, or a contraction of such use, may result in increased price volatility of digital assets or a reduction in the market price of digital assets or in the demand for digital assets which would reduce the demand of our hosting and colocation services or in the value of the digital assets held by us, any of which could have a material adverse effect on our business, financial condition and results of operations.

### *We may diversify our business by mining or investing in additional digital assets, financial instruments and/or businesses, which could require significant investment or expose us to trading risks.*

The field of digital assets is constantly expanding with over 4,000 digital assets in existence as of January 2021. We intend to evaluate the potential for mining or investing in existing, new and alternative digital assets. To the extent we elect to commence activities to generate digital assets, we would be required to invest our assets either to obtain mining equipment configured to generate digital assets based on a "proof of work" protocol or to post "stakes" to generate digital assets based on a "proof of stake" protocol. In addition, or in the alternative, we may trade its digital assets for other digital assets on centralized or decentralized exchanges. Optimization of such trades may vary depending on the exchange on which the trade is conducted because we may not have access to all exchanges on which such trades are available. Further, trading on centralized and decentralized exchanges may expose us to additional risks if such exchanges experience breaches of security measures, system errors or vulnerabilities, software corruption, hacking or other irregularities. Any new digital asset obtained through generation or trading may be more volatile or fail to increase in value compared to digital assets we currently hold. As a result, any investment in different digital assets may not achieve our goals, may be viewed negatively by analysts or investors and may negatively affect our revenues and results of operations.

### *If the transaction fees for recording digital assets in a blockchain increase, demand for digital assets may be reduced and prevent the expansion of the networks to retail merchants and commercial business, resulting in a reduction in the acceptance or price of digital assets.*

As the number of digital assets awarded for solving a block in a blockchain decreases, the incentive for mining participants to contribute processing power to networks will transition from a set reward to transaction fees. In order to incentivize mining participants to continue to contribute processing power to the networks, the network may transition from a set reward to transaction fees earned upon solving for a block. If mining participants demand higher transaction fees to record transactions in a blockchain or a

Ad Hoc Equity Group Exhibit 14

117

SASMF EXHIBIT 25

714 of 979

Table of Contents

software upgrade automatically charges fees for all transactions, the cost of using digital assets may increase and the marketplace may be reluctant to accept digital assets as a means of payment. Existing users may be motivated to switch from one digital asset to another or back to fiat currency. Decreased use and demand for digital assets may adversely affect their value and result in a reduction in the value of our common stock.

*If the award of new digital assets and/or transaction fees for solving blocks is not sufficiently high to incentivize transaction processors, such processors may reduce or cease expending processing power on a particular network, which could negatively impact the utility of the network, reduce the value of its digital assets and have a material adverse effect on our business, financial condition and results of operations.*

As the number of digital assets rewarded to transaction processors for validating blocks in a network decreases, the incentive for transaction processors to continue contributing processing power to the network may shift toward transaction fees. Such a shift may increase the transaction fees on a network. Higher transaction fees may reduce the utility of a network for an end user, which may cause end users to reduce or stop their use of that network. In such case, the price of the relevant digital asset may decline substantially and could go to zero. Such reduced price and demand for, and use of, the relevant digital asset and network, either as it applies to our transaction processing services or to those of our potential hosting customers, may have a material adverse effect on our business, financial condition and results of operations.

*As more processing power is added to a network, our relative percentage of total processing power on that network is expected to decline absent significant capital investment, which has an adverse impact on our ability to generate revenue from processing transactions on that network and could have a material adverse effect on our business, financial condition and results of operations.*

Processing power on networks has been increasing rapidly over time while the rewards and transaction fees available on those networks tends to decline over time. In order to grow or maintain the revenue we generate from processing transactions on such networks, we are required to invest significant capital to acquire new computer servers, expand our power capacity and otherwise increase our effective processing power on such networks. In the event we are unable to invest sufficient capital to grow or maintain the level of our processing power on a network relative to the total processing power of such network, our revenue from the applicable network will decline over time and as a result, it could have a material adverse effect on our business, financial condition and results of operations.

In addition, a decrease in the price of computer servers may result in an increase in transaction processors, which may lead to more competition for fees in a particular network. In the event we are unable to realize adequate fees on a network due to increased competition, our revenue from the applicable network will decline over time and in turn, it could have a material adverse effect on our business, financial condition and results of operations.

*We may only have limited control over our mining operation.*

Our mining operation comprises blockchain mining technologies that depend on a network of computers to run certain software programs to solve complex transactions in competition with other mining operations and to process transactions. Because of this less centralized model and the complexity of our mining operation, we have limited control over the success of our mining operations. While we participate in mining pools to combine our mining operations with other mining participants to increase processing power to solve blocks, there can be no assurance that such pools will adequately address this risk.

*Our reliance on third-party mining pool service providers for our mining revenue payouts may have a negative impact on our operations.*

We utilize third party mining pools to receive our mining rewards from a given network. Mining pools allow mining participants to combine their processing power, which increases the chances of solving a block and getting paid by the network. The rewards are distributed by the pool operator, proportionally to our contribution to the pool's overall mining power used to generate each block. We are dependent on the accuracy of the mining pool operator's record keeping to accurately record the total processing power provided to the pool for a given bitcoin or other digital asset mining application in order to assess the proportion of that total processing power we provided. While we have internal methods of tracking both our power provided and the total power used by the pool, the mining pool operator uses its own record-keeping to determine our proportion of a given reward. We have little means of recourse against the mining pool operator if we determine the proportion of the reward paid out to us by a mining pool operator is incorrect, other than leaving the pool. If we are unable to consistently obtain accurate proportionate rewards from our mining pool operators, we may experience reduced reward for our efforts, which would have an adverse effect on our business and operations.

118

**Ad Hoc Equity Group Exhibit 14**

**118**

**SASMF EXHIBIT 25**

**715 of 979**

Table of Contents

*Malicious actors or botnet may obtain control of more than 50% of the processing power on the Bitcoin or other network.*

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on the Bitcoin or other network, it may be able to alter the blockchain on which the Bitcoin or other network and most Bitcoin or other digital asset transactions rely by constructing fraudulent blocks or preventing certain transactions from completing in a timely manner, or at all. The malicious actor or botnet could control, exclude, or modify the ordering of transactions, though it could not generate new bitcoin or digital assets or transactions using such control. The malicious actor could "double-spend" its own bitcoin or digital assets (i.e., spend the same bitcoin or digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintained control. To the extent that such malicious actor or botnet did not yield its control of the processing power on the Bitcoin or other network, or the Bitcoin or other community did not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible.

Although there are no known reports of malicious activity or control of the Bitcoin blockchain achieved through controlling over 50% of the processing power on the network, it is believed that certain mining pools may have exceeded the 50% threshold. The possible crossing of the 50% threshold indicates a greater risk in that a single mining pool could exert authority over the validation of Bitcoin transactions. To the extent that the Bitcoin or other digital asset ecosystems, including developers and administrators of mining pools, do not act to ensure greater decentralization of Bitcoin or other digital asset mining processing power, the feasibility of a malicious actor obtaining control of the processing power on the Bitcoin or other network will increase, which may adversely affect an investment in us.

*Transaction processing operators may sell a substantial amount of digital assets into the market, which may exert downward pressure on the price of the applicable digital asset and, in turn, could have a material adverse effect on our business, financial condition and results of operations.*

Transaction processing requires the investment of significant capital for the acquisition of hardware, leasing or purchasing space, involves substantial electricity costs and requires the employment of personnel to operate the data facilities, which may lead transaction processing operators to liquidate their positions in digital assets to fund these capital requirements. In addition, if the reward of new digital assets for transaction processing declines, and/or if transaction fees are not sufficiently high, profit margins for transaction processing operators may be reduced, and such operators may be more likely to sell a higher percentage of their digital assets.

Whereas it is believed that individual operators in past years were more likely to hold digital assets for more extended periods, the immediate selling of newly transacted digital assets by operators may increase the supply of such digital assets on the applicable exchange market, which could create downward pressure on the price of the digital assets and, in turn, could have a material adverse effect on our business, financial condition and results of operations.

*To the extent that the profit margins of digital asset mining operations are not high, mining participants are more likely to sell their earned bitcoin, which could constrain bitcoin prices.*

Over the past few years, digital asset mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation application-specific integrated circuit ("ASIC") servers. Currently, new processing power is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. They require the investment of significant capital to acquire this hardware, to lease operating space (often in data centers or warehousing facilities), and to pay the costs of electricity and labor to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior mining operations and have more defined and regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to maintain profit margins on the sale of digital assets. To the extent the price of digital assets decline and such profit margin is constrained, professionalized mining participants are incentivized to more immediately sell digital assets earned from mining operations, whereas it is believed that individual mining participants in past years were more likely to hold newly mined digital assets for more extended periods. The immediate selling of newly mined digital assets greatly increases the trading volume of the digital assets, creating downward pressure on the market price of digital asset rewards. The extent to which the value of digital assets mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined digital assets rapidly if it is operating at a low profit margin and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold more rapidly, thereby potentially depressing digital asset prices. Lower digital asset prices could result in further tightening of profit margins for professionalized mining operations creating a network effect that may further reduce the price of digital assets until mining operations with higher operating

119

Table of Contents

costs become unprofitable forcing them to reduce mining power or cease mining operations temporarily. Such circumstances could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoin and any other digital assets we mine or otherwise acquire or hold for our own account.

***The "halving" of rewards available on the Bitcoin network, or the reduction of rewards on other networks, has had and in the future could have a negative impact on our ability to generate revenue as our customers may not have an adequate incentive to continue transaction processing and customers may cease transaction processing operations altogether, which could have a material adverse effect on our business, financial condition and results of operations.***

Under the current protocols governing the Bitcoin network, the reward for validating a new block on that network is cut in half from time to time, which has been referred to in our industry as the "halving." When the Bitcoin network was first launched, the reward for validating a new block was 50 bitcoin. In 2012, the reward for validating a new block was reduced to 25 bitcoin. In July 2016, the reward for validating a new block was reduced to 12.5 bitcoin, and in May 2020, the reward was further reduced to 6.25 bitcoin. In addition, other networks may operate under rules that, or may alter their rules to, limit the distribution of new digital assets. We, and to our knowledge, our potential hosting customers, currently rely on these rewards to generate a significant portion of our total revenue. If the award of digital assets for solving blocks and transaction fees are not sufficiently high, neither we nor our customers may have an adequate incentive to continue transaction processing and may cease transaction processing operations altogether, which as a result may significantly reduce demand for our hosting services. As a result, the halving of available rewards on the Bitcoin network, or any reduction of rewards on other networks, would have a negative impact on our revenues and may have a material adverse effect on our business, financial condition and results of operations.

In addition, the reduction of rewards may reduce our profit margins, which could result in us selling a substantial portion of our digital assets, which are subject to high volatility. If we are forced to sell digital assets at low prices, it could have a material adverse effect on our business, financial condition and results of operations.

***We recently sold our digital assets, and may from time to time sell all or a portion of digital assets we mine in the future, to pay for costs and expenses, which has reduced the amount of digital assets we hold, thus preventing us from recognizing any gain from the appreciation in value of the digital assets we have sold and may sell in the future.***

We recently sold our digital assets, and may from time to time sell all or a portion of digital assets we mine in the future, to pay for costs and expenses incurred, capital expenditures and other working capital, irrespective of then-current digital asset prices. Our past sales of digital assets have reduced the amount of digital assets we hold. When we sell a digital asset, we are unable to benefit from any future appreciation in the underlying value of that digital asset.

Consequently, our digital assets may be sold at a time when the price is lower than it otherwise might be in the future, which could reduce the gain we might have realized on the sale of that digital asset at a different time. If we sell any digital assets in the future, the loss of potential realized gains from the sale of such digital assets could have a material adverse effect on our business, financial condition and results of operations.

***Digital assets are subject to extreme price volatility. The value of digital assets is dependent on a number of factors, any of which could have a material adverse effect on our business, financial condition and results of operations.***

We currently generate a portion of our revenue from processing blockchain transactions, in return for which receive digital assets like Bitcoin. We believe the value of digital assets related to our business is dependent on a number of factors, including, but not limited to:

- global digital asset supply;

- global digital asset demand, which can be influenced by the growth of retail merchants' and commercial businesses' acceptance of digital assets as payment for goods and services, the security of online digital asset exchanges and digital wallets that hold digital assets, the perception that the use and holding of digital assets is safe and secure, and the regulatory restrictions on their use;

- investors' expectations with respect to the rate of inflation of fiat currencies;

- investors' expectations with respect to the rate of deflation of digital assets;

- cyber theft of digital assets from online wallet providers, or news of such theft from such providers or from individuals' online wallets;

- the availability and popularity of businesses that provide digital asset-related services;

Ad Hoc Equity Group Exhibit 14
120

SASMF EXHIBIT 25
717 of 979

Table of Contents

- fees associated with processing a digital asset transaction;
- changes in the software, software requirements or hardware requirements underlying digital assets;
- changes in the rights, obligations, incentives, or rewards for the various participants in digital asset mining;
- interest rates;
- currency exchange rates, including the rates at which digital assets may be exchanged for fiat currencies;
- fiat currency withdrawal and deposit policies on digital asset exchanges and liquidity on such exchanges;
- interruptions in service or failures of major digital asset exchanges;
- investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in digital assets;
- momentum pricing;
- monetary policies of governments, trade restrictions, currency devaluations and revaluations;
- regulatory measures, if any, that affect the use of digital assets, restrict digital assets as a form of payment, or limit the purchase of digital assets;
- global or regional political, economic or financial events and conditions;
- expectations that the value of digital assets will change in the near or long term. A decrease in the price of a single digital asset may cause volatility in the entire digital asset industry and may affect other digital assets. For example, a security breach that affects investor or user confidence in bitcoin, ethereum, litecoin or another digital asset may affect the industry as a whole and may also cause the price of other digital assets to fluctuate; or
- with respect to bitcoin, increased competition from other forms of digital assets or payments services.

Bitcoin and other digital assets have historically experienced significant intraday and long-term price volatility, significantly impacted by momentum pricing. Momentum pricing typically is associated with growth stocks and other assets whose valuation, as determined by the investing public, accounts for anticipated future appreciation in value. The market price for digital assets is determined using data from various digital asset exchanges, over-the-counter markets, digital asset futures markets, derivative platforms and other digital asset investment vehicles. We believe that momentum pricing may have resulted, and may continue to result, in significant and rampant speculation regarding future appreciation (or depreciation) in the value of digital assets, inflating and making their market prices more volatile, even more so than with traditional asset classes, such as equities. In addition, there is currently growing but limited acceptance of digital assets in the retail and commercial marketplace, as compared to the demand generated by investors seeking a long-term value retention or by speculators seeking to profit from the short- or long-term holding of such digital assets, which may contribute to their extreme levels of price volatility.

Even if shareholders are able to hold their common stock for the long-term, their common stock may never generate a profit, since digital asset markets have historically experienced extended periods of flat or declining prices, in addition to sharp fluctuations. Investors should be aware that there is no assurance that bitcoin or other digital assets will maintain their long-term value in terms of future purchasing power or that the acceptance of digital asset payments by mainstream retail merchants and commercial businesses will continue to grow. If the price of bitcoin or other digital assets declines, we expect our profitability to decline.

***Any loss or destruction of a private key required to access a digital asset of ours is irreversible. We also may temporarily lose access to our digital assets.***

Digital assets are each accessible and controllable only by the possessor of both the unique public key and private key associated with the digital asset, wherein the public and private keys are held in an offline or online digital wallet. To the extent a private key is lost, destroyed or otherwise compromised and no backup of the private key is available, we will be unable to access the applicable digital asset associated with that private key and the private key cannot be restored. As a result, any digital assets associated with such key could be irretrievably lost. Any loss of private keys relating to digital wallets used to store the applicable digital assets could have a material adverse effect on our business, financial condition and results of operations.

In addition, we may temporarily lose access to our digital assets as a result of software or systems upgrades or maintenance. In this case, we would likely rely on third parties to assist in restoring our access, and we cannot provide any assurance that such third parties will be able to restore access on a timely basis, or at all. Any temporary loss, if it occurs, could have a material adverse effect on our business, financial condition and results of operations.

