**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **CORE SCIENTIFIC, INC., *et al.*,** | § | Case No. 23-90341 (CML) |
|  | § |  |
| Debtors.[1] | § | (Jointly Administered) |
|  | § |  |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE**
**STATEMENT AND (II) CONFIRMATION OF THE FOUTH AMENDED JOINT**
**CHAPTER 11 PLAN OF CORE SCIENTIFIC, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (2409024)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated:   January 14, 2024
         Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII LLC (3198).  The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION ..................................................................................................... 3

BACKGROUND .................................................................................................... 3

    **I.**    Chapter 11 Cases .......................................................................... 3

    **II.**    Declarations in Support of Confirmation .................................... 4

    **III.**    Summary of Plan ........................................................................ 5

    **IV.**    Special Committee ...................................................................... 6

    **V.**    Restructuring Negotiations and Plan Settlements ....................... 7

        A.  RSA Settlement ..................................................................... 7

        B.  GUC Settlement .................................................................... 8

        C.  Miner Equipment Lender Settlement ..................................... 9

        D.  Other Plan Settlements ......................................................... 10

    **VI.**    Plan Solicitation ......................................................................... 11

        A.  Initial Solicitation ................................................................. 11

        B.  Supplemental Solicitation ..................................................... 12

        C.  Service to Other Beneficial Owners ...................................... 14

    **VII.**    Plan Supplement ......................................................................... 17

    **VIII.**    Tabulation .................................................................................. 18

ARGUMENT ......................................................................................................... 20

    **I.**    The Disclosure Statement Should be Approved on a Final Basis ........ 21

        A.  Parties in Interest Received Sufficient Notice of Combined Hearing and Objection Deadline .............................................. 21

        B.  Disclosure Statement Contains Adequate Information and Should Be Approved ............................................................ 23

        C.  Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order .............. 27

    **II.**    Plan Settlements, Releases, Exculpation Provision, and Injunction Provisions Are Appropriate and Should Be Approved ...................... 28

        A.  Plan Settlements and Compromises Are Reasonable and Satisfy Bankruptcy Rule 9019 ............................................. 28

        B.  The Plan Releases Are Appropriate and Should Be Approved ...... 34

ii

    C.  Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved ..................................................... 47

    D.  Injunction Provisions Are Appropriate and Should Be Approved ................. 49

    E.  Released Parties and Exculpated Parties Are Entitled to Additional Protections Under Section 1125(e) ...................................................... 51

**III.**    Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed........53

    A.  Section 1129(a)(1): Plan Complies with All Applicable Bankruptcy Code Provisions ................................................................................. 53

    B.  Section 1129(a)(2): Debtors Have Complied with Bankruptcy Code ........... 62

    C.  Section 1129(a)(3): Good Faith .................................................... 67

    D.  Section 1129(a)(4): Professional Fees Subject to Bankruptcy Court Approval ........................................................................................ 69

    E.  Section 1129(a)(5): Information Regarding Proposed Officers and Managers....................................................................................... 70

    F.  Section 1129(a)(6): No Rate Changes ........................................... 71

    G.  Section 1129(a)(7): Best Interests Test........................................... 71

    H.  Section 1129(a)(8): Acceptance of Impaired Classes .................................. 75

    I.  Section 1129(a)(9): Payment in Full of Priority Claims ............................ 76

    J.  Section 1129(a)(10): Impaired Accepting Class.................................. 77

    K.  Section 1129(a)(11): Feasibility .......................................................... 77

    L.  Section 1129(a)(12): Payment of U.S. Trustee Fees..................................... 82

    M.  Section 1129(a)(13): Retiree Benefits ............................................ 82

    N.  Sections 1129(a)(14)–(16) and 1129(e): Inapplicable Provisions ................ 83

    O.  Section 1129(b): Cramdown of Non-Accepting Classes .............................. 84

    P.  Section 1129(c): Plan Is Only Plan Currently on File .................................. 87

    Q.  Section 1129(d): Principal Purpose of Plan..................................... 87

    R.  Request For Waiver of Bankruptcy Rule 3020(e) .......................................... 88

**IV.**    Bankruptcy Court Should Overrule Unresolved Objections and Confirm Plan ...............................................................................................89

CONCLUSION................................................................................... 100

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660
  (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) .............................................74

*In re Allied Props., LLC*,
  No. 06-33754, 2007 WL 1849017 (Bankr. S.D. Tex. June 25, 2007) ....................38

*In re Altera Infrastructure L.P.*,
  No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) ............................................52

*In re Ameriforge Grp., Inc.*,
  No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) ........................................43

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair
  Co.)*,
  203 F.3d 914 (5th Cir. 2000) .................................................................................42

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006).................................................................................86

*In re Astria Health*,
  623 B.R. 793 (Bankr. E.D. Wash. 2021) ..............................................................51

*In re Avaya Inc., et al.*,
  No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) .........................45, 49, 50

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)..............................................................................................69

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber
  Co.)*,
  584 F.3d 229 (5th Cir. 2009) .................................................................................49

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) ........................................28, 36, 41, 90

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985) .................................................................................67

*Cadle Co. v. Mims (In re Moore)*,
  608 F.3d 253 (5th Cir. 2010) .................................................................................37

*Cantu v. Schmidt (In re Cantu)*,
  784 F.3d 253 (5th Cir. 2015) .................................................................................72

*In re Chapel Gate Apartments, Ltd.*,
  64 B.R. 569 (Bankr. N.D. Tex. 1986).................................................................70

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)................................................................68

iv

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
   68 F.3d 914 (5th Cir. 1995) ..................................................................29

*In re Cypresswood Land Partners, I*,
   409 B.R. 396 (Bankr. S.D. Tex. 2009) ...............................................62, 69, 86

*In re Davis Offshore, L.P.*,
   644 F.3d 259 (5th Cir. 2011) ................................................................51

*In re Deep Marine Holdings, Inc.*,
   Nos. 09-39313 (MI), 09-39314, 09-39315, 09-39316, 09-39317, 09-39318,
   2010 WL 5125278 (Bankr. S.D. Tex. June 2, 2010) ...................................63

*In re Derosa-Grund*,
   567 B.R. 773 (Bankr. S.D. Tex. 2017) ...............................................36, 37

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ......................................................86

*In re Energy & Expl. Partners, Inc.*,
   No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) ...............................43

*In re Energy Partners, Ltd.*,
   No. 09-32957, 2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009) ..................63

*In re Fieldwood Energy LLC*,
   No. 20-33948 (MI), 2021 WL 2853151 (Bankr. S.D. Tex. June 25, 2021) ...........52

*Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*,
   116 F.3d 790 (5th Cir. 1997) ................................................................67

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
   255 F. App'x 909 (5th Cir. 2007) ...........................................................42

*In re Gen. Homes Corp.*,
   134 B.R. 853 (Bankr. S.D. Tex. 1991) ...............................................36, 38

*In re GenOn Energy, Inc.*,
   No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) .................................43

*In re Harborwalk, LP*,
   Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620 (Bankr. S.D. Tex.
   Oct. 25, 2010) ...................................................................................63

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe
   Enters., Ltd., II)*,
   994 F.2d 1160 (5th Cir. 1993) ...............................................................53

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007).....................................................36

*Hernandez v. Larry Miller Roofing, Inc.*,
   628 F. App'x 281 (5th Cir. 2016) ...........................................................42

*Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*,
   No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ................42

*In re Hous. Reg'l Sports Network, L.P.*,
    505 B.R. 468 (Bankr. S.D. Tex. 2014) ...........................................................30, 86

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315 (5th
    Cir. 2011) .................................................................................30, 37, 54, 86, 88

*In re J T Thorpe Co.*,
    308 B.R. 782 (Bankr. S.D. Tex. 2003), *aff'd*, No. 02-41487-H5-11, 2004 WL
    720263 (S.D. Tex. Mar. 3, 2004)........................................................52, 53, 63

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988) .........................86

*In re Lakeside Glob. II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) .........................................................78

*In re Landing Assocs.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993).........................................................78

*In re LeBlanc*,
    622 F.2d 872 (5th Cir. 1980) ................................................................87, 90

*Lemelle v. Universal Mfg. Corp.*,
    18 F.3d 1268 (5th Cir. 1994) ....................................................................114

*In re Lincolnshire Campus, LLC*,
    441 B.R. 524 (Bankr. N.D. Tex. 2010).........................................................67

*Lovett v. Homrich Inc. (In re Philip Servs. Corp.)*,
    359 B.R. 616 (Bankr. S.D. Tex. 2006) .........................................................71

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) ....................................................................58

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) ......................................................................45

*In re MCorp Fin., Inc.*,
    160 B.R. 941 (S.D. Tex. 1993) ..................................................................25

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
    Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A, 2006 WL 3780884
    (N.D. Tex. Dec. 26, 2006) ......................................................................29

*In re Moody Nat'l SHS Hous. H, LLC*,
    No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) .....................35, 59

*NexPoint Advisors, L.P. v. Highland Capital Management (In re Highland Cap.
    Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022), *petition for cert. filed*, No. 22-631 (U.S. Jan. 9,
    2023) ................................................................................... *passim*

*In re NPC Int'l, Inc.*,
  No. 20-33353 (DRJ) (Bankr. S.D. Tex. Oct. 30, 2020) ..........................................38

*In re OCA, Inc.*,
  357 B.R. 72 (Bankr. E.D. La. 2006) .....................................................................108

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
  Elec. Power Coop., Inc.)*,
  119 F.3d 349, 355 (5th Cir. 1997) ..................................................................25, 26

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*,
  801 F.3d 530 (5th Cir. 2015) ...........................................................................25, 30

*In re Paige*,
  685 F.3d 1160 (10th Cir. 2012) ...........................................................................104

*In re Pawlowski*,
  428 B.R. 545 (E.D.N.Y. 2009) .............................................................................104

*In re Performance Nutrition, Inc.*,
  239 B.R. 93 (Bankr. N.D. Tex. 1999) ....................................................................45

*Phx. Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint
  Venture)*,
  995 F.2d 1274 (5th Cir. 1991) ...............................................................................52

*In re Pilgrim's Pride Corp.*,
  No. 08-45664-DML-11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010).....................44

*In re Pipeline Health Sys., LLC*,
  No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023)................................44, 47, 94

*In re Pisces Energy, LLC*,
  No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) .................71, 73

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) .........................................................................34, 35

*In re Residential Capital, LLC*,
  No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ....................................33

*In re Rexford Props. LLC*,
  558 B.R. 352 (Bankr. C.D. Cal. 2016)....................................................................87

*In re Richard Buick, Inc.*,
  126 B.R. 840 (Bankr. E.D. Pa. 1991) .....................................................................88

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
  624 F.2d 599 (5th Cir. 1980) .....................................................................25, 26, 29

*In re RNI Wind Down Corp.*,
  369 B.R. 174 (Bankr. D. Del. 2007) ......................................................................101

*Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*,
  939 F.2d 289 (5th Cir. 1991) .....................................................................63, 65, 71

*In re Roqumore*,
   393 B.R. 474 (Bankr. S.D. Tex. 2008) ........................................................26, 30, 31

*In re Save Our Springs (S.O.S.) All., Inc.*,
   632 F.3d 168 (5th Cir. 2011) ....................................................................52, 76, 77

*In re Schepps Food Stores, Inc.*,
   160 B.R. 792 (Bankr. S.D. Tex. 1993) ...................................................................45

*In re Sea Trail Corp.*,
   No. 11-07370-8-SWH, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012) .......86

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ..........................................................83, 108

*In re Serta Simmons Bedding, LLC*,
   No. 23-90020 (DRJ) (Bankr. S.D. Tex. Jan. 24, 2023) .........................................97

*In re Snyder*,
   967 F.2d 1126 (7th Cir. 1992) .............................................................................110

*In re Southcross Holdings, LP*,
   No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) ...........................................36

*In re Speedcast Int'l Ltd.*,
   No. 20-32243 (MI) (Bankr. S.D. Tex. Nov. 2, 2020) ............................................38

*In re Star Ambulance Serv., LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) ......................................................51, 59, 63

*In re Sunguard AS New Holdings, LLC*,
   No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022)....................................47, 50

*In re Superior Energy Servs., Inc.*,
   No. 20-35812 (DRJ) (Bankr. S.D. Tex. Dec. 8, 2020) ...........................................38

*In re Talen Energy Supply, LLC*,
   No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) ................... *passim*

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) .......................................................................87

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
   844 F.2d 1142 (5th Cir. 1988) ...............................................................................71

*In re Thru, Inc.*,
   No. 17-31034, 2017 Bankr. LEXIS 1902 (Bankr. N.D. Tex. July 10, 2017),
   *rev'd on other grounds by Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 2018
   U.S. Dist. LEXIS 179769 (N.D. Tex. Oct. 19, 2018) ...........................................87

*Toibb v. Radloff*,
   501 U.S. 157 (1991)...............................................................................................66

*In re Tribune Co.*,
   972 F.3d 228 (3d Cir. 2020)...................................................................................86

*In re Tucker Freight Lines, Inc.*,
    62 B.R. 213 (Bankr. W.D. Mich. 1986)..................................................................50

*In re Ultra Petroleum Corp.*,
    No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) ..........................................36

*In re UTEX Indus., Inc.*,
    No. 20-34932 (DRJ) (Bankr. S.D. Tex. Oct. 28, 2020).........................................47

*In re W.R. & Grace Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013), *aff'd*, 729
    F.3d 332 (3d Cir. 2013)...........................................................................................63

*W. Real Est. Equities, LLC v. Vill. At Camp Bowie I, L.P. (In re Vill. at Camp
    Bowie I, L.P.)*,
    710 F.3d 239 (5th Cir. 2013) ..................................................................................63

*In re Warren Res., Inc.*,
    No. 16-32760 (MI) (Bankr. S.D. Tex. Sept. 14, 2016).........................................36

*Whitney Bank v. SCC Kyle Partners, Ltd. (In re SCC Kyle Partners, Ltd.)*,
    518 B.R. 393 (W.D. Tex. 2014)..............................................................................76

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007)...................................................................35

*In re Worldcom, Inc.*,
    No. 02–13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......85

**Statutes**

11 U.S.C. § 105............................................................................................................58

11 U.S.C. § 109............................................................................................................59

11 U.S.C. § 362(a)(1)..................................................................................................111

11 U.S.C. § 365............................................................................................................82

11 U.S.C. § 502.......................................................................................................*passim*

11 U.S.C. § 506..........................................................................................................118

11 U.S.C. § 507..............................................................................................75, 81, 82

11 U.S.C. § 509(e)............................................................................................95, 96, 103

11 U.S.C. § 524(e)..........................................................................35, 42, 43, 47

11 U.S.C. § 553.......................................................................................115, 117, 118

11 U.S.C. § 1102............................................................................................................6

11 U.S.C. § 1103...............................................................................42, 43, 47, 58

11 U.S.C. § 1107.....................................................................................................*passim*

11 U.S.C. § 1121..........................................................................................................59

11 U.S.C. § 1122..........................................................................51, 52, 58, 60

11 U.S.C. § 1123(e) ....................................................................... *passim*

11 U.S.C. § 1125(e) ...........................................................47, 49, 50, 51

11 U.S.C. § 1126 ........................................................................... *passim*

11 U.S.C. § 1127 .................................................................................60, 61

11 U.S.C. § 1129 ........................................................................... *passim*

11 U.S.C. § 1141 .........................................................................................58

11 U.S.C. § 1142(b) ...................................................................................46

28 U.S.C. § 157(b) .......................................................................................5

28 U.S.C. § 1334 ...........................................................................................5

Bankruptcy Code, Chapter 5 ....................................................................9

Bankruptcy Code, Chapter 7 ............................................................ *passim*

Bankruptcy Code, Chapter 11 .......................................................... *passim*

Bankruptcy Rule 2019 ...............................................................3, 60, 61

Bankruptcy Rule 3019(a) .........................................................................96

Bankruptcy Rule 3020(E) .................................................................92, 93

Bankruptcy Rule 9019 .........................................................24, 25, 30, 96

Fed. R. Bankr. P. 1015(b) ...........................................................................6

Fed. R. Bankr. P. 3017(a) ................................................................21, 24

Fed. R. Bankr. P. 3019(a) ........................................................................60

Fed. R. Bankr. P. 3020(e) ........................................................................93

**Other Authorities**

Stretto's website at https://cases.stretto.com/corescientific ........................22

H.R. Rep. No. 95-595 (1977) ...................................................................52

S. Rep. No. 95-989 (1978) ........................................................................52

Core Scientific, Inc. ("**Core Parent**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this memorandum of law in support of and omnibus reply to objections to (i) final approval of the Disclosure Statement[2] and (ii) Confirmation of the Plan, including the Plan Supplement, and respectfully represent as follows:[3]

## PRELIMINARY STATEMENT

1.      The Debtors' Plan provides for a comprehensive and value-maximizing restructuring that is supported by each of the Debtors' key stakeholders, including (i) the ad hoc group of the Debtors' Convertible Noteholders (the "**Ad Hoc Noteholder Group**"); (ii) B. Riley Commercial Capital, LLC (together with its affiliated entities, "**B. Riley**"), the Debtors' DIP Facility lender and the largest holder of General Unsecured Claims; (iii) the majority of the Debtors' secured miner equipment lenders (the "**Settling Miner Equipment Lenders**"); (iv) the official committee of unsecured creditors (the "**Creditors' Committee**"), and (v) the official committee of equity security holders (the "**Equity Committee**" and, collectively with the Ad Hoc Noteholder Group, B. Riley, the Settling Miner Equipment Lenders, and the Creditors' Committee, the "**Key Stakeholder Groups**").  The Plan is the culmination of multiple, value-maximizing settlements achieved over hard-fought negotiations, including approximately 6 months of negotiation in mediation overseen by the Honorable Judge Marvin Isgur (the "**Mediation**").[4]

---

[2]     The *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1439) (the "**Initial Disclosure Statement**") and the *Supplement to Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1640) (the "**Disclosure Statement Supplement**" and, together with the Initial Disclosure Statement, the "**Disclosure Statement**").

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

[4]     See *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator Regarding Debtors' Chapter 11 Plan*, entered on July 12, 2023 (Docket No. 1052).

2.     Among other key benefits, the Plan would (i) significantly deleverage the Debtors' balance sheet by approximately $400 million and reduce annual debt service by approximately $60 million, (ii) provide a 100% recovery (including postpetition interest) to all creditors (other than Section 510(b) Claims and creditors that have agreed to accept lesser treatment), as well as a meaningful recovery to existing equity holders, (iii) preserve more than 240 jobs, and (iv) provide the Reorganized Debtors with adequate capital to operate the reorganized business at an optimal level and position the Reorganized Debtors for growth and success.  Indeed, as a result of the Debtors' successful Rights Offering (which was significantly oversubscribed and generated $55 million in proceeds), and following full repayment of the Debtors' DIP Facility, the Debtors are set to emerge from these chapter 11 cases with enhanced liquidity and in a strong position to continue executing their growth plans. The Debtors are targeting an Effective Date of January 23, 2024.

3.     The Debtors have also worked constructively with various parties that have contacted the Debtors with objections or informal comments to resolve as many issues as possible through the addition of provisions in the Proposed Confirmation Order (as defined herein).  The Debtors are pleased to report that they are only aware of *one* unresolved objection to Confirmation of the Plan, which was filed by a securities litigation plaintiff (the "**Hoffman Objection**").  The Hoffman Objection is limited to Mr. Hoffman's objection to certain aspects of the third-party release provision contained in the Plan (the "**Third-Party Releases**").  As further discussed below in *Part IV* of the argument section of this memorandum, the Court should overrule the Hoffman Objection because it is an appropriate exercise of this Court's jurisdiction, consistent with precedent in this Circuit and provided third parties with the option to voluntarily opt out in accordance with the procedures approved in the Disclosure Statement Order (defined below) and

the Complex Case Procedures.  Importantly, and as further discussed below, the Plan is clear that the Third-Party Releases only apply to Holders of Claims and Interests including Other Beneficial Owners (including Hoffman) that were given notice of the opportunity to opt out of granting releases set forth in the Plan but did not opt out (*see* Plan, §1.267).

4.      For the reasons set forth herein, and as the uncontroverted evidence will show, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.  Accordingly, the Court should approve the Disclosure Statement on a final basis and confirm the Plan.  A proposed order confirming the Plan is being filed contemporaneously herewith (the "**Proposed Confirmation Order**").

<u>**JURISDICTION**</u>

5.      This Bankruptcy Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

<u>**BACKGROUND**</u>

I.      <u>**Chapter 11 Cases**</u>

6.      On December 21, 2022 (the "**Petition Date**"), the Debtors commenced their Chapter 11 Cases by filing voluntary petitions in this Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**") (Docket No. 105).

7.      On January 9, 2023, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee in these Chapter 11 Cases pursuant to section 1102

of the Bankruptcy Code (Docket No. 256), which was reconstituted on February 3, 2023 (Docket No. 456).  On March 23, 2023, the U.S. Trustee appointed the Equity Committee (Docket No. 724).  No trustee or examiner has been appointed in these Chapter 11 Cases.

