IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CORE SCIENTIFIC, INC., *et al.*, | Case No. 22-90341 (CML) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF NEAL P. GOLDMAN
IN SUPPORT OF CONFIRMATION OF FOURTH AMENDED JOINT
CHAPTER 11 PLAN OF CORE SCIENTIFIC, INC. AND ITS AFFILIATED DEBTORS**

I, Neal P. Goldman, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I have served as an independent director of the board (the "**Board**") of Core Scientific, Inc. ("**Core**" and, together with and its debtor affiliates, the "**Debtors**" or the "**Company**") since October 2022. I have also served on the special committee of independent directors of the Board (the "**Special Committee**") since it was formed in November 2022.

2. I submit this declaration (the "**Declaration**") in support of the *Fourth Amended Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1639),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

filed on December 28, 2023 (including any exhibits, schedules, or supplements thereto and as may be further amended, modified, or supplemented in accordance with its terms, the "**Plan**").[2]

3. I am knowledgeable about and familiar with the Debtors' business and financial affairs. Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents, my experience, knowledge, and information concerning the Debtors' operations and financial condition, my own reasonable inquiry, and/or my discussions with the Debtors' other directors, officers, and advisors. If called upon to testify, I would testify to the facts set forth in this Declaration.

## Background and Qualifications

4. I am the Managing Member and Chief Executive Officer of SAGE Capital Investments, LLC, a consulting firm specializing in independent board of director services, turnaround consulting, strategic planning, and special situation investments. I have more than twenty-five (25) years of experience as a consultant, corporate director, and investor. From 2001 to 2006, I served as a Managing Director and Portfolio Manager at MacKay Shields LLC. Thereafter, I became a Founding Partner at Brigade Capital Management, LLC, and served in that capacity from 2007 to 2012. I also served as a Managing Director at Och Ziff Capital Management, L.P. from 2014 to 2016. I received a Bachelor of Arts in English Literature from the University of Michigan in 1991 and a Master of Business Administration from the University of Illinois at Urbana-Champaign in 1993.

5. My professional experiences also include service as chairman or director for several corporate boards. I currently serve as the Chairman of the Board for Talos Energy Inc.,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

a position I have held since May 2018. I also serve as Chairman of the Board for Diamond Offshore Drilling, Inc., a position I have held since 2021. I am also a member of the Board of Weatherford International. I have also served as an independent director for numerous companies involved in financial restructurings that were consummated both through court-approved and "out-of-court" transactions, including LightSquared, Inc., J. Crew, Southeastern Grocers, Toys "R" Us, LBI Media, Healogics Corporation, Garrett Motion (Asassco), Elara/BW Homecare, and Lucky Bucks, LLC, among others.

### Formation and Duties of the Special Committee

6. The Board at all relevant times to these Chapter 11 Cases oversaw the Debtors' governance process, which worked as it was designed and intended. Based on my personal observations, I believe that each Board member acted as a fiduciary throughout the chapter 11 process and made decisions in furtherance of the Debtors' Estates.

7. On October 26, 2022, the Board unanimously appointed me as an additional independent director. On November 14, 2022, in connection with the Company's evaluation of strategic alternatives and to ensure the independence and propriety of such evaluation, the Board approved the formation of the Special Committee of three (3) independent directors: Mr. Kneeland Youngblood, Mr. Jarvis Hollingsworth, and me. On January 28, 2023, Mr. Hollingsworth resigned as a member of the Special Committee. The Board delegated authority to the Special Committee to, among other things, evaluate and, if deemed by the Special Committee to be in the best interests of the Debtors, authorize the Debtors to enter into any potential restructuring transactions and strategic alternatives for and on behalf of the Debtors with respect to their outstanding indebtedness and contractual and other liabilities. Since its formation, the Special Committee has regularly met independently, as well as with the Board, the Debtors' management, and the Debtors' advisors and overseen the Debtors' review, consideration, and implementation of strategic

