**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **CORE SCIENTIFIC, INC.,** ***et al.,*** | § | **Case No. 22-90341 (CML)** |
| **Debtors.**[1] | § | **(Jointly Administered)**<br>**Re: Docket Nos. 1639 and 1722** |

**NOTICE OF FILING OF REDLINE FOR**
**FOURTH AMENDED JOINT CHAPTER 11 PLAN**
**OF CORE SCIENTIFIC, INC. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE THAT**, on December 28, 2023, Core Scientific, Inc., and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), filed the *Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1639) (including any exhibits and schedules thereto, the "**Fourth Amended Plan**").

**PLEASE TAKE FURTHER NOTICE THAT**, since the filing of the Fourth Amended Plan, the Debtors have made additional technical modifications to the Fourth Amended Plan, which are reflected in the *Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors (With Technical Modifications)* (Docket No. 1722) (including any exhibits and schedules thereto, the "**Fourth Amended Plan (With Technical Modifications)**").

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

**PLEASE TAKE FURTHER NOTICE THAT** annexed hereto as **Exhibit 1** is a changed-pages-only redline reflecting incremental changes between the Fourth Amended Plan and the Fourth Amended Plan (With Technical Modifications).

[*Remainder of page intentionally left blank*]

Dated: January 15, 2024
      Houston, Texas

Respectfully submitted,

*/s/  Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Clifford W. Carlson (24090024)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Clifford.Carlson@weil.com
          Austin.Crabtree@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Ray.Schrock@weil.com
        Ronit.Berkovich@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on January 15, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson

**Exhibit A**

**Changed-Pages-Only Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC., *et al.*,** | § | **Case No. 22-90341 (CML)** |
| | § | |
| **Debtors[1]** | § | **(Jointly Administered)** |
| | § | |

**FOURTH AMENDED JOINT
CHAPTER 11 PLAN OF
CORE SCIENTIFIC, INC.
AND ITS AFFILIATED DEBTORS (WITH TECHNICAL MODIFICATIONS)**

**WEIL, GOTSHAL & MANGES LLP**
~~Alfredo R. Pérez (15776275)~~
Clifford W. Carlson (24090024)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors
and Debtors in Possession*

Dated: ~~December 28,~~ January 15, 202~~3~~4
Houston, Texas

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

Table of Contents

Page

**ARTICLE I.** DEFINITIONS AND INTERPRETATION. 1
- A. **Definitions** 1
- B. **Interpretation; Application of Definitions and Rules of Construction.** 37
- C. **Computation of Time** 38
- D. **Reference to Monetary Figures.** 38
- E. **Reference to the Debtors or the Reorganized Debtors** 38
- F. **Controlling Document.** 38

**ARTICLE II.** ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS. 38
- 2.1. ***Administrative Expense Claims.*** ~~38~~39
- 2.2. ***Professional Fee Claims.*** 39
- 2.3. ***Priority Tax Claims.*** 39
- 2.4. ***DIP Claims.*** ~~39~~40
- 2.5. ***Restructuring Fees and Expenses and Notes Agent Fees and Expenses.*** 40
- 2.6. ***Professional Fee Escrow.*** 40
- 2.7. ***Professional Fee Claims Estimate.*** 41
- 2.8. ***Post-Effective Date Fees and Expenses.*** 41

**ARTICLE III.** CLASSIFICATION OF CLAIMS AND INTERESTS. 41
- 3.1. ***Classification in General.*** 41
- 3.2. ***Summary of Classification of Claims and Interests.*** ~~41~~42
- 3.3. ***Special Provision Governing Unimpaired Claims.*** 42
- 3.4. ***Elimination of Vacant Classes.*** ~~42~~43
- 3.5. ***No Waiver.*** ~~42~~43
- 3.6. ***Voting Classes; Presumed Acceptance by Non-Voting Classes.*** 43
- 3.7. ***Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.*** 43

**ARTICLE IV.** TREATMENT OF CLAIMS AND INTERESTS. 43
- 4.1. ***April Convertible Notes Secured Claims (Class 1).*** 43
- 4.2. ***August Convertible Notes Secured Claims (Class 2).*** ~~43~~44
- 4.3. ***Miner Equipment Lender Secured Claims (Class 3).*** 44
- 4.4. ***Other Secured Claims (Class 4).*** 45
- 4.5. ***M&M Lien Secured Claims (Class 5).*** ~~45~~46
- 4.6. ***Secured Mortgage Claims (Class 6).*** 47
- 4.7. ***Priority Non-Tax Claims (Class 7).*** ~~47~~48
- 4.8. ***General Unsecured Claims (Class 8A).*** 48
- 4.9. ***Convenience Claims (Class 8B).*** ~~48~~49
- 4.10. ***Intercompany Claims (Class 9).*** 49
- 4.11. ***Intercompany Interests (Class 10).*** 49
- 4.12. ***Section 510(b) Claims (Class 11).*** ~~49~~50
- 4.13. ***Existing Common Interests (Class 12).*** 50

**ARTICLE V.** MEANS FOR IMPLEMENTATION. ~~50~~51
- 5.1. ***Compromise and Settlement of Claims, Interests, and Controversies.*** ~~50~~51
- 5.2. ***Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions.*** 51

Table of Contents
(continued)

Page

5.3. *Intercompany Interests.* 52
5.4. *Authorization and Issuance of New Secured Convertible Notes.* 52
5.5. *Authorization and Issuance of New Secured Notes.* 53
5.6. *Authorization and Issuance of the Contingent Payment Obligations.* 54
5.7. *Authorization and Issuance of the GUC Contingent Payment Obligations.* ~~54~~55
5.8. *New Miner Equipment Lender Debt Facilities.* ~~54~~55
5.9. *Exit Facility.* ~~55~~56
5.10. *New Intercreditor Agreements.* ~~56~~57
5.11. *RSA Settlement.* 57
5.12. *GUC Settlement.* ~~57~~58
5.13. *Miner Equipment Lender Settlement.* 58
5.14. *Brown Settlement.* ~~59~~60
5.15. *Holliwood Settlement.* 60
5.16. *Foundry Settlement* ~~60~~61
5.17. *Rights Offering* ~~61~~62
5.18. *Exemption from Securities Laws.* 62
5.19. *Cancellation of Existing Securities and Agreements.* 64
5.20. *Cancellation of Liens.* ~~64~~65
5.21. *Officers and Boards of Directors.* 65
5.22. *Management Incentive Plan.* 66
5.23. *Authorization, Issuance, and Delivery of New Common Interests and New Warrants; New Listing.* 66
5.24. *Nonconsensual Confirmation.* ~~68~~69
5.25. *Closing of the Chapter 11 Cases.* ~~68~~69
5.26. *Notice of Effective Date.* 69

**ARTICLE VI.** DISTRIBUTIONS. 69
6.1. *Distributions Generally.* 69
6.2. *Distribution Record Date.* 69
6.3. *Date of Distributions.* 70
6.4. *Disbursing Agent.* ~~70~~71
6.5. *Rights and Powers of Disbursing Agent.* ~~70~~71
6.6. *Expenses of Disbursing Agent.* 71
6.7. *No Postpetition Interest on Claims.* ~~71~~72
6.8. *Delivery of Distributions.* ~~71~~72
6.9. *Distributions after Effective Date.* 72
6.10. *Unclaimed Property.* ~~72~~73
6.11. *Time Bar to Cash Payments.* ~~72~~73
6.12. *Manner of Payment under Plan.* ~~72~~73
6.13. *Satisfaction of Claims.* 73
6.14. *Fractional Stock and Notes.* 73
6.15. *Minimum Cash Distributions.* ~~73~~74
6.16. *Setoffs and Recoupments.* ~~73~~74
6.17. *Allocation of Distributions between Principal and Interest.* 74
6.18. *No Distribution in Excess of Amount of Allowed Claim or Existing Common Interest.* 74

Table of Contents
(continued)

