IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC., et al** | § | Case No. 22-90341 (CML) |
| | § | |
| Debtors.[1] | § | Jointly Administered |
| | § | |

**DECLARATION OF RON E. MEISLER IN SUPPORT OF THE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP PURSUANT TO SECTIONS 503(B)(3) AND 503 (B)(4) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 2016, AND SECTIONS 1.6 AND 6.3 OF THE DEBTORS' THIRD AMENDED PLAN FOR ALLOWANCE OF FEES AND EXPENSES INCURRED IN THE MAKING OF A SUBSTANTIAL CONTRIBUTION AS AN ADMINISTRATIVE EXPENSE**

I, Ron E. Meisler, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a partner at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"), with an office at 155 N. Upper Wacker Dr., Chicago, IL 60606. I respectfully submit this Declaration in support of the *Application of Skadden, Arps, Slate, Meagher & Flom LLP Pursuant to Sections 503(b)(3) and 503(b)(4) of the Bankruptcy Code, Bankruptcy Rule 2016, and Sections 1.6 and 6.3 of the Debtors' Third Amended Plan for Allowance of Fees and Expenses Incurred in the Making of a Substantial Contribution as an Administrative Expense* ("**Application**") at Docket Number 1461. This declaration is based on my personal knowledge and my review of the referenced documents.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (N/A); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

*Qualifications and Professional Background*

2.  I received a Bachelor of Arts from the University of Michigan, a Juris Doctor from the University of Michigan Law School, and a Master of Business Administration from the Ross School of Business of the University of Michigan. I have approximately twenty-five (25) years of experience as an attorney at Skadden in the field of restructuring. At Skadden, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees, governmental entities, acquirers of distressed assets, and ad hoc groups.

3.  I have had significant roles in numerous restructurings, including, among others: AMR Corporation; Atlas Resource Partners, L.P.; Blue Bird Bus Company; Comdisco, Inc.; Delphi Corporation; Delta Petroleum Corporation; Dominion Diamond; Dura Automotive; Eagle Food Centers, Inc.; Entegra Power Group, LLC; Kodak; Globalstar, Inc.; McLeodUSA Incorporated; Melinta Therapeutics, Inc.; MiddleBrook Pharmaceuticals, Inc.; Montgomery Ward & Co.; Rdio, Inc.; Readers Digest; Spanish Trail Country Club Inc.; Standard Register Company; SVB Financial Group; Synergy Pharmaceuticals Inc.; The Singer Company N.V.; Takata Corporation; Titan Energy, LLC; and Triangle USA Petroleum Corp.

4.  I have been repeatedly selected for inclusion in Chambers USA: America's Leading Lawyers for Business and The Best Lawyers in America, and was named its 2022 Chicago Bankruptcy and Creditor Debtor Rights / Insolvency and Reorganization Law Lawyer of the Year. I have been recognized as Highly Regarded by IFLR1000 and since 2020 have been named repeatedly to Lawdragon 500's Leading Global Restructuring & Insolvency Lawyers Guide. Additionally, in 2020 I was named as a fellow of the American College of Bankruptcy. I am a frequent guest lecturer on topics of distressed transactions and bankruptcy law at the

University of Pennsylvania School of Law, the Wharton School of Business and, I am an adjunct professor at the University of Michigan Law School.

5.  Noelle Reed, a partner in the firm's Houston office, led Skadden's litigation efforts of these Chapter 11 Cases.  Ms. Reed is the head of the Houston office and its litigation practice.  She is admitted to the bars of Texas, New York, Arkansas, and Oklahoma and numerous federal courts, including the United States Supreme Court.  She specializes in commercial litigation and has represented clients in acquisition-related cases involving more than $100 billion in transaction value.  She is listed in Chambers USA:  America's Leading Lawyers for Business, The Best Lawyers in America, and Lawdragon's 500 Leading Lawyers in America.  She is the former Chair of the Committee for Lawyer Discipline of the State Bar of Texas and a member of the American Law Institute.

6.  Ms. Reed graduated from Harvard Law School in 1996.  After clerking for two judges in the United States Court of Appeals for Second Circuit, she served as a Trial Attorney at the United States Department of Justice, Criminal Division, Terrorism and Violent Crime group.  She served as an Assistant United States Attorney in the Southern District of Texas from 1998 to 2004, where she was lead counsel in approximately 350 cases per year.  As an AUSA, she tried more than thirty cases in federal court as lead trial counsel.  Since 2004 she has worked in Skadden's Houston office, where her practice is primarily commercial and securities litigation.  She has served as lead trial counsel in more than thirty jury trials and arbitrations.  She has also authored and contributed to several publications relating to complex commercial litigation.

