## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## DECLARATION OF MICHAEL BROS IN SUPPORT
## OF (I) CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11
## PLAN OF CORE SCIENTIFIC, INC. AND ITS AFFILIATED DEBTORS,
## (II) FINAL APPROVAL OF THE DISCLOSURE STATEMENT, (III) THE
## OG&E SETTLEMENT, AND (IV) THE FOUNDRY SETTLEMENT

I, Michael Bros, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Senior Vice President of Capital Markets & Acquisitions at Core Scientific, Inc. ("**Core**", and together with its above-captioned debtor affiliates, the "**Debtors**"). I have served in this capacity since January 2022. Before that, starting in December 2018, I was Core's Vice President of Corporate Development. Prior to joining Core, I held various positions at Kayne Anderson from 2014 to 2018 and Merrill Lynch from 2011 to 2014. I hold a Bachelor of Arts from the University of Saint Thomas and a Master in Business Administration from the University of California, Los Angeles Anderson School of Management.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

2.      I submit this declaration (the "**Declaration**") in support of the following:

- confirmation of the *Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors*, dated December 28, 2023 (Docket No. 1639) (including any exhibits, schedules, or supplements thereto and as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**"),[2] including the agreements and other documents set forth in that certain *Notice of Filing of Third Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc., and Its Affiliated Debtors* filed January 5, 2024 (Docket No. 1685) (as may be further amended, supplemented, or otherwise modified from time to time in accordance with the Plan, the "**Plan Supplement**");

- Final approval of the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1439) (the "**Initial Disclosure Statement**") and the *Supplement to Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. and Its Affiliated Debtors* (Docket No. 1640) (the "**Disclosure Statement Supplement**" and, together with the Initial Disclosure Statement, the "**Disclosure Statement**");

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Assumption of the Legacy OG&E Agreement, as Amended and Restated by the A&R Agreement, and (II) Granting Related Relief* (Docket No. 1711) (the "**OG&E Settlement**"); and

- *Debtors' Emergency Motion for Order Approving (I) Revised Settlement Between Debtors and Foundry Digital LLC and (II) Granting Related Relief* (Docket No. 1712) (the "**Foundry Settlement**").

3.      I am generally knowledgeable about and familiar with the terms and provisions of the Plan (including each of the Plan Supplements), the Plan Supplement, the Disclosure Statement, the OG&E Settlement and the Foundry Settlement.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based on my experience and personal knowledge of the Debtors, their operations, and their finances, my discussions with the Debtors' advisors, including legal counsel Weil, Gotshal &

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Debtors' Exhibit No. 4
Page 2 of 27

Manges LLP ("**Weil**"), financial advisor AlixPartners LLP ("**Alix**"), and investment banker PJT Partners LP ("**PJT**", together with Weil and Alix, the "**Advisors**"), my discussions with the Debtors' stakeholders, and information learned during the course of my employment.  I, along with PJT, Weil, and others from the Debtors' management team, led the chapter 11 plan negotiations for the Debtors, which culminated in the Plan.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

5.      I am knowledgeable and familiar with the Debtors' business and financial affairs, the circumstances leading to the commencement of these chapter 11 cases, and the terms of the Plan.  Based on my personal involvement in developing the business plan, the negotiation of the transactions embodied in the Plan and these chapter 11 cases, as well as my discussions with the board of directors of Core (the "**Board**"), the special committee of independent directors of the Board (the "**Special Committee**"), the Advisors, and other members of the Debtors' management team, I believe that (i) the Plan was proposed in good faith and (ii) the Debtors, acting through their officers, directors, managers, and the Advisors, have conducted themselves in good faith and fairly in relation to the formulation and negotiation of, and solicitation of votes on, the Plan.

**Development of Business Plan**

6.      After the filing of these Chapter 11 Cases, favorable changes in the cryptocurrency and power markets rendered the Debtors' prepetition business plan obsolete.  The change in circumstances required myself along with the rest of the Debtors' management team to pivot to developing a new business plan anchored to assumptions reflecting a different economic backdrop.  On April 30, 2023, myself and others in senior management, finalized a preliminary business plan for the Reorganized Debtors (as updated, the "**Business Plan**").  On May 1, 2023 we presented the Business Plan to the Board including the Special Committee, and presented a

Debtors' Exhibit No. 4
Page 3 of 27

revised Business Plan to the Special Committee on May 12, 2023.  In November 2023, we further updated the Business Plan to reflect the current market environment including changes such as a decrease in hashprice assumption and an adjustment to the expansion schedule of the Denton and Cottonwood facilities.  The updated Business Plan covers the period from the first quarter of fiscal year 2024 until the end of fiscal year 2027 (the "**Forecast Period**").

7.     In creating the Business Plan, myself and the management team emphasized post-emergence operational execution, with initiatives including: (i) optimizing self-miner fleet efficiency by refreshing existing bitcoin miners; (ii) expanding capacity at certain facilities; (iii) expanding self-mining presence; and (iv) focusing on cost discipline.  We built flexibility into the Business Plan to ensure it can withstand unexpected changes in variables that could impact projected cash flow.  This ensures that actual results deviating from any one or more of the assumptions would continue to result in the Debtors' commercial viability, and therefore, the Plan's continued feasibility.  Most importantly, the Business Plan provides the flexibility to adapt to changes in hashprice, which is one of the most important factors influencing the economic performance of the Debtors' business.  Specifically, because anticipated capital expenditures contemplated as part of the Business Plan are largely discretionary in nature, any unanticipated decrease in hashprice can be offset by deferring and/or reducing any planned discretionary capital expenditures in such year.  In addition, the cost of bitcoin miners is dynamic based on mining economics, as the cost of purchasing new bitcoin miners decreases as their profitability decreases. Bitcoin miner purchase prices have historically been, and are expected to continue to be, based on a 12-month payback period.

