Date Filed: 04/12/2023
Claim No: 369

**Fill in this information to identify the case:**

Debtor 1    Core Scientific, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   22-90341

## Official Form 410
# Proof of Claim
12/15

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Michael Levitt
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Joanna D. Caytas, Quinn Emanuel Urquhart
Name

711 Louisiana Street, Ste 500
Number     Street

Houston                          TX              77002
City                             State           ZIP Code

Contact phone   713-221-7000

Contact email   joannacaytas@quinnemanuel.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**Where should payments to the creditor be sent?** (if different)

Name

Number     Street

City                             State           ZIP Code

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
        MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

Official Form 410


12024041323300000000022

page 1

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

**6.** **Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7.** **How much is the claim?** $____Unliquidated_____ . Does this amount include interest or other charges?

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9.** **Is all or part of the claim secured?**

☑ No
☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed
☐ Variable

**10.** **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410            Proof of Claim            page 2

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  04/11/2023
         MM / DD / YYYY

Signature _____

**Print the name of the person who is completing and signing this claim:**

| Name | Michael | | Levitt |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | c/o Joanna D. Caytas, Esq. | | |
| Company | Quinn Emanuel Urquhart & Sullivan, LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 711 Louisiana Street, Ste 500 | | |
| | Number        Street | | |
| | Houston | TX | 77001 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

Debtors' Exhibit No. 40
Page 3 of 462

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## ADDENDUM TO PROOF OF CLAIM
## OF MICHAEL LEVITT

On December 21, 2022 (the "**Petition Date**"), the Debtors each filed with this Court

voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

101-1532 (as amended, the "**Bankruptcy Code**"), thereby initiating the above-styled bankruptcy

cases (collectively, the "**Bankruptcy Case**"), which are being jointly administered for procedural

purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  The

Debtors continue to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Michael Levitt ("**Levitt**"), as current Chief Executive Officer, President, and Co-Chairman

of the Board of Directors of Core Scientific, Inc. ("**Core**" or the "**Company**"), does not agree that

the indemnification payments provided for in the bylaws of Core Scientific Inc. and covering

directors and officers are general unsecured claims, but files this proof of claim (the "**Claim**")

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198).  The Debtors' corporate headquarters and service address is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

under compulsion of the deadline to file claims to preserve the ability to assert against Core, in the event that the Debtors dispute his claim, claims in unliquidated amounts in respect of damages incurred by Levitt both pre- and post-petition.

**Securities Lawsuit.** Prior to the Petition Date, a putative class action lawsuit styled *Pang v. Levitt et al.,* Case No. 1:22-cv-01191, was filed in the United States District Court for the Western District of Texas, Austin Division, on behalf of a purported class of people who purchased, or otherwise acquired, Core's securities during a specific pre-petition time period, (the "**Securities Lawsuit**"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against one of the Debtors, Core, and three of Core's current and former officers and directors (collectively, the "**Individual Defendants**"):  (i) Michael Levitt, the current Chief Executive Officer, President, and Co-Chairman of the Board of Directors; (ii) Denise Sterling, the current Chief Financial Officer; and (iii) Michael Trzupek, the former Chief Financial Officer, who served in such capacity from October 12, 2020 to April 4, 2022.  *See* Exhibit A, Complaint in the Securities Lawsuit.

On December 27, 2022—days after the Petition Date—the plaintiffs in the Securities Lawsuit (the "**Plaintiffs**") filed a notice of voluntary dismissal, dismissing the claims against Core and leaving the three Individual Defendants as the sole defendants.  The Securities Lawsuit is proceeding against the Individual Defendants, including Levitt, and the Plaintiffs are to file an amended complaint on or by May 5, 2023; the Individual Defendants will have 45 days from the filing of the amended complaint to answer, move to dismiss, or otherwise respond.

**Indemnification.** Levitt served as Chief Executive Officer, President, and Co-Chairman of the Board of Directors of the Company at the relevant times alleged by the Securities Lawsuit. *See* Exhibit A at 5.  Public securities filings of Core also show that Levitt serves as Chief Executive

2

Officer and Co-Chair of the Board of Directors of Core since January 2022, and previously served as Chief Executive Officer and member of the Board of Directors of Core's affiliate. *See* Exhibit B, 10-K 2022, at 167. The Company agreed to indemnify Levitt numerous times, including, without limitation, the following:

The Amended and Restated Employment Agreement, dated October 10, 2021, between Levitt and Core Scientific Holding Co., which has been publicly filed by the Company multiple times, provides for full indemnification of Levitt:

> [T]he Company shall indemnify and hold [Levitt] harmless, to the fullest extent permitted by the Delaware General Corporation Law, as amended from time to time, and the Company's Certificate of Incorporation or By-Laws, against all claims, expenses, damages, liabilities and losses incurred by Executive provided that Executive acted in good faith and in a manner Executive reasonably believed to be in or not opposed to the best interests of the Company, ….

Exhibit C, 10-K 2022 Ex. 10-28 at 3. Such indemnification covers Levitt as an executive:

> [I]n the event [Levitt] is, or is threatened to be made, a party to any pending, contemplated or threatened action, suit, arbitration, or any other proceeding whether civil, criminal, administrative or investigative, and whether formal or informal ("<u>Proceeding</u>"), by reason of the fact that [Levitt] is or was, or had agreed to become, an employee or director of the Company, is are or was serving at the request of the Company as an employee or director to another corporation, partnership, joint venture, business, person, trust, employee benefit plan or other entity, ….

*Id*. The indemnification covers Levitt, who has been named as defendant in the Securities Lawsuit precisely because of his position at Core.

Separately from Levitt's employment agreement providing for indemnification, Core's securities filings confirm the indemnification of its officers and directors through bylaws and separate indemnification agreements to the fullest extent permitted under Delaware law:

**Indemnification Agreements**
Our certificate of incorporation contains provisions limiting the liability of executive officers and directors, and our bylaws provide that we will

3

indemnify each of our executive officers and directors to the fullest extent permitted under Delaware law.

We have entered into indemnification agreements with all of our directors and executive officers. The indemnification agreements provide that we will indemnify each of our directors, executive officers, and other key employees against any and all expenses incurred by such director, executive officer, or other key employee because of his or her status as one of our directors, executive officers, or other key employees, to the fullest extent permitted by Delaware law, our certificate of incorporation and our bylaws. In addition, the indemnification agreements provide that, to the fullest extent permitted by Delaware law, we will advance all expenses incurred by its directors, executive officers, and other key employees in connection with a legal proceeding involving his or her status as a director, executive officer, or key employee.

Exhibit B, 10-K 2022, at 167. The Form Indemnification Agreement is included in public securities filings of Core; it provides for an indemnity in third-party proceedings as well as a separate indemnification for expenses of a party who is wholly or partly successful:

**2.     Indemnity in Third-Party Proceedings**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or witness or other participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

Exhibit D, 10-K 2022 Ex. 10-30, at 4, and:

**4.     Indemnification for Expenses of a Party Who is Wholly or Partly Successful**. Notwithstanding any other provision of this Agreement, in circumstances where indemnification is not available under Section 2 or 3, as the case may be, to the fullest extent permitted by law and to the extent that Indemnitee is a party to, and is successful (on the merits or otherwise) in defense of, any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee or on Indemnitee's behalf in connection therewith. For purposes

4

> of this Section 4, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

*Id.* The Form Indemnity Agreement further provides for a prompt advance of litigation expenses, including legal fees:

> **6.   Advances of Expenses**. The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding prior to its final disposition, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 30 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company, *except*, with respect to advances of expenses made pursuant to Section 10(c), in which case Indemnitee makes the undertaking provided in Section 10(c). This Section 6 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding (or any part of any Proceeding) for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding (or any part of any Proceeding) referenced in Section 5(b) or 5(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

*Id*. at 5.  Furthermore, Core's Bylaws provide for a full indemnification of its directors and executive officers, again, to the fullest extent permitted under Delaware General Corporation Law:

> **Section 47.   Indemnification   of   Directors,   Executive   Officers, Employees and Other Agents**.
> **(a)   Directors and Executive Officers**. The corporation shall indemnify to the full extent permitted under and in any manner permitted under the DGCL or any other applicable law, any person who is made or threatened to be made a party to or is otherwise involved (as a witness or otherwise) in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter, a "***Proceeding***"), by reason of the fact that such person is or was a director or executive officer (for the purposes of this Article XI, "executive officers" shall be those persons designated by the corporation as (a) executive

5

officers for purposes of the disclosures required in the corporation's proxy and periodic reports or (b) officers for purposes of Section 16 of the 1934 Act) of the corporation, or while serving as a director or executive officer of the corporation, is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, including service with respect to an employee benefit plan (collectively, "*Another Enterprise*"), against expenses (including attorneys' fees), judgments, fines (including ERISA excise taxes or penalties) and amounts paid in settlement actually and reasonably incurred by him or her in connection with such Proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful; provided, however, that the corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, provided, further, that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by applicable law, (ii) the proceeding was authorized by the Board of Directors, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the DGCL or any other applicable law or (iv) such indemnification is required to be made under subsection (d) of this Section 47.

Exhibit E, 10-K 2022 Ex. 3-2, § 47(a).  Core's Bylaws also provide for a prompt advancement of

litigation expenses, including legal fees:

**(c)   Expenses.** The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed Proceeding, by reason of the fact that such person is or was a director or executive officer of the corporation, or is or was serving at the request of the corporation as a director or executive officer of Another Enterprise, prior to the final disposition of the Proceeding, promptly following request therefor, all expenses (including attorneys' fees) incurred by any director or executive officer in connection with such Proceeding; provided, however, that if the DGCL requires, an advancement of expenses incurred by a director or executive officer in his or her capacity as a director or executive officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to

6

> appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 47 or otherwise.

*Id.*, § 47(c).

**Claim Amount.** As set forth above, Levitt hereby asserts an indemnification claim against the Debtors in connection with the Securities Lawsuit, net of any insurance proceeds received, based on all of the foregoing. In addition, and to the extent permitted by applicable law, Levitt claims interest, fees and expenses, and any other charges accrued and incurred before or after the Petition Date, including (but not limited to) all professional fees including attorneys' fees, and those relating to the collection of amounts owed to Levitt, to the extent permitted by law.

**Setoff; Counterclaim**. The claims set forth herein are secured by way of setoff and/or recoupment to the extent of any claims that the Debtors have against Levitt. The Claim is filed without waiver and with express reservation of any and all setoff or recoupment rights that may exist at law or in equity. No effort is made to violate the automatic stay or to take any action contrary to applicable law, but every reservation of rights is otherwise asserted herein with respect to setoff or recoupment rights.

**No Waiver.** By filing this Claim, Levitt does not waive, release, or discharge any, and hereby, expressly reserves all of his rights including the right to file one or more proofs of claim with respect to remedies, powers, claims, counterclaims, interests, actions, defenses, and rights of subrogation, set-off and recoupment (whether contingent, unliquidated or otherwise) against Core, the other Debtors, all other Entities (as defined in the Bankruptcy Code), and all applicable property, in this or any other forum, which Levitt had, has, or may have, including without limitation, in respect of claims presently unknown. This Claim is not intended to be, and shall not be construed as, a waiver of any past, present or future claims or an election of remedies. Levitt

Debtors' Exhibit No. 40
Page 10 of 462

expressly reserves the right to make a separate claim for any administrative expense claims, either in respect of the foregoing or otherwise.

**Filing**. This Claim shall not be deemed a consent by Levitt to the jurisdiction of the Bankruptcy Court or to having any matters relating to any disputed claims or otherwise heard by the Bankruptcy Court; nor shall Levitt's submission of this Claim waive any of Levitt's rights to have final orders in non-core or Stern matters entered only after de novo review by the United States District Court, or to petition the United States District Court to withdraw any reference in any matter subject to mandatory or discretionary withdrawal (or assert that the reference has already been withdrawn), or otherwise challenge the jurisdiction of the Bankruptcy Court. This Claim shall not be deemed a waiver or release of Levitt's right to trial by jury in the Bankruptcy Court or in any other court in any proceeding as to any and all matters so triable herein or therein, and such rights are hereby reserved, nor shall it be construed as a consent to a jury trial in the Bankruptcy Court or in any other court in any proceeding as to any and all matters so triable herein or therein.

**Amendment**. Levitt hereby reserves the right to amend, clarify or supplement this Claim at any time and in any respect, including, without limitation, as necessary or appropriate to amend, quantify or correct amounts, to add or amend categories of payments or liabilities, to change the priority of the claims set forth herein, to provide additional detail regarding the claims set forth herein, or to fix the amount of any contingent or unliquidated claim (including, but not limited to, with respect to (a) pre-petition and post-petition interest, (b) pre-petition and post-petition costs, expenses and other damages, and (c) all other pre-petition and post-petition amounts entitled to indemnification), or to file additional proofs of claim at any time.

**Payment**. All payments in connection with the Claim should be sent to:

8

Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Attn.:  John Bash
        Joanna D. Caytas
Telephone: 713-221-7000
Facsimile:  713-221-7100
Email: johnbash@quinnemanuel.com
        joannacaytas@quinnemanuel.com

     **Notice**. All notices in connection with the Claim should be sent to:

Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Attn.:  John Bash
        Joanna D. Caytas
Telephone: 713-221-7000
Facsimile:  713-221-7100
Email: johnbash@quinnemanuel.com
        joannacaytas@quinnemanuel.com

9

**<u>EXHIBIT A</u>**

**<u>Complaint</u>**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| MEI PANG, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CORE SCIENTIFIC INC., MICHAEL LEVITT, MICHAEL TRZUPEK, and DENISE STERLING,<br><br>    Defendants. | Case No. 1:22-cv-01191<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Mei Pang ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Core Scientific Inc. ("Core Scientific" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Core Scientific; and (c) review of other publicly available information concerning Core Scientific.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Core Scientific securities between January 3, 2022 and October 26, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Core Scientific is a blockchain computing data center provider and digital asset mining company. It mines digital assets for its own account and provides hosting services for other large-scale miners. It became a public company via business combination with Power & Digital Infrastructure Acquisition Corp. ("XPDI") consummated on January 19, 2022 (the "Business Combination").

3.      On March 3, 2022, Culper Research published a report about Core Scientific alleging, among other things, that the Company had overstated its profitability and that the Company's largest customer lacked the financial resources to deliver the rigs pursuant to its contract.

4.      On this news, Core Scientific's stock fell $0.72, or 9.4%, to close at $6.98 on March 3, 2022, thereby injuring investors.

5.      On September 28, 2022, Celsius Network LLC and related entities filed a motion to enforce the automatic stay and for civil contempt in bankruptcy proceedings alleging that Core Scientific "has knowingly and repeatedly violated the automatic stay provisions" by refusing to perform its contractual obligations, threatening to terminate the companies' agreement, and adding improper surcharges.

6.      On this news, Core Scientific's stock price fell $0.15, or 10.3%, to close at $1.30 on September 29, 2022, thereby injuring investors.

7.      On October 27, 2022, before the market opened, Core Scientific disclosed that "given the uncertainty regarding the Company's financial condition, substantial doubt exists about the Company's ability to continue as a going concern," and that it is exploring alternatives to its capital structure. Moreover, the Company held 24 bitcoins, compared to 1,051 bitcoins as of September 30, 2022.

8.      On this news, Core Scientific's stock fell $0.789, or 78.1%, to close at $0.221 per share on October 27, 2022, on unusually high trading volume.

9.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company's largest customer, Gryphon, lacked the financial resources to purchase the necessary miner rigs for Core Scientific to host; (3) that the Company was not providing hosting services to Celsius as required by their contract; (4) that the Company had

implemented an improper surcharge to pass through power costs to Celsius; (5) that, as a result of the foregoing alleged breaches of contract, the Company was reasonably likely to incur liability to defend itself against Celsius; (6) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (7) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (8) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff Mei Pang, as set forth in the accompanying certification, incorporated by reference herein, purchased Core Scientific securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Core Scientific is incorporated under the laws of Delaware with its principal executive offices located in Austin, Texas. Core Scientific's common stock trades on the NASDAQ Exchange under the symbol "CORZ" and its redeemable warrants trade under the symbol "CORZW."

16.     Defendant Michael Levitt ("Levitt") was the Company's President and Chief Executive Officer ("CEO") at all relevant times.

17.     Defendant Michael Trzupek ("Trzupek") was the Company's Chief Financial Officer ("CFO") between October 12, 2020 and April 4, 2022.

18.     Defendant Denise Sterling ("Sterling") has been the Company's Chief Financial Officer ("CFO") since April 4, 2022.

19.     Defendants Levitt, Trzupek, and Sterling (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

### Background

20.      Core Scientific is a blockchain computing data center provider and digital asset mining company. It mines digital assets for its own account and provides hosting services for other large-scale miners.

### Materially False and Misleading

### Statements Issued During the Class Period

21.      The Class Period begins on January 3, 2022.[1] On that day, the Company issued a proxy statement soliciting shareholder approval of a merger between XPDI and Core Scientific (the "Proxy Statement"). The Proxy Statement stated that "electricity costs" were one of the key factors affecting the Company's performance:

> *Electricity Costs*
>
> ***Electricity cost is the major operating cost for the mining fleet, as well as for the hosting services provided to customers and related parties***. See "*Power Providers and Facility Development*" for additional information related to *Electricity Costs*.

22.      The Proxy Statement purported to warn that increases in power costs could impact the Company's profitability:

> Our success depends in large part on our ability to mine digital assets profitably and to attract customers for our hosting capabilities*.* ***Increases in power costs or our inability to mine digital assets efficiently and to sell digital assets at favorable prices will reduce our operating margins,*** impact our ability to attract customers for our services and harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added and footnotes are omitted.

Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. We may not be able to attract customers to our hosting capabilities for a number of reasons, including if:

- there is a reduction in the demand for our services due to macroeconomic factors in the markets in which we operate;

- we fail to provide competitive pricing terms or effectively market them to potential customers;

- *we provide hosting services that are deemed by existing and potential customers or suppliers to be inferior to those of our competitors, or that fail to meet customers' or suppliers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred design features, security considerations and connectivity*;

- businesses decide to host internally as an alternative to the use of our services;

- we fail to successfully communicate the benefits of our services to potential customers;

- we are unable to strengthen awareness of our brand;

- we are unable to provide services that our existing and potential customers desire; or

- our customers are unable to secure an adequate supply of new generation digital asset mining equipment to host with us.

If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

23.     The Proxy Statement contained the following risk factor related to its power costs:

We are subject to risks associated with our *need for significant electric power and the limited availability of power resources, which could have a material adverse effect on our business, financial condition and results of operations*.

Our mining and hosting services require a significant amount of electric power. *The costs of electric power account for a significant portion of our cost of revenue. We require a significant electric power supply to conduct our mining activity and to provide many hosting services we offer*, such as powering and cooling our and our customers' servers and network equipment and operating critical mining and hosting facility and equipment infrastructure.

The amount of power required by us and our customers will increase commensurate with the demand for our services and the increase in miners we operate for ourselves and our hosting customers. Energy costs and availability are vulnerable to seasonality, with increased costs primarily in the summer months and risks of outages and power grid damage as a result of inclement weather, animal incursion, sabotage and other events out of our control. Although we aim to build and operate energy efficient hosting facilities, there can be no assurance such facilities will be able to deliver sufficient power to meet the growing needs of our business. ***The cost of power at our hosting facilities is dependent on our ability to perform under the terms in the power contracts we are a party to, which we may be unable to do successfully.*** Pursuant to these power contracts, if we fail to curtail our power usage when called upon or fail to satisfy certain eligibility requirements for monthly bill credits, our power costs would increase...

24.     The Proxy Statement also stated the following about its hosting facilities:

***Electric Service Agreements with Dalton Utilities***

On October 11, 2018, Core Scientific, through its wholly-owned subsidiary, American Property Acquisitions VII, LLC, entered into an Amended and Restated Electric Service Agreement with The Board of Water, Light and Sinking Fund Commissioners of the City of Dalton, Georgia (d/b/a Dalton Utilities, "Dalton") for the supply of electric power to each of its hosting sites located at Boring Drive, Dalton, Georgia (the "Boring Drive Site") and Industrial South, Dalton, Georgia (the "Industrial South Site"). The agreement for the Boring Drive Site provides for an electrical power capacity of up to 120,000kW, and the agreement for the Industrial South Site provides for an electrical power capacity of up to 50,000kW. ***Under each agreement, Core Scientific agreed to pay to Dalton $0.0364 on a kW per hour basis as modified from time to time, but not to exceed $0.042 prior to December 31, 2021.*** Each agreement has an indefinite term, which can be terminated by Core Scientific for convenience by providing 60 days written notice to Dalton.

25.     The above statements identified in ¶¶ 21-24 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company's largest customer, Gryphon, lacked the financial resources to purchase the necessary miner rigs for Core Scientific to host; (3) that the Company was not providing hosting services to Celsius as required by their contract; (4) that the Company had

implemented an improper surcharge to pass through power costs to Celsius; (5) that, as a result of the foregoing alleged breaches of contract, the Company was reasonably likely to incur liability to defend itself against Celsius; (6) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (7) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (8) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

26.     The truth began to emerge on March 3, 2022 when Culper Research issued a report entitled "Core Scientific, Inc. (CORZ): Rigged Deals" (the "Culper Report"). The Culper Report alleged that the Company's largest customer, Gryphon Digital Mining ("Gryphon") (also referred to as ANY and Sphere) is a stock promotion "with little financial wherewithal to purchase or install miners in Core's facilities, hence leaving Core holding the bag." Specifically, the Culper Report alleged, in relevant part:

**We Think Core's Largest Would-Be Hosting Customer, ANY, is a Stock Promotion**

In October 2021, Core Scientific formed its largest ever hosting deal with Gryphon Digital Mining, for 230 MW of capacity, which can support up to 71,000 machines (7.1 EH/s). However, Gryphon appears to us to be a stock promotion, with little financial wherewithal to purchase or install its miners in Core's facilities, hence leaving Core holding the bag. Gryphon most recently disclosed that as of January 6, 2022, the company had just 3,000 S19J Pro machines. The agreement provides for deployment of the miners [pursuant to a monthly schedule].

[table omitted]

We don't think these miners will ever make it to Core's facilities. The miners appear to originate via Sphere's July 2021 agreement with FuFu Technology Limited ("BitFuFu") for the purchase of 60,000 miners for $305.7 million. Yet of the total price, Sphere has paid only $85.0 million, while the remaining $220.7 million remains payable "over the next 12 months".[] As far as the remainder, we don't think ANY has the cash: pro forma cash for the combined company as of Q3 2021 was just $106.1 million, far short of the $220.7 million in remaining payments Gryphon must make for the miners. Sphere has also not been able to file a 10-Q for

the entirety of 2021, and the Company's last audited financials were for year-end 2020.

In February 2022, ANY's promotion kicked into high gear as the company announced that it entered into an agreement with "NuMiner" to purchase $1.7 billion worth of "NM 440" 440 TH/s miners. We think these miners do not exist, [and] will never exist. . . .

-   NuMiner's rendering of its miners is a laughably juvenile rip-off of the CS-2 by Cerebras, not a bitcoin mining rig but a 660lb supercomputer. Cerebras has since publicly admonished NuMiner and claimed no affiliation with the Company.

-   NuMiner has also issued a feeble attempt at third-party validation, claiming its miners were tested and verified by TUV Nord (a German company) to BTL standards. However, we inquired with both TUV Nord and with BTL, who each disclaimed this theory. BTL stated that NuMiner was prohibited from using their mark. TUV Nord claimed to have "no entry in our database about a customer named NuMiner".

-   NuMiner has claimed that TSMC is a production partner, but we inquired with TSMC who stated to us that "We can confirm to you that Numiner is not a direct customer of TSMC."

-   NuMiner has also claimed Xilinx as a production partner, yet when we inquired with Xilinx, a representative told us that "I'm not sure if they have our permission to use our logo… That's typically reserved for folks who participate in our Xilinx Partner Program." NuMiner does not appear in Xilinx's partner list and thus does not appear to be a participant in the partner program.

\*       \*       \*

-   Taiwanese corporate documents also disclose that NuMiner was capitalized with just ~$40,000 USD, suggesting to us that the group has little ability to produce these miners, nor to provide the contemplated $1.1 billion in vendor financing to Sphere to purchase them, even if they existed.

    In sum, we view Core Scientific as having lent itself to a blatantly transparent stock promotion, and doubt that Sphere will ever fill out the 230 MW capacity called of it in its hosting agreement.

27.     The Culper Report also alleged that Core Scientific overstated its profitability.

While the Company claimed "a mining breakeven of $2,700 in power costs per bitcoin," the Culper

Report "estimate[d] Core's true go-forward power costs are $10,845 per BTC . . . and the

Company's all-in cost to mine (including miner costs and G&A) is $41,723 per bitcoin." Core

Scientific's profitability was allegedly overstated because it: (i) incorrectly assumed a network hash rate of 106 EH/s; (ii) understated the power bills for its Georgia facilities; and (iii) ignored miner costs and expenses. Specifically, the Culper Report alleged, in relevant part:

<u>Core Assumed a Network Hash Rate of Just 106 EH/s</u>

Core's first mining breakeven assumption is a network hash rate of 106 EH/s. We believe Core took advantage of what we view as a temporary depression in the BTC network hash rate to artificially inflate purported self-mining profitability. In the meantime, hash rate has almost doubled to 197.2 EH/s. Moreover, Core's own Michael Levitt has stated that he anticipates the global hash rate will continue to grow at an aggressive pace. Sell-side models we reviewed also expect global hash rate to continue growing, while the next halving event is currently estimated at just over 2 years away. As such, we see this 106 EH/s assumption as cherry-picking a very convenient data point, yet wholly unreflective of the economics of Core's go-forward economics.

*     *     *

<u>Core's Sweetheart Power Agreement Price Cap Expired at Year-End 2021</u>

Core's cost of mining is primarily determined by its power costs, which are governed by its power agreements at each of its facilities. We find that Core's commentary on such agreements does not disclose its approximate monthly power bills for the Dalton, Georgia facilities as it does for each of the others:

[chart omitted]

We think it's possible that Core avoided such disclosers to sidestep scrutiny of its Boring Drive and Industrial South sites, which we find have been aided by a sweetheart power deal that was set to expire at year-end 2021: [The deal provided that] "Core Scientific agreed to pay to Dalton $0.0364 on a kW per hour basis as modified from time to time, **but not to exceed $0.042 prior to December 31, 2021."**

The Georgia rate survey showed Dalton Utilities held a Winter 2021 rate of $0.0962 per kWh. Thus, illustratively, Core's fully-baked costs for its Georgia facilities at full capacity[] would more than double:

| Georgia Facility Illustrative Economics | Old Rate | New Rate |
|---|---|---|
| Cost per KWH | $0.0420 | $0.0962 |
| Cost per MWH | $42.0 | $96.2 |
| MW | 175 | 175 |
| MWH Usage | 1,533,000 | 1,533,000 |
| Electricity Costs ($ millions) | $64 | $147 |
| Incremental Costs ($ millions) | | $83 |

We assume power costs of $0.06 per kWh, a network hash rate of 220 EH, a 2% pool fee, and 95% uptime, which results in **energy costs of $10,845 per BTC, or 4.0x what the Company touted** in its investor presentation[.]

[chart omitted]

Core's Analysis Ignores Miner Costs and Operating Expenses

However, Core's supposed "breakeven" figures also ignored the cost of miner and operating expenses, relatively fundamental items to running a bitcoin mining operation.

Consider that a 100 TH/s miner can be expected to mine 0.158 BTC per year. Core executive Taras Kulyk has stated that miners ought to last 24 to 36 months, so we assume a 2.5 year useful life of the Company's miners.15 While secondary market prices for S19 Pro miners are $10,000 to $15,000 as of late, we assume conservatively that Core pays $6,000 per 110 TH/s miner. We thus estimate rig costs of $15,238 per BTC mined:

| Culper Research Economic Estimates | |
|---|---|
| Miner Cost (110 TH/s miner) | $6,000 |
| Useful life (years) | 2.5 |
| Annual cost of miner | $2,400 |
| Annual BTC mined per miner | 0.158 |
| BTC breakeven cost (miners) | $15,238 |

Finally, consider that in 2020, Core spent $16,847 in operating expenses for each BTC mined, 16 while for the 9 months ended Q3 2021, this figure was remarkably similar at $16,328 in operating expenses per BTC mined:

| CORZ Operating Expenses | FY 2020 | 9 mo Q3 21 |
|---|---|---|
| Operating Expenses ($ millions) | 21.6 | 53.4 |
| BTC mined | 1,282 | 3,271 |
| Opex per BTC mined ($) | $16,847 | $16,328 |

Thus, when fully accounting for the Company's power costs, miner costs, and operating expenses, we estimate that Core's true "economic" breakeven cost to mine a single BTC is $41,723, making its entire operation barely profitable at current BTC prices:

| Culper Estimates - CORZ Breakeven Costs | |
|---|---|
| Miner Costs per BTC Mined | $15,238 |
| Power Costs per BTC Mined | $10,485 |
| Operating Expenses per BTC Mined | $16,000 |
| **BTC Price for CORZ Economic Breakeven** | **$41,723** |

28.     On this news, Core Scientific's stock fell $0.72, or 9.4%, to close at $6.98 on March 3, 2022, thereby injuring investors.

29.     On March 7, 2022, the Company announced preliminary fiscal 2021 financial results in a press release, stating "We expect 2021 revenue to be $515 million to $545 million, net income of $50 million to $60 million and adjusted EBITDA of $225 million to $235 million."

30.     On March 29, 2022, Core Scientific announced its fiscal 2021 financial results in a press release that stated, in relevant part:

**Fiscal Year 2021 Financial Highlights (Compared to Fiscal Year 2020)**

- Total revenue increased by 803% to $544.5 million

- ***Gross profit increased by 2,443% to $238.9 million***

- Net Income increased to $47.3 million

- Adjusted EBITDA[] increased by 3,849% to $238.9 million

31.     On March 30, 2022, the Company filed a Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), affirming the previously reported financial results. The 2021 10-K contained substantially the same statements identified in the Proxy Statement.

32.     On April 5, 2022, Core Scientific issued a press release announcing "March Updates and CFO Transition." Therein, the Company stated, in relevant part:

*Hosting*

In addition to its self-mining fleet, as of March 31, 2022, Core Scientific provided infrastructure, technology and operating support for a growing, diverse group of customers representing 7.9 EH/s.

33.     On May 5, 2022, Core Scientific announced its "April Updates" in a press release that stated, in relevant part:

*Hosting*

In addition to its self-mining fleet, as of April 30, 2022, Core Scientific provided infrastructure, technology and operating support for a growing, diverse group of customers representing 8.1 EH/s.

34.     On May 12, 2022, the Company issued a press release announcing first quarter 2022 results, stating in relevant part:

**First Quarter 2022 Financial Highlights (Compared to First Quarter 2021)**

- Total revenue increased by 255% to $192.5 million

- ***Gross profit increased by 382% to $70.0 million***

- Net loss of $466.2 million, driven by a noncash mark-to-market adjustment on convertible notes of $386.0 million and an impairment on digital assets of $54.0 million

- Adjusted EBITDA[] increased by 644% to $93.0 million

35.     On May 13, 2022, the Company filed its Form 10-Q for the quarter ended March 31, 2022, which contained substantially the same statements identified in the Proxy Statement.

36.     On June 6, 2022, Core Scientific announced its "May Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of May 31, 2022, Core Scientific provided data center colocation services, technology and operating support for a growing, diverse group of customers representing 7.9 EH/s and more than 80,000 ASICs servers.

37.    On July 5, 2022, Core Scientific announced its "June Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of June 30, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 79,000 customer owned ASIC servers generating 7.6 EH/s. Colocated EH/s declined slightly from May to June as a result of the Company's long-planned acquisition of Argo's ASIC servers that were colocated in the Company's data centers.

As of June month end, colocation services accounted for approximately 43% of the Company's data center capacity and digital asset mining operations. Inquiries for colocation services continue to exceed the Company's available infrastructure.

38.    On August 5, 2022, Core Scientific announced its "July Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of July 31, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 86,000 customer owned ASIC servers, a net monthly increase of approximately 7,600 or 10%, generating 8.4 EH/s. During the month of July the Company signed colocation agreements with customers totaling 75MW and representing approximately $50 million in annual revenue when fully deployed. On July 19, Core Scientific deployed the first BITMAIN ANTMINER S19 XP servers in the United States for its customer, NFN8 Group, Inc. The S19 XP servers are rated to operate at up to 140 TH/s and represent the first of many planned for deployment by the Company for self-mining and colocation customers.

As of July month end, colocation services accounted for approximately 44% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

39.    On August 11, 2022, Core Scientific announced its second quarter 2022 financial results in a press release that stated, in relevant part:

Gross profit of $12.7 million decreased by $11.8 million, or 48%, from $24.5 million. The decrease in gross profit was driven primarily by a $18.9 million decrease in gross profit in the hosting and equipment segment, partially offset by an $7.1 million increase in gross profit for the mining segment, driven by an increase in mining revenue. The decrease in gross margin for the mining segment

was driven by higher miner depreciation as well as higher power costs and lower average price per bitcoin mined.

40.     On August 22, 2022, the Company filed its Form 10-Q for the quarter ended June 30, 2022, which contained substantially the same statements identified in the Proxy Statement.

41.     On September 6, 2022, Core Scientific announced its "August Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of August 31, 2022, Core Scientific provided data center colocation services, technology and operating support for more than 97,000 customer-owned ASIC servers. As of August month end, colocation services accounted for approximately 41% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

42.     On October 5, 2022, Core Scientific announced its "September Updates" in a press release that stated, in relevant part:

*Colocation Services*

In addition to its self-mining fleet, as of September 30, 2022, Core Scientific provided data center colocation services, technology and operating support for approximately 102,000 customer-owned ASIC servers representing approximately 9.5 EH/s. In September, the Company deployed approximately 8,400 new servers for its colocation customers. As of September month end, colocation services accounted for approximately 42% of the Company's total hashrate. Inquiries for colocation services continue to exceed the Company's available infrastructure.

43.     The above statements identified in ¶¶ 29-42 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, due in part to the expiration of a favorable pricing agreement, the Company was experiencing increasing power costs; (2) that the Company was not providing hosting services to Celsius as required by their contract; (3) that the Company had implemented an improper surcharge to pass through power costs to Celsius; (4) that, as a result of the foregoing alleged breaches of contract, the Company

was reasonably likely to incur liability to defend itself against Celsius; (5) that, as a result of the foregoing, the Company's profitability would be adversely impacted; (6) that, as a result, there was likely substantial doubt as to the Company's ability to continue as a going concern; (7) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### **Disclosures at the End of the Class Period**

44.    On September 28, 2022, Celsius Network LLC ("Celsius") and related entities filed a motion to enforce the automatic stay and for civil contempt in bankruptcy proceedings alleging that Core Scientific "has knowingly and repeatedly violated the automatic stay provisions." Specifically, Celsius alleged that Core Scientific breached their agreement before Celsius filed its bankruptcy petition by failing to deliver rigs pursuant to the contractual schedule. The motion stated, in relevant part:

**B. Core Scientific's Failure to Deploy Celsius' Rigs**

16. Celsius has delivered 10,885 rigs into Core Scientific's possession under Order #10 [i.e., the operative section of the parties' Master Services Agreement ("MSA")]. ***To this day, Core Scientific is deploying only 6,564 of Celsius' rigs and is providing Celsius with only 21.5 MWs of power. But Celsius is entitled to 79.4 MWs as of September 2022***, which is the hosting capacity to operate approximately 22,000 rigs of the type specified in Order #10. Core Scientific's current shortfall under Order #10 is 58 MWs of power and at least 15,700 rigs.

17. Core Scientific's current shortfalls are a direct consequence of its pre-petition conduct. Since the MSA was signed, Core Scientific has performed a now-familiar routine: it delays deployment of Celsius' rigs; it follows those delays with empty promises to catch up; and it follows those promises with even more delays, in contravention of the Agreement and its own interim representations.

18. Celsius delivered its 10,885 rigs under Order #10 to Core Scientific in three tranches prior to the petition, and each time, Celsius had to wait months for its rigs to come online. ***For nearly half those rigs, Celsius is still waiting***. . . .

(Internal citations omitted.)

45.     Celsius also claimed that Core Scientific imposed improper surcharges in an attempt to "pass through" its power costs. The motion stated, in relevant part:

**E. Core Scientific's Attempt to "Pass Through" Its Power Costs**

26. Finally, since the Petition Date, Core Scientific has begun adding certain surcharges to Celsius' invoices that ***contravene the fixed-price structure*** of the orders between the parties. Worse***, Core Scientific has misrepresented the nature of these surcharges.***

\*     \*     \*

32. In response, Core Scientific provided information showing increased power rates in the various jurisdictions where Celsius rigs are located. This confirmed that the "Power Cost Pass-through" surcharges Core Scientific had been adding to Celsius' post-petition invoices were not new "tariffs," as Core Scientific had claimed, but rather, were simply the incremental increases in power costs to ***Core Scientific***—which were not subject to pass through under the MSA.

(Internal citations omitted and second emphasis in original.)

46.     On this news, Core Scientific's stock price fell $0.15, or 10.3%, to close at $1.30 on September 29, 2022, thereby injuring investors.

47.     On October 27, 2022, Core Scientific filed a Form 8-K with the SEC, stating that due to the "prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius," the Company would not make outstanding payments for financing and was exploring strategic alternatives to its capital structure." Core Scientific also disclosed that its cash resources would be "depleted by the end of 2022 or sooner." It stated, in relevant part:

As previously disclosed, ***the Company's operating performance and liquidity have been severely impacted by the prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and the litigation with Celsius Networks LLC and its affiliates*** ("Celsius"). As a result, management has been actively taking steps to decrease monthly costs, delay construction expenses, reduce and delay capital expenditures and increase hosting revenues. In addition, ***the Board has decided that the Company will not make payments coming due in late October and early November 2022 with respect to several of its equipment and other financings, including its two bridge promissory***

*notes.* As a result, the creditors under these debt facilities may exercise remedies following any applicable grace periods, including electing to accelerate the principal amount of such debt, suing the Company for nonpayment or taking action with respect to collateral, where applicable. Any such creditor actions may result in events of default under the Company's other indebtedness agreements, including its two series of convertible notes due 2025, and the potential exercise of remedies by creditors under such agreements.

***In light of the foregoing, the Company is in the process of exploring a number of potential strategic alternatives with respect to the Company's capital structure, including hiring strategic advisers, raising additional capital or restructuring its existing capital structure***.

\*      \*      \*

It is very difficult to estimate our future liquidity requirements. The Company ***anticipates that existing cash resources will be depleted by the end of 2022 or sooner.***

\*      \*      \*

Given the uncertainty regarding the Company's financial condition, substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time.

48.     On this news, Core Scientific's stock fell $0.789, or 78.1%, to close at $0.221 per share on October 27, 2022, on unusually high trading volume.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Core Scientific securities between January 3, 2022 and October 26, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Core Scientific's shares actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Core Scientific shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Core Scientific or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Core Scientific; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

55.     The market for Core Scientific's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Core Scientific's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Core Scientific's securities relying upon the integrity of the market price of the Company's securities and market information relating to Core Scientific, and have been damaged thereby.

56.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Core Scientific's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Core Scientific's business, operations, and prospects as alleged herein.

57.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Core Scientific's financial well-being and prospects.  These material

misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

58.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

59.     During the Class Period, Plaintiff and the Class purchased Core Scientific's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

60.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Core Scientific, their control over, and/or receipt and/or modification of Core Scientific's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Core Scientific, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

61.     The market for Core Scientific's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Core Scientific's securities traded at artificially inflated prices during the Class Period.  On February 8, 2022, the Company's share price closed at a Class Period high of $10.88 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Core Scientific's securities and market information relating to Core Scientific, and have been damaged thereby.

62.     During the Class Period, the artificial inflation of Core Scientific's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Core Scientific's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Core Scientific and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

63.     At all relevant times, the market for Core Scientific's securities was an efficient market for the following reasons, among others:

(a)     Core Scientific shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Core Scientific filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Core Scientific regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Core Scientific was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Core Scientific's securities promptly digested current information regarding Core Scientific from all publicly available sources and reflected such information in Core Scientific's share price.  Under these circumstances, all purchasers of Core Scientific's securities during the Class Period suffered similar injury through their purchase of Core Scientific's securities at artificially inflated prices and a presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Core Scientific who knew that the statement was false when made.

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

67.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Core Scientific's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

69.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Core Scientific's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Core Scientific's financial well-being and prospects, as specified herein.

71.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Core Scientific's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Core Scientific and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

72.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

73.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Core Scientific's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Core Scientific's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Core Scientific's securities during the Class Period at artificially high prices and were damaged thereby.

75.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Core Scientific was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Core Scientific

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **SECOND CLAIM**

### **Violation of Section 20(a) of The Exchange Act**
### **Against the Individual Defendants**

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.     Individual Defendants acted as controlling persons of Core Scientific within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.     As set forth above, Core Scientific and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 14, 2022.          Respectfully submitted,

                                   */s/ Bruce W. Steckler*
                                   Bruce W. Steckler
                                   Texas Bar I.D. 00785039
                                   **STECKLER WAYNE CHERRY & LOVE PLLC**
                                   12720 Hillcrest Road, Suite 1045
                                   Dallas, TX  75230
                                   T:  972-387-4040
                                   F:  972-387-4041
                                   bruce@swclaw.com

                                   **GLANCY PRONGAY & MURRAY LLP**
                                   Charles H. Linehan
                                   Pavithra Rajesh
                                   1925 Century Park East, Suite 2100
                                   Los Angeles, CA 90067
                                   Telephone: (310) 201-9150
                                   Facsimile: (310) 201-9160

                                   **THE LAW OFFICES OF FRANK R. CRUZ**
                                   Frank R. Cruz
                                   1999 Avenue of the Stars, Suite 1100
                                   Los Angeles, CA 90067
                                   Telephone: (310) 914-5007

                                   *Attorneys for Plaintiff Mei Pang*

**EXHIBIT B**

**10-K 2022 of Core Scientific, Inc.**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from  to**

**Commission file number 001-40046**

# Core Scientific, Inc.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **86-1243837** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**210 Barton Springs Road**
**Suite 300**
**Austin** **Texas**

(Address of Principal Executive Offices)

**78704**

(Zip Code)

**(512) 402-5233**

Registrant's telephone number, including area code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 per share | CORZQ | OTC Markets* |
| Warrants, exercisable for shares of common stock | CRZWQ | OTC Markets* |

\* On January 3, 2023, Core Scientific, Inc. common stock and common stock warrants were suspended from trading on The Nasdaq Global Select Market. On January 3, 2023, Core Scientific, Inc. common stock and common stock warrants began trading on the OTC Markets operated by the OTC Markets Group, Inc., under the trading symbols CORZQ and CRZWQ, respectively.

**Securities registered pursuant to section 12(g) of the Act:**

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company ☐ |
| | | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the common stock outstanding, other than shares held by persons who may be deemed affiliates of the registrant, computed by reference to the closing sales price for the common stock on June 30, 2022, as reported on The Nasdaq Global Select Market, was approximately $377,394,839 (based on the closing sales price of the common stock on June 30, 2022 of $1.49).

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☒ No ☐

As of March 28, 2023, 373,799,959 shares of Common Stock, par value $0.0001, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

## TABLE OF CONTENTS

**Part I**                                                                                        3

Item 1.      Business                                                                              3

Item 1A.     Risk Factors                                                                         14

Item 1B.     Unresolved Staff Comments                                                            62

Item 2.      Properties                                                                           62

Item 3.      Legal Proceedings                                                                    63

Item 4.      Mine Safety Disclosures                                                              63

**Part II**                                                                                       63

Item 5.      Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of
             Equity Securities                                                                    63

Item 6.      [Reserved]                                                                           65

Item 7.      Management's Discussion and Analysis of Financial Condition and Results of Operations 66

Item 7A.     Quantitative and Qualitative Disclosures About Market Risk                          101

Item 8.      Financial Statements and Supplementary Data                                         101

Item 9.      Changes in and Disagreements With Accountants on Accounting and Financial Disclosures 164

Item 9A.     Controls and Procedures                                                             164

Item 9B.     Other Information                                                                    166

Item 9C.     Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

**Part III**                                                                                      167

Item 10.     Directors, Executive Officers and Corporate Governance                              167

Item 11.     Executive Compensation                                                              174

Item 12.     Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
             Matters                                                                             181

Item 13.     Certain Relationships and Related Transactions, and Director Independence           183

Item 14.     Principal Accountant Fees and Services                                              186

**Part IV**                                                                                       188

Item 15.     Exhibit and Financial Statement Schedules                                           188

Item 16.     Form 10-K Summary                                                                    193

Signatures                                                                                        194

2

Debtors' Exhibit No. 40
Page 49 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

## Part I

### Item 1. Business

#### Chapter 11 Reorganization

On December 21, 2022 (the "Petition Date"), Core Scientific, Inc. (the "Company or "we"") and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Debtors filed various "first day" motions with the Bankruptcy Court requesting customary relief, which were generally approved by the Bankruptcy Court on December 22, 2022, that have enabled the Company to operate in the ordinary course while under Chapter 11 protection.

In connection with the filing of the Chapter 11 Cases, the Company entered into a restructuring support agreement (together with all exhibits and schedules thereto, the ("Restructuring Support Agreement") with the ad hoc group of noteholders, representing more than 70% of the holders of its convertible notes (the "Ad Hoc Noteholder Group") pursuant to which the Ad Hoc Noteholder Group agreed to provide commitments for a debtor-in-possession facility (the "Original DIP Facility") of more than $57 million and agreed to support the syndication of up to an additional $18 million in new money DIP (defined below) facility loans to all holders of convertible notes. The Restructuring Support Agreement was terminated by the Company pursuant to a "fiduciary out" which permitted the Company to pursue better alternatives.

On February 2, 2023, the Bankruptcy Court entered an interim order (the "Replacement Interim DIP Order") authorizing, among other things, the Debtors to obtain senior secured non-priming super-priority replacement post-petition financing (the "Replacement DIP Facility"). On February 27, 2023, the Debtors entered into a Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement governing the Replacement DIP Facility (the "Replacement DIP Credit Agreement"), with B. Riley Commercial Capital, LLC, as administrative agent (the "Administrative Agent"), and the lenders from time to time party thereto (collectively, the "Replacement DIP Lender"). Proceeds of the Replacement DIP Facility were used to, among other things, repay amounts outstanding under the Original DIP Facility, including payment of all fees and expenses required to be paid under the terms of the Original DIP Facility. These funds, along with ongoing cash generated from operations, were anticipated to provide the necessary financing to effectuate the planned restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

On March 1, 2023, the Bankruptcy Court entered an order approving the Replacement DIP Facility on a final basis and the terms under which the Debtors are authorized to use the cash collateral of the holders of their convertible notes (the "Final DIP Order").

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was made available following Bankruptcy Court approval of the Interim DIP Order and (ii) $35 million was made available following Bankruptcy Court approval of the Final DIP Order. Loans under the Replacement DIP Facility will bear interest at a rate of 10%, which will be payable in kind in arrears on the first day of each calendar month. The Administrative Agent received an upfront payment equal to 3.5% of the aggregate commitments under the Replacement DIP Facility on February 3, 2023, payable in kind, and the Replacement DIP Lender will receive an exit premium equal to 5% of the amount of the loans being repaid, reduced or satisfied, payable in cash. The Replacement DIP Credit Agreement includes representations and warranties, covenants applicable to the Debtors, and events of default. If an event of default under the Replacement DIP Credit Agreement occurs, the Administrative Agent may, among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Credit Agreement to be immediately due and payable.

The maturity date of the Replacement DIP Credit Agreement is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Credit Agreement will also terminate on the date

core-20221231

that is the earliest of the following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers (as defined in the Replacement DIP Credit Agreement) or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the Loans and the termination of the Commitments (whether automatically, or upon any Event of Default or as otherwise provided in the Replacement DIP Credit Agreement); and (iv) conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

3

The Bankruptcy Court has appointed two official committees: the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which represents general unsecured creditors, and the Official Committee of Equity Security Holders (the "Equity Committee"), which represents equity security holders. These committees have the right to be heard on all matters that come before the Bankruptcy Court and have important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees, including those of their counsel and financial advisors.

**Delisting of Common Stock and Warrants**

On December 13, 2022, the Company received written notice from Nasdaq notifying the Company that, because the closing bid price for the Company's securities had fallen below $1.00 per share for 30 consecutive business days, the Company no longer met the minimum bid price requirement for continued inclusion on the Nasdaq Global Select Market pursuant to Nasdaq Listing Rule 5450(a)(1) (the "Bid Price Requirement"). On December 22, 2022, the Company received written notice (the "Delisting Notice") from Nasdaq notifying the Company that, as a result of the Chapter 11 Cases, and in accordance with Nasdaq Listing Rules 5101, 5110(b) and IM-5101-1, the staff of Nasdaq had determined that the Company's common stock would be delisted from Nasdaq. In the Delisting Notice, the staff of Nasdaq referenced concerns about the Company's ability to sustain compliance with all requirements for continued listing on Nasdaq and public interest concerns related to the Chapter 11 Cases. Trading of the Company's securities was suspended at the opening of business on January 3, 2023, and our common stock and the common stock warrants began trading on the OTC Markets, operated by the OTC Markets Group, Inc, under the symbols "CORZQ" and "CRZWQ", respectively. The Company requested an appeal of Nasdaq's determination and a hearing before a Nasdaq hearings panel, but subsequently withdrew its appeal after further consideration and discussion with representatives of Nasdaq.

**Overview**

The Company is a best-in-class large-scale operator of dedicated, purpose-built facilities for digital asset mining and a premier provider of blockchain infrastructure, software solutions and services. We mine digital assets for our own account and provide colocation hosting services for other large-scale miners. We began digital asset mining in 2018 and in 2020 became one of the largest North American providers of colocation hosting services for third-party mining customers. Historically, we derived almost all of our revenue from third-party colocation hosting fees and the resale of digital asset mining machines and currently derive almost all of our revenue from self-mining bitcoin. We are one of the largest blockchain infrastructure, hosting provider and digital asset mining companies in North America, with approximately 457MW of power as of December 31, 2021, and 592MW of power as of December 31, 2022. We predominately mine bitcoin for third-party hosting customers and for our own account at our eight fully operational data centers in Georgia (2), Kentucky (1), North Carolina (2), North Dakota (1) and Texas (2). In February 2022, the Muskogee City-County Port Authority (Oklahoma) announced an agreement with us to develop a 500MW data center at the Port of Muskogee John T. Griffin Industrial Park which remains substantially undeveloped.

Since July 2018, we have operated for ourselves and on behalf of our customers and related parties, miners of varying models, types, and manufacturers, but primarily miners of bitcoin manufactured by Bitmain Technologies, Ltd ("Bitmain"). We have accumulated significant expertise in the installation, operation, optimization, and repair of digital mining equipment. We have expanded our self-mining operation to take advantage of favorable market conditions and leverage our expertise for our own account.

Although our business operations date uninterrupted back to 2018 (and was known as "Core Scientific" ("Old Core")), the current corporate entity operating our business was formerly known as Power & Digital Infrastructure Acquisition Corp. ("XPDI") which was a special purpose acquisition corporation formed for the purpose of acquiring an operating business like Old Core. On July 20, 2021, XPDI, Core Scientific Holding Co., and XPDI Merger Sub entered into a merger agreement (the "Merger Agreement") which provided for the business combination transactions provided therein (the "Business Combination") pursuant to which the business of Old Core was combined with XPDI and XPDI changed its name to Core Scientific, Inc. ("New Core" or the "Company"). XPDI's stockholders approved the transactions contemplated by the Business Combination at a special meeting of stockholders held on January 19, 2022. See our Management's Discussion and Analysis of Financial Condition and Results of Operations for additional information on the Business Combination.

In July 2021, Old Core completed the acquisition of Blockcap, Inc. ("Blockcap"), one of Old Core's largest hosting customers. Prior to its acquisition, Blockcap had retained Old Core to host in the data centers operated by Old Core Blockcap's industrial scale digital asset mining operations. Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin and, to a lesser extent, Siacoin and Ethereum. At the time of its acquisition, Blockcap claimed to be the largest independent

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

cryptocurrency mining operator in North America. While Blockcap did sell or exchange the digital assets it mined to fund its growth strategies or for general corporate purposes from time to time, it generally retained its digital assets as investments in anticipation of

4

Debtors' Exhibit No. 40
Page 54 of 462

continued adoption of digital assets as a "store of value" and a more accessible and efficient medium of exchange than traditional fiat currencies.

Our hosting colocation business provides a full suite of services to digital asset mining customers. We provide deployment, monitoring, troubleshooting, optimization and maintenance of our customers' digital asset mining equipment and provide necessary electrical power and repair and other infrastructure services necessary to operate, maintain and efficiently mine digital assets.

We operate in two segments: "mining" consisting of digital asset mining for our own account, and "hosting and equipment sales" consisting of our blockchain infrastructure and third-party hosting business, and associated sales of mining equipment to customers.

Our business strategy is to grow our revenue and profitability by increasing the capacity and efficiency of our self-mining fleet and by enhancing our third-party colocation business. We intend to strategically develop the infrastructure necessary to support business growth and profitability and take advantage of adjacent opportunities that leverage our mining expertise and capabilities.

**Blockchain and Digital Assets**

Blockchains are decentralized digital ledgers that record and enable secure peer-to-peer transactions without third-party intermediaries ("Blockchains"). Blockchains enable the existence of digital assets by allowing participants to confirm transactions without the need for a central certifying authority. When a participant requests a transaction, a peer-to-peer computer network consisting of nodes validates the transaction and the user's status using known algorithms. After the transaction is verified, it is combined with other transactions to create a new block of data for the ledger. The new block is added to the existing blockchain in a way that is permanent and unalterable, thereby completing the transaction. As each new block refers back to and "connects" with the immediately prior solved block associated with it, the addition of a new block adds to the blockchain in a manner similar to a new link being added to a chain.

Digital assets (also known as cryptocurrency) are a medium of exchange that use encryption techniques to control the creation of units and to verify the transfer of funds. Consumers use digital assets because they offer lower cost and faster peer-to-peer payment options without the need to provide personal details. Every single transaction, and the ownership of every single digital asset in circulation, is recorded in the blockchain, which effectively contains a record of all account balances. Miners use powerful computers that tally digital asset transactions to operate the blockchain. These miners update stored records each time a transaction is made and ensure the authenticity of information. Each account on the blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key, which is kept secret, like a password. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.

No single entity owns or operates the network. The infrastructure is collectively maintained by a decentralized public user base. Because the network operates in a decentralized manner, it does not rely on governmental authorities or financial institutions to create, transmit or determine the value of digital assets. Rather, value is determined by market factors, primarily the supply and demand for the units, with prices being set in transfers by mutual agreement or through barter among transacting parties, as well as by the number of merchants that may accept the digital asset. As digital asset transactions can be broadcast to the digital asset network by any user's blockchain and digital assets can be transferred without the involvement of intermediaries or third parties, there are currently little to no transaction costs in direct peer-to-peer transactions. Units of digital assets can be converted to fiat currencies, such as the U.S. dollar, at rates determined on various exchanges. Digital asset prices are quoted on various exchanges and demonstrate extreme volatility.

The user community has viewed digital assets to offer several advantages over traditional (also known as 'fiat') currency, including:

• Acting as a fraud deterrent, as digital assets recorded on a blockchain are virtually impossible to counterfeit, reverse, or modify;

• Immediate settlement;

• Elimination of counterparty risk;

- No requirement for a trusted intermediary;

- Lower transaction fees;

5

Debtors' Exhibit No. 40
Page 56 of 462

- Identity theft prevention;

- Universal accessibility;

- Transaction verification and confirmation processes that prevent double spending;

- Decentralized transaction processing at any time of day without any central authority (governments or financial institutions); and

- Universal value.

The market for digital assets has been growing exponentially. In 2017, there were an estimated 2.7 million users of digital assets, whereas today estimated users are 100 million. Bitcoin's daily exchange volume has grown from $92 million in January 2017 to more than $50 billion in May 2021. The initial exchange rate recorded on October 5, 2009, was one bitcoin equaled $0.000764. Bitcoin remains the leading digital asset in terms of market capitalization, which, based on data sourced from coinmarketcap.com, exceeded $875.9 billion as of December 31, 2021. During the year ended December 31, 2022, the trading price of one bitcoin ranged from a high of $48,086.84 in March 2022 to a low of $15,599.05 in November 2022. As of March 25, 2023, based on data sourced from coinmarketcap.com, the trading price of one bitcoin was $27,494.71.

*Digital Asset Mining*

Specialized computers, or "miners," power and secure blockchains by solving complex cryptographic algorithms to validate transactions on specific digital asset networks. In order to add blocks to the blockchain, a miner must map an input data set consisting of the existing blockchain, plus a block of the most recent digital asset transactions and an arbitrary number called a "nonce," to an output data set of a predetermined length using the SHA256 cryptographic hash algorithm. Solving these algorithms is also known as "solving or completing a block." Solving a block results in a reward of digital assets, such as bitcoin, in a process known as "mining." These rewards of digital assets currently can be sold profitably when the sale price of the digital asset exceeds the cost of "mining," which generally consists of the cost of mining hardware, the cost of the electrical power to operate the machine, and other facility costs to house and operate the equipment.

Mining processing power is generally referred to as "hashing power." A "hash" is the computation run by mining hardware in support of the blockchain. A miner's "hash rate" refers to the rate at which it is capable of solving such computations per second. Miners with higher rated hash rate when operating at maximum efficiency have a higher chance of completing a block in the blockchain and receiving a digital asset reward. Currently, the likelihood that an individual mining participant acting alone will solve a block and be awarded a digital asset is extremely low. As a result, to maximize the opportunities to receive a reward, most large-scale miners have joined with other miners in "mining pools" where the computing power of each pool participant is coordinated to complete the block on the blockchain and mining rewards are distributed to participants in accordance with the rules of the mining pool. Fees payable to the operator of the pool vary but are typically as much as 0.01% to 2% of the reward earned and are deducted from the amounts earned by each pool participant. Mining pools are subject to various risks including connection issues, outages and other disruptions which can impact the quantity of digital assets earned by participants.

*Mathematically Controlled Supply*

The method for creating new bitcoin is mathematically controlled in a manner such that the supply of bitcoin grows at a limited rate, based on a pre-determined schedule. The number of bitcoin awarded for solving a new block is automatically halved every 210,000 blocks. This means every block up to and including block 210,000 produced a reward of 50 bitcoin, while blocks beginning with 210,001 produced a reward of 25 bitcoin. Since blocks are mined on average every 10 minutes, 144 blocks are mined per day on average. At 144 blocks per day, 210,000 blocks take four years to mine, on average. The current fixed reward for solving a new block is 6.25 bitcoin per block and it is anticipated that the reward will decrease by half to become 3.125 bitcoin per block in early 2024, according to estimates of the rate of block solution calculated by BitcoinClock.com. This deliberately controlled rate of bitcoin creation means that the number of bitcoin in existence will never exceed 21 million and that bitcoin cannot be devalued through excessive production unless the bitcoin network's source code (and the underlying protocol for bitcoin issuance) is altered. We monitor the blockchain network and, as of December 31, 2022, based on the information we collected from our network access, approximately 19 million bitcoin have been mined.

**Our Operations and Solutions**

As a large-scale bitcoin digital asset miner and provider of blockchain solutions, we believe that we are well positioned to serve customers in a rapidly expanding market for digital asset mining and blockchain solutions. We believe that the adoption and

6

mainstream use of bitcoin and the blockchain technology on which it is based has accelerated the demand for bitcoin and other digital currencies.

As one of the largest owner operator of digital asset mining infrastructure in North America, we focus on colocation clients with large-scale deployments and provide power, racks, proprietary thermodynamic management (heat dissipation and airflow management), redundant connectivity, 24/7 security as well as our proprietary software platforms, MinderTM and MinderOSTM, which provide infrastructure management and custom firmware that are designed to increase performance and energy efficiency. Our blockchain business is one of the only large-scale, vertically integrated digital asset mining and blockchain infrastructure and hosting solutions businesses in North America. Our digital asset mining operation is focused on the generation of bitcoin by solving complex cryptographic algorithms to validate transactions on specific digital asset network blockchains, which is commonly referred to as "mining."

Our proprietary data centers in Georgia, Kentucky, North Carolina, North Dakota, and Texas are purpose-built facilities optimized for the unique requirements of high density blockchain computer servers. We currently have eight fully operational data centers in Georgia (2), Kentucky (1), North Carolina (2), North Dakota (1) and Texas (2), with approximately 592MW of operating electric power as of December 31, 2022. Our existing, completed facilities leverage our specialized construction proficiency by employing high-density, low-cost engineering and power designs. Our proprietary thermodynamic system manages heat and airflow to deliver best-in-class uptime and, ultimately, increasing mining rewards to us and our customers.

Since July 2018, Core Scientific has hosted for itself and its customers, miners of varying models, types and manufacturers. As a result, we have accumulated significant expertise in the installation, operation, optimization and repair of digital mining equipment.

In July 2021 we completed the acquisition of Blockcap, one of Old Core's largest hosting customers. Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin and, to a lesser extent, Siacoin and Ethereum. The acquisition of Blockcap significantly expanded Core Scientific's self-mining operations and is the source of a large number of miners we own.

**Segments**

We have two operating segments: "Equipment Sales and Hosting," which consists primarily of our blockchain infrastructure and third-party hosting business and equipment sales to customers, and "Mining," consisting of digital asset mining for our own account. The blockchain hosting business generates revenue through the sale of electricity-based consumption contracts for our hosting services which are recurring in nature. Equipment sales revenue is derived from our ability to leverage our partnerships with leading equipment manufacturers to secure equipment in advance, which is then sold to our customers when they are unable to obtain them otherwise. The Mining operation segment generates revenue from operating owned computer equipment as part of a pool of users that process transactions conducted on one or more blockchain networks. In exchange for these services, we receive digital assets in the form of bitcoin.

*Mining Equipment*

We own and host specialized computers ("miners") configured for the purpose of validating transactions on multiple digital asset network blockchains (referred to as, "mining"), predominantly the bitcoin network. Substantially all of the miners we own and host were manufactured by Bitmain and incorporate ASIC chips specialized to solve blocks on the bitcoin blockchains using the 256-bit secure hashing algorithm ("SHA-256") in return for bitcoin digital asset rewards.

We have entered into and facilitated agreements with vendors to supply mining equipment for our and our users' digital asset mining operations. We prepay a significant portion of the purchase price for these new miners as partially refundable deposits, with delivery expected to occur in monthly installments through the first quarter of 2023, and the remainder of the purchase price for these new miners is payable in installments, with payment due in advance of the scheduled delivery dates set forth in the applicable purchase agreement. As of December 31, 2022, all new miners have been paid for in arrangements with our customers.

As of December 31, 2022, we had deployed approximately 234,000 bitcoin miners, which number consists of approximately 153,000 self-miners and approximately 81,000 hosted miners, which represented 15.7 exahash per second ("EH/s") and 8.0 EH/s for self-miners and hosted miners, respectively.

7

Debtors' Exhibit No. 40
Page 59 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Suppliers**

*Mining Equipment*

Digital asset mining is dependent on specialized digital asset mining hardware utilizing application-specific integrated circuit ("ASIC") chips to solve blocks on blockchains using the 256-bit secure hashing algorithm. Almost all of these miners are produced outside of the United States, mostly in China and Southeast Asia, by a few manufacturers, the largest of which is Bitmain. We have entered into agreements with Bitmain from time to time to supply most of the miners we intend to acquire for our mining operations.

These agreements, like those of other miner manufacturers, generally require significant refundable deposits payable months in advance of delivery and additional advance payments in monthly installments thereafter. These agreements also contain other terms and conditions favorable to the manufacturer. Our mining business is highly dependent upon digital asset mining equipment suppliers such as Bitmain providing an adequate supply of new generation digital asset mining machines at economical prices to enable profitable mining by us and by third-party customers intending to purchase our hosting and other solutions.

*Power Providers and Facility Development*

We have experienced in-house power and facility development teams focused on sourcing, evaluating, developing and constructing the facilities where we self-mine digital assets and host for other third-party mining equipment. Historically, we have contracted with large electric utility providers to provide a sufficient supply of electricity to power the mining operations in our facilities. We have fixed, variable and interruptible bi-lateral power supply consumption agreements with electric power suppliers at our various facilities. These agreements provide for both firm and interruptible power supply through each provider's transmission and distribution systems to dedicated substations owned by the power provider, the local utility or the Company. We value our relationships with our power providers and work to leverage our operating capabilities to take full advantage of any interruptible programs and all cost saving opportunities.

**Supplier Agreements**

***Industrial Power Contract with Murphy Electric Power Board***

The Company currently operates its "Marble 1" facility in Marble, North Carolina at a power capacity up to 35,000 kW under an Industrial Power Contract (the "Murphy IPC") originally executed on December 15, 2017 with Murphy Electric Power Board (the "MEPB"). MEPB operates as a local power company partner to the larger Tennessee Valley Authority ("TVA") system.

The Company's Marble 1 power rates are governed by MEPB's published rate schedule for large manufacturing service customers. Under that schedule, our rates are historically stable with some month-to-month variability dictated by the MEPB's monthly fuel rider. In an effort to lower overall operating costs, the Company also participates in MEPB's interruptible power program which allows MEPB to curtail our power usage for a limited number of hours each year. By making its usage curtailable and thereby 'usable' by MEPB/TVA, the Company is awarded a monthly bill credit commensurate with the amount of kilowatts it has agreed to provide back to the system when called upon.

Additionally, the Company participates in an economic development program offered by MEPB/TVA which is designed to incent capital investment and employment. Program awards are determined annually and paid monthly in the form of a bill credit.

***Master Services Agreement and Power Arrangements with Duke Energy Carolinas, LLC***

The Company currently operates its "Marble 2" facility in Marble, North Carolina at a power capacity up to 69,000 kW under a Master Services Agreement (the "MSA") originally executed with Duke Energy Carolinas, LLC ("Duke") on June 25, 2018.

The Company also entered into an Electric Service Agreement (the "ESA") with Duke, effective June 10, 2019, for the supply of electric power to Marble 2. The Company's Marble 2 power rates are governed by Duke Energy Carolinas published rate schedule which is overseen by the North Carolina Utilities Commission (the "NCUC"). Rates are largely stable with some seasonality and are subject to adjustment as approved by the NCUC. Further, the Company works to lower operating costs by participating in

core-20221231

interruptible power and economic development incentive programs.

8

core-20221231                                                      https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

### Electric Service Agreements with Dalton Utilities

The Company currently operates two facilities at two separate locations in Dalton, Georgia at a total power capacity of 195,000 kW under an Electric Service Agreement originally executed on October 11, 2018 with The Board of Water, Light and Sinking Fund Commissioners (the "Board of Commissioners") of the City of Dalton, Georgia (d/b/a Dalton Utilities, "Dalton") for the supply of electric power to each of its hosting sites located at Boring Drive, Dalton, Georgia (the "Boring Drive Site") and Industrial South, Dalton, Georgia (the "Industrial South Site").

The Company's base power rates in Dalton are governed by Dalton's Board of Commissioners are subject to change once each year. Additionally, the Board of Commissioners imposes a monthly Fuel Costs Adjustment ("FCA") tied largely to local natural gas power prices. The FCA, like natural gas, is seasonal in nature.

### Firm Power Contract and Related Arrangements with Tennessee Valley Authority

Core entered into a Firm Power Contract ("FPC") with TVA for the supply of electric power to Core's site near Calvert City, Kentucky. The Calvert City facility operates at a rate of up to 150,000 kW.

Subject to other terms and conditions, Core operates as a Large Manufacturing Service customer in accordance with certain TVA service rate schedules as modified or replaced from time to time by agreement between the parties. The FPC may be terminated on or after April 29, 2025 by either Core or TVA upon at least five years' written notice. Similar to our MEPB/TVA governed Marble 1 facility, the Company works to lower operating costs by participating in interruptible power and economic development incentive programs.

### Electric Service Agreement with Nodak/Minnkota

Core entered into an Electric Service Agreement (the "ESA") with Nodak Electric Cooperative and Minnkota Power Cooperative ("MPC") to supply power to it 100,000 kW mining facility in Grand Forks, North Dakota. Operations at the Grand Forks facility began in June of 2022.

The ESA provides a fixed annual rate for power, escalating slightly over time through 2026. As part of that agreement, and in an effort to reduce its fixed rate for power, the Company agreed to curtail its operations for a fixed number of hours each year at the direction of MPC. The Company does retain the right to disregard curtailment calls and pay hourly market prices when deemed economically favorable to its bottom line.

### Power Purchase Agreement with the City of Denton

Effective as of September 3, 2021, Core entered into a Power Purchase Agreement with the City of Denton, Texas, d/b/a Denton Municipal Electric, a Texas Municipal Corporation and Home-Rule City. The agreement provides for an electrical power capacity of up to 297,000kW for a term of seven years at the Denton Energy Center. The price point for the energy delivered is designated as the ERCOT North Zone 15-min real-time index price as published by ERCOT plus ancillary services, transmission/distribution, taxes, and fees. The transmission and distribution utility serving the site is Denton Municipal Electric.

### Master Energy Sales Agreement with MP2 Energy, LLC a Shell Subsidiary

Effective as of September 16, 2022, Core entered into a Master Energy Sales Agreement with retail electric provider MP2 Energy, LLC. The agreement provides for electrical power for the Cottonwood and Cedarvale data centers in Pecos, TX. The price point for the energy delivered is designated as the ERCOT West Zone 15-min real-time index price as published by ERCOT plus ancillary services, transmission/distribution, taxes, and fees. The transmission and distribution utility serving the sites is Texas-New Mexico Power.

**Competition**

We operate in a highly competitive industry with an increasing number of participants.

Our self-mining operations compete with mining operations throughout the world to complete new blocks on the blockchain and earn the reward in the form of an established unit of a digital asset. We compete on the basis of our total number of miners, the degree of mining difficulty, the efficiency of our mining operations and the fiat value of the mining reward.

While miners of digital assets historically range from individual enthusiasts and entrepreneurs to large public company mining operations and large company mining hosting operations with dedicated data centers, the vast majority of mining is now undertaken and further trending towards large-scale, industrial mining facilities. A mining pool is created when mining participants pool the processing power of their miners over a network and mine transactions together. Rewards are then distributed proportionately to the pool participants based on the work/hash power contributed to solving a block. Our self-mining operations also compete with non-digital asset operations for access to suitable real estate and access to affordable and dependable electric power. In addition to competing to solve new blocks, we compete to acquire new miners, to raise capital, to obtain access to facilities for location of mining operations, and to develop or acquire new technologies.

Our hosting activities compete with a large number of other hosting operations. Our success in our hosting operations depends on our ability to supply hosting space and power, our performance with respect to installation, operation and repair of customer equipment, our ability to obtain replacement parts, the value of our service offering to our customers and the availability of mining equipment. To compete effectively as a hosting provider we will have to market our services effectively to large scale miners that value our ability to host at scale and who are willing to pay a premium hosting fee for our high up-time and operational expertise.

Several public companies (traded in the United States, Canada, and internationally), such as the following, may be considered competitors to the Company:

- Applied Digital Corp.;
- Argo Blockchain PLC;
- Bit Digital, Inc.;
- Bitfarms Technologies Ltd. (formerly Blockchain Mining Ltd);
- Cipher Mining Inc.;
- Cleanspark, Inc.;
- Greenidge Generation Holding Inc.;
- Hive Blockchain Technologies Inc.;
- Hut 8 Mining Corp.;
- Iris Energy Ltd.
- Marathon Digital Holdings, Inc.;
- Mawson Infrastructure Group Inc.;
- Riot Platforms, Inc.;
- Stronghold Digital Mining, Inc.; and
- TeraWulf Inc.

The digital assets industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future. Other market participants in the digital assets industry include investors and speculators, retail users transacting in digital assets, and service companies that provide a variety of services, including buying, selling, payment processing and storing of digital assets. To continue to be successful, we will require sufficient additional capital to build additional facilities and to acquire new available mining equipment and related infrastructure. Subject to raising

additional capital, our digital asset initiatives will compete with other industry participants that focus on investing in and securing the blockchains of bitcoin and other digital assets.

10

Debtors' Exhibit No. 40
Page 65 of 462

## Intellectual Property

We seek protection for our intellectual property as appropriate. To establish and protect our proprietary rights, we rely upon a combination of patent, copyright, trade secret and trademark laws and contractual restrictions such as confidentiality agreements, licenses and intellectual property assignment agreements.

We have filed over 70 patent applications and obtained issued patents in technologies such as blockchain, data center management, infrastructure and cooling. We maintain a policy requiring our employees, contractors, consultants and other third parties to enter into confidentiality and proprietary rights agreements to control access to our proprietary information. These laws, procedures and restrictions provide only limited protection, and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed or misappropriated. Furthermore, the laws of certain countries do not protect proprietary rights to the same extent as the laws of the United States, and we therefore may be unable to protect our proprietary technology in certain jurisdictions. Moreover, our platform incorporates software components licensed to the general public under open-source software licenses. We obtain many components from software developed and released by contributors to independent open-source components of our platform. Open-source licenses grant licensees broad permissions to use, copy, modify and redistribute those open-source components of our platform. As a result, open-source development and licensing practices can limit the value of our software copyright assets.

We pursue the registration of our domain names, trademarks and service marks in the United States and in certain locations outside the United States. To protect our brand, we file trademark registrations in some jurisdictions.

## Government Regulation

Due to the relatively short history of digital assets, and their emergence as a new asset class, government regulation of blockchain and digital assets is constantly evolving, with increased interest expressed by U.S. and internal regulators. In October 2020, the Cyber-Digital Task Force of the U.S. Department of Justice published a report entitled "Cryptocurrency: An Enforcement Framework" that detailed the Department's view with respect to digital assets and the tools at the Department's disposal to deal with threats posed by digital assets. In February 2021, representatives of the government of Inner Mongolia, China announced plans to ban digital asset mining within the province due to the energy and rare earth mineral demands of the industry. In March 2021, the nominee for Chair of the U.S. Securities and Exchange Commission ("SEC") expressed the need for investor protection along with promotion of innovation in the digital asset space. In March 2022, President Biden signed an Executive Order outlining an "whole-of-government" approach to addressing the risks and harnessing the potential benefits of digital assets and its underlying technology. The executive order lays out a national policy for digital assets over six highlighted priorities. In January 2023, the U.S. House of Representatives created a new congressional subcommittee focused on digital assets, the Subcommittee of Digital Assets, Financial Technology and Inclusion, operating under the House Financial Services Committee.

In addition to the activities of the United States federal government and its various agencies and regulatory bodies, government regulation of blockchain and digital assets is also under active consideration by similar entities in other countries and transnational organizations, such as the European Union. State and local regulations within the United States also may apply to our activities and other activities in which we may participate in the future. Other governmental or semi-governmental regulatory bodies have shown an interest in regulating or investigating companies engaged in blockchain or digital asset businesses. For instance, the SEC has taken an active role in regulating the use of public offerings of proprietary coins (so-called "initial coin offerings") and has made statements and official promulgations as to the status of certain digital assets as "securities" subject to regulation by the SEC.

The effect of any regulatory change by the federal, state, local or foreign governments or any self-regulatory agencies on the Company is impossible to predict, but such change could be substantial and may have a material adverse effect on the Company's business, financial condition and results of operations. For example, in November 2022, the State of New York enacted a law prohibiting new proof of work mining activities that use power generated from carbon inputs. While the Company does not currently operate in New York and we are unaware of other significant governmental or regulatory action adverse to bitcoin mining in the United States, there is no guarantee that future regulation or adverse action will not take place and interpretation of existing regulations in a manner adverse to our business is possible.

In addition, various foreign jurisdictions either have adopted, or may adopt, laws, regulations or directives that affect digital assets, digital asset networks, and their users and participants. Such laws, regulations or directives may conflict with those of the

Debtors' Exhibit No. 40
Page 66 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

United States, may negatively impact the acceptance of digital assets by users, merchants and service providers outside of the United States, and may therefore impede the growth of digital assets. A number of Eastern European and Asian countries currently have a more restrictive stance toward digital assets and, thereby, have reduced the rate of expansion of digital asset use, as well as digital asset transaction processing, in each of those countries. Presently, we do not believe any U.S. or state regulatory body other than the

11

4/8/2023, 10:22 PM

State of New York has taken any action or position adverse to our main digital asset, bitcoin, with respect to its production, sale, and use as a medium of exchange; however, future changes to existing regulations or entirely new regulations may affect our business in ways it is not presently possible for us to predict with any reasonable degree of certainty. As the regulatory and legal environment evolves, we may become subject to new laws, such as further regulation by the SEC and other agencies, which may affect our mining and other activities.

### Seasonality

The Company's business is not generally subject to seasonality. However, coin generation from the Company's mining operations may vary depending on the Company's total hash rate at a given point in time relative to the total hash rate of the bitcoin network.

### Our Human Capital Resources

All aspects of our business require specialized knowledge and technical skill. Such knowledge and skills include the areas of blockchain technology, research and development, digital assets, digital asset market, digital asset operations, human resource management, data privacy, as well as legal, compliance, finance and accounting. We believe that we have adequate personnel and resources with the specialized skills required to conduct our operations successfully. As of December 31, 2022, we had 235 full-time employees. All of these employees are located in the United States. None of our employees are represented by a labor union or covered by collective bargaining agreements, and we have not experienced any work stoppages.

### Recent Developments

*Chapter 11 Filing*

On December 21, 2022, Core Scientific, Inc. (the "Company") and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with the filing of the Chapter 11 Cases, the Company entered into a restructuring support agreement (together with all exhibits and schedules thereto, the "Restructuring Support Agreement") with the ad hoc group of noteholders, representing more than 70% of the holders of its convertible notes (the "Ad Hoc Noteholder Group") pursuant to which the Ad Hoc Noteholder Group agreed to provide commitments for a debtor-in-possession facility (the "Original DIP Facility") of more than $57 million and agreed to support the syndication of up to an additional $18 million in new money DIP (defined below) facility loans to all holders of convertible notes. The Restructuring Support Agreement was terminated by the Company pursuant to a "fiduciary out" which permitted the Company to pursue better alternatives.

On February 2, 2023, the Bankruptcy Court entered an interim order (the "Replacement Interim DIP Order") authorizing, among other things, the Debtors to obtain senior secured non-priming super-priority replacement post-petition financing (the "Replacement DIP Facility"). On February 27, 2023, the Debtors entered into a Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement governing the Replacement DIP Facility (the "Replacement DIP Credit Agreement"), with B. Riley Commercial Capital, LLC, as administrative agent (the "Administrative Agent"), and the lenders from time to time party thereto (collectively, the "Replacement DIP Lender"). Proceeds of the Replacement DIP Facility were used to, among other things, repay amounts outstanding under the Original DIP Facility, including payment of all fees and expenses required to be paid under the terms of the Original DIP Facility. These funds, along with ongoing cash generated from operations, were anticipated to provide the necessary financing to effectuate the planned restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

On March 1, 2023, the Bankruptcy Court entered an order approving the Replacement DIP Facility on a final basis and the terms under which the Debtors are authorized to use the cash collateral of the holders of their convertible notes (the "Final DIP

core-20221231                                                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Order").

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was made

12

available following Bankruptcy Court approval of the Interim DIP Order and (ii) $35 million was made available following bankruptcy Court approval of the Final DIP Order. Loans under the Replacement DIP Facility will bear interest at a rate of 10%, which will be payable in kind in arrears on the first day of each calendar month. The Administrative Agent received an upfront payment equal to 3.5% of the aggregate commitments under the Replacement DIP Facility on February 3, 2023, payable in kind, and the Replacement DIP Lender will receive an exit premium equal to 5% of the amount of the loans being repaid, reduced or satisfied, payable in cash. The Replacement DIP Credit Agreement includes representations and warranties, covenants applicable to the Debtors, and events of default. If an event of default under the Replacement DIP Credit Agreement occurs, the Administrative Agent may, among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Credit Agreement to be immediately due and payable.

The maturity date of the Replacement DIP Credit Agreement is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Credit Agreement will also terminate on the date that is the earliest of the following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers (as defined in the Replacement DIP Credit Agreement) or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the Loans and the termination of the Commitments (whether automatically, or upon any Event of Default or as otherwise provided in the Replacement DIP Credit Agreement); and (iv) conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court has appointed two official committees: the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which represents general unsecured creditors, and the Official Committee of Equity Security Holders (the "Equity Committee"), which represents equity security holders. These committees have the right to be heard on all matters that come before the Bankruptcy Court and have important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees, including those of their counsel and financial advisors.

Court filings and other documents related to the Chapter 11 process are available on a separate website administered by our claims agent, Stretto, at https://cases.stretto.com/corescientific/. Information is also available by calling 949-404-4152 (toll-free in the U.S.) or +1-888-765-7875 (for parties outside the U.S.) Documents and other information available on such website are not part of this document and shall not be deemed incorporated by reference in this document.

### Corporate Information

Although our business operations date uninterrupted back to 2018 (and was known as "Core Scientific" ("Old Core")), the current corporate entity operating our business was formerly known as Power & Digital Infrastructure Acquisition Corp. ("XPDI") which was a special purpose acquisition corporation formed for the purpose of acquiring an operating business like Old Core. On July 20, 2021, XPDI, Core Scientific Holding Co., and XPDI Merger Sub entered into a merger agreement (the "Merger Agreement") which provided for the business combination transactions provided therein (the "Business Combination") pursuant to which the business of Old Core was combined with XPDI and XPDI changed its name to Core Scientific, Inc. ("New Core" or the "Company"). XPDI's stockholders approved the transactions contemplated by the Business Combination at a special meeting of stockholders held on January 19, 2022. See our Management's Discussion and Analysis of Financial Condition and Results of Operations for additional information on the Business Combination.

### Available Information

Our internet address is www.corescientific.com. The contents of our website are not part of this Annual Report on Form 10-K and our internet address is included in this document as an inactive textual reference only. We currently make our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy reports and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the SEC.

You can access our filings through the SEC's internet site: www.sec.gov (intended to be an inactive textual reference only)

Debtors' Exhibit No. 40
Page 70 of 462

**Item 1A. Risk Factors**

*Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described below together with all of the other information contained in this Report, including our financial statements and related notes elsewhere in this Report and in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before deciding to invest in our securities. Although we have organized risks generally according to these categories in the discussion below, many of the risks may have ramifications in more than one category. These categories, therefore, should be viewed as a starting point for understanding the significant risks we face and not as a limitation on the potential impact of the matters discussed. If any of the events or developments described below were to occur, our business, prospects, operating results and financial condition could suffer materially, the trading price of our common stock could decline, and you could lose all or part of your investment. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business.*

**Summary of Selected Risk Factors Associated with Our Business**

The following is a summary of the principal risks associated with an investment in our common stock:

- We filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and are currently operating as a debtor in possession under the jurisdiction of the United States Bankruptcy Court.

- Digital assets are subject to extreme price volatility.

- Our business is highly dependent on a small number of digital asset mining equipment suppliers.

- Our business is capital intensive, and failure to obtain the necessary capital when needed will force us to delay, limit or terminate our expansion efforts or other operations, which would have a material adverse effect on our business, financial condition and results of operations.

- There is substantial doubt about our ability to continue as a going concern.

- Our substantial level of indebtedness and liquidity constraints have adversely affected our financial condition and our ability to service our indebtedness.

- We will need to raise additional capital to grow our business and satisfy our anticipated future liquidity needs, and we may not be able to raise it on terms acceptable to us, or at all.

- If future prices of bitcoin are not sufficiently high, our business, results of operations and financial condition will be materially and adversely affected, which will have a negative impact on the trading price of our securities.

- Our success depends in large part on our ability to mine digital assets profitably and to attract customers for our hosting capabilities.

- A slowdown in the demand for blockchain technology or blockchain hosting resources and other market and economic conditions could have a material adverse effect on our business, financial condition and results of operations.

- A significant portion of our assets including our miners and our mining facilities are pledged to various of our creditors

- Our revenue comes from the bitcoin we mine and sell and from a small number of hosting customers.

- We are subject to risks associated with our need for significant electric power and the limited availability of power resources, which could have a material adverse effect on our business, financial condition and results of operations. An inability to purchase and develop additional sources of low-cost renewable sources of energy effectively will have a material adverse effect on our business, financial condition and results of operations.

- We may not be able to obtain new hosting and transaction processing hardware or purchase such hardware at competitive prices.

14

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

- Our business is heavily impacted by social, political, economic and other events and circumstances in the United States and in countries outside of the United States, most particularly Asian and other non-Western countries.

- We generate significant revenue from a limited number of facilities in Georgia, Kentucky, North Carolina, North Dakota and Texas.

- We may be vulnerable to security breaches.

- Our future success depends on our ability to keep pace with rapid technological changes that could make our current or future technologies less competitive or obsolete.

- The further development and acceptance of cryptographic and algorithmic protocols governing transaction validation and the issuance of, and transactions in, digital assets are subject to a variety of factors that are difficult to evaluate. The slowing or stoppage of development or acceptance of blockchain networks and digital assets would have an adverse material effect on the successful development of the mining operation and value of mined digital assets.

- Our ability to use net operating losses to offset future taxable income may be subject to limitations.

- We operate in a rapidly developing industry and have an evolving business model with a limited history of generating revenue from our services. In addition, our evolving business model increases the complexity of our business, which makes it difficult to evaluate our future business prospects.

- We have experienced difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions to provide us with customary financial products and services.

- Digital assets exchanges and other trading venues are relatively new and, in some cases, unregulated, and some have experienced fraud and failure.

- We may not have adequate sources of recovery if the digital assets held by us are lost, stolen or destroyed due to third-party digital asset services.

- Losses relating to our business may be uninsured, or insurance may be limited.

- Because there has been limited precedent set for financial accounting for bitcoin and other digital assets, the determinations that we have made for how to account for digital assets transactions may be subject to change.

- As more processing power is added to a network, our relative percentage of total processing power on that network is expected to decline absent significant capital investment, which has an adverse impact on our ability to generate revenue from processing transactions on that network.

- Our reliance on third-party mining pool service providers for our mining revenue payouts may have a negative impact on our operations.

- Malicious actors or botnet may obtain control of more than 50% of the processing power on the bitcoin or other network.

- Any loss or destruction of a private key required to access a digital asset of ours is irreversible. We also may temporarily lose access to our digital assets.

- The digital assets held by us are not subject to FDIC (defined below) or SIPC (defined below) protections.

- Our interactions with a blockchain may expose us to SDN (defined below) or blocked persons or cause us to violate provisions of law that did not contemplate distribute ledger technology.

- We have identified material weaknesses in our internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations. We may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.

15

core-20221231

- We were delisted from Nasdaq and our shares currently trade on the OTC.

**Risks Related to our Chapter 11 Cases**

*We are subject to the risks and uncertainties associated with Chapter 11 proceedings.*

On December 21, 2022 (the "Petition Date"), the Company and certain of its subsidiaries (collectively, the "Debtors"), filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The Chapter 11 Cases are being jointly administered under the caption In re Core Scientific, Inc., et al., No 12-90341 (DRJ). We will continue to operate our businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

For the duration of our Chapter 11 Cases, our operations and our ability to develop and execute our business plan are subject to the risks and uncertainties associated with bankruptcy, including the following:

- our ability to develop, confirm and consummate a Chapter 11 plan or alternative restructuring transaction;

- our ability to obtain court approval with respect to motions filed in Chapter 11 Cases from time to time;

- our ability to maintain our relationships with our suppliers, service providers, customers, employees and other third parties;

- our ability to continue to invest in our business, which could hurt our competitiveness;

- our ability to enter into or maintain contracts that are critical to our operations at competitive rates and terms;

- our ability to execute our business plan;

- our ability to maintain acceptable and appropriate financing;

- the ability of third parties to seek and obtain court approval to terminate contracts and other agreements with us;

- the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for us to propose and confirm a Chapter 11 plan, to appoint a Chapter 11 trustee, or to convert the Chapter 11 Cases to Chapter 7 cases; and

- the actions and decisions of our creditors and other third parties who have interests in our Chapter 11 Cases that may be inconsistent with our plans.

These risks and uncertainties could affect our business and operations in various ways, such as adversely impacting our relationships with our suppliers, service providers, customers, employees and other third parties, which in turn could adversely affect our operations and financial condition. Also, we need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit our ability to respond timely to certain events or take advantage of certain opportunities.

Because of the risks and uncertainties associated with our Chapter 11 proceedings, we cannot accurately predict or quantify the ultimate impact of events that will occur during our Chapter 11 proceedings that may be inconsistent with our plans.

*Operating under Chapter 11 may restrict our ability to pursue our business strategies.*

Under Chapter 11, transactions outside the ordinary course of business will be subject to the prior approval of the Bankruptcy Court, which may limit our ability to respond in a timely manner to certain events or take advantage of certain opportunities. We must obtain Bankruptcy Court approval to, among other things:

- engage in certain transactions with our vendors;

- buy or sell assets outside the ordinary course of business;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- grant liens; and

- finance our operations, investments or other capital needs or to engage in other business activities that would be in our interest.

16

---

Debtors' Exhibit No. 40
Page 76 of 462

***Adverse publicity in connection with the Chapter 11 Cases or otherwise could negatively affect our businesses.***

Adverse publicity or news coverage relating to us, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact our efforts to establish and promote name recognition and a positive image after emergence from the Chapter 11 Cases.

***The Chapter 11 Cases limit the flexibility of our management team in running our business.***

While we operate our businesses as debtor-in-possession under the supervision of the Bankruptcy Court, we are required to obtain the approval of the Bankruptcy Court and, in some cases, certain creditors prior to engaging in activities or transactions outside the ordinary course of business. Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with various official and ad hoc committees and other parties-in-interest and one or more hearings. The various official and ad hoc committees and other parties-in-interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process may delay major transactions and limit our ability to respond quickly to opportunities and events in the marketplace. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, we would be prevented from engaging in activities and transactions that we believe are beneficial to us.

***Our senior management team and other key personnel may not be able to execute the business plans as currently developed, given the substantial attention required of such individuals by the Chapter 11 Cases.***

The execution of our business plans depends on the efforts of our senior management team and other key personnel to execute our business plans. Such individuals may be required to devote significant efforts to the prosecution of the Chapter 11 Cases, thereby potentially impairing their abilities to execute our business plans. Accordingly, our business plans may not be implemented as anticipated, which may cause its financial results to materially deviate from the current projections.

***The pursuit of the bankruptcy filing has consumed and will continue to consume a substantial portion of the time and attention of management, which may have a material adverse effect on our business and results of operations, and we may face increased levels of employee attrition.***

Leading up to and following commencement of the Chapter 11 Cases, our management team has been required to spend a significant amount of time and effort focusing on the filings. This diversion of attention may materially adversely affect the conduct of our business, and, as a result, our financial condition and results of operations, particularly if a Chapter 11 plan is not confirmed. During the continued pendency of the Chapter 11 Cases, our employees are facing distraction and uncertainty and we may experience increased levels of employee attrition. We are highly dependent on the continuing efforts of our executive officers and other personnel as our executive officers have substantial experience and expertise in our industry and have made significant contributions to our business. Uncertainty as a result of the Chapter 11 Cases may adversely affect our ability to attract and retain key personnel, and loss of key personnel or material erosion of employee morale could have a material adverse effect on our ability to meet customer expectations and could require the incurrence of substantial additional costs to recruit replacement personnel, thereby adversely affecting our business and results of operations. In addition, we could experience losses of customers who may be concerned about our long-term viability.

***As a result of the Chapter 11 Cases, our financial results may be volatile and may not reflect historical trends.***

During the Chapter 11 Cases, we expect our financial results to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact our consolidated financial statements. As a result, our historical financial performance is likely not indicative of our financial performance after the date of the bankruptcy filing. In addition, if we emerge from Chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to our operating plans pursuant to a plan of reorganization. We also may be required to adopt fresh start accounting upon emergence, in which case our assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on our consolidated balance sheets. Our financial results after the application of fresh start accounting also may be different from historical trends.

core-20221231

*We may be unable to comply with restrictions or with budget, liquidity or other covenants imposed by the agreements governing the DIP financing and our other financing arrangements. Such non-compliance could result in an event of default*

17

4/8/2023, 10:22 PM

*under the terms of the DIP financing that, if not cured or waived, would have a material adverse effect on our business, financial condition and results of operations.*

The agreements governing our Replacement DIP Facility impose a number of restrictions on us. Specifically, the terms of the credit agreement governing the Replacement DIP Facility impose certain obligations including, among other things, affirmative covenants requiring us to provide financial information, budgets and other information to the agent under the Replacement DIP Facility, and negative covenants restricting our ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in by the terms of the Replacement DIP Facility. Our ability to borrow under the Replacement DIP Facility is subject to the satisfaction of certain conditions precedent. Covenants of the Replacement DIP Facility include general affirmative covenants, as well as negative covenants such as prohibiting us from incurring or permitting debt, investments, liens or dispositions unless specifically permitted. Failure to comply with these covenants would result in an event of default under the Replacement DIP Facility and permit the lenders thereunder to accelerate the loans and otherwise exercise remedies under the loan documentation for the Replacement DIP Facility. Our ability to comply with these provisions may be affected by events beyond our control and our failure to comply or obtain a waiver in the event we cannot comply with a covenant could result in an event of default under the agreements governing the Replacement DIP Facility and our other financing arrangements.

### *We may not be able to obtain confirmation of a Chapter 11 plan of reorganization.*

To emerge successfully from Bankruptcy Court protection as a viable entity, we must meet certain statutory requirements with respect to adequacy of disclosure related to the plan of reorganization, solicit and obtain the requisite acceptances of such a plan and fulfill other statutory conditions for confirmation of such a plan, which have not occurred to date. The confirmation process is subject to unanticipated potential delays.

We may not receive the requisite acceptances of constituencies in the Chapter 11 Cases to confirm our plan of reorganization. Even if the requisite acceptances of our plan of reorganization are received, the Bankruptcy Court may not confirm such a plan. The precise requirements and evidentiary showing for confirming a plan, notwithstanding its rejection by one or more impaired classes of claims or equity interests, depends upon a number of factors, including, without limitation, the status and seniority of the claims or equity interests in the rejecting class (i.e., unsecured claims or secured claims, subordinated or senior claims). If a Chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether we would be able to reorganize our business and what, if anything, holders of claims against us would ultimately receive with respect to their claims.

### *Even if a Chapter 11 plan of reorganization is consummated, we will continue to face risks.*

Even if a Chapter 11 plan of reorganization is consummated, we will continue to face a number of risks, including certain risks that are beyond our control, such as further deterioration or other changes in economic conditions, changes in our industry and potential revaluing of our assets due to the Chapter 11 Cases. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that any plan of reorganization will achieve our stated goals.

Furthermore, we cannot predict the ultimate amount of all the Debtors' liabilities that will be subject to a plan of reorganization. Even if our debts are reduced or discharged through a plan of reorganization, we may need to raise additional funds through public or private debt or equity financing or other various means to fund our business after the completion of the Chapter 11 process. Adequate funds may not be available when needed or may not be available on favorable terms. Even once a plan of reorganization is implemented, our operating results may be adversely affected by the possible reluctance of customers to do business with a company that recently emerged from bankruptcy proceedings.

### *Operating under Bankruptcy Court protection for a long period of time may harm our business.*

Our future results are dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on our business, financial condition, results of operations and liquidity.

### *If the Chapter 11 Cases continue for a longer period than anticipated, customers and suppliers may lose confidence in our*

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

*ability to reorganize our business successfully and will seek to establish alternative commercial relationships.*

Furthermore, so long as the Chapter 11 Cases continue, we will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If we require additional debtor-in-possession financing and

18

are unable to obtain it on favorable terms or at all, our chances of successfully reorganizing our business may be seriously jeopardized, the likelihood that we instead will be required to liquidate our assets may be enhanced, and, as a result, any securities in us could become further devalued or become worthless. Furthermore, we cannot predict the ultimate amount of all liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, our operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from Chapter 11 proceedings.

***Third parties may propose competing Chapter 11 plans of reorganization and we may receive unsolicited offers for the Company or our assets.***

Chapter 11 gives us the exclusive right to file a plan of reorganization during the first 120 days after filing. That period can be extended for cause up to a total of 18 months from the Petition Date with approval of the Bankruptcy Court. While we intend to conclude our Chapter 11 Cases during this "exclusivity period," as it may be extended, there can be no assurance that we will be able to do so. There is also no assurance that a plan of reorganization we propose will be approved by the requisite creditors and the Bankruptcy Court. After the expiration of the exclusivity period, third parties can file one or more Chapter 11 plans of reorganization for the Debtors. An alternative plan of reorganization could contemplate the Company continuing as a going concern, the Company being broken up, the Company or its assets being acquired by a third party, the Company being merged with a competitor or some other proposal. We may not believe that such an alternative plan of reorganization is in our stakeholders' best interests or fully values the benefits to be achieved by our reorganization. If we cannot successfully obtain approval of our plan of reorganization during the exclusivity period, we may have limited ability to prevent an alternative plan of reorganization from being approved by the Bankruptcy Court.

Companies in Chapter 11 are often the target of unsolicited merger and acquisition offers, and there is no guarantee that we will emerge from Chapter 11 as a standalone company. An unsolicited proposal or alternative plan of reorganization could potentially delay our emergence from Chapter 11 and expose us to a number of other risks, including potential limitations on our ability to execute our business plan and strategic initiatives; difficulties in hiring, retaining and motivating key personnel; negative reactions among our employees, vendors, strategic partners and service providers; a failure to provide stakeholders full value for the benefits that could be achieved by the Company post-emergence on a stand-alone basis; and unease and uncertainty among our customer base. In addition, any potential transaction proposed during Chapter 11, even if we decided such transaction was in our best interest, would be expressly subject to Bankruptcy Code requirements and Bankruptcy Court approval.

***The Chapter 11 Cases may limit our ability to offset future U.S. taxable income with tax losses and credits incurred prior to emergence from the Chapter 11 Cases.***

In connection with our emergence from the Chapter 11 Cases, we may be able to retain a portion of our U.S. net operating loss ("NOL"), capital loss and tax credit carryforwards (collectively, the "Tax Attributes"). However, Internal Revenue Code ("IRC") Sections 382 and 383 provide an annual limitation with respect to the ability of a corporation to utilize its Tax Attributes, as well as certain built-in-losses, against future U.S. taxable income in the event of a change in ownership. Our emergence from the Chapter 11 Cases may result in a change in ownership for purposes of IRC Section 382. Additionally, any Chapter 11 plan we may implement extinguishing pre-petition accounts payable, accrued expenses, operating and finance leases, notes payable, and other obligations, absent an exception, may result in cancellation of indebtedness income ("CODI") upon discharge of outstanding indebtedness for an amount of consideration that is less than its adjusted issue price. The IRC provides that a debtor in a bankruptcy case may exclude CODI from income but must reduce certain of its tax attributes by the amount of any CODI realized as a result of the consummation of a Chapter 11 plan. Many states adopt the federal Section 382 rules and therefore have similar limitations with respect to state tax attributes. These events under the IRC are based on the value of the corporation as of the emergence date and the ultimate structure associated with a plan of emergence. As a result, our future U.S. taxable income may not be fully offset by the Tax Attributes if such income exceeds our annual limitation, and we may incur a tax liability with respect to such income. In addition, subsequent changes in ownership for purposes of the IRC could further diminish our Tax Attributes.

***In certain specific instances, including, if we are not able to obtain confirmation of a Chapter 11 plan of reorganization, if current financing is insufficient, or if exit financing is not available, a Chapter 11 case may be converted to a case under Chapter 7 of the Bankruptcy Code, and may result in significant smaller distributions to our creditors than under a Chapter 11 plan of reorganization.***

In order to successfully emerge from Chapter 11 bankruptcy protection, we must develop and obtain confirmation of a Chapter

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

11 plan of reorganization by the Bankruptcy Court. There can be no assurance that we will be able to confirm a plan of reorganization that will permit us to emerge from bankruptcy and continue operations. There can be no assurance that our access to liquidity,

19

including funds available from our DIP financing and amounts of cash from future operations, will be sufficient to fund ongoing operations.

If the Bankruptcy Court finds, after much consideration, that it would be in the best interest of creditors and/or us, the Bankruptcy Court could convert our Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. In such event, a Chapter 7 trustee would be appointed or elected to liquidate our assets for distribution in accordance with the priorities established by the Bankruptcy Code. We believe that liquidation under Chapter 7 would result in significantly smaller distributions being made to our creditors than those provided for in a Chapter 11 plan of reorganization because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner our business as a going concern, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee, and (iii) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of operations.

***We may be subject to claims that will not be discharged in the Chapter 11 Cases, which could have a material adverse effect on our financial condition and results of operations.***

The Bankruptcy Code provides that the confirmation of a Chapter 11 plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arose prior to the Petition Date, or before confirmation of the Chapter 11 plan of reorganization (i) would be subject to compromise and/or treatment under the Chapter 11 plan of reorganization and/or (ii) would be discharged in accordance with the terms of the Chapter 11 plan of reorganization. Any claims not ultimately discharged through the Chapter 11 plan of reorganization could be asserted against the reorganized entities and may have an adverse effect on our financial condition and results of operations on a post-reorganization basis.

***Our cash flows may not provide sufficient liquidity during the Chapter 11 Cases. Our long-term liquidity requirements and the adequacy of our capital resources are difficult to predict at this time.***

Our ability to fund our operations and our capital expenditures require a significant amount of cash. Our principal sources of liquidity historically have been cash flow from operations, borrowing capacity under the senior secured revolving credit facility and issuances of other debt. If our cash flow from operations decreases, we may not have the ability to expend the capital necessary to improve or maintain our current operations, resulting in decreased revenues over time.

We face uncertainty regarding the adequacy of our liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash requirements necessary to fund ongoing operations, we have incurred significant professional fees and other costs in connection with preparation for the Chapter 11 proceedings and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 proceedings. In addition, we must comply with the covenants of our DIP financing in order to continue to access our borrowings thereunder. We cannot assure you that we will be able to comply with the covenants of our DIP financing or that cash on hand and cash flow from operations will be sufficient to continue to fund our operations and allow us to satisfy our obligations related to the Chapter 11 Cases until we are able to emerge from our Chapter 11 Cases.

Our liquidity, including our ability to meet our ongoing operational obligations, is dependent upon, among other things: (i) our ability to comply with the terms and conditions of our DIP financing agreements, (ii) our ability to comply with the terms and conditions of any cash collateral order that may be entered by the Bankruptcy Court in connection with the Chapter 11 Cases, (iii) our ability to maintain adequate cash on hand, (iv) our ability to generate cash flow from operations, (v) our ability to develop, confirm and consummate a Chapter 11 plan or other alternative restructuring transaction and (vi) the cost, duration and outcome of the Chapter 11 Cases.

***If we have substantial indebtedness upon emergence from Chapter 11, it may adversely affect our financial health and operating flexibility.***

Upon emergence from Chapter 11, we may have substantial indebtedness that could have important consequences to us, including:

- limiting our ability to borrow additional amounts for working capital, capital expenditures, debt service requirements,

Debtors' Exhibit No. 40
Page 83 of 462

core-20221231 https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

execution of our business strategy or other purposes;

- limiting our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to service debt;

20

4/8/2023, 10:22 PM

- increasing our vulnerability to general adverse economic and industry conditions, including increases in interest rates, particularly given our substantial indebtedness which bears interest at variable rates;

- limiting our ability to capitalize on business opportunities and to react to competitive pressures; and

- limiting our ability or increasing the costs to refinance indebtedness.

***Trading in our securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. It is possible our common stock will be canceled and that holders of such common stock will not receive any distribution with respect to, or be able to recover any portion of, their investments.***

It is too early to determine if our Chapter 11 plan of reorganization will allow for distributions with respect to our common stock. It is possible that our common stock will be canceled and extinguished upon the approval of the Bankruptcy Court and the holders thereof would not be entitled to receive, and would not receive or retain, any property or interest in property on account of such equity interests. In the event of a cancellation of our common stock, amounts invested by such holders in our outstanding common stock will not be recoverable. Consequently, our currently outstanding common stock would have no value. Alternatively, our Chapter 11 plan of reorganization could provide for additional equity issuances, which would have the effect of diluting our existing common stockholders, or otherwise provide that our existing equity holders receive only a small fraction of the equity in the post-reorganization business. Trading prices for our securities are very volatile and may bear little or no relationship to the actual recovery, if any, by the holders of such securities in the Chapter 11 Cases. Accordingly, we urge that extreme caution be exercised with respect to existing and future investments in our equity securities and any of our other securities.

### Risks Related to our Business and Industry

***Digital assets are subject to extreme price volatility. The value of digital assets is dependent on a number of factors, any of which could have a material adverse effect on our business, financial condition and results of operations.***

We currently generate almost all of our revenue from the sale of bitcoin that we mine in our facilities. Investing in bitcoin and other digital assets is speculative. Bitcoin and other digital assets have historically experienced significant intraday and long-term price volatility, significantly impacted by momentum pricing. Momentum pricing typically is associated with growth stocks and other assets whose valuation, as determined by the investing public, accounts for anticipated future appreciation in value. We believe that momentum pricing may have resulted, and may continue to result, in significant and rampant speculation regarding future appreciation (or depreciation) in the value of digital assets, inflating and making their market prices more volatile. In addition, there is currently growing but limited acceptance of digital assets in the retail and commercial marketplace, as compared to the demand generated by investors seeking a long-term value retention or by speculators seeking to profit from the short- or long-term holding of such digital assets, which may contribute to their extreme levels of price volatility.

We believe the value of digital assets related to our business is dependent on a number of factors, including, but not limited to:

- global digital asset supply;

- global digital asset demand, which can be influenced by the growth of retail merchants' and commercial businesses' acceptance of digital assets as payment for goods and services, the security of online digital asset exchanges and digital wallets that hold digital assets, the perception that the use and holding of digital assets is safe and secure, and the regulatory restrictions on their use;

- investors' expectations with respect to the rate of inflation of fiat currencies;

- investors' expectations with respect to the rate of deflation of digital assets;

- cyber theft of digital assets from online wallet providers, or news of such theft from such providers or from individuals' online wallets;

- the availability and popularity of businesses that provide digital asset-related services;

- fees associated with processing a digital asset transaction;

- changes in the software, software requirements or hardware requirements underlying digital assets;

- changes in the rights, obligations, incentives, or rewards for the various participants in digital asset mining;

Debtors' Exhibit No. 40
Page 85 of 462

- interest rates;

- currency exchange rates, including the rates at which digital assets may be exchanged for fiat currencies;

21

- fiat currency withdrawal and deposit policies on digital asset exchanges and liquidity on such exchanges;

- interruptions in service or failures of major digital asset exchanges;

- investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in digital assets;

- momentum pricing;

- monetary policies of governments, trade restrictions, currency devaluations and revaluations;

- regulatory measures, if any, that affect the use of digital assets, restrict digital assets as a form of payment, or limit the purchase of digital assets;

- global or regional political, economic or financial events and conditions;

- expectations that the value of digital assets will change in the near or long term. A decrease in the price of a single digital asset may cause volatility in the entire digital asset industry and may affect other digital assets. For example, a security breach that affects investor or user confidence in bitcoin, Ethereum, litecoin or another digital asset may affect the industry as a whole and may also cause the price of other digital assets to fluctuate; or

- with respect to bitcoin, increased competition from other forms of digital assets or payments services.

Even if shareholders are able to hold their common stock for the long-term, their common stock may never generate a profit, since digital asset markets have historically experienced extended periods of flat or declining prices, in addition to sharp fluctuations. Investors should be aware that there is no assurance that bitcoin or other digital assets will maintain their long-term value in terms of future purchasing power or that the acceptance of digital asset payments by mainstream retail merchants and commercial businesses will continue to grow. If the price of bitcoin or other digital assets declines, our profitability will decline.

### *Our business is highly dependent on a small number of digital asset mining equipment suppliers.*

Our business is highly dependent upon digital asset mining equipment suppliers such as Bitmain providing an adequate supply of new generation digital asset mining machines at economical prices to customers intending to purchase our hosting and other solutions. The growth in our business is directly related to increased demand for hosting services and digital assets such as bitcoin which is dependent in large part on the availability of new generation mining machines offered for sale at a price conducive to profitable digital asset mining, as well as the trading price of digital assets such as bitcoin. The market price and availability of new mining machines fluctuates with the price of bitcoin and can be volatile. Higher bitcoin prices increase the demand for mining equipment and increases the cost. In addition, as more companies seek to enter the mining industry, the demand for machines may outpace supply and create mining machine equipment shortages. There are no assurances that digital asset mining equipment suppliers, such as Bitmain, will be able to keep pace with any surge in demand for mining equipment. Further, manufacturing mining machine purchase contracts are not favorable to purchasers and we may have little or no recourse in the event a mining machine manufacturer defaults on its mining machine delivery commitments. If we and our customers are not able to obtain a sufficient number of digital asset mining machines at favorable prices, our growth expectations, liquidity, financial condition and results of operations will be negatively impacted.

### *Our business is capital intensive, and failure to obtain the necessary capital when needed will force us to delay, limit or terminate our expansion efforts or other operations, which would have a material adverse effect on our business, financial condition and results of operations.*

The costs of constructing, developing, operating and maintaining digital asset mining and facilities, and owning and operating a large fleet of the latest generation mining equipment are substantial.

Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining digital assets are lower than the price of the digital assets we mine when we sell them. Falling digital asset prices, significantly higher energy prices, inflation and supply chain disruptions have increased electricity costs, delayed miner deployments and reduced our profitability. Our miners experience ordinary wear and tear from operation and may also face more significant malfunctions caused by factors which may be beyond our control. Additionally, as the technology evolves, we may acquire newer models of miners to remain competitive in the market. Over time, we replace those miners which are no longer

Debtors' Exhibit No. 40
Page 87 of 462

core-20221231                                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

functional with new miners purchased from third-party manufacturers, who are primarily based in China.

22

As miners become obsolete or degrade due to ordinary wear and tear from usage, or are lost or damaged due to factors outside of our control, these miners will need to be repaired or replaced along with other equipment from time to time for us to stay competitive. This upgrading process requires substantial capital investment, and we may face challenges in doing so on a timely and cost-effective basis based on availability of new miners and our access to adequate capital resources. If we are unable to obtain adequate numbers of new and replacement miners at scale, we may be unable to remain competitive in our highly competitive and evolving industry.

Moreover, in order to grow our hosting business, we need additional facilities to increase our capacity for more miners. The costs of constructing, developing, operating and maintaining hosting facilities and growing our hosting operations have increased significantly and may continue to increase in the future, which have made it difficult for us to attract new customers, expand our business and to operate our facilities profitably.

We will need to raise additional funds through equity or debt financings in order to meet our operating and capital needs. Current market conditions have made raising additional debt or equity financing difficult and may not be available when needed or, if available, may not be available on satisfactory terms. An inability to generate sufficient cash from operations or to obtain additional debt or equity financing have adversely affected our results of operations.

***We may need to raise additional capital to grow our business and satisfy our anticipated future liquidity needs, and we may not be able to raise it on terms acceptable to us, or at all.***

Growing and operating our business will require significant cash outlays, liquidity reserves and capital expenditures and commitments to respond to business challenges, including developing or enhancing new or existing products. As of December 31, 2022, we had cash and cash equivalents of approximately $15.9 million. Our cash on hand and cash generated from operations may not be sufficient to meet our cash and liquidity needs, and we may need to seek additional capital, potentially through debt or equity financings. To the extent that we raise additional capital through the sale of additional equity or convertible securities, equity ownership interest may be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect Company security holder rights. Debt financing, if available, would result in increased fixed payment obligations and a portion of our operating cash flows, if any, being dedicated to the payment of principal and interest on such indebtedness. In addition, debt financing may involve agreements that include restrictive covenants that impose operating restrictions, such as restrictions on the incurrence of additional debt, the making of certain capital expenditures or the declaration of dividends. Any additional fundraising efforts may divert our management from their day-to-day activities, which may adversely affect our ability to develop and commercialize our products. Even if we believe we have sufficient funds for our current or future operating plans, we may seek additional capital if market conditions are favorable or in light of specific strategic considerations. If we are unable to obtain funding on a timely basis, we may be unable to expand our operations or otherwise capitalize on our business opportunities, as desired, which could materially affect our business, operating results and prospects and cause the price of the common stock to decline. Additionally, there is a possibility that we may not be able to access a portion of our existing cash, cash equivalents and investments due to market conditions. For example, on March 10, 2023, the Federal Deposit Insurance Corporation, or the FDIC, took control and was appointed receiver of Silicon Valley Bank, or SVB. As of March 13, 2023, not including any FDIC-insured amounts, we have no exposure to SVB. If other banks and financial institutions enter receivership or become insolvent in the future in response to financial conditions affecting the banking system and financial markets, our ability to access our existing cash, cash equivalents and investments may be threatened and could have a material adverse effect on our business and financial condition.

***If future prices of bitcoin are not sufficiently high, our business, results of operations and financial condition could be materially and adversely affected, which may have a negative impact on the trading price of our securities.***

Our financial condition and results of operations is reliant on our ability to sell the bitcoin we mine at a price greater than our costs to produce that bitcoin. Low bitcoin prices and our need to sell bitcoin we have mined to increase our cash balances have impacted our balance sheet. As our cost to produce a single bitcoin increases, if future prices of bitcoin are not sufficiently high, we may not realize the benefit of the capital expenditures we have incurred to acquire miners and develop new data centers. Low bitcoin prices have negatively impacted our business, results of operations and financial condition, which has had a negative impact on the trading price of our securities, which may have a materially adverse impact on investors' investment in our Company.

***Miner manufacturers may continue requiring significant advance deposits before orders are fulfilled and delivered.***

23

core-20221231

4/8/2023, 10:22 PM

In the past, miner manufacturers have required advance deposits for miner purchases. If this continues in the future, the Company may need to tie up significant amounts of cash several months before it receives and is able to deploy purchased miners to generate revenue. These advance deposits further drive the financial burden of operating a capital-intensive business. Miner manufacturers holding a deposit from the Company may go out of business before delivering purchased miners, or for other reasons fail to deliver the miners associated with the deposit. There is no certainty that, in such circumstances, the Company would succeed in recovering any of its deposit, which could materially and adversely affect its business, financial condition, and results of operations.

***Our success depends in large part on our ability to mine digital assets profitably and to attract customers for our hosting capabilities. Increases in power costs have impacted our inability to mine digital assets efficiently and reduced bitcoin pricing have reduced our operating margins. Continued increases in power costs and unfavorable prices for digital assets will impact our ability to attract customers for our services, harm our growth prospects and could have a continuing material adverse effect on our business, financial condition and results of operations.***

Our growth depends in large part on our ability to successfully mine digital assets and to attract customers for our hosting capabilities. We may not be able to attract customers to our hosting capabilities or successfully mine digital assets for a number of reasons, including if:

- there is a reduction in the demand for our services or digital assets due to macroeconomic factors in the markets in which we operate, including high energy costs, supply chain disruptions and reduced demand for digital assets at favorable prices;

- we fail to provide competitive colocation terms or effectively market them to potential customers;

- we provide hosting services that are deemed by existing and potential customers or suppliers to be inferior to those of our competitors, or that fail to meet customers' or suppliers' ongoing and evolving program qualification standards, based on a range of factors, including available power, preferred design features, security considerations and connectivity;

- businesses decide to host internally as an alternative to the use of our services;

- we fail to successfully communicate the benefits of our services to potential customers;

- we are unable to strengthen awareness of our brand;

- we are unable to provide services that our existing and potential customers desire; or

- our customers are unable to secure an adequate supply of new generation digital asset mining equipment to host with us.

If we are unable to obtain hosting customers at favorable pricing terms or at all, it could have a material adverse effect on our business, financial condition and results of operations.

***A slowdown in the demand for blockchain technology or blockchain hosting resources and other market and economic conditions could have a material adverse effect on our business, financial condition and results of operations.***

Adverse developments in the blockchain industry, and in the blockchain hosting market could lead to a decrease in the demand for hosting resources, which could have a material adverse effect on our business, financial condition and results of operations. We face risks including those related to:

- the price of bitcoin;

- a decline in the adoption and use of bitcoin and other similar digital assets within the technology industry or a decline in value of digital assets;

- increased costs of digital asset mining or complying with existing or new government regulations applicable to digital assets and other factors;

- a downturn in the market for blockchain hosting space generally, which could be caused by an oversupply of or reduced demand for blockchain space or unfavorable market price for digital assets;

- any transition by our customers of blockchain hosting from third-party providers like us to customer-owned and

Debtors' Exhibit No. 40
Page 91 of 462

core-20221231

operated facilities;

24

---

Debtors' Exhibit No. 40

- the rapid development of new technologies or the adoption of new industry standards that render our or our customers' current products and services obsolete or unmarketable and, in the case of our customers, that contribute to a downturn in their businesses, increasing the likelihood of a default under their service agreements or their becoming insolvent;

- a slowdown in the growth of the internet generally as a medium for commerce and communication;

- availability of an adequate supply of new generation digital asset mining equipment to enable us to mine digital assets at scale and for customers who want to host with us to be able to do so; and

- the degree of difficulty in mining digital assets and the cost of mining or trading price of such assets.

To the extent that any of these or other adverse conditions exist, they are likely to have an adverse impact on our mining rewards and market demand and pricing for our services, which could have a material adverse effect on our business, financial condition and results of operations.

Additionally, we and our customers are affected by general business and economic conditions in the United States and globally. These conditions include short-term and long-term interest rates, inflation, money supply, political issues, legislative and regulatory changes, including the imposition of new tariffs affecting our or our customers' products and services, fluctuations in both debt and equity capital markets and broad trends in industry and finance, all of which are beyond our control. Macroeconomic conditions that affect the economy and the economic outlook of the United States and the rest of the world could adversely affect our customers and vendors, which could have a material adverse effect on our business, financial condition and results of operations.

***Continuing coronavirus outbreaks may have a material adverse impact on our business, liquidity, financial condition and results of operations.***

COVID-19 was first reported in December 2019 in the City of Wuhan, Hubei, China and was recognized as a pandemic by the World Health Organization on March 11, 2020. In response to the pandemic, governmental authorities around the World, including the United States, Canada, China and elsewhere, introduced various measures to limit the spread of the pandemic, including travel restrictions, border closures, business closures, quarantines, self- and forced isolations, shelter-in-place orders and social distancing. COVID-19 reduced the number of new generation machines available for purchase by prospective customers of our blockchain hosting services, reduced demand for our services and delayed and continues to frustrate and delay global supply chains that has impacted and will continue to impact the pace at which new mining machines are added to our facilities. The continued impact or a resurgence of COVID-19, including the emergence of variant strains of COVID-19, could have a material impact on our business, liquidity, financial condition and results of operations and any such impact will be determined by the severity and duration of the continuing pandemic.

***Changes in tariffs or import restrictions could have a material adverse effect on our business, financial condition and results of operations.***

Equipment necessary for digital asset mining is almost entirely manufactured outside of the United States. There is currently significant uncertainty about the future relationship between the United States and various other countries, including China, the European Union, Canada, and Mexico, with respect to trade policies, treaties, tariffs and customs duties, and taxes. For example, since 2019, the U.S. government has implemented significant changes to U.S. trade policy with respect to China. These tariffs have subjected certain digital asset mining equipment manufactured overseas to additional import duties of up to 25%. The amount of the additional tariffs and the number of products subject to them has changed numerous times based on action by the U.S. government. These tariffs have increased costs of digital asset mining equipment, and new or additional tariffs or other restrictions on the import of equipment necessary for digital asset mining could have a material adverse effect on our business, financial condition and results of operations.

***Our historical financial results may not be indicative of our future performance.***

For the year December 31, 2022, we generated limited revenue and incurred substantial losses and may continue to incur losses for the foreseeable future. We had a net loss of $2.15 billion for the year ended December 31, 2022. As of December 31, 2022, our accumulated deficit was $2.17 billion. Our historical results are not indicative of our future performance. If we are not able to successfully develop our business, it will have a material adverse effect on our business, financial condition and results of operations.

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 93 of 462

core-20221231 https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

core-20221231                                                          https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

***We may be required to record goodwill or other long-lived asset impairment charges, which could result in a significant charge to earnings.***

Under GAAP, we review our long-lived assets, such as goodwill, intangible assets and fixed assets, for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. A significant portion of our total assets consists of goodwill and intangible assets. Goodwill is assessed for impairment at least annually. Factors that may be considered in assessing whether goodwill or other long-lived assets may not be recoverable include reduced estimates of future cash flows and slower growth rates in our industry. We may experience unforeseen circumstances that adversely affect the value of our goodwill or other long-lived assets and trigger an evaluation of the recoverability of the recorded goodwill and other long-lived assets. Our results of operations may be materially impacted if we are required to record a significant charge due to an impairment of our goodwill, intangible assets or long-lived assets. See financial statement Note 5 - Property, Plant and Equipment, net and Note 6 - Goodwill in Item 8 for discussions of recently recognized impairments. Separately, we assess our digital assets, which currently predominantly consists of bitcoin, for impairment on a daily basis.

Digital assets are currently considered indefinite-lived intangible assets under GAAP, meaning that any decrease in their fair values below our carrying values for such assets at any time subsequent to their acquisition will require us to recognize impairment charges, whereas we may make no upward revisions for any market price increases until a sale, which may adversely affect our operating results in any period in which such impairment occurs. Moreover, there is no guarantee that future changes in GAAP will not require us to change the way we account for digital assets held by us. Due principally to variability in the price of bitcoin, we have recently recorded related impairment charges, and may continue to do so in future reporting periods. Our results of operations may be materially impacted if we are required to record a significant charge due to an impairment of digital assets.

***Secured Creditors May Seek to Lift the Automatic Stay and Exercise Rights Against the Debtors.***

Subject to certain exceptions under the Bankruptcy Code, the Chapter 11 Cases automatically enjoined, or stayed, the continuation of any judicial or administrative proceedings or other actions against the Debtors or their property to recover on, collect or secure a claim arising prior to the Petition Date. Thus, for example, most creditor actions to obtain possession of property from the Debtors, or to create, perfect or enforce any lien against the property of the Debtors, or to collect on monies owed or otherwise exercise rights or remedies with respect to a claim arising prior to the Petition Date are enjoined unless and until the Bankruptcy Court lifts the automatic stay. Vendors for goods furnished and services provided after the Petition Date are paid in the ordinary course of business.

Secured creditors may petition the Bankruptcy Court to lift the automatic stay and allow such secured creditors to exercise certain rights and remedies against us and our assets. If the automatic stay is lifted, the exercise of such remedies may result in a negative impact on our revenues, liquidity, and operating performance and may also hinder or delay our ability to formulate a new operating business plan or chapter 11 plan.

***Potential Adequate Protection Payments May Harm the Debtors' Liquidity.***

During the Chapter 11 Cases, the Bankruptcy Court can order the payment of cash as adequate protection to secured parties to protect their interests in their collateral. If such relief is sought by one or more secured creditors and granted by the Bankruptcy Court, such adequate protection payments may result in the Debtors utilizing their available liquidity, which may negatively impact our ability to meet our ongoing operational requirements or comply with certain covenants under the Replacement DIP Credit Facility.

***Our revenue comes from the fair value of bitcoin at the time we fulfill our performance obligations to the mining pool(s) and from a small number of hosting customers, and the insolvency of, loss of, or significant decrease in business from, a number of these customers or our failure to continually attract new customers could have a material adverse effect on our business, financial condition and results of operations.***

We generated a significant portion of our hosting revenue from a small number of hosting customers. Since December 2022 we have terminated most of our hosting customers to increase the Company's overall profitability. As of December 31, 2022, our largest hosting customer accounts for 36% of our overall hosting revenue and 9% of our total revenue. Any failure to meet our end-users' expectations, including, but not limited to, any inability to meet their requirements for increased hosting capacity at attractive

core-20221231

rates, could result in cancellation or non-renewal of our business relationships. Our increased focus on self-mining could be interpreted by our current and prospective customers as being competitive or inconsistent with our third-party hosting operations. If these customers reduced spending on our services, or changed their outsourcing strategy by moving to in-house facilities or outsourcing to other service providers, and we are not able to offset that lost revenue or replace the reduced capacity utilization with our own mining equipment, it could have a material adverse effect on our business, financial condition and results of operations. We have made

26

significant investments in our business, such as acquiring additional facilities and equipment, and incurring additional costs in connection with the expansion of our business to meet our anticipated mining needs as well as the anticipated needs of both current and future customers. Accordingly, if we fail to obtain significant additional customers or fail to increase our self-mining operations, it could have a material adverse effect on our business, financial condition and results of operations.

To the extent one or more of our key customers commences bankruptcy proceedings pursuant to Title 11 of the United States Bankruptcy Code, our contracts with such customers may be subject to rejection under applicable provisions of the Code or, if we so agree, may be renegotiated. Further, during any such bankruptcy proceeding, prior to assignment and assumption, rejection or renegotiation of such contracts, the bankruptcy court may temporarily authorize the payment of value for our services less than contractually required, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. The resolution of any outstanding claims against such a customer or counterparty is dependent on the terms of the plan of reorganization and is inherently uncertain.

For example, in July 2022, Celsius Networks, the parent company of Celsius Mining LLC ("Celsius"), filed for voluntary relief under Chapter 11 of the Bankruptcy Code. Celsius is one of our two largest customers. Celsius may take actions in its Chapter 11 proceeding to terminate or renegotiate its agreements with us and/or seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be subject to factors outside of our control. The reduction of our claims for services and damages to which we may be entitled or the reduction in recovery rates for those claims for services and damages could have a material effect on our business, financial condition, results of operations and cash flows.

### *Possibility of less frequent or cessation of monetization of cryptocurrencies.*

A decision by the Company to cease monetization of cryptocurrencies or to monetize cryptocurrencies less frequently can increase the risk of cryptocurrencies held decreasing in value and the risk of loss or theft of cryptocurrencies. This in turn, may increase the level of audit risk for the Company's auditors in the area of auditing the existence and ownership rights of crypto-asset holdings. If the Company's auditors deem the audit risk too high, there is risk that the current auditors would withdraw from the audit which, in turn, would increase the risk of the Company's ability to comply with the requirement for reporting annual audited financial statements as part of its ongoing continuous disclosure requirements as a publicly listed company.

### *Delays in the expansion of existing facilities or the construction of new facilities or significant cost overruns could present significant risks to our business and could have a material adverse effect on our business, financial condition and results of operations.*

The servers used for digital asset transaction processing and colocation hosting require the use of facilities ("facilities") with a highly specialized infrastructure and considerable, reliable power in order to compete effectively. Our strategy is to increase our mining capacity and increase substantially the number of miners we operate. In order to meet our financial plan, we need to expand our existing facilities or build new facilities. We may face challenges in obtaining suitable land to build new facilities or to develop facilities on land we currently own or lease and need to work closely with the local power suppliers and local governments of the places where our proposed facilitates are located. We also may face challenges in generating sufficient cash or obtaining financing necessary to complete or develop planned facilities on time. Delays in actions that require the assistance of such third parties, in receiving required permits and approvals or in mediations with local communities, if any, and lack of available capital, will negatively impact our construction timelines and budget or result in any new facilities not being completed at all.

Our new facilities in Georgia and North Dakota became operational during the fourth quarter of 2021. In February 2022, our facility in Denton, Texas became operational, and we announced the entry of an agreement with the Muskogee City-County Port Authority to develop a new facility in Oklahoma which currently remains undeveloped. Expansion of existing facilities, construction of new facilities, and sales of one or more existing facilities is being evaluated. Expansion and construction require us to procure and rely on the experience of one or more designers, general contractors and subcontractors, and we or such designers or contractors may experience financial or other problems during the design or construction process that could delay completion of planned facilities. We may also experience quality control issues as we implement any upgrades in our hosting capacity through the installation and maintenance of chipsets and servers or new cooling technologies such as immersion and water curtain cooling. Our business will be negatively impacted if we are unable to run our mining operations in a way that is technologically advanced, economically and energy efficient and temperature controlled. If we are unsuccessful, we will damage our miners and the miners of third parties and the profitability of our mining operations.

Debtors' Exhibit No. 40
Page 97 of 462

core-20221231

Delays in the supply of power required to support a facility would cause material and negative effects on our revenue growth, profitability and results of operations. Delay in completing a project, or any substantial cost increase or failure to obtain sufficient capital to complete a project, would materially adversely affect our business, financial condition and results of operations.

27

***We are subject to risks associated with our need for significant electric power and the limited availability of power resources, which could have a material adverse effect on our business, financial condition and results of operations. An inability to purchase and develop additional sources of low-cost renewable sources of energy effectively will have a material adverse effect on our business, financial condition and results of operations.***

Our mining and hosting services require a significant amount of electric power. The costs of electric power account for a significant portion of our cost of revenue. We require a significant electric power supply to conduct our mining activity and to provide many hosting services we offer, such as powering and cooling our and our customers' servers and network equipment and operating critical mining and facility and equipment infrastructure.

The amount of power required by us and our customers will increase commensurate with the demand for our services and the increase in miners we operate for ourselves and our hosting customers. Energy costs and availability are vulnerable to seasonality, with increased costs primarily in the summer months and risks of outages and power grid damage as a result of inclement weather, animal incursion, sabotage and other events out of our control. Higher than expected power rates in 2022 materially impacted our operations.

Although we aim to build and operate energy efficient facilities, there can be no assurance such facilities will be able to deliver sufficient power to meet the growing needs of our business. The cost of power at our facilities is dependent on our ability to perform under the terms in the power contracts we are a party to, which we may be unable to do successfully. Pursuant to these power contracts, if we fail to curtail our power usage when called upon or fail to satisfy certain eligibility requirements for monthly bill credits, our power costs would increase. Any system downtime resulting from curtailments, insufficient power resources or power outages could have a material adverse effect on our business, financial condition and results of operations. Our operations do not run on back-up generators in the event of a power outage or curtailment. Increased power costs and limited availability and curtailment of power resources will reduce our revenue and have a material and adverse effect on our cost of revenue and results of operations.

***We may not be able to obtain transaction processing hardware or purchase such hardware at competitive prices during times of high demand, which could have a material adverse effect on our business, financial condition and results of operations.***

Historically, an increase in interest and demand for digital assets has led to a shortage of transaction processing hardware and increased prices. We and our customers and potential customers have experienced, and may in the future experience, difficulty in obtaining new equipment or replacement components for our and their existing equipment, including graphics processing units and application-specific integrated circuit chipsets and computer servers, which has had, and in the future may have, a material impact on the demand for our services and associated revenue. Furthermore, our Chapter 11 Cases may dissuade suppliers from doing business with us.

***Our business is heavily impacted by social, political, economic and other events and circumstances in the United States and in countries outside of the United States, most particularly Asian and other non-Western countries.***

Our business is heavily impacted by social, political, economic and other events and circumstances in the United States and in countries outside of the United States, most particularly in Asian and other non-Western countries. These events and circumstances are largely outside of our influence and control. We are heavily dependent on the Chinese manufacture of equipment, much of which has historically been for sale within China and other countries outside the United States. We believe that historically China was a location of significant digital asset mining at low electric power rates. Recently, China and other foreign governments have taken action to prohibit or significantly restrict digital asset mining. For example, in May and June 2021, in their efforts to curb digital asset trading and mining, regulators in several Chinese Provinces, including Qinghai, Inner Mongolia and Sichuan, announced policies to curb or ban local digital asset mining operations. The long-term impact of such restrictions is unknown and could be detrimental to our business and profitability. Whether or not the lack of mining activity in China will negatively impact Chinese miner manufacturing and the development, price, availability of new and enhanced mining equipment is unknown. Should China or other countries that currently restrict digital asset mining eliminate such restrictions or actually seek to enhance such mining activity, the likely increase in mining activity would likely reduce our revenue and profitability.

***Global conflict, increasing tensions between the United States and Russia, and other effects of the ongoing conflict in Ukraine, could negatively impact the Company's business, results of operations and financial conditions.***

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Unforeseen global events such as the armed conflict between Russia and Ukraine could adversely affect our business and results of operations. In late February 2022, Russian military forces launched significant military action against Ukraine. Around the same time, the United States, the United Kingdom, the European Union, and several other nations announced a broad array of new or

28

---

Debtors' Exhibit No. 40
Page 100 of 462

expanded sanctions, export controls, and other measures against Russia and others supporting Russia's economy or military efforts. This armed conflict between Russia and Ukraine, including any resulting sanctions, export controls or other restrictive actions that may be imposed by the United States and/or other countries, have created global security concerns that could result in a regional conflict and otherwise have a lasting impact on regional and global economies, any or all of which could adversely affect our business and results of operations. To the extent that this conflict has increased the global cost of energy and disrupted the demand for and price of digital assets, it has and could continue to have an impact on our business. Further sanctions, bans or other economic actions in response to the ongoing conflict in Ukraine or in response to any other global conflict could result in an increase in costs and further disruptions to the Company. White the extent of such items is not presently known, any of them could negatively impact the Company's business, results of operations and financial condition

***Governments and government regulators may potentially restrict the ability of electricity suppliers to provide electricity to transaction processing operations such as ours, which could have a material adverse effect on our business, financial condition and results of operations.***

Governments or government regulators may potentially restrict electricity suppliers from providing electricity to our facilities and transaction processing operators in times of electricity shortage or may otherwise potentially restrict or prohibit the provision of electricity to transaction process operators like us. For example, on May 14, 2018, the Chelan County Public Utility District in Washington approved a three-month extension of a moratorium on the approval of electric service for new digital asset transaction operators in Chelan County. In March 2018, the City of Plattsburgh, New York, placed an 18-month moratorium on transaction processing to preserve natural resources, the health of its residents and the "character and direction" of the city after residents complained about significantly higher electricity bills.

Additionally, the Environmental Conservation Committee of the New York State Assembly has voted to advance legislation that would establish a moratorium on proof-of-work authentication methods for blockchain cryptocurrency mining, for operations such as power plants that generate their own electricity using carbon-based fuels. A companion bill is in the New York State Senate Environmental Conservation Committee. The legislation aims to amend state environmental conservation law to establish the moratorium, as well as requiring a comprehensive generic environmental statement review. If the moratorium legislation becomes law effective immediately, the state would not approve new applications, or permits to operations that utilize a carbon-based fuel to generate "behind the meter" electric energy to mine cryptocurrency using proof-of-work authentication methods to validate blockchain transactions for a period of two years. Additionally, the state would not approve application or permit renewals during that two-year period.

In the event government regulators issue additional moratoriums or impose bans or restrictions involving hosting operations or transaction processing in jurisdictions in which we operate, we will not be able to continue our operations in such jurisdictions. A moratorium, ban or restriction could have a material adverse effect on our business, financial condition and results of operations.

***Power outages in our facilities could have a material adverse effect on our business, financial condition and results of operations.***

Although we control, operate and have access to our servers and all of the other components of our network, we are still vulnerable to disruptions, curtailments and power outages resulting from weather, animal incursions, accidents, equipment failures, curtailments, acts of war, sabotage and other events. We do not have backup power generators for our blockchain operations in the event of a power outage. This could impact our ability to generate and maintain contractually specified power levels to our contractual counterparties, which could have a material adverse effect on our business, financial condition and results of operations.

***If we do not accurately predict our facility requirements, it could have a material adverse effect on our business, financial condition and results of operations.***

The costs of building out, leasing and maintaining our facilities constitute a significant portion of our capital and operating expenses. In order to manage growth and ensure adequate capacity for our digital mining operations and new and existing hosting customers while minimizing unnecessary excess capacity costs, we continuously evaluate our short- and long-term data center capacity requirements. If we overestimate our business' capacity requirements or the demand for our services and therefore secure excess data center capacity, our operating margins could be materially reduced. If we underestimate our data center capacity requirements, we may not be able to service the required or expanding needs of our existing customers and may be required to limit

core-20221231

new customer acquisition, which could have a material adverse effect on our business, financial condition and results of operations.

29

4/8/2023, 10:22 PM

***We plan to continue to acquire other businesses or receive offers to be acquired, which could require significant management attention, disrupt our business or dilute stockholder value.***

As part of our business strategy, we have made and in the future intend to make acquisitions of other companies, products and technologies. We have limited experience in acquisitions. We may not be able to find suitable acquisition candidates and we may not be able to complete acquisitions on favorable terms in the future, if at all.

If we fail to successfully integrate future acquisitions, or the people or technologies associated with those acquisitions, into our company, our results of operations could be adversely affected. Any integration process will require significant time and resources, require significant attention from management and disrupt the ordinary functioning of our business, and we may not be able to manage the process successfully, which could harm our business. Moreover, we may not successfully evaluate or utilize the acquired technology and accurately forecast the financial impact of an acquisition transaction, including accounting charges. Additionally, we may receive indications of interest from other parties interested in acquiring some or all of our business. The time required to evaluate such indications of interest could require significant attention from management, disrupt the ordinary functioning of our business and adversely affect our operating results.

We may have to pay cash, incur debt or issue equity securities to pay for any such acquisition, each of which could affect our financial condition or the value of our capital stock. The sale of equity to finance any such acquisitions could result in dilution to our stockholders. If we incur more debt, it would result in increased fixed obligations and could also subject us to covenants or other restrictions that would impede our ability to flexibly operate our business.

***We may not realize the anticipated benefits of any future acquisitions or partnerships, which could have a material adverse effect on our business, financial condition and results of operations.***

We expect to contemplate and pursue acquisitions to expand and diversify our business. We may also form strategic partnerships with third parties that we believe will complement or augment our existing business. We cannot, however, provide assurance that we will be able to identify any potential acquisition or strategic partnership candidates, consummate any additional acquisitions or enter into any strategic partnerships in the future or that any such future acquisitions or strategic partnerships will be successfully integrated or advantageous to us. Entities we acquire may not achieve the long-term revenue and earnings we anticipated, or their liabilities may exceed our expectations. We could fail to realize synergies that we anticipated from acquisition candidates. The pursuit of potential acquisitions could divert our management's attention and cause us to incur expenses in identifying, investigating and pursuing suitable acquisitions, whether or not they are consummated. We may be unable to profitably manage acquired entities, or we may fail to integrate them successfully without incurring substantial expenses, delays or other problems. We may not achieve the anticipated benefits from future acquisitions or strategic partnerships due to a number of factors, including:

- inability or difficulty integrating and benefiting from acquired technologies or solutions in a profitable manner, including as a result of reductions in operating income, increases in expenses, failure to achieve synergies or otherwise;

- unanticipated costs or liabilities associated with the acquisition or strategic partnership;

- loss of key employees;

- assumption of potential liabilities of the acquired business, including regulatory noncompliance or acquired litigation, and expenses relating to contractual disputes of the acquired business for, infringement of intellectual property rights, data privacy violations or other claims;

- difficulty in acquiring suitable businesses, including challenges in predicting the value an acquisition will ultimately contribute to our business; and

- use of substantial portions of our available cash or assumption of additional indebtedness to consummate an acquisition.

If we fail to successfully integrate other businesses that we may acquire or strategic partnerships that we may enter into, we may not realize any of the benefits we anticipate in connection with any such acquisitions or partnerships, which could have a material adverse effect on our business, financial condition and results of operations.

Debtors' Exhibit No. 40
Page 103 of 462

core-20221231

***If there are significant changes to the method of validating blockchain transactions, such changes could reduce demand for our blockchain hosting services.***

New digital asset transaction protocols are continuously being deployed, and existing and new protocols are in a state of constant change and development. While certain validation protocols currently employ a "proof of work" consensus algorithm, whereby transaction processors are required to expend significant amounts of electrical and computing power to solve complex

4/8/2023, 10:22 PM

mathematical problems in order to validate transactions and create new blocks in a blockchain, there may be a shift towards adopting alternative validating protocols. These protocols may include a "proof of stake" algorithm or an algorithm based on a protocol other than proof of work, which may decrease the reliance on computing power as an advantage to validating blocks. Our transaction processing operations, and, to our knowledge, the operations of our potential hosting customers, are currently designed to primarily support a proof of work consensus algorithm. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate (for example, from lower priced electricity, processing, real estate or hosting) less competitive.

As a result of our efforts to optimize and improve the efficiency of our digital asset mining operations, we may be exposed to the risk in the future of losing the benefit of our capital investments and the competitive advantage we hope to gain from this as a result, and may be negatively impacted if a switch to proof of stake validation were to occur. Any such change to transaction validating protocols could have a material adverse effect on our business, financial condition and results of operations.

***If we fail to accurately estimate the factors upon which we base our contract pricing, we may generate less profit than expected or incur losses on those contracts, which could have a material adverse effect on our business, financial condition and results of operations.***

Our hosting contracts are generally priced on the basis of estimated power consumption by our clients, along with other costs of service, as adjusted for actual costs. Our ability to earn a profit on such contracts requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of generating sufficient hosting and colocation capacity within the contracted time period. In addition, we may not be able to obtain all expected benefits, including tax abatements or government incentives offered in opportunity zones. The inability to accurately estimate the factors upon which we base our contract pricing could have a material adverse effect on our business, financial condition and results of operations.

***Any failure in the critical systems of our facilities or services we provide could lead to disruptions in our and our customers' businesses and could harm our reputation and result in financial penalty and legal liabilities, which would reduce our revenue and have a material adverse effect on our business, financial condition and results of operations.***

The critical systems of the facilities we operate and the services we provide are subject to failure. Any failure in the critical systems of any facility we operate or services that we provide, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, whether or not within our control, could result in service interruptions impacting our operations as well as equipment damage, which could significantly disrupt our business operations and the operations of our customers, harm our reputation and reduce our revenue. Any failure or downtime in one of the facilities that we operate impact mining rewards generated by us and reduce the profitability of our customers.

The total destruction or severe impairment of any of the facilities we operate could result in significant downtime of our operations and services and loss of customer data. Since our ability to generate revenue depends on our ability to provide highly reliable service, even minor interruptions in our operations could harm our reputation and negatively impact our revenue and profitability. Our ability to generate revenue and the services we provide are subject to failures resulting from numerous factors, including:

- power loss, curtailment and disruption;
- equipment failure;
- human error or accidents;
- theft, sabotage and vandalism;
- failure by us or our suppliers to provide adequate service or maintain our equipment;
- network connectivity downtime and fiber cuts;
- service interruptions resulting from server relocation;
- security breaches of our infrastructure;
- improper building maintenance by us;

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

- physical, electronic and cybersecurity breaches;

- animal incursions;

31

- fire, earthquake, hurricane, tornado, flood and other natural disasters;

- extreme temperatures;

- water damage;

- public health emergencies; and

- terrorism.

Moreover, service interruptions and equipment failures may expose us to potential legal liability. As our services are critical to our customers' business operations, any disruption in our services could result in lost profits of or other indirect or consequential damages to our customers. Although our customer contracts typically contain provisions limiting our liability for breach of such agreements, there can be no assurance that a court would enforce any contractual limitations on our liability in the event that one of our customers brings a lawsuit against us as the result of a service interruption that they may ascribe to us. The outcome of any such lawsuit would depend on the specific facts of the case and any legal and policy considerations that we may not be able to mitigate. In such cases, we could be liable for substantial damage awards, which would as a result have a material adverse effect on our business, financial condition and results of operations.

***We generate significant revenue from a limited number of facilities in Georgia, Kentucky, North Carolina, North Dakota and Texas and a significant disruption to operations in any region could have a material adverse effect on our business, financial condition and results of operations.***

A significant portion of our critical business operations are concentrated in Georgia, Kentucky, North Carolina, North Dakota and Texas. A significant disruption to facilities in this region could materially and adversely affect our operations. Additional facilities and development of new facilities, however, will require additional capital investment to reach full "build out." An event beyond our control, including, but not limited to, an act of God (including, but not limited to, fires, explosions, earthquakes, drought, hurricanes, tidal waves, floods and other extreme weather events, including heat, cold, wind and other conditions), war, hostilities (whether war is declared or not), acts of foreign enemies, embargo, rebellion, revolution, insurrection, military or usurped power, civil war, contamination by radioactivity or chemical weapon, riot, strikes, protests, lockouts, disorder, acts or threats of terrorism, pandemics or other catastrophic events that result in the destruction or disruption of any of our critical business or IT systems could severely affect our ability to conduct normal business operations, and, as a result, could have a material adverse effect on our business, financial condition and results of operations.

***Our success is dependent on the ability of our management team and our ability to attract, develop, motivate and retain other well-qualified employees, which may be more difficult, costly or time-consuming than expected.***

Our success depends largely on the development and execution of our business strategy by our senior management team. We cannot assure you that our management will work well together, work well with our other existing employees or successfully execute our business strategy in the near-term or at all, which could have a material adverse effect on our business, financial condition and results of operations.

Our future success also depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled directors and other employees. In particular, it is difficult to locate experienced executives in our industry and offer them competitive salaries at this stage in our development. We may be unable to retain our directors, senior executives and key personnel or attract and retain new directors, senior executives and key personnel in the future, any of which could have a material adverse effect on our business, financial condition and results of operations.

***Competition for employees is intense, and we may not be able to attract and retain the qualified and skilled employees needed to support our business, which in turn could have a material adverse effect on our business, financial condition and results of operation.***

We believe our success depends on the efforts and talent of our employees, including facility design, construction management, operations, data processing, engineering, IT, risk management and sales and marketing personnel. Our future success depends on our continued ability to attract, develop, motivate and retain qualified and skilled employees. Competition for highly skilled personnel is extremely intense. We may not be able to hire and retain these personnel at compensation levels consistent with

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

our existing compensation and salary structure. Some of the companies with which we compete for experienced employees have greater resources than we have and may be able to offer more attractive terms of employment.

32

---

In addition, we invest significant time and expenses in training our employees, which increases their value to competitors who may seek to recruit them. If we fail to retain our employees, we could incur significant expenses in hiring and training their replacements, and the quality of our services and our ability to serve our customers could diminish, resulting in a material adverse effect on our business, financial condition and results of operations.

***We may be vulnerable to security breaches, which could disrupt our operations and have a material adverse effect on our business, financial condition and results of operations.***

A party who is able to compromise the physical security measures protecting our facilities could cause interruptions or malfunctions in our operations and misappropriate our property or the property of our customers. As we provide assurances to our customers that we provide the highest level of security, such a compromise could be particularly harmful to our brand and reputation. We may be required to expend significant capital and resources to protect against such threats or to alleviate problems caused by breaches in security. As techniques used to breach security change frequently and are often not recognized until launched against a target, we may not be able to implement new security measures in a timely manner or, if and when implemented, we may not be certain whether these measures could be circumvented. Any breaches that may occur could expose us to increased risk of lawsuits, regulatory penalties, loss of existing or potential customers, harm to our reputation and increases in our security costs, which could have a material adverse effect on our business, financial condition and results of operations.

In addition, any assertions of alleged security breaches or systems failure made against us, whether true or not, could harm our reputation, cause us to incur substantial legal fees and have a material adverse effect on our business, financial condition and results of operations. Whether or not any such assertion actually develops into litigation, our management may be required to devote significant time and attention to dispute resolution (through litigation, settlement or otherwise), which would detract from our management's ability to focus on our business. Any such resolution could involve the payment of damages or expenses by us, which may be significant. In addition, any such resolution could involve our agreement with terms that restrict the operation of our business. Any such resolution, including the resources exhausted in connection therewith, could have a material adverse effect on our business, financial condition and results of operations.

Furthermore, security breaches, computer malware and computer hacking attacks have been a prevalent concern in the bitcoin exchange market since the launch of the bitcoin network. Any security breach caused by hacking, which involves efforts to gain unauthorized access to information or systems, or to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, and the inadvertent transmission of computer viruses, could harm our business operations or result in loss of our assets.

***We may be exposed to cybersecurity threats and breaches, which could have a material adverse effect on our business, financial condition and results of operations.***

The threats to network and data security are increasingly diverse and sophisticated. Despite our efforts and processes to prevent breaches, our computer servers and computer systems may be vulnerable to cybersecurity risks, including denial-of-service attacks, physical or electronic break-ins, employee theft or misuse and similar disruptions from unauthorized tampering with our computer servers and computer systems. The preventive actions we take to reduce the risk of cyber incidents and protect our information technology and networks may be insufficient to repel a major cyber-attack in the future. To the extent that any disruption or security breach results in a loss or damage to our network, in unauthorized disclosure of confidential information or in a loss of our digital assets, it could cause significant damage to our reputation, lead to claims against us and ultimately have a material adverse effect on our business, financial condition and results of operations. Additionally, we may be required to incur significant costs to protect against damage caused by these disruptions or security breaches in the future.

***We are subject to litigation risks.***

We may be subject to litigation arising out of our operations. Damages claimed under such litigation may be material, and the outcome of such litigation may materially impact our operations, and the value of the common shares. While we will assess the merits of any lawsuits and defend such lawsuits accordingly, we may be required to incur significant expense or devote significant financial resources to such defenses. In addition, the adverse publicity surrounding such claims may have a material adverse effect on our operations.

*Our future success depends on our ability to keep pace with rapid technological changes that could make our current or future technologies less competitive or obsolete.*

Rapid, significant and disruptive technological changes continue to impact our industry. The infrastructure at our facilities may become less marketable due to demand for new processes and technologies, including, without limitation: (i) new processes to deliver power to, or eliminate heat from, computer systems; (ii) customer demand for additional redundancy capacity; (iii) new technology that permits higher levels of critical load and heat removal than our facilities are currently designed to provide; (iv) an inability of the power supply to support new, updated or upgraded technology; and (v) a shift to more power-efficient transaction validation protocols.

In addition, the systems that connect our facilities to the internet and other external networks may become insufficient, including with respect to latency, reliability and diversity of connectivity. We may not be able to adapt to changing technologies, identify and implement new alternatives successfully or meet customer demands for new processes or technologies in a timely and cost-effective manner, if at all, which would have a material adverse effect on our business, financial condition and results of operations.

Even if we succeed in adapting to new processes and technologies, there is no assurance that our use of such new processes or technology would have a positive impact on our financial performance. For example, we could incur substantial additional costs if we needed to materially improve our hosting center infrastructure through the implementation of new systems or new server technologies that require levels of critical load and heat removal that our facilities are not currently designed to provide. In addition, if one of our new offerings were competitive to our prior offerings and represented an adequate or superior alternative, customers could decide to abandon prior offerings that produce higher revenue or better margins for the new offering. Therefore, the adaptation to new processes and technologies could result in lower revenue, lower margins and/or higher costs, which could have a material adverse effect on our business, financial condition and results of operations.

In addition, our competitors or others might develop technologies that are more effective than our current or future technologies, or that render our technologies less competitive or obsolete. Further, many of our competitors may have superior financial and human resources deployed toward research and development efforts. We may not be able to effectively keep pace with relevant technological changes. If competitors introduce superior technologies for hosting operations or transaction processing, and we cannot make upgrades to our hardware or software to remain competitive, it could have a material adverse effect on our business, financial condition and results of operations.

*Our compliance and risk management methods might not be effective and may result in outcomes that could adversely affect our reputation, operating results, and financial condition.*

Our ability to comply with applicable complex and evolving laws, regulations, and rules is largely dependent on the establishment and maintenance of our compliance, audit, and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. While we plan to devote significant resources to develop policies and procedures to identify, monitor and manage our risks, we cannot assure you that our policies and procedures will always be effective against all types of risks, including unidentified or unanticipated risks, or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed in all market environments.

*We may infringe on third-party intellectual property rights or other proprietary rights, which could have a material adverse effect on our business, financial condition and results of operations.*

Our commercial success depends on our ability to operate without infringing third-party intellectual property rights or other proprietary rights. For example, there may be issued patents of which we are not aware that our services or products infringe on. Also, there may be patents we believe we do not infringe on, but that we may ultimately be found to by a court of law or government regulatory agency. Moreover, patent applications are in some cases maintained in secrecy until patents are issued. Because patents can take many years to issue, there may be currently pending applications of which we are unaware that may later result in issued patents that our services or products allegedly infringe on.

If a third party brings any claim against us based on third-party intellectual property rights and/or other proprietary rights, we

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

will be required to spend significant resources to defend and challenge such claim, as well as to invalidate any such rights. Any such claim, if initiated against us, whether or not it is resolved in our favor, could result in significant expense to us, and divert the efforts of our technical and management personnel, which could have a material adverse effect on our business, financial condition and results of operations.

34

---

*The further development and acceptance of cryptographic and algorithmic protocols governing transaction validation and the issuance of, and transactions in, digital assets are subject to a variety of factors that are difficult to evaluate. The slowing or stoppage of development or acceptance of blockchain networks and digital assets would have an adverse material effect on the successful development of the mining operation and value of mined digital assets.*

The use of digital assets to, among other things, buy and sell goods and services, is part of a new and rapidly evolving industry that employs digital assets based upon a computer-generated mathematical and/or cryptographic protocol. The future of this industry is subject to a high degree of uncertainty. The factors affecting the further development of this industry include, but are not limited to:

- continued worldwide growth in the adoption and use of digital assets and blockchain technologies;

- government and quasi-government regulation of digital assets and their use, or restrictions on or regulation of access to and operations of digital asset transaction processing;

- changes in consumer demographics and public tastes and preferences;

- the maintenance and development of the open-source software protocols or similar digital asset systems;

- the availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies;

- general economic conditions and the regulatory environment relating to digital assets; and

- negative consumer perception of digital assets, including digital assets specifically and digital assets generally.

A decline in the popularity or acceptance of digital assets could materially impact us or our potential hosting customers, which could have a material adverse effect on our business, financial condition and results of operations.

*Our ability to use net operating losses to offset future taxable income may be subject to certain limitations.*

As of December 31, 2022, the Company had U.S. federal and state net operating losses ("NOLs") of $344.6 million and $198.5 million, respectively, available to offset future taxable income. Our Federal NOLs can be carried forward indefinitely, but the deductibility of federal NOLs is subject to certain limitations. Our state NOLs begin to expire in 2035. A lack of future taxable income would adversely affect our ability to utilize these NOLs before they expire. As of December 31, 2022, the Company had U.S. federal and state capital loss carryforwards of $220.7 million and $193.4 million, respectively. The capital loss carryforwards begin to expire in 2027.

In addition, under the Code, substantial changes in our ownership may limit the amount of pre-change NOLs that can be utilized annually in the future to offset taxable income. Section 382 of the Code imposes limitations on a company's ability to use its NOLs if one or more stockholders or groups of stockholders that own at least 5% of the company's stock increase their ownership by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. Similar rules may apply under state tax laws. Thus, prior changes in our ownership or future changes in our ownership may limit our ability to use our NOLs. We have not yet determined the cumulative ownership change resulting from the Transactions or any resulting limits on utilization of NOLs or other tax attributes. Similar provisions may subject the capital loss carryforwards to utilization limitation. Subsequent statutory or regulatory changes in respect of the utilization of NOLs for U.S. federal or state purposes, such as suspensions on the use of NOLs or limitations on the deductibility of NOLs carried forward, or other unforeseen reasons, may result in our existing NOLs expiring or otherwise being unavailable to offset future taxable income. For these reasons, we may not be able to utilize a material portion of the NOLs or capital loss carryforwards, even if we have taxable income.

*We may not be able to adequately protect our intellectual property rights and other proprietary rights, which could have a material adverse effect on our business, financial condition and results of operations.*

We may not be able to obtain broad protection in the United States or internationally for all of our existing and future intellectual property and other proprietary rights, and we may not be able to obtain effective protection for our intellectual property and other proprietary rights in every country in which we operate. Protecting our intellectual property rights and other proprietary rights may require significant expenditure of our financial, managerial and operational resources. Moreover, the steps that we may take to protect our intellectual property and other proprietary rights may not be adequate to protect such rights or prevent third parties

Debtors' Exhibit No. 40
Page 113 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

from infringing or misappropriating such rights. Any of our intellectual property rights and other proprietary rights, whether registered, unregistered, issued or unissued, may be challenged by others or invalidated through administrative proceedings and/or litigation.

35

---

Debtors' Exhibit No. 40
Page 114 of 462

We may be required to spend significant resources to secure, maintain, monitor and protect our intellectual property rights and other proprietary rights. Despite our efforts, we may not be able to prevent third parties from infringing upon, misappropriating or otherwise violating our intellectual property rights and other proprietary rights. We may initiate claims, administrative proceedings and/or litigation against others for infringement, misappropriation or violation of our intellectual property rights or other proprietary rights to enforce and/or maintain the validity of such rights. Any such action, if initiated, whether or not it is resolved in our favor, could result in significant expense to us, and divert the efforts of our technical and management personnel, which may have a material adverse effect on our business, financial condition and results of operations.

### Risks Related to our Limited Operating History and Early Stage of Growth

***We operate in a rapidly developing industry and have an evolving business model with a limited history of generating revenue from our services. In addition, our evolving business model increases the complexity of our business, which makes it difficult to evaluate our future business prospects and could have a material adverse effect on our business, financial condition and results of operations.***

Our business model has evolved in the past and continues to do so. We previously were engaged primarily in providing infrastructure hosting services to our commercial counterparties after being founded to engage in the business of verifying and confirming transactions on a blockchain, also known as transaction processing, or "mining." More recently, we decided to substantially increase our focus on digital asset mining for our own account. We have also recently terminated the contracts of several of our hosting customers to improve overall Company profitability and in furtherance of the Company's emphasis on self-mining. We may adjust our business model further from time to time, including trying to offer additional types of products or services, such as a blockchain application designed by us, blockchain services and other related businesses, or entering into strategic partnerships or acquisitions. We have generated limited revenue from such services, and we do not know whether any of them will be successful. The evolution of and modifications to our business strategy will continue to increase the complexity of our business and placed significant strain on our management, personnel, operations, systems, technical performance and financial resources. Future additions to or modifications of our business strategy are likely to have similar effects. Further, any new services that we offer that are not favorably received by the market could damage our reputation or our brand. There can be no assurance that we will ever generate sufficient revenues or achieve profitably in the future or that we will have adequate working capital to meet our obligations as they become due.

We cannot be certain that our current business strategy or any new or revised business strategies will be successful or that we will successfully address the risks we face. In the event that we do not effectively evaluate future business prospects, successfully implement new strategies or adapt to our evolving industry, it will have a material adverse effect on our business, financial condition and results of operations.

***We may not be able to compete effectively against our current and future competitors, which could have a material adverse effect on our business, financial condition and results of operations.***

The digital asset mining industry is highly innovative, rapidly evolving and characterized by healthy competition, experimentation, frequent introductions of new products and services and uncertain and evolving industry and regulatory requirements. We expect competition to further intensify in the future as existing and new competitors introduce new products or enhance existing products. We compete against a number of companies operating both within the United States and abroad, that have greater financial and other resources and that focus on digital asset mining, including businesses focused on developing substantial bitcoin mining operations. If we are unable to compete successfully, or if competing successfully requires us to take costly actions in response to the actions of our competitors, our business, operating results and financial condition could be adversely affected.

We compete with other bitcoin miners and with a range of hosting providers and blockchain providers for some or all of the services we offer. We face competition from numerous developers, owners and operators in the blockchain industry, including technology companies, such as hyperscale cloud players, managed service providers and real estate investment trusts ("REITs"), some of which own or lease properties similar to ours, or may do so in the future, in the same submarkets in which our properties are located. Cloud offerings may also influence our customers to move workloads to cloud providers, which may reduce the services they obtain from us. Our current and future competitors may vary from us in size, service offerings and geographic presence.

Competition is primarily centered on reputation and track record; design, size, quality, available power and geographic coverage of hosting space; quality of installation and customer equipment repair services; relationships with equipment manufacturers

core-20221231                                                           https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

and ability to obtain replacement parts; technical and software expertise; and financial strength and price. Some of our current and future competitors may have greater brand recognition, longer operating histories, stronger marketing, technical and financial resources and access to greater and less expensive power than we do.

36

Debtors' Exhibit No. 40
Page 116 of 462

In addition, many companies in the industry are consolidating, which could further increase the market power of our competitors. As a result, some of our competitors may be able to:

- identify and acquire desirable properties that we are interested in from developers;

- offer hosting services at prices below current market rates or below the prices we currently charge our customers;

- bundle colocation services with other services or equipment they provide at reduced prices;

- develop superior products or services, gain greater market acceptance and expand their service offerings more efficiently or rapidly;

- adapt to new or emerging technologies and changes in customer requirements more quickly;

- take advantage of acquisition and other opportunities more readily; and

- adopt more aggressive pricing policies and devote greater resources to the promotion, marketing and sales of their services.

We operate in a competitive market, and we face pricing pressure with respect to our hosting services. Prices for our hosting services are affected by a variety of factors, including supply and demand conditions and pricing pressures from our competitors. We may be required to lower our prices to remain competitive, which may decrease our margins and could have a material adverse effect on our business, financial condition and results of operations.

In addition, we also face significant competition from other users and/or companies that are processing transactions on one or more digital asset networks, as well as other potential financial vehicles, including securities, derivatives or futures backed by, or linked to, digital assets through entities similar to us, such as exchange-traded funds. Market and financial conditions, and other conditions beyond our control, may make it more attractive to invest in other financial vehicles, or to invest in digital assets directly. Such events could have a material adverse effect on our business, financial condition and results of operations and potentially the value of any digital assets we hold or expect to acquire for our own account.

***Our projections are subject to significant risks, assumptions, estimates and uncertainties, including assumptions regarding the demand for and cost of our hosting services and the adoption of bitcoin and other digital assets. As a result, our projected revenues, market share, expenses and profitability may differ materially from our expectations in any given quarter or fiscal year.***

We operate in a rapidly changing and competitive industry and our projections are subject to the risks and assumptions made by management with respect to our industry. Operating results are difficult to forecast as they generally depend on our assessment of the timing of adoption and use of bitcoin and other digital assets, which is uncertain. Furthermore, as we invest in the development of our hosting and self-mining business, whether because of competition or otherwise, we may not recover the often substantial up-front costs of constructing, developing and maintaining our facilities and purchasing the latest generation of miners or recover the opportunity cost of diverting management and financial resources away from other opportunities. Additionally, our business may be affected by reductions in miner demand for facilities and services and the price of bitcoin and other digital assets as a result of a number of factors which may be difficult to predict. Similarly, our assumptions and expectations with respect to margins and the pricing of our hosting services and market price of bitcoin or other digital assets we mine may not prove to be accurate. This may result in decreased revenue, and we may be unable to adopt measures in a timely manner to compensate for any unexpected shortfall in revenue. This inability could cause our operating results in a given quarter or year to be higher or lower than expected. If actual results differ from our estimates, analysts or investors may negatively react and our stock price could be materially impacted.

***We have experienced difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions to provide us with customary financial products and services, which could have a material adverse effect on our business, financial condition and results of operations.***

As an early stage company with operations focused in the digital asset transaction processing industry, we have in the past experienced, and may in the future experience, difficulties in establishing relationships with banks, leasing companies, insurance companies and other financial institutions to provide us with customary leasing and financial products and services, such as bank accounts, lines of credit, insurance and other related services, which are necessary for our operations. To the extent a significant portion of our business consists of digital asset transaction mining, processing or hosting, we may in the future continue to experience

Debtors' Exhibit No. 40
Page 117 of 462

core-20221231                                                                https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

difficulty obtaining additional financial products and services on customary terms, which could have a material adverse effect on our business, financial condition and results of operations.

37

---

4/8/2023, 10:22 PM

The usefulness of digital assets as a payment system and the public perception of digital assets could be damaged if banks or financial institutions were to close the accounts of businesses engaging in bitcoin and/or other digital asset-related activities. This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk applies to securities firms, clearance and settlement firms, national stock and derivatives on commodities exchanges, the over-the-counter market, and securities depositories, which, if any of such entities adopts or implements similar policies, rules or regulations, could negatively affect the Company's relationships with financial institutions and impede the Company's ability to convert digital assets to fiat currencies. Such factors could have a material adverse effect on the Company's business, prospects or operations and harm investors.

**Risks Related to Regulatory Framework**

***If we were deemed an "investment company" under the Investment Company Act of 1940, as amended (the "1940 Act"), applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.***

An issuer will generally be deemed to be an "investment company" for purposes of the 1940 Act if:

- it is an "orthodox" investment company because it is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities; or

- it is an inadvertent investment company because, absent an applicable exemption, it owns or proposes to acquire "investment securities" having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis.

We believe that we are not and will not be primarily engaged in the business of investing, reinvesting or trading in securities, and we do not hold ourselves out as being engaged in those activities. We intend to hold ourselves out as a digital asset mining business. Accordingly, we do not believe that we are an "orthodox" investment company as described in the first bullet point above.

While certain digital assets may be deemed to be securities, we do not believe that certain other digital assets, in particular bitcoin, are securities; therefore, we believe that less than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis will comprise digital assets that could be considered investment securities. Accordingly, we do not believe that we are an inadvertent investment company by virtue of the 40% inadvertent investment company test as described in the second bullet point above. Although we do not believe any of the digital assets we may own, acquire or mine are securities, there is still some regulatory uncertainty on the subject, see "—*There is no one unifying principle governing the regulatory status of digital assets nor whether digital assets are securities in any particular context. Regulatory changes or actions in one or more countries may alter the nature of an investment in us or restrict the use of digital assets in a manner that adversely affects our business, prospects or operations*." If certain digital assets, including bitcoin, were to be deemed securities, and consequently, investment securities by the SEC, we could be deemed an inadvertent investment company. Similarly, if we were to acquire digital assets deemed investment securities to hold for our own account or to engage in certain transactions, such as loan or repurchase transactions, we could be deemed an inadvertent investment company.

If we were to be deemed an inadvertent investment company, we may seek to rely on Rule 3a-2 under the 1940 Act, which allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which the issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis or (b) the date on which the issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We are putting in place policies that we expect will work to keep the investment securities held by us at less than 40% of our total assets, which may include acquiring assets with our cash, liquidating our investment securities or seeking no-action relief or exemptive relief from the SEC if we are unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner. As Rule 3a-2 is available to an issuer no more than once every three years, and assuming no other exclusion were available to us, we would have to keep within the 40% limit for at least three years after we cease being an inadvertent investment company. This may limit our ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on our earnings. In any event, we do not intend to become an investment company engaged in the business of investing and trading securities.

Finally, we believe we are not an investment company under Section 3(b)(1) of the 1940 Act because we are primarily engaged in a non-investment company business.

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

The 1940 Act and the rules thereunder contain detailed parameters for the organization and operations of investment companies. Among other things, the 1940 Act and the rules thereunder limit or prohibit transactions with affiliates, impose limitations

38

on the issuance of debt and equity securities, prohibit the issuance of stock options, and impose certain governance requirements. We intend to continue to conduct our operations so that we will not be deemed to be an investment company under the 1940 Act. However, if anything were to happen that would cause us to be deemed to be an investment company under the 1940 Act, requirements imposed by the 1940 Act, including limitations on our capital structure, ability to transact business with affiliates and ability to compensate key employees, could make it impractical for us to continue our business as currently conducted, impair the agreements and arrangements between and among us and our senior management team and materially and adversely affect our business, financial condition and results of operations.

*Any change in the interpretive positions of the SEC or its staff with respect to digital asset mining firms could have a material adverse effect on us.*

We intend to conduct our operations so that we are not required to register as an investment company under the 1940 Act. Specifically, we do not believe that digital assets, are securities. The SEC Staff has not provided guidance with respect to the treatment of these assets under the 1940 Act. To the extent the SEC Staff publishes new guidance with respect to these matters, we may be required to adjust our strategy or assets accordingly. There can be no assurance that we will be able to maintain our exclusion from registration as an investment company under the 1940 Act. In addition, as a consequence of our seeking to avoid the need to register under the 1940 Act on an ongoing basis, we may be limited in our ability to engage in digital asset mining operations or otherwise make certain investments or engage in certain transactions, and these limitations could result in our holding assets we may wish to sell or selling assets we may wish to hold, which could materially and adversely affect our business, financial condition and results of operations.

*If regulatory changes or interpretations of our activities require our registration as a money services business ("MSB") under the regulations promulgated by the Financial Crimes Enforcement Network ("FinCEN") under the authority of the U.S. Bank Secrecy Act, or otherwise under state laws, we may incur significant compliance costs, which could be substantial or cost-prohibitive. If we become subject to these regulations, our costs in complying with them may have a material negative effect on our business and the results of our operations.*

To the extent that our activities cause us to be deemed an MSB under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, we may be required to comply with FinCEN regulations, including those that would mandate us to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that our activities would cause us to be deemed a "money transmitter" ("MT") or equivalent designation, under state law in any state in which we may operate, we may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. For example, in August 2015, the New York State Department of Financial Services enacted the first U.S. regulatory framework for licensing participants in "virtual currency business activity." The regulations, known as the "BitLicense," are intended to focus on consumer protection and regulate the conduct of businesses that are involved in "virtual currencies" in New York or with New York customers and prohibit any person or entity involved in such activity to conduct activities without a license.

Such additional federal or state regulatory obligations may cause us to incur extraordinary expenses. Furthermore, we may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs. If we are deemed to be subject to and determine not to comply with such additional regulatory and registration requirements, we may act to dissolve and liquidate.

*Events in 2022 have increased the likelihood that U.S. federal and state legislatures and regulatory agencies will enact laws and regulations to regulate digital assets and digital asset intermediaries, such as digital asset exchanges and custodians.*

The collapse of TerraUSD and Luna and the bankruptcy filings of FTX and its subsidiaries, Three Arrows Capital, Ltd. ("Three Arrows"), Celsius, Voyager Digital Ltd. ("Voyager"), Genesis Global Holdco, LLC ("Genesis Global") and BlockFi inc. have resulted in calls for heightened scrutiny and regulation of the digital asset industry, with a specific focus on digital asset exchanges, platforms, and custodians. Federal and state legislatures and regulatory agencies are expected to introduce and enact new laws and regulations to regulate digital asset intermediaries, such as digital asset exchanges and custodians. The U.S. regulatory regime -

Debtors' Exhibit No. 40
Page 121 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

namely the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., the SEC, the U.S. Commodity Futures Trading Commission (the "CFTC"), FinCEN, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Bureau of Investigation) as well as the White House have issued reports and releases concerning digital assets, including bitcoin and digital asset markets. However, the extent and content of any forthcoming laws and regulations are not yet ascertainable with certainty, and it

39

may not be ascertainable in the near future. It is possible that new laws and increased regulation and regulatory scrutiny may require the Company to comply with certain regulatory regimes, which could result in new costs for the Company. The Company may have to devote increased time and attention to regulatory matters, which could increase costs to the Company. New laws, regulations, and regulatory actions could significantly restrict or eliminate the market for, or uses of, digital assets including bitcoin, which could have a negative effect on the value of bitcoin, which in turn would have a negative effect on the value of the Company's shares.

***There is no one unifying principle governing the regulatory status of digital assets nor whether digital assets are securities in any particular context. Regulatory changes or actions in one or more countries may alter the nature of an investment in us or restrict the use of digital assets in a manner that adversely affects our business, prospects or operations.***

As digital assets have grown in both popularity and market size, governments around the world have reacted differently, with certain governments deeming digital assets illegal, and others allowing their use and trade without restriction. In some jurisdictions, such as in the U.S., digital assets are subject to extensive, and in some cases overlapping, unclear and evolving regulatory requirements. Bitcoin is the oldest and most well-known form of digital asset. Bitcoin and other forms of digital assets have been the source of much regulatory consternation, resulting in differing definitional outcomes without a single unifying statement. Bitcoin and other digital assets are viewed differently by different regulatory and standards setting organizations globally as well as in the United States on the federal and state levels. For example, the Financial Action Task Force considers a digital asset as currency or an asset, and the U.S. Internal Revenue Service ("IRS") considers a digital asset as property and not currency. Further, the IRS applies general tax principles that apply to property transactions to transactions involving virtual currency.

Furthermore, in the several applications to establish an exchange traded fund ("ETF") of digital assets, and in the questions raised by the Staff under the 1940 Act, no clear principles emerge from the regulators as to how they view these issues and how to regulate digital assets under the applicable securities acts. It has been widely reported that the SEC has recently issued letters and requested various ETF applications be withdrawn because of concerns over liquidity and valuation and unanswered questions about absence of reporting and compliance procedures capable of being implemented under the current state of the markets for exchange traded funds. On April 20, 2021, the U.S. House of Representatives passed a bipartisan bill titled "Eliminate Barriers to Innovation Act of 2021" (H.R. 1602). If passed by the Senate and enacted into law, the bipartisan bill would create a digital assets working group to evaluate the current legal and regulatory framework around digital assets in the United States and define when the SEC may have jurisdiction over a particular token or digital asset (i.e., when it is a security) and when the CFTC may have jurisdiction (i.e., when it is a commodity).

If regulatory changes or interpretations require the regulation of bitcoin or other digital assets under the securities laws of the United States or elsewhere, including the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the 1940 Act or similar laws of other jurisdictions and interpretations by the SEC, the CFTC, the IRS, Department of Treasury or other agencies or authorities, we may be required to register and comply with such regulations, including at a state or local level. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary expense or burdens to us. We may also decide to cease certain operations and change our business model. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to us.

Current and future legislation and SEC-rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoin or other digital assets are viewed or treated for classification and clearing purposes. In particular, bitcoin and other digital assets may not be excluded from the definition of "security" by SEC rulemaking or interpretation requiring registration of all transactions unless another exemption is available, including transacting in bitcoin or digital assets among owners and require registration of trading platforms as "exchanges."

Furthermore, the SEC may determine that certain digital assets or interests, for example tokens offered and sold in initial coin offerings ("ICO") may constitute securities under the "Howey" test as stated by the United States Supreme Court. As such, ICO offerings would require registration under the Securities Act or an available exemption therefrom for offers or sales in the United States to be lawful. Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Although, we do not intend to be engaged in the offer or sale of securities in the form of ICO offerings, and we do not believe our planned mining activities would require registration for us to conduct such activities and accumulate digital assets. The SEC, CFTC, securities exchanges, IRS or other governmental or quasi-governmental agency or organization may conclude that our activities

Debtors' Exhibit No. 40
Page 123 of 462

involve the offer or sale of "securities," or ownership of "investment securities," and we may be subject to regulation or registration requirements under various federal laws and related rules. Such regulation or the inability to meet the requirements to continue operations, would have a material adverse effect on our business and operations. We may also face similar issues with various state

40

securities regulators who may interpret our actions as subjecting us to regulation, or requiring registration, under state securities laws, banking laws, or money transmitter and similar laws, which are also an unsettled area or regulation that exposes us to risks.

***Regulatory changes or actions may restrict the use of digital assets or the operation of digital asset networks in a manner that may require us to cease certain or all operations, which could have a material adverse effect on our business, financial condition and results of operations.***

Recently, there has been a significant amount of regulatory attention directed toward digital assets, digital asset networks and other industry participants by United States federal and state governments, foreign governments and self-regulatory agencies. For example, as digital assets such as bitcoin have grown in popularity and in market size, the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., FinCEN, the SEC, the CFTC and the Federal Bureau of Investigation) have begun to examine the operations of the bitcoin network, bitcoin users and bitcoin exchange markets.

In addition, local state regulators such as the Texas State Securities Board, the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth, the New Jersey Bureau of Securities, the North Carolina Secretary of State's Securities Division and the Vermont Department of Financial Regulation have initiated actions against, and investigations of, individuals and companies involved in digital assets.

Also, in March 2018, the South Carolina Attorney General Office's Security Division issued a cease-and-desist order against Genesis Mining and Swiss Gold Global, Inc., stating that both companies were to stop doing business in South Carolina and are permanently barred from offering securities in the state in the future since they offered unregistered securities via cloud mining contracts under the South Carolina Uniformed Securities Act of 2005, S.C. Code Ann. § 35-1-101, et seq. (the order against Genesis Mining was subsequently withdrawn).

Further, the North Carolina Secretary of State's Securities Division issued in March 2018 a Temporary Cease and Desist Order against Power Mining Pool (made permanent pursuant to a Final Order on April 19, 2018), ordering it to cease and desist, among other things, offering "mining pool shares," which were deemed "securities" under N.C. Gen. Stat. 78A-2(11), in North Carolina until they are registered with the North Carolina Secretary of State or are offered for sale pursuant to an exemption from registration under the North Carolina Securities Act, N.C. Gen. Stat. Chapter 78A.

Additionally, we rely on third-party mining pool service providers for mining revenue payouts from our mining operation, and certain of our potential hosting customers could be involved in, or could issue, cloud mining contracts or mining pool shares, and any regulatory restrictions on their practices could significantly reduce demand for our hosting services. Furthermore, it is possible that laws, regulations or directives that affect digital assets, digital asset transaction processing or blockchain server hosting may change in a manner that may adversely affect our ability to conduct our business and operations in the relevant jurisdiction.

In addition, various foreign jurisdictions either have adopted or may adopt laws, regulations or directives that affect digital assets, digital asset networks and their users and hosting service providers that fall within such jurisdictions' regulatory scope. Such laws, regulations or directives may conflict with those of the United States, may negatively impact the acceptance of digital assets by users, merchants and service providers outside of the United States and may therefore impede the growth of digital asset use. A number of countries, including India, China, South Korea and Russia, among others, currently have a more restrictive stance toward digital assets and, thereby, have reduced the rate of expansion of digital asset use, as well as digital asset transaction processing, in each of those countries. For example, in January 2018, several media publications reported that a Chinese multiagency government task force overseeing risk in internet finance issued a notice ordering local authorities to guide the shutdown of digital asset transaction processing in China. However, the People's Bank of China immediately refuted such reports, indicating that digital asset transaction processing is still permitted in China.

As a result of such conflicting positions taken within the Chinese government, a number of digital asset transaction processing operators have moved their operations from China to other jurisdictions in order to build in more regulatory certainty in their operations.

Governments may in the future take regulatory actions that prohibit or severely restrict the right to acquire, own, hold, sell, use or trade digital assets or to exchange digital assets for fiat currency. Ownership of, holding or trading in digital assets may then be

core-20221231                                                                          https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

considered illegal and subject to sanction. Governments may also take regulatory action that may increase the cost and/or subject digital asset mining companies to additional regulation.

41

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 126 of 462

By extension, similar actions by governments may result in the restriction of the acquisition, ownership, holding, selling, use or trading in the capital stock of digital asset mining companies, including our common stock. Such a restriction could result in us liquidating our digital asset inventory at unfavorable prices and may adversely affect our shareholders. The effect of any regulatory change, either by federal, state, local or foreign governments or any self-regulatory agencies, on us or our potential hosting customers is impossible to predict, but such change could be substantial and may require us or our potential hosting customers to cease certain or all operations and could have a material adverse effect on our business, financial condition and results of operations.

***Current and future legislation and rulemaking regarding digital assets may result in extraordinary, non-recurring expenses and could have a material adverse effect on our business, financial condition and results of operations.***

Current and future legislation and rulemaking by the CFTC and SEC or other regulators, including interpretations released by a regulatory authority, may impact the manner in which digital assets are treated. For example, digital assets derivatives are not excluded from the definition of "commodity future" by the CFTC. Furthermore, according to the CFTC, digital assets fall within the definition of a commodity under the Commodities Exchange Act (the "CEA") and as a result, we may be required to register and comply with additional regulations under the CEA, including additional periodic reporting and disclosure standards and requirements. We may also be required to register as a commodity pool operator and to register as a commodity pool with the CFTC through the National Futures Association. If we are required to register with the CFTC or another governmental or self-regulatory authority, the scope of our business and operations may be constrained by the rules of such authority and we may be forced to incur additional expenses in the form of licensing fees, professional fees and other costs of compliance.

The SEC has issued guidance and made numerous statements regarding the application of securities laws to digital assets. For example, on July 25, 2017, the SEC issued a Report of Investigation (the "Report") which concluded that tokens offered and sold by the Decentralized Autonomous Organization ("DAO"), a digital decentralized autonomous organization and investor-directed venture capital fund for digital assets, were issued for the purpose of raising funds. The Report concluded that these tokens were "investment contracts" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, and therefore securities subject to the federal securities laws. In December 2017, the SEC issued a cease-and-desist letter to Munchee Inc., ordering that the company stop its initial coin offering of MUN Tokens on the grounds that it failed to file a registration statement or qualify for an exemption from registration. Similar to the tokens issued by the DAO, the SEC found that the MUN Tokens satisfied the definition of an "investment contract," and were therefore subject to the federal securities laws. In February 2018, both the SEC and CFTC further reiterated their concerns regarding digital assets in written testimony to the Senate Banking, Housing and Urban Affairs Committee. On March 7, 2018, the SEC released a "Statement on Potentially Unlawful Online Platforms for Trading Digital Assets," and reiterated that, if a platform "offers trading of digital assets that are securities" and "operates as 'exchange,' as defined by the federal securities laws," the platform must register with the SEC as a national securities exchange or be exempt from registration. The SEC's statement serves as a notice to operators of any platforms, including secondary market trading platforms, which the SEC is actively monitoring for potentially fraudulent or manipulative behavior in the market for security tokens, as the SEC has cautioned recently in the context of ICOs. On November 16, 2018, the SEC released a "Statement on Digital Asset Securities Issuance and Trading," and emphasized that market participants must adhere to the SEC's well-established and well-functioning federal securities law framework when dealing with technological innovations, regardless of whether the securities are issued in certificated form or using new technologies, such as blockchain. This has all been followed by additional statements and guidance form the SEC including no-action letters relating to specific blockchain-based projects, and a Framework for "Investment Contract" Analysis of Digital Assets published by the Division of Corporation Finance on April 3, 2019. In an August 2021 interview, SEC Chairman Gensler signaled the SEC is contemplating a robust regulatory regime for digital assets and reiterated the SEC's position that many digital assets are unregulated securities.

The SEC has been active in asserting its jurisdiction over ICOs and digital assets and in bringing enforcement cases. The SEC has directed enforcement activity toward digital assets, and more specifically, ICOs. In September 2017, the SEC created a new division known as the "Cyber Unit" to address, among other things, violations involving distributed ledger technology and ICOs, and filed a civil complaint in the Eastern District of New York charging a businessman and two companies with defrauding investors in a pair of so-called ICOs purportedly backed by investments in real estate and diamonds (see Securities and Exchange Commission v. REcoin Group Foundation, LLC, et al., Civil Action NO. 17-cv-05725 (E.D.N.Y, filed Sept. 29, 2017)). Subsequently, the SEC has filed several orders instituting cease-and-desist proceedings against (i) Carrier EQ, Inc., d/b/a AirFox and Paragon Coin, Inc. in connection with their unregistered offerings of tokens (see CarrierEQ, Inc., Rel. No. 33-10575 (Nov. 16, 2018) and Paragon Coin, Inc., Rel. No. 33-10574 (Nov. 16, 2018), respectively), (ii) Crypto Asset Management, LP for failing to register a hedge fund formed

core-20221231                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

for the purpose of investing in digital assets as an investment company (see Crypto Asset Management, LP and Timothy Enneking, Rel. No. 33-10544 (Sept. 11, 2018)), (iii) TokenLot LLC for failing to register as a broker-dealer, even though it did not meet the definition of an exchange (see Tokenlot LLC, Lenny Kugel, and EliL. Lewitt, Rel. No. 33-10543 (Sept. 11, 2018)) and (iv) EtherDelta's founder for failing either to register as a national securities exchange or to operate pursuant to an exemption from

42

Debtors' Exhibit No. 40
Page 128 of 462

registration as an exchange after creating a platform that clearly fell within the definition of an exchange (see Zachary Coburn, Rel. No. 34-84553 (Nov. 8, 2018)).

On June 4, 2019, the SEC filed a complaint in the U.S. District Court for the Southern District of New York against Kik Interactive, Inc. with respect to its September 2017 offering of Kin. According to articles published by various news outlets, the SEC has allegedly issued numerous subpoenas and information requests to technology companies, advisers and individuals involved in the digital asset space and ICOs, as part of a broad inquiry into the digital asset market.

In addition, a number of proposed ICOs have sought to rely on Regulation A and have filed with the SEC a Form 1-A covering a distribution of a digital token. Two such offerings were qualified in July 2019. In addition, some token offerings have been commenced as private securities offerings intended to be exempt from SEC registration. Further, the SEC has yet to approve for listing and trading any exchange-traded products (such as ETFs) holding digital assets. The SEC has taken various actions against persons or entities that have allegedly misused digital assets, engaged in fraudulent schemes (i.e., Ponzi scheme) and/or engaged in the sale of tokens that were deemed securities by the SEC.

Although our activities are not focused on raising capital or assisting others that do so, the federal securities laws are very broad. We cannot provide assurance as to whether the SEC will continue or increase its enforcement with respect to digital assets or ICOs, including taking enforcement action against any person engaged in the sale of unregistered securities in violation of the Securities Act or any person acting as an unregistered investment company in violation of the 1940 Act. Because the SEC has held that certain digital assets are securities based on the current rules and law, we may be required to register and comply with the rules and regulations under federal securities laws. On March 9, 2022, President Biden signed an executive order on cryptocurrencies. While the executive order did not mandate any specific regulations, it instructs various federal agencies to consider potential regulatory measures, including the evaluation of the creation of a U.S. Central Bank digital currency. We cannot be certain as to how future regulatory developments will impact the treatment of digital assets under the law, including, but not limited to, whether digital assets will be classified as a security, commodity, currency and/or new or other existing classification. Such additional regulations may result in extraordinary, non- recurring expenses, thereby materially and adversely affecting an investment in us. Further, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties as a result of any regulatory enforcement actions, all of which could harm our reputation and affect the value of our common stock. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain or all of our operations. Any such action could have a material adverse effect on our business, financial condition and results of operations.

***Federal or state agencies may impose additional regulatory burdens on our business. Changing laws and regulations and changing enforcement policies and priorities have the potential to cause additional expenditures, restrictions, and delays in connection with our business operations.***

Federal and state laws and regulations may be subject to change or changes in enforcement policies or priorities, including changes that may result from changes in the political landscape and changing technologies. Future legislation and regulations, changes to existing laws and regulations, or interpretations thereof, or changes in enforcement policies or priorities, could require significant management attention and cause additional expenditures, restrictions, and delays in connection with our business operations.

***Increasing scrutiny and changing expectations from investors, lenders, customers, government regulators and other market participants with respect to our Environmental, Social and Governance ("ESG") policies may impose additional costs on us or expose us to additional risks.***

Companies across all industries and around the globe are facing increasing scrutiny relating to their ESG policies. Investors, lenders and other market participants are increasingly focused on ESG practices and in recent years have placed increasing importance on the implications and social cost of their investments. In February 2021, the Acting Chair of the SEC issued a statement directing the Division of Corporation Finance to enhance its focus on climate-related disclosure in public company filings and in March 2021 the SEC announced the creation of a Climate and ESG Task Force in the Division of Enforcement. The increased focus and activism related to ESG may hinder our access to capital, as investors and lenders may reconsider their capital investment allocation as a result of their assessment of our ESG practices. If we do not adapt to or comply with investor, lender or other industry shareholder expectations and standards and potential government regulations, which are evolving but may relate to the suitable

core-20221231                                        https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

deployment of electric power, or which are perceived to have not responded appropriately to the growing concern for ESG issues, our reputation suffer which would have a material adverse effect on our business, financial condition and results of operations.

43

Debtors' Exhibit No. 40
Page 130 of 462

*We may be subject to risks associated with misleading and/or fraudulent disclosure or use by the creators of digital assets.*

Generally, we rely primarily on a combination of white papers and other disclosure documents prepared by the creators of applicable digital assets, as well as on our management's ability to obtain adequate information to evaluate the potential implications of transacting in these digital assets. However, such white papers and other disclosure documents and information may contain misleading and/or fraudulent statements (which may include statements concerning the creators' ability to deliver in a timely fashion the product and/or service disclosed in their white papers and other disclosure documents) and/or may not reveal any unlawful activities by the creators. Recently, there has been an increasing number of investigations and lawsuits by the SEC and the CFTC involving digital asset creators for fraud and misappropriation, among other charges. Additionally, FinCEN has increased its enforcement efforts involving digital asset creators regarding compliance with anti-money laundering and Know-Your-Customer laws.

To the extent that any of these creators make misleading and/or fraudulent disclosures or do not comply with federal, state or foreign laws, or if we are unable to uncover all material information about these digital assets and/or their creators, we may not be able to make a fully informed business decision relating to our transacting in or otherwise involving such digital assets, which could have a material adverse effect on our business, financial condition and results of operations.

*Our interactions with a blockchain may expose us to SDN or blocked persons or cause us to violate provisions of law that did not contemplate distributed ledger technology.*

The Office of Financial Assets Control of the U.S. Department of Treasury ("OFAC") requires us to comply with its sanction program and not conduct business with persons named on its specially designated nationals ("SDN") list. However, because of the pseudonymous nature of blockchain transactions, we may inadvertently and without our knowledge engage in transactions with persons named on OFAC's SDN list. Our internal policies prohibit any transactions with such SDN individuals, but we may not be adequately capable of determining the ultimate identity of the individual with whom we transact with respect to selling digital assets. In addition, in the future, OFAC or another regulator, may require us to screen transactions for OFAC addresses or other bad actors before including such transactions in a block, which may increase our compliance costs, decrease our anticipated transaction fees and lead to decreased traffic on our network. Any of these factors, consequently, could have a material adverse effect on our business, prospects, financial condition, and operating results.

Moreover, federal law prohibits any U.S. person from knowingly or unknowingly possessing any visual depiction commonly known as child pornography. Recent media reports have suggested that persons have imbedded such depictions on one or more blockchains. Because our business requires us to download and retain one or more blockchains to effectuate our ongoing business, it is possible that such digital ledgers contain prohibited depictions without our knowledge or consent. To the extent government enforcement authorities literally enforce these and other laws and regulations that are impacted by decentralized distributed ledger technology, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties, all of which could harm our reputation and could have a material adverse effect on our business, prospects, financial condition, and operating results.

<u>Risks Related to Digital Assets</u>

*Because there has been limited precedent set for financial accounting for bitcoin and other digital assets, the determinations that we have made for how to account for digital assets transactions may be subject to change.*

Because there has been limited precedent set for the financial accounting for bitcoin and other digital assets and related revenue recognition and no official guidance has yet been provided by the Financial Accounting Standards Board or the SEC, it is unclear how companies may in the future be required to account for digital asset transactions and assets and related revenue recognition. A change in regulatory or financial accounting standards could result in the necessity to change the accounting methods we currently intend to employ in respect of our anticipated revenues and assets and restate any financial statements produced based on those methods. Such a restatement could adversely affect our business, prospects, financial condition and results of operation.

44

*Digital assets exchanges and other trading venues are relatively new and, in some cases, unregulated and some have experienced fraud and failure.*

To the extent that digital asset exchanges or other trading venues are involved in fraud or experience security failures or other operational issues, a reduction in digital asset prices could occur. Digital asset market prices depend, directly or indirectly, on the prices set on exchanges and other trading venues, which are new and, in most cases, largely unregulated as compared to established, regulated exchanges for securities, derivatives and other currencies. For example, during the past three years, a number of bitcoin exchanges have been closed due to fraud, business failure or security breaches. In many of these instances, the customers of the closed bitcoin exchanges were not compensated or made whole for the partial or complete losses of their account balances in such bitcoin exchanges. While smaller exchanges are less likely to have the infrastructure and capitalization that provide larger exchanges with additional stability, larger exchanges may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information, or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action.

Many digital asset exchanges currently do not provide the public with significant information regarding their ownership structure, management teams, corporate practices or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, digital asset exchanges, which may cause the price of bitcoin to decline. For example, in the first half of 2022, each of Celsius, Voyager, and Three Arrows declared bankruptcy, resulting in a loss of confidence among participants in the digital asset ecosystem and negative publicity surrounding digital assets more broadly. In November 2022, BlockFi Inc. and FTX Trading Ltd ("FTX"), the third largest digital asset exchange by volume at the time, halted customer withdrawals, and, shortly thereafter, FTX and its subsidiaries filed for bankruptcy. Most recently, in January 2023, Genesis Global and certain affiliates filed for bankruptcy.

In response to these events, the digital asset markets, including the market for bitcoin specifically, have experienced extreme price volatility and several other entities in the digital asset industry have been, and may continue to be, negatively affected, further undermining confidence in the digital asset market and in bitcoin. These events have also negatively impacted the liquidity of the digital asset market as certain entities affiliated with FTX engaged in significant trading activity. If the liquidity of the digital asset market continues to be negatively impacted by these events, digital asset prices, including the price of bitcoin, may continue to experience significant volatility and confidence in the digital asset markets may be further undermined. A perceived lack of stability in the digital asset exchange market and the closure or temporary shutdown of digital asset exchanges due to business failure, hackers or malware, government-mandated regulation, or fraud, may reduce confidence at least in part in digital asset networks and result in greater volatility in bitcoin's value. Because the value of bitcoin is derived from the continued willingness of market participants to exchange government-issued currency that is designated as legal tender in its country of issuance through government decree, regulation, or law ("fiat" currency) for bitcoin, should the marketplace for bitcoin be jeopardized or disappear entirely, permanent and total loss of the value of bitcoin may result.

*Digital asset transactions are irrevocable and, if stolen or incorrectly transferred, digital assets may be irretrievable. As a result, any incorrectly executed digital asset transactions could have a material adverse effect on our business, financial condition and results of operations.*

Typically, digital asset transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction or, in theory, control or consent of a majority of the processing power on the applicable network. Once a transaction has been confirmed and verified in a block that is added to the network blockchain, an incorrect transfer of a digital asset or a theft of a digital asset generally will not be reversible and we may not be capable of seeking compensation for any such transfer or theft. Although transfers of any digital assets we hold will regularly be made to or from vendors, consultants, services providers, etc., it is possible that, through computer or human error, or through theft or criminal action, our digital assets could be transferred from us in incorrect amounts or to unauthorized third parties. To the extent that we are unable to seek a corrective transaction with such third party or are incapable of identifying the third party that has received our digital assets through error or theft, we will be unable to revert or otherwise recover our incorrectly transferred digital assets. To the extent that we are unable to seek redress for such error or theft, such loss could have a material adverse effect on our business, financial condition and results of operations.

*We may not have adequate sources of recovery if the digital assets held by us are lost, stolen or destroyed due to third-party*

Debtors' Exhibit No. 40
Page 132 of 462

***digital asset services, which could have a material adverse effect on our business, financial condition and results of operations.***

Certain digital assets held by us are stored using Coinbase Global, Inc. ("Coinbase"), a third-party digital asset service. We believe that the security procedures that Coinbase utilizes, such as dual authentication security, secured facilities, segregated accounts

45

Debtors' Exhibit No. 40
Page 133 of 462

and cold storage, are reasonably designed to safeguard our bitcoin and other digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Nevertheless, the security procedures cannot guarantee the prevention of any loss due to a security breach, software defect or act of God that may be borne by us. In addition, Coinbase's limited liability under its services agreement with us may limit our ability to recover losses relating to our bitcoin. If such digital assets are lost, stolen or destroyed under circumstances rendering a third party liable to us, it is possible that the responsible third party may not have the financial resources or insurance sufficient to satisfy any or all of our claims against the third party, or have the ability to retrieve, restore or replace the lost, stolen or destroyed digital assets due to governing network protocols and the strength of the cryptographic systems associated with such digital assets. To the extent that we are unable to recover on any of our claims against any such third party, such loss could have a material adverse effect on our business, financial condition and results of operations.

***Losses relating to our business may be uninsured, or insurance may be limited.***

Our hosting and colocation operations are subject to hazards and risks normally associated with the daily operations of facilities. Currently, we maintain various insurance policies for business interruption for lost profits, property and casualty, public liability, commercial employee, workers' compensation, personal property and auto liability. Our business interruption insurance for lost profits includes coverage for business interruptions, our property and casualty insurance includes coverage for equipment breakdowns and our commercial employee insurance includes employee group insurance. We believe our insurance coverage adequately covers the risks of our daily business operations. However, our current insurance policies may be insufficient in the event of a prolonged or catastrophic event. The occurrence of any such event that is not entirely covered by our insurance policies may result in interruption of our operations, subject us to significant losses or liabilities and damage our reputation as a provider of business continuity services.

Additionally, it may not be possible, either because of a lack of available policies, limits on coverage or prohibitive cost, for us to obtain insurance of any type that would cover losses associated with our digital asset portfolio. In general, we anticipate that certain losses related to our business may be uninsurable, or the cost of insuring against these losses may not be economically justifiable. We have obtained some limited coverage regarding our business, but if an uninsured loss occurs or a loss exceeds policy limits, it could have a material adverse effect on our business, financial condition and results of operations.

The digital assets held by us are not insured. Therefore, a loss may be suffered with respect to our digital assets which is not covered by insurance and for which no person is liable in damages which could adversely affect our operations and, consequently, an investment in us.

***The impact of geopolitical, economic or other events on the supply of and demand for digital assets is uncertain, but could motivate large-scale sales of digital assets, which could result in a reduction in the price of such digital asset and could have a material adverse effect on our business, financial condition and results of operations.***

As an alternative to fiat currencies that are backed by central governments, digital assets, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services. It is unclear how this supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of digital assets either globally or locally. Large-scale sales of digital assets likely would result in a reduction in the price of the subject digital asset and could have a material adverse effect on our business, financial condition and results of operations.

In addition, the price of digital assets may be affected by the buying and selling of a significant amount of digital assets by a holder, or a group of holders. For example, Mt. Gox's bankruptcy trustee sold approximately $400 million of bitcoin and Bitcoin Cash between December 18, 2017 and February 5, 2018, in order to generate proceeds to repay bitcoin owners and creditors that experienced losses as a result of cyber-attacks against Mt. Gox. Similarly, Satoshi Nakamoto, the pseudonymous person or persons who developed bitcoin, could sell a significant portion of his estimated 1 million bitcoin representing 5% of the total bitcoin in circulation today. Many believe that such sales created a downward pressure on the price of bitcoin. The current macroeconomic environment, inflationary pressures and capital constraints have resulted in large scale selling of digital assets for cash that has contributed to the decrease in the price of digital assets, including bitcoin. Any such similar events, or other unforeseen actions by holders of a significant amount of digital assets, could have a material adverse effect on our business, financial condition and results of operations.

Debtors' Exhibit No. 40
Page 134 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

***Digital assets, including bitcoin, face significant scaling obstacles that can lead to high fees or slow transaction settlement times and any mechanisms of increasing the scale of digital asset settlement may significantly alter the competitive dynamics in the market.***

Digital assets face significant scaling obstacles that can lead to high fees or slow transaction settlement times, and attempts to increase the volume of transactions may not be effective. Scaling digital assets, and particularly bitcoin, is essential to the widespread acceptance of digital assets as a means of payment, which is necessary to the growth and development of our business.

Many digital asset networks face significant scaling challenges. For example, digital assets are limited with respect to how many transactions can occur per second. In this respect, bitcoin may be particularly affected as it relies on the "proof of work" validation, which due to its inherent characteristics may be particularly hard to scale to allow simultaneous processing of multiple daily transactions by users. Participants in the digital asset ecosystem debate potential approaches to increasing the average number of transactions per second that the network can handle and have implemented mechanisms or are researching ways to increase scale, such as "sharding," which is a term for a horizontal partition of data in a database or search engine, which would not require every single transaction to be included in every single miner's or validator's block.

There is no guarantee that any of the mechanisms in place or being explored for increasing the scale of settlement of digital asset transactions will be effective, how long they will take to become effective or whether such mechanisms will be effective for all digital assets. There is also a risk that any mechanisms of increasing the scale of digital asset settlements, such as the ongoing upgrades as part of Ethereum 2.0, may significantly alter the competitive dynamics in the digital asset market and may adversely affect the value of bitcoin and the price of our common stock. Any of which could have a material adverse effect on our business, prospects, financial condition, and operating results.

***The IRS and certain states have taken the position that digital assets are "property" for income tax purposes.***

In early 2014, the IRS issued basic guidance on the tax treatment of digital assets. The IRS has taken the position that a digital asset is "property" instead of "currency" for income tax purposes. As such, general tax principles applicable to property transactions apply to the acquisition, ownership, use, and disposition of digital assets. This overall treatment creates a potential tax liability for, and potential tax reporting requirements applicable to, us in any circumstance where we mine or otherwise acquire, own, use, or dispose of a digital asset. In 2019, the IRS issued additional guidance specifically relating to the income tax consequences that could arise from a digital asset hard fork event in which a new unit of digital asset may or may not be received, and released frequently asked questions to address certain digital asset topics such as tax basis, gain, or loss on the sale or exchange of certain kinds of digital assets and how to determine the fair market value of such digital assets.

There is no guarantee that the IRS will not alter its position with respect to the taxation of digital assets, or that legislation or judicial determinations in the future will not result in a tax treatment of digital assets and transactions in digital assets for tax purposes that differs from the treatment described above. You are urged to consult your own tax advisor as to the tax implications of our acquisition, ownership, use, and disposition of digital assets. The taxation of digital assets for state, local, or non-U.S. tax purposes may not be the same as the taxation of digital assets for U.S. federal income tax purposes.

In addition, under the Tax Cuts and Jobs Act of 2017, as of January 1, 2018, "like-kind exchange" treatment does not apply to digital assets. This means that gain from the sale or exchange of digital assets cannot be deferred by undertaking an exchange of one type of virtual currency for another.

Certain states, including New York and New Jersey, generally follow IRS guidance with respect to the treatment of digital assets for state income tax purposes, but it is unclear if other states will do so. Transactions involving digital assets for other goods and services may also be subject to sales and use or similar taxes under barter transaction treatment or otherwise. The treatment of digital assets for state income tax and sales tax purposes may have negative consequences, including the imposition of a greater tax burden on investors in digital assets or a higher cost with respect to the acquisition, ownership, use, and disposition of digital assets generally. In either case, this could have a negative effect on prices in the relevant digital asset exchange market and could have a material adverse effect on our business, financial condition and results of operations.

Non-U.S. jurisdictions may also elect to treat digital assets in a manner that results in adverse tax consequences. To the extent a

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

non-U.S. jurisdiction with a significant share of the market of digital asset owners or users imposes onerous tax burdens on such owners or users, or imposes sales, use, or value added tax on acquisitions and dispositions of digital assets for fiat currency, such actions could result in decreased demand for digital assets in such jurisdiction, which could impact the price of digital assets and have a material adverse effect on our business, financial condition and results of operations.

47

***Changes to, or changes to interpretations of, the U.S. federal, state, local or other jurisdictional tax laws could have a material adverse effect on our business, financial condition and results of operations.***

All statements contained herein concerning U.S. federal income tax (or other tax) consequences are based on existing law and interpretations thereof. The tax regimes to which we are subject or under which we operate, including income and non-income taxes, are unsettled and may be subject to significant change. While some of these changes could be beneficial, others could negatively affect our after-tax returns. Accordingly, no assurance can be given that the currently anticipated tax treatment will not be modified by legislative, judicial or administrative changes, possibly with retroactive effect. In addition, no assurance can be given that any tax authority or court will agree with any particular interpretation of the relevant laws.

In 2022, significant changes to U.S. federal income tax laws were proposed by the current presidential administration, including increasing the U.S. income tax rate applicable to corporations from 21% to 28% and changes implicating information reporting with respect to digital assets. Congress may include some or all of these proposals in future legislation. There is uncertainty regarding whether these proposals will be enacted and, if enacted, their scope, when they would take effect, and whether they would have retroactive effect.

State, local or other jurisdictions could impose, levy or otherwise enforce tax laws against us. Tax laws and regulations at the state and local levels frequently change, especially in relation to the interpretation of existing tax laws for new and emerging industries, and we cannot always reasonably predict the impact from, or the ultimate cost of compliance with, current or future taxes, which could have a material adverse effect on our business, financial condition and results of operations.

***Concerns about greenhouse gas emissions and global climate change may result in environmental taxes, charges, assessments or penalties and could have a material adverse effect on our business, financial condition and results of operations.***

The effects of human activity on global climate change have attracted considerable public and scientific attention, as well as the attention of the United States and other foreign governments. Efforts are being made to reduce greenhouse gas emissions, particularly those from coal combustion power plants, some of which plants we may rely upon for power. The added cost of any environmental taxes, charges, assessments or penalties levied on such power plants could be passed on to us, increasing the cost to run our facilities. Any enactment of laws or promulgations of regulations regarding greenhouse gas emissions by the United States, or any domestic or foreign jurisdiction in which we conduct business, could have a material adverse effect on our business, financial condition and results of operations.

***Latency in confirming transactions on a network could result in a loss of confidence in the network, which could have a material adverse effect on our business, financial condition and results of operations.***

Latency in confirming transactions on a network can be caused by a number of factors, such as transaction processors ceasing to support the network and/or supporting a different network. To the extent that any transaction processors cease to record transactions on a network, such transactions will not be recorded on the blockchain of the network until a block is solved by a transaction processor that does not require the payment of transaction fees or other incentives. Currently, there are no known incentives for transaction processors to elect to exclude the recording of transactions in solved blocks. However, to the extent that any such incentives arise (for example, with respect to bitcoin, a collective movement among transaction processors or one or more transaction processing pools forcing bitcoin users to pay transaction fees as a substitute for, or in addition to, the award of new bitcoin upon the solving of a block), transaction processors could delay the recording and verification of a significant number of transactions on a network's blockchain. If such latency became systemic, and sustained, it could result in greater exposure to double-spending transactions and a loss of confidence in the applicable network, which could have a material adverse effect on our business, financial condition and results of operations.

In addition, increasing growth and popularity of digital assets, ICOs and security token offerings, as well as non-digital asset related applications that utilize blockchain technology on certain networks, can cause congestion and backlog, and as result, increase latency on such networks. An increase in congestion and backlogs could result in longer transaction confirmation times, an increase in unconfirmed transactions (that is, transactions that have yet to be included in a block on a network and therefore are not yet completed transactions), higher transaction fees and an overall decrease in confidence in a particular network, which could ultimately affect our ability to transact on that particular network and, in turn, could have a material adverse effect on our business,

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

financial condition and results of operations.

48

*Significant or unexpected changes to our transaction processing operations may have a material adverse effect on our business, financial condition and results of operations.*

We and our potential customers are engaged in the business of verifying and confirming transactions on a blockchain, also known as transaction processing, or "mining." We may have to make changes to the specifications of our transaction processing operations for any number of reasons beyond our control (e.g., increased governmental and quasi-governmental regulation of blockchain-related digital assets; changes in methods of validating digital asset transactions; creation of new digital assets; general economic conditions; changes in consumer demographics and public tastes and preferences; and rising energy costs, among other reasons), or we may be unable to develop our transaction processing operations in a manner that realizes those specifications or any form of functioning and profitable transaction processing operations. Furthermore, it is still possible that our transaction processing operations may experience malfunctions, electrical power failure, hacking, cybersecurity breaches or otherwise fail to be adequately developed or maintained. Any of the above risks, which could also impact our potential hosting customers, may have a material adverse effect on our business, financial condition and results of operations.

*Currently, we believe there is relatively limited use of digital assets in the retail and commercial marketplace in comparison to relatively sizable use by speculators, thus contributing to price volatility that could adversely affect our business, financial condition and results of operations.*

We believe digital assets have not yet gained widespread acceptance as a means of payment for goods and services by any major retail or commercial outlets. We believe a significant portion of the demand for digital assets is generated by speculators and investors, some of whom may have no knowledge of the inner workings of those assets. Certain of these investors may seek to profit from the short-term or long-term holding of digital assets, and thus, may contribute to digital asset price volatility. A lack of expansion in the use of digital assets in retail and commercial markets, or a contraction of such use, may result in increased price volatility of digital assets or a reduction in the market price of digital assets or in the demand for digital assets which would reduce the demand of our hosting and colocation services or in the value of the digital assets held by us, any of which could have a material adverse effect on our business, financial condition and results of operations.

*If the transaction fees for recording digital assets in a blockchain increase, demand for digital assets may be reduced and prevent the expansion of the networks to retail merchants and commercial business, resulting in a reduction in the acceptance or price of digital assets.*

As the number of digital assets awarded for solving a block in a blockchain decreases, the incentive for mining participants to contribute processing power to networks will transition from a set reward to transaction fees. In order to incentivize mining participants to continue to contribute processing power to the networks, the network may transition from a set reward to transaction fees earned upon solving for a block. If mining participants demand higher transaction fees to record transactions in a blockchain or a software upgrade automatically charges fees for all transactions, the cost of using digital assets may increase and the marketplace may be reluctant to accept digital assets as a means of payment. Existing users may be motivated to switch from one digital asset to another or back to fiat currency. Decreased use and demand for digital assets may adversely affect their value and result in a reduction in the value of our common stock.

*If the award of new digital assets and/or transaction fees for solving blocks is not sufficiently high to incentivize transaction processors, such processors may reduce or cease expending processing power on a particular network, which could negatively impact the utility of the network, reduce the value of its digital assets and have a material adverse effect on our business, financial condition and results of operations.*

As the number of digital assets rewarded to transaction processors for validating blocks in a network decreases, the incentive for transaction processors to continue contributing processing power to the network may shift toward transaction fees. Such a shift may increase the transaction fees on a network. Higher transaction fees may reduce the utility of a network for an end user, which may cause end users to reduce or stop their use of that network. In such case, the price of the relevant digital asset may decline substantially and could go to zero. Such reduced price and demand for, and use of, the relevant digital asset and network, either as it applies to our transaction processing services or to those of our potential hosting customers, may have a material adverse effect on our business, financial condition and results of operations.

49

Debtors' Exhibit No. 40
Page 140 of 462

*As more processing power is added to a network, our relative percentage of total processing power on that network is expected to decline absent significant capital investment, which has an adverse impact on our ability to generate revenue from processing transactions on that network and could have a material adverse effect on our business, financial condition and results of operations.*

Processing power on networks has been increasing rapidly over time while the rewards and transaction fees available on those networks tends to decline over time. In order to grow or maintain the revenue we generate from processing transactions on such networks, we are required to invest significant capital to acquire new computer servers, expand our power capacity and otherwise increase our effective processing power on such networks. In the event we are unable to invest sufficient capital to grow or maintain the level of our processing power on a network relative to the total processing power of such network, our revenue from the applicable network will decline over time and as a result, it could have a material adverse effect on our business, financial condition and results of operations.

In addition, a decrease in the price of computer servers may result in an increase in transaction processors, which may lead to more competition for fees in a particular network. In the event we are unable to realize adequate fees on a network due to increased competition, our revenue from the applicable network will decline over time and in turn, it could have a material adverse effect on our business, financial condition and results of operations.

*We may only have limited control over our mining operation.*

Our mining operation comprises blockchain mining technologies that depend on a network of computers to run certain software programs to solve complex transactions in competition with other mining operations and to process transactions. Because of this less centralized model and the complexity of our mining operation, we have limited control over the success of our mining operations. While we participate in mining pools to combine our mining operations with other mining participants to increase processing power to solve blocks, there can be no assurance that such pools will adequately address this risk.

*Our reliance on third-party mining pool service providers for our mining revenue payouts may have a negative impact on our operations.*

We utilize third party mining pools to receive our mining rewards from a given network. Mining pools allow mining participants to combine their processing power, which increases the chances of solving a block and getting paid by the network. The rewards are distributed by the pool operator, proportionally to our contribution to the pool's overall mining power used to generate each block. We are dependent on the accuracy of the mining pool operator's record keeping to accurately record the total processing power provided to the pool for a given bitcoin or other digital asset mining application in order to assess the proportion of that total processing power we provided. While we have internal methods of tracking both our power provided and the total power used by the pool, the mining pool operator uses its own record-keeping to determine our proportion of a given reward. We have little means of recourse against the mining pool operator if we determine the proportion of the reward paid out to us by a mining pool operator is incorrect, other than leaving the pool. If we are unable to consistently obtain accurate proportionate rewards from our mining pool operators, we may experience reduced reward for our efforts, which would have an adverse effect on our business and operations.

*Malicious actors or botnet may obtain control of more than 50% of the processing power on the bitcoin or other network.*

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on the bitcoin or other network, it may be able to alter the blockchain on which the bitcoin or other network and most bitcoin or other digital asset transactions rely by constructing fraudulent blocks or preventing certain transactions from completing in a timely manner, or at all. The malicious actor or botnet could control, exclude, or modify the ordering of transactions, though it could not generate new bitcoin or digital assets or transactions using such control. The malicious actor could "double-spend" its own bitcoin or digital assets (i.e., spend the same bitcoin or digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintained control. To the extent that such malicious actor or botnet did not yield its control of the processing power on the bitcoin or other network, or the bitcoin or other community did not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible.

50

Debtors' Exhibit No. 40
Page 142 of 462

Although there are no known reports of malicious activity or control of the bitcoin blockchain achieved through controlling over 50% of the processing power on the network, it is believed that certain mining pools may have exceeded the 50% threshold. The possible crossing of the 50% threshold indicates a greater risk in that a single mining pool could exert authority over the validation of bitcoin transactions. To the extent the Bitcoin or other digital asset ecosystems, including developers and administrators of mining pools, do not act to ensure greater decentralization of bitcoin or other digital asset mining processing power, the feasibility of a malicious actor obtaining control of the processing power on the bitcoin or other network will increase, which may adversely affect an investment in us.

*Transaction processing operators may sell a substantial amount of digital assets into the market, which may exert downward pressure on the price of the applicable digital asset and, in turn, could have a material adverse effect on our business, financial condition and results of operations.*

Transaction processing requires the investment of significant capital for the acquisition of hardware, leasing or purchasing space, involves substantial electricity costs and requires the employment of personnel to operate the data facilities, which may lead transaction processing operators to liquidate their positions in digital assets to fund these capital requirements. In addition, if the reward of new digital assets for transaction processing declines, and/or if transaction fees are not sufficiently high, profit margins for transaction processing operators may be reduced, and such operators may be more likely to sell a higher percentage of their digital assets.

Whereas it is believed that individual operators in past years were more likely to hold digital assets for more extended periods, the immediate selling of newly transacted digital assets by operators may increase the supply of such digital assets on the applicable exchange market, which could create downward pressure on the price of the digital assets and, in turn, could have a material adverse effect on our business, financial condition and results of operations.

*To the extent that the profit margins of digital asset mining operations are not high, mining participants are more likely to sell their earned bitcoin, which could constrain bitcoin prices.*

Over the past few years, digital asset mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation application-specific integrated circuit ("ASIC") servers. Currently, new processing power is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. They require the investment of significant capital to acquire this hardware, to lease operating space (often in data centers or warehousing facilities), and to pay the costs of electricity and labor to operate the mining farms. As a result, professionalized mining operations are of a greater scale than prior mining operations and have more defined and regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to maintain profit margins on the sale of digital assets. To the extent the price of digital assets decline and such profit margin is constrained, professionalized mining participants are incentivized to more immediately sell digital assets earned from mining operations, whereas it is believed that individual mining participants in past years were more likely to hold newly mined digital assets for more extended periods. The immediate selling of newly mined digital assets greatly increases the trading volume of the digital assets, creating downward pressure on the market price of digital asset rewards. The extent to which the value of digital assets mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined digital assets rapidly if it is operating at a low profit margin and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold more rapidly, thereby potentially depressing digital asset prices. Lower digital asset prices could result in further tightening of profit margins for professionalized mining operations creating a network effect that may further reduce the price of digital assets until mining operations with higher operating costs become unprofitable forcing them to reduce mining power or cease mining operations temporarily. Such circumstances could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoin and any other digital assets we mine or otherwise acquire or hold for our own account.

*The "halvening" of rewards available on the bitcoin network, or the reduction of rewards on other networks, has had and in the future could have a negative impact on our ability to generate revenue as our customers may not have an adequate incentive to continue transaction processing and customers may cease transaction processing operations altogether, which could have a material adverse effect on our business, financial condition and results of operations.*

Debtors' Exhibit No. 40
Page 144 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Under the current protocols governing the bitcoin network, the reward for validating a new block on that network is cut in half from time to time, which has been referred to in our industry as the "halvening." When the bitcoin network was first launched, the reward for validating a new block was 50 bitcoin. In 2012, the reward for validating a new block was reduced to 25 bitcoin. In July

51

2016, the reward for validating a new block was reduced to 12.5 bitcoin, and in May 2020, the reward was further reduced to 6.25 bitcoin. The next halvening for the bitcoin blockchain is anticipated to occur in early 2024 at block 840,000. In addition, other networks may operate under rules that, or may alter their rules to, limit the distribution of new digital assets. We, and to our knowledge, our potential hosting customers, currently rely on these rewards to generate a significant portion of our total revenue. If the award of digital assets for solving blocks and transaction fees are not sufficiently high, neither we nor our customers may have an adequate incentive to continue transaction processing and may cease transaction processing operations altogether, which as a result may significantly reduce demand for our hosting services. As a result, the halvening of available rewards on the bitcoin network, or any reduction of rewards on other networks, would have a negative impact on our revenues and may have a material adverse effect on our business, financial condition and results of operations.

In addition, the reduction of rewards may reduce our profit margins, which could result in us selling a substantial portion of our digital assets, which are subject to high volatility. If we are forced to sell digital assets at low prices, it could have a material adverse effect on our business, financial condition and results of operations.

**We currently sell our digital assets, obtained from mining as they are mined, to pay for costs and expenses, which limits the amount of digital assets we hold, thus preventing us from recognizing any gain from the appreciation in value of the digital assets we have sold and may sell in the future.**

We currently sell our digital asset to pay for costs and expenses incurred, capital expenditures and other working capital, irrespective of then-current digital asset prices. When we sell a digital asset, we are unable to benefit from any future appreciation in the underlying value of that digital asset.

Consequently, our digital assets may be sold at a time when the price is lower than it otherwise might be in the future, which could reduce the gain we might have realized on the sale of that digital asset at a different time.

**Any loss or destruction of a private key required to access a digital asset of ours is irreversible. We also may temporarily lose access to our digital assets.**

Digital assets are each accessible and controllable only by the possessor of both the unique public key and private key associated with the digital asset, wherein the public and private keys are held in an offline or online digital wallet. To the extent a private key is lost, destroyed or otherwise compromised and no backup of the private key is available, we will be unable to access the applicable digital asset associated with that private key and the private key cannot be restored. As a result, any digital assets associated with such key could be irretrievably lost. Any loss of private keys relating to digital wallets used to store the applicable digital assets could have a material adverse effect on our business, financial condition and results of operations.

In addition, we may temporarily lose access to our digital assets as a result of software or systems upgrades or maintenance. In this case, we would likely rely on third parties to assist in restoring our access, and we cannot provide any assurance that such third parties will be able to restore access on a timely basis, or at all. Any temporary loss, if it occurs, could have a material adverse effect on our business, financial condition and results of operations.

**Intellectual property rights claims may adversely affect the operation of any or all of the networks.**

Third parties may assert intellectual property rights claims relating to the operation of digital assets and the holding and transfer of such assets. Regardless of the merit of any intellectual property rights claims or other legal action, any threatened action that reduces confidence in the long-term viability of any or all of the networks or other similar peer-to-peer networks, or in the ability of end-users to hold and transfer digital assets, may have a material adverse effect on our business, financial condition and results of operations. Additionally, a meritorious intellectual property rights claim could prevent us and other end-users from holding or transferring the digital assets, which could have a material adverse effect on our business, financial condition and results of operations.

**A soft or hard fork on a network could have a material adverse effect on our business, financial condition and results of operations.**

The rules governing a network's protocol are subject to constant change and, at any given time, there may be different groups

Debtors' Exhibit No. 40
Page 146 of 462

core-20221231                                                      https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

of developers that can modify a network's protocol. As network protocols are not sold and their use does not generate revenues for their development teams, the core developers are generally not compensated for maintaining and updating the network protocols. Consequently, there is a lack of financial incentive for developers to maintain or develop networks and the core developers may lack the resources to adequately address emerging issues with network protocols. Although the bitcoin and other leading networks are

52

Debtors' Exhibit No. 40
Page 147 of 462

currently supported by core developers, there can be no guarantee that such support will continue or be sufficient in the future. To the extent that material issues arise with the bitcoin or another network protocol and the core developers and open-source contributors are unable to address the issues adequately or in a timely manner, the networks may be adversely affected.

Any individual can download the applicable network software and make any desired modifications that alter the protocols and software of the network, which are proposed to developers, users and transaction processors on the applicable network through software downloads and upgrades, typically posted to development forums such as GitHub.com. Such proposed modifications can be agreed upon, developed, adopted and implemented by a substantial majority of developers, transaction processors and users, which, in such event, results in a "soft fork" or "hard fork" on the relevant network. A "soft fork" occurs when an updated version of the validating protocol is still "backwards compatible" with previous versions of the protocol. As a result, non-upgraded network participants with an older version of the validating protocol will still recognize new blocks or transactions and may be able to confirm and validate a transaction; however, the functionality of the non-upgraded network participant may be limited. Thus, non-upgraded network participants are incentivized to adopt the updated version of the protocol. The occurrence of a soft fork could potentially destabilize transaction processing and increase transaction and development costs and decrease trustworthiness of a network.

A "hard fork" occurs when the updated version of the validating protocol is not "backwards compatible" with previous versions of the protocol, and therefore, requires forward adoption by network participants in order to recognize new blocks, validate and verify transactions and maintain consensus on the relevant blockchain. Since the updated version of the protocol is not backwards compatible, a hard fork can cause the relevant blockchain to permanently diverge into two separate blockchains on a network. For example, in the case of bitcoin, a hard fork created two new digital assets: Bitcoin Cash and Bitcoin Gold. The value of a newly created digital asset from a hard fork ("forked digital asset") may or may not have value in the long-run and may affect the price of other digital assets if interest and resources are shifted away from previously existing digital assets to the forked digital asset. The value of a previously existing digital asset after a hard fork is subject to many factors, including the market reaction and value of the forked digital asset and the occurrence of other soft or hard forks in the future. As such, the value of certain digital assets could be materially reduced if existing and future hard forks have a negative effect on their value.

If a soft fork or hard fork occurs on a network, which we or our hosting customers are processing transactions or hold digital assets in, we may be required to upgrade our hardware or software in order to continue our transaction processing operations, and there can be no assurance that we may be able to make such upgrades. A soft fork or hard fork in a particular digital asset that we process could have a negative effect on the value of that digital asset and could have a material adverse effect on our business, financial condition and results of operations.

***The digital assets held by us may be subject to loss, damage, theft or restriction on access, which could have a material adverse effect on our business, financial condition and results of operations.***

There is a risk that some or all of the digital assets held or hosted by us could be lost, stolen or destroyed. We believe that the digital assets held or hosted by us and our mining operation will be an appealing target to hackers or malware distributors seeking to destroy, damage or steal our digital assets. Our security procedures and operational infrastructure may be breached due to the actions of outside parties, error or malfeasance of one of our employees, or otherwise, and, as a result, an unauthorized party may obtain access to our digital asset accounts, private keys, data or digital assets. Although we implement a number of security procedures with various elements such as two-factor verification, segregated accounts and secured facilities and plan to implement the maintenance of data on computers and/or storage media that is not directly connected to, or accessible from, the internet and/or networked with other computers ("cold storage"), to minimize the risk of loss, damage and theft, and we update such security procedures whenever reasonably practicable, we cannot guarantee the prevention of such loss, damage or theft, whether caused intentionally, accidentally or by an act of God.

Additionally, outside parties may attempt to fraudulently induce our employees to disclose sensitive information in order to gain access to our infrastructure. As the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently, or may be designed to remain dormant until a predetermined event, and often are not recognized until launched against a target, we may be unable to anticipate these techniques or implement adequate preventative measures. As technological change occurs, the security threats to our bitcoin will likely adapt and previously unknown threats may emerge. Our ability to adopt technology in response to changing security needs or trends may pose a challenge to the safekeeping of our digital assets. To the extent we are unable to identify and mitigate or stop new security threats, our digital assets may be subject to theft, loss,

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

destruction or other attack.

53

---

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Any of these events could expose us to liability, damage our reputation, reduce customer confidence in our services and otherwise have a material adverse effect on our business, financial condition and results of operations. Furthermore, we believe that as our assets grow, we may become a more appealing target for security threats, such as hackers and malware. If an actual or perceived breach of our digital asset accounts occurs, the market perception of our effectiveness could be harmed.

### *The digital assets held by us are not subject to FDIC or SIPC protections.*

We do not hold our digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC"), and to date, neither the FDIC nor the SIPC has extended any such protections to depositors of digital assets. Accordingly, our digital assets are not subject to the protections by FDIC or SIPC member institutions and any loss of our digital assets could have a material adverse effect on our business, financial condition and results of operations.

### *We may not be able to maintain our competitive position as digital asset networks experience increases in total network hash rate.*

As the relative market prices of a digital asset, such as bitcoin, increases, more companies are encouraged to mine for that digital asset and as more miners are added to the network, its total hash rate increases. In order for us to maintain its competitive position under such circumstances, we must increase our total hash rate by acquiring and deploying more mining machines, including new miners with higher hash rates. There are currently only a few companies capable of producing a sufficient number of machines with adequate quality to address the increased demand. If we are not able to acquire and deploy additional miners on a timely basis, our proportion of the overall network hash rate will decrease and we will have a lower chance of solving new blocks which will have an adverse effect on our business and results of operations.

### *To the extent that any miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee will not be recorded on the blockchain until a block is solved by a miner who does not require the payment of transaction fees. Any widespread delays in the recording of transactions could result in a loss of confidence in that digital asset network, which could adversely impact an investment in us.*

To the extent that any miners cease to record transactions in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing bitcoin users to pay transaction fees as a substitute for or in addition to the award of new bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the blockchain.

Any systemic delays in the recording and confirmation of transactions on the blockchain could result in greater exposure to double-spending transactions and a loss of confidence in certain or all digital asset networks, which could have a material adverse effect on our business, prospects, financial condition, and operating results.

### *We have identified material weaknesses in our internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations. We may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.*

In connection with the audit of our consolidated financial statements for the year ended December 31, 2022, we and our independent registered public accounting firm identified the following material weaknesses in the Company's internal control over financial reporting: (1) The Company did not design and implement program change management controls for certain financially relevant systems to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency. (2) The Company did not design and/or implement user access controls to ensure appropriate segregation of duties that would adequately restrict user and privileged access to the financially relevant systems and data to the appropriate Company personnel. (3) The Company's internal controls over financial reporting did not operate effectively at all

times to ensure transactions

54

were recorded timely and in accordance with GAAP. Appropriate segregation of duties was also not maintained at all times during the year.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. With the oversight of our senior management and audit committee, we have instituted plans to remediate the material weakness and will continue to take remediation steps, including hiring additional key supporting accounting personnel with public company reporting and accounting operations experience. In addition, we are formalizing inter-departmental communication, including establishing appropriate standing and ad hoc committees and enhancing electronic document storage for key financial transactions. We believe the measures described above will remediate the material weaknesses identified and strengthen our internal control.

While we implement our plan to remediate the material weaknesses described above, we cannot predict the success of such plan or the outcome of its assessment of these plans at this time. If our steps are insufficient to remediate the material weaknesses successfully and otherwise establish and maintain an effective system of internal control over financial reporting, the reliability of our financial reporting, investor confidence, and the value of its common stock could be materially and adversely affected. We can give no assurance that the implementation of this plan will remediate these deficiencies in our internal control over financial reporting or that additional material weaknesses or significant deficiencies in our internal control over financial reporting will not be identified in the future. The failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could result in a restatement of its financial statements, causing us to fail to meet its reporting obligations.

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

As a public company, we are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act and the rules and regulations of the applicable OTC listing requirements. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting and financial compliance costs, make some activities more difficult, time-consuming and costly and place significant strain on our personnel, systems and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. In addition, changes in accounting principles or interpretations could also challenge our internal controls and require that we establish new business processes, systems and controls to accommodate such changes. We have limited experience with implementing the systems and controls that are necessary to operate as a public company, as well as adopting changes in accounting principles or interpretations mandated by the relevant regulatory bodies. Additionally, if these new systems, controls or standards and the associated process changes do not give rise to the benefits that we expect or do not operate as intended, it could adversely affect our financial reporting systems and processes, our ability to produce timely and accurate financial reports or the effectiveness of internal control over financial reporting. Moreover, our business may be harmed if we experience problems with any new systems and controls that result in delays in their implementation or increased costs to correct any post-implementation issues that may arise.

Further, in addition to the material weaknesses we currently have, weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our business or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we

Debtors' Exhibit No. 40
Page 152 of 462

will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to

55

continue to meet these requirements, we may not be able to regain our listing on the Nasdaq or other national securities exchanges. As a public company, we are required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until our first annual report filed with the SEC where we are an accelerated filer or a large accelerated filer, and do not qualify as an emerging growth company or smaller reporting company with revenues of less than $100 million. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could harm our business and could cause a decline in the trading price of our common stock. For more information as it relates to the risk controls, please see "—*We have identified material weaknesses in our internal control over financial reporting. Such material weaknesses may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations. We may also identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control.*"

### Risks Related to Ownership of Our Securities and Other General Matters

*Our common stock was delisted from NASDAQ and is currently traded on the OTC Pink Sheets market maintained by the OTC Market Group, Inc., which involves additional risks compared to being listed on a national securities exchange.*

On December 13, 2022, the Company received written notice from Nasdaq notifying the Company that, because the closing bid price for the Company's securities had fallen below $1.00 per share for 30 consecutive business days, the Company no longer met the minimum bid price requirement for continued inclusion on the Nasdaq Global Select Market pursuant to Nasdaq Listing Rule 5450(a)(1) (the "Bid Price Requirement"). On December 22, 2022, the Company received written notice (the "Delisting Notice") from Nasdaq notifying the Company that, as a result of the Chapter 11 Cases, and in accordance with Nasdaq Listing Rules 5101, 5110(b) and IM-5101-1, the staff of Nasdaq had determined that the Company's common stock would be delisted from Nasdaq. In the Delisting Notice, the staff of Nasdaq referenced concerns about the Company's ability to sustain compliance with all requirements for continued listing on Nasdaq and public interest concerns related to the Chapter 11 Cases. Trading of the Company's securities was suspended at the opening of business on January 3, 2023 and our common stock and the common stock warrants began trading on the OTC Markets, operated by the OTC Markets Group, Inc, under the symbols "CORZQ" and "CRZWQ", respectively. The Company requested an appeal of Nasdaq's determination and a hearing before a Nasdaq hearings panel, but subsequently withdrew its appeal after further consideration and discussion with representatives of Nasdaq.

The suspension of trading and delisting of our common stock could have material adverse effects on our business, financial condition and results of operations due to, among other things:

- impair the ability of holders of our common stock to sell their shares at the time they wish to sell them or at a price that they consider reasonable;

- reduce the trading liquidity and fair market value of the shares of our common stock;

- decrease the number of institutional and other investors willing to hold or acquire our stock, coverage by securities analysts, market making activity and information available concerning trading prices and volume, as well as fewer broker-dealers willing to execute trades in our stock, thereby further restricting our ability to obtain equity financing; and

- the price of our common stock could be more likely to be affected by broad market fluctuations, general market conditions, fluctuations in our operating results, changes in the markets' perception of our business, and announcements made by us, our competitors, parties with whom we have business relationships or third parties with interests in the Chapter 11 Cases.

56

***The trading price of our common stock may be volatile, and you could lose all or part of your investment.***

The trading price of our common stock is likely to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. These fluctuations could cause you to lose all or part of your investment in our common stock as you might be unable to sell your shares at or above the price you paid for those shares. Factors that could cause fluctuations in the trading price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the trading prices and trading volumes of technology stocks;

- volatility in the price of bitcoin and other digital assets;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our common stock by us or our stockholders, including sales as a result of the waiver of lock up restrictions that went into effect in March 2022;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections, or our failure to meet those projections;

- announcements by us or our competitors of new products, features, or services;

- the public's reaction to our press releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry, or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses, products, services or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth of our markets.

In addition, in the past, following periods of volatility in the overall market and in the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

***The price of bitcoin and other digital assets have historically been volatile.***

The trading prices of many digital assets, including bitcoin, have experienced extreme volatility in recent periods and may continue to do so. Extreme volatility in the future, including further declines in the prices of digital assets, could have a material adverse effect on the financial and operational results of the Company. Furthermore, negative perception, a lack of stability and standardized regulation in the digital asset economy may reduce confidence in the digital asset economy and may result in greater volatility in the price of bitcoin and other digital assets, including a depreciation in value.

***The Company may face several risks due to disruptions in the digital asset markets, including but not limited to the risk***

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

*from depreciation in the Company's stock price, financing risk, risk of increased losses or impairments in its investments or other assets, risks of legal proceedings and government investigations, and risks from price declines or price volatility of digital assets.*

57

Debtors' Exhibit No. 40

In 2022 and the beginning of 2023, some of the well-known digital asset market participants, including Celsius, Voyager, Three Arrows, BlockFi and Genesis Global declared bankruptcy, resulting in a loss of confidence in participants of the digital asset ecosystem and negative publicity surrounding digital assets more broadly. In November 2022, FTX, the third largest digital asset exchange by volume at the time, halted customer withdrawals and shortly thereafter, FTX and its subsidiaries filed for bankruptcy. In response to these events, the digital asset markets, including the market for bitcoin specifically, have experienced extreme price volatility and several other entities in the digital asset industry have been, and may continue to be, negatively affected, further undermining confidence in the digital asset market and in bitcoin. These events have also negatively impacted the liquidity of the digital asset market as certain entities affiliated with FTX engaged in significant trading activity. If the liquidity of the digital asset market continues to be negatively impacted by these events, digital asset prices (including the price of bitcoin) may continue to experience significant volatility and confidence in the digital asset markets may be further undermined. These events are continuing to develop and it is not possible to predict at this time all of the risks that they may pose to us, our service providers or on the digital asset industry as a whole. The failure or insolvency of large exchanges like FTX may cause the price of bitcoin to fall and decrease confidence in the ecosystem, which could adversely affect an investment in the Company. Such market volatility and decrease in bitcoin price may have a material and adverse effect on the Company's results of operations and financial condition as the results of the Company's operations are significantly tied to the price of bitcoin.

### *Future sales and issuances of our capital stock or rights to purchase capital stock could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to decline.*

We may issue additional securities, including shares of common stock underlying is or as a result of the conversion of convertible notes or the exercise of options or restricted stock units ("RSUs"). Future sales and issuances of our capital stock or rights to purchase our capital stock could result in substantial dilution to our existing stockholders. We may sell common stock, convertible securities and other equity securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, investors may be materially diluted. New investors in such subsequent transactions could gain rights, preferences and privileges senior to those of holders of our common stock.

### *The Public Warrants and Private Placement Warrants may never be in the money and may expire worthless.*

The exercise price of the Public Warrants and Private Placement Warrants is $11.50 per share. We believe the likelihood that warrant holders will exercise the warrants, and therefore the amount of cash proceeds that we would receive, is dependent upon the trading price of our common stock. If the trading price for our common stock is less than $11.50 per share, we believe holders of the Public Warrants and Private Placement Warrants will be unlikely to exercise their warrants. There is no guarantee that the Public Warrants and Private Placement Warrants will be in the money following the time they become exercisable and prior to their expiration, and as such, the Public Warrants and Private Placement Warrants may expire worthless and we may receive no proceeds from the exercise of the warrants.

### *Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results.*

On April 12, 2021, the staff of the SEC (the "SEC Staff") issued a public statement entitled "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies ("SPACs")" (the "Statement"). The Statement focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the Warrant Agreement (as defined below) governing our warrants initially issued by XPDI. As a result of the SEC Statement, we reevaluated the accounting treatment of our 8,625,000 Public Warrants and 6,266,667 Private Placement Warrants, which were initially issued by XPDI, a SPAC, and determined to classify the warrants as derivative liabilities measured at fair value, with changes in fair value each period reported in earnings.

As a result, included on our audited consolidated balance sheets filed with the SEC are derivative liabilities related to embedded features contained within our warrants. Accounting Standards Codification ("ASC") 815, *Derivatives and Hedging*, provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, our consolidated financial statements and results of operations may fluctuate quarterly, based on factors, which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on our warrants each reporting period and that the amount of such gains or losses could be material.

Debtors' Exhibit No. 40
Page 157 of 462

Debtors' Exhibit No. 40
Page 158 of 462

***We may redeem your unexpired public warrants prior to their exercise at a time that is disadvantageous to you, thereby making your public warrants worthless.***

We have the ability to redeem the outstanding public warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, if, among other things, the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for adjustments to the number of shares issuable upon exercise or the exercise price of a public warrant). If and when the public warrants become redeemable by us, we may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding public warrants as described above could force you to (i) exercise your public warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) sell your public warrants at the then-current market price when you might otherwise wish to hold your public warrants or (iii) accept the nominal redemption price which, at the time the outstanding public warrants are called for redemption, we expect would be substantially less than the market value of your public warrants. None of the Private Placement Warrants will be redeemable by us so long as they are held by the sponsor of XPDI, the Anchor Investors (as defined in our Notes to Consolidated Financial Statements) or their permitted transferees.

***Because there is substantial doubt about our ability to continue as a going concern for a reasonable period of time, an investment in our common stock is highly speculative; holders of our common stock could suffer a total loss of their investment.***

The Company determined in October 2022 not to make certain payments with respect to several of its equipment and other financings, including its two bridge promissory notes, the additional liquidity created by such measures may be insufficient. In addition, the creditors under such debt facilities may exercise remedies following any applicable grace periods, including electing to accelerate the principal amount of the indebtedness, suing the Company for nonpayment or taking action with respect to collateral where applicable. Any such creditor actions may result in events of default under the Company's other indebtedness agreements, including its two series of convertible notes due 2025, and the potential exercise of remedies by the creditors under such agreements. As a result, the Company is in the process of exploring a number of potential strategic alternatives with respect to the Company's corporate or capital structure, including hiring strategic advisers, raising additional capital or restructuring its existing capital structure. The Company has begun to engage in discussions with certain of its creditors regarding these initiatives. The Company expects these activities will continue and intensify. Among possible alternatives, the Company may explore liability management transactions, including exchanging its existing debt for equity or additional debt, which transactions may be dilutive to holders of the Company's common stock. These discussions may not result in any agreement on commercially acceptable terms or at all. Furthermore, the Company may seek alternative sources of equity or debt financing, delay capital expenditures or accelerate potential asset sales, and potentially could seek relief under the applicable bankruptcy or insolvency laws. In the event of a bankruptcy proceeding or insolvency, or restructuring of our capital structure, holders of the Company's common stock could suffer a total loss of their investment.

Due to these factors, substantial doubt exists about the Company's ability to continue as a going concern for a reasonable period of time. An investment in our common stock is highly speculative.

***Our substantial level of indebtedness and our current liquidity constraints could adversely affect our financial condition and our ability to service our indebtedness, which, together with the impact of the ongoing Chapter 11 process, could negatively impact your ability to recover your investment in the common stock.***

We have a substantial amount of indebtedness, which requires significant interest payments. As of December 31, 2022, we and our subsidiaries had approximately $1.2 billion aggregate principal amount of indebtedness outstanding. Our substantial level of indebtedness and the current constraints on our liquidity could have important consequences, including the following:

- we must use a substantial portion of our cash flow from operations to pay interest and principal on our indebtedness, which reduces or will reduce funds available to us for other purposes such as working capital, capital expenditures, other general corporate purposes and potential acquisitions;

- our ability to refinance such indebtedness or to obtain additional financing for working capital, capital expenditures, acquisitions or general corporate purposes may be impaired;

- our leverage may be greater than that of some of our competitors, which may put us at a competitive disadvantage and reduce our flexibility in responding to current and changing industry and financial market conditions;

Debtors' Exhibit No. 40
Page 159 of 462

- there are significant constraints on our ability to generate liquidity through incurring additional debt; and

- we may be more vulnerable to economic downturn and adverse developments in our business.

59

Debtors' Exhibit No. 40
Page 160 of 462

We and our subsidiaries may be able to incur substantial additional indebtedness in the future, subject to the outcome of the Chapter 11 Cases and to the restrictions contained in the agreements governing our indebtedness. To the extent new indebtedness is added to our debt levels, including as a result of satisfying interest payment obligations on certain of our indebtedness with payments-in-kind, the related risks that we now face could intensify. If we are unable to comply with our covenants under our indebtedness, our liquidity may be further adversely affected.

Our ability to meet our expenses, to remain in compliance with our covenants under our debt instruments and to make future principal and interest payments in respect of our debt depends on, among other factors, our operating performance, competitive developments and financial market conditions, all of which are significantly affected by financial, business, economic and other factors. We are not able to control many of these factors. Given current industry and economic conditions, our cash flow may not be sufficient to allow us to pay principal and interest on our debt and meet our other obligations.

For example, in October 2022 the Company determined not to make certain payments with respect to several of its debt facilities, equipment financing facilities and leases and other financings, including its two bridge promissory notes. As a result, the creditors under these debt facilities may exercise remedies following any applicable grace periods and pursuant to any confirmed plan or reorganization, including electing to accelerate the principal amount of such debt, suing the Company for nonpayment, increasing interest rates to default rates, or taking action with respect to collateral, where applicable.

***Provisions in our corporate charter documents and under Delaware law may prevent or frustrate attempts by our stockholders to change our management or hinder efforts to acquire a controlling interest in us, and the market price of our common stock may be lower as a result.***

Certain provisions of our second amended and restated certificate of incorporation (the "Charter") and our Bylaws may have an anti-takeover effect and may delay, defer or prevent a merger, acquisition, tender offer, takeover attempt or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by our stockholders.

These provisions provide for, among other things:

- the ability of our board of directors to issue one or more series of preferred stock;
- advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;
- certain limitations on convening special stockholder meetings;
- limiting the persons who may call special meetings of stockholders;
- limiting the ability of stockholders to act by written consent; and
- our board of directors have the express authority to make, alter or repeal the Bylaws.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law ("DGCL"), which prohibit a person who owns 15% or more of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired in excess of 15% of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner.

These anti-takeover provisions could make it more difficult or frustrate or prevent a third party to acquire our company, even if the third party's offer may be considered beneficial by many of our stockholders. Additionally, the provisions may frustrate or prevent any attempts by our stockholders to replace or remove its current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of its management. As a result, our stockholders may be limited in their ability to obtain a premium for their shares. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

***Our common stock market price and trading volume could decline if securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business.***

Debtors' Exhibit No. 40
Page 161 of 462

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If one or more of the analysts who cover us downgrade our common stock or publish inaccurate or unfavorable

60

research about our business, the price of our securities would likely decline. If few securities analysts commence coverage of us, or if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, demand for our securities could decrease, which might cause the price and trading volume of our common stock to decline.

### *We will incur costs and demands upon management as a result of complying with the laws and regulations affecting public companies in the United States, which may harm our business.*

As a public company listed in the United States, we will incur significant additional legal, accounting and other expenses. In addition, changing laws, regulations and standards relating to corporate governance and public disclosure, including regulations implemented by the SEC and the Nasdaq, may increase legal and financial compliance costs and make some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If, notwithstanding our efforts, we fail to comply with new laws, regulations and standards, regulatory authorities may initiate legal proceedings against us, and our business may be harmed.

Failure to comply with these rules might also make it more difficult for us to obtain certain types of insurance, including director and officer liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. The impact of these events would also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, on committees of our board of directors or as members of senior management.

### *We do not intend to pay dividends for the foreseeable future.*

We have never declared nor paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any dividends in the foreseeable future. As a result, stockholders must rely on sales of their common stock after price appreciation as the only way to realize any future gains on their investment.

### *We qualify as an "emerging growth company" within the meaning of the Securities Act, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies, such decision could make our securities less attractive to investors and may make it more difficult to compare our performance to the performance of other public companies.*

We qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we are eligible for and intend to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not "emerging growth companies" for as long as we continue to be an emerging growth company, including, but not limited to, (a) not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, (b) exemptions resulting in reduced disclosure obligations regarding executive compensation in the Company's periodic reports and proxy statements and (c) exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We will remain an emerging growth company until the earliest of (1) the last day of the fiscal year (a) following February 12, 2026, the fifth anniversary of the Initial Public Offering, (b) in which we have total annual gross revenue of at least $1.07 billion or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700.0 million as of the prior June 30th and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. We cannot predict whether investors will find our securities less attractive because of our reliance on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or

core-20221231                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but that any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised

61

Debtors' Exhibit No. 40
Page 164 of 462

and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with those of another public company, which is neither an emerging growth company nor an emerging growth company which has opted out of the extended transition period, difficult or impossible because of the potential differences in accounting standards used.

**Item 1B. Unresolved Staff Comments**

**None.**

62

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 165 of 462

### Item 2. Properties.

Our corporate headquarters is located at 210 Barton Springs Rd., Austin, Texas 78704. In addition, we mine bitcoin for our own account and for third-party hosting customers at our owned and leased facilities in Georgia, Kentucky, North Carolina, North Dakota, and Texas, with approximately 592MW of operating electric power as of December 31, 2022. We lease with an option to purchase at a nominal amount our facility in North Dakota. We also owned a property in Oklahoma that remains substantially undeveloped.We believe that our facilities are suitable to meet our current and anticipated near term needs. Please refer to the discussions contained in our Item 1. – Business for additional information.

### Item 3. Legal Proceedings.

From time to time, we are involved in various legal proceedings arising from the normal course of business activities. Defending such proceedings is costly and can impose a significant burden on management and employees. We may receive unfavorable preliminary or interim rulings in the course of litigation, and there can be no assurances that favorable final outcomes will be obtained.

Notwithstanding the foregoing, any litigation pending against us and any claims that could be asserted against us that arose prior to December 21, 2022, (subject to certain exceptions) are automatically stayed as a result of the commencement of the Chapter 11 Cases pursuant to Section 362(a) of the Bankruptcy Code, subject to certain statutory exceptions.

Please refer to the discussions contained in our Item 1. – Business under the subtitle "Chapter 11 Reorganization" and "Chapter 11 Filing"; Item 1A. – Risk Factors; Item 5. - Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities; Item 7. - Management's Discussion and Analysis of Financial Condition and Results of Operations under the subtitle "Chapter 11 Filing and Other Related Matters"; and our Notes to Consolidated Financial Statements; as well as elsewhere in this report on Form 10-K for further information regarding the commencement of the aforementioned Chapter 11 Cases.

### Item 4. Mine Safety Disclosures.

Not applicable.

### Part II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

#### Market Information and Holders

Our common stock and public warrants were last traded on the Nasdaq Global Select Market under the symbols "CORZ" and "CORZW," respectively on December 30, 2022.

On December 22, 2022, the Company received written notice (the "Delisting Notice") from the staff of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that, as a result of the Chapter 11 Cases and in accordance with Nasdaq Listing Rules 5101, 5110(b) and IM-5101-1, the staff of Nasdaq had determined that the Company's common stock (the "Securities") will be delisted from Nasdaq. Trading of the Securities was suspended at the opening of business on January 3, 2023 and a Form 25-NSE was filed with the Securities and Exchange Commission, which removed the Securities from listing and registration on Nasdaq. Our common stock and public warrants are currently traded on OTC Markets under the symbols "CORZQ" and "CRZWQ." Any over-the-counter market quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

On March 24, 2023, there were 224 holders of record of our Common Stock and 27 holders of record of our public warrants. We believe a substantially greater number of beneficial owners hold shares of Common Stock or public warrants through brokers, banks or other nominees.

core-20221231

**Dividends**

The Company has not paid dividends on its common stock to date and does not intend to pay cash dividends. The payment of cash dividends in the future will be dependent upon revenues and earnings, if any, capital requirements and general financial condition. The payment of any dividends will be within the discretion of the Company's board of directors. It is the present intention

63

---

of the Company's board of directors to retain all earnings, if any, for use in the Company's business operations and, accordingly, the board of directors does not anticipate declaring any dividends in the foreseeable future.

**Stock Performance Graph**

The following performance graph compares the cumulative total return on our common stock with the cumulative total return of the Nasdaq Composite Index and Russell 2000 Index from April 8, 2021 through December 31, 2022. Due to the infancy of our industry, we have not compared our performance against a self-constructed peer group or used a Published Industry Index. Such returns are based on historical results and are not intended to suggest future performance. The graph assumes a $100 investment on April 8, 2021 through December 31, 2022 in our common stock, the Nasdaq Composite Index and the Russell 2000 Index.

This performance graph shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Core Scientific, Inc. under the Securities Act, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.



**Securities Authorized for Issuance Under Equity Compensation Plans**

As of December 31, 2022, the Company has 46,000,000 securities authorized for issuance under the Core Scientific, Inc. 2021 Equity Incentive Plan and Core Scientific, Inc. 2021 Employee Stock Purchase Plan, which became effective immediately upon the closing of the Business Combination. The Company has also assumed all outstanding awards under the Core Scientific, Inc. (f/k/a Mineco Holdings, Inc.) 2018 Omnibus Incentive Plan, as amended.

**Recent Sales of Unregistered Securities; Use of Proceeds from Registered Offerings.**

The Company and MassMutual Asset Finance LLC (the "Lessor") entered into the Master Lease Agreement dated as of December 3, 2021 (the "Master Lease") regarding the leasing of certain equipment. Thereafter, pursuant to the Master Lease, the Company and the Lessor entered into Schedule No. 001, Schedule No. 002, Schedule No. 003, Schedule No. 004 and Schedule No. 005, each dated as of December 15, 2021, to the Master Lease (the "Master Lease Schedules"). In consideration for the Lessor's execution of the amendments to the Master Lease Schedules, on August 17, 2022, the Company issued 127,811 restricted shares of the Company's common stock to the Lessor.

The Company, Barings BDC, Inc., Barings Capital Investment Corporation and Barings Private Credit Corp. (the "Barings Parties") entered into the Master Security Agreement dated as of March 24, 2022, as well as related collateral schedules, which was amended through a series of amendments effective as of August 17, 2022. In consideration for the execution for the Barings Parties

64

execution of the amendments, on August 17, 2022, the Company issued 197,050 restricted shares of the Company's common stock to Barings BDC, Inc.

See Notes 7 — Intangible Assets, Net and 13 — Leases to our consolidated financial statements in Item 8 of Part II of this report for further information regarding these arrangements.

None of the foregoing transactions involved any underwriters, underwriting discounts or commissions, or any public offering. Unless otherwise set forth above, we believe each of these transactions was exempt from registration under the Securities Act of 1933, as amended, (the "Securities Act") in reliance on Section 4(a)(2) of the Securities Act (and Regulation D promulgated thereunder) as transactions by an issuer not involving any public offering. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof and appropriate legends were placed on the share certificates issued in these transactions. All recipients had adequate access, through their relationships with us, to information about us. The sales of these securities were made without any general solicitation or advertising.

**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Item 6. [Reserved]**

Debtors' Exhibit No. 40
Page 170 of 462

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*Unless the context otherwise requires, all references in this section to "we," "us," "our," the "Company" or "Core Scientific" refer to Core Scientific Holding Co. and its subsidiaries prior to the consummation of the Business Combination (as defined below) and Core Scientific, Inc. (f/k/a Power & Digital Infrastructure Acquisition Corp.) and its subsidiaries after the consummation of the Business Combination. References to "XPDI" refer to the predecessor registrant prior to the consummation of the Business Combination.*

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to promote understanding of the results of operations and financial condition. This MD&A is provided as a supplement to, and should be read in conjunction with, our consolidated financial statements and the accompanying Notes to Financial Statements (Part II, Item 8 of this Form 10-K). This section generally discusses the results of operations for 2022 compared to 2021. For discussion related to the results of operations and changes in financial condition for 2021 compared to 2020 refer to Part II, Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations in our fiscal year 2021 Form 10-K, which was filed with the United States Securities and Exchange Commission ("SEC") on March 30, 2022.*

**Overview**

Core Scientific is a best-in-class large-scale operator of dedicated, purpose-built facilities for digital asset mining and a premier provider of blockchain infrastructure, software solutions and services. We mine digital assets for our own account and provide colocation hosting services for other large-scale miners. We began digital asset mining in 2018 and in 2020 became one of the largest North American providers of colocation hosting services for third-party mining customers. Historically, we derived almost all of our revenue from third-party colocation hosting fees and the resale of digital asset mining machines and currently derive almost all of our revenue from self-mining bitcoin. We are one of the largest blockchain infrastructure, hosting provider and digital asset mining companies in North America, with approximately 457MW of power as of December 31, 2021, and 592MW of power as of December 31, 2022. We predominately mine bitcoin for third-party hosting customers and for our own account at our eight fully operational data centers in Georgia (2), Kentucky (1), North Carolina (2), North Dakota (1) and Texas (2). In February 2022, the Muskogee City-County Port Authority (Oklahoma) announced an agreement with us to develop a 500MW data center at the Port of Muskogee John T. Griffin Industrial Park which remains substantially undeveloped.

Although our business operations date uninterrupted back to 2018 (and was known as "Core Scientific" ("Old Core")), the current corporate entity operating our business was formerly known as Power & Digital Infrastructure Acquisition Corp. ("XPDI") which was a special purpose acquisition corporation formed for the purpose of acquiring an operating business like Old Core. On July 20, 2021, XPDI, Core Scientific Holding Co., and XPDI Merger Sub entered into a merger agreement (the "Merger Agreement") which provided for the business combination transactions provided therein (the "Business Combination") pursuant to which the business of Old Core was combined with XPDI and XPDI changed its name to Core Scientific, Inc. ("New Core" or the "Company"). XPDI's stockholders approved the transactions (collectively, the "Merger") contemplated by the Business Combination at a special meeting of stockholders held on January 19, 2022. See our Management's Discussion and Analysis of Financial Condition and Results of Operations for additional information on the Business Combination.

In July 2021, Old Core completed the acquisition of Blockcap, Inc. ("Blockcap"), one of Old Core's largest hosting customers. Prior to its acquisition, Blockcap had retained Old Core to host in the data centers operated by Old Core Blockcap's industrial scale digital asset mining operations. Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin and, to a lesser extent, Siacoin and Ethereum. At the time of its acquisition, Blockcap claimed to be the largest independent cryptocurrency mining operator in North America. While Blockcap did sell or exchange the digital assets it mined to fund its growth strategies or for general corporate purposes from time to time, it generally retained its digital assets as investments in anticipation of continued adoption of digital assets as a "store of value" and a more accessible and efficient medium of exchange than traditional fiat currencies.

Our total revenue was $640.3 million and $544.5 million for the years ended December 31, 2022 and 2021, respectively. We had an operating loss of $2.11 billion and operating income of $131.5 million for the years ended December 31, 2022 and 2021, respectively. We had a net loss of $2.15 billion and net income of $47.3 million for the years ended December 31, 2022 and 2021, respectively. Our Adjusted EBITDA was $174.9 million and $238.9 million for the years ended December 31, 2022 and 2021,

Debtors' Exhibit No. 40
Page 171 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

respectively. Adjusted EBITDA is a non-GAAP financial measure. See "*Key Business Metrics and Non-GAAP Financial Measure*" below for our definition of, and additional information related to, Adjusted EBITDA.

66

---

Debtors' Exhibit No. 40

**Recent Developments**

*Chapter 11 Filing and Other Related Matters*

*Chapter 11*

On December 21, 2022 (the "Petition Date"), the "Company and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Debtors filed various "first day" motions with the Bankruptcy Court requesting customary relief, which were generally approved by the Bankruptcy Court on December 22, 2022, that have enabled the Company to operate in the ordinary course while under Chapter 11 protection. For detailed discussion about the Chapter 11 Cases, refer to Note 3 — Chapter 11 Filing and Other Related Matters to our consolidated financial statements in Item 8 of Part II of this report.

*Original DIP Credit Agreement and Restructuring Support Agreement*

In connection with the Chapter 11 Cases, the Debtors entered into a Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of December 22, 2022 (the "Original DIP Credit Agreement"), with Wilmington Savings Fund Society, FSB, as administrative agent, and the lenders from time to time party thereto (collectively, the "Original DIP Lenders"). The Original DIP Lenders are also holders or affiliates, partners or investors of holders under the Company's notes sold pursuant to (i) the Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific, Inc. (as successor of Core Scientific Holding Co.), the guarantors party thereto from time to time, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder, and (ii) the Convertible Note Purchase Agreement, dated as of August 20, 2021, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific, Inc. (as successor of Core Scientific Holding Co.), the guarantors party thereto from time to time, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder (collectively, the "Convertible Notes").

Also in connection with the filing of the Chapter 11 Cases, the Company entered into a restructuring support agreement (together with all exhibits and schedules thereto, the "Restructuring Support Agreement") with the ad hoc group of noteholders, representing more than 70% of the holders of its convertible notes (the "Ad Hoc Noteholder Group") pursuant to which the Ad Hoc Noteholder Group agreed to provide commitments for a debtor-in-possession facility (the "Original DIP Facility") of more than $57 million and agreed to support the syndication of up to an additional $18 million in new money DIP (defined below) facility loans to all holders of convertible notes. The Restructuring Support Agreement was terminated by the Company pursuant to a "fiduciary out" which permitted the Company to pursue better alternatives.

*Replacement DIP Credit Agreement*

On February 2, 2023, the Bankruptcy Court entered an interim order (the "Replacement Interim DIP Order") authorizing, among other things, the Debtors to obtain senior secured non-priming super-priority replacement post-petition financing (the "Replacement DIP Facility"). On February 27, 2023, the Debtors entered into a Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement governing the Replacement DIP Facility (the "Replacement DIP Credit Agreement"), with B. Riley Commercial Capital, LLC, as administrative agent (the "Administrative Agent"), and the lenders from time to time party thereto (collectively, the "Replacement DIP Lender"). Proceeds of the Replacement DIP Facility were used to, among other things, repay amounts outstanding under the Original DIP Facility, including payment of all fees and expenses required to be paid under the terms of the Original DIP Facility. These funds, along with ongoing cash generated from operations, were anticipated to provide the necessary financing to effectuate the planned restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was made available following Bankruptcy Court approval of the Interim DIP Order and (ii) $35 million was made available following Bankruptcy Court approval of the Final DIP Order. Loans under the Replacement DIP Facility will bear interest at a rate of 10%,

67

which will be payable in kind in arrears on the first day of each calendar month. The Administrative Agent received an upfront payment equal to 3.5% of the aggregate commitments under the Replacement DIP Facility on February 3, 2023, payable in kind, and the Replacement DIP Lender will receive an exit premium equal to 5% of the amount of the loans being repaid, reduced or satisfied, payable in cash. The Replacement DIP Credit Agreement includes representations and warranties, covenants applicable to the Debtors, and events of default. If an event of default under the Replacement DIP Credit Agreement occurs, the Administrative Agent may, among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Credit Agreement to be immediately due and payable.

The maturity date of the Replacement DIP Credit Agreement is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Credit Agreement will also terminate on the date that is the earliest of the following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers (as defined in the Replacement DIP Credit Agreement) or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the Loans and the termination of the Commitments (whether automatically, or upon any Event of Default or as otherwise provided in the Replacement DIP Credit Agreement); and (iv) conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

On March 1, 2023, the Bankruptcy Court entered an order approving the Replacement DIP Facility on a final basis and the terms under which the Debtors are authorized to use the cash collateral of the holders of their convertible notes (the "Final DIP Order"). For detailed discussion about the Replacement DIP Facility, refer to Note 21 — Subsequent Events to our consolidated financial statements in Item 8 of Part II of this report.

The Bankruptcy Court has appointed two official committees: the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which represents general unsecured creditors, and the Official Committee of Equity Security Holders (the "Equity Committee"), which represents equity security holders. These committees have the right to be heard on all matters that come before the Bankruptcy Court and have important roles in the Chapter 11 Cases. The Debtors are required to bear certain costs and expenses of the committees, including those of their counsel and financial advisors, in each case subject to a limited budget.

*Going Concern*

The consolidated financial statements have been prepared on a going concern basis. For the year ended December 31, 2022, the Company generated a net loss of $2.15 billion and used cash in operating activities on $205.2 million. The Company had unrestricted cash and cash equivalents of $15.9 million as of December 31, 2022, compared to $117.9 million as of December 31, 2021. The decrease in cash and cash equivalents for the year ended December 31, 2022 primarily reflected $205.2 million of cash used in operating activities (including $58.1 million of interest payments on debt), $0.59 billion of cash used in investing activities (including $384.0 million of purchases of property, plant and equipment and $217.7 million of deposits for self-mining equipment) and $306.2 million of cash used in financing activities (including $261.3 million of principal payments on debt, net of issuance costs). The Company has historically generated cash primarily from the issuance of common stock and debt, through sales of digital assets received as digital asset mining revenue and from operations through contracts with customers.

*Celsius Bankruptcy*

In July 2022, one of our largest customers, Celsius Mining LLC ("Celsius"), along with its parent company and certain affiliates, filed for voluntary relief under chapter 11 of the United States Bankruptcy Code. On September 28, 2022, Celsius filed a motion in the chapter 11 case alleging that the Company is violating the automatic stay with respect to the Master Services Agreement between Celsius and us (the "Celsius Agreement"). Celsius is also using its chapter 11 proceeding to withhold payment of certain charges billed to Celsius pursuant to the Celsius Agreement. We strongly disagree with the allegations made in the Celsius motion and the interpretation of the Celsius Agreement espoused therein and are vigorously defending our interests, including seeking resolution from the bankruptcy court and payment of any outstanding amounts owed under the Celsius Agreement (subject to applicable bankruptcy law in the Celsius chapter 11 case). The parties have agreed to stay the proceedings, including the evidentiary hearing previously scheduled for November 18, 2022. There can be no guarantee that the Celsius bankruptcy court will rule in our favor in a timely manner or that Celsius will honor the terms of the Celsius Agreement. As of December 31, 2022, $8.7 million was due from Celsius, for which we had reserved $8.7 million as an allowance, that is presented within accounts receivable, net, of which $1.6 million was outstanding in July 2022 at the time of the Celsius bankruptcy petition. Celsius may take actions in its chapter 11 proceeding to seek to reduce our claims for services and damages to which we may be entitled. Our recovery on our claims will be

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

subject to factors outside of our control.

68

*B. Riley Equity Line of Credit*

In July 2022, we entered into a common stock purchase agreement (the "Equity Line of Credit") and a Registration Rights Agreement (the "Registration Rights Agreement") with B. Riley Principal Capital II, LLC ("B. Riley"). Pursuant to the Equity Line of Credit, subject to the satisfaction of the conditions set forth in the Equity Line of Credit, we had the right to sell to B. Riley, up to $100.0 million of shares of our common stock, par value $0.0001 per share (the "Common Stock"), subject to certain limitations and conditions set forth in the Equity Line of Credit, from time to time during the term of the Equity Line of Credit. Sales of common stock pursuant to the Equity Line of Credit, and the timing of any sales, were solely at our option, and we were under no obligation to sell any securities to B. Riley under the Equity Line of Credit. At present the Company is unable to satisfy the conditions set forth in the Equity Line of Credit and is unable to sell Common Stock to B. Riley.

Pursuant to the terms of the Equity Line of Credit, in no event may the Company issue to B. Riley under the Equity Line of Credit more than 70.3 million shares of Common Stock, which number of shares is equal to approximately 19.99% of the shares of the Common Stock outstanding immediately prior to the execution of the Equity Line of Credit (the "Exchange Cap"), unless (i) we obtain stockholder approval to issue shares of Common Stock in excess of the Exchange Cap in accordance with applicable Nasdaq rules, or (ii) the average price per share paid by B. Riley for all of the shares of Common Stock that the Company directs B. Riley to purchase from us pursuant to the Equity Line of Credit, if any, equals or exceeds $1.75 per share (representing the lower of the official closing price of the our Common Stock on Nasdaq on the trading day immediately preceding the date of the Equity Line of Credit and the average official closing price of our Common Stock on Nasdaq for the five consecutive trading days ending on the trading day immediately preceding the date of the Equity Line of Credit, as adjusted pursuant to applicable Nasdaq rules). Moreover, we may not issue or sell any shares of Common Stock to B. Riley under the Equity Line of Credit which, when aggregated with all other shares of Common Stock then beneficially owned by B. Riley and its affiliates (as calculated pursuant to Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 13d-3 thereunder), would result in B. Riley beneficially owning more than 4.99% of the outstanding shares of Common Stock.

During the year ended December 31, 2022, the Company issued 13.4 million shares under the Equity Line of Credit for a total sales price to B. Riley of $20.7 million, which is net of $0.6 million for the fixed 3.0% discount to the volume weighted average price ("VWAP") of the Common Stock, calculated in accordance with the Equity Line of Credit, which was recorded within other non-operating expenses, net on the Company's Consolidated Statements of Operations. As of December 31, 2022, 56.9 million shares of Common Stock were available to be issued under the Equity Line of Credit.

As described below, 25% of the net cash proceeds received for shares issued under the Equity Line of Credit that is required to be applied by us to repay the outstanding principal amount of the Amended Bridge Notes. As of December 31, 2022, the Company owed $5.3 million on the Amended Bridge Notes related to proceeds received under the Equity Line of Credit.

*Amended Bridge Notes*

On August 1, 2022, we entered into two amended and restated bridge promissory notes, one in an aggregate principal amount of $60 million with B. Riley Commercial Capital, LLC ("B. Riley Commercial Capital") and one in an aggregate principal amount of $15 million with an affiliate of B. Riley Commercial Capital (the "Amended Bridge Notes"). The Amended Bridge Notes amend the original notes having identical principal amounts to extend the maturity date from December 7, 2022 to June 1, 2023. The Amended Bridge Notes bear interest at a rate of 7% per annum and amortize collectively as follows (in thousands):

69

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

| Payment Dates | | Payment Amount |
|---|---|---|
| August 1, 2022 | $ | 18,000 |
| September 1, 2022 | $ | 4,875 |
| October 1, 2022 | $ | 4,875 |
| November 1, 2022 | $ | 4,875 |
| December 1, 2022 | $ | 4,875 |
| January 1, 2023 | $ | 6,250 |
| February 1, 2023 | $ | 6,250 |
| March 1, 2023 | $ | 6,250 |
| April 1, 2023 | $ | 6,250 |
| May 1, 2023 | $ | 6,250 |

The net proceeds of the notes were used by us for working capital and general corporate purposes.

The Amended Bridge Notes require the proceeds of (i) any equity issuances (other than issuances consummated for purposes of making tax payments in connection with the vesting of restricted stock and restricted stock units and equity line of credit under the Equity Line of Credit ("ELOC") sales), (ii) any secured debt incurred on or after April 7, 2022 (other than purchase money debt) in excess of $500 million and (iii) any ELOC sales in an amount equal to 25% of the net cash proceeds received from any such ELOC sale, in each case, to be applied by us to repay the outstanding principal amount of the Amended Bridge Notes. As a result of the Company's Chapter 11 Cases, the Company is in default of the Amended Bridge Notes.

*MassMutual Amendments*

In August 2022, the Company amended the Mass Mutual Barings loans to defer principal payments for a period of six months beginning with payments due in August 2022. The amendments result in no change to the term of the loans and the remaining principal will amortize over the remaining life of the loans beginning in February 2023. The amendments also require an additional amount of blockchain computing equipment to be provided as collateral. Interest expense on the amended loans has been recognized based on an effective interest rate of 13.0%. In August 2022, the Company issued 0.3 million shares of Common Stock to Mass Mutual Barings as an amendment fee.

In August 2022, the Company amended the finance lease agreements with MassMutual Asset Finance LLC to defer lease payments for a period of six months beginning with payments due in August 2022. The amendments result in no change to the term of the finance leases and the remaining principal will amortize over the remaining life of the leases beginning in February 2023. The amendments also requires an additional amount blockchain computing equipment to be provided as collateral. The leases under the amended agreements bear interest at a rate of 13.0% per annum. Interest expense on the amended leases has been recognized based on an effective interest rate of 12.5%. As a result of the lease modification, the lease liabilities decreased by $7.7 million with a corresponding decrease to finance lease right-of assets of $7.7 million. As a result of the Company's Chapter 11 Cases, the Company is in default of the Mass Mutual Barings loans and the amended finance lease agreement with MassMutual Asset Finance LLC.

*Impairment Charges*

During the year ended December 31, 2022, falling digital asset prices, significantly higher energy prices, inflation and supply chain disruptions increased our electricity costs, delayed facility development and miner deployments and reduced our profitability. The costs of constructing, developing, operating and maintaining facilities and growing our hosting operations also increased significantly, which have made it difficult for us to expand our business and reduced our operating profitability. Inflation and capital constraints have forced us and many companies like us to sell digital assets for cash that has contributed to large scale selling of digital assets and a decrease in the price of digital assets, including bitcoin. On June 30, 2022, September 30, 2022 and December 31, 2022, we identified a triggering event related to our assets and recorded a goodwill and other intangibles impairment charge of $1.06 billion for the year ended December 31, 2022. The falling prices of digital assets also resulted in a $231.3 million impairment of digital assets being recorded for the year ended December 31, 2022. In addition, the prolonged decrease in the price of bitcoin, the increase in electricity costs and the increase in the global bitcoin network hash rate during the period resulted in an impairment of property, plant and equipment of $590.7 million for the year ended December 31, 2022. A continuation of these trends could result in further asset impairments in future periods.

70

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

*RSU Amendment*

During the year ended December 31, 2022, we amended our outstanding restricted stock units ("RSUs") to provide for the waiver and elimination of the additional vesting requirement that Core Scientific undergo a "change in control" or a "public offering" for full vesting of outstanding time-vested awards (the "RSU Amendment"). As a result of the RSU Amendment, outstanding RSUs that were time-vested were net settled and outstanding RSUs not vested are subject only to time-based vesting. Share-based compensation expense increased by $144.0 million for the year ended December 31, 2022, as compared to the year ended December 31, 2021, primarily as a result of the RSU Amendment.

*Hosting contract terminations*

During the quarter ended December 31, 2022, the hosting contracts for 24 customers, (including two related-party customers) were terminated. The previously-hosted ASIC servers were removed from our data center facilities and returned to the customers. For all 24 customers in the aggregate, we recorded total hosting revenue for the year ended December 31, 2022, of $60.1 million of which $32.5 million was hosting revenue from related parties. We replaced the previously-hosted third-party owned ASIC servers with our own self-mining equipment as the ASIC servers were removed and returned to the customers. As of January 31, 2023, we provided data center colocation services, technology and operating support for approximately 40,000 customer-owned ASIC servers.

## Our Business Model

*Company Overview*

Core Scientific is a blockchain technology company with industrial scale digital asset mining, equipment sales and hosting operations. Our operations are currently conducted in the United States at state-of-the-art facilities specifically designed and constructed for housing advanced mining equipment. The Company's primary business is self-mining and hosting third-party equipment used in mining of digital asset coins and tokens, including bitcoin.

Since July 2018, we have operated for ourselves and on behalf of our customers and related parties, miners of varying models, types, and manufacturers, but primarily miners of bitcoin manufactured by Bitmain Technologies, Ltd ("Bitmain"). We have accumulated significant expertise in the installation, operation, optimization, and repair of digital mining equipment. We have expanded our self-mining operation to take advantage of favorable market conditions and leverage our expertise for our own account.

We were originally known as Power & Digital Infrastructure Acquisition Corp. ("XPDI"). On July 20, 2021, we entered into the merger agreement between XPDI, Core Scientific Holding Co. and XPDI Merger Sub (the "Merger Agreement"). XPDI's stockholders approved the transactions contemplated by the Merger Agreement (collectively, the "Business Combination") at a special meeting of stockholders held on January 19, 2022. Following the aforementioned approval on January 19, 2022, Core Scientific Holding Co., XPDI, and XPDI Merger Sub consummated the Business Combination. In connection with the Business Combination, we changed our name from Power & Digital Infrastructure Acquisition Corp. to Core Scientific, Inc.

In July 2021, Old Core completed the acquisition of Blockcap, Inc. ("Blockcap"), one of Old Core's largest hosting customers. Prior to its acquisition, Blockcap had retained Old Core to host in the data centers operated by Old Core Blockcap's industrial scale digital asset mining operations. Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin and, to a lesser extent, Siacoin and Ethereum. At the time of its acquisition, Blockcap claimed to be the largest independent cryptocurrency mining operator in North America. While Blockcap did sell or exchange the digital assets it mined to fund its growth strategies or for general corporate purposes from time to time, it generally retained its digital assets as investments in anticipation of continued adoption of digital assets as a "store of value" and a more accessible and efficient medium of exchange than traditional fiat currencies.

Our hosting colocation business provides a full suite of services to digital asset mining customers. We provide deployment, monitoring, troubleshooting, optimization and maintenance of our customer's digital asset mining equipment and provide necessary electrical power and repair and other infrastructure services necessary to operate, maintain and efficiently mine digital assets.

Our business strategy is to continue to grow our self-mining operations by significantly increasing the number of miners dedicated to producing digital assets for our own account, and to continue to develop and grow the infrastructure and facilities necessary to house our growing digital asset mining business and support our third-party hosting colocation business. We may also

Debtors' Exhibit No. 40
Page 180 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

explore adjacent lines of businesses that leverage our mining expertise and bitcoin assets.

71

Our proprietary data centers in Georgia, Kentucky, North Carolina, North Dakota and Texas are purpose-built facilities optimized for the unique requirements of high density blockchain computer servers. These facilities have long-term power contracts at approximately 457MW of power as of December 31, 2021 and 592MW of power as of December 31, 2022. In February 2022, the Muskogee City-County Port Authority (Oklahoma) announced an agreement with us to develop a 500MW data center at the Port of Muskogee John T. Griffin Industrial Park which remains substantially undeveloped. Our existing completed facilities leverage our specialized construction proficiency by employing high-density, low-cost engineering and power designs. We continually evaluate our mining performance, including our ability to access additional megawatts of electric power and to expand our total self-mining and customer and related party hosting hash rates. We may explore additional mining facilities and mining arrangements in connection with our short-, medium- and long-term strategic planning.

*Segments*

We have two operating segments: "Equipment Sales and Hosting" which consists primarily of our blockchain infrastructure and third-party hosting business and equipment sales to customers, and "Mining" consisting of digital asset mining for our own account. The blockchain hosting business generates revenue through the sale of consumption-based contracts for our hosting services which are recurring in nature. Equipment sales revenue is derived from our ability to leverage our partnerships with leading equipment manufacturers to secure equipment in advance, which is then sold to our customers when they are unable to obtain them otherwise. The Mining segment generates revenue from operating owned computer equipment as part of a pool of users that process transactions conducted on one or more blockchain networks. In exchange for these services, we receive digital assets.

*Mining Equipment*

We own and host specialized computers ("miners") configured for the purpose of validating transactions on multiple digital asset network blockchains (referred to as, "mining"), predominantly the bitcoin network. Substantially all of the miners we own and host were manufactured by Bitmain and incorporate application-specific integrated circuit ("ASIC") chips specialized to solve blocks on the bitcoin blockchains using the 256-bit secure hashing algorithm ("SHA-256") in return for bitcoin digital asset rewards.

We have entered into and facilitated agreements with vendors to supply mining equipment for our and our users' digital asset mining operations. We pay for these new miners in installments, with payment due in advance of the scheduled delivery dates set forth in the applicable purchase agreement. We allocate in advance our mining equipment orders between our self-mining operations and our hosting operations conducted on behalf of customers based on our estimates of where such equipment can most profitably and efficiently be used and in accordance with contractual arrangements with our customers. As of December 31, 2022, all new miners have been paid for in arrangements with our customers.

As of December 31, 2022, we had deployed approximately 234,000 bitcoin miners, which number consists of approximately 153,000 self-miners and approximately 81,000 hosted miners, which represented 15.7 EH/s and 8.0 EH/s for self-miners and hosted miners, respectively.

The tables below summarize the total number of self- and hosted miners in operation as of December 31, 2022 and December 31, 2021, respectively (miners in thousands).

| Mining Equipment | Bitcoin Miners in Operation as of December 31, 2022 | |
| --- | --- | --- |
| | Hash rate (EH/s) | Number of Miners |
| Self-miners | 15.7 | 153.0 |
| Hosted miners | 8.0 | 81.0 |
| Total mining equipment | 23.7 | 234.0 |

72

Debtors' Exhibit No. 40
Page 182 of 462

| Mining Equipment | Bitcoin Miners in Operation as of December 31, 2021 | |
| | Hash rate to be deployed (EH/s) | Number of Miners |
| --- | --- | --- |
| Self-miners[1] | 6.7 | 66.8 |
| Hosted miners | 7.0 | 73.9 |
| Total mining equipment | 13.7 | 140.7 |

[1] Blockcap's hash rate and number of miners is included in self-miners in the table above.

*Summary of Digital Asset Activity*

Activity related to our digital asset balances for the years ended December 31, 2022 and 2021 were as follows (in thousands):

| | December 31, 2022 | December 31, 2021 |
| --- | --- | --- |
| Digital assets, beginning of period | $ 234,298 | $ 63 |
| Digital asset mining revenue | 397,796 | 216,925 |
| Blockcap acquisition | — | 77,560 |
| Proceeds from sales of digital assets and other | (444,353) | (27,858) |
| Gain from sales of digital assets | 44,298 | 4,814 |
| Impairment of digital assets | (231,315) | (37,206) |
| Digital assets, end of period | $ 724 | $ 234,298 |

The estimated fair value of the Company's digital assets as of December 31, 2022 and 2021, was $0.7 million and $248.1 million, respectively.

*Performance Metrics*

*Hash Rate*

Miners perform computational operations in support of digital asset blockchains measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which it is capable of solving such computations. The original equipment used for mining bitcoin utilized the Central Processing Unit ("CPU") of a computer to mine various forms of digital assets. Due to performance limitations, CPU mining was rapidly replaced by the Graphics Processing Unit ("GPU"), which offers significant performance advantages over CPUs. General purpose chipsets like CPUs and GPUs have since been replaced as the standard in the mining industry by ASIC chips such as those found in the miners we and our customers use to mine bitcoin. These ASIC chips are designed specifically to maximize the rate of hashing operations.

*Network Hash Rate*

In digital asset mining, hash rate is a measure of the processing speed at which a mining computer operates in its attempt to secure a specific digital asset. A participant in a blockchain network's mining function has a hash rate equivalent to the total of all its miners seeking to mine a specific digital asset. System-wide, the total network hash rate reflects the sum total of all miners seeking to mine each specific type of digital asset. A participant's higher total hash rate relative to the system-wide total hash rate generally results in a corresponding higher success rate in digital asset rewards over time as compared to mining participants with relatively lower total hash rates.

However, as the relative market price for a digital asset, such as bitcoin, increases, more users are incentivized to mine for that

digital asset, which increases the network's overall hash rate. As a result, a mining participant must increase its total hash rate in order to maintain its relative possibility of solving a block on the network blockchain. Achieving greater hash rate power by deploying increasingly sophisticated miners in ever greater quantities has become one of the bitcoin mining industry's great sources of competition. Our goal is to deploy a powerful fleet of self- and hosted-miners, while operating as energy-efficiently as possible.

73

**The Merger and Public Company Costs**

The merger of Old Core and XPDI provided gross proceeds of approximately $221.6 million from the XPDI trust account, resulting in approximately $201.0 million in net cash proceeds to Core Scientific, after the payment of transaction expenses. As a result of the merger, former Core Scientific stockholders owned 90.7%, former XPDI public stockholders owned 6.7% and XPDI's sponsor owned 2.6% of the issued and outstanding shares of common stock, respectively, of the Company, excluding the impact of unvested restricted stock units and options. The proceeds from the merger were used to fund mining equipment purchases and infrastructure build-out as the Company expands its leadership position. As a result of the merger, among other things, each outstanding share of Old Core common stock was cancelled in exchange for the right to receive 1.6001528688 of a share of the Company's common stock.

The merger was accounted for as a reverse recapitalization and XPDI was treated as the "acquired" company for financial reporting purposes. Old Core was deemed the predecessor and Core Scientific, Inc., the post-combination company, is the successor Securities and Exchange Commission ("SEC") registrant, meaning that Old Core's financial statements for periods prior to the consummation of the merger are disclosed in Core Scientific's periodic reports.

As a consequence of the merger, the Company and XPDI collectively incurred an aggregate of $39.0 million in professional fees associated with legal services, M&A advisor fees, financial advice, due diligence, and other deal-related costs. These transaction costs were allocated to all instruments assumed or issued in the merger on a relative fair value basis as of the date of the merger. Transaction costs allocated to equity-classified instruments were recognized as an adjustment to additional paid-in capital within total stockholders' equity while transaction costs allocated to liability-classified instruments that were subsequently measured at fair value through earnings were expensed in the first quarter of 2022.

**Key Factors Affecting Our Performance**

*Market Price of Digital Assets*

Our business is heavily dependent on the spot price of bitcoin, as well as other digital assets. The prices of digital assets, specifically bitcoin, have experienced substantial volatility, which may reflect "bubble" type volatility, meaning that high or low prices may have little or no relationship to identifiable market forces, may be subject to rapidly changing investor sentiment, and may be influenced by factors such as technology, regulatory void or changes, fraudulent actors, manipulation, and media reporting. Bitcoin (as well as other digital assets) may have value based on various factors, including their acceptance as a means of exchange by consumers and others, scarcity, and market demand.

Our financial performance and continued growth depend in large part on our ability to mine for digital assets profitably and to attract customers for our hosting services. Increases in power costs, inability to mine digital assets efficiently and to sell digital assets at favorable prices will reduce our operating margins, impact our ability to attract customers for our services, may harm our growth prospects and could have a material adverse effect on our business, financial condition and results of operations. Over time, we have observed a positive trend in the total market capitalization of digital assets which suggests increased adoption. However, historical trends are not indicative of future adoption, and it is possible that the adoption of digital assets and blockchain technology may slow, take longer to develop, or never be broadly adopted, which would negatively impact our business and operating results.

*Network Hash Rate*

Our business is not only impacted by the volatility in digital asset prices, but also by increases in the competition for digital asset production. For bitcoin, this increased competition is described as the network hash rate resulting from the growth in the overall quantity and quality of miners working to solve blocks on the bitcoin blockchain, and the difficulty index associated with the secure hashing algorithm employed in solving the blocks.

*Difficulty*

The increase in bitcoin's network hash rate results in a regular increase in the cryptographic complexity associated with solving blocks on its blockchain, or its difficulty. Increased difficulty reduces the mining proceeds of the equipment proportionally and

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

eventually requires bitcoin miners to upgrade their mining equipment to remain profitable and compete effectively with other miners. Similarly, a decline in network hash rate results in a decrease in difficulty, increasing mining proceeds and profitability.

74

Debtors' Exhibit No. 40

The table below provides a summary of the impact to revenue from the increase or decrease in the market price of bitcoin, difficulty and our hash rate. The impact to revenue in each scenario assumes only one driver increases or decreases and all others are held constant.

|  | Impact to Revenue | |
| --- | --- | --- |
| Driver | Increase in Driver | Decrease in Driver |
| Market Price of Bitcoin | Favorable | Unfavorable |
| Difficulty | Unfavorable | Favorable |
| Core Scientific Hash Rate | Favorable | Unfavorable |

*Halvening*

Further affecting the industry, and particularly for the bitcoin blockchain, the digital asset reward for solving a block is subject to periodic incremental halvening. Halvening is a process designed to control the overall supply and reduce the risk of inflation in digital assets using a proof of work consensus algorithm. At a predetermined block, the mining reward is reduced by half, hence the term "halvening."

For bitcoin, our most significant digital asset to which the vast majority of our mining power is devoted, the reward was initially set at 50 bitcoin currency rewards per block. The bitcoin blockchain has undergone halvening three times since its inception, as follows: (1) on November 28, 2012, at block 210,000; (2) on July 9, 2016 at block 420,000; (3) on May 11, 2020 at block 630,000, when the reward was reduced to its current level of 6.25 bitcoin per block. The next halvening for the bitcoin blockchain is anticipated to occur in early 2024 at block 840,000. This process will repeat until the total amount of bitcoin currency rewards issued reaches 21 million and the theoretical supply of new bitcoin is exhausted, which is expected to occur around the year 2140. Many factors influence the price of bitcoin and the other digital assets we may mine for, and potential increases or decreases in prices in advance of or following a future halvening are unknown.

*Electricity Costs*

Electricity cost is the major operating cost for the mining fleet, as well as for the hosting services provided to customers and related parties. The cost and availability of electricity are affected primarily by changes in seasonal demand, with peak demand during the summer months driving higher costs and increased curtailments to support grid operators. Severe winter weather can increase the cost of electricity and the frequency of curtailments when it results in damage to power transmission infrastructure that reduces the grid's ability to deliver power. Geopolitical and macroeconomic factors, such as overseas military or economic conflict between states, can adversely affect electricity costs by raising the cost of power generation inputs such as natural gas. Locally, factors such as animal incursion, sabotage and other events out of our control can also impact electricity costs and availability.

*Equipment Costs*

The long-term trend of increasing digital assets market value has increased demand for the newest, most efficient miners and has resulted in scarcity in the supply of, and thereby a resulting increase in the price of, those miners. The recent decline in the market value of digital assets has resulted in excess supply of miners and a decline in their price. As a result, the cost of new machines can be unpredictable, and could be significantly higher than our historical cost for new miners.

*Our Customers*

In addition to factors underlying our mining business growth and profitability, our success greatly depends on our ability to retain and develop opportunities with our existing customers and to attract new customers. On July 30, 2021, we acquired an existing hosting customer, Blockcap, and thereby increased our self-mining operations.

Our business environment is constantly evolving, and digital asset miners can range from individual enthusiasts to professional mining operations with dedicated data centers. The Company competes with other enterprises that focus all or a portion of their activities on mining activities at scale. We face significant competition in every aspect of our business, including, but not limited to,

Debtors' Exhibit No. 40
Page 187 of 462

the acquisition of new miners, the ability to raise capital, obtaining low-cost electricity, obtaining access to energy sites with reliable sources of power, and evaluating new technology developments in the industry.

75

At present, the information concerning the activities of these enterprises may not be readily available as the vast majority of the participants in this sector do not publish information publicly, or the information may be unreliable. Published sources of information include "bitcoin.org" and "blockchain.info;" however, the reliability of that information and its continued availability cannot be assured.

We believe, based on available data, that despite the significant decrease in market prices for bitcoin and other major digital assets during 2022, an increase in the scale and sophistication of competition in the digital asset mining industry has continued increasing network hash rate, with new entrants and existing competitors increasing the number of miners mining for bitcoin.

Despite this trend, we believe, we have continued to maintain a competitive hash rate capacity among both public and private Bitcoin miners. However, to remain competitive in our evolving industry, both against new entrants into the market and existing competitors, we anticipate that we will need to continue to expand our existing miner fleet by purchasing new and available used miners, as well as innovating to develop and implement new technologies and mining solutions.

We believe that our integrated blockchain service portfolio, as well as our differentiated customer experience and technology, are keys to retaining and growing revenue from existing customers and to acquiring new customers. For example, we believe our significant build-out and ready power along with our Minder™ fleet management software layer represent meaningful competitive advantages favorable to our business.

### Differentiation, Innovation and Expansion of Our Platform

Our investments in research and development drive differentiation of our service offerings, core technology innovation and our ability to bring new products to market.

We believe that we differentiate ourselves by offering premium products and services, including our ability to manage our electricity sourcing, construct proprietary passive cooled data centers, and enable the efficient performance of commercially available mining equipment through our Minder™ fleet management software.

We intend to continue to invest judiciously in research and development activities to extend our platform management and software solutions in order to manage our mining fleet more efficiently, expand within existing accounts, and gain new customers by offering differentiated capabilities.

### Regulation

Due to the relatively short history of digital assets, and their emergence as a new asset class, government regulation of blockchain and digital assets is constantly evolving, with increased interest expressed by U.S. and internal regulators. In October 2020, the Cyber-Digital Task Force of the U.S. Department of Justice published a report entitled "Cryptocurrency: An Enforcement Framework" that detailed the Department's view with respect to digital assets and the tools at the Department's disposal to deal with threats posed by digital assets. In February 2021, representatives of the government of Inner Mongolia, China announced plans to ban digital asset mining within the province due to the energy and rare earth mineral demands of the industry. In March 2021, the nominee for Chair of the SEC expressed the need for investor protection along with promotion of innovation in the digital asset space. In March 2022, President Biden signed an Executive Order outlining an "whole-of-government" approach to addressing the risks and harnessing the potential benefits of digital assets and its underlying technology. The executive order lays out a national policy for digital assets over six highlighted priorities. In January 2023, the U.S. House of Representatives created a new congressional subcommittee focused on digital assets, the Subcommittee of Digital Assets, Financial Technology and Inclusion, operating under the House Financial Services Committee.

In addition to the activities of the United States federal government and its various agencies and regulatory bodies, government regulation of blockchain and digital assets is also under active consideration by similar entities in other countries and transnational organizations, such as the European Union. State and local regulations within the United States also may apply to our activities and other activities in which we may participate in the future. Other governmental or semi-governmental regulatory bodies have shown an interest in regulating or investigating companies engaged in blockchain or digital asset businesses. For instance, the SEC has taken an active role in regulating the use of public offerings of proprietary coins (so-called "initial coin offerings") and has made statements

and official promulgations as to the status of certain digital assets as "securities" subject to regulation by the SEC.

76

---

### *Strategic Acquisitions and Investments*

Our business strategy is to grow our revenue and profitability by increasing the capacity and efficiency of our self-mining fleet and by enhancing our third-party colocation business. We intend to strategically develop the infrastructure necessary to support business growth and profitability and take advantage of adjacent opportunities that leverage our mining expertise and capabilities.

### *2021 Acquisitions*

In July 2021, Old Core acquired Blockcap, a Nevada corporation engaged in the business of digital asset mining and through its subsidiary, RADAR, an early-stage company focused on technology enhancement and development in the digital asset industry. Pursuant to the Core/Blockcap merger agreement, each eligible share of Blockcap was converted into shares of Core common stock in accordance with a determined ratio, and Blockcap was merged with a wholly owned subsidiary of Old Core. As a result of the merger we acquired for self-mining all of the digital asset mining machines owned by Blockcap and hosted by us in our facilities. As a result, the existing hosting agreement between Old Core and Blockcap was terminated.

### Condensed Statements of Operations

The following table presents a condensed statements of operations for the years ended December 31, 2022 and 2021:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | (in thousands) | |
| Total Revenue | $ 640,313 | $ 544,483 |
| Cost of revenue | 631,913 | 305,621 |
| Gross profit | 8,400 | 238,862 |
| (Loss) gain on legal settlement | — | (2,636) |
| Gain from sales of digital assets | 44,298 | 4,814 |
| Impairment of digital assets | (231,315) | (37,206) |
| Impairment of goodwill and other intangibles | (1,059,265) | — |
| Impairment of property, plant and equipment | (590,673) | — |
| Losses on exchange or disposal of property, plant and equipment | (28,025) | (118) |
| Total operating expenses | 252,973 | 72,222 |
| Operating (loss) income | (2,109,553) | 131,494 |
| Total non-operating expense, net | 53,856 | 68,419 |
| Income (loss) before income taxes | (2,163,409) | 63,075 |
| Income tax expense | (17,091) | 15,763 |
| Net (loss) income | $ (2,146,318) | $ 47,312 |

### Key Business Metrics and Non-GAAP Financial Measure

In addition to our financial results, we use the following business metrics and non-GAAP financial measures to evaluate our business, measure our performance, identify trends affecting our business, and make strategic decisions. For a definition of these key business metrics, see the section titled "Self-Mining Hash Rate" and "Adjusted EBITDA" (below).

Debtors' Exhibit No. 40
Page 191 of 462

|                                           |     | Year Ended December 31, | | |
| ----------------------------------------- | --- | ------ | --- | ------ |
|                                           |     | 2022   |     | 2021   |
| Self-Mining Hash rate (Exahash per second) |     | 15.70  |     | 6.66   |
| Adjusted EBITDA (in millions)             | $   | 174.9  | $   | 238.9  |

Debtors' Exhibit No. 40
Page 192 of 462

### *Self-Mining Hash Rate*

We operate mining hardware which performs computational operations in support of the blockchain measured in "hash rate" or "hashes per second." A "hash" is the computation run by mining hardware in support of the blockchain; therefore, a miner's "hash rate" refers to the rate at which the hardware is capable of solving such computations. Our hash rate represents the hash rate of our miners as a proportion of the total bitcoin network hash rate and drives the number of digital asset rewards that will be earned by our fleet. We calculate and report our hash rate in exahash per second ("EH/s"). One exahash equals one quintillion hashes per second.

We measure the hash rate produced by our mining fleet through our management software Minder™, which consolidates the reported hash rate from each miner. The method by which we measure our hash rate may differ from how other operators present such measure.

Our self-mining hash rate was 15.70 EH/s and 6.66 EH/s for the years ended December 31, 2022 and 2021, respectively representing a 136% increase year over year.

Our combined self-mining and customer and related party hosting hash rate grew 73%, to 23.69 EH/s for the year ended December 31, 2022 from 13.69 EH/s for the year ended December 31, 2021.

### *Adjusted EBITDA*

Adjusted EBITDA is a non-GAAP financial measure defined as our net income or (loss), adjusted to eliminate the effect of (i) interest income, interest expense, and other income (expense), net; (ii) provision for income taxes; (iii) depreciation and amortization; (iv) stock-based compensation expense; (v) gain on sale of intangible assets; (vi) restructuring charges[1]; (vii) Reorganization items, net[2]; and (viii) certain additional non-cash or non-recurring items, that do not reflect our ongoing business operations. For additional information, including the reconciliation of net income (loss) to Adjusted EBITDA, please refer to the table below. We believe Adjusted EBITDA is an important measure because it allows management, investors, and our board of directors to evaluate and compare our operating results, including our return on capital and operating efficiencies, from period-to-period by making the adjustments described above. In addition, it provides useful information to investors and others in understanding and evaluating our results of operations, as well as provides a useful measure for period-to-period comparisons of our business, as it removes the effect of net interest expense, taxes, certain non-cash items, variable charges, and timing differences. Moreover, we have included Adjusted EBITDA in this Annual Report on Form 10-K because it is a key measurement used by our management internally to make operating decisions, including those related to operating expenses, evaluate performance, and perform strategic and financial planning.

The above items are excluded from our Adjusted EBITDA measure because these items are non-cash in nature, or because the amount and timing of these items is unpredictable, not driven by core results of operations and renders comparisons with prior periods and competitors less meaningful. However, you should be aware that when evaluating Adjusted EBITDA, we may incur future expenses similar to those excluded when calculating this measure. Our presentation of this measure should not be construed as an inference that its future results will be unaffected by unusual or non-recurring items. Further, this non-GAAP financial measure should not be considered in isolation from, or as a substitute for, financial information prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). We compensate for these limitations by relying primarily on GAAP results and using Adjusted EBITDA on a supplemental basis. Our computation of Adjusted EBITDA may not be comparable to other similarly titled measures computed by other companies because not all companies calculate this measure in the` same fashion. You should review the reconciliation of net loss to Adjusted EBITDA below and not rely on any single financial measure to evaluate our business.

---

[1] Within the financial statements and relating to financial metrics "restructuring charges" refers to charges relating to a prepetition restructuring plan completed in October 2022 and described further in Note 5 - Acquisitions, Dispositions and Restructuring of the financial statements.

[2] Within the financial statements and relating to financial metrics "Reorganization items, net" refers to charges requiring separate presentation under the provisions of Accounting Standards Codification("ASC") 852, Reorganizations ("ASC 852) and described further in Note 3 - Chapter 11 Filing and Other Related Matters of the financial statements.

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

The following table presents a reconciliation of net income (loss) to Adjusted EBITDA for the years ended December 31, 2022 and 2021:

| | Year Ended December 31, | |
| | 2022 | 2021 |
|---|---|---|
| **Adjusted EBITDA** | (in thousands) | |
| Net loss | $ (2,146,318) | $ 47,312 |
| Adjustments: | | |
| Interest expense, net | 96,826 | 44,354 |
| Income tax expense | (17,091) | 15,763 |
| Depreciation and amortization | 225,259 | 33,362 |
| Loss on debt extinguishment | 287 | 8,016 |
| Stock-based compensation expense[1] | 182,894 | 38,937 |
| Loss on legal settlement | — | 2,636 |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — |
| Fair value adjustment on convertible notes | 186,853 | 16,047 |
| Gain from sales of digital assets | (44,298) | (4,814) |
| Impairment of digital assets | 231,315 | 37,206 |
| Impairment of goodwill and other intangibles | 1,059,265 | — |
| Impairment of property, plant and equipment | 590,673 | — |
| Losses on exchange or disposal of property, plant and equipment | 28,025 | 118 |
| Gain on sale of intangible assets | (5,904) | — |
| Cash restructuring charges | 1,320 | — |
| Reorganization items, net | (197,405) | — |
| Fair value adjustment on acquired vendor liability | 9,498 | — |
| Equity line of credit expenses | 1,668 | — |
| Non-cash and other items | 9,942 | 3 |
| Adjusted EBITDA | $ 174,872 | $ 238,940 |

[1] Includes $1.0 million of stock-based compensation that was provided in severance as part of restructuring charges incurred during the year ended December 31, 2022.

79

Debtors' Exhibit No. 40
Page 195 of 462

**Components of Results of Operations**

*Revenue*

Our revenue consists primarily of returns from our hosting operations, including the sales of mining equipment to be hosted in our data centers and digital asset mining income.

- **Hosting revenue from customers and related parties.** Hosting revenue from customers and related parties is based on electricity-based consumption contracts with our customers and related parties. Most contracts are renewable, and our customers are generally billed on a fixed and recurring basis each month for the duration of their contract, which vary from one to three years in length. See Item 13 - "Certain Relationships and Related Transactions, and Director Independence."

- **Equipment sales to customers and related parties.** Equipment sales to customers and related parties is derived from our ability to leverage our partnerships with leading equipment manufacturers to secure equipment in advance, which is then sold to our customers and related parties. Our equipment sales are typically in connection with a hosting contract.

- **Digital asset mining income.** We operate a digital asset mining operation using specialized computers equipped with application-specific integrated circuit ("ASIC") chips (known as "miners") to solve complex cryptographic algorithms in support of the bitcoin blockchain (in a process known as "solving a block") in exchange for digital asset rewards (primarily bitcoin). The Company participates in "mining pools" organized by "mining pool operators" in which we share our mining power (known as "hash rate") with the hash rate generated by other miners participating in the pool to earn digital asset rewards. The mining pool operator provides a service that coordinates the computing power of the independent mining enterprises participating in the mining pool. The pool uses software that coordinates the pool members' mining power, identifies new block rewards, records how much hash rate each participant contributes to the pool, and assigns digital asset rewards earned by the pool among its participants in proportion to the hash rate each participant contributed to the pool in connection with solving a block. Revenues from digital asset mining are impacted by volatility in bitcoin prices, as well as increases in the bitcoin blockchain's network hash rate resulting from the growth in the overall quantity and quality of miners working to solve blocks on the bitcoin blockchain and the difficulty index associated with the secure hashing algorithm employed in solving the blocks.

*Costs of Revenue*

The Company's Cost of Hosting Services and Cost of Digital Asset Mining primarily consist of electricity costs, salaries, stock-based compensation, depreciation of property, plant and equipment used to perform hosting services and mining operations and other related costs. Cost of Equipment Sales includes costs of computer equipment sold to customers.

*Loss on legal settlements*

Loss on legal settlements represent amounts received as part of the resolution of legal actions for damages resulting from the early termination of agreements by former customers or stock disbursements for resolution of a legal settlement with a former customer.

*Gain from sales of digital assets*

Gain from sales of digital assets consist of gain on sales of digital assets.

*Impairment of digital assets*

We initially recognize digital assets that are received as digital asset mining revenue based on the fair value of the digital assets when earned and received. Digital assets that are purchased in an exchange of one digital asset for another digital asset are recognized at the fair value of the asset received at the time of the transaction.

These assets are adjusted to fair value only when an impairment is recognized. Impairment exists when the carrying amount exceeds its fair value. Impairment is measured using quoted prices of the digital asset at the time its fair value is being assessed. Quoted prices, including intraday low prices, are collected and utilized in impairment testing and measurement on a daily basis. To

core-20221231                                          https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

the extent that an impairment loss is recognized, the loss establishes the new costs basis of the digital asset.

Impairment losses are recognized in the period in which the impairment is identified. The impaired digital assets are written down to their fair value at the time of impairment and this new carrying value will not be adjusted upward for any subsequent increase

80

4/8/2023, 10:22 PM

in fair value. See Note 2 — Summary of Significant Accounting Policies to our consolidated financial statements in Item 8 of Part II of this report for additional information.

### Impairment of goodwill and other intangibles

The Company does not amortize goodwill, but tests it for impairment annually as of October 31 each year, or more frequently if events or changes in circumstances indicate that the carrying value of goodwill may not be recoverable. The Company has the option to first assess qualitative factors to determine whether it is more likely than not that the fair values of the reporting units are less than their carrying amounts as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. If management determines that it is more likely than not that the fair value of a reporting unit is less than the reporting unit's carrying amount, or management chooses not to perform a qualitative assessment, then the quantitative goodwill impairment test will be performed. The quantitative test compares the fair value of the reporting unit with the reporting unit's carrying amount. If the carrying amount exceeds its fair value, the excess of the carrying amount over the fair value is recognized as an impairment loss, and the resulting measurement of goodwill becomes its new cost basis. The Company's reporting units are the same as its reportable and operating segments.

The Company tests intangible assets subject to amortization whenever events or changes in circumstances have occurred that may affect the recoverability or the estimated useful lives of the intangible assets. Intangible assets may be impaired when the estimated future undiscounted cash flows are less than the carrying amount of the asset. If that comparison indicates that the intangible asset's carrying value may not be recoverable, the impairment is measured based on the difference between the carrying amount and the estimated fair value of the intangible asset. This evaluation is performed at the lowest level for which separately identifiable cash flows exist. Intangible assets to be disposed of are reported at the lower of the carrying amount or estimated fair value less costs to sell.

### Impairment of property, plant and equipment

The Company tests property, plant and equipment for recoverability whenever events or changes in circumstances have occurred that may affect the recoverability or the estimated useful lives of the property, plant and equipment. Property, plant and equipment may be impaired when the estimated future undiscounted cash flows are less than the carrying amount of the asset. If that comparison indicates that the asset's carrying value may not be recoverable, the impairment is measured based on the difference between the carrying amount and the estimated fair value of the asset. This evaluation is performed at the lowest level for which separately identifiable cash flows exist.

### Losses on exchange or disposal of property, plant and equipment

Losses on exchange or disposal of property, plant and equipment are measured as the differences between the carrying value of the property, plant and equipment exchanged or disposed of and fair value of the consideration received upon exchange or disposal. The fair value of noncash consideration received in an exchange of property, plant and equipment is determined as of contract inception.

### Operating expenses

Operating expenses consists of research and development, sales and marketing, and general and administrative expenses. Each is outlined in more detail below.

- **Research and development.** We invest in research and development to build capabilities to extend our blockchain platform management and software solutions, in order to manage our mining fleet more efficiently, expand within existing accounts, and to gain new customers by offering differentiated blockchain hosting services. Research and development costs include compensation and benefits, stock-based compensation, other personnel related costs and professional fees.

- **Sales and Marketing.** Sales and Marketing expenses consist of marketing expenses, trade shows and events, professional fees, compensation and benefits, stock-based compensation and other personnel related costs.

- **General and administrative.** General and administrative expenses include compensation and benefits expenses for

employees, who are not part of the research and development and sales and marketing organization, professional fees, and other personnel related expenses. Also included are stock-based compensation, professional fees, business insurance, auditor fees, bad debt, amortization of intangibles, franchise taxes, and bank fees.

81

*Non-operating expenses, net*

Non-operating expenses, net includes loss on debt extinguishment, interest expense, net, fair value adjustment on convertible notes, fair value adjustment on derivative warrant liabilities, Reorganization items, net and other non-operating expenses, net.

*Income tax (benefit) expense*

Income tax (benefit) expense consists of U.S. federal, state and local income taxes. For the year ended December 31, 2022, our income tax benefit was $17.1 million. For the year ended December 31, 2021, our income tax expense was $15.8 million. The $32.9 million decrease in the provision for income taxes for the year ended December 31, 2022, compared to same period in 2021, was primarily due to a reduction in our US federal deferred tax liability. The Company's effective tax rate for the year ended December 31, 2022 was lower than the federal statutory rate of 21% primarily due to losses and certain deductions for which no tax benefit can be recognized. We evaluate our ability to recognize our deferred tax assets quarterly by considering all positive and negative evidence available as proscribed by the Financial Accounting Standards Board ("FASB") under its general principles of ASC 740, *Income Taxes*. See Note 17 — Income Taxes to our consolidated financial statements in Item 8 of Part II of this report for further information.

core-20221231                                                                                          https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Results of Operations**

The following table sets forth our consolidated statements of operations for each of the periods indicated (in thousands, except percentages).

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| Revenue: | | | | |
| Hosting revenue from customers | $ 130,234 | $ 62,350 | $ 67,884 | 109 % |
| Hosting revenue from related parties | 29,454 | 16,973 | 12,481 | 74 % |
| Equipment sales to customers | 11,391 | 138,376 | (126,985) | (92)% |
| Equipment sales to related parties | 71,438 | 109,859 | (38,421) | (35)% |
| Digital asset mining income | 397,796 | 216,925 | 180,871 | 83 % |
| Total revenue | 640,313 | 544,483 | 95,830 | 18 % |
| Cost of revenue: | | | | |
| Cost of hosting services | 169,717 | 77,678 | 92,039 | 118 % |
| Cost of equipment sales | 67,114 | 177,785 | (110,671) | (62)% |
| Cost of digital asset mining | 395,082 | 50,158 | 344,924 | 688 % |
| Total cost of revenue | 631,913 | 305,621 | 326,292 | 107 % |
| Gross profit | 8,400 | 238,862 | (230,462) | (96)% |
| (Loss) gain on legal settlement | — | (2,636) | 2,636 | NM |
| Gain from sales of digital assets | 44,298 | 4,814 | 39,484 | 820 % |
| Impairment of digital assets | (231,315) | (37,206) | (194,109) | 522 % |
| Impairment of goodwill and other intangibles | (1,059,265) | — | (1,059,265) | NM |
| Impairment of property, plant and equipment | (590,673) | — | (590,673) | NM |
| Losses on exchange or disposal of property, plant and equipment | (28,025) | (118) | (27,907) | NM |
| Operating expenses: | | | | |
| Research and development | 26,962 | 7,674 | 19,288 | 251 % |
| Sales and marketing | 12,731 | 4,062 | 8,669 | 213 % |
| General and administrative | 213,280 | 60,486 | 152,794 | 253 % |
| Total operating expenses | 252,973 | 72,222 | 180,751 | 250 % |
| Operating (loss) income | (2,109,553) | 131,494 | (2,241,047) | NM |
| Non-operating expenses, net: | | | | |
| Loss on debt from extinguishment | 287 | 8,016 | (7,729) | (96)% |
| Interest expense, net | 96,826 | 44,354 | 52,472 | 118 % |
| Fair value adjustment on convertible notes | 186,853 | 16,047 | 170,806 | NM |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — | (37,937) | NM |
| Reorganization items, net | (197,405) | — | (197,405) | NM |
| Other non-operating expenses, net | 5,232 | 2 | 5,230 | NM |
| Total non-operating expense, net | 53,856 | 68,419 | (14,563) | (21)% |
| (Loss) income before income taxes | (2,163,409) | 63,075 | (2,226,484) | NM |
| Income tax (benefit) expense | (17,091) | 15,763 | (32,854) | (208)% |
| Net (loss) income | $ (2,146,318) | $ 47,312 | $ (2,193,630) | NM |

NM - Not Meaningful

83

Debtors' Exhibit No. 40
Page 202 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Revenue**

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| Revenue: | (in thousands, except percentages) | | | |
| Hosting revenue from customers | $ 130,234 | $ 62,350 | $ 67,884 | 109 % |
| Hosting revenue from related parties | 29,454 | 16,973 | 12,481 | 74 % |
| Equipment sales to customers | 11,391 | 138,376 | (126,985) | (92)% |
| Equipment sales to related parties | 71,438 | 109,859 | (38,421) | (35)% |
| Digital asset mining income | 397,796 | 216,925 | 180,871 | 83 % |
| Total revenue | $ 640,313 | $ 544,483 | $ 95,830 | 18 % |
| Percentage of total revenue: | | | | |
| Hosting revenue from customers | 20 % | 11 % | | |
| Hosting revenue from related parties | 5 % | 3 % | | |
| Equipment sales to customers | 2 % | 25 % | | |
| Equipment sales to related parties | 11 % | 20 % | | |
| Digital asset mining income | 62 % | 40 % | | |
| Total Revenue | 100 % | 100 % | | |

Total revenue increased by $95.8 million to $640.3 million for the year ended December 31, 2022, from $544.5 million for the year ended December 31, 2021, as a result of the factors described below.

Total hosting revenue from customers increased by $67.9 million or 109%, to $130.2 million for the year ended December 31, 2022, from $62.4 million for the year ended December 31, 2021. The increase in hosting revenue from customers was primarily driven by the full year impact of onboarding of new clients in 2021 and improvements in hosting prices for the year ended December 31, 2022.

Total hosting revenue from related parties increased by $12.5 million or 74%, to $29.5 million for the year ended December 31, 2022, from $17.0 million for the year ended December 31, 2021. The increase in related party hosting revenue was primarily driven by the onboarding of new related party hosting contracts for miners deployed during the year ended December 31, 2022.

During the quarter ended December 31, 2022, the hosting contracts for 24 customers, (including two related-party customers) were terminated. The previously-hosted ASIC servers were removed from our data center facilities and returned to the customers. For all 24 customers in the aggregate, we recorded total hosting revenue for the year ended December 31, 2022, of $60.1 million of which $32.5 million was hosting revenue from related parties.

Equipment sales to customers decreased by $127.0 million or 92%, to $11.4 million for the year ended December 31, 2022, from $138.4 million for the year ended December 31, 2021. The decrease in equipment sales to customers was primarily driven by more of our hosting customers purchasing mining equipment directly from manufacturers for deployments in our data centers during

the year ended December 31, 2022, as compared to the year ended December 31, 2021.

Equipment sales to related parties decreased by $38.4 million or 35%, to $71.4 million for the year ended December 31, 2022, from $109.9 million for the year ended December 31, 2021. The decrease in equipment sales to related parties was primarily driven by more of our hosting customers purchasing mining equipment directly from manufacturers for deployments in our data centers during the year ended December 31, 2022, as compared to the year ended December 31, 2021.

Digital asset mining revenue increased by $180.9 million to $397.8 million for the year ended December 31, 2022, from $216.9 million for the year ended December 31, 2021. The year over year increase in mining revenue was driven primarily by an increase in our self-mining hash rate from increases in the number of mining units deployed, partially offset by the decrease in the price of bitcoin and an increase in the global bitcoin network hash rate. Our self-mining hash rate increased by 138%, to 15.70 EH/s for the year ended December 31, 2022, from 6.66 EH/s for the year ended December 31, 2021. The total number of bitcoins mined for the year ended December 31, 2022, was 14,436 compared to 3,948 for the year ended December 31, 2021. The average price of bitcoin for the year ended December 31, 2022, was $28,198 as compared to $47,437 for the year ended December 31, 2021, a decrease of 41%.

**Cost of revenue**

| | Year Ended December 31, | | Period over Period Change | |
|---|---|---|---|---|
| | **2022** | **2021** | **Dollar** | **Percentage** |
| | (in thousands, except percentages) | | | |
| Cost of revenue | $    631,913 | $    305,621 | $    326,292 | 107 % |
| Gross profit | 8,400 | 238,862 | (230,462) | NM |
| Gross margin | 1 % | 44 % | | |

Cost of revenue increased by $326.3 million or 107%, to $631.9 million for the year ended December 31, 2022, from $305.6 million for the year ended December 31, 2021. As a percentage of total revenue, cost of revenue totaled 99% and 56% for the years ended December 31, 2022 and 2021, respectively. The increase in cost of revenue was primarily attributable to increased depreciation expense of $191.9 million driven by an increase in the number of self-mining units deployed and completion of construction on new data center facilities, higher power consumption costs of $193.6 million driven by an increase in the number of self-mining and hosted miners operating in our fleet and an increase in power rates, higher personnel and facilities operating costs driven by the opening and expansion of our data centers of $51.8 million, which includes increased payroll and benefit costs for personnel of $10.1 million and increased stock-based compensation of $21.7 million, primarily reflecting the RSU Amendment described above, partially offset by lower equipment sales costs of $110.9 million.

**Loss on legal settlements**

The loss on legal settlement of $2.6 million for the year ended December 31, 2021, was driven by the resolution of legal actions for damages resulting from the early termination of agreements by former customers.

**Gain from sales of digital assets**

| | Year Ended December 31, | | Period over Period Change | |
|---|---|---|---|---|
| | **2022** | **2021** | **Dollar** | **Percentage** |
| | (in thousands, except percentages) | | | |
| Gain from sales of digital assets | $    44,298 | $    4,814 | $    39,484 | 820 % |
| Percentage of total revenue | 7 % | 1 % | | |

Gain from sales of digital assets increased by $39.5 million to $44.3 million for the year ended December 31, 2022, from a gain of $4.8 million for the year ended December 31, 2021. Gains are recorded when realized upon sale(s). In determining the gain to be recognized upon sale, we calculate the difference between the sales price and carrying value of the digital assets sold immediately prior to sale. For the year ended December 31, 2022, the carrying value of our digital assets sold was $400.1 million and the sales price was $444.4 million. For the year ended December 31, 2021, the carrying value of our digital assets sold was $68.5 million and the sales price was $73.3 million.

**Impairment of digital assets**

Debtors' Exhibit No. 40
Page 206 of 462

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| | (in thousands, except percentages) | | | |
| Impairment of digital assets | $ (231,315) | $ (37,206) | $ (194,109) | 522 % |
| Percentage of total revenue | (36)% | (7)% | | |

Impairment of digital assets increased by $194.1 million to $231.3 million for the year ended December 31, 2022, from $37.2 million for the year ended December 31, 2021. Impairment exists when the carrying amount exceeds its fair value. Impairment is measured using quoted prices of the digital asset at the time its fair value is being assessed. Quoted prices, including intraday low

85

Debtors' Exhibit No. 40
Page 207 of 462

prices, are collected and utilized in impairment testing and measurement on a daily basis. If the then current carrying value of a digital asset exceeds the fair value so determined, an impairment loss has occurred with respect to those digital assets in the amount equal to the difference between their carrying value and the price determined. The carrying value of our digital assets amounted to $0.7 million and $234.3 million as of December 31, 2022 and December 31, 2021, respectively.

**Impairment of goodwill and other intangibles**

|  | Year Ended December 31, | | Period over Period Change | |
|---|---|---|---|---|
|  | 2022 | 2021 | Dollar | Percentage |
|  | (in thousands, except percentages) | | | |
| Impairment of goodwill and other intangibles | $ (1,059,265) | $ — | $ (1,059,265) | NM |
| Percentage of total revenue | (165)% | — % | | |

Impairment of goodwill and other intangibles increased by $1.06 billion for the year ended December 31, 2022, compared to the year ended December 31, 2021. We identified triggering events as of June 30, 2022, September 30, 2022, and December 31, 2022, due to declines in the market price of bitcoin, the market price of our common stock and our market capitalization and, as such, we performed the quantitative test to compare the fair value to the carrying value for each reporting unit. We concluded the carrying value of the Mining reporting unit and Equipment Sales and Hosting reporting unit exceeded each reporting unit's fair value and, as such, recorded an impairment of goodwill of $996.5 million in our Mining reporting unit and $58.2 million in our Equipment Sales and Hosting reporting unit. See Note 6 — Goodwill to our consolidated financial statements in Item 8 of Part II of this report for further information.

**Impairment of property, plant and equipment**

|  | Year Ended December 31, | | Period over Period Change | |
|---|---|---|---|---|
|  | 2022 | 2021 | Dollar | Percentage |
|  | (in thousands, except percentages) | | | |
| Impairment of property, plant and equipment | $ (590,673) | $ — | $ (590,673) | NM |
| Percentage of total revenue | (92)% | — % | | |

Impairment of property, plant and equipment increased by $590.7 million for the year ended December 31, 2022, compared to the year ended December 31, 2021. During the second half of December 31, 2022, our operating performance and liquidity continued to be severely impacted by the prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and an increase in additional operating costs related to these factors. Additionally, primary and secondary market prices for ASIC miners of the type used in our business operations have decreased significantly from previous levels, including prices for those miners acquired earlier in 2022. Accordingly, we evaluated whether the estimated future undiscounted cash flows from the operation of our data center facilities sites would recover the carrying value of the property, plant and equipment located at the sites and used in site operations, including our deployed mining equipment. Based on this evaluation, we determined that the carrying value of the fleet of deployed mining equipment and of the other non-mining equipment property, plant and equipment at Cedarvale and Cottonwood, Texas facility sites may no longer be fully recoverable by the cash flows of the site. We measured the amount of impairment of the fleet of deployed mining equipment as the difference between their carrying amount of $690.4 million and the estimated fair value of $176.3 million, resulting in an impairment of $514.1 million on the fleet of deployed mining equipment for the year ended December 31, 2022. We measured the amount of impairment at the identified facility sites as the difference between the carrying amount of the site asset group of $211.6 million and the estimated fair value of the site asset group of $135.1 million, resulting in an impairment of the facility site's property, plant and equipment of $76.5 million for the year ended December 31, 2022. See the discussion of long-lived asset impairments in Note 2 — Summary of Significant Accounting Policies to our consolidated financial statements in Item 8 of Part II of this report for further information.

Debtors' Exhibit No. 40
Page 208 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Debtors' Exhibit No. 40

**Losses on exchange or disposal of property, plant and equipment**

| | Year Ended December 31, | | Period over Period Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | Dollar | Percentage |
| | (in thousands, except percentages) | | | |
| Losses on exchange or disposal of property, plant and equipment | $ (28,025) | $ (118) | $ (27,907) | NM |
| Percentage of total revenue | (4)% | — % | | |

Losses on exchange or disposal of property, plant and equipment increased by $27.9 million to $28.0 million for the year ended December 31, 2022, from a nominal loss for the year ended December 31, 2021. The increase was due to various noncash exchange s of mining equipment. See nonrecurring fair value measurements in Note 12 — Fair Value Measurements to our consolidated financial statements in Item 8 of Part II of this report for more information.

## Operating Expenses

### *Research and development*

| | Year Ended December 31, | | Period over Period Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | Dollar | Percentage |
| | (in thousands, except percentages) | | | |
| Research and development | $ 26,962 | $ 7,674 | $ 19,288 | 251 % |
| Percentage of total revenue | 4 % | 1 % | | |

Research and development expenses increased by $19.3 million or 251%, to $27.0 million for the year ended December 31, 2022, from $7.7 million for the year ended December 31, 2021. The increase was driven by higher stock-based compensation of $21.0 million, reflecting the RSU Amendment described above, primarily offset by lower personnel and related expenses of $1.1 million, and a decrease in professional fees of $0.7 million.

### *Sales and marketing*

| | Year Ended December 31, | | Period over Period Change | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | Dollar | Percentage |
| | (in thousands, except percentages) | | | |
| Sales and marketing | $ 12,731 | $ 4,062 | $ 8,669 | 213 % |
| Percentage of total revenue | 2 % | 1 % | | |

Sales and marketing expenses increased by $8.7 million or 213%, to $12.7 million for the year ended December 31, 2022, from $4.1 million for the year ended December 31, 2021. The increase was driven by higher stock-based compensation of $8.6 million, primarily reflecting the RSU Amendment described above.

### *General and administrative*

| | Year Ended December 31, | | Period over Period Change | |
|---|---|---|---|---|
| | 2022 | 2021 | Dollar | Percentage |
| | (in thousands, except percentages) | | | |
| General and administrative | $ 213,280 | $ 60,486 | $ 152,794 | 253 % |
| Percentage of total revenue | 33 % | 11 % | | |

87

General and administrative expenses increased by $152.8 million to $213.3 million for the year ended December 31, 2022, from $60.5 million for the year ended December 31, 2021. The increase was primarily driven by $91.7 million higher stock-based compensation driven by the impact of the Blockcap acquisition and the RSU Amendment described above, $18.9 million of higher professional fees primarily related to investments made to support public company readiness, $10.4 million of higher business insurance primarily for D&O insurance. $10.0 million of higher advisor fees related to the development and consummating of restructuring and reorganization transactions, $9.0 million of higher bad debt expense primarily related to Celsius, $6.9 million of higher payroll and benefit costs for personnel, $2.3 million of higher restructure expenses, $3.6 million of higher other expenses related to rent, workplace services, software and IT expenses, and taxes.

### *Non-operating expenses, net*

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| Non-operating expenses, net: | | (in thousands, except percentages) | | |
| Loss on debt from extinguishment | $ 287 | $ 8,016 | $ (7,729) | NM |
| Interest expense, net | 96,826 | 44,354 | 52,472 | 118 % |
| Fair value adjustment on convertible notes | 186,853 | 16,047 | 170,806 | NM |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — | (37,937) | NM |
| Reorganization items, net | (197,405) | — | (197,405) | NM |
| Other non-operating expenses, net | 5,232 | 2 | 5,230 | NM |
| Total non-operating expense, net | $ 53,856 | $ 68,419 | $ (14,563) | NM |

Total non-operating expenses, net decreased by $14.6 million, to $53.9 million for the year ended December 31, 2022, from $68.4 million for the year ended December 31, 2021. The decrease in non-operating expenses, net was primarily driven by a gain of $197.4 million of Reorganization items, net related to an adjustment of liabilities subject to compromise to their expected allowed amounts under reorganization accounting of $199.7 million (gain) offset by initial reorganization advisory costs of $2.3 million and a decrease in the fair value of the derivative warrant liabilities and corresponding gain of $37.9 million, partially offset by a higher increase in the fair value of the convertible notes (excluding interest expense and changes in instrument-specific credit risk) and a corresponding higher recognized loss of $119.3 million and higher interest expense, net of $52.7 million. The increase in the fair value of the convertible notes was primarily driven by the elimination of the negotiation discount described below, partially offset by a decrease in the market value of our common stock during the year ended December 31, 2022. See Note 12 — Fair Value Measurements to our consolidated financial statements in Item 8 of Part II of this report for further information.

As discussed in Note 12 — Fair Value Measurements to our consolidated financial statements in Item 8 of Part II of this report, the fair value of our convertible notes as of December 31, 2021, included the effect of a negotiation discount, which is a calibration adjustment that reflects the illiquidity of the instruments and the Company's negotiating position. Since the transaction was an orderly transaction, we deemed that the fair value equaled the transaction price at initial recognition. However, the closing of the merger of XPDI (which represents the occurrence of a qualified financing event as defined by the terms of the notes) in January 2022 resulted in the elimination of the negotiation discount along with other changes in fair value, which resulted in a significant increase in the fair value of the convertible notes (excluding interest expense and changes in instrument-specific credit risk) of $186.8 million for the year ended December 31, 2022.

### Income tax (benefit) expense

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| | | (in thousands, except percentages) | | |
| Income tax (benefit) expense | $ (17,091) | $ 15,763 | $ (32,854) | NM |
| | | | | |
| Percentage of total revenue | (3)% | 3 % | | |

Income tax (benefit) expense consists of U.S. federal, state and local income taxes. For the year ended December 31, 2022, our

Debtors' Exhibit No. 40
Page 212 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

income tax benefit was $17.1 million. For the year ended December 31, 2021, our income tax expense was $15.8 million. The $32.9 million decrease in the provision for income taxes for the year ended December 31, 2022, compared to same period in 2021, was

88

---

4/8/2023, 10:22 PM

primarily due to a reduction in our US federal deferred tax liability. The Company's effective tax rate for the year ended December 31, 2022 was lower than the federal statutory rate of 21% primarily due to losses and certain deductions for which no tax benefit can be recognized. We evaluate our ability to recognize our deferred tax assets quarterly by considering all positive and negative evidence available as proscribed by the FASB under its general principles of ASC 740, *Income Taxes.* See Note 17 — Income Taxes to our consolidated financial statements in Item 8 of Part II of this report for further information.

### Segment Total Revenue and Gross Profit

The following table presents total revenue and gross profit by reportable segment for the periods presented:

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
|---|---|---|---|---|
| **Equipment Sales and Hosting Segment** | (in thousands, except percentages) | | | |
| Revenue: | | | | |
| Hosting revenue | $ 159,688 | $ 79,323 | $ 80,365 | 101 % |
| Equipment sales | 82,829 | 248,235 | (165,406) | (67)% |
| Total revenue | 242,517 | 327,558 | (85,041) | (26)% |
| Cost of revenue: | | | | |
| Cost of hosting services | 169,717 | 77,678 | 92,039 | 118 % |
| Cost of equipment sales | 67,114 | 177,785 | (110,671) | (62)% |
| Total cost of revenue | $ 236,831 | $ 255,463 | $ (18,632) | (7)% |
| Gross profit | $ 5,686 | $ 72,095 | $ (66,409) | (92)% |
| **Mining Segment** | | | | |
| Digital asset mining income | $ 397,796 | $ 216,925 | $ 180,871 | 83 % |
| Total revenue | 397,796 | 216,925 | 180,871 | 83 % |
| Cost of revenue | 395,082 | 50,158 | 344,924 | 688 % |
| Gross profit | $ 2,714 | $ 166,767 | $ (164,053) | (98)% |
| Consolidated total revenue | $ 640,313 | $ 544,483 | $ 95,830 | 18 % |
| Consolidated cost of revenue | $ 631,913 | $ 305,621 | $ 326,292 | 107 % |
| Consolidated gross profit | $ 8,400 | $ 238,862 | $ (230,462) | NM |

For the year ended December 31, 2022, cost of revenue included depreciation expense of $12.1 million for the Equipment Sales and Hosting segment and $214.8 million for the Mining segment. For the year ended December 31, 2021, cost of revenue included depreciation expense of $7.4 million for the Equipment Sales and Hosting segment and $24.3 million for the Mining segment.

For the year ended December 31, 2022 and 2021, the top three customers accounted for approximately 57% and 64%, respectively, of the Equipment Sales and Hosting's segment total revenue.

For the year ended December 31, 2022, gross profit in the Equipment Sales and Hosting segment decreased $66.4 million compared to the year ended December 31, 2021, reflecting a Hosting segment gross profit margin of 2% for the year ended December 31, 2022, compared to 22% for the year ended December 31, 2021. The decrease in Hosting segment gross profit margin for the year ended December 31, 2022, compared to the year ended December 31, 2021 was primarily due to lower margins on equipment sales, an increase in stock-based compensation expense, which primarily reflected the RSU Amendment, and higher power costs.

For the year ended December 31, 2022, gross profit in the Mining segment decreased $164.1 million compared to the year ended December 31, 2021, due to a lower Mining segment gross profit margin of 1% for the year ended December 31, 2022, compared to 77% for the year ended December 31, 2021. The decrease in the Mining segment gross profit margin was primarily due to an increase in power rates, an increase in depreciation as a percentage of segment revenues, which reflected higher costs of self-mining units more recently deployed, an increase in stock-based compensation expense as a percentage of revenues, which primarily reflected the RSU Amendment, and a 41% decrease in average price per bitcoin mined. The decrease in the Mining segment gross

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

profit margin was partially offset by an increase in our self-mining hash rate, which was 15.70 EH/s at December 31, 2022, compared to 6.66 EH/s at December 31, 2021.

89

A reconciliation of the reportable segment gross profit to (loss) income before income taxes included in our Consolidated Statements of Operations for the years ended December 31, 2022 and 2021, is as follows:

| | Year Ended December 31, | | Period over Period Change | |
| | 2022 | 2021 | Dollar | Percentage |
| --- | --- | --- | --- | --- |
| | (in thousands, except percentages) | | | |
| Reportable segment gross profit | $ 8,400 | $ 238,862 | $ (230,462) | NM |
| (Loss) gain on legal settlement | — | (2,636) | 2,636 | NM |
| Gain from sales of digital assets | 44,298 | 4,814 | 39,484 | 820 % |
| Impairment of digital assets | (231,315) | (37,206) | (194,109) | 522 % |
| Impairment of goodwill and other intangibles | (1,059,265) | — | (1,059,265) | NM |
| Impairment of property, plant and equipment | (590,673) | — | (590,673) | NM |
| Losses on exchange or disposal of property, plant and equipment | (28,025) | (118) | (27,907) | NM |
| Operating expenses: | | | | |
| Research and development | 26,962 | 7,674 | 19,288 | 251 % |
| Sales and marketing | 12,731 | 4,062 | 8,669 | 213 % |
| General and administrative | 213,280 | 60,486 | 152,794 | 253 % |
| Total operating expense | 252,973 | 72,222 | 180,751 | 250 % |
| Operating (loss) income | (2,109,553) | 131,494 | (2,241,047) | NM |
| Non-operating expense, net: | | | | |
| Loss on debt extinguishment and other | 287 | 8,016 | (7,729) | NM |
| Interest expense, net | 96,826 | 44,354 | 52,472 | 118 % |
| Fair value adjustment on convertible notes | (37,937) | — | (37,937) | NM |
| Fair value adjustment on derivative warrant liabilities | 186,853 | 16,047 | 170,806 | NM |
| Reorganization items, net | (197,405) | — | (197,405) | NM |
| Other non-operating expenses, net | 5,232 | 2 | 5,230 | NM |
| Total non-operating expense, net | 53,856 | 68,419 | (14,563) | NM |
| (Loss) income before income taxes | $ (2,163,409) | $ 63,075 | $ (2,226,484) | NM |

90

Debtors' Exhibit No. 40
Page 216 of 462

**Liquidity and Capital Resources**

*Sources of Liquidity*

Historically, we have financed our operations primarily through sales of equity securities, debt issuances, equipment financing arrangements and cash generated from operations, including sales of self-mined bitcoin and other digital assets.

Our ability to continue as a going concern is dependent upon our ability to, subject to the Bankruptcy Court's approval, implement the plan of reorganization, successfully emerge from the Chapter 11 Cases and generate sufficient liquidity from the restructuring to meet our obligations and operating needs. These factors, together with the Company's recurring losses from operations and accumulated deficit, create substantial doubt about the Company's ability to continue as a going concern.

We have engaged Weil, Gotshal & Manges LLP, as legal advisers, and PJT Partners LP and AlixPartners, LLP, as financial advisers, to assist the Company in managing the Chapter 11 Cases and developing, confirming, and consummating a Chapter 11 plan of reorganization or alternative restructuring transaction.

Refer to "Other Events —Chapter 11 and Other Related Matters" below for more information on the Chapter 11 Cases and their effect on our liquidity.

*Cash, Cash Equivalents, Restricted Cash, Cash Requirements and Cash Flows*

Cash and cash equivalents include all cash balances and highly liquid investments with original maturities of three months or less from the date of acquisition.

| | December 31, | | Period over Period Change | |
|---|---|---|---|---|
| | **2022** | **2021** | **Dollar** | **Percentage** |
| | (in thousands, except percentages) | | | |
| Cash and cash equivalents | $ 15,884 | $ 117,871 | $ (101,987) | NM |
| Restricted Cash | 36,356 | 13,807 | 22,549 | 163% |
| Total cash, cash equivalents and restricted cash | $ 52,240 | $ 131,678 | $ (79,438) | NM |

As of December 31, 2022 and 2021, restricted cash of $36.4 million consisted of cash held in escrow under the Original DIP Credit Agreement and $13.8 million consisted of cash held in escrow to pay for construction and development activities.

The following table summarizes our cash and cash equivalents, restricted cash and cash flows for the periods indicated.

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| | (in thousands) | |
| Cash, cash equivalents and restricted cash | $ 52,240 | $ 131,678 |
| Cash provided by (used in) | | |
| Operating activities | 205,187 | (56,735) |
| Investing activities | (590,778) | (423,840) |
| Financing activities | 306,153 | 603,532 |
| Cash, cash equivalents and restricted cash – beg. of period | 131,678 | 8,721 |
| Cash, cash equivalents and restricted cash – end of period | $ 52,240 | $ 131,678 |

Our principal uses of cash in recent periods have been funding our operations and investing in capital expenditures.

*Operating Activities*

Changes in net cash from operating activities results primarily from cash received from hosting customers and equipment sales and payments for power fees and equipment purchases. Other drivers of the changes in net cash from operating activities include

91

Debtors' Exhibit No. 40
Page 218 of 462

research and development costs, sales and marketing costs and general and administrative expenses (including personnel expenses and fees for professional services) and interest payments on debt.

Net cash provided by operating activities was $205.2 million for the year ended December 31, 2022, compared to net cash used in operating activities of $56.7 million for the year ended December 31, 2021. The increase in net cash provided by operating activities for the year ended December 31, 2022, compared to the year ended December 31, 2021, was primarily due to changes in working capital, which increased cash from operating activities by $528.2 million for the year ended December 31, 2022, compared to the year ended December 31, 2021, primarily driven by a $376.0 million decreased in digital assets and a $294.6 million decrease in deposits for equipment sales to customers, partially offset by a $167.9 million decrease in deferred revenue. Offsetting the increase in net cash provided due to changes in working capital was a decrease in net income, excluding non-cash adjustments, of $66.5 million for the year ended December 31, 2022, compared to the year ended December 31, 2021, primarily driven by a $192.8 million decrease in cash inflows on gross profit, a $53.7 million increase in cash outflows from operating expenses and a $30.3 million increase in cash outflows for interest payments on debt, partially offset by cash proceeds from sales of digital assets in excess of their carrying value of $39.5 million.

*Investing Activities*

Our net cash used in investing activities consists of purchases of property, plant and equipment and acquisitions of intangible assets, net of proceeds from sales of property, plant and equipment. Net cash used in investing activities for the year ended December 31, 2022 and 2021, was $0.59 billion and $423.8 million, respectively, driven primarily by $384.0 million used for the purchase of property, plant and equipment primarily related to the development of facilities and the acquisition of equipment used for generating digital asset mining revenue. For the year ended December 31, 2022, $217.7 million was used for deposits for self-mining equipment.

*Financing Activities*

Net cash provided by financing activities consists of proceeds from stock issuances, issuances of debt, net of issuance costs and principal payments on debt, including notes payable and finance leases.

In connection with the filing of the Chapter 11 Cases, the Company recorded approximately $2.5 million in financing costs related to the issuance of the Original DIP Facility for the year ended December 31, 2022.

For the year ended December 31, 2022, net cash provided by financing activities was $306.2 million, primarily related to $261.3 million from the issuance of debt, driven by equipment financing arrangements and $25.0 million of proceeds from the issuance of common stock, net of issuance costs (including $201.0 million in net cash proceeds received from the merger with XPDI after payment of transaction expenses, $21.3 million in cash proceeds received for shares issued under the Equity Line of Credit, and $3.8 million in cash proceeds received for employee stock option exercises). Offsetting this increase to net cash provided by financing activities for the year ended December 31, 2022, was $113.3 million of principal payments on debt, $31.6 million for the repurchase of common shares to pay employee withholding taxes and $30.3 million of principal repayments of finance leases.

For the year ended December 31, 2021, net cash provided by financing activities was $603.5 million, primarily related to $670.8 million from the issuance of debt, including the issuance of $420.9 million of convertible notes, $10.0 million received in January 2021 from a stockholder for the purchase of bitcoin mining equipment, the issuance of a $9.0 million tranche of senior secured notes (net of issuance costs) in February 2021, and $3.8 million, $13.4 million, $25.6 million and $1.0 million of additional loans under a master equipment finance agreement issued in March 2021, May 2021, July 2021 and August 2021, respectively. Offsetting this increase to net cash provided by financing activities for the year ended December 31, 2021, was $49.3 million of principal payments on debt.

**Operating and Capital Expenditure Requirements**

Historically, a substantial portion of our liquidity needs arise from debt service on our outstanding indebtedness and from funding the costs of operations, working capital and capital expenditures. Our primary sources of cash are cash flows from operations, cash on hand and proceeds from debt borrowings, including issuances of long-term debt and our $35.0 million undrawn borrowing capacity under the Replacement DIP Facility. We have assessed our current and expected funding requirements and our current and expected sources of liquidity, and have determined, based on our forecasted financial results and financial condition as of

Debtors' Exhibit No. 40
Page 219 of 462

core-20221231                                              https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

December 31, 2022, that our operating cash flows and existing cash balances, will be adequate to finance our working capital requirements, fund capital expenditures, make required debt interest and principal payments due under the plan of reorganization, pay taxes and make other payments due under the plan of reorganization. A number of factors, including but not limited to, losses of

92

customers, pricing pressure from increased competition, lower subsidy and switched access revenues, and the impact of economic conditions may negatively affect our cash generated from operations.

However, our ability to continue as a going concern is dependent upon our ability to successfully emerge from the Chapter 11 Cases and generate sufficient liquidity from the restructuring to meet our obligations and operating needs. Refer to "Other Events —Chapter 11 and Other Related Matters" for more information on the terms of the Restructuring Support Agreement, the Chapter 11 Cases and the effects of both on our liquidity.

### Commitments and Contractual Obligations

**Legal Proceedings**—The Company is subject to legal proceedings arising in the ordinary course of business. The Company accrues losses for a legal proceeding when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the uncertainties inherent in legal proceedings make it difficult to reasonably estimate the costs and effects of resolving these matters. Accordingly, actual costs incurred may differ materially from amounts accrued and could materially adversely affect the Company's business, cash flows, results of operations, financial condition and prospects. Unless otherwise indicated, the Company is unable to estimate reasonably possible losses in excess of any amounts accrued. As of December 31, 2022 and 2021, there were no loss contingency accruals for legal matters.

**Loss on Legal Settlements**—The Company recognized a loss of $2.6 million during the year ended December 31, 2021, with respect to the resolution of legal actions for damages resulting from the early termination of agreements by former customers.

**Operating Leases**—The Company has entered into non-cancellable operating leases for office and data facilities, with original lease periods expiring through 2028. In addition, certain leases contain bargain renewal options extending through 2051. The Company recognizes lease expense for these leases on a straight-line basis over the lease term, which includes any bargain renewal options. The Company recognizes rent expense on a straight-line basis over the lease period. Rent expense was $2.3 million and $0.7 million for the years ended December 31, 2022 and 2021, respectively.

The Company's minimum payments under noncancellable operating leases having initial terms and bargain renewal period in excess of one year as of December 31, 2022, are as follows (in thousands):

| | | |
|---|---|---:|
| 2023 | $ | 2,082 |
| 2024 | | 1,810 |
| 2025 | | 1,866 |
| 2026 | | 1,924 |
| 2027 | | 1,985 |
| Thereafter | | 12,037 |
| Total minimum lease payments | $ | 21,704 |

In addition to the above, in December 2021, the Company entered into an agreement to lease office space for its new corporate headquarters that the Company anticipates will commence in the second half of 2022. The lease includes base rent of approximately $14 million to be paid over a period of 130 months.

**Finance Leases**—The Company has entered into arrangements with various parties to finance the acquisition of computer and networking equipment, electrical infrastructure, and office equipment. These arrangements include options exercisable by the Company at the end of the initial terms to renew, purchase the equipment, or to terminate. These arrangements were reclassified as Liabilities subject to compromise at the Petition Date and as of December 31, 2022 the related finance lease obligations were $70.8 million. Prior to the Petition Date these arrangements were classified as finance leases and as of December 31, 2021, the related finance lease obligations were $90.6 million.

As of December 31, 2022, the future minimum lease payments and present value of the net minimum lease payments under these finance leases are as follows (in thousands):

| | | |
|---|---|---:|
| 2023 | $ | 38,876 |
| 2024 | | 39,769 |
| 2025 | | 1,972 |
| 2026 | | 32 |
| 2027 | | — |
| Total minimum lease payments | $ | 80,649 |

## Other Events

### *Chapter 11 and Other Related Matters*

#### *Chapter 11 Cases*

As an initial step towards implementation of the plan of reorganization, on the Petition Date, the Debtors filed the Chapter 11 Cases. Each Debtor continues to operate its business as a "debtor in possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court. The Chapter 11 Cases are being jointly administered under Case No. 22-90341.

In general, as debtors-in-possession under the Bankruptcy Code, we are authorized to continue to operate as an ongoing business, however, we may not engage in transactions outside the ordinary course of business without the prior approval of the Bankruptcy Court. To ensure the Debtors' ability to continue operating in the ordinary course of business and minimize the effect of the restructuring on the Debtors' customers and employees, the Debtors filed certain motions and applications intended to limit the disruption of the bankruptcy proceedings on its operations (the "First Day Motions"), including authority to pay employee wages and benefits, and pay vendors and suppliers for goods and services provided both before and after the filing date, which were approved on a final basis for wages and interim basis for vendors on December 22, 2022. Pursuant to the First Day Motions, the Bankruptcy Court authorized us to conduct our business activities in the ordinary course, including, among other things and subject to the terms and conditions of such orders: continue to operate our cash management system and honor certain prepetition obligations related thereto; maintain existing business forms; continue to perform intercompany transactions; obtain super priority administrative expense status for post-petition intercompany balances; pay certain prepetition claims of critical vendors, lien claimants and section 503(b)(9) of the Bankruptcy Code claimants in the ordinary course of business on a post-petition basis; pay prepetition employee wages, salaries, other compensation and reimbursable employee expenses and continue employee benefits programs; pay obligations under prepetition insurance policies, continue to pay certain brokerage fees; renew, supplement, modify or purchase insurance coverage; maintain our surety bond program; and pay certain prepetition taxes and fees.

#### *Original DIP Credit Agreement and Restructuring Support Agreement*

In connection with the Chapter 11 Cases, the Debtors entered into the Original DIP Credit Agreement, with Wilmington Savings Fund Society, FSB, as administrative agent, and the Original DIP Lenders.

Also in connection with the filing of the Chapter 11 Cases, the Company entered into a Restructuring Support Agreement with the Ad Hoc Noteholder Group pursuant to which the Ad Hoc Noteholder Group agreed to provide commitments for the Original DIP Facility of more than $57 million and agreed to support the syndication of up to an additional $18 million in new money DIP (defined below) facility loans to all holders of convertible notes. The Restructuring Support Agreement was terminated by the Company pursuant to a "fiduciary out" which permitted the Company to pursue better alternatives.

#### *Replacement DIP Credit Agreement*

Proceeds of the Replacement DIP Facility were used to, among other things, repay amounts outstanding under the Original DIP Facility, including payment of all fees and expenses required to be paid under the terms of the Original DIP Facility. These funds, along with ongoing cash generated from operations, were anticipated to provide the necessary financing to effectuate the planned

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

94

---

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was made available following Bankruptcy Court approval of the Interim DIP Order and (ii) $35 million was made available following Bankruptcy Court approval of the Final DIP Order. Loans under the Replacement DIP Facility will bear interest at a rate of 10%, which will be payable in kind in arrears on the first day of each calendar month. The Administrative Agent received an upfront payment equal to 3.5% of the aggregate commitments under the Replacement DIP Facility on February 3, 2023, payable in kind, and the Replacement DIP Lender will receive an exit premium equal to 5% of the amount of the loans being repaid, reduced or satisfied, payable in cash. The Replacement DIP Credit Agreement includes representations and warranties, covenants applicable to the Debtors, and events of default. If an event of default under the Replacement DIP Credit Agreement occurs, the Administrative Agent may, among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Credit Agreement to be immediately due and payable.

The maturity date of the Replacement DIP Credit Agreement is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Credit Agreement will also terminate on the date that is the earliest of the following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers (as defined in the Replacement DIP Credit Agreement) or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the Loans and the termination of the Commitments (whether automatically, or upon any Event of Default or as otherwise provided in the Replacement DIP Credit Agreement); and (iv) conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

On March 1, 2023, the Bankruptcy Court entered an order approving the Replacement DIP Facility on a final basis and the terms under which the Debtors are authorized to use the cash collateral of the holders of their convertible notes (the "Final DIP Order"). For detailed discussion about the Replacement DIP Facility, refer to Note 21 — Subsequent Events to our consolidated financial statements in Item 8 of Part II of this report.

*Financing Activities*

In January 2022, as a result of the closing of the merger with XPDI, we received approximately $201.0 million in net cash proceeds after the payment of transaction expenses along with $0.3 million of cash acquired from XPDI.

In January through March 2022, we borrowed an additional $4.8 million under our lending agreement with Bremer Bank, National Association for the purchase of blockchain mining equipment and improvements to data center and infrastructure. In April 2022, we borrowed an additional $0.7 million from Bremer to finance the construction of our North Dakota facility. The loans bear interest at 5.5% annually and are due at the earlier of the date of sale of the underlying mining equipment or 60 months from issuance.

In January 2022, we borrowed an additional $20.0 million under our two lending agreements with Blockfi Lending, LLC for the purchase of blockchain mining equipment. The loans bear interest at 13.1% with a term of 24 months from issuance.

In February 2022, we drew down on the remaining $10.0 million of our master equipment finance facility agreement with Trinity Capital Inc. ("Trinity") to finance the acquisition of blockchain computing equipment. The loan has a term of 36 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 11.0%.

In March 2022, we entered into a $20.0 million equipment loan and security agreement with Anchorage Lending CA, LLC. ("Anchor Labs") to finance the purchase of blockchain computing equipment. We borrowed $20.0 million in March 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 12.5%.

In March 2022, we entered into a $100.0 million equipment loan and security agreement with Barings BDC, Inc., Barings Capital Investment Corporation and Barings Private Credit Corp. ("Mass Mutual Barings") to finance the purchase of blockchain computing equipment. In March 2022, we borrowed the first tranche of $30.0 million and borrowed the second tranche of $39.6 million in April 2022. The loan has a term of 36 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 9.8%.

In April 2022, we entered into a $60.0 million bridge promissory note with B. Riley Commercial Capital, LLC and a $15.0 million bridge promissory note with an affiliate of B. Riley Commercial Capital, LLC (the "Bridge Notes") maturing in December 2022. Interest expense on the loan has been recognized based on an effective interest rate of 7.0%. In August 2022, we amended the Bridge Notes to, among other things, extend the maturity date to June 2023.

95

---

In April 2022, we entered into an $11.0 million equipment finance agreement with Liberty Commercial Finance LLC ("Liberty") to finance the Company's purchase of blockchain computing equipment. We borrowed $11.0 million in April 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 10.6%.

In May 2022, we entered into a $11.7 million equipment loan and security agreement with Anchor Labs to finance the purchase of blockchain computing equipment. We borrowed $11.7 million in May 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 12.5%.

In July 2022, we entered into a common stock purchase agreement and a Registration Rights Agreement with B. Riley Principal Capital II, LLC. Pursuant to the Equity Line of Credit, we have the right to sell to B. Riley, up to $100.0 million of shares of our common stock, par value $0.0001 per share (the "Common Stock"), subject to certain limitations and conditions set forth in the Equity Line of Credit, from time to time during the term of the Equity Line of Credit. Sales of common stock pursuant to the Equity Line of Credit, and the timing of any sales, are solely at our option, and we are under no obligation to sell any securities to B. Riley under the Equity Line of Credit. As consideration for B. Riley's commitment to purchase shares of Common Stock at our direction upon the terms and subject to the conditions set forth in the Equity Line of Credit, upon execution of the Equity Line of Credit, we issued 0.6 million shares to B. Riley. In addition, we reimbursed $0.1 million of reasonable legal fees and disbursements of B. Riley's legal counsel in connection with the transactions contemplated by the Equity Line of Credit and the Registration Rights Agreement.

In August 2022, the Company amended the Bridge Notes to, among other things, extend the maturity date to June 2023 (the "Amended Bridge Notes"). Under the terms of the modified agreement, $37.5 million of principal payments previously due in the second half of 2022 are now due in the first half of 2023. The Amended Bridge Notes require the proceeds of (i) any equity issuances (other than issuances consummated for purposes of making tax payments in connection with the vesting of restricted stock and restricted stock units and equity line of credit under the Equity Line of Credit ("ELOC") sales discussed in Note 11 — Notes Payable to our consolidated financial statements in Item 8 of Part II of this report), (ii) any secured debt incurred on or after April 7, 2022 (other than purchase money debt) in excess of $500 million and (iii) any ELOC sale in an amount equal to 25% of the net cash proceeds received from any such ELOC sale, in each case, to be applied by us to repay the outstanding principal amount of the Amended Bridge Notes. On August 1, 2022, the Company issued a total of 0.4 million shares of Common Stock to B. Riley Securities, Inc., an affiliate of B. Riley Commercial Capital, in satisfaction of an advisory fee for providing advisory services to the Company in connection with entering into the Amended Bridge Notes.

In August 2022, the Company amended the Mass Mutual Barings loans to defer principal payments for a period of six months beginning with payments due in August 2022. The amendments result in no change to the term of the loans and the remaining principal will amortize over the remaining life of the loans beginning in February 2023. The amendments also required an additional amount of blockchain computing equipment to be provided as collateral. Interest expense on the amended loans has been recognized based on an effective interest rate of 13.0%. In August 2022, the Company issued 0.3 million shares of Common Stock to Mass Mutual Barings as an amendment fee.

In October 2022, the Company determined not to make certain payments with respect to several of its debt facilities, equipment financing facilities and leases and other financings, including our two bridge promissory notes.

On December 21, 2022, the Debtors filed voluntary petitions in the Bankruptcy Court seeking relief under Chapter 11 of the Bankruptcy Code. In connection therewith, the Debtors entered into the Original DIP Facility, as approved on an interim basis by the Bankruptcy Court on December 23, 2022. On February 2, 2023, the Bankruptcy Court entered the Replacement Interim DIP Order, allowing the Debtors to, among other things, repay the Original DIP Facility. On March 1, 2023, the Bankruptcy Court approved the Replacement DIP Facility and Replacement DIP Credit Agreement on a final basis pursuant to the Final DIP Order.

### Related Party Transactions

We have agreements to provide hosting services to various entities that are managed and invested in by individuals who are directors and executives of Core Scientific. For the year ended December 31, 2022, we recognized hosting revenue from the contracts with these entities of $29.5 million. For the year ended December 31, 2021, we recognized hosting revenue from the contracts with these entities of $17.0 million. In addition, for the years ended December 31, 2022 and December 31, 2021, we recognized equipment

Debtors' Exhibit No. 40
Page 226 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

sales revenue of $71.4 million and $109.9 million, respectively, from these entities. A nominal amount was receivable from these entities at December 31, 2022. As of December 31, 2021, we had accounts receivable of $0.3 million from these entities.

96

Debtors' Exhibit No. 40
Page 227 of 462

Core Scientific reimburses certain of its officers and directors for use of a personal aircraft for flights taken on Company business. For the years ended December 31, 2022 and 2021, we incurred reimbursements of $1.9 million and $1.4 million, respectively. As of December 31, 2022, $0.2 million was payable. A nominal amount was payable at December 31, 2021.

**Foreign Currency and Exchange Risk**

The vast majority of our cash generated from revenue are denominated in U.S. dollars, with a small amount denominated in foreign currencies.

**Critical Accounting Policies and Estimates**

Critical accounting policies and estimates are those accounting policies and estimates that are both the most important to the portrayal of our net assets and results of operations and require the most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. These estimates are developed based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Critical accounting estimates are accounting estimates where the nature of the estimates are material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change and the impact of the estimates on financial condition or operating performance is material.

The critical accounting estimates, assumptions and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

*Liabilities Subject to Compromise*

As a result of the commencement of the Chapter 11 Cases, the payment of pre-petition liabilities is subject to compromise or other treatment pursuant to a plan of reorganization. The determination of how liabilities will ultimately be settled or treated cannot be made until the confirmed Chapter 11 plan of reorganization becomes effective. Accordingly, the ultimate amount of such liabilities is not determinable at this time. Pre-petition liabilities that are subject to compromise are to be reported at the amounts expected to be allowed by the Bankruptcy Court, even if they may be settled for different amounts. The amounts currently classified as liabilities subject to compromise are preliminary and may be subject to future adjustments depending on Bankruptcy Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, rejection of executory contracts, continued reconciliation or other events.

*Revenue From Contracts With Customers - Digital Asset Mining Income*

The Company derives its digital asset mining income from operating its owned computer equipment as part of a pool of users, facilitated by a pool operator, that processes transactions conducted on one or more blockchain networks. The contracts with pool operators are terminable at any time by either party. In exchange for providing computing power to the pool, the Company is entitled to receive digital currency assets from the mining pool operator which is a variable amount based on either (a) the amount of computing power the Company has contributed to the mining pool or (b) a fractional share of the digital currency asset award the mining pool operator receives from the blockchain network upon successfully adding a block to the blockchain, based on the proportion of computing power the Company contributed to the mining pool operator to the total computing power contributed by all mining pool participants in processing the block.

Providing computing power in digital asset transaction verification services is an output of the Company's ordinary activities. Providing such computing power is the only performance obligation in the Company's arrangements with mining pool operators. The transaction consideration the Company receives, if any, is noncash consideration that may be either fixed or variable depending on the payout methodology used by the pool operator. In certain arrangements, the Company does not have a reliable means to estimate its relative share of the rewards until they are paid to it and the variable consideration is constrained until the Company receives the consideration, at which time revenue is recognized. The Company measures consideration at fair value on the date received, which is historically not materially different than the fair value at inception of the arrangement or the time the Company has earned the award from the pools. The Company's digital asset mining income is sensitive to changes in the market prices of digital currency assets which may be significant.

Debtors' Exhibit No. 40
Page 228 of 462

There is no significant financing component in these transactions.

97

---

Debtors' Exhibit No. 40
Page 229 of 462

***Revenue From Contracts With Customers - Hosting and Equipment Sales***

The Company primarily generates revenue from contracts with customers from hosting services and, sales of computer equipment. The Company generally recognizes revenue when the promised service is performed, or control of the promised equipment is transferred to customers. Revenue excludes any amounts collected on behalf of third parties, including sales and indirect taxes.

*Performance Obligations*

The Company's performance obligations primarily relate to hosting services and equipment sales, which are described below. The Company has performance obligations associated with commitments in customer hosting contracts for future services and commitments to acquire and deploy customer equipment that have not yet been recognized in the financial statements. For contracts with original terms that exceed one year (typically ranging from 18 to 48 months), those commitments not yet recognized as of December 31, 2022 and 2021, were $159.6 million and $1.05 billion, respectively. The $159.6 million remaining performance obligation as of December 31, 2022, relates solely to the hosting services performance obligation because all equipment sales' performance obligation commitments had been fulfilled and revenue recognized as of December 31, 2022.

*Hosting Services*

We regularly enter contracts that include hosting services, for which revenue is recognized as services are performed on a variable (power consumption) basis. We recognize variable hosting revenue each month as the uncertainty related to the consideration is resolved, hosting services are provided to our customers, and our customers utilize the hosting services (the customer simultaneously receives and consumes the benefits of the Company's performance).

The Company performs hosting services that enable customers to run blockchain and other high-performance computing operations. The Company's performance obligation related to these services is satisfied over time. The Company recognizes revenue for services that are performed on a consumption basis, such as the amount of electricity used in a period, based on the customer's use of such resources. The Company recognizes variable consumption usage hosting revenue each month as the uncertainty related to the consideration is resolved, hosting services are provided to our customers, and our customers utilize the hosting services (the customer simultaneously receives and consumes the benefits of the Company's performance). The Company generally bills its customers in advance based on estimated consumption under the contract. The Company recognizes revenue based on actual consumption in the period and invoices adjustments in subsequent periods or retains credits toward future consumption. The term between invoicing and when payment is due typically does not exceed 30 days.

*Equipment Sales*

We entered contracts with more than one performance obligation. For example, we entered into contacts that include both hosting services and sales of computer equipment to those same customers, for which revenue is recognized at the point in time when control of the equipment is transferred to the customer (typically at the start of the contract period). For these contracts, revenue is recognized based on the relative standalone selling price of each performance obligation in the contract.

The Company recognizes revenue from sales of computer equipment to customers at the point in time when control of the equipment is transferred to the customer, which generally occurs upon deployment of the equipment. Customers make a series of deposits on equipment purchases with the final payment typically being due at least one month prior to deployment. Self-mining computer equipment that is subsequently sold to customers is recognized as Equipment Sales to Customers in the Company's Consolidated Statements of Operations. Due to the change to Bitmain worldwide sale strategy, we do not expect to enter equipment sales contracts in the future or to have any equipment sales revenue after December 31, 2022.

98

*Stock-Based Compensation*

The Black-Scholes assumptions used in evaluating our awards are as follows:

|  | Year Ended December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Dividend yield | 0.00 % | 0.00 % |
| Expected volatility | 72.29 % | 72.57 % |
| Risk-free interest rate | 1.82 % | 1.39 % |
| Expected life (years) | 7.00 | 6.22 |

We will continue to use judgment in evaluating the assumptions related to our stock-based compensation on a prospective basis. As we continue to accumulate additional data related to our common stock, we may refine our estimation process, which could materially impact our future stock-based compensation expense.

In addition, for awards with performance conditions, primarily restricted stock unit awards, we recognize the estimated fair value of the awards based on management's judgment as to whether or not it is probable that the performance conditions will be achieved.

*Common Stock Valuations*

In valuing the fair value of our common stock prior to the Merger, we used the most observable inputs available. We used the market approach, which estimates the value of our business by applying valuation multiples derived from the observed valuation multiples of comparable public companies to our expected financial results.

When observable inputs are not available, we may use the income approach. This approach typically projects cash flows for the forecast period and uses the perpetuity growth method to calculate terminal values. These cash flows and terminal values are then discounted using an appropriate discount rate. Projections of cash flows are based on management's earnings forecasts.

Applying these valuation and allocation approaches involves the use of estimates, judgments and assumptions that are highly complex and subjective, such as those regarding the Company's expected future revenue, expenses and cash flows, as well as discount rates, valuation multiples, the selection of comparable public companies and the probability of future events. Changes in any or all of these estimates and assumptions, or the relationships between these assumptions, impact the Company's valuation as of each valuation date and may have a material impact on the valuation of the Company's common stock and common stock warrants issued with the Company's debt and equity instruments.

*Goodwill*

The total purchase price of any of our acquisitions is allocated to the tangible and intangible assets acquired and the liabilities assumed based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. The fair value assigned to the tangible and intangible assets acquired and liabilities assumed are based on estimates and assumptions around the valuation of our common stock at the time of the acquisition.

We do not amortize goodwill, but tests it for impairment annually as of October 31, or more frequently if events or changes in circumstances indicate that the carrying value of goodwill may not be recoverable. We have the option to first assess qualitative factors to determine whether it is more likely than not that the fair value of its reporting units are less than their carrying amounts as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. If we determine that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, or choose not to perform a qualitative assessment, then the quantitative goodwill impairment test will be performed. The quantitative test compares the fair value of the reporting unit with its carrying amount. If the carrying amount exceeds its fair value, the excess of the carrying amount over the fair value is recognized as an impairment loss, and the resulting measurement of goodwill becomes its new cost basis. During the year ended December 31, 2022, the Company identified goodwill impairment triggering events which, after analysis, resulted in $1.05 billion impairment to goodwill. As of December 31, 2022, after impairment, the Company had no remaining goodwill. As of

December 31, 2021, the carrying amount of goodwill was $1.06 billion. The increase in goodwill during the year ended December 31, 2021 was due to $1.00 billion of goodwill added for the Blockcap acquisition on July 30, 2021. There were no impairment losses recorded for the year ended December 31, 2021.

99

4/8/2023, 10:22 PM

### Long-Lived Assets

We test long-lived assets for recoverability whenever events or changes in circumstances have occurred that may affect the recoverability or the estimated useful lives of long-lived assets. Long-lived assets include intangible assets subject to amortization. A long-lived asset may be impaired when the estimated future undiscounted cash flows are less than the carrying amount of the asset. If that comparison indicates that the asset's carrying value may not be recoverable, the impairment is measured based on the difference between the carrying amount and the estimated fair value of the asset. This evaluation is performed at the lowest level for which separately identifiable cash flows exist. Long-lived assets to be disposed of are reported at the lower of the carrying amount or estimated fair value less costs to sell. For the year ended December 31, 2022, we recorded a $4.5 million impairment of other intangibles and a $590.7 million impairment of property, plant and equipment. We did not have any impairments in our long-lived assets for the year ended December 31, 2021.

### Digital Assets

Our digital assets, e.g., bitcoin, are accounted for as intangible assets with indefinite useful lives. We initially recognize digital currency assets that are received as digital asset mining income based on the fair value of the digital assets in connection with the Company's revenue recognition policy. Digital asset disposals are on a first-in-first-out ("FIFO") basis. Impairment is measured using quoted prices of the digital asset at the time its fair value is being assessed. Quoted prices, including intraday low prices, are collected and utilized in impairment testing and measurement on a daily basis. To the extent an impairment loss is recognized, the loss establishes a new carrying value of the bitcoin lot. Subsequent reversal of impairment losses is not permitted. Digital assets are classified on our balance sheet as a current asset due to the Company's ability to sell it in a highly liquid marketplace and its intent to liquidate its bitcoin to fund operations when needed.

For the years ended December 31, 2022 and 2021, the Company recognized net gains of $44.3 million and $4.8 million, respectively, on sales of digital assets. Purchases and sales of digital assets by the Company and digital assets awarded to the Company are included within Cash flows from operating activities on the Consolidated Statements of Cash Flows regardless of the length of time for which the digital assets are held. Any realized gains or losses from sales of bitcoin are included in Operating income (expense) on the Consolidated Statements of Operations. The Company accounts for its gains or losses by lot on a FIFO basis.

### Foreign Currency and Exchange Risk

Substantially all revenue and operating expenses are denominated in U.S. dollars.

### Recent Accounting Pronouncements

For a discussion of new accounting standards relevant to our business, refer to Note 2 — Summary of Significant Accounting Policies to our consolidated financial statements in Item 8 of Part II of this report.

### Emerging Growth Company

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. We may take advantage of certain exemptions from various public company reporting requirements, including not being required to have our internal control over financial reporting audited by our independent registered public accounting firm under Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and any golden parachute payments. We may take advantage of these exemptions for up to five years or until we are no longer an emerging growth company, whichever is earlier. In addition, the JOBS Act provides that an "emerging growth company" can delay adopting new or revised accounting standards until those standards apply to private companies. We have elected to use the extended transition period under the JOBS Act. Accordingly, our financial statements may not be comparable to the financial statements of public companies that comply with such new or revised accounting standards.

We will remain an emerging growth company under the JOBS Act until the earliest of (a) February 12, 2026, the fifth

anniversary of XPDI's initial public offering, (b) the last date of our fiscal year in which we have a total annual gross revenue of at least $1.07 billion, (c) the date on which we are deemed to be a "large accelerated filer" under the rules of the SEC with at least $700.0 million of outstanding securities held by non-affiliates or (d) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the previous three years.

100

---

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

The following discussion about our market risk exposures involves forward-looking statements. Actual results could differ materially from those projected in our forward-looking statements. For more information regarding the forward-looking statements used in this section and elsewhere in this Annual Report, see the Cautionary Note Regarding Forward-Looking Statements at the forepart of this Annual Report.

**Risk Regarding the Price of Bitcoin**

Our business and development strategy is focused on maintaining and expanding our bitcoin Mining operations to maximize the amount of new bitcoin rewards we earn. As of December 31, 2022, we held 43.55 bitcoin, with a carrying value of $0.7 million, all of which were produced from our bitcoin mining operations.

Quoted prices, including intraday low prices, are collected and utilized in impairment testing and measurement on a daily basis. To the extent that an impairment loss is recognized, the loss establishes the new cost basis of the digital asset. Subsequent reversal of impairment losses is not permitted.

We cannot accurately predict the future market price of bitcoin and, as such, we cannot accurately predict whether we will record impairment of the book value of our bitcoin assets. The future value of bitcoin will affect revenue from our operations, and any future impairment of the value of the bitcoin we mine and hold for our account would be reported in our financial statements and results of operations as charges against net income, which could have a material adverse effect on the market price for our securities.

**Item 8. Financial Statements and Supplementary Data**

Our consolidated financial statements and the notes thereto, included in Part IV, Item 15(1)(a) herein, are incorporated by reference into this Item 8.

**Report of Independent Registered Public Accounting Firm (PCAOB ID 688)**

To the Stockholders and Board of Directors of
Core Scientific, Inc.

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheet of Core Scientific, Inc. (the "Company") as of December 31, 2022, the related consolidated statements of operations, comprehensive loss, changes in contingently redeemable convertible preferred stock and stockholders' deficit, and cash flows for the year then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

### Explanatory Paragraph – Going Concern

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As more fully described in Note 2, the Company has incurred significant losses, has a working capital deficit, and limited cash. In addition, the Company has filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas seeking relief under Chapter 11 of the United States Code. As a result, substantial doubt exists regarding the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

### Adoption of New Accounting Standard

As discussed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for leases in 2022 due to the adoption of ASU No. 2016-02, *Leases (Topic 842)*, as amended, effective January 1, 2022, using the modified retrospective approach.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ Marcum LLP

Marcum LLP

We have served as the Company's auditor since 2022.

Los Angeles, CA
April 3, 2023                                                    102

core-20221231

Debtors' Exhibit No. 40

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Core Scientific, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Core Scientific, Inc. and subsidiaries (Debtor-in-Possession) (the Company) as of December 31, 2021 and 2020, the related consolidated statements of operations and comprehensive income (loss), changes in contingently redeemable convertible preferred stock and stockholders' equity and cash flows for each of the two years in the period ended December 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We served as the Company's auditor from 2018 to 2021.

Seattle, Washington
March 31, 2022
except for the impact of the SPAC recapitalization as described in Note 4, Merger Agreement as to which the date is April 3, 2023

103

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Core Scientific, Inc. (Debtor-in-Possession)**
**Consolidated Balance Sheets**
**(in thousands, except par value)**

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 15,884 | $ 117,871 |
| Restricted cash | 36,356 | 13,807 |
| Accounts receivable, net of allowance of $8,724 and $—, respectively | 234 | 1,382 |
| Accounts receivable from related parties | 23 | 300 |
| Deposits for equipment | — | 358,791 |
| Digital assets | 724 | 234,298 |
| Prepaid expenses and other current assets | 31,881 | 30,111 |
| Total Current Assets | 85,102 | 756,560 |
| Property, plant and equipment, net | 691,134 | 597,304 |
| Operating lease right-of-use assets | 20,430 | |
| Goodwill | — | 1,055,760 |
| Intangible assets, net | 1,704 | 8,195 |
| Other noncurrent assets | 9,316 | 21,045 |
| Total Assets | $ 807,686 | $ 2,438,864 |
| **Liabilities, Contingently Redeemable Preferred Stock and Stockholders' (Deficit) Equity** | | |
| Current Liabilities: | | |
| Accounts payable | $ 53,641 | $ 11,617 |
| Accrued expenses and other current liabilities | 17,952 | 67,862 |
| Operating lease liabilities, current portion | 769 | — |
| Deferred revenue | 77,689 | 63,417 |
| Deferred revenue from related parties | 496 | 72,945 |
| Finance lease obligations, current portion | — | 28,452 |
| Notes payable, current portion | 36,242 | 75,996 |
| Total Current Liabilities | 186,789 | 320,289 |
| Finance lease obligations, net of current portion | — | 62,145 |
| Operating lease liabilities, net of current portion | 720 | |
| Notes payable, net of current portion (includes $— and $557,007 at fair value) | — | 652,213 |
| Other noncurrent liabilities | 2,210 | 18,531 |
| Total liabilities not subject to compromise | 189,719 | 1,053,178 |
| Liabilities subject to compromise | 1,027,313 | — |
| Total Liabilities | 1,217,032 | 1,053,178 |
| Contingently redeemable preferred stock; $0.0001 par value; 2,000,000 and 50,000 shares authorized at December 31, 2022 and 2021, respectively; — and 10,826 shares issued and outstanding at December 31, 2022 and 2021, respectively; $— and 45,164 total liquidation preference at December 31, 2022 and 2021, respectively | — | 44,476 |
| Commitments and contingencies (Note 14) | | |
| Stockholders' (Deficit) Equity: | | |
| Common stock; $0.00010 par value; 10,000,000 and 10,000,000 shares authorized at December 31, 2022 and 2021, respectively; 375,225 and 271,576 shares issued and outstanding at December 31, 2022 and 2021, respectively | 36 | 27 |
| Additional paid-in capital | 1,764,368 | 1,379,581 |
| Accumulated deficit | (2,173,750) | (27,432) |
| Accumulated other comprehensive loss | — | (10,966) |

104

Debtors' Exhibit No. 40
Page 240 of 462

| | | |
|---|---|---|
| Total Stockholders' (Deficit) Equity | | (409,346) | 1,341,210 |
| Total Liabilities, Contingently Redeemable Preferred Stock and Stockholders' (Deficit) Equity | $ | 807,686 | $ | 2,438,864 |

See accompanying notes to consolidated financial statements.

105

Debtors' Exhibit No. 40
Page 241 of 462

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Core Scientific, Inc. (Debtor-in-Possession)**
**Consolidated Statements of Operations**
**(in thousands, except per share amounts)**

4/8/2023, 10:22 PM

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Revenue: | | | |
| Hosting revenue from customers | $ 130,234 | $ 62,350 | $ 34,615 |
| Hosting revenue from related parties | 29,454 | 16,973 | 6,983 |
| Equipment sales to customers | 11,391 | 138,376 | 11,193 |
| Equipment sales to related parties | 71,438 | 109,859 | 1,402 |
| Digital asset mining income | 397,796 | 216,925 | 6,127 |
| Total revenue | 640,313 | 544,483 | 60,320 |
| Cost of revenue: | | | |
| Cost of hosting services | 169,717 | 77,678 | 36,934 |
| Cost of equipment sales | 67,114 | 177,785 | 11,017 |
| Cost of digital asset mining | 395,082 | 50,158 | 2,977 |
| Total cost of revenue | 631,913 | 305,621 | 50,928 |
| Gross profit | 8,400 | 238,862 | 9,392 |
| (Loss) gain on legal settlement | — | (2,636) | 5,814 |
| Gain from sales of digital assets | 44,298 | 4,814 | 69 |
| Impairment of digital assets | (231,315) | (37,206) | (4) |
| Impairment of goodwill and other intangibles | (1,059,265) | — | — |
| Impairment of property, plant and equipment | (590,673) | — | — |
| Losses on exchange or disposal of property, plant and equipment | (28,025) | (118) | (2) |
| Operating expenses: | | | |
| Research and development | 26,962 | 7,674 | 5,271 |
| Sales and marketing | 12,731 | 4,062 | 1,771 |
| General and administrative | 213,280 | 60,486 | 14,554 |
| Total operating expenses | 252,973 | 72,222 | 21,596 |
| Operating (loss) income | (2,109,553) | 131,494 | (6,327) |
| Non-operating expenses, net: | | | |
| Loss on debt from extinguishment | 287 | 8,016 | 1,333 |
| Interest expense, net | 96,826 | 44,354 | 4,436 |
| Fair value adjustment on convertible notes | 186,853 | 16,047 | — |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — | — |
| Reorganization items, net | (197,405) | — | — |
| Other non-operating expenses, net | 5,232 | 2 | 110 |
| Total non-operating expense, net | 53,856 | 68,419 | 5,879 |
| (Loss) income before income taxes | (2,163,409) | 63,075 | (12,206) |

| | | | |
|---|---:|---:|---:|
| Income tax (benefit) expense | (17,091) | 15,763 | — |
| Net (loss) income | (2,146,318) | 47,312 | (12,206) |
| Deemed dividend from common to preferred exchange | — | — | (10,478) |
| Net (loss) income attributable to common stockholders | $ (2,146,318) | $ 47,312 | $ (22,684) |
| Net (loss) income per share (Note 18): | | | |
| Basic | $ (6.30) | $ 0.23 | $ (0.14) |
| Diluted | $ (6.30) | $ 0.20 | $ (0.14) |
| Weighted average shares outstanding: | | | |

106

Debtors' Exhibit No. 40
Page 244 of 462

| | | | |
|---|---|---|---|
| Basic | 340,647 | 207,263 | 157,602 |
| Diluted | 340,647 | 233,305 | 157,602 |

See accompanying notes to consolidated financial statements.

107

Debtors' Exhibit No. 40
Page 245 of 462

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Consolidated Statements of Comprehensive (Loss) Income**
**(in thousands)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2022** | **2021** | **2020** |
| Net (loss) income | $ (2,146,318) | $ 47,312 | $ (12,206) |
| Other comprehensive income (loss), net of income taxes: |  |  |  |
| Change in fair value attributable to instrument-specific credit risk of convertible notes measured at fair value under the fair value option, net of tax effect of $—, $— and $— | 83,579 | (10,966) | — |
| Release to Reorganization items, net of accumulated fair value attributable to instrument-specific credit risk of convertible notes measured at fair value under the fair value option, net of tax effect of $—, $— and $— | (72,613) | — | — |
| Total other comprehensive income (loss), net of income taxes | 10,966 | (10,966) | — |
| Comprehensive (loss) income | $ (2,135,352) | $ 36,346 | $ (12,206) |

See accompanying notes to consolidated financial statements.

108

**Core Scientific, Inc. (Debtor-in-Possession)**
**Consolidated Statements of Changes in Contingently Redeemable Convertible Preferred Stock and Stockholders' (Deficit)**
**Equity**
**(in thousands)**

| | Contingently Redeemable Convertible Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' (Deficit) Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at January 1, 2020 (as previously reported) | 4,421 | $ 29,526 | 99,141 | $   1 | $ 168,866 | $ (62,538) | $   — | $  106,329 |
| Retroactive application of the recapitalization | 2,653 | — | 59,499 | 15 | (15) | — | — | — |
| Balance at January 1, 2020, as adjusted | 7,074 | 29,526 | 158,640 | 16 | 168,851 | (62,538) | — | 106,329 |
| Net loss | — | — | — | — | — | (12,206) | — | (12,206) |
| Stock-based compensation | — | — | — | — | 3,037 | — | — | 3,037 |
| Exchange of common stock for Series A contingently redeemable convertible preferred stock | 2,882 | 12,308 | (1,754) | — | (12,308) | — | — | (12,308) |
| Issuance of Series A contingently redeemable convertible preferred stock | 366 | 1,545 | — | — | — | — | — | — |
| Issuance of Series B contingently redeemable convertible preferred stock | 502 | 1,097 | — | — | — | — | — | — |
| Issuance of common stock - asset acquisition | — | — | 899 | — | 1,967 | — | — | 1,967 |
| Exercise of warrants and stock options | — | — | — | — | 2,405 | — | — | 2,405 |
| Balance at December 31, 2020 | 10,826 | $ 44,476 | 157,786 | $  16 | $ 163,952 | $ (74,744) | $   — | $  89,224 |
| Net income | — | — | — | — | — | 47,312 | — | 47,312 |
| Other comprehensive loss, net of income taxes | — | — | — | — | — | — | (10,966) | (10,966) |
| Stock-based compensation | — | — | 40 | — | 38,937 | — | — | 38,937 |
| Exercise of stock options | — | — | 14 | — | 7 | — | — | 7 |
| Issuances of common stock - business combination | — | — | 113,456 | 11 | 1,173,753 | — | — | 1,173,764 |
| Issuances of common stock - legal settlements | — | — | 240 | — | 2,436 | — | — | 2,436 |
| Exercise of warrants and stock options | — | — | 40 | — | 496 | — | — | 496 |
| Balance at December 31, 2021 | 10,826 | $ 44,476 | 271,576 | $  27 | $1,379,581 | $ (27,432) | $ (10,966) | $1,341,210 |
| Net loss | — | — | — | — | — | (2,146,318) | — | (2,146,318) |
| Other comprehensive income, net of income taxes | — | — | — | — | — | — | 10,966 | 10,966 |
| Stock-based compensation | — | — | — | — | 182,894 | — | — | 182,894 |
| Exercise of stock options | — | — | 1,321 | — | 3,846 | — | — | 3,846 |
| Restricted stock awards issued, net of shares withheld for tax withholding obligations | — | — | 43,762 | 4 | (31,650) | — | — | (31,646) |
| Restricted stock awards forfeited | — | — | (2,456) | — | — | — | — | — |
| Exercise of convertible notes | — | — | 197 | — | 1,574 | — | — | 1,574 |
| Cashless exercise of warrants | — | — | 3,001 | — | — | — | — | — |

109

Debtors' Exhibit No. 40
Page 248 of 462

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Issuances of common stock - equity line of credit | — | — | 13,355 | 1 | 21,200 | — | — | 21,201 |
| Conversion of contingently redeemable preferred stock to common stock | (10,826) | (44,476) | 10,826 | 1 | 44,475 | — | — | 44,476 |
| Issuances of common stock - Merger with XPDI | — | — | 30,778 | 3 | 163,456 | — | — | 163,459 |
| Issuances of common stock - financing transaction fees | — | — | 1,285 | — | 2,960 | — | — | 2,960 |
| Issuances of common stock - vendor settlement | — | — | 1,580 | — | 12,674 | — | — | 12,674 |
| Costs attributable to issuance of common stock and equity instruments - Merger with XPDI | — | — | — | — | (16,642) | — | — | (16,642) |
| Balance at December 31, 2022 | — | $ — | 375,225 | $ 36 | $1,764,368 | $(2,173,750) | $ — | $(409,346) |

See accompanying notes to consolidated financial statements.

110

core-20221231                                                            https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

**Core Scientific, Inc. (Debtor-in-Possession)**
**Consolidated Statements of Cash Flows**
**(in thousands)**

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Cash flows from Operating Activities:** | | | |
| Net (loss) income | $ (2,146,318) | $ 47,312 | $ (12,206) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 225,259 | 33,362 | 9,403 |
| Amortization of operating lease right-of-use assets | 834 | — | |
| Stock-based compensation | 182,894 | 38,937 | 3,037 |
| Digital asset mining income | (397,796) | (216,925) | (6,127) |
| Deferred income taxes | (18,521) | 9,528 | — |
| Loss on legal settlements | — | 2,636 | — |
| Gain on sale of intangible assets | (5,904) | | |
| Loss on debt extinguishment | 287 | 8,016 | 1,333 |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — | — |
| Fair value adjustment on convertible notes | 186,853 | 31,217 | — |
| Fair value adjustment on other liabilities | 9,498 | | |
| Equity line of credit expenses | 1,668 | — | — |
| Amortization of debt discount and debt issuance costs | 7,135 | 1,374 | 1,300 |
| Losses on disposals of property, plant and equipment | 28,025 | 118 | 2 |
| Impairments of digital assets | 231,315 | 37,206 | 4 |
| Impairment of goodwill, other intangibles and property, plant and equipment | 1,649,938 | — | — |
| Allowance for doubtful accounts | 9,004 | | 616 |
| Reorganization | (199,707) | — | — |
| Changes in working capital components: | | | |
| Accounts receivable, net | (7,856) | (7,421) | (1,303) |
| Accounts receivable from related parties | 277 | 16 | (243) |
| Digital assets | 400,055 | 24,011 | 6,090 |
| Deposits for equipment for sales to customers | 50,174 | (244,399) | (54,736) |
| Prepaid expenses and other current assets | 51,818 | (34,076) | (2,353) |
| Accounts payable | 26,713 | (21,991) | (1,770) |
| Accrued expenses and other | 17,229 | 56,200 | 1,625 |
| Deferred revenue | 16,483 | 184,340 | 30,009 |
| Deferred revenue from related parties | (72,449) | | |
| Other noncurrent assets and liabilities, net | (3,784) | (6,196) | 1,554 |
| Net cash provided by (used in) operating activities | 205,187 | (56,735) | (23,765) |
| **Cash flows from Investing Activities:** | | | |
| Purchases of property, plant and equipment | (383,980) | — | — |
| Cash paid in acquisitions | — | (365,210) | (13,668) |
| Deposits (credits) for self-mining equipment | (217,677) | 704 | (1,568) |
| Proceeds from sales (acquisition) of intangibles | 10,850 | (59,275) | — |
| Other | 29 | (59) | 92 |
| Net cash used in investing activities | (590,778) | (423,840) | (15,144) |
| **Cash flows from Financing Activities:** | | | |
| Proceeds from exercise of stock options and warrants | 25,049 | 513 | 2,642 |
| Proceeds from the XPDI merger, net of transaction costs | 195,010 | — | — |
| Proceeds from debt, net of issuance costs | 261,349 | 670,750 | 45,178 |
| Repurchase of common shares to pay employee withholding taxes | (31,646) | — | — |
| Principal repayments of finance leases | (30,319) | (7,768) | (1,831) |
| Payment for transaction costs | — | (10,682) | — |
| Principal payments on debt | (113,290) | (49,281) | (5,266) |
| Net cash provided by financing activities | 306,153 | 603,532 | 40,723 |
| (Decrease) increase in cash, cash equivalents, and restricted cash | (79,438) | 122,957 | 1,814 |
| Cash, cash equivalents and restricted cash—beginning of period | 131,678 | 8,721 | 6,907 |
| Cash, cash equivalents and restricted cash—end of period | $ 52,240 | $ 131,678 | $ 8,721 |

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 251 of 462

Supplemental disclosure of other cash flow information:

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash paid for interest | $ | 86,010 | $ | 38,180 | $ | 2,903 |
| Income tax payments | $ | 5,756 | $ | 9,619 | $ | — |

111

Debtors' Exhibit No. 40
Page 252 of 462

Supplemental disclosure of noncash investing and financing activities:

| | | | | | |
|---|---|---|---|---|---|
| Property, plant and equipment obtained in exchange transaction | $ | 62,338 | $ | — | $ | — |
| Noncash consideration paid for acquisitions | $ | — | $ | 1,138,838 | $ | 1,966 |
| Accrued capital expenditures | $ | 69,286 | $ | 9,002 | $ | 2,544 |
| Increase in notes payable for acquisition of property, plant and equipment | $ | — | $ | — | $ | 19,882 |
| Decrease in notes payable in exchange for equipment | $ | — | $ | 6,842 | $ | 7,000 |
| Cashless exercise of warrants | $ | 3,001 | $ | — | $ | — |
| Property, plant and equipment acquired under finance leases | $ | — | $ | 93,956 | $ | — |
| Payment-in-kind interest | | 31,382 | $ | 7,274 | $ | — |
| Common stock issuances for acquisition of long-lived assets | $ | — | $ | — | $ | 1,486 |

Certain prior year amounts have been reclassified for consistency with the current year presentation. See accompanying notes to consolidated financial statements.

112

---

Debtors' Exhibit No. 40
Page 253 of 462

Table of Contents

Core Scientific, Inc.
(Debtor-in-Possession)
Notes to Consolidated Financial Statements

## 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

MineCo Holdings, Inc. was incorporated on December 13, 2017 in the State of Delaware and changed its name to Core Scientific, Inc. ("Old Core") pursuant to an amendment to its Certificate of Incorporation dated June 12, 2018. On August 17, 2020 Old Core engaged in a holdco restructuring to facilitate a borrowing arrangement by Old Core pursuant to which Old Core was merged with and into a wholly owned subsidiary of Core Scientific Holding Co. and became a wholly owned subsidiary of Core Scientific Holding Co. and the stockholders of Old Core became the stockholders of Core Scientific Holding Co.In July 2021, Core Scientific Holding Co. completed the acquisition of Blockcap, Inc. ("Blockcap"), one of Old Core's largest hosting customers. Prior to its acquisition, Blockcap had retained Core Scientific Holding Co to host in the data centers operated by Core Scientific Holding Co Blockcap's industrial scale digital asset mining operations. On January 19, 2022, following the approval at the special meeting of the stockholders of Power & Digital Infrastructure Acquisition Corp., a Delaware corporation ("XPDI"), Core Scientific Holding Co. merged with XPDI, and XPDI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of XPDI ("Merger Sub"), consummated the transactions contemplated under the merger agreement. In connection with the closing of the merger, XPDI changed its name from Power & Digital Infrastructure Acquisition Corp. to Core Scientific, Inc. ("Core Scientific" or the "Company").

The Company, headquartered in Austin, Texas, is a best-in-class large-scale operator of dedicated, purpose-built facilities for digital asset mining and a premier provider of blockchain infrastructure, software solutions and services. We mine digital assets for our own account and provide colocation hosting services for other large-scale miners. We are one of the largest blockchain infrastructure, hosting provider and digital asset mining companies in North America, with approximately 457MW of power as of December 31, 2021, and 592MW of power as of December 31, 2022. We predominately mine bitcoin for third-party hosting customers and for our own account at our eight fully operational data centers in Georgia (2), Kentucky (1), North Carolina (2), North Dakota (1) and Texas (2). In February 2022, the Muskogee City-County Port Authority (Oklahoma) announced an agreement with us to develop a 500MW data center at the Port of Muskogee John T. Griffin Industrial Park which remains substantially undeveloped.

Our hosting colocation business provides a full suite of services to digital asset mining customers. We provide deployment, monitoring, troubleshooting, optimization and maintenance of our customers' digital asset mining equipment and provide necessary electrical power and repair and other infrastructure services necessary to operate, maintain and efficiently mine digital assets.

We operate in two segments: "mining" consisting of digital asset mining for our own account, and "hosting and equipment sales" consisting of our blockchain infrastructure and third-party hosting business, and associated sales of mining equipment to customers.

Our business strategy is to grow our revenue and profitability by increasing the capacity and efficiency of our self-mining fleet and by enhancing our third-party colocation business. We intend to strategically develop the infrastructure necessary to support business growth and profitability and take advantage of adjacent opportunities that leverage our mining expertise and capabilities.

### Chapter 11 Filing

On December 21, 2022, the Company and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Debtors have filed various "first day" motions with the Bankruptcy Court requesting customary relief, which were generally approved by the Bankruptcy Court on December 22, 2022, that have enabled the Company to operate in the ordinary course while under Chapter 11 protection. For detailed discussion about the Chapter 11 Cases, refer to Note 3 — Chapter 11 Filing and Other Related Matters.

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accompanying consolidated financial statements reflect the application of certain significant accounting policies as described below and elsewhere in these notes to the consolidated financial statements.

113

---

Debtors' Exhibit No. 40
Page 255 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). All intercompany balances and transactions have been eliminated in consolidation.

*Going Concern*

The consolidated financial statements have been prepared on a going concern basis. For the year ended December 31, 2022, the Company generated a net loss of $2.1 billion. The Company had unrestricted cash and cash equivalents of $15.9 million as of December 31, 2022, compared to $117.9 million as of December 31, 2021. The decrease in cash and cash equivalents for the year ended December 31, 2022 primarily reflected $205.2 million of cash provided by operating activities (including $58.1 million of interest payments on debt), $590.8 million of cash used in investing activities (including $384.0 million of purchases of property, plant and equipment and $217.7 million of deposits for self-mining equipment), partially offset by $306.2 million of cash provided by financing activities (including $113.3 million of principal payments on debt). The Company has historically generated cash primarily from the issuance of common stock and debt, through sales of digital assets received as digital asset mining revenue and from operations through contracts with customers.

During the year ended December 31, 2022, the average price of bitcoin declined to $28,198 compared to $47,437 for the year ended December 31, 2021. At the same time the Company's power costs in its Mining Segment increased $136.5 million compared to the year ended December 31, 2021, reflecting increases in both power usage and power rates. These factors contributed to the Company's gross profit of $8.4 million for the year ended December 31, 2022, as compared to a gross profit of $238.9 million for the year ended December 31, 2021. In addition, as discussed in Note 14 — Commitments and Contingencies, in July 2022, one of the Company's largest customers filed for voluntary relief under chapter 11 of the Bankruptcy Code.

Our ability to continue as a going concern is contingent upon, among other things, our ability to, subject to the Bankruptcy Court's approval, implement the Plan, successfully emerge from the Chapter 11 Cases and generate sufficient liquidity from the restructuring to meet our obligations and operating needs. As a result of risks and uncertainties related to (i) the Company's ability to successfully consummate the Plan and emerge from the Chapter 11 Cases, and (ii) the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business, financing and operational relationships, together with the Company's recurring losses from operations and accumulated deficit, substantial doubt exists regarding our ability to continue as a going concern. For detailed discussion about the Chapter 11 Cases and the Plan, refer to Note 3 — Chapter 11 Filing and Other Related Matters.

*Debtor-in Possession*

In general, as debtors-in-possession under the Bankruptcy Code, we are authorized to continue to operate as an ongoing business but may not engage in transactions outside the ordinary course of business without the prior approval of the Bankruptcy Court. Pursuant to certain motions and applications intended to limit the disruption of the bankruptcy proceedings on our operations (the First Day Motions) and other motions filed with the Bankruptcy Court, the Bankruptcy Court has authorized us to conduct our business activities in the ordinary course, including, among other things and subject to the terms and conditions of such orders, authorizing us to obtain DIP financing, pay employee wages and benefits, settle certain de minimis disputes and pay vendors and suppliers in the ordinary course for all goods and services. For detailed discussion about the Chapter 11 Cases, refer to Note 3 — Chapter 11 Filing and Other Related Matters.

*Use of Estimates*

The consolidated assets, liabilities and results of operations prior to the reverse recapitalization are those of Core Scientific Holding Co. The outstanding shares and corresponding capital amounts, and losses per share, prior to the reverse recapitalization, have been retroactively adjusted in accordance with Accounting Standards Codification ("ASC") 805, *Business Combinations*.

The preparation of the Company's consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of income and expenses during the reporting period. Some of the more significant estimates include assumptions used to estimate its ability to continue as a going concern, the valuation of the Company's common shares and the determination of the grant date fair value of stock-based compensation awards for periods prior to the Merger,

Debtors' Exhibit No. 40
Page 256 of 462

the valuation of digital assets, goodwill, other intangible assets and property, plant and equipment, the fair value of convertible debt, derivative warrants, acquisition purchase price accounting, and income taxes. These estimates are based on information available as of the date of the financial statements; therefore, actual results could differ from management's estimates.

114

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

### *Cash, Cash Equivalents, and Restricted Cash*

Cash and cash equivalents include all cash balances and highly liquid investments with original maturities of three months or less from the date of acquisition. As of December 31, 2022, cash equivalents included $10.2 million of highly liquid money market funds, which are classified as Level 1 within the fair value hierarchy. Restricted cash consists of cash held in escrow under the Original DIP Credit Agreement and in escrow to pay for construction and development activities.

The following table provides a reconciliation of the amount of cash, cash equivalents, and restricted cash reported on the Company's Consolidated Balance Sheets to the total of the same amount shown in the consolidated statements of cash flows (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Cash and cash equivalents | $    15,884 | $    117,871 |
| Restricted Cash | 36,356 | 13,807 |
| Total cash, cash equivalents and restricted cash | $    52,240 | $    131,678 |

### *Accounts Receivable and Allowance for Doubtful Accounts*

The Company records accounts receivable at the amount billed to the customer based on the contractual terms, net of the allowance for doubtful accounts.

The Company records an allowance for doubtful accounts based on an estimate of amounts that are not collectible. The Company's credit risk is mitigated by certain customer prepayments, and for transactions that are not prepaid, the relatively short collection period. The Company does not require collateral for accounts receivable, however, the Company's hosting customer agreements allow the Company to use customer equipment for processing transactions on digital asset networks until the Company has recovered the past due receivables. Accounts receivable also includes sales tax receivable.

The Company records adjustments to the allowance when new information becomes available that indicates they are required. The Company writes off accounts receivable in the period in which it deems the receivable to be uncollectible. The Company records recoveries of accounts receivable previously written off when it is known that they will be received. The Company's allowance for doubtful accounts was $8.7 million as of December 31, 2022. The Company had no allowance for doubtful accounts as of December 31, 2021.

### *Valuation of Common Stock*

The Company determined the fair value of New Core Common Stock using the most observable inputs available, including quoted prices of XPDI Class A Common Stock and sales the Company's Series A and Series B Contingently Redeemable Convertible Preferred Stock, discussed in Note 15 — Contingently Redeemable Convertible Preferred Stock. The Company also uses the market approach, which estimates the value of the Company's business by applying valuation multiples derived from the observed valuation multiples of comparable public companies to the Company's expected financial results. The Company retained the services of certified valuation specialists to assist with the valuation of the Company's common stock.

Applying these valuation and allocation approaches involves the use of estimates, judgments and assumptions that are highly complex and subjective, such as those regarding the Company's expected future revenue, expenses, valuation multiples, the selection of comparable public companies and the probability of future events. Changes in any or all of these estimates and assumptions, or the relationships between these assumptions, impact the Company's valuation as of each valuation date and may have a material impact on the valuation of the Company's common stock and common stock warrants issued with the Company's debt and equity instruments.

*Digital Assets*

The Company's digital asset policy prior to the Blockcap acquisition on July 30, 2021, included selling all digital assets and converting them into fiat currency shortly after they are mined, typically within 1-3 days, in order to fund the growth of the Company's operations. Following the Blockcap acquisition, the Company significantly expanded its self-mining operation and consequently reevaluated its digital asset investment policy and, at that time, began holding a more significant portion of its digital assets mined on its balance sheet. Since that time, the Company has sold or held its digital assets as dictated by liquidity and funding

115

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

needs. Sales of digital assets awarded to the Company through its self-mining activities are classified as cash flows from operating activities regardless of the length of time for which the digital assets are held.

The Company's digital assets are accounted for as intangible assets with indefinite useful lives. The Company initially recognizes digital assets that are received as digital asset mining revenue based on the fair value of the digital assets when received. Digital assets that are purchased in an exchange of one digital asset for another digital asset are recognized at the fair value of the asset surrendered. As indefinite lived intangible assets digital assets are not amortized, but are evaluated and assessed for impairment on at least an annual basis and more frequently in the interim when indicators of impairment exist. Impairment is indicated and recognized when the carrying amount of the digital asset lot exceeds its fair value. Impairment is measured using quoted prices of the digital asset at the time its fair value is being assessed. Quoted prices, including intraday low prices, are collected and utilized in impairment testing and measurement on a daily basis. To the extent that an impairment loss is recognized, the loss establishes the new cost basis of the digital asset. For the years ended December 31, 2022, 2021 and 2020, the Company recognized impairments of digital assets of $231.3 million, $37.2 million, and nil respectively. For the years ended December 31, 2022, 2021 and 2020, the Company recognized net gains of $44.3 million, $4.8 million, and $0.1 million respectively, on sales of digital assets.

Activity related to our digital asset balances for the years ended December 31, 2022 and 2021 were as follows (in thousands):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Digital assets, beginning of period | $ 234,298 | $ 63 |
| Digital asset mining revenue | 397,796 | 216,925 |
| Blockcap acquisition | — | 77,560 |
| Proceeds from sales of digital assets and other | (444,353) | (27,858) |
| Gain from sales of digital assets | 44,298 | 4,814 |
| Impairment of digital assets | (231,315) | (37,206) |
| Digital assets, end of period | $ 724 | $ 234,298 |

Digital assets are available to be sold as a source of funds, if needed, for current operations and are classified as current assets on the Company's Consolidated Balance Sheets, the details of which are presented below.

|  | December 31 2022 | December 31 2021 |
|---|---|---|
| Bitcoin (BTC) | $ 724 | $ 224,843 |
| Ethereum (ETH) | — | 4,665 |
| Other | — | 4,790 |
| Total digital assets | $ 724 | $ 234,298 |

The Company does not have any off-balance sheet holdings of digital assets.

***Property, Plant and Equipment, Net***

Property, plant and equipment includes land, buildings and improvements for datacenter facilities and leasehold improvements for the Company's corporate headquarters. Property and equipment consists of computer, mining, network, electrical and other equipment, including property and equipment under finance leases. Property, plant and equipment, net is stated at cost less accumulated depreciation and amortization. Depreciation and amortization is computed using the straight-line method over the estimated useful lives of the assets. Leasehold improvements are capitalized at cost and amortized over the shorter of their estimated useful lives or the lease term. Future obligations related to finance leases are presented as Finance lease obligations, current portion and Finance lease obligations, net of current portion in the Company's Consolidated Balance Sheets. Depreciation expense, including amortization of assets held under finance leases, is primarily included in Cost of Revenue in the Company's Consolidated Statements of Operations.

    Self-mining computer equipment that is subsequently contracted for sale to customers is valued at the lower of cost or net realizable value, with any write-down recognized as Cost of Equipment Sales in the Company's Consolidated Statements of Operations.

116

Debtors' Exhibit No. 40
Page 261 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Long-Lived Asset Impairments*

The Company tests long-lived asset groups for recoverability whenever events or changes in circumstances have occurred that may affect the recoverability or the estimated useful lives of long-lived assets. Long-lived assets include property, plant and equipment and intangible assets subject to amortization. A long-lived asset may be impaired when the estimated future undiscounted cash flows are less than the carrying amount of the asset. If that comparison indicates that the asset's carrying value may not be recoverable, the impairment is measured based on the difference between the carrying amount and the estimated fair value of the asset. Long-lived assets to be disposed of are reported at the lower of the carrying amount or estimated fair value less costs to sell. See Note 5 - Property, Plant and Equipment, net for additional discussion of long-lived asset impairments during the year ended December 31, 2022.

*Goodwill*

The total purchase price of any of the Company's acquisitions is allocated to the tangible and intangible assets acquired and the liabilities assumed based on their estimated fair values as of the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. When stock is issued as consideration, the fair value assigned to the tangible and intangible assets acquired and liabilities assumed are based on estimates and assumptions around the valuation of the Company's common stock at the time of the acquisition.

The Company does not amortize goodwill, but tests it for impairment annually as of October 31, or more frequently if events or changes in circumstances indicate that the carrying value of goodwill may not be recoverable. The Company has the option to first assess qualitative factors to determine whether it is more likely than not that the fair value of its reporting units are less than their carrying amounts as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. If the Company determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, or chooses not to perform a qualitative assessment, then the quantitative goodwill impairment test will be performed. The quantitative test compares the fair value of the reporting unit with its carrying amount. If the carrying amount exceeds its fair value, the excess of the carrying amount over the fair value is recognized as an impairment loss, and the resulting measurement of goodwill becomes its new cost basis.

As of December 31, 2022, the Company had no remaining Goodwill. As of December 31, 2021, the carrying amount of Goodwill was $1.06 billion with no accumulated impairment losses or impairment losses for the year. See Note 6 - Goodwill for additional discussion on goodwill and its impairments during the year ended December 31, 2022.

*Derivative Warrant Liabilities*

The Company does not use derivative instruments to hedge exposures to cash flow, market, or foreign currency risks. The Company evaluates all of its financial instruments, including issued stock purchase warrants, to determine if such instruments are derivatives or contain features that qualify as embedded derivatives. The classification of derivative instruments, including whether such instruments should be classified as liabilities or as equity, is re-assessed at the end of each reporting period.

The Public Warrants and the Private Placement Warrants have been recognized as derivative liabilities. Accordingly, the Company recognized the warrant instruments as liabilities at fair value and adjusted the instruments to fair value at each reporting period. The liabilities were subject to re-measurement at each balance sheet date until exercised, and any change in fair value was recognized in the Company's Consolidated Statements of Operations and presented as fair value adjustment on derivative warrant liabilities. The initial and subsequent estimated fair value of both the Public Warrants and Private Placement Warrants was based on the listed price in an active market for the Public Warrants.

After the Petition Date, discussed in Note 3 - Chapter 11 Filing and Other Related Matters below, the Public Warrants and Private Placement Warrants were moved to liabilities subject to compromise. See Note 10 - Derivative Warrant Liabilities for additional discussion.

*Debt Issuance Costs*

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Debt issuance costs are capitalized and amortized over the term of the associated debt. Debt issuance costs are presented in the consolidated balance sheets as a direct deduction from the carrying amount of the debt liability consistent with the debt discount.

117

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

### *Revenue From Contracts With Customers - Digital Asset Mining Income*

The Company derives its digital asset mining income from operating its owned computer equipment as part of a pool of users, facilitated by a pool operator, that processes transactions conducted on one or more blockchain networks. The contracts with pool operators are terminable at any time by either party. In exchange for providing computing power to the pool, the Company is entitled to receive digital currency assets from the mining pool operator which is a variable amount based on either (a) the amount of computing power the Company has contributed to the mining pool or (b) a fractional share of the digital currency asset award the mining pool operator receives from the blockchain network upon successfully adding a block to the blockchain, based on the proportion of computing power the Company contributed to the mining pool operator to the total computing power contributed by all mining pool participants in processing the block.

Providing computing power in digital asset transaction verification services is an output of the Company's ordinary activities. Providing such computing power is the only performance obligation in the Company's arrangements with mining pool operators. The transaction consideration the Company receives, if any, is noncash consideration that is variable depending on the payout methodology used by the pool operator. In certain arrangements, the Company does not have a reliable means to estimate its relative share of the rewards until they are paid to it and the variable consideration is constrained until the Company receives the consideration, at which time revenue is recognized. The Company measures consideration at fair value on the date received, which is historically not materially different than the fair value at inception of the arrangement or the time the Company has earned the award from the pools. The Company's digital asset mining income is sensitive to changes in the market prices of digital currency assets which may be significant.

There is no significant financing component in these transactions.

### *Revenue From Contracts With Customers - Hosting and Equipment Sales*

The Company primarily generates revenue from contracts with customers from hosting services and, sales of computer equipment. The Company generally recognizes revenue when the promised service is performed, or control of the promised equipment is transferred to customers. Revenue excludes any amounts collected on behalf of third parties, including sales and indirect taxes.

#### *Performance Obligations*

The Company's performance obligations primarily relate to hosting services and equipment sales, which are described below. The Company has performance obligations associated with commitments in customer hosting contracts for future services and commitments to acquire and deploy customer equipment that have not yet been recognized in the financial statements. For contracts with original terms that exceed one year (typically ranging from 18 to 48 months), those commitments not yet recognized as of December 31, 2022 and 2021, were $159.6 million and $1.05 billion, respectively. The $159.6 million remaining performance obligation as of December 31, 2022, relates solely to the hosting services performance obligation because all equipment sales' performance obligation commitments had been fulfilled and revenue recognized as of December 31,2022.

#### *Hosting Services*

We regularly enter contracts that include hosting services, for which revenue is recognized as services are performed on a variable (power consumption) basis. We recognize variable hosting revenue each month as the uncertainty related to the consideration is resolved, hosting services are provided to our customers, and our customers utilize the hosting services (the customer simultaneously receives and consumes the benefits of the Company's performance).

The Company performs hosting services that enable customers to run blockchain and other high-performance computing operations. The Company's performance obligation related to these services is satisfied over time. The Company recognizes revenue for services that are performed on a consumption basis, such as the amount of electricity used in a period, based on the customer's use of such resources. The Company recognizes variable consumption usage hosting revenue each month as the uncertainty related to the consideration is resolved, hosting services are provided to our customers, and our customers utilize the hosting services (the customer simultaneously receives and consumes the benefits of the Company's performance). The Company generally bills its customers in

4/8/2023, 10:22 PM

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

advance based on estimated consumption under the contract. The Company recognizes revenue based on actual consumption in the period and invoices adjustments in subsequent periods or retains credits toward future consumption. The term between invoicing and when payment is due typically does not exceed 30 days.

118

Debtors' Exhibit No. 40

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Equipment Sales*

We entered contracts with more than one performance obligation. For example, we entered into contacts that include both hosting services and sales of computer equipment to those same customers, for which revenue is recognized at the point in time when control of the equipment is transferred to the customer (typically at the start of the contract period). For these contracts, revenue is recognized based on the relative standalone selling price of each performance obligation in the contract.

The Company recognizes revenue from sales of computer equipment to customers at the point in time when control of the equipment is transferred to the customer, which generally occurs upon deployment of the equipment. Customers make a series of deposits on equipment purchases with the final payment typically being due at least one month prior to deployment. Self-mining computer equipment that is subsequently sold to customers is recognized as Equipment Sales to Customers in the Company's Consolidated Statements of Operations. Due to the change to Bitmain worldwide sale strategy, we do not expect to enter equipment sales contracts in the future or to have any equipment sales revenue after December 31, 2022.

**Deferred Revenue**

The Company records contract liabilities in Deferred revenue on the Company's Consolidated Balance Sheets when cash payments are received in advance of performance and recognizes them as revenue when the performance obligations are satisfied. The Company's current and non-current deferred revenue balance as of December 31, 2022 and 2021, was $80.4 million and $136.4 million, respectively, all from advance payments received during the years then ended.

In the year ended December 31, 2022, the Company recognized $88.6 million of revenue that was included in the deferred revenue balance as of the beginning of the year, primarily due to the deployment of customer equipment for which advanced payment had been received from customers prior to January 1, 2021.

In the year ended December 31, 2021, the Company recognized $44.5 million of revenue that was included in the deferred revenue balance as of the beginning of the year, primarily due to the performance of hosting services for which advance payments had been received from customers prior to January 1, 2020.

Advanced payments for hosting services are typically recognized in the following month and advanced payments for equipment sales are generally recognized within one year.

**Deposits for Equipment**

The Company has entered into agreements with vendors to supply equipment for its customers and for the Company's own digital asset mining operations. These agreements generally require significant refundable deposits payable months in advance of delivery and additional advance payments in monthly installments thereafter.

The Company classifies deposits for digital asset mining equipment based on the expected predominant source and use of the cash flows for the equipment that has been contracted for purchase. Prior to the acquisition of Blockcap on July 30, 2021, described in Note 4 — Business Combinations, Acquisitions and Restructuring, the Company expected that the predominant source and use of the cash flows for orders of digital asset mining equipment would be related to customer sales. Beginning with orders placed subsequent to July 30 2021, the Company expects that the predominant source and use of cash flows for digital asset mining equipment will be related to the Company's own self-mining operations. Therefore, the Company has classified deposits for equipment related to orders prior to July 30, 2021, as cash flow from operating activities and has classified deposits for equipment related to orders made subsequent to July 30, 2021, as cash flows from investing activities.

**Costs of Revenue**

The Company's Cost of Hosting Services and Cost of Digital Asset Mining primarily consist of electricity costs, salaries, stock-based compensation, depreciation of property, plant and equipment used to perform hosting services and mining operations and other related costs. Cost of Equipment Sales represents costs of computer equipment sold to customers.

*Research and Development*

The Company's research and development expenses primarily include personnel costs associated with technology and product development and data science research. Research and development costs are expensed as incurred.

119

Debtors' Exhibit No. 40
Page 267 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

### Stock-Based Compensation

The Company recognizes the cost of services received in exchange for awards of equity instruments based upon the fair value of those awards on the grant date. For the years ended December 31, 2022, 2021 and 2020, the Company's consolidated operating results included $36.6 million, $0.9 million, and $0.4 million of stock-based compensation expense related to restricted stock units issued to employees, respectively, and $146.3 million, $5.8 million, and $2.6 million of stock-based compensation expense related to stock options issued to employees and consultants, respectively. In addition, for the year ended December 31, 2021, the Company recognized $32.2 million of post-combination expense for share-based compensation awards related to the Blockcap acquisition described in Note 4 — Business Combinations, Acquisitions and Restructuring. The total tax benefit related to stock-based compensation was nil, $6.1 million, and $0.7 million for the years ended December 31, 2022, 2021, and 2020, respectively.

Stock-based compensation expense for the years ended December 31, 2022, 2021 and 2020 is included in the Company's Consolidated Statements of Operations as follow:

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cost of revenue | $ 25,779 | $ 4,084 | $ — |
| Research and development | 22,093 | 1,140 | — |
| Sales and marketing | 9,401 | 836 | — |
| General and administrative[1] | 125,621 | 32,877 | 3,038 |
| Total stock-based compensation expense[1] | $ 182,894 | $ 38,937 | $ 3,038 |

[1] Includes $1.0 million of stock-based compensation that was provided in severance as part of restructuring charges incurred during the year ended December 31, 2022.

Stock-based compensation expense is measured at the grant date based on the value of the equity award. The fair value of stock option awards is estimated on the date of grant using the Black-Scholes option-pricing model. The fair value of restricted stock unit awards is estimated on the date of grant using the estimated fair value of the Company's common stock on the date of grant.

For awards with only service conditions, primarily stock options and certain restricted stock units, the estimated fair value of the equity awards is recognized as expense on a straight-line basis, less actual forfeitures as they occur, over the requisite service period for the entire award, which is generally the vesting period.

For awards with service and performance conditions, primarily restricted stock unit awards, the compensation expense is recognized separately for each tranche of each award as if it were a separate award with its own vesting date (i.e., on an accelerated attribution basis) and the estimated fair value of the equity awards is recognized as expense when it is probable that the performance conditions will be achieved. If the performance conditions become probable of being achieved before the end of the requisite service period, the unrecognized compensation costs for which the requisite service have been provided is recognized in the period in which achievement becomes probable and the remaining unrecognized compensation costs for which requisite service has not been provided is recognized as expense prospectively on an accelerated attribution basis over the remaining requisite service period for the entire award, less actual forfeitures as they occur. See Note 16 — Stockholders' (Deficit) Equity for more information about the service and performance conditions associated with the Company's equity awards.

### Employee Benefit Plan

The Company currently maintains a defined contribution retirement and savings plan for the benefit of our employees who satisfy certain eligibility requirements (the "401(k) Plan"). The U.S. Internal Revenue Code allows eligible employees to defer a portion of their compensation, within prescribed limits, on a pre-tax basis through contributions to the 401(k) Plan. Prior to January 1, 2022, the Company did not match contributions made by participants in the 401(k) Plan.

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

### Earnings Per Share

The Company computes earnings per share ("EPS") following Financial Accounting Standards Board ("FASB") ASC Topic 260, *Earnings per share*. Basic EPS is measured as the income or loss available to common stockholders divided by the weighted average common shares outstanding for the period. Diluted EPS presents the dilutive effect on a per-share basis from the potential

120

core-20221231                                         https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

conversion of convertible securities or the exercise of options and or warrants; the dilutive impacts of potentially convertible securities are calculated using the if-converted method; the potentially dilutive effect of options or warrants are computed using the treasury stock method. Securities that are potentially an anti-dilutive effect (i.e., those that increase income per share or decrease loss per share) are excluded from diluted EPS calculation.

*Income Taxes*

The Company is subject to income taxes mainly in the jurisdictions in which it provides various infrastructure, technology and colocation and hosting services. The Company's tax position requires significant judgment in order to properly evaluate and quantify tax positions and to determine the provision for income taxes.

The Company uses the assets and liabilities method to account for income taxes, which requires that deferred tax assets and deferred tax liabilities be determined based on the differences between the financial statement and tax basis of assets and liabilities, using enacted tax rates in effect for the years in which the differences are expected to be reversed. The Company estimates its actual current tax expense, including permanent charges and benefits, and the temporary differences resulting from differing treatment of items, for tax and financial accounting purposes.

The Company assesses whether it is more likely than not that its deferred tax assets will be realized by considering both positive and negative evidence. If the Company believes that recovery of these deferred tax assets is not more likely than not, the Company establishes a valuation allowance. Significant judgment is required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, the Company considered all available evidence, including recent operating results, projections of future taxable income, the reversal of taxable temporary differences, and the feasibility of tax planning strategies.

GAAP sets forth a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained upon examination, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement. Interest and penalties related to unrecognized tax benefits are included within Income Tax Expense. Accrued interest and penalties are included in the related tax liability line in the Company's Consolidated Balance Sheets. No penalties or interest have been recognized or accrued for unrecognized tax benefits for the years ended December 31, 2022 and 2021.

The Company adjusts its reserves for tax positions in light of changing facts and circumstances, such as the closing of a tax audit, the refinement of an estimate based on new facts or changes in tax laws. To the extent that the final tax outcome of these matters is different than the amounts recorded, the differences are recorded as adjustments to the provision for income taxes in the period in which such determination is made. The provision (benefit) for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate.

The Company's future effective tax rates could be adversely affected by changes in the valuation of the Company's deferred tax assets or liabilities, or changes in tax laws, regulations, accounting principles or interpretations thereof. In addition, the Company is subject to examination of income tax returns by various tax authorities. The Company regularly assesses the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of its provisions for income taxes.

*Recently Adopted Accounting Standards*

*Simplifying Income Taxes*

In December 2019, the FASB issued Accounting Standards Update ("ASU") 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes*, which simplifies the accounting for income taxes by removing the exceptions to the incremental approach for intra-period tax allocation in certain situations, the requirement to recognize a deferred tax liability for a change in the status of a foreign investment, and the general methodology for computing income taxes in an interim period when year-to-date loss exceeds the anticipated loss for the year. The amendments also simplify the accounting for income taxes with regard to franchise tax, the evaluation of step up in the tax basis goodwill in certain business combinations, allocating current and deferred tax expense to legal entities that are not subject to tax and enacted change in tax laws or rates. The standard was applied on a prospective basis

beginning January 1, 2022 and the adoption of this standard did not have a material effect on the Company's consolidated financial statements.

---

121

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Leases*

In February 2016, the FASB issued ASU No. 2016-02, *Leases-(Topic 842)*. Under this new guidance, lessees are required to recognize for all leases (with the exception of short-term leases): 1) a lease liability equal to the lessee's obligation to make lease payments arising from a lease, measured on a discounted basis and 2) a right-of-use asset which will represent the lessee's right to use, or control the use of, a specified asset for the lease term ("ROU asset"). The Company adopted Topic 842 effective for the Company's annual and interim reporting periods beginning January 1, 2022. The adoption of Topic 842 required the Company to recognize non-current assets and liabilities for right-of-use assets and operating lease liabilities on its Consolidated Balance Sheet, but it did not have a material effect on the Company's results of operations or cash flows. Topic 842 also requires additional footnote disclosures to the
Company's consolidated financial statements.

A modified retrospective transition approach is required, applying the new standard to all leases existing at the date of initial application. The Company adopted the new standard on January 1, 2022, and used the effective date as the date of initial application. Consequently, financial information has not been updated, and the disclosures required under the new standard will not be provided for dates and periods before January 1, 2022.

The new standard provides a number of optional practical expedients in transition. The Company has elected the 'package of practical expedients', which permits the Company not to reassess prior conclusions about lease identification, lease classification and initial direct costs under the new standard. The Company has not elected the use-of-hindsight or the practical expedient pertaining to land easements; the latter not being applicable to the Company. The new standard also provides practical expedients for the Company's ongoing accounting. The Company has elected the short-term lease recognition exemption for all leases that qualify. This means, for those leases that qualify, the Company does not recognize ROU assets or lease liabilities, and this includes not recognizing ROU assets or lease liabilities for existing short-term leases of those assets in transition. The Company has not elected to apply the practical expedient to not separate lease and non-lease components for the Company's leases as of the transition date of January 1, 2022, but may apply the practical expedient prospectively to certain asset classes.

122

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The cumulative effect of initially applying the new lease standard on January 1, 2022 is as follows (in thousands):

| | January 1, 2022 | | |
| | Beginning Balance | Cumulative Effect Adjustment | Beginning Balance, As Adjusted |
|---|---|---|---|
| **Assets** | | | |
| Prepaid expenses and other current assets | $ 30,111 | $ (453) | $ 29,658 |
| Other noncurrent assets | $ 21,045 | $ 1,814 | $ 22,859 |
| **Liabilities** | | | |
| Accrued expenses and other current liabilities | $ 67,862 | $ (188) | $ 67,674 |
| Other noncurrent liabilities | $ 18,531 | $ (1,173) | $ 17,358 |

The most significant judgments and impacts upon adoption of the standard include the following:

- We recognized right-of-use assets and operating lease liabilities for operating leases that have not previously been recorded. The lease liability for operating leases is based on the net present value of future minimum lease payments. The right-of-use asset for operating leases is based on the lease liability adjusted for the reclassification of certain balance sheet amounts such as prepaid rent. Deferred and prepaid rent are no longer presented separately but are included in the balance of operating lease right-of-use assets.

- In determining the discount rate used to measure the right-of-use asset and lease liability, rates implicit in the leases were not readily available and therefore we used an estimate of our incremental borrowing rate. Our incremental borrowing rate was based on an estimated secured rate with reference to recent borrowings of similar collateral and tenure.

- Certain line items in the Company's Consolidated Balance Sheets have been renamed to align with the new terminology presented in the new lease standard; "Capital lease obligations, current portion" and "Capital lease obligations, net of current portion" are now presented as "Finance lease liabilities, current portion" and "Finance lease liabilities, net of current portion" on the Consolidated Balance Sheets, respectively.

- Upon adoption on January 1, 2022, Operating lease right-of-use assets of $6.7 million were recorded in Other noncurrent assets, which included $0.5 million related to prepaid rent that was reclassified from Prepaid expenses and other current assets and $4.8 million related to prepaid rent and other that had already previously been presented as Other noncurrent assets on the Consolidated Balance Sheets. In addition, upon adoption on January 1, 2022, the current portion of operating lease liabilities of $0.2 million were recorded in Accrued expenses and other and the noncurrent portion of operating lease liabilities of $1.2 million were recorded within Other noncurrent liabilities on the Consolidated Balance Sheets.

***Accounting Standards Not Yet Adopted***

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Measurement of Credit Losses on Financial Instruments*, which will require an entity to measure credit losses for certain financial instruments and financial assets, including trade receivables. Under this update, on initial recognition and at each reporting period, an entity will be required to recognize an allowance that reflects the entity's current estimate of credit losses expected to be incurred over the life of the financial instrument. This update will be effective for and adopted by the Company during the annual reporting period beginning January 1, 2023, including interim periods within that reporting period. The adoption of this standard is not expected to have a material effect on the Company's consolidated financial statements.

There are no other new accounting pronouncements that are expected to have a significant impact on the Company's consolidated financial statements.

123

Debtors' Exhibit No. 40
Page 273 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

## 3. CHAPTER 11 FILING AND OTHER RELATED MATTERS

*Chapter 11*

On December 21, 2022 (the "Petition Date"), the "Company and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") seeking relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases are jointly administered under Case No. 22-90341. The Debtors continue to operate their business and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Debtors filed various "first day" motions with the Bankruptcy Court requesting customary relief, which were generally approved by the Bankruptcy Court on December 22, 2022, that have enabled the Company to operate in the ordinary course while under Chapter 11 protection.

*Original DIP Credit Agreement and Restructuring Support Agreement*

In connection with the Chapter 11 Cases, the Debtors entered into a Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of December 22, 2022 (the "Original DIP Credit Agreement"), with Wilmington Savings Fund Society, FSB, as administrative agent, and the lenders from time to time party thereto (collectively, the "Original DIP Lenders"). The Original DIP Lenders are also holders or affiliates, partners or investors of holders under the Company's notes sold pursuant to (i) the Secured Convertible Note Purchase Agreement, dated as of April 19, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific, Inc. (as successor of Core Scientific Holding Co.), the guarantors party thereto from time to time, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder, and (ii) the Convertible Note Purchase Agreement, dated as of August 20, 2021, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Core Scientific, Inc. (as successor of Core Scientific Holding Co.), the guarantors party thereto from time to time, U.S. Bank National Association, as note agent and collateral agent, and the purchasers of the notes issued thereunder (collectively, the "Convertible Notes").

Also in connection with the filing of the Chapter 11 Cases, the Company entered into a restructuring support agreement (together with all exhibits and schedules thereto, the "Restructuring Support Agreement") with the ad hoc group of noteholders, representing more than 70% of the holders of its convertible notes (the "Ad Hoc Noteholder Group") pursuant to which the Ad Hoc Noteholder Group agreed to provide commitments for a debtor-in-possession facility of more than $57 million and agreed to support the syndication of up to an additional $18 million in new money DIP (defined below) facility loans to all holders of convertible notes. The Restructuring Support Agreement was terminated by the Company pursuant to a "fiduciary out" which permitted the Company to pursue better alternatives.

*Replacement DIP Credit Agreement*

On February 2, 2023, the Bankruptcy Court entered an interim order (the "Replacement Interim DIP Order") authorizing, among other things, the Debtors to obtain senior secured non-priming super-priority replacement post-petition financing (the "Replacement DIP Facility"). On February 27, 2023, the Debtors entered into a Senior Secured Super-Priority Replacement Debtor-in-Possession Loan and Security Agreement governing the Replacement DIP Facility (the "Replacement DIP Credit Agreement"), with Riley Commercial Capital, LLC, as administrative agent (the "Administrative Agent"), and the lenders from time to time party thereto (collectively, the "Replacement DIP Lender"). Proceeds of the Replacement DIP Facility were used to, among other things, repay amounts outstanding under the Original DIP Facility, including payment of all fees and expenses required to be paid under the terms of the Original DIP Facility. These funds, along with ongoing cash generated from operations, were anticipated to provide the necessary financing to effectuate the planned restructuring, facilitate the emergence from Chapter 11, and cover the fees and expenses of legal and financial advisors.

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was made available following Bankruptcy Court approval of the Interim DIP Order and (ii) $35 million was made available following Bankruptcy Court approval of the Final DIP Order. Loans under the Replacement DIP Facility will bear interest at a rate of 10%, which will be payable in kind in arrears on the first day of each calendar month. The Administrative Agent received an upfront payment equal to 3.5% of the aggregate commitments under the Replacement DIP Facility on February 3, 2023, payable in kind, and the Replacement DIP Lender will receive an exit premium equal to 5% of the amount of the loans being repaid, reduced or satisfied,

Debtors' Exhibit No. 40
Page 274 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

payable in cash. The Replacement DIP Credit Agreement includes representations and warranties, covenants applicable to the Debtors, and events of default. If an event of default under the Replacement DIP Credit Agreement occurs, the Administrative Agent may,

124

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Credit Agreement to be immediately due and payable.

The maturity date of the Replacement DIP Credit Agreement is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Credit Agreement will also terminate on the date that is the earliest of the following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers (as defined in the Replacement DIP Credit Agreement) or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the Loans and the termination of the Commitments (whether automatically, or upon any Event of Default or as otherwise provided in the Replacement DIP Credit Agreement); and (iv) conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

On March 1, 2023, the Bankruptcy Court entered an order approving the Replacement DIP Facility on a final basis and the terms under which the Debtors are authorized to use the cash collateral of the holders of their convertible notes (the "Final DIP Order"). For detailed discussion about the Replacement DIP Facility, refer to Note 21 — Subsequent Events.

### *Reorganization items, net and Liabilities Subject to Compromise*

Effective on December 21, 2022, we began to apply the provisions of ASC 852, *Reorganizations* ("ASC 852"), which is applicable to companies under bankruptcy protection, and requires amendments to the presentation of certain financial statement line items. ASC 852 requires that the financial statements for periods including and after the filing of the Chapter 11 Cases distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Expenses (including professional fees), realized gains and losses, and provisions for losses that can be directly associated with the reorganization must be reported separately as Reorganization items, net in the consolidated statements of operations beginning December 21, 2022, the date of filing of the Chapter 11 Cases. Liabilities that may be affected by the Plan must be classified as liabilities subject to compromise at the amounts expected to be allowed by the Bankruptcy Court, even if they may be settled for lesser amounts as a result of the Plan or negotiations with creditors. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Bankruptcy Court actions, further developments with respect to disputed claims, determinations of secured status of certain claims, the values of any collateral securing such claims, or other events. Any resulting changes in classification will be reflected in subsequent financial statements. If there is uncertainty about whether a secured claim is undersecured, or will be impaired under the Plan, the entire amount of the claim is included with prepetition claims in liabilities subject to compromise.

As a result of the filing of the Chapter 11 Cases on December 21, 2022, the classification of pre-petition indebtedness is generally subject to compromise pursuant to the Plan. Generally, actions to enforce or otherwise effect payment of pre-bankruptcy filing liabilities are stayed. Although payment of pre-petition claims generally is not permitted, the Bankruptcy Court granted the Debtors authority to pay certain pre-petition claims in designated categories and subject to certain terms and conditions. This relief generally was designed to preserve the value of the Debtors' businesses and assets. Among other things, the Bankruptcy Court authorized the Debtors' to pay certain pre-petition claims relating to employee wages and benefits, taxes and critical vendors. The Debtors are paying and intend to pay undisputed post-petition liabilities in the ordinary course of business. In addition, the Debtors may reject certain pre-petition executory contracts and unexpired leases with respect to their operations with the approval of the Bankruptcy Court. Any damages resulting from the rejection of executory contracts and unexpired leases are treated as general unsecured claims.

Reorganization items, net incurred as a result of the Chapter 11 Cases presented separately in the accompanying consolidated statements of operations were as follows (in thousands):

|  | Year Ended December 31, 2022 |
|---|---:|
| Write-off of debt issuance costs and original issue net discount on liabilities subject to compromise | $ 3,529 |
| (Gain) from adjustment of liabilities subject to compromise fair value to expected allowed amount | (203,236) |
| Professional fees and other bankruptcy related costs | 2,302 |
| Reorganization items, net | $ (197,405) |

core-20221231                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

The Company has incurred and continues to incur significant costs associated with the reorganization, primarily legal and professional fees, which were classified as Reorganization items, net subsequent to our petition. Write-off of deferred debt issuance

125

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

costs, the write-off of original issue net discount related to debt subject to compromise, and the derecognition of the fair value adjustments to liabilities transferred to subject to compromise were also included in Reorganization items, net.

The accompanying consolidated balance sheets as of December 31, 2022, includes amounts classified as Liabilities subject to compromise, which represent liabilities the Company anticipates will be allowed as claims in the Chapter 11 Cases. These amounts represent the Company's current estimate of known or potential obligations to be resolved in connection with the Chapter 11 Cases and may differ from actual future settlement amounts paid. Differences between liabilities estimated and claims filed, or to be filed, will be investigated and resolved in connection with the claims resolution process.

Liabilities subject to compromise consisted of the following (in thousands):

|  | December 31, 2022 |
|---|---|
| Accounts payable | $ 20,908 |
| Other current liabilities | 64,493 |
| Accounts payable, and other current liabilities | $ 85,401 |
|  |  |
| Operating lease liability | 13,868 |
| Financing lease liability | 70,796 |
| Debt subject to compromise | 844,695 |
| Accrued interest on liabilities subject to compromise | 12,553 |
| Leases, debt and accrued interest | $ 941,912 |
| Liabilities subject to compromise | $ 1,027,313 |

Determination of the value at which liabilities will ultimately be settled cannot be made until the Plan becomes effective and the Company emerges from bankruptcy. The Company will continue to evaluate and adjust the amount and classification of its pre-petition liabilities. Such adjustments may be material. Any additional liabilities that are subject to compromise will be recognized accordingly, and the aggregate amount of Liabilities subject to compromise may change.

## 4. BUSINESS COMBINATIONS, ACQUISITIONS AND RESTRUCTURING

### Merger Agreement

In 2021, XPDI entered into that certain Agreement and Plan of Reorganization and Merger, dated as of July 20, 2021, as amended on October 1, 2021, and as further amended on December 29, 2021, by and among Core Scientific Holding Co., XPDI Merger Sub and XPDI (the "Merger Agreement"). XPDI's stockholders approved the transactions (collectively, the "Merger") contemplated by the Merger Agreement at a special meeting of stockholders held on January 19, 2022 (the "Special Meeting").

Pursuant to the terms of (a) the Merger Agreement and (b) that certain Agreement and Plan of Merger, dated as of October 1, 2021, as amended on January 14, 2022, by and among XPDI, Core Scientific Holding Co., XPDI Merger Sub 3, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI ("Merger Sub 3"), and Blockcap, Inc., a Nevada corporation and wholly owned subsidiary of Core Scientific ("Blockcap"), the Merger was effected by (i) the merger of Merger Sub with and into Core Scientific (the "First Merger"), which occurred on January 19, 2022 (the "Closing Date"), with Core Scientific surviving the First Merger as a wholly owned subsidiary of XPDI, (ii) the merger of Core Scientific with and into XPDI (the "Second Merger"), which occurred on January 20, 2022, with XPDI surviving the Second Merger, and (iii) following the closing of the Second Merger on January 20, 2022, the merger of Blockcap with and into Merger Sub 3 (the "Third Merger"), with Merger Sub 3 surviving the Third Merger as a wholly owned subsidiary of XPDI under the name "Core Scientific Acquired Mining LLC." Immediately prior to the effective time of the First Merger (such effective time of the First Merger, the "Effective Time"), XPDI filed a Second Amended and Restated Certificate of Incorporation (the "Post-Combination Charter") with the Secretary of State of the State of Delaware pursuant to which XPDI changed its name from "Power & Digital Infrastructure Acquisition Corp." to "Core Scientific, Inc." (hereinafter referred to as the "Company" or "New Core") and redesignated its Class A common stock, par value $0.0001 per share ("XPDI Class A Common Stock"), and Class B common stock, par value $0.0001 per share ("XPDI Class B Common Stock"), as common stock, par value $0.0001, of the Company ("New Core Common Stock"). The Exchange Ratio (as defined in the Merger Agreement) was 1.6001528688 of a share of New Core Common Stock per fully-diluted share of Old Core.

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

In connection with the Special Meeting and the Merger, holders of 12.3 million of the 34.5 million then-outstanding shares of XPDI Class A Common Stock exercised their right to redeem their shares for cash at a redemption price of approximately $10.00 per share, for an aggregate redemption amount of $123.5 million.

The Merger provided gross proceeds of approximately $221.6 million from the XPDI trust account, resulting in approximately $201.0 million in net cash proceeds to Core Scientific, after the payment of transaction expenses, which is presented within proceeds from issuance of common stock, net of transaction costs on the consolidated statements of cash flows. Following the Merger, Old Core stockholders owned 90.7%, former XPDI public stockholders owned 6.7% and XPDI's sponsor owned 2.6% of the issued and outstanding shares of New Core Common Stock, excluding the impact of unvested restricted stock units and options. The proceeds from the Merger were used to fund mining equipment purchases and infrastructure build-out.

The Merger is accounted for as a reverse recapitalization with the Company being the accounting acquirer. A reverse recapitalization does not result in a new basis of accounting. Accordingly, the reverse recapitalization was treated as the equivalent of Core Scientific Holding Co. issuing stock for the net assets of XPDI, accompanied by a recapitalization. The net assets of XPDI are stated at historical costs, with no goodwill or other intangible assets recorded. The Company identified $18.6 million of direct and incremental transaction costs, which consist of legal, accounting, and other professional services directly related to the Merger, of which $10.7 million were recorded in other noncurrent assets on the Company's Consolidated Balance Sheets as of December 31, 2021, and the remaining $7.9 million were recognized during the year ended December 31, 2022. These transaction costs have been allocated to all instruments assumed or issued in the Merger on a relative fair value basis as of the date of the Merger. Transaction costs of $16.6 million have been allocated to equity-classified instruments and recognized as an adjustment to additional paid-in capital within total stockholders' (deficit) equity. The cash outflows related to these costs have been netted against the proceeds from the issuance of New Core Common Stock upon the Merger with XPDI within financing activities on the Company's consolidated statement of cash flows. Transaction costs of $2.0 million have been allocated to liability-classified instruments that are measured at fair value through earnings and have been recognized as a charge within general and administrative expenses for the year ended December 31, 2022.

Immediately prior to the Effective Time, each share of Series A convertible preferred stock, par value $0.00001, of Old Core automatically converted into one share of New Core Common Stock, and each share of Series B convertible preferred stock, par value $0.00001, of Old Core automatically converted into one share of New Core Common Stock.

In addition, immediately prior to the Effective Time, each share of XPDI Class B Common Stock automatically converted into one share of New Core Common Stock. 1.7 million shares ("SPAC Vesting Shares") are subject to vesting conditions, and will vest i) upon the date on which New Core Common Stock's volume-weighted average price is greater than $12.50 per share for any 20 trading days within any 30 consecutive trading day period within five years of the Closing Date or ii) upon any change in control of the Company, or a sale of substantially all of the Company's assets that results in a change of control that is consummated within five years of the Closing Date that results in a price per share paid to the holders of the Company's Common Stock equal to or in excess of $12.50 per share.

As a result of the Merger, all of XPDI's Class A Common Stock and Class B Common Stock automatically converted into shares of New Core Common Stock on a one-for-one basis. XPDI's 8.6 million public warrants issued in its initial public offering (the "Public Warrants") and 6.3 million warrants issued in connection with private placement at the time of XPDI's initial public offering (the "Private Placement Warrants") became warrants for New Core Common Stock.

All share-based compensation awards were converted into comparable equity awards that are settled or exercisable for shares of New Core Common Stock. As a result, each stock option and warrant was converted into an option or warrant to purchase shares New Core Common Stock based on an exchange ratio of 1.6001528688. Each award of the Company's restricted stock units ("RSUs") was converted into RSUs of New Core based on an exchange ratio of 1.6001528688.

Each convertible note is convertible into New Core Common Stock in accordance with the terms of such convertible promissory note; provided, however, that with respect to outstanding convertible promissory notes for which Core Scientific received a duly executed exercise of conversion in accordance with such convertible promissory note, exercising the right of such holder to convert such convertible promissory note subject to and conditioned upon the occurrence of the Effective Time, the outstanding principal amount and accrued interest as of the Effective Time with respect to such convertible promissory note was converted into shares of New Core Common Stock, equal to the product (rounded down to the nearest whole number) of (i) the number of shares of

Core Scientific Common Stock issuable upon the conversion of such convertible promissory note in accordance with such convertible promissory note immediately prior to the Effective Time and (ii) the Exchange Ratio.

127

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Blockcap Acquisition*

On July 30, 2021, the Company acquired 100% of the equity interest in Blockcap, one of its largest hosting customers. Blockcap is a blockchain technology company with industrial scale digital asset mining operations. Blockcap's primary historical business was the mining of digital asset coins and tokens, primarily bitcoin and, to a lesser extent, Siacoin and Ethereum. While Blockcap did sell or exchange the digital assets it mined to fund its growth strategies or for general corporate purposes from time to time, it generally retained its digital assets as investments in anticipation of continued adoption of digital assets as a "store of value" and a more accessible and efficient medium of exchange than traditional fiat currencies. In addition to mining, holding and exchanging digital assets, Blockcap also evaluated and completed investments in related technologies and ancillary businesses, including RADAR, an early stage company focused on technology enhancement and development in the digital asset industry that it acquired on July 1, 2021. The acquisition of Blockcap significantly expanded the Company's self-mining operations and increased the number of miners it owns.

Consideration consisted of the issuance of 113.9 million shares of the Company's common stock, approximately 6.8 million shares of the Company's restricted stock and approximately 7.3 million options to purchase shares of the Company's common stock. The acquisition has been accounted for as a business combination using the acquisition method of accounting, whereby the net assets acquired and the liabilities assumed were recorded at fair value. The Company and Blockcap had preexisting relationships which were settled on the acquisition date. Using the estimated purchase price for the transaction, the Company has allocated the purchase price to identifiable assets and liabilities based upon preliminary fair value estimates. The excess of the purchase price over the fair value of the net identifiable assets acquired was allocated to goodwill.

In a business combination, the initial allocation of the purchase price is considered preliminary and therefore subject to change until the end of the measurement period (not to exceed one year from the acquisition date). During the three months ended June 30, 2022, we determined that a measurement period adjustment to the accounting for the Blockcap acquisition was necessary based upon obtaining updated information about property, plant and equipment, net acquired, resulting in an increase in fair value of property, plant and equipment, net of $0.7 million, a decrease in goodwill of $1.0 million and additional depreciation expense of $0.3 million recognized in the three months ended June 30, 2022. The measurement period for the Blockcap acquisition closed during the three months ended June 30, 2022.

The following table summarizes the fair values for each major class of assets acquired and liabilities assumed at the acquisition date. The Company retained the services of certified valuation specialists to assist with assigning estimated values to certain acquired assets and assumed liabilities. Amounts initially disclosed for the estimated values of certain acquired assets and liabilities assumed were adjusted through December 31, 2022, based on information arising after the initial preliminary valuation.

128

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Purchase Price Allocation*

Consideration *(in thousands)*:

|  |  |  |
|---|---|---:|
| 113.9 million common shares valued at $10.11 per share[1,2] | $ | 1,151,985 |
| Fair value of replaced Blockcap share-based payments attributable to pre-combination service[3] |  | 21,768 |
| Settlement of Blockcap debt[4] |  | 25,607 |
| Settlement of preexisting contracts[5] |  | (60,522) |
| Total Consideration | $ | 1,138,838 |
| Fair value of assets acquired, and liabilities assumed: |  |  |
| Cash and cash equivalents | $ | 704 |
| Digital assets-Bitcoin |  | 73,304 |
| Digital assets-Ethereum |  | 365 |
| Digital assets-Bitcoin cash |  | 8 |
| Digital assets-Siacoin |  | 554 |
| Digital assets-Other |  | 3,329 |
| Other current assets |  | 633 |
| Intangible assets, net |  | 2,925 |
| Property, plant and equipment, net |  | 98,965 |
| Other noncurrent assets |  | 1,293 |
| **Total assets acquired** |  | **182,080** |
| Accounts payable |  | 492 |
| Accrued expenses and other |  | 22,647 |
| Deferred revenue |  | 414 |
| Other current liabilities |  | 7,204 |
| Deferred tax liability |  | 9,003 |
| **Total liabilities assumed** | $ | **39,760** |
| **Total identifiable net assets** | $ | **142,320** |
| **Goodwill on acquisition** | $ | **996,518** |

[1] 113.9 million common shares represent the equivalent Core Scientific common shares issued to Blockcap shareholders as consideration for the purchase.

[2] The price per share of our common shares was estimated to be $10.11. As the Core Scientific common shares were not listed on a public marketplace, the calculation of the fair value of the common shares was subject to a greater degree of estimation. Given the absence of a public market, an estimate of the fair value of the common shares was required at the time of the Blockcap Acquisition. Objective and subjective factors were considered in determining the estimated fair value and because there was no active trading of the Core Scientific equity shares on an established securities market, an independent valuation specialist was engaged. The valuation was determined by weighting the outcomes of scenarios estimating share value based on both public company valuations and private company valuations. Both a market approach and common stock equivalency model were used to determine a range of outcomes, which were weighted based on probability to determine the result.

[3] Reflects the estimated fair value of replaced Blockcap share-based payments allocated to purchase price based on the proportion of service related to the pre-combination period

[4] Reflects the fair value of loans issued by the Company in July 2021 that were effectively used to settle debt that had previously been held by Blockcap. Refer to Note 12 for further discussion of the debt issuance.

[5] Blockcap had preexisting hosting and equipment contracts with the Company that were effectively settled by the Company's acquisition of Blockcap. As a result, the consideration transferred to Blockcap has been adjusted by the deferred revenue balances that were settled at the time of acquisition.

See Note 6 — Goodwill for a reconciliation of the carrying amount of goodwill at the beginning and end of the reporting period.

4/8/2023, 10:22 PM

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

***Intangible Assets***

Other intangible assets acquired in the Blockcap acquisition consisted of $2.8 million developed technology intangibles and $0.1 million of customer relationships with a weighted-average useful life of 3 years.

129

4/8/2023, 10:22 PM

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Transaction Costs*

The Company recognized transaction costs of $1.1 million for the year ended December 31, 2021. These costs were associated with legal and professional services and were recognized as General and administrative expenses in the Company's Consolidated Statements of Operations.

*Unaudited Pro Forma Information*

The following unaudited pro forma financial information gives effect to the Blockcap acquisition as if it had been completed on January 1, 2020. The unaudited pro forma information was prepared in accordance with the requirements of ASC 805, *Business Combinations*, which is a different basis than pro forma information prepared under Article 11 of Regulation S-X ("Article 11"). As such, they are not directly comparable with historical results for stand-alone Core Scientific prior to July 30, 2021, historical results for Core Scientific from July 30, 2021 that reflect the acquisition and are inclusive of the results and operations of Blockcap, nor our previously provided pro forma financials prepared in accordance with Article 11. The pro forma results for the year ended December 31, 2021 include the impact of several significant nonrecurring pro forma adjustments to previously reported operating results. The pro forma adjustments are based on historically reported transactions by the respective companies. The pro forma results do not include any anticipated synergies or other expected benefits of the acquisition (in thousands).

| | Year Ended December 31, | |
| | 2021 | 2020 |
|---|---|---|
| Total revenue | $ 586,991 | $ 70,948 |
| Operating income | $ 137,109 | $ (23,354) |

Significant pro forma adjustments include:

- Transaction costs of $1.9 million are assumed to have occurred on the pro forma close date of January 1, 2020, and are recognized as if incurred in the first quarter of 2020;

- Tangible and intangible assets are assumed to be recorded at their estimated fair values as of January 1, 2020 and are depreciated or amortized over their estimated useful lives; and

- Accounting policies of Blockcap are conformed to those of Core Scientific including depreciation for mining equipment.

- Share-based compensation awards of Blockcap for which the performance condition of the award is assumed to be probable of being met as of January 1, 2020 and expensed as they are earned based on the service condition.

- The elimination of $19.2 million of expense recognized by Blockcap in July 2021 for the acceleration of certain equity awards of its CEO and others. Because this acceleration was deemed to be in contemplation of the Merger, Core Scientific has recorded $23.3 million of compensation expense for the acceleration in its financial statements for the period ending December 31, 2021, which was determined based on the fair value of the awards at the time of the Merger. This adjustment is necessary to avoid duplication of the expense attributable to the combined company related to the acceleration of the same awards.

The selected unaudited pro forma condensed combined financial information is provided for illustrative purposes only and does not purport to represent what the actual consolidated results of operations would have been had the acquisition actually occurred on January 1, 2021, nor do they purport to project the future consolidated results of operations.

For the periods subsequent to the acquisition, Blockcap contributed total revenues of $42.6 million and operating income of $15.5 million for the year ended December 31, 2021, that were included in the Company's Consolidated Statements of Operations.

*Restructuring Activities*

During the second quarter of 2022 market conditions led management to evaluate its operations and refocus its efforts and resources on the core activities of its hosting and mining segments. Management initiated a plan to exit certain activities, technologies and ancillary businesses, and to reduce portions of the Company's workforce including those acquired through Blockcap's acquisition

core-20221231                                                                     https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

of RADAR. Management completed the restructuring plan in October 2022 and all expected costs of the restructuring plan have been recognized as of December 31, 2022.

130

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 286 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

At June 30, 2022 Core had accrued and expensed estimated cash restructuring charges of $1.4 million relating to this restructuring plan. Cash severance and related payments under the Company's ongoing severance policy of $0.9 million were paid as compensation for the year ended December 31, 2022. In addition to the cash restructuring charges, $1.0 million of stock based compensation was paid in severance during the year ended December 31, 2022. Total cash and stock-based restructuring charges of $2.3 million were recognized in general and administrative expenses for the year ended December 31, 2022.

As a result of exiting Blockchain Technologies during the second quarter of 2022, $2.0 million of intangible assets will cease to be used. Additionally, the Company determined that $2.5 million of software intangible assets that were previously acquired from Stax Digital LLC would no longer be used as a result of current and planned software upgrades. Consequently, the Company recorded an impairment of other intangible assets of $4.5 million for the year ended December 31, 2022, which is presented within impairment of goodwill and other intangibles on the Company's Consolidated Statements of Operations. Goodwill associated with these activities was included in the goodwill impairment charge of $1.05 billion for the year ended December 31, 2022, of which $996.5 million was related to the Mining reporting unit and $58.2 million was related to the Equipment Sales and Hosting reporting unit.

### 5. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net as of December 31, 2022 and 2021 consist of the following (in thousands):

| | December 31, | | Estimated Useful Lives |
|---|---|---|---|
| | 2022 | 2021 | |
| Land and improvements[1] | $  27,758 | $  12,995 | 20 years |
| Building and improvements | 294,480 | 93,064 | 12 to 39 years |
| Computer, mining and network equipment[2] | 464,823 | 475,331 | 1 to 5 years |
| Electrical equipment[3] | 170,793 | 59,253 | 5 to 10 years |
| Other property, plant and equipment[4] | 1,513 | 1,156 | 5 to 7 years |
| Total | 959,367 | 641,799 | |
| Less: accumulated depreciation and amortization[5] | 268,233 | 44,495 | |
| Property, plant and equipment, net | $  691,134 | $  597,304 | |

[1] Estimated useful life of improvements. Land is not depreciated.

[2] Includes finance lease assets of $112.7 million and $103.9 million at December 31, 2022 and 2021, respectively.

[3] Includes finance lease assets of $12.6 million and $12.6 million at December 31, 2022 and 2021, respectively.

[4] Includes finance lease assets of $0.4 million and $0.4 million at December 31, 2022 and 2021, respectively.

[5] Includes accumulated amortization for assets under finance leases of $41.7 million and $10.3 million at December 31, 2022 and 2021, respectively.

Depreciation expense, including amortization of finance lease assets, for the years ended December 31, 2022 and 2021, was $224.1 million and $31.8 million, respectively. Depreciation for the year ended December 31, 2022 and 2021, allocated to costs of revenue was $223.6 million and was $31.7 million, respectively.

During the year ended December 31, 2022, the Company's operating performance and liquidity continued to be severely impacted by the prolonged decrease in the price of bitcoin, the increase in electricity costs, the increase in the global bitcoin network hash rate and an increase in additional operating costs related to these factors. Additionally, primary and secondary market prices for ASIC miners of the type used by the Company in its business operations have decreased significantly from previous levels.

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

During the quarter ended September 30, 2022, the Company evaluated whether the estimated future undiscounted cash flows from the operation of its data center facilities would recover the carrying value of the property, plant and equipment located at the sites and used in site operations, including the Company's deployed mining equipment. Based on this evaluation, the Company determined that the carrying value of the property, plant and equipment at the Cedarvale, Texas facility site may no longer be fully recoverable by the cash flows of the site. The Company measured the amount of impairment at the Cedarvale facility site as the difference between the carrying amount of the site asset group of $119.8 million and the estimated fair value of the site asset group of $60.5 million, resulting in an impairment of the facility site's property, plant and equipment of $59.3 million for the quarter ended September 30, 2022.

During the quarter ended December 31, 2022, the Company evaluated whether the estimated future undiscounted cash flows from its operations would recover the carrying value of the property, plant and equipment asset groups located at the sites and used in

131

Debtors' Exhibit No. 40
Page 288 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

site operations, including the Company's deployed mining equipment. Based on this evaluation, the Company determined that the carrying value of its entire fleet of mining equipment and the other property, plant and equipment at the Cedarvale and Cottonwood, Texas facility sites may no longer be fully recoverable by the cash flows of those asset groups. The Company measured the amount of impairment of its fleet of mining equipment as the difference between their carrying amount of $668.5 million and their estimated fair value of $176.3 million resulting in an impairment of the fleet of mining equipment of $492.2 million. The Company measured the amount of impairment of its other property, plant and equipment at the Cedarvale and Cottonwood, Texas facility sites as the difference between their carrying amount of $174.3 million and their estimated fair value of $135.1 million resulting in an impairment of the other site property, plant and equipment of $39.2 million.

During the year ended December 31, 2022, the Company recognized impairments to property, plant and equipment of $590.7 million. There were no impairments to long-lived assets for the years ended December 31, 2021 and 2020.

The Company's analysis involved the use of a combination and corroboration of cost and market approaches. The cost approach has been used to estimate the fair value of some buildings, improvements, electrical equipment and other tangible assets used in combination with other assets. The cost approach was also used to corroborate certain estimates made using the market approach. Significant assumptions used in the cost approach include reproduction and replacement costs, useful service life, and orderly liquidation values. The cost approach utilizes useful service life and other estimates developed by the Company to determine fair value, which are unobservable Level 3 inputs. The market approach has been used to estimate the fair value of the Company's ASIC miners, network equipment, real estate, and other of its buildings, improvements, electrical equipment and other tangible assets. The market approach was also used to corroborate certain estimates made using the cost approach. Valuations using the market approach are derived from manufacturer and secondary market pricing sources and, when available, comparable secondary market transactions. Significant judgment in using the market approach includes the selection of comparable assets based on the most relevant attributes of the evaluated asset, a selection of and modifications to transactions according to comparable use, size, geography and other traits, and the use of broker indications of relative market price metrics. The market approach utilizes comparable use, relative efficiency and other estimates developed by the Company to determine fair value, which are unobservable Level 3 inputs. Unobservable Level 3 inputs are used to measure fair value to the extent that relevant observable inputs are not available. The Company developed its estimates using the best information available at the time. Changes in management's estimates or any of its other assumptions used in its analysis could result in a different conclusion. Continued elevated power costs, continued increases in the bitcoin network hash rate and a continuing depression or further decrease of bitcoin's value in the market could result in further impairment of the Company's property, plant and equipment.

## 6. GOODWILL

The following table provides the reconciliation of the carrying amount of goodwill by segment at the beginning and end of the reporting period (in thousands):

| | Equipment Sales and Hosting Segment | Mining Segment | Total Goodwill |
|---|---|---|---|
| Balance as of December 31, 2021 | $ 58,241 | $ 997,519 | $ 1,055,760 |
| Subsequent measurement period adjustment | — | (1,000) | (1,000) |
| Impairment of goodwill | (58,241) | (996,519) | (1,054,760) |
| Balance as of December 31, 2022 | $ — | $ — | $ — |

As of December 31, 2022, after impairment, the Company had no remaining goodwill. At December 31, 2021, the carrying amount of goodwill was $1.06 billion. For the year ended December 31, 2022 there was a measurement period adjustment reducing goodwill by $1.0 million and accumulated impairment losses of $1.05 billion. There were no goodwill adjustments or impairment losses for the year ended December 31, 2021.

The Company does not amortize goodwill, but tests it for impairment annually as of October 31, or more frequently if events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable. The Company has the option to

core-20221231                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

first assess qualitative factors to determine whether it is more likely than not that the fair values of the reporting units are less than their carrying amounts as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test. If management determines that it is more likely than not that the fair value of a reporting unit is less than the reporting unit's carrying

132

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

amount, or management chooses not to perform a qualitative assessment, then the quantitative goodwill impairment test will be performed. The quantitative test compares the fair value of the reporting unit with the reporting unit's carrying amount. If the carrying amount exceeds its fair value, the excess of the carrying amount over the fair value is recognized as an impairment loss, and the resulting measurement of goodwill becomes its new cost basis. The Company's reporting units are the same as its reportable and operating segments.

The Company identified goodwill impairment triggering events during the year ended December 31, 2022. These events included declines in the market price of bitcoin, the market price of the Company's stock and the Company's market capitalization. As a result, the Company performed the quantitative test to compare the fair value to the carrying amount for each reporting unit at June 30, 2022. Sustained and further deterioration in market prices and in the Company's financial position resulted in additional quantitative testing at September 30, 2022. The Company concluded that the carrying value of the Mining reporting unit exceeded its fair value and, as such, recorded a $996.5 million impairment of goodwill in its Mining reporting unit for the year ended December 31, 2022. The Company concluded the carrying amount of the Equipment Sales and Hosting reporting unit exceeded its fair value and, as such, recorded a $58.2 million impairment of goodwill in its Equipment Sales and Hosting reporting unit for the year ended December 31, 2022. These impairments are presented within impairment of goodwill and other intangibles on the Company's Consolidated Statements of Operations.

The Company's analysis during the year ended December 31, 2022, involved the use of a market approach. Valuations using the market approach are derived from metrics of market transactions. Significant judgments and assumptions used in the market approach includes the selection of comparable businesses based on the characteristics of each reporting unit, the consideration and application of relevant relative metrics and a reconciliation to the Company's market capitalization to the fair value measured. Sustained depressed bitcoin market value, increased power costs, decreased liquidity, and increased cost of financing, along with other factors have contributed to significant and sustained deterioration in the Company's market capitalization. The Company concluded that the fair value of its reporting units would no longer support the remaining acquired goodwill carrying values. The Company developed its estimates using the best information available at the time. Changes in management's estimates or any of its other assumptions used in its analysis could result in a different conclusion.

133

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

### 7. INTANGIBLE ASSETS, NET

Intangible assets, net as of December 31, 2022 and 2021 consist of the following (in thousands):

| | December 31, 2022 | | | |
| | Gross | Accumulated Amortization | Net Carrying Amount | Estimated Useful Lives |
|---|---|---|---|---|
| Internally-developed software | $ 1,452 | $ (87) | $ 1,365 | 3-8 years |
| Patents | 344 | (22) | 322 | 20 years |
| Trademarks | 66 | (49) | 17 | 8 years |
| Total intangible assets, net | $ 1,862 | $ (158) | $ 1,704 | |

| | December 31, 2021 | | | |
| | Gross | Accumulated Amortization | Net Carrying Amount | Estimated Useful Lives |
|---|---|---|---|---|
| Internally-developed software | $ 10,093 | $ (2,503) | $ 7,590 | 3-8 years |
| Patents | 423 | (9) | 414 | 20 years |
| Customer relationships | 150 | (21) | 129 | 3 years |
| Trademarks | 73 | (11) | 62 | 8 years |
| Total intangible assets, net | $ 10,739 | $ (2,544) | $ 8,195 | |

The Company amortizes intangible assets subject to amortization over their estimated useful lives. Amortization of intangible assets is included within general and administrative expenses in the Company's Consolidated Statements of Operations. Amortization expense for intangible assets was $1.2 million and $1.6 million for the years ended December 31, 2022 and 2021, respectively.

During the year ended December 31, 2022, the Company recorded a $590.7 million impairment charge to internally developed software within impairment of goodwill and other intangibles in the Consolidated Statements of Operations.

The future five-year amortization of intangibles subject to amortization as of December 31, 2022 was as follows (in thousands):

| | Amortization |
|---|---|
| 2023 | $ 598 |
| 2024 | 550 |
| 2025 | 421 |
| 2026 | 15 |
| 2027 | 12 |
| Thereafter | 108 |
| Total | $ 1,704 |

Debtors' Exhibit No. 40
Page 292 of 462

***Sale of Intangible Assets***

In March 2022, the Company reclassified $2.2 million of intangible assets that were previously acquired from Atrio Inc. and RStor, Inc. to be held for sale as a result of the expected sale of the software and related patents. The intangible assets were sold in June 2022 for proceeds of $10.9 million, resulting in a gain on sale of intangible assets of $5.9 million. The resulting gain is reflected within other non-operating expenses, net in the Consolidated Statements of Operations.

134

Debtors' Exhibit No. 40
Page 293 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

## 8. OTHER ASSETS

Prepaid expenses and other current assets as of December 31, 2022 and 2021 consist of the following (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Prepaid expenses | $ 28,308 | $ 27,055 |
| Security deposits | 241 | 355 |
| Prepaid rent | 46 | 453 |
| Other | 3,286 | 2,248 |
| Total prepaid expenses and other current assets | $ 31,881 | $ 30,111 |

Prepaid expenses include prepayments of insurance premiums, rent expense, licenses, and subscriptions. Security deposits represent payments by the Company primarily associated with utilities and leases.

Other noncurrent assets as of December 31, 2022 and 2021 consist of the following (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Security deposits | $ 9,084 | $ 2,079 |
| Utility construction contributions | — | 2,453 |
| Prepaid rent | 232 | 4,478 |
| Capitalized transaction costs | — | 10,682 |
| Other | — | 1,353 |
| Total other noncurrent assets | $ 9,316 | $ 21,045 |

Security deposits represents payments by the Company primarily associated with utilities and leases. Utility construction contributions include amounts contributed to utilities for the construction of assets that allow the Company to obtain utility services, primarily electricity.

## 9. ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other as of December 31, 2022 and 2021 consist of the following (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Accrued expenses and other | $ 11,590 | $ 25,332 |
| Accrued taxes | 4,720 | 5,736 |
| Vendor payable | — | 21,313 |
| Customer deposits[1] | — | 5,570 |
| Accrued interest | — | 5,521 |
| Other current liabilities | 1,642 | 4,390 |
| Total accrued expenses and other | $ 17,952 | $ 67,862 |

[1] Consists of amounts deposited by the Company's customers relating to future tax estimates. Should the deposits be unnecessary once the customer units are owned

and deployed, the deposits are either applied against an existing equipment balance due, or applied against future hosting invoices.

135

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

### 10. DERIVATIVE WARRANT LIABILITIES

As of December 31, 2022, the Company had 14.9 million warrants outstanding, including: (a) 8.6 million Public Warrants and (b) 6.3 million Private Placement Warrants issued to XPDI Sponsor LLC ("Sponsor") and certain institutional investors ("Anchor Investors").

Each Public Warrant and Private Placement Warrant became exercisable 30 days following the Closing Date of the XPDI Merger and may be exercised for one share of common stock at an exercise price of $11.50 per share. The Public Warrants and Private Placement Warrants expire January 19, 2027, which is five years after the Closing Date.

Redemption of Public Warrants when the price per share of common stock equals or exceeds $18.00

Once the warrants become exercisable, the Company may redeem the outstanding Public Warrants:

• in whole and not in part;

• at a price of $0.01 per warrant;

• upon a minimum of 30 days' prior written notice of redemption to each warrant holder; and

• if, and only if, the last reported sale price of common stock for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders equals or exceeds $18.00 per share (as adjusted).

The Company will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of common stock is available throughout the 30-day redemption period. If and when the warrants become redeemable by the Company, the Company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

*Redemption of Public Warrants when the price per share of common stock equals or exceeds $10.00*

Once the warrants become exercisable, the Company may redeem the outstanding Public Warrants:

• in whole and not in part;

• at $0.10 per warrant upon a minimum of 30 days' prior written notice of redemption provided that holders will be able to exercise their warrants on a cashless basis prior to redemption and receive that number of shares determined by reference to an agreed table based on the redemption date and the "fair market value" (as defined below) of common stock;

• if, and only if, the last reported sales price of the Company's common stock for any twenty (20) trading days within the thirty (30) trading-day period ending on the third trading day prior to the date on which notice of the redemption is given (the "Reference Value") equals or exceeds $10.00 per share (as adjusted for adjustments to the number of shares issuable upon exercise or the exercise price of a warrant); and

• if the Reference Value is less than $18.00 per share (as adjusted for adjustments to the number of shares issuable upon exercise or the exercise price of a warrant), the Private Placement Warrants must also concurrently be called for redemption on the same terms as the outstanding Public Warrants, as described above.

• The "fair market value" of common stock shall mean the volume-weighted average price of common stock during the 10 trading days immediately following the date on which the notice of redemption is sent to the holders of warrants. In no event will the warrants be exercisable in connection with this redemption feature for more than 0.361 shares of Class A common stock per warrant (subject to adjustment).

*Redemption of Private Placement Warrants*

The terms of redemption of Private Placement Warrants are identical in all respects to those for the Public Warrants except that, so long as they are held by the Sponsor, Anchor Investors or their permitted transferees they will not be redeemable, except as described above in Redemption of Public Warrants when the price per share of common stock equals or exceeds $10.00. If the Private

4/8/2023, 10:22 PM

Placement Warrants are held by someone other than the Sponsor, the Anchor Investors or their respective permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

136

core-20221231                                                      https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Effect of Chapter 11 Filing*

As discussed in Note 3 - Chapter 11 Filing and Other Related Matters, liabilities that may be affected by the Plan must be classified as liabilities subject to compromise at the amounts expected to be allowed by the Bankruptcy Court. The warrants have been classified as liabilities subject to compromise at their expected allowed amount of zero at December 31, 2022. Their fair value of $335 thousand was derecognized as a gain in Reorganization items, net in the Company's Consolidated Statements of Operations at December 31, 2022.

137

4/8/2023, 10:22 PM

https://www.sec.gov/Archives/edgar/data/1839341/000162828023010[...]

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

## 11. NOTES PAYABLE

The commencement of the Chapter 11 Cases constituted an event of default under certain of the Company's debt agreements. Accordingly, all debt not reclassified as liabilities subject to compromise with original long-term stated maturities was classified as current on the consolidated balance sheets as of December 31, 2022. However, any efforts to enforce payment obligations under the debt instruments are automatically stayed as a result of the Chapter 11 Cases and the creditors' rights in respect of the debt instruments are subject to the applicable provisions of the Bankruptcy Code. See Note 3 — Chapter 11 Filing and Other Related Matters for further information.

Notes payable as of December 31, 2022 and 2021 consist of the following (in thousands):

| | December 31 2022 | December 31 2021 |
|---|---|---|
| Kentucky note | $       529 | $     1,032 |
| Genesis loan | — | 552 |
| NYDIG loan | 38,573 | 67,435 |
| Stockholder loan | 10,000 | 10,000 |
| Trinity loan | 23,356 | 19,641 |
| Bremer | 18,331 | 15,066 |
| Blockfi | 53,913 | 60,000 |
| Anchor Labs loan | 25,159 | — |
| Mass Mutual Barings loans | 63,844 | — |
| B. Riley Bridge loans | 41,777 | — |
| Liberty loan | 6,968 | — |
| Secured Convertible Notes[1] | 237,584 | 220,871 |
| Other Convertible Notes[2] | 322,396 | 301,226 |
| Original DIP Credit Agreement[3] | 35,547 | |
| Other | 2,960 | 663 |
| Notes payable, prior to reclassification to Liabilities subject to compromise | 880,937 | 696,486 |
| Less: Notes payable in Liabilities subject to compromise[4] | 844,695 | — |
| Unamortized discount and debt issuance costs[5] | (36,456) | (3,187) |
| Fair value adjustments to convertible notes[6] | (808,148) | 34,910 |
| Total notes payable, net | $   36,242 | $   728,209 |

[1] Secured Convertible Notes includes principal balance at issuance and PIK interest.
[2] Other Convertible Notes includes principal balance at issuance and PIK interest.
[3] Original DIP Credit Agreement, see Note 3 - Chapter 11 Filing and Other Related Matters for further information.
[4] In connection with the Company's Chapter 11 Cases, $844.7 million of outstanding notes payable have been reclassified to Liabilities subject to compromise in the Company's consolidated balance sheets as of December 31, 2022 at their expected allowed amount. Up to the Petition Date, the Company continued to accrue interest expense in relation to these reclassified debt instruments. At December 31, 2022 $12.6 million of accrued interest was classified as liabilities subject to compromise.
[5] As a result of the Company's Chapter 11 Cases, the Company expensed $3.5 million of unamortized discount and debt issuance costs, net recorded in Reorganization items, net in the year ended December 31, 2022.
[6] As a result of the Company's Chapter 11 Cases, the Company recognized a gain of $202.9 million from the derecognition of accumulated fair value adjustments recorded in Reorganization items, net in the year ended December 31, 2022.

**Kentucky Note**—In December 2018, the Company entered into a five-year secured promissory note agreement for $2.4 million in connection with the acquisition of property in Kentucky for datacenter development ("Kentucky note"). The note bears interest at a rate per annum of 5% and the Company is required to make monthly payments of principal and interest. Interest

expense on the note has been recognized based on an effective interest rate of 5%. The loan is secured by the underlying property purchased.

**Genesis Loan**—In July 2020, the Company entered into a credit facility with Genesis Global Capital, LLC that provides capacity of up to $13.0 million to finance the Company's acquisition of blockchain computing equipment ("Genesis loan"). The Company borrowed $5.3 million in three installments and the borrowing capacity of the facility was reduced via an amendment in September 2020 to equal the actual amounts borrowed. The loans under the credit facility are secured by the blockchain computing equipment and the Company is required to comply with an approved mining strategy and other restrictions on use of the collateral. Loans under the credit facility have terms of 20 months, bear interest at a rate per annum of 16% plus a fixed risk premium, and require monthly payments. Interest expense on the loans has been recognized based on an effective interest rate of 28%, which

138

Debtors' Exhibit No. 40
Page 300 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

includes the amortization of a debt discount. The loan is secured by blockchain computing equipment financed by the loans. The loan was paid off in April 2022.

**NYDIG Loan**—In October 2020, the Company entered into a master equipment finance agreement with NYDIG and received a loan of $0.8 million to finance the Company's acquisition of blockchain computing equipment. In March 2021, the Company received $3.8 million of additional loans under the master equipment finance agreement with NYDIG to finance the Company's acquisition of blockchain computing equipment. The loans bear an interest rate of 15% and have a term of 24 months from issuance. Interest expense on the loans has been recognized based on an effective interest rate of 16%. The loans are secured by the blockchain computing equipment financed by the loans.

In May 2021, the Company received $13.4 million of additional loans under the master equipment finance agreement with NYDIG to finance the Company's acquisition of blockchain computing equipment that bear an interest rate of 14.25% and have a term of 24 months from issuance. Interest expense on the loans issued in May 2021 has been recognized based on an effective interest rate of 17%.

In July 2021, the Company received blockchain computing equipment from NYDIG (which had been concurrently acquired by NYDIG from Blockcap in exchange for settlement of Blockcap's debt with NYDIG) in exchange for $26.1 million of additional loans under the master equipment finance agreement with NYDIG that bear an interest rate of 14.25% and have a term of 24 months from issuance. Interest expense on the loans issued in July 2021 has been recognized based on an effective interest rate of 16%.

In November 2021, the Company received blockchain computing equipment from NYDIG in exchange for $33.4 million of additional loans under the master equipment finance agreement with NYDIG that bear an interest rate of 11% and have a term of 24 months from issuance. Interest expense on the loans issued in November 2021 has been recognized based on an effective interest rate of 11%.

**Stockholder Loan**—In January 2021, the Company borrowed $10.0 million from a stockholder for the purchase of blockchain computing equipment. The loan bears interest at 10% per annum over a two-year term. The loan was issued with a warrant to purchase 0.2 million shares of common stock at an exercise price of $4.21 per share. The warrant has a two-year term. The Company allocated proceeds of $9.5 million to the notes and $0.5 million to the warrants on a relative fair value basis. Interest expense on the loan has been recognized based on an effective interest rate of 20%. The loan is secured by the blockchain computing equipment financed by the loan.

**Trinity Loan**—In August 2021, the Company entered into a $30.0 million master equipment finance facility agreement with Trinity Capital Inc. ("Trinity") to finance the Company's acquisition of blockchain computing equipment and received a loan of $1.0 million at close. The loan has a term of 36 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 11.0%. In November and December 2021, the Company borrowed $14.0 million and $5.0 million, respectively. The remaining balance of $10.0 million was drawn in February 2022. The loan is secured by the blockchain computing equipment financed by the loan.

**Bremer Loan**—In October 2021, the Company entered into a lending agreement with Bremer Bank, National Association to borrow up to $16.2 million in two tranches through May 22, 2022 for the purchase of blockchain mining equipment and for improvements to data center and infrastructure. In December 2021, the Company entered into an additional term loan to borrow up to $9.6 million. The Company borrowed $15.2 million in October through December 2021. The Company borrowed an additional $4.8 million in January through March 2022. In April 2022, the Company borrowed an additional $0.7 million from Bremer to finance the construction of our North Dakota facility. The loans bear interest at 5.5% annually and are due at the earlier of the date of sale of the underlying mining equipment or 60 months from issuance. Interest expense on the loans has been recognized based on an effective interest rate of 5.6%. The loans require the Company to maintain the following financial covenants: (1) a minimum debt service coverage ratio (defined in the agreement as EBITDA divided by scheduled principal and interest payments) of not less than 1.2:1, measured annually beginning December 31, 2022; and (2) a fixed charge coverage ratio (defined in the agreement as EBITDA minus net distributions divided by scheduled principal and interest payments) of 1:1, measured annually beginning December 31, 2022. The loans are secured by a first priority security interest in certain of the assets financed by the loans.

139

Debtors' Exhibit No. 40
Page 301 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

Additionally, an interest buydown agreement was made between Grand Forks Growth Fund and the Bank of North Dakota acting on behalf of the PACE Program for the purpose of a buydown on the interest for certain of the Company's loans financed through Bremer Bank. The total amount of interest buydown over the term of the loan is $0.8 million. In order to receive the interest buydown incentive, the Company must (a) continue operation in the jurisdiction for a minimum of five years from the benefit date, (b) employ 13 new full-time employees within two years of receiving the incentive and continue to keep them employed for the duration of the agreement and (c) continue to make debt payments and no event of default should occur. If the Company discontinues operation in the jurisdiction within the next five years, it is obligated to repay the incentive back to the Bank of North Dakota. If after two years, the Company does not employ 13 new full-time employees, the interest buydown will be prorated to reflect any partial fulfillment and the Company, at a minimum, is required to pay back the value of the incentive to the Bank of North Dakota. For the years ended December 31, 2022 and 2021, there was no interest buydown.

**Blockfi Loan**—In December 2021, the Company entered into two lending agreements with Blockfi Lending, LLC to borrow up to $110.0 million for the purchase of blockchain mining equipment. The first agreement consists of $10.0 million and bears interest at 9.7% with a term of 24 months from issuance. Interest expense on the loans issued in December 2021 has been recognized based on an effective interest rate of 10.1%. The second agreement consists of $100.0 million and bears interest at 13.1% with a term of 24 months from issuance. The Company borrowed the first tranche totaling $60.0 million across the two loans in December 2021 and borrowed the second tranche of $20.0 million in January 2022. The remaining $30.0 million expired unused in March 2022. Interest expense on the loans issued in December 2021 has been recognized based on an effective interest rate of 13.1%. The loans are secured by a first priority security interest in certain of the assets financed by the loans.

**Anchor Labs Loan**—In March 2022, the Company entered into a $20.0 million equipment loan and security agreement with Anchorage Lending CA, LLC. ("Anchor Labs") to finance the Company's purchase of blockchain computing equipment. The Company borrowed $20.0 million in March 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 12.5%. In May 2022, the Company entered into a $11.7 million equipment loan and security agreement with Anchor Labs to finance the Company's purchase of blockchain computing equipment. The Company borrowed $11.7 million in May 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 12.5%. The loans are secured by a first priority security interest in certain of the assets financed by the loans.

**Mass Mutual Barings Loans**—In March 2022, the Company entered into a $100.0 million equipment loan and security agreement with Barings BDC, Inc., Barings Capital Investment Corporation and Barings Private Credit Corp. ("Mass Mutual Barings") to finance the Company's purchase of blockchain computing equipment. The Company borrowed the first tranche of $30.0 million in March 2022 and borrowed the second tranche of $39.6 million in April 2022. On June 30, 2022, the remaining $30.4 million funding commitment expired unused. The loans under the agreement have a term of 36 months from issuance. Interest expense on the loans have been recognized based on an effective interest rate of 9.8%. The loans are secured by certain blockchain computing equipment.

In August 2022, the Company amended the Mass Mutual Barings loans to defer principal payments for a period of six months beginning with payments due in August 2022. The amendments result in no change to the term of the loans and the remaining principal will amortize over the remaining life of the loans beginning in February 2023. The amendments also require an additional amount of blockchain computing equipment to be provided as collateral. Interest expense on the amended loans has been recognized based on an effective interest rate of 13.0%. In August 2022, the Company issued 0.3 million shares of Common Stock to Mass Mutual Barings as an amendment fee.

140

Debtors' Exhibit No. 40
Page 302 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

**B. Riley Bridge Notes**—In April 2022, the Company entered into a $60.0 million bridge promissory note with B. Riley Commercial Capital, LLC and a $15.0 million bridge promissory note with an affiliate of B. Riley Commercial Capital, LLC (the "Bridge Notes") maturing in December 2022. Interest expense on the Bridge Notes has been recognized based on an effective interest rate of 7.0%.

In August 2022, the Company amended the Bridge Notes to, among other things, extend the maturity date to June 2023 (the "Amended Bridge Notes"). Under the terms of the modified agreement, $37.5 million of principal payments previously due in the second half of 2022 are now due in the first half of 2023. The Amended Bridge Notes require the proceeds of (i) any equity issuances (other than issuances consummated for purposes of making tax payments in connection with the vesting of restricted stock and restricted stock units and equity line of credit under the Equity Line of Credit discussed in Note 16 — Stockholders' (Deficit) Equity ("ELOC") sales), (ii) any secured debt incurred on or after April 7, 2022 (other than purchase money debt) in excess of $500 million and (iii) any ELOC sales in an amount equal to 25% of the net cash proceeds received from any such ELOC sale, in each case, to be applied by us to repay the outstanding principal amount of the Amended Bridge Notes. On August 1, 2022, the Company issued a total of 0.4 million shares of Common Stock to B. Riley Securities, Inc., an affiliate of B. Riley Commercial Capital, in satisfaction of an advisory fee for providing advisory services to the Company in connection with entering into the Amended Bridge Notes.

**Liberty Loan**—In April 2022, the Company entered into an $11.0 million equipment finance agreement with Liberty Commercial Finance LLC ("Liberty") to finance the Company's purchase of blockchain computing equipment. The Company borrowed $11.0 million in April 2022. The loan has a term of 24 months from issuance. Interest expense on the loan has been recognized based on an effective interest rate of 10.6%. The loans are secured by a first priority security interest in the equipment purchased.

**Convertible Notes**—In April 2021, the Company entered into a secured convertible note purchase agreement and issued $215.0 million of secured convertible notes to new and existing lenders (the "Secured Convertible Notes"). In addition, in August 2021 the Company entered into a convertible note purchase agreement and issued $299.8 million of convertible notes in August through November 2021 under substantially the same terms and conditions as the original April 2021 notes except that the August through November 2021 notes have a minimum payoff based on the face value plus accrued interest rather than two times the outstanding face amount plus accrued interest. In addition, the August through November 2021 notes were unsecured until an initial public offering or SPAC merger and then became secured by a lien on the same collateral securing the Secured Convertible Notes in January 2022 upon the closing of the Merger Agreement with XPDI (together with the Secured Convertible Notes, the "Convertible Notes"). In addition, the Company also issued $31.4 million from issuance through December 31, 2022 as payment-in-kind interest on convertible notes outstanding at the end of the period. The Convertible Notes have a maturity date of April 2025 and bear interest at a rate of 10% per annum, of which 4% is payable in cash and 6% is payable in kind. Upon the closing of the Merger Agreement with XPDI in January 2022, the Convertible Notes became convertible into common shares at the option of the holder at a conversion price equal to $8.00 per share. The proceeds from the Convertible Notes were used, in part, to repay $30.0 million of senior secured loans to Silverpeak Credit Partners LP. During the year ended December 31, 2022, $1.6 million of Convertible Notes were exercised resulting in 0.2 million shares issued to the holders of the Convertible Notes that were exercised.

As discussed in Note 12 — Fair Value Measurements, the Company had elected to measure its Convertible Notes at fair value prior to the Petition Date and accordingly recognized $13.1 million of debt issuance costs as incurred at the time of issuance within interest expense, net in the Company's Consolidated Statements of Operations. The Company presented changes in fair value of the Convertible Notes during the periods prior to the Petition Date as follows: (1) the 10% contractual rate of interest on the convertible notes (consisting of 4% cash interest and 6% PIK interest) was presented as interest expense, net on the Consolidated Statements of Operations; (2) changes in fair value attributable to the Company's own credit risk were presented within Accumulated other comprehensive loss on the Company's Consolidated Balance Sheets and as a component of Other comprehensive income (loss) on the Consolidated Statements of Comprehensive (Loss) Income; and (3) other fair value changes were presented within Non-operating expenses, net on the Consolidated Statements of Operations. The fair value option is not available to liabilities subject to compromise as they are recorded at their expected allowed amount. At the Petition Date the accumulated fair value adjustment on the Convertible Notes was $130.3 million and the Accumulated other comprehensive loss related to changes in fair value attributable to the Company's own credit risk was $72.6 million, these amounts were derecognized for a gain of $202.9 million reported in Reorganization items, net when the Convertible Notes were reclassified as Liabilities subject to compromise.

The fair value of the Company's Convertible Notes as of December 31, 2021, included the effect of a negotiation discount,

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

which is a calibration adjustment that reflects the illiquidity of the instruments and the Company's negotiating position. Since the transaction was an orderly transaction, the Company deemed that the fair value equaled the transaction price at initial recognition. However, the closing of the merger of XPDI (which represents the occurrence of a qualified financing event as defined by the terms of the notes) in January 2022 resulted in the elimination of the negotiation discount along with other changes in fair value resulted in a

141

Debtors' Exhibit No. 40
Page 304 of 462

core-20221231

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

significant increase in the fair value of the convertible notes (excluding interest expense and instrument-specific credit risk) for the year up until the Petition Date.

The following summarizes the fair value adjustments and debt issuance costs recognized on the Convertible Notes (in thousands):

| | Financial statement line item | Year Ended December 31, | |
| | | 2022 | 2021 |
|---|---|---|---|
| Cash interest payments | Interest expense, net | $ 21,581 | $ 10,114 |
| Payment-in-kind (PIK) interest | Interest expense, net | 31,550 | 15,170 |
| Instrument-specific credit risk | Other comprehensive income, net of income taxes | (83,579) | 10,966 |
| Other fair value adjustments | Fair value adjustment on convertible notes | (103,274) | 16,047 |
| Reclass to Reorganization items, net | Reorganization items, net | 202,900 | — |
| Total fair value adjustments | | $ 69,178 | $ 52,297 |
| Debt issuance costs | Reorganization items, net | $ 2,788 | $ 12,831 |

The principal amount of the Convertible Notes as of December 31, 2022, reflects the proceeds received plus any PIK interest added to the principal balance of the notes. Upon the closing of the Merger Agreement with XPDI in January 2022, the conversion price for the Convertible Notes became fixed at 80% of the financing price ($8.00 per share of common stock) and the holders now have the right to convert at any time until maturity. At maturity, any Secured Convertible Notes not converted will be owed two times the original face value plus accrued interest; any other Convertible Notes (other than the Secured Convertible Notes) not converted will be owed the original face value plus accrued interest. In addition, at any time (both before and after the merger with XPDI), the Company has the right to prepay the Secured Convertible Notes at the minimum payoff of two times the outstanding face value plus accrued interest and for other Convertible Notes the outstanding face value plus accrued interest. All of the Convertible Notes, totaling $560.0 million as of December 31, 2022, are scheduled to mature on April 19, 2025, which includes $237.6 million for the face value of the Secured Convertible Notes which have payoff at maturity of two times the face value of the note plus accrued interest. The total amount that would be owed on the Secured Convertible Notes outstanding as of December 31, 2022, if held to maturity was $475.2 million. The total amount that would be owed on the Convertible Notes if prepaid as of December 31, 2022, was $811.3 million. See Note 12 — Fair Value Measurements for further information on fair value measurement of the Convertible Notes.

## 12. FAIR VALUE MEASUREMENTS

The Company measures certain assets and liabilities at fair value on a recurring or non-recurring basis in certain circumstances. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. To increase the comparability of fair value measures, the following hierarchy prioritizes the inputs to valuation methodologies used to measure fair value:

Level 1 — Valuations based on quoted prices for identical assets and liabilities in active markets.

Level 2 — Valuations based on observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

Level 3 — Valuations based on unobservable inputs reflecting the Company's own assumptions, consistent with reasonably available assumptions made by other market participants. These valuations require significant judgment.

The Company uses observable market data when determining fair value whenever possible and relies on unobservable inputs only when observable market data is not available.

142

Debtors' Exhibit No. 40
Page 305 of 462

core-20221231

Debtors' Exhibit No. 40

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Recurring fair value measurements*

Prior to the Petition Date the Public Warrants and the Private Placement Warrants were recognized as derivative liabilities in accordance with ASC 815, *Derivatives and Hedging*. Accordingly, the Company recognized the warrant instruments as liabilities at fair value and adjusted the instruments to fair value at each reporting period. The liabilities were subject to remeasurement at each balance sheet date until exercised, and any change in fair value were recognized in the Company's Consolidated Statements of Operations. The initial and subsequent fair value estimates of the Public Warrants and Private Placement Warrants are based on the listed price in an active market for such warrants. After the Petition Date the Public Warrants and Private Placement Warrants were transferred to Liabilities subject to compromise at the expected allowed amount of zero dollars. A gain of $0.3 million from the derecognition of the prior fair value is reported in Reorganization items, net.

The Company had elected prior to the Petition Date to measure its Convertible Notes at fair value on a recurring basis because the Company believed it better reflected the underlying economics of the Convertible Notes, which contain multiple embedded derivative features. The fair value of the Company's convertible notes payable is determined using a market approach based on observable market prices for similar securities when available.

Prior to the three months ended June 30, 2022, when observable market data was not available, the Company used an as-converted value plus risk put option model that included certain unobservable inputs that were significant to the fair value measurement such as probability of a financing event occurring (e.g., a SPAC merger or qualified financing), expected term, volatility and the negotiation discount. The fair value of the Secured Convertible Notes considered the minimum payoff at maturity of two times the face value of the note plus accrued interest, as well as the opportunity for appreciation if the value of the Company's stock increased 60% or more relative to the pricing at the financing event (since the conversion price is set at 80% of the stock price at the financing event, a stock price appreciation of 60% would match the minimum payoff of two times the face value plus accrued interest). The fair value of the other Convertible Notes considered the minimum payoff at maturity of one times the face value of the note plus accrued interest, as well as the opportunity for appreciation if the value of the Company's stock were to fall no more than 20% relative to the pricing at the financing event (since the conversion price is set at 80% of the stock price at the financing event, a stock price decline of 20% would match the minimum payoff of one times the face value plus accrued interest). Upon the closing of the Merger Agreement with XPDI in January 2022, the conversion price for the Convertible Notes became fixed at 80% of the financing price ($8.00 per share of common stock) and the holders now have the right to convert at any time until maturity.

Due to the occurrence of the SPAC merger and the subsequent significant decline in the Company's stock price below the conversion price, the fair value of the Company's convertible notes beginning with the three months ended June 30, 2022 was determined using a discounted cash flow model that considered the principal and interest payments, including the minimum payoff at maturity of two times the face value of the note plus accrued interest for the Secured Convertible Notes and the value of the call option that includes certain unobservable inputs that may be significant to the fair value measurement such as expected term and volatility of the call option.

At December 31, 2022 the Company did not have any remaining recurring fair value measurements.

143

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The following presents the levels of the fair value hierarchy for the Company's derivative warrant liabilities and the Convertible Notes by issuance date measured at fair value on a recurring basis as of December 31, 2021 (in thousands):

| | | | | | December 31, 2021 | | |
| | | | | Fair value hierarchy | | | |
| | Principal | | Level 1 | | Level 2 | Level 3 | Fair value |
|---|---|---|---|---|---|---|---|
| Convertible notes: | | | | | | | |
| April 19, 2021[1] | $ 91,430 | $ | — | $ | — | $ 101,078 | $ 101,078 |
| April 21, 2021[1] | 5,137 | | — | | — | 5,674 | 5,674 |
| April 23, 2021[1] | 46,229 | | — | | — | 51,062 | 51,062 |
| April 26, 2021[1] | 78,075 | | — | | — | 86,165 | 86,165 |
| August 20, 2021[2] | 50,597 | | — | | — | 50,941 | 50,941 |
| September 10, 2021[2] | 16,110 | | — | | — | 16,472 | 16,472 |
| September 23, 2021[2] | 76,051 | | — | | — | 77,559 | 77,559 |
| September 24, 2021[2] | 60,016 | | — | | — | 61,179 | 61,179 |
| September 27, 2021[2] | 1,974 | | — | | — | 2,012 | 2,012 |
| October 1, 2021[2] | 86,655 | | — | | — | 87,150 | 87,150 |
| November 10, 2021[2] | 9,823 | | — | | — | 9,819 | 9,819 |
| Accrued PIK interest[1,2,3] | — | | — | | — | 7,896 | 7,896 |
| Total convertible notes | $ 522,097 | $ | — | $ | — | $ 557,007 | $ 557,007 |

[1] Secured Convertible Notes (includes principal balance at issuance and PIK interest) which considers the minimum payoff at maturity of two times the face value of the note plus accrued interest.
[2] Other Convertible Notes (other than the Secured Convertible notes) which considers the minimum payoff at maturity of one times the face value of the note plus accrued interest.
[3] Represents PIK interest accrued as of December 31, 2021 which was recorded as additional principal for each respective convertible note on January 1, 2022.

***Level 3 Recurring Fair Value Measurements***

The following presents a rollforward of the activity for the Convertible Notes measured at fair value on a recurring basis using Level 3 inputs as of December 31, 2022 (in thousands):

| | Convertible Notes (Level 3) |
|---|---|
| Balance at December 31, 2021 | $ 557,007 |
| Issuances (PIK principal recorded) | 31,382 |
| Settlements (including interest payments and conversions) | (23,144) |
| Unrealized gains | 186,853 |
| Transfers out of Level 3 | (752,098) |
| Balance at December 31, 2022 | $ — |

Securities are transferred from Level 2 to Level 3 when observable market prices for similar securities are no longer available and unobservable inputs become significant to the fair value measurement. All transfers into and out of Level 3 are assumed to occur at the beginning of the quarterly reporting period in which they occur. As of December 31, 2022, there were no Level 3 financial instruments. During the year ended December 31, 2022, the Convertible Notes were transferred from Level 3 out of recurring fair value measurements. During the year ended December 31, 2021, the Convertible Notes were transferred from Level 2 to Level 3.

144

Debtors' Exhibit No. 40
Page 309 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

*Nonrecurring fair value measurements*

The Company's non-financial assets, including digital assets, property, plant and equipment, goodwill, and intangible assets are measured at estimated fair value on a nonrecurring basis. These assets are adjusted to fair value only when an impairment is recognized, or the underlying asset is held for sale. Refer to Note 2 — Summary of Significant Accounting Policies, Note 5 — Property, Plant and Equipment, Net, Note 6 — Goodwill and Note 7 — Intangible Assets, Net for more information regarding fair value considerations when measuring impairment. The estimated fair value of the Company's digital assets as of December 31, 2022 and 2021, was $0.7 million and $248.1 million, respectively.

No non-financial assets were classified as Level 3 as of December 31, 2022, or December 31, 2021.

*Fair value of financial instruments*

The Company's financial instruments include cash and cash equivalents, restricted cash, accounts receivable, net, accounts payable, notes payable and certain accrued expenses and other liabilities. The carrying amount of these financial instruments, other than notes payable discussed below, approximates fair value due to the short-term nature of these instruments.

The fair value of the Company's notes payable (excluding the Convertible Notes carried at fair value described above and the expected allowed amount transferred to Liabilities subject to compromise), which are carried at amortized cost, was determined based on a discounted cash flow approach using market interest rates of instruments with similar terms and maturities and an estimate for our standalone credit risk. We classified the other notes payable as Level 3 financial instruments due to the considerable judgment required to develop assumptions of the Company's standalone credit risk and the significance of those assumptions to the fair value measurement. At December 31, 2022, the estimated fair value of the Company's other notes payable, including both the current and noncurrent portion, was $36.2 million and equaled the carrying value of the Company's other notes payable, including both the current and noncurrent portion. At December 31, 2021, the estimated fair value and carrying value of the Company's notes payable, including both the current and noncurrent portion, was $184.7 million and $171.2 million, respectively.

13. LEASES

The Company has entered into non-cancellable operating and finance leases for office, data facilities, computer and networking equipment, electrical infrastructure and office equipment, with original lease periods expiring through 2033. In addition, certain leases contain bargain renewal options extending through 2051. The Company recognizes lease expense for these leases on a straight-line basis over the lease term, which includes any bargain renewal options. The Company recognizes rent expense on a straight-line basis over the lease period. In addition to minimum rent, certain leases require payment of real estate taxes, insurance, common area maintenance charges, and other executory costs. Differences between rent expense and rent paid are recognized as adjustments to operating lease right-of-use assets on the Company's Consolidated Balance Sheets. For certain leases, the Company receives lease incentives, such as tenant improvement allowances, and records those as adjustments to operating lease right-of-use assets and

145

Debtors' Exhibit No. 40
Page 310 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

operating lease liabilities on the Company's Consolidated Balance Sheets and amortizes the lease incentives on a straight-line basis over the lease term as an adjustment to rent expense.

The components of operating and finance leases are presented on the Company's Consolidated Balance Sheets as follows (in thousands):

|  | Financial statement line item | | December 31, 2022 |
|---|---|---|---|
| **Assets:** | | | |
| Operating lease right-of-use assets | Operating lease right-of-use assets | $ | 20,430 |
| Finance lease right-of-use assets | Property, plant and equipment, net | $ | 84,092 |
| **Liabilities:** | | | |
| Operating lease liabilities, current portion | Operating lease liabilities, current portion | $ | 769 |
| Operating lease liabilities, net of current portion | Operating lease liabilities, net of current portion | $ | 720 |
| Finance lease liabilities, current portion | Finance lease liabilities, current portion | $ | — |
| Finance lease liabilities, net of current portion | Finance lease liabilities, net of current portion | $ | — |
| Operating and finance lease liabilities subject to compromise | Liabilities subject to compromise | $ | 84,664 |

The components of lease expense were as follows (in thousands):

|  | Financial statement line item | | Year Ended December 31, 2022 |
|---|---|---|---|
| Operating lease expense | General and administrative expenses | $ | 1,937 |
| Short-term lease expense | General and administrative expenses | | 24 |
| Finance lease expense: | | | |
| Amortization of right-of-use assets | Cost of revenue | | 31,372 |
| Interest on lease liabilities | Interest expense, net | | 7,080 |
| Total finance lease expense | | | 38,452 |
| Total lease expense | | $ | 40,413 |

In determining the discount rate used to measure the right-of-use asset and lease liability, we use rates implicit in the lease, or if not readily available, we use our incremental borrowing rate. Our incremental borrowing rate is based on an estimated secured rate with reference to recent borrowings of similar collateral and tenure when available. Determining our incremental borrowing rate, especially if there are insufficient observable borrowings near the time of lease commencement, may require significant judgment.

Information relating to the lease term and discount rate is as follows:

|  | December 31, 2022 |
|---|---|
| **Weighted Average Remaining Lease Term (Years)** | |
| Operating leases | 10.5 |
| Finance leases | 2.1 |
| **Weighted Average Discount Rate** | |
| Operating leases | 6.5 % |
| Finance leases | 12.4 % |

146

Debtors' Exhibit No. 40
Page 311 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The following table summarizes the Company's supplemental cash flow information (in thousands):

| | Year Ended December 31, 2022 |
|---|---|
| **Lease Payments** | |
| Operating lease payments | $ 726 |
| Finance lease payments | $ 36,740 |
| **Supplemental Noncash Information** | |
| Operating lease right-of-use assets obtained in exchange for lease obligations[1] | $ 14,195 |
| Finance lease right-of-use assets obtained in exchange for lease obligations | $ 10,557 |
| Increase in finance lease right-of-use assets as a result of lease modification | $ 693 |

[1] Includes operating lease right-of-use assets of $6.7 million that were recorded upon adoption of Topic 842 on January 1, 2022. Refer to Note 2 for further information.

The Company's minimum payments under noncancelable operating and finance leases having initial terms and bargain renewal periods in excess of one year are as follows at December 31, 2022, and thereafter (in thousands):

| | Operating leases | Finance leases |
|---|---|---|
| 2023 | 2,082 | 38,876 |
| 2024 | 1,810 | 39,769 |
| 2025 | 1,866 | 1,972 |
| 2026 | 1,924 | 32 |
| 2027 | 1,985 | — |
| Thereafter | 12,037 | — |
| Total lease payments | 21,704 | 80,649 |
| Less: imputed interest | 6,347 | 9,853 |
| Less: Liabilities subject to compromise | 13,868 | 70,796 |
| Total | $ 1,489 | $ — |

*Operating leases*

In September 2021, the Company entered into operating lease agreements with Minnkota Power Cooperative to develop a hosting facility in Grand Forks, North Dakota as well as enter into a power supply purchase agreement to purchase 100 megawatts of power supply once construction of the facility is complete. As a result of the agreements being entered into contemporaneously and in contemplation of one another, the agreements are considered to be a single unit of account and consideration has been allocated between lease and non-lease components based on relative standalone selling price with approximately $5.3 million allocated to the lease components and $2.6 million allocated to the non-lease components. Substantially all of the payments for the intended leases would be for a five-year to thirty-year term (comprising an initial five-year term with five five-year bargain renewal options to renew) with purchase options exercisable at any time for approximately $5.6 million less any rent paid to date and subject to certain other adjustments.

In addition to the above, in December 2021, the Company entered into an agreement to lease office space for its new corporate headquarters that commenced in July of 2022. The lease includes base rent of approximately $14.0 million to be paid over a period of 130 months. On November 11, 2022, the landlord notified the Company that it was terminating the lease.

*Finance leases*

In December 2021, the Company entered into finance lease agreements with Liberty Commercial Finance LLC totaling $40.9 million for the purchase of bitcoin mining equipment, with a weighted average term of 3.2 years. The leases bear interest at a weighted average rate per annum of 12.6% and the Company is required to make monthly payments of principal and interest. Interest expense on the lease has been recognized based on a weighted average effective interest rate of 12.6%.

In December 2021, the Company entered into finance lease agreements with MassMutual Asset Finance LLC totaling $50.0 million for the purchase of bitcoin mining equipment, with a weighted average term of 3.2 years. The leases bear interest at a

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

rate per annum of 10% and the Company is required to make monthly payments of principal and interest. Interest expense on the leases has been recognized based on an effective interest rate of 10%.

In August 2022, the Company amended the finance lease agreements with MassMutual Asset Finance LLC to defer lease payments for a period of six months beginning with payments due in August 2022. The amendments result in no change to the term of the finance leases and the remaining principal will amortize over the remaining life of the leases beginning in February 2023. The amendments also requires an additional amount blockchain computing equipment to be provided as collateral. The leases under the amended agreements bear interest at a rate of 13.0% per annum. Interest expense on the amended leases has been recognized based on an effective interest rate of 12.5%. As a result of the lease modification, the lease liabilities decreased by $7.7 million with a corresponding decrease to finance lease right-of assets of $7.7 million.

*Balance Sheet Classification*

As discussed in Note 11 — Notes Payable, in October 2022, the Company determined not to make certain payments with respect to several of its debt facilities, equipment financing facilities and leases and other financings, including its two bridge promissory notes. As a result, the creditors under these debt facilities may exercise remedies following any applicable grace periods and pursuant to any confirmed plan of reorganization, including electing to accelerate the principal amount of such debt, suing the Company for nonpayment, increasing interest rates to default rates, or taking action with respect to collateral, where applicable. The Company has classified all of its finance lease liabilities as current liabilities as of December 31, 2022.

## 14. COMMITMENTS AND CONTINGENCIES

**Legal Proceedings**—The Company is subject to legal proceedings arising in the ordinary course of business. The Company accrues losses for a legal proceeding when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the uncertainties inherent in legal proceedings make it difficult to reasonably estimate the costs and effects of resolving these matters. Accordingly, actual costs incurred may differ materially from amounts accrued and could materially adversely affect the Company's business, cash flows, results of operations, financial condition and prospects. Unless otherwise indicated, the Company is unable to estimate reasonably possible losses in excess of any amounts accrued.

In July 2022, one of the Company's largest customers, Celsius Mining LLC ("Celsius"), along with its parent company and certain affiliates, filed for voluntary relief under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. On September 28, 2022, Celsius filed a motion in the chapter 11 case alleging that the Company is violating the automatic stay with respect to the Master Services Agreement between Celsius and the Company (the "Celsius Agreement"). Celsius is also using its Chapter 11 proceeding to withhold payment of certain charges billed to Celsius pursuant to the Celsius Agreement. The Company strongly disagrees with the allegations made in the Celsius motion and the interpretation of the Celsius Agreement espoused therein and is vigorously defending its interests, including seeking resolution from the bankruptcy court and payment of any outstanding amounts owed under the Celsius Agreement (subject to applicable bankruptcy law in the Celsius chapter 11 case). The parties have agreed to stay the proceedings, including the evidentiary hearing scheduled for November 18, 2022. There can be no guarantee that the bankruptcy court will rule in the Company's favor in a timely manner or that Celsius will honor the terms of the Celsius Agreement. An adverse ruling by the bankruptcy court that provides Celsius the benefits of the Company's hosting services without Celsius fully paying the costs of such services would have a material effect on the Company's business, financial condition, results of operations and cash flows. As of December 31, 2022, the Company had accrued $8.7 million as an allowance against amounts due from Celsius.

In November 2022, Sphere 3D Corp. filed a demand for arbitration with JAMS alleging the existence and breach of a contract for hosting services. The arbitration demand alleges that the Company has failed to provide contracted for services and to return prepayments allegedly made by Sphere 3D for such services. The Company denies the allegations contained in Sphere 3D's arbitration demand and intends to vigorously defend its interests. The arbitration demand was stayed by the filing of the Company Parties' Chapter 11 Cases. Refer to the discussion contained within this footnote under the subtitle "Effect of Automatic Stay."

In November 2022, McCarthy Building Companies, Inc. filed a complaint against the Company in the United States District Court for the Eastern District of Texas, alleging breach of contract for failing to pay when due certain payments allegedly owing under a contract for construction entered into between the parties.

In November 2022, plaintiff Mei Peng filed a putative class action in the United States District Court, Western District of Texas, Austin Division, asserting that the Company violated the Securities Exchange Act by failing to disclose to investors, among other things, that the Company was vulnerable to litigation, that certain clients had breached their agreements, and that this impacted

148

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

the Company's profitability and ability to continue as a going concern. The Company denies the allegations contained in the complaint and intends to vigorously defend its interests.

As of December 31, 2022 and 2021, there were no other material loss contingency accruals for legal matters.

*Effect of Automatic Stay*

Subject to certain exceptions under the Bankruptcy Code, the filing of the Company Parties' Chapter 11 Cases automatically stayed the continuation of most legal proceedings or the filing of other actions against or on behalf of the Debtors or their property to recover on, collect or secure a claim arising prior to the Petition Date or to exercise control over property of the Debtors' bankruptcy estates, unless and until the Bankruptcy Court modifies or lifts the automatic stay as to any such claim. Notwithstanding the general application of the automatic stay described above, governmental authorities may determine to continue actions brought under their police and regulatory powers.

**Leases**—See Note 13 — Leases for further information.

**Loss on legal settlements**—The Company recognized a loss of $2.6 million during the year ended December 31, 2021 with respect to the resolution of legal actions for damages resulting from the early termination of agreements by former customers.

## 15. CONTINGENTLY REDEEMABLE CONVERTIBLE PREFERRED STOCK

The Company is authorized to issue 2.00 billion shares of preferred stock, $0.00010 par value. Prior to the Merger with XPDI, the Company was authorized to issue 50.0 million shares of preferred stock, $0.0001 par value. As of December 31, 2021, 10.8 million shares of preferred stock were issued and outstanding.

Upon the closing of the merger with XPDI on January 19, 2022, each share of Series A and Series B Preferred Stock automatically converted into one share of Old Core Common Stock and each outstanding share of Old Core Common Stock issued as a result of the conversion of Series A and Series B Preferred Stock in connection with the Merger was cancelled and extinguished and converted into the right to receive a number of shares of New Core Common Stock equal to the Exchange Ratio of 1.6001528688. All of the Company's shares of contingently redeemable convertible preferred stock were converted into 10.8 million shares of New Core Common Stock during the year ended December 31, 2022.

As of December 31, 2021, 10.8 million shares of preferred stock were issued and outstanding (the below table is in thousands, except per share amounts).

| | Year Ended December 31, 2021 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Shares Authorized | Shares Issued and Outstanding | Issuance Price per Share | Net Proceeds | Liquidation preference |
| Contingently Redeemable Convertible Preferred Stock: | | | | | |
| Series A | 14,641 | 10,324 | $ 4.27 | $ 31,070 | $ 44,064 |
| Series B | 14,327 | 502 | 2.19 | 1,097 | 1,100 |
| Undesignated | 21,032 | — | | — | — |
| Total contingently redeemable convertible preferred stock | 50,000 | 10,826 | | $ 32,167 | $ 45,164 |

There were no additional contingently redeemable convertible preferred stock issuances in 2021.

**16. STOCKHOLDERS' (DEFICIT) EQUITY**

**Authorized Capital**—As of December 31, 2022, the Company was authorized to issue 10.0 billion shares of common stock, $0.0001 par value. The holders of the Company's common stock are entitled to one vote per share.

In January 2021, in connection with the stockholder loan described in Note 11 — Notes Payable, the Company issued a warrant to the stockholder to purchase up to 0.2 million shares of common stock at an exercise price of $4.21 per share. The warrant is set to expire in January 2023 and is exercisable and unexercised as of December 31, 2022.

149

Debtors' Exhibit No. 40
Page 318 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

As a result of the Merger, all of XPDI's Class A Common Stock and Class B Common Stock automatically converted into 30.8 million shares of New Core Common Stock on a one-for-one basis. XPDI's 8.6 million public warrants issued in its initial public offering (the "Public Warrants") and 6.3 million warrants issued in connection with private placement at the time of XPDI's initial public offering (the "Private Placement Warrants") became warrants for New Core Common Stock.

Following the Merger with XPDI, each share of common stock or warrant was converted to shares of New Core Common Stock or a warrant to purchase shares of New Core Common Stock based on an exchange ratio of 1.6001528688.

*Equity Line of Credit*

In July 2022, the Company entered into a common stock purchase agreement (the "Equity Line of Credit") and a Registration Rights Agreement (the "Registration Rights Agreement") with B. Riley. Pursuant to the Equity Line of Credit, subject to the satisfaction of the conditions set forth in the Equity Line of Credit, the Company will have the right to sell to B. Riley, up to $100.0 million of shares of the Company's common stock, par value $0.0001 per share (the "Common Stock"), subject to certain limitations and conditions set forth in the Equity Line of Credit, from time to time during the term of the Equity Line of Credit. Sales of Common Stock pursuant to the Equity Line of Credit, and the timing of any sales, are solely at the Company's option, and the Company is under no obligation to sell any securities to B. Riley under the Equity Line of Credit.

The per share purchase price that B. Riley is required to pay for shares of the Company's Common Stock in a Purchase effected by the Company pursuant to the Equity Line of Credit, if any, will be determined by reference to the volume weighted average price ("VWAP") of the Common Stock, calculated in accordance with the Equity Line of Credit, for the period (the "Purchase Valuation Period") beginning at the official open (or "commencement") of the regular trading session on Nasdaq on the applicable Purchase Date (as defined in the Equity Line of Credit) for such Purchase, and ending at the earliest to occur of (i) 3:59 p.m., New York City time, on such Purchase Date or such earlier time publicly announced by the trading market as the official close of the regular trading session on such Purchase Date, (ii) such time that the total aggregate number (or volume) of shares of Common Stock traded on Nasdaq during such Purchase Valuation Period (calculated in accordance with the Equity Line of Credit) reaches the applicable share volume maximum amount for such Purchase (the "Purchase Share Volume Maximum"), calculated by dividing (a) the applicable Purchase Share Amount for such Purchase, by (b) 0.20, and (iii) such time that the trading price of a share of Common Stock on Nasdaq during such Purchase Valuation Period (calculated in accordance with the Equity Line of Credit) falls below the applicable minimum price threshold for such Purchase specified by the Company in the Purchase Notice for such Purchase, or if the Company does not specify a minimum price threshold in such Purchase Notice, a price equal to 75.0% of the closing sale price of the Common Stock on the trading day immediately prior to the applicable Purchase Date for such Purchase (the "Minimum Price Threshold"), less a fixed 3.0% discount to the VWAP for such Purchase Valuation Period.

The net proceeds to the Company from sales that the Company elects to make to B. Riley under the Equity Line of Credit, if any, will depend on the frequency and prices at which the Company sells shares of the Company's Common Stock to B. Riley. The Company expects that any proceeds received by the Company from such sales to B. Riley will be used for general corporate purposes.

There are no restrictions on future financings, rights of first refusal, participation rights, penalties or liquidated damages in the Equity Line of Credit or Registration Rights Agreement, other than a prohibition (with certain limited exceptions) on entering into specified "Variable Rate Transactions" (as such term is defined in the Equity Line of Credit) during the term of the Equity Line of Credit. Such transactions include, among others, the issuance of convertible securities with a conversion or exercise price that is based upon or varies with the trading price of the Company's Common Stock after the date of issuance, or the Company's effecting or entering into an agreement to effect an "equity line of credit" or other substantially similar continuous offering with a third party, in which the Company may offer, issue or sell Common Stock or any securities exercisable, exchangeable or convertible into Common Stock at a future determined price.

The Equity Line of Credit will automatically terminate on the earliest to occur of (i) the first day of the month next following the 24-month anniversary of the Commencement Date (as such term is defined in the Equity Line of Credit), (ii) the date on which B. Riley shall have purchased from the Company under the Equity Line of Credit shares of Common Stock for an aggregate gross purchase price of $100.0 million, (iii) the date on which the Common Stock shall have failed to be listed or quoted on Nasdaq or another U.S. national securities exchange identified as an "eligible market" in the Equity Line of Credit, (iv) the 30th trading day after the date on which the Company commences a voluntary proceeding or any third party commences a bankruptcy proceeding

4/8/2023, 10:22 PM

against the Company that is not discharged or dismissed prior to such trading day, and (v) the date on which a bankruptcy custodian is appointed for all or substantially all of the Company's property or the Company makes a general assignment for the benefit of creditors.

150

Debtors' Exhibit No. 40
Page 320 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The Company has the right to terminate the Equity Line of Credit at any time after Commencement, at no cost or penalty, upon five (5) trading days' prior written notice to B. Riley. B. Riley has the right to terminate the Equity Line of Credit upon five (5) trading days' prior written notice to the Company upon the occurrence of certain events set forth in the Equity Line of Credit. The Company and B. Riley may also agree to terminate the Equity Line of Credit by mutual written consent, provided that no termination of the Equity Line of Credit will be effective until the fifth trading day immediately following the settlement date related to any pending purchase that has not been fully settled in accordance with the Equity Line of Credit. Neither the Company nor B. Riley may assign or transfer their respective rights and obligations under the Equity Line of Credit or the Registration Rights Agreement.

As consideration for B. Riley's commitment to purchase shares of Common Stock at the Company's direction upon the terms and subject to the conditions set forth in the Equity Line of Credit, upon execution of the Equity Line of Credit in July 2022, the Company issued 0.6 million shares to B. Riley with a fair value of $1.1 million at issuance which was recorded within other non-operating expenses, net on the Company's Consolidated Statements of Operations and presented as equity line of credit expenses on the Consolidated Statements of Cash Flows. In addition, the Company reimbursed $0.1 million of reasonable legal fees and disbursements of B. Riley's legal counsel in connection with the transactions contemplated by the Equity Line of Credit and the Registration Rights Agreement.

During the year ended December 31, 2022, the Company issued 13.4 million shares under the Equity Line of Credit for a total sales price to B. Riley of $20.7 million is net of $0.6 million for the fixed 3.0% discount to the VWAP described above which was recorded within other non-operating expenses, net on the Company's Consolidated Statements of Operations and presented as equity line of credit expenses on the Consolidated Statements of Cash Flows. As of December 31, 2022, 56.9 million shares of Common Stock were available to be issued under the Equity Line of Credit.

As discussed in Note 11 — Notes Payable, 25% of the net cash proceeds received for shares issued under the Equity Line of Credit is required to be applied by the Company to repay the outstanding principal amount of the Amended Bridge Notes. As of December 31, 2022, the Company owed $5.3 million on the Amended Bridge Notes related to proceeds received under the Equity Line of Credit.

*Warrant Exercises*

In March 2020, the Company issued warrants to the Company's President and Chief Executive Officer and a member of the Board of Directors to purchase up to 6.4 million shares of the Company's common stock at an exercise price of $0.84 per share (as amended). In March 2022, a warrant holder exercised their warrant to purchase 3.2 million shares in a cashless exercise resulting in 2.9 million net shares issued to the warrant holder after withholding 0.3 million shares for the exercise price.

In March 2020, the Company issued warrants to service providers in exchange for services provided related to the issuance of Series A Convertible Preferred Stock. The warrants were for an aggregate of 0.2 million shares at an exercise price of $4.27 per share.

During the year ended December 31, 2022, 4.4 million of the warrants were exercised in a cashless exercise resulting in 3.0 million net shares issued to the warrant holders.

*Convertible Note Exercises*

As discussed in Note 11 — Notes Payable, the Company issued $514.8 million of Convertible Notes in 2021 along with issuing an additional $31.4 million from issuance through December 31, 2022, as payment-in-kind interest on convertible notes outstanding. The Convertible Notes became convertible into common shares at the option of the holder at a conversion price equal to $8.00 per share upon the closing of the Merger Agreement with XPDI in January 2022. During the year ended December 31, 2022, $1.6 million of Convertible Notes were exercised resulting in 0.2 million shares issued to the holders of the Convertible Notes that were exercised.

*SPAC Vesting Shares*

1.7 million common shares are subject to vesting requirements, as described further in Note 1 — Organization and Description of Business. These contingently issuable shares do not require future service in order to vest and do not result in stock-based compensation expense. The SPAC Vesting Shares are accounted for as an equity contract, and meet the criteria for equity

classification. The Company has recorded the SPAC Vesting Shares within additional paid-in capital on the Company's Consolidated Balance Sheets as of December 31, 2022.

**_Vendor Settlement_**

Debtors' Exhibit No. 40
Page 322 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

In March 2022, the Company issued 1.6 million shares of the Company's common stock related to a vendor liability that had been assumed by the Company in July 2021 as part of the Blockcap acquisition. In addition, the vendor liability requires settlement in cash based on the difference between the weighted average of the closing price of the Company's common stock for each day there was a closing price during the thirty consecutive days immediately prior to the expiration of the lockup period (defined in the agreement as 180 days from the date from the closing of the XPDI merger) and the $21.3 million contractual amount of the liability. During the year ended December 31, 2022, we recorded $9.5 million, within Other non-operating expenses, net on the Consolidated Statements of Operations related to changes in the fair value of the vendor liability. As of December 31, 2022, the fair value of the liability of $18.1 million was recorded within Liabilities subject to compromise on the Consolidated Balance Sheets.

*Equity Incentive Plans*

The Company has outstanding awards under the 2018 Omnibus Incentive Plan (the "2018 Plan"). No new awards can be made under the 2018 Plan subsequent to the XPDI Merger, as described below. Awards that were granted under the 2018 Plan included incentive stock options (must meet all statutory requirements), non-qualified stock options and restricted stock units. Awards granted under the 2018 Plan were subject to a minimum vesting period of at least one year commencing from the date of grant. Additionally, options granted under the plan must expire within ten years of the grant date and were required to be granted with exercise prices of no less than the fair value of the common stock on the grant date, as determined by the Company's board of directors (the "Board").

In July 2021, the Company acquired Blockcap. Under the terms of the Blockcap merger agreement, (i) each stock option granted, whether vested or unvested, and each award of restricted stock under the Blockcap, Inc. Equity Incentive Plan (the "Legacy Blockcap Plan") was assumed by the Company. In addition, the Radar Relay, Inc. Amended and Restated 2018 Equity Incentive Plan (the "RADAR Plan") provides for the grant of stock options, restricted stock awards, and other awards to eligible employees, non-employee directors and consultants. On June 4, 2021, prior to its acquisition by the Company, Blockcap entered into an agreement and plan of merger with RADAR for all the issued and outstanding equity interests of RADAR, which merger closed on July 1, 2021 (the "Blockcap/RADAR Merger"). The RADAR Plan was assumed by us upon the closing of the Blockcap/RADAR Merger and the Blockcap acquisition. No new awards may be made under the Legacy Blockcap Plan and the RADAR Plan (the "Blockcap Plans") subsequent to the closing of the Blockcap acquisition.

At the Special Meeting in connection with the XPDI Merger, the stockholders of XPDI approved the Core Scientific, Inc. 2021 Equity Incentive Plan (the "2021 Plan"). Awards granted under the 2021 Plan may be incentive stock options (subject to satisfaction of applicable statutory requirements), non-qualified stock options, stock appreciation rights, restricted stock and stock units, performance awards and other cash-based or stock-based awards. Awards granted under the 2021 Plan are subject to a minimum vesting period of at least one year commencing from the date of grant. Additionally, options granted under the plan must expire within ten years of the grant date and must be granted with exercise prices of no less than the fair value of the common stock on the grant date, as determined by the Company's Board. Following the consummation of the Merger, the Company expects that its Board will make grants of awards under the 2021 Plan to eligible participants. The maximum number of shares of the Company's common stock that may be issued under the 2021 Plan is 45.0 million shares, of which 30.6 million was available for issuance as of December 31, 2022.

*Stock-Based Compensation*

Stock-based compensation expense relates primarily to expense for restricted stock awards ("RSAs"), restricted stock units ("RSUs"), and stock options. As of December 31, 2022, we had unvested or unexercised stock-based awards outstanding representing approximately 69.1 million shares of our common stock, consisting of approximately 45.2 million RSAs and RSUs and options to purchase approximately 23.9 million shares of our common stock.

On June 8, 2022, the compensation committee (the "Compensation Committee") of the Board of the Company approved an amendment to the Company's award agreement for the RSUs outstanding under the 2018 Plan, to provide for the waiver and elimination of the requirement that the Company undergo a "change in control" or a "public offering" for full vesting of the previously outstanding time-vested award (the "RSU Amendment"). Although the mergers that the Company underwent did not satisfy the event-based vesting requirement, they significantly reduced the possibility of the requirement being met as contemplated under the 2018 Plan. The RSU Amendment was authorized and approved by the Board and the Compensation Committee as necessary, desirable, and in the best interest of the Company and its stockholders. As a result of the RSU Amendment, all outstanding RSUs under the 2018 Plan are subject only to time-based vesting, of which RSUs covering approximately 42 million shares of

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Common Stock were net settled, with approximately 15 million shares of Common Stock to be canceled and forfeited to satisfy tax withholding obligations in June 2022.

152

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

**Stock Options**—Stock options granted under the 2018 Plan are granted at a price per share not less than the fair value at date of grant. Options granted to date generally vest over 4 years and are exercisable for up to 10 years. Determining the fair value of stock options at the grant date requires judgment, including estimating the expected term, expected volatility, risk-free interest rate, and expected dividends.

*Expected Term*—The Company's expected term is determined using the simplified method and represents the midpoint between the vesting period and the contractual term of the awards.

*Expected Volatility*—The Company's volatility factor is estimated using comparable public company volatility for similar terms.

*Risk-Free Interest Rate*—The Company bases the risk-free interest rate used in the Black-Scholes option-pricing model on the implied yield currently available on US Treasury zero coupon issues with an equivalent remaining term. Where the expected term of the Company's stock-based awards does not correspond with the term for which an interest rate is quoted, the Company performs a straight-line interpolation to determine the rate from the available term maturities.

*Expected Dividends*—The Company has no history of paying cash dividends and has no present intention to pay common stock cash dividends in the future; as a result, the expected dividend yield is 0% as of December 31, 2022 and 2021.

The weighted-average assumptions for options granted for the years ended December 31, 2022 and 2021, are as follows:

|  | Year Ended December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Dividend yield | 0.00 % | 0.00 % |
| Expected volatility | 72.29 % | 72.57 % |
| Risk-free interest rate | 1.82 % | 1.39 % |
| Expected life (years) | 7.00 | 6.22 |

A summary of stock option activity for the year ended December 31, 2022 is as follows (amounts in thousands, except per share amounts):

|  | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Options outstanding - December 31, 2021 | 31,942 | 8.76 |  |  |
| Granted | — | — |  |  |
| Exercised | (1,321) | 2.91 |  |  |
| Forfeited | (5,528) | 10.45 |  |  |
| Expired | (1,178) | 10.04 |  |  |
| Options outstanding - December 31, 2022 | 23,915 | $ 8.64 | 7.6 | $ — |
| Options vested and expected to vest as of December 31, 2022 | 23,915 | $ 8.64 | 8.8 | $ — |
| Options vested and exercisable as of December 31, 2022 | 7,521 | $ 5.42 | 5.0 | $ — |

The weighted-average grant date fair value of options granted for the year ended December 31, 2021, was $10.92. The total fair value of stock options vested during the year ended December 31, 2022 and 2021, was $0.6 million and $35.6 million, respectively.

As of December 31, 2022, total unrecognized stock-based compensation expense related to unvested stock options was approximately $83.0 million, which is expected to be recognized over a weighted-average time period of 3.1 years.

153

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

**Restricted Stock Units**—Restricted stock units ("RSUs") granted in 2018 required that the holder elect before the date of grant whether the RSUs will vest either

- Over a 4-year service period, or

- Over a 4-year service period and upon either i) completion of an initial public offering of the Company's common stock, or ii) upon consummation of a transaction resulting in a change in control of the Company.

RSUs granted in 2022 and 2021 generally vest over a 4-year service period and upon either i) completion of an initial public offering of the Company's common stock, or ii) upon consummation of a transaction resulting in a change in control of the Company. RSUs granted as replacement awards in the Blockcap acquisition on July 30, 2021 vest based on a service period only and are not subject to any transaction-based vesting conditions.

A summary of RSU activity for the year ended December 31, 2022 is as follows (amounts in thousands, except per share amounts):

|  | Number of Shares | | Weighted-Average Grant Date Fair Value |
| --- | --- | --- | --- |
| Unvested - December 31, 2021 | 88,600 | $ | 7.74 |
| Granted | 28,897 | | 2.84 |
| Vested | (53,908) | | 2.49 |
| Forfeited | (18,372) | | 4.65 |
| Unvested - December 31, 2022 | 45,217 | $ | 2.79 |

As of December 31, 2022, the Company had approximately $98.2 million of unrecognized stock-based compensation expense, of which $75.3 million is expected to be recognized over a weighted-average time period of 3.0 years and $22.9 million is related to RSUs for which some or all of the requisite service had been provided under the service condition but had performance conditions that had not yet been achieved. For RSUs subject to both the service and performance conditions, the unrecognized compensation expense will be recognized as expense when it is probable that the performance conditions will be achieved. The performance conditions for the RSUs are satisfied upon the earlier of a change in control or an initial public offering. The closing of the Merger Agreement with XPDI in January 2022 did not meet the definition of a change in control or an initial public offering. The performance condition can be met in future years only with respect to a change in control or waiver of the condition by the Company's board of directors and is not expected to occur, if at all, prior to expiration of the applicable lock-up period. If the performance conditions become probable of being achieved before the end of the requisite service period, the unrecognized compensation expense for which requisite service has not been provided will be recognized as expense prospectively on an accelerated attribution basis over the remaining requisite service period.

## 17. INCOME TAXES

Current income tax expense represents the amount expected to be reported on the Company's income tax returns, and deferred tax expense or benefit represents the change in net deferred tax assets and liabilities. Deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis of assets and liabilities as measured by the enacted tax rates that will be in effect when these differences reverse. Valuation allowances are recorded as appropriate to reduce deferred tax assets to the amount considered more likely than not to be realized. The Company had $17.1 million of income tax benefit for the year ended December 31, 2022 and $15.8 million income tax expense for the year ended December 31, 2021. There was no income tax expense for the year ended December 31, 2020.

154

core-20221231                                                     https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Current tax: | | | |
| Federal | $ 74 | $ — | $ — |
| State | 1,356 | 6,235 | — |
| Total current tax | 1,430 | 6,235 | — |
| Deferred tax: | | | |
| Federal | (18,532) | 11,218 | — |
| State | 11 | (1,690) | — |
| Total deferred tax | (18,521) | 9,528 | — |
| Total income tax (benefit) expense | $ (17,091) | $ 15,763 | $ — |

155

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The reconciliation between the U.S. statutory tax rate and the Company's effective tax rate is presented as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| U.S. federal statutory income tax (benefit) expense applied to loss before income taxes | $ (454,316) | $ 13,246 | $ (2,563) |
| State income taxes, net of federal benefit | (31,667) | 3,591 | (410) |
| Stock compensation | 4,789 | 141 | — |
| Non-deductible interest | 11,366 | 5,310 | — |
| Fair value adjustment - convertible notes | (10,942) | 3,370 | — |
| Non-deductible expenses | 288 | (702) | — |
| Valuation allowance | 241,892 | (9,180) | 1,106 |
| Deferred tax adjustments | — | — | 1,827 |
| Goodwill impairment | 221,499 | | |
| Other permanent items | — | (13) | 40 |
| Total income tax expense | $ (17,091) | $ 15,763 | $ — |

The Company's deferred tax assets and liabilities are detailed as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Deferred tax assets: | | | |
| Net operating loss carryforward | $ 79,729 | $ 29,837 | $ 10,674 |
| Capital loss carryforward | 52,765 | | |
| Deferred interest carryforward | 11,289 | — | 137 |
| Research tax credit carryforward | 404 | 404 | — |
| Reserves and accruals | 4,248 | 148 | 159 |
| Stock-based compensation | 16,917 | 15,190 | 3,579 |
| Unrealized capital loss | — | — | 548 |
| Property, plant and equipment, net | 70,464 | — | |
| Digital asset impairment loss | — | 8,368 | 61 |
| Debt extinguishment loss | 2,561 | 2,558 | 406 |
| Intangibles (other than goodwill) | 2,301 | 2,270 | 3,015 |
| Leases | 7,062 | 5,231 | — |
| Capitalized research and development expenses | 801 | | |
| Other | 169 | 3 | — |
| Gross deferred tax assets | 248,710 | 64,009 | 18,579 |
| Valuation allowance | (248,710) | (6,781) | (15,961) |
| Deferred tax assets, net of valuation allowance | — | 57,228 | 2,618 |
| Deferred tax liabilities: | | | |
| Property, plant and equipment, net | — | (75,759) | (2,618) |
| Deferred tax liabilities, net | — | (75,759) | (2,618) |
| Total net deferred tax assets (liabilities) | $ — | $ (18,531) | $ — |

156

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The changes in the Company's valuation allowance were as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Beginning Balance | $ 6,781 | $ 15,961 | $ 14,855 |
| Change related to current net operating losses and impairments | 241,892 | 20,680 | 2,238 |
| Net change related to generation of tax attributes | — | (695) | 695 |
| Change related to deferred tax adjustments | 37 | (20,025) | (1,827) |
| Change related to prior period adjustments | — | (137) | |
| Acquisition deferred tax liabilities | — | (9,003) | — |
| Ending Balance | $ 248,710 | $ 6,781 | $ 15,961 |

Realization of deferred tax assets is dependent upon the generation of future taxable income, if any, the timing and amount of which are uncertain. The assessment regarding whether a valuation allowance is required on deferred tax assets considers the evaluation of both positive and negative evidence when concluding whether it is more likely than not that deferred tax assets are realizable. After reviewing the positive and negative evidence available, the Company has recorded a valuation allowance of $248.7 million. The valuation allowance primarily relates to deferred tax assets for fixed assets, net operating loss carryforwards and capital loss carryforwards.

In connection with the Blockcap and Radar acquisition on July 30, 2021, the Company recognized a deferred tax liability of $9.0 million during the year. As a result, the Company recorded an income tax benefit of $9.0 million for the release of the valuation allowance on the existing deferred tax assets because of the offset of the deferred tax liabilities established for fixed and intangible assets from the acquisition.

As of December 31, 2022, the Company has federal and state net operating loss carryforwards in the amount of $344.6 million and $198.5 million, respectively. As of December 31, 2021, the Company had federal and state net operating loss carryforwards in the amount of $142.3 million and $16.0 million, respectively. The federal net operating loss can be carried forward indefinitely, however the utilization of the federal net operating loss for a tax year is equal to the lesser of (1) the aggregate of the net operating loss carryovers to such year, plus the net operating carrybacks to such tax year, or (2) 80% of taxable income determined without regard to the deduction. The Company's state net operating loss carryforwards range from 2035 to indefinite. As of December 31, 2022, the Company had U.S. federal and state capital loss carryforwards of $220.7 million and $193.4 million, respectively. The capital loss carryforwards begin to expire in 2027.

In addition, the Company's net operating loss may be subject to utilization limitations due to changes of control, as defined by tax law under Internal Revenue Code Sections 382. Similar provisions may subject the capital loss carryforwards to utilization limitation. The Company completed a Section 382 study related to the acquired Blockcap tax attributes and determined there are no limitations on future utilization of the acquired attributes.

The Company had no unrecognized income tax benefits for the years ended December 31, 2022, 2021 and 2020. To date, no interest and penalties have been recognized related to the underpayment of income taxes. The Company continues to believe its positions are supportable; however, due to uncertainties in any tax audit outcome, the Company's estimates of the ultimate settlement of uncertain tax positions may change and the actual tax benefits may differ from the estimates.

The Company files income tax returns in the U.S. federal and various state jurisdictions. The Company's 2018 through 2021 tax years are subject to U.S. federal and state examination.

## 18. NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS

Basic EPS is measured as the income or loss available to common stockholders divided by the weighted average common shares outstanding for the period. Diluted EPS presents the dilutive effect on a per-share basis from the potential conversion of convertible securities or the exercise of options and/or warrants; the dilutive impacts of potentially convertible securities are

calculated using the if-converted method; the potentially dilutive effect of options or warrants are computed using the treasury stock method.

157

Debtors' Exhibit No. 40
Page 332 of 462

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

Securities that potentially have an anti-dilutive effect (i.e., those that increase income per share or decrease loss per share) are excluded from the diluted EPS calculation.

Upon the closing of the Merger Agreement with XPDI in January 2022, the Convertible Notes became convertible into common shares at the option of the holder at a conversion price equal to $8.00 per share and also began to meet the definition of a participating security. On or after the closing of the Merger, dividend payments made to equity holders of the Company are also made ratably to holders of the Convertible Notes on an as-converted basis. As a result, the Convertible Notes meet the definition of participating securities based on their respective rights to receive dividends and they are treated as a separate class of securities in computing basic EPS using the two-class method. Under the two-class method, all earnings (distributed and undistributed) are allocated to common stock and participating securities. However, undistributed losses are not allocated to the Convertible Notes under the two-class method because holders of the Convertible Notes do not have a contractual obligation to share in the losses of the Company. Diluted EPS for the Convertible Notes is calculated under both the two-class and if-converted methods, and the more dilutive amount is reported.

Restricted stock awards assumed from Blockcap in July 2021 and the SPAC Vesting Shares issued as part of the XPDI Merger in January 2022 also have non-forfeitable rights to receive dividends, if declared, and meet the definition of participating securities. Because these instruments do not have a contractual obligation to share in the losses of the Company, undistributed losses are not allocated to them.

As discussed in Note 1 — Organization and Description of Business, the shares and corresponding capital amounts and earnings per share available for common stockholders prior to the Merger with XPDI have been retroactively restated as shares reflecting the exchange ratio established in the Merger. As a result of the Merger, the Company has retrospectively adjusted the weighted average number of shares of common stock outstanding prior to January 19, 2022, by multiplying them by the exchange ratio of 1.6001528688 used to determine the number of shares of Class A common stock into which they converted.

4/8/2023, 10:22 PM

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The following table sets forth reconciliations of the numerators and denominators used to compute basic and diluted earnings per share (in thousands, except per share amounts):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | **2020** |
| Net (loss) income | $ | (2,146,318) | $ | 47,312 | $ | (12,206) |
| Deemed dividend from common to preferred exchange | | — | | — | | (10,478) |
| | $ | (2,146,318) | $ | 47,312 | $ | (22,684) |
| Weighted average shares outstanding - basic | | 340,647 | | 207,263 | | 157,602 |
| Add: Dilutive share-based compensation awards | | — | | 26,042 | | — |
| Weighted average shares outstanding - diluted | | 340,647 | | 233,305 | | 157,602 |
| Net (loss) income per share - basic | $ | (6.30) | $ | 0.23 | $ | (0.14) |
| Net (loss) income per share - diluted | $ | (6.30) | $ | 0.20 | $ | (0.14) |

Potentially dilutive securities includes securities not included in the calculation of diluted net loss per share because to do so would be anti-dilutive and contingently issuable shares for which all necessary conditions for issuance had not been satisfied by the end of the period. Potentially dilutive securities are as follows (in common stock equivalent shares, in thousands):

| | December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Stock options | 23,915 | 6,716 | 4,048 |
| Preferred stock | — | — | 10,827 |
| Warrants | 18,311 | — | 6,617 |
| Restricted stock | 45,217 | 84,035 | 60,719 |
| Share settled liability | — | 1,943 | — |
| SPAC vesting shares | 1,725 | — | — |
| Total potentially dilutive shares | 89,168 | 92,694 | 82,211 |

### 19. SEGMENT REPORTING

The Company's operating segments are aggregated into reportable segments only if they exhibit similar economic characteristics and have similar business activities.

The Company has two operating segments: "Equipment Sales and Hosting" which consists primarily of its blockchain infrastructure and third-party hosting business and equipment sales to customers, and "Mining" consisting of digital asset mining for its own account. The blockchain hosting business generates revenue through the sale of consumption-based contracts for its hosting services which are recurring in nature. Equipment sales revenue is derived from its ability to leverage its partnership with leading equipment manufacturers to secure equipment in advance, which is then sold to its customers when they are unable to obtain them otherwise. The Mining segment generates revenue from operating owned computer equipment as part of a pool of users that process transactions conducted on one or more blockchain networks. In exchange for these services, the Company receives digital assets.

The primary financial measures used by the CODM to evaluate performance and allocate resources are revenue and gross profit. The CODM does not evaluate performance or allocate resources based on segment asset or liability information; accordingly, the Company has not presented a measure of assets by segment. The segments' accounting policies are the same as those described in

Debtors' Exhibit No. 40
Page 334 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

the summary of significant accounting policies. The Company excludes certain operating expenses and other expense from the allocations to operating segments.

159

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

The following table presents revenue and gross profit by reportable segment for the periods presented (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Equipment Sales and Hosting Segment** | | | |
| Revenue: | | | |
| Hosting revenue | $ 159,688 | $ 79,323 | $ 41,598 |
| Equipment sales | 82,829 | 248,235 | 12,595 |
| Total revenue | 242,517 | 327,558 | 54,193 |
| Cost of revenue: | | | |
| Cost of hosting services | 169,717 | 77,678 | 36,934 |
| Cost of equipment sales | 67,114 | 177,785 | 11,017 |
| Total cost of revenue | $ 236,831 | $ 255,463 | $ 47,951 |
| Gross profit | $ 5,686 | $ 72,095 | $ 6,242 |
| **Mining Segment** | | | |
| Digital asset mining income | $ 397,796 | $ 216,925 | $ 6,127 |
| Total revenue | 397,796 | 216,925 | 6,127 |
| Cost of revenue | 395,082 | 50,158 | 2,977 |
| Gross profit | $ 2,714 | $ 166,767 | $ 3,150 |
| Consolidated total revenue | $ 640,313 | $ 544,483 | $ 60,320 |
| Consolidated cost of revenue | $ 631,913 | $ 305,621 | $ 50,928 |
| Consolidated gross profit | $ 8,400 | $ 238,862 | $ 9,392 |

For the years ended December 31, 2022, 2021 and 2020, cost of revenue included depreciation expense of $12.1 million, $7.4 million and $7.4 million, respectively for the Equipment Sales and Hosting segment. For the years ended December 31, 2022, 2021 and 2020, cost of revenue included depreciation expense of $223.6 million, $24.3 million and $1.1 million, respectively for the Mining segment.

***Concentrations of Revenue and Credit Risk***

Financial instruments that potentially subject the Company to concentration of credit risk consist primarily of cash and cash equivalents and accounts receivable. Credit risk with respect to accounts receivable is concentrated with a small number of customers. The Company places its cash and cash equivalents with major financial institutions, which management assesses to be of high credit quality, in order to limit the exposure to credit risk. As of December 31, 2022 and 2021, all of the Company's fixed assets were located in the United States. For the years ended December 31, 2022 and 2021, 99% and 100% of the Company's revenue was generated in the United States, respectively. For the years ended December 31, 2022 and 2021, 62% and 40%, respectively, of the Company's total revenue was generated from digital asset mining of bitcoin, which is subject to extreme price volatility. As of December 31, 2022 and 2021, substantially all of our digital assets were held by two third-party digital asset services.

For the years ended December 31, 2022, 2021 and 2020, the concentration of customers comprising 10% or more of the Company's total revenue and Equipment Sales and Hosting segment revenue was as follows:

|  | Year Ended December 31, | | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2022 | 2021 | 2020 | 2022 | 2021 | 2020 |
|  | Percent of total revenue: | | | Percent of Equipment Sales and Hosting segment: | | |
| **Customer** | | | | | | |
| A | N/A | 15 % | N/A | N/A | 26 % | N/A |
| B | N/A | 14 % | N/A | N/A | 23 % | N/A |
| C | N/A | N/A | 24 % | N/A | N/A | 27 % |
| D | N/A | N/A | 13 % | N/A | N/A | 14 % |

160

Debtors' Exhibit No. 40
Page 337 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

A reconciliation of the reportable segment gross profit to (loss) income before income taxes included in the Company's Consolidated Statements of Operations for the years ended December 31, 2022, 2021 and 2020, is as follows (in thousands):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2022 | 2021 | 2020 |
| Reportable segment gross profit | $ 8,400 | $ 238,862 | $ 9,392 |
| (Loss) gain on legal settlement | — | (2,636) | 5,814 |
| Gain from sales of digital assets | 44,298 | 4,814 | 69 |
| Impairment of digital assets | (231,315) | (37,206) | (4) |
| Impairment of goodwill and other intangibles | (1,059,265) | — | — |
| Impairment of property, plant and equipment | (590,673) | — | — |
| Losses on exchange or disposal of property, plant and equipment | (28,025) | (118) | (2) |
| Operating expense: | | | |
| Research and development | 26,962 | 7,674 | 5,271 |
| Sales and marketing | 12,731 | 4,062 | 1,771 |
| General and administrative | 213,280 | 60,486 | 14,554 |
| Total operating expense | 252,973 | 72,222 | 21,596 |
| Operating (loss) income | (2,109,553) | 131,494 | (6,327) |
| Non-operating expense, net: | | | |
| Loss on debt extinguishment and other | 287 | 8,016 | 1,333 |
| Interest expense, net | 96,826 | 44,354 | 4,436 |
| Fair value adjustment on convertible notes | 186,853 | 16,047 | — |
| Fair value adjustment on derivative warrant liabilities | (37,937) | — | — |
| Reorganization items, net | (197,405) | — | — |
| Other non-operating expenses, net | 5,232 | 2 | 110 |
| Total non-operating expense, net | 53,856 | 68,419 | 5,879 |
| (Loss) income before income taxes | $ (2,163,409) | $ 63,075 | $ (12,206) |

161

Debtors' Exhibit No. 40
Page 338 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

## 20. RELATED-PARTY TRANSACTIONS

In the ordinary course of business, the Company enters into various transactions with related parties.

The Company has agreements to provide hosting services to various entities that are managed and invested in by individuals that are directors and executives of the Company. For the years ended December 31, 2022 and 2021, the Company recognized hosting revenue from the contracts with these entities of $29.5 million and $17.0 million, respectively. In addition, for the years ended December 31, 2022 and 2021, there was equipment sales revenue recognized of $71.4 million and $109.9 million to these same various entities. A nominal amount was receivable from these entities at December 31, 2022. As of December 31, 2021, the Company had accounts receivable of $0.3 million from these entities.

During the year ended December 31, 2021, the Company entered various promissory notes with Blockcap, a related party entity that was managed by individuals that are directors and executives of the Company. The Company had existing contracts for equipment sales and hosting services with Blockcap prior to the Company acquiring Blockcap on July 30, 2021, as described above. The promissory notes deferred $32.7 million of amounts originally due in June through July 2021, from Blockcap contracts until August 2021. The promissory notes were effectively settled by the Company's acquisition of Blockcap.

During the year ended December 31, 2021, Company paid $0.1 million for management and professional fees from an affiliated company that had been accrued by Blockcap prior to being acquired on July 30, 2021.

The Company reimburses certain officers and directors of the Company for use of a personal aircraft for flights taken on Company business. For the years ended December 31, 2022 and 2021, the Company incurred reimbursements of $1.9 million and $1.4 million, respectively. Nominal amounts were payable at December 31, 2022 and 2021.

## 21. SUBSEQUENT EVENTS

### The Replacement DIP Facility

As previously discussed in Note 3 — Chapter 11 Filing and Other Related Matters, in connection with the Chapter 11 Cases, the Debtors entered into a Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of December 22, 2022 (the "Original DIP Credit Agreement"), with Wilmington Savings Fund Society, FSB, as administrative agent, and the lenders from time to time party thereto, which was authorized, on an interim basis, pursuant to an order of the Bankruptcy Court on December 23, 2022 (the "Original Interim DIP Order"). In connection therewith, the Company utilized $37.5 million of the approximately $57.3 million available under the Original DIP Credit Agreement.

Subsequent to the Original Interim DIP Order, the Debtors sought new financing with improved terms to replace the Original DIP Credit Agreement. On February 2, 2023, the Bankruptcy Court entered an interim order (the "Replacement Interim DIP Order") authorizing, among other things, the Debtors to (i) obtain senior secured non-priming super-priority replacement post-petition financing (the "Replacement DIP Facility") from B. Riley Commercial Capital, LLC (the "Replacement DIP Lender") and (ii) refinance the Original DIP Credit Agreement.

The Replacement DIP Facility, among other things, provides for a non-amortizing super-priority senior secured term loan facility in an aggregate principal amount not to exceed $70 million. Under the Replacement DIP Facility, (i) $35 million was available following Bankruptcy Court approval pursuant to the Replacement Interim DIP Order and (ii) up to $35 million became available following Bankruptcy Court approval on a final basis (the "Final DIP Order").

DIP Loans under the Replacement DIP Facility will bear interest at a rate of 10% which will be payable in kind in arrears on the first day of each month. The Replacement DIP Lender will receive an upfront commitment fee equal to 3.5% of the aggregate commitments under the Replacement DIP Facility, payable in kind, and exit fees equal to 5% of the amount of the DIP Loans being repaid, reduced or satisfied. The Replacement DIP Facility includes representations and warranties, covenants applicable to the Debtors, and events of default. If an Event of Default under the Replacement DIP Facility occurs, the Replacement DIP Lender may, among other things, permanently reduce any remaining commitments and declare the outstanding obligations under the Replacement DIP Facility to be immediately due and payable.

The maturity date of the Replacement DIP Facility is December 22, 2023, which can be extended, under certain conditions, by an additional three months to March 22, 2024. The Replacement DIP Facility will also terminate on the date that is the earliest of the

core-20221231

following (i) the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor; (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of the DIP Loans and the termination of the DIP Commitments; (iv) the date of the

162

Debtors' Exhibit No. 40
Page 340 of 462

Table of Contents

**Core Scientific, Inc.**
**(Debtor-in-Possession)**
**Notes to Consolidated Financial Statements**

DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default under the Replacement DIP Facility; and (v) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

**NYDIG Settlement**

On February 26, 2023, the Bankruptcy Court entered an order (the "NYDIG Order"), whereby the Debtors and NYDIG agree that the Debtors would transfer the ASICs serving as collateral under the NYDIG Loan back to NYDIG over a period of several months in exchange for the full extinguishment of the NYDIG Loan. The Company anticipates that the final shipment of ASICs serving as collateral under the NYDIG loan to occur on or about March 31, 2023, after which the NYDIG Loan will be extinguished in full.

**Priority Power Settlement**

On March 20, 2023, the Bankruptcy Court entered an order (the "Priority Power Order"), whereby the Debtors and Priority Power agree that the Debtors would transfer equipment to Priority Power and assume an Energy Management and Consulting Services Agreement and other new agreements.

Debtors' Exhibit No. 40
Page 341 of 462

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosures**

As previously reported in our Current Report on Form 8-K filed with the SEC on October 28, 2022 (the "October 28th Form 8-K"), at a meeting held on October 24, 2022, the Audit Committee of the Board of Directors of Core Scientific, Inc. (the "Company") approved the engagement of Marcum LLP ("Marcum") as its independent registered public accounting firm for the fiscal year ending December 31, 2022, subject to Marcum's completion of their client acceptance procedures. At the same meeting, the Audit Committee approved the dismissal of Ernst & Young LLP ("EY") as independent registered public accounting firm of the Company effective upon the date of the filing of the quarterly report on Form 10-Q for the quarter ending September 30, 2022.

The report of EY on the financial statements of Core Scientific Holding Co. and its subsidiaries ("Legacy Core") for the fiscal years ended December 31, 2021 and December 31, 2020, included in the Form 8-K/A of Core Scientific, Inc., which was filed with the SEC on March 31, 2022, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

In connection with the audits of Legacy Core's consolidated financial statements for each of the two fiscal years ended December 31, 2021 and December 31, 2020, and for the Company's financial statements in the subsequent interim periods through the date of the October 28th Form 8-K there were no (i) disagreements, as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions, between the Company and EY on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedure, which, if not resolved to the satisfaction of EY, would have caused EY to make reference to the matter in their reports for such fiscal years, and (ii) no "reportable events" (as that term is defined in Item 304(a)(1)(v) of Regulation S-K), except for the following material weaknesses identified in connection with the audit of Legacy Core's consolidated financial statements for the two fiscal years ended December 31, 2021 and December 31, 2020 and the review of the Company's consolidated financial statements for the interim period ended March 31, 2022 and the interim period ended June 30, 2022 in Core Scientific's internal control over financial reporting related to (i) insufficient accounting and supervision with respect to the appropriate level of technical accounting experience and appropriate processes and procedures to assess and apply the relevant accounting framework, particularly in new or non-routine areas, (ii) a lack of appropriate communication and recordkeeping, particularly related to equity transactions, (iii) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for manual journal entries to our books and records, and (iv) design deficiencies in internal controls necessary to enforce appropriate segregation of duties for our digital asset wallets.

The Company provided EY with a copy of the disclosures it is making in the October 28th Form 8-K and requested that EY furnish the Company a letter addressed to the U.S. Securities and Exchange Commission stating whether it agrees with the above statements. A copy of EY's letter, dated October 28, 2022, was filed as Exhibit 16.1 to the October 28th Form 8-K.

Subsequently, as reported on our Current Report on Form 8-K/A filed with the SEC on November 23, 2022 (the "November 23rd 8-K/A), on November 22, 2022, Marcum completed its client acceptance procedures. During the Company's two most recent fiscal years ended December 31, 2021 and 2020, and the subsequent interim period through November 22, 2022, neither the Company nor anyone acting on its behalf consulted with Marcum regarding either: (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, in connection with which either a written report or oral advice was provided to the Company that Marcum concluded was a factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) or reportable event (as defined in Item 304(a)(1)(v) of Regulation S-K).

**Item 9A. Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, have evaluated our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) prior to the filing of this annual report.

Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that, as of the end of the

period covered by this annual report, certain of our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting.

---

164

---

Debtors' Exhibit No. 40
Page 343 of 462

Table of Contents

**Management's Report on Internal Controls over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022. In making this assessment, our management used the criteria established in the Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO Framework. Based upon this evaluation and as discussed within this annual report, our management has concluded that, as of December 31, 2022, our internal control over financial reporting was not effective based on these criteria.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis. As of the end of the period covered by this report, our material weaknesses are as follows:

i.  The Company did not design and implement program change management controls for certain financially relevant systems to ensure that IT program and data changes affecting the Company's (i) financial IT applications, (ii) digital currency mining equipment, and (iii) underlying accounting records, are identified, tested, authorized and implemented appropriately to validate that data produced by its relevant IT system(s) were complete and accurate. Automated process-level controls and manual controls that are dependent upon the information derived from such financially relevant systems were also determined to be ineffective as a result of such deficiency.

ii. The Company did not design and/or implement user access controls to ensure appropriate segregation of duties that would adequately restrict user and privileged access to the financially relevant systems and data to the appropriate Company personnel.

iii. The Company's internal controls over financial reporting did not operate effectively at all times to ensure transactions were recorded timely and in accordance with GAAP. Appropriate segregation of duties was also not maintained at all times during the year.

With the oversight of our senior management and audit committee, we have instituted plans to remediate the material weakness and will continue to take remediation steps, including hiring additional key supporting accounting personnel with public company reporting and accounting operations experience. In addition, we are formalizing inter-departmental communication, including establishing appropriate standing and ad hoc committees, and enhancing electronic document storage for key financial transactions. We believe the measures described above will remediate the material weaknesses identified and strengthen our internal control.

This annual report on Form 10-K does not include an attestation report of our independent registered accounting firm regarding internal control over financial reporting due to a transition period established by rules of the SEC for an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012.

**Changes in Internal Control over Financial Reporting**

During the most recently completed fiscal quarter, there was no change in Core Scientific, Inc.'s internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Remediation Efforts to Address Previously Disclosed Material Weakness**

Our management, with oversight from our audit committee, has taken steps to implement the following remediation actions to address the previously disclosed material weakness and to improve our internal control over financial reporting, primarily through:

•  increasing the depth and experience within our accounting and finance organization;

•  enhancing the communication and coordination among our accounting and financial reporting department and expanded cross-functional involvement and input into period-end disclosures; and

•  implementing additional internal reporting procedures, including enhancing the analytical procedures used to assess period-end balances, to add depth to our review process and improve our segregation of duties.

While we believe these efforts will remediate the material weaknesses, these material weaknesses cannot be considered fully remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

165

Debtors' Exhibit No. 40
Page 345 of 462

Table of Contents

**Limitations on Controls**

Our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving the desired control objectives. Our management recognizes that any control system, no matter how well designed and operated, is based upon certain judgments and assumptions and cannot provide absolute assurance that its objectives will be met. Similarly, an evaluation of controls cannot provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected.

**Item 9B. Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

4/8/2023, 10:22 PM

Table of Contents

**Part III**

**Item 10. Directors, Executive Officers and Corporate Governance**

**Description of the Business Combination Completed in January 2022**

Although our business operations date uninterrupted back to 2018 (and was known as "Core Scientific" (through the corporation known as Core Scientific Holding Co., a Delaware corporation and its subsidiary entities, collectively "Legacy Core")), the current corporate entity operating our business was formerly known as Power & Digital Infrastructure Acquisition Corp. ("XPDI") which was a special purpose acquisition corporation formed for the purpose of acquiring an operating business such as Legacy Core. On July 20, 2021, XPDI, Core Scientific Holding Co., and XPDI Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of XPDI ("Merger Sub") entered into an Agreement and Plan of Reorganization of Merger (as amended on October 1, 2021, and as further amended on December 29,2021, the "Merger Agreement"). Pursuant to the terms of (a) the Merger Agreement and (b) that certain Agreement and Plan of Merger, dated as of October 1, 2021, as amended on January 14, 2022, by and among XPDI, Legacy Core, XPDI Merger Sub 3, LLC, a Delaware limited liability company and wholly owned subsidiary of XPDI ("Merger Sub 3"), and Blockcap, Inc., a Nevada corporation and wholly owned subsidiary of Legacy Core ("Blockcap"), the Business Combination (as defined below) was effected by (i) the merger of Merger Sub with and into Legacy Core (the "First Merger"), which occurred on January 19, 2022, with Legacy Core surviving the First Merger as a wholly owned subsidiary of XPDI, (ii) the merger of Legacy Core with and into XPDI (the "Second Merger"), which occurred on January 20, 2022, with XPDI surviving the Second Merger, and (iii) following the closing of the Second Merger on January 20, 2022, the merger of Blockcap with and into Merger Sub 3 (the "Third Merger" and collectively with the First Merger, the Second Merger and the other transactions described in the Merger Agreement, the "Business Combination"), with Merger Sub 3 surviving the Third Merger as a wholly owned subsidiary of XPDI under the name "Core Scientific Acquired Mining LLC." Immediately prior to the effective time of the First Merger, XPDI filed a Second Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware pursuant to which XPDI changed its name from "Power & Digital Infrastructure Acquisition Corp." to "Core Scientific, Inc."

*As the context requires, any reference in this Part III of this Annual Report on Form 10-K to "Core," "we," "us" or "our" refers to Legacy Core and the business conducted by Legacy Core and its consolidated subsidiaries prior to the consummation of the Business Combination and/or to the current entity Core Scientific, Inc. and its consolidated subsidiaries following the Business Combination, as applicable. All share counts in this section are shown on a post-Business Combination basis.*

**Directors and Executive Officers**

The following table sets forth information covering our current directors and executive officers. There are no family relationships between any of our directors or executive officers, and there is no arrangement or understanding between any director or executive officer and any other person pursuant to which the director or executive officer was selected.

| Name | Age | Title |
| --- | --- | --- |
| Michael Levitt | 64 | Chief Executive Officer and Co-Chair of the Board of Directors |
| Todd M. DuChene | 59 | President and Chief Legal Officer |
| Denise Sterling | 58 | Executive Vice President, Chief Financial Officer |
| Darin Feinstein | 51 | Executive Vice President, Corporate Strategy and Co-Chair of the Board of Directors |
| Jarvis Hollingsworth | 60 | Director |
| Matt Minnis | 58 | Director |
| Kneeland Youngblood | 67 | Director |
| Neal P. Goldman | 53 | Director |

**Michael Levitt.** Mr. Levitt has served as our Chief Executive Officer and Co-Chair and a member of the Company's Board of Directors since January 2022. Mr. Levitt served as the Chief Executive Officer of Legacy Core from May 2021 until the Business Combination, and as Chairman and a member of Legacy Core's board of directors from June 2018 until the Business Combination. Mr. Levitt has also served as Chairman of Irradiant Partners, LP since October 2021. From July 2016 to July 2021, Mr. Levitt was the Chief Executive Officer of Kayne Anderson Capital Advisors, L.P. Prior to joining Kayne, Mr. Levitt served as a Vice Chairman and

Partner of Apollo Global Management, LLC (NYSE: APO) from April 2012 to May 2016. Mr. Levitt joined Apollo following

167

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

Apollo's acquisition of Stone Tower Capital LLC, an investment firm, which he founded in 2001 and where he served as Chairman of the board of directors, Chief Executive Officer and Chief Investment Officer. Prior to that, Mr. Levitt worked as a Partner at Hicks, Muse, Tate & Furst Incorporated, a private equity firm. Earlier in his career, Mr. Levitt served as the Co-Head of the Investment Banking Division of Smith Barney Inc. Mr. Levitt began his investment banking career at Morgan Stanley & Co., Inc. Mr. Levitt has served on the board of directors of The Music Acquisition Corporation (NYSE: TMAC) from December 2020 to December 2022, and served on the board of directors of Kayne Anderson BDC, LLC from May 2018 to October 2021. Mr. Levitt holds a B.B.A. and J.D. from the University of Michigan. We believe that Mr. Levit's significant financial expertise, his knowledge of the corporate credit and investment markets, his business acumen and his leadership as a sitting Chief Executive Officer provide him with the qualifications and skills to serve on our Board.

**Todd DuChene.** Mr. DuChene has served as our President and Chief Legal Officer since November 2022. He served as EVP, General Counsel, Chief Compliance Officer and Secretary from January 2022 to November 2022. Mr. DuChene served as the General Counsel and Secretary of Legacy Core from April 2019 until the Business Combination. Prior to joining Legacy Core, Mr. DuChene served as Senior Vice President, General Counsel and Secretary and Chief Compliance Officer for FLIR Systems, Inc., an industrial and military technology company, from September 2014 to April 2019. Prior to joining FLIR, Mr. DuChene served as Executive Vice President, General Counsel and Secretary of Nuance Communications, Inc., a leading provider of speech recognition and related technology to enterprise, healthcare and mobile and consumer customers from October 2011 to September 2014. Previously, Mr. DuChene served as Senior Vice President, General Counsel and Secretary of National Semiconductor Corporation from January 2008 to October 2011, prior to its acquisition by Texas Instruments Inc. In addition, Mr. DuChene has served as General Counsel to each of Solectron Corporation, Fisher Scientific International Inc. (now ThermoFisher Scientific) and OfficeMax, Inc. Mr. DuChene began his legal career as an associate with BakerHostetler (a law firm) in Cleveland, Ohio in 1988. Mr. DuChene holds a B.A. in Political Science from The College of Wooster and a J.D. from the University of Michigan Law School.

**Denise Sterling.** Ms. Sterling has served as our Executive Vice President, Chief Financial Officer since April 2022. In October 2022, Ms. Sterling was appointed as Principal Accounting Officer. Ms. Sterling previously served as the Company's Senior Vice President of Finance from May 2021 to April 2022. Before joining the Company, Ms. Sterling worked for Oportun, a Nasdaq-listed financial services company that leverages its digital platform to provide responsible consumer credit to hardworking people, as Senior Vice President of FP&A and Finance from June 2018 to May 2021. Ms. Sterling served in various tax and finance roles for Visa from 1995 to 2018, including as Senior Vice President of the Global Risk Management team from November 2016 to June 2018. Ms. Sterling holds a bachelor's degree in accounting from San Francisco State University and a master's degree in tax from Golden Gate University. She is a Certified Public Accountant.

**Darin Feinstein.** Mr. Feinstein has served as our Co-Chair and Executive Vice President, Corporate Strategy since January 2022. From July 2021 through January 2022 Mr. Feinstein served as Co-Chair and Chief Vision Officer. Mr. Feinstein is an American entrepreneur who has been involved in many ventures within the digital assets space since 2012. Mr. Feinstein co-founded Legacy Core in 2017 and founded Blockcap in 2020. In addition to these blockchain companies, Mr. Feinstein owns and operates a portfolio of business ventures across a variety of industries including live entertainment, finance, food and beverage, hospitality and technology, among others. Mr. Feinstein is a philanthropist who co-founded The Feinstein Griffin foundation, with Eddie Griffin, and Mr. Feinstein and Mr. Griffin for the past decade have been hosting events and donating to various charities around the United States. Mr. Feinstein is a California Licensed attorney (currently non-practicing) and holds many privileged licenses including a gaming license, liquor licenses and various financial licenses in multiple states across the United States. We believe that Mr. Feinstein's significant experience in the digital asset space and his institutional knowledge of our businesses as a co-founder of Legacy Core and Blockcap provide him with the qualifications and skills to serve on our Board.

**Jarvis Hollingsworth.** Mr. Hollingsworth has served as a member of our Board since January 2022. Mr. Hollingsworth has served as Chairman of the Board of Trustees of the Teacher Retirement System of Texas, a $190 billion pension trust fund for retirees, teachers and employees of education-related institutions since November 2019. Since November 2019, Mr. Hollingsworth has also served on the board of directors of Vital Energy, Inc. (NYSE: VTLE), a diversified energy company, and on the finance committee of the Memorial Hermann Hospital System since May 2017. Mr. Hollingsworth has also served as Vice Chairman at Irradiant Partners, LP since September 2021. Mr. Hollingsworth served as General Counsel and a member and executive committee member of the board of directors for Kayne Anderson Capital Advisors, L.P., a leading alternatives investment management firm from May 2019 to July 2021. Mr. Hollingsworth served as a director of Emergent Technologies LP, a fintech company that provides payment services in emerging markets using a gold-backed digital currency from April 2016 to November 2019, and from May 2017 to July 2019 served as a director of Cullen Frost Bankers, Inc. (NYSE: CFR). Mr. Hollingsworth holds a Bachelor of Science from

core-20221231

the United States Military Academy at West Point and served for several years on active and reserve duty in the United States Army. Mr. Hollingsworth holds a J.D. from the University of Houston Law Center. We believe that Mr. Hollingsworth's knowledge of the digital assets industry

168

Table of Contents

and his understanding of public company governance and operations from his service on public company boards of directors provide him with the qualifications and skills to serve on our Board.

**Matt Minnis.** Mr. Minnis has served as a member of our Board since January 2022. Mr. Minnis co-founded Legacy Core in 2017 and served as a member of its board of directors from June 2018 until the Business Combination. Mr. Minnis has also served as Managing Member of BEP 888 and BEP 999 digital asset mining companies, which were founded in 2020. Further, Mr. Minnis has served as Chairman of the board of directors of Pledgling Technologies, Inc., a company focused on charitable donations, which he co-founded in 2014. Mr. Minnis has also served as President and Chief Executive Officer of Minnis Investments LLC, a private investment firm focused on early-stage technology companies, real estate and venture capital investments since 2009. Mr. Minnis holds a B.B.A. in Marketing and M.B.A. in Finance from Texas Christian University. We believe that Mr. Minnis' knowledge of Legacy Core and the digital asset mining industry as well as his investment and venture capital expertise provide him with the qualifications and skills to serve on our Board.

**Kneeland Youngblood.** Mr. Youngblood has served as a member of our Board since January 2022. Mr. Youngblood has served as a member of the board of directors of numerous TPG Pace SPAC transactions since 2015. Mr. Youngblood is a director nominee of TPG Pace Beneficial II Corp. Mr. Youngblood has served as a founding partner of Pharos Capital Group, LLC since 1998, a private equity firm that focuses on providing growth and expansion capital/buyouts in the health care service sector. Mr. Youngblood is a director of Mallinckrodt Pharmaceuticals, a director of Scientific Games Corporation and Chairman of the Finance Committee of the President's Advisory Board of the UT Southwestern Medical Center. Previously, Mr. Youngblood served as a member of the board of directors of Pace-I from September 2015 through its business combination with Playa in March 2017. Mr. Youngblood has also served as a member of the board of directors of Pace-II from June 2017 through its business combination with Accel. Mr. Youngblood is also a former director of Burger King Corporation, Starwood Hotels and Lodging, Gap Inc. and Energy Future Holdings (formerly TXXU). He also serves on several private company and not-for-profit boards. Mr. Youngblood graduated from Princeton University in 1978 with an A.B in Politics/Science in Human Affairs and earned an M.D. degree from the University of Texas, Southwestern Medical School. We believe that Mr. Youngblood's extensive leadership experience, expertise in growth investing and his service as a board member across a diverse set of industries provide him with the qualifications and skills to serve on our Board.

**Neal P. Goldman.** Mr. Goldman has served as a member of our Board since October 2022. Mr. Goldman has over 25 years of experience in investing and working with companies, in a variety of industries, to maximize shareholder value. Since January 2013, Mr. Goldman has served as the Managing Member of SAGE Capital Investments, LLC, a consulting firm specializing in independent board of director services, restructuring, strategic planning and transformations for companies in numerous industries, including healthcare, energy, technology, media, retail, gaming and industrials. Mr. Goldman was formerly a Managing Director at Och Ziff Capital Management, LP from 2014 to 2016 and before that, a Founding Partner of Brigade Capital Management, LLC, from 2007 to 2012, which he helped build to over $12 billion in assets under management. Prior to this, Mr. Goldman was a Portfolio Manager at MacKay Shields, LLC and also held various positions at Salomon Brothers Inc, both as a mergers and acquisitions banker and as an investor in the high yield trading group. Mr. Goldman currently serves as chairman of the board of directors of Talos Energy Inc. and Diamond Offshore, Inc., positions he has held since 2018 and 2021, respectively, and has been a member of the board of directors of Weatherford International plc since 2019. He served as chairman of Stone Energy Corporation, prior to its combination with Talos Energy, from 2017 to 2018. He previously served as a director on the board of Midstates Petroleum Company Inc. (from 2017 to 2019), Ditech Holding Corporation (from 2017 to 2019), Ultra Petroleum Corp. (from 2017 to 2019), Garrett Motion Inc. (from 2020 to 2021) and Redbox Entertainment Inc. (in 2022). He has also served on numerous other public and private company boards throughout his career including Fairway Markets, Eddie Bauer, Toys R Us, J. Crew, and NII Holdings. He earned a BA from the University of Michigan and an MBA from the University of Illinois. We believe that Mr. Goldman's extensive corporate governance and strategic planning expertise and his experience on multiple boards provide him with the qualifications and skills to serve on our Board.

There are no family relationships between or among any of our directors or nominees. There is no arrangement or understanding between any of our directors or nominees and any other person or persons pursuant to which he or she is to be selected as a director or nominee.

There are no legal proceedings to which any of our directors is a party adverse to us or any of our subsidiaries or in which any such person has a material interest adverse to us or any of our subsidiaries.

Debtors' Exhibit No. 40
Page 351 of 462

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires the Company's directors and executive officers and persons who beneficially own more than ten percent of a registered class of the Company's equity securities to file with the SEC initial reports of ownership and reports of changes in ownership of equity securities of the Company. To the Company's knowledge, based solely on a review of the copies of such filings on file with the SEC and written representations from the Company's directors and executive officers, we believe that during 2022, all transactions were reported on a timely basis except for:

- one Form 4 by Todd DuChene reporting two transactions on June 13, 2022, which was filed on June 16, 2022,

- one Form 4 by Darin Feinstein reporting one transaction on May 27, 2022, which was filed on June 1, 2022,

- one Form 4 by Denise Sterling reporting two transactions on June 13, 2022, which was filed on June 16, 2022,

- one Form 4 by Brian Neville reporting two transactions on June 13, 2022, which was filed on June 16, 2022,

- one Form 4 by Michael Levitt reporting two transactions on June 13, 2022, which was filed on July 7, 2022,

- one Form 4 by Jarvis Hollingsworth reporting one transaction on June 13, 2022, which was filed on September 6, 2022,

- one Form 4 by Kneeland Youngblood reporting one transaction on June 13, 2022, which was filed on September 6, 2022, and

- one Form 4 by Stacie Olivares reporting one transaction on June 13, 2022, which was filed on September 6, 2022.

**Board Diversity**

The Board Diversity Matrix below provides the diversity statistics for our Board.

**Board Diversity Matrix (As of March 24, 2023)**

Total Number of Directors

|  | Female | Male | Non-Binary | Did Not Disclose Gender |
|---|---|---|---|---|
| **Part I: Gender Identity** | | | | |
| Directors | | 6 | | |
| **Part II: Demographic Background** | | | | |
| African American or Black | | 2 | | |
| Alaskan Native or Native American | | | | |
| Asian | | | | |
| Hispanic or Latinx | | | | |
| Native Hawaiian or Pacific Islander | | | | |
| White | | | | |
| Two or More Races or Ethnicities | | 4 | | |
| LGBTQ+ | | | | |
| Did Not Disclose Demographic Background | | | | |

**Board Leadership Structure**

Our Board is led by Mr. Levitt, who also serves as our Chief Executive Officer. Mr. Feinstein is Co-Chair and EVP, Corporate Strategy. We believe that combining the positions of Chief Executive Officer and Chair of the Board will help to ensure that the Board and management will act with a common purpose and provide a single, clear chain of command to execute our strategic initiatives and business plans. In addition, we believe that a combined Chief Executive Officer/Chair is better positioned to act as a bridge between management and the Board, facilitating the regular flow of information.

Our Board has appointed Mr. Hollingsworth as lead independent director in order to help reinforce the independence of the

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Board as a whole. The position of lead independent director has been structured to serve as an effective balance to Mr. Levitt's leadership as the combined Chief Executive Officer and Chair. The lead independent director is empowered to, among other duties

170

Table of Contents

and responsibilities, work with the Chief Executive Officer to develop and approve an appropriate board meeting schedule; work with the Chief Executive Officer to develop and approve meeting agendas; provide the Chief Executive Officer feedback on the quality, quantity and timeliness of the information provided to the Board; develop the agenda and moderate executive sessions of the independent members of the Board; preside over board meetings when the Chief Executive Officer is not present or when such person's performance or compensation is discussed; act as principal liaison between the independent members of the Board and the Chief Executive Officer; convene meetings of the independent directors as appropriate; and perform such other duties as may be established or delegated by the Board. As a result, we believe that the lead independent director can help ensure the effective independent functioning of the Board in its oversight responsibilities. In addition, we believe that the lead independent director serves as a conduit between the other independent directors and the Chair, for example, by facilitating the inclusion on meeting agendas of matters of concern to the independent directors.

**Role of the Board in Risk Oversight**

One of the key functions of our Board is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various standing committees of our Board that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements.

**Board Committees**

Our Board has three standing committees: an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee approved the formation of a Special Committee in November 2022. Each of these committees has authority to engage legal counsel or other experts or consultants, as it deems appropriate to fulfill its responsibilities. Copies of the standing committee charters are available on the investor relations page of our website, https://investors.corescientific.com, by clicking on the "Governance" tab. The information on our website is not part of this Annual Report on Form 10-K and is not deemed incorporated by reference into this Annual Report on Form 10-K or any other public filing made with the SEC.

*Audit Committee*

The Audit Committee is currently composed of three members: Mr. Youngblood, Mr. Hollingsworth and Mr. Goldman. Our Board has determined that each of these individuals meets the independence requirements of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act"), Rule 10A-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the applicable listing standards of the Nasdaq Stock Market ("Nasdaq"). Each member of our audit committee can read and understand fundamental financial statements in accordance with Nasdaq audit committee requirements. Additionally, our Board has determined that each of Mr. Hollingsworth, Mr. Goldman and Mr. Youngblood are qualified as audit committee financial experts within the meaning of SEC regulations and meet the financial sophistication requirements of the applicable Nasdaq listing rules. In arriving at this determination, the Board has examined each audit committee member's scope of experience and the nature of their prior and/or current employment and has determined that each audit committee member qualifies as a financial expert as defined in Item 407(d) of Regulation S-K. Both our independent registered public accounting firm and management periodically meet privately with our audit committee.

The primary purpose of the Audit Committee is to discharge the responsibilities of the Board with respect to corporate accounting and financial reporting processes, systems of internal control and financial statement audits, and to oversee our independent registered public accounting firm. Specific responsibilities of the audit committee include:

- helping the Board oversee corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence and performance of a qualified firm to serve as the independent registered public accounting firm to audit the financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, the interim and   year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing related person transactions;

171

core-20221231

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40

Table of Contents

- obtaining and reviewing a report by the independent registered public accounting firm at least annually that describes internal quality control procedures, any material issues with such procedures and any steps taken to deal with such issues when required by applicable law; and

- approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

### *Compensation Committee*

The Compensation Committee is currently composed of two directors: Mr. Youngblood (Chair) and Mr. Minnis. Our Board has determined that each of the members of the Compensation Committee is a non-employee director, as defined in Rule 16b-3 promulgated under the Exchange Act and is "independent" as defined under the applicable listing standards of Nasdaq, including the standards specific to members of a compensation committee.

The primary purpose of the Compensation Committee is to discharge the responsibilities of the Board in overseeing the compensation policies, plans and programs and to review and determine the compensation to be paid to executive officers, directors and other senior management, as appropriate. Specific responsibilities of the compensation committee include:

- reviewing and approving the compensation of the chief executive officer, other executive officers and senior management;

- administering the equity incentive plans and other benefit programs;

- reviewing, adopting, amending and terminating incentive compensation and equity plans, severance agreements, profit sharing plans, bonus plans, change-of-control protections and any other compensatory arrangements for the executive officers and other senior management; and

- reviewing and establishing general policies relating to compensation and benefits of the employees.

### *Compensation Committee Processes and Procedure*

Typically, the compensation committee meets quarterly and with greater frequency if necessary. The compensation committee also acts periodically by unanimous written consent in lieu of a formal meeting. The agenda for each meeting is usually developed by the chair of the compensation committee, in consultation with our Chief Executive Officer and Chief Legal Officer. The Compensation Committee meets regularly in executive session. However, from time to time, the Compensation Committee may invite various members of management and other employees as well as outside advisors or consultants to make presentations, to provide financial or other background information or advice or to otherwise participate in Compensation Committee meetings. The Chief Executive Officer may not participate in, or be present during, any deliberations or determinations of the Compensation Committee regarding his compensation. The charter of the Compensation Committee grants the Compensation Committee full access to all books, records, facilities and personnel of the Company.

In addition, under the charter, the Compensation Committee has the authority to obtain, at the expense of the Company, advice and assistance from compensation consultants and internal and external legal, accounting or other advisors and other external resources that the Compensation Committee considers necessary or appropriate in the performance of its duties. The Compensation Committee has direct responsibility for the oversight of the work of any consultants or advisers engaged for the purpose of advising the Committee. In particular, the Compensation Committee has the sole authority to retain, in its sole discretion, compensation consultants to assist in its evaluation of executive and director compensation, including the authority to approve the consultant's reasonable fees and other retention terms. Under the charter, the Compensation Committee may select, or receive advice from, a compensation consultant, legal counsel or other adviser to the compensation committee, other than in-house legal counsel and certain other types of advisers, only after taking into consideration six factors, prescribed by the SEC, that bear upon the adviser's independence; however, there is no requirement that any adviser be independent.

### *Nominating and Corporate Governance Committee*

The Nominating and Corporate Governance Committee is currently composed of three directors: Mr. Hollingsworth (Chair), Mr. Minnis and Mr. Youngblood. All members of the Nominating and Corporate Governance Committee are independent.

The Nominating and Corporate Governance Committee of the Board is responsible for identifying and evaluating candidates,

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on the Board, considering and making recommendations to the Board regarding the composition and chairmanship of the committees of the Board, developing and making recommendations to the Board regarding corporate governance guidelines and matters, including in relation to

---

172

---

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 358 of 462

Table of Contents

corporate social responsibility and overseeing periodic evaluations of the performance of the Board, including its individual directors and committees.

The Nominating and Corporate Governance Committee believes that candidates for director should have certain minimum qualifications, including a reputation for integrity, honesty and adherence to high ethical standards; demonstrated business acumen, experience and the ability to exercise sound judgements in matters that relate to the current and long-term objectives of the Company and a willingness and ability to contribute positively to the decision-making process of the Company; a commitment to understand the Company and its industry and to regularly attend and participate in meetings of the Board and its committees; the interest and ability to understand the sometimes conflicting interests of the various constituencies of the Company, which include stockholders, employees, customers, governmental units, creditors and the general public, and to act in the interests of all stockholders; and the ability to serve for at least three years before reaching the age of 75. The Nominating and Corporate Governance Committee also believes that candidates for director should not have, nor appear to have, a conflict of interest that would impair the candidate's ability to represent the interests of all the Company's stockholders and to fulfill the responsibilities of a director. However, the Nominating and Corporate Governance Committee retains the right to modify these qualifications from time to time. Candidates for director nominees are reviewed in the context of the current composition of the Board, the operating requirements of the Company and the long-term interests of stockholders, and the Nominating and Corporate Governance Committee has direct input from the Chairman of the Board and the Chief Executive Officer.

Our Nominating and Corporate Governance Committee has not adopted a formal diversity policy in connection with the consideration of director nominations or the selection of nominees but believes that our Board, taken as a whole, should embody a diverse set of skills, experiences and backgrounds. In this regard, the Nominating and Corporate Governance Committee will consider issues of diversity among its members in identifying and considering nominees for director and strive where appropriate to achieve a diverse balance of backgrounds, perspectives, experience, age, gender, ethnicity and country of citizenship on our Board and its committees. The Nominating and Corporate Governance Committee does not make any particular weighting of diversity or any other characteristic in evaluating nominees and directors.

The Nominating and Corporate Governance Committee appreciates the value of thoughtful Board refreshment, and regularly identifies and considers qualities, skills and other director attributes that would enhance the composition of the Board. In the case of incumbent directors whose terms of office are set to expire, the Committee reviews these directors' overall service to the Company during their terms, including the number of meetings attended, level of participation, quality of performance and any other relationships and transactions that might impair the directors' independence. The Nominating and Corporate Governance Committee also takes into account the results of the Board's self-evaluation, conducted annually on a group and individual basis. In the case of new director candidates, the Nominating and Corporate Governance Committee also determines whether the nominee is independent, which determination is based upon applicable SEC rules and regulations and the advice of counsel, if necessary. The Nominating and Corporate Governance Committee then uses its network of contacts to compile a list of potential candidates, but may also engage, if it deems appropriate, a professional search firm. The Nominating and Corporate Governance Committee conducts any appropriate and necessary inquiries into the backgrounds and qualifications of possible candidates after considering the function and needs of the board. The Nominating and Corporate Governance Committee meets to discuss and consider the candidates' qualifications and then selects a nominee for recommendation to the board by majority vote.

The Nominating and Corporate Governance Committee will consider director candidates recommended by stockholders. The Nominating and Corporate Governance Committee does not intend to alter the manner in which it evaluates candidates, including the minimum criteria set forth above, based on whether or not a stockholder recommended the candidate. Stockholders who wish to recommend individuals for consideration by the Nominating and Corporate Governance Committee to become nominees for election to the Board may do so by delivering a written recommendation to the Nominating and Corporate Governance Committee at the following address: c/o Core Scientific, Inc., 2407 S. Congress Ave, Ste. E-101, Austin, Texas 78704 at least 120 days prior to the anniversary date of the mailing of our proxy statement for the last Annual Meeting of Stockholders. Submissions must include the full name of the proposed nominee, a description of the proposed nominee's business experience for at least the previous five years, complete biographical information, a description of the proposed nominee's qualifications as a director and a representation that the nominating stockholder is a beneficial or record holder of our common stock and has been a holder for at least one year. Any such submission must be accompanied by the written consent of the proposed nominee to be named as a nominee and to serve as a director if elected.

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

*Special Committee*

The Special Committee is currently composed of three directors: Mr. Kneeland, Mr. Goldman and Mr. Youngblood. All members of our Special Committee are independent (as independence is currently defined in Rule 5605(d)(2) of the Nasdaq listing

173

---

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 360 of 462

Table of Contents

standards). The Special Committee was formed to evaluate and consider potential restructuring transactions and other strategic alternatives in connection with its outstanding indebtedness and contractual and other liabilities, including restructuring, reorganization and other strategic alternatives. Each of the members of the Special Committee is a non-employee director, as defined in Rule 16b-3 promulgated under the Exchange Act. In making this determination, our Board has considered their requite qualifications, skills, and independence to exercise independent judgement in the evaluation of strategic alternatives and various restructuring activities.

### Stockholder Communications with the Board of Directors

Stockholders of the Company wishing to communicate with the Board or an individual director may send a written communication to the Board or such director c/o Core Scientific, Inc., 2407 S. Congress Ave, Ste. E-101, Austin, Texas 78704, Attn: Secretary. The Secretary will review each communication. The Secretary will forward such communication to the Board or to any individual director to whom the communication is addressed unless the communication contains advertisements or solicitations or is unduly hostile, threatening or similarly inappropriate, in which case the Secretary shall discard the communication or inform the proper authorities, as may be appropriate.

### Code of Business Conduct and Ethics

We have adopted a code of conduct (the "Code of Conduct") applicable to all employees, directors and officers, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. The Code of Conduct is available under the Governance section of our website at https://investors.corescientific.com. If we make any substantive amendments to the Code of Conduct or grants any waiver from a provision of the Code of Conduct to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

### Hedging Policy

Our Board has adopted an insider trading policy, which prohibits our employees, directors and certain consultants from engaging in hedging or monetization transactions with respect to our securities, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars, and exchange funds. In addition, our insider trading policy prohibits trading in derivative securities related to our securities, which include publicly traded call and put options, engaging in short selling of our common stock, purchasing our common stock on margin or holding it in a margin account and pledging our shares as collateral for a loan.

### Item 11. Executive Compensation

Our named executive officers for the fiscal year ended December 31, 2022 are:

- Michael Levitt, Chief Executive Officer;

- Todd M. DuChene, President and Chief Legal Officer;

- Denise Sterling, Executive Vice President and Chief Financial Officer; and

- Michael Trzupek, former Executive Vice President and Chief Financial Officer.

174

Table of Contents

**Summary Compensation Table**

The following table provides information regarding total compensation awarded to, earned by, and paid to our named executive officers for services rendered to the Company in all capacities for the fiscal years ended December 31, 2021 and 2022.

| Name and Principal Position | Year | Salary($)(1) | | Stock Awards($)(2) | All Other Compensation ($) | | Total($) |
|---|---|---|---|---|---|---|---|
| Michael Levitt(3) *Chief Executive Officer* | 2021 | 30,824 | (4) | 160,664,903 | — | | 160,695,727 |
| | 2022 | 60,165 | | 5,746,149 | — | | 5,806,314 |
| Todd M. DuChene(5) *President and Chief Legal Officer* | 2021 | 300,824 | | 12,292,500 | 498,691 | (8) | 13,092,015 |
| | 2022 | 300,824 | | 3,851,883 | 375,000 | (9) | 4,527,707 |
| Denise Sterling(6) EVP and *Chief Financial Officer* | 2021 | 194,505 | | — | 100,000 | (10) | 294,505 |
| | 2022 | 300,824 | | 242,422 | 50,000 | (9) | 593,246 |
| Michael Trzupek(7) *Former EVP and Chief Financial Officer* | 2021 | 300,824 | | 9,210,000 | — | | 9,510,824 |
| | 2022 | 105,495 | | 2,424,000 | 75,000 | (11) | 2,529,570 |

(1) Salary amounts represent actual amounts earned and paid during the fiscal year.

(2) Amounts reported represent the aggregate grant date fair value of RSUs granted to the named executive officer during the fiscal year. The aggregate grant date fair value for 2021 is based upon an estimate of the per share price of Legacy Core common stock at the grant date and for 2022, is based on the closing trading price of Core Scientific common stock on Nasdaq on the date of grant. In accordance with the Financial Accounting Standard Board Accounting Standards Codification, Topic 718, or ASC Topic 718, recognition of compensation cost was deferred until consummation of the Business Combination. Assumptions used in the calculation of these amounts are included in the notes to the Company's audited consolidated financial statements included in this Annual Report on Form 10-K. Values shown do not reflect the actual economic value realized or realizable by the named executive officers.

(3) Mr. Levitt was appointed as Legacy Core's Chief Executive Officer in July 2021.

(4) The salary reported for Mr. Levitt represents a pro-rata portion of his salary in 2021. His annualized base salary for 2021 and 2022 was $60,000.

(5) Mr. DuChene was appointed President and Chief Legal Officer effective November 14, 2022. Prior to that time he served as Executive Vice President and General Counsel.

(6) Ms. Sterling assumed the role of Chief Financial Officer on April 5, 2022. Ms. Sterling was hired as Senior Vice President Corporate Finance in May 2021 but she was not a named executive officer in 2021. The salary reported for Ms. Sterling for 2021 represents a pro-rata portion of her salary.

(7) Mr. Trzupek resigned from his position effective April 4, 2022.

(8) Amount shown represents $498,691 relocation expenses reimbursed by Legacy Core to Mr. DuChene.

(9) Amounts shown represent payments under the Key Employee Retention Program.

(10) Amount represents hiring bonus.

(11) Includes Mr. Trzupek's severance payment of $75,000, as described further below under "Potential Payments Upon Termination or Change in Control."

175

Table of Contents

**Narrative Disclosure to Summary Compensation Table**

*Annual Base Salary*

The compensation of Legacy Core's named executive officers is generally determined and approved by the compensation committee of its board of directors. The base salaries of each of the named executive officers for the fiscal years ended December 31, 2021 and 2022 are listed in the table below.

| Name | Fiscal Year 2021 Base Salary($) | Fiscal Year 2022 Base Salary($) |
|---|---|---|
| Michael Levitt(1) | 60,000 | 60,000 |
| Todd M. DuChene | 300,000 | 300,000 |
| Denise Sterling(2) | 300,000 | 300,000 |
| Michael Trzupek(3) | 300,000 | 300,000 |

(1) Mr. Levitt was appointed as Legacy Core's Chief Executive Officer in May 2021.

(2) Ms. Sterling assumed the role of Chief Financial Officer on April 5, 2022. She was appointed Senior Vice President Corporate Finance in May 2021 but not a named executive officer in 2021.

(3) Mr. Trzupek resigned from his role as Chief Financial Officer effective April 4, 2022.

*Annual Performance-Based Bonus Opportunity*

Our compensation program does not generally provide for cash bonus payments to any executive officer. For the fiscal years ended December 31, 2021 and 2022, executive officers were not eligible to receive performance-based cash bonuses.

*Equity-Based Incentive Awards*

Our equity-based incentive awards are designed to align our interests and those of our stockholders with those of our employees and consultants, including executive officers. The Board is responsible for approving equity grants.

To preserve cash and to incentivize exceptional performance from its executive officers, we have historically used RSUs as an incentive for long-term compensation to our executive officers. Our executives generally are awarded an initial grant in the form of RSUs in connection with their commencement of employment. Additional grants may occur periodically in order to specifically incentivize executives with respect to achieving certain corporate goals or to reward executives for exceptional performance. We may grant equity awards at such times as our Board determines appropriate.

Prior to the Business Combination, all RSUs were granted pursuant to (i) the Core Scientific, Inc. (f/k/a Mineco Holdings, Inc.) 2018 Omnibus Incentive Plan (as amended, the "2018 Plan"), (ii) the Blockcap, Inc. Equity Incentive Plan and (iii) the Amended and Restated 2018 Equity Incentive Plan (collectively, the "Legacy Core Plans"). For additional information regarding the equity awards held by the named executive officers as of December 31, 2022, please see the section below titled "—Outstanding Equity Awards at Fiscal Year-End of 2022."

On June 8, 2022, the Compensation Committee approved an amendment to the Company's award agreement for the restricted stock units ("RSUs") outstanding under the 2018 Plan to provide for the waiver and elimination of the requirement that the Company undergo a "change in control" or a "public offering" for full vesting of existing RSUs that have otherwise met the time vesting requirements (the "RSU Amendment"). The Board ratified the RSU Amendment on June 14, 2022. As a result of the RSU Amendment, all outstanding RSUs under the 2018 Plan that had not been forfeited prior to the date of the RSU Amendment are subject only to time-based vesting.

In connection with the Business Combination, on January 19, 2022, Company stockholders approved the Core Scientific, Inc. 2021 Equity Incentive Plan (the "2021 Plan") which provides for the grant of incentive stock options ("ISOs"), nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance awards and other forms of awards to employees, directors and consultants, including employees and consultants of Core's affiliates. The maximum number of Company common stock that may be issued under the 2021 Plan will not exceed 45,000,000 shares of Company common stock. In

Debtors' Exhibit No. 40
Page 363 of 462

core-20221231                                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

addition the number of shares reserved for issuance under the 2021 Plan will automatically increase on January 1 of each year, beginning on

176

Table of Contents

January 1, 2022 and continuing through and including January 1, 2031, in an amount equal to (i) 4% of the total number of shares of Company common stock outstanding on December 31 of the preceding year, or (ii)a lessor number of shares of Company common stock determined by the Company's Board prior to the date of increase. The maximum number of shares of Company common stock that may be issued upon the exercise of ISOs under the 2021 Plan is 45,000,000 shares. See Core Scientific, Inc. 2021 Equity Incentive Plan included as Exhibit 10.8 to the Company's Current Report on Form 8-K dated January 19, 2022 and filed with the SEC on January 24, 2022. Following the closing of the Business Combination, we no longer grant equity incentive awards under the Legacy Core Plans.

### Employment Agreements with Named Executive Officers

**Michael Levitt**. In October 2021, Legacy Core entered into an amended and restated employment agreement with Mr. Levitt, pursuant to which Mr. Levitt serves as our Chief Executive Officer. Mr. Levitt's agreement provides for a base salary of $60,000 and an initial award of RSUs convertible into 8,400,000 shares of common stock, which was granted to Mr. Levitt in July 2021. In addition, pursuant to the terms of his agreement, on January 19, 2022, Mr. Levitt was granted an award of 5,000,000 stock options having an exercise price of $16.24 per share and exercisable 25% on each of the first four anniversaries of the vesting commencement date in connection with the Business Combination. See the Outstanding Equity Awards table below for a description of the vesting terms of the RSUs. Mr. Levitt also has the opportunity to earn an additional annual grant of up to 1,600,000 RSUs subject to achievement of certain performance metrics established by the Board. If, for certain period during the term of his agreement, the positive total shareholder return ("TSR") of Core exceeds the TSR for the S&P 500 Index during the same period ("TSR Over Performance"), the Mr. Levitt is entitled to a bonus equal to the product of .0375 multiplied by the amount of the increase in Core equity value attributable to TSR Over Performance. The bonus amount is payable at the option and discretion of Core in cash, bitcoin or shares of common stock having a fair market value on the date of issue equal to the amount of the bonus. The term of Mr. Levitt's agreement continues until May 17, 2025, following which the agreement automatically renews for one additional year on each anniversary thereafter, unless, not less than ninety (90) days prior to the commencement of any such renewal term, either party has given written notice to the other that it does not wish to extend the agreement (a "Non-Renewal").

**Todd M. DuChene**. In December 2018, Legacy Core entered into a letter agreement with Mr. DuChene, effective upon his first day of employment on April 1, 2019. Mr. DuChene's agreement provides for a base salary of $300,000 and an initial award of RSUs convertible into 1,000,000 shares of common stock. See the Outstanding Equity Awards table below for a description of the vesting terms of the RSUs.

**Denise Sterling**. In May 2021, Legacy Core entered into a letter agreement with Ms Sterling. Ms. Sterling's agreement provided for a base salary of $300,000, a sign on bonus of $100,000 and an initial award of RSUs convertible into 300,000 shares of common stock (480,037 post Business Combination). See the Outstanding Equity Awards table below for a description of the vesting terms of the RSUs.

**Michael Trzupek**. In September 2020, Legacy Core entered into a letter agreement with Mr.Trzupek. Mr. Trzupek's agreement provided for a base salary of $300,000 and an initial award of RSUs convertible into 2,000,000 (3,200,251 post Business Combination) shares of common stock. His agreement also provided for payment equal to 3 months base salary if Mr. Trzupek's employment is terminated by other than for Cause. Mr. Trzupek's employment terminated in April 2022 and he was paid severance in the amount of $75,000 and 1,200,000 RSUs were determined to be time-vested and subject to the transaction vesting requirement under the 2018 Plan. See the Outstanding Equity Awards table below for a description of the vesting terms of the RSUs.

### Key Employee Retention Plan

On December 18, 2022, the Board approved and adopted the Core Scientific Key Employee Retention Plan (the "KERP"), which provides retention awards to certain key employees, including certain of the Company's named executive officers. Executive KERP amounts were paid upon adoption of the KERP, subject to possible clawback if the executive voluntarily terminates employment prior to vesting. The executive KERP awards will become vested upon the earlier of (a) twelve (12) months following execution of the KERP agreement and (b) the occurrence of a specified restructuring event, as defined in the KERP. If the Company terminates the executive's employment for "cause" or the executive voluntarily terminates his or her employment with the Company without "good reason" (each as defined in the KERP) prior to the award becoming vested, the executive will forfeit the award and must repay the Company the gross (pre-tax) amount of such award.

core-20221231

The KERP was formulated based upon the recommendations of the independent compensation consultant of the Compensation Committee of the Board.

Table of Contents

The following sets forth the amount awarded under the KERP for the Company's named executive officers, other than Mr. Levitt who is not a participant in the KERP:

| Named Executive Officer | Retention Award Amount | | Increased Salary Amount | |
|---|---|---|---|---|
| Todd M. DuChene *President and Chief Legal Officer* | $ | 375,000 | $ | 200,000 |
| Denise Sterling *Chief Financial Officer* | $ | 50,000 | $ | — |

### *Other Compensation and Benefits*

All of our named executive officers are eligible to participate in our employee benefit plans, including medical, dental, vision, life and accidental death and dismemberment insurance plans, in each case on the same basis as all of our other employees. We generally do not provide perquisites or personal benefits to the named executive officers.

We maintain a 401(k) plan that provides eligible U.S. employees with an opportunity to save for retirement on a tax advantaged basis. Eligible employees are able to defer eligible compensation up to certain Code limits, which are updated annually. We have the ability to make matching and discretionary contributions to the 401(k) plan. Currently, we do not make matching contributions or discretionary contributions to the 401(k) plan. The 401(k) plan is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986 (the "Code"), with the related trust intended to be tax exempt under Section 501(a) of the Code. As a tax-qualified retirement plan, contributions to the 401(k) plan are deductible by us when made and contributions and earnings on those amounts are not generally taxable to the employees until withdrawn or distributed from the 401(k) plan.

Our named executive officers did not participate in, or earn any benefits under, a nonqualified deferred compensation plan sponsored by Legacy Core during the fiscal years ended December 31, 2021 and 2022. Our Board may elect to provide our officers and other employees with nonqualified defined contribution or other nonqualified deferred compensation benefits in the future if it determines that doing so is in our best interests.

### *Potential Payments upon Termination or Change in Control*

Legacy Core has entered into certain agreements with Messrs. Levitt and DuChene that will require Core to provide compensation to such named executive officers in the event of a termination of employment of Core.

Pursuant to Mr. Levitt's employment agreement, in the event Mr. Levitt's employment is terminated by Core without cause, by Mr. Levitt for good reason, by either party after a change in control, or as a result of a non-renewal by the Company (in each case as such terms are defined in the employment agreement), Mr. Levitt is entitled to the following severance benefits, subject to his execution and non-revocation of a general release of claims: (i) base salary continuation for twelve months, (ii) bonus, if any, for the year in which the termination occurs in an amount equal to the target bonus amount approved by the Board, and (iii) if he timely elects coverage under COBRA, a cash payment equal to the full premium for actively employed executives of Core with the same level of coverage for twelve months following the date of termination. Mr. Levitt's employment agreement contains covenants regarding non-competition with Core and non-solicitation of Core's customers and employees, in each case for a period of one year following any termination of employment.

In addition, in the event Mr. Levitt's employment is terminated as a result of death or "disability" (as defined in his agreement), or by Core without "cause" or for "good reason", then all of the equity awards granted to Mr. Levitt during the term of his employment will become fully vested and exercisable as of the date of his termination.

Pursuant to the letter agreements entered into with each of Mr. DuChene and Ms. Sterling, in the event either of Mr DuChene's or Ms. Sterling's employment is terminated without "cause" (as defined in each officer's letter agreement), then subject to such officer's execution and non-revocation of a general release of claims, such officer is entitled to three months of base salary.

178

Debtors' Exhibit No. 40
Page 367 of 462

Table of Contents

### Separation Agreement with Former Chief Financial Officer

On April 4, 2022, Mr. Trzupek notified the Board of the Company of his decision to resign from his position, effective immediately.

On April 19, 2022, the Company and Mr. Trzupek reached an agreement regarding Mr. Trzupek's separation from the Company (the "Separation Agreement"), effective May 6, 2022 (the "Separation Date").

Pursuant to the Separation Agreement, in exchange for certain releases of claims, Mr. Trzupek's agreement to transition his responsibilities and duties to other Company personnel, and certain additional covenants related to cooperation and competitive activity, the Company provided cash severance benefits to Mr. Trzupek of $75,000, representing three months of base salary, paid in a single lump sum less any required taxes and other withholding amounts. He was also entitled to any accrued but unpaid compensation for the period prior to the Separation Date. In addition, Mr. Trzupek was deemed to have time vested in 1,200,000 of his outstanding restricted stock units, as detailed in the award agreements assumed by XPDI.

### Outstanding Equity Awards at Fiscal Year-End of 2022

The following table presents the outstanding equity incentive plan awards held by each named executive officer as of December 31, 2022.

| | | | Stock Awards(1) | |
|---|---|---|---|---|
| Name | Grant Date | Vesting Commencement Date | Number of Shares or Units of Stock that Have Not Vested or Not Exercisable (#) | Market Value of Shares or Units of Stock that Have Not Vested($)(2) |
| Michael Levitt | July 2, 2021 | July 2, 2021 | 10,080,963 (3) | 806,477 |
| | January 19, 2022 | June 10, 2022 | 4,880,466 (3) | 390,437 |
| | January 19, 2022 | June 10, 2022 | 8,000,764 (4) | — |
| | August 15, 2022 | August 16, 2022 | 2,800,000 (3) | 224,000 |
| Todd M. DuChene | March 6, 2019 | March 6, 2019 | 133,330 (5) | 10,666 |
| | June 12, 2020 | June 12, 2020 | 200,018 (3) | 16,001 |
| | February 2, 2021 | January 1, 2021 | 300,028 (3) | 24,002 |
| | July 9, 2021 | June 24, 2021 | 600,057 (3) | 48,005 |
| | August 15, 2022 | August 16, 2022 | 1,200,000 (3) | 96,000 |
| Denise Sterling | July 9, 2021 | May 10, 2021 | 360,034 (3) | 28,803 |
| | January 18, 2022 | January 18, 2022 | 80,007 (3) | 6,401 |
| | August 15, 2022 | August 16, 2022 | 1,000,000 (3) | 80,000 |
| Darin Feinstein | January 19, 2022 | June 10, 2022 | 8,000,764 (4) | — |
| Michael Trzupek | October 1, 2020 | September 21, 2020 | — | — |
| | July 9, 2021 | June 9, 2021 | — | — |

(1) Stock awards listed in this table and granted on or prior to January 19, 2022, the date on which the Business Combination was consummated represent RSUs and stock options (as indicated) granted pursuant to the 2018 Plan. Stock Awards granted after January 19, 2022, represent RSUs and other awards granted pursuant to the 2021 Plan.

(2) Based on the closing price per share of Core common stock of $0.075 as of December 30, 2022, as reported on the OTCBB.

(3) One fourth of these RSUs vest on each of the first four anniversaries of the vesting commencement date, provided that the recipient remains in continuous service with us through each vesting date.

(4) Represents the unvested stock options from a grant of 8,000,573 granted on January 19, 2022. The original grant on January 19, 2022 was for 5,000,000 stock options having an exercise price of $16.24 per share exercisable 25% on each of the first four anniversaries of the vesting commencement date in connection with the Business Combination. As a result of the Business Combination, each stock option was converted into an option to purchase shares New Core Common Stock based on an

179

Debtors' Exhibit No. 40
Page 369 of 462

core-20221231

Table of Contents

exchange ratio of 1.6001528688, increasing this grant to 8,000,764 stock options at a price of $10.15 with the same vesting schedule.

(5) One fourth of these RSUs vest on the one-year anniversary of the vesting commencement date and 1/36 of the remaining RSUs vest monthly thereafter, provided that the recipient remains in continuous service with us through each vesting date.

### 2022 Compensation of Non-Employee Directors

The following table provides information regarding compensation earned by non-employee directors who served during the year ended December 31, 2022.

| Name | Fees Earned or Paid in Cash($) | Stock Awards ($)(1) | Total($) |
|------|--------------------------------|---------------------|----------|
| Kneeland Youngblood | 190,000 | — | 190,000 |
| Jarvis Hollingsworth | 230,000 | 559,796 | 789,796 |
| Matt Minnis | — | — | — |
| Neal P. Goldman(2) | 70,000 | — | 70,000 |
| Stacie Olivares(3) | 191,855 | — | 191,855 |

(1) The amount reported represents the aggregate grant date fair value of the RSUs granted during the fiscal year ended December 31, 2022 under the 2021 Plan, computed in accordance with ASC Topic 718. Assumptions used in the calculation of these amounts are included in the notes to the Company's audited consolidated financial statements included in this Annual Report on Form 10-K. These amounts do not reflect the actual economic value that may be realized by the non-employee director. As of December 31, 2022, Mr. Youngblood holds 400,038 RSUs. Mr. Youngblood's RSUs vest 25% per year in each of January 2023, 2024, 2025 and 2026. Mr. Hollingsworth holds 811,917 restricted stock awards ("RSAs") and 400,038 RSUs (collectively "RSUs"). 302,989 of Mr. Hollingsworth RSUs are currently vested. The remaining RSUs vest 25% per year in each of January 2022, 2023, 2024 and 2025. Messrs. Minnis and Goldman do not currently hold any RSUs.

(2) Mr. Goldman was appointed to the board of directors of Core in October 2022.

(3) Ms. Olivares resigned from the Board effective November 21, 2022.

Currently, each non-employee director is eligible to receive annual cash retainers for their service on our Board and committees as follows. An eligible director may make a timely election to receive all or a portion of his or her annual cash retainer in the form of shares of common stock. In addition, we reimburse reasonable expenses incurred by our non-employee directors in connection with attendance at Board or committee meetings.

1. Annual Board Service Retainer:

   a. All Eligible Directors: $300,000

   b. Lead Director: $5,000

2. Annual Committee Chair Service Retainer:

   a. Chair of the Audit Committee: $20,000

   b. Chair of the Compensation Committee: $20,000

   c. Chair of the Corporate Governance and Nominating Committee: $20,000

   d. Chair of the Special Committee: $25,000

3. Annual Committee Member Service Retainer (not applicable to Committee Chairs):

   a. Member of the Audit Committee: $10,000

   b. Member of the Compensation Committee: $10,000

   c. Member of the Nominating and Corporate Governance Committee: $10,000

core-20221231

Table of Contents

     d. Chair of the Special Committee: $15,000

During 2022, each non-employee director who was first elected or appointed to the Board following the Business Combination (other than Mr. Goldman and Mr. Minnis), on the date of such director's initial election or appointment to the Board (or, if such date is not a market trading day, the first market trading day thereafter), the director was automatically, and without further action by the Board or the Compensation Committee of the Board, granted RSUs with respect to shares of common stock with an aggregate Fair Market Value (as defined in the Incentive Plan) as of the grant date equal to $500,000 (the "Initial RSU Grant"). The Initial RSU Grant will vest over a four-year period, with one-fourth of the Initial RSU Grant vesting on each anniversary of the grant date, such that the Initial RSU Grant is fully vested on the fourth anniversary of the date of grant, subject to the director's Continuous Service (a defined in the Incentive Plan) through each such vesting date.

*Non-Employee Director Compensation Limit*

The aggregate value of all compensation granted or paid to any non-employee director with respect to any calendar year, including awards granted and cash fees paid to such non-employee director, will not exceed (1) $750,000 in total value or (2) if such non-employee director is first appointed or elected to Core's Board during such calendar year, $1,000,000 in total value, in each case, calculating the value of any equity awards based on the grant date fair value of such equity awards for financial reporting purposes and excluding distributions from a deferred compensation program.

**Compensation Committee Interlocks and Insider Participation**

Our Compensation Committee consists of two directors, each of whom is a non-employee director: Mr. Youngblood (Chair) and Mr. Minnis. During 2022, none of the foregoing were an officer or employee of ours, was formerly an officer of ours or had any relationship requiring disclosure by us under Item 404 of Regulation S-K. No interlocking relationship as described in Item 407(e)(4) of Regulation S-K exists between any of our executive officers or Compensation Committee members, on the one hand, and the executive officers or compensation committee members of any other entity, on the other hand, nor has any such interlocking relationship existed in the past.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The following table sets forth certain information regarding the ownership of the Company's common stock as of March 22, 2023 by: (i) each director and nominee for director; (ii) each of the executive officers named in the Summary Compensation Table; (iii) all current executive officers and directors of the Company as a group; and (iv) all those known by the Company to be beneficial owners of more than five percent of its common stock. Applicable percentages are based on 373,799,959 shares outstanding on March 22, 2023, adjusted as required by rules promulgated by the SEC. Unless otherwise noted below, the address of each stockholder below is c/o Core Scientific, Inc., 2407 S. Congress Ave, Ste. E-101, Austin, Texas 78704.

| Name of Beneficial Owner | Beneficial Ownership of Common Stock(1) | | |
| --- | --- | --- | --- |
| | Amount and Nature of Beneficial Ownership | | Percent of Class |
| Michael Levitt | 24,577,584 | (2) | 6.6 % |
| Darin Feinstein | 36,596,005 | (3) | 9.8 % |
| Michael Trzupek | 1,200,000 | (4) | * |
| Denise Sterling | 140,013 | (5) | * |
| Todd M. DuChene | 1,466,610 | (6) | * |
| Brian Neville | 120,012 | (7) | * |
| Jarvis Hollingsworth | 302,989 | (8) | * |
| Matt Minnis | 29,111,679 | (9) | 7.8 % |
| Kneeland Youngblood | 100,010 | (10) | * |
| Neal P. Goldman | — | (11) | * |
| All current directors and executive officers as a group (8 individuals) | 93,614,902 | | 25.0 % |

181

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 374 of 462

Table of Contents

\* Less the 1%

(1) This table is based upon information supplied by officers, directors and principal shareholders and Schedules 13D and 13G and Forms 3 and 4 filed with the SEC. Unless otherwise indicated in the footnotes to this table and subject to community property laws where applicable, the Company believes that each of the shareholders named in this table has sole voting and investment power with respect to the shares indicated as beneficially owned. Applicable percentages are based on 373,799,959 shares outstanding on March 22, 2023, adjusted as required by rules promulgated by the SEC.

(2) Consists of (i) 210,853 shares of Core common stock held of record by Mr. Levitt, (ii) options to purchase 2,000,191 shares of common stock at a price of $10.15 per share which are currently exercisable, (iii) 294,110 shares of Core common stock held of record by HKM Investment LLC ("HKM"), (iv) an aggregate of 2,496,146 shares of Core common stock held of record by The MJL 2012 Younger Children Trust, modified as of March 21, 2021, and The MJL 2012 Older Children Trust, modified as of March 21, 2021, (v) 3,835,366 shares of common stock held of record by The CS 1219 Trust, dated April 13, 2017, (vi) 11,236,009 shares of Core common stock held of record by The MJL Revocable Trust, modified as of June 18, 2021, (vii) 800,212 shares of Core common stock held of record by The NBL Revocable Trust, modified as of June 18, 2021 and (viii) 3,704,697 shares of Core common stock held of record by MJL Blockchain LLC ("MJL Blockchain"). Mr. Levitt is the managing member of each of HKM and MJL Blockchain and a trustee of each of (i) The MJL 2012 Younger Children Trust, modified as of March 21, 2021, (ii) The MJL 2012 Older Children Trust, modified as of March 21, 2021, (iii) The CS 1219 Trust, dated April 13, 2017, (iv) The MJL Revocable Trust, modified as of June 18, 2021, and (v) The NBL Revocable Trust, modified as of June 18, 2021.

(3) Consists of (i) 30,483,592 shares of Core common stock held of record by Mr. Feinstein, (ii) 974,301 shares of Core common stock held of record by Texas Blockchain 888 LLC ("Texas Blockchain") (iii) 319,894 shares of Core common stock held of record by Red Moon 88, LLC ("Red Moon") and (iv) 4,818,218 shares of Core common stock issuable upon exercise of options within 60 days of March 22, 2023, held by Mr. Feinstein. Mr. Feinstein has pledged 20,000,000 shares to certain lenders in connection with a financing arrangement. Mr. Feinstein is the managing member of each of Texas Blockchain and Red Moon. The principal business address of each of Texas Blockchain and Red Moon is 3753 Howard Hughes Pkwy, Suite 200, Las Vegas, NV 89169.

(4) Represents RSUs deemed time vested at the time of his resignation and net settled in June 2022 when the transaction vesting requirement was waived. Mr. Trzupek resigned from the Company on April 4, 2022.

(5) Represents 120,011 shares of Core common stock owned by Ms. Sterling and 20,002 shares of common stock issuable with respect to vested RSUs not yet distributed. Ms. Sterling was appointed as Chief Financial Officer on April 4, 2022 and Principal Accounting Officer on October 20, 2022.

(6) Represents 1,266,607 shares of Core common stock owned by Mr. DuChene, 166,684 shares of common stock issuable with respect to vested RSUs not yet distributed, and 33,319 shares of common stock issuable with respect to RSUs that vest within the next 60 days.

(7) Represents RSUs deemed time vested at the time of his resignation. Mr. Neville resigned from the Company on October 20, 2022.

(8) Represents 302,989 shares of Core common stock owned by Ms. Hollingsworth.

(9) Consists of (i) 29,111,649 shares of Core common stock held of record by MPM Life, LLC ("MPM"). Mr. Minnis is the managing member of MPM and is deemed to be the beneficial owner of the securities held by MPM.

(10) Represents 100,010 shares of Core common stock owned by Ms. Kneeland.

(11) Mr. Goldman was appointed to the board of directors of Core in October 2022.

### Securities Authorized for Issuance Under Equity Compensation Plans

*Equity Compensation Plan Information*

The following table provides certain information with respect to all of Core equity compensation plans in effect as of December 31, 2022. Information is included for equity compensation plans approved by Core's shareholders. Core does not have any equity compensation plans not approved by its shareholders.

182

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 95,911,574 (1) | $        6.19 (2) | 51,538,000 (3) |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 95,911,574 | $        6.19 | 51,538,000 |

(1) Includes shares of Company common stock issuable pursuant to outstanding awards under the 2018 Plan and the 2021 Plan. No rights or awards have been issued under the Core Scientific, Inc. Employee Stock Purchase Plan ("2021 ESPP").

(2) The weighted average exercise price is calculated based solely on outstanding stock options and does not take into account shares of common stock underlying restricted stock units, which have no exercise price.

(3) Includes the 2021 Plan and the 2021 ESPP. Stock options or other share awards granted under the Legacy Core Plans that are forfeited, terminated, expired or repurchased do not become available for issuance under the 2021 Plan. In accordance with the terms of the 2021 Plan and the 2021 ESPP, the total number of our shares of common stock reserved for issuance thereunder will automatically increase on January 1st of each year in an amount equal to 4.0% and 1.0%, respectively, of the total number of shares of capital stock outstanding on December 31st of the preceding year. The number of shares of common stock available for issuance under the 2021 Plan and the 2021 ESPP is expected to be increased on January 1, 2023, pursuant to these provisions.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

*Warrants*

In March 2020, in connection with certain bridge financings, Legacy Core issued warrants to Mr. Levitt, exercisable for 2,000,000 shares of common stock at any time for two years following the issuance. The exercise price of the common stock issuable under such warrants is $1.34 per share. These warrants expired on March 20, 2023.

*Related Party Commercial Relationships*

*Executive Officers and Directors*

The Company reimburses certain officers and directors of the Company for use of a personal aircraft for flights taken on Company business. For the years ended December 31, 2022 and 2021, the Company incurred reimbursements of $1.8 million and $1.3 million, respectively. As of December 31, 2022, $0.2 million was payable. A nominal amount was payable at December 31, 2021.

In July 2019, Legacy Core entered into an ongoing commercial relationship with one of its customers, Gilley Enterprises, LLC ("Gilley"), where Gilley purchases hosting services from Legacy Core on an ongoing basis. Jeff Pratt, Core's Senior Vice President of Operations and Finance is a shareholder in Gilley. James Cleveland, Legacy Core's Chief Power Officer is a shareholder in Gilley. Pursuant to the arrangement, Gilley is paid on average approximately $41,300 per month in hosting fees. These arrangements were terminated as to Pratt and Cleveland in November 2022. Gilley was terminated in March 2023.

In October 2019, Legacy Core entered into an ongoing commercial relationship with one of its customers, UnionJack LLC ("UnionJack"), where UnionJack purchases hosting services from Legacy Core on an ongoing basis. Kevin Turner, Legacy Core's former President and Chief Executive Officer, and a former member of Legacy Core's board of directors, is a shareholder in UnionJack. Matthew Bishop, a member of Legacy Core's board of directors, serves as director of UnionJack.

In December 2020, Legacy Core entered into hosting services arrangements with a then-customer, Blockcap, before Legacy Core acquired Blockcap on July 30, 2021. Pursuant to the arrangements, Blockcap purchased hosting services from Legacy Core.

Debtors' Exhibit No. 40
Page 377 of 462

core-20221231
https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Darin Feinstein, an owner of greater than 5% of Legacy Core's capital stock and the Co-Chair of Legacy Core's board of directors, held an approximately 12% equity ownership interest in Blockcap. Kevin Turner, Legacy Core's former President and Chief Executive Officer, and a former member of Legacy Core's board of directors. Matthew Minnis, a member of Core's Board and Michael Levitt, Core's Chief Executive Officer, Co-Chair of its Board, and a member of its Board, were shareholders in Blockcap.

183

Table of Contents

James Cleveland, Core's Chief Power Officer, Jeff Pratt, Core's Senior Vice President of Operations and Finance, Sharon Orlopp, Core's Chief Human Resources Officer, and Russel Cann, Core's Chief Customer Success Officer, were each holders of options to purchase Blockcap common stock. Pursuant to the arrangement, Legacy Core was paid on average approximately $2,000,000 per month in hosting fees.

In May 2021, Legacy Core entered into an ongoing commercial relationship with one of its customers, GEM Mining 2 LLC ("GEM 2"), where GEM 2 purchases hosting services from Legacy Core on an ongoing basis. Russell Cann, Core's Chief Customer Success Officer, is the Managing Member of GEM 2. Pursuant to the arrangement, Legacy Core is paid on average approximately $76,800 per month in hosting fees.

### Legacy Core/Blockcap Merger

On July 15, 2021, Legacy Core entered into an Agreement and Plan of Merger (the "Legacy Core/Blockcap merger agreement") by and among Legacy Core, Block Merger Sub, Inc., a Delaware corporation and direct, wholly owned subsidiary of Legacy Core ("Blockcap Merger Sub"), Blockcap and Harlin Dean, solely in his capacity as the representative of the Blockcap stockholders, pursuant to which Blockcap Merger Sub merged with and into Blockcap, with Blockcap surviving the merger as a wholly owned subsidiary of Legacy Core. This merger was consummated on July 30, 2021. Upon consummation of the merger, Legacy Core stockholders owned approximately 66.67% of the company formed by combining Legacy Core with Blockcap and former Blockcap stockholders owned approximately 33.33% of such combined company.

In connection with the merger, Legacy Core issued an aggregate amount of 81,032,304 shares of Legacy Core common stock to Blockcap stockholders in accordance with the exchange ratio set forth in the Legacy Core/Blockcap merger agreement. At the effective time of the merger, (i) each share of Blockcap common stock issued and outstanding as of immediately prior to the effective time of the merger (other than any dissenters' shares, Blockcap treasury shares and Blockcap restricted shares) was automatically cancelled and extinguished and collectively converted into the right to receive a number of shares of Core common stock equal to the exchange ratio set forth in the Legacy Core/Blockcap merger agreement; (ii) each Blockcap restricted share was converted into a right to receive restricted shares of Core common stock on the same terms and conditions (including applicable vesting conditions) as were set forth in the applicable award agreement pursuant to which such Blockcap restricted share was granted and in effect as of immediately prior to the effective time of the merger, in a number equal to the exchange ratio set forth in the Legacy Core/Blockcap merger agreement; and (iii) each Blockcap option was assumed by Legacy Core and converted into an option to purchase shares of Legacy Core common stock on the same terms and conditions (including applicable vesting conditions) as were set forth in the applicable award agreement pursuant to which such Blockcap option was granted and in effect as of immediately prior to the effective time of the merger on terms set forth in the Legacy Core/Blockcap merger agreement.

As of the effective time of the merger, (i) Mr. Michael Levitt, Core's Chief Executive officer, Chairman of its Board, and a member of its board of directors, indirectly owned approximately 0.07% of Blockcap on a fully-diluted basis, and as such received consideration upon the consummation of the merger; and (ii) Mr. Matthew Minnis, a member of Core's board of directors, indirectly owned approximately 6.17% of Blockcap on a fully-diluted basis, and as such received consideration upon the consummation of the merger. Certain other officers of Core, Messrs. Cleveland, Pratt, Adams, Cann, Kulyk and Ms. Orlopp were granted options in Blockcap.

### Blockcap Secured Demand Promissory Note

On June 30, 2021, Legacy Core issued a Secured Demand Promissory Note (the "Blockcap Note"), in an aggregate principal amount of $16.2 million to Blockcap for outstanding amounts owed pursuant to certain equipment invoices. The Blockcap Note accrues interest at a rate of 10% compounded annually and was due on July 14, 2021. On July 16, 2021, the Blockcap Note was amended to extend the maturity date to July 23, 2021. The Blockcap Note was secured by the purchased equipment. Darin Feinstein, an owner of greater than 5% of Core's capital stock and the Co-Chair of Core's Board, held an approximately 12% equity ownership interest in Blockcap. Kevin Turner, Legacy Core's former President and Chief Executive Officer, and a former member of Legacy Core's board of directors, is a shareholder in Blockcap. Matthew Minnis, a member of Core's Board, is a shareholder in Blockcap. Michael Levitt, a member of Core's Board, is a shareholder in Blockcap. James Cleveland, Core's Chief Power Officer, is an optionholder in Blockcap. Jeff Pratt, Core's Senior Vice President of Operations and Finance, is an optionholder in Blockcap. Sharon Orlopp, Core's Chief Human Resources Officer, is an optionholder in Blockcap. Russel Cann, Core's Chief Revenue Officer and Managing Director of Business Development, is an optionholder in Blockcap. Taras Kulyk, Core's Senior Vice President of

core-20221231                                                        https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Blockchain Business Development, is an optionholder in Blockcap. As of July 30, 2021, the total principal outstanding was approximately $32.7 million and the amount of accrued interest on the Blockcap Note was approximately $260,000.

184

Table of Contents

*Support Agreements*

In connection with the entry into the Merger Agreement, XPDI, Legacy Core and certain Legacy Core stockholders, including holders affiliated with members of the Legacy Core board of directors and beneficial owners of greater than 5% of Legacy Core's capital stock, entered into certain support agreements, whereby such Legacy Core stockholders agreed to, among other things, vote all of their shares of Legacy Core's capital stock in favor of the approval and adoption of the transactions contemplated by the Merger Agreement.

*Amended and Restated Registration Rights Agreement*

In connection with the closing of the Business Combination, Core, the Sponsor, the former independent directors of XPDI and certain of our securityholders entered into an amended and restated registration rights agreement. Pursuant to the agreement, we agreed that we will file with the SEC a registration statement registering the resale of certain securities held by or issuable to such holders, and we will use reasonable best efforts to have such registration statement declared effective as soon as practicable after the filing thereof. In certain circumstances, certain holders can demand up to two underwritten offerings in any 12-month period, and certain holders are entitled to piggyback registration rights.

*Indemnification Agreements*

Our certificate of incorporation contains provisions limiting the liability of executive officers and directors, and our bylaws provide that we will indemnify each of our executive officers and directors to the fullest extent permitted under Delaware law.

We have entered into indemnification agreements with all of our directors and executive officers. The indemnification agreements provide that we will indemnify each of our directors, executive officers, and other key employees against any and all expenses incurred by such director, executive officer, or other key employee because of his or her status as one of our directors, executive officers, or other key employees, to the fullest extent permitted by Delaware law, our certificate of incorporation and our bylaws. In addition, the indemnification agreements provide that, to the fullest extent permitted by Delaware law, we will advance all expenses incurred by its directors, executive officers, and other key employees in connection with a legal proceeding involving his or her status as a director, executive officer, or key employee.

*Other Related Party Transactions*

We have entered into employment agreements with our executive officers. For more information regarding employment agreements with our named executive officers, see the section titled "Executive Compensation—Employment Agreements with Named Executive Officers."

We have also granted restricted stock units to our executive officers and directors. For a description of these equity awards, see the section titled "Executive Compensation."

**Related Person Transactions Policy Following the Business Combination**

We have adopted a written related person transactions policy that sets forth our policies and procedures regarding the identification, review, consideration and oversight of "related person transactions." For purposes of the policy only, a "related person transaction" is a transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which we or any of our subsidiaries are participants involving an amount that exceeds $120,000, in which any "related person" has a material interest.

Transactions involving compensation for services provided to us as an employee, consultant or director will not be considered related person transactions under this policy. A related person is any officer, director, nominee to become a director, employee or a holder of more than 5% of any class of our voting securities (including the common stock), including any of their immediate family members and affiliates, including entities owned or controlled by such persons.

Under the policy, the related person in question or, in the case of transactions with a holder of more than 5% of any class of our voting securities, an officer with knowledge of a proposed transaction, must present information regarding the proposed related person transaction to the audit committee (or, where review by the audit committee would be inappropriate, to another independent body of the board) for review. To identify related person transactions in advance, we will rely on information supplied by our officers, directors and certain significant stockholders. In considering related person transactions, the audit committee will take into account

core-20221231                                                       https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

the relevant available facts and circumstances, which may include, but are not limited to:

- the risks, costs, and benefits to us;

185

Table of Contents

- the impact on a director's independence in the event the related person is a director, immediate family member of a director or an entity with which a director is affiliated;

- the terms of the transaction;

- the availability of other sources for comparable services or products; and

- the terms available to or from, as the case may be, unrelated third parties.

The audit committee will approve only those transactions that it determines are fair to us and in our best interests. All of the transactions described above were entered into prior to the adoption of such policy.

**Director Independence**

As previously discussed, our common stock was delisted from Nasdaq and is currently traded on the OTC Pink Sheets market maintained by the OTC Market Group, Inc. The Company continues to use the definition of director independence promulgated under the Nasdaq listing standards. As required under the Nasdaq listing standards, a majority of the members of a listed company's board of directors must qualify as "independent," as affirmatively determined by the board of directors. The Board consults with its counsel to ensure that the Board's determinations are consistent with relevant securities and other laws and regulations regarding the definition of "independent," including those set forth in pertinent listing standards of Nasdaq, as in effect from time to time.

Consistent with these considerations, after review of all relevant identified transactions or relationships between each director, or any of his or her family members, and the Company, its senior management and its independent auditors, the Board has affirmatively determined that the following four directors are independent directors within the meaning of the applicable Nasdaq listing standards: Mr. Hollingsworth, Mr. Minnis and Mr. Youngblood. In making this determination, the Board found that none of these directors or nominees for director had a material or other disqualifying relationship with the Company. Mr. Levitt and Mr. Feinstein are employed by us and are therefore not independent under Nasdaq listing standards.

**Item 14. Principal Accountant Fees and Services.**

**Change in Auditor**

In connection with the Business Combination, on January 21, 2022, the Audit Committee of the Company's Board of Directors approved the dismissal of Marcum LLP ("Marcum") as the independent registered public accounting firm of the Company, effective upon completion of Marcum's audit of XPDI's consolidated financial statements as of and for the year ended December 31, 2021, and the issuance of their report thereon (the "Auditor Change Effective Date"). The management communicated the Audit Committee's decision to Marcum on January 21, 2022. At the same meeting, the Audit Committee approved the engagement of Ernst & Young LLP ("EY") as the independent registered public accounting firm of the Company, effective upon the Auditor Change Effective Date. EY previously served as the independent registered public accounting firm of Legacy Core prior to the Business Combination.

On October 24, 2022, the Audit Committee approved the engagement of Marcum as its independent registered public accounting firm for the fiscal year ending December 31, 2022, subject to Marcum's completion of their client acceptance procedures. At the same meeting, the Audit Committee approved the dismissal of EY as independent registered public accounting firm of the Company effective November 22, 2022, the date of the filing of our quarterly report on Form 10-Q for the quarter ending September 30, 2022. After completion of their client acceptance procedures on November, 22, 2022, Marcum was formally appointed the independent registered public accounting firm of the Company on November 23, 2023

**Marcum Fees**

The following table represents aggregate fees billed to Core for the fiscal year ended December 31, 2022 and billed to XPDI for the fiscal year ended December 31, 2021 by Marcum (in thousands):

| | Year Ended December 31, | |
| | 2022 | 2021 |
| --- | --- | --- |
| Audit Fees(1)(2) | $ 1,174 | $ 230 |
| Audit-Related Fees(3) | — | 69 |
| Tax Fees(4) | — | — |
| **Total Fees** | $ 1,174 | $ 299 |

186

Debtors' Exhibit No. 40
Page 384 of 462

Table of Contents

(1) For the year ended December 31, 2022, audit fees consisted of fees incurred for services rendered in the annual audit of the Company's consolidated financial statements, along with $90,000 of audit services provided to XPDI prior to the Merger.

(2) For the year ended December 31, 2021, audit fees consisted of fees incurred for services rendered to XPDI in connection with the annual audit of XPDI's consolidated financial statements the review of its quarterly condensed consolidated financial statements. The audit fees also include fees for professional services provided in connection with XPDI's initial public offering, incurred during the fiscal year ended December 31, 2021, including consents and review of documents filed with the SEC.

(3) Audit-related fees consist of fees related to transaction advisory services provided to XPDI in connection with the merger with Core Scientific.

(4) We did not incur any audit-related, tax or other fees with Marcum for the years ended December 31, 2022 or 2021.

All fees described above were pre-approved by the Audit Committee. There were no services that were approved by the Audit Committee pursuant to Rule 2-01(c)(7)(i)(C) (relating to the approval of a de minimis amount of non-audit services after the fact but before completion of the audit).

**EY Fees**

The following table sets forth the fees billed by EY for audit and other services rendered (in thousands):

|  | Year Ended December 31, | |
|  | 2022 | 2021 |
| --- | --- | --- |
| Audit Fees(1) | $ 5,320 | $ 8,770 |
| Audit-Related Fees(2) | — | — |
| Tax Fees(3) | 37 | 94 |
| All Other Fees (4) | 7 | 4 |
| **Total Fees** | $ 5,364 | $ 8,868 |

(1) Audit Fees consisted of fees incurred for services rendered for the annual audit and quarterly reviews of the Company's consolidated financial statements, audits required by public company regulation, professional consultations with respect to accounting issues, registration statement filings, including our Registration Statements on Form S-1 and Form S-4 and related to the Business Combination, shares registration, stock incentive plan registration and issuance of consents and similar matters.

(2) Audit-related fees consist of fees incurred for consultation regarding financial accounting and reporting matters.

(3) Tax fees for 2021 consist of tax advice and tax planning services.

(4) All other fees consist primarily of the cost of our subscription to an accounting research tool provided by EY.

**Pre-Approval Policies and Procedures**

The Audit Committee has adopted a policy and procedures for the pre-approval of audit and non-audit services rendered by the Company's independent registered public accounting firm. The policy generally pre-approves specified services in the defined categories of audit services, audit-related services and tax services and permissible non-audit services subject to a de minimis exception. Pre-approval may also be given as part of the Audit Committee's approval of the scope of the engagement of the independent auditor or on an individual, explicit, case-by-case basis before the independent auditor is engaged to provide each service. The pre-approval of services may be delegated to one or more of the Audit Committee's members, but the decision must be reported to the full Audit Committee at its next scheduled meeting.

Prior to the Business Combination, all of the services listed in the table above provided by Marcum were pre-approved by XPDI in accordance with its policies then in effect. Following the Business Combination, all of the services listed in the table above provided by EY were pre-approved by Core's Audit Committee. Core's Audit Committee has determined that the rendering of services other than audit services by EY is compatible with maintaining the principal accountant's independence.

187

4/8/2023, 10:22 PM

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

**Part IV**

**Item 15. Exhibits and Financial Statement Schedules.**

1. **Consolidated Financial Statements**

The following consolidated financial statements of Core Scientific, Inc. are filed as part of this report.

| Contents | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB 688); Marcum LLP, Los Angeles, CA | 102 |
| Report of Independent Registered Public Accounting Firm (PCAOB 42); Ernst & Young LLP | 103 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 104 |
| Consolidated Statements of Operations for the years ended December 31, 2022, 2021 and 2020 | 106 |
| Consolidated Statements of Comprehensive (Loss) Income for the years ended December 31, 2022, 2021 and 2020 | 108 |
| Consolidated Statements of Changes in Contingently Redeemable Convertible Preferred Stock and Stockholders' (Deficit) Equity for the years ended December 31, 2022, 2021 and 2020 | 109 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2022, 2021 and 2020 | 111 |
| Notes to Consolidated Financial Statements | 113 |

**2. Consolidated Financial Statement Schedules**

All schedules are omitted as the information required is inapplicable or the information is presented in the consolidated financial statements or the related notes.

**3. Exhibits**

| Exhibit | Description |
| --- | --- |
| 2.1†† | Agreement and Plan of Merger and Reorganization by and among Power & Digital Infrastructure Acquisition Corp., XPDI Merger Sub Inc., XPDI Merger Sub 2, LLC, and Core Scientific Holding Co. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on July 21, 2021). |
| 2.2†† | First Amendment to Agreement and Plan of Merger and Reorganization by and among Power & Digital Infrastructure Acquisition Corp., XPDI Merger Sub Inc., XPDI Merger Sub 2, LLC, and Core Scientific Holding Co. (incorporated by reference to Exhibit 2.2 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on October 4, 2021). |
| 2.3†† | Second Amendment to Agreement and Plan of Merger and Reorganization, by and among Power & Digital Infrastructure Acquisition Corp., XPDI Merger Sub Inc., and Core Scientific Holding Co. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on December 30, 2021). |
| 3.1 | Second Amended and Restated Certificate of Incorporation of Core Scientific, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on January 24, 2022). |
| 3.2 | Amended and Restated Bylaws of Core Scientific, Inc. (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on January 24, 2022). |
| 4.1 | Specimen Unit Certificate (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-1, filed with the SEC on January 22, 2021). |
| 4.2 | Specimen Class A Common Stock Certificate (incorporated by reference to Exhibit 4.2 to the Company's Registration Statement on Form S-1, filed with the SEC on January 22, 2021). |
| 4.3 | Specimen Warrant Certificate (incorporated by reference to Exhibit 4.3 to the Company's Registration Statement on Form S-1, filed with the SEC on January 22, 2021). |

188

core-20221231                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

4/8/2023, 10:22 PM

| Exhibit | Description |
|---------|-------------|
| 4.4 | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.4 to the Company's Annual Report on Form 10-K, filed with the SEC on March 30, 2022). |
| 4.5 | Assignment, Assumption and Amendment Agreement, by and among Power & Digital Infrastructure Acquisition Corp., Core Scientific Holding Co., Continental Stock Transfer & Trust Company, Computershare Inc. and its wholly-owned subsidiary, Computershare Trust Company, N.A. (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, filed with the SEC on January 24, 2022). |
| 4.6 | Form of Bridge Promissory Note, by, between the Company and B. Riley Commercial Capital, LLC (incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046) for the period ended March 31, 2022 filed with the SEC on May 13, 2022). |
| 4.7 | Form of Bridge Promissory Note, by, and between the Company and BRF Finance Co., LLC (incorporated by reference to Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046) for the period ended March 31, 2022 filed with the SEC on May 13, 2022). |
| 4.8 | Warrant Agreement between Continental Stock Transfer & Trust Company and the Company (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on February 12, 2021). |
| 4.9†† | Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among Core Scientific Holding Co., the Guarantors thereto, the Purchasers thereto and U.S. Bank National Association as note agent and collateral agent (incorporated by reference to Exhibit 4.5 to the Company's Registration Statement on Form S-1 (File No. 333-262596), filed with the SEC on February 9, 2022). |
| 4.10 | First Amendment to Secured Convertible Note Purchase Agreement, dated as of April 22, 2021, by and among Core Scientific Holding Co., the Guarantors thereto, the Purchasers thereto and U.S. Bank National Association as note agent and collateral agent (incorporated by reference to Exhibit 4.6 to the Company's Registration Statement on Form S-1 (File No. 333-262596), filed with the SEC on February 9, 2022). |
| 4.11 | Form of Secured Convertible Promissory Note (incorporated by reference to Exhibit 4.7 to the Company's Registration Statement on Form S-1 (File No. 333-262596), filed with the SEC on February 9, 2022). |
| 4.12†† | Convertible Note Purchase Agreement by and among Core Scientific Holding Co., the Guarantors thereto, the Purchasers thereto and U.S. Bank National Association as note agent and collateral agent, dated August 20, 2021 (incorporated by reference to Exhibit 4.7 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 4.13 | First Amendment to Convertible Note Purchase Agreement by and among Core Scientific Holding Co., the Guarantors thereto, the Purchasers thereto and U.S. Bank National Association as note agent and collateral agent dated September 23, 2021 (incorporated by reference to Exhibit 4.8 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 4.14 | Form of Convertible Promissory Note (incorporated by reference to Exhibit 4.9 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 4.15 | Description of registered securities (incorporated by reference to Exhibit 4.13 to the Company's Annual Report on Form 10-K (File No. 001-40046), filed with the SEC on March 30, 2022). |
| 10.1 | Sponsor Agreement, dated as of July 20, 2021, among Power & Digital Infrastructure Acquisition Corp., XPDI Sponsor LLC and the other parties thereto (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on July 21, 2021). |
| 10.2 | Form of Support Agreement (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on July 21, 2021). |
| 10.3 | Form of Lock-Up Agreement (incorporated by reference to Exhibit 10.23 the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on October 4, 2021). |
| 10.4 | Registration and Stockholder Rights Agreement between Power & Digital Infrastructure Acquisition Corp., XPDI Sponsor LLC, the Anchor Investors and certain directors of Power & Digital Infrastructure Acquisition Corp (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on February 12, 2021). |

189

Debtors' Exhibit No. 40
Page 390 of 462

Table of Contents

| Exhibit | Description |
|---|---|
| 10.5 | Amended and Restated Registration Rights Agreement by and among Power & Digital Infrastructure Acquisition Corp., XPDI Sponsor LLC, Core Scientific Holding Co., and other parties thereto, dated January 19, 2022 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on January 24, 2022). |
| 10.6# | Form of Indemnification Agreement (incorporated by reference to Exhibit 10.30 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 10.7# | Core Scientific, Inc. (f/k/a MineCo Holdings, Inc.) 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.13 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.8# | First Amendment to Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.21 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.9# | Second Amendment to Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.22 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.10# | Third Amendment to Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.23 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.11# | Restricted Stock Unit Award Agreement underlying the Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.24 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.12# | Restricted Stock Unit Award Agreement underlying the Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.25 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.13# | Nonqualified Option Award Agreement underlying the Core Scientific, Inc. 2018 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.26 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.14# | Core Scientific, Inc. 2021 Equity Incentive Plan (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on January 24, 2022). |
| 10.15# | Form of Restricted Stock Unit Award Agreement underlying the Core Scientific, Inc. 2021 Equity Incentive Plan (incorporated by reference to Exhibit 10.26 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on October 4, 2021). |
| 10.16# | Form of Stock Option Agreement underlying the Core Scientific, Inc. 2021 Equity Incentive Plan (incorporated by reference to Exhibit 10.27 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on October 4, 2021). |
| 10.17# | Core Scientific, Inc. Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on January 24, 2022). |
| 10.18# | Letter Agreement by and between Michael Trzupek and Core Scientific, Inc., dated September 14, 2020 (incorporated by reference to Exhibit 10.15 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.19# | Letter Agreement by and between Todd DuChene and Core Scientific, Inc., dated December 15, 2018 (incorporated by reference to Exhibit 10.16 to the Company's Registration Statement on Form S-4 (File No. 333-258720), filed with the SEC on August 11, 2021). |
| 10.20# | Amended and Restated Employment Agreement by and between Michael J. Levitt and Core Scientific Holding Co., dated October 10, 2021 (incorporated by reference to Exhibit 10.28 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |

190

core-20221231

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

| Exhibit | Description |
|---|---|
| 10.21# | Employment Agreement by and between Darin Feinstein and Core Scientific Holding Co., dated October 10, 2021 (incorporated by reference to Exhibit 10.29 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 10.22# | Non-Employee Director Compensation Policy of Core Scientific, Inc (incorporated by reference to Exhibit 10.14 to the Company's Registration Statement on Form S-4/A (File No. 333-258720), filed with the SEC on November 19, 2021). |
| 10.23#†† | Separation Agreement, dated as of April 18, 2022, by and between the Company and Michael Trzupek (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046), for the period ended March 31, 2022 filed with the SEC on May 13, 2022). |
| 10.24# | Employment Agreement, dated as of April 7, 2022, by and between the Company and Denise Sterling (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046), for the period ended March 31, 2022 filed with the SEC on May 13, 2022). |
| 10.25++ | Industrial Power Contract by and between Murphy Electric Power Board and BCV 77, LLC, dated December 15, 2017, as assigned and assumed on February 19, 2018 (incorporated by reference to Exhibit 10.3 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.26†† | Interruptible Power Product Agreement by and between Murphy Electric Power Board and Core Scientific Holding Co., dated August 30, 2018 (incorporated by reference to Exhibit 10.4 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.27++ | Investment Credit Agreement by and among Core Scientific Holding Co., Murphy Electric Power Board and the Tennessee Valley Authority, dated October 10, 2018 (incorporated by reference to Exhibit 10.5 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.28++ | Master Services Agreement by and between Core Scientific Holding Co. and Duke Energy Carolinas, LLC, dated June 25, 2018 (incorporated by reference to Exhibit 10.6 to the Company's Registration Statement on Form S-4 filed with the SEC on August 11, 2021). |
| 10.29††++ | Electric Service Agreement by and between Core Scientific Holding Co. and Duke Energy Carolinas, LLC, dated June 10, 2019 (incorporated by reference to Exhibit 10.7 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.30††++ | Amended and Restated Electric Service Agreement by and between American Property Acquisitions VII, LLC and The Board of Water, Light and Sinking Fund Commissioners of the City of Dalton, Georgia, dated October 11, 2018 (Industrial South Premises) (incorporated by reference to Exhibit 10.8 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.31††++ | Amended and Restated Electric Service Agreement by and between American Property Acquisitions VII, LLC and The Board of Water, Light and Sinking Fund Commissioners of the City of Dalton, Georgia, dated October 11, 2018 (Boring Drive Property) (incorporated by reference to Exhibit 10.9 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.32 | Firm Power Contract by and between Core Scientific Holding Co. and the Tennessee Valley Authority, dated March 12, 2019, as amended on April 30, 2020 and February 25, 2021 (incorporated by reference to Exhibit 10.10 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.33 | Interruptible Power Product Agreement by and between Core Scientific Holding Co. and the Tennessee Valley Authority, dated April 28, 2020 (incorporated by reference to Exhibit 10.11 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.34 | Form of Sales and Purchase Agreement by and between Core Scientific and Bitmain Technologies Limited and affiliates (incorporated by reference to Exhibit 10.12 to the Company's Registration Statement on Form S-4, filed with the SEC on August 11, 2021). |
| 10.35††++ | Bridge Promissory Note, dated as of April 7, 2022, by and between the Company and B. Riley Commercial Capital, LLC (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046), for the period ended June 30, 2022 filed with the SEC on August 22, 2022). |

Debtors' Exhibit No. 40
Page 393 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

4/8/2023, 10:22 PM

Table of Contents

| Exhibit | Description |
|---|---|
| 10.36††++ | Bridge Promissory Note, dated as of April 7, 2022, by and between the Company and BRF Finance Co., LLC (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q (File No. 001-40046), for the period ended June 30, 2022 filed with the SEC on August 22, 2022). |
| 10.37++ | Amended and Restated Bridge Promissory Note, dated as of August 1, 2022, by and between the Company and B. Riley Commercial Capital, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on August 4, 2022). |
| 10.38++ | Amended and Restated Bridge Promissory Note, dated as of August 1, 2022, by and between the Company and BRF Finance Co., LLC (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on August 4, 2022). |
| 10.39 | Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of December 22, 2022, by and among the Company, Wilmington Savings Fund Society, FSB as the administrative agent and collateral agent and the lenders party thereto (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on December 22, 2022). |
| 10.40 | Restructuring Support Agreement, dated as of December 22, 2022, by and among the Company and the Ad Hoc Noteholder Group (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on December 22, 2022). |
| 10.41 | Common Stock Purchase Agreement, dated as of July 20, 2022, by and between Core Scientific, Inc. and B. Riley Principal Capital II, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on July 21, 2022). |
| 10.42 | Registration Rights Agreement, dated as of July 20, 2022, by and between Core Scientific, Inc. and B. Riley (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-40046), filed with the SEC on July 21, 2022). |
| 16.1 | Letter regarding Change in Certifying Accountant, dated as of October 28, 2022 (incorporated by reference to Exhibit 16.1 to the Company's Current Report on Form 8-K (File No. 001-40046) filed with the SEC on October 28, 2022. |
| 16.2 | Letter regarding Change in Certifying Accountant, dated as of November 23, 2022 (incorporated by reference to Exhibit 16.1 to the Company's Current Report on Form 8-K (File No. 001-40046) filed with the SEC on November 23, 2022. |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to the Company's Current Report on Form 8-K, filed with the SEC on January 24, 2022). |
| 23.1* | Consent of Marcum LLP |
| 23.2* | Consent of Ernst & Young, LLP |
| 31.1* | Certificate of the Chief Executive Officer of Core Scientific, Inc. furnished pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certificate of the Chief Financial Officer of Core Scientific, Inc. furnished pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Certificate of the Chief Executive Officer of Core Scientific, Inc. furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certificate of the Chief Financial Officer of Core Scientific, Inc. furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. |

Debtors' Exhibit No. 40
Page 395 of 462

core-20221231

core-20221231                                                    https://www.sec.gov/Archives/edgar/data/1839341/0001628280230104...

Table of Contents

| Exhibit | Description |
|---|---|
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase. |
| 104 | Cover Page Interactive Data File (the cover page XBRL tags) |

\*   Filed herewith.

\#   Indicates management contract or compensatory plan.

††   Certain of the exhibits and schedules to these exhibits have been omitted in accordance with Regulation S-K Item 601(a)(5). The registrant agrees to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

++   Portions of this Exhibit (indicated by asterisks) have been omitted as the Registrant has determined that (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the Registrant if publicly disclosed.

**Item 16. Form 10-K Summary**

Not applicable.

193

4/8/2023, 10:22 PM

Debtors' Exhibit No. 40
Page 397 of 462

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Core Scientific, Inc.**

| | |
|---|---|
| By: | /s/ Michael Levitt |
| Name: | Michael Levitt |
| Title: | Chief Executive Officer |
| Date: | April 3, 2023 |

Pursuant to the requirements of the Securities Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Position | Date |
|---|---|---|
| /s/ Michael Levitt<br>Michael Levitt | Chief Executive Officer and Director (Co-Chairman)<br>(*Principal Executive Officer*) | April 3, 2023 |
| /s/ Denise Sterling<br>Denise Sterling | Chief Financial Officer<br>(*Principal Accounting and Financial Officer*) | April 3, 2023 |
| /s/ Darin Feinstein<br>Darin Feinstein | Executive Vice President, Corporate Strategy and Director (Co-Chairman) | April 3, 2023 |
| /s/ Neal P. Goldman<br>Neal P. Goldman | Director | April 3, 2023 |
| /s/ Jarvis Hollingsworth<br>Jarvis Hollingsworth | Director | April 3, 2023 |
| /s/ Matt Minnis<br>Matt Minnis | Director | April 3, 2023 |
| /s/ Kneeland Youngblood<br>Kneeland Youngblood | Director | April 3, 2023 |

194

Debtors' Exhibit No. 40
Page 398 of 462

## **EXHIBIT C**

**Employment Agreement**
**10-K 2022 of Core Scientific, Inc., Exhibit 10-28**

EX-10.28

EX-10.28 5 d172159dex1028.htm EX-10.28

**Exhibit 10.28**

<u>**AMENDED AND RESTATED**</u>
<u>**EMPLOYMENT AGREEMENT**</u>

THIS EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of October 10, 2021 and between Michael J. Levitt ("<u>Executive</u>") and Core Scientific Holding Co. (the "<u>Company</u>").

**WHEREAS,** the Company desires to employ Executive and Executive desires to be employed by the Company, on the terms set forth in this Agreement.

**WHEREAS,** the Company and Executive are parties to an Employment Agreement dated as of July 2, 2021;

**WHEREAS,** the parties desire to amend and restate the Agreement as of the date hereof;

**NOW**, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>Employment Term</u>. The Company hereby agrees to employ Executive, and Executive hereby agrees to be employed with the Company, upon the terms and conditions contained in this Agreement. Executive's employment with the Company pursuant to this Agreement shall be deemed to have commenced on May 17, 2021 (the "<u>Effective Date</u>") and shall continue until the fourth (4th) anniversary of the Effective Date (the "<u>Initial Term</u>") unless earlier terminated pursuant to <u>Section 8</u>; <u>provided</u>, that the term of this Agreement shall automatically be extended for one (1) additional year commencing on the fourth anniversary of the Effective Date and on each anniversary thereafter (each, a "<u>Renewal Term</u>") unless, not less than ninety (90) days prior to the commencement of any such Renewal Term, either party shall have given written notice to the other that it does not wish to extend this Agreement (a "<u>Non-Renewal Notice</u>"), in which case, Executive's employment under this Agreement shall terminate upon the close of business on the last day of the Initial Term or the then-current Renewal Term, as applicable. The period during which Executive is employed by the Company pursuant to this Agreement is hereinafter referred to as the "<u>Term</u>."

2.  <u>Employment Duties</u>. Executive shall have the title of Chairman of the Board and Chief Executive Officer of the Company and shall have such duties, authorities and responsibilities as are consistent with such position and as the Board of Directors of the Company (the "<u>Board</u>") may designate from time to time. Executive shall also serve as a member of the Board. Executive shall report to the Board. Executive shall devote Executive's full working time and attention and Executive's best efforts to Executive's employment and service with the Company and shall perform Executive's services in a capacity and in a manner consistent with Executive's position for the Company; <u>provided</u>, that this <u>Section 2</u> shall not be interpreted as prohibiting Executive from (i) managing Executive's personal investments and other lawful business interests, including without limitation, serving on the board or as an executive of any investment banking or investment or asset management business, (ii) engaging in charitable or civic activities, (iii) participating on boards of directors or similar bodies of non-profit organizations, or (iv) subject to approval by the Board in its reasonable business judgment, participating on boards of directors or similar bodies of for-profit organizations, in each case of (i) – (iv), so long as such activities do not, individually or in the aggregate, (a) materially

1

4/9/2023, 4:48 AM

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

interfere with the performance of Executive's duties and responsibilities hereunder, (b) create a fiduciary conflict, or (c) result in a violation of <u>Section 13</u> of this Agreement. If requested, Executive shall also serve as an executive officer of any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Company (an "<u>Affiliate</u>") without any additional compensation.

3.   <u>Base Salary and Bonus</u>. During the Term, the Company shall pay Executive a base salary at an annual rate of $60,000, payable in accordance with the Company's normal payroll practices for employees as in effect from time to time. The Board shall review Executive's base salary annually. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "<u>Base Salary</u>." If for any calendar year during the term of this Agreement (or partial year in the case of the year in which this Agreement terminates) the positive total shareholder return ("TSR") of the Company exceeds the TSR for the S&P 500 Index during the same period ("TSR Over Performance"), Executive shall be entitled to a bonus ("Bonus") equal to the product of .0375 multiplied by the amount of the increase in Company equity value attributable to TSR Over Performance. The Bonus amount is payable at the option and discretion of the Company in cash, bitcoin ("BTC") or shares of Company common stock having a fair market value on the date of issue equal to the amount of the Bonus.

4.   <u>Equity Awards and Benefits</u>. As soon as reasonably practicable following the Effective Date, subject to approval by the Board, Executive or his designees shall be granted 8,400,000 restricted stock units pursuant to the Company's 2018 Omnibus Incentive Plan or such other or successor plan then established by Company Executive shall also be entitled to an award of 3,150,000 restricted stock units following an initial public offering involving the common stock of the Company or the consummation of a transaction in which the common stock of the Company is converted into shares of an entity that is publicly traded on a national securities exchange. In addition, on an annual basis the Board shall conduct an annual performance review of Executive pursuant to which Executive shall have the opportunity to earn an additional annual grant of up to 1,000,000 additional restricted stock units subject to achievement of certain performance metrics established by the Board of Directors in the Board's discretion which metrics shall include the Company's performance with respect to environmental, social and governance practices, improvements with respect to sustainability in the Company's business operations as well as such other business operational performance as the Board of Directors may establish. The Restricted stock units granted to Executive hereunder or during the term of Executive's employment shall be issued pursuant to the Company's 2018 Omnibus Incentive Plan or such other successor plan established by Company (as amended from time to time, the "<u>Plan</u>") or otherwise as the Board shall determine in its discretion. Equity awards granted to Executive or his designees shall have such terms, conditions and vesting set forth in the applicable award agreement issued pursuant to the Plan the form of which is attached as Exhibit A. Notwithstanding the foregoing, equity awards granted to Executive during the term of his employment shall fully vest if Executive's employment is terminated as a result of Executive's death or "Disability" (as defined in Section 8(b) hereof, or by Company without "Cause" (as defined in Section 10(a) hereof) or for "Good Reason" (as defined in Section 10(c) hereof).

5.   <u>Benefits</u>. Executive shall be entitled to participate in any benefit plans, including medical, disability life insurance and disability offered by the Company as in effect from time to

2

Debtors' Exhibit No. 40
Page 401 of 462

time (collectively, "Benefit Plans"), on the same basis as those generally made available to other executives of the Company, to the extent consistent with applicable law and the terms of the applicable Benefit Plan. The Company does not promise the adoption or continuance of any particular Benefit Plan and reserves the right to amend or cancel any Benefit Plan at any time in its sole discretion (subject to the terms of such Benefit Plan and applicable law).

6.   Indemnity and Director and Officer Insurance. The Company agrees that in the event Executive is, or is threatened to be made, a party to any pending, contemplated or threatened action, suit, arbitration, or any other proceeding whether civil, criminal, administrative or investigative, and whether formal or informal ("Proceeding"), by reason of the fact that Executive is or was, or had agreed to become, an employee or director of the Company, is are or was serving at the request of the Company as an employee or director to another corporation, partnership, joint venture, business, person, trust, employee benefit plan or other entity, the Company shall indemnify and hold Executive harmless, to the fullest extent permitted by the Delaware General Corporation Law, as amended from time to time, and the Company's Certificate of Incorporation or By-Laws, against all claims, expenses, damages, liabilities and losses incurred by Executive, provided that Executive acted in good faith and in a manner Executive reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal Proceeding, had no reasonable cause to believe Executive's conduct was unlawful; provided, further that Executive shall not be entitled to any such indemnification (A) in respect of any Proceeding based upon or attributable to Executive's gaining in fact any personal profit or advantage to which Executive was or is not entitled or resulting from Executive's fraudulent misconduct, (B) to the extent Executive has already received indemnification or payment pursuant to the Company's Certificate of Incorporation, By-laws or other governing documents or otherwise or (C) in respect of any Proceeding initiated by Executive, unless: (I) the Company has joined in or the Board has authorized such Proceeding or (II) Executive is obligated to bring a proceeding against the Company to enforce the Company's indemnity or expense advance obligations. Any such indemnification shall include advancement of costs and expenses. The indemnification obligations of the Company shall survive from the date hereof and continue until (i) ten years after the date that Executive shall have ceased to serve as an employee or director to the Company or (ii) the final termination of all Proceedings pending on the date set forth in clause (i) in respect of which Executive is granted rights of indemnification or advancement of expenses hereunder (the "Survival Period"), and shall survive after the Survival Period with respect to any indemnification claim as to which the Company has received notice on or prior to the end of the Survival Period. The Company's belief regarding a statute of limitations applicable to a claim, any position taken by the Company in response to a claim, or the determination of any judicial, quasi-judicial, or arbitral body in connection with a claim and any statute of limitations applicable to a claim(s) shall in no event relieve the Company from its obligation to indemnify Executive. In addition to Executive entering into a customary written Indemnification Agreement with the Company, for so long as Executive is a director on the Board, Executive will also be entitled to coverage under the Company's D&O (and other applicable) insurance policies as then in effect. The Company will also obtain on Executive's behalf and pay for a personal director's liability insurance policy.

7.   Expense Reimbursement. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business expenses incurred by Executive in connection with the performance of Executive's duties hereunder in accordance with the Company's expense reimbursement policies and procedures in effect time to time, subject to presentation by

3

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

Executive of documentation reasonably satisfactory to the Company that the applicable expense has been incurred. Executive shall be permitted to fly private for business travel and shall be reimbursed for use of Executive's own aircraft at a rate of $8,000 per flight hour or the reasonable actual cost of charter aircraft in the event Executive's aircraft is unavailable.

8. <u>Termination of Employment</u>. The Term and Executive's employment hereunder may be terminated as follows:

(a)   Automatically in the event of the death of Executive;

(b)   At the option of the Company, by written notice to Executive or Executive's personal representative in the event of the Disability of Executive. As used herein, the term "<u>Disability</u>" shall mean Executive's inability to perform the essential duties, responsibilities, and functions of his position with the Company as a result of any mental or physical disability or incapacity, with or without reasonable accommodation (including for example but not by way of limitation, by providing reasonable accommodation in the form of protected leave) and such inability continues for at least 120 consecutive calendar days or 150 nonconsecutive days during any consecutive 12-month period after its commencement. Notwithstanding the foregoing, Executive shall not be terminated for "Disability" under circumstances that would violate Executive's rights to reasonable accommodation or protected leave under applicable law protecting individuals with disabilities or requiring leave. Family and medical leave or disability leave provided under federal, state or local law may be unpaid as per the requirements of such laws; <u>provided</u>, <u>however</u>, that Executive shall be entitled to such payments and benefits under the Company's sick leave or disability leave programs as per the terms of such programs. The Company may terminate Executive's active employment because of a Disability by giving written notice to Executive at any time effective at or within twenty (20) days after the end period of leave as may be required under the family and medical leave laws or under federal, state or local disability laws, but the Company shall retain Executive as an inactive employee if necessary to maintain Executive's eligibility for any disability leave benefits. A reduction or elimination of the duties defined in <u>Section 2</u> during the period Executive is designated as an inactive employee shall not constitute Good Reason. In the event of a dispute over the occurrence of a Disability, Executive agrees to submit to an examination by a doctor selected by the Company who will determine fitness for duties as defined in <u>Section 2</u> above. If Executive's physician disagrees with the Company's physician's opinion, a third physician, mutually agreed upon by Executive and the Company, shall examine Executive and that physician's opinion shall be conclusive as to Executive's fitness for duty.

(c)   At the option of the Company for Cause, by delivering prior written notice to Executive specifying the facts and circumstances and the section of the Agreement on which the Company bases its determination of Cause;

(d)   At the option of the Company at any time without Cause, by delivering written notice of its determination to terminate to Executive;

(e)   At the option of Executive for Good Reason; or

(f)   At the option of Executive without Good Reason, upon sixty (60) days prior written notice to the Company (which the Company may, in its sole discretion, make effective earlier than the termination date provided in such notice), or

4

EX-10.28

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

(g)    Upon the close of business on the last day of the Initial Term or the then-current Renewal Term, as applicable, as a result of a Non-Renewal Notice.

9.    <u>Payments by Virtue of Termination of Employment</u>.

(a)    Within thirty (30) days following Executive's termination of employment, Executive shall receive: (a) payment of Executive's accrued and unpaid Base Salary as of the date of termination, (b) any accrued amounts or accrued benefits due to Executive in accordance with the Benefit Plans, programs or policies (other than severance), and (c) reimbursement of expenses under <u>Section 7</u> incurred as of the date of termination. Executive hereby acknowledges and agrees that, other than the payments described in this <u>Section 9</u> and set forth in any applicable award agreement under the Plan, upon the effective date of the termination of Executive's employment, Executive shall not be entitled to any other payments or benefits of any kind under any Company benefit plan or policy generally available to the Company's employees or otherwise and all other rights of Executive to compensation under this Agreement shall end as of such date.

(b)    In the event the Executive's employment is terminated by the Company without Cause, by the Executive for Good Reason, by either Party after a Change in Control, or as a result of a Company Non-Renewal, the Executive shall be entitled to (i) the payments set forth in Section 9(a) and (ii) subject to Section 9(c) of this Agreement, (1) Base Salary continuation for twelve (12) months, payable in substantially equal installments in accordance with the Company's regular payroll practices, (2) Bonus, if any, for the year in which the termination occurs in an amount equal to the target bonus amount approved by the Board with respect to Executive and payable within thirty (30) days following Executive's termination of employment, and (3) if Executive timely elects coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("<u>COBRA</u>"), a cash payment equal to the full premium for actively employed executives of the Company with the same level of coverage, payable monthly in accordance with the Company's standard payroll practices for twelve (12) months following the date of termination; <u>provided</u>, that the first payment pursuant to this <u>Section 9(b)(ii)</u> shall be made on the next regularly scheduled payroll date following the sixtieth (60th) day after Executive's termination and shall include payment of any amounts that would otherwise be due prior thereto. Executive hereby acknowledges and agrees that, other than the payments described in this <u>Section 9</u> and set forth in any applicable award agreement under the Plan, upon the effective date of the termination of Executive's employment, Executive shall not be entitled to any other payments or benefits of any kind under any Company benefit plan or policy generally available to the Company's employees or otherwise and all other rights of Executive to compensation under this Agreement shall end as of such date.

(c)    All payments and benefits due to Executive under this <u>Section 9(b)(ii)</u> which are not otherwise required by applicable law shall be payable only if Executive executes a release of claims in a form mutually agreed by the Parties and such release becomes irrevocable, within sixty (60) days following termination of employment. The form of release executed by the Parties shall include release of any and all claims that the Company might have or assert against Executive. Failure to timely execute and return such release or the revocation of such release during the revocation period shall be a waiver by Executive of Executive's right to the payments in <u>Section 9(b)(ii)</u>. In addition, the payments in <u>Section 9(b)(ii)</u> shall be conditioned on Executive's compliance with <u>Sections 11</u> of this Agreement and on Executive's continued compliance with <u>Section 13</u> of this Agreement.

5

EX-10.28

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

10.  <u>Definitions</u>. For purposes of this Agreement,

(a)   "<u>Cause</u>" shall mean, (i) Executive's conviction of, or a plea of guilty or no contest to, any indictable criminal offense or any other criminal offense involving fraud, misappropriation or moral turpitude, (ii) Executive's continued failure to materially perform Executive's duties hereunder (for any reason other than illness or physical or mental incapacity) and failure to cure the same within thirty (30) days after the Company provides written notice consistent with Section 8(c) to Executive or a material breach of fiduciary duty, (iii) Executive's theft, fraud, or dishonesty with regard to the Company or any of its Affiliates or in connection with Executive's duties, (iv) Executive's material violation of the Company's code of conduct or similar written policies, (v) Executive's willful misconduct unrelated to the Company or any of its Affiliates having, or likely to have, a material negative impact on the Company or any of its Affiliates (economically or its reputation), (vi) an act of gross negligence or willful misconduct by Executive that relates to the affairs of the Company or any of its Affiliates, or (vii) material breach by Executive of any provisions of this Agreement. Notwithstanding the foregoing, Executive may only be terminated for "Cause" under (iv) or (vii) of this Section if he first receives written notice consistent with Section 8(c) from the Company and fails to cure the same within thirty (30) days after the Company provides such written notice. Notwithstanding anything else in this Agreement, a good faith error in judgment in the normal course of business shall not constitute Cause for termination.

(b)   "<u>Good Reason</u>" shall mean, without Executive's consent, (i) any material diminution in Executive's responsibilities, authorities or duties, (ii) any material reduction in Base Salary, other than across the board reductions for all executives, and (iii) a relocation of Executive's principal place of employment by more than fifty (50) miles from Executive's residence in Austin, Texas; provided, that no event described in clause (i), (ii) or (iii) shall constitute Good Reason unless (A) Executive has given the Company written notice of the termination, setting forth the conduct of the Company that is alleged to constitute Good Reason, within sixty (60) days following the occurrence of such event, and (B) Executive has provided the Company at least sixty (60) days following the date on which such notice is provided to cure such conduct and the Company has failed to do so. Failing such cure, a termination of employment by Executive for Good Reason shall be effective on the day following the expiration of such cure period.

(c)   For the purposes of any equity awards granted under the Plan, "<u>Change in Control</u>" shall mean (i) the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its subsidiaries (taken as a whole) to any "person" or "group" (as such terms are defined in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) other than the Initial Shareholders or (ii) any person or group, other than the Initial Shareholders Affiliated Sponsor Entities, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the voting equity of the Company, including by way of merger, consolidation or otherwise. In determining whether any person or group constitutes a "person" or "group" for purposes of subsections (i) or (ii) above, the Initial Shareholders shall be excluded from such "person" or "group". For purposes of determining whether (i) or (ii) has occurred, an

6

Debtors' Exhibit No. 40
Page 405 of 462

EX-10.28                                                                 https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

issuance of shares of the Company by the Company (or its successor), whether through an initial public offering, other primary issuance or otherwise, shall be excluded. Notwithstanding the foregoing, a Change in Control shall not occur unless such transaction constitutes a change in the ownership of the Company, a change in effective control of the Company, or a change in the ownership of a substantial portion of the Company's assets under Section 409A. "Initial Shareholders" shall mean each of the shareholders of the Company and their respective affiliates as of the Effective Date.

11.   Return of Company Property. Within ten (10) days following the effective date of Executive's termination for any reason, Executive, or Executive's personal representative shall return all property of the Company or any of its Affiliates in Executive's possession, including, but not limited to, all Company-owned computer equipment (hardware and software), telephones, facsimile machines, tablet computers and other communication devices, credit cards, office keys, security access cards, badges, identification cards and all copies (including drafts) of any documentation or information (however stored) relating to the business of the Company or any of its Affiliates, the Company's or any of its Affiliates' customers and clients or their respective prospective customers or clients.

12.   Resignation as Officer or Director. Upon the effective date of Executive's termination, Executive shall be deemed to have resigned from Executive's position and, to the extent applicable, as an officer of the Company, as a member of the Board or similar governing body of the Company or any of its Affiliates, and as a fiduciary of any Company benefit plan. On or immediately following the effective date of any such termination of Executive's employment, Executive shall confirm the foregoing by submitting to the Company in writing a confirmation of Executive's resignation(s).

13.   Confidentiality; Non-Solicitation; Non-Competition.

(a)   Confidential and Proprietary Information. Executive agrees that all materials and items produced or developed by Executive for the Company or any of its Affiliates or obtained by Executive from the Company or any of its Affiliates either directly or indirectly pursuant to this Agreement shall be and remains the property of the Company and its Affiliates. Executive acknowledges that he will, during Executive's association with the Company, acquire, or be exposed to, or have access to, materials, data and information that constitute valuable, confidential and proprietary information of the Company and its Affiliates, including, without limitation, any or all of the following: business plans, practices and procedures, pricing information, sales figures, profit or loss figures, this Agreement and its terms, information relating to customers, clients, intellectual property, suppliers, technology, sources of supply and customer lists, research, technical data, trade secrets, or know-how, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, policies, training manuals and similar materials used by the Company in conducting its business operations, personnel information of any Person employed by the Company, potential business combinations, and such other information or material as the Company may designate as confidential and/or proprietary from time to time (collectively hereinafter, the "Confidential and Proprietary Information"). During Executive's employment with the Company and at all times thereafter, Executive shall not, directly or indirectly, use, misuse, misappropriate, disclose or make known, without the prior written approval of the Board, to any party, firm, corporation, association or other entity, any such Confidential and Proprietary Information for any reason or purpose whatsoever, except as may

7

be required in the course of Executive's performance of Executive's duties hereunder. In consideration of the unique nature of the Confidential and Proprietary Information, all obligations pertaining to the confidentiality and nondisclosure thereof shall remain in effect until the Company and its Affiliates have released such information; provided, that the provisions of this Section 13(a) shall not apply to the disclosure of Confidential and Proprietary Information to the Company's Affiliates together with each of their respective shareholders, directors, officers, accountants, lawyers and other representatives or agents, nor to a Permitted Disclosure as defined in Section 13(b) below. In addition, it shall not be a breach of the confidentiality obligations hereof if Executive is required by applicable law to disclose any Confidential and Proprietary Information; provided, that in such case, Executive shall (x) give the Company the earliest notice possible that such disclosure is or may be required and (y) cooperate with the Company, at the Company's expense, in protecting to the maximum extent legally permitted, the confidential or proprietary nature of the Confidential and Proprietary Information which must be so disclosed. Upon termination of Executive's employment, Executive agrees that all Confidential and Proprietary Information, directly or indirectly, in Executive's possession that is in writing or other tangible form (together with all duplicates thereof) will promptly (and in any event within 10 days following such termination) be returned to the Company and will not be retained by Executive or furnished to any person, either by sample, facsimile film, audio or video cassette, electronic data, verbal communication or any other means of communication. Notwithstanding the foregoing or anything else in this Agreement, Executive may disclose the terms of this Agreement and information regarding his compensation arrangements with his spouse, and his tax, legal and financial advisors.

      (b)   <u>Permitted Disclosure</u>. This Agreement does not limit or interfere with Executive's right, without notice to or authorization of the Company, to communicate and cooperate in good faith with any self-regulatory organization or U.S. federal, state, or local governmental or law enforcement branch, agency, commission, or entity (collectively, a "<u>Government Entity</u>") for the purpose of (i) reporting a possible violation of any U.S. federal, state, or local law or regulation, (ii) participating in any investigation or proceeding that may be conducted or managed by any Government Entity, including by providing documents or other information, or (iii) filing a charge or complaint with a Government Entity, provided that in each case, such communications, participation, and disclosures are consistent with applicable law. Additionally, Executive shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Executive files a lawsuit for retaliation by an employer for reporting a suspected violation of law, Executive may disclose the trade secret to Executive's attorney and use the trade secret information in the court proceeding, if Executive files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order. All disclosures permitted under this Section 13(b) are herein referred to as "<u>Permitted Disclosures.</u>"

      (c)   <u>Confidentiality of this Agreement and its Terms</u>. Executive acknowledges that the terms of this Agreement are intended to be confidential between the Parties and except in response to a lawful subpoena, court order or governmental administrative request, Executive will not discuss the terms of this Agreement with any third party. The only exceptions will be that Executive may discuss the fact and terms of this Agreement with his spouse, attorneys, and financial advisor(s).

8

(d)   Non-Solicitation. Executive agrees that during the Restricted Period (defined below), Executive will not, without written consent of the Company, directly or indirectly, including causing, encouraging, directing or soliciting any other Person (defined below) to, contact, approach or solicit (except as so long as Executive continues to be employed by the Company and makes such contact, approach or solicitation on behalf of the Company and excluding offspring of Executive) for the purpose of offering employment to or hiring (whether as an employee, consultant, agent, independent contractor or otherwise) or actually hire any Person who is or has been employed or retained in the operation of the Company's Business (defined below) by the Company or its Affiliates during the period commencing one year prior to the date hereof and ending on the date of termination of the Restricted Period, or induce, interfere with or solicit, or attempt to induce, interfere with or solicit, any Person that is a current or former customer, vendor, supplier or other business relation of the Company or its Affiliates into any business relationship that might harm the Company's Business. The restrictions in this Section 13(d) shall not prohibit a general solicitation to the public through general advertising or similar methods of solicitation by search firms not specifically directed at employees of the Company. "Restricted Period" means the period beginning on the Effective Date and ending on the one (1) year anniversary of the date on which Executive's employment is terminated. "Person" means an individual, a partnership, a corporation, an association, a limited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof. "Business" means crypto mining and competing blockchain businesses; "Business" shall not include any non-competing blockchain business.

(e)   Non-Competition. Executive agrees that during the Restricted Period, Executive will not, within or with respect to the geographical area of (i) the United State of America and (ii) all other areas of the world in which the Company is then engaged in Business. (the "Restricted Area"), except in the furtherance of the Company's Business directly or indirectly own, operate, lease, manage, control, participate in, consult with, advise, permit the Employee's name to be used by, provide services for, or in any manner engage in (other than ownership for investment purposes of less than two percent (2%) of a publicly traded company) any company or other entity or organization that, directly or indirectly, engages in the Business of the Company in the Restricted Area (A) as conducted by the Company during the course of Executive's employment with the Company or (B) planned to be conducted by the Company pursuant to a product or business plan developed prior to the termination of Executive's employment with the Company, provided such plans were documented and the Executive was aware of these plans. Notwithstanding the foregoing, however, nothing herein shall prohibit Executive from engaging in any of the activities described above as a result of the activities of investment banking, investment or asset management businesses owned, operated, managed, controlled, or invested in by Executive or such entities with which Executive is affiliated or as to which Executive counsels, advises or is otherwise engaged by or with.

(f)   Nondisparagement. Executive agrees not to disparage or make defamatory statements about the Company, its subsidiaries, affiliates or predecessors, or their past and present investors, officers, directors or employees, or any of their affiliates. Nothing in this Section 13(f) shall interfere with Executive's ability to make the Permitted Disclosures as defined in Section 13(b) above. The Company agrees to instruct its executive officers not to disparage or make defamatory statements about Executive. Nothing in this Agreement shall be

9

Debtors' Exhibit No. 40
Page 408 of 462

EX-10.28                                             https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

interpreted, however, to preclude: (1) either the Company or its subsidiaries, officers and/or directors from making any truthful statements about Employee to the extent required by applicable law or regulation, in connection with any proceeding (regardless of whether between Employee and the Company) or in the course of any regulatory or administrative inquiry, review or investigation or other proceeding that may be conducted by a government agency or (2) the Executive from making any truthful statements about the Company to the extent required by applicable law or regulation, in connection with any proceeding (regardless of whether between Employee and the Company) or in the course of any regulatory or administrative inquiry, review or investigation or other proceeding that may be conducted by a government agency. Notwithstanding the foregoing, competitive speech other than legally actionable defamation or, comparisons of products and/or services by Executive on behalf of future employers following the expiration of the Restricted Period shall not be a violation of this Section 13(f).

(g)    Acknowledgement. Executive acknowledges, agrees and stipulates that: (i) the terms and provisions of this Agreement are reasonable and constitute an otherwise enforceable agreement; (ii) the consideration provided by the Company under this Agreement is not illusory; and (iii) the consideration given by the Company under this Agreement, including, without limitation, the provision by the Company of confidential information to Executive as contemplated by Section 13(a), gives rise to the Company's interest in restraining and prohibiting Executive from engaging in the activities described in Sections 13(c) and 13(d), and Executive's covenant not to engage in these activities is designed to enforce Executive's consideration (or return promises), including, without limitation, Executive's promise to not disclose confidential information under this Agreement.

(h)    Tolling. In the event of any violation of the provisions of this Section 13, Executive acknowledges and agrees that the post-termination restrictions contained in this Section 13 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

14.    Cooperation. From and after an Executive's termination of employment, Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during Executive's employment hereunder, provided, that the Company shall reimburse Executive for Executive's reasonable costs and expenses (including legal counsel selected by Executive and reasonably acceptable to the Company) and such cooperation shall not unreasonably burden Executive or unreasonably interfere with any subsequent employment that Executive may undertake.

15.    Injunctive Relief and Specific Performance. Executive understands and agrees that Executive's covenants under Sections 11, 13 and 14 are special and unique and that the Company and its Affiliates may suffer irreparable harm if Executive breaches any of Sections 11, 13, or 14 because monetary damages would be inadequate to compensate the Company and its Affiliates for the breach of any of these sections. Accordingly, Executive acknowledges and agrees that the Company shall, in addition to any other remedies available to the Company at law or in equity, be entitled to obtain specific performance and injunctive or other equitable relief by a federal or state court in Delaware to enforce the provisions of Sections 11, 13 and/or 14 without the necessity of posting a bond or proving actual damages, without liability should such relief be denied, modified or vacated, and to obtain attorney's fees in respect of the foregoing if

10

4/9/2023, 4:48 AM

EX-10.28

the Company prevails in any such action or proceeding. Executive also recognizes that the territorial, time and scope limitations set forth in <u>Section 13</u> are reasonable and are properly required for the protection of the Company and its Affiliates and in the event that any such territorial, time or scope limitation is deemed to be unreasonable by a court of competent jurisdiction, the Company and Executive agree, and Executive submits, to the reduction of any or all of said territorial, time or scope limitations to such an area, period or scope as said court shall deem reasonable under the circumstances.

16.   <u>Section 280G</u>. Notwithstanding anything to the contrary in this Agreement, if Executive is a "disqualified individual" (as defined in section 280G(c) of the Internal Revenue Code of 1986, as amended (the "Code")), and the payments and benefits provided for in this Agreement, together with any other payments and benefits which Executive has the right to receive from the Company or any of its Affiliates, would constitute a "parachute payment" (as defined in section 280G(b)(2) of the Code), then the payments and benefits provided for in this Agreement shall be either (a) reduced (but not below zero) so that the present value of such total amounts and benefits received by Executive from the Company and its affiliates will be one dollar ($1.00) less than three times Executive's "base amount" (as defined in section 280G(b)(3) of the Code) and so that no portion of such amounts and benefits received by Executive shall be subject to the excise tax imposed by section 4999 of the Code or (b) paid in full, whichever produces the better net after-tax position to Executive (taking into account any applicable excise tax under section 4999 of the Code and any other applicable taxes). The reduction of payments and benefits hereunder, if applicable, shall be made by reducing, first, payments or benefits to be paid in cash hereunder in the order in which such payment or benefit would be paid or provided (beginning with such payment or benefit that would be made last in time and continuing, to the extent necessary, through to such payment or benefit that would be made first in time) and then, reducing any benefit to be provided in-kind hereunder in a similar order. The determination as to whether any such reduction in the amount of the payments and benefits provided hereunder is necessary shall be made by the Company in good faith. If a reduced payment or benefit is made or provided and through error or otherwise that payment or benefit, when aggregated with other payments and benefits from the Company (or its affiliates) used in determining if a "parachute payment" exists, exceeds one dollar ($1.00) less than three times Executive's base amount, then Executive shall immediately repay such excess to the Company upon notification that an overpayment has been made. Nothing in this <u>Section 16</u> shall require the Company to be responsible for, or have any liability or obligation with respect to, Executive's excise tax liabilities under section 4999 of the Code.

17.   <u>Miscellaneous</u>.

(a)   All notices hereunder, to be effective, shall be in writing and shall be deemed effective when delivered by hand or mailed by (i) certified mail, postage and fees prepaid, or (ii) nationally recognized overnight express mail service, as follows:

If to the Company:
Core Scientific Holding Co.
Email: tduchene@corescientific.com
To: Todd M. DuChene

If to Executive:

11

Debtors' Exhibit No. 40
Page 410 of 462

At Executive's home address as then shown in the Company's personnel records, or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

(b)    This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and its successors and assigns.

(c)    This Agreement contains the entire agreement between the parties with respect to the subject matter hereof supersedes all other agreements, term sheets, offer letters, and drafts thereof, oral or written, between the parties hereto with respect to the subject matter hereof. No promises, statements, understandings, representations or warranties of any kind, whether oral or in writing, express or implied, have been made to Executive by any person or entity to induce Executive to enter into this Agreement other than the express terms set forth herein, and Executive is not relying upon any promises, statements, understandings, representations, or warranties other than those expressly set forth in this Agreement.

(d)    No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by all of the parties hereto. No waiver of any provisions of this Agreement shall be valid unless in writing and signed by the party charged with waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver, unless so provided in the waiver.

(e)    If any provisions of this Agreement (or portions thereof) shall, for any reason, be held invalid or unenforceable, such provisions (or portions thereof) shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining provisions of this Agreement (or portions thereof) shall nevertheless be valid, enforceable and of full force and effect. If any court of competent jurisdiction finds that any restriction contained in this Agreement is invalid or unenforceable, then the parties hereto agree that such invalid or unenforceable restriction shall be deemed modified so that it shall be valid and enforceable to the greatest extent permissible under law, and if such restriction cannot be modified so as to make it enforceable or valid, such finding shall not affect the enforceability or validity of any of the other restrictions contained herein.

(f)    This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(g)    The section or paragraph headings or titles herein are for convenience of reference only and shall not be deemed a part of this Agreement. The parties have jointly

12

EX-10.28                                                                 https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

participated in the drafting of this Agreement, and the rule of construction that a contract shall be construed against the drafter shall not be applied. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(h)     Notwithstanding anything to the contrary in this Agreement:

(i)     The parties agree that this Agreement shall be interpreted to comply with or be exempt from Section 409A of the Code and the regulations and authoritative guidance promulgated thereunder to the extent applicable (collectively "Section 409A"), and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. In no event whatsoever will the Company, any of its affiliates, or any of their respective directors, officers, agents, attorneys, employees, executives, shareholders, investors, members, managers, trustees, fiduciaries, representatives, principals, accountants, insurers, successors or assigns be liable for any additional tax, interest or penalties that may be imposed on Executive under Section 409A or any damages for failing to comply with Section 409A.

(ii)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A, and for purposes of any such provision of this Agreement, references to a "resignation," "termination," "terminate," "termination of employment" or like terms shall mean separation from service. If any payment, compensation or other benefit provided to Executive in connection with the termination of Executive's employment is determined, in whole or in part, to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is a specified employee as defined in Section 409A(2)(B)(i) of the Code, no part of such payments shall be paid before the day that is six (6) months plus one (1) day after the date of termination or, if earlier, ten business days following Executive's death (the "New Payment Date"). The aggregate of any payments that otherwise would have been paid to Executive during the period between the date of termination and the New Payment Date shall be paid to Executive in a lump sum on such New Payment Date. Thereafter, any payments that remain outstanding as of the day immediately following the New Payment Date shall be paid without delay over the time period originally scheduled, in accordance with the terms of this Agreement.

(iii)     All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which Executive incurs such expense. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind, benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(iv)     If under this Agreement, an amount is paid in two or more installments, for purposes of Section 409A, each installment shall be treated as a separate

13

Debtors' Exhibit No. 40
Page 412 of 462

payment. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(i)     All questions concerning the construction, validity and interpretation of this Agreement and the exhibits to this Agreement will be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereby irrevocably and unconditionally submit in any legal action or proceeding arising out of or relating to this Agreement to the exclusive jurisdiction of either a state court located in the State of Delaware, with subject matter jurisdiction over the action or the United States District Court or in the Federal Courts located in Delaware, and, in any such action or proceeding, consent to jurisdiction in such courts and waive any objection to the venue in any such court. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

(j)     Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he/she is bound, (ii) Executive is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive on and after the Effective Date, enforceable in accordance with its terms. Executive hereby acknowledges and represents that he has had the opportunity to consult with independent legal counsel or other advisor of Executive's choice and has done so regarding Executive's rights and obligations under this Agreement, that he is entering into this Agreement knowingly, voluntarily, and of Executive's own free will, that he is relying on Executive's own judgment in doing so, and that he fully understands the terms and conditions contained herein.

(k)     The Company shall have the right to withhold from any amount payable hereunder any Federal, state and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

(l)     The covenants and obligations of the Company under Sections 9, 13, 14, 15 and 17 hereof, and the covenants and obligations of Executive under Sections 11, 12, 13, 14, 15 and 17 hereof, shall continue and survive any expiration of the Term, termination of Executive's employment or any termination of this Agreement.

*[signature page follows]*

14

EX-10.28                                            https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

CORE SCIENTIFIC HOLDING CO.

By: /s/ Todd DuChene
    By: Todd M. DuChene
    Title: General Counsel

EXECUTIVE

/s/ Michael Levitt
Name: Michael J. Levitt

4/9/2023, 4:48 AM

EX-10.28

Exhibit A

Form of Restricted Stock Unit Agreement

**CORE SCIENTIFIC HOLDING CO.**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

THIS RESTRICTED STOCK UNIT AWARD AGREEMENT (this "Award Agreement") is made effective as of DATE (the "Grant Date") by and between Core Scientific Holding Co., a Delaware corporation (the "Company"), and NAME (the "Grantee"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Core Scientific Holding Co (f/k/a MineCo Holdings, Inc.) 2018 Omnibus Incentive Plan (the "Plan").

### R E C I T A L S:

WHEREAS, the Board of Directors of the Company (the "Board") has determined that it would be in the best interests of the Company and its stockholders to grant the restricted stock units provided for herein to the Grantee pursuant to the terms set forth herein.

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

**Number of Restricted Stock Units Subject to this Award**: ("RSUs")

**Vesting Commencement Date:**

**Vesting**: The RSUs shall be subject to both a time vesting condition and a transaction-based vesting condition as set forth in clauses (i) and (ii) below.

Time-Vesting Condition. Twenty five percent (25%) of the RSUs shall time vest on each of the first four (4) anniversaries of the Vesting Commencement Date, subject to the Grantee's continued Service with the Company on each applicable time vesting date ("Time Vesting Condition").

Transaction-based Vesting Condition. The RSUs shall transaction-based vest upon the earlier of a Change in Control or the initial Public Offering of equity securities of the Company ("Transaction-based Vesting Condition").

Both the Time Vesting Condition and the Transaction-based Vesting Condition must be satisfied in order for the RSUs to vest (such RSUs, the "Vested RSUs"). The date in which both the Time Vesting Condition and the Transaction-based Vesting Condition has been satisfied with respect to any RSUs shall be referred to as a "Vesting Date."

16

**Termination of Service**

If the Grantee's service is terminated for Cause or the Grantee breaches any restrictive covenants in favor of the Company to which the Grantee is a party, all Vested RSUs, unvested RSUs and any Shares received in connection with the settlement of RSUs shall be forfeited.

In the event the Grantee's Service is terminated for any reason other than for Cause, any RSUs that have not satisfied the Time Vesting Condition as of the date of such termination shall be forfeited. The RSUs that have satisfied the Time Vesting Condition as of the date of such termination (the "Time Vested RSUs") shall remain outstanding and eligible to vest for two (2) years following the date of such termination. If the Time Vested RSUs satisfy the Transaction-based Vesting Condition on or prior to the second (2nd) anniversary of the date of termination of the Grantee's Service, such RSUs shall be settled in accordance with Section 5 or if the Time Vested RSUs do not satisfy the Transaction-based Vesting Condition on or prior to the second (2nd) anniversary of the date of termination of the Grantee's Service, the Time Vested RSUs shall be immediately forfeited for no consideration on such second (2nd) anniversary.

For purposes of this Award Agreement, "Service" shall mean, the Grantee's service as an employee, director, advisor, consultant or independent contractor with the Company or a Subsidiary.

**Settlement of Restricted Stock Units**

Settlement Schedule. Vested RSUs shall be settled as soon as reasonably practicable following the Vesting Date but in no event later than March 15th of the year following the calendar year in which the Vesting Date occurs (such date of settlement, the "Settlement Date"); provided that the Company shall have the sole and absolute discretion to determine the Settlement Date during such period.

Conversion of RSUs and Issuance of Shares. Upon settlement, one share of Common Stock shall be issuable for each Vested RSU (the "Settlement Shares") subject to the terms and provisions of the Plan and this Award Agreement. Prior to the issuance of any Settlement Shares, Grantee shall enter into a joinder to the Company's shareholder agreement or other similar agreement in a form to be provided by the Company under which the Settlement Shares will be subject to transfer restrictions, voting agreements and other obligations to be provided therein. No fractional shares shall be issued under this Award Agreement.

17

EX-10.28

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

<u>Right to Settlement Shares</u>. Grantee shall not have any right in, to or with respect to any of the Settlement Shares (including any voting rights) issuable under the Award until the Award is settled by the issuance of such Settlement Shares to Grantee.

<u>Award is Unfunded</u>. By entering into this Award Agreement and accepting the Award, Grantee acknowledges that the Company has not formally funded the award of RSUs and that Grantee is considered a general unsecured creditor of the Company with respect to such award.

**No Right to Continued Service.** The granting of the RSUs evidenced hereby and this Award Agreement shall impose no obligation on the Company or any Affiliate to continue the Service of the Grantee and shall not lessen or affect any right that the Company or any Affiliate may have to terminate the Service of such Grantee.

**Taxes**. Grantee is ultimately liable and responsible for all taxes owed in connection with the Award, regardless of any action the Company or any of its Affiliates takes with respect to any tax withholding obligations that arise in connection with the Award. Neither the Company nor any of its Affiliates makes any representation or undertaking regarding the treatment of any tax withholding in connection with the grant or vesting of the Award or the subsequent sale of Shares issuable pursuant to the Award. The Company and its Affiliates do not commit to structure the Award to reduce or eliminate Grantee's tax liability, and are under no obligation to do so. Prior to the issuance of any Settlement Shares, the Grantee shall be required to pay to the Company or its Affiliates, and the Company and its Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the RSUs or any payment or transfer under or with respect to the RSUs and to take such other action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes. If the Grantee has not paid the required minimum applicable tax withholding amount to the Company, as determined by the Company, within thirty (30) days following the applicable Settlement Date, the RSUs and any Settlement Shares issuable thereunder shall be forfeited for no consideration. The minimum applicable tax withholding amount may be paid by the Grantee as follows: (i) in cash or by check, bank draft or money order payable to the order of the Company; (ii) solely to the extent permitted by applicable law, if the Common Stock is traded on a national securities exchange, through a procedure whereby the Grantee delivers irrevocable instructions to a broker reasonably acceptable to the Committee to deliver promptly to the Company an amount equal to the applicable tax withholding amount; or (iii) to the extent permitted by the Committee in its sole discretion, by having Common Stock otherwise deliverable to the Grantee in respect of the RSUs with a Fair Market Value equal to the minimum applicable tax withholding amount, withheld by the Company.

18

**Legends**. Grantee acknowledges that, unless a registration statement shall then be in effect covering the resale of the Settlement Shares, any certificate representing the Settlement Shares shall bear the following legend:

> "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF (EACH, A "TRANSFER") UNLESS REGISTERED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR UNLESS SUCH TRANSFER IS (A) EXEMPT FROM REGISTRATION OR IS OTHERWISE IN COMPLIANCE WITH THE ACT AND SUCH LAWS IN THE OPINION OF COUNSEL TO THE SHAREHOLDER, WHICH COUNSEL MUST BE, AND THE FORM AND SUBSTANCE OF WHICH OPINION ARE, REASONABLY SATISFACTORY TO THE ISSUER AND (B) IN COMPLIANCE WITH THE TERMS OF THE COMPANY'S CERTIFICATE OF INCORPORATION AND ANY AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS THERETO."

Unless a Public Offering shall have been consummated, any certificate representing the Settlement Shares shall bear the following additional legend:

> "The anticipation, alienation, attachment, sale, transfer, assignment, pledge, encumbrance or charge of the shares of stock represented hereby are subject to the terms and conditions (including forfeiture) of the Core Scientific, Inc. (the "Company") 2018 Omnibus Incentive Plan (the "Plan") and an Agreement entered into between the registered owner and the Company dated [__ ]. Copies of such Plan and Agreement are on file at the principal office of the Company."

**Restriction on Sale upon Public Offering**. Grantee agrees that, in the event the Company files a registration statement or other offering statement in connection with a Public Offering, Grantee will not, without the prior written consent of the Company, effect any public sale or distribution of any of the Settlement Shares (other than as part of such Public Offering), including but not limited to pursuant to Rule 144 or Rule 144A under the Securities Act, for the duration (not to exceed 20 days prior to and the 180 days after the effective date of such registration statement or offering statement) specified by and to the extent requested by the Company and an underwriter or sales agent of the Common Stock or other securities of the Company at any time during such period except Common Stock (or other securities) included in such registration or qualified offering; provided, however, that (i) all officers and directors of the Company and all persons with registration rights with respect to the Company's capital stock enter into similar agreements; and (ii) the restrictions applicable to Grantee are no more restrictive than those applicable to any other shareholder, director or officer of the Company. Grantee further understands and acknowledges that any sale, transfer or other disposition of the Settlement Shares by Grantee following a Public Offering will be subject to compliance with, and may be limited under, the federal securities laws and/or state "blue sky" laws.

19

**Registration**. As soon as practicable following a Public Offering, the Company shall use its commercially reasonable efforts to effect the registration under the Securities Act of all of the Shares evidenced hereby, to the extent such Shares are eligible for registration on Form S-8 (or other applicable form for registration relating to the sale of securities to employees or other service providers in a Company equity incentive plan).

**Section 409A**. The intent of the parties is that payments or issuance of Settlement Shares under this Award Agreement comply with or be exempt from Section 409A of the Code and, accordingly, to the maximum extent permitted, this Award Agreement shall be interpreted to be in compliance therewith or exempt therefrom, as applicable. If any other payments due or issuance of Settlement Shares to the Grantee hereunder could cause the application of an accelerated or additional tax under Section 409A of the Code, the Company may (i) adopt such amendments to the Award Agreement, including amendments with retroactive effect, that the Company determines necessary or appropriate to preserve the intended tax treatment of the payments or issuance of Settlement Shares provided by the Award Agreement and/or (ii) take such other actions as the Company determines necessary or appropriate to comply with the requirements of Section 409A. A termination of Service shall not be deemed to have occurred for purposes of this Award Agreement providing for the payment of any amounts or issuance of Settlement Shares that are considered nonqualified deferred compensation under Section 409A upon or following a termination of employment, unless such termination is also a "separation from service" within the meaning of Section 409A and the payment or issuance thereof prior to a "separation from service" would violate Section 409A. For purposes of any such provision of this Award Agreement relating to any such payment or issuance, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If the Grantee is deemed on the date of termination to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B), then, notwithstanding any other provision herein, with regard to any payment or issuance of Settlement Shares that is considered nonqualified deferred compensation under Section 409A payable on account of a "separation from service," such payment or issuance shall not be made or provided prior to the date which is the earlier of (A) the expiration of the six-month period measured from the date of such "separation from service" of the Grantee, and (B) the date of the Grantee's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments or issuances of Settlement Shares delayed pursuant to this Section 11 (whether they would have otherwise been payable in a single lump

20

EX-10.28

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

sum or in installments in the absence of such delay) shall be paid to the Grantee in a lump sum or issued to the Grantee on the first business day following the Delay Period, and any remaining payments or issuances due under this Award Agreement shall be paid or issued in accordance with the normal payment dates specified for them herein. Nothing contained in this Award Agreement shall constitute any representation or warranty by the Company regarding compliance with Section 409A. The Company has no obligation to take any action to prevent the assessment of any additional income tax, interest or penalties under Section 409A on any person and the Company, its subsidiaries and affiliates, and each of their employees and representatives shall not have any liability to the Grantee with respect thereto.

**Limitation on Rights; No Right to Future Grants; Extraordinary Item**. By entering into this Award Agreement and accepting the Award, Grantee acknowledges that: (i) the Plan is discretionary and may be modified, suspended or terminated by the Company at any time as provided in the Plan; (ii) the grant of the Award is a one-time benefit and does not create any contractual or other right to receive future grants of awards or benefits in lieu of awards; (iii) all determinations with respect to any such future grants, including but not limited to the times when awards will be granted, the number of shares subject to each award, the award price, if any, and the time or times when each award will be settled, will be at the sole discretion of the Company; (iv) Grantee's participation in the Plan is voluntary; (v) the Award is not part of normal or expected compensation for any purpose; (vi) the future value of the Common Stock subject to the Award is unknown and cannot be predicted with certainty; (vii) neither the Plan, the Award nor the issuance of the Shares confers upon Grantee any right to continue to provide services to the Company or an Affiliate; and (viii) the grant of the Award will not be interpreted to form an employment relationship with the Company or any Affiliate.

**Miscellaneous**

Entire Agreement. The Award Agreement (including the Plan and the Company's shareholders agreement) constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) which relate to the subject matter hereof.

Waiver. No waiver of any breach or condition of this Award Agreement shall be deemed to be a waiver of any other or subsequent breach or condition whether of like or different nature.

Successors and Assigns. The provisions of this Award Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and upon the Grantee, the Grantee's assigns and the legal representatives, heirs and legatees of the Grantee's estate, whether or not any such person shall have become a party to this Award Agreement and have agreed in writing to be joined herein and be bound by the terms hereof.

21

4/9/2023, 4:48 AM

EX-10.28                                                   https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

Choice of Law. THE VALIDITY, CONSTRUCTION, INTERPRETATION, ADMINISTRATION AND EFFECT OF THE PLAN, AND OF ITS RULES AND REGULATIONS, AND RIGHTS RELATING TO THE PLAN AND TO THIS AWARD AGREEMENT, SHALL BE GOVERNED BY THE SUBSTANTIVE LAWS, BUT NOT THE CHOICE OF LAW RULES, OF THE STATE OF DELAWARE.

Mutual Waiver of Jury Trial. TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AWARD AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AWARD AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

Amendment. The Committee may amend or alter this Award Agreement and the RSUs granted hereunder at any time; provided that, no such amendment or alteration shall be made without the consent of the Grantee if such action would materially diminish any of the rights of the Grantee under this Award Agreement or with respect to the RSUs. The Board may amend the Company's shareholder agreement without the consent of the Grantee, whether before or after the Grantee becomes a party thereto.

Severability. The provisions of this Award Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Signature in Counterparts. This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

*       *       *

22

EX-10.28

IN WITNESS WHEREOF, the parties hereto have executed this Restricted Stock Unit Award Agreement as of the date first written above.

**CORE SCIENTIFIC HOLDING CO.**

By: _____

Agreed and acknowledged as

of the date first above written:

_____
                    GRANTEE

**<u>EXHIBIT D</u>**

**<u>Form Indemnification Agreement</u>**
**<u>10-K 2022 of Core Scientific, Inc., Exhibit 10-30</u>**

EX-10.30

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

EX-10.30 7 d172159dex1030.htm EX-10.30

**EXHIBIT 10.30**

## CORE SCIENTIFIC, INC.
## INDEMNIFICATION AGREEMENT

This **INDEMNIFICATION AGREEMENT** (this "*Agreement*") is dated as of _____, 20__ and is between Core Scientific, Inc., a Delaware corporation (the "*Company*"), and _____ ("*Indemnitee*").

### RECITALS

**A.**   Indemnitee's service to the Company substantially benefits the Company.

**B.**   Individuals are reluctant to serve as directors or officers of corporations or in certain other capacities unless they are provided with adequate protection through insurance or indemnification against the risks of claims and actions against them arising out of such service.

**C.**   Indemnitee does not regard the protection currently provided by applicable law, the Company's governing documents and any insurance as adequate under the present circumstances, and Indemnitee may not be willing to serve as a director or officer without additional protection.

**D.**   In order to induce Indemnitee to continue to provide services to the Company, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, Indemnitee as permitted by applicable law.

**E.**   This Agreement is a supplement to and in furtherance of the indemnification provided in the Company's certificate of incorporation and bylaws, and any resolutions adopted pursuant thereto, and this Agreement shall not be deemed a substitute therefor, nor shall this Agreement be deemed to limit, diminish or abrogate any rights of Indemnitee thereunder.

### AGREEMENT

The parties agree as follows:

**1.   Definitions.**

   **(a)**   "*Beneficial Owner*" shall have the meaning given to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"); provided, however, that "Beneficial Owner" shall exclude any Person otherwise becoming a Beneficial Owner solely by reason of (i) the stockholders of the Company approving a merger of the Company with another Person, or entering into tender or support agreements relating thereto, provided such merger was approved by the Company's board of directors, or (ii) the Company's board of directors approving a sale of securities by the Company to such Person.

   **(b)**   A "*Change in Control*" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

      **(i)**   *Acquisition of Stock by Third Party.* Any Person (as defined below) becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities;

1 of 14

4/9/2023, 4:49 AM

(ii)   *Change in Board Composition.* During any period of two consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constituted the Company's board of directors and any Approved Directors cease for any reason to constitute at least a majority of the members of the Company's board of directors. "***Approved Directors***" means new directors (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 1(b)(i), 1(b)(iii) or 1(b)(iv)) whose election or nomination by the board of directors (or, if applicable, by the Company's stockholders) was approved by a vote of at least two thirds of the directors then still in office who either were directors at the beginning of such two-year period or whose election or nomination for election was previously so approved;

(iii)   *Corporate Transactions.* The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect a majority of the board of directors or other governing body of such surviving entity; or

(iv)   *Liquidation.* The approval by the Company's board of directors of a complete liquidation or the dissolution of the Company or an agreement for the sale, lease or disposition by the Company of all or substantially all of the Company's assets; or

(v)   *Other Events.* Any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar schedule or form) promulgated under the Exchange Act, whether or not the Company is then subject to such reporting requirement, *except* the completion of the Company's initial public offering shall not be considered a Change in Control.

(c)   "***Corporate Status***" describes the status of a person who is or was a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise.

(d)   "***DGCL***" means the General Corporation Law of the State of Delaware.

(e)   "***Disinterested Director***" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(f)   "***Enterprise***" means the Company and any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary.

(g)   "***Expenses***" include all reasonable and actually incurred attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond or other appeal bond or their equivalent, and (ii) for purposes of Section 10(d),

2

Debtors' Exhibit No. 40
Page 425 of 462

Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)    "*Independent Counsel*" means a law firm, or a partner or member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company, any Enterprise or Indemnitee in any matter material to any such party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term Independent Counsel shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(i)    "*Person*" shall have the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act; *provided*, *however*, that Person shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(j)    "*Proceeding*" means any threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative or investigative nature, whether formal or informal, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of the Company, (ii) any action taken by Indemnitee or any action or inaction on Indemnitee's part while acting as a director or officer of the Company, or (iii) the fact that he or she is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

(k)    "*to the fullest extent permitted by applicable law*" means to the fullest extent permitted by all applicable laws, including without limitation: (i) the fullest extent permitted by DGCL as of the date of this Agreement and (ii) the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

(l)    In connection with any Proceeding relating to an employee benefit plan: references to "*fines*" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "*serving at the request of the Company*" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "*not opposed to the best interests of the Company*" as referred to in this Agreement.

3

EX-10.30                                                                                            https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

**2.    Indemnity in Third-Party Proceedings**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or witness or other participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

**3.    Indemnity in Proceedings by or in the Right of the Company**. The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a witness or other participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Delaware Court of Chancery or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Delaware Court of Chancery or such other court shall deem proper.

**4.    Indemnification for Expenses of a Party Who is Wholly or Partly Successful**. Notwithstanding any other provision of this Agreement, in circumstances where indemnification is not available under Section 2 or 3, as the case may be, to the fullest extent permitted by law and to the extent that Indemnitee is a party to, and is successful (on the merits or otherwise) in defense of, any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee or on Indemnitee's behalf in connection therewith. For purposes of this Section 4, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

**5.    Exclusions**. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any Proceeding (or any part of any Proceeding):

**(a)**    for which payment has actually been made to or on behalf of Indemnitee under any statute, insurance policy, indemnity provision, vote or otherwise, except with respect to any excess beyond the amount paid;

**(b)**    for an accounting or disgorgement of profits pursuant to Section 16(b) of the Exchange Act, or similar provisions of federal, state or local statutory law or common law, if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

**(c)**    for any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "*Sarbanes-Oxley Act*"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

4

(d)    initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees, agents or other indemnitees, unless (i) the Company's board of directors authorized the Proceeding (or the relevant part of the Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, (iii) otherwise authorized in Section 10(d) or (iv) otherwise required by applicable law; provided, for the avoidance of doubt, Indemnitee shall not be deemed for purposes of this paragraph, to have initiated any Proceeding (or any part of a Proceeding) by reason of (i) having asserted any affirmative defenses in connection with a claim not initiated by Indemnitee or (ii) having made any counterclaim (whether permissive or mandatory) in connection with any claim not initiated by Indemnitee; or

(e)    if prohibited by the DGCL or other applicable law.

6.    **Advances of Expenses.** The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding prior to its final disposition, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 30 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company, *except*, with respect to advances of expenses made pursuant to Section 10(c), in which case Indemnitee makes the undertaking provided in Section 10(c). This Section 6 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding (or any part of any Proceeding) for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding (or any part of any Proceeding) referenced in Section 5(b) or 5(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

7.    **Procedures for Notification and Defense of Claim.**

(a)    Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding. The failure by Indemnitee to notify the Company will not relieve the Company from any liability that it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Company.

(b)    If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect that may be applicable to the Proceeding, the Company shall give prompt notice of the commencement of the Proceeding to the insurers in accordance with the procedures set forth in the applicable policies. The Company shall thereafter take all commercially reasonable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)    In the event the Company may be obligated to make any indemnity in connection with a Proceeding, the Company shall be entitled to assume the defense of such Proceeding with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, conditioned or delayed, upon the delivery to Indemnitee of written notice of its election to do so. After delivery of such notice, approval

5

Debtors' Exhibit No. 40
Page 428 of 462

of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Company's assumption of the defense of any such Proceeding, the Company shall be obligated to pay the fees and expenses of Indemnitee's separate counsel to the extent (i) the employment of separate counsel by Indemnitee is authorized by the Company, (ii) counsel for the Company shall have reasonably concluded that there is a conflict of interest between the Company and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the Company is not financially or legally able to perform its indemnification obligations, or (iv) the Company shall not have retained, or shall not continue to retain, counsel to defend such Proceeding. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense. The Company shall not be entitled, without the consent of Indemnitee, to assume the defense of any claim brought by or in the right of the Company.

(d)   Indemnitee shall give the Company such information and cooperation in connection with the Proceeding as may be reasonably appropriate.

(e)   The Company shall not be liable to indemnify Indemnitee for any settlement of any Proceeding (or any part thereof) effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in a settlement to which the Company has given its prior written consent, such settlement shall be treated as a success on the merits in the settled action, suit or proceeding.

(f)   The Company shall not settle any Proceeding (or any part thereof) in a manner that imposes any penalty or liability on Indemnitee not paid by the Company without Indemnitee's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

8.   **Procedures upon Application for Indemnification.**

(a)   To obtain indemnification, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and as is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Proceeding. Any delay in providing the request will not relieve the Company from its obligations under this Agreement, except to the extent such failure is prejudicial.

(b)   Upon written request by Indemnitee for indemnification pursuant to Section 8(a), a determination with respect to Indemnitee's entitlement thereto shall be made as follows, provided that a Change in Control shall not have occurred: (i) by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors; (ii) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors; (iii) if there are no such Disinterested Directors or, if a majority of Disinterested Directors so direct, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee; or (iv) if so directed by the Company's board of directors, by the stockholders of the Company. If a Change in Control shall have occurred, then a determination with respect to Indemnitee's entitlement to indemnification shall be made by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee. If it is determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within 10 days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including

6

EX-10.30

providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) actually and reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company, to the extent permitted by applicable law.

(c)    In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 8(b), the Independent Counsel shall be selected as provided in this Section 8(c). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Company's board of directors, and the Company shall give written notice to Indemnitee advising him or her of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Company's board of directors, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either event, Indemnitee or the Company, as the case may be, may, within 10 days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 1, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 8(a) and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, either the Company or Indemnitee may petition a court of competent jurisdiction for resolution of any objection that shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 8(b). Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 10(a), the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(d)    The Company shall pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

9.    **Presumptions and Effect of Certain Proceedings.**

(a)    In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement, and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption by clear and convincing evidence.

(b)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner that he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

7

Debtors' Exhibit No. 40
Page 430 of 462

**(c)**   For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith to the extent Indemnitee relied in good faith on (i) the records or books of account of the Enterprise, including financial statements, (ii) information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, (iii) the advice of legal counsel for the Enterprise or its board of directors or counsel selected by any committee of the board of directors or (iv) information or records given or reports made to the Enterprise by an independent certified public accountant, an appraiser, investment banker or other expert selected with reasonable care by the Enterprise or its board of directors or any committee of the board of directors. The provisions of this Section 9(c) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

**(d)**   Neither the knowledge, actions nor failure to act of any other director, officer, agent or employee of the Enterprise shall be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

**10.   Remedies of Indemnitee.**

**(a)**   Subject to Section 10(e), in the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 6 or 10(d), (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 8 within 30 days after the later of the receipt by the Company of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made (A) within ten days after a determination has been made that Indemnitee is entitled to indemnification or (B) with respect to indemnification pursuant to Sections 4, 5 and 10(d), within 30 days after receipt by the Company of a written request therefor, or (v) the Company or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of his or her entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his or her option, may seek an award in arbitration with respect to his or her entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 12 months following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 10(a); *provided, however,* that the foregoing clause shall not apply in respect of a proceeding brought by Indemnitee to enforce his or her rights under Section 4. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

**(b)**   Neither (i) the failure of the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination by the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders that Indemnitee has not met the applicable standard of conduct, shall create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made pursuant to Section 8 that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 10 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits, and

8

Debtors' Exhibit No. 40
Page 431 of 462

EX-10.30

Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 10, the Company shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be, and the burden of proof shall be by clear and convincing evidence.

(c)   To the fullest extent not prohibited by law, the Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 10 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Section 10 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 10, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)   To the extent not prohibited by law, the Company shall indemnify Indemnitee against all Expenses incurred by Indemnitee in connection with any action for indemnification or advancement of Expenses from the Company under this Agreement, any other agreement, the Company's certificate of incorporation or bylaws or under any directors' and officers' liability insurance policies maintained by the Company to the extent Indemnitee is successful in such action, and, if requested by Indemnitee, shall (as soon as reasonably practicable, but in any event no later than 30 days, after receipt by the Company of a written request therefor) advance such Expenses to Indemnitee, subject to the provisions of Section 6. Indemnitee hereby undertakes to repay such advances to the extent the Indemnitee is ultimately unsuccessful in such action or arbitration.

(e)   Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of the Proceeding.

11.   **Contribution**. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amounts incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid or to be paid in settlement, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the events and transactions giving rise to such Proceeding; and (ii) the relative fault of Indemnitee and the Company (and its other directors, officers, employees and agents) in connection with such events and transactions.

12.   **Non-Exclusivity**. The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Company's certificate of incorporation or bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Company's certificate of incorporation and bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change, subject to the restrictions expressly set forth herein or therein. Except as expressly set forth herein, no right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

9

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

**13.   Primary Responsibility**. The Company acknowledges that to the extent Indemnitee is serving as a director on the Company's board of directors at the request or direction of a private equity or venture capital fund or other entity and/or certain of its affiliates (collectively, the "**Secondary Indemnitors**"), Indemnitee may have certain rights to indemnification and advancement of expenses provided by such Secondary Indemnitors. The Company agrees that, as between the Company and the Secondary Indemnitors, the Company is primarily responsible for amounts required to be indemnified or advanced under the Company's certificate of incorporation or bylaws or this Agreement and any obligation of the Secondary Indemnitors to provide indemnification or advancement for the same amounts is secondary to those Company obligations. To the extent not in contravention of any insurance policy or policies providing liability or other insurance for the Company or any director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, the Company waives any right of contribution or subrogation against the Secondary Indemnitors with respect to the liabilities for which the Company is primarily responsible under this Section 13. In the event of any payment by the Secondary Indemnitors of amounts otherwise required to be indemnified or advanced by the Company under the Company's certificate of incorporation or bylaws or this Agreement, the Secondary Indemnitors shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee for indemnification or advancement of expenses under the Company's certificate of incorporation or bylaws or this Agreement or, to the extent such subrogation is unavailable and contribution is found to be the applicable remedy, shall have a right of contribution with respect to the amounts paid. The Secondary Indemnitors are express third-party beneficiaries of the terms of this Section 13.

**14.   No Duplication of Payments**. Subject to Section 13, the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received payment for such amounts under any insurance policy, contract, agreement or otherwise.

**15.   Insurance**. To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, trustees, general partners, managing members, officers, employees, agents or fiduciaries of the Company or any other Enterprise, Indemnitee shall be covered by such policy or policies to the same extent as the most favorably-insured persons under such policy or policies in a comparable position.

**16.   Subrogation**. Subject to Section 13, in the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

**17.   Services to the Company**. Indemnitee agrees to serve as a director or officer of the Company or, at the request of the Company, as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of another Enterprise, for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his or her resignation or is removed from such position. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee. Indemnitee specifically acknowledges that any employment with the Company (or any of its subsidiaries or any Enterprise) is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, with or without notice, except as may be otherwise expressly provided in any executed, written

10

Debtors' Exhibit No. 40
Page 433 of 462

EX-10.30

employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), any existing formal severance policies adopted by the Company's board of directors or, with respect to service as a director or officer of the Company, the Company's certificate of incorporation or bylaws or the DGCL. No such document shall be subject to any oral modification thereof.

**18.   Duration.** All agreements and obligations of the Company contained herein will continue during the period Indemnitee is an Agent of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and will continue thereafter so long as Indemnitee will be subject to any proceeding by reason of his or her corporate status as an Agent, whether or not he or she is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement. This Agreement will be binding on and inure to the benefit of and be enforceable by the parties of this Agreement and their respective successors (including any direct or indirect successor by purchase, merger, consolidation, or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors, and personal and legal representatives.

**19.   Successors.** This Agreement shall be binding upon the Company and its successors and assigns, including any direct or indirect successor, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. Further, the Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

**20.   Severability.** Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

**21.   Enforcement.** The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.

**22.   Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; *provided*, *however*, that this Agreement is a supplement to and in furtherance of the Company's certificate of incorporation and bylaws and applicable law.

11

Debtors' Exhibit No. 40
Page 434 of 462

**23.  Modification and Waiver**. No supplement, modification or amendment to this Agreement shall be binding unless executed in writing by the parties hereto. No amendment, alteration or repeal of this Agreement shall adversely affect any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his or her Corporate Status prior to such amendment, alteration or repeal. No waiver of any of the provisions of this Agreement shall constitute or be deemed a waiver of any other provision of this Agreement nor shall any waiver constitute a continuing waiver.

**24.  Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

**(a)**   if to Indemnitee, to Indemnitee's address, facsimile number or electronic mail address as shown on the signature page of this Agreement or in the Company's records, as may be updated in accordance with the provisions hereof; or

**(b)**   if to the Company, to Core Scientific, Inc., 106 East 6th Street, Suite 900-145, Austin, Texas 78701, Attention: General Counsel, or at such other current address as the Company shall have furnished to Indemnitee, with a copy to Cooley LLP, 55 Hudson Yards, New York, NY 10001, Attention: Nicolas Dumont and Daniel Peale.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent *via* a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer or, if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

**25.  Applicable Law and Consent to Jurisdiction**. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 10(a), the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court of Chancery, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Delaware, The Corporation Trust Company, Wilmington, Delaware as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court of Chancery, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court of Chancery has been brought in an improper or inconvenient forum.

**26.  Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

12

**27.  Captions**. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

*(signature page follows)*

13

Debtors' Exhibit No. 40
Page 436 of 462

EX-10.30

https://www.sec.gov/Archives/edgar/data/1839341/0001193125213342...

The parties are signing this Indemnification Agreement as of the date stated in the introductory sentence.

CORE SCIENTIFIC, INC.

By: _____
Name: _____
Title: _____

_____

[INDEMNITEE NAME]

Address: _____
_____

[*Signature Page to Indemnification Agreement*]

**<u>EXHIBIT E</u>**

**<u>Bylaws of Core Scientific, Inc.</u>**
**<u>10-K 2022 of Core Scientific, Inc., Exhibit 3-2</u>**

EX-3.2

https://www.sec.gov/Archives/edgar/data/1839341/0001193125220161...

EX-3.2 3 d285128dex32.htm EX-3.2

**Exhibit 3.2**

**AMENDED AND RESTATED BYLAWS**

**OF**

**CORE SCIENTIFIC, INC.**
**(A DELAWARE CORPORATION)**

**ARTICLE I**

**OFFICES**

**Section 1.   Registered Office.** The registered office of the corporation in the State of Delaware shall be as set forth in the Second Amended and Restated Certificate of Incorporation of the corporation, as the same may be amended or restated from time to time (the "***Certificate of Incorporation***").

**Section 2.   Other Offices.** The corporation may also have and maintain an office or principal place of business at such place as may be fixed by the Board of Directors of the corporation (the "***Board of Directors***"), and may also have offices at such other places, both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the corporation may require.

**ARTICLE II**

**CORPORATE SEAL**

**Section 3.   Corporate Seal.** The Board of Directors may adopt a corporate seal. If adopted, the corporate seal shall consist of the name of the corporation and the inscription, "***Corporate Seal-Delaware***." Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

**ARTICLE III**

**STOCKHOLDERS' MEETINGS**

**Section 4.   Place of Meetings.** Meetings of the stockholders of the corporation may be held at such place, if any, either within or without the State of Delaware, as may be determined from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as provided under the General Corporation Law of the State of Delaware ("***DGCL***") and Section 14 below.

**Section 5.   Annual Meetings.**

(a)   The annual meeting of the stockholders of the corporation, for the purpose of election of directors and for such other business as may properly come before it, shall be held on such date and at such time as may be designated from time to time by the Board of Directors. The corporation may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board of Directors. Nominations of persons for election to the Board of Directors and proposals of business to be considered by the stockholders may be made at an annual meeting of stockholders: (i) pursuant to the corporation's notice of meeting of stockholders; (ii) by or at the direction of the Board of Directors or a duly authorized committee thereof; or (iii) by any stockholder of the corporation who was a stockholder of record (and, with respect to any beneficial owner, if different, on whose

1 of 24

4/4/2023, 1:48 PM

behalf such business is proposed or such nomination or nominations are made, only if such beneficial owner was the beneficial owner of shares of the corporation) at the time of giving the stockholder's notice provided for in Section 5(b) below, who is entitled to vote at the meeting and who complied with the notice procedures set forth in this Section 5. For the avoidance of doubt, clause (iii) above shall be the exclusive means for a stockholder to make nominations and submit other business (other than matters properly included in the corporation's notice of meeting of stockholders and proxy statement under Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (the "***1934 Act***")) before an annual meeting of stockholders.

**(b)**   At an annual meeting of the stockholders, only such business shall be conducted as is a proper matter for stockholder action under Delaware law, the Certificate of Incorporation and these Second Amended and Restated Bylaws ("***Bylaws***"), and only such nominations shall be made and such business shall be conducted as shall have been properly brought before the meeting in accordance with the procedures below.

**(i)**   For nominations for the election to the Board of Directors to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 5(a), the stockholder must deliver written notice to the Secretary at the principal executive offices of the corporation on a timely basis as set forth in Section 5(b)(iii) and must update and supplement such written notice on a timely basis as set forth in Section 5(c). Such stockholder's notice shall set forth: (A) as to each nominee such stockholder proposes to nominate at the meeting: (1) the name, age, business address and residence address of such nominee, (2) the principal occupation or employment of such nominee, (3) the class or series and number of shares of each class or series of capital stock of the corporation that are owned of record and beneficially by such nominee, (4) the date or dates on which such shares were acquired and the investment intent of such acquisition and (5) all other information concerning such nominee as would be required to be disclosed in a proxy statement soliciting proxies for the election of such nominee as a director in an election contest (even if an election contest is not involved and whether or not proxies are being or will be solicited), or that is otherwise required to be disclosed pursuant to Section 14 of the 1934 Act (including such person's written consent to being named in the corporation's proxy statement and associated proxy card as a nominee of the stockholder and to serving as a director if elected); and (B) all of the information required by Section 5(b)(iv). The corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as an independent director of the corporation (as such term is used in any applicable stock exchange listing requirements or applicable law) or on any committee or sub-committee of the Board of Directors under any applicable stock exchange listing requirements or applicable law, or that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such proposed nominee. The number of nominees a stockholder may nominate for election at the annual meeting (or in the case of a stockholder giving the notice on behalf of a beneficial owner, the number of nominees a stockholder may nominate for election at the annual meeting on behalf of such beneficial owner) shall not exceed the number of directors to be elected at such annual meeting.

**(ii)**   Other than proposals sought to be included in the corporation's proxy materials pursuant to Rule 14a-8 under the 1934 Act, for business other than nominations for the election to the Board of Directors to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 5(a), the stockholder must deliver written notice to the Secretary at the principal executive offices of the corporation on a timely basis as set forth in Section 5(b)(iii), and must update and supplement such written notice on a timely basis as set forth in Section 5(c). Such stockholder's notice shall set forth: (A) as to each matter such stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment), the reasons for conducting such business at the meeting, and any material interest (including any anticipated benefit of such business to any Proponent (as defined below) other than solely as a result of its ownership of the corporation's capital stock, that is material to any Proponent individually, or to the Proponents in the aggregate) in such business of any Proponent; and (B) the information required by Section 5(b)(iv).

4/4/2023, 1:48 PM

EX-3.2

https://www.sec.gov/Archives/edgar/data/1839341/0001193125220161...

    **(iii)**    To be timely, the written notice required by Section 5(b)(i) or 5(b)(ii) must be received by the Secretary at the principal executive offices of the corporation not later than the close of business on the 90th day, nor earlier than the close of business on the 120th day, prior to the first anniversary of the immediately preceding year's annual meeting; *provided, however,* that, subject to the last sentence of this Section 5(b)(iii), in the event that (A) the date of the annual meeting is advanced more than 30 days prior to or delayed by more than 30 days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so received not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or, if later than the 90th day prior to such annual meeting, the 10th day following the day on which public announcement of the date of such meeting is first made by the corporation or (B) the corporation did not have an annual meeting in the preceding year, notice by the stockholder to be timely must be so received not later than the 10th day following the day on which public announcement of the date of such meeting is first made. In no event shall an adjournment or postponement of an annual meeting for which notice has been given, or the public announcement thereof has been made, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

    **(iv)**    The written notice required by Sections 5(b)(i) or 5(b)(ii) shall also set forth, as of the date of the notice and as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (each, a "***Proponent***" and collectively, the "***Proponents***"): (A) the name and address of each Proponent, including, if applicable, such name and address as they appear on the corporation's books and records; (B) the class, series and number of shares of each class or series of the capital stock of the corporation that are, directly or indirectly, owned of record or beneficially (within the meaning of Rule 13d-3 under the 1934 Act) by each Proponent (provided, that for purposes of this Section 5(b)(iv), such Proponent shall in all events be deemed to beneficially own all shares of any class or series of capital stock of the corporation as to which such Proponent has a right to acquire beneficial ownership at any time in the future); (C) a description of any agreement, arrangement or understanding (whether oral or in writing) with respect to such nomination or proposal (and/or the voting of shares of any class or series of capital stock of the corporation) between or among any Proponent and any of its affiliates or associates, and any others (including their names) acting in concert, or otherwise under the agreement, arrangement or understanding, with any of the foregoing; (D) a representation that the Proponents are holders of record or beneficial owners, as the case may be, of shares of the corporation at the time of giving notice, will be entitled to vote at the meeting, and intend to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice (with respect to a notice under Section 5(b)(i)) or to propose the business that is specified in the notice (with respect to a notice under Section 5(b)(ii)); (E) a representation as to whether the Proponents intend to deliver a proxy statement and form of proxy to holders of a sufficient number of the corporation's voting shares to elect such nominee or nominees (with respect to a notice under Section 5(b)(i)) or to carry such proposal (with respect to a notice under Section 5(b)(ii)); (F) to the extent known by any Proponent, the name and address of any other stockholder supporting the proposal on the date of such stockholder's notice; and (G) a description of all Derivative Transactions (as defined below) by each Proponent during the previous 12-month period, including the date of the transactions and the class, series and number of securities involved in, and the material economic terms of, such Derivative Transactions.

    **(c)**    A stockholder providing the written notice required by Section 5(b)(i) or (ii) shall update and supplement such notice in writing, if necessary, so that the information provided or required to be provided in such notice is true and correct in all material respects as of (i) the record date for the determination of stockholders entitled to notice of the meeting and (ii) the date that is five Business Days (as defined below) prior to the meeting and, in the event of any adjournment or postponement thereof, five Business Days prior to such adjourned or postponed meeting. In the case of an update and supplement pursuant to clause (i) of this Section 5(c), such update and supplement shall be received by the Secretary at the principal executive offices of the corporation not later than five Business Days after the later of the record date for the determination of stockholders entitled to notice of the meeting or the public announcement of such record date. In the case of an update and supplement pursuant to clause (ii) of this Section 5(c), such update and supplement shall be received by the Secretary at the principal executive offices of the corporation not later than two Business Days prior to the date for the meeting, and, in the event of any adjournment or postponement thereof, two Business Days prior to such adjourned or postponed meeting.

(d)   Notwithstanding anything in Section 5(b)(iii) to the contrary, in the event that the number of directors to be elected to the Board of Directors at the annual meeting is increased effective after the time period for which nominations would otherwise be due under Section 5(b)(iii) and there is no public announcement by the corporation naming the nominees for the additional directorships at least 100 days before the first anniversary of the preceding year's annual meeting, a stockholder's notice required by this Section 5 and that complies with the requirements in Section 5(b)(i), other than the timing requirements in Section 5(b)(iii), shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be received by the Secretary at the principal executive offices of the corporation not later than the close of business on the tenth day following the day on which such public announcement is first made by the corporation.

(e)   A person shall not be eligible for election or re-election as a director at an annual meeting, unless the person is nominated in accordance with either clause (ii) or (iii) of Section 5(a) and in accordance with the procedures set forth in Section 5(b), Section 5(c), and Section 5(d), as applicable. Only such business shall be conducted at any annual meeting of the stockholders of the corporation as shall have been brought before the meeting in accordance with clauses (i), (ii), or (iii) of Section 5(a) and in accordance with the procedures set forth in Section 5(b) and Section 5(c), as applicable. Except as otherwise required by applicable law, the chairperson of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made, or proposed, as the case may be, in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, or the Proponent does not act in accordance with the representations in Sections 5(b)(iv)(D) and 5(b)(iv)(E), to declare that such proposal or nomination shall not be presented for stockholder action at the meeting and shall be disregarded, or that such business shall not be transacted, notwithstanding that proxies in respect of such nomination or such business may have been solicited or received. Notwithstanding the foregoing provisions of this Section 5, unless otherwise required by law, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the corporation to present a nomination or proposed business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the corporation. For purposes of this Section 5, to be considered a qualified representative of the stockholder, a person must be a duly authorized officer, manager or partner of such stockholder or must be authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders.

(f)   Notwithstanding the foregoing provisions of this Section 5, in order to include information with respect to a stockholder proposal in the proxy statement and form of proxy for a stockholders' meeting, a stockholder must also comply with all applicable requirements of the 1934 Act. Nothing in these Bylaws shall be deemed to affect any rights of stockholders to request inclusion of proposals in the corporation's proxy statement pursuant to Rule 14a-8 under the 1934 Act; *provided, however,* that any references in these Bylaws to the 1934 Act are not intended to and shall not limit the requirements applicable to proposals and/or nominations to be considered pursuant to Section 5(a)(iii). Nothing in these Bylaws shall be deemed to affect any rights of holders of any class or series of preferred stock to nominate and elect directors pursuant to and to the extent provided in any applicable provision of the Certificate of Incorporation.

(g)   For purposes of Sections 5 and 6,

(i)   "*affiliates*" and "*associates*" shall have the meanings set forth in Rule 405 under the Securities Act of 1933, as amended (the "*1933 Act*");

(ii)   "*Business Day*" means any day other than Saturday, Sunday or a day on which banks are closed in New York City, New York;

Debtors' Exhibit No. 40
Page 442 of 462

EX-3.2

      (iii)   "*close of business*" means 5:00 p.m. local time at the principal executive offices of the corporation on any calendar day, whether or not the day is a Business Day;

      (iv)   "*Derivative Transaction*" means any agreement, arrangement, interest or understanding entered into by, or on behalf or for the benefit of, any Proponent or any of its affiliates or associates, whether record or beneficial:

      (A) the value of which is derived in whole or in part from the value of any class or series of shares or other securities of the corporation;

      (B) that otherwise provides any direct or indirect opportunity to gain or share in any gain derived from a change in the value of securities of the corporation;

      (C) the effect or intent of which is to mitigate loss, manage risk or benefit from changes in value or price with respect to any securities of the corporation; or

      (D) that provides the right to vote or increase or decrease the voting power of, such Proponent, or any of its affiliates or associates, directly or indirectly, with respect to any securities of the corporation,

which agreement, arrangement, interest or understanding may include, without limitation, any option, warrant, debt position, note, bond, convertible security, swap, stock appreciation or similar right, short position, profit interest, hedge, right to dividends, voting agreement, performance-related fee or arrangement to borrow or lend shares (whether or not subject to payment, settlement, exercise or conversion in any such class or series), and any proportionate interest of such Proponent in the securities of the corporation held by any general or limited partnership, or any limited liability company, of which such Proponent is, directly or indirectly, a general partner or managing member; and

      (v)   "*public announcement*" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the 1934 Act or by such other means reasonably designed to inform the public or security holders in general of such information, including, without limitation, posting on the corporation's investor relations website.

    **Section 6.   Special Meetings.**

    **(a)**   Special meetings of the stockholders of the corporation may be called, for any purpose as is a proper matter for stockholder action under Delaware law, by (i) the Chairperson of the Board of Directors, (ii) the Chief Executive Officer, or (iii) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption). The corporation may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board of Directors.

    **(b)**   The Board of Directors shall determine the time and place, if any, of such special meeting. Upon determination of the time and place, if any, of the meeting, the Secretary shall cause a notice of meeting to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7. No business may be transacted at such special meeting otherwise than specified in the notice of meeting.

    **(c)**   Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the corporation's notice of meeting. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected (i) by or at the direction of the Board of Directors or a duly authorized committee thereof or (ii) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the

corporation who is a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf such nomination or nominations are made, only if such beneficial owner was the beneficial owner of shares of the corporation) at the time of giving notice provided for in this paragraph, who is entitled to vote at the meeting and who delivers written notice to the Secretary of the corporation setting forth the information required by Sections 5(b)(i) and 5(b)(iv). The number of nominees a stockholder may nominate for election at the special meeting (or in the case of a stockholder giving the notice on behalf of a beneficial owner, the number of nominees a stockholder may nominate for election at the special meeting on behalf of such beneficial owner) shall not exceed the number of directors to be elected at such special meeting. In the event the corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any such stockholder of record may nominate a person or persons (as the case may be), for election to such position(s) as specified in the corporation's notice of meeting, if written notice setting forth the information required by Sections 5(b)(i) and 5(b)(iv) shall be received by the Secretary at the principal executive offices of the corporation not earlier than 120 days prior to such special meeting and not later than the close of business on the later of the 90th day prior to such meeting or the tenth day following the day on which the corporation first makes a public announcement of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such special meeting. The stockholder shall also update and supplement such information as required under Section 5(c). In no event shall an adjournment or a postponement of a special meeting for which notice has been given, or the public announcement thereof has been made, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

A person shall not be eligible for election or re-election as a director at the special meeting unless the person is nominated either in accordance with clause (i) or clause (ii) of this Section 6(c). Except as otherwise required by applicable law, the chairperson of the meeting shall have the power and duty to determine whether a nomination was made in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, or if the Proponent does not act in accordance with the representations in Sections 5(b)(iv)(D) and 5(b)(iv)(E), to declare that such nomination shall not be presented for stockholder action at the meeting and shall be disregarded, notwithstanding that proxies in respect of such nomination may have been solicited or received. Notwithstanding the foregoing provisions of this Section 6, unless otherwise required by law, if the stockholder (or a qualified representative of the stockholder (meeting the requirements specified in Section 5(e))) does not appear at the special meeting of stockholders of the corporation to present a nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such vote may have been received by the corporation.

(d)    Notwithstanding the foregoing provisions of this Section 6, a stockholder must also comply with all applicable requirements of the 1934 Act with respect to matters set forth in this Section 6. Nothing in these Bylaws shall be deemed to affect any rights of stockholders to request inclusion of proposals in the corporation's proxy statement pursuant to Rule 14a-8 under the 1934 Act; *provided, however,* that any references in these Bylaws to the 1934 Act are not intended to and shall not limit the requirements applicable to nominations for the election to the Board of Directors to be considered pursuant to Section 6(c).

Section 7.   Notice of Meetings. Except as otherwise provided by applicable law, notice, given in writing or by electronic transmission, of each meeting of stockholders shall be given not less than ten nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting. Such notice shall specify the place, if any, date and hour, in the case of special meetings, the purpose or purposes of the meeting, the record date for determining stockholders entitled to vote at the meeting, if such record date is different from the record date for determining stockholders entitled to notice of the meeting, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at any such meeting. Such notice may be given by personal delivery, mail or with the consent of the stockholder entitled to receive notice, by facsimile or electronic transmission. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation. If delivered by courier service, the notice is given on the earlier of when the notice is received or left at the stockholder's address. If sent via electronic mail, notice is given when

Debtors' Exhibit No. 40
Page 444 of 462

https://www.sec.gov/Archives/edgar/data/1839341/0001193125220161...

directed to such stockholder's electronic mail address in accordance with applicable law unless (a) the stockholder has notified the corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or (b) electronic transmission of such notice is prohibited by applicable law. Notice of the time, place, if any, and purpose of any meeting of stockholders (to the extent required) may be waived in writing, signed by the person entitled to notice thereof, or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his or her attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

**Section 8.   Quorum and Vote Required.** At all meetings of stockholders, except where otherwise provided by statute or by the Certificate of Incorporation, or by these Bylaws, the presence, in person, by remote communication, if applicable, or by proxy, of the holders of a majority of the voting power of the outstanding shares of stock entitled to vote at the meeting shall constitute a quorum for the transaction of business. In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairperson of the meeting or by vote of the holders of a majority of the voting power of the shares represented thereat and entitled to vote thereon, but no other business shall be transacted at such meeting. The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

Except as otherwise provided by statute or by applicable stock exchange rules, or by the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of the holders of a majority of the voting power of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and voting affirmatively or negatively (excluding abstentions and broker non-votes) on such matter shall be be the act of the stockholders. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors shall be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote generally on the election of directors. Where a separate vote by a class or classes or series is required, except where otherwise provided by statute or by the Certificate of Incorporation or these Bylaws or any applicable stock exchange rules, the holders of a majority of the voting power of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter. Except where otherwise provided by statute or by the Certificate of Incorporation or these Bylaws or any applicable stock exchange rules, the affirmative vote of the holders of a majority (plurality, in the case of the election of directors) of the voting power of the shares of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting and voting affirmatively or negatively (excluding abstention and broker non-votes) on such matter shall be the act of such class or classes or series.

**Section 9.   Adjournment and Notice of Adjourned Meetings.** Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairperson of the meeting or by the vote of the holders of a majority of the voting power of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, thereof and the means of remote communication, if any, by which stockholders and proxyholders may be deemed present in person and may vote at such meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned meeting.

**Section 10.  Voting Rights.** For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders or adjournment thereof, except as otherwise provided by applicable law, only persons in whose names shares stand on the stock records of the corporation on the record date shall be entitled to vote at any meeting of stockholders. Every person entitled to vote shall have the right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Delaware law. An agent so appointed need not be a stockholder. No proxy shall be voted after three years from its date of creation unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

**Section 11.  Joint Owners of Stock.** If shares or other securities having voting power stand of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one votes, his or her act binds all; (b) if more than one votes, the act of the majority so voting binds all; (c) if more than one votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in Section 217(b) of the DGCL. If the instrument filed with the Secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of subsection (c) shall be a majority or even-split in interest.

**Section 12.  List of Stockholders.** The corporation shall prepare, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of each stockholder and the number and class of shares registered in the name of each stockholder; provided, however, if the record date for determining the stockholders entitled to vote is less than ten days before the meeting date, the list shall reflect all of the stockholders entitled to vote as of the tenth day before the meeting date. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours, at the principal place of business of the corporation. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. The list shall be open to examination of any stockholder during the time of the meeting as provided by applicable law.

**Section 13.  Action without Meeting.**

Subject to the rights of holders of any series of preferred stock then outstanding, no action shall be taken by the stockholders of the corporation except at an annual or special meeting of stockholders duly called in accordance with these Bylaws and no action shall be taken by the stockholders by written consent.

**Section 14.  Remote Communication.**

**(a)**  For the purposes of these Bylaws, if authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders may, by means of remote communication:

**(i)**  participate in a meeting of stockholders; and

**(ii)** be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.

**(b)** Whenever this Article III requires one or more persons (including a record or beneficial owner of stock) to deliver a document or information to the corporation or any officer, employee or agent thereof (including any notice, request, questionnaire, revocation, representation or other document or agreement), such document or information shall be in writing exclusively (and not in an electronic transmission) and shall be delivered exclusively by hand (including, without limitation, overnight courier service) or by certified or registered mail, return receipt requested and the corporation shall not be required to accept delivery of any document not in such written form or so delivered. For the avoidance of doubt, with respect to any notice from any stockholder of record or beneficial owner of the corporation's capital stock under the Certificate of Incorporation, these Bylaws or the DGCL, to the fullest extent permitted by law, the corporation expressly opts out of Section 116 of the DGCL.

**Section 15.    Organization.**

**(a)** At every meeting of stockholders, the Chairperson of the Board of Directors, or, if a Chairperson has not been appointed, is absent or refuses to act, the Chief Executive Officer, or if no Chief Executive Officer is then serving or the Chief Executive Officer is absent or refuses to act, the President, or, if the President is absent or refuses to act, a chairperson of the meeting designated by the Board of Directors, or, if the Board of Directors does not designate such chairperson, a chairperson of the meeting chosen by a majority of the voting power of the stockholders entitled to vote, present in person or by proxy, shall act as chairperson of the meeting of stockholders. The Chairperson of the Board of Directors may appoint the Chief Executive Officer as chairperson of the meeting. The Secretary, or, in his or her absence, an Assistant Secretary or other officer or other person directed to do so by the chairperson of the meeting, shall act as secretary of the meeting.

**(b)** The Board of Directors shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations of the Board of Directors, if any, the chairperson of the meeting shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairperson, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on participation in such meeting to stockholders of record of the corporation and their duly authorized and constituted proxies and such other persons as the chairperson shall permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters that are to be voted on by ballot. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting. Unless and to the extent determined by the Board of Directors or the chairperson of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

Debtors' Exhibit No. 40
Page 447 of 462

## ARTICLE IV

### DIRECTORS

**Section 16.   Number and Term of Office.** The authorized number of directors of the corporation shall be fixed in accordance with the Certificate of Incorporation. Directors need not be stockholders unless so required by the Certificate of Incorporation. If for any cause, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient at a special meeting of the stockholders called for that purpose in the manner provided in these Bylaws.

**Section 17.   Powers.** The business and affairs of the corporation shall be managed by or under the direction of the Board of Directors, except as may be otherwise provided by the Certificate of Incorporation or the DGCL.

**Section 18.   Terms of Directors.** The terms of directors shall be as set forth in the Certificate of Incorporation.

**Section 19.   Vacancies.** Vacancies and newly created directorships on the Board of Directors shall be filled as set forth in the Certificate of Incorporation.

**Section 20.   Resignation.** Any director may resign at any time by delivering his or her notice in writing or by electronic transmission to the Board of Directors or the Secretary. Such resignation shall take effect at the time of delivery of the notice or at any later time specified therein. Acceptance of such resignation shall not be necessary to make it effective. When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors serving on the Board of Directors at such time, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office for the unexpired portion of the term of the director whose place shall be vacated and until his or her successor shall have been duly elected and qualified or until his or her earlier death, resignation or removal.

**Section 21.   Removal.** Directors shall be removed as set forth in the Certificate of Incorporation.

**Section 22.   Meetings.**

(a)   **Regular Meetings.** Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may be held at any time or date and at any place within or without the State of Delaware that has been designated by the Board of Directors and publicized among all directors, either orally or in writing, by telephone, including a voice-messaging system or other system designed to record and communicate messages, or by electronic mail or other electronic means. No further notice shall be required for regular meetings of the Board of Directors.

(b)   **Special Meetings.** Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or without the State of Delaware as designated and called by the Chairperson of the Board of Directors, the Chief Executive Officer or the Board of Directors.

(c)   **Meetings by Electronic Communications Equipment.** Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)   **Notice of Special Meetings.** Notice of the time and place, if any, of all special meetings of the Board of Directors shall be transmitted orally or in writing, by telephone, including a voice messaging system or

other system or technology designed to record and communicate messages, or by electronic mail or other electronic means, during normal business hours, at least 24 hours before the date and time of the meeting. If notice is sent by U.S. mail, it shall be sent by first class mail, postage prepaid, at least three days before the date of the meeting.

**(e)   Waiver of Notice.** Notice of any meeting of the Board of Directors may be waived in writing, or by electronic transmission, at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, shall be as valid as though it had been transacted at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the directors not present who did not receive notice shall sign a written waiver of notice or shall waive notice by electronic transmission. All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

**Section 23.   Quorum and Voting.**

**(a)**   Unless the Certificate of Incorporation requires a greater number, and except with respect to questions related to indemnification arising under Section 47 for which a quorum shall be one-third of the authorized number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation, a quorum of the Board of Directors shall consist of a majority of the total number of directors then serving on the Board of Directors or, if greater, one-third of the authorized number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation. At any meeting whether a quorum be present or otherwise, a majority of the directors present may adjourn from time to time, without notice other than by announcement at the meeting.

**(b)**   At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by applicable law, the Certificate of Incorporation or these Bylaws.

**Section 24.   Action without Meeting.** Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission. Such consent or consents shall be filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

**(a)   Fees and Compensation.** Directors shall be entitled to such compensation for their services on the Board of Directors or any committee thereof as may be approved by the Board of Directors, or a committee thereof to which the Board of Directors has delegated such responsibility and authority, including, if so approved, by resolution of the Board of Directors or a committee thereof to which the Board of Directors has delegated such responsibility and authority, including, without limitation, a fixed sum and reimbursement of expenses incurred, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors, as well as reimbursement for other reasonable expenses incurred with respect to duties as a member of the Board of Directors or any committee thereof. Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

Debtors' Exhibit No. 40
Page 449 of 462

**Section 25.   Committees.**

**(a)   Executive Committee.** The Board of Directors may appoint an Executive Committee to consist of one or more members of the Board of Directors. The Executive Committee, to the extent permitted by applicable law and provided in the resolution of the Board of Directors shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority in reference to (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopting, amending or repealing any Bylaw of the corporation.

**(b)   Other Committees.** The Board of Directors may, from time to time, appoint such other committees as may be permitted by applicable law. Such other committees appointed by the Board of Directors shall consist of one or more members of the Board of Directors and shall have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees, but in no event shall any such committee have the powers denied to the Executive Committee in these Bylaws.

**(c)   Term.** The Board of Directors, subject to any requirements of any outstanding series of preferred stock and the provisions of subsections (a) or (b) of this Section 25, may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The membership of a committee member shall terminate on the date of his or her death or voluntary resignation from the committee or from the Board of Directors. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

**(d)   Meetings.** Unless the Board of Directors shall otherwise provide, regular meetings of the Executive Committee or any other committee appointed pursuant to this Section 25 shall be held at such times and places, if any, as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings of any such committee may be held at such place, if any, that has been determined from time to time by such committee, and may be called by any director who is a member of such committee, upon notice to the members of such committee of the time and place, if any, of such special meeting given in the manner provided for the giving of notice to members of the Board of Directors of the time and place, if any, of special meetings of the Board of Directors. Notice of any meeting of any committee may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends such meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

**Section 26.   Duties of Chairperson of the Board of Directors.** The Chairperson of the Board of Directors, when present, shall preside at all meetings of the stockholders and the Board of Directors. The Chairperson of the Board of Directors shall perform such other duties customarily associated with the office and shall also perform such other duties and have such other powers, as the Board of Directors shall designate from time to time.

Debtors' Exhibit No. 40
Page 450 of 462

**Section 27.   Lead Independent Director.** The Chairperson of the Board of Directors, or if the Chairperson is not an independent director, one of the independent directors, may be designated by the Board of Directors as lead independent director to serve until replaced by the Board of Directors ("***Lead Independent Director***"). The Lead Independent Director will preside over meetings of the independent directors and perform such other duties as may be established or delegated by the Board of Directors and perform such other duties as may be established or delegated by the Chairperson of the Board of Directors.

**Section 28.   Organization.** At every meeting of the directors, the Chairperson of the Board of Directors, or, if a Chairperson has not been appointed or is absent, the Lead Independent Director, or if the Lead Independent Director has not been appointed or is absent, the Chief Executive Officer (if a director) or, if a Chief Executive Officer is absent, the President (if a director), or if the President is absent, the most senior Vice President (if a director), or, in the absence of any such person, a chairperson of the meeting chosen by a majority of the directors present, shall preside over the meeting. The Secretary, or in his or her absence, any Assistant Secretary or other officer, director or other person directed to do so by the person presiding over the meeting, shall act as secretary of the meeting.

**ARTICLE V**

**OFFICERS**

**Section 29.   Officers Designated.** The officers of the corporation shall include, if and when designated by the Board of Directors, the Chief Executive Officer, the President, one or more Vice Presidents, the Secretary, the Chief Financial Officer and the Treasurer. The Board of Directors may also appoint one or more Assistant Secretaries and Assistant Treasurers and such other officers and agents with such powers and duties as it shall deem appropriate or necessary. The Board of Directors may assign such additional titles to one or more of the officers as it shall deem appropriate. Any one person may hold any number of offices of the corporation at any one time unless specifically prohibited therefrom by applicable law, the Certificate of Incorporation or these Bylaws. The salaries and other compensation of the officers of the corporation shall be fixed by or in the manner designated by the Board of Directors or by a committee thereof to which the Board of Directors has delegated such responsibility.

**Section 30.   Tenure and Duties of Officers.**

     **(a)   General.** All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed, subject to such officer's earlier death, resignation or removal. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors or by a committee thereof to which the Board of Directors has delegated such responsibility or, if so authorized by the Board of Directors, by the Chief Executive Officer or another officer of the corporation.

     **(b)   Duties of Chief Executive Officer.** The Chief Executive Officer shall be the chief executive officer of the corporation and, subject to the supervision, direction and control of the Board of Directors, shall have the general powers and duties of supervision, direction, management and control of the business and officers of the corporation as are customarily associated with the position of Chief Executive Officer. To the extent that a Chief Executive Officer has been appointed and no President has been appointed, all references in these Bylaws to the President shall be deemed references to the Chief Executive Officer. The Chief Executive Officer shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers, as the Board of Directors shall designate from time to time.

     **(c)   Duties of President.** Unless another officer has been appointed Chief Executive Officer of the corporation, the President shall be the chief executive officer of the corporation and, subject to the supervision,

direction and control of the Board of Directors, shall have the general powers and duties of supervision, direction, management and control of the business and officers of the corporation as are customarily associated with the position of President. The President shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers, as the Board of Directors (or the Chief Executive Officer, if the Chief Executive Officer and President are not the same person and the Board of Directors has delegated the designation of the President's duties to the Chief Executive Officer) shall designate from time to time.

      **(d)    Duties of Vice Presidents.** A Vice President may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant (unless the duties of the President are being filled by the Chief Executive Officer). A Vice President shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or, if the Chief Executive Officer has not been appointed or is absent, the President shall designate from time to time.

      **(e)    Duties of Secretary and Assistant Secretary.** The Secretary shall attend all meetings of the stockholders and of the Board of Directors and shall record all acts, votes and proceedings thereof in the minute books of the corporation. The Secretary shall give notice in conformity with these Bylaws of all meetings of the stockholders and of all meetings of the Board of Directors and any committee thereof requiring notice. The Secretary shall perform all other duties provided for in these Bylaws and other duties customarily associated with the office and shall also perform such other duties and have such other powers, as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President shall designate from time to time. The Chief Executive Officer, or if no Chief Executive Officer is then serving, the President may direct any Assistant Secretary or other officer to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President shall designate from time to time.

      **(f)    Duties of Chief Financial Officer.** The Chief Financial Officer shall keep or cause to be kept the books of account of the corporation in a thorough and proper manner and shall render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors, the Chief Executive Officer, or the President. The Chief Financial Officer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the corporation. The Chief Financial Officer shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President shall designate from time to time. To the extent that a Chief Financial Officer has been appointed and no Treasurer has been appointed, all references in these Bylaws to the Treasurer shall be deemed references to the Chief Financial Officer.

      **(g)    Duties of Treasurer and Assistant Treasurer.** Unless another officer has been appointed Chief Financial Officer of the corporation, the Treasurer shall be the chief financial officer of the corporation. The Treasurer shall perform other duties customarily associated with the office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President shall designate from time to time. The Chief Executive Officer, or if no Chief Executive Officer is then serving, the President may direct any Assistant Treasurer or other officer to assume and perform the duties of the Treasurer in the absence or disability of the Treasurer, and each Assistant Treasurer shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer, or if no Chief Executive Officer is then serving, the President shall designate from time to time.

      **Section 31.    Delegation of Authority.** The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

Debtors' Exhibit No. 40
Page 452 of 462

**Section 32.    Resignations.** Any officer may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors, the Chairperson of the Board of Directors, the Chief Executive Officer, the President or the Secretary. Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract with the resigning officer.

**Section 33.    Removal.** Any officer may be removed from office at any time, either with or without cause, by the Board of Directors, or by any duly authorized committee thereof or any superior officer upon whom such power of removal may have been conferred by the Board of Directors.

### ARTICLE VI

### EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

**Section 34.    Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute, sign or endorse on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to enter into contracts on behalf of the corporation, except where otherwise provided by applicable law or these Bylaws, and such execution or signature shall be binding upon the corporation.

All checks and drafts drawn on banks or other depositaries on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall from time to time authorize so to do.

Unless otherwise specifically determined by the Board of Directors or otherwise required by applicable law, the execution, signing or endorsement of any corporate instrument or document by or on behalf of the corporation may be effected manually, by facsimile or (to the extent permitted by applicable law and subject to such policies and procedures as the corporation may have in effect from time to time) by electronic signature.

Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 35.    Voting of Securities Owned by the Corporation.** All stock and other securities of or interests in other corporations or entities owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairperson of the Board of Directors, the Chief Executive Officer, the President, or any Vice President.

### ARTICLE VII

### SHARES OF STOCK

**Section 36.    Form and Execution of Certificates.** The shares of the corporation shall be represented by certificates, or shall be uncertificated if so provided by resolution or resolutions of the Board of Directors. Certificates for the shares of stock, if any, shall be in such form as is consistent with the Certificate of

Debtors' Exhibit No. 40
Page 453 of 462

Incorporation and applicable law. Every holder of stock in the corporation represented by certificates shall be entitled to have a certificate signed by or in the name of the corporation by any two authorized officers of the corporation (it being understood that each of the Chairperson of the Board of Directors, the Chief Executive Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary and any Assistant Secretary shall be an authorized officer for such purpose), certifying the number, and the class or series, of shares owned by such holder in the corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.

Section 37.   **Lost Certificates.** A new certificate or certificates shall be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to agree to indemnify the corporation in such manner as it shall require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

Section 38.   **Transfers.**

  **(a)**   Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and, in the case of stock represented by certificate, upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

  **(b)**   The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes or series of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes or series owned by such stockholders in any manner not prohibited by the DGCL.

Section 39.   **Fixing Record Dates.**

  **(a)**   In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, subject to applicable law, not be more than 60 nor less than ten days before the date of such meeting. If the Board of Directors so fixes a record date for determining the stockholders entitled to notice of any meeting of stockholders, such date shall also be the record date for determining the stockholders entitled to vote at such meeting, unless the Board of Directors determines, at the time it fixes the record date for determining the stockholders entitled to notice of such meeting, that a later date on or before the date of the meeting shall be the record date for determining the stockholders entitled to vote at such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day immediately preceding the day on which notice is given, or if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the Board of Directors may fix a new record date for the adjourned meeting in accordance with the provisions of this Section 39(a).

  **(b)**   In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board

Debtors' Exhibit No. 40
Page 454 of 462

EX-3.2

https://www.sec.gov/Archives/edgar/data/1839341/0001193125220161...

of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 40.   Registered Stockholders.** The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**Section 41.   Additional Powers of the Board.** In addition to, and without limiting, the powers set forth in these Bylaws, the Board of Directors shall have power and authority to make all such rules and regulations as it shall deem expedient concerning the issue, transfer, and registration of certificates for shares of stock of the corporation, including the use of uncertificated shares of stock, subject to the provisions of the DGCL, other applicable law, the Certificate of Incorporation and these Bylaws. The Board of Directors may appoint and remove transfer agents and registrars of transfers, and may require all stock certificates to bear the signature of any such transfer agent and/or any such registrar of transfers.

**Section 42.   Lock-Up.**

**(a)**   Subject to Section 42(b) below, the holders (the "*Lock-up Holders*") of (i) any shares of Class A common stock, par value $0.0001 per share, of the corporation issued in connection with the transactions contemplated by that certain Agreement and Plan of Merger and Reorganization entered into by and among the corporation, XPDI Merger Sub Inc., a Delaware corporation XPDI Merger Sub 2, LLC, a Delaware limited liability company, and Core Scientific Holding Co., a Delaware corporation ("*Core Holdings*") (as amended, "*Merger Agreement*"), as such shares of Class A common stock may be subsequently designated as Common Stock (as defined in the Certificate of Incorporation), any shares of Common Stock issuable upon the exercise of options to purchase shares of Common Stock held by such Lock-Up Holder immediately after the Closing (as defined in the Merger Agreement), or any securities convertible into or exercisable or exchangeable for Common Stock held by such Lock-Up Holder immediately after the Closing (collectively, the "*Core Shares*"); (ii) any shares of Class B common stock of the corporation that were converted into Class A common stock pursuant to the Merger Agreement and subsequently designated as Common Stock (the "*Founder Shares*"), and (iii) any Common Stock underlying the warrants issued and sold in that certain private placement consummated simultaneously with the closing of the corporation's initial public offering in February 2021 (the "*Warrant Shares*" and collectively with the Core Shares and the Founder Shares, the "*Lock-Up Shares*"), may not Transfer any Lock-Up Shares until the end of the Lock-Up Period (the "*Lock-Up*").

**(b)**   The restrictions set forth in Section 42(a) above shall not apply to (i) in the case of an entity, Transfers to or distributions to any direct or indirect stockholder, partner, member or affiliate of such entity (or to any executive officer or director of such entity or of such entity's affiliates) or to any investment fund or other entity controlling, controlled by, managing or managed by or under common control or management with such entity or affiliates of such entity (including, for the avoidance of doubt, where the undersigned is a partnership, to its general partner or a successor partnership or fund, or any other funds managed by or under common management as such partnership); (ii) in the case of an individual, Transfers by gift to members of the individual's immediate family (as defined below) or to a trust, the beneficiary of which is a member of one of the individual's immediate family, to an affiliate of such person or to a charitable organization; (iii) in the case of an individual, Transfers by virtue of laws of descent and distribution upon death of the individual; (iv) in the case of an individual, Transfers pursuant to a qualified domestic relations order or divorce settlement; (v) in the case of an entity, Transfers by virtue of the laws of the state or jurisdiction of the entity's organization and the entity's organizational documents upon dissolution of the entity; (vi) transactions relating to Common Stock or other securities convertible into or exercisable or exchangeable for Common Stock acquired in open market

17 of 24

transactions after the Closing, provided that no such transaction is required to be, or is, publicly announced (whether on Form 4, Form 5 or otherwise, other than a required filing on Schedule 13F, 13G or 13G/A) during the Lock-Up Period; (vii) the exercise of any options or warrants to purchase Common Stock (which exercises may be effected on a cashless basis to the extent the instruments representing such options or warrants permit exercises on a cashless basis); (viii) Transfers (including forfeitures) (x) to the corporation to satisfy tax withholding obligations pursuant to equity incentive plans or arrangements of the corporation or (y) pursuant to escrow arrangement with the corporation with respect to tax withholding obligations pursuant to the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"); (ix) the establishment of a trading plan that meets the requirements of Rule 10b5-1(c) under the Exchange Act (a "*Trading Plan*"); provided, however, that (a) no sales of Lock-Up Shares, shall be made by a Lock-Up Holder pursuant to such Trading Plan during the Lock-Up Period, and (b)(x) no public announcement or filing shall be made voluntarily regarding such plan during the Lock-Up Period or (y) if any public announcement is required of or voluntarily made by or on behalf of the Lock-up Holder or the corporation regarding such plan, then such announcement or filing shall include a statement to the effect that no Transfer may be made under such plan during the Lock-Up Period; (x) transactions in the event of completion of a liquidation, merger, consolidation, stock exchange, reorganization, tender offer or other similar transaction which results in all of the corporation's securityholders having the right to exchange their shares of Common Stock for cash, securities or other property; (xi) transactions to satisfy any U.S. federal, state, or local income tax obligations of the Lock-Up Holder (or its direct or indirect owners) arising from a change in the Code, or the U.S. Treasury Regulations promulgated thereunder (the "Regulations") after the date on which the Merger Agreement was executed by the parties, and such change prevents the Mergers from qualifying as a "reorganization" pursuant to Section 368 of the Code (and the Mergers do not qualify for similar tax-free treatment pursuant to any successor or other provision of the Code or Regulations taking into account such changes), in each case, solely to the extent necessary to cover any tax liability as a result of the transaction; and (xii) in connection with the creation of any charge, lien, mortgage, pledge or other security interest or posting as collateral of any of the Lock-Up Holder's Lock-Up Shares in connection with a bona fide loan transaction; provided that prior to entering into the collateral agreement or similar agreement in connection with the loan transaction, each pledgee shall execute and deliver to the corporation a lock-up agreement in substantially the form of this Section 42 to take effect in the event that the pledge takes possession of the Lock-Up Holder's Lock-Up Shares as a result of a foreclosure, margin call or similar disposition; provided, however, that in the case of clauses (i) through (v), these permitted transferees must enter into a written agreement agreeing to be bound by the provisions of this Section 42 (it being understood that any references to "immediate family" in the agreement executed by such transferee shall expressly refer only to the immediate family of the Lock-Up Holder and not to the immediate family of the transferee), agreeing to be bound by these Transfer restrictions. For purposes of this Section 42(b), "immediate family" shall mean a spouse, domestic partner, child, grandchild or other lineal descendant (including by adoption), father, mother, brother or sister of the Lock-Up Holder; and "affiliate" shall have the meaning set forth in Rule 405 under the Securities Act of 1933, as amended.

     **(c)**    For purpose of this Section 42:

     **(i)**    the term "**Lock-Up Period**" means the period beginning on the Closing Date (as defined in the Merger Agreement) and ending on: (a) with respect to the Core Shares, the earlier to occur of (x) 180 calendar days after the Closing and (y) the approval of the majority of the members of the Board of Directors of the corporation to permit such Transfer; (b) with respect to the Warrant Shares, the earlier to occur of (1) 30 calendar days after the Closing and (2) the approval of the majority of the members of the Board of Directors of the corporation to permit such Transfer; and (c) with respect to the Founder Shares, the earlier to occur of (i) one year after the Closing and (y) the approval of the majority of the members of the Board of Directors of the corporation to permit such Transfer; provided that, in the case of this subclause (c), if the closing price of the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 Trading Days (as defined below) within a 30-Trading Day period commencing at least 150 days after the Closing, such Lock-Up Shares shall be automatically released from the Lock-Up Period; provided, however, that, in the case of each of subclause (a), (b) and (c), if (i) at least 120 days have elapsed since the Closing and (ii) the Lock-Up Period is scheduled to end during a Blackout Period (as

defined below) or within five Trading Days prior to a Blackout Period, the Lock-Up Period shall end ten Trading Days prior to the commencement of the Blackout Period (the "**_Blackout-Related Release_**"); provided further, that (x) promptly upon the corporation's determination of the date of the Blackout-Related Release, and in any event at least two Trading Days in advance of the Blackout-Related Release, the corporation shall announce the date of the Blackout-Related Release through a major news service or a Current Report on Form 8-K, and (y) the Blackout-Related Release shall not occur unless the corporation shall have publicly released its earnings results for the fiscal year ended December 31, 2021;

    **(ii)**   the term "**Transfer**" means, with respect to a Lock-Up Share, to, (1) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option, right or warrant to purchase or otherwise transfer or dispose of, or agree to transfer or dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the 1934 Act, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of such securities, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (3) publicly announce any intention to effect any transaction specified in clause (1) or (2) during the Lock-Up Period;

    **(iii)**   the term "**Trading Day**" is a day on which the New York Stock Exchange and the Nasdaq Stock Market are open for the buying and selling of securities; and

    **(iv)**   the term "**Blackout Period**" shall mean a broadly applicable period during which trading in the corporation's securities would not be permitted under the corporation's insider trading policy.

    **(d)**   Notwithstanding anything herein to the contrary, this Section 42 shall not apply (i) with respect to a Lock-up Holder to the extent such Lock-Up Holder is party to that certain Lock-up Agreement dated as of January 19, 2022 by and between the corporation and the Lock-up Holder and (ii) to any holder of (A) any secured convertible promissory notes issued by Core Holdings (and the corporation as co-obligor thereof upon the assumption by the corporation of Core Holdings's obligations thereunder) pursuant to the Secured Convertible Note Purchase Agreement, dated as of April 19, 2021, by and among Core Holdings, each purchaser party thereto, U.S. Bank National Association, as Note Agent, and U.S. Bank National Association, as Collateral Agent and (B) any convertible promissory notes issued by Core Holdings (and the corporation as co-obligor thereof upon the assumption by the corporation of Core Holdings's obligations thereunder) pursuant to the Convertible Note Purchase Agreement, dated as of August 20, 2021, by and among Core Holdings, each purchaser party thereto and U.S. Bank National Association, as Note Agent (such clause (ii), collectively, the "**Company Convertible Notes**") or any holder of Common Stock upon conversion of any Company Convertible Notes.

**ARTICLE VIII**

**OTHER SECURITIES OF THE CORPORATION**

    **Section 43.**   **Execution of Other Securities.** All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Section 36), may be signed by the Chairperson of the Board of Directors, the Chief Executive Officer, the President or any Vice President, or such other person as may be authorized by the Board of Directors; *provided, however,* that where any such bond, debenture or other corporate security shall be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the Treasurer or an Assistant Treasurer of the corporation or such other person as may be authorized by the Board of

Directors, or bear imprinted thereon the facsimile signature of such person. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the corporation.

## ARTICLE IX

## DIVIDENDS

**Section 44.    Declaration of Dividends.** Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and applicable law.

**Section 45.    Dividend Reserve.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, determines proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose or purposes as the Board of Directors shall determine to be conducive to the interests of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE X

## FISCAL YEAR

**Section 46.    Fiscal Year.** The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

## ARTICLE XI

## INDEMNIFICATION

**Section 47.    Indemnification of Directors, Executive Officers, Employees and Other Agents.**

**(a)    Directors and Executive Officers.** The corporation shall indemnify to the full extent permitted under and in any manner permitted under the DGCL or any other applicable law, any person who is made or threatened to be made a party to or is otherwise involved (as a witness or otherwise) in any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (hereinafter, a "***Proceeding***"), by reason of the fact that such person is or was a director or executive officer (for the purposes of this Article XI, "executive officers" shall be those persons designated by the corporation as (a) executive officers for purposes of the disclosures required in the corporation's proxy and periodic reports or (b) officers for purposes of Section 16 of the 1934 Act) of the corporation, or while serving as a director or executive officer of the corporation, is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, including service with respect to an employee benefit plan (collectively, "***Another Enterprise***"), against expenses (including attorneys' fees), judgments, fines (including ERISA excise taxes or penalties) and amounts paid in settlement actually and

Debtors' Exhibit No. 40
Page 458 of 462

reasonably incurred by him or her in connection with such Proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful; *provided, however,* that the corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, *provided, further,* that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by applicable law, (ii) the proceeding was authorized by the Board of Directors, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the DGCL or any other applicable law or (iv) such indemnification is required to be made under subsection (d) of this Section 47.

      **(b)   Other Officers, Employees and Other Agents.** The corporation shall have power to indemnify (including the power to advance expenses in a manner consistent with subsection (c) of this Section 47) its other officers, employees and other agents as set forth in the DGCL or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person to any executive officer or other persons as the Board of Directors shall determine.

      **(c)   Expenses.** The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed Proceeding, by reason of the fact that such person is or was a director or executive officer of the corporation, or is or was serving at the request of the corporation as a director or executive officer of Another Enterprise, prior to the final disposition of the Proceeding, promptly following request therefor, all expenses (including attorneys' fees) incurred by any director or executive officer in connection with such Proceeding; *provided, however,* that if the DGCL requires, an advancement of expenses incurred by a director or executive officer in his or her capacity as a director or executive officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking (hereinafter an "***undertaking***"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "***final adjudication***") that such indemnitee is not entitled to be indemnified for such expenses under this Section 47 or otherwise.

      Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (d) of this Section 47, no advance shall be made by the corporation to an executive officer of the corporation (except by reason of the fact that such executive officer is or was a director of the corporation in which event this paragraph shall not apply) in any Proceeding, if a determination is reasonably and promptly made (i) by a majority vote of directors who were not parties to the Proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority vote of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation.

      **(d)   Enforcement.** Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and executive officers under this Section 47 shall be deemed to be contractual rights, shall vest when the person becomes a director or executive officer of the corporation, shall continue as vested contract rights even if such person ceases to be a director or executive officer of the corporation, and shall be effective to the same extent and as if provided for in a contract between the corporation and the director or executive officer. Any right to indemnification or advances granted by this Section 47 to a director or executive officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within 90 days of request therefor. To the fullest extent permitted by applicable law, the claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the

Debtors' Exhibit No. 40
Page 459 of 462

expense of prosecuting the claim. In connection with any claim for indemnification, the corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an executive officer of the corporation (except in any Proceeding, by reason of the fact that such executive officer is or was a director of the corporation) for advances, the corporation shall be entitled to raise a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his or her conduct was lawful. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL or any other applicable law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. In any suit brought by a director or executive officer to enforce a right to indemnification or to an advancement of expenses hereunder, the burden of proving that the director or executive officer is not entitled to be indemnified, or to such advancement of expenses, under this Section 47 or otherwise shall be on the corporation.

(e)   **Non-Exclusivity of Rights.** The rights conferred on any person by this Section 47 shall not be exclusive of any other right that such person may have or hereafter acquire under any applicable statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office. The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL, or by any other applicable law.

(f)   **Survival of Rights.** The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director or executive officer or officer, employee or other agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(g)   **Insurance.** To the fullest extent permitted by the DGCL or any other applicable law, the corporation, upon approval by the Board of Directors, may purchase and maintain insurance on behalf of any person required or permitted to be indemnified pursuant to this Section 47.

(h)   **Amendments.** Any repeal or modification of this Section 47 shall only be prospective and shall not affect the rights under this Section 47 as in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any Proceeding against any agent of the corporation.

(i)   **Saving Clause.** If this Article XI or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each director and executive officer to the full extent not prohibited by any applicable portion of this Article XI that shall not have been invalidated, or by any other applicable law. If this Article XI shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the corporation shall indemnify each director and executive officer to the full extent not prohibited under the applicable law of such jurisdiction.

(j)   **Certain Definitions and Construction of Terms.** For the purposes of Article XI of these Bylaws, the following definitions and rules of construction shall apply:

(i)   References to "***Another Enterprise***" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee

Debtors' Exhibit No. 40
Page 460 of 462

or agent of the corporation that imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Section 47.

       **(ii)**    The term the "*corporation*" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section 47 with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

       **(iii)**    References to a "*director*," "*executive officer*," "*officer*," "*employee*," or "*agent*" of the corporation shall include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

       **(iv)**    The term "*expenses*" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any Proceeding.

       **(v)**    The term "*Proceeding*" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

**ARTICLE XII**

**NOTICES**

**Section 48.**    **Notices.**

       **(a)**    **Notice to Stockholders.** Notice to stockholders of stockholder meetings shall be given as provided in Section 7. Without limiting the manner by which notice may otherwise be given effectively to stockholders under any agreement or contract with such stockholder, and except as otherwise required by applicable law, written notice to stockholders for purposes other than stockholder meetings may be sent by U.S. mail or nationally recognized overnight courier, or by electronic mail or other electronic means.

       **(b)**    **Notice to Directors.** Any notice required to be given to any director may be given by the method stated in subsection (a), as otherwise provided in these Bylaws (including by any of the means specified in Section 22(d)), or by overnight delivery service. Any notice sent by overnight delivery service or U.S. mail shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

       **(c)**    **Affidavit of Mailing.** An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected, or other agent, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall in the absence of fraud, be prima facie evidence of the facts therein contained.

Debtors' Exhibit No. 40
Page 461 of 462

EX-3.2

https://www.sec.gov/Archives/edgar/data/1839341/0001193125220161...

**(d)   Methods of Notice.** It shall not be necessary that the same method of giving notice be employed in respect of all recipients of notice, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

**(e)   Notice to Person with Whom Communication is Unlawful.** Whenever notice is required to be given, under applicable law or any provision of the Certificate of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

**(f)   Notice to Stockholders Sharing an Address.** Except as otherwise prohibited under the DGCL, any notice given under the provisions of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Such consent shall have been deemed to have been given if such stockholder fails to object in writing to the corporation within 60 days of having been given notice by the corporation of its intention to send the single notice. Any consent shall be revocable by the stockholder by written notice to the corporation.

## ARTICLE XIII

### AMENDMENTS

**Section 49.   Amendments.** Subject to the limitations set forth in Section 47(h) and the provisions of the Certificate of Incorporation, the Board of Directors is expressly empowered to adopt, amend or repeal these Bylaws of the corporation. Any adoption, amendment or repeal of these Bylaws of the corporation by the Board of Directors shall require the approval of a majority of the directors then in office. The stockholders also shall have power to adopt, amend or repeal these Bylaws of the corporation; *provided, however,* that, in addition to any vote of the holders of any class or series of stock of the corporation required by applicable law or by the Certificate of Incorporation, such action by stockholders shall require the affirmative vote of the holders of at least 66 2/3% of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class.