United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 18, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | **Case No. 22-90341 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

### ORDER (I) AUTHORIZING
### (A) ASSUMPTION OF MCCARTHY CONTRACTS, AS AMENDED IN
### ACCORDANCE WITH THE SETTLEMENT AGREEMENT AND (B) ENTRY
### INTO THE SETTLEMENT AGREEMENT, AND (II) GRANTING RELATED RELIEF

On December 18, 2023, Core Scientific, Inc. ("**Core**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed a motion (the "**Motion**") and requested (i) authority for (a) the Debtors' assumption of the McCarthy Contracts (as defined in the Motion) between the Debtors and McCarthy Building Companies, Inc. ("**McCarthy**"), as amended in accordance with that certain *Settlement Agreement*, dated as of December 11, 2023, annexed hereto as <u>Exhibit 1</u> (the "**Settlement Agreement**")[2] by and among the Debtors, McCarthy, and Humphrey & Associates, Inc. ("**Humphrey**" and together with the Debtors and McCarthy, collectively, the "**Parties**" and, each, a "**Party**"), including, without limitation, by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions, VII, LLC (3198). The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704. The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Settlement Agreement, as applicable.

entering into that certain Change Order No. 5 and Fourth Modification of GMP in the form of Exhibit D to the Settlement Agreement (the "**Change Order No. 5**"); (b) the Debtors' entry into the Settlement Agreement and the transactions provided for therein (collectively, the "**Settlement**"); and (ii) granting related relief, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409; and due and proper notice of the Motion having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing,

**IT IS HEREBY ORDERED THAT:**

1.      Pursuant to sections 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, the Settlement by and between the Debtors, McCarthy, and Humphrey, on the terms set forth and agreed to in the Settlement Agreement and herein, is authorized and approved, and the Debtors are authorized to enter into, and perform under, the Settlement Agreement.

2.      The Debtors' entry into the Settlement Agreement represents a reasonable exercise of the Debtors' sound business judgment under section 363 of the Bankruptcy Code.

3.      The Settlement is the product of extensive, good faith, arms' length negotiations between the Parties and their respective representatives.

4.      Pursuant to section 365(a) of the Bankruptcy Code, the McCarthy Contracts, as amended in accordance with Settlement Agreement (including by entering into Charge Order No. 5), are assumed in their entirety by the Debtors, and all cure costs in connection with the assumption of the McCarthy Contracts (including all Contract Documents) are deemed satisfied in full in accordance with the Settlement Agreement.

5.      The Debtors' assumption of the McCarthy Contracts, as amended by the Settlement Agreement, represents a reasonable exercise of the Debtors' sound business judgment under section 365 of the Bankruptcy Code.

6.      Immediately upon entry of this Order:

(a)      except as set forth in the Settlement Agreement, the McCarthy Claims and any other Claim (as defined in the Bankruptcy Code) held by McCarthy against the Debtors (including but not limited to Proof of Claims No. 468) shall be deemed finally and fully satisfied, released and expunged, and, from and after the Cash Payment Date,[3] McCarthy shall cooperate with the Debtors and take all reasonable steps necessary to obtain the release of the Subcontractor Claims, including supporting any objections to the Subcontractor Claims filed by the Debtors;

(b)      except as set forth in this Agreement, the Humphrey Claims and any other Claim (as defined in the Bankruptcy Code) held by Humphrey against the Debtors (including but not limited to Proof of Claims No. 510) shall be deemed finally and fully satisfied, released and expunged, and, from and after the Cash Payment Date, Humphrey shall cooperate with the Debtors

---

[3] As defined herein.

and take all reasonable steps necessary to obtain release of the Subcontractor Claims, including supporting any objections to the Subcontractor Claims filed by the Debtors;

(c)     other than the Construction Contract and any contracts or purchase orders required by or arising under the Construction Contract, all contracts and outstanding purchase orders between McCarthy or Humphrey, on the one hand, and the Debtors, on the other hand, are terminated, and McCarthy and Humphrey each release and shall not have any claims for rejection damages based on such termination;

(d)     other than with respect to the obligations set forth in the Settlement Agreement, the Debtors and their chapter 11 estates (together, the "**Debtor Releasors**") and McCarthy and Humphrey and each of their affiliates (each of the Debtor Releasors and McCarthy and its affiliates and Humphrey and its affiliates, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), each on behalf of itself and any other party, person or entity claiming under or through it, hereby completely and finally releases, discharges, acquits, and covenants not to sue (i) each other Releasing Party and its respective current and former agents, servants, officers, directors, shareholders, employees, subsidiaries, divisions, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, including each Releasing Party, a "**Released Party**") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, liens, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulatory, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that

such releasing Party ever had or claimed to have or now has or claims to have, against any Released Party arising under or related to the Claims, the Liens, the Construction Contract or the Project or the Denton Facility, including, for the avoidance of doubt, any preference, fraudulent transfer, or other avoidance action arising under chapter 5 of the Bankruptcy Code or other applicable law, in each case from any and all other claims or causes of action arising prior to the entry of this Order, and (ii) each other Releasing Party from any and all other claims or causes of action arising prior to the entry of this Order; and

(e)     other than as set forth in the Settlement Agreement, neither McCarthy nor Humphrey shall be entitled to receive any other recovery in connection with any claims it has, or could have, asserted in connection with these chapter 11 cases or otherwise.

7.     Within one (1) business day following the entry of this Order, Core and McCarthy shall execute and enter into a Change Order in the form attached as Exhibit D of the Settlement Agreement.

8.     Within two (2) business days following entry of this Order:

(a)     McCarthy shall withdraw the McCarthy Complaint with prejudice with the United States District Court for the Eastern District of Texas;

(b)     in consideration for the Debtors' obligations under the Settlement Agreement, McCarthy shall file a notice of withdrawal of the Proof of Claim No. 468 with prejudice with the Court; and

(c)     in consideration for Debtors' obligations under the Settlement Agreement, Humphrey shall file a notice of withdrawal of the Proof of Claim No. 510 with prejudice with the Court.

9.       On the date that is earlier to occur of (x) the date which is ninety (90) days following the Emergence Date, or (y) the date which is three (3) business days following the earlier to occur of (i) the date on which Core delivers to McCarthy the A&B Notice to Proceed or (ii) the date on which Core delivers to McCarthy the F&G Notice to Proceed (such date, the "**Cash Payment Date**"), Core shall:

(a)       make a payment to McCarthy in the amount of $6,754,767.94 (the "**McCarthy Cash Payment**"), which McCarthy shall use to pay _first_ all Subcontractors, except for Humphrey, in full, and _then_, any remaining amounts to McCarthy;

(b)       make a payment to Humphrey in the amount of $5,628,816.85 (the "**Humphrey Cash Payment**"), which Humphrey shall use to pay _first_ all of Humphrey's subcontractors, sub-subcontractors and suppliers on the Project, in full, and _then_, any remaining amounts to Humphrey;

(c)       execute and deliver to McCarthy the McCarthy Note in accordance with the Settlement Agreement; and

(d)       execute and deliver to Humphrey the Humphrey Note in accordance with the Settlement Agreement.

10.       Within five (5) days following the Cash Payment Date:

(a)       McCarthy shall deliver to Core unconditional final lien waivers for those subcontractors and suppliers who have not yet filed and recorded a lien on the Property, in form and substance reasonably acceptable to Core, provided such lien waiver is in accordance with applicable Texas law, executed by each such subcontractor or supplier for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection

with the Debtors or the Project or the Property, duly executed by each Subcontractor, and in recordable form, which lien waiver shall provide for the release of all Subcontractor Liens;

(b)     McCarthy shall cause the Subcontractors (except for Humphrey), to extent that such Subcontractor filed and recorded a Subcontractor Lien on the Property, to file and record unconditional final lien releases in the real property records in Denton County, Texas of their respective Subcontractor Liens against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each Subcontractor, and in recordable form, which lien waiver shall provide for the final and unconditional release of all Subcontractor Liens, such lien releases to be in form and substance reasonably acceptable to Core;

(c)     Humphrey shall deliver to Core and McCarthy unconditional final lien waivers for those subcontractors and suppliers of Humphrey who have not yet filed and recorded a lien on the Property, in form and substance reasonably acceptable to Core, provided such lien waiver is in accordance with applicable Texas law, executed by each of its subcontractor and suppliers for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each subcontractor or supplier, and in recordable form, which lien waiver shall provide for the release of all subcontractor or supplier liens; and

(d)     Humphrey shall cause its subcontractors and suppliers, to the extent such subcontractor or supplier filed and recorded a lien on the Property, to file and record in the real property records in Denton County, Texas unconditional final lien releases of any liens that they might have impressed against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project

7

or the Property, duly executed by each subcontractor or supplier, and in recordable form, which lien waiver shall provide for the release of all subcontractor or supplier liens, such lien releases to be in form and substance reasonably acceptable to Core.

11.     Within seven (7) days following receipt of the Cash Payments:

(a)     McCarthy shall deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the McCarthy Liens, decreasing the amount of the McCarthy Liens to an amount not to exceed the principal amount of the McCarthy Note; and

(b)     Humphrey shall deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the Humphrey Liens, decreasing the amount of the Humphrey Liens to an amount not to exceed the principal amount of the Humphrey Note.

12.     Within five (5) business days following written request by Core:

(a)     McCarthy shall from time to time until the McCarthy Note has been paid in full, deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the McCarthy Liens, decreasing the amount of the McCarthy Liens to an amount not to exceed the then outstanding principal amount of the McCarthy Note; and

(b)     Humphrey shall from time to time until the Humphrey Note has been paid in full, deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the Humphrey Liens, decreasing the amount of the Humphrey Liens to an amount not to exceed the then outstanding principal amount of the Humphrey Note.

13.     Within five (5) business days following payment in full of the McCarthy Note, McCarthy shall deliver to Core and record in the real property records in Denton County, Texas, final unconditional lien waivers and releases of the McCarthy Liens and the Humphrey Liens, each in form and substance reasonably acceptable to Core, for all work performed on the Project or at the Property and all goods, labor, and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by McCarthy or Humphrey, as applicable, and in recordable form, which lien waivers shall provide for the final and unconditional release of the McCarthy Liens and the Humphrey Liens.

14.     Within five (5) business days following payment in full of the Humphrey Note, Humphrey shall deliver to Core and record in the real property records in Denton County, Texas, a final unconditional lien waiver and release of the Humphrey Liens in form and substance reasonably acceptable to Core, for all work performed on the Project or at the Property and all goods, labor, and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by Humphrey, and in recordable form, which lien waivers shall provide for the final and unconditional release of the Humphrey Liens.

15.     Unless and until an Event of Default (as defined in the McCarthy Note) occurs, McCarthy shall not foreclose or otherwise enforce or seek to enforce the McCarthy Liens or otherwise take adverse action against the Debtors, the Reorganized Debtors, or any of the assets thereof.

16.     Unless and until an Event of Default (as defined in the Humphrey Note) occurs, Humphrey shall be not foreclose or otherwise enforce or seek to enforce the Humphrey Liens or otherwise take adverse action against the Debtors, the Reorganized Debtors, or any of the assets thereof.

17.     Unless and until an Event of Default (as defined in the Settlement Agreement) occurs:

(a)     the Subcontractors shall be stayed from, and McCarthy shall cause the Subcontractors not to, foreclose or otherwise enforce or seek to enforce the Subcontractor Liens or otherwise take adverse action against the Debtors, the Reorganized Debtors, or any of the assets thereof; and

(b)     Humphrey's subcontractors and suppliers shall be stayed from, and Humphrey shall cause its subcontractors and suppliers not to, foreclose or otherwise enforce or seek to enforce any liens that they might have impressed against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property or otherwise take adverse action against the Debtors, the Reorganized Debtors, or any of the assets thereof.

18.     Unless Core delivers the A&B Notice to Proceed or the F&G Notice to Proceed on the Denton Facility, the Reorganized Debtors shall have no further obligations under the McCarthy Contracts.

