United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 24, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.,* | § | Case No. 22-90341 (CML) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## ORDER (I) AUTHORIZING ASSUMPTION OF THE LEGACY OG&E AGREEMENT, AS AMENDED AND RESTATED BY THE A&R AGREEMENT, AND (II) GRANTING RELATED RELIEF

On January 12, 2024, Core Scientific, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") filed an emergency motion (the "**Motion**")[2] and requested (a) authority for the assumption and performance of the Legacy OG&E Agreement, in each case as amended and restated by the A&R Agreement annexed hereto as **Exhibit 1** between the Debtors and the Oklahoma Gas and Electric Company ("**OG&E**" and together with the Debtors, the "**Parties**" and, each, a "**Party**"), and (b) granting related relief, as more fully set forth in the Motion, as supplemented by the Notice of Revised OG&E Settlement filed on January 22, 2024; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Core Scientific Mining LLC (6971); Core Scientific, Inc. (3837); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); Starboard Capital LLC (6677); RADAR LLC (5106); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII, LLC (3198).  The Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.  The Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. § 1408 and 1409; and due and proper notice of the Motion having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing,

**IT IS HEREBY ORDERED THAT:**

1. Pursuant to sections 365(a) and 105(a) of the Bankruptcy Code, the Legacy OG&E Agreement, as amended and restated by the A&R Agreement, are assumed in their entirety by the Debtors.

2. The Debtors' assumption of the Legacy OG&E Agreement, as amended and restated by the A&R Agreement, represents a reasonable exercise of the Debtors' sound business judgment under section 365 of the Bankruptcy Code.

3. Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors are authorized to enter into the A&R Agreement and the Settlement, and perform all obligations thereunder.

4. In full and final satisfaction of any and all claims held by OG&E against the Debtors, including the OG&E Claim and any cure claims in connection with the assumption of the A&R Agreement the OG&E Claim is hereby Allowed as a General Unsecured Claim in the amount of $4.8 million.

5. The Reorganized Debtors shall issue New Common Interests, at Plan Value, to holders of Convertible Notes Claims (as of the Effective Date), in an amount equal to the Shortfall (if any) multiplied by 28.4% (the "**True-Up Shares**"); *provided*, that if OG&E has not sold their New Common Interests prior to February 29, 2024, solely for purposes of determining the extent to which the Reorganized Debtors are required to distribute any True-Up Shares to the Convertible Notes Claims, any Shortfall shall be calculated based on the volume-weighted average price of the New Common Interests for the twenty trading days (or, if there are not 20 trading days, such lesser period) immediately preceding February 29, 2024; *provided further*, that Holders of Convertible Notes Claims receiving True-Up Shares are granted customary "piggyback rights" with respect to a registration statement filed in connection with the New Common Interests issued in connection with the Asset Purchase Agreement with Bitmain Technologies Delaware Limited, as approved by the Bankruptcy Court in the *Order (I) Authorizing Core Scientific, Inc.'s Entry Into Asset Purchase Agreement and (II) Granting Related Relief* (Docket No. 1675), subject to delivery of customary stockholder information and questionnaires to the Company.

6. The Debtors' entry into the A&R Agreement represents a reasonable exercise of the Debtors' sound business judgment under section 363 of the Bankruptcy Code.

7. The Settlement is the product of extensive, good faith, arms' length negotiations between the Parties and their respective representatives.

8. The Debtors are authorized to enter into, execute, deliver, and implement the terms of the A&R Agreement in all respects, as agreed to by the Parties.

9. Upon the occurrence of the Effective Date, (a) any "claim" (as defined in section 101(5) of the Bankruptcy Code) held by OG&E against the Debtors, including the OG&E Claim and any cure claims, shall be an Allowed General Unsecured Claim pursuant to the Plan

and be deemed finally and fully paid, satisfied, released and expunged upon the Effective Date of the Plan; (b) the Debtors and their respective bankruptcy estates (together, the "**Debtor Releasors**") and OG&E (each of the Debtor Releasors and OG&E, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), irrevocably releases, acquits and forever discharges (i) each other Releasing Party and its respective their affiliates, successors, assigns, designees, subsidiaries, employees, shareholders, attorneys, accountants, officers and directors (each of the foregoing, including each Releasing Party, a "**Released Party**") from any and all claims, actions, liabilities, debts and causes of action, whatsoever, whether in law or in equity, whether known or unknown, that such releasing Party has, ever had, might have had, or might have in the future, up through and including the Effective Date, including with respect to the OG&E Claim and any other claims arising out of or pertaining to the OG&E Claim, the Legacy OG&E Agreement, the Parties business dealings and all matters related thereto, and (c) other than as set forth herein and the A&R Agreement, OG&E shall not be entitled to receive any other recovery in connection with any claims it has, or could have, asserted in connection with these chapter 11 cases or otherwise.

10. The Debtors are authorized to enter into, perform, execute, and deliver all documents, and take all actions, necessary or appropriate to immediately continue and fully implement the A&R Agreement and carry out the relief granted in this Order.

