IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CORE SCIENTIFIC, INC.,** *et al.*, | § | **Case No. 22-90341 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **Reorganized Debtors.[1]** | § | |
| | § | |

**REORGANIZED DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 646 AND 647
FILED BY GEM MINING 1 AND PROOFS OF CLAIM NOS. 648 AND 649 FILED BY
GEM MINING 4 AND REPLY IN FURTHER SUPPORT OF OBJECTION TO
PROOFS OF CLAIM NOS. 503, 505, 506, 508, 570, 571, 572, AND 617[2]**

> **THIS IS AN OBJECTION TO YOUR CLAIMS. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIMS THAT YOU FILED IN THIS BANKRUPTCY CASE. YOU SHOULD IMMEDIATELY CONTACT THE OBJECTING PARTY TO RESOLVE THE DISPUTE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIMS MAY BE DISALLOWED WITHOUT A HEARING.**

Core Scientific, Inc. ("**Core**") and its reorganized debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Reorganized Debtors**"), represent as follows in support of this objection to Proofs of Claim Nos. 646, 647, 648, and 649 (the "**Rejection Damages**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are as follows: Core Scientific, Inc. (3837); Core Scientific Specialty Mining (Oklahoma) LLC (4327); American Property Acquisition, LLC (0825); American Property Acquisitions I, LLC (9717); and American Property Acquisitions VII, LLC (3198).  The Reorganized Debtors' corporate headquarters is 210 Barton Springs Road, Suite 300, Austin, Texas 78704.  The Reorganized Debtors' service address is 2407 S. Congress Ave, Suite E-101, Austin, Texas 78704.  The Debtors in the other six pending chapter 11 cases (which continue to be jointly administered with the cases of the Reorganized Debtors), each of which have either been dissolved or merged into other entities as of the Effective Date, consist of the following: Core Scientific Mining LLC (6971); Core Scientific Acquired Mining LLC (6074); Core Scientific Operating Company (5526); Radar Relay, Inc. (0496); Starboard Capital LLC (6677); and RADAR LLC (5106).

[2] GEM Mining 1, LLC filed Proofs of Claim No. 503 and 617.  GEM Mining 2B, LLC filed Proofs of Claim Nos. 505 and 571.  GEM Mining 2, LLC filed Proofs of Claim Nos. 508 and 570. GEM Mining 4, LLC filed Proofs of Claim Nos. 506 and 572.

Objection") and reply (the "**PPT Reply**") in further support of the Reorganized Debtors' previously filed objection to Proofs of Claim Nos. 503, 505, 506, 508, 570, 571, 572, and 617,[3] Dkt. 854. (the "**PPT Objection**").  The PPT Reply addresses the arguments set forth in GEM's response to the PPT Objection, Dkt. 1196 (the "**GEM Response**").

      The Reorganized Debtors request entry of an order substantially in the form attached hereto as <u>**Exhibit A**</u> ("the **Proposed Order**") disallowing Proofs of Claim Nos. 503, 617, 646, and 647 (the "**GEM 1 POCs**") filed by GEM Mining 1, LLC ("**GEM 1**"); Proofs of Claim Nos. 505 and 571 (the "**GEM 2B POCs**") filed by GEM Mining 2B, LLC ("**GEM 2B**"); Proofs of Claim Nos. 508 and 570 (the "**GEM 2 POCs**") filed by GEM Mining 2, LLC ("**GEM 2**"); and Proofs of Claim Nos. 506, 572, 648, and 649 (the "**GEM 4 POCs**") filed by GEM Mining 4, LLC ("**GEM 4**").  The GEM 4 POCs, together with the GEM 1 POCs, GEM 2B POCs, and GEM 2 POCs, are referred to collectively herein as the "**GEM POCs**."[4]  GEM 4, together with GEM 1, GEM 2B, and GEM 2, are referred to collectively herein as "**GEM**."  GEM, together with the Reorganized Debtors, are referred to collectively herein as the "**Parties**."

### Preliminary Statement

      1.    For nearly a year, and consistent with the terms of the GEM Hosting Agreements (as defined below), Core invoiced GEM for increased power costs through power pass-through charges (the "**PPT**") as it was permitted to do based on the terms of the relevant agreements.  GEM acquiesced and consistently paid these invoices without properly noticing Core

---

[3] The PPT Objection inadvertently failed to list Proof of Claim No. 617, which is duplicative of Proof of Claim No. 503, which the Reorganized Debtors objected to previously.  Accordingly, Proof of Claim No. 617 should be disallowed for the same reasons previously discussed relating to Claim No. 503, as well as those set forth herein.

[4] GEM states that, out of an abundance of caution, it filed duplicate claims against Core Scientific, Inc. and Core Scientific Operating Company, clarifying that GEM only seeks recovery against the correct entity.  Accordingly, it is undisputed that under no circumstances would GEM be entitled to duplicative recoveries.

of any dispute as expressly and unambiguously required under the governing agreements.[5]  As relates specifically to GEM 2B and GEM 2, they requested that Core agree to early termination of their agreements because the PPT amounts were too expensive for them and asked that Core apply the GEM 2B and GEM 2 prepayments to GEM 4.  Neither GEM 2B or GEM 2 ever claimed that the PPT was wrongfully charged or sought return of those amounts.  It is in this context that GEM now belatedly claims in the GEM POCs that Core was not entitled to charge, and GEM should not have paid, the PPT amounts.

2.      GEM 1 and GEM 4 also seek rejection damages in the total amount of approximately $8 million, claiming that they are entitled to recover the costs represented by the alleged difference between the replacement hosting rates with other providers and the hosting rates they had with Core.  But under the plain and unambiguous terms of the GEM Hosting Agreements, GEM 1 and GEM 4 are precluded from recovering these types of damages.  Moreover, even if these type of damages were recoverable, which they are not, the GEM Hosting Agreements expressly limit any recovery to an aggregate of one month's fee—here, no more than $802,629.69 for GEM 1 and $337,603.68 for GEM 4, based on the final invoices that issued at the time of rejection.  Furthermore, a portion of the asserted rejection damages are speculative as they are determined based on *anticipated* hosting rates, which GEM admits it has not yet incurred.

3.      Overall, as related to the PPT claims, the GEM POCs (i) are time-barred under the terms of the GEM Hosting Agreements, (ii) contradict a plain language interpretation of the GEM Hosting Agreements (including Section 4(f) of the MSAs (defined below)), and (iii) fail

---

[5] As explained in more detail below, although GEM purported to "dispute" a PPT charge in a February 2022 email thread relating to a GEM 1 invoice, GEM neither provided formal written notice of any dispute as expressly required by the MSAs nor disputed any subsequent invoiced amounts within three days of the corresponding invoice to the various GEM entities, also as expressly required by the MSAs.

to recognize the industry standard and course of performance established between the Parties.  As related to the rejection-damages claims, the GEM 1 and GEM 4 POCs (i) seek to recover damages that are expressly barred under the GEM Hosting Agreements, (ii) would in any event be capped at one month's fee payable under the GEM Hosting Agreements, and (iii) for at least a portion, are speculative and lack sufficient evidentiary support.  The Court, therefore, should recognize the GEM POCs for what they are: attempts to (1) alter GEM's contractual obligation to pay the PPT as required under the MSAs, in a transparent and failed effort to ride the coattails of Celsius Mining LLC ("**Celsius**"), another Core customer who raised similar claims but later settled the dispute, affirming that Core was indeed entitled to the PPT,[6] and (2) evade express contractual provisions limiting the type and amount of damages that are recoverable.