Ad Hoc Equity Group Exhibit 14
121

SASMF EXHIBIT 25
718 of 979

Table of Contents

*Intellectual property rights claims may adversely affect the operation of any or all of the networks.*

Third parties may assert intellectual property rights claims relating to the operation of digital assets and the holding and transfer of such assets. Regardless of the merit of any intellectual property rights claims or other legal action, any threatened action that reduces confidence in the long-term viability of any or all of the networks or other similar peer-to-peer networks, or in the ability of end-users to hold and transfer digital assets, may have a material adverse effect on our business, financial condition and results of operations. Additionally, a meritorious intellectual property rights claim could prevent us and other end-users from holding or transferring the digital assets, which could have a material adverse effect on our business, financial condition and results of operations.

*A soft or hard fork on a network could have a material adverse effect on our business, financial condition and results of operations.*

The rules governing a network's protocol are subject to constant change and, at any given time, there may be different groups of developers that can modify a network's protocol. As network protocols are not sold and their use does not generate revenues for their development teams, the core developers are generally not compensated for maintaining and updating the network protocols. Consequently, there is a lack of financial incentive for developers to maintain or develop networks and the core developers may lack the resources to adequately address emerging issues with network protocols. Although the Bitcoin and other leading networks are currently supported by core developers, there can be no guarantee that such support will continue or be sufficient in the future. To the extent that material issues arise with the Bitcoin or another network protocol and the core developers and open-source contributors are unable to address the issues adequately or in a timely manner, the networks may be adversely affected.

Any individual can download the applicable network software and make any desired modifications that alter the protocols and software of the network, which are proposed to developers, users and transaction processors on the applicable network through software downloads and upgrades, typically posted to development forums such as GitHub.com. Such proposed modifications can be agreed upon, developed, adopted and implemented by a substantial majority of developers, transaction processors and users, which, in such event, results in a "soft fork" or "hard fork" on the relevant network. A "soft fork" occurs when an updated version of the validating protocol is still "backwards compatible" with previous versions of the protocol. As a result, non-upgraded network participants with an older version of the validating protocol will still recognize new blocks or transactions and may be able to confirm and validate a transaction; however, the functionality of the non-upgraded network participant may be limited. Thus, non-upgraded network participants are incentivized to adopt the updated version of the protocol. The occurrence of a soft fork could potentially destabilize transaction processing and increase transaction and development costs and decrease trustworthiness of a network.

A "hard fork" occurs when the updated version of the validating protocol is not "backwards compatible" with previous versions of the protocol, and therefore, requires forward adoption by network participants in order to recognize new blocks, validate and verify transactions and maintain consensus on the relevant blockchain. Since the updated version of the protocol is not backwards compatible, a hard fork can cause the relevant blockchain to permanently diverge into two separate blockchains on a network. For example, in the case of Bitcoin, a hard fork created two new digital assets: Bitcoin Cash and Bitcoin Gold. The value of a newly created digital asset from a hard fork ("forked digital asset") may or may not have value in the long-run and may affect the price of other digital assets if interest and resources are shifted away from previously existing digital assets to the forked digital asset. The value of a previously existing digital asset after a hard fork is subject to many factors, including the market reaction and value of the forked digital asset and the occurrence of other soft or hard forks in the future. As such, the value of certain digital assets could be materially reduced if existing and future hard forks have a negative effect on their value.

If a soft fork or hard fork occurs on a network, which we or our hosting customers are processing transactions or hold digital assets in, we may be required to upgrade our hardware or software in order to continue our transaction processing operations, and there can be no assurance that we may be able to make such upgrades. A soft fork or hard fork in a particular digital asset that we process could have a negative effect on the value of that digital asset and could have a material adverse effect on our business, financial condition and results of operations.

*The digital assets held by us may be subject to loss, damage, theft or restriction on access, which could have a material adverse effect on our business, financial condition and results of operations.*

There is a risk that some or all of the digital assets held or hosted by us could be lost, stolen or destroyed. We believe that the digital assets held or hosted by us and our mining operation will be an appealing target to hackers or malware distributors seeking to destroy, damage or steal our digital assets. Our security procedures and operational infrastructure may be breached due to the actions of outside parties, error or malfeasance of one of our employees, or otherwise, and, as a result, an unauthorized party may obtain access to our digital asset accounts, private keys, data or digital assets. Although we implement a number of security procedures with various elements such as two-factor verification, segregated accounts and secured facilities and plan to implement the maintenance of

122

Table of Contents

data on computers and/or storage media that is not directly connected to, or accessible from, the internet and/or networked with other computers ("cold storage"), to minimize the risk of loss, damage and theft, and we update such security procedures whenever reasonably practicable, we cannot guarantee the prevention of such loss, damage or theft, whether caused intentionally, accidentally or by an act of God.

Additionally, outside parties may attempt to fraudulently induce our employees to disclose sensitive information in order to gain access to our infrastructure. As the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently, or may be designed to remain dormant until a predetermined event, and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. As technological change occurs, the security threats to our bitcoin will likely adapt and previously unknown threats may emerge. Our ability to adopt technology in response to changing security needs or trends may pose a challenge to the safekeeping of our digital assets. To the extent we are unable to identify and mitigate or stop new security threats, our digital assets may be subject to theft, loss, destruction or other attack.

Any of these events could expose us to liability, damage our reputation, reduce customer confidence in our services and otherwise have a material adverse effect on our business, financial condition and results of operations. Furthermore, we believe that as our assets grow, we may become a more appealing target for security threats, such as hackers and malware. If an actual or perceived breach of our digital asset accounts occurs, the market perception of our effectiveness could be harmed.

### *The digital assets held by us are not subject to FDIC or SIPC protections.*

We do not hold our digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC"), and to date, neither the FDIC nor the SIPC has extended any such protections to depositors of digital assets. Accordingly, our digital assets are not subject to the protections by FDIC or SIPC member institutions and any loss of our digital assets could have a material adverse effect on our business, financial condition and results of operations.

### *We may not be able to maintain our competitive position as digital asset networks experience increases in total network hash rate.*

As the relative market prices of a digital asset, such as Bitcoin, increases, more companies are encouraged to mine for that digital asset and as more miners are added to the network, its total hash rate increases. In order for us to maintain its competitive position under such circumstances, we must increase our total hash rate by acquiring and deploying more mining machines, including new miners with higher hash rates. There are currently only a few companies capable of producing a sufficient number of machines with adequate quality to address the increased demand. If we are not able to acquire and deploy additional miners on a timely basis, our proportion of the overall network hash rate will decrease and we will have a lower chance of solving new blocks which will have an adverse effect on our business and results of operations.

### *To the extent that any miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee will not be recorded on the blockchain until a block is solved by a miner who does not require the payment of transaction fees. Any widespread delays in the recording of transactions could result in a loss of confidence in that digital asset network, which could adversely impact an investment in us.*

To the extent that any miners cease to record transactions in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing Bitcoin users to pay transaction fees as a substitute for or in addition to the award of new Bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the blockchain.

Any systemic delays in the recording and confirmation of transactions on the blockchain could result in greater exposure to double-spending transactions and a loss of confidence in certain or all digital asset networks, which could have a material adverse effect on our business, prospects, financial condition, and operating results.

123

**Ad Hoc Equity Group Exhibit 14**

**123**

**SASMF EXHIBIT 25**

**720 of 979**

Table of Contents

***Our interactions with a blockchain may expose us to SDN or blocked persons or cause us to violate provisions of law that did not contemplate distribute ledger technology.***

The Office of Financial Assets Control of the U.S. Department of Treasury ("OFAC") requires us to comply with its sanction program and not conduct business with persons named on its specially designated nationals ("SDN") list. However, because of the pseudonymous nature of blockchain transactions, we may inadvertently and without our knowledge engage in transactions with persons named on OFAC's SDN list. Our internal policies prohibit any transactions with such SDN individuals, but we may not be adequately capable of determining the ultimate identity of the individual with whom we transact with respect to selling digital assets. In addition, in the future, OFAC or another regulator, may require us to screen transactions for OFAC addresses or other bad actors before including such transactions in a block, which may increase our compliance costs, decrease our anticipated transaction fees and lead to decreased traffic on our network. Any of these factors, consequently, could have a material adverse effect on our business, prospects, financial condition, and operating results.

Moreover, federal law prohibits any U.S. person from knowingly or unknowingly possessing any visual depiction commonly known as child pornography. Recent media reports have suggested that persons have imbedded such depictions on one or more blockchains. Because our business requires us to download and retain one or more blockchains to effectuate our ongoing business, it is possible that such digital ledgers contain prohibited depictions without our knowledge or consent. To the extent government enforcement authorities literally enforce these and other laws and regulations that are impacted by decentralized distributed ledger technology, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties, all of which could harm our reputation and could have a material adverse effect on our business, prospects, financial condition, and operating results.

***We have identified material weaknesses in our internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations. We may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.***

As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal control over financial reporting. In connection with the audit of our consolidated financial statements for the year ended December 31, 2021, we and our independent registered public accounting firm identified material weaknesses in Core Scientific's internal control over financial reporting related to (i) insufficient accounting and supervision with respect to the appropriate level of technical accounting experience and appropriate processes and procedures to assess and apply the relevant accounting framework, particularly in new or non-routine areas, (ii) a lack of appropriate communication and recordkeeping, particularly related to equity transactions, (iii) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for manual journal entries to our books and records, and (iv) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for our digital asset wallets. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. With the oversight of our senior management and audit committee, we have instituted plans to remediate the material weakness and will continue to take remediation steps, including hiring additional key supporting accounting personnel with public company reporting and accounting operations experience. In addition, we are formalizing inter-departmental communication, including establishing appropriate standing and ad hoc committees and enhancing electronic document storage for key financial transactions. We believe the measures described above will remediate the material weaknesses identified and strengthen our internal control.

While we implement our plan to remediate the material weaknesses described above, we cannot predict the success of such plan or the outcome of its assessment of these plans at this time. If our steps are insufficient to remediate the material weaknesses successfully and otherwise establish and maintain an effective system of internal control over financial reporting, the reliability of our financial reporting, investor confidence, and the value of its common stock could be materially and adversely affected. We can give no assurance that the implementation of this plan will remediate these deficiencies in our internal control over financial reporting or that additional material weaknesses or significant deficiencies in our internal control over financial reporting will not be identified in the future. The failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could result in a restatement of its financial statements, causing us to fail to meet its reporting obligations.

**Ad Hoc Equity Group Exhibit 14**

**SASMF EXHIBIT 25**

**124**

**721 of 979**

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

As a public company, we are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act and the rules and regulations of the applicable listing standards of the Nasdaq. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting and financial compliance costs, make some activities more difficult, time-consuming and costly and place significant strain on our personnel, systems and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. In addition, changes in accounting principles or interpretations could also challenge our internal controls and require that we establish new business processes, systems and controls to accommodate such changes. We have limited experience with implementing the systems and controls that are necessary to operate as a public company, as well as adopting changes in accounting principles or interpretations mandated by the relevant regulatory bodies. Additionally, if these new systems, controls or standards and the associated process changes do not give rise to the benefits that we expect or do not operate as intended, it could adversely affect our financial reporting systems and processes, our ability to produce timely and accurate financial reports or the effectiveness of internal control over financial reporting. Moreover, our business may be harmed if we experience problems with any new systems and controls that result in delays in their implementation or increased costs to correct any post-implementation issues that may arise.

Further, in addition to the material weaknesses we currently have, weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our business or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the Nasdaq. We are not currently required to comply with the SEC rules that implement Section 404 of the Sarbanes-Oxley Act and are therefore not required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose. As a public company, we are required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until our first annual report filed with the SEC where we are an accelerated filer or a large accelerated filer, and do not qualify as an emerging growth company or smaller reporting company with revenues of less than $100 million. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could harm our business and could cause a decline in the trading price of our common stock. For more information as it relates to the risk controls, please see "*—We have identified material weaknesses in our internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations. We may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.*"

Table of Contents

**Risks Related to Ownership of Our Securities and Other General Matters**

*An active trading market for our common stock may never develop or be sustained.*

Our common stock is listed on the Nasdaq under the symbol "CORZ." However, we cannot assure you that an active trading market for our common stock will develop on that exchange or elsewhere or, if developed, that any market will be sustained. Accordingly, we cannot assure you of the likelihood that an active trading market for our common stock will develop or be maintained, your ability to sell your shares of our common stock when desired or the prices that you may obtain for your shares.

*The trading price of our common stock may be volatile, and you could lose all or part of your investment.*

The trading price of our common stock is likely to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. These fluctuations could cause you to lose all or part of your investment in our common stock as you might be unable to sell your shares at or above the price you paid for those shares. Factors that could cause fluctuations in the trading price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the trading prices and trading volumes of technology stocks;

- volatility in the price of bitcoin and other digital assets;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our common stock by us or our stockholders, including sales as a result of the waiver of lock up restrictions that went into effect in March 2022;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections, or our failure to meet those projections;

- announcements by us or our competitors of new products, features, or services;

- the public's reaction to our press releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry, or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses, products, services or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth of our markets.

In addition, in the past, following periods of volatility in the overall market and in the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

126

Table of Contents

*Future sales and issuances of our capital stock or rights to purchase capital stock could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to decline.*

We may issue additional securities, including shares of common stock underlying warrants or as a result of the conversion of convertible notes or the exercise of options or restricted stock units ("RSUs"). Future sales and issuances of our capital stock or rights to purchase our capital stock could result in substantial dilution to our existing stockholders. We may sell common stock, convertible securities and other equity securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, investors may be materially diluted. New investors in such subsequent transactions could gain rights, preferences and privileges senior to those of holders of our common stock.

*Sales of our common stock, or the perception of such sales, in the public market could cause the market price of our common stock to drop significantly, even if our business is doing well, and certain selling securityholders still may receive significant proceeds.*

The sale of our securities in the public market or the perception that such sales could occur, could harm the prevailing market price of our securities. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. Resales of our common stock may cause the market price of our securities to drop significantly, even if our business is doing well.

Pursuant to our second amended and restated bylaws (the "Bylaws") and certain lock-up agreements entered into prior to the consummation of the Business Combination by and among Core and the stockholders and employees signatories thereto, certain stockholders of Core, including Legacy Core Scientific's stockholders and XPDI Sponsor LLC (the "Sponsor"), which held approximately 90.7% and 2.6%, respectively, of our outstanding common stock as of the closing of the Business Combination, agreed that, with respect to our common stock (including securities convertible into our common stock) held by Legacy Core Scientific's stockholders, through the date that is 180 days after the closing of the Business Combination, with respect to the Private Placement Warrants (as defined in the Merger Agreement) and any of our common stock issuable upon the exercise of the Private Placement Warrants, through the date that is 30 days after the closing of the Business Combination, and, with respect to the Founder Shares (as defined in the Merger Agreement), through the date that is one year after the closing of the Business Combination, subject to certain exceptions, to not, without the prior written consent of our board of directors, among other things, sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly any shares of our common stock, the Private Placement Warrants, our common stock issuable upon the exercise of the Private Placement Warrants, as applicable, held by the respective parties. Our board of directors can terminate these restrictions at any time and may do so to increase the number of shares eligible for resale on the public market.

The above-referenced lock-up restrictions on our common stock issuable upon the exercise of the Private Placement Warrants expired on February 18, 2022, the 30th day following the Business Combination. In addition, as previously announced, on February 24, 2022, our board of directors unanimously approved a complete waiver and release of the lock-up restrictions under the Bylaws and the comparable contractual lock-up restrictions pursuant to the lock-up agreements, effective March 10, 2022. As a result, 282,311,836 shares of our common stock became eligible for sale in the public market at the opening of trading on March 10, 2022 (subject to trading limitations on shares held by affiliates of the Company, compliance with securities laws, continued vesting of any unvested equity awards as of such date, and the Company's insider trading policy). These lock-up parties are no longer restricted from selling our securities held by them, other than by applicable securities laws.