8.    The pertinent facts relating to the commencement of these Chapter 11 Cases and the key events during the cases are more fully set forth in the Disclosure Statement.

## II.    **Declarations in Support of Confirmation**

9.    In support for Confirmation, the Debtors respectfully refer the Court to the following declarations and affidavits (collectively, the "**Confirmation Declarations**"):

- *Certificate of Service re: Solicitation Materials*, dated November 27, 2023 (Docket No. 1471), *Certificate of Service re: Solicitation Materials*, dated December 13, 2023 (Docket No. 1547), *Certificate of Service re: Solicitation Materials*, dated December 14, 2023 (Docket No. 1552), *Certificate of Service re: Solicitation Materials*, dated December 20, 2023 (Docket No. 1591), *Certificate of Service re: Solicitation Materials*, dated December 27, 2023 (Docket No. 1628) and *Certificate of Service re: Second Solicitation Materials*, dated January 8, 2024 (Docket No. 1689) (collectively, the "**Solicitation Certificates**");

- *Declaration of Jung W. Song of Stretto Inc., Regarding Voting and Tabulation of Ballots Cast on Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (the "**Solicitation Declaration**"), filed contemporaneously herewith;

- *Declaration of Michael Bros in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (the "**Bros Declaration**"), filed contemporaneously herewith, which addresses the satisfaction of the elements under section 1129 of the Bankruptcy Code, feasibility (including exit financing, the new capital structure post-emergence, and the adequacy of capital at emergence), the Debtors' business plan, and the Financial Projections (as defined herein);

- *Declaration of Rodi Blokh in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (the "**Blokh Declaration**"), filed contemporaneously herewith, which addresses the Liquidation Analysis (as defined herein);

- *Declaration of John Singh in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (the "**Singh Declaration**"), filed contemporaneously herewith, which

addresses the Enterprise Value and Plan Equity Value of the Reorganized Debtors; and

- *Declaration of Neal P. Goldman in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (the "**Goldman Declaration**"), filed contemporaneously herewith, which addresses the process of the Plan negotiations, the Debtors' corporate governance, the Debtor Releases (as defined herein), and the Third-Party Releases.

### III.    Summary of Plan

10.    The Plan provides for a comprehensive restructuring and deleveraging of the Debtors' balance sheet anchored by the various Plan Settlements, including those reached with the Key Stakeholder Groups.  Specifically, the proposed restructuring contemplates, among other things:

- 100% recoveries (including postpetition interest) to all Classes of creditors (other than Section 510(b) Claims and creditors that have agreed to accept lesser treatment) in the form of one or more of the following: (i) Cash, (ii) New Common Interests, Contingent Payment Obligations or GUC Contingent Payment Obligations (as applicable) relating thereto, (iii) take-back debt issued and/or guaranteed by one or more of the Reorganized Debtors, and/or (iv) reinstatement of Claims;

- Distributions to Holders of Existing Common Interests in the form of (i) New Common Interests from the Residual Equity Pool, (ii) New Warrants, and (iii) Subscription Rights in connection with the Rights Offering;

- Distributions to the Holders of Allowed Section 510(b) Claims (if any) in the form of (i) New Common Interests from the Residual Equity Pool, (ii) New Warrants, and (iii) in lieu of the right to participate in the Rights Offering, either Cash, New Common Interests, or some combination thereof, at the Company's option, in an amount equal to the value of the Subscription Rights;

- The issuance of an $80 million senior secured, first-lien delayed draw term loan credit facility (the "**Exit Facility**"), consisting of (i) $40 million new money ($20 million of which will be available immediately upon the

Effective Date) and (ii) $40 million from rolling up the applicable Convertible Notes Secured Claims;[5]

- $55 million fully subscribed Rights Offering; and

- A number of Plan Settlements with various parties in interest, including, but not limited to, (i) the RSA Settlement, (ii) the GUC Settlement, (iii) the Miner Equipment Lender Settlement, (iv) the Brown Settlement, (v) the Holliwood Settlement, and (vi) the Foundry Settlement.

### IV.   Special Committee

11.      The board of directors (the "**Board**") of Core Parent at all relevant times to these Chapter 11 Cases oversaw the Debtors' governance process, which worked as it was designed and intended.  On November 14, 2022, in connection with Core's evaluation of strategic alternatives and to ensure the independence and propriety of such evaluation, the Board approved the formation of a special committee of three (3) independent directors: Neal Goldman, Jarvis Hollingsworth, and Kneeland Youngblood (the "**Special Committee**").  On January 28, 2023, Mr. Hollingsworth resigned as a member of the Special Committee.  *See* Goldman Decl., ¶6.

12.      The Board delegated authority to the Special Committee to, among other things, evaluate and, if deemed by the Special Committee to be in the best interests of the Debtors, authorize the Debtors to enter into any potential restructuring transactions and strategic alternatives for and on behalf of the Debtors with respect to their outstanding indebtedness and contractual and other liabilities.  Since its formation, the Special Committee has regularly met independently, as well as with the Board, the Debtors' management, and the Debtors' advisors and overseen the Debtors' review, consideration, and implementation of strategic alternatives, including, but not limited to, (i) the commencement of these Chapter 11 Cases, (ii) the Mediation before the Honorable Judge Marvin Isgur that eventually led to the RSA Settlement, as well as the subsequent

---

[5]     Approximately $61 million of the Exit Facility (including approximately $1 million of payment-in-kind fee on the new money) will be drawn on the Effective Date.

mediation held before Judge Isgur in December 2023 that resulted in the GUC Settlement, (iii) the Debtors' capital raise process (including the negotiation of the Rights Offering, the Backstop Commitment Letter, and the Exit Facility), and (iv) the Plan, the Plan Settlements (including, but not limited to, the RSA Settlement and the GUC Settlement), the Disclosure Statement, the Plan Supplement, and the transactions contemplated thereunder, each of which the Special Committee reviewed and approved.  *See* Goldman Decl., ¶ 7.

### V.   Restructuring Negotiations and Plan Settlements

13.   During these Chapter 11 Cases, the Debtors have engaged in continuous, constructive, and meaningful discussions with each of their key stakeholders (including the Key Stakeholder Groups) to build widespread support for the Plan and to resolve disputes with such stakeholders, which resulted in a number of value-maximizing Plan Settlements, including (i) the RSA Settlement, (ii) the GUC Settlement, (iii) the Miner Equipment Lender Settlement, and (iv) various other claims settlements (e.g., the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement).[6]

#### A.   *RSA Settlement*

14.   After months of extensive, arms' length negotiation and Mediation beginning July 2023, the Debtors finalized and executed that certain *Restructuring Support Agreement* (Docket No. 1440) on November 16, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including all exhibits, annexes, and schedules thereto, the "**RSA**") with (i) the

---

[6]   Separate from the Plan Settlements, the Debtors reached numerous additional settlements with various stakeholders including a number of M&M Lien Settlements, a settlement with Celsius Mining LLC and certain of its affiliates (Docket No. 1292), a settlement with Dalton Utilities (Docket No. 1651) (the "**Dalton Settlement**"), a settlement with Sphere 3D Corp. and Gryphon Digital Mining, Inc. (the "**Core-Sphere-Gryphon Settlement**") (Docket No. 1663), and a settlement with Oklahoma Gas and Electric Company (Docket No. 1711).

Convertible Noteholders that are members of the Ad Hoc Noteholder Group and comprise (a) 93% of the Holders of the April Convertible Notes Secured Claims and (b) 80% of the Holders of the August Convertible Notes Secured Claims (collectively, the foregoing (a) and (b), the "**Consenting Creditors**") and (ii) the Equity Committee and the members of the Equity Committee, excluding Foundry Digital LLC ("**Foundry**"), (collectively, the "**RSA Parties**").[7] The RSA settlement in the RSA was a global settlement of issues between the Debtors and the RSA Parties, including, among other issues, the Enterprise Value of the Reorganized Debtors, the size of the Convertible Noteholders' Allowed Claims, including resolution of the dispute on the validity of the 2X Amounts (as defined herein), the treatment of the Class 1 April Convertible Notes Secured Claims and Class 2 August Convertible Notes Secured Claims, the treatment of Existing Common Interests, and the terms of exit capital to fund the Plan. The RSA Settlement is incorporated into the Plan.

### B.    *GUC Settlement*

15.     Subsequent to the entry into and execution of the RSA, the Debtors continued good faith negotiations with B. Riley and the Creditors' Committee in an attempt to achieve a fully consensual Plan. The Debtors organized and participated in a subsequent Mediation before the Honorable Judge Marvin Isgur in December 2023, which ultimately culminated in the GUC Settlement between the Debtors, B. Riley, the Creditors' Committee, and the members thereof (except for any claims (i) held by the Debtors against Sphere 3D Corp. or (ii) held by Sphere 3D Corp. against the Debtors).[8] The GUC Settlement resolved all the remaining

---

[7]    Although Foundry is not party to the RSA, the Debtors and Foundry have reached a revised settlement (the "**Foundry Settlement**"), which is described in greater detail below.

[8]    As mentioned above, the Debtors have also reached the Core-Sphere-Gryphon Settlement, which, among other things, provides for mutual releases between the Debtors on the one hand and Sphere 3D Corp. and Gryphon Digital Mining, Inc. on the other hand.

issues with respect to the Plan among the Debtors and the Key Stakeholder Groups and is supported by all of the Key Stakeholder Groups.

16.     The GUC Settlement resulted in additional recoveries for Holders of Class 8A General Unsecured Claims, including the issuance and distribution of the GUC Contingent Payment Obligations and the GUC Settlement Additional Equity Distribution Amount and resolution of the Allowed amount of certain Class 8A General Unsecured Claims as set forth on the Schedule of Allowed General Unsecured Claims in Exhibit N of the Plan Supplement.  The GUC Settlement also resulted in the creation of the Class 8B Convenience Claims class consisting of unsecured claims equal to or less than $10,000 (and any Holder of an Allowed General Unsecured Claim that elected to reduce the allowed amount of its claim to $10,000), and each Class 8B Holder will receive Cash in an amount equal to such Holder's Allowed Convenience Claim.

### C.     *Miner Equipment Lender Settlement*

17.     The Plan also reflects a compromise and settlement with the Settling Miner Equipment Lenders with respect to the treatment of the Class 3 Miner Equipment Lender Claims. The Miner Equipment Lender Settlement resolves the Allowed amount of the Miner Equipment Lender Claims for the Settling Miner Equipment Lenders and the treatment of the Miner Equipment Lender Claims of the Settling Miner Equipment Lenders.   Each Settling Miner Equipment Lender agrees to support confirmation of the Plan in exchange for an election of the following negotiated treatment options under the Plan: (i) the Default Miner Equipment Lender Treatment, (ii) Miner Equipment Lender Treatment (Election 1), which is a full equitization of one hundred percent (100%) of such Holder's Allowed Miner Equipment Lender Claim Amount (the "**Equitization Option**"), or (iii) Miner Equipment Lender Takeback Debt (Election 2) with a principal amount that is 80% of the Settling Miner Equipment Lender's Allowed Claims.   As

discussed below, most of the Settling Miner Equipment Lenders chose the Equitization Option, which will reduce approximately $200 million of debt from the Reorganized Debtors' balance sheet.

### D. *Other Plan Settlements*

18.     The Debtors also entered into a several other value-maximizing Plan Settlements that resolved the Allowed amount of various secured or unsecured Claims against the Debtors and the treatment thereof and have been incorporated in the Plan, including the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement.

- The Brown Settlement reflects the compromise and settlement between the Debtors and Brown Corporation.  The Brown Settlement resolves the Allowed amount of the Secured Mortgage Claim (Brown) against Debtor American Property Acquisition, LLC.  It also resolves the treatment thereof and provides Brown Corporation with the option of either the Default Mortgage Treatment (Mortgage Takeback Debt) or Mortgage Treatment Election (Cash in an amount equal to ninety-five percent (95%) of such Holder's Allowed Secured Mortgage Claim Amount).  Brown Corporation also agrees to support confirmation of the Plan under the Brown Settlement.

- The Holliwood Settlement reflects the compromise and settlement between the Debtors and Holliwood LLC.  The Holliwood Settlement resolves the Allowed amount of the Secured Mortgage Claim (Holliwood) against Debtor American Property Acquisition, LLC.  Similar to the Brown Settlement, it also provides Holliwood LLC with the option of either the Default Mortgage Treatment or Mortgage Treatment Election.  Holliwood LLC also agrees to support confirmation of the Plan under the Brown Settlement.

- The Foundry Settlement reflects the compromise and settlement between the Debtors and Foundry.[9]  Under the Foundry Settlement, Foundry will receive a total Allowed Class 8A General Unsecured Claim of $5.5 million and will receive the same treatment as other Holders of Allowed Class 8A General Unsecured Claims under the Plan.  In addition, the Debtors shall assume the Foundry Hosting Agreements (as defined in the Plan) on the

---

[9]     After filing the Plan, the Debtors filed the *Debtors' Emergency Motion for Order Approving (I) Revised Settlement between Debtors and Foundry Digital LLC and (II) Granting Related Relief* (Docket No. 1712), which supersedes the settlement filed with the original motion at Docket No. 1188 and is scheduled to be heard before the Court at the Combined Hearing on January 16, 2024.  The Foundry Settlement is also incorporated into Section 5.16 of the Plan.

Effective Date, and shall perform thereunder in accordance with the Foundry Settlement (which, as of the date hereof, the parties estimate to be $0). The Foundry Settlement also includes mutual releases between the Debtors and Foundry.

## VI.  Plan Solicitation

### A.  *Initial Solicitation*

19.  On November 17, 2023, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (V) Approving Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (VI) Approving Notice Procedures For Reinstatement of Claims; (VII) Establishing Rights Offering Procedures; and (VIII) Granting Related Relief* (Docket No. 1426) (the "**Initial Disclosure Statement Order**"). The Initial Disclosure Statement Order, among other things, conditionally approved the Disclosure Statement and approved (i) the Rights Offering Procedures, (ii) the Solicitation and Voting Procedures, (iii) form of the Ballots, the Release Opt Out Form, and other notices, and granted other related relief.

20.  As set forth in the Solicitation and Voting Procedures, the Holders of Claims and Interests, as applicable, in Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims), Class 5 (M&M Lien Secured Claims), Class 6 (Secured Mortgage Claims), Class 8A (General Unsecured Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims), and Class 12 (Existing Common Interests) were entitled to vote on the Plan (collectively, the "**Voting Classes**").

11

21.     On November 17, 2023, the Debtors filed the first Combined Hearing Notice (Docket No. 1448).  On November 17, 2023, the Debtors commenced the solicitation of votes on the Third Amended Plan in accordance with the Initial Disclosure Statement Order by causing Stretto Inc. ("**Stretto**"), the Debtors' solicitation agent, to distribute copies of the Initial Disclosure Statement Order, the Initial Disclosure Statement (with all exhibits, including the Third Amended Plan), a copy of the Solicitation and Voting Procedures, the Combined Hearing Notice, the applicable Ballot, and a letter from the Equity Committee supporting the Third Amended Plan and recommending that the Holders of Existing Common Interests in Class 12 vote to accept the Third Amended Plan (collectively, the "**Solicitation Package**") to Holders of Claims and Interests in the Voting Classes.  *See* Solicitation Certificates.

22.     In addition to serving the Solicitation Packages on all voting parties, Stretto timely served on November 17, 2023 and November 18, 2023 (a) Notices of Non-Voting Status on holders of Administrative Claims, holders of Priority Tax Claims, and holders of Claims and Interests, if any, in Class 4 (Other Secured Claims) and Class 7 (Priority Non-Tax Claims) (Class 4 and Class 7 collectively, the "**Non-Voting Classes**"); and (b) the Combined Hearing Notice on all known parties in interest.  Furthermore, free copies of the Disclosure Statement, the Plan, and all other documents filed in these cases are, and have been, available on the internet at https://cases.stretto.com/corescientific.  *See* Solicitation Certificates.  The Combined Hearing Notice was also published in the *Wall Street Journal* and various other local newspapers in November 2023, *See* Publication Aff. (Docket No. 1509).

B.     *Supplemental Solicitation*

23.     After the Debtor's entry into the GUC Settlement, the Debtors filed the Plan and the Disclosure Statement Supplement (each of which incorporated the GUC Settlement), and, on December 28, 2023, the Court entered the *Order (I) Modifying Dates and Deadlines Set Forth*

*in the Disclosure Statement Order and (II) Conditionally Approving the Debtors' Disclosure Statement Supplement* (Docket No. 1638) (the "**Supplemental Disclosure Statement Order**" and together with the Initial Disclosure Statement Order, the "**Disclosure Statement Order**").  The Supplemental Disclosure Statement Order, among other things, conditionally approved the Disclosure Statement Supplement and approved (i) the proposed modified Solicitation and Voting Procedures reflecting the changed terms in the Plan, including the creation of the Class 8B Convenience Claims (collectively, the "**Supplemental Solicitation Packages**"), (ii) the amended Class 8 and Class 3 Ballots, (iii) the Supplemental Solicitation Packages, (iv) certain modified dates and deadlines related to Plan confirmation and solicitation, and granted other related relief.

24.    On December 29, 2023, pursuant to and in accordance with the Supplemental Disclosure Statement Order, Stretto served the Supplemental Solicitation Packages (including the Plan, the Disclosure Statement Supplement, and the amended Ballots) on holders of Claims or Interests in the Voting Classes.  A certificate of service evidencing Stretto's service of the foregoing was filed with the Court on January 8, 2024 (Docket No. 1689).  *See* Solicitation Certificates.

25.    In addition, on December 29, 2023, in accordance with the Supplemental Disclosure Statement Order, Stretto timely served (a) Notices of Non-Voting Status on Holders of Administrative Claims, Holders of Priority Tax Claims, and Holders of Claims and Interests in the Non-Voting Classes; and (b) the amended Combined Hearing Notice on all known parties in interest.  Stretto periodically served subsequent Notices of Non-Voting Status on Holders of Claims in the Non-Voting Classes on account of (a) forwarding instructions included on packages returned as undeliverable, and/or (b) at the request of interested parties.  These services are

evidenced by a certificate of service filed with the Court on January 8, 2024 (Docket No. 1689). *See* Solicitation Certificates; *see generally* Solicitation Decl.

26.     The Ballots and Notice of Non-Voting Status contained the full text of the release, exculpation, and injunction provisions set forth in Article X of the Plan and advised such Holders that they would be deemed to be bound by the Third-Party Releases[10] unless they timely and properly opted out of such release contained in the Release Opt Out Form attached to the Notice of Non-Voting Status, in accordance with Rule 40 of the *Procedures for Complex Cases in the Southern District of Texas*, effective October 18, 2023 (the "**Complex Case Rules**") and consistent with the Disclosure Statement Order.

### C.     *Service to Other Beneficial Owners*

27.     Further, in accordance with the Disclosure Statement Order and as detailed in the Solicitation Declaration, Stretto coordinated with coordinated with the banks, brokers, or other financial institutions (or their agents) that might have purchased  equity securities of Core Parent in "street name" (the "**Nominees**") on behalf of the current or former underlying beneficial owners of those equity securities during the period from January 3, 2022 through December 20, 2022, inclusive (the "**Other Beneficial Owners**") to identify Other Beneficial Owners and send the Release Opt Out Form and Confirmation Hearing Notice to Other Beneficial Owners.  In connection with and pursuant to the *Order (I) Establishing Deadlines to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* (Docket No. 652) (the "**Bar Date Order**"),

---

[10]     The Third-Party Releases are set forth in Section 10.6(b) of the Plan, which provides for releases by the Releasing Parties in each case from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Stretto had previously reached out to the Nominees and intermediaries of Nominees and instructed them to compile names and addresses of all Other Beneficial Owners and either (a) provide that information to Stretto for direct service of the Bar Date Order and relevant documents or (b) request the number of copies necessary to complete their own service of the Bar Date Order and relevant documents.  Stretto directed the Nominees to retain their records with respect to the names and addresses of the Other Beneficial Owners and, therefore, was able to utilize that information for the mailing of the notices, including the Release Opt Out Form, throughout the Debtors' chapter 11 cases.  *See* Solicitation Decl. ¶ 11.

28.     In addition to utilizing the records collected in connection with the service of the Bar Date Order, Stretto sent the Nominees the Confirmation Hearing Notice, Release Opt Out Form, and detailed instructions directing them to comply with the process set forth in the Disclosure Statement Order.  In that mailing, Stretto directed the Nominees to, within seven (7) days of receipt of the documents, (a) provide Stretto with the names and addresses of the Other Beneficial Owners or (b) request sufficient copies of the Confirmation Hearing Notice and Release Opt Out Form to forward to the Other Beneficial Holders and do so within seven (7) days of receipt of such copies, all in accordance with the Disclosure Statement Order.  *See* Solicitation Decl. ¶ 12.