alternatives, including, but not limited to, (i) the commencement of these Chapter 11 Cases, (ii) the mediation before the Honorable Judge Marvin Isgur, which commenced on July 17, 2023 pursuant to the Mediation Order (the "**Mediation**")[3] and eventually led to the RSA Settlement, as well as the subsequent mediation held before Judge Isgur in December, 2023 that resulted in the GUC Settlement, (iii) the Debtors' capital raise process (including the negotiation of the Rights Offering, the Backstop Commitment Letter, and the Exit Facility), and (iv) the Plan, the Plan Settlements (including, but not limited to, the RSA Settlement and the GUC Settlement), the Disclosure Statement, the Plan Supplement, and the transactions contemplated thereunder, each of which the Special Committee reviewed and approved.

8.  The Special Committee met frequently before and after the commencement of the Chapter 11 Cases. Throughout my tenure as an independent member of the Board and Special Committee, I, along with Mr. Youngblood, have worked consistently to uphold our fiduciary duties by independently exercising our oversight of the Debtors' restructuring process and have always been guided by a duty to maximize the value of the Debtors' Estates. In addition, based on my observations and interactions with each of the other members of the Board, I believe that at all times, both before and after the commencement of the Chapter 11 Cases, each Board member acted in accordance with their fiduciary duties by seeking to maximize the value of the Debtors' Estates—including, without limitation, through the creation of the Special Committee and the appointment of myself and Mr. Youngblood as independent members of the Board and Restructuring Committee.

---

[3] Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator Regarding Debtors' Chapter 11 Plan, entered on July 12, 2023 (Docket No. 1052) (the "**Mediation Order**").

**Special Committee Investigation**

9. In connection with certain releases by and between the Debtors and the Released Parties in Article 10.6(a) of the Plan (the "**Debtor Releases**"), the Special Committee instructed Weil, Gotshal & Manges LLP ("**Weil**") to conduct an investigation (the "**Investigation**") to determine whether any potential claims existed on behalf of the Debtors against any of the Debtors' former and current officers, directors, and shareholders (the "**Investigated Parties**") that were colorable and/or had value.

10. The Investigation, which lasted over several months, was focused on whether any colorable bankruptcy, state law, or common law claims could be asserted by the Company against the Investigated Parties, including potential claims based on, among other things, breach of fiduciary duty (including related party transactions), corporate waste, fraudulent conveyance, and breaches of company policies. As part of the Investigation, I understand that the Weil team (i) collected and reviewed thousands of Company documents and email correspondence related to the Investigated Parties, (ii) reviewed minutes of meetings of the Board, the audit committee of the Board, and the Special Committee, (iii) conducted numerous interviews, and (iv) performed substantive legal and factual analysis. Weil also provided updates to the Special Committee regarding the status of the investigation and preliminary findings prior to presenting a final assessment. In my capacity as a member of the Special Committee, I oversaw the Investigation, including reviewing the Investigation materials, asking questions, and offering feedback regarding the Investigation process.

**Debtor Releases**

11. The Special Committee received the Weil team's final assessment of the Investigation on November 10, 2023. Based upon the Investigation, the Special Committee concluded that there are no viable or colorable claims or Causes of Action against the Investigated

Parties worth pursuing in the context of these Chapter 11 Cases. The Special Committee also considered the fact that, in consideration of the Releases, many of the Investigated Parties and other Released Parties provided and continue to provide integral support to the Debtors during these Chapter 11 Cases and have contributed meaningfully to the Debtors' proposed reorganization. Certain of the Released Parties provided pre- and postpetition services to the Debtors in their capacity as directors, managers, and officers and guided the Debtors through their restructuring, including these Chapter 11 Cases. Specifically, the Debtors' officers, managers, directors, and executive management team were instrumental throughout these Chapter 11 Cases, including negotiation of the Plan Settlements and the Plan during the Mediation, which provides for a comprehensive restructuring of the Debtors' balance sheet, with a full recovery (100% of the Claim plus postpetition interest) to all creditors (other than Holders of Section 510(b) Claims and creditors that have agreed to take lesser treatment) and a meaningful recovery to their shareholders. In addition, since the inception of evaluation of the Debtors' strategic alternatives in order to preserve value for all stakeholders more than almost one and half years ago, and subsequently the commence of these Chapter 11 Cases, the Debtors' officers, managers, directors, and executive management team also (i) managed intense demands associated with these Chapter 11 Cases, while maintaining their regular operational duties, (ii) stabilized the Debtors' operations during the course of these Chapter 11 Cases in addition to ensuring the preservation of the Debtors' business as a going concern through the negotiation of the Plan and, by extension, the value of the Estates, and (iii) preserved more than 240 jobs.