Page

6.19. *Withholding and Reporting Requirements.* 74

**ARTICLE VII.** PROCEDURES FOR DISPUTED CLAIMS. 75
7.1. *Disputed Claims Generally.* 75
7.2. *Objections to Claims.* 75
7.3. *Estimation of Claims.* ~~75~~76
7.4. *Adjustment to Claims Register Without Objection.* ~~75~~76
7.5. *Disallowance of Claims.* 76
7.6. *No Distributions Pending Allowance.* ~~76~~77
7.7. *Distributions after Allowance.* ~~76~~77
7.8. *Claim Resolution Procedures Cumulative.* ~~76~~77
7.9. *Single Satisfaction of Claims and Interests.* ~~76~~77
7.10. *Amendments to Claims.* 77
7.11. *Procedures for Reinstated Claims.* 77

**ARTICLE VIII.** EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ~~77~~78
8.1. *General Treatment.* ~~77~~78
8.2. *Determination of Assumption and Cure Disputes and Deemed Consent.* ~~78~~79
8.3. *Rejection Claims.* ~~79~~80
8.4. *Survival of the Debtors' Indemnification Obligations.* 80
8.5. *Employee Arrangements and Employee Obligations.* ~~80~~81
8.6. *Insurance Policies/Claims Payable By Third Parties.* ~~82~~83
8.7. *Intellectual Property Licenses and Agreements.* ~~83~~84
8.8. *Assignment.* ~~83~~84
8.9. *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* ~~84~~85
8.10. *Reservation of Rights.* ~~84~~85

**ARTICLE IX.** CONDITIONS PRECEDENT TO EFFECTIVE DATE. ~~84~~85
9.1. *Conditions Precedent to the Effective Date.* ~~84~~85
9.2. *Timing of Conditions Precedent.* ~~86~~87
9.3. *Waiver of Conditions Precedent.* ~~86~~87
9.4. *Effect of Failure of a Condition.* ~~86~~87

**ARTICLE X.** EFFECT OF CONFIRMATION OF PLAN. ~~86~~87
10.1. *Vesting of Assets in the Reorganized Debtors.* ~~86~~87
10.2. *Binding Effect.* ~~87~~88
10.3. *Discharge of Claims and Termination of Interests.* ~~87~~88
10.4. *Term of Injunctions or Stays.* ~~87~~88
10.5. *Injunction.* 88
10.6. *Releases.* ~~89~~90
10.7. *Exculpation.* ~~91~~92
10.8. *Retention of Causes of Action/Transfer of Causes of Action and Reservation of Rights.* ~~92~~93
10.9. *Ipso Facto and Similar Provisions Ineffective.* ~~92~~93
10.10. *Solicitation of Plan.* ~~92~~93

Table of Contents
(continued)

Page

10.11. ***Corporate and Limited Liability Company Action*** ........ ~~93~~94
10.12. ***Waiver of Avoidance Actions*** ........ ~~93~~94

**ARTICLE XI.** RETENTION OF JURISDICTION. ........ ~~93~~94
11.1. ***Retention of Jurisdiction*** ........ ~~93~~94
11.2. ***Courts of Competent Jurisdiction*** ........ ~~95~~96

**ARTICLE XII.** MISCELLANEOUS PROVISIONS. ........ ~~95~~96
12.1. ***Payment of Statutory Fees*** ........ ~~95~~96
12.2. ***Substantial Consummation of the Plan*** ........ ~~95~~96
12.3. ***Request for Expedited Determination of Taxes*** ........ 96
12.4. ***Exemption from Certain Transfer Taxes*** ........ ~~96~~97
12.5. ***Amendments*** ........ ~~96~~97
12.6. ***Effectuating Documents and Further Transactions*** ........ ~~97~~98
12.7. ***Revocation or Withdrawal of the Plan*** ........ ~~97~~98
12.8. ***Severability of Plan Provisions*** ........ ~~97~~98
12.9. ***Governing Law*** ........ ~~97~~98
12.10. ***Time*** ........ ~~98~~99
12.11. ***Dates of Actions to Implement the Plan*** ........ ~~98~~99
12.12. ***Immediate Binding Effect*** ........ ~~98~~99
12.13. ***Deemed Acts*** ........ ~~98~~99
12.14. ***Successor and Assigns*** ........ ~~98~~99
12.15. ***Entire Agreement*** ........ ~~98~~99
12.16. ***Exhibits to Plan.*** ~~98~~99
12.17. ***Dissolution of Creditors' Committee and Equity Committee.*** ........ ~~99~~100
12.18. ***Notices*** ........ ~~99~~100

No. 5, dated April 27, 2022, by and between Core Scientific, Inc. and Barings Capital Investment Corporation, issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 5, dated August 12, 2022, by and between Core Scientific Inc. and Barings Capital Investment Corporation, and (vi) that certain Collateral Schedule No. 6, dated April 27, 2022, by and between Core Scientific, Inc. and Barings Private Credit Corp., issued in connection with that certain Master Security Agreement, dated March 24, 2022, by and between Core Scientific, Inc., on one hand, and Barings BDC, Inc., Barings Capital Investment Corporation, and Barings Private Credit Corp., on the other hand, and as amended by that certain Amendment No. 1 to Collateral Schedule No. 6, dated August 12, 2022, by and between Core Scientific Inc. and Barings Private Credit Corp.

*1.41* ***"Bitmain APA"*** means that certain *Asset Purchase Agreement*, dated September 5, 2023, by and between Bitmain Technologies Delaware Limited and Core Scientific, Inc., as amended by that certain *Amendment to Asset Purchase Agreement*, dated November 6, 2023; *provided*, that any further amendments to the Bitmain APA shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.42* ***"Bitmain Transaction"*** means the transaction described in the *Debtors' Motion for Entry of an Order (I) Authorizing Core Scientific, Inc.'s Entry Into Asset Purchase Agreement and (II) Granting Related Relief* (Docket No. 1497) and approved by the Bankruptcy Court pursuant to the *Order (I) Authorizing Core Scientific, Inc.'s Entry Into Asset Purchase Agreement and (II) Granting Related Relief* (Docket No. ~~[●]~~1675), which approves, among other things, entry into the Bitmain APA and any related agreements, each of which shall be reasonably acceptable to the Requisite Consenting Creditors.

*1.43* ***"BlockFi Agreements"*** means those certain Facility and Security Agreements, each dated December 30, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and BlockFi Lending LLC.

*1.44* ***"Bremer Agreements"*** means (i) that certain Loan Agreement, dated October 4, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Bremer Bank, National Association, as amended by that certain 2021 Amendment to Loan Agreement, dated December 10, 2021, (ii) that certain Security Agreement, dated October 4, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Bremer Bank, National Association, as amended by that certain Leasehold Mortgage Modification Agreement and Extension Affidavit, dated December 10, 2021, (iii) those certain Promissory Notes, dated October 4, 2021, October 4, 2021, and December 10, 2021, issued in connection therewith, and (iv) those certain other Loan Documents (as defined in the Loan Agreement described in clause (i) hereof).

*1.45* ***"Bremer Secured Claim"*** means the Claim held by Bremer Bank, National Association arising from the Bremer Agreements.

*1.46* ***"Brown Agreement"*** means that certain Purchase Money Deed to Secured Debt, dated September 28, 2018, by and between American Property Acquisitions VI, LLC (and assigned by operation of law to American Property Acquisition, LLC, the sole member of American Property Acquisitions VI, LLC, following the dissolution of American Property Acquisitions VI, LLC) and Brown Corporation, securing the indebtedness evidenced by that certain Promissory Note, dated September 28,

*1.130* "***Foundry***" means Foundry Digital LLC.

*1.131* "***Foundry Allowed Claims***" has the meaning set forth in section 5.16 hereof.

*1.132* ***"Foundry Claims"*** means the Claims held by Foundry arising under or related to the A&R Purchase Agreement (as defined in the Foundry Settlement Agreement), including those set forth in the Foundry POCs.