7.  All of the statements made in my *Declaration of Ron E. Meisler in Support of the Ad Hoc Group of Equity Holders' Reply in Further Support of the Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an*

3

*Official Committee of Equity Security Holders* at Docket No. 578 are incorporated herein by reference.

### *Retention*

8.  An ad hoc group of beneficial holders of the common stock of Core Scientific, Inc. ("**Ad Hoc Equity Group**") retained Skadden on or about December 26, 2022 to represent them in these Chapter 11 Cases. Following the addition of another 23 members to the Ad Hoc Equity Group on or about January 17, 2023,[2] the members of the Ad Hoc Equity Group and Skadden entered into an Amended and Restated Engagement Letter to expand the scope of Skadden's retention and to remove the limit on the fees and expenses that Skadden could incur in the pursuit of the appointment of an official equity committee.

9.  As set forth in the Amended and Restated Engagement Letter, the Ad Hoc Equity Group retained Skadden for the purposes of seeking the appointment of an official committee of equity holders in these Chapter 11 Cases. **Exhibit 5** and **Exhibit 6** at Docket No. 1704 and 1708, respectively, are true and correct copies of Skadden's engagement letters with the Ad Hoc Equity Group. Pursuant to the Amended Engagement Letter, the members of the Ad Hoc Equity Group agreed to be severally, but not jointly, liable for Skadden's fees and expenses incurred in seeking the appointment of an official equity committee.

10. At the direction of the Ad Hoc Equity Group, the scope evolved to include an objection to the initial DIP financing facility (the "**Initial DIP Facility**") because it was tied to the initial restructuring support agreement (the "**Initial RSA**") which would have likely deprived equity holders of any value in the reorganized company. Under the Initial RSA, the equity holders and general unsecured creditors would have shared 3% of new common shares, subject

---

[2]  An additional two members joined the Ad Hoc Group in February of 2023.

to dilution, but the allocation between these groups was undetermined, which meant that the equity holders likely would not have received any recovery in light of the absolute priority rule.

11. When the Debtors filed their replacement DIP financing agreement, the Ad Hoc Equity Group directed Skadden to file the *Limited Objection of Ad Hoc Group of Equity Holders to the Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Replacement Senior Secured Non-Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Pay Off Existing Postpetition Financing Facility, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 584] (the "**Limited Objection**"), because the DIP budget did not include any payments for the official equity committee's retained professionals to the extent such committee would be appointed.

12. Skadden's efforts on behalf of the Ad Hoc Equity Group were narrowly focused on (a) securing the appointment of the official equity committee and an allocation of sufficient funds in the budget to pay professionals and (b) objecting to the initial proposed DIP financing and seeking alternatives that would impose lower fees and provide alternatives to required support for the Initial RSA.

13. In connection with Skadden's services, Skadden incurred $1,457,292.31 of professional fees and expenses in its representation of the Ad Hoc Equity Group. **Exhibit 1**, **Exhibit 2**, **Exhibit 3**, and **Exhibit 4** at Docket No. 1704 are true and correct copies of Skadden's invoices, including time and expense reports, reflecting these fees and expenses. As of December 31, 2023, Skadden incurred approximately $267,000 in fees, preparing the Application and preparing to defend the Application against the now-withdrawn objection of the

ad hoc group of convertible noteholders (the "**Ad Hoc Noteholder Group**"); however, Skadden is not seeking to recover more than $1,500,000 for its fees and expenses.

*Appointment of the Official Equity Committee*

14. In its efforts on behalf of the Ad Hoc Equity Group to obtain the appointment of the official equity committee, Skadden drafted and sent a letter to the U.S. Trustee on behalf of the Ad Hoc Equity Group on January 6, 2023. Skadden spent significant time researching and gathering substantial evidence of the Debtors' solvency, which Skadden presented to the U.S. Trustee in the January 6 letter. **Exhibit 12** at Docket No. 1704 is a true and correct copy of the letter that Skadden sent to the U.S. Trustee on behalf of the Ad Hoc Equity Group. After sending the January 6 letter, Skadden continued its research and followed up regularly with the U.S. Trustee to highlight the substantial increase in the price of Bitcoin, the surge in the stock prices of the Debtors' competitors, and the Ad Hoc Equity Group's growth from eight to 33 equity holders.