8.     In addition, should hashprice decrease further, myself and the management team anticipate that the Reorganized Debtors (and others) would power down certain bitcoin

miners, in accordance with existing industry practice, as the profitability of certain bitcoin miners would decline (i.e., the lower revenues may not exceed certain bitcoin miners' operating costs). Powering down miners would then reduce the network hashrate and, all else equal, increase hashprice (and thus, increases profitability of the then-powered and operating bitcoin miners). Certain less efficient bitcoin miners may go offline permanently.  It may be challenging for other mining companies to replace those less efficient bitcoin miners with newer, more efficient bitcoin miners; doing so would require time and capital.  The global chip and silicone shortage may exacerbate the issue.  In contrast, in such a scenario I believe the Reorganized Debtors will be in a preferred position to purchase new bitcoin miners, because the Debtors are one of the largest customers of Bitmain (the leading manufacturer of bitcoin miners), and Bitmain is one of the Debtors' hosting customers

9.      The Business Plan has been utilized to develop the below described Financial Projections (as defined below), which I worked closely with the Advisors to develop, and demonstrates the feasibility of the Plan

### Restructuring Negotiations and Plan Settlements

10.      The Plan provides for a comprehensive restructuring and deleveraging of the Debtors' balance sheet anchored by the various Plan Settlements, including those reached with the Key Stakeholder Groups.  During these Chapter 11 Cases, myself, other members of the Debtors' management team, and the Advisors, engaged in continuous, constructive, and meaningful discussions with each of the Debtors' key stakeholders (including the Key Stakeholder Groups) to build widespread support for the Plan and to resolve disputes with such stakeholders, which resulted in a number of value-maximizing Plan Settlements, each described in greater detail below, including (i) the RSA Settlement, (ii) the GUC Settlement, (iii) the Miner Equipment

Debtors' Exhibit No. 4
Page 5 of 27

Lender Settlement, and (iv) various other claims settlements (e.g., the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement).

### i.   *RSA Settlement*

11.    After months of extensive, arms' length negotiation and Mediation beginning July 2023, the Debtors finalized and executed that certain *Restructuring Support Agreement* (Docket No. 1440) on November 16, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, and including all exhibits, annexes, and schedules thereto, the "**RSA**") with (i) the Convertible Noteholders that are members of the Ad Hoc Noteholder Group and comprise (a) 93% of the Holders of the April Convertible Notes Secured Claims and (b) 80% of the Holders of the August Convertible Notes Secured Claims (collectively, the foregoing (a) and (b), the "**Consenting Creditors**") and (ii) the Equity Committee and the members of the Equity Committee, excluding Foundry Digital LLC ("**Foundry**"), (collectively, the "**RSA Parties**").[3] The RSA settlement in the RSA was a global settlement of issues between the Debtors and the RSA Parties, including, among other issues, the Enterprise Value of the Reorganized Debtors, the size of the Convertible Noteholders' Allowed Claims, including resolution of the dispute on the validity of the allowed amount and the treatment of the Class 1 April Convertible Notes Secured Claims and Class 2 August Convertible Notes Secured Claims, the treatment of Existing Common Interests, and the terms of exit capital to fund the Plan.  The RSA Settlement is incorporated into the Plan.

### ii.   *GUC Settlement*

---

[3]   Although Foundry is not party to the RSA, the Debtors and Foundry have reached a revised settlement (the "**Foundry Settlement**"), which is described in greater detail in the Plan.

Debtors' Exhibit No. 4
Page 6 of 27

12.     Subsequent to the entry into and execution of the RSA, the Debtors, including myself, continued good faith negotiations with B. Riley and the Creditors' Committee in an attempt to achieve a fully consensual Plan.  The Debtors organized and participated in a subsequent Mediation before the Honorable Judge Marvin Isgur in December 2023, which ultimately culminated in the GUC Settlement between the Debtors, B. Riley, the Creditors' Committee, and the members thereof (except for any claims (i) held by the Debtors against Sphere 3D Corp. or (ii) held by Sphere 3D Corp. against the Debtors).[4] The GUC Settlement resolved all the remaining issues with respect to the Plan among the Debtors and the Key Stakeholder Groups and is supported by all of the Key Stakeholder Groups.

13.     The GUC Settlement resolved all the remaining issues with respect to the Plan among the Debtors and the Key Stakeholder Groups and is supported by all of the Key Stakeholder Groups.  The GUC Settlement resulted in additional recoveries for Holders of Class 8A General Unsecured Claims, including the issuance and distribution of the GUC Contingent Payment Obligations and the GUC Settlement Additional Equity Distribution Amount and resolution of the Allowed amount of certain Class 8A General Unsecured Claims as set forth on the Schedule of Allowed General Unsecured Claims in Exhibit N of the Plan Supplement.  The GUC Settlement also resulted in the creation of the Class 8B Convenience Claims class consisting of unsecured claims equal to or less than $10,000 (and any Holder of an Allowed General Unsecured Claim that elected to reduce the allowed amount of its claim to $10,000), and each Class 8B Holder will receive cash in an amount equal to such Holder's Allowed Convenience Claim.