19.     The Debtors are authorized to enter into, execute, deliver, and implement the Settlement as set forth herein and in the Settlement Agreement in all respects, as agreed to by the Parties.  The Debtors are further authorized to enter into, perform, execute, and deliver all documents, and take all actions, necessary or appropriate to immediately continue and fully implement the Settlement Agreement and carry out the relief granted in this Order.  The Parties shall do, execute, acknowledge and deliver all such further acts, instruments and assurances and take all such further action as shall be necessary or desirable to fully implement the Settlement

Agreement carry out the relief granted in this Order and fully consummate and effect the transactions provided for in this Order.

20.     Except as set forth in this Order, nothing contained in the Motion, this Order, or any actions taken by the Debtors pursuant to the relief granted in the Order shall be construed as: (a) an admission as to the validity of any claim against the Debtors, (b) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (c) an approval of an assumption of any lease, sublease, or contract pursuant to section 365 of the Bankruptcy Code.

21.     The Debtors, McCarthy, and Humphrey are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.  To the extent that there is any inconsistency between the Settlement Agreement and this Order or between the Motion and this Order, the provisions of this Order will govern.

22.     This Order shall be immediately effective and enforceable upon its entry.

23.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this

Signed: January 18, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

## Exhibit 1

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made and entered into as of December 11, 2023 (the "Effective Date") by and among McCarthy Building Companies, Inc., a Missouri corporation ("McCarthy"), Humphrey & Associates, Inc., a Texas corporation ("Humphrey"), and Core Scientific Operating Company, a Delaware corporation (f/k/a Core Scientific, Inc.) ("Core" and, together with its affiliated debtors in the Chapter 11 Cases (as defined herein), collectively, the "Debtors"). Each of McCarthy, Humphrey and the Debtors are referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, on November 17, 2021, McCarthy and Core entered into (i) that certain AIA® Document A102™ – 2017 Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price (as amended, modified, or supplemented from time to time by any change orders, the "Construction Contract") and (ii) that certain AIA® Document A201™ – 2017 General Conditions of the Contract for Construction (the "Conditions of Contract"). Under the Construction Contract, McCarthy agreed to provide labor, equipment, services, material and/or supplies to Core for the construction of a cryptocurrency mining facility (the "Project") on land demised to the Debtors in Denton, Texas (the "Property").

WHEREAS, on December 9, 2021, McCarthy and Core entered into an Escrow Agreement (the "Escrow Agreement"), pursuant to which Core agreed to establish and maintain an escrow account to secure Core's obligations under the Construction Contract. The Construction Contract, Conditions of Contract, the Escrow Agreement, and the other documents, as more specifically described and defined in Article 1 of the Construction Contract are collectively the "Contract Documents," as used in Article 1 of the Construction Contract. Capitalized terms used herein that are not defined either in this Agreement shall have the meanings given to them in the Construction Contract.

WHEREAS, on December 24, 2021, McCarthy and Humphrey entered into McCarthy Subcontract 2229-067 (the "Humphrey Subcontract") to perform and provide certain electrical and fire alarm-related labor, equipment, services, material and/or supplies for the construction of the Project at the Property.

WHEREAS, prior to filing the Chapter 11 Cases, McCarthy also entered into certain subcontract agreements (collectively, but not including the Humphrey Subcontract, the "Subcontracts" and each, individually, a "Subcontract") with the subcontractors set forth on the first column of Schedule I hereto (collectively, but not including Humphrey, the "Subcontractors" and, each, individually, a "Subcontractor") to provide labor, equipment, services, material and/or supplies for the construction of Project at the Property.

WHEREAS, on October 31, 2022, McCarthy filed a complaint against Core in the United States District Court for the Eastern District of Texas, case no. 4:22-cv-00924, asserting, among other things, breach of contract claims under the Contract Documents and violations of Chapter 28 of the Texas Property Code, due to, among other things, Core's failure to: (a) pay McCarthy as

required under the Construction Contract and Contract Documents; (b) fund the escrow account as required by the Escrow Agreement; and (c) post the requisite payment bond as required under the Construction Contract (the "McCarthy Complaint").  The McCarthy Complaint was stayed due to the Debtors' filing of the Chapter 11 Cases.

WHEREAS, McCarthy has asserted certain liens against certain of the Debtors' assets (the "McCarthy Lien"), including (i) that certain *Amended Affidavit for Mechanic's Lien* recorded on November 14, 2022 under Document Number 158011 (the "McCarthy Lien Filing") under Texas Property Code § 53.001, *et seq.* in the Land Records of Denton County, Texas; and (ii) that certain *Notice of Continued Perfection of Materialman's and Mechanic's Lien Pursuant to 11 U.S.C. § 546(b)* Docket No. 337 filed by McCarthy on January 23, 2023 (the "McCarthy Lien Notice"). The interest perfected, maintained, and/or continued by the McCarthy Lien Filing extends in and to the Debtors' interest in the Property, improvements, and/or leasehold interest in the Property. As of the recording of the McCarthy Lien Filing, McCarthy asserts that the amount owed to McCarthy subject to the McCarthy Lien is at least $17,052,583.65, exclusive of accruing interest and other charges, and additional amounts which have continued and are continuing to accrue.

WHEREAS, Humphrey (a subcontractor of McCarthy) has asserted certain liens against certain of the Debtors' assets (the "Humphrey Lien"), including (i) that certain *Lien Affidavit and Claim* recorded on November 15, 2022 under Document Number 158075, under Texas Property Code § 53.001, *et seq.* in the Land Records of Denton County, Texas, as amended by that certain *Partial Release of Lien* recorded on April 14, 2023 under Document Number 37449 in the Land Records of Denton County, Texas (collectively, the "Humphrey Lien Filing") and (ii) that certain *Notice of Perfection, Continuation, and/or Maintenance of Mechanic's Lien Pursuant to 11 U.S.C. § 546(B)(2)* Docket No. 798 (the "Humphrey Lien Notice").  The interest perfected, maintained, and/or continued by the Humphrey Lien Filing extends in and to the Debtors' interest in the Property, improvements, and/or leasehold interest in the Property.  As of the initial recording of the Humphrey Lien Filing, Humphrey asserted that the amount owed to Humphrey subject to the Humphrey Lien is at least $9,365,366.20, exclusive of accruing interest and other charges, and additional amounts which have continued and are continuing to accrue, which amount was reduced pursuant to the *Partial Release of Lien* to reflect receipt of a partial payment from McCarthy from escrowed funds in the amount of $2,329,345.14 thereby reducing the Humphrey Lien to $7,036,021.06.

WHEREAS, prepetition, certain Subcontractors also asserted certain liens against certain of the Debtors' assets (collectively, but not including Humphrey Lien, the "Subcontractor Liens," and together with the McCarthy Lien and the Humphrey Lien, collectively, the "Liens"), including, without limitation, the mechanics' liens against the Property in the amounts set forth opposite such Subcontractor in the fourth column of Schedule I to this Agreement, as more particularly described on Exhibit A to this Agreement.

WHEREAS, on December 21, 2022, the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") initiating their respective Chapter 11 cases, which are being jointly administered under Case Number 22-90341 (CML) (the "Chapter 11 Cases").

2

WHEREAS, McCarthy has asserted prepetition and post-petition claims against the Debtors (collectively, the "McCarthy Claims"), including the claims set forth in the McCarthy Complaint and that certain Proof of Claim No. 468 filed by McCarthy on April 14, 2023, relating to claims arising under the Contract Documents and the McCarthy Lien Filing and asserting a claim in the amount of $18,799,499, secured for an unknown amount, partially liquidated and non-contingent, and partially unliquidated and contingent, exclusive of additional costs, attorneys' and professional fees that continue to accrue, and interest (the "McCarthy POC").

WHEREAS, Humphrey has asserted prepetition and post-petition claims against the Debtors (collectively, the "Humphrey Claims"), including the claims set forth in that certain Proof of Claim No. 510 filed by Humphrey on April 14, 2023, asserting a secured claim in the amount of $7,036,021.06 (the "Humphrey POC").

WHEREAS, certain of the Subcontractors have asserted prepetition and post-petition claims against the Debtors (collectively, the "Subcontractor Claims," and together with the McCarthy Claims and the Humphrey Claims, the "Claims"), including, without limitation, those Proofs of Claims Nos. set forth opposite such Subcontractor in the second column of Schedule I to this Agreement asserting claims in the amounts set forth opposite such Subcontractor in the third column of Schedule I of this Agreement.

WHEREAS, on June 20, 2023, the Debtors filed their Joint Chapter 11 Plan of Reorganization of Core Scientific, Inc. and its Debtor Affiliates Docket No. 974 (together with any and all appendices, exhibits, schedules, and supplements thereto (including, without limitation, any appendices, schedules, and supplements thereto contained in the Plan Supplement (as defined in the Plan), as each of the foregoing may be amended, supplemented, or modified, the "Plan") and related Disclosure Statement Docket No. 975 (as may be amended, modified, or supplemented, the "Disclosure Statement").

WHEREAS, on September 6, 2023, McCarthy filed an Objection Docket No. 1197 (the "McCarthy Objection") to the Debtors' Disclosure Statement (as defined herein), later withdrawn, without prejudice, at Docket No. 1412. That same day, Humphrey filed its Objection and joining in the McCarthy Objection to the Debtors' Disclosure Statement Docket No. 1198 (the "Humphrey Joinder"), later withdrawn, without prejudice, at Docket No. 1419.

WHEREAS, on November 16, 2023, the Debtors filed their Third Amended Joint Chapter 11 Plan of Reorganization of Core Scientific, Inc. and its Debtor Affiliates Docket No. 1438 and related Disclosure Statement Docket No. 1439.

WHEREAS, the Parties engaged in good faith, arm's-length discussions regarding the Construction Contract, the Liens, the Claims, and the McCarthy Complaint, and have determined that it would be in their respective best interests to enter into this Agreement and the agreements set forth herein.

WHEREAS, the Debtors have determined that the compromises set forth herein are fair, reasonable and in the best interests of the Debtors, their estates and their creditors.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.      The above recitals are incorporated herein by reference with the same force and effect as if fully set forth hereunder.

2.      The Settlement Transactions.

a.      Within five (5) business days following the Effective Date, the Debtors shall file a motion with the Bankruptcy Court, in form and substance reasonably acceptable to McCarthy and Humphrey, seeking entry by the Bankruptcy Court of an order (the "Approval Order") authorizing and approving this Agreement and the agreements set forth herein pursuant to Bankruptcy Rule 9019 and section 365 of the Bankruptcy Code.

b.      Neither the Plan nor any order confirming the Plan shall alter the terms of this Agreement (as approved by the Approval Order) or the Approval Order.  To the extent there are any conflicts between this Agreement (as approved by the Approval Order), the Approval Order, the Plan, or any order approving the Plan, then the Approval Order and this Agreement (as approved by the Approval Order) shall govern in all respects and supersede anything to the contrary.

c.      The Cash Payments; Lien Releases/Amendments; and Notes.

i.      The Cash Payments.  On the Cash Payment Date (as defined herein), Core shall:

1)      make a payment to McCarthy in the amount of $6,754,767.94 (the "McCarthy Cash Payment"), which McCarthy shall use to pay *first* all Subcontractors, except for Humphrey, in full and *then*, any remaining amounts to McCarthy; and

2)      make a payment to Humphrey in the amount of $5,628,816.85 (the "Humphrey Cash Payment" and, together with the McCarthy Cash Payment, collectively, the "Cash Payments"), which Humphrey shall use to pay *first* all of Humphrey's subcontractors, sub-subcontractors and suppliers on the Project in full and *then*, any remaining amounts to Humphrey.

As used herein, "Cash Payment Date" shall mean the earlier to occur of (x) the date which is ninety (90) days following the date on which the Plan is effective (such Plan effective date, the "Emergence Date"), or (y) the date which is three (3) business days following the earlier to occur of (i) the date on which Core delivers a notice to McCarthy to proceed with the construction of those certain Buildings A&B on the A&B-South Parcel (the "A&B Notice to Proceed") or (ii) the date on which Core delivers a notice to McCarthy to proceed with the construction of those certain Buildings F&G on the F&G-North Parcel (the "F&G Notice to Proceed", collectively with the A&B Notice to Proceed, the "Notices to Proceed").

4

ii.      The Lien Waivers/Releases.