11. Except as set forth in this Order, nothing contained in the Motion, the A&R Agreement, this Order, or any actions taken by the Debtors pursuant to the relief granted in the Order shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (iii) an approval of an assumption or rejection of any lease, sublease, or contract pursuant to section 365 of the Bankruptcy Code.

12. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

13. This Court shall retain jurisdiction to hear and determine matters arising from or related to the implementation, interpretation, or enforcement of this Order to the extent provided under the A&R Agreement.

Signed: January 24, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**A&R Agreement**

WEIL:\99537944\4\39031.0014

# `ELECTRIC SERVICE AGREEMENT
# MINIMUM BILLING REQUIREMENTS
### Amended and Restated

THIS ELECTRIC SERVICE AGREEMENT, including all exhibits, schedules, addenda, or attachments hereto, which amends and restates the Electric Service Agreement Minimum Billing Requirements dated _____, ("Amended Agreement"), is effective by and between the **OKLAHOMA GAS AND ELECTRIC COMPANY** (hereinafter called "Company") and Core Scientific, Inc., (hereinafter called "Consumer," and together with Company, the "Parties").

WHEREAS Consumer has requested electrical service from Company for use in connection with **Cryptocurrency mining and/or data center** at **1525 W. Smith Ferry Road, Muskogee, OK  74401** ("Service Location").

WHEREAS Company has agreed to sell Consumer electricity at the Service Location, however, before Company can deliver the electricity requested at the Service Location, it will need to perform engineering, design, procurement and/or construction work ("Work").

WHEREAS, in consideration for all of the costs associated with the Work ("Cost To Serve"), Consumer is agreeing to purchase electrical service from Company pursuant to the terms and conditions of this Amended Agreement.

THEREFORE, Parties agree as follows:

1. **Physical Address Required**. This Amended Agreement is conditioned upon Consumer already possessing or entering into a binding and enforceable lease or purchase agreement within thirty (30) days for the Service Location.  If Consumer fails to enter into a purchase agreement or binding and enforceable lease during this period, this Amended Agreement shall be deemed terminated by Consumer unless Company, in its sole discretion, decides to extend this thirty (30) day deadline in writing.
2. **Requested Electrical Service.**  The electric service anticipated to be delivered to Consumer under this Amended Agreement is for an estimated maximum demand of 100,000 kilowatts (kW) and of a character commonly known as 345,000 volts, **3** phases **4**-wire solidly grounded wye of approximately **60** hertz (with reasonable variation in voltage and frequency in either direction allowed) (the "Maximum Demand"). The service will be billed as Service Level One**.**
3. **Changes to Maximum Demand.**
    a. If Consumer's highest billed demand remains below seventy-five percent (75%) of the Maximum Demand for any six (6) consecutive month period, Company may, at its sole discretion, reduce the Maximum Demand requirement to the highest billed demand level within the six (6) consecutive month period and inform Consumer in writing of the change. The reduced demand level communicated to Consumer shall become the new Maximum Demand.
    b. Prior to an increase to Consumer's Maximum Demand, Consumer will make a written request to the Company.  Company will review the request and may require additional information about the Consumer, further reviews and/or studies, additional contract documents, additional financial obligations and/or impose additional technical and operational requirements of Consumer.  An increase to Maximum Demand is not guaranteed. Requests to increase the Maximum Demand require at least sixty (60) days to review.  If Company agrees to increase Consumer's Maximum Demand, Parties will enter into additional contract documents to reflect the amended relationship.
        i. Consumer shall be responsible for damage to any equipment caused by or related to an unauthorized increase in Maximum Demand or resulting from any

       misrepresentation of identity or facts for the purpose of obtaining service. If there is an increase in the amount of electricity being used at the Service Location beyond the Maximum Demand, Company may disconnect service. According to the Rules on Electricity, OAC 165:35, disconnection will be taken to avoid an adverse effect of the unauthorized increase in Maximum Demand on the service of other Company customers and to correct a condition that is posing a safety hazard to the equipment of Company. Reconnection of service following disconnection for an unauthorized increase in Maximum Demand may require the payment of a service fee pursuant to Company's Standard Terms and Conditions of Service. Furthermore, repeated unauthorized increases may lead to permanent disconnection of service.

   c. The obligations of this section shall survive the termination of this Amended Agreement and shall continue for so long as Consumer has an active account associated with the Service Location.

4. **Description of Amount and Nature of Consumer's Load.** Consumer anticipates service requirements of at least 100,000 kW of demand to serve up to two data center buildings (up to 55,000 square feet each), along with one supporting warehouse & other technical facilities. OG&E will order and add a new breaker to the Griffin substation in order for Consumer to extend its line to connect to the point of interconnection at the Griffin substation.

5. **Billed Rates**. So long as Consumer is receiving electric service from Company, Consumer shall be billed in accordance with the Tariff and/or classification of service in effect at the time electrical service is delivered, and Consumer agrees to pay such amount billed. Should a change occur, Company shall, upon the effective date thereof, bill Consumer in accordance with the revised Tariff and/or classification of service.