### Relief Requested

4.      Pursuant to sections 105(a) and 502(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Reorganized Debtors seek entry of the Proposed Order, disallowing the GEM POCs in their entirety because (i) all the claims related to the PPT are untimely pursuant to Section 3(a) of the MSAs since they seek reimbursement for amounts that are barred by the MSAs' three-day deadline

---

[6] Nearly identical issues relating to the PPT amounts were briefed with respect to a settled dispute between Core and Celsius regarding substantially similar language in Core's hosting agreements with Celsius.  *See Debtors' Objection to Proof of Claim Nos. 425 and 497 filed by Celsius Mining LLC*, Dkt. No. 819.  Significantly, Celsius has since acknowledged that the hosting agreements permitted Core to charge the PPT.  *See Emergency Order Approving (I) Global Settlement Between Debtors and Celsius, (II) Sale of Cedarvale Facility and Related Assets, (III) Assumption and Assignment of Transferred Contracts and (IV) Granting Related Relief*, Dkt. No. 1292 ¶ 38 ("Celsius affirms that Core was contractually entitled to pass through power costs to Celsius when Core incurred higher power costs to host Celsius's mining equipment, and that Celsius had a contractual obligation to pay the 'power cost pass-through' as invoiced by Core.").

to notice Core in writing of an invoice dispute; (ii) even if the invoice disputes were not untimely, GEM is not entitled to any recovery on its PPT claims because the MSAs require GEM to pay the PPT amounts, by their plain language, interpretation in light of industry standards, and the course of performance between the Parties; (iii) any purported rejection damages in connection with the GEM POCs are categorically barred under the GEM Hosting Agreements; and (iv) any alleged rejection damages in connection with the GEM POCs are capped under the GEM Hosting Agreements to one month's fee payable pursuant to the applicable orders, which is approximately $1.1 million ($802,629.69 for GEM 1, plus $337,603.68 for GEM 4).  In addition, because each of the claims are asserted against multiple debtor entities, the duplicate claims should be expunged regardless of the outcome of this contested matter.[7]

## Jurisdiction and Venue

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested herein is sought pursuant to §§ 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007, and Bankruptcy Local Rule 3007-1.

## Background

### A.      *The GEM Hosting Agreements*

6.      Between February 2021 and July 2021, Core and the various GEM entities entered into the following Master Services Agreements (collectively, the "**MSAs**"), which govern

---

[7] GEM 1 also recently filed a motion seeking to recover an administrative claim against the Reorganized Debtors.  *See GEM Mining 1, LLC'S Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Granting Related Relief*, Dkt. No. 1816. The Reorganized Debtors will respond to that motion in due course, which presents different issues than those addressed here.

the Parties' relationship with respect to cryptocurrency mining equipment hosted at Core's data centers and related services (the "**Services**"):

| MSA Date | GEM Counterparty | Associated GEM POC Nos. |
|---|---|---|
| February 5, 2021 | GEM Mining 1, LLC | 503, 617, 646, 647 |
| July 16, 2021 | GEM Mining 2B, LLC | 505, 571 |
| May 24, 2021 | GEM Mining 2, LLC | 508, 570 |
| July 9, 2021 | GEM Mining 4, LLC | 506, 572, 648, 649 |

7.      The terms of each MSA are substantially similar.  Pursuant to the MSAs, Core and GEM executed numerous orders, which are governed by the terms of the applicable MSA, except where expressly overridden by specific terms of the applicable order (the "**Orders**," and together with the MSAs, the "**GEM Hosting Agreements**").  True and correct copies of the MSAs and the latest Order(s) for each are attached to the GEM POCs.  *See* Proofs of Claim Nos. 503 at 7–20, 617 at 7–20, 646 at 7–20, and 647 at 7–20 (the "**GEM 1 Hosting Agreement**"); 505 at 7–28 and 571 at 7–28 (the "**GEM 2B Hosting Agreement**"); 508 at 7–29 and 570 at 7–29 (the "**GEM 2 Hosting Agreement**"); and 506 at 7–20, 572 at 7–20, 648 at 7–20, and 649 at 7–20 (the "**GEM 4 Hosting Agreement**").

8.      The GEM Hosting Agreements are governed by Delaware law and set forth the Parties' rights and obligations for the Services.  Under the GEM Hosting Agreements, as relevant here, GEM is obligated to pay a hosting fee rate per miner, subject to Core's right to pass through increases in power costs, among other increased costs, as an additional cost to host GEM's miners.[8]  In addition, pursuant to each Order, GEM is required to prepay certain amounts in

---

[8] Here, as with all references to specific MSA provisions cited herein, the language of the referenced provision is identical in each of the MSAs attached to the GEM POCs.

advance.  The GEM Hosting Agreements also uniformly and explicitly provide that neither party is liable to the other party for, among other things, lost profits, loss of business, loss of revenues, any consequential or indirect damages, or cost of cover.

### B. GEM's Proofs of Claim

9.       GEM filed Proofs of Claim Nos. 503, 505, 506, 508, 570–572, and 617 on April 14, 2023 and Proofs of Claim Nos. 646–649 on October 30, 2023.  After accounting for duplicative claims, GEM asserts claims totaling approximately $12.1 million across all of the GEM POCs, as summarized below:[9]

| GEM Entity | GEM POC No. | Debtor Entity | Amounts |
|---|---|---|---|
| GEM Mining 1, LLC | 503 | Core Scientific, Inc. | $560,253.50 |
| | 617 (Duplicate) | Core Scientific Operating Company | $560,253.50 |
| | 646 | Core Scientific, Inc. | $5,897,311.67 |
| | 647 (Duplicate) | Core Scientific Operating Company | $5,897,311.67 |
| GEM Mining 2B, LLC | 505 | Core Scientific, Inc. | $269,236.00 |
| | 571 (Duplicate) | Core Scientific Operating Company | $269,236.00 |
| GEM Mining 2, LLC | 508 | Core Scientific, Inc. | $2,862,274.67 |
| | 570 (Duplicate) | Core Scientific Operating Company | $2,862,274.67 |
| GEM Mining 4, LLC | 506 | Core Scientific, Inc. | $403,278.13 |
| | 572 (Duplicate) | Core Scientific Operating Company | $403,278.13 |
| | 648 (Duplicate) | Core Scientific Operating Company | $2,163,762.82 |
| | 649 | Core Scientific, Inc. | $2,163,762.82 |

---

[9] As reflected in the table and further discussed herein, half of the GEM POCs are duplicates by GEM's own admission. *See* Proofs of Claim Nos. 503 at 5–6; 505 at 5–6; 506 at 5–6; 508 at 6; 570 at 6; 571 at 5–6; 572 at 5–6; 617 at 5–6; 646 at 6; 647 at 6; 648 at 6; and 649 at 6.