In connection with the Business Combination, XPDI's existing registration rights agreement was amended and restated to: (i) provide that we will file a registration statement to register for resale of the securities held by the parties thereto under the Securities Act and (ii) afford each such party "piggyback" registration rights with respect to any underwritten offerings by the other stockholders and by us. We filed a resale Registration Statement on Form S-1 (the "Resale Registration Statement") under the Securities Act to register certain shares of common stock or securities convertible into or exchangeable for shares of common stock issued in connection with the Business Combination and we may file additional such registration statements in the future.

Additionally, the Company entered into a common stock purchase agreement (the "Equity Line of Credit") and a registration rights agreement with B. Riley Principal Capital II, LLC ("B. Riley"). Pursuant to the B. Riley Equity Line of Credit, subject to the satisfaction of the conditions set forth in the B. Riley Equity Line of Credit, the Company will have the right to sell up to $100,000,000 of shares of the Company's common stock, subject to certain limitations and conditions. The Company filed a Registration Statement on Form S-1 (the "B. Riley Registration Statement" and, together with the Resale Registration Statement, the "Registration Statements") under the Securities Act to register the resale of shares of common stock sold pursuant to the B. Riley Equity Line of Credit, which has not yet been declared effective as of the date of this Quarterly Report on Form 10-Q.

The shares of common stock being offered for resale by the selling securityholders pursuant to the Registration Statements represent approximately 53.2% of shares outstanding on a fully diluted basis as of August 12, 2022. Given the substantial number of

Table of Contents

shares of common stock being registered for potential resale by the selling securityholders, the sale of shares by the selling securityholders, or the perception in the market that the selling securityholders of a large number of shares intend to sell shares, could increase the volatility of the market price of our common stock or result in a significant decline in the public trading price of our common stock. Even if our trading price is significantly below $10.00, the offering price for the units offered in XPDI's IPO, certain of the selling securityholders, including the Sponsor, may still have an incentive to sell shares of our common stock because they purchased the shares at prices lower than the public investors or the current trading price of our common stock.

For example, based on the closing price of our common stock of $2.91 as of August 18, 2022, the Sponsor and other holders of the Founder Shares would experience a potential profit of up to approximately $2.917 per share, or approximately $25.2 million in the aggregate.

Sales of a substantial number of shares of our common stock in the public market could occur at any time, particularly after expiration of the above-mentioned lock-up periods and the registration of the resale of our securities discussed above. These sales, or the perception in the market that members of our management or holders of a large number of shares intend to sell shares, could reduce the market price of our common stock, the Public Warrants (as defined in the Merger Agreement) and Private Placement Warrants.

In addition, common stock reserved for future issuance under our equity incentive plans will become eligible for sale in the public market once those shares are issued, subject to provisions relating to various vesting agreements and, in some cases, limitations on volume and manner of sale applicable to affiliates under Rule 144, as applicable. The aggregate number of shares of our common stock reserved for future issuance under the Core Scientific, Inc. 2021 Equity Incentive Plan is 45,000,000 shares. We filed a Registration Statement on Form S-8 under the Securities Act to register shares of common stock or securities convertible into or exchangeable for shares of common stock issued pursuant to this plan and may file additional such registration statements in the future. In addition, we registered for resale 122,292,178 shares subject to the Core assumed options and Core assumed RSUs and to be issued under various Legacy Core Scientific equity incentive plans under such Registration Statement on Form S-8. All Form S-8 registration statements automatically become effective upon filing. Accordingly, shares registered under such registration statements may be immediately available for sale in the open market.

### *The Public Warrants and Private Placement Warrants may never be in the money, and may expire worthless.*

The exercise price of the Public Warrants and Private Placement Warrants is $11.50 per share. We believe the likelihood that warrant holders will exercise the warrants, and therefore the amount of cash proceeds that we would receive, is dependent upon the trading price of our common stock. If the trading price for our common stock is less than $11.50 per share, we believe holders of the Public Warrants and Private Placement Warrants will be unlikely to exercise their warrants. There is no guarantee that the Public Warrants and Private Placement Warrants will be in the money following the time they become exercisable and prior to their expiration, and as such, the Public Warrants and Private Placement Warrants may expire worthless and we may receive no proceeds from the exercise of the warrants.

### *Because we have not conducted an underwritten offering of our securities, no underwriter has conducted due diligence of our business, operations or financial condition or reviewed our disclosure.*

Section 11 of the Securities Act ("Section 11") imposes liability on parties, including underwriters, involved in a securities offering if the registration statement contains a materially false statement or material omission. To effectively establish a due diligence defense against a cause of action brought pursuant to Section 11, a defendant, including an underwriter, carries the burden of proof to demonstrate that he or she, after reasonable investigation, believed that the statements in the registration statement were true and free of material omissions. In order to meet this burden of proof, underwriters in a registered offering typically conduct extensive due diligence of the registrant and vet the registrant's disclosure. Such due diligence may include calls with the issuer's management, review of material agreements, and background checks on key personnel, among other investigations.

Because we became publicly traded through a business combination with XPDI, a SPAC (as defined below), rather through an underwritten offering of its ordinary shares, no underwriter has conducted diligence on Legacy Core Scientific or XPDI in order to establish a due diligence defense with respect to the disclosure presented in this Quarterly Report on Form 10-Q. If such investigation had occurred, certain information in our public disclosures may have been presented in a different manner or additional information may have been presented at the request of such underwriter.

**Ad Hoc Equity Group Exhibit 14**

**128**

**SASMF EXHIBIT 25**

**725 of 979**

Table of Contents

***XPDI has identified a material weakness in its internal control over financial reporting. This material weakness could continue to adversely affect Core's ability to report its results of operations and financial condition accurately and in a timely manner.***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our management is likewise required, on a quarterly basis, to evaluate the effectiveness of our internal controls and to disclose any changes and material weaknesses identified through such evaluation in those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

XPDI identified a material weakness in its internal control over financial reporting relating to the classification of a portion of the Class A Common Stock in permanent equity rather than temporary equity, as further described herein. Specifically, XPDI's management concluded that its control around the interpretation and accounting for certain complex features of the shares of Class A Common Stock and warrants issued by XPDI was not effectively designed or maintained. This material weakness resulted in the restatement of XPDI's balance sheet as of February 12, 2021 and its interim financial statements for the quarters ended March 31, 2021 and June 30, 2021. Additionally, this material weakness could result in a misstatement of the warrant liability, shares of Class A Common Stock and related accounts and disclosures that would result in a material misstatement of the financial statements that would not be prevented or detected on a timely basis. As a result of this material weakness, XPDI's management concluded that its internal control over financial reporting was not effective as of March 31, 2021, June 30, 2021, September 30, 2021 and December 31, 2021.

Any failure to maintain such internal control could adversely impact our ability to report our financial position and results of operations on a timely and accurate basis. If our financial statements are not accurate, investors may not have a complete understanding of our operations. Likewise, if our financial statements are not filed on a timely basis, we could be subject to sanctions or investigations by the stock exchange on which our common stock is listed, the SEC or other regulatory authorities. In either case, there could result a material adverse effect on our business. Failure to timely file will cause us to be ineligible to utilize short form registration statements on Form S-3 or Form S-4, which may impair our ability to obtain capital in a timely fashion to execute our business strategies or issue shares to effect an acquisition. Ineffective internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our stock.

We can give no assurance that any additional material weaknesses or restatements of financial results will not arise in the future due to a failure to implement and maintain adequate internal control over financial reporting or circumvention of these controls. In addition, even if we are successful in strengthening our controls and procedures, in the future those controls and procedures may not be adequate to prevent or identify irregularities or errors or to facilitate the fair presentation of our financial statements.

***Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results.***

On April 12, 2021, the staff of the SEC (the "SEC Staff") issued a public statement entitled "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies ("SPACs")" (the "Statement"). The Statement focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the Warrant Agreement (as defined below) governing our warrants initially issued by XPDI. As a result of the SEC Statement, we reevaluated the accounting treatment of our 8,625,000 Public Warrants and 6,266,667 Private Placement Warrants, which were initially issued by XPDI, a SPAC, and determined to classify the warrants as derivative liabilities measured at fair value, with changes in fair value each period reported in earnings.

As a result, included on our unaudited condensed consolidated balance sheets filed with the SEC are derivative liabilities related to embedded features contained within our warrants. Accounting Standards Codification ("ASC") 815, *Derivatives and Hedging*, provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, our consolidated financial statements and results of operations may fluctuate quarterly, based on factors, which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on our warrants each reporting period and that the amount of such gains or losses could be material.

Table of Contents

*We may redeem your unexpired public warrants prior to their exercise at a time that is disadvantageous to you, thereby making your public warrants worthless.*

We have the ability to redeem the outstanding public warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, if, among other things, the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for adjustments to the number of shares issuable upon exercise or the exercise price of a public warrant). If and when the public warrants become redeemable by us, we may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding public warrants as described above could force you to (i) exercise your public warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) sell your public warrants at the then-current market price when you might otherwise wish to hold your public warrants or (iii) accept the nominal redemption price which, at the time the outstanding public warrants are called for redemption, we expect would be substantially less than the market value of your public warrants. None of the Private Placement Warrants will be redeemable by us so long as they are held by the Sponsor, the Anchor Investors or their permitted transferees.

*We may be required to take write-downs or write-offs, or may be subject to restructuring, impairment or other charges that could have a significant negative effect on our financial condition, results of operations and the price of our common stock, which could cause you to lose some or all of your investment.*

Factors outside of Legacy Core Scientific's control may arise at any time. As a result of these factors, Core may be forced to later write-down or write-off assets, restructure operations or incur impairment or other charges that could result in Core reporting losses. Even though these charges may be non-cash items and therefore not have an immediate impact on Core's liquidity, the fact that Core could report charges of this nature could contribute to negative market perceptions about Core or its securities. In addition, charges of this nature may cause Core to be unable to obtain future financing on favorable terms or at all.

*Because there is substantial doubt about our ability to continue as a going concern for a reasonable period of time, an investment in our common stock is highly speculative; holders of our common stock could suffer a total loss of their investment.*

The Company anticipates that existing cash resources will be depleted by the end of 2022 or sooner. Although the Company determined in October 2022 not to make certain payments with respect to several of its equipment and other financings, including its two bridge promissory notes, the additional liquidity created by such measures may be insufficient. In addition, the creditors under such debt facilities may exercise remedies following any applicable grace periods, including electing to accelerate the principal amount of the indebtedness, suing the Company for nonpayment or taking action with respect to collateral where applicable. Any such creditor actions may result in events of default under the Company's other indebtedness agreements, including its two series of convertible notes due 2025, and the potential exercise of remedies by the creditors under such agreements. As a result, the Company is in the process of exploring a number of potential strategic alternatives with respect to the Company's corporate or capital structure, including hiring strategic advisers, raising additional capital or restructuring its existing capital structure. The Company has begun to engage in discussions with certain of its creditors regarding these initiatives. The Company expects these activities will continue and intensify. Among possible alternatives, the Company may explore liability management transactions, including exchanging its existing debt for equity or additional debt, which transactions may be dilutive to holders of the Company's common stock. These discussions may not result in any agreement on commercially acceptable terms or at all. Furthermore, the Company may seek alternative sources of equity or debt financing, delay capital expenditures or evaluate potential asset sales, and potentially could seek relief under the applicable bankruptcy or insolvency laws. In the event of a bankruptcy proceeding or insolvency, or restructuring of our capital structure, holders of the Company's common stock could suffer a total loss of their investment..

Due to these factors, substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time. An investment in our common stock is highly speculative.

*Our substantial level of indebtedness and our current liquidity constraints could adversely affect our financial condition and our ability to service our indebtedness, which could negatively impact your ability to recover your investment in the common stock.*

We have a substantial amount of indebtedness, which requires significant interest payments. As of September 30, 2022, we and our subsidiaries had approximately $1 billion aggregate principal amount of indebtedness outstanding. Our substantial level of indebtedness and the current constraints on our liquidity could have important consequences, including the following:

- we must use a substantial portion of our cash flow from operations to pay interest and principal on our indebtedness, which reduces or will reduce funds available to us for other purposes such as working capital, capital expenditures, other general corporate purposes and potential acquisitions;

Ad Hoc Equity Group Exhibit 14
130

SASMF EXHIBIT 25
727 of 979

Table of Contents

- our ability to refinance such indebtedness or to obtain additional financing for working capital, capital expenditures, acquisitions or general corporate purposes may be impaired;

- our leverage may be greater than that of some of our competitors, which may put us at a competitive disadvantage and reduce our flexibility in responding to current and changing industry and financial market conditions;

- there are significant constraints on our ability to generate liquidity through incurring additional debt; and

- we may be more vulnerable to economic downturn and adverse developments in our business.

We and our subsidiaries may be able to incur substantial additional indebtedness in the future, subject to the restrictions contained in the agreements governing our indebtedness. To the extent new indebtedness is added to our debt levels, including as a result of satisfying interest payment obligations on certain of our indebtedness with payments-in-kind, the related risks that we now face could intensify. If we are unable to comply with our covenants under our indebtedness, our liquidity may be further adversely affected.

Our ability to meet our expenses, to remain in compliance with our covenants under our debt instruments and to make future principal and interest payments in respect of our debt depends on, among other factors, our operating performance, competitive developments and financial market conditions, all of which are significantly affected by financial, business, economic and other factors. We are not able to control many of these factors. Given current industry and economic conditions, our cash flow may not be sufficient to allow us to pay principal and interest on our debt and meet our other obligations.

For example, in October 2022 the Company determined not to make certain payments with respect to several of its debt facilities, equipment financing facilities and leases and other financings, including its two bridge promissory notes. As a result, the creditors under these debt facilities may exercise remedies following any applicable grace periods, including electing to accelerate the principal amount of such debt, suing the Company for nonpayment, increasing interest rates to default rates, or taking action with respect to collateral, where applicable. In addition, if the holders of certain of these debt instruments were to accelerate their obligations, such acceleration would trigger events of default under our convertible notes. We may seek waivers or other relief from the creditors under certain of our indebtedness agreements with respect to any events of default; however there is no guarantee that any such efforts will be successful. If certain creditors were to accelerate and we were not able to refinance such indebtedness, such acceleration could have an adverse effect on the Company and could ultimately force the Company into bankruptcy or liquidation. In the event of a bankruptcy or liquidation, the claims in respect of indebtedness rank senior to claims of an equity holder, and the holders of common stock could suffer a total loss on their investment.

***The agreements governing our indebtedness contain covenants that may limit our ability to take advantage of certain business opportunities advantageous to us.***

The agreements governing our indebtedness contain various covenants that limit our ability to, among other things:

- pay dividends or make other distributions to our stockholders;

- make restricted payments;

- incur liens;

- engage in transactions with affiliates;

- modify certain material contracts; and

- enter into business combinations.

These restrictions could limit our ability to obtain future financing, make acquisitions, fund needed capital expenditures, withstand economic downturns in our business or the economy in general, conduct operations or otherwise take advantage of business opportunities that may arise. At the same time, the covenants in the instruments governing our indebtedness may not provide investors with protections against transactions that may deem undesirable. If our cash flows prove inadequate to service our debt and provide for our other obligations, we may be required to refinance all or a portion of our existing debt or future debt at terms unfavorable to us.

Our ability to make payments on and refinance our debt and other financial obligations and to fund our capital expenditures and acquisitions will depend on our ability to generate substantial operating cash flow. This will depend on our future performance, which will be subject to prevailing economic conditions and to financial, business and other factors beyond our control.

Table of Contents

In addition, our debt obligations require us to repay or refinance our obligations when they come due. If our cash flows were to prove inadequate to meet our debt service, rental and other obligations in the future, we may be required to refinance all or a portion of our existing or future debt, on or before maturity, to sell assets or to obtain additional financing. We cannot give assurance that we will be able to refinance any of our indebtedness, sell any such assets, or obtain additional financing on commercially reasonable terms or at all.

***Provisions in our corporate charter documents and under Delaware law may prevent or frustrate attempts by our stockholders to change our management or hinder efforts to acquire a controlling interest in us, and the market price of our common stock may be lower as a result.***

Certain provisions of our second amended and restated certificate of incorporation (the "Charter") and our Bylaws may have an anti-takeover effect and may delay, defer or prevent a merger, acquisition, tender offer, takeover attempt or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by our stockholders.