29.     Release Opt Out Forms were sent on two separate occasions, both to the Holders of Claims in Non-Voting Classes and to the Other Beneficial Owners, and all Release Opt Out Forms received were tabulated.  Any Holder of Claims in Non-Voting Classes or Other Beneficial Owner that had submitted a Release Opt Out Form in the first solicitation was not required to submit an additional Release Opt Out Form to render such Holder's or Other Beneficial Owner's opt out effective.  *See* Solicitation Decl. ¶ 13.

30.     Through this process, in connection with each of the Initial Service of Solicitation Packages and Supplemental Service of Solicitation Packages (each as defined in the Solicitation Declaration), Stretto reached out to 1,192 Nominees, provided approximately 6,671 copies of the Confirmation Hearing Notice and Release Opt Out Form to Nominees for mailing, and directly mailed 1,144 copies of the documents directly to Other Beneficial Holders. Furthermore, Stretto was advised by one of the Nominee intermediaries, namely Broadridge Class Action Group, that approximately 15,000 emails, which including the links to Confirmation Hearing Notice and Release Opt Out Form, were sent to Other Beneficial Owners for each of the Initial Service of Solicitation Packages and Supplemental Service of Solicitation Packages. *See* Solicitation Decl. ¶ 14.

31.     The Release Opt Out Form states in capitalized, bold-faced text that Holders of Claims or Interests and Other Beneficial Owners that do not specifically opt out will be bound by the Third-Party Releases. *See* Initial Disclosure Statement Ord., Ex 14. The Release Opt Out Form also contains the full language of the Third-Party Releases and clearly provides when and how the form must be returned to Stretto. The Debtors established January 11, 2024 as the deadline for all parties to submit their Release Opt Out Forms. The Debtors went to great lengths to provide notice and an opportunity to opt out to Other Beneficial Owners and Holders of Claims or Interests and such parties were given a meaningful opportunity to exercise their right to opt out.

32.     As a result of these extensive noticing efforts, parties received the Release Opt Out Form and were able to navigate the process for submitting it. The Debtors received approximately 50 valid Release Opt Out Forms and Opt Out Elections (as defined in the

Solicitation Declaration), with approximately 7 of those from Other Beneficial Owners.[11]  *See* Solicitation Decl. ¶ 14.

VII.   **Plan Supplement**

33.   On December 8, 2023, the Debtors filed the initial Plan Supplement (Docket No. 1528), subject to further review and negotiation by the Ad Hoc Noteholder Group, the Equity Committee, and the Settling Miner Equipment Lenders.  The Plan Supplement included the following: (i) the New Corporate Governance Documents solely with respect to Reorganized Parent; (ii) the New Secured Convertible Notes Indenture; (iii) the New Secured Notes Indenture; (iv) the Contingent Payment Obligations Agreement; (v) the New Miner Equipment Lender Debt Documents; (vi) the Exit Facility Credit Agreement; (vii) the New Warrants Agreement; (viii) the New Intercreditor Agreement (Miner Equipment Lenders, New Secured Notes, New Secured Convertible Notes, Exit Facility); (ix) information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (x) the Restructuring Transactions Exhibit; (xi) the Schedule of Retained Causes of Action; (xii) the Schedule of Rejected Contracts; (xiii) the Schedule of Assumed Contracts; (xiv) the Schedule of Allowed General Unsecured Claims; and (xv) form Registration Rights Agreement.  *See* Plan Suppl. (Docket No. 1528), Exs. A–O.

34.   On December 11, 2023, the Debtors filed the amended Plan Supplement (Docket No. 1536), subject to further review and negotiation by the Ad Hoc Noteholder Group, the Equity Committee, and the Settling Miner Equipment Lenders.  The amended Plan Supplement

---

[11]   A total of 612 Opt Out Elections were received by Stretto in connection with both the initial service of Solicitation Packages and subsequent service of Supplemental Solicitation Packages. 562 of these Ballot submissions included both a vote to accept the Plan <u>and</u> elected to opt out of the Releases, and thus have not been included as valid Opt Out Elections pursuant to the terms of the Solicitation and Voting Procedures, and as made clear in the instructions on the Ballot and in the Disclosure Statement Order.  Out of the 562 invalid Opt Out Elections, 554 were from Holders of Existing Common Interests.

included the following: (i) the revised New Secured Convertible Notes Indenture; and (ii) the revised New Secured Notes Indenture.  *See* Plan Suppl. (Docket No. 1536), Exs. B–C.

35.     On December 27, 2023, the Debtors filed the second amended Plan Supplement (Docket No. 1623), which included the Schedule of Allowed General Unsecured Claims.  *See* Plan Suppl. (Docket No. 1623), Ex. N.

36.     On January 5, 2024, the Debtors filed the third amended Plan Supplement (Docket No. 1685), subject to further review and negotiation by the Ad Hoc Noteholder Group, the Equity Committee, and the Settling Miner Equipment Lenders.  The third amended Plan Supplement included the following: (i) the revised New Corporate Governance Documents solely with respect to Reorganized Parent; (ii) the revised New Secured Convertible Notes Indenture; (iii) the revised New Secured Notes Indenture; (iv) the revised Contingent Payment Obligations Agreement; (v) the revised New Miner Equipment Lender Debt Documents; (vi) the revised Exit Facility Credit Agreement; (vii) the revised New Warrants Agreement; (viii) the revised New Intercreditor Agreement (Miner Equipment Lenders, New Secured Notes, New Secured Convertible Notes, Exit Facility); (ix) revised information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (x) the revised Restructuring Transactions Exhibit; (xi) the revised Schedule of Retained Causes of Action; (xii) the revised Schedule of Rejected Contracts; (xiii) the revised Schedule of Assumed Contracts; and (xiv) the revised Schedule of Allowed General Unsecured Claims.  *See* Plan Suppl. (Docket No. 1685), Exs. A–N.

**VIII.   <u>Tabulation</u>**

37.     The Initial Disclosure Statement Order, among other things, established December 13, 2023 as the deadline by which all Ballots had to be received by Stretto to be counted as a valid vote to accept or reject the Plan.  The Supplemental Disclosure Statement Order extended

the deadline by which all Ballots had to be received by Stretto to be counted as a valid vote to accept or reject the Plan to January 11, 2024 (the "**Voting Deadline**").

38.     Following the mailing of Supplemental Solicitation Packages, all Holders of Existing Common Interests in Class 12 were required to submit new Ballots in accordance with the Disclosure Statement Order, any Ballots submitted by such Holders in connection with the original Solicitation Packages were not tabulated.  This was specified in each of the following documents received by such Holders: (i) the amended Ballots, (ii) the Disclosure Statement Supplement, and (iii) the Supplemental Disclosure Statement Order.  *See* Solicitation Declaration.

39.     Ballots submitted by Holders of Claims (but not Holders of Existing Common Interests in Class 12) that had already submitted a Ballot received in the initial service of Solicitation Packages and did not submit a new Ballot were tabulated.  However, where any Holder of Claims later submitted a Ballot received by Stretto on or before the Voting Deadline, the later submitted Ballot was tabulated.  *See* Solicitation Declaration.

40.     After the Voting Deadline, and following a complete review by Stretto of all Ballots received, Stretto finalized the tabulation of the Ballots, as described in the Solicitation Declaration.  Exhibit B to the Solicitation Declaration also describes in detail the voting results as to all Debtor entities.  As noted in the Solicitation Declaration, the following Voting Classes voted to accept the Plan pursuant to the requirements of section 1126 of the Bankruptcy Code at each of the applicable Debtor entities: Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims), Class 6 (Secured Mortgage Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims), and Class 12 (Existing Common Interests). None of the Holders of Claims in Class 5 (M&M Lien Secured Claims) voted on the Plan.  Class 8A (General Unsecured Claims) voted to accept the

Plan at all but one Debtor entity Core Scientific Mining LLC. *See* Solicitation Decl., Ex. A. The Debtors have included a chart below summarizing the voting results on an aggregate basis:

| | Aggregate Voting Results | | | | |
|---|---|---|---|---|---|
| | **Accept** | | **Reject** | | |
| **Class** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Result** |
| **Class 1 (April Convertible Notes Secured Claims)** | $327,209,302.35 (100%) | 10 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| **Class 2 (August Convertible Notes Secured Claims)** | $273,865,860.51 (100%) | 37 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| **Class 3 (Miner Equipment Lender Secured Claims)** | $56,642,663.42 (100%) | 11 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| **Class 5 (M&M Lien Secured Claims)[12]** | N/A | N/A | N/A | N/A | N/A |
| **Class 6 (Secured Mortgage Claims)** | $759,781.48 (100%) | 2 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| **Class 8A (General Unsecured Claims)** | $222,270,037.96 (99.6%) | 44 (93.6%) | $980,679.39 (0.4%) | 3 (6.4%) | Accept |
| **Class 8B (Convenience Claims)** | $6,516.00 (100%) | 2 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| **Class 11 (Section 510(b) Claims)** | $5.00 (83.3%) | 5 (83.3%) | $1.00 (16.7%) | 5 (16.7%) | Accept |
| **Class 12 (Existing Common Interests)** | 76,023,611 (99.4%) | N/A | 453,996 (8.9%) | N/A | Accept |

## **ARGUMENT**

41.    This argument is divided into four parts. *Part I* addresses the requirements for final approval of the Disclosure Statement under section 1125(a) of the Bankruptcy Code and demonstrates the satisfaction of each such requirement. *Part II* addresses satisfaction of

---

[12]    No Holders of Class 5 M&M Lien Secured Claims voted, as all Allowed M&M Lien Secured Claims have been otherwise satisfied under the applicable M&M Lien Settlements.

the applicable requirements for Plan Settlements, the Debtor Releases, the Third-Party Releases, Exculpation Provision, and Injunction Provisions contained in a chapter 11 plan pursuant to Bankruptcy Rule 9019, section 1123 of the Bankruptcy Code, and applicable Fifth Circuit law. *Part III* addresses the applicable requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement. *Part IV* responds to the Hoffman Objection raised to the confirmation of the Debtors' Plan.

## I.     The Disclosure Statement Should be Approved on a Final Basis

42.     For the reasons set forth below, the Disclosure Statement satisfies the applicable requirements of section 1125 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be confirmed.

### A.     *Parties in Interest Received Sufficient Notice of Combined Hearing and Objection Deadline*

43.     Bankruptcy Rule 3017(a) authorizes the Court to fix a time for filing objections to the adequacy of a disclosure statement, and Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing objections to confirmation of a plan. Bankruptcy Rules 2002(b), 2002(d), and 3017(a) generally provide that parties in interest should receive not less than 28 days' notice by mail of the time fixed for filing objections to approval of a disclosure statement and confirmation of a plan. However, Bankruptcy Rule 9006(c)(1) provides that the Court for cause shown may in its discretion order the time periods reduced, unless Bankruptcy Rule 9006(c)(2) (which is not applicable here) prohibits such reduction.

44.     Further, the Fifth Circuit has adopted the general rule that "[d]ue process requires that notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding." *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753

F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  When evaluating the sufficiency of notice, courts in this Circuit consider whether "(1) the notice apprised the claimant of the pendency of the action, and (2) [whether] it was sufficiently timely to permit the claimant to present his objections."  *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994); *Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.)*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998).  Indeed, "[w]hether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case." *Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992).

   45. On November 3, 2020, the Debtors filed the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (a) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (V) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; (VI) Approving Notice Procedures for Reinstatement of Claims; (VII) Establishing Rights Offering Procedures; And (VIII) Granting Related Relief* (Docket No. 1384) (the "**Disclosure Statement Motion**") requesting that the Court enter an order (i) scheduling the Combined Hearing to approve the Initial Disclosure Statement on a final basis and confirm the Third Amended Plan, (ii) conditionally approving the Initial Disclosure Statement, (iii) approving the Solicitation and Voting Procedures, (iv) establishing dates for the various dates and deadlines related thereto, including establishing the deadline to file objections to the adequacy of the Initial Disclosure Statement or confirmation of the Third Amended Plan (the "**Objection Deadline**"), (v) approving notice procedures for (a) the assumption or rejection of Executory Contracts and

Unexpired Leases and (b) Reinstated Claims, and (vi) establishing procedures for the Rights Offering.  The Debtors submitted to the Court that the Combined Hearing was appropriate and would promote judicial economy and save administrative expenses by allowing the Debtors to confirm the Plan quickly and transition expeditiously to restructuring the Debtors, thereby preserving value.  *See* Disclosure Statement Mot. ¶ 66.

46.     On November 17, 2023, the Court entered the Initial Disclosure Statement Order, among other things, conditionally approving the Initial Disclosure Statement, approving the solicitation procedures, setting the Combined Hearing on December 12, 2023, approving the Objection Deadline of December 13, 2023, and approving the form and process of notice thereof. As stated above, the Debtors commenced service of the Solicitation Packages on November 17, 2023.

47.     On December 28, 2023, the Court entered the Supplemental Disclosure Statement Order, among other things, rescheduling the Combined Hearing to January 16, 2024 and extending the Objection Deadline to January 11, 2024.   As stated above, the Debtors commenced service of the Supplemental Solicitation Packages on January 3, 2024.  *See Certificate of Service* (Docket No. 1672).

48.     Accordingly, the Debtors submit that all parties in interest had sufficient notice of the Objection Deadline and the Combined Hearing, and no party has been prejudiced by this schedule.

### B.     *Disclosure Statement Contains Adequate Information and Should Be Approved*

49.     As set forth in the Solicitation Certificates and in accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from Holders of the Voting Classes.  To approve a solicitation of votes to accept or reject a plan, the Court must

determine that such solicitation complied with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

50.     On November 17, 2023, the Court entered the Initial Disclosure Statement Order, conditionally approving the Initial Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  On December 28, 2024, the Court entered the Supplemental Disclosure Statement Order, conditionally approving the Disclosure Statement (including the Disclosure Statement Supplement) as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  In accordance with section 1125(b), the Debtors did not solicit votes on the *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1422) (the "**Third Amended Plan**") until after the Initial Disclosure Statement Order was entered, and did not solicit votes on the Plan until after the Supplement Disclosure Statement Order was entered.  *See Notice of Commencement of Solicitation of Plan* (Docket No. 1451) and *Notice of Filing of Solicitation Versions of (A) Fourth Amended Plan, (B) Disclosure Statement Supplement, and (C) Updated Forms Of Ballots For Certain Classes* (Docket No. 1641).

51.     Under section 1125 of the Bankruptcy Code, a plan proponent must provide holders of impaired claims and interests with "adequate information" regarding a debtor's proposed plan.[13]  A debtor's disclosure statement must provide sufficient information to permit an informed judgment by impaired creditors entitled to vote on the plan.  *See, e.g.*, *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) ("The

---

[13]   "Adequate information" is defined in section 1125(a)(1) of the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

proponent of a reorganization plan . . . must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan."); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").  The essential requirement of a disclosure statement is that it "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Keisler*, No. 08-34321, 2009 WL 1851413, at *4 (Bankr. E.D. Tenn. June 29, 2009) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

52.     Whether a disclosure statement contains adequate information "is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation." 11 U.S.C. § 1125(d).  Instead, bankruptcy courts have broad discretion to determine the adequacy of the information contained in a disclosure statement.  *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the determination of what is adequate information is "largely within the discretion of the bankruptcy court").

53.     Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement to facilitate effective reorganizations of debtors in a broad range of businesses, taking into account the various facts and circumstances that accompany chapter 11 cases.  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408–09 (1977); *see also Cajun Elec. Power*, 150 F.3d at 518 ("[W]ith respect to a particular disclosure statement, 'both the kind

25

and form of information are left essentially to the judicial discretion of the court.'" (quoting S. Rep. No. 95-989, at 121 (1978))).   Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See Tex. Extrusion*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

54.     Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the Court:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.  There will be a balancing of interests in each case.

H.R. Rep. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365.  *See also Tex. Extrusion*, 844 F.2d at 1157.

55.     The Disclosure Statement is extensive and comprehensive.  It includes descriptions and/or summaries of (i) the Plan and restructuring, (ii) Plan classification and treatment of Claims and Interests, (iii) the Debtors' business operations, (iv) the Debtors' capital structure (v) significant events leading to the commencement of these Chapter 11 Cases, (vi) key events during these Chapter 11 Cases, (vii) transfer restrictions and consequences under federal securities laws, (viii) certain tax consequences of the Plan , (ix) certain risk factors to be considered, (x) voting procedures and requirements, (xi) the requirements for confirmation of the Plan (xii) an analysis of the alternatives to confirmation and consummation of the Plan, (xiii) a valuation of the Debtors' estates; (xiv) the Financial Projections (as defined herein); and (xv) the Liquidation Analysis setting forth the estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation.

56.     For the reasons set forth above, the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Order, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

**C.**     ***Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order***

57.     As approved in the Disclosure Statement Order, the Solicitation Packages, Supplemental Solicitation Packages, and Solicitation Procedures comply with the Bankruptcy Code and Bankruptcy Rules.  *See* Initial Disclosure Statement Order ¶ 4 and 8 and Supplemental Disclosure Statement Order ¶ 2.

58.     Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan.  Bankruptcy Rule 3018(c) provides for the necessary form of acceptances and rejections of a plan.

59.     In accordance with these rules and the Disclosure Statement Order, only Holders of Claims or Interests in the Voting Classes were sent Ballots.  Such Holders also received a copy of the Disclosure Statement, the Disclosure Statement Order, and the Combined Hearing Notice.  The Ballot conformed to Official Form No. 314, as modified to address the facts of these cases and to be appropriate for the Voting Class.  These modifications included bold and capitalized language disclosing the third-party releases and the procedures for opting out of such releases.  The Ballots were approved by the Court in the Disclosure Statement Order, and no party has objected to the sufficiency of the Ballots.  Accordingly, the Debtors have satisfied Bankruptcy Rules 3017(d), 3018(c), and 9009.

60.     Pursuant to section 1125(e) of the Bankruptcy Code, "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions

of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.  11 U.S.C. § 1125(e).

61.     As set forth in the Bros Declaration and as further described above, the Debtors engaged in arm's-length, good faith negotiations with their key stakeholders and other parties in interest, and all parties, including Stretto, took appropriate actions in connection with the solicitation of the Plan.  *See* Bros Decl. ¶ 32.  Therefore, the Debtors submit that the Court should grant these parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.     Plan Settlements, Releases, Exculpation Provision, and Injunction Provisions Are Appropriate and Should Be Approved

### A.     *Plan Settlements and Compromises Are Reasonable and Satisfy Bankruptcy Rule 9019*

62.     The Plan embodies a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or shareholder may have with respect to any Allowed Claim or Existing Equity Interest or any distribution to be made on account thereof.  "The standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of a plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019."  *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)).  Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'"  *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997) (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (additional citations omitted)).

63. To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)). Specifically, a bankruptcy court evaluates: (i) "the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law"; (ii) "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay"; and (iii) "all other factors bearing on the wisdom of the compromise," including (a) "the best interests of the creditors, with proper deference to their reasonable views," and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Cajun Elec. Power*, 119 F.3d at 356; and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).

64. Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high." *See In re Roquemore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008). Indeed, the court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness." *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roquemore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (citations omitted)).

65. Here, the Plan Settlements are the result of months of good faith, arm's length negotiations, and, as it relates to the RSA Settlement and the GUC Settlement, Mediation among the parties. As described in the greater detail above, the Plan Settlements, among other

things, provide for a clear path to execution of the Plan and the Debtors' exit from chapter 11 with a de-leveraged balance sheet and exit capital as well as the stability to run their businesses on a go-forward basis.  The Plan Settlements also allow the Debtors to resolve and settle the amount and treatment of various secured claims and unsecured claims against the Debtors in the best interests of stakeholders and save the Estates' resources from costly litigation on a number of complicated issues against various parties of the Plan Settlements.

(i)  <strong>RSA Settlement</strong>

66. Specifically, the RSA Settlement, among other things, brings consensus among the Debtors and the RSA Parties with respect to the Enterprise Value of the Reorganized Debtors.  The RSA Settlement also resolves the dispute regarding the 2X Amounts and the Plan treatment of the Convertible Notes Secured Claims.  The terms of the April NPA and August NPA provide for a repayment amount equal to <u>two times</u> the outstanding principal accrued and unpaid interest under each of the April NPA and August NPA (the "**2X Amounts**") upon the occurrence of three specified events: (a) the maturity date of April 19, 2025 (April NPA only); (b) voluntary prepayment; and (c) change of control.  While the Debtors believe there are strong arguments in favor of the 2X Amounts not being not owed to the Holders of Convertible Notes Secured Claims under the contractual terms of the April NPA and August NPA as well as under the Bankruptcy Code, the Holders of Convertible Notes Secured Claims have asserted otherwise[14] and litigation on the issue is uncertain.  The RSA Settlement brings consensus on the Allowed amount of Convertible Notes Secured Claims among the Debtors and the RSA Parties, including the Ad Hoc Noteholder Group.  It allows the Debtors to avoid litigation on both the Allowed amount of the

---

[14] *See* Proof of Claim No. 523 and Proof of Claim No. 526.