12. In approving the Debtor Releases of the Released Parties (including the Investigated Parties), the Special Committee also considered the fact that the Debtor Releases contained certain limitations, including (among other limitations and carve-outs) that the Debtor

Releases (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (b) releasing any Released Party from Claims or Causes of Action held by the Debtors arising from an act or omission that is determined by a Final Order or by a federal government agency to have constituted a violation of any federal securities laws.

13. Moreover, I understand that many of the Released Parties made significant concessions in these Chapter 11 Cases as part of Plan Settlements, including the release of Claims held against the Debtors' Estates, which resulted in the value-maximizing Plan. I also understand that the Debtor Releases were a material inducement for parties to enter into the RSA Settlement and various other Plan Settlements and provide their support for the Plan and the Plan Settlements embodied therein.

14. Accordingly, the Special Committee determined that the Debtor Releases, as set forth in Section 10.6(a) of the Plan, were appropriate, in the best interest of the Estates, and should be approved, subject to the Special Committee's fiduciary-out rights under the RSA with respect to any new facts that the Special Committee was to become aware of leading up to confirmation. The Special Committee voted to approve filing of the Plan, including the Debtor Releases therein, on December 15, 2023. Furthermore, the Special Committee is not aware of any new facts that would necessitate reconsideration of the conclusion reached in the Investigation. The Special Committee's approval of the Debtor Releases demonstrates an independent view concerning the viability and propriety of potential claims released thereby.

15. Moreover, based on my experience as an independent board member in various chapter 11 cases, the Debtor Releases constitute a sound exercise of the Debtors' business

judgment, are customary in transactions of this kind, are fair and reasonable, and are in the best interests of the Debtors and their Estates.

### Third-Party Releases

16. I understand that Section 10.6(b) of the Plan sets forth certain voluntary releases and discharge of any and all claims and Causes of Action by certain non-Debtor third parties (the "**Third-Party Releases**"). The Special Committee has reviewed the Third-Party Releases as part of its oversight of these Chapter 11 Cases and supports the inclusion of the Third-Party Releases in the Plan. In addition, the Investigation undertaken at the Special Committee's direction reviewed the facts and circumstances involving claims against the Debtors' current and former officers and directors that are also the subject of the putative class action in *Pang v. Levitt, et al.*, Case No. 1:22-cv-01191-DAE (W.D. Tex.), D.I. 73, which further informed the Special Committee's view that the Third-Party Releases are appropriate.

17. I also understand that there are procedures in place that allowed parties to opt-out of the Third-Party Releases and that such releases contained customary limitations and carve-outs, including that the Plan does not release any of the Released Parties for claims or causes of action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. Finally, my understanding is that the Third-Party Releases were a material inducement for parties to enter into the RSA Settlement and various other Plan Settlements and provide their support for the Plan and the Plan Settlements embodied therein. In approving the Third Party Releases, I also considered the fact

that the Debtors owe certain indemnification obligations to certain of the Released Parties and that the Plan provides that such indemnification obligations will survive following the Effective Date.

### Plan, RSA Settlement, and GUC Settlement

18. As mentioned above, since its formation, the Special Committee has regularly met on its own, with the Board, the Debtors' management, and the Debtors' advisors and overseen the Debtors' review, consideration, and implementation of strategic alternatives, including the Plan, the RSA Settlement, the GUC Settlement, and the Mediation that culminated in the RSA Settlement and the GUC Settlement.