*1.133* "***Foundry Hosting Agreements***" means, collectively, (i) the Master Services Agreement, dated November 23, 2019, between Core Scientific Operating Company (f/k/a Core Scientific, Inc.) and Foundry (the "**2019 Foundry MSA**"), and each of the Orders (as defined in the 2019 Foundry MSA) entered into or executed between Core Scientific Operating Company or Core Scientific, Inc. (as applicable) pursuant to or in connection with the 2019 Foundry MSA, including the Master Services Agreement Order #5, Master Services Agreement Order #6 and Master Services Agreement Order #7, in each case, as amended, supplemented or modified in accordance with the terms thereof and (ii) the Master Services Agreement, dated September 21, 2022, between Core Scientific, Inc. and Foundry (the "**2022 Foundry MSA**"), and each of the Orders (as defined in the 2022 Foundry MSA) entered into or executed between Core Scientific Operating Company or Core Scientific, Inc. (as applicable) pursuant to or in with the 2022 Foundry MSA, including the Master Services Agreement Order #1, in each case, as amended, supplemented or modified in accordance with the terms thereof.

*1.134* "***Foundry POCs***" means Proofs of Claim numbers 360 and 361, each in the amount of not less than $18,404,990.08, plus interest, filed by Foundry against certain of the Debtors.

*1.135* ~~-~~"***Foundry Settlement***" means the settlement, transactions and agreements among the Debtors and Foundry, and the consideration given or received, as applicable, by each, as set forth in, and subject to the terms and conditions of, the Foundry Settlement Agreement.

*1.136* "***Foundry Settlement Agreement***" means that certain Settlement Agreement, dated as of ~~[December][●]~~January 12, 202~~3~~4, by and among Foundry, Core Scientific, Inc. and the other Debtors (together with all appendices, exhibits, and schedules thereto), which the Debtors shall have obtained or shall seek approval of from the Bankruptcy Court on or before the Confirmation Hearing and which shall be acceptable to the Requisite Consenting Creditors.

*1.137* **"*Foundry Settlement Approval Order*"** has the meaning set forth in section 5.16 hereof.

*1.138* ***"General Bar Date"*** means April 14, 2023, at 5:00 p.m. (prevailing Central Time), which is the deadline by which all Persons, except Governmental Units, were required to have Filed Proofs of Claim against the Debtors as established by the Bar Date Order.

*1.139* ***"General Contract"*** means any agreement, contract, or purchase order between a Debtor that owns or leases real property and a General Contractor for the provision of labor, materials, equipment, and/or services in connection with the construction, development, or improvement of any real property owned or leased by such Debtor.

*1.140* ***"General Contractor"*** means a Person contracting directly with any Debtor pursuant to a General Contract.

*1.141* ***"General Contractor Unsecured Claim"*** means a Claim held by a General Contractor arising from a General Contract that is not a Secured Claim, which Claim shall be Allowed as a General

Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement, and (iv) that certain Equipment Schedule No. 15, dated December 29, 2021, by and between Core Scientific, Inc. (now known as Core Scientific Operating Company) and Core Scientific Holding Co. (now known as Core Scientific, Inc.), on one hand, and Liberty Commercial Finance LLC, on the other hand, issued in connection with the Liberty Master Lease Agreement. For the avoidance of doubt, (i) the Liberty Non-Miner Agreements are not Unexpired Leases and are financing agreements and (ii) the equipment that is the subject of the Liberty Non-Miner Agreements are Assets owned by the applicable Debtor.

*1.170* "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

*1.171* "***Local Bankruptcy Rules***" means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

*1.172* "***M&M Lien" or "M&M Liens"*** means the mechanics', materialmens', workmens', and repairmens' Liens and other similar Liens and encumbrances arising under state law, including any Liens filed, asserted, or held by General Contractors and Subcontractors, encumbering any real property owned or leased by any Debtor, regardless of whether a Proof of Claim has been filed relating to such Liens, which Liens and encumbrances (i) may be determined to be validly perfected prepetition or may be deemed to be validly perfected prepetition pursuant to applicable state laws permitting relation back, in each case, if the applicable lienholder complied with the state law procedures required to perfect the same and (ii) allegedly satisfy the requirements of Bankruptcy Code section 546(b).

*1.173* ***"M&M Lien Claims Schedule"*** means the schedule attached hereto as **Exhibit I**.

*1.174* ***"M&M Lien Secured Claims"*** means, collectively, the Claims, the amount of which the Debtors' books and records reflect are attributable to the provision by General Contractors and Subcontractors of labor, materials, equipment and/or services in connection with the construction, development or improvement of any real property owned or leased by any Debtor and for which such General Contractors and Subcontractors may be entitled to an M&M Lien, as set forth on the M&M Lien Claims Schedule in the column titled "Amount of Allowed M&M Lien Secured Claim," in each case held by the applicable Holder, secured by the applicable Collateral, and in the applicable amounts as set forth on the M&M Lien Claims Schedule.

*1.175* ***"M&M Lien Settlement"*** means any settlement of an M&M Lien Secured Claim approved by the Bankruptcy Court, each in accordance with the terms and provisions of the relevant settlement agreement, including the settlements approved by the Bankruptcy Court pursuant to the (i) *Order Approving (I) Global Settlement Between Debtors and Condair Inc. and (II) Granting Related Relief* (Docket No. 1057), (ii) *Order Approving (I) Global Settlement Between Debtors and Huband-Mantor Construction, Inc. and (II) Granting Related Relief* (Docket No. 1167), (iii) *Order Approving (I) Global Settlement Between Debtors and JW Didado Electric LLC and (II) Granting Related Relief* (Docket No. 1288), (iv) *Order Approving (I) Global Settlement Between Debtors and Trilogy LLC and (II) Granting Related Relief* (Docket No. 1289), (v) *Order Approving (I) Global Settlement Between Debtors and Harper Construction Company, Inc. and (II) Granting Related Relief* (Docket No. 1167), (vi) *Order (I) Authorizing and Approving (A) Settlement Between Debtors and Maddox Industrial Transformer LLC, (B) Purchase of Transformers, (C) Rejection of Existing Purchase Orders, and (II) Granting Related Relief* ~~(Docket No. [●])~~, (vii) *Order (I) Authorizing (A) Assumption of McCarthy Contracts, as Amended in Accordance with the Settlement Agreement and (B) Entry Into the Settlement Agreement, and (II) Granting Related Relief* ~~(Docket No. [●])~~, and (viii) any other settlement of an M&M Lien Secured Claim approved by the Bankruptcy Court, which settlement shall include terms

*1.205* ***"New Miner Equipment Lender Debt Documents (Election 2)"*** means, collectively, the New Miner Equipment Lender Debt Facilities (Election 2) and all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof), each of which shall, to the extent applicable, contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Election 2) and be in form and substance otherwise reasonably acceptable to the Settling Miner Equipment Lenders party thereto and acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.206* ***"New Miner Equipment Lender Debt Term Sheet (Default)"*** means that certain term sheet attached hereto as **Exhibit E** that sets forth the principal terms of the Miner Equipment Takeback Debt (Default).

*1.207* ***"New Miner Equipment Lender Debt Term Sheet (Election 2)"*** means that certain term sheet attached hereto as **Exhibit F** that sets forth the principal terms of the Miner Equipment Takeback Debt (Election 2).

*1.208* ***"New Miner Equipment Lender Debt Facilities (Default)"*** means those certain loan and security agreements, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), in each case, by and between the Debtor that is party to the applicable Miner Equipment Lender Agreement and the applicable Holder, which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Default) and be in form and substance otherwise reasonably acceptable to the Debtors, the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA), and the Settling Miner Equipment Lenders party thereto.

*1.209* ***"New Miner Equipment Lender Debt Facilities (Election 2)"*** means those certain loan and security agreements, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), in each case, by and between the Debtor that is party to the applicable Miner Equipment Lender Agreement and the applicable Holder, which shall contain terms consistent with the New Miner Equipment Lender Debt Term Sheet (Election 2) and be in form and substance otherwise reasonably acceptable to the Debtors, the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA), and the Settling Miner Equipment Lenders party thereto.

*1.210* ***"New Secured Convertible Notes"*** means the secured convertible notes to be issued to Holders of Convertible Notes Secured Claims by Reorganized Parent, in the aggregate principal amount of $260,000,000, on the terms and conditions set forth in the New Secured Convertible Notes Documents.

*1.211* ***"New Secured Convertible Notes Agent"*** means the ~~note agent~~trustee and collateral agent under the New Secured Convertible Notes Indenture, which shall be selected by the Requisite Consenting Creditors.