15. On January 20, 2023, the U.S. Trustee sent Skadden an email explaining that he was declining to appoint an official equity committee. See Exhibit D to the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* ("**Motion to Appoint**") at Docket No. 458. Exhibit D to **Exhibit 14** at Docket No. 1704 is a true and correct copy of this email from the U.S. Trustee.

16. On January 23, 2023, the Ad Hoc Equity Group, through Skadden, sent a letter to Debtors' counsel asking for their support for the appointment of an official equity committee and indicating the Ad Hoc Equity Group's intent to file a motion seeking the appointment of an

6

official equity committee.  **Exhibit 13** at Docket No. 1704 is a true and correct copy of the letter that Skadden sent to the Debtors on behalf of the Ad Hoc Equity Group.

17. In accordance with the terms of Skadden's engagement letter with the Ad Hoc Equity Group, after the U.S. Trustee's denial, Skadden drafted and filed the *Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders* at Docket No. 458.  **Exhibit 14** at Docket No. 1704 is a true and correct copy of the Motion to Appoint filed by Skadden.  To prepare this motion, Skadden attorneys continued to conduct research related to the value of the company and drafted the requisite pleadings.  Skadden's research into the value of the company required ongoing review of news and market reports about the value of Bitcoin and the Debtors competitors.

18. To advance the basis for the Ad Hoc Equity Group's Motion to Appoint and support its position that the Debtors were solvent, Skadden served deposition notices on the Debtor with the intent of investigating the Debtors' valuation.  **Exhibit 19** and **Exhibit 20** at Docket No. 1704 are true and correct copies of the deposition notices that Skadden served on the Debtors.

19. The Ad Hoc Equity Group, through Skadden, also engaged the Debtors, Ad Hoc Noteholder Group, and Official Unsecured Creditors' Committee ("**Creditors' Committee**") in negotiations to reach a settlement on the Ad Hoc Equity Group's motion.  Skadden engaged in negotiations for weeks regarding the appointment of an official equity committee.  As a result of these efforts, the Debtors ultimately agreed to both the appointment of the official committee and the allocation of a $4.75 million budget to the committee.  The Debtors filed the *Debtors' Response to Motion for Appointment of an Official Committee of Equity Security Holders* at

7

Docket No. 570, memorializing their support. **Exhibit 16** at Docket No. 1704 is a true and correct copy of the Debtors' response. Similarly, the Creditors' Committee also filed a statement expressing that they did not oppose the Motion to Appoint at Docket No. 571.

20. Notwithstanding the settlement the Ad Hoc Equity Group reached with the Debtors and the Creditors' Committee, the Ad Hoc Noteholder Group maintained its objection to the Motion to Appoint. In connection with that objection, the Noteholder Group first served discovery requests on the Ad Hoc Equity Group on February 24, 2024. Skadden spent significant time responding to these document requests, which required extensive document review. Skadden also had to prepare a written response, objecting to most requests. **Exhibit 18** at Docket No. 1704 is a true and correct copy of the discovery requests that Skadden received from the Ad Hoc Noteholder Group. **Exhibit 22** at Docket No. 1704 is a true and correct copy of Skadden's response to the Ad Hoc Noteholder Group's first set of requests for production.

21. On February 24, 2023, the Ad Hoc Noteholder Group filed an emergency motion to adjourn the hearing on the Motion to Appoint and served a deposition notice and discovery requests on the Ad Hoc Equity Group. As a result, on February 27, 2023, Skadden promptly filed an objection (found at Docket No. 583) to the Noteholders' motion to adjourn the hearing and a motion to quash the deposition notice. **Exhibit 23** at Docket No. 1704 is a true and correct copy of *The Ad Hoc Equity Group's (1) Objection to the Ad Hoc Noteholder Group's Emergency Motion to Adjourn Hearing, and (2) Motion to Quash Notice of Deposition*.

22. Skadden spent significant time responding substantively to the Ad Hoc Noteholder Group's discovery requests, drafting a motion to quash some of the discovery, and preparing for a contested evidentiary hearing on the Motion to Appoint. These tasks were necessary to both represent the Ad Hoc Equity Group's interest in seeking appointment of an

official equity committee and minimize the cost of doing so by seeking to limit unnecessary discovery.