---

[4] Following the entry into the GUC Settlement, the Debtors entered into a settlement with Sphere 3D Corp. (the "**Core-Sphere-Gryphon Settlement**").

Debtors' Exhibit No. 4
Page 7 of 27

### iii.   *Miner Equipment Lender Settlement*

14.     During the summer of 2023, the Debtors reached a compromise and settlement with the Settling Miner Equipment Lenders with respect to the treatment of the Class 3 Miner Equipment Lender Claims.  The Miner Equipment Lender Settlement resolves the Allowed amount of the Miner Equipment Lender Claims for the Settling Miner Equipment Lenders and the treatment of the Miner Equipment Lender Claims of the Settling Miner Equipment Lenders.  Each Settling Miner Equipment Lender agrees to support confirmation of the Plan in exchange for an election of the following negotiated treatment options under the Plan: (i) the Default Miner Equipment Lender Treatment, (ii) Miner Equipment Lender Treatment (Election 1), which is a full equitization of one hundred percent (100%) of such Holder's Allowed Miner Equipment Lender Claim Amount (the "**Equitization Option**"), or (iii) Miner Equipment Lender Takeback Debt (Election 2) with a principal amount that is 80% of the Settling Miner Equipment Lender's Allowed Claims.   As discussed below, most of the Settling Miner Equipment Lenders chose the Equitization Option, which will reduce approximately $200 million of debt from the Reorganized Debtors' balance sheet.

### iv.   *Other Plan Settlements*

15.     In addition to the above, the Debtors also entered into several other value-maximizing Plan Settlements that resolved the Allowed amount of various secured or unsecured Claims against the Debtors and the treatment thereof and have been incorporated in the Plan, including the Brown Settlement, the Holliwood Settlement, and the Foundry Settlement.

- The Brown Settlement reflects the compromise and settlement between the Debtors and Brown Corporation.  The Brown Settlement resolves the Allowed amount of the Secured Mortgage Claim (Brown) against Debtor American Property Acquisition, LLC.  It also resolves the treatment thereof and provides Brown Corporation with the option of either the Default Mortgage Treatment (Mortgage Takeback Debt) or Mortgage Treatment

8

Election (Cash in in an amount equal to ninety-five percent (95%) of such Holder's Allowed Secured Mortgage Claim Amount). Brown Corporation also agrees to support confirmation of the Plan under the Brown Settlement.

- The Holliwood Settlement reflects the compromise and settlement between the Debtors and Holliwood LLC. The Holliwood Settlement resolves the Allowed amount of the Secured Mortgage Claim (Holliwood) against Debtor American Property Acquisition, LLC. Similar to the Brown Settlement, it also provides Holliwood LLC with the option of either the Default Mortgage Treatment or Mortgage Treatment Election. Holliwood LLC also agrees to support confirmation of the Plan under the Brown Settlement.

- The Foundry Settlement reflects the compromise and settlement between the Debtors and Foundry.[5] Under the Foundry Settlement, Foundry will receive a total Allowed Class 8A General Unsecured Claim of $5.5 million and will receive the same treatment as other Holders of Allowed Class 8A General Unsecured Claims under the Plan. In addition, the Debtors shall assume the Foundry Hosting Agreements (as defined in the Plan) on the Effective Date, and shall perform thereunder in accordance with the Foundry Settlement (which, as of the date hereof, the parties estimate to be $0). The Foundry Settlement also includes mutual releases between the Debtors and Foundry.

16.    Incorporating each of the above described settlements, the Plan provides for, among other things, a comprehensive restructuring and significant deleveraging of the Debtors' balance sheet to support the long-term viability of the Debtors' enterprise. The Restructuring contemplated by the Plan provides the Debtors with a viable path forward and a framework to exit chapter 11 successfully and in a timely fashion with the support of the Consenting Creditors, Equity Committee, Creditors' Committee, and Settling Miner Equipment Lenders.

---

[5]    After filing the Plan, the Debtors filed the *Debtors' Emergency Motion for Order Approving (I) Revised Settlement between Debtors and Foundry Digital LLC and (II) Granting Related Relief* (Docket No. 1712), which supersedes the settlement filed with the original motion at Docket No. 1188 and is scheduled to be heard before the Court at the Combined Hearing on January 16, 2024. The Foundry Settlement is also incorporated into Section 5.16 of the Plan.

Debtors' Exhibit No. 4
Page 9 of 27

### Requirements for Confirmation under Section 1129 of Bankruptcy Code

17.    I am aware that, for the Bankruptcy Court to confirm the Plan, the Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of the title 11 of the United States Code (the "**Bankruptcy Code**").  Below I set out facts with respect to certain of those requirements as I understand them, based on the events that have occurred throughout these chapter 11 cases, my experience as the Debtors' Senior Vice President of Capital Markets & Acquisitions, and discussions I have had with the Advisors and other members of the Debtors' management team.  Other facts supporting these requirements are set forth in the Plan and Plan Supplement, as well as other declarations filed in support of confirmation of the Plan.