1)      Within five (5) days following the Cash Payment Date, McCarthy shall: (a) deliver to Core unconditional final lien waivers for those subcontractors and suppliers who have not yet filed and recorded a lien on the Property, in form and substance reasonably acceptable to Core, provided such lien waiver is in accordance with applicable Texas law, executed by each such subcontractor or supplier for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each Subcontractor, and in recordable form, which lien waiver shall provide for the release of all Subcontractor Liens; and (b) cause the Subcontractors (except for Humphrey), to extent that such Subcontractor filed and recorded a Subcontractor Lien on the Property, to file and record unconditional final lien releases in the real property records in Denton County, Texas of their respective Subcontractor Liens against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each Subcontractor, and in recordable form, which lien waiver shall provide for the release of all Subcontractor Liens, such lien releases to be in form and substance reasonably acceptable to Core.

2)      Within five (5) days following the Cash Payment Date, Humphrey shall: (a) deliver to Core and McCarthy unconditional final lien waivers for those subcontractors and suppliers of Humphrey who have not yet filed and recorded a lien on the Property, in form and substance reasonably acceptable to Core, provided such lien waiver is in accordance with applicable Texas law, executed by each of its subcontractor and suppliers for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each subcontractor or supplier, and in recordable form, which lien waiver shall provide for the release of all subcontractor or supplier liens; and (b) cause its subcontractors and suppliers, to the extent such subcontractor or supplier filed and recorded a lien on the Property, to file and record in the real property records in Denton County, Texas unconditional final lien releases of any liens that they might have impressed against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by each subcontractor or supplier, and in recordable form, which lien waiver shall provide for the release of all subcontractor or supplier liens, such lien releases to be in form and substance reasonably acceptable to Core.

3)      Within seven (7) days following receipt of the Cash Payments, McCarthy shall deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the McCarthy Lien, decreasing the amount of the McCarthy Lien to an amount not to exceed $6,809,344.21, which amount includes the principal amount of the McCarthy Note (as defined herein).

4)      Within seven (7) days following receipt of the Cash Payments, Humphrey shall deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the Humphrey Lien, decreasing the amount of the Humphrey Lien to an amount not to exceed $1,407,204.21, which is the principal amount of the Humphrey Note (as defined herein).

5

iii.     The Notes.

1)     The Humphrey Note.

a)     On the Cash Payment Date, Core shall execute and deliver to Humphrey a Promissory Note in the form attached hereto as Exhibit B (the "Humphrey Note") in the principal amount of $1,407,204.21, which Humphrey Note shall (i) bear interest at the rate of five percent (5%), compounded monthly, (ii) begin accruing interest on the date which is one hundred twenty (120) days after the Emergence Date, (iii) be payable in thirty (30) equal monthly installments, with the first (1st) monthly installment to be due one hundred twenty (120) days following the Emergence Date, (iv) require mandatory prepayment in full, without penalties or fees, within one (1) business day following delivery by Core of the A&B Notice to Proceed or the F&G Notice to Proceed, and (v) provide that Core may make voluntary partial or full prepayments, without penalties or fees.

b)     Humphrey acknowledges and agrees that, from and after the Cash Payment Date, the Humphrey Lien shall only secure payment of the principal amount of the Humphrey Note then outstanding.  Within five (5) business days following written request by Core, Humphrey shall from time to time until the Humphrey Note has been paid in full, deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the Humphrey Lien, decreasing the amount of the Humphrey Lien to an amount not to exceed the then outstanding principal amount of the Humphrey Note.

c)     Within five (5) business days following payment in full of the Humphrey Note, Humphrey shall deliver to Core and record in the real property records in Denton County, Texas, a final unconditional lien waiver and release of the Humphrey Lien in form and substance reasonably acceptable to Core, for all work performed on the Project or at the Property and all goods, labor, and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by Humphrey, and in recordable form, which lien waivers shall provide for the release of the Humphrey Lien.

2)     The McCarthy Note.

a)     On the Cash Payment Date, Core shall execute and deliver to McCarthy a Promissory Note in the form attached hereto as Exhibit C (the "McCarthy Note") in the principal amount of $6,809,344.21, which McCarthy Note shall (i) provide that the obligations thereunder shall be bifurcated into (A) an obligation to pay the principal amount of $5,402,140 (the "Primary Obligation") and (B) an obligation to pay the principal amount then payable under the Humphrey Note (the "Secondary Obligation"), (ii) bear interest on the Primary Obligation at the rate of five percent (5%), compounded monthly, and not bear interest on the Secondary Obligation, (iii) begin accruing interest, as applicable, on the date which is one hundred twenty (120) days after the Emergence Date, (iv) be payable in thirty (30) equal monthly installments, with the first (1st) monthly installment to be due one hundred twenty (120) days following the Emergence Date, (v) require mandatory prepayment of the Primary Obligation in full, without penalties or fees, within one (1) business day following the earlier to occur of (i) delivery by Core of the A&B Notice to Proceed or the F&G Notice to Proceed, (vi) provide that

6

Core may make voluntary partial or full prepayments, without penalties or fees, and (vii) provide that payments made under the McCarthy Note shall (A) first, reduce the Primary Obligation and (B) then, after the Primary Obligation has been paid in full, reduce the Secondary Obligation, and (viii) provide that all payments made under the Humphrey Note which are applied toward the reduction of principal of the Humphrey Note shall be deemed to be a payment of, and reduce the outstanding principal amount of, the Secondary Obligation.

b)      McCarthy acknowledges and agrees that, from and after the Cash Payment Date, the McCarthy Lien shall only secure payment of the principal amount of the McCarthy Note then outstanding. Within five (5) business days following written request by Core, McCarthy shall from time to time until the McCarthy Note has been paid in full, deliver to Core and record in the real property records in Denton County, Texas, a partial lien waiver and release, in form and substance reasonably acceptable to Core, of the McCarthy Lien, decreasing the amount of the McCarthy Lien to an amount not to exceed the then outstanding principal amount of the McCarthy Note.

c)      Within five (5) business days following payment in full of the McCarthy Note, McCarthy shall deliver to Core and record in the real property records in Denton County, Texas, a final unconditional lien waiver and release of the McCarthy Lien and the Humphrey Lien, each in form and substance reasonably acceptable to Core, for all work performed on the Project or at the Property and all goods, labor, and materials supplied to, for or in connection with the Debtors or the Project or the Property, duly executed by McCarthy or Humphrey, as applicable, and in recordable form, which lien waivers shall provide for the release of the McCarthy Lien and the Humphrey Lien.

iv.      <u>Standstill of Lien Enforcement; Statutes of Limitation</u>.

1)      Unless and until an Event of Default (as defined in the McCarthy Note) occurs, McCarthy shall not foreclose or otherwise enforce or seek to enforce the McCarthy Lien or otherwise take adverse action against the Debtors or any of the Debtors' assets. Unless and until an Event of Default (as defined herein) occurs, the Subcontractors shall be stayed from, and McCarthy shall cause the Subcontractors not to, foreclose or otherwise enforce or seek to enforce the Subcontractor Liens or otherwise take adverse action against the Debtors or any of the Debtors' assets.

2)      Unless and until an Event of Default (as defined in the Humphrey note) occurs, Humphrey shall be not foreclose or otherwise enforce or seek to enforce the Humphrey Lien or otherwise take adverse action against the Debtors or any of the Debtors' assets. Unless and until an Event of Default (as defined herein) occurs, Humphrey's subcontractors and suppliers shall be stayed from, and Humphrey shall cause its subcontractors and suppliers not to, foreclose or otherwise enforce or seek to enforce any liens that they might have impressed against the Property for all work performed on the Project or at the Property and all goods, labor and materials supplied to, for or in connection with the Debtors or the Project or the Property or otherwise take adverse action against the Debtors or any of the Debtors' assets.

3)      With respect to the enforcement of the Humphrey Lien and the McCarthy Lien, Core agrees that any applicable statutes of limitation applicable to the

Humphrey Lien or the McCarthy Lien, as applicable, shall be tolled from the Emergence Date until (a) with respect to the Humphrey Lien, the date on which an Event of Default (as defined in the Humphrey Note), if any, occurs and (b) with respect to the McCarthy Lien, the date on which an Event of Default (as defined in the McCarthy Note), if any, occurs. With respect to the enforcement of any Liens held by the Subcontractors (other than Humphrey), Core agrees that any applicable statutes of limitation applicable to such Liens shall be tolled from the Emergence Date until the date on which an Event of Default (as defined herein), if any, occurs.

4) As used herein, an "Event of Default" shall be deemed to have occurred if Core breaches or defaults in the performance of any obligation of Core contained in this Agreement if such failure shall remain uncured for sixty (60) days following delivery of written notice to Core by McCarthy or Humphrey.

d. **Assumption of Construction Contract.** The Approval Order shall provide that the Construction Contract (including all Contract Documents), as amended by Change Order No. 5 (as defined herein), is assumed by Core pursuant to 11 U.S.C.§ 365. From and after the entry of the Approval Order, Core and McCarthy shall perform under the Construction Contract (including all Contract Documents and Change Order No. 5), in accordance with the terms of the Construction Contract (including all Contract Documents and Change Order No. 5), and the Construction Contract (including all Contract Documents and Change Order No. 5) shall remain in full force and effect, except to the extent expressly modified by this Agreement. All cure costs to be paid in connection with the assumption of the Construction Contract (including all Contract Documents) are deemed satisfied in full in accordance with this Agreement.

e. **Modifications to Construction Contract and Change Order.** Within one (1) business day following the Bankruptcy Court's entry of the Approval Order, Core and McCarthy shall execute and enter into a Change Order No. 5 and Fourth Modification of GMP in the form attached hereto as Exhibit D (the "Change Order No. 5"), which shall provide, among other things, that (i) unless Core delivers the A&B Notice to Proceed or the F&G Notice to Proceed to McCarthy, Core shall have no further obligations under the Construction Contract and (ii) Core shall have the option, but not the obligation, (A) exercisable by delivery of the A&B Notice to Proceed, to build-out the A&B-South Parcel and (B) exercisable by delivery of the F&G Notice to Proceed, to build-out the F&G-North Parcel, in each case subject to the terms of the Construction Contract (including all Contract Documents and Change Order No. 5).

i. **Notices to Proceed and Escrowed Funds:**

1) Promptly following delivery of the A&B Notice to Proceed, Core, McCarthy and an escrow agent mutually acceptable to Core and McCarthy ("Escrow Agent") shall enter into an escrow agreement (the "A&B Escrow Agreement") which shall (A) provide that Core shall deposit with Escrow Agent $1,000,000.00 (the "A&B-South Parcel Deposit") for the purpose of finishing the A&B-South Parcel and (B) otherwise be substantially similar to the Escrow Agreement, in form and substance, with such changes as are requested by Escrow Agent and reasonably agreed to by Core and McCarthy. Core and McCarthy acknowledge and agree that (I) the amount of the A&B-South Parcel Deposit is based upon McCarthy's good faith estimate of the cost to complete the construction of the A&B-South Parcel, (II) the A&B Escrow Agreement shall provide that in the event that the actual cost to complete the construction

8

of the A&B-South Parcel is less than the amount of the A&B-South Parcel Deposit, any excess funds remaining in the escrow account shall be promptly returned to Core and (III) in the event that the A&B-South Parcel Deposit is insufficient to complete the construction on the A&B-South Parcel, Core shall promptly remit payment to McCarthy on account of invoices in excess of the A&B-South Parcel Deposit in accordance with the terms set forth in the Construction Contract.