6. **Operational and Technical Requirements**.
   a. Consumer agrees to satisfy any and all Technical and Operational Requirements (defined below) of the Company or from any applicable filed and approved Tariff (as defined by OAC 165:35-1-2), or Company's classifications of service including any modifications or new Tariffs/classifications of services.
      i. Operational Requirements are defined as essential capabilities, associated requirements, performance measurements, generational requirements (including the cost to add generation), and any process or series of actions required to affect desired results, requirements, or capabilities.
      ii. Technical Requirements are defined as standards that a system or software must follow. This includes security, architectural and functionality requirements.
   b. Consumer shall be responsible for providing, owning, installing, and maintaining their electrical system, equipment, and process designed to operate and conform with all applicable standards and codes including, but not limited to, IEEE-519-2014, and any successor IEEE standards. In addition, the Consumer will operate its equipment to meet IEEE-1453-2012 guidelines as measured with an IEEE compliant flicker meter at the point of common coupling ("PCC").
   c. In consideration for Company's Cost To Serve, except as when used as a back-up source for electric services during an emergency or outage, Consumer shall not use or engage behind the meter generation for more than ten percent (10%) of the Service Location's energy needs for the duration of this Agreement.
   d. Unless otherwise noted, the obligations of this section shall survive the termination of this Agreement and shall continue for so long as Consumer has an active account associated with the Service Location.

7. **Conditions for Construction/Installation.** If Consumer fails to satisfy any conditions or requirements given to Consumer by Company for construction and/or installation of Company-owned equipment, Company reserves the right to immediately stop-work until such time as the deficiency is resolved. Consumer shall also be responsible for any damages or harm incurred by Company because of Consumer's failure to abide by any provided conditions or requirements. These obligations shall survive the termination of this Amended Agreement and shall continue for so long as Consumer has an active account associated with the Service Location.
8. **Load Connection Study**. As part of the Work, the Southwest Power Pool ("SPP") may require a confirming load connection study to be completed to determine if any transmission system upgrades are needed before official permission can be given to serve a future load that exceeds what has been included in the growth projections for the area of the Service Location. Projects are typically reviewed, and a decision made by the SPP, within approximately sixty (60) days for routine requests and up to one hundred and twenty (120) or more days for non-routine requests. Any associated upgrade costs resulting from the SPP connection study will be the Consumer's responsibility and may require parties to enter into additional contract documents and may require a contribution in aid of construction payment from Consumer.
9. **Rights of Way**. The performance of this Amended Agreement is contingent upon Company being able to secure the necessary rights of way to the Service Location for its facilities at a cost which, in its sole judgment, is reasonable. If the cost of the right of way is, in Company's sole opinion, not acceptable, Consumer shall be required to pay any such rights of way costs in excess of that amount which Company determines to be reasonable.
10. **New Electric Consuming Facilities.** So long as Consumer has an active account with the Company, Consumer will grant Company first right of refusal for any other new electric consuming facilities Consumer will own and / or operates in Company's service territory provided the location of the new electric consuming facilities is in a competitive area. Pursuant to 17 O.S. § 158.25(E), competitive area is defined as a location in Company's service area within an unincorporated area where a new electric consuming facility having a connected load for initial full operation of 1,000 kW or larger is located.
11. **Load Reduction Program**. *Select as applicable.*
    ☐ Consumer is electing to participate in the Standard Pricing Schedule: LR: Load Reduction Rider.
    X Consumer is electing to participate in Company's Direct Load Control Program available under the Standard Pricing Schedule: LR: Load Reduction Rider. **Eligibility requirements exist.
    ☐ Consumer is **not** participating in Load Reduction.
      *Consumer may, in the future, participate pursuant to the terms and conditions of the Standard Pricing Schedule: LR: Load Reduction Rider or other applicable Tariff(s).
12. **Service Levels**.
    a. Consumer will follow all Tariff requirements for the service level applicable to the Service Location however, for Service 1 and Service Level 2, the following additional requirements will apply.
        i. Should Consumer elect **Service Level 1,** service from a Consumer-owned substation, the point of delivery under this Agreement shall be the point at which the electric facilities of Company will connect to the electric facilities of Consumer, typically at Consumer-owned dead end structure in Consumer's substation. Consumer is obligated to modify the substation in the future as Company's transmission continues to evolve. When deemed necessary by

        Company changes in Consumer's substation may be needed to conform to industry standards, transmission system characteristics, and Company practices, or to take advantage of technological advances which will maintain the reliability of the substation. The billing metering will be on the low side of Consumer-owned transformer. Consumer shall install Company-owned and provided potential and current transformers used for metering per Company specifications. Consumer shall also install raceway from the potential and current transformers to a Company-owned but Consumer installed meter base. Company will adjust for transformer losses when calculating the bill. Consumer shall provide reasonable access to the metering equipment for maintenance and testing.