10.      In Proofs of Claim Nos. 503, 505, 506, 508, 570, 571, 572, and 617 (the "**GEM PPT POCs**"), GEM asserts that Core improperly charged the applicable GEM entity for the PPT "in contravention of the terms of the MSA."  *See* Proofs of Claim Nos. 503 at 5; 505 at 5; 506 at 5; 508 at 5; 570 at 5; 571 at 5; 572 at 5; and 617 at 5.

11.      In Proofs of Claim Nos. 646, 647, 648, and 649 (the "**GEM Rejection POCs**"), GEM 1 and GEM 4 assert claims for rejection damages attributable to the differences between actual and/or anticipated replacement hosting rates for its miners and the original hosting rates under the GEM 1 Hosting Agreement and the GEM 4 Hosting Agreement.  *See* Proofs of Claim Nos. 646 at 5; 647 at 5; 648 at 5; and 649 at 5.

12.      GEM 1 filed Proofs of Claim Nos. 646 and 647 (the "**GEM 1 Rejection POCs**"), asserting a claim of $5,897,311.67 for rejection damages, which GEM 1 contends reflects "the difference between anticipated replacement hosting rates for the miners and the previous hosting rates for the miners under GEM [] 1 Contracts."  *See* Proofs of Claim Nos. 646 at 5 and 647 at 5.  In support of the GEM 1 Rejection POCs, GEM 1 attaches a spreadsheet purportedly reflecting these damages on an itemized basis.  *See* Proofs of Claim Nos. 646 at 22 and 647 at 22. The spreadsheet contains a note on the "[e]stimated [h]osting [r]ate" stating that "[o]nly a portion of GEM 1's miners have signed new agreements as of the date of this filing.  For calculation purposes the actual hosting rate per GEM 1's new contracts is applied to the miners which are not yet included in a new hosting agreement."  *Id.*  No other material is included or referenced in the GEM 1 Rejection POCs to support these estimates.

13.      GEM 4 filed Proofs of Claim Nos. 648 and 649 (the "**GEM 4 Rejection POCs**"), asserting a claim of $2,163,762.82 for rejection damages based on the same theory.  *See* Proofs of Claim Nos. 648 at 5 and 649 at 5.  In support of the GEM 4 Rejection POCs, GEM 4

likewise attached a spreadsheet purportedly reflecting these damages on an itemized basis.  *See* Proofs of Claim Nos. 648 at 22 and 649 at 22.

14.     Contemporaneously with filing the GEM PPT POCs, GEM also filed a motion to compel Core to assume or reject the GEM Hosting Agreements.  *See GEM Mining's Emergency Motion to Compel Assumption or Rejection of Executory Contracts or, in the Alternative, for Adequate Protection*, Dkt. No. 787 (the "**Motion to Compel**").  On August 14, 2023, the Court entered the *Stipulation and Agreed Order on GEM Mining's Emergency Motion to Compel Assumption or Rejection of Executory Contracts or, in the Alternative, for Adequate Protection*, Dkt. No. 1146 (the "**Agreed Order**").  The Agreed Order provided that, *inter alia*, the GEM Hosting Agreements would be deemed rejected as of September 30, 2023, and the Debtors' right to assert that the GEM Hosting Agreements terminated, as well as GEM's right to assert rejection damages, would be reserved.  *Id.* ¶ 1.  The Motion to Compel was thus deemed moot.  *Id.* ¶ 4.  The Agreed Order stated that it "shall not be construed as an admission of liability by the Debtors or any of the non-Debtor affiliates or GEM regarding any claim or cause of action arising from or related to the [Motion to Compel] or any other matter."  *Id.* ¶ 8.

15.     On May 4, 2023, the Debtors filed the PPT Objection, an objection to the GEM PPT POCs.  *See Debtors' Objection to Proof of Claims Nos. 503, 505, 506, 508, 570, 571, and 572 filed by GEM Mining 1, LLC, GEM Mining 2B, LLC, GEM Mining 4, LLC, GEM Mining 2, LLC*, Dkt. 854.  GEM filed the GEM Response in opposition to the PPT Objection.  *See GEM Mining's Response in Opposition to Debtors' Objection to Proof of Claim Nos. 503, 505, 506, 508, 570, 571, and 572 filed by GEM Mining 1, LLC, GEM Mining 2B, LLC, GEM Mining 4, LLC, GEM Mining 2, LLC*, Dkt. 1196.  The Reorganized Debtors now file this Reply in further support

of the PPT Objection and object in the first instance to the GEM Rejection POCs filed on October 30, 2023.

### C.    GEM Hosting Agreements & Parties' Course of Performance

16.    Before objecting to the invoiced PPT amounts claimed in the GEM PPT POCs—detailed in the table below—GEM paid every invoiced PPT amount without providing Core timely written notice of a dispute as required by the MSAs.  GEM does not dispute that it paid these invoiced amounts to Core, nor does GEM dispute that it was aware of the invoiced PPT amounts detailed below.  Rather, GEM argues that a single email from February 2022 relating to an invoice for GEM 1 qualifies as notice of a blanket dispute of all PPT amounts invoiced from February 15, 2022 to January 12, 2023 for all GEM entities.  *See* GEM Response at 6–9.

| Invoice Number | Invoice Date | GEM Mining 1 | GEM Mining 2 B | GEM Mining 2 | GEM Mining 4 |
|---|---|---|---|---|---|
| INV42316 | 2/15/2022 | $ 18,653.55 | | | |
| INV42317 | 2/15/2022 | | | $ 97.62 | |
| CM10169 | 2/15/2022 | | | | $ 3,867.74 |
| INV42437 | 4/15/2022 | $ 7,957.89 | | | |
| INV42438 | 4/15/2022 | | | $ 41.18 | |
| INV42440 | 4/15/2022 | | | | $ 1,685.68 |
| INV42483 | 5/16/2022 | $ 15,850.10 | | | |
| INV42484 | 5/16/2022 | | | $ 81.89 | |
| INV42486 | 5/16/2022 | | | | $ 3,460.78 |
| CM10203 | 6/17/2022 | $ 23,571.58 | | | |
| INV42532 | 6/17/2022 | | $ 22,865.48 | | |
| INV42531 | 6/17/2022 | | | $ 280,899.78 | |
| INV42533 | 6/17/2022 | | | | $ 30,750.77 |
| INV42591 | 7/15/2022 | $ 69,229.76 | | | |
| INV42592 | 7/15/2022 | | $ 33,324.19 | | |
| INV42593 | 7/15/2022 | | | $ 412,476.27 | |
| INV42594 | 7/15/2022 | | | | $ 48,747.61 |
| INV42637 | 8/15/2022 | $ 81,945.67 | | | |
| INV42638 | 8/15/2022 | | $ 35,710.11 | | |
| INV42639 | 8/15/2022 | | | $ 426,701.53 | |
| INV42640 | 8/15/2022 | | | | $ 52,198.37 |
| INV42681 | 9/15/2022 | $ 120,561.16 | | | |
| INV42682 | 9/15/2022 | | $ 59,671.01 | | |
| INV42683 | 9/15/2022 | | | $ 735,043.43 | |
| INV42684 | 9/15/2022 | | | | $ 85,426.11 |
| INV42727 | 10/14/2022 | $ 84,318.14 | | | |
| INV42728 | 10/14/2022 | | $ 58,876.37 | | |
| INV42729 | 10/14/2022 | | | $ 406,513.03 | |
| INV42730 | 10/14/2022 | | | | $ 75,295.79 |
| INV42784 | 11/15/2022 | $ 72,927.05 | | | |
| CM10239 | 11/15/2022 | | $ 58,788.84 | | |
| CM10240 | 11/15/2022 | | | $ 600,419.94 | |