These provisions provide for, among other things:

*   the ability of our board of directors to issue one or more series of preferred stock;
*   advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;
*   certain limitations on convening special stockholder meetings;
*   limiting the persons who may call special meetings of stockholders;
*   limiting the ability of stockholders to act by written consent; and
*   our board of directors have the express authority to make, alter or repeal the Bylaws.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law ("DGCL"), which prohibit a person who owns 15% or more of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired in excess of 15% of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner.

These anti-takeover provisions could make it more difficult or frustrate or prevent a third party to acquire our company, even if the third party's offer may be considered beneficial by many of our stockholders. Additionally, the provisions may frustrate or prevent any attempts by our stockholders to replace or remove its current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of its management. As a result, our stockholders may be limited in their ability to obtain a premium for their shares. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

132

*Our common stock market price and trading volume could decline if securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business.*

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If one or more of the analysts who cover us downgrade our common stock or publish inaccurate or unfavorable research about our business, the price of our securities would likely decline. If few securities analysts commence coverage of us, or if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, demand for our securities could decrease, which might cause the price and trading volume of our common stock to decline.

*We will incur costs and demands upon management as a result of complying with the laws and regulations affecting public companies in the United States, which may harm our business.*

As a public company listed in the United States, we will incur significant additional legal, accounting and other expenses. In addition, changing laws, regulations and standards relating to corporate governance and public disclosure, including regulations implemented by the SEC and the Nasdaq, may increase legal and financial compliance costs and make some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If, notwithstanding our efforts, we fail to comply with new laws, regulations and standards, regulatory authorities may initiate legal proceedings against us, and our business may be harmed.

Failure to comply with these rules might also make it more difficult for us to obtain certain types of insurance, including director and officer liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. The impact of these events would also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, on committees of our board of directors or as members of senior management.

*We do not intend to pay dividends for the foreseeable future.*

We have never declared nor paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any dividends in the foreseeable future. As a result, stockholders must rely on sales of their common stock after price appreciation as the only way to realize any future gains on their investment.

*Our management has limited experience in operating a public company. The requirements of being a public company may strain our resources and divert management's attention, and the increases in legal, accounting and compliance expenses may be greater than we anticipate.*

We are incurring significant legal, accounting and other expenses that Legacy Core Scientific did not incur as a private company, and may incur additional expenses once we are no longer an "emerging growth company" or a "smaller reporting company." We are subject to the reporting requirements of the Exchange Act, and are required to comply with the applicable requirements of the U.S. Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), and the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as the rules and regulations subsequently implemented by the SEC and the listing standards of the Nasdaq, including changes in corporate governance practices and the establishment and maintenance of effective disclosure and financial controls. Compliance with these rules and regulations can be burdensome.

Our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased, and will continue to increase, Legacy Core Scientific's historical legal and financial compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations may make it more difficult and more expensive for us to attract and retain qualified members of its board of directors as compared to a private company. In particular, we have incurred and expect to continue to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act, which will increase when we are no longer an "emerging growth company" or a "smaller reporting company" with revenues of less than $100 million. We have hired and will continue to hire additional accounting and financial staff, and engage outside consultants, all with appropriate public company experience and technical accounting knowledge and maintain an internal audit function, which will increase our operating expenses. Moreover, we have incurred and may continue to incur additional compensation costs in the event that we decide

133

Table of Contents

to pay cash compensation closer to that of other publicly listed companies, which would increase our general and administrative expenses and could materially and adversely affect our profitability.

Our executive officers have limited experience in the management of a publicly traded company. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of their time may be devoted to these activities, which will result in less time being devoted to the management and growth of the post-combination company. Our management must continually assess its staffing and training procedures to improve its internal control over financial reporting. Further, the development, implementation, documentation and assessment of appropriate processes, in addition to the need to remediate any potential deficiencies, requires substantial time and attention from management. The development and implementation of the standards and controls necessary for us to continue to achieve the level of accounting standards required of a public company may require costs greater than expected. It is possible that we will be required to further expand our employee base and hire additional employees to support our operations as a public company, which will increase our operating costs in future periods.

***We qualify as an "emerging growth company" within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, such decision could make our securities less attractive to investors and may make it more difficult to compare our performance to the performance of other public companies.***

We qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we are eligible for and intend to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not "emerging growth companies" for as long as we continue to be an emerging growth company, including, but not limited to, (a) not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, (b) exemptions resulting in reduced disclosure obligations regarding executive compensation in Core's periodic reports and proxy statements and (c) exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We will remain an emerging growth company until the earliest of (1) the last day of the fiscal year (a) following February 12, 2026, the fifth anniversary of the Initial Public Offering, (b) in which we have total annual gross revenue of at least $1.07 billion or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700.0 million as of the prior June 30th and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. We cannot predict whether investors will find our securities less attractive because of our reliance on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but that any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with those of another public company, which is neither an emerging growth company nor an emerging growth company which has opted out of the extended transition period, difficult or impossible because of the potential differences in accounting standards used.

134

Table of Contents

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

On July 20, 2022, in connection with the B. Riley Equity Line of Credit and, in consideration for B. Riley's commitment to purchase shares of common stock at the Company's direction upon the terms and subject to the conditions set forth in the Equity Line of Credit, the Company issued 573,381 shares of Company common stock to B. Riley as a commitment fee (the "Commitment Fee Shares"). The net proceeds to the Company from sales that the Company elects to make to B. Riley under the B. Riley Equity Line of Credit, if any, will depend on the frequency and prices at which the Company sells shares of the Company's Common Stock to B. Riley. The Company expects that any proceeds received by the Company from such sales to B. Riley will be used for general corporate purposes. The Company and B.Riley have entered into a Registration Rights Agreement providing for the registration of such shares.

In August 1, 2022, in connection with the execution of the Amended Bridge Notes, the Company agreed to pay B. Riley Commercial Capital an advisory fee of $750,000, paid in the form of 386,697 shares of Company common stock (the "Advisory Fee Shares"). The net proceeds from the Amended Bridge Notes were used by the Company for working capital and general corporate purposes. The Advisory Fee Shares are subject to the Registration Rights Agreement.

The Commitment Fee Shares and the Advisory Fee Shares were issued by the Company in reliance upon the exemptions from the registration requirements of the Securities Act afforded by Section 4(a)(2) of the Securities Act and Rule 506(b) of Regulation D promulgated thereunder. The Company filed the B. Riley Registration Statement to register the resale of the Commitment Fee Shares and the Advisory Fee Shares, which B. Riley Registration Statement has not yet been declared effective as of the date of this Quarterly Report on Form 10-Q.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

None.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

| Exhibit No. | Exhibit Description | Filed Herein |
|---|---|---|
| 10.1†# | Amended and Restated Bridge Promissory Note, dated as of August 1, 2022, by and between the Company and B. Riley Commercial Capital, LLC (filed as Exhibit 10.1 to Current Report on Form 8-K filed on August 4, 2022) | |
| 10.2†# | Amended and Restated Bridge Promissory Note, dated as of August 1, 2022, by and between the Company and BRF Finance Co, LLC (filed as Exhibit 10.2 to Current Report on Form 8-K filed on August 4, 2022). | |
| 31.1 | Certifications of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | X |
| 31.2 | Certifications of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | X |
| 32.1* | Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | X |
| 32.2* | Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | X |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | |
| 101.SCH | XBRL Taxonomy Extension Schema Document. | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. | X |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase. | X |
| 104 | Cover Page Interactive Data File (the cover page XBRL tags) | |

---

†     Certain of the exhibits and schedules to these exhibits have been omitted in accordance with Regulation S-K Item 601(a)(5). The registrant agrees to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

\#     Certain portions of this exhibit (indicated by asterisks) have been omitted because they are not material and are the type that the registrant treats as private or confidential.

\*     Furnished herewith. This exhibit shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liability of that Section. Such exhibit shall not be deemed incorporated into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CORE SCIENTIFIC, INC.**

Date: November 21, 2022

By: /s/ Denise Sterling
Denise Sterling
Chief Financial Officer (Principal Financial Officer)

137

**CERTIFICATION PURSUANT TO RULES 13a-14(a) AND 15d-14(a)**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mike Levitt, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 of Core Scientific Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   [Paragraph omitted pursuant to SEC Release Nos. 33-8238/34-47986 and 33-8392/34-49313];

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: November 21, 2022

By:   /s/ Mike Levitt
      Mike Levitt
      Chief Executive Officer and Director
      (Principal Executive Officer)

**CERTIFICATION PURSUANT TO RULES 13a-14(a) AND 15d-14(a)
UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Denise Sterling, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 of Core Scientific Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   [Paragraph omitted pursuant to SEC Release Nos. 33-8238/34-47986 and 33-8392/34-49313];

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: November 21, 2022                                                          By:   /s/ Denise Sterling
                                                                                      Denise Sterling
                                                                                      Chief Financial Officer
                                                                                      (Principal Accounting and Financial Officer)

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Core Scientific Inc. (the "Company") on Form 10-Q for the quarter ended September 30, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Mike Levitt, Chief Executive Officer and Director of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)   the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 21, 2022

By:    /s/ Mike Levitt
Mike Levitt
Chief Executive Officer and Director
(Principal Executive Officer)

Exhibit 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Core Scientific Inc. (the "Company") on Form 10-Q for the quarter ended September 30, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Denise Sterling, Chief Financial Officer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)   the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 21, 2022

By:  /s/ Denise Sterling
Denise Sterling
Chief Financial Officer
(Principal Financial and Accounting Officer)

**Exhibit 15**

# B. RILEY FINANCIAL ISSUES OPEN LETTER TO CORE SCIENTIFIC INVESTORS



NEWS PROVIDED BY

**B. Riley Financial →**
Dec 14, 2022, 13:58 ET

---

*Proposes Debt Restructuring to Core Scientific Board in Order to Avoid Bankruptcy*

LOS ANGELES, Dec. 14, 2022 /PRNewswire/ -- B. Riley Financial, Inc. (NASDAQ: RILY) ("B. Riley"), a diversified financial services platform which is one of the largest creditors of Core Scientific, Inc. (NASDAQ: CORZ) ("Core Scientific" or "the Company"), today issued an open letter to Core Scientific shareholders and lenders.

In light of Core Scientific's strategic alternatives process with respect to its capital structure, B. Riley has engaged with the Company to restructure its debt and provide liquidity to avoid a potential unnecessary and value destructive bankruptcy proceeding. We believe that there is a path forward and have been proactive in working through a solution, specifically by providing debt on a number of unencumbered assets.  B. Riley strongly urges the Company's Board of Directors to work with creditors expeditiously to achieve a productive resolution for the benefit of all Core Scientific stakeholders.

The full text of the letter is as follows:

## An Open Letter From B. Riley To Core Scientific's Shareholders And Lenders

Dear Fellow Shareholders and Lenders of Core Scientific:

On October 26, 2022, Core Scientific announced that it would be suspending all principal and interest payments coming due in October and early November to several of its equipment lenders and for other financings, including its two bridge promissory notes. The Company also stated that it was exploring strategic alternatives with respect to its capital structure, and suggested that all options, including bankruptcy, were on the table. Since then, Core Scientific's common shares have declined 86% and currently trade at $0.15 per share, representing a market capitalization of approximately $50 million.

As one of Core Scientific's largest creditors, this announcement took us by surprise. Bankruptcy is not the answer and would be a disservice to the Company's investors. It will destroy value for the Company's shareholders, reduce potential recoveries for the Company's lenders, deplete its limited resources and create massive uncertainty for all its stakeholders.

**Moreover, bankruptcy is not necessary at all.** In our opinion, the vast majority of Core Scientific's issues are self-imposed and can be corrected in conjunction with an open, transparent discussion and ongoing participation with its creditors and equity holders. To that end, B. Riley has proposed to Core Scientific's Board of Directors that it would provide $72 million in new, non-cash pay financing on favorable terms, providing more than two years of runway for the Company to achieve profitability. This is a far superior approach for all constituents, one that would avoid bankruptcy while preserving meaningful value for all of Core Scientific's stakeholders.

Our proposal and analysis are as follows. Core Scientific currently has approximately $300 million of equipment and other loans (B. Riley's outstanding loan is $42 million) that have a very short maturity. These loans were made when the price of Bitcoin was significantly higher than it is today and the theoretical payoff on miners was significantly faster. These debts were incurred as part of an aggressive, ill-conceived strategy by the Company to continue to build out power facilities and expand miners while never selling Bitcoin on hand and never hedging prices. This approach has led to the Company having to sell all of its inventory, representing 9,618 Bitcoins in April 2022 valued at $362 million, at a massive loss. This decision combined with the fast maturity associated with mining has led the Company to its current position.

Our analyst, Lucas Pipes, has been following Core Scientific since February 10, 2022. Based on his model, adjusted for current metrics, even at a Bitcoin price of $18,000, Core Scientific can generate Adjusted EBITDA of ~$140 million. Additionally, if the company builds out the Denton, Texas facility for an incremental $40 million of capital, that could add an additional $25 million of EBITDA, resulting in a run rate EBITDA of ~$165 million. On top of that, every $1,000 increase in the price of Bitcoin would likely add up to $20 million of EBITDA—meaning that if the price of Bitcoin were to increase to $20,000, Adjusted EBITDA could be over $200 million on a run-rate basis. If Bitcoin prices return to $24,500, we estimate that Core Scientific will generate nearly $275 million of Adjusted EBITDA to service creditors.

Our proposal is simple. It provides sufficient liquidity to avoid bankruptcy. B. Riley's proposal does not purport to haircut amounts owed to the Company's equipment lenders. B. Riley is prepared to fund the first $40 million of financing immediately, with zero contingencies. For the remainder of B. Riley's proposed new financing, at Bitcoin prices of $18,500 and below, all principal payments to equipment lenders would need to be suspended until the price of Bitcoin recovers to $18,500. Once that happens, the proposal provides free cash flow will be distributed in cascading amounts to equipment lenders in the form of interest and partial principal payments until they are made whole. As Bitcoin continues to rise, additional free cash flow will be distributed in increasing amounts. In the meantime, all interest payments to equipment lenders (and B. Riley itself under its outstanding bridge loan) would be paid in kind for one year to provide additional runway for the Company. We have had extensive discussions with the Company's equipment lenders and believe this path should be acceptable to them.

That leaves the convertible debt. There is no reason to address this debt at the present juncture. It has more than 2 years remaining to maturity and only $17 million of cash interest payments. It is a piece of paper that was put in place to withstand a reduction in the price of Bitcoin. To address this now is unnecessary. If every oil producer had decided to restructure its debt two years ago when oil traded in the single digits, the only beneficiary would have been those that participated in an unnecessary restructuring.

Time is of the essence. We have extensive experience advising and participating in a "review" process. It is expensive and when the train gets going it is hard to stop. Fortunately, due to our involvement with the Company, we are prepared to move forward with a deliberate,

superior proposal immediately. We are also prepared to work with all stakeholders to achieve the best outcome under the circumstances. In our view it would be a gross violation of the fiduciary duties owed by the Board and Management for those fiduciaries—who must put our interests ahead of their own—to authorize a Chapter 11 filing.

We strongly urge the Board of Directors to work with us expeditiously to achieve a productive resolution for the benefit of all Core Scientific stakeholders.

Sincerely,

Bryant Riley

**About B. Riley Financial**

B. Riley Financial is a diversified financial services platform that delivers tailored solutions to meet the strategic, operational, and capital needs of its clients and partners. B. Riley leverages cross-platform expertise to provide clients with full service, collaborative solutions at every stage of the business life cycle. Through its affiliated subsidiaries, B. Riley provides end-to-end, collaborative financial services across investment banking, institutional brokerage, private wealth and investment management, financial consulting, corporate restructuring, operations management, risk and compliance, due diligence, forensic accounting, litigation support, appraisal and valuation, auction, and liquidation services. B. Riley opportunistically invests to benefit its shareholders, and certain registered affiliates originate and underwrite senior secured loans for asset-rich companies. B. Riley refers to B. Riley Financial, Inc. and/or one or more of its subsidiaries or affiliates. For more information, please visit www.brileyfin.com.