Convertible Notes Secured Claims and the treatment of such Claims,[15] issues that which would be costly to the Debtors' estates to litigate and result in significant delay to the confirmation of the Debtors' Plan, while the result of such litigation would be uncertain.  In addition, the RSA Settlement enabled the equitization of hundreds of millions of dollars of Convertible Notes Secured Claims, contributing to the Debtor' substantial de-leveraging; this is something the Debtors could not have achieved absent the consent of the Ad Hoc Noteholder Group.[16]  The Special Committee reviewed and approved the terms of the RSA Settlement.  *See* Goldman Decl. ¶ 7.  The Debtors believe that the RSA Settlement maximizes value for the Debtors and their Estates and provides certainty and a path toward emergence to the Debtors and their stakeholders.

### (ii)  GUC Settlement

67.    The GUC Settlement enabled the Debtors to garner additional support for the Plan from the Creditors' Committee and its members and resolved objections to the Plan raised by the Creditors' Committee and B. Riley. The Creditors' Committee was opposed to the Third Amended Plan and advised Holders of General Unsecured Claims to vote to reject the Third Amended Plan.[17]  After filing of the Third Amended Plan, the Creditors' Committee served various discovery and depositions requests on the Debtors and other parties, and the Debtors produced numerous documents in response to the Creditors' Committee document requests.  At the same time, subsequent to the entry into and execution of the RSA, the Debtors continued good-faith negotiations with B. Riley and the Creditors' Committee in an attempt to achieve a fully consensual Plan.  The Debtors subsequently organized and participated in a subsequent Mediation before

---

[15]    The Debtors' previous chapter 11 plan (Docket No. 974) filed in June 2023 provided for a cram-up of the secured convertible notes claims.

[16]    *See* 11 U.S.C. § 1129(b)(2)(A).

[17]    *See* section I.C of the Initial Disclosure Statement.

Judge Isgur with B. Riley and the Creditors' Committee in the hopes of a fully consensual Plan, which ultimately led to the GUC Settlement.

68.     The GUC Settlement resolved the remaining issues with respect to the Plan amongst the Debtors and the Key Stakeholder Groups.  The GUC Settlement resulted in revised treatment of Class 8A General Unsecured Claims, including to add the issuance of the GUC Contingent Payment Obligations and the GUC Settlement Additional Equity Distribution Amount, and the resolution of the Allowed amount of certain Class 8A General Unsecured Claims as set forth on the Schedule of Allowed General Unsecured Claims in Exhibit N of the Plan Supplement. The GUC Settlement also resulted in the creation of the Class 8B Convenience Claims class consisting of unsecured claims equal to or less than $10,000, and each Class 8B Holder will receive Cash in an amount equal to such Holder's Allowed Convenience Claim.  In exchange, the Creditors' Committee and its members will not object to the Plan and instead recommends that Holders of the Class 8A General Unsecured Claims accept the Plan.

69.     The GUC Settlement also avoids the Debtors' incurrence of extensive further litigation costs related to the Creditors' Committee's discovery requests and litigating the potential confirmation challenges raised by the Creditors' Committee.  Litigating with the Creditors' Committee over confirmation of the Plan would have resulted in substantial fees and expenses, delay, and the attendant litigation risk, each causing harm to by the Debtors' Estates. The GUC Settlement fully and finally resolves various Plan-related issues among the Key Stakeholder Groups and allows the Plan to enjoy support from all five of the Key Stakeholder Groups, which the Debtors have strived to achieve since inception of these Chapter 11 Cases. *See* Goldman Decl. ¶ 11.

(iii)     **Miner Equipment Lender Settlement**

70.     The Miner Equipment Lender Settlement resolves disputes with various Settling Miner Equipment Lenders[18] relating to (i) the Debtors' valuation of the collateral of various secured miner equipment lenders, (ii) the amounts of the Allowed Class 3 Miner Equipment Lender Secured Claim Amounts (as set forth on the Miner Equipment Claims Schedule), (iii) the terms of the take-back debt for Holders of Allowed Miner Equipment Lender Secured Claims under the Plan, (iv) the treatment of Class 3 Miner Equipment Lender Settlement Claims, and (v) adequate protection/diminution of value.  Specifically, under the Miner Equipment Lender Settlement, in exchange for each Settling Miner Equipment Lender's agreement to support confirmation of the Plan, each Settling Miner Equipment Lender is provided with three options: Default Miner Equipment Lender Treatment, the Miner Equipment Lender Treatment (Election 1) (the Equitization Option), the Miner Equipment Lender Takeback Debt (Election 2) (the full debt option).  The Miner Equipment Lender Settlement resolves the complicated and novel legal issues of valuing cryptocurrency miner collateral,[19] a dispute of which could delay confirmation of the Plan.  Although the Debtors believed they would prevail in litigation, it would be costly and the result would be uncertain.  Most of the Settling Miner Equipment Lenders chose the Equitization Option, which will reduce approximately $200 million of debt from the Reorganized Debtors' balance sheet.

---

[18]   The Settling Equipment Lenders include: Anchorage Lending CA, LLC; Barings BDC, Inc.; Barings Capital Investment Corporation; Barings Private Credit Corp.; BlockFi Lending LLC, MassMutual Asset Finance LLC; Stonebriar Commercial Finance LLC; and Trinity Capital Inc.

[19]   *See* BlockFi Lending LLC's *(I) Limited Objection to Emergency Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief, (II) Joinder in Limited Objection of Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp. to the DIP Motion, and (III) Reservation of Rights* (Docket No. 298).

### (iv)     Other Plan Settlements

71.     In addition to the RSA Settlement, the GUC Settlement, and the Miner Equipment Lender Settlement, the Debtors have also entered into various other Plan Settlements, including the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement.  During these Chapter 11 Cases, the Debtors have engaged in continuous, constructive, and meaningful discussions with parties of each of these Plan Settlements to build additional support for the Plan and to resolve disputes with such parties.  These Plan Settlements (i) allow the Debtors to resolve and settle the amount and treatment of various secured claims and unsecured claims against the Debtors in the best interests of stakeholders and save the Estates' resources from costly litigation against various parties of the Plan Settlements, (ii) provide mutual release between the parties and the Debtors, including the Debtor Releases and the Third-Party Releases, and (iii) provide support of the Debtors' value-maximizing Plan.

72.     The Debtors, the RSA Parties, the Settling Miner Equipment Lenders, B. Riley, the Creditors' Committee, and various other parties under the Plan Settlements are all represented by experienced and competent counsel who vigorously negotiated each of the Plan Settlements.  Plan Settlements are a significantly better outcome for the Debtors than the litigation prone alternatives.  Accordingly, the Plan Settlements, both individually and collectively, represent a reasonable resolution of the issues raised in these Chapter 11 Cases, result in a Plan that is fair and equitable and in the best interest of the Debtors' estates and all of their stakeholders, and should therefore be approved by the Court.

### B.     *The Plan Releases Are Appropriate and Should Be Approved*

73.     The Plan provides for the release and discharge of any and all claims and Causes of Action by (a) the Debtors and their estates as set forth in Section 10.6(a) of the Plan (the "**Debtor Releases**") and (b) certain non-Debtor third parties as set forth in Section 10.6(b) of

the Plan (the "**Third-Party Releases**"), each in favor of the Released Parties.[20]   The Debtor Releases and Third-Party Releases are integral components of the Plan, were a material inducement for parties to enter into various Plan Settlements, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with the applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth below, should be approved.

### (i)   The Debtor Releases

74.   The Debtor Releases set forth in Section 10.6(a) of the Plan represent valid and appropriate settlements of Claims that the Debtors (or Reorganized Debtors) may have against the Released Parties.   Because the Debtors conducted an investigation and did not identify any valuable claims they may have against any of the Released Parties, the Debtors' releases with respect to the Released Parties, as contemplated by the Plan, reflect a reasonable judgment that any Claims or Causes of Action being released pursuant to the Debtor Releases are not worth pursuing.   The Debtor Releases constitute an integral aspect of the Debtors' arm's-length negotiations with their key creditor constituencies that resulted in the Plan and the Plan Settlements and are being granted in exchange for the benefits provided to the Debtors leading up to and throughout these Chapter 11 Cases.

75.   Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).   Accordingly, the Debtors may release Causes of Action

---

[20]   "***Released Parties***" means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Equity Committee; (iv) the members of the Equity Committee that are party to the RSA, solely in their capacities as such; (v) the Backstop Parties; (vi) the Creditors' Committee; (vii) the present and former members of the Creditors' Committee, solely in their capacities as such; (viii) the Settling Miner Equipment Lenders; (ix) Brown Corporation; (x) Holliwood LLC; (xi) the Ad Hoc Noteholder Group; (xii) the Consenting Creditors; (xiii) the Exit Lenders; (xiv) the Notes Agent, solely in its capacity as such; (xv) Foundry Digital LLC; (xvi) B. Riley Commercial Capital, LLC; (xvii) BRF Finance Co., LLC; and (xviii) with respect to each of the foregoing Persons in clauses (i) through (xvii), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

as consideration for concessions made by their various stakeholders pursuant to the Plan.  *See, e.g.*, *Bigler*, 442 B.R. at 547 (plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").  In considering the appropriateness of such releases, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate."  *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see Bigler*, 442 B.R. at 543 n.6; *see In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *Heritage*, 375 B.R. at 259.

76.     A debtor's releases are evaluated under the standard for settlements set forth in Bankruptcy Rule 9019.  *See Bigler*, 442 B.R. at 543 n.6 ("[S]ettlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under Rule 9019." (citations omitted)).  In these Chapter 11 Cases, such releases are "fair and equitable and in the best interest of the [Debtors' E]state[s]" and should be approved.  *Foster Mortg.*, 68 F.3d at 917 (citations omitted).  Additionally, courts generally determine whether a release is "in the best interests of the estate" by reference to the following factors:

- The probability of success of litigation, with due consideration for the uncertainty in fact and law;

- The complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

- The paramount interest of the creditors and a proper deference to their respective views;

- The extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

- All other factors bearing on the wisdom of the compromise.

*Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Foster Mortg.*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

77.     In determining whether a settlement is appropriate and should be approved, "a bankruptcy court need not 'conduct a mini-trial' [but] [r]ather . . . must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'" *See Age Refin.*, 801 F.3d at 541 (citations omitted).  Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high." *See Roqumore*, 393 B.R. at 480.  Indeed, the Bankruptcy Court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness." *See Idearc*, 423 B.R. at 182 (citations omitted); *see also Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (citations omitted)); *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017, at *4–5 (Bankr. S.D. Tex. June 25, 2007) (same) (citations omitted).  Ultimately, courts afford debtors some discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action. *See Gen. Homes*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

37

78.     The Debtor Releases, set forth in Section 10.6(a) of the Plan, meet the controlling standard, are in the best interest of the Estates, and should be approved for the following reasons.  *First*, the Debtors do not believe there exist any valuable, colorable claims against the Released Parties.  As described above and in the Disclosure Statement, on November 14, 2022, in connection with the Debtors' evaluation of strategic alternatives and to ensure the independence and propriety of such evaluation, the Board approved the formation of the Special Committee. In connection with the contemplated Debtor Releases in Section 10.6 of the Plan, the Special Committee instructed Weil to conduct an investigation (the "**Investigation**") to determine whether any potential claims existed on behalf of the Debtors against any of the Debtors' former and current officers, directors, and shareholders (the "**Investigated Parties**") that were colorable and/or had value.  *See* Goldman Decl., ¶ 9.  The Investigation, which lasted over several months, was focused on whether any colorable bankruptcy, state law, or common law claims could be asserted by the Company against the Investigated Parties, including potential claims based on, among other things, breach of fiduciary duty (including related party transactions), corporate waste, fraudulent conveyance, and breaches of company policies.  As part of the Investigation, Weil (i) collected and reviewed thousands of Company documents and email correspondence related to the Investigated Parties, (ii) reviewed minutes of meetings of the Board, the audit committee of the Board, and the Special Committee, (iii) conducted numerous interviews, and (iv) performed substantive legal and factual analysis.  *See* Goldman Decl., ¶ 10.  Weil also provided updates to the Special Committee regarding the status of the investigation and preliminary findings prior to presenting a final assessment.  *See* Goldman Decl., ¶ 10.

79.     Based upon the Investigation, the Special Committee concluded that there are no viable or colorable claims or Causes of Action against the Investigated Parties worth

pursuing in the context of these Chapter 11 Cases.  The Special Committee voted to approve filing of the Plan, including the Debtor Releases therein, on December 15, 2023.  Furthermore, the Special Committee is not aware of any new facts that would necessitate reconsideration of the conclusion reached in the Investigation.  The Special Committee's approval of the Debtor Releases demonstrates an independent view concerning the viability and propriety of potential claims released thereby. *See* Goldman Decl., ¶ 12.

80.     *Second*, the Plan is supported by all of the Key Stakeholder Groups and each of the Voting Classes voted to accept the Plan (with the exception of one class at one Debtor that has no assets, as described further below).  *See* Solicitation Decl., Ex. A;.  This level of stakeholder support demonstrates the stakeholders' interest in approval of the Plan, including the Debtor Releases contained therein.

81.     *Third*, many of the Released Parties made significant concessions in these Chapter 11 Cases as part of Plan Settlements, including the release of Claims of Released Parties held against the Debtors' Estates, which resulted in the value-maximizing Plan.  The Debtor Releases were also a material inducement for parties to enter into the RSA Settlement and various other Plan Settlements and provide their support for the Plan and the Plan Settlements embodied therein. *See* Goldman Decl., ¶ 13.  The result is a comprehensive, integrated compromise that reflects true arm's-length negotiations.

82.     *Fourth*, in consideration of the Debtor Releases, many of the Investigated Parties and other Released Parties provided, and continue to provide, integral support to the Debtors during these Chapter 11 Cases and have contributed meaningfully to the Debtors' proposed reorganization.  *See* Goldman Decl., ¶ 11.  Certain of the Released Parties provided pre- and postpetition services to the Debtors in their capacity as directors, managers, and officers and

guided the Debtors through their restructuring, including these Chapter 11 Cases.  Specifically, the

Debtors' officers, managers, directors, and executive management team were instrumental

throughout these Chapter 11 Cases, including negotiation of the Plan Settlements and the Plan,

which provides for a comprehensive restructuring of the Debtors' balance sheet, with a full

recovery (100% of the Claim plus postpetition interest) to all creditors (other than Holders of

Section 510(b) Claims and creditors that have agreed to take lesser treatment) and a meaningful

recovery to their shareholders.  In addition, since the inception of evaluation of the Debtors'

strategic alternatives in order to preserve value for all stakeholders more than almost one and half

years ago, and subsequently the commence of these Chapter 11 Cases, the Debtors' officers,

managers, directors, and executive management team also (i) managed intense demands associated

with these Chapter 11 Cases, while maintaining their regular operational duties, (ii) stabilized the

Debtors' operations during the course of these Chapter 11 Cases in addition to ensuring the

preservation of the Debtors' business as a going concern through the negotiation of the Plan and,

by extension, the value of the Estates, and (iii) preserved more than 240 jobs.  *See* Goldman Decl.,

¶ 11.

83.    In approving the Debtor Releases of the Released Parties (including the

Investigated Parties), the Special Committee also considered the fact that the Debtor Releases

contained certain limitations, including (among other limitations and carve-outs) that the Debtor

Releases (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be

construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act

or omission that is judicially determined by a Final Order to have constituted actual fraud, willful

misconduct, or gross negligence, or (b) releasing any Released Party from Claims or Causes of

Action held by the Debtors arising from an act or omission that is determined by a Final Order or by a federal government agency to have constituted a violation of any federal securities laws.

84.     Accordingly, the Debtors submit that the Debtor Releases are fair, equitable, and in the best interest of the Estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

### (ii)     Third-Party Releases

85.     In addition to the Debtor Releases, Section 10.6 of the Plan sets forth certain consensual Third-Party Releases.  Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  Under Fifth Circuit law, a plan may include a releases of third parties if such releases are being provided by parties that consented to such releases and received consideration in exchange therefor.  *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)).  If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code[.]"  *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

86.     Employing that standard, Fifth Circuit courts routinely allow third-party releases in chapter 11 plans when the third-party releases are (i) consensual, (ii) specific in language, (iii) integral to the plan, (iv) a condition of a settlement, and (v) given for consideration, so long as such releases do not otherwise violate provisions of the Bankruptcy Code.  *See, e.g.*,

*Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e)." (citations omitted)); *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286–88 (5th Cir. 2016) (discussing the specificity requirement for third-party releases in Fifth Circuit; *FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third-party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient." (citations omitted)).

87.     In determining whether such a release is consensual, courts in this Circuit have focused on two things—notice and opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."  [Conf. Hr'g Tr. at 47], *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection of the U.S. Trustee, in light of sufficient notice and opportunity to object); *see also In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017)

(Docket No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) (confirming chapter 11 plan over U.S. Trustee objection where certain impaired creditors were deemed to have consented to third-party release provisions unless they opted out); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) (Docket No. 1324) (same); Conf. Hr'g Tr. at 42, *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 191) (finding that the debtors correctly characterized a release as consensual because debtors provided extensive notice of plan and confirmation hearing and no party specifically objected to plan's release provisions); *see also, e.g.*, Conf. Hr'g Tr. at 14, *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. Sept. 14, 2016) (Docket No. 352) ("If there are third-party releases that are negotiated between the Debtor and third parties as part of their deal, that doesn't seem to me to really run afoul of anything.").

88.     To ensure proper notice and an opportunity to object, the Complex Case Rules provide the following with respect to consensual plan releases:

> If a proposed plan seeks consensual pre- or postpetition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest.  The ballot and the notices must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Rules ¶ 40.

89.     Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code and the Complex Case Rules and should be approved.  As set forth above and in compliance with the Disclosure Statement Order,

parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, the proposed Third-Party Releases, and the Objection Deadline.  *See* Solicitation Decl.  The Combined Hearing Notice, the Notice of Non-Voting Status, and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 10.6(b) in the Plan.  *See* Disclosure Statement Order Exhibits 2-14.  The Combined Hearing Notice, the Notice of Non-Voting Status, the Ballots, and the Release Opt Out Forms advised careful review and consideration of the terms of the Third-Party Releases, along with the Exculpation Provision and the Injunction Provisions.  *Id*.  The language of the Third-Party Releases was also emphasized using bold font in the Plan and was included in the Disclosure Statement.  *See* Plan, §§ 10.6.; Disclosure Statement, Ex. B.

90.     In addition, the Notice of Non-Voting Status, the Release Opt Out Form, and the Ballots each set forth the procedures for opting out of such Third-Party Releases, and the Ballots and Release Opt Out Form each included the appropriate form for parties to opt out of the Third-Party Releases in compliance with Rule 40 of the Complex Case Rules.  *See* Initial Disclosure Statement Ord., ¶ 8, 11, 17–24, Exs. 3–14; Supp. Disclosure Statement Ord., ¶ 2–5, Exs. 1–3.  The Ballots provided a checkbox to opt out of the consensual Third-Party Releases, and the Notice of Non-Voting Status included the Release Opt Out Form that also provided a checkbox to opt out of the consensual Third-Party Releases.  *See* Initial Disclosure Statement Ord., Exs. 3-12; Supp. Disclosure Statement Ord., ¶ 2-5, Exs. 1–3.  *See* Initial Disclosure Statement Ord., Exs. 3-12; Supp. Disclosure Statement Ord., ¶ 2-5, Exs. 1–3.

91.     In addition, as described above, the Ballots and Notice of Non-Voting Status contained the full text of the release, exculpation, and injunction provisions set forth in Article X of the Plan and advised such Holders that they would be deemed to be bound by the Third-Party Releases unless they timely and properly opted out of such release contained in the

Release Opt Out Form attached to the Notice of Non-Voting Status. Ultimately, approximately 49 valid Release Opt Out Forms and opt out elections were received by Stretto by the Opt Out deadline and approximately 7 of such Release Opt Out Forms were from Other Beneficial Owners.[21] *See* Solicitation Decl. ¶¶ 14. Courts in this district have approved similar opt-out elections pursuant to the Complex Case Rules.[22] Similar relief is also appropriate here.

92.     *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released. The Third-Party Releases describe the nature and type of claims being released, including claims with respect to:

> [T]he Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the

---

[21]   As discussed above and in the Solicitation Declaration, a total of 611 Opt Out Elections were received by Stretto in connection with both the Initial Service of Solicitation Packages and Supplemental Service of Solicitation Packages. 562 of these Ballot submissions included both a vote to accept the Plan and elected to Opt Out of the Releases, and thus have not been included as valid Opt Out Elections. Out of the 562 invalid Opt Out Elections, 554 were from Holders of Existing Common Interests.

[22]   *See, e.g., In re Air Methods Corporation,* No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023) (Docket No. 311) (confirming chapter 11 plan that included a third-party release with an opt out mechanism); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) (Docket No. 1711) (same); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D.Tex. June 28, 2023) (Docket No. 1982) (same); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Docket No. 350) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same).