    **A.**    **RSA Settlement**

19. After months of extensive, arms'-length negotiation and Mediation since July 2023, the Debtors finalized and executed that certain *Restructuring Support Agreement* (Docket No. 1440) on November 16, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including all exhibits, annexes, and schedules thereto, the "**RSA**") with (i) the Convertible Noteholders that are members of the Ad Hoc Noteholder Group and comprise (a) 93% of the Holders of the April Convertible Notes Secured Claims and (b) 80% of the Holders of the August Convertible Notes Secured Claims (collectively, the foregoing (a) and (b), the "**Consenting Creditors**") and (ii) the Equity Committee and the members of the Equity Committee, excluding Foundry Digital LLC (collectively, the "**RSA Parties**").[4] The RSA Settlement was incorporated

---

[4] Although Foundry Digital LLC ("**Foundry**") is not party to the RSA, the Debtors and Foundry have reached a revised settlement with Foundry (the "**Foundry Settlement**"), which is described in greater detail in the Plan.

in the *Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1438) (including any exhibits and schedules thereto, the "**Third Amended Plan**").

20. The RSA Settlement is a global settlement of issues between the Debtors and the RSA Parties. The RSA Settlement, among other things, brings consensus amongst the RSA Parties with respect to the Enterprise Value of the Reorganized Debtors. The RSA Settlement also resolves a dispute regarding the amounts of Allowed Convertible Notes Secured Claims and the treatment of the Convertible Notes Secured Claims. It allows the Debtors to avoid litigation of all these issues, which would be costly to the Debtors' estates and result in significant delay to the confirmation of the Debtors' Plan, while the result of such litigation would be uncertain. The Special Committee reviewed and approved the terms of the RSA Settlement. Based upon my review of the Plan, and the RSA and discussions with the Debtors' management and advisors, I believe that the RSA Settlement maximizes value for the Debtors and their Estates and provides certainty and a path toward emergence to the Debtors and their stakeholders.

B. **GUC Settlement**

21. Subsequent to the entry into and execution of the RSA, the Debtors continued good-faith negotiation with B. Riley and the Creditors' Committee in hopes of reaching a fully consensual Plan. After filing of the Third Amended Plan, the Creditors' Committee served various discovery and depositions requests, and the Debtors produced numerous documents in response to the Creditors' Committee document requests. The Debtors also organized a subsequent Mediation before Judge Isgur and were eventually able to finalize the GUC Settlement with B. Riley, the Creditors' Committee, and the members thereof (except for any claims (i) held by the Debtors against Sphere 3D Corp. or (ii) held by Sphere 3D Corp. against the Debtors).[5] The

---

[5] The Debtors have also since reached a settlement with Sphere 3D Corp. and Gryphon Digital Mining, Inc., described in greater detail in the Debtors' *Emergency Motion for Order (I) Authorizing And Approving Settlement*

GUC Settlement resolves the remaining issues with respect to the Plan amongst the Debtors and the Key Stakeholder Groups and is supported by all five of the Key Stakeholder Groups.

22. The Special Committee reviewed and approved the terms of the GUC Settlement embodied in the Plan. Based upon my review of the GUC Settlement and the Plan, with the assistance of the Debtors' management and advisors, I believe that the GUC Settlement is in the best interests of the Debtors' Estates because it fully and finally settles various Plan-related issues amongst the Key Stakeholder Groups and allows the Plan to enjoy support from all five of the Key Stakeholder Groups, which the Debtors have strived to achieve since inception of these Chapter 11 Cases. In addition, the GUC Settlement allows the Debtors to avoid incurring extensive litigation costs related to discovery requests from the Creditors' Committee and litigating the potential confirmation challenges.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 14, 2024
New York, New York

                                                */s/ Neal P. Goldman*
                                                Neal P. Goldman

---

*Among Debtors, Sphere 3D Corp., and Gryphon Digital Mining Inc., and (II) Granting Related Relief* (Docket No. 1663), which, among other things, provides for mutual releases between the Debtors on the one hand and Sphere 3D Corp. and Gryphon Digital Mining, Inc. on the other hand.