*1.212* ***"New Secured Convertible Notes Documents"*** means, collectively, the New Secured Convertible Notes Indenture and all other "Note Documents" (as defined in the New Secured Convertible Notes Indenture), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each

of which shall, to the extent applicable, contain terms consistent with the New Secured Convertible Notes Term Sheet and shall otherwise be acceptable to the Debtors and the Requisite Consenting Creditors and reasonably acceptable to the Equity Committee (subject to the parties' rights and obligations under the RSA).

*1.213* ***"New Secured Convertible Notes Indenture"*** means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New Secured Convertible Notes Term Sheet and shall otherwise be acceptable to the Debtors and the Requisite Consenting Creditors and reasonably acceptable to the Equity Committee (subject to the parties' rights and obligations under the RSA).

*1.214* "***New Secured Convertible Notes Term Sheet"*** means that certain term sheet attached hereto as **Exhibit C** that sets forth the principal terms of the New Secured Convertible Notes.

*1.215* ***"New Secured Notes"*** means the secured notes to be issued to Holders of April Convertible Notes Secured Claims by Reorganized Parent, in the aggregate principal amount of $150,000,000, on the terms and conditions set forth in the New Secured Notes Documents.

*1.216* ***"New Secured Notes Agent"*** means the ~~note agent~~trustee and collateral agent under the New Secured Notes Indenture, which shall selected by the Requisite Consenting Creditors.

*1.217* ***"New Secured Notes Documents"*** means, collectively, the New Secured Notes Indenture and all other "Note Documents" (as defined in the New Secured Notes Indenture), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the New Secured Notes Term Sheet and shall otherwise be acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.218* ***"New Secured Notes Indenture"*** means that certain indenture, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), which shall contain terms consistent with the New Secured Notes Term Sheet and shall otherwise be acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.219* ***"New Secured Notes Term Sheet"*** means that certain term sheet attached hereto as **Exhibit B** that sets forth the principal terms of the New Secured Notes.

*1.220* ***"New Warrants Agreement"*** means a warrant agreement governing the New Warrants, substantially in the form to be included in the Plan Supplement, which shall contain terms consistent with the New Warrants Term Sheet and shall otherwise be acceptable to the Debtors, the Requisite Consenting Creditors, and the Equity Committee (subject to the parties' rights and obligations under the RSA).

*1.221* ***"New Warrants"*** means two tranches of warrants with the terms and subject to the conditions set forth in the New Warrants Agreement.

Settling Miner Equipment Lenders' rights or Claims), and the Creditors' Committee (solely to the extent it materially affects the GUC Settlement or treatment of General Unsecured Claims).

*1.244* ***"Plan Distribution"*** means the payment or distribution of consideration to Holders of Allowed Claims and Existing Common Interests under the Plan.

*1.245* ***"Plan Documents"*** means any of the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, each of which shall be in form and substance acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.246* ***"Plan Equity Value"*** means the Enterprise Value, minus the sum of the net debt (calculated by subtracting the excess cash balance from total debt and to be determined by the Debtors, the Requisite Consenting Creditors, the Creditors' Committee, and the Equity Committee prior to the Effective Date) incurred pursuant to the Exit Facility (amount drawn as of the Effective Date), New Secured Notes, New Secured Convertible Notes, Miner Equipment Lender Takeback Debt (Default), Miner Equipment Lender Takeback Debt (Election 2), Reinstated Other Secured Claims Agreements, M&M Lien Takeback Debt, the M&M Lien Settlements, ~~and~~ Mortgage Takeback Debt, and the promissory note to be issued pursuant to the *Order (I) Authorizing Assumption and Performance of the Legacy Dalton Agreements, as Amended by the Dalton Settlement Agreement and (II) Granting Related Relief* (Docket No. 1651).

*1.247* ***"Plan Settlements"*** means, collectively, the RSA Settlement, the GUC Settlement, the Miner Equipment Lender Settlement, the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement.

*1.248* ***"Plan Supplement"*** means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (i) the New Corporate Governance Documents solely with respect to Reorganized Parent; (ii) the New Secured Convertible Notes Indenture; (iii) the New Secured Notes Indenture; (iv) the Contingent Payment Obligations Agreement; (v) the New Miner Equipment Lender Debt Documents; (vi) the Exit Facility Credit Agreement; (vii) the New Warrants Agreement; (viii) the New Intercreditor Agreement (Miner Equipment Lenders, New Secured Notes, New Secured Convertible Notes, Exit Facility); (ix) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (x) the Restructuring Transactions Exhibit; (xi) the Schedule of Retained Causes of Action; (xii) the Schedule of Rejected Contracts; (xiii) the Schedule of Assumed Contracts; and (xiv) the Schedule of Allowed General Unsecured Claims~~; and (xv) any form Registration Rights Agreement, if applicable~~, each of which shall be in form and substance acceptable to the Debtors and Required Consenting Creditors (subject to the parties' rights and obligations under the RSA); *provided*, that through the Effective Date, the Debtors, with the consent of the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA), shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the RSA; *provided*, *further*, that the New Corporate Governance Documents of Reorganized Parent, the New Warrants Agreement, the form Registration Rights Agreement, if applicable and related documents shall also be in form and substance acceptable to the Equity Committee, and the New Secured Convertible Notes Documents shall also be in form and substance reasonably acceptable to the Equity Committee (subject to the parties' rights and obligations under the RSA; *provided*, *further*, that the New Miner

*1.263* ***"Proof of Claim"*** means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

*1.264* ***"Reinstate, Reinstated, or Reinstatement"*** means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

*1.265* ***"Related Parties"*** means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such, and any and all other Persons or Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities.

*1.266* ***"Released Parties"*** means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Equity Committee; (iv) the members of the Equity Committee that are party to the RSA, solely in their capacities as such; (v) the Backstop Parties; (vi) the Creditors' Committee; (vii) the present and former members of the Creditors' Committee, solely in their capacities as such; (viii) the Settling Miner Equipment Lenders; (ix) Brown Corporation; (x) Holliwood LLC; (xi) the Ad Hoc Noteholder Group; (xii) the Consenting Creditors; (xiii) the Exit Lenders; (xiv) the Notes Agent, solely in its capacity as such; (xv) Foundry Digital LLC; (xvi) B. Riley Commercial Capital, LLC; (xvii) BRF Finance Co., LLC; ~~and~~ (xviii) the New Secured Convertible Notes Agent, solely in its capacity as such; (xix) the New Secured Notes Agent, solely in its capacity as such; and (xx) with respect to each of the foregoing Persons in clauses (i) through (~~xvii~~xix), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

*1.267* ***"Releasing Parties"*** means collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Reorganized Debtors; (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), all Related Parties; (iv) the Released Parties; (v) the Holders of all Claims or Interests that vote to accept the Plan; (vi) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (vii) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein; and (viii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

*1.268* ***"Reorganized Debtor"*** means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

*1.269* ***"Reorganized Parent"*** means, Core Scientific, Inc., a Delaware corporation, on and after the Effective Date.

*1.270* ***"Requisite April Convertible Noteholders"*** means Consenting Creditors holding at least 50.1% of the aggregate outstanding amount of the April Convertible Notes held by Consenting Creditors.

*1.271* ***"Requisite August Convertible Noteholders"*** means Consenting Creditors holding at least 50.1% of the aggregate outstanding amount of the August Convertible Notes held by Consenting Creditors.

*1.272* ***"Requisite Consenting Creditors"*** means the Requisite April Convertible Noteholders and the Requisite August Convertible Noteholders.