23. Skadden also spent significant time preparing for an evidentiary hearing on the Ad Hoc Equity Group's Motion to Appoint. Skadden did so at the direction of the Ad Hoc Equity Group because of the importance of prevailing on the Motion to Appoint so that equity holders would have a meaningful voice in the Debtors' chapter 11 process through the formation of an official equity committee. Skadden prepared and filed 38 exhibits to support the motion along with my previous declaration. Skadden prepared to present a witness to sponsor the exhibits and to cross examine a Noteholder witness. Skadden also drafted and filed a reply to the Ad hoc Noteholder Group's objection at Docket No. 588. **Exhibit 24** at Docket No. 1704 is a true and correct copy of *the Reply of Ad Hoc Group of Equity Holders (A) to Objection of the Ad Hoc Noteholder Group and (B) in Further Support of the Motion of the Ad Hoc Group of Equity Holders of Core Scientific for Entry of an Order Directing the Appointment of an Official Committee of Equity Security Holders*.

24. Based on the motion and evidence prepared by Skadden, combined with the support of the Debtors – which Skadden sought and obtained through extensive negotiations – the Court indicated that it was inclined to appoint an official committee. Skadden continued to negotiate with the Noteholders' counsel, and with the Debtors' support and the Court's encouragement, all parties ultimately agreed to the appointment of an official equity committee with a budget of $4.75 million.

*Improving the DIP Financing*

25. Before Skadden filed the Motion to Appoint, at the direction of the Ad Hoc Equity Group, it sought to improve the Initial DIP Facility to protect value for the Ad Hoc Equity Group

9

(and for all equity holders). The Initial DIP Facility required the implementation of the Initial RSA, which required a chapter 11 plan that likely would have eliminated any recovery for equity holders. Skadden researched, drafted, and on January 27, 2023 filed an objection to the Initial DIP Facility at Docket No. 375. **Exhibit 30** at Docket No 1704 is a true and correct copy of the *Objection of Ad Hoc Equity Group to the Emergency Motion of Debtors for Entry of Interim and Final orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief.*

26. In addition, Skadden and the Ad Hoc Equity Group identified certain potential alternative DIP financing sources. Skadden notified one alternative DIP lender about the lending opportunity which, to the best of my knowledge, facilitated a competitive process. Ultimately, in connection with a competitive DIP lending process, the Debtors negotiated improved DIP financing terms that were not tied to the Initial RSA.

27. At the direction of the Ad Hoc Equity Group, Skadden also researched, drafted and on February 28, 2023, filed a limited objection to the replacement DIP financing facility at Docket No. 584 (the "**Limited DIP Objection**"). The Limited DIP Objection was necessary because the replacement DIP lender and Ad Hoc Noteholder Group did not include in the facility a budget for fees to be incurred by an official equity committee's retained professionals, to the extent such a committee were to be appointed by the Court. The Ad Hoc Equity Group was the only party to object to the replacement DIP facility on these grounds. **Exhibit 32** at Docket No. 1704 is a true and correct copy of the Limited DIP Objection. The Court sustained the objection

and the replacement DIP facility was modified to include a $4.75 million budget for the official equity committee, allowing them to retain professionals to represent them in these proceedings.

28. Skadden attorneys participated at the contested evidentiary hearings in March 2023, ultimately securing the appointment of the Official Equity Committee and a budget of $4.75 million for professional fees and expenses.

29. When the Ad Hoc Equity Group, through Skadden, objected to the Initial DIP and Replacement DIP, equity holders did not yet have any other meaningful representation in these Chapter 11 Cases. The Ad Hoc Equity Group functionally served as the representative of equity holders generally. In acting as such a representative, Skadden objected to the Initial DIP financing, including its Initial RSA features, and facilitated the inclusion of a budget for the benefit of the Official Equity Committee in the Replacement DIP. These were matters as to which no estate fiduciary had the same interest.

### *Actual and Necessary Expenses of the Ad Hoc Equity Group*

30. Section 503(b)(3) of the Bankruptcy Code allows administrative claims, including "the actual, necessary expenses … incurred by … a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this tile, in making a substantial contribution in a case under chapter 9 or 11 of this title[.]" 11 U.S.C. § 503(b)(3)(D).