### I.    Section 1129(a)(1):  Plan Complies with All Applicable Bankruptcy Code Provisions

18.    The Plan provides for the following thirteen (13) Classes of Claims and Interests: (i) Class 1 (April Convertible Notes Secured Claims); (ii) Class 2 (August Convertible Notes Secured Claims); (iii) Class 3 (Miner Equipment Lender Secured Claims); (iv) Class 4 (Other Secured Claims); (v) Class 5 (M&M Lien Secured Claims); (vi) Class 6 (Secured Mortgage Claims); (vii) Class 7 (Priority Non-Tax Claims); (viii) Class 8A (General Unsecured Claims); (ix) Class 8B (Convenience Claims); (x) Class 9 (Intercompany Claims); (xi) Class 10 (Intercompany Interests); (xii) Class 11 (Section 510(b) Claims); and (xiii) Class 12 (Existing Common Interests).[6]

19.    ***Classification & Compliance with Section 1122 of the Bankruptcy Code***. The classification structure of the Plan is rational and appropriate.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of

---

[6]    Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, and Professional Fee Claims have not been classified and are separately treated under the Plan.

Debtors' Exhibit No. 4
Page 10 of 27

such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests.

20.     From my own knowledge and discussions with the Advisors, I understand that each Class of secured Claims is comprised of Claims arising under different types of financial instruments governed by separate debt documents or other debt obligations that are (i) secured by valid Liens against different Collaterals of the Estates and/or (ii) in the case that different Liens are against the same Collateral, different in priority of Liens against such Collateral.  Within each Class of Secured Claims, Holders share common priority and rights against the Debtors' Estates.

21.     From my own knowledge and discussions with the Advisors, I understand that each Class of Unsecured Claims is comprised of Claims arising under different debt obligations and/or different facts and circumstances.  In particular, the Debtors established Class 8B for Claims that would otherwise be General Unsecured Claims but are allowed in the amount of $10,000 or less, which separate classification and different treatment is, in my view, reasonable under the circumstances and necessary for administrative convenience.  The classification and treatment of Classes 8A and 8B are also a result of extensive, arm's length negotiations with the Creditors' Committee and part of the GUC Settlement and in any event, Holders of both Class 8A and 8B receive full recovery on account of their Claims under the Plan.

22.     Therefore, I believe the classification structure of the Plan is rational.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests.  The classification scheme generally tracks the Debtors'

Debtors' Exhibit No. 4
Page 11 of 27

prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments or debts giving rise to such Claims and Interests.

23.     Moreover, within a given Class, all Claims and Interests have the same or similar rights against the Debtors.

24.     ***Release Provisions Comply with Section 1123(b)(6) of Bankruptcy Code***. The Debtors submitted a separate declaration by Neal Goldman regarding the Plan's satisfaction of section 1123(b)(6).

## II.     Section 1129(a)(2):  Debtors Compliance with Bankruptcy Code

25.     Each of the Debtors has a domicile, a place of business, and property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code, and therefore each Debtor is eligible for relief under chapter 11 of the Bankruptcy Code.

26.     On November 17, 2023 and December 28, 2023, the Bankruptcy Court entered an orders that, among other things, conditionally approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Debtors' proposed Ballots, forms, notices, and Solicitation and Voting Procedures (as defined therein) (Docket Nos. 1447 and 1638) (together, the "**Disclosure Statement Order**").  As detailed in the paragraph 6 of the *Declaration of Jung W. Song in Support Of  Confirmation of the Fourth Amended Joint Chapter 11 Plan of Core Scientific, Inc. And Its Affiliated Debtors*, filed contemporaneously herewith (the "**Solicitation Declaration**"), I understand that, in accordance with the Solicitation and Voting Procedures, the Debtors solicited votes from or Interests as of the Voting Record Date in Class 1 (April Convertible Notes Secured Claims), Class 2 (August Convertible Notes Secured Claims),Class 3 (Miner Equipment Lender Secured Claims), Class 5 (M&M Lien Secured Claims), Class 6 (Secured Mortgage Claims), Class

Debtors' Exhibit No. 4
Page 12 of 27

8A (General Unsecured Claims), Class 8B (Convenience Claims), Class 11 (Section 510(b) Claims), Class 12 (Existing Common Interests).

27.     Subsequent to filing this Declaration and pursuant to section 1127 of the Bankruptcy Code, the Debtors may make certain additional immaterial changes to the Plan prior to the Confirmation Hearing.  Based on my discussions with the Advisors, I have no reason to believe that any of these modifications to the Plan will require additional disclosures.

**III.**     **Section 1129(a)(3):  Good Faith**

28.     I believe the Plan has been proposed by the Debtors in good faith and for the legitimate and honest purposes of reorganizing the Debtors' ongoing business and enhancing the Debtors' long-term financial viability while providing 100% recoveries to all holders of Allowed Claims (other than Section 510(b) Claims and Holders of Claims that have agreed to accept lesser treatment) and a meaningful recover to existing equity holders.  The restructuring is the culmination of extensive, good faith negotiations between the Debtors and a number of their key economic stakeholders, including the Ad Hoc Noteholder Group, B. Riley, the Settling Miner Equipment Lenders, the Creditors' Committee, the Equity Committee, and several other claimants. The Plan, including both the RSA Settlement and the GUC Settlement, is also the product of the Mediation that was overseen by Judge Isgur.