     2) Within twenty-one (21) days following written request by Core, McCarthy shall deliver a notice (the "F&G Cost Estimate Notice") to Core setting forth McCarthy's good faith estimate of the cost to complete the construction of the F&G-North Parcel (the "F&G Deposit Amount"). In the event that Core thereafter delivers the F&G Notice to Proceed, then, promptly following receipt of the F&G Cost Estimate Notice, Core, McCarthy and Escrow Agent shall enter into an escrow agreement (the "F&G Escrow Agreement") which shall (A) provide that Core shall deposit with Escrow Agent the F&G Deposit Amount (the "F&G-North Parcel Deposit") for the purpose of finishing the F&G North Parcel and (B) otherwise be substantially similar to the Escrow Agreement, in form and substance, with such changes as are requested by Escrow Agent and reasonably agreed to by Core and McCarthy. Core and McCarthy acknowledge and agree that (I) the amount of the F&G-North Parcel Deposit is based upon McCarthy's good faith estimate of the cost to complete the construction of the F&G-North Parcel, (II) the F&G Escrow Agreement shall provide that in the event that the actual cost to complete the construction of the F&G-North Parcel is less than the amount of the F&G-North Parcel Deposit, any excess funds remaining in the escrow account shall be promptly returned to Core and (III) in the event that the F&G-North Parcel Deposit is insufficient to complete the construction on the F&G-North Parcel, Core shall promptly remit payment to McCarthy on account of invoices in excess of the F&G-North Parcel Deposit in accordance with the terms set forth in the Construction Contract (including all Contract Documents and Change Order No. 5).

   ii. Commencement of Work: Following the delivery of the A&B Notice to Proceed and/or the F&G Notice to Proceed, McCarthy shall commence work on the A&B-South Parcel or the F&G-North Parcel, as applicable, within 30 days following the date on which each of the following conditions has been satisfied:

     1) Core pays the McCarthy Cash Payment to McCarthy;

     2) Core pays the Humphrey Cash Payment to Humphrey;

     3) Core pays the Humphrey Note in full, inclusive of all interest accrued thereunder;

     4) Core pays, or is deemed to have paid, in each case, pursuant to the terms of the McCarthy Note, the McCarthy Note in full, inclusive of all interest accrued thereunder;

     5) In the event that Core delivers (A) the A&B Notice to Proceed, the A&B-South Parcel Deposit has been deposited with Escrow Agent pursuant to the A&B Escrow Agreement and (B) the F&G Notice to Proceed, the F&G-North Parcel Deposit has been deposited with Escrow Agent pursuant to the F&G Escrow Agreement.

   iii. No Representation as to Costs to Complete.

1)       Core acknowledges that McCarthy's estimate for the A&B-South Parcel Deposit and any other cost and timing estimates provided in the course of negotiating this Agreement, including with respect to the F&G-North Parcel Deposit, contemplate commencement of work on both the A&B-South Parcel and the F&G-North Parcel in early 2024. Core further acknowledges that if the A&B Notice to Proceed is issued after March 31, 2024 or the F&G Notice to Proceed is issued after March 31, 2025, then additional market conditions, (*e.g.*, at least three separate large projects in the Dallas-Fort Worth area) may impact costs and schedules due to the availability of subcontractors to complete the work and that the Guaranteed Maximum Prices for such work set forth in Change Order No. 5 may increase.

2)       Core acknowledges that if Core delivers the A&B Notice to Proceed and the F&G Notice to Proceed at different times, additional costs may be incurred related to, among other things, the need for two different mobilizations and the decreased ability to share general conditions, supervision, and labor between the A&B-South Parcel and the F&G-North Parcel.

3.       <u>Releases.</u>

a.       Immediately upon entry of the Approval Order:

i.       Except as set forth in this Agreement, the McCarthy Claims and any other Claim (as defined in the Bankruptcy Code) held by McCarthy against the Debtors (including but not limited to the McCarthy POC) shall be deemed finally and fully satisfied, released and expunged, and, from and after the Cash Payment Date, McCarthy shall cooperate with the Debtors and take all reasonable steps necessary to obtain release of the Subcontractor Claims, including supporting any objections to the Subcontractor Claims filed by the Debtors;

ii.       Except as set forth in this Agreement, the Humphrey Claims and any other Claim (as defined in the Bankruptcy Code) held by Humphrey against the Debtors (including but not limited to the Humphrey POC) shall be deemed finally and fully satisfied, released and expunged, and, from and after the Cash Payment Date, Humphrey shall cooperate with the Debtors and take all reasonable steps necessary to obtain release of the Subcontractor Claims, including supporting any objections to the Subcontractor Claims filed by the Debtors;

iii.       other than the Construction Contract and any contracts or purchase orders required by or arising under the Construction Contract, all contracts and outstanding purchase orders between McCarthy or Humphrey, on the one hand, and the Debtors, on the other hand, are terminated, and McCarthy and Humphrey each release and shall not have any claims for rejection damages based on such termination;

iv.       other than with respect to the obligations set forth herein, the Debtors and their chapter 11 estates (together, the "<u>Debtor Releasors</u>") and McCarthy and Humphrey and each of their affiliates (each of the Debtor Releasors and McCarthy and its affiliates and Humphrey and its affiliates, a "<u>Releasing Party</u>" and, collectively, the "<u>Releasing Parties</u>"), each on behalf of itself and any other party, person or entity claiming under or through it, hereby completely and finally releases, discharges, acquits, and covenants not to sue (i) each other Releasing Party and its respective current and former agents, servants, officers, directors,

10

shareholders, employees, subsidiaries, divisions, affiliates, parents, attorneys, successors, predecessors, heirs, personal representatives, and assigns (each of the foregoing, including each Releasing Party, a "Released Party") from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, liens, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulatory, tort (including, without limitation, intentional torts, fraud, misrepresentation, defamation, breaches of alleged fiduciary duty, recklessness, gross negligence, or negligence) or otherwise, accrued or unaccrued, known or unknown, matured, unmatured, liquidated or unliquidated, certain or contingent, that such releasing Party ever had or claimed to have or now has or claims to have, against any Released Party arising under or related to the Claims, the Liens, the Construction Contract or the Project or the Facilities, including, for the avoidance of doubt, any preference, fraudulent transfer, or other avoidance action arising under chapter 5 of the Bankruptcy Code or other applicable law, in each case from any and all other claims or causes of action arising prior to the entry of this Order, and (ii) each other Releasing Party from any and all other claims or causes of action arising prior to the entry of this Order; and

v.      other than as set forth herein, neither McCarthy nor Humphrey shall be entitled to receive any other recovery in connection with any claims it has, or could have, asserted in connection with the Chapter 11 Cases or otherwise.

b.      Within two (2) business days following entry of the Approval Order:

i.      McCarthy shall withdraw the McCarthy Complaint with prejudice with the United States District Court for the Eastern District of Texas;

ii.      in consideration for Core's obligations hereunder, including the obligation to make the McCarthy Cash Payment and deliver the McCarthy Note, McCarthy shall file a notice of withdrawal of the McCarthy POC with prejudice with the Bankruptcy Court; and

iii.      in consideration for Core's obligations hereunder, including the obligation to make the Humphrey Cash Payment and deliver the Humphrey Note, Humphrey shall file a notice of withdrawal of the Humphrey POC with prejudice with the Bankruptcy Court.

4.      Court Approval. This Agreement is subject to approval by the Bankruptcy Court under Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rule(s)") 9019 and section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court does not approve this Agreement, then this Agreement shall be null and void with the Parties returning to their original respective positions with no rights waived.  For purposes of this Agreement, this Agreement will be deemed effective upon the Bankruptcy Court's entry of an order (the "Approval Order") in form and substance acceptable to the Parties authorizing and approving the settlement and the agreements set forth herein pursuant to Bankruptcy Rule 9019 and section 365 of the Bankruptcy Code.

5.      Notices. Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("e-mail"), (b) when delivered personally, (c) one (1)

11

business day after deposit with an overnight courier service, or (d) three (3) business days after the date of mailing by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a Party hereto as shall be specified by like notice to the other Party hereto); provided that in the case of this clause (a) confirmation of receipt is received by sender, in each case of clause (b) through (d), so long as such notice is sent to the following addresses:

If to the Debtors:

c/o Core Scientific Inc.
210 Barton Springs Road
Suite 300
Austin, Texas 78704
Attention: Legal Counsel

with copies to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, Esq.
Phone: (212) 310-8210
E-mail: Ray.Schrock@weil.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ronit J. Berkovich, Esq.
Phone: (212) 310-8534
E-mail: Ronit.Berkovich@weil.com

and

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002-2755
Attention: Clifford Carlson, Esq.
Phone: (713) 546-5248
E-mail: Clifford.Carlson@weil.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Avelina Burbridge, Esq.
Phone: (212) 310-8053
E-mail: Avelina.Burbridge@weil.com

If to McCarthy:

Michael Steinkamp
Project Senior Manager
McCarthy Building Companies, Inc.
3400 N Central Expressway, Suite 500
Richardson, Texas 75080
Msteinkamp@McCarthy.com

Maura Kelly
Vice President Legal & Associate General Counsel
McCarthy Holdings, Inc.
3800 Buffalo Speedway, Suite 250
Houston, Texas 77098
MKelly@McCarthy.com

With a copy to:

Jennifer L. Kneeland
Watt, Tieder, Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
jkneeland@watttieder.com

If to Humphrey:

Randall P. Humphrey
Executive Vice President
Humphrey & Associates, Inc.
1501 Luna Road
Carrollton, Texas 75006
randyh@teamhumphrey.com

With a copy to:

Jason R. Kennedy
Laperouse, PC
5220 Spring Valley Rd., Suite 615

13

Dallas, Texas 75254
jason.kennedy@laperouselaw.com

6.      Acknowledgement. Each Party represents that it has had the opportunity to consult with an attorney and has carefully read and understands the scope and effect of the provisions of this Agreement.

7.      Entire Agreement. This Agreement (including the schedules and exhibits hereto) and the Construction Contract (including the Contract Documents and Change Order No. 5), along with the Approval Order, constitute the entire agreement and understanding between the Parties concerning the subject matter of this Agreement.

8.      Binding Effect; Assignment. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and permitted assigns, including, in the case of the Debtors, any reorganized Debtor, and/or any trustee or estate representative appointed in the Chapter 11 Cases or in any successor chapter 7 case.  No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of law or otherwise) without the prior written consent of the other party hereto, and any attempted assignment without the required consents shall be void.

9.      Severability. If any term, condition or other provision, or any portion of any provision hereof, or any surviving agreement made a part hereof becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said term, condition, provision or portion of provision, so long as the economic and legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

10.      No Oral Modification. This Agreement may be amended only in a writing signed by all Parties to this Agreement.

11.      No Waiver. The waiver by any party hereto of any provision of this Agreement or any breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any other or subsequent breach of any provision of this Agreement. No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.      No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Parties and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

14

13.     <u>Survival.</u> Following the entry of the Approval Order, this Agreement shall be and shall remain enforceable and in full force and effect in the Chapter 11 Cases and on and after the Emergence Date. This Agreement, the Approval Order, the Notes, Change Order No. 5, the Construction Contract and the other Contract Documents, and the obligations of the parties hereunder and thereunder, shall not be released, waived, discharged or otherwise affected in any way by the Plan, any order confirming such Plan or the consummation of any such Plan.

14.     <u>Counterparts.</u> This Agreement and any other agreement or document contemplated hereby, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparties shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services) a photographic, photostatic, facsimile, portable document format (.pdf) or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any other agreement or document contemplated herein shall raise the use of electronic signature, facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf as of the day and year first written above.

**Core Scientific Operating Company** (f/k/a Core Scientific, Inc.)

By: *Todd DuChene*

Name: Todd DuChene

Title: Chief Legal Officer

**McCarthy Building Companies, Inc.**

By: _____

Name: _____

Title: _____

**Humphrey & Associates, Inc.**

By: _____

Name: _____

Title: _____

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf as of the day and year first written above.

**Core Scientific Operating Company** (f/k/a Core Scientific, Inc.)

By:_____

Name:_____

Title: _____

**McCarthy Building Companies, Inc.**

By:_____

Name: Joseph A. Jouvenal, Jr

Title: Chief Administrative Officer

**Humphrey & Associates, Inc.**

By:_____

Name:_____

Title: _____

*[Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed on its behalf as of the day and year first written above.