    ii. Should Consumer elect **Service Level 2,** service from an onsite substation, Company will be responsible for the design and construction of any facilities needed and Consumer will reimburse for any and all costs that exceed the allowable expenditure. The location of the pad will be on Consumer's property at a mutually agreeable location. Consumer shall grant, at no cost to Company easements for: (i) the new substation to be constructed; (ii) the transmission and distribution infrastructure; and (iii) ingress and egress access to the substation and transmission and distribution infrastructure. All such easements shall be in a form that is acceptable to and approved by Company and such easements shall include, as a material term, the right of Company to extend the rights granted to Company under the easements to third parties for purposes including, but not limited to, allowing such third parties to access the substation for their electric service needs or area load growth needs. Consumer will identify any environmental permitting exemptions, authorizations, and/or existing permits that apply to current or anticipated construction and operations. These may include, but are not limited to, areas such as, stormwater discharges, spill control and countermeasure plans, waste management, temporary generators, air emissions, or endangered species. The acquisition of such permits or authorizations, as well as the development of related control and implementation plans, will be identified and coordinated between the Parties in a timely manner so as not to impact a project plan that is mutually agreeable to the Parties.

  b. For a Service Location outside of the Company's certified territory, Consumer is responsible for installing a connected load of 1,000 kW or greater for initial full operation. If, after service is initiated and it is determined that the actual connected load for initial full operation is under 1,000 kW, Consumer will be required to obtain service from the incumbent retail electric service provider and will reimburse Company for all actual expenses associated with the construction and design of the electrical system required to serve Consumer's facility located at the Service Location described in this Amended Agreement.

13. **Deposit**. Consumer is responsible for remitting a deposit to the Company based on the two (2) months average projected usage for the Service Location. Failure to remit the deposit will be treated as a Consumer's termination of this Amended Agreement.

14. **CIAC.**
    a. As detailed in Exhibit A, Consumer shall be required to provide contribution in aid of construction ("CIAC") to the Company.
    b. Consumer's failure to remit the CIAC as detailed in Exhibit A, shall be treated as a termination of this Amended Agreement by the Consumer. Such cancellation shall be effective from the date that Company has provided written notice of Consumer's default. Provided, however, that Company may, in its sole discretion, elect to extend the thirty (30) day period referenced

in this section.  No extension shall be effective unless it is in writing and signed by the Parties.
15. **Term & Termination.**
    a. Subject to Company's Terms and Conditions of Service and rules and regulations of any regulatory authority having jurisdiction, this Amended Agreement shall become effective on the last signature date set forth below ("Effective Date") and remain in effect for an initial term of five years from the date Permanent Electric Service is first rendered hereunder (the "Initial Term").  Following expiration of the Initial Term Consumer will continue to receive service under applicable Tariffs.
    b. Prior to Permanent Electric Service, if Consumer, at any time, is unable to proceed in a timely manner with the work or process necessary to establish Permanent Electric Service at the Service Location, including, but not limited to the execution of any other contractual document required, this Amended Agreement will be considered terminated following a thirty (30) day notice to cure.  While Company's right to terminate may be executed at its sole discretion pursuant to this subsection, Company shall refrain from exercising its right herein so long as Consumer is utilizing commercially reasonable efforts.
    c. If Consumer does not make application for an electric service account within three (3) months from the date Permanent Electric Service has been made available to the Service Location, Company shall longer be obligated to deliver electric service to the Service Location and Consumer will reimburse Company for all actual expenses associated with the Cost To Serve and this Amended Agreement shall be considered terminated.
        i. *Permanent Electric Service* means Company has completed all design and construction of electrical facilities necessary to make available electric service to Consumer's point of interconnection.
    d. If Consumer does not provide CIAC according to the terms in Exhibit A, this Agreement shall be considered terminated
    d. **Effect of Termination**.
        i. If this Amended Agreement is terminated for any reason prior to the expiration of the Initial Term, Consumer shall be responsible for any remaining Cost To Serve not recovered through Consumer's Billing.  Cost To Serve expenses may include but are not limited to the engineering costs, costs of obtaining easements, material costs, material cancellation costs, and construction labor.
        ii. Termination of the Amended Agreement shall not affect Company's exclusive right to provide electrical service to Consumer at the Service Location for any future electrical service needs at its standard Tariffed rates.
    e. In addition to those obligations with express survival language, upon expiration or termination of the Amended Agreement, the obligations which by their nature are intended to survive expiration or termination of the Amended Agreement shall survive.
    f. If an event of Force Majeure (defined below) occurs that prevents Company from providing retail electric service hereunder or Consumer from receiving retail electric service hereunder ("Claiming Party"), the Minimum Monthly Billing Requirement will be extended to reflect the exact number of days which such Force Majeure event is in effect.  Force Majeure shall mean an event that is not within the reasonable control of the Claiming Party, and despite the Claiming Party's exercise of due diligence, the Claiming Party is unable to overcome the event in a commercially reasonable manner or obtain a commercially reasonable substitute performance. Events of Force Majeure include, without limitations, wrongful or negligent acts of a person or persons other than Company, acts of God, fire, adverse weather conditions, such as ice, tornados, wind, or other conditions that damage or destroy Claiming Party facilities which damage renders the provision of service impossible, civil disturbance, labor disputes or labor shortage, strikes, sabotage, action or restraints by a governmental authority, provided the

      Claiming Party has not applied for or assisted in the application for and, to the extent reasonable, has opposed such action or restraint, and inability, after diligent application, to obtain or maintain required permits, licenses, zoning or other required approvals from any governmental authority or other third party whose consent is required as a condition to Company's performance hereunder.