| | | | | | |
|---|---|---|---|---|---|
| INV42785 | 11/15/2022 | | | | $ 59,601.14 |
| INV42823 | 12/13/2022 | $ 42,054.66 | | | |
| INV42824 | 12/13/2022 | | | | $ 26,045.23 |
| INV42846 | 1/12/2023 | $ 23,183.94 | | | |
| INV42847 | 1/12/2023 | | | | $ 16,198.91 |
| **Grand Total** | | $ 560,253.50 | $ 269,236.00 | $ 2,862,274.67 | $ 403,278.13 | $ 4,095,042.30 |

17.     In February 2022, Core sent email communications to its customers—including GEM—noting a pass-through charge for increased power costs calculated based on actual power consumption.  *See Declaration of Jeff Pratt in Support of Reorganized Debtors' Objection to Proofs of Claim Nos. 646 and 647 filed by GEM Mining 1 and Proofs of Claim Nos. 648 and 649 filed by GEM Mining 4 and Reply in Further Support of Objection to Proofs of Claim Nos. 503, 505, 506, 508, 570, 571, 572, and 617* ("**Pratt Decl.**") ¶ 9.

18.     In response to the invoice sent to GEM 1, Joe Poore—GEM's Chief Financial Officer—questioned the charge, asked for additional information, and stated that his email "should be considered a written dispute of all invoices with a rate above the Services rate listed in the applicable agreement.  These invoices should be considered subject to the written dispute procedures outlined in the master service agreement."  *See* Pratt Decl. ¶ 12; GEM Response at Exhibit A, *Declaration of Joseph Poore in Support of GEM Mining's Response in Opposition to Debtors' Objection to Proofs of Claim* at Exhibit 1 (February 2022 Email Thread).  GEM argues that this lone email constitutes a valid and blanket dispute of all subsequent PPT amounts for all GEM entities.  GEM Response at 6–9.

19.     As these PPT costs continued unabated and were not a one-off occurrence, starting with invoices in July 2022, Core included a specific line item for "Power Costs Pass-through" in each of the invoices issued pursuant to the GEM Hosting Agreements, which each GEM entity paid without providing notice to Core of any dispute.  *See* Pratt Decl. ¶ 11; *see, e.g.*, Proof of Claim No. 572 at 56 (Exhibit 4, Invoice No. 42594 dated July 15, 2022).  In addition to

paying the PPT without giving Core notice of any dispute, GEM 2B and GEM 2 further acquiesced to the PPT by requesting that Core (1) agree to early termination of the GEM 2B Hosting Agreement and GEM 2 Hosting Agreement because they did not want to shoulder the higher cost of power (which they did not dispute was their responsibility to bear), and (2) apply the GEM 2B and GEM 2 prepayment balance of $351,236.39 to the GEM 4 account.  *See* Pratt Decl. ¶ 13.  Core agreed, and the GEM 2B and GEM 2 Hosting Agreements were terminated effective November 7, 2022, with the prepayment balance of $351,236.39 transferred to GEM 4.  *See id.* ¶ 14.  A true and correct copy of the letter terminating the GEM 2B and GEM 2 Hosting Agreements is attached to the Pratt Decl. as **Exhibit A**.  At no time did GEM 2B or GEM 2 ever raise, let alone dispute, the PPT during these discussions.  *See id.* ¶ 14.

20.     Following the Petition Date, GEM 1 and GEM 4—the only remaining GEM entities with active Hosting Agreements—continued paying invoiced PPT amounts without noticing Core of any dispute.  *See id.* ¶ 11.

21.     GEM now takes a litigation position that not only departs abruptly from the express terms of the GEM Hosting Agreements—including with respect to the GEM Rejection POCs, which seek to recover amounts that Core is not liable for under the plain terms of the MSAs—but also ignores the Parties' course of performance and relevant history, detailed above.

## Basis for Relief

22.     Bankruptcy Rule 3001(f) provides that a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).  However, *prima facie* validity under Bankruptcy Rule 3001(f) "can be overcome by rebuttal evidence."  *Cal. State Bd. of Equalization v. Off. Unsecured Creditors' Comm. (In re Fidelity Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988).  "Upon production of this rebuttal

evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence."

*In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Fidelity*, 837 F.2d at 698).

And "the ultimate burden of proof always lies with the claimant." *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

23.     GEM cannot carry its ultimate burden.  With respect to the GEM PPT POCs, GEM has asserted claims for approximately $4.1 million in the aggregate based on PPT payments made by various GEM entities.  By failing to properly dispute the PPT amounts as required by the MSAs, and by otherwise acquiescing to the PPT, GEM has forfeited any right to these claims under the terms of the MSAs.  Further, even if the PPT claims are not time barred under the MSAs' terms, which they are, the plain language of the GEM Hosting Agreements allows Core to charge the GEM entities for the PPT amounts.  Moreover, even if Core's right to pass through the PPT amounts to GEM is ambiguous (it is not), the course of performance established by the Parties and industry standards and practices confirm Core's right to charge the PPT amounts.  In short, the GEM Hosting Agreements allow Core to charge the various GEM entities for the PPT amounts. Moreover, each GEM entity acquiesced to these payment amounts by paying the PPT for several months without dispute and—for GEM 2B and GEM 2—requesting early termination of their Hosting Agreements and application of the remaining prepayment amounts to GEM 4.  On this record, GEM cannot now assert claims for amounts that Core properly charged and collected.

24.     With respect to the GEM Rejection POCs, GEM 1 and GEM 4 asserted a combined total of approximately $8 million in rejection damages.  These claims also fail on several grounds.  First, the GEM Hosting Agreements preclude damages based on, among other things, cover costs, lost profits, loss of revenues, and consequential and special damages, which forecloses GEM's claim.  Second, even if GEM 1 and GEM 4 could prove entitlement to damages not

excluded by the GEM Hosting Agreements, the MSAs expressly limit the amount of recoverable damages to an aggregate of one month's fee payable pursuant to the applicable order.  Here, any damages would be limited to $802,629.69 for GEM 1 and $337,603.68 for GEM 4, based on the final invoices that issued at the time of rejection.  *See* Pratt Decl. ¶¶ 15–17.  True and correct copies of these invoices are attached to the Pratt Decl. as **Exhibit B** and **Exhibit C**.