**Contacts**

*Media*

Jo Anne McCusker

jmccusker@brileyfin.com

(646) 885-5425

*Investors*

Mike Frank

ir@brileyfin.com

(212) 409-2424

SOURCE B. Riley Financial

**Exhibit 16**

SASMF EXHIBIT 25
745 of 979

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

**FORM 8-K**

_____

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): December 15, 2022**

_____

# Core Scientific, Inc.

(Exact name of registrant as specified in its charter)

_____

| | | |
|---|---|---|
| **Delaware** | **001-40046** | **86-1243837** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **210 Barton Springs Road, Suite 300** | |
| **Austin, Texas** | **78704** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (512) 402-5233**

_____

(Former Name or Former Address, if Changed Since Last Report)

_____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 per share | CORZ | The Nasdaq Global Select Market |
| Warrants, exercisable for shares of common stock | CORZW | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.03**          **Bankruptcy or Receivership**

*Chapter 11 Filing*

On December 21, 2022, Core Scientific, Inc. (the "Company") and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Company is seeking to have the Chapter 11 Cases jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Debtors have filed various "first day" motions with the Bankruptcy Court requesting customary relief that will enable the Company to transition into Chapter 11 protection without material disruption to their ordinary course operations.

The Company expects to enter into a restructuring support agreement (the "Restructuring Support Agreement") with the Ad Hoc Noteholder Group, representing more than 70% of the holders of its convertible notes.

In connection with the Restructuring Support Agreement, the Ad Hoc Noteholder Group has agreed to provide commitments for a debtor-in-possession facility (the "DIP Facility") of more than $57 million and has agreed to support the syndication of up to an additional $18 million in new money DIP Facility loans to all holders of convertible notes. These funds, along with ongoing cash generated from operations, are anticipated to provide the necessary financing to effectuate the planned restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

The Restructuring Support Agreement will be subject to a "fiduciary out" for the Company to pursue better alternatives. As contemplated, the restructuring will reduce the Company's funded indebtedness by hundreds of millions of dollars and reduce annual interest expense by tens of millions of dollars.

Pursuant to the contemplated Restructuring Support Agreement, the Company's existing convertible noteholders will equitize their debt into a significant majority of the common stock of the reorganized company. In addition, holders of general unsecured claims and existing common shareholders would also receive a percentage of reorganized common stock and warrants exercisable for common stock of the reorganized enterprise upon obtaining certain valuation thresholds. Both the common stock and the warrants will enable stakeholders to capture a share of the Company's future growth.

**Item 2.04     Triggering Events That Accelerate or Increase a Direct Financial Obligation of an Obligation under an Off-Balance Sheet Arrangement**

The filing of the Chapter 11 Cases constitutes an event of default that accelerated the Company's obligations under the following debt instruments (the "Debt Instruments"):

- Term Loan and Purchase Money Security Agreement, dated as of January 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Jack Novak, as lender, of which $10 million aggregate principal amount remain outstanding.

- Payment Agreement, dated as of February 25, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and Dell Financial Services L.L.C., as lender, related to approximately $166,000 outstanding aggregate amount of fees.

- Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific Holding Co., the guarantors, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder, governing the 10.00% Convertible Notes due 2025 which mature on April 19, 2025, of which $215 million aggregate principal amount remain outstanding, excluding accrued PIK interest.

- Convertible Note Purchase Agreement, dated as of August 20, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific Holding Co., the guarantors, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder, governing the 10.00% Convertible Notes due 2025 which mature on April 19, 2025, of which $298.3 million aggregate principal amount remain outstanding, excluding accrued PIK interest.

- Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender, related to $6.7 million outstanding aggregate principal amount of loans.

- Facility and Security Agreement, dated as of December 30, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as borrower, and BlockFi Lending LLC, as lender, related to $47.2 million outstanding aggregate principal amount of loans.

- Master Lease Agreement, dated as of December 31, 2021, by and between Core Scientific Operating Company (f/k/a Core Scientific, Inc.), as lessee, and MassMutual Asset Finance LLC, as lessor, of which $41.4 million aggregate principal amount remain outstanding.

- Master Security Agreement, dated as of March 24, 2022, by and between the Company, as borrower, and Barings Private Credit Corp., Barings Capital Investment Corporation and Barings BDC, Inc. as lenders, of which $63.8 million aggregate principal amount remain outstanding.

- Bridge Promissory Notes, dated as of April 7, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between Core Scientific, Inc., as borrower, and BRF Finance Co, LLC and B. Riley Commercial Capital, LLC, as Noteholders, related to $41.8 million outstanding aggregate principal amount of loans.

Also, on December 15, 2022, the Company received written notice from NYDIG ABL LLC (f/k/a Arctos Credit, LLC) ("NYDIG") notifying the Company that it was in default of the Master Equipment Finance Agreement, dated as of October 27, 2020 (the "NYDIG MEFA"), by and between the Company and NYDIG and that NYDIG was declaring the principal amount due and owing under each of the Schedules and all other Obligations (as such terms are defined in the NYDIG MEFA), including all previously instituted default interest at a rate per annum equal to 5.0% and a previously instituted late charge equal to 5.0% on all outstanding Obligations pursuant to Section 12(i) and Section 3(b) of the NYDIG MEFA, respectively. As of December 15, 2022, the outstanding principal amount under the NYDIG MEFA was $38.6 million.

Any efforts to enforce payment obligations under the Debt Instruments are automatically stayed as a result of the filing of the Chapter 11 Cases and the holders' rights of enforcement in respect of the Debt Instruments are subject to the applicable provisions of the Bankruptcy Code.

**Item 5.02**    **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Key Employee Retention Plan*

On December 18, 2022, the Board of Directors (the "Board") of Core Scientific, Inc. (the "Company") approved and adopted the Core Scientific Key Employee Retention Plan (the "KERP"), which will provide retention awards to certain key employees, including certain of the Company's named executive officers. Executive KERP amounts were paid upon adoption of the KERP, subject to possible clawback if the executive voluntarily terminates employment prior to vesting. The executive KERP awards will become vested upon the earlier of (a) twelve (12) months following execution of the KERP agreement and (b) the occurrence of a specified restructuring event, as defined in the KERP. If an executive participant is terminated for "cause" or voluntarily terminates his or her employment with the Company without "good reason" (each as defined in the KERP) prior to the award becoming vested, the executive participant will forfeit the award and must repay the Company the gross (pre-tax) amount of such award.

In addition, the Compensation Committee of the Board has approved increases in the annual base salaries of certain executive officers.

The KERP and the salary increases were formulated based upon the recommendations of the independent compensation consultant of the Compensation Committee of the Board.

The following sets forth the amount awarded under the KERP and the increased salary amount for the Company's Named Executive Officers:

| Named Executive Officer | Retention Award Amount | Increased Salary Amount |
|---|---|---|
| Todd M. DuChene<br>*President and Chief Legal Officer* | $ 375,000 | $ 200,000 |
| Denise Sterling<br>*Chief Financial Officer* | $ 50,000 | Nil |

**Item 7.01        Regulation FD Disclosure**

As previously announced, in order to address liquidity and balance sheet issues, the Company engaged financial and legal advisors to consider a number of strategic alternatives the Company may take to address these issues. In connection with the review of strategic alternatives, the Company entered into discussions, and confidentiality agreements (the "Confidentiality Agreements"), with certain holders of its Convertible Notes (collectively, the "Ad Hoc Noteholders").

In connection with such discussions, and pursuant to the Confidentiality Agreements, the Ad Hoc Noteholders were provided with certain confidential information regarding the Company, which includes the materials attached hereto as Exhibit 99.1 (the "Confidential Information").

The Company is furnishing the Confidential Information on this Current Report on Form 8-K in accordance with the terms of the Confidentiality Agreements.

The Confidential Information, including any financial projections and forecasts, was not prepared with a view toward public disclosure or compliance with the published guidelines of the Securities and Exchange Commission or the guidelines established by the Public Company Accounting Oversight Board and should not be relied upon to make an investment decision with respect to the Company. The Confidential Information does not purport to present the Company's financial condition in accordance with GAAP. The Company's independent registered public accounting firm has not examined, compiled or otherwise applied procedures to the Confidential Information and, accordingly, does not express an opinion or any other form of assurance with respect to the Confidential Information. Any financial projections or forecasts were prepared for internal use, capital budgeting and other management decisions and are subjective in many respects. Any such financial projections or forecasts reflect numerous assumptions made by management of the Company with respect to financial condition, business and industry performance, general economic, market and financial conditions, and other matters, all of which are difficult to predict, and many of which are beyond the Company's control. Accordingly, there can be no assurance that the assumptions made in preparing such financial projections or forecasts will prove to be accurate. It is expected that there will be differences between actual and projected results, and the differences may be material, including due to the occurrence of unforeseen events occurring subsequent to the preparation of any financial projections or forecasts. The disclosure of the Confidential Information should not be regarded as an indication that the Company or its affiliates or representatives consider the Confidential Information to be a reliable prediction of

future events, and the Confidential Information should not be relied upon as such. The statements in the Confidential Information speak only as of the date such statements were made, or any earlier date indicated therein. Neither the Company nor any of its affiliates or representatives has made or makes any representation to any person regarding the ultimate outcome of the foregoing, and none of them undertakes any obligation to publicly update the Confidential Information to reflect circumstances existing after the date when the Confidential Information was made available to the Ad Hoc Noteholders or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying the Confidential Information are shown to be in error. The statements provided in the Confidential Information are subject to all of the cautionary statements and limitations described herein, therein and under the caption "Forward-Looking Statements."

In accordance with General Instruction B.2 of Form 8-K, the information being furnished under this Item 7.01 pursuant to this Current Report on Form 8-K, including Exhibit 99.1, shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference into any registration statement or other document filed by the Company under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as expressly set forth by specific reference in such filing.

<div align="center">

**Private Securities Litigation Reform Act of 1995 –**
**A Caution Concerning Forward-Looking Statements**

</div>

This Form 8-K includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. The Company's actual results may differ materially from those anticipated in these forward-looking statements as a result of certain risks and other factors, which could include the following: risks and uncertainties relating to the Company's Chapter 11 Cases including but not limited to, the Company's ability to obtain Bankruptcy Court approval with respect to motions in its Chapter 11 Cases, successfully enter into and implement a restructuring plan, emerge from Chapter 11 and achieve significant cash flows from operations; the effects of the Chapter 11 Cases on the Company and on the interests of various constituents, Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general, the length of time the Company will operate under the Chapter 11 Cases, risks associated with any third-party motions in the Chapter 11 Cases, the potential adverse effects of the Chapter 11 Cases on the Company's liquidity or results of operations and increased legal and other professional costs necessary to execute the Company's reorganization; finalization and receipt of the DIP Facility; satisfaction of any conditions to which the Company's DIP financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside of the Company's control; the consequences of the acceleration of the Company's debt obligations; the trading price and volatility of the Company's common stock and the ability of the Company to remain listed on The Nasdaq Global Select Market as well as other risk factors set forth in the Company's Annual Report on Form 10-K and Quarterly Reports on From 10-Q filed with the Securities and Exchange Commission. These statements are provided for illustrative purposes only and are based on various assumptions, whether or not identified in this press release, and on the current expectations of the Company's management. These forward-looking statements are not intended to serve, and must not be relied on by any investor, as a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company. These forward-looking statements are subject to a number of risks and uncertainties, including those identified in the Company's reports filed with the U.S. Securities & Exchange Commission, and if any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**Item 9.01        Financial Statements and Exhibits.**

(d) Exhibits

99.1        Lender Presentation

104        Cover Page Interactive Data File (embedded within the Inline XBRL document)

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Core Scientific, Inc.**

Date: December 21, 2022

| | |
|---|---|
| By: | /s/ Todd M. DuChene |
| Name: | Todd M. DuChene |
| Title: | President and Chief Legal Officer |

Exhibit 99.1





# Core Scientific
## Creditor Discussion Materials

November 30, 2022

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Situation Overview

Core Scientific, Inc. ("Core" or the "Company") is facing several concurrent challenges in the macroeconomic environment, bringing about exploration of capital structure alternatives and discussions with various stakeholders within the capital structure.

**Several challenges have pressured the Company's cash flows:**

- 65% YTD decline in BTC prices and increase in network hash rate – 153% over the last two years – following relief of miner delivery backlog[1]
- Increase in power costs resulting from global commodities uplift
- Crypto contagion, including related to certain Core customers who have been unable or unwilling to pay certain components of their hosting bills
- Challenges accessing capital markets

**Near-term liquidity is of immediate focus, with several actions executed or being explored, among various other matters:**

- Paused debt service payments to certain lenders
- Paused construction / expansion activities
- Bringing additional self-miners online
- Monitoring payables

**Given the market environment, a revised business plan was prepared to maximize long-term value creation; strategy review in advance of preparing business plan involved focus on the following key topics, among others:**

- Mix, regarding self-miners vs. hosted miners
- Go-forward hosting contract flexibility and related billing/economics
- Facility footprint, including both (i) expansion activities and (ii) optimization of existing facilities

**Reviews of potential savings related to operating expenses, G&A, and capital expenditures are also underway**

- Significant reductions in corporate overhead, with continued optimization and right-sizing of operating cost structure ongoing
- Limiting capex spend only to those facilities where expansion is necessary

PROPRIETARY & CONFIDENTIAL
(1) Figures are as of November 27, 2022.

CORE SCIENTIFIC

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Highly Experienced Management Team


**MIKE LEVITT**
*Co-Chairman and CEO*


**TODD DUCHENE**
*President and Chief Legal Officer*


**MATT BROWN**
*EVP, Data Center Operations*


**DARIN FEINSTEIN**
*EVP, Strategy*



**RUSSELL CANN**
*EVP, Client Services*


**DENISE STERLING**
*CFO*



**MICHAEL BROS**
*SVP, Capital Markets and Acquisitions*


**KATY HALL**
*General Counsel*



**JEFF TAYLOR**
*SVP, Chief Information Security Officer*

🔒 PROPRIETARY & CONFIDENTIAL





# Company Background

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Ad Hoc Equity Group Exhibit 16
11

SASMF EXHIBIT 25
756 of 979

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Company Overview

## Background

- Established in December 2017 as a digital asset mining owner-operator, using facilities and software solutions for self-mining and third-party hosting services
- Following de-SPAC merger announcement in July 2021, Core went public in January 2022
- Core has generally focused on three primary lines of business:

  <u>Self-Mining</u>: Miners owned by Core, from which Core earns BTCs

  <u>Hosting Services</u>: Miners owned by third-parties (whether sold by Core or purchased independently) that are hosted at Core's facilities

  <u>Equipment Sales</u>: Miners sold by Core to third-parties, many of which entered hosting services contracts with Core, wherein miners would be located at Core facilities

## Capital Markets History

- Core has just over $900mm of funded debt

  Since 2020, Core has entered into several equipment financing agreements, for both mining and non-mining assets

  In April 2021, Core issued $215mm of 10% (4% cash / 6% PIK) secured convertible notes

  In August 2021, Core issued $300mm of additional convertible notes, which became secured in 2022

  In April 2022, Core entered into two unsecured bridge promissory notes with B.Riley totaling $75mm; proceeds were utilized for working capital and general purposes

  Core has partially paid down the notes with partial proceeds of the ELOC, to an outstanding balance today of $42mm

## Going Forward

- As part of its revised business plan, Core has shifted away from historical Equipment Sales, with greater focus on Self-Mining and Hosting Services

🔒 PROPRIETARY & CONFIDENTIAL
(1) As of 11/22/22

| Key Operating Figures[1] | |
|---|---|
| Average BTC Mined Per Day | 45 |
| BTC Self Miners Installed | 152K |
| Self-Mining Hash Rate | ~15 EH/s |
| Self-Miners Anticipated Deployments | 32K |
| % of Miners Owned vs. Hosted | 65% / 35% |
| Operational MWs | 814 |
| # of Operating Facilities (Owned / Leased) | 3 / 3 |

### Core Facilities



CORE SCIENTIFIC



# Market Position

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

Core Scientific is the leading listed Bitcoin miner.