> New Secured Convertible Notes Documents, the New Secured Notes Documents, the Contingent Payment Obligations Documents, the GUC Contingent Payment Obligations Term Sheet, the New Miner Equipment Lender Debt Documents, the Exit Facility Documents, the New Warrants Agreement, the Rights Offering, the Backstop Commitment Letter, the Initial DIP Loan Documents, the DIP Facility, the Terminated RSA, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.

Plan § 10.6(b).

93.     *Third*, the Third-Party Releases are a material inducement for parties to enter into the RSA Settlement and various other Plan Settlements and provide their support for the Plan and the Plan Settlements embodied therein.  *See* Goldman Decl., ¶ 17.  By facilitating participation of the Released Parties in both the negotiation of the Plan and the chapter 11 process, the Third-Party Releases were critical to gaining support for the Plan.

94.     *Fourth*, the Third-Party Releases are given for consideration described herein.  Many of the Investigated Parties and other Released Parties provided, and continue to provide, integral support to the Debtors during these Chapter 11 Cases and have contributed meaningfully to the Debtors' proposed reorganization. *See* Goldman Decl., ¶ 13.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan and the contributions of the Released Parties in furtherance thereof.

95.     *Fifth*, the Special Committee has reviewed the Third-Party Releases as part of its oversight of these Chapter 11 Cases and supports the inclusion of the Third-Party Releases in the Plan.  In addition, the Investigation undertaken at the Special Committee's direction reviewed the facts and circumstances involving claims against the Debtors' current and former

officers and directors that are also the subject of the putative class action in *Pang v. Levitt, et al.*, Case No. 1:22-cv-01191-DAE (W.D. Tex.), D.I. 73, which further informed the Special Committee's view that the Third-Party Releases are appropriate.  *See* Goldman Decl., ¶ 17.

96.     Accordingly, for the reasons set forth herein, the Third-Party Releases comply with the Bankruptcy Code, the Complex Case Rules, and controlling Fifth Circuit standards, are appropriate and justified under the circumstances, and should be approved.

**C.     *Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved***

97.     In addition to the Debtor Releases and Third-Party Releases, the Plan provides for the exculpation of certain parties as set forth in Section 10.7 of the Plan (the "**Exculpation Provision**").  The Exculpation Provision protects the Exculpated Parties[23] from, among other things, Claims and Causes of Action arising out of or relating to the Debtors' restructuring, these Chapter 11 Cases, and the negotiations and agreements made in connection therewith.  *See* Plan, § 10.7.

98.     Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence, willful misconduct, or actual fraud in hypothetical future litigation against an exculpated party for acts

---

[23]   "***Exculpated Parties***" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the Equity Committee and each of its present and former members, each solely in their capacity as such. (and as it relates to former members, solely with regard to the time period for which they served on the Equity Committee); and (iii) the Creditors' Committee and each of its present and former members, each solely in its capacity as such (and as it relates to former members, solely with regard to the time period for which they served on the Creditors' Committee).

arising out of the Restructuring.[24]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").  An exculpation provision represents a legal determination that flows from several findings a court must reach in confirming a plan, as well as the exculpation in section 1125(e) of the Bankruptcy Code.  *See* 28 U.S.C. § 157(b)(2)(L); 11 U.S.C. § 1125(e).  Once the court makes a good faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that plan.  *See In re PWS Holding*, 228 F.3d at 246-47 (observing that creditors providing services to debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").  As such, the Exculpation Provision prevents future collateral attacks against the estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and their estates.

---

[24]   The Exculpation Provision exculpates parties with respect to "any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date, of the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, and related agreements, instruments, or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Convertible Notes Documents, the New Secured Notes Documents, the Contingent Payment Obligations Documents, the GUC Contingent Payment Obligations Term Sheet, the New Miner Equipment Lender Debt Documents, the Exit Facility Documents, the New Warrants Agreement, the Rights Offering, the Backstop Commitment Letter, the Initial DIP Loan Documents, the DIP Facility, the Terminated RSA, the RSA, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Common Interests), or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence,. . . ."  *See* Plan, § 10.7.

99.     The Debtors have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code, as set forth below.  Further, granting such relief falls within the "fresh start" principles underlying the Bankruptcy Code.  *See Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-53 (5th Cir. 2009).

100.     Here, the Exculpation Provision is appropriate as it only protects Estate fiduciaries that have participated in the Debtors' restructuring in good faith, the exculpation of which is supported by express sources of authority within the Bankruptcy Code, including 11 U.S.C. §§ 524(e), 1107(a), and 1125(e).  The Exculpation Provision is further limited such that it is only applicable "to the fullest extent permitted by applicable law" and only covers actions from the Petition Date through the Plan Effective Date.  *See* Plan, § 10.7.  The Exculpation Provision is consistent with Fifth Circuit precedent, including the Fifth Circuit's recent holding in *Highland Capital* and the terms of chapter 11 plans subsequently approved by this district.[25]  Accordingly, the Debtors submit that the Exculpation Provision is appropriate and should be approved.

### D.     *Injunction Provisions Are Appropriate and Should Be Approved*

101.     The Plan also provides for the injunction of certain actions as set forth in Section 10.5 of the Plan (the "**Injunction Provisions**").  The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the

---

[25]     *See NexPoint Advisors, L.P. v. Highland Capital Management (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419 , 437–38(5th Cir. 2022), *petition for cert. filed*, No. 22-631 (U.S. Jan. 9, 2023) ("[O]ur precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . .").  *See also In re Air Methods Corporation,* No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023) (Docket No. 311) (confirming chapter 11 plan that included a similar exculpation provision); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) (Docket No. 1711) (same); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D.T ex. June 28, 2023) (Docket No. 1982) (same); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. June 14, 2023) (Docket No. 1071) (same); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Docket No. 350) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same).

Plan.  The Injunction Provisions are integral to the Plan because, among other things, they (i) provide certainty to the Debtors and Reorganized Debtors that the Plan will be enforceable in accordance with its terms, and (ii) enforce the Debtor Releases, the Third-Party Releases, and the Exculpation Provision.  Importantly, the Injunction Provisions implement the Plan by permanently enjoining all Persons from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions.  The Injunction Provisions include a "gatekeeper provision," which provides that, before any Claim or Cause of Action is brought against a Released Party or Exculpated Party (each as defined in the Plan), the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable, and (ii) specifically authorize such person or entity to bring such Claim or Cause of Action (the "**Gatekeeper Provision**").  The Gatekeeper Provision is consistent with the one authorized by the Fifth Circuit in *NexPoint Advisors, L.P. v. Highland Cap. Mgmt. Fund Advisors, L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022) and similar provisions approved in this district.[26]

102.    The Injunction Provisions are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with the applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth above, should be approved.

---

[26]    *See Highland Cap.*, 48 F.4th at 439 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function. . . . [W]e affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *see also In re Air Methods Corporation*, No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023) (Docket No. 311) (confirming chapter 11 plan that included an injunction and gatekeeper provision); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) (Docket No. 1711) (same); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D.Tex. June 28, 2023) (Docket No. 1982) (same); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. June 14, 2023) (Docket No. 1071) (same); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) (Docket No. 350) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same).

### E.   *Released Parties and Exculpated Parties Are Entitled to Additional Protections Under Section 1125(e)*

103.    Section 1125(e) provides that any "person that solicits acceptance or rejection of a plan . . . or that participates, in good faith . . . in the offer, issuance, sale, or purchase of a security . . . under the plan, is not liable, on account of the solicitation or participation, for violation of" any applicable law governing securities or solicitation.   11 U.S.C. § 1125(e). Section 1125(e) of the Bankruptcy Code is understood to provide "a safe harbor for the disclosure and solicitation process of a bankruptcy."  *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011).  Section 1125(e) is broadly applicable to any person involved in the solicitation process, regardless of whether such person is an estate fiduciary.  *See In re Astria Health*, 623 B.R. 793, 800 (Bankr. E.D. Wash. 2021) ("Section 1125(e) limits the liability of a broad array of persons for acts related to soliciting votes for a plan – regardless whether the person is an estate fiduciary."); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 216 (Bankr. W.D. Mich. 1986) ("[Section 1125(e)] confers immunity from violations of any law, rule or regulation covering the sale of securities upon *anyone* who in good faith solicits rejection of a plan." (emphasis added)).  Courts in this district

frequently enter confirmation orders with protections based on section 1125(e) of the Bankruptcy Code.[27]

104.    Here, the Released Parties and Exculpated Parties are entitled to the protections set forth in section 1125(e) of the Bankruptcy Code.  Since the outset of these Chapter 11 Cases, the Released Parties and Exculpated Parties have participated in good faith in the negotiation and development of the Plan.  Among other participating parties, the Debtors' directors, officers, employees, and professionals have overseen the solicitation of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Further, through the adoption and incorporation of the Plan Settlements, the Plan and/or its solicitation subsumed the acts of the Released Parties and the Exculpated Parties with respect to the negotiations, decisions to approve, and implementation of those settlements.

105.    Accordingly, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

---

[27]    *See, e.g.*, *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (approving the protection of the debtors, the directors, managers, and officers of any debtor entity, the parties to the restructuring support agreement, the Official Committee of Unsecured Creditors and its members, the DIP agent and DIP lenders, and certain settling parties, among others, pursuant to section 1125(e) of the Bankruptcy Code); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) (Docket No. 533) (approving protection of the debtors' and certain other plan proponents' affiliates, directors, officers, members, managers, employees, and advisors pursuant to section 1125(e) of the Bankruptcy Code); *In re Sunguard AS New Holdings, LLC*, No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) (Docket No. 763) (approving of the debtors' and other plan proponents' affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys relating to the offer, issuance, sale, and purchase of securities offered and sold under the plan); *see also In re Fieldwood Energy LLC*, No. 20-33948 (MI), 2021 WL 2853151, *10 (Bankr. S.D. Tex. June 25, 2021) ("Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in 'good faith' within the meaning of section 1125(e) of the Bankruptcy Code . . . in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities . . . and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan."); *In re J T Thorpe Co.*, 308 B.R. 782, 791 (Bankr. S.D. Tex. 2003), *aff'd*, No. 02-41487-H5-11, 2004 WL 720263 (S.D. Tex. Mar. 3, 2004) ("Debtor transmitted the solicitation materials and solicited acceptances and rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Thus, the Debtor is entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan.").

### III.        **Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed**

106.    To obtain confirmation of the Plan, the Debtors must demonstrate by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").  For the reasons set forth below, the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be confirmed.

#### A.        *Section 1129(a)(1): Plan Complies with All Applicable Bankruptcy Code Provisions*

107.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  This provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and interests and the contents of the plan, respectively.  *See, e.g.*, *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.") (citing, *inter alia*, *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 174 (5th Cir. 2011)); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003), *aff'd*, No. 02-41487-H5-11, 2004 WL 720263 (S.D. Tex. Mar. 3, 2004) ("The Plan complies with the applicable provisions of the Bankruptcy Code, including the requirements of Sections 1122 and 1123(a) and (b) of the Bankruptcy Code, thereby satisfying Section 1129(a)(1) of the Bankruptcy Code."); H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).  As discussed below, the Plan complies with both section 1122 and section 1123.

### (i)        Section 1122: Classification

108.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  A plan proponent is afforded "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."  *Idearc*, 423 B.R. at 160; *see also Phx. Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class.").  Section 1122(b) of the Bankruptcy Code further provides that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."  11 U.S.C. § 1122(b).

109.    Here, the Plan provides for the following thirteen (13) Classes of Claims and Interests: (i) Class 1 (April Convertible Notes Secured Claims); (ii) Class 2 (August Convertible Notes Secured Claims); (iii) Class 3 (Miner Equipment Lender Secured Claims); (iv) Class 4 (Other Secured Claims); (v) Class 5 (M&M Lien Secured Claims); (vi) Class 6 (Secured Mortgage Claims); (vii) Class 7 (Priority Non-Tax Claims); (viii) Class 8A (General Unsecured Claims); (ix) Class 8B (Convenience Claims); (x) Class 9 (Intercompany Claims); (xi) Class 10 (Intercompany Interests); (xii) Class 11 (Section 510(b) Claims); and (xiii) Class 12 (Existing Common Interests).[28]

---

[28]    Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, and Professional Fee Claims have not been classified and are separately treated under the Plan.

110.     The classification structure of the Plan is rational and complies with the Bankruptcy Code.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests.  *See* Bros Decl. ¶ 26.  Within a given Class, all Claims and Interests have the same or similar rights against the Debtors.  *See* Bros Decl. ¶ 27.

111.     The Debtors have a reasonable and permissible basis for the differing classification of each of the four Classes of secured Claims:

- *Class 1 (April Convertible Notes Secured Claims)*. Class 1 is comprised of Claims arising under or related to the April NPA.  *See* Plan, §1.19.

- *Class 2 (August Convertible Notes Secured Claims)*.  Class 2 is comprised of Claims arising under or related to the August NPA.  *See* Plan, §1.23.

- *Class 3 (Miner Equipment Lender Secured Claims)*.  Class 3 is comprised of Claims, in each case, held by the applicable Holder, arising pursuant to the applicable Miner Equipment Lender Agreement(s), secured by the applicable Collateral, and in the applicable amounts as set forth in the Miner Equipment Lender Claims Schedule. *See* Plan, §1.182.[29]

- *Class 4 (Other Secured Claims)*.  Class 4 is comprised of, collectively, the Bremer Secured Claim, Non-Miner Equipment Lender Claim (Bank of the West), Non-Miner Equipment Lender Claim (Dell), Non-Miner Equipment Lender Claim (Indigo), Non-Miner Equipment Lender Claim (Meridian), Non-Miner Equipment Lender Claim (North Mill), Non-Miner Equipment Lender Claim (North Star), Non-Miner Equipment Lender Claim (Prime), and Non-Miner Equipment Lender Claim (Wingspire). *See* Plan, §1.239.

- *Class 5 (M&M Lien Secured Claims)*.  Class 5 is comprised of Claims, the amount of which the Debtors' books and records reflect are attributable to the provision by General Contractors and Subcontractors of labor, materials, equipment and/or services in connection with the construction, development or improvement of any real property owned or leased by any Debtor and for which such General Contractors and Subcontractors may be

---

[29]    In accordance with section 4.3 of the Plan, each Miner Equipment Lender Secured Claim shall be treated as a separate subclass of Class 3 for purposes of voting to accept or reject the Plan and receiving Plan Distributions.

entitled to an M&M Lien, as set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien Secured Claim," in each case held by the applicable Holder, secured by the applicable Collateral, and in the applicable amounts as set forth on the M&M Lien Claims Schedule.  *See* Plan, §1.174.[30]

- ***Class 6 (Secured Mortgage Claims)***.  Class 6 is comprised of (i) the Secured Claim held by Brown Corporation arising from the Brown Agreement in accordance with the Brown Settlement and (ii) the Secured Claim held by Holliwood LLC arising from the Holliwood Agreements in accordance with the Holliwood Settlement.  *See* Plan, §1.299.

As shown above, each Class of secured Claims is comprised of Claims arising under different types financial instruments governed by separate debt documents or other debt obligations that are (i) secured by valid Liens against different Collateral of the Estates and/or (ii) in the case that different Liens are against the same Collateral, different in priority of Liens against such Collateral. Within each Class of Secured Claims, Holders share common priority and rights against the Debtors' Estates.

112.    Similarly, the Debtors also have a reasonable and permissible basis for the differing classification of the following Classes of Unsecured Claims:

- ***Class 7 (Priority Non-Tax Claims)***.  Class 7 is comprised of any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.  *See* Plan, §1.252.

- ***Class 8A (General Unsecured Claims)***.  Class 8A is comprised of any Claim that is not a Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Convenience Claim, Professional Fee Claim, DIP Claim, Intercompany Claim, Section 510(b) Claim, or an Administrative Expense Claim. Except as otherwise provided in the Plan, Class 8A includes all Miner Equipment Lender Deficiency Claims.  *See* Plan, §1.142.

---

[30]    Assuming the Court grants the relief requested in the McCarthy Settlement Motion (as defined below), each M&M Lien Secured Claim held by a General Contractor will be satisfied pursuant to the applicable M&M Lien Settlement.  Furthermore, the Debtors intend to file an objection to any remaining M&M Lien Secured Claims held by a Subcontractor (including those that are not otherwise satisfied pursuant a M&M Lien Settlement).  Thus, subject to entry of an order sustaining such objections, there will be no M&M Lien Secured Claims held by any Subcontractor, and Class 5 will be vacant in accordance with section 3.4 of the Plan.

- ***Class 8B (Convenience Claims)***.  Class 8B is comprised of any Claim that would otherwise be a General Unsecured Claim that is (i) Allowed in the Convenience Claim Amount or less as set forth on the Schedule of Allowed General Unsecured Claims or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the Holder of an Allowed General Unsecured Claim evidenced on the Ballot timely and validly submitted by such Holder. *See* Plan, §1.67.  Further, separate classification of the Convenience Claims was the result of the GUC Settlement. *See* Bros Decl. ¶ 49.

- ***Class 9 (Intercompany Claims)***.  Class 9 is comprised of any Claim against a Debtor held by another Debtor. *See* Plan, §1.162.

- ***Class 11 (Section 510(b) Claims)***.  Class 11 is comprised of any Claim against any Debtor (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an Affiliate of any Debtor (including the Existing Common Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.  For the avoidance of doubt, (x) any claims asserted or assertable against the Debtors in the Securities Class Action and (y) Proofs of Claim Nos. 52, 54, 81, 82, 241, and 351 shall, in each case, constitute Section 510(b) Claims. *See* Plan, §1.292

As shown above, each Class of Unsecured Claims is comprised of Claims arising under different debt obligations and/or different facts and circumstances.  In particular, the Debtors established Class 8B for Claims that would otherwise be General Unsecured Claims but are allowed in the amount of $10,000 or less, which separate classification and different treatment is permitted under section 1122(b) of the Bankruptcy Code when reasonable and necessary for administrative convenience.  The classification and treatment of Classes 8A and 8B are also a result of extensive, arm's-length negotiations with the Creditors' Committee and part of the GUC Settlement and in any event, Holders of both Class 8A and 8B receive full recovery on account of their Claims under the Plan. *See* Bros Decl. ¶ 49.

113.    The Debtors also have a reasonable and permissible basis for the differing classification of the two Classes of Interests: Class 10 (Intercompany Interests) and Class 12 (Existing Common Interests) because these Classes are at different Debtor entities and are

comprised of dissimilar Interests, given that Class 10 contains Interests held by another Debtor or

an affiliate of a Debtor while Class 12 contains Interests held by third parties as set forth below.

- ***Class 10 (Intercompany Interests)***.  Class 10 is comprised of Interests in a Debtor held by another Debtor.  *See* Plan, §1.163

- ***Class 12 (Existing Common Interests)***.  Class 12 is comprised of (i) the common stock issued by Core Parent that existed immediately prior to the Effective Date, including any Restricted Stock and (ii) any Vested RSUs, in each case held by the Holders as reflected in the Debtors' books and records as of the Distribution Record Date, including the records of the Debtors' transfer agent(s), and/or DTC's records.  Unvested RSUs and Stock Options shall not be considered Existing Common Interests*.  See* Plan, §1.116

114.     Therefore, the classification structure of the Plan is rational and complies

with the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights

against the Debtors.  The Plan provides for the separate classification of Claims and Interests based

upon the different legal nature and priority of such Claims and Interests.  The classification scheme

generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and

Interests into Classes based on the underlying instruments or debts giving rise to such Claims and

Interests.

**(ii)     Section 1123(a): Plan's Content Is Appropriate**

115.     Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements

applicable to a corporate debtor's chapter 11 plan.[31]   The Plan satisfies the section 1123(a)

requirements, as set forth in more detail below:

- **Section 1123(a)(1)**.  Article III of the Plan designates Classes of Claims and Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

---

[31]     An eighth requirement, set forth in section 1123(a)(8), applies only in a case when the debtor is an individual.

- **Section 1123(a)(2)**. Article III of the Plan specifies whether each Class is Impaired or Unimpaired under the Plan.

- **Section 1123(a)(3)**. Article IV of the Plan specifies the treatment of each Impaired Class.

- **Section 1123(a)(4)**. Article IV of the Plan provides that, except as a holder of a particular Claim or Interest may agree to less favorable treatment, the treatment of each Claim or Interest in a particular Class is the same as the treatment of each other Claim or Interest in such Class.