*1.273* ***"Residual Equity Pool"*** means the New Common Interests remaining following (i) any and all distributions of New Common Interests to (a) Holders of Allowed April Convertible Notes Secured Claims in Class 1 pursuant to section 4.1 hereof, (b) Holders of Allowed August Convertible Notes Secured Claims in Class 2 pursuant to section 4.2 hereof, (c) Holders of Allowed Miner Equipment Lender Secured Claims in Class 3 pursuant to section 4.3 hereof, (d) Holders of Allowed General Unsecured Claims in Class 8A pursuant to section 4.8 hereof, (e) Holders of Existing Common Interests that participate in the Rights Offering on account of Rights Offering Shares, (f) the Backstop Parties on account of the Backstop Commitment Premium and Backstop Shares (if any), and (g) the Exit Lenders on account of the Exit Facility in the event of an ERO Shortfall (if any), (ii) the issuance ~~and reservation~~ of New Common Interests pursuant to the Bitmain Transaction, (iii) the issuance and reservation as treasury stock of New Common Interests in an amount sufficient to issue to Holders of Unvested RSUs and Stock Options their requisite New Common Interests assuming that all Unvested RSUs will vest and all Stock Options are exercised, and (iv) the Disputed Class 8A Claim Shares that are treated as if issued (but not actually issued) for the purpose of calculating the total number of New Common Interests to be distributed to Holders of Claims and Interests on the Effective Date and the proper allocation of such New Common Interests among such Holders. For the avoidance of doubt, (x) the following shall dilute the Residual Equity Pool: the New Common Interests issued (a) upon conversion of the New Secured Convertible Notes, (b) upon exercise of the New Warrants, and (c) pursuant to the Management Incentive Plan, (y) following Allowance or Disallowance of Disputed Claims in Classes 8A and 11 and final determination of the Second Incremental Convertible Noteholders Equity Distribution Amount, the Residual Equity Pool shall include the New Common Interests distributable to Holders of Allowed Claims and Interests in Classes 11 and 12 in accordance with sections 5.23(b), (c), and (d) hereof, if any, and (z) if any New Common Interests distributable to Holders of Unvested RSUs, Stock Options, or Unvested Restricted Stock are later forfeited pursuant to the terms and conditions of the applicable RSU Award Agreement, Stock Option Award Agreement, or the restrictions/vesting conditions applicable to such Unvested Restricted Stock, respectively, then the Residual Equity Pool shall include the New Common Interests distributable to Holders of Allowed Claims and Interests in Classes 11 and 12 in accordance with sections 8.5(c)(i), (iii), and (iv) hereof.

*1.274* ***"Restricted Stock"*** means restricted stock that is outstanding pursuant to the terms of the 2018 Equity Plan and the applicable individual Restricted Stock Award Agreement, including Unvested Restricted Stock and Vested Restricted Stock.

*1.275* ***"Restricted Stock Award Agreement"*** means an award agreement by and between Core Scientific, Inc. (or any of its predecessors in interest, including MineCo Holdings, Inc.) and a grantee evidencing a grant of restricted stock pursuant to the 2018 Equity Plan.

*1.276* ***"Restructuring Fees and Expenses"*** means the reasonable and documented fees, costs and expenses of the Ad Hoc Noteholder Group Advisors, the Settling Miner Equipment Lenders subject to the terms and conditions set forth in the Miner Equipment Lender Settlement, and the DIP Lenders, in

*1.284* ***"RSA Settlement"*** means the settlement of all Claims and controversies among the Debtors, the Consenting Creditors, the Equity Committee, and certain members of the Equity Committee (in their capacity as members of the Equity Committee), including regarding the amounts owing on account of the Repayment Amount (as defined in the April NPA and August NPA), and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in section 5.11 hereof.

*1.285* "***RSU"*** means a restricted stock unit that is outstanding pursuant to the terms of an Equity Incentive Plan and the applicable individual RSU Award Agreement.

*1.286* ***"RSU Award Agreement"*** means an individual award agreement, by and between Core Scientific, Inc. (or any of its predecessors in interest, *e.g.*, MineCo Holdings, Inc.) and a grantee evidencing a grant of RSUs pursuant to the 2018 Equity Plan or the 2021 Equity Plan, as applicable.

*1.287* ***"Schedule of Allowed General Unsecured Claims"*** means the schedule of General Unsecured Claims that shall be Allowed as of the Effective Date to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

*1.288* ***"Schedule of Assumed Contracts"*** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, which shall be in form and substance acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.289* ***"Schedule of Rejected Contracts"*** means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, if any, and to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, which shall be in form and substance acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA).

*1.290* ***"Schedule of Retained Causes of Action"*** means the schedule of Causes of Action to be retained by the Reorganized Debtors and to be included in the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA)***.***

*1.291* "***Schedules***" means any schedules of Assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as the same may have been amended, modified, or supplemented from time to time.

*1.292* "***Section 510(b) Claims"*** means any Claim against any Debtor (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an Affiliate of any Debtor (including the Existing Common Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim. For the avoidance of doubt, (i) any claims asserted or assertable against the Debtors in the Securities Class Action and (ii) Proofs of Claim Nos. 52, 54, 81, 82, 241, and 351~~, 556, and 632~~ shall, in each case, constitute Section 510(b) Claims.

accordance with the Foundry Settlement Agreement (which, as of the date hereof, the parties estimate to be $0).

d. Foundry shall be a Released Party under the Plan.

e. Foundry shall, subject to (i) the entry of an order by the Bankruptcy Court in form and substance acceptable to Foundry approving the Foundry Settlement (the "**Foundry Settlement Approval Order**"), (ii) the terms and conditions of the Foundry Settlement Agreement and (iii) Foundry's receipt of a Bankruptcy Court approved Disclosure Statement, vote the Foundry Allowed Claims to accept the Plan; *provided* that such Plan and Disclosure Statement are each in form and substance reasonably acceptable to Foundry (solely to the extent it materially affects the Foundry Settlement or treatment of the Foundry Allowed Claims) and incorporate the terms of and are consistent with the Foundry Settlement Agreement; *provided*, *further*, that notwithstanding the foregoing, if (w) the Foundry Settlement Approval Order is not entered prior to the date set forth in the Foundry Settlement Agreement, (x) the Plan is inconsistent with Foundry Settlement Agreement, (y) any of the conditions to the Settlement Effective Date have not been satisfied, or (z) the Foundry Settlement Agreement is terminated, then, unless the Debtors are otherwise instructed or notified by Foundry, Foundry's vote to accept the Plan, and/or any release or consent provided or deemed to be provided by Foundry, shall be deemed revoked, null and void, and of no force and effect, and Foundry shall be entitled to submit revised ballot(s), which shall be deemed timely submitted.

f. The Debtors shall have sought or shall seek entry of the Confirmation Order confirming a Plan that incorporates the terms of the Foundry Settlement Agreement and includes Foundry as a Released Party, which Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and Foundry (each in its sole discretion) solely to the extent it materially affects the Foundry Settlement or treatment of the Foundry Allowed Claims.

The summary above does not reflect all of the material terms of the Foundry Settlement, and the failure to include a particular term in the above summary shall not be construed as such term not being a material term of the Foundry Settlement. Notwithstanding anything to the contrary herein, or in any Plan Document or Plan Supplement, in the event of a conflict between the Foundry Settlement Agreement, on the one hand, and the Plan or any other document, agreement, pleading or order, on the other hand, the Foundry Settlement Agreement shall govern and control.

~~[For the avoidance of doubt, the Foundry Settlement and the Foundry Settlement Agreement remain subject to ongoing negotiations between Foundry and the Debtors and nothing herein shall be construed as Foundry's or the Debtors' agreement to the terms thereof, and Foundry's and the Debtors' rights with respect thereto and the Plan are reserved.]~~

5.17. ***Rights Offering***

(a) General. Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and, on the Effective Date, the Debtors shall consummate the Rights Offering subject to the terms and conditions of the Plan, the Rights Offering Procedures, the Backstop Commitment Letter, and the Confirmation Order.

In accordance with the Backstop Commitment Letter and the Rights Offering Procedures, each holder of Existing Common Interests as of the Rights Offering Record Date shall have a Subscription Right to purchase for Cash their pro rata allocation of the New Common Interests to be issued pursuant to the Rights Offering. In addition, each Holder of Existing Common Interests shall have an oversubscription right to elect to purchase additional New Common Interests offered in the Rights Offering that are not timely, duly and validly subscribed for in the Rights Offering in accordance with the Rights Offering Procedures; *provided*, *however*, that no Holder may exercise an oversubscription right until it has fully exercised its Subscription Right.

(b) The right to participate in the Rights Offering may not be sold, transferred, or assigned. The Rights Offering shall be backstopped pursuant to the Backstop Commitment Letter in an amount that is no less than $30,000,000.