31. The Ad Hoc Equity Group's work satisfies this provision of the Bankruptcy Code because the Ad Hoc Equity Group's efforts facilitated the appointment of the official equity committee, which gave a voice to all equity holders and in turn led to a consensual chapter 11 plan that provides significant value to equity holders. The majority of Skadden's fees and expenses relate to the Ad Hoc Equity Group's efforts to obtain the appointment of the official equity committee. Skadden's success in obtaining the appointment of the official committee

resulted in an otherwise unrepresented class of stakeholders having representation in these Chapter 11 Cases. The official equity committee would not have been appointed to perform this critical role but for the Ad Hoc Equity Group's efforts through Skadden. The Ad Hoc Equity Group further preserved value in the Debtors by objecting to the Initial DIP Facility and securing a budget for the official equity committee by filing and prosecuting a limited objection to the Replacement DIP Facility. Finally, pursuant to the Amended Engagement Letter, the members of the Ad Hoc Equity Group agreed to be severally, but not jointly, liable for Skadden's fees and expenses incurred in seeking the appointment of an official equity committee.

32. For these reasons and for all other reasons set forth in the Application and the *Reply of Skadden, Arps, Slate, Meagher & Flom LLP to the Ad Hoc Group of Convertible Noteholder's Objection to the Application for Allowance of Fees and Expenses Incurred by the Ad Hoc Equity Group in Making a Substantial Contribution in the Cases* at Docket No. 1598, the Ad Hoc Equity Group made a substantial contribution in these chapter 11 cases and satisfied Section 503(b)(3) of the Bankruptcy Code.

### *Reasonableness of Skadden's Fees and Expenses*

33. Skadden's work meets the requirements of section 503(b)(4) of the Bankruptcy Code which requires that fees claimed for making a substantial contribution by reasonable "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services" and that the fees be "actual, necessary expenses incurred" by an attorney. 11 U.S.C. § 503(b)(4).

34. Skadden's fees are reasonable given the nature of services provided. These Chapter 11 Cases are complex, and the issues involved in establishing the Debtors' solvency presented a unique set of circumstances. Ultimately, Skadden was successful in assisting the Ad

Hoc Equity Group achieve the appointment of an official committee, a rare and difficult outcome in chapter 11 cases.

35. Obtaining the appointment of the Ad Hoc Equity Group which required significant time negotiating with stakeholders, drafting various pleadings, defending against discovery and deposition requests, and objecting to both the Initial DIP Facility and the Replacement DIP Facility. These workstreams required substantial time and labor. Skadden attorneys and paraprofessional staff billed over 1,250 hours to the Ad Hoc Equity Group for these services.

36. Skadden drew upon the extensive experience of its attorneys in handling complex restructuring and litigation matters. Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with valuation issues and the fast-paced needs of chapter 11 cases. Skadden's depth of experience allowed it to address the matters important to the Ad Hoc Equity Group promptly and effectively. Skadden employed both restructuring and litigation attorneys to represent the Ad Hoc Equity Group.

37. Skadden was careful with its staffing and assigned discrete tasks to attorneys, avoiding duplicative and unnecessary work. Junior attorneys were staffed on the matter wherever appropriate to avoid incurring additional costs. Of the 1,253.6 hours billed by Skadden on this matter, 917.7 hours were billed by associates and paraprofessionals. Moreover, prior to issuing invoices to the members of the Ad Hoc Equity Group, Ms. Reed and I carefully reviewed each time entry and determined to write off certain time charges, which in the aggregate resulted in write offs across all of Skadden's invoices totaling approximately $242,064 in fees or 128.1 hours as a voluntary accommodation.

38. The rates that Skadden charged the Ad Hoc Equity Group in this matter are consistent with Skadden' standard rates and material terms for non-bankruptcy matters and terms of other comparably skilled counsel.  None of Skadden's fees were contingent on any outcomes in these Chapter 11 Cases.  The fees and expenses sought by Skadden are consistent with the fees, charges, and disbursements incurred in other chapter 11 cases of similar size, complexity, and duration by Skadden and its peer firms.

39. The rates that Skadden charged the Ad Hoc equity Group are also consistent with the fees charged by the professionals retained in these Chapter 11 Cases.

40. All of the fees and expenses sought by Skadden in its Application are reasonable given the  nature of services provided and the complexity of the issues in these chapter 11 cases.  Moreover, the fees and expenses sought represent actual and necessary expenses incurred by the firm in its representation of the Ad Hoc Equity Group and charged to the Ad Hoc Equity Group throughout the term of Skadden's representation.

Dated: January 16, 2023
Chicago, Illinois

                                                  */s/ Ron E. Meisler*
                                                  Ron E. Meisler

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be served by electronic transmission via the Court's ECF system to all parties registered to receive electronic notice in this case.

*/s/ Noelle M. Reed*
Noelle M. Reed