29.     Myself and other members of the Debtors' senior management, along with the Advisors negotiated the Plan, including the Restructuring Transactions memorialized and various Plan Settlements embodied therein, and the Plan was approved by the Special Committee. The Special Committee reviewed and approved the filing of the Plan, the Disclosure Statement, and the Plan Supplement, and the Restructuring Transactions contemplated thereunder.  The RSA also includes a "fiduciary-out" provision that allows the Debtors to terminate the RSA in accordance with its terms should their performance be inconsistent with the exercise of the

Debtors' Exhibit No. 4
Page 13 of 27

Debtors' board of directors' fiduciary duties under applicable law. As a result of the above described process, a comprehensive restructuring is embodied in the Plan, which (i) facilitates a reduction of current debt on the Debtors' balance sheet by approximately $400 million and a reduction in the Debtors' annual debt service by approximately $60 million, (ii) provides one-hundred percent (100%) recoveries (including postpetition interest) to all Classes of Claims (other than Section 510(b) Claims and Holders of Claims that have agreed to accept lesser treatment), (iii) provides meaningful recovery to Holders of Existing Common Interests, (iv) preserves more than 240 jobs, and (v) enables the Debtors to emerge with adequate capital to operate the reorganized businesses and position the Reorganized Debtors for growth and success.

30.     To the best of my knowledge, and based on my observations, the Debtors followed appropriate governance practices throughout the entire Plan negotiation and approval process and, as such, the Debtors have proposed the Plan in good faith.

### IV.     Section 1129(a)(4):  Professional Fees Subject to Bankruptcy Court Approval

31.     All payments by the Debtors for services provided to the Debtors during these chapter 11 cases will be subject to approval by the Bankruptcy Court as reasonable. Specifically, section 2.2 of the Plan provides that all Professionals seeking approval by the Bankruptcy Court of the Professional Fee Claims must file final applications no later than forty-five (45) days after the Effective Date (except for the Equity Committee's Professionals, who must file on or before (and no later than) the date that is ten (10) days after the Effective Date), unless extended by the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, thereby giving interested parties adequate time to review the Professional Fee Claims. Further, Article XI of the Plan provides that the Bankruptcy Court will "retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things,

14

[…] all Professional Fee Claims[.]" Plan, § 11.1.  Any other professional fee payments to be made by the Debtors will be made in accordance with the Plan.

**V.    Section 1129(a)(5): Information Regarding Proposed Officers and Managers**

32.    I believe that the Debtors have satisfied or will satisfy the requirements under section 1129(a)(5) of the Bankruptcy Code through disclosures in section 5.21 of the Plan and Exhibit I of the Plan Supplement that I understand requires disclosure of proposed officers of the Reorganized Debtors.  The Plan Supplement provides that, to the extent compliant with NASDAQ rules and the Delaware General Corporation Law, the New Board will consist of the following seven members: (i) Adam Sullivan (the Debtors' Chief Executive Officer); (ii) Jarrod Patten,; (iii) Jeff Booth; (iv) Eric Weiss; (v) Todd Becker; (vi ) Jordan Levy; and (vii) Yadin Rozov.  Exhibit I of the Plan Supplement discloses the affiliation of each proposed New Board member.  I believe that the Plan provisions governing the manner of selection of any officer, director, or manager of the Reorganized Debtors are consistent with the interests of creditors and equity security holders and with public policy.

**VI.    Section 1129(a)(6):  No Rate Changes**

33.    It is my understanding that the Plan does not provide for any rate changes by the Debtors.

**VII.    Section 1129(a)(7):  Best Interests Test**

34.    The Debtors submitted a separate declaration by Rodi Blokh of Alix regarding the Plan's satisfaction of section 1129(a)(7).

**VIII.    Section 1129(a)(8): Acceptance of Impaired Classes**

35.    The Debtors submitted a separate declaration by Jung W. Song of Stretto regarding the Plan's satisfaction of section 1129(a)(8).

15

## IX.    Section 1129(a)(9): Payment in Full of Priority Claims

36.    It is my understanding, based on discussions with the Advisors, that section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.  Section 2.1 of the Plan provides that Allowed Administrative Expense Claims will be paid in full in Cash on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  Section 2.3 of the Plan provides that Allowed Priority Tax Claims will be paid in full in Cash on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (ii) such other treatment reasonably acceptable to the Debtors or Reorganized Debtors (as applicable) with the consent of the Requisite Consenting Creditors (subject to the parties' rights and obligations under the RSA) and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the Plan pays all priority claims in full in cash.

## X.    Section 1129(a)(11):  Feasibility

37.    It is my understanding, based on discussions with the Advisors, that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if it is feasible (i.e., if the Debtors' reorganization is not likely to be followed by liquidation or the need for further financial reorganization).  As set forth in Exhibit E to the Initial Disclosure Statement, the Debtors have

16

prepared and filed with the Bankruptcy Court financial projections for the Reorganized Debtors (the "**Financial Projections**") for the period beginning with the first quarter of 2024 through fiscal year-end 2027.

38.     The Financial Projections were prepared utilizing a number of reasonable and good faith assumptions based upon the current views and understandings of the Debtors' management, each of whom has years of experience in, and an intimate understanding of, the bitcoin mining industry.  Specifically, the Financial Projections were developed based on the Debtors' updated Business Plan (the "**Business Plan**"), which covers the period from the first quarter of fiscal year 2024 until the end of fiscal year 2027.  The Business Plan was created with management's expectation of post-emergence operational execution in mind, with initiatives including: (i) optimizing self-miner fleet efficiency by refreshing existing miners; (ii) expanding capacity at certain facilities; (iii) expanding self-mining presence; and (iv) focusing on cost discipline.  The Debtors built flexibility into the Business Plan to ensure it can withstand unexpected changes in variables that could impact projected cash flow.  This ensures that actual results deviating from any one or more of the assumptions would continue to result in the Debtors' commercial viability, and therefore, the Plan's continued feasibility.  Most importantly, as further described in the Initial Disclosure Statement, the Business Plan provides the flexibility to adapt to changes in hashprice, which is one of the most important factors influencing the economic performance of the Debtors' business.  The Financial Projections also assumed a reorganization of the Debtors' capital structure as set forth in Section II.C of the Initial Disclosure Statement.