**Core Scientific Operating Company** (f/k/a Core Scientific, Inc.)

By:_____
Name:_____
Title: _____

**McCarthy Building Companies, Inc.**

By:_____
Name:_____
Title: _____

**Humphrey & Associates, Inc.**

By:_____
Name: Randall P Humphrey
Title: EVP / Corp Secretary

*[Signature Page to Settlement Agreement]*

Schedule I

Subcontractor Claims and Liens

| Subcontractor | Proof of Claim No. | Total Claim Asserted | Total Lien Asserted |
|---|---|---|---|
| ABLe Communications, Inc. | 538 | $1,094,850.64 | $1,094,850.64 |
| BEAM Concrete Construction, Inc. | 187 | $417,912.18 | $878,306.82 |
| BURNCO Texas LLC | — | — | $531,956.77[1] |
| Housley Communications, Inc. | 167 | $53,883.90 | $0.00[2] |
| Imperial Fire Protection | 122 | $209,210.00 | $209,210.00 |
| McCorvey Sheet Metal Works, LP | — | — | $20,895.50 |
| North Texas Contracting, Inc. | — | — | $189,425.90 |
| Pillar Electric Group, LP | — | — | $0.00[3] |
| Power Engineering Services, Inc. | — | — | $0.00[4] |
| RPM xConstruction, LLC | — | — | $19,394.12 |
| Sure Steel – Texas LP | 110 | $1,758,424.83 | $1,758,424.93[5] |
| Way Mechanical | — | — | $436,029.00 |
|  |  |  |  |
| **TOTAL:** | | **$3,534,281.55** | **$5,272,575.18** |

[1] BURNCO Texas LLC asserted a lien in the amount of $531,956.77. McCarthy's records reflect an outstanding amount of $352,390.59.

[2] Housley Communications released its lien in the amount of $53,883.90 pursuant to that certain Release of Lien, dated January 24, 2023 and recorded on March 16, 2023.

[3] Pillar Electric Group, LP released its lien in the amount of $28,266.49 pursuant to that certain Release of Lien, dated January 19, 2023 and recorded on March 16, 2023.

[4] Power Engineering Services, Inc. released its lien in the amount of $98,440.00 pursuant to that certain Release of Lien, dated January 23, 2023 and recorded on March 16, 2023.

[5] Sure Steel – Texas LP asserted an initial lien in the amount of $1,237,031.22. Subsequently, Sure Steel – Texas LP filed a partial lien waiver which purported to release $541,754.19 and should have reduced the balance of the remaining lien to $695,277.03. However, in the partial release, Sure Steel – Texas LP asserts that the balance of its remaining lien is $1,758,424.93.

Exhibit A

Subcontractor Liens

1. That certain Affidavit for Mechanic's and Materialman's Lien in the amount of $1,237,031.22, filed by Sure Steel – Texas LP, recorded on October 28, 2022, under Recording Number 20221028000606, as partially released by that certain Partial Release of Mechanic's Lien in the amount of $541,754.19, recorded on January 19, 2023, under Recording Number 20230119000008.

2. That certain Affidavit for Mechanic's and Materialman's Lien - Leasehold in the amount of $20,895.50, filed by McCorvey Sheet Metal Works, LP, recorded on November 1, 2022, under Recording Number 20221101000264.

3. That certain Affidavit for Mechanic's and Materialman's Lien - Leasehold in the amount of $151,316.10, filed by Way Mechanical, recorded on November 1, 2022, under Recording Number 20221101000264.

4. That certain Affidavit for Mechanic's and Materialman's Lien - Leasehold in the amount of $284,712.90, filed by Way Mechanical, recorded on November 1, 2022, under Recording Number 20221101000264.

5. That certain Mechanic's Lien Affidavit in the amount of $878,306.82, filed by BEAM Concrete Construction, Inc., recorded on November 14, 2022, under Recording Number 20221114000404.

6. That certain Lien Affidavit in the amount of $209,210.00, filed by Imperial Fire Protection, recorded on December 12, 2022, under Recording Number 20221212000233.

7. That certain Affidavit for Mechanic's and Materialman's Lien in the amount of $1,228,932.14, filed by ABLe Communications, Inc., recorded on December 13, 2022, under Recording Number 20221213000379, and that certain Notice of Perfection of Mechanic's and Materialmen's Lien of ABLe Communications, Inc. in the amount of $1,094,850.64, submitted by ABLe Communications, Inc., filed on April 14, 2023, under Docket Number 796.

8. That certain Affidavit of Lien Claim in the amount of $177,554.80, filed by North Texas Contracting, Inc., recorded on December 30, 2022, under Recording Number 20221230000038.

9. That certain Affidavit of Lien Claim in the amount of $11,871.10, filed by North Texas Contracting, Inc., recorded on December 30, 2022, under Recording Number 20221230000038.

10. That certain Lien Affidavit and Claim in the amount of $9,217.82, filed by RPM xConstruction, LLC, recorded on January 13, 2023, under Recording Number 20230113000446.

11. That certain Mechanic's and Materialman's Lien Affidavit in the amount of $531,956.77, filed by BURNCO Texas LLC, recorded on January 13, 2023, under Recording Number 20230113000427.

12. That certain Lien Affidavit and Claim in the amount of $10,176.30, filed by RPM xConstruction, LLC, recorded on February 15, 2023, under Recording Number 20230215000663.

13. That certain Affidavit Claiming Mechanic's and Materialmen's Lien Including for Retainage in the amount of $53,883.90, filed by Housley Communications, Inc., recorded on December 1, 2022, under Recording Number 164584, as released by that certain Release of Lien, recorded on March 16, 2023, under Recording Number 25551.

14. That certain Affidavit for Mechanic's Lien in the amount of $28,266.49, filed by Pillar Electric Group, LP, recorded on December 15, 2022, under Recording Number 169545, as released by that certain Release of Lien, recorded on March 16, 2023, under Recording Number 25554.

15. That certain Affidavit of Mechanic's Lien in the amount of $98,440.00, filed by Power Engineering Services, Inc., recorded on December 16, 2022, under Recording Number 170453, as released by that certain Release of Lien, recorded on March 16, 2023, under Recording Number 25556.

Exhibit B

Form of Humphrey Note

**THIS SECURED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF UNLESS SO REGISTERED OR AN EXEMPTION FROM REGISTRATION UNDER SAID ACT AND LAWS IS AVAILABLE.**

### SECURED PROMISSORY NOTE

**Date of Issuance:**       [__]

**Principal Amount:**    $1,407,204.21

FOR VALUE RECEIVED, Core Scientific Operating Company (f/k/a Core Scientific, Inc.), a Delaware corporation (the "Issuer"), hereby unconditionally promises to pay to the order of Humphrey & Associates, Inc. (the "Payee") the principal amount of $1,407,204.21 (the "Principal Amount"), together with interest thereon calculated from the Initial Payment Date in accordance with the provisions of this Promissory Note (this "Note"). Capitalized terms used but not defined herein shall have the meanings set forth on Schedule A hereto.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Interest.  Commencing on the Initial Payment Date, interest shall accrue at a rate equal to five percent (5.00%) per annum (computed on the basis of a 365-day year and the actual number of days elapsed in any year), compounded monthly, on the unpaid Principal Amount outstanding from time to time hereunder. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note (or, if this Note has been paid in full, refunded to the Issuer).

2.      Payment of Principal Amount.

(a)      Monthly Payments.  Commencing on the Initial Payment Date and ending on the earlier of the date this Note is paid in full or the Stated Maturity Date, the Issuer shall pay the Monthly Payment Amount to the Payee on the Monthly Payment Date of each month.

(b)      Maturity Date.  Subject to Section 7, the Issuer shall pay the outstanding Principal Amount (together with all accrued and unpaid interest with respect thereto and all other amounts due by the Issuer hereunder) (collectively, the "Obligations"), in cash on the earliest to occur of (i) the Stated Maturity Date and (ii) the exercise of remedies under Section 7(b) (such date, the "Maturity Date").

(c)      Mandatory Prepayments. Within one (1) business day following the earlier to occur of (i) delivery by Issuer to Payee of the A&B Notice to Proceed (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement or (ii) delivery by Issuer to Payee of the F&G Notice to Proceed (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement, the Issuer shall be required to prepay in whole, without premium or penalty, all of the accrued but unpaid interest on, and all of the outstanding principal balance of, the Principal Amount.

(d)     <u>Voluntary Prepayments</u>.  The Issuer may, at any time and from time to time without premium or penalty, prepay in whole or in part, the accrued but unpaid interest on, and the outstanding principal balance of, the Principal Amount.

(e)     Each voluntary or mandatory prepayment of this Note shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under this Note, change the amounts of such installments, nor change the application of payment priority under <u>Section 3(c)</u>, until this Note is paid in full.

3.     <u>Payments and Computations</u>.

(a)     All payments to be made to the Payee shall be made in the lawful money of the United States of America in immediately available funds and without notice, demand, set-off or deduction.

(b)     The Issuer shall make each payment hereunder not later than 5:00 P.M. (Central Time) on the day when due in U.S. Dollars to the Payee in immediately available funds. Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest hereunder.

(c)     Each payment made by or on behalf of the Issuer to the Payee hereunder shall be applied in the following order of priority:  (i) first, to accrued and unpaid interest, (ii) second, to any other amounts (other than principal or interest) payable hereunder as designated by the Payee, and (iii) third, to reduce the Principal Amount.

4.     <u>Security; Guaranty</u>.  As of the date hereof, the Payee is the lienholder of the M&M Lien encumbering the Collateral in an amount equal to the lesser of (i) the Principal Amount, (ii) the then outstanding Principal Amount due (or deemed to be due) under this Note, and (iii) the amount of the M&M Lien allowed pursuant to the Settlement Order.  The M&M Lien secures the repayment of the Obligations on the terms and subject to the conditions set forth in this Note.

5.     <u>Recourse</u>. The Payee's recourse against the Issuer with respect to the obligations shall not be limited to a foreclosure of the Collateral. The Issuer shall remain liable for payment under this Note and the Payee shall have recourse to, and the right to proceed against, the Issuer for an amount equal to 100% of the entire Obligations payable to the Payee hereunder.

6.     <u>Representations and Warranties of the Issuer</u>.  The Issuer hereby represents and warrants, as of the date hereof, as follows:

(a)     The Issuer is a duly organized and validly existing corporation, in good standing under the laws of the jurisdiction of its organization and has the corporate power and authority to own its property and assets and to transact the business in which it is engaged.

(b)     The Issuer has full capacity, right, power and authority to execute, deliver and perform this Note, and all required action and approvals therefor have been duly taken and obtained. The individual signing this Note and all other documents executed or to be executed pursuant hereto on behalf of the Issuer are and shall be duly authorized to sign the same on the Issuer's behalf and to bind the Issuer thereto.

7.     Events of Default.

(a)     An "Event of Default" shall be deemed to have occurred if any of the following events occur:

(i)     the Issuer fails to pay when due and payable in accordance with the terms of this Note all or any portion of the Obligations if such failure shall remain uncured for sixty (60) days following delivery of written notice to the Issuer by Payee;

(ii)    subsequent to the Emergence Date, the Issuer makes an assignment for the benefit of creditors or an order, judgment or decree is entered adjudicating the Issuer bankrupt; or the Issuer commences any proceeding relating to the Issuer under any bankruptcy law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against the Issuer and either (A) the Issuer by any act indicates its approval thereof, consent thereto or acquiescence therein, or (B) such petition, application or proceeding is not dismissed within sixty (60) days; or

(iii)   the Issuer breaches or defaults in the performance of any obligation of the Issuer contained in this Note if such failure shall remain uncured for sixty (60) days following delivery of written notice to the Issuer by the Payee.

(b)     Consequences of Events of Default.  If an Event of Default of the type described in Section 7(a)(ii) has occurred, all of the outstanding Obligations shall be immediately due and payable in full. In addition, upon the occurrence of any Event of Default, the Payee shall have, in addition to all other rights and remedies granted to the Payee under this Note, all of the other rights and remedies provided by applicable law, under the M&M Lien or in equity. All such rights and remedies shall be cumulative and not as an alternative.

(c)     Exercise of Remedies. Unless and until an Event of Default occurs, the Payee shall be barred from foreclosing or otherwise enforcing or seeking to enforce the M&M Lien or otherwise taking adverse action against the Issuer or any of the Issuer's assets.

8.     Replacement.  Upon receipt of evidence reasonably satisfactory to the Issuer of the loss, theft, destruction or mutilation of this Note and, in the case of any such loss, theft or destruction of this Note, upon receipt of an indemnity reasonably satisfactory to the Issuer or, in the case of any such mutilation, upon the surrender and cancellation of this Note, the Issuer at its expense, shall execute and deliver, in lieu thereof, a new Note of like tenor and dated as of the date hereof.  Any Note in lieu of which any such new Note has been so executed and delivered by the Issuer shall not be deemed to be an outstanding Note.  No such substitution shall constitute payment of such lost or mutilated Note.