16. **Title & Ownership**. Company shall retain all right, title and interest to any items associated with the expansion of Company's electric system as contemplated in the Amended Agreement including but not limited to materials, services, easements purchased, acquired or obtained by Company in connection with this Amended Agreement. In addition, ownership, and control of all such items of expansion shall at all times remain with Company and Company shall have the right to use the same for the purpose of serving Company's other customers.

17. **Governing Law and Authority**.
    a. To protect the reliability and resiliency of its electrical system, Company reserves its right to limit service or disconnect service in the event that Consumer breaches this Amended Agreement.
    b. This Amended Agreement shall be governed and construed in accordance with the laws of the State of Oklahoma excepting its laws regarding conflicts of law.  Any suit, claim or legal proceeding arising out of or relating to this Amended Agreement shall be brought exclusively in the state or federal courts located in Oklahoma County, Oklahoma.  The Parties hereby agree to the exclusive jurisdiction of and venue in such courts and the Parties expressly and irrevocably waive any objections to such exclusive jurisdiction and venue.  In the event of any dispute relating to this Amended Agreement, the Parties agree that they shall first attempt to resolve the dispute via informal negotiations before initiating any legal proceeding.  THE PARTIES EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS AMENDED AGREEMENT.
    c. Nothing contained herein shall be construed as affecting in any way the right of Company to unilaterally make application to the Corporation Commission of Oklahoma and/or the Arkansas Public Service Commission or to any other regulatory agency having jurisdiction, as applicable, for a change in rates, charges, classification, service, Terms and Conditions of Service or any rule, regulation or contract relating thereto, during the term of this Amended Agreement, Company shall, upon the effective date of any order or rule resulting from such application, bill Consumer on the basis of such change and Consumer agrees to pay such amount billed reflecting such change.
    d. Parties agree to comply with all applicable provisions and respective amendments of Federal and State laws, rules and regulations, ordinances, judicial decisions, and executive orders, in performance of this Amended Agreement.

18. **Notice**.  All notices or communications relating to this Amended Agreement shall be in writing and sent to the addresses identified by the Parties below via internationally recognized delivery service or certified United States mail with delivery confirmation for all such methods.  Either Party may change its notice address by providing written notice of such change to the other Party.

19. **Miscellaneous.**
    a. The person signing this Amended Agreement on behalf of a Party represents and warrants that that he or she is a duly authorized representative of that Party and that he or she has express authority to sign this Amended Agreement on behalf of that Party.
    b. The Parties have caused this Amended Agreement to be signed by their duly authorized officers as of the Effective Date. This Amended Agreement may be executed in counterparts, each of which so executed shall be deemed an original and constitute one and the same agreement.
    c. Consumer shall remain subject to Company's applicable tariffs and Terms and Conditions of

      Service; however, this Amended Agreement constitutes the entire agreement between the Parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous oral or written agreements, conditions, or representations.  Should a conflict arise, it will be resolved in favor of this Amended Agreement. This Amended Agreement is deemed to include all exhibits, schedules, addenda, or any other attachment hereto which are made a part of this Amended Agreement by this reference.

    d. Unless specifically defined herein, capitalized terms shall have the meanings assigned to them under the applicable Rate Tariff or Company's Standard Terms and Conditions of Service and in the event of a conflict or inconsistency with any defined terms the applicable Rate Tariff and/or Company's Standard Terms and Conditions of Service will apply.

    e. The rights and obligations of the Consumer under this Amended Agreement may not be sold, assigned, or otherwise transferred without written approval from the Company.

**Core Scientific, Inc.**
 ("Consumer")

**OKLAHOMA GAS & ELECTRIC COMPANY**
("Company")

By: _____
Signature (Authorized Representative)

By: _____
Signature (Authorized Representative)

Print Name:

Print Name: _____

Title:

Title: _____

Date:

Date: _____

Address:

**OG&E Internal Use Only:**
Account Exec_____     All, Exp._____     CTS_____     Service Level_____

Page **7** of **8**

Exhibit A

## CONTRIBUTION IN AID OF CONSTRUCTION

1. COMPANY agrees to accept from Consumer GUC Claim Consideration of $4.8M to be applied to Cost of Service as CIAC. GUC Claim Consideration is defined as the fair market value of the consideration (if other than cash) received by the Company as a holder of a general unsecured claim in Class 8A of the Consumer's plan of reorganization determined as the dollar volume-weighted average price for Consumer's common stock on the NASDAQ for twenty-day period ending on the 30th day of April, 2024 as reported by Bloomberg. If, however, the Company has sold the GUC Claim Consideration in an open market transaction(s), the "fair market value" shall be the actual net proceeds received by the Company as shown by the trading confirmations reflecting such transactions.
2. COMPANY will sell the GUC Claim Consideration in an open market transaction(s) once an account has been approved by OG&E's Board of Directors and OG&E has the ability to make the trades. COMPANY will trade the GUC Consideration as quickly as reasonably and commercially possible.
3. If the fair market value of the GUC Claim Consideration exceeds $4.8M, the GUC Claim Consideration will be applied in the following manner:
    a. $4.8M to Cost of Service as CIAC
    b. COMPANY may hold up to 30% above $4.8M
    c. Any amount above the 30% will be applied to any additional CIAC, per the terms of any new Minimum Bill Agreement for the additional load.
        i. If the fair market value of the COMPANY's GUC Claim Consideration exceeds the CIAC amount for any additional load, such excess will be applied first to any required Billing Deposit. If the fair market value exceeds the required Billing Deposit, it will be applied as a credit towards future electric bills.
4. If the fair market value of the GUC Claim Consideration is less than $4.8M, Consumer shall pay an amount equal to the difference between $4.8m and the fair market value of the GUC Claim Consideration within 90 days following COMPANY's initial receipt of GUC Claim Consideration to satisfy the Cost of Service amount.
5. COMPANY will order and add a new breaker to the Griffin substation once the full amount of CIAC has been received.

United States Bankruptcy Court
Southern District of Texas

In re: Case No. 22-90341-cml
Core Scientific, Inc. Chapter 11
Official Committee of Unsecured Creditor
    Debtors

# CERTIFICATE OF NOTICE

District/off: 0541-4      User: ADIuser      Page 1 of 4
Date Rcvd: Jan 24, 2024      Form ID: pdf002      Total Noticed: 60

The following symbols are used throughout this certificate:
**Symbol**      **Definition**

\+      Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

^      Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jan 26, 2024:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | American Property Acquisition, LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | American Property Acquisitions I, LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | American Property Acquisitions VII, LLC, 210 Barton Springs Road, Suite 300, Austiin, TX 78704-1251 |
| db | + | Core Scientific Acquired Mining LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Mining LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Operating Company, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific Specialty Mining (Oklahoma) LLC, 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Core Scientific, Inc., 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | RADAR LLC, 210 Barton Springs Road, Suite 300, Austiin, TX 78704-1251 |
| db | + | Radar Relay, Inc., 210 Barton Springs Road, Suite 300, Austin, TX 78704-1251 |
| db | + | Starboard Capital LLC, 210 Barton Springs Road, Suite 300, Austiin, TX 78704-1251 |
| aty | + | Allegra Bianchini, Hogan Lovells US LLP, 390 Madison Ave., New York, NY 10017-2507 |
| aty | + | Dennis Tracey, Hogan Lovells US LLP, 390 Madison Ave., New York, NY 10017-2507 |
| aty | + | Richard L. Wynne, Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067-6047 |
| aty | + | Robert D. Drain, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY 10001-0193 |
| aty | + | Sara Posner, Hogan Lovells US LLP, 390 Madison Ave., New York, NY 10017-2507 |
| cr | + | Allegheny Casualty Company, c/o Chiesa Shahinian & Giantomasi PC, 105 Eisenhower Parkway, Attn: Scott Zuber, Esq., Roseland, NJ 07068 UNITED STATES 07068-1640 |
| cr | + | Argo Partners, 12 West 37th Street, Ste. 900, New York, NY 10018-7381 |
| trnsfee | + | B. Riley Securities, Inc., 11100 Santa Monica Blvd., Suite 800, Los Angeles, CA 90025-3979 |
| cr | + | Baker Drywall Fort Worth, Ltd., 3705 East 1st Street, Forth Worth, TX 76111-5804 |
| intp | + | Board of Directors of Core Scientific, Inc., c/o Peter C. Lewis, Scheef & Stone, L.L.P., 500 North Akard Street, Suite 2700, Dallas, TX 75201-3306 |
| cr | + | CRG Financial LLC, 84 Herbert Avenue, Building B, Suite 202, Closter, NJ 07624 UNITED STATES 07624-1313 |
| intp | + | Condair Inc., c/o John S. Collins, Vorys, Sater, Seymour and Pease LLP, 909 Fannin, Suite 2700, Houston, TX 77010-1009 |
| cr | + | Dalton Utilities, Howley Law PLLC, 711 Louisiana Street, Ste. 1850, Houston, TX 77002-2790 |
| cr | + | Dennis Powers, 362 S. Clarkson St., Denver, CO 80209-2126 |
| cr | + | Harco National Insurance Company, c/o Chiesa Shahinian & Giantomasi PC, 105 Eisenhower Parkway, Attn: Scott Zuber, Esq., Roseland, NJ 07068 UNITED STATES 07068-1640 |
| cr | + | Harlin Dean, Attn: Hudson M. Jobe, 2001 Bryan Street, Suite 1800, Dallas, TX 75201 UNITED STATES 75201-3070 |
| cr | + | Indigo Direct Lending, LLC, c/o Ross, Smith & Binford, PC, Attn: Frances A. Smith, 700 N. Pearl Street, Suite 1610 Dallas, TX 75201-7459 |
| cr | + | International Fidelity Insurance Company, c/o Chiesa Shahinian & Giantomasi PC, 105 Eisenhower Parkway, Attn: Scott Zuber, Esq., Roseland, NJ 07068 UNITED STATES 07068-1640 |
| cr | + | J.W. Didado Electric, LLC, c/o Leonard I. Pataki, Quanta Services, 4500 S. Garnett Road, Suite 100, Tulsa, OK 74146-5221 |
| cr | + | LV.NET, LLC, 1221 S. Casino Center Blvd., Las Vegas, NV 89104, UNITED STATES 89104-1015 |
| cr | + | Maddox Industrial Transformer, LLC, c/o Mary M. Caskey, Esq., Haynsworth Sinkler Boyd, PA, PO Box 11889, Columbia, SC 29211-1889 |
| intp | + | McCarthy Building Companies, Inc., c/o Watt, Tieder, Hoffar & Fitzgerald, L, 1765 Greensboro Station Place, Suite 1000, McLean, VA 22102-3468 |
| intp | + | Michael G. Patton, 15 Jessica Rae Lane, Fredericksburg, VA 22405-5774 |
| cr | + | North Mill Equipment Finance LLC, c/o Padfield & Stout, LLP, Christopher V. Arisco, 420 Throckmorton Street, Suite 1210, Fort Worth, TX 76102-3792 |
| cr | + | North Texas Contracting, Inc., PO Box 468, Keller, TX 76244-0468 |
| cr | + | Pescadero Capital, LLC, Building LAW/JB, 700 Universe Blvd, Juno Beach, FL 33408, UNITED STATES 33408-2657 |
| cr | + | Quinn Emanuel Urquhart & Sullivan, LLP, c/o Asher Griffin, 300 W 6th Street, Suite 2010, Austin, TX 78701 UNITED STATES 78701-3901 |