### A. *GEM Failed to Timely and Properly Dispute the PPT Amounts as Required by the MSAs*

25. As asserted in the PPT Objection, GEM failed to timely and properly notice Core of any dispute of the invoiced PPT amounts, as required by the MSAs.  This is fatal to the recovery that GEM seeks in the GEM PPT POCs.  In the GEM Response, GEM argues that a single email thread from February 2022 in response to a single invoice (INV42316) issued to GEM Mining 1, LLC, which purported to constitute "a written dispute of all invoices with a rate above the Services rate listed in the applicable agreement," constitutes a valid dispute of each and every PPT amount invoiced to each GEM entity from February 2022 to January 2023.  *See* GEM Response at 6–9.  This assertion fails under the plain terms of the MSA.

26. The MSAs expressly limit GEM's ability to dispute invoiced amounts to three (3) calendar days from the invoice date and require that notice of a dispute be submitted in very specific ways.  Paragraph 3(b) of each MSA, labeled "Payment Terms and Taxes," provides as follows:

> Client [i.e., the applicable GEM entity] may, in good faith, dispute any invoice or any part thereof (a "Disputed Amount") *by submitting a written notice of such dispute along with reasonable supporting documentation within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears, failing which Client waives all rights to dispute such Disputed Amount and to file any claim*.

*See, e.g.*, Proof of Claim No. 503 at 9 (Exhibit 1, MSA § 3(b)) (emphasis added).[10]

27.     The MSAs further require that written notice of any Disputed Amount "be in writing and sent by overnight courier, certified or registered mail, overnight delivery requiring a signature upon receipt, or delivery by hand to the parties." *See, e.g.*, Proof of Claim No. 503 at 14 (Exhibit 1, MSA § 8(a)).  The language could not be more clear and unambiguous: GEM had three (3) calendar days after each invoice issued to send formal written notice of any dispute to Core in specific ways that did not include email.  GEM admittedly did not adhere to these provisions.

28.     Under Delaware law, "[w]hen the contract is clear and unambiguous, [courts] will give effect to the plain-meaning of the contract's terms and provisions." *Alkek & Williams, Ltd. v. Tuckerbrook Alt. Invs., L.P.*, 419 F. App'x 492, 495 (5th Cir. 2011) (alterations in original) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)); *see PR Acquisitions, LLC v. Midland Funding LLC*, No. 2017–0465–TMR, 2018 WL 2041521, at *7 (Del. Ch. Apr. 30, 2018) (rejecting argument that contract did not require strict compliance with its own terms regarding notice because contract clearly specified what constituted adequate notice).  And Delaware courts will not imply a contractual term where the contract expressly addresses the subject yet does not provide for the term that is claimed to arise by implication. *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1995 WL 662685, at *8 (Del. Ch. Nov. 2, 1995).  GEM's reliance on the February 2022 email thread as proof of adequate notice is thus insufficient under the plain terms of the MSAs.  The claims asserted in the GEM PPT POCs are therefore barred because GEM did not adhere to the MSAs' notice procedures.

---

[10] Each of the MSAs attached to the GEM POCs contain this exact language, as noted in footnote 8, *supra*.

29.     Delaware courts routinely enforce express contractual deadlines. *See MirTech Inc. v. AgroFresh Inc.*, 561 F. Supp. 3d 447, 458 (D. Del. 2021) (observing that "[i]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently . . . it is the court's job to enforce the clear terms of contracts" and holding that "the Court will not overlook the clear deadline established by [the parties' contract]") (citations and internal quotes omitted); *JD Holdings, LLC v. Dowdy*, No. 7480–VCL, 2014 WL 4980669, at *8–9 (Del. Ch. Oct. 1, 2014) (upholding contractual provision that contained "a framework for selling [certain hotels] within a defined period of time" and finding that trust would be liable for breach if it did not complete sale process by certain deadline).  Here is no different, especially given that GEM is a sophisticated business party. *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) ("Under Delaware law, sophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written [because] . . . [h]olding sophisticated contracting parties to their agreement promotes certainty and predictability in commercial transactions.") (citations omitted).

30.     GEM's PPT POCs also fail because the February 2022 "notice" constitutes an improper omnibus notice, which runs counter to the procedures set out in the MSAs.  The MSAs specify that GEM could "in good faith, dispute *any invoice* or any part thereof (a "Disputed Amount") by submitting *a written notice of such dispute*" subject to certain conditions.  *See, e.g.*, Proof of Claim No. 503 at 9 (Exhibit 1, MSA § 3(b)) (emphasis supplied).  Section 3(b) does not authorize GEM to file a single omnibus notice applicable to more than one invoice.  Rather, it must submit "*a* written notice" to dispute "*any* invoice or any part thereof." *Id.*  Thus, each invoice (or part of an invoice) disputed requires a separate written notice.

16

31.     Separately, an omnibus notice could not possibly comply with the terms of section 3(b) because notice must be sent "within three (3) calendar days of the date of the initial invoice on which the Disputed Amount appears." *Id.*  GEM 1 characterized its February 2022 emails as constituting a "written dispute of all invoices with a rate above the Services rate listed in the applicable agreement." *See* GEM Response at 8–9.  However, this purported blanket notice was ineffectual under the MSAs to the extent it purported to dispute invoices that had not even been sent yet for amounts that had yet to be incurred and for different entities.  Accordingly, because GEM's sole purported notice constituted an impermissible omnibus notice and did not comply with the express three-day deadline, the claims asserted in the GEM PPT POCs are time barred by the terms of the MSAs.

32.     Further, even assuming that the February 2022 email thread constitutes adequate notice (it does not), GEM objected only to PPT amounts charged to GEM 1.  The subject line of the emails, "RE: [External]Core Scientific Inc. February 2022 Hosting Invoice – GEM Mining 1 LLC," clearly indicates the email communications relate to invoices charged to GEM 1. *See* GEM Response at 8–9.  This is further supported by the fact that the originating email in the thread, sent from Core, attached the invoice specifying that it was issued to "*GEM Mining1 LLC*." *Id.*  Accordingly, based on the subject line and body of the February 2022 email thread, at most, Mr. Poore disputed only the PPT amounts issued to GEM 1 (claimed to be $560,253.50 in total).

33.     That GEM 1 is the only entity that made a (contractually insufficient) attempt to dispute an invoice containing the PPT is further supported by the fact that GEM 2B and GEM 2 requested that Core (1) agree to early termination of the GEM 2B Hosting Agreement and GEM 2 Hosting Agreement because they did not want to shoulder the higher cost of power (which they did not dispute was their responsibility to bear), and (2) apply the GEM 2B and GEM 2

prepayment balance of $351,236.39 to the GEM 4 account.  *See* Pratt Decl. ¶¶ 13–14.  If GEM 2B and GEM 2 believed that they had disputed the PPT, they would have at least mentioned that when asking Core for the favor of allowing them an early exit from the agreements with a shift of their outstanding prepayment balances to another GEM entity, but they did not.