Sources: Marathon: YE expected hashrate from Marathon Digital Holdings Q3 '22 Update; BTC self-mined from press releases. Riot: YE expected hashrate from October 2022 Production and Operations Updates; BTC self-mined from press releases. Hive: YE expected hashrate from Hive Blockchain Technologies LTD. Corporate Presentation; BTC self-mined from press releases. Bitfarms: YE expected hashrate from Third Quarter 2022 Results; BTC self-mined from press releases. Hut8: YE expected hashrate from Operating and Financial Results for Q2 2022; BTC self-mined from press releases. Argo Blockchain: YE expected hashrate from Argo Interim Half Year Results 2022; BTC self-mined from press releases. CleanSpark: YE expected hashrate from October 2022 Update; BTC self-mined from press releases.

PROPRIETARY & CONFIDENTIAL

(1) Excludes third-party hosted capacity.
(2) Reflects Q1 2023 expected hashrate.

CORE SCIENTIFIC

Ad Hoc Equity Group Exhibit 16
13

SASMF EXHIBIT 25
758 of 979

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Capital Markets Perspectives

**Core announced its SPAC transaction in July 2021**
- Transaction valued Core at $4.3bn
- Due to SPAC accounting rule changes that brought about delays, the Company's de-SPAC transaction was not consummated until January 2022

**In the months after the SPAC announcement and prior to transaction close, debt markets had begun to widen**
- Between July 2021 and January 2022, the HY index widened by over 100 bps
- While BTC prices increased materially following the merger announcement, BTC prices had fallen to ~$40K by the time the transaction was completed

**Market headwinds brought about immediate pressure on CORZ's stock**
- With geopolitical risk rising and BTC pricing highly volatile *and* trending downwards, CORZ stock fell over 20% in the first two days of trading following CORZ going public

**Debt markets became less favorable in 2Q'22**
- Any potential capital raise efforts were hampered by tighter credit markets and the geopolitical situation continuing to deteriorate

PROPRIETARY & CONFIDENTIAL







# Hosting Operations

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Hosting Operations Overview

**Core Hosting History**

- In 2020, access to mining equipment was limited for a variety of reasons
  - Core's relationship with a key OEM allowed Core to provide third parties with access to miners
- Core was able to sell hardware "bundled" with hosting, bringing cash upfront via equipment sales
  - While hosting contracts were not particularly profitable, margins were subsidized by profits earned upon upfront sale of miners to third parties
- Bitmain has since opened a U.S. office to sell directly to customers, such as Core's existing hosting customers

**Hosting Business Rationale**

- Hosting diversifies the Company's revenue streams, as end-to-end self-mining-only operations can be challenging to navigate through volatility cycles
- $ USD revenues from hosting services can be used to cover expenses paid in $ USD, to the extent BTCs mined are not sold immediately upon generation

**Core's Competitive Positioning**

- Core has positioned itself as a premium provider of hosting services to third-party miners, with high quality facilities that provide the optimal operating environment for consistent performance
  - Customers can take advantage of consistent high uptime % – despite slightly higher hosting price with Core – by producing add'l BTCs
    - Customers recognize increased BTC production resulting from high uptime, which is especially valuable when BTC prices are high and the opportunity cost of not mining is concurrently high
    - Many competitors position themselves as low-cost, though inconsistent uptime can have a detrimental opportunity cost impact as they do not provide as optimal of an operating environment for customers' hosted miners
  - Direct maintenance of third-party machines in order to minimize downtime and maximize ROI for customers
    - Core's facilities include onsite technicians available 24/7 for repair
- Core can deploy a significant number of miners per day per site and is agnostic to what vendor developed the miner/hardware
- Core uses custom software to manage GPU and ASIC miners remotely
  - Software allows for real-time performance monitoring, historical data analysis, deployment tracking, and instant adjustment of voltage draws

🔒 PROPRIETARY & CONFIDENTIAL



Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Hosting Operations Overview *(Cont'd)*

**Core Hosting Customer Base**

| Customer | Miners[1] | MW[1] |
|---|---|---|
| Customer 1 | 10,000+ | 250+ |
| Customer 2 | 5,000-10,000 | 10-50 |
| Customer 3 | 5,000-10,000 | 10-50 |
| Customer 4 | 5,000-10,000 | 10-50 |
| Customer 5 | 250-5,000 | 1-10 |
| Customer 6 | 250-5,000 | 1-10 |
| Customer 7 | 250-5,000 | 1-10 |
| Customer 8 | 250-5,000 | 1-10 |
| Other Customers | < 250 | < 1 |
| **Total** | **107K** | **347** |

**Hosting Focus**

- Core is focused on maintaining and building stable hosting relationships with strategic, large-scale, high-quality customers
  - Larger, professionally-managed customers benefit more from Core's premium hosting value proposition (i.e., high uptime, software solutions)
  - Customers with higher miner counts are more likely to generate consistent cash flows needed to pay Core
- Since its peak at 40 customers, Core currently has 14 customers

**Generic Hosting Contract Components**

Fixed Fees:
- Installation Fees
- Configuration
- Ongoing Base Fees
- Optional Miner Maintenance

Variable Fees:
- Hourly Rates
- Power Pass Throughs ("PPT")

PROPRIETARY & CONFIDENTIAL
(1) Estimated run-rate as of June 2023.

 CORE SCIENTIFIC

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Celsius Dispute

Core and Celsius Network LLC ("Celsius") have been engaged in litigation over the past few months, with Celsius refusing to pay post-petition power pass-through costs that the contract permits Core to charge.

**Since filing for chapter 11, Celsius has refused to pay Core for post-petition power pass-through costs and the automatic stay has prevented Core from exercising self-help remedies**

- Celsius has not paid post-petition and certain pre-petition power pass-through costs to Core, resulting in (i) ~$1.6mm of outstanding pre-petition amounts Celsius still owes to Core and (ii) ~$5.2mm in outstanding post-petition amounts Celsius still owes to Core (includes accrued amounts through September)

| ($ in millions) | May-June 22 | July 22 | August 22 | September 22 | October 22 | Total |
|---|---|---|---|---|---|---|
| Hosting (Pre-Petition) | $0.1 | - | - | - | - | $0.1 |
| Power (Pre-Petition) | 0.9 | 0.6 | - | - | - | 1.5 |
| Power (Post-Petition) | - | 0.4 | 1.7 | 1.5 | 1.5 | 5.2 |
| **Total** | **$1.0** | **$1.0** | **$1.7** | **$1.5** | **$1.5** | **$6.7** |
| *Memo: Cumulative* | *$1.0* | *$2.0* | *$3.7* | *$5.2* | *$6.7* | *$6.7* |

**Of the ~88K miners hosted by Core (but not owned by Core), Celsius owns ~36K miners[1]**

🔒 PROPRIETARY & CONFIDENTIAL
(1) As of 10/31/22

 CORE SCIENTIFIC

11





# Self-Mining Operations

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Self-Mining Operations Overview

**In addition to Hosting, the Company has participated in self-mining since inception**

- Self-mining's share of total miners has grown substantially, from 10% in 2020 to 65% today, in part due to the Blockcap acquisition (previously one of Core's largest hosting customers) in July 2021

**Almost all of Core's miners are produced by Bitmain Technologies**

**Core has ~152K BTC self-miner rigs operational, with anticipated deployments of ~2K incremental self-miners through year-end 2022 and ~30K further incremental self-miner deployments through April 2023**

- Costs related to miners to be delivered are limited to shipping / customs, as Core will be able to utilize credits / pre-payments in order to fund the actual cost of the miners
- The majority of the Company's self-miners are S19s, S19 Pros, and S19j Pros; several of upcoming miner deployments will be S19 XPs

**Core expects to reach a 184K run-rate self-miner total in April 2023**

**Since 2020, the Company has entered into several equipment financing agreements - with $278mm[3] currently outstanding - to purchase mining equipment**

- Of Core's self-miners, ~91K are financed by equipment loans
- The remaining miners – 93K – are / will be owned outright by the Company

| Key Self-Mining Operating Figures[1] | |
|---|---|
| S19 Base | 30K |
| S19 Pro | 16K |
| S19j Pro | 102K |
| S19 XP | 4K |
| Total Self-Miners[2] | 152K |
| Number of Self-Miners Financed | 91K |
| Average Miner Hashrate | 101 TH/s |
| Total Self-Mining Hashrate | ~15 EH/s |

S19
34.5 J/TH/s

S19 Pro
29.5 J/TH/s

S19j Pro
29.5 J/TH/s

S19 XP
21.5 J/TH/s

(1) As of 11/27/22.
🔒 PROPRIETARY & CONFIDENTIAL
(2) Excludes mini-BTC miners.
(3) Reflects principal plus accrued interest through 12/15/22.

CORE SCIENTIFIC

# Self-Mining Equipment Financing Perspective

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

Of Core's 184K self-mining rigs (inclusive of 32K incremental miners anticipated to be deployed by April 2023), 91K are owned under various equipment financings.

| Lender | Miner Models Mix | # of Miners | Average TH / Miner | Principal Outstanding ($mm)[1] |
|---|---|---|---|---|
| Mass Mutual | S19, S19j Pro | ~29K | 97 | $107 |
| BlockFi | S19 Pro | ~15K | 99 | 55 |
| NYDIG | S19, S19j Pro | ~27K | 96 | 40 |
| Anchor | S19 | ~5K | 97 | 26 |
| Trinity | S19j Pro | ~6K | 98 | 23 |
| Liberty | S19j Pro | ~9K | 102 | 28 |
| **Total** | | **~91K** | **99** | **$278** |

🔒 PROPRIETARY & CONFIDENTIAL
(1) Reflects principal plus accrued interest through 12/15/22.

 CORE SCIENTIFIC



# General Operations



Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

# Facilities Overview

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

| Location | Type of Transaction | Land (acres) | Current Operational Capacity (in MWs)[1] | Buildings (ft²) | Status |
|---|---|---|---|---|---|
| Marble, NC | Owned | 70 | 104 | +/- 250,000 | At Capacity |
| Dalton, GA | Owned | 20 | 195 | +/- 300,000 | At Capacity |
| Calvert City, KY | Owned | 15 | 150 | +/- 60,000 | At Capacity |
| Grand Forks, ND | Leased | 20 | 100 | +/- 90,000 | At Capacity, Possible Expansion |
| Denton, TX | Leased | 31 | 125 | +/- 300,000 | At Capacity, Expansion Anticipated |
| Pecos, TX ("Cottonwood") | Leased | 100 | 140 | +/- 125,000 | At Capacity, Possible Expansion |

🔒 PROPRIETARY & CONFIDENTIAL
(1) Does not reflect total potential MWs available at facility.

 CORE SCIENTIFIC

16

# Power Overview

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

**Power History**

- Core has rapidly scaled power consumption, especially in Texas
  - Texas facilities have no minimum usage requirement, though there are certain limited adders to certain facilities on account of RECs, REPs, and consulting fees
- Commodity price volatility has brought about significant increases in the delivered price of power over the past several months

**Future Power Costs**

- Core's power prices are projected to fall on account of both (i) declining commodity / natural gas pricing (relative to early-to-mid 2022) and (ii) greater MW utilization at its Texas facilities, spreading demand charges across a larger MW base

**Hedging / Fixed Pricing**

- The Company is in the process of exploring fixed power pricing at certain facilities via potential hedging structures

**Controllable Load Resource ("CLR") / Grid Payments**

- Several Core machines recently passed tests to become CLRs in ERCOT, allowing for Core to scale power consumption up and down within seconds by reacting to real-time signals from ERCOT, assisting with grid load balancing
- Certain facilities outside of Texas have similar programs, though curtailment must be signaled well in advance and last for a previously stipulated period of time (i.e., greater visibility)

PROPRIETARY & CONFIDENTIAL







# Power Background by Facility

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

| Facility | Location | Current Operational Capacity (MW) | Total Available Capacity (MW) | Power Company | Term / Expiration |
|---|---|---|---|---|---|
| Marble 1 | Marble, NC | 35 | 35 | TVA-Murphy Power | Auto-renewal |
| Marble 2 | Marble, NC | 69 | 69 | Duke Carolinas | Dec. 2022 |
| Dalton Brown | Dalton, GA | 53 | 53 | Dalton Utilities | Dec. 2022 |
| Dalton Green | Dalton, GA | 142 | 142 | Dalton Utilities | Dec. 2022 |
| TVA Calvert | Calvert City, KY | 150 | 150 | TVA Direct | Apr. 2029 |
| Grand Forks | Grand Forks, ND | 100 | 100 | Minnkota / NoDak | Dec. 2026 |
| Denton | Denton, TX | 125 | 297 | ERCOT (Supplier: City of Denton) | Sept. 2028 |
| Cottonwood | Pecos, TX | 140 | 140 | ERCOT (Supplier: Shell) | 1 month |



18

# Expansion Overview

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

### Denton Expansion

- Denton build-out in process throughout 2022, with 125MW of current capacity
- Core anticipates expanding the Denton site
  - Denton expansion anticipated to cost an incremental ~$42mm (inclusive of past due invoices and power deposits, subject to continuing review) with payments anticipated between March 2023 and May 2023
    - Expansion would add an additional 172MW
      - Implies cost per incremental MW of ~$200K (excl. power deposits)
      - Following completion of expansion, Denton capacity will be 297MW
- Future Denton expansion predicated on committed hosting demand
  - Certain hosting customers have expressed a desire to increase their hosting presence with Core
  - Core's hosting services are particularly attractive to customers given the Company's focus on operating the highest quality facilities, which utilize impactful software and result in the high uptime for customers





 CORE SCIENTIFIC





# Near-Term Liquidity

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# 13-Week Cash Flow Forecast Assumptions

| | | Description |
|---|---|---|
| **Operating Cash Flows** | Self-Mining Proceeds | > Based on actual performance through November 13, 2022 and underlying business plan thereafter<br>> Assumes step-down to $15,000 BTC price and held flat until emergence; BTC sold as mined |
| | Hosting Payments | > Based on forecasted weekly receipts through 2022 and the underlying business plan thereafter (monthly payments distributed pro rata across weeks) |
| | Equipment Sales | > Excluded / none anticipated |
| | Power & Operating Costs | > Based on forecasted weekly disbursements through 2022 and underlying business plan thereafter (monthly spend distributed pro rata across weeks)<br>> All employees, utilities and vendors are paid in the ordinary course on pre- and post-petition amounts |
| | Capital Expenditures | > Forecasted period includes payments for past due construction invoices, developer fee, and miner capex (customs / shipping only) |
| | Insurance | > One-time $2.5mm payment in early December<br>> Remaining insurance premiums paid monthly in equal amounts |
| **Restructuring Cash Flows** | In-Court Timing | > 45-day process with filing week ending Dec. 18, 2022 and emergence week ending Feb. 5, 2023 |
| | Restructuring Professional Fees | > Includes company, convertible note, and equipment loan (counsel only) professionals, plus US Trustee |
| | Utility Deposits | > Per above, utilities assumed to be paid in the ordinary course on pre- and post-petition amounts<br>> $15mm in utility deposits for adequate assurance – bulk of which is anticipate to be returned to the Company upon emergence – and other matters[1] |
| | Debt Service Costs | > Includes debt service costs for non-miner equipment loans, assumed to be paid in ordinary course |
| | DIP Financing | > $50mm DIP which rolls into Exit Term Loan at emergence, including 1.5% upfront fee, 1.5% exit fee, 10% interest rate |