- **Section 1123(a)(5)**. The Plan provides adequate means for implementation, including by way of the compromise and settlement of Claims, Interests, and controversies (Plan, § 5.1); the Debtors' continued corporate existence and the effectuation of the Restructuring Transactions (Plan, § 5.2; Plan Suppl., Ex. J); the authorization of the Reorganized Debtors' issuance of the New Secured Convertible Notes (Plan, § 5.4), the New Secured Notes (Plan, § 5.5), the Contingent Payment Obligations (Plan, § 5.6), and the GUC Contingent Payment Obligations (Plan, § 5.7); the applicable Reorganized Debtors' entry into the New Miner Equipment Lender Debt Facilities (Plan, § 5.8), the Exit Facility (Plan, § 5.9), and the New Intercreditor Agreements (Plan, § 5.10); the Debtors' receipt of $55 million of proceeds through the Rights Offering (Plan, § 5.17); the Debtors' entry into the RSA Settlement (Plan, § 5.11), the GUC Settlement (Plan, § 5.12), the Miner Equipment Lender Settlement (Plan, § 5.13), the Brown Settlement (Plan, § 5.14), the Holliwood Settlement (Plan, § 5.15), and the Foundry Settlement (Plan, § 5.16); the exemption from certain securities law for the offer, issuance, and distribution of certain securities under the Plan (Plan, § 5.18); the cancellation of certain of the existing securities and agreements of the Debtors (Plan, § 5.19); the cancellation of certain of the existing liens (Plan, § 5.20); the composition of the New Board and the officers of the Reorganized Debtors (Plan, § 5.21; Plan Supplement, Ex. I); the Management Incentive Plan (Plan, § 5.22); the authorization, issuance, and delivery of the New Common Interests and New Warrants and the listing thereof on NASDAQ, NYSE, or another nationally recognized exchange (Plan, § 5.23); provisions governing distributions under the Plan (Plan, Art. VI); the assumption of and cure of defaults for all assumed executory contracts and unexpired leases (Plan, Art. VIII); and the Debtor Releases, Third-Party Releases, and Exculpation Provision (Plan, Art. X). As discussed herein, the Plan Settlements, along with the Debtor Releases, Third-Party Releases, and Exculpation Provision are reasonable and appropriate

- **Section 1123(a)(6)**. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Corporate Governance Documents, including the organization documents for Reorganized Debtors, include or will

include a provision prohibiting the issuance of non-voting equity securities. *See* Plan Supplement, Ex. A.

- **Section 1123(a)(7)**. Section 5.21 of the Plan provides that, to the extent compliant with NASDAQ rules and the Delaware General Corporation Law, the New Board will consist of seven (7) members and three (3) classes of directors which shall include the following:

  - *Class 1* shall consist of two (2) directors, initially being the current Chief Executive Officer of Core Scientific, Inc., and one (1) director selected by the Equity Committee, which must be reasonably acceptable to the Debtors, and each with an initial term to expire thirteen (13) months after the Effective Date;

  - *Class 2* shall consist of two (2) directors, initially being two (2) directors selected by the Equity Committee, and each with an initial term to expire twenty-six (26) months after the Effective Date; and

  - *Class 3* shall consist of three (3) directors, initially being three (3) directors selected by the Ad Hoc Noteholder Group, one (1) of which must be reasonably acceptable to the Debtors, and each with an initial term to expire thirty-nine (39) months after the Effective Date;[32]

  *See* Plan, § 5.21.  In addition, Exhibit I in the Plan Supplement discloses the affiliation of each proposed Board member, in accordance with section 1129(a)(5) of the Bankruptcy Code.  *See* Plan Suppl. Ex. I. The Debtors will also disclose the nature of any compensation to be paid to any proposed member of the New Board that is an "insider" under the Bankruptcy Code, including the Debtors' Chief Executive Officer. *See* Plan Supp., Ex. I.  The Plan provisions governing the manner of selection of any officer, director, or manager of the Reorganized Debtors are consistent with the interests of creditors and equity security holders and with public policy. See Bros Decl.

---

[32] *Provided* that each director selected by the Ad Hoc Noteholder Group and the Equity Committee must be independent as defined by the applicable NASDAQ and SEC rules; *provided*, further that if any director appointed by the Ad Hoc Noteholder Group resigns or is removed from the New Board for any reason including due to death or disability or for cause, any replacement for such director shall be chosen from a list of nominees provided by the Ad Hoc Noteholder Group on or prior to the Effective Date and, if none of the nominees on such list are available, such replacement shall be selected by a majority vote of the directors and shall be acceptable to the remaining Class 3 director.

116.   Accordingly, the Plan contains all of the provisions required by section 1123(a) of the Bankruptcy Code.

### (iii)   Section 1123(b): Plan's Content Is Permissible

117.   Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be included in a chapter 11 plan.  Here, the relevant provisions of the Plan are permissible under section 1123(b),[33] as set forth in more detail below.

- **Section 1123(b)(1)**. Article III of the Plan describes the treatment for the following Unimpaired Classes:  Class 4 (Other Secured Claims), Class 7 (Priority Non-Tax Claims), Class 9 (Intercompany Claims), and Class 10 (Intercompany Interests).

- **Section 1123(b)(2)**. Article VIII of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases to which one or more of the Debtors are a party (including Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Contracts), except for those Executory Contracts and Unexpired Leases that are otherwise listed on the Schedule of Rejected Contracts (or those that were previously assumed or rejected). The Schedule of Rejected Contracts and the Schedule of Assumed Contracts were filed with the Plan Supplement.  *See* Plan. Suppl., Exs. L-M. Additionally, section 8.2 of the Plan provides for payment of applicable Cure Amounts, if any, upon the assumption or assumption and assignment, as applicable, of the underlying Executory Contracts and Unexpired Leases, in accordance with the terms and provisions of section 8.2 of the Plan.

- **Section 1123(b)(3)(A)**. As described above, the Plan Settlements represent a good faith compromise and global settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that the parties to the Plan Settlements may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  Additionally, as discussed in more detail above, the Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1125(e), and/or 1141 of the Bankruptcy Code.

- **Section 1123(b)(3)(B)**. Section 3.3 of the Plan preserves for the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims or Reinstated Claims, all of the rights, claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses that the Debtors

---

[33]   Section 1123(b)(4), which authorizes the sale of substantially all of a debtor's property pursuant to a plan, is inapplicable here.

had immediately before the Effective Date, except as otherwise expressly set forth in the Plan.

- **Section 1123(b)(5)**. Article IV of the Plan modifies the rights of holders of Claims in the Impaired Classes, including holders of Secured Claims (Classes 1, 2, 3, 5, and 6), and leaves unaffected the rights of holders of Claims in the Unimpaired Classes.

- **Section 1123(b)(6)**. There are no provisions in the Plan that are inconsistent with the Bankruptcy Code. In accordance with section 1123(b)(6) of the Bankruptcy Code, Article X of the Plan includes certain release, exculpation, and injunction provisions that are integral to the Debtors' reorganization and are consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent.

118.    Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code. In addition, as discussed in more detail above, the Plan's Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provision are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1125(e), and/or 1141 of the Bankruptcy Code and applicable law.

119.    For the foregoing reasons, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### B.    *Section 1129(a)(2): Debtors Have Complied with Bankruptcy Code*

120.    Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code. *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry

under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125." (citation omitted)); *Star Ambulance*, 540 B.R. at 262 ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126." (citation omitted)). Often, courts have also considered whether the debtor "is a proper debtor under Section 109 of the Bankruptcy Code and a proper proponent of [a plan] under Section 1121(a) of the Bankruptcy Code." *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*, Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010) (same); *In re Energy Partners, Ltd.*, No. 09-32957, 2009 WL 2898876, at *6 (Bankr. S.D. Tex. Aug. 3, 2009) (same); *In re Deep Marine Holdings, Inc.*, Nos. 09-39313 (MI), 09-39314, 09-39315, 09-39316, 09-39317, 09-39318, 2010 WL 5125278, at *5 (Bankr. S.D. Tex. June 2, 2010) (same).

### (i)   Debtors Are Proper Debtors and Plan Proponents

121.   Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor . . . ." 11 U.S.C. § 109(a).  Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ." 11 U.S.C. § 109(d).  Because each of the Debtors has a domicile, a place of business, and property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code, each Debtor is a proper chapter 11 debtor.  *See* Bros Decl. ¶ 12.

### (ii)   Debtors Have Complied with Section 1125

122.   Under section 1125(b) of the Bankruptcy Code:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

123.   The Court entered the Initial Disclosure Statement Order on November 17, 2023 and the Supplement Disclosure Statement Order on December 28, 2023, which together conditionally approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Solicitation Package. As detailed in the Solicitation Declaration, after the filing of the Third Amended Plan and the Court's entry of the Initial Disclosure Statement Order, the Debtors solicited votes on the Third Amended Plan from Holders of Claims and Existing Common Interests in the Voting Classes. *See* Solicitation Decl. After the Debtors entered into the GUC Settlement and filed the Plan, the Court entered the Supplement Disclosure Statement Order, and the Debtors then re-solicited votes from Holders of Claims and Existing Common Interests in the Voting Classes. *See* Solicitation Decl. In accordance with section 1125(b), the Debtors did not solicit votes on the Third Amended Plan until after the Initial Disclosure Statement Order was entered, and did not solicit votes on the Plan until after the Supplement Disclosure Statement Order was entered. *See Notice of Commencement of Solicitation of Plan* (Docket No. 1451) and *Notice of Filing of Solicitation Versions of (A) Fourth Amended Plan, (B) Disclosure Statement Supplement, and (C) Updated Forms Of Ballots For Certain Classes* (Docket No. 1641).

124.   In addition, the Debtors may make certain additional immaterial changes to the Plan prior to or during the Combined Hearing pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. In accordance with Bankruptcy Rule 3019, these modifications will

not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code.  Further, these modifications to the Plan will be consistent with section 1129 of the Bankruptcy Code.  *See* Bros Decl.

125.    Based on the foregoing, the Debtors have satisfied the requirements of sections 1125 and 1127 of the Bankruptcy Code.

### (iii)    Debtors Have Complied with Section 1126

126.    Under section 1126 of the Bankruptcy Code:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

. . .

(c)    A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.

(d)    A class of interests has accepted a plan if such plan has been accepted by holders of such interests . . . that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests . . . that have accepted or rejected such plan.

. . .

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interests of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

127.    As provided in the Solicitation Declaration, the Debtors solicited votes on the Plan from the Voting Classes in compliance with the Disclosure Statement Order, which included the Holders of Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims), Class 5

(M&M Lien Secured Claims), Class 6 (Secured Mortgage Claims), Class 8A (General Unsecured Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims), and Class 12 (Existing Common Interests).  In accordance with sections 1126(f) of the Bankruptcy Code, the Debtors did not solicit acceptances of the Plan from Holders of Claims and Interests, as applicable, in Class 4 (Other Secured Claims), Class 7 (Priority Non-Tax Claims), Class 9 (Intercompany Claims), and Class 10 (Intercompany Interests), because Holders of such Claims and Interests are Unimpaired and conclusively presumed to have accepted the Plan.

128.    As set forth in the Solicitation Declaration, with respect to each of the Debtors, the Plan has been accepted by (i) at least two-thirds in amount and more than one-half in number of Claims in Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims) Class 6 (Secured Mortgage Claims), Class 8B (Convenience Claims), and Class 11 (Section 510(b) Claims), and (ii) at least two-thirds in amount in Class 12 (Existing Common Interests).  None of the Holders of Claims in Class 5 (M&M Lien Secured Claims) voted on the Plan.  *See* Solicitation Decl.  In addition, with respect to each of the Debtors except Core Scientific Mining LLC, discussed below in more detail, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 8A (General Unsecured Claims).  *See* Solicitation Decl.[34]

129.    Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

---

[34]   As mentioned above, as set forth in the Solicitation Declaration, four (4) Debtors did not have any Holders of Claims or Interests in any of the Voting Classes. Pursuant to Section 3.4 of the Plan, any such Class shall be considered vacant, deemed eliminated from the Plan, and disregarded for purposes of satisfying section 1129(a)(8) of the Bankruptcy Code.

C.      *Section 1129(a)(3): Good Faith*

130.    Under section 1129(a)(3) of the Bankruptcy Code, a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "[G]ood faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Banskruptcy Code is to give debtors a reasonable opportunity to make a fresh start."  *Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T H New Orleans L.P.)*, 116 F.3d 790, 802 (5th Cir. 1997); *see also W. Real Est. Equities, LLC v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (quoting *Cajun Elec. Power*, 150 F.3d at 519).  Good faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success . . . ."  *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).  Whether a plan is proposed for honest and good reasons depends on "whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."  *In re W.R. & Grace Co.*, 475 B.R. 34, 88 (D. Del. 2012), *aff'd sub nom.*, 532 F. App'x 264 (3d Cir. 2013), *aff'd sub nom.*, 729 F.3d 332 (3d Cir. 2013), *aff'd sub nom.*, 729 F.3d 311 (3d Cir. 2013) (internal citation omitted).

131.    Here, the Plan has been proposed by the Debtors in good faith and for the legitimate and honest purposes of reorganizing the Debtors' ongoing business and enhancing the Debtors' long-term financial viability, while providing 100% recoveries to all holders of Allowed Claims (other than Section 510(b) Claims and Holders of Claims that have agreed to accept lesser treatment) and a meaningful recovery to existing equity holders.  The restructuring is the culmination of extensive, good faith negotiations between the Debtors and a number of their key

economic stakeholders, including the Ad Hoc Noteholder Group, B. Riley, the Settling Miner Equipment Lenders, the Creditors' Committee, the Equity Committee, and several other claimants. These facts are the hallmarks of good faith. *See In re Lincolnshire Campus, LLC*, 441 B.R. 524, 530 (Bankr. N.D. Tex. 2010) (holding that a plan was proposed in good faith where plan was developed and negotiated at arm's-length among representatives of debtors and other major parties in interest); *In re Chemtura Corp.*, 439 B.R. 561, 608–09 (Bankr. S.D.N.Y. 2010) (finding that a plan was proposed in good faith where, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan which "in the aggregate" demonstrated "a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies" in case). The Plan, including both the RSA Settlement and the GUC Settlement, is also the product of the Mediation that was overseen by Judge Isgur, further demonstrating the integrity of the negotiation process. *See* Bros Decl.

132.    The Debtors' senior management, along with their legal and financial advisors, negotiated the Plan, including the various Plan Settlements embodied therein, and the Plan was approved by the Special Committee. The Special Committee reviewed and approved the filing of the Plan, the Disclosure Statement, the Plan Supplement, and the transaction contemplated thereunder. The RSA also includes a "fiduciary-out" provision that allows the Debtors to terminate the RSA in accordance with its terms should their performance be inconsistent with the exercise of the Debtors' board of directors' fiduciary duties under applicable law. Thus, the Debtors followed appropriate governance practices throughout the entire Plan negotiation and approval process and, as such, the Debtors have proposed the Plan in good faith consistent with section 1129(a)(3) of the Bankruptcy Code.

133.     A debtor's plan must also foster a result consistent with the Bankruptcy Code's objectives.  *See Cypresswood Land*, 409 B.R. at 425 ("[T]o be proposed in good faith, a plan must fairly achieve a result consistent with the [Bankruptcy] Code.") (alteration in original) (quoting *Block Shim Dev*, 939 F.2d at 292).  The main objectives of chapter 11 are twofold: (i) to preserve debtors' abilities to continue operating as going concerns, and (ii) to maximize value available to satisfy creditors.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (noting that underlying Chapter 11 is the objective of "preserving going concerns and maximizing property available to satisfy creditors") (quoting *Toibb v. Radloff*, 501 U.S. 157, 163, (1991)).

134.     Here, there is no question that the Plan furthers each of these objectives. The Plan represents a comprehensive restructuring transaction, which (i) facilitates a reduction of current debt on the Debtors' balance sheet by approximately $400 million and a reduction in the Debtors' annual debt service by approximately $60 million, (ii) provides one-hundred percent (100%) recoveries (including postpetition interest) to all Classes of Claims (other than Section 510(b) Claims and Holders of Claims that have agreed to accept lesser treatment), (iii) provides meaningful recovery to Holders of Existing Common Interests, (iv) preserves more than 240 jobs, and (v) enables the Debtors to emerge with adequate capital to operate the reorganized businesses and position the Reorganized Debtors for growth and success.  As the evidence will show, the Plan was proposed in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

## D.     *Section 1129(a)(4): Professional Fees Subject to Bankruptcy Court Approval*

135.     Under section 1129(a)(4) of the Bankruptcy Code, "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject

to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court. *See Cajun Elec. Power*, 150 F.3d at 513–14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) ("[T]here must be a provision [in the plan] for review by the Court of any professional compensation.").

136.    All payments by the Debtors for services provided to the Debtors during these Chapter 11 Cases will be subject to approval by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code. Specifically, section 2.2 of the Plan provides that all Professionals seeking approval by the Court of the Professional Fee Claims must file final applications no later than forty-five (45) days after the Effective Date (except for the Equity Committee's Professionals, who must file on or before (and no later than) the date that is ten (10) days after the Effective Date), unless extended by the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, thereby giving interested parties adequate time to review the Professional Fee Claims. Further, Article XI of the Plan provides that the Court will "retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, […] all Professional Fee Claims[.]" Plan, § 11.1. Any other professional fee payments to be made by the Debtors will be made in accordance with the Plan. *See* Bros Decl. Accordingly, the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

E.    ***Section 1129(a)(5): Information Regarding Proposed Officers and Managers***

137.    The Debtors have satisfied or will satisfy the requirements under section 1129(a)(5) of the Bankruptcy Code through disclosures in Section 5.21 of the Plan and Exhibit I of the Plan Supplement. The Plan Supplement provides that, to the extent compliant with

NASDAQ rules and the Delaware General Corporation Law, the New Board will consist of the following seven members: Adam Sullivan (the Debtors' Chief Executive Officer), Jarrod Patten, Jeff Booth, Eric Weiss, Todd Becker, Jordan Levy, and Yadin Rozov.  *See* Plan, § 5.21; Plan Suppl., Ex. I.  In addition, Exhibit I in the Plan Supplement discloses the affiliation of each proposed Board member, in accordance with section 1129(a)(5) of the Bankruptcy Code.  *See id*. The Debtors will also disclose the nature of any compensation to be paid to any proposed member of the New Board that is an "insider" under the Bankruptcy Code, including the Debtors' Chief Executive Officer. *See* id;  *see also* Bros Decl. .  Accordingly, the Plan satisfies the requirements under section 1129(a)(5) of the Bankruptcy Code.

### F.      *Section 1129(a)(6): No Rate Changes*

138.     Under section 1129(a)(6) of the Bankruptcy Code, "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor [must have] approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."   11 U.S.C. § 1129(a)(6).   The Plan does not provide for rate changes by the Debtors.  *See* Bros Decl.  Accordingly, section 1129(a)(6) does not apply to the Plan.

### G.      *Section 1129(a)(7): Best Interests Test*

139.     Under section 1129(a)(7) of the Bankruptcy Code, a plan must provide that each holder of an impaired claim or interest receives at least what it would have received if the debtor were liquidated under chapter 7, which is commonly referred to as the "best interests" test. "The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."  *LaSalle*, 526 U.S. at 441 n.13.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or

interest under the debtor's plan of reorganization.  *Id.*; *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

140.    Moreover, "the inquiry is what would the creditor receive from the debtor's estate if the debtor were to liquidate under chapter 7 of the Bankruptcy Code, not what the creditor would have received from a third party."  *Lovett v. Homrich Inc. (In re Philip Servs. Corp.)*, 359 B.R. 616, 630 (Bankr. S.D. Tex. 2006).  The value of plan distributions is measured "in present value terms."  *Briscoe Enters.*, 994 F.2d at 1167; *In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *12 (Bankr. S.D. Tex. Dec. 21, 2009).  "Although creditors being 'at least as well off' is the statutory requirement for plan confirmation, ordinarily creditors are better off when the debtor is reorganized into a going concern than when a liquidation occurs."  *Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 262 (5th Cir. 2015) (citation omitted).  A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis.  *Block Shim*, 939 F.2d at 292.

141.    Here, the relative recoveries of Holders of Claims and Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in Exhibit C to the Initial Disclosure Statement (the "**Liquidation Analysis**"), as more fully described in the Blokh Declaration.  *See* Blokh Decl.,. The Liquidation Analysis demonstrates that each Holder of a Claim or Interest in an Impaired Class (a) has either accepted the Plan or (b) is receiving at least as much value under the Plan as it would receive in a hypothetical chapter 7 liquidation.  *See* Blokh Decl.  Specifically, the Debtors determined that, subject to the assumptions and limitations described in the Liquidation Analysis, the Net Liquidation Proceeds for Distribution (as defined in the Liquidation Analysis)

in a hypothetical chapter 7 liquidation to the Debtors' claimants range between approximately $314.2 million to $573.8 million, compared to approximately $1.06 billion of total distributable value under the Plan. *See* Blokh Decl.

142.    The table below sets forth recoveries to Holders of Allowed Claims and Interests pursuant to the Liquidation Analysis compared to the Plan.

**Liquidation vs. Plan Recoveries**

| Class and Designation | Plan Recoveries | Chapter 7 Liquidation | |
|---|---|---|---|
| | | Low | High |
| Chapter 11 Administrative Claims[35] | 100% | 100% | 100% |
| Mechanics' Liens | 100% | 100% | 100% |
| Mortgages | 100% | 100% | 100% |
| DIP Loan Claims | 100% | 100% | 100% |
| Miner Equipment Lender Claims | 100% | 13% | 34% |
| Other Secured Claims (Non-Miner Equipment Lender Claims) | 100% | 100% | 100% |
| Convertible Notes (April) | 100% | 40% | 79% |
| Convertible Notes (August) | 100% | 16% | 43% |
| General Unsecured Claims | 100% | 7% | 19% |
| Intercompany Claims | 100% | 0% | 0% |
| Section 510(b) Claims | Up to 100% | 0% | 0% |
| Equity Interests | Up to 100% | 0% | 0% |

*See* Blokh Decl., Table 1.