(c) Purpose. On the Effective Date, the proceeds of the Rights Offering may be used to (i) pay all reasonable and documented Restructuring Fees and Expenses, (ii) fund Plan Distributions, case administration expenses, and exit costs, including Professional Fee Claims, and (iii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(d) Backstop Commitment. In accordance with the Backstop Commitment Letter and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash, by funding its Backstop Commitments on or prior to the Backstop Funding Deadline (as defined in the Backstop Order), its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Letter) of the unsubscribed New Common Interests offered in the Rights Offering.

(e) Backstop Commitment Premium. As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Letter.

5.18. ***Exemption from Securities Laws***.

(a) Except as set forth in section 5.18(b) hereof, the offer, issuance, and distribution under the Plan of the New Secured Convertible Notes, the New Secured Notes, the Contingent Payment Obligations, the GUC Contingent Payment Obligations (to the extent securities), the New Warrants, and the New Common Interests (including those (i) issued upon the conversion of the New Secured Convertible Notes, if any, (ii) issued in connection with the Contingent Payment Obligations or the GUC Contingent Payment Obligations, if any, and (iii) issued upon exercise of the New Warrants) shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b) The offer, sale, issuance, and distribution of the Rights Offering Shares (including with respect to the sale, issuance, and distribution of Rights Offering Shares in connection with the exercise of an oversubscription right) to be issued pursuant to the Rights Offering shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities. ~~The Backstop Shares shall be exempt, pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.~~

(c) The offer, issuance and sale of the New Common Interests issued to the Backstop Parties under the Backstop Commitment Letter comprising the Backstop Commitment Premium is being made in reliance on the exemption pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(d) The New Common Interests, including the Rights Offering Shares ~~(other than~~, the ~~Backstop Shares),~~ New Secured Convertible Notes, the New Secured Notes, the Contingent Payment Obligations, the GUC Contingent Payment Obligations (to the extent securities), the New Warrants, and the New Common Interests issued (i) upon conversion of the New Secured Convertible Notes, if any, (ii) in connection with the Contingent Payment Obligations or the GUC Contingent Payment Obligations, if any, and (iii) upon exercise of the New Warrants, may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (iii) applicable regulatory approval, and (iv) the transfer provisions, if any, and other applicable provisions set forth in, as applicable, the New Corporate Governance Documents, the New Secured Convertible Notes Documents, the New Secured Notes Documents, the Contingent Payment Obligations Documents, the GUC Contingent Payment Obligations Term Sheet, and the New Warrants Agreement.

~~(e) Persons who purchase the New Common Interests pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act. Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the New Corporate Governance Documents.~~

(e) ~~(f)~~ The Reorganized Debtors shall reflect the ownership of the New Secured Convertible Notes, New Secured Notes, New Warrants, Contingent Payment Obligations, and New Common Interests through the facilities of DTC, in certificated form, or on the books and records of the Reorganized Debtors or the applicable agent or trustee. Subject to section 6.8 hereof, the Reorganized Debtors may elect, on or after the Effective Date, to reflect all or any portion of the ownership of New ~~Common Interests, the~~Secured Convertible Notes, New Secured Notes, Contingent Payment Obligations, ~~the~~ New Warrants, ~~and the~~ New Common Interests, and New Common Interests issued (i) upon conversion of the New Secured Convertible Notes, if any, (ii) in connection with the Contingent Payment Obligations or the GUC Contingent Payment Obligations, if any, and (iii) upon exercise of the New Warrants, through the facilities of DTC, in certificated form, or on the books and records of the Reorganized Debtors or the applicable agent or trustee. In connection therewith, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable New Common Interests, New Secured Convertible Notes or the New Common Interests issued upon conversion thereof, if any, the New Secured Notes, Contingent Payment Obligations, or the New Common Interests issued pursuant thereto or pursuant to the GUC Contingent Payment Obligations, if any, or New Warrants or New Common Interests issued pursuant thereto, as applicable, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

(f) ~~(g)~~ DTC and all other Persons shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding whether the New Common Interests, the New Secured Convertible Notes, the New Secured Notes, the Contingent Payment Obligations, the New Warrants, or the New Common Interests issued (i) upon conversion of the New Secured Convertible Notes, if any, (ii) in connection with the Contingent Payment Obligations or GUC Contingent Payment Obligations, if any, or (iii) upon ~~payment of the~~ exercise ~~price in accordance with the terms~~ of the New Warrants ~~Agreement~~, if any, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

(g) ~~(h)~~ The Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the securities to be issued under the Plan under applicable securities laws or the validity of any other transaction contemplated by the Plan or the Confirmation Order. Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Interests, the New Secured Convertible Notes, the New Secured Notes, the Contingent Payment Obligations, the GUC Contingent Payment Obligations (to the extent securities), the New Warrants, or the New Common Interests issued (i) upon conversion of the New Secured Convertible Notes, if any, (ii) in connection with the Contingent Payment Obligations or the GUC Contingent Payment Obligations, if any, or (iii) upon exercise of the New Warrants, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services or validly issued, fully paid, and non-assessable.

5.19. ***Cancellation of Existing Securities and Agreements***.

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors, or any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all Interests (including, for the avoidance of doubt, any warrants), agreements, instruments, notes, certificates, mortgages, security documents, and any other instruments or documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Plan and the Reinstated Other Secured Claims in Class 4) and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, without any further act or action under any applicable agreement, instrument, document, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed fully and finally satisfied, settled, released, and discharged. Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors or their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect, and the Debtors shall be entitled to continue to use (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of the Mortgage Agreements, Miner Equipment Lender Agreements, or the Convertible Notes Agreements, as applicable. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties (i) under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder, (ii) relating to the Reinstated Other Secured Claims in Class 4, (iii) relating to allowing the Notes Agent to enforce its rights, claims, and interest vis-à-vis any party other than the Debtors or any Released Party, (iv) relating to allowing the Notes Agent to make distributions in accordance with the Plan (if any), as applicable, (v) relating to preserving any rights of the Notes Agent to payment of fees, expenses and indemnification obligations as

**other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(a) (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, (b) releasing any Released Party from Claims or Causes of Action held by the Debtors arising from an act or omission that is determined by a Final Order or by a federal government agency to have constituted a violation of any federal securities laws, or (c) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (iii) shall not release or be construed as releasing (a) Harlin Dean~~,~~ or (b) ~~the plaintiffs in the Securities Class Action, (c) any Holder asserting a Section 510(b) Claim, or (d)~~ Sphere 3D Corp., in its individual capacity, notwithstanding the inclusion of any of the foregoing within the definition of Released Parties hereunder.**

(b) Releases by Holders of Claims and Interests.

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), the DIP Facility, the Convertible Notes Agreements, the Miner Equipment Lender Agreements, the Mortgage Agreements, the General Contracts, any and all agreements relating to M&M Liens, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Plan Settlements, the New Secured Convertible Notes Documents, the New Secured Notes Documents, the Contingent Payment Obligations Documents, the GUC Contingent Payment Obligations Term Sheet, the New Miner**

**Exhibit I**

**M&M Lien Claims Schedule**

**M&M Lien Claims Schedule**[1]

[1] ~~Except with regard to McCarthy Building Companies, Inc., this Schedule assumes approval is obtained with respect to all M&M Lien and Claim settlements for which the Debtors have entered into binding term sheets or settlement agreements with a Lienholder / Claimant for which the Debtors have sought, or intend to seek, Bankruptcy Court approval. With regard to McCarthy Building Companies, Inc., the Debtors filed~~Assuming the Court grants the relief requested in the *Debtors' Motion ~~f~~For Entry of ~~an~~An Order (I) Authorizing (A) Assumption of McCarthy Contracts, ~~as~~As Amended in Accordance with the Settlement Agreement and (B) Entry into the Settlement Agreement, and (II) Granting Related Relief* (Docket No. 1580)~~ (the "**McCarthy Settlement Motion**"). Following entry of an order approving the McCarthy Settlement Motion, the General Contractor and Subcontractor Claims relating to McCarthy Building Companies, Inc. will be removed from this Schedule~~, each M&M Lien Secured Claim held by a General Contractor will be satisfied pursuant to the applicable M&M Lien Settlement. Furthermore, the Debtors intend to file an objection to any remaining M&M Lien Secured Claims held by Subcontractors (including those that are not otherwise satisfied pursuant an M&M Lien Settlement). Thus, subject to entry of an order sustaining such objection, there will be no M&M Lien Secured Claims held by Subcontractors, and Class 5 will be vacant in accordance with section 3.4 of the Plan.