39.     In addition, the anticipated capital structure upon the Effective Date has changed since the filing of the Initial Disclosure Statement, including (i) the final treatment election by Holders of Class 3 Miner Equipment Lender Secured Claims, which is different than

Debtors' Exhibit No. 4
Page 17 of 27

the Debtors' assumptions as of the filing of the Initial Disclosure Statement as most of them chose the Equitization Option (resulting in significantly less debt than anticipated)[7]; (ii) the updated total amount of secured debt for mechanics' liens claimants under the M&M Lien Settlements;[8] and (ii) additional unsecured debt as a result of the Dalton Settlement.[9]   The Debtors' now anticipated capital structure as of the Effective Date is as follow:

- **Exit Facility**: $80 million commitment, consisting of (i) $40 million new money ($20 million of which will be available immediately upon the Effective Date) and (ii) $40 million from rolling up the applicable Convertible Notes Secured Claims. The Exit Facility accrues interest at 9% per annum. Approximately $61 million of the Exit Facility (including approximately $1 million of payment-in-kind fee on the new money) will be drawn on the Effective Date.

- **New Secured Notes:** $150 million at 12.5% annual cash interest. The first interest payment is due on June 15, 2024 and subsequent interest payments are paid quarterly thereafter.

- **New Secured Convertible Notes:** $260 million at either (i) 6.0% cash interest and 6.0% payment-in-kind interests or (ii) 10% cash interest, at the Reorganized Debtors' option. The first interest payment is due on June 15, 2024 and subsequent interest payments are paid quarterly thereafter.

- **Miner Equipment Loans:** $53 million of Miner Equipment Lender Takeback Debt (Election 2).

- **Other Secured and/or Unsecured Debts**: include approximately (i) $20.1 million of Reinstated Other Secured Claims, (ii) $54 million of secured debt for mechanics' liens claimants under the M&M Lien Settlements, (iii) $9 million of unsecured debt under the Dalton Settlement, and (iv) $1 million of Secured Mortgage Claims.

---

[7]    The Holders of Class 3 Miner Equipment Lender Secured Claims who chose the Equitization Option include: 36th Street Capital Partners, LLC; Anchorage Lending CA, LLC; Barings BDC, Inc.; Barings Capital Investment Corporation; Barings Private Credit Corp.; MassMutual Asset Finance LLC; and Stonebriar Commercial Finance LLC.

[8]    *See* the *Debtors' Motion For Entry of An Order (I) Authorizing (A) Assumption of McCarthy Contracts, As Amended in Accordance with the Settlement Agreement and (B) Entry into the Settlement Agreement, and (II) Granting Related Relief* (Docket No. 1580) (the "**McCarthy Settlement Motion**").

[9]    *See Order (I) Authorizing Assumption and Performance of the Legacy Dalton Agreements, As Amended By the Dalton Settlement Agreement and (II) Granting Related Relief* (Docket No. 1651) (the "**Dalton Settlement**").

18

40.     Overall, the updated anticipated Effective Date capital structure of the Debtors presents an even more significant de-leveraging than previously assumed under the Financial Projections, primarily driven by more Settling Equipment Miner Lenders' election of the Equitization Option than the Debtors anticipated.  This not only signals the Settling Equipment Miner Lenders' strong confidence in the Business Plan and the Reorganized Debtors' successful operation; it also reduces the amount of debt service assumed under the Business Plan and further strengthens my belief that the Debtors will have sufficient resources and cash flow to make all payments required pursuant to the Plan and to service their debt as it becomes due.

41.     I understand that the Debtors will fund distributions under the Plan with (i) the Debtors' cash on hand (projected to be approximately $50 million) and (ii) proceeds available from the Exit Facility and the Rights Offering.  The Rights Offering (which was significantly oversubscribed) generated $55 million in cash proceeds.  As noted above, the Exit Facility provides the Reorganized Debtors with $40 million in new money, $20 million of which will be drawn immediately upon emergence.  The Debtors believe the new sources of capital provided by the Rights Offering and the Exit Facility will be sufficient to satisfy all of the Debtors' obligations under the Plan, comply with the terms of their debt instruments, and provide the Reorganized Debtors with a healthy balance sheet that will position them to implement their Business Plan successfully.

42.     Based upon my understanding of the Plan, the advice of the Advisors, work in preparing the Financial Projections, and my experience with the Debtors' business and industry, I believe that the Plan is feasible.  The Plan embodies a carefully tailored restructuring that will provide for the continued viability of the Debtors' business.

19

**XI.**     **Section 1129(a)(12): Payment of U.S. Trustee Fees**

43.     It is my understanding, based on discussions with the Advisors, that section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan.  The Plan provides that, on or after the Effective Date, such fees will be paid by the Reorganized Debtors in Cash.

**XII.**     **Section 1129(a)(13): Retiree Benefits**

44.     It is my understanding, based on discussions with the Advisors, that section 1129(a)(13) of the Bankruptcy Code requires the continuation of payment of all retiree benefits.  I understand that Section 8.5(e) of the Plan provides that any Employee Arrangements (including the Debtors' programs for their retirees) that are Executory Contracts and not otherwise addressed in the Plan or listed on the Schedule of Rejected Contracts in the Plan Supplement shall be deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.  Section 8.5(f) of the Plan provides that any Employee Arrangements (including the Debtors' programs for their retirees) that are not Executory Contracts and not otherwise addressed in the Plan shall be continued in the ordinary course of business following the Effective Date.