9.     Miscellaneous.

(a)     Specific Performance.  The parties hereto agree that irreparable damage would occur if any of the provisions of this Note were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Note and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

(b)     Governing Law.  This Note, and all claims or causes of action based upon, arising out of, or related to this Note or the transactions contemplated hereby, shall be exclusively governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of laws of another jurisdiction.

(c)     WAIVER OF JURY TRIAL.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9(C).

(d)     Venue.  Any suit, action or proceeding arising out of or related to this Note must be brought in any state or federal court in the County of Harris in the State of Texas or state appellate court therefrom within the State of Texas and all parties submit to the jurisdiction of such court.  The parties irrevocably waive, to the fullest extent permitted by law, any objection the party may have to the laying of venue for any such suit, action or proceeding brought in such court.  If any one or more provisions of this Section 9(d) are for any reason held invalid or unenforceable, it is the specific intent of the parties that such provisions be modified to the minimum extent necessary to make it or its application valid and enforceable.

(e)     Counterparts. This Note may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties, it being understood that all parties need not sign the same counterpart.  This Note may be executed and delivered by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means.

(f)     Severability.  Any term or provision of this Note that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions of this Note or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If a final judgment of a court of competent jurisdiction declares that any term or provision of this Note is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit such term or provision, to delete specific words or phrases or to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Note shall be valid and enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term or provision.

(g)     Waiver. No delay or omission on the part of any party to this Note in exercising any right, power or remedy provided by law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right,

25

power or remedy.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  The Issuer for itself and its heirs, legal representatives, successors and assigns, respectively, severally waives, to the extent not prohibited by applicable law, (a) all presentments, demands for performance, notices of nonperformance (except to the extent, if any, required by the provisions hereof), protests, notices of protest and notices of dishonor, (b) any requirement of diligence or promptness on the part of the Payee in the enforcement of its and their rights under this Note, (c) all notices of every kind that may be required to be given by any statute or rule of law, (d) any valuation, stay, appraisement or redemption laws and (e) any defense of any kind (other than payment) that the Issuer may now or hereafter have with respect to its liability under this Note, and (e) any right to be released by reason of any extension of time or change in terms of payment or any change, alteration, or release of any security given for the payment hereof.

(h)     Headings; Rules of Construction. Section and subsection headings in this Note are included herein for convenience of reference only and shall not constitute a part of this Note for any other purpose or be given any substantive effect. The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.

(i)     Successors and Assigns; Subsequent Holders.  Neither this Note nor any right or obligation hereunder shall be assigned, delegated, or otherwise transferred (whether voluntarily, by operation of law, by merger, or otherwise) by the Issuer, without the prior written consent of the Payee. The Payee may assign this Note or any right or obligation hereunder to any person or entity without the consent of the Issuer.  This Note (together with any amendments, modifications, termination or waivers hereunder) shall be binding upon and shall inure to the benefit of the parties hereto and their respective representatives, heirs, administrators, successors and permitted assigns, as applicable.

(j)     No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Issuer and the Payee and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

(k)     Attorneys' Fees.  The Issuer shall reimburse the Payee for all costs and reasonable attorneys' fees incurred by the Payee in pursuing any remedies after an Event of Default relating to the collection of amounts due in connection with this Note.

(l)     Entirety.  This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.

(m)     Notices.  Any notice to be given to the Issuer or the Payee shall be deemed effective if in writing and delivered to the applicable addresses indicated below or such other address as may be provided by notice hereunder:

If to the Issuer:

c/o Core Scientific Operating Company
210 Barton Springs Road
Suite 300
Austin, Texas 78704
Attention: Todd DuChene, Esq.
E-mail: tduchene@corescientific.com

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, Esq.
Phone: (212) 310-8210
E-mail: Ray.Schrock@weil.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ronit J. Berkovich, Esq.
Phone: (212) 310-8534
E-mail: Ronit.Berkovich@weil.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Avelina Burbridge, Esq.
Phone: (212) 310-8053
E-mail: Avelina.Burbridge@weil.com

If to the Payee:

Humphrey & Associates, Inc.
1501 Luna Road
Carrollton, Texas 75006
Attention: Randall P. Humphrey
Phone: [___]
Email: randy@teamhumphrey.com

With a copy to:

Laperouse, PC
5220 Spring Valley Rd., Suite 615
Dallas, Texas 75254
Attention: Jason R. Kennedy
Phone: [___]
Email: jason.kennedy@laperouselaw.com

Notices shall be given by one of the following methods:  (i) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (ii) a nationally-recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier for overnight delivery; (iii) certified or registered U.S. Mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the fourth Business Day following deposit with the U.S. Postal Service (or, if earlier, upon actual delivery); or (iv) email transmission, provided that the transmission is completed no later than 6:00 p.m. Central Time on a Business Day, whereby delivery is deemed to have occurred on the Business Day on which electronic transmission is completed (or, if completed on a day other than a Business Day, then on the first Business Day thereafter), in each case with appropriate confirmation or proof of such

transmission.  Telephone numbers set forth in the addresses above are included solely for the purpose of convenience and not as a method for delivering notices, including by text message or otherwise.

        (n)    <u>No Usury</u>.  Anything in this Note to the contrary notwithstanding, it is expressly stipulated and agreed that the intent of the Issuer and the Payee are to comply at all times with all usury and other laws relating to this Note. If the laws of any applicable jurisdiction would now or hereafter render usurious, or are revised, repealed or judicially interpreted so as to render usurious, any amount called for under this Note, or contracted for, charged or received with respect to the loan evidenced by this Note, or if any prepayment by the Issuer results in the Issuer having paid any interest in excess of that permitted by law, then it is the Issuer's and the Payee's express intent that all excess amounts theretofore collected by the Payee be credited to the principal balance of this Note (or, if this Note has been paid in full, refunded to the Issuer), and the provisions of this Note immediately be deemed reformed and the amounts therefor collectible hereunder reduced, without the necessity of execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

* * * * *

IN WITNESS WHEREOF, the Issuer has executed and delivered this Note on the date first written above.

**CORE SCIENTIFIC OPERATING COMPANY**
(f/k/a Core Scientific, Inc.), a Delaware corporation

By: _____

Name:

Title:

**ACKNOWLEDGED AND AGREED:**

**HUMPHREY & ASSOCIATES, INC.**

By: _____
Name:
Title:

**MCCARTHY BUILDING COMPANIES, INC.**

By: _____
Name:
Title:

## SCHEDULE A

### Definitions

"Business Day" means a day of the year on which banks are not required or authorized to close in the State of Texas or the State of New York.

"Chapter 11 Cases" means the chapter 11 bankruptcy cases of the Issuer and its debtor affiliates being administered in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which are being jointly administered under case number 22-90341 (CML).

"Collateral" means any assets of the Issuer or other assets encumbered by the M&M Lien in favor of the Payee.

"Emergence Date" means the date on which the Plan (as defined in the Settlement Agreement) is effective.

"Initial Payment Date" means the date which is one hundred twenty (120) days after the Emergence Date.

"M&M Lien" means that certain *Lien Affidavit and Claim* recorded on November 15, 2022 under Document Number 158075, under Texas Property Code § 53.001, et seq. in the Land Records of Denton County, Texas, as amended by that certain *Partial Release of Lien* recorded on April 14, 2023 under Document Number 37449 in the Land Records of Denton County, Texas, as further evidenced by that certain *Notice of Perfection, Continuation, and/or Maintenance of Mechanic's Lien Pursuant to 11 U.S.C. § 546(B)(2)* at Docket No. 798 in the Chapter 11 Cases.

"Monthly Payment Amount" means, with respect to each payment date, an amount equal to $[__].

"Monthly Payment Date" means, with respect to each payment date, the date of the month which is the date of the month of the Initial Payment Date. For example, if the Initial Payment Date is March 15, 2024, the Monthly Payment Date will be the 15th of each month on which a payment date occurs.

"Settlement Agreement" means that certain Settlement Agreement, dated as of [__], by and among Issuer and its debtor affiliates, McCarthy Building Companies, Inc. and Humphrey & Associates, Inc.

"Settlement Order" means that certain Order Approving (I) Global Settlement between Issuer and its debtor affiliates, McCarthy Building Companies, Inc. and Humphrey & Associates, Inc. and (II) Granting Related Relief at Docket No. [___] in the Chapter 11 Cases.

"Stated Maturity Date" means the date that is one (1) day prior to the date that is thirty (30) months after the Initial Payment Date.

Exhibit C

Form of McCarthy Note

**THIS SECURED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF UNLESS SO REGISTERED OR AN EXEMPTION FROM REGISTRATION UNDER SAID ACT AND LAWS IS AVAILABLE.**

## SECURED PROMISSORY NOTE

**Date of Issuance:**　　　[__]

**Principal Amount:**　　$6,809,344.21

FOR VALUE RECEIVED, Core Scientific Operating Company (f/k/a Core Scientific, Inc.), a Delaware corporation (the "Issuer"), hereby unconditionally promises to pay to the order of McCarthy Building Companies, Inc. (the "Payee") the principal amount of $6,809,344.21 (the "Principal Amount"), together with interest on the Primary Principal Amount (as defined herein) calculated from the Initial Payment Date in accordance with the provisions of this Promissory Note (this "Note"). Capitalized terms used but not defined herein shall have the meanings set forth on Schedule A hereto.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.　　Principal Amount.  The Principal Amount is comprised of (a) a primary principal amount of $5,402,140.00 (the "Primary Principal Amount") and (b) a secondary principal amount of the Humphrey Principal Amount (the "Secondary Principal Amount").

2.　　Interest.

(a)　　Primary Principal Amount.  Commencing on the Initial Payment Date, interest shall accrue at a rate equal to five percent (5.00%) per annum (computed on the basis of a 365-day year and the actual number of days elapsed in any year), compounded monthly, only on the unpaid Primary Principal Amount outstanding from time to time hereunder. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note (or, if this Note has been paid in full, refunded to the Issuer).

(b)　　Secondary Principal Amount.  No interest shall accrue on the unpaid Secondary Principal Amount outstanding from time to time hereunder.

3.　　Payment of Principal Amount.

(a)　　Monthly Payments.  Commencing on the Initial Payment Date and ending on the earlier of the date this Note is paid in full or the Stated Maturity Date, the Issuer shall pay the Monthly Payment Amount to the Payee on the Monthly Payment Date of each month.

(b)　　Maturity Date.  Subject to Section 8, the Issuer shall pay the sum of (a) the outstanding Primary Principal Amount (together with all accrued and unpaid interest with respect to the Primary Principal Amount) (collectively, the "Primary Obligations"), (b) the outstanding Secondary Principal Amount after taking into account all payments made to the Humphrey Payee in reduction of the

Humphrey Principal Amount of the Humphrey Note (collectively, the "<u>Secondary Obligations</u>"), and (c) all other amounts due by the Issuer hereunder (such amounts, together with the Primary Obligations and the Secondary Obligations, collectively, the "<u>Obligations</u>"), in cash on the earliest to occur of (i) the Stated Maturity Date and (ii) the exercise of remedies under <u>Section 8(b)</u> (such date, the "<u>Maturity Date</u>").

(c)     <u>Mandatory Prepayments</u>.  Within one (1) business day following the earlier to occur of (i) delivery by Issuer to Payee of the A&B Notice to Proceed (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement or (ii) delivery by Issuer to Payee of the F&G Notice to Proceed (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement, the Issuer shall be required to prepay in whole, without premium or penalty, each of (A) all of the accrued but unpaid interest on, and all of the outstanding principal balance of, the Primary Principal Amount and (B) all of the outstanding principal balance of the Secondary Principal Amount after taking into account all payments made to the Humphrey Payee on or prior to the date of such mandatory prepayment in reduction of the Humphrey Principal Amount of the Humphrey Note.

(d)     <u>Voluntary Prepayments</u>.  The Issuer may, at any time and from time to time without premium or penalty, prepay in whole or in part, the accrued but unpaid interest on, and the outstanding principal balance of, the Principal Amount.