| | | |
|---|---|---|
| cr | + | Tanmar Rentals, LLC, c/o Wells & Cuellar, P.C., 440 Louisiana Suite 718, Houston, TX 77002, UNITED STATES 77002-1058 |
| cr | + | Ted Farmer VFS LLC, c/o Ted C. Farmer, Esq., Suite 395 East, 41000 Woodward Avenue, Bloomfield Hills, MI 48304-5130 |
| cr | + | Tenaska Power Services Co., c/o Ross & Smith, P.C., Attn: Jason Binford, 2003 N. Lamar Blvd., Suite 100 Austin, TX 78705-4932 |
| cr | + | Truckload Connections, 3270 Hampton Ave., St. Louis, MO 63139-2367 |
| intp | + | U.S. Bank National Association, as Prepetition Not, c/o Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103-1803 |
| cr | + | c/o James Bailey Esq Gaylor Electric, Inc., d/b/a, Bradley Arant Boult Cummings LLP, One Federal Place, 1819 5th Ave. N, Birmingham, AL 35203-2119 |

TOTAL: 44

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | + | Email/Text: ahochheiser@mauricewutscher.com | Jan 24 2024 22:24:00 | AmTrust North America, Inc. on behalf of Associate, c/o Maurice Wutscher LLP, 23611 Chagrin Blvd. Suite 207, Beachwood, OH 44122-5540 |
| cr | + | Email/Text: beanland@mssattorneys.com | Jan 24 2024 22:24:00 | BEAM Concrete Construction, Inc., c/o Misti L. Beanland, 8131 LBJ Freeway, Suite 700, Dallas, TX 75251-1352 |
| cr | + | Email/Text: notices@crgfinancial.com | Jan 24 2024 22:24:00 | CRG Financial LLC, 84 Herbert Avenue, Building B, Suite 202, Closter, NJ 07624, UNITED STATES 07624-1313 |
| cr | + | Email/Text: dallas.bankruptcy@LGBS.com | Jan 24 2024 22:24:00 | Dallas County, Linebarger Goggan Blair & Sampson, LLP, c/o John K. Turner, 2777 N. Stemmons Freeway, Suite 1000, Dallas, TX 75207-2328 |
| cr | | Email/Text: fred.glass@fairharborcapital.com | Jan 24 2024 22:24:00 | Fair Harbor Capital, LLC, PO Box 237037, New York, NY 10023, US |
| cr | ^ | MEBN | Jan 24 2024 22:25:04 | GEM Mining 1, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | ^ | MEBN | Jan 24 2024 22:25:03 | GEM Mining 2, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | ^ | MEBN | Jan 24 2024 22:25:02 | GEM Mining 2B, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | ^ | MEBN | Jan 24 2024 22:25:00 | GEM Mining 3, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | ^ | MEBN | Jan 24 2024 22:24:59 | GEM Mining 4, LLC, c/o Evan N. Parrott, 11 North Water Street, Suite 24290, Mobile, AL 36602-5024 |
| cr | | Email/Text: sanantonio.bankruptcy@publicans.com | Jan 24 2024 22:23:00 | Ward County, 112 E Pecan Street, Suite 2200, San Antonio, TX 78205 |
| cr | + | Email/Text: rmcdowell@slgcollect.com | Jan 24 2024 22:24:00 | Meridian Equipment Finance, LLC, c/o Saldutti Law Group, 1040 Kings Highway N., Suite 100, Cherry Hill, NJ 08034-1925 |
| cr | | Email/Text: shirley.palumbo@nexteraenergy.com | Jan 24 2024 22:24:00 | NextEra Energy Resources, LAW/JB, 700 Universe Blvd., Juno Beach, FL 33408, UNITED STATES |
| cr | + | Email/Text: schristianson@buchalter.com | Jan 24 2024 22:23:00 | Oracle America, Inc., Buchalter PC, c/o Shawn M. Christianson, 425 Market St., Suite 2900, San Francisco, Ca 94105-2491 |
| cr | + | Email/Text: neil.orleans@judithwross.com | Jan 24 2024 22:24:00 | Tenaska Power Services Co., c/o Ross & Smith, P.C., Attn: Judith W. Ross, 700 N. Pearl Street, Suite 1610, Dallas, TX 75201-7459 |
| cr | ^ | MEBN | | |