      **B.**     ***The GEM Hosting Agreements Permitted the PPT***

      34.     Beyond the time bar set forth in the MSAs, the GEM Hosting Agreements permitted Core to charge GEM (and its other customers) the PPT.  Indeed, the PPT is not only permitted by the terms of the MSA, but is also confirmed by industry usage, the commercial context, and the Parties' course of performance.

      35.     In the GEM Response, relying heavily on briefing in Core's now-settled dispute with Celsius, GEM argues that Core improperly invoiced GEM (and other customers like Celsius) for increased power costs because the Hosting Agreements purportedly set forth a fixed-rate contract.  GEM Response at 9–14.  GEM's attempt to leverage Core's prior dispute with Celsius is not only unsuccessful, but underscores the illegitimacy of GEM's claims.  After extensive discovery, including depositions, Core and Celsius settled their dispute, with Celsius expressly acknowledging that, pursuant to the Celsius hosting agreements—which are identical to the GEM Hosting Agreements in all respects material to GEM's arguments—"Core was *contractually entitled to pass through power costs to Celsius* when Core incurred higher power costs to host Celsius's mining equipment, and that *Celsius had a contractual obligation to pay the 'power cost pass-through' as invoiced by Core.*"  *See Emergency Order Approving (I) Global Settlement Between Debtors and Celsius, (II) Sale of Cedarvale Facility and Related Assets, (III) Assumption and Assignment of Transferred Contracts and (IV) Granting Related Relief*, Dkt. No. 1292 ¶ 38 (emphasis added).  This significantly undercuts GEM's argument, which it elected to tie directly to Celsius's position.  *See* GEM Response at 9–11.

18

36.     Besides GEM's misplaced reliance on Celsius, GEM's contention that the Hosting Agreements set forth a fixed-rate contract is plainly wrong on the merits. In each of the operative Orders in the Hosting Agreements, the "Fees" provision permits "[s]ubsequent invoices" to "contain any additional charges incurred by [GEM]" among other adjustments. *See* Proofs of Claim Nos. 503 at 19; 505 at 19, 22, 26; 506 at 19; 508 at 19, 23, 27; 570 at 19, 23, 27; 571 at 19, 22, 26; 572 at 19; 617 at 19; 648 at 19; and 649 at 19. Section 4(f) in the MSAs, in turn, provides that "if there are any increases, changes in, or introduction or administration of any new" (i) "tariffs" or (ii) "charges with respect to the provision of Services," among other categories, Core may "in its sole and absolute discretion, pass through all such amounts to [GEM]." *See, e.g.*, Proof of Claim No. 503 at 11 (Exhibit 1, MSA § 4(f)). Read together, section 4(f) in the MSAs and the "Fees" provision in the Orders permit Core to invoice customers for additional charges or adjustments, specifically including, but not limited to, costs associated with "new" tariffs and service-related charges. The notion, advanced by GEM, that Core was locked into a fixed rate and unable to invoice GEM for "additional charges" or "adjustments" attributable to "increases, [or] changes in" tariffs or service-related charges, defies the express language and meaning of the MSAs and Orders.

37.     GEM additionally argues that Core's construction of "tariffs" "is inconsistent with common sense and the plain language of the MSAs." *See* GEM Response at 11. GEM is wrong.  As explained *supra*, section 4(f) of the MSAs provides that Core, in its "sole and absolute discretion" has the right to "pass through" to GEM costs attributable to "any increases, changes in, or introduction or administration of, any new" (i) "tariffs" or (ii) "charges with respect to the provision of Services," among other categories. *See, e.g.*, Proof of Claim No. 503 at 11 (Exhibit 1, MSA § 4(f)). GEM attempts to distort the meaning of "tariff" in the MSAs by

referencing several dictionaries to define the term as applied in the context of international trade. *See* GEM Response at 12. This definition is entirely inapplicable, however, because the international trade context bears no relevance whatsoever to the services provided by Core to GEM. Rather, the contextually proper definitions describe "tariff" as "a listing or scale of rates or charges for a business or public entity." *Tariff*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/tariff (last visited Feb. 21, 2024); *see also tariff*, n., Oxford English Dictionary, https://www.oed.com/dictionary/tariff_n#18988370 (last visited Feb. 21, 2024) (defining "tariff" as "[a] classified list or scale of charges made in any private or public business; as, a hotel tariff, a railroad tariff").

38.     Industry usage of the "tariffs" term further bolsters this conclusion. *See Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 361–62 (3d Cir. 2014) (industry usage can aid in interpreting an unambiguous contract term). As detailed in the expert declaration of KC Mares (the "**Mares Declaration**"), submitted in support of Core's nearly identical dispute with Celsius, "tariffs" as used in Section 4(f) of the MSAs, includes the rates charged by electric utilities to their customers, like Core. A true and correct copy of the Mares Declaration is attached to the Pratt Declaration as **Exhibit D**. Electricity is by far the largest cost for cryptocurrency mining infrastructure providers like Core, typically 60–75% of total operating costs. *See* Mares Decl. ¶ 18. As such, it is standard practice for providers like Core to pass through electricity price increases to customers. *Id.* ¶¶ 24–29; *see also* Pratt Decl. ¶ 10 (explaining that this is an "absolute cornerstone of Core's business model relating to hosting services").

39.     The commercial context and relationship of the parties additionally supports Core's position. *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926–27 (Del. 2017) (Delaware courts read contracts "in full and situated in the commercial context

between the parties," such that the "basic business relationship between parties must be understood to give sensible life to any contract"). The commercial context here involves a power-intensive industry where electricity costs incurred by cryptocurrency miners comprise the majority of input costs. *See* Pratt Decl. ¶ 10. It is thus standard practice in the industry for infrastructure providers to pass through increases in electricity costs because it would be economically unfeasible for providers to bear the risk of energy price increases while forfeiting the fruits of mining. *Id.* The "basic business relationship" tasks Core with hosting the machines, whereas GEM owns them and collects the cryptocurrency they mine. Based on this relationship, it would be irrational to read "tariff" in the context of international trade as proposed by GEM. Rather, "tariff" must be read in the commercial context and relationship here—a hosting agreement between a cryptocurrency miner and infrastructure provider.

40.     GEM further argues that, even accepting Core's interpretation of the word "tariff," the GEM Hosting Agreements are fixed-rate agreements—despite the language in Section 4(f)—because each order states a "[h]osting-[s]ervices [r]ate," which purportedly binds Core to providing GEM a fixed rate regardless of any increases in power costs.  GEM Response at 13. GEM adds that Core's interpretation of the contract does not make sense because the parties would have structured a direct pass-through of increased costs if their true intent was for GEM to bear increased power costs.  *Id.* at 13, 15.  These are not persuasive arguments.