PROPRIETARY & CONFIDENTIAL

 CORE SCIENTIFIC

# 13-Week Cash Flow Forecast[1]

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

| | Forecast | Forecast | Forecast | Forecast | Filing Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Exit Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Starting | 11/14/2022 | 11/21/2022 | 11/28/2022 | 12/5/2022 | 12/12/2022 | 12/19/2022 | 12/26/2022 | 1/2/2023 | 1/9/2023 | 1/16/2023 | 1/23/2023 | 1/30/2023 |
| Week Ending | 11/20/2022 | 11/27/2022 | 12/4/2022 | 12/11/2022 | 12/18/2022 | 12/25/2022 | 1/1/2023 | 1/8/2023 | 1/15/2023 | 1/22/2023 | 1/29/2023 | 2/5/2023 |
| **Operating Statistics** | | | | | | | | | | | | |
| BTC Mined | | 341 | 349 | 354 | 354 | 354 | 363 | 414 | 414 | 414 | 414 | 429 |
| BTC Sold | | 341 | 349 | 354 | 354 | 354 | 363 | 414 | 414 | 414 | 414 | 429 |
| BTC Price | | 16,000 | 15,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| **Operating Cash Flows** | | | | | | | | | | | | |
| Self-Mined BTC Held Value | $2.8 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |
| Self-Mined BTC Sale Proceeds | 6.6 | 5.5 | 5.4 | 5.3 | 5.3 | 5.3 | 5.4 | 6.2 | 6.2 | 6.2 | 6.2 | 6.4 |
| Self-Mined BTC Proceeds | 9.4 | 5.5 | 5.4 | 5.3 | 5.3 | 5.3 | 5.4 | 6.2 | 6.2 | 6.2 | 6.2 | 6.4 |
| Hosting Payments | 1.0 | 9.8 | 0.8 | | 0.0 | 9.7 | | 2.5 | 2.5 | 2.5 | 2.5 | 2.0 |
| **Net Receipts** | $10.3 | $15.2 | $6.2 | $5.3 | $5.4 | $15.0 | $5.4 | $8.7 | $8.7 | $8.7 | $8.7 | $8.5 |
| Power Costs | (5.5) | (14.4) | (7.8) | (6.6) | (2.2) | (3.0) | (14.1) | (7.4) | (7.4) | (7.4) | (7.4) | (7.3) |
| Operating Costs | (1.5) | (6.4) | (1.0) | (2.3) | (1.2) | (2.1) | (0.8) | (1.4) | (1.4) | (1.4) | (1.4) | (1.8) |
| Insurance (TBD) | | | | (2.5) | | | | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Tax Payments | | | | | | | | | | | | |
| **Net Operating Disbursements** | ($7.0) | ($20.8) | ($8.9) | ($11.4) | ($3.4) | ($5.1) | ($14.9) | ($8.8) | ($8.8) | ($8.8) | ($8.8) | ($9.2) |
| Construction & Infrastructure Capex | (0.2) | | (0.2) | (0.4) | (2.2) | | (0.8) | (0.9) | | | | |
| Miner Capex | | (0.7) | | | | (0.8) | | | | | | |
| **Net Capital Expenditures** | ($0.2) | ($0.7) | ($0.2) | ($0.4) | ($2.2) | ($0.8) | $0.0 | ($0.9) | $0.0 | $0.0 | $0.0 | $0.0 |
| **Total Operating Cash Flows** | $3.1 | ($6.2) | ($2.9) | ($6.5) | ($0.2) | $9.1 | ($9.5) | ($1.0) | ($0.1) | ($0.1) | ($0.1) | ($0.7) |
| **Non-Operating Cash Flows** | | | | | | | | | | | | |
| Professional Fees | ($0.8) | ($1.5) | ($1.3) | ($3.2) | ($4.7) | $0.0 | $0.0 | ($0.3) | $0.0 | $0.0 | $0.0 | ($19.3) |
| Utility Deposits | | | | | | (10.0) | | | | | | 10.0 |
| DIP Service Costs | (0.4) | | (0.4) | (0.0) | (0.4) | | | (0.3) | (0.0) | (0.4) | | (0.3) |
| DIP Interest & Fees | | | | | (0.8) | | | | | | | (1.4) |
| Other | | | | (5.0) | | | | | | | | |
| **Net Non-Operating Cash Flows** | ($1.2) | ($1.5) | ($1.6) | ($8.2) | ($5.8) | ($10.0) | $0.0 | ($0.6) | ($0.0) | ($0.4) | $0.0 | ($11.0) |
| **Liquidity Balances** | | | | | | | | | | | | |
| Starting Cash Balance | $27.5 | $29.5 | $21.7 | $17.2 | $2.5 | $46.4 | $45.5 | $36.0 | $34.4 | $34.3 | $33.8 | $33.7 |
| DIP Financing | | | | | 50.0 | | | | | | | |
| Net Cash Flow | 1.9 | (7.8) | (4.5) | (14.7) | (6.1) | (0.9) | (9.5) | (1.6) | (0.1) | (0.5) | (0.1) | (11.7) |
| **Ending Cash Balance** | $29.5 | $21.7 | $17.2 | $2.5 | $46.4 | $45.5 | $36.0 | $34.4 | $34.3 | $33.8 | $33.7 | $22.0 |

🔒 PROPRIETARY & CONFIDENTIAL

CORE SCIENTIFIC

1. In accordance with Item 10(e)(1)(ii) of Regulation S-K, a quantitative reconciliation of a forward-looking non-GAAP financial measure is only required to the extent it is available without unreasonable efforts. The Company does not currently have sufficient data to accurately estimate the variables and individual adjustments to such reconciliations, and to quantify the probable significance of these items at this time. The additional required to map such reconciliation of the Company's forward-looking non-GAAP forecast measures cannot be accurately forecasted by the Company, and therefore this reconciliation has been omitted.

Ad Hoc Equity Group Exhibit 16
29

SASMF EXHIBIT 25
774 of 979



# Business Plan



Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Business Plan Background & Strategy

| Self-Miners | > Assumes 165K self-miners beginning in January 2023, growing to 184K self-miners by April 2023<br>> All BTCs produced assumed to be sold soon after mining |
|---|---|
| **Hosted Mining** | > Assumes 108K miners in October 2022, falling to 56K in March 2023, before rising again to 107K in June 2023<br>> Hosted customers pay base fee and full power pass-through |
| **Equipment Sales** | > No new equipment sales |
| **Facilities** | > Six facilities utilized with aggregate potential power consumption of 986MW<br>> Expansion of 172MW at Denton during 2Q 2023 |
| **BTC Pricing / Network Hash Rate** | > BTC implied by flat 6.5c/TH/s-day<br>> Prior to 2024 halving event, network hash rate of 232 EH/s<br>> Following 2024 halving event, BTC price unchanged and network hashrate implied by flat 6.5c/TH/s-day |
| **Capital Expenditures** | > Development at Denton facility completed with $42mm incremental cash spend, including past due invoices and power deposits |
| **New Money** | > DIP financing converted into new $50mm Exit Term Loan upon emergence<br>> New $45mm Denton mortgage facility |

🔒 PROPRIETARY & CONFIDENTIAL

 CORE SCIENTIFIC

# Business Plan Assumptions

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

| | | |
|---|---|---|
| **BTC Price** | | > $16,500 post-emergence |
| **Self-Mining** | **Miners** | > 143K miners in October 2022 increasing to 184K by April 2023 |
| | **Avg. Miner Hash Rate (TH/s)** | > 98.5 TH/s in October 2022 increasing to 100.0 TH/s by March 2023 |
| | **Uptime** | > 90%+, consistent with historical figures |
| **Hosting** | **Miners** | > 88K miners in October 2022, falling to 56K in March 2023, before rising again to 107K in June 2023 |
| | **Avg. Fee** | > ~8c/kWh, beginning in January 2023 |
| | **Uptime** | > 90%+, consistent with historical figures |
| **Equipment Sales** | **Units Sold** | > No equipment sales assumed for the projected period |
| | **Cost per Unit** | |
| **Power Costs** | **Avg. Rate** | > ~5c/kWh, including incremental costs for hedging |
| | **Uptime** | > 90-95% |
| **Non-Power Costs** | **Payroll & Benefits** | > ~250 personnel, with no growth assumed<br>> ~$2mm / month |
| | **Non-Payroll** | > Facilities repair and maintenance, equipment and supplies, break fix parts, security<br>> R&D<br>> Business insurance, rent, taxes<br>> ~$6mm / month |

🔒 PROPRIETARY & CONFIDENTIAL



Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Business Plan Key Takeaways

**ADJUSTED EBITDA**



**UNLEVERED FREE CASH FLOW**



**NUMBER OF MINERS DEPLOYED**



**DAILY AVERAGE BTC MINED**



🔒 PROPRIETARY & CONFIDENTIAL

CORE SCIENTIFIC

# Business Plan Monthly Liquidity(1)

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

| ($ in millions , unless specified otherwise) | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue: | | | | | | | | | | | | | | | | | | |
| Digital Asset Mining | $30.2 | $28.8 | $33.7 | $34.0 | $35.2 | $34.1 | $33.4 | $34.1 | $35.2 | $34.1 | $35.2 | $35.2 | $32.9 | $35.2 | $34.1 | | | $34.1 |
| Hosting | 15.1 | 11.5 | 10.4 | 11.9 | 15.6 | 17.9 | 18.8 | 18.8 | 19.2 | 19.9 | 19.2 | 19.9 | 19.9 | 18.6 | 19.9 | 19.2 | 19.9 | 19.2 |
| Equipment Sales | - | | | | | | | | | | | | | | | | | |
| Blockchain Technology | | | | | | | | | | | | | | | | | | |
| **Total Revenue** | **$45.3** | **$40.3** | **$44.1** | **$45.9** | **$50.8** | **$51.9** | **$52.2** | **$52.2** | **$53.3** | **$55.1** | **$53.3** | **$55.1** | **$55.1** | **$51.5** | **$55.1** | **$53.3** | **$55.1** | **$53.3** |
| COGS | | | | | | | | | | | | | | | | | | |
| Power | $32.7 | $29.1 | $28.9 | $26.3 | $27.7 | $32.0 | $38.1 | $38.2 | $35.0 | $30.2 | $28.6 | $30.9 | $40.5 | $38.1 | $36.3 | $30.3 | $29.8 | $32.8 |
| Facilities Operations | 2.2 | 2.1 | 3.7 | 2.4 | 2.6 | 4.5 | 2.8 | 2.8 | 4.3 | 2.7 | 2.7 | 4.4 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 | 3.3 |
| Stock Based Compensation | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Facilities Depreciation + Miner Depreciation | 23.8 | 24.4 | 26.0 | 25.1 | 25.2 | 25.3 | 25.3 | 25.3 | 25.3 | 25.3 | 25.3 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 |
| Equipment Sales | - | | | | | | | | | | | | | | | | | |
| **Total COGS** | **$59.5** | **$56.3** | **$59.2** | **$54.5** | **$56.2** | **$62.5** | **$66.9** | **$67.1** | **$63.4** | **$58.9** | **$57.3** | **$52.9** | **$61.4** | **$58.9** | **$57.1** | **$51.1** | **$50.7** | **$53.6** |
| **Gross Profit** | **($14.2)** | **($16.0)** | **($15.1)** | **($8.6)** | **($5.3)** | **($10.5)** | **($14.7)** | **($14.9)** | **($10.1)** | **($3.8)** | **($3.9)** | **$2.2** | **($6.3)** | **($7.4)** | **($2.0)** | **$2.2** | **$4.4** | **($0.3)** |
| Operating Expenses | | | | | | | | | | | | | | | | | | |
| Research and Development | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 |
| SG&A (excl. Advisor Fees) | 3.7 | 4.8 | 4.6 | 4.2 | 4.4 | 4.5 | 4.0 | 4.0 | 4.4 | 4.4 | 4.4 | 4.4 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 | 4.3 |
| Depreciation and Amortization | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Stock Based Compensation | 5.1 | 5.1 | 5.1 | 5.0 | 5.0 | 5.0 | 4.9 | 4.9 | 4.9 | 4.8 | 4.8 | 4.8 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 |
| **Total Operating Expenses** | **$9.4** | **$10.4** | **$10.3** | **$9.8** | **$10.0** | **$10.1** | **$9.5** | **$9.5** | **$10.1** | **$9.9** | **$9.8** | **$9.8** | **$9.6** | **$9.6** | **$9.6** | **$9.6** | **$9.6** | **$9.6** |
| **Adj. EBIT** | **($23.5)** | **($26.4)** | **($25.4)** | **($18.3)** | **($15.3)** | **($20.6)** | **($24.2)** | **($24.4)** | **($20.1)** | **($13.6)** | **($13.7)** | **($7.6)** | **($15.9)** | **($17.0)** | **($11.7)** | **($7.4)** | **($5.2)** | **($9.9)** |
| (+) Depreciation & Amortization | 24.0 | 24.6 | 26.2 | 25.3 | 25.4 | 25.5 | 25.5 | 25.5 | 25.5 | 25.5 | 25.5 | 17.2 | 17.2 | 17.2 | 17.2 | 17.2 | 17.2 | 17.2 |
| (+) Stock Based Compensation | 5.8 | 5.8 | 5.8 | 5.7 | 5.7 | 5.7 | 5.6 | 5.6 | 5.6 | 5.5 | 5.5 | 5.5 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 |
| (+) Restructuring | | | | | | | | | | | | | | | | | | |
| **Adj. EBITDA** | **$6.3** | **$3.9** | **$6.6** | **$12.7** | **$15.8** | **$10.6** | **$6.9** | **$6.8** | **$11.0** | **$17.4** | **$17.3** | **$15.0** | **$6.6** | **$5.5** | **$10.8** | **$15.1** | **$17.3** | **$12.5** |
| % Adj. EBITDA Margin | 14% | 10% | 15% | 28% | 31% | 20% | 13% | 13% | 21% | 32% | 32% | 27% | 12% | 11% | 20% | 28% | 31% | 23% |
| (-) Miner Capex | - | | | | | | | | | | | | | | | | | |
| (-) Past Due Invoices | (0.9) | (0.3) | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) |
| (-) Construction Capex for Expansion | - | - | (38.3) | (2.0) | (2.0) | | | | | | | | | | | | | |
| (-) Advisor Fees | (18.3) | | | | | | | | | | | | | | | | | |
| (-) Cash Taxes | | | | | | | | | | | | | | | (0.9) | | | (9.9) |
| **Unlevered Free Cash Flow** | **($12.9)** | **$3.6** | **($31.8)** | **$10.2** | **$13.3** | **$10.1** | **$6.5** | **$6.3** | **$10.6** | **$17.0** | **$16.9** | **$14.6** | **$6.1** | **$5.1** | **$9.5** | **$14.6** | **$16.9** | **$11.2** |

PROPRIETARY & CONFIDENTIAL
(1) In accordance with Item 10(e)(1)(i)(C) of Regulation S-K, a quantitative reconciliation of forward-looking non-GAAP financial measures is only required to the extent it is available without unreasonable efforts. The Company does not currently have sufficient data to accurately estimate the variables and individual adjustments for such reconciliation, or to quantitatively provide such figures, which at this time. The aforesaid measures required for any such reconciliation of the Company's forward-looking non-GAAP financial measures cannot be accurately determined (as the Company and therefore the reconciliation has been omitted.)

CORE SCIENTIFIC





# Appendix

Additional Company Information

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Capital Structure

($ in millions)

| | Maturity | Interest Rate | Amount Outstanding | LTM Leverage | Total Interest |
|---|---|---|---|---|---|
| Convertible Notes Tranche 1 | Apr-25 | 10.0%[1] | $234 | | $23 |
| Convertible Notes Tranche 2 | Apr-25 | 10.0%[1] | 318 | | 32 |
| Miner Equipment Financing | Various | 12.5%[2] | 273 | | 34 |
| Non-Miner Financing | Various | 7.6%[2] | 31 | | 2 |
| **Secured Debt** | | | **$857** | **2.4x** | **$92** |
| B. Riley Notes | Jun-23 | 7.0% | 42 | | 3 |
| Novak Loan | Jan-23 | 10.0% | 10 | | 1 |
| **Total Debt** | | | **$908** | **2.5x** | **$96** |
| (-) Cash and Cash Equivalents (incl. BTCs) | | | (30) | | |
| **Net Debt** | | | **$879** | **2.5x** | |

*Memo:*

| | |
|---|---|
| LTM Adjusted EBITDA (as of 6/30/22) | $358 |
| Cash and Cash Equivalents (incl. BTCs) (as of 11/21/22) | 30 |

🔒 PROPRIETARY & CONFIDENTIAL
(1) 4% cash, 6% PIK.
(2) Weighted average across multiple contracts.