---

[35]    Under a Chapter 7 liquidation scenario, Carve Out Claims (as defined in the Liquidation Analysis) would be satisfied prior to DIP Claims, pursuant to the DIP Order.

143.    As the United States District Court for the Southern District of Texas has

reasoned:

> The additional costs of three chapter 7 trustees, the short time allowed a
> plain liquidation, the potential for more claims to be filed against the
> estates, and the loss of knowledge and momentum . . . about the
> management of these assets would combine to reduce significantly the
> cash to be realized by the estates from these assets.  The lower prices
> from the liquidation are reasonable.

*MCorp Fin.*, 160 B.R. at 961 (confirming chapter 11 plan).  Further, as this Bankruptcy Court has

explained:

> [A] chapter 7 liquidation would increase the administrative costs of the
> Bankruptcy Cases and adversely affect the ultimate proceeds available
> for distribution to all holders of Allowed Claims in the Bankruptcy
> Cases and the Debtors' [post-effective] date operations.  Moreover, the
> increased costs associated with a liquidation under chapter 7 would
> further reduce the proceeds available for distribution.  These costs
> would include, among other things, administrative fees and costs
> payable to a trustee in bankruptcy and professional advisors to such
> trustee.
>
> . . . The Bankruptcy Court here considers, *inter alia:* (1) the problems
> associated with the quick sale of assets as contemplated in chapter 7;
> (2) the limitations of section 721 of the Bankruptcy Code; and (3) loss
> of value through passage of time.

*Pisces Energy*, 2009 WL 7227880, at *12, n.7 (holding that plan satisfied best interests test);

*accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–58 (Bankr. S.D.N.Y. 2007), *appeal*

*dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) (considering, among

other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees

and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays

in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would

adopt settlements embodied in plan).

144.     As the evidence will show, the assumptions made in the Liquidation Analysis are consistent with Mr. Blokh's extensive experience as a financial advisor to distressed companies and are appropriate for and tailored to the Debtors' specific business and assets.  *See* Blokh Decl.  Accordingly, the Debtors' assumptions and estimates used in the Liquidation Analysis are appropriate.  Because each holder of a Claim or an Interest in an Impaired Class will receive a distribution under the Plan greater than or equal to what such holder would receive in a hypothetical chapter 7 liquidation, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.  *See* Blokh Decl.

### H.     *Section 1129(a)(8): Acceptance of Impaired Classes*

145.     Under section 1129(a)(8) of the Bankruptcy Code, claims and interests must either accept a plan or be unimpaired under the plan.  Here, the voting results were as follows:

- Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims) Class 6 (Secured Mortgage Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims) and Class 12 (Existing Common Interests) voted to accept the Plan at each Debtor entity at which such Classes held Claims and Interests.[36]  *See* Solicitation Decl.

- None of the Holders of Claims in Class 5 (M&M Lien Secured Claims) voted on the Plan.  *See* Solicitation Decl.

- Class 8A (General Unsecured Claims) voted to reject the Plan at Core Scientific Mining LLC and accepted the Plan at all other Debtor entities. *See* Solicitation Decl.

146.     Holders of Claims in Class 4 (Other Secured Claims), Class 7 (Priority Non-Tax Claims) and Class 9 (Intercompany Claims) and Holders of Interests in Class 10

---

[36]   There are were no Claims against the following Debtors: Radar Relay, Inc., RADAR LLC, Starboard Capital LLC, and Core Scientific Specialty Mining (Oklahoma) LLC.

(Intercompany Interests) are Unimpaired and, therefore, are conclusively presumed to accept the Plan. *See* Plan, § 3.2. [37]

147.    As a result, other than Class 8A (General Unsecured Claims) at Core Scientific Mining LLC, the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code.   As discussed below, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Class 8A (General Unsecured Claims) at Core Scientific Mining LLC. *See infra*

## I.    *Section 1129(a)(9): Payment in Full of Priority Claims*

148.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.  11 U.S.C. § 1129(a)(9). Section 2.1 of the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. Section 2.3 of the Plan provides that Allowed Priority Tax Claims will be paid in full in Cash on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the

---

[37] As mentioned above, as set forth in the Solicitation Declaration, four (4) Debtors did not have any Holders of Claims or Interests in any of the Voting Classes. Pursuant to <u>Section 3.4</u> of the Plan, any such Class shall be considered vacant, deemed eliminated from the Plan, and disregarded for purposes of satisfying section 1129(a)(8) of the Bankruptcy Code.

ordinary course, or (ii) such other treatment reasonably acceptable to the Debtors or Reorganized Debtors (as applicable) with the consent of the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA) and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. Accordingly, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

### J.      *Section 1129(a)(10): Impaired Accepting Class*

149.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth above, Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims), Class 3 (Miner Equipment Lender Secured Claims), Class 6 (Secured Mortgage Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims), and Class 12 (Existing Common Interests), as well as the Holders of Claims in Class 8A (General Unsecured Claims) against all Debtor entities except Core Scientific Mining LLC, are all Impaired and have all voted to accept the Plan.

150.    Given that (i) Holders of Class 1 (April Convertible Notes Secured Claims) and Class 2 (August Convertible Notes Secured Claims) hold claims against seven of eleven Debtors and (ii) there are no impaired claims against the other four Debtor entities, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code with respect to each Debtor. *See* Bros Decl.

### K.      *Section 1129(a)(11): Feasibility*

151.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that the Plan is feasible. "[T]he court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required." *Briscoe Enters.*, 994 F.2d at 1165–66 (internal quotation marks and citation omitted); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506

(Bankr. S.D. Tex. 1989) (holding that feasibility "contemplates whether the debtor can realistically carry out its plan . . . and whether the plan offers a reasonable prospect of success and is workable") (citations omitted).  As a matter of law, the "mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." *Whitney Bank v. SCC Kyle Partners, Ltd. (In re SCC Kyle Partners, Ltd.)*, 518 B.R. 393, 406 (W.D. Tex. 2014) (internal quotation marks and citation omitted).

152.    The key element of feasibility is whether there is a reasonable probability of a successful reorganization pursuant to the Plan.  *See In re Landing Assocs.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (stating that section 1129(a)(11) only requires a finding that a plan offers "a reasonable probability of success"); *Save Our Springs*, 632 F.3d at 172 ("To obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization.'" (quoting 11 U.S.C. § 1129(a)(11))); *T-H New Orleans*, 116 F.3d at 801 ("Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation . . . ."); *Lakeside*, 116 B.R. at 507 ("The purpose of the feasibility requirement is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." (internal quotation marks and citation omitted)). Specifically, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." *T-H New Orleans*, 116 F.3d at 802 (alteration in original) (internal quotation marks and citation omitted).

153.    In assessing feasibility, courts consider, among others, the following factors: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) the economic conditions; (iv) the ability of management; (v) the probability of the continuation of the same management; and (vi) any other matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *Save Our Springs*, 632 F.3d at 173 n.6.  "There is no requirement, however, that the court consider all six factors." *Id*. at 173.

154.    As discussed in the Bros Declaration, the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors, and will allow the Debtors to emerge as a competitive, financially flexible, and healthy company. *See* Bros Decl. The Debtors have filed consolidated financial projections for the Reorganized Debtors (the "**Financial Projections**") for the period beginning with the first quarter of 2024 through fiscal year-end 2027, as set forth in Exhibit E to the Initial Disclosure Statement. *See* Initial Disclosure Statement, Ex. H.

155.    The Financial Projections were prepared utilizing a number of reasonable and good faith assumptions based upon the current views and understandings of the Debtors' management, each of whom has years of experience in, and an intimate understanding of, the bitcoin mining industry.  Specifically, the Financial Projections were developed based on the Debtors' updated Business Plan (the "**Business Plan**"), which covers the period from the first quarter of fiscal year 2024 until the end of fiscal year 2027.  The Business Plan was created with management's expectation of post-emergence operational execution in mind, with initiatives including: (i) optimizing self-miner fleet efficiency by refreshing existing miners; (ii) expanding capacity at certain facilities; (iii) expanding self-mining presence; and (iv) focusing on cost

discipline.  The Debtors built flexibility into the Business Plan to ensure it can withstand unexpected changes in variables that could impact projected cash flow.  This ensures that actual results deviating from any one or more of the assumptions would continue to result in the Debtors' commercial viability, and therefore, the Plan's continued feasibility.  Most importantly, as further described in the Initial Disclosure Statement, the Business Plan provides the flexibility to adapt to changes in hashprice, which is one of the most important factors influencing the economic performance of the Debtors' business.  The Financial Projections also assumed a reorganization of the Debtors' capital structure as set forth in Section II.C of the Initial Disclosure Statement.  *See* Bros Decl.

156.    In addition, the anticipated capital structure upon the Effective Date has changed since the filing of the Initial Disclosure Statement, including (i) the final treatment election by Holders of Class 3 Miner Equipment Lender Secured Claims, which is different than the Debtors' assumptions as of the filing of the Initial Disclosure Statement as most of them chose the Equitization Option (resulting in significantly less debt than anticipated)[38]; (ii) the updated total amount of secured debt for mechanics' liens claimants under the M&M Lien Settlements;[39] and (ii) additional unsecured debt as a result of the Dalton Settlement.[40]  The Debtors' now anticipated capital structure as of the Effective Date is as follow:

- ***Exit Facility***: $80 million commitment, consisting of (i) $40 million new money ($20 million of which will be available immediately upon the Effective Date) and (ii) $40 million from rolling up the applicable

---

[38]    The Holders of Class 3 Miner Equipment Lender Secured Claims who chose the Equitization Option include: 36th Street Capital Partners, LLC; Anchorage Lending CA, LLC; Barings BDC, Inc.; Barings Capital Investment Corporation; Barings Private Credit Corp.; MassMutual Asset Finance LLC; and Stonebriar Commercial Finance LLC.

[39]    *See* the *Debtors' Motion For Entry of An Order (I) Authorizing (A) Assumption of McCarthy Contracts, As Amended in Accordance with the Settlement Agreement and (B) Entry into the Settlement Agreement, and (II) Granting Related Relief* (Docket No. 1580) (the "**McCarthy Settlement Motion**").

[40]    *See Order (I) Authorizing Assumption and Performance of the Legacy Dalton Agreements, As Amended By the Dalton Settlement Agreement and (II) Granting Related Relief* (Docket No. 1651) (the "**Dalton Settlement**").

Convertible Notes Secured Claims. The Exit Facility accrues interest at 9% per annum.  Approximately $61 million of the Exit Facility (including approximately $1 million of payment-in-kind fee on the new money) will be drawn on the Effective Date.

- ***New Secured Notes:*** $150 million at 12.5% annual cash interest. The first interest payment is due on June 15, 2024 and subsequent interest payments are paid quarterly thereafter.

- ***New Secured Convertible Notes:*** $260 million at either (i) 6.0% cash interest and 6.0% payment-in-kind interests or (ii) 10% cash interest, at the Reorganized Debtors' option. The first interest payment is due on June 15, 2024 and subsequent interest payments are paid quarterly thereafter.

- ***Miner Equipment Loans:*** $53 million of Miner Equipment Lender Takeback Debt (Election 2).

- ***Other Secured and/or Unsecured Debts***: include approximately (i) $20.1 million of Reinstated Other Secured Claims, (ii) $54 million of secured debt for mechanics' liens claimants under the M&M Lien Settlements, (iii) $9 million of unsecured debt under the Dalton Settlement, and (iv) $1 million of Secured Mortgage Claims.

*See* Bros Decl.  Overall, the updated anticipated Effective Date capital structure of the Debtors presents an even more significant de-leveraging than previously assumed under the Financial Projections, primarily driven by more Settling Equipment Miner Lenders' election of the Equitization Option than the Debtors anticipated.  This not only signals the Settling Equipment Miner Lenders' strong confidence in the Business Plan and the Reorganized Debtors' successful operation; it also reduces the amount of debt service assumed under the Business Plan and further strengthens the Debtors' belief that they will have sufficient resources and cash flow to make all payments required pursuant to the Plan and to service their debt as it becomes due.  See Bros Decl.

157.    Further, the Plan contemplates that the Debtors will fund distributions under the Plan with (i) the Debtors' cash on hand (projected to be approximately $50 million) and (ii) proceeds available from the Exit Facility and the Rights Offering.  The Rights Offering (which was significantly oversubscribed) generated $55 million in cash proceeds.  As noted above, the

Exit Facility provides the Reorganized Debtors with $40 million in new money, $20 million of which will be drawn immediately upon emergence. The Debtors believe the new sources of capital provided by the Rights Offering and the Exit Facility will be sufficient to satisfy all of the Debtors' obligations under the Plan, comply with the terms of their debt instruments, and provide the Reorganized Debtors with a healthy balance sheet that will position them to implement their Business Plan successfully. The Debtors expect that the bid price of the New Common Interests will exceed $4.00 per share on the Effective Date. *See* Bros Decl.

158.    Accordingly, the Plan complies with section 1129(a)(11) of the Bankruptcy Code and is feasible.

### L.    *Section 1129(a)(12): Payment of U.S. Trustee Fees*

159.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan . . . ." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2).

160.    In accordance with these provisions, the Plan provides that, on or after the Effective Date, such fees will be paid by the Reorganized Debtors in Cash. *See* Plan, § 12.1. The Proposed Confirmation Order also provides for the payment of all such statutory fees. *See* Proposed Confirmation Order.

161.    Accordingly, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

### M.    *Section 1129(a)(13): Retiree Benefits*

162.    Section 1129(a)(13) requires "the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of [the Bankruptcy Code],

at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of [the Bankruptcy Code]."   11 U.S.C. § 1129(a)(13).   Section 8.5(e) of the Plan provides that any Employee Arrangements (including the Debtors' programs for their retirees) that are Executory Contracts and not otherwise addressed in the Plan or listed on the Schedule of Rejected Contracts in the Plan Supplement shall be deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.   Section 8.5(f) of the Plan provides that any Employee Arrangements (including the Debtors' programs for their retirees) that are not Executory Contracts and not otherwise addressed in the Plan shall be continued in the ordinary course of business following the Effective Date.   The Schedule of Rejected Contracts does not include any Executory Contracts with respect to the Debtors' programs for their retirees. *See* Plan Supplement, Ex. L.

163.    Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

### N.    *Sections 1129(a)(14)–(16) and 1129(e): Inapplicable Provisions*

164.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.   The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply.   *See* Bros Decl.   Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).   The Debtors are not "individuals" and, accordingly, section 1129(a)(15) does not apply.   *See* Bros Decl.   Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.   Each Debtor is a moneyed, business, or commercial corporation, and, accordingly, section 1129(a)(16) does not apply.   *See* Bros Decl.   The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined by that

section.  These Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code does not apply.  *See* Bros Decl.

> ### O.   *Section 1129(b): Cramdown of Non-Accepting Classes*

165.   Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests, which is known informally as "cramdown."  Section 1129(b) of the Bankruptcy Code provides, in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Under section 1129(b), the Court may "cramdown" a plan over the dissenting vote of an impaired class of claims or interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 862 (Bankr. S.D. Tex. 2001).  By its express terms, section 1129(b) of the Bankruptcy Code only applies to a class of creditors or shareholders that rejects a plan.   *See* 11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan." (emphasis added)).

166.   As noted above, the following Voting Classes voted to accept the Plan pursuant to the requirements of section 1126 of the Bankruptcy Code at all of the Debtor entities: Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured

Claims), Class 3 (Miner Equipment Lender Secured Claims), Class 8B (Convenience Claims), Class 11 (Section 501(b) Claims), and Class 12 (Existing Holdings Interests).  *See* Solicitation Decl., Ex. .  Class 8A (General Unsecured Claims) voted to accept the Plan at all Debtor entities except Core Scientific Mining LLC.  *Id.*   Holders of Claims in Class 4 (Other Secured Claims), Class 7 (Priority Non-Tax Claims) and Class 9 (Intercompany Claims) and Holders of Interests in applicable Class 10 (Intercompany Interests) are Unimpaired and, therefore, are conclusively presumed to accept the Plan.  *Id*.

167.    Therefore, cramdown is only relevant with respect to Class 8A (General Unsecured Claims) at Core Scientific Mining LLC.  As discussed below, the Plan satisfies the cramdown requirements with respect to all applicable Classes.

(i)       **Plan Does Not Discriminate Unfairly**

168.    The unfair discrimination standard of section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes.  Section 1129(b)(1) of the Bankruptcy Code, however, does not prohibit discrimination between classes; it only prohibits discrimination that is "unfair."  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *In re Cypresswood Land Partners, I*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("[H]allmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.") (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)).  As between two classes of claims or classes of interests, there is no unfair discrimination if (i) the

85

classes are comprised of dissimilar claims, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988), or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. *See, e.g.*, *In re Worldcom, Inc.*, No. 02–13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)) ("[I]f under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

169.    The Bankruptcy Code does not set forth the standard for determining when "unfair" discrimination exists.  *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009); *In re Tribune Co.*, 972 F.3d 228, 24–43 (3d Cir. 2020) (summarizing the various standards applied to unfair discrimination and affirming under *de novo* review the Delaware Bankruptcy Court's application of the rebuttable presumption test); *In re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

170.    The Plan does not discriminate unfairly with respect to the Class 8A General Unsecure Claims at Core Scientific Mining LLC.  With respect to the Debtors' general unsecured Classes, there is no unfair discrimination between Class 8A (General Unsecured Claims) and Class

8B (Convenience Claims).  As an initial matter, Core Scientific Mining LLC does not have any material assets.  Moreover, although two holders asserted claims against Core Scientific Mining LLC, the Debtors submit that such claims were not asserted against the correct entity.  In any event, each holder is receiving a 100% recovery on account of its claims.  *See* Bros Decl. Accordingly, there is no unfair discrimination in the Plan under section 1129(b) of the Bankruptcy Code.

### (ii)     Plan Is Fair and Equitable

171.    Sections 1129(b)(2)(B)(i) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that each holder of a claim in the rejecting class will receive or retain, on account of its claim, property of a value, as of the effective date of the plan, equal to the allowed amount of the claim.

172.    Here, the "fair and equitable" rule is satisfied because, as mentioned above, all Classes of creditors (other than Section 510(b) Claims and creditors that have agreed to accept lesser treatment) are receiving a full recovery under the Plan at each Debtor entity, including Holders in Class 8A at Core Scientific Mining LLC.  Therefore, the Plan is fair and equitable with respect to Class 8A at Core Scientific Mining LLC.  *See* Bros Decl. ¶ [●].

### P.     *Section 1129(c): Plan Is Only Plan Currently on File*

173.    The Plan is the only operative chapter 11 plan currently on file in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

### Q.     *Section 1129(d): Principal Purpose of Plan*

174.    The principal purpose of the Plan is to reorganize the Debtors' ongoing business, de-lever the Debtors' capital structure, and enhance the Debtors' long-term financial viability while providing recoveries to all of the Debtors' stakeholders, not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.

*See* Bros Decl. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### R.    *Request For Waiver of Bankruptcy Rule 3020(e)*

175.    The Debtors respectfully request that the Court direct that the Proposed Confirmation Order be effective immediately upon its entry notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).  Under Bankruptcy Rule 3020(e), "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  As the Advisory Committee notes to Bankruptcy Rule 3020(e) state, "[t]he court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions made immediately." Fed. R. Bankr. P. 3020(e), Advisory Committee's Note to 1999 Amendment; *see Idearc*, 423 B.R. at 158 ("Good cause exists for waiving and eliminating the stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e).  In particular, the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible.").

176.    Here, it is appropriate for the Court to exercise its discretion with respect to the stay imposed by Bankruptcy Rule 3020(e) and permit the Debtors to consummate the Plan and the transactions contemplated thereby (including those set forth in the Restructuring Transactions Exhibit) and commence its implementation without delay.  Any significant delay in emerging from these chapter 11 cases may have an impact on the Debtors' financial performance and ability to achieve the Financial Projections, as well as listing of the Reorganized Debtors' New Common Interests on NASDAQ and thus the Reorganized Debtors' access to capital markets.  *See* Bros Decl.  In addition, each day of delay in emerging from these chapter 11 cases will result in additional accrual of post-petition interests for the Allowed amount of both Class 1 (April

Convertible Notes Secured Claims) and Class 2 (August Convertible Notes Secured Claims) as well as more professional fees incurred in these Chapter 11 Cases.  *See* Plan, §1.15 & § 1.16; *See* Bros Decl.   Therefore, a waiver of the 14-day stay is in the best interests of the Estates and will not prejudice any party in interest.  Accordingly, the Court should waive the 14-day stay under Bankruptcy Rule 3020(e).