| ty | Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Allowed Unsecured Claim Amount | Amount of Allowed M&M Lien[2] | Amount of Allowed M&M Lien Secured Claim[3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor | P Per applic Lien Debt direc C Cor Sub |
|---|---|---|---|---|---|---|---|---|---|
| ~~to~~ | ~~B. McCarthy Building Companies, Inc.~~ | ~~C. General Contractor~~ | ~~D. McCarthy Building Companies, Inc.~~ | ~~E. 468~~ | ~~F. $1,746,915.35~~ | ~~G. $17,052,583.65~~ | ~~H. $17,052,583.65~~ | ~~I. $5,814,510.32~~ | ~~J.~~ |
| ~~to~~ | ~~L. Sure Steel – Texas, L.P.~~ | ~~M. Subcontractor~~ | ~~N. McCarthy Building Companies,~~ | ~~O. 110~~ | ~~P. $0~~ | ~~Q. $695,277.03~~ | ~~R. $0~~ | ~~S. $695,277.03~~ | ~~T.~~ |

[2] The proposed allowed amount of each M&M Lien set forth on this Schedule is subject to the Debtors' ongoing analysis regarding whether each ~~M&M Lien is valid and was properly perfected in accordance with applicable law.~~

[3] The proposed allowed amount of each M&M Lien Secured Claim set forth on this Schedule is subject to the Debtors' ongoing analysis regarding ~~whether each of the related M&M Liens are valid and were properly perfected in accordance with applicable law.~~

| ty | Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Allowed Unsecured Claim Amount | Amount of Allowed M&M Lien[2] | Amount of Allowed M&M Lien Secured Claim[3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor | P Per applic Lien Debt direc C Cor Sub |
|---|---|---|---|---|---|---|---|---|---|
| | | | ~~Inc.~~ | | | | | | |
| | ~~Way Mechanical~~None | ~~Subcontractor~~None | ~~McCarthy Building Companies, Inc.~~None | ~~N/A~~None | ~~$0~~None | ~~$436,029.00~~None | ~~$0~~None | ~~$436,029.00~~None | ~~2.5~~ |
| ~~to~~ | ~~V. McCorvey Sheet Metal Works, LP~~ | ~~W. Subcontractor~~ | ~~X. McCarthy Building Companies, Inc.~~ | ~~Y. N/A~~ | ~~Z. $0~~ | ~~AA. $20,895.50~~ | ~~BB. $0~~ | ~~CC. $20,895.50~~ | ~~DD.~~ |
| ~~to~~ | ~~FF. BEAM Concrete Construction, Inc.~~ | ~~GG. Subcontractor~~ | ~~HH. McCarthy Building Companies, Inc.~~ | ~~II. 187~~ | ~~JJ. $0~~ | ~~KK. $878,306.82~~ | ~~LL. $0~~ | ~~MM. $878,306.82~~ | ~~NN.~~ |
| ~~to~~ | ~~PP. Humphrey & Associates, Inc.~~ | ~~QQ. Subcontractor~~ | ~~RR. McCarthy Building Companies, Inc.~~ | ~~SS. 510~~ | ~~TT. $0~~ | ~~UU. $7,036,021.06~~ | ~~VV. $0~~ | ~~WW. $7,036,021.06~~ | ~~XX.~~ |

3

| ty | | Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Allowed Unsecured Claim Amount | Amount of Allowed M&M Lien[2] | Amount of Allowed M&M Lien Secured Claim[3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor | P Per applic Lien Debt dire C Con Sub |
|---|---|---|---|---|---|---|---|---|---|---|
| ~~to~~ | | ~~ZZ. Imperial Fire Protection, LLC~~ | ~~AAA. Subcontractor~~ | ~~BBB. McCarthy Building Companies, Inc.~~ | ~~CCC. 122~~ | ~~DDD. $0~~ | ~~EEE. $209,210.00~~ | ~~FFF. $0~~ | ~~GGG. $209,210.00~~ | ~~HHH~~ |
| ~~to~~ | | ~~JJJ. ABLe Communications, Inc.~~ | ~~KKK. Subcontractor~~ | ~~LLL. McCarthy Building Companies, Inc.~~ | ~~MMM. 538~~ | ~~NNN. $0~~ | ~~OOO. $1,094,850.64~~ | ~~PPP. $0~~ | ~~QQQ. $1,094,850.64~~ | ~~RRR~~ |
| ~~to~~ | | ~~TTT. Pillar Electric Group, LP~~ | ~~UUU. Subcontractor~~ | ~~VVV. McCarthy Building Companies, Inc.~~ | ~~WWW. N/A~~ | ~~XXX. $0~~ | ~~YYY. $28,266.49~~ | ~~ZZZ. $0~~ | ~~AAAA. $28,266.49~~ | ~~BBB~~ |
| ~~to~~ | | ~~DDDD. Power Engineering Services, Inc.~~ | ~~EEEE. Subcontractor~~ | ~~FFFF. McCarthy Building Companies,~~ | ~~GGGG. N/A~~ | ~~HHHH. $0~~ | ~~IIII. $98,440.00~~ | ~~JJJJ. $0~~ | ~~KKKK. $98,440.00~~ | ~~LLL~~ |

| ty | Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Allowed Unsecured Claim Amount | Amount of Allowed M&M Lien[2] | Amount of Allowed M&M Lien Secured Claim[3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor | P Per applic Lien Debt direc C Con Sub |
|---|---|---|---|---|---|---|---|---|---|
| | | | ~~Inc.~~ | | | | | | |
| on | ~~NNNN. North Texas Contracting, Inc.~~ | ~~OOOO. Subcontractor~~ | ~~PPPP. McCarthy Building Companies, Inc.~~ | ~~QQQQ. N/A~~ | ~~RRRR. $0~~ | ~~SSSS. $189,425.90~~ | ~~TTTT. $0~~ | ~~UUUU. $189,425.90~~ | ~~VV~~ |
| on | ~~XXXX. RPM xConstruction, LLC~~ | ~~YYYY. Subcontractor~~ | ~~ZZZZ. McCarthy Building Companies, Inc.~~ | ~~AAAAA. /A~~ | ~~BBBBB.$0~~ | ~~CCCCC.$19,394.12~~ | ~~DDDDD. $ 0~~ | ~~EEEEE. $19,394.12~~ | ~~FFF~~ |
| on | ~~HHHHH. BURNCO Texas LLC~~ | ~~IIIII. Subcontractor~~ | ~~JJJJJ. McCarthy Building Companies, Inc.~~ | ~~KKKKK. /A~~ | ~~LLLLL. $0~~ | ~~MMMMM. $531,956.77~~ | ~~NNNNN. $ 0~~ | ~~OOOOO. $ 531,956.77~~ | ~~PPP~~ |
| on | ~~RRRRR.Housley Communications~~ | ~~SSSSS. Subcontractor~~ | ~~TTTTT. McCarthy Building Comp~~ | ~~UUUUU. 67~~ | ~~VVVVV. $ 0~~ | ~~WWWWW. $0~~ | ~~XXXXX. $ 0~~ | ~~YYYYY. $ 0~~ | ~~ZZ~~ |

| ty | Lienholder/ Claimant | General Contractor or Subcontractor | General Contractor under applicable General Contract which gives rise to the M&M Liens and/or Claims | Proof of Claim Numbers Filed by Lienholder/ Claimant | Allowed Unsecured Claim Amount | Amount of Allowed M&M Lien[2] | Amount of Allowed M&M Lien Secured Claim[3] (which shall equal the amount of M&M Lien Takeback Debt to be issued to each General Contractor) | Amount of applicable M&M Takeback Debt to be repaid directly to such General Contractor or Subcontractor | P Per applic Lien Debt direc C Cor Sub |
|---|---|---|---|---|---|---|---|---|---|
| | | | ~~anies, Inc.~~ | | | | | | |