**XIII.**     **Section 1129(b):  Cramdown of Non-Accepting Classes**

45.     It is my understanding, based on discussions with the Advisors, that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests (i.e., "crammed down") so long as the plan is "fair and equitable" and it does not discriminate unfairly as to the non-accepting class. Based upon my discussions with the Advisors, I understand that the only Class to which cramdown is relevant is Class 8A (General Unsecured Claims) at Core Scientific Mining LLC.

20

### A.      Plan Does Not Discriminate Unfairly

46.      Based upon my discussions with the Advisors, I understand that section 1129(b)(1) of the Bankruptcy Code prohibits unfair discrimination, which occurs when similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  I believe that with respect to the Debtors' general unsecured Classes, there is no unfair discrimination between Class 8A (General Unsecured Claims) and Class 8B (Convenience Claims).  Although holders in Class 8A and Class 8B are receiving a different form of recovery (holders in Class 8A receive equity, whereas holders in Class 8B receive cash), my understanding is that holders of claims in both Class 8A and Class 8B (including Holders of claims against Core Scientific Mining LLC) are entitled to a 100% recovery.  Therefore, my understanding is that the Plan does not discriminate unfairly.

### B.      Plan Is Fair and Equitable

47.      Based upon my discussions with the Advisors, I understand that section 1129(b)(2) of the Bankruptcy Code requires that a plan be fair and equitable with respect to rejecting classes of claims or interests and that this is assessed by whether the plan provides that each holder of a claim in the rejecting class will receive or retain, on account of its claim, property of a value, as of the effective date of the plan, equal to the allowed amount of the claim.

48.      Here, I believe the "fair and equitable" rule is satisfied.  All Classes of creditors (other than Section 510(b) Claims and creditors that have agreed to accept lesser treatment) are receiving a full recovery under the Plan at each Debtor entity, including Holders in Class 8A at Core Scientific Mining LLC.

### XIV.      Section 1129(a)(14)–(16):  Inapplicable Provisions

49.      The Debtors are not subject to any domestic support obligations , no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code, and the Debtors

Debtors' Exhibit No. 4
Page 21 of 27

are each a moneyed, business, or commercial corporation, and these Chapter 11 Cases are not "small business cases."

### XV.  Section 1129(c):  Plan Is Only Plan Currently on File

50.  The Plan is the only operative chapter 11 plan currently on file in these Chapter 11 Cases.

### XVI.  Section 1129(d):  Principal Purpose of Plan Is Not Avoidance of Taxes

51.  The principal purpose of the Plan is to reorganize the Debtors' ongoing business, de-lever the Debtors' capital structure, and enhance the Debtors' long-term financial viability while providing recoveries to all of the Debtors' stakeholders, not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.

### XVII.  Section 1129(e):  Inapplicable Provision

52.  Based on my understanding of the Plan and discussions with the Advisors, these chapter 11 cases are not "small business cases" as I understand that term to be defined in the Bankruptcy Code.

### Request for Waiver of Bankruptcy Rule 3020(e)

53.  It is my understanding, based on discussions with the Advisors, that there is a 14-day stay imposed on the Proposed Confirmation Order. I believe that it is appropriate for the Bankruptcy Court to permit the Debtors to consummate the Plan and the transactions contemplated thereby (including those set forth in the Restructuring Transactions Exhibit) and commence its implementation without delay.  Any significant delay in emerging from these chapter 11 cases may have an impact on the Debtors' financial performance and ability to achieve the Financial Projections, as well as listing of the Reorganized Debtors' New Common Interests on NASDAQ and thus the Reorganized Debtors' access to capital markets.  In addition, each day of delay in emerging from these chapter 11 cases will result in additional accrual of post-petition

Debtors' Exhibit No. 4
Page 22 of 27

interest for the Allowed amount of both Class 1 (April Convertible Notes Secured Claims) and Class 2 (August Convertible Notes Secured Claims), as well as more professional fees incurred in these Chapter 11 Cases.  I believe a waiver of the 14-day stay under Bankruptcy Rule 3020(e) is in the best interests of the Estates and will not prejudice any party in interest.

**<u>Disclosure Statement Provides Adequate Information</u>**

54.     I was also involved in the negotiation and preparation of the Disclosure Statement.  I have reviewed the Disclosure Statements and to the best of my knowledge, information and belief, I believe the information in the Disclosure Statement is true and correct.  I also believe that the Disclosure Statement provided holders of impaired claims and existing equity holders adequate information to allow such holders to make an informed decision whether to vote for or against the Plan.

**<u>OG&E Settlement</u>**

55.     On January 12, 2024, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Assumption of the Legacy OG&E Agreement, as Amended and Restated by the A&R Agreement, and (II) Granting Related Relief* (Docket No. [1711] (the "**OG&E Motion**").

56.     As described in the OG&E Motion, the Debtors and Oklahoma Gas and Electric Company ("**OG&E**")—a regulated electric utility company—are party to a prepetition agreement (the "**Legacy OG&E Agreement**") relating to the provision of electricity utility services at the Debtors' mining facility under construction located in Muskogee, Oklahoma (the "**Muskogee Facility**"). Upon completion of the construction, the Muskogee Facility's operation will require electricity to operate and OG&E is the only electric services provider available for the Muskogee Facility.