(e)     Each voluntary or mandatory prepayment of this Note shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under this Note, change the amounts of such installments, nor change the application of payment priority under <u>Section 4(c)</u>, until this Note is paid in full.

4.     <u>Payments and Computations</u>.

(a)     All payments to be made to the Payee shall be made in the lawful money of the United States of America in immediately available funds and without notice, demand, set-off or deduction.

(b)     The Issuer shall make each payment hereunder not later than 5:00 P.M. (Central Time) on the day when due in U.S. Dollars to the Payee in immediately available funds. Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest hereunder.

(c)     Each payment made by or on behalf of the Issuer to the Payee hereunder shall be applied in the following order of priority:  (i) first, to accrued and unpaid interest, (ii) second, to any other amounts (other than principal or interest) payable hereunder as designated by the Payee, (iii) third, to reduce the Primary Principal Amount, and (iv) fourth, to reduce the Secondary Principal Amount.

(d)     All payments made to the Humphrey Payee in reduction of the Humphrey Principal Amount under the Humphrey Note shall be deemed to be a payment by the Issuer to the Payee under this Note and shall be applied to reduce the Secondary Principal Amount as and when such payments are made to the Humphrey Payee.

5.     <u>Security; Guaranty</u>.  As of the date hereof, the Payee is the lienholder of the M&M Lien encumbering the Collateral in an amount equal to the lesser of (i) the Principal Amount, (ii) the then outstanding Principal Amount due (or deemed to be due) under this Note, and (iii) the amount of the M&M Lien allowed pursuant to the Settlement Order.  The M&M Lien secures the repayment of the Obligations on the terms and subject to the conditions set forth in this Note.

6.      Recourse. The Payee's recourse against the Issuer with respect to the obligations shall not be limited to a foreclosure of the Collateral. The Issuer shall remain liable for payment under this Note and the Payee shall have recourse to, and the right to proceed against, the Issuer for an amount equal to 100% of the entire Obligations payable to the Payee hereunder.

7.      Representations and Warranties of the Issuer.  The Issuer hereby represents and warrants, as of the date hereof, as follows:

(a)      The Issuer is a duly organized and validly existing corporation, in good standing under the laws of the jurisdiction of its organization and has the corporate power and authority to own its property and assets and to transact the business in which it is engaged.

(b)      The Issuer has full capacity, right, power and authority to execute, deliver and perform this Note, and all required action and approvals therefor have been duly taken and obtained. The individual signing this Note and all other documents executed or to be executed pursuant hereto on behalf of the Issuer are and shall be duly authorized to sign the same on the Issuer's behalf and to bind the Issuer thereto.

8.      Events of Default.

(a)      An "Event of Default" shall be deemed to have occurred if any of the following events occur:

(i)      the Issuer fails to pay when due and payable in accordance with the terms of this Note all or any portion of the Obligations if such failure shall remain uncured for sixty (60) days following delivery of written notice to the Issuer by Payee;

(ii)      subsequent to the Emergence Date, the Issuer makes an assignment for the benefit of creditors or an order, judgment or decree is entered adjudicating the Issuer bankrupt; or the Issuer commences any proceeding relating to the Issuer under any bankruptcy law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against the Issuer and either (A) the Issuer by any act indicates its approval thereof, consent thereto or acquiescence therein, or (B) such petition, application or proceeding is not dismissed within sixty (60) days; or

(iii)      the Issuer breaches or defaults in the performance of any obligation of the Issuer contained in this Note if such failure shall remain uncured for sixty (60) days following delivery of written notice to the Issuer by the Payee.

(b)      Consequences of Events of Default.  If an Event of Default of the type described in Section 8(a)(ii) has occurred, all of the outstanding Obligations shall be immediately due and payable in full. In addition, upon the occurrence of any Event of Default, the Payee shall have, in addition to all other rights and remedies granted to the Payee under this Note, all of the other rights and remedies provided by applicable law, under the M&M Lien or in equity. All such rights and remedies shall be cumulative and not as an alternative.

34

(c)    Exercise of Remedies. Unless and until an Event of Default occurs, the Payee shall be barred from foreclosing or otherwise enforcing or seeking to enforce the M&M Lien or otherwise taking adverse action against the Issuer or any of the Issuer's assets.

9.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Issuer of the loss, theft, destruction or mutilation of this Note and, in the case of any such loss, theft or destruction of this Note, upon receipt of an indemnity reasonably satisfactory to the Issuer or, in the case of any such mutilation, upon the surrender and cancellation of this Note, the Issuer at its expense, shall execute and deliver, in lieu thereof, a new Note of like tenor and dated as of the date hereof.  Any Note in lieu of which any such new Note has been so executed and delivered by the Issuer shall not be deemed to be an outstanding Note.  No such substitution shall constitute payment of such lost or mutilated Note.

10.    Miscellaneous.

(a)    Specific Performance.  The parties hereto agree that irreparable damage would occur if any of the provisions of this Note were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Note and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

(b)    Governing Law.  This Note, and all claims or causes of action based upon, arising out of, or related to this Note or the transactions contemplated hereby, shall be exclusively governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of laws of another jurisdiction.

(c)    WAIVER OF JURY TRIAL.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10(C).

(d)    Venue.  Any suit, action or proceeding arising out of or related to this Note must be brought in any state or federal court in the County of Harris in the State of Texas or state appellate court therefrom within the State of Texas and all parties submit to the jurisdiction of such court.  The parties irrevocably waive, to the fullest extent permitted by law, any objection the party may have to the laying of venue for any such suit, action or proceeding brought in such court.  If any one or more provisions of this Section 10(d) are for any reason held invalid or unenforceable, it is the specific intent of the parties that such provisions be modified to the minimum extent necessary to make it or its application valid and enforceable.

(e)    Counterparts. This Note may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties, it being understood that all parties need not sign the same counterpart.  This Note may

be executed and delivered by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means.

(f)     Severability.  Any term or provision of this Note that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions of this Note or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If a final judgment of a court of competent jurisdiction declares that any term or provision of this Note is invalid or unenforceable, the parties hereto agree that the court making such determination shall have the power to limit such term or provision, to delete specific words or phrases or to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Note shall be valid and enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term or provision.

(g)     Waiver.  No delay or omission on the part of any party to this Note in exercising any right, power or remedy provided by law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof.  The single or partial exercise of any right, power or remedy provided by applicable law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy.  The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable law.  The Issuer for itself and its heirs, legal representatives, successors and assigns, respectively, severally waives, to the extent not prohibited by applicable law, (a) all presentments, demands for performance, notices of nonperformance (except to the extent, if any, required by the provisions hereof), protests, notices of protest and notices of dishonor, (b) any requirement of diligence or promptness on the part of the Payee in the enforcement of its and their rights under this Note, (c) all notices of every kind that may be required to be given by any statute or rule of law, (d) any valuation, stay, appraisement or redemption laws and (e) any defense of any kind (other than payment) that the Issuer may now or hereafter have with respect to its liability under this Note, and (e) any right to be released by reason of any extension of time or change in terms of payment or any change, alteration, or release of any security given for the payment hereof.

(h)     Headings; Rules of Construction.  Section and subsection headings in this Note are included herein for convenience of reference only and shall not constitute a part of this Note for any other purpose or be given any substantive effect.  The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person or entity.  The use of the word "including" and "includes" in this Note shall be by way of example rather than by limitation.

(i)     Successors and Assigns; Subsequent Holders.  Neither this Note nor any right or obligation hereunder shall be assigned, delegated, or otherwise transferred (whether voluntarily, by operation of law, by merger, or otherwise) by the Issuer, without the prior written consent of the Payee.  The Payee may assign this Note or any right or obligation hereunder to any person or entity without the consent of the Issuer.  This Note (together with any amendments, modifications, termination or waivers hereunder) shall be binding upon and shall inure to the benefit of the parties hereto and their respective representatives, heirs, administrators, successors and permitted assigns, as applicable.

(j)     No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Issuer and the Payee and their respective permitted successors and assigns, any rights or remedies under or by reason of this Note.

(k)     Attorneys' Fees.  The Issuer shall reimburse the Payee for all costs and reasonable attorneys' fees incurred by the Payee in pursuing any remedies after an Event of Default relating to the collection of amounts due in connection with this Note.

(l)     Entirety.   This Note embodies the entire agreement among the parties and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.

(m)     Notices.  Any notice to be given to the Issuer or the Payee shall be deemed effective if in writing and delivered to the applicable addresses indicated below or such other address as may be provided by notice hereunder:

If to the Issuer:

c/o Core Scientific Operating Company
210 Barton Springs Road
Suite 300
Austin, Texas 78704
Attention: Todd DuChene, Esq.
E-mail: tduchene@corescientific.com

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, Esq.
Phone: (212) 310-8210
E-mail: Ray.Schrock@weil.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ronit J. Berkovich, Esq.
Phone: (212) 310-8534
E-mail: Ronit.Berkovich@weil.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Avelina Burbridge, Esq.
Phone: (212) 310-8053
E-mail: Avelina.Burbridge@weil.com

If to the Payee:

McCarthy Building Companies, Inc.
3400 N Central Expressway, Suite 500
Richardson, Texas 75080
Attention: Michael Steinkamp, Project Senior Manager
Phone: [__]
Email: Msteinkamp@McCarthy.com

McCarthy Holdings, Inc.
3800 Buffalo Speedway, Suite 250
Houston, Texas 77098
Attention: Maura Kelly, Vice President Legal & Associate General Counsel
Phone: [__]
Email: MKelly@McCarthy.com

With a copy to:

Watt, Tieder, Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
Attention: Jennifer L. Kneeland
Phone: [__]
Email: jkneeland@watttieder.com

Notices shall be given by one of the following methods:  (i) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (ii) a nationally-recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier for overnight delivery; (iii) certified or registered U.S. Mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the fourth Business Day following deposit with the U.S. Postal Service (or, if earlier, upon actual delivery); or (iv) email transmission, provided that the transmission is completed no later than 6:00 p.m. Central Time on a Business Day, whereby delivery is deemed to have occurred on the Business Day on which electronic transmission is completed (or, if completed on a day other than a Business Day, then on the first Business Day thereafter), in each case with appropriate confirmation or proof of such transmission.  Telephone numbers set forth in the addresses above are included solely for the purpose of convenience and not as a method for delivering notices, including by text message or otherwise.

(n)     No Usury.  Anything in this Note to the contrary notwithstanding, it is expressly stipulated and agreed that the intent of the Issuer and the Payee are to comply at all times with all usury and other laws relating to this Note. If the laws of any applicable jurisdiction would now or hereafter render usurious, or are revised, repealed or judicially interpreted so as to render usurious, any amount called for under this Note, or contracted for, charged or received with respect to the loan evidenced by this Note, or if any prepayment by the Issuer results in the Issuer having paid any interest in excess of that permitted by law, then it is the Issuer's and the Payee's express intent that all excess amounts theretofore collected by the Payee be credited to the principal balance of this Note (or, if this Note has been paid in full, refunded to the Issuer), and the provisions of this Note immediately be deemed reformed and the amounts therefor collectible hereunder reduced, without the necessity of execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

* * * * *

38

IN WITNESS WHEREOF, the Issuer has executed and delivered this Note on the date first written above.

**CORE SCIENTIFIC OPERATING COMPANY**
(f/k/a Core Scientific, Inc.), a Delaware corporation

By:

_____
Name:

Title:

**ACKNOWLEDGED AND AGREED:**

**MCCARTHY BUILDING COMPANIES, INC.**

By: _____
Name:
Title:

## SCHEDULE A

### Definitions

"Business Day" means a day of the year on which banks are not required or authorized to close in the State of Texas or the State of New York.

"Chapter 11 Cases" means the chapter 11 bankruptcy cases of the Issuer and its debtor affiliates being administered in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which are being jointly administered under case number 22-90341 (CML).

"Collateral" means any assets of the Issuer or other assets encumbered by the M&M Lien in favor of the Payee.

"Emergence Date" means the date on which the Plan (as defined in the Settlement Agreement) is effective.

"Humphrey Note" means that certain Promissory Note, dated as of the date hereof, in the principal amount of $1,407,204.21, made by Issuer to Humphrey & Associates, Inc.