| District/off: 0541-4 | User: ADIuser | Page 3 of 4 |
|---|---|---|
| Date Rcvd: Jan 24, 2024 | Form ID: pdf002 | Total Noticed: 60 |

| | | Jan 24 2024 22:24:01 | Texas Comptroller of Public Accounts, Revenue Acco, Christopher S. Murphy, P.O. Box 12548, Austin, TX 78711-2548 |
|---|---|---|---|
| cr | + Email/Text: BKECF@traviscountytx.gov | Jan 24 2024 22:24:00 | Travis County, c/o Jason A. Starks, P.O. Box 1748, Austin, TX 78767-1748 |

TOTAL: 17

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | 36th Street Capital Partners, LLC |
| cr | | ABLe Communications, Inc. |
| cr | | Ad Hoc Group of Secured Convertible Noteholders |
| cr | | Anchorage Lending CA, LLC |
| intp | | B. Riley Commercial Capital, LLC |
| cr | | Barings BDC, Inc. |
| cr | | Barings Capital Investment Corporation |
| cr | | Barings Private Credit Corp. |
| cr | | BlockFi Lending LLC |
| cr | | BlockFi, Inc. and its affiliated entities |
| cr | | Bremer Bank |
| cr | | Brown Corporation Brown Corporation, 311 Pointe North Place #4, Dalton, UNITED STATES |
| cr | | Bryce Johnson |
| cr | | CEC Energy Services LLC |
| cr | | Celsius Mining, LLC |
| intp | | Centro de Investigaciones Energeticas, Medioambien |
| cr | | Charles Basil |
| cr | | City of Denton |
| cr | | Coonrod Electric Co. LLC |
| intp | | Foundry Digital LLC |
| cr | | General Casualty Company of Wisconsin |
| cr | | Gryphon Digital Mining, Inc. |
| intp | | Harper Construction Company, Inc. |
| cr | | Huband-Mantor Construction, Inc. |
| cr | | Humphrey & Associates, Inc. |
| cr | | MK Marlow Company, LLC |
| cr | | MP2 Energy Texas LLC d/b/a Shell Energy Solutions |
| cr | | Marnoy Interests, Ltd. d/b/a Office Pavilion |
| cr | | MassMutual Asset Finance, LLC |
| cr | | Mitch Edwards |
| cr | | Morgan Hoffman |
| cr | | NYDIG ABL LLC |
| intp | | Official Committee of Equity Security Holders |
| crcm | | Official Committee of Unsecured Creditors |
| cr | | Prime Alliance Bank, Inc. |
| cr | | Priority Power Management, LLC |
| intp | | SRPF A QR Riversouth LLC |
| intp | | Skadden, Arps, Slate, Meagher & Flom LLP |
| cr | | Sphere 3D Corp. |
| cr | | Summit Electric Supply Company, Inc. |
| cr | | TOYOTA INDUSTRIES COMMERCIAL FINANCE INC. |
| cr | | Texas Capitalization Resource Group, Inc., 5201 Camp Bowie Blvd. Suite 200, Fort Worth |
| intp | | The Ad Hoc Equity Group |
| intp | | Trilogy LLC |
| intp | | Trinity Capital Inc. |
| cr | | Wingspire Equipment Finance, LLC |

TOTAL: 46 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

| | | |
|---|---|---|
| District/off: 0541-4 | User: ADIuser | Page 4 of 4 |
| Date Rcvd: Jan 24, 2024 | Form ID: pdf002 | Total Noticed: 60 |

## NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jan 26, 2024              Signature:       /s/Gustava Winters