41.     Indeed, even if fixed rates might make sense in certain circumstances, the contracts governing those circumstances would presumably make that point clearly and unambiguously.  Here, neither the MSAs nor any of the Orders even contain the word "fixed", let alone support the conclusion that the fees paid by GEM would be fixed and not subject to any increase.  In fact, the relevant agreements here expressly state the opposite—as they unequivocally

state that Core has the right to pass through Increased Cost for Services to GEM (MSA Section 4(f)) and that GEM would be subject to "additional charges" ("Fees" section of Orders). *See, e.g.*, Proof of Claim No. 503 at 19 (Exhibit 2, Amended and Restated Order No. 8).   Thus, contrary to GEM's contention, there are no conflicts between the language of the MSAs and the Orders. GEM Response at 13.  GEM cannot now rewrite the agreements because, in hindsight, it would have preferred different terms.

42.    GEM also argues that Core cannot rely on its course-of-performance argument because (1) GEM disputed the PPT amounts, and (2) the MSAs required that, after disputing the PPT amounts, GEM continue to pay the PPT.  *Id.* at 15.  This argument fails for the simple reason that GEM never timely and properly disputed the invoiced PPT amounts.  *See supra* ¶¶ 25–33.

43.    Delaware law adopts the common law understanding of course of performance, under which "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement[,]" especially "[w]here an agreement involves repeated occasions for performance" and each party has knowledge and an opportunity to object to performance by the other.  Restatement (Second) of Contracts § 202 (1981); *see Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 101 & n.78 (Del. Ch. 2009) (quoting *Sun–Times Media Grp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) and Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.")).

44.    Here, GEM's lone February 2022 email thread complaining about the PPT is insufficient to defeat the extensive and established course of performance, whereby all GEM entities paid the PPT for months without dispute.  As detailed above, this one single email thread

does not constitute a valid dispute of *any* invoiced PPT amount because it fails to comport with the detailed and plain notice provisions set forth in the MSAs, and is in any event limited to only one PPT amount invoiced to only one GEM entity. *See supra* ¶¶ 25–33.

45.     Additionally, GEM 2B and GEM 2 should be precluded from disputing the PPT. When GEM 2B and GEM 2 decided that power costs were too high, rather than dispute the PPT, they requested that Core (1) agree to early termination of the GEM 2B Hosting Agreement and GEM 2 Hosting Agreement, and (2) apply the GEM 2B and GEM 2 prepayment balance to the GEM 4 account. *See* Pratt Decl. ¶¶ 13–14. In this way—in addition to having paid the PPT for months without dispute—GEM 2B and GEM 2 further acquiesced to the PPT and are estopped from now challenging the PPT under the doctrines of ratification and acquiescence.

46.     "Ratification is an equitable defense that precludes a party 'who [has] accept[ed] the benefits of a transaction from thereafter attacking it.'" *See, e.g.*, *Genger v. TR Invs., LLC*, 26 A.3d 180, 195 (Del. 2011) (alterations in original) (citation omitted). "Implied ratification occurs '[w]here the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, [and] his ratification is implied through his acquiescence.'" *Id.* (alterations in original) (quoting *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943)). GEM 2B and GEM 2 affirmatively agreed to accept the benefits of an early termination of their respective hosting agreements, including the release of their contractual obligations thereto. *See* Pratt Decl. ¶¶ 13–14. Moreover, at that time, GEM 2B and GEM 2 were aware of the PPT, which had been reflected on invoices issued to them over the preceding months, but never raised an issue with respect thereto at any time—including when their contracts were consensually terminated. *See id.* at ¶¶ 9–14. Accordingly, GEM 2B and GEM 2 are deemed to have ratified the PPT upon accepting the benefits of early termination of their

respective hosting agreements and are now estopped from recovering on any claim based on the PPT.

47.     By accepting and paying the PPT charges for months, GEM established a course of performance under the GEM Hosting Agreements.  Despite GEM's opportunistic attempt to rewrite the GEM Hosting Agreements and ignore the established course of conduct, it is clear that the Parties both expressly and through their conduct agreed that the burden of increased power costs would be borne by GEM.

**C.**     ***The GEM Hosting Agreements Preclude or Otherwise Limit the Damages GEM Seeks in the GEM Rejection POCs***

48.     The GEM Hosting Agreements, and more specifically the MSAs, expressly preclude the type of damages that GEM seeks to recover in the GEM Rejection POCs. Additionally, even if the MSAs permitted the type of damages that GEM seeks to recover (they do not), the MSAs limit the amount of any recoverable damages.

49.     First, the GEM Hosting Agreements' broad limitation of liability provisions explicitly bar recovery for cost of cover, lost profits, loss of business, loss of revenues, and any consequential or indirect damages:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ***(I) LOST PROFITS; (II) LOSS OF BUSINESS; (III) LOSS OF REVENUES*** (EXCEPT THAT [GEM] SHALL BE LIABLE FOR ANY FEES OR OTHER AMOUNTS OWED TO [CORE] UNDER THIS AGREEMENT); (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF [GEM] EQUIPMENT; **(V) ANY *CONSEQUENTIAL, OR INDIRECT DAMAGES; OR (VI) COST OF COVER, ANY INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES*** (IF APPLICABLE) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*See, e.g.*, Proof of Claim No. 646 at 12 (Exhibit 1, MSA § 5(c)) (emphasis added).

50.     GEM has stated in its GEM Rejection POCs that its alleged rejection damages are based on "the difference between anticipated replacement hosting rates for the miners

and the previous hosting rates for the miners under [its contracts with Core]." *See* Proofs of Claim Nos. 646 at 5; 647 at 5; 648 at 5; and 649 at 5.  But these type of damages are exactly the type of damages that fall squarely within § 5(c) of the MSA and thus cannot be recovered under the express terms of the Parties' agreements.

51.     Second, even if the damages that GEM 1 and GEM 4 seek in the GEM Rejection POCs are not precluded in their entirety by the broad limitation of liability provisions, the GEM Hosting Agreements also explicitly limit Core's total liability in the aggregate to GEM 1 and GEM 4 to an amount equal to one month's fee:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, ***[CORE'S] TOTAL LIABILITY TO [GEM] IN THE AGGREGATE FOR THE ENTIRE TERM (REGARDLESS OF WHETHER THE CLAIMS ARE BROUGHT DURING OR AFTER THE TERM)*** WITH RESPECT TO ALL CLAIMS ARISING FROM OR RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) ***WILL NOT EXCEED AN AMOUNT EQUAL TO ONE (1) MONTHS FEE PAYABLE TO [CORE] PURSUANT TO THE APPLICABLE ORDER.***

*See, e.g.*, Proof of Claim No. 646 at 12–13 (Exhibit 1, MSA § 5(d)) (emphasis added).

52.     Accordingly, any amounts Core may be found to owe GEM 1 and GEM 4 in rejection damages (and there should be none) would be capped at one month's fee— $802,629.69 for GEM 1 and $337,603.68 for GEM 4—not the approximately $8 million that GEM 1 and GEM 4 have asserted, combined.  *See* Pratt Decl. ¶¶ 15–17.