 CORE SCIENTIFIC    29

# Organizational Structure

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT



PROPRIETARY & CONFIDENTIAL



# Appendix

Key Market Data & Statistics

Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT
🔒 PROPRIETARY & CONFIDENTIAL





Subject to FRE 408 and its Equivalents
Prepared at the Request of Counsel
Preliminary & Subject to Material Change
DRAFT

# Hash Price *($ per TH/s-day)*



**Bitcoin Halving Events**
- [#1](): November 2012
- [#2](): July 2016
- [#3](): May 2020
- [#4](): April 2024 *(expected)*

🔒 PROPRIETARY & CONFIDENTIAL
Source: Luxor Technology Corp.

 CORE SCIENTIFIC          33

**Exhibit 17**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): January 9, 2023**

# Core Scientific, Inc.
### (Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-40046** | **8** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IF Iden |

**210 Barton Springs Road**
**Suite 300**
**Austin, Texas**                                    **78704**
(Address of principal executive offices)               (Zip Code)

**Registrant's telephone number, including area code: (512) 402-5233**

*(Former Name or Former Address, if Changed Since Last Report)*

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligations of the reg following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name on w |
|---|---|---|
| Common stock, par value $0.0001 per share | CORZQ | |
| Warrants, exercisable for shares of common stock | CORZWQ | |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act c chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition perioc new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

\*        The registrant's common stock and warrants began trading exclusively on the OTC Pink Marketplace on January 3, 20
         "CORZQ" and "CRZWQ," respectively.

**Item 7.01.        Regulation FD Disclosure.**

EX-99.1 2 d445212dex991.htm EX-99.1

**Exhibit 99.1**



PRESS RELEASE
www.corescientific.com

**Core Scientific Announces November and December 2022 Updates**

- *Operated approximately 243,000 and 234,000 owned and colocated ASIC servers in November and December, respectively*

- *Produced 1,356 and 1,435 self-mined bitcoin, and 795 and 931 bitcoin for colocation customers in November and December, respectively*

**AUSTIN, Texas, January 9, 2023 – Core Scientific, Inc. (OTC: CORZQ)** ("Core Scientific" or "the Company"), a leader in high-performance blockchain computing data centers and software solutions, today announced production and operational updates for November and December 2022.

*Data Centers*

As of month-end, the Company operated approximately 243,000 and 234,000 ASIC servers for both colocation and self-mining, representing a total of 24.4 and 23.7 EH/s in November and December, respectively, at its data center facilities in Georgia, Kentucky, North Carolina, North Dakota and Texas.

*Self-Mining*

Core Scientific's self-mining operations produced 1,356 and 1,435 bitcoin in November and December, respectively. As of month end, the Company operated approximately 152,000 and 153,000 self-mining servers accounting for approximately 63% and 66% of its total number of servers and representing a self-mining hashrate of 15.4 and 15.7 EH/s in November and December, respectively.

-more-

**Ad Hoc Equity Group Exhibit 17**
**2**

**SASMF EXHIBIT 25**
**788 of 979**

*Colocation Services*

In addition to its self-mining fleet, Core Scientific provided data center colocation services, technology and operating support for approximately 91,000 and 80,500 customer-owned ASIC servers, representing approximately 37% and 34% of the mining servers in operation in the Company's data centers as of November 30 and December 31, respectively. Customer-owned ASIC servers produced approximately 795 and 931 bitcoin in the months of November and December, respectively.

*Grid Support*

In the months of November and December, the Company powered down its data center operations on several occasions. Curtailments in November and December totaled 5,828 and 17,179 megawatt hours, respectively. Core Scientific works with the communities and utility companies in which it operates to enhance electrical grid stability.

## ABOUT CORE SCIENTIFIC

Core Scientific (OTC: CORZQ) is one of the largest blockchain computing data center providers and miners of digital assets in North America. Core Scientific has operated blockchain computing data centers in North America since 2017, using its facilities and intellectual property portfolio for colocated digital asset mining and self-mining. Core Scientific operates data centers in Georgia, Kentucky, North Carolina, North Dakota and Texas. Core Scientific's proprietary Minder® fleet management software combines the Company's colocation expertise with data analytics to deliver maximum uptime, alerting, monitoring and management of all miners in the Company's network. To learn more, visit http://www.corescientific.com.

-more-

**FORWARD LOOKING STATEMENTS AND EXPLANATORY NOTES**

This press release includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, those related to the Company's ability to scale and grow its business, meet its expected operating plan, source clean and renewable energy, the advantages and expected growth of the Company, future estimates of revenue, net income, adjusted EBITDA, total debt, free cash flow, liquidity and future financing availability, future estimates of computing capacity and operating capacity, future demand for colocation capacity, future estimate of hashrate (including mix of self-mining and colocation) and operating gigawatts, future projects in construction or negotiation and future expectations of operation location, orders for miners and critical infrastructure, future estimates of self-mining capacity, the public float of the Company's shares, future infrastructure additions and their operational capacity, and operating capacity and site features of the Company's operations and planned operations. These statements are provided for illustrative purposes only and are based on various assumptions, whether or not identified in this press release, and on the current expectations of the Company's management. These forward-looking statements are not intended to serve, and must not be relied on by any investor, as a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company. These forward-looking statements are subject to a number of risks and uncertainties, including, but not limited to, the Company's ability to obtain bankruptcy court approval with respect to motions in its Chapter 11 cases, successfully enter into and implement a restructuring

-more-

**Ad Hoc Equity Group Exhibit 17**

**SASMF EXHIBIT 25**

**790 of 979**

4

plan, emerge from Chapter 11 and achieve significant cash flows from operations; the effects of the Chapter 11 cases on the Company and on the interests of various constituents, bankruptcy court rulings in the Chapter 11 cases and the outcome of the Chapter 11 cases in general, the length of time the Company will operate under the Chapter 11 cases, risks associated with any third-party motions in the Chapter 11 cases, the potential adverse effects of the Chapter 11 cases on the Company's liquidity or results of operations and increased legal and other professional costs necessary to execute the Company's reorganization; satisfaction of any conditions to which the Company's debtor-in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside of the Company's control; the consequences of the acceleration of the Company's debt obligations; the trading price and volatility of the Company's common stock as well as other risk factors set forth in the Company's reports filed with the U.S. Securities & Exchange Commission. If any of these risks materialize or our assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. Accordingly, undue reliance should not be placed upon the forward-looking statements.

Month over month comparisons are based on the combined results of Core Scientific and its acquired entities and are unaudited.

Core Scientific provides this and any future similar unaudited updates to provide shareholders with visibility into the Company's results and progress toward previously announced capacity and operational projections.

-more-

**Please follow us on:**

 

https://www.linkedin.com/company/corescientific/

https://twitter.com/core_scientific

**CONTACTS**

Investors:

ir@corescientific.com

Media:

press@corescientific.com

-end-

**Exhibit 18**

SASMF EXHIBIT 25
793 of 979



# NATURAL GAS

| OVERVIEW | DATA | ANALYSIS & PROJECTIONS | | GLOSSARY › | FAQS › |

Referring Pages:
- Natural Gas Futures Prices (NYMEX)

View History: ○ Daily  ○ Weekly  ● Monthly  ○ Annual     Download Data (XLS File)

Chart Tools

no analysis applied ▾

### Henry Hub Natural Gas Spot Price

Dollars per Million Btu                                                      ⬇ DOWNLOAD





This series is available through the EIA open data API and can be downloaded to Excel or embedded as an interactive chart or map on your website.

**Henry Hub Natural Gas Spot Price (Dollars per Million Btu)**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 1997 | 3.45 | 2.15 | 1.89 | 2.03 | 2.25 | 2.20 | 2.19 | 2.49 | 2.88 | 3.07 | 3.01 | 2.35 |
| 1998 | 2.09 | 2.23 | 2.24 | 2.43 | 2.14 | 2.17 | 2.17 | 1.85 | 2.02 | 1.91 | 2.12 | 1.72 |
| 1999 | 1.85 | 1.77 | 1.79 | 2.15 | 2.26 | 2.30 | 2.31 | 2.80 | 2.55 | 2.73 | 2.37 | 2.36 |
| 2000 | 2.42 | 2.66 | 2.79 | 3.04 | 3.59 | 4.29 | 3.99 | 4.43 | 5.06 | 5.02 | 5.52 | 8.90 |
| 2001 | 8.17 | 5.61 | 5.23 | 5.19 | 4.19 | 3.72 | 3.11 | 2.97 | 2.19 | 2.46 | 2.34 | 2.30 |
| 2002 | 2.32 | 2.32 | 3.03 | 3.43 | 3.50 | 3.26 | 2.99 | 3.09 | 3.55 | 4.13 | 4.04 | 4.74 |
| 2003 | 5.43 | 7.71 | 5.93 | 5.26 | 5.81 | 5.82 | 5.03 | 4.99 | 4.62 | 4.63 | 4.47 | 6.13 |
| 2004 | 6.14 | 5.37 | 5.39 | 5.71 | 6.33 | 6.27 | 5.93 | 5.41 | 5.15 | 6.35 | 6.17 | 6.58 |
| 2005 | 6.15 | 6.14 | 6.96 | 7.16 | 6.47 | 7.18 | 7.63 | 9.53 | 11.75 | 13.42 | 10.30 | 13.05 |
| 2006 | 8.69 | 7.54 | 6.89 | 7.16 | 6.25 | 6.21 | 6.17 | 7.14 | 4.90 | 5.85 | 7.41 | 6.73 |
| 2007 | 6.55 | 8.00 | 7.11 | 7.60 | 7.64 | 7.35 | 6.22 | 6.22 | 6.08 | 6.74 | 7.10 | 7.11 |
| 2008 | 7.99 | 8.54 | 9.41 | 10.18 | 11.27 | 12.69 | 11.09 | 8.26 | 7.67 | 6.74 | 6.68 | 5.82 |
| 2009 | 5.24 | 4.52 | 3.96 | 3.50 | 3.83 | 3.80 | 3.38 | 3.14 | 2.99 | 4.01 | 3.66 | 5.35 |
| 2010 | 5.83 | 5.32 | 4.29 | 4.03 | 4.14 | 4.80 | 4.63 | 4.32 | 3.89 | 3.43 | 3.71 | 4.25 |
| 2011 | 4.49 | 4.09 | 3.97 | 4.24 | 4.31 | 4.54 | 4.42 | 4.06 | 3.90 | 3.57 | 3.24 | 3.17 |
| 2012 | 2.67 | 2.51 | 2.17 | 1.95 | 2.43 | 2.46 | 2.95 | 2.84 | 2.85 | 3.32 | 3.54 | 3.34 |
| 2013 | 3.33 | 3.33 | 3.81 | 4.17 | 4.04 | 3.83 | 3.62 | 3.43 | 3.62 | 3.68 | 3.64 | 4.24 |
| 2014 | 4.71 | 6.00 | 4.90 | 4.66 | 4.58 | 4.59 | 4.05 | 3.91 | 3.92 | 3.78 | 4.12 | 3.48 |
| 2015 | 2.99 | 2.87 | 2.83 | 2.61 | 2.85 | 2.78 | 2.84 | 2.77 | 2.66 | 2.34 | 2.09 | 1.93 |
| 2016 | 2.28 | 1.99 | 1.73 | 1.92 | 1.92 | 2.59 | 2.82 | 2.82 | 2.99 | 2.98 | 2.55 | 3.59 |
| 2017 | 3.30 | 2.85 | 2.88 | 3.10 | 3.15 | 2.98 | 2.98 | 2.90 | 2.98 | 2.88 | 3.01 | 2.82 |
| 2018 | 3.87 | 2.67 | 2.69 | 2.80 | 2.80 | 2.97 | 2.83 | 2.96 | 3.00 | 3.28 | 4.09 | 4.04 |

Ad Hoc Equity Group Exhibit 18
1

SASMF EXHIBIT 25
794 of 979

| Year | | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2019 | 3.11 | 2.69 | 2.95 | 2.65 | 2.64 | 2.40 | 2.37 | 2.22 | 2.56 | 2.33 | 2.65 | 2.22 |
| 2020 | 2.02 | 1.91 | 1.79 | 1.74 | 1.75 | 1.63 | 1.77 | 2.30 | 1.92 | 2.39 | 2.61 | 2.59 |
| 2021 | 2.71 | 5.35 | 2.62 | 2.66 | 2.91 | 3.26 | 3.84 | 4.07 | 5.16 | 5.51 | 5.05 | 3.76 |
| 2022 | 4.38 | 4.69 | 4.90 | 6.60 | 8.14 | 7.70 | 7.28 | 8.81 | 7.88 | 5.66 | 5.45 | 5.53 |
| 2023 | 3.27 | | | | | | | | | | | |

- = No Data Reported;   -- = Not Applicable;   NA = Not Available;   W = Withheld to avoid disclosure of individual company data.

Release Date: 2/23/2023
Next Release Date: 3/1/2023

Referring Pages:
- Natural Gas Futures Prices (NYMEX)

Ad Hoc Equity Group Exhibit 18
2

SASMF EXHIBIT 25
795 of 979

2/2

**Exhibit 19**

SASMF EXHIBIT 25
796 of 979



Sundry Photography via Getty Images

**DIVE BRIEF**

# Electricity prices surged 14.3% in 2022, double overall inflation: US report

Published Jan. 19, 2023

## Dive Brief:

- Consumers paid 14.3% more for electricity last year on average, than in 2021, more than double the overall 6.5% rise in prices, according to Consumer Price Increase data released Jan. 12 by the U.S. Bureau of Labor Statistics. Month to month, electricity prices rose 1% while the overall CPI decreased by 0.1%.

- The price of residential electricity is projected in the coming years to rise more slowly, the Energy Information Administration said Jan. 10. It jumped to 15.07 cents a kWh last year, from 13.66 cents per kWh in 2021. It's projected to rise to 15.45 cents a kWh this year and by a penny in 2024.

- Electricity to heat homes is expected to cost 10.2% more this winter over last year, or $1,359 for the season, according to the National Energy Assistance Directors' Association.

## Dive Insight:

The inflationary spiral gripping the economy since the end of 2020 is easing. Overall December price increases were down from a 7.1% year-over-year rise in November, and represented the sixth straight month of year-over-year declines after peaking at 9.1% in June.

Year-over-year price inflation for electricity peaked at 15.8% in August, according to the BLS.

Tyson Slocum, director of Public Citizen's Energy Program, said domestic electricity prices are "tethered to global calamities," specifically Russia's 11-month war against Ukraine that has roiled global markets.

Energy costs are regressive, taking a bigger share of income from low-income consumers than from the affluent, he said. To cut costs, consumers must improve efficiency. But renters can't make the investments needed to boost energy efficiency, Slocum said.

The Inflation Reduction Act is expected to help fund energy efficiency improvements, but it's "still heavily tax incentive-focused," he said, putting it out of reach of many consumers.

More than 20 million families, or about one of six in the U.S., were behind on their utility bills as of Nov. 7, according to NEADA, which represents the state directors of the federal government's Low Income Home Energy Assistance Program. Families owed about $16.1 billion as of last August, double the amount at the end of December 2019, NEADA said. The average amount owed increased to about $788, from $629.

The EIA said it expects retail electricity sales will decline due to a milder summer this year compared to 2022 and about 10% fewer cooling degree days.

U.S. generation in EIA's forecast will decline in 2023, following a drop in electricity consumption this year and trend up in 2024. Generation from renewable sources is the main contributor to growth in U.S. electricity generation, EIA said. The forecast share of U.S. renewables generation will rise to 24% this year and 26% in 2024, from 21% in 2022.

The EIA said natural gas consumption, production and exports broke records in 2022 as real average prices hit a 14-year high. U.S. natural gas consumption reached record levels last year due partly to increased use in the electric power sector.

**Exhibit 20**



# Energy Price Index
119.29 for Jan 2023

🔔  + WATCHLIST

**Overview**    Interactive Chart

## Level Chart
VIEW FULL CHART



1D  5D  1M  3M  6M  YTD  **1Y**  3Y  5Y  10Y  MAX

MAR '22    MAY '22    JUL '22    SEP '22    NOV '22

QUICKFLOWS

### Basic Info

Energy Price Index is at a current level of 119.29, down from 130.92 last month and down from 121.31 one year ago. This is a change of -8.88% from last month and -1.66% from one year ago.

| Report | Commodity Markets Review | Region | N/A |
| Categories | Agriculture and Livestock , Chemicals , Metals | Source | World Bank |