## IV.   Bankruptcy Court Should Overrule Unresolved Objections and Confirm Plan

177.    The Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.   The Debtors respectfully request that the Court confirm the Plan, overrule the Hoffman Objection, and grant such other and further relief as is just and appropriate.

### A.    *The Hoffman Objection Should Be Overruled*

178.    The cornerstone of the Hoffman Objection is the contention that this Court lacks subject matter jurisdiction to approve the Third-Party Releases in Section 10.6(b) of the Plan and that there is no personal jurisdiction over the parties who have not filed a proof of claim in these Chapter 11 Proceedings.   There can be no question, however, that jurisdiction exists to provide this Court with authority to approve the Third-Party Releases.

179.    In addition, the Hoffman Objection mischaracterizes the Third-Party Releases as improper *nonconsensual* releases.   In fact, most of the Hoffman Objection relies on arguments and cases related to nonconsensual releases, which are simply not relevant here.  Moreover, the main case relied on by Hoffman in support of the contention that opt-out provisions do not constitute consensual releases, *Patterson v. Mahwag*, is from outside the Fifth Circuit and is directly contrary to decisions from courts in this Circuit that have approved the very same type of releases and opt-out procedures as those in the Plan.

89

180.    Indeed, as discussed in more detail below, "The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.' Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans." *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) (Rosenthal, J.) (citing *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775–76 (Bankr. N.D. Tex. 2007); *In re Bigler LP*, 442 B.R. 537, 543–44 (Bankr. S.D. Tex. 2010); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011); *In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010)).  In short, there can be no escaping the conclusion that the Third-Party Releases here are consensual releases in accordance with applicable law from courts in this Circuit and should be approved and the Hoffman Objection overruled.

## A.    The Court Has Jurisdiction to Approve the Third-Party Releases

181.    This Court can exercise "related to" subject matter jurisdiction to approve the Third-Party Releases. "In enacting § 1334(b) Congress intended to grant comprehensive jurisdiction to bankruptcy courts allowing them to deal efficiently and expeditiously with all matters connected with a bankruptcy estate." *In re Houston Regional Sports Network, L.P.*, 2014 WL 2159435, at *3 (Bankr. S.D. Tex. May 22, 2014) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)) (Isgur, J.). "Related to" bankruptcy jurisdiction includes "suits between third parties which have an effect on the bankruptcy estate." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 434 (5th Cir. 2001) (citations omitted). The Firth Circuit instructs bankruptcy courts, in determining related to jurisdiction, to analyze "whether the outcome of [the] proceeding could ***conceivably have any*** effect on the estate being administered in bankruptcy." *Id.* (citing *In re Canion*, 196 F.3d 579, 585 (5th Cir. 1999)) (emphasis added). "***Certainty, or even likelihood of such an effect is*** ***not a requirement***." *Id.* (emphasis added). "***Contingent or tangential effects*** may be sufficient in

the Fifth Circuit to establish related-to jurisdiction." *Houston Reg'l*, 2014 WL 2159534, at *8 (citing *In re Canion*, 196 F.3d 579, 587 n.30 (5th Cir. 1999)) (emphasis added).

182.    Hoffman's invocation of the Third Circuit's decision in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), does not help his cause.  As Judge Isgur explained in *Houston Reg'l*, "[t]here is some dispute amongst courts regarding the meaning of *Pacor* and its progeny." 2014 WL 2159435, at *4. Notably, in *Pacor*, Judge Isgur explained, the defendant "did **not** have a contractual right to indemnification and would have had to bring entirely separate proceedings to receive indemnification from the debtor." *Id.* (emphasis added). Thus, "[b]ecause [debtor] would not be automatically liable to [defendant], the court found that there was no related-to jurisdiction" as the "dispute between the third parties was at best a precursor to a potential third party claim against [debtor]." *Id.*

183.    Here, by contrast, the Debtors are automatically responsible for indemnifying their current and former officers and directors (among other parties), including the only remaining defendant in the Securities Litigation, Mr. Levitt.  *See* Plan § 8.4 (providing, in relevant part, that all Indemnification Obligations shall remain in full force and effect and survive unimpaired and unaffected following the Effective Date); Proof of Claim No. 369 (Mr. Levitt asserting contingent indemnification claims against the Debtors' estates in connection with Securities Litigation); Core Bylaws and Levitt Employment Agreement; *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss*, *Pang v. Levitt, et al.*, No. 1:22-cv-01191-DAE, ECF No. 73, at 55 (W.D. Tex. Dec. 20, 2023) (the "**Securities Litigation MTD Order**").[41]

---

[41]    Judge Ezra granted the motion to dismiss without prejudice as to (1) Plaintiffs' claims under Section 10(b) of the Exchange Act, and as to (2) Plaintiffs' claim under Section 20(a) of the Exchange Act. *Id.* The Court denied the motion to dismiss as to (1) Plaintiffs' claim under Section 11 of the Securities Act, and (2) Plaintiffs' claim under Section 14 of the Exchange Act. *Id.* The Court dismissed without prejudice the section 15 claims against Michael

Thus, Mr. Hoffman's discussion of *Pacor* is inapposite. *See also In re Masterwear Corp.*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) (holding that when an obligation to indemnify is contractual and absolute, the third party litigation is related to the bankruptcy case); *In re WorldCom, Inc. Securities Litigation*, 293 B.R. 308, 318–20 (S.D.N.Y. 2003) (rejecting rigid reading of *Pacor* and finding related to jurisdiction where there was a reasonable legal basis for indemnification claim).

184.    In *Houston Regional*, Judge Isgur found the Court could exercise related to jurisdiction over claims by third parties against company executives for fraudulent inducement, fraud by nondisclosure, civil conspiracy, and negligent misrepresentation as they would have "at least a conceivable effect on the Estate because the [debtor] Network [would] potentially be liable based on the outcome in each cause of action." 2014 WL 2159534, at *8. Likewise, this Court can exercise related-to jurisdiction as relates to the Third-Party Releases impact on the Securities Litigation because the claims at issue there will have "at least a conceivable effect" on Debtors' estate due to the indemnification obligations owed to Mr. Levitt, and other officers and directors to the extent the applicable pleadings are amended.

185.    Hoffman's reliance on *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641 (E.D. Va. 2022) is likewise misplaced.  That decision is not a Fifth Circuit decision nor a decision from a Fifth Circuit district or bankruptcy court and thus lacks any binding effect on this Court. Furthermore, the holding in that case is directly contrary to the holdings by courts in this Circuit that have expressly approved third-party releases like those in the Plan.   Moreover, in *Mahwah Bergen*, the U.S. Trustee was appealing the application of the third-party releases across the spectrum of applicable parties and claims. *Id.* at 661-662. Here, the only objection to the Third-

---

Trzupek, Denise Sterling, Darin Feinstein, Brian Neville, Jarvis Hollingsworth, Matt Minnis, Stacie Olivares, Kneeland Youngblood, Patrick C. Eilers, Theodore J. Brombach, Paul Gaynor, Paul Dabbar, Colleen Sullivan, and Scott Widham. *Id.* The Court allowed the Section 15 claim against Mr. Levitt to proceed. *Id.*

Party Releases relates to their application to the Securities Litigation and the specific named defendants in that action—who were all current or former officers or directors of the Debtors or their predecessor, and who as of now only include Mr. Levitt.  Finally, as noted herein, the facts upon which the Securities Litigation is predicated—those related to the Debtors' power pass-throughs—relate to the Debtors' conduct and issues currently before this Court and, as such, relate to the bankruptcy case.

186.    The Court's exercise of related-to jurisdiction here is further supported by the fact that the underlying issues raised in the Securities Litigation, the appropriateness of power pass through charges to Core's customers, relate specifically to Core's conduct and are identical to issues that have been raised before, and remain pending, in this Court. In a nutshell, the allegations in the Securities Litigation are that certain Core directors and officers failed to make proper disclosures in relation to the Company's decision to impose power cost pass-through charges onto its customers. *See* Securities Litigation MTD Order, at 5. This very issue was litigated in these Chapter 11 cases between Debtors and Celsius Mining LLC. *See* Celsius Mining LLC's Prelim. Obj. to the Debtors' Emergency Mot. for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC (ECF No. 265, at 10–22); Debtors' Obj. to Proof of Claim Nos. 425 and 497 filed by Celsius Mining LLC (ECF No. 819, at 15–16); Celsius Mining LLC's Obj. to the Debtors' Mot. for Partial Summ. J. with Respect to Proof of Claim Nos. 425 and 497 filed by Celsius Mining LLC (ECF No. 984, at 3–6).

187.    This issue is also the subject of pending litigation in these Chapter 11 cases between Debtors and the GEM entities. *See* Debtors' Obj. to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 571 filed by GEM Mining 1, LLC, GEM Mining 2B, LLC, GEM Mining 4, LLC, GEM Mining 2, LLC (ECF No. 854, at 12–15). Thus, the fact that the underlying factual

issues in the Securities Litigation involve the Debtors' alleged conduct relating to power pass through cost charges that relate specifically to claims in the Chapter 11 cases by others, supports the Court's exercise of related-to subject matter jurisdiction here.

### B.  The Court Can Exercise Personal Jurisdiction Over Hoffman and the Putative Class Members

188.    Hoffman lacks any basis to challenge personal jurisdiction at this stage as he has waived that right by attending hearings before this Court, through counsel. *See, e.g.*, *In re Padco Pressure Control, L.L.C.*, 797 F. App'x 893, 894 (5th Cir. 2020) (observing that "personal jurisdiction is a waivable right" and holding that "[b]y attending his hearings . . . [party] consented to the bankruptcy court's exercise of jurisdiction over him.") (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)). Moreover, Hoffman is not functioning in a representative capacity in these Chapter 11 proceedings on behalf of the Securities Litigation putative class, as this Court previously rejected his motion for class treatment and disallowed his class proof of claim. *See* ECF No. 1522 (sustaining Debtors' objection to Hoffman's class proof of claim, denying Hoffman's motion for class treatment, and disallowing Hoffman's class proof of claim without prejudice to file an individual proof of claim). Accordingly, Mr. Hoffman has waived any basis to challenge personal jurisdiction at this late stage.

189.    Mr. Hoffman's assertion that he and the Securities Litigation class members are "strangers" to this proceeding is also without merit.  The Debtors were originally named a defendant in the Securities Litigation and were only dismissed after filing for bankruptcy. And after the bankruptcy filing, Mr. Hoffman, claiming to be the "Lead Plaintiff" representing the putative class, filed a proof of claim purportedly as Lead Plaintiff on behalf of the Securities Litigation putative class, filed a motion for class treatment (the bankruptcy equivalent of a class certification motion), and attempted to file a class proof of claim. By doing all of the following,

Mr. Hoffman consented to personal jurisdiction in this forum on behalf of himself.  Mr. Hoffman cannot now walk back this consent and claim to be, along with his class members, a "stranger" to this proceeding.[42]

190.    Moreover, the Securities Litigation putative class cannot claim to be "strangers" to these Chapter 11 cases because, in addition to previously naming Debtors as a defendant, the alleged conduct at issue in the Securities Litigation involves the actions or omissions of certain individuals acting in their official capacities as officers and directors of the Debtors regarding business decisions of the Debtors. In addition, each member of the Securities Litigation putative class necessarily held securities in the Debtors at one point and thus cannot credibly suggest they never heard of Core or that the chapter 11 proceedings of a company in which they hold or held securities, and whose conduct they are claiming caused them harm, is a mystery to them.  Finally, as noted above, courts in this District have exercised jurisdiction and approved third-party releases, like those here, that impacted rights of third parties like the putative class in the Securities Litigation.

### C.  The Third-Party Releases Conform To Relevant Precedent and Complex Procedures

191.    Having established that the Court has the authority to approve third-party releases, it is also the case that the Third-Party Releases here are appropriate and conform to relevant precedent.

---

[42]    Mr. Hoffman's claim that he did not submit to this Court's jurisdiction because he only sought "equitable relief as against the Debtors" is demonstrably false.  *See* Hoffman Objection, n. 7.  The amended proof of claim that Mr. Hoffman had filed on behalf of himself and the putative class—which was disallowed as a class proof of claim—sought damages in the amount of $188.6 million against the Debtors.  That Mr. Hoffman deliberately and apparently for strategic purposes, chose not to file an individual proof of claim reflecting the amount of his own purported damages, does not change the fact that he has submitted to this Court's jurisdiction.

192.     As noted above, Courts in this Circuit have approved consensual third-party releases such as those in the Plan here.  In addition, in *CJ Holding Co.*, an ex-employee, who had filed an EEOC complaint for sexual harassment, discrimination, and retaliation against a debtor subsidiary, challenged the plan's consensual nondebtor release provision. 597 B.R. at 608. The court rejected the ex-employee's argument that "consent" in this context requires "affirmative action" and "more than silent acquiescence." *Id.* at 608–09. The court likewise rejected the ex-employee's argument challenging the sufficiency of notice on the grounds that "he did not understand the Plan because it is long and full of complicated terms." *Id.* at 610. The court found the notice adequate because it "contained a paragraph set off by [a] heading in bold font, [stating] 'Release by Holders of Claims and Interests,'" and clearly identified the releasing parties and released parties. *Id.* Moreover, the ex-employee "neither provide[d] facts nor identifie[d] evidence that the Plan misled him." *Id.* "Neither the Supreme Court nor the Fifth Circuit requires a debtor or a bankruptcy court to help creditors understand a proposed plan." *Id.*

193.     Here, there is no question that notice was sent to class members and that they were given an opportunity to opt out of the Third Party Release. While Hoffman complains about the scope of the notice and the length of the opt-out form, those complaints are not a basis for denying approval of the Third-Party Releases.  First, if a party can demonstrate that it did not receive notice of the Release Opt Out Form, it has nothing to worry about, as it would then not be subject to the release. *See* Plan, § 1.267 (limiting the definition of "Releasing Parties," in relevant part, to "the Holders of all Claims and Interests and all Other Beneficial Owners **that were given notice of the opportunity to opt out** of granting the releases set forth herein but did not opt out")

(emphasis added).  But that issue need not be decided today in order to approve the Third-Party Releases.[43]

194.    Second, the Release Opt Out Form was expressly approved and ordered by this Court in its November 17, 2023 Order. *See* ECF No. 1447. Specifically, the Court held that the Release Opt Out Form was "APPROVED." *Id.* at 11. This Court determined that the "Release Opt Out Form complies with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and Complex Case Procedures and, together with the Combined Hearing Notice and, as applicable, the Notice of Non-Voting Status, provides adequate notice to Other Beneficial Owners and Holders of Claims in Class 4 (Other Secured Claims) and Class 7 (Priority Non-Tax Claims). No further notice is required or necessary." *Id.* Accordingly, the issue of whether the Release Opt Out Form complies with the Bankruptcy Code and is valid, has already been determined in the affirmative by this Court and is binding in these Chapter 11 cases under the law-of-the-case doctrine. *See, e.g.*, *Matter of AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023) (explaining that, under the law-of-the-case doctrine, "when a court decides an issue, that decision should continue to govern the same issues in subsequent stages of the same case") (internal quotes omitted); *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001) (observing that, for law-of-the-case to apply, "the issues need not have been explicitly decided" as "the doctrine also applies to those issues decided by 'necessary implication'") (citations omitted). Moreover, the Debtors know from the fact that forty-nine (49)

---

[43]    To that end, there is no record that Mr. Hoffman submitted the Release Opt Out Form opting out of the release. If in fact Mr. Hoffman failed to do so, such conduct would smack of gamesmanship, especially when considering that he also failed to refile an individual proof of claim after this Court afforded him an opportunity to do so. *See* ECF No. 1522.  There should be no sympathy for those who received the Opt Out Form, clearly understood its implications, but failed to opt out for their own strategic reasons.

parties submitted valid Release Opt Out Forms that they not only received them, but that they knew how to fill them out and return them for tabulation. *See* Solicitation Declaration.

195.    Finally, as noted above, the Third-Party Releases comply with the Complex Case Procedures that provide: "[i]f a proposed plan seeks consensual releases with respect to claims that creditors may hold against non-debtor parties, then . . . [t]he ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases . . . ."  Complex Case Procedures, at ¶ 36.  Parties are free to opt out of the Third-Party Releases and, those who do so, will not be bound.  Courts in this district have approved similar opt-out elections in accordance with the Complex Case Procedures.  Specifically in *In re CBL & Associates Properties, Inc., et al.*, No. 20-35226 (DRJ), Docket No. 1186 (May 26, 2021), the court approved identical opt out procedures in a case involving plaintiffs in a class action lawsuit asserting securities fraud against the debtors and certain of their directors and officers.

196.    Here, the Release Opt-Out Form includes the full text of the Releases, bolded for emphasis in clear language so that all parties are made aware of who is being released from what.  The release provisions clearly notify all parties that causes of action related to the Securities Litigation are being released, and the Release Opt Out Form provides such parties with clear instructions on how to check a box and opt out of granting such Third-Party Releases.  Each release provision includes language regarding claims being released, which reads: "(which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action)." *See* Plan, § 10.6(b).  Here, Holders of Claims and Interests including Other Beneficial Owners, including Hoffman, had ***two*** rounds of solicitation over the course of approximately 8 weeks to complete and submit the Release Opt Out Form. First, on November 17

and 18, 2023, the Release Opt-Out Form was mailed out to Holders of Claims and Interests, as well as Other Beneficial Owners who are a current or former shareholder of equity securities of the Debtors, purchased during the period from January 3, 2022 through December 20, 2022. *See* Solicitation Declaration ⁋ 8, 13. The Holders of Claims and Interests including Other Beneficial Owners comprise all potential claimants that hold or may hold a claim that will be released pursuant to the Plan.

197.    On December 29, 2023, an amended Release Opt-Out Form, reflecting modifications to the Release provision from the Third Amended Plan to the Plan, was mailed out to Holders of Claims and Interests as well as Other Beneficial Owners. *See* Solicitation Declaration ⁋⁋ 10, 13. The Debtors specified that any prior received Release Opt-Out Forms would be effective. *See* Supplemental Disclosure Statement Section 1. Additionally, the Debtors provided all parties with an extension of the Opt Out Deadline from December 13, 2023 to January 11, 2024. *See* Supplemental Disclosure Statement Order ⁋ 9.

198.    The Release Opt Out Form contains language at the top of the page which reads: "a Holder of Claims, Interests, and/or an Other Beneficial Owner is deemed to grant the third-party releases set forth below unless such holder affirmatively opts out on or before the Opt Out Deadline." *See* Initial Disclosure Statement Order Exhibit 14. This plainly states the method by which parties can opt out of the releases.  By having noticed the Other Beneficial Owners, the Debtors noticed parties eligible to participate as plaintiffs in the Securities Litigation even if they no longer hold Core securities. Therefore, all necessary parties had the opportunity to opt out of the Third-Party Releases. Accordingly, the foregoing supports the conclusion that Hoffman and Claimants have received extensive notice and an opportunity to opt-out of the Third-Party Releases.

199.    The responses received by Stretto confirm that relevant parties received notice of the opt-out procedures and forms and sent them in. *See* Solicitation Declaration. Nonetheless, and as noted above, whether and to what extent specific members of the Securities Litigation received actual notice and are individually bound by the Third-Party Releases is not ripe for the Court today. To the extent a hypothetical class member later claims to not be bound by the release, that is a decision for a later time, and potentially another court, to address. What is ripe for today is whether the Third-Party Releases in the Plan (which expressly limits the universe of Other Beneficial Owners that may be a "Releasing Party" to those owners that were given notice of the opportunity to opt out) should be approved. Based on the foregoing, the answer to that question is an unequivocal and resounding, yes.

### D. Hoffman's Proposed Omnibus Opt-Out is Barred

200.    Hoffman suggests that the Court can exercise its discretion to permit him to file an "omnibus opt-out" of the Third-Party Releases on behalf of the Securities Litigation putative class. *See* Objection, at 27. Hoffman contends that Debtors never specifically objected previously to an omnibus opt-out, and that the Court did not address the issue. *Id.* The Debtors, and the Court, did not address that argument previously because the issue before the Court then related to proofs of claim, not third-party releases and omnibus opt outs.  In any event, for the same reasons the Court disallowed Hoffman's ability to file a class proof of claim, he also lacks the ability to act in a representative capacity on behalf of the Securities Litigation putative class to opt out of the Third-Party Releases on a class basis.  Accordingly, Hoffman's request for an omnibus opt out should also be denied.

### CONCLUSION

201.    The Disclosure Statement satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be approved.  In addition, the Plan satisfies

all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.  The Debtors respectfully request that the Court approve the Disclosure Statement on a final basis, confirm the Plan, overrule the Hoffman Objection, and grant such other and further relief as is just and appropriate.

Dated: January 14, 2024
      Houston, Texas

Respectfully submitted,

  /s/ *Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Clifford W. Carlson (24090024)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Clifford.Carlson@weil.com
       Austin.Crabtree@weil.com

– and –

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com
      Ronit.Berkovich@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on January 14, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Clifford W. Carlson_
Clifford W. Carlson