# **Exhibit J**

## **Miner Equipment Lender Claims Schedule**

**Miner Equipment Lender Claims Schedule**

| Holder | Agreement(s) | Proof of Claim Number | Allowed Miner Equipment Lender Claim (as of ~~Petition~~Effective Date)[1] | Allowed Miner Equipment Lender Secured Claim (as of ~~Petition~~Effective Date) | Allowed Miner Equipment Lender Deficiency Claim (as of ~~Petition~~Effective Date)[2] | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Default Miner Equipment Lender Treatment[~~2~~3] | Miner Equipment Lender Treatment Election 2[~~3~~4] |
| 36th Street Capital Partners, LLC | 36th Street Miner Agreement | 294 | $~~4,066,802.27~~4,275,420.19 | $1,016,211.33 | $~~3,050,590.93~~3,259,208.85 | 970 | $1,016,211.33 | $~~3,419,916.82~~3,420,336.15 |
| Anchorage Lending CA, LLC | Anchorage Agreements | 362 | $~~25,931,198.54~~27,243,189.31 | $4,732,276.58 | $~~21,198,921.96~~22,510,912.72 | 5,354 | $4,732,276.58 | $~~21,791,914.28~~21,794,551.44 |

[1] In accordance with section 1.182 of the Plan, the amounts in this column include post-petition interest at the Federal Judgment Rate (as defined in the Plan) accruing on the applicable Miner Equipment Lender Claim through a projected Effective Date of January 23, 2024. The amounts reflected herein *do not* include any legal or advisor fees or expenses, which shall be treated pursuant to section 2.5 of the Plan in accordance with section 5.13 of the Plan, whereby each Initial Settling Miner Equipment Lender shall be entitled to reasonable and documented fees and expenses, paid in cash; *provided*, *that* in no event shall the aggregate fees and expenses payable to all Settling Miner Equipment Lenders exceed $4,000,000.

[2] In accordance with section 1.182 of the Plan, the amounts in this column include post-petition interest at the Federal Judgment Rate (as defined in the Plan) accruing on the applicable Miner Equipment Lender Claim through a projected Effective Date of January 23, 2024.

[~~2~~3] Equal to Allowed Secured Claim as of a projected Effective Date of January ~~22~~23, 2024.

[~~3~~4] Equal to 80% of the applicable Miner Equipment Lender Claim (as of a projected Effective Date of January ~~22~~23, 2024).

| Holder | Agreement(s) | Proof of Claim Number | Allowed Miner Equipment Lender Claim (as of ~~Petition~~Effective Date)[1] | Allowed Miner Equipment Lender Secured Claim (as of ~~Petition~~Effective Date) | Allowed Miner Equipment Lender Deficiency Claim (as of ~~Petition~~Effective Date)[2] | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| Barings (Consolidated)[~~4~~5] | Barings (Consolidated) | | $~~65,971,295.24~~69,309,117.44 | $12,316,472.00 | $~~53,654,823.24~~56,992,645.44 | 11,181 | $12,316,472.00 | $~~55,440,584.76~~55,447,293.95 |
| Barings BDC, Inc. | Barings Agreements | 432[~~5~~6] | | | | | | |
| Barings Capital | Barings | | | | | | | |

[~~4~~5] The Debtors have reflected the Barings entities on a consolidated basis. The Debtors may amend this schedule to reflect amounts allocated for each entity.

[~~5~~6] Any other Proofs of Claim filed by Barings BDC, Inc., including Proofs of Claim Nos. 438, 444, 453, 455, 460, 466, 467, 473, 477, and 478, are Disallowed.

| Holder | Agreement(s) | Proof of Claim Number | Allowed Miner Equipment Lender Claim (as of PetitionEffective Date)[1] | Allowed Miner Equipment Lender Secured Claim (as of PetitionEffective Date) | Allowed Miner Equipment Lender Deficiency Claim (as of PetitionEffective Date)[2] | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| Investment Corporation | Agreements | 443[6][7] | | | | | | |
| Barings Private Credit Corp. | Barings Agreements | 442[7][8] | | | | | | |
| BlockFi Lending LLC | BlockFi Agreements | 447[8][9] | $55,712,407.48 58,570,330.1 | $15,064,256.50 | $40,648,150.98 4 | 14,508 | $15,064,256.50 | $46,850,519.57 |

[6][7] Any other Proofs of Claim filed by Barings Capital Investment Corporation, including Proofs of Claim Nos. 440, 449, 451, 454, 457, 461, 463, 464, 472, and 475, are Disallowed.

[7][8] Any other Proofs of Claim filed by Barings Private Credit Corp., including Proofs of Claim Nos. 433, 446, 450, 452, 458, 462, 465, 470, 471, and 474, are Disallowed.

[8][9] A Proof of Claim No. 423 filed by BlockFi Lending LLC is Disallowed.

| Holder | Agreement(s) | Proof of Claim Number | Allowed Miner Equipment Lender Claim (as of ~~Petition~~Effective Date)[1] | Allowed Miner Equipment Lender Secured Claim (as of ~~Petition~~Effective Date) | Allowed Miner Equipment Lender Deficiency Claim (as of ~~Petition~~Effective Date)[2] | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| | | | 8 | | 3,506,073.68 | | | 46,856,264.14 |
| Jack Novak | Novak Agreements | 224[~~9~~10] | $~~10,957,524.25~~10,566,395.88 | $0.00 | $~~10,957,524.25~~10,566,395.88 | N/A | $0.00 | $~~8,452,093.87~~8,453,116.70 |
| MassMutual Asset Finance LLC | MassMutual Agreements | 298[~~10~~11] | $~~43,679,664.81~~45,889,640.44 | $14,899,759.00 | $~~28,779,905.81~~30,989,881.44 | 15,066 | $14,899,759.00 | $~~36,707,270.19~~36,711,712.35 |
| Stonebriar Commercial Finance LLC | Stonebriar Agreement | 490 | $~~7,254,478.10~~7,621,518.92 | $1,516,622.67 | $~~5,737,855.43~~6,104,896.25 | 1,465 | $1,516,622.67 | $~~6,096,477.36~~6,097,215.13 |
| Trinity Capital Inc. | Trinity Agreements OpCo | 370 | $~~17,342,591.80~~18,232,228.22 | $4,202,208.67 | $~~13,140,383.13~~14,030,019.55 | 4,001 | $4,202,208.67 | $~~14,583,994.36~~14,585,782.57 |
| Trinity Capital Inc. | Trinity Agreement Parent | 371 | $~~9,595,265.90~~10,087,481.72 | $1,781,078.00 | $~~7,814,187.90~~8,306,403.72 | 1,811 | $1,781,078.00 | $~~8,068,995.99~~8,069,985.37 |

[~~9~~10] Any other Proofs of Claim filed by Jack Novak, including Proof of Claim No. 201, are Disallowed.

[~~10~~11] Any other Proofs of Claim filed by MassMutual Asset Finance LLC, including Proof of Claim No. 319, are Disallowed.

| Holder | Agreement(s) | Proof of Claim Number | Allowed Miner Equipment Lender Claim (as of ~~Petition~~Effective Date)[1] | Allowed Miner Equipment Lender Secured Claim (as of ~~Petition~~Effective Date) | Allowed Miner Equipment Lender Deficiency Claim (as of ~~Petition~~Effective Date)[2] | Collateral (# of Miners) | Principal of New Debt | |
|---|---|---|---|---|---|---|---|---|
| Wingspire Equipment Finance LLC (f/k/a Liberty Commercial Finance LLC) | Liberty Miner Agreements | 402[~~11~~12] | $~~2,508,444.25~~2,635,359.15 | $1,113,778.67 | $~~1,394,665.58~~1,521,580.49 | 1,170 | $1,113,778.67 | $~~2,108,032.22~~2,108,287.32 |

[~~11~~12] For the avoidance of doubt, the Allowed Claim amounts set forth in this schedule relate only to the Liberty Miner Agreements and not the Liberty Non-Miner Agreements. Wingspire Equipment Finance LLC's Claim with regard to the Liberty Non-Miner Agreements is treated in Class 4 as set forth in section 4.4 of the Plan.