23

57.     OG&E filed proof of claim number 34 asserting an unsecured claim of approximately $8.0 million in connection with amounts that OG&E has expended to construct a substation to service the Muskogee Facility (the "**OG&E Claim**").

58.     After engaging in extensive good faith and arm's length negotiations, the Debtors and OG&E have agreed on a settlement of the OG&E Claim, through the assumption of the Legacy OG&E Agreement, as amended and restated to reflect the terms of the settlement (such assumed amended and restated agreement, the "**A&R Agreement**"), on a form of A&R Agreement, subject to this Bankruptcy Court's approval.

59.     The settlement, as reflected in the A&R Agreement and the proposed Order attached to the OG&E Motion, provides the following:

a.      OG&E must provide to the Muskogee Facility a minimum operational electrical capacity of not less than 100 megawatts for the initial five (5) year term of the A&R Agreement;

b.      In full and final satisfaction of any cure claims owed in connection with the assumption of the A&R Agreement, the OG&E Claim shall be an Allowed General Unsecured Claim under the Plan in the amount of $4.8 million; and

c.      OG&E will sell the New Common Interests received on account of the OG&E Claim as soon as reasonably and commercially possible. To the extent the fair market value of the New Common Interests received and sold by OG&E on account of the OG&E Claim exceeds $4.8 million, OG&E will retain 30% of such excess amount, with the remainder applied by OG&E against other costs in contribution in aid of construction of the Muskogee substation, or otherwise towards certain billing deposits or as credits against future electric bills of the Reorganized Debtor. To the extent the fair market value of the New Common Interests sold by OG&E is less than $4.8 million, the Reorganized Debtor will pay OG&E such difference within 90 days following OG&E's receipt of such New Common Interests on account of the OG&E Claim.

60.     Upon completion, the Muskogee Facility will be a part of the Reorganized Debtors' operations and its operation is a key component of the Debtors' business plan. Simply put, without the provision of electricity from OG&E, the Muskogee Facility cannot operate.

Debtors' Exhibit No. 4
Page 24 of 27

61.     I believe that the terms of the settlement with OG&E, as reflected by the A&R Agreement, are fair, reasonable, are in the best interests of, and provides considerable savings to, the Debtors and their Estates.  Further, I believe that without assuming the A&R Agreement, and guaranteeing the availability of electricity to the Muskogee Facility, which would effectively result in the Muskogee Facility becoming inoperable, the Reorganized Debtors' ability to meet its goals under the Business Plan would be hindered.  As such, I believe the Bankruptcy Court should authorize the assumption of the A&R Agreement, as requested by the Debtors in the OG&E Motion.

## **Foundry Settlement**

62.     On January 12, 2024, the Debtors filed the *Debtors' Emergency Motion for Order Approving (I) Revised Settlement Between Debtors and Foundry Digital LLC and (II) Granting Related Relief* [Docket No. 1712] (the "**Foundry Motion**").

63.     Foundry Digital LLC ("**Foundry**") is a digital asset mining-focused subsidiary of Digital Currency Group. As described more fully in the Foundry Motion, Foundry and certain of the Debtors are party to several agreements whereby the Debtors agreed to provide services, including, without limitation, colocation, hosting and other services for Foundry's cryptocurrency mining equipment (the "**Hosting Agreements**").

64.     Additionally, in February 2022, certain of the Debtors entered into an Amended and Restated Asset Purchase Agreement (the "**A&R APA**") pursuant to which Foundry sold 2,106 Bitmain Antminer S19 machines to the Debtors for a total purchase price of $21,312,720.00 (the "**Purchase Price**"), which was paid to Foundry through the issuance of 1,580,288 of Core Scientific shares to Foundry (the "**APA Consideration**").  The A&R APA contained a provision whereby if the trading price of the APA Consideration at the end of the lock-

25

Debtors' Exhibit No. 4
Page 25 of 27

up period provided in the A&R APA was less than the Purchase Price, the Debtors would be required to pay Foundry the difference of such amounts the ("**True-Up Provision**").

65.     On April, 13, 2023, Foundry filed proofs of claim numbers 360 and 361, asserting an $18.4 million unsecured claim in connection with amounts that Foundry asserted were owed pursuant to the True-Up Provision (the "**Foundry Claims**").

66.     After engaging in extensive good faith and arm's length negotiations, the Debtors and Foundry reached a settlement agreement (attached as Exhibit A to the Proposed Order to the Foundry Motion, the "**Foundry Settlement Agreement**") whereby:

    a.    The Foundry Claims would be allowed as an Allowed General Unsecured Claim in an amount of $5.5 million as of the Effective Date of the Plan; and

    b.    The Debtors would assume all existing Hosting Agreements.

67.     I believe that the terms of the Foundry Settlement Agreement, are fair, reasonable, are in the best interests of, and provides considerable savings to, the Debtors and their Estates.  Additionally, Foundry is, and has been, a valuable business partner to the Debtors, and I believe that the settlement of the Foundry Claims, as provided under terms of the Foundry Settlement, is import to ensure that this business relationship with Foundry continue. As such, I believe the Bankruptcy Court should authorize the Debtors to enter into the Foundry Settlement Agreement, as requested by the Debtors in the Foundry Motion.

Debtors' Exhibit No. 4
Page 26 of 27

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 15, 2024
      Bellevue, Washington

*/s/  Michael Bros*
_____

By:    Michael Bros
Title:  Senior Vice President of
       Capital Markets &
       Acquisitions

Debtors' Exhibit No. 4
Page 27 of 27