"Humphrey Payee" means the Payee (as defined in the Humphrey Note).

"Humphrey Principal Amount" means the Principal Amount (as defined in the Humphrey Note) outstanding from time to time under the Humphrey Note.

"Initial Payment Date" means the date which is one hundred twenty (120) days after the Emergence Date.

"M&M Lien" means that certain *Amended Affidavit for Mechanic's Lien* recorded on November 14, 2022 under Document Number 158011 under Texas Property Code § 53.001, *et seq.* in the Land Records of Denton County, Texas, as further evidenced by that certain *Notice of Continued Perfection of Materialman's and Mechanic's Lien Pursuant to 11 U.S.C. § 546(B)* at Docket No. 337 in the Chapter 11 Cases.

"Monthly Payment Amount" means, with respect to each payment date, an amount equal to $[__].

"Monthly Payment Date" means, with respect to each payment date, the date of the month which is the date of the month of the Initial Payment Date. For example, if the Initial Payment Date is March 15, 2024, the Monthly Payment Date will be the 15th of each month on which a payment date occurs.

"Settlement Agreement" means that certain Settlement Agreement, dated as of [__], by and among Issuer and its debtor affiliates, McCarthy Building Companies, Inc. and Humphrey & Associates, Inc.

"Settlement Order" means that certain Order Approving (I) Global Settlement between Issuer and its debtor affiliates, McCarthy Building Companies, Inc. and Humphrey & Associates, Inc. and (II) Granting Related Relief at Docket No. [___] in the Chapter 11 Cases.

"Stated Maturity Date" means the date that is one (1) day prior to the date that is thirty (30) months after the Initial Payment Date.

Exhibit D

Form of Change Order No. 5

CHANGE ORDER NO. 5 AND FOURTH MODIFICATION OF GMP

This CHANGE ORDER NO. 5 AND FOURTH MODIFICATION OF GMP (this "**Change Order No. 5**") is made and entered into as of _____ _____, 202__, by and among McCarthy Building Companies, Inc., a Missouri corporation ("**McCarthy**" or "**Contractor**") and Core Scientific Operating Company, a Delaware corporation (f/k/a Core Scientific, Inc.) ("**Core**" or "**Owner**"; and, together with McCarthy, collectively, the "**Parties**"), pursuant to which the Parties mutually agree to amend that certain AIA® Document A102™ – 2017 Standard Form of Agreement Between Owner and Contractor, dated as of November 17, 2021 where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price  (as the same has been amended, modified, or supplemented from time to time by any change orders, the "**Agreement**") on the terms set forth in this Change Order No. 5 and in accordance with that certain Settlement Agreement, dated as of December 11, 2023 (the "**Settlement Agreement**") by and between Core, McCarthy, and Humphrey & Associates, Inc.[6]

The Parties acknowledge and agree that (i) McCarthy suspended work under the Agreement on October 27, 2022 (the "**Suspension Date**"); (ii) the Settlement Agreement provides for the payment in full of all costs (including all direct and indirect costs, fees, markups, incentives and shared savings) and amounts payable by Core to McCarthy with respect to all work that was completed by McCarthy under the Agreement as of the Suspension Date (the "**Pre-Suspension Work**"); (iii) the Pre-Suspension Work was substantially complete as of the Suspension Date and, as such, (a) the title to and risk of loss for the entirety of the Pre-Suspension Work transferred to Core and (b) the warranty obligations with respect to the Pre-Suspension Work expired on or about October 27, 2023[7]; and (iv) all work remaining under the Agreement as of the Suspension Date (the "**Deferred Work**") is comprised of the uncompleted and remaining portions of each of the South Parcel (Buildings A&B) and the North Parcel (Buildings F&G) as well as associated site work and appurtenances.

The Parties hereby amend the Agreement as follows:

---

[6] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement, the Conditions of Contract, and the Contract Documents.

[7] The Parties' acknowledgement and agreement regarding the expiration of the warranty obligations with respect to the Pre-Suspension Work is not, and shall not be construed to be, a waiver of the Parties' respective rights subsequent to entry of the Approval Order (as defined in the Settlement Agreement) under the Agreement, the Conditions of Contract, the Contract Documents, and applicable law, including its rights with respect to any latent defects.

1. The Deferred Work is removed in its entirety from the scope of Work to be performed by Contractor under the Agreement.

2. Unless Core delivers the A&B Notice to Proceed (as defined in the Settlement Agreement) or the F&G Notice to Proceed (as defined in the Settlement Agreement) to McCarthy, Core shall have no further obligations under the Agreement.

3. Section 5.2.2.2 of the Agreement is hereby deleted and replaced in its entirety as follows in order to  reincorporate the Deferred Work into the Agreement as elective alternates:

> "§ 5.2.2.2 Subject to the conditions noted below, the following alternates may be accepted by the Owner following execution of this Agreement. Upon acceptance, the Owner shall issue a Modification to this Agreement.
> **<u>Alternate One:</u>**
> Completion of the portion of the Deferred Work to be performed on South Parcel (Buildings A&B) and related sitework and appurtenances required to obtain a Certificate of Occupancy (the "**South Parcel Alternate Work**").  If the Owner properly exercises its election to proceed with the South Parcel Alternate Work as set forth herein, then commencement of the South Parcel Alternate Work shall occur within 30 days following the date on which each of the conditions set forth in Section 2(e)(ii) of the Settlement Agreement have been satisfied. The election to proceed with the South Parcel Alternate Work may be exercised by the delivery of: (1) the A&B Notice to Proceed (as defined in the Settlement Agreement); and (2) an accompanying Change Order that: (a) sets the Guaranteed Maximum Price with respect to the South Parcel Alternate Work at One Million U.S. Dollars ($1,000,000 USD) (provided that the A&B Notice to Proceed is exercised on or prior to March 31, 2024); (b) establishes the Substantial Completion date as the date of commencement of the South Parcel Alternate Work plus 90 calendar days; and (c) provides that with respect to the South Parcel Alternate Work, Section 2.2.1 of the AIA® Document A201™ – 2017 General Conditions of the Contract for Construction (the "**Conditions of Contract**") executed with the Agreement shall be deemed to provide:
>
>> § 2.2.1 Prior to commencement of the Work, the Owner shall establish an escrow account and deposit funds therein in the

amount of One Million U.S. Dollars ($1,000,000 USD). The purpose of the account shall be to secure the Owner's obligations under the Agreement. The Owner shall be fully responsible for the timely payment of all fees assessed by the bank acting as an intermediary in relation to the escrow account. The Contractor shall have no obligation to commence the South Parcel Alternate Work until: (1) an escrow agreement has been entered between the Contractor, the Owner, and a mutually agreeable intermediary bank ("**Intermediary**") substantially in the form attached to the A102-2017 Agreement as Exhibit D; and (2) the Owner has established and funded the escrow account (the "**Escrow Account**") pursuant to such agreement, and the Settlement Agreement.  If commencement of the South Parcel Alternate Work is delayed under this Section 2.2.1, the Contract Time shall be extended appropriately.

Additionally, the scope added by this South Parcel Alternate Work is subject to the following conditions and qualifications:

1. All transformers, PDUs and other Owner-Furnished material and equipment shall be on site at the Project no later than 1 month after Core issues its notice to proceed, including replacement of equipment currently onsite which has been determined to be defective.

2. Any stored materials consumed by Core to support ongoing operations must be replaced prior to McCarthy's remobilization at the Project, provided that McCarthy shall create an inventory of all such materials and provide Core any such missing materials pursuant to and in accordance with the Agreement.

3. As the materials have remained on site at the Project during the extended suspension of work, Core's acceptance of McCarthy's work under the Construction Contract will be based on the materials and equipment being functionally new.  Minor aesthetic blemishes, including but not limited to surface scaling, oxidation or coating deterioration, will not be the basis for rejection by Core.

4. As the warranty period for the majority of the equipment on site at the Project has expired, all warranty work required under Section 3.5 and 9.8.4 of the Conditions of Contract will be completed on a reimbursable service call basis.  However, in the event that there are issues related to latent defects solely due to the work of McCarthy

or its subcontractors, and not due to the exposure of the site during the work stoppage, such defects will be remedied pursuant to the terms and conditions of the Amended Contract and applicable law.

5. The Contract Documents shall be amended to provide that all work shall be completed on a 40 hour/5 days/week schedule.

6. McCarthy shall have full unrestricted use of the North Tech building during the duration of construction.

**Alternate Two:**

Completion of the portion of the Deferred Work to be performed on North Parcel (Buildings F&G) and related sitework and appurtenances required to obtain a Certificate of Occupancy (the "**North Parcel Alternate Work**"). Unless otherwise agreed to by McCarthy in writing, Owner must elect to proceed with the North Parcel Alternate Work on or before July 31, 2025. If the Owner properly exercises its election to proceed with the North Parcel Alternate Work as set forth herein, then, commencement of the North Parcel Alternate Work shall occur within 30 days following the date on which each of the conditions set forth in Section 2(e)(ii) of the Settlement Agreement have been satisfied. The election to proceed with the North Parcel Alternate Work may be exercised by the delivery of: (1) the F&G Notice to Proceed (as defined in the Settlement Agreement); and (2) an accompanying Change Order that: (a) sets the Guaranteed Maximum Price with respect to the North Parcel Alternate Work in an amount equal to the F&G Deposit Amount (as defined in the Settlement Agreement) set forth in the F&G Cost Estimate Notice (as defined in the Settlement Agreement); and (b) establishes the Substantial Completion date as the date of commencement plus an estimated 150 calendar days. The Change Order will provide that with respect to the North Parcel Alternate Work, Section 2.2.1 of the Conditions of Contract executed with the Agreement shall be deemed to provide:

§ 2.2.1 Prior to commencement of the Work, the Owner shall establish an escrow account and deposit funds therein in the amount of the F&G Deposit Amount (as defined in the Settlement Agreement). The purpose of the account shall be to secure the Owner's obligations under the Agreement. The Owner shall be fully responsible for the timely payment of all fees assessed by the bank acting as an intermediary in relation to the escrow account. The Contractor shall have no obligation to commence the North Parcel Alternate Work until: (1) an escrow

agreement has been entered between the Contractor, the Owner, and a mutually agreeable intermediary bank ("**Intermediary**") substantially in the form attached to the A102-2017 Agreement as Exhibit D; and (2) the Owner has established and funded the escrow account (the "**Escrow Account**") pursuant to such agreement and the Contract Documents.  If commencement of the North Parcel Alternate Work is delayed under this Section 2.2.1, the Contract Time shall be extended appropriately.

Additionally, the scope added by this alternate is subject to the following conditions and qualifications:

1. All transformers, PDUs and other Owner-Furnished material and equipment shall be on site at the Project no later than 1 month after Core issues its notice to proceed, including replacement of equipment currently onsite which has been determined to be defective.

2. Any stored materials consumed by Core to support ongoing operations must be replaced prior to McCarthy's remobilization at the Project, provided that McCarthy shall create an inventory of all such materials and provide Core any such missing materials pursuant to and in accordance with the Agreement.

3. As the materials have remained on site at the Project during the extended suspension of work, Core's acceptance of McCarthy's work under the Construction Contract will be based on the materials and equipment being functionally new.  Minor aesthetic blemishes, including but not limited to surface scaling, oxidation or coating deterioration, will not be the basis for rejection by Core.

4. As the warranty period for the majority of the equipment on site at the Project has expired, all warranty work required under Section 3.5 and 9.8.4 of the Conditions of Contract will be completed on a reimbursable service call basis.  However, in the event that there are issues related to latent defects solely due to the work of McCarthy or its subcontractors, and not due to the exposure of the site during the work stoppage, such defects will be remedied pursuant to the terms and conditions of the Amended Contract and applicable law.

5. The Contract Documents shall be amended to provide that all work shall be completed on a 40 hour/5 days/week schedule.

6. McCarthy shall have full unrestricted use of the North Tech building during the duration of construction.

IN WITNESS WHEREOF, each Party has caused this Change Order to be duly executed on its behalf as of the day and year first written above.

**Core Scientific Operating Company** (f/k/a Core Scientific, Inc.)

By:_____
Name:_____
Title: _____

**McCarthy Building Companies, Inc.**

By:_____
Name:_____
Title: _____