53.     Additionally, for the avoidance of any doubt, the GEM Hosting Agreements further specify that "THE LIMITATIONS SET FORTH IN SECTIONS 5 c AND 5 d WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY."  *See, e.g.*, Proof of Claim No. 646 at 13 (Exhibit 1, MSA § 5(e)).

54.     When a debtor rejects an executory contract, rejection damages are measured based on the state law governing breach of contract—here, Delaware law. *See In re Pilgrim's Pride Corp.*, 467 B.R. 871, 879–81 (Bankr. N.D. Tex. 2012) (applying the governing state law of the rejected contracts to evaluate and measure damages).  Delaware law holds that contracts are enforced as they are written. *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013) (enforcing a limitation of liability provision).

55.     Delaware courts routinely enforce limitation of liability provisions, especially where, as here, the limitation is plain and unambiguous. *See Pilgrim's Pride*, 467 B.R. at 881 (applying Delaware law and granting summary judgment to the debtors because the contracts excluded consequential or non-compensatory damages); *Iavarone v. Eagle Eye Home Inspections*, *LLC*, No. N18C-05-217 ALR, 2019 WL 5692265, at *2 (Del. Super. Ct. Nov. 4, 2019) (upholding limitation of liability provision where the plain language of the clause was clear regarding the people and types of conduct to which the limitation applied, the contract was not lengthy, and the limitations' language was clear); *eCommerce Indus., Inc.*, 2013 WL 5621678, at *45 (enforcing a limitation of liability provision and noting that "freedom of contract would suggest that parties . . . should be entitled to draft agreements so as to avoid certain . . . duties and liabilities").

56.     Here, the language of the relevant contractual provisions is clear and unambiguous and is presented in recognizable capitalized text.  The Parties plainly agreed upon the express exclusion of certain types of damages, like those sought by GEM here, and the limitation of damages to one month's fee for damages that were not otherwise precluded.  This is further highlighted by Section 5(f) of the MSA, which explicitly states, "Each party recognizes and agrees that the warranty disclaimers, *limitations of liability and remedy limitations* in this

Agreement *are materially bargained for by the parties*."  *See, e.g.*, Proof of Claim No. 646 at 13 (Exhibit 1, MSA § 5(f)) (emphasis added).  GEM 1 and GEM 4 cannot now—years later—ignore the clear language of the MSAs in an attempt to obtain damages that the agreements clearly prohibit or otherwise limit.  These provisions were bargained for by Core in its agreements with GEM 1 and GEM 4 and are a material component of the GEM Hosting Agreements.

57.     The limitation of liability provisions were negotiated by two sophisticated commercial entities, with equal bargaining power, at arms' length; the provisions should, therefore, be enforced as written.  *See Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at *11 (Del. Ch. July 9, 2002) (upholding the terms of a contract as written because nothing prevented the plaintiff, a sophisticated commercial entity, from refusing to contract if it did not have the leverage to obtain favorable terms); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 552 (Del. Super. Ct. 2005) (concluding that sophisticated parties cannot "escape the express language" of a contract), *aff'd*, 886 A.2d 1278 (Del. 2005) (unpublished table decision).

58.     Accepting the claims asserted by GEM 1 and GEM 4 for any of these categories of precluded damages would thus render the Parties' explicit exclusion of such damages in the MSAs' limitation of liability provisions meaningless and contrary to the Parties' expressed intent as reflected in the MSAs.

59.     In addition to being contractually unavailable, the GEM 1 Rejection POCs seek damages that—at least in part—are speculative and admittedly not yet incurred.  *See* Proof of Claim Nos. 646 at 22 and 647 at 22 ("Only a portion of GEM 1's miners have signed new agreements as of the date of this filing.  For calculation purposes the actual hosting rate per GEM

1's new contracts is applied to the miners which are not yet included in a new hosting agreement."). GEM 1 cannot recover for these speculative damages.

### D. Half of the GEM POCs Are Duplicative and Should Be Disallowed on That Basis

60.     In each of the GEM POCs, the respective GEM entity states that it "only seeks one recovery of the [applicable] Claim," but that each GEM entity "has filed a proof of claim against both Core Scientific, Inc. and Core Scientific Operating Company out of an abundance of caution." *See* Proofs of Claim Nos. 503 at 5–6; 505 at 5–6; 506 at 5–6; 508 at 6; 570 at 6; 571 at 5–6; 572 at 5–6; 617 at 5–6; 646 at 6; 647 at 6; 648 at 6; and 649 at 6. Thus, GEM acknowledges that it can only recover on one set of the GEM POCs and that the duplicate claims must be expunged.

61.     In the GEM Response to the PPT Objection, GEM argues that Core failed to provide sufficient evidence of the proper Core entity that GEM's claims should be asserted against, but makes clear that it is not seeking to recover on its duplicative claims. *See* GEM Response at 5–6. In this post-confirmation context, only claims against the Reorganized Debtor Core Scientific, Inc. should remain. As there is no difference in the treatment of claims by debtor entity, this approach makes the most administrative sense. As GEM has no legitimate basis for disputing this approach, the Reorganized Debtors request that the Court disallow, and direct Stretto, Inc.—as claims, noticing, and solicitation agent in these chapter 11 cases—to expunge GEM POC Nos. 570, 571, 572, 617, 647, and 648 as duplicative. *See supra* ¶ 9.

\* \* \* \* \*

62.     Accordingly, for the foregoing reasons, the Reorganized Debtors request that the Court disallow the GEM POCs.

**Reservation of Rights**

63.     This Objection and Reply is limited to the grounds stated herein and accordingly is without prejudice to the rights of the Reorganized Debtors or any other party in interest to object to any claim, including any of GEM's claims, on any further grounds, and the Reorganized Debtors expressly reserve all other substantive or procedural objections that they may have, including as it relates to the limitation of liability provisions in the GEM Hosting Agreements.  In addition, the Reorganized Debtors reserve the right to assert set-off claims against GEM for breach of the GEM Hosting Agreements, and any other claims that discovery in this contested matter may reveal.  Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Reorganized Debtors, (ii) a waiver of the Reorganized Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Reorganized Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

**Notice**

64.     Notice of the Objection will be provided to (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, (ii) the affected claimant, and (iii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Reorganized Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 21, 2024
Houston, Texas

/s/ Clifford W. Carlson
WEIL, GOTSHAL & MANGES LLP
Clifford W. Carlson (24090024)
Austin B. Crabtree (24109763)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:    (713) 546-5000
Facsimile:    (713) 224-9511
Email: Clifford.Carlson@weil.com
        Austin.Crabtree@weil.com
-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Ronit J. Berkovich (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Christine A. Calabrese (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
Email: Ray.Schrock@weil.com
        Ronit.Berkovich@weil.com
        Theodore.Tsekerides@weil.com
        Christine.Calabrese@weil.com

*Counsel for Debtors and Debtors in Possession*

### Certificate of Service

I hereby certify that on February 21, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson